ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1193

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————

INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA;
AMERICAN PETROLEUM INSTITUTE,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, Administrator, U.S. EPA,

*Respondents*.

———————————————

On Petition for Review of a Final Rule of the U.S.
Environmental Protection Agency

———————————————

**MOTION FOR STAY**

———————————————

SAMUEL B. BOXERMAN
ERIC D. MCARTHUR
KATHLEEN MUELLER
JEREMY ROZANSKY
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for Interstate Natural
Gas Association of America and
American Petroleum Institute*

July 27, 2023

## <u>CERTIFICATE AS TO PARTIES,<br>RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rules 18(a)(4), 27 and 28(a)(1)(A), petitioners certify:

### A.  Parties and Amici to this Case (No. 23-1193)

<u>Petitioners:</u> Interstate Natural Gas Association of America; American Petroleum Institute.

<u>Respondents:</u> The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

<u>Proposed Intervenors:</u> None at present.

<u>Proposed Amici:</u> None at present.

### B.  Parties and Amici to Related Cases in this Circuit

#### i.  No. 23-1157, *Utah v. EPA*

<u>Petitioner:</u> The State of Utah, by and through its Governor, Spencer J. Cox, and its Attorney General, Sean D. Reyes.

<u>Respondents:</u> The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

<u>Proposed Intervenors:</u> Air Alliance Houston; Appalachian Mountain Club; Center for Biological Diversity; Chesapeake Bay Foundation; Citizens for Pennsylvania's Future; Clean Air Council; Clean Wisconsin; Downwinders at Risk; Environmental Defense Fund; Louisiana Environmental Action Network; Sierra Club; Southern Utah Wilderness Alliance; Utah Physicians for a Healthy Environment; State of New York; State of Connecticut; State of Delaware; State of Illinois; State of Maryland; State of New Jersey; State of Wisconsin; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; District of Columbia; City of New York; Harris County, Texas.

<u>Proposed Amici:</u> None at present.

ii. **No. 23-1181, *Kinder Morgan v. EPA***

<u>Petitioner:</u> Kinder Morgan, Inc.

Respondents: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

Proposed Intervenors: State of New York; State of Connecticut; State of Delaware; State of Illinois; State of Maryland; State of New Jersey; State of Wisconsin; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; District of Columbia; City of New York; Harris County, Texas.

Proposed Amici: None at present.

### iii.  No. 23-1183, *Ohio v. EPA*

Petitioners: State of Ohio; State of West Virginia; State of Indiana.

Respondents: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

Proposed Intervenors: State of New York; State of Connecticut; State of Delaware; State of Illinois; State

of Maryland; State of New Jersey; State of Wisconsin; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; District of Columbia; City of New York; Harris County, Texas.

<u>Proposed Amici:</u> None at present.

**iv.    No. 23-1190, *Am. Forest & Paper Assoc. v. EPA***

<u>Petitioner:</u> American Forest & Paper Association.

<u>Respondents:</u> The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

<u>Proposed Intervenors:</u> None at present.

<u>Proposed Amici:</u> None at present.

**v.    No. 23-1191, *Midwest Ozone Group v. EPA***

<u>Petitioner:</u> Midwest Ozone Group.

<u>Respondents:</u> The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

<u>Proposed Intervenors:</u> None at present.

<u>Proposed Amici:</u> None at present.

**C.  Ruling Under Review**

Petitioners seek review of a final rule promulgated by the Environmental Protection Agency titled *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, and published in the Federal Register at 88 Fed. Reg. 36,654 (June 5, 2023).

/s/ Eric D. McArthur
Eric D. McArthur

## CERTIFICATE OF COMPLIANCE
## WITH CIRCUIT RULES 18(A)(1) AND (A)(2)

The undersigned certifies that this motion for stay complies with Circuit Rule 18(a)(1). Petitioners previously requested relief from EPA in a Petition for Administrative Stay Pending Judicial Review of *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 36,654 (June 5, 2023) – Dkt. No. EPA-HQ-OAR-2021-0668, submitted on July 17, 2023. EPA acknowledged receipt of the petition but has not acted upon it. Therefore, petitioners now seek a stay from this Court.

In accordance with Circuit Rule 18(a)(2), undersigned counsel notified EPA's counsel by voicemail and email on July 26, 2023, that petitioners planned to file this motion for stay. EPA opposes this motion and plans to file a response.

/s/ Eric D. McArthur
Eric D. McArthur

## **RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, D.C. Circuit Rule 18(a)(4), and D.C. Circuit Rule 26.1, petitioner Interstate Natural Gas Association of America ("INGAA") hereby states that INGAA is a national trade association that represents interstate natural gas transmission pipeline companies. INGAA has no parent corporation, and no publicly held corporation has a 10% or greater ownership in INGAA.

Pursuant to Federal Rule of Appellate Procedure 26.1, D.C. Circuit Rule 18(a)(4), and D.C. Circuit Rule 26.1, petitioner American Petroleum Institute ("API") hereby states that API is a national trade association that represents all segments of America's natural gas and oil industry. API has no parent corporation, and no publicly held corporation has a 10% or greater ownership in API.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES ..................................................................... i

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULES
18(A)(1) AND (A)(2) ............................................................ vi

RULE 26.1 DISCLOSURE STATEMENT ............................... vii

TABLE OF AUTHORITIES ...................................................... x

GLOSSARY OF TERMS ......................................................... xiii

INTRODUCTION ..................................................................... 1

BACKGROUND ........................................................................ 2

    A.   The Good Neighbor Provision ................................... 2

    B.   EPA's "Good Neighbor Plan" for the 2015 Ozone
       National Air-Quality Standard ................................ 4

    C.   The Rule's Regulation of Pipeline Engines ........... 6

LEGAL STANDARD ................................................................. 7

ARGUMENT ............................................................................. 7

I.    Petitioners Are Likely To Succeed On The Merits ......... 7

    A.   EPA's 1,000-horsepower applicability criterion for
       pipeline engines is unlawful .................................... 8

    B.   EPA unreasonably required emissions reductions
       that are not cost-effective ...................................... 13

II.   Petitioners' Members Face Irreparable Harm Absent A
    Stay. ......................................................................... 20

III.  The Public Interest Favors A Stay ............................... 24

CONCLUSION ........................................................................ 25

CERTIFICATE OF COMPLIANCE

CERTIFIATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

*Ass'n of Oil Pipe Lines v. FERC*,
   281 F.3d 239 (D.C. Cir. 2002) ............................................................ 20

*Dist. Hosp. Partner, LP v. Burwell*,
   786 F.3d 46 (D.C. Cir. 2015) .............................................................. 18

*\*EPA v. EME Homer City Generation, L.P.*,
   572 U.S. 489 (2014) ................................................................. 3, 4, 10

*Erwin v. FAA*,
   23 F.4th 999 (D.C. Cir. 2022) ............................................................ 17

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ............................................................... 24

*Maryland v. EPA*,
   958 F.3d 1185 (D.C. Cir. 2020) ........................................................... 8

*\*Michigan v. EPA*,
   576 U.S. 743 (2015) ........................................................................ 16

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................................... 10, 15

*N. Mariana Islands v. United States*,
   686 F. Supp. 2d 7 (D.D.C. 2009) ........................................................ 24

*Nken v. Holder*,
   556 U.S. 418 (2009) .......................................................................... 7

*In re NTE Conn., LLC*,
   26 F.4th 980 (D.C. Cir. 2022) .................................................. 7, 21, 25

*R.J. Reynolds Tobacco Co. v. FDA*,
   823 F. Supp. 2d 36 (D.D.C. 2011), *vacated on other
   grounds,* 696 F.3d 1205 (D.C. Cir. 2012) ........................................... 24

*Authorities chiefly relied upon are marked with asterisks

x

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016)...............................................23

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ...........................................................21

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone
   River Power, Inc.*,
   805 F.2d 351 (10th Cir. 1986) ...........................................25

*Wisconsin v. EPA*,
   938 F.3d 303 (D.C. Cir. 2019) .....................................18, 20

*Worldcom, Inc. v. FCC*,
   238 F.3d 449 (D.C. Cir. 2001) ...........................................11

## Statutes and Regulations

5 U.S.C. § 705 .........................................................................25

42 U.S.C. § 7409(a) ...................................................................2

42 U.S.C. § 7410(a)(2)(C).......................................................2, 3

42 U.S.C. § 7410(a)(2)(D)(i) ..................................................3, 11

42 U.S.C. § 7410(c)(1) ...............................................................2

40 C.F.R. § 52.40(e)..............................................................6, 19

40 C.F.R. § 52.41......................................................................25

40 C.F.R. § 52.41(a) ...................................................................6

40 C.F.R. § 52.41(b) ..............................................................6, 12

40 C.F.R. § 52.41(c) ...................................................................6

40 C.F.R. § 52.41(d) ............................................................6, 7, 18

*Federal Implementation Plan Addressing Regional Ozone
   Transport for the 2015 Ozone National Ambient Air
   Quality Standard*, 87 Fed. Reg. 20,036 (Apr. 6, 2022)..................9, 13

*Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 36,654 (June 5, 2023).. 1, 3, 4, 5, 6, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 23, 24, 26

## Other Authorities

EPA, *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial Stays of SIP Disapproval Action for Certain States* (June 29, 2023) ........................................................... 5

EPA, *Non-EGU Facilities and Units.xlsx* (Mar. 2023) ........................... 10

EPA, *Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026* (Feb. 28, 2022) .................................... 8

EPA, *Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units* (Mar. 15, 2023) ................................................................... 12

EPA, *Technical Support Document (TSD) for the Final Rule: Final Non-EGU Sectors TSD* (Mar. 2023) ........................................... 9

# <u>GLOSSARY OF TERMS</u>

EPA  Environmental Protection Agency

NOx  Nitrogen oxide

**<u>INTRODUCTION</u>**

Petitioners Interstate Natural Gas Association of America (INGAA) and American Petroleum Institute (API) hereby move for a stay of provisions of the final rule of the Environmental Protection Agency (EPA) entitled *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 36,654 (June 5, 2023).

In this rule, EPA for the first time imposed "good neighbor" obligations on natural gas pipelines. Specifically, the rule limits nitrogen-oxide ($NO_X$) emissions from internal combustion engines used to transport natural gas. EPA claimed these limits were needed to eliminate the pipeline engines' "significant contribution" to downwind air-quality problems.

In imposing these limits, however, EPA exceeded its statutory authority and acted arbitrarily and capriciously. *First*, EPA imposed emissions limits on all pipeline engines with a given horsepower rating, even though the vast majority of the engines EPA thereby swept into the rule emit far less than the significant-contribution threshold EPA used to screen sources out of the rule. *Second*, while purporting to define "significant contribution" based on the amount of emissions that can be "cost-effectively" reduced, EPA imposed emissions limits that apply *without*

*regard to cost*, requiring engines to be controlled even if the cost of controls vastly exceeds the agency's own cost-effectiveness threshold.

Without a stay, the rule will inflict irreparable harm on petitioners' members. To comply with the rule's emissions limits when they take effect, petitioners' members will have to immediately begin the process of retrofitting their engines, at a cost that will run into the hundreds of millions of dollars in the time it will take to litigate this case. These compliance costs cannot be recovered from the government if petitioners prevail.

The public interest also favors a stay. An agency's compliance with the law is always in the public interest. And, unless stayed, EPA's unlawful rule will threaten disruption to the nation's natural gas supply.

## **BACKGROUND**

### A.    The Good Neighbor Provision

The Clean Air Act requires EPA to set national air-quality standards that are typically implemented at the state level through state plans approved by EPA. *See* 42 U.S.C. §§ 7409(a), 7410(a)(2)(C). But if a State declines to submit a plan, or if the State's plan does not satisfy the federal standards, EPA promulgates a federal plan in its stead. *Id.* § 7410(c)(1). Each state plan must include emissions limitations and other control measures to ensure the national standards are met within the State's

2

borders. *Id.* § 7410(a)(2)(C). And because emissions in upwind States may affect downwind air quality, the Act requires state plans to prohibit sources "within the State from emitting any air pollutant in amounts" that will "contribute significantly" to another State's nonattainment, or interfere with maintenance, of the national standards. *Id.* § 7410(a)(2)(D)(i). This is known as the "Good Neighbor Provision." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498 (2014).

To implement this provision, EPA uses modeling and data from "receptors" that monitor air quality throughout the country to identify the downwind States expected to have problems attaining or maintaining the national standards, and the upwind States that contribute emissions to those downwind receptors. *See* 88 Fed. Reg. at 36,659; *EME Homer*, 572 U.S. at 500. To determine which upwind emissions must be eliminated because they "contribute significantly" to downwind nonattainment, EPA considers the cost of reducing the emissions and the impact it will have on downwind air quality. 88 Fed. Reg. at 36,660.

EPA developed this approach in an earlier "Transport Rule" that the Supreme Court upheld in *EME Homer*. *See id.* at 36,668–69. EPA had

determined that an upwind State's emissions "'contribute[d] significantly' to downwind nonattainment to the extent its exported pollution both (1) produced one percent or more of a[n] [air-quality standard] in at least one downwind State"; and "(2) could be eliminated most cost-effectively as determined by EPA." *EME Homer*, 572 U.S. at 502–03. The Court concluded that eliminating "amounts that can cost-effectively be reduced is an efficient and equitable solution to the allocation problem the Good Neighbor Provision requires the Agency to address." *Id.* at 519.

The Court made clear, however, that EPA cannot "require a State to reduce its output of pollution by more than is necessary to achieve attainment in every downwind State or at odds with the one-percent threshold the Agency has set." *Id.* at 521. If EPA were to engage in such "over-control," it "will have overstepped its authority." *Id.* at 521–22.

## B. EPA's "Good Neighbor Plan" for the 2015 Ozone National Air-Quality Standard

In October 2015, EPA promulgated a new, more stringent national air-quality standard for ozone. *See* 88 Fed. Reg. at 36,656. Because $NO_X$ emissions influence atmospheric ozone formation, the new ozone standard triggered a duty on upwind States to revise their state plans to restrict $NO_X$ emissions to satisfy their good-neighbor obligations.

4

EPA ultimately concluded that 23 States did not adequately discharge that obligation. 88 Fed. Reg. at 36,656. Accordingly, on June 5, 2023, EPA issued a rule establishing a federal plan to restrict $NO_X$ emissions from sources in those States. *Id.*[1] The rule imposes new emissions restrictions on electric generating units—*i.e.*, power plants—in these States beginning in 2023. *Id.* at 36,657. It also restricts emissions from sources in other industries in 20 of the 23 States beginning in 2026, including (as relevant here) reciprocating internal combustion engines used in pipeline transportation of natural gas. *Id.*

EPA imposed these restrictions after examining the available emissions-control technologies and allegedly selecting the "cost threshold" that it found "in general, maximized cost-effectiveness—*i.e.*, that achieved a reasonable balance of incremental $NO_X$ reduction potential and corresponding downwind air quality improvements" relative to other possible reductions. *Id.* at 36,678. EPA said that "[t]aken together," the rule's emissions limits "will fully eliminate the amount of emissions that

[1] EPA has since issued an interim final rule preventing the federal plan from taking effect in some of the States where courts have stayed EPA's disapproval of the state plan. *See* EPA, *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial Stays of SIP Disapproval Action for Certain States* (June 29, 2023).

constitute the covered states' significant contribution to nonattainment and interference with maintenance in downwind states for purposes of the 2015 ozone [standard]." *Id.* at 36,657.

### C.    The Rule's Regulation of Pipeline Engines

The rule limits emissions from pipeline engines with a "nameplate rating" of 1,000 horsepower or greater. 40 C.F.R. § 52.41(b). The specific limitations vary based on the type of engine, but each caps the grams of $NO_X$ that can be emitted per horsepower-hour (calculated over a rolling 30-day average during ozone season). *Id.* § 52.41(c).

The rule exempts "emergency engines" that are "operated to provide electrical power or mechanical work during an emergency situation." *Id.* § 52.41(a), (b). Operators may also seek EPA's discretionary approval, on "a case-by-case" basis, for a higher emissions limit for an engine that cannot comply with the applicable limit "due to technical impossibility or extreme economic hardship." *Id.* § 52.40(e).

Operators also may seek EPA approval for a "Facility-Wide Averaging Plan as an alternative means of compliance." *Id.* § 52.41(d). If approved by EPA, the plan would permit an operator to average emissions

across the engines in a "facility" so long as the "total emissions reductions" for all the engines in the facility are "equivalent to or greater than those" that would be achieved if each engine complied. *Id.*

## LEGAL STANDARD

On a motion for stay pending appeal, this Court considers "(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re NTE Conn., LLC*, 26 F.4th 980, 987 (D.C. Cir. 2022) (cleaned up). In a case against the government, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I.  Petitioners Are Likely To Succeed On The Merits.

The rule's treatment of pipeline engines exceeds EPA's statutory authority and is arbitrary and capricious in multiple respects. Two suffice to show that petitioners are likely to succeed on the merits. *First*, EPA established a vastly overinclusive applicability criterion that sweeps in large numbers of engines whose emissions are below EPA's own significant-contribution threshold. *Second*, EPA unreasonably disregarded

7

its own cost-effectiveness threshold and imposed emissions limits that apply regardless of the actual cost of controlling a given engine.

## A. EPA's 1,000-horsepower applicability criterion for pipeline engines is unlawful.

EPA erred by adopting an applicability criterion that captures many pipeline engines whose emissions are below the threshold EPA used to screen out sources that do not "contribute significantly."

In determining which sources to regulate, EPA "focused on assessing emission units that emit > 100 [tons per year] of $NO_X$." EPA, *Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026* at 3 (Feb. 28, 2022). EPA's decision to screen out sources that emit less than that amount necessarily represents a determination that those sources do not "contribute significantly" to downwind nonattainment; otherwise EPA would be required to regulate them. *See Maryland v. EPA*, 958 F.3d 1185, 1204 (D.C. Cir. 2020) ("upwind sources violate the Good Neighbor Provision if they will significantly contribute" to downwind nonattainment).

For some other non-power plant sources, EPA used the 100-tons-per-year threshold as the applicability criterion to determine which units

8

to regulate. *See* 88 Fed. Reg. at 36,825 (cement and concrete product manufacturing); *id.* at 36,827 (iron and steel mills and ferroalloy manufacturing); *id.* at 36,829 (glass and glass product manufacturing). For pipeline engines, by contrast, EPA implemented the 100-tons-per-year threshold not by considering a unit's actual emissions, but by using a horsepower-based proxy. Specifically, EPA regulated all pipeline engines with a design capacity of 1,000 horsepower or greater, asserting that this criterion "reasonably approximates" the 100-tons-per-year threshold. 88 Fed. Reg. at 36,820; *see also* 87 Fed. Reg. 20,036, 20,142 (Apr. 6, 2022).

At the proposal stage, EPA projected its horsepower proxy would sweep in only 307 engines nationwide. *Id.* at 20,090. And it projected that a significant majority of those engines would exceed the 100-tons-per-year threshold: EPA estimated that "over 200 engines" out of 307 "emitted greater than 100 [tons per year]." EPA, *Technical Support Document (TSD) for the Final Rule: Final Non-EGU Sectors TSD* at 4 (Mar. 2023).

Commenters demonstrated that EPA had wildly underestimated the rule's reach. *See* INGAA Comment at 8–9 (stating association members alone operate 1,380 units that would be regulated); TC Energy Comment at 4–5 (similar). In the final rule, EPA acknowledged that the 1,000-

9

horsepower criterion had "captured more units than the EPA intended," including "low-use units and some units with emissions of less than 100 tons per year." 88 Fed. Reg. at 36,819, 36,821. That was an understatement: EPA now projected that 3,005 units would be subject to the rule—almost *ten times* its initial projection of 307. *Id.* at 36,824. Yet EPA continued to project that fewer than 300 units would meet the 100-tons-per-year threshold. *See* EPA, *Non-EGU Facilities and Units.xlsx* (Mar. 2023) (listing about 260 engines above the threshold).

EPA nonetheless persisted in its plan to regulate all units with a 1,000-horsepower rating, refusing to adjust its applicability criterion to address the mismatch. 88 Fed. Reg. at 36,819–21. This was unlawful.

*First*, EPA's applicability criterion results in regulation of a significant number of engines that, by EPA's own logic, do not "contribute significantly." That exceeds EPA's authority under the statute. EPA may not require emissions reductions "at odds with the [significant-contribution] threshold the Agency has set." *EME Homer*, 572 U.S. at 521.

*Second*, EPA's finding that a 1,000-horsepower rating "reasonably approximates" the 100-tons-per-year threshold, 88 Fed. Reg. at 36,820, "runs counter to the evidence before the agency," *Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). According to EPA's own data, fewer than *one in ten* of the units subject to the rule meet the 100-tons-per-year threshold. The rest are collateral damage. A "reasonable approximation" is one that fairly, if inexactly, captures the target group. *Cf. Worldcom, Inc. v. FCC*, 238 F.3d 449, 459 (D.C. Cir. 2001). What EPA has promulgated instead is a grossly overinclusive rule that amounts to a tenfold expansion of its regulatory reach.

*Third*, EPA's reasons for declining to adjust the applicability criterion are arbitrary and capricious. EPA tried to justify its overreach by claiming that the hundreds of units below the emissions threshold could one day exceed 100 tons per year and it is "not possible to guarantee without an effective emissions control program that all such units could not increase emissions in the future." 88 Fed. Reg. at 36,821. But the statute applies only to sources that "*will* … contribute significantly," 42 U.S.C. § 7410(a)(2)(D)(i) (emphasis added), not that "could potentially" do so in the future. And, contrary to EPA's assertion, it *is* possible to ensure that units do not increase their emissions: EPA could impose a reporting obligation and require compliance with emissions limits if the 100-tons-per-

11

year threshold is exceeded. *Cf.* 40 C.F.R. § 52.45(b)(1)–(2) (exempting low-use boilers from all but recordkeeping and reporting requirements).

EPA also tried to justify its decision on the ground that pipeline engines with a 1,000-horsepower rating "collectively" emit substantial amounts of NO$_X$. 88 Fed. Reg. at 36,821. But the statute nowhere authorizes EPA to regulate individual sources that do not "contribute significantly" by lumping them together with other sources that do.

Nor does facility-wide averaging cure the problem. Even with averaging, controls will need to be applied to hundreds of units that emit less than the significant-contribution threshold. Of the 905 units that EPA projected will install controls, *two-thirds* of them emit less than 100 tons per year. *See* EPA, *Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units* at 9 (Mar. 15, 2023); EPA, *Non-EGU Facilities and Units.xlsx* (Mar. 2023). More fundamentally, by requiring engines that emit less than 100 tons per year to be included in the facility-wide average, EPA is improperly regulating them, whether or not they have to install controls under an averaging plan.

12

### B.    EPA unreasonably required emissions reductions that are not cost-effective.

EPA further erred by disregarding the cost-effectiveness threshold it used to assess significant contribution and imposing emissions limits that all covered engines must meet, regardless of cost.

The proposed rule sought to impose restrictions on sources in several industries outside the electric power industry whose $NO_X$ emissions could be reduced at a marginal cost of $7,500 or less per ton. 87 Fed. Reg. at 20,083. EPA chose this threshold because its analysis indicated that $7,500 per ton was "a notable 'knee-in-the-curve'"—*i.e.*, a "breakpoint" above which "there are very little additional emissions reductions and air quality improvement at problematic [downwind] receptors, and the cost associated with these measures increases substantially on a dollar per ton basis." *Id.* at 20,095. EPA said its proposed emissions limits for pipeline engines were within that breakpoint because there was technology that could be applied to reduce emissions "at the marginal cost threshold of $7,500 per ton." *Id.* at 20,142–43; *see also id.* at 20,143 (declining to propose lower emissions limit for certain engines that "might not be achievable with layered combustion controls alone for some units, and those units would require additional controls beyond our cost threshold").

13

EPA was mistaken. As commenters demonstrated, it would be cost-prohibitive to retrofit all the engines subject to the rule. Due to the 1,000-horsepower threshold, the rule requires controls even on certain engines that, more often than not, do not operate (because not all engines are needed outside of periods of peak demand). INGAA Comment at 12. Engines that operate fewer hours emit fewer emissions, but the emissions-control technology can cost several million dollars per unit. *See* Kinder Morgan Comment at 21–23; TC Energy Comment at 5. As a result, the rule would require emissions reductions on engines at marginal costs that vastly exceed $7,500 per ton. One company, for example, explained how the rule would require installation of technology at costs as high as $109,301/ton (for 95 of its engines), $225,587/ton (for 16 engines), and even $684,169/ton (for 3 engines). Kinder Morgan Comment at 21–26.

EPA did not dispute the accuracy of these comments. And it acknowledged it had used "a $7,500 marginal cost-per-ton threshold" in the proposed rule "as a proxy to identify cost-effective emissions control opportunities." 88 Fed. Reg. at 36,746. Yet EPA arbitrarily issued a final rule that imposes emissions limits that apply regardless of whether emissions controls are cost-effective by that metric—indeed, that apply with

no defined upper bound *at all* on how much it would cost to bring a given engine into compliance. And EPA nowhere attempted to demonstrate (nor could it) that its emissions limits are justified no matter the cost.

Instead, EPA claimed that $7,500 per ton "is not intended to represent the maximum cost that any facility may need to expend but is rather intended to be a representative figure for evaluating technologies to allow for a relative comparison between different levels of control stringency." *Id.* EPA "recognize[d] that the $7,500/ton threshold does not reflect the full range of cost-effectiveness values that are likely present across the many different types of [non-power plant] industries and emissions units assessed." *Id.* But EPA nonetheless concluded that "the overall mix of emissions controls it identified at proposal" was "appropriate." *Id.*

EPA's decision to impose emissions limits that require pipeline operators to install emissions-control technology costing vastly more than $7,500 per ton was arbitrary and capricious. EPA cannot choose to define a source's "significant contribution" in terms of whether the source can make cost-effective emissions reductions, identify a threshold for assessing cost-effectiveness, and then deem it irrelevant whether its rule will impose costs that vastly exceed that threshold. *See State Farm*, 463

U.S. at 43 ("the agency must examine the relevant data and articulate a satisfactory explanation for its action" that contains "a rational connection between the facts found and the choice made"). Nor can EPA reasonably require emissions reductions whose costs are grossly out of proportion to the resulting downwind air-quality benefits. *See Michigan v. EPA*, 576 U.S. 743, 752 (2015) ("One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits.").

Perhaps recognizing this, EPA attempted to justify the final rule by asserting that "overall" the "range of cost-effectiveness values for [non-power plant] industries and emissions units compares favorably with the values used to evaluate [power plants]." 88 Fed. Reg. at 36,746. That is a non sequitur. As EPA itself acknowledged, "it is not the cost per ton value itself that is inherently meaningful." *Id.* at 36,683. What matters is whether the "level of control stringency" is set at the breakpoint at "which further emissions mitigation strategies become excessively costly on a per-ton basis while also delivering far fewer additional emissions reductions and air quality benefits." *Id.* EPA did not do that for pipelines. And

16

EPA provided neither technical analysis nor narrative discussion explaining how the $11,000 per ton breakpoint used for power plants, *id.* at 36,744, 36,746, demonstrates that it was reasonable for EPA to establish emissions limits for pipelines that vastly exceed the $7,500 per ton cost-effectiveness breakpoint for pipelines. EPA thus gave no rational response to commenters' showing that the emissions limits for pipelines are not cost-effective. *See Erwin v. FAA*, 23 F.4th 999, 1007 (D.C. Cir. 2022) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result.").

And even if that defect could be overlooked, EPA's decision would still be arbitrary and capricious because the costs imposed on pipeline engines *do not* "compar[e] favorably" with the costs imposed on power plants. 88 Fed. Reg. at 36,746. As EPA acknowledged, the industries are different: power plants are "relatively homogeneous," while other sources "are relatively heterogeneous, even within a single industrial category, and have far greater variation" in "emissions levels, and technologies to reduce emissions." *Id.* at 36,720. As a result, the variability in costs per ton of emissions reductions for pipeline engines far exceeds the variability and upper-end costs that EPA claims will be incurred by power plants.

The changes EPA made in the final rule do not make the emissions limits cost-effective for all pipeline engines or prevent operators from having "to expend great costs to achieve insignificant environmental benefits." *Wisconsin v. EPA*, 938 F.3d 303, 322 (D.C. Cir. 2019). The final rule allows a pipeline operator to submit a facility-wide averaging plan that, if approved by EPA, will permit an operator to average emissions across the engines at a "facility" and to install emissions controls on the engines that will be the most cost-effective way to achieve the combined emissions limit for the engines in the facility. *See* 40 C.F.R. § 52.41(d); 88 Fed. Reg. at 36,823.[2] EPA said it conducted an analysis indicating that "emissions averaging should allow most facilities to install controls on approximately one-third of the engines at their sites, on average." 88 Fed. Reg. at 36,824. But EPA did not report how much that reduced the cost, in dollars per ton, at those facilities, much less at the facilities where controls were needed on more than one-third of the engines. And of

---

[2] Petitioners and their members asked that the rule permit an operator to average its emissions across all of its engines in the State. INGAA Comment at 25–33; Kinder Morgan Comment at 38–39. In another instance of arbitrary decisionmaking, EPA failed to explain why it rejected this alternative. *See Dist. Hosp. Partner, LP v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) (court will not "uphold agency action if it fails to consider 'significant and viable obvious alternatives'").

course, facility-wide averaging does not reduce the costs of installing emissions controls on units that cannot be included in an averaging plan (because, *e.g.*, the facility includes only one engine).

The final rule also allows operators to request EPA "approval of a case-by-case emissions limit" for an engine that cannot comply with the applicable emissions limit "due to technical impossibility or extreme economic hardship," 40 C.F.R. § 52.40(e). But operators have no right to obtain a lower emissions limit in cases of extreme economic hardship. The rule leaves the decision entirely to the discretion of EPA, which "may" or may not approve an operator's request. *Id.* § 52.40(e)(4).

Nor does the rule specify what cost per ton would move EPA to grant an exception, stating only that the operator must "demonstrat[e], to the satisfaction of the Administrator, that the cost of complying with the applicable emissions limit would present an extreme economic hardship relative to the costs borne by other comparable sources in the industry." *Id.* § 52.40(e)(2)(i)(B). EPA stressed that it created this exception to address "unique circumstances the Agency cannot anticipate." 88 Fed. Reg. at 36,818. In evaluating requests, EPA will consider whether the source's costs "would significantly exceed the highest representative end

of the range of estimated cost-per-ton figures identified for any source in the relevant industry as discussed in section V of [the preamble]." *Id.* at 36,819. But Section V provides no "representative" end range for pipeline engines, other than the $7,500 figure. *Id.* at 36,746. And the rule is so overbroad that other "comparable sources in the industry" will also have to incur costs well in excess of $7,500 per ton. EPA cannot save its unreasonable rule with a discretionary and standardless exception that provides no assurance that the rule's "benefits [will] be 'at least roughly commensurate with its costs.'" *Wisconsin*, 938 F.3d at 322 (alteration omitted; quoting *Michigan v. EPA*, 213 F.3d 663, 678–79 (D.C. Cir. 2000)); *see Ass'n of Oil Pipe Lines v. FERC*, 281 F.3d 239, 244 (D.C. Cir. 2002) (holding that a "safety valve" could not "rescue" a rule from "systemic errors").

## II. Petitioners' Members Face Irreparable Harm Absent A Stay.

A stay is necessary to prevent irreparable harm to petitioners' members. Absent a stay, they will have to immediately begin spending hundreds of millions of dollars to develop the engineering designs and procure the equipment and specialized contractors to retrofit their engines. These costs are irreparable because they cannot later be recovered from the government. *See In re NTE Conn., LLC*, 26 F.4th at 990–91

20

("[F]inancial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." (cleaned up)); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.").

Although the compliance costs will vary for different engines, petitioners' members estimate that they will generally have to spend $2–5 million dollars on *each engine* that must be retrofitted to comply with the rule. *See* Decl. of Kimberly Tarr ¶ 13 (approximately $2 million per engine for Boardwalk Pipeline's 102 engines); Decl. of Danika Yeager ¶ 15 ($585,000–$6.8 million per engine for TC Energy's 280 engines); Decl. of Kenneth W. Grubb ¶ 26 (average costs of $4.74 million–$5 million per engine for Kinder Morgan's 443 engines).

In addition, pipeline operators will incur additional costs if they cannot meet their obligations to provide natural gas to customers because they have to shut down pipeline engines for several months to be retrofitted with emissions controls. *See* Grubb Decl. ¶¶ 70–73. Natural gas

21

shippers that contract for firm capacity on an interstate pipeline regulated by the Federal Energy Regulatory Commission typically pay a "reservation charge" that is based on the amount of pipeline capacity reserved by the shipper. *Id.* ¶ 70. If service is interrupted, pipeline operators must give customers a refund of the reservation charges. *Id.*

Petitioners' members are beginning to spend money now—and will have to spend hundreds of millions of dollars to retrofit engines over the next 12–18 months while this litigation proceeds—to be prepared to comply with the emissions restrictions when they take effect. *See* Decl. of Scott Yager ¶ 10 (INGAA estimates that its members will spend "up to $300 million or more . . . in the next 12–18 months"); Tarr Decl.¶ 15 ("at least $23 million" for Boardwalk Pipeline); Yeager Decl. ¶ 9 ("up to $75 million" for TC Energy); Grubb Decl. ¶ 6 ($80 million for Kinder Morgan, and more if the existing judicial stays are lifted); Decl. of Thomas Wooden ¶ 13 ("approximately $350 million" for Enbridge).

Petitioners' members must incur these costs now because retrofitting all the engines covered by the rule will take years to complete. Yager Decl. ¶¶ 9–11; Decl. of Robin Rorick ¶¶ 7–8. Engineering plans and designs must be developed for each engine; parts must be procured; and

22

specialized contractors hired to install and test the equipment. *See* Grubb Decl. ¶ 48–49; Tarr Decl. ¶¶ 9–10; Yeager Decl. ¶¶ 16, 18. Scheduling is difficult because there are currently only two primary technology service providers that can install the controls needed for two-stroke lean burn engines (the vast majority of engines regulated by the rule), and their capacity is limited. *See* Yager Decl. ¶ 18; Grubb Decl. ¶ 50; Yeager Decl. ¶ 19. In addition, the companies will have to obtain new or modified state or federal permits—a process that can take one to two years or more. *See* 88 Fed. Reg. at 36,759; Yager Decl. ¶ 21; Grubb Decl. ¶ 52.

In short, petitioners' members must start working now to retrofit engines to have any hope of being able to comply with the 2026 ozone season limits or to obtain an extension from EPA. *See* 88 Fed. Reg. at 36,760 (extensions will be given only when needed "despite all good faith efforts to install the necessary controls by May 1, 2026"). These unrecoverable compliance costs constitute irreparable harm. *See, e.g.*, *Texas v. EPA*, 829 F.3d 405, 433–34 (5th Cir. 2016) (the "tremendous costs of the emissions controls" mandated by EPA constituted irreparable harm to power companies); *R.J. Reynolds Tobacco Co. v. FDA*, 823 F. Supp. 2d 36, 49–50 (D.D.C. 2011), *vacated on other grounds,* 696 F.3d 1205 (D.C. Cir.

23

2012) (the "tens of millions of dollars" in unrecoverable compliance costs the plaintiffs would have to incur "during the 15-month preparation period necessary to comply with the Rule" constituted irreparable harm).

## III.  The Public Interest Favors A Stay.

The public has a fundamental interest "in having governmental agencies abide by the federal laws that govern their existence and operations," including the Administrative Procedure Act. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA."). Here, a stay is necessary to prevent the implementation of an unlawful rule, and so the public interest favors that stay. *See League of Women Voters*, 838 F.3d at 12 ("[T]here is generally no public interest in the perpetuation of unlawful agency action.").

The public's interest in reliable and sufficient supplies of natural gas further supports a stay. To install the required controls within EPA's compliance timeline, petitioners' members would need to take multiple pipeline engines offline at once. Wooden Decl. ¶ 11; Grubb Decl. ¶¶ 65,

67. These retrofitting shutdowns cannot be coordinated among compa-

nies, and they will cause capacity restrictions that could result in signif-

icant interruptions to the supply of natural gas to households and busi-

nesses. Wooden Decl. ¶ 12; Yager Decl. ¶¶ 23–24; Grubb Decl. ¶ 11. One

member's modeling suggests that a significant share of the public will

suffer electric power outages, heating outages, delays to industrial supply

chains, and increases in the price of electricity. Grubb Decl. ¶¶ 60, 65, 67.

The public has a strong interest in avoiding these sorts of harms. *See,*

*e.g.*, *In re NTE Conn., LLC,* 26 F.4th at 992 (public interest in "more effi-

cient (i.e., less expensive) electricity"); *Tri-State Generation & Transmis-*

*sion Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 357 (10th

Cir. 1986) (public interest in avoiding loss of power supply).

## CONCLUSION

For the foregoing reasons, the Court should stay the provisions of

the final rule applicable to pipeline engines, 40 C.F.R. § 52.41. To ensure

that petitioners' members will have adequate time to come into compli-

ance if and when the stay is lifted, the Court should postpone the effective

date of § 52.41 until 31 months after the stay is lifted. *See* 5 U.S.C. § 705;

88 Fed. Reg. at 36,759 (recognizing natural gas pipelines would need this

amount of lead time to come into compliance with the rule).

Respectfully submitted,

/s/ Eric D. McArthur

SAMUEL B. BOXERMAN
ERIC D. MCARTHUR
KATHLEEN MUELLER
JEREMY ROZANSKY
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for Interstate Natural Gas Association of America and American Petroleum Institute*

July 27, 2023

26

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(5)–(7) and D.C. Circuit Rules 27(a)(2) and 32, I certify that:

This motion complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because it contains 5,186 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f) and 27(a)(2)(B).

This motion complies with the typeface and type style requirements of Fed. R. App. P. 27(d)(1)(E) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2016 Century Schoolbook 14-point font.

/s/ Eric D. McArthur
Eric D. McArthur

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 27th day of July, 2023, I will cause the foregoing document to be electronically filed through this Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

<p style="text-align:right">/s/ Eric D. McArthur <br>Eric D. McArthur</p>

Addendum

# TABLE OF CONTENTS

*Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 36,654 (June 5, 2023) ................................................................................. 1a

EPA, *Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026* (Feb. 28, 2022) .............................. 266a

*Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, 87 Fed. Reg. 20,036 (Apr. 6, 2022) .................. 291a

EPA, *Non-EGU Facilities and Units.xlsx* (Mar. 2023) ...................... 473a

EPA, *Technical Support Document (TSD) for the Final Rule: Final Non-EGU Sectors TSD* (Mar. 2023) ..................................... 536a

EPA, *Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units* (Mar. 15, 2023) ............................................................................... 569a

INGAA Comments on the Proposed Rule, "Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard," 87 Fed. Reg. 20,036 (April 6, 2022) ................ 588a

Kinder Morgan Comments on the Proposed Rule, "Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard," 87 Fed. Reg. 20,036 (April 6, 2022) ................ 652a

TC Energy Comments on the Proposed Rule, "Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard," 87 Fed. Reg. 20,036 (April 6, 2022) ................ 730a

EPA, *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial Stays of SIP Disapproval Action for Certain States* (June 29, 2023) ............................................................ 744a

Declaration of Scott Yager in Support of Interstate Natural Gas Association of America's Motion for Stay .............................. 804a

Declaration of Robin Rorick in Support of American Petroleum Institute and Interstate Natural Gas Association of America's Motion for Stay ...................................... 814a

Declaration of Kimberly Tarr in Support of Interstate Natural Gas Association of America's Motion for Stay ................. 818a

Declaration of Thomas V. Wooden Jr. in Support of Interstate Natural Gas Association of America's Motion for Stay ........................................................................... 825a

Declaration of Kenneth W. Grubb in Support of Interstate Natural Gas Association of America's Motion to Stay the Final Rule of the U.S. Environmental Protection Agency Pending Review ................................................................. 836a

Declaration of Danika Yeager in Support of Interstate Natural Gas Association of America's Motion for Stay ................. 884a

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 52, 75, 78, and 97**

[EPA–HQ–OAR–2021–0668; FRL–8670–02–OAR]

RIN 2060–AV51

## Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This action finalizes Federal Implementation Plan (FIP) requirements to address 23 states' obligations to eliminate significant contribution to nonattainment, or interference with maintenance, of the 2015 ozone National Ambient Air Quality Standards (NAAQS) in other states. The U.S. Environmental Protection Agency (EPA) is taking this action under the "good neighbor" or "interstate transport" provision of the Clean Air Act (CAA or Act). The Agency is defining the amount of ozone-precursor emissions (specifically, nitrogen oxides) that constitute significant contribution to nonattainment and interference with maintenance from these 23 states. With respect to fossil fuel-fired power plants in 22 states, this action will prohibit those emissions by implementing an allowance-based trading program beginning in the 2023 ozone season. With respect to certain other industrial stationary sources in 20 states, this action will prohibit those emissions through emissions limitations and associated requirements beginning in the 2026 ozone season. These industrial source types are: reciprocating internal combustion engines in Pipeline Transportation of Natural Gas; kilns in Cement and Cement Product Manufacturing; reheat furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; furnaces in Glass and Glass Product Manufacturing; boilers in Iron and Steel Mills and Ferroalloy Manufacturing, Metal Ore Mining, Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills; and combustors and incinerators in Solid Waste Combustors and Incinerators.

**DATES:** This final rule is effective on August 4, 2023.

**ADDRESSES:** The EPA has established a docket for this rulemaking under Docket ID No. EPA–HQ–OAR–2021–0668. All documents in the docket are listed in the *https://www.regulations.gov* index. Although listed in the index, some

information is not publicly available, *e.g.*, Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically at *https://www.regulations.gov* or in hard copy at the U.S. Environmental Protection Agency, EPA Docket Center, William Jefferson Clinton West Building, Room 3334, 1301 Constitution Ave. NW, Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the Office of Air and Radiation Docket is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** Ms. Elizabeth Selbst, Air Quality Policy Division, Office of Air Quality Planning and Standards (C539–01), Environmental Protection Agency, 109 TW Alexander Drive, Research Triangle Park, NC 27711; telephone number: (312) 886–4746; email address: *selbst.elizabeth@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

## Preamble Glossary of Terms and Abbreviations

The following are abbreviations of terms used in the preamble.

2016v1   2016 Version 1 Emissions Modeling Platform
2016v2   2016 Version 2 Emissions Modeling Platform
4-Step Framework   4-Step Interstate Transport Framework
ABC   Associated Builders and Contractors
ACS   American Community Survey
ACT   Alternative Control Techniques
AEO   Annual Energy Outlook
AQAT   Air Quality Assessment Tool
AQS   Air Quality System
BACT   Best Available Control Technology
BART   Best Available Retrofit Technology
BOF   Basic Oxygen Furnace
BPT   Benefit Per Ton
C1C2   Category 1 and Category 2
C3   Category 3
CAA or Act   Clean Air Act
CAIR   Clean Air Interstate Rule
CBI   Confidential Business Information
CCR   Coal Combustion Residual
CDC   Centers for Disease Control and Prevention
CDX   Central Data Exchange
CEDRI   Compliance and Emissions Data Reporting Interface
CEMS   Continuous Emissions Monitoring Systems
CES   Clean Energy Standards
CFB   Circulating Fluidized Bed Units
CHP   Combined Heat and Power
CMDB   Control Measures Database
CMV   Commercial Marine Vehicle

CoST   Control Strategy Tool
CPT   Cost Per Ton
CRA   Congressional Review Act
CSAPR   Cross-State Air Pollution Rule
DAHS   Data Acquisition and Handling System
DOE   Department of Energy
EAF   Electric Arc Furnace
EGU   Electric Generating Unit
EIA   U.S. Energy Information Agency
EIS   Emissions Inventory System
EISA   Energy Independence and Security Act
ELG   Effluent Limitation Guidelines
E.O.   Executive Order
EPA or the Agency   United States Environmental Protection Agency
ERT   Electronic Reporting Tool
FERC   Federal Energy Regulatory Commission
FFS   Findings of Failure to Submit
FIP   Federal Implementation Plan
GIS   Geographic Information System
g/hp-hr   grams per horsepower per hour
HDGHG   Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles
HEDD   High Electricity Demand Days
ICI   Industrial, Commercial, and Institutional
I/M   Inspection and Maintenance
IPM   Integrated Planning Model
IRA   Inflation Reduction Act
LAER   Lowest Achievable Emission Rate
LDC   Local Distribution Company
LME   Low Mass Emissions
LNB   Low-$NO_X$ Burners
MATS   Mercury and Air Toxics Standards
MCM   Menu of Control Measures
MDA8   Maximum Daily Average 8-Hour
MJO   Multi-Jurisdictional Organization
MOU   Memorandum of Understanding
MOVES   Motor Vehicle Emissions Simulator
MSAT2   Mobile Source Air Toxics Rule
MWC   Municipal Waste Combustor
NAAQS   National Ambient Air Quality Standards
NACAA   National Association of Clean Air Agencies
NAICS   North American Industry Classification System
NEEDS   National Electric Energy Data System
NEI   National Emissions Inventory
NERC   North American Electric Reliability Corporation
NESHAP   National Emissions Standards for Hazardous Air Pollutants
NMB   Normalized Mean Bias
NME   Normalized Mean Error
No SISNOSE   No Significant Economic Impact on a Substantial Number of Small Entities
Non-EGU   Non-Electric Generating Unit
NODA   Notice of Data Availability
$NO_X$   Nitrogen Oxides
NREL   National Renewable Energy Lab
NSCR   Non-Selective Catalytic Reduction
NSPS   New Source Performance Standard
NSR   New Source Review
NTTAA   National Technology Transfer and Advancement Act
OFA   Over-Fire Air
OMB   United States Office of Management and Budget

OSAT/APCA   Ozone Source Apportionment Technology/Anthropogenic Precursor Culpability Analysis
OTC   Ozone Transport Commission
OTR   Ozone Transport Region
OTSA   Oklahoma Tribal Statistical Area
PDF   Portable Document Format
PEMS   Predictive Emissions Monitoring Systems
$PM_{2.5}$   Fine Particulate Matter
ppb   parts per billion
ppm   parts per million
ppmv   parts per million by volume
ppmvd   parts per million by volume, dry
PRA   Paperwork Reduction Act
PSD   Prevention of Significant Deterioration
PTE   Potential to Emit
RACT   Reasonably Available Control Technology
RATA   Relative Accuracy Test Audit
RCF   Relative Contribution Factor
RFA   Regulatory Flexibility Act
RICE   Reciprocating Internal Combustion Engines
ROP   Rate of Progress
RPS   Renewable Portfolio Standards
RRF   Relative Response Factor
RTC   Response to Comments
RTO   Regional Transmission Organization
SAFETEA   Safe, Accountable, Flexible, Efficient, Transportation Equity Act
SCC   Source Classification Code
SCR   Selective Catalytic Reduction
SIL   Significant Impact Level
SIP   State Implementation Plan
SMOKE   Sparse Matrix Operator Kernel Emissions
SNCR   Selective Non-Catalytic Reduction
$SO_2$   Sulfur Dioxide
tpd   ton per day
TAS   Treatment as State
TSD   Technical Support Document
UMRA   Unfunded Mandates Reform Act
VMT   Vehicle Miles Traveled
VOCs   Volatile Organic Compounds
WRAP   Western Regional Air Partnership
WRF   Weather Research and Forecasting

## Table of Contents

I. Executive Summary
   A. Purpose of the Regulatory Action
   B. Emissions Limitations for EGUs Established by the Final Rule
   1. Emissions Limitations for EGUs Established by the Final Rule
   2. Emissions Limitations for Industrial Stationary Point Sources Established by the Final Rule
   B. Summary of the Regulatory Framework of the Rule
   C. Costs and Benefits
II. General Information
   A. Does this action apply to me?
   B. What action is the Agency taking?
   C. What is the Agency's legal authority for taking this action?
   D. What actions has the EPA previously issued to address regional ozone transport?
III. Air Quality Issues Addressed and Overall Rule Approach
   A. The Interstate Ozone Transport Air Quality Challenge
   1. Nature of Ozone and the Ozone NAAQS
   2. Ozone Transport
   3. Health and Environmental Effects
   B. Final Rule Approach
   1. The 4-Step Interstate Transport Framework
   a. Step 1 Approach
   b. Step 2 Approach
   c. Step 3 Approach
   d. Step 4 Approach
   2. FIP Authority for Each State Covered by the Rule
   C. Other CAA Authorities for This Action
   1. Withdrawal of Proposed Error Correction for Delaware
   2. Application of Rule in Indian Country and Necessary or Appropriate Finding
   a. Indian Country Subject to Tribal Jurisdiction
   b. Indian Country Subject to State Implementation Planning Authority
   D. Severability
IV. Analyzing Downwind Air Quality Problems and Contributions From Upwind States
   A. Selection of Analytic Years for Evaluating Ozone Transport Contributions to Downwind Air Quality Problems
   B. Overview of Air Quality Modeling Platform
   C. Emissions Inventories
   1. Foundation Emissions Inventory Data Sets
   2. Development of Emissions Inventories for EGUs
   a. EGU Emissions Inventories Supporting This Rule
   b. Impact of the Inflation Reduction Act on EGU Emissions
   3. Development of Emissions Inventories for Stationary Industrial Point Sources
   4. Development of Emissions Inventories for Onroad Mobile Sources
   5. Development of Emissions Inventories for Commercial Marine Vessels
   6. Development of Emissions Inventories for Other Nonroad Mobile Sources
   7. Development of Emissions Inventories for Nonpoint Sources
   D. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors
   E. Methodology for Projecting Future Year Ozone Design Values
   F. Pollutant Transport From Upwind States
   1. Air Quality Modeling To Quantify Upwind State Ozone Contributions
   2. Application of Ozone Contribution Screening Threshold
   a. States That Contribute Below the Screening Threshold
   b. States That Contribute Above the Screening Threshold
   G. Treatment of Certain Monitoring Sites in California and Implications for Oregon's Good Neighbor Obligations for the 2015 Ozone NAAQS
V. Quantifying Upwind-State $NO_X$ Emissions Reduction Potential To Reduce Interstate Ozone Transport for the 2015 Ozone NAAQS
   A. The Multi-Factor Test for Determining Significant Contribution
   B. Identifying Control Stringency Levels
   1. EGU $NO_X$ Mitigation Strategies
   a. Optimizing Existing SCRs
   b. Installing State-of-the-Art $NO_X$ Combustion Controls
   c. Optimizing Already Operating SNCRs or Turning on Idled Existing SNCRs
   d. Installing New SNCRs
   e. Installing New SCRs
   f. Generation Shifting
   g. Other EGU Mitigation Measures
   2. Non-EGU or Stationary Industrial Source $NO_X$ Mitigation Strategies
   3. Other Stationary Sources $NO_X$ Mitigation Strategies
   a. Municipal Solid Waste Units
   b. Electric Generating Units Less Than or Equal to 25 MW
   c. Cogeneration Units
   4. Mobile Source $NO_X$ Mitigation Strategies
   C. Control Stringencies Represented by Cost Threshold ($ per ton) and Corresponding Emissions Reductions
   1. EGU Emissions Reduction Potential by Cost Threshold
   2. Non-EGU or Industrial Source Emissions Reduction Potential
   D. Assessing Cost, EGU and Industrial Source $NO_X$ Reductions, and Air Quality
   1. EGU Assessment
   2. Stationary Industrial Sources Assessment
   3. Combined EGU and Non-EGU Assessment
   4. Over-Control Analysis
VI. Implementation of Emissions Reductions
   A. $NO_X$ Reduction Implementation Schedule
   1. 2023–2025: EGU $NO_X$ Reductions Beginning in 2023
   2. 2026 and Later Years: EGU and Stationary Industrial Source $NO_X$ Reductions Beginning in 2026
   a. EGU Schedule for 2026 and Later Years
   b. Non-EGU or Industrial Source Schedule for 2026 and Later Years
   B. Regulatory Requirements for EGUs
   1. Trading Program Background and Overview of Revisions
   a. Current CSAPR Trading Program Design Elements and Identified Concerns
   b. Enhancements To Maintain Selected Control Stringency Over Time
   i. Revised Emissions Budget-Setting Process
   ii. Allowance Bank Recalibration
   c. Enhancements To Improve Emissions Performance at Individual Units
   i. Unit-Specific Backstop Daily Emissions Rates
   ii. Unit-Specific Emissions Limitations Contingent on Assurance Level Exceedances
   d. Responses to General Comments on the Revisions to the Group 3 Trading Program
   2. Expansion of Geographic Scope
   3. Applicability and Tentative Identification of Newly Affected Units
   4. State Emissions Budgets
   a. Methodology for Determining Preset State Emissions Budgets for the 2023 through 2029 Control Periods
   b. Methodology for Determining Dynamic State Emissions Budgets for Control Periods in 2026 Onwards
   c. Final Preset State Emissions Budgets
   5. Variability Limits and Assurance Levels
   6. Annual Recalibration of Allowance Bank
   7. Unit-Specific Backstop Daily Emissions Rates
   8. Unit-Specific Emissions Limitations Contingent on Assurance Level Exceedances

9. Unit-Level Allowance Allocation and Recordation Procedures
a. Set-Asides of Portions of State Emissions Budgets
b. Allocations to Existing Units, Including Units That Cease Operation
c. Allocations From Portions of State Emissions Budgets Set Aside for New Units
d. Incorrectly Allocated Allowances
10. Monitoring and Reporting Requirements
a. Monitor Certification Deadlines
b. Additional Recordkeeping and Reporting Requirements
11. Designated Representative Requirements
12. Transitional Provisions
a. Prorating Emissions Budgets, Assurance Levels, and Unit-Level Allowance Allocations in the Event of an Effective Date After May 1, 2023
b. Creation of Additional Group 3 Allowance Bank for 2023 Control Period
c. Recall of Group 2 Allowances for Control Periods After 2022
13. Conforming Revisions to Regulations for Other CSAPR Trading Programs
C. Regulatory Requirements for Stationary Industrial Sources
1. Pipeline Transportation of Natural Gas
2. Cement and Concrete Product Manufacturing
3. Iron and Steel Mills and Ferroalloy Manufacturing
4. Glass and Glass Product Manufacturing
5. Boilers at Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, Pulp, Paper, and Paperboard Mills, Iron and Steel and Ferroalloys Manufacturing, and Metal Ore Mining Facilities
a. Coal-fired Industrial Boilers
b. Oil-fired Industrial Boilers
c. Natural gas-fired Industrial Boilers
6. Municipal Waste Combustors
D. Submitting a SIP
1. SIP Option To Modify Allocations for 2024 under EGU Trading Program
2. SIP Option To Modify Allocations for 2025 and Beyond Under EGU Trading Program
3. SIP Option To Replace the Federal EGU Trading Program With an Integrated State EGU Trading Program
4. SIP Revisions That Do Not Use the New Trading Program
5. SIP Revision Requirements for Non-EGU or Industrial Source Control Requirements
E. Title V Permitting
1. Title V Permitting Considerations for EGUs
2. Title V Permitting Considerations for Industrial Stationary Sources
F. Relationship to Other Emissions Trading and Ozone Transport Programs
1. NO$_X$ SIP Call
2. Acid Rain Program
3. Other CSAPR Trading Programs
VII. Environmental Justice Analytical Considerations and Stakeholder Outreach and Engagement
A. Introduction
B. Analytical Considerations
C. Outreach and Engagement

VIII. Costs, Benefits, and Other Impacts of the Final Rule
IX. Summary of Changes to the Regulatory Text for the Federal Implementation Plans and Trading Programs for EGUs
A. Amendments to FIP Provisions in 40 CFR Part 52
B. Amendments to Group 3 Trading Program and Related Regulations
C. Transitional Provisions
D. Clarifications and Conforming Revisions
X. Statutory and Executive Order Reviews
A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
B. Paperwork Reduction Act (PRA)
1. Information Collection Request for EGUs
2. Information Collection Request for Non-EGUs
C. Regulatory Flexibility Act (RFA)
D. Unfunded Mandates Reform Act (UMRA)
E. Executive Order 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use
I. National Technology Transfer and Advancement Act (NTTAA)
J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
K. Congressional Review Act
L. Determinations Under CAA Section 307(b)(1) and (d)

## I. Executive Summary

This final rule resolves the interstate transport obligations of 23 states under CAA section 110(a)(2)(D)(i)(I), referred to as the ''good neighbor provision'' or the ''interstate transport provision'' of the Act, for the 2015 ozone NAAQS. On October 1, 2015, the EPA revised the primary and secondary 8-hour standards for ozone to 70 parts per billion (ppb).[1] States were required to submit to EPA ozone infrastructure State Implementation Plan (SIP) revisions to fulfill interstate transport obligations for the 2015 ozone NAAQS by October 1, 2018. The EPA proposed the subject rule to address outstanding interstate ozone transport obligations for the 2015 ozone NAAQS in the **Federal Register** on April 6, 2022 (87 FR 20036).

The EPA is making a finding that interstate transport of ozone precursor emissions from 23 upwind states (Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New

Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wisconsin) is significantly contributing to nonattainment or interfering with maintenance of the 2015 ozone NAAQS in downwind states, based on projected ozone precursor emissions in the 2023 ozone season. The EPA is issuing FIP requirements to eliminate interstate transport of ozone precursor emissions from these 23 states that significantly contributes to nonattainment or interferes with maintenance of the NAAQS in downwind states. The EPA is not finalizing its proposed error correction for Delaware's ozone transport SIP, and we are deferring final action at this time on the proposed FIPs for Tennessee and Wyoming pending further review of the updated air quality and contribution modeling and analysis developed for this final action. As discussed in section III of this document, the EPA's updated analysis of 2023 suggests that the states of Arizona, Iowa, Kansas, and New Mexico may be significantly contributing to one or more nonattainment or maintenance receptors. The EPA is not making any final determinations with respect to these states in this action but intends to address these states, along with Tennessee and Wyoming, in a subsequent action or actions.

The EPA is finalizing FIP requirements for 21 states for which the Agency has, in a separate action, disapproved (or partially disapproved) ozone transport SIP revisions that were submitted for the 2015 ozone NAAQS: Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Texas, Utah, West Virginia, and Wisconsin. *See* 88 FR 9336. In this final rule, the EPA is issuing FIPs for two states—Pennsylvania and Virginia—for which the EPA issued Findings of Failure to Submit for 2015 ozone NAAQS transport SIPs. *See* 84 FR 66612 (December 5, 2019). Under CAA section 301(d)(4), the EPA is extending FIP requirements to apply in Indian country located within the upwind geography of the final rule, including Indian reservation lands and other areas of Indian country over which the EPA or a tribe has demonstrated that a tribe has jurisdiction.[2]

This final rule defines ozone season nitrogen oxides (NO$_X$) emissions

---

[1] *See* 80 FR 65291 (October 26, 2015).

[2] In general, specific tribal names or reservations are not identified separately in this final rule except as needed. *See* section III.C.2 of this document for further discussion about the application of this rule in Indian Country.

3a

performance obligations for Electric Generating Unit (EGU) sources and fulfills those obligations by implementing an allowance-based ozone season trading program beginning in 2023. This rule also establishes emissions limitations beginning in 2026 for certain other industrial stationary sources (referred to generally as ''non-Electric Generating Units'' (non-EGUs). Taken together, these regulatory requirements will fully eliminate the amount of emissions that constitute the covered states' significant contribution to nonattainment and interference with maintenance in downwind states for purposes of the 2015 ozone NAAQS.

This final rule implements the necessary emissions reductions as follows. Under the FIP requirements, EGUs in 22 states (Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wisconsin) are required to participate in a revised version of the Cross-State Air Pollution Rule (CSAPR) $NO_X$ Ozone Season Group 3 Trading Program that was previously established in the Revised CSAPR Update.[3] In addition to reflecting emissions reductions based on the Agency's determination of the necessary control stringency in this rule, the revised trading program includes several enhancements to the program's design to better ensure achievement of the selected control stringency on all days of the ozone season and over time. For 12 states already required to participate in the CSAPR $NO_X$ Ozone Season Group 3 Trading Program (Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia) under the Revised CSAPR Update (with respect to the 2008 ozone NAAQS), the FIPs are amended by the revisions to the Group 3 trading program regulations. For seven states currently covered by the CSAPR $NO_X$ Ozone Season Group 2 Trading Program under SIPs or FIPs, the EPA is issuing new FIPs for two states (Alabama and Missouri) and amending existing FIPs for five states (Arkansas, Mississippi, Oklahoma, Texas, and Wisconsin) to transition EGU sources in these states from the Group 2 program to the revised Group 3 trading program, beginning with the 2023 ozone season. The EPA is

issuing new FIPs for three states not currently covered by any CSAPR $NO_X$ ozone season trading program: Minnesota, Nevada, and Utah.

This rulemaking requires emissions reductions in the selected control stringency to be achieved as expeditiously as practicable and, to the extent possible, by the next applicable nonattainment dates for downwind areas for the 2015 ozone NAAQS. Thus, initial emissions reductions from EGUs will be required beginning in the 2023 ozone season and prior to the August 3, 2024, attainment date for areas classified as Moderate nonattainment for the 2015 ozone NAAQS.

The remaining emissions reduction obligations will be phased in as soon as possible thereafter. Substantial additional emissions reductions from potential new post-combustion control installations at EGUs as well as from installation of new pollution controls at non-EGUs, also referred to in this action as industrial sources, will phase in beginning in the 2026 ozone season, associated with the August 3, 2027, attainment date for areas classified as Serious nonattainment for the 2015 ozone NAAQS. The EPA had proposed to require all emissions reductions to be in place by the 2026 ozone season. While we continue to view 2026 as the appropriate analytic year for purposes of applying the 4-step interstate transport framework, as discussed in section V.D.4 and VI.A.2 of this document, the final rule will allow individual facilities limited additional time to fully implement the required emissions reductions where the owner or operator demonstrates to the EPA's satisfaction that more rapid compliance is not possible. For EGUs, the emissions trading program budget stringency associated with retrofit of post-combustion controls will be phased in over two ozone seasons (2026–2027). For industrial sources, this final rule provides a process for individual facilities to seek a one year extension, with the possibility of up to two additional years, based on a specific showing of necessity.

The EGU emissions reductions are based on the feasibility of control installation for EGUs in 19 states that remain linked to downwind nonattainment and maintenance receptors in 2026. These 19 states are: Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia. The emissions reductions required for EGUs in these

states are based primarily on the potential retrofit of additional post-combustion controls for $NO_X$ on most coal-fired EGUs and a portion of oil/gas-fired EGUs that are currently lacking such controls.

The EPA is finalizing, with some modifications from proposal in response to comments, certain additional features in the allowance-based trading program approach for EGUs, including dynamic adjustments of the emissions budgets and recalibration of the allowance bank over time as well as backstop daily emissions rate limits for large coal-fired units. The purpose of these enhancements is to better ensure that the emissions control stringency the EPA found necessary to eliminate significant contribution at Step 3 of the 4-step interstate transport framework is maintained over time in Step 4 implementation and is durable to changes in the power sector. These enhancements ensure the elimination of significant contribution is maintained both in terms of geographical distribution (by limiting the degree to which individual sources can avoid making emissions reductions) and in terms of temporal distribution (by better ensuring emissions reductions are maintained throughout each ozone season, year over year). As we further discuss in section V.D of this document, these changes do not alter the stringency of the emissions trading program over time. Rather, they ensure that the trading program (as the method of implementation at Step 4) remains aligned with the determinations made at Step 3. These enhancements are further discussed in section VI.B of this document.

The EPA is making a finding that $NO_X$ emissions from certain non-EGU sources are significantly contributing to nonattainment or interfering with maintenance of the 2015 ozone NAAQS and that cost-effective controls for $NO_X$ emissions reductions are available in certain industrial source categories that would result in meaningful air quality improvements in downwind receptors. The EPA is establishing emissions limitations beginning in 2026 for non-EGU sources located within 20 states: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia. The final rule establishes $NO_X$ emissions limitations during the ozone season for the following unit types for sources in

---

[3] As explained in section V.C.1 of this document, the EPA is making a finding that EGU sources within the State of California are sufficiently controlled such that no further emissions reductions are needed from them to eliminate significant contribution to downwind states.

**36658**     **Federal Register** / Vol. 88, No. 107 / Monday, June 5, 2023 / Rules and Regulations

non-EGU industries:[4] reciprocating internal combustion engines in Pipeline Transportation of Natural Gas; kilns in Cement and Cement Product Manufacturing; reheat furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; furnaces in Glass and Glass Product Manufacturing; boilers in Iron and Steel Mills and Ferroalloy Manufacturing, Metal Ore Mining, Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills; and combustors and incinerators in Solid Waste Combustors and Incinerators.

*A. Purpose of the Regulatory Action*

The purpose of this rulemaking is to protect public health and the environment by reducing interstate transport of certain air pollutants that significantly contribute to nonattainment, or interfere with maintenance, of the 2015 ozone NAAQS in downwind states. Ground-level ozone has detrimental effects on human health as well as vegetation and ecosystems. Acute and chronic exposure to ozone in humans is associated with premature mortality and certain morbidity effects, such as asthma exacerbation. Ozone exposure can also negatively impact ecosystems by limiting tree growth, causing foliar injury, and changing ecosystem community composition. Section III of this document provides additional evidence of the harmful effects of ozone exposure on human health and the environment. Studies have established that ozone air pollution can be transported over hundreds of miles, with elevated ground-level ozone concentrations occurring in rural and metropolitan areas.[5][6] Assessments of ozone control approaches have concluded that control strategies targeting reduction of $NO_X$ emissions are an effective method to reduce regional-scale ozone transport.[7]

CAA section 110(a)(2)(D)(i)(I) requires states to prohibit emissions that will contribute significantly to nonattainment or interfere with maintenance in any other state with

respect to any primary or secondary NAAQS.[8] Within 3 years of the EPA promulgating a new or revised NAAQS, all states are required to provide SIP submittals, often referred to as "infrastructure SIPs," addressing certain requirements, including the good neighbor provision. *See* CAA section 110(a)(1) and (2). The EPA must either approve or disapprove such submittals or make a finding that a state has failed to submit a complete SIP revision. As with any other type of SIP under the Act, when the EPA disapproves an interstate transport SIP or finds that a state failed to submit an interstate transport SIP, the CAA requires the EPA to issue a FIP to directly implement the measures necessary to eliminate significant contribution under the good neighbor provision. *See generally* CAA section 110(k) and 110(c). As such, in this rule, the EPA is finalizing requirements to fully address good neighbor obligations for the covered states for the 2015 ozone NAAQS under its authority to promulgate FIPs under CAA section 110(c). By eliminating significant contribution from these upwind states, this rule will make substantial and meaningful improvements in air quality by reducing ozone levels at the identified downwind receptors as well as many other areas of the country. At any time after the effective date of this rule, states may submit a Good Neighbor SIP to replace the FIP requirements contained in this rule, subject to EPA approval under CAA section 110(a).

The EPA conducted air quality modeling for the 2023 and 2026 analytic years to identify (1) the downwind areas identified as "receptors" (which are associated with monitoring sites) that are expected to have trouble attaining or maintaining the 2015 ozone NAAQS in the future and (2) the contribution of ozone transport from upwind states to the downwind air quality problems. We use the term "downwind" to describe those states or areas where a receptor is located, and we use the term "upwind" to describe states whose emissions are linked to one or more receptors. States may be both downwind and upwind depending on the receptor or linkage in question. Section IV of this document provides a full description of the results of the EPA's updated air quality modeling and relevant analyses for the rulemaking, including a discussion of how updates to the modeling and air quality analysis following the proposed rule have resulted in some modest changes in the overall geography of the final rule. Based on the EPA's air quality

analysis, the 23 upwind states covered in this action are linked above the 1 percent of the NAAQS threshold to downwind air quality problems in downwind states. The EPA intends to expeditiously review the updated air quality modeling and related analyses to address potential good neighbor requirements of six additional states— Arizona, Iowa, Kansas, New Mexico, Tennessee, and Wyoming—in a subsequent action. The EPA had previously approved 2015 ozone transport SIPs submitted by Oregon and Delaware, but in the proposed FIP action the EPA found these states potentially to be linked in the modeling supporting our proposal. We proposed to issue an error correction for our prior approval of Delaware's 2015 ozone transport SIP; however, in this final rule, the EPA is withdrawing the proposed error correction and the proposed FIP for Delaware, because our updated modeling for this final rule confirms that Delaware is not linked above the 1 percent of NAAQS threshold (*see* section III.C.1 of this document for additional information). The EPA is deferring finalizing a finding at this time for Oregon (*see* section IV.G of this document for additional information).

1. Emissions Limitations for EGUs Established by the Final Rule

In this rule, the EPA is issuing FIP requirements that apply the provisions of the CSAPR $NO_X$ Ozone Season Group 3 Trading Program as revised in the rule to EGU sources within the borders of the following 22 states: Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wisconsin. Implementation of the revised trading program provisions begins in the 2023 ozone season.

The EPA is expanding the CSAPR $NO_X$ Ozone Season Group 3 Trading Program beginning in the 2023 ozone season. Specifically, the FIPs require power plants within the borders of the 22 states listed in the previous paragraph to participate in an expanded and revised version of the CSAPR $NO_X$ Ozone Season Group 3 Trading Program created by the Revised CSAPR Update. Affected EGUs within the borders of the following 12 states currently participating in the Group 3 Trading Program under existing FIPs remain in the program, with revised provisions beginning in the 2023 ozone season, under this rule: Illinois, Indiana, Kentucky, Louisiana, Maryland,

---

[4] We use the terms "emissions limitation" and "emissions limit" to refer to both numeric emissions limitations and control technology requirements that specify levels of emissions reductions to be achieved.

[5] Bergin, M.S. et al. (2007) Regional air quality: local and interstate impacts of $NO_X$ and $SO_2$ emissions on ozone and fine particulate matter in the eastern United States. Environmental Sci & Tech. 41: 4677–4689.

[6] Liao, K. et al. (2013) Impacts of interstate transport of pollutants on high ozone events over the Mid-Atlantic United States. Atmospheric Environment 84, 100–112.

[7] *See* 82 FR 51238, 51248 (November 3, 2017) [citing 76 FR 48208, 48222 (August 8, 2011)] and 63 FR 57381 (October 27, 1998).

[8] 42 U.S.C. 7410(a)(2)(D)(i)(I).

Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia. The FIPs also require affected EGUs within the borders of the following seven states currently covered by the CSAPR $NO_X$ Ozone Season Group 2 Trading Program (the "Group 2 trading program") under existing FIPs or existing SIPs to transition from the Group 2 program to the revised Group 3 trading program beginning with the 2023 control period: Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Texas, and Wisconsin.[9] Finally, the EPA is issuing new FIPs for EGUs within the borders of three states not currently covered by any existing CSAPR trading program for seasonal $NO_X$ emissions: Minnesota, Nevada, and Utah. Sources in these states will enter the Group 3 trading program in the 2023 control period following the effective date of the final rule.[10] Refer to section VI.B of this document for details on EGU regulatory requirements.

2. Emissions Limitations for Industrial Stationary Point Sources Established by the Final Rule

The EPA is issuing FIP requirements that include new $NO_X$ emissions limitations for industrial or non-EGU sources in 20 states, with sources expected to demonstrate compliance no later than 2026. The EPA is requiring emissions reductions from non-EGU sources to address interstate transport obligations for the 2015 ozone NAAQS for the following 20 states: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia and West Virginia.

The EPA is establishing emissions limitations for the following unit types in non-EGU industries: reciprocating internal combustion engines in Pipeline Transportation of Natural Gas; kilns in Cement and Cement Product Manufacturing; reheat furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; furnaces in Glass and Glass Product Manufacturing; boilers in Iron and Steel Mills and Ferroalloy Manufacturing, Metal Ore Mining, Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills; and combustors and incinerators in Solid Waste Combustors and Incinerators. Refer to Table II.A–1 for a list of North American Industry Classification System (NAICS) codes for each entity included for regulation under this rule.

*B. Summary of the Regulatory Framework of the Rule*

The EPA is applying the 4-step interstate transport framework developed and used in CSAPR, the CSAPR Update, the Revised CSAPR Update, and other previous ozone transport rules under the authority provided in CAA section 110(a)(2)(D)(i)(I). The 4-step interstate transport framework provides a stepwise method for the EPA to define and implement good neighbor obligations for the 2015 ozone NAAQS. The four steps are as follows: (Step 1) identifying downwind receptors that are expected to have problems attaining or maintaining the NAAQS; (Step 2) determining which upwind states contribute to these identified problems in amounts sufficient to "link" them to the downwind air quality problems (*i.e.,* in this rule as in prior transport rules beginning with CSAPR in 2011, above a contribution threshold of 1 percent of the NAAQS); (Step 3) for states linked to downwind air quality problems, identifying upwind emissions that significantly contribute to downwind nonattainment or interfere with downwind maintenance of the NAAQS through a multifactor analysis; and (Step 4) for states that are found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in downwind areas, implementing the necessary emissions reductions through enforceable measures. The remainder of this section provides a general overview of the EPA's application of the 4-step framework as it applies to the provisions of the rule; additional details regarding the EPA's approach are found in section III of this document.

To apply the first step of the 4-step framework to the 2015 ozone NAAQS, the EPA performed air quality modeling to project ozone concentrations at air quality monitoring sites in 2023 and 2026.[11] The EPA evaluated projected ozone concentrations for the 2023 analytic year at individual monitoring sites and considered current ozone monitoring data at these sites to identify receptors that are anticipated to have problems attaining or maintaining the 2015 ozone NAAQS. This analysis of projected ozone concentrations was then repeated for 2026.

To apply the second step of the framework, the EPA used air quality modeling to quantify the contributions from upwind states to ozone concentrations in 2023 and 2026 at downwind receptors.[12] Once quantified, the EPA then evaluated these contributions relative to a screening threshold of 1 percent of the NAAQS (*i.e.,* 0.70 ppb).[13] States with contributions that equaled or exceeded 1 percent of the NAAQS were identified as warranting further analysis at Step 3 of the 4-step framework to determine if the upwind state significantly contributes to nonattainment or interference with maintenance in a downwind state. States with contributions below 1 percent of the NAAQS were considered not to significantly contribute to nonattainment or interfere with maintenance of the NAAQS in downwind states.

Based on the EPA's most recent air quality modeling and contribution analysis using 2023 as the analytic year, the EPA finds that the following 23 states have contributions that equal or exceed 1 percent of the 2015 ozone NAAQS, and, thereby, warrant further analysis of significant contribution to nonattainment or interference with maintenance of the NAAQS: Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wisconsin.

There are locations in California to which Oregon contributes greater than 1 percent of the NAAQS; the EPA

---

[9] Five of these seven states (Arkansas, Mississippi, Oklahoma, Texas, and Wisconsin) currently participate in the Federal Group 2 trading program pursuant to the FIPs finalized in the CSAPR Update. The FIPs required under this rule amend the existing FIPs for these states. The other two states (Alabama and Missouri) have already replaced the FIPs finalized in the CSAPR Update with approved SIP revisions that require their EGUs to participate in state Group 2 trading programs integrated with the Federal Group 2 trading program, so the FIPs required in this action constitute new FIPs for these states. The EPA will cease implementation of the state Group 2 trading programs included in the two states' SIPs on the effective date of this rule.

[10] Three states, Kansas, Iowa, and Tennessee, will remain in the Group 2 Trading Program.

[11] These 2 analytic years are the last full ozone seasons before, and thus align with, upcoming attainment dates for the 2015 ozone NAAQS:

August 3, 2024, for areas classified as Moderate nonattainment, and August 3, 2027, for areas classified as Serious nonattainment. *See* 83 FR 25776.

[12] The EPA performed air quality modeling for 2032 in the proposed rulemaking, but did not perform contribution modeling for 2032 since contribution data for this year were not needed to identify upwind states to be analyzed in Step 3. The modeling of 2032 done at proposal using the 2016v2 platform does not constitute or represent any final agency determinations respecting air quality conditions or regulatory judgments with respect to good neighbor obligations or any other CAA requirements.

[13] *See* section IV.F of this document for explanation of EPA's use of the 1 percent of the NAAQS threshold in the Step 2 analysis.

proposed that downwind areas represented by these monitoring sites in California should not be considered interstate ozone transport receptors at Step 1. However, the EPA is deferring finalizing a finding at this time for Oregon (*see* section IV.G of this document for additional information).

Based on the air quality analysis presented in section IV of this document, the EPA finds that, with the exception of Alabama, Minnesota, and Wisconsin, the states found linked in 2023 will continue to contribute above the 1 percent of the NAAQS threshold to at least one receptor whose nonattainment and maintenance concerns persist through the 2026 ozone season. As a result, the EPA's evaluation of significantly contributing emissions at Step 3 for Alabama, Minnesota, and Wisconsin is limited to emissions reductions achievable by the 2023 and 2024 ozone seasons.

At the third step of the 4-step framework, the EPA applied a multifactor test that incorporates cost, availability of emissions reductions, and air quality impacts at the downwind receptors to determine the amount of ozone precursor emissions from the linked upwind states that "significantly" contribute to downwind nonattainment or maintenance receptors. The EPA is applying the multifactor test described in section V.A of this document to both EGU and industrial sources. The EPA assessed the potential emissions reductions in 2023 and 2026,[14] as well as in intervening and later years to determine the emissions reductions required to eliminate significant contribution in 2023 and future years where downwind areas are projected to have potential problems attaining or maintaining the 2015 ozone NAAQS.

For EGU sources, the EPA evaluated the following set of widely-available NOₓ emissions control technologies: (1) fully operating existing selective catalytic reduction (SCR) controls, including both optimizing NOₓ removal by existing operational SCRs and turning on and optimizing existing idled SCRs; (2) installing state-of-the-art NOₓ

combustion controls; (3) fully operating existing selective non-catalytic reduction (SNCR) controls, including both optimizing NOₓ removal by existing operational SNCRs and turning on and optimizing existing idled SNCRs; (4) installing new SNCRs; (5) installing new SCRs; and (6) generation shifting. For the reasons explained in section V of this document and supported by the "Technical Support Document (TSD) for the Final Federal Good Neighbor Plan for the 2015 Ozone National Ambient Air Quality Standard, Docket ID No. EPA–HQ–OAR–2021–0668, EGU NOₓ Mitigation Strategies Final Rule TSD" (Mar. 2023), hereinafter referred to as the EGU NOₓ Mitigation Strategies Final Rule TSD, included in the docket for this action, the EPA determines that for the regional, multi-state scale of this rulemaking, only fully operating and optimizing existing SCRs and existing SNCRs (EGU NOₓ emissions controls options 1 and 3 in the list earlier) are possible for the 2023 ozone season. The EPA determined that state-of-the-art NOₓ combustion controls at EGUs (emissions control option 2 in the list above) are available by the beginning of the 2024 ozone season. *See* section V.B.1 of this document for a full discussion of EPA's analysis of NOₓ emissions mitigation strategies for EGU sources.

The EPA is requiring control stringency levels that offer the most incremental NOₓ emissions reduction potential from EGUs—among the uniform mitigation measures assessed for the covered region—and the most corresponding downwind ozone air quality improvements to the extent feasible in each year analyzed. The EPA is making a finding that the required controls provide cost-effective reductions of NOₓ emissions that will provide substantial improvements in downwind ozone air quality to address interstate transport obligations for the 2015 ozone NAAQS in a timely manner. These controls represent greater stringency in upwind EGU controls than in the EPA's most recent ozone transport rulemakings, such as the CSAPR Update and the Revised CSAPR Update. However, programs to address interstate ozone transport based on the retrofit of post-combustion controls are by no means unprecedented. In prior ozone transport rulemakings such as the NOₓ SIP Call and the Clean Air Interstate Rule (CAIR), the EPA established EGU budgets premised on the widespread availability of retrofitting EGUs with post-combustion

emissions controls such as SCR.[15] While these programs successfully drove many EGUs to retrofit post-combustion controls, other EGUs throughout the present geography of linked upwind states continue to operate without such controls and continue to emit at relatively high rates more than 20 years after similar units reduced these emissions under prior interstate ozone transport rulemakings.

Furthermore, the CSAPR Update provided only a partial remedy for eliminating significant contribution for the 2008 ozone NAAQS, as needed to obtain available reductions by the 2017 ozone season. In that rule, the EPA made no determination regarding the appropriateness of more stringent EGU NOₓ controls that would be required for a *full* remedy for interstate transport for the 2008 ozone NAAQS. Following the remand of the CSAPR Update in *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019) (*Wisconsin*), the EPA again declined to require the retrofit of new post-combustion controls on EGUs in the Revised CSAPR Update, but that determination was based on a specific timing consideration: downwind air quality problems under the 2008 ozone NAAQS were projected to resolve before post-combustion control retrofits could be accomplished on a fleetwide, regional scale. *See* 86 FR 23054, 23110 (April 30, 2021).

In this rulemaking, the EPA is addressing good neighbor obligations for the more protective 2015 ozone NAAQS, and the Agency observes ongoing and persistent contribution from upwind states to ozone nonattainment and maintenance receptors in downwind states under that NAAQS. As further discussed in section V of this document, the nature of this contribution warrants a greater degree of control stringency than the EPA determined to be necessary to eliminate significant contribution of ozone transport in prior CSAPR rulemakings. In this rule, the EPA is requiring emissions performance levels for EGU NOₓ control strategies commensurate with those determined to be necessary in the NOₓ SIP Call and CAIR.

Based on the Step 3 analysis described in section V of this document, the EPA finds that emissions reductions commensurate with the full operation of all existing post-combustion controls (both SCRs and SNCRs) and state-of-the-art combustion control upgrades constitute the Agency's selected control stringency for EGUs within the borders of 22 states linked to downwind

---

[14] The EPA included emissions reductions from the potential installation of SCRs at all affected large coal-fired EGUs in the 2026 analytic year for the purposes of assessing significant contribution to nonattainment and interference with maintenance, which is consistent with the associated attainment date. However, in response to comments identifying potential supply chain and outage scheduling challenges if the full breadth of these assumed SCR installations were to occur, the EPA is implementing half of this emissions reduction potential in 2026 ozone-season NOₓ budgets for states containing these EGUs and the other half of this emissions reduction potential in 2027 ozone-season NOₓ budgets for those states.

[15] *See, e.g.,* 70 FR 25162, 25205–06 (May 12, 2005).

nonattainment or maintenance in 2023 (Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wisconsin). For 19 of those states that are also linked in 2026 (Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia), the EPA is determining that the selected EGU control stringency also includes emissions reductions commensurate with the retrofit of SCR at coal-fired units of 100 MW or greater capacity (excepting circulating fluidized bed units (CFB)), new SNCR on coal-fired units of less than 100 MW capacity and on CFBs of any capacity size, and SCR on oil/gas steam units greater than 100 MW that have historically emitted at least 150 tons of $NO_X$ per ozone season.

To identify appropriate control strategies for non-EGU sources to achieve $NO_X$ emissions reductions that would result in meaningful air quality improvements in downwind areas, for the proposed FIP, the EPA evaluated air quality modeling information, annual emissions, and information about potential controls to determine which industries, beyond the power sector, could have the greatest impact in providing ozone air quality improvements in affected downwind states. Once the EPA identified the industries, the EPA used its Control Strategy Tool to identify potential emissions units and control measures and to estimate emissions reductions and compliance costs associated with application of non-EGU emissions control measures. The technical memorandum *Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026* lays out the analytical framework and data used to prepare proxy estimates for 2026 of potentially affected non-EGU facilities and emissions units, emissions reductions, and costs.[16][17] This

information helped shape the proposal and final rule. To further evaluate the industries and emissions unit types identified by the screening assessment and to establish the applicability criteria and proposed emissions limits, the EPA reviewed Reasonably Available Control Technology (RACT) rules, New Source Performance Standards (NSPS) rules, National Emissions Standards for Hazardous Air Pollutants (NESHAP) rules, existing technical studies, rules in approved SIPs, consent decrees, and permit limits. That evaluation is detailed in the "Technical Support Document (TSD) for the Proposed Rule, Docket ID No. EPA–HQ–OAR–2021–0668, Non-EGU Sectors TSD" (Dec. 2021), hereinafter referred to as the Proposed Non-EGU Sectors TSD, prepared for the proposed FIP.[18]

In this final rule, the EPA is retaining the industries and many of the emissions unit types included in the proposal in its findings of significant contribution at Step 3, as discussed in section V of this document. As discussed in the memorandum for the final rule, titled "Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Units, Emissions Reductions, and Costs," the EPA uses the 2019 emissions inventory, the list of emissions units estimated to be captured by the applicability criteria, the assumed control technologies that would meet the emissions limits, and information on control efficiencies and default cost/ton values from the Control Measures Database,[19] to estimate $NO_X$ emissions reductions and costs for the year 2026. In this final rule, the EPA made changes to the applicability criteria and emissions limits following consideration of comments on the proposal and reassessed the overall non-EGU emissions reduction strategy based on the factors at Step 3 to render a judgment as to whether the level of emissions control that would be achievable from these units meets the criteria for "significant contribution." In the final rule, we affirm our proposed determinations of which industries and emissions units are potentially

impactful and warrant further analysis at Step 3, and we find that the available emissions reductions are cost-effective and make meaningful improvements at the identified downwind receptors. For a detailed discussion of the changes, between the proposal and this final rule, in emissions unit types included and in emissions limits, see section VI.C. of this document.

The EPA performed air quality analysis using the Ozone Air Quality Assessment Tool (AQAT) to evaluate the air quality improvements anticipated to result from the implementation of the selected EGU and non-EGU emissions reduction strategies. See section V.D of this document.[20] We also used AQAT to determine whether the emissions reductions for both EGUs and non-EGUs potentially cause an "over-control" scenario. As in prior transport rules following the holdings in *EME Homer City,* overcontrol would be established if the record indicated that, for any given state, there is a less stringent emissions control approach for that state, by which (1) the expected ozone improvements would be sufficient to resolve all of the downwind receptor(s) to which that state is linked; or (2) the expected ozone improvements would reduce the upwind state's ozone contributions below the screening threshold (*i.e.,* 1 percent of the NAAQS or 0.70 ppb) to all of linked receptors. The EPA's over-control analysis, discussed in section V.D.4 of this document, shows that the control stringencies for EGU and non-EGU sources in this final rule do not over-control upwind states' emissions either with respect to the downwind air quality problems to which they are linked or with respect to the 1 percent of the NAAQS contribution threshold, such that over-control would trigger re-evaluation at Step 3 for any linked upwind state.

Based on the multi-factor test applied to both EGU and non-EGU sources and

---

[16] The memorandum is available in the docket at *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0150.*

[17] This screening assessment was not intended to identify the specific emissions units subject to the proposed emissions limits for non-EGU sources but was intended to inform the development of the proposed rule by identifying proxies for (1) non-EGU emissions units that had emissions reduction potential, (2) potential controls for and emissions reductions from these emissions units, and (3) control costs from the potential controls on these

emissions units. This information helped shape the proposed rule.

[18] The TSD is available in the docket at *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0145.*

[19] More information about the control measures database (CMDB) can be found at the following link: *https://www.epa.gov/economic-and-cost-analysis-air-pollution-regulations/cost-analysis-modelstools-air-pollution.*

[20] The use of AQAT and other simplified modeling tools to generate "appropriately reliable projections of air quality conditions and contributions" when there is limited time to conduct full-scale photochemical grid modeling was upheld by the D.C. Circuit in *MOG v. EPA,* No. 21–1146 (D.C. Cir. March 3, 2023). The EPA has used AQAT for the purpose of air quality and overcontrol assessments at Step 3 in the prior CSAPR rulemakings, and we continue to find it reliable for such purposes. We discuss the calibration of AQAT for this action and the multiple sensitivity checks we performed to ensure its reliability in the Ozone Transport Policy Analysis Final Rule TSD in the docket. Because we were able to conduct a photochemical grid modeling run of the 2026 final rule policy scenario, these results are also included in the docket and confirm the regulatory conclusions reached with AQAT. *See* section VIII of this document and Appendix 3A of the Final Rule RIA for more information.

our subsequent assessment of over-control, the EPA finds that the selected EGU and non-EGU control stringencies constitute the elimination of significant contribution and interference with maintenance, without over-controlling emissions, from the 23 upwind states subject to EGU and non-EGU emissions reductions requirements under the rule. For additional details about the multi-factor test and the over-control analysis, *see* the document titled "Technical Support Document (TSD) for the Final Federal Good Neighbor Plan for the 2015 Ozone National Ambient Air Quality Standard, Docket ID No. EPA–HQ–OAR–2021–0668, Ozone Transport Policy Analysis Proposed Rule TSD" (Mar. 2023), hereinafter referred to as Ozone Transport Policy Analysis Final Rule TSD, included in the docket for this rulemaking.

In this fourth step of the 4-step framework, the EPA is including enforceable measures in the promulgated FIPs to achieve the required emissions reductions in each of the 23 states. Specifically, the FIPs require covered power plants within the borders of 22 states (Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wisconsin) to participate in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program created by the Revised CSAPR Update. Affected EGUs within the borders of the following 12 states currently participating in the Group 3 Trading Program will remain in the program, with revised provisions beginning in the 2023 ozone season, under this rule: Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia. Affected EGUs within the borders of the following seven states currently covered by the CSAPR NO$_X$ Ozone Season Group 2 Trading Program (the "Group 2 trading program")—Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Texas, and Wisconsin—will transition from the Group 2 program to the revised Group 3 trading program beginning with the 2023 control period,[21] and affected

EGUs within the borders of three states not currently covered by any CSAPR trading program for seasonal NO$_X$ emissions—Minnesota, Nevada, and Utah—will enter the Group 3 trading program in the 2023 control period following the effective date of the final rule. In addition, the EPA is revising other aspects of the Group 3 trading program to better ensure that this method of implementation at Step 4 provides a durable remedy for the elimination of the amount of emissions deemed to constitute significant contribution at Step 3 of the interstate transport framework. These enhancements, summarized later in this section, are designed to operate together to maintain that degree of control stringency over time, thus improving emissions performance at individual units and offering a necessary measure of assurance that NO$_X$ pollution controls will be operated throughout each ozone season, as described in section VI.B of this document. This rulemaking does not revise the budget stringency and geography of the existing CSAPR NO$_X$ Ozone Season Group 1 trading program. Aside from the seven states moving from the Group 2 trading program to the Group 3 trading program under the final rule, this rule otherwise leaves unchanged the budget stringency of the existing CSAPR NO$_X$ Ozone Season Group 2 trading program.

The EPA is establishing preset ozone season NO$_X$ emissions budgets for each ozone season from 2023 through 2029, using generally the same Group 3 trading program budget-setting methodology used in the Revised CSAPR Update, as explained in section VI.B of this document and as shown in Table I.B–1. The preset budgets for the 2026 through 2029 ozone seasons incorporate EGU emissions reductions to eliminate significant contribution and also take into account a substantial number of known retirements over that period to ensure the elimination of significant contribution is maintained as intended by this rule. These budgets serve as floors and may be supplanted by a budget that the EPA calculates for that control period using more recent information (a "dynamic budget") if that dynamic budget yields a higher level of allowable emissions—still consistent with the Step 3 level of emissions control stringency—than the preset budget. As reflected in Table I.B–1, and accounting for both the stringency of the rule and known fleet change, the 2026 preset budget is 23 percent lower than the 2025 preset budget; the 2027 preset budget is 20 percent lower than the 2026 preset budget; the 2028 preset

budget is 4 percent lower than the 2027 preset budget; and the 2029 preset budget is 8 percent lower than the 2028 preset budget.

While it is possible that additional EGUs may seek to retire in this 2026–2029 period than are currently scheduled and captured in the preset emissions budgets, it is also possible that EGUs with currently scheduled retirements may adjust their retirement timing to accommodate the timing of replacement generation and/or transmission upgrades necessitated by their retirement. While the EPA designed this final rule to provide preset budgets through 2029 to incorporate known retirement-related emissions reductions to ensure the elimination of significant contribution as identified at Step 3 is maintained over time, the use of these floors also provides generators and grid operators enhanced certainty regarding the minimum amount of allowable NO$_X$ emissions for reliability planning through the 2020s. By providing the opportunity for dynamic budgets to subsequently calibrate budgets to any unforeseen increases in fleet demand, it also ensures this rule will not interfere with ongoing retirement scheduling or adjustments and thus is robust to future uncertainty during a transition period.

The EPA also believes the likelihood and magnitude of a scenario in which a state's preset emissions budgets during this period would authorize more emissions than the corresponding dynamic budget is low. As described elsewhere, dynamic budgets are incorporated to best calibrate the rule's stringency to future unknown changes to the fleet. The circumstances in which a dynamic budget would produce a level of allowable emissions less than preset budgets is most pronounced for future periods in which there is a high degree of unknown retirements (increasing the risk that budgets are not appropriately calibrated to the reduced fossil fuel heat input post retirement). However, the 2026–2029 period presents a case where retirement planning has been announced with greater lead time than normal due to a combination of utility 2030 decarbonization commitments, and Effluent Limitation Guideline (ELG) and Coal Combustion Residual (CCR) alternative compliance pathways available to units planning to cease combustion of coal by December 31, 2028. For each of these existing rules, facilities that are planning to retire have already conveyed that intention to EPA in order to take advantage of the alternative compliance pathways

---

[21] The EPA will deem participation in the Group 3 trading program by the EGUs in these seven states as also addressing the respective states' good neighbor obligations with respect to the 2008 ozone NAAQS (for all seven states), the 1997 ozone NAAQS (for all the states except Texas), and the 1979 ozone NAAQS (for Alabama and Missouri) to the same extent that those obligations are currently being addressed by participation of the states' EGUs in the Group 2 trading program.

available to such facilities.[22] Therefore, the likelihood of unknown retirements—leading to lower dynamic budgets—is much lower than typical for this time horizon. This makes EPA's balanced use of preset emissions budgets or dynamic budgets if they exceed preset levels a reasonable

mechanism to accommodate planning and fleet transition dynamics during this period. The need and reasoning for the limited-period preset budget floor is further discussed in section VI.B.4.

For control periods in 2030 and thereafter, the emissions budgets will be the amounts calculated for each state and noticed to the public roughly one

year before the control period, using the dynamic budget-setting methodology. In this manner, the stringency of the program will be secured and sustained in the dynamic budgets of this program, regardless of whatever EGU transition activities ultimately occur in this 2026–2029 transition period.

TABLE I.B–1—PRESET CSAPR NO$_X$ OZONE SEASON GROUP 3 STATE EMISSIONS BUDGETS (TONS) FOR 2023 THROUGH 2029 CONTROL PERIODS *

| State | 2023 State budget | 2024 State budget | 2025 State budget | 2026 State budget ** | 2027 State budget ** | 2028 State budget ** | 2029 State budget ** |
|---|---|---|---|---|---|---|---|
| Alabama | 6,379 | 6,489 | 6,489 | 6,339 | 6,236 | 6,236 | 5,105 |
| Arkansas | 8,927 | 8,927 | 8,927 | 6,365 | 4,031 | 4,031 | 3,582 |
| Illinois | 7,474 | 7,325 | 7,325 | 5,889 | 5,363 | 4,555 | 4,050 |
| Indiana | 12,440 | 11,413 | 11,413 | 8,410 | 8,135 | 7,280 | 5,808 |
| Kentucky | 13,601 | 12,999 | 12,472 | 10,190 | 7,908 | 7,837 | 7,392 |
| Louisiana | 9,363 | 9,363 | 9,107 | 6,370 | 3,792 | 3,792 | 3,639 |
| Maryland | 1,206 | 1,206 | 1,206 | 842 | 842 | 842 | 842 |
| Michigan | 10,727 | 10,275 | 10,275 | 6,743 | 5,691 | 5,691 | 4,656 |
| Minnesota | 5,504 | 4,058 | 4,058 | 4,058 | 2,905 | 2,905 | 2,578 |
| Mississippi | 6,210 | 5,058 | 5,037 | 3,484 | 2,084 | 1,752 | 1,752 |
| Missouri | 12,598 | 11,116 | 11,116 | 9,248 | 7,329 | 7,329 | 7,329 |
| Nevada | 2,368 | 2,589 | 2,545 | 1,142 | 1,113 | 1,113 | 880 |
| New Jersey | 773 | 773 | 773 | 773 | 773 | 773 | 773 |
| New York | 3,912 | 3,912 | 3,912 | 3,650 | 3,388 | 3,388 | 3,388 |
| Ohio | 9,110 | 7,929 | 7,929 | 7,929 | 7,929 | 6,911 | 6,409 |
| Oklahoma | 10,271 | 9,384 | 9,376 | 6,631 | 3,917 | 3,917 | 3,917 |
| Pennsylvania | 8,138 | 8,138 | 8,138 | 7,512 | 7,158 | 7,158 | 4,828 |
| Texas | 40,134 | 40,134 | 38,542 | 31,123 | 23,009 | 21,623 | 20,635 |
| Utah | 15,755 | 15,917 | 15,917 | 6,258 | 2,593 | 2,593 | 2,593 |
| Virginia | 3,143 | 2,756 | 2,756 | 2,565 | 2,373 | 2,373 | 1,951 |
| West Virginia | 13,791 | 11,958 | 11,958 | 10,818 | 9,678 | 9,678 | 9,678 |
| Wisconsin | 6,295 | 6,295 | 5,988 | 4,990 | 3,416 | 3,416 | 3,416 |
| Total | 208,119 | 198,014 | 195,259 | 151,329 | 119,663 | 115,193 | 105,201 |

* Further information on the state-level emissions budget calculations pertaining to Table I.B–1 is provided in section VI.B.4 of this document as well as the Ozone Transport Policy Analysis Final Rule TSD. Further information on the approach for allocating a portion of Utah's emissions budget for each control period to the existing EGU in the Uintah and Ouray Reservation within Utah's borders is provided in section VI.B.9 of this document.

** As described in section VI of this document, the budget for these years will be subsequently determined and equal the greater of the value above or that derived from the dynamic budget methodology.

The budget-setting methodology that the EPA will use to determine dynamic budgets for each control period starting with 2026 is an extension of the methodology used to determine the preset budgets and will be used routinely to determine emissions budgets for each future control period in the year before that control period, with each emissions budget reflecting the latest available information on the composition and utilization of the EGU fleet at the time that emissions budget is determined. The stringency of the dynamic emissions budgets will simply reflect the stringency of the emissions control strategies selected in the rulemaking more consistently over time and ensure that annual updates would eliminate emissions determined to be unlawful under the good neighbor

provision. As already noted, for the control periods in which both preset budgets and dynamic budgets are determined for a state (*i.e.,* 2026 through 2029), the state's dynamic budget will apply only if it is higher than the state's preset budget. *See* section VI.B of this document for additional discussion of the EPA's method for adjusting emissions budgets to ensure elimination of significant contribution from EGU sources in the linked upwind states.

In conjunction with the levels of the emissions budgets, the carryover of unused allowances for use in future control periods as banked allowances affects the ability of a trading program to maintain the rule's selected control stringency and related EGU effective emissions rate performance level as the EGU fleet evolves over time.

Unrestricted banking of allowances allows what might otherwise be temporary surpluses of allowances in some individual control periods to accumulate into a long-term allowance surplus that reduces allowance prices and weakens the trading program's incentives to control emissions. To prevent this outcome, the EPA is also revising the Group 3 trading program by adding provisions that establish a routine recalibration process for banked allowances using a target percentage of 21 percent for the 2024–2029 control periods and 10.5 percent for control periods in 2030 and later years.

As an enhancement to the structure of the trading program originally promulgated in the Revised CSAPR Update, the EPA is also establishing backstop daily emissions rates for coal

---

[22] Notices of Planned Participation for the ELG Reconsideration Rule were due October 31, 2021

(85 FR 64708, 64679). For the CCR Action, facilities

had to indicate their future plans to cease receipt of waste by April 11, 2021 (85 FR 53517).

steam EGUs greater than or equal to 100 MW in covered states. Starting with the 2024 control period, a 3-for-1 allowance surrender ratio (instead of the usual 1-for-1 surrender ratio) will apply to emissions during the ozone season from any large coal-fired EGU with existing SCR controls exceeding by more than 50 tons a daily average $NO_X$ emissions rate of 0.14 lb/mmBtu. The daily average emissions rate provisions will apply to large coal-fired EGUs without existing SCR controls starting with the second control period in which newly installed SCR controls are operational at the unit, but not later than the 2030 control period.

The backstop daily emissions rates work in tandem with the ozone season emissions budgets to ensure the elimination of significant contribution as determined at Step 3 is maintained over time and more consistently throughout each ozone season. They will offer downwind receptor areas a necessary measure of assurance that they will be protected on a daily basis during the ozone season by more continuous and consistent operation of installed pollution controls. The EPA's experience with the CSAPR trading programs has revealed instances where EGUs have reduced their SCRs' performance on a given day, or across the entire ozone seasons in some cases, including high ozone days.[23] In addition to maintaining a mass-based seasonal requirement, this rule will achieve a much more consistent level of emissions control in line with our Step 3 determination of significant contribution while maintaining

compliance flexibility consistent with that determination. These trading program improvements will promote consistent emissions control performance across the power sector in the linked upwind states, which protects communities living in downwind ozone nonattainment areas from exceedances of the NAAQS that might otherwise occur.

The EPA is including enforceable emissions control requirements that will apply during the ozone season (annually from May to September) for nine non-EGU industries in the promulgated FIPs to achieve the required emissions reductions in 20 states with remaining interstate transport obligations for the 2015 ozone NAAQS in 2026: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia. These requirements would apply to all existing emissions units and to any future emissions units constructed in the covered states that meet the relevant applicability criteria. Thus, the emissions limitations for non-EGU sources and associated compliance requirements would apply in all 20 states listed in this paragraph, even if some of these states do not currently have any existing emissions units meeting the applicability criteria for the identified industries.

Based on our evaluation of the time required to install controls at the types of non-EGU sources covered by this rule, the EPA has identified the 2026 ozone season as a reasonable

compliance date for industrial sources. The EPA is therefore finalizing control requirements for non-EGU sources that take effect in 2026. However, in recognition of comments and additional information indicating that not all facilities may be capable of meeting the control requirements by that time, the final rule provides a process by which the EPA may grant compliance extensions of up to 1 year, which if approved by the EPA, would require compliance no later than the 2027 ozone season, followed by an additional possible extension of up to 2 more years, where specific criteria are met. For sources located in the 20 states listed in the previous paragraph, the EPA is finalizing the $NO_X$ emissions limits listed in Table I.B–2 for reciprocating internal combustion engines in Pipeline Transportation of Natural Gas; the $NO_X$ emissions limits listed in Table I.B–3 for kilns in Cement and Cement Product Manufacturing; the $NO_X$ emissions limits listed in Table I.B–4 for reheat furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; the $NO_X$ emissions limits listed in Table I.B–5 for furnaces in Glass and Glass Product Manufacturing; the $NO_X$ emissions limits listed in Table I.B–6 for boilers in Iron and Steel Mills and Ferroalloy Manufacturing, Metal Ore Mining, Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills; and the $NO_X$ emissions limits listed in Table I.B–7 for combustors and incinerators in Solid Waste Combustors or Incinerators.

TABLE I.B–2—SUMMARY OF $NO_X$ EMISSIONS LIMITS FOR PIPELINE TRANSPORTATION OF NATURAL GAS

| Engine type and fuel | $NO_X$ emissions limit (g/hp-hr) |
|---|---|
| Natural Gas Fired Four Stroke Rich Burn | 1.0 |
| Natural Gas Fired Four Stroke Lean Burn | 1.5 |
| Natural Gas Fired Two Stroke Lean Burn | 3.0 |

TABLE I.B–3—SUMMARY OF $NO_X$ EMISSIONS LIMITS FOR KILN TYPES IN CEMENT AND CONCRETE PRODUCT MANUFACTURING

| Kiln type | $NO_X$ emissions limit (lb/ton of clinker) |
|---|---|
| Long Wet | 4.0 |
| Long Dry | 3.0 |
| Preheater | 3.8 |
| Precalciner | 2.3 |
| Preheater/Precalciner | 2.8 |

[23] *See* 86 FR 23090. The EPA highlighted the Miami Fort Unit 7 (possessing a SCR) more than tripled its ozone-season $NO_X$ emission rate between 2017 and 2019.

Based on evaluation of comments received, the EPA is not, at this time, finalizing the source cap limit as proposed at 87 FR 20046 (*see* section VII.C.2 of the April 6, 2022, Proposal).

TABLE I.B–4—SUMMARY OF NO$_X$ CONTROL REQUIREMENTS FOR IRON AND STEEL AND FERROALLOY EMISSIONS UNITS

| Emissions unit | NO$_X$ emissions standard or requirement (lb/mmBtu) |
|---|---|
| Reheat furnace ................................................................................ | Test and set limit based on installation of Low-NO$_X$ Burners. |

TABLE I.B–5—SUMMARY OF NO$_X$ EMISSIONS LIMITS FOR FURNACE UNIT TYPES IN GLASS AND GLASS PRODUCT MANUFACTURING

| Furnace type | NO$_X$ emissions limit (lb/ton of glass produced) |
|---|---|
| Container Glass Manufacturing Furnace ................................................................................ | 4.0 |
| Pressed/Blown Glass Manufacturing Furnace or Fiberglass Manufacturing Furnace ................ | 4.0 |
| Flat Glass Manufacturing Furnace ................................................................................ | 7.0 |

TABLE I.B–6—SUMMARY OF NO$_X$ EMISSIONS LIMITS FOR BOILERS IN IRON AND STEEL AND FERROALLOY MANUFACTURING, METAL ORE MINING, BASIC CHEMICAL MANUFACTURING, PETROLEUM AND COAL PRODUCTS MANUFACTURING, AND PULP, PAPER, AND PAPERBOARD MILLS

| Unit type | Emissions limit (lbs NO$_X$/mmBtu) |
|---|---|
| Coal ................................................................................ | 0.20 |
| Residual oil ................................................................................ | 0.20 |
| Distillate oil ................................................................................ | 0.12 |
| Natural gas ................................................................................ | 0.08 |

TABLE I.B–7—SUMMARY OF NO$_X$ EMISSIONS LIMITS FOR COMBUSTORS AND INCINERATORS IN SOLID WASTE COMBUSTORS OR INCINERATORS

| Combustor or incinerator, averaging period | NO$_X$ emissions limit (ppmvd) |
|---|---|
| ppmvd on a 24-hour block averaging period ................................................................................ | 110 |
| ppmvd on a 30-day rolling averaging period ................................................................................ | 105 |

Section VI.C of this document provides an overview of the applicability criteria, compliance assurance requirements, and the EPA's rationale for establishing these emissions limits and control requirements for each of the non-EGU industries covered by the rule.

The remainder of this preamble is organized as follows: section II of this document outlines general applicability criteria and describes the EPA's legal authority for this rule and the relationship of the rule to previous interstate ozone transport rulemakings. Section III of this document describes the human health and environmental challenges posed by interstate transport contributions to ozone air quality problems, as well as the EPA's overall approach for addressing interstate transport for the 2015 ozone NAAQS in this rule. Section IV of this document describes the Agency's analyses of air quality data to inform this rulemaking, including descriptions of the air quality modeling platform and emissions inventories used in the rule, as well as the EPA's methods for identifying downwind air quality problems and upwind states' ozone transport contributions to downwind states. Section V of this document describes the EPA's approach to quantifying upwind states' obligations in the form of EGU NO$_X$ control stringencies and non-EGU emissions limits. Section VI of this document describes key elements of the implementation schedule for EGU and non-EGU emissions reductions requirements, including details regarding the revised aspects of the CSAPR NO$_X$ Group 3 trading program and compliance deadlines, as well as regulatory requirements and compliance deadlines for non-EGU sources. Section VII of this document discusses the environmental justice analysis of the rule, as well as outreach and engagement efforts. Section VIII of this document describes the expected costs, benefits, and other impacts of this rule.

Section IX of this document provides a summary of changes to the existing regulatory text applicable to the EGUs covered by this rule; and section X of this document discusses the statutory and executive orders affecting this rulemaking.

*C. Costs and Benefits*

A summary of the key results of the cost-benefit analysis that was prepared for this final rule is presented in Table I.C–1. Table I.C–1 presents estimates of the present values (PV) and equivalent annualized values (EAV), calculated using discount rates of 3 and 7 percent as recommended by OMB's Circular A–4, of the health and climate benefits, compliance costs, and net benefits of the final rule, in 2016 dollars, discounted to 2023. The estimated monetized net benefits are the estimated monetized benefits minus the estimated monetized costs of the final rule. These results present an incomplete overview of the effects of the rule because important

categories of benefits—including benefits from reducing other types of air pollutants, and water pollution—were

not monetized and are therefore not reflected in the cost-benefit tables. We anticipate that taking non-monetized

effects into account would show the rule to be more net beneficial than this table reflects.

TABLE I.C–1—ESTIMATED MONETIZED HEALTH AND CLIMATE BENEFITS, COMPLIANCE COSTS, AND NET BENEFITS OF THE FINAL RULE, 2023 THROUGH 2042

[Millions 2016$, discounted to 2023] [a]

|  | 3% Discount rate | 7% Discount rate |
|---|---|---|
| Present Value: |  |  |
| Health Benefits [b] | $200,000 | $130,000 |
| Climate Benefits [c] | 15,000 | 15,000 |
| Compliance Costs [d] | 14,000 | 9,400 |
| Net Benefits | 200,000 | 140,000 |
| Equivalent Annualized Value: |  |  |
| Health Benefits | 13,000 | 12,000 |
| Climate Benefits | 970 | 970 |
| Compliance Costs | 910 | 770 |
| Net Benefits | 13,000 | 12,000 |

[a] Rows may not appear to add correctly due to rounding.
[b] The annualized present value of costs and benefits are calculated over a 20-year period from 2023 to 2042. Monetized benefits include those related to public health associated with reductions in ozone and PM$_{2.5}$ concentrations. The health benefits are associated with two point estimates and are presented at real discount rates of 3 and 7 percent. Several categories of benefits remain unmonetized and are thus not reflected in the table.
[c] Climate benefits are calculated using four different estimates of the social cost of carbon (SC–CO$_2$ (model average at 2.5 percent, 3 percent, and 5 percent discount rates; 95th percentile at 3 percent discount rate). For presentational purposes in this table, the climate benefits associated with the average SC–CO$_2$ at a 3-percent discount rate are used in the columns displaying results of other costs and benefits that are discounted at either a 3-percent or 7-percent discount rate.
[d] The costs presented in this table are consistent with the costs presented in Chapter 4 of the *Regulatory Impact Analysis (RIA)*. To estimate these annualized costs for EGUs, the EPA uses a conventional and widely accepted approach that applies a capital recovery factor (CRF) multiplier to capital investments and adds that to the annual incremental operating expenses. Costs were calculated using a 3.76 percent real discount rate consistent with the rate used in IPM's objective function for cost-minimization. For further information on the discount rate use, please see Chapter 4, Table 4–8 in the RIA.

As shown in Table I.C–1, the PV of the monetized health benefits, associated with reductions in ozone and PM$_{2.5}$ concentrations, of this final rule, discounted at a 3-percent discount rate, is estimated to be about $200 billion ($200,000 million), with an EAV of about $13 billion ($13,000 million). At a 7-percent discount rate, the PV of the monetized health benefits is estimated to be $130 billion ($130,000 million), with an EAV of about $12 billion

($12,000 million). The PV of the monetized climate benefits, associated with reductions in GHG emissions, of this final rule, discounted at a 3-percent discount rate, is estimated to be about $15 billion ($15,000 million), with an EAV of about $970 million. The PV of the monetized compliance costs, discounted at a 3-percent rate, is estimated to be about $14 billion ($14,000 million), with an EAV of about $910 million. At a 7-percent discount

rate, the PV of the compliance costs is estimated to be about $9.4 billion ($9,400 million), with an EAV of about $770 million.

## II. General Information

### A. Does this action apply to me?

This rule affects EGU and non-EGU sources, and regulates the groups identified in Table II.A–1.

TABLE II.A–1—REGULATED GROUPS

| Industry group | NAICS |
|---|---|
| Fossil fuel-fired electric power generation | 221112 |
| Pipeline Transportation of Natural Gas | 4862 |
| Metal Ore Mining | 2122 |
| Cement and Concrete Product Manufacturing | 3273 |
| Iron and Steel Mills and Ferroalloy Manufacturing | 3311 |
| Glass and Glass Product Manufacturing | 3272 |
| Basic Chemical Manufacturing | 3251 |
| Petroleum and Coal Products Manufacturing | 3241 |
| Pulp, Paper, and Paperboard Mills | 3221 |
| Solid Waste Combustors and Incinerators | 562213 |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be regulated by this rule. This table lists the types of entities that the EPA is now aware could potentially be regulated by this rule. Other types of entities not

listed in the table could also be regulated. To determine whether your EGU entity is regulated by this rule, you should carefully examine the applicability criteria found in 40 CFR 97.1004, which are unchanged in this rule. If you have questions regarding the

applicability of this rule to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

## B. What action is the Agency taking?

The EPA evaluated whether interstate ozone transport emissions from upwind states are significantly contributing to nonattainment, or interfering with maintenance, of the 2015 ozone NAAQS in any downwind state using the same 4-step interstate transport framework that was developed in previous ozone transport rulemakings. The EPA finds that emissions reductions are required from EGU and non-EGU sources in a total of 23 upwind states to eliminate significant contribution to downwind air quality problems for the 2015 ozone standard under the interstate transport provision of the CAA. The EPA will ensure that these $NO_X$ emissions reductions are achieved by issuing FIP requirements for 23 states: Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wisconsin.

The EPA is revising the existing CSAPR Group 3 Trading Program to include additional states beginning in the 2023 ozone season. EGUs in three states not currently covered by any CSAPR trading program for seasonal $NO_X$ emissions—Minnesota, Nevada, and Utah—will be added to the CSAPR Group 3 Trading Program under this rule. EGUs in twelve states currently participating in the Group 3 Trading Program will remain in the program under this rule: Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia. EGUs in seven states (Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Texas, and Wisconsin) will transition from the CSAPR Group 2 Trading Program to the CSAPR Group 3 Trading Program under this rule beginning in the 2023 ozone season. The EPA is establishing control stringency levels reflecting installation of state-of-the-art combustion controls on certain covered EGU sources in emissions budgets beginning in the 2024 ozone season. The EPA is establishing control stringency levels reflecting installation of new SCR or SNCR controls on certain covered EGU sources in emissions budgets beginning in the 2026 ozone season.

As a complement to the ozone season emissions budgets, the EPA is also establishing a backstop daily emissions rate of 0.14 lb/mmBtu for coal-fired steam units greater than or equal to 100 MW in covered states. The backstop emissions rate will first apply in 2024

for coal-fired steam sources with existing SCRs, and in the second control period in which a new SCR operates, but not later than 2030, for those currently without SCRs.

This rule establishes emissions limitations for non-EGU sources in 20 states: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia. In these states, the EPA is establishing control requirements for the following unit types in non-EGU industries: reciprocating internal combustion engines in Pipeline Transportation of Natural Gas; kilns in Cement and Cement Product Manufacturing; reheat furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; furnaces in Glass and Glass Product Manufacturing; boilers in Iron and Steel Mills and Ferroalloy Manufacturing, Metal Ore Mining, Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills; and combustors and incinerators in Solid Waste Combustors and Incinerators. *See* Table II.A–1 in this document for a list of NAICS codes for each entity included for regulation in this rule.

This rule reduces the transport of ozone precursor emissions to downwind areas, which is protective of human health and the environment because acute and chronic exposure to ozone are both associated with negative health impacts. Ozone exposure is also associated with negative effects on ecosystems. Additional information on the air quality issues addressed by this rule are included in section III of this document.

## C. What is the Agency's legal authority for taking this action?

The statutory authority for this rule is provided by the CAA as amended (42 U.S.C. 7401 *et seq.*). Specifically, sections 110 and 301 of the CAA provide the primary statutory underpinnings for this rule. The most relevant portions of CAA section 110 are subsections 110(a)(1), 110(a)(2) (including 110(a)(2)(D)(i)(I)) and 110(c)(1)).

CAA section 110(a)(1) provides that states must make SIP submissions "within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof)," and that these SIP submissions are to provide for the "implementation, maintenance, and

enforcement" of such NAAQS.[24] The statute directly imposes on states the duty to make these SIP submissions, and the requirement to make the submissions is not conditioned upon the EPA taking any action other than promulgating a new or revised NAAQS.[25]

The EPA has historically referred to SIP submissions made for the purpose of satisfying the applicable requirements of CAA sections 110(a)(1) and 110(a)(2) as "infrastructure SIP" or "iSIP" submissions. CAA section 110(a)(1) addresses the timing and general requirements for iSIP submissions, and CAA section 110(a)(2) provides more details concerning the required content of these submissions.[26] It includes a list of specific elements that "[e]ach such plan" must address.[27]

CAA section 110(c)(1) requires the Administrator to promulgate a FIP at any time within 2 years after the Administrator: (1) finds that a state has failed to make a required SIP submission; (2) finds a SIP submission to be incomplete pursuant to CAA section 110(k)(1)(C); or (3) disapproves a SIP submission. This obligation applies unless the state corrects the deficiency through a SIP revision that the Administrator approves before the FIP is promulgated.[28]

CAA section 110(a)(2)(D)(i)(I), also known as the "good neighbor" provision, provides the primary basis for this rule.[29] It requires that each state SIP include provisions sufficient to "prohibit[ ], consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]."[30] The EPA often refers to the emissions reduction requirements under this provision as "good neighbor obligations" and submissions addressing these requirements as "good neighbor SIPs."

---

[24] 42 U.S.C. 7410(a)(1).

[25] *See EPA* v. *EME Homer City Generation, L.P.,* 572 U.S. 489, 509–10 (2014).

[26] 42 U.S.C. 7410(a)(2).

[27] The EPA's general approach to infrastructure SIP submissions is explained in greater detail in individual notices acting or proposing to act on state infrastructure SIP submissions and in guidance. *See, e.g.,* Memorandum from Stephen D. Page on Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2) (September 13, 2013).

[28] 42 U.S.C. 7410(c)(1).

[29] 42 U.S.C. 7410(a)(2)(D)(i)(I).

[30] *Id.*

Once the EPA promulgates a NAAQS, the EPA must designate areas as being in "attainment" or "nonattainment" of the NAAQS, or "unclassifiable." CAA section 107(d).[31] For ozone, nonattainment is further split into five classifications based on the severity of the violation—Marginal, Moderate, Serious, Severe, or Extreme. Higher classifications provide states with progressively more time to attain while imposing progressively more stringent control requirements. *See* CAA sections 181, 182.[32] In general, states with nonattainment areas classified as Moderate or higher must submit plans to the EPA to bring these areas into attainment according to the statutory schedule. CAA section 182.[33] If an area fails to attain the NAAQS by the attainment date associated with its classification, it is "bumped up" to the next classification. CAA section 181(b).[34]

Section 301(a)(1) of the CAA gives the Administrator the general authority to prescribe such regulations as are necessary to carry out functions under the Act.[35] Pursuant to this section, the EPA has authority to clarify the applicability of CAA requirements and undertake other rulemaking action as necessary to implement CAA requirements. CAA section 301 affords the Agency any additional authority that may be needed to make certain other changes to its regulations under 40 CFR parts 52, 75, 78, and 97, to effectuate the purposes of the Act. Such changes are discussed in section IX of this document.

Tribes are not required to submit state implementation plans. However, as explained in the EPA's regulations outlining Tribal Clean Air Act authority, the EPA is authorized to promulgate FIPs for Indian country as necessary or appropriate to protect air quality if a tribe does not submit, and obtain the EPA's approval of, an implementation plan. *See* 40 CFR 49.11(a); *see also* CAA section 301(d)(4).[36] In the proposed rule, the EPA proposed an "appropriate or necessary" finding under CAA section 301(d) and proposed tribal FIP(s) as necessary to implement the relevant requirements. The EPA is finalizing these determinations, as further discussed in section III.C.2 of this document.

[31] 42 U.S.C. 7407(d).
[32] 42 U.S.C. 7511, 7511a.
[33] 42 U.S.C. 7511a.
[34] 42 U.S.C. 7511(b).
[35] 42 U.S.C. 7601(a)(1).
[36] 42 U.S.C. 7601(d)(4).

*D. What actions has the EPA previously issued to address regional ozone transport?*

The EPA has issued several previous rules interpreting and clarifying the requirements of CAA section 110(a)(2)(D)(i)(I) with respect to the regional transport of ozone. These rules, and the associated court decisions addressing these rules, summarized here, provide important direction regarding the requirements of CAA section 110(a)(2)(D)(i)(I).

The "NOx SIP Call," promulgated in 1998, addressed the good neighbor provision for the 1979 1-hour ozone NAAQS.[37] The rule required 22 states and the District of Columbia to amend their SIPs to reduce NOx emissions that contribute to ozone nonattainment in downwind states. The EPA set ozone season NOx budgets for each state, and the states were given the option to participate in a regional allowance trading program, known as the NOx Budget Trading Program.[38] The D.C. Circuit largely upheld the NOx SIP Call in *Michigan* v. *EPA,* 213 F.3d 663 (D.C. Cir. 2000), *cert. denied,* 532 U.S. 904 (2001).

The EPA's next rule addressing the good neighbor provision, CAIR, was promulgated in 2005 and addressed both the 1997 fine particulate matter (PM2.5) NAAQS and 1997 ozone NAAQS.[39] CAIR required SIP revisions in 28 states and the District of Columbia to reduce emissions of sulfur dioxide (SO2) or NOx—important precursors of regionally transported PM2.5 (SO2 and annual NOx) and ozone (summer-time NOx). As in the NOx SIP Call, states were given the option to participate in regional trading programs to achieve the reductions. When the EPA promulgated the final CAIR in 2005, the EPA also issued findings that states nationwide had failed to submit SIPs to address the requirements of CAA section 110(a)(2)(D)(i) with respect to the 1997

[37] *Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone,* 63 FR 57356 (Oct. 27, 1998). As originally promulgated, the NOx SIP Call also addressed good neighbor obligations under the 1997 8-hour ozone NAAQS, but EPA subsequently stayed and later rescinded the rule's provisions with respect to that standard. *See* 84 FR 8422 (March 8, 2019).

[38] "Allowance Trading," sometimes referred to as "cap and trade," is an approach to reducing pollution that has been used successfully to protect human health and the environment. The design elements of the EPA's most recent trading programs are discussed in section VI.B.1.a of this document.

[39] *Rule To Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air Interstate Rule); Revisions to Acid Rain Program; Revisions to the* NOx *SIP Call,* 70 FR 25162 (May 12, 2005).

PM2.5 and 1997 ozone NAAQS.[40] On March 15, 2006, the EPA promulgated FIPs to implement the emissions reductions required by CAIR.[41] CAIR was remanded to EPA by the D.C. Circuit in *North Carolina* v. *EPA,* 531 F.3d 896 (D.C. Cir.), *modified on reh'g,* 550 F.3d 1176 (D.C. Cir. 2008). For more information on the legal issues underlying CAIR and the D.C. Circuit's holding in *North Carolina,* refer to the preamble of the CSAPR rule.[42]

In 2011, the EPA promulgated CSAPR to address the issues raised by the remand of CAIR. CSAPR addressed the two NAAQS at issue in CAIR and additionally addressed the good neighbor provision for the 2006 PM2.5 NAAQS.[43] CSAPR required 28 states to reduce SO2 emissions, annual NOx emissions, or ozone season NOx emissions that significantly contribute to other states' nonattainment or interfere with other states' abilities to maintain these air quality standards.[44] To align implementation with the applicable attainment deadlines, the EPA promulgated FIPs for each of the 28 states covered by CSAPR. The FIPs require EGUs in the covered states to participate in regional trading programs to achieve the necessary emissions reductions. Each state can submit a good neighbor SIP at any time that, if approved by EPA, would replace the CSAPR FIP for that state.

CSAPR was the subject of an adverse decision by the D.C. Circuit in August 2012.[45] However, this decision was reversed in April 2014 by the Supreme Court, which largely upheld the rule, including the EPA's approach to addressing interstate transport in CSAPR. *EPA* v. *EME Homer City Generation, L.P.,* 572 U.S. 489 (2014) (*EME Homer City I*). The rule was remanded to the D.C. Circuit to consider claims not addressed by the Supreme Court. *Id.* In July 2015 the D.C. Circuit

[40] 70 FR 21147 (April 25, 2005).
[41] 71 FR 25328 (April 28, 2006).
[42] *Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals,* 76 FR 48208, 48217 (August 8, 2011).
[43] 76 FR 48208.
[44] CSAPR was revised by several rulemakings after its initial promulgation to revise certain states' budgets and to promulgate FIPs for five additional states addressing the good neighbor obligation for the 1997 ozone NAAQS. *See* 76 FR 80760 (December 27, 2011); 77 FR 10324 (February 21, 2012); 77 FR 34830 (June 12, 2012).
[45] On August 21, 2012, the D.C. Circuit issued a decision in *EME Homer City Generation, L.P.* v. *EPA,* 696 F.3d 7 (D.C. Cir. 2012), vacating CSAPR. The EPA sought review with the D.C. Circuit *en banc* and the D.C. Circuit declined to consider the EPA's appeal *en banc. EME Homer City Generation, L.P.* v. *EPA,* No. 11–1302 (D.C. Cir. January 24, 2013), ECF No. 1417012 (denying EPA's motion for rehearing en banc).

generally affirmed the EPA's interpretation of various statutory provisions and the EPA's technical decisions. *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118 (2015) (*EME Homer City II*). However, the court remanded the rule without vacatur for reconsideration of the EPA's emissions budgets for certain states, which the court found may have over-controlled those states' emissions with respect to the downwind air quality problems to which the states were linked. *Id.* at 129–30, 138. For more information on the legal issues associated with CSAPR and the Supreme Court's and D.C. Circuit's decisions in the *EME Homer City* litigation, refer to the preamble of the CSAPR Update.[46]

In 2016, the EPA promulgated the CSAPR Update to address interstate transport of ozone pollution with respect to the 2008 ozone NAAQS.[47] The final rule updated the CSAPR ozone season $NO_X$ emissions budgets for 22 states to achieve cost-effective and immediately feasible $NO_X$ emissions reductions from EGUs within those states.[48] The EPA aligned the analysis and implementation of the CSAPR Update with the 2017 ozone season to assist downwind states with timely attainment of the 2008 ozone NAAQS.[49] The CSAPR Update implemented the budgets through FIPs requiring sources to participate in a revised CSAPR $NO_X$ ozone season trading program beginning with the 2017 ozone season. As under CSAPR, each state could submit a good neighbor SIP at any time that, if approved by the EPA, would replace the CSAPR Update FIP for that state. The final CSAPR Update also addressed the remand by the D.C. Circuit of certain states' CSAPR phase 2 ozone season $NO_X$ emissions budgets in *EME Homer City II.*

In December 2018, the EPA promulgated the CSAPR "Close-Out," which determined that no further enforceable reductions in emissions of $NO_X$ were required with respect to the 2008 ozone NAAQS for 20 of the 22 eastern states covered by the CSAPR Update.[50]

The CSAPR Update and the CSAPR Close-Out were both subject to legal challenges in the D.C. Circuit. *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019) (*Wisconsin*); *New York* v. *EPA,* 781 Fed. App'x 4 (D.C. Cir. 2019) (*New York*). In September 2019, the D.C. Circuit upheld the CSAPR Update in virtually all respects but remanded the rule because it was partial in nature and did not fully eliminate upwind states' significant contribution to nonattainment or interference with maintenance of the 2008 ozone NAAQS by "the relevant downwind attainment deadlines" in the CAA. *Wisconsin,* 938 F.3d at 313–15. In October 2019, the D.C. Circuit vacated the CSAPR Close-Out on the same grounds that it remanded the CSAPR Update in *Wisconsin,* specifically because the Close-Out rule did not address good neighbor obligations by "the next applicable attainment date" of downwind states. *New York,* 781 Fed. App'x at 7.[51]

In response to the *Wisconsin* remand of the CSAPR Update and the *New York* vacatur of the CSAPR Close-Out, the EPA promulgated the Revised CSAPR Update on April 30, 2021.[52] The Revised CSAPR Update found that the CSAPR Update was a full remedy for nine of the covered states. For the 12 remaining states, the EPA found that their projected 2021 ozone season $NO_X$ emissions would significantly contribute to downwind states' nonattainment or maintenance problems. The EPA issued new or amended FIPs for these 12 states and required implementation of revised emissions budgets for EGUs beginning

with the 2021 ozone season. Based on the EPA's assessment of remaining air quality issues and additional emissions control strategies for EGUs and emissions sources in other industry sectors (non-EGUs), the EPA determined that the $NO_X$ emissions reductions achieved by the Revised CSAPR Update fully eliminated these states' significant contributions to downwind air quality problems for the 2008 ozone NAAQS. As under the CSAPR and the CSAPR Update, each state can submit a good neighbor SIP at any time that, if approved by the EPA, would replace the Revised CSAPR Update FIP for that state.

On March 3, 2023, the D.C. Circuit Court of Appeals denied the Midwest Ozone Group's (MOG) petition for review of the Revised CSAPR Update. *MOG* v. *EPA,* No. 21–1146 (D.C. Cir. March 3, 2023). The court noted that it has "exhaustively" addressed the interstate transport framework before, citing relevant cases, and "incorporate them herein by reference." Slip Op. 1 n.1. In response to MOG's arguments, the court upheld the Agency's air quality analysis. *Id.* at 10–11. The court noted that in light of the statutory timing framework and court-ordered schedule the EPA was under, the Agency's methodological choices were reasonable and provided "an appropriately reliable projection of air quality conditions and contributions in 2021." *Id.* at 11–12.

## III. Air Quality Issues Addressed and Overall Rule Approach

### A. The Interstate Ozone Transport Air Quality Challenge

#### 1. Nature of Ozone and the Ozone NAAQS

Ground-level ozone is not emitted directly into the air but is created by chemical reactions between $NO_X$ and volatile organic compounds (VOCs) in the presence of sunlight. Emissions from electric utilities and industrial facilities, motor vehicles, gasoline vapors, and chemical solvents are some of the major sources of $NO_X$ and VOCs.

Because ground-level ozone formation increases with temperature and sunlight, ozone levels are generally higher during the summer months. Increased temperature also increases emissions of volatile man-made and biogenic organics and can also indirectly increase $NO_X$ emissions (*e.g.,* increased electricity generation for air conditioning).

On October 1, 2015, the EPA strengthened the primary and secondary ozone standards to 70 ppb as an 8-hour

---

[46] *Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS,* 81 FR 74504, 74511 (October 26, 2016).

[47] 81 FR 74504.

[48] One state, Kansas, was made newly subject to ozone season $NO_X$ requirements by the CSAPR Update. All other CSAPR Update states were already subject to ozone season $NO_X$ requirements under CSAPR.

[49] 81 FR 74516. The EPA's final 2008 Ozone NAAQS SIP Requirements Rule, 80 FR 12264, 12268 (March 6, 2015), revised the attainment deadline for ozone nonattainment areas designated as Moderate to July 20, 2018. *See* 40 CFR 51.1103. To demonstrate attainment by this deadline, states were required to rely on design values calculated using ozone season data from 2015 through 2017, since the July 20, 2018, deadline did not afford enough time for measured data of the full 2018 ozone season.

[50] *Determination Regarding Good Neighbor Obligations for the 2008 Ozone National Ambient Air Quality Standard,* 83 FR 65878, 65882 (December 21, 2018). After promulgating the CSAPR Update and before promulgating the CSAPR Close-Out, the EPA approved a SIP from Kentucky resolving the Commonwealth's good neighbor obligations for the 2008 ozone NAAQS. 83 FR 33730 (July 17, 2018). In the Revised CSAPR Update, the EPA made an error correction under CAA section 110(k)(6) to convert this approval to a disapproval, because the Kentucky approval relied on the same analysis which the D.C. Circuit determined to be unlawful in the CSAPR Close-Out.

[51] Subsequently, the D.C. Circuit made clear in a decision reviewing the EPA's denial of a petition under CAA section 126 that the holding in *Wisconsin* regarding alignment with downwind area's attainment schedules applies with equal force to the Marginal area attainment date established under CAA section 181(a). *See Maryland* v. *EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020).

[52] *Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS,* 86 FR 23054 (April 30, 2021).

level.[53] Specifically, the standards require that the 3-year average of the fourth highest 24-hour maximum 8-hour average ozone concentration may not exceed 70 ppb as a truncated value (*i.e.,* digits to right of decimal removed).[54] In general, areas that exceed the ozone standard are designated as nonattainment areas, pursuant to the designations process under CAA section 107(d), and are subject to heightened planning requirements depending on the severity of their nonattainment classification, *see* CAA sections 181, 182.

In the process of setting the 2015 ozone NAAQS, the EPA noted that the conditions conducive to the formation of ozone (*i.e.,* seasonally-dependent factors such as ambient temperature, strength of solar insolation, and length of day) differ by location, and that the Agency believes it is important that ozone monitors operate during all periods when there is a reasonable possibility of ambient levels approaching the level of the NAAQS. At that time, the EPA stated that ambient ozone concentrations in many areas could approach or exceed the level of the NAAQS, more frequently and during more months of the year compared with the historical ozone season monitoring lengths. Consequently, the EPA extended the ozone monitoring season for many locations. *See* 80 FR 65416 for more details.

Furthermore, the EPA stated that in addition to being affected by changing emissions, future ozone concentrations may also be affected by climate change. Modeling studies in the EPA's Interim Assessment (U.S. EPA, 2009a) that are cited in support of the 2009 Greenhouse Gas Endangerment Finding under CAA section 202(a) (74 FR 66496, Dec. 15, 2009) as well as a recent assessment of potential climate change impacts (Fann et al., 2015) project that climate change may lead to future increases in summer ozone concentrations across the contiguous U.S.[55] (80 FR 65300). The U.S. Global Change Research Program's *Impacts of Climate Change on Human Health in the United States: A Scientific Assessment* [56] and *Impacts, Risks, and*

*Adaptation in the United States: Fourth National Climate Assessment, Volume II* [57] reinforced these findings. The increase in ozone results from changes in local weather conditions, including temperature and atmospheric circulation patterns, as well as changes in ozone precursor emissions that are influenced by meteorology (Nolte et al., 2018). While the projected impact may not be uniform, climate change has the potential to increase average summertime ozone relative to a future without climate change.[58][59][60] Climate change has the potential to offset some of the improvements in ozone air quality, and therefore some of the improvements in public health, that are expected from reductions in emissions of ozone precursors (80 FR 65300). The EPA responds to comments received on the impacts of climate change on ozone formation in section 11 of the *Response to Comments* (*RTC*) document.

### 2. Ozone Transport

Studies have established that ozone formation, atmospheric residence, and transport occur on a regional scale (*i.e.,* thousands of kilometers) over much of the U.S.[61] While substantial progress has been made in reducing ozone in many areas, the interstate transport of ozone precursor emissions remains an

important contributor to peak ozone concentrations and high-ozone days during the summer ozone season.

The EPA has previously concluded in the $NO_X$ SIP Call, CAIR, CSAPR, the CSAPR Update, and the Revised CSAPR Update that a regional $NO_X$ control strategy would be effective in reducing regional-scale transport of ozone precursor emissions. $NO_X$ emissions can be transported downwind as $NO_X$ or as ozone after transformation in the atmosphere. In any given location, ozone pollution levels are impacted by a combination of background ozone concentration, local emissions, and emissions from upwind sources resulting from ozone transport, in conjunction with variable meteorological conditions. Downwind states' ability to meet health-based air quality standards such as the NAAQS is challenged by the transport of ozone pollution across state borders. For example, ozone assessments conducted for the October 2015 Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone [62] continue to show the importance of $NO_X$ emissions for ozone transport. This analysis is included in the docket for this rulemaking.

Further, studies have found that EGU $NO_X$ emissions reductions can be effective in reducing individual 8-hour peak ozone concentrations and in reducing 8-hour peak ozone concentrations averaged across the ozone season. For example, a study of the EGU $NO_X$ reductions achieved under the $NO_X$ Budget Trading Program (*i.e.,* the $NO_X$ SIP Call) shows that regulating $NO_X$ emissions in that program was highly effective in reducing ozone concentrations during the ozone season.[63]

Previous regional ozone transport efforts, including the $NO_X$ SIP Call, CAIR, CSAPR, the CSAPR Update, and the Revised CSAPR Update, required ozone season $NO_X$ reductions from EGU sources to address interstate transport of ozone. Together with $NO_X$, the EPA has also identified VOCs as a precursor in forming ground-level ozone. Ozone formation chemistry can be "$NO_X$-limited," where ozone production is primarily determined by the amount of $NO_X$ emissions or "VOC-limited," where ozone production is primarily

---

[53] 80 FR 65291.

[54] 40 CFR part 50, appendix P.

[55] These modeling studies are based on coupled global climate and regional air quality models and are designed to assess the sensitivity of U.S. air quality to climate change. A wide range of future climate scenarios and future years have been modeled and there can be variations in the expected response in U.S. O3 by scenario and across models and years, within the overall signal of higher summer O3 concentrations in a warmer climate.

[56] U.S. Global Change Research Program (USGCRP), 2016: *The Impacts of Climate Change on Human Health in the United States: A Scientific*

*Assessment.* Crimmins, A., J. Balbus, J.L. Gamble, C.B. Beard, J.E. Bell, D. Dodgen, R.J. Eisen, N. Fann, M.D. Hawkins, S.C. Herring, L. Jantarasami, D.M. Mills, S. Saha, M.C. Sarofim, J. Trtanj, and L. Ziska, Eds. U.S. Global Change Research Program, Washington, DC, 312 pp. *https://dx.doi.org/10.7930/J0R49NQX.*

[57] USGCRP, 2018: *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II* [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, 1515 pp. doi: 10.7930/NCA4.2018.

[58] Fann NL, Nolte CG, Sarofim MC, Martinich J, Nassikas NJ. Associations Between Simulated Future Changes in Climate, Air Quality, and Human Health. JAMA Netw Open. 2021;4(1):e2032064. doi:10.1001/jamanetworkopen.2020.32064

[59] Christopher G Nolte, Tanya L Spero, Jared H Bowden, Marcus C Sarofim, Jeremy Martinich, Megan S Mallard. Regional temperature-ozone relationships across the U.S. under multiple climate and emissions scenarios. J Air Waste Manag Assoc. 2021 Oct;71(10):1251–1264. doi: 10.1080/10962247.2021.1970048.

[60] Nolte, C.G., P.D. Dolwick, N. Fann, L.W. Horowitz, V. Naik, R.W. Pinder, T.L. Spero, D.A. Winner, and L.H. Ziska, 2018: Air Quality. In Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 512–538. doi: 10.7930/NCA4.2018.CH13

[61] Bergin, M.S. et al. (2007) Regional air quality: Local and interstate impacts of $NO_X$ and $SO_2$ emissions on ozone and fine particulate matter in the eastern United States. Environmental Sci & Tech. 41: 4677–4689.

[62] Available in the docket for the October 2015 Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone at *https://www.regulations.gov/docket/EPA-HQ-OAR-2008-0699.*

[63] Butler, et al., "Response of Ozone and Nitrate to Stationary Source Reductions in the Eastern USA." *Atmospheric Environment,* 2011.

determined by the amount of VOC emissions.[64] The EPA and others have long regarded $NO_X$ to be the more significant ozone precursor in the context of interstate ozone transport.[65]

The EPA has determined that the regulation of VOCs as an ozone precursor is not necessary to eliminate significant contribution of ozone transport to downwind areas in this rule. As described in section V.A of this document, the EPA examined the results of the contribution modeling performed for this rule to identify the portion of the ozone contribution attributable to anthropogenic $NO_X$ emissions versus VOC emissions from each linked upwind state to each downwind receptor. Our analysis of the ozone contribution from upwind states subject to regulation demonstrates that regional ozone concentrations affecting the vast majority of the downwind areas of air quality concern are $NO_X$-limited, rather than VOC-limited. Therefore, the rule's strategy for reducing regional-scale transport of ozone targets $NO_X$ emissions from stationary sources to achieve the most effective reductions of ozone transport over the geography of the affected downwind areas. The potential impacts of $NO_X$ mitigation strategies from other sources are discussed in section V.B of this document.

In section V of this document, the EPA describes the multi-factor test that is used to determine $NO_X$ emissions reductions that are cost-effective and reduce interstate transport of ground-level ozone. Our analysis indicates that the EGU and non-EGU control requirements included in this rule will provide meaningful improvements in air quality at the downwind receptors. Based on the implementation schedule established in section VI.A of this document, the EPA finds that the regulatory requirements included in the rule are as expeditious as practicable and are aligned with the attainment schedule of downwind areas.

### 3. Health and Environmental Effects

Exposure to ambient ozone causes a variety of negative effects on human health, vegetation, and ecosystems. In humans, acute and chronic exposure to ozone is associated with premature mortality and certain morbidity effects, such as asthma exacerbation. In ecosystems, ozone exposure causes visible foliar injury, decreases plant growth, and affects ecosystem

community composition. *See* EPA's October 2015 Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone[66] in the docket for this rulemaking for more information on the human health and ecosystem effects associated with ambient ozone exposure.

Commenters on prior ozone transport rules have asserted that VOC emissions harm underserved and overburdened communities experiencing disproportionate environmental health burdens and facing other environmental injustices. The EPA acknowledges that VOCs can contain toxic chemicals that are detrimental to public health. The EPA conducted a demographic analysis as part of the regulatory impact analysis for the 2015 revisions to the primary and secondary ozone NAAQS. This analysis, which is included in the docket for this rulemaking, found greater representation of minority populations in areas with poor air quality relative to the revised ozone standard than in the U.S. as a whole. The EPA concluded that populations in these areas would be expected to benefit from implementation of future air pollution control actions from state and local air agencies in implementing the strengthened standard. This rule is an example of air pollution control actions implemented by the Federal Government in support of the more protective 2015 ozone NAAQS, and populations living in downwind ozone nonattainment and maintenance areas are expected to benefit from improved air quality that will result from reducing ozone transport. Further discussion of the environmental justice analysis of this rule is located in section VII of this document and in the accompanying regulatory impact analysis, titled "Regulatory Impact Analysis for Final Federal Good Neighbor Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard" [EPA–452/D–22–001], which is available in the docket for this rulemaking.

The Agency regulates exposure to toxic pollutant concentrations and ambient exposure to criteria pollutants other than ozone through other sections of the Act, such as the regulation of hazardous air pollutants under CAA section 112 or the process for revising and implementing the NAAQS under CAA sections 107–110. The purpose of the subject rulemaking is to protect public health and the environment by eliminating significant contribution

from 23 states to nonattainment or maintenance of the 2015 ozone NAAQS to meet the requirements of the CAA's interstate transport provision. In this rule, the EPA continues to observe that requiring $NO_X$ emissions reductions from stationary sources is an effective strategy for reducing regional ozone transport in the U.S.

The EPA responds to other comments received on the health and environmental impacts of ozone exposure in section 11 of the *RTC* document.

### B. Final Rule Approach

#### 1. The 4-Step Interstate Transport Framework

The EPA first developed a multi-step process to address the requirements of the good neighbor provision in the 1998 $NO_X$ SIP Call and the 2005 CAIR. The Agency built upon this framework and further refined the methodology for addressing interstate transport obligations in subsequent rules such as CSAPR in 2011, the CSAPR Update in 2016, and the Revised CSAPR Update in 2021.[67] In CSAPR, the EPA first articulated a "4-step framework" within which to assess interstate transport obligations for ozone. In this rule to address interstate transport obligations for the 2015 ozone NAAQS, the EPA is again utilizing the 4-step interstate transport framework. These steps are: (1) identifying downwind receptors that are expected to have problems attaining the NAAQS (nonattainment receptors) or maintaining the NAAQS (maintenance receptors); (2) determining which upwind states are "linked" to these identified downwind receptors based on a numerical contribution threshold; (3) for states linked to downwind air quality problems, identifying upwind emissions on a statewide basis that significantly contribute to downwind nonattainment or interfere with downwind maintenance of the NAAQS, considering cost- and air quality-based factors; and (4) for upwind states that are found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in any downwind state, implementing the necessary emissions reductions through enforceable measures.

*Comment:* The EPA received comments supporting the Agency's use of the 4-step interstate transport framework as a permissible method for assigning the required amount of

---

[64] "Ozone Air Pollution." *Introduction to Atmospheric Chemistry*, by Daniel J. Jacob, Princeton University Press, Princeton, New Jersey, 1999, pp. 231–244.

[65] 81 FR 74514.

[66] Available at *https://www.epa.gov/sites/default/files/2016-02/documents/20151001ria.pdf*.

[67] *See* CSAPR, Final Rule, 76 FR 48208, 48248–48249 (August 8, 2011); CSAPR Update, Final Rule, 81 FR 74504, 74517–74521 (October 26, 2016).

emissions reductions necessary to eliminate upwind states' significant contribution. Commenters also noted that the 4-step interstate transport framework was reviewed by the Supreme Court in *EPA vs. EME Homer City Generation,* 572 U.S. 489 (2014), and upheld. However, other commenters took exception to the overall approach of this proposed action. These commenters alleged that the EPA is ignoring the "flexibility" in addressing good neighbor obligations that it had purportedly suggested to states would be permissible in memoranda that the EPA issued in 2018. Commenters also raised concerns that the air quality modeling (2016v2) the EPA used to propose to disapprove SIP submittals and as the basis for the proposed FIP was not available to states at the time they made their submissions and that the changes in results at Steps 1 and 2 from prior rounds of modeling rendered the new modeling unreliable. Commenters also raised a number of arguments that the EPA should allow states an additional opportunity to submit SIPs before promulgating a FIP, advocated that the EPA should issue a "SIP call" under CAA section 110(k)(5), asked for the EPA to issue new or more specific guidance, or otherwise suggested that the EPA should defer acting to promulgate a FIP at this time.

*Response:* As an initial matter, comments regarding the EPA's basis for disapproving SIPs are beyond the scope of this action.[68] To the extent these comments relate to the legal basis for the EPA to promulgate a FIP, the EPA disagrees that it is acting in a manner contrary to what it released in 2018 related to good neighbor obligations for the 2015 ozone NAAQS. Arguments that the EPA must or should allow states to re-submit SIP submissions based on the most recent modeling information before the EPA promulgates a FIP ignore the plain language of the statute and relevant caselaw. CAA section 110(c) authorizes the EPA to promulgate a FIP "at any time within 2 years" of a SIP disapproval. No provision of the Act requires the EPA to give states an additional opportunity to prepare a new SIP submittal once the EPA has proposed a FIP or proposed disapproval of a SIP submittal. Comments regarding the timing of the EPA's actions and calls

for the EPA to allow time for states to resubmit SIPs are further addressed in *RTC* sections 1.1 and 2.4.

With regard to the need for the EPA to develop and issue guidance in addressing good neighbor obligations, in *EPA* v. *EME Homer City Generation, L.P.,* the Supreme Court held that "nothing in the statute places the EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations." [69] While we have taken a different approach in some prior rulemakings by providing states with an opportunity to submit a SIP after we quantified the states' budgets (*e.g.,* the NO$_X$ SIP Call and CAIR[70]), the CAA does not require such an approach.

*2018 Memoranda.* As commenters point out, the EPA issued three "memoranda" in 2018 to provide some assistance to states in developing these SIP submittals.[71] Each memorandum made clear that the EPA's action on SIP submissions would be through a separate notice-and-comment rulemaking process and that SIP submissions seeking to rely on or take advantage of any so-called "flexibilities" in these memoranda would be carefully reviewed against the relevant legal requirements and technical information available to the EPA at the time it would take such rulemaking action. Further, certain aspects of discussions in those memoranda were specifically identified as not constituting agency guidance (especially Attachment A to the March

2018 memorandum, which comprised an unvetted list of external stakeholders' ideas). And, although outside the scope of this action, as the EPA has explained in disapproving states' SIP submittals, those submittals did not meet the terms of the August 2018 or October 2018 memoranda addressing contribution thresholds and maintenance receptors, respectively.

Commenters mistakenly view Attachment A to the March 2018 memorandum as constituting agency guidance. This memorandum was primarily issued to share modeling results for 2023 that represented the best information available to the Agency as of March 2018, while Attachment A then listed certain ideas from certain stakeholders that the EPA said could be further discussed among states and stakeholders. The EPA disagrees with commenters' characterization of the EPA's stance regarding these so-called "flexibilities" listed (without analysis) in Attachment A. The March 2018 memorandum provided, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision." The EPA again affirms that the concepts listed in Attachment A to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development. However, the EPA made clear in both the March 2018 memorandum[72] and in Attachment A that the list of ideas was not endorsed by the Agency but rather "comments provided in various forums" on which the EPA sought "feedback from interested stakeholders." [73] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches." [74] Attachment A to the March 2018 memorandum, therefore, does not

---

[68] We nonetheless further respond to comments regarding the timing and sequence of the EPA's SIP and FIP actions, the relevance of judicial consent decrees, the requests for a SIP call, and related comments—to the extent any of these issues are within scope of the present action—in Sections 1 and 2 of the *RTC* document located in the docket for this action.

[69] 572 U.S. 489, 510 (2014). "Nothing in the Act differentiates the Good Neighbor Provision from the several other matters a State must address in its SIP. Rather, the statute speaks without reservation: Once a NAAQS has been issued, a State 'shall' propose a SIP within three years, § 7410(a)(1), and that SIP 'shall' include, among other components, provisions adequate to satisfy the Good Neighbor Provision, § 7410(a)(2)." *EPA* v. *EME Homer City Generation, L.P.,* 572 U.S. at 515.

[70] For information on the NO$_X$ SIP call see 63 FR 57356 (October 27, 1998). For information on CAIR *see* 70 FR 25162 (May 12, 2005).

[71] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (March 27, 2018) ("March 2018 memorandum"); Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, August 31, 2018) ("August 2018 memorandum"); Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, October 19, 2018 ("October 2018 memorandum"). These are available in the docket or at *https:// www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[72] "In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states." March 2018 memorandum at 1.

[73] March 2018 memorandum, Attachment A at A–1.

[74] *Id.*

constitute agency guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. The EPA emphasized in these memoranda that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal. To the extent states sought to develop or rely on one or more of these ideas in support of their SIP submissions, the EPA reviewed their technical and legal justifications for doing so.[75]

Regarding the October 2018 memorandum, that document recognized that states may be able to demonstrate in their SIPs that conditions exist that would justify treating a monitoring site as not being a maintenance receptor despite results from our modeling methodology identifying it as such a receptor. The EPA explained that this demonstration could be appropriate under two circumstances: (1) the site currently has "clean data" indicating attainment of the 2015 ozone NAAQS based on measured air quality concentrations, or (2) the state believes there is a technical reason to justify using a design value from the baseline period that is lower than the maximum design value based on monitored data during the same baseline period. To justify such an approach, the EPA anticipated that any such showing would be based on an analytical demonstration that (1) meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections; (2) ozone precursor emissions have been trending downward at the site since 2011 (and ozone precursor emissions of $NO_X$ and VOC have also decreased); and (3) emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor. Although this is beyond the scope of this action, the EPA explained in its final SIP disapproval action that no state successfully demonstrated that one of these alternative approaches is justified. In this action, our analysis of the air quality data and projections in section IV of this document indicate that trends in historic measured data do not necessarily support adopting a less

stringent approach for identifying maintenance receptors for purposes of the 2015 ozone NAAQS. In fact, as explained in section III.B.1.a and IV.D of this document, the EPA has found in its analysis for this final rule that, in general, recent measured data from regulatory ambient air quality ozone monitoring sites suggest that a number of receptors with elevated ozone levels will persist in 2023 even though our traditional methodology at Step 1 did not identify these monitoring sites as receptors in 2023. Thus, the EPA is not acting inconsistently with that memorandum—the factual conditions that would need to exist for the suggested approaches of that memorandum to be applicable have not been demonstrated as being applicable or appropriate based on the relevant data.

Regarding the August 2018 memorandum, as discussed in section IV.F.2 of this document, for purposes of Step 2 of our ozone transport evaluation framework, we are applying a 1 percent of NAAQS threshold rather than a 1 ppb threshold, as this memorandum had suggested might be appropriate for states to apply as an alternative. The EPA is finalizing its proposed approach of consistently using a 1 percent of the NAAQS contribution threshold at Step 2 to evaluate whether states are linked to downwind nonattainment and maintenance concerns for purposes of this FIP.

The approach of this FIP ensures both national consistency across all states and consistency and continuity with our prior interstate transport actions for other NAAQS. Further, in this action the EPA is promulgating FIPs under the authority of CAA section 110(c). In doing so, the EPA has exercised its discretion to determine how to define and apply good neighbor obligations in place of the discretion states otherwise would exercise (subject to the EPA's approval as compliant with the Act). In general, the EPA is applying the 4-step interstate transport framework it devised over the course of its prior good neighbor rulemakings, including applying a consistent definition of nonattainment and maintenance-only receptors, and applying the 1 percent of NAAQS threshold at Step 2. The basis for these decisions is further explained in sections IV.F.1 and IV.F.2 of the document. These policy judgments reflect consistency with relevant good neighbor case law and past agency practice implementing the good neighbor provision as reflected in the original CSAPR, CSAPR Update, Revised CSAPR Update, and related rulemakings. Nationwide consistency in

approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving the collective emissions of many smaller contributors. Effective policy solutions to the problem of interstate ozone transport dating back to the $NO_X$ SIP Call (63 FR 57356 (October 27, 1998)) have necessitated the application of a uniform framework of policy judgments, and the EPA's framework applied here has been upheld as ensuring an "efficient and equitable" approach. *See EME Homer City Generation, LP* v. *EPA,* 572 U.S. 489, 519 (2014).

*Updated modeling.* The EPA had originally provided 2023 modeling results in its March 2018 memorandum, which used a 2011-based platform. Many states used this modeling in providing good neighbor SIP submittals for the 2015 ozone NAAQS. While our action on the SIP submittals is not within scope of this action, commenters claim the use of new modeling or other information not available to states at the time they made their submittals renders this action promulgating a FIP unlawful. Notwithstanding whether that is an accurate characterization of the EPA's basis for disapproving the SIPs, we note that the court in *Wisconsin* rejected this precise argument against the CSAPR Update FIPs as a collateral attack on the SIP disapprovals. 938 F.3d at 336 ("That is the hallmark of an improper collateral attack. The true gravamen of the claim lies in the agency's failure to timely act upon the States' SIP submissions and, relatedly, its reliance on data compiled after the SIP action deadline. Both go directly to the legitimacy of the SIP denials.").

Nonetheless, we offer the following explanation of the evolution of the EPA's understanding of projected air quality conditions and contributions in 2023 resulting from the iterative nature of our modeling efforts. These modeling efforts are further addressed in section IV of this document. We acknowledge that to evaluate transport SIPs and support our proposed FIP the EPA reassessed receptors at Step 1 and states' contribution levels at Step 2 through additional modeling (2016v2) before proposing this action and have reassessed again to inform the final action (2016v3). At proposal, we relied on CAMx Version 7.10 and the 2016v2 emissions platform to make updated determinations regarding which receptors would likely exist in 2023 and which states are projected to contribute above the contribution threshold to those receptors. As explained in the preamble of the EPA's proposed FIP and further detailed in the "Air Quality

---

[75] *E.g.,* 87 FR 64423–64425 (Alabama); 87 FR 31453–31454 (California); 87 FR 9852–9854 (Illinois); 87 FR 9859–9860 (Indiana); 87 FR 9508, 9515 (Kentucky); 87 FR 9861–9862 (Michigan); 87 FR 9869–9870 (Ohio); 87 FR 9798, 9818–9820 (Oklahoma); 87 FR 31477–31481 (Utah); 87 FR 9526–9527 (West Virginia).

Modeling Technical Support Document for the Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards Proposed Rulemaking'' (Dec. 2021), hereinafter referred to as Air Quality Modeling Proposed Rule TSD, and the ''Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform'' (Dec. 2021), hereinafter referred to as the 2016v2 Emissions Inventory TSD, both available in the docket for this action (docket ID no. EPA–HQ–OAR–2021–0668), this modeling built off of previous modeling iterations used to support the EPA's action on interstate transport obligations. The EPA periodically refines its modeling to ensure the results are as indicative as possible of air quality in future years. This includes making any necessary adjustments to our modeling platform and updating our emissions inventories to reflect current information, including information submitted during public comments on proposed actions.

For this final rule, the EPA has evaluated a raft of technical information and critiques of its 2016v2 modeling provided by commenters on this action (as well as comments on the SIP actions) and has responded to those comments and incorporated updates into the version of the modeling used to support this final rule (2016v3). As explained in section IV.B of the document, in response to additional information provided by stakeholders following the release of the 2016v2 emissions inventory and during the comment periods on the proposed SIP actions, the EPA has reviewed and revised its 2016v2 modeling platform and input since the platform was made available for comment. The new modeling platform 2016v3 was developed from this input, and the modeling results using platform 2016v3 are available with this action. *See* section IV of this document for further discussion. Thus, the EPA's final rule is based on a comprehensive record of data and technical evaluation, including the updated modeling information used at proposal (2016v2), the comments received on that modeling, and the latest modeling used in this final rule (2016v3).

The changes in projected outcomes at Steps 1 and 2 are a product of these changes; these updates between the data released in 2018 to now are an outgrowth of this iterative process, including updating the platform from a 2011 to a 2016 base year, updates to the

emissions inventory information and other updates. It is reasonable for the Agency to improve its understanding of a situation before taking final action, and the Agency uses the best information available to it in taking this action.

Further, these modeling updates have not uniformly resulted in new linkages—the 2016v2 modeling, for instance, corroborated the proposed approval of Montana and supported approval of Colorado's SIP in October of 2022.[76] Although some commenters indicate that our modeling iterations have provided differing outcomes and are therefore unreliable, this is not what the overall record indicates. Rather, in general, although the specifics of states' linkages may have changed to some extent, our modeling on the whole has provided consistent outcomes regarding which states are linked to downwind air quality problems. For example, the EPA's modeling shows that most states that were linked to one or more receptors using the 2011-based platform (*i.e.,* the March 2018 data release) are also linked to one or more receptors using the newer 2016-based platform. Because the new platform uses different meteorology (*i.e.,* 2016 instead of 2011), it is not unexpected that an upwind state would be linked to different receptors using 2011 versus 2016 meteorology. In addition, although a state may be linked to a different set of receptors, those receptors are within the same areas that have historically had a persistent air quality problem. Only three upwind states included in the FIP went from being unlinked to being linked in 2023 between the 2011-based modeling provided in the March 2018 memorandum and the 2016v3-based modeling—Alabama, Minnesota, and Nevada.

Additionally, we disagree with commenters who claim that the 2016v2 modeling results were sprung upon the states with the publication of the proposed SIP disapprovals. In fact, states had prior access to a series of data and modeling releases beginning as early as the publication of the 2016v1 modeling with the proposed Revised CSAPR Update in October 2020. States could have reviewed and used this technical information to understand and track how the EPA's modeling updates were affecting the list of potential receptors and linkages for the 2015 ozone NAAQS in the 2023 analytic year.

The 2016-based meteorology and boundary conditions used in the modeling have been available through the 2016v1 platform, which was used for the Revised CSAPR Update (proposed, 85 FR 68964; October 30, 2020). The updated emissions inventory files used in the current modeling were publicly released September 21, 2021, for stakeholder feedback, and have been available on our website since that time.[77] The CAMx modeling software that the EPA used has likewise been publicly available for over a year before this final rule was proposed on April 6, 2022. CAMx version 7.10 was released by the model developer, Ramboll, in December 2020. On January 19, 2022, we released on our website and notified a wide range of stakeholders of the availability of both the modeling results for 2023 and 2026 (including contribution data) along with many key underlying input files.[78]

By providing the 2016 meteorology and boundary conditions (used in the 2016v1 version) in fall of 2020, and by releasing updated emissions inventory information used in 2016v2 in September of 2021,[79] we gave states and other interested parties multiple opportunities prior to proposal of this rule on April 6, 2022, to consider how our modeling updates could affect their status for purposes of evaluating potential linkages for the 2015 ozone NAAQS. In this final rule, we have updated our modeling to 2016v3, incorporating and reflecting the feedback and additional information we received through the multiple public comment opportunities the EPA made available on the 2016v2 modeling.

The EPA's development of and reliance on newer modeling is reasonable and is simply another iteration of the EPA's longstanding scientific and technical work to improve our understanding of air quality issues and causes going back many decades.

*Comment:* Commenters asserted that the EPA lacks authority under the good neighbor provision to do more than establish state-wide emissions budgets, which states may implement through their own choice of emissions controls. The commenters claim that the EPA lacks authority to directly regulate emissions sources under the good neighbor provision, and they cite to case law that they view as establishing a ''federalism bar'' to direct Federal regulation. Commenters assert that the

---

[76] 87 FR 6095, 6097 at n. 15 (February 3, 2022) (Montana proposal); 87 FR 27050, 27056 (May 6, 2022) (Colorado, proposal); 87 FR 61249 (October 11, 2022) (Colorado, final).

[77] *See* https://www.epa.gov/air-emissions-modeling/2016v2-platform.

[78] *See* https://www.epa.gov/scram/photochemical-modeling-applications.

[79] https://www.epa.gov/air-emissions-modeling/2016v2-platform.

term ''amounts'' as used in the good neighbor provision prevents the agency from establishing emissions limits at individual sources, such as the non-EGU industrial units that the EPA proposed to regulate or implementing ''enhancements'' in its mass-based emissions trading approach for EGUs as it had proposed. Commenters claim these aspects of the rule are an unlawful or arbitrary and capricious departure from the EPA's prior transport rulemakings, which they claim only set mass-based emissions budgets as the means to eliminate ''significant contribution.''

*Response:* To the extent these comments challenge the EPA's disapproval of states' 2015 ozone NAAQS good neighbor SIP submissions, they are out of scope of this action, which promulgates a FIP under the authority of CAA section 110(c)(1). To the extent commenters assert that the EPA does not have the authority to directly implement source-specific emissions control requirements or other emissions control measures, means, or techniques, including emissions trading programs, in the exercise of that FIP authority, the EPA disagrees. While the courts have long recognized that the states have wide discretion in the design of SIPs to attain and maintain the NAAQS, *see, e.g., Union Electric Co* v. *EPA,* 427 U.S. 246 (1976), when the EPA promulgates a FIP to cure a defective SIP, the Act, including the definition of a FIP in section 302(y), provides for the EPA to directly implement the Act's requirements. The EPA is granted authority to choose among a broad range of ''emission limitations or other control measures, means, or techniques (including economic incentives, such as marketable permits or auctions of emissions allowances) . . . .'' CAA section 302(y); *see also* CAA section 110(a)(2) (empowering states to implement an identical set of emissions control mechanisms).

The courts have also recognized that the EPA has broad authority to cure a defective SIP, that the EPA may exercise its own, independent regulatory authority in implementing a FIP in accordance with the CAA, and that the EPA in effect steps into the shoes of a state when it promulgates a FIP. *See, e.g., Central Ariz. Water Conservation Dist.* v. *EPA,* 990 F.2d 1531 (9th Cir. 1993); *South Terminal Corp.* v. *EPA,* 504 F.2d 646 (1st Cir. 1974). *Accord Virginia* v. *EPA,* 108 F.3d 1397, 1406–07 (D.C. Cir. 1997) (''The Federal Plan 'provides an additional incentive for state compliance because it rescinds state authority to make the many sensitive and policy choices that a

pollution control regime demands.''') (quoting *Natural Resources Defense Council* v. *Browner,* 57 F.3d 1122, 1124 (D.C. Cir. 1995)). *Cf. District of Columbia* v. *Train,* 521 F.2d 971 (D.C. Cir. 1975), *vacated sub nom. EPA* v. *Brown,* 431 U.S. 99 (1977) (''[W]here cooperation [from states] is not forthcoming, we believe that the recourse contemplated by the commerce clause is direct federal regulation of the offending activity . . . .'').

These same principles apply where the EPA must promulgate a FIP to address good neighbor requirements under CAA section 110(a)(2)(D)(i)(I). The EPA has promulgated a series of FIPs in the past to address the relevant requirements for prior ozone and PM NAAQS. *See, e.g.,* CAIR FIP, 71 FR 25328 (April 28, 2006); CSAPR, 76 FR 48208 (August 8, 2011); the CSAPR Update, 81 FR 74504 (October 26, 2016); and the Revised CSAPR Update, 86 FR 23054 (April 30, 2021). Courts have upheld the EPA's exercise of this authority. *See EME Homer City Generation* v. *EPA,* 572 U.S. 489 (2014); *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019). Indeed, in *EME Homer City,* the U.S. Supreme Court held that the EPA is not obligated to provide guidance to states before acting on their good neighbor submissions or give states a second chance at correcting the deficiencies before promulgating a FIP, and the EPA may promulgate a FIP at any time after finalizing its disapproval of SIP submissions. 572 U.S. at 508–11.

The cases cited by commenters, which they refer to as establishing the *Train-Virginia* federalism bar, were not reviewing the exercise of the EPA's authority in promulgating a FIP under CAA section 110(c)(1) but rather were describing the scope of the EPA's authority in acting on SIP submissions under CAA section 110(k)(3) or in issuing a ''SIP call'' under section 110(k)(5). In those latter contexts, the courts have held that the EPA may not dictate the specific control measures states must implement to meet the Act's requirements. *See Virginia,* 108 F.3d at 1409–10. In *Michigan,* the D.C. Circuit upheld the EPA's exercise of CAA section 110(k)(5) authority in issuing the ''NOₓ SIP Call,'' because, ''EPA does not tell the states how to achieve SIP compliance. Rather, EPA looks to section 110(a)(2)(D) and merely provides the levels to be achieved by state-determined compliance mechanisms. . . . However, EPA made clear that states do not have to adopt the control scheme that EPA assumed for budget-setting purposes.'' *Michigan* v. *EPA,* 213 F.3d 663, 687–88 (D.C. Cir. 2000).

Commenters' position that the EPA must provide similar flexibility to the states in this action (*i.e.,* only provide a general emissions reduction target and leave to states how to meet that target) is a non sequitur. The EPA is implementing a FIP in this action and *must* directly implement the necessary emissions controls. The EPA is not empowered to require states to implement FIP mandates. Such an approach would conflict with constitutional anti-commandeering principles, is not provided for in the Act, and would only constitute a partial implementation of FIP obligations in contravention of the holding in *Wisconsin* v. *EPA,* 938 F.3d at 313–20.

Commenters' attempt to contrast the implementation of source-specific emissions limitations at industrial sources with the establishment of a specific mass-based budget (as the EPA has set for power plants in prior good neighbor FIPs) is unavailing. CAA section 110(c)(1) and 302(y) authorize the EPA in promulgating a FIP to establish ''enforceable emission limitations'' in addition to other types of control measures like mass-based trading programs. Further, in this action, the EPA has developed an emissions control strategy that prohibits the ''amount'' of pollution that significantly contributes to nonattainment and/or interferes with maintenance. We determine that amount, as we have in prior transport actions, at Step 3 of the analysis, by applying a multifactor analysis that includes considering cost and downwind air quality effects. *See* section V.A of this document. With the implementation of the selected controls (at Step 4) through both an emissions trading program for power plants and source-specific emissions limitations for industrial sources, those ''amounts'' that had been emitted prior to imposition of the controls will be eliminated.

The Act does not mandate that the EPA must set a specific mass-based budget for each state to eliminate significant contribution based on the use of the term ''amounts'' in CAA section 110(a)(2)(D)(i). As the Supreme Court recognized, the statute ''*requires* States to eliminate those 'amounts' of pollution that 'contribute significantly to nonattainment' in downwind States,'' and it delegates to states or EPA acting in their stead discretion to determine *how* to apportion responsibility among those upwind states. 572 U.S. at 514 (emphasis added). The statute does not define the term ''amount'' in the way commenters suggest (or in any other way), and neither the Agency nor any court has reached that conclusion. The

Supreme Court itself has recognized that the language of the good neighbor provision is amenable to different types of metrics for quantification of "significant contribution." *See EME Homer City Generation, L.P.,* 572 U.S. at 514 ("How is EPA to divide responsibility among the . . . States? Should the Agency allocate reductions proportionally . . ., on a per capita basis, on the basis of the cost of abatement, or by some other metric? . . . The Good Neighbor Provision does not answer that question for EPA."); *see also Michigan* v. *EPA,* 213 F.3d 663, 677 D.C. Cir. 2000) ("Nothing in the text of . . . the statute spells out a criterion for classifying 'emissions activity' as 'significant.' "); *id.* at 677 ("Must EPA simply pick some flat 'amount' of contribution . . . ?"). When the State of Delaware petitioned the Agency under CAA section 126(b) to establish daily emissions rates for EGUs to remedy what it saw as continuing violations of the good neighbor provision for the 2008 ozone NAAQS, neither the EPA nor the reviewing court questioned whether the Agency had the statutory authority to do so. The EPA's decision not to was upheld on record grounds. *See Maryland* v. *EPA,* 958 F.3d 1185, 1207 D.C. Cir. 2020) ("In other words, Delaware's concern makes sense but has not been observed in practice.").[80]

The term "amounts" can be interpreted to refer to any number of metrics, and in fact the CAA uses the term in several contexts where it is clear Congress did not intend the term to refer to a fixed, mass-based quantity of emissions. For example, in the definition of "lowest achievable emission rate" (LAER) in CAA section 171, the Act provides that the application of LAER shall not permit a proposed new or modified source to emit any pollutant in excess of "the amount allowable under applicable new source standards of performance [NSPS]." NSPS may be, and usually are, set as emissions standards or limitations that are rate- or concentration-based. *See, e.g.,* 40 CFR part 60, subpart KKKK, table I (establishing concentration-based and rate-based emissions limits for stationary combustion turbines).[81] Congress has elsewhere used the term "amount" in the CAA to refer to

concentration-based standards. For example, in CAA section 163(b), Congress provided that maximum allowable increases in concentrations of certain pollutants "shall not exceed the following amounts," with a list of allowable increases provided that are expressed in micrograms per cubic meter.[82] As a third example, in the 1990 CAA Amendments, Congress provided that ozone nonattainment areas classified as Serious must provide a reasonable further progress demonstration of reductions in VOC emissions "equal to the following amount," which is then described as a percentage reduction from baseline emissions. CAA section 182(c)(2)(B). These examples illustrate that the word "amounts" is amenable to a variety of meanings depending on what is being measured or quantified. It would therefore be highly unlikely that Congress could have intended that "amount" as used in the good neighbor provision must signify only a fixed mass budget of emissions for each state expressed as total tons per ozone season.

Such an approach would, in fact, fail to address an important aspect of the problem of interstate transport. As explained in sections III.B.1.d, V.D.4, and VI.B.1, the EPA in this rule seeks to better address the need for emissions reductions on each day of the ozone season, reflecting the daily, but unpredictably recurring, nature of the air pollution problem, short-term health impacts, and the form of the 2015 ozone NAAQS, wherein nonattainment for downwind areas (and thus heightened regulatory requirements) could be based on ozone exceedances on just a few days of the year. The expression of the "amount" of pollution that should be eliminated to address upwind states' "significant contribution" to that type of air pollution problem may appropriately take into account those aspects of the problem, and the EPA may appropriately conclude, as we do here, that a single, fixed, emissions budget covering an entire ozone season is not sufficient to the task at hand.

In this action, the EPA reasonably applies the good neighbor provision, including the term "amount," through the 4-step interstate transport framework. Under this approach, the EPA here, as it has in prior transport rulemakings for regional pollutants like

ozone, identifies a uniform level of emissions reduction that the covered sources in the linked upwind states can achieve that cost-effectively delivers improvement in air quality at downwind receptors on a regional scale. The "amount" of pollution that is identified for elimination at Step 3 of the framework is therefore that amount of emissions that is in excess of the emissions control strategies the EPA has deemed cost-effective. Contrary to commenters' views, in prior transport rules utilizing emissions trading, the mass budgets through which the elimination of significant contribution was effectuated did not constitute the "amounts" to be eliminated but rather the residual emissions remaining following the elimination of significant contribution through the control stringency selected based on our multifactor assessment at Step 3. Nor did the EPA consider a mass-based budget to be the sole expression, even indirectly, of what constituted "significant contribution." *See, e.g.,* CSAPR, 76 FR 48256–57 (discussing the evaluation of the control strategies that would eliminate significant contribution for the 1997 ozone NAAQS, including combustion controls, and explaining, "[I]t would be inappropriate for a state linked to downwind nonattainment or maintenance areas to stop operating existing pollution control equipment (which would increase their emissions and contribution).").

In other actions the EPA has taken to implement good neighbor obligations, the EPA has required or allowed for reliance on source-specific emissions limitations rather than defining significant contribution as a mass-based budget. For example, the EPA imposed unit-specific emissions limitations in granting a CAA section 126(b) petition from the State of New Jersey in 2011. Final Response to Petition From New Jersey Regarding SO₂ Emissions From the Portland Generating Station, 76 FR 69052, 69063–64 (Nov. 7, 2011) (discussing the analytical basis for the establishment of emissions limits at specific units). This action was upheld by the Third Circuit in *Genon Rema LLC* v. *EPA,* 722 F.3d 513, 526 (3d. Cir. 2013).[83]

---

[80] The Agency's view of the basis for backstop daily emissions rates for certain EGUs within the trading program has changed since the time of its action on Delaware's petition, as explained in section VI.B.

[81] The EPA has interpreted the term "amount" as used in CAA section 111(a)(4) in the definition of the term "modifications" as an increase in a rate of emissions expressed as kilograms per hour. 40 CFR 60.14(b).

[82] Notably, both the provisions of CAA section 171 and section 163 given as examples here were added by the CAA Amendments of 1977, in the same set of amendments that Congress first strengthened the good neighbor provision and added the term "amounts." *See* Public Law 95–95, 91 Stat. 685, 693, 732, 746.

[83] In CAA section 126(c), Congress provided for the EPA to directly impose "emission limitations" to eliminate prohibited significant contribution. Notably, the statute affords the EPA and states flexibility in how an "emissions limitation" may be expressed, including as a "quantity, rate, or concentration," *see* CAA section 302(k). It would make little sense that the EPA could only establish a mass-based definition of "amounts" under CAA section 110(a)(2)(D)(i)(I), when the statute provides for rate- or concentration-based limitations in CAA section 126, which directly incorporates

Even where the EPA has provided for implementation of good neighbor requirements through mass-based budgets, it has recognized that other approaches may be acceptable as providing an equivalent degree of emissions reduction to eliminate significant contribution. *See, e.g.,* NO$_X$ SIP Call, 63 FR 57378–79 (discussing approvability of rate-based emissions limit approaches for implementing NO$_X$ SIP Call and providing, "the 2007 overall budget is an important accounting tool. However, the State is not required to demonstrate that it has limited its total NO$_X$ emissions to the budget amounts. Thus, the overall budget amount is not an independently enforceable requirement."); CAIR, 70 FR 25261–62 (discussing ways states could implement CAIR obligations, including through emission-rate limitations, so long as adequately demonstrated to achieve comparable reductions to CAIR's emissions budgets).

Finally, as it has in its prior transport FIP actions, the EPA has in this action provided guidance for states on methods by which they could replace this FIP with SIPs, and in so doing, continues to recognize substantial state flexibility in achieving an equivalent degree of emissions reduction that would successfully eliminate significant contribution for the 2015 ozone NAAQS. *See* section VI.D of this document. While the EPA has exercised the responsibility it has under CAA section 110(c)(1) to step into the shoes of the covered states and directly implement good neighbor requirements through a particular set of regulatory mechanisms in this action, we anticipate that states may identify alternative, equivalent mechanisms that we would be bound to evaluate and approve if satisfactory, should states seek to replace this FIP with a SIP.

For these reasons, the EPA disagrees with the contention that it is constrained by the good neighbor provision to define upwind state obligations solely by reference to a fixed, mass budget. We find it reasonable in this action to again determine the amount of "significant contribution" at Step 3 by reference to uniform levels of cost-effective emissions controls that can be applied across the upwind sources. And, we find it appropriate to implement those emissions reductions at Step 4 through

110(a)(2)(D)(i)(I). (In observing this, we do not concede that an "emissions limitation" itself could not also be expressed through a mass-based approach, which may be read as authorized by the term "quantity," a term also used in CAA section 302(k).)

mechanisms that go beyond fixed, mass-based, ozone-season long budgets.

The EPA's authority for its industrial source control strategies is further discussed in sections II.C. and III.B.1.c of this document. The relationship of the control strategy to the assessment of overcontrol is discussed in section V.D.4 of this document. The relationship of our FIP authority to state authorities and SIP calls under CAA section 110(k)(5) is further discussed in *RTC* sections 1 and 2.

a. Step 1 Approach

As proposed, the EPA applies the same basic method of the CSAPR Update and the Revised CSAPR Update for identifying nonattainment and maintenance receptors. However, we received comments arguing that the outcome of applying our methodology to identify receptors in 2023 appears overly optimistic in light of current measured data from the network of ambient air quality monitors across the country. These commenters suggest that the EPA give greater weight to current measured data as part of the method for identifying projected receptors. As discussed further in section IV.D of this document, the EPA has modified its approach for identifying receptors for this final rule in response to these comments.

This concern is more evident given that the 2023 ozone season is just a few months away, and the most recent measured ozone values in many areas strongly suggest that these areas will not likely see the substantial reduction in ozone levels that the 2016v2 and 2016v3 modeling continue to project.

It would not be reasonable to ignore recent measured ozone levels in many areas that are clearly not fully consistent with certain concentrations in the Step 1 analysis for 2023. Therefore, the EPA has developed an additional maintenance-only receptor category, which includes what we refer to as "violating monitor" receptors, based on current ozone concentrations measured by regulatory ambient air quality monitoring sites. We acknowledge that the traditional modeling plus monitoring methodology we used at proposal and in prior ozone transport rules would otherwise have identified such sites as being in attainment in 2023. Despite the implications of the current measured data suggesting there will be a nonattainment problem at these sites in 2023, we cannot definitively establish that such sites will be in nonattainment in 2023 in light of our modeling projections. In the face of this uncertainty, we regard our ability to consider such sites as receptors for

purposes of good neighbor analysis under CAA section 110(a)(2)(D)(i)(I) to be a function of the requirement to prohibit emissions that interfere with maintenance of the NAAQS; even if our transport modeling projects that an area may reach attainment in 2023, we have other information indicating that there is an identified risk that attainment will not in fact be achieved in 2023. The EPA's analysis of these additional receptors further is explained in section IV.D of this document.

However, because we did not identify this basis for receptor-identification at proposal, in this final action we are only using this receptor category on a confirmatory basis. That is, for states that we find linked based on our traditional modeling-based methodology in 2023, we find in this final analysis that the linkage at Step 2 is strengthened and confirmed if that state is also linked to one or more "violating monitor" receptors. If a state is only linked to a violating-monitor receptor in this final analysis, we are deferring promulgating a final FIP (and we have also deferred taking final action on that state's SIP submittal). This is the case for the State of Tennessee. Among the states that previously had their transport SIPs fully approved for the 2015 ozone NAAQS, the EPA has also identified a linkage to violating-monitor receptors for the State of Kansas. The EPA intends to further review its air quality modeling results and recent measured ozone levels, and we intend to address these states' good neighbor obligations as expeditiously as practicable in a future action.

b. Step 2 Approach

The EPA applies the same approach for identifying which states are contributing to downwind nonattainment and maintenance receptors as it has applied in the three prior CSAPR rulemakings. CSAPR, the CSAPR Update, and the Revised CSAPR Update used a screening threshold of 1 percent of the NAAQS to identify upwind states that were "linked" to downwind air pollution problems. States with contributions greater than or equal to the threshold for at least one downwind nonattainment or maintenance receptor identified in Step 1 were identified in these rules as needing further evaluation of their good neighbor obligations to downwind states at Step 3.[84] The EPA evaluated each state's contribution based on the average relative downwind impact calculated

[84] For ozone, the impacts include those from VOC and NO$_X$ from all sectors.

over multiple days.[85] States whose air quality impacts to all downwind receptors were below this threshold did not require further evaluation for measures to address transport. In other words, the EPA determined that these states did not contribute to downwind air quality problems and therefore had no emissions reduction obligations under the good neighbor provision. The EPA applies a relatively low contribution screening threshold because many downwind ozone nonattainment and maintenance receptors receive transport contributions from multiple upwind states. While the proportion of contribution from a single upwind state may be relatively small, the effect of collective contribution resulting from multiple upwind states may substantially contribute to nonattainment of or interference with maintenance of the NAAQS in downwind areas. The preambles to the proposed and final CSAPR rules discuss the use of the 1 percent threshold for CSAPR. *See* 75 FR 45237 (August 2, 2010); 76 FR 48238 (August 8, 2011). The same metric is discussed in the CSAPR Update, *see* 81 FR 74538, and in the Revised CSAPR Update, *see* 86 FR 23054. In this final rule, the EPA has updated the air quality modeling data used for determining contributions at Step 2 of the 4-step interstate transport framework using the 2016v3 modeling platform. The EPA continues to find that this threshold is appropriate to apply for the 2015 ozone NAAQS. This rule's application of the Step 2 approach is comprehensively described in section IV of this document.

Many commenters challenged the use of a 1 percent of NAAQS threshold or otherwise raised issues with the EPA's Step 2 methodology. These comments are addressed in section IV.F of this document and in the *RTC* document.

### c. Step 3 Approach

The EPA continues to apply the same approach as the prior three CSAPR rulemakings for evaluating "significant contribution" at Step 3.[86] For states that are linked at Step 2 to downwind air quality problems, CSAPR, the CSAPR Update, and the Revised CSAPR Update evaluated $NO_X$ reduction potential, cost, and downwind air quality improvements available at various mitigation technology breakpoints (represented by cost thresholds) in the multi-factor test. In CSAPR, the CSAPR Update, and the Revised CSAPR Update, the EPA selected the technology breakpoint (represented by a cost threshold) that, in general, maximized cost-effectiveness—*i.e.,* that achieved a reasonable balance of incremental $NO_X$ reduction potential and corresponding downwind ozone air quality improvements, relative to the other emissions budget levels evaluated. *See, e.g.,* 81 FR 74550. The EPA determined the level of emissions reductions associated with that level of control stringency to constitute significant contribution to nonattainment or interfere with maintenance of a NAAQS downwind. *See, e.g.,* 86 FR 23116. This approach was upheld by the U.S. Supreme Court in *EPA* v. *EME Homer City.*[87]

In this action, the EPA applies this approach to identify EGU and non-EGU $NO_X$ control stringencies necessary to address significant contribution for the 2015 ozone NAAQS. The EPA applies a multifactor assessment using cost-thresholds, total emissions reduction potential, and downwind air quality effects as key factors in determining a reasonable balance of $NO_X$ controls in light of the downwind air quality problems. The EPA's evaluation of available $NO_X$ mitigation strategies for EGUs focuses on the same core set of measures as prior transport rules, and the EPA finalizes a control stringency for EGUs from these measures that is commensurate with the nature of the ongoing ozone nonattainment and maintenance problems observed for the 2015 ozone NAAQS. Similarly, in this action, the EPA includes other industrial sources (non-EGUs) in its Step 3 analysis and finalizes emissions limitations for certain non-EGU sources as needed to eliminate significant contribution and interference with maintenance. The available reductions and cost-levels for the non-EGU stringency is commensurate with the control strategy for EGUs.

In CSAPR, the CSAPR Update, and the Revised CSAPR Update, the EPA focused its Step 3 analysis on EGUs. In the Revised CSAPR Update, in response to the *Wisconsin* decision's finding that the EPA had not adequately evaluated potential non-EGU reductions, *see* 938 F.3d at 318, the EPA determined that the available $NO_X$ emissions reductions from non-EGU sources, for purposes of addressing good neighbor obligations for the 2008 ozone NAAQS, at a comparable cost threshold to the required EGU emissions reductions (for which the EPA used an adjusted representative cost of \$1,800 per ton), and based on the timing of when such measures could be implemented, did not provide a sufficiently meaningful and timely air quality improvement at the downwind receptors before those receptors were projected to resolve. *See* 86 FR 23110. On that basis, the EPA made a finding that emissions reductions from non-EGU sources were not required to eliminate significant contribution to downwind air quality problems under the interstate transport provision for the 2008 ozone NAAQS. In this rule, the EPA's "significant contribution" analysis at Step 3 of the 4-step framework includes a comprehensive evaluation of major stationary source non-EGU industries in the linked upwind states. The EPA finds that emissions from certain non-EGU sources in the upwind states significantly contribute to downwind air quality problems for the 2015 ozone NAAQS, and that cost-effective emissions reductions from these sources are required to eliminate significant contribution under the interstate transport provision. Therefore, this rule requires emissions reductions from non-EGU sources in upwind states to fulfill interstate transport obligations for the 2015 ozone NAAQS. This analysis is described fully in section V of this document.

In this rule, the EPA also continues to apply its approach for assessing and avoiding "over-control." In *EME Homer*

---

[85] The number of days used in calculating the average contribution metric has historically been determined in a manner that is generally consistent with the EPA's recommendations for projecting future year ozone design values. Our ozone attainment demonstration modeling guidance at the time of CSAPR recommended using all model-predicted days above the NAAQS to calculate future year design values (*https://www3.epa.gov/ttn/scram/guidance/guide/final-03-pm-rh-guidance.pdf*). In 2014, the EPA issued draft revised guidance that changed the recommended number of days to the top-10 model predicted days (*https://www3.epa.gov/ttn/scram/guidance/guide/Draft-O3-PM-RH-Modeling_Guidance-2014.pdf*). For the CSAPR Update, the EPA transitioned to calculating design values based on this draft revised approach. The revised modeling guidance was finalized in 2019 and, in this regard, the EPA is calculating both the ozone design values and the contributions based on a top-10 day approach (*https://www3.epa.gov/ttn/scram/guidance/guide/O3-PM-RH-Modeling_Guidance-2018.pdf*).

[86] For simplicity, the EPA (and courts) at times will refer to the Step 3 analysis as determining "significant contribution"; however, the EPA's approach at Step 3 also implements the "interference with maintenance" prong of the good neighbor provision by also addressing emissions that impact the maintenance receptors identified at Step 1. See 86 FR 23074 ("In effect, EPA's determination of what level of upwind contribution constitutes 'interference' with a maintenance receptor is the same determination as what constitutes 'significant contribution' for a nonattainment receptor. Nonetheless, this continues to give independent effect to prong 2 because the EPA applies a broader definition for identifying maintenance receptors, which accounts for the possibility of problems maintaining the NAAQS under realistic potential future conditions."). See also *EME Homer City,* 795 F.3d 118, 136 (upholding this approach to prong 2).

[87] *EPA* v. *EME Homer City Generation, L.P.,* 572 U.S. 489 (2014).

*City,* the Supreme Court held that "EPA cannot require a State to reduce its output of pollution by more than is necessary to achieve attainment in every downwind State or at odds with the one-percent threshold the Agency has set." 572 U.S. at 521. The Court acknowledged that "instances of 'over-control' in particular downwind locations may be incidental to reductions necessary to ensure attainment elsewhere." *Id.* at 492.

Because individual upwind States often 'contribute significantly' to nonattainment in multiple downwind locations, the emissions reductions required to bring one linked downwind State into attainment may well be large enough to push other linked downwind States over the attainment threshold. As the Good Neighbor Provision seeks attainment in *every* downwind State, however, exceeding attainment in one State cannot rank as 'over-control' unless unnecessary to achieving attainment in *any* downwind State. Only reductions unnecessary to downwind attainment *anywhere* fall outside the Agency's statutory authority.

*Id.* at 522 (footnotes omitted).

The Court further explained that "while EPA has a statutory duty to avoid over-control, the Agency also has a statutory obligation to avoid 'under-control,' *i.e.,* to maximize achievement of attainment downwind." *Id.* at 523. Therefore, in the CSAPR Update and Revised CSAPR Update, the EPA evaluated possible over-control by considering whether an upwind state is linked solely to downwind air quality problems that can be resolved at a lower cost threshold, or if upwind states would reduce their emissions at a lower cost threshold to the extent that they would no longer meet or exceed the 1 percent air quality contribution threshold. *See, e.g.,* 81 FR 74551–52. *See also Wisconsin,* 938 F.3d at 325 (over-control must be proven through a "'particularized, as-applied challenge'") (quoting *EME Homer City Generation,* 572 U.S. at 523–24). The EPA continues to apply this framework for assessing over-control in this rule, and, as discussed in section V.D.4 of this document, does not find any over-control at the final control stringency selected.

This evaluation of cost, $NO_X$ reductions, and air quality improvements, including consideration of whether there is proven over-control, results in the EPA's determination of the appropriate level of upwind control stringency that would result in elimination of emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in downwind areas.

*Comment:* Commenters alleged that the EPA lacks authority to regulate EGUs under the good neighbor provision of the CAA, or at least in the manner proposed, because in their view, this regulation would intrude into areas of regulation that are reserved to other Federal agencies or are beyond the EPA's expertise. They focused in particular on the EGU trading program enhancements, which they alleged would threaten electric grid reliability, and asserted that EPA lacks authority or expertise to dictate the mix of electricity generation in the country.

*Response:* The EPA disagrees that the regulation of EGUs in this action is unlawful or unsupported. The Agency has consistently and successfully regulated EGUs' ozone season $NO_X$ emissions under the good neighbor provision for over 25 years, beginning with the 1997 $NO_X$ SIP Call. This action does not intrude on other Federal agencies' authorities and responsibilities with respect to managing the electric power grid and ensuring reliable electricity. While other agencies such as the Federal Energy Regulatory Commission (FERC) have primary responsibility for ensuring reliability of the bulk electric system, the EPA has ensured that its final rule here will not create electric reliability concerns. See section VI.B.1.d of this document. Thus, to the extent commenters are raising a record-based issue that the EPA through this action has created a reliability concern, we disagree. The EPA engaged in a series of stakeholder meetings with Reliability Coordinators who commented on the proposed rule, including several Regional Transmission Organizations (RTOs) as well as non-RTO entities throughout the rulemaking process.[88]

To the extent commenters maintain that—despite this record of collaboration and sensitivity to the need to ensure reliability in the implementation of its mandates, including in this rule—the EPA nonetheless fundamentally lacks authority to regulate the electric-power sector in any way that "impact[s] national electricity and energy markets," the EPA disagrees. The EPA has successfully regulated interstate ozone-precursor emissions from the power sector since the $NO_X$ SIP Call and the establishment of the $NO_X$ Budget Trading Program. *See generally Michigan* v. *EPA,* 213 F.3d 663 (D.C. Cir.

2000); *Appalachian Power Co.* v. *EPA,* 249 F.3d 1032 (D.C. Cir. 2001). In fact, each of the EPA's interstate ozone transport rulemakings has focused on the regulation of ozone-precursor emissions from the power sector (all but the $NO_X$ SIP Call exclusively), because substantial, cost-effective reductions in ozone-precursor emissions have been and continue to be available from fossil-fuel fired EGUs. *See, e.g.,* 63 FR 57399–400 ($NO_X$ SIP Call); 70 FR 25165 and 71 FR 25343 (CAIR and CAIR FIP); 76 FR 48210–11 (CSAPR); 81 FR 74507 (CSAPR Update); 86 FR 23061 (Revised CSAPR Update).[89]

This rule, like all prior EPA ozone-transport rulemakings, regulates only one aspect of the operation of fossil-fuel fired EGUs, that is, the emissions of $NO_X$ as an ozone-precursor pollutant during the ozone season. This rule limits EGU $NO_X$ emissions that interfere with downwind states' ability to attain and maintain the 2015 ozone NAAQS. The rule does not regulate any other aspect of energy generation, distribution, or sale. For these reasons, the rule does not intrude on FERC's power under the Federal Power Act, 16 U.S.C. 791a, *et seq.* And, as in prior transport rules, the EPA implements this regulation through a proven, flexible mass-based emissions trading program that integrates well with, and in no way intrudes upon, the management of the power sector under other state and Federal authorities. This rule will not alter the procedures system operators employ to dispatch resources or force changes to FERC-jurisdictional electricity markets, nor have commenters offered any explanation in this regard themselves.

The actual compliance requirement that the EGUs must meet in the allowance trading system finalized here—just as in all prior interstate transport trading programs—is simply to hold sufficient allowances to cover emissions during a given control period, not to undertake any specific

---

[88] See Documents no. EPA–HQ–OAR–2021–0668–0938, EPA–HQ–OAR–2021–0668–0940, EPA–HQ–OAR–2021–0668–0941, EPA–HQ–OAR–2021–0668–0942, EPA–HQ–OAR–2021–0668–0943, EPA–HQ–OAR–2021–0668–0944, and EPA–HQ–OAR–2021–0668–0945 in the docket for this rulemaking.

[89] There are myriad other examples of effective power sector regulation under the CAA and other environmental statutes, including for example, new source performance standards (NSPS), best available retrofit technology (BART) requirements, and mercury and air toxics standards (MATS) under the CAA; effluent limitation guidelines (ELGs) under the Clean Water Act; and coal combustion residuals (CCR) requirements under the Resource Conservation and Recovery Act. Whether implemented through unit- or facility-level pollution control requirements or through emissions-trading or other market-based programs, these regulations have been effective in reducing air and water pollution while not intruding into the regulatory arenas of other state and Federal entities. *See* Section 1 of the *RTC* for further discussion.

compliance strategy.[90] The owner or operator of an EGU has flexibility in determining how it will meet this requirement, whether through the add-on emissions controls that the EPA has selected in our Step 3 analysis, or through some other method or methods of compliance. The costs of meeting this allowance-holding requirement—just like the cost associated with meeting any other regulatory requirements—could possibly then be factored into what that unit bids in the wholesale electricity market (or in regulated jurisdictions, would factor into utility regulators' determinations of what can be cost-recovered).

Those costs could, in turn, result in a reduction in electricity generation from higher-emitting sources and an increase in electricity generation from lower-emitting or zero-emitting generators, but that kind of generation shifting (not mandated but occurring as an economic choice by the regulated sources) is consistent, and in no way interferes with, the existing security-constrained economic dispatch protocols of the modern electrical grid. Further, this type of ''impact'' on electricity markets—merely incidental, not mandated or even intended—is of the same type that results from any other kind of regulation, environmental or otherwise. Indeed, the U.S. Supreme Court recognizes that regulatory actions that may have some ''effect,'' or impact, in electricity markets do not on that basis alone intrude into authorities reserved to electricity rate-setting regulators by the Federal Power Act. *See FERC* v. *Electric Power Supply Ass'n,* 577 U.S. 260, 282–84 (2016) (distinguishing between actions that have an effect on retail rates and actual intrusion into retail rate-setting itself); *see also Hughes* v. *Talen,* 578 U.S. 150, 166 (2016). The Supreme Court again recognized this distinction between ''incidental'' effects caused by lawfully issued environmental regulations and

attempts to mandate a particular energy mix in *West Virginia* v. *EPA. See* 142 S. Ct. 2587, 2613 n.4 (2022) (''[T]here is an obvious difference between (1) issuing a rule that may end up causing an incidental loss of coal's market share, and (2) simply announcing what the market share of coal, natural gas, wind, and solar must be . . . .'').

This rule is squarely in the former camp: as the most stringent component of its emissions controls strategy for EGUs, the EPA has determined that to eliminate significant contribution to harmful levels of ozone in other states, certain fossil-fuel fired EGUs in ''linked'' upwind states that do not already have selective catalytic reduction (SCR) post-combustion control technology, should install it (or achieve emissions reductions commensurate with that technology). SCR is a well-established at-the-source $NO_X$ control technology already in use by EGUs representing roughly 60 percent of the existing coal-fired generating capacity in the United States. This technology can be installed and operated to reduce $NO_X$ emissions without forcing the retirement or reduced utilization of any EGU. However, if market conditions are such that an EGU faced with this mandate (again, as expressed through an emissions trading budget) finds it more economic to comply with the mandate through the purchase of allowances, installation of other types of pollution control, reduced utilization, and/or retirement, rather than installing SCR technology, that is a choice that the EGU owner/operator can freely make under this rule.[91] Security constrained economic dispatch is thereby maintained and is in no way interfered with.

The EPA recognizes that cost to operate generators is one of the major factors that system operators utilize to determine ''merit'' order in dispatching resources. However, this rule does not intrude in any way into that process. To the extent that compliance with environmental regulations is a kind of cost that may need to be factored into generators' bids, this rule is no different

than many other such requirements EGUs are already subject to. Further, as in prior transport rules, this rule applies a uniform control stringency to EGUs within the covered upwind states. EGUs that may have enjoyed a competitive advantage in the past through not bearing the costs of installing and running state-of-the-art emissions control technology now must bear that cost just as their competitors with that technology already are. *Cf. EME Homer City,* 572 U.S. 489, 519 (CSAPR is ''[e]quitable because, by imposing uniform cost thresholds on regulated States, EPA's rule subjects to stricter regulation those States that have done relatively less in the past to control their pollution. Upwind States that have not yet implemented pollution controls of the same stringency as their neighbors will be stopped from free riding on their neighbors' efforts to reduce pollution. They will have to bring down their emissions by installing devices of the kind in which neighboring States have already invested.'').

Finally, we note that this final rule does not include ''generation shifting'' as a component of the budget-setting process, even in the limited way that it had been used in prior transport rules like CSAPR and the CSAPR Update, *i.e.,* to ensure the budget provided adequate incentive to ensure implementation of the selected emission-control strategy. *See* section V.B.1.f of this document. Further comments regarding legal authority for ''generation shifting,'' relationship to state authorities, and expertise associated with grid reliability are addressed in section 1.3 of the *RTC.* We further discuss our consideration of grid reliability concerns and adjustments in the approach to the EGU emissions trading program from proposal in section VI.B.1.d of this document.

*Comment:* Commenters generally challenged the EPA's authority to establish emissions control requirements for non-EGU industrial sources in this action, or argued that such controls are unnecessary or unsupported, or run contrary to the EPA's prior actions under the good neighbor provision.

*Response:* The states and the EPA have authority under CAA section 110(a)(2)(D)(i)(I) to prohibit emissions from ''any source or other type of emissions activity'' that are found to significantly contribute to nonattainment or interfere with maintenance of the NAAQS in downwind states. This language is not limited only to power plant emissions, nor is it limited only to ''major'' sources or ''stationary'' sources. Thus, as a legal

---

[90] The EPA has included in this trading program certain ''enhancements'' to ensure that the program continues to eliminate the emissions the EPA has determined constitute ''significant contribution'' over the entire life of the trading program. While one of the enhancements elevates a type of conduct that was already strongly discouraged into an enforceable violation, the other enhancements all simply modify the traditional allowance-based program structure to revise how the specific quantities of allowances that must be surrendered or the specific quantities of allowances available for surrender are determined. In finalizing this rule, the EPA has made a number of changes to its proposed enhancements to the trading program in response to comment and in part to ensure no impact on system reliability. Nonetheless, with these changes, the EPA has determined that the enhanced trading program can be implemented without impacting grid reliability. See section VI.B.1.d of this document.

[91] As explained in section V.B of this document, the imposition of a backstop emissions rate beginning in 2030 for units that do not already have SCR installed could lead the owner of a given unit to decide that the unit's continued operation would be uneconomic without installation of SCR, but the establishment of technology-based emissions rates that require such decisions is consistent with decades of the EPA's rulemaking and permitting actions requiring source-specific pollution controls. Further, the backstop rate in this program is implemented through an enhanced allowance-surrender ratio, thus preserving some degree of flexibility through the emissions-trading program as the mechanism of compliance.

matter, the emissions control requirements for certain large "non-EGU" industrial sources in this action are grounded in unambiguous statutory authority, in particular the statute's use of the broad term "any source." Whereas the Act elsewhere includes definitions of "major stationary source," "small source," and "stationary source," *see, e.g.,* CAA section 302(j), (x), and (z), no such qualifying terms are used with respect to the term "any source" at CAA section 110(a)(2)(D)(i). Rather, the scope of authority in this provision expands to encompass "other type of emissions activity" in addition to "any source." The EPA has previously included non-EGU industrial sources in findings quantifying states' obligations under the good neighbor provision, in the 1998 NO$_X$ SIP Call, *see* 63 FR 57365.[92] *See also Michigan* v. *EPA,* 213 F.3d 663, 690–93 (upholding the inclusion of certain non-EGU boilers in the NO$_X$ SIP Call). The EPA's determinations in prior transport rules not to regulate sources beyond the power sector were grounded in considerations not related to the Agency's statutory authority. For example, in the original CSAPR rulemaking, the EPA determined that the analytical effort needed to regulate non-EGU industrial sources would substantially delay the implementation of emissions reductions from the power sector. *See, e.g.,* 76 FR 48247–48 ("[D]eveloping the additional information needed to consider NO$_X$ emissions from non-EGU source categories to fully quantify upwind state responsibility with respect to the 1997 ozone NAAQS would substantially delay promulgation of the Transport Rule. . . . [W]e do not believe that effort should delay the emissions reductions and large health benefits this final rule will deliver[.]"). The EPA acknowledged that by not addressing non-EGUs, it may not have promulgated a complete remedy to good neighbor obligations in CSAPR, *id.* at 48248. Nonetheless, the EPA went on to explain that there were limited emissions reductions available from non-EGUs at the cost thresholds the EPA determined would deliver

substantial reductions from power plants. *See id.* at 48249 (the EPA's "preliminary assessment in the rule proposal suggested that there likely would be very large emissions reductions available from EGUs before costs reach the point for which non-EGU sources have available reductions . . . . EPA revisited these non-EGU reduction cost levels in this final rulemaking and verified that there are little or no reductions available from non-EGUs at costs lower than the thresholds that EPA has chosen . . . ."). The EPA noted in CSAPR that states retained the authority to regulate non-EGUs as a method of addressing their good neighbor obligations. *Id.* at 48320. The EPA also noted in CSAPR that "potentially substantial" non-EGU emissions reductions could be available in future rulemakings applying a higher cost threshold. *See id.* at 48256.

Similarly, in the CSAPR Update, which addressed good neighbor obligations for the 2008 ozone NAAQS, the EPA found that regulation of non-EGUs was not warranted as the analysis required could delay the expeditious implementation of power plant reductions. The EPA found that the availability and cost-effectiveness of non-EGU reductions was uncertain and further analysis could delay implementation of the EGU strategy beyond 2017. The EPA acknowledged that it was not promulgating a complete remedy for good neighbor obligations for the 2008 ozone NAAQS and indicated its intention to further review emissions-reduction opportunities from non-EGU and EGU sources. 81 FR 74521–22.

In *Wisconsin,* the court held that the EPA's deferral of a complete good neighbor remedy by 2017, on the basis, among other things, of uncertainty regarding non-EGU emissions reductions and the need for further regulatory analysis, was unlawful. 938 F.3d at 318–19. The court noted that " 'the statutes and common sense demand regulatory action to prevent harm, even if the regulator is less than certain.' " *Id.* at 319 (quoting *Ethyl Corp.* v. *EPA,* 541 F.2d 1, 24–25 (D.C. Cir. 1976)), and that agencies can only avoid meeting their statutory obligations where "scientific uncertainty is so profound that it precludes EPA from making a reasoned judgment." *Id.* (citing *Massachusetts* v. *EPA,* 549 U.S. 497, 534 (2007)). Further, the court rejected the EPA's argument that it would have delayed its rulemaking if the EPA needed to complete a non-EGU analysis in a timely manner, holding that "administrative infeasibility" is not sufficient to "justify . . .

noncompliance with the statute." *Id.* Rather, the Agency would need to "meet the 'heavy burden to demonstrate the existence of an impossibility.' " *Id.* (quoting *Sierra Club* v. *EPA,* 719 F.2d 436, 462 (D.C. Cir. 1983)).

Following the remand of the CSAPR Update in *Wisconsin,* in the Revised CSAPR Update, the EPA conducted an analysis of non-EGUs to ensure it had implemented a complete remedy to eliminate significant contribution for the covered states for the 2008 ozone NAAQS. While acknowledging uncertainty in the datasets for non-EGUs, the EPA concluded: "[U]sing the best information currently available to the Agency, . . . the EPA is concluding that there are relatively fewer emissions reductions available at a cost threshold comparable to the cost threshold selected for EGUs. In the EPA's reasoned judgment, the Agency concludes such reductions are estimated to have a much smaller effect on any downwind receptor in the year by which the EPA finds such controls could be installed." 86 FR 23059. Therefore, the EPA determined control of non-EGU emissions was not required to eliminate significant contribution for the 2008 ozone NAAQS.

The circumstances that led the EPA to defer or decline regulation of non-EGU sources in CSAPR, the CSAPR Update, and the Revised CSAPR Update, are not present here, and the EPA's determination in this action that prohibiting certain emissions from certain non-EGU sources is necessary to eliminate significant contribution for the 2015 ozone NAAQS is a logical extension of the analyses and evolution of regulatory policy development spanning its prior good neighbor rules, now applied to implement this more protective NAAQS. As the EPA explained at proposal, unlike in CSAPR and the Revised CSAPR Update, in this action the EPA finds that available reductions and cost-levels for the non-EGU stringency are commensurate with the control strategy for EGUs. Following consideration of comments and after some adjustments in the non-EGU analysis and control strategy, in this final rule, the EPA continues to find this to be the case. *See* sections V.C and V.D of this document.

In particular, the EPA continues to find that cost-effective emissions reductions are available for non-EGUs at a representative cost-threshold that is lower than the cost-threshold the EPA is applying for EGUs. *See* section V.C. of this document. These emissions control strategies are generally comparable to the emissions reduction requirements that similar sources in downwind states

---

[92] Specifically, in the NO$_X$ SIP Call, the EPA set statewide budgets while states could determine which sectors to regulate. The EPA recommended that states regulate certain types of non-EGUs and quantified the statewide budgets based in part on the emissions reductions from those types of non-EGUs. In the parallel rule that followed under the EPA's CAA section 126(b) authority to directly regulate emissions to eliminate significant contribution, we promulgated an emissions trading program that would have included these same types of non-EGUs. Before this rule was implemented, all states adopted equivalent state trading programs using the NO$_X$ SIP Call model rule.

are already required to meet. *See* section V.B.2 of this document. The EPA finds that the implementation of these emissions control strategies at non-EGUs, in conjunction with the strategies for EGU, will make a cost-effective and meaningful improvement in air quality through reducing ozone levels at the identified downwind receptors, and, therefore, the EPA has determined that these strategies will eliminate the amount of upwind emissions needed to address significant contribution under the good neighbor provision. The EPA's action here is focused on the most impactful industries and emissions units as determined by our evaluation of the power sector and the non-EGU screening assessment prepared for the proposal; indeed, of the 41 industries, as identified by North American Industry Classification System codes, we analyzed, only nine industries met the criteria for further evaluation of significant contribution. *See* section V.B.2 of this document. Further, the EPA finds that these strategies do not result in "overcontrol." *See* section V.D.4 of this document. As such, the EPA maintains that its final determinations regarding non-EGUs and its inclusion of non-EGU emissions sources within this final rule are statutorily authorized and lawful.[93]

The EPA disagrees that it should defer regulation of industrial sources to the NSPS program under CAA section 111(b). CAA section 111(b) does not expressly provide for the elimination of "significant contribution" as is required under CAA section 110(a)(2)(D)(i)(I). In particular, commenter's statement that NSPS rulemakings under section 111(b) will appropriately address the emissions that we find must be eliminated in this action is not correct. Standards under section 111(b) apply only to new and modified sources, not existing sources. This action, however, finds that reductions in ongoing emissions from existing sources are needed to eliminate significant contribution. An NSPS standard for new and modified sources would not address such emissions from existing sources. To the extent that covered sources in this action also may be covered by an older NSPS, these sources nonetheless continue to have emissions that the EPA finds significantly contribute and can be eliminated through further emissions control as determined in this action. We further disagree with commenter's separate suggestion that the EPA use

section 111(b) and (d) to regulate both new and existing sources of ozone season NOₓ, which is premised on the incorrect notion that the EPA's action here is an attempt to regulate entire source categories nationwide, rather than to eliminate significant contribution pursuant to CAA section 110(a)(2)(D)(i)(I). This action applies only to the extent a state is "linked" to downwind receptors, and therefore this action only regulates covered non-EGU industrial sources in 20 states. Further, this comment ignores that the regulation of criteria pollutant emissions from existing sources under CAA section 111(d) is limited by the criteria pollutant exclusion in CAA section 111(d)(1)(A)(i).

The EPA agrees with the commenters who assert that the EPA's authority to regulate non-EGUs under the good neighbor provision is well-grounded in administrative precedent and case law. Our previous discussion briefly recites several of the most salient aspects of that history. We also agree that the statutory language is not limited only to those sources that emit above 100 tons per year. The EPA's Step 3 and Step 4 analyses in this regard, which establish certain thresholds based on historical actual emissions, potential to emit and/or metrics for unit design capacity, reflect a reasoned judgment by the Agency regarding which emissions can be cost-effectively eliminated to address significant contribution, under the facts and circumstances of this action. That these thresholds are designed to exclude certain smaller or lower-emitting units does not reflect a determination that the EPA lacks legal authority to regulate such sources under different facts and circumstances.

The EPA identified two industry tiers of potential non-EGU emissions reductions in its non-EGU screening assessment at proposal, based on screening metrics intended to capture different kinds of impacts that non-EGU sources may have on identified receptors. The EPA agrees that it is only authorized to prohibit emissions under the good neighbor provision that significantly contribute to nonattainment or interfere with maintenance in downwind states, and we determined that these industries did so. The EPA sought comment on whether additional non-EGU industries significantly contributed to nonattainment or interfered with maintenance in downwind states. The EPA did not receive comments identifying other industrial stationary sources that are more impactful that should be regulated instead of those the EPA identified. We believed at proposal

and confirm here in our final rule that the methodology used in the screening assessment comported with the factors that we consider at Step 3. Further, the EPA's 4-step interstate transport framework, including the Step 3 analysis and an overcontrol assessment, ensure that the emissions reductions achieved at each source covered by this rule are in fact justified as part of an overall, complete remedy to eliminate significant contribution for the covered states for the 2015 ozone NAAQS. The EPA has decided to finalize emissions limitations for all of the non-EGU industries, with some modifications from proposal reflecting public input, as discussed in section VI.C of this document. The Agency's authority to establish unit- and/or source-specific emissions limitations in exercising our FIP authority is further discussed in section III.B.1 of this document.

*Comment:* Commenters raise additional issues with the overall approach of the rule at Step 3 to address significant contribution through our evaluation of EGU and non-EGU strategies through parallel but separate analyses. They stated that the EPA failed to establish that the identified non-EGU emissions reductions are needed to eliminate significant contribution. Commenters stated that the identified non-EGU emissions reductions are not impactful of air quality at receptors or that they are much less cost-effective than the EGU emissions reductions. Commenters stated that the EPA grouped all non-EGU emissions reductions together in making a cost-effectiveness determination that is only an average and ignores significant variation in costs associated with controls on different types of non-EGU emissions units. They also stated the EPA did not assess multiple control technologies in the way that it did for EGUs, and they argued there is great variation in the profile of non-EGU industries and emissions unit types in the different upwind states or that individual emissions units do not contribute to an out-of-state air quality problem at all. Commenters argued that certain non-EGU controls were not feasible, or that the EPA had applied a different standard for "feasibility" for non-EGUs than it did for EGUs. Commenters stated that the EPA should have provided a mass-based trading option for non-EGUs just as it had for EGUs. By contrast, other commenters supported the regulation of non-EGUs in this action as necessary to ensure a complete remedy to good neighbor obligations, since the statute is not limited to regulating power plants.

---

[93] Certain changes in the emissions control strategies for non-EGUs reflecting comments and updated information are explained in section VI.C of this document.

Some commenters further stated that EGUs should not face any further emissions reduction obligation because all cost-effective controls have already been identified through prior transport rules, and that any further regulation of EGUs would only lead to the retirement of coal plants, which they believe is the EPA's true objective. Finally, some commenters argued that the EPA had not ensured that it only regulated up to the minimum needed for downwind areas to come into attainment.

*Response:* Issues related to the specific technical bases for the Agency's determinations of what emissions constitute "significant contribution" at Step 3 of the 4-step framework are addressed in section V of this document. Here, we evaluate commenters' more general assertions that this action addresses non-EGU or EGU emissions in an inconsistent way. First, the EPA agrees with commenters that the task of evaluating significant contribution from the non-EGU industries is complex compared to EGUs in light of the much greater diversity in industries and emissions unit types. This, however, is not a valid basis to avoid emissions control requirements on such sources if needed to eliminate significant contribution. In this respect, the EPA's analysis in this final rule is that the 4-step framework, as upheld by the Supreme Court in *EME Homer City,* can be adequately applied even to this more complex set of sources in a way that parallels the analysis previously conducted only for EGUs. This analysis relies on evaluation of uniform levels of control stringency across all upwind states to find a level of emissions control that is cost-effective and collectively delivers meaningful downwind air quality improvement. For non-EGUs, the EPA identified the most impactful industries and emissions unit types and evaluated emissions control strategies for these units that have been demonstrated or applied across many similar facilities and emissions units. The EPA has evaluated whether these strategies are cost-effective on a cost-per-ton basis, and in particular has compared these strategies to those selected for EGUs. This analysis is set forth in sections V and VI of this document and associated technical support documents.

Commenter's statement that the establishment of a uniform level of control for each group of industrial units across the linked upwind states fails to assess with greater precision or define a state-specific proportion of emissions reduction that is needed for each downwind receptor is effectively an attempt to relitigate *EME Homer City.*

The Court in that case rejected that the EPA must define significant contribution by reference to a specific quantum of reductions that each state must achieve that is proportional to its impact at a downwind receptor. The Court agreed with the EPA's concerns as to why that approach would be problematically complicated or even impossible to apply in light of the complex set of linkages among states for a regional pollutant like ozone. *See* 572 U.S. at 515–17. The Court found that the use of uniform cost thresholds to allocate responsibility for good neighbor obligations to be efficient and equitable, in that it requires those sources that have done less to reduce their emissions to come up to a minimum level of performance to what other sources are already achieving. *Id.* at 519. The EPA's analysis in this action in section V of this document establishes that this continues to be an appropriate means of delivering meaningful air quality improvement to downwind receptors, taking into consideration the complexities of interstate pollution transport.

Not every upwind state has the same mix of non-EGU industries and emissions unit types, and it is also the case that the costs for installation of the selected level of control technology will vary from facility to facility based on site-specific considerations. This is also true for the set of EGU sources regulated here and in previous CSAPR rulemakings. These real-world complexities do not obviate the broader policy and technical judgements that the EPA makes at Step 3 regarding what level of emissions control performance can be achieved on a region-wide basis to resolve significant contribution for a regional-scale pollutant like ozone. The EPA's design of cost thresholds derives from the identification of discrete types of $NO_X$ emissions control strategies. The EPA then identifies a representative cost-effectiveness on a per ton basis for that technology. In the Step 3 analysis, it is not the cost per ton value itself that is inherently meaningful, but rather how that cost-effectiveness value relates to other control stringencies, how many emissions reductions may be obtained, and how air quality is ultimately impacted. The selected level of control stringency reflects a point at which further emissions mitigation strategies become excessively costly on a per-ton basis while also delivering far fewer additional emissions reductions and air quality benefits. This is often referred to as a "knee in the curve" analysis. There are always inherent uncertainties in identifying a representative cost per ton

value for any particular control stringency, but this in itself does not upset the EPA's ability to render an overall policy judgment based on the Step 3 factors as to a set of emissions control strategies that together eliminate significant contribution. *See* 86 FR 23054, 23073 (responding to similar comments on the Revised CSAPR Update).

We note that the EPA has made a number of adjustments to the non-EGU emissions limits identified at Step 4 to accommodate legitimate concerns regarding the ability of certain non-EGU facilities to meet the emissions control requirements that the EPA had proposed. The Agency's determinations regarding feasibility and installation timing for pollution controls are comparable and not inconsistent between EGUs and non-EGUs. The EPA is not establishing a trading program for non-EGUs because the Agency does not have adequate baseline emissions data and information on monitoring currently at many of these emissions units to develop emissions budgets that could reliably implement the Step 3 determinations made in this action. However, for most of the non-EGU industries,[94] the EPA is not mandating a specific control technology and is instead establishing numeric emissions limits that are uniform across the region and that allow sources to choose how to comply. The EPA's analysis, including review of RACT determinations, consent decrees, and permitting actions, shows that these emissions limits and control requirements are achievable by existing units in the non-EGU industries covered by this final rule. This rule will therefore bring all of these impactful industries and unit types across the region of linked upwind states up to this standard of performance, and thus will result collectively in a relatively substantial decrease in ozone-season $NO_X$ emissions, with associated reductions in ozone levels projected to result at the downwind receptors. This is further discussed in section V.D.

Some commenters alleged that the EPA's EGU control strategy goes beyond the cost-effectiveness determinations of prior transport rules, and they believe that the EPA's true objective is to force the retirement of coal plants. First, we note that the EGU emissions control strategy is premised entirely on at-the-

---

[94] For reheat furnaces in the Iron and Steel Mills and Ferroalloy Manufacturing industry, the EPA is establishing requirements to operate low-$NO_X$ burners achieving a specified level of emissions reduction; this approach is needed to allow for unit-specific testing before an appropriate emissions limitation can be set. *See* section VI.C.3 of this document.

source emissions control technologies that are widely available and in use across the EGU fleet. It is not the EPA's intention in this rule to force the retirement of any EGU or non-EGU facilities or emissions units but to identify and eliminate significant contribution under CAA section 110(a)(2)(D)(i)(I) based on cost-effective and proven control technologies that are appropriate in relation to address the problem of interstate transport for the 2015 ozone NAAQS. Further, determinations of cost-effectiveness must be made in relation to the particular statutory provision and its purpose. The EPA recognized in CSAPR, for example, that additional emissions reductions beyond what were determined to be cost-effective in that action could be required to implement good neighbor obligations if a NAAQS were revised to a more protective level. *See* 76 FR 48210. Here it is not surprising that a more stringent level of control could be found justified in implementing transport obligations for the more protective 2015 ozone NAAQS. Those reductions are projected to deliver meaningful air quality improvement to downwind receptors, as discussed in section V.D of this document. Those air quality benefits continue to compare favorably to the air quality benefits that will be delivered through the combined non-EGU emissions limits, which apply to nine non-EGU industries (see section V.C of this document). We find that the implementation of both the EGU and non-EGU strategies identified in section V of this document together represent the appropriate level of emissions control stringency to eliminate significant contribution under CAA section 110(a)(2)(D)(i)(I).

Finally, the EPA also analyzed for overcontrol and does not identify any. Some commenters misstate the purpose of this rule as bringing downwind receptors into attainment. In line with the statutory directive in CAA section 110(a)(2)(D)(i)(I), this rule eliminates "significant contribution" from upwind states; while the rule has substantial air quality benefits for downwind receptors, in many cases we project that a nonattainment or maintenance problem will continue to persist through 2023 and 2026 despite the emissions reductions achieved by this rule. Commenters alleging overcontrol have not met the requirement that overcontrol be established by particularized evidence through as-applied challenges. The Supreme Court has recognized that the EPA also has an obligation to avoid under-control and

must have some leeway in fulfilling the good neighbor mandate of the Act given uncertainty in making forward projections of air quality and the efficacy or impact of emissions control determinations. *See EME Homer City,* 572 U.S. at 523. This is further addressed in section V.D.4 of this document.

d. Step 4 Approach

The EPA is finalizing an approach similar to its prior transport rulemakings to implement the necessary emissions reductions through permanent and enforceable measures. The EPA is requiring EGU sources to participate in an emissions trading program and is making additional enhancements to the trading regime to maintain the selected control stringency over time and improve emissions performance at individual units, offering a necessary measure of assurance that emissions controls will be operated throughout the ozone season. For non-EGUs, the EPA is finalizing permanent and enforceable emissions rate limits and work practice standards, and associated compliance requirements, for several types of $NO_X$-emitting combustion units across several industrial sectors. The measures for both EGUs and non-EGUs are required throughout the May 1–September 30 ozone season of each year. The EGU program will begin with the 2023 ozone season, and the non-EGU implementation schedule is targeted to the 2026 ozone season. Refer to section VI.A of this document for details on the implementation schedule.

Based on the EPA's experience in implementing prior transport rulemakings, the Agency is making several enhancements to its trading-program approach for implementing good neighbor requirements for EGUs. In CSAPR, the CSAPR Update, and the Revised CSAPR Update, the EPA established interstate trading programs for EGUs to implement the necessary emissions reductions. In each of these rules, EGUs in each covered state are assigned an emissions budget in each control period for their collective emissions. Emissions allowances are allocated to units covered by the trading program, and the covered units then surrender allowances after the close of the control period, usually in an amount equal to their ozone season EGU $NO_X$ emissions. While these programs have been effective in achieving overall reductions in emissions, experience has shown that these programs may not fully reflect in perpetuity the degree of emissions stringency determined necessary to eliminate significant

contribution in Step 3 and may not adequately ensure the control of emissions throughout all days of the ozone season. At the same time, the EPA continues to find that an interstate-trading program approach delivers substantial benefits at Step 4 in terms of affording an appropriate degree of compliance flexibility, certainty in emissions outcomes, data and performance transparency, and cost-effective achievement of a high degree of aggregate emissions reductions. As such, the EPA is retaining an interstate trading program approach while making several enhancements to that approach.

Thus, in this rulemaking, the EPA is including dynamic budget-setting procedures in the regulations that will allow state emissions budgets for control periods in 2026 and later years to reflect more current data on the composition and utilization of the EGU fleet (*e.g.,* the 2026 budgets will reflect recent data through 2024 data, the 2027 budgets will reflect data through 2025, etc.). These enhancements will enable the trading program to better maintain over time the selected control stringency that was determined to be necessary to address states' good neighbor obligations with respect to the 2015 ozone NAAQS. In prior programs, where state emissions budgets were static across years rather than calibrated to yearly fleet changes, the EPA has observed instances of units idling their emissions controls in the latter years of the program. To provide greater certainty regarding the minimum quantities of allowances that will be available for compliance for the control periods in 2026 through 2029, the EPA is also establishing preset state emissions budgets for these control periods, and a dynamic state emissions budget determined for one of these control periods will apply only if it is higher than the state's preset budget for the control period.

In the trading programs established for ozone season $NO_X$ emissions under CSAPR, the CSAPR Update, and the Revised CSAPR Update, the EPA included assurance provisions to limit state emissions to levels below 121 percent of the state's budget by requiring additional allowance surrenders in the instance that emissions in the state exceed this level. This limit on the degree to which a state's emissions can exceed its budget is designed to allow for a certain level of year-to-year variability in power sector emissions to account for fluctuations in demand and EGU operations and is responsive to previous court decisions (see discussion in section VI.B.5 of this document). In this

action, the EPA is maintaining the existing assurance provisions that limit state emissions to levels below a percentage of the state's budget by requiring additional allowance surrenders in any instance where emissions in the state exceed the specified level, but with adjustments that allow the level to exceed 121 percent of a state's budget in a given control period if necessary to account for actual operational conditions in that control period. In addition, the EPA is also making several additional enhancements to the EGU trading program in this action, including routine recalibrations of the total amount of banked allowances, unit-specific backstop daily emissions rates for certain units, and unit-specific secondary emissions limitations for certain units that contribute to exceedances of the assurance levels, to ensure EGU emissions control operation and associated air quality improvements. Implementation of the EGU emissions reductions using a CSAPR $NO_X$ trading program is further described in section VI.B of this document.

In this rule, the EPA is also establishing emissions limitations for the non-EGU industry sources listed in Table II.A–1. The EPA has the authority to require emissions limitations from stationary sources, as well as from other sources and emissions activities, under CAA section 110(a)(2)(D)(i)(I). The EPA finds that requiring $NO_X$ emissions reductions through emissions rate limits and control technology requirements for certain non-EGU industrial sources that the EPA found at Step 3 to be relatively impactful[95] on downwind air quality is an effective strategy for reducing regional ozone transport. Therefore, the EPA is establishing $NO_X$ emissions limitations and associated compliance requirements for non-EGU sources to ensure the elimination of significant contribution of ozone precursor emissions required under the interstate transport provision for the 2015 ozone NAAQS.

Finally, the EPA finds that the control measures determined to be required for the identified EGU and non-EGU sources apply to both existing units and any new, modified, or reconstructed units meeting the applicability criteria established in this final rule. This is

consistent with the EPA's transport actions dating back to the $NO_X$ SIP Call and the $NO_X$ Budget Trading Program. In all CSAPR EGU trading programs, for instance, new EGUs are subject to the program, and the EPA has established provisions for the allocation of allowances to such units through "new unit set asides." *See, e.g.,* 86 FR 23126. In the $NO_X$ SIP Call, the EPA required that states cover new and existing units in the relevant source sectors through an enforceable cap or other emissions limitation. *See* 40 CFR 51.121(f). The EPA's approach of allocating new units in the $NO_X$ Budget Trading Program promulgated under the EPA's CAA section 126 authority was upheld by the D.C. Circuit in *Appalachian Power* v. *EPA,* 249 F.3d 1032 (2001). As the court noted, the EPA explained in its action:

Once EPA has determined that the emissions from the existing sources in an upwind State already make a significant contribution to one or more petitioning downwind States, any additional emissions from a new source in that upwind State would also constitute a portion of that significant contribution, unless the emissions from that new source are limited to the level of highly effective controls.

*Id.* at 1058 (quoting EPA 1999 RTC at 39). The court affirmed this approach: "Indeed, it would be irrational to enable the EPA to make findings that a group of sources in an upwind state contribute to downwind nonattainment, but then preclude the EPA from regulating new sources that contribute to that same pollution." *Id.* at 1057–58. The EPA is implementing the same court-affirmed approach in this action because this reasoning is equally applicable to addressing interstate transport obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.

*Comment:* Commenters took issue with aspects of the EPA's proposed Step 4 approach. Commenters argued the EPA could not set unit- or source-specific emissions limits or other control requirements, for EGUs or non-EGUs. Commenters argued that various aspects of the non-EGU emissions control strategy would not be feasible for their facilities or were otherwise flawed. Many industrial-source and EGU commenters argued that the EPA had not provided sufficient time for sources to come into compliance. Commenters also challenged the EGU trading program "enhancements" as unnecessary or beyond the EPA's authority. In this regard, commenters argued that these changes deviated from the EPA's prior approach, were unnecessary overcontrol, constituted a command-and-control approach, could

not be supported on the basis of environmental justice benefits, or were otherwise unlawful for other reasons. These commenters argue that the EPA's Step 4 dynamic budget approach for EGU regulation purportedly re-defines each state's "significant contribution" annually and independent of any impact (or lack thereof) on air quality. They further argue that under this dynamic budgeting approach, even if a state eliminates the "amount" the EPA has identified as the state's significant contribution by respecting a given control period's emissions budget, sources within that state are expected to continue to make further reductions by operating their controls in a particular manner in subsequent control periods under potentially lower emissions budgets, which these commenters argue is inconsistent with case law on prior CSAPR rules.

*Response:* Many of these comments regarding Step 4 issues are addressed elsewhere in this document or in the *RTC* document. The EPA's authority to establish unit- or source-specific emissions rates is addressed in section IV.B.1 of this document. Responses to comments and adjustments in the timing requirements of the final rule compared to proposal are discussed in VI.A. Responses to comments and adjustments in emissions control requirements for non-EGUs in the final rule compared to proposal are in section VI.C of this document.

Responses to comments on the EGU trading program enhancements and adjustments in the final rule are contained in section VI.B of this document. However, here, in light of the changes in the emissions trading program for EGUs that we are finalizing in this action as compared to prior EGU emissions trading programs promulgated to address good neighbor obligations under NAAQS, we set forth responses to comments specific to this topic.

The EPA finds that these comments confuse Step 3 emissions reduction stringency determinations with Step 4 implementation program details. In this rulemaking's Step 3 analysis, the EPA is measuring emissions reduction potential from improving effective emissions rates across groups of EGUs adopting applicable pollution control measures and selecting a uniform control level whose effective emissions rates deliver an acceptable outcome under the multifactor test (including a finding of no overcontrol at the selected control stringency level). The "amounts" defined as significant contribution to nonattainment and interference with maintenance are

---

[95] Section III of the Non-EGU Screening Assessment memorandum in the docket for this rulemaking describes the EPA's approach to evaluating impacts on downwind air quality, considering estimated total, maximum, and average contributions from each industry and the total number of receptors with contributions from each industry.

emissions that occur at effective emissions rates above the control stringency level selected at Step 3. That is, if a state's affected EGUs fail to reduce their effective emissions rates in line with the widely available and cost-effective control measures identified, they have therefore failed to eliminate their significant contribution to nonattainment and interference with maintenance of this NAAQS.

In this rule, the EPA is finalizing several "enhancements" to its existing Group 3 emissions trading program for ozone season $NO_X$, for reasons explained in section VI.B.1 of this document. In general, these changes will ensure that the emissions control program promulgated for EGUs at Step 4 of the EPA's 4-step interstate transport framework is in alignment with the emissions control stringency determinations the EPA made at Step 3. These enhancements reflect lessons learned through the EPA's experience with prior trading programs implemented under the good neighbor provision and ensure that the implementation of the elimination of significant contribution through an emissions trading program remains durable through a period of power sector transition. None of commenters' arguments against the EPA's authority to implement these enhancements are persuasive.

First, the EPA is not mandating that any EGU must install SCR technology. All but one of the enhancements to the trading program continue to be implemented through allowance-holding requirements under the mass-based emissions budget and trading system, including the backstop rate. (The secondary emissions limitation, which is not implemented through allowance-holding requirements under the mass-based emissions budget and trading system, and which is discussed in section VI.B.1.c.ii of this document, merely establishes a stronger deterrent for a type of conduct that was already strongly discouraged under the pre-existing trading program regulations). Nonetheless, the EPA *does* have the authority to impose unit-specific emissions limits under the exercise of its FIP authority, and it has done so in this action for non-EGU industrial sources. This authority is distinct from the EPA's title I permitting authority as discussed by certain commenters, and the scope of that permitting authority is not relevant to this action.

The quantification of emissions budgets in an allowance-based emissions trading program is one of multiple potential Step 4 implementation program design choices

that states and the EPA have authority to select in securing the emissions reductions deemed necessary under Step 3. *See* CAA section 110(a)(2)(A). The EPA and the states routinely determine control stringency on an emissions rate basis in line with demonstrated pollution control opportunities, and both the EPA and the states have implementation program design discretion to determine what compliance requirements, whether expressed on a rate, mass, concentration, or percentage basis, will assure an emissions performance that reflects the control stringency required. Dynamic budgets in the Step 4 implementation of this rule are simply to ensure the trading program continues to incentivize the implementation of the EGU control strategies we find are necessary to eliminate significant contribution at Step 3. The key distinction between dynamic budget approaches and preset budget approaches is not one in stringency or authority, but rather in timing and data resources for determining the suitable mass-based limits that are as well-matched as possible to expected emissions of the affected EGUs achieving the emissions rate-based control stringency deemed necessary under Step 3 to eliminate significant contribution to nonattainment and interference with maintenance of the NAAQS.

The EPA does not agree that the administrative mechanisms by which it will implement "dynamic budgeting" conflict with CAA section 307(d) or the Administrative Procedure Act. The EPA is promulgating a complete FIP in this action, and the codified language of that FIP will not need to be modified as budgets are adjusted. This is because the FIP establishes the formula by which the budgets will be calculated each year (with preset budgets functioning as a floor from 2026 through 2029). This is no different than how the EPA has implemented other calculations such as updating allocations using a rolling set of data in its prior CSAPR trading programs. *See, e.g.,* 87 FR 10786. We view these actions as fundamentally ministerial in nature in that no exercise of Agency discretion is required. This process will rely on notices of availability of the relevant data in the **Federal Register**, coupled with an opportunity for the public to correct any errors they may identify in the data before the EPA sets each updated budget. See section VI.B.4 for more detail on how the EPA intends to implement dynamic budgeting. As in prior transport rules, this rule provides

the opportunity for administrative appeal should an interested party identify some flaw in the EPA's updated data. See 40 CFR 78.1(b)(19)(i) (2023). That process is coupled with the availability of judicial review should the party remain dissatisfied with the EPA's resolution of complaints. *See* 40 CFR 78.1(a)(2) (requiring administrative adjudication as a prerequisite for judicial review). This administrative process has worked well throughout the history of implementing good neighbor trading programs under Part 97, and no such disputes have necessitated judicial resolution.

Further, because the dynamic budgets simply implement the stringency level reflective of the emissions control performance the EPA has determined at Step 3 for the covered EGUs, the EPA does not agree that any "potential variables" that are unforeseeable now could upset the basis for the formula the EPA is establishing in this action. The EPA has adjusted the role of dynamic budgeting in this final rule as compared to the proposal. See sections VI.B.1 and VI.B.4 of the preamble. In particular, the EPA is applying an approach to budget setting through 2029 that will use the greater of either a preset budget based on information known to the Agency at the time of this action, or the dynamic budget to be calculated based upon future data yet to be reported. Thus, through 2029 the imposition of a dynamic budget would only increase rather than diminish the emissions allowed for that control period compared to the preset budgets established in this action. In addition, the EPA will determine each state's dynamic budget based on a rolling 3-year average of the state's heat input, thus smoothing out trends to account for interannual variability in demand and heat input and provide greater certainty and predictability as the budget updates from year to year.

Moreover, the EPA does not agree that the EPA is constrained by the statute to only implement good neighbor obligations through fixed, unchanging, mass-based emissions budgets. *See* section III.B.1 of this document. The EPA finds good reason based on its experience with trading programs using fixed budgets why this approach does not necessarily ensure the elimination of significant contribution in perpetuity. The EPA has already once adjusted its historical approach to better account for known, upcoming changes in the EGU fleet to ensure mass-based emissions budgets adequately incentivize the control strategy determined at Step 3. This adjustment was introduced in the Revised CSAPR Update. *See* 82 FR

23121–22.[96] The EPA now believes it is appropriate to ensure in a more comprehensive manner, and in perpetuity, that the mass-based emissions budget incentivize continuing implementation of the Step 3 control strategies to ensure significant contribution is eliminated in all upwind states and remains so. The dynamic budget-setting process preserves these incentives over time by calculating the state emissions budgets for each future control period so as to reflect the Step 3 control stringency finalized in this rule as applied to the most current information regarding the composition of the power sector in the control period. This is fully analogous in material respect to an approach to implementation at Step 4 that relies on application of unit-specific emissions rates that apply in perpetuity. The availability of unit-specific emissions rates as a means to eliminate significant contribution is discussed in further detail in section III.B.1 of this document. The EPA also explained this in the proposal. *See* 87 FR 20095–96. The EPA does not agree that either dynamic budgeting or the backstop rate results in overcontrol. *See* section V.D.4 of this document.

The EPA is enhancing the trading program to help reconcile the approach of using mass-based budgets to achieve the elimination of significant contribution with the *Wisconsin* directive to provide a complete remedy under the good neighbor provision. This approach also better accords with ensuring measures to attain and maintain the NAAQS are permanent and enforceable. The dynamic budget approach recognizes that the uncertainty around future fleet conditions increases the further into the future one looks (and the EPA must look further under the "full remedy" directive). To preserve its ability to successfully implement its identified Step 3 stringency, the EPA is designing the implementation of this rule's emissions control program to benefit from the future availability of better data from the regulated sources to inform its

application of its stringency measures identified in this rule.

The EPA does not agree with commenters who suggest that these enhancements are undertaken for the purpose of a non-statutory "environmental justice" objective. As explained in section VI.B of this document, certain enhancements to the trading program ensure that each EGU is adequately incentivized to continuously operate its emissions controls once those controls are installed. One commenter contends that the backstop emissions rate is not authorized based on environmental justice considerations, since it is not necessary and is overcontrol with respect to the EPA's statutory authority to address good neighbor obligations. But the EPA disagrees with the premise that these enhancements are unrelated to the statutory obligation to eliminate significant contribution. Taking measures to ensure that each upwind source covered by an emissions trading program to eliminate significant contribution is operating its installed pollution controls on a more continuous and consistent basis throughout the ozone season is entirely appropriate in light of the daily nature of the ozone problem, the impacts to public health and the environment from ozone that can occur through short-term exposure (*e.g.*, over a course of hours), the fact that the 2015 ozone NAAQS is expressed as an 8-hour average, and that only a small number of days in excess of the ozone NAAQS are necessary to place a downwind area in nonattainment, resulting in continuing and/or increased regulatory burden on the downwind jurisdiction. *See* section III.A of this document.

Further, the D.C. Circuit has held that the EPA must ensure that its good neighbor program has eliminated *each* state's sources from continuing to significantly contribute to nonattainment or interfere with maintenance in downwind states. *See North Carolina,* 531 F.3d at 921. The commenters neglect to acknowledge the scenario that has frequently borne out in prior programs, in which future fleet changes that were not known at the time of initial setting of state emissions budgets produce unexpected "hot air" in the budget that, if unaccounted for, other units can exploit to forgo identified cost-effective mitigation measures deemed necessary to eliminate significant contribution to nonattainment and interference with maintenance of the NAAQS.

The EPA's experience is that fixed mass-based budgets that are determined based only on the profile of the power

sector at the time the rule is promulgated, and without any additional requirement for pollution controls operation, can become quickly obsolete if the composition of the group of affected EGUs changes notably over time. As some sources retire, other sources relax their operation of $NO_X$ controls in response to a growing surplus of allowances, even though the EPA had concluded that ongoing operation of those controls was necessary to meet the statutory good neighbor requirements. For instance, under the CSAPR Update, in the 2018–2020 period, the fixed budget approach enabled large, frequently run units with existing SCR controls to not optimize those controls even though the EPA's assessment (as reflected in the CSAPR Update) was that the optimization of those controls was necessary to eliminate significant contribution. This deterioration in emission rate at SCR-controlled coal plants was widely observed across the CSAPR Update geography as the program advanced into later years and allowance price deteriorated. Whereas coal sources with SCR performed, on average, at a 0.086 lb/mmBtu rate in 2017, that same set of sources saw their environmental performance worsen to a 0.099 lb/mmBtu rate in 2020. A Congressional Research Service Report on EPA prior CSAPR trading programs indicated low prices observed in later years "could lead to some decisions not to run some pollution controls at maximum output. This would, in turn, lead to higher emissions".[97]

In the case of individual units, this deterioration in performance can be quite pronounced and can occur as quickly as the second or third control period, as in the case of Miami Fort Unit 7 in Ohio in 2019, discussed in section V.B of this document. The absence of a sufficient incentive under the trading program to implement the identified control strategy at Step 3 can even result in collective emissions that exceed state-wide assurance levels. The EPA established these levels beginning with CSAPR, above which enhanced allowance-surrender requirements are triggered, in an effort to ensure sources in each state are held to eliminate their own significant contribution, which the D.C. Circuit has held is legally required, *see North Carolina,* 531 F.3d 896, 906–08 (D.C. Cir. 2008). In four instances over the course of the 2019, 2020, and

---

[96] Further, in the Revised CSAPR Update, the EPA acknowledged that a mechanism like dynamic budgeting could be appropriate for a transport rule with longer time horizons. We stated in response to comments that we were not "in this action, including an adjustment mechanism to further adjust state emission budgets to account for currently unknown or uncertain retirements after the finalization of this rule . . . . EPA observes that the commenter's proposed mechanism would become increasingly valuable for rules where the timeframe extends further into the future where retirement uncertainty is higher." Revised CSAPR Update Response to Comments, EPA–HQ–OAR–2020–0272–219, at 153.

[97] Shouse, Kate. "The Clean Air Act's Good Neighbor Provision: Overview of Interstate Air Pollution Control". Congressional Research Services. August 30, 2018. Available at *https://sgp.fas.org/crs/misc/R45299.pdf.*

2021 control periods under the CSAPR Update, sources in Mississippi and Missouri collectively exceeded their state-wide assurance levels in part due to deterioration in emissions performance that can be attributed to a glut of allowances within the CSAPR Update. See section VI.B.8 of the preamble.

Thus, while this trading program structure may achieve some environmental benefit through fixed emissions budgets for initial control periods, over time those fixed budgets cease to have their intended effect, and remaining operating facilities can, and have, increased emissions or even discontinued the operation of their emissions controls. This, in turn, can lead to the continuation (or re-emergence) of significant contribution in terms of a recurrence of excessive emissions that had been slated for permanent elimination under the EPA's determinations at Step 3. Although the EPA has always intended for its trading programs to provide flexibility, the Agency did not expect and has certainly never endorsed the use of that flexibility to stop the operation of controls that have already been installed. *See, e.g.,* 76 FR 48256–57 ("[I]t would be inappropriate for a state linked to downwind nonattainment or maintenance areas to stop operating existing pollution control equipment (which would increase their emissions and contribution)."). Despite the EPA's expectations in CSAPR, the historical data establishes a real risk of "under-control" if the existing trading framework is not improved upon. *See EME Homer City,* 572 U.S. at 523 ("[T]he Agency also has a statutory obligation to avoid 'under-control,' *i.e.,* to maximize achievement of attainment downwind.").

This result is also inconsistent with the statutory mandate to "prohibit" significant contribution and interference with maintenance of the NAAQS in downwind states, as evidenced most clearly in CAA section 126, which makes it unlawful for a source "to *operate* more than three months after [a finding that the source emits or would emit in violation of the good neighbor provision] has been made with respect to it." 42 U.S.C. 7426(c)(2) (emphasis added). *See also North Carolina,* 531 F.3d at 906–08 (each state must be held to the elimination of its own significant contribution). The purpose of the Agency's interstate trading programs under the good neighbor provision is to afford sources some flexibility in achieving region-wide emissions reductions; however, there is no justification that can be sustained

within that framework for sources in certain areas within that region, or during periods of high ozone when good emissions performance is most essential, to emit at levels well in excess of the EPA's Step 3 determinations of significant contribution. Significant contribution, according to the statute, must be "prohibited." CAA section 110(a)(2)(D)(i).

Thus, these trading program enhancements are within the EPA's authority under CAA section 110(a)(2)(D)(i)(I) to eliminate interstate ozone pollution that significantly contributes to nonattainment or interferes with maintenance in downwind states. These enhancements ensure the elimination of significant contribution across all upwind states and throughout each ozone season. We observe in the Ozone Transport Policy Analysis Final Rule TSD, section E, that the trading program enhancements may also benefit underserved and overburdened communities downwind of EGUs in the covered geography of the final rule. See section VI.B of this document. This does not detract from the statutorily-authorized basis for these changes, and the EPA finds nothing impermissible in acknowledging the reality of these potential benefits for underserved and overburdened communities.

The EPA appreciates a commenter's concern that our actions be legally defensible. The EPA acknowledges that the changes to the trading program structure for implementing good neighbor obligations discussed here constitute a change in the policy underlying its prior transport-rule trading programs for EGUs. However, the EPA is confident that these changes are in compliance with the holdings in judicial decisions reviewing prior transport rules. The fact that the EPA is making changes does not somehow render these enhancements legally impermissible or even subject to a heightened standard of review. *See FCC* v. *Fox Television Stations,* 556 U.S. 502, 514 (2009) ("We find no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review."). We have explained previously and elsewhere in the record that there are "good reasons" for the "new policy." *See id.* at 515. And, we are of course fully aware that we have changed our position. *See id.* at 514–15. Specifically, we have gone from previously treating fixed, mass-based budgets as sufficient to eliminate significant contribution, to an approach for purposes of the 2015 ozone NAAQS reflecting a more nuanced

understanding of how an emissions trading program that does not properly anticipate future fleet conditions at Step 4 may fail to achieve the elimination of emissions that should be prohibited based on our findings at Step 3. Further, we find there to be no "serious reliance interests" that have been or even could have been "engendered" by any prior policy on these issues, *see id.* at 515–16. The EPA is implementing these enhancements for the first time with respect to a new obligation—good neighbor requirements for the 2015 ozone NAAQS. No party reasonably could have invested substantial resources to-date to comply with an obligation that was heretofore undefined; and no commenter has supplied any information to the contrary.

## 2. FIP Authority for Each State Covered by the Rule

On October 26, 2015, the EPA promulgated a revision to the 2015 8-hour ozone NAAQS, lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm).[98] These revisions of the NAAQS, in turn, established a 3-year deadline for states to provide SIP submissions addressing infrastructure requirements under CAA sections 110(a)(1) and CAA 110(a)(2), including the good neighbor provision, by October 1, 2018. If the EPA makes a determination that a state failed to submit a SIP, or if EPA disapproves a SIP submission, then the EPA is obligated under CAA section 110(c) to promulgate a FIP for that state within 2 years. For a more detailed discussion of CAA section 110 authority and timelines, refer to section III.C of this document.

The EPA is finalizing this FIP action now to address 23 states' good neighbor obligations for the 2015 ozone NAAQS.[99] For each state for which the EPA is finalizing this FIP, the EPA either issued final findings of failure to submit or has issued a final disapproval of that state's SIP submission.

Several commenters asserted that the sequence of the EPA's actions, and in particular, the timing of its proposed FIP (which was signed on February 28,

---

[98] *National Ambient Air Quality Standards for Ozone,* Final Rule, 80 FR 65292 (Oct. 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[99] The EPA notes that it is subject to, and has met through this action, a consent decree deadline to promulgate FIPs addressing 2015 ozone NAAQS good neighbor obligations for the states of Pennsylvania, Utah, and Virginia. *See Sierra Club et al.* v. *Regan,* No. 3:22–cv–01992–JD (N.D. Cal. entered January 24, 2023).

2022, and published on April 6, 2022) in relation to the timing of its proposed SIP disapprovals (most of which were published on February 22, 2022, four of which were published on May 24, 2022, and one of which was published on October 25, 2022), was either unlawful or unreasonable in light of the sequence of steps required under CAA section 110(k) and (c).

These commenters are incorrect. As an initial matter, concerns about the timing or substance of the EPA's actions on the SIP submittals are beyond the scope of this action. Nor are the timing or contents of merely proposed actions to be considered final agency actions or subject to judicial review. *See In re Murray Energy,* 788 F.3d 330 (D.C. Cir. 2015). With these principles in mind, the timing of this final action is lawful under the Act. First, the EPA is not required to wait to propose a FIP until after the Agency proposes or finalizes a SIP disapproval or makes a finding of failure to submit.[100] CAA section 110(c) authorizes the EPA to promulgate a FIP "at any time within 2 years" of a SIP

disapproval or making a finding of failure to submit. The Supreme Court recognized in *EME Homer City* that the EPA is not obligated to first define a state's good neighbor obligations or give the state an additional opportunity to submit an approvable SIP before promulgating a FIP: "EPA is not obliged to wait two years or postpone its action even a single day: The Act empowers the Agency to promulgate a FIP 'at any time' within the two-year limit." [101] Thus, the EPA may promulgate a FIP contemporaneously with or immediately following predicate final SIP disapproval (or finding no SIP was submitted). To accomplish this, the EPA must necessarily be able to propose a FIP prior to taking final action to disapprove a SIP or make a finding of failure to submit.

Second, and more importantly, the EPA has established predicate authority to promulgate FIPs for all of the covered states through its action with respect to the relevant SIP submittals. A brief history of these actions follows:

On February 22, 2022, the EPA proposed to disapprove 19 good neighbor SIP submissions (Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Tennessee, Texas, West Virginia, Wisconsin).[102] Alabama subsequently withdrew its SIP submission and re-submitted a SIP submission on June 22, 2022. The EPA proposed to disapprove that SIP submittal on October 25, 2022.[103] The EPA proposed to disapprove good neighbor SIP submissions for four additional states, California, Nevada, Utah, and Wyoming, on May 24, 2022.[104]

Subsequently, on January 31, 2023, the EPA Administrator signed a single disapproval action for all of the above states, with the exception of Tennessee and Wyoming.[105] This action established the EPA's authority to promulgate FIPs for the disapproved states. (As explained in section IV.F of this document, the Agency is deferring action at this time for Tennessee and Wyoming with respect to its proposed

FIP actions for those states. As discussed in section IV.F of this document, the EPA's most recent modeling and air quality analysis indicates that several states may be linked to downwind receptors for which we had not previously proposed disapproval or FIP action. The EPA anticipates addressing remaining interstate transport obligations for the 2015 ozone NAAQS for these in a subsequent rulemaking.)

Additionally, the EPA has taken action that has triggered the EPA's obligation under CAA section 110(c) to promulgate FIPs addressing the good neighbor provision for several downwind states. On December 5, 2019, the EPA published a rule finding that seven states (Maine, New Mexico, Pennsylvania, Rhode Island, South Dakota, Utah, and Virginia) failed to submit or otherwise make complete submissions that address the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.[106] This finding triggered a 2-year deadline for the EPA to issue FIPs to address the good neighbor provision for these states by January 6, 2022. As the EPA has subsequently received and taken final action to approve good neighbor SIPs from Maine, Rhode Island, and South Dakota,[107] the EPA currently has authority under the December 5, 2019, findings of failure to submit to issue FIPs for New Mexico, Pennsylvania, Utah, and Virginia. In this final rule, the EPA is issuing FIP requirements for Pennsylvania, Utah, and Virginia.[108]

Further information on the procedural history establishing the EPA's authority for this final rule is provided in a document in the docket.[109]

---

[100] The EPA notes there are three consent decrees to resolve three deadline suits related to EPA's duty to act on good neighbor SIP submissions for the 2015 ozone NAAQS. In *New York et al.* v. *Regan, et al.* (No. 1:21–CV–00252, S.D.N.Y.), the EPA agreed to take final action on the 2015 ozone NAAQS good neighbor SIP submissions from Indiana, Kentucky, Michigan, Ohio, Texas, and West Virginia by April 30, 2022; however, if the EPA proposes to disapprove any SIP submissions and proposes a replacement FIP by February 28, 2022, then EPA's deadline to take final action on that SIP submission is extended to December 30, 2022. In *Downwinders at Risk et al.* v. *Regan* (No. 21–cv–03551, N.D. Cal.), the EPA agreed to take final action on the 2015 ozone NAAQS good neighbor SIP submissions from Alabama, Arkansas, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, New Jersey, New York, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Texas, West Virginia, and Wisconsin by April 30, 2022; however, if the EPA proposes to disapprove any of these SIP submissions and proposes a replacement FIP by February 28, 2022, then the EPA's deadline to take final action on that SIP submission is December 30, 2022. In this CD, the EPA also agreed to take final action on Hawaii's SIP submission by April 30, 2022, and to take final action on the SIP submissions of Arizona, California, Montana, Nevada, and Wyoming by December 15, 2022. In *Our Children's Earth Foundation* v. *EPA* (No. 20–8232, S.D.N.Y.), the EPA agreed to take final action on the 2015 ozone NAAQS good neighbor SIP submission from New York by April 30, 2022; however, if the EPA proposes to disapprove New York's SIP submission and proposes a replacement FIP by February 28, 2022, then the EPA's deadline to take final action on New York's SIP submission is extended to December 30, 2022. By stipulation of the parties, the December 15, 2022, date in all three of these consent decrees was extended to January 31, 2023. By further stipulation of the parties in the *Downwinders at Risk* case, the January 31, 2023, date was further extended to December 15, 2023 for the EPA to act on the SIP submissions from the states of Arizona, Tennessee, and Wyoming.

[101] *See EPA* v. *EME Homer City Generation, L.P.,* 572 U.S. 489, 509 (2014) (citations omitted).

[102] *See* 87 FR 9463 (Maryland); 87 FR 9484 (New Jersey, New York); 87 FR 9498 (Kentucky); 87 FR 9516 (West Virginia); 87 FR 9533 (Missouri); 87 FR 9545 (Alabama, Mississippi, Tennessee); 87 FR 9798 (Arkansas, Louisiana, Oklahoma, Texas); 87 FR 9838 (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin).

[103] *See* 87 FR 64412.

[104] *See* 87 FR 31443 (California); 87 FR 31485 (Nevada); 87 FR 31470 (Utah); 87 FR 31495 (Wyoming).

[105] *See* 88 FR 9336.

[106] *Findings of Failure To Submit a Clean Air Act Section 110 State Implementation Plan for Interstate Transport for the 2015 Ozone National Ambient Air Quality Standards (NAAQS),* 84 FR 66612 (December 5, 2019, effective January 6, 2020).

[107] *Air Plan Approval; Maine and New Hampshire; 2015 Ozone NAAQS Interstate Transport Requirements,* 86 FR 45870 (August 17, 2021); *Air Plan Approval; Rhode Island; 2015 Ozone NAAQS Interstate Transport Requirements,* 86 FR 70409 (December 10, 2021); *Promulgation of State Implementation Plan Revisions; Infrastructure Requirements for the 2015 Ozone National Ambient Air Quality Standards; South Dakota; Revisions to the Administrative Rules of South Dakota,* 85 FR 29882 (May 19, 2020).

[108] *WildEarth Guardians* v. *Regan,* No. 1:22–cv–00174 (D.N.M. entered Aug. 16, 2022); *Sierra Club et al.* v. *EPA,* No. 3:22–cv–01992 (N.D. Cal. entered Jan. 24, 2022).

[109] *See* "Final Rule: Status of CAA Section 110(a)(2)(D)(i)(I) SIP Submissions for the 2015 Ozone NAAQS for States Covered by the Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards." This document updates a prior document of the same title provided
Continued

While the EPA's previous actions are sufficient to establish that the EPA's promulgation of this FIP action at this time is all the more reasonable in light of the need for the EPA to address good neighbor obligations consistent with the rest of title I of the CAA. In particular, the D.C. Circuit in *Wisconsin* held that states and the EPA are obligated to fully address good neighbor obligations for ozone ''as expeditiously as practical'' and in no event later than the next relevant downwind attainment dates found in CAA section 181(a).[110] In *Maryland* v. *EPA*, the D.C. Circuit made clear that *Wisconsin's* and *North Carolina's* holdings are fully applicable to the Marginal area attainment date for the 2015 ozone NAAQS,[111] which fell on August 3, 2021.[112] As discussed in section VI.A of this document, by finalizing this action now, the EPA is able to implement initial required emissions reductions to eliminate significant contribution by the 2023 ozone season, which is the last full ozone season before the next attainment date, the Moderate area attainment date of August 3, 2024. The *Wisconsin* court emphasized that the EPA has the authority under CAA section 110 to structure and time its actions in a manner such that the Agency can ensure necessary reductions are achieved in alignment with the downwind attainment schedule, and that is precisely what the EPA is doing here.[113] The EPA provides further response to the comments on this issue in section 1 of the *RTC* document.

*C. Other CAA Authorities for This Action*

1. Withdrawal of Proposed Error Correction for Delaware

The EPA proposed at 87 FR 20036 to make an error correction under CAA section 110(k)(6) of its May 1, 2020, approval at 85 FR 25307 of the interstate transport elements for Delaware's October 11, 2018, and December 26, 2019, ozone infrastructure SIP submissions as satisfying the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. The EPA proposed to determine that the basis for the prior SIP approval was invalidated by the Agency's more recent technical evaluation of air quality modeling performed in support of the proposed rule,[114] and that Delaware had unresolved interstate transport obligations for the 2015 ozone NAAQS. The EPA also proposed to issue a FIP for Delaware given these unresolved interstate transport obligations. However, based on the updated air quality modeling described in section IV.F. of this document and the technical assessment that informs this final rule, the EPA finds that Delaware is not projected to be linked to any downwind receptor above the 1 percent of the NAAQS threshold in 2023. Thus, based on the record before the Agency now, the original approval of Delaware's SIP submission was not in error, and the EPA is withdrawing its proposed error correction and proposed FIP for Delaware.

2. Application of Rule in Indian Country and Necessary or Appropriate Finding

The EPA is finalizing its determination that this rule will be applicable in all areas of Indian country (as defined at 18 U.S.C. 1151) within the covered geography of the final rule, as defined in this section. Certain areas of Indian country within the geography of the rule are or may be subject to state implementation planning authority. Other areas of Indian country within that geography are subject to tribal planning authority, although none of the relevant tribes have as yet sought eligibility to administer a tribal plan to implement the good neighbor provision.[115] As described later, the EPA is including all areas of Indian country within the covered geography, notwithstanding whether those areas are currently subject to a state's implementation planning authority or the potential planning authority of a tribe.

a. Indian Country Subject to Tribal Jurisdiction

With respect to areas of Indian country not currently subject to a state's implementation planning authority— *i.e.,* Indian reservation lands (with the partial exception of reservation lands located in the State of Oklahoma, as described further in this section) and other areas of Indian country over which the EPA or a tribe has demonstrated that a tribe has jurisdiction—the EPA here makes a ''necessary or appropriate'' finding that direct Federal implementation of the rule's requirements is warranted under CAA section 301(d)(4) and 40 CFR 49.11(a) (the areas of Indian country subject to this finding will be referred to as the CAA section 301(d) FIP areas). Indian Tribes may, but are not required to, submit tribal plans to implement CAA requirements, including the good neighbor provision. Section 301(d) of the CAA and 40 CFR part 49 authorize the Administrator to treat an Indian Tribe in the same manner as a state (*i.e.,* TAS) for purposes of developing and implementing a tribal plan implementing good neighbor obligations. *See* 40 CFR 49.3; *see also* ''Indian Tribes: Air Quality Planning and Management,'' hereafter ''Tribal Authority Rule'' (63 FR 7254, February 12, 1998). The EPA is authorized to directly implement the good neighbor provision in the 301(d) FIP areas when it finds, consistent with the authority of CAA section 301—which the EPA has exercised in 40 CFR 49.11—that it is necessary or appropriate to do so.[116]

---

at proposal (Document no. EPA–HQ–OAR–2021–0668–0131).

[110] *Wisconsin* v. *EPA*, 938 F.3d 303, 313–14 (D.C. Cir. 2019) (citing *North Carolina* v. *EPA*, 531 F.3d 896, 911–13 (D.C. Cir. 2008).

[111] *Maryland* v. *EPA*, 958 F.3d 1185, 1203–04 (D.C. Cir. 2020).

[112] *See* CAA section 181(a); 40 CFR 51.1303; *Additional Air Quality Designations for the 2015 National Ambient Air Quality Standards*, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[113] 938 F.3d at 318 (''When EPA determines a State's SIP is inadequate, EPA presumably must issue a FIP that will bring that State into compliance before upcoming attainment deadlines, even if the outer limit of the statutory timeframe gives EPA more time to formulate the FIP.'') (citing *Sierra Club* v. *EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002)).

[114] *See* the Air Quality Modeling Proposed Rule TSD in the docket for this rule.

[115] We note that, consistent with the EPA's prior good neighbor actions in California, the regulatory ozone monitor located on the Morongo Band of Mission Indians (''Morongo'') reservation is a projected downwind receptor in 2023. *See* monitoring site 060651016 in Table IV.D.–1. We also note that the Temecula, California, regulatory ozone monitor is a projected downwind receptor in 2023 and in past regulatory actions has been deemed representative of air quality on the Pechanga Band of Luiseño Indians (''Pechanga'') reservation. *See, e.g., Approval of Tribal Implementation Plan and Designation of Air Quality Planning Area; Pechanga Band of Luiseño Mission Indians,* 80 FR 18120, at 18121–18123 (April 3, 2015); *see also* monitoring site 060650016 in Table IV.D–1. The presence of receptors on, or representative of, the Morongo and Pechanga reservations does not trigger obligations for the Morongo and Pechanga Tribes. Nevertheless, these receptors are relevant to the EPA's assessment of

any linked upwind states' good neighbor obligations. *See, e.g., Approval and Promulgation of Air Quality State Implementation Plans; California; Interstate Transport Requirements for Ozone, Fine Particulate Matter, and Sulfur Dioxide,* 83 FR 65093 (December 19, 2018). Under 40 CFR 49.4(a), tribes are not subject to the specific plan submittal and implementation deadlines for NAAQS-related requirements, including deadlines for submittal of plans addressing transport impacts.

[116] *See Arizona Pub. Serv. Co.* v. *U.S. E.P.A.*, 562 F.3d 1116, 1125 (10th Cir. 2009) (stating that 40 CFR 49.11(a) ''provides the EPA discretion to determine what rulemaking is necessary or appropriate to protect air quality and requires the EPA to promulgate such rulemaking''); *Safe Air For Everyone* v. *U.S. Env't Prot. Agency,* No. 05–73383, 2006 WL 3697684, at *1 (9th Cir., Dec. 15, 2006) (''The statutes and regulations that enable EPA to regulate air quality on Indian reservations provide EPA with broad discretion in setting the content of such regulations.'').

The EPA hereby finds that it is both necessary and appropriate to regulate all new and existing EGU and industrial sources meeting the applicability criteria set forth in this rule in all of the 301(d) FIP areas that are located within the geographic scope of coverage of the rule. For purposes of this finding, the geographic scope of coverage of the rule means the areas of the United States encompassed within the borders of the states the EPA has determined to be linked at Steps 1 and 2 of the 4-step interstate transport framework.[117] For EGU applicability criteria, *see* section VI.B of this document; for industrial-source applicability criteria, *see* section VI.C of this document. To EPA's knowledge, only one existing EGU or industrial source is located within the CAA section 301(d) FIP areas: the Bonanza Power Plant, an EGU source, located on the Uintah and Ouray Reservation, geographically located within the borders of Utah.

This finding is consistent with the EPA's prior good neighbor rules. In prior rulemakings under the good neighbor provision, the EPA has included all areas of Indian country within the geographic scope of those FIPs, such that any new or existing sources meeting the rules' applicability criteria would be subject to the rule irrespective of whether subject to state or tribal underlying CAA planning authority. In CSAPR, the CSAPR Update, and the Revised CSAPR Update, the scope of the emissions trading programs established for EGUs extended to cover all areas of Indian country located within the geographic boundaries of the covered states. In these rules, at the time of their promulgation, no existing units were located in the covered areas of Indian country; under the general applicability criteria of the trading programs, however, any new sources locating in such areas would become subject to the programs. Thus, the EPA established a separate allowance allocation that would be available for any new units locating in any of the relevant areas of Indian country. *See, e.g.,* 76 FR 48293 (describing the CSAPR methodology of allowance allocation under the "Indian country new unit set-aside" provisions); *see also id.* at 48217 (explaining the EPA's source of authority for directly regulating in relevant areas of Indian

country as necessary or appropriate). Further, in any action in which the EPA subsequently approved a state's SIP submittal to partially or wholly replace the provisions of a CSAPR FIP, the EPA has clearly delineated that it will continue to administer the Indian country new unit set aside for sources in any areas of Indian country geographically located within a state's borders and not subject to that state's CAA planning authority, and the state may not exercise jurisdiction over any such sources. *See, e.g.,* 82 FR 46674, 46677 (October 6, 2017) (approving Alabama's SIP submission establishing a state CSAPR trading program for ozone season NOₓ but providing, "The SIP is not approved to apply on any Indian reservation land or in any other area where EPA or an Indian tribe has demonstrated that a tribe has jurisdiction.").

In this rule, the EPA is taking an approach similar to the prior CSAPR rulemakings with respect to regulating sources in the CAA section 301(d) FIP areas.[118] The EPA believes this approach is necessary and appropriate for several reasons. First, the purpose of this rule is to address the interstate transport of ozone on a national scale, and the technical record establishes that the nonattainment and maintenance receptors located throughout the country are impacted by sources of ozone pollution on a broad geographic scale. The upwind regions associated with each receptor typically span at least two, and often far more, states. Within the broad upwind region covered by this rule, the EPA is applying—consistent with the methodology of allocating upwind responsibility in prior transport rules going back to the NOₓ SIP Call—a uniform level of control stringency (as determined separately for linkages existing in 2023, and linkages persisting in 2026). (*See* section V of this document for a discussion of EPA's determination of control stringency for this rule.) Within this approach, consistency in rule requirements across all jurisdictions is vital in ensuring the remedy for ozone transport is, in the words of the Supreme Court, "efficient and equitable," 572 U.S. 489, 519. In particular, as the Supreme Court found in *EME Homer City Generation,* allocating responsibility through uniform levels of control across the

entire upwind geography is "equitable" because, by imposing uniform cost thresholds on regulated States, the EPA's rule subjects to stricter regulation those States that have done relatively less in the past to control their pollution. Upwind States that have not yet implemented pollution controls of the same stringency as their neighbors will be stopped from free riding on their neighbors' efforts to reduce pollution. They will have to reduce their emissions by installing devices of the kind in which neighboring States have already invested. *Id.*

In the context of addressing regional-scale ozone transport in this rule, the importance of a uniform level of stringency that extends to and includes the CAA section 301(d) FIP areas geographically located within the boundaries of the linked upwind states carries significant force. Failure to include all such areas within the scope of the rule creates a significant risk that these areas may be targeted for the siting of facilities emitting ozone-precursor pollutants, to avoid the regulatory costs that would be imposed under this rule in the surrounding areas of state jurisdiction. Electricity generation or the production of other goods and commodities may become more cost-competitive at any EGU or industrial sources not subject to the rule but located in a geography where the same types of sources are subject to the rule. For instance, the affected EGU source located on the Uintah and Ouray Reservation of the Ute Tribe is in an area that is interconnected with the western electricity grid and is owned and operated by an entity that generates and provides electricity to customers in several states. It is both necessary and appropriate, in the EPA's view, to avoid creating, via this rule, a structure of incentives that may cause generation or production—and the associated NOₓ emissions—to shift into the CAA section 301(d) FIP areas to escape regulation needed to eliminate interstate transport under the good neighbor provision.

The EPA finds it is appropriate to directly implement the rule's requirements in the CAA section 301(d) FIP areas in this action rather than at a later date. Tribes have the opportunity to seek treatment as a state (TAS) and to undertake tribal implementation plans under the CAA. To date, the one tribe which could develop and seek approval of a tribal implementation plan to address good neighbor obligations with respect to an existing EGU in the CAA section 301(d) FIP areas for the 2015 ozone NAAQS (or for any other NAAQS), the Ute Indian Tribe of the Uintah and Ouray Reservation, has not

---

[117] With respect to any industrial sources located in the CAA section 301(d) FIP areas, the geographic scope of coverage of this rule does not include those states for which the EPA finds, based on air quality modeling, that no further linkage exists by the 2026 analytic year at Steps 1 and 2. The states in this rule not linked in 2026 are Alabama, Minnesota, and Wisconsin.

[118] *See* section VI.B.9 of this document for a discussion of revisions that are being made in this rulemaking regarding the point in the allowance allocation process at which the EPA would establish set-asides of allowances for units in Indian country not subject to a state's CAA implementation planning authority.

expressed an intent to do so. Nor has the EPA heard intentions from any other tribe, and it would not be reasonable to expect tribes to undertake that planning effort, particularly when no existing sources are currently located on their lands. Further, the EPA is mindful that under court precedent, the EPA and states bear an obligation to fully implement any required emissions reductions to eliminate significant contribution under the good neighbor provision as expeditiously as practicable and in alignment with downwind areas' attainment schedule under the Act. As discussed in section VI.A of this document, the EPA is implementing certain required emissions reductions by the 2023 ozone season, the last full ozone season before the 2024 Moderate area attainment date, and other key additional required emissions reductions by the 2026 ozone season, the last full ozone season before the 2027 Serious area attainment date. Absent the application of this FIP in the CAA section 301(d) FIP areas, $NO_X$ emissions from any existing or new EGU or non-EGU sources located in, or locating in, the CAA section 301(d) FIP areas within the covered geography of the rule would remain unregulated for purposes of CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS and could continue or potentially increase. This would be inconsistent with the EPA's overall goal of aligning good neighbor obligations with the downwind areas' attainment schedule and to achieve emissions reductions as expeditiously as practicable.

Further, the EPA recognizes that Indian country, including the CAA section 301(d) FIP areas, is often home to communities with environmental justice concerns, and these communities may bear a disproportionate level of pollution burden as compared with other areas of the United States. The EPA's Fiscal Year 2022–2026 Strategic Plan [119] includes an objective to promote environmental justice at the Federal, Tribal, state, and local levels and states: "Integration of environmental justice principles into all EPA activities with Tribal governments and in Indian country is designed to be flexible enough to accommodate EPA's Tribal program activities and goals, while at the same time meeting the Agency's environmental justice goals." As described in section X.F of this document, the EPA offered Tribal consultation to 574 Tribes in April of 2022 and received no requests for Tribal

consultation after publication of the proposed rulemaking. By including all areas of Indian country within the covered geography of the rule, the EPA is advancing environmental justice, lowering pollution burdens in such areas, and preventing the potential for "pollution havens" to form in such areas as a result of facilities seeking to locate there to avoid the requirements that would otherwise apply outside of such areas under this rule.

Therefore, to ensure timely alignment of all needed emissions reductions within the timetables of this rule, to ensure equitable distribution of the upwind pollution reduction obligation across all upwind jurisdictions, to avoid perverse economic incentives to locate sources of ozone-precursor pollution in the CAA section 301(d) FIP areas, and to deliver greater environmental justice to tribal communities in line with Executive Order 13985: Advancing Racial Equity and Support for Underserved Communities Through the Federal Government,[120] the EPA finds it both necessary and appropriate that all existing and new EGU and industrial sources that are located in the CAA section 301(d) FIP areas within the geographic boundaries of the covered states, and which would be subject to this rule if located within areas subject to state CAA planning authority, should be included in this rule. The EPA issues this finding under CAA section 301(d)(4) of the Act and 40 CFR 49.11. Further, to avoid "unreasonable delay" in promulgating this FIP, as required under section 49.11, the EPA makes this finding now, to align emissions reduction obligations for any covered new or existing sources in the CAA section 301(d) FIP areas with the larger schedule of reductions under this rule. Because all other covered EGU and non-EGU sources within the geography of this rule would be subject to emissions reductions of uniform stringency beginning in the 2023 ozone season, and as necessary to fully and expeditiously address good neighbor obligations for the 2015 ozone NAAQS, there is little benefit to be had by not including the CAA section 301(d) FIP areas in this rule now and a potentially significant downside to not doing so.

The Agency recognizes that Tribal governments may still choose to seek TAS to develop a Tribal plan with respect to the obligations under this rule, and this determination does not preclude the tribes from taking such

actions. Although the formal tribal consultation process associated with this action has concluded, the EPA is willing and available to engage with any tribe as this rule is implemented.

b. Indian Country Subject to State Implementation Planning Authority

Following the U.S. Supreme Court decision in *McGirt* v. *Oklahoma,* 140 S. Ct. 2452 (2020), the Governor of the State of Oklahoma requested approval under section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005: A Legacy for Users, Public Law 109–59, 119 Stat. 1144, 1937 (August 10, 2005) ("SAFETEA"), to administer in certain areas of Indian country (as defined at 18 U.S.C. 1151) the State's environmental regulatory programs that were previously approved by the EPA for areas outside of Indian country. The State's request excluded certain areas of Indian country further described later. In addition, the State only sought approval to the extent that such approval is necessary for the State to administer a program in light of *Oklahoma Dept. of Environmental Quality* v. *EPA,* 740 F.3d 185 (D.C. Cir. 2014).[121]

On October 1, 2020, the EPA approved Oklahoma's SAFETEA request to administer all the State's EPA-approved environmental regulatory programs, including the Oklahoma SIP, in the requested areas of Indian country.[122] As requested by Oklahoma, the EPA's approval under SAFETEA does not include Indian country lands, including rights-of-way running through the same, that: (1) qualify as Indian allotments, the Indian titles to which have not been extinguished, under 18 U.S.C. 1151(c); (2) are held in trust by the United States on behalf of an individual Indian or Tribe; or (3) are owned in fee by a Tribe, if the Tribe (a) acquired that fee title to such land, or an area that included such land, in accordance with a treaty with the United States to which such Tribe was a party, and (b) never allotted the land to a member or citizen of the Tribe

---

[119] https://www.epa.gov/system/files/documents/2022-03/fy-2022-2026-epa-strategic-plan.pdf.

[120] Executive Order 13985 (January 20, 2021) (86 FR 7009 (January 25, 2021)): https://www.govinfo.gov/content/pkg/FR-2021-01-25/pdf/2021-01753.pdf.

[121] In *ODEQ* v. *EPA,* the D.C. Circuit held that under the CAA, a state has the authority to implement a SIP in non-reservation areas of Indian country in the state, where there has been no demonstration of tribal jurisdiction. Under the D.C. Circuit's decision, the CAA does not provide authority to states to implement SIPs in Indian reservations. *ODEQ* did not, however, substantively address the separate authority in Indian country provided specifically to Oklahoma under SAFETEA. That separate authority was not invoked until the State submitted its request under SAFETEA, and was not approved until the EPA's decision, described in this section, on October 1, 2020.

[122] Available in the docket for this rulemaking.

(collectively "excluded Indian country lands").

The EPA's approval under SAFETEA expressly provided that to the extent EPA's prior approvals of Oklahoma's environmental programs excluded Indian country, any such exclusions are superseded for the geographic areas of Indian country covered by the EPA's approval of Oklahoma's SAFETEA request.[123] The approval also provided that future revisions or amendments to Oklahoma's approved environmental regulatory programs would extend to the covered areas of Indian country (without any further need for additional requests under SAFETEA).

In a **Federal Register** document published on February 13, 2023 (88 FR 9336), the EPA disapproved the portion of an Oklahoma SIP submittal pertaining to the state's interstate transport obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Consistent with the D.C. Circuit's decision in *ODEQ* v. *EPA* and with the EPA's October 1, 2020 SAFETEA approval, the EPA has authority under CAA section 110(c) to promulgate a FIP as needed to address the disapproved aspects of Oklahoma's good neighbor SIP submittal.[124] In accordance with the previous discussion, the EPA's FIP authority in this circumstance extends to all Indian country in Oklahoma, other than the excluded Indian country lands, as described previously.[125] Because—per the State's request under SAFETEA— EPA's October 1, 2020 approval does not displace any SIP authority previously exercised by the State under the CAA as interpreted in *ODEQ* v. *EPA*, the EPA's FIP authority under CAA section 110(c) also applies to any Indian allotments or dependent Indian communities located outside of an Indian reservation over which there has been no demonstration of tribal authority. The EPA's FIP authority under CAA section 110(c) similarly applies to Indian allotments or dependent Indian communities located outside of an Indian reservation over which there has been no demonstration of tribal authority located in any other state within the geographic scope of this rule.

In light of the relevant legal authorities discussed above regarding the scope of the State of Oklahoma's regulatory jurisdiction under the CAA, the EPA has FIP authority under CAA section 110(c) with respect to all Indian country in Oklahoma other than excluded Indian country lands. To the extent any change occurs in the scope of Oklahoma's SIP authority in Indian country following finalization of this rule, and such change affects the exercise of FIP authority provided under section 110(c) of the Act,[126] then, to the extent any such areas would fall more appropriately within the CAA section 301(d) FIP areas as described in section III.C.2.a of this document, the EPA's necessary or appropriate finding as set forth above with respect to all other CAA section 301(d) FIP areas within the geographic scope of coverage of the rule would apply.

*D. Severability*

The EPA regards this action as a complete remedy, which will as expeditiously as practicable implement good neighbor obligations for the 2015 ozone NAAQS for the covered states, consistent with the requirements of the Act. *See North Carolina* v. *EPA,* 531 F.3d 896, 911–12 (D.C. Cir. 2008); *Wisconsin* v. *EPA,* 938 F.3d 303, 313– 20 (D.C. Cir. 2019); *Maryland* v. *EPA,* 958 F.3d 1185, 1204 (D.C. Cir. 2020); *New York* v. *EPA,* 964 F.3d 1214, 1226 (D.C. Cir. 2020); *New York* v. *EPA,* 781 Fed. App'x 4, 7–8 (D.C. Cir. 2019) (all holding that the EPA must address good neighbor obligations as expeditiously as practicable and by no later than the next applicable attainment date). Yet should a court find any discrete aspect of this document to be invalid, the Agency believes that the remaining aspects of this rule can and should continue to be implemented to the extent possible. In particular, this action promulgates a FIP for each covered state (and, pursuant to CAA section 301(d), for each area of tribal jurisdiction within the geographic boundaries of those states). Should any jurisdiction-specific aspect of the final rule be found invalid, the EPA views this rule as severable along those state and/or tribal jurisdictional lines, such that the rule can continue to be implemented as to any remaining jurisdictions. This action promulgates discrete emissions control requirements for the power sector and for each of seven other industries. Should any industry-specific aspect of the final rule be found invalid, the EPA views this rule as severable as between the different industries and different types of emissions control requirements. This is not intended to be an exhaustive list of the ways in which the rule may be severable. In the event any part of it is found invalid, our intention is that the remaining portions should continue to be implemented consistent with any judicial ruling.

The EPA's conclusion that this rule is severable also reflects the important public health and environmental benefits of this rulemaking in eliminating significant contribution and to ensure to the greatest extent possible the ability of both upwind states and downwind states and other relevant stakeholders to be able to rely on this final rule in their planning. *Cf. Wisconsin,* 938 F.3d at 336–37 ("As a general rule, we do not vacate regulations when doing so would risk significant harm to the public health or the environment."); *North Carolina* v. *EPA,* 550 F.3d 1176, 1178 (D.C. Cir. 2008) (noting the need to preserve public health benefits); *EME Homer City* v. *EPA,* 795 F.3d 118, 132 (D.C. Cir. 2015) (noting the need to avoid disruption to emissions trading market that had developed).

**IV. Analyzing Downwind Air Quality Problems and Contributions From Upwind States**

*A. Selection of Analytic Years for Evaluating Ozone Transport Contributions to Downwind Air Quality Problems*

In this section, the EPA describes its process for selecting analytic years for air quality modeling and analyses performed to identify nonattainment and maintenance receptors and identify upwind state linkages. For this final rule, the EPA evaluated air quality to identify receptors at Step 1 for two

---

[123] The EPA's prior approvals relating to Oklahoma's SIP frequently noted that the SIP was not approved to apply in areas of Indian country (consistent with the D.C. Circuit's decision in *ODEQ* v. *EPA*) located in the state. *See, e.g.,* 85 FR 20178, 20180 (April 10, 2020). Such prior expressed limitations are superseded by the EPA's approval of Oklahoma's SAFETEA request.

[124] The antecedent fact that the state had the authority and jurisdiction to implement requirements under the good neighbor provision, in the EPA's view, supplies the condition necessary for the Agency to exercise its FIP authority to the extent the EPA has disapproved the state's SIP submission with respect to those requirements. Under CAA section 110(c), the EPA "stands in the shoes of the defaulting state, and all of the rights and duties that would otherwise fall to the state accrue instead to the EPA." *Central Ariz. Water Conservation Dist.* v. *EPA,* 990 F.2d 1531, 1541 (9th Cir. 1993).

[125] With respect to those areas of Indian country constituting "excluded Indian country lands" in the State of Oklahoma, as defined supra, the EPA applies the same necessary or appropriate finding as set forth above within the geographic scope of coverage of the rule.

[126] On December 22, 2021, the EPA proposed to withdraw and reconsider the October 1, 2020, SAFETEA approval. *See https://www.epa.gov/ok/ proposed-withdrawal-and-reconsideration-and- supporting-information.* The EPA is engaging in further consultation with tribal governments and expects to have discussions with the State of Oklahoma as part of this reconsideration. The EPA also notes that the October 1, 2020, approval is the subject of a pending challenge in Federal court. *Pawnee Nation of Oklahoma* v. *Regan,* No. 20–9635 (10th Cir.).

analytic years: 2023 and 2026. The EPA evaluated interstate contributions to these receptors from individual upwind states at Step 2 for these two analytic years. In selecting these years, the EPA views 2023 and 2026 to constitute years by which key emissions reductions from EGUs and non-EGUS can be implemented "as expeditiously as practicable." In addition, these years are the last full ozone seasons before the Moderate and Serious area attainment dates for the 2015 ozone NAAQS (ozone seasons run each year from May 1– September 30). To demonstrate attainment by these deadlines, downwind states would be required to rely on design values calculated using ozone data from 2021 through 2023 and 2024 through 2026, respectively. By focusing its analysis, and, potentially, achieving emissions reductions by, the last full ozone seasons before the attainment dates (*i.e.*, in 2023 or 2026), this final rule can assist the downwind areas with demonstrating attainment or receiving extensions of attainment dates under CAA section 181(a)(5). (The EPA explains in detail in sections V and VI of this document its determinations regarding which emissions reduction strategies can be implemented by 2023, and which emissions reduction strategies require additional time beyond that ozone season, or the 2026 ozone season.)

It would not be logical for the EPA to analyze any earlier year than 2023. The EPA continues to interpret the good neighbor provision as forward-looking, based on Congress's use of the future-tense "will" in CAA section 110(a)(2)(D)(i), an interpretation upheld in *Wisconsin,* 938 F.3d at 322. It would be "anomalous," *id.,* for the EPA to impose good neighbor obligations in 2023 and future years based solely on finding that "significant contribution" had existed at some time in the past. *Id.*

Applying this framework in the proposal, the EPA recognized that the 2021 Marginal area attainment date had already passed. Further, based on the timing of the proposal, it was not possible to finalize this rulemaking before the 2022 ozone season had also passed. Thus, the EPA has selected 2023 as the first appropriate future analytic year for this final rule because it reflects implementation of good neighbor obligations as expeditiously as practicable and coincides with the August 3, 2024, Moderate area attainment date established for the 2015 ozone NAAQS.

The EPA conducted additional analysis for 2026 to ensure a complete Step 3 analysis for future ozone transport contributions to downwind

areas. As noted above, 2023 and 2026 coincide with the last full ozone seasons before future attainment dates for the 2015 ozone NAAQS. In addition, 2026 coincides with the ozone season by which key additional emissions reductions from EGUs and non-EGUs become available. Thus, the EPA analyzed additional years beyond 2023 to determine whether any additional emissions reductions that are impossible to obtain by the 2024 attainment date could still be necessary to fully address significant contribution. In all cases, implementation of necessary emissions reductions is as expeditiously as practicable, with all possible emissions reductions implemented by the next applicable attainment date.

The timing framework and selection of analytic years set forth above comports with the D.C. Circuit's direction in *Wisconsin* that implementing good neighbor obligations beyond the dates established for attainment may be justified on a proper showing of impossibility or necessity. *See* 938 F.3d at 320.

*Comment:* A commenter claims that the EPA has not followed the holdings of *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019), *North Carolina* v. *EPA,* 550 F.3d 1176 (D.C. Cir. 2008), and *Maryland* v. *EPA,* 958 F. 3d 1185 (D.C. Cir. 2020) in the selection of analytic years, in that commenter interprets those decisions as holding that the EPA must "harmonize" the exact timing of upwind emissions reductions with when downwind states implement their required reductions. Commenter also points to the EPA's proposed action on New York's Good Neighbor SIP submission specifically to argue that the EPA is treating upwind and downwind states dissimilarly. Commenter also cites CAA sections 172, 177, and 179 to argue the EPA did not properly align upwind and downwind obligations. Several commenters believe the EPA should defer implementing good neighbor requirements until downwind receptor areas have first implemented their own emissions control strategies.

*Response:* The EPA maintains that 2023 is an appropriate analytic year and comports with the relevant caselaw. Section VI.A further discusses the compliance schedule for emissions reductions under this rule. Commenter misreads the *North Carolina, Wisconsin,* and *Maryland* decisions as calling for good neighbor analysis and emissions controls to be aligned with the timing of the *implementation* of nonattainment controls by downwind states. However, the D.C. Circuit has held that the *statutory attainment dates* are the

relevant downwind deadlines the EPA must align with in implementing the good neighbor provision. In *Wisconsin,* the court held, "In sum, under our decision in *North Carolina,* the Good Neighbor Provision calls for elimination of upwind States' significant contributions *on par with the relevant downwind attainment deadlines.*" *Wisconsin,* 938 F.3d. at 321 (emphasis added).

After that decision, the EPA interpreted *Wisconsin* as limited to the attainment dates for Moderate or higher classifications under CAA section 181 on the basis that Marginal nonattainment areas have reduced planning requirements and other considerations. *See, e.g.,* 85 FR 29882, 29888–89 (May 19, 2020) (proposed approval of South Dakota's 2015 ozone NAAQS good neighbor SIP). However, on May 19, 2020, the D.C. Circuit in *Maryland* v. *EPA,* 958 F.3d 1185 (D.C. Cir. 2020), applying the *Wisconsin* decision, rejected that argument and held that the EPA must assess air quality at the next downwind attainment date, including Marginal area attainment dates under CAA section 181, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). 958 F.3d at 1203– 04. After *Maryland,* the EPA acknowledged that the Marginal attainment date is the first attainment date to consider in evaluating good neighbor obligations. *See, e.g.,* 85 FR 67653, 67654 (Oct. 26, 2020) (final approval of South Dakota's 2015 ozone NAAQS good neighbor SIP).

The D.C. Circuit again had occasion to revisit the Agency's interpretation of *North Carolina, Wisconsin,* and *Maryland,* in a challenge to the Revised CSAPR Update brought by the Midwest Ozone Group (MOG). The court declined to entertain similar arguments to those presented by commenters here and instead in a footnote explained that it had "exhaustively summarized the regulatory framework governing EPA's conduct" and that it "[drew] on those decisions and incorporate them herein by reference," citing, among other cases, *Maryland,* 958 F.3d 1185, and *New York,* 781 F. App'x 4. *MOG* v. *EPA,* No. 21–1146 (D.C. Cir. March 3, 2023), Slip Op. at 3 n.1.

The relevance of CAA sections 172, 177, and 179 to the selection of the analytic year in this action is not clear. Commenter cites these provisions to conclude that the EPA did not appropriately consider downwind attainment deadlines and the timing of upwind good neighbor obligations. These provisions are found in subpart I, and while they may have continuing

relevance or applicability to aspects of ozone nonattainment planning requirements, the nonattainment dates for the 2015 ozone NAAQS flow from subpart 2 of title I of the CAA, and specifically CAA section 181(a). Applying that statutory schedule to the designations for the 2015 ozone NAAQS, the EPA has promulgated the applicable attainment dates in its regulations at 40 CFR 51.1303. The effective date of the initial designations for the 2015 ozone NAAQS was August 3, 2018 (83 FR 25776, June 4, 2018, effective August 3, 2018).[127] Thus, the first deadline for attainment planning under the 2015 ozone NAAQS was the Marginal attainment date of August 3, 2021, and the second deadline for attainment planning is the Moderate attainment date of August 3, 2024. If a Marginal area fails to attain by the attainment date it is reclassified, or "bumped up," to Moderate. Indeed, the EPA has just completed a rulemaking action reclassifying many areas of the country from Marginal to Moderate nonattainment, including all of the areas where downwind receptors have been identified in our 2023 modeling as well as many other areas of the country. 87 FR 60897, 60899 (Oct. 7, 2022).

Other than under the narrow circumstances of CAA section 181(a)(5) (discussed further in this section), the EPA is not permitted under the CAA to extend the attainment dates for areas under a given classification. That is, no matter when or if the EPA finalizes a determination that an area failed to attain by its attainment date and reclassifies that area, the attainment date remains fixed, based on the number of years from the area's initial designation. *See, e.g.,* CAA section 182(i) (authorizing the EPA to adjust any applicable deadlines for newly reclassified areas "other than attainment dates"). As the D.C. Circuit has repeatedly made clear, the statutory attainment schedule of the downwind nonattainment areas under subpart 2 is rigorously enforced and is not subject to change based on policy considerations of the EPA or the states.

[T]he attainment deadlines, the Supreme Court has said, are "the heart" of the Act. *Train* v. *Nat. Res. Def. Council,* 421 U.S. 60, 66, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *see Sierra Club* v. *EPA,* 294 F.3d 155, 161 (D.C. Cir. 2002) ("the attainment deadlines are central to the regulatory scheme") (alteration and internal quotation marks omitted). The Act's central object is the "attain[ment] [of] air quality of specified standards [within] a specified period of time." *Train,* 421 U.S. at 64–65, 95 S.Ct. 1470.

*Wisconsin,* 938 F.3d at 316. *See also Natural Resources Defense Council* v. *EPA,* 777 F.3d 456, 466–68 (D.C. Cir. 2014) (holding the EPA cannot adjust the section 181 attainment schedule to run from any other date than from the date of designation); *id.* at 468 ("EPA identifies no statutory provision giving it free-form discretion to set Subpart 2 compliance deadlines based on its own policy assessment concerning the number of ozone seasons within which a nonattainment area should be expected to achieve compliance.") (citing and quoting *Whitman* v. *American Trucking Ass'ns,* 531 U.S. 457, 484, (2001) ("The principal distinction between Subpart 1 and Subpart 2 is that the latter eliminates regulatory discretion that the former allowed."). Furthermore, as the court in *NRDC* noted, "[T]he 'attainment deadlines . . . leave no room for claims of technological or economic infeasibility.' " 777 F.3d at 488 (quoting *Sierra Club,* 294 F.3d at 161) (internal quotation marks and brackets omitted).

With the exception of the Uinta Basin, which is not an identified receptor in this action, no Marginal nonattainment area met the conditions of CAA section 181(a)(5) to obtain a one-year extension of the Moderate area attainment date. 87 FR 60899. Thus, all Marginal areas (other than Uinta) that failed to attain have been reclassified to Moderate. *Id.* (And the New York City Metropolitan nonattainment area was initially classified as Moderate (see following text for further details).) Even if the EPA had extended the attainment date for any of the downwind areas, it is not clear that it would necessarily follow that the EPA must correspondingly extend or delay the implementation of good neighbor obligations. While the *Wisconsin* court recognized extensions under CAA section 181(a)(5) as a possible source of timing flexibility in implementing the good neighbor provision, 938 F.3d at 320, the EPA and the states are still obligated to implement good neighbor reductions as expeditiously as practicable and are also obligated under the good neighbor provision to address "interference with maintenance." Areas that have obtained an extension under CAA section 181(a)(5) or which are not designated as in nonattainment could still be identified as struggling to maintain the NAAQS, and the EPA is obligated under the good neighbor provision to eliminate upwind emissions interfering with the ability to maintain the NAAQS, as well. *North Carolina,* 531 F.3d at 908–11. Thus, while an extension under CAA section 181(a)(5) may be a source

of flexibility for the EPA to consider in the timing of implementation of good neighbor obligations, as *Wisconsin* recognized, it is not the case that the EPA *must* delay or defer good neighbor obligations for that reason, and neither the D.C. Circuit nor any other court has so held.

Commenter is therefore incorrect to the extent that they argue the selection of 2023 as an analytic year for upwind obligations results in the misalignment of downwind and upwind state obligations. To the contrary, both downwind and upwind state obligations are driven by the statutory attainment date of August 3, 2024 for Moderate areas, and the last year that air quality data may impact whether nonattainment areas are found to have attained by the attainment date is 2023. That is why, in the recent final rulemaking determinations that certain Marginal areas failed to attain by the attainment date, bumping those areas up to Moderate, and giving them SIP submission deadlines, reasonably available control measures (RACM), and reasonably RACT implementation deadlines, the EPA set the attainment SIP submission deadlines for the bumped up Moderate areas to be January 1, 2023. See 87 FR 60897, 60900 (Oct. 7, 2022). The implementation deadline for RACM and RACT is also January 1, 2023. *Id.* This was in large part driven by the EPA's ozone implementation regulations, 40 CFR 51.1312(a)(3)(i), which previously established a RACT implementation deadline for initially classified Moderate as no later than January 1, 2023, and the modeling and attainment demonstration requirements in 40 CFR 51.1308(d), which require a state to provide for implementation of all control measures needed for attainment no later than the beginning of the attainment year ozone season (*i.e.,* 2023). Given this regulatory history, the EPA can hardly be accused of letting states with nonattainment areas for the 2015 ozone NAAQS avoid or delay their mandatory CAA obligations.

Commenter's proposal that the EPA align good neighbor obligations with the actual implementation of measures in downwind areas is untethered from the statute, as discussed above. It is also unworkable in practice. It would necessitate coordinating the activities of multiple states and EPA regional and headquarters offices to an impossible degree and effectively could preclude the implementation of good neighbor obligations altogether. Commenter does not explain how the EPA or upwind states should coordinate upwind emissions control obligations for states

[127] September 24, 2018, for the San Antonio area. 83 FR 35136 (July 25, 2018).

**42a**

linked to multiple downwind receptors whose states may be implementing their requirements on different timetables. Less drastic mechanisms than subjecting people living in downwind receptor areas to continuing high levels of air pollution caused in part by upwind-state pollution are available if the actual implementation of mandatory CAA requirements in the downwind areas is delayed: CAA section 304(a)(2) provides for judicial recourse where there is an alleged failure by the Agency to perform a nondiscretionary duty; that recourse is for the Agency to be placed on a court-ordered deadline to address the relevant obligations. *See Oklahoma* v. *U.S. EPA,* 723 F.3d 1201, 1223–24 (10th Cir. 2013); *Montana Sulphur and Chemical Co.* v. *U.S. EPA,* 666 F.3d 1174, 1190–91 (9th Cir. 2012). Commenter focuses on the EPA's evaluation of New York's Good Neighbor SIP submission to argue the EPA is treating upwind and downwind states dissimilarly. The argument conflates New York's role as both a downwind and an upwind state. In evaluating the Good Neighbor SIP submission that New York submitted, the EPA identified as a basis for disapproval that none of the state emissions control programs New York cited included implementation timeframes to achieve the reductions, let alone ensure they were achieved by 2023. 87 FR 9484, 9494 (Feb. 22, 2022). The EPA conducted the same inquiry into other states' claims regarding their existing or proposed state laws or other emissions reductions claimed in their SIP submissions. *See, e.g.,* 87 FR 9472–73 (evaluating claims regarding emissions reductions anticipated under Maryland's state law); 87 FR 9854 (evaluating claims regarding emissions reductions anticipated under Illinois' state law). Consistent with its treatment of the other upwind states included in this action, the EPA in a separate action disapproved New York's good neighbor SIP submission for the 2015 ozone NAAQS because its arguments did not demonstrate that it had fully prohibited emissions significantly contributing to out of state nonattainment or maintenance problems.

Commenter attempts to contrast this evaluation with what it believes is the EPA's permissive attitude toward delays by downwind states, specifically claiming that ''certain nonattainment areas have delayed implementation of nonattainment controls until 2025 and beyond.'' This apparently references New York's simple cycle and regenerative combustion turbines (SCCT) controls, which commenter cited elsewhere in its comments. New

York's SCCT controls were not included by New York in its good neighbor SIP submission, nor was the prior approval of the SCCT controls reexamined by the EPA or reopened for consideration by the Agency in this action. Although not part of this rulemaking, the EPA notes that the SCCT controls were approved by the EPA as a SIP strengthening measure and not to satisfy any specific planning requirements for the 2015 ozone NAAQS under CAA section 182. 86 FR 43956, 43958 (Aug. 11, 2021). The SCCT controls submitted to the EPA were already a state rule, and the only effect under the CAA of the EPA approving them into New York's SIP was to make them federally enforceable. 86 FR 43956, 43959 (Aug. 11, 2021). In other words, approval of the SCCT controls did not relieve New York of its nonattainment planning obligations for the 2015 ozone NAAQS.

The EPA notes that the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area was initially designated as Moderate nonattainment. 83 FR 25776 (June 4, 2018). Pursuant to this designation, New York was required to submit a RACT SIP submission and an attainment demonstration no later than 24 months and 36 months, respectively, after the effective date of the Moderate designation. CAA section 182; 40 CFR 51.1308(a), 51.1312(a)(2). New York submitted a RACT SIP for the 2015 ozone standards on January 29, 2021,[128] and the EPA is currently evaluating that submission. New York has not yet submitted its attainment demonstration, which was due August 3, 2021. Further, the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area remains subject to the Moderate nonattainment area date of August 3, 2024. If it fails to attain the 2015 ozone NAAQS by August 3, 2024, it will be reclassified to Serious nonattainment, resulting in additional requirements on the New York nonattainment area.

In any case, regardless of the status of New York's and the EPA's efforts in relation to the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area (which are outside the scope of this action), the EPA's evaluation of 2023 as the relevant analytic year in assessing New York's and other states' good neighbor obligations is consistent with the statutory framework and court decisions calling on the agency to align these obligations with the downwind areas' statutory attainment schedule. The EPA

further responds to these comments in the *RTC* document in the docket.

The remainder of this section includes information on (1) the air quality modeling platform used in support of the final rule with a focus on the base year and future year base case emissions inventories, (2) the method for projecting design values in 2023 and 2026, and (3) the approach for calculating ozone contributions from upwind states. The Agency also provides the design values for nonattainment and maintenance receptors and the largest predicted downwind contributions in 2023 and 2026 from each state. The 2016 base period and 2023 and 2026 projected design values and contributions for all ozone monitoring sites are provided in the docket for this rule. The ''Air Quality Modeling Technical Support Document for the Federal Good Neighbor Plan for the 2015 Ozone National Ambient Air Quality Standards Final Rulemaking'' (Mar. 2023), hereinafter referred to as the Air Quality Modeling Final Rule TSD, in the docket for this final rule contains more detailed information on the air quality modeling aspects of this rule.

*B. Overview of Air Quality Modeling Platform*

The EPA used version 3 of the 2016-based modeling platform (*i.e.,* 2016v3) for the air quality modeling for this final rule. This modeling platform includes 2016 base year emissions from anthropogenic and natural sources and anthropogenic emissions projections for 2023 and 2026. The emissions data contained in this platform represent an update to the 2016 version 2 inventories used for the proposal modeling.

The air quality modeling for this final rule was performed for a modeling region (*i.e.,* modeling domain) that covers the contiguous 48 states using a horizontal resolution of 12 x 12 km. The EPA used the CAMx version 7.10 for air quality modeling which is the same model that EPA used for the proposed rule air quality modeling.[129] Additional information on the 2016-based air quality modeling platform can be found in the Air Quality Modeling Final Rule TSD.

*Comment:* Commenters noted that the 2016 base year summer maximum daily average 8-hour (MDA8) ozone predictions from the proposal modeling were biased low compared to the corresponding measured concentrations in certain locations. In this regard, commenters said that model

---

[128] *https://edap.epa.gov/public/extensions/S4S_Public_Dashboard_2/S4S_Public_Dashboard_2.html.*

[129] Ramboll Environment and Health, January 2021, *https://www.camx.com.*

performance statistics for a number of monitoring sites, particularly those in portions of the West and in the area around Lake Michigan, were outside the range of published performance criteria for normalized mean bias (NMB) and normalized mean error (NME) of less than ±15 percent and less than 25 percent, respectively (Emory, et al., 2017).[130] The commenters said EPA must investigate the factors contributing to low bias and make necessary corrections to improve model performance in the final rule modeling. Some commenters said that EPA should include $NO_X$ emissions from lightning strikes and assess the treatment of other background sources of ozone to improve model performance for the final rule. Additional information on the comments on model performance can be found in the *RTC* document for this final rule.

*Response:* In response to these comments EPA examined the temporal and spatial characteristics of model under prediction to investigate the possible causes of under prediction of MDA8 ozone concentrations in different regions of the U.S. in the proposal modeling. EPA's analysis indicates that the under prediction was most extensive during May and June with less bias during July and August in most regions of the U.S. For example, in the Upper Midwest region model under prediction was larger in May and June compared to July through September. Specifically, in the proposal modeling, the normalized mean bias for days with measured concentrations ≥60 ppb improved from a 21.4 percent under prediction for May and June to a 12.6 percent under prediction in the period July through September. As described in the Air Quality Modeling Final Rule TSD, the seasonal pattern in bias in the Upper Midwest region improves somewhat gradually with time from the middle of May to the latter part of June. In view of the seasonal pattern in bias in the Upper Midwest and in other regions of the U.S., EPA focused its investigation of model performance on model inputs that, by their nature, have the largest temporal variation within the ozone season. These inputs include emissions from biogenic sources and lightning $NO_X$, and contributions from transport of international anthropogenic emissions and natural sources into the U.S. Both biogenic and lightning $NO_X$

emissions in the U.S. dramatically increase from spring to summer.[131][132] In contrast, ozone transported into the U.S. from international anthropogenic and natural sources peaks during the period March through June, with lower contributions during July through September.[133][134] To investigate the impacts of these sources, EPA conducted sensitivity model runs which focused on the effects on model performance of adding $NO_X$ emissions from lightning strikes, updating biogenic emissions, and using an alternative approach for quantifying transport of ozone and precursor pollutants into the U.S. from international anthropogenic and natural sources. The development of lightning $NO_X$ emissions and the updates to biogenic emissions, are described in section IV.C of this document. In the proposal modeling the amount of transport from international anthropogenic and natural sources was based on a simulation of the hemispheric version of the Community Multi-scale Air Quality Model (H–CMAQ) for 2016.[135] The outputs from this hemispheric modeling were then used to provide boundary conditions for national scale air quality modeling at proposal.[136] Overall, H–CMAQ tends to

under-predict daytime ozone concentrations at rural and remote monitoring sites across the U.S. during the spring of 2016 whereas the predictions from the GEOS-Chem global model [137] were generally less biased.[138] During the summer of 2016 both models showed varying degrees of over prediction with GEOS-Chem showing somewhat greater over-prediction, compared to H–CMAQ. In view of those results, EPA examined the impacts of using GEOS-Chem as an alternative to H–CMAQ for providing boundary conditions for the final rule modeling.

For the lightning $NO_X$, biogenics, and GEOS-Chem sensitivity runs, EPA reran the proposal modeling using each of these inputs, individually. Results from these sensitivity runs indicate that each of the three updates provides an improvement in model performance. However, by far the greatest improvement in model performance is attributable to the use of GEOS-Chem. In view of these results EPA has included lightning $NO_X$ emissions, updated biogenic emissions, and international transport from GEOS-Chem in the final rule air quality modeling. Details on the results of the individual sensitivity runs can be found in the Air Quality Modeling Final Rule TSD. For the air quality modeling supporting this final action, model performance based on days in 2016 with measured MDA8 ozone ≥60 ppb is considerably improved (*i.e.,* less bias and error) compared to the proposal modeling in nearly all regions of the U.S. For example, in the Upper Midwest, which includes monitoring sites along Lake Michigan, the normalized mean bias improved from a 19 percent under prediction to a 6.9 percent under prediction and in the Southwest region, which includes monitoring sites in Denver and Salt Lake City, normalized mean bias improved from a 13.6 percent under prediction to a 4.8 percent under prediction.[139] In all regions, the

[130] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582–598, DOI: 10.1080/10962247.1265027.

[131] Guenther, A.B., 1997. Seasonal and spatial variations in natural volatile organic compound emissions. Ecol. Appl. 7, 34–45. *https://doi.org/10.1890/1051-0761(1997)007[0034:SASVIN]2.0.CO;2*. Guenther, A., Hewitt, C.N., Erickson, D., Fall, R.

[132] Kang D, Mathur R, Pouliot GA, Gilliam RC, Wong DC. Significant ground-level ozone attributed to lightning-induced nitrogen oxides during summertime over the Mountain West States. NPJ Clim Atmos Sci. 2020 Jan 30;3:6. doi: 10.1038/s41612–020–0108–2. PMID: 32181370; PMCID: PMC7075249.

[133] Jaffe DA, Cooper OR, Fiore AM, Henderson BH, Tonnesen GS, Russell AG, Henze DK, Langford AO, Lin M, Moore T. Scientific assessment of background ozone over the U.S.: Implications for air quality management. Elementa (Wash DC). 2018;6(1):56. doi: 10.1525/elementa.309. PMID: 30364819; PMCID: PMC6198683.

[134] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, N. Possiel, G. Pouliot, B. Timin, K.W. Appel, 2019. Global Sources of North American Ozone. Presented at the 18th Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 21–23, 2019.

[135] Mathur, R., Gilliam, R., Bullock, O.R., Roselle, S., Pleim, J., Wong, D., Binkowski, F., and 1 Streets, D.: Extending the applicability of the community multiscale air quality model to 2 hemispheric scales: motivation, challenges, and progress. In: Steyn DG, Trini S (eds) Air 3 pollution modeling and its applications, XXI. Springer, Dordrecht, pp 175–179, 2012.

[136] Boundary conditions are the concentrations of pollutants along the north, east, south, and west boundaries of the air quality modeling domain. Boundary conditions vary in space and time and are typically obtained from predictions of global or hemispheric models. Information on how boundary conditions were developed for the final rule

modeling can be found in the Air Quality Modeling Final Rule TSD.

[137] J. Bey, D.J. Jacob, R.M. Yantosca, J.A. Logan, B.D. Field, A.M. Fiore, Q. Li, H.Y. Liu, L.J. Mickley, M.G. Schultz. Global modeling of tropospheric chemistry with assimilated meteorology: model description and evaluation. J. Geophys. Res. Atmos., 106 (2001), pp. 23073–23095, 10.1029/2001jd000807.

[138] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, G., N. Possiel, B. Timin, K.W. Appel, 2022. Meteorological and Emission Sensitivity of Hemispheric Ozone and $PM_{2.5}$. Presented at the 21st Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 17–19, 2022.

[139] A comparison of model performance from the proposal modeling to the final modeling for

Continued

normalized mean bias and normalized mean error statistics for high ozone days based on the final rule modeling are within the range of performance criteria benchmarks (*i.e.,* < ±15 percent for normalized mean bias and <25 percent for normalized mean error).[140] Additional information on model performance is provided in the Air Quality Modeling Final Rule TSD. In summary, EPA included emissions of lightning $NO_X$, as requested by commenters, and investigated and addressed concerns about model performance for the final rule modeling.

*C. Emissions Inventories*

The EPA developed emissions inventories to support air quality modeling for this final rule, including emissions estimates for EGUs, non-EGU point sources (*i.e.,* stationary point sources), stationary nonpoint sources, onroad mobile sources, nonroad mobile sources, other mobile sources, wildfires, prescribed fires, and biogenic emissions that are not the direct result of human activities. The EPA's air quality modeling relies on this comprehensive set of emissions inventories because emissions from multiple source categories are needed to model ambient air quality and to facilitate comparison of model outputs with ambient measurements.

Prior to air quality modeling, the emissions inventories were processed into a format that is appropriate for the air quality model to use. To prepare the emissions inventories for air quality modeling, the EPA processed the emissions inventories using the Sparse Matrix Operator Kernel Emissions (SMOKE) Modeling System version 4.9 to produce the gridded, hourly, speciated, model-ready emissions for input to the air quality model. Additional information on the development of the emissions inventories and on data sets used during the emissions modeling process are provided in the document titled, ''Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform'' (Jan. 2023), hereafter known as the 2016v3

Emissions Modeling TSD. This TSD is available in the docket for this rule.[141]

1. Foundation Emissions Inventory Data Sets

The 2016v3 emissions platform is comprised of data from various sources including data developed using models, methods, and source datasets that became available in calendar years 2020 through 2022, in addition to data retained from the Inventory Collaborative 2016 version 1 (2016v1) Emissions Modeling Platform, released in October 2019. The 2016v1 platform was developed through a national collaborative effort between the EPA and state and local agencies along with MJOs. The 2016v2 platform used to support the proposed action included updated data from the 2017 NEI along with updates to models and methods as compared to 2016v1. The 2016v3 platform includes updates to the 2016v2 platform implemented in response to comments along with other updates to the 2016v2 platform such as corrections and the incorporation of updated data sources that became available prior to the 2016v3 inventories being developed. Several commenters noted that the 2016v2 platform did not include $NO_X$ emissions that resulted from lightning strikes. To address this, lightning $NO_X$ emissions were computed and included in the 2016v3 platform.

For this final rule, the EPA developed emissions inventories for the base year of 2016 and the projected years of 2023 and 2026. The 2023 and 2026 inventories represent changes in activity data and of predicted emissions reductions from on-the-books actions, planned emissions control installations, and promulgated Federal measures that affect anthropogenic emissions.[142] The 2016 emissions inventories for the U.S. primarily include data derived from the 2017 National Emissions Inventory (2017 NEI)[143] and data specific to the year of 2016. The following sections provide an overview of the construct of the 2016v3 emissions and projections. The fire emissions were unchanged between the 2016v2 and 2016v3 emissions platforms. For the 2016v3 platform, the biogenic emissions were

updated to use the latest available versions of the Biogenic Emissions Inventory System and associated land use data to help address comments related to a degradation in model performance in the 2016v2 platform as compared to the 2016v1 platform. Details on the construction of the inventories are available in the 2016v3 Emissions Modeling TSD. Details on how the EPA responded to comments related to emissions inventories are available in the *RTC* document for this rule.

2. Development of Emissions Inventories for EGUs

a. EGU Emissions Inventories Supporting This Final Rule

Development of emissions inventories for annual $NO_X$ and $SO_2$ emissions for EGUs in the 2016 base year inventory are based primarily on data from continuous emissions monitoring systems (CEMS) and other monitoring systems allowed for use by qualifying units under 40 CFR part 75, with other EGU pollutants estimated using emissions factors and annual heat input data reported to the EPA. For EGUs not reporting under Part 75, the EPA used data submitted to the NEI by the state, local, and tribal agencies. The Air Emissions Reporting Rule (80 FR 8787; February 19, 2015), requires that Type A point sources large enough to meet or exceed specific thresholds for emissions be reported to the EPA every year, while the smaller Type B point sources must only be reported to EPA every 3 years. Emissions data for EGUs that did not have data submitted to the NEI specific to the year 2016 were filled in with data from the 2017 NEI. For more information on the details of how the 2016 EGU emissions were developed and prepared for air quality modeling, see the 2016v3 Emissions Modeling TSD.

The EPA projected 2023 and 2026 baseline EGU emissions using the version 6—Updated Summer 2021 Reference Case of the Integrated Planning Model (IPM). IPM, developed by ICF Consulting, is a state-of-the-art, peer-reviewed, multi-regional, dynamic, deterministic linear programming model of the contiguous U.S. electric power sector. It provides forecasts of least cost capacity expansion, electricity dispatch, and emissions control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints. The EPA has used IPM for over two decades, including all prior implemented CSAPR rulemakings, to better understand power sector behavior under future business-

---

individual monitoring sites can be found in the docket for this final rule.

[140] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582–598, DOI: 10.1080/10962247.1265027.

[141] See 2016v3 Emissions Modeling TSD, also available at *https://www.epa.gov/air-emissions-modeling/2016v3-platform*.

[142] Biogenic emissions and emissions from wildfires and prescribed fires were held constant between 2016 and the future years because (1) these emissions are tied to the 2016 meteorological conditions and (2) the focus of this rule is on the contribution from anthropogenic emissions to projected ozone nonattainment and maintenance.

[143] *https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-technical-support-document-tsd.*

as-usual conditions and to evaluate the economic and emissions impacts of prospective environmental policies. The model is designed to reflect electricity markets as accurately as possible. The EPA uses the best available information from utilities, industry experts, gas and coal market experts, financial institutions, and government statistics as the basis for the detailed power sector modeling in IPM. The model documentation provides additional information on the assumptions discussed here as well as all other model assumptions and inputs.[144] The EPA relied on the same model platform at final as it did at proposal, but made substantial updates to reflect public comments on near-term fossil fuel market price volatility and updated fleet information reflecting Summer 2022 U.S. Energy Information Agency (EIA) 860 data, unit-level comments, and additional updates to the National Electric Energy Data System (NEEDS) inventory.

The IPM version 6—Updated Summer 2021 Reference Case incorporated recent updates through the Summer of 2022 to account for updated Federal and state environmental regulations (including Renewable Portfolio Standards (RPS), Clean Energy Standards (CES) and other state mandates), fleet changes (committed EGU retirements and new builds), electricity demand, technology cost and performance assumptions from recent data (for renewables adopting from National Renewable Energy Lab (NREL's) Annual Technology Baseline 2020 and for fossil sources from EIA's Annual Energy Outlook (AEO) 2020. Natural gas and coal price projections reflect data developed in Fall 2020 but updated in summer of 2022 to capture near-term price volatility and current market conditions. The inventory of EGUs provided as an input to the model was the NEEDS fall 2022 version and is available on EPA's website.[145] This version of NEEDS reflects announced retirements and under-construction new builds known as of early summer 2022. This projected base case accounts for the effects of the finalized Mercury and Air Toxics Standards rule, CSAPR, the CSAPR Update, the Revised CSAPR Update, NSR enforcement settlements, the final ELG Rule, CCR Rule, and other on-the-books Federal and state rules

(including renewable energy tax credit extensions from the Consolidated Appropriations Act of 2021) through early 2021 impacting $SO_2$, $NO_X$, directly emitted particulate matter, $CO_2$, and power plant operations. It also includes final actions the EPA has taken to implement the Regional Haze Rule and best available retrofit technology (BART) requirements. Documentation of IPM version 6 and NEEDS, along with updates, is in Docket ID No. EPA–HQ–OAR–2021–0668 and available online at *https://www.epa.gov/airmarkets/power-sector-modeling*. IPM has projected output years for 2023 and 2025. IPM year 2025 outputs were adjusted for known retirements to be reflective of year 2026, and IPM year 2030 outputs were used for the year 2032 as is specified by the mapping of IPM output years to specific years.

Additional 2023 through 2026 EGU emissions baseline levels were developed through engineering analytics as an alternative approach that did not involve IPM. The EPA developed this inventory for use in Step 3 of this final rule, where it determines emissions reduction potential and corresponding state-level emissions budgets. IPM includes optimization and perfect foresight in solving for least cost dispatch. Given that this final rule will likely become effective immediately prior to the start of the 2023 ozone season, the EPA adopted a similar approach to the CSAPR Update and the Revised CSAPR Update where it utilized historical data and an engineering analytics approach in Step 3 to avoid overstating optimization and dispatch decisions in state-emissions budget quantification that may not be possible in a short time frame. The EPA does this by starting with unit-level reported data and only making adjustments to reflect known baseline changes such as planned retirements and new builds (for the base case scenarios) and also identified mitigation strategies for determining state emissions budgets. In both the CSAPR Update and in this rule at Step 3, the EPA complemented that projected IPM EGU outlook with a historical (*e.g.*, engineering analytics) perspective based on historical data that only factors in known changes to the fleet. This 2023 engineering analytics data set is described in more detail in the Ozone Transport Policy Analysis Final Rule TSD and corresponding Appendix A: State Emissions Budgets Calculations and Underlying Data. The Engineering Analysis used in Step 3 is also discussed further in section VII.B of this document.

Both IPM and the Engineering Analytics tools are valuable for estimating future EGU emissions and examining the cone of uncertainty around any future sector-level inventory estimate. A key difference between the two tools is that IPM reflects both announced and projected changes in fleet operation, whereas the Engineering Analytics tool only reflects announced changes. By not reflecting projected regional changes that are anticipated in response to market forces and fleet trends, the Engineering Analysis deliberately creates future estimates of the power sector where state estimates are limited to known changes. Throughout all of the CSAPR rules to date, and prior interstate transport actions, the EPA has used IPM at Steps 1 and 2 as it is best suited for projecting emissions in an airshed, at projecting emissions for time horizons more than a few years out (for which changes would not yet be announced and thus projecting changes is critical), and for scenarios where the assumed change in emissions is not being codified into a state emissions reduction requirement. Using IPM at Steps 1 and 2 helps the EPA avoid overstating the current analytic year receptor values (Step 1) and future year linkages (Step 2) by reflecting reductions anticipated to occur within the airshed in the relevant timeframe.

Engineering analytics has been a useful tool for Step 3 state-level emissions reduction estimates in CSAPR rulemaking, because at that step the EPA is dealing with more geographic granularity (state-level as opposed to regional air shed), more near-term (as opposed to medium-term) assessments, and scenarios where reduction estimates are codified into regulatory requirements. Using the Engineering Analytics tool at this step ensures that the EPA is not codifying into the base case, and consequently into state emissions budgets, changes in the power sector that are merely modeled to occur rather than announced by real-world actors.

Finally, both in the Revised CSAPR Update and in this rule, the EPA was able to use the Air Quality Assessment Tool to determine that regardless of which EGU inventory is used, the 2023 geography of the program is not impacted. In other words, regardless of whether a stakeholder takes a more comprehensive view of the EGU future (IPM) or one limited to current data and known changes (Engineering Analysis), the states that are linked to receptors at Steps 1 and 2 would be the same. This finding is consistent with the observation that EGUs are now less than

---

[144] Detailed information and documentation of EPA's Base Case, including all the underlying assumptions, data sources, and architecture parameters can be found on EPA's website at: *https://www.epa.gov/airmarkets/epas-power-sector-modeling-platform-v6-using-ipm-summer-2021-reference-case*.

[145] Available at *https://www.epa.gov/airmarkets/national-electric-energy-data-system-needs-v6*.

10 percent of the total ozone-season $NO_X$ inventory and the degree of near-term difference between the IPM and Engineering Analytic regional projections is relatively small on the regional level. The EPA continues to believe that IPM is best suited for Step 1 and Step 2, and engineering analytics is best suited for Step 3 efforts in this rulemaking. The Ozone Transport Policy Analysis Final Rule TSD contains data on 2023 and 2026 AQ impacts of each dataset.

*Comment:* Some commenters express concern that using IPM for Step 1 and Step 2 captures generation shifting across state lines, which exceeds the EPA's authority. Moreover, the commenters suggest that the resulting proposed baseline EGU inventory may understate emissions levels as it projects economic retirements that are not yet announced or firm. Other commenters more generally allege that the EPA is using different modeling tools at different steps in its analysis, and this introduces confusion or uncertainty into the basis for the EPA's regulatory conclusions.

*Response:* The EPA believes the first aspect of this comment, in regards to its focus on generation shifting, is misguided in several ways. For Step 1 and Step 2, the EPA models no incremental generation shifting attributable to the implementation of an emissions control policy at Step 3. Rather, any generation patterns are merely a reflection of the model's projection of how regional load requirements will be met with the generation sources serving that region in the baseline. The EPA is not modeling any additional generation shifting, but merely capturing the expected generation dispatch under anticipated baseline market conditions. Electricity generated in one state regularly is transmitted across state boundaries and is used to serve load in other states; IPM is not incentivizing or requiring any additional generation transfer across state lines in this scenario but is merely projecting the pattern of this behavior in the future. Moreover, as noted previously, the EPA affirms its geographic findings at Step 2 (states contributing over 1 percent of the NAAQS to a downwind receptor) using historical data (engineering analysis) in a sensitivity analysis. These historical data reflect the actual generation patterns observed to meet regional load. Therefore, any suggestion by the commenter that the EPA's projected view of baseline grid dispatch is unreasonable, is mooted by the fact that the use of historical reported generation patterns produces the same result.

Additionally, at the time of the proposal's analysis, the 2023 ozone season was still nearly two years away. Therefore, it was appropriate for EPA's modeling to project economic retirements as those retirements—which are regularly occurring—are often not firm or announced two years in advance. However, for this final rule, the 2023 analytic year was close enough to the period in which EPA was conducting its analysis that such retirements would likely be announced. Therefore, the EPA was able to incorporate those announced and firm retirements to occur in the 2023 year. Further, in recognition of this very near timeframe, we deactivated IPM's ability to project additional economic retirements for the 2023 year (reflecting the notion that any retirements occurring by 2023 would be known at this point). This adjustment further accommodates the commenters' concern that the baseline overstates generation shifting (driven by retirements) in the near term, and consequently understates emissions levels. Finally, with respect to comments that the EPA is using different modeling tools at different steps in the framework, we previously explained why these techniques are appropriate for the purposes at each step of the analysis, and they are not incompatible nor do they produce results so different as to call into question their reliability or the bases for our regulatory determinations (EPA notes that the nationwide projected ozone season total $NO_X$ emissions vary by less than 1 percent in the 2023 analytic year). Nonetheless, we also observe that the effect of using engineering analytics to inform analysis at Steps 1 and 2 would tend to produce higher assumed emissions from EGUs in the baseline than IPM would project in 2026 and beyond and therefore only strengthen and further affirm the Step 1 and Step 2 geographic findings. EPA's use of different tools to project EGU scenarios is not inconsistent, but rather it is carefully explained as a deliberate measure taken to preserve—not introduce—consistency across each of the Steps in the 4-step framework. By using IPM at Step 1 and 2, EPA is selecting the more conservative approach for identifying the degree of nonattainment and geography of states contributing above 1 percent. By using Engineering Analytics at Step 3, EPA is selecting the more conservative value to codify into state-level budgets.

**b. Impact of the Inflation Reduction Act on EGU Emissions**

The EGU modeling used to construct the EGU emissions inventories used to

inform the modeling projections for 2023 and 2026 was conducted prior to the passage of the Inflation Reduction Act (IRA), Public Law 117–169. The EPA did not have time to incorporate updated EGU projections reflecting the passage of the IRA into the primary air quality modeling for this final rule. However, the EPA was able to perform a sensitivity analysis reflecting the IRA in its EGU $NO_X$ emissions inventories. The results from this scenario were run through AQAT and demonstrated that the status of states identified as linked at the 1 percent of NAAQS contribution threshold (based on the modeling and air quality analysis described in this section) would not change regardless of which inventory (with or without IRA) is used. This sensitivity analysis is presented in the Regulatory Impact Analysis accompanying this rule, and that discussion provides additional detail on the emissions consequences of including the IRA in a baseline EGU inventory. The air quality impact of including the IRA in EPA's emissions inventories and in its Step 3 scenarios is discussed in Appendix K of the Ozone Transport Policy Analysis Final Rule TSD.

The results of this analysis are not surprising and accord with what is generally understood to be the overall effect of the IRA over the short to long term. While the IRA is anticipated to have a potentially dramatic effect on reducing both GHG and conventional pollutant emissions from the power sector, it is likely to have a more substantial impact later in the forecast period (*i.e.,* beyond the attainment deadlines by which the emissions reductions under this final rule must occur). This timing reflects a realistic assessment of utilities', regulators', and transmission authorities' planning requirements associated with the addition of substantial new renewable and storage capacity to the grid, as well as the time needed to integrate that capacity and retire existing capacity. Additionally, the IRA incentives span a longer time period (for example, certain tax incentives for clean energy sources are available until the later of 2032 or the year in which power sector emissions are 75 percent below 2022 levels) and therefore there is no IRA-related deadline to build cleaner generation by 2026. Recent analysis by the Congressional Budget Office supports the finding that the majority of power sector EGU emissions reductions expected from the IRA occur well after the 2023 and 2026 analytic years relevant to the attainment dates and this

rulemaking.[146] While the report focuses on $CO_2$ rather than $NO_X$, the drivers of the emissions reductions (primarily increased zero-emitting generation) would generally have a downward impact on both pollutants.

We note that important uncertainties remain at this time in the implementation of the IRA that further counsel against over-assuming short-term emissions reductions for purposes of this rule. The legislation provides economic incentives for shifting to cleaner forms of power generation but does not mandate emissions reductions through an enforceable regulatory program. The strength of those incentives will vary to some extent depending on other key market factors (such as the cost of natural gas or renewable energy technologies). Further, some incentives, such as tax credits for carbon capture and storage, could lead EGUs to remain in operation longer, which could in turn result in greater $NO_X$ emissions, if those emissions are not also well controlled.

Nonetheless, while we find that the passage of the IRA does not affect the geography of the rule in terms of which states we identify as linked, the Agency is confident that the incentives toward clean technology provided in the IRA will, in the longer run beyond the 2015 ozone NAAQS attainment deadlines, facilitate ongoing EGU compliance with the emissions reduction requirements of this rule and will reduce costs borne by EGUs and their customers as the U.S. power sector transitions. As discussed in greater detail in section VI.B of this document, we have made several adjustments in the final rule to provide greater flexibility to EGU owners and operators to integrate this rule's requirements with and facilitate the accelerating transition to an overall cleaner electricity-generating sector, which the IRA represents. Despite the uncertainties inherent in the implementation of the IRA at this time, the EPA also has performed a sensitivity analysis on the final rule to confirm that our finding of no overcontrol is robust to a future with the IRA in effect.

### 3. Development of Emissions Inventories for Stationary Industrial Point Sources

Non-EGU point source emissions are mostly consistent with those in the proposal modeling except where they were updated in response to comments. Several commenters mentioned that

point source emissions carried forward from 2014 NEI were not the best estimates of 2017 emissions. Thus, emissions sources in 2016v2 that had been projected from the 2014 NEI in the proposal were replaced with emissions based on the 2017 NEI. Point source emissions submitted to the 2016 NEI or to the 2016v1 platform development process specifically for the year 2016 were retained in 2016v3. Other 2016 non-EGU updates in 2016v3 include a few sources being moved to the EGU inventory, the addition of some control efficiency information for the year 2016, the replacement of most emissions projected from 2014 NEI with data from 2017 NEI, and the inclusion of point source data for solvent processes that had not been included in the 2016v2 non-EGU inventory.

The 2023 and 2026 non-EGU point source emissions were grown from 2016 to those years using factors based on the AEO 2022 and reflect emissions reductions due to known national and local rules, control programs, plant closures, consent decrees, and settlements that could be computed as reductions to specific units by July 2022.

Aircraft emissions and ground support equipment at airports are represented as point sources and are based on adjustments to emissions in the January 2017 version of the 2017 NEI. The EPA developed and applied factors to adjust the 2017 airport emissions to 2016, 2023 and 2026 based on activity growth projected by the Federal Aviation Administration Terminal Area Forecast 2021 [147] data, the latest available version at the time the factors were developed. By basing the factors on the latest available Terminal Area Forecast that was released following the most significant pandemic impacts on the aviation sector, the reduction and rebound impacts of the pandemic on aircraft and ground support equipment were reflected in the 2023 and 2026 airport emissions.

Emissions at rail yards were represented as point sources. The 2016 rail yard emissions are largely consistent with the 2017 NEI rail yard emissions. The 2016 and 2023 rail yard emissions were developed through the 2016v1 Inventory Collaborative process, with the 2026 emissions interpolated between the 2023 and 2028 emissions from 2016v1 rail yard emissions were interpolated from the 2016 and 2023 emissions. Class I rail yard emissions were projected based on the AEO freight

rail energy use growth rate projections for 2023, and 2026 with the fleet mix assumed to be constant throughout the period.

The EPA made multiple updates to point source oil and gas emissions in response to comments. For the final rule, the point source oil and gas emissions for 2016 were based on the 2016v2 point inventory except that most 2014 NEI-based emissions were replaced with 2017 NEI emissions. Additionally, in response to comments, state-provided emissions equivalent to those in the 2016v1 platform were used for Colorado, and some New Mexico emissions were replaced with data backcast from 2020 to 2016. To develop inventories for 2023 and 2026 for the final rule, the year 2016 oil and gas point source inventories were first projected to 2021 values based on actual historical production data, then those 2021 emissions were projected to 2023 and 2026 using regional projection factors based on AEO 2022 projections. This was an update from the proposal approach that used actual data only through the year 2019, because 2021 data were not yet available. $NO_X$ and VOC reductions resulting from co-benefits of NSPS for Stationary Reciprocating Internal Combustion Engines (RICE) are reflected, along with Natural Gas Turbine and Process Heater NSPS $NO_X$ controls and Oil and Gas NSPS VOC controls. In some cases, year 2019 point source inventory data were used instead of the projected future year emissions except for the Western Regional Air Partnership (WRAP) states of Colorado, New Mexico, Montana, Wyoming, Utah, North Dakota, and South Dakota. The WRAP future year inventory [148] was used in these WRAP states in all future years except in New Mexico where the WRAP base year emissions were projected using the EIA historical and AEO forecasted production data. Estimated impacts from the New Mexico Administrative code 20.2.50 [149] were also included.

### 4. Development of Emissions Inventories for Onroad Mobile Sources

Onroad mobile sources include exhaust, evaporative, and brake and tire wear emissions from vehicles that drive on roads, parked vehicles, and vehicle refueling. Emissions from vehicles using regular gasoline, high ethanol gasoline, diesel fuel, and electric vehicles were represented, along with buses that used compressed natural gas. The EPA

---

[146] "Emissions of Carbon Dioxide In the Electric Power Sector," Congressional Budget Office. December 2022. Available at *https://www.cbo.gov/publication/58860.*

[147] *https://www.faa.gov/data_research/aviation/taf/.*

[148] *http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf.*

[149] *https://www.srca.nm.gov/parts/title20/20.002.0050.html.*

developed the onroad mobile source emissions for states other than California using the EPA's Motor Vehicle Emissions Simulator (MOVES). MOVES3 was released in November 2020 and has been followed by some minor releases that improved the usage of the model but that do not have substantive impacts on the emissions estimates. For the proposal, MOVES3 was run using inputs provided by state and local agencies through the 2017 NEI where available, in combination with nationally available data sets to develop a complete inventory. Onroad emissions were developed based on emissions factors output from MOVES3 runs for the year 2016, coupled with activity data (*e.g.*, vehicle miles traveled and vehicle populations) representing the year 2016. The 2016 activity data were provided by some state and local agencies through the 2016v1 process, and the remaining activity data were derived from those used to develop the 2017 NEI. The onroad emissions were computed within SMOKE by multiplying emissions factors developed using MOVES with the appropriate activity data. Prior to computing the final rule emissions, updates to some onroad inputs were made in response to comments and to implement corrections. Onroad mobile source emissions for California were consistent with the updated emissions data provided by the state for the final rule.

The 2023 and 2026 onroad emissions reflect projected changes to fuel properties and usage, along with the impact of the rules included in MOVES3 for each of those years. MOVES emissions factors for the years 2023 and 2026 were used. A comprehensive list of control programs included for onroad mobile sources is available in the 2016v3 Emissions Modeling TSD. Year 2023 and 2026 activity data for onroad mobile sources were provided by some state and local agencies, and otherwise were projected to 2023 and 2026 by first projecting the 2016 activity to year 2019 based on county level vehicle miles traveled (VMT) from the Federal Highway Administration. Because VMT for onroad mobile sources were substantially impacted by the pandemic and took about two years to rebound to pre-pandemic levels, in the 2016v3 platform no growth in VMT was implemented from 2019 to. The estimated 2021 VMT were then grown from 2021 to 2023 and 2026 using AEO 2022-based factors. Recent updates to inspection and maintenance programs in North Carolina and Tennessee were reflected in the MOVES inputs for the

final rule modeling. The 2023 and 2026 onroad mobile emissions were computed within SMOKE by multiplying the respective emissions factors developed using MOVES with the year-specific activity data. Prior to computing the final rule emissions for 2023, the EPA made updates to some onroad inputs in response to comments and to implement corrections.

5. Development of Emissions Inventories for Commercial Marine Vessels

The commercial marine vessel (CMV) emissions in the 2016 base case emissions inventory for this rule were based on those in the 2017 NEI. Factors were applied to adjust the 2017 NEI emissions backward to represent emissions for the year 2016. The CMV emissions reflect reductions associated with the Emissions Control Area proposal to the International Maritime Organization control strategy (EPA–420–F–10–041, August 2010); reductions of $NO_X$, VOC, and CO emissions for new category 3 (C3) engines that went into effect in 2011; and fuel sulfur limits that went into effect prior to 2016. The cumulative impacts of these rules through 2023 and 2026 were incorporated into the projected emissions for CMV sources. The CMV emissions were split into emissions inventories from the larger C3 engines, and those from the smaller category 1 and 2 (C1C2) engines. CMV emissions in California are based on emissions provided by the state. The CMV emissions are consistent with the emissions for the 2016v1 platform updated CMV emissions released by February 2020 although they include projected emissions for the years of 2023 and 2026 instead of 2023 and 2028. In addition, in response to comments, the EPA implemented an improved process for spatial allocating CMV emissions along state and county boundaries.

6. Development of Emissions Inventories for Other Nonroad Mobile Sources

The EPA developed nonroad mobile source emissions inventories (other than CMV, locomotive, and aircraft emissions) for 2016, 2023, and 2026 from monthly, county, and process level emissions output from MOVES3. Types of nonroad equipment include recreational vehicles, pleasure craft, and construction, agricultural, mining, and lawn and garden equipment. State-submitted emissions data for nonroad sources were used for California. The nonroad emissions for the final rule were unchanged from those at the

proposal. The nonroad mobile emissions control programs include reductions to locomotives, diesel engines, and recreational marine engines, along with standards for fuel sulfur content and evaporative emissions. A comprehensive list of control programs included for mobile sources is available in the 2016v3 Emissions Modeling TSD.

Line haul locomotives are also considered a type of nonroad mobile source but the emissions inventories for locomotives were not developed using MOVES3. Year 2016 locomotive emissions were developed through the 2016v1 collaborative process and the year 2016 emissions are mostly consistent with those in the 2017 NEI. More information on the development of the Class I, Class II and III, and commuter rail line haul locomotive emissions is available in the 2016v3 Emissions Modeling TSD. The projected locomotive emissions for 2023 and 2026 were developed by applying factors to the 2016 emissions using activity data based on AEO freight rail energy use growth rate projections along with emissions rates adjusted to account for recent historical trends. The emission factors used for $NO_X$, PM10 and VOC for line haul locomotives in the analytic years were derived from trend lines based on historic line-haul emission factors from the period of 2007 through 2017 and extrapolated to 2023 and 2026.

7. Development of Emissions Inventories for Nonpoint Sources

For stationary nonpoint sources, some emissions in the 2016 base case emissions inventory come directly from the 2017 NEI, others were adjusted from the 2017 NEI to represent 2016 levels, and the remaining emissions including those from oil and gas, fertilizer, and solvents were computed specifically to represent 2016. Stationary nonpoint sources include evaporative sources, consumer products, fuel combustion that is not captured by point sources, agricultural livestock, agricultural fertilizer, residential wood combustion, fugitive dust, and oil and gas sources. The emissions sources derived from the 2017 NEI include agricultural livestock, fugitive dust, residential wood combustion, waste disposal (including composting), bulk gasoline terminals, and miscellaneous non-industrial sources such as cremation, hospitals, lamp breakage, and automotive repair shops. A recent method to compute solvent VOC emissions was used.[150]

Where comments were provided about projected control measures or

---

[150] *https://doi.org/10.5194/acp-21-5079-2021.*

changes in nonpoint source emissions, those inputs were first reviewed by the EPA. Those found to be based on reasonable data for affected emissions sources were incorporated into the projected inventories for 2023 and 2026 to the extent possible. Where possible, projection factors based on the AEO used data from AEO 2022, the most recent AEO at the time available at the time the inventories were developed. Federal regulations that impact the nonpoint sources were reflected in the inventories. Adjustments for state fuel sulfur content rules for fuel oil in the Northeast were included along with solvent controls applicable within the ozone transport region. Details are available in the 2016v3 Emissions Modeling TSD.

Nonpoint oil and gas emissions inventories for many states were developed based on outputs from the 2017 NEI version of the EPA Oil and Gas Tool using activity data for year 2016. Production-related emissions data from the 2017 NEI were used for Oklahoma, 2016v1 emissions were used for Colorado and for Texas production-related sources to response to comments. Data for production-related nonpoint oil and gas emissions in the states of Colorado, Montana, New Mexico, North Dakota, South Dakota, Utah, and Wyoming were obtained from the WRAP baseline inventory.[151] A California Air Resources Board-provided inventory was used for 2016 oil and gas emissions in California. Nonpoint oil and gas inventories for 2023 and 2026 were developed by first projecting the 2016 oil and gas inventories to 2021 values based on actual production data. Next, those 2021 emissions were projected to 2023 and 2026 using regional projection factors by product type based on AEO 2022 projections. A 2017–2019 average inventory was used for oil and natural gas exploration emissions in 2023 and 2026 except for California and in the WRAP states in which data from the WRAP future year inventory[152] were used. $NO_X$ and VOC reductions that are co-benefits to the NSPS for RICE are reflected, along with Natural Gas Turbines and Process Heaters NSPS $NO_X$ controls and NSPS Oil and Gas VOC controls. The WRAP future year inventory was used for oil and natural gas production sources in 2023 and 2026 except in New Mexico where the WRAP Base year emissions were projected using the EIA historical and AEO forecasted production data. Estimated impacts from the New Mexico Administrative Code 20.2.50 were included.

*D. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors*

In this section, the Agency describes the air quality modeling and analyses performed in Step 1 to identify locations where the Agency expects there to be nonattainment or maintenance receptors for the 2015 ozone NAAQS in the 2023 and 2026 analytic years. Where the EPA's analysis shows that an area or site does not fall under the definition of a nonattainment or maintenance receptor in these analytic years, that site is excluded from further analysis under this rule.

In the proposed rule, the EPA applied the same approach used in the CSAPR Update and the Revised CSAPR Update to identify nonattainment and maintenance receptors for the 2008 ozone NAAQS.[153] *See* 86 FR 23078–79. The EPA's approach gives independent effect to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina*.[154] Further, in its decision on the remand of the CSAPR from the Supreme Court in the *EME Homer City* case, the D.C. Circuit confirmed that EPA's approach to identifying maintenance receptors in the CSAPR comported with the court's prior instruction to give independent meaning to the "interfere with maintenance" prong in the good neighbor provision. *EME Homer City II*, 795 F.3d at 136.

In the CSAPR Update and the Revised CSAPR Update, the EPA identified nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the $NO_X$ SIP Call and CAIR, where the EPA defined nonattainment receptors as those areas that both currently monitor nonattainment and that the EPA projects will be in nonattainment in the future compliance year.[155]

The Agency explained in the $NO_X$ SIP Call and CAIR and then reaffirmed in the CSAPR Update that the EPA has the most confidence in our projections of nonattainment for those monitoring sites that also measure nonattainment for the most recent period of available ambient data. The EPA separately identified maintenance receptors as those monitoring sites that would have difficulty maintaining the relevant NAAQS in a scenario that accounts for historical variability in air quality at that site. The variability in air quality was determined by evaluating the "maximum" future design value at each monitoring site based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.*, ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.*, dominant wind direction, temperatures, and air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur.[156] The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Therefore, applying this methodology in this rule, the EPA assessed the magnitude of the projected maximum design values for 2023 and 2026 at each monitoring site in relation to the 2015 ozone NAAQS and, where such a value exceeds the NAAQS, the EPA determined that receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City II*.[157] That is,

---

[151] *http://www.wrapair2.org/pdf/WRAP_OGWG_Report_Baseline_17Sep2019.pdf.*

[152] *http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf.*

[153] *See* 86 FR 23078–79.

[154] 531 F.3d at 910–911 (holding that the EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[155] *See* 63 FR 57375, 57377 (October 27, 1998); 70 FR 25241 (January 14, 2005). *See also North Carolina*, 531 F.3d at 913–914 (affirming as

reasonable EPA's approach to defining nonattainment in CAIR).

[156] The EPA's air quality modeling guidance identifies the use of the highest of the relevant base period design values as a means to evaluate future year attainment under meteorological conditions that are especially conducive to ozone formation. *See* U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, $PM_{2.5}$, and Regional Haze, Research Triangle Park, NC.

[157] *See* 795 F.3d at 136.

monitoring sites with a maximum design value that exceeds the NAAQS are projected to have maintenance problems in the future analytic years.[158]

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term ''maintenance-only'' to refer to receptors that are not also nonattainment receptors. Consistent with the concepts for maintenance receptors, as described previously, the EPA identifies ''maintenance-only'' receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as ''maintenance only'' receptors, even if they are currently measuring nonattainment based on the most recent official design values.[159]

*Comment:* The EPA received comments claiming that the projected design values for 2023 were biased low compared to recent measured data.

---

[158] The EPA issued a memorandum in October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 8-hour ozone NAAQS concerning considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-step interstate transport framework. *See* Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, October 19, 2018 (''October 2018 memorandum''), available in Docket No. EPA–HQ–OAR–2021–0668 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.* EPA is not applying the suggested analytical approaches in that memorandum in this rule, nor would those approaches be appropriate in light of currently available data. Potential alternative approaches would introduce unnecessary and substantial additional analytical burdens that could frustrate timely and efficient implementation of good neighbor obligations. In addition, the information supplied in that memorandum is now outdated due to several additional years of air quality monitoring data and updated modeling results. EPA's current approach to defining ''maintenance'' receptors has been upheld and continues to provide an appropriate approach to addressing the ''interference with maintenance'' prong of the Good Neighbor provision. *See EME Homer City,* 795 F.3d 118, 136–37; *Wisconsin,* 938 F.3d at 325–26.

[159] See *https://www.epa.gov/air-trends/air-quality-design-values* for design value reports. At the time of this action, the most recent reports available are for the calendar year 2021.

Commenters noted that a number of monitoring sites that are projected to be below the NAAQS in 2023 based on the EPA's modeling for the proposed action are currently measuring nonattainment based on data from 2020 and 2021. One commenter requested that the EPA determine whether its past modeling tends to overestimate or underestimate actual observed design values. If EPA finds that the agency's modeling tends to underestimate future year design values, the commenter requests that EPA re-run its ozone modeling, incorporating parameters that account for this tendency.

*Response:* In response to comments, the EPA compared the projected 2023 design values based on the proposal modeling to recent trends in measured data. As a result of this analysis, the EPA agrees that current data indicate that there are monitoring sites at risk of continued nonattainment in 2023 even though the model projected average and maximum design values at these sites are below the NAAQS (*i.e.,* sites that are not modeling-based receptors). It would not be reasonable to ignore recent measured ozone levels in many areas that are clearly not fully consistent with certain concentrations in the Step 1 analysis for 2023. Therefore, the EPA has also developed an additional maintenance-only receptor category, which includes what we refer to as ''violating monitor'' receptors, based on current ozone concentrations measured by regulatory ambient air quality monitoring sites.

Specifically, the EPA has identified monitoring sites with measured 2021 and preliminary 2022 design values *and* 4th high maximum daily 8-hour average (MDA8) ozone in both 2021 and 2022 (preliminary data) that exceed the NAAQS, although projected to be in attainment in 2023, as having the greatest risk of continuing to have a problem attaining the standard in 2023. These criteria sufficiently consider measured air quality data so as to avoid including monitoring sites that have measured nonattainment data in recent years but could reasonably be anticipated to not have a nonattainment or maintenance problem in 2023, in line with our modeling results. Our methodology is intended only to identify those sites that have sufficiently poor ozone levels that there is clearly a reasonable expectation that an ozone nonattainment or maintenance problem will persist in the 2023 ozone season.

Moreover, 2023 is so near in time that recent measured ozone levels can be used to reasonably project whether an air quality problem is likely to persist. We view this approach to identifying additional receptors in 2023 as the best means of responding to the comments on this issue in this action, while also identifying all transport receptors.

For purposes of this action, we treat these violating monitors as an additional type of maintenance-only receptor. Because our modeling did not identify these sites as receptors, we do not believe it is sufficiently certain that these sites will be in nonattainment such that they should be considered nonattainment receptors. Rather, our authority for treating these sites as receptors in 2023 flows from the responsibility in CAA section 110(a)(2)(i)(I) to prohibit emissions that interfere with maintenance of the NAAQS. *See, e.g., North Carolina,* 531 F.3d at 910–11 (failing to give effect to the interfere with maintenance clause ''provides no protection for downwind areas that, *despite EPA's predictions,* still find themselves struggling to meet NAAQS due to upwind interference . . . .'') (emphasis added). Recognizing that no modeling can perfectly forecast the future, and ''a degree of imprecision is inevitable in tackling the problem of interstate air pollution,'' this approach in the Agency's judgement best balances the need to avoid both ''under-control'' and ''overcontrol,'' *EME Homer City,* 572 U.S. at 523.

We acknowledge that the traditional modeling plus monitoring methodology we used at proposal and in prior ozone transport rules would otherwise have identified such sites as being in attainment in 2023. Despite the implications of the current measured data suggesting there will be a nonattainment problem at these sites in 2023, we cannot definitively establish that such sites will be in nonattainment in 2023 in light of our modeling projections. In the face of this uncertainty, we regard our ability to consider such sites as receptors for purposes of good neighbor analysis under CAA section 110(a)(2)(D)(i)(I) to be a function of the requirement to prohibit emissions that interfere with maintenance of the NAAQS; even if an area may be technically in attainment, we have reliable information indicating that there is an identified risk that attainment will not in fact be achieved.

**51a**

However, because we did not identify this basis for receptor-identification at proposal, in this final action we are only using this receptor category on a confirmatory basis. That is, for states that we find linked based on our traditional modeling-based methodology in 2023, we find in this final analysis that the linkage at Step 2 is strengthened and confirmed if that state is also linked to one or more "violating monitor" receptors. If a state is only linked to a violating-monitor receptor in this final analysis, we are deferring taking final action on that state's SIP submittal. This is the case for the State of Tennessee. Among the states that previously had their transport SIPs fully approved for the 2015 ozone NAAQS, the EPA has also identified a linkage to violating-monitor receptors for the State of Kansas. The EPA intends to further review its air quality modeling results and recent measured ozone levels, and we intend to address these states' good neighbor obligations as expeditiously as practicable in a future action.

### E. Methodology for Projecting Future Year Ozone Design Values

Consistent with the EPA's modeling guidance, the 2016 base year and future year air quality modeling results were used in a relative sense to project design values for 2023 and 2026. That is, the ratios of future year model predictions to base year model predictions are used to adjust ambient ozone design values[160] up or down depending on the relative (percent) change in model predictions for each location. The modeling guidance recommends using measured ozone concentrations for the 5-year period centered on the base year as the air quality data starting point for future year projections. This average design value is used to dampen the effects of inter-annual variability in meteorology on ozone concentrations and to provide a reasonable projection of future air quality at the receptor under average conditions. In addition, the Agency calculated maximum design values from within the 5-year base period to represent conditions when meteorology is more favorable than average for ozone formation. Because the base year for the air quality modeling used in this final rule is 2016, measured data for 2014–2018 (i.e., design values for 2016, 2017, and 2018) were used to project average and maximum design values in 2023 and 2026.

The ozone predictions from the 2016 and future year air quality model simulations were used to project 2016–2018 average and maximum ozone design values to 2023 and 2026 using an approach similar to the approach in EPA's guidance for attainment demonstration modeling. This guidance recommends using model predictions from the 3 × 3 array of grid cells[161] surrounding the location of the monitoring site to calculate a Relative Response Factor (RRF) for that site.[162] However, the guidance also notes that an alternative array of grid cells may be used in certain situations where local topographic or geographical feature (e.g., a large water body or a significant elevation change) may influence model response.

The 2016–2018 base period average and maximum design values were multiplied by the RRF to project each of these design values to each of the three future years. In this manner, the projected design values are grounded in monitored data, and not the absolute model-predicted future year concentrations. Following the approach in the CSAPR Update and the Revised CSAPR Update, the EPA also projected future year design values based on a modified version of the "3 × 3" approach for those monitoring sites located in coastal areas. In this alternative approach, the EPA eliminated from the RRF calculations the modeling data in those grid cells that are dominated by water (i.e., more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (i.e., if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation). The choice of more than 50 percent of the grid cell area as water as the criteria for identifying overwater grid cells is based on the treatment of land use in the Weather Research and Forecasting model (WRF).[163] Specifically, in the

WRF meteorological model those grid cells that are greater than 50 percent overwater are treated as being 100 percent overwater. In such cases the meteorological conditions in the entire grid cell reflect the vertical mixing and winds over water, even if part of the grid cell also happens to be over land with land-based emissions, as can often be the case for coastal areas. Overlaying land-based emissions with overwater meteorology may be representative of conditions at coastal monitors during times of on-shore flow associated with synoptic conditions or sea-breeze or lake-breeze wind flows. But there may be other times, particularly with off-shore wind flow, when vertical mixing of land-based emissions may be too limited due to the presence of overwater meteorology. Thus, for our modeling the EPA projected average and maximum design values at individual monitoring sites based on both the "3 × 3" approach as well as the alternative approach that eliminates overwater cells in the RRF calculation for near-coastal areas (i.e., "no water" approach). The projected 2023 and 2026 design values using both the "3 × 3" and "no-water" approaches are provided in the docket for this final rule. For this final rule, the EPA is relying upon design values based on the "no water" approach for identifying nonattainment and maintenance receptors.[164]

Consistent with the truncation and rounding procedures for the 8-hour ozone NAAQS, the projected design values are truncated to integers in units of ppb.[165] Therefore, projected design values that are greater than or equal to 71 ppb are considered to be violating the 2015 ozone NAAQS. For those sites that are projected to be violating the NAAQS based on the average design values in the future analytic years, the Agency examined the measured design values for 2021, which are the most recent official measured design values at the time of this final rule. As noted earlier, the Agency is identifying nonattainment receptors in this rulemaking as those sites that are violating the NAAQS based on current

---

[160] The ozone design value at a particular monitoring site is the 3-year average of the annual 4th highest daily maximum 8-hour ozone concentration at that site.

[161] As noted in this section, each model grid cell is 12 × 12 km.

[162] The relative response factor represents the change in ozone at a given site. To calculate the RRF, the EPA's modeling guidance recommends selecting the 10 highest ozone days in an ozone season at a given monitor in the base year, noting which of the grid cells surrounding the monitor experienced the highest ozone concentrations in the base year, and averaging those ten highest concentrations. The model is then run using the projected year emissions, in this case 2023, with all other model variables held constant. Ozone concentrations from the same ten days, in the same grid cells, are then averaged. The fractional change between the base year (2016 model run) average ozone concentration and the future year (e.g., 2023 model run) average ozone concentration represents the relative response factor.

[163] https://www.mmm.ucar.edu/weather-research-and-forecasting-model.

[164] Using design values from the "3 × 3" approach, the maintenance-only receptor at site 550590019 in Kenosha County, WI would become a nonattainment receptor because the average design value with the "3 × 3" approach is 72.0 ppb versus 70.8 ppb with the "no water" approach. In addition, the maintenance-only receptor at site 090099002 in New Haven County, CT would become a nonattainment receptor using the "3 × 3" approach because the average design value with the "3 × 3" approach is 71.2 ppb versus 70.5 ppb with the "no water" approach.

[165] 40 CFR part 50, appendix P—Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone.

**36706**    **Federal Register** / Vol. 88, No. 107 / Monday, June 5, 2023 / Rules and Regulations

measured air quality and also have projected average design values of 71 ppb or greater. Maintenance-only receptors include both (1) those sites with projected average design values above the NAAQS that are currently measuring clean data (*i.e.,* ozone design values below the level of the 2015 ozone NAAQS) and (2) those sites with projected average design values below the level of the NAAQS, but with projected maximum design values of 71 ppb or greater. In addition to the maintenance-only receptors, ozone nonattainment receptors are also maintenance receptors because the maximum design values for each of these sites is always greater than or equal to the average design value. The monitoring sites that the Agency projects to be nonattainment and maintenance receptors for the ozone NAAQS in the 2023 and 2026 base case are used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of the 2015 ozone NAAQS as part of this final rule.[166]

Table IV.D–1 contains the 2016-centered [167] base period average and maximum 8-hour ozone design values, the 2023 base case average and maximum design values and the measured 2021 design values for the sites that are projected to be nonattainment receptors in 2023. Table IV.D–2 contains this same information for monitoring sites that are projected to be maintenance-only receptors in 2023. The design values for all monitoring sites in the U.S. are provided in the docket for this rule. Additional details on the approach for projecting average and maximum design values are provided in the Air Quality Modeling Final Rule TSD.

TABLE IV.D–1—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2021 DESIGN VALUES (ppb) AT PROJECTED NONATTAINMENT RECEPTORS

| Monitor ID | State | County | 2016 Centered average | 2016 Centered maximum | 2023 Average | 2023 Maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 060650016 | CA | Riverside | 79.0 | 80.0 | 72.2 | 73.1 | 78 |
| 060651016 | CA | Riverside | 99.7 | 101.0 | 91.0 | 92.2 | 95 |
| 080350004 | CO | Douglas | 77.3 | 78 | 71.3 | 71.9 | 83 |
| 080590006 | CO | Jefferson | 77.3 | 78 | 72.8 | 73.5 | 81 |
| 080590011 | CO | Jefferson | 79.3 | 80 | 73.5 | 74.1 | 83 |
| 090010017 | CT | Fairfield | 79.3 | 80 | 71.6 | 72.2 | 79 |
| 090013007 | CT | Fairfield | 82.0 | 83 | 72.9 | 73.8 | 81 |
| 090019003 | CT | Fairfield | 82.7 | 83 | 73.3 | 73.6 | 80 |
| 481671034 | TX | Galveston | 75.7 | 77 | 71.5 | 72.8 | 72 |
| 482010024 | TX | Harris | 79.3 | 81 | 75.1 | 76.7 | 74 |
| 490110004 | UT | Davis | 75.7 | 78 | 72.0 | 74.2 | 78 |
| 490353006 | UT | Salt Lake | 76.3 | 78 | 72.6 | 74.2 | 76 |
| 490353013 | UT | Salt Lake | 76.5 | 77 | 73.3 | 73.8 | 76 |
| 551170006 | WI | Sheboygan | 80.0 | 81 | 72.7 | 73.6 | 72 |

TABLE IV.D–2—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2021 DESIGN VALUES (ppb) AT PROJECTED MAINTENANCE-ONLY RECEPTORS

| Monitor ID | State | County | 2016 Centered average | 2016 Centered maximum | 2023 Average | 2023 Maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 040278011 | AZ | Yuma | 72.3 | 74 | 70.4 | 72.1 | 67 |
| 080690011 | CO | Larimer | 75.7 | 77 | 70.9 | 72.1 | 77 |
| 090099002 | CT | New Haven | 79.7 | 82 | 70.5 | 72.6 | 82 |
| 170310001 | IL | Cook | 73.0 | 77 | 68.2 | 71.9 | 71 |
| 170314201 | IL | Cook | 73.3 | 77 | 68.0 | 71.5 | 74 |
| 170317002 | IL | Cook | 74.0 | 77 | 68.5 | 71.3 | 73 |
| 350130021 | NM | Dona Ana | 72.7 | 74 | 70.8 | 72.1 | 80 |
| 350130022 | NM | Dona Ana | 71.3 | 74 | 69.7 | 72.4 | 75 |
| 350151005 | NM | Eddy | 69.7 | 74 | 69.7 | 74.1 | 77 |
| 350250008 | NM | Lea | 67.7 | 70 | 69.8 | 72.2 | 66 |
| 480391004 | TX | Brazoria | 74.7 | 77 | 70.4 | 72.5 | 75 |
| 481210034 | TX | Denton | 78.0 | 80 | 69.8 | 71.6 | 74 |
| 481410037 | TX | El Paso | 71.3 | 73 | 69.8 | 71.4 | 75 |
| 482010055 | TX | Harris | 76.0 | 77 | 70.9 | 71.9 | 77 |
| 482011034 | TX | Harris | 73.7 | 75 | 70.1 | 71.3 | 71 |
| 482011035 | TX | Harris | 71.3 | 75 | 67.8 | 71.3 | 71 |
| 530330023 | WA | King | 73.3 | 77 | 67.6 | 71.0 | 64 |
| 550590019 | WI | Kenosha | 78.0 | 79 | 70.8 | 71.7 | 74 |
| 551010020 | WI | Racine | 76.0 | 78 | 69.7 | 71.5 | 73 |

[166] In addition, there are 71 monitoring sites in California with projected 2023 maximum design values above the NAAQS. With two exceptions, as described in section IV.F of this document, the Agency is not making a determination in this action that these monitors are ozone transport receptors.

The two exceptions are the two monitoring sites that represent air quality impacts to lands of the Morongo and Pechanga tribes. As explained in footnote 110 supra, we treat these as transport receptors that are impacted by emissions from California.

[167] 2016-centered averaged design values represent the average of the design values for 2016, 2017, and 2018. Similarly, the maximum 2016-centered design value is the highest measured design value from these three design value periods.

**Federal Register** / Vol. 88, No. 107 / Monday, June 5, 2023 / Rules and Regulations     **36707**

In total, in the 2023 base case there are a total of 33 projected modeling-based receptors nationwide including 14 nonattainment receptors in 9 different counties and 19 maintenance-only receptors in 13 additional counties (Harris County, TX, has both nonattainment and maintenance-only receptors).[168] Of the 14 nonattainment receptors in 2023, 7 remain nonattainment receptors, 5 are projected to become maintenance-only receptors and 2 are projected to be in attainment in 2026. Of the 19 maintenance-only receptors in 2023, 7 are projected to remain maintenance-only receptors and 12 are projected to be in attainment in 2026. The projected average and maximum design values in 2026 for all receptors are included in the Air Quality Modeling Final Rule TSD.

*Comment:* EPA received comments saying that the projected design values for 2023 were biased low compared to recent measured data. Commenters noted that a number of monitoring sites that are projected to be below the NAAQS in 2023 based on EPA's modeling for the proposed rule are currently measuring nonattainment. Because 2023 is only a year later than the most recent measured data some commenters said that EPA should give greater weight to measured data when identifying downwind receptors.

*Response:* Based on an analysis of model projections for 2023 and recent trends in measured data, the EPA agrees that current data indicate that there are monitoring sites at risk of continued nonattainment in 2023 even though the model projected average and maximum design values at these sites are below the NAAQS (*i.e.,* sites that are not modeling-based receptors).[169] Specifically, the EPA believes that monitoring sites with measured design values *and* 4th high maximum daily 8-hour average (MDA8) ozone based on 2021 *and* preliminary 2022 data have

the greatest risk of continuing to have a problem attaining the standard in 2023, even when the modeling projects these sites will attain. These criteria are sufficiently conservative that we avoid including monitoring sites that have measured nonattainment data in recent years but could reasonably be anticipated to not have a nonattainment or maintenance problem in 2023, in line with our modeling results. Our methodology is intended only to identify those sites that have sufficiently poor ozone levels that there is clearly a reasonable expectation that an ozone nonattainment or maintenance problem will persist in the 2023 ozone season. We do not apply this methodology for the 2026 analytic year, because that year is sufficiently farther in the future that we do not believe there would be a reasonable basis to supplement our modeling analysis with this "violating monitor" methodology. By comparison, 2023 is so near in time that recent measured ozone levels can be used reasonably to project whether an air quality problem is likely to persist. We view this approach to identifying additional receptors in 2023 as the best means of responding to the comments on this issue in this action. The monitoring sites that meet these criteria, along with the corresponding measured and modeled data, are provided in Table IV.D–3.

For purposes of this action, we will treat these sites as an additional type of maintenance-only receptor. Because our modeling did not identify these sites as receptors, we do not believe it is sufficiently certain that these sites will be in nonattainment that they should be considered nonattainment receptors for purposes of this final rule. Rather, our authority for treating these sites as receptors in 2023 flows from the responsibility in CAA section 110(a)(2)(i)(I) to prohibit emissions that interfere with maintenance of the

NAAQS. *See, e.g., North Carolina,* 531 F.3d at 910–11 (failing to give effect to the interfere with maintenance clause "provides no protection for downwind areas that, *despite EPA's predictions,* still find themselves struggling to meet NAAQS due to upwind interference . . . .") (emphasis added). Recognizing that no modeling can perfectly forecast the future, and "a degree of imprecision is inevitable in tackling the problem of interstate air pollution," this approach in the Agency's judgement best balances the need to avoid both "under-control" and "overcontrol," *EME Homer City,* 572 U.S. at 523.

In this action, we identify "violating monitor" maintenance-only receptors for purposes of more firmly establishing that the states we have otherwise identified as linked at Step 2 in our modeling-based methodology can indeed be reasonably anticipated to be linked to air quality problems in downwind states in 2023 for reasons that extend beyond that methodology. In this sense, this approach is "confirmatory" and does not alter the geography of the final rule compared to the application of the modeling-based receptor definitions used at proposal. Rather, it strengthens the analytical basis for our Step 2 findings by establishing that many upwind states covered in this action are also projected to contribute above 1 percent of the NAAQS to these types of receptors. For purposes of this final rule, we will not finalize FIPs for any states that this analysis indicates contribute greater than 1 percent of the NAAQS only to a "violating monitor" receptor. Our analysis suggests this would be the case for two states, Kansas and Tennessee (see section IV.F of this document).[170] We are making no final decisions with respect to these states in this action and intend to address these states in a subsequent action.

TABLE IV.D–3—AVERAGE AND MAXIMUM 2023 BASE CASE 8-HOUR OZONE, AND 2021 AND PRELIMINARY 2022 DESIGN VALUES (ppb) AND 4TH HIGH CONCENTRATIONS AT VIOLATING MONITORS

| Monitor ID | State | County | 2023 Average | 2023 Maximum | 2021 | 2022 P* | 2021 4th high | 2022 P 4th high |
|---|---|---|---|---|---|---|---|---|
| 40070010 ........................ | AZ | Gila ..................................... | 67.9 | 69.5 | 77 | 76 | 75 | 74 |

[168] The EPA's modeling also projects that three monitoring sites in the Uintah Basin (*i.e.,* monitor 490472003 in Uintah County, Utah, and monitors 490130002 and 490137011 in Duchesne County, Utah) will have average design values above the NAAQS in 2023. However, as noted in the proposed rule, the Uinta Basin nonattainment area was designated as nonattainment for the 2015 ozone NAAQS not because of an ongoing problem with summertime ozone (as is usually the case in other parts of the country), but instead because it violates the ozone NAAQS in winter. The main causes of

the Uinta Basin's wintertime ozone are sources located at low elevations within the Basin, the Basin's unique topography, and the influence of the wintertime meteorologic inversions that keep ozone and ozone precursors near the Basin floor and restrict air flow in the Basin. Because of the localized nature of the ozone problem at these sites the EPA has not identified these three monitors as receptors in Step 1 of this final rule.

[169] In addition, we note that comparing the projected 2023 maximum design values at

modeling-based receptors listed in Table IV.D–1 and Table IV.D–2 to the 2021 design values measured at these sites indicates that the projected maximum values are lower than the measured data at most receptors. These differences are particularly evident at receptors in coastal Connecticut and in Denver. (See Air Quality Modeling Final Rule TSD for details).

[170] We have not conducted an analysis in this action to determine whether violating-monitor receptors may exist in California.

TABLE IV.D–3—AVERAGE AND MAXIMUM 2023 BASE CASE 8-HOUR OZONE, AND 2021 AND PRELIMINARY 2022 DESIGN VALUES (ppb) AND 4TH HIGH CONCENTRATIONS AT VIOLATING MONITORS—Continued

| Monitor ID | State | County | 2023 Average | 2023 Maximum | 2021 | 2022 P* | 2021 4th high | 2022 P 4th high |
|---|---|---|---|---|---|---|---|---|
| 40130019 | AZ | Maricopa | 69.8 | 70.0 | 75 | 77 | 78 | 76 |
| 40131003 | AZ | Maricopa | 70.1 | 70.7 | 80 | 80 | 83 | 78 |
| 40131004 | AZ | Maricopa | 70.2 | 70.8 | 80 | 81 | 81 | 77 |
| 40131010 | AZ | Maricopa | 68.3 | 69.2 | 79 | 80 | 80 | 78 |
| 40132001 | AZ | Maricopa | 63.8 | 64.1 | 74 | 78 | 79 | 81 |
| 40132005 | AZ | Maricopa | 69.6 | 70.5 | 78 | 79 | 79 | 77 |
| 40133002 | AZ | Maricopa | 65.8 | 65.8 | 75 | 75 | 81 | 72 |
| 40134004 | AZ | Maricopa | 65.7 | 66.6 | 73 | 73 | 73 | 71 |
| 40134005 | AZ | Maricopa | 62.3 | 62.3 | 73 | 75 | 79 | 73 |
| 40134008 | AZ | Maricopa | 65.6 | 66.5 | 74 | 74 | 74 | 71 |
| 40134010 | AZ | Maricopa | 63.8 | 66.9 | 74 | 76 | 77 | 75 |
| 40137020 | AZ | Maricopa | 67.0 | 67.0 | 76 | 77 | 77 | 75 |
| 40137021 | AZ | Maricopa | 69.8 | 70.1 | 77 | 77 | 78 | 75 |
| 40137022 | AZ | Maricopa | 68.2 | 69.1 | 76 | 78 | 76 | 79 |
| 40137024 | AZ | Maricopa | 67.0 | 67.9 | 74 | 76 | 74 | 77 |
| 40139702 | AZ | Maricopa | 66.9 | 68.1 | 75 | 77 | 72 | 77 |
| 40139704 | AZ | Maricopa | 65.3 | 66.2 | 74 | 77 | 76 | 76 |
| 40139997 | AZ | Maricopa | 70.5 | 70.5 | 76 | 79 | 82 | 76 |
| 40218001 | AZ | Pinal | 67.8 | 69.0 | 75 | 76 | 73 | 77 |
| 80013001 | CO | Adams | 63.0 | 63.0 | 72 | 77 | 79 | 75 |
| 80050002 | CO | Arapahoe | 68.0 | 68.0 | 80 | 80 | 84 | 73 |
| 80310002 | CO | Denver | 63.6 | 64.8 | 72 | 74 | 77 | 71 |
| 80310026 | CO | Denver | 64.5 | 64.8 | 75 | 77 | 83 | 72 |
| 90079007 | CT | Middlesex | 68.7 | 69.0 | 74 | 73 | 78 | 73 |
| 90110124 | CT | New London | 65.5 | 67.0 | 73 | 72 | 75 | 71 |
| 170310032 | IL | Cook | 67.3 | 69.8 | 75 | 75 | 77 | 72 |
| 170311601 | IL | Cook | 63.8 | 64.5 | 72 | 73 | 72 | 71 |
| 181270024 | IN | Porter | 63.4 | 64.6 | 72 | 73 | 72 | 73 |
| 260050003 | MI | Allegan | 66.2 | 67.4 | 75 | 75 | 78 | 73 |
| 261210039 | MI | Muskegon | 67.5 | 68.4 | 74 | 79 | 75 | 82 |
| 320030043 | NV | Clark | 68.4 | 69.4 | 73 | 75 | 74 | 74 |
| 350011012 | NM | Bernalillo | 63.8 | 66.0 | 72 | 73 | 76 | 74 |
| 350130008 | NM | Dona Ana | 65.6 | 66.3 | 72 | 76 | 79 | 78 |
| 361030002 | NY | Suffolk | 66.2 | 68.0 | 73 | 74 | 79 | 74 |
| 390850003 | OH | Lake | 64.3 | 64.6 | 72 | 74 | 72 | 76 |
| 480290052 | TX | Bexar | 67.1 | 67.8 | 73 | 74 | 78 | 72 |
| 480850005 | TX | Collin | 65.4 | 66.0 | 75 | 74 | 81 | 73 |
| 481130075 | TX | Dallas | 65.3 | 66.5 | 71 | 71 | 73 | 72 |
| 481211032 | TX | Denton | 65.9 | 67.7 | 76 | 77 | 85 | 77 |
| 482010051 | TX | Harris | 65.3 | 66.3 | 74 | 73 | 83 | 72 |
| 482010416 | TX | Harris | 68.8 | 70.4 | 73 | 73 | 78 | 71 |
| 484390075 | TX | Tarrant | 63.8 | 64.7 | 75 | 76 | 76 | 77 |
| 484391002 | TX | Tarrant | 64.1 | 65.7 | 72 | 77 | 76 | 80 |
| 484392003 | TX | Tarrant | 65.2 | 65.9 | 72 | 72 | 74 | 72 |
| 484393009 | TX | Tarrant | 67.5 | 68.1 | 74 | 75 | 75 | 75 |
| 490571003 | UT | Weber | 69.3 | 70.3 | 71 | 74 | 77 | 71 |
| 550590025 | WI | Kenosha | 67.6 | 70.7 | 72 | 73 | 72 | 71 |
| 550890008 | WI | Ozaukee | 65.2 | 65.8 | 71 | 72 | 72 | 72 |

*2022 preliminary design values are based on 2022 measured MDA8 concentrations provided by state air agencies to the EPA's Air Quality System (AQS), as of January 3, 2023.

## F. Pollutant Transport From Upwind States

### 1. Air Quality Modeling To Quantify Upwind State Contributions

This section documents the procedures the EPA used to quantify the impact of emissions from specific upwind states on ozone design values in 2023 and 2026 for the identified downwind nonattainment and maintenance receptors. The EPA used CAMx photochemical source apportionment modeling to quantify the impact of emissions in specific upwind states on downwind nonattainment and maintenance receptors for 8-hour ozone. CAMx employs enhanced source apportionment techniques that track the formation and transport of ozone from specific emissions sources and calculates the contribution of sources and precursors to ozone for individual receptor locations. The benefit of the photochemical model source apportionment technique is that all modeled ozone at a given receptor location in the modeling domain is tracked back to specific sources of emissions and boundary conditions to fully characterize culpable sources.

The EPA performed nationwide, state-level ozone source apportionment modeling using the CAMx Ozone Source Apportionment Technology/Anthropogenic Precursor Culpability Analysis (OSAT/APCA) technique[171] to quantify the contribution of 2023 and 2026 base case NOₓ and VOC emissions from all sources in each state to the

---

[171] As part of this technique, ozone formed from reactions between biogenic VOC and NOₓ with anthropogenic NOₓ and VOC are assigned to the anthropogenic emissions.

corresponding projected ozone design values in 2023 and 2026 at air quality monitoring sites. The CAMx OSAT/APCA model run was performed for the period May 1 through September 30 using the projected future base case emissions and 2016 meteorology for this time period. In the source apportionment modeling the Agency tracked (*i.e.*, tagged) the amount of ozone formed from anthropogenic emissions in each state individually as well as the contributions from other sources (*e.g.*, natural emissions).

In the state-by-state source apportionment model runs, the EPA tracked the ozone formed from each of the following tags:

• States—anthropogenic NO$_X$ and VOC emissions from each state tracked individually (emissions from all anthropogenic sectors in a given state were combined);

• Biogenics—biogenic NO$_X$ and VOC emissions domain-wide (*i.e.*, not by state);

• Boundary Concentrations—concentrations transported into the air quality modeling domain;

• Tribes—the emissions from those tribal lands for which the Agency has point source inventory data in the 2016v3 emissions modeling platform (EPA did not model the contributions from individual tribes);

• Canada and Mexico—anthropogenic emissions from sources in the portions of Canada and Mexico included in the modeling domain (the EPA did not model the contributions from Canada and Mexico separately);

• Fires—combined emissions from wild and prescribed fires domain-wide (*i.e.*, not by state); and

• Offshore—combined emissions from offshore marine vessels and offshore drilling platforms.

The contribution modeling provided contributions to ozone from anthropogenic NO$_X$ and VOC emissions in each state, individually. The contributions to ozone from chemical reactions between biogenic NO$_X$ and VOC emissions were modeled and assigned to the ''biogenic'' category. The contributions from wildfire and prescribed fire NO$_X$ and VOC emissions were modeled and assigned to the ''fires'' category. That is, the contributions from the ''biogenic'' and ''fires'' categories are not assigned to individual states nor are they included in the state contributions.

For the Step 2 analysis, the EPA calculated a contribution metric that considers the average contribution on the 10 highest ozone concentration days (*i.e.*, top 10 days) in 2023. This average contribution metric is intended to provide a reasonable representation of the contribution from individual states to projected future year design values, based on modeled transport patterns and other meteorological conditions generally associated with modeled high ozone concentrations at the receptor. An average contribution metric constructed in this manner is beneficial since the magnitude of the contributions is directly related to the magnitude of the design value at each site.

The analytic steps for calculating the contribution metric for the 2023 analytic year are as follows:

(1) Calculate the 8-hour average contribution from each source tag to each monitoring site for the time period of the 8-hour daily maximum modeled concentrations in 2023;

(2) Average the contributions and average the concentrations for the top 10 modeled ozone concentration days in 2023;

(3) Divide the average contribution by the corresponding average concentration to obtain a Relative Contribution Factor (RCF) for each monitoring site;

(4) Multiply the 2023 average design values by the 2023 RCF at each site to produce the average contribution metric values in 2023.[172]

This same approach was applied to calculate contribution metric values at individual monitoring sites for 2026.[173]

The resulting contributions from each tag to each monitoring site in the U.S. for 2023 and 2026 can be found in the docket for this final rule. Additional details on the source apportionment modeling and the procedures for calculating contributions can be found in the Air Quality Modeling Final Rule TSD. The EPA's response to comments on the method for calculating the contribution metric can be found in the *RTC* document for this final rule.

The largest contribution from each state that is the subject of this rule to modeled 8-hour ozone nonattainment and maintenance receptors in downwind states in 2023 and 2026 are provided in Table IV.F–1 and Table IV.F–2, respectively. The largest contribution from each state to a ''violating monitor'' maintenance-only receptor is provided in Table IV.F–3.

TABLE IV.F–1—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023

[ppb]

| Upwind state | Largest contribution to downwind nonattainment receptors | Largest contribution to downwind maintenance-only receptors |
|---|---|---|
| Alabama | 0.75 | 0.65 |
| Arizona | 0.54 | 1.69 |
| Arkansas | 0.94 | 1.21 |
| California | 35.27 | 6.31 |
| Colorado | 0.14 | 0.18 |
| Connecticut | 0.01 | 0.01 |
| Delaware | 0.44 | 0.56 |
| District of Columbia | 0.03 | 0.04 |
| Florida | 0.50 | 0.54 |
| Georgia | 0.18 | 0.17 |
| Idaho | 0.42 | 0.41 |
| Illinois | 13.89 | 19.09 |

[172] Note that a contribution metric value was not calculated for any receptor at which there were fewer than 5 days with model-predicted MDA8 ozone concentrations greater than or equal to 60 ppb in 2023. The monitoring site in Seattle, King County, Washington (530330023), was the only receptor which did not meet this criterion.

[173] To provide consistency in the contributions for 2023 and 2026, the contribution metric values for 2026 are based on the 2026 daily contributions for the same days that were used to calculate the contribution metric values for 2023.

TABLE IV.F–1—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023—Continued

[ppb]

| Upwind state | Largest contribution to downwind nonattainment receptors | Largest contribution to downwind maintenance-only receptors |
|---|---|---|
| Indiana | 8.90 | 10.03 |
| Iowa | 0.67 | 0.90 |
| Kansas | 0.46 | 0.52 |
| Kentucky | 0.84 | 0.79 |
| Louisiana | 9.51 | 5.62 |
| Maine | 0.02 | 0.01 |
| Maryland | 1.13 | 1.28 |
| Massachusetts | 0.33 | 0.15 |
| Michigan | 1.59 | 1.56 |
| Minnesota | 0.36 | 0.85 |
| Mississippi | 1.32 | 0.91 |
| Missouri | 1.87 | 1.39 |
| Montana | 0.08 | 0.10 |
| Nebraska | 0.20 | 0.36 |
| Nevada | 1.11 | 1.13 |
| New Hampshire | 0.10 | 0.02 |
| New Jersey | 8.38 | 5.79 |
| New Mexico | 0.36 | 1.59 |
| New York | 16.10 | 11.29 |
| North Carolina | 0.45 | 0.66 |
| North Dakota | 0.18 | 0.45 |
| Ohio | 2.05 | 1.98 |
| Oklahoma | 0.79 | 1.01 |
| Oregon * | 0.46 | 0.31 |
| Pennsylvania | 6.00 | 4.36 |
| Rhode Island | 0.04 | 0.01 |
| South Carolina | 0.16 | 0.18 |
| South Dakota | 0.05 | 0.08 |
| Tennessee | 0.60 | 0.68 |
| Texas | 1.03 | 4.74 |
| Utah | 1.29 | 0.98 |
| Vermont | 0.02 | 0.01 |
| Virginia | 1.16 | 1.76 |
| Washington | 0.16 | 0.09 |
| West Virginia | 1.37 | 1.49 |
| Wisconsin | 0.21 | 2.86 |
| Wyoming | 0.68 | 0.67 |

TABLE IV.F–2—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2026

[ppb]

| Upwind state | Largest contribution to downwind nonattainment receptors | Largest contribution to downwind maintenance-only receptors |
|---|---|---|
| Alabama | 0.20 | 0.69 |
| Arizona | 0.44 | 1.34 |
| Arkansas | 0.53 | 1.16 |
| California | 34.03 | 6.16 |
| Colorado | 0.04 | 0.17 |
| Connecticut | 0.00 | 0.01 |
| Delaware | 0.43 | 0.41 |
| District of Columbia | 0.03 | 0.02 |
| Florida | 0.46 | 0.17 |
| Georgia | 0.13 | 0.16 |
| Idaho | 0.27 | 0.36 |
| Illinois | 0.63 | 13.57 |
| Indiana | 1.06 | 8.53 |
| Iowa | 0.14 | 0.62 |
| Kansas | 0.14 | 0.42 |
| Kentucky | 0.79 | 0.76 |
| Louisiana | 4.57 | 9.37 |

TABLE IV.F–2—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2026—Continued

[ppb]

| Upwind state | Largest contribution to downwind nonattainment receptors | Largest contribution to downwind maintenance-only receptors |
|---|---|---|
| Maine | 0.00 | 0.01 |
| Maryland | 1.06 | 0.92 |
| Massachusetts | 0.06 | 0.31 |
| Michigan | 1.39 | 1.47 |
| Minnesota | 0.15 | 0.32 |
| Mississippi | 0.29 | 1.15 |
| Missouri | 0.29 | 1.68 |
| Montana | 0.06 | 0.07 |
| Nebraska | 0.09 | 0.19 |
| Nevada | 0.67 | 0.90 |
| New Hampshire | 0.01 | 0.09 |
| New Jersey | 8.10 | 7.04 |
| New Mexico | 0.35 | 0.46 |
| New York | 12.65 | 12.34 |
| North Carolina | 0.40 | 0.42 |
| North Dakota | 0.09 | 0.17 |
| Ohio | 1.95 | 1.93 |
| Oklahoma | 0.19 | 0.74 |
| Oregon * | 0.26 | 0.41 |
| Pennsylvania | 5.47 | 4.94 |
| Rhode Island | 0.00 | 0.03 |
| South Carolina | 0.14 | 0.15 |
| South Dakota | 0.03 | 0.04 |
| Tennessee | 0.24 | 0.54 |
| Texas | 0.48 | 4.34 |
| Utah | 1.05 | 0.81 |
| Vermont | 0.01 | 0.02 |
| Virginia | 1.09 | 1.10 |
| Washington | 0.10 | 0.14 |
| West Virginia | 1.36 | 1.34 |
| Wisconsin | 0.17 | 0.18 |
| Wyoming | 0.40 | 0.59 |

TABLE IV.F–3—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE "VIOLATING MONITOR" MAINTENANCE-ONLY RECEPTORS

[ppb]

| Upwind state | Largest contribution to downwind violating monitor maintenance-only receptors |
|---|---|
| Alabama | 0.79 |
| Arizona | 1.62 |
| Arkansas | 1.16 |
| California | 6.97 |
| Colorado | 0.39 |
| Connecticut | 0.17 |
| Delaware | 0.42 |
| District of Columbia | 0.03 |
| Florida | 0.50 |
| Georgia | 0.31 |
| Idaho | 0.46 |
| Illinois | 16.53 |
| Indiana | 9.39 |
| Iowa | 1.13 |
| Kansas | 0.82 |
| Kentucky | 1.57 |
| Louisiana | 5.06 |
| Maine | 0.02 |
| Maryland | 1.14 |
| Massachusetts | 0.39 |
| Michigan | 3.47 |

TABLE IV.F–3—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE "VIOLATING MONITOR" MAINTENANCE-ONLY RECEPTORS—Continued

[ppb]

| Upwind state | Largest contribution to downwind violating monitor maintenance-only receptors |
|---|---|
| Minnesota | 0.64 |
| Mississippi | 1.02 |
| Missouri | 2.95 |
| Montana | 0.12 |
| Nebraska | 0.43 |
| Nevada | 1.11 |
| New Hampshire | 0.10 |
| New Jersey | 8.00 |
| New Mexico | 0.34 |
| New York | 12.08 |
| North Carolina | 0.65 |
| North Dakota | 0.35 |
| Ohio | 2.25 |
| Oklahoma | 1.57 |
| Oregon * | 0.36 |
| Pennsylvania | 5.20 |
| Rhode Island | 0.08 |
| South Carolina | 0.23 |
| South Dakota | 0.12 |
| Tennessee | 0.86 |
| Texas | 3.83 |
| Utah | 1.46 |
| Vermont | 0.03 |
| Virginia | 1.39 |
| Washington | 0.11 |
| West Virginia | 1.79 |
| Wisconsin | 5.10 |
| Wyoming | 0.42 |

* Does not include California monitoring sites.

## 2. Application of Contribution Screening Threshold

In Step 2 of the interstate transport framework, the EPA uses an air quality screening threshold to identify upwind ozone concentrations in amounts sufficient to "link" them to these to downwind nonattainment and maintenance receptors. The contributions from each state to each downwind nonattainment or maintenance receptor that were used for the Step 2 evaluation can be found in the Air Quality Modeling Final Rule TSD.

The EPA applies an air quality screening threshold of 1 percent of the NAAQS, which has been used since the CSAPR rulemaking, including in the CSAPR Update, the Revised CSAPR Update, and numerous actions evaluating states' transport SIP submittals. The explanation for how this value was originally derived is available in the CSAPR rulemaking from 2011. *See* 76 FR 48208, 48237–38. As originally explained there, the application of a relatively low threshold

is intended to capture a relatively large percentage of the contribution from upwind states to downwind receptors in light of the regional-scale, collective contribution problem associated with both ozone and PM2.5 NAAQS. *Id.* The Agency also explained that the use of a higher threshold in transport rules prior to CSAPR was based on single-day maximum contribution, whereas in CSAPR (and continuing in subsequent rules including this one), the Agency uses a more robust, average contribution metric over multiple days. Thus, it was not the case that 1 percent of NAAQS was substantially more stringent than that prior approach. *Id.* at 48238. In the 2016 CSAPR Update, the EPA reviewed the 1 percent threshold (as coupled with multi-day averaging) and determined it was appropriate to continue to apply this threshold. The EPA compared the 1 percent threshold to a 0.5 percent of NAAQS threshold and a 5 percent of NAAQS threshold. The EPA found that the lower threshold did not capture appreciably more upwind state contribution compared to the 1 percent threshold, while the 5 percent threshold

allowed too much upwind state contribution to drop out from further analysis.[174] The EPA continues to observe that nonattainment and maintenance receptors identified at Step 1 are impacted collectively by emissions from numerous upwind contributors. Therefore, application of a low, uniform screening threshold allows the EPA to identify upwind states that share a responsibility under the interstate transport provision to eliminate their significant contribution.

As we explained at proposal, the EPA recognizes that in 2018 it issued a memorandum indicating the potential for states to use a higher threshold at Step 2 in the development of their good neighbor SIP submissions where it could be technically justified. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative 1 ppb threshold at Step 2.[175] (The memorandum also indicated that any

---

[174] *See* Final CSAPR Update Air Quality Modeling TSD, at 27–30 (EPA–HQ–OAR–2015–0596–0144). *See also* 86 FR 23054, 23085.

[175] August 2018 memo at 4.

**59a**

higher alternative threshold, such as 2 ppb, would likely not be appropriate.) The EPA nonetheless proposed to fulfill its role under CAA section 110(c) in promulgating FIPs to directly implement good neighbor requirements, and in this role, proposed retaining use of the 1 percent threshold for all states. We noted that in several documents proposing transport SIP disapprovals, *see, e.g.,* 87 FR 9498 and 87 FR 9510 (Feb. 22, 2022), we explained that our experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds led the Agency to believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2, either in the context of SIPs or FIPs.

We went on to explain that the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Using multiple different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[176] The application of different thresholds at Step 2 has the potential to result in inconsistent determination of good neighbor obligations. From the perspective of ensuring effective regional implementation of good neighbor obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. We explained that while alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of alternative thresholds would allow certain states to avoid further evaluation of potential emissions controls while other states must proceed to a Step 3 analysis. This could create significant equity and consistency problems among states.

The EPA further proposed that, in promulgating FIPs to address these obligations on a nationwide scale,

national ozone transport policy would not be well-served by applying a single, less stringent threshold at Step 2. The EPA recognized in the August 2018 memo that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA noted at proposal that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3. Considering the core statutory objective of ensuring elimination of *all* significant contribution to nonattainment or interference of the NAAQS in downwind states and the broad, regional nature of the collective contribution problem with respect to ozone, EPA could not identify a compelling policy imperative to move to a 1 ppb threshold.

In the proposal, we also found consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less protective ozone NAAQS) to be an important consideration. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport for the more protective NAAQS.

The Agency also questioned whether it would be a good use of limited resources to attempt to further justify the use of alternative thresholds for certain states at Step 2 for purposes of the 2015 ozone NAAQS. Therefore, while EPA articulated the possibility of an alternative threshold in the August 2018 memorandum, the EPA concluded in the proposal that our experience and further evaluation since the issuance of that memo has revealed substantial programmatic and policy difficulties in attempting to implement this approach, and therefore we proposed to apply the 1 percent of NAAQS threshold.

*Comment:* Many commenters disagreed with our proposal to continue using a 1 percent of NAAQS threshold. They argued that the EPA was reversing course from its policy as articulated in the August 2018 memorandum and that the EPA was now bound to use a 1 ppb threshold rather than 1 percent of NAAQS, even in promulgating a FIP rather than evaluating SIPs.

Commenters further argued that a 1 ppb threshold would be more consistent with the EPA's "significant impact level" (SIL) guidance related to implementing prevention of significant deterioration (PSD) permitting requirements. They argued that the 1 percent threshold was below precision limits of regulatory ozone monitors, and they argued it was within the "margin of error" of the EPA's modeling.

*Response:* The EPA is finalizing its proposed approach of consistently using a 1 percent of the NAAQS threshold at Step 2 in this action to determine which states contribute to identified nonattainment and maintenance receptors. This approach ensures both national consistency across all states and consistency and continuity with our prior interstate transport actions for other NAAQS. We do not agree that this approach is inconsistent with or a reversal in policy from the August 2018 memorandum, which only suggested that states in the development of their SIPs "may" be able to establish that 1 ppb could be an appropriate alternative threshold. The EPA has been consistent in that memorandum, and since that time, that final determinations on alternative thresholds would be made through rulemaking action, as the EPA is taking here.

The August 2018 memorandum made clear that the Agency had substantial doubts that any threshold greater than 1 ppb (such as 2 ppb) would be acceptable, and the Agency is affirming that a threshold higher than 1 ppb would not be justified under any circumstance for purposes of this action. No commenter credibly provided a basis for using a threshold even higher than 1 ppb, and so this issue is primarily limited to the difference between a 0.7 ppb threshold (the 1 percent of the NAAQS threshold discussed previously in this section) and a 1.0 ppb threshold. Therefore, before proceeding in responding to these comments, we note that this issue is only relevant to a small number of states whose contributions to any receptor are above 1 percent of the NAAQS but lower than 1 ppb. Under the 2016v3 modeling of 2023 being used in this final rule, the states in this rule with contributions that fall between 0.70 ppb and 1 ppb are Alabama, Kentucky, and Minnesota. Similarly, the EPA applies the 1 percent threshold in its 2026 modeling projections to determine if any states will not be linked to an ozone receptor by that year, and therefore should not be subject to the more stringent requirements that take effect in 2026. The states in this rule in that year with contribution between 0.70 ppb and 1 ppb are

---

[176] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

Kentucky, Nevada, and Oklahoma. For all other states covered in this action, at least one linkage exists in 2023 (and, as relevant, in 2026) that is greater than 1 ppb, and therefore the question of whether the EPA must recognize a 1 ppb threshold would not have a dispositive effect on the regulatory determination being made at Step 2.

The 1 percent of the NAAQS threshold is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS and has subsequently been applied in the CSAPR Update and Revised CSAPR Update when evaluating determining interstate transport obligations for the 2008 ozone NAAQS. The EPA continues to find 1 percent of the ozone NAAQS to be an appropriate threshold. For ozone, as the EPA found in CAIR, CSAPR, and the CSAPR Update, a portion of the nonattainment and maintenance problems in the U.S. results from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and other sources. The EPA's analysis shows that the ozone transport problem being analyzed in this rule is still the result of the collective impacts of emissions from multiple upwind contributors. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution (to the extent found "significant" at Step 3) to the downwind nonattainment and maintenance problems to which they collectively contribute. Where a great number of geographically dispersed emissions sources contribute to a downwind air quality problem, which is the case for ozone, EPA believes that, in the context of CAA section 110(a)(2)(D)(i)(I), a state-level threshold of 1 percent of the NAAQS is a reasonably small enough value to identify only the greater-than-de minimis contributors yet is not so large that it unfairly focuses attention for further action only on the largest single or few upwind contributors. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 86 FR 23054, 23085; 81 FR 74504, 74518; 76 FR 48208, 48237–38.

Further, the EPA notes that the role of the Step 2 threshold is limited and just one step in the larger 4-Step Framework. It serves to screen in states for further evaluation of emissions control opportunities applying a multifactor analysis at Step 3. Thus, as the Supreme Court has recognized, the contribution threshold essentially functions to exclude states with "*de miminis*" impacts. *EME Homer City,* 572 U.S. 489, 500.

Comments related to the August 2018 memorandum argued that the EPA legally committed itself to approving SIP submissions from states with contributions below 1 ppb and so now the EPA must apply that threshold in this FIP action. (Comments regarding this issue as related to the EPA's action on SIPs is addressed in that rulemaking and is beyond the scope of this action.) This is not what the memorandum said. The memorandum merely provided an analysis regarding "the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states." [177] It interpreted "that information to make recommendations about what thresholds *may* be appropriate for use in" SIP submissions (emphasis added).[178] Specifically, the August 2018 memorandum said, "Because the amount of upwind collective contribution capture with the 1 percent and the 1 ppb thresholds is *generally comparable, overall, we believe it may be* reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS" (emphasis added).[179] Thus, the text of the August 2018 memorandum in no way committed that the EPA would be using a 1 ppb threshold going forward either in its evaluation of SIPs or in promulgating a FIP. The August 2018 memorandum indicated that "[f]ollowing these recommendations does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP. Final decisions by the EPA to approve a particular SIP revision will only be made based on the requirements of the statute and will only be made following an air agency's final submission of the SIP revision to the EPA, and after appropriate notice and opportunity for public review and comment." [180] Further, the August 2018 memorandum

said that "EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation." [181] The memorandum said nothing regarding what threshold the EPA would apply if promulgating a FIP.

As explained in the SIP disapproval action and again here, the EPA finds it would not be sound policy to apply an alternative contribution threshold or thresholds to one or more states within the 4-step interstate transport framework for the 2015 ozone NAAQS. However, the EPA disagrees with commenters' claims that the agency has reversed course on applying the August 2018 memorandum, because the memorandum never adopted a view that the use of 1 ppb or other alternative thresholds would in fact be acceptable. Although the EPA said at proposal that the EPA may rescind the guidance in the future, we took comment on the subject and also stated, "EPA is not at this time rescinding the August 2018 memorandum." [182] The EPA is not formally rescinding the August 2018 memorandum in this action or at this time. However, it is not required that agencies must "rescind" a memorandum or guidance the moment it becomes outdated or called into question. The August 2018 memorandum was not issued through notice-and-comment rulemaking and is not binding on the Agency or other parties. While the *willingness* of the Agency as expressed in that memorandum to entertain the possibility of an alternative threshold of 1 ppb may be considered a kind of policy position, agencies may change their non-binding policies without going through notice and comment rulemaking. *Catawba County* v. *EPA,* 571 F.3d 20, 34 (D.C. Cir. 2009). In this case, we went through notice and comment rulemaking on this topic in the SIP-disapproval action (88 FR 9336) and here, even though the August 2018 memorandum was issued without such opportunity for public input. We further address the basis for the consistent use of a 1 percent of NAAQS threshold and summarize our conclusions under the *FCC* v. *Fox* factors below.

We continue to believe, as set forth in our proposed action, that national ozone transport policy is not well served by

---

[177] August 2018 memorandum, at 1.

[178] *Id.*

[179] *Id.* at 4.

[180] *Id.* at 1.

[181] *Id.*

[182] 87 FR 9545, 9551 (Feb. 22, 2022) (Alabama, Mississippi, Tennessee); 87 FR 9498, 9510 (Feb. 22, 2022) (Kentucky); 87 FR 9838, 9844 (Feb. 22, 2022) (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin); 87 FR 9798, 9807, 9813, 9820 (Feb. 22, 2022) (Arkansas, Louisiana, Oklahoma, Texas); 87 FR 9533, 9542 (Feb. 22, 2022) (Missouri); 87 FR 31470, 31479 (May 24, 2022) (Utah); 87 FR 31495, 31504 (May 24, 2022) (Wyoming); 87 FR 31485, 31490 (May 24, 2022) (Nevada).

allowing for less protective thresholds than 1 percent of the NAAQS at Step 2. Furthermore, the EPA disagrees with commenters who suggest that national consistency is an inappropriate consideration in the context of interstate ozone transport. The Good Neighbor provision, CAA section 110(a)(2)(D)(i)(I), requires to a unique degree of concern for consistency, parity, and equity across state lines.[183] For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on the EPA's review of good neighbor SIP submissions to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency concludes that the attempted use of different thresholds at Step 2 with respect to the 2015 8-hour ozone NAAQS raises substantial policy consistency and practical implementation concerns. The availability of different thresholds at Step 2 has the potential to result in inconsistent application of good neighbor obligations based solely on the strength of a state's SIP submission at Step 2 of the 4-step interstate transport framework. The steps of the analysis that lead up to evaluating emissions reductions opportunities to address states' significant contribution at Step 3 should be applied on a consistent basis. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emissions controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states and could lead to ineffective or inefficient approaches to eliminating significant contribution.

One commenter suggested the EPA could address this potentially inequitable outcome by simply adopting a 1 ppb contribution threshold for all states. However, the August 2018 memorandum did not conclude that 1 ppb would be appropriate for all states and the EPA does not view that conclusion to be supported at present. The EPA recognized in the August 2018

memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold for every state. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (e.g., roughly 7 percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum; in the EPA's 2016v2 modeling, the amount lost is 5 percent; in the EPA's 2016v3 modeling used for final, the amount lost is also 5 percent). Further, this logic has no end point. A similar observation could be made with respect to any incremental change. For example, should the EPA next recognize a 1.2 ppb threshold because that would only cause some small additional loss in capture of upwind state contribution as compared to 1 ppb? If the only basis for moving to a 1 ppb threshold is that it captures a "similar" (but actually smaller) amount of upwind contribution, then there is no basis for moving to that threshold at all. Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference with maintenance of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, we continue to find no compelling policy reason to adopt a new threshold for all states of 1 ppb.

Nor have commenters explained why use of a 1 ppb threshold would be appropriate under the more protective 2015 ozone NAAQS when a 1 percent of the NAAQS contribution threshold has been used for less protective ozone NAAQS. To illustrate, a state contributing greater than 0.75 ppb but less than 1 ppb to a receptor under the 2008 ozone NAAQS was "linked" at Step 2,[184] but if a 1 ppb threshold were used for the 2015 ozone NAAQS then that same state would *not* be "linked" to a receptor at Step 2 under a NAAQS that is set to be *more* protective of human health and the environment. Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which all used the 1 percent of the NAAQS for less protective ozone NAAQS), is an important consideration. We affirm our view in CSAPR that continuing to use a 1 percent of NAAQS approach ensures that if the NAAQS are revised and made

more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport. *See* 76 FR 48208, 48237–38.

We note further that application of a 1 percent of NAAQS threshold has been the EPA's consistent approach in each of our notice-and-comment rulemakings beginning with CSAPR and continuing with the CSAPR Update, the Revised CSAPR Update, and numerous actions on ozone transport SIP submissions. In each case, the 1 percent of the NAAQS threshold was subject to rigorous vetting through public comment and the Agency's response to those comments, including through the use of analytical evaluations of alternative thresholds. *See, e.g.,* 81 FR 74518–19. By contrast, the August 2018 memorandum was not issued through notice-and-comment rulemaking procedures, and the EPA was careful to caveat its utility and ultimate reliability for that reason.

The EPA disagrees with claims that the EPA is applying the August 2018 memorandum inconsistently based on the EPA's actions with regard to Arizona, Iowa, and Oregon. The EPA withdrew a previously proposed approval of Iowa's SIP submission that was premised on a 1 ppb contribution threshold, and re-proposed and finalized approval of that SIP based on a different rationale using a 1 percent of the NAAQS contribution threshold. 87 FR 9477 (Feb. 22, 2022); 87 FR 22463 (April 15, 2022). The EPA also disagrees with any claim that Oregon and Arizona were "allowed" to use a 1 ppb or higher threshold. The EPA approved Oregon's SIP submission for the 2015 ozone NAAQS on May 17, 2019, and both Oregon and the EPA relied on a 1 percent of the NAAQS contribution threshold. 84 FR 7854, 7856 (March 5, 2019) (proposal); 84 FR 22376 (May 17, 2019) (final). In the proposal for this action, the EPA explained it was not proposing to conduct an error correction for Oregon even though updated modeling indicated Oregon contributed above 1 percent of the NAAQS to monitors in California.

The EPA is deferring finalizing a finding at this time for Oregon (*see* section IV.G of this document for additional information). In 2016, the EPA approved Arizona's SIP for the earlier 2008 ozone NAAQS based on a similar rationale with regard to certain monitors in California. 81 FR 15200 (March 22, 2016) (proposal); 81 FR 31513 (May 19, 2016) (final rule). We are deferring finalizing a finding at this time that such a rationale is appropriate

[183] EPA notes that Congress has placed on EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[184] *See* 86 FR 23054, 23058 (April 30, 2021).

**62a**

with respect to the more protective 2015 ozone NAAQS. While Arizona and Oregon's interstate transport obligations for the 2015 ozone NAAQS remain pending (along with several other states), there is no inconsistency in the treatment of these states or any other state at Step 2.

Some commenters claim the EPA must use a 1 ppb threshold based on the identification of 1 ppb as a significance threshold in one step of the PSD permitting process. The EPA's SIL guidances, however, relate to a different provision of the Clean Air Act regarding implementation of the prevention of significant deterioration (PSD) permitting program. This program applies in areas that have been designated attainment of the NAAQS and is intended to ensure that such areas remain in attainment even if emissions were to increase as a result of new sources or major modifications to existing sources located in those areas. This purpose is different than the purpose of the good neighbor provision, which is to assist downwind areas (in some cases hundreds or thousands of miles away) in resolving ongoing nonattainment of the NAAQS or difficulty maintaining the NAAQS through eliminating the emissions from other states that are significantly contributing to those problems. In addition, as discussed in preceding paragraphs, the purpose of the Step 2 threshold within the EPA's interstate transport framework for ozone is to broadly sweep in all states contributing to identified receptors above a de minimis level in recognition of the collective-contribution problem associated with regional-scale ozone transport. The threshold used in the context of PSD SIL serves a different purpose, and so it does not follow that they should be made equivalent. Further, commenters incorrectly associate the EPA's Step 2 contribution threshold with the identification of ''significant'' emissions (which does not occur until Step 3), and so it is not the case that the EPA is interpreting the same term differently.

The EPA has previously explained this distinction between the good neighbor framework and PSD SILs. *See* 70 FR 25162, 25190–25191 (May 12, 2005); 76 FR 48208, 48237 (Aug. 8, 2011). Importantly, the implication of the PSD SIL threshold is not that single-source contribution below this level indicates the absence of a contribution or that no emissions control requirements are warranted. Rather, the PSD SIL threshold addresses whether further, more comprehensive, multi-source review or analysis of air quality

impacts are required of the source to support a demonstration that it meets the criteria for a permit. A source with estimated impacts below the PSD SIL may use this to demonstrate that it will not cause or contribute (as those terms are used within the PSD program) to a violation of an ambient air quality standard, but is still subject to meeting applicable control requirements, including best available control technology, designed to moderate the source's impact on air quality.

Moreover, other aspects of the technical methodology in the SILs guidance compared to the good neighbor framework make a direct comparison between these two values misleading. For instance, in PSD permit modeling using a single year of meteorology the maximum single-day 8-hour contribution is evaluated with respect to the SIL. The purpose of the contribution threshold at Step 2 of the 4-step good neighbor framework is to determine whether the average contribution from a collection of sources in a state is small enough not to warrant any additional control for the purpose of mitigating interstate transport, even if that control were highly cost effective. Using a 1 percent of the NAAQS threshold is more appropriate for evaluating multi-day average contributions from upwind states than a 1 ppb threshold applied for a single day, since that lower value of 1 percent of the NAAQS will capture variations in contribution. If EPA were to use a single day reflecting the maximum amount of contribution from an upwind state to determine whether a linkage exists at Step 2, commenters' arguments for use of the PSD SIL might have more force. This would in effect be a return to the pre-CSAPR contribution calculation methodology of using a single day, *see* 76 FR 48238. However, that would likely cause more states to become linked, not less. And in any case, consistent with the method in our modeling guidance for projecting future attainment/nonattainment and as the EPA concluded in 2011 in CSAPR, the present good neighbor methodology of using multiple days provides a more robust approach to establishing that a linkage exists at the state level than relying on a single day of data.

A commenter also claimed the 1 percent of NAAQS threshold is inconsistent with the standards of precision for Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, appendix U, Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone. Commenter claimed that the 1

percent contribution threshold of 0.7 ppb is lower than the manufacturer's reported precision of these reference monitors and that the requirements found in Appendix U truncates monitor values of 0.7 ppb to 0 ppb. However, the commenter is mistaken in applying criteria related to the precision of monitoring technology to the modeling methodology by which we project contributions when quantifying and evaluating interstate transport at Step 2. Indeed, contributions by source or state cannot be derived from the total ambient concentration of ozone at a monitor at all but must be apportioned through modeling. Under our longstanding methodology for doing so, the contribution values identified from upwind states are based on a robust assessment of the average impact of each upwind state's ozone-precursor emissions over a range of scenarios, as explained in the 2016v3 modeling's Air Quality Modeling Final Rule TSD, in the docket for this rule, Docket ID No. EPA–HQ–OAR–2021–0668. This analysis is in no way connected with or dependent on monitoring instruments' precision of measurement. *See EME Homer City,* 795 F.3d 118, 135–36 (''[A] model is meant to simplify reality in order to make it tractable.'') (quoting *Chemical Manufacturers Association* v. *EPA,* 28 F.3d 1259, 1264 (D.C. Cir. 1994).

To the extent that commenters argue that the EPA consider a less stringent threshold as a result of modeling uncertainty, the EPA disagrees with this notion. The EPA has successfully applied a 1 percent of NAAQS threshold to identify linked upwind states using modeling in three prior FIP rulemakings and numerous state-specific actions on good neighbor obligations. This continues to be a reasonable approach, and indeed courts have repeatedly declined to establish bright line criteria for model performance. In upholding the EPA's approach to evaluating interstate transport in CSAPR, the D.C. Circuit held that it would not ''invalidate EPA's predictions solely because there might be discrepancies between those predictions and the real world. That possibility is inherent in the enterprise of prediction.'' *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118, 135 (2015). ''[T]he fact that a 'model does not fit every application perfectly is no criticism; a model is meant to simplify reality in order to make it tractable.' '' *Id.* at 135–36 (quoting *Chemical Manufacturers Association* v. *EPA,* 28 F.3d 1259, 1264 (D.C. Cir. 1994). *See also Sierra Club* v. *EPA,* 939 F.3d 649, 686–87 (5th Cir. 2019) (upholding EPA's modeling in the

face of complaints regarding an alleged "margin of error," noting challengers face a "considerable burden" in overcoming a "presumption of regularity" afforded "the EPA's choice of analytical methodology") (citing *BCCA Appeal Grp.* v. *EPA,* 355 F.3d 817, 832 (5th Cir. 2003)).

The Agency will continue to use the CAMx model to evaluate contributions from upwind states to downwind areas. The agency has used CAMx routinely in previous notice and comment transport rulemakings to evaluate contributions relative to the 1 percent threshold for both ozone and $PM_{2.5}$. In fact, in the original CSAPR, the EPA found that "[t]here was wide support from commenters for the use of CAMx as an appropriate, state-of-the-science air quality tool for use in the [Cross-State Air Pollution] Rule. There were no comments that suggested that the EPA should use an alternative model for quantifying interstate transport." 76 FR 48229 (August 8, 2011). In this action, the EPA has taken a number of steps based on comments and new information to ensure to the greatest extent the accuracy and reliability of its modeling projections at Step 1 and 2, as discussed elsewhere in this section.

The EPA disagrees with commenters that case law reviewing changes in agency positions such as *FCC* v. *Fox TV Stations, Inc.,* 556 U.S. 502, 515 (2009), is applicable with respect to this issue. As explained above, under the terms of the August 2018 memorandum, the Agency did not conclude that the use of an alternative contribution threshold was justified for any states. But even if it were found that the Agency's position had changed between this rulemaking action and the August 2018 memorandum, the *FCC* v. *Fox* factors are met. We have explained above that there are good reasons for continuing to use a 1 percent of NAAQS threshold. We also are aware that we are not using a 1 ppb threshold despite acknowledging the potential for doing so in the August 2018 memorandum. We do not believe that any party has a serious reliance interest that would be sufficient to overcome the countervailing public interest that is served through the EPA's determination to maintain continuity with its longstanding, more protective 1 percent of NAAQS threshold in this action. *Cf.* 88 FR 9373 (reviewing reliance in the context of the SIP-disapproval action).

The EPA therefore will continue its longstanding practice of applying the 1 percent of NAAQS threshold in this action.

### a. States That Contribute Below the Screening Threshold

Based on the EPA's modeling and considering measured data at violating monitors, the contributions from each of the following states to nonattainment or maintenance-only receptors in the 2023 analytic year are below the 1 percent of the NAAQS threshold: Colorado, Connecticut, the District of Columbia, Delaware, Florida, Georgia, Idaho, Maine, Massachusetts, Montana, Nebraska, New Hampshire, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Vermont, and Washington.[185] The EPA has already approved these states' 2015 ozone good neighbor SIP submittals. Because the contributions from these states to projected downwind air quality problems are below the screening threshold in the current modeling, these states are not within the scope of this final rule. Additionally, the EPA has made final determinations that two states outside the modeling domain for the air quality modeling analyzed in this final rulemaking—Hawaii[186] and Alaska[187]—do not significantly contribute to nonattainment or interfere with maintenance of the NAAQS in any other state.

With respect to Wyoming, our methodology when applied using the 2016v3 modeling suggests that whether the state is linked is uncertain and warrants further analysis. The EPA intends to expeditiously review its assessment with respect to Wyoming and take action addressing Wyoming's good neighbor obligations for the 2015 ozone NAAQS through a separate action.

### b. States That Contribute at or Above the Screening Threshold

Based on the maximum downwind contributions in Table IV.F–1, the Step 2 analysis identifies that the following 21 states contribute at or above the 0.70 ppb threshold to downwind nonattainment receptors in 2023: Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia. Based on the maximum downwind contributions in Table IV.F–

1, the following 23 states contribute at or above the 0.70 ppb threshold to downwind modeling-based maintenance-only receptors in 2023: Arizona, Arkansas, California, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, Ohio, Oklahoma, Texas, Virginia, West Virginia, and Wisconsin. Based on the maximum downwind contribution in Table IV.F–3, the following additional states contribute at or above the 0.70 ppb threshold to downwind violating monitor maintenance-only receptors in 2023: Kansas and Tennessee. (However, the EPA is not taking final action based on this analytical result for these two states at this time.) The levels of contribution between each of these linked upwind states and downwind nonattainment receptors and maintenance-only receptors are provided in the Air Quality Modeling Final Rule TSD.

Among the linked states are several western states—California, Nevada, and Utah. While the EPA has not previously included action on linked western states in its prior CSAPR rulemakings, the EPA has consistently applied the 4-step framework in evaluating good neighbor obligations from these states. On a case-by-case basis, the EPA has found in some instances with respect to the 2008 ozone NAAQS that a unique consideration has warranted approval of a western state's good neighbor SIP submittal that might otherwise be found to contribute above 1 percent of the NAAQS without concluding that additional emissions reductions are required at Step 3 of the framework.[188] The EPA has also explained in prior actions that its air quality modeling is reliable for assessing downwind air quality problems and ozone transport contributions from upwind states throughout the nationwide modeling domain.[189] The EPA is deferring finalizing a finding at this time for Oregon (*see* section IV.G of this document for additional information).

As explained in the following section, the EPA is not, in this action, altering its prior approval of Oregon's good neighbor SIP submission for the 2015 ozone NAAQS. For the remaining western states included in this rule, the EPA's modeling supports a conclusion that these states are linked above the

---

[185] The status of monitoring sites in California to which Oregon may be linked is under review. *See* section IV.G.

[186] The EPA approved Hawaii's 2015 ozone transport SIP on December 27, 2021. *See* 86 FR 73129.

[187] The EPA approved Alaska's 2015 ozone transport SIP on December 18, 2019. *See* 84 FR 69331.

[188] *See* interstate transport approval actions under the 2008 ozone NAAQS for Arizona, California, and Wyoming at 81 FR 36179 (June 6, 2016), 83 FR 65093 (December 19, 2018), and 84 FR 14270 (April 10, 2019)], respectively.

[189] *See* 81 FR 71991 (October 19, 2016), 82 FR 9155 (February 3, 2017).

contribution threshold to identified ozone transport receptors in downwind states, and therefore, consistent with the treatment of all other states within the modeling domain, the EPA proposes to proceed to evaluate these states for a determination of "significant contribution" at Step 3.

In conclusion, as described above, states with contributions that equal or exceed 1 percent of the NAAQS to either nonattainment or maintenance-only receptors are identified as "linked" at Step 2 of the good neighbor framework and warrant further analysis for significant contribution to nonattainment or interference with maintenance under Step 3. The EPA finds that for purposes of this final rule, the following 23 states are linked at Step 2 in 2023: Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wisconsin. In addition, the EPA finds that the following 20 States are linked at Step 2 in 2026: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia. We note that our updated modeling for this final rule shows that two states, Minnesota and Wisconsin, that we found linked in 2026 at proposal are no longer projected to be linked in that year but are linked in 2023.[190] As at proposal, Alabama is only projected to be linked in 2023, not 2026.

For six states, the EPA's analysis at this time indicates that a linkage may exist in 2023 for which the EPA had not proposed FIP requirements, or the updated analysis for this final rule suggests that linkages we had previously found in the proposed action are now uncertain and warrant further analysis. The EPA intends to expeditiously address these states in a separate action or actions: Arizona, Iowa, Kansas, New Mexico, Tennessee, and Wyoming.

*G. Treatment of Certain Monitoring Sites in California and Implications for Oregon's Good Neighbor Obligations for the 2015 Ozone NAAQS*

The EPA previously approved Oregon's September 25, 2018 transport SIP submittal for the 2015 ozone

NAAQS on May 17, 2019 (84 FR 22376), because in an earlier round of modeling Oregon was not projected to contribute above 1 percent of the NAAQS to any downwind receptors. In the EPA's updated modeling used at proposal (2016v2) and again in the final modeling (2016v3), Oregon is modeled to contribute above the 1 percent of NAAQS threshold to several monitoring sites in California that would generally meet the EPA's definition of nonattainment or maintenance "receptors" at Step 1.[191] At proposal, the EPA explained that our analysis of the nature of the air quality problem at these monitoring sites led us to propose a determination that these monitoring sites should not be treated as receptors for purposes of determining interstate transport obligations of upwind states under CAA section 110(a)(2)(D)(i)(I). We explained that we reached this conclusion at Step 1 of our 4-step framework.

The EPA previously made a similar assessment of the nature of certain other monitoring sites in California in approving Arizona's 2008 ozone NAAQS transport SIP submittal.[192] There, the EPA noted that a "factor [. . .] relevant to determining the nature of a projected receptor's interstate transport problem is the magnitude of ozone attributable to transport from all upwind states collectively contributing to the air quality problem." [193] The EPA observed that only one upwind state (Arizona) was linked above 1 percent of the 2008 ozone NAAQS to the two relevant monitoring sites in California, and the cumulative ozone contribution from all upwind states to those sites was 2.5 percent and 4.4 percent of the total ozone, respectively. The EPA determined that the size of those cumulative upwind contributions was "negligible, particularly when compared to the relatively large contributions from upwind states in the East or in certain other areas of the West." [194] In that action, the EPA concluded the two California sites to which Arizona was linked should not be treated as receptors for the purposes of determining Good Neighbor obligations for the 2008 ozone NAAQS.[195]

*Comment:* Commenters criticized what they considered to be unfair treatment of Oregon, stating that the EPA is applying a higher contribution threshold than it applies to other states. Commenters argued that EPA has not established a specific threshold for why the level of upwind-state impact at these sites should not be considered meaningful. Commenters argued that our analysis ignored the fact that there are many monitoring sites in California to which Oregon contributes above 1 percent of the NAAQS. Commenters state that EPA has failed to explain why Oregon is not subject to this rulemaking, while other states contribute lower total downwind ozone contributions and fewer receptors. Commenters concluded that since Oregon is linked it should be subject to the same emissions control determinations at Step 3 and 4 as every other state, or otherwise apply the same "nature of the air quality problem" consideration to eliminate other receptors.

*Response:* The EPA acknowledges that several commenters opposed the proposed treatment of Oregon and the California monitoring sites to which it is linked in the proposed and final modeling. We also recognize that other commenters expressed confusion regarding the role of this proposed determination at Step 1 and how it relates to the longstanding 4-step interstate transport framework that the EPA is otherwise applying in this action. In recognition of these concerns and the need to give further thought to the appropriate treatment of both upwind states and downwind receptors in these circumstances, the EPA is deferring finalizing a finding at this time for Oregon. The current approval of the state's SIP submission will remain in place for the time being, pending further review. We make no final determination in this action regarding whether the California monitoring sites at issue should or should not be treated as receptors for purposes of addressing interstate transport for the 2015 ozone NAAQS.

**V. Quantifying Upwind-State NO_X Emissions Reduction Potential To Reduce Interstate Ozone Transport for the 2015 Ozone NAAQS**

*A. The Multi-Factor Test for Determining Significant Contribution*

This section describes the EPA's methodology at Step 3 of the 4-step framework for identifying upwind emissions that constitute "significant" contribution for the states subject to this final rule and focuses on the 23 states with FIP requirements identified in the

---

[190] Minnesota and Wisconsin were linked to maintenance-only receptors in Cook County, IL in 2023. Minnesota and Wisconsin are not linked in 2026 because the 2026 average and maximum design values at the monitoring sites are projected to show attainment.

[191] Monitors are included in the docket for this rulemaking. While EPA is providing information about cumulative upwind contribution to the California monitors, the Agency is not making a determination in this action that these monitors are ozone transport receptors.

[192] 81 FR 15200 (March 22, 2016) (proposal); 81 FR 31513 (May 19, 2016) (final rule).

[193] 81 FR 15203.

[194] *Id.*

[195] *Id.*

previous sections. Following the existing framework as applied in the prior CSAPR rulemakings, the EPA's assessment of linked upwind state emissions is based primarily on analysis of several alternative levels of $NO_X$ emissions control stringency applied uniformly across all of the linked states. The analysis includes assessment of non-EGU stationary sources in addition to EGU sources in the linked upwind states.

The EPA applies a multi-factor test—the same multi-factor test that was used in CSAPR, the CSAPR Update, and the Revised CSAPR Update [196]—to evaluate increasing levels of uniform $NO_X$ control stringency. The multi-factor test, which is central to EPA's Step 3 quantification of significant contribution, considers cost, available emissions reductions, downwind air quality impacts, and other factors to determine the appropriate level of uniform $NO_X$ control stringency that would eliminate significant contribution to downwind nonattainment or maintenance receptors. The selection of a uniform level of $NO_X$ emissions control stringency across all of the linked states, reflected as a representative cost per ton of emissions reduction (or a weighted average cost per ton in the case of EPA's non-EGU and EGU analysis for 2026 mitigation measures), also serves to apportion the reduction responsibility among collectively contributing upwind states. This approach to quantifying upwind state emission-reduction obligations using uniform cost was reviewed by the Supreme Court in *EME Homer City Generation*, which held that using such an approach to apportion emissions reduction responsibilities among upwind states that are collectively responsible for downwind air quality impacts ''is an efficient and equitable solution to the allocation problem the Good Neighbor Provision requires the Agency to address.'' 572 U.S. at 519.

There are four stages in developing the multi-factor test: (1) identify levels of uniform $NO_X$ control stringency; (2) evaluate potential $NO_X$ emissions reductions associated with each identified level of uniform control stringency; (3) assess air quality improvements at downwind receptors for each level of uniform control stringency; and (4) select a level of control stringency considering the identified cost, available $NO_X$ emissions reductions, and downwind air quality impacts, while also ensuring that emissions reductions do not

unnecessarily over-control relative to the contribution threshold or downwind air quality.

As mentioned in section III.A.2 of this document, commenters on the proposed rule and previous ozone transport rules have suggested that the EPA should regulate VOCs as an ozone precursor. For this final rule, the EPA examined the results of the contribution modeling performed for this rule to identify the portion of the ozone contribution attributable to anthropogenic $NO_X$ emissions versus VOC emissions from each linked upwind state to each downwind receptor. Of the total upwind-downwind linkages in 2023, the contributions from $NO_X$ emissions comprise 80 percent or more of the total anthropogenic contribution for nearly all of the linkages (121 out of 124 total). Across all receptors, the contribution from $NO_X$ emissions ranges from 84 percent to 97 percent of the total anthropogenic contribution from upwind states. This review of the portion of the ozone contribution attributable to anthropogenic $NO_X$ emissions versus VOC emissions from each linked upwind state leads the Agency to conclude that the vast majority of the downwind air quality areas addressed by the final rule under are primarily $NO_X$-limited, rather than VOC-limited. Therefore, the EPA continues to find that regulation of VOCs as an ozone precursor in upwind states is not necessary to eliminate significant contribution or interference with maintenance in downwind areas in this final rule. The remainder of this section focuses on EPA's strategy for reducing regional-scale transport of ozone by targeting $NO_X$ emissions from stationary sources to achieve the most effective reductions of ozone transport over the geography of the affected downwind areas.

For both EGUs and non-EGUs, section V.B of this document describes the available $NO_X$ emissions controls that the EPA evaluated for this final rule and their representative unit costs (in 2016$). Section V.C of this document discusses EPA's application of that information to assess emissions reduction potential of the identified control stringencies. Finally, section V.D of this document describes EPA's assessment of associated air quality impacts and EPA's subsequent identification of appropriate control stringencies considering the key relevant factors (cost, available emissions reductions, and downwind air quality impacts).

This multi-factor approach is consistent with EPA's approach in prior transport actions, such as CSAPR. In

addition, as was evaluated in the CSAPR Update and Revised CSAPR Update, the EPA evaluated whether, based on particularized evidence, its selected control strategy would result in over-control for any upwind state by examining whether an upwind state is linked solely to downwind air quality problems that could have been resolved at a lesser threshold of control stringency and whether an upwind state could reduce its emissions below the 1 percent air quality contribution threshold at a lesser threshold of control stringency. This analysis is described in section V.D of this document.

Finally, while the EPA has evaluated potential emissions reductions from non-EGU sources in prior rules and found certain non-EGU emissions reductions should inform the budgets established in the $NO_X$ SIP Call, this is the first action for which the EPA is finalizing non-EGU emissions reductions within the context of the specific, 4-step interstate transport framework established in CSAPR. The EPA applies its multi-factor test to non-EGUs and independently evaluates non-EGU industries in a consistent but parallel track to its Step 3 assessment for EGUs. This is consistent with the parallel assessment approach taken for EGUs and non-EGUs in the Revised CSAPR Update. Following the conclusions of the EGU and non-EGU multi-factor tests, the identified reductions for EGUs and non-EGUs are combined and collectively analyzed to assess their effects on downwind air quality and whether the rule achieves a full remedy to eliminate ''significant contribution'' while avoiding over-control.

To ensure that this rule implements a full remedy for the elimination of significant contribution from upwind states, the EPA has reviewed available information on all major industrial source sectors in the upwind states inclusive of commenter-provided data. This analysis leads the EPA to conclude that both EGUs and certain large sources in several specific industrial categories should be evaluated for emissions control opportunities. As discussed in the sections that follow, the EPA determines, for both EGUs and the selected non-EGU source categories, there are impactful emissions reduction opportunities available at reasonable cost-effectiveness thresholds. As in the Revised CSAPR Update, the EPA examines EGUs and non-EGUs in this section on consistent but distinct parallel tracks due to differences stemming from the unique characteristics of the power sector

---

[196] *See* CSAPR, Final Rule, 76 FR 48208 (August 8, 2011).

compared to other industrial source categories.

Since the NOₓ SIP Call, EGUs have consistently been regulated under ozone transport rules. These units operate in a coordinated manner across a highly interconnected electrical grid. Their configuration and emissions control strategies are relatively homogenous, and their emissions levels and emissions control opportunities are generally very well understood due to longstanding monitoring and data-reporting requirements. Non-EGU sources, by contrast, are relatively heterogeneous, even within a single industrial category, and have far greater variation in existing emissions control requirements, emissions levels, and technologies to reduce emissions. In general, despite these differences, the information available for this rulemaking indicates that both EGUs and certain non-EGU categories have available cost-effective NOₓ emissions reduction opportunities at relatively commensurate cost per ton levels, and these emissions reductions will make a meaningful improvement in air quality at the downwind receptors. Section V.B.2 of this document describes EPA's process for selecting specific non-EGU industries and emissions unit types included in this final rulemaking.

The EPA notes that its Step 3 analysis for this FIP does not assess additional emissions reduction opportunities from mobile sources. The EPA continues to believe that title II of the CAA provides the primary authority and process for reducing these emissions at the Federal level. EPA's various Federal mobile source programs, summarized in this section, have delivered and are projected to continue to deliver substantial nationwide reductions in both VOCs and NOₓ emissions; these reductions from final rules are factored into the Agency's assessment of air quality and contributions at Steps 1 and 2. Further, states are generally preempted from regulating new vehicles and engines with certain exceptions, and therefore a question exists regarding EPA's authority to address such emissions through such means when regulating in place of the states under CAA section 110(c). *See generally* CAA section 209. *See also* 86 FR 23099. As noted earlier, the EPA accounted for mobile source emissions reductions resulting from other federally enforceable regulatory programs in the development of emissions inventories used to support analysis for this final rulemaking, and the EPA does not evaluate any mobile source control measures in its Step 3 evaluation in this

rule.[197] For further discussion of EPA's existing and ongoing mobile source measures, *see* section V.B.4 of this document.

*B. Identifying Control Stringency Levels*

1. EGU NOₓ Mitigation Strategies

In identifying levels of uniform control stringency for EGUs, the EPA assessed the same NOₓ emissions controls that the Agency analyzed in the CSAPR Update and the Revised CSAPR Update, all of which are considered to be widely available in this sector: (1) fully operating existing SCR, including both optimizing NOₓ removal by existing operational SCRs and turning on and optimizing existing idled SCRs; (2) installing state-of-the-art NOₓ combustion controls; (3) fully operating existing SNCRs, including both optimizing NOₓ removal by existing operational SNCRs and turning on and optimizing existing idled SNCRs; (4) installing new SNCRs; and (5) installing new SCRs. Finally, for each of these combustion and post combustion technologies identified, EPA evaluated whether emissions reduction potential from generation shifting at that representative dollar per ton level was appropriate at this Step. Shifting generation to lower NOₓ emitting or zero-emitting EGUs may occur in response to economic factors. As the cost of emitting NOₓ increases, it becomes increasingly cost-effective for units with lower NOₓ rates to increase generation, while units with higher NOₓ rates reduce generation. Because the cost of generation is unit-specific, this generation shifting occurs incrementally on a continuum. For the reasons explained in the following sections and supported by technical information provided in the EGU NOₓ Mitigation Strategies Final Rule TSD included in the docket for this final rule, the EPA determined that for the regional, multi-state scale of this rulemaking, only EGU NOₓ emissions controls 1 and 3 are possible for the 2023 ozone season (fully operating existing SCRs and SNCRs). The EPA finds that it is not possible to

install state-of-the-art NOₓ combustion controls by the 2023 ozone season on a regional scale; those controls are assumed to be available by the beginning of the 2024 ozone season. All cost values discussed in the rest of the section for EGUs are in 2016 dollars.

a. Optimizing Existing SCRs

Optimizing (*i.e.,* turning on idled or improving operation of partially operating) existing SCRs can substantially reduce EGU NOₓ emissions quickly, using investments that have already been made in pollution control technologies. With the promulgation of the CSAPR Update and the Revised CSAPR Update, most operators in the covered states improved their SCR performance and have continued to maintain that level of improved operation. However, this optimized SCR performance was not universal and not always sustained. Between 2017 and 2020, as the CSAPR Update ozone-season NOₓ allowance price declined, NOₓ emissions rates at some SCR-controlled EGUs increased. For example, power sector data from 2019 revealed that, in some cases, operating units had SCR controls that had been idled or were operating partially, and therefore suggested that there remained emissions reduction potential through optimization.[198] The EPA determined in the Revised CSAPR Update that optimizing SCRs was a readily available approach for EGUs to reduce NOₓ emissions in the 12 states addressed by a FIP in that rulemaking. Noticeable improvements in emissions rates at units with SCRs during the 2021 and 2022 compliance period further affirm the ability of sources to quickly implement this mitigation strategy and to realize emissions reductions from doing so. This emissions reduction measure is currently available at EGUs across the broader geography affected in this final rulemaking (including in states not previously affected by the Revised CSAPR Update). The EPA thus determines that SCR optimization, of both idled and partially operating controls, is a viable mitigation strategy for the 2023 ozone season.

The EPA estimates a representative marginal cost of optimizing SCR controls to be approximately $1,600 per ton, consistent with its estimation in the Revised CSAPR Update for this technology. EPA's EGU NOₓ Mitigation Strategies Final Rule TSD for this rule describes a range of cost estimates for

---

[197] The EPA recognizes that mechanisms exist under title I of the CAA that allow for the regulation of the use and operation of mobile sources to reduce ozone-precursor emissions. These include specific requirements that apply in certain ozone nonattainment areas including motor vehicle inspection and maintenance (I/M) programs, gasoline vapor recovery, clean-fuel vehicle programs, transportation control programs, and vehicle miles traveled programs. *See, e.g.,* CAA sections 182(b)(3), 182(b)(4), 182(c)(3), 182(c)(4), 182(c)(5), 182(d)(1), 182(e)(3), and 182(e)(4). The EPA views these programs as well as others that meet CAA requirements can be effective and appropriate in the context of the planning requirements applicable to designated nonattainment areas.

[198] *See* "Ozone Season Data 2018 vs. 2019" and "Coal-fired Characteristics and Controls" at *https://www.epa.gov/airmarkets/power-plant-data-highlights#OzoneSeason.*

this technology noting that the costs are frequently lower than—and for the majority of EGUs, significantly lower than—this representative marginal cost. While the costs of optimizing existing, operational SCRs include only variable costs, the cost of optimizing SCR units that are currently idled considers both variable and fixed costs of returning the control into service. Variable and fixed costs include labor, maintenance and repair, parasitic load, and ammonia or urea for use as a $NO_X$ reduction reagent in SCR systems. Depending on a unit's control operating status, the representative cost at the 90th percentile unit (among the relevant fleet of coal units with SCR covered in this rulemaking) ranges between $900 and $1,700 per ton. The EPA performed an in-depth cost assessment for all coal-fired units with SCRs and found that for the subset of SCRs that are already partially operating, the cost of optimizing is often much lower than $1,600 per ton and is often under $900 per ton. The EPA anticipates the vast majority of realized cost for compliance with this strategy to be better reflected by the $900 per ton end of that range (reflecting the 90th percentile of EGUs optimizing SCRs that are already partially operating) because this circumstance is considerably more common than EGUs that have ceased operating their SCR. This cost distinction is reflected in the EPA's RIA cost estimates. When representing the cost of optimization here, the EPA uses the higher value to reflect both optimization of partially operating and idled controls. EPA's analysis of this emissions control is informed by the latest engineering modeling equations used in EPA's IPM platform. These cost and performance equations were recently updated in the summer of 2021 in preparation for this rule, and subsequently evaluated for the final rule in 2022 and determined to still be appropriate. The description and development of the equations are documented in EGU $NO_X$ Mitigation Strategies Final Rule TSD and accompanying documents.[199] They are also implemented in an interactive spreadsheet tool called the Retrofit Cost Analyzer and applied to all units in the fleet. These materials are available in the docket for this action.

The EPA is using the same methodology to identify SCR

performance as it did in the Revised CSAPR Update. To estimate EGU $NO_X$ reduction potential from optimizing, the EPA considers the difference between the non-optimized $NO_X$ emissions rates and an achievable operating and optimized SCR $NO_X$ emissions rate. To determine this rate, EPA evaluated nationwide coal-fired EGU $NO_X$ ozone season emissions data from 2009 through 2019 and calculated an average $NO_X$ ozone season emissions rate across the fleet of coal-fired EGUs with SCR for each of these eleven years. The EPA found it prudent to not consider the lowest or second-lowest ozone season $NO_X$ emissions rates, which may reflect SCR systems that have all new components (e.g., new layers of catalyst). Data from these systems are potentially not representative of ongoing achievable $NO_X$ emissions rates considering broken-in components and routine maintenance schedules. Considering the emissions data over the full time period from 2009–2019 results in a third-best rate of 0.079 pounds $NO_X$ per million British thermal units (lb/mmBtu). Therefore, consistent with the Revised CSAPR Update, where EPA identified 0.08 lb/mmBtu as a reasonable level of performance for units with optimized SCR, the EPA finalizes a rate of 0.08 lb/mmBtu as the optimized rate for this rule. The EPA notes that half of the SCR-controlled EGUs achieved a $NO_X$ emissions rate of 0.064 lb/mmBtu or lower over their third-best entire ozone season. Moreover, for the SCR-controlled coal units that the EPA identified as having a 2021 emissions rate greater than 0.08 lb/mmBtu, the EPA verified that in prior years, the majority (more than 90 percent) of these same units had demonstrated and achieved a $NO_X$ emissions rate of 0.08 lb/mmBtu or less on a seasonal or monthly basis. This further supports EPA's determination that 0.08 lb/mmBtu reflects a reasonable emissions rate for representing SCR optimization at coal steam units in identifying uniform control stringency. This emissions rate assumption of 0.08 lb/mmBtu reflects what those units would achieve on average when optimized, recognizing that individual units may achieve lower or higher rates based on unit-specific configuration and dispatch patterns. Units historically performing at, or better, than this rate of 0.08 lb/mmBtu are assumed to continue to operate at that prior performance level.

Given the magnitude and duration of the air quality problems addressed by this rulemaking, the EPA also applied the same methodology to identify a

reasonable level of performance for optimizing existing SCRs at oil- and gas-fired steam units and simple cycle units (for which EPA determined that a 0.03 lb/mmBtu emissions rate reflected SCR optimization) as well as at combined-cycle units (for which the EPA determined that a 0.012 lb/mmBtu emissions rate reflected SCR optimization).

The EPA evaluated the feasibility of optimizing idled SCRs for the 2023 ozone season. Based on industry past practice, the EPA determined that idled controls can be restored to operation quickly (i.e., in less than 2 months). This timeframe is informed by many electric utilities' previous long-standing practice of utilizing SCRs to reduce EGU $NO_X$ emissions during the ozone season while putting the systems into protective lay-up during the non-ozone season months. For example, this was the long-standing practice of many EGUs that used SCR systems for compliance with the $NO_X$ Budget Trading Program. It was quite typical for SCRs to be turned off following the end of the ozone season control period on September 30. These controls would then be put into protective lay-up for several months of non-use before being returned to operation by May 1 of the following ozone season.[200] Therefore, the EPA believes that optimization of existing SCRs is possible for the portion of the 2023 ozone season covered under this final rule. The recent successful implementation of this strategy for the Revised CSAPR Update Rule, and corresponding fast improvement in SCR performance rates at units with optimization potential, provides further supporting evidence of the viability of this timeframe.

The vast majority of SCR-controlled units (nationwide and in the 23 linked states for which EPA is issuing a FIP for EGUs) are already partially operating these controls during the ozone season based on reported 2021 and 2022 emissions rates. Notably, the higher ozone season $NO_X$ allowance price observed in 2022 resulted in more units operating their controls closer to their potential and bringing collective emissions from those 12 states closer to the 2023 emissions budgets for those states in this final rule, accordingly.

---

[199] The CSAPR Update estimated $1,400 per ton as a representative cost of turning on idled SCR controls. EPA used the same costing methodology while updating for input cost increases (e.g., urea reagent) to arrive at $1,600 per ton in the final Revised CSAPR Update (while also updating from 2011 dollars to 2016 dollars).

[200] In the 22-state CSAPR Update region, 2005 EGU $NO_X$ emissions data suggest that 125 EGUs operated SCR systems in the summer ozone season while idling these controls for the remaining 7 non-ozone season months of the year. Units with SCR were identified as those with 2005 ozone season average $NO_X$ rates that were less than 0.12 lb/mmBtu and 2005 average non-ozone season $NO_X$ emissions rates that exceeded 0.12 lb/mmBtu and where the average non-ozone season $NO_X$ rate was more than double the ozone season rate.

Existing SCRs operating at partial capacity still provide functioning, maintained systems that may only require an increased chemical reagent feed rate (*i.e.,* ammonia or urea) up to their design potential and catalyst maintenance for mitigating $NO_X$ emissions; such units may require increased frequency or quantity of deliveries, which can be accomplished within a few weeks. In many cases, EGUs with SCR have historically achieved more efficient $NO_X$ removal rates than their current performance and can therefore revert to earlier operation and maintenance plans that achieved demonstrably better SCR performance.

In the 12 states subject to this control stringency in the Revised CSAPR Update, the EPA observed significant immediate-term improvements in SCR performance in the first ozone season following finalization of that rule, as evidenced in particular by the sharp drop in emissions rate at Miami Fort unit 7 (*see* EGU $NO_X$ Mitigation Strategies Final Rule TSD). For instance, in June of 2021—within months of the Revised CSAPR Rule being finalized—Miami Fort Unit 7 and Unit 8 (which had substantial SCR optimization potential) were able to reach levels of 0.07 lb/mmBtu of $NO_X$ (a greater than 50 percent reduction from where they had operated the prior year during the same month). Such empirical data further illustrates the viability of this mitigation strategy for the 2023 control period in response to this rule.

*Comment:* EPA received comments supporting the 0.08 lb/mmBtu emissions rate as achievable and, according to some commenters, underestimate the control's potential. Some of these commenters went on to provide their own analysis demonstrating that the 0.08 lb/mmBtu was achievable not only on average for the non-optimized fleet, but also for these individual state units and that the resulting state emissions budgets were likewise achievable. Some commenters suggested that the rate should be lower and premised on EPA using the first- or second-best year instead of the third best year of SCR performance. Some commenters observed that using the same methodology, but omitting SCR units that have since retired, could deliver an even lower SCR performance benchmark rate.

*Response:* The EPA notes that updating the inventory of coal-fired EGUs to reflect recent retirements and to include data reported since 2019 (*e.g.,* 2009–2021) would provide a lower value of 0.071 lb/mmBtu. However, EPA acknowledges that 2020 operational

data included impacts from COVID–19 pandemic shutdowns (such as atypical electricity demand patterns) which complicate interpretations of typical EGU emissions performance. Additionally, EPA believes that in this context, a unit's retirement in 2020 or 2021 does not obviate the usefulness of its prior SCR operational data for assessing the emissions control performance of other existing SCRs across the fleet. Consequently, EPA is continuing to use the same value of the 0.08 lb/mmBtu emissions rate calculated from the 2009–2019 data set identified at the time of the final Revised CSAPR Update Rule in this rulemaking. EPA's analysis focuses on the third best ozone season average rate because EPA believes that the first- or second-best rate, consistent with its CSAPR Update final rule and in the Revised CSAPR Update, could give undue weight to the emissions control performance of new SCRs in their first year of service and their corresponding newer SCR components. It does not necessarily reflect achievable ongoing $NO_X$ emissions rates at relatively older SCRs. The third-lowest season was selected because it represents a time when the unit was most likely consistently and efficiently operating its SCR in a manner representative of sustained future operation.

*Comment:* Other commenters suggested that EPA should apply a higher $NO_X$ emissions rate than 0.08 lb/mmBtu to existing SCR at coal EGUs premised on considerations such as: a generally reduced average capacity factor for coal units in recent years, the age of the boiler, coal rank (bituminous or subbituminous), or other unit-specific considerations that commenters claim make the 0.08 lb/mmBtu rate unattainable for a specific unit.

*Response:* EPA did not find sufficient justification to apply a higher average emissions rate than 0.08 lb/mmBtu. EPA found that some commenters were misunderstanding or misconstruing both EPA's assumption and implementation mechanism as a unit-level requirement for every SCR-controlled unit instead of a reflection of a fleet-wide average based on a third-best rate. The commenters' observation—that 0.08 lb/mmBtu may be difficult for some units to achieve or may not be a preferred compliance strategy for a given unit given its dispatch levels—does not contradict EPA's assumption, but rather supports its methodology and assumptions. As EPA pointed out in the proposed rule, this fleet-level emissions rate assumption of 0.08 lb/mmBtu for non-optimized units reflects, on average,

what those units would achieve when optimized. Some of these units may achieve rates that are lower than 0.08 lb/mmBtu, and some units may operate above that rate based on unit-specific configuration and dispatch patterns. In other words, EPA is using this assumption as the average performance of a unit that optimizes its SCR, recognizing that heterogeneity within the fleet will likely lead some units to overperform and others to underperform this rate. Moreover, a review of unit-specific historical data indicates that this is a reasonable assumption: not only has the group of units with SCR optimization potential demonstrated they can perform at or better than the 0.08 lb/mmBtu rate on average, over 90 percent of the individual units in this group have already met this rate on a seasonal and/or monthly basis based on their reported historical data.

Additionally, EPA's examination of units experiencing SCR performance deterioration included notable instances of poor $NO_X$ control at *increased* capacity factors. As an example, Miami Fort Unit 7 had considerably more hours of operation at a 70 to 79 percent capacity factor in 2019 compared to previous years. However, Miami Fort Unit 7's ozone-season $NO_X$ emissions rate *substantially increased* in 2019 compared to previous years. This SCR performance deterioration runs counter to the notion that an increase in emissions rates is purely driven by reduced capacity factor, as suggested by commenters. This substantial deterioration in the median emissions rate performance is observable even when comparing specific hours in 2019 to specific hours in prior years when the unit operated in the same 70 to 79 percent capacity factor range. In fact, in 2019 the unit experienced notable emissions rate increases from prior years across multiple capacity factor ranges as low as 40 percent to as high as 80 percent. This type of data indicates instances where the increase in emissions rate (and emissions) is not necessitated by load changes but is more likely due to the erosion of the existing incentive to optimize controls (*i.e.,* the ozone-season $NO_X$ allowance price has fallen so low that unit operators find it more economic to surrender additional allowances instead of continuing to operate pollution controls at an optimized level).

EPA observed this pattern in other units identified in this rulemaking as having significant SCR optimization emissions reduction potential. In the accompanying Emissions Data TSD for the supplemental notice that EPA recently released in a proceeding to

address a recommendation submitted to EPA by the Ozone Transport Commission under CAA section 184(c), EPA noted, ''In their years with the lowest average ozone season $NO_X$ emissions rates in this analysis, these EGUs had relatively low $NO_X$ emissions rates at mid- and high-operating levels; moreover, there was little variability in $NO_X$ emissions rates at these operating levels. However, during the 2019 ozone season, these EGUs had higher $NO_X$ emissions rates and greater variability in

$NO_X$ emissions rates across operating levels than in the past, particularly at mid-operating levels.''[201] That hourly data analysis, included in this docket, controls for operating level changes and still finds there to be instances across multiple SCR-controlled units where hourly emissions rates are increasing even when compared to the same load levels in previous years.

Some commenters have alleged that in recent years coal-fired EGUs have declined in capacity factor and that SCR

performance declines at those lower operating levels. However, hourly data indicate that maintaining consistent SCR performance at lower capacity factors is possible. For example, the unit-level performance data in Figure 2 to section VI.B of this document show the emissions rate at a coal-fired EGU with existing SCR staying relatively low (consistent with our optimization assumption of 0.08 lb/mmBtu) and stable across a wide range of capacity factors.[202]

**Figure 2 to section V.B.1.a: Example of Consistently Low Unit-level Emissions Rate During Periods of Varying Capacity Factor**



Furthermore, most recent data from 2022 illustrates that cycling units do have the ability to adjust cycling patterns in a manner that enables them to maintain a lower emissions rate throughout the season while still achieving a load cycling pattern at the unit. For example, the SCR-controlled Conemaugh Unit 2 in Pennsylvania adjusted operating patterns in 2022 to have a slightly higher minimum load in most hours (maintaining a range of 550 MW–900 MW for most hours as opposed to 450 MW–900 MW observed in 2021). This change in minimum load, and corresponding minimum operating temperature, enabled the unit to maintain emissions rates in the 0.05 lb/mmBtu to 0.10 lb/mmBtu range for most of the 2022 season (as opposed to $NO_X$ emissions rates that regularly exceeded

0.25 lb/mmBtu in the 2021 season). This 2022 improvement in SCR operation occurred during a period when allowance prices increased relative to prior years, creating an incentive for potential emissions reductions through SCR optimization.

*Comment:* EPA also received comment suggesting it should deviate from its approach in the CSAPR Update of using a nationwide data set of all SCR controlled coal units to establish a third best year, and instead limit the dataset to either just the covered states, or—in the case of some commenters—just to the baseline years of those units at which EPA is identifying optimization potential. They claim the current methodology may capture extremely efficient SCR performance years at the best performing units and that level of

performance may not be available at all units with optimization potential. These commenters also disagree with the EPA finding that SCRs can consistently maintain a 0.08 lb/mmBtu rate over time.

*Response:* EPA reviewed the data and its methodology and evaluated it against its intention to identify a technology-specific representative emissions rate for SCR optimization. In doing so, EPA did not identify any need to make the suggested change. EPA is interested in the performance potential of a technology, and a larger dataset provides a superior indication of that potential as opposed to a smaller, state-limited dataset. Moreover, EPA's use of the third best year (as opposed to best) from its baseline period results in an average optimization level that is robust

---

[201] ''Analysis of Ozone Season $NO_X$ Emissions Data for Coal-Fired EGUs in Four Mid-Atlantic States,'' EPA Clean Air Markets Division. December

2020. Available at *https://www.epa.gov/sites/production/files/2020-12/documents/184c_emission_data_tsd.pdf.*

[202] EPA, *Air Markets Program Data.* Available at *www.epa.gov/ampd.*

to the commenters' concern that EPA should not overstate the fleetwide representative optimization level. Prior experience with EPA's methodology and program has borne out empirical evidence of its reasonableness. In both the CSAPR Update and in Revised CSAPR Update rule, EPA appropriately relied on the largest dataset possible (*i.e.,* nationwide) to derive technology performance averages that it then applied respectively to the CSAPR Update 22-state region and the Revised CSAPR Update's 12-state region. EPA repeats that successful approach in this rule. Finally, as noted in the preceding paragraphs, in affirming the reasonableness of this approach, EPA examined the historical reported data (pre-2021) for the units in the states with SCR optimization potential and found the nationwide derived average appropriate and consistent with demonstrated capability and performance of units within those states. That is, the vast majority of units to which this resulting emissions rate assumption was being applied had demonstrated the ability to achieve this rate in some prior year for an extended monthly or seasonal basis. This information is discussed further in the EGU NOₓ Mitigation Strategies Final Rule TSD in the docket.

*Comment:* Some commenters suggested the price of SCR optimization is higher than the $1,600 per ton figure proposed due to current market conditions for aqueous ammonia or other input prices.

*Response:* EPA provides a representative cost for this mitigation technology which is anticipated to reflect the cost, on average, throughout the compliance period for the rule. While there may be volatility in the market during that period where the price falls above or below the single representative threshold value, EPA's EGU NOₓ Mitigation Strategies Final Rule TSD explains how the representative cost is derived and is inclusive of consultation and vetting by third party air pollution control consulting groups. Commenters did not demonstrate that observed 2021 elevated prices amid market volatility would continue into the future compliance periods discussed in this rule. Moreover, the selection of the mitigation technology is reflective of a variety of factors including reduction potential and air quality impact. A higher cost (commenter suggests up to $3,800 per ton) would not change EPA's determination that optimizing already existing SCRs is an appropriate mitigation strategy for Step 3 emissions reduction analysis in this rulemaking as

it would remain one of the most widely available, widely practiced, and lowest cost mitigation measures with meaningful downwind air quality benefit. Appendix B of the EGU NOₓ Mitigation Strategies Final Rule TSD further addresses commenters' concerns as it provides a variety of sensitivities showing cost per ton levels under a variety of different input assumptions (including higher material and reagent cost). It supports the continued inclusion of this technology in the rule even in the event that higher reagent costs extend into compliance years.

*Comment:* While many commenters supported the feasibility of 2023 ozone-season implementation by noting the "immediate availability" of SCR optimization, other commenters argued that the engineering, procurement, and other steps required for SCR optimization were not feasible given the anticipated limited window between rule finalization and the start of the 2023 ozone season.

*Response:* There is ample evidence of units restoring their optimal performance within a two-month timeframe. Not only do units reactivate SCR performance level at the start of an ozone-season when tighter emissions limits begin, but unit-level data also shows instances where sources have demonstrated the ability to quickly alter their emissions rate within an ozone-season and even within the same day in some cases. Moreover, this emissions control is familiar to sources and was analyzed and included in the Revised CSAPR Update emissions budgets finalized in 2021 and the CSAPR Update emissions budgets finalized in 2016. With this experience, and notice through the March 2022 proposed rule, as well as over two months from final rule to effective date, the viability of this emissions control for the 2023 ozone season is consistent with the 2-week to 2-month timeframe that EPA identified as reasonable in the CSAPR Update, Revised CSAPR Update, and in this rulemaking. Similar to prior rules, commenters provide some unit-level examples where it has taken longer. Also similar to those prior rules, EPA does not find those unit-level examples compelling in the context of its fleet average assumptions and in the implementation context of a trading program which provides compliance alternatives in the event a specific unit prefers more time to implement a given control measure. As noted in *Wisconsin,* ". . . all those anecdotes show is that installation can drag on when companies are unconstrained by the ticking clock of the law." 938 F.3d at 330.

**b. Installing State-of-the-Art NOₓ Combustion Controls**

The EPA estimates that the representative cost of installing state-of-the-art combustion controls is comparable to, if not notably less than, the estimated cost of optimizing existing SCR (represented by $1,600 per ton). State-of-the-art combustion controls such as low-NOₓ burners (LNB) and over-fire air (OFA) can be installed or updated quickly and can substantially reduce EGU NOₓ emissions. Nationwide, approximately 99 percent of coal-fired EGU capacity greater than 25 MW is equipped with some form of combustion control; however, the control configuration or corresponding emissions rates at a small portion of those units (including units in those states covered in this action) indicate they do not currently have state-of-the-art combustion control technology. For this rulemaking, the Agency re-evaluated its NOₓ emissions rate assumptions for upgrading existing combustion controls to state-of-the-art combustion control. The EPA is maintaining its determination that NOₓ emissions rates of 0.146 to 0.199 lb/mmBtu can be achieved on average depending on the unit's boiler configuration,[203] and, once installed, reduce NOₓ emissions at all times of EGU operation.

These assumptions are consistent with the Revised CSAPR Update. They are further discussed in the EGU NOₓ Mitigation Strategies Final Rule TSD. In particular, the EPA is finalizing, as proposed, the application of the 0.199 lb/mmBtu emissions rate assumption for both boiler types (tangentially and wall fired). EPA's analysis calculated average emissions rates of 0.199 lb/mmBtu for combustion controls on dry bottom wall fired units and 0.146 lb/mmBtu for tangentially fired units. However, many of the likely impacted units burn bituminous coal, and the 0.146 lb/mmBtu nationwide average for tangentially-fired (inclusive of subbituminous units) appears to be below the demonstrated emissions rate of state-of-the-art combustion controls for bituminous coal units of this boiler type. Therefore, EPA's assignment of a 0.199 lb/mmBtu emissions rate for combustion controls at all affected unit types is robust to current and future coal choice at a unit.

The EPA has previously examined the feasibility of installing combustion controls and found that industry had demonstrated ability to install state-of-

---

[203] Details of EPA's assessment of state-of-the-art NOₓ combustion controls are provided in the EGU NOₓ Mitigation Strategies Final Rule TSD.

the-art LNB controls on a large unit (800 MW) in under six months when including the pre-installation phases (design, order placement, fabrication, and delivery).[204] In prior rules, the EPA has documented its own assessment of combustion control timing installation as well as evaluated comments it received regarding installation of combustion controls from the Institute of Clean Air Companies.[205] Those comments provided information on the equipment and typical installation time frame for new combustion controls, accounting for all steps. To date, the EPA has found it generally takes between 6–8 months on a typical boiler—covering the time through bid evaluation through start-up of the technology. The deployment schedule is repeated here as:

- 4–8 weeks—bid evaluation and negotiation
- 4–6 weeks—engineering and completion of engineering drawings
- 2 weeks—drawing review and approval from user
- 10–12 weeks—fabrication of equipment and shipping to end user site
- 2–3 weeks—installation at end user site
- 1 week—commissioning and start-up of technology

Given the referenced timeframe of approximately 6 to 8 months to complete combustion control installation in the region, the EPA is finalizing that installation of state-of-the-art combustion controls is a readily available approach for EGUs to reduce $NO_X$ emissions by the start of the 2024 ozone season. More details on these analyses can be found in the *EGU $NO_X$ Mitigation Strategies Final Rule TSD*.

The cost of installing state-of-the-art combustion controls per ton of $NO_X$ reduced is dependent on the combustion control type and unit type. The EPA estimates the cost per ton of state-of-the-art combustion controls to be $400 per ton to $1,200 per ton of $NO_X$ removed using a representative capacity factor of 85 percent. This cost fits well within EPA's representative cost threshold observed for SCR optimization and combustion controls (of $1,600 per ton) which would accommodate combustion control upgrade even under scenarios where a lower capacity factor is assumed. 99 percent of units have some form of combustion controls, indicating the widespread cost-effectiveness of this control. *See* the *EGU $NO_X$ Mitigation Strategies Final Rule TSD* for additional details.

At proposal EPA assumed that emissions reductions from combustion control upgrades at affected EGUs in states subject to the Revised CSAPR Update program could occur by 2023 given that those EGUs may have already begun pursuing such upgrades in response to that previous rule. However, EPA does not have data to confirm that presumption, and hence EPA is determining in this final rule that combustion control upgrades for all affected EGUs, regardless of whether they were previously subject to the Revised CSAPR Update program, should be considered available by the 2024 ozone season, consistent with the deployment schedule noted in this section.

*Comment:* Some commenters suggested that EPA, in its modeling for the proposed rule, overestimated the ability of combustion control technologies to achieve very low $NO_X$ emissions rates. The commenters claim EPA's assumptions are derived from projected $NO_X$ emissions rates based on ideal circumstances for $NO_X$ emissions reductions, including combinations of fuel composition and unit design that are not typical and should not be extrapolated to the national inventory.

*Response:* EPA's emissions performance rate for state-of-the-art combustion controls is derived from historical data and takes both boiler type and coal choice into account. EPA reviewed historical data and identified the average emissions rates for units with this technology already in place. It segmented this analysis by boiler type (dry-bottom wall-fired boiler and tangentially-fired, and further segmented by coal rank to assess the average performance among these varying parameters. As explained in the *EGU $NO_X$ Mitigation Strategies Final Rule TSD*, EPA chose an emissions rate for which it verified accommodated (*i.e.*, was greater than or equal to) the average performance rate identified above for each boiler configuration with state-of-the-art combustion controls and resulted in reductions consistent with the technology's assumed percent reduction potential when applied to this subset of units. It also assessed whether the rate had been demonstrated by both subbituminous and bituminous coal units with state-of-the-art combustion controls. EPA further assessed the percent reduction that achieving this rate would require from the specific segment of the fleet identified as having this mitigation measure available. Here too, EPA found that the effective percent reduction for the identified fleet (inclusive of their existing coal rank choice) is well within the historical performance range for this technology. Therefore, EPA is finalizing the combustion control upgrade performance assumption of 0.199 lb/mmBtu as appropriate representative average performance rate for this technology and robust to different boiler types and coal ranks.

### c. Optimizing Already Operating SNCRs or Turning on Idled Existing SNCRs

Optimizing already operating SNCRs or turning on idled existing SNCRs can also reduce EGU $NO_X$ emissions quickly, using investments in pollution control technologies that have already been made. Compared to no post-combustion controls on a unit, SNCRs can achieve a 25 percent reduction on average in EGU $NO_X$ emissions (with sufficient reagent). They are less capital intensive but less efficient at $NO_X$ removal than SCRs. These controls are in use to some degree across the U.S. power sector. In the 22 linked states with EGU reductions identified in this final rule, approximately 11 percent of coal-fired EGU capacity is equipped with SNCR.[206] Recent power sector data suggest that, in some cases, SNCR controls have been operating less in 2021 relative to performance in prior years. For instance, EPA reviewed the last five years of performance data for all the units with SNCR optimization potential in its Engineering Analysis. It found that in 2021—the most recent year reviewed—that the weighted average ozone season emissions rate for these units was higher than the prior three years (indicating some deterioration in average performance). Moreover, a unit level review illustrated that 80 of the 107 units had performed better in a prior year by an average of 13 percent—indicating substantial optimization potential.[207]

The EPA determined that optimizing already operating SNCRs or turning on idled SNCRs is an available approach for EGUs to reduce $NO_X$ emissions, has similar implementation timing to restarting idled SCR controls (less than 2 months for a given unit), and therefore could be implemented in time for the 2023 ozone season. In this final rule, the EPA is determining that this emissions

---

[204] The EPA finds that, generally, the installation phase of state-of-the-art combustion control upgrades—on a single-unit basis—can be as little as 4 weeks to install with a scheduled outage (not including the pre-installation phases such as permitting, design, order, fabrication, and delivery) and as little as 6 months considering all implementation phases.

[205] EPA–HQ–OAR–2015–0500–0093.

[206] https://www.epa.gov/airmarkets/national-electric-energy-data-system-needs-v6.

[207] See "Historical Emission Rates for Units with SNCR Optimization Potential" in the docket for this rulemaking.

control measure is available beginning in the 2023 ozone season.

Using the Retrofit Cost Analyzer described in the *EGU NO_X Mitigation Strategies Final TSD*, the EPA estimates a representative cost of optimizing SNCR ranging from approximately $1,800 per ton (for partially operating SNCRs) to $3,900 per ton (for idled SNCRs). For existing SNCRs that have been idled, unit operators may need to restart payment of some fixed and variable operating costs including labor, maintenance and repair, parasitic load, and ammonia or urea. The EPA determined that the majority of units with existing SNCR optimization potential were already partially operating their controls. Therefore, the EPA finalizes a representative cost of $1,800 per ton for SNCR optimization as this value best reflects the circumstances of the majority of the affected EGUs with SNCR.

**d. Installing New SNCRs**

The EPA evaluated potential emissions reductions and associated costs from retrofitting EGUs with new SNCR post-combustion controls at steam units lacking such controls, which can achieve a 25 percent NO_X reduction on average. New SNCR technology provides owners with a relatively less capital-intensive option for reducing NO_X emissions compared to new SCR technology, albeit at the expense of higher operating costs on a per-ton basis and less total emissions reduction potential. SNCR is more widely observed on relatively smaller coal units given its low capital/variable cost ratio. The average capacity of a coal unit with SNCR is half the size of the average capacity of coal unit with SCR.[208] Given these observations, the EPA identifies this technology as an emissions reduction measure for coal units less than 100 MW lacking post-combustion NO_X control technology. As described in the *EGU NO_X Mitigation Strategies Final Rule TSD*, the EPA estimated that $6,700 per ton reflects a representative SNCR retrofit cost level for these units.

For this rulemaking, EPA is not considering SNCR installation timing unto itself but is instead considering how long eligible EGUs may need to adopt either SNCR or SCR as a post-combustion control measure. SNCR installations generally have shorter project installation timeframes relative to other post-combustion controls. The time for engineering review, contract award, fabrication, delivery, and

hookup is as little as 16 months including pre-contract award steps for an individual power plant installing controls on more than one boiler. However, SNCR retrofits have less pollution reduction potential than SCRs, and as explained further in the next section, the EPA is identifying the retrofit of SCR rather than SNCR as a strategy for larger steam units due to this lower removal efficiency. This approach respects empirical evidence that larger coal-fired EGUs which installed post-combustion NO_X control technology have overwhelmingly chosen SCRs over SNCRs. Even for smaller units less than 100 MW identified as potential candidates for SNCR technology, the EPA does not want to preclude those units from pursuing SCR in lieu of SNCR.

Therefore, in this final rule the EPA defines the availability of emissions reductions from post-combustion control installation to be in 2026, the same period as the start of SCR-based reductions becoming available, to allow enough time for eligible EGUs to choose between SCR or SNCR. SNCR installation shares similar implementation steps with and also need to account for the same regional factors as SCR installations, which are described in the next section. While the EPA is determining that at least 16 months would be needed to complete all necessary steps of SNCR development and installation, an eligible EGU choosing new SCR instead would require installation timing of 36 to 48 months. EPA believes its finalized joint timing considerations for post-combustion control retrofits (SNCR and SCR) are justified given that post-combustion control retrofit decisions are subject to unit-specific economic and engineering factors and are sensitive to operator compliance strategy choices with respect to multiple regulatory requirements.

*Comment:* Some commenters argued that post-combustion control timing assumptions (SCR and SNCR) should be decoupled, which could result in the EPA using the 16-month time frame specific to SNCR installation to require emissions reductions related to new SNCR installations by the 2025 ozone season.

*Response:* The EPA does not agree that decoupling SCR and SNCR timing consideration is justified in the context of this final rule's emissions control program for EGUs. Approximately 1,000 tons of emissions reduction potential are estimated for the small coal EGUs deemed eligible for SNCR retrofit. The incentives provided through the implementation of this rule's trading

program will encourage these EGUs to determine and adopt emissions reduction measures (including SNCR or SCR) as soon as possible to reduce their allowance holding compliance burden. By scheduling SNCR-related emissions reductions potential for the 2026 ozone season, the EPA preserves the opportunity for considerably superior emissions reduction potential from these EGUs should they select SCR retrofit instead, while still requiring post-combustion control emissions reduction potential ahead of the next attainment date.

*Comment:* Some commenters argued that the upper range of SNCR NO_X removal performance (40 percent) referenced by EPA is optimistic for many boilers.

*Response:* EPA evaluated both actual performance and engineering literature regarding SNCR retrofit technology and found both sources supported the range of reduction estimates cited by EPA. (Refer to the *EGU NO_X Mitigation Strategies Final Rule TSD* in the docket for this rulemaking for additional information.) Moreover, for purposes of calculating state budgets, EPA assumes 25 percent reduction from this technology—not 40 percent—which reflects a value well within the range of documented performance for this technology. Remaining comments on SNCR performance potential are addressed in the *RTC* Document and in the *EGU NO_X Mitigation Strategies Final Rule TSD*.

**e. Installing New SCRs**

Selective Catalytic Reduction (SCR) controls already exist on over 66 percent of the coal fleet in the linked states that are subject to a FIP in this rulemaking. Nearly every pulverized coal unit larger than 100 MW built in the last 30 years has installed this control, which is generally required for Best Available Control Technology (BACT) purposes. Other than circulating fluidized bed coal units which can achieve a comparably low emissions rate without this technology, the EPA identifies this emissions reduction measure for coal steam units greater than or equal to 100 MW. SCR is widely available for existing coal units of this size and can provide significant emissions reduction potential, with removal efficiencies of up to 90 percent. The EPA limited its consideration of SCR technology to steam units greater than or equal to 100 MW. The costs for retrofitting a plant smaller than 100 MW with SCR increase

---

[208] *See* EGU NO_X Mitigation Strategies Final Rule TSD for additional discussion.

rapidly due to a lack of economies of scale.[209]

The amount of time needed to retrofit an EGU with new SCR extends beyond the 2023 ozone season. Similar to the SNCR retrofits discussed in this section, the EPA evaluated potential emissions reductions and associated costs from this control technology, as well as the impacts and need for this emissions control strategy, at the earliest point in time when their installation could be achieved. EPA notes that it has previously determined in the context of ozone transport that regional scale implementation of SCRs at numerous EGUs is achievable in 36 months. *See* 63 FR 57356, 57447–50 (October. 27, 1998). However, since that time, the EPA has found up to 36–48 months to be a more appropriate installation timeframe for regionwide actions when the EPA is evaluating multiple installations at multiple locations.[210]

In the past, the EPA has found the amount of time to retrofit a single EGU with new SCR, depending on the regulatory program under which such control may be required, may vary between approximately 2 and 4 years depending on site-specific engineering considerations and on the number of installations being considered. This includes steps for engineering review, construction permit, operating permit, and control technology installation (including fabrication, pre hookup, control hookup, and testing). EPA's assessment of installation procedures suggests as little as 21 months may be needed for a single SCR at an individual plant and 36 months at a single plant with multiple boilers. EPA's assessment of units with SCR retrofit potential indicate the majority fall into this first classification, *i.e.,* a single SCR at a power plant.

While EPA finds that 36 months is a possible time frame for SCR installation at individual units or plants, the total of nearly 31 GW of coal capacity with SCR retrofit potential and 19 GW of oil/gas steam capacity with SCR retrofit potential within the geographic footprint of the final rule is a scale of retrofit activity that is not demonstrated to have been achieved within a three-year span based on data from the past two decades. Given that some of the

assumed SCR retrofit potential occurs at plants with multiple units identified with retrofit potential, and given the total volume of SCR retrofit capacity being implemented across the region, EPA is allowing in this final rule between 36 to 48 months, consistent with the regional time frame discussed for SCR retrofit in prior rules, for the full implementation of reductions commensurate with this volume of SCR retrofit capacity, as described further in section VI.A of this document.

The Agency examined the cost for retrofitting a coal unit with new SCR technology, which typically attains controlled $NO_X$ rates of 0.05 lb/mmBtu or less. These updates are further discussed in the EGU $NO_X$ Mitigation Strategies Final Rule TSD.[211] Based on the characteristics of coal units of 100 MW or greater capacity that do not have post-combustion $NO_X$ control technology, the EPA estimated a weighted-average representative SCR cost of $11,000 per ton.[212]

The 0.05 lb/mmBtu emissions rate performance assumption for new SCR retrofits is supported by historical data and third party independent review by pollution control engineering and consulting firms. The EPA first examined unit-level emissions rate data for coal-fired units that had a relatively recent SCR installation (within the last 10 years). The best performing 10 percent of these SCRs were demonstrating seasonal emissions rates of 0.036 lb/mmBtu during this time.

While the EPA identified the 0.05 lb/mmBtu performance assumption consistent with historical data, these performance levels are also informed and consistent with the Agency's IPM modeling assumptions used for more than a decade. These modeling assumptions are based on input from leading engineering and pollution control consulting entities. Most recently, these data assumptions were affirmed and updated in the summer of 2021 and included in the docket for this rulemaking.[213] The EPA relies on a

global firm providing engineering, construction management, and consulting services for power and energy with expertise in grid modernization, renewable energy, energy storage, nuclear power, and fossil fuels. Their familiarity with state-of-the art pollution controls at power plants derives from experience providing comprehensive project services—from consulting, design, and implementation to construction management, commissioning, and operations/maintenance. This review and update supported the 0.05 lb/mmBtu performance assumption as a representative emissions rate for new SCR across coal types.

The EPA performed an assessment for oil/gas steam units in which it evaluated the nationwide performance of those units with SCR technology. For these units, the EPA tabulated EGU $NO_X$ ozone season emissions data from 2009 through 2021 and calculated an average $NO_X$ ozone season emissions rate across the fleet of oil- and gas-fired EGUs with SCR for each of these years. The EPA identified the third lowest year which yielded an SCR performance rate of 0.03 lb/mmBtu as representative of performance for this retrofit technology applied to this type of EGU. Next, the EPA evaluated the emissions and operational characteristics for the existing oil/gas steam fleet lacking SCR technology. EPA's analysis indicated that the majority of reduction potential (approximately 76 percent) from these units occurred at units greater than or equal to 100 MW and that were emitting more than 150 tons per ozone season (*i.e.,* approximately 1 ton per day). Moreover, the cost of reductions for units falling below these criteria increased significantly on a dollar per ton basis. Therefore, the EPA identified the portion of the oil/gas steam fleet meeting these criteria (*i.e.,* greater than or equal to 100 MW and emitting more than 150 tons per ozone season) as representative of the SCR retrofit reduction potential.[214] For this segment of the oil/gas steam units lacking post-combustion $NO_X$ control technology, the EPA estimated a weighted-average representative SCR cost of $7,700 per ton.

*Comment:* Some commenters disagreed with EPA's proposed 36-month timeframe for SCR retrofit. These commenters noted that, while possible at the unit or plant level, the collective volume of SCR installation occurring in

---

[209] IPM Model-Updates to Cost and Performance for APC Technologies. SCR Cost Development Methodology for Coal-fired Boilers. February 2022.

[210] *See, e.g.,* CSAPR Close-Out, 83 FR 65878, 65895 (December 21, 2018) and Revised CSAPR Update, 86 FR 23102 (April 30, 2021). *See also* Final Report: Engineering and Economic Factors Affecting the Installation of Control Technologies for Multipollutant Strategies, EPA–600/R–02/073 (Oct. 2002), available at *https://nepis.epa.gov/Adobe/PDF/P1001G0O.pdf.*

[211] As noted in that TSD, approximately half of the recent SCR retrofits (*i.e.,* installed in the last 10 years) have demonstrated an emission rate across the ozone season below 0.05 lb/mmBtu, even absent a requirement or strong incentive to operate at that level in many cases.

[212] This cost estimate is representative of coal units lacking any post-combustion control. A subset of units within the universe of coal sources with SCR retrofit potential, but that have an existing SNCR technology in place would have a weighted average cost that falls above this level, but still cost effective. See the EGU $NO_X$ Mitigation Strategies Final Rule TSD for more discussion.

[213] See "IPM Model—Updates to Cost and Performance for APC Technologies: SCR Cost Development Methodology for Coal-fired Boilers".

[214] The EPA used a 3-year average of 2019–2021 reported ozone season emissions to derive a tons per ozone season value representative for each covered oil/gas steam unit.

a limited region of the country would not be possible given the labor constraints, supply constraints, and simultaneous outages necessary to complete SCR retrofit projects on such a schedule. They noted that achieving such a timeframe against a backdrop of such challenging circumstances is unprecedented and that EPA's assumptions ignore that many of the remaining unretrofitted coal units reflect more site-specific challenges than those that were already retrofitted on a quicker timeframe.

*Response:* EPA reviewed the comments and is making several changes in this final rule to address some of the concerns identified by the commenters. In particular, EPA found that its own review of historical retrofit patterns as well as technical information submitted by commenters supported commenters' concerns regarding: (1) current and anticipated constraints in labor and supply markets, (2) the potential collective capacity levels of SCR retrofit within 36 months, and (3) possible site-specific complexities at the remaining units without an existing SCR. To address these concerns, EPA is phasing in its SCR installation requirement over a 48-month time frame in this final rule, instead of a 36-month time frame as proposed (see additional detail and discussion in section VI.A.2.a and the EGU NO$_X$ Mitigation Strategies Final Rule TSD). EPA will require half of the reductions associated with SCR installation in 2026 and the other half in 2027. Additionally, EPA is moving the daily backstop rate for these units with identified SCR reduction potential from 2027 to no later than 2030, which defers the increased allowance surrender ratio for emissions above the backstop rate at any outlier units unable to complete the retrofit during that time frame. These adjustments continue to incentivize reductions in NO$_X$ emissions by the attainment date that are consistent with cost-effective SCR controls, but provide more flexibility (both from timing and technology perspective) in how they are procured.

Some commenters requested more than 48 months to install SCR controls based on the collective total volume of SCR retrofit volume identified and past projects that took five or more years. EPA disagrees with these comments and finds that they ignored key aspects of the proposed rule. First, the final rule does not directly require implementation of SCR; rather, it requires reductions commensurate with SCR installations based on a rigorous assessment of SCR retrofit potential. Implementing the reductions through a trading program means that sources in many cases, as suggested by the *Regulatory Impact Analysis (RIA),* will find alternative, and more economic means, of reducing emissions—including reduced generation and retirements that are already planned based on the age of the unit, decarbonization goals, or compliance with other Federal/state/local regulation compliance dates. Moreover, the additional new generation incentives provided by the Inflation Reduction Act (enacted after the proposed rule) will further increase the pace of new generation replacing some of the older generating capacity identified as having retrofit potential.[215] In short, although EPA identified the total SCR retrofit capacity potential for today's existing fleet and does not premise any reduction requirements of incremental retirements, the announced and planned futures for these units indicates that many will likely retire instead of installing SCR. For the capacity identified at Step 3 which lacks SCR, the planned or projected retirement in place of a retrofit moots the SCR timing for these units. Moreover, it also reduces the demand for associated labor and materials which, in turn, frees up resources for any units proceeding with a SCR retrofit. Therefore, comments which cite labor and supply chain challenges for accommodating the entire fleet capacity identified as having SCR retrofit potential significantly overstate the supply-side challenge—as it ignores the fact that much of this capacity has explicit or expected operation plans that will result in compliance without a retrofit.

Even for sources choosing a SCR retrofit compliance pathway, many of these comments ignore the timing flexibilities of the trading program, which (particularly with the changes to the backstop daily emissions rate in this final rule) allow sources to temporarily comply through means other than SCR retrofit if they experience any site-specific retrofit limitations that increase their time frame. Also, historical examples of SCR retrofit projects that exceeded 48 months in duration do not necessarily demonstrate that such projects are impossible in less than 48 months, but rather that they can extend beyond the timeframe if no requirements or incentives are in place for a faster installation. Some also cite site-specific conditions that resulted an outlier cases of project timing that would not be representative of the conditions expected at future retrofit projects.[216]

*Comment:* Some stakeholders suggested that EPA's cost estimates of $11,000 per ton are premised on a 15-year book life of the equipment and are therefore too optimistic for units that plan to retire in well under 15 years.

*Response:* EPA analysis of SCR retrofit cost reflects a representative value for the technology based on a weighted average cost. The underlying data and the discussion in the EGU NO$_X$ Mitigation Strategies Final TSD illustrates that these costs can vary significantly at the unit level based on factors such as the length of time a pollution control technology would be in operation, the capacity factor of the unit (*i.e.,* how much does it operate), its size or potential to emit, and its baseline emissions rate. The EPA has not in prior transport rulemakings used such factors as justification to excuse any source that is significantly contributing to nonattainment or interfering with maintenance in another state from eliminating that significant contribution as expeditiously as practicable. Unlike under other statutory provisions that may require retrofit of emissions controls on existing sources, such as under CAA section 111(d) or CAA section 169A, there is no remaining useful life factor expressly identified as a justification to relax the requirements of CAA section 110(a)(2)(D)(i)(I). EPA continues to believe that where an emissions control strategy has been identified at Step 3 that is cost-effective on a regional scale and provides meaningful downwind air quality improvement, and is thus appropriately identified as necessary to eliminate significant contribution under the good neighbor provision, it would not be appropriate to allow emissions to continue in excess of those achievable emissions reductions beyond the timeframe for expeditious implementation of reductions as provided under the larger title I structure of the Act for attaining and maintaining the NAAQS. The court in *Wisconsin* recognized that where such emissions have been identified, they should be eliminated as expeditiously as practicable, and in line with the

---

[215] *See* "Regulatory Impact Analysis for 2015 Good Neighbor Plan, Appendix 4A: Inflation Reduction Act EGU Sensitivity Run Results." EPA estimated the compliance costs and emissions changes of the final rule in the presence of the IRA, but given time and resource constraints, did not quantify benefits for this sensitivity.

[216] Commenters, for example, cited the timing of SCR installation at Sammis 6 and 7. Here, the SCR design and material delivery schedule were tailored to meet unique site conditions that were unlike many other SCR systems where large modules can be used to maximize shop and ground assembly techniques. Additional information is available at *https://www.babcock.com/home/about/resources/success-stories/sammis-plant.*

attainment schedule for downwind areas, which, for the 2015 ozone NAAQS, is provided in CAA section 181. 938 F.3d at 313–20.

Further, EPA observes that more than one-third of the identified SCR retrofit potential (in terms of generating capacity) has no planned retirement date within 15 years, and therefore the cost of pollution control technology on such units would likely be lower, holding all other parameters equal, on a dollar per ton basis by virtue of the length of time the pollution control equipment may be in operation. Nor does EPA agree that units that would retire in less than 15 years should automatically be considered to face an unreasonably higher cost burden. Based on data analyzed in the EGU $NO_X$ Mitigation Strategies Final Rule TSD, we find that the cost per ton associated with SCR retrofit technology does not begin to increase significantly above the $11,000/ton benchmark unless units have dramatically lower operating capacity or retire in less than 5 years' time—as illustrated in Figure 1 to section V.B.1.e of this document.

**Figure 1 to section V.B.1.e: SCR Retrofit Cost Weighted Average $/ton vs Debt Life[217]**



Finally, EPA's identification of this mitigation strategy is not meant to be limited only to units that experience a retrofit cost that is less than the representative cost threshold. First, that threshold represents an average, meaning that EPA's analysis already recognizes that some units on a facility-specific basis may face costs higher than that threshold. Further, EPA identifies this technology as widely available, implemented in practice already at many existing EGUs, and now standard for any coal-fired unit coming online in the past 25 years. More than 66 percent of the current large coal fleet already has such controls in place. Even if the cost were higher for some units for the reasons provided by commenters—and

there were no less costly means provided to them to achieve the same level of emissions reduction (which the trading program allows for)—that would not necessarily obviate EPA's basis for finding that an emissions-reduction requirement commensurate with this standard pollution control practice for this unit type is warranted. The implementation of emissions reductions through a trading program, and its corresponding compliance flexibilities, make the use of a single representative cost all the more appropriate in this assessment. Therefore, upon reviewing all of the data including the information supplied by commenters, and even accounting for certain units' announced plans to retire earlier than an assumed 15-year book life for SCR retrofit technology, EPA finds its representative

cost for this technology to be appropriate and reasonable for purposes of analysis under CAA section 110(a)(2)(D)(i)(I) and maintains this cost estimate in the final rule.

However, in recognition of the unique circumstances related to the transition of the power sector away from coal-fired and other high-$NO_X$ emitting fuels and generating technologies, which is anticipated to accelerate in the late 2020s and into the 2030s, EPA has adjusted the final rule to avoid imposing a capital-intensive control technology retrofit obligation which could have overall net-negative environmental consequences (*e.g.,* by extending the life of a higher-emitting EGU or necessitating the allocation of material and personnel that could be used for more advanced clean-technology

[217] "Debt Life" refers to the term length, or duration, for a loan used to finance the retrofit.

innovations). For units that plan to retire by 2030, the final rule—by extending the daily backstop rate to 2030—allows these units to continue to operate, so long as they comply with the mass-based emissions trading program requirements.[218] Therefore, a unit experiencing a higher dollar per ton retrofit cost due to retirement plans has the flexibility to install less capital intensive controls such as SNCR, procure less costly allowances through either banking or purchase, or they may also reduce their allowance holding requirement through reduced utilization consistent with their phasing out towards a planned retirement date. This flexibility that EPA has included in the final rule is discussed in further detail in section VI.B of this document.

*Comment:* Some commenters suggested that the 0.05 lb/mmBtu emissions rate assumed for new SCRs at large coal units is not achievable at all coal units with retrofit potential and that EPA should raise this performance assumption to a value of 0.08 lb/mmBtu consistent with that assumption for existing SCRs.

*Response:* First, EPA believes the commenter misunderstands its intention with the 0.05 lb/mmBtu SCR rate assumption. This is meant to reflect a representative assumption for emissions rate performance for new SCR installed on the currently unretrofitted coal fleet—in this respect, it represents an average, not a maximum. EPA recognizes that some units will likely perform better (*i.e.,* lower) than this rate and some will potentially perform worse (*i.e.,* higher) than this rate—but that 0.05 lb/mmBtu is a reasonable representation of new SCR retrofit potential on a fleet-wide basis and for identifying expected state and regional emissions reduction potential from this technology. It would be inappropriate for EPA to use the worst performing tier of new SCR retrofit for this representative value. Moreover, EPA's review of historical environmental performance for recently installed SCRs does not support any indication that 0.05 is not representative of the retrofit potential for the fleet. EPA found that three quarters of the SCR retrofit projects completed in the last 15 years have achieved a rate of 0.05 lb/mmBtu or better on a monthly or seasonal basis. Moreover, its review of the engineering literature and consultation with third party pollution control engineering consultancies suggests that vendors are

often willing to guarantee 0.05 lb/mmBtu seasonal performance for new SCR retrofit projects. Current SCR catalyst suppliers provide $NO_X$ emissions warranties based at the catalyst's end-of-life period, often after 16,000 to 24,000 hours of operations, with newer catalyst achieving similar or better $NO_X$ removal rates. Standard commercial terms, made by the purchaser to the SCR Retrofit supplier, can specify a system capable of meeting the proposed $NO_X$ emissions rate and define the catalyst operational life before replacement. Thus, achieving the proposed reduction rates is accomplished through the buyer specifying the SCR retrofit requirements and the supplier providing an optimized system design and installing sufficient catalyst for the targeted end-of-life $NO_X$ emissions rate. The agency is confident that SCR retrofit suppliers will be able to warrant their offerings for the emissions rates proposed in the regulation and to provide sufficient operating life for the affected sector.

*Comment:* Some commenters suggest that the evaluation of pollution control installation cost at Step 3 should be segmented depending on unit characteristics, and by failing to do so understate the cost of retrofitting SCR controls. In particular, these commenters note that units with lower capacity factors, different coal ranks, with pre-existing controls—such as SNCR—face substantially higher dollar per ton reduced costs than those that do not have such controls in place and should not be identified as a cost-effective mitigation strategy.

*Response:* Consistent with prior CSAPR rulemakings, at Step 3 EPA evaluates a mitigation technology and its representative cost and performance for the fleet on average. This representative cost is inclusive and robust to the portion of the fleet that may face higher dollar per ton cost. Both the "Technical Support Document (TSD) for the Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard, Docket ID No. EPA–HQ–OAR–2021–0668, EGU $NO_X$ Mitigation Strategies Proposed Rule TSD" (Feb. 2022), hereinafter referred to as the EGU $NO_X$ Mitigation Strategies Proposed Rule TSD, and the EGU $NO_X$ Mitigation Strategies Final Rule TSD discuss the SCR retrofit cost specific to the segment of the fleet that has a SNCR in place and notes that those unit-level higher retrofit cost estimates are factored into its determination of the fleet-wide representative number. Although EPA believes its representative cost are

appropriate and underpinned by operating assumptions reflective of the fleet averages, it nevertheless examined how cost would vary based on some of the variables highlighted by commenter. The EPA derived its capacity factor assumption based on expected future operations of this fleet segment that are inclusive of units operating at a range of capacity factors. It also examined how cost would change assuming different coal rank, assuming different book life, and different reagent cost. These analyses are discussed and shown in Appendix B of the EGU $NO_X$ Mitigations Strategies Final Rule TSD and demonstrate that even under different operating assumptions, the variation in cost does not reach a point that would reverse EPA's finding regarding the appropriateness of this technology as part of this final rule's control stringency. Moreover, as discussed in section V.D of this document, EPA identifies appropriate mitigation strategies based on multiple factors—not solely on cost, and there is no indication that an individual unit's higher retrofit cost would obviate the appropriateness of retrofitting this standard and best practice technology at the unit. Finally, in prior rules and in the proposal, EPA recognized that some units will have higher cost and some will have lower cost relative the fleetwide representative value provided. Implementing the region and state reduction requirements through a mass-based emissions trading program provides a means of alternative lower cost compliance for those sources particularly concerned about the higher retrofit cost at their unit.

*Comment:* Some commenters suggested that EPA's proposed representative cost for SCR pollution control is likely too high and overstates the true cost of such control. They also noted it aligns with agency precedent. These commenters claim that EPA's cost recovery factor is higher than necessary (thus inflating the cost) as it reflects a weighting of utility-owned to merchant-owned plants that is representative of the fleet, but not the unretrofitted fleet with this retrofit potential identified in this rule. They also noted that EPA's assumed interest rate informing the cost estimate was higher than the prime rate in June of 2022.

*Response:* EPA agrees that its approach for identifying representative cost thresholds is aligned with prior rules and agrees that its approach is reasonable. As the commenter points out, prime rates and cost recovery factors may indeed be lower in recent data than those assumed by EPA for future years. However, given the

---

[218] In the RIA, EPA has modeled the mass-based budgets that are premised on retrofit of SCR technology with the option of complying through other strategies, and finds that they are readily achievable through those other strategies.

volatility among these metrics, EPA believes its choices are appropriate to build cost estimates that are robust to future uncertainty, and if these cost input factors do materialize to be the lower values highlighted by commenter, then it will result in a lower cost assumed in this final rule, but would not otherwise alter any of the stringency identification or regulatory findings put forward in this final rule. EPA performed a cost sensitivity analysis in Appendix B of the EGU NO$_X$ Mitigation Strategies Final Rule TSD which shows how cost for this technology would vary based on different assumed levels for this variable. This analysis shows that under lower interest rates such as those put forward by commenter, that technology cost would drop by approximately 15 percent relative to the representative values put forward in this rule.

f. Generation Shifting

At proposal, EPA considered intrastate emissions reduction potential from generation shifting across the representative dollar per ton levels estimated for the emissions controls considered in previous sections. As the cost of emitting NO$_X$ increases, it becomes increasingly cost-effective for units with lower NO$_X$ rates to increase generation, while units with higher NO$_X$ rates reduce generation. Because the cost of generation is unit-specific, this generation shifting occurs incrementally on a continuum. Consequently, there is more generation shifting at higher cost NO$_X$-control levels.

The EPA recognizes that imposing a NO$_X$-control requirement on affected EGUs, like any environmental regulation, internalizes the cost of their pollution, which could result in generation shifting away from those sources toward other generators offering electricity at a lower pollution cost. If, in the context of a market-based allowance trading program form of implementation, the EPA imposes a preset emissions budget that is premised only on assumed installation, optimization, and continued operation of unit-specific pollution control technologies, with no accounting for the likely generation shift in the marketplace away from these higher-polluting sources, that preset emissions budget will contain more tons than would be emitted if the affected EGUs achieved the emissions performance level (on a rate basis) selected at step 3. Hence, EPA has previously quantified and required expected emissions reductions from generation shifting in prior transport rules to avoid undermining the program's incentive to install, optimize, and operate controls identified in the Agency's determinations regarding the requisite level of emissions control at Step 3. *See, e.g.,* 81 FR 74544–45; 76 FR 48280.

As in these prior rules, at proposal, the EPA did not identify generation shifting as a primary mitigation strategy and stringency measure on its own, but included emissions reductions from this strategy as it would be projected to occur in response to the selected emissions control stringency levels (and corresponding allowance price signals in step 4 implementation). For this rule's proposal, the EPA only specified emissions reductions from generation shifting in its preset budget calculations for 2023 and 2024. Because this rule's dynamic budget methodology applies the selected control stringency's emissions rates to the most recently reported heat input at each affected EGU, dynamic budgeting effectively serves a similar purpose to our ex ante quantification of emissions reduction potential from generation shifting for preset budgets in prior transport rules, *i.e.,* to adequately and continuously incentivize the implementation of the emissions control strategies selected at Step 3. Therefore, dynamic budgets under this rule's program moot the need to specify discrete emissions reduction potential from generation shifting for those control periods, as they automatically reflect whatever generation balance affected EGUs would determine in the marketplace inclusive of their response to the emissions performance levels imposed by this rule.

*Comment:* Commenters offered both support for and opposition against the inclusion of generation shifting at Step 3 analysis for EGUs. Those in support noted that inclusion of emissions reductions from generation-shifting is integral to the successful implementation of the pollution control measures identified in the selected control stringency at Step 3. Those opposed generally argued the EPA was overestimating reduction potential from generation shifting in light of recent volatility and high prices in the markets for lower emitting fuels such as natural gas. Commenters also noted the electrical grid in certain regions has constraints that would make generation shifting more difficult than the EPA assumed. Commenters also asserted that the EPA did not have the legal authority to require generation shifting.

*Response:* The EPA disagrees with these comments regarding our legal authority but notes this issue is not relevant for purposes of this final action. The EPA continues to believe it has authority under CAA section 110(a)(2)(D)(i)(I) to consider and require emissions reductions from generation shifting if the EPA were to find that strategy was necessary to eliminate significant contribution. However, based on circumstances currently facing affected EGUs, as well as the inherent strength of the dynamic budget methodology to automatically reflect the market-determined balance of generation across sources responding to this rule, the EPA is not specifying emissions reduction potential from generation shifting as a part of the Step 3 analysis, nor to require any emissions reductions from generation shifting in preset budgets formulated under Step 4 for any control period, for this final rule.

Currently observable market conditions (*e.g.,* fuel prices) present unusual uncertainty with respect to key economic drivers of generation shifting. The availability of emissions reductions through generation shifting, and the magnitude of those emissions, is dependent on the availability and cost of substitute generation. The primary driver of near-term generation shifting-based emissions reductions has been shifting to lower-emitting natural gas generation. Recent volatility and high prices in the natural gas market have increased the uncertainty and reduced the potential of this emissions control strategy at any given cost threshold in the near term. For example, Henry Hub natural gas prices went from under $3.00/mmBtu during most of the last decade to an average of nearly $8.00/mmBtu for the most recent (2022) ozone season before declining sharply at the start of 2023. The current volatility in natural gas prices reduces the availability of emissions reductions from generation shifting and make its identification and quantification too uncertain for incorporation into Step 3 emissions reduction estimates for this rulemaking.

The Step 4 dynamic budget-setting process of this rule obviates the need to specify and require discrete emissions reductions from generation shifting under Step 3. As discussed in section VI of this document, the EPA in this final rule will implement a budget-setting approach that relies on two components: first, we have calculated "preset" budgets that reflect the best information currently available about fleet change over the period 2023 through 2029. Second, beginning in 2026, dynamic state emissions budgets will be calculated that will reflect the balance of generation across sources reported to EPA by EGU operators. Between 2026 and 2029, the actual budget that will be implemented will

reflect the greater of either the preset budget or the dynamic budget calculation; from 2030 onwards, the budgets will be set only through the dynamic budget calculation. This overall approach is well suited for a period of significant power sector transition driven by a variety of economic, policy, and regulatory forces and allows for the balance of generation in this period to adjust in response to these forces while nonetheless ensuring that the budgets will continuously incentivize the emissions control stringency identified at Step 3. See section VI.B.4 of this document for further discussion on the interaction of preset and dynamic budgets during the 2026–2029 time period. With these approaches, and on the present record before the Agency, we conclude that the estimation and incorporation of specified emissions reductions from generation shifting at Step 3 is not necessary to eliminate significant contribution from EGUs for the 2015 ozone NAAQS through this rule's program implementation.

In previous CSAPR rulemakings, the EPA included generation shifting in the budget setting process to capture those reductions that would occur through shifting generation as an economic response to the control stringency determined based on the selected NOₓ control strategies. *See, e.g.,* 81 FR 74544–45. "Because we have identified discrete cost thresholds resulting from the full implementation of particular types of emissions controls, it is reasonable to simultaneously quantify the reduction potential from generation shifting strategy at each cost level. Including these reductions is important, ensuring that other cost-effective reductions (*e.g.,* fully operating controls) can be expected to occur." EGU NOₓ Mitigation Strategies Final Rule TSD (EPA–HQ–OAR–2015–0500– 0554), at 11–12.

Commenters on this rule and prior transport rules have observed that using preset budgets to factor in generation shifting is flawed in that it results in EPA incorporating specific quantities of emissions reductions from discrete levels of generation shifting that are projected to occur but may in fact ultimately transpire differently in the marketplace. Commenters on this rule claim that other variables, such as constraints in transmission capacity or changes in fuel prices, can drive such differences in projected versus realized generation shifting, and these concerns are particularly exacerbated in a time of significant uncertainty around energy supplies and markets together with new laws passed by Congress (*e.g.,* the

Infrastructure Investment and Jobs Act and the Inflation Reduction Act) driving the current transformation of the power sector. By refraining in this rule from specifying discrete emissions reductions from generation shifting in preset budgets and instead relying on a dynamic budgeting approach to reflect market-driven generation patterns, EPA ensures that its budgets remain sufficiently stringent over the long term to continually incentivize the emissions control stringency it determined to be cost-effective and therefore appropriate to eliminate significant contribution at Step 3. Thus, dynamic budgeting addresses the same concern that animated our use of generation shifting in the CSAPR rulemakings, but in doing so uses a market-following approach that will accommodate, over the long term, unforeseen drops or increases in heat input levels.

g. Other EGU Mitigation Measures

The EPA requested comment on whether other EGU ozone-season NOₓ Mitigation technologies should be required to eliminate significant contribution. For instance, the EGU NOₓ Mitigation Strategies Proposed and Final Rule TSDs discussed certain mitigation technologies that have been applied to "peaking" units (small, low-capacity factor gas combustion turbines often only operating during periods of peak demand).

*Comment:* Some commenters emphasized that simple cycle combustion turbines play a significant role in downwind contribution, and they highlight that states such as New York have imposed emissions limits on these sources acknowledging their impact on downwind nonattainment. These commenters suggest that EPA pursue and expedite the implementation of these or similar mitigation measures.

*Response:* As explained in greater detail in the EGU NOₓ Mitigation Strategies Final TSD, both the configuration and operation of this segment of the EGU fleet reflects significant variability among units and across time. In other words, one unit may have a capacity factor in a given year that is one hundred times greater than a similar unit in that same year, or even than its own capacity factor from a preceding year. This type of variability and heterogeneity make it unlikely that there is a single cost-effective control strategy across this fleet segment, and commenters did not provide evidence to the contrary. EPA's analysis discussed in the EGU NOₓ Mitigation Strategies Final Rule TSD highlights that there are 32 units emitting more than 10 tons per

year on average for the 2019–2021 ozone seasons and lacking combustion controls or more advanced controls (totaling approximately 1,000 tons of ozone season NOₓ emissions in 2021). EPA analysis estimates a representative cost of $22,000 per ton for dry low NOₓ burners or ultra-low NOₓ burners at these simple cycle combustion turbines, and over $100,000 per ton for SCR retrofit at some combustion turbines. Therefore, EPA does not identify any such control mitigation measure at Step 3 when estimating reduction potential.

Nonetheless, the EPA recognizes that these simple cycle combustion turbines may have cost-effective emissions-reduction opportunities. These units are included in the emissions trading program and therefore, as in prior transport rules, the program continues to subject them to an allowance holding requirement under this rule which will likely incentivize any available cost-effective NOₓ reductions from these EGUs. For instance, emissions rates from these units in New York were considerably lower in 2022, when they faced a high allowance price, versus 2021, when the allowance price was much lower. Therefore, we find that the appropriate treatment of these units in this final rule is to continue to include them in the emissions trading program to incentivize cost-effective emissions reductions, but EPA does not find the magnitude or consistency of cost-effective mitigation potential to establish a specific increment of emissions reduction through a specific Step 3 emissions control determination. Moreover, while EPA's program will incentivize any available cost-effective reductions within this cadre of units (and such behavior is captured in its final program evaluation and modeling the *RIA*), it does not obviate the need for the other EGU cost-effective reductions elsewhere as suggested by some commenters.

2. Non-EGU or Stationary Industrial Source NOₓ Mitigation Strategies

In the early stages of preparing the proposed FIP, the EPA evaluated air quality modeling information, annual emissions, and information about potential controls to determine which industries, beyond the power sector, could have the greatest impact on downwind receptors' air quality and therefore the greatest impact in providing ozone air quality improvements in affected downwind states through reducing those emissions. Specifically, the EPA conducted a screening assessment focused on individual emissions units with >100

tpy of actual NO$_X$ emissions in 23 upwind states. Once the industries were identified, the EPA used its Control Strategy Tool to identify potential emissions units and control measures and to estimate emissions reductions and compliance costs associated with application of non-EGU emissions control measures. The technical memorandum "Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026" ("Non-EGU Screening Assessment" or "screening assessment") lays out the analytical framework and data used to prepare proxy estimates for 2026 of potentially affected non-EGU facilities and emissions units, emissions reductions, and costs.[219]

This screening assessment was not intended to identify the specific emissions units subject to the proposed emissions limits for non-EGU sources but was intended to inform the development of the proposed rule by identifying proxies for (1) non-EGU emissions units that potentially had the most impact in terms of the magnitude of emissions and potential for emissions reductions, (2) potential controls for and emissions reductions from these emissions units, and (3) control costs from the potential controls on these emissions units. This information helped shape the proposed rule.

To further evaluate the industries and emissions unit types identified by the screening assessment and to establish the applicability criteria and proposed emissions limits, the EPA reviewed RACT rules, NSPS rules, NESHAP rules, existing technical studies, rules in approved SIP submittals, consent decrees, and permit limits. That evaluation is detailed in the Proposed Non-EGU Sectors TSD prepared for the proposed FIP.[220]

In this final rule, for purposes of this part of the Step 3 analysis, the EPA is retaining emissions control requirements for these industries and many of the emissions unit types included in the proposal. However, based on comments that credibly indicated in certain cases that emissions reduction opportunities are either not available for certain unit types or are at costs that are far greater than the EPA estimated at proposal, the EPA has changed the final rule to either remove or adjust the applicability criteria for such units. For a detailed discussion of

the changes between the proposed FIP and this final rule, in emissions unit types included and in emissions limits, see section VI.C of this document. Tables I.B–2 through I.B–7 in section I.B of this document identify the emissions units and applicable emissions limitations, and Table II.A–1 in section II.A of this document identifies the industries included in the final rule.

For the final rule, to determine NO$_X$ emissions reduction potential for the non-EGU industries and emissions unit types, with the exception of Solid Waste Combustors and Incinerators, we used a 2019 inventory prepared from the emissions inventory system (EIS) to estimate a list of emissions units captured by the applicability criteria for the final rule. For Solid Waste Combustors and Incinerators, the EPA estimated the list of covered units using the 2019 inventory, as well as the NEEDS-v6-summer-2021-reference-case workbook.[221] Based on the review of RACT, NSPS, NESHAP rules, as well as SIPs, consent decrees, and permits, we also assumed certain control technologies could meet the final emissions limits.[222] We did not run the Control Strategy Tool to estimate emissions reductions and costs and instead programmed the assessment using R.[223] Using the list of emissions units estimated to be captured by the final rule applicability criteria, the assumed control technologies that would meet the emissions limits, and information on control efficiencies and default cost/ton values from the control measures database (CMDB)[224] the EPA estimated NO$_X$ emissions reductions and costs for the year 2026. We estimated emissions reductions using the actual emissions from the 2019 emissions inventory. In the assessment, we matched emissions units by Source Classification Code (SCC) from the inventory to the applicable control technologies in the CMDB. We modified SCC codes as necessary to match control technologies to inventory records.

The EPA recognized both at proposal and in the final rule that the cost per ton of emissions controls could vary by industry and by facility. The $7,500

marginal cost/ton threshold reflected in the Non-EGU Screening Assessment functioned as a relative, representative cost/ton level. Similar to the role of cost-effectiveness thresholds the EPA uses at Step 3 to evaluate EGU emissions control opportunities, this threshold is not intended to represent the maximum cost any facility may need to expend but is rather intended to be a representative figure for evaluating technologies to allow for a relative comparison between different levels of control stringency. The value was used to identify potentially cost-effective controls for further evaluation.

In the final rule, partly in recognition of the many comments indicating widely varying cost-per-ton values across industries and facilities, the EPA has updated its analysis of costs for the covered non-EGU industries. This data is summarized in the Technical Memorandum "Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Units, Emissions Reductions, and Costs," available in the docket. We further respond to comments on the screening assessment in section 2.2 of the response to comments document.

3. Other Stationary Sources NO$_X$ Mitigation Strategies

As part of its analysis for this final rule, the EPA also reviewed whether NO$_X$ mitigation strategies for any other stationary sources may be appropriate. In this section, the EPA discusses three classes of units that have historically been excluded from our interstate air transport programs: (1) solid waste incineration units, (2) electric generating units less than or equal to 25 MW, and (3) cogeneration units. EPA's initial assessment did not lead it to propose inclusion of the units in these categories. However, EPA requested comment on whether any particular units within this category may offer cost-effective reduction potential.

Based on our request for comment, comments received, and our further evaluation, the EPA is including emissions limits and associated control requirements for the ozone season for solid waste incinerator units in this final rule, in line with the requirements we laid out for comment at proposal. Our analysis in this final rule confirms that these units have emissions reductions of a magnitude, degree of beneficial impact, and cost-effectiveness that is on par with the units in other industrial sectors included in this final rule.

---

[219] The memorandum is available in the docket here: *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0150*.

[220] The TSD for the proposed FIP is available in the docket here: *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0145*.

[221] The workbook is available here: *https://www.epa.gov/power-sector-modeling/national-electric-energy-data-system-needs-v6*.

[222] The Final Non-EGU Sectors TSD is available in the docket.

[223] R is a free software environment for statistical computing and graphics. Additional information is available here: *https://www.r-project.org/*.

[224] More information about the Control Strategy Tool (CoST) and the control measures database (CMDB) can be found at the following link: *https://www.epa.gov/economic-and-cost-analysis-air-pollution-regulations/cost-analysis-modelstools-air-pollution*.

For electric generating units less than 25 MW and cogeneration units previously exempted from EGU emissions budgets established through ozone interstate transport rules, the EPA has determined that these units should not be treated as EGUs in this final rule.

The EPA provides a summary of these three segments, their emissions control opportunities, and potential air quality benefits in the following sections. Additional considerations are further discussed in the EGU NO$_X$ Mitigation Strategies Final TSD and in the *RTC Document*.

a. Municipal Solid Waste Units

At proposal, the EPA solicited comments on whether NO$_X$ emissions reductions should be sought from municipal waste combustors (MWCs) to address interstate ozone transport, specifically on potential emissions limits, control technologies, and control costs. The EPA requested comment on emissions limits of 105 ppmvd on a 30-day rolling average and a 110 ppmvd on a 24-hour block average based on determinations made in the June 2021 Ozone Transport Commission (OTC) *Municipal Waste Combustor Workgroup Report* (OTC MWC Report). *See* 87 FR 20085–20086. The OTC MWC Report found that MWCs in the Ozone Transport Region (OTR) are a significant source of NO$_X$ emissions and that significant annual NO$_X$ reductions could be achieved from MWCs in the OTR using several different technologies, or combination of technologies at a reasonable cost. The OTC MWC report is included in the docket for this action.

*Comment:* The EPA received multiple comments supporting the inclusion of emissions limits for MWCs in the final rule. Commenters noted that MWCs are significant sources of NO$_X$ that contribute to ozone problems in the states covered by the proposal. Multiple commenters referenced the OTC MWC report to contend that NO$_X$ emissions from MWCs could be significantly reduced at a reasonable cost. Some commenters reasoned that sources closer to downwind monitors, including MWCs, should be regulated as a more targeted approach and a means to prevent overcontrol of upwind sources. Commenters also noted that the OTC recently signed a memorandum of understanding (MOU) requesting that OTC member states develop cost effective solutions and select the strategy or combination of strategies, as necessary and appropriate, that provides both the maximum certainty and flexibility for that state and its MWCs. Additionally, multiple commenters

noted that MWCs are often located in economically marginalized communities or communities of color. Lastly, one commenter stated that MWCs were arbitrarily excluded from the non-EGU screening assessment prepared for the proposal.

*Response:* As described in section VI.B.2 of the notice of proposed rulemaking, the EPA assessed emissions reduction potential from non-EGUs by preparing a screening assessment to identify those industries that could have the greatest air quality impact at downwind receptors. While the EPA did not prepare an updated non-EGU screening assessment in preparation for this final rule, the Agency did evaluate MWCs using the criteria developed in the screening assessment for proposal and determined that MWCs should be included in this rulemaking. A discussion of this analysis for MWCs is available in the *Municipal Waste Combustor Supplement to February 28, 2022 Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026*, which is available in the docket for this final rule.

Considering EPA's conclusion that MWCs should be included in this final rule if EPA applied the same criteria developed in the screening assessment for proposal, the findings from the OTC MWC report and recent MOU, the fact that many state RACT NO$_X$ rules apply to MWCs, and information received during public comment, the EPA finds that MWCs should be included in this final rule. Thus, the EPA is finalizing NO$_X$ emissions limits and compliance assurance requirements for large MWCs as defined in the regulatory text at § 52.46 and as described in this section.

*Comment:* Some commenters did not support the inclusion of emissions limits for MWCs in the final rule. Some commenters suggested that the inclusion of NO$_X$ limits in a FIP is not necessary to continue to reduce NO$_X$ emissions from MWCs or to address interstate transport problems. Some commenters noted that many of the MWCs in the states covered by the proposal are already subject to RACT-based NO$_X$ emissions limits that are below the current Federal NSPS NO$_X$ emissions limits for MWCs under 40 CFR part 60, subparts Cb and Eb. One commenter noted that MWCs do not always account for a large percentage of statewide NO$_X$ emissions. Others suggested that voluntary industry actions are also driving downward trends of NO$_X$ emissions for some MWCs. Some commenters also asserted that regulation could interfere with state

waste reduction policies and associated environmental considerations.

*Response:* Regarding the comments that some MWCs are already subject to RACT NO$_X$ emissions limits, the EPA acknowledges that some states included in this rulemaking have promulgated RACT NO$_X$ emissions limits that apply to certain MWCs, including some that are lower than current MWC NSPS NO$_X$ emissions limits. The EPA does not consider a source to be exempt from this rulemaking just because the source may be subject to other regulatory requirements. As noted, the Agency did evaluate MWCs using the criteria developed in the screening assessment for proposal and has concluded that MWCs should be included in this rulemaking. In considering the emissions limits that are being finalized in this rulemaking, the EPA reviewed existing state RACT rules as described in section VI.C.6 of this document and the "Technical Support Document (TSD) for the Final Rule, Docket ID No. EPA–HQ–OAR–2021–0668, Non-EGU Sectors TSD" (Mar. 2023), hereinafter referred to as Final Non-EGU Sectors TSD. We note that sources already subject to RACT NO$_X$ emissions limits that are equal to or more stringent than the limits finalized in this rulemaking will have the option to streamline regulatory requirements through the Title V permitting process.

Regarding the statement that regulation could interfere with state waste reduction policies and associated environmental considerations, the EPA acknowledges that MWCs serve an important role in municipal solid waste management programs, and that many function as cogeneration facilities that produce electrical power for the power grid. The EPA also analyzed control costs and determined that the required NO$_X$ emissions limits for MWCs can be achieved at a reasonable cost, as described in section VI.C.6 of this document, the Final Non-EGU Sectors TSD, and the OTC MWC Report. Although the EPA does not expect these regulations to disrupt the ability of the industry to provide municipal solid waste and electric services, to the extent a facility is unable to comply with the standards due to technical impossibility or extreme economic hardship, the final rule includes provisions for facility operators to apply for a case-by-case alternative emissions limit. *See* section VI.C of this document and 40 CFR 52.40(d). In addition, for MWC facilities that are unable to comply with the standard by the 2026 ozone season, the final rule includes provisions for requesting limited extensions of time to

comply. *See* section VI.C and 40 CFR 52.40(c).

**b. Electric Generating Units Less Than or Equal to 25 MW**

The EPA has historically not included control requirements for emissions for electric generating units less than or equal to 25 MW of generation for three primary reasons: low potential reductions, relatively high cost per ton of reduction, and high monitoring and other compliance burdens. In the January 11, 1993, Acid Rain permitting rule, the EPA provided for a conditional exemption from the emissions reduction, emitting, and emissions monitoring requirements of the Acid Rain Program for new units having a nameplate capacity of 25 MWe or less that burn fuels with a sulfur content no greater than 0.05 percent by weight, because of the *de minimis* nature of their potential $SO_2$, $CO_2$ and $NO_X$ emissions. *See* 63 FR 57484. The $NO_X$ SIP Call identified these as *Small Point Sources.* For the purposes of that rulemaking, the EPA considered electricity generating boilers and turbines serving a generator 25 MWe or less, to be small point sources. The EPA noted that the collective emissions from small sources were relatively small and the administrative burden to the states and regulated entities of controlling such sources were likely to be considerable. As a result, the rule did not assume reductions from those sources in state emissions budgets requirements (63 FR 57402). Similar size thresholds have been incorporated in subsequent transport programs such as CAIR and CSAPR. As these sources were not identified as having cost-effective reductions and so were not included in those programs, they were also exempted from current reporting requirements and the data for these sources is, therefore, not of the same caliber as that of covered larger sources.

EPA's preliminary survey of current data, compared to this initial justification, does not appear to offer a compelling reason to depart from this past practice by requiring emissions reductions from these small EGU sources as part of this rule. For instance, as explained in the EGU $NO_X$ Mitigation Strategies Final Rule TSD, EPA has evaluated the costs of SCR retrofits at small EGUs using its Retrofit Cost Analyzer and found that such controls become markedly less cost-effective at lower levels of generating capacity. This analysis concluded that, after controlling for all other unit characteristics, the dollar per ton cost for a SCR retrofit increases by about a factor of 2.5 when moving from a 500 MW to a 10 MW unit, and a factor of 8 when moving to a 1 MW unit.[225] Moreover, the EPA estimates that under 6 percent of nationwide EGU emissions come from units that are less than 25 MW and not covered by current applicability criteria due to this size exemption threshold. Therefore, the EPA is not finalizing any emissions reductions for these units.

*Comment:* EPA received comment supporting the continued application of the 25 MW threshold.

*Response:* Consistent with prior rules, the proposal, and stakeholder comment, EPA is continuing to apply its 25 MW applicability threshold for EGUs in this rulemaking. EPA did not find compelling comment to reverse its determination that (1) these sources offer low potential reductions, (2) have relatively high cost per ton, and (3) have high monitoring and other compliance burdens.

**c. Cogeneration Units**

Consistent with prior transport rules, fossil fuel-fired boilers and combustion turbines that produce both electricity and useful thermal energy (generally referred to as "cogeneration units") and that meet the applicability criteria to be included in the CSAPR $NO_X$ Ozone Season Group 3 Trading Program would be subject to the emissions reduction requirements established in this rulemaking for EGUs. However, those applicability criteria—which the EPA is not altering in this rulemaking (*see* section VI.B.3 of this document)— exempt some cogeneration units from coverage as EGUs under the trading program. The EPA is finalizing that fossil fuel-fired boilers and combustion turbines that produce both electricity and useful thermal energy and that do not meet the applicability criteria to be included in the CSAPR $NO_X$ Ozone Season Group 3 Trading Program as EGUs would not be subject to the Group 3 emissions trading program. However, to the extent a cogeneration unit meets the applicability criteria for industrial non-EGU boilers covered by this rule, that unit will be subject to the relevant requirements and is not exempted by virtue of being a cogeneration unit.

According to information contained in the EPA's Combined Heat and Power Partnership's document "Catalog of CHP Technologies",[226] there are 4,226 CHP installations in the U.S. providing 83,317 MWe of electrical capacity. Over 99 percent of the installations are powered by 5 equipment types, those being reciprocating engines (52 percent), boilers/steam turbines (17 percent), gas turbines (16 percent), microturbines (8 percent), and fuel cells (4 percent). The majority of the electrical capacity is provided by gas turbine CHP systems (64 percent) and boiler/steam turbine CHP systems (32 percent). The various CHP technologies described herewith are available in a large range of sizes, from as small as 1 kilowatt reciprocating engine systems to as large as 300 megawatt gas turbine powered systems.

$NO_X$ emissions from rich burn reciprocating engine, gas turbine, and microturbine systems are low, ranging from 0.013 to 0.05 lb/mmBtu. $NO_X$ emissions from lean burn reciprocating engine systems and gas-powered steam turbines systems range from 0.1 to 0.2 lb/mmBtu. The highest $NO_X$ emitting CHP units are solid fuel-fired boiler/steam turbine systems which emit $NO_X$ at rates ranging from 0.2 to 1.2 lb/mmBtu.

Under the final rule (consistent with prior CSAPR rulemakings), certain cogeneration units would be exempt from coverage under the CSAPR $NO_X$ Ozone Season Group 3 Trading Program as EGUs. Specifically, the trading program regulations include an exemption for a unit that qualifies as a cogeneration unit throughout the later of 2005 or the first 12 months during which the unit first produces electricity and continues to qualify through each calendar year ending after the later of 2005 or that 12-month period and that meets the limitation on electricity sales to the grid. To meet the trading program's definition of "cogeneration unit" under the regulations, a unit (*i.e.,* a fossil fuel-fired boiler or combustion turbine) must be a topping-cycle or bottoming-cycle type that operates as part of a "cogeneration system." A cogeneration system is defined as an integrated group of equipment at a source (including a boiler, or combustion turbine, and a generator) designed to produce useful thermal energy for industrial, commercial, heating, or cooling purposes and electricity through the sequential use of energy. A topping-cycle unit is a unit where the sequential use of energy results in production of useful power first and then, through use of reject heat from such production, in production of useful thermal energy. A bottoming-cycle unit is a unit where the sequential use of energy results in production of useful thermal energy first, and then, through use of reject heat from such production, in production of useful

---

[225] Preliminary estimate based on representative coal units with starting $NO_X$ rate of 0.2 lb/mmBtu, 10,000 BTU/kwh, and assuming 80 percent reduction.

[226] This document is available at: *https://www.epa.gov/sites/default/files/2015-07/documents/catalog_of_chp_technologies.pdf.*

power. To qualify as a cogeneration unit, a unit also must meet certain efficiency and operating standards in 2005 and each year thereafter. The electricity sales limitation under the exemption is applied in the same way whether a unit serves only one generator or serves more than one generator. In both cases, the total amount of electricity produced annually by a unit and sold to the grid cannot exceed the greater of one-third of the unit's potential electric output capacity or 219,000 MWh. This is consistent with the approach taken in the Acid Rain Program (40 CFR 72.7(b)(4)), where the cogeneration-unit exemption originated.

The EPA requested comment on requiring fossil fuel-fired boilers in the non-EGU industries identified in section VI.C of this document that serve electricity generators and that qualify for an exemption from inclusion in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program as EGUs to instead meet the same emissions standards, if any, that would apply under this rulemaking to fossil fuel-fired boilers at facilities in the same non-EGU industries that do not serve electricity generators.

*Comment:* Some stakeholders support the continued exclusion of qualifying cogenerators from the EGU program, but suggested they be regulated as non-EGUs if they don't fit the EGU applicability criteria.

*Response:* The EPA agrees that there is no basis within the four-step framework to exempt cogeneration units that fall under the applicability criteria of the final rule for non-EGU boilers simply because they are cogeneration units. While cogeneration units do have environmental benefits as noted at proposal, some cogeneration unit-types, particularly boilers, are estimated to have NO$_X$ emissions that would otherwise meet this rule's criteria at Step 3 for constituting "significant contribution." These units can meet the emissions limits that are otherwise finalized for these unit types, and the EPA does not find a basis to exclude them simply because they may have other environmentally-beneficial attributes.

These emissions limits are set forth in section VI.C.5 of this document. Therefore, the final requirements for non-EGUs do not exempt cogeneration units and any cogeneration emissions units meeting the applicability criteria for non-EGUs will be subject to the final emissions limits for the appropriate non-EGU emissions unit. Based on EPA's review of available data, across all of the non-EGU industries covered by this rule, there are four cogeneration

boilers (two in Pulp and Papermill and two in Basic Chemical Manufacturing) that would meet the final rule's applicability criteria for non-EGU units and are included in the analysis of non-EGU emissions reduction potential in section V.C.2 of this document.

### 4. Mobile Source NO$_X$ Mitigation Strategies

Under a variety of CAA programs, the EPA has established Federal emissions and fuel standards that reduce emissions from cars, trucks, buses, nonroad engines and equipment, locomotives, marine vessels, and aircraft (*i.e.,* "mobile sources"). Because states are generally preempted from regulating new vehicles and engines with certain exceptions (*see generally* CAA section 209), mobile source emissions are primarily controlled through EPA's Federal programs. The EPA has been regulating mobile source emissions since it was established as a Federal agency in 1970, and all mobile source sectors are currently subject to NO$_X$ emissions standards. The EPA factors these standards and associated emissions reductions into its baseline air quality assessment in good neighbor rulemaking, including in this final rule. These data are factored into EPA's analysis at Steps 1 and 2 of the 4-step framework. As a result of this long history, NO$_X$ emissions from onroad and nonroad mobile sources have substantially decreased (73 percent and 57 percent since 2002, for onroad and nonroad, respectively)[227] and are predicted to continue to decrease into the future as newer vehicles and engines that are subject to the most recent, stringent standards replace older vehicles and engines.[228]

For example, in 2014, the EPA promulgated new, more stringent emissions and fuel standards for light-duty passenger cars and trucks.[229] The fuel standards took effect in 2017, and the vehicle standards phase in between 2017 and 2025. Other EPA actions that are continuing to reduce NO$_X$ emissions include the Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements (66 FR 5002; January 18, 2001); the Clean Air Nonroad Diesel Rule (69 FR 38957; June 29, 2004); the Locomotive and

Marine Rule (73 FR 25098; May 6, 2008); the Marine Spark-Ignition and Small Spark-Ignition Engine Rule (73 FR 59034; October 8, 2008); the New Marine Compression-Ignition Engines at or Above 30 Liters per Cylinder Rule (75 FR 22895; April 30, 2010); and the Aircraft and Aircraft Engine Emissions Standards (77 FR 36342; June 18, 2012).

Most recently, EPA finalized more stringent emissions standards for NO$_X$ and other pollution from heavy-duty trucks (Control of Air Pollution from New Motor Vehicles: Heavy-Duty Engine and Vehicle Standards, 88 FR 4296, January 24, 2023). These standards will take effect beginning with model year 2027. Heavy-duty vehicles are the largest contributor to mobile source emissions of NO$_X$ and will be one of the largest mobile source contributors to ozone in 2025.[230] Reducing heavy-duty vehicle emissions nationally will improve air quality where the trucks are operating as well as downwind. The EPA's existing regulatory program for mobile sources will continue to reduce NO$_X$ emissions into the future.

*Comment:* The EPA received comments on ozone-precursor emissions from mobile sources, including cars, trucks, trains, ships, and planes. Commenters broadly encouraged the EPA to require emissions reductions from mobile sources in this rule. Commenters stated that the transportation sector plays a significant role in NO$_X$ pollution and ozone formation and urged the EPA to finalize emissions reductions for the transportation sector that will enable attainment of the 2015 ozone NAAQS. Some commenters noted that high proportions of NO$_X$ emissions in various upwind states are attributable to the transportation sector, and stated that EPA should have targeted emissions reductions from mobile sources first before requiring more stringent emissions controls from stationary sources in the same upwind states.

*Response:* The EPA agrees with commenters that a variety of sources, including mobile sources in the transportation sector, produce NO$_X$ emissions that contribute to ozone air quality problems across the U.S. This rule, as with prior interstate transport actions, does not ignore those emissions, and it credits those on-the-books measures of states and the Federal Government within the four-step framework by including emissions and

[227] US EPA. Our Nation's Air: Status and Trends Through 2019. *https://gispub.epa.gov/air/trendsreport/2020/#home.*

[228] National Emissions Inventory Collaborative (2019). 2016v1 Emissions Modeling Platform. Retrieved from *http://views.cira.colostate.edu/wiki/wiki/10202.*

[229] Control of Air Pollution from Motor Vehicles: Tier 3 Motor Vehicle Emissions and Fuel Standards, 79 FR 23414 (April 28, 2014).

[230] Zawacki et al, 2018. Mobile source contributions to ambient ozone and particulate matter in 2025. Atmospheric Environment. Vol 188, pg 129–141. Available online: *https://doi.org/10.1016/j.atmosenv.2018.04.057.*

**Federal Register** / Vol. 88, No. 107 / Monday, June 5, 2023 / Rules and Regulations **36737**

emissions reductions from these sources in the emissions inventory for air quality modeling, which informs Steps 1 and 2 of this analysis. Thus, this rule accurately represents emissions from mobile sources that are used to evaluate the contribution of states to ozone air quality problems in other states. See section IV.C of this document.

The EPA notes that its Step 3 analysis for this FIP does not assess additional emissions reductions opportunities from mobile sources. The EPA continues to believe that title II of the CAA provides the primary authority and process for reducing these emissions at the Federal level. EPA's various Federal mobile source programs, summarized above in this section, have delivered and are projected to continue to deliver substantial nationwide reductions in both VOCs and $NO_X$ emissions; these reductions from final rules are factored into the Agency's assessment of air quality and contributions at Steps 1 and 2. Further, states are generally preempted from regulating new vehicles and engines with certain exceptions, and therefore a question exists regarding the EPA's authority to address such emissions through such means when regulating in place of the states under CAA section 110(c). *See generally* CAA section 209. *See also* 86 FR 23099.[231] In

any case, the existence of mobile source emissions noted by commenters does not lead to the conclusion that the EPA must require mobile source reductions in this rule or that the EPA has not properly identified "source[s] or other type[s] of emissions activity" in upwind states that "significantly contribute" for purposes of the Good Neighbor Provision. The EPA is committed to continuing the effective implementation and enforcement of current mobile source standards and continuing its efforts on new standards. The EPA will continue to work with state and local air agencies to incorporate emissions reductions from the transportation sector into required ozone attainment planning elements.

*C. Control Stringencies Represented by Cost Threshold ($ per ton) and Corresponding Emissions Reductions*

1. EGU Emissions Reduction Potential by Cost Threshold

For EGUs, as discussed in section V.A of this document, the multi-factor test considers increasing levels of uniform control stringency in combination with considering total $NO_X$ reduction potential and corresponding air quality improvements. The EPA evaluated EGU $NO_X$ emissions controls that are widely available (described previously in

section V.B.1 of this document), that were assessed in previous rules to address ozone transport, and that have been incorporated into state planning requirements to address ozone nonattainment.

The EPA evaluated the EGU sources within the State of California and found there were no covered coal steam sources greater than 100 MW that would have emissions reduction potential according to EPA's assumed EGU SCR retrofit mitigation technologies.[232] The EGUs in the state are sufficiently well-controlled resulting in the lowest fossil-fuel emissions rate and highest share of renewable generation among the 23 states examined at Step 3. EPA's Step 3 analysis, including analysis of the emissions reduction factors from EGU sources in the state, therefore resulted in no additional emissions reductions required to eliminate significant contribution from any EGU sources in California.

The following tables summarize the emissions reduction potentials (in ozone season tons) from these emissions controls across the affected jurisdictions. Table V.C.1–1 focuses on near-term emissions controls while Table V.C.1–2 includes emissions controls with extended implementation timeframes.

TABLE V.C.1–1—EGU OZONE-SEASON EMISSIONS AND REDUCTION POTENTIAL (TONS)—2023

| State | Baseline 2023 OS $NO_X$ | Reduction potential (tons) for varying levels of technology inclusion | | |
|---|---|---|---|---|
| | | SCR optimization | SCR optimization + combustion control upgrades | SCR/SNCR optimization + combustion control upgrades |
| Alabama | 6,412 | 32 | 32 | 32 |
| Arkansas | 8,955 | 28 | 28 | 28 |
| Illinois | 7,721 | 70 | 70 | 247 |
| Indiana | 13,298 | 856 | 856 | 858 |
| Kentucky | 13,900 | 299 | 901 | 901 |
| Louisiana | 9,974 | 515 | 515 | 611 |
| Maryland | 1,214 | 0 | 0 | 8 |
| Michigan | 10,746 | 4 | 4 | 19 |
| Minnesota | 5,643 | 98 | 98 | 139 |
| Mississippi | 6,283 | 73 | 984 | 984 |
| Missouri | 20,094 | 7,339 | 7,339 | 7,497 |
| Nevada | 2,372 | 4 | 4 | 4 |
| New Jersey | 915 | 143 | 143 | 143 |
| New York | 3,977 | 64 | 64 | 64 |
| Ohio | 10,264 | 1,154 | 1,154 | 1,154 |
| Oklahoma | 10,470 | 199 | 890 | 890 |
| Pennsylvania | 8,573 | 336 | 336 | 436 |
| Texas | 41,276 | 909 | 909 | 1,142 |
| Utah | 15,762 | 7 | 7 | 7 |
| Virginia | 3,329 | 164 | 242 | 263 |
| West Virginia | 14,686 | 554 | 1,099 | 1,380 |

[231] This is not to say that states lack other options to reduce emissions from mobile sources. For example, a general list of types of transportation control measures can be found in CAA section 108(f). In addition, in accordance with section 177,

states may (but are not required to) adopt California vehicle emissions standards for which a waiver has been granted from the preemption provisions in section 209(a). States that decide to adopt California vehicle emissions standards may also choose to

submit those standards to be included as a part of their SIP.

[232] The only coal-fired power plant in California is the 63 MW Argus Cogeneration facility in Trona, California.

TABLE V.C.1–1—EGU OZONE-SEASON EMISSIONS AND REDUCTION POTENTIAL (TONS)—2023—Continued

| State | Baseline 2023 OS NOₓ | Reduction potential (tons) for varying levels of technology inclusion | | |
| | | SCR optimization | SCR optimization + combustion control upgrades | SCR/SNCR optimization + combustion control upgrades |
|---|---|---|---|---|
| Wisconsin .................................................. | 6,321 | 7 | 7 | 26 |
| Total .................................................. | 222,184 | 12,854 | 15,681 | 16,832 |

\* The EPA shows reduction potential from state-of-the-art LNB upgrade as near-term emissions controls, but explains in section V.B and VI.A of this document that this reduction potential would not be available until 2024.

TABLE V.C.1–2—EGU OZONE-SEASON EMISSIONS AND REDUCTION POTENTIAL (TONS)—2026 \*

| State | Baseline 2026 OS NOₓ | Reduction potential (tons) for varying levels of technology inclusion | | | |
| | | SCR optimization | SCR optimization + combustion control upgrades | SCR/SNCR optimization + combustion control upgrades | SCR/SNCR optimization + combustion control upgrades + SCR/SNCR retrofits |
|---|---|---|---|---|---|
| Alabama .................................................. | 6,371 | 32 | 32 | 32 | 604 |
| Arkansas .................................................. | 8,728 | 28 | 28 | 28 | 4,697 |
| Illinois .................................................. | 6,644 | 70 | 70 | 230 | 1,281 |
| Indiana .................................................. | 9,468 | 768 | 768 | 770 | 1,333 |
| Kentucky .................................................. | 13,211 | 299 | 739 | 739 | 5,303 |
| Louisiana .................................................. | 9,704 | 515 | 515 | 611 | 5,894 |
| Maryland .................................................. | 901 | 51 | 51 | 59 | 59 |
| Michigan .................................................. | 7,790 | 4 | 4 | 19 | 1,959 |
| Minnesota .................................................. | 4,197 | 98 | 98 | 139 | 1,613 |
| Mississippi .................................................. | 6,022 | 73 | 984 | 984 | 3,938 |
| Missouri .................................................. | 18,612 | 7,339 | 7,339 | 7,497 | 11,231 |
| Nevada .................................................. | 1,146 | 4 | 4 | 4 | 4 |
| New Jersey .................................................. | 915 | 143 | 143 | 143 | 143 |
| New York .................................................. | 3,977 | 64 | 64 | 64 | 589 |
| Ohio .................................................. | 9,083 | 1,154 | 1,154 | 1,154 | 1,154 |
| Oklahoma .................................................. | 10,259 | 199 | 890 | 890 | 5,968 |
| Pennsylvania .................................................. | 8,362 | 352 | 352 | 452 | 1,204 |
| Texas .................................................. | 39,684 | 909 | 909 | 1,142 | 15,980 |
| Utah .................................................. | 9,930 | 7 | 7 | 7 | 7,338 |
| Virginia .................................................. | 3,019 | 164 | 242 | 263 | 646 |
| West Virginia .................................................. | 13,185 | 401 | 947 | 1,227 | 3,507 |
| Wisconsin .................................................. | 5,016 | 7 | 7 | 26 | 623 |
| Total .................................................. | 196,225 | 12,680 | 15,346 | 16,480 | 75,067 |

\* The EPA shows all emissions reduction potential identified for assumed SCR retrofits in the Step 3 analytic year 2026, but explains in sections V.B and VI.A of this document that for Step 4 implementation this emissions reduction potential will be phased in during the 2026 and 2027 ozone season control periods.

2. Non-EGU or Industrial Source Emissions Reduction Potential

As described in the memorandum titled "Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Units, Emissions Reductions, and Costs," the EPA uses the 2019 emissions inventory, the list of emissions units estimated to be captured by the applicability criteria, the assumed control technologies that would meet the emissions limits, and information on control efficiencies and default cost/ton values from the CMDB, to estimate NOₓ emissions reductions and costs for the year 2026. The estimates using the 2019 inventory and information from the CMDB identify proxies for emissions units, as well as emissions reductions, and costs associated with the assumed control technologies that would meet the final emissions limits. Emissions units subject to the final rule emissions limits may differ from those estimated in this assessment, and the estimated emissions reductions from and costs to meet the final rule emissions limits may also differ from those estimated in this assessment. The costs do not include monitoring, recordkeeping, reporting, or testing costs.

Table V.C.2–1 summarizes the industries, estimated emissions unit types, assumed control technologies, estimated annual costs (2016$), and estimated ozone season emissions reductions in 2026, and Table V.C.2–2 summarizes the estimated reductions by state.

**Federal Register** / Vol. 88, No. 107 / Monday, June 5, 2023 / Rules and Regulations    **36739**

TABLE V.C.2–1—BY INDUSTRY IN 2026, ESTIMATED EMISSIONS UNIT TYPES, ASSUMED CONTROL TECHNOLOGIES, ANNUAL COSTS (2016$), AND ESTIMATED EMISSIONS REDUCTIONS (OZONE SEASON TONS)

| Industry/industries | Emissions unit type | Assumed control technologies that meet final emissions limits | Annual costs (2016$) | Ozone season emissions reductions |
|---|---|---|---|---|
| Pipeline Transportation of Natural Gas ..... | Reciprocating Internal Combustion Engine | NSCR or Layered Combustion, Layered Combustion, SCR, NSCR. | 385,463,197 | 32,247 |
| Cement and Concrete Product Manufacturing. | Kiln | SNCR ............................................................. | 10,078,205 | 2,573 |
| Iron and Steel Mills and Ferroalloy Manufacturing. | Reheat Furnaces ........................... | LNB ............................................................... | 3,579,294 | 408 |
| Glass and Glass Product Manufacturing .. | Furnaces ..................................... | LNB ............................................................... | 7,052,088 | 3,129 |
| Iron and Steel Mills and Ferroalloy Manufacturing. | Boilers ........................................ | SCR, LNB + FGR ......................................... | 8,838,171 | 440 |
| Metal Ore Mining .................................... | ........................................... | ...................................................................... | 621,496 | 18 |
| Basic Chemical Manufacturing ................ | ........................................... | ...................................................................... | 49,697,848 | 1,748 |
| Petroleum and Coal Products Manufacturing. | ........................................... | ...................................................................... | 5,128,439 | 147 |
| Pulp, Paper, and Paperboard Mills .......... | ........................................... | ...................................................................... | 62,268,540 | 1,836 |
| Solid Waste Combustors and Incinerators | Combustors or Incinerators ............ | ANSCR or LN™ and SNCR ................... | 38,949,560 | 2,071 |
| Totals ................................................. | | | 571,676,839 | 44,616 |

TABLE V.C.2–2—ESTIMATED EMISSIONS REDUCTIONS (OZONE SEASON TONS) BY UPWIND STATE IN 2026

| State | 2019 OS emissions * | OS NO$_X$ reductions |
|---|---|---|
| AR ............................................................................................................. | 8,790 | 1,546 |
| CA ............................................................................................................. | 16,562 | 1,600 |
| IL .............................................................................................................. | 15,821 | 2,311 |
| IN .............................................................................................................. | 16,673 | 1,976 |
| KY ............................................................................................................. | 10,134 | 2,665 |
| LA ............................................................................................................. | 40,954 | 7,142 |
| MD ............................................................................................................ | 2,818 | 157 |
| MI ............................................................................................................. | 20,576 | 2,985 |
| MO ............................................................................................................ | 11,237 | 2,065 |
| MS ............................................................................................................ | 9,763 | 2,499 |
| NJ ............................................................................................................. | 2,078 | 242 |
| NV [233] ..................................................................................................... | 2,544 | 0 |
| NY ............................................................................................................. | 5,363 | 958 |
| OH ............................................................................................................ | 18,000 | 3,105 |
| OK ............................................................................................................ | 26,786 | 4,388 |
| PA ............................................................................................................. | 14,919 | 2,184 |
| TX ............................................................................................................. | 61,099 | 4,691 |
| UT ............................................................................................................. | 4,232 | 252 |
| VA ............................................................................................................. | 7,757 | 2,200 |
| WV ............................................................................................................ | 6,318 | 1,649 |
| Totals ................................................................................................. | 302,425 | 44,616 |

*The 2019 OS season emissions are calculated as 5/12 of the annual emissions from the following two emissions inventory files: nonegu_SmokeFlatFile_2019NEI_POINT_20210721_controlupdate_13sep2021_v0 and oilgas_SmokeFlatFile_2019NEI_POINT_20210721_controlupdate_13sep2021_v0.

In Table V.C.2–3 by industry and emissions unit type, the EPA provides a summary of the control technologies applied and their average costs across all of the non-EGU emissions units. The average cost per ton values range from $939 to $14,595 per ton. Note that the average cost per ton values are in 2016 dollars and reflect simple averages and not a percentile or other representative cost values from a distribution of cost estimates.

TABLE V.C.2–3—BY INDUSTRY, EMISSIONS UNIT TYPE, ASSUMED CONTROL TECHNOLOGIES, AND ESTIMATED AVERAGE COST PER TON BY CONTROL TECHNOLOGY ACROSS ALL NON-EGU EMISSIONS UNITS

| Industry/industries | Emissions unit type | Assumed control technologies that meet final emissions limits | Average cost/ton values (2016$) |
|---|---|---|---|
| Pipeline Transportation of Natural Gas ................ | Reciprocating Internal Combustion Engine ........ | NSCR or Layered Combustion, Layered Combustion, SCR, NSCR. | 4,981 |
| Cement and Concrete Product Manufacturing ..... | Kiln | SNCR ............................................................. | 1,632 |

[233] We are not aware of existing non-EGU emissions units in Nevada that meet the applicability criteria for non-EGUs in the final rule. If any such units in fact exist, they would be subject to the requirements of the rule just as in any other state. In addition, any new emissions unit in Nevada that meets the applicability criteria in the final rule will be subject to the final rule's requirements. *See* section III.B.1.d.

TABLE V.C.2–3—BY INDUSTRY, EMISSIONS UNIT TYPE, ASSUMED CONTROL TECHNOLOGIES, AND ESTIMATED AVERAGE COST PER TON BY CONTROL TECHNOLOGY ACROSS ALL NON-EGU EMISSIONS UNITS—Continued

| Industry/industries | Emissions unit type | Assumed control technologies that meet final emissions limits | Average cost/ton values (2016$) |
|---|---|---|---|
| Iron and Steel Mills and Ferroalloy Manufacturing | Reheat Furnaces | LNB | 3,656 |
| Glass and Glass Product Manufacturing | Furnaces | LNB | 939 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Boilers | SCR or LNB + FGR | 8,369 |
| Metal Ore Mining | | | 14,595 |
| Basic Chemical Manufacturing | | | 11,845 |
| Petroleum and Coal Products Manufacturing | | | 14,582 |
| Pulp, Paper, and Paperboard Mills | | | 14,134 |
| Solid Waste Combustors and Incinerators | Combustors or Incinerators | ANSCR or LN™ and SNCR | 7,836 |
| Overall Average Cost/Ton | | | 5,339 |

Refer to the memorandum titled "Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Units, Emissions Reductions, and Costs" for additional estimates—including by industry and by state. These estimates are proxy estimates, and the EPA also did not prepare detailed engineering analyses for the industries, facilities, and individual emissions units identified for the final rule. Emissions units subject to the final rule emissions limits may differ from those estimated in this assessment, and the estimated emissions reductions from and costs to meet the final rule emissions limits may also differ from those estimated in this assessment.

*Comment:* Regarding the marginal cost threshold of $7,500/ton used to assess potential emissions reductions in the non-EGU screening assessment prepared for proposal, commenters raised a range of questions, including (1) why the EPA used a marginal cost threshold that is much higher than the $2,000/ton threshold used in the 2021 Revised CSAPR Update Rule, (2) why the EPA used a "one size fits all" approach for addressing the estimated cost and actual emissions reductions achievable, particularly for existing sources of NOₓ emissions, (3) why the EPA set a $7,500/ton marginal cost threshold for all non-EGUs, despite acknowledging the heterogeneity of industry, emissions unit types and control options and failing to consider the actual costs associated with achieving the proposed reductions at different types of emissions units in order to artificially inflate the marginal cost threshold and to justify otherwise cost-prohibitive NOₓ control technologies. Commenters also stated that controls for their industry are not cost-effective using the EPA's presumptive value of $7,500/ton and

that the value may not be technically feasible to apply to existing sources that would have to retrofit controls.

*Response:* The EPA notes that the primary purpose of the *Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026* (non-EGU screening assessment) was to identify potentially impactful industries and emissions unit types for further evaluation.[234] In the non-EGU screening assessment memorandum we presented an analytical framework to further analyze potential emissions reductions and costs and included proxy estimates for 2026.

As noted in section V.D. of this document, at proposal the EPA found that based on data available at that time and for the purposes of the non-EGU screening assessment, it appeared that a $7,500 marginal cost-per-ton threshold could be used as a proxy to identify cost-effective emissions control opportunities. Also, the $7,500 marginal cost-per-ton threshold is higher than the cost-per-ton value used in the Revised Cross-State Air Pollution Rule Update because that rulemaking assessed significant contribution for the less protective 2008 ozone NAAQS, and it is reasonable when assessing significant contribution associated with the more protective 2015 ozone NAAQS, that a potentially more costly universe of emissions controls and related potential reductions should be included in the analysis.[235] Similar to the role of cost-

effectiveness thresholds the EPA uses at Step 3 to evaluate EGU emissions control opportunities, this threshold is not intended to represent the maximum cost any facility may need to expend but is rather intended to be a representative figure for evaluating technologies to allow for a relative comparison between different levels of control stringency. The EPA's potential cost threshold for non-EGU controls at proposal was intended to serve a similar representative purpose. Based on the EPA's updated analysis for this final rule, the EPA recognizes that the $7,500/ton threshold does not reflect the full range of cost-effectiveness values that are likely present across the many different types of non-EGU industries and emissions units assessed.

While the potentially impactful industries (identified in Step 1 of the analytical framework presented in the non-EGU screening assessment) were directly used, the proxy estimates for emissions unit types, emissions reductions, and costs from the non-EGU screening assessment were not directly used to establish applicability thresholds and emissions limits in the proposal. To further evaluate the impactful industries and emissions unit types and establish the proposed emissions limits, the EPA reviewed RACT rules, NSPS rules, NESHAP rules, existing technical studies (*e.g.*, Ozone Transport Commission, Technical Information Oil and Gas Sector Significant Stationary Sources of NOₓ Emissions, October 17, 2012), rules in approved SIP submittals, consent decrees, and permit limits.[236]

---

[234] The non-EGU screening assessment memorandum is available in the docket here: *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0150.*

[235] As the amount of air pollution that is allowed in the ambient air is reduced (i.e., when a NAAQS is revised), it is reasonable to expect that further emissions reductions may be necessary to bring areas into attainment with that more protective standard. At the same time, the available remaining emissions reduction opportunities will likely have become more costly compared to a prior period, because other CAA requirements, including such as earlier transport rules, will have consumed those

emissions reduction opportunities that were the least costly. The EPA noted this same possibility in the original CSAPR rulemaking, *see* 76 FR 48210.

[236] This review is detailed in the Final Non-EGU Sectors TSD available in the docket here: *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0145.*

*D. Assessing Cost, EGU and Non-EGU NO_X Reductions, and Air Quality*

To determine the emissions that are significantly contributing to nonattainment or interfering with maintenance, the EPA applied the multi-factor test to EGUs and non-EGUs separately, considering for each the relationship of cost, available emissions reductions, and downwind air quality impacts. Specifically, for each sector, the EPA finalizes a determination regarding the appropriate level of uniform NO_X control stringency that would collectively eliminate significant contribution to downwind nonattainment and maintenance receptors. Based on the air quality results presented in this section, we find that the emissions control strategies that were identified and evaluated in sections V.B and V.C of this document and found to be both cost-effective and feasible, deliver meaningful air quality benefits through projected reductions in ozone levels across the linked downwind nonattainment and maintenance receptors in the relevant analytic years 2023 and 2026. Further, EPA finds the emissions control strategies in upwind states that would deliver these benefits to be widely available and in use at many other similar EGU and non-EGU facilities throughout the country, particularly in those areas that have historically or now continue to struggle to attain and maintain the 2015 ozone NAAQS. Applying these emissions control strategies on a uniform basis across all linked upwind states continues to constitute an efficient and equitable solution to the problem of allocating upwind-state responsibility for the elimination of significant contribution. This approach continues to effectively address the "thorny" causation problem of interstate pollution transport for regional-scale pollutants like ozone that transport over large distances and are affected by the vagaries of meteorology. *EME Homer City,* 572 U.S. at 514–16. It requires the most impactful sources in each state that has been found to contribute to ozone problems in other states to come up to minimum standards of environmental performance based on demonstrated NO_X pollution-control technology. *Id.* at 519. When the effects of these emissions reductions are assessed collectively across the hundreds of EGU and non-EGU industrial sources that are subject to this rule, the cumulative improvements in ozone levels at downwind receptors, while they may vary to some extent, are both measurable and meaningful and will assist downwind areas in attaining

and maintaining the 2015 ozone NAAQS.

In addition to the findings of cost-effectiveness, feasibility and widespread availability that support EPA's identification of the appropriate level of emissions-control stringency at Step 3 discussed in sections V.B and V.C, the findings regarding air quality improvement in this section—as in prior transport rules—are a central component of our Step 3 analytic findings as to the definition of "significant contribution." EPA's assessment of air quality improvement for all of the emissions control strategies included shows continued air quality improvement with each additional control strategy measure. Within the group of selected control strategies for EGUs and non-EGUs no clear "knee-in-the-curve" is evident; *i.e.,* there is no point at which there is a noticeable decline in the rate of air quality improvement up through the control stringency level selected. However, if EPA were to go beyond the selected control stringency through inclusion of additional EGU or non-EGU NO_X mitigation technologies for the covered sources and unit-types that are, at least on the record of this action, not widely available, uncertain or untested, and/or far more costly, a "knee-in-the-curve" does materialize, where the incremental air quality benefit per dollar spent per ton on mitigation measures plateaus even as costs increase dramatically. In the Revised CSAPR Update, EPA explained that a knee in the curve "is not on its own a justification for not requiring reductions beyond that point," 86 FR 23107, but does indicate that it is a useful indicator for informing potential stopping points. The observation that no "knee-in-the-curve" materializes at the stringency levels up through that selected by EPA supports EPA's identified control stringency.

Further, as the Supreme Court has explained, "while EPA has a statutory duty to avoid over-control, the Agency also has a statutory obligation to avoid 'under-control,' *i.e.,* to maximize achievement of attainment downwind." 572 U.S. at 523. While the ultimate purpose of the good neighbor provision is to eliminate significant contribution and not necessarily to resolve downwind areas' nonattainment and maintenance problems, we have evaluated the expected attainment status at each identified receptor as we examine the air quality effects of the different emissions control strategies identified. As discussed further in this section, the EPA notes that multiple receptors shift into projected attainment status or shift from projected

nonattainment to maintenance status up through the stringency level ultimately selected by EPA. (And all receptors show improvement in air quality even if their status does not change.) These analytic findings at Step 3 cement EPA's identification of the selected EGU and non-EGU mitigation measures as the appropriate control stringency to fulfill its statutory obligation to eliminate significant contribution for the 2015 ozone NAAQS for the covered states. The EPA also evaluated whether the final rule resulted in possible over-control scenarios by evaluating if an upwind state is linked solely to downwind air quality problems that could have been resolved at a lower cost threshold, or if an upwind state could have reduced its emissions below the 1 percent of NAAQS air quality contribution threshold at a lower cost threshold. The Agency finds no overcontrol from this rule. See section V.D.4 of this document.

1. EGU Assessment

For EGUs, the EPA examined the emissions reduction potential associated with each EGU emissions control technology (presented in section V.C.1 of this document) and its impact on the air quality at downwind receptors. Specifically, EPA identified and assessed the projected average air quality improvements relative to the base case and whether these improvements are sufficient to shift the status of receptors from projected nonattainment to maintenance or from maintenance to attainment. Combining these air quality factors, costs, and emissions reductions, the EPA identified a control stringency for EGUs that results in substantial air quality improvement from emissions controls that are available in the timeframe for which air quality problems at downwind receptors persist. For all affected jurisdictions, this control stringency reflects, at a minimum, the optimization of existing post-combustion controls and installation of state-of-the-art NO_X combustion controls, which are widely available at a representative cost of $1,800 per ton. EPA's evaluation also shows that the effective emissions rate performance across affected EGUs consistent with realization of these mitigation measures does not over-control upwind states' emissions relative to either the downwind air quality problems to which they are linked at Step 1 or the 1 percent contribution threshold that triggers further evaluation at Step 3 of the 4-step framework for the 2015 ozone NAAQS.

Similarly, the EPA also identified installation of new SCR post-combustion controls at coal steam sources greater than or equal to 100 MW and for a more limited portion of the oil/gas steam fleet that had higher levels of emissions as components of the required control stringency. These SCR retrofits are widely available starting in the 2026 ozone season at $11,000 and $7,700 per ton respectively. For all but 3 of the affected states (Alabama, Minnesota, and Wisconsin, which are no longer linked in 2026 at Steps 1 and 2 in EPA's base case air quality modeling for this final rule), EPA's evaluation shows that the effective emissions rate performance across EGUs consistent with the full realization of these mitigation measures does not over-control upwind states' emissions in 2026 relative to either the downwind air quality problems to which they are linked at Step 1 or the 1 percent contribution threshold that triggers further evaluation at Step 3 of the 4-step framework for the 2015 ozone NAAQS (*see* the Ozone Transport Policy Analysis Final Rule TSD for details).

To assess downwind air quality impacts for the nonattainment and maintenance receptors identified in section IV.D of this document, the EPA evaluated the air quality change at that receptor expected from the progressively more stringent upwind EGU control stringencies that were available for that time period in upwind states linked to that receptor. This assessment provides the downwind ozone improvements for consideration and provides air quality data that is used to evaluate potential over-control situations.

To assess the air quality impacts of the various control stringencies at downwind receptors for the purposes of Step 3, the EPA evaluated changes resulting from the emissions reductions associated with the identified emissions controls in each of the upwind states, as well as assumed corresponding reductions of similar stringency in the downwind state containing the receptor to which they are linked. By applying these emissions reductions to the state containing the receptor, the EPA assumes that the downwind state will

implement (if it has not already) an emissions control stringency for its sources that is comparable to the upwind control stringency identified here. Consequently, the EPA is accounting for the downwind state's "fair share" of the responsibility for resolving a nonattainment or maintenance problem as a part of the over-control evaluation.[237]

For this assessment, the EPA used an ozone air quality assessment tool (ozone AQAT) to estimate downwind changes in ozone concentrations related to upwind changes in emissions levels. The EPA focused its assessment on the years 2023 and 2026 as they pertain to the last years for which ozone season emissions data can be used for purposes of determining attainment for the Moderate (2024) and Serious (2027) attainment dates. For each EGU emissions control technology, the EPA first evaluated the magnitude of the change in ozone concentrations at the nonattainment and maintenance receptors for each relevant year (*i.e.,* 2023 and 2026). Next, the EPA evaluated whether the estimated change in concentration would resolve the receptor's nonattainment or maintenance concern by lowering the average or maximum design values, respectively, below 71 ppb. For a complete set of estimates, see the Ozone Transport Policy Analysis Final Rule TSD or the ozone AQAT Excel file.

For 2023, the EPA evaluated potential air quality improvements at the downwind receptors outside of California associated with available EGU emissions control technologies in that timeframe. The EPA determined for the purposes of Step 3 that the average air quality improvement at the receptors relative to the engineering analytics base case was 0.06 ppb for emissions reductions commensurate with optimization of existing SCRs/SNCRs and combustion control upgrades. The EPA determined for the purposes of

Step 3 that no receptors switch from maintenance to attainment or from nonattainment to maintenance with these mitigation strategies in place. Table V.D.1–1 summarizes the results of EPA's Step 3 evaluation of air quality improvements at these receptors using AQAT.

For 2026, the EPA determined that the average air quality improvement at these receptors relative to the engineering analytics base case was 0.47 ppb for emissions reductions commensurate with optimization of existing SCRs/SNCRs, combustion control upgrades, and new post-combustion control (SCR and SNCR) retrofits at eligible units are to be implemented. The EPA determined for the purposes of Step 3 that in 2026, all but one of the receptors are expected to remain nonattainment or maintenance across these control stringencies, with one receptor in Larimer County, Colorado (Monitor 080690011), switching from maintenance to attainment and two receptors (one in Fairfield County, Connecticut (Monitor 90013007), and one in Galveston, Texas (Monitor ID 481671034)) switching from nonattainment to maintenance with these mitigation strategies in place.[238] Table V.D.1–2 summarizes the results of EPA's Step 3 evaluation of air quality improvements at the receptors included in the AQAT analysis. For more information about how this assessment was performed and the results of the analysis for each receptor, refer to the Ozone Transport Policy Analysis Final Rule TSD and to the Ozone AQAT included in the docket for this rule.

---

[237] For EGUs, this analysis for the Connecticut receptors shows no EGU reduction potential in Connecticut from the emissions reduction measures identified given that state's already low-emitting fleet; however, EGU reductions were identified in Colorado and these reductions were included in the over-control analysis.

[238] As in prior rules, for the purpose of defining significant contribution at Step 3, the EPA evaluated air quality changes resulting from the application of the emissions reductions in only those states that are linked to each receptor as well as the state containing the receptor. By applying reductions to the state containing the receptor, the EPA ensures that it is accounting for the downwind state's fair share. This method holds each upwind state responsible for its fair share of the downwind problems to which it is linked. Reductions made by other states to address air quality problems at other receptors do not increase or decrease this share. The air quality impacts on design values that reflect the emissions reductions in all linked states action are further discussed in sections V.D.3 and V.D.4 of this document.

*Federal Register*/Vol. 88, No. 107/Monday, June 5, 2023/Rules and Regulations **36743**

### TABLE V.D.1–1—AIR QUALITY AT THE RECEPTORS IN 2023 FROM EGU EMISSIONS CONTROL TECHNOLOGIES[a]

| Monitor ID No. | State | County | Average DV (ppb) | | Max DV (ppb) | |
|---|---|---|---|---|---|---|
| | | | Baseline (engineering analysis) | SCR/SNCR optimization + LNB upgrade | Baseline (engineering analysis) | SCR/SNCR optimization + LNB upgrade |
| 40278011 | Arizona | Yuma | 70.36 | 70.34 | 72.05 | 72.04 |
| 80350004 | Colorado | Douglas | 71.12 | 71.10 | 71.71 | 71.70 |
| 80590006 | Colorado | Jefferson | 72.63 | 72.61 | 73.32 | 73.31 |
| 80590011 | Colorado | Jefferson | 73.29 | 73.27 | 73.89 | 73.87 |
| 80690011 | Colorado | Larimer | 70.79 | 70.78 | 71.99 | 71.98 |
| 90010017 | Connecticut | Fairfield | 71.62 | 71.56 | 72.22 | 72.16 |
| 90013007 | Connecticut | Fairfield | 72.99 | 72.90 | 73.89 | 73.80 |
| 90019003 | Connecticut | Fairfield | 73.32 | 73.25 | 73.62 | 73.55 |
| 90099002 | Connecticut | New Haven | 70.61 | 70.51 | 72.71 | 72.61 |
| 170310001 | Illinois | Cook | 68.13 | 68.11 | 71.82 | 71.80 |
| 170314201 | Illinois | Cook | 67.92 | 67.88 | 71.41 | 71.37 |
| 170317002 | Illinois | Cook | 68.47 | 68.37 | 71.27 | 71.17 |
| 350130021 | New Mexico | Dona Ana | 70.83 | 70.82 | 72.13 | 72.12 |
| 350130022 | New Mexico | Dona Ana | 69.73 | 69.72 | 72.43 | 72.42 |
| 350151005 | New Mexico[b] | Eddy | .............. | .............. | .............. | .............. |
| 350250008 | New Mexico | Lea | .............. | .............. | .............. | .............. |
| 480391004 | Texas | Brazoria | 70.59 | 70.52 | 72.69 | 72.62 |
| 481210034 | Texas | Denton | 69.93 | 69.88 | 71.73 | 71.68 |
| 481410037 | Texas | El Paso | 69.82 | 69.81 | 71.43 | 71.41 |
| 481671034 | Texas | Galveston | 71.82 | 71.70 | 73.13 | 73.01 |
| 482010024 | Texas | Harris | 75.33 | 75.25 | 76.93 | 76.85 |
| 482010055 | Texas | Harris | 71.19 | 71.10 | 72.20 | 72.10 |
| 482011034 | Texas | Harris | 70.32 | 70.25 | 71.52 | 71.45 |
| 482011035 | Texas | Harris | 68.01 | 67.94 | 71.52 | 71.45 |
| 490110004 | Utah | Davis | 71.88 | 71.87 | 74.08 | 74.07 |
| 490353006 | Utah | Salt Lake | 72.48 | 72.47 | 74.07 | 74.06 |
| 490353013 | Utah | Salt Lake | 73.21 | 73.20 | 73.71 | 73.70 |
| 550590019 | Wisconsin | Kenosha | 70.75 | 70.65 | 71.65 | 71.55 |
| 551010020 | Wisconsin | Racine | 69.59 | 69.46 | 71.39 | 71.25 |
| 551170006 | Wisconsin | Sheboygan | 72.64 | 72.46 | 73.54 | 73.36 |
| Average AQ Change Relative to Base (ppb) | | | .............. | .............. | .............. | 0.06 |
| Total PPB Change Across All Receptors Relative to Base[c] | | | .............. | .............. | .............. | 1.58 |

**Table Notes:**
[a] The EPA notes that the design values reflected in tables V.D.1–1 and –2 correspond to the engineering analysis EGU emissions inventory that was used in AQAT to determine state-level baseline emissions and reductions at Step 3. These tools are discussed in greater detail in the Ozone Transport Policy Analysis Final Rule TSD.
[b] New Mexico Eddy and Lea monitors have no values in tables V.D.1–1 and 1–2 as EPA does not have calibration factors for these monitors as no contributions were calculated for them from the proposal AQ modeling
[c] The cumulative ppb change only shows the aggregate change across all problematic receptors (some of which are located within close proximity to one another) in this part of the Step 3 analysis. Section VIII of this document provides a more complete picture of the air quality impacts of the final rule.

### TABLE V.D.1–2—AIR QUALITY AT RECEPTORS IN 2026 FROM EGU EMISSIONS CONTROL TECHNOLOGIES

| Monitor ID No. | State | County | Average DV (ppb) | | Max DV (ppb) | |
|---|---|---|---|---|---|---|
| | | | Baseline (engineering analysis) | SCR/SNCR optimization + LNB upgrade + SCR/SNCR retrofit | Baseline (engineering analysis) | SCR/SNCR optimization + LNB upgrade + SCR/SNCR retrofit |
| 40278011 | Arizona | Yuma | 69.87 | 69.84 | 71.47 | 71.44 |
| 80590006 | Colorado | Jefferson | 71.70 | 71.36 | 72.30 | 71.95 |
| 80590011 | Colorado | Jefferson | 72.06 | 71.59 | 72.66 | 72.19 |
| 80690011 | Colorado | Larimer | 69.84 | 69.54 | 71.04 | 70.73 |
| 90013007 | Connecticut | Fairfield | 71.25 | 70.98 | 72.06 | 71.78 |
| 90019003 | Connecticut | Fairfield | 71.58 | 71.34 | 71.78 | 71.54 |
| 350130021 | New Mexico | Dona Ana | 70.06 | 69.89 | 71.36 | 71.19 |
| 350130022 | New Mexico | Dona Ana | 69.17 | 69.00 | 71.77 | 71.60 |
| 350151005 | New Mexico | Eddy | .............. | .............. | .............. | .............. |
| 350250008 | New Mexico | Lea | .............. | .............. | .............. | .............. |
| 480391004 | Texas | Brazoria | 69.89 | 68.96 | 72.02 | 71.06 |
| 481671034 | Texas | Galveston | 71.29 | 70.02 | 72.51 | 71.22 |
| 482010024 | Texas | Harris | 74.83 | 73.86 | 76.45 | 75.46 |
| 490110004 | Utah | Davis | 69.90 | 69.34 | 72.10 | 71.52 |
| 490353006 | Utah | Salt Lake | 70.50 | 69.96 | 72.10 | 71.55 |
| 490353013 | Utah | Salt Lake | 71.91 | 71.45 | 72.31 | 71.84 |
| 551170006 | Wisconsin | Sheboygan | 70.83 | 70.51 | 71.73 | 71.41 |
| Average AQ Change Relative to Base (ppb) | | | .............. | .............. | .............. | 0.47 |
| Total PPB Change Across All Receptors Relative to Base (ppb) | | | .............. | .............. | .............. | 7.04 |

Figures 1 and 2 to section V.D.1 of this document, included in Appendix I of the Ozone Transport Policy Analysis Final Rule TSD available in the docket for this rulemaking, illustrate the air quality improvement relative to the estimated representative cost associated with the previously identified emissions control technologies. The graphs show improving air quality at the downwind receptors as emissions reductions commensurate with the identified control technologies are assumed to be implemented. Figure 1 to section V.D.1 of this document reflects emissions reductions commensurate with optimization of existing SNCRs and SCRs. Figure 2 to section V.D.1 of this document reflects emissions reductions commensurate with installation of new post combustion controls (mainly SCRs) layered on top of the emissions reduction potential from the technologies represented in Figure 1 to section V.D.1 of this document. The graphic, and underlying AQAT receptor-by-receptor analysis demonstrates that air quality continues to improve at downwind receptors as EPA examines increasingly stringent EGU NO$_X$ control technologies. While all major technology breakpoints identified in sections V.B and V.C of this document show continued air quality improvements at problematic receptors and at cost and technology levels that are commensurate with mitigation strategies that are proven to be widely available and implemented, EPA's quantification and application of those breakpoints reflect certain exclusions to: (1) preserve this consistency with widely observed mitigation measures in states, and (2) remove any retrofit assumptions at marginal units that would have much higher dollar per ton representative cost and little or no air quality benefit. For instance, the EPA does not define the SCR retrofit breakpoint ($11,000 per ton) to include retrofit application at steam units less than 100 MW or at oil/gas steam units emitting at less than 150 tons per ozone season. The emissions reductions from these potential categories of measures are small and do not constitute additional "breakpoints" in EPA's estimation. They would entail much higher dollar per ton costs, going beyond what is widely observed in the fleet. This careful calibration of technology breakpoints through exclusion of measures that are clearly not cost-effective in terms of air quality benefit allows for the identification of an EGU uniform control stringency that is an appropriate reflection of those readily available and widely

implemented emissions reduction strategies that will have meaningful downwind air quality impact.

Moreover, these technologies (and representative cost) are demonstrated ozone pollution mitigation strategies that are widely practiced across the EGU fleet and are of comparable stringency to emissions reduction measures that many downwind states have already instituted. The coal SCR retrofit measures driving the majority of the emissions reductions in this action not only reflect industry best practice, but they also reflect prevailing practice among EGUs. More than 66 percent of the existing coal capacity already has this technology in place. For nearly 25 years, all new coal-fired EGUs that commenced construction have had SCR (or equivalent emissions rates). The 1997 proposed amendments to subpart Da revised the NO$_X$ standard based on the use of SCR. The NO$_X$ SIP Call (promulgated in 1998) established emissions reduction requirements premised on extensive SCR installation (142 units) and incentivized well over 40 GWs of SCR retrofit in the ensuing years.[239] Similarly, the Clean Air Interstate Rule established emissions reductions requirements in 2006 that assumed SCR would be installed on another 58 units (15 GW) in the ensuing years among just 10 states, and an even greater volume of capacity chose SCR retrofit measures in the wake of finalizing that action.[240]

Basing emissions reduction requirements for EGUs on SCR retrofits is also consistent with regulatory approaches adopted by states, which—particularly in downwind areas more impacted by ozone transport contribution from upwind state emissions—have already adopted SCR-based standards as part of stringent NO$_X$ control programs. Regulatory programs that impose stringent RACT requirements on all major power plants and Lowest Achievable Emission Rate (LAER) standards on all new major sources of NO$_X$ have resulted in remaining coal-fired generating resources in states along the Northeast Corridor such as Connecticut, Delaware, New Jersey, New York, and Massachusetts all being retrofitted with SCR.[241] The Maryland Code of Regulations requires coal-fired sources to operate existing SCR controls or install SCR controls by specified

dates.[242] Programs like North Carolina's Clean Smokestacks Act and Colorado's Clean Air, Clean Jobs Act have also required or prompted SCR retrofits on units.[243] Unit-level BART requirements for the first Regional Haze planning period also determined SCR retrofits (and corresponding emissions rates) were cost-effective controls for a variety of sources in the U.S.[244]

As shown in Figure 1 to section V.D.1 of this document,[245] the majority of EGU emissions reduction potential and associated air quality improvements estimated for 2023 occurs from optimization of existing SCRs, with some additional reductions from installation of state-of-the-art combustion controls at the same representative cost threshold. At the slightly higher representative cost threshold of $1,800 per ton, there is some additional air quality improvement from optimization of existing SNCRs. These measures taken together represent the control stringency at which near-term incremental EGU NO$_X$ reduction potential and corresponding downwind ozone air quality improvements are maximized. This evaluation shows that EGU NO$_X$ reductions for each of the near-term emissions control technologies are available at reasonable cost and that these reductions provide meaningful improvements in downwind ozone concentrations at the identified nonattainment and maintenance receptors. Figure 1 to section V.D.1 of this document [246] highlights (1) the continuous connection between identified emissions reduction potential and downwind air quality improvement across the range of near-term mitigation measures assessed, and (2) the cost-effective availability of these reductions and corresponding air quality improvements.

Additional considerations that are unique to EGUs provide additional support for EPA's determination to include SCR and SNCR optimization as part of the identified near-term control stringency, including:

---

[239] 63 FR 57448.

[240] 71 FR 25345.

[241] EPA–HQ–OAR–2020–0272. Comment letter from Attorneys General of NY, NJ, CT, DE, MA.

[242] COMAR 26.11.38 (control of NO$_X$ Emissions from Coal-Fired Electric Generating Units).

[243] https://www.epa.gov/system/files/documents/2021-09/table-3-30-state-power-sector-regulations-included-in-epa-platform-v6-summer-2021-refe.pdf.

[244] See table 3–35 BART regulations in EPA IPM documentation available at https://www.epa.gov/airmarkets/documentation-epas-power-sector-modeling-platform-v6-summer-2021-reference-case.

[245] Included in Appendix I of the Ozone Transport Policy Analysis Final Rule TSD, which is available in the docket for this rulemaking.

[246] Included in Appendix I of the Ozone Transport Policy Analysis Final Rule TSD, which is available in the docket for this rulemaking.

• these controls are already installed and available for operation on these units;

• they are on average already partially operating, but not necessarily optimized;

• the reductions are available in the near-term (during ozone seasons when the problematic receptors are projected to persist), including by the 2023 ozone season aligned with the Moderate area attainment date; and

• these sources are already covered under the existing CSAPR $NO_X$ Ozone Season Group 2 or Group 3 Trading Programs or the Acid Rain Program and thus have the monitoring, reporting, recordkeeping, and all other necessary elements of compliance with the trading program already in place.

The majority of EGU emissions reduction potential and associated air quality improvements estimated to start in 2026 occur from retrofitting uncontrolled steam sources with post-combustion controls. At the representative cost threshold of $11,000 per ton, there are significant additional air quality improvements from emissions reductions commensurate with installation of new SCRs and SNCRs. These measures taken together with the near-term emissions reduction measures described previously represent the level of control stringency in 2026 at which incremental EGU $NO_X$ reduction potential and corresponding downwind ozone air quality improvements are maximized. This evaluation shows that EGU $NO_X$ reductions for each of the emissions control technologies are available at reasonable cost and that these reductions can provide improvements in downwind ozone concentrations at the identified nonattainment and maintenance receptors.

The EPA finds that the control stringency that reflects optimization of existing SCRs and SNCRs, installation of state-of-the-art combustion controls, and the retrofitting of new post combustion controls at the coal and oil/gas steam capacity described previously is projected to result in nearly 73,000 tons of $NO_X$ reduction (approximately 40 percent of the 2026 baseline level) for the 19 linked states in 2026 subject to a FIP for EGUs, which will deliver notable air quality improvements across all transport-impacted receptors and assist in fully resolving one downwind air quality receptor for the 2015 ozone NAAQS. Figure 2 to section V.D.1 of this document [247] demonstrates the

continuous connection between identified emissions reduction potential and downwind air quality improvement across the range of mitigation measures assessed in 2026. At no point do the additional emissions mitigation measures examined here fail to produce corresponding downwind air quality improvements.

The EPA is determining that the appropriate EGU control stringency is commensurate with the full operation of all existing post-combustion controls (both SCRs and SNCRs) and state-of-the-art combustion control upgrades for those states linked to downwind nonattainment or maintenance receptors in 2023. For those states also linked in 2026, the EPA is determining that the appropriate EGU control stringency also includes emissions reductions commensurate with the retrofit of SCR at coal steam units of 100 MW or greater capacity (excepting circulating fluidized bed units), new SNCR on coal steam units of less than 100 MW capacity and circulating fluidized bed units, and SCR on oil/gas steam units greater than 100 MW that have historically emitted at least 150 tons of $NO_X$ per ozone season.

As noted previously in section V.B of this document and in the EGU $NO_X$ Mitigation Strategies Final Rule TSD, the EPA considered other methods of identifying mitigation measures (*e.g.*, SCRs on smaller units, combustion control upgrades on combustion turbines, SCRs on combined cycle and simple cycle combustion turbines). The emissions reductions from these potential categories of measures do not constitute additional "technology breakpoints" in EPA's estimation, but rather reflect a different tier of assessment where further mitigation measures are based on inclusion of smaller and/or different generator-type units (rather than different pollution control technologies). Emissions reductions from these measures are relatively small and would entail much higher dollar per ton costs, going beyond what is widely observed in the fleet. Although these additional measures are not included in EPA's technology breakpoint analysis discussed in this section, the EPA did analyze the cost, potential reductions, and air quality impact of these additional measures to affirm that they do not merit inclusion in the final stringency for this action. That analysis shows the potential emissions reductions and air quality improvements from these additional measures occur beyond a notable "knee-in-the-curve" breakpoint. In other words, there are very little additional emissions reductions and air quality

improvement at problematic receptors, and the cost associated with these measures increases substantially on a dollar per ton basis. The graphic capturing this effect (located in Appendix I of the Ozone Transport Policy Analysis Final Rule TSD) illustrates the significant decline in cost-effectiveness of reductions if these measures had been included in EPA's final stringency.[248]

2. Non-EGU Assessment

Using a 2019 emissions inventory, the list of emissions units estimated to be captured by the applicability criteria, the assumed control technologies that would meet the emissions limits, and information on control efficiencies and default cost/ton values from the control measures database, the EPA estimated $NO_X$ emissions reductions and costs for the year 2026. Given the EPA's conclusion that the 2026 ozone season is the earliest date by which the required controls can be installed across the identified non-EGU industries, the EPA assessed the effects of these controls in 2026 under its multi-factor test. In the assessment, we matched emissions units by Source Classification Code (SCC) from the inventory to the applicable control technologies in the CMDB. We modified SCC codes as necessary to match control technologies to inventory records. For additional details about the steps taken to estimate emissions units, emissions reductions, and costs, see the memorandum titled "Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Units, Emissions Reductions, and Costs" available in the docket. The estimates using the 2019 inventory and information from the CMDB identify proxies for emissions units, as well as emissions reductions, and costs associated with the assumed control

---

[247] Included in Appendix I of the Ozone Transport Policy Analysis Final Rule TSD, which is available in the docket for this rulemaking.

[248] This is not to discount the potential effectiveness of these or other $NO_X$ mitigation strategies outside the context of this rulemaking, which addresses regional ozone transport on a nationwide basis based on the present record. States and local jurisdictions may find such measures particularly impactful or necessary in the context of local attainment planning or other unique circumstances. Further, while the EPA finds on the present record that this rule is a complete remedy to the problem of interstate transport for the 2015 ozone NAAQS for the covered states, the EPA has in the past recognized that circumstances may arise after the promulgation of remedies under CAA section 110(a)(2)(D)(i)(I) in which the exercise of further remedial authority against specific stationary sources or groups of sources under CAA section 126 may be warranted. *See* Response to Clean Air Act Section 126(b) Petition From Delaware and Maryland, 83 FR 50444, 50453–54 (Oct. 5, 2018).

**36746**     **Federal Register** / Vol. 88, No. 107 / Monday, June 5, 2023 / Rules and Regulations

technologies that would meet the final emissions limits. Emissions units subject to the final rule emissions limits may differ from those estimated in this assessment, and the estimated emissions reductions from, and costs to meet, the final rule emissions limits may also differ from those estimated in this assessment. The costs do not include monitoring, recordkeeping, reporting, or testing costs.

After reviewing public comments and updating some of the data used to provide an accurate assessment of the likely potential emissions reductions that could be achieved from the identified emissions units in the industries analyzed for proposal, the EPA finds that in general, these emissions reductions (with some modifications from proposal) are necessary to eliminate significant contribution at Step 3. The EPA's use of the analytical framework presented in the non-EGU screening assessment to identify potentially impactful industries and emissions unit types in the proposal remains valid. The EPA's criteria were intended to identify industries and emissions unit types that on a broad scale impact multiple receptors to varying degrees. The EPA focused its non-EGU screening assessment on (1) emissions and potential emissions reductions from these industries and emissions units and (2) the potential impact that emissions reductions from those industries and emissions units could deliver to the receptors.

While commenters criticized the analytical framework in the non-EGU screening assessment for assuming potentially unachievable emissions reductions at Step 3, or for not corresponding to a precise list of emissions units that would be covered at Step 4, these comments did not offer an alternative methodology for the Step 3 analysis to identify those industries and emissions units that potentially have the greatest impact and therefore should be scrutinized more closely for emissions reduction opportunities.[249] Further, contrary to some commenters' assertions, the EPA's assessment did not result in an unbounded scope of regulation of industrial sources. Of the approximately 40 industries defined by North American Industry Classification System codes the EPA analyzed, only

---

[249] For example, while the EPA has found it appropriate to limit the scope of emissions units that would be subject to emissions limits and controls in the iron and steel industry in light of comments regarding certain sources' inability to meet the EPA's proposed emission limits, this does not alter the EPA's determination that this industry is an impactful industry and that certain emissions controls should still be required.

seven industries were identified as having emissions and potential emissions reduction opportunities that met the EPA's air quality criteria for further assessment.

At proposal, the EPA found that based on data available at that time and for the purposes of the screening assessment, it appeared that a $7,500 marginal cost-per-ton threshold could be used as a proxy to identify cost-effective emissions control opportunities. Similar to the role of cost-effectiveness thresholds the EPA uses at Step 3 to evaluate EGU emissions control opportunities, this threshold is not intended to represent the maximum cost any facility may need to expend but is rather intended to be a representative figure for evaluating technologies to allow for a relative comparison between different levels of control stringency. For example, in the EGU analysis, the $11,000/ton average cost threshold for an SCR retrofit represents a range of SCR retrofit costs for units for which the 90th percentile cost-per-ton is roughly $21,000. See section V.B.a of this document. The EPA's potential cost threshold for non-EGU controls at proposal was intended to serve a similar representative purpose. We respond briefly to comments regarding the use of the $7,500/ton threshold in section V.C of this document. Comments regarding the screening assessment are further addressed in section 2.2 of the response to comments document in the docket.

Based on the EPA's updated analysis for this final rule, the EPA recognizes that the $7,500/ton threshold does not reflect the full range of cost-effectiveness values that are likely present across the many different types of non-EGU industries and emissions units assessed. However, the EPA nonetheless finds that, with some adjustments from proposal, the overall mix of emissions controls it identified at proposal is appropriate to eliminate significant contribution to nonattainment or interference with maintenance in downwind areas. In the final analysis, we find that the average cost-per-ton of emissions reductions across all non-EGU industries in this rule generally ranges from approximately $939/ton to $14,595/ton, with an overall average of approximately $5,339/ton. *See* memorandum titled "Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Units, Emissions Reductions, and Costs," available in the docket.

Nonetheless, overall the EPA finds that the range of cost-effectiveness values for non-EGU industries and emissions units compares favorably with the values used to evaluate EGUs. As discussed in the preceding paragraphs, the representative cost for EGUs to retrofit SCR is $11,000/ton. This reflects a range of cost estimates, with $20,900/ton reflecting the 90th percentile of units (see section V.B.a of this document). The higher end of the estimated average cost range for certain non-EGU industrial emissions units is also in that range. While specific emissions units may have higher costs associated with installing pollution control technologies than other similar unit types, this does not in itself undermine the Agency's conclusion that a level of emissions control associated with a specific emissions limit or control technology is appropriate to require across the linked upwind state region, in light of the overall emissions reductions and air quality benefits at downwind receptors that those controls are projected to deliver.

We note that the non-EGU control cost estimates in this final rule were based on historical actual emissions. This can affect the presentation of cost-per-ton values at the unit level, and it would not be appropriate to abandon uniform control stringency among like units in the covered industries across or within upwind states based on such cost differentials.

The EPA finds it appropriate to require a uniform level of emissions control across similar emissions unit types to, among other things, prevent two potential outcomes related to shifting production, either between units within the same facility or between units at different facilities. First, if some units were exempted from control requirements because of historically low actual emissions, there is a risk that source owners or operators may shift production to these specific units, increasing their utilization and resulting in emissions increases from these units. Second, if some owners or operators were able to avoid the control requirements of the final rule on this basis, they could gain a competitive advantage vis-à-vis other facilities within their respective industries. Production could shift from units at another facility subject to the control requirements to the units that avoided control requirements (and thus avoid costs the regulated facility should bear), potentially resulting in emissions increases. The effect of such an approach in such circumstances would be mere emissions shifting rather than the elimination of significant

**Federal Register** / Vol. 88, No. 107 / Monday, June 5, 2023 / Rules and Regulations    **36747**

contribution. Finally, as we have explained in prior transport actions, the cost-effectiveness figure is not the only factor that the agency considers at Step 3, *see* 86 FR 23073, and if used in isolation to make a policy decision without considering other information, could produce a result that is inconsistent with the objective of ensuring significant contribution is eliminated.[250]

In addition to our evaluation of cost-effectiveness on a cost per ton basis, the EPA's determination at Step 3 for non-EGUs is also informed by the overall level of emissions reductions that will be achieved across the region and the effect those reductions are projected to have on air quality at the downwind receptors (discussed more later in this section). We are also influenced by the fact that these emissions control strategies for non-EGUs are generally well demonstrated on many existing units, as established

through our review of consent decrees, permits, RACT determinations, and other data sources. These levels of emissions control have in many cases already been required by states with downwind nonattainment areas for the 2015 ozone NAAQS.

The EPA determined that, for 2026, the incremental average air quality improvement at receptors relative to the EGU case when SCR post-combustion controls were installed was 0.19 ppb when non-EGU controls were applied, based on the Step 3 analysis. The total average air quality improvement was 0.66 ppb when the non-EGU improvement was added to the EGU improvement, meaning that the non-EGU increment accounts for about 29 percent of this average air quality improvement. In general, the air quality results from non-EGU emissions reductions yield additional important downwind benefits to the air quality benefits of the EGU strategy. For

example, the total ppb improvement summed over all of the receptors from EGUs was 7.04 ppb and the non-EGU increment adds another 2.82 ppb of improvement bringing the total to 9.87 (when accounting for rounding). Non-EGUs account for 29 percent of this total air quality improvement as well. Further, these figures should not be considered in isolation; EPA is not comparing EGU strategy effects and non-EGU effects to make a selection between two different approaches. Rather, both the selected EGU and non-EGU emissions reduction strategies at the cost-effectiveness values identified in section V.B and V.C of this document present a comprehensive solution to eliminating significant contribution for the covered states. The combined effect of the EGU and non-EGU strategies is further presented in the following section.

TABLE V.D.2–2—AIR QUALITY AT RECEPTORS IN 2026 FROM NON-EGU INDUSTRIES

| Monitor ID No. | State | County | Average DV (ppb) | | Max DV (ppb) | |
|---|---|---|---|---|---|---|
| | | | Baseline (engineering analysis) | EGU SCR/SNCR optimization + LNB upgrade + SCR/SNCR retrofit + non-EGU | Baseline (engineering analysis) | EGU SCR/SNCR optimization + LNB upgrade + SCR/SNCR retrofit + non-EGU |
| 40278011 | Arizona | Yuma | 69.87 | 69.80 | 71.47 | 71.40 |
| 80590006 | Colorado | Jefferson | 71.70 | 71.34 | 72.30 | 71.93 |
| 80590011 | Colorado | Jefferson | 72.06 | 71.57 | 72.66 | 72.16 |
| 80690011 | Colorado | Larimer | 69.84 | 69.53 | 71.04 | 70.72 |
| 90013007 | Connecticut | Fairfield | 71.25 | 70.66 | 72.06 | 71.46 |
| 90019003 | Connecticut | Fairfield | 71.58 | 71.06 | 71.78 | 71.26 |
| 350130021 | New Mexico | Dona Ana | 70.06 | 69.86 | 71.36 | 71.16 |
| 350130022 | New Mexico | Dona Ana | 69.17 | 68.96 | 71.77 | 71.56 |
| 350151005 | New Mexico | Eddy | .............. | .............. | .............. | .............. |
| 350250008 | New Mexico | Lea | .............. | .............. | .............. | .............. |
| 480391004 | Texas | Brazoria | 69.89 | 68.50 | 72.02 | 70.58 |
| 481671034 | Texas | Galveston | 71.29 | 69.28 | 72.51 | 70.47 |
| 482010024 | Texas | Harris | 74.83 | 73.39 | 76.45 | 74.98 |
| 490110004 | Utah | Davis | 69.90 | 69.28 | 72.10 | 71.46 |
| 490353006 | Utah | Salt Lake | 70.50 | 69.91 | 72.10 | 71.50 |
| 490353013 | Utah | Salt Lake | 71.91 | 71.40 | 72.31 | 71.80 |
| 551170006 | Wisconsin | Sheboygan | 70.83 | 70.27 | 71.73 | 71.17 |
| Average AQ Change Relative to Base (ppb) | | | .............. | .............. | .............. | 0.66 |
| Total PPB Change Across All Receptors Relative to Base (ppb) | | | .............. | .............. | .............. | 9.87 |

**Table Notes:**

a The EPA notes that the design values reflected in Table V.D.–2 correspond to the engineering analysis EGU emissions inventory that was used in AQAT to determine state-level baseline emissions and reductions at Step 3. These tools are discussed in greater detail in the Ozone Transport Policy Analysis Final Rule TSD.

b New Mexico Eddy and Lea monitors have no values in Table V.D.2–2 as EPA does not have calibration factors for these monitors as no contributions were calculated for them from the proposal AQ modeling.

c The cumulative ppb change only shows the aggregate change across all problematic receptors (some of which are located within close proximity to one another) in this part of the Step 3 analysis. Section VIII of this document provides a more complete picture of the air quality impacts of the final rule.

---

[250] Nonetheless, recognizing the diverse non-EGU industries and emissions units covered in this action and the potential that certain individual facilities and emissions units may face extreme hardship in meeting the general requirements being finalized in this action, the EPA has provided mechanisms in the regulatory requirements for industrial sources that provide for some flexibility in the emissions limits based on a demonstration of technical impossibility or extreme economic hardship. *See* section VI.C of this document.

For more information about how this assessment was performed and the results of the analysis for each receptor, refer to the Ozone Transport Policy Analysis Final Rule TSD and to the Ozone AQAT included in the docket for this rule.

3. Combined EGU and Non-EGU Assessment

The EPA used the Ozone AQAT to evaluate the combined impact of these selected stringency levels for both EGUs and non-EGUs on all receptors remaining in the 2026 air quality modeling base case to inform the air quality effects of the rule and to conduct our over-control analysis. EPA's evaluation demonstrated air quality improvement at the remaining nonattainment or maintenance receptors outside of California (*see* section IV.D of this document for receptor details). The EPA estimated that the average air quality improvement at these receptors relative to the engineering analytics base case was 0.66 ppb for emissions reductions commensurate with optimization of existing SCRs/SNCRs, combustion control upgrades, application of new post-combustion control (SCR and SNCR) retrofits at eligible units, and all estimated emissions reductions from the non-EGU industries. Table V.D.3–1 summarizes the results of EPA's Step 3 evaluation of air quality improvements at these receptors using AQAT. In summary, the collective application of these mitigation measures and emissions reductions are projected to deliver meaningful downwind air quality improvements.

TABLE V.D.3–1—CHANGE IN AIR QUALITY AT RECEPTORS IN 2026 FROM FINAL RULE EGU AND NON-EGU EMISSIONS REDUCTIONS [a] [b] [c]

| Sector/technology | Ozone season emissions reductions | Total PPB change across all downwind receptors [d] | Average PPB change across all downwind receptors |
|---|---|---|---|
| EGU (SCR/SNCR optimization + LNB upgrade) | 16,282 | 0.71 | 0.05 |
| EGU SCR/SNCR Retrofit | 55,672 | 6.34 | 0.42 |
| Non-EGU Industries | 44,616 | 2.82 | 0.19 |
| Total | | 9.87 | 0.66 |

Table Notes:

[a] As in prior rules, for the purpose of defining significant contribution at Step 3, the EPA evaluated air quality changes resulting from the application of the emissions reductions in only those states that are linked to each receptor as well as the state containing the receptor. By applying reductions to the state containing the receptor, the EPA ensures that it is accounting for the downwind state's fair share. In addition, this method holds each upwind state responsible for its fair share of the downwind problems to which it is linked. Reductions made by other states to address air quality problems at other receptors do not increase or decrease this share. The air quality impacts on design values that reflect the emissions reductions in all linked states and associated health and climate benefits are discussed in section VII of this document.

[b] The EPA notes that the design values reflected in Tables V.D.1–1 and –2 correspond to the engineering analysis EGU emissions inventory used in AQAT to determine state-level baseline emissions and reductions at Step 3. These tools are discussed in greater detail in the Ozone Transport Policy Analysis Final Rule TSD. Additionally, these emissions reduction values vary slightly from the technology reduction estimates described in section V.C of this document, as the values here reflect the sum of the final identified stringency for each state (*e.g.,* SCR retrofit potential is not assumed in Alabama, Minnesota, and Wisconsin).

[c] The total and average ppb results from non-EGUs emissions reductions shown here were generated using the Step 3 AQAT methodology consistent with that for EGUs (*i.e.,* including reductions from the state containing the receptor and excluding states that are not explicitly linked to particular receptors). The values shown in Table V.C.2–1 were prepared for the non-EGU screening assessment using a methodology where states within the program make emissions reductions for all receptors. States that contain receptors (*i.e.,* Connecticut and Colorado) that are not linked to other receptors are not assumed to make reductions under that methodology.

[d] The cumulative ppb change only shows the aggregate change across all problematic receptors (some of which are located within close proximity to one another) in this part of the Step 3 analysis. Section VIII of this document provides a picture of the projected air quality impacts of the final rule using modeling techniques that differ from the methodologies employed here.

4. Over-Control Analysis

The EPA applied its over-control test to this same set of aggregated EGU and non-EGU data described in the previous section. The EPA performed air quality analysis using the Ozone AQAT to determine whether the emissions reductions for both EGUs and non-EGUs potentially create an "over-control" scenario. As in prior transport rules following the holdings in *EME Homer City,* overcontrol would be established if the record indicated that, for any given state, there is an identified, less stringent emissions control approach for that state, by which (1) the expected ozone improvements would be sufficient to resolve all of the downwind receptor(s) to which that state is linked; or (2) the expected ozone improvements would reduce the upwind state's ozone contributions below the screening threshold (*i.e.,* 1 percent of the NAAQS or 0.70 ppb) to all receptors. In *EME Homer City,* the Supreme Court held that the EPA cannot "require[] an upwind State to reduce emissions by more than the amount necessary to achieve attainment in every downwind State to which it is linked." 572 U.S. at 521. On remand from the Supreme Court, the D.C. Circuit held that this means that the EPA might overstep its authority "when those downwind locations would achieve attainment even if less stringent emissions limits were imposed on the upwind States linked to those locations." *EME Homer City II,* 795 F.3d at 127. The D.C. Circuit qualified this statement by noting that this "does not mean that every such upwind state would then be entitled to less stringent emissions limits. Some of those upwind States may still be subject to the more stringent emissions limits so as not to cause other downwind locations to which those States are linked to fall into nonattainment." *Id.* at 14–15. Further, as the Supreme Court explained, "while EPA has a statutory duty to avoid over-control, the Agency also has a statutory obligation to avoid 'under-control,' *i.e.,* to maximize achievement of attainment downwind." 572 U.S. at 523. The Court noted that "a degree of imprecision is inevitable in tackling the problem of interstate air pollution" and that incidental over-control may be unavoidable. *Id.* "Required to balance the possibilities of under-control and over-control, EPA must have leeway in fulfilling its statutory mandate." *Id.*[251]

[251] Although the Court described over-control as going beyond what is needed to address "nonattainment" problems, the EPA interprets this

Consistent with these instructions from the Supreme Court and the D.C. Circuit, using the Ozone AQAT, the EPA first evaluated whether reductions resulting from the selected control stringencies for EGUs in 2023 and 2026 combined with the emissions reductions selected for non-EGUs in 2026 can be anticipated to resolve any downwind nonattainment or maintenance problems (see the Ozone Transport Policy Analysis Final Rule TSD for details on the construction and application of AQAT).

Similar to our approach in the CSAPR Update and the Revised CSAPR Update, our primary overcontrol assessment examines the receptor changes from the emissions reductions of the upwind states found linked to a receptor. Consistent with prior Rules, EPA also assumed that downwind states that are not upwind states in this rule implement reductions commensurate with the rule's requirements (this treatment applies specifically to Colorado and Connecticut). This configuration effectively presents an equitable representation of the effects of the rule in that linked upwind states do not shift their responsibility to other upwind states linked to different receptors. It also effectively resolves any interdependence and "which state goes first?" questions. Furthermore, the downwind states in which a receptor is located are held to a "fair share" of emissions reductions—*i.e.*, the same level of emissions control stringency that the upwind states must implement.

The EPA also repeated this analysis using an alternative configuration, as described in the Ozone Transport Policy Analysis Final Rule TSD. In this configuration, we looked at the combined effect of the entire program across all linked upwind states on each receptor and did not assume that a downwind state that is not also an upwind state makes any additional emissions reductions beyond the baseline in the relevant year. This configuration effectively isolates how the rule as a whole, and just the rule, will affect air quality and linkages. While the first configuration described is, in the Agency's view, the more appropriate way to evaluate overcontrol, taken together the configurations provide a more robust basis on which to rest our conclusions regarding overcontrol. In any case, as further

illustrated in the Ozone Transport Policy Analysis Final Rule TSD, our analysis under both configurations establishes that there is no overcontrol and so there is no need to reconcile any difference in results between them.

We also looked at the ordering of increments of emissions reduction and have found that it does not matter whether we assume EGU emissions controls would be applied first, followed by non-EGU controls, or vice-versa. For 2023, the question is moot as there are only EGU reductions to examine. For 2026, the analysis showed there would be no overcontrol either way. In 2026, the EPA's overcontrol analysis (as presented here) examined all EGU reductions first and layered in non-EGU reductions in the last step of the overcontrol check. However, the EPA also examined an alternative ordering scenario where the non-EGU reductions were assessed prior to the EGU reductions associated with installation of new SCR post-combustion controls (see the Ozone Transport Policy Analysis Final Rule TSD for details). This ordering did not impact the results of the overcontrol test. The specific results of these analyses are presented in the TSD.

The control stringency selected for 2023 (a representative cost threshold of $1,800 per ton for EGUs) includes emissions reductions commensurate with optimization of existing SCRs and SNCRs and installation of state-of-the-art combustion controls, is not estimated to change the status of any receptors.[252] Thus, the nonattainment or maintenance receptors that the states are linked to remain unresolved. Nor do any states' contribution levels drop below the 1 percent of NAAQS threshold. Thus, the EPA determined that none of the 23 linked states have all of their linkages resolved at the final EGU level of control stringency in 2023, and hence, the EPA finds no over-control in the final level of stringency.

Based on the air quality baseline modeling for 2026, all receptors to which Alabama, Minnesota, and Wisconsin are linked in 2023 are projected to be in attainment in 2026. Therefore, no additional stringency is finalized for EGUs or non-EGUs in those states beyond the 2023 level of stringency. For the remaining 20 states,

the selected control stringency beginning in 2026 includes additional EGU controls and the non-EGU emissions reductions.

The EPA assesses air quality impacts and overcontrol in the year 2026 in this final rule, even though the rule accommodates the potential need for individual facilities (both EGU and non-EGU) to have some additional time to come into compliance. The EPA views this additional time to be a reflection of need (based on demonstrated impossibility) that is justified at Step 4 of the interstate transport framework rather than at Step 3. As explained in section VI.A of this document, with respect to EGUs, the EPA extends the full implementation of the SCR retrofit-based reductions across 2026 and 2027 to accommodate any *unit-level* scheduling challenges. However, we find that many sources can meet a three-year installation time and the trading program features and the allowance price will incentivize these reductions to occur as soon as possible. Similarly, with respect to non-EGU industrial sources, the final rule provides limited circumstances for individual facilities to seek and to be granted extensions of time to install required pollution controls and achieve the emissions rates established in this rule based on a showing of necessity. Those circumstances where an extension may be warranted for any specific facility are unknown at this time and will be evaluated through a source-specific application process, where the need for extension can be established with source-specific evidence. See section VI.C of this document. Further, 2026 is the critical analytic year associated with the last full ozone season before the 2027 Serious area attainment date and is the year by which significant contribution must be eliminated if at all possible. Therefore, for purposes of this analysis, the collective *state and regional* representation of these reductions are fully assumed in 2026. The potential ability of both EGU and non-EGU sources to have some amount of additional time beyond 2026 to comply with requirements that we have determined at Step 3 are necessary to eliminate significant contribution does not necessitate evaluating a later year than 2026 for overcontrol. The stringency of the control program does not alter in any year beyond 2026.[253] By

---

[252] For purposes of this rule, the violating monitor receptors inform our determinations at Step 1 and 2 by strengthening the analytical basis on which we conclude upwind states are linked in 2023. Because no linkages identified using our air quality modeling methodology resolve in 2023 under the selected control stringency, it is not necessary to evaluate overcontrol with respect to the additional set of violating-monitor receptors.

[253] Thus, we note, this circumstance is different than the record on which overcontrol was found in *EME Homer City.* There, CSAPR would have implemented an increase in the emissions control stringency of the rule (as reflected in a change in emissions control stringency expressed as dollars

Continued

---

**96a**

fully reflecting all Step 3 emissions reductions in its overcontrol test for 2026, EPA ensures that it is not understating the emissions impact and benefit when performing the test.

The EPA used the Ozone AQAT to evaluate the impact of this selected stringency level (as well as other potential stringency levels) on all receptors remaining in the 2026 air quality modeling base case. This assessment shows that the selected control stringency level is estimated to change the status of three receptors to attainment or maintenance in 2026. Brazoria County, Texas (Monitor ID 480391004); and Galveston County, Texas (Monitor ID 481671034), are estimated to come into attainment. We observe that one of the Fairfield, Connecticut, receptors (Monitor ID 090013007) is estimated to go from nonattainment to maintenance (when EGU emissions reductions with SCR are applied, prior to the application of the non-EGU emissions reductions). This receptor is expected to remain in maintenance even after the application of the non-EGU emissions reductions. Based on these data, EPA finds that all linked states except Arkansas, Mississippi, and Oklahoma are projected to continue to be linked to nonattainment or maintenance receptors after implementation of all identified Step 3 reductions, and hence, the EPA finds no over-control in its determination of that level of stringency for those states. Arkansas, Mississippi, and Oklahoma are linked to at least one of the two Texas receptors that are projected to come into attainment with the full implementation of the control strategy at Step 3. However, these two Texas receptors are expected to remain as maintenance-only receptors prior to the final increment of reductions assessed (the addition of the non-EGU reductions), so EPA concludes that imposition of the incremental non-EGU

level is appropriate to avoid under-control as to these states and does not constitute overcontrol.[254]

Next, the EPA evaluated the potential for over-control with respect to the 1 percent of the NAAQS threshold applied in this final rulemaking at Step 3 of the good neighbor framework, assessed for the selected control stringencies for each state for each period that downwind nonattainment and maintenance problems persist (*i.e.,* 2023 and 2026). Specifically, the EPA evaluated whether the selected control stringencies would reduce upwind emissions to a level where the contribution from any of the 23 linked states in 2023 or 20 linked states in 2026 would be below the 1 percent threshold. The EPA finds that for the mitigation measures assessed in 2023 and in 2026, all states that contributed greater than or equal to the 1 percent threshold in the base case are projected to continue to contribute greater than or equal to 1 percent of the NAAQS to at least one remaining downwind nonattainment or maintenance receptor for as long as that receptor remained in nonattainment or maintenance. EPA notes that in 2026, for Oklahoma, when the incremental level of stringency associated with the non-EGU control strategy is applied, Oklahoma's contribution to Galveston County Texas is expected to drop below the 1 percent threshold (at the same time that the receptor has its maintenance problems resolved). EPA concludes that this does not constitute overcontrol because both the receptor and the contribution are estimated to remain above the maintenance level and linkage threshold at the prior level of stringency and, thus, since otherwise justified at Step 3, the full stringency for 2026 is appropriate to avoid under-control. For more information about this assessment, refer to the Ozone Transport Policy Analysis Final Rule TSD and the Ozone AQAT.

Therefore, EPA finds that all of the selected EGU and non-EGU NO$_X$ reduction strategies selected in EPA's Step 3 analysis can be applied to all states linked in 2026 to eliminate significant contribution to nonattainment and interference with maintenance of the 2015 ozone NAAQS without introducing an overcontrol

problem based on the present record. The Supreme Court has directed the EPA to avoid both over-control and under-control in addressing good neighbor obligations. In addition, the D.C. Circuit has reinforced that over-control must be established based on particularized, record evidence on an as-applied basis.

The determination that the stringency of this action does not constitute overcontrol for any linked state is further reinforced by EPA's observation in section III.A of this document regarding the nature of the ozone problem. Ozone levels are known to vary, at times dramatically, from year to year. Future ozone concentrations and the formation of ground level ozone may also be impacted by factors in future years that the EPA cannot fully account for at present. For example, changes to meteorological conditions could affect future ozone levels. Climate change could also contribute to higher than anticipated ozone levels in future years through wildfires and heat waves, which can contribute directly and indirectly to higher levels of ozone. Any modeling projection can be characterized as having some uncertainty, and that is not a sufficient reason to ignore modeling results. However, in the context of the overcontrol test, the question is whether it is clear according to particularized evidence that there is no need for the emissions reductions in question. *See EME Homer City,* 572 U.S. at 523 ("[A] degree of imprecision is inevitable in tackling the problem of interstate air pollution. Slight changes in wind patterns or energy consumption, for example, may vary downwind air quality in ways EPA might not have anticipated."). Under this standard, the degree of attainment that is projected to occur under the rule in relation to the Texas receptors discussed above is not so large or certain to occur that it would be appropriate to attempt to devise a less stringent emissions control strategy for the relevant linked states as a result, particularly in light of the fact that at the penultimate stringency level the receptors are not resolved.

It is also possible that ozone-precursor emissions from certain sources may decline beyond what we currently project in this rule. For example, the IRA may result in reductions in fossil-fuel fired generation, which should in turn result in lower NO$_X$ emissions during the ozone season.[255] We have

---

per ton from $100/ton to $500/ton). That change in stringency marked a determination that EPA had made at Step 3 regarding the degree of emissions reduction that sources needed to achieve beginning in 2014. But in that year, the court found EPA's record to reveal that certain states would not need to go up to that higher level of stringency because air quality problems and/or linkages were already projected to be resolved at the lower level of stringency. *See* 795 F.3d at 128–30. The analogous year to 2014 here is 2026. The stringency level of this control program does not change post-2026. Nor do we think individual sources should gain the benefit of delaying emissions reductions simply in the hopes that they could show those reductions would be overcontrol; each source must be held to the elimination of its portion of significant contribution. Necessity may demand some additional amount of time for compliance, but equity demands that individual sources not gain an untoward advantage from delay and reliance on other sources' timelier compliance.

[254] Even with full implementation of the rule, these two receptors are only projected to come into attainment by a relatively small degree, and no policy option is ascertained in the record by which attainment could be achieved to an even lesser degree. Nonetheless, the EPA further evaluated whether there were any overcontrol concerns through sensitivity analyses. Under all scenarios, the EPA finds there is no overcontrol. See the Ozone Transport Policy Analysis Final Rule TSD for more discussion and analysis.

[255] As discussed in section IV.C.2.b, there are also potential ways in which the IRA may not necessarily result in reductions in NO$_X$ emissions from EGUs.

assessed this scenario to ensure our overcontrol conclusions are robust even if the IRA has those effects. As discussed in the Regulatory Impact Analysis, the EPA conducted additional modeling of the final policy scenario (inclusive of economically efficient methods of compliance available within the Step 4 implementation programs) using its IPM tool. The EPA observes that the differences in estimated costs and emissions reductions in the IRA sensitivity (presented in Appendix 4A of the RIA) suggests that there would also be differences in estimated health and climate benefits under that scenario, although the Agency did not have time under this rulemaking schedule to quantify those differences. The EPA also used AQAT to conduct an additional EGU modeling sensitivity reflecting the IRA. Both the IPM sensitivity and the corresponding AQAT assessment of the IRA scenarios demonstrated no overcontrol as every state linkage to a downwind problematic receptor persisted in the penultimate level of stringency when EPA performed its Step 3 evaluation—even when the impacts of the IRA are incorporated. This further affirmed EPA's conclusion of no overcontrol concerns at the stringency level of the final rule. This overcontrol sensitivity is further discussed in the Ozone Transport Policy Analysis Final Rule TSD, Appendix K.

In light of the mandate of the CAA to protect the public health and environment through the elimination of significant contribution under the Good Neighbor Provision for the 2015 ozone NAAQS, nothing in the present record establishes on an as-applied, particularized basis that this rule will result in an unnecessary degree of control of upwind-state emissions.

*Comment:* Many commenters alleged that the rule overcontrols emissions by more than necessary to eliminate significant contribution for the 2015 ozone NAAQS, on the basis that the emissions reductions are unnecessary or are unnecessarily stringent.

*Response:* As discussed earlier in this section, EPA has analyzed whether this rule "overcontrols" emissions and has found based on a robust, multi-faceted analysis, that it does not. In particular, EPA has not identified a lesser-stringency emissions control strategy for any state that would either fully resolve the air quality problems at a downwind receptor location or reduce that upwind state's linkage to a level below the 1 percent of NAAQS contribution threshold. No commenter has provided a particularized, as-applied analysis demonstrating that EPA's emissions

control strategy will actually result in any overcontrol of emissions in the manner the EPA or courts have understood that term, and overcontrol allegations must be proven through particularized, as-applied challenges. *See EME Homer City*, 795 F.3d at 127; *see also Wisconsin*, 938 F.3d at 325 ("[T]he way to contest instances of over-control is not through generalized claims that EPA's methodology would lead to over-control, but rather through a 'particularized, as-applied challenge.' " Accordingly, as we did when presented with similar arguments in *EME Homer III*, we reject Industry Petitioners' arguments because they do no more than speculate that aspects of 'EPA's methodology *could* lead to over-control of upwind States.' ") (cleaned up) (citing *EME Homer City*, 795 F.3d at 136–137).

*Comment:* For 2 of the 20 states linked in 2026, the last downwind receptor to which these two states are linked (*i.e.,* Brazoria County, Texas) was estimated to achieve attainment and maintenance after full application of EGU reductions and Tier 1 non-EGU reductions at proposal. Commenters noted that this suggested application of the estimated non-EGU, and/or some EGU, emissions reductions constituted over-control for these states.

*Response:* EPA notes that at proposal, this downwind receptor only resolved by a small margin after the application of all EGU and Tier 1 non-EGU emissions reductions. As explained earlier in this section, the final rule air quality modeling shows that the receptors to which these states are linked do not resolve upon full implementation of the identified EGU reductions by themselves, and only reach attainment by a small degree following the additional reductions from the non-EGU control strategy.[256] If the EPA were to select the control stringency of this penultimate step, both upwind-state contribution and downwind-state air quality receptors would persist while the cost-effective emissions reductions that were identified to eliminate significant

---

[256] Because in the final record we do not identify cost, air quality, and emission reduction factors that sufficiently differentiate either source-type or emissions control strategy among the Tier 1 and Tier 2 industries identified at proposal, we combined the non-EGU industries and emissions reductions into one group, and we are finalizing requirements for all non-EGU industries and most emissions unit types identified at proposal. In light of the small degree to which the relevant receptors reach attainment and the multi-faceted assessment of overcontrol we have undertaken, the overcontrol assessment with respect to non-EGUs in the final rule is sufficient to establish that there is no overcontrol.

contribution remain available but un-implemented. This would constitute under-control. Consequently, as described, the EPA views the control stringency required of these states in this final rule as not constituting over-control and appropriate to eliminate significant contribution to nonattainment and interference with maintenance of this NAAQS in line with our Step 3 determinations for all other states. See the Ozone Transport Policy Analysis Final Rule TSD section C.3 for discussion and analysis regarding overcontrol for states solely linked to one or both of these receptors.

*Comment:* Commenters raised a variety of arguments that the enhancements to the EGU trading program in this action will result in overcontrol of power plant emissions. They alleged that dynamic budgeting would cause the budget to continually decrease even after significant contribution is eliminated. They similarly argue that annual emissions bank recalibration and the emissions backstop emissions rate have not been shown to be justified to eliminate significant contribution.

*Response:* This final rule's determination regarding the appropriate level of control stringency for EGUs finds that the amounts of $NO_X$ emissions reduction achieved through these strategies at EGUs are appropriate and cost-justified under the Step 3 multifactor analysis. These determinations are associated with particular emissions control technologies and strategies as detailed in sections V.B.1 and V.C.1 above. It is the implementation of those strategies at the covered EGU sources and the air quality effects of those strategies (coupled with non-EGUs) in the relevant analytic year of 2026 on which we base our determination of significant contribution at Step 3. This includes the evaluation of whether there is overcontrol, which is also conducted for the 2026 analytic year as explained above. As explained below, we disagree that the enhancements to the trading program at Step 4 implicate the need for further overcontrol analysis. These enhancements operate together to ensure the trading program continues to maintain the Step 3 emissions control stringency over time. These enhancements reflect lessons learned through EPA's experience with prior trading programs implemented under the good neighbor provision. None of commenters' arguments that these enhancements result in overcontrol are persuasive.

Commenters contend that these enhancements to the trading program go

beyond a mass-based budget approach as applied in CSAPR. Because these improvements in the program result in a continuing incentive for each covered EGU source to maintain the pollution control performance the EPA found appropriate to eliminate significant contribution at Step 3, commenters believe these enhancements must necessarily result in prohibited overcontrol. These arguments appear to be premised on the assumption that overall emissions may later decline to such a point that there is no longer a linkage between a particular state and any downwind receptors for reasons other than the requirements of this rule.

As an initial matter, no commenter has provided an empirical analysis demonstrating that the control stringency identified at Step 3 to eliminate significant contribution would actually result in any overcontrol. The case law is clear that over-control allegations must be proven through particularized, as-applied challenges. See prior response to comments. More importantly here, the Group 3 trading program enhancements do not impose increased stringency in years after 2030 and do not force emissions to continually be reduced to ever lower levels. They are only designed to incentivize the implementation of the Step 3 emissions control stringency that eliminates significant contribution. The circumstances that could potentially cause a receptor or linkage to resolve at some point in the future after 2026 are not circumstances that are within the power of this rule to control. Nor would those circumstances present a justification as to why upwind sources should no longer be obligated to eliminate their own significant contribution. *Wisconsin,* 938 F.3d at 324–25 (rejecting overcontrol arguments premised on attributing air quality problems to other emissions).

Further, the EPA is not constrained by the statute to only implement good neighbor obligations through fixed, unchanging, mass-based emissions budgets. *See* section III.B.1 of this document. The EPA has defined the ''amount'' of emissions that must be prohibited to eliminate significant contribution in this action based on a series of determinations of which emissions control strategies, for certain identified EGU and non-EGU sources, are appropriate applying the Step 3 multifactor analysis. Notably, the non-EGU industrial source emissions reductions in this action are *not* being achieved at Step 4 through mass-based emissions trading, nor are they required to be by any provision of the CAA. See section III.B.1.

As explained in sections III.B.1.d and VI.B.1 of this document, the EPA finds good reason based on its experience with trading programs that using fixed, mass-based, ozone-season wide budgets does not necessarily ensure the elimination of significant contribution over the entire region of linked states or throughout each ozone season. Even in the original CSAPR rulemaking, which promulgated only fixed, mass-based budgets, such outcomes were never the EPA's intention to allow. *See, e.g.,* 76 FR 48256–57 (''[I]t would be inappropriate for a state linked to downwind nonattainment or maintenance areas to stop operating existing pollution control equipment (which would increase their emissions and contribution).''). Despite the EPA's expectations in CSAPR, the experience of the Agency since that time establishes a real risk of ''under-control'' if the existing trading framework is not enhanced. *See EME Homer City,* 572 U.S. at 523 (''[T]he Agency also has a statutory obligation to avoid 'under-control,' i.e., to maximize achievement of attainment downwind.'').

Further, the EPA has already once adjusted its historical approach to better account for known, upcoming changes in the EGU fleet to ensure mass-based emissions budgets adequately incentivize the control strategy determined at Step 3. This adjustment was introduced in the Revised CSAPR Update. *See* 82 FR 23121–22. The EPA now believes it is appropriate to ensure in a more comprehensive manner, and in perpetuity, that a mass-based emissions-trading framework incentivizes continuing implementation of the Step 3 control strategies to ensure significant contribution is eliminated in all upwind states and remains so. This is fully analogous in material respect to an approach to implementation at Step 4 that relies on application of unit-specific emissions limitations, which under the Act would typically apply in perpetuity and may only be modified through a future SIP- or FIP-revision rulemaking process. *See* CAA section 110(i) prohibiting modifications to implementation plan requirements except by enumerated processes. The availability of unit-specific emissions rates as a means to eliminate significant contribution is discussed in further detail in section III.B.1 of this document. The EPA also explained this in the proposal. *See* 87 FR 20095–96.

Further, these enhancements are directly related to assisting downwind areas specifically with the goal of attaining and maintaining the 2015 8-hour ozone NAAQS. In this respect, they are not ''unnecessary'' or

''unrelated'' to carrying out the mandates of CAA section 110(a)(2)(D)(i)(I). Taking measures to ensure that each upwind source covered by an emissions trading program is adequately incentivized to eliminate excessive emissions (as found at Step 3) throughout the entirety of each ozone season is entirely appropriate in light of the nature of the ozone problem. Ozone exceedances recur on varying days throughout the summertime ozone season, and it is not possible to predict in advance which specific days will have high ozone. Further, impacts to public health and the environment from ozone can occur through short-term exposure (*e.g.,* over a course of hours, *i.e.,* on a daily basis). The 2015 ozone NAAQS is expressed as an 8-hour average, and only a small number of days in excess of the ozone NAAQS can cause a downwind area to be in nonattainment. Thus, even a small number of exceedances can result in continuing and/or increased regulatory burdens on the downwind jurisdiction. Taking these considerations into account, it is evident that a fixed, mass-based emissions program that does not adequately incentivize emissions reductions commensurate with our Step 3 determinations on each day of every ozone season going forward does not provide a sufficient guarantee that the emissions that significantly contribute on those particular days and at particular receptor locations when ozone levels are at risk of exceeding the NAAQS have been eliminated. *See* section V.B.1.a and VI.B of this document for more discussion of data observations regarding SCR optimization.

These enhancements are also consistent with the general policies and principles EPA has long applied in implementing the NAAQS through the SIP/FIP framework of section 110. Emissions control measures relied on to meet CAA requirements must be permanent and enforceable and included in the implementation plan itself. *See, e.g., Montana Sulfur & Chem. Co.* v. *EPA,* 666 F.3d 1174, 1196 (9th Cir. 2012); 40 CFR 51.112(a). In the General Preamble laying out EPA's plans for implementing the 1990 CAA Amendments, the EPA identified a core ''principle'' that control strategies should be ''accountable.'' ''This means, for example, that source-specific limits should be permanent and must reflect the assumptions used in the SIP demonstrations.'' 57 FR 13498, 13568 (April 16, 1992). EPA went on, ''The principles of quantification, enforceability, replicability, and

accountability apply to all SIPs and control strategies, including those involving emissions trading, marketable permits and allowances." *Id.* EPA also explained that its "emissions trading policy provides that only trades producing reductions that are surplus, enforceable, permanent, and quantifiable can get credit and be banked or used in an emissions trade." *Id.* These principles follow from the language of the Act, including CAA section 110(a)(2), 107(d)(3)(E)(iii), 110(i), and 110(l). These provisions and principles further underscore the importance of ensuring that the emissions reductions the EPA has found necessary to eliminate significant contribution are in fact implemented on a consistent and permanent basis even within the context of an emissions trading program.

The EPA disagrees that the budget adjustments that would occur over time under this final rule (for example, the annual dynamic-budget adjustment) must be reassessed each time they occur through notice and comment rulemaking under CAA section 307(d). This would serve no purpose. The formulas that the EPA will apply to adjust the budgets and allowance bank are set in this final rule and are intended to maintain, not increase (or decrease), program stringency. While the EPA intends to provide an opportunity for stakeholders to review and propose corrections to its data as it implements the established budget formulas, no larger reassessment of the emissions control program is needed on an ongoing basis, because, again, that program is simply calibrated to ensure that emissions reductions commensurate with the determination of "significance" in Step 3 continue to be obtained over the long term. As described earlier, these trading program provisions are analogous to, or mimic, the effect of unit-specific emissions limitations that apply in perpetuity.[257]

Commenters also confuse the "amount" of emissions that must be eliminated under CAA section 110(a)(2)(D)(i)(I) as being synonymous with a fixed, mass-based budget that reflects the residual emissions allowed following the elimination of significant contribution. However, EPA views the "amount" to be eliminated as those emissions that are in excess of the cost-

effective emissions control strategies identified in Step 3. This is further explained in section III.B.1 of this document.

Thus, this rule is in compliance with the overcontrol principles that the D.C. Circuit applied on remand in *EME Homer City* to find certain instances of overcontrol in CSAPR's emissions control strategies. The D.C. Circuit found that EPA had imposed more stringent emissions-control strategies for certain states than were necessary to resolve all of those states' linkages. 795 F.3d at 128–30. Specifically, for sulfur dioxide, the court found certain receptors would reach attainment if all linked upwind states had implemented "cost controls" at $100/ton or $400/ton, rather than EPA's selected stringency level of $500/ton. Similarly, for ozone season $NO_X$, the court found that receptors were projected to attain the NAAQS at stringencies below $500/ton. The court's focus was on the *stringency* of the emissions control obligations as determined through the application of cost thresholds at Step 3 of the analysis. The court did not hold that EPA may only use fixed, mass-based budgets to implement those reductions. The court did not hold that EPA must permit individual polluting sources to be allowed to increase their emissions at some point in the future. The court did not hold that EPA's good neighbor FIPs must, effectively, contain termination clauses, such that they cease to ensure the implementation of the control stringency determined as necessary at Step 3, the moment a downwind receptor reaches attainment. Indeed, such a rule would contravene the statute's clear, forward-looking directive that EPA must also eliminate upwind emissions that interfere with *maintenance* of the NAAQS; *see North Carolina*, 531 F.3d at 908–911; *Wisconsin*, 938 F.3d at 325–26.

The *EME Homer City* court on remand in fact rejected various arguments that other aspects of EPA's emissions control strategy in CSAPR resulted in overcontrol, holding that EPA had properly given effect to the interfere with maintenance prong, and noting that petitioners failed to make out proven, as-applied demonstrations of overcontrol:

At bottom, each of those claims is an argument that EPA's methodology could lead to over-control of upwind States that are found to interfere with maintenance at a downwind location. That could prove to be correct in certain locations. But the Supreme Court made clear in *EME Homer* that the way to contest instances of over-control is not through generalized claims that EPA's methodology would lead to over-control, but

rather through a "particularized, as-applied challenge." *EME Homer*, 134 S. Ct. at 1609, slip op. at 31. And petitioners do not point to any actual such instances of over-control at downwind locations.

795 F.3d at 137. The court went on to observe, "EPA may only limit emissions 'by just enough to permit an already-attaining State to maintain satisfactory air quality.' If States have been forced to reduce emissions beyond that point, affected parties will have meritorious as-applied challenges." *Id.* (quoting 572 U.S. at 521–22). But this too was not a holding that EPA may not ensure effective and permanent implementation of an emissions control stringency that EPA has found warranted under CAA section 110(a)(2)(D)(i)(I). Such an approach is available through the more conventional CAA practice of setting unit-specific emissions limitations that would apply on a permanent and enforceable basis. *See* CAA sections 110(a)(2) and 302(y) (providing for SIPs and FIPs to include "enforceable emissions limitations" in addition to economic incentive measures like trading programs).[258] This is in fact how EPA intends to ensure significant contribution is eliminated from non-EGU industrial sources for which a mass-based trading regime is, at least at the present time, unworkable (see section VI.C of this document). And EPA has provided for the elimination of significant contribution through source-specific emissions limitations in prior transport actions as well, so this position is not novel. See section III.B of this document.

Nonetheless, EPA recognizes that under the Act, both FIPs and SIPs may be revised, and states may replace FIPs with SIPs if EPA approves them. Any such revision must be evaluated to ensure no applicable CAA requirements are interfered with. *See, e.g., Indiana* v. *EPA*, 796 F.3d 803 (7th Cir. 2015). For example, states may be able to demonstrate in the future that through some other permanent and enforceable methods of emissions reduction that they have adopted into their SIP, they will be able to achieve a similar emissions control stringency with different emissions reduction requirements imposed on different sources as compared to the FIPs finalized in this action. See section VI.D of this document.

Therefore, commenters' contentions that EPA's trading program enhancements result in prohibited

---

[257] We note further that because all of the trading program provisions, including the dynamic budget-setting provisions and process, are established by this final FIP rulemaking, the ministerial future-year budget adjustment process complies with the CAA section 110(i) prohibition on modification of implementation plan requirements except by enumerated process.

[258] "Emissions limitation" is in turn defined at CAA section 302(k) as a "requirement . . . which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis. . . ."

overcontrol are not proven through as-applied, particularized challenges, and they are premised on an incorrect understanding of the CAA and the relevant case law. The Agency rejects the contention that it must somehow provide in the present FIP action for a relaxation in the stringency of the Step 4 implementation program and thus allow for the recurrence of pollution that we have found here, in this action, significantly contributes to downwind ozone nonattainment and maintenance problems.

## VI. Implementation of Emissions Reductions

### A. NO_X Reduction Implementation Schedule

This action will ensure that emissions reductions necessary to eliminate significant contribution will be achieved ''as expeditiously as practicable'' and no later than the downwind attainment dates except where compliance by those dates is not possible. *See* CAA section 181(a); *Wisconsin,* 938 F.3d at 318–20. The timing of this action will provide for all possible emissions reductions to go into effect beginning in the 2023 ozone season for the covered states, which is aligned with the next upcoming attainment date of August 3, 2024, for areas classified as Moderate nonattainment under the 2015 ozone standard. Additional emissions reductions that the EPA finds not possible to implement by that attainment date will take effect as expeditiously as practicable. Emissions reductions commensurate with SCR mitigation measures for EGUs will start in 2026 and be fully implemented by 2027. Emissions reductions through the mitigation measures for industrial sources will generally go into effect in 2026; however, as explained in section VI.C of this document, we have provided for case-by-case extensions of up to one year based on a demonstration of necessity (with the potential for up to an additional two years based on a further demonstration). The full suite of emissions reductions is generally anticipated to take effect by the 2027 ozone season, which is aligned with the August 3, 2027, attainment date for areas classified as Serious nonattainment under the 2015 ozone NAAQS. This rule constitutes a full remedy for interstate transport for the 2015 ozone NAAQS for the states covered; the EPA does not anticipate further rulemaking to address good neighbor obligations under this NAAQS will be required for these states with the finalization of this rule.

EPA's determinations regarding the timing of this rule are informed by and in compliance with several recent court decisions. The D.C. Circuit has reiterated several times that, under the terms of the Good Neighbor Provision, upwind states must eliminate their significant contributions to downwind areas ''consistent with the provisions of [title I of the Act],'' including those provisions setting attainment deadlines for downwind areas.[259] In *North Carolina,* the D.C. Circuit found the 2015 compliance deadline that the EPA had established in CAIR unlawful in light of the downwind nonattainment areas' 2010 deadline for attaining the 1997 NAAQS for ozone and PM$_{2.5}$.[260] Similarly, in *Wisconsin,* the Court found the CSAPR Update unlawful to the extent it allowed upwind states to continue their significant contributions to downwind air quality problems beyond the downwind states' statutory deadlines for attaining the 2008 ozone NAAQS.[261] In *Maryland,* the Court found the EPA's selection of a 2023 analysis year in evaluating state petitions submitted under CAA section 126 unlawful in light of the downwind Marginal nonattainment areas' 2021 deadline for attaining the 2015 ozone NAAQS.[262] The Court noted in *Wisconsin* that the statutory command—that compliance with the Good Neighbor Provision must be achieved in a manner ''consistent with'' title I of the CAA—may be read to allow for some deviation from the mandate to eliminate prohibited transport by downwind attainment deadlines, ''under particular circumstances and upon a sufficient showing of necessity,'' but concluded that ''[a]ny such deviation would need to be rooted in Title I's framework'' and would need to ''provide a sufficient level of protection to downwind States.''[263]

#### 1. 2023–2025: EGU NO_X Reductions Beginning in 2023

The near-term EGU control stringencies and corresponding

[259] *North Carolina* v. *EPA,* 531 F.3d 896 (D.C. Cir. 2008), *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019), and *Maryland* v. *EPA,* 958 F.3d 1185 (D.C. Cir. 2020).

[260] *North Carolina,* 531 F.3d at 911–913.

[261] *Wisconsin,* 938 F. 3d at 303, 3018–20.

[262] *Maryland,* 958 F.3d at 1203–1204. Similarly, in *New York* v. *EPA,* 964 F.3d 1214 (D.C. Cir. 2020), the Court found the EPA's selection of a 2023 analysis year in evaluating New York's section 126 petition unlawful in light of the New York Metropolitan Area's 2021 Serious area deadline for attaining the 2008 ozone NAAQS. 964 F.3d at 1226 (citing *Wisconsin* and *Maryland*).

[263] *Wisconsin,* 938 F. 3d at 320 (citing CAA section 181(a) (allowing one-year extension of attainment deadlines in particular circumstances) and *North Carolina,* 531 F.3d at 912).

reductions in this rulemaking cover the 2023, 2024, and 2025 ozone seasons. This is the period in which some reductions will be available, but the portion of full remedy reductions related to post combustion control installation identified in sections V.B through V.D of this document are not yet available. The EGU NO_X mitigation strategies available during these initial 3 years are the optimization of existing post-combustion controls (SCRs and SNCRs) and combustion control upgrades. As described in sections V.B through V.D of this document and in accompanying TSDs, these mitigation measures can be implemented in under two months in the case of existing control optimization and in 6 months in the case of combustion control upgrades. These timing assumptions account for planning, procurement, and any physical or structural modification necessary. The EPA provides significant historical data, including the implementation of the most recent Revised CSAPR Update, as well as engineering studies and input factor analysis documenting the feasibility of these timing assumptions. However, these timing assumptions are representative of fleet averages, and the EPA has noted that some units will likely overperform their installation timing assumptions, while others may have unit configuration or operational considerations that result in their underperforming these timing assumptions. As in prior interstate transport rules, the EPA is implementing these EGU reductions through a trading program approach. The trading program's option to buy additional allowances provides flexibility in the program for outlier sources that may need more time than what is representative of the fleet average to implement these mitigation strategies while providing an economic incentive to outperform rate and timing assumptions for those sources that can do so. In effect, this trading program implementation operationalizes the mitigation measures as state-wide assumptions for the EGU fleet rather than unit-specific assumptions.

However, starting in 2024, as described in section VI.B.7 of this document, unit-specific backstop daily emissions rates are applied to coal units with existing SCR at a level consistent with operating that control. The EPA believes that implementing these emissions reductions through state emissions budgets starting in 2023 while imposing the unit-specific backstop emissions rates in 2024 achieves the necessary environmental

performance as soon as possible while accommodating any heterogeneity in unit-level implementation schedules regarding daily operation of optimized SCRs.

Additionally, as in prior rules, the EPA assumes combustion control upgrade implementation may take up to 6 months. In the Revised CSAPR Update, covering 12 of the 22 states for which emissions reduction requirements for EGUs are established under this action, the EPA finalized the rule in March of 2021 and thus did not require these combustion control-based emissions reductions in ozone-season state emissions budgets until 2022 (year two of that program).[264] The EPA is applying the same timing assumption regarding combustion control upgrades for this rulemaking. Given the same relationship here between the date of final action and the year one ozone season, the EPA is not assuming the implementation of any additional combustion control upgrades in state emissions budgets until year two (i.e., the 2024 ozone season). Any identified combustion control upgrade emissions reductions are reflected beginning in the 2024 ozone-season budgets for all covered states. For the 12 states covered under the Revised CSAPR Update, any identified emissions reduction potential from combustion control upgrade is included and reflected in those state budgets beginning in 2024—which means EGUs in those states have even more time than the 14 months between finalization of this rule and the 2024 ozone season if they started any planning or installation earlier in response to the Revised CSAPR Update.

2. 2026 and Later Years: EGU and Stationary Industrial Source NO$_X$ Reductions Beginning in 2026

The EPA finds that it is not possible to implement all necessary emissions controls across all of the affected EGU and non-EGU sources by the August 3, 2024, Moderate area attainment date. In accordance with the good neighbor provision and the downwind attainment schedule under CAA section 181 for the 2015 ozone NAAQS, the EPA is aligning its analysis and implementation of the emissions reductions addressing significant contribution from EGU and non-EGU sources that require relatively longer lead time at a sectoral scale with the 2026 ozone season. The 2026 ozone season is the last full ozone season that precedes the August 3, 2027, Serious area attainment date for the 2015 ozone

NAAQS.[265] The EPA proposed to require compliance with all of the remaining EGU and non-EGU control requirements beginning in the 2026 ozone season. The EPA continues to find 2026 to be the relevant analytic year for purposes of its Step 3 analysis, including its analysis of overcontrol, as discussed in section V.D.4 of this document. However, many commenters argued that full implementation of the EGU and industrial source control strategies is not feasible for every source by the 2026 ozone season. The EPA addresses these technical comments specifically in sections V.B and VI.C of this document. The EPA also commissioned a study to develop a better understanding of the time needed for installation of emissions controls for the industrial sector units covered in this rule, which is included in the docket and discussed in section VI.A.2.b of this document. While the EPA does not agree with all of the commenters' assertions regarding the time they claim is needed for control installation, in other respects the concerns raised were sufficient to justify some adjustments to the compliance schedule for the final rule. We have provided for the emissions reductions commensurate with assumed EGU post-combustion emissions control retrofits to be phased in over the 2026 and 2027 ozone season emissions budgets, and we have provided a process in the final regulations for individual non-EGU industrial sources to seek limited compliance extensions extending no later than 2029 based on a case-by-case demonstration of necessity. This compliance schedule delivers substantial emissions reductions in the 2026 and 2027 ozone seasons and before the 2027 Serious area attainment date, and it only allows compliance extensions beyond that attainment date based on a rigorous, source-specific demonstration of need for the additional time.[266]

The timing of this final rule provides three to four years for EGU and non-EGU sources to install whatever controls they deem suitable to comply with required emissions reductions by the start of the 2026 and 2027 ozone seasons. In addition, the publication of the proposal provided roughly an additional year of notice to these source owners and operators that they should begin engineering and financial planning (steps that can be taken prior to any capital investment) in order to be prepared to meet this implementation timetable.

The EPA views this timeframe for retrofitting post-combustion NO$_X$ emissions controls and other non-EGU controls to be reasonable and achievable. A 3-year period for installation of control technologies is consistent with the statutory timeframe for implementation of the controls required to address interstate pollution under section 110(a)(2)(D) and 126 of the Act, the statutory timeframes for implementation of RACT in ozone nonattainment areas classified as Moderate or above, and other statutory provisions that establish control requirements for existing stationary sources of pollution.

For example, section 126 of the CAA authorizes a downwind state or tribe to petition the EPA for a finding that emissions from "any major source or group of stationary sources" in an upwind state contribute significantly to nonattainment in, or interfere with maintenance by, the downwind state. If the EPA makes a finding that a major source or a group of stationary sources emits or would emit pollutants in violation of the relevant prohibition in CAA section 110(a)(2)(D), the source(s) must shut down within three months from the finding unless the EPA directly regulates the source(s) by establishing emissions limitations and a compliance schedule extending no later than three years from the date of the finding, to eliminate the prohibited interstate transport of pollutants as expeditiously as practicable.[267] Thus, in the provision that allows for direct Federal regulation of sources violating the good neighbor provision, Congress established three years as the maximum amount of time available from a final rule to when emissions reductions need to be achieved at the relevant source or group of sources. Because this action is not taken under CAA section 126(c), the mandatory timeframe for implementation of emissions controls

---

[264] 86 FR 23093.

[265] For each nonattainment area classified under CAA section 181(a) for the 2015 ozone NAAQS, the attainment date is "as expeditiously as practicable" but not later than the date provided in table 1 to 40 CFR 51.1303(a). Thus, for areas initially designated nonattainment effective August 3, 2018 (83 FR 25776), the latest permissible attainment dates are: August 3, 2021 (for Marginal areas), August 3, 2024 (for Moderate areas), August 3, 2027 (for Serious areas), and August 3, 2033 (for Severe areas).

[266] While we generally use the term "necessity" to describe the showing that non-EGU facilities must meet in seeking compliance extensions, the elements for this showing are designed to allow the EPA to make a judgment that comports with the standard of "impossibility" established in case law such as Wisconsin. In other words, the "necessity" for additional time is effectively a showing by the source that it would be "impossible" for it to meet the compliance deadline.

[267] CAA 110(a)(2)(D)(i) and 126(c).

under that provision is not directly applicable, but it is informative.

In response to arguments from sources that more time than has been provided in the final rule is necessary, this provision strongly indicates that allowing time beyond a three-year period must be based on a substantial showing of impossibility. Our analysis based on comments and considering additional information is that the additional time we have provided in the final rule is both justified and sufficient in light of the statutory objective of expeditious compliance.

Additionally, for ozone nonattainment areas classified as Moderate or higher, the CAA requires states to implement RACT requirements less than three years after the statutory deadline for submitting these measures to the EPA.[268] Specifically, for these areas, CAA sections 182(b)(2) and 182(f) require that states implement RACT for existing VOC and $NO_X$ sources as expeditiously as practicable but no later than May 31, 1995, approximately 30 months after the November 15, 1992, deadline for submitting RACT SIP revisions. For purposes of the 2015 ozone NAAQS, the EPA has interpreted these provisions to require implementation of RACT SIP revisions as expeditiously as practicable but no later than January 1 of the fifth year after the effective date of designation, which is less than three years after the deadline for submitting RACT SIP revisions.[269] For areas initially designated nonattainment with a Moderate or higher classification effective August 3, 2018 (83 FR 25776), that implementation deadline falls on January 1, 2023, approximately 29 months after the August 3, 2020

submission deadline.[270] Moderate ozone nonattainment areas must also implement all reasonably available control measures (including RACT) needed for expeditious attainment within three years after the statutory deadline for states to submit these measures to the EPA as part of a Moderate area attainment demonstration.[271] Nonattainment areas for the 2015 ozone NAAQS that were reclassified to Moderate nonattainment in October 2022 face this same regulatory schedule, meaning that their sources are required to implement RACT controls in 2023. With the exception of the Uinta Basin, which is not an identified receptor in this action, no Marginal nonattainment area met the conditions of CAA section 181(a)(5) to obtain a one-year extension of the Moderate area attainment date. 87 FR 60899 (Oct. 7, 2022). Thus, all Marginal areas (other than Uinta) that failed to attain have been reclassified to Moderate. *Id.* In the October 2022 final rulemaking EPA made determinations that certain Marginal areas failed to attain by the attainment date, reclassified those areas to Moderate, and established SIP submission deadlines and RACM and RACT implementation deadlines. EPA set the attainment SIP submission deadlines for the bumped up Moderate areas to be January 1, 2023. *See* 87 FR 60897, 60900. The implementation deadline for RACM and RACT is also January 1, 2023. *Id.*

The EPA notes that the types and sizes of the EGU and non-EGU sources that the EPA includes in this rule, as well as the types of emissions control

technologies on which the EPA bases the emissions limitations that would take effect for the 2026 and 2027 ozone seasons, generally are consistent with the scope and stringency of RACT requirements for existing major sources of $NO_X$ in downwind Moderate nonattainment areas and some upwind areas, which many states have already implemented in their SIPs.[272] Thus, the timing Congress allotted for sources in downwind states to come into compliance with RACT requirements bears directly on the amount of time that should be allotted here and indicates, as does CAA section 126, that three years is an outer limit on the time that should be given sources to come into compliance where possible. In light of the January 1, 2023, deadline for implementation of RACT in Moderate nonattainment areas, the EPA finds that a May 1, 2026 deadline for full implementation of the emissions control requirements in this final rule would generally provide adequate time for any individual source to install the necessary controls, barring the circumstances of necessity discussed further in this section.

Finally, with respect to emissions standards for hazardous air pollutants, section 112(i)(3) of the CAA requires the EPA to establish compliance dates for each category or subcategory of existing sources subject to an emissions standard that ''provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard,'' with limited exceptions. CAA section 112(i)(3)(B) authorizes the EPA to grant an extension of up to 1 additional year for an existing source to comply with emissions standards ''if such additional period is necessary for the installation of controls,'' and sections 112(i)(4) through (7) provide for limited compliance extensions where other conditions are met.[273] Here again, where Congress was concerned with addressing emissions of pollutants that impact public health, a 3-year time period was allotted as the time needed for existing sources to come into compliance where possible. As discussed further in section VI.A.2.b of this document, the process for obtaining a compliance extension for industrial sources in this rule is generally modeled on 40 CFR 63.6(i)(3), which implements

---

[268] *See, e.g.,* 40 CFR 51.1112(a)(3) and 51.1312(a)(3)(i) (requiring implementation of RACT required pursuant to initial nonattainment area designations no later than January 1 of the fifth year after the effective date of designation, which is less than 3 years after the SIP submission deadline under 40 CFR 51.1112(a)(2)) and 51.1312(a)(2)(i), respectively).

[269] 40 CFR 51.1312(a)(2)(i) (requiring submission of RACT SIP revisions no later than 24 months after the effective date of designation) and 40 CFR 51.1312(a)(3)(i) (requiring implementation of RACT SIP revisions as expeditiously as practicable, but no later than January 1 of the fifth year after the effective date of designation). For reclassified areas, states must implement RACT SIP revisions as expeditiously as practicable, but no later than the start of the attainment year ozone season associated with the area's new attainment deadline, or January 1 of the third year after the associated SIP revision submittal deadline, whichever is earlier; or the deadline established by the Administrator in the final action issuing the area reclassification. 40 CFR 51.1312(a)(3)(ii); *see also* 83 FR 62989, 63012–63014.

[270] 40 CFR 51.1312(a)(2)(i) (requiring submission of RACT SIP revisions no later than 24 months after the effective date of designation).

[271] *See, e.g.,* 40 CFR 51.1108(d) (requiring implementation of all control measures (including RACT) needed for expeditious attainment no later than the beginning of the attainment year ozone season, which, for a Moderate nonattainment area, occurs less than 3 years after the deadline for submission of reasonably available control measures under 40 CFR 51.1112(c) and 51.1108(a)) and 40 CFR 51.1308(d) (requiring implementation of all control measures (including RACT) needed for expeditious attainment no later than the beginning of the attainment year ozone season, which, for a Moderate nonattainment area, occurs less than three years after the deadline for submission of reasonably available control measures under 40 CFR 51.1112(c) and 51.1308(a)). Because the attainment demonstration for a Moderate nonattainment area (including RACT needed for expeditious attainment) is due three years after the effective date of the area's designation (40 CFR 51.1308(a) and 51.1312(c)), and all Moderate nonattainment areas must attain the NAAQS as expeditiously as practicable but no later than 6 years after the effective date of the area's designation (40 CFR 51.1303(a)), the beginning of the ''attainment year ozone season'' (as defined in 40 CFR 51.1300(g)) for such an area is less than three years after the due date for the attainment demonstration.

[272] *See* the Final Non-EGU Sectors TSD for a discussion of SIP-approved RACT rules in effect in downwind states.

[273] *See, e.g.,* CAA section 112(i)(4), which provides for limited compliance extensions granted by the President based on national security interests.

the extension provision for existing sources under CAA section 112(i)(3)(B).

All of these statutory timeframes for implementation of new control requirements on existing stationary sources indicate that Congress considered 3 years to be not only a sufficient amount of time but an upper bound of time allowable (barring instances of impossibility) for existing stationary sources to install or begin the installation of pollution controls as necessary for expeditious attainment, to eliminate prohibited interstate transport of pollutants, and to protect public health.

Further, the EPA notes that, given the number of years that have passed since EPA's promulgation of the 2015 ozone NAAQS and related nonattainment area designations in 2018, and in light of the *Maryland* court's holding that good neighbor obligations for the 2015 ozone NAAQS should have been implemented by the Marginal area attainment date in 2021,[274] the implementation of good neighbor obligations for these NAAQS is already delayed, and the sources subject to $NO_X$ emissions control in this rule have continued to operate for several years without the controls necessary to eliminate their significant contribution to ongoing and persistent ozone nonattainment and maintenance problems in other states. Under these circumstances, we find it reasonable to require compliance with the control requirements for all non-EGUs and the EGU reductions related to post-combustion control retrofit identified in section V.B.1.b of this document beginning in the 2026 ozone season (with full implementation by the 2027 ozone season for EGUs, and the availability of source-specific extensions based on a demonstration of necessity for non-EGUs).

As the D.C. Circuit noted in *Wisconsin,* the good neighbor provision requires upwind states to "eliminate their substantial contributions to downwind nonattainment in concert with the attainment deadlines" in the downwind states, even where those attainment deadlines occur before EPA's statutory deadline under CAA section 110(c) to promulgate a FIP.[275]

Referencing the Supreme Court's description of the attainment deadlines as "the heart" of the CAA, the *Wisconsin* court noted that some deviation from the mandate to eliminate prohibited transport by downwind attainment deadlines may be allowed only "under particular circumstances and upon a sufficient showing of necessity." [276]

For the reasons provided in the following sub-sections, the EPA finds that installation of certain EGU controls and all non-EGU controls is not possible by the Moderate area attainment date for the 2015 ozone NAAQS (*i.e.,* August 3, 2024),[277] and, for certain sources, may not be possible by the 2026 ozone season or even the August 3, 2027, Serious area attainment date. While the EPA's technical analysis demonstrates that for any individual source, control installation could be accomplished by the start of the 2026 ozone season, in light of the scope of this rule coupled with current information on the present economic capacity of sources, control-installation vendors, and associated markets for labor and material, it is the EPA's judgment that a three-year timeframe is not possible for all sources subject to this rule collectively to come into compliance. Therefore, additional time beyond 2026 will be allowed for certain facilities in recognition of these constraints on the processes needed for installation of controls across all of the covered sources.

### a. EGU Schedule for 2026 and Later Years

As discussed in sections V.B through V.D of this document, significant emissions reduction potential exists and is included in EPA's quantification of significant contribution based on the potential to install post-combustion controls (SCR and SNCRs) at EGUs. However, as discussed in detail in those sections, the assumption for installation of this technology on a region-wide scale is 36–48 months in this final rule. This amount of time allows for all necessary procurement, permitting, and installation milestones across multiple units in the covered region. Therefore, the EPA finds that these emissions reductions are not available any earlier than the 2026 compliance period. Starting in 2026, state emissions budgets will reflect full implementation of assumed SNCR mitigation measures and

implementation of half the emissions reduction potential identified for assumed SCR mitigation measures. For each year in 2027 and beyond, state emissions budgets include all of the emissions reductions commensurate with these post-combustion control technologies identified for covered units in Step 3. The EPA notes that similar compliance schedules and post-combustion control retrofit installations have been realized successfully in prior programs allowing similar timeframes. Subsequent to the $NO_X$ SIP Call and the parallel Finding of Significant Contribution and Rulemaking on Section 126 Petitions (which became effective December 28, 1998, and February 17, 2000, respectively [278]), nearly 19 GW of SCR retrofit came online in 2002 and another 42 GW of SCR retrofit came online for steam boilers in 2003, illustrating that a considerable volume of SCR retrofit capacity is possible within a 36-month period.

*Comment:* Some commenters disagreed with EPA's proposed 36-month timeframe for SCR retrofit. These commenters noted that, while possible at the unit or plant level, the collective volume of assumed SCR installation would not be possible given the labor constraints, supply constraints, and simultaneous outages necessary to complete SCR retrofit projects on such a schedule. They noted that many of the remaining coal units lacking SCR pose more site-specific installation challenges than those that were already retrofitted on a quicker timeframe.

*Response:* EPA is making several changes in this final rule to address these concerns. First, EPA is phasing in emissions reductions commensurate with assumed SCR installations consistent with a 36-to-48-month time frame in this final rule, instead of a 36-month time frame as proposed. EPA is implementing half of this emissions reduction potential in 2026 ozone-season $NO_X$ budgets for states containing these EGUs and the other half of this emissions reduction potential in 2027 ozone-season $NO_X$ budgets for those states. This phase-in approach to implementing SCR retrofit reduction potential over a three to four year period is in response to comments, including those from third-party full-service engineering firms. These commenters highlighted that while the

---

[274] 958 F.3d at 1203–1204 (remanding the EPA denial of section 126 petition based on the EPA analysis of downwind air quality in 2023 rather than 2021, the year containing the Marginal area attainment date).

[275] 938 F.3d at 317–318. For example, the court observed that the EPA may shorten the deadline for SIP submissions under CAA section 110(a)(1) and may issue FIPs soon thereafter under CAA section 110(c)(1), to align the upwind states' deadline for satisfying good neighbor obligations with the downwind states' deadline for attaining the NAAQS. *Id.* at 318.

[276] *Id.* at 316 and 319–320 (noting that any such deviation must be "rooted in Title I's framework" and "provide a sufficient level of protection to downwind States").

[277] Compliance by the August 3, 2021, Marginal area attainment date is also impossible as that date has passed.

[278] *See* 63 FR 57356 (October 27, 1998); 65 FR 2674 (January 18, 2000). The D.C. Circuit stayed the $NO_X$ SIP Call by an order issued May 25, 1999. After upholding the rule in most respects in *Michigan* v. *EPA,* 213 F.3d 663 (D.C. Cir. 2000), the court lifted the stay by an order issued June 22, 2000.

proposed 36-month time frame is viable at the plant level, it would be "very unlikely" that the collective volume of SCR capacity could be installed in a three-year time frame based on a variety of factors. First, the commenters identified constraints on labor needed to retrofit 32 GW of capacity, highlighting that the Bureau of Labor and Statistics projects that there will be a decline in boilermaker employment over the decade and that the Associated Builders and Contractors (ABC) identifies the need for 650,000 additional skilled craft professionals on top of the normal hiring pace to meet the economy-wide demand created by infrastructure investment and other clean energy projects (e.g., carbon capture and storage). They highlighted the decline in companies serving this type of large-scale retrofit project as the lack of new coal units and the retirement of coal units has curtailed activity in this area over the past five years. They also identified supply bottlenecks for key SCR components that would slow the ability to implement a large volume of SCR within 3 years, affecting electrical conduits, transformers, piping, structural and plate steel, and wire (with temporary price increases ranging from 30 percent to 200 percent). Finally, commenters note that site-specific conditions can make retrofits for individual units a lengthier process than historical averages (e.g., under prior rules more accommodating sites retrofitted first) and that four years may be necessary for some projects, accordingly. EPA found the technical justification submitted in comment consistent with its prior assessments that a range of 39–48 months is appropriate for SCR-retrofit timing within regional-scale programs.[279] Therefore, EPA is adjusting the timeframe to still incentivize these reductions by the attainment date while accommodating the potential for some SCR retrofits to require between 36–48 months for installation.

Some commenters requested more than 48 months for SCR installation based on past projects that took five or more years. EPA disagrees with these commenters for two reasons. First, while EPA is identifying SCR retrofit potential to define significant contribution at Step 3, the rule only requires emissions reductions commensurate with that technology, implemented through a trading program, meaning that operators of EGUs eligible for SCR retrofit may pursue a variety of strategies for reducing emissions. Such compliance

flexibility will accommodate extreme or unique circumstances in which a desired SCR retrofit is not achieved by the 2027 ozone season, although EPA finds such a circumstance exceedingly unlikely. Second, the historical examples that exceeded 48 months do not necessarily demonstrate that such projects are impossible to execute in less than 48 months, but rather that they can extend beyond that timeframe if no requirements or incentives are in place for a faster installation. As the D.C. Circuit has recognized, historical data on the amount of time sources have taken to install pollution controls do not in themselves establish the minimum amount of time in which those controls could be installed if sources are subject to a legal mandate to do so. *See Wisconsin*, 938 F.3d at 330 ("[A]ll those anecdotes show is that installation can drag on when companies are unconstrained by the ticking clock of the law.").

b. Non-EGU or Industrial Source Schedule for 2026 and Later Years

The EPA proposed to require that all emissions reductions associated with the requirements for non-EGU industrial sources go into effect by the start of the 2026 ozone season, but also requested comment on its control-installation timing estimates for non-EGUs and requested comment on the possibility of providing for limited compliance extensions based on a showing of necessity. *See* 87 FR 20104–05.

*Comment:* The EPA received numerous comments regarding the inability of various non-EGU industries to install controls to comply with the emissions limits by 2026. Specifically, commenters raised concerns regarding the ability to meet these deadlines due to the ongoing geopolitical instability triggered by the war in Ukraine, COVID–19 pandemic-driven disruptions, and supply chain delays and shortages. Commenters also claimed that the EPA's three-year installation timeframe for non-EGUs does not account for the time needed to obtain necessary permits. Commenters stated that even where controls are feasible for a source, some sources would need to shut down due to their inability to install controls by 2026 and requested that the EPA provide additional time for sources to come into compliance. Commenters from multiple non-EGU industries stated that the proposed applicability criteria will require controls to be installed on thousands of non-EGU emissions units. Because of the number of emissions units, commenters raised concerns with permitting delays and the unavailability of skilled labor and

necessary components. Commenters suggested various timelines for control installation timing ranging from one additional year to seven years. Other commenters asserted that the data supported the conclusion that all non-EGU sources, or at least some non-EGU sources, could install controls by 2026 or earlier, and that EPA has a legal obligation to impose good neighbor requirements as expeditiously as practicable by such sources, including earlier than 2026 if possible.

*Response:* After reviewing the information received during the public comment period and the additional information presented in the Non-EGU Control Installation Timing Report, the EPA has concluded that the majority of non-EGUs can install and operate the required controls by the 2026 ozone season. For the non-EGU control requirements on which the EPA has based its Step 3 findings as described in section V of this document, the emissions limits will generally go into effect starting with the 2026 ozone season (except where an individual source qualifies for a limited extension of time to comply based on a specific demonstration of necessity, as described in this section). The EPA finds that meeting the emissions limitations of this final rule through installation of necessary controls by an ozone season before 2026 is not expected to be possible for the industrial sources covered by this final rule.

The EPA recognizes that labor shortages, supply shortages, or other circumstances beyond the control of source owner/operators may, in some cases, render compliance by 2026 impossible for a particular industrial source. Therefore, the final rule contains provisions allowing source owner/operators to request limited compliance extensions based on a case-by-case demonstration of necessity. Under these provisions, the owner or operator of a source may initially apply for an extension of up to one year to comply with the applicable emissions control requirements, which if approved by the EPA, would require compliance no later than the 2027 ozone season. The EPA may grant an additional case-based extension of up to two additional years for full compliance, where specific criteria are met.

The EPA initiated a study to examine the time necessary to install the potential controls identified in the final rule's cost analysis for all of the non-EGU industries subject to the final rule, including SNCR, low NOₓ burners, layered combustion, NSCR, SCR, fluid gas recirculation, and SNCR/advanced selective noncatalytic reduction

---

[279] 86 FR 23102.

(ASNCR). The resulting report, which we refer to as the ''Non-EGU Control Installation Timing Report,'' identified a range of estimated installation times with minimum estimated installation times ranging from 6–27 months without any supply chain delays and 6–40 months with potential supply chain delays depending on the industry.[280] The Non-EGU Control Installation Timing Report also identified maximum estimated installation times ranging from 12–28 months without any supply chain delays and 12–72 months with potential supply chain delays depending on the industry. As indicated in the Non-EGU Control Installation Timing Report, the installation of layered combustion and NSCR control technology, in particular, could take between 9 and 72 months depending on supply chain delays.[281] The report also indicated that permitting processes may take 6 to 12 months but noted that these processes typically can proceed concurrent with other steps of the installation process.[282]

We find that the potential time needed for permitting processes is generally unlikely to significantly affect installation timeframes of at least three years given that a source that has three or more years to comply is expected, in most cases, to have adequate time to apply for and secure the necessary permits during that time. Permitting processes may, however, impact shorter installation times ranging from 12–28 months. Given the 12–28 month estimate for minimum and maximum installation times without supply chain delays and permitting timeframes typically ranging from 6–12 months, the EPA finds that the controls for non-EGU sources needed to comply with this final rule are generally not expected to be installed significantly before the 2026 ozone season.

Generally, the Non-EGU Control Installation Timing Report indicated that all non-EGU unit types subject to the final rule could install controls within 28 months if there are no supply chain delays. Thus, the Non-EGU Control Installation Timing Report confirms that for any individual facility, meeting the emissions limitations of this final rule through installation of controls can be completed by the start of the 2026 ozone season. It is only when the number of units in the U.S. potentially affected by the rule is taken into account, coupled with broader considerations of economic capacity including current information on supply-chain delays, that the potential need for additional time beyond 2026 becomes a possibility. Under ideal economic conditions (*i.e.,* no supply-chain delays or other constraints), affected units are estimated to be capable to install both combustion and post-combustion controls before the 2026 ozone season. Many commenters, however, provided information on installation timing estimates based on current supply chain delays and labor constraints. These commenters generally stated that installation of the necessary controls for some units would take longer than three years if supply chain delays similar to those that have occurred over the past few years continue. The Non-EGU Control Installation Timing Report reflected this information, together with additional information gathered from pollution control vendors, to develop ranges of estimates of possible installation times given current (*i.e.,* 2022) labor market conditions and material supplies. The Non-EGU Control Installation Timing Report also discussed how the installation and optimization of post-combustion controls over a similar timeframe at both EGUs and non-EGUs subject to this final rule would, considered cumulatively, potentially affect the installation timing needs of the covered non-EGU sources.

Based on information provided by commenters and vendors, the Non-EGU Control Installation Timing Report indicated that if current supply chain delays continue, control installations could take as long as 61 months for most non-EGU industries and possibly as long as 64–112 months in difficult cases. Notably, however, the conclusions in the Non-EGU Control Installation Timing Report reflect three key assumptions that could result in the relatively lengthy timing estimates at the outer end of this range: (1) the current state of supply chain delays and disruptions would continue without any increase in labor supply, materials, or reduction in fabrication timing; (2) the labor and materials markets would not adjust in response to this rule in the timeframe needed to meet the increased demand for control installations; and (3) the Report was unable to account for some of the flexibilities built into the final rule that will allow owners and operators to install controls on the most cost-effective units with shorter installation times.

As presented in the Non-EGU Control Installation Timing Report, supply chain delays and disruptions have generally been lessening since they peaked in 2020 during the COVID–19 pandemic, and many economic indicators have showed some improvement towards pre-pandemic levels, including freight transportation, inventory to sales ratios, interstate miles traveled, U.S. goods imports, and supply chain indices.[283] If these economic indicators continue to improve and the availability of fabricators and materials continues to trend upward, the control timing estimates identified in the Non-EGU Control Installation Timing Report could prove to be overstated for some industries and control technologies. In addition, the Non-EGU Control Installation Timing Report did not account for the labor and supply market adjustments that would be anticipated to occur to meet increased demand for control technologies and related materials and labor over the next several years in response to the rule. *Cf. Wisconsin,* 938 F.3d at 330 (''[A]ll those anecdotes [of elongated control installation times] show is that installation can drag on when companies are unconstrained by the ticking clock of the law.''). For example, some of the longer installation timeframes identified in the Non-EGU Control Installation Timing Report are based on assumed limits on the current availability of skilled labor needed to install combustion controls and post combustion controls. If the market adjusts in response to increasing demand for this type of skilled labor in the timeframe needed for compliance (*e.g.,* there is an increase in boilermaker and engine controls labor), the installation timing estimates in the Non-EGU Control Installation Timing Report again could be overstated.

The Non-EGU Control Installation Timing Report also did not account for flexibilities provided in this final rule that will enable owners and operators of certain affected units to identify the most cost-effective and efficient means for installing any necessary controls. For example, one concern highlighted by commenters was the amount of time necessary to install controls on engines that have been in operation for 50 or more years. The requirements that we are finalizing for engines in the Pipeline Transportation of Natural Gas industry include an exemption for emergency engines and provisions allowing source owner/operators to request the EPA approval of facility-wide emissions averaging plans, both of which enable owners and operators of affected units to take costs, installation timing needs,

---

[280] *See generally* SC&A, *NOₓ Emission Control Technology Installation Timing for Non-EGU Sources* (March 14, 2023) (''Non-EGU Control Installation Timing Report'').

[281] *See* Non-EGU Control Installation Timing Report, Executive Summary (March 14, 2023).

[282] Id. at Section 5.6.

[283] Id. at Section 6.1.

and other considerations into account in deciding which engines to control.

In response to industry concern about the number and size of units captured by the proposed applicability criteria, the EPA has made several changes to the applicability criteria in the final rule to focus the control requirements on impactful non-EGU units. As explained further in section VI.C of this document, the EPA is establishing exemptions for low-use boilers and engines where it would not be cost-effective to require controls at this time. Finally, as discussed in section VI.C.3 of this document, the EPA is not finalizing the proposed requirements for most emissions unit types in the Iron and Steel Mills and Ferroalloy Manufacturing industry given the EPA does not currently have a sufficient technical basis for finalizing those proposed requirements. These changes reduce the number of non-EGU units that will actually need to install controls and should reduce the strain on the labor and supply chain and permitting processes. For example, for engines, the EPA estimates that the facility-wide emissions averaging provision would, in many cases, allow facilities to install controls on only one-third of their engines, on average (see section VI.C.1 of this document for further discussion).

Taking all of these considerations into account, the EPA finds that the outer range of timing estimates presented in the Non-EGU Control Installation Timing Report generally reflects a conservative set of installation timing estimates and that the factors described previously could result in installation timeframes that fall toward the shorter end of the ranges of time that factor in supply-chain delays or could obviate those supply-chain delay issues entirely.

Based on all of these considerations, the EPA has concluded that three years is generally an adequate amount of time for the non-EGU sources covered by this final rule to install the controls in the 20 states that remain linked in 2026. The EPA also recognizes, however, that some sources may not be able to install controls by the 2026 ozone season despite making good faith efforts to do so, due to the aforementioned supply chain delays or other circumstances entirely beyond the owner or operator's control. Therefore, the final FIPs require compliance with the emissions control requirements for non-EGUs by the beginning of the 2026 ozone season, with limited exceptions based on a showing of necessity for individual sources that meet specific criteria. Where an individual owner or operator submits a satisfactory demonstration

that an extension of time to comply is necessary, due to circumstances entirely beyond the owner or operator's control and despite all good faith efforts to install the necessary controls by May 1, 2026, the EPA may determine that installation by 2026 is not possible and thereby grant an extension of up to one year for that source to fully implement the required controls. If, after the EPA has granted a request for an initial compliance extension, the source remains unable to comply by the extended compliance date due to circumstances entirely beyond the owner or operator's control and despite all good faith efforts to install the necessary controls by the extended compliance date, the owner or operator may request and the EPA may grant a second extension of up to two additional years for full compliance, where specific criteria are met. This application process is generally in accordance with the concept on which the Agency requested comment in the proposal, *see* 87 FR 20104–05, and is modeled on a similar process provided for industrial sources subject to CAA section 112 NESHAPs, found at 40 CFR 63.6(i)(3).

The EPA intends to grant a request for an initial compliance extension only where a source demonstrates that it has taken all steps possible to install the necessary controls by the applicable compliance date and still cannot comply by the 2026 ozone season, due to circumstances entirely beyond its control. Any request for a compliance extension must be received by the EPA at least 180 days before the May 1, 2026, compliance date. The request must include all information obtained from control technology vendors demonstrating that the necessary controls cannot be installed by the applicable compliance date, any permit(s) secured for the installation of controls or information from the permitting authority on the timeline for issuance of such permit(s) if the source has not yet obtained the required permit(s); and any contracts entered into by the source for the installation of the control technology or an explanation as to why no contract is necessary. The EPA may also consider documentation of a source owner's/operator's plans to shut down a source by the 2027 ozone season in determining whether a source is eligible for a compliance extension. The owner or operator of an affected unit remains subject to the May 1, 2026 compliance date unless and until the Administrator grants a compliance extension.

The EPA intends to grant a request for a second compliance extension beyond

2027 only where a source owner/ operator submits updated documentation showing that it is not possible to install and operate controls by the 2027 ozone season, despite all good faith efforts to comply and due to circumstances entirely beyond its control. The request must be received by the EPA at least 180 days before the extended compliance date and must include, at minimum, the same types of information as that required for the initial extension request. The owner or operator of an affected unit remains subject to the initial extended compliance date unless and until the Administrator grants a second compliance extension. A denial will be effective on the date of denial.

As discussed earlier in section VI.A, in *Wisconsin* the court held that some deviation from the CAA's mandate to eliminate prohibited transport by downwind attainment deadlines may be allowed only ''under particular circumstances and upon a sufficient showing of necessity.''[284] This standard is met when, in the EPA's judgment, compliance by the attainment date amounts to an impossibility. The EPA cannot allow a covered industrial source to avoid timely compliance with the emissions control requirements established in this final rule unless the source owner/operator can demonstrate that compliance by the 2026 ozone season is not possible due to circumstances entirely beyond their control. The criteria that must be met to qualify for limited extensions of time to comply are designed to meet this statutory mandate. The EPA anticipates that the majority of the industrial sources covered by this final rule will not qualify for a compliance extension.

### B. Regulatory Requirements for EGUs

To implement the required emissions reductions from EGUs, the EPA is revising the existing CSAPR NO$_X$ Ozone Season Group 3 Trading Program (the ''Group 3 trading program'') established in the Revised CSAPR Update both to expand the program's geographic scope and to enhance the program's ability to ensure favorable environmental outcomes. The EPA is using a trading program for EGUs because of the inherently greater flexibility that a trading program can provide relative to more prescriptive, ''command-and-control'' forms of regulation of sufficient stringency to achieve the necessary emissions reductions. In the electric

---

[284] *Wisconsin*, 938 F.3d at 316 and 319–320 (noting that any such deviation must be ''rooted in Title I's framework'' and ''provide a sufficient level of protection to downwind States'').

power sector, EGUs' extensive interconnectedness and coordination create the ability to shift both electricity production and emissions among units, providing a closely related ability to achieve emissions reductions in part by shifting electricity production from higher-emitting units to lower-emitting or non-emitting units. Thus, while the Step 3 control-stringency determination for EGUs to eliminate significant contribution is based on strategies that do not require generation shifting or reduced utilization of EGUs, the sector's unusual flexibility with respect to how emissions reductions can be achieved makes the flexibility of a trading program particularly useful as a means of lowering the overall costs of obtaining such reductions. In addition, it is essential for the electric power sector to retain short-term operational flexibility sufficient to allow electricity to be produced at all times in the quantities needed to meet demand simultaneously, and the flexibility of a trading program can be helpful in supporting this aspect of the industry as well.

To ensure emissions reductions necessary to eliminate significant contribution are maintained, in this rulemaking, the EPA is making certain enhancements to the current provisions of the Group 3 trading program addressing emissions-control performance by some kinds of individual units that will necessarily reduce the flexibility of the program to some extent for those units. In analyzing significant contribution at Step 3, once a linkage has been established between an upwind state and a downwind receptor, we identify an appropriate set of emissions control strategies, considering cost and other factors, that would eliminate significant contribution from the upwind state without leading to undercontrol or overcontrol at the downwind linked receptors. At Step 4, for EGUs, we develop emissions budgets based on consistent application of the identified strategies to the sources. This level of emission control at each source identified in Step 3 is what the EPA deems to eliminate significant contribution, while the design of emission budgets that successfully implement that level of emission control is determined at Step 4. See section III.B and V.

The trading program enhancements discussed in this section are designed to ensure that sources actually achieve that level of emission control and thereby eliminate significant contribution on a permanent basis at Step 4. The enhancements ensure that the emissions budgets for EGUs continue to secure the level of emission control identified at Step 3 at the sources active in the trading program on a more consistent basis throughout each ozone season than prior transport trading programs (including those that did not provide complete remedies for interstate pollution transport) have required. An alternative form of implementation at Step 4 would be to implement source-specific emissions limitations (*e.g.,* rate-based standards expressed as mass per unit of heat input) reflecting the control strategies identified at Step 3. This is a very common form of implementation for many other CAA requirements and is indeed the manner of implementation selected in this very rulemaking for other affected industrial sources. See sections III.B, V.D.4, and VI.C. But doing so would require loss of the flexibilities inherent in a trading program, inclusive of these enhancements, that facilitate orderly and timely achievement of the required emission reductions in the power sector.

Prior to this rule, the Group 3 trading program has applied to EGUs meeting the program's applicability criteria within the borders of twelve states: Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia. Affected EGUs in these twelve states will continue to participate in the Group 3 trading program as revised in this rulemaking, with some revised provisions taking effect in the 2023 control period and other revised provisions taking effect later as discussed elsewhere in this document. The EPA is expanding the Group 3 trading program's geographic scope to include all of the additional states for which EGU emissions reduction requirements are being established in this rulemaking. Affected EGUs within the borders of seven states currently covered by the CSAPR NOₓ Ozone Season Group 2 Trading Program (the "Group 2 trading program")—Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Texas, and Wisconsin—will transition from the Group 2 trading program to the revised Group 3 trading program at the beginning of the 2023 control period,[285] and affected EGUs within the borders of the three states not currently covered by any CSAPR trading program for seasonal NOₓ emissions—Minnesota, Nevada, and Utah—will enter the Group 3 trading program on the effective date of this rule.

As discussed in section VI.B.12.a of this document, because the effective date of the rule will likely be sometime during the 2023 ozone season, special transitional provisions have been developed to allow for efficient administration of the rule's EGU requirements through the Group 3 trading program while not imposing any new substantive obligations on parties prior to the rule's effective date, similar to the transitional provisions implemented under the Revised CSAPR Update.

As is the case for the states already in the Group 3 trading program, for each state added to the program, the set of affected EGUs will include new units as well as existing units and will also include units located in Indian country within the state's borders. Sections VI.B.2 and VI.B.3 of this rule provide additional discussion of the geographic expansion of the Group 3 trading program and the units in the expanded geography that will become subject to the program under the program's existing applicability provisions.

In addition to expanding the Group 3 trading program's geographic scope, the EPA is modifying the program's regulations prospectively to include certain enhancements to improve environmental outcomes. Two of the proposed enhancements will adjust the overall quantities of allowances available for compliance in the trading program in each control period so as to maintain the rule's selected control stringency and related EGU effective emissions rate performance level as the EGU fleet evolves. First, instead of establishing emissions budgets for all future years under the program at the time of the rulemaking, which cannot reflect future changes in the EGU fleet unknown at the time of the rulemaking, the EPA is revising the trading program regulations to include a dynamic budgeting procedure. Under this procedure, the EPA will calculate emissions budgets for control periods in 2026 and later years based on more current information about the composition and utilization of the EGU fleet, specifically data available from the 2024 ozone season and following (*e.g.,* for 2026, data from periods through 2024; for 2027, data from periods through 2025; etc.). Through the 2029 control period, the dynamically determined budgets will apply only if they are higher than preset budgets established in the rule. (Associated revisions to the program's variability limits and unit-level allowance allocation procedures will coordinate these provisions with the revised budget-setting procedures.) Second,

---

[285] Affected EGUs in the three other states currently covered by the Group 2 trading program—Iowa, Kansas, and Tennessee—will continue to participate in that program.

starting with the 2024 control period, the EPA will annually recalibrate the quantity of accumulated banked allowances under the program to prevent the quantity of allowances carried over from each control period to the next from exceeding the target bank level, which would be revised to represent a preset percentage of the sum of the state emissions budgets for each control period. The preset percentage will be 21 percent for control periods through 2029 and 10.5 percent for control periods in 2030 and later years. Together, these enhancements will protect the intended stringency of the trading program against potential erosion caused by EGU fleet turnover and will better sustain over time the incentives created by the trading program to achieve the degree of emissions control for EGUs that the EPA has determined is necessary to address states' good neighbor obligations.

Two further enhancements to the Group 3 trading program establish provisions designed to promote more consistent emissions control by individual EGUs within the context of the trading program. First, starting with the 2024 control period for coal-fired EGUs with existing SCR controls and the earlier of the 2030 control period or the control period after which an SCR is installed for other large coal-fired EGUs, a daily $NO_X$ emissions rate of 0.14 lb/mmBtu will apply as a backstop to the seasonal emissions budgets (which are based on an assumed seasonal average emissions rate of 0.08 lb/mmBtu for EGUs with existing SCR controls). Each ton of emissions exceeding a unit's backstop daily emissions rate, after the first 50 such tons, in a given control period will incur a 3-for-1 allowance surrender ratio instead of the usual 1-for-1 allowance surrender ratio. Second, also starting with the 2024 control period, the trading program's existing assurance provisions, which require extra allowance surrenders from sources that are found responsible for contributing to an exceedance of the relevant state's "assurance level" (*i.e.,* typically 121 percent of the state's emissions budget), will be strengthened by the addition of another backstop requirement. Specifically, for any unit equipped with post-combustion controls that is found responsible for contributing to an exceedance of the state's assurance level, the revised regulations will prohibit the unit's seasonal emissions from exceeding by more than 50 tons the emissions that would have resulted if the unit had achieved a seasonal average emissions rate equal to the

higher of 0.10 lb/mmBtu or 125 percent of the unit's lowest previous seasonal average emissions rate under any CSAPR seasonal $NO_X$ trading program.[286]

These two enhancements are designed to ensure that all individual units with SCR controls have strong incentives to continuously operate and optimize their controls, and also to ensure that all units with post-combustion controls have strong incentives to optimize their emissions performance when a state's assurance level might otherwise be exceeded. These enhancements are generally designed to ensure consistency with the EPA's determination regarding the emissions control stringency needed from EGUs to eliminate significant contribution under the Step 3 multifactor analysis as discussed in section V of this document. Further, these enhancements are designed to provide greater assurance that emissions controls will be operated on all days of the ozone season and therefore necessarily on the days that turn out to be most critical for downwind ozone levels. The EPA expects that promoting more consistently good emissions performance by individual EGUs will better ensure that each state's significant contribution is fully eliminated by this action, *see North Carolina,* 531 F.3d at 919–21. In addition to addressing the statutory requirements of eliminating significant contribution, the EPA anticipates that these enhancements will also deliver public health and environmental benefits to underserved and overburdened communities.

The revisions to the Group 3 trading program being finalized in this rule are very similar to the proposed revisions. The changes from proposal to the set of states covered are driven largely by updates to the air quality modeling performed for the final rule, as described in section IV of this document. The changes from proposal to the trading program enhancements are generally being made in response to comments on the proposal, as discussed in more detail in the remainder of section VI.B of this document.

1. Trading Program Background and Overview of Revisions

a. Current CSAPR Trading Program Design Elements and Identified Concerns

The use of allowance trading programs to achieve required emissions reductions from the electric power sector has a long history, rooted in the Clean Air Act Amendments of 1990. In Title IV of those amendments, Congress specified the design elements for a 48-state allowance trading program to reduce $SO_2$ emissions and the resulting acid precipitation. Building on the success of that first allowance trading program as a tool for addressing multi-state air pollution issues, since 1998 EPA has promulgated and implemented multiple allowance trading programs for $SO_2$ or $NO_X$ emissions to address the requirements of the CAA's good neighbor provision with respect to successively more protective NAAQS for fine particulate matter and ozone. Most of these trading programs have applied either exclusively or primarily to EGUs.

The EPA currently administers six CSAPR trading programs for EGUs (promulgated in CSAPR, the CSAPR Update, and the Revised CSAPR Update) that differ in the pollutants, geographic regions, and time periods covered and in the levels of stringency, but that otherwise have been nearly identical in their core design elements and their regulatory text.[287] The principal common design elements currently reflected in all of the programs are as follows:

• An "emissions budget" is established for each state for each control period, representing the EPA's quantification of the emissions that would remain under certain projected conditions after elimination of the emissions prohibited by the good neighbor provision under those projected conditions. For each control period of program operation, a quantity of newly issued "allowances" equal to the amount of each state's emissions budget is allocated among the state's sources. (States have options to replace the EPA's default allocations or to institute an auction process.) Total emissions in a given control period from all sources in the program are effectively

---

[286] The requirement would not apply for control periods during which the unit operated for less than 10 percent of the hours, and emissions rates achieved in such previous control periods would be excluded from the comparison.

[287] The six current CSAPR trading programs are the CSAPR $NO_X$ Annual Trading Program, CSAPR $NO_X$ Ozone Season Group 1 Trading Program, CSAPR $SO_2$ Group 1 Trading Program, CSAPR $SO_2$ Group 2 Trading Program, CSAPR $NO_X$ Ozone Season Group 2 Trading Program, and CSAPR $NO_X$ Ozone Season Group 3 Trading Program. The regulations for the six programs are set forth at subparts AAAAA, BBBBB, CCCCC, DDDDD, EEEEE, and GGGGG, respectively, of 40 CFR part 97.

capped at a level no higher than the total quantity of allowances available for use in the control period, consisting of the sum of all states' emissions budgets for the control period plus any unused allowances carried over from previous control periods as ''banked'' allowances.

• ''Assurance provisions'' in each program establish an ''assurance level'' for each state for each control period, defined as the sum of the state's emissions budget plus a specified ''variability limit.'' The purpose of the assurance provisions is to limit the total emissions from each state's sources in each control period to an amount close to the state's emissions budget for the control period, consistent with the good neighbor provision's mandate that required emissions reductions must be achieved within the state, while allowing some flexibility beyond the emissions budget to accommodate year-to-year operational variability. In the event a state's assurance level is exceeded, responsibility for the exceedance is apportioned among the state's sources through a procedure that accounts for the sources' shares of the state's total emissions for the control period as well as the sources' shares of the state's assurance level for the control period.

• At the program's compliance deadlines after each control period, sources are required to hold for surrender specified quantities of allowances. The minimum quantities of allowances that must be surrendered are based on the sources' reported emissions for the control period at a 1-for-1 ratio of allowances to tons of emissions (or 2-for-1 in instances of late compliance). In addition, two more allowances must be surrendered for each ton of emissions exceeding a state's assurance level for a control period, yielding an overall 3-for-1 surrender ratio for those emissions (or 4-for-1 in instances of late compliance). Failure to timely surrender all required allowances is potentially subject to penalties under the CAA's enforcement provisions.

• To continuously incentivize sources to reduce their emissions even when they already hold sufficient allowances to cover their expected emissions for a control period, and to promote compliance cost minimization, operational flexibility, and allowance market liquidity, the programs allow trading of allowances—both among sources in the program and with non-source entities—and also let allowances that are unused in one control period be carried over for use in future control periods as banked allowances. Although the CSAPR programs do not limit trading of allowances, and prior to this rule have not limited banking of allowances within a given trading program, the 3-for-1 surrender ratio imposed by the assurance provisions on any emissions exceeding a state's assurance level disincentivizes sources from relying on either in-state banked allowances or net out-of-state purchased allowances to emit over the assurance level.[288]

• Finally, other common design elements ensure program integrity, source accountability, and administrative transparency. Most notably, each unit must monitor and report emissions and operational data in accordance with the provisions of 40 CFR part 75; all allowance allocations or auction results, transfers, and deductions must be properly recorded in the EPA's Allowance Management System; each source must have a designated representative who is authorized to represent all of the source's owners and operators and is responsible for certifying the accuracy of the source's reports to the EPA and overseeing the source's Allowance Management System account; and comprehensive data on emissions and allowances are made publicly available.

The EPA continues to believe that the historical CSAPR trading program structure established by the common design elements just described has important positive attributes, particularly with respect to the exceptional degree of compliance flexibility it can provide to a sector such as the electric power sector where such flexibility is especially useful and valuable. However, the EPA also shares many stakeholders' concerns about whether the historical structure, without enhancements, is capable of adequately addressing states' good neighbor obligations with respect to the 2015 ozone NAAQS in light of the rapidly evolving EGU fleet and the protectiveness and short-term form of the ozone standard. One set of concerns relates to the historically observed tendency under the trading programs for the supply of allowances to grow over time while the demand for allowances falls, reducing allowance prices and eroding the consequent incentives for sources to effectively control their emissions. A second, overlapping set of concerns relates to the general absence of source- or unit-specific emissions reduction requirements, allowing some individual sources to idle or run less optimally existing emissions controls even when a linkage between the sources' state and a receptor persists. For example, certain units in Ohio and Pennsylvania have been found to have operated their controls below target emissions performance levels used for budget setting under the CSAPR Update in the 2019–2021 period, even though the Revised CSAPR Update found that these states remained linked through at least 2021 to receptors for the 2008 ozone NAAQS, and the CSAPR Update itself was only a partial remedy. *See* 86 FR 23071, 23083. While this unit-level behavior may have been permissible under the prior program, emissions from these individual sources can contribute to increased pollution concentrations downwind on the particular days that matter for downwind exceedances of the relevant air quality standard. This indicates that the prior program design was not effectively ensuring the elimination of significant contribution.[289]

The EPA has analyzed hourly emissions data reported in prior cap-and-trade programs and identified instances of sources that did not operate SCR controls for substantial portions of recent ozone seasons. In an effort to ensure emissions control on critically important highest ozone days, guard against non-operation of emissions controls under a more protective NAAQS, and provide assurance of elimination of significant contribution to downwind areas, while also maintaining appropriate compliance and operational flexibility for EGUs, the EPA in this rule is implementing a suite of enhancements to the trading program. These will help to ensure reductions occur on the highest ozone days commensurate with our Step 3 determinations, in addition to maintaining a mass-based seasonal requirement. To meet the statutory mandate to eliminate significant contribution and interference with

---

[288] As discussed in section VI.B.6 of this document, while allowance banking has not previously been limited under any of the CSAPR trading programs, limits on the use of banked allowances were included in the earlier $NO_X$ Budget Trading Program in the form of ''flow control'' provisions.

[289] We also observe that these sources' emissions have the potential to impact downwind overburdened communities. *See* Ozone Transport Policy Analysis Final Rule TSD, Section E. The EPA conducted a screening-level analysis to determine whether there may be impacts on overburdened communities resulting from those EGUs receiving backstop emissions rates under this rule. This analysis identified a greater potential for these sources to affect areas of potential concern than the national coal-fired EGU fleet on average. However, this analysis is distinct from the more comprehensive exposure analysis conducted as discussed in section VII of this document and the RIA. In addition, we note that our conclusions regarding the EGU trading program enhancements in this final rule are wholly supportable and justified under the good neighbor provision, even in the absence of any potential benefits to overburdened communities.

maintenance on the critically important days, this combination of provisions will strongly incentivize sources to plan to run controls all season, including on the highest ozone days, while giving reasonable flexibility for occasional operational needs.[290]

In this rulemaking, the EPA is revising the Group 3 trading program to include enhancements designed to address both sets of concerns described previously. The principles guiding the various revisions and the relationships of the revisions to one another are discussed in sections VI.B.1.b and VI.B.1.c of this document. The individual revisions are discussed in more detail in sections VI.B.4 through VI.B.9 of this document.

b. Enhancements To Maintain Selected Control Stringency Over Time

The first set of concerns noted about the current CSAPR trading program structure relates to the programs' ability to maintain the rule's selected control stringency and related EGU effective emissions performance level as the EGU fleet evolves over time. Under the historical structure of the CSAPR trading programs, the effectiveness of the programs at maintaining the rule's selected control stringency depends entirely on how allowance prices over time compare to the costs of sources' various emissions reduction opportunities, which in turn depends on the relationship between the supply for allowances and the demand for allowances. In considering possible ways to address concerns about the ability to enhance the historical trading program structure to better sustain incentives to control emissions over time, the EPA has focused on the trading program design elements that determine the supply of allowances, specifically the approach for setting state emissions budgets and the rules concerning the carryover of unused allowances for use in future control periods as banked allowances.

i. Revised Emissions Budget-Setting Process

In each of the previous rulemakings establishing CSAPR trading programs, the EPA has evaluated the emissions that could be eliminated through implementation of certain types of emissions control strategies available at various cost thresholds to achieve

certain rates of emissions per unit of heat input (*i.e.,* the amount of fuel consumed) and the effects of the resulting emissions reductions on downwind air quality. After determining the emissions control strategies and associated emissions reductions that should be required under the good neighbor provision by considering these factors in a multifactor test at Step 3, the EPA has then for purposes of Step 4 implementation program design projected the amounts of emissions that would remain after the assumed implementation of the selected emissions control strategies at various points in the future and has established the projected remaining amounts of emissions as the state emissions budgets in trading programs.

Projecting the amounts of emissions remaining after implementation of selected emissions controls necessarily requires projections not only for sources' future emissions rates but also for other factors that influence total emissions, notably the composition of the future EGU fleet (*i.e.,* the capacity amounts of different types of sources with different emissions rates) and their future utilization levels (*i.e.,* their heat input). To the extent conditions unfold in practice that differ from the projections made at the time of a rulemaking for these other factors, over time the emissions budgets may not reflect the intended stringency of the emissions control strategies identified in the rulemaking as consistent with addressing states' good neighbor obligations. Further, projecting EGU fleet composition and utilization beyond the relatively near-term analytic years of 2023 and 2026 given particular attention in this rulemaking has become increasingly challenging in light of the anticipated continued evolution of the electric power sector toward more efficient and cleaner sources of generation, including as driven by incentives provided by the Infrastructure Investment and Jobs Act as well as the Inflation Reduction Act.

A consequence of using a trading program approach with preset emissions budgets that do not keep pace with the trends in EGU fleet composition and heat input is that the preset emissions budgets maintain the supply of allowances at levels that increasingly exceed the emissions that would occur even without implementation of the emissions control strategies used as the basis for determining the emissions budgets, causing decreases in allowance prices and hence the incentives to implement the control strategies. As an example, although the emissions

budgets in the CSAPR Update established in 2016 reflected implementation of the emissions control strategy of operating and optimizing existing SCR controls, within four years the EPA found that EGU retirements and changes in utilization not anticipated in EPA's previous budget-setting computations had made it economically attractive for at least some sources to idle or reduce the effectiveness of their existing controls (relying on purchased allowances instead).[291] While the EPA has provided analysis indicating that, on average, sources operate their controls more effectively on high electric demand days, it has also identified cases where units fail to optimize their controls on these days. Downwind states have suggested this type of reduced pollution control performance has occurred on the day and preceding day of an ozone exceedance.[292][293] While the EPA had previously provided analysis focusing on the year of initial program implementation, when allowance prices were high (*i.e.,* 2017 for the CSAPR Update), to demonstrate that on average, sources operate their controls more effectively on high electric demand days, even in that case it had identified situations where particular units failed to optimize their controls on these days. In later years, when allowance prices had fallen, more sources, including some identified by commenters, had idled or reduced the effectiveness of their controls. Such an outcome undermined the ongoing achievement of emissions rate performance consistent with the control strategies identified in the CSAPR Update to eliminate significant contribution to nonattainment and interference with maintenance, despite the fact that the mass-based budgets were being met.

In the Revised CSAPR Update, the EPA took steps to better address the rapid evolution of the EGU fleet, specifically by setting updated emissions budgets for individual future

---

[290] Deferral of the backstop daily emissions rate for certain EGUs, for reasons discussed in section VI.B.7 of this document, does not alter this finding that this trading program enhancement is an important part of the solution to eliminating significant contribution from EGUs under CAA section 110(a)(2)(D)(i)(I).

[291] The price of allowances in CSAPR Update states started at levels near $800 per ton in 2017 but declined to less than $100 per ton by 2019 and were less than $70 per ton in July 2020 (data from S&P Global Market Intelligence).

[292] 86 FR 23117.

[293] *See* EPA–HQ–OAR–2020–0272–0094 ("[This] is demonstrated through examination of Maryland's ozone design value days for June 26th–28th, 2019. On those days, Maryland recorded 8-hour ozone levels of 75, 85 and 83 ppb at the Edgewood monitor. Maryland Department of the Environment evaluated the daily NOX emission rate for units in Pennsylvania that were found to influence the design values on the 3 exceedance days (and 1 day prior to the exceedance) against the past-best ozone season 30-day rolling average optimized NOX rate (which tends to be higher than the absolute lowest seasonal average rate).").

years though 2024 that reflect future EGU fleet changes known with reasonable certainty at the time of the rulemaking. Some commenters in that rulemaking requested that the EPA also update the year-by-year emissions budgets to reflect future fleet changes that might become known after the time of the rulemaking, but the EPA declined to do so, in part because no methodology for making future emissions budget adjustments in response to post-rulemaking fleet changes had been included in the proposal for the rulemaking.

Based on information available as of December 2022, it appears that the emissions budgets set for the first two control periods covered by the Revised CSAPR Update generally succeeded at creating incentives to operate emissions controls under the Group 3 trading program for those control periods. However, the EPA recognizes that the lack of emissions budget adjustments after 2024 in conjunction with industry trends toward more efficient and cleaner resources will likely lead to a surplus of allowances after the adjustments end. This prospect for the existing Group 3 trading program should be avoided by the changes being made in this rulemaking. In this rulemaking, besides establishing new preset emissions budgets for the 2023 through 2029 control periods, the EPA is also extending the Group 3 trading program budget-setting methodology used in the Revised CSAPR Update to routinely calculate dynamic emissions budgets for each future control period from 2026 on, to be published in the year before that control period, with each dynamic emissions budget generally reflecting the latest available information on the composition and utilization of the EGU fleet at the time that dynamic emissions budget is determined. For the control periods in 2026 through 2029, each state's final emissions budget will be the preset budget determined for the state in this rulemaking except in instances when the dynamic budget determined for the state (and published approximately one year before the control period using the dynamic budget-setting methodology) is higher. For control periods in 2030 and thereafter, the emissions budgets will be the amounts determined for each state in the year before the control period using the dynamic budget-setting methodology.

The current budget-setting methodology established in the Revised CSAPR Update and the revisions being made to that methodology are discussed in detail in section VI.B.4 of this document and the Ozone Transport

Policy Analysis Final Rule TSD. To summarize here, the methodology used to determine the preset budgets largely follows the Revised CSAPR Update's emissions budget-setting methodology, which included three primary steps: (1) establishment of a baseline inventory of EGUs adjusted for known retirements and new units, with heat input and emissions rate data for each EGU in the inventory based on recent historical data; (2) adjustment of the baseline data to reflect assumed emissions rate changes resulting from known new controls, known gas conversions, and implementation of the emissions control strategies used to determine states' good neighbor obligations; and (3) application of an increment or decrement to reflect the effect on emissions from projected generation shifting among the units in a state at the emissions reduction cost associated with the selected emissions control strategies. In this rulemaking, the EPA has determined the preset state emissions budgets for the control periods from 2023 through 2029 by using the Revised CSAPR Update's budget-setting methodology, except that the step of that methodology intended to reflect the effects of generation shifting has been eliminated.

The dynamic budget-setting methodology used to determine dynamic state emissions budgets in the year before each control period starting with the 2026 control period is set forth in the revised Group 3 trading program regulations at 40 CFR 97.1010(a). This methodology modifies the Revised CSAPR Update's budget-setting methodology in two ways. First, the baseline EGU inventory and heat input data, but not the emissions rate data, will be updated for each control period using the most recent available reported data in combination with reported data from the four immediately preceding years. For example, in early 2025, using the final data reported for 2020 through 2024, the EPA will update the baseline inventory and heat input data used to determine dynamic state emissions budgets for the 2026 control period.[294] Second, the EPA will not apply an increment or decrement to any state emissions budget for projected

generation shifting associated with implementation of the selected control strategies, because any such shifting should already be reflected in the reported heat input data used to update the baseline.

The EPA believes that the revisions to the emissions budget-setting process will substantially improve the ability of the emissions budgets to keep pace with changes in the composition and utilization of the EGU fleet. The dynamic budget-setting methodology will account for the electric power sector's overall trends toward more efficient and cleaner resources, both of which tend to decrease total heat input at affected EGUs, and through 2029 the preset budgets established in the rule will also account for these factors to the extent known. The dynamic budget-setting methodology will also account for other factors that could lead to increased heat input in some states, such as generation shifting from other states or increases in electricity demand caused by rising electrification. The dynamic budget-setting procedure is specified in this final rule's trading program regulations and the computations, which are straightforward, can be performed in a spreadsheet to deliver reliable results. The EPA will provide public notice of the preliminary calculations and the data used by March 1 of the year preceding the control period and will provide an opportunity for submission of any objections to the data and preliminary calculations before finalizing the dynamic budgets for each control period by May 1 of the year before the control period to which those dynamic budgets apply. Thus, for example, sources and other stakeholders will have certainty by May 1, 2025, of the dynamic emissions budgets that will be calculated for the 2026 control period that starts May 1, 2026. Moreover, as of the issuance of this final rule, stakeholders will know the state-level preset emissions budgets for the 2026–2029 control periods, which serve as floors that will only be supplanted by dynamic budgets calculated for those control periods if such a dynamic budget yields a higher amount of tons than the corresponding preset budget established in this action.

It bears emphasis that the annually updated information used in the dynamic budget-setting computations will concern only the composition and utilization of the EGU fleet and not the emissions rate data also used in those computations. The dynamically determined emissions budget computations for all years will reflect only the specific emissions control

---

[294] As discussed in section VI.B.4 of this document, the state-level data used to determine the overall state-level heat input for computing a state's dynamic budget will be a three-year average (*e.g.,* 2022–2024 state-level data will be used in 2025 to set the 2026 dynamic budgets). The unit-level data used to determine individual units' shares of the state-level heat input in the computations will be the average of the three highest non-zero heat input amounts for the respective units over the most recent five years (*e.g.,* 2020–2024 unit-level data will be used in 2025 to set the 2026 dynamic budgets).

strategies used to determine states' good neighbor obligations as determined in this rulemaking, along with fixed historical emissions rates for units that are not assumed to implement additional control strategies, thereby ensuring that the annual updates will eliminate emissions as determined to be required under the good neighbor provision. The stringency of the emissions budgets will simply reflect the stringency of the emissions control strategies determined in the Step 3 multifactor analysis and will do so more consistently over time than the EPA's previous approach of computing emissions budgets for all future control periods at the time of the rulemaking.

The rule's revisions relating to state emissions budgets and the budget-setting process generally follow the proposal except for two changes we are making in response to comments, specifically: we will use historical data from multiple years rather than a single year in the dynamic budget-setting process, and we are establishing preset emissions budgets for the 2026–2029 control periods such that the dynamic budgets for those control periods will only be imposed where they exceed the corresponding preset budgets finalized in this rule. The rationale for these changes is discussed later in this section as part of the responses to the relevant comments. Details of the final budget-setting methodology and responses to additional comments are discussed further in section VI.B.4 of this document.

The final rule's provisions relating to the determination of state-level variability limits and assurance levels and unit-level allowance allocations are coordinated with the budget-setting methodology. These provisions generally follow the proposal except that the change to the methodology for determining variability limits is implemented starting with the 2023 control period instead of the 2025 control period and the final methodology for determining unit-level allocations of allowances to coal-fired units considers the controlled emissions rate assumptions applicable to the same units in the budget-setting process. Details of these provisions, including the rationales for the changes from proposal, are discussed in sections VI.B.5 and VI.B.9, respectively.

ii. Allowance Bank Recalibration

Besides the levels of the emissions budgets, the second design element of the trading program structure that affects the supply of allowances in each control period, and that consequently also affects the ability of a trading

program to maintain the rule's selected control stringency as the EGU fleet evolves over time, is the set of rules concerning the carryover of unused allowances for use in future control periods as banked allowances. As noted previously, trading and banking of allowances in the CSAPR trading programs can serve a variety of purposes: continuously incentivizing sources to reduce their emissions even when they already hold sufficient allowances to cover their expected emissions for a control period, facilitating compliance cost minimization, accommodating necessary operational flexibility, and promoting allowance market liquidity. All of these purposes are advanced by rules that allow sources to trade allowances freely (both with other sources and with non-source entities such as brokers). All of these purposes are also advanced by rules that allow unused allowances to be carried over for possible use in future control periods, thereby preserving a value for the unused allowances. However, while the EPA considers it generally advantageous to place as few restrictions on the trading of allowances as possible,[295] unrestricted banking of allowances has a potentially significant disadvantage offsetting its advantages, namely that it allows what might otherwise be temporary surpluses of allowances in some individual control periods to accumulate into a long-term allowance surplus that reduces allowance prices and weakens the trading program's incentives to control emissions. With weakened incentives, some operators would be more likely to choose not to continuously operate and optimize their emissions controls, imperiling the ongoing achievement of emissions rate performance consistent with the control

strategies defined as eliminating significant contribution to nonattainment and interference with maintenance.

As discussed in detail in section VI.B.6 of this rule, the EPA is revising the Group 3 trading program by adding provisions that establish a routine recalibration process for banked allowances that will be carried out in August 2024 and each subsequent August, after the compliance deadline for the control period in the previous year. In each recalibration, the EPA will reset the total quantity of banked allowances for the Group 3 trading program ("Group 3 allowances") held in all Allowance Management System accounts to a level computed as a target percentage of the sum of the state emissions budgets for the current control period. The target percentage will be 21 percent for the 2024–2029 control periods and 10.5 percent for control periods in 2030 and later years. The recalibration procedure entails identifying the ratio of the target bank amount to the total quantity of banked allowances held in all accounts before the recalibration and then, if the ratio is less than 1.0, multiplying the quantity of banked allowances held in each account by the ratio to identify the appropriate recalibrated amount for the account (rounded to the nearest allowance), and deducting any allowances in the account exceeding the recalibrated amount.

As noted previously, recalibration of the bank for each control period will be carried out in August of that control period. This timing will accommodate the process of deducting allowances for compliance for the previous control period, which cannot be completed before sources' June 1 compliance deadline for the previous control period, and will then provide approximately two additional months for sources to engage in any desired allowance transactions before recalibration occurs. However, data that can be used to estimate the bank recalibration ratio for each control period will be available shortly after the end of the previous control period, and the EPA will use these data to make information on the estimated bank recalibration ratio for each control period publicly available no later than March 1 of the year of that control period, thereby facilitating the ability of affected EGUs to anticipate their ultimate holdings of recalibrated banked allowances to inform their compliance planning for that control season. Affected EGUs will also have several months following the completed bank recalibration in August to transact allowances with other parties as needed

---

[295] The advantages of trading programs discussed earlier in this section—providing continuous emissions reduction incentives, facilitating compliance cost minimization, and supporting operational flexibility—depend on the existence of a marketplace for purchasing and selling allowances. Broader marketplaces generally provide greater market liquidity and therefore make trading programs better at providing these advantages. The EPA recognizes that unrestricted use of *net* purchased allowances—meaning quantities of purchased allowances that exceed the quantities of allowances sold—by a source or group of sources as an alternative to making emissions reductions can interfere with the achievement of the desired environmental outcome. Therefore, section VI.B.1.c of this document discusses the enhancements to the Group 3 trading program that the EPA is making in this rulemaking to reduce reliance on net purchased allowances by incentivizing or requiring better environmental performance at individual EGUs. However, the concern arises from the *use of an excessive quantity* of net purchased allowances for a particular purpose, not from the existence of a *marketplace* where allowances may be freely bought and sold.

before the allowance transfer deadline of June 1 of the following year.

The EPA believes this revision to the Group 3 trading program's banking provisions establishing an annual bank recalibration process will complement the revisions to the budget-setting process by preventing any surplus of allowances created in one control period from diminishing the intended stringency and resulting emissions reductions of the emissions budgets for subsequent control periods.

The calibration procedure will not erase the value of unused allowances for the holder, because the larger the quantity of banked allowances that is held in a given account before each recalibration, the larger the quantity of banked allowances that will be left in the account after the recalibration for possible sale or use in meeting future compliance requirements. Because the banked allowances will always have value, the opportunity to bank allowances will continue to advance the purposes served by otherwise unrestricted banking as described previously. Opportunities to bank unused allowances can serve all these same purposes whether a banked allowance is of partial value (if the bank needs recalibrating to its target level) or is of full value compared to a newly issued allowance for the next control period.

The final rule's provisions relating to bank recalibration generally follow the proposal except that, in response to comments, the target percentage used to determine the recalibrated bank levels for the 2024–2029 control periods is being set at 21 percent instead of 10.5 percent. The rationale for this change is discussed later in this section as part of the responses to the relevant comments. Details of the bank recalibration provisions are discussed further in section VI.B.6 of this rule.

c. Enhancements To Improve Emissions Performance at Individual Units

The second set of concerns about the structure of the current CSAPR trading programs relates to the general absence of source- or unit-specific emissions reduction requirements. Without such requirements, the programs affect individual sources' emissions performance only to the extent that the incentives created by allowance prices are high enough relative to the costs of the sources' various emissions control opportunities. In circumstances where the incentives to control emissions are insufficient, some individual sources even idle existing emissions controls. Emissions from these individual sources can contribute to increased pollution

concentrations downwind on the particular days that matter for downwind exceedances of the relevant air quality standard.

This EPA intends that the trading program enhancements described in section VI.B.1.b of this rule will improve the Group 3 trading program's ability to sustain emissions control incentives over time such that needed emissions performance will be achieved by all participating units without the need for additional requirements to be imposed at the level of individual units. However, because obtaining needed emissions performance at individual units is also important to the elimination of significant contribution in keeping with the EPA's Step 3 determinations, the EPA is supplementing the previously described enhancements with two other new sets of provisions that will apply to certain individual units within the larger context of the Group 3 trading program. The allowance price will continue to be the most important driver of good environmental performance for most units, but the proposed unit-level requirements will be important supplemental drivers of performance and will offer additional assurance that significant contribution is eliminated on a daily basis during the ozone season by more continuous operation of existing pollution controls.

i. Unit-Specific Backstop Daily Emissions Rates

The first of the trading program enhancements intended to improve emissions performance at the level of individual units is the addition of backstop daily $NO_X$ emissions rate provisions that will apply to large coal-fired EGUs, defined for this purpose as units serving electricity generators with nameplate capacities equal to or greater than 100 MW and combusting any coal during the control period in question. Starting with the 2024 control period, a 3-for-1 allowance surrender ratio (instead of the usual 1-for-1 surrender ratio) will apply to emissions during the ozone season from any large coal-fired EGU with existing SCR controls exceeding by more than 50 tons a daily average $NO_X$ emissions rate of 0.14 lb/mmBtu. The additional allowance surrender requirement will be integrated into the trading program as a new component in the calculation of each unit's primary emissions limitation, such that the additional allowances will have to be surrendered by the same compliance deadline of June 1 after each control period. The amount of additional allowances to be surrendered will be determined by computing, for

each day of the control period, any excess of the unit's reported emissions (in pounds) over the emissions that would have resulted from combusting that day's actual heat input at an average daily emissions rate of 0.14 lb/mmBtu, summing the daily amounts, converting from pounds to tons, computing the amount of any excess over 50 tons, and multiplying by two. Starting with the second control period in which newly installed SCR controls are operational, but not later than the 2030 control period, the 3-for-1 surrender ratio will apply in the same way to all large coal-fired EGUs except circulating fluidized bed units, consistent with EPA's determination that a control stringency reflecting installation and operation of SCR controls on all such large coal-fired EGUs is appropriate to address states' good neighbor obligations with respect to the 2015 ozone NAAQS.

In prior rules addressing interstate transport of air pollution, stakeholders have noted that while seasonal cap-and-trade programs are effective at lowering ozone and ozone-forming precursors across the ozone season, attainment of the standard is measured on key days and therefore it is necessary to ensure that the rule requires emissions reductions not just seasonally, but also on those key days.[296] They have noted that while the trading programs established under the $NO_X$ SIP Call, CAIR, and CSAPR have all been successful in ensuring seasonal reductions, states must remain below daily peak levels, not just seasonal levels, to reach attainment. These downwind stakeholder communities have suggested that operating pollution controls on the highest ozone days (and immediately preceding days) during the ozone season is of critical importance. The EPA has analyzed hourly emissions data reported in prior cap-and-trade programs and has identified instances of sources that did not operate SCR controls for substantial portions of recent ozone seasons. These instances are discussed in section V.B.1.a of this document and in the EGU $NO_X$ Mitigation Strategies Final Rule TSD in the docket. While the EPA has in prior ozone transport actions not found sufficient evidence of emissions control idling or non-optimization to take the step of building in enhancements to the trading program to ensure unit-level control operation, our review of subsequent-year data for prior programs suggests that the non-optimization

---

[296] *E.g.*, comments of Maryland Department of the Environment on the proposed Revised CSAPR Update at 3, EPA–HQ–OAR–2020–0272–0094.

behavior increases in the latter years of a program. Applied to this context (*e.g.,* a rule providing a full remedy to interstate transport for the more protective 2015 ozone NAAQS and an extended period of expected persistence of receptors), this data suggests this deterioration in performance could become prevalent and problematic in future years if not addressed. Rather than allow for the potential of continued deterioration in the environmental performance of our trading programs, the EPA finds the evidence of declining SCR performance in later years of trading programs sufficient to justify prophylactic measures in this rule to ensure the emissions control strategy selected at Step 3 is indeed implemented at Step 4. Thus, particularly in the context of the more protective 2015 ozone NAAQS combined with the full remedy nature of this action and the extended timeframe for which upwind contribution to downwind nonattainment is projected to persist, the EPA agrees with these stakeholders that the set of measures promulgated in this rulemaking to implement the control stringency levels found necessary to address states' good neighbor obligations should include measures designed to more effectively ensure that individual units operate their emissions controls routinely throughout the ozone season, thereby also ensuring that the controls are planned to be in operation on the particular days that turn out to be most critical for ozone formation and for attainment of the NAAQS. Routine operation of emissions controls will also provide relief to overburdened communities downwind of any units that might otherwise have chosen not to operate their controls. In the Ozone Transport Policy Analysis TSD, the EPA conducted a screening analysis that found nearly all of the EGUs included in this analysis are located within a 24-hour transport distance of many areas with potential EJ concerns. Thus, the EPA is adopting backstop daily rate limits at the individual unit level because it is appropriate and justified in the context of eliminating significant contribution under CAA section 110(a)(2)(D)(i)(I). While the former justification is sufficient to finalize this enhancement to the trading program, we also anticipate that this measure will deliver public health and environmental benefits to overburdened communities (as well as the rest of the population).[297]

We considered whether, as some commenters suggested, it would be appropriate to simply implement unit-specific daily emissions limitation at all of the large, coal-fired EGUs, and forego an emissions trading approach altogether. While this is within the EPA's statutory authority, *see* CAA section 110(a)(2)(A) and 302(y), and merits careful consideration, we are declining to do so in this action but intend to closely monitor EGU emissions performance in response to the trading program finalized here. The purpose of establishing a backstop daily NOₓ emissions rate and implementing it through additional allowance surrender requirements instead of as an enforceable emissions limitation is to incentivize improved emissions performance at the individual unit level while continuing to preserve, to the extent possible, the advantages that flexibility of a trading program brings to the electric power sector. As discussed in section VI.B.7 of this document, under the EPA's historical trading programs without the enhancements made in this rulemaking, some individual coal-fired units with SCR controls have chosen to operate the controls at lower removal efficiencies than in past ozone seasons or even to idle the controls for entire ozone seasons. In addition, some SCR-equipped units have chosen to routinely cycle their emissions controls off at lower load levels, such as while operating overnight, instead of operating the controls, upgrading the units to enable the controls to be operated under those conditions, or not operating the units under those conditions. Collectively, this non-optimization of existing controls has a detrimental impact on problematic receptors. Table V.D.1–1 shows the expected air quality benefit from control optimization (totaling nearly 1.6 ppb change across all receptors).[298]

The EPA has identified sources of interstate ozone pollution such as the New Madrid and Conemaugh plants (in Missouri and Pennsylvania, respectively) whose SCR controls were not operating for substantial portions of recent ozone seasons. The data included in Appendix G of the Ozone Transport Policy Analysis Final Rule TSD, available in the docket for this rulemaking, demonstrate that these units have operated their SCRs better and more consistently during years with

higher NOₓ allowance prices. Downwind stakeholders have noted that some of the higher emissions rates (specifically in the case of Conemaugh Unit 2 in 2019) have occurred on the day of and the preceding day of an ozone exceedance in bordering states.[299]

The EPA believes that the design of the daily emissions rate provisions will be effective in addressing these types of high-emitting behavior by significantly raising the cost of planned operator decisions that substantially compromise environmental performance. At the same time, the provision will not unduly penalize an occasional unplanned exceedance, because the amount of additional allowances that would have to be surrendered to address a single day's exceedance would be much smaller than the amount that would have to be surrendered to address planned poor performance sustained over longer time periods. Moreover, the EPA believes that the inclusion of a 50-ton threshold before the increased surrender requirements would apply is sufficient to address virtually all instances where a unit's emissions would exceed the 0.14 lb/mmBtu daily rate because of unavoidable startup or shutdown conditions during which SCR equipment cannot be operated, thereby ensuring that the provision will not penalize units for emissions that are beyond their reasonable control.

The EPA is applying the daily emissions rate provisions to large coal-fired EGUs, and not to other types of units, for reasons that are consistent with EPA's determinations regarding the appropriate control stringency for EGUs to address states' good neighbor obligations with respect to the 2015 ozone NAAQS. Installation and operation of SCR controls is well-established as a common practice for the best control of NOₓ emissions from coal-fired EGUs, as evidenced by the fact that the technology is already installed on more than 60 percent of the sector's total coal-fired capacity and installed on nearly 100 percent of the coal fired boilers in the top quartile of emissions rate performance. In the context of addressing good neighbor obligations with respect to the 2015 ozone NAAQS, the EPA is determining that a control stringency reflecting universal installation and operation of SCR technology at large coal-fired EGUs (other than circulating fluidized bed units) is appropriate at Step 3. Finally, where SCR controls are installed on such units, optimized operation of those controls is an extremely cost-effective method of achieving NOₓ emissions

---

[297] Nonetheless, the environmental justice exposure analysis indicates that preexisting disparities among demographic groups are likely to

persist even under this final rule. *See* section VII of this document.

[298] As illustrated in the table and underlying data, a small portion of this ppb impact is attributable to combustion control upgrade potential.

[299] EPA–HQ–OAR–2020–0272–0094.

reductions. The EPA believes these considerations support establishment of the daily emissions rate provisions on a universal basis for large coal-fired EGUs, with near-term application of the provisions for units that already have the controls installed and deferred application for other units, as discussed later.

With regard to gas-fired steam EGUs, SCR controls are nowhere near as prevalent, and while the EPA is including some SCR controls at gas-fired steam units in the selected control stringency at Step 3, the EPA is not including universal SCR controls at gas-fired steam units. Because the EPA is not determining that universal installation and operation of SCR controls at gas-fired steam EGUs is part of the selected control stringency, in order not to constrain the power sector's flexibility to choose which particular gas-fired steam EGUs are the preferred candidates for achieving the required emissions reductions, the EPA is not applying the daily emissions rate provisions to large gas-fired steam EGUs. Focusing the backstop daily emissions rates on coal-fired units is also consistent with stakeholder input which has emphasized the need for short-term rate limits at coal units given their relatively higher emissions rates.

The EPA developed the level of the daily average $NO_X$ emissions rate—0.14 lb/mmBtu—through analysis of historical data, as described in section VI.B.7 of this document. A rate of 0.14 lb/mmBtu represents the daily average $NO_X$ emissions rate that has been demonstrated to be achievable on approximately 95 percent of days covering more than 99 percent of total ozone-season $NO_X$ emissions by coal-fired units with SCR controls that are achieving a seasonal $NO_X$ average emissions rate of 0.08 lb/mmBtu (or less), which is the seasonal $NO_X$ emissions rate that the EPA has determined is indicative of optimized SCR performance by units with existing SCR controls.

As noted previously, the daily average emissions rate provisions will apply beginning in the 2024 control period for large coal-fired units with installed SCR controls, one control period later than optimization of those controls will be reflected in the state emissions budgets under this rule. For these units, not applying the daily average rate provisions until 2024 serves three purposes. First, it provides all the units with a preparatory interval to focus attention on improving not only the average performance of their SCR controls but also the day-to-day consistency of performance before they will be held to increased allowance-surrender consequences for exceeding the daily rate. Second, it provides the subset of units that exhaust to common stacks with other units that currently lack SCR controls an opportunity to exercise the option to install and certify any additional monitoring systems needed to monitor the individual units' $NO_X$ emissions rates separately; otherwise, the daily emissions rate provisions will apply to the SCR-equipped units based on the combined $NO_X$ emissions rates measured in the common stacks. Third, it provides all units sufficient time to update the data handling software in their existing monitoring systems as needed to compute and report the additional hourly and daily data values needed for implementation of the provisions.[300]

With respect to the units without existing SCR controls, the daily average emissions rate provisions will apply starting with the second control period in which newly installed SCR controls are operational at the unit, but not later than the 2030 control period. This implementation timing represents a change from the proposal, under which the daily average emissions rate provisions would have applied to units without existing SCR starting in the 2027 control period. Commenters noted that for many units without SCR, replacement of the unit within a few years, and shifting of some generation to cleaner units in the interim, would be a more economic compliance strategy than installation of new SCR controls. The commenters further noted that implementation of the daily average emissions rate for these units starting in 2027 would strongly disadvantage such an alternative strategy if the capacity replacement and any associated transmission improvements could not be implemented by 2027. In light of these comments, the EPA has determined that as long as the emissions budgets determined in this rule to eliminate significant contribution are still being implemented as expeditiously as practicable—which in this instance the EPA has determined requires phasing in the required emissions reductions by 2027—it is reasonable to defer implementation of the daily average emissions rate provisions to 2030 for units without SCR to allow temporarily greater flexibility to pursue compliance strategies other than installation of new

controls. This lag is permissible consistent with the obligation to eliminate significant contribution for reasons that are further discussed in response to comments in section VI.B.1.d of this document. However, for any units that choose a compliance strategy of installing new SCR controls before 2030, the daily average emissions rate provisions would apply in the second control period of operation. Specification of the second control period rather than the first control period provides the unit operators with an opportunity to gain operational experience with the new equipment before the units will be held to increased allowance-surrender consequences for exceeding the daily rate.

The unit-specific daily emissions rate provisions are being finalized as proposed except for two changes noted in the previous summary: the exclusion from extra allowance surrender requirements of a unit's first 50 tons of emissions in a control period exceeding the backstop daily rate, and the revision of the starting date for implementation of the requirement for units without existing SCR controls to 2030 or the second control period of SCR operation, if earlier. The rationale for these changes is further discussed in the responses to comments later in this section. Additional details of the unit-specific daily emissions rate provisions are discussed in section VI.B.7 of this document.

ii. Unit-Specific Emissions Limitations Contingent on Assurance Level Exceedances

The second of the trading program enhancements intended to improve emissions performance at the level of individual units is the addition of unit-specific secondary emissions limitations for units with post-combustion controls starting with the 2024 control period. The secondary emissions limitations will be determined on a unit-specific basis according to each unit's individual performance but will apply to a given unit only under the circumstance where a state's assurance level for a control period has been exceeded, the unit is included in a group of units to which responsibility for the exceedance has been apportioned under the program's assurance provisions, and the unit operated during at least 10 percent of the hours in the control period. Where these conditions for application of a secondary emissions limitation to a given unit for a given control period are met, the unit's secondary emissions limitation consists of a prohibition on $NO_X$ emissions during the control

---

[300] For further discussion of emissions monitoring and reporting requirements under the rule, including the options available to plants where SCR-equipped and non-SCR-equipped coal-fired units exhaust to common stacks, see section VI.B.10 of this document.

period that exceed by more than 50 tons the NO$_X$ emissions that would have resulted if the unit had achieved an average emissions rate for the control period equal to the higher of 0.10 lb/mmBtu or 125 percent of the unit's lowest average emissions rate for any previous control period under any CSAPR seasonal NO$_X$ trading program during which the unit operated for at least 10 percent of the hours.

The secondary emissions limitation is in addition to, not in lieu of, the primary emissions limitation applicable to each source, which continues to take the form of a requirement to surrender a quantity of allowances based on the source's emissions, and also in addition to the existing assurance provisions, which similarly continue to take the form of a requirement for the owners and operators of some sources to surrender additional allowances when a state's assurance level is exceeded. In contrast to these other requirements, the unit-specific secondary emissions limitation takes the form of a prohibition on emissions over a specified level, such that any emissions by a unit exceeding its secondary emissions limitation would be subject to potential administrative or judicial action and subject to penalties and other forms of relief under the CAA's enforcement authorities. The reason for establishing this form of limitation is that experience under the existing CSAPR trading programs has shown that, in some circumstances, the existing assurance provisions have been insufficient to prevent exceedances of a state's assurance level for a control period even when the likelihood of an exceedance has been foreseeable and the exceedance could have been readily avoided if certain units had operated with emissions rates closer to the lower emissions rates achieved in past control periods. The assurance levels exist to ensure that emissions from each state that contribute significantly to nonattainment or interfere with maintenance of a NAAQS in another state are prohibited. *North Carolina* v. *EPA*, 531 F.3d 896, 906–08 (D.C. Cir. 2008). The EPA's programs to eliminate significant contribution must therefore achieve this prohibition, and the evidence of foreseeable and avoidable exceedances of the assurance levels demonstrates that EPA's existing approach has not been sufficient to accomplish this.

The purpose of including assurance levels higher than the state emissions budgets in the CSAPR trading programs is to provide flexibility to accommodate operational variability attributable to factors that are largely outside of an

individual owner's or operator's control, not to allow owners and operators to plan to emit at emissions rates that could be anticipated to cause a state's total emissions to exceed the state's emissions budget or assurance level. Conduct leading to a foreseeable, readily avoidable exceedance of a state's assurance level cannot be reconciled with the statutory mandate of the CAA's good neighbor provision that emissions "within the state" significantly contributing to nonattainment or interfering with maintenance of a NAAQS in another state must be prohibited. Because the current CSAPR regulations do not expressly prohibit such conduct and have proven insufficient to deter it in some circumstances, the EPA is correcting the regulatory deficiency in the Group 3 trading program by adding secondary emissions limitations that cannot be complied with through the use of allowances.

The EPA notes that although the purpose of the secondary emissions limitations is to strengthen the assurance provisions, which apply on a statewide, seasonal basis, the unit-specific structure of the new limitations will strengthen the incentives for individual units with post-combustion controls to maintain their emissions performance at levels consistent with their previously demonstrated capabilities. The new limitations will strengthen the incentives to operate and optimize the controls continuously, which can be expected to reduce some individual units' emissions rates throughout the ozone season, including on the days that turn out to be most critical for downwind ozone levels. Better emissions performance on average across the ozone season by individual units likely will also help address impacts of pollution on overburdened communities downwind from some such units. *See* Ozone Transport Policy Analysis Final Rule TSD, Section E.

The unit-specific secondary emissions limitations are being finalized as proposed except that the limitations will apply only to units with post-combustion controls. The rationale for this change, and additional details regarding the provisions, are discussed in section VI.B.8 of this document.

**d. Responses to General Comments on the Revisions to the Group 3 Trading Program**

This section summarizes and provides the EPA's responses to overarching comments received on the EPA's proposal to implement the emissions reductions required from EGUs under

this rule through expansion and enhancement of the Group 3 trading program originally established in the Revised CSAPR Update, particularly comments on electric system reliability. Responses to comments about individual aspects of the enhanced trading program are addressed in the respective subsections of this section in which those aspects are discussed. Responses to comments concerning alleged overcontrol and the EPA's legal authority are in sections V.D. and III. Comments not addressed in this document are addressed in the separate *RTC* document available in the docket for this action.

*Comment:* Some commenters, including EGU owners, states, and several RTOs, expressed concern that the requirements for EGUs as formulated in the proposal could lead to a degradation in the reliability of the electric system. As background, some of these commenters noted that the power sector is currently undergoing rapid change, with older and less economic fossil-fuel-fired steam generating units retiring while the majority of the new capacity being added consists of wind and solar capacity. They noted that fossil-fuel-fired generating capacity provides reliability benefits not necessarily provided by other types of generating capacity, including not only the ability to generate electricity in the absence of wind or sunlight, but also inertia, ramping capability, voltage support, and frequency response. Commenters stated that past EGU retirements and the pace of change in the generating capacity mix have already been stressing the electric system in some regions, and that the forecasted risk of events where the electric system would be unable to fully meet load is rising.

For purposes of their comments, these commenters generally assumed that the rule would lead to additional retirements of fossil-fuel-fired generating capacity beyond the retirements that EGU owners have already planned and announced. Some of the commenters also suggested that remaining fossil-fuel-fired generators would be unwilling to operate when needed because allowances might be unavailable for purchase or too costly. In the context of an already-stressed electric system, the commenters predicted that these assumed consequences of the rule would threaten resource adequacy and result in degraded electric reliability. To support their assumptions concerning additional retirements, some of the commenters pointed to projections of incremental generating capacity retirements

included in the results of modeling performed by the EPA to analyze the costs and benefits of the proposed rule. Some commenters indicated that they expected EGU owners to be interested in retiring and replacing uncontrolled units as of the date of implementation of the backstop daily rate requirement on uncontrolled units, and expressed concern that the proposal to implement that requirement as of the 2027 control period did not allow sufficient time for planning and implementation of all the necessary generation and transmission investments to make this a viable compliance strategy; for these commenters, 2027 and the immediately following years were the period of greatest concern. Some commenters appear simply to have assumed that owners of units not already equipped with SCR controls would choose to retire the units as of the ozone season in which the units would otherwise become subject to the backstop daily emissions rate provisions, regardless of whether replacement investments had been completed.

Some of the commenters raising concerns about electric system reliability suggested potential modifications to the proposed rule that the commenters believed could help address their concerns. The suggestions included various mechanisms for suspending some or all of the trading program's requirements for certain EGUs at times when an RTO or other entity responsible for overseeing a region of the interconnected electrical grid determines that generation from those EGUs is needed and the EGUs might not otherwise agree to operate. Other suggestions focused on ways of providing EGUs with greater confidence that allowances would be available to cover their incremental emissions during particular events. A number of commenters used the term ''reliability safety valve,'' in some cases with reference to the types of suggestions just mentioned and in other cases without details. Some commenters pointed to the ''safety valve'' provision included in the Group 2 trading program regulations under the Revised CSAPR Update. Another commenter pointed to provisions for a ''reliability safety valve'' included in the Clean Power Plan (80 FR 64662, Oct. 23, 2015).

In addition to offering critiques and recommendations concerning the proposed rule's contents, some commenters claimed that the EPA had failed to conduct sufficient analysis of the potential implications of the proposed rule on electrical system reliability. These commenters called on the EPA to consult with RTOs and other

entities with responsibilities relating to electric system reliability and to perform additional analysis. Some commenters advocated for renewed consultations and analysis before each planned adjustment to emissions budgets under the dynamic budget-setting process. Commenters cited the consultation processes followed during implementation of other EPA rules, such as the Mercury and Air Toxics Standards (MATS) (77 FR 9304, Feb. 16, 2012).

*Response:* The EPA disagrees with the comments asserting that this rule would threaten resource adequacy or otherwise degrade electric system reliability. The emissions reduction requirements for EGUs under this rule are being implemented through the mechanism of an allowance trading program. Under the trading program, no EGU is required to cease operation. The core trading program requirements for a participating EGU are to monitor and report the unit's $NO_X$ emissions for each ozone season period and to surrender a quantity of allowances after the end of the ozone season based on the reported emissions. To address states' obligations under the good neighbor program, some units of course will have to take some type of action to reduce emissions, the actions taken to reduce emissions will generally have costs, and some EGU owners will conclude that, all else being equal, retiring a particular EGU and replacing it with cleaner generating capacity is likely to be a more economic option from the perspective of the unit's customers and/or owners than making substantial investments in new emissions controls at the unit. However, the EPA also understands that before implementing such a retirement decision, the unit's owner will follow the processes put in place by the relevant RTO, balancing authority, or state regulator to protect electric system reliability. These processes typically include analysis of the potential impacts of the proposed EGU retirement on electrical system reliability, identification of options for mitigating any identified adverse impacts, and, in some cases, temporary provision of additional revenues to support the EGU's continued operation until longer-term mitigation measures can be put in place. No commenter stated that this rule would somehow authorize any EGU owner to unilaterally retire a unit without following these processes, yet some comments nevertheless assume that is how multiple EGU owners would proceed, in violation of their obligations to RTOs, balancing authorities, or state regulators relating to the provision of

reliable electric service. Assumptions of this nature are simply not reasonable. Like many commenters, the EPA does expect that retirement will be viewed as a more economic compliance strategy for some EGUs than installing new controls, but the Agency also expects that any resulting unit retirements will be carried out through an orderly process in which RTOs, balancing authorities, and state regulators use their powers to ensure that electric system reliability is protected. The trading program inherently provides ample flexibility to allow such an orderly transition to take place. In addition, as discussed later in this section, the EPA has adopted several changes in the final rule to increase flexibility specifically for the early years of the trading program for which commenters have indicated the greatest concerns about electric system reliability.

As an initial matter, the EPA notes two fundamental aspects of this rulemaking which together provide a strong foundation for the Agency's conclusion that the emissions reductions required from EGUs can be achieved with no adverse impacts on electric system reliability. First, there is ample evidence indicating that the required emissions reductions are feasible. As discussed in section V of this document, the magnitude and timing of the EGU emissions reductions required by this action reflect application of technologies that are already in widespread use, on schedules that are supported by industry experience. Second, the required emissions reductions are being implemented through the mechanism of a trading program. The enhanced trading program under this rule, like the trading programs established by the EPA under prior rules, provides EGU owners with opportunities to substitute emissions reductions from sources where achieving reductions is cheaper and easier for emissions reductions from other sources where achieving reductions is more costly or difficult. In general, an EGU owner has options to operate the emissions controls identified by the EPA for that type of unit (including installation or upgrade of controls where necessary), operate other types of emissions controls, or adapt the unit's levels of operation to produce less generation if the unit is a higher-emitting EGU or more generation if the unit is a lower-emitting EGU. The backstop daily emissions rate provisions in this rule reduce the degree of available flexibility relative to the degree of flexibility in the Agency's

previous trading programs under CAIR and CSAPR but by no means eliminate it. Moreover, even the backstop rate provisions are structured as requirements to surrender additional allowances rather than as hard limits, providing a further element of flexibility No EGU is required to retire or is prohibited from operating at any time under this rule. EGUs only need to surrender of the appropriate quantities of allowances after the end of the control period.[301]

Further, in the large number of comments submitted in this rulemaking that assert concerns over electric system reliability, no commenter has cited a single instance where implementation of an EPA trading program has actually caused an adverse reliability impact. Indeed, similar claims made in the context of the EPA's prior trading program rulemakings have shown a considerable gap between rhetoric and reality. For example, in the litigation over the industry's multiple motions to stay implementation of CSAPR, claims were made that allowing the rule to go into effect would compromise reliability. Yet in the 2012 ozone season starting just over 4 months after the rule was stayed, EGUs covered by CSAPR collectively emitted below the overall program budgets that the rule would have imposed in that year if the rule had been allowed to take effect, with most individual states emitting below their respective state budgets despite CSAPR not being in effect.[302] Similarly, in the litigation over the 2015 Clean Power Plan, assertions that the rule would threaten electric system reliability were made by some utilities or their representatives, yet even though the Supreme Court stayed the rule in 2016, the industry achieved the rule's emissions reduction targets without the rule ever going into effect. *See West Virginia* v. *EPA,* 142 S. Ct. 2587, 2638 (2022) (Kagan, J., dissenting) ("[T]he industry didn't fall short of the [Clean Power] Plan's goal; rather, the industry exceeded that target, all on its own. . . . At the time of the repeal . . . 'there [was] likely to be no difference between a world where the [Clean Power Plan was] implemented and one where it [was] not.' ") (quoting 84 FR 32561). The claims that these rules

would have had adverse reliability impacts were proved to be groundless.

Notwithstanding the long experience confirming the ability of the EPA's trading programs to obtain emissions reductions from EGUs without impairing the sector's ability to provide reliable electric service, the Agency of course does not rely here solely on its experience, but has carefully reviewed the comments on this topic for any information that might indicate the appropriateness of modifications to the enhanced trading program as proposed. In recognition of the important role that RTOs play in ensuring electric system reliability, and consistent with the requests of some commenters, the EPA has engaged in outreach to the RTOs that commented on the proposal to better understand their comments specifically and the reliability-related comments of other commenters more generally.[303] Through these meetings, the central reliability-related concern was identified as one of timing. In order for retirement to be a viable compliance strategy for a unit that cannot be entirely spared until replacement investments in generation or transmission are completed, it must be possible for the unit to operate at critical times for a transition period. Like other stakeholders, the RTOs perceived implementation of the backstop daily emissions rate provisions on uncontrolled units as materially strengthening incentives for such units to either install controls or retire. The RTOs were concerned that the option for a coal-fired unit without SCR controls to maintain limited operation while surrendering allowances at a 3-for-1 ratio for all emissions exceeding the backstop daily rate was one that EGU owners would be reluctant to pursue. Accordingly, the RTOs expected considerable interest from EGU owners in retiring and replacing uncontrolled units as of the date of implementation of the backstop daily rate requirement on uncontrolled units, and they were concerned that the proposal to implement that requirement as of the 2027 control period did not allow sufficient time for planning and implementation of all the necessary generation and transmission investments to make this a viable compliance strategy. The RTOs described their concerns as greatest

through approximately the 2029 control period.

The RTOs also described a concern about potentially illiquid allowance markets. They believed it was possible that some EGUs might claim an inability to operate at particular times when needed unless they had confidence that they would be able obtain additional allowances. The RTOs were particularly concerned that introduction of dynamic budgeting as proposed would create uncertainty for some EGUs regarding the quantities of allowances they would have available for use, particularly given the potentially large year-to-year swings if budgets were based on historical data from a single year. Some of the RTOs suggested potential solutions for these issues, principally in the form of auctions or RTO-administered allocations of allowances from pools of supplemental allowances, with access to the supplemental allowances triggered by certain indications of temporary stress on the electric system.

In the final rule, the EPA is adopting several changes from the proposal to help address the reliability-related concerns that were identified in comments and brought into greater focus by the consultations with the RTOs. The first change adopted in response to these comments is that application of the backstop daily $NO_X$ emissions rate to units without existing SCR controls is being deferred until the 2030 control period, or the second control period in which a unit operates new SCR controls, if earlier. The purpose of this change is to address the concerns that application of the backstop daily $NO_X$ emissions rate to EGUs without existing SCR starting in 2027 would provide insufficient time for planning and investments needed to facilitate unit retirement as a compliance pathway, which some commenters noted they prefer or have already planned. In particular, where an EGU owner would prefer to retire and replace an uncontrolled EGU rather than to install new controls, and in recognition that reliability-related needs may require some degree of operation from such units in the period before the investments needed to replace the unit can be completed, deferral of the backstop daily emissions rate provisions ensures that the necessary generation can be provided without being made subject to a 3-for-1 allowance surrender ratio that might render that compliance strategy uneconomic compared to the faster but less environmentally beneficial compliance strategy of installing new controls. The EPA has considered the statutory mandate that states' good neighbor obligations—

---

[301] The EPA has prepared a resource adequacy assessment of the projected impacts of the final rule showing that the projected impacts of the final rule on power system operations, under conditions preserving resource adequacy, are modest and manageable. See *Resource Adequacy and Reliability Analysis Final Rule TSD,* available in the docket.

[302] For a state-by-state comparison, see Appendix G of the Ozone Transport Policy Analysis Final Rule TSD.

[303] The EPA also met with non-RTO balancing authorities that submitted comments. Memoranda identifying the dates, attendees, and topics of discussion of these meetings with RTOs and non-RTO balancing authorities are available in the docket.

including this action's requirement for large coal-fired EGUs to make emissions reductions commensurate with good SCR operation—be addressed as expeditiously as practicable. The EPA has also considered the fact that in this rule, the backstop daily emissions rate serves as a supplement to the broader requirement for emissions reductions commensurate with application of several control technologies at several types of EGUs, encompassing the extent of emissions reductions that would be incentivized by the backstop emissions rate requirement. The EPA views the backstop daily emissions rate as part of the solution to eliminating significant contribution in that it strongly incentivizes emissions-control operation throughout each day of the ozone season. *See* sections III.B.1.d, VI.B.1.b, VI.B.1.c.i. For that reason, in general we are finalizing the daily backstop emissions rate for units that have SCR installed or that install it in the future. It is only as an exception to that general rule that we defer the backstop daily emissions rate given the transition period and reliability concerns identified by commenters. The EPA finds that in this circumstance, as long as state emissions budgets continue to reflect the required degree of emissions reductions, deferral of the backstop rate requirement for uncontrolled units for a transition period can be justified on the basis of the greater long-term environmental benefits obtained through facilitating the replacement of these affected EGUs with cleaner sources of generation. Beginning in the 2030 ozone season, all coal-fired EGUs identified for SCR retrofit potential in this action will be subject to the backstop daily emissions rate. Any such units that remain in operation in that year can and should meet the backstop daily emissions rate or be subject to the heightened allowance surrender ratio.

The second change from the proposal adopted in response to the reliability-related comments is that the target percentage of the states' emissions budgets used to recalibrate the target bank level will be set at the proposed 10.5 percent starting in the 2030 control period, and for the control periods from 2024 through 2029, a target percentage of 21 percent will be used instead. The adoption of the higher target percentage for use through the 2029 control period is intended to promote greater allowance market liquidity during a period of relatively rapid fleet transition about which commenters expressed more focused reliability-related needs. As discussed later in this section, the EPA expects the introduction of the

bank recalibration process in 2024 generally to boost market liquidity (by discouraging allowance hoarding) and also considers the target percentage of 10.5 percent set forth in the proposal well supported. Nevertheless, the Agency agrees with suggestions by commenters that, at least in the early years of the enhanced trading program, a larger bank would provide further liquidity and would give program participants greater confidence that allowances would be available for purchase when needed. Greater confidence by sources would help address RTOs' concern about the possibility that some sources could be reluctant to operate if they were unsure of their ability to procure allowances to cover their emissions. In finding that this modification from proposal is appropriate, the EPA has considered the fact that use of a higher target percentage will not result in the creation of any additional allowances in any control period, because under the recalibration provisions, when the total quantity of allowances banked from the previous control period is less than the bank target level, the consequence is not that additional allowances are created to raise the bank to the target level, but simply that no bank adjustment is carried out. We also note that while including an annual bank recalibration of any percentage is an enhancement in the trading program from prior trading programs under the good neighbor provision established in the CAIR, CSAPR, CSAPR Update, and Revised CSAPR Update rulemakings, it is not unprecedented; the trading program established under the NO$_X$ SIP Call included "progressive flow control" provisions that were designed differently from the bank recalibration provisions in this rule but had the same purpose and general effect.

The third change from the proposal adopted in response to the reliability-related comments is that the EPA is determining preset state emissions budgets not only for the control periods in 2023 and 2024 as proposed, but also for the control periods in 2025 through 2029. Finalizing preset state emissions budgets through 2029 will establish predictable amounts for the minimum quantities of allowances available during the period when commenters have expressed concern that the reliability-related need for such predictability is greatest. Moreover, the EPA will also determine state emissions budgets using the final dynamic budget-setting methodology for the control periods in 2026 through 2029, and for each state and control period, the

dynamic budget to be published in the future will only supplant the preset budget finalized in this rule for a control period in which that dynamic budget is higher than the corresponding preset budget. The reason for using dynamic budgets when they are higher than the corresponding preset budgets is that the EPA recognizes that evolution of the EGU fleet will not follow the exact path projected at the time of the rulemaking, and that by not accounting for certain events, the preset methodology could result in issuance of smaller quantities of allowances than the EPA would find consistent with the quantities of emissions from a well-controlled EGU fleet using the dynamic budget-setting methodology. Events that could cause preset budgets to underpredict a state's well-controlled emissions, which are more likely in years farther in the future from the time of the rulemaking, include deferral of a large EGU's previously planned retirement date or increases in electricity demand that outpace the general trend of lower-emitting or non-emitting generation replacing higher-emitting generation. After considering the commenters' interest in greater predictability during the early years of the amended trading program as well as the need to protect against instances where the preset budgets could underpredict a state's well-controlled emissions in years farther from the year of the rulemaking, the EPA finds that the combination of these factors justifies the approach of using the higher of the two budgets for the control periods from 2026 through 2029.

In addition to the changes made in response to reliability-related comments, several other changes to the proposal being adopted primarily for other reasons will also help address the factors identified as reliability-related concerns. Most notably, the EPA is adopting changes to the dynamic budget computation procedure to incorporate multiple years of heat input data, which will reduce year-to-year variability in the budgets determined under that procedure and should to some extent reduce uncertainty about the quantities of allowances available for use in instances where a dynamic budget is being used instead of preset budget. In addition, the adoption of a 50-ton threshold before application of the 3-for-1 surrender ratio to emissions exceeding the backstop daily NO$_X$ emissions rate should ensure that no unit incurs the higher surrender ratio solely because of unavoidable emissions during startup and should help address concerns that some units might be reluctant to operate because of the associated emissions-

related costs. Also, the 2026–2027 phase-in of emissions reductions commensurate with installation of new SCR controls will increase the quantities of allowances available in the 2026 state emissions budgets for most states in the trading program.

To summarize: in light of the strong record supporting the feasibility of the emissions reductions required from EGUs; the use of a trading program as the mechanism for achieving those emissions reductions, with multiple options for achieving compliance and no requirements to cease operation of any individual EGU at any time; the established processes of RTOs, other balancing authorities, and state regulators for managing any EGU retirement requests that do occur in an orderly manner with evaluation of potential reliability impacts and implementation of mitigation measures where needed; the unbroken, decades-long historical success of the EPA's trading programs at achieving emissions reductions without any adverse reliability impacts; the views expressed by commenters that facilitating EGU retirement and replacement as a possible compliance strategy through 2029 would be particularly helpful; the changes made in the final rule for control periods through 2029 specifically to increase flexibility during this transitional period, including deferring application of the backstop daily emissions rate provisions for EGUs without existing SCR controls, increasing the target percentage used to determine the target allowance bank level for purposes of the bank recalibration provisions, and establishing preset state emissions budgets which serve as floors against potential dynamic budget imposition in those control periods; and the changes made in the final rule incorporating multiple years of heat input data into the dynamic budget-setting procedure, adding a 50-ton threshold before application of the 3-for-1 surrender ratio to emissions exceeding the backstop daily $NO_X$ emissions rate, and phasing in emissions reductions requirements commensurate with new SCR installations through 2027; the EPA concludes that this action does not pose any material risk of adverse impact to electric system reliability.

The EPA has also considered the other suggestions offered by commenters for addressing reliability-related issues. With respect to suggestions that the rule should include provisions allowing some or all of the trading program's requirements to be suspended at times when an RTO or other entity with grid management

responsibilities determines there is a reliability-related need, the EPA again observes that the rule's emissions reduction requirements are being implemented through a trading program mechanism which makes exceptions of this nature unnecessary. Trading programs inherently offer the flexibility to accommodate variability in the utilization of individual units. The "reliability safety valve" provisions in the Clean Power Plan, which one commenter cited as a precedent to support some form of temporary exemption under this rule, in fact was available only in situations where a state plan did not allow emissions trading and instead imposed unit-specific emissions constraints. *See* 80 FR 64877–879. Even the 3-for-1 allowance surrender ratio under the backstop daily $NO_X$ emissions rate provisions can be met through the surrender of additional allowances. The rule does not bar any EGU from operating at any time as long as all allowance surrender requirements are met.

With respect to suggestions that the EPA must undertake recurring modeling of the evolving electrical system and consult with RTOs before each planned adjustment to emissions budgets, which start from the premise that the rule poses risk to electric system reliability that must be continuously monitored, the EPA disagrees with the premise and therefore also disagrees with the suggestions. As discussed in section V of this document, the EPA has taken care to ensure that the emissions reduction requirements applicable to EGUs under this rule are feasible through application of the control technologies selected as the basis of the emissions reductions. The EPA has also performed modeling in this rulemaking to assess the benefits and costs of the rule when all required emissions reductions are achieved. That modeling, which incorporates a representation of electrical grid regions and interregional constraints on energy and capacity exchange, affirms the feasibility of the overall emissions reduction requirements and is illustrative of a control strategy where some units retire and are replaced instead of installing new controls. The EPA has also consulted with the RTOs (as well as other balancing authorities) in the course of this rulemaking to ensure that the EPA understood the concerns expressed in their comments such that we could address those comments in this final rule. The EPA does not agree that further modeling or ongoing consultations with RTOs are needed in

advance of the recurring dynamic budget adjustments, which do not increase the stringency of the rule's emissions reduction requirements established in the final rule. The extensive consultation processes adopted by the Agency in conjunction with the MATS rulemaking are not a relevant precedent; the MATS rule, which was promulgated to address a different statutory mandate, was structured in the form of unit-specific emissions constraints, fundamentally different from the requirements of this rule. The EPA notes that other entities responsible for maintaining reliability and managing entry and exit of resources, including the North American Electric Reliability Corporation (NERC) and RTOs and other balancing authorities, already routinely assess resource adequacy and reliability inclusive of meeting all regulatory requirements, including environmental requirements.

While the EPA does not agree that such consultations are a necessary precondition for successful implementation of this rule, the Agency remains available to engage with any affected EGU or reliability authority requesting to meet and discuss the intersection of its power sector regulatory programs with electric reliability planning and operations. The EPA is also continuing its practice of meeting with the U.S. Department of Energy and the Federal Energy Regulatory Commission to maintain mutual awareness of how Federal actions and programs intersect with the industry's responsibility to maintain electric reliability.[304]

The EPA is not adopting the suggestion to replicate the so-called "safety valve" mechanism created under the Revised CSAPR Update. That mechanism, cited by some commenters as potential precedent for an unspecified form of "reliability safety valve" in this action, gave owners of covered EGUs a one-time opportunity to voluntarily convert allowances banked under the Group 2 trading program to allowances useable in the Group 3 trading program at an 18-for-1 ratio for use in the trading program's initial control period in 2021. *See* 82 FR 23137–138. EGU owners chose to use the voluntary mechanism to acquire a total of 382 allowances, representing only 0.36 percent of the sum of the state emissions budgets and only 0.26 percent

---

[304] *See, e.g.,* U.S. Department of Energy and U.S. Environmental Protection Agency, Joint Memorandum on Interagency Communication and Consultation on Electric Reliability (March 8, 2023), available at *https://www.epa.gov/power-sector/electric-reliability-mou.*

of the total quantity of allowances available for compliance in that control period.[305] For the 2023 control period, the bank of allowances carried over from the 2022 control period plus the incremental starting bank that will be created by conversion of additional allowances banked under the Group 2 trading program (see section VI.B.12.b of this document) will total over 30 percent of the full-season emissions budgets.[306] Given the larger starting bank and this rule's bank recalibration provisions (which will be implemented starting with the 2024 control period, but which the EPA expects will increase allowance market liquidity starting with the 2023 control period), the Agency views establishment of a one-time voluntary conversion opportunity for the 2023 control period analogous to the Revised CSAPR Update's ''safety valve'' provision as unnecessary.

Finally, in the final rule the EPA is not adopting any of the other suggestions concerning additional mechanisms to make additional allowances available through auctions or RTO-administered allowance pools. For the reasons discussed throughout this section, the EPA concludes that the trading program as established in this action provides a flexible compliance mechanism that will allow the required emissions reductions to be achieved without the need for creation of additional allowances. However, the EPA also recognizes the potential for allowance market liquidity to be further increased through some form of auction mechanism. For instance, it may be appropriate to pair the introduction of an auction with a reduction in the bank recalibration percentage that begins earlier than 2030. Through a supplemental rulemaking, the Agency intends to propose and take comment on potential amendments to the Group 3 trading program that would add such an auction mechanism to the regulations and make other appropriate adjustments

in the implementation framework at Step 4.[307]

2. Expansion of Geographic Scope

In light of the findings at Steps 1, 2, and 3 of the 4-step interstate transport framework, the EPA is expanding the geographic scope of the existing CSAPR $NO_X$ Ozone Season Group 3 Trading Program to encompass additional states (and Indian country within the borders of such states) with EGU emissions that significantly contribute for purposes of the 2015 ozone NAAQS. Specifically, the EPA is expanding the Group 3 trading program to include the following states and Indian country within the borders of the states: Alabama, Arkansas, Minnesota, Mississippi, Missouri, Nevada, Oklahoma, Texas, Utah, and Wisconsin. Any unit located in a newly added jurisdiction that meets the applicability criteria for the Group 3 trading program will become an affected unit under the program, as discussed in section VI.B.3 of this document.

CSAPR, the CSAPR Update, and the Revised CSAPR Update also applied to sources in Indian country, although, when those rules were issued, no existing EGUs within the regions covered by the rules were located on lands that the EPA understood at the time to be Indian country.[308] In contrast, within the geographic scope of this rulemaking, the EPA is aware of areas of Indian country within the borders of both Utah and Oklahoma with existing EGUs that meet the program's applicability criteria. Issues related to state, tribal, and Federal CAA implementation planning authority with

respect to sources in Indian country in general and in these areas in particular are discussed in section III.C.2 of this document. EPA's approach for determining a portion of each state's budget for each control period that will be set aside for allocation to any units in areas of Indian country within the state not subject to the state's CAA implementation planning authority is discussed in section VI.B.9 of this document.

Units within the borders of each newly added state will join the Group 3 trading program on one of two possible dates during the program's 2023 control period (that is, the period from May 1, 2023, through September 30, 2023). The reason that two entry dates are necessary is that, as discussed in section VI.B.12.a of this document, the effective date is expected to fall after May 1, 2023. In the case of states (and Indian country within the states' borders) whose sources do not currently participate in the CSAPR $NO_X$ Ozone Season Group 2 trading program—Minnesota, Nevada, and Utah—the sources will begin participating in the Group 3 trading program on the rule's effective date. However, in the case of the states (and Indian country within the states' borders) whose sources do currently participate in the Group 2 trading program—Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Texas, and Wisconsin—the sources will begin participating in the Group 3 trading program on May 1, 2023, regardless of the rule's effective date, subject to transitional provisions designed to ensure that the increased stringency of the Group 3 trading program as revised in this rulemaking will not substantively affect the sources' requirements prior to the rule's effective date. This approach provides a simpler transition for the sources historically covered by the Group 2 trading program than the alternative approach of being required to switch from the Group 2 trading program to the Group 3 trading program in the middle of a control period, and it is the same approach that was followed for sources that transitioned from the Group 2 trading program to the Group 3 trading program in 2021 under the Revised CSAPR Update. Section VI.B.12.a of this document contains further discussion of the rationale for this approach and the specific transitional provisions.

The EPA notes that under the rule, the expanded Group 3 trading program will include not only 19 states for which the EPA is determining that the required control stringency includes, among other measures, installation of new post-combustion controls, but also three

---

[305] Additional allowances available for compliance under the Group 3 trading program in the 2021 control period included a starting allowance bank created through mandatory conversion of a portion of the allowances banked under the Group 2 trading program as well as supplemental allowances issued to ensure that no provisions of the Revised CSAPR Update increasing regulatory stringency would take effect before that rule's effective date. *See* 86 FR 23133–137.

[306] The full-season emissions budgets for the 2023 control period under the Group 3 trading program and the incremental starting bank created in this action through conversion of additional Group 2 allowances (but not the bank of allowances carried over from the 2022 control period under the Group 3 trading program) will be prorated to reflect the portion of the 2023 ozone season occurring after the effective date of this rule. See sections VI.B.12.a. and VI.B.12.b.

[307] Such a rulemaking would not reopen any determinations which the Agency has made at Steps 1, 2, or 3 of the interstate transport framework in this action. Nor would it reopen any aspects of implementation of the program at Step 4 except for those in relation to establishing an auction and associated adjustments to ensure program stringency is maintained. In this respect, such a rulemaking would constitute a discretionary action that is not necessary to resolution of good neighbor obligations. Rather, these adjustments, if finalized, would reflect a shift from one acceptable form of implementation at Step 4 to a slightly modified but also acceptable form of implementation at Step 4, as related to EGUs. No legal or technical justification for this action as set forth in the record here depends on or would be undermined by the development of an alternative approach that includes an auction, and if the EPA for any reason determines not to propose or finalize such a rulemaking, no aspect of this rule would thereby be rendered infeasible or incomplete.

[308] CSAPR and the CSAPR Update both applied to EGUs located in areas within Oklahoma's borders that are now understood to be Indian country, consistent with the U.S. Supreme Court's decision in *McGirt* v. *Oklahoma*, 140 S. Ct. 2452 (2020) (and subsequent case law), clarifying the extent of certain Indian country within Oklahoma's borders. However, those rules were issued before the *McGirt* decision. *See* section III.C.2.a.

states—Alabama, Minnesota, and Wisconsin—for which the EPA is determining that the required control stringency does not include such measures. In previous rulemakings, the EPA has chosen to combine states in a single multi-state trading program only where the selected control stringencies were comparable, to ensure that states did not effectively shift their emissions reduction requirements to other states with less stringent emissions reduction requirements by using net out-of-state purchased allowances. Although the assurance provisions in the CSAPR trading programs were designed to address the same general concern about excessive shifting of emissions reduction activities between states, EPA chose not to rely on the assurance provisions as sufficient to allow for interstate trading in situations where the states were assigned differing emissions control stringencies.

In this rulemaking, the EPA believes the previous concern about the possibility that certain states might not make the required emissions reductions is sufficiently addressed through the various enhancements to the design of the trading program, even where states have been assigned differing emissions control stringencies. First, the existing assurance provisions are being substantially strengthened through the addition of the unit-specific secondary emissions limitations discussed in sections VI.B.1.c.ii and VI.B.8. Second, by ensuring that individual units operate their emissions controls effectively, the unit-specific backstop daily emissions rate provisions discussed in sections VI.B.1.c.i and VI.B.7 will necessarily also ensure that required emissions reductions occur within the state. With these enhancements to the design of the trading program, the EPA does not believe it is necessary for sources in Alabama, Minnesota, and Wisconsin to be excluded from the revised Group 3 trading program simply because their emissions budgets reflect a different selected emissions control stringency than the other states in the program.

The EPA's legal and analytic bases for expansion of the Group 3 trading program to each of the additional covered states, as well as responses to the principal related comments, are discussed in sections III, IV, and V of this document, respectively, and responses to additional comments are contained in the *RTC* document. With respect to the proposed approach of including all states covered by the rule in a single trading program even where the assigned control stringencies differ, the only comments received by the EPA

supported the approach, which is finalized as proposed.

### 3. Applicability and Tentative Identification of Newly Affected Units

The Group 3 trading program generally applies to any stationary, fossil-fuel-fired boiler or stationary, fossil fuel-fired combustion turbine located in a covered state (or Indian country within the borders of a covered state) and serving at any time on or after January 1, 2005, a generator with nameplate capacity exceeding 25 MW and producing electricity for sale, with exemptions for certain cogeneration units and certain solid waste incineration units. To qualify for an exemption as a cogeneration unit, an otherwise-affected unit generally (1) must be designed to produce electricity and useful thermal energy through the sequential use of energy, (2) must convert energy inputs to energy outputs with efficiency exceeding specified minimum levels, and (3) may not produce electricity for sale in amounts above specified thresholds. To qualify for an exemption as a solid waste incineration unit, an otherwise-affected unit generally (1) must meet the CAA section 129(g)(1) definition of a ''solid waste incineration unit'' and (2) may not consume fossil fuel in amounts above specified thresholds. The complete text of the Group 3 trading program's applicability provisions and the associated definitions can be found at 40 CFR 97.1004 and 97.1002, respectively. The applicability of this rule to MWCs and cogeneration units outside the Group 3 trading program is discussed in sections V.B.3.a and V.B.3.c of this document, respectively, and MWC applicability criteria are further discussed in section VI.C.6 of this document.

In this rulemaking, the EPA did not propose and is not finalizing any revisions to the existing applicability provisions for the Group 3 trading program. Thus, any unit that is located in a newly added state and that meets the existing applicability criteria for the Group 3 trading program will become an affected unit under the program. The fact that the applicability criteria for all of the CSAPR trading programs are identical therefore is sufficient to establish that any units that are currently required to participate in another CSAPR trading program in any of the additional states where such other programs currently are in effect— Alabama, Arkansas, Minnesota, Mississippi, Missouri, Oklahoma, Texas, and Wisconsin (including Indian country within the borders of such

states)—will also become subject to the Group 3 trading program.

In the additional states where other CSAPR trading programs are not currently in effect—Nevada and Utah (including Indian country within the borders of such states)—units already subject to the Acid Rain Program under that program's applicability criteria (*see* 40 CFR 72.6) generally also meet the applicability criteria for the Group 3 trading program. Based on a preliminary screening analysis of the units in these states that currently report emissions and operating data to the EPA under the Acid Rain Program, the Agency believes that all such units are likely to meet the applicability criteria for the Group 3 trading program.

Because the applicability criteria for the Acid Rain Program and the Group 3 trading program are not identical, it is possible that some units could meet the applicability criteria for the Group 3 trading program even if they are not subject to the Acid Rain Program. Using data reported to the U.S. Energy Information Administration, in the proposal the EPA identified six sources in Nevada and Utah (and Indian country within the borders of the states) with a total of 15 units that appear to meet the general applicability criteria for the Group 3 trading program and that do not currently report $NO_X$ emissions and operating data to the EPA under the Acid Rain Program. These units were listed in a table in the proposed rule, and the data from that table for these units are reproduced as Table VI.B.3–1 of this document. For each of these units, the table shows the estimated historical heat input and emissions data that the EPA proposed to use for the unit when determining state emissions budgets if the unit was ultimately treated as subject to the Group 3 trading program.[309] The EPA requested comment on whether each listed unit would or would not meet all relevant criteria set forth in 40 CFR 97.1004 and the associated definitions in 97.1002 to qualify for an exemption from the trading program and whether the estimated historical heat input and emissions data identified for each unit

---

[309] As discussed in section VI.B.10, any unit that becomes subject to the Group 3 trading program pursuant to this rule and that does not already report emissions data to the EPA in accordance with 40 CFR part 75 will not be required to report emissions data or be subject to allowance holding requirements under the Group 3 trading program until May 1, 2024, in order to provide time for installation and certification of the required monitoring systems. Such a unit will not be taken into account for purposes of determining state emissions budgets and unit-level allocations under the Group 3 trading program until the 2024 control period.

were representative. With respect to the listed units within the borders of Nevada or Utah, the EPA received no comments asserting either that the units qualified for applicability exemptions or that the estimated data identified by the EPA were unrepresentative.[310] For purposes of this rule, the EPA is therefore presuming that the units listed in Table VI.B.3–1 do not qualify for applicability exemptions and that the estimated data shown in the table for each unit are representative. However, the owners and operators of the sources retain the option to seek applicability determinations under the trading program regulations at 40 CFR 97.1004(c).

TABLE VI.B.3–1—ESTIMATED DATA TO BE USED FOR PRESUMPTIVELY AFFECTED UNITS WITHIN THE BORDERS OF NEVADA AND UTAH THAT DO NOT REPORT UNDER THE ACID RAIN PROGRAM

| State | Facility ID | Facility name | Unit ID | Unit type | Estimated ozone season heat input (mmBtu) | Estimated ozone season average NO$_X$ emissions rate (lb/mmBtu) | Notes |
|---|---|---|---|---|---|---|---|
| Nevada | 2322 | Clark | GT4 | CT | 190,985 | 0.0475 | |
| Nevada | 2322 | Clark | GT5 | CT | 1,455,741 | 0.0191 | |
| Nevada | 2322 | Clark | GT6 | CT | 1,455,741 | 0.0187 | |
| Nevada | 2322 | Clark | GT7 | CT | 1,455,741 | 0.0178 | |
| Nevada | 2322 | Clark | GT8 | CT | 1,455,741 | 0.0204 | |
| Nevada | 54350 | Nev. Cogen. Assoc. 1—Garnet Val | GTA | CT | 660,100 | 0.0377 | 1 |
| Nevada | 54350 | Nev. Cogen. Assoc. 1—Garnet Val | GTB | CT | 660,100 | 0.0387 | 1 |
| Nevada | 54350 | Nev. Cogen. Assoc. 1—Garnet Val | GTC | CT | 660,100 | 0.0387 | 1 |
| Nevada | 54349 | Nev. Cogen. Assoc. 2—Black Mtn .. | GTA | CT | 749,778 | 0.0323 | 1 |
| Nevada | 54349 | Nev. Cogen. Assoc. 2—Black Mtn .. | GTB | CT | 749,778 | 0.0370 | 1 |
| Nevada | 54349 | Nev. Cogen. Assoc. 2—Black Mtn .. | GTC | CT | 749,778 | 0.0364 | 1 |
| Nevada | 56405 | Nevada Solar One | HI | Boiler | 479,452 | 0.1667 | |
| Nevada | 54271 | Saguaro | CTG1 | CT | 1,383,149 | 0.0314 | 1 |
| Nevada | 54271 | Saguaro | CTG2 | CT | 1,383,149 | 0.0301 | 1 |
| Utah | 50951 | Sunnyside | 1 | Boiler | 1,888,174 | 0.1715 | |

**Table notes:**
[1] Unit reports capability of producing both electricity and useful thermal energy.

#### 4. State Emissions Budgets

In this final rule, the EPA is using a combination of a "preset" budget calculation methodology and a "dynamic" budget calculation methodology to establish state emissions budgets for the Group 3 trading program. A "preset" budget is one for which the absolute amount expressed as tons per ozone season control period is established in this final rule. It uses the latest data currently available on EGU fleet composition at the time of this final action. A "dynamic" budget is one for which the formula and emissions-rate information is finalized in this rule, but updated EGU heat input and inventory information is used on a rolling basis to set the total tons per ozone season for each control period. Both methods of budget calculation are designed to set budgets reflective of the emissions control strategies and associated stringency levels (expressed as an emissions rate of pounds of NO$_X$ per mmBtu) identified for relevant EGU types at Step 3—which we will refer to in this section as the "Step 3 emissions control stringency." Preset budgets provide greater certainty for planning purposes and can be reliably established in the short-term based on known, upcoming changes in the EGU fleet. Due to build time for new units and planning and approval processes for plant retirements, these major fleet alterations are often known several years in advance. This information facilitates presetting budgets that appropriately calibrate the identified control stringency to the fleet. Dynamic budgets better assure that the budgets remain commensurate with the Step 3 emissions control stringency over the longer term, as currently unknown changes in the EGU fleet occur. In this final rule, in response to comments, we have adjusted the proposal to give a greater role for preset budgets through 2029, while dynamic budgeting will be phased in in the short term and allow for a transition period to an exclusively "dynamic" approach beginning in 2030.

For the control periods from 2023 through 2025, the preset budgets established in the rule will serve as the state emissions budgets for the control periods in those years, with no role for dynamic budgeting. For the control periods from 2026 through 2029, the EPA is determining preset emissions budgets for each control period in the rule and will also calculate and publish dynamic budgets for each state in the year before each control period using the dynamic budget-setting methodology finalized in this rule, applied to data available at the time of the calculations. For these four control periods, each state's preset budget serves as a floor and may be supplanted by the dynamic emissions budget EPA calculates for the state for that control period only if the dynamic budget is higher than the preset budget. For control periods in 2030 and thereafter, the state emissions budgets will be the dynamic budgets calculated and published in the year before each control period.

In the dynamic budget calculation methodology, it is the fleet composition (reflected by heat input patterns across the fleet in service, inclusive of EGU entry and exit) that is dynamic, while the emissions stringency finalized in this rule is constant, as reflected in

---

[310] One commenter expressed the view that eight of the listed units within Nevada's borders appear to meet the CSAPR applicability criteria but provided no comments on the specific proposed data. See comments of Berkshire Hathaway Energy,

EPA–HQ–OAR–2021–0668–0554, at 58–59. The EPA also received comments concerning sources within Delaware's borders that were included in the proposal's request for comment; these comments are moot because Delaware is not being added to

the Group 3 trading program in the final rule. See comments of Calpine, EPA–HQ–OAR–2021–0668–0515; comments of Delaware City Refining, EPA–HQ–OAR–2021–0668–0309.

emissions rates for various types of units. Multiplying the assumed emissions rate for each unit (as finalized in this rule) by the identified recent historical heat input for each unit and summing the results to the state level would provide a given year's state dynamic emissions budgets. Dynamic budgets are a product of the formula promulgated in this action applied to a rolling three-year average of reported heat input data at the state level and a rolling highest-three-of-five-year average of reported heat input data at the unit level. As such, the EPA is confident that dynamic budgets will more accurately reflect power sector composition, particularly in later years, and certainly from 2030 and beyond, than preset budgets could and will therefore better implement the Step 3 emissions control stringency over long time horizons.

Starting in 2025 (for the 2026 control period), the dynamic budgets, along with the underlying data and calculations will be publicly announced, and this will occur approximately one year before the relevant control period begins. These will be published in the **Federal Register** through notices of data availability (NODAs), similar to how other periodic actions that are ministerial in nature to implement the trading programs are currently handled. And as with such other actions, interested parties will have the opportunity to seek corrections or administrative adjudication under 40 CFR part 78 if they believe any data used in making these calculations, or the calculations themselves, are in error.

To illustrate how dynamic budgeting will work after the transition from preset budgets, the dynamic budgets for the 2030 ozone season control period will be identified by May 1, 2029, using the latest available average of three years of reported operational data at that time (*i.e.,* the average of 2026–2028 heat input data at the state level and 2024–2028 years of rolling data at the unit level) applied in a simple mathematical formula finalized in this rule, which multiplies this heat input data by the emissions rates quantified in this rule. Therefore, if a unit retires before the start of the 2028 ozone season but had not announced its upcoming retirement at the time of this rule's finalization, the dynamic budget approach ensures that the dynamic budgets for 2030 and subsequent control periods would represent the identified control stringency applied to a fleet reflecting that retirement.

The two examples discussed next illustrate the implementation of the dynamic budget during the 2026–2029

time period. During this period, the state emissions budget for each state for a given control period will be the preset state emissions budget unless the dynamic budget is higher. This approach accommodates scenarios where baseline fossil heat input may exceed levels anticipated by EPA in the preset budgets (*e.g.,* this could result from greater electric vehicle penetration rates). Table VI.B.4–1 illustrates this scenario. In the preset budget approach for 2028, the 2028 heat input is estimated based on the latest available heat input data at the time of rule proposal (*i.e.,* 2021; see the subsection on preset budget methodology later in this section), which cannot reflect a subsequent change in fleet heat input values (column 2) due to, *e.g.,* increased utilization to meet increased electric load. However, the dynamic budget would use 2022–2026 heat input values at the unit level and 2024–2026 heat input values at the state level—as opposed to 2021 heat input values—as the latest representative values to inform the 2028 state emissions budget. Therefore, the heat input values in column 2 under the dynamic scenario reflect the change in fleet utilization levels, and when multiplied by the emissions rates reflecting the Step 3 emissions control stringency in this final rule, the corresponding emissions (18,700 tons) summed in column 4 constitute a state budget that more accurately reflects the Step 3 emissions control stringency applied to the fleet composition for that year, as opposed to the 17,000 tons identified in the preset budget approach. As illustrated in the example, the dynamic variable is the heat input variable, which changes over time. In this instance, the dynamic budget value of 18,700 tons would be implemented for 2028 instead of the preset value, and thus accommodate the unforeseen utilization changes in response to higher demand.

In the second table, Table VI.B.4–2, the dynamic budget is lower than the preset budget due to retirements that were not foreseen at the time the preset budgets were determined. In the preset budget approach for 2028, the 2028 heat input is still estimated based on the latest available heat input data at the time of rule proposal (*i.e.,* 2021), which cannot reflect a subsequent fleet change in heat input values due to an unanticipated retirement of one of the state's coal-fired units before the start of the 2028 ozone season. However, the dynamic budget again would use 2022–2026 heat input values at the unit level and 2024–2026 heat input values at the state level—as opposed to 2021 heat

input values—as the latest representative values to inform the 2028 state emissions budget, which would reflect the decline in coal heat input and replacement with natural gas heat input (capturing the coal unit's retirement). Therefore, the heat input values under the dynamic budget scenario reflect the change in fleet composition, and when multiplied by the relevant emissions rates reflecting the Step 3 emissions control stringency identified in this final rule, the corresponding emissions (15,000 tons) constitute a state budget that reflects the identified control stringency applied to the fleet composition for that year as opposed to the 17,000 tons in summed in the first table. However, for the 2026–2029 period, in which the EPA implements an approach that utilizes the higher of the dynamic budget or preset budget, the budget implemented for 2028 in this scenario would be the 17,000 ton preset amount.

During the 2026–2029 transition period—during which substantial, publicly announced utility commitments exist for higher emitting units to exit the fleet—it is still possible that yet-to-be known, unit-specific retirements (such as illustrated in this second scenario) may result in dynamic budgets that are lower than the preset budgets finalized in this rule. However, during this transition period EPA believes that having the preset budgets serve as floors for the state emissions budgets is appropriate for two primary reasons identified by commenters. First, commenters repeatedly emphasized the need for certainty and flexibility to successfully carryout plans for significant fleet transition through the end of the decade. The 2026–2029 period is expected to have substantial fleet turnover. Current Form EIA–860 data, in which utilities report their retirement plans, identify 2028 as the year with the most planned coal capacity retirements during the 2023–2029 timeframe. Using preset budgets as state emissions budget floors provides states and utilities with information on minimum quantities of allowances that can be used for planning purposes. In turn, this fosters the operational flexibility needed while putting generation and transmission solutions into place to accommodate such elevated levels of retirements. Second, the latter part of the decade has a significant amount of unit-level firm retirements already planned and announced for purposes of compliance with other power sector regulations or fulfillment of utility commitments. These known retirements are already

captured in the preset state budgets, with the result that the likelihood and magnitude of instances where a state's dynamic budget for a given control period would be lower than its preset budget for the control period is reduced in this 2026–2029 period relative to control periods further in the future for which retirement plans have not yet been announced. After 2029, the dynamic budgets from 2030 forward will fully capture all prior retirements and new builds when the fleet is entering this period where unit-specific data on such plans is less frequently available. For instance, through the remaining portion of the decade, the amount of coal steam retirements identified and reported through Form EIA–860 is nearly 7 GW each year. However, for the decade beginning in 2030—the amount of capacity currently reported with a planned retirement is less than 2 GW each year.[311] This yet-to-be available data and relative lack of currently known firm retirement plans for 2030 and beyond make dynamic budget implementation for those years essential for state emissions budgets to maintain the Step 3 control stringency required under this rule.

TABLE VI.B.4–1—EXAMPLE OF PRESET AND DYNAMIC BUDGET CALCULATION IN SCENARIO OF INCREASED FOSSIL HEAT INPUT

| | Preset budget approach (2028) | | | Dynamic budget approach (2028) | | |
|---|---|---|---|---|---|---|
| | Preset heat input (tBtu) | Preset emissions rate (lb/mmBtu) | Preset tons (heat input × emissions rate)/2000 | Heat input (tBtu) | Emissions rate (lb/mmBtu) | Tons (heat input × emissions rate)/2000 |
| Coal Units ............................................. | 600 | 0.05 | 15,000 | 660 | 0.05 | 16,500 |
| Gas Units ............................................. | 400 | 0.01 | 2,000 | 440 | 0.01 | 2,200 |
| State Budget (tons) ............................ | .................. | .................... | 17,000 | .................. | .................... | 18,700 |

TABLE VI.B.4–2—EXAMPLE OF PRESET AND DYNAMIC BUDGET CALCULATION IN SCENARIO OF UNANTICIPATED RETIREMENT

| | Preset budget approach (2028) | | | Dynamic budget approach (2028) | | |
|---|---|---|---|---|---|---|
| | Preset heat input (tBtu) | Preset emissions rate (lb/mmBtu) | Preset tons (heat input × emissions rate)/2000 | Heat input (tBtu) | Emissions rate (lb/mmBtu) | Tons (heat input × emissions rate)/2000 |
| Coal Units ............................................. | 600 | 0.05 | 15,000 | 500 | 0.05 | 12,500 |
| Gas Units ............................................. | 400 | 0.01 | 2,000 | 500 | 0.01 | 2,500 |
| State Budget (tons) ............................ | .................. | .................... | 17,000 | .................. | .................... | 15,000 |

In summary, for the control periods in 2023 through 2025, EPA is providing only preset budgets in this final rule because those control periods are in the immediate future and would not substantially benefit from the use of future reported data. For these years, the certainty around new builds and retirements is higher than ensuing years. For the ozone season control periods of 2026 through 2029, EPA is providing both preset budgets in this final rule and dynamic budgets via future ministerial actions. For those control periods from 2026 through 2029, the preset budgets finalized in this rule serve as floors, such that a given state's dynamic budget ultimately calculated and published for that control period will apply to that state's affected EGUs only if it is higher than the corresponding preset budget finalized in this rulemaking. This approach is in response to stakeholder comments requesting more advance notice regarding the total quantities of allowances available to accommodate compliance planning through the latter half of the decade, during a period of particularly high fleet transition expected with or without this rulemaking.

EPA's emissions budget methodology and formula for establishing Group 3 budgets are described in detail in the Ozone Transport Policy Analysis Final Rule TSD and summarized later in this section.

a. Methodology for Determining Preset State Emissions Budgets for the 2023 Through 2029 Control Periods

To compose preset state emissions budgets, the EPA is using the best available data at the time of developing this final rule regarding retirements and new builds. The EPA relies on a compilation of data from Form EIA–860 (where facilities report their future retirement plans), the PJM Retirement Tracker, utilities' integrated resource plans, notification of compliance plans with other EPA power sector regulatory requirements, and other information sources that EPA routinely canvasses to populate the data fields included in the Agency's NEEDS database. The EPA has updated this data on retirements and new builds using the latest information available from these sources at the time of final rule development as well as input provided by commenters.

For determining preset state emissions budgets, the EPA generally uses historical ozone season data from the 2021 ozone season, the most recent data available to EPA and to commenters responding to this rulemaking's proposal and providing a reasonable representation of near-term fleet conditions. This is similar to the approach taken in the CSAPR Update and the Revised CSAPR Update, where

---

[311] See 2021 Form EIA Form 860—Schedule 3, Generator Data. Department of Energy, Energy Information Administration.

the EPA likewise began with data for the most recent ozone season at the time of proposal (2015 and 2019, respectively).

By using historical unit-level NO$_X$ emissions rates, heat input, and emissions data in the first stage of determining preset emissions budgets, the EPA is grounding its budgets in the most recent representative historical operation for the covered units at the time EPA began its final rulemaking. This data set is a reasonable starting point for the budget-setting process as it reflects recent publicly available and quality assured data reported by affected facilities under 40 CFR part 75, largely using CEMS. The reporting requirements include quality control measures, verification measures, and instrumentation to best record and report the data. In addition, the designated representatives of EGU sources are required to attest to the accuracy and completeness of the data.

The first step in deriving the future year state emissions budget is to calibrate historical data to planned future fleet conditions. EPA does this by adjusting this historical baseline information to reflect the known changes (e.g., when deriving the 2023 state emissions budget, EPA starts by adjusting 2021 unit-level data to reflect changes announced and planned to occur by 2023). The EPA adjusted the 2021 ozone-season data to reflect committed fleet changes expected to occur in the baseline. This includes announced and confirmed retirements, new builds, and retrofits that occur after 2021 but prior to 2023. For example, if a unit emitted in 2021, but retired prior to May 1, 2022, its 2021 emissions would not be included in the 2023 baseline estimate. For units that had no known changes, the EPA uses the actual emissions, heat input, and emissions rates reported for 2021 as the baseline starting point for calculating the 2023 state emissions budgets. Using this method, the EPA arrived at a baseline emission, heat input, and emissions rate estimate for each unit for a future year (e.g., 2023).

The second step in deriving the preset state emissions budgets is for EPA to take the adjusted historical data from Step 1, and adjust the emissions rates and mass emissions to reflect the control stringencies identified as appropriate for EGUs of that type. For instance, if an SCR-equipped unit was not operating its SCR so as to achieve a seasonal average emissions rate of 0.08 lb/mmBtu or less in the historical baseline, the EPA lowered that unit's assumed emissions rate to 0.08 lb/mmBtu and calculated the impact on the unit's mass emissions. Note that the heat input is held constant for the unit in the process, reflecting the same level of unit operation compared to historical 2021 data. The improved emissions rate of 0.08 lb/mmBtu is applied to this constant heat input, reflecting control optimization. In this manner, the unit-level totals from Step 1 are adjusted to reflect the additional application of the assumed control technology at a given control stringency. This is illustrated in Table VI.B.4.a–1. Row 1 reflects the 2021 historical data for this SCR-controlled unit. Row 2 reflects no change (as there are no known changes such as planned retirement or coal-to-gas conversion). Row 3 reflects application of the Step 3 stringency (i.e., a 0.08 lb/mmBtu emissions rate from SCR optimization). The resulting impact on emissions is a reduction from the historical 4,700 tons to an expected future level of 615 tons. A state's preset budget for a given control period is the sum of the amounts computed in this manner for each unit in the state for the control period.

#### TABLE VI.B.4.a–1—EXAMPLE OF UNIT-LEVEL DATA CALCULATIONS FOR DERIVING STATE EMISSIONS BUDGETS

|  | Heat input (tBtu) | Emission rate (lb/mmBtu) | Emissions (tons) |
|---|---|---|---|
| Historical Data (2021) ........................................................................................................ | 15.384 | 0.61 | 4,700 |
| Step 1 (Baseline)—Historical data adjusted for planned changes ................................... | 15.384 | 0.61 | 4,700 |
| Step 2—Baseline further adjusted for Step 3 stringency ................................................ | 15.384 | 0.08 | 615 |

For each control period from 2026 onward, the unit-specific emissions rates assumed for all affected states except Alabama, Minnesota, and Wisconsin will reflect the selected control stringency that incorporates post-combustion control retrofit opportunities for the relevant units identified in the state emissions budgets and calculations appendix to the Ozone Transport Policy Analysis Final Rule TSD. The emissions rates assigned to large coal-fired EGUs for 2026 state emissions budget computations only reflect 50 percent of the SCR retrofit emissions reduction potential at each of those units, to capture the phase-in approach EPA is taking for this control as described in section VI.A of this document. The EPA calculates these unit-level emissions rates in 2026 as the sum of the unit's baseline emissions rate and its controlled emissions rate divided by two (i.e., 50 percent of the emissions reduction potential of that pollution control measure). The emissions rates assigned to these large coal-fired EGUs for 2027 state emissions budget computations reflect the full assumed SCR emissions potential at those units, by applying the controlled emissions rate only. For example, a coal steam unit greater than or equal to 100 MW currently lacking a SCR and emitting at 0.20 lb/mmBtu would be assumed to reduce its emissions rate to 0.125 lb/mmBtu rate in 2026 and 0.050 lb/mmBtu rate in 2027 for purposes of deriving its preset state emissions budgets in those years.

*Comment:* Some commenters suggested that EPA should not reflect planned retirements in its preset budgets. The suggestion stems from commenters' observation that those retirement decisions may yet change.

*Response:* The effectiveness of EPA's future year preset state emissions budgets depends on how well they are calibrated to the expected future fleet. Therefore, EPA believes it is important to incorporate expected new builds, retirements, and unit changes already slated to occur. Ignoring these factors would dilute, rather than strengthen, the ability of preset budgets to capture the most representative fleet of EGUs to which they will be applied. Omitting scheduled retirements and new builds from state emissions budgets would reflect units that power sector operators and planning authorities do not expect to exist, while failing to reflect units that are expected to exist.

EPA notes it is using the best available data at the time of the final rule. EPA relies on a compilation of data from Form EIA–860 where facilities report their future retirement plans. In addition, EPA is using data from regional transmission organizations who are cataloging, evaluating, and approving such retirement plans and data; data from notifications submitted directly to EPA by the utility themselves

**127a**

through comments; and retirement notifications submitted to permitting authorities. This information is highly reliable, real-world information that provides EPA with the high confidence that such retirements will in fact occur.

If a unit's future retirement does not occur on the currently scheduled date, EPA observes that such an unexpected departure from the currently available evidence would still not undermine the ability of affected EGUs to comply with their applicable state budgets. EPA's approach of using historical data and incorporation only of announced fleet changes in estimating its future engineering analytics baseline means that its future year baseline generation and retirement outlook for higher emitting sources is more likely to understate future retirements (rather than overstate as suggested by commenter), as EPA does not assume for the purpose of preset budget quantification any retirements beyond those that are already planned. In other words, in the 2023 through 2029 timeframe for which EPA is establishing preset state emissions budgets in this rulemaking, there are more likely to be additional future EGU retirements beyond those scheduled prior to the finalization of this rule than there are to be reversed or substantially delayed changes to already announced EGU retirement plans. For instance, subsequent to the EPA's finalization of the Revised CSAPR Update Rule budgets for 2023 (rule finalized in March 2021), the owners of Sammis Units 5–7 and Zimmer Unit 1 in Ohio (totaling nearly 3 GW of coal capacity) announced that the units would retire by 2023—nearly 5 years earlier than previously planned.[312][313] These coal retirements were not captured in Ohio's 2023 or 2024 state emissions budgets established under the Revised CSAPR Update. Meanwhile, there have been no announcements of previously announced retirement plans being rescinded or delayed for other Ohio units. Similarly, the Joppa Power Plant in Illinois accelerated its retirement from 2025 to 2022 shortly after the Revised CSAPR Update Rule was signed.[314]

We further observe that the commenters' concern is only materially meaningful for the 2023 through 2025 preset budget periods, where the currently known information is generally the most reliable. For the 2026–2029 control periods, if an anticipated fleet change such as an EGU retirement does not actually occur, the dynamic budget setting methodology would, all else being equal, generate a budget reflective of that unit's continued operation (as the budget would be based on the preceding years of historical data), and that dynamic budget will supplant the preset budget for that state (if it represents a total quantity of emissions higher than the preset budget).

Because the future is inherently uncertain, all analytic tools and information resources used in any estimation of future EGU emissions will yield some differences between the projected future and the realized future. Such potential differences may either increase or decrease future emissions in practice, and the unavoidable existence of such differences does not, on its own, render the EPA's inclusion of currently announced retirements an unreasonable feature of the methodology for determining future year preset emissions budgets. To the contrary, if the EPA failed to include these announced retirements, the rule would knowingly authorize amounts of additional, sustained pollution that are not currently expected to occur. If those retirements largely or entirely occur as currently scheduled, the overestimated state budgets would allow other EGUs to emit additional pollution in place of the emissions from the retired EGUs instead of maintaining or improving their emissions performance to eliminate significant contribution with nonattainment and interference with maintenance of the NAAQS.[315]

Additionally, as noted elsewhere, EPA's use of a market-based program, a starting bank of converted allowances, and variability limits are all features that will readily accommodate whatever relatively limited differences in emissions may occur if a currently scheduled EGU retirement is ultimately postponed during the preset budget years of 2023 through 2025. Therefore, EPA's resulting preset state emissions budgets—inclusive of expected fleet turnover—are robust to the inherent uncertainty in future year baseline

conditions for the period in which they are applied.

*Comment:* Some commenters suggested that EPA should use a multi-year baseline for all of its state budget derivations, including preset budgets, to control for outlier years that may not be representative of future years due to major weather events or other fleet disruptions (such as a large nuclear unit outage).

*Response:* For preset state emissions budget derivation, EPA is finalizing use of the same single-year [316] historical baseline approach it used in the proposed rule. This approach is similar to the Revised CSAPR Update, where EPA also relied on a single-year historical baseline to inform its Step 3 approach. EPA's interest in a historical data set to inform this part of the analysis is to capture the most representative view of the power sector. For estimating preset state budgets, EPA finds that, particularly at the state level, more recent data is a better representation and basis for future year baselines rather than incorporating older data. Taking as an example preset budget estimation for the 2023 through 2025 ozone seasons, the EPA is able to compare its single-year base line to an alternative multi-year baseline (*e.g.,* a 3-year baseline encompassing 2020–2022) and determine that the single year baseline better reflects future fleet operation expectation than a multi-year baseline that incorporates units which have since retired as well as outlier patterns in load during pandemic-related shutdowns.

EPA recognizes that 2021 is the latest available historical data as of the preparation of this rulemaking, and therefore the most up-to-date picture of the fleet at the time EPA began its analysis. EPA then further evaluates the 2021 historical data at the state level to determine whether it was a representative starting point for estimating future year baseline levels and subsequently deriving the preset state emissions budgets. If the Agency finds any state-level anomalies, it makes necessary adjustments to the data. While unit-level variation may occur from year-to-year, those variations are often offset by substitute generation from other units within the state. Therefore, EPA conducts its first screening at the state level by identifying any states where 2021 heat

---

[312] Available at *https://www.prnewswire.com/news-releases/energy-harbor-transitions-to-100-carbon-free-energy-infrastructure-company-in-2023-301501879.html.*

[313] Available at *https://www.spglobal.com/commodityinsights/en/market-insights/latest-news/coal/071921-vistra-plans-to-retire-13-gw-zimmer-coal-plant-in-ohio-five-years-early.*

[314] Available at *https://www.prnewswire.com/news-releases/joppa-power-plant-to-close-in-2022-as-company-transitions-to-a-cleaner-future-301263013.html.*

[315] Some of these announced retirements reflect the operator's reported intention to EPA to retire the affected capacity by that time as part of their compliance with effluent limitation guidelines or with the coal combustion residuals rule.

[316] For the purposes of this rulemaking, when describing a ''year'' or ''years'' of data utilized in state emission budget computations, the EPA is actually utilizing the relevant data from May 1 through September 30 of the referenced year(s), consistent with the control period duration of this rule's EGU trading program.

input and 2021 emissions were the lowest year for heat input and emissions relative to the past several years (2018–2022, excluding 2020 due to shut downs and corresponding reduced utilization related to the pandemic onset).[317][318] Then, for that limited number of states (AL, LA, MS, and TX) in which 2021 reflects the minimum fossil fuel heat input and minimum emissions over the baseline evaluation period, EPA—similar to prior rules—evaluated whether any unit-level anomalies in operation were driving this lower heat input at the state level. EPA examined unit-level 2021 outages to determine where an individual unit-level outage might yield a significant difference in state heat input, corresponding emissions baseline and resulting state emissions budgets. When applying this test to all of the units in the previously identified states (and even when applying to EGUs in all states for whom Federal implementation plans are finalized in this rulemaking), the EPA determined that the only unit with a 2021 outage that (1) decreased its output relative to preceding or subsequent years by 75 percent or more (signifying an outage), and (2) could potentially impact the state's emissions budget substantially as it constituted more than 5 percent of the state's heat input in a non-outage year was Daniel Unit 2 in Mississippi. EPA therefore adjusted this state's baseline heat input and $NO_X$ emissions to reflect the operation of this unit based on its 2019 data—which was the second most recent year of data available at the time of proposal (excluding 2020 given atypical impacts from pandemic-related shutdowns) for which this unit operated. The EPA then applied the Step 3 mitigation strategies as appropriate to this unit (*i.e.,* combustion controls upgrade in 2024, SCR retrofit in 2026/2027) to derive this portion of Mississippi's budget. This test, and subsequent adjustment as necessary, enables EPA to utilize the latest, most representative data in a manner that is robust to any substantial state-level or region-level outlier events within that dataset and further validates EPA's comprehensive approach to using the most recent single year of data for preset budgets.

b. Methodology for Determining Dynamic State Emissions Budgets for Control Periods in 2026 onwards

In this final rule, the EPA is finalizing an approach of using multi-year baseline data for purposes of dynamic budget computation. The aforementioned testing of the representative nature of a single year of baseline data for purposes of preset budget setting is not possible in the dynamic budget process as that data will not be available until a later date. Further, the EPA generally agrees with commenters that use of a multi-year period will be more robust to any unrepresentative outlier years in fleet operation and thus better suited for purposes of dynamic budgets. The methodology for determining dynamic state emissions budgets for later control periods (2026 and beyond) relies on a nearly identical methodology for applying unit-level emissions rate assumptions as the preset budget methodology. But it uses more recent heat input data that will become available by that future time, employing a multi-year approach for identifying the heat input data so as to ensure representativeness.

For dynamic budgets, EPA uses more years of baseline data to control for any state-level and unit-level variation that may occur in a future single year that is not possible to identify at present. First, for each unit operating in the most recent ozone season for which data have been reported, EPA identifies the average of the three highest unit-level heat input values from the five ozone seasons ending with that ozone season to get a representative unit-level heat input. Ozone seasons for which a unit reported zero heat input are excluded from the averaging of the three highest heat input values for that unit. These representative unit-level heat input values established for each unit individually are then summed for all units in each state. Each unit's representative unit-level heat input is then divided into this state-level sum to get that unit's representative percent of the aggregated average heat input values for all affected EGUs in that state.

Next, EPA calculates a representative state-level heat input by taking the average state-level total heat input across affected EGUs from the most recent three ozone seasons for which data have been reported, to which the above-derived representative unit-level percentages of heat input are applied. The EPA uses a three-year baseline period for state-level heat input versus the five-year baseline period noted previously for unit-level heat input because there is less variation from year to year at the state level compared to the unit level. Multiplying the representative unit-level percentages of heat input by the representative state-level heat input yields a normalized unit-level heat input value for each affected EGU. This step assures that the total heat input being reflected in a dynamic state budget does not exceed the average total heat input reported by affected EGUs in that state from the three most recent years. Finally, each normalized unit-level heat input value is multiplied by the emissions rate reflecting the assumed unit-specific control stringency for each particular year (determined at Step 3) to get a unit-level emissions estimate. These unit-level emissions estimates are then summed to the state level to identify the dynamic budget for that year. This procedure to derive normalized unit-level heat input is captured in the following table:

TABLE VI.B.4.b–1—DERIVATION OF NORMALIZED UNIT-LEVEL HEAT INPUT

[Illustrative]

| | 2022 Heat input | 2023 Heat input | 2024 Heat input | 2025 Heat input | 2026 Heat input | Representative unit-level heat input (avg of 3 highest of past 5) | Representative unit-level percent | Representative state level heat input (avg 3 most recent state totals) | Normalized unit—level heat input |
|---|---|---|---|---|---|---|---|---|---|
| Unit A ............................... | 100 | 200 | 150 | 200 | 300 | 233 | 41% | 483 | 199 |
| Unit B ............................... | 50 | 100 | 200 | 50 | 100 | 133 | 24 | 483 | 114 |
| Unit C ............................... | 250 | 150 | 150 | 200 | 100 | 200 | 35 | 483 | 170 |

---

[317] EPA identified states for which 2021 both heat input and emissions were the low year among the examined baseline period as a preliminary screen to identify potential instances where reduced utilization may lead to an understated emissions baseline value.

[318] EPA also conducted a similar test to identify states in which 2021 heat input and emissions were the high year among the examined baseline period and found that it was for both Utah and Pennsylvania. However, for both states the elevated heat input trend persisted into 2022 (at slightly lower levels and was correlated with retirements elsewhere in the region—indicating that some of this heat input increase may be representative of the future fleet and that planned retirements factored into preset budget will remove any unrepresentative heat input from 2021.

TABLE VI.B.4.b–1—DERIVATION OF NORMALIZED UNIT-LEVEL HEAT INPUT—Continued

[Illustrative]

| | 2022 Heat input | 2023 Heat input | 2024 Heat input | 2025 Heat input | 2026 Heat input | Representative unit-level heat input (avg of 3 highest of past 5) | Representative unit-level percent | Representative state level heat input (avg 3 most recent state totals) | Normalized unit—level heat input |
|---|---|---|---|---|---|---|---|---|---|
| State Total .................. | 400 | 450 | 500 | 450 | 500 | 567 | ......................... | ......................... | ......................... |

The EPA will issue these dynamic budget quantifications approximately 1 year before the relevant control period. We view such actions as ministerial in nature in that no exercise of agency discretion is required. For instance, starting in early 2025, the EPA would take the most recent three years of state-level heat input data and the most recent five years of unit-level heat input data and calculate 2026 state emissions budgets using the methodology described previously. For 2026–2029, EPA is establishing the preset state emissions budgets finalized in this rulemaking and will only supplant those preset emissions budgets with the to-be-published dynamic emissions budgets if, for a given state and a given control period, that dynamic budget yields a higher level of emissions than the corresponding preset budget finalized in this rulemaking. For 2030 and beyond, the EPA solely uses the dynamic budget process.

By March 1 of 2025, and each year thereafter, the EPA will make publicly available through a NODA the preliminary state emissions budgets for the subsequent control period and will provide stakeholders with a 30-day opportunity to submit any objections to the updated data and computations. (This process will be similar to the releases of data and preliminary computations for allocations from new unit set-asides that is already used in existing CSAPR trading programs.) By May 1 of 2025, and each year thereafter, the EPA will publish the dynamic budgets for the ozone-season control period in the following calendar year. Through the 2029 ozone season control period, these budgets will only be imposed if the applicable dynamic state budget is higher than the corresponding preset state budget finalized in this rulemaking. Preliminary and final unit-level allowance allocations for the units in each state in each control period will be published on the same schedule as the dynamic budgets for the control period. For the control periods from 2026 through 2029, the allocations will reflect the higher of the preset or dynamic budget for each state, and after 2030, the allocations will reflect the dynamic budgets. Additional details,

corresponding data and formulas, and examples for the dynamic budget are described in the Ozone Transport Policy Analysis Final Rule TSD.

*Comment:* Multiple commenters claimed that designing a dynamic budget process that relies on a single year of yet-to-be known heat input data may produce an unrepresentative view of fleet operations for the immediate ensuing years. Commenters pointed to the hypothetical of another pandemic-like year (*e.g.,* 2020) occurring in the future, noting that 2020 would have been a poor choice for estimating 2022 fleet operation and the same would likely hold true if a similar event occurred, for example, in 2025—that would consequently make that year a poor choice as a representative of 2027 baseline. They further pointed out that severe weather events and operating disruptions (a large nuclear plant outage) can similarly render a single year baseline a risky choice to inform future expectations.

*Response:* Insofar as the commenters are addressing the reference period for dynamic budget computation regarding years of data that have not yet occurred and therefore not currently available for evaluating their representative nature, EPA agrees and is incorporating a rolling 3-year baseline at the state level and a rolling 5-year baseline at the unit level for determining dynamic budgets in this final rule. These multi-year rolling baseline (or reference periods) will minimize any otherwise undue impact from individual years where fleet-level or unit-level heat input was uncharacteristically high or low. EPA determined that such an approach, while not needed for preset budgets, is necessary in the case of dynamic budgets because the baseline in that instance is occurring in a future year and therefore is not knowable and available to test for representativeness at the time of the final rule. To control for this type of uncertainty, the EPA finds it appropriate to use a multi-year baseline in this instance per commenter suggestion. While a multi-year baseline may have a slight drawback of using a slightly more dated past fleet performance (including emissions from higher emitting EGUs that may have

subsequently reduced utilization by the target year for which the dynamic budget is being calculated) to estimate the expected future fleet performance at the emissions performance levels determined by the Step 3 result in this rulemaking, that drawback is worth the advantage of protecting against instances where atypical circumstances in the most recent single year may occur and not be representative of the subsequent year for which the dynamic budget is being estimated. This singular drawback of moving to a multi-year baseline is most pronounced in the early years of dynamic budgeting. Therefore, EPA is able to lessen the impact of this drawback of the multi-year baseline by extending the earliest start date of dynamic budgets from 2025 (as proposed) to 2026 in the final rule.

*Comment:* Commenters suggested that the dynamic budget procedure would not provide enough advance notice of state budget and unit level allocation for sources to adequately plan future year operation.

*Response:* EPA disagrees with the notion that the timing of the dynamic budget determination would occur too close to the control period to allow adequate operations planning for compliance. As described previously, the dynamic budget level would be provided approximately 1 year in advance of the start of the control period (*i.e.,* around May 1), and the allowance allocations would occur on July 1, approximately 10 months prior to the start of the compliance period. Not only is this an adequate amount of time as demonstrated by the successful implementation of past rules that have been finalized and implemented within several months of the beginning of the first affected compliance period (*e.g.,* Revised CSAPR Update), but EPA notes it is maintaining similar trading program flexibility and banking flexibilities of past programs which provide further opportunities for sources to procure allowances and plan for any future operating conditions. Finally, as noted previously, the EPA is providing preset budgets for the years 2023–2029, which serve as an effective floor on the state's ultimate emissions budget level for years 2026–2029, as

states will receive the higher of the preset or dynamic budget for those years. This provision of certain preset state emissions budgets serving as a floor level for 2026–2029 should further assuage commenters' concerns regarding planning certainty about allowance allocations and state emissions budget levels during this period of power sector transition to cleaner energy sources.

*Comment:* Commenters raised concerns that there is a two-year lag in the dynamic budgets in that, for example, for the dynamic budget in the 2026 control period, the calculations will be based on heat input and inventory information reflective of data through 2024. Commenters contend that, if there is a much greater need for allowances for compliance due to unavoidable or unforeseen need for a higher amount of heat input than reflected in prior years' data, the budget for that control period will not reflect this need, and the allowances will only become available when that dynamic budget is calculated using that information (*i.e.,* 2025 data would be reflected starting in the 2027 dynamic budget). According to commenters, this lag could present a serious compliance challenge. Other commenters raised a concern in the opposite direction about the potential ''slack'' created by the lag time—meaning that as high-emitting units retire, their emissions and operation will still inform the state emissions budgets for additional years beyond their retirement due to the lag.

*Response:* The EPA recognizes there will be a data lag inherent in the computation of future year dynamic emissions budgets, because the dynamic budgets will reflect fleet composition and utilization data from recent previous control periods rather than the control periods for which the dynamic budgets are being calculated. This means that the resulting dynamic budgets will reflect a limited lag behind the actual pace of the EGU fleet's trends. However, on the whole, those trends are clearly toward more efficient and cleaner generating resources. Thus, the data lag on the whole will inure to the compliance benefit of EGUs by resulting in dynamic budgets that are generally calculated at levels likely to be somewhat higher than what a dynamic budget calculation reflecting real-time EGU operations would produce. The EPA believes that this data lag is worthwhile to provide more compliance planning certainty and advance notice to affected EGUs of the dynamic budget applicable to an upcoming control period. Furthermore, this data lag in dynamic budget computation is comparable to the data lag of quantifying preset state

budgets for 2023 through 2025 based upon 2021 data, and at no point in the long history of EPA's trading programs has such a data lag in state budget computation yielded any compliance problems for affected EGUs. Without dynamic budgeting, the data lag inherent in calculating preset budgets would grow unabated with the passage of time, as a fixed reference year of heat input levels would continually apply regardless of potentially higher heat input levels farther and farther into the future. By eliminating the increase in the length of the data lag, this new dynamic budgeting approach is a substantial improvement in performance of the program relative to previous approaches that were not capable of capturing changes over time in the fleet and its utilization beyond the scheduled changes known to the EPA at the time of establishing preset budgets.

The EPA disagrees that this lag will in fact pose compliance challenges for EGUs even if the unlikely scenario described by commenters were to occur. Several factors influence this. First, the change in methodology to preset budgets serving as a floor on budgets through 2029 means that the dynamic budget methodology can only produce an increase in the budget from this final rule through that year. Second, the adoption of a multi-year approach for identifying the heat input used to calculate the dynamic budgets will smooth the year-to-year budget changes and effectively eliminate the possibility of greatest concern, which was that a single year of unusually low heat input would be used to set the budget for a subsequent year that turned out to have unusually high heat input. While a year of unusually high heat input for a given state may still occur, the state's budgets for those years will never be based on heat input from an anomalously low year, but instead will always be based on an average of several years' heat input. Third, because the Group 3 trading program is an interstate program implemented over a wide geographic region, and it is unlikely that all regions of the country would uniformly experience a marked increase in fossil fuel heat input necessitating an additional supply of allowances, it is likely that allowances will be available for trade from one area of the country where there is less demand to another area where there is greater demand. Fourth, as explained in section VI.B.5 of this document, each state's assurance level will adjust to reflect actual heat input in that year. Specifically, the EPA will determine each state's variability

limit for a given control period so that the percentage value used will be the higher of 21 percent or the percentage (if any) by which the total reported heat input of the state's affected EGUs in the control period exceeds the total reported heat input of the state's affected EGUs as reflected in the state's emissions budget for the control period. Thus, if in year 2030, for example, a state's actual heat input levels increase to a level that is not reflected in the dynamic budget calculation using earlier years of data, the assurance level (which absent the unusually high heat input would be 121 percent of the state's budget) will be calculated by the EPA following the 2030 ozone season, using that higher reported heat input. This will avoid imposing a three-for-one allowance surrender penalty on sources except where emissions exceed the assurance level even factoring in the increase in heat input in that year. Finally, as some commenters observed, the inherent data lag in dynamic budget quantification means that a state budget for the year 2030 will continue to reflect emissions from any EGU that retires before the 2030 control period but is still operating anytime during the 2026–2028 reference years from which the 2030 dynamic budget will be calculated. Given the likely ongoing trend of relatively high-emitting EGU retirements over time, this method for determining dynamic budgets should further assist the ability of remaining EGUs to obtain sufficient allowances to cover future heat input levels.

With respect to the comments expressing concern that dynamic budgets would create too much slack because of the lag in incorporating retirements, the EPA observes that dynamic budgets will yield a closer representation of Step 3 control stringency across the future fleet than preset budgets for years in which retirement plans are currently relatively unknown. Moreover, any risk that the lag would lead to an unacceptably large surplus of allowances is limited by EPA's finalization of the annual bank recalibration to 21 percent and 10.5 percent of the budget beginning in 2024 and 2030 respectively. The corresponding risk that a lag will lead sources to not operate emissions controls, due to a surplus of allowances, is also limited by the backstop daily emissions rates that start in 2024 (for sources with existing SCR controls) and no later than 2030 for other coal-fired sources.

*Comment:* Commenters allege that the dynamic budget methodology is effectively a ''one-way ratchet'' because, if EGUs pursue compliance strategies

such as reduced utilization or generation shifting to comply with the rule rather than install or optimize pollution controls pursuant to the identified Step 3 emissions control strategies, the effect will be that the dynamic budget calculated in a future year will reflect that reduced heat input, but the applied emissions rate assumption will be the same. Thus, the approach according to commenters actually "punishes" sources for achievement of emissions reductions commensurate with EPA's Step 3 determinations through alternative compliance means, by producing a smaller budget in later years (less heat input multiplied by the same emissions rate). If the source again reduces utilization or shifts generation to comply with this budget, then budgets in later years will again ratchet down, and so on.

*Response:* First, the claims of dynamic budgeting being a one-way ratchet are incorrect. As pointed out at proposal, the dynamic budget process would allow for increased utilization to result in increased budgets. Moreover, this concern is entirely mooted for the period 2026 through 2029 with the shift to preset budgets serving as a floor; dynamic budgeting can only increase the budget used in any given year in this time period. Additionally, the use of a multi-year average heat input in the budget-setting calculations will, on the

whole, modulate the dynamic budgets such that the budgets over time will only gradually change with changes in the operating profile of the EGU fleet.

For the control periods 2030 and later, this rule is premised on the expectation that all large coal-fired EGU sources identified for SCR-retrofit potential will, if they continue operating in 2030 or later, have installed the requisite post-combustion controls. Thus, the backstop daily emissions rate applies for all such sources beginning in the 2030 ozone season. In this latter period (post-2030), the EPA disagrees that the dynamic budget will punish fleet segments seeking to continue to pursue a strategy of reduced utilization. Rather, the dynamic budget will simply continue to reflect the Step 3 emissions control stringency. For instance, if there are two otherwise high-emitting sources in a state that can reduce emissions by operating SCR, this rule's control stringency finds it cost effective for both sources to operate their controls. If one source retires and is replaced by new lower-emitting generation, it is not a punishment to have the budgets adjust in a way that still incentivize remaining units to operate their controls. This is simply right-sizing the budget to an evolving fleet. It is a feature of the rule, not a flaw, and is designed to address observed instances in prior rules where market-driven reduced utilization resulted in non-binding (*i.e.,* overly

slack) budgets and corresponding conditions where the incentive to operate a control dissipated over time. In the event that sources reduce utilization whether for compliance purposes or market-driven reasons, that also does not obviate the importance of continuing to incentivize the Step 3 emissions control stringency at identified sources.

### c. Final Preset State Emissions Budgets

For affected EGUs in each covered state (and Indian country within the state's borders), this final rule establishes preset budgets for the control periods 2023 through 2029. For control periods 2026 through 2029, any of those preset budgets may be supplanted by the corresponding dynamic budget that will be tabulated at later date, if and only if that dynamic budget yields a higher amount. For 2030 and beyond, the dynamic budget formula promulgated in this rule will be applied to future year data to quantify state emissions budgets for those control periods. The procedures for allocating the allowances from each state budget among the units in each state (and Indian country within the state's borders) are described in section VI.B.9 of this document. The amounts of the final preset state emissions budgets for the 2023 through 2029 control periods are shown in Table VI.B.4.c–1.

TABLE VI.B.4.c–1—CSAPR NOₓ OZONE SEASON GROUP 3 PRESET STATE EMISSIONS BUDGETS FOR THE 2023 THROUGH 2029 CONTROL PERIODS

[Tons] [a][b]

| State | Final emissions budgets for 2023 | Final emissions budgets for 2024 | Final emissions budgets for 2025 | Preset emissions budgets for 2026 | Preset emissions budgets for 2027 | Preset emissions budgets for 2028 | Preset emissions budgets for 2029 |
|---|---|---|---|---|---|---|---|
| Alabama | 6,379 | 6,489 | 6,489 | 6,339 | 6,236 | 6,236 | 5,105 |
| Arkansas | 8,927 | 8,927 | 8,927 | 6,365 | 4,031 | 4,031 | 3,582 |
| Illinois | 7,474 | 7,325 | 7,325 | 5,889 | 5,363 | 4,555 | 4,050 |
| Indiana | 12,440 | 11,413 | 11,413 | 8,410 | 8,135 | 7,280 | 5,808 |
| Kentucky | 13,601 | 12,999 | 12,472 | 10,190 | 7,908 | 7,837 | 7,392 |
| Louisiana | 9,363 | 9,363 | 9,107 | 6,370 | 3,792 | 3,792 | 3,639 |
| Maryland | 1,206 | 1,206 | 1,206 | 842 | 842 | 842 | 842 |
| Michigan | 10,727 | 10,275 | 10,275 | 6,743 | 5,691 | 5,691 | 4,656 |
| Minnesota | 5,504 | 4,058 | 4,058 | 4,058 | 2,905 | 2,905 | 2,578 |
| Mississippi | 6,210 | 5,058 | 5,037 | 3,484 | 2,084 | 1,752 | 1,752 |
| Missouri | 12,598 | 11,116 | 11,116 | 9,248 | 7,329 | 7,329 | 7,329 |
| Nevada | 2,368 | 2,589 | 2,545 | 1,142 | 1,113 | 1,113 | 880 |
| New Jersey | 773 | 773 | 773 | 773 | 773 | 773 | 773 |
| New York | 3,912 | 3,912 | 3,912 | 3,650 | 3,388 | 3,388 | 3,388 |
| Ohio | 9,110 | 7,929 | 7,929 | 7,929 | 7,929 | 6,911 | 6,409 |
| Oklahoma | 10,271 | 9,384 | 9,376 | 6,631 | 3,917 | 3,917 | 3,917 |
| Pennsylvania | 8,138 | 8,138 | 8,138 | 7,512 | 7,158 | 7,158 | 4,828 |
| Texas | 40,134 | 40,134 | 38,542 | 31,123 | 23,009 | 21,623 | 20,635 |
| Utah | 15,755 | 15,917 | 15,917 | 6,258 | 2,593 | 2,593 | 2,593 |
| Virginia | 3,143 | 2,756 | 2,756 | 2,565 | 2,373 | 2,373 | 1,951 |
| West Virginia | 13,791 | 11,958 | 11,958 | 10,818 | 9,678 | 9,678 | 9,678 |
| Wisconsin | 6,295 | 6,295 | 5,988 | 4,990 | 3,416 | 3,416 | 3,416 |

Table VI.B.4.c–1—CSAPR NO$_X$ Ozone Season Group 3 Preset State Emissions Budgets for the 2023 Through 2029 Control Periods—Continued

[Tons] [a b]

| State | Final emissions budgets for 2023 | Final emissions budgets for 2024 | Final emissions budgets for 2025 | Preset emissions budgets for 2026 | Preset emissions budgets for 2027 | Preset emissions budgets for 2028 | Preset emissions budgets for 2029 |
|---|---|---|---|---|---|---|---|
| Total ............................................................... | 208,119 | 198,014 | 195,259 | 151,329 | 119,663 | 115,193 | 105,201 |

**Table Notes:**

[a] The state emissions budget calculations pertaining to Table VI.B.4.c–1 are described in greater detail in the Ozone Transport Policy Analysis Final Rule TSD. Budget calculations and underlying data are also available in Appendix A of that TSD.

[b] In the event this final rule becomes effective after May 1, 2023, the emissions budgets and assurance levels for the 2023 control period will be adjusted under the rule's transitional provisions to ensure that the increased stringency of the new budgets would apply only after the rule's effective date. The 2023 budget amounts shown in Table VI.B.4.c–1 do not reflect these possible adjustments. The transitional provisions are discussed in section VI.B.12 of this document.

5. Variability Limits and Assurance Levels

Like each of the other CSAPR trading programs, the Group 3 trading program includes assurance provisions designed to limit the total emissions from the sources in each state (and Indian country within the state's borders) in each control period to an amount close to the state's emissions budget for the control period, consistent with the principle that each state's sources must be held to the elimination of significant contribution within that state, while allowing some flexibility beyond the emissions budget to accommodate year-to-year operational variability beyond sources' reasonable ability to control. For each state, the assurance provisions establish an assurance level for each control period, defined as the sum of the state's emissions budget for the control period plus a variability limit, which under the Group 3 trading program regulations in effect before this rulemaking was 21 percent of the relevant state emissions budget. The purpose of the variability limit is to account for year-to-year variability in EGU operations, which can occur for a variety of reasons including changes in weather patterns, changes in electricity demand, and disruptions in electricity supply from other units or from the transmission grid. Because of the need to account for such variability in operations of each state's EGUs, the fact that emissions from the state's EGUs may exceed the state's emissions budget for a given control period is not treated as inconsistent with satisfaction of the state's good neighbor obligations as long as the total emissions from the EGUs remain below the state's assurance level. Emissions from a state's EGUs above the state's emissions budget but below the state's assurance level are treated in the same manner as emissions below the state's emissions budget in that such emissions are subject to the same

requirement to surrender allowances at a ratio of one allowance per ton of emissions. In contrast, emissions above the state's assurance level for a given control period are strongly discouraged as inconsistent with the state's good neighbor obligations and are subject to an overall 3-for-1 allowance surrender ratio. The establishment of assurance levels with associated extra allowance surrender requirements was intended to respond to the D.C. Circuit's holding in *North Carolina* requiring the EPA to ensure within the context of an interstate trading program that sources in each state are required to address their good neighbor obligations within the state and may not simply shift those obligations to other states by failing to reduce their own emissions and instead surrendering surplus allowances purchased from sources in other states.[319]

In this rulemaking, the EPA did not propose and is not making changes to the basic structure of the Group 3 trading program's assurance provisions, which will continue to set an assurance level for each control period equal to the state's emissions budget for the control period plus a variability limit and will continue to apply a 3-for-1 surrender ratio to emissions exceeding the state's assurance level.[320] Each assurance level will also continue to apply to the collective emissions of all units within the state and Indian country within the state's borders.[321] However, the EPA is making a change to the methodology for determining the variability limits. Specifically, the EPA will determine

each state's variability limit for a given control period so that, instead of always multiplying the state's emissions budget for the control period by a value of 21 percent, the percentage value used will be the higher of 21 percent or the percentage (if any) by which the total reported heat input of the state's affected EGUs in the control period exceeds the total historical heat input of the state's affected EGUs as reflected in the state's emissions budget for the control period. For example, if the total reported heat input of the state's covered sources for the 2025 control period is 130 percent of the historical heat input used in computing the state's 2025 budget, then the state's variability limit for the 2025 control period will be 30 percent of the state's emissions budget instead of 21 percent of the state's emissions budget. The EPA expects that the minimum 21 percent will apply in almost all instances, and that the alternative, higher percentage value will apply only in control periods where operational variability causes an unusually large increase relative to the historical data used in setting the state's emissions budget, which would be a situation meriting a temporarily higher variability limit and assurance level. The revised methodology for determining the variability limits will apply both with respect to control periods when a state's emissions budget is a preset budget established in this final rule and with respect to control periods when a state's emissions budget is a dynamically-determined budget computed using the procedures laid out in the regulations, and it will apply starting with the 2023 control period rather than starting with the 2025 control period as proposed.

The purpose of the revision to the variability limits is to better align the variability limits for successive control periods with the heat input data used in setting the state emissions budgets. Under the final rule, each dynamically

---

[319] 531 F.3d at 908.

[320] As discussed in section VI.B.8, the EPA is also establishing a new secondary emissions limitation for individual units that will apply in situations where an exceedance of the relevant state's assurance level has occurred.

[321] *See* 40 CFR 97.1002 (definitions of "common designated representative," "common designated representative's assurance level" and "common designated representative's share"), 97.1006(c)(2), and 97.1025.

determined emissions budget will be computed using the latest available reported heat input, which for each budget set for a control period in 2026 or a later year will be the average state-level heat input for the control periods two, three, and four years before the control period whose budget is being determined (for example, the dynamic state emissions budgets for the 2026 control period will be computed in early 2025 using the reported state-level heat input for the 2022–2024 control periods). The revised variability limits will be well coordinated with the budgets established using this dynamic budgeting process, because the percentage change in the actual heat input for the control period relative to the earlier multi-year average heat input used in computing the state's emissions budget will be an appropriate measure of the degree of operational variability actually experienced by the state's EGUs in the control period relative to the assumed operating conditions reflected in the state's budget. Setting a variability limit in this manner is thus entirely consistent with the overall purpose of including variability limits in the assurance provisions.

As discussed in sections VI.B.1.b.i and VI.B.4, for the 2023–2025 control periods the state emissions budget for a given control period will be the preset budget determined in this rule, and for the 2026–2029 control periods, the state emissions budget for a given control period will be the preset budget determined in this rule rather than the dynamically determined budget computed in the year before the control period unless the dynamic budget is higher than the preset budget. If the state emissions budget is the preset budget, the historical heat input data reflected in that budget will be the heat input data for the 2021 control period, adjusted to reflect projected changes in fleet composition over time that are known at the time of this rulemaking, but not adjusted to reflect changes in fleet composition that are not known at the time of the rulemaking or changes in the utilization of individual units.[322] In this case, the variability limit for the control period would be the higher of 21 percent or the percentage change in the actual heat input for the control period relative to the heat input for the 2021 control period as adjusted to reflect the projected changes in fleet composition. The EPA believes it is reasonable to

apply the same principle in setting the variability limit in control periods where the preset floor budgets are used as in control periods where the dynamically determined budgets are used, because the preset floor budgets are computed using the same principles as the dynamically determined budgets, with the major difference being that the available heat input data used in computing the preset budgets are necessarily less current. Accordingly, because preset budgets established in this manner are used starting with the 2023 control period, the EPA believes it is also reasonable to begin implementing the revised methodology for determining variability limits starting with the 2023 control period.

The reason the EPA is using the higher of a fixed 21 percent or the percentage change in heat input computed as just described is that the EPA believes that, for operational planning purposes, it can be useful for sources to know in advance of the control period a minimum value for what the variability limit could turn out to be. Because a state's actual total heat input for a control period is not known until after the end of the control period, this revision will have the consequence that the state's final variability limit and assurance level for the control period also will not be known until after the control period. However, because the rule provides that the variability limit will always be at least 21 percent, the sources in a state will be able to rely for planning purposes on the knowledge that the assurance level will always be at least 121 percent of the state's emissions budget for the control period. Advance knowledge of the minimum possible amount of the assurance level can be useful to sources, because one way a fleet owner can be confident that it will never incur the 3-for-1 allowance surrender ratio owed for emissions exceeding its state's assurance level is to plan its operations so as to never allow the emissions from its fleet to exceed the fleet's aggregated share of the state's assurance level for the control period. Knowing that the variability limit will always be at least 21 percent will provide sources with minimum values they could use for such planning purposes.

The EPA believes that 21 percent is a reasonable value to use as the minimum variability limit. To determine appropriate variability limits for the trading programs established in CSAPR, the EPA analyzed historical state-level heat input variability over the period from 2000 through 2010 as a proxy for emissions variability, assuming constant emissions rates. *See* 76 FR 48265. Based

on that analysis, the variability limits for ozone season $NO_X$ in both CSAPR and the CSAPR Update were set at 21 percent of each state's budget, and these variability limits for the $NO_X$ ozone season trading programs were then codified in 40 CFR 97.510 and 97.810, along with the respective state budgets.[323] For the Revised CSAPR Update, the EPA performed an updated variability analysis for the twelve states being moved into the Group 3 trading program in that rulemaking, evaluating historical state-level heat input variability over the period from 2000 through 2019. The updated analysis again resulted in a variability estimate of 21 percent. The EPA also considered shorter time periods for the updated analysis and found that the resulting variability estimates were not especially sensitive to the particular time period analyzed.[324] A further updated analysis for this rulemaking again results in a variability estimate of 21 percent for most states, and although the historical analysis indicates a higher percentage for the covered state with the smallest total heat input figures in this analysis— New Jersey—the EPA does not consider it appropriate to raise the minimum variability limit percentage beyond 21 percent for all other covered states based on the analytic results for one state, where small absolute heat input figures have resulted in a larger variability percentage.[325] (Moreover, because of the provision allowing a state's variability limit for a given control period to be higher than 21 percent if the state's actual heat input exceeds the heat input used to set the state's emissions budget by more than 21 percent, there is no need to set a minimum variability limit higher than 21 percent specifically for New Jersey.) Based on the consistent conclusions of these multiple analyses, the EPA is continuing to use 21 percent as the

---

[322] The total heat input amount used in computing each state's preset emissions budget for each control period from 2023 through 2029 is included in Appendix A of the Ozone Transport Policy Analysis Final Rule TSD at column I of the "State 2023"–"State 2029" worksheets.

[323] Briefly, the 21 percent variability limit was determined in the analysis by identifying, for all the states in the region covered by the ozone season $NO_X$ trading program, and at a 95 percent confidence level, the maximum expected deviation in any state's total heat input for any single control period in the data sample from that state's trend-adjusted mean total heat input for all the control periods in the data sample. For details on the original variability analysis for 26 states over the 2000–2010 period, including a description of the methodology, see the Power Sector Variability Final Rule TSD from the CSAPR (EPA–HQ–OAR–2009–0491–4454), available in the docket for this rule.

[324] For the updated variability analysis for twelve states for the 2000–2019 period, *see* the Excel file "Historical Variability in Heat Input 2000 to 2019.xls", available in the docket for this rule.

[325] *See* the Excel document, "OS Heat Input— Variability 2000 to 2021.xls" for updated data, application of the CSAPR variability methodology, and results applied to heat input for 2000 through 2021 for all states and for the region collectively.

minimum value in the revised approach for establishing variability limits for all control periods under this rule.

The provisions of the final rule relating to assurance levels and variability limits are unchanged from proposal, with the exception that the provision establishing a higher variability limit for a state in a given control period where the state's actual heat input exceeds the heat input used in computing the state emissions budget for that control period by more than 21 percent will be implemented starting with the 2023 control period instead of the 2025 control period.

*Comment:* Some commenters supported the EPA's proposal to raise a state's variability limit above 21 percent for a given control period if the state's actual heat input for the control period was more than 121 percent of the historical heat input used to set the state's budget for that control period. These commenters agreed with the EPA that making this adjustment is consistent with the assurance provisions' purpose of strongly incentivizing each state to achieve its required emissions reductions within the state while also accounting for year-to-year variability in electric system operations.

One commenter stated that the EPA should not finalize the proposed revision to the variability limit provisions, claiming that by allowing sources in some states to increase utilization and heat input so as to exceed the state's budget by more than 21 percent in a given year, the adjustment would then cause the state's subsequent dynamically determined budgets to be higher, allowing greater emissions over time.

*Response:* The EPA disagrees with the comment advocating against finalization of the proposed change to the variability limit provisions. The Agency continues to view the proposed change as useful for accommodating instances where, because of electrical system operating needs, a state's actual total heat input in a control period exceeds the historical heat input used to set the state emissions budget for the control period, potentially causing increased emissions even when all EGUs in a state are achieving emissions rates consistent with the Step 3 emissions control stringency. Moreover, the EPA does not believe that the provision would lead to higher overall program-wide budgets. No extra allowances would be created by the increase in a state's variability limit, so with or without the adjustment, any allowances to cover the emissions in excess of the state's budget would still need to be obtained through

acquisition of allowances issued to sources in other states or the use of banked allowances. Thus, to the extent that the change in the variability limit provisions facilitates shifting of generation from some states to other states, increased heat input in the first set of states would generally be offset by decreased heat input in the second set of states, such that any increases in future dynamic budgets for the first set of states would be offset by decreases in future dynamic budgets for the second set of states. In addition, the final rule's use of multiple years of historical heat input data to compute the dynamically-determined state budgets will moderate the effect of any single year's heat input on the dynamically-determined budgets for future control periods.

6. Annual Recalibration of Allowance Bank

As discussed in section VI.B.1.b of this document, the EPA is making two revisions to the Group 3 trading program designed to better maintain the Step 3 emissions control stringency over time. The first proposed revision, discussed in section VI.B.4 of this document, is to adopt a dynamic budget-setting methodology that will allow state emissions budgets in future years to reflect more accurate information about the composition and utilization of the EGU fleet. The second, complementary, revision is to recalibrate the bank of unused allowances each control period to prevent allowance surpluses from accumulating and adversely impacting the ability of the trading program in future control periods to maintain the Step 3 emissions control stringency.

As proposed and now finalized in this rule, the bank recalibration process will start with the 2024 control period, after the compliance process for the 2023 control period for all current and newly added states in the Group 3 trading program has been completed. The recalibration process for each control period will be carried out on or shortly after August 1 of that control period, two months after the compliance deadline for the previous control period, making the date of the first recalibration August 1, 2024. The recalibrations take place on August 1 each year because compliance for the previous control period would not be completed until after June 1. However, because data on the amounts of allowances held are publicly available and the total quantity of allowances needed for compliance for the previous control period will be known shortly after the end of that control period, sources and other market participants will be able to ascertain

with reasonable accuracy shortly after the end of each control period what degree of recalibration to expect for the next control period, even if the recalibration would not actually be carried out until the following August. The EPA will make an estimate of the applicable calibration ratio for each control period publicly available no later than March 1 of the year of the control period for which the bank will be recalibrated.

Before undertaking a recalibration process each control period, the EPA will first determine whether the total amount of all banked Group 3 allowances from previous control periods held in all facility accounts and general accounts in the Allowance Management System exceeds the target bank amount. (For this purpose, no distinction will be made between banked Group 3 allowances issued from the state emissions budgets for previous control periods and banked Group 3 allowances issued through the conversion of previously banked Group 2 allowances.) If the total amount of banked Group 3 allowances does not exceed the target bank amount, the EPA will not carry out any recalibration for that control period. If the total amount of unused allowances does exceed the target bank amount, the EPA will determine for each account with holdings of banked Group 3 allowances the account-specific recalibrated amount of allowances, computed as the account's total holdings of banked Group 3 allowances immediately before the recalibration multiplied by the target bank amount and divided by the total amount of banked Group 3 allowances in all accounts, rounded up to the nearest allowance. Finally, the EPA will deduct from each account any banked Group 3 allowances exceeding the account's recalibrated amount of banked allowances.

As the target bank amount used in the recalibration process for each control period, the EPA will use an amount determined as a percentage of the sum of the state emissions budgets for the control period. For the control periods from 2024 through 2029, the target percentage will be 21 percent, which is the sum of the states' minimum variability limits.[326] For control periods in 2030 and later years, the target percentage will be 10.5 percent, or half of the sum of the states' minimum

---

[326] As discussed in section VI.B.5, an individual state's variability limit can be higher than 21 percent in a given control period if the state's actual heat input for that control period is more than 121 percent of the historical heat input used in computing the state emissions budget for the control period.

variability limits. In the proposal, the EPA cited two reasons for proposing the 10.5 percent amount. First, in the transition from CSAPR to the CSAPR Update, where the EPA set a target bank amount 1.5 times the sum of the variability limits, and in the transition from the CSAPR Update to the Revised CSAPR Update, where the EPA set a target bank amount of 1.0 times the sum of the variability limits, in each case the initial bank proved larger than necessary, as total emissions of all sources in the program were less than the budgets. Second, an analysis of year-to-year variability of heat input for the region covered by this rule suggests that the regional heat input for an individual year can be expected to vary by up to 10.5 percent above or below the central trend with 95 percent confidence. This variability analysis is an application to the entire region of the variability analysis EPA has performed for individual states to establish the minimum variability limit of 21 percent for the states in the trading program.[327] When the analysis is performed at the regional level, the data show less year-to-year variation than when the analysis is performed at the individual state level. Within the trading program structure, it is reasonable to use variability analyzed at the level of individual states to set the variability limits, which apply at the level of individual states, while using variability analyzed at the level of the overall region to set a target level for a bank, which will apply at the level of the overall program.

In the final rule, in response to comments, the EPA has determined to maintain the 10.5 target percentage for the reasons discussed in previous paragraphs, but to defer application of this target percentage until the 2030 control period. For the control periods from 2024 through 2029, the EPA will instead use a target percentage of 21 percent. The reason for using a higher target percentage for the 2024–2029 control periods is to provide additional support for allowance market liquidity during these years, which both the EPA and commenters view as an important period of generating fleet transition for the power industry.

The annual bank recalibrations, at either ratio, are an important

enhancement to the trading program that will help maintain the control stringency determined to be necessary to address states' good neighbor obligations for the 2015 ozone NAAQS over time. Moreover, the recalibrations are less complex than alternative approaches would be. For example, the $NO_X$ Budget Trading Program established in the $NO_X$ SIP Call also contained provisions designed to prevent excessive accumulations of banked allowances on program stringency, but those provisions—under the name "progressive flow control"—introduced uncertainty as to whether banked allowances would be usable to offset one ton of emissions or less than one ton of emissions in the current control period. As a consequence of this uncertainty, in some control periods, allowances banked from earlier control periods traded at lower prices than allowances issued for the current control period.[328] The EPA considers the recalibration mechanism established in this rule to be simpler with less associated uncertainty. Following each bank recalibration, all allowances usable for compliance in the control period will have known, equal compliance values for the remainder of the control period and until the deadline for surrendering allowances after the control period.

Finally, the EPA observes that the recalibration mechanism is entirely consistent with the Agency's existing authority under 40 CFR 97.1006(c)(6) to "terminate or limit the use and duration" of any Group 3 allowance "to the extent the Administrator determines is necessary or appropriate to implement any provision of the Clean Air Act." The Administrator is determining that the recalibrations are both necessary and appropriate to ensure that the control stringency selected in this rulemaking is maintained and states' good neighbor obligations with respect to the 2015 ozone NAAQS are addressed. The recalibration process will complement the revised budget-setting process by preventing any surplus of allowances created in one control period from diminishing the intended stringency and resulting emissions reductions of the emissions budgets for subsequent control periods. For further discussion

of the reasons for bank recalibration, see section VI.B.1.b.ii of this document.

The bank recalibration mechanism finalized in this rule is unchanged from the proposal except for the final rule's adoption of a target percentage of 21 percent rather than 10.5 percent for the control periods from 2024 through 2029. The EPA's responses to comments on the bank recalibration mechanism are discussed in the remainder or this section and in section 5 of the *RTC* document. Further discussion of the reasons for adopting a higher target percentage for the 2024–2029 control periods is included in section VI.B.1.d of this document.

*Comment:* Some commenters acknowledged the EPA's authority to manage the quantities of allowances carried over from one control period to the next as banked allowances, including some commenters who as a policy matter did not support such an approach. Other commenters claimed that any removal from the program of allowances banked in earlier control periods would constitute an unlawful taking of property or would constitute unlawful overcontrol.

*Response:* The EPA disagrees with comments contending that the proposed bank recalibration provisions would be unlawful, either as asserted takings of property or as over-control for purposes of the Good Neighbor provision. With respect to the claim that removing allowances would constitute takings of property, the commenters misconstrue the nature of an allowance. The allowances used in the Group 3 trading program are created under the program's regulations, which expressly provide that the allowances are not property rights but are limited authorizations to emit $NO_X$ in accordance with the provisions of the Group 3 trading program.[329] These provisions of the Group 3 trading program regulations have been in existence since the Revised CSAPR Update and were not reopened in this action. This approach of creating limited authorizations to engage in particular forms of conduct within a regulatory program extends back to the Acid Rain Program, where the approach was mandated by Congress, and has been followed by EPA in each subsequent allowance trading program for the electric power sector.[330] Moreover, as noted earlier in this section, the Group 3 trading program regulations provide the EPA

---

[327] See the Power Sector Variability Final Rule TSD from CSAPR, available at *https://www.epa.gov/csapr/power-sector-variability-final-rule-tsd* for a description of the methodology. Also see the Excel document "OS Heat Input—Variability 2000 to 2021.xls" for updated data, application of the CSAPR variability methodology, and results applied to heat input for 2000 through 2021 for all states and for the region collectively.

[328] For more discussion of the progressive flow control mechanism, as well as allowance price data showing a discounted value for banked allowances, see "$NO_X$ Budget Trading Program: 2005 Program Compliance and Environmental Results" (September 2006) at 28–30, *https://www.epa.gov/sites/default/files/2015-08/documents/2005-nbp-compliance-report.pdf.*

[329] 40 CFR 97.1006(c)(6)–(7).

[330] *See, e.g.,* 42 U.S.C. 7651b(f) and 40 CFR 72.9(c)(6)–(7) (Acid Rain Program example); 40 CFR 97.6(c)(6)–(7) (Federal $NO_X$ Budget Trading Program example); 40 CFR 97.106(c)(5)–(6) (CAIR $NO_X$ Annual Trading Program example).

Administrator with the authority to terminate or limit the use and duration of such authorization to the extent the Administrator determines is necessary or appropriate to implement any provision of the Clean Air Act, and the Administrator is making such a determination in this rule.

The EPA also disagrees that bank recalibration would constitute overcontrol. The emissions that are permissible in a given control period consistent with the Step 3 control stringency are quantified in the state emissions budgets for the control period. Banked allowances from previous control periods are necessarily surplus to the state emissions budgets for the current control period. As noted in section VI.B.1, in an allowance trading program, banking provisions can serve several useful purposes, including continuously incentivizing sources to reduce their emissions even when they already hold sufficient allowances to cover their expected emissions for a control period, facilitating compliance cost minimization, accommodating necessary operational flexibility, and promoting allowance market liquidity. However, these useful purposes do *not* include allowing sources to plan to emit in excess of the Step 3 control stringency as represented by the state emissions budgets for the control period. Accordingly, in the overcontrol analysis discussed in section V.D.4, the EPA analyzed whether the emissions reductions necessary to meet the state emissions budgets without relying for compliance purposes on any allowances banked in earlier control periods would result in overcontrol and determined there would be no overcontrol. (That is, the modeling of the effects of the Group 3 emissions budgets in 2026 did not include an assumption that there would be any banked allowances.) Thus, even if the Agency had finalized regulatory provisions removing *all* banked allowances from the trading program between control periods—in contrast to the actual bank recalibration provisions, which permit substantial quantities of banked allowances to remain in the trading program—the information available to the Agency suggests such provisions would not constitute overcontrol. With respect to some commenters' assertions that bank recalibration would overcontrol by "writing off" emission reductions that may have gone beyond the reductions necessary to address the Good Neighbor provision or would make it more difficult to create surplus allowances in one control period to offset excess emissions in later control periods, EPA

notes that the NAAQS apply continuously, and the possibility that the sources in a state may have done more than the minimum necessary to meet the state's Good Neighbor obligations in one control period does not create a right for the state to do less than is necessary to meet the state's Good Neighbor obligations in subsequent control periods.

*Comment:* Some commenters expressed concern that excessive quantities of banked allowances, like excessive quantities of budgeted allowances, can lead to lower allowance prices. The commenters observed that with lower allowance prices, some units would likely operate their controls less effectively, resulting in a greater likelihood that the emissions stringency found necessary in this rule would not be sustained. Other commenters expressed the view that other provisions of the rule, including more stringent state emissions budgets, the backstop daily $NO_X$ emissions rate provisions, and the assurance provisions would be sufficient to incentivize EGUs to operate their controls effectively, making allowance bank recalibration superfluous for this purpose.

*Response:* The EPA agrees with the comments explaining that without bank recalibration, the quantities of banked allowances can grow, leading to lower allowance prices, diminished incentives for sources to optimize control operation, and greater risk of failure to sustain the Step 3 control stringency, and disagrees with the comments arguing that other rule provisions would make bank recalibration unnecessary. The suggestion that the assurance provisions can maintain program stringency regardless of allowance quantities ignores the fact that the emission levels consistent with the Group 3 control stringency in a given control period are the state emissions budgets, not the higher assurance levels. If the quantities of banked allowances in the program grow to the point where sources collectively can plan to emit above the collective state emissions budgets, then the trading program would be unable to ensure that the Group 3 control stringency is being achieved, even if emissions do not rise further than the assurance levels. Further, there are now examples from the Group 2 trading program of sources emitting in excess of the state-wide assurance levels, because a glut of banked allowances which was not prevented by the regulations for that trading program rendered even the three-to-one surrender ratio ineffective. Suggestions that the backstop emissions rate provisions can maintain program

stringency regardless of the quantities of banked allowances are similarly mistaken, because rather than reducing overall emissions of all sources in the trading program, the backstop rate provisions are designed to ensure that the largest individual sources of potential emissions operate their controls consistently. If the quantities of banked allowances are allowed to grow to the point where sources collectively can plan to emit above the collective state emissions budgets, the backstop rate provisions would do nothing to constrain emissions from the sources not subject to the backstop rate.

With respect to the suggestion that state emissions budgets reflecting sufficient control stringency can avoid the need for bank recalibration, the EPA observes that the budget-setting and bank recalibration provisions in this rule are complements, not substitutes. If in a given year sources collectively emit against the collective state emissions budgets such that the ending allowance bank—that is, the allowances remaining after deduction of the allowances required for compliance—is less than the bank target amount, then the bank will not be recalibrated for the following control period. However, in the event that sources collectively emit against the collective state emissions budgets such that the ending allowance bank is above the bank target amount, then the recalibration provisions will ensure that the recalibrated allowance bank does not introduce an excessive overall quantity of allowances into the trading program for the following control period when combined with the state emissions budgets calculated for that control period. Without the recalibration provisions, the trading program would lack any mechanism for removing excess allowances that are inconsistent with maintaining the Step 3 emissions control stringency which the Step 4 trading program is designed to implement.

*Comment:* Some commenters claimed that the recalibration process itself would have undesirable consequences. First, some said that because bank recalibration would be executed partway through the control period, it would introduce uncertainty concerning the quantities of allowances each source would have available, impeding efforts to plan. Second, some commenters claimed that the prospect of bank recalibration would create counterproductive incentives for allowance holders. According to the commenters, allowances holders would be incentivized to "use or lose" their allowances (to reduce the number of allowances that would be removed from

their accounts in the recalibration process), thereby causing increased emissions, or alternatively would be incentivized to refuse to sell allowances (to allow the holders to have more allowances after the next recalibration), thereby reducing allowance market liquidity.

*Response:* The EPA disagrees with these comments. As discussed previously in this section, the recalibration process has been scheduled for August 1 of each control period because compliance for the previous control period (and the associated allowance trading activities) would not be completed until after June 1. However, the information needed to project the degree of recalibration will be available by early November of the previous year, and the EPA will make an estimate publicly available no later than March 1, two months before the start of the control period. Further, at least 80 percent of the allowances for use in a given control period will be the allowances allocated from the state emissions budgets (with the recalibrated banked allowances from the prior control period comprising the remainder), and the emissions budgets and unit-level allocations amounts will be known approximately a year before the start the control period.

The comments claiming that the introduction of a bank recalibration process would create incentives to "use or lose" allowances or to hoard allowances are not persuasive. By reducing the supply of allowances carried over from previous control periods, bank recalibration would tend to raise the price of allowances in the current control period, making it more cost-effective and therefore in sources' interest to further reduce their emissions than to increase their emissions. Higher allowance prices would also increase the cost of hoarding allowances just as higher fuel prices raise the cost of maintaining large fuel inventories. Moreover, the EPA expects that the prospect of having banked allowances recalibrated after the end of the control period is much more likely to *discourage* hoarding than to encourage it. Given the choice between holding an allowance which may be removed as part of an upcoming recalibration process or instead selling the allowance for cash, the sale option will become more attractive. By creating a "sell or lose" incentive for holders of surplus allowances, the recalibration process should increase allowance market liquidity. At the same time, by ensuring a banked allowance will always have some value for use in a future control period, the bank

recalibration mechanism in this program will continue to incentivize early emissions reductions.

*Comment:* Turning to the level of the bank recalibration target, some commenters objected to the target bank percentage of 10.5 percent, saying that a larger bank would be needed to ensure that sufficient allowances would be available to enable sources to run as needed to provide reliable electricity service, particularly with the large year-to-year swings in budgets that the commenters anticipated could occur with dynamic budgets computed using a single rolling historical year and with anticipated growth in renewable generation. Some commenters recommended a target bank percentage of 21 percent. Some commenters stated that even if the overall quantity of allowances available for use was greater than the total amount of emissions, a larger bank of allowances would facilitate trading and promote greater allowance market liquidity, citing reports of high allowance prices in 2022.

*Response:* As discussed in sections VI.B.1.d and VI.B.4 and earlier in this section, the EPA does not agree with comments suggesting that annual bank recalibration in itself poses a risk to electric grid reliability. Nevertheless, the Agency has made several changes from proposal in the final rule designed to address concerns expressed about reliability by increasing compliance flexibility through the 2029 control period. These changes through the 2029 control period include the use of a target bank percentage of 21 percent and the promulgation of preset budgets that will serve as the state emissions budgets unless the dynamic budgets for the control periods are higher. In addition, to reduce year-to-year variability under the budget-setting methodology, dynamic budgets will be calculated using multiple years of historical heat input data instead of heat input data from a single year. The EPA views these changes as responsive to the principal reasons that commenters gave for their claims that the target bank percentage should be higher than 10.5 percent. Regarding the claim that a higher target bank percentage is needed because increased renewable generation makes the demand for fossil generation more variable, commenters did not provide evidence demonstrating that the overall quantities of fossil generation throughout the multi-state region covered by this rule—as opposed to the operating patterns of some individual units—are becoming more variable, and the Agency declines to make an

adjustment for such a reason at this time.

With respect to the comments advocating for an even higher bank target percentage to facilitate trading and promote market liquidity, the Agency observes that any such advantage of larger allowance banks must be balanced with the disadvantages of excess allowance supply—specifically, reduced allowance prices, diminished incentives for sources to optimize control operation, and greater risk of failure to sustain the Step 3 control stringency. In the final rule, the EPA finds that a reasonable balance between these opposing considerations is struck by temporarily adopting a higher bank target percentage of 21 percent (consistent with the initial bank targets used in this rule and previous rules) and deferring implementation of the 10.5 percent target bank percentage identified by the Agency's analysis as a sustainable percentage in the longer term until the 2030 control period.

### 7. Unit-Specific Backstop Daily Emissions Rates

While the identified EGU emissions reductions in section V of this document (*i.e.,* the Step 3 emissions control stringency) are incentivized and secured primarily through the corresponding seasonal state emissions budgets (expressed as a seasonal tonnage limit for all covered EGUs within a state's borders) described earlier, the EPA is also incorporating a backstop daily emissions rate of 0.14 lb/mmBtu applied to coal-fired steam units serving generators with nameplate capacity greater than or equal to 100 MW in covered states, except circulating fluidized bed units. This is important for ensuring the elimination of significant contribution on a more consistent basis from the relevant sources and over each day of the ozone season.

Starting with the 2024 control period, a 3-for-1 allowance surrender ratio (instead of the usual 1-for-1 surrender ratio) will apply to emissions during the ozone season from any large coal-fired EGU with existing SCR controls exceeding by more than 50 tons a daily average $NO_X$ emissions rate of 0.14 lb/mmBtu. The daily average emissions rate provisions will apply to large coal-fired EGUs without existing SCR controls (except circulating fluidized bed units) starting with the second control period in which newly installed SCR controls are operational at the unit, but not later than the 2030 control period. See Appendix A of the Ozone Transport Policy Analysis Final Rule

TSD for a list of coal-fired steam units serving generators larger than or equal to 100 MW in covered states for which the identified backstop emissions rate will apply.

For each unit subject to the backstop daily emissions rate provisions for a given control period, the amount of emissions subject to the 3-for-1 surrender ratio will be determined as follows, generally on an automated basis using the unit's data acquisition and handling system (DAHS) required under 40 CFR part 75. For each day of the control period where the unit's average emissions rate for that day was higher than 0.14 lb/mmBtu, the owner or operator will compute what the unit's reported emissions on that day would have been (given the unit's reported heat input for the day) at an emissions rate of 0.14 lb/mmBtu. The difference between the unit's emissions for the day as actually reported and the emissions that would have been reported if the unit's emissions rate was 0.14 lb/mmBtu is the unit's daily exceedance. The amount of emissions subject to the 3-for-1 surrender ratio for the control period is the sum of the unit's daily exceedances for all days of the control period minus 50 tons (but not less than zero).[331] All calculations will rely on the data monitored and reported for the unit in accordance with 40 CFR part 75.

The EGU NO$_X$ Mitigation Strategies Final Rule TSD describes the methodology for deriving the 0.14 lb/mmBtu daily rate limit in more detail. The methodology is summarized as follows. First, consistent with stakeholders' focus on providing daily assurance of control operation, which is consistent with the 8-hour form of the 2015 ozone NAAQS and the tendency for ozone levels to spike on a diurnal cycle, the EPA determined that daily (as opposed to hourly or monthly) was an appropriate time metric for backstop emissions rate limits instituted to ensure operation of controls on high ozone days. The EPA derived the 0.14 lb/mmBtu daily rate limit by determining the particular level of a daily rate that would be comparable in stringency to the 0.08 lb/mmBtu seasonal emissions rate that the Agency has identified as reflecting SCR optimization at existing units.[332] The

EPA first conducted an empirical exercise using reported daily emissions rate data from existing, SCR-controlled coal units that were emitting at or below 0.08 lb/mmBtu on a seasonal average basis. This seasonal rate reflects the average across a unit's range of varying daily rates reflecting different operation conditions. When the EPA examined the daily emissions rate pattern for these units considered to be optimizing their SCRs on a seasonal basis, the EPA observed that over 95 percent of the time, their daily rates were below 0.14 lb/mmBtu. In addition, for these units, less than 1 percent of their seasonal emissions would exceed this daily rate limit.

The EPA conducted this analysis to be consistent with the methodology developed in the 2014 1-hr SO$_2$ attainment area guidance for identifying "comparably stringent" emissions rates over varying time-periods.[333] Appendix C of that guidance describes a series of steps that involve: (1) compiling emissions data to reflect a distribution of emissions rates with various averaging times, (2) determining the 99th percentile of the average emissions values compiled in the previous step, and then (3) applying "adjustment factors" or ratios of the 99th percentile values to emissions rates to convert them (usually from a short-term rate to a longer-term rate). In this case, the EPA applied the methodology in reverse to convert a longer-term limit (the seasonal rate of 0.08 lb/mmBtu which was assumed to be equivalent to a 30-day rate of 0.08 lb/mmBtu for purposes of this comparison of rates across averaging times) to a comparably stringent short-term limit (a daily rate of 0.14 lb/mmBtu).

The inclusion of a 50-ton threshold for emissions exceeding the backstop daily emissions rate before the 3-for-1 surrender applies is a change from the proposal. As discussed in section VI.B.1.d of this document, the EPA made this change in response to comments concerning the possibility that the 3-for-1 surrender ratio could otherwise have applied to emissions outside an EGU operator's control, with

the most important example being the emissions during unit startup before SCR equipment can be brought into service, and to a lesser extent the emissions during unit shutdown. The analysis used by the EPA to derive the 50-ton threshold is described in detail in the Ozone Transport Policy Analysis Final Rule TSD. Briefly, for a set of 164 SCR-equipped units with seasonal average NO$_X$ emissions rates at or below 0.08 lb/mmBtu in 2021, the EPA evaluated the total amounts of emissions that would have been determined to exceed a daily average emissions rate of 0.14 lb/mmBtu in the 2021 and 2022 ozone seasons. In the 2021 ozone season, only 572 tons out of these units' total emissions of 60,350 tons, or 0.9 percent, would have been considered exceedances, with an average exceedance per unit of less than 4 tons. The highest amount for any of the 164 individual units in either ozone season was 48 tons. Based on this analysis, the EPA concludes that adding a 50-ton threshold to the backstop daily emissions rate provisions will ensure that substantially all emissions outside the control of an SCR-equipped unit's operator will not be subject to the 3-for-1 surrender ratio. Because there is no reason to expect the range of emissions during conditions when SCR controls cannot be operated to differ between SCR-equipped units and units without SCR, inclusion of the 50-ton threshold effectively prevents application of the 3-for-1 ratio to emissions during startup and shutdown by units without SCR as well.

At the same time, the EPA believes the 50-ton threshold is not large enough to eliminate the intended incentive to achieve emissions rates consistent with good SCR performance under conditions other than startup and shutdown. For a set of 124 SCR-equipped units with seasonal average NO$_X$ emissions rates above 0.08 lb/mmBtu, the total amount of emissions exceeding a daily average emissions rate of 0.14 lb/mmBtu in the 2021 ozone season was 18,629 tons. Of this total amount, 15,374 tons would have been in excess of the 50-ton thresholds for the various units, indicating that even after application of the threshold, the 3-for-1 surrender ratio would have applied to over 80 percent of the daily exceedance amounts.

The backstop daily NO$_X$ emissions rate provisions finalized in this rule are unchanged from the proposal except for the inclusion of a 50-ton threshold for emissions exceeding the backstop emissions rate before the 3-for-1 surrender ratio applies and the deferral of the application of the provisions to units without existing SCR controls

---

[331] In the regulatory text at 40 CFR 97.1024 defining the total quantity of allowances that must be surrendered for a source's emissions in a control period, these amounts of emissions for all the units at the source are subject to a requirement to surrender two extra allowances per ton in addition to the usual 1-for-1 allowance surrender requirement, yielding a total surrender ratio of 3-for-1 for emissions over the 50-ton threshold.

[332] *See* page 24 of "Guidance for 1-hour SO$_2$ Nonattainment Area SIP Submission" at *https://*

*www.epa.gov/sites/default/files/2016-06/ documents/20140423guidance_nonattainment_ sip.pdf.* "A limit based on the 30-day average of emissions, for example, at a particular level is likely to be a less stringent limit than a 1-hour limit at the same level 1 since the control level needed to meet a 1-hour limit every hour is likely to be greater than the control level needed to achieve the same limit on a 30-day average basis."

[333] *See* Guidance for 1-Hour SO$_2$ Nonattainment Area SIP Submissions available at *https:// www.epa.gov/sites/default/files/2016-06/ documents/20140423guidance_nonattainment_ sip.pdf.*

until the 2030 control period or, if earlier, the second control period in which new SCR controls are operated at a unit. The EPA's responses to comments on the backstop daily NOX emissions rate provisions, including the reasons for these changes, are discussed in the remainder of this section and in section 5 of the *RTC* document.

*Comment:* Some commenters strongly supported the backstop daily emissions rate provisions, noting their benefit to downwind receptors on potential nonattainment days, their benefit to neighboring communities, and evidence of deterioration in SCR performance in the absence of such provisions. Other commenters stated that the backstop daily emissions rate provisions are unnecessary, either because SCR-equipped EGUs would already be sufficiently incentivized to operate and optimize their controls by the stringency of the state emissions budgets and the resulting allowance prices or because most SCR-equipped EGUs are already required to operate and optimize their SCRs by conditions in their operating permits. Some commenters cited previous EPA analyses showing that it is unusual for SCR-equipped units to turn off their SCRs only on high electricity demand days (HEDD).

Commenters suggested diverse possible changes to the types of EGUs that would be covered by the backstop daily emissions rate provisions. Some commenters stated that the provisions should apply to all EGUs or to all SCR-equipped EGUs, including non-coal-fired units. Other commenters stated that exemptions should be provided for units operating at capacity factors below 10 percent or for emissions during emergencies.

Some commenters stated that implementation of the backstop daily emissions rate provisions would cause unintended and counterproductive consequences. Some of these commenters claimed that by requiring the surrender of extra allowances, the backstop emissions rate provisions would create shortages of allowances for the program overall. Other commenters claimed that the disincentives to operate units subject to the backstop emissions rate provisions would cause load to shift to higher-emitting generators not covered by the trading program (such as sources in states outside the program's geographic region, EGUs smaller than 25 MW, and sources considered demand-side resources, including end-user-sited diesel generator units), potentially resulting in higher overall emissions.

*Response:* The EPA agrees that backstop daily emissions rate provisions should be implemented and disagrees

with comments suggesting that the need for the backstop daily emissions rate provisions is contradicted by previous EPA analyses or is already adequately addressed by other provisions of this rule or other legal requirements. As discussed in sections V.D.1 and VI.B.1.c of this document, the EPA has determined that a control stringency reflecting universal installation and operation of SCR technology at large coal-fired EGUs is appropriate. There are several important differences between this rule and previous actions addressing interstate ozone transport where the Agency did not include such provisions. First, this rule constitutes a full remedy, unlike some prior actions. Second, this rule is the first rule in which the EPA is addressing good neighbor obligations with respect to the more protective 2015 ozone NAAQS. Third, the EPA has examined the most recent data over a broader geographic and temporal footprint specific to the coverage of this rule, and it illustrates a greater degree of SCR performance erosion than in the prior years in which EPA conducted such analysis. Fourth, nonattainment and maintenance for this NAAQS are projected to persist well into the future in EPA's baseline, making enhancements and safeguards such as the backstop daily emissions rate provisions essential for securing elimination of significant contribution in future periods for which fleet configuration is inherently more uncertain.

With respect to claims that inclusion of the backstop daily emissions rate provisions is contradicted by the EPA's earlier analyses concerning SCR operational changes specific to high electricity demand days, the EPA disagrees. Historical data reported to the EPA show that multiple SCR-equipped units across the states covered by this action have chosen not to operate their SCRs, or to operate them at materially less than their full removal capability, for entire ozone seasons. The apparent infrequency of one type of behavior— *i.e.,* instances of units running their controls on most days but turning the controls off specifically on high electricity demand days—does not contradict the evidence concerning another type of behavior—*i.e.,* non-operation or suboptimal operation of controls for entire ozone seasons. The evidence from previous trading programs demonstrates that reliance solely on the incentives created by allowance prices and corresponding static state emissions budgets has been insufficient to cause all SCR-equipped

units to operate and optimize their controls for entire ozone seasons.

The EPA acknowledges that some SCR-equipped units are likely already subject to other legal requirements calling for their SCR controls to be operated and optimized such that their seasonal average NOX emissions rates will generally not exceed 0.08 lb/mmBtu (the level of seasonal SCR performance that the EPA used to derive the equivalent 0.14 lb/mmBtu level of daily SCR performance for the backstop daily NOX emissions rate). However, commenters do not claim, and the EPA does not believe, that *all* SCR-equipped units are subject to other legal requirements calling for an equivalent degree of SCR operation and optimization. In the context of a multi-state trading program, it is more efficient and equitable, and far more transparent, for the EPA to establish rule provisions uniformly incentivizing all large coal-fired EGUs to install and operate SCR controls than to attempt to establish differentiated requirements for various units according to the EPA's analysis of the effectiveness of their pre-existing permit conditions. Further, to the extent that a given unit's permits already require SCR performance that would meet the backstop emissions rate established in this rule, or to the extent that allowance prices would incentivize the unit to operate the SCR anyway, the EPA expects that the backstop daily emissions rate provisions (as finalized with a 50-ton threshold to address emissions outside an EGU's control before the 3-for-1 surrender ratio applies) will cause no incremental cost for the unit.

The EPA disagrees with the suggested changes to applicability of the backstop emissions rate provisions. With respect to the comments advocating broader coverage, the EPA discusses its reasons for applying the provisions only to coal-fired EGUs in section VI.B.1.c of this document, including the fact that operation of SCR controls is a well-established practice among the best performing coal-fired boilers but not for non-coal-fired units.[334] The comments indicate a preference for a less flexible trading program design than the EPA has found appropriate but do not demonstrate that EPA's decision to allow greater flexibility is either impermissible or unreasonable; our reasoning in this regard is further explained in section VI.B.1.c.i of this

---

[334] Nationwide and among operating units in 2021, EPA identified the best performing quartile (*i.e.,* lowest ozone season emissions rate) of coal-fired EGU boilers (excluding CFB units). Nearly 100 percent of these units (159 of 160 units) were equipped with SCR controls.

document. With respect to the comments advocating narrower coverage, the commenters have provided no information indicating that the sources for which exemptions are sought could not comply with the provisions, including through the surrender of additional allowances if necessary. The EPA notes that emissions from coal-fired units operating at low capacity factors may be concentrated around days of high electricity demand when incentives to minimize such emissions may be most helpful in mitigating downwind air quality problems. The EPA also notes that to the extent the comments are intended to support exemptions for units without existing SCR controls, the final rule defers application of the backstop emissions rate provisions to such units until the 2030 control period, providing additional flexibility to develop alternatives to the use of such units if the owners choose not to equip them with SCR controls.

Finally, the EPA also disagrees with the comments asserting that the backstop emissions rate provisions would cause unintended and counterproductive consequences. With respect to units already equipped with SCR controls, the EPA expects that by far the most important effect of the provisions will be to incentivize the units to operate and optimize their controls. The EPA sees no basis for speculation that such units would choose to operate in a manner that would result in large amounts of emissions becoming subject to the 3-for-1 allowance surrender ratio or in generation being shifted to sources outside the trading program. The results of the EPA's modeling of benefits and costs of the rule show little leakage of emissions to non-covered sources, and commenters have presented no analysis to the contrary. For instance, as shown in Table 4.6 of the *RIA*, non-covered state ozone season NO<sub>X</sub> emissions increased on average by 1 percent over the 2023–2030 time period between the base and final rule scenarios, while covered state emissions fell by 14 percent on average over the same period. With respect to units without existing SCR controls, the EPA expects the backstop emissions rate provisions, when they would take effect for such units, to provide a strong incentive against extensive operation (unless and until such controls are installed), again not resulting in large amounts of emissions becoming subject to the 3-for-1 allowance surrender ratio.

*Comment:* For units with existing SCR controls, the aspect of the backstop daily emissions rate provisions that

received the most attention in comments was how emissions outside the operator's control should be treated. Multiple commenters expressed concern that the backstop daily emissions rate would be exceeded on days when the SCR equipment cannot be operated for all or a portion of the day. The most commonly cited example of a situation where SCR equipment cannot be operated was unit startups, although some commenters also mentioned unit shutdowns, boiler or emissions control malfunctions, and unit maintenance or tests. The commenters expressed the view that emissions that cannot be controlled by SCR equipment should be exempted from the backstop emissions rate provisions and suggested a variety of approaches for implementing an exemption.

Some commenters also stated that the backstop emissions rate provisions would not sufficiently accommodate sustained low-load operation, such as where an SCR-equipped unit operates for extended periods at a load level too low to permit SCR operation so that the unit is ready to ramp up to higher load levels in less time than would be required for a startup. The commenters suggested that implementation of a backstop daily rate would reduce the ability to operate the units in this manner, generally reducing system flexibility. Some noted that the need for flexibility of this nature is increasing because of the rapid growth in intermittent renewable generation.

Additional comments on the backstop daily emissions rate provisions for units with existing SCR controls addressed the level of the daily emissions rate and the implementation timing. With respect to the rate level, various commenters suggested rates from 0.08 to 0.20 lb/mmBtu. With respect to implementation timing, some commenters stated that because immediate compliance was possible, the good neighbor provision required implementation as of the 2023 control period rather than the 2024 control period as proposed. Other commenters expressed the view that units with existing SCR controls should not be required to comply with the backstop emissions rate provisions earlier than units without existing SCR controls. Some owners of SCR-equipped EGUs that exhaust to stacks shared with EGUs without SCR suggested that their particular units with existing SCR controls should not be required to comply with the backstop emissions rate provisions earlier than units without existing SCR controls in order to avoid the cost of upgrading their emissions monitoring equipment.

*Response:* With respect to the topic of emissions outside an operator's control, as a general matter the EPA agrees that the backstop daily emissions rate provisions are intended to incentivize good SCR operation and that it was not the Agency's intent to apply a higher surrender ratio to emissions that are truly unavoidable, such as emissions occurring before an operator could reasonably initialize SCR operation when a unit is started up. As explained elsewhere in this section, the EPA selected the level of the backstop rate based on analysis of 2021 emissions data showing that for SCR-equipped coal-fired units achieving seasonal average NO<sub>X</sub> emissions rates at or below 0.08 lb/mmBtu, more than 99 percent of the units' emissions would fall below a backstop daily emissions rate of 0.14 lb/mmBtu. In response to the comments summarized previously, the EPA has further analyzed 2021 and 2022 emissions data to determine what if any modifications to the proposal might be appropriate to limit the imposition of a 3-to-1 allowance surrender requirement for emissions caused by circumstances outside an operator's control while preserving the intended incentive to operate and optimize SCR controls whenever possible. The analysis showed that for the same set of units achieving seasonal average emissions rates at or below 0.08 lb/mmBtu, the highest total amount of emissions exceeding the backstop daily emissions rate in either the 2021 or 2022 control period for any unit was 48 tons. The Agency views this amount as a reasonable upper bound on the quantity of emissions that might contribute to an exceedance of the backstop emissions rate arising from circumstances outside an operator's control for any coal-fired unit, not just the well-controlled units in the data set analyzed, because the amount generally encompasses all of a unit's emissions occurring in hours when an SCR could not be operated over an ozone season.

Based on this analysis, the backstop daily emissions rate provisions in this final rule exclude the first 50 tons of a unit's emissions in a given control period exceeding the backstop daily emissions rate from incremental allowance surrender requirements. The EPA finds that establishing a threshold of this nature will provide an appropriate maximum exclusion to all coal-fired units for unavoidable emissions caused by circumstances outside the operator's control while maintaining the incentives for less well-controlled units to improve their emissions performance on all days of

the ozone season. Well-controlled units will likely have no emissions over the threshold that will be subject to incremental allowance surrender requirements, while for SCR-equipped units not already achieving a seasonal average emissions rates sufficiently low to routinely operate at daily average emissions rates of 0.14 lb/mmBtu or less, the incentive to reduce daily emissions rates will remain in place, because the 50-ton threshold is not expected to encompass all emissions exceeding the backstop daily emissions rate for such units. In contrast to more complicated exceptions suggested by commenters, the 50-ton threshold can be easily integrated into the overall trading program structure with minimal additional recordkeeping and reporting requirements.

With respect to the comments claiming that the inability of some SCR-equipped units to operate their SCR controls at sustained low load levels likewise merits alteration of the backstop daily emissions rate provisions, the EPA disagrees. There is no dispute concerning the technical need for a unit to attain and maintain a certain range of exhaust gas temperatures at the SCR inlet in order to achieve optimal SCR performance and no dispute concerning the general relationship between a unit's load level in a given hour and its ability to attain and maintain that exhaust gas temperature range in that hour. However, the EPA is also aware that at least in some cases, units whose role in the integrated electric system currently calls for them to operate at low load levels for sustained periods (such as overnight) in fact may be able to operate at slightly higher load levels that would accommodate SCR operation during those periods and still meet the needs of the integrated electric system, thereby avoiding operation of the unit for sustained periods with the SCR out of service. Figure B.5 in the EGU NO$_X$ Mitigation Strategies Final Rule TSD illustrates this opportunity using data reported for the 2021 and 2022 ozone seasons by a large SCR-equipped EGU in Pennsylvania. In both ozone seasons, the unit often cycled daily between its maximum load of approximately 900 MW during the daytime and a lower load level overnight, and in both ozone seasons the unit's typical daytime emissions rate was between 0.05 and 0.07 lb/mmBtu. However, while in the 2021 ozone season, the unit cycled down to a load level of approximately 440 MW overnight and did not operate its SCR, in the 2022 ozone season, when allowance prices were considerably

higher, the unit cycled down to a load level of approximately 540 MW overnight and did operate its SCR. Despite the higher nighttime generation levels, the result was a decrease of roughly 50 percent in the unit's seasonal average NO$_X$ emissions rate, from approximately 0.14 lb/mmBtu to approximately 0.07 lb/mmBtu, and a comparable reduction in NO$_X$ mass emissions. This unit is not uniquely situated; operating data for several other large SCR-equipped EGUs in Pennsylvania show the same past pattern of cycling down to low load levels at which the SCR controls cannot be operated, and these other units have similar opportunities to cycle down to somewhat higher load levels (necessarily subject to the needs and constraints of the integrated electric system) at which their SCR controls can be operated.[335] No commenter has submitted data to the contrary. Furthermore, this example demonstrates the need for this rule's backstop daily emissions rate provision, which (had it been in place) would have motivated this facility to operate its SCR overnight during the 2021 ozone season when the prevailing allowance price provided an insufficient incentive to do so.

The EPA disagrees with the comments advocating for a backstop daily emissions rate lower or higher than 0.14 lb/mmBtu. In general, these comments simply represent disagreements with the EPA's conclusions regarding the identification of required emissions reductions under this rule, as reflected in part by the EPA's conclusion that a seasonal average emissions rate of 0.08 lb/mmBtu reasonably reflects the seasonal average emissions rate achievable through optimization of controls by existing SCR-equipped units that are not already achieving a lower seasonal average emissions rate. Comments concerning the selection of the 0.08 lb/mmBtu seasonal average emissions rate are addressed in section V of this document. Commenters did not challenge the EPA's analysis identifying a daily emissions rate of 0.14 lb/mmBtu as comparable in stringency to a seasonal average emissions rate of 0.08 lb/mmBtu (see further discussion elsewhere in this section).

The EPA also disagrees with the comments stating that the backstop daily emissions rate provisions should apply to units with existing SCR controls starting in a control period earlier or later than the 2024 control period. The EPA does not consider

implementation of the provisions in the 2023 control period feasible because it is currently unknown whether the necessary updates to the emissions recordkeeping and reporting software for all the affected sources could be completed and tested before July 30, 2023, which is the first quarterly reporting deadline for the 2023 control period. Moreover, as discussed in section VI.B.1.c.i of this document, implementing the requirements starting in 2024 will provide a window for EGUs to improve the consistency of SCR operation or in some cases to optionally install additional emissions monitoring equipment. As for the suggestion that implementation timing of the backstop daily emissions rate provisions for units with existing SCR controls should be synchronized with the later implementation timing for units without existing SCR controls, the EPA is not persuaded that there is any inequity in implementing provisions intended to incentivize operation of SCR controls first at sources that already have such controls and later at sources that do not already have such controls, allowing time for the latter sources to install the controls. In any event, in this instance, where some upwind sources have an immediate and highly cost-effective option for controlling their emissions, the statutory requirement for significant contribution to be eliminated as expeditiously as practicable so as to provide downwind states with the protection intended by the Good Neighbor provision overrides these sources' claim of inequity relative to sources whose emissions control options would take longer and have higher cost. We conclude that the backstop daily emissions rate is an important aspect of the elimination of significant contribution and should be applied at the relevant units. It is only out of recognition of unique circumstances associated with facilitating power-sector transition as identified by commenters, that we defer the application of the rate for the minority of units that have not yet installed SCR controls.

Finally, with respect to the SCR-equipped units that share common stacks with units that do not have SCR, the EPA disagrees that monitoring cost considerations merit a later implementation date for the backstop daily emissions rate provisions. As discussed in section VI.B.10 of this document, five plants with this configuration are covered by the rule (one of which has announced plans to retire in 2023). Under this rule, as proposed, the owner of a plant with this

---

[335] See the spreadsheet "Conemaugh and Keystone unit 2021 to 2022 hourly ozone season data" in the docket.

configuration can choose between either upgrading the plant's monitoring systems so as to obtain unit-specific $NO_X$ emissions rate data for each unit subject to the backstop daily emissions rate or else using the $NO_X$ emissions rate data from the common stack, recognizing that the common stack emissions rate would generally be biased upwards relative to the emissions rate that could be reported for the SCR-equipped unit if that unit's emissions were monitored separately. Commenters have suggested a third option of a temporary exemption from the backstop emissions rate to avoid the cost of upgrading their monitoring systems. With the timing for implementation of the backstop emissions rate provisions for currently uncontrolled units in the proposal, the temporary exemption for the SCR-equipped units would have been in place for three control periods, from 2024 through 2026. With the final rule's deferral of the implementation of the backstop emissions rate provisions for the uncontrolled units for up to three years, the suggested temporary exemption for the SCR-equipped units would be in effect for up to six control periods, from 2024 through 2029. The EPA does not consider it reasonable to allow these SCR-equipped units an exemption from the backstop rate provisions for six years to avoid the cost of upgrading their monitoring systems, particularly given that the additional costs of monitoring at the individual-unit level are already borne by the large majority of other plants and the rule already provides these plants with an alternative to the monitoring system upgrades, if desired, by allowing the plants to use the emissions rate data from the common stack.[336]

*Comment:* With respect to units without existing SCRs, some commenters viewed the backstop daily emissions rate provisions as likely to make units without SCR altogether unwilling or unable to operate and characterized the provisions as a mandate for such units to install such controls or retire as of the control period when the provisions are implemented. Other commenters acknowledged that the provisions are not actually hard limits but stated that the higher allowance surrender ratio for emissions in excess of the backstop daily rate would nevertheless reduce the ability of

such units to operate as needed to back up intermittent renewable generation. Some commenters claimed that inclusion of the backstop daily emissions rate provisions would substantially eliminate the potential benefits of allowance trading, because all units would have to meet the same emissions rate.

Some commenters stated that the proposed application of the daily backstop emissions rate provisions in the 2027 control period in some cases would occur only slightly before the units' otherwise planned retirement dates, and that short-term reliability considerations could create the need to make substantial investments in new controls at the units, which in turn could result in deferral of the units' retirement plans. In the proposal, the EPA requested comment on the possibility of deferring the application of the backstop emissions rate provisions to units without existing SCR controls until the 2029 control period if the owners provided the EPA with information indicating with sufficient certainty that the units would retire by the end of 2028. Commenters in favor of this concept suggested longer deferral periods, ranging from 2029 through 2032, and some also suggested that the EPA should simultaneously enlarge the emissions budgets to provide more allowances for units subject to the deferred requirement. Other commenters opposed any deferral of the applicability of the backstop rate provisions.

*Response:* The EPA disagrees that implementation of the backstop daily emissions rate provisions for EGUs without existing SCR controls constitutes a mandate for such units to install controls or retire but agrees that, as intended, the provisions would create strong incentives to minimize operation of the units unless and until controls are installed, and further agrees that in some instances retirement and replacement may be a more economically attractive option for the unit's customers and/or owners than installation of new controls. The EPA's rationale for determining at Step 3 that the control stringency required to address states' good neighbor obligations includes achievement of emissions rates consistent with good SCR performance at all large coal-fired EGUs (other than circulating fluidized bed boilers) is discussed in section V.D.1 of this document, and the EPA's rationale for determining at Step 4 that the trading program should include strong unit-level incentives to implement these controls is discussed in section VI.B.1.c. of this document. As

noted in section VI.B.1.c of this document, the backstop daily emissions rate provisions are structured as incremental allowance surrender requirements rather than as directly enforceable emissions limits to incentivize improved emissions performance at the individual unit level while continuing to preserve, to the extent possible, the advantages that the flexibility of a trading program brings to the electric power sector. The EPA appreciates that, in comparison to previous transport rules using a trading program mechanism for the power sector, the degree of flexibility available under this rule is reduced both by the greater stringency of the overall emissions reduction requirements, which leave less room to accommodate emissions from high-emitting units such as uncontrolled coal-fired units, and by the backstop daily emissions rate provisions. However, the EPA maintains that the trading program structure still is significantly more flexible than an array of directly enforceable emissions limits imposed on all EGUs or even on all coal-fired EGUs, and the comments do not show otherwise.

With respect to the comments concerning the timing for application of the backstop daily emissions rate provisions to EGUs without existing SCR controls, in the final rule the provisions will apply to these units starting with the second control period in which newly installed SCR controls are operational at the unit, but not later than the 2030 control period. As discussed in section VI.B.1.d of this document, the purpose of this change from the proposal is to address concerns expressed by RTOs and other commenters that application of the backstop daily $NO_X$ emissions rate to EGUs without existing SCR controls starting in the 2027 control period would provide insufficient time for planning and investments needed to facilitate the unit retirements they viewed as likely to be a preferred compliance pathway for some owners. The EPA recognizes that retrofitting new emissions controls on aging coal-fired EGUs may be less environmentally efficient than the alternative of retirement and replacement, which could yield lower cumulative emissions of $NO_X$ and multiple other pollutants over time. The EPA also recognizes that several coal-fired EGUs have already been considering retirement in 2028 (or earlier) under compliance pathways available under the Clean Water Act effluent guidelines [337] and the coal combustion residuals rule under the

---

[336] The owner of one of the five plants with common stacks submitted comments stating that no location in the plant's ductwork could meet the criteria for a unit-specific monitoring location. As discussed in section VI.B.10 of this document, EPA staff have reviewed the comment and do not believe the commenter has provided sufficient information to reach such a conclusion.

[337] See 40 CFR 423.11(w).

Resource Conservation and Recovery Act.[338] The year 2028 also represents the end of the second planning period under the Regional Haze program, and thus is a significant year in states' planning of strategies to make reasonable progress towards natural visibility at Class I areas.[339] In addition, other regulatory actions at the state or Federal level are being or recently have been proposed. This includes among other things a proposed revision to the PM NAAQS for which transport SIPs would be due later in the 2020s. We understand that EGUs may wish to take the entire regulatory and market landscape into account when deciding whether to invest in SCR or pursue other NO$_X$ reduction strategies. To facilitate a unit-level compliance alternative under this rule that maintains the NO$_X$ reductions corresponding to SCR-level emissions control performance required by the state budgets from 2026 forward and that is potentially superior both economically and environmentally across multiple regulatory programs than installation of new, capital-intensive, post-combustion controls, the EPA is providing the fleet more flexibility in how to achieve those emissions reductions in the years through 2029. Relatedly, the deferral of the application of the backstop emissions rate provisions to uncontrolled units also addresses commenters' concerns that the provisions otherwise would reduce the ability of uncontrolled units to operate as needed to back up intermittent renewable generation (subject of course to the allowance-holding requirements to cover emissions). The deferral addresses this concern directly for the period through 2029, by eliminating application of the backstop provisions to uncontrolled EGUs through this period, and also indirectly after 2029, by ensuring the availability of sufficient time for owners and operators to complete other investments that may be needed to back up renewable generation after that point.

The EPA disagrees with the comments stating that application of the backstop daily emissions rate provisions to uncontrolled CAIR should not be deferred and also disagrees with the comments stating that deferral should be accompanied by increases in the state emissions budgets reflecting higher assumed emissions rates for these units. The responses to these two comments are related. This rule complies with the mandate for the EPA to address good

neighbor obligations as expeditiously as practicable and is based on a demonstration that emissions reductions commensurate with the overall emissions control strategy at Step 3 can be achieved beginning in the 2027 ozone season (following a two-year phase in of emissions reductions associated with installation of SCR retrofits). In the *RIA*, we demonstrate that EGUs will have multiple pathways to meeting the state budgets even if they choose not to install the SCR controls—thus no relaxation in the stringency of these budgets has been demonstrated to be warranted based on feasibility, necessity, or impossibility. The EGU emissions modeling discussed in the *RIA* illustrates that many sources identified as currently having SCR retrofit potential elect not to install a SCR, and those that do retrofit SCR make no such installation until 2030. Yet, the fleet is able to comply with 2026 state emissions budgets (whose emissions reductions are premised in large part on assumed SCR retrofits) through reduced utilization (many of these units are projected to retire, and thus reduce emissions). While these changes in coal fleet utilization are not required or imposed through the EPA's state emissions budgets, they are projected to be an economic preference for a substantial portion of the unretrofitted fleet owing to future market and policy conditions. If sources do ultimately elect this pathway, then compliance will occur with significantly less demand on SCR retrofit labor and material markets than assumed at Step 3. The daily emissions rates are a backstop to the broader emissions reduction requirements, which we view as an important and necessary component to the elimination of significant contribution. But we also recognize that the objectives to be accomplished by the backstop must be balanced with larger economic and environmental conditions facing EGUs for which a deferral of the backstop rate ultimately is the most reasonable approach given these competing concerns. *See Wisconsin,* 938 F.3d at 320 ("EPA, though, possesses a measure of latitude in defining which upwind contribution 'amounts' count as 'significant[ ]' and thus must be abated."). As noted in section VI.B.1.d of this document, the EPA finds that as long as state emissions budgets continue to reflect the required degree of emissions reductions at least for an interim period until the backstop rate would apply more uniformly, deferral of the backstop rate requirement for uncontrolled units in recognition of the

transition period identified by commenters can be justified on the basis of the greater long-term environmental benefits obtained through greater compliance flexibility.

8. Unit-Specific Emissions Limitations Contingent on Assurance Level Exceedances

As emphasized by the D.C. Circuit in its decision invalidating CAIR, under the CAA's good neighbor provision, emissions "within the State" that contribute significantly to nonattainment or interfere with maintenance of a NAAQS in another state must be prohibited. *North Carolina* v. *EPA,* 531 F.3d 896, 906–08 (D.C. Cir. 2008). The CAIR trading programs contained no provisions limiting the degree to which a state could rely on net purchased allowances as a substitute for making in-state emissions reductions, an omission which the court found was inconsistent with the requirements of the good neighbor provision. *Id.* In response to that holding, the EPA established the CSAPR trading programs' assurance provisions to ensure that, in the context of a flexible trading program, the emissions reductions required under the good neighbor provision in fact will take place within the state. The EPA believes the assurance provisions have generally been successful in achieving that objective, as evidenced by the fact that since the assurance provisions took effect in 2017, out of the nearly 300 instances where a given state's compliance with the assurance provisions of a given CSAPR trading program for a given control period has been assessed, a state's collective emissions have exceeded the applicable assurance level only four times.

Unfortunately, the EPA also recognizes that the assurance provisions' very good historical compliance record is not good enough. The four past exceedances all occurred under the Group 2 trading program: sources in Mississippi collectively exceeded their applicable assurance levels in the 2019 and 2020 control periods, and sources in Missouri collectively exceeded their applicable assurance levels in the 2020 and 2021 control periods.[340] Both of the exceedances by Missouri sources could easily have been avoided if the owner and operator of several SCR-equipped,

[340] Information on the assurance level exceedances in the 2019, 2020, and 2021 control periods is available in the final notices concerning EPA's administration of the assurance provisions for those control periods. 85 FR 53364 (August 28, 2020); 86 FR 52674 (September 22, 2021); 87 FR 57695 (September 21, 2022).

---

[338] See 40 CFR 257.103(b).

[339] See 40 CFR 51.308(f).

coal-fired steam units had not chosen to idle the units' controls and rely instead on net out-of-state purchased allowances. The exceedances were large, and ample quantities of allowances to cover the resulting 3-for-1 allowance surrender requirements were purchased in advance, suggesting that the assurance level exceedances may have been anticipated as a possibility. In the case of the Mississippi exceedances, the exceedances were smaller, operational variability (manifesting as increased heat input) appears to have been a material contributing factor, and the EPA has not concluded that the owners and operators anticipated the exceedances. However, an additional contributing factor was the fact that several large, gas-fired steam units without SCR controls emitted $NO_X$ at average rates much higher than the average emissions rates the same units had achieved in previous control periods. In short, while the Missouri exceedances appear far more significant, the EPA's analysis indicates that all four past exceedances could have been avoided if the units most responsible had achieved emissions rates more comparable to the same units' previous performance. In the EPA's view, the operation of the Missouri units in particular—although not prohibited by the current regulatory requirements—cannot be reconciled with the statutory requirements of the good neighbor provision. The fact that such operation is not prohibited by the current regulations therefore indicates a deficiency in the current regulatory requirements.

To correct the deficiency in the regulatory requirements, the EPA in this rulemaking is revising the Group 3 trading program regulations to establish an additional emissions limitation to more effectively deter avoidable assurance level exceedances starting with the 2024 control period. Because the pollutant involved is ozone season $NO_X$ and the particular sources for which deterrence is most needed are located in states that are transitioning from the Group 2 trading program to the Group 3 trading program, the EPA is promulgating the strengthening provisions as revisions to the Group 3 trading program regulations rather than the Group 2 trading program regulations.[341]

The two historical emissions-related compliance requirements in the Group 3 trading program regulations are both structured in the form of requirements to hold allowances. The first requirement applies at the source level: specifically, at the compliance deadline after each control period, the owners and operators of each source covered by the program must surrender a quantity of allowances that is determined based on the emissions from the units at the source during the control period. The second requirement applies at the designated representative level (which typically is the owner or operator level): if the state's sources collectively emit in excess of the state's assurance level, the owners and operators of each set of sources determined to have contributed to the exceedance must surrender an additional quantity of allowances. As long as a source's owners and operators comply with these two allowance surrender requirements (and meet certain other requirements not related to the amounts of the sources' emissions), they are in compliance with the program.

In light of the operation of the Missouri sources, the EPA is doubtful that strengthening the assurance provisions by increasing allowance surrender requirements at the unit, source, or designated representative level would create a sufficient deterrent. Accordingly, the EPA is instead adding a new, unit-level emissions limitation structured as a prohibition to emit $NO_X$ in excess of a defined amount. A violation of the prohibition will not trigger additional allowance surrender requirements beyond the surrender requirements that would otherwise apply, but will trigger the possible application of the CAA's enforcement authorities. The new emissions limitation will be in addition to, not in lieu of, the other requirements of the Group 3 trading program. This point is being made explicit by relabeling the source-level allowance holding requirement, currently called the "emissions limitation," as the "primary emissions limitation" and labeling the

new unit-level requirement as the "secondary emissions limitation." (The regulations label the designated representative-level requirement as "compliance with the . . . assurance provisions.")

Because the purpose of the new unit-level secondary emissions limitation is to deter conduct causing exceedances of a state's assurance level, the EPA is conditioning applicability of the new limitation on (1) the occurrence of an exceedance of the state's assurance level for the control period, and (2) the apportionment of at least some of the responsibility for the assurance level exceedance to the set of units represented by the unit's designated representative. Apportionment of responsibility for the assurance level exceedance will be carried out according to the existing assurance provision procedures and will therefore depend on the designated representative's shares of both the state's total emissions for the control period and the state's assurance level for the control period. To ensure that the secondary emissions limitation is focused on units where the need for improved incentives is greatest, and also to ensure that the limitation will not apply to units used only to meet peak electricity demand, the limitation applies only to units that are equipped with post-combustion controls (*i.e.,* SCR or SNCR) and that operated for at least ten percent of the hours in the control period in question and in at least one previous control period.

For units to which a secondary emissions limitation applies in a given control period based on the conditions just summarized, the limitation is defined by a formula in the regulations. The formula is generally designed to compute the potential amount the unit would have emitted during the control period, given its actual heat input during the control period, if the unit had achieved an average emissions rate equal to the unit's lowest average emissions rate in a previous control period plus a margin of 25 percent. To ensure that the data used to establish the unit's lowest previous average emissions rate are representative and of high quality, only past control periods where the unit participated in a CSAPR trading program for ozone season $NO_X$ and operated in at least ten percent of the hours in the control period are considered. Further, to avoid causing units that achieve emissions rates lower than 0.08 lb/mmBtu from becoming subject to more stringent secondary emissions limitations in subsequent control periods, the secondary emissions limitation formula uses a

the same revisions to the assurance provisions for all the other CSAPR trading programs. The EPA is not doing so at this time because the Agency has seen no reason to expect exceedances of the assurance levels under any of the other CSAPR trading programs by any of the states that will remain subject to the respective trading programs after this rulemaking, except possibly by Missouri under the CSAPR $NO_X$ Annual Trading Program. The EPA expects that reductions in Missouri's seasonal $NO_X$ emissions sufficient to comply with the proposed provisions of the revised Group 3 trading program, including the secondary emissions limitations, would also prevent exceedances of Missouri's currently applicable assurance level for annual $NO_X$ emissions.

[341] The EPA believes that the occurrence of avoidable assurance level exceedances under the Group 2 trading program, combined with the express statutory directive that good neighbor obligations must be addressed "within the state," and through "prohibition," would also provide a sufficient legal basis for the Agency to promulgate

**Federal Register** / Vol. 88, No. 107 / Monday, June 5, 2023 / Rules and Regulations          **36799**

floor emissions rate of 0.10 lb/mmBtu (which is 0.08 lb/mmBtu plus the formula's 25 percent margin). In addition to making sure that performance better than 0.08 lb/mmBtu is not disincentivized, the inclusion of the floor emissions rate also ensures that no unit achieving an average emissions rate of 0.10 lb/mmBtu or less in a given control period will exceed a secondary emissions limitation in that control period. Finally, the formula includes a 50-ton threshold, which will avert violations for small performance deviations at large EGUs and also ensure that no unit emitting less than 50 tons in a given control period will exceed a secondary emissions limitation in that control period.

In summary, a secondary emissions limitation is applicable to a unit for a given control period only if the state's assurance level is exceeded, responsibility for the exceedance is apportioned at least in part to the set of units represented by the unit's designated representative, the unit is equipped with post-combustion controls, and the unit operated for at least ten percent of the hours in the control period. Where a secondary emissions limitation applies to a unit for a given control period, the amount of the limitation is computed as the sum of 50 tons plus the product of (1) the unit's heat input for the control period times (2) a $NO_X$ emissions rate of 0.10 lb/mmBtu or, if higher, 125 percent times the lowest seasonal average $NO_X$ emissions rate achieved by the unit in a previous control period when the unit participated in a CSAPR trading program for ozone season $NO_X$ emissions and operated in at least ten percent of the hours in the control period.[342]

Table VI.B.8–1 shows the secondary emissions limitations that the formula would have produced and which units would have exceeded those limitations if the limitations and formula had been in effect for the Group 2 trading program in 2020 and 2021 when assurance level exceedances occurred in Missouri. Following consideration of comments, the EPA believes that in each case the formula functions in a reasonable manner, and the Missouri units identified as exceeding their respective secondary emissions limitations are sources for which an enforcement deterrent under CAA sections 113 and 304 would have been appropriate to compel better control of $NO_X$ emissions. Table VI.B.8–1 does not show any units that would have been identified as subject to secondary emissions limitations in the case of the 2019 and 2020 assurance level exceedances in Mississippi because no units in the state meeting all conditions for applicability—including the requirement to be equipped with post-combustion controls—exceeded their respective limitations.

TABLE VI.B.8–1—ILLUSTRATIVE RESULTS OF APPLYING SECONDARY EMISSIONS LIMITATION IN PREVIOUS INSTANCES OF ASSURANCE LEVEL EXCEEDANCES

| Owner/operator | Unit | 125% of Lowest previously achieved $NO_X$ emissions rate (lb/mmBtu) | Actual $NO_X$ emissions rate (lb/mmBtu) | Secondary emissions limitation (tons) | Actual $NO_X$ emissions (tons) | Exceedance (tons) |
|---|---|---|---|---|---|---|
| **Missouri—2020** | | | | | | |
| Assoc. Elec. Coop | New Madrid 1 | 0.135 | 0.670 | 961 | 4,524 | 3,563 |
| Assoc. Elec. Coop | New Madrid 2 | 0.131 | 0.497 | 866 | 3,108 | 2,242 |
| Assoc. Elec. Coop | Thomas Hill 1 | 0.123 | 0.526 | 374 | 1,384 | 1,010 |
| Assoc. Elec. Coop | Thomas Hill 2 | 0.122 | 0.537 | 548 | 2,187 | 1,639 |
| Assoc. Elec. Coop | Thomas Hill 3 | 0.104 | 0.195 | 780 | 1,374 | 594 |
| **Missouri—2021** | | | | | | |
| Assoc. Elec. Coop | New Madrid 1 | 0.135 | 0.652 | 353 | 1,466 | 1,113 |
| Assoc. Elec. Coop | New Madrid 2 | 0.131 | 0.611 | 1,054 | 4,700 | 3,646 |
| Assoc. Elec. Coop | Thomas Hill 1 | 0.123 | 0.146 | 421 | 440 | 19 |
| Assoc. Elec. Coop | Thomas Hill 2 | 0.122 | 0.400 | 600 | 1,801 | 1,201 |

For further illustrations of the application of the secondary emissions limitation formula to other units in the states to be subject to the expanded Group 3 trading program in the control periods from 2016 through 2021, see the spreadsheet "Illustrative Calculations Using Proposed Secondary Emissions Limitation Formula," available in the docket. The EPA notes that, with the exception of the units listed in Table VI.B.8–1, no unit shown in the spreadsheet as having emissions exceeding the illustrative secondary emissions limitation calculated for the unit would have violated the prohibition because no violation would occur in the absence of an exceedance of the assurance level and apportionment of responsibility for a share of the exceedance to the unit under the assurance provisions.

The secondary emissions limitation provisions are being finalized as proposed except for the addition of the condition that a unit to which the provisions apply must be equipped with post-combustion controls. The EPA's responses to comments concerning the secondary emissions limitation provisions, including the comments giving rise to the change just mentioned, are in the remainder of this section and section 5 of the *RTC* document.

*Comment:* Some commenters stated that the secondary emissions limitation is not necessary, or would be a disproportionate remedy, because experience shows that exceedances of the assurance level have been rare, and where exceedances of a state's assurance level have occurred, the 3-for-1 surrender ratio under the existing regulations has applied, providing a sufficient remedy.

*Response:* The EPA disagrees with these comments. The purpose of the assurance provisions in the CSAPR trading programs is to ensure that the emissions reductions required to address a state's obligations under the Good Neighbor Provision occur "within the state" as mandated by the CAA. See *North Carolina* v. *EPA*, 531 F.3d 896, 906–08 (D.C. Cir. 2008). Prior to this action, the sole consequence for an exceedance of a state's assurance level

---

[342] For the actual regulatory language, see 40 CFR 97.1025(c) as added by this rule.

has been a requirement to surrender two additional allowances for each ton of the exceedance. The repeated, large, foreseeable, and easily avoidable exceedances of Missouri's assurance level under the Group 2 trading program in 2020 and 2021 have made clear that a remedy based solely on additional allowance surrenders is insufficient to address this statutory requirement and that a materially stronger deterrent is needed.

*Comment:* Some commenters stated that the secondary emissions limitation could apply to exceedances caused by factors outside the control of the EGU operator, going beyond the EPA's intent of deterring exceedances that are foreseeable and avoidable. For example, commenters pointed out that some units that typically combust gas may sometimes be ordered to combust oil at times when supplies of gas are constrained and expressed concern that the resulting higher $NO_X$ emissions could cause a unit to exceed its secondary emissions limitation. Another commenter stated that it is not uncommon for units' seasonal average $NO_X$ emissions rate to vary by more than 25 percent across control periods.

*Response:* The EPA agrees that the secondary emissions limitation is intended to apply to units in a position to avert an exceedance of a state's assurance level. The contention that year-to-year variability of 25 percent in units' seasonal average emissions rates is common is not in itself a persuasive reason to omit the secondary emissions limitation from the final rule, because the mere existence of such variability says nothing about whether the operators of those units could reduce that variability through their operational decisions, and the commenter provided no data regarding the extent to which the historical variability was avoidable. However, the EPA agrees that a secondary emissions limitation should be designed to avoid application to a unit whose increase in emissions rate was caused by mandated combustion of a higher-$NO_X$ fuel than the unit's normal fuel. Moreover, based on the analysis of the secondary emissions limitation formula prepared for the proposal, the EPA has reviewed the applicability of the limitation more generally and has determined that it should apply only to units with post-combustion controls, which are the units with the greatest ability to manage their emissions rates through their operating behavior. This modification will avoid application of a secondary emissions limitation in situations where a unit's increase in seasonal average $NO_X$ emissions rate relative to past

control periods is caused by factors in that control period beyond the operator's control, such as being mandated by a regulator to combust a higher proportion of oil or operating for a higher proportion of hours at load levels where the unit has a higher $NO_X$ emissions rate for reasons other than non-operation of emissions controls.

*Comment:* Some commenters asserted that because it is not known if a state's assurance level has been exceeded until after the end of the control period, EGU operators would be unable to know whether the secondary emissions limitation would apply to them during the control period. Some of these commenters suggested that where a unit has been found to have contributed to an assurance level exceedance, the EPA should apply a secondary emissions limitation to the unit not in that control period but instead in the following control period.

Commenters suggested that uncertainty about whether a unit would be subject to a secondary emissions limitation could have a variety of undesirable consequences. For example, they asserted that some EGUs could become unwilling to operate when needed for reliability because they would be concerned that merely operating more than in previous control periods could cause a unit to exceed its limitation. One commenter asserted that the uncertainty would make it difficult for an owner of multiple EGUs to use allowances allocated to one EGU to meet another EGU's surrender requirements, possibly leading to operating restrictions on multiple EGUs.

*Response:* The EPA disagrees with these comments. While an operator cannot be certain that the secondary emissions limitation *will* apply to a particular EGU until after the end of a control period, the operator can be certain that the limitation *will not* apply to a particular EGU simply by ensuring that the unit's seasonal average $NO_X$ emissions rate does not exceed the higher of 0.10 lb/mmBtu or 125 percent of the unit's lowest seasonal average $NO_X$ emissions rate in a previous control period under a CSAPR trading program (excluding control periods where the unit operated for less than 10 percent of the hours). Because any operator of a unit with post-combustion controls can readily avoid being subject to the limitation, there is no need for application of the limitation to be deferred to the following control period. Deferral of the limitation's application would also have the effect of excusing a unit's first contribution to an assurance level exceedance, which the

EPA views as inappropriate when that exceedance could have been avoided.

The asserted possible consequences of uncertainty about whether the limitation would apply rest on mischaracterizations of the provision. The formula for the limitation reflects the unit's actual heat input for the control period, so there is no penalty for increased operation as long as the unit's seasonal $NO_X$ average emissions rate stays below the level just referenced. Finally, nothing about the secondary emissions limitation disincentivizes an EGU fleet owner from transferring allocated allowances among the fleet's EGUs, because apportionment of responsibility for an assurance level exceedance—one of the conditions for application of the secondary emissions limitation—is determined at the level of the group of units represented by a common designated representative (typically the set of all units operated by a particular owner) rather than the individual unit.

*Comment:* Some commenters stated that the EPA should revise the secondary emissions limitation formula so that where a limitation applies to a unit, the unit's previous $NO_X$ emissions rate used in the formula would not be subject to any floor. These commenters also recommended that if the secondary emissions limitation provisions are not finalized, the EPA instead should raise the allowance surrender ratio applied to exceedances of the assurance level in this final rule.

*Response:* The EPA disagrees with the suggestion to remove the emissions rate floor from the secondary emissions limitation formula, which would have the effect of making the limitation more stringent for any unit that has achieved a seasonal average $NO_X$ emissions rate lower than 0.08 lb/mmBtu in a past control period. As indicated by their label, the secondary emissions limitation provisions play a secondary role in the Group 3 trading program regulations, specifically to provide the strongest possible deterrent against conduct leading to foreseeable and avoidable exceedances of a state's assurance level. The distinguishing feature of the secondary emissions limitation provisions is therefore the remedy for an exceedance, which is potential application of the CAA's enforcement authorities. The trading program's primary role of achieving required emissions reductions in a more flexible and cost-effective manner than command-and-control regulation is played by the primary emissions limitation provisions, which are structured as allowance surrender requirements. Within this overall

trading program structure, the EPA considers it sufficient for the operation of units at emissions rates lower than 0.08 lb/mmBtu to be incentivized through the allowance surrender requirements instead of being mandated through potential application of the CAA's enforcement authorities.

The recommendation to raise the allowance surrender ratio applicable to exceedances of the assurance level if the secondary emissions limitation is not finalized is moot because the secondary emissions limitation is being finalized.

9. Unit-Level Allowance Allocation and Recordation Procedures

In this rule, the EPA is establishing default procedures for allocating CSAPR $NO_X$ Ozone Season Group 3 allowances ("Group 3 allowances") in amounts equal to each state emissions budget for each control period among the sources in the state for use in complying with the Group 3 trading program. Like the allocation processes established in CSAPR, the CSAPR Update, and the Revised CSAPR Update, the revised allocation process finalized in this rule is designed to provide default allowance allocations to all units that are subject to allowance holding requirements. The EPA's allocations and allocation procedures apply for the 2023 control period [343] and, by default, for subsequent control periods unless and until a state or tribe provides state-determined or tribe-determined allowance allocations under an approved SIP revision or tribal implementation plan.[344]

The default allocation process for the Group 3 trading program as updated in this rule involves three main steps. First, portions of each state emissions budget for each control period are reserved for potential allocation to units that are subject to allowance holding requirements and that might not otherwise receive allowance allocations in the overall allocation process, including both "existing" units in any

areas of Indian country not subject to a state's CAA implementation planning authority as well as "new" units anywhere within a state's borders.[345] Second, in advance of each control period, the unreserved portion of the state budget is allocated among the state's eligible existing units, any portion of the state budget reserved for existing units in Indian country not subject to the state's CAA implementation planning authority is allocated among those units, and the allocations are recorded in the respective sources' compliance accounts. Finally, after the control period but before the compliance deadline by which sources must hold allowances to cover their emissions for the control period, allowances from the portion of the budget reserved for new units are allocated to qualifying units, any remaining reserved allowances not allocated to qualifying units are allocated among the state's existing units, and the allocations are recorded in the respective sources' compliance accounts.

While the overall three-step allocation process summarized in this section was also followed in CSAPR, the CSAPR Update, and the Revised CSAPR Update, in this rule the EPA is making revisions to each step to better address units in Indian country and to better coordinate the unit-level allocation process with the dynamic budget-setting process discussed in section VI.B.4 of this document. The revisions to the three steps are discussed in sections VI.B.9.a, VI.B.9.b, and VI.B.9.c, respectively.

a. Set-Asides of Portions of State Emissions Budgets

The first step of the overall unit-level allocation process for a given control period involves reserving portions of each state's budget for the control period in "set-asides." In this rule, the EPA is making several revisions affecting the establishment of set-asides. The first revision, which is largely unrelated to the other aspects of this

rulemaking, will update the regulations for the Group 3 trading program [346] to reflect the D.C. Circuit's holding in *ODEQ* v. *EPA* that the relevant states have initial CAA implementation planning authority in non-reservation areas of Indian country until displaced by a demonstration of tribal jurisdiction over such an area.[347] Consistent with this holding, the EPA is revising language in the Group 3 trading program regulations that prior to this rule, for purposes of allocating allowances from a given state's emissions budget, distinguished between (1) the set of units within the state's borders that are not in Indian country and (2) the set of units within the state's borders that are in Indian country. As revised, the provisions now distinguish between (1) the set of units within the state's borders that are not in Indian country or are in areas of Indian country covered by the state's CAA implementation planning authority and (2) the set of units within the state's borders that are in areas of Indian country not covered by the state's CAA implementation planning authority. The revised language more accurately distinguishes which units are, or are not, covered by a state's CAA implementation planning authority, which is the underlying purpose for which the term "Indian country" is currently used in the allowance allocation provisions. The effect of the revision is that any units located in areas of "Indian country" as defined in 18 U.S.C. 1151 that are covered by a state's CAA implementation planning authority will be treated for allowance allocation purposes in the same manner as units in areas of the state that are not Indian country, consistent with the *ODEQ* holding.[348]

The remaining revisions, which are interrelated, concern the types of set-asides that in the context of this rule will best accomplish the goal of ensuring the availability of allocations to units that are subject to allowance holding requirements and that would

---

[343] The rule does not include an option for states to replace the EPA's unit-level allocations for the 2023 control period because the Agency believes a process for obtaining appropriately authorized allowance allocations determined by a state or tribe could not be completed in time for those allocations to be recorded before the end of the 2023 control period.

[344] The options for states to submit SIP revisions that would replace the EPA's default allowance allocations are discussed in sections VI.D.1, VI.D.2, and VI.D.3 of this document. Similarly, for a covered area of Indian country not subject to a state's CAA implementation planning authority, a tribe could elect to work with the EPA under the Tribal Authority Rule to develop a full or partial tribal implementation plan under which the tribe would determine allowance allocations that would replace the EPA's default allowance allocations for subsequent control periods.

[345] Under this rule, the unit-level allocations to "existing" units are generally computed in the year before the year of each control period, and the determination of whether to treat a particular unit as existing for purposes of that control period's allocations is made as part of the allocation process, generally based on whether the Agency has the data needed to compute an allocation for the unit as an existing unit. A unit that is subject to allowance holding requirements for a given control period and that did not receive an allocation for that control period as an existing unit is generally eligible to receive an allocation from the portion of the budget reserved for "new" units. For further discussion of which units are considered eligible for allocations as existing units or new units in particular control periods, see sections VI.B.9.b and VI.B.9.c.

[346] As discussed in section VI.B.13, the EPA is also making this revision to the regulations for the other CSAPR trading programs in addition to the Group 3 trading program.

[347] For additional discussion of the *ODEQ* v. *EPA* decision and other issues related to the CAA implementation planning authority of states, tribes, and the EPA in various areas of Indian country, *see* section III.C.2.

[348] The EPA notes that the units that will be treated for allocation purposes in the same manner as units not in Indian country will include units in any areas of Indian country subject to a state's CAA implementation planning authority, whether those are non-reservation areas (consistent with *ODEQ*) or reservation areas (such as areas of Indian country within Oklahoma's borders covered by the EPA's October 1, 2020 approval of Oklahoma's request under SAFETEA, as discussed in section III.C.2).

not otherwise receive allowance allocations. One revision to the types of set-asides addresses allocations to existing units in Indian country. The revised geographic scope of the Group 3 trading program under this rule will for the first time include an existing EGU in Indian country not covered by a state's CAA implementation planning authority—the Bonanza coal-fired unit in the Uintah and Ouray Reservation within Utah's borders. To provide an option for Utah (or a similarly situated state in the future) to replace the Agency's default allowance allocations to most existing units with state-determined allocations through a SIP revision while continuing to ensure the availability of a default allocation to the Bonanza unit, which is not subject to the state's jurisdiction or control (or similarly situated units in the future), the EPA is revising the Group 3 trading program regulations to provide for "Indian country existing unit set-asides." Specifically, for each state and for each control period where the set of units within a state's borders eligible to receive allocations as existing units includes one or more units [349] in an area of Indian country not covered by the state's CAA implementation planning authority, the EPA will reserve a portion of the state's emissions budget in an Indian country existing unit set-aside for the unit or units. The amount of each Indian country existing unit set-aside will equal the sum of the default allocations that the units covered by the set-aside would receive if the allocations to all existing units within the state's borders were computed according to EPA's default allocation procedure (which is discussed in section VI.B.9.b of this document). Immediately after determining the amount of a state's emissions budget for a control period (and after reserving a portion for potential allocation to new units, as discussed later in this section), the EPA will first determine the default allocations for all existing units within the state's borders, then allocate the appropriate quantity of allowances to the Indian country existing unit set-aside, then allocate the allowances from the set-aside to the covered units in Indian country, and finally record the allocations in the sources' compliance

accounts at the same time as the allocations to other sources not in Indian country. The existence of the Indian country existing unit set-aside thus will have no substantive effect unless and until the relevant state chooses to replace the EPA's default allowance allocations through a SIP revision, in which case the state would have the ability to establish state-determined allocations for the units subject to the state's CAA implementation planning authority while the EPA would continue to administer the Indian country existing unit set-aside for the units in Indian country not covered by the state's CAA implementation planning authority.[350] The EPA believes the establishment of Indian country existing unit set-asides accomplishes the objective of allowing states to control allowance allocations to units covered by their CAA implementation planning authority while ensuring that the allocations to units in Indian country not covered by such authority remain under Federal authority (unless replaced by a tribal implementation plan).

The remaining revisions to the types of set-asides address the set-asides used to ensure availability of allowance allocations to *new* units in light of the division of the budget for *existing* units into a reserved portion for existing units in Indian country and an unreserved portion for other existing units. Under the Group 3 trading program regulations as in effect before this rule, allowances for new units have been provided from separate new unit set-asides and Indian country new unit set-asides. Under this rule, the EPA is combining these two types of set-asides starting with the 2023 control period by eliminating the Indian country new unit set-asides and expanding eligibility for allocations from the new unit set-asides to include units anywhere within the relevant states' borders. However, as with the Indian country new unit set-asides under the current regulations, the EPA will continue to administer the new unit set-asides in the event a state chooses to replace the EPA's default allocations to existing units with state-determined allocations, thereby ensuring the availability of allocations to any new units not covered by a state's CAA implementation planning authority.

The reason for the revisions to the new unit set-asides and Indian country

new unit set-asides is to avoid unnecessary and potentially inequitable changes to the degree to which individual existing units contribute to, or benefit from, the new unit set-asides. The allowances used to establish these set-asides are reserved from each state emissions budget before determination of the allocations from the unreserved portion of the budget to existing units, so that certain existing units—generally those receiving the largest allocations—contribute to creation of the set-asides through roughly proportional reductions in their allocations. Later, if any allowances in a set-aside are not allocated to qualifying new units, the remaining allowances are reallocated to the existing units in proportion to their initial allocations from the unreserved portion of the budget, so that certain existing units—again, generally those receiving the largest allocations—benefit from the reallocations in rough proportion to their previous contributions.[351] The EPA believes maintaining this symmetry, where the same existing units—whether in Indian country or not—both contribute to and potentially benefit from the set-asides, is a reasonable policy objective, and doing so requires that the EPA continue to administer the new unit set-asides in the event a state chooses to replace the EPA's default allocations to existing units with state-determined allocations, because otherwise the EPA would be unable to maintain Federal implementation authority and ensure that the units in Indian country would receive an appropriate share of any reallocated allowances.[352] The principal difference between the new unit set-asides and the Indian country new unit set-asides under the regulations in effect before this rule was that, if a state chose to replace the EPA's default allocations with state-determined allocations, the state would take over administration of the new unit set-aside, but not any Indian country new unit set-aside.

---

[349] In coordination with the dynamic budgeting process discussed in section VI.B.4, each unit included in the unit inventory used to determine a state's dynamic emissions budget for a given control period in 2026 or a later year will be considered an "existing" unit for that control period for purposes of the determination of unit-level allowance allocations. In other words, there will no longer be a single fixed date that divides "existing" from "new" units.

[350] As noted in section VI.D, a tribe could elect to work with EPA under the Tribal Authority Rule to develop a full or partial tribal implementation plan under which the tribe would determine allowance allocations for units in the relevant area of Indian country that would replace EPA's default allocations for subsequent control periods.

[351] Under the regulations in effect before this final rule, allowances from an Indian country new unit set-aside that are not allocated to qualifying new units in Indian country are first transferred to the state's new unit set-aside, and if the allowances are not allocated to qualifying new units elsewhere within the state's borders, the allowances are then reallocated to the state's existing units.

[352] If units in Indian country were unable to share in the benefits of reallocation of allowances from the new unit set-asides, it would be possible to achieve a different form of symmetry by simultaneously exempting the units in Indian country from the obligation to share in the contribution of allowances to the new unit set-asides. However, some stakeholders might view this alternative as potentially inequitable because existing units in Indian country would then make no contributions toward the new unit set-aside while other existing units would still be required to do so.

Federal Register / Vol. 88, No. 107 / Monday, June 5, 2023 / Rules and Regulations **36803**

Under the revised regulations finalized in this rule, states will not be able to take over administration of the new unit set-asides in this situation. Therefore, there is no longer any reason to establish separate Indian country new unit set-asides in order to preserve Federal (and potentially tribal) authority to implement the rule in areas of Indian country subject to tribal jurisdiction.

With respect to the total amounts of allowances that will be set aside for potential allocation to new units from the emissions budgets for each state, for the control periods in 2023 through 2025 (but not for subsequent control periods, as discussed later in this section), the EPA is establishing total set-aside amounts equal to the projected amounts of emissions from any planned units in the state for the control period, plus an additional base 2 percent of the state emissions budget to address any unknown new units, with a minimum total amount of 5 percent. For example, if planned units in a state are projected to emit 4 percent of the state's $NO_X$ ozone season emissions budget, then the

new unit set-aside for the state would be set at 6 percent, which is the sum of the 4 percent for planned units plus the base 2 percent for unknown new units. Alternatively, if planned new units are projected to emit only 1 percent of the state's budget, the new unit set-aside would be set at the minimum 5 percent amount. Except for the addition of the 5 percent minimum, which is a change being made in response to comments, the approach to setting the new unit set-aside amounts is generally the same approach previously used to establish the amounts of new unit set-asides in CSAPR, the CSAPR Update, and the Revised CSAPR Update for all the CSAPR trading programs. *See, e.g.,* 76 FR 48292 (August 8, 2011).

As under the Revised CSAPR Update, the EPA is making an exception for New York for the 2023 through 2025 control periods, establishing a total new unit set-aside amount for each control period of 5 percent of the state's emissions budget, with no additional consideration for planned units, because this approach is consistent with New

York's preferences as reflected in an approved SIP addressing allowance allocations for the Group 2 trading program.

The final regulations issued under this rule specify the new unit set-aside amounts in terms of the percentages of the state emissions budgets. The amounts are shown in Tables VI.B.9.a–1, VI.B.9.a–2, and VI.B.9.a–3 of this document show the tonnage amounts of the new unit set-asides for the control periods in 2023 through 2025 that are computed by multiplying the new unit set-aside percentages by the preset budgets finalized in this rule for those control periods. The amounts of the 2023 new unit set-asides are illustrative because they do not reflect the impact of transitional adjustments included in the rule that that are likely to affect the 2023 budgets as implemented.[353] The amounts of the 2024 and 2025 new unit set-asides are the actual amounts, because the 2024 and 2025 budgets computed in this rule are the budgets that will be implemented, without any need for transitional adjustments.

TABLE VI.B.9.a–1—ILLUSTRATIVE CSAPR $NO_X$ OZONE SEASON GROUP 3 NEW UNIT SET-ASIDE (NUSA) AMOUNTS FOR THE 2023 CONTROL PERIOD

| State | Emissions budgets (tons) | New unit set-aside amount (percent) | New unit set-aside amount (tons) |
|---|---|---|---|
| Alabama | 6,379 | 5 | 319 |
| Arkansas | 8,927 | 5 | 446 |
| Illinois | 7,474 | 5 | 374 |
| Indiana | 12,440 | 5 | 622 |
| Kentucky | 13,601 | 5 | 680 |
| Louisiana | 9,363 | 5 | 468 |
| Maryland | 1,206 | 5 | 60 |
| Michigan | 10,727 | 5 | 536 |
| Minnesota | 5,504 | 5 | 275 |
| Mississippi | 6,210 | 5 | 311 |
| Missouri | 12,598 | 5 | 630 |
| Nevada | 2,368 | 9 | 213 |
| New Jersey | 773 | 5 | 39 |
| New York | 3,912 | 5 | 196 |
| Ohio | 9,110 | 6 | 547 |
| Oklahoma | 10,271 | 5 | 514 |
| Pennsylvania | 8,138 | 5 | 407 |
| Texas | 40,134 | 5 | 2,007 |
| Utah | 15,755 | 5 | 788 |
| Virginia | 3,143 | 5 | 157 |
| West Virginia | 13,791 | 5 | 690 |
| Wisconsin | 6,295 | 5 | 315 |

[353] As discussed in section VI.B.12, the EPA expects that this final rule will become effective after May 1, 2023, causing the emissions budgets for the 2023 control period to be adjusted under the

rule's transitional provisions so as to ensure that the new budgets will apply only after the rule's effective date. The actual new unit set-asides for the 2023 control period will be computed using the

adjusted budgets, but the 2023 budget amounts shown in Table VI.B.9.a–1 do not reflect these adjustments.

TABLE VI.B.9.a–2—CSAPR NO$_X$ OZONE SEASON GROUP 3 NEW UNIT SET-ASIDE (NUSA) AMOUNTS FOR THE 2024 CONTROL PERIOD

| State | Emissions budgets (tons) | New unit set-aside amount (percent) | New unit set-aside amount (tons) |
|---|---|---|---|
| Alabama | 6,489 | 5 | 324 |
| Arkansas | 8,927 | 5 | 446 |
| Illinois | 7,325 | 5 | 366 |
| Indiana | 11,413 | 5 | 571 |
| Kentucky | 12,999 | 5 | 650 |
| Louisiana | 9,363 | 5 | 468 |
| Maryland | 1,206 | 5 | 60 |
| Michigan | 10,275 | 5 | 514 |
| Minnesota | 4,058 | 5 | 203 |
| Mississippi | 5,058 | 5 | 253 |
| Missouri | 11,116 | 5 | 556 |
| Nevada | 2,589 | 9 | 233 |
| New Jersey | 773 | 5 | 39 |
| New York | 3,912 | 5 | 196 |
| Ohio | 7,929 | 6 | 476 |
| Oklahoma | 9,384 | 5 | 469 |
| Pennsylvania | 8,138 | 5 | 407 |
| Texas | 40,134 | 5 | 2,007 |
| Utah | 15,917 | 5 | 796 |
| Virginia | 2,756 | 5 | 138 |
| West Virginia | 11,958 | 5 | 598 |
| Wisconsin | 6,295 | 5 | 315 |

TABLE VI.B.9.a–3—CSAPR NO$_X$ OZONE SEASON GROUP 3 NEW UNIT SET-ASIDE (NUSA) AMOUNTS FOR THE 2025 CONTROL PERIOD

| State | Emissions budgets (tons) | New unit set-aside amount (percent) | New unit set-aside amount (tons) |
|---|---|---|---|
| Alabama | 6,489 | 5 | 324 |
| Arkansas | 8,927 | 5 | 446 |
| Illinois | 7,325 | 5 | 366 |
| Indiana | 11,413 | 5 | 571 |
| Kentucky | 12,472 | 5 | 624 |
| Louisiana | 9,107 | 5 | 455 |
| Maryland | 1,206 | 5 | 60 |
| Michigan | 10,275 | 5 | 514 |
| Minnesota | 4,058 | 5 | 203 |
| Mississippi | 5,037 | 5 | 252 |
| Missouri | 11,116 | 5 | 556 |
| Nevada | 2,545 | 9 | 229 |
| New Jersey | 773 | 5 | 39 |
| New York | 3,912 | 5 | 196 |
| Ohio | 7,929 | 6 | 476 |
| Oklahoma | 9,376 | 5 | 469 |
| Pennsylvania | 8,138 | 5 | 407 |
| Texas | 38,542 | 5 | 1,927 |
| Utah | 15,917 | 5 | 796 |
| Virginia | 2,756 | 5 | 138 |
| West Virginia | 11,958 | 5 | 598 |
| Wisconsin | 5,988 | 5 | 299 |

For control periods in 2026 and later years, the EPA will allocate a total of 5 percent of each state emissions budget to a new unit set-aside, with no additional amount for planned new units. The amounts of the set-asides for each state and control period will be computed when the emissions budgets for the control period are established, by May 1 of the year before the year of the control period. The procedure for determining the amounts of the set-asides based on the amounts of the state emissions budgets is being codified in the Group 3 trading program regulations and will reflect the same percentage of the emissions budget for all states.

The purpose of the change to the procedure for establishing the amounts of the set-asides is to coordinate with the dynamic budget-setting process that may be used to determine budgets beginning with the 2026 control period. As discussed in section VI.B.4 of this document, under the dynamic budget-setting process, each state's budget for each control period will be computed using fleet composition information and the total ozone season heat input reported by all affected units in the state

for the most recent control periods before the budget-setting computations. (For example, 2026 emissions budgets would be based on 2022–2024 state-level heat input data.) Moreover, as discussed in section VI.B.9.b of this document, the set of units eligible to receive allocations as "existing" units in a given control period will generally be the set of units that operated in the control period two years earlier (with the exception of any units whose monitor certification deadlines fell after the start of that earlier control period). Consequently, for the 2025 control period, all or almost all units that commenced commercial operation before issuance of this rule will be considered "existing" units for purposes of budget-setting and allocations, and units commencing commercial operation after issuance of this rule generally will be considered "existing" units for all but their first two full control periods of operation (and possibly a preceding partial control period). Given that new units will not be relying on the new unit set-asides as a permanent source of allowances, as is the case for "new" units under the other CSAPR trading programs, the EPA believes it is unnecessary to establish set-aside percentages for some states that are permanently larger than 5 percent based solely on the fact that projected emissions from planned new units happen to be a somewhat larger proportion of those states' overall budgets at the time of this rule's issuance.

The changes to the structure and amounts of set-asides in this rule largely follow the proposal. The EPA received few comments on these topics. As noted previously, one commenter expressed the view that if the amounts of the new unit set-asides were based on 2 percent of the respective states' budgets, the set-asides would be too small in certain circumstances, and in response the final rule bases the amounts of the set-asides on a floor percentage of 5 percent instead of 2 percent. The remaining commenters expressed a concern that the final rule's provisions regarding set-asides should ensure that any tribal decisions relating to allowance allocations would not be constrained by state decisions. The EPA had this same concern in mind when designing the rule and believes that the final set-aside structure—encompassing Indian country existing unit set-asides as well as EPA-administered new unit set-asides for sources in all areas within each state's borders—fully addresses the concern, is equitable, and preserves Federal and tribal authority under this

rule for areas of Indian country subject to tribal jurisdiction. The comments and the EPA's responses are discussed in greater detail in section 1 of the *RTC* document.

b. Allocations to Existing Units, Including Units That Cease Operation

In conjunction with the new and revised state emissions budget-setting methodology for the Group 3 trading program finalized in this rulemaking, the EPA is necessarily establishing a revised procedure for making unit-level allocations of Group 3 allowances to existing units.[354] The procedure that the EPA is employing to compute the unit-level allocations is very similar but not identical to the procedure used to compute unit-level allocations for units subject to the Group 3 trading program in the Revised CSAPR Update. The steps of the procedure for determining allocations from each state emissions budget for each control period are described in detail in the Unit-Level Allowance Allocations Final Rule TSD. The steps are summarized in the following paragraphs, with changes from the procedure followed in the Revised CSAPR Update noted.

In the first step, the EPA identifies the list of units eligible to receive allocations for the control period. The unit inventories used to compute unit-level allocations for the control periods in 2023 through 2025 are the same inventories that have been used to determine the preset emissions budget for these control periods. These inventories have been determined in this rulemaking in essentially the same manner as in the Revised CSAPR Update. The procedures for updating the unit inventories for these control periods are discussed in section VI.B.4 of this document, and the criteria that the EPA has applied to determine whether a unit's scheduled retirement is sufficiently certain to serve as a basis for adjusting emissions budgets and unit-level allocations, are discussed in section V.B of this document and in the Ozone Transport Policy Analysis Final Rule TSD.

The unit inventories used to compute unit-level allocations for control periods in 2026 and later years will be determined in the year before the control period in question based on the latest reported emissions and operational data, which is an extension

of the methodology used in the Revised CSAPR Update to reflect more recent data (for example, the unit inventories used to compute 2026 budgets and allocations will reflect reported data up through the 2024 control period). These inventories, which are generally the same as the inventories used to compute dynamic budgets for each control period, include any unit whose monitor certification deadline was no later than the start of the relevant historical control period and that reported emissions data during the relevant historical control period. The EPA notes that basing the list of eligible units on the list of units that reported heat input in the control period two years earlier than the control period for which allocations are being determined represents a revision to the Group 3 trading program regulations as in effect before this rule concerning the treatment of allocations to retired units. Under the prior regulations, units that cease operations for two consecutive control periods would continue to receive allocations as existing units for three additional years (that is, a total of five years) before the allowances they would otherwise have received are reallocated to the new unit set-aside for the state. Under the regulations as revised in this rule, units that cease operation will receive allocations for only two full control periods of non-operation. While the EPA has in prior transport rulemakings noted a qualitative concern that ceasing allowance allocations prematurely could distort the economic incentives of EGUs to continue operating when retirement is more economical, the EPA believes that anticipated market conditions (in particular, the incentives toward power sector transition to cleaner generating sources), particularly in the later 2020s, are such that a continuation of allowance allocations to retiring units likely has no more than a de minimis effect on the consideration of an EGU whether to retire or not.

In the second step of the procedure for determining allocations to existing units, the EPA will compile a database containing for each eligible unit the unit's historical heat input and total $NO_X$ emissions data for the five most recent ozone seasons. For each unit, the EPA will compute an average heat input value based on the three highest non-zero heat input values over the 5-year period, or as the average of all the non-zero values in the period if there are fewer than three non-zero values. For each unit, the EPA will also determine the maximum total $NO_X$ emissions value over the 5-year period. For coal-

---

[354] The revisions to the procedures for computing unit-level allowance allocations in this rulemaking apply only to the Group 3 trading program. In this rulemaking, the EPA is not reopening the methodology for computing the amounts of allowances allocated to any unit under any other CSAPR trading program.

fired units of 100 MW or larger, the EPA will further determine a ''maximum controlled baseline'' $NO_X$ emissions value, computed as the unit's maximum heat input over the 5-year period times a $NO_X$ emissions rate of 0.08 lb/mmBtu. The maximum controlled baseline will serve as an additional cap on unit-level allocations for all such coal-fired units starting with the control periods in which the assumed use of SCR controls at the units is reflected in the state emissions budgets. Thus, the maximum controlled baseline will apply for purposes of allocations to units with existing SCR controls for all control periods starting with the 2024 control period and for all other coal-fired units of 100 MW or more (except circulating fluidized bed units) starting with the 2027 control period. These procedures are nearly identical to the procedures used in the Revised CSAPR Update, with three exceptions. First, instead of using only the data available at the time of the rulemaking, for each control period the EPA will use data from the most recent five control periods for which data had been reported. (For example, for the 2026 control period, the EPA will use data for the 2020–2024 control periods.) Second, to simplify the data compilation process, the EPA will use only a five-year period for $NO_X$ mass emissions, in contrast to the 8-year period used in the Revised CSAPR Update for $NO_X$ mass emissions. Third, the use of the maximum controlled baseline as an additional cap on emissions is a change adopted in this rule in response to comments received on the proposal. Specifically, commenters observed that if a state's emissions budget is decreased to reflect an assumption that a particular unit in the state is capable of reducing its emissions through the installation of new SCR controls, but the historical emissions cap applied to that unit in the unit-level allocation methodology does not reflect use of the new controls, then the allocation methodology could have the effect of reducing unit-level allocations to the other units in the state whose historical emissions already reflect use of existing controls rather than the unit assumed to install new controls. The EPA agrees with the comment and in this rule has added the maximum controlled baseline provision to the allocation methodology to mitigate the potential effect identified by the commenters.

In the third step of the procedure for determining allocations to existing units in each state, the EPA will allocate the available allowances for that state among the state's eligible units in proportion to the share each unit's average heat input value represents of the total of the average heat input values for all the state's eligible units, but not more than the unit's maximum total $NO_X$ value or, if applicable, the unit's maximum controlled baseline. If the allocations to one or more units are curtailed because of the units' applicable caps, the EPA will iterate the calculation procedure as needed to allocate the remaining allowances, excluding from each successive iteration any units whose allocations have already reached their caps. (If all units in a state reach their caps, any remaining allowances are allocated in proportion to the units' average heat input values, notwithstanding the caps.) This calculation procedure is identical to the calculation procedure used in the Revised CSAPR Update (as well as the CSAPR Update and CSAPR), but using caps that reflect both the units' maximum historical $NO_X$ values and also, where applicable, the maximum controlled baseline values.

Illustrative unit-level allocations for the 2023 control period and final unit-level allocations for the 2024 and 2025 control periods are being determined in this rulemaking based on the emissions budgets for those control periods also determined in the rulemaking and are included in the docket. The 2023 allocations are only illustrative because, as discussed in section VI.B.12.a, the EPA expects the effective date of the rule to occur after the start of the 2023 control period and consequently expects the 2023 control period to be a transitional period in which the emissions budgets determined in this rulemaking apply only for the portion of the control period occurring on and after the rule's effective date, while any previously determined emissions budgets apply for the portion of the control period before the rule's effective date. The rule's effective date will become known when the rule is published in the **Federal Register**. As soon as practicable thereafter, the EPA will calculate the final prorated or blended 2023 state emissions budgets and 2023 unit-level allocations based on the transitional formulas finalized in this action (see section VI.B.12.a of this document) and will communicate the information to the public through a notice of data availability. The 2023 and 2024 allocations will then be recorded 30 days after the effective date of the final rule (to provide an interval in which to execute the recall of 2023 and 2024 Group 2 allowances, as discussed in section VI.B.12.c of this document),

while the 2025 allocations will be recorded by July 1, 2024.[355]

The default unit-level allocations for each control period in 2026 or a later year will be computed immediately following the determination of the state emissions budgets for the control period. The EPA will perform the computations and issue a notice of data availability concerning the preliminary unit-level allocations for each control period by March 1 of the year before the control period. There will be a 30-day period in which objections to the data and preliminary computations may be submitted, and the EPA will then make any appropriate revisions and issue another notice of data availability by May 1 of the year before the control period. The EPA will then record the allocations by July 1 of the year before the control period.[356]

All covered states also have options to establish state-determined allowance allocations for control periods in 2024 and later years. As discussed in section VI.D.1 of this rule, a state choosing to establish state-determined allocations for the 2024 control period would need to submit a letter of intent to the EPA by August 4, 2023, and would need to submit the SIP revision with the allocations by September 1, 2023. The EPA would defer recordation of the 2024 allocations for the state's sources until March 1, 2024, to provide time for this process to be completed. As discussed in sections VI.D.2 and VI.D.3 of this rule, a state choosing to establish state-determined allocations for control periods in 2025 and later years would need to submit a SIP revision by December 1 of the year two years before the first year for which state-determined allocations are being established—*e.g.,* by December 1, 2023, for allocations for the 2025 control period—and would need to submit the allocations for each control period by June 1 of the year before the control period—*e.g.,* by June 1, 2024, for allocations for the 2025

---

[355] The recordation schedule for the 2023 and 2024 allocations represents an expected acceleration of the recordation schedule in effect immediately before this final rule, which called for allocations of 2023 and 2024 Group 3 allowances to existing units to be recorded by September 1, 2023. *See* Deadlines for Submission and Recordation of Allowance Allocations Under the Cross-State Air Pollution Rule (CSAPR) Trading Programs and the Texas $SO_2$ Trading Program (the ''Recordation Rule''), 87 FR 52473 (August 26, 2022).

[356] The current recordation schedule, which provides for almost all allowance allocations to existing units for a given control period under all the CSAPR trading programs to be recorded by July 1 of the year before the year of that control period, was adopted in the Recordation Rule.

control period.[357] The EPA would record any state-determined allocations for control periods in 2025 and later years by July 1 of the year before the control period, simultaneously with the recordation of allocations to units in states where the EPA determines the unit-level allocations.

The EPA notes that for the three states with approved SIP revisions establishing their own methodologies for allocating Group 2 allowances— Alabama, Indiana, and New York—the EPA will follow the states' methodologies to the extent possible in developing the EPA's allocations of Group 3 allowances to the units in those states for the control periods in 2023 through 2025.[358] The EPA will not follow any state-specific methodologies as part of the procedures for determining default unit-level allocations of Group 3 allowances for control periods in 2026 or later years. However, like other states, these three states have options to replace the EPA's default allocations with state-determined allocations through SIP revisions starting with the 2024 control period.

As an exception to all of the recordation deadlines that would otherwise apply, the EPA will not record any allocations of Group 3 allowances in a source's compliance account unless that source has complied with the requirements to surrender previously allocated 2023–2024 Group 2 allowances. The surrender requirements are necessary to maintain the previously established levels of stringency of the Group 2 trading program for the states and sources that remain subject to that program under this final rule. The EPA finds that it is reasonable to condition the recordation of Group 3 allowances on compliance with the surrender requirements because the condition will spur compliance and will not impose an inappropriate burden on sources. The EPA considers establishment of this

condition, which will facilitate the continued functioning of the Group 2 trading program, to be an appropriate exercise of the Agency's authority under CAA section 301 (42 U.S.C. 7601) to prescribe such regulations as are necessary to carry out its functions under the Act.

The provisions governing allocations to existing units are being finalized substantially as proposed, except for the addition of an additional cap on unit-level allocations in response to comments. The EPA's responses to comments on the unit-level allocation provisions for existing units are in section 5 of the *RTC* document.

### c. Allocations From Portions of State Emissions Budgets Set Aside for New Units

The Group 3 trading program regulations provide for the EPA to allocate allowances from each new unit set-aside after the end of the control period at issue. An eligible new unit for purposes of allocations from a set-aside for a given control period is generally any unit in the relevant area that reported emissions subject to allowance surrender requirements during the control period and that was not eligible to receive an allowance allocation as an "existing" unit for the control period. Thus, in addition to units that have not yet completed two full control periods of operation since their monitor certification deadlines, units eligible for allocations from the new unit set-asides may also include existing coal-fired units that first lose their eligibility for allocations from the unreserved portion of the applicable state budget by ceasing operation, and then resume operation in a later control period. The regulations call for the EPA to allocate allowances to any eligible "new" units in the state generally in proportion to their respective emissions during the control period, up to the amounts of those emissions if the relevant set-aside contains sufficient allowances, and not exceeding those emissions. However, in the case of a unit whose allocation for the control period would have been subject to a maximum controlled baseline if the unit was eligible to receive allocations as an existing unit, the unit's allocation from the new unit set-aside will not exceed a cap equal to the unit's reported heat input for the control period times an emissions rate of 0.08 lb/mmBtu.

Any allowances remaining in a new unit set-aside after the allocations to new units are reallocated to the existing units in the state in proportion to those units' previous allocations for the control period as existing units. The

EPA issues a notice of data availability concerning the proposed allocations by March 1 following the control period, provides an opportunity for submission of objections, and issues a final notice of data availability and record the allocations by May 1 following the control period, one month before the June 1 compliance deadline.

This EPA notes that the revisions to other provisions of the Group 3 trading program regulations discussed elsewhere in this document will reduce the portions of the state emissions budgets that are allocated through the new unit set-asides. Specifically, because the new unit set-asides will no longer receive any additional allowances when units retire, for control periods in 2025 and later years the amounts of allowances in the new unit set-asides will always be 5 percent of the respective state emissions budgets for the respective control periods. This limit on growth of the new unit set-asides is appropriate given that the number of consecutive control periods for which any particular unit is likely to receive allocations from a state's new unit set-aside will be reduced to two full control periods (and possibly a partial control period before those two control periods) before the unit becomes eligible to receive allocations as an "existing" unit from the unreserved portion of the state's emissions budget. This approach contrasts with the approach under the other CSAPR trading programs where a new unit never becomes eligible to receive allocations from the unreserved portion of the emissions budget and where the new unit set-aside therefore needs to grow to accommodate an ever-increasing share of the state's total emissions.

The EPA also notes that, as discussed in sections VI.D.2 and VI.D.3 of this document, in the event that a state chooses to replace EPA's default allowance allocations under the Group 3 trading program with state-determined allocations through a SIP revision, the EPA will continue to administer the portion of each state emissions budget reserved in a new unit set-aside to ensure the availability of allowance allocations to new units in any areas of Indian country within the state not covered by the state's CAA implementation planning authority.

The final rule's provisions concerning unit-level allocations from the new unit set-asides are unchanged from the proposal except for the addition of the allocation cap in a given control period for any unit that would have been subject to a maximum controlled baseline if the unit was eligible to receive an allocation as an existing unit

---

[357] The current deadlines for states to submit state-determined allowance allocations to the EPA were adopted in the Recordation Rule and are coordinated with the schedule for computation of state emissions budgets for control periods in 2026 and later years. For example, for the 2026 control period, by May 1, 2025, the EPA will publish the final state emissions budgets and the EPA's default unit-level allocations; by June 1, 2025, states will submit any state-determined unit-level allocations that would replace the default allocations; and by July 1, 2025, the EPA will record the default unit-level allocations or the state-determined unit-level allocations, as applicable, in sources' compliance accounts.

[358] For discussion of how the EPA is using the previously approved allocation methodologies for Alabama, Indiana, and New York to determine allocations to units in these states for the 2023– 2025 control periods, see the Allowance Allocation Final Rule TSD.

for that control period.[359] This change was made to address the same comments discussed in section VI.B.9.b of this document that caused the Agency to add the maximum controlled baseline provision to the procedure for allocating allowances to existing units. The Agency did not receive any other comments on the proposed provisions concerning unit-level allocations of allowances from the new unit set-asides.

d. Incorrectly Allocated Allowances

The Group 3 trading program regulations as promulgated in the Revised CSAPR Update include provisions addressing incorrectly allocated allowances. With regard to any allowances that were incorrectly allocated and are subsequently recovered, the provisions as in effect prior to this rule have generally called for the recovered allowances to be reallocated to other units in the relevant state (or Indian country within the borders of the state) through the process for allocating allowances from the new unit set-aside (or Indian country new unit set-aside) for the state. If the procedures for allocating allowances from the set-asides have already been carried out for the control period for which the recovered allowances were issued, the allowances would be allocated through the set-asides for subsequent control periods.

The EPA continues to view the current provisions for disposition of recovered allowances as reasonable in the case of any allowances that are recovered before the deadline for recording allocations of allowances from the new unit set-aside for the control period for which the recovered allowances were issued. However, in the case of any allowances that are recovered after that deadline, adding the recovered allowances to the new unit set-aside for a subsequent control period, as provided in the current regulations, would be inconsistent with the trading program enhancements discussed elsewhere in this document, where the amounts of allowances provided in the state emissions budgets for each control period are designed to reflect the most current available information on fleet composition and utilization and where the quantities of banked allowances available for use in each control period are recalibrated for consistency with the state emissions budgets. The EPA is therefore finalizing

revisions to provide that, starting with allowances allocated for the 2024 control period, any incorrectly allocated allowances that are recovered after the deadline for allocating allowances from the new unit set-aside for that control period (i.e., May 1 of the year following the control period) will be transferred to a surrender account instead of being reallocated to other units in the state. The EPA received no comments on this proposed revision, which is being finalized as proposed.

10. Monitoring and Reporting Requirements

The Group 3 trading program requires monitoring and reporting of emissions and heat input data in accordance with the provisions of 40 CFR part 75. Under 40 CFR part 75, a given unit may have several options for monitoring and reporting. Any unit can use CEMS. Qualifying gas- or oil-fired units can use certain excepted monitoring methodologies that rely in part on fuel-flow metering in combination with CEMS-based or testing-based $NO_X$ emissions rate data. Certain non-coal-fired, low-emitting units can use a low mass emissions (LME) methodology, and sources can seek approval of alternative monitoring systems approved by the Administrator through a petition process. Each CEMS must undergo rigorous initial certification testing and periodic quality assurance testing thereafter, including the use of relative accuracy test audits and 24-hour calibrations. In addition, when a monitoring system is not operating properly, standard substitute data procedures are applied to produce a conservative estimate of emissions for the period involved. Further, 40 CFR part 75 requires electronic submission of quarterly emissions reports to the Administrator, in a format prescribed by the Administrator. The quarterly reports will contain all the data required concerning ozone season $NO_X$ emissions under the Group 3 trading program.

In this rulemaking, as proposed, the EPA is making two changes to the Group 3 trading program's previous requirements related to monitoring, recordkeeping, and reporting. First, the EPA is revising the monitor certification deadline in the Group 3 trading program regulations applicable to certain units that have not already certified monitoring systems for use under 40 CFR part 75. This revision is expected to provide approximately 15 EGUs in Nevada and Utah with 180 days following the rule's effective date to certify monitoring systems, with the consequence that the units are expected to become subject to allowance holding

requirements under the Group 3 trading program starting with the 2024 control period. Second, to implement the trading program enhancements, the EPA is adding certain new recordkeeping and reporting requirements, which will be implemented through amendments to the regulations in 40 CFR part 75 and will apply starting January 1, 2024. Sources generally will be able to meet the additional recordkeeping and reporting requirements using the data that are already collected by their current monitoring systems, and the EPA is not requiring the installation of additional monitoring systems at any source. However, a small number of sources with common stacks could find it advantageous to upgrade their monitoring systems so as to monitor at the individual units instead of monitoring at the common stack. The Group 3 trading program monitor certification deadline revisions and the additional recordkeeping and reporting requirements are discussed in sections VI.B.10.a and VI.B.10.b, respectively.[360]

a. Monitor Certification Deadlines

In general, a unit subject to the Group 3 trading program must monitor and report emissions data using certified monitoring systems starting as of the date the unit enters the trading program or, if later, 180 days after the unit commences commercial operation. Where an EGU has already certified and maintained monitoring systems in accordance with 40 CFR part 75 for purposes of another trading program, no recertification solely for purposes of entering the Group 3 trading program is required. Under these pre-existing provisions of the Group 3 trading program regulations, nearly all currently operating EGUs transitioning to the trading program under this rule are positioned to begin monitoring and reporting under the trading program as of their dates of entry (or if later, 180 days after they commence commercial operation) because of the units' previous requirements to monitor and report emissions under other programs including the CSAPR $NO_X$ Ozone Season Group 2 Trading Program (for

---

[359] As discussed in section IX.B of this rule, the EPA is relocating some of the regulatory provisions relating to administration of the new unit set-asides and is also removing certain provisions that are made obsolete by revisions to other provisions of the Group 3 trading program regulations.

[360] The EPA is not amending the existing provisions of the Group 3 trading program regulations that govern whether units covered by the program must record and report required data on a year-round basis or may elect to record and report required data on an ozone season-only basis. See 40 CFR 97.1034(d)(1); see also 40 CFR 75.74(a)–(b). Thus, for units that are required or elect to report other data on a year-round basis, the additional recordkeeping and reporting requirements will also apply year-round, while for units that are allowed and elect to report other data on an ozone season-only basis, the additional requirements will also apply for the ozone season only.

**Federal Register** / Vol. 88, No. 107 / Monday, June 5, 2023 / Rules and Regulations **36809**

units in Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Texas, and Wisconsin), the CSAPR $NO_X$ Annual Trading Program (for units in Minnesota), and the Acid Rain Program (for most units in Nevada and Utah).

As discussed in section VI.B.3 of this document, the EPA has identified 15 potentially affected units in Nevada and Utah that commenced commercial operation more than 180 days before the effective date of this rule and that do not currently report emissions data to the Agency under 40 CFR part 75.[361] To ensure that units in this situation have sufficient time to certify monitoring systems as required under this rule, the final rule establishes a monitoring certification deadline of 180 days after the effective date of the rule for affected units that are not already required to report emissions under 40 CFR part 75 under another program, equivalent to the 180-day window already provided to units commencing commercial operation after (or less than 180 days before) the final rule's effective date. The 180th day for units in this situation will likely fall after the end of the 2023 ozone season, with the result that the certification deadline will be extended until May 1, 2024, the first day of the 2024 ozone season. Because the Group 3 trading program's allowance holding requirements apply to a given unit only after that unit's monitor certification deadline, the units in this situation consequently will become subject to allowance holding requirements as of the 2024 ozone season rather than the 2023 ozone season.

The EPA received no comments on the provisions establishing a monitor certification deadline 180 days after the effective date of the rule for affected units that are not already required to report emissions under 40 CFR part 75, and the provisions are being finalized as proposed.

b. Additional Recordkeeping and Reporting Requirements

To facilitate implementation of the backstop daily $NO_X$ emissions rates for certain coal-fired units, the secondary emissions limitations for units contributing to assurance level exceedances, and the revised default unit-level allowance allocation procedures, the final rule amends 40 CFR part 75 to establish two sets of additional recordkeeping and reporting requirements. The first set of additional recordkeeping and reporting requirements is specific to the backstop daily emissions rate provisions. Starting January 1, 2024, units listing coal as a fuel in their monitoring plans, serving generators of 100 MW or larger, and equipped with SCR controls on or before the end of the previous control period (except circulating fluidized bed units) will be required to record and report total daily $NO_X$ emissions and total daily heat input, daily average $NO_X$ emissions rate, and daily $NO_X$ emissions exceeding the backstop daily $NO_X$ emissions rate. The units will also be required to record and report cumulative $NO_X$ emissions exceeding the backstop daily $NO_X$ emissions rate for the ozone season and any portion of such cumulative $NO_X$ emissions exceeding 50 tons. Starting January 1, 2030, the same recordkeeping and reporting requirements will apply to all units listing coal as a fuel in their monitoring plans and serving generators of 100 MW or larger (except circulating fluidized bed units), including units not equipped with SCR controls. These data will be used to determine the allowance surrender requirements related to the backstop daily $NO_X$ emissions rates. Implementation of these additional recordkeeping and reporting requirements would necessitate a one-time update to the units' data acquisition and handling systems but would not require any changes to the monitoring systems already needed to meet other requirements under 40 CFR part 75.

The second type of additional recordkeeping and reporting requirements applies to units exhausting to common stacks. For these units, 40 CFR part 75 includes options that often allow monitoring to be conducted at the common stack on a combined basis for all the units as an alternative to installing separate monitoring systems for the individual units in the ductwork leading to the common stack. The units then keep records and report hourly and cumulative $NO_X$ mass emissions and in many cases heat input data on a combined basis for all units exhausting to the common stack. With respect to heat input data, but not $NO_X$ mass emissions data, most such units have also been required historically to record and report hourly and cumulative data on an individual-unit basis, and where necessary they typically have computed the necessary unit-level hourly heat input values by apportioning the combined hourly heat input values for the common stack in proportion to the individual units' recorded hourly output of electricity or steam. *See generally* 40 CFR 75.72.

In this rulemaking, the provisions governing default unit-level allowance allocations, backstop daily $NO_X$ emissions rates for certain coal-fired units, and secondary emissions limitations for units contributing to assurance level exceedances all require the use of unit-level reported data on $NO_X$ mass emissions (or unit-level $NO_X$ emissions rates computed in part based on unit-level reported data on $NO_X$ mass emissions). To facilitate the implementation of these provisions, the final rule requires all units covered by the Group 3 trading program exhausting to common stacks to record and report unit-level hourly and cumulative $NO_X$ mass emissions data starting January 1, 2024. To obtain the necessary unit-level hourly mass emissions values, the revised regulations rule allow the units to apportion hourly mass emissions values determined at the common stack in proportion to the individual units' recorded hourly heat input. The apportionment procedure is very similar to the apportionment procedure that most such units already apply to compute reported unit-level heat input data. Where sources choose to obtain the additional required data values through apportionment, implementation of the additional recordkeeping and reporting requirements will necessitate a one-time update to the units' data acquisition and handling systems but will not require any changes to the monitoring systems already needed to meet other requirements under 40 CFR part 75.

For most units sharing common stacks, the EPA expects that the reported unit-specific hourly $NO_X$ emissions values computed through the apportionment procedures will reasonably approximate the values that could be obtained through installation and operation of separate monitoring systems for the individual units, because the units exhausting to the common stack would be expected to have similar $NO_X$ emissions rates. However, the EPA also recognizes that at some plants, particularly those where SCR-equipped and non-SCR-equipped coal-fired units share a common stack, unit-level values determined through apportionment based on electricity or steam output could overstate the reported $NO_X$ mass emissions for the SCR-equipped units and correspondingly understate the reported $NO_X$ mass emissions for the non-SCR-equipped units.[362] As proposed, the

---

[361] The units are listed in Table VI.B.3–1.

[362] The EPA is aware of five plants in the states covered by this rule where SCR-equipped and non-SCR-equipped coal-fired units exhaust to a common stack: Clifty Creek in Indiana; Cooper, Ghent, and Shawnee in Kentucky; and Sammis in Ohio. The owners of the Sammis plant have announced plans to retire the plant in 2023.

final rule leaves in place the existing options under 40 CFR part 75 for plants to upgrade their monitoring equipment to monitor on a unit-specific basis instead of at the common stack. Plant owners may find this option attractive if they believe it would reduce the quantities of reported emissions exceeding the backstop daily emissions rate.

The EPA is finalizing the additional recordkeeping and reporting requirements generally as proposed, with modifications as needed to accommodate the changes in the backstop daily emissions rate provisions from proposal discussed in sections VI.B.1.c.i and VI.B.1.7. No comments were received on the recordkeeping and reporting requirements added to facilitate implementation of the backstop daily emissions rate. Comments on the requirement to report unit-specific $NO_X$ emissions data for units sharing common stacks are addressed in the following paragraphs.

*Comment:* Some commenters claimed that for plants where SCR-equipped and non-SCR-equipped coal-fired units share common stacks, the rule as proposed would have effectively mandated installation of unit-specific monitoring systems in order to comply with the backstop daily emissions rate provisions. The commenters generally requested that application of the backstop daily rate provisions be delayed for plants with common stacks until all units sharing the stacks were subject to the provisions. Alternatively, they claimed that the EPA should consider the cost of the additional unit-specific monitoring system to be a cost of the rule.

One commenter claimed that the option to install unit-specific monitoring systems for the units sharing a common stack at its plant was not feasible because of a lack of locations in the units' ductwork suitable for installation of the monitoring equipment. Specifically, the commenter claimed that EPA Method 1 requires monitoring equipment to be located at least eight duct diameters downstream and two duct diameters upstream of any flow disturbance and stated that the units had no straight runs of ductwork sufficiently long to meet these criteria.

*Response:* The EPA's response to comments about the application of backstop daily rate requirements to units sharing common stacks is in section VI.B.7 of this document. With respect to assertions that the rule effectively mandates installation of unit-specific monitoring systems, the EPA disagrees. Although the EPA pointed out the option in the proposal, anticipating that owners of some units sharing common stacks might find it advantageous to upgrade their monitoring systems, the final rule does not mandate such upgrades and explicitly provides a reporting option that can be used if a plant owner continues to monitor only at the common stack. For example, a plant owner might choose not to upgrade monitoring systems if the owner does not plan to operate the non-SCR-equipped units sharing the stack frequently. Regarding the contention that the cost of additional monitoring systems should be considered a cost of the rule, the EPA notes that the monitoring cost estimates that the Agency regularly develops for 40 CFR part 75 already reflect the conservative assumption that all affected units perform monitoring on a unit-specific basis.

With respect to the comment asserting an inability to install unit-specific monitoring equipment because of a lack of suitable locations, the EPA does not believe the commenter has provided sufficient information to support the assertion. Although the commenter cites the EPA Method 1 location criteria, the CEMS location provisions in 40 CFR part 75 do not reference those location criteria but instead reference the EPA Performance Specification 2 location criteria, which recommend that a CEMS be located at least two duct diameters downstream and a half duct diameter upstream from a point at which a change in pollutant concentration may occur.[363] Thus, while the commenter states that its units do not have straight runs of ductwork ten duct diameters long, the relevant siting criteria actually call for straight runs of ductwork only 2.5 duct diameters long, and the commenter has not provided information indicating that these criteria could not be met. Moreover, even EPA Method 1 does not require monitoring equipment to be located eight duct diameters upstream and two duct diameters downstream of any flow disturbance. While the method recommends those distances as the first option, the method also allows for locations two duct diameters upstream and a half duct diameter upstream from any flow disturbance, as well as other locations if certain performance criteria can be met.[364]

---

[363] Appendix B to 40 CFR part 60, Performance Specification 2, sec. 8.1.2; *see also* appendix A to 40 CFR part 75, section 1.1.

[364] Appendix A–1 to 40 CFR part 60, Method 1, sec. 11.1.

**11. Designated Representative Requirements**

As noted in section VI.B.1.a of this document, a core design element of all the CSAPR trading programs is the requirement that each source must have a designated representative who is authorized to represent all of the source's owners and operators and is responsible for certifying the accuracy of the source's reports to the EPA and overseeing the source's Allowance Management System account. The necessary authorization of a designated representative is certified to the EPA in a certificate of representation.

The existing designated representative provisions in the Group 3 trading program regulations already provide that the EPA will interpret references to the Group 2 trading program in certain documents—including a certificate of representation as well as a notice of delegation to an agent or an application for a general account—as if the documents referenced the Group 3 trading program instead of the Group 2 trading program. For these reasons, sources that have participated in the Group 2 trading program and that are transitioning to the Group 3 trading program under this rule will not need to submit any new forms as part of the transition, because previously submitted forms will be valid for purposes of the Group 3 trading program.

For a source that is newly affected under the Group 3 trading program and that is not currently affected under the Group 2 trading program, a designated representative who has been duly authorized by the source's owners and operators must submit a new or updated certificate of representation to the EPA. The EPA will not record any Group 3 allowances allocated to a source in the source's compliance account until a certificate of representation has been submitted for the source. If a source is also affected under other CSAPR trading programs or the Acid Rain Program, the same individual must be the source's designated representative for purposes of all the programs.

The EPA did not propose and is not finalizing any changes to the designated representative requirements. The EPA received no comments on the provisions of the proposal relating to these requirements.

**12. Transitional Provisions**

This section discusses several provisions that the EPA will implement to address the transition of sources into the Group 3 trading program as revised. The purposes of the transitional provisions are generally the same as the

purposes of the analogous transitional provisions promulgated in the Revised CSAPR Update: first, addressing the likelihood that the effective date of this rule will fall after the starting date of the first affected ozone season (which in this case is, May 1, 2023); second, establishing an appropriately-sized initial allowance bank through the conversion of previously banked allowances; and third, preserving the intended stringency of the Group 2 trading program for the sources that will continue to be subject to that program.[365] However, the sources that will be participants in the revised Group 3 trading program under this rule are transitioning from several different starting points—with some sources already in the existing Group 3 trading program, some sources coming from the Group 2 trading program, and some sources not currently participating in any seasonal NO$_X$ trading program. The EPA is therefore finalizing transitional provisions that differ across the sets of potentially affected sources based on the sources' different starting points.

a. Prorating Emissions Budgets, Assurance Levels, and Unit-Level Allowance Allocations in the Event of an Effective Date After May 1, 2023

The EPA expects that the effective date of this rule will fall after the start of the Group 3 trading program's 2023 control period on May 1, 2023, because the effective date of the rule will be 60 days after the date of the final rule's publication in the **Federal Register**. The EPA is addressing this circumstance by determining the amounts of emissions budgets and unit-level allowance allocations on a full-season basis in the rulemaking and by also including provisions in the revised regulations to prorate the full-season amounts as needed to ensure that no sources become subject to new or more stringent regulatory requirements before the final rule's effective date.[366] Variability

limits, assurance levels, and unit-level allocations for 2023 will all be computed using the appropriately prorated emissions budgets amounts.[367]

As discussed in section VI.B.2 of this document, in the case of the three states (and Indian country within the states' borders) whose sources do not currently participate in either the Group 2 trading program or the Group 3 trading program—Minnesota, Nevada, and Utah—the sources will begin participating in the Group 3 trading program on the later of May 1, 2023, or the rule's effective date. For these states, in the rulemaking the EPA has computed the full-season emissions budgets that would have applied for the entire 2023 control period if the final rule had become effective no later than May 1, 2023, and were therefore in effect for the entire 153-day control period from May 1, 2023, through September 30, 2023. Assuming that the final rule becomes effective after May 1, 2023, as expected, the EPA will determine prorated emissions budgets for the 2023 control period by multiplying each full-season emissions budget by the number of days from the rule's effective date through September 30, 2023, dividing by 153 days, and rounding to the nearest allowance. The prorated variability limits for the 2023 control period will be computed by first determining for each state the percentage by which the state's reported heat input for the full 2023 ozone season (*i.e.*, May 1, 2023 through September 30, 2023) exceeds the heat input used to compute the state's full-season 2023 emissions budget under this rule and then multiplying the higher of this percentage or 21 percent by the state's prorated emissions budget and rounding to the nearest allowance, yielding prorated assurance levels that equal a minimum of 121 percent of the prorated emissions budgets. To determine unit-level allocation amounts from the prorated emissions budgets, the EPA will apply the unit-level allocation procedure described in section VI.B.9 to the prorated budgets. All calculations required to determine the prorated emissions budgets, the minimum 21 percent variability limits, and the unit-level allocations for the 2023 control period will be carried out as soon as possible after the EPA learns the rule's effective date. The unit-level

allocations for both the 2023 and 2024 control periods will be recorded in facilities' compliance accounts approximately 30 days after the rule's effective date, as discussed in section VI.B.9.b of this document.

In the case of the states (and Indian country within the states' borders) whose sources currently participate in the Group 3 trading program—Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia—the sources will continue to participate in the Group 3 trading program for the 2023 control period, subject to prorating procedures designed to ensure that the changes in 2023 emissions budgets and assurance levels will not substantively affect the sources' requirements prior to the rule's effective date. For these states, in the rulemaking the EPA has computed the full-season emissions budgets that would have applied for the entire 2023 control period if the final rule had become effective no later than May 1, 2023, but the EPA has also retained in the regulations the full-season emissions budgets for the 2023 control period that were established in the Revised CSAPR Update rulemaking. The EPA has added a provision to the regulations indicating that the emissions budgets promulgated in the Revised CSAPR Update will apply on a prorated basis for the portion of the 2023 control period before the final rule's effective date and the emissions budgets established in this rulemaking will apply on a prorated basis for the portion of the 2023 control period on and after the final rule's effective date. Under this provision, the EPA will determine a blended emissions budget for each state for the 2023 control period, computed as the sum of the appropriately prorated amounts of the state's previous and revised emissions budgets. (For example, if the final rule becomes effective on the eleventh day of the 153-day 2023 control period, the blended emissions budget will equal the sum of 10/153 times the previous emissions budget plus 143/153 times the revised emissions budget, rounded to the nearest allowance.) Blended variability limits for the 2023 control period will be computed by first determining for each state the percentage by which the state's reported heat input for the full 2023 ozone season exceeds the heat input used to compute the state's full-season 2023 emissions budget under this rule and then multiplying the higher of this percentage or 21 percent by the state's prorated emissions budget and rounding to the nearest allowance,

---

[365] As discussed in section VI.B.1.d, the EPA is not creating a "safety valve" mechanism in this rule analogous to the voluntary supplemental allowance conversion mechanism established under the Revised CSAPR Update, but intends in the near future to propose and take comment on potential amendments to the Group 3 trading program that would add an auction mechanism to the regulations for the purpose of further increasing allowance market liquidity in conjunction with other appropriate changes to ensure program stringency is maintained. While these changes may provide an additional measure of assurance to the market that allowances will be available for compliance to a degree consistent with the Step 3 emissions control stringency, the EPA does not anticipate that market liquidity concerns pose a challenge to the feasibility of sources to comply with the Group 3 trading program as finalized in this action.

[366] As discussed in sections VI.B.7 and VI.B.8, the revisions establishing unit-specific backstop daily

emissions rates and, for units contributing to assurance level exceedances, secondary unit-specific emissions limitations, will not take effect until the 2024 control period or later.

[367] The EPA notes that transitional provisions similar to the prorating provisions being finalized in this rule were finalized and implemented without issue under the Revised CSAPR Update.

yielding blended assurance levels that equal a minimum of 121 percent of the blended emissions budgets. Unit-level allocations will be determined by applying the allocation procedure described in section VI.B.9 to the blended budgets. Again, all calculations required to determine the prorated emissions budgets, the minimum 21 percent variability limits, and the unit-level allocations for the 2023 control period will be carried out as soon as possible after the EPA learns the effective date of this rule. The unit-level allocations for both the 2023 and 2024 control periods will be recorded in facilities' compliance accounts approximately 30 days after the final rule's effective date, as discussed in section VI.B.9.b of this document.

In the case of the states (and Indian country within the states' borders) whose sources currently participate in the Group 2 trading program—Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Texas, and Wisconsin—the sources will begin to participate in the Group 3 trading program as of May 1, 2023, regardless of the rule's effective date, as discussed in section VI.B.2 of this document, subject to prorating procedures designed to ensure that the transition from the Group 2 trading program to the Group 3 trading program will not substantively affect the sources' requirements prior to the rule's effective date. The prorating procedures for these states mirror the procedures for the states currently in the Group 3 trading program, except that because no emissions budgets currently appear in the Group 3 trading program regulations for the states that are currently covered by the Group 2 trading program, the EPA has added two sets of emissions budgets for these states to the Group 3 trading program regulations: first, the states' emissions budgets for the 2023 control period that currently appear in the Group 2 trading program regulations, which are being included in the revised Group 3 trading program regulations to represent the states' emissions budgets for the portion of the 2023 control period before the rule's effective date, and second, the emissions budgets for the 2023 control period established for the states in this rulemaking, which are being included in the revised Group 3 trading program regulations to represent the state's emissions budgets for the portion of the 2023 control period on and after the rule's effective date. The procedures and timing for determining blended emissions budgets, variability limits and assurance levels, and unit-level allowance allocations, as well as the

timing for the recordation of unit-level allocations, are the same as for the states currently in the Group 3 trading program.

Beginning administrative implementation of the Group 3 trading program starting on May 1, 2023, for sources currently in the Group 2 trading program imposes no new or different requirements on these sources. It would serve the public interest and greatly aid in administrative efficiency for most elements of the Group 3 trading program—specifically, all elements of the trading program other than the elements designed to establish more stringent emissions limitations for the sources coming from the Group 2 trading program—to apply to the sources starting on May 1, 2023. This is how the EPA handled the earlier transition of twelve states from the Group 2 to the Group 3 trading program in the Revised CSAPR Update, which was accomplished successfully and without incident. *See* 86 FR 23133–34. This approach would facilitate implementation of the Group 3 trading program in an orderly manner for the entire 2023 ozone season and reduce compliance burdens and potential confusion. Each of the CSAPR trading programs for ozone season $NO_X$ is designed to be implemented over an entire ozone season. Implementing the transition from the Group 2 trading program to the Group 3 trading program in a manner that required the covered sources to participate in the Group 2 trading program for part of the 2023 ozone season and the Group 3 trading program for the remainder of that ozone season would be complex and burdensome for sources. Attempting to address the issue by splitting the Group 2 and Group 3 requirements for these sources into separate years is not a viable approach, because the EPA has no legal basis for releasing the transitioning Group 2 sources from the emissions reduction requirements found to be necessary in the CSAPR Update for a portion of the 2023 ozone season, and the EPA similarly has no legal basis for deferring implementation of the 2023 emissions reduction requirements found to be necessary under this rule for the transitioning Group 2 sources until 2024. Moreover, the requirements of the current Group 2 trading program and the revised Group 3 trading program for the 2023 control period are substantively identical as to almost all provisions, such that with respect to those provisions, a source will not need to alter its operations in any manner or face different compliance obligations as a consequence of a transition from the

Group 2 trading program to the Group 3 trading program. Thus, the EPA believes that no substantive concerns regarding retroactivity arise from transitioning the sources currently in the Group 2 trading program to the Group 3 trading program starting on May 1, 2023, as long as those aspects of the revised Group 3 trading program for the 2023 control period that *do* meaningfully differ from the analogous aspects of the Group 2 trading program—that is, the relative stringencies of the two trading programs, as reflected in the emissions budgets and associated assurance levels—are applied only as of the effective date of the final rule.

In all respects other than prorating the emissions budgets, variability limits and assurance levels, and unit-level allowance allocations, with respect to the sources currently participating in the Group 2 trading program or the Group 3 trading program, the EPA will implement the revised Group 3 trading program for the 2023 control period in a uniform manner for the entire control period. Thus, emissions will be monitored and reported for the entire 2023 ozone season (*i.e.,* May 1, 2023, through September 30, 2023), and as of the allowance transfer deadline for the 2023 control period (*i.e.,* June 1, 2024) each source will be required to hold in its compliance account vintage-year 2023 Group 3 allowances not less than the source's emissions of $NO_X$ during the entire 2023 ozone season. Any efforts undertaken by one of these sources to reduce its emissions during the portion of the 2023 ozone season before the effective date of the rule will aid the source's compliance by reducing the amount of Group 3 allowances that the source would need to hold in its compliance account as of the allowance transfer deadline, increasing the range of options available to the source for meeting its compliance obligations under the revised Group 3 trading program.

In the case of the sources in the three states that do not currently participate in the Group 2 trading program or the Group 3 trading program, the 2023 control period will begin on the effective date of the rule, and because the effective date of the rule is expected to fall after May 1, 2023, the 2023 control period for the sources in these states will be shorter than the 153-day length of the 2023 control period for the sources in the remaining states. However, the EPA similarly will implement the revised Group 3 trading program for the sources in these states in a uniform manner for the entire shorter control period.

The prorating provisions are being finalized as proposed. The EPA received no comments on the portion of the proposal discussing these provisions.

b. Creation of Additional Group 3 Allowance Bank for 2023 Control Period

In the CSAPR Update, where the EPA established the Group 2 trading program and transitioned over 95 percent of the sources that had been participating in what is now the CSAPR $NO_X$ Ozone Season Group 1 Trading Program (the "Group 1 trading program") to the new program, the EPA determined that it was reasonable to establish an initial bank of allowances for the Group 2 trading program by converting almost all allowances banked under the Group 1 trading program at a conversion ratio determined by a formula. In the Revised CSAPR Update, where the EPA established the Group 3 trading program and transitioned approximately 55 percent of the sources that had been participating in the Group 2 trading program to the new program, the EPA similarly determined that it was reasonable to provide for an initial bank of allowances for the Group 3 trading program by converting allowances banked under the Group 2 trading program at a conversion ratio determined by a formula, using a conversion procedure that was modified to leave much of the Group 2 allowance bank available for use by the approximately 45 percent of sources then in the Group 2 trading program that would remain in that program. Any conversion of banked allowances from a previous trading program for use in a new trading program must ensure that implementation of the new trading program will result in $NO_X$ emissions reductions sufficient to address significant contribution by all states that would be participating in the new trading program, while also providing industry certainty (and obtaining an environmental benefit) through continued recognition of the value of saving allowances through early reductions in emissions. The EPA's approach to balancing these concerns in the CSAPR Update through the conversion of banked allowances from the Group 1 trading program to the Group 2 trading program was upheld in *Wisconsin* v. *EPA,* 938 F.3d at 321.

Under this final rule, applying the same balancing principle as in the CSAPR Update and the Revised CSAPR Update, the EPA will carry out a further conversion of allowances banked for control periods before 2023 under the Group 2 trading program into allowances usable in the Group 3 trading program in control periods in 2023 and later years. Because the EPA is transitioning over 80 percent of the remaining sources in the Group 2 trading program to the Group 3 trading program—much closer to the situation in the CSAPR Update than the situation in the Revised CSAPR Update—in this rule the EPA is applying a conversion procedure similar to the procedure followed in the CSAPR Update. Under the conversion procedure in this rule, the EPA has not set a predetermined conversion ratio in the regulations (as was done in the Revised CSAPR Update) but instead has established provisions identifying the target amount of new Group 3 allowances that will be created and defining the types of accounts whose holdings of Group 2 allowances will be converted to Group 3 allowances (as was done in the CSAPR Update). The conversion date will be carried out by September 18, 2023, which is expected to be approximately 2 months after the compliance deadline for the 2022 control period under the Group 2 trading program and approximately ten months before the compliance deadline for the 2023 control period under the Group 3 trading program. The actual conversion ratio will be determined as of the conversion date and will be the ratio of the total amount of Group 2 allowances held in the identified types of accounts prior to the conversion to the total amount of Group 3 allowances being created.

With respect to the numerator of the conversion ratio—that is, the total amount of Group 2 allowances being converted—the EPA has defined the types of accounts included in the conversion to include all accounts except the facility accounts of sources in states that will remain in the Group 2 trading program, consistent with the approach taken in the CSAPR Update.[368] Thus, the accounts whose holdings of Group 2 allowances will be converted to Group 3 allowances will include (1) the facility accounts of all sources in the states transitioning from the Group 2 trading program to the Group 3 trading program, (2) the facility accounts of all sources in the states already participating in the Group 3 trading program, (3) the facility accounts of all sources in any other states not covered by the Group 2 trading program that happen to hold Group 2 allowances as of the conversion date, and (4) all general accounts (that is, accounts that are not facility accounts, including other accounts controlled by source owners as well as accounts controlled by non-source entities such as allowance brokers). Creating the new Group 3 allowances through conversion of previously banked Group 2 allowances will also help preserve the stringency of the Group 2 trading program for the states that remain covered by that trading program at levels consistent with the stringency found to be appropriate to address those states' good neighbor obligations with respect to the 2008 ozone NAAQS in the CSAPR Update.

With respect to the denominator of the conversion ratio—that is, the target amount of Group 3 allowances that will be created in the conversion process— the EPA has followed the same approach for setting the target amount that was used in the Revised CSAPR Update for creation of the initial Group 3 allowance bank. Specifically, the target amount of Group 3 allowances to be created in this rule will be computed as the sum of the minimum 21 percent variability limits for the 2024 control period[369] established for the ten states being added to the Group 3 trading program, prorated to reflect the portion of the 2023 control period occurring on and after the effective date of the final rule. Based on the amounts of the state emissions budgets and variability limits, the full-season target amount for the conversion would be 23,094 Group 3 allowances. The quantity of banked Group 2 allowances currently held in accounts other than the facility accounts of sources in Iowa, Kansas, and Tennessee exceeding the quantity of allowances likely to be needed for 2022 compliance is approximately 149,386 allowances. Thus, if the quantities of banked Group 2 allowances held in the accounts being included in the conversion do not change between now and the conversion date, and if there was no prorating adjustment, the conversion ratio would be approximately 6.5-to-1, meaning that one Group 3 allowance would be created for every 6.5 Group 2 allowances deducted in the conversion process.[370]

As noted in section VI.B.12.a of this document, the EPA expects that the effective date of this rule will occur after

---

[368] The states whose sources will continue to participate in the Group 2 trading program for the 2023 control period will be Iowa, Kansas, and Tennessee.

[369] Similar to the approach taken in the Revised CSAPR Update, because emissions reductions from some of the emissions controls that EPA has identified as appropriate to use in setting budgets are first reflected in the 2024 state budgets rather than the 2023 state budgets, the EPA is basing the bank target amount on the sum of the states' 2024 variability limits rather than the 2023 variability limits.

[370] By comparison, the analogous conversion ratio under the Revised CSAPR Update was 8-to-1.

the start of the 2023 ozone season, and prorating provisions are being promulgated in this rule to ensure that the increased stringency of this rule's state budgets and state assurance levels (*i.e.,* the sums of the budgets and variability limits) will take effect only after the rule's effective date. Consistent with these other procedures, the EPA will similarly prorate the bank target amount used in the conversion process. For example, if the effective date of the final rule is the eleventh day of the 153-day 2023 ozone season, the full-season initial bank target amount of 23,094 allowances would be prorated to an initial bank target amount of 21,585 allowances.[371] The EPA notes that prorating the bank amount in this manner will not reduce sources' compliance flexibility for the 2023 ozone season, because the amounts of Group 3 allowances that sources will receive for the portion of the 2023 ozone season before the rule's effective date will be based on the trading program budgets for the 2023 control period that were in effect before this rulemaking. These trading program budgets exceed the sources' collective 2022 emissions by approximately 29,789 tons, indicating potentially surplus allowances roughly 1.3 times the full-season bank conversion target amount of 23,094 allowances. Thus, although the prorating procedure will reduce the amount of Group 3 allowances that would be available to sources in the form of an initial bank, the reduction in the quantity of these allowances will be more than offset by the quantities of Group 3 allowances that will be allocated in excess of sources' recent historical emissions levels for the portion of the ozone season before the final rule's effective date.

As in the CSAPR Update and the Revised CSAPR Update, the EPA's overall objective in establishing the target amount for the allowance conversion is to achieve a total target amount for the bank at a level high enough to accommodate year-to-year variability in operations and emissions, as reflected in states' variability limits, but not high enough to allow sources collectively to plan to emit in excess of the collective state budgets. The EPA believes that a well-established trading program should be able to function with an allowance bank lower than the full amount of the covered states' variability limits, as discussed in section VI.B.6 of this document with respect to the bank recalibration process that will begin with the 2024 control period. However, the EPA also believes there are several

compelling reasons in this instance to use a bank target higher than the minimum practicable level.

First, making an allowance bank available for use in the 2023 control period that is somewhat higher than the minimum practicable level will help to address concerns that might otherwise arise regarding the transition to a new set of compliance requirements, for some sources, and the transition to compliance requirements based on revised emissions budgets different from the emissions budgets that the sources had reason to anticipate under previous rulemakings, for the remaining sources. Although the EPA is confident that the emissions budgets being established in this rulemaking for the 2023 control period are readily achievable, the EPA also believes that the existence of a somewhat larger allowance bank at this transition point will promote sources' confidence in their ability to meet their 2023 compliance obligations in general and in a liquid allowance market in particular. Second, because the large majority of the remaining Group 2 allowances that will be converted to Group 3 allowances in this rulemaking are held by the sources currently in the Group 2 trading program, while the large majority of the initial bank of Group 3 allowances previously created in the conversion under the Revised CSAPR Update are held by the sources already in the Group 3 trading program, basing the conversion in this rulemaking on a target bank amount set in the same manner as the target bank amount used in the Revised CSAPR Update is expected to result in a less concentrated distribution of holdings of banked Group 3 allowances following the conversion than would be the case if a more stringent target bank amount were used under this rulemaking than was used in the Revised CSAPR Update. A lower concentration of holdings of banked Group 3 allowances would generally be expected to help ensure allowance market liquidity. Third, the EPA considers it equitable to treat the sources in the states transitioning from the Group 2 trading program to the Group 3 trading program in this rulemaking roughly similarly to the sources in the states that transitioned between the same two trading programs in the Revised CSAPR Update with respect to the benefit they would receive under the Group 3 trading program for any efforts they may have made to make emissions reductions under the Group 2 trading program beyond the minimum efforts that were required to comply with the emissions budgets under that program. Finally, to the extent that the

conversion results in a larger bank of allowances remaining after the 2023 control period than is considered necessary to sustain a well-functioning trading program in subsequent control periods, the excess will be removed from the program in the bank recalibration process that will be implemented starting with the 2024 control period and therefore will not weaken sources' incentives to control emissions on a permanent basis.

The rule's provisions relating to the creation of an incremental Group 3 allowance bank are being finalized as proposed. Comments on the creation of the incremental Group 3 allowance bank are discussed in section 5 of the *RTC*.

### c. Recall of Group 2 Allowances Allocated for Control Periods After 2022

To maintain the previously established levels of stringency for the Group 2 trading program for the states and sources that remain subject to that program, the EPA is recalling CSAPR $NO_X$ Ozone Season Group 2 allowances equivalent in amount and usability to all vintage year 2023–2024 CSAPR $NO_X$ Ozone Season Group 2 allowances previously allocated to sources in states and areas of Indian country transitioning to the Group 3 trading program and recorded in the sources' compliance accounts. The recall provisions apply to all sources in jurisdictions newly added to the Group 3 trading program in whose compliance accounts CSAPR $NO_X$ Ozone Season Group 2 allowances for a control period in 2023 or 2024 were recorded, including sources where some or all units have permanently retired or where the previously recorded 2023–2024 allowances have been transferred out of the compliance account. The recall provisions provide a flexible compliance schedule intended to accommodate any sources that have already transferred the previously recorded 2023–2024 allowances out of their compliance accounts and allow Group 2 allowances of earlier vintages to be surrendered to achieve compliance. Like the similar recall provisions finalized in the Revised CSAPR Update, the recall provisions include specifications for how the recall provisions apply in instances where a source and its allowances have been transferred to different parties and for the procedures that the EPA will follow to implement the recall.

Under the Group 2 trading program regulations, each Group 2 allowance is a "limited authorization to emit one ton of $NO_X$ during the control period in one year," where the relevant limitations include the EPA Administrator's

---

[371] $23,094 \times (153 - 10) \div 153 = 21,585.$

authority "to terminate or limit the use and duration of such authorization to the extent the Administrator determines is necessary or appropriate to implement any provision of the Clean Air Act." 40 CFR 97.806(c)(6)(ii). The Administrator is determining that, to effectively implement the Group 2 trading program as a compliance mechanism through which states not subject to the Group 3 trading program may continue to meet their obligations under CAA section 110(a)(2)(D)(i)(I) with regard to the 2008 ozone NAAQS, it is necessary to limit the use of Group 2 allowances equivalent in quantity and usability to all Group 2 allowances previously allocated for the 2023–2024 control periods and recorded in the compliance accounts of sources in the newly added Group 3 jurisdictions. The Group 2 allowances that have already been allocated to sources in the newly added Group 3 states for the 2023–2024 control periods and recorded in the sources' compliance accounts represent the substantial majority of the total remaining quantity of Group 2 allowances that have been allocated and recorded for the 2023–2024 control periods and that were not already made subject to recall when other jurisdictions were transferred from the Group 2 trading program to the Group 3 trading program in the Revised CSAPR Update. Because allowances can be freely traded, if the use of the 2023–2024 Group 2 allowances previously recorded in newly added Group 3 sources' compliance accounts (or equivalent Group 2 allowances) were not limited, the effect would be the same as if the EPA had issued to sources in the states that will remain covered by the Group 2 trading program a quantity of allowances available for compliance under the 2023–2024 control periods many times the levels that the EPA determined to be appropriate emissions budgets for these states in the CSAPR Update. Through the use of banked allowances, the excess Group 2 allowances would affect compliance under the Group 2 trading program in control periods after 2024 as well. Continued implementation of the Group 2 trading program at levels of stringency consistent with the levels contemplated under the CSAPR Update therefore requires that the EPA limit the use of the excess allowances, as the EPA is doing through the recall provisions.

In this rule, the EPA is implementing limitations on the use of the excess 2023–2024 Group 2 allowances through requirements to surrender, for each 2023–2024 Group 2 allowance recorded in a newly added Group 3 source's compliance account, one Group 2 allowance of equivalent usability under the Group 2 trading program. The surrender requirements apply to the owners and operators of the Group 3 sources in whose compliance account the excess 2023–2024 Group 2 allowances were initially recorded. In general, each source's current owners and operators are required to comply with the surrender requirements for the source by ensuring that sufficient allowances to complete the deductions are available in the source's compliance account by one of two possible deadlines discussed later in this section. However, an exception is provided if a source's current owners and operators obtained ownership and operational control of the source in a transaction that did not include rights to direct the use and transfer of some or all of the 2023–2024 Group 2 allowances allocated and recorded (either before or after that transaction) in the source's compliance account. The rule provides that in such a circumstance, with respect to the 2023–2024 Group 2 allowances for which rights were not included in the transaction, the surrender requirements apply to the most recent former owners and operators of the source before any such transactions occurred. Because in this situation a source's former owners and operators might lack the ability to access the source's compliance account for purposes of complying with the surrender requirements, the former owners and operators would instead be allowed to meet the surrender requirements with Group 2 allowances held in a general account.[372]

To provide as much flexibility as possible consistent with the need to limit the use of the excess Group 2 allowances, for each 2023–2024 Group 2 allowance recorded in a Group 3 source's compliance account, the EPA will accept the surrender of either the same specific 2023–2024 Group 2 allowance or any other Group 2 allowance with equivalent (or greater) usability under the Group 2 trading program. Thus, a surrender requirement with regard to a Group 2 allowance allocated for the 2023 control period could be met through the surrender of any Group 2 allowance allocated for the 2023 control period or the control period in any earlier year—in other words, any 2017–2023 Group 2 allowance.[373] Similarly, the surrender requirement with regard to a 2024 Group 2 allowance could be met through the surrender of any 2017–2024 Group 2 allowance.

Owners and operators subject to the surrender requirements can choose from two possible deadlines for meeting the requirements. The optional first deadline will be 15 days after the effective date of this rule.[374] As soon as practicable or after this date, the EPA will make a first attempt to complete the deductions of Group 2 allowances required for each Group 3 source from the source's compliance account. The EPA will deduct Group 2 allowances first to address any surrender requirements for the 2023 control period and then to address any surrender requirements for the 2024 control period. When deducting Group 2 allowances to address the surrender requirements for each control period, EPA will first deduct allowances allocated for that control period and then will deduct allowances allocated for each successively earlier control period. This order of deductions is intended to ensure that whatever Group 2 allowances are available in the account are applied to the surrender requirements in a manner that both maximizes the extent to which all of the source's surrender requirements will be met and also ensures that any Group 2 allowances left in the source's compliance account after completion of all required deductions will be the earliest allocated, and therefore most useful, Group 2 allowances possible. Among the Group 2 allowances allocated for a given control period, The EPA will first deduct allowances that were initially recorded in that account, in the order of recordation, and will then deduct allowances that were transferred into that account after having been initially recorded in some other account, in the order of recordation.

Following the first attempt to deduct Group 2 allowances to address Group 3 sources' surrender requirements, the

---

[372] The EPA is currently unaware of any source that would need to use this flexibility but has included the option in the rule to address the theoretical possibility of such a situation.

[373] The first control period for the Group 2 trading program was in 2017.

[374] As discussed later in this section and in section VI.B.9.b, the EPA has conditioned recordation of any allocations of Group 3 allowances in a source's compliance account on the source's prior compliance with the recall requirements for Group 2 allowances. The purpose of providing an optional first deadline for the recall provisions 15 days after a final rule's effective is to ensure that sources have an early opportunity to comply with the recall provisions to be eligible to have allocations of Group 3 allowances recorded in their accounts 30 days after the final rule's effective date. Because the vast majority of sources subject to the recall provisions already hold sufficient Group 2 allowances to comply with the recall provisions, the EPA anticipates that the sources will easily be able to comply with the optional first recall deadline.

EPA will send a notification to the designated representative for each such source (as well as any alternate designated representative) indicating whether all required deductions were completed and, if not, the additional amounts of Group 2 allowances usable in the 2023 or 2024 control periods that must be held in the appropriate account by the second surrender deadline of September 15, 2023. Each notification will be sent to the email addresses most recently provided to the EPA for the recipients and will include information on how to contact the EPA with any questions. The EPA has provided that no allocations of Group 3 allowances will be recorded in a source's compliance account until all the source's surrender requirements with regard to 2023–2024 Group 2 allowances have been met. For this reason, the principal consequence to a source of failure to fully comply with the surrender requirements by 15 days after the effective date of this rule will be that any Group 3 allowances allocated to the units at the source for the 2023 and 2024 control periods that would otherwise have been recorded in the source's compliance account by 30 days after the effective date of a final rule will not be recorded as of that recordation date.

If all surrender requirements of 2023–2024 Group 2 allowances for a source have not been met in EPA's first attempt, the EPA will make a second attempt to complete the required deductions from the source's compliance account (or from a specified general account, in the limited circumstance noted previously) as soon as practicable on or after September 15, 2023. The order in which Group 2 allowances are deducted will be the same as described previously for the first attempt.

If the second attempt to deduct Group 2 allowances to meet the surrender requirements through deductions from the source's compliance account (or from a specified general account) is unsuccessful for a given source, as soon as practicable on or after November 15, 2023, to the extent necessary to address the unsatisfied surrender requirements for the source, the EPA will deduct the 2023–2024 Group 2 allowances that were initially recorded in the source's compliance account from whatever accounts the allowances are held in as of the date of the deduction, except for any allowances where, as of April 30, 2022, no person with an ownership interest in the allowances was an owner or operator of the source, was a direct or indirect parent or subsidiary of an owner or operator of the source, or was

directly or indirectly under common ownership with an owner or operator of the source.[375] Before making any deduction under this provision, the EPA will send a notification to the authorized account representative for the account in which the allowance is held and will provide an opportunity for submission of objections concerning the data upon which the EPA is relying. In EPA's view, this provision does not unduly interfere with the legitimate expectations of participants in the allowance markets because the provision will not be invoked in the case of any allowance that was transferred to an independent party in an arms-length transaction before EPA's intent to recall 2023–2024 Group 2 allowances became widely known. The provision would apply only to a Group 2 allowance that as, of April 30, 2022, was still controlled either by the owners and operators of the source in whose compliance account it was initially recorded or by an entity affiliated with such an owner or operator. The EPA believes that by April 30, 2022, all market participants had ample opportunity to become informed of the proposed rule provisions to recall 2023–2024 Group 2 allowances recorded in Group 3 sources' compliance accounts, particularly since the EPA implemented a closely analogous recall of Group 2 allowances in the Revised CSAPR Update.[376]

The final revised regulations provide that failure of a source's owners and operators to comply with the surrender requirements will be subject to possible enforcement as a violation of the CAA, with each allowance and each day of the control period constituting a separate violation.

To eliminate any possible uncertainty regarding the amounts of Group 2 allowances allocated for the 2023–2024 control periods (or earlier control periods) that the owners and operators

of each Group 3 source are required to surrender under the recall provisions, the EPA has prepared a list of the sources in the additional Group 3 states and areas of Indian country in whose compliance accounts allocations of 2023–2024 Group 2 allowances were recorded, with the amounts of the allocations recorded in each such compliance account for the 2023 and 2024 control periods. An additional list shows, for each newly added Group 3 source, the specific Group 2 allowances (batched by serial number) allocated for each control period and recorded in the source's compliance account and indicates whether, as of April 30, 2022, that batch of allowances was held in the source's compliance account, in an account believed to be partially or fully controlled by a related party (*i.e.,* an owner or operator of the source or an affiliate of an owner or operator of the source), or in an account believed to be fully controlled by independent parties. The lists are in a spreadsheet titled, "Recall of Additional CSAPR $NO_X$ Ozone Season Group 2 Allowances," available in the docket for this rule. After the first and second surrender deadlines, the EPA intends to update the lists to indicate for each Group 3 source whether the surrender requirements for the source under the recall provisions have been fully satisfied. The EPA will post the updated lists on a publicly accessible website to ensure that all market participants have the ability to determine which specific 2023–2024 Group 2 allowances initially recorded in any given Group 3 source's compliance account do or do not remain subject to potential deduction to address the source's surrender requirements under the recall provisions.

The recall provisions have been finalized without change from the proposal. The EPA received no comments on the proposed provisions.

### 13. Conforming Revisions to Regulations for Other CSAPR Trading Programs

As noted in section VI.B.1.a of this document, in addition to the Group 3 trading program, EPA currently administers five other CSAPR trading programs, all of which have provisions that in most respects parallel the provisions of the Group 3 trading program.[377] In this rulemaking, in addition to the revisions to the Group 3 trading program, the EPA is finalizing a set of conforming revisions that concern how various areas of Indian country are

---

[375] The provision under which the EPA will not deduct Group 2 allowances transferred to unrelated parties before April 30, 2022 from the transferees' accounts does not relieve the source to which the Group 2 allowances were originally allocated from the obligation to comply with the recall requirements. Specifically, the source would be required to comply with the recall requirements by obtaining and surrendering other Group 2 allowances.

[376] Even before publication of the proposed rule, the EPA posted information on its websites to notify market participants that a pending rulemaking could have consequences for the value and usability of Group 2 allowances. The posted locations included the electronic portal that authorized account representatives use to enter allowance transfers for recordation by the EPA in the Allowance Management System. Additionally, the EPA emailed a notice identifying the possibility of such consequences to the representatives for all Allowance Management System accounts.

[377] The regulations for the Group 3 Trading Program are at 40 CFR part 97, subpart GGGGG. The regulations for the other five CSAPR trading programs are at 40 CFR part 97, subparts AAAAA, BBBBB, CCCCC, DDDDD, and EEEEE.

treated for purposes of the allowance allocation provisions of the regulations for all the CSAPR trading programs.[378]

As discussed in section VI.B.9.a of this document, to reflect the D.C. Circuit's holding in *ODEQ* v. *EPA* that states have initial CAA implementation planning authority in non-reservation areas of Indian country until displaced by a demonstration of tribal jurisdiction over such an area, the EPA is revising the allowance allocation provisions in the Group 3 trading program regulations so that, instead of distinguishing between the sets of units within a given state's borders that either are not or are in Indian country, the revised regulations distinguish between (1) the set of units within the state's borders that are not in Indian country or are in areas of Indian country covered by the state's CAA implementation planning authority and (2) the set of units within the state's borders that are in areas of Indian country not covered by the state's CAA implementation planning authority. For the same reasons stated in section VI.B.9.a of this document for the Group 3 trading program, the EPA is revising the allowance allocation provisions in the regulations for all the other CSAPR trading programs establishing the same substantive distinction among the sets of units within each state's borders. The specific regulatory provisions that are affected are identified in section IX.D of this document. The EPA is unaware of any currently operating units that would be affected by this revision to the regulations for the other CSAPR trading programs.

The conforming revisions to the regulations for the other CSAPR trading programs concerning Indian country are being finalized as proposed with no changes. The EPA received no comments on this portion of the proposal.

### C. Regulatory Requirements for Stationary Industrial Sources

The EPA is finalizing FIPs with requirements for certain non-EGU industry sources for 20 of the states covered in this final rule. See section II.B of this document for the list of states. The FIPs include new emissions limitations for units in nine non-EGU industries that the EPA finds (as discussed in sections IV and V of this final rule) are significantly contributing

to nonattainment or interfering with maintenance in other states. The emissions control requirements of these FIPs for non-EGU sources apply only during the ozone season (May through September) each year, beginning in 2026.

To achieve the necessary non-EGU emissions reductions for these 20 states, the EPA is finalizing the proposed emissions limitations with some adjustments as a result of information received during the public comment period. The final emissions limits apply to the most impactful types of units in the relevant industries and are achievable with the control technologies identified in this preamble and further discussed in the Final Non-EGU Sectors TSD. The non-EGU regulatory requirements unique to each industry that EPA is finalizing after considering public comments are discussed in sections VI.C.1 through VI.C.6 of this document.

These final FIP requirements apply to both new and existing emissions units. The non-EGU emissions limits and compliance requirements will apply in all 20 states (and, as discussed in section III.C.2 of this document, in areas of Indian country within the borders of those states), even if some of those states do not currently have emissions units in a particular source category. This approach is consistent with the approach that the EPA proposed, and the EPA did not receive any comments specifically objecting to our proposal to regulate new units. This approach will ensure that all new sources constructed in any of the 20 states will be subject to the same good neighbor requirements that apply to existing units under this final rule. This will also avoid creating incentives to move production from an existing non-EGU source to a new non-EGU source of the same type but lacking the relevant emissions control requirements either within a linked state or in another linked state.

*Comment:* The EPA received several comments regarding the proposed approach of establishing unit-specific emissions limitations for non-EGUs instead of an emissions trading program. Some commenters suggested that a trading program for non-EGUs could provide for operational flexibility and that EPA should allow sources to work with regulatory authorities to develop a trading program. Other commenters generally supported EPA's proposed approach and the decision to not include non-EGUs in an emissions trading program, because the EPA would not need to require sources to unnecessarily install CEMS. Commenters from several states and

industry groups generally supported other monitoring options over CEMS, such as parametric monitoring, performance testing, and predictive emissions monitoring systems (PEMS). Additional commenters voiced concern with the expense and burden of continuous parametric monitoring and semi-annual performance tests. Specifically, commenters explained that semi-annual testing should not be required when the emissions limits only apply during the ozone season. Commenters also noted that many non-EGU boilers have recently been relieved from meeting the CEMS requirements under the 1998 NO$_X$ SIP Call and that implementing CEMS on many of the non-EGU sources would be difficult and unnecessary.

*Response:* The EPA is finalizing a unit-specific approach with rate-based emissions limitations set on a uniform basis for the different segments of non-EGU emissions units using applicability criteria based on size and type of unit and, in some cases, emissions thresholds. In response to public comments, the EPA has adjusted these requirements as necessary to ensure that the emissions control requirements are achievable while ensuring that the FIPs achieve the necessary emissions reductions from the covered units to eliminate significant contribution to nonattainment and interference with maintenance as discussed in section V of this document. The EPA has concluded that a unit-specific approach is more appropriate for non-EGUs at this time than implementing a trading program and requiring all units to implement rigorous part 75 monitoring and reporting requirements. As explained in the proposal, to be considered for a trading program, non-EGU sources would have to comply with requirements for monitoring and reporting of hourly mass emissions in accordance with 40 CFR part 75 as we have required for all previous trading programs. Monitoring and reporting under part 75 include CEMS (or an approved alternative method), rigorous initial certification testing, and periodic quality assurance testing thereafter, such as relative accuracy test audits and daily calibrations. Consistent and accurate measurement of emissions is necessary to ensure that each allowance actually represents one ton of emissions and that one ton of reported emissions from one source would be equivalent to one ton of reported emissions from another source. *See* 75 FR 45325 (August 2, 2010). Moreover, these monitoring requirements generally would need to be in place for at least

---

[378] Additional conforming revisions concerning the schedules for the EPA to record allowance allocations in source's compliance accounts and for states to submit state-determined allowance allocations to the EPA for subsequent recordation were finalized in an earlier final rule in this docket. See 87 FR 52473 (August 26, 2022).

one full ozone season to establish baseline data before it would be appropriate to rely on a trading program as the mechanism to achieve the required emissions reductions. Many industry and state commenters provided information confirming that many non-EGU units subject to this rulemaking do not currently utilize CEMS and specifically requested that EPA avoid requiring CEMS for all non-EGU industries. The EPA generally agrees that CEMS is not necessary for all non-EGU industries under the approach of this final rule and is finalizing other continuous monitoring, recordkeeping, and reporting requirements, as appropriate, that are specific to each non-EGU industry. The EPA has determined that establishing unit-specific emissions limitations for non-EGUs is a preferable approach in part because it avoids the rigorous monitoring requirements that would be applied to non-EGUs for the first time under a trading program.

Furthermore, to address commenters' concerns regarding non-EGU requirements for performance testing on a semi-annual basis, the EPA has also reduced the frequency of all required performance testing for non-EGU sources to once per calendar year. As commenters correctly pointed out, the emissions limits in these final FIPs only apply during the ozone season and testing once per calendar year should be sufficient to confirm the accuracy of the parameters being monitored to demonstrate continuous compliance during the ozone season. The EPA also agrees with commenters that the annual testing requirements need not occur during the ozone season.

In addition, the EPA is modifying the applicability criteria and other regulatory requirements in response to public comments to provide certain compliance flexibilities for non-EGU industries where appropriate. As discussed further in section V.C.1 of this document, the EPA is modifying the requirements for Pipeline Transportation of Natural Gas by finalizing an exemption for emergency engines and allowing any owner or operator of an affected unit to propose a "Facility-Wide Averaging Plan" that would, if approved by EPA, provide an alternative means for compliance with the emissions limits in this final rule. Further, as discussed in section VI.C.5 of this document, the EPA is finalizing a low-use exemption for non-EGU boilers that operates less than 10 percent per year on an hourly basis, based on the three most recent years of use and no more than 20 percent in any one of the three years. These final rule

provisions require controls on the most impactful non-EGU industrial sources while providing the flexibility needed to accommodate unique circumstances on a case-by-case basis.

*Comment:* Commenters from several non-EGU industries and states raised general concerns regarding the ability for all sources to comply with the proposed emissions limits. Some commenters suggested that the EPA allow for case-by-case limits where necessary, similar to case-by-case RACT determinations. Specifically, commenters operating boilers, furnaces, and MWCs provided general explanations of how some units might not be able to meet the proposed emissions limits and requested that EPA provide for compliance flexibility where a source can demonstrate technical and economical infeasibility.

*Response:* As explained more in sections VI.C.1 through VI.C.6, the EPA has made several adjustments to the proposed applicability criteria, emissions limits, and compliance requirements in response to public comments and to reduce the costs of compliance with the final rule. For Pipeline Transportation and Natural Gas, the EPA is finalizing emissions averaging provisions and exemptions for emergency engines to allow facilities to avoid installing controls on units with lower actual emissions where the installation of controls would be less cost effective compared to higher-emitting units. For Cement and Concrete Product Manufacturing, the EPA has removed the daily source cap that would have resulted in an artificially restrictive $NO_X$ emissions limit for affected cement kilns that have operated at lower levels due to the COVID–19 pandemic. For Iron and Steel and Ferroalloy Manufacturing, the EPA is finalizing a "test-and-set" requirement for reheat furnaces that will require the installation of low-$NO_X$ burners or equivalent technology. The EPA has addressed the economic concerns raised by commenters regarding installation of controls at Iron and Steel facilities by not finalizing the other ten proposed emissions limits that were intended to require the installation of SCR at these facilities. For Glass and Glass Product Manufacturing, the EPA is finalizing alternative standards that apply during startup, shutdown, and idling conditions. For boilers in Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, Pulp, Paper, and Paperboard Mills, Metal Ore Mining, and the Iron and Steel Industry, the EPA is finalizing a low-use exemption to eliminate the need to install controls on boilers that would

have resulted in relatively small reductions in emissions. Finally, the EPA has modified the monitoring and recordkeeping requirements for all non-EGU industries where possible to reduce the testing frequency to once a year and to provide for alternative monitoring protocols where appropriate, which should further reduce the costs of compliance on non-EGU sources. With these modifications to the final rule in response to comments, the non-EGU sources subject to this rule should be able to meet the applicable control requirements established in this final rule.

The EPA also recognizes, however, that there may be unique circumstances the Agency cannot anticipate that would, for a particular source, render the final emissions control requirements technically impossible or impossible without extreme economic hardship. To address these limited circumstances, the EPA is finalizing a provision that allows a source to request EPA approval of a case-by-case emissions limit based on a showing that an emissions unit cannot meet the applicable standard due to technical impossibility or extreme economic hardship. The EPA has modeled the case-by-case emissions limit mechanism on case-by-case RACT requirements and certain facility-specific emissions limits under 40 CFR part 60 identified by commenters.[379] The owner or operator of a source seeking a case-by-case emissions limit must submit a request meeting specific requirements to the EPA by August 5, 2024, one year after the effective date of this final rule. The applicable emissions limits established in this final rule remain in effect until the EPA approves a source's request for a case-by-case emissions limit. Given the May 1, 2026 compliance date that generally applies to all affected units in the non-EGU industries covered by this final rule, we encourage owners and operators of affected units who believe they must seek case-by-case emissions limits to submit their requests to the EPA before the one-year deadline for such requests, if possible, to ensure adequate time for EPA review and to install the necessary controls.

For a source requesting a case-by-case limit due to technical impossibility, the final rule requires that the request include emissions data obtained through CEMS or stack tests, an analysis

---

[379] For examples of case-by-case RACT provisions and source specific limits for boilers in subpart Db of the EPA's NSPS, see 40 CFR 60.44b(f); Regulations of Connecticut State Agencies section 22a–174–22e; Code of Maryland Regulations section 26.11.09.08(B)(3); and Code of Maine Rules section 096–138–3, subsection (I).

of all available control technologies based on an engineering assessment by a professional engineer or data from a representative sample of similar sources, and a recommendation concerning the most stringent emissions limit the source can technically achieve.

For a source requesting a case-by-case limit on the basis of extreme economic hardship, the final rule requires that the request include at least three vendor estimates from three separate vendors that do not have a corporate or business-affiliation with the source of the costs of installing the control technology necessary to meet the applicable emissions limit and other information that demonstrates, to the satisfaction of the Administrator, that the cost of compliance with the applicable emissions limit for that particular source would present an extreme economic hardship relative to the costs borne by other comparable sources in the industry under this rule. In evaluating a source's request for a case-by-case limit due to extreme economic hardship, the EPA will consider the emissions reductions and costs identified in this final rulemaking (and related support documents) for other sources in the relevant industry and whether the costs of compliance for the source seeking the case-by-case limit would significantly exceed the highest representative end of the range of estimated cost-per-ton figures identified for any source in the relevant industry as discussed in section V of this document.

As discussed in section VI.A of this document, in *Wisconsin* the court held that some deviation from the CAA's mandate to eliminate prohibited transport by downwind attainment deadlines may be allowed only ''under particular circumstances and upon a sufficient showing of necessity,'' *e.g.,* when compliance with the statutory mandate amounts to an impossibility.[380] Given these directives, the EPA cannot allow a covered source to avoid complying with the emissions limits established in this final rule unless the source can demonstrate that compliance with the limit would either be impossible as a technical matter or result in an extreme economic hardship—*i.e.,* exceed the high end of the cost-effectiveness estimates that informed the EPA's Step 3 determination of significant contribution, as discussed in section V of this document. The criteria that must

---

[380] *Wisconsin,* 938 F.3d at 316 and 319–320 (noting that any such deviation must be ''rooted in Title I's framework'' and ''provide a sufficient level of protection to downwind States'').

---

be met to qualify for a case-by-case limit are designed to meet this statutory mandate.

*Comment:* Several commenters raised concerns about the EPA's differing applicability criteria for the various non-EGU industries. Specifically, the commenters questioned why EPA set applicability criteria for engines in Pipeline Transportation of Natural Gas and non-EGU boilers based on design capacity instead of potential to emit (PTE). Commenters also requested that the EPA allow each non-EGU category to rely on operating permits or other federally enforceable instruments to avoid being subject to the rule, such as limits to the PTE or limits on fuels used.

*Response:* The 100 tpy PTE threshold and comparable design capacity thresholds of 1,000 horsepower (hp) for engines and 100 mmBtu/hr for boilers are appropriate to ensure that the final rule reduces emissions from the most impactful units. The EPA finds the control technologies assumed to be installed to meet the final emissions limits would not be as readily available or cost effective for emissions units with PTE or design capacities lower than the applicability thresholds in this final rule.

With regard to the selection of design capacity thresholds for boilers and engines, the EPA finds that most RACT requirements and other standards reviewed by the EPA establish applicability criteria for engines and boilers based on design capacity rather than PTE. We further explain our basis for establishing applicability thresholds based on design capacity for these two source categories in sections VI.C.1. and VI.C.5. For consistency with preexisting requirements for engines and boilers and to capture the sizes of units identified in Step 3 of our analysis, the EPA selected design capacities of 1,000 hp for engines and 100 mmBtu/hr for boilers. The EPA recognizes that these applicability thresholds captured more units than the EPA intended, particularly some low-use units. Therefore, as explained in sections VI.C.1 and VI.C.5., the EPA is establishing exemptions for low-use boilers and emergency engines, as well as new emissions averaging provisions for engines, to ensure that this final rule focuses on larger, more impactful units.

The EPA also agrees with commenters that the applicability criteria should allow for sources to rely on enforceable requirements that limit a source's PTE and is finalizing a regulatory definition of PTE that is generally consistent with the definitions of that term in the EPA's title V and NSR permit programs. *See, e.g.,* 40 CFR 51.165(a)(1)(iii), 70.2. In

constructing the list of potential sources subject to the final rule, the EPA relied on available information to identify the PTE of the emissions units in the various non-EGU industries that are captured by the applicability criteria. *See Memo to Docket titled Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Limits, Emissions Reductions, and Costs.* Thus, the EPA's Step 3 analysis takes into account available information about currently enforceable emissions limits and physical and operational limitations identified in existing permits. The EPA finds it necessary to define PTE consistent with its use in the title V and NSR permit programs to ensure that the requirements of the final FIPs apply to the most impactful units identified in Step 3 of our analysis. However, to ensure that these FIPs achieve the emissions reductions necessary to eliminate significant contribution or interference with maintenance as described in this final rule, the applicability criteria for the Cement and Concrete Manufacturing, Iron and Steel and Ferroalloy Manufacturing, and Glass and Glass Product Manufacturing industries take into account only those enforceable PTE limits in effect as of the effective date of this final rule. Thus, any emissions unit in these three industries that has a PTE equal to or greater than 100 tons per year and thus meets the definition of an ''affected unit'' as of August 4, 2023, will remain subject to the applicable FIPs, without regard to any PTE limit that the emissions unit may subsequently become subject to. Each affected unit in these three industries must submit an initial notification of applicability to the EPA by December 4, 2023, that identifies its PTE as of the effective date of this final rule. Additionally, any owner or operator of an existing emissions unit that is not an affected unit as of August 4, 2023, but subsequently meets the applicability criteria (*e.g.,* due to a change in fuel use that increases the unit's PTE) will become an affected unit subject to the applicable requirements of this final rule at that time.

*Comment:* In responding to the EPA's request for comment on whether some non-EGU units would need to run controls required by the final FIP year-round, one commenter anticipated that control equipment would be operated as necessary to achieve applicable emissions limits, but that operational

flexibility, cost considerations and equipment longevity would warrant operation of certain control equipment on a schedule such that the equipment would not be used when unnecessary to meet emissions limits and/or outside of ozone season (*i.e.,* during winter months). The commenter further explained that flexibility in the operation of certain control equipment when unnecessary to meet emissions limits will allow for routine maintenance and repairs without requiring variances or similar exemptions from continuous operation requirements.

*Response:* Based on the feedback received during the public comment period, the EPA is finalizing requirements for non-EGU sources that will apply only during the ozone season, which runs annually from May to September. As discussed in the proposed rule, this is consistent with EPA's prior practice in Federal actions to eliminate significant contribution of ozone in the 1998 $NO_X$ SIP Call, CAIR, CSAPR, CSAPR Update, and the Revised CSAPR Update. In addition, the EPA did not receive any information during the public comment period suggesting that sources would have to run the necessary controls year-round due to the nature of those controls. We note, however, that certain emissions-control technologies, such as combustion controls that are integrated into the unit itself, would likely function to reduce $NO_X$ emissions year-round as a practical engineering matter.

*Comment:* Regarding electronic reporting through the Compliance and Emissions Data Reporting Interface (CEDRI), one commenter requested that CEDRI reporting requirements be consolidated in one location rather than repeated in each section. Another commenter requested that EPA include electronic reporting requirements for MWCs and specifically require that MWCs report CEMS data to CEDRI. Another commenter requested that EPA allow for extensions of time for electronic reports due to technical glitches.

*Response:* To increase the ease and efficiency of data submittal and data accessibility, the EPA is finalizing, as proposed, a requirement that owners and operators of non-EGU sources subject to the final FIPs, including MWCs, submit electronic copies of required initial notifications of applicability, performance test reports, performance evaluation reports, quarterly and semi-annual reports, and excess emissions reports through EPA's Central Data Exchange (CDX) using the CEDRI. The final rule requires that

performance test results collected using test methods that are supported by the EPA's Electronic Reporting Tool (ERT) as listed on the ERT website [381] at the time of the test be submitted in the format generated through the use of the ERT or an electronic file consistent with the XML schema on the ERT website and that other performance test results be submitted in portable document format (PDF) using the attachment module of the ERT. Similarly, the EPA is finalizing a requirement that performance evaluation results of CEMS measuring relative accuracy test audit (RATA) pollutants that are supported by the ERT at the time of the test be submitted in the format generated through the use of the ERT or an electronic file consistent with the XML schema on the ERT website, and a requirement that other performance evaluation results be submitted in PDF using the attachment module of the ERT. The final rule also requires that initial notifications of applicability, annual compliance reports, and excess emissions reports be submitted in PDF uploaded in CEDRI.

Furthermore, the EPA is finalizing, as proposed, provisions that allow owners and operators to seek extensions of time to submit electronic reports due to circumstances beyond the control of the owner or operator (*e.g.,* due to a possible outage in CDX or CEDRI or a *force majeure* event) in the time just prior to a report's due date, as well as provisions specifying how to submit such a claim. Public commenters supported these proposed provisions.

The EPA agrees with commenters that the CEDRI reporting requirements could be centralized and has moved the CEDRI reporting requirements to 40 CFR 52.40.

### 1. Pipeline Transportation of Natural Gas

#### Applicability

The EPA is finalizing regulatory requirements for the Pipeline Transportation of Natural Gas industry that apply to stationary, natural gas-fired, spark ignited reciprocating internal combustion engines ("stationary SI engines") within these facilities that have a maximum rated capacity of 1,000 hp or greater. Based on our review of the potential emissions from stationary SI engines, we find that use of a maximum rated capacity of 1,000 hp reasonably approximates the 100 tpy PTE threshold used in the *Screening Assessment of Potential Emissions Reductions, Air Quality*

---

[381] The ERT website is located at *https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert.*

*Impacts, and Costs from Non-EGU Emissions Units for 2026,* as described in section V.B of this document.

The EPA is also modifying certain provisions in response to public comments to provide compliance flexibilities for the Pipeline Transportation of Natural Gas industry sector in order to focus emissions reduction efforts on the highest emitting units. Specifically, the EPA is finalizing an exemption for emergency engines, and establishing provisions that allow any owner or operator of an affected unit to propose a Facility-Wide Averaging Plan that would, if approved by EPA, provide an alternative means for compliance with the emissions limits in this final rule.

For purposes of this rule, the EPA is clarifying and narrowing the definition of "pipeline transportation of natural gas" to mean the transport or storage of natural gas prior to delivery to a local distribution company custody transfer station or to a final end-user (if there is no local distribution company custody transfer station). The revised definition of this term in § 52.41(a) is consistent with the EPA's regulatory definition of "natural gas transmission and storage segment" in 40 CFR 60.5430a(a) (subpart OOOOa, Standards of Performance for Crude Oil and Natural Gas Facilities for Which Construction, Modification, or Reconstruction Commenced After September 18, 2015).

The EPA is also adding definitions of the terms "local distribution company" and "local distribution company custody transfer station" that are consistent with the definitions found in 40 CFR 98.400 (subpart NN, Suppliers of Natural Gas and Natural Gas Liquids) and 40 CFR 60.5430a(a) (subpart OOOOa, Standards of Performance for Crude Oil and Natural Gas Facilities for Which Construction, Modification, or Reconstruction Commenced After September 18, 2015), respectively.

*Comment:* Several commenters asked EPA to exclude emergency engines in the final rule and one commenter recommended that the EPA revise the definition of affected unit to specifically exempt emergency engines. Commenters stated that doing so would not only be consistent with other regulations applicable to stationary SI engines, but it would also be more consistent with EPA's applicability analysis, which assumes stationary SI engines will operate for 7,000 hours a year, something emergency engines are prohibited from doing by Federal regulation. Commenters also stated that emergency generators are currently exempt from requirements applicable to non-emergency RICE covered by both

the relevant NSPS rule (subpart JJJJ), as well as the relevant NESHAP rule (subpart ZZZZ), and that although the NSPS and NESHAP standards EPA has adopted for emergency RICE do not limit the amount of time they may run for emergency purposes, EPA has recognized in the past that states may assume a maximum of 500 hours of operation to estimate the "potential to emit" in issuing air permits for emergency RICE. One commenter asserted that emergency engines operating under other standards currently only operate for emergencies or for a few hours at a time to periodically conduct regular maintenance, that their emissions are low, and that their contribution to the ozone transport issues EPA's proposal seeks to address is negligible. Another commenter stated that the EPA has traditionally exempted emergency engines in past standards because the EPA has typically found that the use of add-on emissions controls cannot be justified due to the cost of the technology relative to the emissions reduction that would be obtained.

*Response:* With respect to stationary SI emergency engines, the EPA has reviewed the information submitted by the commenters and has decided to exempt such engines from the requirements of the final rule. Exemption of emergency engines is generally consistent with the EPA's treatment of emergency engines in other CAA rulemakings. *See, e.g.,* 40 CFR 63.6585(f). The EPA expects that this change from the proposed rule addresses the concerns expressed by the commenters about the requirements for stationary emergency engines.

The final rule defines emergency engines as engines that are stationary and operated to provide electrical power or mechanical work during an emergency situation. These engines are typically used only a few hours per year, and the costs of emissions control are not warranted when compared to the emissions reductions that would be achieved.

In the final rule, emergency engines are subject to certain compliance requirements on a continuous basis. Continuous compliance requirements include operating limitations that apply during non-emergency use but do not include emissions testing of emergency engines.

*Comment:* Several commenters raised concerns about the EPA's proposal to establish applicability criteria for engines in Pipeline Transportation of Natural Gas based on design capacity rather than PTE. Other commenters asserted that the horsepower rating of an engine does not necessarily correspond to its annual emissions and that engines with a rated capacity of more than 1,000 hp in this industry sector may operate at low load and/or infrequently and be associated with limited $NO_X$ emissions. One commenter stated that most of the subject facilities in their state that have natural gas fired SI engines with a nameplate capacity rating of 1,000 hp or greater have annual $NO_X$ emissions less than 100 tpy, with nearly 25 percent of them less than 25 tpy. The commenter suggested that the 1,000 hp applicability threshold would result in overcontrol. According to one commenter, the EPA has overestimated the emissions rates and operating hours of engines with a rated capacity of more than 1,000 hp and thus underestimated the size of pipeline RICE that would be expected to emit more than 100 tpy of $NO_X$ annually. According to this commenter, only engines much larger than 1,000 hp are likely to emit at the level EPA deemed appropriate for regulation.

Another commenter suggested that the EPA should use a 150 ton per year threshold that the commenter alleges was used in the Revised CSAPR Update rulemaking so that stationary SI engines are regulated on equal footing with EGUs and raise the 1,000 hp threshold to 2,000 hp, which according to the commenter would not sacrifice the emissions reductions to be achieved.

*Response:* As explained in the proposal, the EPA found that most RACT requirements and other standards reviewed by the EPA establish applicability criteria for engines based on design capacity rather than PTE. For consistency with preexisting requirements for engines, the EPA selected a design capacity of 1,000 hp for engines to capture the sizes of units identified in Step 3 of our analysis. Based on the Non-EGU Screening Assessment memorandum, engines with a potential to emit of 100 tpy or greater had the most significant potential for $NO_X$ emissions reductions. The EPA recognizes that the use of a 1,000 hp design capacity as part of the applicability criteria may capture low-

use units and some units with emissions of less than 100 tons per year. However, it is also not possible to guarantee without an effective emissions control program that all such units could not increase emissions in the future. As discussed in section V of this document, we continue to find that collectively engines with a design capacity of 1,000 hp or higher in the states and industries covered by this final rule emit substantial amounts of $NO_X$ that significantly contribute to downwind air quality problems.

However, in response to concerns raised by commenters while continuing to ensure that this rule establishes an effective emissions control program for these units that is consistent with our Step 3 determinations, the EPA is establishing a compliance alternative using facility-wide emissions averaging, which will allow facilities to prioritize emissions reductions from larger, higher-emitting units. (As previously discussed, we are also establishing an exemption for emergency engines, which also helps ensure that this final rule focuses on larger, more impactful units in this industry.) The facility-wide emissions averaging alternative is explained in the following paragraphs.

Emissions Limitations and Rationale

In developing the emissions limits for the Pipeline Transportation of Natural Gas industry, the EPA reviewed RACT $NO_X$ rules, air permits, and OTC model rules. While some permits and rules express engine emissions limits in parts per million by volume (ppmv), the majority of rules and source-specific requirements express the emissions limits in grams per horsepower per hour (g/hp-hr). The EPA has historically set emissions limits for these types of engines using g/hp-hr and finds that method appropriate for this final FIP as well.

Based on the available information for this industry, including applicable State and local air agency rules and active air permits issued to sources with similar engines, the EPA is finalizing the following emissions limits for stationary SI engines in the covered states. Beginning in the 2026 ozone season and in each ozone season thereafter, the following emissions limits apply, based on a 30-day rolling average emissions rate during the ozone season:

TABLE VI.C–1—SUMMARY OF FINAL $NO_X$ EMISSIONS LIMITS FOR PIPELINE TRANSPORTATION OF NATURAL GAS

| Engine type and fuel | Final $NO_X$ emissions limit (g/hp-hr) |
|---|---|
| Natural Gas Fired Four Stroke Rich Burn | 1.0 |
| Natural Gas Fired Four Stroke Lean Burn | 1.5 |
| Natural Gas Fired Two Stroke Lean Burn | 3.0 |

The EPA anticipates that, in some cases, affected engines will need to install $NO_X$ controls to comply with the final emissions limits in Table VI.C–1. The emissions limits for four stroke rich burn engines, four stroke lean burn engines and two stroke lean burn engines are designed to be achievable by installing Non-Selective Catalytic Reduction (NSCR) on existing four stroke rich burn engines; installing SCR on existing four stroke lean burn engines; and retrofitting layer combustion on existing two stroke lean burn engines as identified in the Final Non-EGU Sectors TSD. Sources have the flexibility to install any other control technologies that enable the affected units to meet the applicable emissions limit on a continuous basis.

The EPA is establishing provisions that allow any owner or operator of an affected unit in the Pipeline Transportation of Natural Gas Industry to propose a Facility-Wide Averaging Plan that would, if approved by EPA, provide an alternative means for compliance with the emissions limits in this final rule. These provisions will provide some flexibility to owners and operators of affected units to determine which engines to control and at what level, so long as the average emissions across all covered units, on a weighted basis, meet the applicable emissions limits for each engine type. This approach allows facilities to target the most cost-effective emissions reductions and to avoid installing controls on equipment that is infrequently operated.

We provide a more detailed discussion of the basis for the final emissions limits and the anticipated control technologies to be installed in the Final Non-EGU Sectors TSD.

Four Stroke Rich Burn and Four Stroke Lean Burn Engines

The EPA requested comment on whether a lower emissions limit is appropriate for four stroke rich burn engines since even an assumed reduction of 95 percent would result in most engines being able to achieve an emissions rate of 0.5 g/hp-hr. The EPA also requested comment on whether a lower or higher emissions limit is appropriate for four stroke lean burn engines.

*Comment:* One commenter stated that the limits as proposed were not technically feasible in all circumstances. The commenter explained that its company has 150 four stroke rich burn engines in its fleet and that some of those engines cannot achieve the proposed 1.0 g/hp-hr limit even with both NSCR and layered combustion due to the vintage design of the individual cylinder geometry and the fact that most of these engines are not in production today, which limits availability of parts and retrofit technologies. The commenter asserted that 10 of its four stroke rich burn engines have all available controls on them and half of those still exceed the proposed limits. The commenter estimated that 10 of its four stroke lean burn engines would require SCR to meet the 1.5 g/hp-hr limit and that this control installation would require custom retrofit due to the age of these engines. Furthermore, the commenter stated that if current limits are not achievable in all circumstances, then lower limits are likewise impossible for four stroke rich burn engines and four stroke lean burn engines in even more circumstances. The commenter stated that the technical feasibility of installing controls on any single existing engine varies and depends, in part, on site-specific and engine-specific considerations such as space for the installation of the control, the availability of sufficient power, the emissions reductions required to meet the applicable standards, and the vintage, make, and model of a particular engine. Another commenter recommended tightening the proposed emissions standards for four stroke lean burn engines to an emissions limit similar to Colorado's limit of 1.2 g/hp-hr. A third commenter noted that the District of Columbia Department of Energy and Environment has $NO_X$ emissions limits for both rich- and lean burn engines burning natural gas at 0.7 g/hp-hr.

*Response:* The EPA is finalizing the emissions limits for both four stroke rich burn engines and four stroke lean burn engines as proposed but also establishing alternative compliance provisions and criteria for establishing case-by-case alternative emissions limits in response to the concerns raised by commenters. NSCR can achieve $NO_X$ reductions of 90 to 99 percent, and engines in California, Colorado, Pennsylvania and Texas have achieved the emissions limits that the EPA had proposed. Based on this information and the emissions limits and $NO_X$ controls analysis developed by the OTC in a report entitled *Technical Information Oil and Gas Sector Significant Stationary Sources of $NO_X$ Emissions* (October 17, 2012), the EPA is finalizing a 1.0 g/hp-hr emissions limit for four stroke rich burn engines and a 1.5 g/hp-hr emissions limit for four stroke lean burn engines. The Final Non-EGU Sectors TSD provides a more detailed explanation of the basis for these emissions limits.

To address the concerns raised by some commenters that not all engines may be able to achieve the emissions limits as proposed due to engine vintage and technical constraints, the final rule allows any owner or operator of an affected unit to request a Facility-Wide Averaging Plan that would, if approved by EPA, provide an alternative means for compliance with the emissions limits in the final rule. An approved Facility-Wide Averaging Plan would allow the owner or operator of the facility to identify the most cost-effective means for installing the necessary controls (*i.e.,* by installing controls on the subset of engines that provide the greatest emissions reduction potential at lowest costs). In addition to the Facility-Wide Averaging Plan provisions, the final rule allows owners and operators to seek EPA approval of alternative emissions limits, on a case-by-case basis, where necessary due to technical impossibility or to avoid extreme economic hardship. The provisions governing case-by-case alternative limits are explained in more detail in section VI.C of this document.

Two Stroke Lean Burn Engines

The EPA requested comment on whether a lower emissions limit would be achievable with layered combustion alone for the two stroke lean burn engines covered by this final rule. The

EPA also sought comment on whether these engines could install additional control technology at or below the marginal cost threshold to achieve a lower emissions rate.

*Comment:* Commenters did not specifically address whether a lower emissions limit would be achievable with layered combustion alone at two stroke lean burn engines. However, one commenter stated that older two stroke lean burn engines generally would not be able to achieve the proposed $NO_X$ emissions limits. The commenter stated that conversion kits are available for several models that can reduce emissions but that such kits are not made for all models, especially older stationary engines. Commenters further stated that where conversion kits are not available, a company would likely have no choice but to replace the older four stroke or two stroke stationary engines, typically at a cost of $2 million to $4 million each.

Two commenters stated that they are required by their state agency to have RACT, BACT, or BART controls, at minimum. Commenters stated that requiring additional controls at facilities already equipped with RACT, BACT or BART control technologies would not achieve the anticipated emissions reductions due to operational factors inherent in the preexisting and pre-controlled equipment and that the achievability of targeted control levels is highly dependent upon a number of variables at each facility.

Another commenter suggested that the EPA set lower limits for two stroke lean burn engines similar to the OTC-recommended limits in the range of 1.5–2.0 g/hp-hr.

*Response:* Information currently available to the EPA indicates that the amount of emissions reductions achievable with layered combustion controls is unit specific and can range from a 60 to 90 percent reduction in $NO_X$ emissions. The EPA estimates that existing uncontrolled two stroke lean burn engines would need to reduce emissions by up to 80 percent to comply with a 3.0 g/hp-hr emissions limit. The EPA has found that engines in California, Colorado, Pennsylvania and Texas have achieved these emissions rates. Based on this information and the emissions limits and $NO_X$ controls analysis developed by the OTC in a report entitled *Technical Information Oil and Gas Sector Significant Stationary Sources of $NO_X$ Emissions* (October 17, 2012), the EPA is finalizing a 3.0 g/hp-hr emissions limit for two stroke lean burn engines. Although some affected units may be able to achieve a lower emissions rate, we find

that a 3.0 g/hp-hr emissions limit generally reflects a level of control that is cost-effective for the majority of the affected units and sufficient to achieve the necessary emissions reductions. As explained in the proposed rule and expressed by public commenters, if the EPA were to establish an emissions limit lower than 3.0 g/hp-hr, some two stroke lean burn engines would not be able to meet the emissions limit with the installation of layered combustion control alone. In that case, the lower limit might require the installation of SCR, which the EPA did not find to be cost-effective for two stroke lean burn engines in its Step 3 analysis.[382] The Final Non-EGU Sectors TSD provides a more detailed explanation of the basis for this emissions limit.

In response to commenters' concerns about the difficulties involved in retrofitting or replacing older stationary engines to achieve the EPA's proposed emissions limit, the final rule allows any owner or operator of an affected unit to request a Facility-Wide Averaging Plan that would, if approved by EPA, provide an alternative means for compliance with the emissions limits in the final rule. In addition to the Facility-Wide Averaging Plan provisions, the final rule allows owners and operators to seek EPA approval of alternative emissions limits, on a case-by-case basis, where necessary due to technical impossibility or to avoid extreme economic hardship. However, in the context of older or ''vintage,'' high-emitting engines in this industry for which commenters claim emissions control technology retrofit is not feasible, the Agency anticipates taking into consideration the cost associated with alternative compliance strategies, such as replacement with new, far more efficient and less polluting engines, in evaluating claims of extreme economic hardship.

Facility-Wide Averaging Plan

The EPA is finalizing regulatory text that provides for an emissions limit compliance alternative using facility-level emissions averaging. An approved Facility-Wide Averaging Plan will allow the owner or operator of the facility to average emissions across all participating units and thus to select the most cost-effective means for installing controls on the subset of engines that provide the greatest emissions reduction potential at lowest costs and avoiding

installation of controls on equipment that is infrequently operated or otherwise less cost-effective to control). So long as all of the emissions units covered by the Facility-Wide Averaging Plan collectively emit less than or equal to the total amount of $NO_X$ emissions (in tons per day) that would be emitted if each covered unit individually met the applicable $NO_X$ emissions limitations, the covered units will be in compliance with the final rule. Under this alternative compliance option, facilities have the flexibility to prioritize emissions reductions from larger, dirtier engines.

*Comment:* Several commenters recommended that the EPA promulgate emissions averaging provisions, as it did in the 2004 $NO_X$ SIP Call Phase 2 rule (69 FR 21604), in which the EPA evaluated and supported reliance on emissions averaging for RICE in the Pipeline Transportation of Natural Gas industry sector. The commenter stated that the EPA's guidance to states on developing an appropriate SIP in response to the SIP Call provided companies the ''flexibility'' to use a number of control options, as long as the collective result achieved the required $NO_X$ reductions, and that many states built their revised SIPs around the emissions averaging approach addressed in this guidance document.[383] One commenter recommended that the EPA allow intra-state emissions averaging across all pipeline RICE owned or operated by the same company. Another commenter asserted that units of certain vintages and units from certain manufacturers will not be able to meet the emissions rate limits the EPA had proposed. The commenter claimed that, absent a system based on source-specific emissions limits, emissions averaging is one of the only practical mechanisms for addressing these challenges.

One commenter stated that it had evaluated the cost of controls for engines in its fleet and that the variety in cost-per-ton for each potential project counsels for a more flexible approach, like an averaging program. Another commenter advocated for an emissions averaging plan that would allow an engine-by-engine showing of economic infeasibility to ensure a cost-effective application of the emissions standards, a reduced impact on natural gas capacity, and a means for addressing the problem presented by achieving

---

[382] 87 FR 20036, 20143 (noting that an emissions limit below 3.0 g/hp-hr may require some two stroke lean burn engines to install additional controls beyond the EPA's cost threshold).

[383] The commenter refers to an August 22, 2002 memorandum from Lydia N. Wegman, Director, EPA, Air Quality Strategies and Standards Division to EPA Air Division Directors, entitled ''State Implementation Plan (SIP) Call for Reducing Nitrogen Oxides ($NO_X$)—Stationary Reciprocating Internal Combustion Engines.''

compliance on engines that are technically impossible to retrofit.

One commenter stated that the EPA should also consider allowing companies to choose a mass-based alternative that would ensure emissions reductions align with the tons per year reductions upon which the EPA based its significant contribution and over-control analyses.

*Response:* Based upon the EPA's 2019 NEI emissions inventory data, the EPA estimates that a total of 3,005 stationary SI engines are subject to the final rule. The EPA recognizes that many low-use engines are captured by the 1,000 hp design capacity applicability threshold. In the process of reviewing public comments, the EPA reviewed emissions averaging plans found in state air quality rules for Colorado, Illinois, Louisiana, New Jersey, and Tennessee.[384] Based on these additional reviews, the EPA is finalizing in § 52.41(c) of this final rule an emissions limit compliance alternative using facility-level emissions averaging. Emissions averaging plans will allow facility owners and operators to determine how to best achieve the necessary emissions reductions by installing controls on the affected engines with the greatest emissions reduction potential rather than on units with lower actual emissions where the installation of controls may be less cost effective. The final rule defines "facility" consistent with the definition of this term as it generally applies in the EPA's NSR and title V permitting regulations,[385] with one addition to make clear that, for purposes of this final rule, a "facility" may not extend beyond the boundaries of the 20 states covered by the FIP for industrial sources, as identified in § 52.40(b)(2). Because a facility cannot extend beyond this geographic area, a Facility-Wide Averaging Plan also cannot extend beyond the 20-state area covered by the FIP.

To estimate the number of facilities that may take advantage of the Facility-Wide Averaging Plan provisions, and the number of affected units that would install controls under such an emissions averaging plan, the EPA conducted an analysis on a subset of the estimated 3,005 stationary IC engines subject to the final rule. The EPA evaluated the reported actual $NO_X$ emissions data in tpy from a subset of facilities in the covered states using 2019 NEI data for stationary IC engines with design capacities of 1,000 hp or greater. The EPA then identified a number of facilities that have more than one affected engine, calculated each facility's emissions "cap" as the total $NO_X$ emissions (in tpy) allowed facility-wide based on the unit-specific $NO_X$ emissions limits applicable to all affected units at the facility, and identified a number of higher-emitting engines at each facility that were candidates for having controls installed. For engines that EPA identified were likely to install controls, the EPA assumed that four stroke rich burn engines, four stroke lean burn engines, and two stroke lean burn engines could achieve a $NO_X$ emissions rate of 0.5 g/hp-hr with the installation of SCR based on data obtained from the Ozone Transport Commission report *Technical Information Oil and Gas Sector Significant Stationary Sources of $NO_X$ Emissions* (October 17, 2012). For the remaining engines identified as uncontrolled, the EPA assumed a $NO_X$ emissions rate of 16 g/hp-hr for all engine types. Thus, under the assumed averaging scenarios, engines with controls installed would achieve emissions levels below the emissions limits in the final rule and would offset the higher emissions from the remaining uncontrolled units.

The EPA then calculated the total facility-wide emissions (in tpy) under various assumed averaging scenarios and compared those totals to each facility's calculated emissions cap (in tpy) to estimate the number of affected units at each facility that would need to install controls to ensure that total facility-wide emissions remained below the emissions cap. Based on these analyses, the EPA found that emissions averaging should allow most facilities to install controls on approximately one-third of the engines at their sites, on average, while complying with the applicable $NO_X$ emissions cap on a facility-wide basis. For a more detailed discussion of the EPA's analysis and related assumptions, see the Final Non-EGU Sectors TSD.

The Facility-Wide Averaging Plan provisions that the EPA is finalizing provide the flexibility needed to address the concerns about the costs of emissions control installations for certain stationary SI engines, by allowing facility owners and operators to average emissions across all participating units and thus to select the most cost-effective means for installing the necessary controls (*i.e.,* by installing controls on the subset of engines that provide the greatest emissions reduction potential at lowest costs and avoiding installation of controls on equipment that is infrequently operated or otherwise less cost-effective to control).

An owner or operator of a facility containing more than one affected unit may elect to use an EPA-approved Facility-Wide Averaging Plan as an alternative means of compliance with the $NO_X$ emissions limits in § 52.41(c). The owner or operator of such a facility must submit a request to the EPA that, among other things, specifies the affected units that will be covered by the plan, provides facility and unit-level identification information, identifies the facility-wide emissions "cap" (in tpd) that the facility must comply with on a 30-day rolling average basis, and provides the calculation methodology used to demonstrate compliance with the identified emissions cap. The EPA will approve a request for a Facility-Wide Averaging Plan if the EPA determines that the facility-wide emissions total (in tpd), based on a 30-day rolling emissions average basis during the ozone season, is less than the emissions cap (in tpd) and the plan establishes satisfactory means for determining initial and continuous compliance, including appropriate testing, monitoring, and recordkeeping requirements.

Compliance Assurance Requirements

The EPA is requiring owners and operators of affected units to conduct annual performance tests in accordance with 40 CFR 60.8 to demonstrate compliance with the $NO_X$ emissions limit in this final rule. The EPA is also requiring owners and operators to monitor and record hours of operation and fuel consumption and to use continuous parametric monitoring systems to demonstrate ongoing compliance with the applicable $NO_X$ emissions limit. For example, owners and operators of engines that utilize layered combustion controls will need to monitor and record temperature, air to fuel ratio, and other parameters as appropriate to ensure that combustion conditions are optimized to reduce $NO_X$ emissions and assure compliance with the emissions limit. For engines using SCR or NSCR, owners and operators must monitor and record parameters such as inlet temperature to the catalyst

---

[384] *See* Code of Colorado Regulations, Regulation Number 7 (5 CCR 1001–9), Part E, Section I.D.5.c., Illinois Administrative Code, Title 35, Section 217.390, Louisiana Administrative Code, Title 33, Section 2201, New Jersey Administrative Code, Title 7, Chapter 27, Section 19.6, and Rules of the Tennessee Dept. of Environment and Conservation, Rule 1200–03–27–.09.

[385] See 40 CFR 51.165(a)(1)(ii)(A), 51.166(b)(6)(i), and 52.21(b)(6)(i) (defining "building, structure, facility, or installation" for Nonattainment New Source Review and Prevention of Significant Deterioration permits) and *Natural Resources Defense Council* v. *EPA,* 725 F.2d 761 (D.C. Cir. 1984) (vacating and remanding EPA's categorial exclusion of vessel activities from this definition); see also 40 CFR 70.2 (defining "major source" for title V operating permits).

**171a**

and pressure drop across the catalyst. For affected engines that meet the certification requirements of § 60.4243(a), however, the facility-wide emissions calculations may be based on certified engine emissions standards data pursuant to § 60.4243(a), instead of performance tests.

In calculating the facility-wide emissions total during the ozone season, affected engines covered by the Facility-Wide Averaging Plan must be identified by each engine's nameplate capacity in horsepower, its actual operating hours during the ozone season, and its emissions rates in g/hp-hr from certified engine data or from the most recent performance test results for non-certified engines according to § 52.41(e).

*Comment:* Several commenters stated that semi-annual performance testing would not be appropriate due to its high costs and limited benefits. One commenter proposed a ''step-down'' testing alternative that could be conducted after establishing an engine's initial compliance via performance testing. Under this approach, owners and operators would conduct one performance test and would only need to conduct a second performance test within a given year if the first performance test demonstrated that an engine was not meeting the applicable emissions standards.

Another commenter asserted that to test all of its 950 units, a minimum of 12 months would be needed rather than the six months the EPA had proposed to provide (or five months if the EPA would require one of the semi-annual tests to be conducted during the ozone season). The commenter stated that the EPA had accounted for these operational realities in the past and that under the NSPS and NESHAP, testing is generally required only once for every 8,760 hours of run time. The commenter asserted that there is no reason to require more frequent testing than those required under the NSPS and NESHAP.

Several commenters requested that the EPA allow for reduction in the frequency of testing to once every two years if testing shows that $NO_X$ emissions are no more than 75 percent of permitted $NO_X$ emissions limits. In addition, several commenters stated that since the rule is intended to address the ozone season, a single, annual test is more feasible than semi-annual testing and reporting.

*Response:* For the stationary SI engines subject to this final rule, the EPA is revising the frequency of required performance tests from a semi-annual basis to once per calendar year. As commenters correctly pointed out, the emissions limits in these final FIPs only apply during the 5-month ozone season and testing once per calendar year should be sufficient to confirm the accuracy of the parameters being monitored to determine continuous compliance during the ozone season. The EPA also agrees with commenters that the annual tests required under the final rule need not occur during the ozone season. However, where sources are able to do so, we recommend conducting a stack test in the period relatively soon before the start of the ozone season. This would provide the greatest assurance that the emissions control systems are working as intended and the applicable emissions limit will be met when the ozone season starts.

*Comment:* Commenters generally stated that requiring CEMS would add an unnecessary cost and complexity, would provide no emissions reduction benefit for the affected units the proposed FIP intends to control and are not warranted due to the availability of other established methods of compliance assurance, such as parametric monitoring and periodic testing. One commenter stated that requiring CEMS would add unnecessary CEMS testing obligations. Another commenter stated that the costs associated with CEMS and frequent performance testing on affected RICE would be as much, if not more, than the costs associated with installation and operation of some of the control technologies EPA has considered in setting the proposed emissions limits. According to one commenter, the EPA has traditionally agreed with this viewpoint on the high cost of CEMS, as most stationary engines are not currently required under the NSPS or NESHAP to install or operate CEMS.

Another commenter stated that in addition to cost, there are other barriers to installing CEMS on RICE across the Pipeline Transportation of Natural Gas industry. Many RICE in the Pipeline Transportation of Natural Gas industry are located at remote, unstaffed locations, meaning that there would be no staff available to respond and react to communication or alarms from CEMS.

*Response:* The EPA acknowledges the costs associated with the installation and maintenance of CEMS at affected units in the Pipeline Transportation of Natural Gas industry and agrees that it is not necessary to require CEMS for purposes of compliance with the requirements of this final rule for this industry. Accordingly, the EPA is not finalizing requirements for affected units in this industry sector to install or operate CEMS. Instead, the EPA is requiring parametric monitoring protocols, as described earlier, coupled with an annual performance test, which will ensure that the emissions limits are legally and practically enforceable on a continuous basis, and that data are recorded, reported, and can be made publicly available, ensuring the ability of state and Federal regulators and other persons under CAA sections 113 and 304 to enforce the requirements of the Act.

### 2. Cement and Concrete Product Manufacturing

#### Applicability

For cement kilns in the Cement and Cement Product Manufacturing industry, the EPA is finalizing the proposed applicability provisions without change. The affected units in this industry are cement kilns that emit or have a PTE of 100 tpy or more of $NO_X$. The EPA received comments regarding the definition of PTE, which we address in section VI.C, but no comments concerning the 100 tpy PTE threshold for applicability purposes.

#### Emissions Limitations and Rationale

As explained in the proposal, the EPA based the proposed emissions limits for cement kilns on the types of limits being met across the nation in RACT $NO_X$ rules, NSPS, air permits, and consent decrees. Based on these requirements, the EPA proposed emissions limits in the form of mass of pollutant emitted (in pounds) per kiln's clinker output (in tons), *i.e.,* pounds of $NO_X$ emitted per ton of clinker produced during a 30-operating day rolling average period. Further, the EPA proposed specific emissions limits for long wet, long dry, preheater, precalciner, and combined preheater/precalciner kilns. The EPA also proposed a daily source cap limit that would apply to all units at a facility. Based on information received from public comments, the EPA is removing the daily source cap limit but finalizing the emissions limits as proposed in all other respects, as shown in Table VI.C–2.

TABLE VI.C–2—SUMMARY OF NO$_X$ EMISSIONS LIMITS FOR KILN TYPES IN CEMENT AND CONCRETE PRODUCT MANUFACTURING

| Kiln type | NO$_X$ emissions limit (lb/ton of clinker) |
|---|---|
| Long Wet | 4.0 |
| Long Dry | 3.0 |
| Preheater | 3.8 |
| Precalciner | 2.3 |
| Preheater/Precalciner | 2.8 |

*Comment:* Numerous commenters raised concerns about designing a source cap limit based on average annual production in tons of clinker and kiln type. Commenters stated that the source cap limit equation as used in a prior action applied to long wet and dry preheater-precalciner or precalciner kilns and did not include other kiln types. Commenters expressed concern that the CAP2015 Ozone Transport equation the EPA proposed in this rule could lead to artificially low and restrictive daily emissions caps for facilities that experienced a temporary decrease in production due to the COVID–19 pandemic, during the historical three-year period proposed for use in determining the NO$_X$ source cap. Also, commenters expressed concern that the proposed daily emissions cap limit originated as a local or regional limit for a single county and would not be appropriate for national application without further evaluation taking into account the specific characteristics of cement kilns in other states. One commenter suggested more stringent emissions limits than those the EPA had proposed for individual kiln types.

*Response:* The EPA is not finalizing the proposed daily source cap limit as the Agency agrees with the commenters that this proposed limit would be unnecessarily restrictive and was based on a formula that did not include all kiln types. Given the unusual reduction in cement production activities due to the COVID–19 pandemic, production rates during the 2019–2021 period are not representative of cement plants activities generally. Accordingly, use of the proposed daily source cap limit would result in an artificially restrictive NO$_X$ emissions limit for affected cement kilns, particularly when this sector operates longer hours during the spring and summer construction season. With respect to those comments supporting more stringent emissions limits than those the EPA proposed for individual kiln types, we disagree given the significant differences among different kilns in design, configuration, age, fuel capabilities, and raw material composition. The EPA finds that the

ozone season emissions limits for individual kiln types listed in Table VI.C–2 will achieve the necessary emissions reductions for purposes of eliminating significant contribution as defined in section V and is, therefore, finalizing these emissions limitations without change.

*Comment:* One commenter supported retirement of existing long wet kilns and replacement of these kilns with modern kilns. Other commenters opposed the phase out and retiring of these kilns, stating that many of the screened kilns have SNCR already installed and questioning whether replacement of existing long wet kilns is cost-effective. Some commenters also stated that according to EPA's ''NO$_X$ Control Technologies for the Cement Industry, Final Report,'' SNCR is not an appropriate NO$_X$ control technique for long wet kilns.

*Response:* The EPA appreciates the challenges identified by commenters, such as site-specific technical evaluation and review and significant capital investment associated with undertaking kiln conversions or to install new kilns and is not finalizing any requirements to replace existing long wet kilns in this rule.

*Comment:* Several commenters expressed concern about the supply chain issues relevant to the procurement, design, construction, and installation of control devices, as well as securing related contracts, for the cement industry, particularly when cement sources will be competing with the EGU and other industrial sectors for similar services. One commenter stated that many preheater/precalciner kilns are already equipped with SNCR and that one facility not equipped with SNCR is already meeting NO$_X$ emissions levels of 1.95 lb/ton of clinker or less. The commenter stated that the EPA should revise its assessment of potential NO$_X$ reductions and cost estimates by accurately accounting for existing operating efficiencies and control devices at cement kilns.

*Response:* The EPA's response to comments on the time needed for installation of controls for non-EGU

sources is provided in section VI.A. Regarding the comment that certain facilities may already have SNCR control technology installed, we recognize that many sources throughout the EGU sector and non-EGU industries covered by this rule may already be achieving enforceable emissions performance commensurate with the requirements of this action. This is entirely consistent with the logic of our 4-step interstate transport framework, which is designed to bring all covered sources within the region of linked upwind states up to a uniform level of NO$_X$ emissions performance during the ozone season. *See EME Homer City,* 572 U.S. at 519. Sources that are already achieving that level of performance will face relatively limited compliance costs associated with this rule.

Compliance Assurance Requirements

The EPA received no comments on the proposed test methods and procedures provisions for the cement industry. Therefore, we are finalizing the proposed test methods and procedures for affected cement kilns without change.

*Comment:* Commenters generally supported requiring performance testing or installation of CEMS on affected cement kilns. Some commenters suggested that no performance testing should be required and others suggested that performance testing should only be required when a title V permit is due for renewal (every 5 years). One commenter suggested requiring sources to conduct stack tests during the ozone season.

*Response:* Affected kilns that operate a NO$_X$ CEMS may use CEMS data consistent with the requirements of 40 CFR 60.13 in lieu of performance tests to demonstrate compliance with the requirements of this final rule. For affected kilns subject to this final rule that do not employ NO$_X$ CEMS, the EPA is adjusting the performance testing frequency and requiring kilns to conduct a performance test on an annual basis during a given calendar

year.[386] The EPA finds that annual performance testing and recordkeeping of cement production and fuel consumption during the ozone season will assure compliance with the emissions limits during the ozone season (May through September) each year for purposes of this rule. The required annual performance test may be performed at any time during the calendar year. However, where sources are able to do so, we recommend conducting a stack test in the period relatively soon before the start of the ozone season. This would provide the greatest assurance that the emissions control systems are working as intended and the applicable emissions limit will be met when the ozone season starts.

*Comment:* One commenter stated that CEMS has been used successfully at its facility. Another commenter explained that the inside of a cement kiln is an extremely challenging environment for making any kind of continuous measurement as temperatures are high, and there is a lot of dust and tumbling clinker can damage in situ measuring instruments.

*Response:* The majority of cement kilns in the United States are already equipped with CEMS. However, in response to commenters concerns regarding the installation of CEMS, the EPA is finalizing alternative compliance requirements in lieu of CEMS. Owners or operators of affected emissions units without CEMS installed must conduct annual performance testing and continuous parametric monitoring to demonstrate compliance with the emissions limits in this final rule. Specifically, owners or operators of affected units without CEMS must monitor and record stack exhaust gas flow rate, hourly production rate, and stack exhaust temperature during the initial performance test and subsequent annual performance tests to assure compliance with the applicable emissions limit. The owner or operator must then continuously monitor and record those parameters to demonstrate continuous compliance with the $NO_X$ emissions limits.

### 3. Iron and Steel Mills and Ferroalloy Manufacturing

#### Applicability

The EPA is establishing emissions control requirements for the Iron and Steel Mills and Ferroalloy Manufacturing source category that apply to reheat furnaces that directly emit or have the potential to emit 100

tpy or more of $NO_X$. After review of all available information received during public comment, the EPA has determined that there is sufficient information to determine that low-$NO_X$ burners can be installed on reheat furnaces. As explained further in the Final Non-EGU Sectors TSD, the EPA identified 32 reheat furnaces with low-$NO_X$ burners installed and has concluded that low-$NO_X$ burners are a readily available and widely implemented emissions reduction strategy.[387] This rule defines reheat furnaces to include all furnaces used to heat steel product—metal ingots, billets, slabs, beams, blooms and other similar products—to temperatures at which it will be suitable for deformation and further processing.

*Comment:* Several industry commenters requested that the EPA not include certain iron and steel emissions units—including blast furnaces, basic oxygen furnaces (BOFs), ladle and tundish preheaters, annealing furnaces, vacuum degassers, taconite kilns, coke ovens, and electric arc furnaces (EAFs)—in the final rule as proposed due to, among other things, the uniqueness of each emissions unit, various design-related challenges, and expected impossibility of successful implementation of add-on $NO_X$ control technology. Commenters expressed concern about requirements to install SCR for all iron and steel units for which the EPA proposed emissions limits. The commenters stated that iron and steel units had not installed SCR except in a few rare instances for experimental reasons and that SCR technology was not readily available or known for the iron and steel industry, unlike the control technologies expected to be installed in other non-EGU industries. Furthermore, commenters stated that SCR had not been applied for RACT, BACT, or LAER purposes on iron and steel units.

*Response:* In light of the comments we received on the complex economic and, in some cases, technical challenges associated with implementation of $NO_X$ control technologies on certain emissions units in this sector, the EPA is not finalizing the proposed emissions limits for blast furnaces, BOFs, ladle and tundish preheaters, annealing furnaces, vacuum degassers, taconite kilns, coke ovens, or EAFs.

The EPA is aware of many examples of low-$NO_X$ technology utilized at furnaces, kilns, and other emissions units in other sectors with similar stoichiometry, including taconite kilns, blast furnace stoves, electric arc

furnaces (oxy-fuel burners), and many other examples at refineries and other large industrial facilities. The EPA anticipates that with adequate time, modeling, and optimization efforts, such $NO_X$ reduction technology may be achievable and cost-effective for these emissions units in the Iron and Steel Mills and Ferroalloy Manufacturing sector as well. However, the data we have reviewed is insufficient at this time to support a generalized conclusion that the application of $NO_X$ controls, including SCR or other $NO_X$ control technologies such as LNB, is currently both technically feasible and cost effective on a fleetwide basis for these emission source types in this industry. We provide a more detailed discussion of the economic and technical issues associated with implementation of $NO_X$ control technologies on these emissions units, including information provided by commenters, in section 4 of the Final Non-EGU Sectors TSD.

Reheat furnaces are the only type of emissions unit within the Iron and Steel Mills and Ferroalloy Manufacturing industry that this final rule applies to. Low-$NO_X$ controls (*e.g.,* low-$NO_X$ burners) are a demonstrated control technology that many reheat furnaces have successfully employed.

*Comment:* One commenter claimed that the proposed definition of "reheat furnaces" is overly vague and requested that the EPA amend the definition. Specifically, the commenter asserted that the EPA's proposed definition does not indicate what counts as "steel product" and whether this includes only products that have already been manufactured into some form before being introduced to a reheat furnace, or whether it also includes steel that has never left the original production process, such as hot steel coming directly from a connected casting process which has not yet been formed into a definitive product. The commenter referenced the definition of reheat furnaces in Ohio's RACT regulations as an example to consider.

*Response:* In response to these comments, the EPA is finalizing a definition of reheat furnaces that is consistent with the definition in Ohio's $NO_X$ RACT regulations. *See* Ohio Admin. Code 3745–110–01(b)(35) (March 25, 2022). Specifically, the EPA is defining reheat furnaces to mean "all furnaces used to heat steel product, including metal ingots, billets, slabs, beams, blooms and other similar products, to temperatures at which it will be suitable for deformation and further processing."

---

[386] 40 CFR 63.11237 "Calendar year" defined as the period between January 1 and December 31, inclusive, for a given year.

[387] See Final Non-EGU Sectors TSD, Section 4.

Emissions Control Requirements, Testing, and Rationale

Based on the available information for this industry, applicable Federal and state rules, and active air permits or enforceable orders issued to affected facilities in the iron and steel and ferroalloy manufacturing industry, the EPA is finalizing requirements for each facility with an affected reheat furnace to design, fabricate and install high-efficiency low-$NO_X$ burners designed to reduce $NO_X$ emissions from pre-installation emissions rates by at least 40 percent by volume, and to conduct performance testing before and after burner installation to set emissions limits and verify emissions reductions from pre-installation emissions rates. Each low-$NO_X$ burner shall be designed to achieve at least 40 percent $NO_X$ reduction from existing reheat furnace exhaust emissions rates. Each facility with an affected reheat furnace shall, within 60 days of conclusion of the post-installation performance test, submit testing results to the EPA to establish $NO_X$ emissions limits over a 30-day rolling average. Each proposed emissions limit must be supported by performance test data and analysis.

In evaluating potential emissions limits for the Iron and Steel and Ferroalloy Manufacturing industry, the EPA reviewed RACT $NO_X$ rules, NESHAP rules, air permits and related emissions tests, technical support documents, and consent decrees. These rules and source-specific requirements most commonly express emissions limits for this industry in terms of mass of pollutant emitted (pounds) per operating hour (hour) (*i.e.*, pounds of $NO_X$ emitted per production hour), pounds per energy unit (*i.e.*, million British thermal unit (mmBtu)), or pounds of $NO_X$ per ton of steel produced. Regulated iron and steel facilities, including facilities operating reheat furnaces in this sector, routinely monitor and keep track of production in terms of tons of steel produced per hour (heat rate) as it pertains to each facility's rate of iron and steel production. Several facilities, including Steel Dynamics, Columbia, Indiana, Cleveland-Cliffs, Cleveland, Ohio, and Cleveland-Cliffs, Burns Harbor, Indiana, are already operating various types of reheat furnaces with low-$NO_X$ burners and achieving emissions rates as low as 0.11 lb/mmBtu of $NO_X$. The EPA identified at least nine reheat furnaces with a PTE greater than 100 tpy, including slab, rotary hearth, and walking beam furnaces, that have

installed low-$NO_X$ burners and are achieving various emissions rates.[388]

Due to variations in the emissions rates that different types of reheat furnaces can achieve, the EPA is not finalizing one emissions limit for all reheat furnaces and is instead requiring the installation of low-$NO_X$ burners or equivalent low-$NO_X$ technology designed to achieve a minimum 40 percent reduction from baseline $NO_X$ emission levels, together with source specific emissions limits to be set thereafter based on performance testing. Specifically, the final rule requires that each owner or operator of an affected unit submit to the EPA, within one year after the effective date of the final rule, a work plan that identifies the low-$NO_X$ burner or alternative low-$NO_X$ technology selected, the phased construction timeframe by which the owner or operator will design, install, and consistently operate the control device, an emissions limit reflecting the required 40 percent reduction in $NO_X$ emission levels, and, where applicable, performance test results obtained no more than five years before the effective date of the final rule to be used as baseline emissions testing data providing the basis for the required emissions reductions. If no such data exist, then the owner or operator must perform pre-installation testing to establish baseline emissions data.

*Comment:* One commenter stated that the standard practice for setting $NO_X$ limits for iron and steel sources often requires consideration of site or unit-specific issues. Similarly, another commenter stated that a single limit would not provide an adequate basis for establishing $NO_X$ emissions limits that will universally apply to multiple, unique facilities. The same commenter stated that $NO_X$ reduction in certain furnaces is routinely achievable by combustion controls or measures other than SCR.

*Response:* The EPA acknowledges the difficulty in crafting one emissions limit for multiple iron and steel facilities and units of varying size, age, and design, in light of the unique issues associated with varying unit types in this particular industry. We also acknowledge that in some cases, reheat furnaces are equipped with recently

installed, high-efficiency low-$NO_X$ burners. Many sources throughout the EGU sector and non-EGU industries covered by this rule may already be achieving enforceable emissions performance commensurate with the requirements of this action. This is entirely consistent with the logic of our 4-step interstate transport framework, which is designed to bring all covered sources within the region of linked upwind states up to a uniform level of $NO_X$ emissions performance during the ozone season. *See EME Homer City,* 572 U.S. at 519. Sources that are already achieving that level of performance will face relatively limited compliance costs associated with this rule.

The EPA is finalizing requirements for reheat furnaces to install high-efficiency low-$NO_X$ burners designed to reduce $NO_X$ emissions from pre-installation emissions rates by 40 percent by volume, and to perform pre- and post-installation performance testing at exhaust outlets to determine rate-based emissions limits for reheat furnaces in lb/hour, lb/mmBtu, or lb/ton on a rolling 30-operating day average. Owners and operators of affected units must also monitor $NO_X$ emissions from reheat furnaces using CEMS or annual performance testing and recordkeeping and operate low-$NO_X$ burners in accordance with work practice standards set forth in the regulatory text. Due to the many types of emissions units within the Iron and Steel Mills and Ferroalloy Manufacturing industry, and the limited information available at this time regarding $NO_X$ control options that are achievable for these units, the EPA is finalizing requirements only for reheat furnaces at this time.

*Comment:* Commenters expressed concern that the proposed emissions limits identified both a 3-hour and a 30-day averaging time for the same limits and requested that the EPA clarify the averaging time in the final rule. Commenters requested that the EPA finalize limits with a 30-day averaging time consistent with the requirements for other non-EGU industries.

*Response:* In determining the appropriateness of 30-day rolling averaging times, the EPA initially reviewed the NESHAP for Iron and Steel Foundries codified at 40 CFR part 63, subpart EEEEE, the NESHAP for Integrated Iron and Steel manufacturing facilities codified at 40 CFR part 63, subpart FFFFF, the NESHAP for Ferroalloys Production: Ferromanganese and Silicomanganese codified at 40 CFR part 63, subpart XXX, and the NESHAP for Ferroalloys Production Facilities codified at 40 CFR part 63, subpart YYYYYY. The EPA also reviewed

---

[388] Specifically, through a review of title V permits, the EPA identified reheat furnaces with low-$NO_X$ burners installed at Steel Dynamics in Columbia City, Indiana (two furnaces), Steel Dynamics in Butler, Indiana (one furnace), Cleveland Cliffs in Burns Harbor, Indiana (four furnaces), Cleveland Cliffs in East Chicago, Indiana (one furnace), and Cleveland Cliffs in Cleveland, Ohio (one furnace). For a further discussion of the limits and information on these facilities, see the Final Non-EGU Sectors TSD.

various RACT $NO_X$ rules from states located within the OTR, several of which have chosen to implement OTC model rules and recommendations. Based on this information and the information provided by public commenters, the EPA is requiring a 30-operating day rolling average period as the averaging timeframe for reheat furnaces. The EPA finds that a 30-operating day rolling average period provides a reasonable balance between short term (hourly or daily) and long term (annual) averaging periods, while providing the flexibility needed to address fluctuations in operations and production.

Compliance Assurance Requirements

The EPA is finalizing requirements for each owner or operator of an affected unit in the Iron and Steel Mills and Ferroalloy Manufacturing industry to use CEMS or annual performance tests and continuous parametric monitoring to determine compliance with the 30-day rolling average emissions limit during the ozone season. Facilities choosing to use CEMS must perform an initial RATA per CEMS and maintain and operate the CEMS according to the applicable performance specifications in 40 CFR part 60, appendix B. Facilities choosing to use testing and continuous parametric monitoring for compliance purposes must use the test methods and procedures in 40 CFR part 60, appendix A–4, Method 7E, or other EPA-approved (federally enforceable) test methods and procedures.

*Comment:* Several commenters raised concerns with the requirement to install and operate CEMS to monitor $NO_X$ emissions. Commenters cited the high relative costs of installing CEMS, especially for smaller units with lower actual emissions, and the complexities with installing CEMS on mobile reheat furnaces. Further, commenters explained that due to the unique configuration of certain facilities, it would be impossible for a CEMS to differentiate emissions from a reheat furnace and other units, like waste heat boilers. As an alternative to CEMS, commenters requested that the EPA finalize similar monitoring and recordkeeping requirements as proposed for the Cement and Concrete Product Manufacturing industry in the proposed rule, which allow for CEMS or performance testing and recordkeeping. Commenters explained that for reheat furnaces that are natural gas-fired, emissions can be tracked by relying on vendor guarantees and emissions factors and natural gas throughput.

*Response:* The EPA reviewed comments received from the industry regarding their concerns of affected units within the iron and steel mills and ferroalloy manufacturing sector being required to demonstrate compliance through CEMS. The EPA acknowledges the cost associated with the installation and maintenance of CEMS to demonstrate compliance with the finalized emissions standards for reheat furnaces. In this final rule, the EPA is revising the compliance assurance requirements to provide flexibility to owners or operators of affected units. Compliance may be demonstrated through CEMS or annual performance testing and continuous parametric monitoring to demonstrate compliance with the emissions limits in this final rule. If an affected unit does not use CEMS, the final rule requires the owner or operator to monitor and record stack exhaust gas flow rate, hourly production rate, and stack exhaust temperature during the initial performance test and subsequent annual performance tests to assure compliance with the applicable emissions limit. The owner or operator must then continuously monitor and record those parameters to demonstrate continuous compliance with the $NO_X$ emissions limits. Affected units that operate $NO_X$ CEMS meeting specified requirements may use CEMS data in lieu of performance testing and monitoring of operating parameters. For sources relying on annual performance tests and continuous parametric monitoring to assure compliance, the EPA is requiring that sources keep records of production and fuel usage during the ozone season to assure compliance with the emissions limits on a 30-day rolling average basis. To avoid challenges in scheduling and availability of testing firms, the annual performance test required under this final rule does not have to be performed during the ozone season. However, where sources are able to do so, we recommend conducting a stack test in the period relatively soon before the start of the ozone season. This would provide the greatest assurance that the emissions control systems are working as intended and the applicable emissions limit will be met when the ozone season starts.

4. Glass and Glass Product Manufacturing

Applicability

The EPA is finalizing regulatory requirements for the Glass and Glass Product Manufacturing source category that apply to furnaces that directly emit or have a PTE of 100 tpy or more of $NO_X$. For this industry, the EPA is finalizing the proposed applicability provisions without change.

*Comment:* One commenter requested that the applicability threshold for glass manufacturing furnaces should be based on a unit's design production capacity instead of the proposed applicability criteria (*i.e.*, units that directly emit or have the potential to emit 100 TPY or more of $NO_X$). The commenter stated that the production capacity for glass manufacturing furnaces is a more relevant basis for applicability and would focus the EPA analysis on cost-effective regulations.

*Response:* During the EPA's development of the proposed emissions limits, the EPA reviewed the applicability provisions in various state RACT $NO_X$ rules, air permits, consent decrees, and Federal regulations applicable to glass manufacturing furnaces. Most of these applicability provisions were expressed in terms of actual emissions or PTE. Given the significant differences in the types, designs, configurations, ages, and fuel capabilities among glass furnaces, and differences in raw material compositions within the sector, the EPA finds that applicability criteria based on emissions or potential to emit are the most appropriate way to capture higher-emitting glass manufacturing furnaces that contribute $NO_X$ emissions to downwind receptors.

Emissions Limitations and Rationale

The EPA is finalizing the proposed $NO_X$ emissions limits for furnaces within the Glass and Glass Product Manufacturing industry, except that for flat glass manufacturing furnaces the EPA is finalizing an emissions limit slightly lower than the limit we had proposed, based on a correction to a factual error in our proposal. For further discussion of the basis for the form and level of the final emissions limits, see the proposed rule, 87 FR 20036, 20146 (April 6, 2022) (discussing EPA review of state RACT rules, NSPS, and other regulations applicable to the Glass and Glass Product Manufacturing industry). Several comments supported the EPA's effort to regulate sources within the Glass and Glass Product Manufacturing industry but also requested that the EPA establish more stringent emissions limits for this industry.

*Comment:* One commenter stated that $NO_X$ emissions from the Glass and Glass Product Manufacturing industry are not currently subject to any Federal NSPS and that the industry is expected to grow in the coming years. The commenter stated that while the EPA's proposed limits on glass furnaces fell within the ranges of limits required by

various states and air districts, they fell at the weakest levels within those ranges. For example, the commenter stated that the EPA had proposed a 4.0 lb/ton $NO_X$ emissions limit for container glass manufacturing furnaces, while state and local $NO_X$ emissions limits for these emissions units range from 1 to 4 lb/ton. Similarly, the commenter stated that the EPA had proposed a 4.0 lb/ton $NO_X$ emissions limit for pressed/blown glass manufacturing furnaces, while state and local $NO_X$ emissions limits for these emissions units range from 1.36 to 4 lb/ton, and that EPA had proposed a 9.2 lb/ton $NO_X$ emissions limit for flat glass manufacturing furnaces, while state $NO_X$ emissions limits for these emissions units range from 5–9.2 lb/ton. The commenter urged the EPA to establish emissions limits lower than those the EPA had proposed.

*Response:* The EPA is finalizing the emissions limits for affected units in the glass and glass product manufacturing industry as proposed for all but flat glass manufacturing furnaces, for which the EPA is finalizing a slightly lower emissions limit to reflect a correction to a factual error in our proposal. During the EPA's development of the proposed emissions limits, the EPA reviewed the control requirements or recommendations and related analyses in various RACT $NO_X$ rules, air permits, Alternative Control Techniques (ACT) documents, and consent decrees to

determine the appropriate $NO_X$ emissions limits for the different types of glass manufacturing furnaces. Based on these reviews and given the significant differences in the types, designs, configurations, ages, and fuel capabilities among glass furnaces, and differences in raw material compositions within the sector, the EPA has concluded that it is appropriate to finalize the emissions limits for this industry as proposed, except for the limit proposed for flat glass manufacturing furnaces. For flat glass manufacturing furnaces, the EPA had proposed a $NO_X$ emissions limit of 9.2 pounds (lbs) per ton of glass pulled but is finalizing a limit of 7.0 lbs/ton of glass pulled on a 30-day averaging basis. This is based on our review of specific state RACT $NO_X$ regulations that contain a 9.2 lbs/ton limit averaged over a single day but contain a 7.0 lbs/ton limit over a 30-day averaging period. This change aligns the final limit for flat glass manufacturing furnaces with the correct averaging time and is consistent with both the state RACT regulations that we reviewed [389] and our evaluation of cost-effective controls for this industry in the supporting documents for the proposed and final rule.

The EPA acknowledges that $NO_X$ emissions from some glass manufacturing furnaces are subject to control under other regulatory programs, such as those adopted by

states to meet CAA RACT requirements, and that some of these programs have implemented more stringent emissions limits than those the EPA is finalizing in these FIPs. However, as noted in the preamble to the proposed rule and related TSD, many OTR states do not establish specific $NO_X$ emissions limits for glass manufacturing sources.[390] *See* 87 FR 20146. In addition to state RACT rules, air permits, ACT documents, and consent decrees applicable to this industry, the EPA reviewed reports and recommendations from the National Association of Clean Air Agencies (NACAA), the European Union Commission, and EPA's Menu of Control Measures (MCM) to identify potentially available control measures for reducing $NO_X$ emissions from the glass manufacturing industry. The EPA also reviewed permit data for existing glass manufacturing furnaces to identify control devices currently in use at these sources. Based on these reviews, we find that the final emissions limits for the Glass and Glass Product Manufacturing industry provided in Table VI.C.3–1 generally reflect a level of control that is cost-effective for the majority of the affected units and sufficient to achieve the necessary emissions reductions. The Final Non-EGU Sectors TSD provides a more detailed explanation of the basis for these emissions limits.

TABLE VI.C.3–1—SUMMARY OF FINALIZED $NO_X$ EMISSIONS LIMITS FOR FURNACE UNIT TYPES IN GLASS AND GLASS PRODUCT MANUFACTURING

| Furnace type | $NO_X$ emissions limit (lbs/ton of glass produced, 30 operating-day rolling average) |
|---|---|
| Container Glass Manufacturing Furnace | 4.0 |
| Pressed/Blown Glass Manufacturing Furnace or Fiberglass Manufacturing Furnace | 4.0 |
| Flat Glass Manufacturing Furnace | 7.0 |

Alternative Emissions Standards During Periods of Start-Up, Shutdown, and Idling

*Comment:* Numerous commenters urged the EPA to provide additional flexibilities, alternative $NO_X$ emissions limits, or exceptions to the $NO_X$ emissions limits for glass manufacturing furnaces during periods of startup, shutdown and idling. Commenters requested that the EPA consider excluding days with low glass pull (e.g.,

abnormally low production rate), furnace start-up days, furnace maintenance days, and malfunction days from the definition of ''operating day'' to allow for exclusion of these days from the calculation of an emissions unit's 30-operating day rolling average emissions. The commenters argued that because the glass furnace temperature is much lower during these periods than they are during normal operating conditions, it

would be technologically infeasible to equip furnaces with $NO_X$ control devices including SCR. Commenters also stated that because control equipment cannot be operated during these periods without damaging the equipment, it would be very difficult or impossible to meet the proposed $NO_X$ limits during these periods.

*Response:* After review of the comments received and the EPA's assessment of current practices within

[389] For example, Pennsylvania's RACT $NO_X$ emission limits for flat glass furnaces are 7.0 lbs of $NO_X$ per ton of glass produced on 30-day rolling average. *See* Title 25, Part I, Subpart C, Article III, Section 129.304, available at *https://casetext.com/regulation/pennsylvania-code-rules-and-regulations/title-25-environmental-protection/part-i-department-of-environmental-protection/subpart-c-protection-of-natural-resources/article-iii-air-resources/chapter-129-standards-for-sources/control-of-nox-emissions-from-glass-melting-furnaces/section-129304-emission-requirements.

[390] See Proposed Non-EGU Sectors TSD at 56, EPA–HQ–OAR–2021–0668–0145.

the glass manufacturing industry, the EPA is establishing provisions for alternative work practice standards and emissions limits that may apply in lieu of the emissions limits in § 52.44(c) during periods of start-up, shutdown, and idling. The emissions limits for glass melting furnaces in § 52.44(c) do not apply during periods of start-up, shutdown, and/or idling at affected units that comply instead with the alternative requirements for start-up, shutdown, and/or idling periods specified in § 52.44(d), (e), and/or (f), respectively. The EPA has modeled these alternative requirements that apply during startup, shutdown, and idling to some extent on State RACT requirements identified by commenters.[391] These alternative work practice standards adequately address the seven criteria that the EPA has recommended states consider when establishing appropriate alternative emissions limitations for periods of startup and shutdown.[392] We provide a more detailed evaluation of these provisions in the TSD supporting this final rule.

Specifically, each owner or operator of an affected unit seeking to comply with alternative work practice standards in lieu of emissions limits during startup or shutdown periods must submit specific information to the Administrator no later than 30 days prior to the anticipated date of startup or shutdown. The required information is necessary to ensure that the furnace will be properly operated during the startup or shutdown period, as applicable. The final rule establishes limits on the number of days when the owner or operator may comply with alternative work practice standards in lieu of emissions limits during startup and shutdown, depending on the type of glass furnace. Additionally, the owner or operator must maintain operating records and additional documentation as necessary to demonstrate compliance with the alternative requirements during startup or shutdown periods. For startups, the owner or operator must place the emissions control system in operation as soon as technologically feasible to minimize emissions. For shutdowns, the owner or operator must operate the emissions control system whenever technologically feasible to minimize emissions.

For periods of idling, the owner or operator of an affected unit may comply with an alternative emissions limit calculated in accordance with a specific equation to limit emissions to an amount (in pounds per day) that reflects the furnace's permitted production capacity in tons of glass produced per day. Additionally, the owner or operator must maintain operating records as necessary to demonstrate compliance with the alternative emissions limitations during idling periods. During idling, the owner or operator must operate the emissions control system to minimize emissions whenever technologically feasible.

All-Electric Glass Furnaces

The EPA solicited comment on whether it is feasible or appropriate to phase out and retire existing glass manufacturing furnaces in the affected states and replace them with more energy efficient and less emitting units like all-electric melter installations. The EPA also requested comment on the time needed to complete such a task. All-electric melters are glass melting furnaces in which all the heat required for melting is provided by electric current from electrodes submerged in the molten glass.[393] The EPA received numerous comments from the glass industry regarding their concerns with replacing an existing glass manufacturing furnace with an all-electric melter. The commenters stated that various operational restrictions present within all-electric furnaces prevent these units from being implemented throughout the industry, including limited glass production output, reduced glass furnace life, and increased glass plant operating cost due to high levels of electric current usage. Based on the EPA's review of comments submitted on this issue, the EPA has decided not to establish any requirements to replace existing glass manufacturing furnaces with all-electric furnaces at this time. We provide in the following paragraphs a summary of the comments and the EPA's responses thereto.

*Comment:* One commenter stated that the lifetime of an all-electric glass melting furnace is only about three to five years before it must be rebricked, compared to well-maintained natural gas or hybrid furnace that may be operated continuously for as long as fifteen to twenty years between rebricking events. The commenter also states that electric furnaces for manufacture of glass containers are limited to a maximum glass production of about 120 tons per day, which is a stark contrast to large natural gas fired glass melting furnaces, which are capable of producing over 400 tons of glass per day. The commenter also stated that the cullet percentage is greatly reduced in all-electric furnaces which increases energy consumption in the affected facility.

*Response:* At proposal, the EPA solicited comment on whether it is feasible or appropriate for owners or operators of existing glass manufacturing furnaces to phase out and retire their units and replace them with less emitting units like all-electric furnace installations. As explained in the Final Non-EGU Sectors TSD, over the last few decades the demand for flat, container, and pressed/blown glass has continued to grow annually. Nitrogen oxides remain one of the primary air pollutants emitted during the production and manufacturing of glass products. However, no current Federal CAA regulation controls $NO_X$ emissions from the industry on a category-wide basis.[394] Therefore, the glass manufacturing industry has conducted various pollution prevention and research efforts to help identify preferred techniques for the control of $NO_X$. Some of these studies revealed recent trends to control $NO_X$ emissions in the glass industry, including the use of all-electric glass furnaces. We understand based on the comments received from the glass manufacturing industry that significant differences exist in the design, configuration, age, and replacement cost of glass furnaces and in the feasibility of controls and raw material compositions. These differences as well as the production limitations present with all-electric furnaces create difficulties in implementing all-electric furnaces across the industry while keeping up with glass product demands. Therefore, the EPA is not mandating any requirement for owners or operators of existing glass manufacturing furnaces to replace their units with all-electric furnaces.

Combustion Modification and Post-Combustion Modification Control Devices

According to the EPA's "Alternative Control Techniques Document—$NO_X$ Emissions from Glass

---

[391] See Pennsylvania Code, Title 25, Part I, Subpart C, Article III, Sections 129.305–129.307 (effective June 19, 2010), available at *https://www.pacodeandbulletin.gov/Display/pacode?file=/secure/pacode/data/chapter129/chap129toc.html&d=reduce* and San Joaquin Valley Unified Air Pollution Control District, Rule 4354, "Glass Melting Furnaces," sections 5.5–5.7 (amended May 19, 2011), available at *https://www.valleyair.org/rules/currntrules/R4354%20051911.pdf.*

[392] See 80 FR 33840, 33914 (June 12, 2015) (identifying the EPA's recommended criteria for developing and evaluating alternative emissions limitations applicable during startup and shutdown).

[393] *See* definitions in 40 CFR part 60, subpart CC.

[394] See Final Non-EGU Sectors TSD.

Manufacturing,'' [395] glass manufacturing furnaces may utilize combustion modifications equivalent to low-$NO_X$ burners and oxy-firing. At proposal, the EPA solicited comments on whether it is feasible or appropriate to require sources with existing glass manufacturing furnaces in affected states that currently utilize these combustion modifications to add or operate a post-combustion modifications control device like SNCR or SCR to further improve their $NO_X$ removal efficiency. The EPA received numerous comments from the glass industry that detailed the differences present in glass furnace designs, operations and finished product that influenced the type of combustion modification or post-combustion modification control device that is feasible for such unit. Several commenters have requested that the EPA focus on establishing an emissions limit rather than specifying the use of a particular control technology given the significant differences across glass furnaces. As a result of the comments received, the EPA is not specifically requiring affected units to install combustion modification and post-combustion controls to meet the finalized emissions limits. The EPA is finalizing the emissions limits as proposed, which may be met with combustion modifications (*e.g.*, low-$NO_X$ burners, oxy-firing), process modifications (*e.g.*, modified furnace, cullet preheat), and/or post-combustion controls (SNCR or SCR) and thus provide sources some flexibility to choose the control technology that works best for their unique circumstances.

*Comment:* Multiple commenters responded to EPA's request for comments by stating it is unnecessary and unhelpful for the proposed rule to specify use of particular post-combustion control device. The commenters note that various flat glass furnaces have a variety of combustion and post-combustion control options. Each furnace is different in its design, operations, and finished product produced. The commenters state that it is more appropriate for EPA to establish an emissions limit in the proposed rule than it is for the EPA to specify use of a particular control technology.

*Response:* In response to these comments, the EPA is not establishing any requirements for affected units to install specific control technologies to meet the emissions limits. The EPA is

finalizing the limits as proposed to offer sources some flexibility to choose the control technology that works best for their unique circumstances.

Compliance Assurance Requirements

The EPA proposed to require owners or operators of an affected facility that is subject to the $NO_X$ emissions standards for glass manufacturing furnaces to install, calibrate, maintain and operate a CEMS for the measurement of $NO_X$ emissions discharged. The EPA also solicited comments on alternative monitoring systems or methods that are equivalent to CEMS to demonstrate compliance with the emissions limits. The EPA received numerous comments from the glass manufacturing industry expressing concern with any requirement to use CEMS at affected units. After review of the comments received and EPA's assessment of practices conducted within the glass manufacturing industry, the EPA is finalizing compliance assurance requirements that allow affected glass manufacturing furnaces to demonstrate compliance through annual testing or use CEMS, or similar alternative monitoring system data in lieu of a performance test. The EPA is also establishing recordkeeping provisions that require owners or operators of affected units to conduct parametric monitoring of fuel use and glass production during performance testing to assure continuous compliance on a 30-operating day rolling average.

*Comment:* Commenters representing the glass industry stated that a requirement to install and operate CEMS would present significant costs and technical complexities in a situation where emissions can be effectively monitored using stack testing rather than continuous monitoring. Commenters also objected to the EPA's proposal to require CEMS together with semi-annual stack testing. Commenters stated that a requirement to both operate CEMS and conduct semi-annual testing would be unnecessary and excessive and would not provide commensurate benefit unless a facility's emissions are near or above the proposed emissions limit. Commenters requested that owners or operators of affected units be allowed to use alternative monitoring systems, *e.g.*, parametric emissions monitoring. The commenters stated that parametric monitoring requires less initial and ongoing manpower requirements, has lower capital and operating costs than CEMS, does not require spare parts, and is accurate over a mapped range.

*Response:* The EPA is establishing compliance assurance requirements that

provide flexibility to owners or operators of affected units. Compliance with the emissions limits in this final rule may be demonstrated through CEMS or via annual performance test and continuous parametric monitoring. If an affected unit does not use CEMS, the final rule requires the owner or operator to monitor and record stack exhaust gas flow rate, hourly production rate, and stack exhaust temperature during the initial performance test and subsequent annual performance tests to assure compliance with the applicable emissions limit. The owner or operator must then continuously monitor and record those parameters to demonstrate continuous compliance with the $NO_X$ emissions limits. Affected units that operate $NO_X$ CEMS meeting specified requirements may use CEMS data in lieu of performance testing and monitoring of operating parameters. To avoid challenges in scheduling and availability of testing firms, the annual performance test required under this final rule does not have to be performed during the ozone season.

5. Boilers at Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, Pulp, Paper, and Paperboard Mills, Iron and Steel and Ferroalloys Manufacturing, and Metal Ore Mining facilities

Applicability

The EPA is finalizing regulatory requirements for the Iron and Steel Mills and Ferroalloy Manufacturing industry, Basic Chemical Manufacturing industry, Petroleum and Coal Products Manufacturing industry, Pulp, Paper, and Paperboard Mills industry, and the Metal Ore Mining industry that apply to boilers that have a design capacity of 100 mmBtu/hr or greater. The Non-EGU Screening Assessment memorandum developed in support of Step 3 of our proposal identified emissions from large boilers in certain industries (*i.e.*, those projected to emit more than 100 tpy of $NO_X$ in 2026) as having adverse impacts on downwind receptors. As discussed in the proposed rule, we developed applicability criteria for boilers based on design capacity (*i.e.*, heat input), rather than on potential emissions, because use of a boiler design capacity of 100 mmBtu/hr reasonably approximates the 100 tpy threshold used in the Non-EGU Screening Assessment memorandum to identify impactful boilers. In this final rule, we are establishing the heat input-based applicability criteria described in our proposal, with some adjustments as explained further in this section. Additionally, we have determined that boilers meeting these applicability

[395] EPA, Alternative Control Techniques Document—$NO_X$ Emissions from Glass Manufacturing, EPA–453/R–94–037, June 1994.

criteria exist within the following five industries: Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, Pulp, Paper, and Paperboard Mills, Metal Ore Mining, and Iron and Steel Mills and Ferroalloy Manufacturing.

As we explained in the proposed rule, the potential emissions from industrial boilers with a design capacity of 100 mmBtu/hr or greater burning coal, residual or distillate oil, or natural gas can equal or exceed the 100 tpy threshold that we used to identify impactful boilers within the Non-EGU Screening Assessment memorandum. We are finalizing $NO_X$ emissions limits that apply to boilers with design capacities of 100 mmBTU/hr or greater located at any of the five identified industries in any of the 20 covered states with non-EGU emissions reduction obligations. In response to comments on our proposed rule, however, the EPA is finalizing a low-use exemption for industrial boilers that operate less than 10 percent per year and provisions for EPA approval of alternative emissions limits on a case-by-case basis, where specific criteria are met. Additionally, only boilers that combust, on a BTU basis, 90 percent or more of coal, residual or distillate oil, natural gas, or combinations of these fuels are subject to the requirements of these final FIPs.

The EPA has determined that boilers meeting the applicability criteria of this section exist within the five industrial sectors identified in Table VI.C.5–1:

TABLE VI.C.5—1: NON-EGU INDUSTRIES WITH LARGE BOILERS AND ASSOCIATED NAICS CODES

| Industry | NAICS code |
|---|---|
| Basic Chemical Manufacturing | 3251xx |
| Petroleum and Coal Products Manufacturing | 3241xx |
| Pulp, Paper, and Paperboard Mills | 3221xx |
| Iron and Steel and Ferroalloys Manufacturing | 3311xx |
| Metal Ore Mining | 2122xx |

*Comment:* Several commenters requested that the EPA establish PTE-based applicability criteria for boilers as it had proposed to do for other non-EGU sectors and stated that using heat input as the basis for determining applicability would result in low-emitting boilers being subject to the final rule's control requirements. Commenters stated that the EPA should provide a low-use exemption for infrequently run units because these units produce a lower amount of emissions.

*Response:* The EPA is finalizing applicability criteria for boilers based on boiler design capacity for a number of reasons. First, Federal emissions standards applicable to boilers [396] and all of the state RACT rules that we reviewed contain applicability criteria based on boiler design capacity. Second, as explained in the Final Non-EGU Sectors TSD, most boilers with design capacities of 100 mmBTU/hr or greater that are fueled by coal, oil, or gas have the potential to emit 100 tpy or more of $NO_X$. Thus, use of a boiler design capacity of 100 mmBtu/hr for applicability purposes reasonably approximates the 100 tpy threshold used in the Non-EGU Screening Assessment memorandum to identify impactful boilers. Finally, use of a boiler's design capacity for applicability purposes facilitates applicability determinations given that a boiler's design capacity is, in most cases, clearly indicated by the manufacture on the unit's nameplate.

In response to the comments expressing concern that infrequently-operated boilers would be captured by the EPA's proposed applicability criteria, the EPA is finalizing a low-use exemption for industrial boilers that operate less than 10 percent per year on an hourly basis, based on the three most recent years of use and no more than 20 percent in any one of the three years. Such boilers will be exempt from the emissions limits in these FIPs provided they operate less than 10 percent per year, on an hourly basis, based on the three most recent years of use and no more than 20 percent in any one of the three years, but will have recordkeeping obligations. The EPA finds it appropriate to exempt such low-use boilers from the emissions limits in this final rule because the amount of air pollution emitted from a boiler is directly related to its operational hours, and installation of controls on infrequently operated units results in reduced air quality benefits.

*Comment:* Commenters asked whether the EPA's proposed emissions limits for boilers would apply to emissions units that burn fuels other than coal, residual or distillate oil, or natural gas. For example, one commenter stated that some biomass boilers start up by co-firing oil or gas and that some $NO_X$ controls such as low-$NO_X$ burners (LNB) cannot be used on biomass boilers. The commenter requested clarification on whether boilers burning biomass would be covered by the EPA's proposed requirements. Other commenters noted that some industrial boilers burn natural gas in conjunction with other gaseous fuels, such as hydrogen/methane off-gas and vent gas from various on-site processes, and may not be able to meet the EPA's proposed 0.08 lb/mmBtu $NO_X$ emissions limit for boilers burning natural gas. One commenter stated that it operated a boiler that burns hazardous waste and is subject to 40 CFR part 63, subpart EEE, National Emission Standards for Hazardous Air Pollutants from Hazardous Waste Combustors, and that this boiler uses natural gas for start-up and at other times to stabilize operations but also combusts other fuels such as liquid waste. The commenter asserted that such boilers should not be covered by the final rule.

*Response:* In recognition and consideration of comments received on our proposal, the EPA is finalizing requirements for boilers that apply only to boilers burning 90 percent or more coal, residual or distillate oil, or natural gas or combinations of these fuels on a heat-input basis. Public commenters presented information indicating that the burning of fuels other than coal, residual or distillate oil, or natural gas at levels exceeding 10 percent may interfere with the functions of the control technologies that may be necessary to the meet the final rule, like SCR. The EPA does not have sufficient information at this time to conclude that units burning more than 10 percent fuels other than coal, residual or distillate oil, or natural gas can operate the necessary controls effectively and at a reasonable cost. Therefore, boilers that burn greater than 10 percent fuels other than coal, residual or distillate oil,

---

[396] *See, e.g.,* 40 CFR 60.44b (subpart Db, Standards of Performance for Industrial-Commercial-Institutional Steam Generating Units).

natural gas, or combinations of these three fuels are not subject to the emissions limits and other requirements of this final rule.

*Comment:* Some commenters claimed that the EPA cannot include emissions limits for boilers that burn combinations of coal, residual or distillate oil, and natural gas, because the EPA did not propose limits for such boilers. Other commenters suggested it would be appropriate to establish emissions limits for such boilers as long as the EPA provides criteria for establishing such emissions limits.

*Response:* The EPA disagrees with the claim that boilers burning combinations of coal, residual or distillate oil, or natural gas cannot be covered by the final FIP because the EPA did not propose specific emissions limits for

these boilers and agrees with commenters who stated that the EPA's proposed emissions limits can be extended to such boilers provided the EPA provides criteria for doing so. The applicability criteria in the final rule cover boilers burning combinations of coal, residual or distillate oil, or natural gas and include a methodology for determining the emissions limits for such units based on a simple formula that correlates the amount of heat input expended while burning each fuel with the corresponding emissions limit for that particular fuel. For example, a boiler with a heat input of 85 percent natural gas and 15 percent distillate oil would be subject to an emissions limit derived by multiplying the natural gas emissions limit by 0.85 and adding to that the distillate oil emissions limit

multiplied by 0.15. Thus calculated, the $NO_X$ emissions limits for boilers burning combinations of coal, residual or distillate oil, or natural gas are consistent with the $NO_X$ emissions limits identified in our proposed rule for each of these individual fuels.

Emissions Limitations and Rationale

The EPA is finalizing all of the proposed $NO_X$ emissions limits for industrial boilers and adding a formula for calculating emissions limits for multi-fueled units as shown in Table VI.C.5–2. The emissions limits apply to boilers with design capacities of 100 mmBtu/hr or greater located at any of the five industries identified in Table II.A–1 within any of the 20 states covered by the non-EGU requirements of this final rule.

TABLE VI.C.5–2—$NO_X$ EMISSIONS LIMITS FOR BOILERS >100 mmBtu/hr

[Based on a 30-day rolling average]

| Unit type | Emissions limit (lbs $NO_X$/mmBtu) |
|---|---|
| Coal | 0.20. |
| Residual oil | 0.20. |
| Distillate oil | 0.12. |
| Natural gas | 0.08. |
| Multi-fueled unit | Limit derived by formula based on heat input contribution from each fuel. |

Additional information on the EPA's derivation of these proposed emissions rates for boilers is provided in the Final Non-EGU Sectors TSD.

*Comment:* Some commenters noted that many boilers are already subject to other state and Federal controls, and that programs such as RACT, NSR, BACT, NSPS, and maximum achievable control technology (MACT) are all achieving emissions reductions from boilers.

*Response:* The EPA acknowledges that some affected units may already be meeting the emissions limits established in this rule as a result of controls installed to comply with other regulatory programs, such as the CAA's RACT requirements. However, emissions from the universe of boilers subject to the applicability requirements of this final rule are not being uniformly reduced by these programs to the same extent that the limits we are adopting will require, nor for the same reason, which is to mitigate the impact of emissions from upwind sources on downwind locations that are experiencing air quality problems. The EPA has determined that the limits we are finalizing in this action are readily achievable and are already required in practice in many parts of the country.

Regarding RACT controls, some of the sources covered by the final rule are not subject to RACT requirements because RACT is only applicable to sources located in ozone nonattainment areas and in the OTR, and many sources covered by the final rule are not located within such jurisdictions. Regarding sources that are subject to RACT, we note that unlike RACT requirements applicable to sources of VOCs, where a majority of such sources are covered by state RACT rules adopted to conform with uniform "presumptive" limits contained within the EPA's Control Technique Guidelines (CTGs), in most cases presumptive $NO_X$ emissions limits have not been established for industrial sources of this pollutant. In light of this, $NO_X$ RACT requirements are primarily determined on a state-by-state basis and exhibit a range of stringencies as determined by each state. Additionally, RACT requirements tend to become more stringent with the passage of time as existing control options are improved, and new options become available. Thus, older RACT determinations may not be as stringent as more recent determinations made for similar equipment types. As noted in our proposal, we based our $NO_X$ emissions limits for coal, residual or

distillate oil, and natural gas-fired industrial boilers on RACT limits that are already in place in many areas of the country.

Regarding NSR control requirements, we note that the NSR program was created by the 1977 amendments to the CAA and applies only to new or modified stationary sources. Many of the boilers covered by the applicability requirement of this final rule were initially installed or last modified prior to 1977 and have not undergone NSR analysis, such as a BACT analysis for sources located within an attainment area or a LAER analysis for sources located within nonattainment areas. Additionally, BACT and LAER determinations made many years ago are not likely to be as stringent as more recent determinations.

Regarding NSPS requirements, 40 CFR part 60, subpart Db, Standards of Performance for Industrial-Commercial-Institutional Steam Generating Units, contains $NO_X$ emissions limits for boilers with capacities of 100 mmBTU/hr or greater that were constructed or modified after June 19, 1984, and so boilers constructed or modified prior to that date are not subject to its requirements. Additionally, the limits for coal, residual or distillate oil, and

gas-fired units are not as stringent as more recent limits adopted by states pursuant to RACT control obligations.

Lastly, MACT controls are primarily designed to reduce emissions of hazardous air pollutants, not to reduce $NO_X$ emissions. We anticipate the MACT program's boiler tune-up requirement should reduce $NO_X$ emissions to some extent, but not to the extent that compliance with the limits adopted within this final rule will achieve.

*Comment:* One commenter noted that a 2017 OTC survey found that boilers, including those used in the paper products, chemical, and petroleum industries, are already required to achieve more stringent limits, and pointed to limits for distillate oil that are lower than what the EPA considered in developing the proposal. The commenter also noted that California's South Coast Air Quality Management District has adopted a facility-wide $NO_X$ emissions limit of 0.03 lb/mmBtu at petroleum refineries. The commenter noted that CEMs data shows a residual oil-fired boiler at the Ravenswood Steam Plant in New York achieves an average $NO_X$ emissions rate of 0.0716 lb $NO_X$/MMBtu and that CEMS data shows that a gas-fired boiler in Johnsonville, Tennessee, achieves an average $NO_X$ emissions rate of 0.0058 lb $NO_X$/mmBTU. Regarding coal-fired boilers, the commenter stated that a coal boiler at the Ingredion Incorporated Argo Plant in Illinois achieves an average $NO_X$ emissions rate of 0.1153 lb $NO_X$/MMBtu with selective non-catalytic control technology, and the Axiall Corporation facility in West Virginia achieves a 0.1162 lb/mmBtu using low-$NO_X$ burner technology with overfire air. The commenter also noted that more than half of the gas-fired boilers included in the air markets program database already emit $NO_X$ at rates below the EPA's proposed emissions rate, and that the RACT/BACT/LAER Clearinghouse (RBLC) shows more stringent limits for gas boilers than the limits the EPA proposed, with many facilities being required to meet a $NO_X$ limit of less than 0.0400 lb/mmBtu.

*Response:* The EPA's intent was not to set the $NO_X$ emissions limits for coal, residual or distillate oil, and natural gas-fired boilers to match the lowest levels required elsewhere by state or local authorities, but rather to establish limits that are commensurate with broadly applicable RACT limits currently in place in a number of states as noted within our proposal. The limits we selected were not the most stringent of the state RACT rules we reviewed but were relatively close to that value. We

did not select the most stringent limits because such limits may reflect case-specific technological and economic feasibility considerations that do not apply more broadly across the industry. Furthermore, although the EPA acknowledges that some industrial boilers powered by coal, residual or distillate oil, natural gas, or combinations of these fuels can meet very low $NO_X$ emissions limits as noted by the commenter, it is unlikely that all such units could meet these limits given case-specific considerations such as boiler design and operation, some of which limit the types of control technology that may be available to a particular unit.

a. Coal-Fired Industrial Boilers

As we proposed, coal-fired industrial boilers subject to the applicability requirements of this section are required to meet a $NO_X$ emissions limit of 0.2 lb/mmBtu on a 30-day rolling average basis. Various forms of combustion and post-combustion $NO_X$ control technology exist that should enable most facilities to retrofit with equipment to meet this emissions limit. As we explained in our proposal, many states containing ozone nonattainment areas or located within the OTR have already adopted RACT emissions limits similar to or more stringent than the limits in this final rule, and most of those RACT limits apply statewide and extend to boilers located at commercial and institutional facilities, not just to boilers located in the industrial sector.

*Comment:* One commenter noted that the coal-fired boilers it operates already use combustion controls to reduce $NO_X$ emissions and contended that the effectiveness of SNCR on these boilers is unknown but would likely be on the low end of the control effectiveness range because they experience variable loads, which would compromise the proper functioning of an SNCR control system. The commenter stated that the only way their coal-fired boilers would be able to comply with the EPA's proposed $NO_X$ limit would be to install SCR. The commenter added that for coal-fired industrial boilers with a heat input rating of 100 MMBtu/hr or more, a review of the available RBLC records indicates that out of the 23 RBLC entries identified, nine units (less than half) were subject to an emissions limit at or below 0.2 lb/mmBtu, and eight of these nine units were equipped with SNCR. The commenter stated that based on a review of the available data in the RBLC and given the technical difficulties and low control efficiencies when applying SNCR to swing boilers, the EPA's proposed limit for coal firing does not

appear achievable for industrial coal-fired boilers that experience load swings unless SCR is installed. Other commenters stated that while there have been recent advancements in SNCR technology, such as the setting up of multiple injection grids and the addition of sophisticated CEMs-based feedback loops, implementing SNCR on industrial load-following boilers continues to pose several technical challenges, including lack of achievement of optimal temperature range for the reduction reactions to successfully complete, and inadequate reagent dispersion in the injection region due to boiler design which can lead to significant amounts of unreacted ammonia exhausted to the atmosphere (*i.e.,* large ammonia slip). The commenter noted that at least one pulp mill boiler had to abandon its SNCR system due to problems caused by poor dispersion of the reagent within the boiler, and that SNCR has yet to be successfully demonstrated for a pulp mill boiler with constant swing loads.

*Response:* To the extent the commenter's concerns pertain primarily to SNCR control technology, we note that the final rule does not mandate the use of any particular type of control technology and that other types of control equipment such as SCR should be examined as a means for meeting the final emissions limits. The EPA acknowledges that some coal-fired industrial boilers subject to this section of the final rule may need to install SCR to meet the $NO_X$ emissions limits. This is reflected in our evaluation of costs for the non-EGU sector contained within the Non-EGU Screening Assessment memorandum and the cost calculations for the final rule discussed in section V and the *Memo to Docket—Non-EGU Applicability Requirements and Estimate Emissions Reductions and Costs.* We note that although the RBLC contains information on emissions limits and control technology for some units, it only provides information on a relatively small number of units subject to $NO_X$ emissions limits and operating $NO_X$ controls. Additionally, our final rule provides an exemption for units that operate infrequently (*i.e.,* "low-use boilers"), and also allows a facility owner or operator to submit a request for a case-by-case alternative emissions limit in cases where compliance with the emissions limit in this final rule is technically impossible or would result in extreme economic hardship. We note that non-EGU boilers share many similarities with EGU boilers, many of which already operate SCR to control $NO_X$ emissions or will be required to

install and operate SCR systems under the requirements for EGUs contained in this final rule. Lastly, we note that information collected during the development of updates to the EPA's MACT requirements for industrial, commercial, and institutional (ICI) boilers indicates that over 150 ICI boilers have installed SCR control systems to reduce their $NO_X$ emissions. This information is in the docket for this final rule.

All affected units must install and operate $NO_X$ control equipment as necessary to meet the applicable emissions limits in the final rule, except that if the owner or operator requests, and the EPA approves, a case-by-case emissions limit based on a showing of technical impossibility or extreme economic hardship, the affected unit would be required to comply with the EPA-approved case-by-case emissions limit instead.

b. Residual or Distillate Oil-Fired Industrial Boilers

Most oil-fired boilers are fueled by either residual (heavy) oil or distillate (light) oil. We proposed a $NO_X$ emissions limit of 0.2 lb/mmBtu [397] for residual oil-fired boilers and proposed a $NO_X$ emissions limit of 0.12 lb/mmBtu for distillate oil-fired boilers. We are finalizing both limits as proposed, based on a 30-day rolling average. As with coal-fired industrial boilers, a number of combustion and post-combustion $NO_X$ control technologies exist that should generally enable facilities meeting the applicability criteria of this section to meet these emissions limits, and the Final Non-EGU Sectors TSD identifies numerous states that have already adopted emissions limits similar to the limits in this final rule. There are relatively few boilers fueled by residual or distillate oil within the industries affected by this final rule that meet the applicability criteria of this section, and we received relatively few comments regarding our proposed emissions limits for them.

c. Natural Gas-Fired Industrial Boilers

We proposed a $NO_X$ emissions limit of 0.08 lb/mmBtu based on a 30-day rolling average for natural gas-fired boilers meeting the applicability criteria of this section, and we are finalizing this emissions limit and averaging time as proposed. As explained in our proposal,

numerous combustion and post-combustion $NO_X$ control technologies exist that should generally enable facilities meeting the applicability criteria of this section to meet this emissions limit. Additionally, many states have already adopted emissions limits similar to the emissions limit in this final rule, and some natural gas-fired industrial boilers may be able to meet the 0.08 lb/mmBtu emissions limit by modifying existing $NO_X$ control equipment installed to meet the requirements in 40 CFR 60.44b (subpart Db of 40 CFR part 60, Standards of Performance for Industrial-Commercial-Institutional Steam Generating Units), which already requires that natural gas-fired units meet a $NO_X$ emissions limit of between 0.1 to 0.2 lbs/MMBtu.

Compliance Assurance Requirements

We proposed compliance provisions for boilers subject to the requirements of this section similar to the emissions monitoring requirements found in 40 CFR 60.45 (subpart D of 40 CFR part 60, Standards of Performance for Fossil-Fuel-Fired Steam Generators). Those requirements include, among other provisions, the performance of an initial compliance test and installation of a CEMS unless the initial performance test indicates the unit's emissions rate is 70 percent or less of the emissions limit in this final rule. We received a number of comments on this portion of our proposal and provide responses to some of these comments in the following paragraphs. Our full responses to comments are provided in the response to comments document included in the docket for this action.

*Comment:* A number of commenters stated that CEMS monitoring is too expensive and unnecessary for ensuring compliance with the emissions limits for boilers and requested that alternative monitoring techniques be allowed.

*Response:* The EPA acknowledges that the installation and operation of CEMs systems is more expensive than other monitoring techniques and may not be necessary for smaller sized boilers that typically produce less emissions than larger ones. In response to these comments, we have modified the monitoring requirements in the final rule such that boilers rated with heat-input capacities less than 250 mmBTU/hr can demonstrate compliance by conducting an annual stack test as an alternative to monitoring using a CEMs system and by complying with the provisions of a monitoring plan meeting specific criteria that enables the facility owner or operator to demonstrate continuous compliance with the emissions limits of this final rule.

*Comment:* One commenter stated that the proposed reporting obligations require the submittal of excess emissions reports, continuous monitoring, and quarterly emissions reports. The commenter suggested that since the $NO_X$ emissions standards only apply during the ozone season (May 1–September 30), the reporting requirements should only apply during the second and third quarters of the year and should require that only emissions and monitoring data from this time period be included in these reports.

*Response:* In response to these comments, the EPA is finalizing recordkeeping, monitoring, and reporting requirements that are designed to ensure compliance with the applicable emissions limits only during the ozone season. Additionally, the final rule requires annual reports rather than the proposed quarterly reports as annual reports are adequate to determine compliance with the emissions limits during the ozone season.

*Comment:* A number of commenters stated that some of their boilers that may potentially be subject to a final FIP already have a $NO_X$ CEMS installed and requested that the EPA clarify whether a 30-day initial compliance test is required in such cases.

*Response:* The EPA's final rule provides that in instances where a boiler meeting the applicability requirements of this section has already installed a $NO_X$ CEMs that meets the requirements for such equipment located within 40 CFR 60.13 or 40 CFR part 75, Continuous Emissions Monitoring, pursuant to a federally enforceable requirement, a 30-day initial compliance test is not required.

*Comment:* One commenter stated that § 52.45(d) of the EPA's proposed rule included requirements to complete an initial 30-day compliance test within 90 days of installing pollution control equipment but did not specify whether the test must be complete prior to the May 1, 2026, ozone season or by some later date.

*Response:* In response to this comment, the EPA is finalizing provisions requiring that initial compliance tests occur prior to the May 1, 2026 compliance date.

6. Municipal Waste Combustors

Applicability

The EPA is finalizing regulatory requirements that apply to municipal solid waste combustors located in a state subject to the non-EGU requirements of this final rule (*i.e.,* the 20 states with linkages that persist in 2026 as identified in section II.B) and

---

[397] Section 52.45(c) of the regulatory text in our proposed rule identified a proposed emissions limit of 0.15 lb/mmBtu for residual oil-fired boilers, but the emissions limit that we intended to propose for this equipment and discussed both in the preamble to the proposed rule and in the TSD supporting the proposed rule was 0.20 lb/mmBtu.

that combust greater than or equal to 250 tons per day of municipal solid waste (''affected units''). *See* 40 CFR 52.46(d) for guidelines on calculating municipal waste combustor unit capacity. This applicability threshold was supported by commenters and is consistent with the applicability criteria in 40 CFR part 60, subpart Eb, Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Large Municipal Waste Combustors. State RACT rules for MWCs and the OTC MWC report similarly define large MWC units as units with a combustion capacity greater than or equal to 250 tons per day.

Across the 20 states subject to the non-EGU requirements, this applicability threshold captures 28 MWC facilities with a total of 80 affected units. The identified affected units include mass burn waterwall units, mass burn rotary waterwall units, refuse derived fuel (RDF) units, and one CLEERGAS™ (''Covanta Low Emissions Energy Recovery Gasification'') modular system.[398] The EPA analyzed actual emissions from the facilities captured by this threshold and found that on average, a unit with a design capacity of 250 tons per day has a PTE of approximately 138 tons per year,[399] which is similar to the PTE threshold applied to other non-EGU sources under this rulemaking.

*Emissions Limitations and Rationale*

Based on the available information for this industry, including information provided during the public comment period, the OTC MWC Report, a review of State and local RACT rules that apply to MWCs, and active air permits issued to MWCs, the EPA is finalizing the following emissions limits for municipal solid waste combustors.

TABLE VI.C.6–1—NO$_X$ EMISSIONS LIMITS FOR LARGE MUNICIPAL WASTE COMBUSTORS

| NO$_X$ Limit (ppmvd) corrected to 7 percent oxygen | Averaging period |
| --- | --- |
| 110 | 24-hour. |
| 105 | 30-day. |

At proposal, the EPA noted that the NO$_X$ limits for large MWCs constructed on or before September 20, 1994 under NSPS subpart Cb are found within Tables 1 and 2 of 40 CFR 60.39b and

range from 165 to 250 ppm depending on the combustor design type. The NO$_X$ limits for large MWCs constructed after September 20, 1994 or for which modification or reconstruction is commenced after June 19, 1996 under NSPS subpart Eb are found at 40 CFR 60.52b(d) and are 180 ppm during a unit's first year of operation and 150 ppm afterwards, applicable across all combustor types. These limits correspond to NO$_X$ emissions rates of 0.31 and 0.26 lb/mmBtu, respectively. In reviewing active air permits for MWCs, the EPA found that most MWCs are meeting emissions limits similar to those reflected in the applicable NSPS.[400]

The EPA also cited the OTC's MWC report that evaluated the emissions reduction potential of large MWCs located in the OTR from two different control levels, one based on a NO$_X$ concentration of 105 to 110 ppm, and another based on a limit of 130 ppm. The OTC MWC report found that a control level of 105 ppmvd on a 30-day rolling average basis and a 110 ppmvd on a 24-hour block averaging period would reduce NO$_X$ emissions from MWCs by approximately 7,300 tons annually, and that a limit of 130 ppmvd on a 30 day-average could achieve a 4,000 ton reduction. The OTR MWC Report noted that at the time of publication, eight MWC units were already subject to permit limits of 110 ppm, seven in Virginia, and one in Florida. In consideration of control costs, the report cited multiple studies evaluating MWCs similar in design to the large MWCs in the OTR and found NO$_X$ reductions could be achieved at costs ranging from $2,900 to $6,600 per ton of NO$_X$ reduced.

To further inform the EPA's consideration of emissions limits for MWCs, the EPA requested comment on the emissions limit and averaging time MWCs should be required to meet, and specifically whether the EPA should adopt emissions rates of 105 ppmvd on a 30-day rolling averaging basis and 110 ppmvd on a 24-hour block averaging basis.

*Comment:* The agency received several comments regarding emissions limits and averaging time for MWCs. Many commenters asserted that the EPA should set a 24-hour emissions limit no higher than 110 ppm, noting that recent studies have shown that there are a variety of technologies that can help a wide range of MWC types achieve this limit at costs that are significantly below the $7,500/ton cost effectiveness

threshold that the EPA identified at proposal. Some commenters confirmed the accuracy of the OTC workgroup's estimated cost of controls for reducing NO$_X$ emissions from MWCs of $2,900 to $6,600 while others stated that the cost of controls is well below $7,500. One commenter asserted that the EPA should set a 24-hour NO$_X$ emissions limit of 50 ppmvd for MWCs, which could be achieved by the installation of SCR technology. Alternatively, the commenters stated that the EPA should set a 24-hour emissions limit no higher than 110 ppm based on less effective, though still widely available, control technology. Although some commenters stated that MWCs should not be included in the rulemaking, no commenters specifically identified units or categories of units that could not achieve emissions limits of 105 ppmvd on a 30-day rolling averaging basis and 110 ppmvd on a 24-hour block averaging basis.

*Response:* The EPA recognizes that there have been instances where MWCs have installed SCR and achieved emissions rates of 50 ppmvd on a 24-hr averaging basis and 45 ppmvd on a 30-day rolling averaging basis with cost effectiveness estimates around $10,296/ ton to $12,779/ton of NO$_X$ reduced. Given uncertainties pertaining to whether SCR can be installed on all types of MWCs, the EPA has decided not to establish emissions limits as low as 50 ppmvd for MWCs using SCR at this time. However, as generally supported by most commenters, the EPA is finalizing emissions limits of 105 ppmvd at 7 percent oxygen (O$_2$) on a 30-day rolling average and 110 ppmvd at 7 percent O$_2$ on a 24-hour block average that apply at all times except during periods of startup and shutdown. The EPA recognizes that the final emissions limits for steady-state operations cannot be achieved during periods of startup, shutdown, and malfunction. This is primarily due to the fact that during periods of startup and shutdown, additional ambient air is introduced into the units, resulting in higher oxygen concentrations. Therefore, the EPA is finalizing provisions applicable during periods of startup and shutdown that do not require correction of CEMS data to 7 percent oxygen but do require that such data be measured at stack oxygen content. This approach is consistent with EPA regulations applicable during startup and shutdown periods for other solid-waste incinerators under the NSPS for Commercial and Industrial Solid Waste Incineration Units. *See* 40 CFR part 60, subparts CCCC and DDDD.

---

[398] *See* the Final Non-EGU Sectors TSD for additional information on this inventory.

[399] *See* the Final Non-EGU Sectors TSD for additional information on the calculation of PTE for large MWCs.

[400] For further discussion of the permits reviewed, see the Final Non-EGU Sectors TSD.

Information received from public commenters generally aligned with the results from studies showing that the emissions limits of 105 ppmvd on a 30-day rolling averaging basis and 110 ppmvd on a 24-hour block averaging basis can be reached using ASNCR or low NOₓ technology in addition to SNCR.[401] The EPA recognizes that not all units can implement low NOₓ technology, including those using Aireal grate technology, those operating RFD units, and those with rotary combustor units. Of the 80 affected MWC units that the EPA identified, nine units across two facilities are classified as rotary combustors, four units at a single facility are classified as RDF, and no units captured are classified as using Aireal grate technology. One affected unit is classified as CLEERGAS gasification while the remaining 64 affected units are classified as mass burn waterwall combustors, which have not been explicitly identified as units unable to install low NOₓ technology. For those units unable to install low NOₓ technology or SNCR, the EPA has identified ASCNR as an alternative control technology that has been shown to enable units to achieve emissions limits of 105 ppmvd on a 30-day rolling averaging basis and 110 ppmvd on a 24-hour block averaging basis, either as a new retrofit technology or as a significant upgrade to existing SNCR. The EPA finds that the availability of ASNCR or SNCR and low NOₓ burners provides sufficient flexibility for MWCs to meet the emissions limits in the final rule, especially considering that 74 of the 80 affected units already have SNCR installed. Although there is uncertainty on the cost effectiveness of ASNCR for achieving significant NOₓ reductions in small MWCs, small MWCs that combust less than 250 tons per day of municipal solid waste are not included in this rulemaking.

While commenters noted discrepancies across cost effectiveness values for specific types of control technology, no commenters specifically indicated that emissions control technology could not be cost effectively installed on large MWCs to achieve an emissions limit of 105 ppmvd on a 30-day rolling averaging basis and 110 ppmvd on a 24-hour block averaging

basis. Studies show that these limits can be achieved through a variety of emissions controls, including ASNCR and the addition of low NOₓ technology to existing SNCR.[402] Of the 80 MWC units subject to this rule, 55 units already have SNCR installed, 16 units already have SNCR and low NOₓ technology installed, and three units already have ASNCR installed. Applying the cost values provided in the OTC's MWC report to the MWC inventory in section 7 of the Final Non-EGU Sectors TSD, the estimated weighted average cost effectiveness of applying advanced SNCR to units with and without existing SNCR and adding low NOₓ technology to eligible units with SNCR was found to be approximately $7,929.02/ton.[403] This value is in line with the control technology costs for other non-EGU sectors and the EGU costs associated with this final rule.

Compliance Assurance Requirements

In this final rule, the EPA is establishing compliance requirements for MWCs similar to the NSPS requirements for large MWCs under 40 CFR part 60, subpart Eb. Those requirements include, among other provisions, the performance of an initial performance test and installation of a CEMS. At proposal, the EPA requested comment on whether it would be appropriate to rely on existing testing, monitoring, recordkeeping, and reporting requirements for MWCs under applicable NSPS or other requirements.

*Comment:* Some commenters noted that all large MWCs are already required to use CEMS to demonstrate compliance with NOₓ limits under the NSPS program. These commenters asserted that the EPA should improve electronic reporting requirements beyond current requirements in the NSPS. The commenters suggested that an owner or operator of an MWC subject to a limit

under the final rule should be required to report NOₓ CEMS data electronically at least annually to the EPA's CEDRI and any other database that the EPA will utilize when considering revisions to the NSPS for large MWCs. The commenters asserted that MWC operators should be required to report NOₓ CEMS data to the EPA's Clean Air Markets database, to allow the public access to MWC CEMS data on a large scale for the first time.

*Response:* The EPA is finalizing provisions that require MWCs subject to the requirements of this section to install, calibrate, maintain, and operate a CEMS for the measurement of NOₓ emissions discharged into the atmosphere from the affected facility. This is consistent with NSPS requirements for large MWCs under 40 CFR part 60, subparts Ea and Eb, and state RACT rules that are applicable to MWCs in many of the states covered under this rulemaking.[404] Additionally, each emissions unit will be required to conduct an initial performance test. With regard to electronic reporting, the final rule requires performance tests and reports, including CEMS data, to be submitted to CEDRI, as required for all non-EGU industries covered by this final rule.

*D. Submitting a SIP*

A state may submit a SIP at any time to address CAA requirements that are covered by a FIP, and if the EPA approves the SIP it would replace the FIP, in whole or in part, as appropriate. As discussed in this section, states may opt for one of several alternatives that the EPA has provided to take over all or portions of the FIP. However, as discussed in greater detail further in this section, the EPA also recognizes that states retain the discretion to develop SIPs to replace a FIP under approaches that differ from those the EPA has finalized.

The EPA has established certain specialized provisions for replacing FIPs with SIPs within all the CSAPR trading programs, including the use of so-called "abbreviated SIPs" and "full SIPs," *see* 40 CFR 52.38(a)(4) and (5) and (b)(4), (5), (8), (9), (11), and (12); 40 CFR 52.39(e), (f), (h), and (i). For a state to remove all FIP provisions through an approved SIP revision, a state would need to address all of the required reductions addressed by the FIP for that state, *i.e.,* reductions achieved through both EGU control and non-EGU control,

---

[401] The only demonstrated use of low NOₓ technology in addition to SNCR at MWC facilities is at Covanta facilities using Covanta's proprietary low NOₓ combustion system (LN™). For the purpose of this rule, EPA is assuming Covanta facilities will take advantage of this technology and others will use ASNCR. However, other iterations of low NOₓ technology could become available, or facilities could work with Covanta to apply this technology to their units.

[402] *See* OTC MWC Report at 6–7; Trinity Consultants, *Project Report Covanta Alexandria/ Arlington, Inc., Reasonably Available Control Technology Determination for NOₓ* (September 2017); Trinity Consultants, *Project Report Covanta Fairfax, Inc., Reasonably Available Control Technology Determination for NOₓ* (September 2017); Babcock Power Environmental, *Waste to Energy NOₓ* Feasibility Study, Prepared for: Wheelabrator Technologies Baltimore Waste to Energy Facility Baltimore, MD (February 20, 2020); White, M., Goff, S., Deduck, S., Gohlke, O., *New Process for Achieving Very Low NOₓ, Proceedings of the 17th Annual North American Waste-to-Energy Conference, NAWTEC17* (May 2009); Letter from the State of New Jersey to Michael Klein, In Reference to Covanta Energy Group, Inc. Essex County Resource Recovery Facility, Newark Annual Stack Test Program (March 14, 2019).

[403] See Final Non-EGU Sectors TSD for more information on these cost effectiveness estimates were generated.

[404] For examples of RACT provisions applicable to MWCs that require CEMS, see Regulations of Connecticut State Agencies section 22a–174–22e; and Virginia Administrative Code section 5–40–6730, subsection (D).

as applicable to that state. Additionally, tribes in Indian country within the geographic scope of this rule may elect to work with EPA under the Tribal Authority Rule to replace the FIP for areas of Indian country, in whole or in part, with a tribal implementation plan or reasonably severable portions of a tribal implementation plan.

Under the FIPs for the 22 states whose EGUs are required to participate in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program with the modifications finalized in this rule, EPA continues to offer "abbreviated" and "full" SIP options for states. An "abbreviated SIP" allows a state to submit a SIP revision that establishes state-determined allowance allocation provisions replacing the default FIP allocation provisions but leaving the remaining FIP provisions in place. A "full SIP" allows a state to adopt a trading program meeting certain requirements that allow sources in the state to continue to use the EPA-administered trading program through an approved SIP revision, rather than a FIP. In addition, as under past CSAPR rulemakings, states have the option to adopt state-determined allowance allocations for existing units for the second control period under this rule—in this case, the 2024 control period—through streamlined SIP revisions. *See* 76 FR 48326–48332 for additional discussion of full and abbreviated SIP options; *see also* 40 CFR 52.38(b).

*Comments:* Some commenters alleged that by taking this action, EPA is depriving states of the ability to develop SIPs to implement good neighbor obligations for the 2015 ozone NAAQS or from choosing their own compliance strategies. Commenters also claimed that the EPA cannot require states to implement emissions reductions equivalent to the emissions control stringency that the EPA determined at Step 3 if their proposed SIPs are otherwise shown to be adequate to eliminate significant contribution. Other commenters raised concerns that the trading program enhancements for EGUs made it too uncertain what a state could develop as an approvable replacement SIP. At least one commenter argued that the EPA must give states a single, mass-based emissions budget so that they can understand how to replace the FIP with a SIP.

*Response:* The EPA disagrees that it is depriving States of the opportunity to replace the FIP with a SIP or preventing states from targeting alternative emissions reductions strategies that can be shown to be equivalent to the FIP. States have always possessed the authority and the opportunity to revise

their SIPs at any point. The EPA has repeatedly emphasized that states are free to develop a SIP revision to replace a transport FIP and submit that to the EPA for approval, and this remains true. *See* 87 FR 20036, 20051 (April 6, 2022); 86 FR 23054, 23062 (April 30, 2021); 81 FR 74504, 74506 (Oct. 26, 2016). In the FIP proposal, as in prior transport actions, the EPA discussed a number of ways in which states could take over or replace a FIP, *see* 87 FR 20036, 20149–51 (section VII.D: "Submitting A SIP"); *see also id.* at 20040 (noting as one purpose in proposing the FIP that "this proposal will provide states with as much information as the EPA can supply at this time to support their ability to submit SIP revisions to achieve the emissions reductions the EPA believes necessary to eliminate significant contribution"). The EPA provides further guidance on submitting SIPs in this section. If, and when, the EPA receives a SIP submission that satisfies the requirements of CAA section 110(a)(2)(D)(i)(I) and 110(l), the Agency will take action to approve those SIP submissions and withdraw the FIP.

At the outset, we note that the Agency does not anticipate revisiting its findings at Steps 1 or 2 of the transport framework. Those findings establish that the projected baseline anthropogenic emissions from these states contribute to downwind nonattainment or maintenance receptors in 2023, and, for certain states, that contribution continues through 2026. Those represent critical analytical years for downwind areas as they are the last full ozone season before the Moderate and Serious area attainment dates. Those findings, for those years, establish the basis for an upwind state's linkage, from which we proceed to evaluate emissions control opportunities and their implementation at Steps 3 and 4.

We cannot prejudge now whether state submissions to replace the EPA's FIP will be approvable, but we note a number of statutory and implementation considerations states should be aware of if designing a replacement SIP. We have demonstrated that the EPA's transport FIP is adequate to eliminate significant contribution to downwind air quality problems for purposes of the 2015 ozone NAAQS, and that the FIP does not result in overcontrol. The level of reductions required by the FIP therefore provides an important benchmark for states in evaluating the equivalence of possible replacement SIPs. As discussed in more detail in this section, in order to comply with their obligation under CAA section 110(a)(2)(D)(i)(I), we generally anticipate that states seeking to replace the FIP

with a SIP that takes an alternative approach would need to establish, at a minimum, an equivalent level of emissions reduction to what the FIP requires at Step 3, and any such replacement SIP will need to comply with CAA section 110(*l*).

The concept of equivalency is important for the state to consider. Under CAA section 110(l), "the Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment . . . or any other applicable requirement of this chapter." Section 110(l) applies to all CAA requirements, including 110(a)(2)(D) requirements relating to interstate transport. The EPA interprets section 110(l) such that states have two main options to make a noninterference demonstration. First, the state could demonstrate that emissions reductions removed from the SIP are replaced with new control measures that achieve equivalent or greater emissions reductions. Thus, a 110(l) analysis would generally need to show that the SIP revision, or, in this case, a potential SIP submission replacing an existing FIP, will not interfere with any area's ability to continue to attain or maintain the affected NAAQS or other CAA requirements. The EPA further has interpreted section 110(l) as requiring such substitute measures to be quantifiable, permanent, and enforceable, among other considerations. For section 110(l) purposes, "permanent" means the state cannot modify or remove the substitute measure without EPA review and approval. Second, the state could conduct air quality modeling or develop an attainment or maintenance demonstration based on the EPA's most recent technical guidance to show that, even without the control measure or with the control measure in its modified form, significant contribution from the state would continue to be prohibited as the Act requires. As discussed further in this section, for purposes of interstate ozone transport, such an analysis entails important questions of consistency and equity among states for resolving air quality problems that the EPA would need to carefully evaluate.[405]

---

[405] For instance, future circumstances in which the receptor or receptors to which a state is linked come fully into attainment or to which the upwind state's linkage drops below 1 percent of the NAAQS would likely not, solely on those grounds, be sufficient to relax transport requirements established by the FIP or justify approving a less stringent SIP. First, the emissions reductions achieved by the FIP are part of the reason that a receptor may come into attainment or a linkage may drop below 1 percent of the NAAQS. Simply

Continued

In the EPA's experience implementing the CAA criteria pollutant program, reductions arising from the good neighbor provision have been critically important to the improvement of air quality in downwind areas struggling with attainment and maintenance of the NAAQS, and states' reliance on good neighbor FIP reductions will need to be taken into account in any replacement SIP. In order for a nonattainment area to be redesignated to attainment, the CAA requires not only that an area attain the standard, but also the Administrator must determine "that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions." CAA section 107(d)(3)(E)(i) and (iii). Many nonattainment areas across the country that have attained various $PM_{2.5}$ and ozone NAAQS have done so in part due to the imposition of Federal good neighbor emissions control measures, and, per CAA section 107(d)(3)(E)(iii), states have specifically relied on the emissions reductions required by those programs in order to be redesignated to attainment. *See, e.g.,* 84 FR 8422, 8425 (March 8, 2019) (noting that "[a]t least 140 EPA final actions redesignating areas in 20 states to attainment with an ozone NAAQS or a fine particulate matter ($PM_{2.5}$) NAAQS—because $NO_X$ is a precursor to $PM_{2.5}$ as well as ozone—have relied in part on the $NO_X$ SIP Call's emissions reductions"); *see also Sierra Club* v. *EPA,* 774 F.3d 383, 397–99 (7th Cir. 2014) (upholding EPA's approval of a redesignation, and specifically EPA's determination that reductions from Federal good neighbor transport trading programs could reasonably be

<hr>

removing emissions control requirements the moment this occurs is illogical, since those reductions are part of the solution by which the attaining air quality was achieved or the linkage was resolved. *See* CAA section 107(d)(3)(E)(iii) (areas cannot be redesignated unless based on permanent and enforceable reductions); *see also Wisconsin,* 938 F.3d at 324–25 (explaining that upwind states are held to a contribution standard, not a but-for causation standard and thus cannot escape good neighbor obligations on the basis that other emissions "cause" the NAAQS to be exceeded). There is a risk of inconsistency and inequity in removing any requirements in this manner in that any increase in emissions that could occur in one upwind state would likely need to be reviewed in relation to the obligations other upwind states would continue to meet. Further, any such relaxation in upwind state requirements could then unreasonably shift the burden for maintaining air quality onto the downwind states where receptors are located. These issues may entail complex state- or case-specific analyses that would need to be evaluated at the time such a SIP revision is submitted; these issues are not ripe for resolution in this action.

considered "permanent and enforceable" under the statute); *Sierra Club* v. *EPA,* 793 F.3d 656, 665–68 (6th Cir. 2015) (same). States seeking area redesignations are also required under CAA section 107(d)(3)(E)(iv) to develop revisions to their state implementation plans that provide for maintenance of the NAAQS. In so doing, states develop air quality modeling, in which they project future air quality based on emissions inputs that account for enforceable emissions reductions, or states project emissions in the future relative to emissions in an attainment year, showing that the future emissions (which, again, account for on-the-books, enforceable emissions limits) do not exceed emissions in the baseline attainment year. *See* "Procedures for Processing Requests to Redesignate Areas to Attainment," Memo from John Calcagni to EPA Regions, September 4, 1992, at 9. Reductions required by Federal good neighbor programs may therefore also be relied upon by states seeking area redesignations in the context of how states demonstrate that areas will maintain the NAAQS.

We anticipate that air quality in areas struggling to attain and maintain the 2015 ozone NAAQS will improve due to the emissions reductions required by EPA's FIP. We also anticipate that, consistent with EPA's historical experience implementing the NAAQS and acting on state requests for nonattainment area redesignations, emissions reductions associated with EPA's transport FIP for the 2015 ozone NAAQS are likely to be a critical component in those requests for redesignation. Where states have relied on and are relying on the FIP's reductions in order to attain and maintain the NAAQS, EPA will look very critically at any replacement SIP that appears to fall short of equivalent emissions reductions—in terms of the level of reductions or the permanence of those reductions.

Finally, we disagree with commenters that the absence of fixed, mass-based emissions budgets for each state make it impossible to replace the FIP with an equivalent SIP. In the case of the trading program enhancements for EGUs, the EPA recognizes that the dynamic budgeting methodology will generally function to impose a continuous incentive on relevant EGUs to continue to implement the emissions control strategies determined at Step 3. Further, the backstop rate and banking recalibration enhancements also are designed to ensure that EGUs implement emissions controls consistent with Step 3 determinations on a continuous basis throughout each

ozone season. As explained in section V.D.4 of this document, these aspects of the trading program do not in themselves introduce an overcontrol concern. Nonetheless, consistent with the more general principles discussed in this section with respect to the potential bases on which states may replace the FIP with SIPs, we reserve judgment at this time on whether some future demonstration could successfully establish that revision of the FIP or its replacement with a SIP could be acceptable even if the way that significant contribution is eliminated is through means that differ from the trading program enhancements included for EGUs in this action. As discussed further in this section, a state may choose to withdraw its EGUs from the trading program and instead subject those EGUs to daily emissions rates commensurate with installation and optimization of state-of-the-art combustion and post-combustion controls as the EPA determined at Step 3. Likewise, states are free to explore an alternative set of emissions controls on non-EGU industrial sources (or other sources in the state), so long as they can demonstrate that an equivalent amount of emissions is eliminated. In any case, we need not resolve these questions here. The EPA, in promulgating a FIP, is not obligated to identify each way a state could replace it with a SIP revision. Several options are discussed further in this section, and, as always, EPA Regional Offices will work closely with states who wish to explore these options or other alternatives.

### 1. SIP Option To Modify Allocations for 2024 Under EGU Trading Program

As with the start of past CSAPR rulemakings, the EPA is finalizing the option to allow a state to use a similar process to submit a SIP revision establishing allowance allocations for existing EGU units in the state for the second control period of the new requirements, *i.e.,* in 2024, to replace the EPA-determined default allocations. A state must submit a letter to EPA by August 4, 2023, indicating its intent to submit a complete SIP revision by September 1, 2023. The SIP would provide in an EPA-prescribed format a list of existing units within the state and their allocations for the 2024 control period. If a state does not submit a letter of intent to submit a SIP revision, the EPA-determined default allocations will be recorded by September 5, 2023. If a state submits a timely letter of intent but fails to submit a SIP revision, the EPA-determined default allocations will be recorded by September 15, 2023. If a state submits a timely letter of intent

followed by a timely SIP revision that is approved, the approved SIP allocations will be recorded by March 1, 2024.

The EPA received no comments on the proposed option to modify allowance allocations under the Group 3 trading program for EGUs for the 2024 control period through a SIP revision and is finalizing the provisions as proposed.

2. SIP Option To Modify Allocations for 2025 and Beyond Under EGU Trading Program

For the 2025 control period and later, states in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program can modify the EPA-determined default allocations with an approved SIP revision. For the 2025 control period and later, SIPs can be full or abbreviated SIPs. *See* 76 FR 48326–48332 for additional discussion of full and abbreviated SIP options; *see also* 40 CFR 52.38(b).

In this final rule, the EPA is removing the previous regulatory text defining specific options for states to expand CSAPR NO$_X$ Ozone Season Group 3 trading program applicability to include EGUs between 15 MWe and 25 MWe or, in the case of states subject to the NO$_X$ SIP Call, large non-EGU boilers and combustion turbines. These options for expanding trading program applicability through SIP revisions have been available to states since the start of the CSAPR trading programs for small EGUs and since the CSAPR Update for large non-EGU boilers and combustion turbines, and no state has chosen to use the SIP process for this purpose. Additionally, the EPA did not receive comment supporting these expansion options during the comment period for this rule. The EPA is finalizing a methodology for updating the affected EGU portion of the budget in this rule, and the regulatory text defining the applicability expansion to non-EGUs did not include a mechanism for updating the incremental non-EGU portion of a state's budget based on changes over time of the non-EGU fleet; therefore, continuation of the option to expand applicability to certain non-EGUs subject to the NO$_X$ SIP Call would be inconsistent with the trading program as applied to EGUs in this rule.

However, the EPA recognizes that states may seek to include non-EGUs covered in this action in an emissions trading program, subject to important considerations to ensure equivalency in emissions reductions is maintained. While the EPA is not offering specific regulatory text to implement an option to expand the trading program applicability, a state could submit a SIP to expand the CSAPR NO$_X$ Ozone

Season Group 3 Trading Program applicability, which the EPA would evaluate on a case-by-case basis. The SIP revision would need to address critical program elements, and include: (1) high-quality baseline data, (2) ongoing Part 75 monitoring, and (3) provisions to update the non-EGU portion of the budget to appropriately reflect changes to the fleet over time.

For states that want to modify the EPA-determined default allocations, the EPA proposed that a state could submit a SIP revision that makes changes only to that provision while relying on the FIP for the remaining provisions of the EGU trading program. This abbreviated SIP option allows states to tailor the FIP to their individual choices while maintaining the FIP-based structure of the trading program. To ensure the availability of allowance allocations for units in any Indian country within a state not covered by the state's CAA implementation planning authority, if the state chose to replace the EPA's default allocations with state-determined allocations, the EPA would continue to administer any portion of each state emissions budget reserved as a new unit set-aside or an Indian country existing unit set-aside.

The SIP submittal deadline for this type of revision is December 1, 2023, if the state intends for the SIP revision to be effective beginning with the 2025 control period. For states that submit this type of SIP revision, the deadline to submit state-determined allocations beginning with the 2025 control period under an approved SIP is June 1, 2024, and the deadline for the EPA to record those allocations is July 1, 2024. Similarly, a state can submit a SIP revision beginning with the 2026 control period and beyond by December 1, 2024, with state allocations for the 2026 control period due June 1, 2025, and EPA recordation of the allocations by July 1, 2025.

The EPA received no comment on the option to replace certain allowance allocation provisions under the Group 3 trading program for EGUs for control periods in 2025 and later years through a SIP revision and is finalizing the provisions generally as proposed, with the exception that any potential expansion of trading program applicability under a SIP revision would be evaluated on a case-by-case basis.

3. SIP Option To Replace the Federal EGU Trading Program With an Integrated State EGU Trading Program

For the 2025 control period and later, states in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program can choose to replace the Federal EGU trading

program with an integrated State EGU trading program through an approved SIP revision. Under this option, a state can submit a SIP revision that makes changes only to modify the EPA-determined default allocations and that adopts identical provisions for the remaining portions of the EGU trading program. This SIP option allows states to replace these FIP provisions with state-based SIP provisions while continuing participation in the larger regional trading program. As with the abbreviated SIP option discussed previously, to ensure the availability of allowance allocations for units in any Indian country within a state not covered by the state's CAA implementation planning authority, if the state chooses to replace the EPA's default allocations with state-determined allocations, the EPA would continue to administer any portion of each state emissions budget reserved as a new unit set-aside or an Indian country existing unit set-aside. Also, for the same reasons discussed with respect to the abbreviated SIP option, the EPA is removing the option for states to expand CSAPR NO$_X$ Ozone Season Group 3 trading program applicability to include EGUs between 15 MWe and 25 MWe or, in the case of states subject to the NO$_X$ SIP Call, large non-EGU boilers and combustion turbines.

Deadlines for this type of SIP revision are the same as the deadlines for abbreviated SIP revisions. For the SIP-based program to start with the 2025 control period, the SIP deadline is December 1, 2023, the deadline to submit state-determined allocations for the 2025 control period under an approved SIP is June 1, 2024, and the deadline for the EPA to record those allocations is July 1, 2024, and so on.

The EPA received no comment on the option to replace the Federal trading program for EGUs with an integrated state trading program for EGUs for control periods in 2025 and later years through a SIP revision and is finalizing the provisions generally as proposed, with the exception that any potential expansion of trading program applicability under a SIP revision would be evaluated on a case-by-case basis.

4. SIP Revisions That Do Not Use the Trading Program

States can submit SIP revisions to replace the FIP that achieve the necessary EGU emissions reductions but do not use the CSAPR NO$_X$ Ozone Season Group 3 Trading Program. For a transport SIP revision that does not use the CSAPR NO$_X$ Ozone Season Group 3 Trading Program, the EPA would evaluate the transport SIP based on the

particular control strategies selected and whether the strategies as a whole provide adequate and enforceable provisions ensuring that the necessary emissions reductions (*i.e.,* reductions equal to or greater than what the Group 3 trading program will achieve) will be achieved. To address the applicable CAA requirements, the SIP revision should include the following general elements: (1) a comprehensive baseline 2023 statewide $NO_X$ emissions inventory (which includes existing control requirements), which should be consistent with the 2023 emissions inventory that the EPA used to calculate the required state budget in this final rule (unless the state can explain the discrepancy); (2) a list and description of control measures to satisfy the state emissions reduction obligation and a demonstration showing when each measure would be implemented to meet the 2023 and successive control periods; (3) fully-adopted state rules providing for such $NO_X$ controls during the ozone season; (4) for EGUs greater than 25 MWe, monitoring and reporting under 40 CFR part 75, and for other units, monitoring and reporting procedures sufficient to demonstrate that sources are complying with the SIP (*see* 40 CFR part 51, subpart K (''source surveillance'' requirements)); and (5) a projected inventory demonstrating that state measures along with Federal measures will achieve the necessary emissions reductions in time to meet the 2023 and successive compliance deadlines (*e.g.,* enforceable reductions commensurate with installation of SCR on coal-fired EGUs by the 2027 ozone season). The SIPs must meet procedural requirements under the Act, such as the requirements for public hearing, be adopted by the appropriate state board or authority, and establish by a practically enforceable regulation or permit(s) a schedule and date for each affected source or source category to achieve compliance. Once the state has made a SIP submission, the EPA will evaluate the submission(s) for completeness before acting on the SIP. EPA's criteria for determining completeness of a SIP submission are codified at 40 CFR part 51, appendix V.

For further background information on considerations for replacing a FIP with a SIP, *see* the discussion in the final CSAPR rulemaking (76 FR 48326).

**5. SIP Revision Requirements for Non-EGU or Industrial Source Control Requirements**

EPA's promulgation of a non-EGU transport FIP would in no way affect the ability of states to submit, for review and approval, a SIP that replaces the

requirements of the FIP with state requirements. To replace the non-EGU portion of the FIP in a state, the state's SIP must provide adequate provisions to prohibit $NO_X$ emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. The state SIP submittal must demonstrate that the emissions reductions required by the SIP would continue to ensure that significant contribution from that state has been eliminated through permanent and enforceable measures. The non-EGU requirements of the FIP would remain in place in each covered state until a state's SIP has been approved by the EPA to replace the FIP.

The most straightforward method for a state to submit a presumptively approvable SIP revision to replace the non-EGU portion of the FIPs for the state would be to provide a SIP that includes emissions limits at an equivalent or greater level of stringency than is specified for non-EGU sources meeting the applicability criteria and associated compliance assurance provisions for each of the unit types identified in section VI.C of this document.

*Comment:* One commenter stated that they believed EPA's assertion in the proposal that any SIP submittal would have to achieve equal or greater reductions for non-EGUs than the FIP was unlawful. The commenter asserted that a state's ability to replace the FIP must be tied to whether it has addressed the underlying nonattainment/maintenance concerns by reducing significant contribution from sources in the state below the significance threshold, (as opposed to whether it prohibits equivalent emissions to the FIP).

*Response:* The EPA recognizes that states may select emissions reductions strategies that differ from the emissions limitations included in the proposed non-EGU FIP; this is discussed in response to comments earlier in this section. For example, some states may desire to include non-EGUs in a trading program. This may be possible subject to taking into account a number of considerations as discussed earlier in this section to ensure equivalency between the different approaches. But the state must still demonstrate that the replacement SIP provides an equivalent or greater amount of emissions reductions as the proposed FIP to be presumptively approvable. The EPA anticipates that such emissions reductions strategies would have to achieve reductions equivalent to or beyond those emissions reductions already projected to occur in EPA's

emissions projections and air quality modeling conducted at Steps 1 and 2. Such reductions must also be achieved by the 2026 ozone season.

EPA further acknowledges that a demonstration of equivalency using other control strategies is complicated by the fact that the final emissions limits for non-EGU sources are generally unit-specific and expressed in a variety of forms; comparative analysis with alternative control requirements to determine equivalency would need to take this into account. Similarly, we recognize that the emissions trading program for EGUs in this action includes a number of enhancements to ensure that the Step 3 determination of which emissions are ''significant'' and must be eliminated continues to be implemented over time. Although there is not a fixed, mass-based emissions budget established for each state in this action, there are other objective metrics that could guide states in developing replacement SIPs. For example, for non-EGUs, states may choose to conduct an analysis of their industrial stationary sources and present an alternative set of emissions limits applying to specific units that it believes would achieve an equivalent level of emissions reduction. States could apply cost-effectiveness thresholds for emissions control technologies that could be applied to establish that some alternative emissions control strategy results in equivalent or greater improvement at downwind receptors. The EPA anticipates that such a comparison may entail review of both baseline emissions information and growth projections between the different sets of units to ensure that a truly equivalent or greater degree of emissions reduction is achieved; additionality and emissions shifting potential may also need to be considered. We note that the CAMx policy case run for 2026 provides a benchmark for assessing the level of air quality improvement anticipated at receptors with implementation of the FIP. This data may be of use to states as part of a demonstration that a replacement SIP achieves an equivalent or greater level of air quality improvement to the FIP; however, the use of such modeling in such a demonstration would need to be more fully evaluated at the time of such a SIP revision.

In all cases, a SIP submitted by a state to replace the non-EGU components of the FIPs would very likely need to rely on permanent and practically enforceable controls measures that are included in the SIP and, once approved by the EPA, rendered federally enforceable. So-called ''demonstration-

only'' or ''non-regulatory'' SIPs would very likely be insufficient; see discussion in response to comments earlier in this section. Further, the EPA anticipates that states would bear the burden of establishing that the state's alternative approach achieves at least an equivalent level of emissions reduction as the FIP.

*E. Title V Permitting*

This final rule, like CSAPR, the CSAPR Update, and the Revised CSAPR Update does not establish any permitting requirements independent of those under Title V of the CAA and the regulations implementing Title V, 40 CFR parts 70 and 71.[406] All major stationary sources of air pollution and certain other sources are required to apply for title V operating permits that include emissions limitations and other conditions as necessary to ensure compliance with the applicable requirements of the CAA, including the requirements of the applicable SIP. CAA sections 502(a) and 504(a), 42 U.S.C. 7661a(a) and 7661c(a). The ''applicable requirements'' that must be addressed in title V permits are defined in the title V regulations (40 CFR 70.2 and 71.2 (definition of ''applicable requirement'')).

The EPA anticipates that, given the nature of the units subject to this final rule, most if not all of the sources at which the units are located are already subject to title V permitting requirements and already possess a title V operating permit. For sources subject to title V, the interstate transport requirements for the 2015 ozone NAAQS that are applicable to them under the FIPs finalized in this action would be ''applicable requirements'' under title V and therefore must be addressed in the title V permits. For example, EGU requirements concerning designated representatives, monitoring, reporting, and recordkeeping, the requirement to hold allowances covering emissions, the compliance assurance provisions, and liability, and for non-EGUs, the emissions limits and compliance requirements are, to the extent relevant to each source, ''applicable requirements'' that must be addressed in the permits.

Consistent with EPA's approach under CSAPR, the CSAPR Update and the Revised CSAPR Update, the applicable requirements resulting from the FIPs generally will have to be incorporated into affected sources' existing title V permits either pursuant

to the provisions for reopening for cause (40 CFR 70.7(f) and 71.7(f)), significant modifications (40 CFR 70.7(e)(4)) or the standard permit renewal provisions (40 CFR 70.7(c) and 71.7(c)).[407] For sources newly subject to title V that are affected sources under the FIPs, the initial title V permit issued pursuant to 40 CFR 70.7(a) should address the final FIP requirements.

As was the case in the CSAPR, the CSAPR Update and the Revised CSAPR Update, the new and amended FIPs impose no independent permitting requirements and the title V permitting process will impose no additional burden on sources already required to be permitted under title V.

1. Title V Permitting Considerations for EGUs

Title V of the CAA establishes the basic requirements for state title V permitting programs, including, among other things, provisions governing permit applications, permit content, and permit revisions that address applicable requirements under final FIPs in a manner that provides the flexibility necessary to implement market-based programs such as the trading programs established in CSAPR, the CSAPR Update, the Revised CSAPR Update and this final rule. 42 U.S.C. 7661a(b); 40 CFR 70.6(a)(8) & (10); 40 CFR 71.6(a)(8) & (10).

In CSAPR, the CSAPR Update and the Revised CSAPR Update, the EPA established standard requirements governing how sources covered by those rules would comply with title V and its regulations.[408] 40 CFR 97.506(d), 97.806(d) and 97.1006(d). For any new or existing sources subject to this rule, identical title V compliance provisions will apply with respect to the CSAPR NOₓ Ozone Season Group 3 Trading Program. For example, the title V regulations provide that a permit issued under title V must include ''[a] provision stating that no permit revision

shall be required under any approved . . . emissions trading and other similar programs or processes for changes that are provided for in the permit.'' 40 CFR 70.6(a)(8) and 71.6(a)(8). Consistent with these provisions in the title V regulations, in CSAPR, the CSAPR Update and the Revised CSAPR Update, the EPA included a provision stating that no permit revision is necessary for the allocation, holding, deduction, or transfer of allowances. 40 CFR 97.506(d)(1), 97.806(d)(1) and 97.1006(d)(1). This provision is also included in each title V permit for an affected source. This final rule maintains the approach taken under CSAPR, the CSAPR Update and the Revised CSAPR Update that allows allowances to be traded (or allocated, held, or deducted) without a revision to the title V permit of any of the sources involved.

Similarly, this final rule would also continue to support the means by which a source in the final trading program can use the title V minor modification procedure to change its approach for monitoring and reporting emissions, in certain circumstances. Specifically, sources may use the minor modification procedure so long as the new monitoring and reporting approach is one of the prior-approved approaches under CSAPR, the CSAPR Update and the Revised CSAPR Update (*i.e.,* approaches using a continuous emissions monitoring system under subparts B and H of 40 CFR part 75, an excepted monitoring system under appendices D and E to 40 CFR part 75, a low mass emissions excepted monitoring methodology under 40 CFR 75.19, or an alternative monitoring system under subpart E of 40 CFR part 75), and the permit already includes a description of the new monitoring and reporting approach to be used. *See* 40 CFR 97.506(d)(2), 97.806(d)(2) and 97.1006(d)(2); 40 CFR 70.7(e)(2)(i)(B) and 71.7(e)(1)(i)(B). As described in EPA's 2015 Title V Guidance, sources may comply with this requirement by including a table of all of the approved monitoring and reporting approaches under CSAPR, the CSAPR Update and the Revised CSAPR Update trading programs in which the source is required to participate, and the applicable requirements governing each of those approaches.[409] Inclusion of such a table in a source's title V permit therefore allows a covered unit that seeks to change or add to its chosen monitoring and recordkeeping approach to easily comply with the regulations

---

[406] Part 70 addresses requirements for state title V programs, and part 71 governs the Federal title V program.

[407] A permit is reopened for cause if any new applicable requirements (such as those under a FIP) become applicable to an affected source with a remaining permit term of 3 or more years. If the remaining permit term is less than 3 years, such new applicable requirements will be added to the permit during permit renewal. *See* 40 CFR 70.7(f)(1)(i) and 71.7(f)(1)(i).

[408] The EPA has also issued a guidance document and template that includes instructions for how to incorporate the applicable requirements into a source's Title V permit. *See* Memorandum dated May 13, 2015, from Anna Marie Wood, Director, Air Quality Policy Division, and Reid P. Harvey, Director, Clean Air Market Division, EPA, to Regional Air Division Directors, Subject: ''Title V Permit Guidance and Template for the Cross-State Air Pollution Rule'' (''2015 Title V Guidance''), available at *https://www.epa.gov/sites/default/files/2016–10/documents/csapr_title_v_permit_guidance.pdf.*

[409] *Id.*

governing the use of the title V minor modification procedure.

Under CSAPR, the CSAPR Update and the Revised CSAPR Update, to employ a monitoring or reporting approach different from the prior-approved approaches discussed previously, unit owners and operators must submit monitoring system certification applications to the EPA establishing the monitoring and reporting approach actually to be used by the unit, or, if the owners and operators choose to employ an alternative monitoring system, to submit petitions for that alternative to the EPA. These applications and petitions are subject to the EPA review and approval to ensure consistency in monitoring and reporting among all trading program participants. EPA's responses to any petitions for alternative monitoring systems or for alternatives to specific monitoring or reporting requirements are posted on EPA's website.[410] The EPA maintains the same approach for the trading program in this final rule.

### 2. Title V Permitting Considerations for Industrial Stationary Sources

For non-EGU sources, affected sources will need to work with their local, state, or tribal permitting authority to determine if the new applicable requirements should be incorporated into their existing title V permit under the reopening for cause, significant modification, or permit renewal procedures of the approved permitting program. Title V permits for existing sources will need to be updated to include the applicable requirements of this final rule and any necessary preconstruction permits obtained in order to comply with this final rule.

### F. Relationship to Other Emissions Trading and Ozone Transport Programs

#### 1. NO$_X$ SIP Call

Sources in states affected by both the NO$_X$ SIP Call for the 1979 ozone NAAQS and the requirements established in this final rule for the 2015 ozone NAAQS will be required to comply with the requirements of both rules. With respect to EGUs larger than 25 MW, in this rule the EPA is requiring NO$_X$ ozone season emissions reductions from these sources in many of the NO$_X$ SIP Call states, and at greater stringency than required by the NO$_X$ SIP Call, by requiring the EGUs to participate in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program. The emissions reductions required under this rule are therefore sufficient to satisfy the emissions reduction requirements under the NO$_X$ SIP Call for these large EGUs.

With respect to the large non-EGU boilers and combustion turbines that formerly participated in the NO$_X$ Budget Trading Program under the NO$_X$ SIP Call, the EPA provided options under both the CSAPR Update and the Revised CSAPR Update for states to address these sources' ongoing NO$_X$ SIP Call requirements by expanding applicability of the relevant CSAPR trading programs for ozone season NO$_X$ emissions to include the sources, and no state chose to use these options. As discussed in sections VI.D.2 and VI.D.3, in this rule the EPA is removing the previous regulatory text defining specific options for states to expand trading program applicability to include these sources and instead will evaluate any SIP revisions seeking to include these sources in the Group 3 trading program on a case-by-case basis.[411]

#### 2. Acid Rain Program

This rule does not affect any SO$_2$ and NO$_X$ requirements under the Acid Rain Program, which are established separately under 40 CFR parts 72 through 78 and will continue to apply independently of this rule's provisions. Sources subject to the Acid Rain Program will continue to be required to comply with all requirements of that program, including the requirement to hold sufficient allowances issued under the Acid Rain Program to cover their SO$_2$ emissions after the end of each control period.

#### 3. Other CSAPR Trading Programs

This rule does not substantively affect any provisions of the CSAPR NO$_X$ Annual, CSAPR SO$_2$ Group 1, CSAPR SO$_2$ Group 2, CSAPR NO$_X$ Ozone Season Group 1, or CSAPR NO$_X$ Ozone Season Group 2 trading programs for sources that continue to participate in those programs. Sources subject to any of the CSAPR trading programs will continue to be required to comply with all requirements of all such trading programs to which they are subject, including the requirement to hold sufficient allowances issued under the respective programs to cover emissions after the end of each control period.

The EPA also notes that where a state's good neighbor obligations with respect to the 1997 ozone NAAQS or the 2008 ozone NAAQS have previously been met by participation of the state's large EGUs in the CSAPR NO$_X$ Ozone Season Group 2 Trading Program (or earlier by the CSAPR NO$_X$ Ozone Season Group 1 Trading Program), the EPA will deem those obligations to be satisfied by the participation of the same sources in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program. Specifically, for all states covered by the Group 3 trading program under this rule except Minnesota, Nevada, and Utah, participation of the state's EGUs in the Group 3 trading program will be deemed to satisfy not only the EGU-related portion of the state's good neighbor obligations with respect to the 2015 ozone NAAQS but also the state's good neighbor obligations with respect to the 2008 ozone NAAQS. In addition, for Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, and Wisconsin, participation of the state's EGUs in the Group 3 trading program will also be deemed to satisfy the state's good neighbor obligations with respect to the 1997 ozone NAAQS.[412]

## VII. Environmental Justice Analytical Considerations and Stakeholder Outreach and Engagement

Consistent with EPA's commitment to integrating environmental justice in the agency's actions, and following the directives set forth in multiple Executive orders, the Agency has analyzed the impacts of this final rule on communities with environmental justice concerns and engaged with stakeholders representing these communities to seek input and feedback. Executive Order 12898 is discussed in section X.J of this final rule and analytical results are available in Chapter 7 of the *RIA*. This analysis is being provided for informational purposes only.

### A. Introduction

Executive Order 12898 directs EPA to identify the populations of concern who are most likely to experience unequal burdens from environmental harms; specifically, minority populations, low-income populations, and indigenous peoples.[413] Additionally, Executive

---

[410] *https://www.epa.gov/airmarkets/part-75-petition-responses.*

[411] Only one NO$_X$ SIP Call state—Tennessee—continues to participate in the Group 2 trading program, and the EPA has already approved other SIP provisions addressing the ongoing NO$_X$ SIP Call obligations for Tennessee's large non-EGU boilers and combustion turbines. *See* 84 FR 7998 (March 6, 2019); 86 FR 12092 (March 2, 2021).

[412] For the remaining state transitioning from the Group 2 trading program to the Group 3 trading program under this rule—Texas—as well as the remaining states that transitioned from the Group 2 trading program to the Group 3 trading program under the Revised CSAPR Update—Maryland, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia—participation of the states' EGUs in the Group 2 trading program as required by the CSAPR Update was addressing good neighbor obligations of the states with respect to only the 2008 ozone NAAQS, not the 1997 ozone NAAQS. *See* 81 FR 74523–74526.

[413] 59 FR 7629, February 16, 1994.

Order 13985 is intended to advance racial equity and support underserved communities through Federal Government actions.[414] The EPA defines environmental justice as the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income, with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. The EPA further defines the term fair treatment to mean that ''no group of people should bear a disproportionate burden of environmental harms and risks, including those resulting from the negative environmental consequences of industrial, governmental, and commercial operations or programs and policies.'' [415] In recognizing that minority and low-income populations often bear an unequal burden of environmental harms and risks, the EPA continues to consider ways of protecting them from adverse public health and environmental effects of air pollution.

*B. Analytical Considerations*

The EPA's environmental justice (EJ) technical guidance [416] states that:

The analysis of potential EJ concerns for regulatory actions should address three questions:

1. Are there potential EJ concerns associated with environmental stressors affected by the regulatory action for population groups of concern in the baseline?

2. Are there potential EJ concerns associated with environmental stressors affected by the regulatory action for population groups of concern for the regulatory option(s) under consideration?

3. For the regulatory option(s) under consideration, are potential EJ concerns created or mitigated compared to the baseline?

To address these questions in the EPA's first quantitative EJ analysis in the context of a transport rule, the EPA developed a unique analytical approach that considers the purpose and specifics of the final rulemaking, as well as the nature of known and potential exposures and impacts. However, due to data limitations, it is possible that our analysis failed to identify disparities that may exist, such as potential environmental justice characteristics (*e.g.*, residence of historically red lined areas), environmental impacts (*e.g.*, other ozone metrics), and more granular spatial resolutions (*e.g.*, neighborhood scale) that were not evaluated.

For the final rule, we employ two types of analytics to respond to the previous three questions: proximity analyses and exposure analyses. Both types of analyses can inform whether there are potential EJ concerns for population groups of concern in the baseline (question 1).[417] In contrast, only the exposure analyses, which are based on future air quality modeling, can inform whether there will be potential EJ concerns after implementation of the regulatory options under consideration (question 2) and whether potential EJ concerns will be created or mitigated compared to the baseline (question 3). While the exposure analysis can respond to all three questions, several caveats should be noted. For example, the air pollutant exposure metrics are limited to those used in the benefits assessment. For ozone, that is the maximum daily 8-hour average, averaged across the April through September warm season (AS–MO3) and for $PM_{2.5}$ that is the annual average. This ozone metric likely smooths potential daily ozone gradients and is not directly relatable to the National Ambient Air Quality Standard (NAAQS), whereas the $PM_{2.5}$ metric is more similar to the long term $PM_{2.5}$ standard. The air quality modeling estimates are also based on state level emissions data paired with facility-level baseline emissions, and provided at a resolution of 12km². Additionally, here we focus on air quality changes due to this final rulemaking and infer post-policy exposure burden impacts.

Exposure analytic results are provided in two formats: aggregated and distributional. The aggregated results provide an overview of potential ozone exposure differences across populations at the national- and state-levels, while the distributional results show detailed information about ozone concentration changes experienced by everyone within each population.

In Chapter 7 of the *RIA* we utilize the two types of analytics to address the three EJ questions by quantitatively evaluating: (1) the proximity of affected facilities to potentially disadvantaged populations (section 7.3); and (2) the potential for disproportionate ozone and $PM_{2.5}$ concentrations in the baseline and concentration changes after rule implementation across different demographic groups (section 7.4). Each of these analyses depends on mutually exclusive assumptions, was performed as separate questions, and is

associated with unique limitations and uncertainties.

Baseline demographic proximity analyses can be relevant for identifying populations that may be exposed to local pollutants, such as $NO_2$ emitted from affected sources in this final rule. However, such analyses are less useful here as they do not account for the potential impacts of this final rule on long-range concentration changes. Baseline demographic proximity analysis presented in the *RIA* suggest that larger percentages of Hispanics, African Americans, people below the poverty level, people with less educational attainment, and people linguistically isolated are living within 5 km and 10 km of an affected EGU, compared to national averages. It also finds larger percentages of African Americans, people below the poverty level, and with less educational attainment living within 5 km and 10 km of an affected non-EGU facility. Relating these results to question 1 from section 7.2 of the *RIA*, we conclude that there may be potential EJ concerns associated with directly emitted pollutants that are affected by the regulatory action (*e.g.*, $NO_2$) for certain population groups of concern in the baseline. However, as proximity to affected facilities does not capture variation in baseline exposure across communities, nor does it indicate that any exposures or impacts will occur, these results do not in themselves demonstrate disproportionate impacts of affected facilities in the baseline and should not be interpreted as a direct measure of exposure or impact.

Whereas proximity analyses are limited to evaluating the representativeness of populations residing nearby affected facilities, the ozone and $PM_{2.5}$ exposure analyses can provide insight into all three EJ questions. Even though both the proximity and exposure analyses can potentially improve understanding of baseline EJ concerns (question 1), the two should not be directly compared. This is because the demographic proximity analysis does not include air quality information and is based on current, not future, population information.

The baseline analysis of ozone and $PM_{2.5}$ concentration burden responds to question 1 from EPA's environmental justice technical guidance document more directly than the proximity analyses, as it evaluates a form of the environmental stressor targeted by the regulatory action. Baseline ozone and $PM_{2.5}$ analyses show that certain populations, such as Hispanics, Asians, those linguistically isolated, those less

---

[414] 86 FR 7009, January 20, 2021.

[415] *https://www.epa.gov/environmentaljustice.*

[416] U.S. Environmental Protection Agency (EPA), 2015. Guidance on Considering Environmental Justice During the Development of Regulatory Actions.

[417] The baseline for proximity analyses is current population information (*e.g.*, 2021), whereas the baseline for ozone exposure analyses are the future years in which the regulatory options will be implemented (*e.g.*, 2023 and 2026).

educated, and children may experience somewhat higher ozone and $PM_{2.5}$ concentrations compared to the national average. Therefore, also in response to question 1, there likely are potential environmental justice concerns associated with ozone and $PM_{2.5}$ exposures affected by the regulatory action for population groups of concern in the baseline. However, these baseline exposure results have not been fully explored and additional analyses are likely needed to understand potential implications. In addition, we infer that disparities in the ozone and $PM_{2.5}$ concentration burdens are likely to persist after implementation of the regulatory action or alternatives under consideration due to similar modeled concentration reductions across population demographics (question 2).

Question 3 asks whether potential EJ concerns will be created or mitigated as compared to the baseline. Due to the very small differences observed in the distributional analyses of post-policy ozone and $PM_{2.5}$ exposure impacts across populations, we do not find evidence that potential EJ concerns related to ozone and $PM_{2.5}$ concentrations will be created or mitigated as compared to the baseline.[418]

### C. Outreach and Engagement

Prior to proposal, the EPA hosted an outreach webinar with environmental justice stakeholders to share information about the proposed rule and solicit feedback about potential environmental justice considerations. The webinar was attended by representatives of state governments, federally recognized tribes, environmental NGOs, higher education institutions, industry, and the EPA.[419] Participants were invited to comment on pre-proposal environmental justice considerations during the webinar or submit written comments to a pre-proposal non-regulatory docket.

After proposal, the EPA opened a public comment period to invite the public to submit written comments to the regulatory docket for this rulemaking.[420] The EPA also invited the public to participate in a public hearing held on April 21, 2022. A transcript of the public hearing is available in the docket for this rulemaking. Additionally, on March 31, 2022, the EPA hosted an informational webinar with non-governmental groups and environmental justice stakeholders to answer questions and share information about the proposed rule. A record of this webinar, including the informational power point shared at the webinar is available in the docket for this rulemaking.

### VIII. Costs, Benefits, and Other Impacts of the Final Rule

In the *RIA* for the Federal Good Neighbor Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards, the EPA estimated the health and climate benefits, compliance costs, and emissions changes that may result from the final rule for the analysis period 2023 to 2042. The estimated health and climate benefits and compliance costs are presented in detail in this *RIA*. The EPA notes that for EGUs the estimated benefits and compliance costs are directly associated with fully operating existing SCRs during ozone season; fully operating existing SNCRs during ozone season; installing state-of-the-art combustion controls; imposing a backstop emissions rate on certain units that lack SCR controls; and installing SCR and SNCR post-combustion controls. The EPA also notes that for non-EGUs the estimated health benefits and compliance costs are directly associated with installing controls to meet the $NO_X$ emissions requirements presented in section I.B of this document.

For EGUs, the EPA analyzed this action's emissions budgets using uniform control stringency represented by $1,800 per ton of $NO_X$ (2016$) in 2023 and $11,000 per ton of $NO_X$ (2016$) in 2026. The EPA also analyzed a more and a less stringent alternative. The more and less stringent alternatives differ from the rule in that they set different $NO_X$ ozone season emissions budgets for the affected EGUs and different dates for large, coal-fired EGUs' compliance with the backstop emissions rate.

For non-EGUs, the EPA developed an analytical framework to determine which industries and emissions unit types to include in a proposed Transport FIP for the 2015 ozone NAAQS transport obligations. A February 28, 2022 memorandum, titled "Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026," documents the analytical framework used to identify industries and emissions unit types included in the proposed FIP. To further evaluate the industries and emissions unit types identified and to establish the proposed emissions limits, the EPA reviewed Reasonably RACT rules, NSPS rules, NESHAP rules, existing technical studies, rules in approved SIP submittals, consent decrees, and permit limits. That evaluation is detailed in the Proposed Non-EGU Sectors TSD prepared for the proposed FIP. The EPA is retaining the industries and many of the emissions unit types included in the proposal in this final action. For the non-EGU industries, in the final rule we made some minor changes to the non-EGU emissions units covered, the applicability criteria, as well as provided for facility-wide emissions averaging for engines and for a low-use exemption to eliminate the need to install controls on low-use boilers.

Table VIII–1 provides the projected 2023 through 2027, 2030, 2035, and 2042 EGU $NO_X$, $SO_2$, $PM_{2.5}$, and $CO_2$ emissions reductions for the evaluated regulatory control alternatives. For additional information on emissions changes, see Table 4–6 and Table 4–7 in Chapter 4 of the *RIA*.

TABLE VIII–1—EGU OZONE SEASON $NO_X$ EMISSIONS CHANGES AND ANNUAL EMISSIONS REDUCTIONS (TONS) FOR $NO_X$, $SO_2$, $PM_{2.5}$, AND $CO_2$ FOR THE REGULATORY CONTROL ALTERNATIVES FROM 2023–2042

|  | Final rule | Less stringent alternative | More stringent alternative |
|---|---|---|---|
| *2023:* | | | |
| $NO_X$ (ozone season) | 10,000 | 10,000 | 10,000 |
| $NO_X$ (annual) | 15,000 | 15,000 | 15,000 |
| $SO_2$ (annual) | 1,000 | 3,000 | 1,000 |
| $CO_2$ (annual, thousand metric tons) | | | |

---

[418] Please note, exposure results should not be extrapolated to other air pollutant. Detailed environmental justice analytical results can be found in Chapter 7 of the RIA.

[419] This does not constitute EPA's tribal consultation under E.O. 13175, which is described in section XI.F of this rule.

[420] Comments and responses regarding environmental justice considerations are available in Section 6 of the *RTC* document for this rulemaking.

TABLE VIII–1—EGU OZONE SEASON NO$_X$ EMISSIONS CHANGES AND ANNUAL EMISSIONS REDUCTIONS (TONS) FOR NO$_X$, SO$_2$, PM$_{2.5}$, AND CO$_2$ FOR THE REGULATORY CONTROL ALTERNATIVES FROM 2023–2042—Continued

|  | Final rule | Less stringent alternative | More stringent alternative |
|---|---|---|---|
| PM$_{2.5}$ (annual) ......................... | ......................... | ......................... | ......................... |
| *2024:* |  |  |  |
| NO$_X$ (ozone season) ..................... | 21,000 | 10,000 | 33,000 |
| NO$_X$ (annual) ............................. | 25,000 | 15,000 | 57,000 |
| SO$_2$ (annual) ............................. | 19,000 | 5,000 | 59,000 |
| CO$_2$ (annual, thousand metric tons) ... | 10,000 | 4,000 | 20,000 |
| PM$_{2.5}$ (annual) .......................... | 1,000 | ......................... | 1,000 |
| *2025:* |  |  |  |
| NO$_X$ (ozone season) ..................... | 32,000 | 10,000 | 56,000 |
| NO$_X$ (annual) ............................. | 35,000 | 15,000 | 99,000 |
| SO$_2$ (annual) ............................. | 38,000 | 7,000 | 118,000 |
| CO$_2$ (annual, thousand metric tons) ... | 21,000 | 8,000 | 40,000 |
| PM$_{2.5}$ (annual) .......................... | 2,000 | 1,000 | 2,000 |
| *2026:* |  |  |  |
| NO$_X$ (ozone season) ..................... | 25,000 | 8,000 | 49,000 |
| NO$_X$ (annual) ............................. | 29,000 | 12,000 | 88,000 |
| SO$_2$ (annual) ............................. | 29,000 | 5,000 | 104,000 |
| CO$_2$ (annual, thousand metric tons) ... | 16,000 | 6,000 | 34,000 |
| PM$_{2.5}$ (annual) .......................... | 1,000 | ......................... | 2,000 |
| *2027:* |  |  |  |
| NO$_X$ (ozone season) ..................... | 19,000 | 6,000 | 43,000 |
| NO$_X$ (annual) ............................. | 22,000 | 9,000 | 78,000 |
| SO$_2$ (annual) ............................. | 21,000 | 4,000 | 91,000 |
| CO$_2$ (annual, thousand metric tons) ... | 10,000 | 3,000 | 28,000 |
| PM$_{2.5}$ (annual) .......................... | 1,000 | ......................... | 2,000 |
| *2030:* |  |  |  |
| NO$_X$ (ozone season) ..................... | 34,000 | 33,000 | 31,000 |
| NO$_X$ (annual) ............................. | 62,000 | 59,000 | 50,000 |
| SO$_2$ (annual) ............................. | 93,000 | 98,000 | 51,000 |
| CO$_2$ (annual, thousand metric tons) ... | 26,000 | 23,000 | 8,000 |
| PM$_{2.5}$ (annual) .......................... | 1,000 | 1,000 | ......................... |
| *2035:* |  |  |  |
| NO$_X$ (ozone season) ..................... | 29,000 | 30,000 | 27,000 |
| NO$_X$ (annual) ............................. | 46,000 | 46,000 | 41,000 |
| SO$_2$ (annual) ............................. | 21,000 | 19,000 | 15,000 |
| CO$_2$ (annual, thousand metric tons) ... | 16,000 | 15,000 | 8,000 |
| PM$_{2.5}$ (annual) .......................... | 1,000 | 1,000 | ......................... |
| *2042:* |  |  |  |
| NO$_X$ (ozone season) ..................... | 22,000 | 22,000 | 22,000 |
| NO$_X$ (annual) ............................. | 23,000 | 22,000 | 21,000 |
| SO$_2$ (annual) ............................. | 15,000 | 15,000 | 7,000 |
| CO$_2$ (annual, thousand metric tons) ... | 9,000 | 8,000 | 4,000 |
| PM$_{2.5}$ (annual). |  |  |  |

Emissions changes for NO$_X$, SO$_2$, and PM$_{2.5}$ are in tons.

Table VIII–2 provides a summary of the ozone season NO$_X$ emissions for non-EGUs for the 20 states subject to the non-EGU emissions requirements starting in 2026, along with the estimated ozone season NO$_X$ reductions for 2026 for the rule and the less and more stringent alternatives. The analysis in the *RIA* assumes that the estimated reductions in 2026 will be the same in later years.

TABLE VIII–2—OZONE SEASON NO$_X$ EMISSIONS AND EMISSIONS REDUCTIONS (TONS) FOR NON-EGUS FOR THE FINAL RULE AND THE LESS AND MORE STRINGENT ALTERNATIVES

| State | 2019 Ozone season emissions [a] | Final rule— ozone season NO$_X$ reductions | Less stringent— ozone season NO$_X$ reductions | More stringent— ozone season NO$_X$ reductions |
|---|---|---|---|---|
| AR ......................... | 8,790 | 1,546 | 457 | 1,690 |
| CA ......................... | 16,562 | 1,600 | 1,432 | 4,346 |
| IL ......................... | 15,821 | 2,311 | 751 | 2,991 |
| IN ......................... | 16,673 | 1,976 | 1,352 | 3,428 |
| KY ......................... | 10,134 | 2,665 | 583 | 3,120 |
| LA ......................... | 40,954 | 7,142 | 1,869 | 7,687 |
| MD ......................... | 2,818 | 157 | 147 | 1,145 |
| MI ......................... | 20,576 | 2,985 | 760 | 5,087 |
| MO ......................... | 11,237 | 2,065 | 579 | 4,716 |
| MS ......................... | 9,763 | 2,499 | 507 | 2,650 |

TABLE VIII–2—OZONE SEASON NO$_X$ EMISSIONS AND EMISSIONS REDUCTIONS (TONS) FOR NON-EGUS FOR THE FINAL RULE AND THE LESS AND MORE STRINGENT ALTERNATIVES—Continued

| State | 2019 Ozone season emissions [a] | Final rule— ozone season NO$_X$ reductions | Less stringent— ozone season NO$_X$ reductions | More stringent— ozone season NO$_X$ reductions |
|---|---|---|---|---|
| NJ | 2,078 | 242 | 242 | 258 |
| NV [421] | 2,544 | 0 | 0 | 0 |
| NY | 5,363 | 958 | 726 | 1,447 |
| OH | 18,000 | 3,105 | 1,031 | 4,006 |
| OK | 26,786 | 4,388 | 1,376 | 5,276 |
| PA | 14,919 | 2,184 | 1,656 | 4,550 |
| TX | 61,099 | 4,691 | 1,880 | 9,963 |
| UT | 4,232 | 252 | 52 | 615 |
| VA | 7,757 | 2,200 | 978 | 2,652 |
| WV | 6,318 | 1,649 | 408 | 2,100 |
| Totals | 302,425 | 44,616 | 16,786 | 67,728 |

[a] The 2019 ozone season emissions are calculated as 5/12 of the annual emissions from the following two emissions inventory files: nonegu_SmokeFlatFile_2019NEI_POINT_20210721_controlupdate_13sep2021_v0 and oilgas_SmokeFlatFile_2019NEI_POINT_20210721_controlupdate_13sep2021_v0.

For EGUs, the EPA analyzed ozone season NO$_X$ emissions reductions and the associated costs to the power sector using the Integrated Planning Model (IPM) and its underlying data and inputs. For non-EGUs, the EPA prepared an assessment summarized in the memorandum titled *Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Units, Emissions Reductions, and Costs*, and the memorandum includes estimated emissions reductions by state for the rule.[421]

Table VIII–3 reflects the estimates of the changes in the cost of supplying electricity for the regulatory control alternatives for EGUs and estimates of

complying with the emissions requirements for non-EGUs. The costs presented in Table VIII–3 do not include monitoring and reporting costs, which EPA summarizes in section X.B.2 of this document. The monitoring and reporting costs presented in section X.B.2 are $0.35 million per year for EGUs and $3.8 million per year for non-EGUs. For EGUs, compliance costs are negative in 2026. While seemingly counterintuitive, estimating negative compliance costs in a single year is possible given IPM's objective function is to minimize the discounted net present value (NPV) of a stream of annual total cost of generation over a multi-decadal time period. As such the model may undertake a compliance pathway that pushes higher costs later

into the forecast period, since future costs are discounted more heavily than near term costs. This can result in a policy scenario showing single year costs that are lower than the Baseline, but over the entire forecast horizon, the policy scenario shows higher costs.[422] For a detailed description of these cost trends, please see Chapter 4, section 4.5.2, of the *RIA*. For a detailed description of the methods and results from the memorandum titled *Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Units, Emissions Reductions, and Costs*, see Chapter 4, sections 4.4 and 4.5.4 of the *RIA*.

TABLE VIII–3—TOTAL ESTIMATED COMPLIANCE COSTS (MILLION 2016$), 2023–2042

| | Final rule | Less-stringent alternative | More-stringent alternative |
|---|---|---|---|
| 2023: | | | |
| EGUs | 57 | 56 | 49 |
| Non-EGUs | | | |
| Total | 57 | 56 | 49 |
| 2024: | | | |
| EGUs | (5) | (35) | 840 |
| Non-EGUs | | | |
| Total | (5) | (35) | 840 |
| 2025: | | | |
| EGUs | (5) | (35) | 840 |
| Non-EGUs | | | |
| Total | (5) | (35) | 840 |
| 2026: | | | |

[421] We are not aware of existing non-EGU emissions units in Nevada that meet the applicability criteria for non-EGUs in the final rule. If any such units in fact exist, they would be subject to the requirements of the rule just as in any other state. In addition, any new emissions unit in

Nevada that meets the applicability criteria in the final rule will be subject to the final rule's requirements. See section III.B.1.d.

[422] As a sensitivity, the EPA re-calculated costs assuming annual costs cannot be negative. This

resulted in annualized 2023–42 costs under the final rule increasing from $448.6 million to $449.5 million (less than 1%) and did not change the conclusions of the RIA. See Section 4.5.2 of the RIA for more information.

TABLE VIII–3—TOTAL ESTIMATED COMPLIANCE COSTS (MILLION 2016$), 2023–2042—Continued

|  | Final rule | Less-stringent alternative | More-stringent alternative |
|---|---|---|---|
| EGUs | (5) | (35) | 840 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 570 | 110 | 2,100 |
| 2027: |  |  |  |
| EGUs | 24 | (47) | 760 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 600 | 97 | 2,000 |
| 2028: |  |  |  |
| EGUs | 24 | (47) | 760 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 600 | 97 | 2,000 |
| 2029: |  |  |  |
| EGUs | 24 | (47) | 760 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 600 | 97 | 2,000 |
| 2030: |  |  |  |
| EGUs | 710 | 770 | 840 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,300 | 920 | 2,100 |
| 2031: |  |  |  |
| EGUs | 710 | 770 | 840 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,300 | 920 | 2,100 |
| 2032: |  |  |  |
| EGUs | 820 | 850 | 590 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,400 | 990 | 1,900 |
| 2033: |  |  |  |
| EGUs | 820 | 850 | 590 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,400 | 990 | 1,900 |
| 2034: |  |  |  |
| EGUs | 820 | 850 | 590 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,400 | 990 | 1,900 |
| 2035: |  |  |  |
| EGUs | 820 | 850 | 590 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,400 | 990 | 1,900 |
| 2036: |  |  |  |
| EGUs | 820 | 850 | 590 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,400 | 990 | 1,900 |
| 2037: |  |  |  |
| EGUs | 820 | 850 | 590 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,400 | 990 | 1,900 |
| 2038: |  |  |  |
| EGUs | 820 | 830 | 600 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,400 | 970 | 1,900 |
| 2039: |  |  |  |
| EGUs | 820 | 830 | 600 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,400 | 970 | 1,900 |
| 2040: |  |  |  |
| EGUs | 820 | 830 | 600 |

**196a**

TABLE VIII–3—TOTAL ESTIMATED COMPLIANCE COSTS (MILLION 2016$), 2023–2042—Continued

|  | Final rule | Less-stringent alternative | More-stringent alternative |
|---|---|---|---|
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,400 | 970 | 1,900 |
| 2041: |  |  |  |
| EGUs | 820 | 830 | 600 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,400 | 970 | 1,900 |
| 2042: |  |  |  |
| EGUs | 820 | 830 | 600 |
| Non-EGUs | 570 | 140 | 1,300 |
| Total | 1,400 | 970 | 1,900 |

Tables VIII–4 and VIII–5 report the estimated economic value of avoided premature deaths and illness in each year relative to the baseline along with the 95 percent confidence interval. In each of these tables, for each discount rate and regulatory control alternative, two benefits estimates are presented reflecting alternative ozone and PM$_{2.5}$ mortality risk estimates. For additional information on these benefits, see Chapter 5 of the *RIA*.

TABLE VIII–4—ESTIMATED DISCOUNTED ECONOMIC VALUE OF AVOIDED OZONE-RELATED PREMATURE MORTALITY AND ILLNESS FOR THE FINAL RULE AND THE LESS AND MORE STRINGENT ALTERNATIVES IN 2023

[95 Percent confidence interval; millions of 2016$] [a] [b]

| Disc rate | Pollutant | Final rule | Less stringent alternative | More stringent alternative |
|---|---|---|---|---|
| 3% | Ozone Benefits | $100 [$27 to $220][c] *and* $820 [$91 to $2,100][d]. | $100 [$27 to $220][c] *and* $810 [$91 to $2,100][d]. | $110 [$28 to $230][c] *and* $840 [$94 to $2,200][d]. |
| 7% | Ozone Benefits | $93 [$17 to 210][c] *and* $730 [$75 to $1,900][d]. | $93 [$17 to $210][c] *and* $730 [$75 to $1,900][d]. | $96 [$18 to $210][c] *and* $750 [$77 to $2,000][d]. |

[a] Values rounded to two significant figures. The two benefits estimates are separated by the word "and" to signify that they are two separate estimates. The estimates do not represent lower- and upper-bound estimates and should not be summed.
[b] We estimated ozone benefits for changes in NO$_X$ for the ozone season. This table does not include benefits from reductions for non-EGUs because reductions from these sources are not expected prior to 2026 when the final standards would apply to those sources.
[c] Using the pooled short-term ozone exposure mortality risk estimate.
[d] Using the long-term ozone exposure mortality risk estimate.

TABLE VIII–5—ESTIMATED DISCOUNTED ECONOMIC VALUE OF AVOIDED OZONE AND PM$_{2.5}$-RELATED PREMATURE MORTALITY AND ILLNESS FOR THE FINAL RULE AND THE LESS AND MORE STRINGENT ALTERNATIVES IN 2026

[95% Confidence interval; millions of 2016$] [a] [b]

| Disc rate | Pollutant | Final rule | Less stringent alternative | More stringent alternative |
|---|---|---|---|---|
| 3% | Ozone Benefits | $1,100 [$280 to $2,400][c] *and* $9,400 [$1,000 to $25,000][d]. | $420 [$110 to $900][c] *and* $3,400 [$380 to $8,900][d]. | $1,900 [470 to $4,000][c] *and* $15,000 [$1,700 to $40,000][d]. |
|  | PM Benefits | $2,000 [$220 to $5,300] *and* $4,400 [$430 to $12,000]. | $530 [$57 to $1,400] *and* $1,100 [$110 to $3,100]. | $6,400 [$690 to $17,000] *and* $14,000 [$1,300 to $37,000]. |
|  | Ozone plus PM Benefits. | $3,200 [$500 to $7,700][c] *and* $14,000 [$1,500 to $36,000][d]. | $950 [$160 to $2,300][c] *and* $4,600 [$490 to $12,000][d]. | $8,300 [$1,200 to $21,000][c] *and* $29,000 [$3,000 to $77,000][d]. |
| 7% | Ozone Benefits | $1,000 [$180 to $2,300][c] *and* $8,400 [$850 to $22,000][d]. | $380 [$68 to $850][c] *and* $3,100 [$310 to $8,100][d]. | $1,700 [$300 to $3,800][c] *and* $14,000 [$1,400 to $36,000][d]. |
|  | PM Benefits | $1,800 [$190 to $4,700] *and* $3,900 [$380 to $11,000]. | 470 [$50 to $1,200] *and* $1,000 [$100 to $2,800]. | $5,800 [$600 to $15,000] *and* $12,000 [$1,200 to $33,000]. |
|  | Ozone plus PM Benefits. | $2,800 [$370 to $7,000][c] *and* $12,000 [$1,200 to $33,000][d]. | $850 [$120 to $2,100][c] *and* $4,100 [$410 to $11,000][d]. | $7,500 [$910 to $19,000][c] *and* $26,000 [$2,600 to $69,000][d]. |

[a] Values rounded to two significant figures. The two benefits estimates are separated by the word "and" to signify that they are two separate estimates. The estimates do not represent lower- and upper-bound estimates and should not be summed.
[b] We estimated changes in NO$_X$ for the ozone season and annual changes in PM$_{2.5}$ and PM$_{2.5}$ precursors in 2026.
[c] Sum of ozone mortality estimated using the pooled short-term ozone exposure risk estimate and the Di et al. (2017) long-term PM$_{2.5}$ exposure mortality risk estimate.
[d] Sum of the Turner et al. (2016) long-term ozone exposure risk estimate and the Di et al. (2017) long-term PM$_{2.5}$ exposure mortality risk estimate.

In Tables VIII–6, VIII–7, and VIII–8, the EPA presents a summary of the monetized health and climate benefits, costs, and net benefits of the rule and the more and less stringent alternatives for 2023, 2026, and 2030, respectively. There are important water quality benefits and health benefits associated with reductions in concentrations of air pollutants other than ozone and PM$_{2.5}$ that are not quantified. Discussion of the non-monetized health, welfare, and water quality benefits is found in Chapter 5 of the *RIA*. In this action, monetized climate benefits are presented for purposes of providing a complete economic impact analysis under E.O. 12866 and other relevant Executive orders. The estimates of GHG emissions changes and the monetized benefits associated with those changes

**197a**

is not part of the record basis for this action, which is taken to implement the good neighbor provision, CAA section 110(a)(2)(D)(i)(I), for the 2015 ozone NAAQS.

### TABLE VIII–6—MONETIZED BENEFITS, COSTS, AND NET BENEFITS OF THE FINAL RULE AND LESS AND MORE STRINGENT ALTERNATIVES FOR 2023 FOR THE U.S.

[3% Discount rate for benefits, millions of 2016$] [a] [b]

| | Final rule | Less stringent alternative | More stringent alternative |
|---|---|---|---|
| Health Benefits [c] | $100 and $820 | $100 and $810 | $110 and $840. |
| Climate Benefits | $5 | $4 | $5. |
| Total Benefits | $100 and $820 | $100 and $820 | $110 and $840. |
| Costs [d] | $57 | $56 | $49. |
| Net Benefits | $48 and $760 | $48 and $760 | $66 and $800. |

[a] We focus results to provide a snapshot of costs and benefits in 2023, using the best available information to approximate social costs and social benefits recognizing uncertainties and limitations in those estimates.

[b] Rows may not appear to add correctly due to rounding.

[c] The health benefits are associated with two point estimates from two different epidemiologic studies. For the purposes of presenting the values in this table the health and climate benefits are discounted at 3 percent.

[d] The costs presented in this table are 2023 annual estimates for each alternative analyzed. For EGUs, an NPV of costs was calculated using a 3.76 percent real discount rate consistent with the rate used in IPM's objective function for cost-minimization. For further information on the discount rate use, please see Chapter 4, Table 4–8 in the RIA.

### TABLE VIII–7—MONETIZED BENEFITS, COSTS, AND NET BENEFITS OF THE FINAL RULE AND LESS AND MORE STRINGENT ALTERNATIVES FOR 2026 FOR THE U.S.

[3% Discount rate for benefits, millions of 2016$] [a] [b]

| | Final rule | Less stringent alternative | More stringent alternative |
|---|---|---|---|
| Health Benefits [c] | $3,200 and $14,000 | $950 and $4,600 | $8,300 and $29,000. |
| Climate Benefits | $1,100 | $420 | $2,100. |
| Total Benefits | $4,300 and $15,000 | $1,400 and $5,000 | $10,000 and $31,000. |
| Costs [d] | $570 | $110 | $2,100. |
| Net Benefits | $3,700 and $14,000 | $1,300 and $4,900 | $8,300 and $29,000. |

[a] We focus results to provide a snapshot of costs and benefits in 2026, using the best available information to approximate social costs and social benefits recognizing uncertainties and limitations in those estimates.

[b] Rows may not appear to add correctly due to rounding.

[c] The health benefits are associated with two point estimates from two different epidemiologic studies. For the purposes of presenting the values in this table the health and climate benefits are discounted at 3 percent.

[d] The costs presented in this table are 2026 annual estimates for each alternative analyzed. For EGUs, an NPV of costs was calculated using a 3.76 percent real discount rate consistent with the rate used in IPM's objective function for cost-minimization. For further information on the discount rate use, please see Chapter 4, Table 4–8 in the RIA.

### TABLE VIII–8—MONETIZED BENEFITS, COSTS, AND NET BENEFITS OF THE FINAL RULE AND LESS AND MORE STRINGENT ALTERNATIVES FOR 2030 FOR THE U.S.

[3% Discount rate for benefits, millions of 2016$] [a] [b]

| | Final rule | Less stringent alternative | More stringent alternative |
|---|---|---|---|
| Health Benefits [c] | $3,400 and $15,000 | $1,000 and $4,900 | $9,000 and $31,000. |
| Climate Benefits | $1,500 | $1,300 | $500. |
| Total Benefits | $4,900 and $16,000 | $2,300 and $6,200 | $9,500 and $31,000. |
| Costs [d] | $1,300 | $920 | $2,100. |
| Net Benefits | $3,600 and $15,000 | $1,400 and $5,300 | $7,400 and $29,000. |

[a] We focus results to provide a snapshot of costs and benefits in 2030, using the best available information to approximate social costs and social benefits recognizing uncertainties and limitations in those estimates.

[b] Rows may not appear to add correctly due to rounding.

[c] The health benefits are associated with two point estimates from two different epidemiologic studies. For the purposes of presenting the values in this table the health and climate benefits are discounted at 3 percent.

[d] The costs presented in this table are 2030 annual estimates for each alternative analyzed. For EGUs, an NPV of costs was calculated using a 3.76 percent real discount rate consistent with the rate used in IPM's objective function for cost-minimization. For further information on the discount rate use, please see Chapter 4, Table 4–8 in the RIA.

In addition, Table VIII–9 presents estimates of the present value (PV) of the monetized benefits and costs and the equivalent annualized value (EAV), an estimate of the annualized value of the net benefits consistent with the present value, over the twenty-year period of 2023 to 2042. The estimates of the PV and EAV are calculated using discount rates of 3 and 7 percent as recommended by OMB's Circular A–4 and are presented in 2016 dollars discounted to 2023.

TABLE VIII–9—MONETIZED ESTIMATED HEALTH AND CLIMATE BENEFITS, COMPLIANCE COSTS, AND NET BENEFITS OF THE FINAL RULE AND LESS AND MORE STRINGENT ALTERNATIVES, 2023 THROUGH 2042

[Millions 2016$, discounted to 2023]

| | 3 Percent discount rate | | 7 Percent discount rate | |
|---|---|---|---|---|
| | PV | EAV | PV | EAV |
| **Health benefits** | | | | |
| Final Rule ................................................ | $200,000 | $13,000 | $130,000 | $12,000 |
| Less Stringent Alternative ......................... | 67,000 | 4,500 | 40,000 | 3,800 |
| More Stringent Alternative ........................ | 410,000 | 28,000 | 240,000 | 23,000 |
| **Climate Benefits** [a] | | | | |
| Final Rule ................................................ | 15,000 | 970 | 15,000 | 970 |
| Less Stringent Alternative ......................... | 11,000 | 770 | 11,000 | 770 |
| More Stringent Alternative ........................ | 14,000 | 920 | 14,000 | 920 |
| **Compliance Costs** | | | | |
| Final Rule ................................................ | 14,000 | 910 | 9,400 | 770 |
| Less Stringent Alternative ......................... | 8,700 | 590 | 5,300 | 500 |
| More Stringent Alternative ........................ | 25,000 | 1,700 | 17,000 | 1,600 |
| **Net Benefits** | | | | |
| Final Rule ................................................ | 200,000 | 13,000 | 140,000 | 12,000 |
| Less Stringent Alternative ......................... | 70,000 | 4,700 | 42,000 | 4,000 |
| More Stringent Alternative ........................ | 400,000 | 27,000 | 240,000 | 22,000 |

[a] Climate benefits are calculated using four different estimates of the social cost of carbon (SC–$CO_2$) (model average at 2.5 percent, 3 percent, and 5 percent discount rates; 95th percentile at 3 percent discount rate). For presentational purposes in this table, the climate benefits associated with the average SC–$CO_2$ at a 3-percent discount rate are used in the columns displaying results of other costs and benefits that are discounted at either a 3-percent or 7-percent discount rate.

As shown in Table VIII–9, the PV of the monetized health benefits of this rule, discounted at a 3-percent discount rate, is estimated to be about $200 billion ($200,000 million), with an EAV of about $13 billion ($13,000 million). At a 7-percent discount rate, the PV of the monetized health benefits is estimated to be about $130 billion ($130,000 million), with an EAV of about $12 billion ($12,000 million). The PV of the monetized climate benefits of this rule, discounted at a 3-percent discount rate, is estimated to be about $15 billion ($15,000 million), with an EAV of about $970 million. The PV of the monetized compliance costs, discounted at a 3-percent rate, is estimated to be about $14 billion ($14,000 million), with an EAV of about $910 million. At a 7-percent discount rate, the PV of the compliance costs is estimated to be about $9.4 billion ($9,400 million), with an EAV of about $770 million.

In addition to the analysis of costs and benefits as described above, for the final rule, the EPA was able to conduct a full-scale photochemical grid modeling run of the effects of the "final rule" emissions control scenario in 2026. This modeling can be used to estimate the impacts on projected 2026 ozone design values that are expected from the combined EGU and non-EGU

control emissions reductions in this final rule. These results do not replace the AQAT-generated estimates used for our Step 3 determinations, and the EPA needed to continue to use AQAT for Step 3 determinations in order to characterize various potential control scenarios to inform these regulatory determinations. Nonetheless, though they differ slightly from the AQAT-generated air quality estimates of the final rule control scenario conducted for purposes of our Step 3 analysis (as presented in section V.D of this document), these results using full-scale photochemical grid modeling complement those estimates and confirm in all cases the regulatory conclusions reached applying AQAT.[423] Appendix 3A of the *RIA* presents the full results of the projected impacts of the final rule control scenario on ozone levels using CAMx. To briefly summarize, the largest reductions in

[423] Note that the EPA's "overcontrol" analysis relies primarily on a "Step 3" control scenario rather than the "full geography" scenario. The CAMx modeling described here captures the effects of the rule as a whole and so is more akin to the "full geography" scenario, which the EPA does not believe is the appropriate method for conducting overcontrol analysis. Nonetheless, as explained in the Ozone Transport Policy Analysis Final Rule TSD, the results under either scenario establish no overcontrol, and the CAMx results presented here do not call those conclusions into question.

ozone design values at identified receptors are predicted to occur in the Houston-Galveston-Brazoria, Texas area. In this area the reductions from the final rule case range from 0.7 to 0.9 ppb. At most of the receptors in both the Dallas/Ft Worth and the New York/Coastal Connecticut areas the reductions in ozone range from 0.4 to 0.5 ppb. At receptors in Indiana, Michigan, and Wisconsin near the shoreline of Lake Michigan, ozone is projected to decline by 0.3 to 0.4 ppb, but by as much as 0.5 ppb at the receptor in Muskegon, MI. Reductions of 0.1 ppb are predicted in the urban and near-urban receptors in Chicago. In the West, ozone reductions just under 0.2 ppb are predicted at receptors in Denver with slightly greater reductions, just above 0.2 ppb, at receptors in Salt Lake City. At receptors in Phoenix, California, El Paso/Las Cruces, and southeast New Mexico the reductions in ozone are predicted to be less than 0.1 ppb.

## IX. Summary of Changes to the Regulatory Text for the Federal Implementation Plans and Trading Programs for EGUs

This section describes the amendments to the regulatory text that implement the findings and remedy discussed elsewhere in this rule with respect to EGUs. The primary CFR

amendments are revisions to the FIP provisions addressing states' good neighbor obligations related to ozone in 40 CFR part 52 as well as the revisions to the regulations for the CSAPR NOₓ Ozone Season Group 3 Trading Program in 40 CFR part 97, subpart GGGGG. In conjunction with the amendments to the Group 3 trading program, the monitoring, recordkeeping, and reporting regulations in 40 CFR part 75 are being amended to reflect the addition of certain new reporting requirements associated with the amended trading program and the administrative appeal provisions in 40 CFR part 78 are being amended to identify certain additional types of appealable decisions of the EPA Administrator under the amended trading program. The provisions to address the transition of the EGUs in certain states from the Group 2 trading program to the Group 3 trading program are implemented in part through revisions to the regulations noted previously and in part through revisions to the regulations for the Group 2 trading program in 40 CFR part 97, subpart EEEEE.

In addition to these primary amendments, certain revisions are being made to the regulations for the other CSAPR trading programs in 40 CFR part 97, subparts AAAAA through EEEEE, for conformity with the amended provisions of the Group 3 trading program, as discussed in section VI.B.13. Documents have been included in the docket for this rule showing all of the revisions in redline-strikeout format.

*A. Amendments to FIP Provisions in 40 CFR Part 52*

The CSAPR, CSAPR Update, and Revised CSAPR Update FIP requirements related to ozone season NOₓ emissions are set forth in 40 CFR 52.38(b) as well as other sections of part 52 specific to each covered state. The existing text of § 52.38(b)(1) identifies the trading program regulations in 40 CFR part 97, subparts BBBBB, EEEEE, and GGGGG, as constituting the relevant FIP provisions relating to seasonal NOₓ emissions and transported ozone pollution. Because in this rulemaking the EPA is establishing new or amended FIP requirements not only for the types of EGUs covered by the trading programs but also for certain other types of industrial sources, an amendment to § 52.38(b)(1) clarifies that the trading programs constitute the FIP provisions only for the sources meeting the applicability requirements of the trading programs. A parallel clarification is being added to §§ 52.38(a)(1) and

52.39(a) with respect to the CSAPR FIP requirements relating to annual NOₓ emissions, SO₂ emissions, and transported fine particulate pollution.

The states whose EGU sources are required to participate in the CSAPR NOₓ Ozone Season Group 1, Group 2, and Group 3 trading programs under the FIPs established in CSAPR, the CSAPR Update, and the Revised CSAPR Update, as well as the control periods for which those requirements apply, are identified in § 52.38(b)(2). The amendments to this paragraph expand the applicability of the Group 3 trading program to sources in the ten additional states that the EPA is adding to the Group 3 trading program starting with the 2023 control period and end the applicability of the Group 2 trading program (with the exception of certain provisions) for sources in seven of the ten states after the 2022 control period, as discussed in section VI.B.2.[424] The paragraphs within § 52.38(b)(2) are being renumbered to clarify the organization of the provisions and to facilitate cross-references from other regulatory provisions. Regarding the two states currently participating in the Group 2 trading program through approved SIP revisions that replaced the previous FIPs issued under the CSAPR Update (Alabama and Missouri), a provision indicating that the EPA will no longer administer the state trading programs adopted under those SIP revisions after the 2022 control period is being added at § 52.38(b)(16)(ii)(B).

In the Revised CSAPR Update, the EPA established several options for states to revise their SIPs to modify or replace the FIPs applicable to their sources while continuing to use the Group 3 trading program as the mechanism for meeting the states' good neighbor obligations. As in effect before this rule, § 52.38(b)(10), (11), and (12) established options to replace allowance allocations for the 2022 control period, to adopt an abbreviated SIP revision for control periods in 2023 or later years, and to adopt a full SIP revision for control periods in 2023 or later years, respectively.[425] As discussed in section VI.D, the EPA is retaining these SIP revision options and is making them available for all states covered by the Group 3 trading program after the geographic expansion. The option under

§ 52.38(b)(10) to replace allowance allocations for a single control period is being amended to be available for the 2024 control period, with attendant revisions to the years and dates shown in § 52.38(b)(10) (multiple paragraphs) and (b)(17)(i) as well as the Group 3 trading program regulations, as discussed in section IX.B. The options under § 52.38(b)(11) and (12) to adopt abbreviated or full SIP revisions are being amended to be available starting with the 2025 control period, with attendant revisions to § 52.38(b)(11)(iii), (b)(12)(iii), and (b)(17)(ii).[426] The removal of the previous options for states to expand applicability of the trading programs for ozone season NOₓ emissions to certain non-EGUs and smaller EGUs, discussed in sections VI.D.2 and VI.D.3, is accomplished by the removal or revision of multiple paragraphs of § 52.38(b), including most notably the removal of § 52.38(b)(4)(i), (b)(5)(i), (b)(8)(i)–(ii), (b)(9)(i)–(ii), (b)(11)(i)–(iii), and (b)(12)(i)–(iii).

The changes with respect to set-asides and the treatment of units in Indian country discussed in section VI.B.9, although implemented largely through amendments to the Group 3 trading program regulations, are also implemented in part through amendments to § 52.38(b)(11) and (12). First, the text in § 52.38(b)(11)(iii)(A) and (b)(12)(iii)(A) identifying the portion of each state trading budget for which a state may establish state-determined allowance allocations is being revised to exclude any allowances in a new unit set-aside or Indian country existing unit set-aside. Second, the text in § 52.38(b)(12)(vi) identifying provisions that states may not adopt into their SIPs (because the provisions concern regulation of sources in Indian country not subject to a state's CAA implementation planning authority) are being revised to include the provisions of the amended Group 3 trading program addressing allocation and recordation of allowances from all types of set-asides. Finally, the text in § 52.38(b)(12)(vii) authorizing the EPA to modify the previous approval of a SIP revision with regard to the assurance provisions "if and when a covered unit is located in Indian country" are being revised to account for the fact that at least one covered unit is already located in Indian country not subject to a state's CAA planning authority.

The transitional provisions discussed in sections VI.B.12.b and VI.B.12.c to

---

[424] Like the previous text of § 52.38(b)(2), the final amended text expressly encompasses sources in Indian country within the respective states' borders.

[425] Revisions to the deadlines for states with approved SIP revisions to submit their state-determined allowance allocations to the EPA for subsequent recordation were finalized in an earlier final rule in this docket. See 87 FR 52473 (August 26, 2022).

[426] No state currently in the Group 3 trading program has submitted a SIP revision to make use of these options in control periods before the control periods in which the options can be used under the amended provisions.

convert certain 2017–2022 Group 2 allowances to Group 3 allowances and to recall certain 2023–2024 Group 2 allowances, although promulgated as amendments to the Group 2 trading program regulations, will necessarily be implemented after the end of the 2022 control period. Amendments clarifying that these provisions continue to apply to the relevant sources and holders of allowances notwithstanding the transition of certain states out of the Group 2 trading program after the 2022 control period are being added at § 52.38(b)(14)(iii). Cross-references clarifying that the EPA's allocations of the converted Group 3 allowances are not subject to modification through SIP revisions are also being added to the existing provisions at § 52.38(b)(11)(iii)(D) and (b)(12)(iii)(D).

The general FIP provisions applicable to all states covered by this rule as set forth in § 52.38(b)(2) are being replicated in the state-specific subparts of 40 CFR part 52 for each of the nine states that the EPA is adding to the Group 3 trading program.[427] In each such state-specific CFR subpart, provisions are being added indicating that sources in the state are required to participate in the CSAPR NOₓ Ozone Season Group 3 Trading Program with respect to emissions starting in 2023. Provisions are also being added repeating the substance of § 52.38(b)(13)(i), which generally provides that the Administrator's full and unconditional approval of a full SIP revision correcting the same SIP deficiency that is the basis for a FIP promulgated in this rulemaking would cause the FIP to no longer apply to sources subject to the state's CAA implementation planning authority, and § 52.38(b)(14)(ii), which generally provides the EPA with authority to complete recordation of EPA-determined allowance allocations for any control period for which EPA has already started such recordation notwithstanding the approval of a state's SIP revision establishing state-determined allowance allocations.

For each of the seven states that the EPA is removing from the Group 2 trading program, the provisions of the state-specific CFR subparts indicating that sources in the state are required to participate in that trading program are being revised to end that requirement with respect to emissions after 2022, and a further provision is being added

repeating the substance of § 52.38(b)(14)(iii), which identifies certain provisions that continue to apply to sources and allowances notwithstanding discontinuation of a trading program with respect to a particular state.[428] In addition, for the five states that during their time in the Group 2 trading program have not exercised the option to adopt full SIP revisions to replace the FIPs issued under the CSAPR Update (all but Alabama and Missouri), obsolete provisions concerning the unexercised SIP revision option are being removed.

No amendments with respect to FIP requirements for EGUs are being made to the state-specific CFR subparts for the twelve states whose sources currently participate in the Group 3 trading program[429] except as needed to update cross-references or to implement the changes related to the treatment of Indian country, as discussed in section IX.D.

## B. Amendments to Group 3 Trading Program and Related Regulations

To implement the geographic expansion of the Group 3 trading program and the revised trading budgets that are being established under the new and amended FIPs in this rulemaking, several sections of the Group 3 trading program regulations are being amended. Revisions identifying the applicable control periods, deadlines for certification of monitoring systems, and deadlines for commencement of quarterly reporting for sources not previously covered by the Group 3 trading program are being made at §§ 97.1006(c)(3)(i), 97.1030(b)(1), and 97.1034(d)(2)(i), respectively. Revisions identifying the new or revised budgets and new unit set-asides for the control periods after 2022 for all covered states are being made at § 97.1010(a)(1) and (c)(2), respectively.

Each of the enhancements to the Group 3 trading program discussed in section VI.B is also implemented primarily through revisions to the trading program regulations. The dynamic budget-setting process discussed in sections VI.B.1.b.i and VI.B.4 is implemented at § 97.1010(a)(2) through (4), and the associated revised process for determining variability

limits and assurance levels discussed in section VI.B.5 is implemented at § 97.1010(e). The Group 3 allowance bank recalibration process discussed in sections VI.B.1.b.ii and VI.B.6 is implemented at § 97.1026(d). The backstop daily NOₓ emissions rate component of the primary emissions limitation discussed in sections VI.B.1.c.i and VI.B.7 is implemented at §§ 97.1006(c)(1)(i) and 97.1024(b)(1) and (3), accompanied by the addition of a definition of "backstop daily NOₓ emissions rate" and modification of the definition of "CSAPR NOₓ Ozone Season Group 3 allowance" in §§ 97.1002 and 97.1006(c)(6). The secondary emissions limitation for sources found responsible for exceedances of the assurance levels discussed in sections VI.B.1.c.ii and VI.B.8 is implemented at §§ 97.1006(c)(1)(iii) and (iv) and (c)(3)(ii) and 97.1025(c), accompanied by the addition of a definition of "CSAPR NOₓ Ozone Season Group 3 secondary emissions limitation" in § 97.1002.

The changes relating to set-asides, the treatment of Indian country, and unit-level allowance allocations discussed in section VI.B.9 of this document are implemented through revisions to multiple paragraphs of §§ 97.1010, 97.1011, and 97.1012, as well as limited revisions to §§ 97.1002 (definition of "allocate or allocation") and 97.1006(b)(2). In § 97.1010, paragraphs (b), (c), and (d) address the amounts for each control period of the Indian country existing unit set-asides, new unit set-asides, and Indian country new unit set-asides, respectively.[430] Paragraphs (b) and (d) reflect the establishment of Indian country existing unit set-asides starting with the 2023 control period and the discontinuation of Indian country new unit set-asides after the 2022 control period.

A newly added definition at § 97.1002 for "coal-derived fuel" (based on the existing definition in 40 CFR 72.2) helps in implementation of both the backstop daily NOₓ emissions rate provisions and the unit-level allocation provisions by clarifying that the provisions apply without regard to how any coal combusted by a unit might have been processed before combustion. Another newly added definition at § 97.1002 for "historical control period" helps in implementation of the dynamic budget-setting provisions, the secondary emissions limitation provisions, and the

---

[427] See §§ 52.54(b) (Alabama), 52.184(a) (Arkansas), 52.1240(d) (Minnesota), 52.1824(a) (Mississippi), 52.1326(b) (Missouri), 51.1492 (Nevada), 52.1930(a) (Oklahoma), 52.2283(d) (Texas), 52.2356 (Utah), and 52.2587(e) (Wisconsin).

[428] See §§ 52.54(b) (Alabama), 52.184(a) (Arkansas), 52.1824(a) (Mississippi), 52.1326(b) (Missouri), 51.1930(a) (Oklahoma), 52.2283(d) (Texas), and 52.2587(e) (Wisconsin).

[429] See §§ 52.731(b) (Illinois), 52.789(b) (Indiana), 52.940(b) (Kentucky), 52.984(d) (Louisiana), 52.1084(b) (Maryland), 52.1186(e) (Michigan), 52.1584(e) (New Jersey), 52.1684(b) (New York), 52.1882(b) (Ohio), 52.2040(b) (Pennsylvania), 52.2440(b) (Virginia), and 52.2540(b) (West Virginia).

[430] The former § 97.1011(c), which addresses the relationships of set-asides and variability limits to state trading budgets, is being relocated to § 97.1011(f).

unit-level allocation provisions by facilitating references to data reported by a unit for periods before the unit's entry into the Group 3 trading program.

The revisions to § 97.1011 refocus the section exclusively on allocation to "existing" units from the portion of each state emissions budget not reserved in a new unit set-aside or Indian country new unit set-aside. In § 97.1011(a), the provision formerly in § 97.1011(a)(1) requiring allocations to existing units to be made in the amounts provided in NODAs issued by the EPA is being split into two separate provisions, with paragraph (a)(1) applying to existing units in the state and areas of Indian country covered by the state's CAA implementation planning authority and paragraph (a)(2) applying to existing units in areas of Indian country not covered by the state's CAA implementation planning authority.[431] This split will facilitate the submission and approval of SIP revisions by states interested in submitting state-determined allowance allocations for the units over which they exercise CAA implementation authority, while leaving allocations to any units outside their authority to be addressed either by the EPA or by the relevant tribe under an approved tribal implementation plan. The process for determining default allocations to existing units of allowances from state trading budgets starting with the 2026 control period is set forth in revised § 97.1011(b), while the former provisions of § 97.1011(b), which concern timing and notice procedures for allocations to new units, are being relocated to § 97.1012. The provisions addressing incorrectly allocated allowances at § 97.1011(c) are being streamlined by relocating the portions applicable to new units to § 97.1012(c). In addition, as discussed in section VI.B.9.d, § 97.1011(c)(5) is being revised to provide that, starting with the 2024 control period, any incorrectly allocated allowances recovered after May 1 of the year following the control period will not be reallocated to other units in the

state but instead would be transferred to a surrender account.

The revisions to § 97.1012 retain the section's current focus on allocations to "new" units, generally combining the former provisions at § 97.1012 with the former provisions at § 97.1011(b) and (c) that address new units. The text of multiple paragraphs in both § 97.1012(a) and (b) is being revised as needed to reflect the change in treatment of Indian country discussed in section VI.B.9.a, under which the new unit set-asides will be used to provide allowance allocations to new units both in non-Indian country and Indian country within the borders of the respective states for control periods starting in 2023.[432] The timing and notice provisions in § 97.1012(a)(13) and (b)(13) are relocated from former § 97.1011(b)(1) and (2). The text of § 97.1012(c), addressing incorrect allocations to new units, is largely relocated from § 97.1011(c) (which addresses incorrect allocations to existing units) and reflects a parallel revision addressing the disposition of recovered allowances, as discussed in section VI.B.9.d.

The amendments to § 97.1021 implement two distinct sets of changes discussed in sections VI.B.9 and VI.D.1. First, revisions to § 97.1021(b) through (e) replace the previous schedule for recording Group 3 allowances for the 2023 and 2024 control periods established in the August 2022 Recordation Rule with an updated recordation schedule tailored to the effective date of this rule. The updated schedule also eliminates the unused former option for states to provide state-determined allowance allocations for the 2022 control period and establishes a substantively equivalent new option for states to provide state-determined allowance allocations for the 2024 control period. Second, revisions to § 97.1021(g) through (j) begin recordation for Indian country existing unit set-asides starting with allocations for the 2023 control period, modify the text to eliminate references to state-determined allocations of allowances from new unit set-asides, and end recordation for Indian country new unit set-asides after allocations for the 2022 control period.

Implementation of the revisions to the Group 3 trading program is also accomplished in part through amendments to regulations in other CFR parts. In 40 CFR part 75, which contains detailed monitoring, recordkeeping, and reporting requirements applicable to sources covered by the Group 3 trading program, the additional recordkeeping and reporting requirements discussed in section VI.B.10 of this document are implemented through the addition of §§ 75.72(f) and 75.73(f)(1)(ix) and (x) and revisions to § 75.75, and the procedures for calculating daily total heat input and daily total $NO_X$ emissions and the procedures for apportioning $NO_X$ mass emissions monitored at a common stack among the individual units using the common stack are being added at sections 5.3.3, 8.4(c), and 8.5.3 of appendix F to part 75. In 40 CFR part 78, which contains the administrative appeal procedures applicable to decisions of the EPA Administrator under the Group 3 trading program, § 78.1(b)(19) is being amended to add calculation of the dynamic budgets to the list of administrative decisions under the trading program regulations that will be appealable under those procedures.

*C. Transitional Provisions*

As discussed in section VI.B.12, the EPA is establishing several transitional provisions for sources entering the Group 3 trading program. The provisions discussed in section VI.B.12.a of this document, concerning the prorating of state emissions budgets, assurance levels, and unit-level allocations for the 2023 control period, are implemented through the Group 3 trading program regulations. Specifically, the state emissions budgets for the 2023 control period will be prorated according to procedures set out at § 97.1010(a)(1)(ii). Variability limits for the 2023 control period, and the resulting assurance levels, will be computed under § 97.1010(e) from the prorated state emissions budgets. Unit-level allocations to existing units for the 2023 control period will be computed from the prorated state emissions budgets according to procedures substantively the same as the procedures codified in § 97.1011(b) for calculating default allocations to existing units for later control periods, as discussed in section VI.B.9.b, and will be announced in the notice of data availability issued under § 97.1011(a)(1) and (2) for the 2023 through 2025 control periods.

The remaining transitional provisions are being implemented through the Group 2 trading program regulations.

---

[431] An additional provision currently in § 97.1011(a)(1), which clarifies that an allocation or lack of allocation to a unit in a NODA does not constitute a determination by the EPA that the unit is or is not a CSAPR $NO_X$ Ozone Season Group 3 unit, is being relocated to § 97.1011(a)(3). The former § 97.1011(a)(2), which provides for certain existing units that cease operations to receive allocations for their first five control periods of non-operation and provides for the allowances for subsequent control periods to be allocated to the relevant state's new unit set-asides, is inconsistent with the proposed revisions to the set-asides and the default allowance allocation process, as discussed in section VI.B.9, and is being removed as obsolete.

[432] Revisions are also being made to the text of § 97.1012(a) and (b) for the control periods in 2021 and 2022 consistent with the revisions to the parallel provisions in the regulations for the other CSAPR trading programs, generally calling for allocations to units in areas of Indian country subject to a state's CAA implementation planning authority to be made from the new unit set-asides instead of from the Indian country new unit set-asides.

The creation of an additional Group 3 allowance bank for the 2023 control period through the conversion of banked 2017–2022 Group 2 allowances as discussed in section VI.B.12.b of this document is implemented at § 97.826(e).[433] Related provisions addressing the use of Group 3 allowances to satisfy after-arising compliance obligations under the Group 2 trading program or the Group 1 trading program are implemented at §§ 97.826(f)(2) and 97.526(e)(3), respectively, and related provisions addressing recordation of late-arising allocations of Group 1 allowances are implemented at § 97.526(d)(2)(iii). The recall of Group 2 allowances previously issued for the 2023 and 2024 control periods as discussed in section VI.B.12.c of this document is implemented at § 97.811(e).

Decisions of the Administrator related to the allowance bank creation provisions and the allowance recall provisions are identified as appealable decisions under 40 CFR part 78 through revisions to § 78.1(b)(17)(viii) and (ix).

*D. Clarifications and Conforming Revisions*

As discussed in section VI.B.13 of this document, the EPA is revising the provisions regarding allowance allocations for units in Indian country in all the CSAPR trading programs so that instead of distinguishing among units based on whether they are or are not located in Indian country, the revised provisions distinguish among units based on whether they are or are not covered by a state's CAA implementation planning authority. The revisions are implemented in multiple paragraphs of §§ 97.411(b), 97.412, 97.511(b), 97.512, 97.611(b), 97.612, 97.711(b), 97.712, 97.811(b), and 97.812. The associated revisions to states' options regarding SIP revisions to establish state-determined allowance allocations for units covered by their CAA implementation planning authority are implemented in multiple paragraphs of §§ 52.38(a) and (b) and 52.39 as well as the state-specific subparts of 40 CFR part 52.

Certain other revisions to the regulatory text in the FIP and trading program regulations are minor simplifications and clarifications. First, in the Group 2 trading program regulations, the paragraphs in § 97.810 setting forth the amounts of state emissions budgets, new unit set-asides,

Indian country new unit set-asides, and variability limits for states that the EPA is transitioning out of the Group 2 trading program are being modified to indicate that the amounts are applicable under that program only for control periods through 2022.

Second, as noted in sections VI.D.2 and VI.D.3, the existing options for states subject to the NO$_X$ SIP Call to expand applicability of the Group 2 trading program to include certain non-EGUs and smaller EGUs are being eliminated. While the most directly affected provisions are the provisions setting forth the SIP options at § 52.38(b)(4), (5), (8), (9), (12), and (13), as discussed in section IX.A of this document, the changes also render references to "base" units and "base" sources in the regulations for the Group 2 trading program and the Group 3 trading program obsolete. Removal of the references to "base" units and "base" sources affects multiple paragraphs of §§ 97.802, 97.806, 97.825, 97.1002, 97.1006, and 97.1025.

Third, to clarify the regulatory text, the EPA is removing the language in the Group 3 trading program regulations that formerly appeared at §§ 97.1002 (definition of "common designated representative's assurance level"), 97.1006(c)(2)(iii), 97.1010(d), and 97.1011(a)(1) referencing supplemental amounts of allowances issued for the 2021 control period and associated increments to the 2021 assurance level amounts (each state's assurance level increment was described as 21 percent of the state's supplemental amount of allowances). In place of the removed language, the EPA is restating the amounts of the 2021 state emissions budgets in § 97.1010(a)(1)(i) so as to include the supplemental amounts of allowances and is restating the amounts of the 2021 variability limits in § 97.1010(e)(1) so as to include the associated assurance level increments. The revised language is substantively equivalent to and simpler than the previous language.

Fourth, in 40 CFR part 75, the EPA is removing obsolete text in § 75.73(c) and (f) to clarify the context for other text being added to the section, as discussed in section IX.B of this document.

Fifth, in 40 CFR part 52, the EPA is adding §§ 52.38(a)(7)(iii) and 52.39(k)(3) to clarify in §§ 52.38 and 52.39 that the Allowance Management System housekeeping provisions added by the Revised CSAPR Update at §§ 97.426(c), 97.626(c), and 97.726(c) in the regulations for the CSAPR NO$_X$ Annual, SO$_2$ Group 1, and SO$_2$ Group 2 trading programs, respectively, continue to apply after the sources in a given state

have been removed from the programs, consistent with the text of the latter provisions.

Finally, the EPA is updating cross-references throughout 40 CFR parts 52 and 97 for consistency with the other amendments being made in this rulemaking.

## X. Statutory and Executive Orders Reviews

Additional information about these statutes and Executive orders ("E.O.") can be found at *https://www2.epa.gov/laws-regulations/laws-and-executive-orders.*

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This action is a significant regulatory action within the scope of section 3(f)(1) of Executive Order 12866 that was submitted to the Office of Management and Budget (OMB) for review. Any changes made in response to Executive Order 12866 review have been documented in the docket. The EPA prepared an analysis of the potential costs and benefits associated with this action. This analysis, which is contained in the "Regulatory Impact Analysis for Federal Good Neighbor Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard" [EPA–452–R–23–001], is available in the docket and is briefly summarized in section VIII of this document.

*B. Paperwork Reduction Act (PRA)*

1. Information Collection Request for Electric Generating Units

The information collection activities in this rule have been submitted for approval to the Office of Management and Budget (OMB) under the PRA. The Information Collection Request (ICR) document that the EPA prepared has been assigned EPA ICR number 2709.01. The EPA has placed a copy of the ICR in the docket for this rule, and it is briefly summarized here.

The EPA is finalizing an information collection request (ICR), related specifically to electric generating units (EGU), for the Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards. The rule would amend the Cross-State Air Pollution Rule (CSAPR) NO$_X$ Ozone Season Group 3 trading program addressing seasonal NO$_X$ emissions in various states. Under the amendments, all EGU sources in the original twelve Group 3 states (Illinois, Indiana,

---

[433] The provision formerly at § 97.826(e)(1) is being relocated to § 97.826(f)(1), and the provision formerly at § 97.826(e)(2) is being removed as no longer necessary.

Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia) would remain. Additionally, EGU sources in seven states (Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Texas, and Wisconsin) currently covered by the CSAPR $NO_X$ Ozone Season Group 2 Trading Program would transition from the Group 2 program to the revised Group 3 trading program beginning with the 2023 ozone season. Further, sources in three states not currently covered by any CSAPR $NO_X$ ozone season trading program would join the revised Group 3 trading program: Minnesota, Nevada, and Utah. In total, EGU sources in 22 states would now be covered by the Group 3 program.

There is an existing ICR (OMB Control Number 2060–0667), that includes information collection requirements placed on EGU sources for the six Cross-State Air Pollution Rule (CSAPR) trading programs addressing sulfur dioxide ($SO_2$) emissions, annual nitrogen oxides ($NO_X$) emissions, or seasonal $NO_X$ emissions in various sets of states, and the Texas $SO_2$ trading program which is modeled after CSAPR. This ICR accounts for the additional respondent burden related to the amendments to the CSAPR $NO_X$ Ozone Group 3 trading program.

The principal information collection requirements under the CSAPR and Texas trading programs relate to the monitoring and reporting of emissions and associated data in accordance with 40 CFR part 75. Other information collection requirements under the programs concern the submittal of information necessary to allocate and transfer emissions allowances and the submittal of certificates of representation and other typically one-time registration forms.

Affected sources under the CSAPR and Texas trading programs are generally stationary, fossil fuel-fired boilers and combustion turbines serving electricity generators larger than 25 megawatts (MW) producing electricity for sale. Most of these affected sources are also subject to the Acid Rain Program (ARP). The information collection requirements under the CSAPR and Texas trading programs and the ARP substantially overlap and are fully integrated. The burden and costs of overlapping requirements are accounted for in the ARP ICR (OMB Control Number 2060–0258). Thus, this ICR accounts for information collection burden and costs under the CSAPR $NO_X$ Ozone Season Group 3 trading program that are incremental to the burden and costs

already accounted for in both the ARP and CSAPR ICRs.

For most sources already reporting data under the CSAPR $NO_X$ Ozone Season Group 3 or the CSAPR $NO_X$ Ozone Group 2 trading programs, the reporting requirements will remain identical so there will be no incremental burden or cost. Certain sources currently reporting data will be subject to additional emissions reporting requirements under the rule requiring these sources to make a one-time monitoring plan and DAHS update. These sources include those with a common stack configuration and/or those that are large, coal-fired EGUs. Additionally, sources with a common stack configuration have the option to install additional monitoring equipment to measure emissions at each individual unit within the facility, and for purposes of estimating information collection costs and burden, the EPA assumes certain sources will utilize this option. Finally, the assessment of incremental cost and burden are required for those sources in the three states not currently reporting data under a CSAPR $NO_X$ Ozone Season program. Sources in Minnesota are already reporting data for the CSAPR $NO_X$ Annual program with almost identical information collection requirements, requiring only a one-time monitoring plan and DAHS update. Most of the affected sources in Nevada and Utah are already reporting data as part of the Acid Rain Program, thus only requiring a monitoring plan and DAHS update as well. There are a small number of sources in Nevada and Utah that do not report emissions data to the EPA under 40 CFR part 75 and will need to implement a Part 75 monitoring methodology which includes burdens related to installation, certification, and necessary updates.

*Respondents/affected entities:* Industry respondents are stationary, fossil fuel-fired boilers and combustion turbines serving electricity generators subject to the CSAPR and Texas trading programs, as well as non-source entities voluntarily participating in allowance trading activities. Potential state respondents are states that can elect to submit state-determined allowance allocations for sources located in their states.

*Respondent's obligation to respond:* Industry respondents: voluntary and mandatory (sections 110(a) and 301(a) of the Clean Air Act).

*Estimated number of respondents:* The EPA estimates that there would be 120 industry respondents.

*Frequency of response:* on occasion, quarterly, and annually.

*Total estimated additional burden:* 2,289 hours (per year). Burden is defined at 5 CFR 1320.03(b).

*Total estimated additional cost:* $356,623 (per year); includes $182,379 annualized capital or operation & maintenance costs.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9. When OMB approves this ICR, the Agency will announce that approval in the **Federal Register** and publish a technical amendment to 40 CFR part 9 to display the OMB control number for the approved information collection activities contained in this final rule.

2. Information Collection Request for Non-Electric Generating Units

The information collection activities in this final rule have been submitted for approval to the Office of Management and Budget (OMB) under the PRA. The Information Collection Request (ICR) document that the EPA prepared has been assigned EPA ICR number 2705.02. The EPA has filed a copy of the non-EGU ICR in the docket for this rule, and it is briefly summarized here.

ICR No. 2705.02 is a new request and it addresses the burden associated with new regulatory requirements under the final rule. Owners and operators of certain non-Electric Generating Unit (non-EGU) industry stationary sources will potentially modify or install new emissions controls and associated monitoring systems to meet the nitrogen oxides ($NO_X$) emissions limits of this final rule. The burden in this ICR reflects the new monitoring, calibrating, recordkeeping, reporting and testing activities required of covered industrial sources. This information is being collected to assure compliance with the final rule. In accordance with the Clean Air Act Amendments of 1990, any monitoring information to be submitted by sources is a matter of public record. Information received and identified by owners or operators as confidential business information (CBI) and approved as CBI by the EPA, in accordance with 40 CFR chapter I, part 2, subpart B, shall be maintained appropriately (see 40 CFR part 2; 41 FR 36902, September 1, 1976; amended by 43 FR 39999, September 8, 1978; 43 FR 42251, September 28, 1978; 44 FR 17674, March 23, 1979).

*Respondents/affected entities:* The respondents/affected entities are the owners/operators of certain non-EGU

industry sources in the following industry sectors: furnaces in Glass and Glass Product Manufacturing; boilers and furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; kilns in Cement and Cement Product Manufacturing; reciprocating internal combustion engines in Pipeline Transportation of Natural Gas; and boilers in Metal Ore Mining, Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills; and combustors and incinerators in Solid Waste Combustors and Incinerators.

*Respondent's obligation to respond:* Voluntary and mandatory. (Sections 110(a) and 301(a) of the Clean Air Act.) All data that is recorded or reported by respondents is required by the final rule, titled "Federal ''Good Neighbor Plan'' for the 2015 Ozone National Ambient Air Quality Standards.''

*Estimated number of respondents:* 3,328.

*Frequency of response:* The specific frequency for each information collection activity within the non-EGU ICR is shown at the end of the ICR document in Tables 1 through 18. In general, the frequency varies across the monitoring, recordkeeping, and reporting activities. Some recordkeeping such as work plan preparation is a one-time activity whereas pipeline engine maintenance recordkeeping is conducted quarterly. Reporting frequency is on an annual basis.

*Total estimated burden:* 11,481 hours (per year). Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost:* $3,823,000 (average per year); includes $2,400,000 annualized capital or operation & maintenance costs.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9. When OMB approves this ICR, the Agency will announce that approval in the **Federal Register** and publish a technical amendment to 40 CFR part 9 to display the OMB control number for the approved information collection activities contained in this final rule.

*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. The small entities subject to the requirements of this action are small businesses, which includes EGUs and non-EGUs and are described in more detail below. In 2026,

the EPA identified a total of 29 small entities affected by the rule. Of these, 2 small entities may experience costs of greater than 1 percent of revenues. In 2026 for EGUs, the EPA identified 19 small entities. The EPA's decision to exclude units smaller than 25 MW capacity from the final rule, and exclusion of uncontrolled units smaller than 100 MW from backstop emissions rates significantly reduced the burden on small entities by reducing the number of affected small entity-owned units. Further, in 2026 for non-EGUs, there are ten small entities, and two small entities are estimated to have a cost-to-sales impact between 1.7 and 2.4 percent of their revenues.

The Agency has not determined that a significant number of small entities potentially affected by the rule will have compliance costs greater than 1 percent of annual revenues during the compliance period. The EPA has concluded that there will be no significant economic impact on a substantial number of small entities (No SISNOSE) for this rule overall. Details of this analysis are presented in Chapter 6 of the *RIA*, which is in the public docket.

*D. Unfunded Mandates Reform Act (UMRA)*

This action contains no unfunded Federal mandate for State, local, or Tribal governments as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action imposes no enforceable duty on any State, local, or Tribal government. This action contains a Federal mandate under UMRA, 2 U.S.C. 1531–1538, that may result in expenditures of $100 million or more in any one year for the private sector. Accordingly, the costs and benefits associated with this action are discussed in section VIII of this preamble and in the *RIA*, which is in the docket for this rule. Additional details are presented in the *RIA*. This action is not subject to the requirements of UMRA section 203 because it contains no regulatory requirements that might significantly or uniquely affect small governments.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This final action has tribal implications. However, it would neither impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law.

The EPA is finalizing a finding that interstate transport of ozone precursor emissions from 23 upwind states (Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wisconsin) is significantly contributing to downwind nonattainment or interfering with maintenance of the 2015 ozone NAAQS in other states. The EPA is promulgating FIP requirements to eliminate interstate transport of ozone precursors from these 23 states. Under CAA section 301(d)(4), the EPA is extending FIP requirements to apply in Indian country located within the upwind geography of the final rule, including Indian reservation lands and other areas of Indian country over which the EPA or a tribe has demonstrated that a tribe has jurisdiction. The EPA's determinations in this regard are described further in section III.C.2 of this document, *Application of Rule in Indian Country and Necessary or Appropriate Finding.* The EPA finds that all covered existing and new EGU and non-EGU sources that are located in the ''301(d) FIP'' areas within the geographic boundaries of the covered states, and which would be subject to this rule if located within areas subject to state CAA planning authority, should be included in this rule. To the EPA's knowledge, only one covered existing EGU or non-EGU source is located within the 301(d) FIP areas: the Bonanza Power Plant, an EGU source, located on the Uintah and Ouray Reservation, geographically located within the borders of Utah. This final action has tribal implication because of the extension of FIP requirements into Indian country and because, in general, tribes have a vested interest in how this final rule would affect air quality.

The EPA hosted an environmental justice webinar on October 26, 2021, that was attended by state regulatory authorities, environmental groups, federally recognized tribes, and small business stakeholders. The EPA issued tribal consultation letters addressed to 574 tribes in February 2022 after the proposed rule was signed. The EPA received no further requests to facilitate

additional tribal consultation for the final rule.

## G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive order. This action is not subject to Executive Order 13045 because it implements a previously promulgated health-based federal standard. This action's health and risk assessments are contained in Chapter 5 and 6 of the *RIA*. The EPA believes that the ozone-related benefits, $PM_{2.5}$-related benefits, and $CO_2$-related benefits from this final rule will further improve children's health. Additionally, the ozone and $PM_{2.5}$ EJ exposure analyses in Chapter 7 of the *RIA* suggests that nationally, children (ages 0–17) will experience at least as great a reduction in ozone and $PM_{2.5}$ exposures as adults (ages 18–64) in 2023 and 2026 under all regulatory alternatives of this rulemaking.

## H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use

This action is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. The EPA has prepared a Statement of Energy Effects for the final regulatory control alternative as follows. The Agency estimates a 1 percent change in retail electricity prices on average across the contiguous U.S. in the 2025 run year, a 4 percent reduction (28 GWh) in coal-fired electricity generation, a 2 percent increase (21 GWh) in natural gas-fired electricity generation, and a 1 percent increase (8 GWh) in renewable electricity generation as a result of this final rule. The EPA projects that utility power sector delivered natural gas prices will change by less than 1 percent in 2025. Details of the estimated energy effects are presented in Chapter 4 of the *RIA*, which is in the public docket.

## I. National Technology Transfer and Advancement Act (NTTAA)

This rulemaking does not involve technical standards.

## J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

Executive Order 12898 (59 FR 7629, February 16, 1994) directs Federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations (people of color and/or indigenous peoples) and low-income populations.

The EPA believes that the human health or environmental conditions that exist prior to this action result in or have the potential to result in disproportionate and adverse human health or environmental effects on people of color, low-income populations and/or Indigenous peoples. The documentation for this decision is contained in section VII of this document, *Environmental Justice Analytical Considerations and Stakeholder Outreach and Engagement,* and in Chapter 7, *Environmental Justice Impacts* of the *RIA*, which is in the public document. Briefly, proximity demographic analyses found larger percentages of Hispanics, African Americans, people below the poverty level, people with less educational attainment, and people linguistically isolated are living within 5 km and 10 km of an affected EGU, compared to national averages. It also finds larger percentages of African Americans, people below the poverty level, and with less educational attainment living within 5 km and 10 km of an affected non-EGU facility. Considering the known limitations of proximity analyses, including the inability to assess policy-specific impacts, we also performed analysis of baseline EJ ozone and $PM_{2.5}$ exposures. Baseline ozone and $PM_{2.5}$ exposure analyses show that certain populations, such as Hispanics, Asians, those linguistically isolated, those less educated, and children may experience disproportionately higher ozone and $PM_{2.5}$ exposures as compared to the national average. American Indians may also experience disproportionately higher ozone concentrations than the reference group.

The EPA believes that this action is not likely to change existing disproportionate and adverse effects on people of color, low-income populations and/or Indigenous peoples. Specifically, we do not find evidence that potential EJ concerns related to ozone or $PM_{2.5}$ exposures will be meaningfully exacerbated or mitigated in the regulatory alternatives under consideration as compared to the baseline. We infer that baseline disparities in the ozone and $PM_{2.5}$ concentration burdens are likely to persist after implementation of the regulatory action or alternatives under consideration, due to similar modeled concentration reductions across population demographics. Importantly, the action described in this rule is expected to lower ozone and $PM_{2.5}$ in many areas, including in ozone nonattainment areas, and thus mitigate some pre-existing health risks across all populations evaluated.

The EPA additionally identified and addressed environmental justice concerns by providing the public, including those communities disproportionately impacted by the burdens of pollution, opportunities for meaningful engagement with the EPA on this action through outreach activities conducted by the Agency. The information supporting this Executive order review is contained in section VII of this document.

## K. Congressional Review Act

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. Because this action falls within the definition provided by 5 U.S.C. 804(2), the rule's effective date is consistent with 5 U.S.C. 801(a)(3).

## L. Determinations Under CAA Section 307(b)(1) and (d)

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) when the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).[434]

---

[434] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C.
Continued

This rulemaking is "nationally applicable" within the meaning of CAA section 307(b)(1). In this final action, the EPA is applying a uniform legal interpretation and common, nationwide analytical methods with respect to the requirements of CAA section 110(a)(2)(D)(i)(I) concerning interstate transport of pollution (i.e., "good neighbor" requirements) to promulgate FIPs that satisfy these requirements for the 2015 ozone NAAQS. Based on these analyses, the EPA is promulgating FIPs for 23 states located across a wide geographic area in eight of the ten EPA regions and ten Federal judicial circuits. Given that this action addresses implementation of the good neighbor requirements of CAA section 110(a)(2)(D)(i)(I) in a large number of states located across the country, and given the interdependent nature of interstate pollution transport and the common core of knowledge and analysis involved in promulgating these FIPs, this is a "nationally applicable" action within the meaning of CAA section 307(b)(1).

In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). In this final action, the EPA is interpreting and applying section 110(a)(2)(d)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here the same, nationally consistent 4-step framework for assessing good neighbor obligations for the 2015 ozone NAAQS that it has applied in other nationally applicable rulemakings, such as CSAPR, the CSAPR Update, and the Revised CSAPR Update. The EPA is relying on the results from nationwide photochemical grid modeling using a 2016 base year and 2023 projection year as the primary basis for its assessment of air quality conditions and pollution contribution levels at Step 1 and Step 2 of that 4-step framework and applying a nationally uniform approach to the identification of nonattainment and maintenance receptors across the entire

Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

geographic area covered by this final rule.[435]

The Administrator finds that this is a matter on which national uniformity in judicial resolution of any petitions for review is desirable, to take advantage of the D.C. Circuit's administrative law expertise, and to facilitate the orderly development of the basic law under the Act. The Administrator also finds that consolidated review of this action in the D.C. Circuit will avoid piecemeal litigation in the regional circuits, further judicial economy, and eliminate the risk of inconsistent results for different states, and that a nationally consistent approach to the CAA's mandate concerning interstate transport of ozone pollution constitutes the best use of agency resources. The EPA's responses to comments on the appropriate venue for petitions for review are contained in section 1.10 of the *RTC* document.

For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is publishing that finding in the **Federal Register**. Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit by August 4, 2023.

This action is subject to the provisions of section 307(d). CAA section 307(d)(1)(B) provides that section 307(d) applies to, among other things, "the promulgation or revision of an implementation plan by the Administrator under [CAA section 110(c)]." 42 U.S.C. 7407(d)(1)(B). This action, among other things, promulgates new Federal implementation plans pursuant to the authority of section 110(c). To the extent any portion of this final action is not expressly identified under section 307(d)(1)(B), the Administrator determines that the provisions of section 307(d) apply to such final action. *See* CAA section 307(d)(1)(V) (the provisions of section 307(d) apply to "such other actions as the Administrator may determine").

[435] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

## List of Subjects

### 40 CFR Part 52

Environmental protection, Administrative practice and procedure, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Ozone, Particulate matter, Sulfur dioxide.

### 40 CFR Part 75

Environmental protection, Administrative practice and procedure, Air pollution control, Continuous emissions monitoring, Electric power plants, Nitrogen oxides, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur dioxide.

### 40 CFR Part 78

Environmental protection, Administrative practice and procedure, Air pollution control, Electric power plants, Nitrogen oxides, Ozone, Particulate matter, Sulfur dioxide.

### 40 CFR Part 97

Environmental protection, Administrative practice and procedure, Air pollution control, Electric power plants, Nitrogen oxides, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur dioxide.

**Michael S. Regan,**
*Administrator.*

For the reasons stated in the preamble, parts 52, 75, 78, and 97 of title 40 of the Code of Federal Regulations are amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart A—General Provisions

■ 2. Amend § 52.38 by:
■ a. In paragraph (a)(1), removing "(NO$_X$), except" and adding in its place "(NO$_X$) for sources meeting the applicability criteria set forth in subpart AAAAA, except";
■ b. In paragraph (a)(3) introductory text:
■ i. Removing "(a)(2)(i) or (ii)" and adding in its place "(a)(2)"; and
■ ii. Removing "the State and" and adding in its place "sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for";
■ c. In paragraph (a)(3)(i), removing "State and" and adding in its place

''State and areas of Indian country within the borders of the State subject to the State's SIP authority and that'';

■ d. In paragraph (a)(4) introductory text, removing ''for the State's sources, and'' and adding in its place ''with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, and'';

■ e. Revising table 1 to paragraph (a)(4)(i)(B);

■ f. In paragraph (a)(4)(ii), removing ''deadlines for submission of allocations or auction results under paragraphs (a)(4)(i)(B) and (C)'' and adding in its place ''deadline for submission of allocations or auction results under paragraph (a)(4)(i)(B)'';

■ g. In paragraph (a)(5) introductory text, removing ''State (but not sources in any Indian country within the borders of the State), regulations'' and adding in its place ''State and areas of Indian country within the borders of the State subject to the State's SIP authority, regulations'';

■ h. Revising table 2 to paragraph (a)(5)(i)(B);

■ i. In paragraph (a)(5)(iv), removing ''Indian country within the borders of the State'' and adding in its place ''areas of Indian country within the borders of the State not subject to the State's SIP authority'';

■ j. In paragraph (a)(5)(v), removing ''Indian country within the borders of the State, the'' and adding in its place ''areas of Indian country within the borders of the State not subject to the State's SIP authority, the'';

■ k. In paragraph (a)(5)(vi), removing ''deadlines for submission of allocations or auction results under paragraphs (a)(5)(i)(B) and (C)'' and adding in its place ''deadline for submission of allocations or auction results under paragraph (a)(5)(i)(B)'';

■ l. Revising paragraphs (a)(6) and (a)(7)(ii);

■ m. Adding paragraph (a)(7)(iii);

■ n. In paragraphs (a)(8)(i) and (ii), removing ''the State and'' and adding in its place ''sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for'';

■ o. In paragraph (a)(8)(iii), removing ''State (but not sources in any Indian country within the borders of the State):'' and adding in its place ''State and areas of Indian country within the borders of the State subject to the State's SIP authority:'';

■ p. In paragraph (b)(1), removing ''year), except'' and adding in its place ''year)'' for sources meeting the applicability criteria set forth in

subparts BBBBB, EEEEE, and GGGGG, except'';

■ q. Redesignating paragraphs (b)(2)(i) and (ii) as paragraphs (b)(2)(i)(A) and (B), respectively, paragraphs (b)(2)(iii) and (iv) as paragraphs (b)(2)(ii)(A) and (B), respectively, and paragraph (b)(2)(v) as paragraph (b)(2)(iii)(A);

■ r. In newly redesignated paragraph (b)(2)(ii)(A), removing ''Alabama, Arkansas, Iowa, Kansas, Mississippi, Missouri, Oklahoma, Tennessee, Texas, and Wisconsin.'' and adding in its place ''Iowa, Kansas, and Tennessee.'';

■ s. Adding paragraphs (b)(2)(ii)(C) and (b)(2)(iii)(B) and (C);

■ t. In paragraph (b)(3) introductory text:

■ i. Removing ''or (ii)''; and

■ ii. Removing ''the State and'' and adding in its place ''sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for'';

■ u. In paragraph (b)(3)(i), removing ''State and'' and adding in its place ''State and areas of Indian country within the borders of the State subject to the State's SIP authority and that'';

■ v. Revising paragraph (b)(4) introductory text;

■ w. Removing and reserving paragraph (b)(4)(i);

■ x. Revising table 3 to paragraph (b)(4)(ii)(B) and paragraphs (b)(4)(iii) and (b)(5) introductory text;

■ y. Removing and reserving paragraph (b)(5)(i);

■ z. Revising table 4 to paragraph (b)(5)(ii)(B);

■ aa. In paragraph (b)(5)(v), removing ''Indian country within the borders of the State'' and adding in its place ''areas of Indian country within the borders of the State not subject to the State's SIP authority'';

■ bb. In paragraph (b)(5)(vi), removing ''Indian country within the borders of the State, the'' and adding in its place ''areas of Indian country within the borders of the State not subject to the State's SIP authority, the'';

■ cc. Revising paragraphs (b)(5)(vii), (b)(7) introductory text, (b)(7)(i), and (b)(8) introductory text;

■ dd. Removing and reserving paragraphs (b)(8)(i) and (ii);

■ ee. Revising paragraph (b)(8)(iii)(A), table 5 to paragraph (b)(8)(iii)(B), and paragraphs (b)(8)(iv) and (b)(9) introductory text;

■ ff. Removing and reserving paragraphs (b)(9)(i) and (ii);

■ gg. Revising paragraph (b)(9)(iii)(A) and table 6 to paragraph (b)(9)(iii)(B);

■ hh. In paragraph (b)(9)(vi), removing ''Indian country within the borders of the State'' and adding in its place ''areas of Indian country within the borders of

the State not subject to the State's SIP authority'';

■ ii. Revising paragraphs (b)(9)(vii) and (viii), (b)(10) introductory text, (b)(10)(i) and (ii), (b)(10)(v)(A) and (B), and (b)(11) introductory text;

■ jj. Removing and reserving paragraphs (b)(11)(i) and (ii);

■ kk. In paragraph (b)(11)(iii) introductory text, removing ''§§ 97.1011(a) and (b)(1) and 97.1012(a)'' and adding in its place ''§ 97.1011(a)(1)'';

■ ll. Revising paragraph (b)(11)(iii)(A);

mm. In paragraph (b)(11)(iii)(B):

■ i. Removing ''§ 97.1011(a)'' and adding in its place ''§ 97.1011(a)(1)''; and

■ ii. Adding ''and'' after the semicolon;

■ nn. Removing and reserving paragraph (b)(11)(iii)(C);

■ oo. Revising paragraphs (b)(11)(iii)(D), (b)(11)(iv), and (b)(12) introductory text;

■ pp. Removing and reserving paragraphs (b)(12)(i) and (ii);

■ qq. In paragraph (b)(12)(iii) introductory text, removing ''§§ 97.1011(a) and (b)(1) and 97.1012(a)'' and adding in its place ''§ 97.1011(a)(1)'';

■ rr. Revising paragraph (b)(12)(iii)(A);

■ ss. In paragraph (b)(12)(iii)(B):

■ i. Removing ''§ 97.1011(a)'' and adding in its place ''§ 97.1011(a)(1)''; and

■ ii. Adding ''and'' after the semicolon;

■ tt. Removing and reserving paragraph (b)(12)(iii)(C);

■ uu. Revising paragraphs (b)(12)(iii)(D), (b)(12)(vi) through (viii), (b)(13) introductory text, and (b)(13)(i);

■ vv. In paragraph (b)(13)(ii), removing ''regulations, including any sources made subject to such regulations pursuant to paragraph (b)(9)(ii) or (b)(12)(ii) of this section, the'' and adding in its place ''regulations the'';

■ ww. In paragraph (b)(14)(i)(F), removing ''§ 97.825(b)'' and adding in its place ''§§ 97.806(c)(2) and (3) and 97.825(b)'';

■ xx. In paragraph (b)(14)(i)(G), removing ''§ 97.826(e)'' and adding in its place ''§ 97.826(f)'';

■ yy. Revising paragraphs (b)(14)(ii) and (iii);

■ zz. In paragraph (b)(15)(i), removing ''the State and'' and adding in its place ''sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for'';

■ aaa. Revising paragraph (b)(15)(ii);

■ bbb. In paragraph (b)(15)(iii), removing ''State (but not sources in any Indian country within the borders of the State):'' and adding in its place ''State and areas of Indian country within the borders of the State subject to the State's SIP authority:'';

■ ccc. In paragraph (b)(16)(i)(A), removing "the State and" and adding in its place "sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for";
■ ddd. Revising paragraphs (b)(16)(i)(B) and (C);
■ eee. Redesignating paragraph (b)(16)(ii) as paragraph (b)(16)(ii)(A),

and, in newly redesignated paragraph (b)(16)(ii)(A), removing "(b)(2)(iv)" and adding in its place "(b)(2)(ii)(B)";
■ fff. Adding paragraph (b)(16)(ii)(B); and
■ ggg. Revising paragraphs (b)(17)(i) through (iii).

The revisions and additions read as follows:

**§ 52.38  What are the requirements of the Federal Implementation Plans (FIPs) for the Cross-State Air Pollution Rule (CSAPR) relating to emissions of nitrogen oxides?**

(a) * * *

(4) * * *

(i) * * *

(B) * * *

TABLE 1 TO PARAGRAPH (a)(4)(i)(B)

| Year of the control period for which CSAPR NO$_X$ Annual allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the administrator |
|---|---|
| 2017 or 2018 | June 1, 2016. |
| 2019 or 2020 | June 1, 2017. |
| 2021 or 2022 | June 1, 2018. |
| 2023 | June 1, 2019. |
| 2024 | June 1, 2020. |
| 2025 or any year thereafter | June 1 of the year before the year of the control period. |

* * * * *

(5) * * *

(i) * * *

(B) * * *

TABLE 2 TO PARAGRAPH (a)(5)(i)(B)

| Year of the control period for which CSAPR NO$_X$ Annual allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the administrator |
|---|---|
| 2017 or 2018 | June 1, 2016. |
| 2019 or 2020 | June 1, 2017. |
| 2021 or 2022 | June 1, 2018. |
| 2023 | June 1, 2019. |
| 2024 | June 1, 2020. |
| 2025 or any year thereafter | June 1 of the year before the year of the control period. |

* * * * *

(6) *Withdrawal of CSAPR FIP provisions relating to NO$_X$ annual emissions.* Except as provided in paragraph (a)(7) of this section, following promulgation of an approval by the Administrator of a State's SIP revision as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (a)(1), (a)(2)(i), and (a)(3) and (4) of this section for sources in the State and Indian country within the borders of the State subject to the State's SIP authority, the provisions of paragraph (a)(2)(i) of this section will no longer apply to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, unless the Administrator's approval of the SIP revision is partial or conditional, and will continue to apply to sources in areas of Indian country within the borders of the State not subject to the State's SIP authority, provided that if the CSAPR Federal Implementation Plan was promulgated as a partial rather than full remedy for an obligation of the

State to address interstate air pollution, the SIP revision likewise will constitute a partial rather than full remedy for the State's obligation unless provided otherwise in the Administrator's approval of the SIP revision.

(7) * * *

(ii) Notwithstanding the provisions of paragraph (a)(6) of this section, if, at the time of any approval of a State's SIP revision under this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart AAAAA authorizing the Administrator to complete the allocation and recordation of such allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(iii) Notwithstanding any discontinuation pursuant to paragraph

(a)(2)(ii) or (a)(6) of this section of the applicability of subpart AAAAA of part 97 of this chapter to the sources in a State and areas of Indian country within the borders of the State subject to the State's SIP authority with regard to emissions occurring in any control period, the following provisions shall continue to apply with regard to all CSAPR NO$_X$ Annual allowances at any time allocated for any control period to any source or other entity in the State and areas of Indian country within the borders of the State subject to the State's SIP authority and shall apply to all entities, wherever located, that at any time hold or held such allowances:

(A) The provisions of § 97.426(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Annual allowances between certain Allowance Management System accounts under common control).

(B) [Reserved]

* * * * *

(b) * * *

(2) * * *

(ii) * * *

(C) The provisions of subpart EEEEE of part 97 of this chapter apply to sources in each of the following States and Indian country located within the borders of such States with regard to emissions occurring in 2017 through 2022 only, except as provided in paragraph (b)(14)(iii) of this section: Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Texas, and Wisconsin.

(iii) * * *

(B) The provisions of subpart GGGGG of part 97 of this chapter apply to sources in each of the following States and Indian country located within the borders of such States with regard to emissions occurring in 2023 and each subsequent year: Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Texas, and Wisconsin.

(C) The provisions of subpart GGGGG of part 97 of this chapter apply to sources in each of the following States and Indian country located within the borders of such States with regard to emissions occurring on and after August 4, 2023, and in each subsequent year: Minnesota, Nevada, and Utah.

* * * * *

(4) *Abbreviated SIP revisions replacing certain provisions of the*

*Federal CSAPR NO$_X$ Ozone Season Group 1 Trading Program.* A State listed in paragraph (b)(2)(i)(A) of this section may adopt and include in a SIP revision, and the Administrator will approve, regulations replacing specified provisions of subpart BBBBB of part 97 of this chapter with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, and not substantively replacing any other provisions, as follows:

* * * * *

(ii) * * *

(B) * * *

### TABLE 3 TO PARAGRAPH (b)(4)(ii)(B)

| Year of the control period for which CSAPR NO$_X$ Ozone Season Group 1 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the administrator |
|---|---|
| 2017 or 2018 ................................................................ | June 1, 2016. |
| 2019 or 2020 ................................................................ | June 1, 2017. |
| 2021 or 2022 ................................................................ | June 1, 2018. |
| 2023 ............................................................................ | June 1, 2019. |
| 2024 ............................................................................ | June 1, 2020. |
| 2025 or any year thereafter ......................................... | June 1 of the year before the year of the control period. |

* * * * *

(iii) Provided that the State must submit a complete SIP revision meeting the requirements of paragraph (b)(4)(ii) of this section by December 1 of the year before the year of the deadline for submission of allocations or auction results under paragraph (b)(4)(ii)(B) of this section applicable to the first control period for which the State wants to make allocations or hold an auction under paragraph (b)(4)(ii) of this section.

(5) *Full SIP revisions adopting State CSAPR NO$_X$ Ozone Season Group 1 Trading Programs.* A State listed in paragraph (b)(2)(i)(A) of this section may adopt and include in a SIP revision, and the Administrator will approve, as correcting the deficiency in the SIP that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (b)(1), (b)(2)(i), and (b)(3) and (4) of this section with regard to sources in the State and areas of Indian

country within the borders of the State subject to the State's SIP authority, regulations that are substantively identical to the provisions of the CSAPR NO$_X$ Ozone Season Group 1 Trading Program set forth in §§ 97.502 through 97.535 of this chapter, except that the SIP revision:

* * * * *

(ii) * * *

(B) * * *

### TABLE 4 TO PARAGRAPH (b)(5)(ii)(B)

| Year of the control period for which CSAPR NO$_X$ Ozone Season group 1 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the administrator |
|---|---|
| 2017 or 2018 ................................................................ | June 1, 2016. |
| 2019 or 2020 ................................................................ | June 1, 2017. |
| 2021 or 2022 ................................................................ | June 1, 2018. |
| 2023 ............................................................................ | June 1, 2019. |
| 2024 ............................................................................ | June 1, 2020. |
| 2025 or any year thereafter ......................................... | June 1 of the year before the year of the control period. |

* * * * *

(vii) Provided that the State must submit a complete SIP revision meeting the requirements of paragraphs (b)(5)(ii) through (v) of this section by December 1 of the year before the year of the deadline for submission of allocations or auction results under paragraph (b)(5)(ii)(B) of this section applicable to the first control period for which the State wants to make allocations or hold an auction under paragraph (b)(5)(ii) of this section.

* * * * *

(7) *State-determined allocations of CSAPR NO$_X$ Ozone Season Group 2 allowances for 2018.* A State listed in paragraph (b)(2)(ii) of this section may adopt and include in a SIP revision, and the Administrator will approve, as CSAPR NO$_X$ Ozone Season Group 2 allowance allocation provisions replacing the provisions in § 97.811(a) of this chapter with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for the control period in 2018, a list of CSAPR

NO$_X$ Ozone Season Group 2 units and the amount of CSAPR NO$_X$ Ozone Season Group 2 allowances allocated to each unit on such list, provided that the list of units and allocations meets the following requirements:

(i) All of the units on the list must be units that are in the State and areas of Indian country within the borders of the State subject to the State's SIP authority and that commenced commercial operation before January 1, 2015;

* * * * *

**210a**

(8) *Abbreviated SIP revisions replacing certain provisions of the Federal CSAPR NO$_X$ Ozone Season Group 2 Trading Program.* A State listed in paragraph (b)(2)(ii) of this section may adopt and include in a SIP revision, and the Administrator will approve, regulations replacing specified provisions of subpart EEEEE of part 97 of this chapter with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, and not substantively replacing any other provisions, as follows:

* * * * *

(iii) * * *

(A) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of CSAPR NO$_X$ Ozone Season Group 2 allowances for any such control period not exceeding the amount, under §§ 97.810(a) and 97.821 of this chapter for the State and such control period, of the CSAPR NO$_X$ Ozone Season Group 2 trading budget minus the sum of the Indian country new unit set-aside and the amount of any CSAPR NO$_X$ Ozone Season Group 2 allowances already allocated and recorded by the Administrator;

(B) * * *

TABLE 5 TO PARAGRAPH (b)(8)(iii)(B)

| Year of the control period for which CSAPR NO$_X$ Ozone Season Group 2 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the administrator |
|---|---|
| 2019 or 2020 ........................................................ | June 1, 2018. |
| 2021 or 2022 ........................................................ | June 1, 2019. |
| 2023 or 2024 ........................................................ | June 1, 2020. |
| 2025 or any year thereafter ................................. | June 1 of the year before the year of the control period. |

* * * * *

(iv) Provided that the State must submit a complete SIP revision meeting the requirements of paragraph (b)(8)(iii) of this section by December 1 of the year before the year of the deadline for submission of allocations or auction results under paragraph (b)(8)(iii)(B) of this section applicable to the first control period for which the State wants to make allocations or hold an auction under paragraph (b)(8)(iii) of this section.

(9) *Full SIP revisions adopting State CSAPR NO$_X$ Ozone Season Group 2 Trading Programs.* A State listed in paragraph (b)(2)(ii) of this section may

adopt and include in a SIP revision, and the Administrator will approve, as correcting the deficiency in the SIP that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (b)(1), (b)(2)(ii), and (b)(7) and (8) of this section with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, regulations that are substantively identical to the provisions of the CSAPR NO$_X$ Ozone Season Group 2 Trading Program set forth in §§ 97.802 through 97.835 of this chapter, except that the SIP revision:

* * * * *

(iii) * * *

(A) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of CSAPR NO$_X$ Ozone Season Group 2 allowances for any such control period not exceeding the amount, under §§ 97.810(a) and 97.821 of this chapter for the State and such control period, of the CSAPR NO$_X$ Ozone Season Group 2 trading budget minus the sum of the Indian country new unit set-aside and the amount of any CSAPR NO$_X$ Ozone Season Group 2 allowances already allocated and recorded by the Administrator;

(B) * * *

TABLE 6 TO PARAGRAPH (b)(9)(iii)(B)

| Year of the control period for which CSAPR NO$_X$ Ozone Season Group 2 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the administrator |
|---|---|
| 2019 or 2020 ........................................................ | June 1, 2018. |
| 2021 or 2022 ........................................................ | June 1, 2019. |
| 2023 or 2024 ........................................................ | June 1, 2020. |
| 2025 or any year thereafter ................................. | June 1 of the year before the year of the control period. |

* * * * *

(vii) Provided that, if and when any covered unit is located in areas of Indian country within the borders of the State not subject to the State's SIP authority, the Administrator may modify his or her approval of the SIP revision to exclude the provisions in §§ 97.802 (definitions of "common designated representative", "common designated representative's assurance level", and "common designated representative's share"), 97.806(c)(2), and 97.825 of this chapter and the portions of other provisions of subpart EEEEE of part 97 of this chapter referencing §§ 97.802, 97.806(c)(2), and

97.825 and may modify any portion of the CSAPR Federal Implementation Plan that is not replaced by the SIP revision to include these provisions; and

(viii) Provided that the State must submit a complete SIP revision meeting the requirements of paragraphs (b)(9)(iii) through (vi) of this section by December 1 of the year before the year of the deadline for submission of allocations or auction results under paragraph (b)(9)(iii)(B) of this section applicable to the first control period for which the State wants to make allocations or hold an auction under paragraph (b)(9)(iii) of this section.

(10) *State-determined allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for 2024.* A State listed in paragraph (b)(2)(iii) of this section may adopt and include in a SIP revision, and the Administrator will approve, as CSAPR NO$_X$ Ozone Season Group 3 allowance allocation provisions replacing the provisions in § 97.1011(a)(1) of this chapter with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for the control period in 2024, a list of CSAPR NO$_X$ Ozone Season Group 3 units and the amount of CSAPR NO$_X$ Ozone Season Group 3 allowances

allocated to each unit on such list, provided that the list of units and allocations meets the following requirements:

(i) All of the units on the list must be units that are in the State and areas of Indian country within the borders of the State subject to the State's SIP authority and that commenced commercial operation before January 1, 2021;

(ii) The total amount of CSAPR NO$_X$ Ozone Season Group 3 allowance allocations on the list must not exceed the amount, under § 97.1010 of this chapter for the State and the control period in 2024, of the CSAPR NO$_X$ Ozone Season Group 3 trading budget minus the sum of the Indian country existing unit set-aside and the new unit set-aside;

\*     \*     \*     \*     \*

(v) \*     \*     \*

(A) By August 4, 2023, the State must notify the Administrator electronically in a format specified by the Administrator of the State's intent to submit to the Administrator a complete SIP revision meeting the requirements of paragraphs (b)(10)(i) through (iv) of this section by September 1, 2023; and

(B) The State must submit to the Administrator a complete SIP revision described in paragraph (b)(10)(v)(A) of this section by September 1, 2023.

(11) *Abbreviated SIP revisions replacing certain provisions of the Federal CSAPR NO$_X$ Ozone Season Group 3 Trading Program.* A State listed in paragraph (b)(2)(iii) of this section may adopt and include in a SIP revision, and the Administrator will approve, regulations replacing specified provisions of subpart GGGGG of part 97 of this chapter with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, and not substantively replacing any other provisions, as follows:

\*     \*     \*     \*     \*

(iii) \*     \*     \*

(A) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for any such control period not exceeding the amount, under §§ 97.1010 and 97.1021 of this chapter for the State and such control period, of the CSAPR NO$_X$ Ozone Season Group 3 trading budget minus the sum of the Indian country existing unit set-aside, the new unit set-aside, and the amount of any CSAPR NO$_X$ Ozone Season Group 3 allowances already allocated and recorded by the Administrator;

\*     \*     \*     \*     \*

(D) Does not provide for any change, after the submission deadlines in paragraph (b)(11)(iii)(B) of this section, in the allocations submitted to the Administrator by such deadlines and does not provide for any change in any allocation determined and recorded by the Administrator under subpart GGGGG of part 97 of this chapter under § 97.526(d) or § 97.826(d) or (e) of this chapter; and

(iv) Provided that the State must submit a complete SIP revision meeting the requirements of paragraph (b)(11)(iii) of this section by December 1 of the year before the year of the deadline for submission of allocations or auction results under paragraph (b)(11)(iii)(B) of this section applicable to the first control period for which the State wants to make allocations or hold an auction under paragraph (b)(11)(iii) of this section.

(12) *Full SIP revisions adopting State CSAPR NO$_X$ Ozone Season Group 3 Trading Programs.* A State listed in paragraph (b)(2)(iii) of this section may adopt and include in a SIP revision, and the Administrator will approve, as correcting the deficiency in the SIP that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (b)(1), (b)(2)(iii), and (b)(10) and (11) of this section with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, regulations that are substantively identical to the provisions of the CSAPR NO$_X$ Ozone Season Group 3 Trading Program set forth in §§ 97.1002 through 97.1035 of this chapter, except that the SIP revision:

\*     \*     \*     \*     \*

(iii) \*     \*     \*

(A) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for any such control period not exceeding the amount, under §§ 97.1010 and 97.1021 of this chapter for the State and such control period, of the CSAPR NO$_X$ Ozone Season Group 3 trading budget minus the sum of the Indian country existing unit set-aside, the new unit set-aside, and the amount of any CSAPR NO$_X$ Ozone Season Group 3 allowances already allocated and recorded by the Administrator;

\*     \*     \*     \*     \*

(D) Does not provide for any change, after the submission deadlines in paragraph (b)(12)(iii)(B) of this section, in the allocations submitted to the Administrator by such deadlines and does not provide for any change in any allocation determined and recorded by

the Administrator under subpart GGGGG of part 97 of this chapter or § 97.526(d) or § 97.826(d) or (e) of this chapter;

\*     \*     \*     \*     \*

(vi) Must not include any of the requirements imposed on any unit in areas of Indian country within the borders of the State not subject to the State's SIP authority in the provisions in §§ 97.1002 through 97.1035 of this chapter and must not include the provisions in §§ 97.1011(a)(2), 97.1012, and 97.1021(g) through (j) of this chapter, all of which provisions will continue to apply under any portion of the CSAPR Federal Implementation Plan that is not replaced by the SIP revision;

(vii) Provided that, if before the Administrator's approval of the SIP revision any covered unit is located in areas of Indian country within the borders of the State not subject to the State's SIP authority before the Administrator's approval of the SIP revision, the SIP revision must exclude the provisions in §§ 97.1002 (definitions of "common designated representative", "common designated representative's assurance level", and "common designated representative's share"), 97.1006(c)(2), and 97.1025 of this chapter and the portions of other provisions of subpart GGGGG of part 97 of this chapter referencing §§ 97.1002, 97.1006(c)(2), and 97.1025, and further provided that, if and when after the Administrator's approval of the SIP revision any covered unit is located in areas of Indian country within the borders of the State not subject to the State's SIP authority, the Administrator may modify his or her approval of the SIP revision to exclude these provisions and may modify any portion of the CSAPR Federal Implementation Plan that is not replaced by the SIP revision to include these provisions; and

(viii) Provided that the State must submit a complete SIP revision meeting the requirements of paragraphs (b)(12)(iii) through (vi) of this section by December 1 of the year before the year of the deadline for submission of allocations or auction results under paragraph (b)(12)(iii)(B) of this section applicable to the first control period for which the State wants to make allocations or hold an auction under paragraph (b)(12)(iii) of this section.

(13) *Withdrawal of CSAPR FIP provisions relating to NO$_X$ ozone season emissions; satisfaction of NO$_X$ SIP Call requirements.* Following promulgation of an approval by the Administrator of a State's SIP revision as correcting the SIP's deficiency that is the basis for the

CSAPR Federal Implementation Plan set forth in paragraphs (b)(1), (b)(2)(i), and (b)(3) and (4) of this section, paragraphs (b)(1), (b)(2)(ii), and (b)(7) and (8) of this section, or paragraphs (b)(1), (b)(2)(iii), and (b)(10) and (11) of this section for sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority—

(i) Except as provided in paragraph (b)(14) of this section, the provisions of paragraph (b)(2)(i), (ii), or (iii) of this section, as applicable, will no longer apply to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, unless the Administrator's approval of the SIP revision is partial or conditional, and will continue to apply to sources in areas of Indian country within the borders of the State not subject to the State's SIP authority, provided that if the CSAPR Federal Implementation Plan was promulgated as a partial rather than full remedy for an obligation of the State to address interstate air pollution, the SIP revision likewise will constitute a partial rather than full remedy for the State's obligation unless provided otherwise in the Administrator's approval of the SIP revision; and

*        *        *        *        *

(14) * * *

(ii) Notwithstanding the provisions of paragraph (b)(13)(i) of this section, if, at the time of any approval of a State's SIP revision under this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 1 allowances under subpart BBBBB of part 97 of this chapter, or allocations of CSAPR NO$_X$ Ozone Season Group 2 allowances under subpart EEEEE of part 97 of this chapter, or allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter, to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of such subpart authorizing the Administrator to complete the allocation and recordation of such allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(iii) Notwithstanding any discontinuation pursuant to paragraph (b)(2)(i)(B), (b)(2)(ii)(B) or (C), or (b)(13)(i) of this section of the applicability of subpart BBBBB or EEEEE of part 97 of this chapter to the sources in a State and areas of Indian country within the borders of the State

subject to the State's SIP authority with regard to emissions occurring in any control period, the following provisions shall continue to apply with regard to all CSAPR NO$_X$ Ozone Season Group 1 allowances and CSAPR NO$_X$ Ozone Season Group 2 allowances at any time allocated for any control period to any source or other entity in the State and areas of Indian country within the borders of the State subject to the State's SIP authority and shall apply to all entities, wherever located, that at any time held or hold such allowances:

(A) The provisions of §§ 97.526(c) and 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 1 allowances and CSAPR NO$_X$ Ozone Season Group 2 allowances between certain Allowance Management System accounts under common control);

(B) The provisions of §§ 97.526(d) and 97.826(d) and (e) of this chapter (concerning the conversion of unused CSAPR NO$_X$ Ozone Season Group 1 allowances allocated for specified control periods to different amounts of CSAPR NO$_X$ Ozone Season Group 2 allowances or CSAPR NO$_X$ Ozone Season Group 3 allowances and the conversion of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for specified control periods to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances); and

(C) The provisions of § 97.811(d) and (e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for specified control periods and recorded in specified Allowance Management System accounts).

(15) * * *

(ii) For each of the following States, the Administrator has approved a SIP revision under paragraph (b)(4) of this section as replacing the CSAPR NO$_X$ Ozone Season Group 1 allowance allocation provisions in §§ 97.511(a) and (b)(1) and 97.512(a) of this chapter with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for the control period in 2017 or any subsequent year: [none].

*        *        *        *        *

(16) * * *

(i) * * *

(B) For each of the following States, the Administrator has approved a SIP revision under paragraph (b)(8) of this section as replacing the CSAPR NO$_X$ Ozone Season Group 2 allowance allocation provisions in §§ 97.811(a) and (b)(1) and 97.812(a) of this chapter with

regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for the control period in 2019 or any subsequent year: New York.

(C) For each of the following States, the Administrator has approved a SIP revision under paragraph (b)(9) of this section as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (b)(1), (b)(2)(ii), and (b)(7) and (8) of this section with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority: Alabama, Indiana, and Missouri.

(ii) * * *

(B) Notwithstanding any provision of subpart EEEEE of part 97 of this chapter or any State's SIP, with regard to any State listed in paragraph (b)(2)(ii)(C) of this section and any control period that begins after December 31, 2022, the Administrator will not carry out any of the functions set forth for the Administrator in subpart EEEEE of part 97 of this chapter, except §§ 97.811(e) and 97.826(c) and (e) of this chapter, or in any emissions trading program provisions in a State's SIP approved under paragraph (b)(8) or (9) of this section.

(17) * * *

(i) For each of the following States, the Administrator has approved a SIP revision under paragraph (b)(10) of this section as replacing the CSAPR NO$_X$ Ozone Season Group 3 allowance allocation provisions in § 97.1011(a)(1) of this chapter with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for the control period in 2024: [none].

(ii) For each of the following States, the Administrator has approved a SIP revision under paragraph (b)(11) of this section as replacing the CSAPR NO$_X$ Ozone Season Group 3 allowance allocation provisions in § 97.1011(a)(1) of this chapter with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for the control period in 2025 or any subsequent year: [none].

(iii) For each of the following States, the Administrator has approved a SIP revision under paragraph (b)(12) of this section as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (b)(1), (b)(2)(iii), and (b)(10) and (11) of this section with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority: [none].

■ 3. Amend § 52.39 by:

■ a. In paragraph (a), removing "(SO₂), except" and adding in its place "(SO₂) for sources meeting the applicability criteria set forth in subparts CCCCC and DDDDD, except";

■ b. In paragraph (d) introductory text, removing "the State and" and adding in its place "sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for";

■ c. In paragraph (d)(1), removing "State and" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority and that";

■ d. In paragraph (e) introductory text, removing "for the State's sources, and" and adding in its place "with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, and";

■ e. Revising table 1 to paragraph (e)(1)(ii);

■ f. In paragraph (e)(2), removing "deadlines for submission of allocations or auction results under paragraphs (e)(1)(ii) and (iii)" and adding in its place "deadline for submission of allocations or auction results under paragraph (e)(1)(ii)";

■ g. In paragraph (f) introductory text, removing "State (but not sources in any Indian country within the borders of the State), regulations" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, regulations";

■ h. Revising table 2 to paragraph (f)(1)(ii);

■ i. In paragraph (f)(4), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority";

■ j. In paragraph (f)(5), removing "Indian country within the borders of the State, the" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority, the";

■ k. In paragraph (f)(6), removing "deadlines for submission of allocations or auction results under paragraphs (f)(1)(ii) and (iii)" and adding in its place "deadline for submission of allocations or auction results under paragraph (f)(1)(ii)";

■ l. In paragraph (g) introductory text:

■ i. Removing "(c)(1) or (2)" and adding in its place "(c)"; and

■ ii. Removing "the State and" and adding in its place "sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for";

■ m. In paragraph (g)(1), removing "State and" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority and that";

■ n. In paragraph (h) introductory text, removing "for the State's sources, and" and adding in its place "with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, and";

■ o. Revising table 3 to paragraph (h)(1)(ii);

■ p. In paragraph (h)(2), removing "deadlines for submission of allocations or auction results under paragraphs (h)(1)(ii) and (iii)" and adding in its place "deadline for submission of allocations or auction results under paragraph (h)(1)(ii)";

■ q. In paragraph (i) introductory text, removing "State (but not sources in any Indian country within the borders of the State), regulations" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, regulations";

■ r. Revising table 4 to paragraph (i)(1)(ii);

■ s. In paragraph (i)(4), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority";

■ t. In paragraph (i)(5), removing "Indian country within the borders of the State, the" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority, the";

■ u. In paragraph (i)(6), removing "deadlines for submission of allocations or auction results under paragraphs (i)(1)(ii) and (iii)" and adding in its place "deadline for submission of allocations or auction results under paragraph (i)(1)(ii)";

■ v. Revising paragraphs (j) and (k)(2);

■ w. Adding paragraph (k)(3);

■ x. In paragraphs (l)(1) and (2), removing "the State and" and adding in its place "sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for";

■ y. In paragraph (l)(3), removing "State (but not sources in any Indian country within the borders of the State):" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority:".

■ z. In paragraphs (m)(1) and (2), removing "the State and" and adding in its place "sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for"; and

■ aa. In paragraph (m)(3), removing "State (but not sources in any Indian country within the borders of the State):" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority:".

The revisions and addition read as follows:

**§ 52.39  What are the requirements of the Federal Implementation Plans (FIPs) for the Cross-State Air Pollution Rule (CSAPR) relating to emissions of sulfur dioxide?**

\*    \*    \*    \*    \*

(e) \*  \*  \*

(1) \*  \*  \*

(ii) \*  \*  \*

TABLE 1 TO PARAGRAPH (e)(1)(ii)

| Year of the control period for which CSAPR SO₂ group 1 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the administrator |
| --- | --- |
| 2017 or 2018 | June 1, 2016. |
| 2019 or 2020 | June 1, 2017. |
| 2021 or 2022 | June 1, 2018. |
| 2023 | June 1, 2019. |
| 2024 | June 1, 2020. |
| 2025 or any year thereafter | June 1 of the year before the year of the control period. |

\* \* \* \* \*                    (ii) \* \* \*

(f) \* \* \*

(1) \* \* \*

### TABLE 2 TO PARAGRAPH (f)(1)(ii)

| Year of the control period for which CSAPR SO$_2$ group 1 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the administrator |
|---|---|
| 2017 or 2018 ............................................................. | June 1, 2016. |
| 2019 or 2020 ............................................................. | June 1, 2017. |
| 2021 or 2022 ............................................................. | June 1, 2018. |
| 2023 ......................................................................... | June 1, 2019. |
| 2024 ......................................................................... | June 1, 2020. |
| 2025 or any year thereafter ...................................... | June 1 of the year before the year of the control period. |

\* \* \* \* \*                    (ii) \* \* \*

(h) \* \* \*

(1) \* \* \*

### TABLE 3 TO PARAGRAPH (h)(1)(ii)

| Year of the control period for which CSAPR SO$_2$ group 2 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the administrator |
|---|---|
| 2017 or 2018 ............................................................. | June 1, 2016. |
| 2019 or 2020 ............................................................. | June 1, 2017. |
| 2021 or 2022 ............................................................. | June 1, 2018. |
| 2023 ......................................................................... | June 1, 2019. |
| 2024 ......................................................................... | June 1, 2020. |
| 2025 or any year thereafter ...................................... | June 1 of the year before the year of the control period. |

\* \* \* \* \*                    (ii) \* \* \*

(i) \* \* \*

(1) \* \* \*

### TABLE 4 TO PARAGRAPH (i)(1)(ii)

| Year of the control period for which CSAPR SO$_2$ group 2 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the administrator |
|---|---|
| 2017 or 2018 ............................................................. | June 1, 2016. |
| 2019 or 2020 ............................................................. | June 1, 2017. |
| 2021 or 2022 ............................................................. | June 1, 2018. |
| 2023 ......................................................................... | June 1, 2019. |
| 2024 ......................................................................... | June 1, 2020. |
| 2025 or any year thereafter ...................................... | June 1 of the year before the year of the control period. |

\* \* \* \* \*

(j) *Withdrawal of CSAPR FIP provisions relating to SO$_2$ emissions.* Except as provided in paragraph (k) of this section, following promulgation of an approval by the Administrator of a State's SIP revision as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (a), (b), (d), and (e) of this section or paragraphs (a), (c)(1), (g), and (h) of this section for sources in the State and Indian country within the borders of the State subject to the State's SIP authority, the provisions of paragraph (b) or (c)(1) of this section, as applicable, will no longer apply to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority,

unless the Administrator's approval of the SIP revision is partial or conditional, and will continue to apply to sources in areas of Indian country within the borders of the State not subject to the State's SIP authority, provided that if the CSAPR Federal Implementation Plan was promulgated as a partial rather than full remedy for an obligation of the State to address interstate air pollution, the SIP revision likewise will constitute a partial rather than full remedy for the State's obligation unless provided otherwise in the Administrator's approval of the SIP revision.

(k) \* \* \*

(2) Notwithstanding the provisions of paragraph (j) of this section, if, at the time of any approval of a State's SIP revision under this section, the

Administrator has already started recording any allocations of CSAPR SO$_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter, or allocations of CSAPR SO$_2$ Group 2 allowances under subpart DDDDD of part 97 of this chapter, to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of such subpart authorizing the Administrator to complete the allocation and recordation of such allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(3) Notwithstanding any discontinuation pursuant to paragraph

**215a**

(c)(2) or (j) of this section of the applicability of subpart CCCCC or DDDDD of part 97 of this chapter to the sources in a State and areas of Indian country within the borders of the State subject to the State's SIP authority with regard to emissions occurring in any control period, the following provisions shall continue to apply with regard to all CSAPR $SO_2$ Group 1 allowances and CSAPR $SO_2$ Group 2 allowances at any time allocated for any control period to any source or other entity in the State and areas of Indian country within the borders of the State subject to the State's SIP authority and shall apply to all entities, wherever located, that at any time held or hold such allowances:

(i) The provisions of §§ 97.626(c) and 97.726(c) of this chapter (concerning the transfer of CSAPR $SO_2$ Group 1 allowances and CSAPR $SO_2$ Group 2 allowances between certain Allowance Management System accounts under common control).

(ii) [Reserved]

\* \* \* \* \*

■ 4. Add §§ 52.40 through 52.46 to subpart A to read as follows:

Sec.

\* \* \* \* \*

52.40 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from sources not subject to the CSAPR ozone season trading program?

52.41 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Pipeline Transportation of Natural Gas Industry?

52.42 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Cement and Concrete Product Manufacturing Industry?

52.43 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Iron and Steel Mills and Ferroalloy Manufacturing Industry?

52.44 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Glass and Glass Product Manufacturing Industry?

52.45 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, the Pulp, Paper, and Paperboard Mills Industries, Metal Ore Mining, and the Iron and Steel and Ferroalloy Manufacturing Industries?

52.46 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from Municipal Waste Combustors?

\* \* \* \* \*

### § 52.40 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from sources not subject to the CSAPR ozone season trading program?

(a) *Purpose.* This section establishes Federal Implementation Plan requirements for new and existing units in the industries specified in paragraph (b) of this section to eliminate significant contribution to nonattainment, or interference with maintenance, of the 2015 8-hour ozone National Ambient Air Quality Standards in other states pursuant to 42 U.S.C. 7410(a)(2)(D)(i)(I).

(b) *Definitions.* The terms used in this section and §§ 52.41 through 52.46 are defined as follows:

*Calendar year* means the period between January 1 and December 31, inclusive, for a given year.

*Existing affected unit* means any affected unit for which construction commenced before August 4, 2023.

*New affected unit* means any affected unit for which construction commenced on or after August 4, 2023.

*Operator* means any person who operates, controls, or supervises an affected unit and shall include, but not be limited to, any holding company, utility system, or plant manager of such affected unit.

*Owner* means any holder of any portion of the legal or equitable title in an affected unit.

*Potential to emit* means the maximum capacity of a unit to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the unit to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design only if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a unit.

*Rolling average* means the weighted average of all data, meeting quality assurance and quality control (QA/QC) requirements in this part or otherwise normalized, collected during the applicable averaging period. The period of a rolling average stipulates the frequency of data averaging and reporting. To demonstrate compliance with an operating parameter a 30-day rolling average period requires calculation of a new average value each operating day and shall include the average of all the hourly averages of the specific operating parameter. For demonstration of compliance with an emissions limit based on pollutant concentration, a 30-day rolling average is comprised of the average of all the hourly average concentrations over the previous 30 operating days. For demonstration of compliance with an emissions limit based on lbs-pollutant per production unit, the 30-day rolling average is calculated by summing the hourly mass emissions over the previous 30 operating days, then dividing that sum by the total production during the same period.

(c) *General requirements.* (1) The $NO_X$ emissions limitations or emissions control requirements and associated compliance requirements for the following listed source categories not subject to the CSAPR ozone season trading program constitute the Federal Implementation Plan provisions that relate to emissions of $NO_X$ during the ozone season (defined as May 1 through September 30 of a calendar year): §§ 52.41 for engines in the Pipeline Transportation of Natural Gas Industry, 52.42 for kilns in the Cement and Concrete Product Manufacturing Industry, 52.43 for reheat furnaces in the Iron and Steel Mills and Ferroalloy Manufacturing Industry, 52.44 for furnaces in the Glass and Glass Product Manufacturing Industry, 52.45 for boilers in the Iron and Steel Mills and Ferroalloy Manufacturing, Metal Ore Mining, Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills industries, and 52.46 for Municipal Waste Combustors.

(2) The provisions of this section or § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 apply to affected units located in each of the following States, including Indian country located within the borders of such States, beginning in the 2026 ozone season and in each subsequent ozone season: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia.

(3) The testing, monitoring, recordkeeping, and reporting requirements of this section or § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 only apply during the ozone season, except as otherwise specified in these sections. Additionally, if an owner or operator of an affected unit chooses to conduct a performance or compliance test outside of the ozone season, all recordkeeping, reporting, and notification requirements associated

with that test shall apply, without regard to whether they occur during the ozone season.

(d) *Requests for extension of compliance.* (1) The owner or operator of an existing affected unit under § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 that cannot comply with the applicable requirements in those sections by May 1, 2026, due to circumstances entirely beyond the owner or operator's control, may request an initial compliance extension to a date certain no later than May 1, 2027. The extension request must contain a demonstration of necessity consistent with the requirements of paragraph (d)(3) of this section.

(2) If, after the EPA has granted a request for an initial compliance extension, the source remains unable to comply with the applicable requirements in § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 by the extended compliance date due to circumstances entirely beyond the owner or operator's control, the owner or operator may apply for a second compliance extension to a date certain no later than May 1, 2029. The extension request must contain an updated demonstration of necessity consistent with the requirements of paragraph (d)(3) of this section.

(3) Each request for a compliance extension shall demonstrate that the owner or operator has taken all steps possible to install the controls necessary for compliance with the applicable requirements in § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 by the applicable compliance date and shall:

(i) Identify each affected unit for which the owner or operator is seeking the compliance extension;

(ii) Identify and describe the controls to be installed at each affected unit to comply with the applicable requirements in § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46;

(iii) Identify the circumstances entirely beyond the owner or operator's control that necessitate additional time to install the identified controls;

(iv) Identify the date(s) by which on-site construction, installation of control equipment, and/or process changes will be initiated;

(v) Identify the owner or operator's proposed compliance date. A request for an initial compliance extension under paragraph (d)(1) of this section must specify a proposed compliance date no later than May 1, 2027, and state whether the owner or operator anticipates a need to request a second compliance extension. A request for a second compliance extension under paragraph (d)(2) of this section must

specify a proposed compliance date no later than May 1, 2029, and identify additional actions taken by the owner or operator to ensure that the affected unit(s) will be in compliance with the applicable requirements in this section by that proposed compliance date;

(vi) Include all information obtained from control technology vendors demonstrating that the identified controls cannot be installed by the applicable compliance date;

(vii) Include any and all contract(s) entered into for the installation of the identified controls or an explanation as to why no contract is necessary or obtainable; and

(viii) Include any permit(s) obtained for the installation of the identified controls or, where a required permit has not yet been issued, a copy of the permit application submitted to the permitting authority and a statement from the permitting authority identifying its anticipated timeframe for issuance of such permit(s).

(4) Each request for a compliance extension shall be submitted via the Compliance and Emissions Data Reporting Interface (CEDRI) or analogous electronic submission system provided by the EPA no later than 180 days prior to the applicable compliance date. Until an extension has been granted by the Administrator under this section, the owner or operator of an affected unit shall comply with all applicable requirements of this section and shall remain subject to the May 1, 2026 compliance date or the initial extended compliance date, as applicable. A denial will be effective as of the date of denial.

(5) The owner or operator of an affected unit who has requested a compliance extension under this paragraph (d)(5) and is required to have a title V permit shall apply to have the relevant title V permit revised to incorporate the conditions of the extension of compliance. The conditions of a compliance extension granted under this paragraph (d)(5) will be incorporated into the affected unit's title V permit according to the provisions of an EPA-approved state operating permit program or the Federal title V regulations in 40 CFR part 71, whichever apply.

(6) Based on the information provided in any request made under paragraph (d) of this section or other information, the Administrator may grant an extension of time to comply with applicable requirements in § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 consistent with the provisions of paragraph (d)(1) or (2) of this section. The decision to grant an extension will

be provided by notification via the CEDRI or analogous electronic submission system provided by the EPA and publicly available, and will identify each affected unit covered by the extension; specify the termination date of the extension; and specify any additional conditions that the Administrator deems necessary to ensure timely installation of the necessary controls (*e.g.,* the date(s) by which on-site construction, installation of control equipment, and/or process changes will be initiated).

(7) The Administrator will provide notification via the CEDRI or analogous electronic submission system provided by the EPA to the owner or operator of an affected unit who has requested a compliance extension under this paragraph (d)(7) whether the submitted request is complete, that is, whether the request contains sufficient information to make a determination, within 60 calendar days after receipt of the original request and within 60 calendar days after receipt of any supplementary information.

(8) The Administrator will provide notification via the CEDRI or analogous electronic submission system provided by the EPA, which shall be publicly available, to the owner or operator of a decision to grant or intention to deny a request for a compliance extension within 60 calendar days after providing written notification pursuant to paragraph (d)(7) of this section that the submitted request is complete.

(9) Before denying any request for an extension of compliance, the Administrator will provide notification via the CEDRI or analogous electronic submission system provided by the EPA to the owner or operator in writing of the Administrator's intention to issue the denial, together with:

(i) Notice of the information and findings on which the intended denial is based; and

(ii) Notice of opportunity for the owner or operator to present via the CEDRI or analogous electronic submission system provided by the EPA, within 15 calendar days after he/she is notified of the intended denial, additional information or arguments to the Administrator before further action on the request.

(10) The Administrator's final decision to deny any request for an extension will be provided via the CEDRI or analogous electronic submission system provided by the EPA and publicly available, and will set forth the specific grounds on which the denial is based. The final decision will be made within 60 calendar days after presentation of additional information

or argument (if the request is complete), or within 60 calendar days after the deadline for the submission of additional information or argument under paragraph (d)(9)(ii) of this section, if no such submission is made.

(11) The granting of an extension under this section shall not abrogate the Administrator's authority under section 114 of the Clean Air Act (CAA or the Act).

(e) *Requests for case-by-case emissions limits.* (1) The owner or operator of an existing affected unit under § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 that cannot comply with the applicable requirements in those sections due to technical impossibility or extreme economic hardship may submit to the Administrator, by August 5, 2024, a request for approval of a case-by-case emissions limit. The request shall contain information sufficient for the Administrator to confirm that the affected unit is unable to comply with the applicable emissions limit, due to technical impossibility or extreme economic hardship, and to establish an appropriate alternative case-by-case emissions limit for the affected unit. Until a case-by-case emissions limit has been approved by the Administrator under this section, the owner or operator shall remain subject to all applicable requirements in § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46. A denial will be effective as of the date of denial.

(2) Each request for a case-by-case emissions limit shall include, but not be limited to, the following:

(i) A demonstration that the affected unit cannot achieve the applicable emissions limit with available control technology due to technical impossibility or extreme economic hardship.

(A) A demonstration of technical impossibility shall include:

(*1*) Uncontrolled $NO_X$ emissions for the affected unit established with a CEMS, or stack tests obtained during steady state operation in accordance with the applicable reference test methods of 40 CFR part 60, appendix A–4, any alternative test method approved by the EPA as of June 5, 2023, under 40 CFR 59.104(f), 60.8(b)(3), 61.13(h)(1)(ii), 63.7(e)(2)(ii)(2), or 65.158(a)(2) and available at the EPA's website (*https://www.epa.gov/emc/broadly-applicable-approved-alternative-test-methods*), or other methods and procedures approved by the EPA through notice-and-comment rulemaking; and

(*2*) A demonstration that the affected unit cannot meet the applicable

emissions limit even with available control technology, including:

(*i*) Stack test data or other emissions data for the affected unit; or

(*ii*) A third-party engineering assessment demonstrating that the affected unit cannot meet the applicable emissions limit with available control technology.

(B) A demonstration of extreme economic hardship shall include at least three vendor estimates of the costs of installing control technology necessary to meet the applicable emissions limit and other information that demonstrates, to the satisfaction of the Administrator, that the cost of complying with the applicable emissions limit would present an extreme economic hardship relative to the costs borne by other comparable sources in the industry.

(ii) An analysis of available control technology options and a proposed case-by-case emissions limit that represents the lowest emissions limitation technically achievable by the affected unit without causing extreme economic hardship relative to the costs borne by other comparable sources in the industry. The owner or operator may propose additional measures to reduce $NO_X$ emissions, such as operational standards or work practice standards.

(iii) Calculations of the $NO_X$ emissions reduction to be achieved through implementation of the proposed case-by-case emissions limit and any additional proposed measures, the difference between this $NO_X$ emissions reduction level and the $NO_X$ emissions reductions that would have occurred if the affected unit complied with the applicable emissions limitations in § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46, and a description of the methodology used for these calculations.

(3) The owner or operator of an affected unit who has requested a case-by-case emissions limit under this paragraph (e)(3) and is required to have a title V permit shall apply to have the relevant title V permit revised to incorporate the case-by-case emissions limit. Any case-by-case emissions limit approved under this paragraph (e)(3) will be incorporated into the affected unit's title V permit according to the provisions of an EPA-approved state operating permit program or the Federal title V regulations in 40 CFR part 71, whichever apply.

(4) Based on the information provided in any request made under this paragraph (e)(4) or other information, the Administrator may approve a case-by-case emissions limit that will apply to an affected unit in lieu of the

applicable emissions limit in § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46. The decision to approve a case-by-case emissions limit will be provided via the CEDRI or analogous electronic submission system provided by the EPA in paragraph (d) of this section and publicly available, and will identify each affected unit covered by the case-by-case emissions limit.

(5) The Administrator will provide notification via the CEDRI or analogous electronic submission system provided by the EPA in paragraph (d) of this section to the owner or operator of an affected unit who has requested a case-by-case emissions limit under this paragraph (e)(5) whether the submitted request is complete, that is, whether the request contains sufficient information to make a determination, within 60 calendar days after receipt of the original request and within 60 calendar days after receipt of any supplementary information.

(6) The Administrator will provide notification via the CEDRI or analogous electronic submission system described by the EPA in paragraph (d) of this section, which shall be publicly available, to the owner or operator of a decision to approve or intention to deny the request within 60 calendar days after providing notification pursuant to paragraph (e)(5) of this section that the submitted request is complete.

(7) Before denying any request for a case-by-case emissions limit, the Administrator will provide notification via the CEDRI or analogous electronic submission system provided by the EPA to the owner or operator in writing of the Administrator's intention to issue the denial, together with:

(i) Notice of the information and findings on which the intended denial is based; and

(ii) Notice of opportunity for the owner or operator to present via the CEDRI or analogous electronic submission system provided by the EPA, within 15 calendar days after he/she is notified of the intended denial, additional information or arguments to the Administrator before further action on the request.

(8) The Administrator's final decision to deny any request for a case-by-case emissions limit will be provided by notification via the CEDRI or analogous electronic submission system provided by the EPA and publicly available, and will set forth the specific grounds on which the denial is based. The final decision will be made within 60 calendar days after presentation of additional information or argument (if the request is complete), or within 60 calendar days after the deadline for the

submission of additional information or argument under paragraph (e)(7)(ii) of this section, if no such submission is made.

(9) The approval of a case-by-case emissions limit under this section shall not abrogate the Administrator's authority under section 114 of the Act.

(f) *Recordkeeping requirements.* (1) The owner or operator of an affected unit subject to the provisions of this section or § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 shall maintain files of all information (including all reports and notifications) required by these sections recorded in a form suitable and readily available for expeditious inspection and review. The files shall be retained for at least 5 years following the date of each occurrence, measurement, maintenance, corrective action, report, or record. At minimum, the most recent 2 years of data shall be retained on site. The remaining 3 years of data may be retained off site. Such files may be maintained on microfilm, on a computer, on computer floppy disks, on magnetic tape disks, or on microfiche.

(2) Any records required to be maintained by § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 that are submitted electronically via the EPA's Compliance and Emissions Data Reporting Interface (CEDRI) may be maintained in electronic format. This ability to maintain electronic copies does not affect the requirement for facilities to make records, data, and reports available upon request to the EPA as part of an on-site compliance evaluation.

(g) *CEDRI reporting requirements.* (1) You shall submit the results of the performance test following the procedures specified in paragraphs (g)(1)(i) through (iii) of this section:

(i) Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) at the time of the test. Submit the results of the performance test to the EPA via the CEDRI or analogous electronic reporting approach provided by the EPA to report data required by § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46, which can be accessed through the EPA's Central Data Exchange (CDX) (*https://cdx.epa.gov/*). The data must be submitted in a file format generated using the EPA's ERT. Alternatively, you may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website.

(ii) Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test. The results of the performance test must be included as an attachment in the ERT or an alternate electronic file consistent with the XML schema listed on the EPA's ERT website. Submit the ERT generated package or alternative file to the EPA via CEDRI.

(iii)(A) The EPA will make all the information submitted through CEDRI available to the public without further notice to you. Do not use CEDRI to submit information you claim as confidential business information (CBI). Although we do not expect persons to assert a claim of CBI, if you wish to assert a CBI claim for some of the information submitted under paragraph (g)(1) or (2) of this section, you should submit a complete file, including information claimed to be CBI, to the EPA.

(B) The file must be generated using the EPA's ERT or an alternate electronic file consistent with the XML schema listed on the EPA's ERT website.

(C) Clearly mark the part or all of the information that you claim to be CBI. Information not marked as CBI may be authorized for public release without prior notice. Information marked as CBI will not be disclosed except in accordance with procedures set forth in 40 CFR part 2.

(D) The preferred method to receive CBI is for it to be transmitted electronically using email attachments, File Transfer Protocol, or other online file sharing services. Electronic submissions must be transmitted directly to the Office of Air Quality Planning and Standards (OAQPS) CBI Office at the email address *oaqpscbi@epa.gov*, and as described in this paragraph (g), should include clear CBI markings and be to the attention of Lead of 2015 Ozone Transport FIP. If assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please email *oaqpscbi@epa.gov* to request a file transfer link.

(E) If you cannot transmit the file electronically, you may send CBI information through the postal service to the following address: OAQPS Document Control Officer (C404–02), OAQPS, U.S. Environmental Protection Agency, Research Triangle Park, North Carolina 27711, Attention Lead of 2015 Ozone Transport FIP. The mailed CBI material should be double wrapped and clearly marked. Any CBI markings should not show through the outer envelope.

(F) All CBI claims must be asserted at the time of submission. Anything submitted using CEDRI cannot later be claimed CBI. Furthermore, under CAA section 114(c), emissions data is not entitled to confidential treatment, and the EPA is required to make emissions data available to the public. Thus, emissions data will not be protected as CBI and will be made publicly available.

(G) You must submit the same file submitted to the CBI office with the CBI omitted to the EPA via the EPA's CDX as described in paragraphs (g)(1) and (2) of this section.

(2) Annual reports must be submitted via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46.

(3) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of EPA system outage for failure to timely comply with that reporting requirement. To assert a claim of EPA system outage, you must meet the requirements outlined in paragraphs (g)(3)(i) through (vii) of this section.

(i) You must have been or will be precluded from accessing CEDRI and submitting a required report within the time prescribed due to an outage of either the EPA's CEDRI or CDX systems.

(ii) The outage must have occurred within the period of time beginning five business days prior to the date that the submission is due.

(iii) The outage may be planned or unplanned.

(iv) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(v) You must provide to the Administrator a written description identifying:

(A) The date(s) and time(s) when CDX or CEDRI was accessed and the system was unavailable;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to EPA system outage;

(C) A description of measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(vi) The decision to accept the claim of EPA system outage and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(vii) In any circumstance, the report must be submitted electronically as soon as possible after the outage is resolved.

(4) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of force majeure for failure to timely comply with that reporting requirement. To assert a claim of force majeure, you must meet the requirements outlined in paragraphs (g)(4)(i) through (v) of this section.

(i) You may submit a claim if a force majeure event is about to occur, occurs, or has occurred or there are lingering effects from such an event within the period of time beginning five business days prior to the date the submission is due. For the purposes of this section, a force majeure event is defined as an event that will be or has been caused by circumstances beyond the control of the affected unit, its contractors, or any entity controlled by the affected unit that prevents you from complying with the requirement to submit a report electronically within the time period prescribed. Examples of such events are acts of nature (*e.g.,* hurricanes, earthquakes, or floods), acts of war or terrorism, or equipment failure or safety hazard beyond the control of the affected unit (*e.g.,* large scale power outage).

(ii) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(iii) You must provide to the Administrator:

(A) A written description of the force majeure event;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to the force majeure event;

(C) A description of measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(iv) The decision to accept the claim of force majeure and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(v) In any circumstance, the reporting must occur as soon as possible after the force majeure event occurs.

**§ 52.41   What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Pipeline Transportation of Natural Gas Industry?**

(a) *Definitions.* All terms not defined in this paragraph (a) shall have the meaning given to them in the Act and in subpart A of 40 CFR part 60.

*Affected unit* means an engine meeting the applicability criteria of this section.

*Cap* means the total amount of $NO_X$ emissions, in tons per day on a 30-day rolling average basis, that is collectively allowed from all of the affected units covered by a Facility-Wide Averaging Plan and is calculated as the sum each affected unit's $NO_X$ emissions at the emissions limit applicable to such unit under paragraph (c) of this section, converted to tons per day in accordance with paragraph (d)(3) of this section.

*Emergency engine* means any stationary reciprocating internal combustion engine (RICE) that meets all of the criteria in paragraphs (i) and (ii) of this definition. All emergency stationary RICE must comply with the requirements specified in paragraph (b)(1) of this section in order to be considered emergency engines. If the engine does not comply with the requirements specified in paragraph (b)(1), it is not considered an emergency engine under this section.

(i) The stationary engine is operated to provide electrical power or mechanical work during an emergency situation. Examples include stationary RICE used to produce power for critical networks or equipment (including power supplied to portions of a facility) when electric power from the local utility (or the normal power source, if the facility runs on its own power production) is interrupted, or stationary RICE used to pump water in the case of fire or flood, etc.

(ii) The stationary RICE is operated under limited circumstances for purposes other than those identified in paragraph (i) of this definition, as specified in paragraph (b)(1) of this section.

*Facility* means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control). Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same "Major Group" (*i.e.,* which have the same first two digit code as described in the Standard Industrial Classification Manual, 1987). For purposes of this section, a facility may

not extend beyond the 20 states identified in § 52.40(b)(2).

*Four stroke* means any type of engine which completes the power cycle in two crankshaft revolutions, with intake and compression strokes in the first revolution and power and exhaust strokes in the second revolution.

*ISO conditions* means 288 Kelvin (15 °C), 60 percent relative humidity, and 101.3 kilopascals pressure.

*Lean burn* means any two-stroke or four-stroke spark ignited reciprocating internal combustion engine that does not meet the definition of a rich burn engine.

*Local Distribution Companies (LDCs)* are companies that own or operate distribution pipelines, but not interstate pipelines or intrastate pipelines, that physically deliver natural gas to end users and that are within a single state that are regulated as separate operating companies by State public utility commissions or that operate as independent municipally-owned distribution systems. LDCs do not include pipelines (both interstate and intrastate) delivering natural gas directly to major industrial users and farm taps upstream of the local distribution company inlet.

*Local Distribution Company (LDC) custody transfer station* means a metering station where the LDC receives a natural gas supply from an upstream supplier, which may be an interstate transmission pipeline or a local natural gas producer, for delivery to customers through the LDC's intrastate transmission or distribution lines.

*Nameplate rating* means the manufacturer's maximum design capacity in horsepower (hp) at the installation site conditions. Starting from the completion of any physical change in the engine resulting in an increase in the maximum output (in hp) that the engine is capable of producing on a steady state basis and during continuous operation, such increased maximum output shall be as specified by the person conducting the physical change.

*Natural gas* means a fluid mixture of hydrocarbons (*e.g.,* methane, ethane, or propane) or non-hydrocarbons, composed of at least 70 percent methane by volume or that has a gross calorific value between 35 and 41 megajoules (MJ) per dry standard cubic meter (950 and 1,100 Btu per dry standard cubic foot), that maintains a gaseous state under ISO conditions. Natural gas does not include the following gaseous fuels: Landfill gas, digester gas, refinery gas, sour gas, blast furnace gas, coal-derived gas, producer gas, coke oven gas, or any gaseous fuel produced in a process

which might result in highly variable $CO_2$ content or heating value.

*Natural gas-fired* means that greater than or equal to 90% of the engine's heat input, excluding recirculated or recuperated exhaust heat, is derived from the combustion of natural gas.

*Natural gas processing plant* means any processing site engaged in the extraction of natural gas liquids from field gas, fractionation of mixed natural gas liquids to natural gas products, or both. A Joule-Thompson valve, a dew point depression valve, or an isolated or standalone Joule-Thompson skid is not a natural gas processing plant.

*Natural gas production facility* means all equipment at a single stationary source directly associated with one or more natural gas wells upstream of the natural gas processing plant. This equipment includes, but is not limited to, equipment used for storage, separation, treating, dehydration, artificial lift, combustion, compression, pumping, metering, monitoring, and flowline.

*Operating day* means a 24-hour period beginning at 12:00 midnight during which any fuel is combusted at any time in the engine.

*Pipeline transportation of natural gas* means the movement of natural gas through an interconnected network of compressors and pipeline components, including the compressor and pipeline network used to transport the natural gas from processing plants over a distance (intrastate or interstate) to and from storage facilities, to large natural gas end-users, and prior to delivery to a ''local distribution company custody transfer station'' (as defined in this section) of an LDC that provides the natural gas to end-users. *Pipeline transportation of natural gas* does not include natural gas production facilities, natural gas processing plants, or the portion of a compressor and pipeline network that is upstream of a natural gas processing plant.

*Reciprocating internal combustion engine (RICE)* means a reciprocating engine in which power, produced by heat and/or pressure that is developed in the engine combustion chambers by the burning of a mixture of air and fuel, is subsequently converted to mechanical work.

*Rich burn* means any four-stroke spark ignited reciprocating internal combustion engine where the manufacturer's recommended operating air/fuel ratio divided by the stoichiometric air/fuel ratio at full load conditions is less than or equal to 1.1. Internal combustion engines originally manufactured as rich burn engines but modified with passive emissions control

technology for nitrogen oxides $(NO_X)$ (such as pre-combustion chambers) will be considered lean burn engines. Existing affected unit where there are no manufacturer's recommendations regarding air/fuel ratio will be considered rich burn engines if the excess oxygen content of the exhaust at full load conditions is less than or equal to 2 percent.

*Spark ignition* means a reciprocating internal combustion engine utilizing a spark plug (or other sparking device) to ignite the air/fuel mixture and with operating characteristics significantly similar to the theoretical Otto combustion cycle.

*Stoichiometric* means the theoretical air-to-fuel ratio required for complete combustion.

*Two stroke* means a type of reciprocating internal combustion engine which completes the power cycle in a single crankshaft revolution by combining the intake and compression operations into one stroke (one-half revolution) and the power and exhaust operations into a second stroke. This system requires auxiliary exhaust scavenging of the combustion products and inherently runs lean (excess of air) of stoichiometry.

(b) *Applicability*. You are subject to the requirements under this section if you own or operate a new or existing natural gas-fired spark ignition engine, other than an emergency engine, with a nameplate rating of 1,000 hp or greater that is used for pipeline transportation of natural gas and is located within any of the States listed in § 52.40(c)(2), including Indian country located within the borders of any such State(s).

(1) For purposes of this section, the owner or operator of an emergency stationary RICE must operate the RICE according to the requirements in paragraphs (b)(1)(i) through (iii) of this section to be treated as an emergency stationary RICE. In order for stationary RICE to be treated as an emergency RICE under this subpart, any operation other than emergency operation, maintenance and testing, and operation in non-emergency situations for up to 50 hours per year, as described in paragraphs (b)(1)(i) through (iii), is prohibited. If you do not operate the RICE according to the requirements in paragraphs (b)(1)(i) through (iii), the RICE will not be considered an emergency engine under this section and must meet all requirements for affected units in this section.

(i) There is no time limit on the use of emergency stationary RICE in emergency situations.

(ii) The owner or operator may operate your emergency stationary RICE

for maintenance checks and readiness testing for a maximum of 100 hours per calendar year, provided that the tests are recommended by a Federal, state, or local government agency, the manufacturer, the vendor, or the insurance company associated with the engine. Any operation for non-emergency situations as allowed by paragraph (b)(1)(iii) of this section counts as part of the 100 hours per calendar year allowed by paragraph (b)(1)(ii) of this section. The owner or operator may petition the Administrator for approval of additional hours to be used for maintenance checks and readiness testing, but a petition is not required if the owner or operator maintains records confirming that Federal, state, or local standards require maintenance and testing of emergency RICE beyond 100 hours per calendar year. Any approval of a petition for additional hours granted by the Administrator under 40 CFR part 63, subpart ZZZZ, shall constitute approval by the Administrator of the same petition under this paragraph (b)(1)(ii).

(iii) Emergency stationary RICE may be operated for up to 50 hours per calendar year in non-emergency situations. The 50 hours of operation in non-emergency situations are counted as part of the 100 hours per calendar year for maintenance and testing provided in paragraph (b)(1)(ii) of this section.

(2) If you own or operate a natural gas-fired two stroke lean burn spark ignition engine manufactured after July 1, 2007 that is meeting the emissions limits in 40 CFR part 60, subpart JJJJ, table 1, the engine is not an affected unit under this section and you do not have to comply with the requirements of this section.

(3) If you own or operate a natural gas-fired four stroke lean or rich burn spark ignition engine manufactured after July 1, 2010, that is meeting the applicable emissions limits in 40 CFR part 60, subpart JJJJ, table 1, the engine is not an affected unit under this section and you do not have to comply with the requirements of this section.

(c) *Emissions limitations*. If you are the owner or operator of an affected unit, you must meet the following emissions limitations on a 30-day rolling average basis during the 2026 ozone season and in each ozone season thereafter:

(1) Natural gas-fired four stroke rich burn spark ignition engine: 1.0 grams per hp-hour (g/hp-hr);

(2) Natural gas-fired four stroke lean burn spark ignition engine: 1.5 g/hp-hr; and

(3) Natural gas-fired two stroke lean burn spark ignition engine: 3.0 g/hp-hr.

(d) *Facility-Wide Averaging Plan.* If you are the owner or operator of a facility containing more than one affected unit, you may submit a request via the CEDRI or analogous electronic submission system provided by the EPA to the Administrator for approval of a proposed Facility-Wide Averaging Plan as an alternative means of compliance with the applicable emissions limits in paragraph (c) of this section. Any such request shall be submitted to the Administrator on or before October 1st of the year prior to each emissions averaging year. The Administrator will approve a proposed Facility-Wide Averaging Plan submitted under this paragraph (d) if the Administrator determines that the proposed Facility-Wide Averaging Plan meets the requirements of this paragraph (d), will provide total emissions reductions equivalent to or greater than those achieved by the applicable emissions limits in paragraph (c), and identifies satisfactory means for determining initial and continuous compliance, including appropriate testing, monitoring, recordkeeping, and reporting requirements. You may only include affected units (*i.e.,* engines meeting the applicability criteria in paragraph (b) of this section) in a Facility-Wide Averaging Plan. Upon EPA approval of a proposed Facility-Wide Averaging Plan, you cannot withdraw any affected unit listed in such plan, and the terms of the plan may not be changed unless approved in writing by the Administrator.

(1) Each request for approval of a proposed Facility-Wide Averaging Plan shall include, but not be limited to:

(i) The address of the facility;

(ii) A list of all affected units at the facility that will be covered by the plan, identified by unit identification number, the engine manufacturer's name, and model;

(iii) For each affected unit, a description of any existing $NO_X$ emissions control technology and the date of installation, and a description of any $NO_X$ emissions control technology to be installed and the projected date of installation;

(iv) Identification of the emissions cap, calculated in accordance with paragraph (d)(3) of this section, that all affected units covered by the proposed Facility-Wide Averaging Plan will be subject to during the ozone season, together with all assumptions included in such calculation; and

(v) Adequate provisions for testing, monitoring, recordkeeping, and reporting for each affected unit.

(2) Upon the Administrator's approval of a proposed Facility-Wide Averaging Plan, the owner or operator of the affected units covered by the Facility-Wide Averaging Plan shall comply with the cap identified in the plan in lieu of the emissions limits in paragraph (c) of this section. You will be in compliance with the cap if the sum of $NO_X$ emissions from all units covered by the Facility-Wide Averaging Plan, in tons per day on a 30-day rolling average basis, is less than or equal to the cap.

(3) The owner or operator will calculate the cap according to equation 1 to this paragraph (d)(3). You will monitor and record daily hours of engine operation for use in calculating the cap on a 30-day rolling average basis. You will base the hours of operation on hour readings from a non-resettable hour meter or an equivalent monitoring device.

Equation 1 to Paragraph (d)(3)

$$Cap\ (tons\ per\ day) = 907{,}184.74\ x \sum_{i=1}^{N} (R_{li}\ x\ DC\ x\ H_i)$$

Where:

$H_i$ = the average daily operating hours based on the highest consecutive 30-day period during the ozone season of the two most recent years preceding the emissions averaging year (hours).

i = each affected unit included in the Cap.

N = number of affected units.

DC = the engine manufacturer's design maximum capacity in horsepower (hp) at the installation site conditions.

$R_{li}$ = the emissions limit for each affected unit from paragraph (c) of this section (grams/hp-hr).

(i) Any affected unit for which less than two years of operating data are available shall not be included in the Facility-Wide Averaging Plan unless the owner or operator extrapolates the available operating data for the affected unit to two years of operating data, for use in calculating the emissions cap in accordance with paragraph (d)(3) of this section.

(ii) [Reserved]

(4) The owner or operator of an affected unit covered by an EPA-approved Facility-Wide Averaging Plan will be in violation of the cap if the sum of $NO_X$ emissions from all such units, in tons per day on a 30-day rolling average basis, exceeds the cap. Each day of noncompliance by each affected unit covered by the Facility-Wide Averaging Plan shall be a violation of the cap until corrective action is taken to achieve compliance.

(e) *Testing and monitoring requirements.* (1) If you are the owner or operator of an affected unit subject to a $NO_X$ emissions limit under paragraph (c) of this section, you must keep a maintenance plan and records of conducted maintenance and must, to the extent practicable, maintain and operate the engine in a manner consistent with good air pollution control practice for minimizing emissions.

(2) If you are the owner or operator of an affected unit and are operating a $NO_X$ continuous emissions monitoring system (CEMS) that monitors $NO_X$ emissions from the affected unit, you may use the CEMS data in lieu of the annual performance tests and parametric monitoring required under this section. You must meet the following requirements for using CEMS to monitor $NO_X$ emissions:

(i) You shall install, calibrate, maintain, and operate a continuous emissions monitoring system (CEMS) for measuring $NO_X$ emissions and either oxygen ($O_2$) or carbon dioxide ($CO_2$).

(ii) The CEMS shall be operated and data recorded during all periods of operation of the affected unit except for CEMS breakdowns and repairs. Data shall be recorded during calibration checks and zero and span adjustments.

(iii) The 1-hour average $NO_X$ emissions rates measured by the CEMS shall be used to calculate the average emissions rates to demonstrate compliance with the applicable emissions limits in this section.

(iv) The procedures under 40 CFR 60.13 shall be followed for installation, evaluation, and operation of the continuous monitoring systems.

(v) When $NO_X$ emissions data are not obtained because of CEMS breakdowns, repairs, calibration checks, and zero and span adjustments, emissions data will be obtained by using standby

monitoring systems, Method 7 of 40 CFR part 60, appendix A–4, Method 7A of 40 CFR part 60, appendix A–4, or other approved reference methods to provide emissions data for a minimum of 75 percent of the operating hours in each affected unit operating day, in at least 22 out of 30 successive operating days.

(3)(i) If you are the owner or operator of a new affected unit, you must conduct an initial performance test within six months of engine startup and conduct subsequent performance tests every twelve months thereafter to demonstrate compliance. If pollution control equipment is installed to comply with a $NO_X$ emissions limit in paragraph (c) of this section, however, the initial performance test shall be conducted within 90 days of such installation.

(ii) If you are the owner or operator of an existing affected unit, you must conduct an initial performance test within six months of becoming subject to an emissions limit under paragraph (c) of this section and conduct subsequent performance tests every twelve months thereafter to demonstrate compliance. If pollution control equipment is installed to comply with a $NO_X$ emissions limit in paragraph (c) of this section, however, the initial performance test shall be conducted within 90 days of such installation.

(iii) If you are the owner or operator of a new or existing affected unit that is only operated during peak demand periods outside of the ozone season and the engine's hours of operation during the ozone season are 50 hours or less, the affected unit is not subject to the testing and monitoring requirements of this paragraph (e)(3)(iii) as long as you record and report your hours of operation during the ozone season in accordance with paragraphs (f) and (g) of this section.

(iv) If you are the owner or operator of an affected unit, you must conduct all performance tests consistent with the requirements of 40 CFR 60.4244 in accordance with the applicable reference test methods identified in table 2 to subpart JJJJ of 40 CFR part 60, any alternative test method approved by the EPA as of June 5, 2023, under 40 CFR 59.104(f), 60.8(b)(3), 61.13(h)(1)(ii), 63.7(e)(2)(ii), or 65.158(a)(2) and available at the EPA's website (*https://www.epa.gov/emc/broadly-applicable-approved-alternative-test-methods*), or other methods and procedures approved by the EPA through notice-and-comment rulemaking. To determine compliance with the $NO_X$ emissions limit in paragraph (c) of this section, the emissions rate shall be calculated in accordance with the requirements of 40 CFR 60.4244(d).

(4) If you are the owner or operator of an affected unit that has a non-selective catalytic reduction (NSCR) control device to reduce emissions, you must:

(i) Monitor the inlet temperature to the catalyst daily and conduct maintenance if the temperature is not within the observed inlet temperature range from the most recent performance test or the temperatures specified by the manufacturer if no performance test was required by this section; and

(ii) Measure the pressure drop across the catalyst monthly and conduct maintenance if the pressure drop across the catalyst changes by more than 2 inches of water at 100 percent load plus or minus 10 percent from the pressure drop across the catalyst measured during the most recent performance test.

(5) If you are the owner of operator of an affected unit not using an NSCR control device to reduce emissions, you are required to conduct continuous parametric monitoring to assure compliance with the applicable emissions limits according to the requirements in paragraphs (e)(5)(i) through (vi) of this section.

(i) You must prepare a site-specific monitoring plan that includes all of the following monitoring system design, data collection, and quality assurance and quality control elements:

(A) The performance criteria and design specifications for the monitoring system equipment, including the sample interface, detector signal analyzer, and data acquisition and calculations.

(B) Sampling interface (*e.g.,* thermocouple) location such that the monitoring system will provide representative measurements.

(C) Equipment performance evaluations, system accuracy audits, or other audit procedures.

(D) Ongoing operation and maintenance procedures in accordance with the requirements of paragraph (e)(1) of this section.

(E) Ongoing recordkeeping and reporting procedures in accordance with the requirements of paragraphs (f) and (g) of this section.

(ii) You must continuously monitor the selected operating parameters according to the procedures in your site-specific monitoring plan.

(iii) You must collect parametric monitoring data at least once every 15 minutes.

(iv) When measuring temperature range, the temperature sensor must have a minimum tolerance of 2.8 degrees Celsius (5 degrees Fahrenheit) or 1 percent of the measurement range, whichever is larger.

(v) You must conduct performance evaluations, system accuracy audits, or other audit procedures specified in your site-specific monitoring plan at least annually.

(vi) You must conduct a performance evaluation of each parametric monitoring device in accordance with your site-specific monitoring plan.

(6) If you are the owner or operator of an affected unit that is only operated during peak periods outside of the ozone season and your hours of operation during the ozone season are 0, you are not subject to the testing and monitoring requirements of this paragraph (e)(6) so long as you record and report your hours of operation during the ozone season in accordance with paragraphs (f) and (g) of this section.

(f) *Recordkeeping requirements.* If you are the owner or operator of an affected unit, you must keep records of:

(1) Performance tests conducted pursuant to paragraph (e)(2) of this section, including the date, engine settings on the date of the test, and documentation of the methods and results of the test.

(2) Catalyst monitoring required by paragraph (e)(3) of this section, if applicable, and any actions taken to address monitored values outside the temperature or pressure drop parameters, including the date and a description of actions taken.

(3) Parameters monitored pursuant to the facility's site-specific parametric monitoring plan.

(4) Hours of operation on a daily basis.

(5) Tuning, adjustments, or other combustion process adjustments and the date of the adjustment(s).

(6) For any Facility-Wide Averaging Plan approved by the Administrator under paragraph (d) of this section, daily calculations of total $NO_X$ emissions to demonstrate compliance with the cap during the ozone season. You must use the equation in this paragraph (f)(6) to calculate total $NO_X$ emissions from all affected units covered by the Facility-Wide Averaging Plan, in tons per day on a 30-day rolling average basis, for purposes of determining compliance with the cap during the ozone season. A new 30-day rolling average emissions rate is calculated for each operating day during the ozone season, using the 30-day rolling average daily operating hours for the preceding 30 operating days.

Equation 2 to Paragraph (f)(6)

$$\sum_{i=1}^{N} (R_{ai} \ x \ DC \ x \ H_{ai}) \leq Cap \ (tons \ per \ day)$$

Where:

$H_{ai}$ = the consecutive 30-day rolling average daily operating hours for the preceding 30 operating days during ozone season (hours).

i = each affected unit.

N = number of affected units.

DC = the engine manufacturer's maximum design capacity in horsepower (hp) at the installation site conditions.

$R_{ai}$ = the actual emissions rate for each affected unit based on the most recent performance test results, (grams/hp-hr).

(g) *Reporting requirements.* (1) If you are the owner or operator of an affected unit, you must submit the results of the performance test or performance evaluation of the CEMS following the procedures specified in § 52.40(g) within 60 days after completing each performance test required by this section.

(2) If you are the owner or operator of an affected unit, you are required to submit excess emissions reports for any excess emissions that occurred during the reporting period. Excess emissions are defined as any calculated 30-day rolling average $NO_X$ emissions rate that exceeds the applicable emissions limit in paragraph (c) of this section. Excess emissions reports must be submitted in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section following the procedures specified in § 52.40(g).

(3) If you are the owner or operator of an affected unit, you must submit an annual report in PDF format to the EPA by January 30th of each year via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section. Annual reports shall be submitted following the procedures in paragraph (g) of this section. The report shall contain the following information:

(i) The name and address of the owner and operator;

(ii) The address of the subject engine;

(iii) Longitude and latitude coordinates of the subject engine;

(iv) Identification of the subject engine;

(v) Statement of compliance with the applicable emissions limit under paragraph (c) of this section or a Facility-Wide Averaging Plan under paragraph (d) of this section; and

(vi) Statement of compliance regarding the conduct of maintenance and operations in a manner consistent with good air pollution control practices for minimizing emissions;

(vii) The date and results of the performance test conducted pursuant to paragraph (e) of this section;

(viii) Any records required by paragraph (f) of this section, including records of parametric monitoring data, to demonstrate compliance with the applicable emissions limit under paragraph (c) of this section or a Facility-Wide Averaging Plan under paragraph (d) of this section, if applicable;

(ix) If applicable, a statement documenting any change in the operating characteristics of the subject engine; and

(x) A statement certifying that the information included in the annual report is complete and accurate.

### § 52.42 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Cement and Concrete Product Manufacturing Industry?

(a) *Definitions.* All terms not defined in this paragraph (a) shall have the meaning given to them in the Act and in subpart A of 40 CFR part 60.

*Affected unit* means a cement kiln meeting the applicability criteria of this section.

*Cement kiln* means an installation, including any associated pre-heater or pre-calciner devices, that produces clinker by heating limestone and other materials to produce Portland cement.

*Cement plant* means any facility manufacturing cement by either the wet or dry process.

*Clinker* means the product of a cement kiln from which finished cement is manufactured by milling and grinding.

*Operating day* means a 24-hour period beginning at 12:00 midnight during which the kiln produces clinker at any time.

(b) *Applicability.* You are subject to the requirements of this section if you own or operate a new or existing cement kiln that emits or has the potential to emit 100 tons per year or more of $NO_X$ on or after August 4, 2023, and is located within any of the States listed in § 52.40(c)(2), including Indian country located within the borders of any such State(s). Any existing cement kiln with a potential to emit of 100 tons per year or more of $NO_X$ on August 4, 2023, will continue to be subject to the requirements of this section even if that unit later becomes subject to a physical or operational limitation that lowers its potential to emit below 100 tons per year of $NO_X$.

(c) *Emissions limitations.* If you are the owner or operator of an affected unit, you must meet the following emissions limitations on a 30-day rolling average basis during the 2026 ozone season and in each ozone season thereafter:

(1) Long wet kilns: 4.0 lb/ton of clinker;

(2) Long dry kilns: 3.0 lb/ton of clinker;

(3) Preheater kilns: 3.8 lb/ton of clinker;

(4) Precalciner kilns: 2.3 lb/ton of clinker; and

(5) Preheater/Precalciner kilns: 2.8 lb/ton of clinker.

(d) *Testing and monitoring requirements.* (1) If you are the owner or operator of an affected unit you must conduct performance tests, on an annual basis, in accordance with the applicable reference test methods of 40 CFR part 60, appendix A–4, any alternative test method approved by the EPA as of June 5, 2023, under 40 CFR 59.104(f), 60.8(b)(3), 61.13(h)(1)(ii), 63.7(e)(2)(ii), or 65.158(a)(2) and available at the EPA's website (*https://www.epa.gov/emc/broadly-applicable-approved-alternative-test-methods*), or other methods and procedures approved by the EPA through notice-and-comment rulemaking. The annual performance test does not have to be performed during the ozone season. You must calculate and record the 30-operating day rolling average emissions rate of $NO_X$ as the total of all hourly emissions data for a cement kiln in the preceding 30 days, divided by the total tons of clinker produced in that kiln during the same 30-operating day period, using equation 1 to this paragraph (d)(1):

Equation 1 to Paragraph (d)(1)

$$E_{30D} = k \left( \frac{\sum_{i=1}^{N} Ci \ Qi}{P} \right)$$

Where:

$E_{30D}$ = 30 kiln operating day average emissions rate of $NO_X$, in lbs/ton of clinker.

Ci = Concentration of $NO_X$ for hour i, in ppm.

Qi = Volumetric flow rate of effluent gas for hour i, where Ci and Qi are on the same basis (either wet or dry), in scf/hr.

P = 30 days of clinker production during the same Time period as the $NO_X$ emissions measured, in tons.

k = Conversion factor, $1.194 \times 10^{-7}$ for $NO_X$, in lb/scf/ppm.

n = Number of kiln operating hours over 30 kiln operating days.

(2) If you are the owner or operator of an affected unit and are operating a $NO_X$ continuous emissions monitoring system (CEMS) that monitors $NO_X$ emissions from the affected unit, you may use the CEMS data in lieu of the annual performance tests and parametric monitoring required under this section. You must meet the following requirements for using CEMS to monitor $NO_X$ emissions:

(i) You shall install, calibrate, maintain, and operate a continuous emissions monitoring system (CEMS) for measuring $NO_X$ emissions and either oxygen ($O_2$) or carbon dioxide ($CO_2$).

(ii) The CEMS shall be operated and data recorded during all periods of operation during the ozone season of the affected unit except for CEMS breakdowns and repairs. Data shall be recorded during calibration checks and zero and span adjustments.

(iii) The 1-hour average $NO_X$ emissions rates measured by the CEMS shall be expressed in terms of lbs/ton of clinker and shall be used to calculate the average emissions rates to demonstrate compliance with the applicable emissions limits in this section.

(iv) The procedures under 40 CFR 60.13 shall be followed for installation, evaluation, and operation of the continuous monitoring systems.

(v) When $NO_X$ emissions data are not obtained because of CEMS breakdowns, repairs, calibration checks and zero and span adjustments, emissions data will be obtained by using standby monitoring systems, Method 7 of 40 CFR part 60, appendix A–4, Method 7A of 40 CFR part 60, appendix A–4, or other approved reference methods to provide emissions data for a minimum of 75 percent of the operating hours in each affected unit operating day, in at least 22 out of 30 successive operating days.

(3) If you are the owner or operator of an affected unit not operating $NO_X$ CEMS, you must conduct an initial performance test before the 2026 ozone season to establish appropriate indicator ranges for operating parameters and continuously monitor those operator parameters consistent with the requirements of paragraphs (d)(3)(i) through (v) of this section.

(i) You must monitor and record kiln stack exhaust gas flow rate, hourly clinker production rate or kiln feed rate, and kiln stack exhaust temperature during the initial performance test and subsequent annual performance tests to demonstrate continuous compliance with your $NO_X$ emissions limits.

(ii) You must determine hourly clinker production by one of two methods:

(A) Install, calibrate, maintain, and operate a permanent weigh scale system to record weight rates of the amount of clinker produced in tons of mass per hour. The system of measuring hourly clinker production must be maintained within ±5 percent accuracy; or

(B) Install, calibrate, maintain, and operate a permanent weigh scale system to measure and record weight rates of the amount of feed to the kiln in tons of mass per hour. The system of measuring feed must be maintained within ±5 percent accuracy. Calculate your hourly clinker production rate using a kiln specific feed-to-clinker ratio based on reconciled clinker production rates determined for accounting purposes and recorded feed rates. This ratio should be updated monthly. Note that if this ratio changes at clinker reconciliation, you must use the new ratio going forward, but you do not have to retroactively change clinker production rates previously estimated.

(C) For each kiln operating hour for which you do not have data on clinker production or the amount of feed to the kiln, use the value from the most recent previous hour for which valid data are available.

(D) If you measure clinker production directly, record the daily clinker production rates; if you measure the kiln feed rates and calculate clinker production, record the daily kiln feed and clinker production rates.

(iii) You must use the kiln stack exhaust gas flow rate, hourly kiln production rate or kiln feed rate, and kiln stack exhaust temperature during the initial performance test and subsequent annual performance tests as indicators of $NO_X$ operating parameters to demonstrate continuous compliance and establish site-specific indicator ranges for these operating parameters.

(iv) You must repeat the performance test annually to reassess and adjust the site-specific operating parameter indicator ranges in accordance with the results of the performance test.

(v) You must report and include your ongoing site-specific operating parameter data in the annual reports required under paragraph (e) of this section and semi-annual title V monitoring reports to the relevant permitting authority.

(e) *Recordkeeping requirements.* If you are the owner or operator of an affected unit, you shall maintain records of the following information for each day the affected unit operates:

(1) Calendar date;

(2) The average hourly $NO_X$ emissions rates measured or predicted;

(3) The 30-day average $NO_X$ emissions rates calculated at the end of each affected unit operating day from the measured or predicted hourly $NO_X$ emissions rates for the preceding 30 operating days;

(4) Identification of the affected unit operating days when the calculated 30-day average $NO_X$ emissions rates are in excess of the applicable site-specific $NO_X$ emissions limit with the reasons for such excess emissions as well as a description of corrective actions taken;

(5) Identification of the affected unit operating days for which pollutant data have not been obtained, including reasons for not obtaining sufficient data and a description of corrective actions taken;

(6) Identification of the times when emissions data have been excluded from the calculation of average emissions rates and the reasons for excluding data;

(7) If a CEMS is used to verify compliance:

(i) Identification of the times when the pollutant concentration exceeded full span of the CEMS;

(ii) Description of any modifications to the CEMS that could affect the ability of the CEMS to comply with Performance Specification 2 or 3 in appendix B to 40 CFR part 60; and

(iii) Results of daily CEMS drift tests and quarterly accuracy assessments as required under Procedure 1 of 40 CFR part 60, appendix F;

(8) Operating parameters required under paragraph (d) of this section to demonstrate compliance during the ozone season;

(9) Each fuel type, usage, and heat content; and

(10) Clinker production rates.

(f) *Reporting requirements.* (1) If you are the owner or operator of an affected unit, you shall submit the results of the performance test or performance evaluation of the CEMS following the procedures specified in § 52.40(g) within 60 days after the date of completing each performance test required by this section.

(2) If you are the owner or operator of an affected unit, you are required to submit excess emissions reports for any excess emissions that occurred during the reporting period. Excess emissions are defined as any calculated 30-day rolling average $NO_X$ emissions rate that exceeds the applicable emissions limit established under paragraph (c) of this section. Excess emissions reports must

be submitted in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section following the procedures specified in § 52.40(g).

(3) If you are the owner or operator of an affected unit, you shall submit an annual report in PDF format to the EPA by January 30th of each year via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section. Annual reports shall be submitted following the procedures in § 52.40(g). The report shall include records all records required by paragraph (d) of this section, including record of CEMS data or operating parameters required by paragraph (d) to demonstrate continuous compliance the applicable emissions limits under paragraph (c) of this section.

(g) *Initial notification requirements for existing affected units.* (1) The requirements of this paragraph (g) apply to the owner or operator of an existing affected unit.

(2) The owner or operator of an existing affected unit that emits or has a potential to emit 100 tons per year or greater as of August 4, 2023, shall notify the Administrator via the CEDRI or analogous electronic submission system provided by the EPA that the unit is subject to this section. The notification, which shall be submitted not later than December 4, 2023, shall be submitted in PDF format to the EPA via CEDRI, which can be accessed through the EPA's CDX (*https://cdx.epa.gov/*). The notification shall provide the following information:

(i) The name and address of the owner or operator;

(ii) The address (*i.e.,* physical location) of the affected unit;

(iii) An identification of the relevant standard, or other requirement, that is the basis for the notification and the unit's compliance date; and

(iv) A brief description of the nature, size, design, and method of operation of the facility and an identification of the types of emissions points (units) within the facility subject to the relevant standard.

**§ 52.43   What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Iron and Steel Mills and Ferroalloy Manufacturing Industry?**

(a) *Definitions.* All terms not defined in this paragraph (a) shall have the meaning given to them in the Act and in subpart A of 40 CFR part 60.

*Affected unit* means any reheat furnace meeting the applicability criteria of this section.

*Day* means a calendar day unless expressly stated to be a business day. In computing any period of time for recordkeeping and reporting purposes where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next business day.

*Low $NO_X$ burner* means a burner designed to reduce flame turbulence by the mixing of fuel and air and by establishing fuel-rich zones for initial combustion, thereby reducing the formation of $NO_X$.

*Low-$NO_X$ technology* means any post-combustion $NO_X$ control technology capable of reducing $NO_X$ emissions by 40% from baseline emission levels as measured during pre-installation testing.

*Operating day* means a 24-hour period beginning at 12:00 midnight during which any fuel is combusted at any time in the reheat furnace.

*Reheat furnace* means a furnace used to heat steel product—including metal ingots, billets, slabs, beams, blooms and other similar products—for the purpose of deformation and rolling.

(b) *Applicability.* The requirements of this section apply to each new or existing reheat furnace at an iron and steel mill or ferroalloy manufacturing facility that directly emits or has the potential to emit 100 tons per year or more of $NO_X$ on or after August 4, 2023, does not have low-$NO_X$ burners installed, and is located within any of the States listed in § 52.40(c)(2), including Indian country located within the borders of any such State(s). Any existing reheat furnace with a potential to emit of 100 tons per year or more of $NO_X$ on August 4, 2023, will continue to be subject to the requirements of this section even if that unit later becomes subject to a physical or operational limitation that lowers its potential to emit below 100 tons per year of $NO_X$.

(c) *Emissions control requirements.* If you are the owner or operator of an affected unit without low-$NO_X$ burners already installed, you must install and operate low-$NO_X$ burners or equivalent alternative low-$NO_X$ technology designed to achieve at least a 40% reduction from baseline $NO_X$ emissions in accordance with the work plan established pursuant to paragraph (d) of this section. You must meet the emissions limit established under paragraph (d) on a 30-day rolling average basis.

(d) *Work plan requirements.* (1) The owner or operator of each affected unit must submit a work plan for each

affected unit by August 5, 2024. The work plan must be submitted via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section following the procedures specified in § 52.40(g). Each work plan must include a description of the affected unit and rated production and energy capacities, identification of the low-$NO_X$ burner or alternative low $NO_X$ technology selected, and the phased construction timeframe by which you will design, install, and consistently operate the device. Each work plan shall also include, where applicable, performance test results obtained no more than five years before August 4, 2023, to be used as baseline emissions testing data providing the basis for required emissions reductions. If no such data exist, then the owner or operator must perform pre-installation testing as described in paragraph (e)(3) of this section.

(2) The owner or operator of an affected unit shall design each low-$NO_X$ burner or alternative low-$NO_X$ technology identified in the work plan to achieve $NO_X$ emission reductions by a minimum of 40% from baseline emission levels measured during performance testing that meets the criteria set forth in paragraph (e)(1) of this section, or during pre-installation testing as described in paragraph (e)(3) of this section. Each low-$NO_X$ burner or alternative low-$NO_X$ technology shall be continuously operated during all production periods according to paragraph (c) of this section.

(3) The owner or operator of an affected unit shall establish an emissions limit in the work plan that the affected unit must comply with in accordance with paragraph (c) of this section.

(4) The EPA's action on work plans:

(i) The Administrator will provide via the CEDRI or analogous electronic submission system provided by the EPA notification to the owner or operator of an affected unit if the submitted work plan is complete, that is, whether the request contains sufficient information to make a determination, within 60 calendar days after receipt of the original work plan and within 60 calendar days after receipt of any supplementary information.

(ii) The Administrator will provide notification via the CEDRI or analogous electronic submission system provided by the EPA, which shall be publicly available, to the owner or operator of a decision to approve or intention to disapprove the work plan within 60 calendar days after providing written notification pursuant to paragraph

(d)(4)(i) of this section that the submitted work plan is complete.

(iii) Before disapproving a work plan, the Administrator will notify the owner or operator via the CEDRI or analogous electronic submission system provided by the EPA of the Administrator's intention to issue the disapproval, together with:

(A) Notice of the information and findings on which the intended disapproval is based; and

(B) Notice of opportunity for the owner or operator to present in writing, within 15 calendar days after he/she is notified of the intended disapproval, additional information or arguments to the Administrator before further action on the work plan.

(iv) The Administrator's final decision to disapprove a work plan will be via the CEDRI or analogous electronic submission system provided by the EPA and publicly available, and will set forth the specific grounds on which the disapproval is based. The final decision will be made within 60 calendar days after presentation of additional information or argument (if the submitted work plan is complete), or within 60 calendar days after the deadline for the submission of additional information or argument under paragraph (d)(5)(iii)(B) of this section, if no such submission is made.

(v) If the Administrator disapproves the submitted work plan for failure to satisfy the requirements of paragraphs (c) and (d)(1) through (3) of this section, or if the owner or operator of an affected unit fails to submit a work plan by August 5, 2024, the owner or operator will be in violation of this section. Each day that the affected unit operates following such disapproval or failure to submit shall constitute a violation.

(e) *Testing and monitoring requirements.* (1) If you are the owner or operator of an affected unit you must conduct performance tests, on an annual basis, in accordance with the applicable reference test methods of 40 CFR part 60, appendix A–4, any alternative test method approved by the EPA as of June 5, 2023, under 40 CFR 59.104(f), 60.8(b)(3), 61.13(h)(1)(ii), 63.7(e)(2)(ii), or 65.158(a)(2) and available at the EPA's website (*https://www.epa.gov/emc/broadly-applicable-approved-alternative-test-methods*), or other methods and procedures approved by the EPA through notice-and-comment rulemaking. The annual performance test does not have to be performed during the ozone season.

(2) If you are the owner or operator of an affected unit and are operating a $NO_X$ continuous emissions monitoring system (CEMS) that monitors $NO_X$ emissions from the affected unit, you may use the CEMS data in lieu of the annual performance tests and parametric monitoring required under this section. You must meet the following requirements for using CEMS to monitor $NO_X$ emissions:

(i) You shall install, calibrate, maintain, and operate a continuous emissions monitoring system (CEMS) for measuring $NO_X$ emissions and either oxygen ($O_2$) or carbon dioxide ($CO_2$).

(ii) The CEMS shall be operated and data recorded during all periods of operation during the ozone season of the affected unit except for CEMS breakdowns and repairs. Data shall be recorded during calibration checks and zero and span adjustments.

(iii) The 1-hour average $NO_X$ emissions rates measured by the CEMS shall be expressed in form of the emissions limit established in the work plan and shall be used to calculate the average emissions rates to demonstrate compliance with the applicable emissions limits established in the work plan.

(iv) The procedures under 40 CFR 60.13 shall be followed for installation, evaluation, and operation of continuous monitoring systems.

(v) When $NO_X$ emissions data are not obtained because of CEMS breakdowns, repairs, calibration checks and zero and span adjustments, emissions data will be obtained by using standby monitoring systems, Method 7 of 40 CFR part 60, appendix A–4, Method 7A of 40 CFR part 60, appendix A–4, or other approved reference methods to provide emissions data for a minimum of 75 percent of the operating hours in each affected unit operating day, in at least 22 out of 30 successive operating days.

(3) If you are the owner or operator of an affected unit not operating $NO_X$ CEMS, you must conduct an initial performance test before the 2026 ozone season to establish appropriate indicator ranges for operating parameters and continuously monitor those operator parameters consistent with the requirements of paragraphs (e)(3)(i) through (iv) of this section.

(i) You must monitor and record stack exhaust gas flow rate and temperature during the initial performance test and subsequent annual performance tests to demonstrate continuous compliance with your $NO_X$ emissions limits.

(ii) You must use the stack exhaust gas flow rate and temperature during the initial performance test and subsequent annual performance tests to establish a site-specific indicator for these operating parameters.

(iii) You must repeat the performance test annually to reassess and adjust the site-specific operating parameter indicator ranges in accordance with the results of the performance test.

(iv) You must report and include your ongoing site-specific operating parameter data in the annual reports required under paragraph (f) of this section and semi-annual title V monitoring reports to the relevant permitting authority.

(f) *Recordkeeping requirements.* If you are the owner or operator of an affected unit, you shall maintain records of the following information for each day the affected unit operates:

(1) Calendar date;

(2) The average hourly $NO_X$ emissions rates measured or predicted;

(3) The 30-day average $NO_X$ emissions rates calculated at the end of each affected unit operating day from the measured or predicted hourly $NO_X$ emissions rates for the preceding 30 operating days;

(4) Identification of the affected unit operating days when the calculated 30-day average $NO_X$ emissions rates are in excess of the applicable site-specific $NO_X$ emissions limit with the reasons for such excess emissions as well as a description of corrective actions taken;

(5) Identification of the affected unit operating days for which pollutant data have not been obtained, including reasons for not obtaining sufficient data and a description of corrective actions taken;

(6) Identification of the times when emissions data have been excluded from the calculation of average emissions rates and the reasons for excluding data;

(7) If a CEMS is used to verify compliance:

(i) Identification of the times when the pollutant concentration exceeded full span of the CEMS;

(ii) Description of any modifications to the CEMS that could affect the ability of the CEMS to comply with Performance Specification 2 or 3 in appendix B to 40 CFR part 60; and

(iii) Results of daily CEMS drift tests and quarterly accuracy assessments as required under Procedure 1 of 40 CFR part 60, appendix F;

(8) Operating parameters required under paragraph (d) of this section to demonstrate compliance during the ozone season; and

(9) Each fuel type, usage, and heat content.

(g) *Reporting requirements.* (1) If you are the owner or operator of an affected unit, you shall submit a final report via the CEDRI or analogous electronic submission system provided by the EPA, by no later than March 30, 2026,

certifying that installation of each selected control device has been completed. You shall include in the report the dates of final construction and relevant performance testing, where applicable, demonstrating compliance with the selected emission limits pursuant to paragraphs (c) and (d) of this section.

(2) If you are the owner or operator of an affected unit, you must submit the results of the performance test or performance evaluation of the CEMS following the procedures specified in § 52.40(g) within 60 days after the date of completing each performance test required by this section.

(3) If you are the owner or operator of an affected unit, you are required to submit excess emissions reports for any excess emissions that occurred during the reporting period. Excess emissions are defined as any calculated 30-day rolling average NOₓ emissions rate that exceeds the applicable emissions limit established under paragraphs (c) and (d) of this section. Excess emissions reports must be submitted in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section following the procedures specified in § 52.40(g).

(4) If you are the owner or operator of an affected unit, you shall submit an annual report in PDF format to the EPA by January 30th of each year via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section. Annual reports shall be submitted following the procedures in § 52.40(g). The report shall include records all records required by paragraphs (e) and (f) of this section, including record of CEMS data or operating parameters required by paragraph (e) to demonstrate compliance the applicable emissions limits established under paragraphs (c) and (d) of this section.

(h) *Initial notification requirements for existing affected units.* (1) The requirements of this paragraph (h) apply to the owner or operator of an existing affected unit.

(2) The owner or operator of an existing affected unit that emits or has a potential to emit 100 tons per year or more of NOₓ as of August 4, 2023, shall notify the Administrator via the CEDRI or analogous electronic submission system provided by the EPA that the unit is subject to this section. The notification, which shall be submitted not later than December 4, 2023, shall be submitted in PDF format to the EPA via CEDRI, which can be accessed through the EPA's CDX (*https://cdx.epa.gov/*). The notification shall provide the following information:

(i) The name and address of the owner or operator;

(ii) The address (*i.e.,* physical location) of the affected unit;

(iii) An identification of the relevant standard, or other requirement, that is the basis for the notification and the unit's compliance date; and

(iv) A brief description of the nature, size, design, and method of operation of the facility and an identification of the types of emissions points (units) within the facility subject to the relevant standard.

### § 52.44  What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Glass and Glass Product Manufacturing Industry?

(a) *Definitions.* All terms not defined in this paragraph (a) shall have the meaning given to them in the Act and in subpart A of 40 CFR part 60.

*Affected units* means a glass manufacturing furnace meeting the applicability criteria of this section.

*Borosilicate recipe* means glass product composition of the following approximate ranges of weight proportions: 60 to 80 percent silicon dioxide, 4 to 10 percent total $R_2O$ (*e.g.,* $Na_2O$ and $K_2O$), 5 to 35 percent boric oxides, and 0 to 13 percent other oxides.

*Container glass* means glass made of soda-lime recipe, clear or colored, which is pressed and/or blown into bottles, jars, ampoules, and other products listed in Standard Industrial Classification (SIC) 3221 (SIC 3221).

*Flat glass* means glass made of soda-lime recipe and produced into continuous flat sheets and other products listed in SIC 3211.

*Glass melting furnace* means a unit comprising a refractory vessel in which raw materials are charged, melted at high temperature, refined, and conditioned to produce molten glass. The unit includes foundations, superstructure and retaining walls, raw material charger systems, heat exchangers, melter cooling system, exhaust system, refractory brick work, fuel supply and electrical boosting equipment, integral control systems and instrumentation, and appendages for conditioning and distributing molten glass to forming apparatuses. The forming apparatuses, including the float bath used in flat glass manufacturing and flow channels in wool fiberglass and textile fiberglass manufacturing, are not considered part of the glass melting furnace.

*Glass produced* means the weight of the glass pulled from the glass melting furnace.

*Idling* means the operation of a glass melting furnace at less than 25% of the permitted production capacity or fuel use capacity as stated in the operating permit.

*Lead recipe* means glass product composition of the following ranges of weight proportions: 50 to 60 percent silicon dioxide, 18 to 35 percent lead oxides, 5 to 20 percent total $R_2O$ (*e.g.,* $Na_2O$ and $K_2O$), 0 to 8 percent total $R_2O_3$ (*e.g.,* $Al_2O_3$), 0 to 15 percent total RO (*e.g.,* CaO, MgO), other than lead oxide, and 5 to 10 percent other oxides.

*Operating day* means a 24-hr period beginning at 12:00 midnight during which the furnace combusts fuel at any time but excludes any period of startup, shutdown, or idling during which the affected unit complies with the requirements in paragraphs (d) through (f) of this section, as applicable.

*Pressed and blown glass* means glass which is pressed, blown, or both, including textile fiberglass, noncontinuous flat glass, noncontainer glass, and other products listed in SIC 3229. It is separated into: Glass of borosilicate recipe, Glass of soda-lime and lead recipes, and Glass of opal, fluoride, and other recipes.

*Raw material* means minerals, such as silica sand, limestone, and dolomite; inorganic chemical compounds, such as soda ash (sodium carbonate), salt cake (sodium sulfate), and potash (potassium carbonate); metal oxides and other metal-based compounds, such as lead oxide, chromium oxide, and sodium antimonate; metal ores, such as chromite and pyrolusite; and other substances that are intentionally added to a glass manufacturing batch and melted in a glass melting furnace to produce glass. Metals that are naturally-occurring trace constituents or contaminants of other substances are not considered to be raw materials.

*Shutdown* means the period of time during which a glass melting furnace is taken from an operational to a non-operational status by allowing it to cool down from its operating temperature to a cold or ambient temperature as the fuel supply is turned off.

*Soda-lime recipe* means glass product composition of the following ranges of weight proportions: 60 to 75 percent silicon dioxide, 10 to 17 percent total $R_2O$ (*e.g.,* $Na_2O$ and $K_2O$), 8 to 20 percent total RO but not to include any PbO (*e.g.,* CaO, and MgO), 0 to 8 percent total $R_2O_3$ (*e.g.,* $Al_2O_3$), and 1 to 5 percent other oxides.

*Startup* means the period of time, after initial construction or a furnace rebuild, during which a glass melting furnace is heated to operating temperatures by the primary furnace

combustion system, and systems and instrumentation are brought to stabilization.

*Textile fiberglass* means fibrous glass in the form of continuous strands having uniform thickness.

*Wool fiberglass* means fibrous glass of random texture, including accoustical board and tile (mineral wool), fiberglass insulation, glass wool, insulation (rock wool, fiberglass, slag, and silicia minerals), and mineral wool roofing mats.

(b) *Applicability.* You are subject to the requirements under this section if you own or operate a new or existing glass manufacturing furnace that directly emits or has the potential to emit 100 tons per year or more of $NO_X$ on or after August 4, 2023, and is located within any of the States listed in § 52.40(c)(2), including Indian country located within the borders of any such State(s). Any existing glass manufacturing furnace with a potential to emit of 100 tons per year or more of $NO_X$ on August 4, 2023, will continue to be subject to the requirements of this section even if that unit later becomes subject to a physical or operational limitation that lowers its potential to emit below 100 tons per year of $NO_X$.

(c) *Emissions limitations.* If you are the owner or operator of an affected unit, you must meet the emissions limitations in paragraphs (c)(1) and (2) of this section on a 30-day rolling average basis during the 2026 ozone season and in each ozone season thereafter. For the 2026 ozone season, the emissions limitations in paragraphs (c)(1) and (2) do not apply during shutdown and idling if the affected unit complies with the requirements in paragraphs (e) and (f) of this section, as applicable. For the 2027 and subsequent ozone seasons, the emissions limitations in paragraphs (c)(1) and (2) do not apply during startup, shutdown, and idling, if the affected unit complies with the requirements in paragraphs (d) through (f) of this section, as applicable.

(1) Container glass, pressed/blown glass, or fiberglass manufacturing furnace: 4.0 lb/ton of glass; and

(2) Flat glass manufacturing furnace: 7.0 lb/ton of glass.

(d) *Startup requirements.* (1) If you are the owner or operator of an affected unit, you shall submit via the CEDRI or analogous electronic submission system provided by the EPA, no later than 30 days prior to the anticipated date of startup, the following information to assure proper operation of the furnace:

(i) A detailed list of activities to be performed during startup and explanations to support the length of time needed to complete each activity.

(ii) A description of the material process flow rates, system operating parameters, and other information that the owner or operator shall monitor and record during the startup period.

(iii) Identification of the control technologies or strategies to be utilized.

(iv) A description of the physical conditions present during startup periods that prevent the controls from being effective.

(v) A reasonably precise estimate as to when physical conditions will have reached a state that allows for the effective control of emissions.

(2) The length of startup following activation of the primary furnace combustion system may not exceed:

(i) Seventy days for a container, pressed or blown glass furnace;

(ii) Forty days for a fiberglass furnace; and

(iii) One hundred and four days for a flat glass furnace and for all other glass melting furnaces not covered under paragraphs (d)(2)(i) and (ii) of this section.

(3) During the startup period, the owner or operator of an affected unit shall maintain the stoichiometric ratio of the primary furnace combustion system so as not to exceed 5 percent excess oxygen, as calculated from the actual fuel and oxidant flow measurements for combustion in the affected unit.

(4) The owner or operator of an affected unit shall place the emissions control system in operation as soon as technologically feasible during startup to minimize emissions.

(e) *Shutdown requirements.* (1) If you are the owner or operator of an affected unit, you shall submit via the CEDRI or analogous electronic submission system provided by the EPA to the Administrator, no later than 30 days prior to the anticipated date of shutdown, the following information to assure proper operation of the furnace:

(i) A detailed list of activities to be performed during shutdown and explanations to support the length of time needed to complete each activity.

(ii) A description of the material process flow rates, system operating parameters, and other information that the owner or operator shall monitor and record during the shutdown period.

(iii) Identification of the control technologies or strategies to be utilized.

(iv) A description of the physical conditions present during shutdown periods that prevent the controls from being effective.

(v) A reasonably precise estimate as to when physical conditions will have reached a state that allows for the effective control of emissions.

(2) The duration of a shutdown, as measured from the time the furnace operations drop below 25% of the permitted production capacity or fuel use capacity to when all emissions from the furnace cease, may not exceed 20 days.

(3) If you are the owner or operator of an affected unit, you shall operate the emissions control system whenever technologically feasible during shutdown to minimize emissions.

(f) *Idling requirements.* (1) If you are the owner or operator of an affected unit, you shall operate the emissions control system whenever technologically feasible during idling to minimize emissions.

(2) If you are the owner or operator of an affected unit, your $NO_X$ emissions during idling may not exceed the amount calculated using the following equation: Pounds per day emissions limit of $NO_X$ = (Applicable $NO_X$ emissions limit specified in paragraph (c) of this section expressed in pounds per ton of glass produced) × (Furnace permitted production capacity in tons of glass produced per day).

(3) To demonstrate compliance with the alternative daily $NO_X$ emissions limit identified in paragraph (f)(2) of this section during periods of idling, the owners or operators of an affected unit shall maintain records consistent with paragraph (h)(3) of this section.

(g) *Testing and monitoring requirements.* (1) If you own or operate an affected unit subject to the $NO_X$ emissions limits under paragraph (c) of this section you must conduct performance tests, on an annual basis, in accordance with the applicable reference test methods of 40 CFR part 60, appendix A–4, any alternative test method approved by the EPA as of June 5, 2023, under 40 CFR 59.104(f), 60.8(b)(3), 61.13(h)(1)(ii), 63.7(e)(2)(ii), or 65.158(a)(2) and available at the EPA's website (*https://www.epa.gov/emc/broadly-applicable-approved-alternative-test-methods*), or other methods and procedures approved by the EPA through notice-and-comment rulemaking. The annual performance test does not have to be performed during the ozone season. Owners or operators of affected units must calculate and record the 30-day rolling average emissions rate of $NO_X$ as the total of all hourly emissions data for an affected unit in the preceding 30 days, divided by the total tons of glass produced in that affected unit during the same 30-day period. Direct measurement or material balance using good engineering practice shall be used to determine the amount of glass produced during the performance test.

The rate of glass produced is defined as the weight of glass pulled from the affected unit during the performance test divided by the number of hours taken to perform the performance test.

(2) If you are the owner or operator of an affected unit subject to the $NO_X$ emissions limits under paragraph (c)(1) of this section and are operating a $NO_X$ CEMS that monitors $NO_X$ emissions from the affected unit, you may use the CEMS data in lieu of the annual performance tests and parametric monitoring required under this section. You must meet the following requirements for using CEMS to monitor $NO_X$ emissions:

(i) You shall install, calibrate, maintain, and operate a continuous emissions monitoring system (CEMS) for measuring $NO_X$ emissions and either oxygen ($O_2$) or carbon dioxide ($CO_2$).

(ii) The CEMS shall be operated and data recorded during all periods of operation during the ozone season of the affected unit except for CEMS breakdowns and repairs. Data shall be recorded during calibration checks and zero and span adjustments.

(iii) The 1-hour average $NO_X$ emissions rates measured by the CEMS shall be expressed in terms of lbs/ton of glass and shall be used to calculate the average emissions rates to demonstrate compliance with the applicable emissions limits in this section.

(iv) The procedures under 40 CFR 60.13 shall be followed for installation, evaluation, and operation of the continuous monitoring systems.

(v) When $NO_X$ emissions data are not obtained because of CEMS breakdowns, repairs, calibration checks and zero and span adjustments, emissions data will be obtained by using standby monitoring systems, Method 7 of 40 CFR part 60, appendix A–4, Method 7A of 40 CFR part 60, appendix A–4, or other approved reference methods to provide emissions data for a minimum of 75 percent of the operating hours in each affected unit operating day, in at least 22 out of 30 successive operating days.

(3) If you are the owner or operator of an affected unit not operating $NO_X$ CEMS, you must conduct an initial performance test before the 2026 ozone season to establish appropriate indicator ranges for operating parameters and continuously monitor those operator parameters consistent with the requirements of paragraphs (g)(3)(i) through (iv) of this section.

(i) You must monitor and record stack exhaust gas flow rate, hourly glass production, and stack exhaust gas temperature during the initial performance test and subsequent annual performance tests to demonstrate continuous compliance with your $NO_X$ emissions limits.

(ii) You must use the stack exhaust gas flow rate, hourly glass production, and stack exhaust gas temperature and subsequent annual performance test as $NO_X$ CEMS indicators to demonstrate continuous compliance and establish a site-specific indicator ranges for these operating parameters.

(iii) You must repeat the performance test annually to reassess and adjust the site-specific operating parameter indicator ranges in accordance with the results of the performance test.

(iv) You must report and include your ongoing site-specific operating parameter data in the annual reports required under paragraph (h) of this section and semi-annual title V monitoring reports to the relevant permitting authority.

(4) If you are the owner or operator of an affected unit seeking to comply with the requirements for startup under paragraph (d) of this section or shutdown under paragraph (e) of this section in lieu of the applicable emissions limit under paragraph (c) of this section, you must monitor material process flow rates, fuel throughput, oxidant flow rate, and the selected system operating parameters in accordance with paragraphs (d)(1)(ii) and (e)(1)(ii) of this section.

(h) *Recordkeeping requirements.* (1) If you are the owner or operator of an affected unit, you shall maintain records of the following information for each day the affected unit operates:

(i) Calendar date;

(ii) The average hourly $NO_X$ emissions rates measured or predicted;

(iii) The 30-day average $NO_X$ emissions rates calculated at the end of each affected unit operating day from the measured or predicted hourly $NO_X$ emissions rates for the preceding 30 operating days;

(iv) Identification of the affected unit operating days when the calculated 30-day average $NO_X$ emissions rates are in excess of the applicable site-specific $NO_X$ emissions limit with the reasons for such excess emissions as well as a description of corrective actions taken;

(v) Identification of the affected unit operating days for which pollutant data have not been obtained, including reasons for not obtaining sufficient data and a description of corrective actions taken;

(vi) Identification of the times when emissions data have been excluded from the calculation of average emissions rates and the reasons for excluding data;

(vii) If a CEMS is used to verify compliance:

(A) Identification of the times when the pollutant concentration exceeded full span of the CEMS;

(B) Description of any modifications to the CEMS that could affect the ability of the CEMS to comply with Performance Specification 2 or 3 in appendix B to 40 CFR part 60; and

(C) Results of daily CEMS drift tests and quarterly accuracy assessments as required under Procedure 1 of 40 CFR part 60, appendix F;

(D) Operating parameters required under paragraph (g) to demonstrate compliance during the ozone season;

(viii) Each fuel type, usage, and heat content; and

(ix) Glass production rate.

(2) If you are the owner or operator of an affected unit, you shall maintain all records necessary to demonstrate compliance with the startup and shutdown requirements in paragraphs (d) and (e) of this section, including but not limited to records of material process flow rates, system operating parameters, the duration of each startup and shutdown period, fuel throughput, oxidant flow rate, and any additional records necessary to determine whether the stoichiometric ratio of the primary furnace combustion system exceeded 5 percent excess oxygen during startup.

(3) If you are the owner or operator of an affected unit, you shall maintain records of daily $NO_X$ emissions in pounds per day for purposes of determining compliance with the applicable emissions limit for idling periods under paragraph (f)(2) of this section. Each owner or operator shall also record the duration of each idling period.

(i) *Reporting requirements.* (1) If you are the owner or operator of an affected unit, you must submit the results of the performance test or performance evaluation of the CEMS following the procedures specified in § 52.40(g) within 60 days after the date of completing each performance test required by this section.

(2) If you are the owner or operator of an affected unit, you are required to submit excess emissions reports for any excess emissions that occurred during the reporting period. Excess emissions are defined as any calculated 30-day rolling average $NO_X$ emissions rate that exceeds the applicable emissions limit in paragraph (c) of this section. Excess emissions reports must be submitted in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section following the procedures specified in § 52.40(g).

(3) If you own or operate an affected unit, you shall submit an annual report in PDF format to the EPA by January 30th of each year via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section. Annual reports shall be submitted following the procedures in § 52.40(g). The report shall include records all records required by paragraph (g) of this section, including record of CEMS data or operating parameters to demonstrate continuous compliance the applicable emissions limits under paragraphs (c) of this section.

(j) *Initial notification requirements for existing affected units.* (1) The requirements of this paragraph (j) apply to the owner or operator of an existing affected unit.

(2) The owner or operator of an existing affected unit that emits or has a potential to emit greater than 100 tons per year or greater as of August 4, 2023, shall notify the Administrator via the CEDRI or analogous electronic submission system provided by the EPA that the unit is subject to this section. The notification, which shall be submitted not later than June 23, 2023, shall be submitted in PDF format to the EPA via CEDRI, which can be accessed through the EPA's CDX (*https://cdx.epa.gov/*). The notification shall provide the following information:

(i) The name and address of the owner or operator;

(ii) The address (*i.e.,* physical location) of the affected unit;

(iii) An identification of the relevant standard, or other requirement, that is the basis for the notification and the unit's compliance date; and

(iv) A brief description of the nature, size, design, and method of operation of the facility and an identification of the types of emissions points (units) within the facility subject to the relevant standard.

**§ 52.45   What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, the Pulp, Paper, and Paperboard Mills Industries, Metal Ore Mining, and the Iron and Steel and Ferroalloy Manufacturing Industries?**

(a) *Definitions.* All terms not defined in this paragraph (a) shall have the meaning given to them in the Act and in subpart A of 40 CFR part 60.

*Affected unit* means an industrial boiler meeting the applicability criteria of this section.

*Boiler* means an enclosed device using controlled flame combustion and having the primary purpose of recovering thermal energy in the form of steam or hot water. Controlled flame combustion refers to a steady-state, or near steady-state, process wherein fuel and/or oxidizer feed rates are controlled.

*Coal* means "coal" as defined in 40 CFR 60.41b.

*Distillate oil* means "distillate oil" as defined in 40 CFR 60.41b.

*Maximum heat input capacity* means means the ability of a steam generating unit to combust a stated maximum amount of fuel on a steady state basis, as determined by the physical design and characteristics of the steam generating unit.

*Natural gas* means "natural gas" as defined in 40 CFR 60.41.

*Operating day* means a 24-hour period between 12:00 midnight and the following midnight during which any fuel is combusted at any time in the steam generating unit. It is not necessary for fuel to be combusted continuously for the entire 24-hour period.

*Residual oil* means "residual oil" as defined in 40 CFR 60.41c.

(b) *Applicability.* (1) The requirements of this section apply to each new or existing boiler with a design capacity of 100 mmBtu/hr or greater that receives 90% or more of its heat input from coal, residual oil, distillate oil, natural gas, or combinations of these fuels in the previous ozone season, is located at sources that are within the Basic Chemical Manufacturing industry, the Petroleum and Coal Products Manufacturing industry, the Pulp, Paper, and Paperboard industry, the Metal Ore Mining industry, and the Iron and Steel and Ferroalloys Manufacturing industry and which is located within any of the States listed in § 52.40(c)(2), including Indian country located within the borders of any such State(s). The requirements of this section do not apply to an emissions unit that meets the requirements for a low-use exemption as provided in paragraph (b)(2) of this section.

(2) If you are the owner or operator of a boiler meeting the applicability criteria of paragraph (b)(1) of this section that operates less than 10% per year on an hourly basis, based on the three most recent years of use and no more than 20% in any one of the three years, you are exempt from meeting the emissions limits of this section and are only subject to the recordkeeping and reporting requirements of paragraph (f)(2) of this section.

(i) If you are the owner or operator of an affected unit that exceeds the 10% per year hour of operation over three years or the 20% hours of operation per year criteria, you can no longer comply via the low-use exemption provisions and must meet the applicable emissions limits and other applicable provisions as soon as possible but not later than one year from the date eligibility as a low-use boiler was negated by exceedance of the low-use boiler criteria.

(ii) [Reserved]

(c) *Emissions limitations.* If you are the owner or operator of an affected unit, you must meet the following emissions limitations on a 30-day rolling average basis during the 2026 ozone season and in each ozone season thereafter:

(1) Coal-fired industrial boilers: 0.20 lbs $NO_X$/mmBtu;

(2) Residual oil-fired industrial boilers: 0.20 lbs $NO_X$/mmBtu;

(3) Distillate oil-fired industrial boilers: 0.12 lbs $NO_X$/mmBtu;

(4) Natural gas-fired industrial boilers: 0.08 lbs $NO_X$/mmBtu; and

(5) Boilers using combinations of fuels listed in paragraphs (c)(1) through (4) of this section: such units shall comply with a $NO_X$ emissions limit derived by summing the products of each fuel's heat input and respective emissions limit and dividing by the sum of the heat input contributed by each fuel.

(d) *Testing and monitoring requirements.* (1) If you are the owner or operator of an affected unit, you shall conduct an initial compliance test as described in 40 CFR 60.8 using the continuous system for monitoring $NO_X$ specified by EPA Test Method 7E of 40 CFR part 60, appendix A–4, to determine compliance with the emissions limits for $NO_X$ identified in paragraph (c) of this section. In lieu of the timing of the compliance test described in 40 CFR 60.8(a), you shall conduct the test within 90 days from the installation of the pollution control equipment used to comply with the $NO_X$ emissions limits in paragraph (c) of this section and no later than May 1, 2026.

(i) For the initial compliance test, you shall monitor $NO_X$ emissions from the affected unit for 30 successive operating days and the 30-day average emissions rate will be used to determine compliance with the $NO_X$ emissions limits in paragraph (c) of this section. You shall calculate the 30-day average emission rate as the average of all hourly emissions data recorded by the monitoring system during the 30-day test period.

(ii) You are not required to conduct an initial compliance test if the affected unit is subject to a pre-existing, federally enforceable requirement to monitor its $NO_X$ emissions using a

CEMS in accordance with 40 CFR 60.13 or 40 CFR part 75.

(2) If you are the owner or operator of an affected unit with a heat input capacity of 250 mmBTU/hr or greater, you are subject to the following monitoring requirements:

(i) You shall install, calibrate, maintain, and operate a continuous emissions monitoring system (CEMS) for measuring $NO_X$ emissions and either oxygen ($O_2$) or carbon dioxide ($CO_2$), unless the Administrator has approved a request from you to use an alternative monitoring technique under paragraph (d)(2)(vii) of this section. If you have previously installed a $NO_X$ emissions rate CEMS to meet the requirements of 40 CFR 60.13 or 40 CFR part 75 and continue to meet the ongoing requirements of 40 CFR 60.13 or 40 CFR part 75, that CEMS may be used to meet the monitoring requirements of this section.

(ii) You shall operate the CEMS and record data during all periods of operation during the ozone season of the affected unit except for CEMS breakdowns and repairs. You shall record data during calibration checks and zero and span adjustments.

(iii) You shall express the 1-hour average $NO_X$ emissions rates measured by the CEMS in terms of lbs/mmBtu heat input and shall be used to calculate the average emissions rates under paragraph (c) of this section.

(iv) Following the date on which the initial compliance test is completed, you shall determine compliance with the applicable $NO_X$ emissions limit in paragraph (c) of this section during the ozone season on a continuous basis using a 30-day rolling average emissions rate unless you monitor emissions by means of an alternative monitoring procedure approved pursuant to paragraph (d)(2)(vii) of this section. You shall calculate a new 30-day rolling average emissions rate for each operating day as the average of all the hourly $NO_X$ emissions data for the preceding 30 operating days.

(v) You shall follow the procedures under 40 CFR 60.13 for installation, evaluation, and operation of the continuous monitoring systems. Additionally, you shall use a span value of 1000 ppm $NO_X$ for affected units combusting coal and span value of 500 ppm $NO_X$ for units combusting oil or gas. As an alternative to meeting these span values, you may elect to use the $NO_X$ span values determined according to section 2.1.2 in appendix A to 40 CFR part 75.

(vi) When you are unable to obtain $NO_X$ emissions data because of CEMS breakdowns, repairs, calibration checks and zero and span adjustments, you will obtain emissions data by using standby monitoring systems, Method 7 of 40 CFR part 60, appendix A–4, Method 7A of 40 CFR part 60, appendix A–4, or other approved reference methods to provide emissions data for a minimum of 75 percent of the operating hours in each affected unit operating day, in at least 22 out of 30 successive operating days.

(vii) You may delay installing a CEMS for $NO_X$ until after the initial performance test has been conducted. If you demonstrate during the performance test that emissions of $NO_X$ are less than 70 percent of the applicable emissions limit in paragraph (c) of this section, you are not required to install a CEMS for measuring $NO_X$. If you demonstrate your affected unit emits less than 70 percent of the applicable emissions limit chooses to not install a CEMS, you must submit a written request to the Administrator that documents the results of the initial performance test and includes an alternative monitoring procedure that will be used to track compliance with the applicable $NO_X$ emissions limit(s) in paragraph (c) of this section. The Administrator may consider the request and, following public notice and comment, may approve the alternative monitoring procedure with or without revision, or disapprove the request. Upon receipt of a disapproved request, you will have one year to install a CEMS.

(3) If you are the owner or operator of an affected unit with a heat input capacity less than 250 mmBTU/hr, you must monitor $NO_X$ emission via the requirements of paragraph (e)(1) of this section or you must monitor $NO_X$ emissions by conducting an annual test in conjunction with the implementation of a monitoring plan meeting the following requirements:

(i) You must conduct an initial performance test over a minimum of 24 consecutive steam generating unit operating hours at maximum heat input capacity to demonstrate compliance with the $NO_X$ emission standards under paragraph (c) of this section using Method 7, 7A, or 7E of appendix A–4 to 40 CFR part 60, Method 320 of appendix A to 40 CFR part 63, or other approved reference methods.

(ii) You must conduct annual performance tests once per calendar year to demonstrate compliance with the $NO_X$ emission standards under paragraph (c) of this section over a minimum of 3 consecutive steam generating unit operating hours at maximum heat input capacity using Method 7, 7A, or 7E of appendix A–4

to 40 CFR part 60, Method 320 of appendix A to 40 CFR part 63, or other approved reference methods. The annual performance test must be conducted before the affected units operates more than 400 hours in a given year.

(iii) You must develop and comply with a monitoring plan that relates the operational parameters to emissions of the affected unit. The owner or operator of each affected unit shall develop a monitoring plan that identifies the operating conditions of the affected unit to be monitored and the records to be maintained in order to reliably predict $NO_X$ emissions and determine compliance with the applicable emissions limits of this section on a continuous basis. You shall include the following information in the plan:

(A) You shall identify the specific operating parameters to be monitored and the relationship between these operating parameters and the applicable $NO_X$ emission rate. Operating parameters of the affected unit include, but are not limited to, the degree of staged combustion (*i.e.,* the ratio of primary air to secondary and/or tertiary air) and the level of excess air (*i.e.,* flue gas $O_2$ level).

(B) You shall include the data and information used to identify the relationship between $NO_X$ emission rates and these operating conditions.

(C) *You shall identify:* how these operating parameters, including steam generating unit load, will be monitored on an hourly basis during periods of operation of the affected unit; the quality assurance procedures or practices that will be employed to ensure that the data generated by monitoring these operating parameters will be representative and accurate; and the type and format of the records of these operating parameters, including steam generating unit load, that you will maintain.

(4) You shall submit the monitoring plan to the EPA via the CEDRI reporting system, and request that the relevant permitting agency incorporate the monitoring plan into the facility's title V permit.

(e) *Recordkeeping requirements.* (1) If you are the owner or operator of an affected unit, which is not a low-use boiler, you shall maintain records of the following information for each day the affected unit operates during the ozone season:

(i) Calendar date;

(ii) The average hourly $NO_X$ emissions rates (expressed as lbs $NO_2$/mmBtu heat input) measured or predicted;

(iii) The 30-day average $NO_X$ emissions rates calculated at the end of

each affected unit operating day from the measured or predicted hourly $NO_X$ emissions rates for the preceding 30 steam generating unit operating days;

(iv) Identification of the affected unit operating days when the calculated 30-day rolling average $NO_X$ emissions rates are in excess of the applicable $NO_X$ emissions limit in paragraph (c) of this section with the reasons for such excess emissions as well as a description of corrective actions taken;

(v) Identification of the affected unit operating days for which pollutant data have not been obtained, including reasons for not obtaining sufficient data and a description of corrective actions taken;

(vi) Identification of the times when emissions data have been excluded from the calculation of average emissions rates and the reasons for excluding data;

(vii) Identification of "F" factor used for calculations, method of determination, and type of fuel combusted;

(viii) Identification of the times when the pollutant concentration exceeded full span of the CEMS;

(ix) Description of any modifications to the CEMS that could affect the ability of the CEMS to comply with Performance Specification 2 or 3 in appendix B to 40 CFR part 60;

(x) Results of daily CEMS drift tests and quarterly accuracy assessments as required under Procedure 1 of 40 CFR part 60, appendix F; and

(xi) The type and amounts of each fuel combusted.

(2) If you are the owner or operator of an affected unit complying as a low-use boiler, you must maintain the following records consistent with the requirements of § 52.40(g):

(i) Identification and location of the boiler;

(ii) Nameplate capacity;

(iii) The fuel or fuels used by the boiler;

(iv) For each operating day, the type and amount of fuel combusted, and the date and total number of hours of operation; and

(v) the annual hours of operation for each of the prior 3 years, and the 3-year average hours or operation.

(f) *Reporting requirements.* (1) If you are the owner or operator of an affected unit, you must submit the results of the performance test or performance evaluation of the CEMS following the procedures specified in § 52.40(g) within 60 days after the date of completing each performance test required by this section.

(2) If you are the owner or operator of an affected unit, you are required to submit excess emissions reports for any

excess emissions that occurred during the reporting period. Excess emissions are defined as any calculated 30-day rolling average $NO_X$ emissions rate, as determined under paragraph (e)(1)(iii) of this section, that exceeds the applicable emissions limit in paragraph (c) of this section. Excess emissions reports must be submitted in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section following the procedures specified in § 52.40(g).

(3) If you are the owner or operator an affected unit subject to the continuous monitoring requirements for $NO_X$ under paragraph (d) of this section, you shall submit reports containing the information recorded under paragraph (d) of this section as described in paragraph (e)(1) of this section. You shall submit compliance reports for continuous monitoring in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section following the procedures specified in § 52.40(g).

(4) If you are the owner or operator of an affected unit, you shall submit an annual report in PDF format to the EPA by January 30th of each year via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section. Annual reports shall be submitted following the procedures in § 52.40(g).

**§ 52.46   What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from Municipal Waste Combustors?**

(a) *Definitions.* All terms not defined in this paragraph (a) shall have the meaning given them in the Act and in subpart A of 40 CFR part 60.

*Affected unit* means a municipal waste combustor meeting the applicability criteria of this section.

*Chief facility operator* means the person in direct charge and control of the operation of a municipal waste combustor and who is responsible for daily onsite supervision, technical direction, management, and overall performance of the facility.

*Mass burn refractory municipal waste combustor* means a field-erected combustor that combusts municipal solid waste in a refractory wall furnace. Unless otherwise specified, this includes combustors with a cylindrical rotary refractory wall furnace.

*Mass burn rotary waterwall municipal waste combustor* means a field-erected combustor that combusts municipal solid waste in a cylindrical rotary

waterwall furnace or on a tumbling-tile grate.

*Mass burn waterwall municipal waste combustor* means a field-erected combustor that combusts municipal solid waste in a waterwall furnace.

*Municipal waste combustor, MWC,* or *municipal waste combustor unit* means:

(i) Means any setting or equipment that combusts solid, liquid, or gasified MSW including, but not limited to, field-erected incinerators (with or without heat recovery), modular incinerators (starved-air or excess-air), boilers (*i.e.,* steam-generating units), furnaces (whether suspension-fired, grate-fired, mass-fired, air curtain incinerators, or fluidized bed-fired), and pyrolysis/combustion units. Municipal waste combustors do not include pyrolysis/combustion units located at plastics/rubber recycling units. Municipal waste combustors do not include internal combustion engines, gas turbines, or other combustion devices that combust landfill gases collected by landfill gas collection systems.

(ii) The boundaries of a MWC are defined as follows. The MWC unit includes, but is not limited to, the MSW fuel feed system, grate system, flue gas system, bottom ash system, and the combustor water system. The MWC boundary starts at the MSW pit or hopper and extends through:

(A) The combustor flue gas system, which ends immediately following the heat recovery equipment or, if there is no heat recovery equipment, immediately following the combustion chamber;

(B) The combustor bottom ash system, which ends at the truck loading station or similar ash handling equipment that transfer the ash to final disposal, including all ash handling systems that are connected to the bottom ash handling system; and

(C) The combustor water system, which starts at the feed water pump and ends at the piping exiting the steam drum or superheater.

(iii) The MWC unit does not include air pollution control equipment, the stack, water treatment equipment, or the turbine generator set.

*Municipal waste combustor unit capacity* means the maximum charging rate of a municipal waste combustor unit expressed in tons per day of municipal solid waste combusted, calculated according to the procedures under paragraph (e)(4) of this section.

*Shift supervisor* means the person who is in direct charge and control of the operation of a municipal waste combustor and who is responsible for onsite supervision, technical direction,

management, and overall performance of the facility during an assigned shift.

(b) *Applicability.* The requirements of this section apply to each new or existing municipal waste combustor unit with a combustion capacity greater than 250 tons per day (225 megagrams per day) of municipal solid waste and which is located within any of the States listed in § 52.40(c)(2), including Indian country located within the borders of any such State(s).

(c) *Emissions limitations.* If you are the owner or operator of an affected unit, you must meet the following emissions limitations at all times, except during startup and shutdown, on a 30-day rolling average basis during the 2026 ozone season and in each ozone season thereafter:

(1) 110 ppmvd at 7 percent oxygen on a 24-hour block averaging period; and

(2) 105 ppmvd at 7 percent oxygen on a 30-day rolling averaging period.

(d) *Startup and shutdown requirements.* If you are the owner or operator of an affected unit, you must comply with the following requirements during startup and shutdown:

(1) During periods of startup and shutdown, you shall meet the following emissions limits at stack oxygen content:

(i) 110 ppmvd at stack oxygen content on a 24-hour block averaging period; and

(ii) 105 ppmvd at stack oxygen content on a 30-day rolling averaging period.

(2) Duration of startup and shutdown, periods are limited to 3 hours per occurrence.

(3) The startup period commences when the affected unit begins the continuous burning of municipal solid waste and does not include any warmup period when the affected unit is combusting fossil fuel or other nonmunicipal solid waste fuel, and no municipal solid waste is being fed to the combustor.

(4) Continuous burning is the continuous, semicontinuous, or batch feeding of municipal solid waste for purposes of waste disposal, energy production, or providing heat to the combustion system in preparation for waste disposal or energy production. The use of municipal solid waste solely to provide thermal protection of the grate or hearth during the startup period when municipal solid waste is not being fed to the grate is not considered to be continuous burning.

(5) The owner and operator of an affected unit shall minimize $NO_X$ emissions by operating and optimizing the use of all installed pollution control technology and combustion controls

consistent with the technological limitations, manufacturers' specifications, good engineering and maintenance practices, and good air pollution control practices for minimizing emissions (as defined in 40 CFR 60.11(d)) for such equipment and the unit at all times the unit is in operation.

(e) *Testing and monitoring requirements.* (1) If you are the owner or operator of an affected unit, you shall install, calibrate, maintain, and operate a continuous emissions monitoring system (CEMS) for measuring the oxygen or carbon dioxide content of the flue gas at each location where $NO_X$ are monitored and record the output of the system. You shall comply with the following test procedures and test methods:

(i) You shall use a span value of 25 percent oxygen for the oxygen monitor or 20 percent carbon dioxide for the carbon dioxide monitor;

(ii) You shall install, evaluate, and operate the CEMS in accordance with 40 CFR 60.13;

(iii) You shall complete the initial performance evaluation no later than 180 days after the date of initial startup of the affected unit, as specified under 40 CFR 60.8;

(iv) You shall operate the monitor in conformance with Performance Specification 3 in 40 CFR part 60, appendix B, except for section 2.3 (relative accuracy requirement);

(v) You shall operate the monitor in accordance with the quality assurance procedures of 40 CFR part 60, appendix F, except for section 5.1.1 (relative accuracy test audit); and

(vi) If you select carbon dioxide for use in diluent corrections, you shall establish the relationship between oxygen and carbon dioxide levels during the initial performance test according to the following procedures and methods:

(A) This relationship may be reestablished during performance compliance tests; and

(B) You shall submit the relationship between carbon dioxide and oxygen concentrations to the EPA as part of the initial performance test report and as part of the annual test report if the relationship is reestablished during the annual performance test.

(2) If you are the owner or operator of an affected unit, you shall use the following procedures and test methods to determine compliance with the $NO_X$ emission limits in paragraph (c) of this section:

(i) If you are not already operating a CEMS in accordance with 40 CFR 60.13, you shall conduct an initial

performance test for nitrogen oxides consistent with 40 CFR 60.8.

(ii) You shall install and operate the $NO_X$ CEMS according to Performance Specification 2 in 40 CFR part 60, appendix B, and shall follow the requirements of 40 CFR 60.58b(h)(10).

(iii) Quarterly accuracy determinations and daily calibration drift tests for the CEMS shall be performed in accordance with Procedure 1 in 40 CFR part 60, appendix F.

(iv) When $NO_X$ continuous emissions data are not obtained because of CEMS breakdowns, repairs, calibration checks, and zero and span adjustments, emissions data shall be obtained using other monitoring systems as approved by the EPA or EPA Reference Method 19 in 40 CFR part 60, appendix A–7, to provide, as necessary, valid emissions data for a minimum of 90 percent of the hours per calendar quarter and 95 percent of the hours per calendar year the unit is operated and combusting municipal solid waste.

(v) You shall use EPA Reference Method 19, section 4.1, in 40 CFR part 60, appendix A–7, for determining the daily arithmetic average $NO_X$ emissions concentration.

(A) You may request that compliance with the $NO_X$ emissions limit be determined using carbon dioxide measurements corrected to an equivalent of 7 percent oxygen. The relationship between oxygen and carbon dioxide levels for the affected unit shall be established as specified in paragraph (e)(1)(vi) of this section.

(B) [Reserved]

(vi) At a minimum, you shall obtain valid CEMS hourly averages for 90 percent of the operating hours per calendar quarter and for 95 percent of the operating hours per calendar year that the affected unit is combusting municipal solid waste:

(A) At least 2 data points per hour shall be used to calculate each 1-hour arithmetic average.

(B) Each $NO_X$ 1-hour arithmetic average shall be corrected to 7 percent oxygen on an hourly basis using the 1-hour arithmetic average of the oxygen (or carbon dioxide) continuous emissions monitoring system data.

(vii) The 1-hour arithmetic averages section shall be expressed in parts per million by volume (dry basis) and used to calculate the 24-hour daily arithmetic average concentrations. The 1-hour arithmetic averages shall be calculated using the data points required under 40 CFR 60.13(e)(2).

(viii) All valid CEMS data must be used in calculating emissions averages even if the minimum CEMS data

requirements of paragraph (e)(2)(iv) of this section are not met.

(ix) The procedures under 40 CFR 60.13 shall be followed for installation, evaluation, and operation of the CEMS. The initial performance evaluation shall be completed no later than 180 days after the date of initial startup of the municipal waste combustor unit.

(3) If you are the owner or operator of an affected unit, you must determine compliance with the startup and shutdown requirements of paragraph (d) of this section by following the requirements in paragraphs (e)(3)(i) and (ii) of this section:

(i) You can measure CEMS data at stack oxygen content. You can dismiss or exclude CEMS data from compliance calculations, but you shall record and report CEMS data in accordance with the provisions of 40 CFR 60.59b(d)(7).

(ii) You shall determine compliance with the $NO_X$ mass loading emissions limitation for periods of startup and shutdown by calculating the 24-hour average of all hourly average $NO_X$ emissions concentrations from continuous emissions monitoring systems.

(A) You shall perform this calculations using stack flow rates derived from flow monitors, for all the hours during the 3-hour startup or shutdown period and the remaining 21 hours of the 24-hour period.

(B) [Reserved]

(4) If you are the owner or operator of an affected unit, you shall calculate municipal waste combustor unit capacity using the following procedures:

(i) For municipal waste combustor units capable of combusting municipal solid waste continuously for a 24-hour period, municipal waste combustor unit capacity shall be calculated based on 24 hours of operation at the maximum charging rate. The maximum charging rate shall be calculated as specified in paragraphs (e)(4)(i)(A) and (B) of this section as applicable.

(A) For combustors that are designed based on heat capacity, the maximum charging rate shall be calculated based on the maximum design heat input capacity of the unit and a heating value of 12,800 kilojoules per kilogram for combustors firing refuse-derived fuel and a heating value of 10,500 kilojoules per kilogram for combustors firing municipal solid waste that is not refuse-derived fuel.

(B) For combustors that are not designed based on heat capacity, the maximum charging rate shall be the maximum design charging rate.

(ii) For batch feed municipal waste combustor units, municipal waste combustor unit capacity shall be

calculated as the maximum design amount of municipal solid waste that can be charged per batch multiplied by the maximum number of batches that could be processed in a 24-hour period. The maximum number of batches that could be processed in a 24-hour period is calculated as 24 hours divided by the design number of hours required to process one batch of municipal solid waste, and may include fractional batches (*e.g.,* if one batch requires 16 hours, then 24/16, or 1.5 batches, could be combusted in a 24-hour period). For batch combustors that are designed based on heat capacity, the design heating value of 12,800 kilojoules per kilogram for combustors firing refuse-derived fuel and a heating value of 10,500 kilojoules per kilogram for combustors firing municipal solid waste that is not refuse-derived fuel shall be used in calculating the municipal waste combustor unit capacity in megagrams per day of municipal solid waste.

(f) *Recordkeeping requirements.* If you are the owner or operator of an affected unit, you shall maintain records of the following information, as applicable, for each affected unit consistent with the requirements of § 52.40(g).

(1) The calendar date of each record.

(2) The emissions concentrations and parameters measured using continuous monitoring systems.

(i) All 1-hour average $NO_X$ emissions concentrations.

(ii) The average concentrations and percent reductions, as applicable, including all 24-hour daily arithmetic average $NO_X$ emissions concentrations.

(3) Identification of the calendar dates and times (hours) for which valid hourly $NO_X$ emissions, including reasons for not obtaining the data and a description of corrective actions taken.

(4) Identification of each occurrence that $NO_X$ emissions data, or operational data (*i.e.,* unit load) have been excluded from the calculation of average emissions concentrations or parameters, and the reasons for excluding the data.

(5) The results of daily drift tests and quarterly accuracy determinations for CEMS, as required under 40 CFR part 60, appendix F, Procedure 1.

(6) The following records:

(i) Records showing the names of the municipal waste combustor chief facility operator, shift supervisors, and control room operators who have been provisionally certified by the American Society of Mechanical Engineers or an equivalent State-approved certification program as required by 40 CFR 60.54b(a) including the dates of initial and renewal certifications and documentation of current certification;

(ii) Records showing the names of the municipal waste combustor chief facility operator, shift supervisors, and control room operators who have been fully certified by the American Society of Mechanical Engineers or an equivalent State-approved certification program as required by 40 CFR 60.54b(b) including the dates of initial and renewal certifications and documentation of current certification;

(iii) Records showing the names of the municipal waste combustor chief facility operator, shift supervisors, and control room operators who have completed the EPA municipal waste combustor operator training course or a State-approved equivalent course as required by 40 CFR 60.54b(d) including documentation of training completion; and

(iv) Records of when a certified operator is temporarily off site. Include two main items:

(A) If the certified chief facility operator and certified shift supervisor are off site for more than 12 hours, but for 2 weeks or less, and no other certified operator is on site, record the dates that the certified chief facility operator and certified shift supervisor were off site.

(B) When all certified chief facility operators and certified shift supervisors are off site for more than 2 weeks and no other certified operator is on site, keep records of four items:

(*1*) Time of day that all certified persons are off site.

(*2*) The conditions that cause those people to be off site.

(*3*) The corrective actions taken by the owner or operator of the affected unit to ensure a certified chief facility operator or certified shift supervisor is on site as soon as practicable.

(*4*) Copies of the reports submitted every 4 weeks that summarize the actions taken by the owner or operator of the affected unit to ensure that a certified chief facility operator or certified shift supervisor will be on site as soon as practicable.

(7) Records showing the names of persons who have completed a review of the operating manual as required by 40 CFR 60.54b(f) including the date of the initial review and subsequent annual reviews.

(8) Records of steps taken to minimize emissions during startup and shutdown as required by paragraph (d)(5) of this section.

(g) *Reporting requirements.* (1) If you are the owner or operator of an affected unit, you must submit the results of the performance test or performance evaluation of the CEMS following the procedures specified in § 52.40(g)

within 60 days after the date of completing each performance test required by this section.

(2) If you are the owner or operator of an affected unit, you shall submit an annual report in PDF format to the EPA by January 30th of each year via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section. Annual reports shall be submitted following the procedures in § 52.40(g). The report shall include all information required by paragraph (e) of this section, including CEMS data to demonstrate compliance with the applicable emissions limits under paragraph (c) of this section.

## Subpart B—Alabama

■ 5. Amend § 52.54 by revising paragraphs (b)(2) and (3) and adding paragraphs (b)(4) and (5) to read as follows:

### § 52.54  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(b) \* \* \*

(2) The owner and operator of each source and each unit located in the State of Alabama and Indian country within the borders of the State and for which requirements are set forth under the CSAPR $NO_X$ Ozone Season Group 2 Trading Program in subpart EEEEE of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2017 through 2022. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Alabama's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(ii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Alabama's SIP.

(3) The owner and operator of each source and each unit located in the State of Alabama and Indian country within the borders of the State and for which

requirements are set forth under the CSAPR $NO_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Alabama's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Alabama's SIP.

(4) Notwithstanding the provisions of paragraphs (b)(2) and (3) of this section, if, at the time of the approval of Alabama's SIP revision described in paragraph (b)(2) or (3) of this section, the Administrator has already started recording any allocations of CSAPR $NO_X$ Ozone Season Group 2 allowances or CSAPR $NO_X$ Ozone Season Group 3 allowances under subpart EEEEE or GGGGG, respectively, of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of such subpart authorizing the Administrator to complete the allocation and recordation of such allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (b)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR $NO_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR $NO_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR $NO_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR $NO_X$ Ozone Season

Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State and Indian country within the borders of the State for control periods after 2022) shall continue to apply.

## Subpart E—Arkansas

■ 6. Amend § 52.184 by:
■ a. Redesignating paragraphs (a) through (c) as paragraphs (a)(1) through (3);
■ b. In newly redesignated paragraph (a)(2):
■ i. Removing "2017 and each subsequent year" and adding in its place "2017 through 2022"; and
■ ii. Removing the second sentence;
■ c. Revising newly redesignated paragraph (a)(3); and
■ d. Adding paragraphs (a)(4) and (5) and (b).

The revision and additions read as follows:

### § 52.184  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a) \* \* \*

(3) The owner and operator of each source and each unit located in the State of Arkansas and for which requirements are set forth under the CSAPR $NO_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Arkansas' State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii), except to the extent the Administrator's approval is partial or conditional.

(4) Notwithstanding the provisions of paragraph (a)(3) of this section, if, at the time of the approval of Arkansas' SIP revision described in paragraph (a)(3) of this section, the Administrator has already started recording any allocations of CSAPR $NO_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR $NO_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (a)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the use of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State for control periods after 2022) shall continue to apply.

(b) The owner and operator of each source located in the State of Arkansas and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart F—California

■ 7. Add § 52.284 to read as follows:

### § 52.284  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

The owner and operator of each source located in the State of California and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart O—Illinois

■ 8. Amend § 52.731 by:
■ a. In paragraph (b)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (c).
The addition reads as follows:

### § 52.731  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*    *    *    *    *

(c) The owner and operator of each source located in the State of Illinois and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart P—Indiana

■ 9. Amend § 52.789 by:
■ a. In paragraph (b)(2), removing "(b)(2)(iv), except" and adding in its place "(b)(2)(ii), except";
■ b. In paragraph (b)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ c. Adding paragraph (c).
The addition reads as follows:

### § 52.789  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*    *    *    *    *

(c) The owner and operator of each source located in the State of Indiana and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart S—Kentucky

■ 10. Amend § 52.940 by:
■ a. In paragraph (b)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (c).
The addition reads as follows:

### § 52.940  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*    *    *    *    *

(c) The owner and operator of each source located in the State of Kentucky and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart T—Louisiana

■ 11. Amend § 52.984 by:
■ a. In paragraph (d)(3), revising the second and third sentences;
■ b. Revising paragraph (d)(4);
■ c. In paragraph (d)(5), adding "and Indian country within the borders of the State" after "in the State"; and
■ d. Adding paragraph (e).
The revision and addition read as follows:

### § 52.984  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*    *    *    *    *

(d) *    *    *

(3) *  *  * The obligation to comply with such requirements with regard to sources and units in the State and areas

of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Louisiana's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Louisiana's SIP.

(4) Notwithstanding the provisions of paragraph (d)(3) of this section, if, at the time of the approval of Louisiana's SIP revision described in paragraph (d)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

*    *    *    *    *

(e) The owner and operator of each source located in the State of Louisiana and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart V—Maryland

■ 12. Amend § 52.1084 by:
■ a. In paragraph (b)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (c).
The addition reads as follows:

### § 52.1084  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*    *    *    *    *

(c) The owner and operator of each source located in the State of Maryland

and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart X—Michigan

■ 13. Amend § 52.1186 by:
■ a. In paragraph (e)(3), revising the second and third sentences;
■ b. Revising paragraph (e)(4);
■ c. In paragraph (e)(5), adding "and Indian country within the borders of the State" after "in the State"; and
■ d. Adding paragraph (f).

The revision and addition read as follows:

### § 52.1186 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*       *       *       *       *

(e) * * *

(3) * * * The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Michigan's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of a revision to Michigan's SIP.

(4) Notwithstanding the provisions of paragraph (e)(3) of this section, if, at the time of the approval of Michigan's SIP revision described in paragraph (e)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply,

unless provided otherwise by such approval of the State's SIP revision.

*       *       *       *       *

(f) The owner and operator of each source located in the State of Michigan and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart Y—Minnesota

■ 14. Amend § 52.1240 by adding paragraph (d) to read as follows:

### § 52.1240 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*       *       *       *       *

(d)(1) The owner and operator of each source and each unit located in the State of Minnesota and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Minnesota's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of a revision to Minnesota's SIP.

(2) Notwithstanding the provisions of paragraph (d)(1) of this section, if, at the time of the approval of Minnesota's SIP revision described in paragraph (d)(1) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the

State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart Z—Mississippi

■ 15. Amend § 52.1284 by:
■ a. Redesignating paragraphs (a) through (c) as paragraphs (a)(1) through (3);
■ b. In newly redesignated paragraph (a)(2):
■ i. Removing "2017 and each subsequent year" and adding in its place "2017 through 2022"; and
■ ii. Removing the second and third sentences;
■ c. Revising newly redesignated paragraph (a)(3); and
■ d. Adding paragraphs (a)(4) and (5) and (b).

The revision and additions read as follows:

### § 52.1284 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a) * * *

(3) The owner and operator of each source and each unit located in the State of Mississippi and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Mississippi's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of a revision to Mississippi's SIP.

(4) Notwithstanding the provisions of paragraph (a)(3) of this section, if, at the time of the approval of Mississippi's SIP revision described in paragraph (a)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (a)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State and Indian country within the borders of the State for control periods after 2022) shall continue to apply.

(b) The owner and operator of each source located in the State of Mississippi and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart AA—Missouri

■ 16. Amend § 52.1326 by revising paragraph (b)(2) and (3) and adding paragraphs (b)(4) and (5) and (c) to read as follows:

### § 52.1326 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*       *       *       *       *

(b) * * *

(2) The owner and operator of each source and each unit located in the State of Missouri and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 2 Trading Program in subpart EEEEE of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2017 through 2022. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Missouri's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(ii), except to the extent the Administrator's approval is partial or conditional.

(3) The owner and operator of each source and each unit located in the State of Missouri and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Missouri's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii), except to the extent the Administrator's approval is partial or conditional.

(4) Notwithstanding the provisions of paragraphs (b)(2) and (3) of this section, if, at the time of the approval of Missouri's SIP revision described in paragraph (b)(2) or (3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 2 allowances or CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart EEEEE or GGGGG, respectively, of part 97 of this chapter to units in the State for a control period in any year, the provisions of such subpart authorizing the Administrator to complete the allocation and recordation of such allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (b)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State for control periods after 2022) shall continue to apply.

(c) The owner and operator of each source located in the State of Missouri and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart DD—Nevada

■ 17. Add § 52.1492 to read as follows:

### § 52.1492 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of Nevada and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Nevada's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval of a revision to Nevada's SIP.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Nevada's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within

the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b) The owner and operator of each source located in the State of Nevada and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart FF—New Jersey

■ 18. Amend § 52.1584 by:
■ a. In paragraph (e)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (f).

The addition reads as follows:

#### § 52.1584  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*     \*     \*     \*     \*

(f) The owner and operator of each source located in the State of New Jersey and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart HH—New York

■ 19. Amend § 52.1684 by:
■ a. In paragraph (b)(3), revising the second and third sentences;
■ b. Revising paragraph (b)(4);
■ c. In paragraph (b)(5), adding "and Indian country within the borders of the State" after "in the State"; and
■ d. Adding paragraph (c).

The revision and addition read as follows:

#### § 52.1684  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*     \*     \*     \*     \*

(b) \* \* \*
(3) \* \* \* The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the

promulgation of an approval by the Administrator of a revision to New York's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to New York's SIP.

(4) Notwithstanding the provisions of paragraph (b)(3) of this section, if, at the time of the approval of New York's SIP revision described in paragraph (b)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

\*     \*     \*     \*     \*

(c) The owner and operator of each source located in the State of New York and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart KK—Ohio

■ 20. Amend § 52.1882 by:
■ a. In paragraph (b)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (c).

The addition reads as follows:

#### § 52.1882  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*     \*     \*     \*     \*

(c) The owner and operator of each source located in the State of Ohio and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43,

§ 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart LL—Oklahoma

■ 21. Amend § 52.1930 by:
■ a. Redesignating paragraphs (a) through (c) as paragraphs (a)(1) through (3);
■ b. In newly redesignated paragraph (a)(2):
■ i. Removing "2017 and each subsequent year" and adding in its place "2017 through 2022"; and
■ ii. Removing the second and third sentences;
■ c. Revising newly redesignated paragraph (a)(3); and
■ d. Adding paragraphs (a)(4) and (5) and (b).

The revision and additions read as follows:

#### § 52.1930  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a) \* \* \*
(3) The owner and operator of each source and each unit located in the State of Oklahoma and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Oklahoma's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Oklahoma's SIP.

(4) Notwithstanding the provisions of paragraph (a)(3) of this section, if, at the time of the approval of Oklahoma's SIP revision described in paragraph (a)(3) of this section, the Administrator has already started recording any allocations

of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (a)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State and Indian country within the borders of the State for control periods after 2022) shall continue to apply.

(b) The owner and operator of each source located in the State of Oklahoma and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart NN—Pennsylvania

■ 22. Amend § 52.2040 by:
■ a. In paragraph (b)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (c).
The addition reads as follows:

### § 52.2040  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(c) The owner and operator of each source located in the State of Pennsylvania and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions

occurring in 2026 and each subsequent year.

### Subpart SS—Texas

■ 23. Amend § 52.2283 by:
■ a. In paragraph (d)(2):
■ i. Removing "2017 and each subsequent year" and adding in its place "2017 through 2022"; and
■ ii. Removing the second and third sentences;
■ b. Revising paragraph (d)(3); and
■ c. Adding paragraphs (d)(4) and (5) and (e).
The revision and additions read as follows:

### § 52.2283  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(d) \* \* \*

(3) The owner and operator of each source and each unit located in the State of Texas and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Texas' State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Texas' SIP.

(4) Notwithstanding the provisions of paragraph (d)(3) of this section, if, at the time of the approval of Texas' SIP revision described in paragraph (d)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period

in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (d)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State and Indian country within the borders of the State for control periods after 2022) shall continue to apply.

(e) The owner and operator of each source located in the State of Texas and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart TT—Utah

■ 24. Add § 52.2356 to read as follows:

### § 52.2356  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of Utah and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Utah's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal

Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Utah's SIP.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Utah's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b) The owner and operator of each source located in the State of Utah and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart VV—Virginia

■ 25. Amend § 52.2440 by:
■ a. In paragraph (b)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (c).
The addition reads as follows:

### § 52.2440  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*    *    *    *    *

(c) The owner and operator of each source located in the State of Virginia and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart XX—West Virginia

■ 26. Amend § 52.2540 by:

■ a. In paragraph (b)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (c).
The addition reads as follows:

### § 52.2540  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*    *    *    *    *

(c) The owner and operator of each source located in the State of West Virginia and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart YY—Wisconsin

■ 27. Amend § 52.2587 by:
■ a. In paragraph (e)(2):
■ i. Removing "2017 and each subsequent year" and adding in its place "2017 through 2022"; and
■ ii. Removing the second and third sentences;
■ b. Revising paragraph (e)(3); and
■ c. Adding paragraphs (e)(4) and (5).
The revision and additions read as follows:

### § 52.2587  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*    *    *    *    *

(e) * * *

(3) The owner and operator of each source and each unit located in the State of Wisconsin and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Wisconsin's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP

authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Wisconsin's SIP.

(4) Notwithstanding the provisions of paragraph (e)(3) of this section, if, at the time of the approval of Wisconsin's SIP revision described in paragraph (e)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (e)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State and Indian country within the borders of the State for control periods after 2022) shall continue to apply.

## PART 75—CONTINUOUS EMISSION MONITORING

■ 28. The authority citation for part 75 is revised to read as follows:

**Authority:** 42 U.S.C. 7401–7671q and 7651k note.

## Subpart H—NO$_X$ Mass Emissions Provisions

■ 29. Amend § 75.72 by:
■ a. In paragraph (c)(3), removing "appendix B of this part" and adding in its place "appendix B to this part";
■ b. In paragraph (e)(1)(ii), removing "heat input from" and adding in its place "heat input rate to";
■ c. In paragraph (e)(2), removing "appendix D of this part" and adding in its place "appendix D to this part"; and

■ d. Adding paragraph (f).
The addition reads as follows:

### §75.72   Determination of NO$_X$ mass emissions for common stack and multiple stack configurations.

\*    \*    \*    \*    \*

(f) *Procedures for apportioning hourly NO$_X$ mass emission rate to the unit level.* If the owner or operator of a unit determining hourly NO$_X$ mass emission rate at a common stack under this section is subject to a State or Federal NO$_X$ mass emissions reduction program under subpart GGGGG of part 97 of this chapter or under a state implementation plan approved pursuant to §52.38(b)(12) of this chapter, then on and after January 1, 2024, the owner or operator shall apportion the hourly NO$_X$ mass emissions rate at the common stack to each unit using the common stack based on the ratio of the hourly heat input rate for each such unit to the total hourly heat input rate for all such units, in conjunction with the appropriate unit and stack operating times, according to the procedures in section 8.5.3 of appendix F to this part.

\*    \*    \*    \*    \*

■ 30. Amend §75.73 by:
■ a. Revising paragraph (a)(3);
■ b. In paragraph (c)(1), removing "NO$_X$ emissions" and adding in its place "NO$_X$ emissions";
■ c. Adding a heading to paragraph (c)(2);
■ d. Revising paragraphs (c)(3) and (f)(1) introductory text;
■ e. Removing and reserving paragraph (f)(1)(i)(B);
■ f. In paragraph (f)(1)(ii)(G), removing "appendix D;" and adding in its place "appendix D to this part;";
■ g. Adding paragraphs (f)(1)(ix) and (x);
■ h. Adding a heading to paragraph (f)(2); and
■ i. Revising paragraph (f)(4).
The revisions and additions read as follows:

### §75.73   Recordkeeping and reporting.

(a) \*    \*    \*

(3) For each hour when the unit is operating, NO$_X$ mass emission rate, calculated in accordance with section 8 of appendix F to this part.

\*    \*    \*    \*    \*

(c) \*    \*    \*

(2) *Monitoring plan updates.* \*    \*    \*

(3) *Contents of the monitoring plan.* Each monitoring plan shall contain the information in §75.53(g)(1) in electronic format and the information in §75.53(g)(2) in hardcopy format. In addition, to the extent applicable, each monitoring plan shall contain the information in §75.53(h)(1)(i) and (h)(2)(i) in electronic format and the

information in §75.53(h)(1)(ii) and (h)(2)(ii) in hardcopy format. For units using the low mass emissions excepted methodology under §75.19, the monitoring plan shall include the additional information in §75.53(h)(4)(i) and (ii). The monitoring plan also shall include a seasonal controls indicator and an ozone season fuel-switching flag.

\*    \*    \*    \*    \*

(f) \*    \*    \*

(1) *Electronic submission.* The designated representative for an affected unit shall electronically report the data and information in this paragraph (f)(1) and in paragraphs (f)(2) and (3) of this section to the Administrator quarterly, unless the unit has been placed in long-term cold storage (as defined in §72.2 of this chapter). Each electronic report must be submitted to the Administrator within 30 days following the end of each calendar quarter. Each electronic report shall include the information provided in paragraphs (f)(1)(i) through (x) of this section and shall also include the date of report generation. A unit placed into long-term cold storage is exempted from submitting quarterly reports beginning with the calendar quarter following the quarter in which the unit is placed into long-term cold storage, provided that the owner or operator shall submit quarterly reports for the unit beginning with the data from the quarter in which the unit recommences operation (where the initial quarterly report contains hourly data beginning with the first hour of recommenced operation of the unit).

\*    \*    \*    \*    \*

(ix) On and after on January 1, 2024, for a unit subject to subpart GGGGG of part 97 of this chapter or a state implementation plan approved under §52.38(b)(12) of this chapter and determining NO$_X$ mass emission rate at a common stack, apportioned hourly NO$_X$ mass emission rate for the unit, lb/hr.

(x) On and after January 1, 2024, for a unit that is subject to subpart GGGGG of part 97 of this chapter or a state implementation plan approved under §52.38(b)(12) of this chapter, that lists coal or a solid coal-derived fuel as a fuel in the unit's monitoring plan under §75.53 for any portion of the ozone season in the year for which data are being reported, that serves a generator of 100 MW or larger nameplate capacity, and that is not a circulating fluidized bed boiler, provided that through December 31, 2029, the requirements under this paragraph (f)(1)(x) shall apply to a unit in a given calendar year only if the unit also was equipped with selective catalytic reduction controls on

or before September 30 of the previous year:

(A) Daily NO$_X$ emissions (lbs) for each day of the reporting period;

(B) Daily heat input (mmBtu) for each day of the reporting period;

(C) Daily average NO$_X$ emission rate (lb/mmBtu, rounded to the nearest thousandth) for each day of the reporting period;

(D) Daily NO$_X$ emissions (lbs) exceeding the applicable backstop daily NO$_X$ emission rate for each day of the reporting period;

(E) Cumulative NO$_X$ emissions (tons, rounded to the nearest tenth) exceeding the applicable backstop daily NO$_X$ emission rate during the ozone season; and

(F) Cumulative NO$_X$ emissions (tons, rounded to the nearest tenth) exceeding the applicable backstop daily NO$_X$ emission rate during the ozone season by more than 50 tons, calculated as the remainder of the amount calculated under paragraph (f)(1)(x)(E) of this section minus 50, but not less than zero.

(2) *Verification of identification codes and formulas.* \*    \*    \*

(4) *Electronic format, method of submission, and explanatory information.* The designated representative shall comply with all of the quarterly reporting requirements in §75.64(d), (f), and (g).

■ 31. Revise §75.75 to read as follows:

### §75.75   Additional ozone season calculation procedures.

(a) The owner or operator of a unit that is required to calculate daily or ozone season heat input shall do so by summing the unit's hourly heat input determined according to the procedures in this part for all hours in which the unit operated during the day or ozone season.

(b) The owner or operator of a unit that is required to determine daily or ozone season NO$_X$ emission rate (in lbs/mmBtu) shall do so by dividing daily or ozone season NO$_X$ mass emissions (in lbs) determined in accordance with this subpart, by daily or ozone season heat input determined in accordance with paragraph (a) of this section.

■ 32. Amend appendix F to part 75 by:
■ a. Adding section 5.3.3;
■ b. In section 8.1.2, revising the introductory text preceding Equation F–25;
■ c. In section 8.4, revising the introductory text, paragraph (a) introductory text (preceding Equation F–27), and paragraph (b) introductory text (preceding Equation F–27a) and adding paragraph (c);
■ d. In section 8.5.2, removing "the hourly NO$_X$ mass emissions at each

unit" and adding in its place "hourly $NO_X$ mass emissions at the common stack"; and

■ e. Adding section 8.5.3.

The additions and revisions read as follows:

**Appendix F to Part 75—Conversion Procedures**

\* \* \* \* \*

**5. Procedures for Heat Input**

\* \* \* \* \*

**5.3 Heat Input Summation (for Heat Input Determined Using a Flow Monitor and Diluent Monitor)**

\* \* \* \* \*

5.3.3 Calculate total daily heat input for a unit using a flow monitor and diluent monitor to calculate heat input, using the following equation:

$$HI_d = \sum_{h=1}^{24} HI_h t_h$$

(Eq. F-18c)

Where:

$HI_d$ = Total heat input for a unit for the day, mmBtu.

$HI_h$ = Heat input rate for the unit for hour "h" from Equation F–15, F–16, F–17, F–18, F–21a, or F–21b to this appendix, mmBtu/hr.

$t_h$ = Unit operating time, fraction of the hour (0.00 to 1.00, in equal increments from one hundredth to one quarter of an hour, at the option of the owner or operator).

$h$ = Designation of a particular hour.

\* \* \* \* \*

**8. Procedures for $NO_X$ Mass Emissions**

\* \* \* \* \*

8.1.2 If $NO_X$ emission rate is measured at a common stack and heat input rate is measured at the unit level, calculate the hourly heat input rate at the common stack according to the following formula:

\* \* \* \* \*

8.4 Use the following equations to calculate daily, quarterly, cumulative ozone season, and cumulative year-to-date $NO_X$ mass emissions:

(a) When hourly $NO_X$ mass emissions are reported in lb., use Eq. F–27 to this appendix to calculate quarterly, cumulative ozone season, and cumulative year-to-date $NO_X$ mass emissions in tons.

\* \* \* \* \*

(b) When hourly $NO_X$ mass emission rate is reported in lb/hr, use Eq. F–27a to this appendix to calculate quarterly, cumulative ozone season, and cumulative year-to-date $NO_X$ mass emissions in tons.

\* \* \* \* \*

(c) To calculate daily $NO_X$ mass emissions for a unit in pounds, use Eq. F–27b to this appendix.

$$M_{(NOX)_d} = \sum_{h=1}^{24} E_{(NOX)_h} t_h$$

(Eq. F-27b)

Where:

$M_{(NOX)_d}$ = $NO_X$ mass emissions for a unit for the day, pounds.

$E_{(NOX)_h}$ = $NO_X$ mass emission rate for the unit for hour "h" from Equation F–24a, F–26a, F–26b, or F–28, lb/hr.

$t_h$ = Unit operating time, fraction of the hour (0.00 to 1.00, in equal increments from one hundredth to one quarter of an hour, at the option of the owner or operator).

$h$ = Designation of a particular hour.

\* \* \* \* \*

8.5.3 Where applicable, the owner or operator of a unit that determines hourly $NO_X$ mass emission rate at a common stack shall apportion hourly $NO_X$ mass emissions rate to the units using the common stack based on the hourly heat input rate, using Equation F–28 to this appendix:

$$E_{(NOX)_i} = E_{(NOX)_{CS}} \left( \frac{t_{CS}}{t_i} \right) \left[ \frac{HI_i t_i}{\sum_{i=1}^{n} HI_i t_i} \right]$$

(Eq. F-28)

Where:

$E_{(NOX)_i}$ = Apportioned $NO_X$ mass emission rate for the hour for unit "i", lb/hr.

$E_{(NOX)_{CS}}$ = $NO_X$ mass emission rate for the hour at the common stack, lb/hr.

$HI_i$ = Heat input rate for the hour for unit "i"," from Equation F–15, F–16, F–17, F–18, F–21a, or F–21b to this appendix, mmBtu/hr.

$t_i$ = Operating time for unit "i", fraction of the hour (0.00 to 1.00, in equal increments from one hundredth to one

quarter of an hour, at the option of the owner or operator).

$t_{CS}$ = Common stack operating time, fraction of the hour (0.00 to 1.00, in equal increments from one hundredth to one quarter of an hour, at the option of the owner or operator).

$n$ = Number of units using the common stack.

$i$ = Designation of a particular unit.

\* \* \* \* \*

**PART 78—APPEAL PROCEDURES**

■ 33. The authority citation for part 78 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

■ 34. Amend § 78.1 by:

■ a. In paragraphs (b)(13)(i), (b)(14)(i), (b)(15)(i), (b)(16)(i), and (b)(17)(i), removing "decision on the" and adding in its place "calculation of an";

■ b. In paragraph (b)(17)(viii), adding "or (e)" after "§ 97.826(d)";
■ c. In paragraph (b)(17)(ix), adding "or (e)" after "§ 97.811(d)";
■ d. In paragraph (b)(18)(i), removing "decision on the" and adding in its place "calculation of an"; and
■ e. Revising paragraph (b)(19).
The revision reads as follows:

**§ 78.1   Purpose and scope.**

\*     \*     \*     \*     \*
(b) \* \* \*
(19) Under subpart GGGGG of part 97 of this chapter:
(i) The calculation of a dynamic trading budget under § 97.1010(a)(4) of this chapter.
(ii) The calculation of an allocation of CSAPR NO$_X$ Ozone Season Group 3 allowances under § 97.1011 or § 97.1012 of this chapter.
(iii) The decision on the transfer of CSAPR NO$_X$ Ozone Season Group 3 allowances under § 97.1023 of this chapter.
(iv) The decision on the deduction of CSAPR NO$_X$ Ozone Season Group 3 allowances under § 97.1024, § 97.1025, or § 97.1026(d) of this chapter.
(v) The correction of an error in an Allowance Management System account under § 97.1027 of this chapter.
(vi) The adjustment of information in a submission and the decision on the deduction and transfer of CSAPR NO$_X$ Ozone Season Group 3 allowances based on the information as adjusted under § 97.1028 of this chapter.
(vii) The finalization of control period emissions data, including retroactive adjustment based on audit.
(viii) The approval or disapproval of a petition under § 97.1035 of this chapter.

\*     \*     \*     \*     \*

**PART 97—FEDERAL NO$_X$ BUDGET TRADING PROGRAM, CAIR NO$_X$ AND SO$_2$ TRADING PROGRAMS, CSAPR NO$_X$ AND SO$_2$ TRADING PROGRAMS, AND TEXAS SO$_2$ TRADING PROGRAM**

■ 35. The authority citation for part 97 continues to read as follows:

**Authority:** 42 U.S.C. 7401, 7403, 7410, 7426, 7491, 7601, and 7651, *et seq.*

**Subpart AAAAA—CSAPR NO$_X$ Annual Trading Program**

**§ 97.402   [Amended]**

■ 36. Amend § 97.402 by:
■ a. In the definition of "CSAPR NO$_X$ Ozone Season Group 1 Trading Program", removing "(b)(2)(i) and (ii), and" and adding in its place "(b)(2)(i), and"; and
■ b. In the definition of "CSAPR NO$_X$ Ozone Season Group 2 Trading

Program", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and"; and
■ c. In the definition of "CSAPR NO$_X$ Ozone Season Group 3 Trading Program", removing "(b)(2)(v), and" and adding in its place "(b)(2)(iii), and".

**§ 97.411   [Amended]**

■ 37. Amend § 97.411 by:
■ a. In paragraphs (b)(1)(i)(A) and (B), removing "State, in accordance" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, in accordance"; and
■ b. In paragraphs (b)(2)(i)(A) and (B), removing "Indian country within the borders of a State, in accordance" and adding in its place "areas of Indian country within the borders of a State not subject to the State's SIP authority, in accordance".

**§ 97.412   [Amended]**

■ 38. Amend § 97.412 by:
■ a. In paragraph (a) introductory text, removing "State, the Administrator" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, the Administrator";
■ b. In paragraphs (a)(3)(iii) and (a)(5), adding "and areas of Indian country within the borders of the State subject to the State's SIP authority" after "in the State";
■ c. In paragraph (a)(10), removing "State, is allocated" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, is allocated";
■ d. In paragraph (b) introductory text, removing "Indian country within the borders of each State, the Administrator" and adding in its place "areas of Indian country within the borders of each State not subject to the State's SIP authority, the Administrator"; and
■ e. In paragraph (b)(5), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority".

**§ 97.426   [Amended]**

■ 39. In § 97.426, amend paragraph (c) by:
■ a. Removing "set forth in" and adding in its place "established under"; and
■ b. Removing "State (or Indian" and adding in its place "State (and Indian".

**Subpart BBBBB—CSAPR NO$_X$ Ozone Season Group 1 Trading Program**

**§ 97.502   [Amended]**

■ 40. Amend § 97.502 by:
■ a. In the definition of "CSAPR NO$_X$ Ozone Season Group 1 Trading Program", removing "(b)(2)(i) and (ii), and" and adding in its place "(b)(2)(i), and";
■ b. In the definition of "CSAPR NO$_X$ Ozone Season Group 2 Trading Program", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and";
■ c. In the definition of "CSAPR NO$_X$ Ozone Season Group 3 allowance":
■ i. Adding "or (e)" after "§ 97.826(d)"; and
■ ii. Adding "or less" after "one ton";
■ d. In the definition of "CSAPR NO$_X$ Ozone Season Group 3 Trading Program", removing "(b)(2)(v), and" and adding in its place "(b)(2)(iii), and"; and
■ e. In the definition of "State", removing "(b)(2)(i) and (ii), and" and adding in its place "(b)(2)(i), and".

**§ 97.511   [Amended]**

■ 41. Amend § 97.511 by:
■ a. In paragraphs (b)(1)(i)(A) and (B), removing "State, in accordance" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, in accordance"; and
■ b. In paragraphs (b)(2)(i)(A) and (B), removing "Indian country within the borders of a State, in accordance" and adding in its place "areas of Indian country within the borders of a State not subject to the State's SIP authority, in accordance".

**§ 97.512   [Amended]**

■ 42. Amend § 97.512 by:
■ a. In paragraph (a) introductory text, removing "State, the Administrator" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, the Administrator";
■ b. In paragraphs (a)(3)(iii) and (a)(5), adding "and areas of Indian country within the borders of the State subject to the State's SIP authority" after "in the State";
■ c. In paragraph (a)(10), removing "State, is allocated" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, is allocated";
■ d. In paragraph (b) introductory text, removing "Indian country within the borders of each State, the Administrator" and adding in its place "areas of Indian country within the borders of each State not subject to the

State's SIP authority, the Administrator''; and
■ e. In paragraph (b)(5), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority".
■ 43. Amend § 97.526 by:
■ a. In paragraph (c):
■ i. Removing "set forth in" and adding in its place "established under"; and
■ ii. Removing "State (or Indian" and adding in its place "State (and Indian";
■ b. In paragraph (d)(1) introductory text, removing "§ 52.38(b)(2)(i) of this chapter (or" and adding in its place "§ 52.38(b)(2)(i)(A) of this chapter (and";
■ c. In paragraph (d)(1)(ii), removing "except a State listed in § 52.38(b)(2)(i)" and adding in its place "listed in § 52.38(b)(2)(ii)";
■ d. In paragraph (d)(1)(iv), removing "§ 52.38(b)(2)(iii) or (iv) of this chapter (or" and adding in its place "§ 52.38(b)(2)(ii) of this chapter (and";
■ e. Revising paragraph (d)(2)(i);
■ f. In paragraph (d)(2)(ii), removing "§ 52.38(b)(2)(v) of this chapter (or" and adding in its place "§ 52.38(b)(2)(iii)(A) of this chapter (and";
■ g. Adding paragraph (d)(2)(iii);
■ h. In paragraph (e)(1), removing "§ 52.38(b)(2)(ii) of this chapter (or Indian" and adding in its place "§ 52.38(b)(2)(i)(B) of this chapter (and Indian";
■ i. In paragraph (e)(2), removing "§ 52.38(b)(2)(iv) of this chapter (or" and adding in its place "§ 52.38(b)(2)(ii)(B) of this chapter (and"; and
■ j. Adding paragraph (e)(3).
The revisions and additions read as follows:

### § 97.526   Banking and conversion.

\*    \*    \*    \*    \*
(d) \* \* \*
(2)(i) Except as provided in paragraphs (d)(2)(ii) and (iii) of this section, after the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section, upon any determination that would otherwise result in the initial recordation of a given number of CSAPR $NO_X$ Ozone Season Group 1 allowances in the compliance account for a source in a State listed in § 52.38(b)(2)(ii) of this chapter (and Indian country within the borders of such a State), the Administrator will not record such CSAPR $NO_X$ Ozone Season Group 1 allowances but instead will allocate and record in such account an amount of CSAPR $NO_X$ Ozone Season Group 2 allowances for the control period in

2017 computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR $NO_X$ Ozone Season Group 1 allowances divided by the conversion factor determined under paragraph (d)(1)(ii) of this section.

\*    \*    \*    \*    \*
(iii) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and § 97.826(e)(1), upon any determination that would otherwise result in the initial recordation of a given number of CSAPR $NO_X$ Ozone Season Group 1 allowances in the compliance account for a source in a State listed in § 52.38(b)(2)(iii)(B) of this chapter (and Indian country within the borders of such a State), the Administrator will not record such CSAPR $NO_X$ Ozone Season Group 1 allowances but instead will allocate and record in such account an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances for the control period in 2023 computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR $NO_X$ Ozone Season Group 1 allowances divided by the conversion factor determined under paragraph (d)(1)(ii) of this section and further divided by the conversion factor determined under § 97.826(e)(1)(ii).
(e) \* \* \*
(3) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and § 97.826(e)(1), the owner or operator of a CSAPR $NO_X$ Ozone Season Group 1 source in a State listed in § 52.38(b)(2)(ii)(C) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR $NO_X$ Ozone Season Group 1 allowances for the control period in 2015 or 2016 by holding instead, in a general account established for this sole purpose, an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances for the control period in 2023 (or any later control period for which the allowance transfer deadline defined in § 97.1002 has passed) computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR $NO_X$ Ozone Season Group 1 allowances divided by the conversion factor determined under paragraph (d)(1)(ii) of this section and further divided by the conversion factor determined under § 97.826(e)(1)(ii).

## Subpart CCCCC—CSAPR $SO_2$ Group 1 Trading Program

### § 97.602   [Amended]

■ 44. Amend § 97.602 by:
■ a. In the definition of "CSAPR $NO_X$ Ozone Season Group 1 Trading

Program", removing "(b)(2)(i) and (ii), and" and adding in its place "(b)(2)(i), and";
■ b. In the definition of "CSAPR $NO_X$ Ozone Season Group 2 Trading Program", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and"; and
■ c. In the definition of "CSAPR $NO_X$ Ozone Season Group 3 Trading Program", removing "(b)(2)(v), and" and adding in its place "(b)(2)(iii), and".

### § 97.611   [Amended]

■ 45. Amend § 97.611 by:
■ a. In paragraphs (b)(1)(i)(A) and (B), removing "State, in accordance" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, in accordance"; and
■ b. In paragraphs (b)(2)(i)(A) and (B), removing "Indian country within the borders of a State, in accordance" and adding in its place "areas of Indian country within the borders of a State not subject to the State's SIP authority, in accordance".

### § 97.612   [Amended]

■ 46. Amend § 97.612 by:
■ a. In paragraph (a) introductory text, removing "State, the Administrator" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, the Administrator";
■ b. In paragraphs (a)(3)(iii) and (a)(5), adding "and areas of Indian country within the borders of the State subject to the State's SIP authority" after "in the State";
■ c. In paragraph (a)(10), removing "State, is allocated" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, is allocated";
■ d. In paragraph (b) introductory text, removing "Indian country within the borders of each State, the Administrator" and adding in its place "areas of Indian country within the borders of each State not subject to the State's SIP authority, the Administrator"; and
■ e. In paragraph (b)(5), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority".

### § 97.626   [Amended]

■ 47. In § 97.626, amend paragraph (c) by:
■ a. Removing "set forth in" and adding in its place "established under"; and

■ b. Removing "State (or Indian" and adding in its place "State (and Indian".

## Subpart DDDDD—CSAPR SO₂ Group 2 Trading Program

■ 48. Amend § 97.702 by:
■ a. In the definition of "Alternate designated representative", removing "or CSAPR NOₓ Ozone Season Group 2 Trading Program, then" and adding in its place "CSAPR NOₓ Ozone Season Group 2 Trading Program, or CSAPR NOₓ Ozone Season Group 3 Trading Program, then";
■ b. In the definition of "CSAPR NOₓ Ozone Season Group 1 Trading Program", removing "(b)(2)(i) and (ii), and" and adding in its place "(b)(2)(i), and";
■ c. In the definition of "CSAPR NOₓ Ozone Season Group 2 Trading Program", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(iii), and";
■ d. Adding in alphabetical order a definition for "CSAPR NOₓ Ozone Season Group 3 Trading Program"; and
■ e. In the definition of "Designated representative", removing "or CSAPR NOₓ Ozone Season Group 2 Trading Program, then" and adding in its place "CSAPR NOₓ Ozone Season Group 2 Trading Program, or CSAPR NOₓ Ozone Season Group 3 Trading Program, then".
    The addition reads as follows:

### § 97.702  Definitions.

\*    \*    \*    \*    \*

*CSAPR NOₓ Ozone Season Group 3 Trading Program* means a multi-state NOₓ air pollution control and emission reduction program established in accordance with subpart GGGGG of this part and § 52.38(b)(1), (b)(2)(iii), and (b)(10) through (14) and (17) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(b)(10) or (11) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(b)(12) of this chapter), as a means of mitigating interstate transport of ozone and NOₓ.

\*    \*    \*    \*    \*

### § 97.711  [Amended]

■ 49. Amend § 97.711 by:
■ a. In paragraphs (b)(1)(i)(A) and (B), removing "State, in accordance" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, in accordance"; and
■ b. In paragraphs (b)(2)(i)(A) and (B), removing "Indian country within the borders of a State, in accordance" and adding in its place "areas of Indian

country within the borders of a State not subject to the State's SIP authority, in accordance".

### § 97.712  [Amended]

■ 50. Amend § 97.712 by:
■ a. In paragraph (a) introductory text, removing "State, the Administrator" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, the Administrator";
■ b. In paragraphs (a)(3)(iii) and (a)(5), adding "and areas of Indian country within the borders of the State subject to the State's SIP authority" after "in the State";
■ c. In paragraph (a)(10), removing "State, is allocated" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, is allocated";
■ d. In paragraph (b) introductory text, removing "Indian country within the borders of each State, the Administrator" and adding in its place "areas of Indian country within the borders of each State not subject to the State's SIP authority, the Administrator"; and
■ e. In paragraph (b)(5), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority".

### § 97.726  [Amended]

■ 51. In § 97.726, amend paragraph (c) by:
■ a. Removing "set forth in" and adding in its place "established under"; and
■ b. Removing "State (or Indian" and adding in its place "State (and Indian".

### § 97.734  [Amended]

■ 52. In § 97.734, amend paragraph (d)(3) by removing "or CSAPR NOₓ Ozone Season Group 2 Trading Program, quarterly" and adding in its place "CSAPR NOₓ Ozone Season Group 2 Trading Program, or CSAPR NOₓ Ozone Season Group 3 Trading Program, quarterly".

## Subpart EEEEE—CSAPR NOₓ Ozone Season Group 2 Trading Program

■ 53. Amend § 97.802 by:
■ a. In the definition of "Assurance account", removing "base CSAPR" and adding in its place "CSAPR";
■ b. Removing the definitions for "Base CSAPR NOₓ Ozone Season Group 2 source" and "Base CSAPR NOₓ Ozone Season Group 2 unit";
■ c. In the definition of "Common designated representative", removing

"base CSAPR" and adding in its place "CSAPR";
■ d. In the definition of "Common designated representative's assurance level", revising paragraph (1);
■ e. In the definition of "Common designated representative's share", removing "base CSAPR" and adding in its place "CSAPR" each time it appears;
■ f. In the definition of "CSAPR NOₓ Ozone Season Group 2 Trading Program", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and";
■ g. In the definition of "CSAPR NOₓ Ozone Season Group 3 allowance":
■ i. Adding "or (e)" after "§ 97.826(d)"; and
■ ii. Adding "or less" after "one ton";
■ h. In the definition of "CSAPR NOₓ Ozone Season Group 3 Trading Program", removing "(b)(2)(v), and" and adding in its place "(b)(2)(iii), and"; and
■ i. In the definition of "State", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and".
    The revision reads as follows:

### § 97.802  Definitions.

\*    \*    \*    \*    \*

*Common designated representative's assurance level* \* \* \*

    (1) The amount (rounded to the nearest allowance) equal to the sum of the total amount of CSAPR NOₓ Ozone Season Group 2 allowances allocated for such control period to the group of one or more CSAPR NOₓ Ozone Season Group 2 units in such State (and such Indian country) having the common designated representative for such control period and the total amount of CSAPR NOₓ Ozone Season Group 2 allowances purchased by an owner or operator of such CSAPR NOₓ Ozone Season Group 2 units in an auction for such control period and submitted by the State or the permitting authority to the Administrator for recordation in the compliance accounts for such CSAPR NOₓ Ozone Season Group 2 units in accordance with the CSAPR NOₓ Ozone Season Group 2 allowance auction provisions in a SIP revision approved by the Administrator under § 52.38(b)(8) or (9) of this chapter, multiplied by the sum of the State NOₓ Ozone Season Group 2 trading budget under § 97.810(a) and the State's variability limit under § 97.810(b) for such control period, and divided by such State NOₓ Ozone Season Group 2 trading budget;

\*    \*    \*    \*    \*

### § 97.806  [Amended]

■ 54. Amend § 97.806 by:
■ a. In paragraphs (c)(2)(i) introductory text, (c)(2)(i)(B), and (c)(2)(iii) and (iv),

removing "base CSAPR" and adding in its place "CSAPR" each time it appears;

■ b. In paragraph (c)(3)(i), removing "paragraph (c)(1)" and adding in its place "paragraphs (c)(1) and (2)"; and

■ c. Removing and reserving paragraph (c)(3)(ii).

## § 97.810    [Amended]

■ 55. In § 97.810, amend paragraphs (a)(1)(i) through (iii), (a)(2)(i) and (ii), (a)(12)(i) through (iii), (a)(13)(i) and (ii), (a)(17)(i) through (iii), (a)(20)(i) through (iii), (a)(23)(i) through (iii), and (b)(1), (2), (12), (13), (17), (20), and (23) by removing "and thereafter" and adding in its place "through 2022".

■ 56. Amend § 97.811 by:

■ a. In paragraphs (b)(1)(i)(A) and (B), removing "State, in accordance" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, in accordance";

■ b. In paragraphs (b)(2)(i)(A) and (B), removing "Indian country within the borders of a State, in accordance" and adding in its place "areas of Indian country within the borders of a State not subject to the State's SIP authority, in accordance";

■ c. In paragraph (d)(1), removing "§ 52.38(b)(2)(iv) of this chapter (or" and adding in its place "§ 52.38(b)(2)(ii)(B) of this chapter (and"; and

■ d. Adding paragraph (e).

The addition reads as follows:

## § 97.811    Timing requirements for CSAPR NOₓ Ozone Season Group 2 allowance allocations.

\*      \*      \*      \*      \*

(e) *Recall of CSAPR NOₓ Ozone Season Group 2 allowances allocated for control periods after 2022.* (1) Notwithstanding any other provision of this subpart, part 52 of this chapter, or any SIP revision approved under § 52.38(b) of this chapter, the provisions of this paragraph (e)(1) and paragraphs (e)(2) through (7) of this section shall apply with regard to each CSAPR NOₓ Ozone Season Group 2 allowance that was allocated for a control period after 2022 to any unit (including a permanently retired unit qualifying for an exemption under § 97.805) in a State listed in § 52.38(b)(2)(ii)(C) of this chapter (and Indian country within the borders of such a State) and that was initially recorded in the compliance account for the source that includes the unit, whether such CSAPR NOₓ Ozone Season Group 2 allowance was allocated pursuant to this subpart or pursuant to a SIP revision approved under § 52.38(b) of this chapter and whether such CSAPR NOₓ Ozone Season Group 2

allowance remains in such compliance account or has been transferred to another Allowance Management System account.

(2)(i) For each CSAPR NOₓ Ozone Season Group 2 allowance described in paragraph (e)(1) of this section that was allocated for a given control period and initially recorded in a given source's compliance account, one CSAPR NOₓ Ozone Season Group 2 allowance that was allocated for the same or an earlier control period and initially recorded in the same or any other Allowance Management System account must be surrendered in accordance with the procedures in paragraphs (e)(3) and (4) of this section.

(ii)(A) The surrender requirement under paragraph (e)(2)(i) of this section corresponding to each CSAPR NOₓ Ozone Season Group 2 allowance described in paragraph (e)(1) of this section initially recorded in a given source's compliance account shall apply to such source's current owners and operators, except as provided in paragraph (e)(2)(ii)(B) of this section.

(B) If the owners and operators of a given source as of a given date assumed ownership and operational control of the source through a transaction that did not also provide rights to direct the use or transfer of a given CSAPR NOₓ Ozone Season Group 2 allowance described in paragraph (e)(1) of this section with regard to such source (whether recordation of such CSAPR NOₓ Ozone Season Group 2 allowance in the source's compliance account occurred before such transaction or was anticipated to occur after such transaction), then the surrender requirement under paragraph (e)(2)(i) of this section corresponding to such CSAPR NOₓ Ozone Season Group 2 allowance shall apply to the most recent former owners and operators of the source before the occurrence of such a transaction.

(C) The Administrator will not adjudicate any private legal dispute among the owners and operators of a source or among the former owners and operators of a source, including any disputes relating to the requirements to surrender CSAPR NOₓ Ozone Season Group 2 allowances for the source under paragraph (e)(2)(i) of this section.

(3)(i) As soon as practicable on or after August 4, 2023, the Administrator will send a notification to the designated representative for each source described in paragraph (e)(1) of this section identifying the amounts of CSAPR NOₓ Ozone Season Group 2 allowances allocated for each control period after 2022 and recorded in the source's compliance account and the

corresponding surrender requirements for the source under paragraph (e)(2)(i) of this section.

(ii) As soon as practicable on or after August 21, 2023, the Administrator will deduct from the compliance account for each source described in paragraph (e)(1) of this section CSAPR NOₓ Ozone Season Group 2 allowances eligible to satisfy the surrender requirements for the source under paragraph (e)(2)(i) of this section until all such surrender requirements for the source are satisfied or until no more CSAPR NOₓ Ozone Season Group 2 allowances eligible to satisfy such surrender requirements remain in such compliance account.

(iii) As soon as practicable after completion of the deductions under paragraph (e)(3)(ii) of this section, the Administrator will identify for each source described in paragraph (e)(1) of this section the amounts, if any, of CSAPR NOₓ Ozone Season Group 2 allowances allocated for each control period after 2022 and recorded in the source's compliance account for which the corresponding surrender requirements under paragraph (e)(2)(i) of this section have not been satisfied and will send a notification concerning such identified amounts to the designated representative for the source.

(iv) With regard to each source for which unsatisfied surrender requirements under paragraph (e)(2)(i) of this section remain after the deductions under paragraph (e)(3)(ii) of this section:

(A) Except as provided in paragraph (e)(3)(iv)(B) of this section, not later than September 15, 2023, the owners and operators of the source shall hold sufficient CSAPR NOₓ Ozone Season Group 2 allowances eligible to satisfy such unsatisfied surrender requirements under paragraph (e)(2)(i) of this section in the source's compliance account.

(B) With regard to any portion of such unsatisfied surrender requirements that apply to former owners and operators of the source pursuant to paragraph (e)(2)(ii)(B) of this section, not later than September 15, 2023, such former owners and operators shall hold sufficient CSAPR NOₓ Ozone Season Group 2 allowances eligible to satisfy such portion of the unsatisfied surrender requirements under paragraph (e)(2)(i) of this section either in the source's compliance account or in another Allowance Management System account identified to the Administrator on or before such date in a submission by the authorized account representative for such account.

(C) As soon as practicable on or after September 15, 2023, the Administrator will deduct from the Allowance

Management System account identified in accordance with paragraph (e)(3)(iv)(A) or (B) of this section CSAPR NO$_X$ Ozone Season Group 2 allowances eligible to satisfy the surrender requirements for the source under paragraph (e)(2)(i) of this section until all such surrender requirements for the source are satisfied or until no more CSAPR NO$_X$ Ozone Season Group 2 allowances eligible to satisfy such surrender requirements remain in such account.

(v) When making deductions under paragraph (e)(3)(ii) or (iv) of this section to address the surrender requirements under paragraph (e)(2)(i) of this section for a given source:

(A) The Administrator will make deductions to address any surrender requirements with regard to first the 2023 control period and then the 2024 control period.

(B) When making deductions to address the surrender requirements with regard to a given control period, the Administrator will first deduct CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for such given control period and will then deduct CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for each successively earlier control period in sequence.

(C) When deducting CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for a given control period from a given Allowance Management System account, the Administrator will first deduct CSAPR NO$_X$ Ozone Season Group 2 allowances initially recorded in the account under § 97.821 (if the account is a compliance account) in the order of recordation and will then deduct CSAPR NO$_X$ Ozone Season Group 2 allowances recorded in the account under § 97.526(d) or § 97.823 in the order of recordation.

(4)(i) To the extent the surrender requirements under paragraph (e)(2)(i) of this section corresponding to any CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for a control period after 2022 and initially recorded in a given source's compliance account have not been fully satisfied through the deductions under paragraph (e)(3) of this section, as soon as practicable on or after November 15, 2023, the Administrator will deduct such initially recorded CSAPR NO$_X$ Ozone Season Group 2 allowances from any Allowance Management System accounts in which such CSAPR NO$_X$ Ozone Season Group 2 allowances are held, making such deductions in any order determined by the Administrator, until all such surrender requirements for such source have been satisfied or until all such CSAPR NO$_X$ Ozone

Season Group 2 allowances have been deducted, except as provided in paragraph (e)(4)(ii) of this section.

(ii) If no person with an ownership interest in a given CSAPR NO$_X$ Ozone Season Group 2 allowance as of April 30, 2022, was an owner or operator of the source in whose compliance account such CSAPR NO$_X$ Ozone Season Group 2 allowance was initially recorded, was a direct or indirect parent or subsidiary of an owner or operator of such source, or was directly or indirectly under common ownership with an owner or operator of such source, the Administrator will not deduct such CSAPR NO$_X$ Ozone Season Group 2 allowance under paragraph (e)(4)(i) of this section. For purposes of this paragraph (e)(4)(ii), each owner or operator of a source shall be deemed to be a person with an ownership interest in any CSAPR NO$_X$ Ozone Season Group 2 allowance held in that source's compliance account. The limitation established by this paragraph (e)(4)(ii) on the deductibility of certain CSAPR NO$_X$ Ozone Season Group 2 allowances under paragraph (e)(4)(i) of this section shall not be construed as a waiver of the surrender requirements under paragraph (e)(2)(i) of this section corresponding to such CSAPR NO$_X$ Ozone Season Group 2 allowances.

(iii) Not less than 45 days before the planned date for any deductions under paragraph (e)(4)(i) of this section, the Administrator will send a notification to the authorized account representative for the Allowance Management System account from which such deductions will be made identifying the CSAPR NO$_X$ Ozone Season Group 2 allowances to be deducted and the data upon which the Administrator has relied and specifying a process for submission of any objections to such data. Any objections must be submitted to the Administrator not later than 15 days before the planned date for such deductions as indicated in such notification.

(5) To the extent the surrender requirements under paragraph (e)(2)(i) of this section corresponding to any CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for a control period after 2022 and initially recorded in a given source's compliance account have not been fully satisfied through the deductions under paragraphs (e)(3) and (4) of this section:

(i) The persons identified in accordance with paragraph (e)(2)(ii) of this section with regard to such source and each such CSAPR NO$_X$ Ozone Season Group 2 allowance shall pay any fine, penalty, or assessment or comply

with any other remedy imposed under the Clean Air Act; and

(ii) Each such CSAPR NO$_X$ Ozone Season Group 2 allowance, and each day in such control period, shall constitute a separate violation of this subpart and the Clean Air Act.

(6) The Administrator will record in the appropriate Allowance Management System accounts all deductions of CSAPR NO$_X$ Ozone Season Group 2 allowances under paragraphs (e)(3) and (4) of this section.

(7)(i) Each submission, objection, or other written communication from a designated representative, authorized account representative, or other person to the Administrator under paragraph (e)(2), (3), or (4) of this section shall be sent electronically to the email address *CSAPR@epa.gov*. Each such communication from a designated representative must contain the certification statement set forth in § 97.814(a), and each such communication from the authorized account representative for a general account must contain the certification statement set forth in § 97.820(c)(2)(ii).

(ii) Each notification from the Administrator to a designated representative or authorized account representative under paragraph (e)(3) or (4) of this section will be sent electronically to the email address most recently received by the Administrator for such representative. In any such notification, the Administrator may provide information by means of a reference to a publicly accessible website where the information is available.

### § 97.812  [Amended]

■ 57. Amend § 97.812 by:
■ a. In paragraph (a) introductory text, removing "State, the Administrator" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, the Administrator";
■ b. In paragraphs (a)(3)(iii) and (a)(5), adding "and areas of Indian country within the borders of the State subject to the State's SIP authority" after "in the State";
■ c. In paragraph (a)(10), removing "State, is allocated" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, is allocated";
■ d. In paragraph (b) introductory text, removing "Indian country within the borders of each State, the Administrator" and adding in its place "areas of Indian country within the borders of each State not subject to the

State's SIP authority, the Administrator'';and

■ e. In paragraph (b)(5), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority".

§ 97.825    [Amended]

■ 58. In § 97.825, amend paragraphs (a) introductory text, (a)(2), (b)(1)(i), (b)(1)(ii)(A) and (B), (b)(3), (b)(4)(i), (b)(5), (b)(6)(i), (b)(6)(iii) introductory text, and (b)(6)(iii)(A) and (B) by removing "base CSAPR" and adding in its place "CSAPR" each time it appears.

■ 59. Amend § 97.826 by:

■ a. In paragraph (b), removing "(c) or (d)" and adding in its place "(c), (d), or (e)";

■ b. In paragraph (c):

■ i. Removing "set forth in" and adding in its place "established under"; and

■ ii. Removing "State (or Indian" and adding in its place "State (and Indian";

■ c. In paragraphs (d)(1)(i)(A) and (B), removing "§ 52.38(b)(2)(iv)" and adding in its place "§ 52.38(b)(2)(ii)(B)";

■ d. Revising paragraph (d)(1)(i)(C);

■ e. In paragraph (d)(1)(ii) introductory text, removing "§ 52.38(b)(2)(v)" and adding in its place "§ 52.38(b)(2)(iii)(A)";

■ f. In paragraphs (d)(2)(i) and (d)(3), removing "§ 52.38(b)(2)(v) of this chapter (or" and adding in its place "§ 52.38(b)(2)(iii)(A) of this chapter (and";

■ g. Redesignating paragraph (e) as paragraph (f) and adding a new paragraph (e); and

■ h. Revising newly redesignated paragraphs (f)(1) and (2).

The revisions and additions read as follows:

§ 97.826    Banking and conversion.

\*    \*    \*    \*    \*

(d) \* \* \*

(1) \* \* \*

(i) \* \* \*

(C) The full-season CSAPR NO$_X$ Ozone Season Group 3 allowance bank target, computed as the sum for all States listed in § 52.38(b)(2)(iii)(A) of this chapter of the variability limits under § 97.1010(e) for such States for the control period in 2022.

\*    \*    \*    \*    \*

(e) Notwithstanding any other provision of this subpart, part 52 of this chapter, or any SIP revision approved under § 52.38(b)(8) or (9) of this chapter:

(1) By September 18, 2023, the Administrator will temporarily suspend acceptance of CSAPR NO$_X$ Ozone Season Group 2 allowance transfers submitted under § 97.822 and, before resuming acceptance of such transfers, will take the following actions with regard to every general account and every compliance account except a compliance account for a CSAPR NO$_X$ Ozone Season Group 2 source in a State listed in § 52.38(b)(2)(ii)(A) of this chapter (and Indian country within the borders of such a State):

(i) The Administrator will deduct all CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for the control periods in 2017 through 2022 from each such account.

(ii) The Administrator will determine a conversion factor equal to the greater of 1.0000 or the quotient, expressed to four decimal places, of—

(A) The sum of all CSAPR NO$_X$ Ozone Season Group 2 allowances deducted from all such accounts under paragraph (e)(1)(i) of this section; divided by

(B) The product of the sum of the variability limits for the control period in 2024 under § 97.1010(e) for all States listed in § 52.38(b)(2)(iii)(B) and (C) of this chapter multiplied by a fraction whose numerator is the number of days from August 4, 2023 through September 30, 2023, inclusive, and whose denominator is 153.

(iii) The Administrator will allocate and record in each such account an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2023 computed as the quotient, rounded up to the nearest allowance, of the number of CSAPR NO$_X$ Ozone Season Group 2 allowances deducted from such account under paragraph (e)(1)(i) of this section divided by the conversion factor determined under paragraph (e)(1)(ii) of this section, except as provided in paragraph (e)(1)(iv) or (v) of this section.

(iv) Where, pursuant to paragraph (e)(1)(i) of this section, the Administrator deducts CSAPR NO$_X$ Ozone Season Group 2 allowances from the compliance account for a source in a State not listed in § 52.38(b)(2)(iii) of this chapter (and Indian country within the borders of such a State), the Administrator will not record CSAPR NO$_X$ Ozone Season Group 3 allowances in that compliance account but instead will allocate and record the amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2023 computed for such source in accordance with paragraph (e)(1)(iii) of this section in a general account identified by the designated representative for such source, provided that if the designated representative fails to identify such a general account in a submission to the Administrator by September 18, 2023, the Administrator

may record such CSAPR NO$_X$ Ozone Season Group 3 allowances in a general account identified or established by the Administrator with the designated representative as the authorized account representative and with the owners and operators of such source (as indicated on the certificate of representation for the source) as the persons represented by the authorized account representative.

(v)(A) In computing any amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances to be allocated to and recorded in general accounts under paragraph (e)(1)(iii) of this section, the Administrator may group multiple general accounts whose ownership interests are held by the same or related persons or entities and treat the group of accounts as a single account for purposes of such computation.

(B) Following a computation for a group of general accounts in accordance with paragraph (e)(1)(v)(A) of this section, the Administrator will allocate to and record in each individual account in such group a proportional share of the quantity of CSAPR NO$_X$ Ozone Season Group 3 allowances computed for such group, basing such shares on the respective quantities of CSAPR NO$_X$ Ozone Season Group 2 allowances removed from such individual accounts under paragraph (e)(1)(i) of this section.

(C) In determining the proportional shares under paragraph (e)(1)(v)(B) of this section, the Administrator may employ any reasonable adjustment methodology to truncate or round each such share up or down to a whole number and to cause the total of such whole numbers to equal the amount of CSAPR NO$_X$ Ozone Season Group 3 allowances computed for such group of accounts in accordance with paragraph (e)(1)(v)(A) of this section, even where such adjustments cause the numbers of CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to some individual accounts to equal zero.

(2) After the Administrator has carried out the procedures set forth in paragraph (e)(1) of this section, upon any determination that would otherwise result in the initial recordation of a given number of CSAPR NO$_X$ Ozone Season Group 2 allowances in the compliance account for a source in a State listed in § 52.38(b)(2)(iii)(B) of this chapter (and Indian country within the borders of such a State), the Administrator will not record such CSAPR NO$_X$ Ozone Season Group 2 allowances but instead will allocate and record in such account an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in

**250a**

2023 computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR $NO_X$ Ozone Season Group 2 allowances divided by the conversion factor determined under paragraph (e)(1)(ii) of this section.

(f) * * *

(1) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section, the owner or operator of a CSAPR $NO_X$ Ozone Season Group 2 source in a State listed in § 52.38(b)(2)(ii)(B) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR $NO_X$ Ozone Season Group 2 allowances for a control period in 2017 through 2020 by holding instead, in a general account established for this sole purpose, an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances for the control period in 2021 (or any later control period for which the allowance transfer deadline defined in § 97.1002 has passed) computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR $NO_X$ Ozone Season Group 2 allowances divided by the conversion factor determined under paragraph (d)(1)(i)(D) of this section.

(2) After the Administrator has carried out the procedures set forth in paragraph (e)(1) of this section, the owner or operator of a CSAPR $NO_X$ Ozone Season Group 2 source in a State listed in § 52.38(b)(2)(ii)(C) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR $NO_X$ Ozone Season Group 2 allowances for a control period in 2017 through 2022 by holding instead, in a general account established for this sole purpose, an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances for the control period in 2023 (or any later control period for which the allowance transfer deadline defined in § 97.1002 has passed) computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR $NO_X$ Ozone Season Group 2 allowances divided by the conversion factor determined under paragraph (e)(1)(ii) of this section.

## Subpart FFFFF—Texas $SO_2$ Trading Program

■ 60. Amend § 97.902 by:

■ a. In the definition of "Alternate designated representative", removing "Program or CSAPR $NO_X$ Ozone Season Group 2 Trading Program, then" and adding in its place "Program, CSAPR $NO_X$ Ozone Season Group 2 Trading

Program, or CSAPR $NO_X$ Ozone Season Group 3 Trading Program, then";

■ b. In the definition of "CSAPR $NO_X$ Ozone Season Group 2 Trading Program", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and";

■ c. Adding in alphabetical order a definition for "CSAPR $NO_X$ Ozone Season Group 3 Trading Program"; and

■ d. In the definition of "Designated representative", removing "Program or CSAPR $NO_X$ Ozone Season Group 2 Trading Program, then" and adding in its place "Program, CSAPR $NO_X$ Ozone Season Group 2 Trading Program, or CSAPR $NO_X$ Ozone Season Group 3 Trading Program, then".

The addition reads as follows:

### § 97.902    Definitions.

*    *    *    *    *

*CSAPR $NO_X$ Ozone Season Group 3 Trading Program* means a multi-state $NO_X$ air pollution control and emission reduction program established in accordance with subpart GGGGG of this part and § 52.38(b)(1), (b)(2)(iii), and (b)(10) through (14) and (17) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(b)(10) or (11) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(b)(12) of this chapter), as a means of mitigating interstate transport of ozone and $NO_X$.

*    *    *    *    *

### § 97.934    [Amended]

■ 61. In § 97.934, amend paragraph (d)(3) by removing "Program or CSAPR $NO_X$ Ozone Season Group 2 Trading Program, quarterly" and adding in its place "Program, CSAPR $NO_X$ Ozone Season Group 2 Trading Program, or CSAPR $NO_X$ Ozone Season Group 3 Trading Program, quarterly".

## Subpart GGGGG—CSAPR $NO_X$ Ozone Season Group 3 Trading Program

■ 62. Amend § 97.1002 by:

■ a. Revising the definition of "Allocate or allocation";

■ b. In the definition of "Allowance transfer deadline", adding "primary" before "emissions limitation";

■ c. In the definition of "Alternate designated representative", removing "or CSAPR $SO_2$ Group 1 Trading Program, then" and adding in its place "CSAPR $SO_2$ Group 1 Trading Program, or CSAPR $SO_2$ Group 2 Trading Program, then";

■ d. In the definition of "Assurance account", removing "base CSAPR" and adding in its place "CSAPR";

■ e. Adding in alphabetical order a definition for "Backstop daily $NO_X$ emissions rate";

■ f. Removing the definitions for "Base CSAPR $NO_X$ Ozone Season Group 3 source" and "Base CSAPR $NO_X$ Ozone Season Group 3 unit";

■ g. Adding in alphabetical order a definition for "Coal-derived fuel";

■ h. In the definition of "Common designated representative", removing "base CSAPR" and adding in its place "CSAPR";

■ i. Revising the definition of "Common designated representative's assurance level";

■ j. In the definition of "Common designated representative's share", removing "base CSAPR" and adding in its place "CSAPR" each time it appears;

■ k. In the definition of "Compliance account", adding "primary" before "emissions limitation";

■ l. Adding in alphabetical order a definition for "CSAPR $NO_X$ Ozone Season Group 1 Trading Program";

■ m. In the definition of "CSAPR $NO_X$ Ozone Season Group 2 Trading Program", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and";

■ n. In the definition of "CSAPR $NO_X$ Ozone Season Group 3 allowance":

■ i. Adding "or (e)" after "§ 97.826(d)"; and

■ ii. Adding "or less" after "one ton";

■ o. In the definitions of "CSAPR $NO_X$ Ozone Season Group 3 allowance deduction" and "CSAPR $NO_X$ Ozone Season Group 3 emissions limitation", adding "primary" before "emissions limitation";

■ p. Adding in alphabetical order a definition for "CSAPR $NO_X$ Ozone Season Group 3 secondary emissions limitation";

■ q. In the definition of "CSAPR $NO_X$ Ozone Season Group 3 Trading Program", removing "(b)(2)(v), and" and adding in its place "(b)(2)(iii), and";

■ r. Adding in alphabetical order a definition for "CSAPR $SO_2$ Group 2 Trading Program";

■ s. In the definition of "Designated representative", removing "or CSAPR $SO_2$ Group 1 Trading Program, then" and adding in its place "CSAPR $SO_2$ Group 1 Trading Program, or CSAPR $SO_2$ Group 2 Trading Program, then".

■ t. In the definition of "Excess emissions", adding "primary" before "emissions limitation";

■ u. Adding in alphabetical order a definition for "Historical control period"; and

■ v. In the definition of "State", removing "(b)(2)(v), and" and adding in its place "(b)(2)(iii), and".

The revisions and additions read as follows:

## § 97.1002   Definitions.

\* \* \* \* \*

*Allocate* or *allocation* means, with regard to CSAPR $NO_X$ Ozone Season Group 3 allowances, the determination by the Administrator, State, or permitting authority, in accordance with this subpart, §§ 97.526(d) and 97.826(d) and (e), and any SIP revision submitted by the State and approved by the Administrator under § 52.38(b)(10), (11), or (12) of this chapter, of the amount of such CSAPR $NO_X$ Ozone Season Group 3 allowances to be initially credited, at no cost to the recipient, to:

(1) A CSAPR $NO_X$ Ozone Season Group 3 unit;

(2) A new unit set-aside;

(3) An Indian country new unit set-aside;

(4) An Indian country existing unit set-aside; or

(5) An entity not listed in paragraphs (1) through (4) of this definition;

(6) Provided that, if the Administrator, State, or permitting authority initially credits, to a CSAPR $NO_X$ Ozone Season Group 3 unit qualifying for an initial credit, a credit in the amount of zero CSAPR $NO_X$ Ozone Season Group 3 allowances, the CSAPR $NO_X$ Ozone Season Group 3 unit will be treated as being allocated an amount (*i.e.*, zero) of CSAPR $NO_X$ Ozone Season Group 3 allowances.

\* \* \* \* \*

*Backstop daily $NO_X$ emissions rate* means a $NO_X$ emissions rate used in the determination of the CSAPR $NO_X$ Ozone Season Group 3 primary emissions limitation for a CSAPR $NO_X$ Ozone Season Group 3 source in accordance with § 97.1024(b).

\* \* \* \* \*

*Coal-derived fuel* means any fuel, whether in a solid, liquid, or gaseous state, produced by the mechanical, thermal, or chemical processing of coal.

\* \* \* \* \*

*Common designated representative's assurance level* means, with regard to a specific common designated representative and a State (and Indian country within the borders of such State) and control period in a given year for which the State assurance level is exceeded as described in § 97.1006(c)(2)(iii):

(1) The amount (rounded to the nearest allowance) equal to the sum of the total amount of CSAPR $NO_X$ Ozone Season Group 3 allowances allocated for such control period to the group of one or more CSAPR $NO_X$ Ozone Season Group 3 units in such State (and such Indian country) having the common designated representative for such control period and the total amount of CSAPR $NO_X$ Ozone Season Group 3 allowances purchased by an owner or operator of such CSAPR $NO_X$ Ozone Season Group 3 units in an auction for such control period and submitted to the Administrator for recordation in the compliance accounts for such CSAPR $NO_X$ Ozone Season Group 3 units in accordance with the CSAPR $NO_X$ Ozone Season Group 3 allowance auction provisions in a SIP revision approved by the Administrator under § 52.38(b)(11) or (12) of this chapter, multiplied by the sum of the State $NO_X$ Ozone Season Group 3 trading budget under § 97.1010(a) and the State's variability limit under § 97.1010(e) for such control period, and divided by such State $NO_X$ Ozone Season Group 3 trading budget;

(2) Provided that the allocations of CSAPR $NO_X$ Ozone Season Group 3 allowances for any control period taken into account for purposes of this definition shall exclude any CSAPR $NO_X$ Ozone Season Group 3 allowances allocated for such control period under § 97.526(d) or § 97.826(d) or (e).

\* \* \* \* \*

*CSAPR $NO_X$ Ozone Season Group 1 Trading Program* means a multi-state $NO_X$ air pollution control and emission reduction program established in accordance with subpart BBBBB of this part and § 52.38(b)(1), (b)(2)(i), and (b)(3) through (5) and (13) through (15) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(b)(3) or (4) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(b)(5) of this chapter), as a means of mitigating interstate transport of ozone and $NO_X$.

\* \* \* \* \*

*CSAPR $NO_X$ Ozone Season Group 3 secondary emissions limitation* means, for a CSAPR $NO_X$ Ozone Season Group 3 unit to which such a limitation applies under § 97.1025(c)(1) for a control period in a given year, the tonnage of $NO_X$ emissions calculated for the unit in accordance with § 97.1025(c)(2) for such control period.

\* \* \* \* \*

*CSAPR $SO_2$ Group 2 Trading Program* means a multi-state $SO_2$ air pollution control and emission reduction program established in accordance with subpart DDDDD of this part and § 52.39(a), (c), (g) through (k), and (m) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.39(g) or (h) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.39(i) of this chapter), as a means of mitigating interstate transport of fine particulates and $SO_2$.

\* \* \* \* \*

*Historical control period* means, for a unit as of a given calendar year, the period starting May 1 of a previous calendar year and ending September 30 of that previous calendar year, inclusive, without regard to whether the unit was subject to requirements under the CSAPR $NO_X$ Ozone Season Group 3 Trading Program during such period.

■ 63. Amend § 97.1006 by:
■ a. Revising paragraph (b)(2), paragraph (c)(1) heading, paragraph (c)(1)(i), and paragraph (c)(1)(ii) introductory text;
■ b. Adding paragraphs (c)(1)(iii) and (iv);
■ c. In paragraphs (c)(2)(i) introductory text and (c)(2)(i)(B), removing "base CSAPR" and adding in its place "CSAPR" each time it appears;
■ d. Revising paragraph (c)(2)(iii);
■ e. In paragraph (c)(2)(iv), removing "base CSAPR" and adding in its place "CSAPR" each time it appears;
■ f. Revising paragraph (c)(3); and
■ g. In paragraph (c)(6) introductory text, adding "or less" after "one ton".
The revisions and additions read as follows:

## § 97.1006   Standard requirements.

\* \* \* \* \*

(b) \* \* \*

(2) The emissions and heat input data determined in accordance with §§ 97.1030 through 97.1035 shall be used to calculate allocations of CSAPR $NO_X$ Ozone Season Group 3 allowances under §§ 97.1011 and 97.1012 and to determine compliance with the CSAPR $NO_X$ Ozone Season Group 3 primary and secondary emissions limitations and assurance provisions under paragraph (c) of this section, provided that, for each monitoring location from which mass emissions are reported, the mass emissions amount used in calculating such allocations and determining such compliance shall be the mass emissions amount for the monitoring location determined in accordance with §§ 97.1030 through 97.1035 and rounded to the nearest ton, with any fraction of a ton less than 0.50 being deemed to be zero.

(c) \* \* \*

(1) *CSAPR $NO_X$ Ozone Season Group 3 primary and secondary emissions limitations*—(i) *Primary emissions limitation.* As of the allowance transfer deadline for a control period in a given year, the owners and operators of each CSAPR $NO_X$ Ozone Season Group 3 source and each CSAPR $NO_X$ Ozone

Season Group 3 unit at the source shall hold, in the source's compliance account, CSAPR NO$_X$ Ozone Season Group 3 allowances available for deduction for such control period under § 97.1024(a) in an amount not less than the amount determined under § 97.1024(b), comprising the sum of—

(A) The tons of total NO$_X$ emissions for such control period from all CSAPR NO$_X$ Ozone Season Group 3 units at the source; plus

(B) Two times the excess, if any, over 50 tons of the sum, for all CSAPR NO$_X$ Ozone Season Group 3 units at the source and all calendar days of the control period, of any NO$_X$ emissions from such a unit on any calendar day of the control period exceeding the NO$_X$ emissions that would have occurred on that calendar day if the unit had combusted the same daily heat input and emitted at any backstop daily NO$_X$ emissions rate applicable to the unit for that control period.

(ii) *Exceedances of primary emissions limitation.* If total NO$_X$ emissions during a control period in a given year from the CSAPR NO$_X$ Ozone Season Group 3 units at a CSAPR NO$_X$ Ozone Season Group 3 source are in excess of the CSAPR NO$_X$ Ozone Season Group 3 primary emissions limitation set forth in paragraph (c)(1)(i) of this section, then:

\* \* \* \* \*

(iii) *Secondary emissions limitation.* The owner or operator of a CSAPR NO$_X$ Ozone Season Group 3 unit subject to an emissions limitation under § 97.1025(c)(1) shall not discharge, or allow to be discharged, emissions of NO$_X$ to the atmosphere during a control period in excess of the tonnage amount

calculated in accordance with § 97.1025(c)(2).

(iv) *Exceedances of secondary emissions limitation.* If total NO$_X$ emissions during a control period in a given year from a CSAPR NO$_X$ Ozone Season Group 3 unit are in excess of the amount of a CSAPR NO$_X$ Ozone Season Group 3 secondary emissions limitation applicable to the unit for the control period under paragraph (c)(1)(iii) of this section, then the owners and operators of the unit and the source at which the unit is located shall pay any fine, penalty, or assessment or comply with any other remedy imposed, for the same violations, under the Clean Air Act, and each ton of such excess emissions and each day of such control period shall constitute a separate violation of this subpart and the Clean Air Act.

(2) \* \* \*

(iii) Total NO$_X$ emissions from all CSAPR NO$_X$ Ozone Season Group 3 units at CSAPR NO$_X$ Ozone Season Group 3 sources in a State (and Indian country within the borders of such State) during a control period in a given year exceed the State assurance level if such total NO$_X$ emissions exceed the sum, for such control period, of the State NO$_X$ Ozone Season Group 3 trading budget under § 97.1010(a) and the State's variability limit under § 97.1010(e).

\* \* \* \* \*

(3) *Compliance periods.* (i) A CSAPR NO$_X$ Ozone Season Group 3 unit shall be subject to the requirements under paragraphs (c)(1)(i) and (ii) and (c)(2) of this section for the control period starting on the later of the applicable date in paragraph (c)(3)(i)(A), (B), or (C)

of this section or the deadline for meeting the unit's monitor certification requirements under § 97.1030(b) and for each control period thereafter:

(A) May 1, 2021, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(A) of this chapter;

(B) May 1, 2023, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(B) of this chapter; or

(C) August 4, 2023, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(C) of this chapter.

(ii) A CSAPR NO$_X$ Ozone Season Group 3 unit shall be subject to the requirements under paragraphs (c)(1)(iii) and (iv) of this section for the control period starting on the later of May 1, 2024, or the deadline for meeting the unit's monitor certification requirements under § 97.1030(b) and for each control period thereafter.

■ 64. Revise § 97.1010 to read as follows:

### § 97.1010 State NO$_X$ Ozone Season Group 3 trading budgets, set-asides, and variability limits.

(a) *State NO$_X$ Ozone Season Group 3 trading budgets.* (1)(i) The State NO$_X$ Ozone Season Group 3 trading budgets for allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control periods in 2021 through 2025 shall be as indicated in table 1 to this paragraph (a)(1)(i), subject to prorating for the control period in 2023 as provided in paragraph (a)(1)(ii) of this section:

TABLE 1 TO PARAGRAPH (a)(1)(i)—STATE NO$_X$ OZONE SEASON GROUP 3 TRADING BUDGETS BY CONTROL PERIOD, 2021–2025

[Tons]

| State | 2021 | 2022 | Portion of 2023 control period before August 4, 2023, before prorating | Portion of 2023 control period on and after August 4, 2023, before prorating | 2024 | 2025 |
|---|---|---|---|---|---|---|
| Alabama | | | 13,211 | 6,379 | 6,489 | 6,489 |
| Arkansas | | | 9,210 | 8,927 | 8,927 | 8,927 |
| Illinois | 11,223 | 9,102 | 8,179 | 7,474 | 7,325 | 7,325 |
| Indiana | 17,004 | 12,582 | 12,553 | 12,440 | 11,413 | 11,413 |
| Kentucky | 17,542 | 14,051 | 14,051 | 13,601 | 12,999 | 12,472 |
| Louisiana | 16,291 | 14,818 | 14,818 | 9,363 | 9,363 | 9,107 |
| Maryland | 2,397 | 1,266 | 1,266 | 1,206 | 1,206 | 1,206 |
| Michigan | 14,384 | 12,290 | 9,975 | 10,727 | 10,275 | 10,275 |
| Minnesota | | | | 5,504 | 4,058 | 4,058 |
| Mississippi | | | 6,315 | 6,210 | 5,058 | 5,037 |
| Missouri | | | 15,780 | 12,598 | 11,116 | 11,116 |
| Nevada | | | | 2,368 | 2,589 | 2,545 |
| New Jersey | 1,565 | 1,253 | 1,253 | 773 | 773 | 773 |
| New York | 4,079 | 3,416 | 3,421 | 3,912 | 3,912 | 3,912 |
| Ohio | 13,481 | 9,773 | 9,773 | 9,110 | 7,929 | 7,929 |
| Oklahoma | | | 11,641 | 10,271 | 9,384 | 9,376 |

TABLE 1 TO PARAGRAPH (a)(1)(i)—STATE NO$_X$ OZONE SEASON GROUP 3 TRADING BUDGETS BY CONTROL PERIOD, 2021–2025—Continued

[Tons]

| State | 2021 | 2022 | Portion of 2023 control period before August 4, 2023, before prorating | Portion of 2023 control period on and after August 4, 2023, before prorating | 2024 | 2025 |
|---|---|---|---|---|---|---|
| Pennsylvania | 12,071 | 8,373 | 8,373 | 8,138 | 8,138 | 8,138 |
| Texas | | | 52,301 | 40,134 | 40,134 | 38,542 |
| Utah | | | | 15,755 | 15,917 | 15,917 |
| Virginia | 6,331 | 3,897 | 3,980 | 3,143 | 2,756 | 2,756 |
| West Virginia | 15,062 | 12,884 | 12,884 | 13,791 | 11,958 | 11,958 |
| Wisconsin | | | 7,915 | 6,295 | 6,295 | 5,988 |

(ii) For the control period in 2023, the State NO$_X$ Ozone Season Group 3 trading budget for each State shall be calculated as the sum, rounded to the nearest allowance, of the following prorated amounts:

(A) The product of the non-prorated trading budget for the portion of the 2023 control period before August 4, 2023, shown for the State in table 1 to paragraph (a)(1)(i) of this section (or zero if table 1 to paragraph (a)(1)(i) shows no amount for such portion of the 2023 control period for the State) multiplied by a fraction whose numerator is the number of days from May 1, 2023, through the day before August 4, 2023, inclusive, and whose denominator is 153; plus

(B) The product of the non-prorated trading budget for the portion of the 2023 control period on and after August 4, 2023, shown for the State in table 1 to paragraph (a)(1)(i) of this section multiplied by a fraction whose numerator is the number of days from August 4, 2023, through September 30, 2023, inclusive, and whose denominator is 153.

(2)(i) The State NO$_X$ Ozone Season Group 3 trading budget for each State and each control period in 2026 through 2029 shall be the preset trading budget indicated for the State and control period in table 2 to this paragraph (a)(2)(i), except as provided in paragraph (a)(2)(ii) of this section.

TABLE 2 TO PARAGRAPH (a)(2)(i)—PRESET TRADING BUDGETS BY CONTROL PERIOD, 2026–2029

[Tons]

| State | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|
| Alabama | 6,339 | 6,236 | 6,236 | 5,105 |
| Arkansas | 6,365 | 4,031 | 4,031 | 3,582 |
| Illinois | 5,889 | 5,363 | 4,555 | 4,050 |
| Indiana | 8,363 | 8,135 | 7,280 | 5,808 |
| Kentucky | 9,697 | 7,908 | 7,837 | 7,392 |
| Louisiana | 6,370 | 3,792 | 3,792 | 3,639 |
| Maryland | 842 | 842 | 842 | 842 |
| Michigan | 6,743 | 5,691 | 5,691 | 4,656 |
| Minnesota | 4,058 | 2,905 | 2,905 | 2,578 |
| Mississippi | 3,484 | 2,084 | 1,752 | 1,752 |
| Missouri | 9,248 | 7,329 | 7,329 | 7,329 |
| Nevada | 1,142 | 1,113 | 1,113 | 880 |
| New Jersey | 773 | 773 | 773 | 773 |
| New York | 3,650 | 3,388 | 3,388 | 3,388 |
| Ohio | 7,929 | 7,929 | 6,911 | 6,409 |
| Oklahoma | 6,631 | 3,917 | 3,917 | 3,917 |
| Pennsylvania | 7,512 | 7,158 | 7,158 | 4,828 |
| Texas | 31,123 | 23,009 | 21,623 | 20,635 |
| Utah | 6,258 | 2,593 | 2,593 | 2,593 |
| Virginia | 2,565 | 2,373 | 2,373 | 1,951 |
| West Virginia | 10,818 | 9,678 | 9,678 | 9,678 |
| Wisconsin | 4,990 | 3,416 | 3,416 | 3,416 |

(ii) If the preset trading budget indicated for a given State and control period in table 2 to paragraph (a)(2)(i) of this section is less than the dynamic trading budget for the State and control period referenced in the applicable notice promulgated under paragraph (a)(4)(v)(C) of this section, then the State NO$_X$ Ozone Season Group 3 trading budget for the State and control period shall be the dynamic trading budget for the State and control period referenced in the applicable notice promulgated under paragraph (a)(4)(v)(C) of this section.

(3) The State NO$_X$ Ozone Season Group 3 trading budget for each State and each control period in 2030 and thereafter shall be the dynamic trading budget for the State and control period referenced in the applicable notice promulgated under paragraph (a)(4)(v)(C) of this section.

(4) The Administrator will calculate the dynamic trading budget for each State and each control period in 2026

254a

and thereafter in the year before the year of the control period as follows:

(i) The Administrator will include a unit in a State (and Indian country within the borders of the State) in the calculation of the State's dynamic trading budget for a control period if—

(A) To the best of the Administrator's knowledge, the unit qualifies as a CSAPR NO$_X$ Ozone Season Group 3 unit under § 97.1004, without regard to whether the unit has permanently retired, provided that including a unit in the calculation of a dynamic trading budget does not constitute a determination that the unit is a CSAPR NO$_X$ Ozone Season Group 3 unit, and not including a unit in the calculation of a dynamic trading budget does not constitute a determination that the unit is not a CSAPR NO$_X$ Ozone Season Group 3 unit;

(B) The unit's deadline for certification of monitoring systems under § 97.1030(b) is on or before May 1 of the year two years before the year of the control period for which the dynamic trading budget is being calculated; and

(C) The owner or operator reported heat input greater than zero for the unit in accordance with part 75 of this chapter for the historical control period in the year two years before the year of the control period for which the dynamic trading budget is being calculated.

(ii) For each unit identified for inclusion in the calculation of the State's dynamic trading budget for a control period under paragraph (a)(4)(i) of this section, the Administrator will calculate the heat input amount in mmBtu to be used in the budget calculation as follows:

(A) For each such unit, the Administrator will determine the following unit-level amounts:

(1) The total heat input amounts reported in accordance with part 75 of this chapter for the unit for the historical control periods in the years two, three, four, five, and six years before the year of the control period for which the dynamic trading budget is being calculated, except any historical control period that commenced before the unit's first deadline under any regulatory program to begin recording and reporting heat input in accordance with part 75 of this chapter; and

(2) The average of the three highest unit-level total heat input amounts identified for the unit under paragraph (a)(4)(iv)(A)(1) of this section or, if fewer than three non-zero amounts are identified for the unit, the average of all such non-zero total heat input amounts.

(B) For the State, the Administrator will determine the following state-level amounts:

(1) The sum for all units in the State meeting the criterion under paragraph (a)(4)(i)(A) of this section, without regard to whether such units also meet the criteria under paragraphs (a)(4)(i)(B) and (C) of this section, of the total heat input amounts reported in accordance with part 75 of this chapter for the historical control periods in the years two, three, and four years before the year of the control period for which the dynamic trading budget is being calculated, provided that for the historical control periods in 2022 and 2023, the total reported heat input amounts for Nevada and Utah as otherwise determined under this paragraph (a)(4)(ii)(B)(1) shall be increased by 13,489,332 mmBtu for Nevada and by 1,888,174 mmBtu for Utah;

(2) The average of the three state-level total heat input amounts calculated for the State under paragraph (a)(4)(ii)(B)(1) of this section; and

(3) The sum for all units identified for inclusion in the calculation of the State's dynamic trading budget for the control period under paragraph (a)(4)(i) of this section of the unit-level average heat input amounts calculated under paragraph (a)(4)(ii)(A)(2) of this section.

(C) The heat input amount for a unit used in the calculation of the State's dynamic trading budget shall be the product of the unit-level average total heat input amount calculated for the unit under paragraph (a)(4)(ii)(A)(2) of this section multiplied by a fraction whose numerator is the state-level average total heat input amount calculated under paragraph (a)(4)(ii)(B)(2) of this section and whose denominator is the state-level sum of the unit-level average heat input amounts calculated under paragraph (a)(4)(ii)(B)(3) of this section.

(iii) For each unit identified for inclusion in the calculation of the State's dynamic trading budget for a control period under paragraph (a)(4)(i) of this section, the Administrator will identify the NO$_X$ emissions rate in lb/mmBtu to be used in the calculation as follows:

(A) For a unit listed in the document entitled ''Unit-Specific Ozone Season NO$_X$ Emissions Rates for Dynamic Budget Calculations'' posted at *www.regulations.gov* in docket EPA–HQ–OAR–2021–0668, the NO$_X$ emissions rate used in the calculation for the control period shall be the NO$_X$ emissions rate shown for the unit and control period in that document.

(B) For a unit not listed in the document referenced in paragraph (a)(4)(iii)(A) of this section, the NO$_X$ emissions rate used in the calculation for the control period shall be identified according to the type of unit and the type of fuel combusted by the unit during the control period beginning May 1 on or immediately after the unit's deadline for certification of monitoring systems under § 97.1030(b) as follows:

(1) 0.011 lb/mmBtu, for a simple cycle combustion turbine or a combined cycle combustion turbine other than an integrated coal gasification combined cycle unit;

(2) 0.030 lb/mmBtu, for a boiler combusting only fuel oil or gaseous fuel (other than coal-derived fuel) during such control period; or

(3) 0.050 lb/mmBtu, for a boiler combusting any amount of coal or coal-derived fuel during such control period or any other unit not covered by paragraph (a)(4)(iii)(B)(1) or (2) of this section.

(iv) The Administrator will calculate the State's dynamic trading budget for the control period as the sum (converted to tons at a conversion factor of 2,000 lb/ton and rounded to the nearest ton), for all units identified for inclusion in the calculation under paragraph (a)(4)(i) of this section, of the product for each such unit of the heat input amount in mmBtu calculated for the unit under paragraph (a)(4)(ii) of this section multiplied by the NO$_X$ emissions rate in lb/mmBtu identified for the unit under paragraph (a)(4)(iii) of this section.

(v)(A) By March 1, 2025 and March 1 of each year thereafter, the Administrator will calculate the dynamic trading budget for each State, in accordance with paragraphs (a)(4)(i) through (iv) of this section and §§ 97.1006(b)(2) and 97.1030 through 97.1035, for the control period in the year after the year of the applicable calculation deadline under this paragraph (a)(4)(v)(A) and will promulgate a notice of data availability of the results of the calculations.

(B) For each notice of data availability required in paragraph (a)(4)(v)(A) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice. Objections shall be submitted by the deadline specified in such notice and shall be limited to addressing whether the calculations (including the identification of the units included in the calculations) are in accordance with the provisions referenced in paragraph (a)(4)(v)(A) of this section.

(C) The Administrator will adjust the calculations to the extent necessary to

ensure that they are in accordance with the provisions referenced in paragraph (a)(4)(v)(A) of this section. By May 1 immediately after the promulgation of each notice of data availability required in paragraph (a)(4)(v)(A) of this section, the Administrator will promulgate a notice of data availability of the results of the calculations incorporating any adjustments that the Administrator determines to be necessary and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (a)(4)(v)(B) of this section.

(b) *Indian country existing unit set-asides for the control periods in 2023 and thereafter.* The Indian country existing unit set-aside for allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for each State for each control period in 2023 and thereafter shall be calculated as the sum of all allowance allocations to units in areas of Indian country within the borders of the State not subject to the State's SIP authority as provided in the applicable notice of data availability for the control period referenced in § 97.1011(a)(2).

(c) *New unit set-asides.* (1) The new unit set-asides for allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control periods in 2021 and 2022 for each State with CSAPR NO$_X$ Ozone Season Group 3 trading budgets for such control periods shall be as indicated in table 3 to this paragraph (c)(1):

### TABLE 3 TO PARAGRAPH (c)(1)—NEW UNIT SET-ASIDES BY CONTROL PERIOD

[2021–2022 (tons)]

| State | 2021 | 2022 |
|---|---|---|
| Illinois | 265 | 265 |
| Indiana | 262 | 254 |
| Kentucky | 309 | 283 |
| Louisiana | 430 | 430 |
| Maryland | 135 | 115 |
| Michigan | 500 | 482 |
| New Jersey | 27 | 27 |
| New York | 168 | 168 |
| Ohio | 291 | 290 |
| Pennsylvania | 335 | 339 |
| Virginia | 185 | 161 |
| West Virginia | 266 | 261 |

(2) The new unit set-aside for allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for each State for each control period in 2023 and thereafter shall be calculated as the product (rounded to the nearest allowance) of the State NO$_X$ Ozone Season Group 3 trading budget for the State and control period established in

accordance with paragraph (a) of this section multiplied by—

(i) 0.09, for Nevada for the control periods in 2023 through 2025;

(ii) 0.06, for Ohio for the control periods in 2023 through 2025;

(iii) 0.05, for each State other than Nevada and Ohio for the control periods in 2023 through 2025; or

(iv) 0.05, for each State for each control period in 2026 and thereafter.

(d) *Indian country new unit set-asides for the control periods in 2021 and 2022.* The Indian country new unit set-asides for allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control periods in 2021 and 2022 for each State with CSAPR NO$_X$ Ozone Season Group 3 trading budgets for such control periods shall be as indicated in table 4 to this paragraph (d):

### TABLE 4 TO PARAGRAPH (d)—INDIAN COUNTRY NEW UNIT SET-ASIDES BY CONTROL PERIOD

[2021–2022 (tons)]

| State | 2021 | 2022 |
|---|---|---|
| Illinois | ......... | ......... |
| Indiana | ......... | ......... |
| Kentucky | ......... | ......... |
| Louisiana | 15 | 15 |
| Maryland | ......... | ......... |
| Michigan | 13 | 12 |
| New Jersey | ......... | ......... |
| New York | 3 | 3 |
| Ohio | ......... | ......... |
| Pennsylvania | ......... | ......... |
| Virginia | ......... | ......... |
| West Virginia | ......... | ......... |

(e) *Variability limits.* (1) The variability limits for the State NO$_X$ Ozone Season Group 3 trading budgets for the control periods in 2021 and 2022 for each State with such trading budgets for such control periods shall be as indicated in table 5 to this paragraph (e)(1).

### TABLE 5 TO PARAGRAPH (e)(1)—VARIABILITY LIMITS BY CONTROL PERIOD

[2021–2022 (tons)]

| State | 2021 | 2022 |
|---|---|---|
| Illinois | 2,356 | 1,911 |
| Indiana | 3,571 | 2,642 |
| Kentucky | 3,684 | 2,951 |
| Louisiana | 3,421 | 3,112 |
| Maryland | 504 | 266 |
| Michigan | 3,021 | 2,581 |
| New Jersey | 329 | 263 |
| New York | 856 | 717 |

### TABLE 5 TO PARAGRAPH (e)(1)—VARIABILITY LIMITS BY CONTROL PERIOD—Continued

[2021–2022 (tons)]

| State | 2021 | 2022 |
|---|---|---|
| Ohio | 2,831 | 2,052 |
| Pennsylvania | 2,535 | 1,758 |
| Virginia | 1,329 | 818 |
| West Virginia | 3,163 | 2,706 |

(2) The variability limit for the State NO$_X$ Ozone Season Group 3 trading budget for each State for each control period in 2023 and thereafter shall be calculated as the product (rounded to the nearest ton) of the State NO$_X$ Ozone Season Group 3 trading budget for the State and control period established in accordance with paragraph (a) of this section multiplied by the greater of—

(i) 0.21; or

(ii) Any excess over 1.00 of the quotient (rounded to two decimal places) of—

(A) The sum for all CSAPR NO$_X$ Ozone Season Group 3 units in the State and Indian country within the borders of the State of the total heat input reported for the control period in mmBtu, provided that, for purposes of this paragraph (e)(2)(ii)(A), the 2023 control period for all States shall be deemed to be the period from May 1, 2023 through September 30, 2023, inclusive; divided by

(B) The state-level total heat input amount used in the calculation of the State NO$_X$ Ozone Season Group 3 trading budget for the State and control period in mmBtu, as identified in accordance with paragraph (e)(3) of this section.

(3) For purposes of paragraph (e)(2)(ii)(B) of this section, the state-level total heat input amount used in the calculation of a State NO$_X$ Ozone Season Group 3 trading budget for a given control period shall be identified as follows:

(i) For a control period in 2023 through 2025, and for a control period in 2026 through 2029 if the State NO$_X$ Ozone Season Group 3 trading budget for the State and control period under paragraph (a)(2) of this section is the preset trading budget set forth for the State and control period in table 2 to paragraph (a)(2)(i) of this section, the state-level total heat input amounts shall be as indicated in table 6 to this paragraph (e)(3)(i).

**36910**    **Federal Register** / Vol. 88, No. 107 / Monday, June 5, 2023 / Rules and Regulations

TABLE 6 TO PARAGRAPH (e)(3)(i)—STATE-LEVEL TOTAL HEAT INPUT USED IN CALCULATIONS OF PRESET TRADING BUDGETS BY CONTROL PERIOD

[2023–2029 (mmBtu)]

| State | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|
| Alabama | 313,037,541 | 333,030,691 | 333,030,691 | 330,396,046 | 328,650,653 | 328,650,653 | 307,987,882 |
| Arkansas | 192,843,561 | 192,843,561 | 192,843,561 | 190,921,052 | 190,921,052 | 190,921,052 | 190,921,052 |
| Illinois | 274,005,935 | 286,568,112 | 286,568,112 | 253,219,463 | 253,219,463 | 214,086,655 | 193,900,867 |
| Indiana | 356,047,916 | 330,175,944 | 330,175,944 | 302,245,332 | 302,245,332 | 277,218,546 | 236,611,101 |
| Kentucky | 301,161,750 | 301,161,750 | 295,857,697 | 295,857,697 | 295,857,697 | 293,016,485 | 274,595,978 |
| Louisiana | 280,592,592 | 280,592,592 | 278,766,253 | 278,461,807 | 277,262,840 | 277,262,840 | 277,262,840 |
| Maryland | 70,725,007 | 70,725,007 | 70,725,007 | 70,725,007 | 70,725,007 | 70,725,007 | 70,725,007 |
| Michigan | 313,846,533 | 299,124,688 | 299,124,688 | 258,225,107 | 258,225,107 | 258,225,107 | 222,314,181 |
| Minnesota | 128,893,685 | 107,821,236 | 107,821,236 | 107,821,236 | 93,890,928 | 93,890,928 | 85,707,385 |
| Mississippi | 192,978,295 | 189,415,018 | 189,279,160 | 189,279,160 | 189,279,160 | 176,004,820 | 176,004,820 |
| Missouri | 284,308,851 | 249,153,661 | 249,153,661 | 249,153,661 | 248,413,545 | 248,413,545 | 248,413,545 |
| Nevada | 103,489,785 | 116,979,117 | 114,729,782 | 105,018,415 | 100,193,805 | 100,193,805 | 96,378,269 |
| New Jersey | 112,233,231 | 112,233,231 | 112,233,231 | 112,233,231 | 112,233,231 | 112,233,231 | 112,233,231 |
| New York | 242,853,661 | 242,853,661 | 242,853,661 | 242,853,661 | 242,853,661 | 242,853,661 | 242,853,661 |
| Ohio | 412,292,609 | 386,560,212 | 386,560,212 | 386,560,212 | 386,560,212 | 358,992,155 | 342,075,946 |
| Oklahoma | 212,903,386 | 211,187,283 | 211,165,691 | 211,145,820 | 196,160,642 | 196,160,642 | 196,160,642 |
| Pennsylvania | 550,993,363 | 550,993,363 | 550,993,363 | 550,993,363 | 550,993,363 | 550,993,363 | 487,590,728 |
| Texas | 1,395,116,925 | 1,395,116,925 | 1,389,251,813 | 1,389,251,813 | 1,356,192,532 | 1,320,040,162 | 1,280,014,875 |
| Utah | 164,519,648 | 166,407,822 | 166,407,822 | 127,217,396 | 127,217,396 | 127,217,396 | 127,217,396 |
| Virginia | 202,953,791 | 194,015,719 | 194,015,719 | 194,015,719 | 194,015,719 | 194,015,719 | 186,848,587 |
| West Virginia | 306,845,495 | 273,151,957 | 273,151,957 | 273,151,957 | 273,151,957 | 273,151,957 | 273,151,957 |
| Wisconsin | 220,794,282 | 220,792,155 | 213,038,308 | 185,469,476 | 151,343,287 | 151,343,287 | 151,343,287 |

(ii) For a control period in 2026 through 2029 if the State $NO_X$ Ozone Season Group 3 trading budget for the State and control period under paragraph (a)(2) of this section is the dynamic trading budget for the State and control period referenced in the applicable notice promulgated under paragraph (a)(4)(v)(C) of this section, and for a control period in 2030 and thereafter, the state-level total heat input amount shall be the amount for the State and control period calculated under paragraph (a)(4)(ii)(B)(2) of this section.

(f) *Relationship of trading budgets, set-asides, and variability limits.* Each State $NO_X$ Ozone Season Group 3 trading budget in this section includes any tons in an Indian country existing unit set-aside, a new unit set-aside, or an Indian country new unit set-aside but does not include any tons in a variability limit.

■ 65. Amend § 97.1011 by revising the section heading and paragraphs (a), (b), paragraph (c) heading, and paragraphs (c)(1) and (5) to read as follows:

**§ 97.1011   CSAPR $NO_X$ Ozone Season Group 3 allowance allocations to existing units.**

(a) *Allocations to existing units in general.* (1) For the control periods in 2021 and each year thereafter, CSAPR $NO_X$ Ozone Season Group 3 allowances will be allocated to units in each State and areas of Indian country within the borders of the State subject to the State's SIP authority as provided in notices of data availability issued by the Administrator. Starting with the control period in 2026, the notices of data availability will be the notices issued

under paragraph (b)(11)(iii) of this section.

(2) For the control periods in 2023 and each year thereafter, CSAPR $NO_X$ Ozone Season Group 3 allowances will be allocated to units in areas of Indian country within the borders of each State not subject to the State's SIP authority as provided in notices of data availability issued by the Administrator. Starting with the control period in 2026, the notices of data availability will be the notices issued under paragraph (b)(11)(iii) of this section.

(3) Providing an allocation to a unit in a notice of data availability does not constitute a determination that the unit is a CSAPR $NO_X$ Ozone Season Group 3 unit, and not providing an allocation to a unit in such notice does not constitute a determination that the unit is not a CSAPR $NO_X$ Ozone Season Group 3 unit.

(b) *Calculation of default allocations to existing units for control periods in 2026 and thereafter.* For each control period in 2026 and thereafter, and for the CSAPR $NO_X$ Ozone Season Group 3 units in each State and areas of Indian country within the borders of the State, the Administrator will calculate default allocations of CSAPR $NO_X$ Ozone Season Group 3 allowances to the CSAPR $NO_X$ Ozone Season Group 3 units as follows:

(1) For each State and control period, the total amount of CSAPR $NO_X$ Ozone Season Group 3 allowances for which the Administrator will calculate default allocations shall be the remainder of the State $NO_X$ Ozone Season Group 3 trading budget for the control period under § 97.1010(a) minus the new unit

set-aside for the control period under § 97.1010(c).

(2) The Administrator will calculate a default allocation of CSAPR $NO_X$ Ozone Season Group 3 allowances for each CSAPR $NO_X$ Ozone Season Group 3 unit in the State and Indian country within the borders of the State meeting the following criteria:

(i) To the best of the Administrator's knowledge, the unit qualifies as a CSAPR $NO_X$ Ozone Season Group 3 unit under § 97.1004, without regard to whether the unit has permanently retired;

(ii) The unit's deadline for certification of monitoring systems under § 97.1030(b) is on or before May 1 of the year two years before the year of the control period for which the allowances are being allocated; and

(iii) The owner or operator reported heat input greater than zero for the unit in accordance with part 75 of this chapter for the historical control period in the year two years before the year of the control period for which the allowances are being allocated.

(3) For each CSAPR $NO_X$ Ozone Season Group 3 unit for which a default allocation is being calculated for a control period, the Administrator will calculate an average heat input amount to be used in the allocation calculations as follows:

(i) The Administrator will identify the total heat input amounts reported for the unit in accordance with part 75 of this chapter for the historical control periods in the years two, three, four, five, and six years before the year of the control period for which the allowances are being allocated, except any

**257a**

historical control period that commenced before the unit's first deadline under any regulatory program to begin recording and reporting heat input in accordance with part 75 of this chapter.

(ii) The average heat input amount used in the allocation calculations shall be the average of the three highest total heat input amounts identified for the unit under paragraph (b)(3)(i) of this section or, if fewer than three non-zero amounts are identified for the unit, the average of all such non-zero total heat input amounts.

(4) For each CSAPR $NO_X$ Ozone Season Group 3 unit for which a default allocation is being calculated for a control period, the Administrator will calculate a tentative maximum allocation amount to be used in the allocation calculations as follows:

(i) The Administrator will identify the total $NO_X$ emissions amounts reported for the unit in accordance with part 75 of this chapter for the historical control periods in the years two, three, four, five, and six years before the year of the control period for which the allowances are being allocated.

(ii) The tentative maximum allocation amount used in the allocation calculations shall be the highest of the total $NO_X$ emissions amounts identified for the unit under paragraph (b)(4)(i) of this section or, if less, any applicable amount calculated under paragraph (b)(4)(iii) of this section.

(iii)(A) The tentative maximum allocation amount under paragraph (b)(4)(ii) of this section for a unit described in paragraph (b)(4)(iii)(B) or (C) of this section may not exceed a maximum controlled baseline calculated as the product (converted to tons at a conversion factor of 2,000 lb/ ton and rounded to the nearest ton) of the highest total heat input amount identified for the unit under paragraph (b)(3)(i) of this section in mmBtu multiplied by a $NO_X$ emissions rate of 0.08 lb/mmBtu.

(B) For the control period in 2026, a maximum controlled baseline under paragraph (b)(4)(iii)(A) of this section shall apply to any unit that combusted any coal or solid coal-derived fuel during the historical control period for which the unit's heat input was most recently reported, that serves a generator with nameplate capacity of 100 MW or more, and that is equipped with selective catalytic reduction controls, except a circulating fluidized bed boiler.

(C) For each control period in 2027 and thereafter, a maximum controlled baseline under paragraph (b)(4)(iii)(A) of this section shall apply to any unit that combusted any coal or solid coal-derived fuel during the historical control period for which the unit's heat input was most recently reported and that serves a generator with nameplate capacity of 100 MW or more, except a circulating fluidized bed boiler.

(5) The Administrator will calculate the initial unrounded default allocations for each CSAPR $NO_X$ Ozone Season Group 3 unit according to the procedure in paragraph (b)(6) of this section and will recalculate the unrounded default allocations according to the procedures in paragraph (b)(7) or (8) of this section, as applicable, iterating the recalculations as necessary until the total of the unrounded default allocations to all eligible units equals the amount of allowances determined for the State under paragraph (b)(1) of this section.

(6) The Administrator will calculate the initial unrounded default allocations to CSAPR $NO_X$ Ozone Season Group 3 units as follows:

(i) The Administrator will calculate the sum, for all units determined under paragraph (b)(2) of this section to be eligible to receive default allocations, of the units' average heat input amounts determined under paragraph (b)(3)(ii) of this section.

(ii) For each unit determined under paragraph (b)(2) of this section to be eligible to receive a default allocation, the Administrator will calculate the unit's unrounded default allocation as the lesser of—

(A) The product of the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section multiplied by a fraction whose numerator is the unit's average heat input amount determined under paragraph (b)(3)(ii) of this section and whose denominator is the sum determined under paragraph (b)(6)(i) of this section; and

(B) The unit's tentative maximum allocation amount determined under paragraph (b)(4)(ii) of this section.

(iii) If the sum of the unrounded default allocations determined under paragraph (b)(6)(ii) of this section is less than the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section, the Administrator will follow the procedures in paragraph (b)(7) or (8) of this section, as applicable.

(iv) If the sum of the unrounded default allocations determined under paragraph (b)(6)(ii) of this section equals the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section, the Administrator will determine the rounded default allocations according to the procedures in paragraphs (b)(9) and (10) of this section.

(7) If the unrounded default allocation determined in the previous round of the calculation procedure for at least one CSAPR $NO_X$ Ozone Season Group 3 unit is less than the unit's tentative maximum allocation amount determined under paragraph (b)(4)(ii) of this section, the Administrator will recalculate the unrounded default allocations as follows:

(i) The Administrator will calculate the additional pool of allowances to be allocated as the remainder of the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section minus the sum of the unrounded default allocations from the previous round of the calculation procedure for all units determined under paragraph (b)(2) of this section to be eligible to receive default allocations.

(ii) The Administrator will calculate the sum, for all units whose unrounded default allocations determined in the previous round of the calculation procedure were less than the respective units' tentative maximum allocation amounts determined under paragraph (b)(4)(ii) of this section, of the units' average heat input amounts determined under paragraph (b)(3)(ii) of this section.

(iii) For each unit whose unrounded default allocation determined in the previous round of the calculation procedure was less than the unit's tentative maximum allocation amount determined under paragraph (b)(4)(ii) of this section, the Administrator will recalculate the unit's unrounded default allocation as the lesser of—

(A) The sum of the unit's unrounded default allocation determined in the previous round of the calculation procedure plus the product of the additional pool of allowances determined under paragraph (b)(7)(i) of this section multiplied by a fraction whose numerator is the unit's average heat input amount determined under paragraph (b)(3)(ii) of this section and whose denominator is the sum determined under paragraph (b)(7)(ii) of this section; and

(B) The unit's tentative maximum allocation amount determined under paragraph (b)(4)(ii) of this section.

(iv) Except as provided in paragraph (b)(7)(iii) of this section, a unit's unrounded default allocation shall equal the amount determined in the previous round of the calculation procedure.

(v) If the sum of the unrounded default allocations determined under paragraphs (b)(7)(iii) and (iv) of this section is less than the total amount of

allowances determined for the State and control period under paragraph (b)(1) of this section, the Administrator will iterate the procedures in paragraph (b)(7) of this section or follow the procedures in paragraph (b)(8) of this section, as applicable.

(vi) If the sum of the unrounded default allocations determined under paragraphs (b)(7)(iii) and (iv) of this section equals the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section, the Administrator will determine the rounded default allocations according to the procedures in paragraphs (b)(9) and (10) of this section.

(8) If the unrounded default allocation determined in the previous round of the calculation procedure for every CSAPR NO$_X$ Ozone Season Group 3 unit equals the unit's tentative maximum allocation amount determined under paragraph (b)(4)(ii) of this section, the Administrator will recalculate the unrounded default allocations as follows:

(i) The Administrator will calculate the additional pool of allowances to be allocated as the remainder of the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section minus the sum of the unrounded default allocations from the previous round of the calculation procedure for all units determined under paragraph (b)(2) of this section to be eligible to receive default allocations.

(ii) The Administrator will recalculate the unrounded default allocation for each eligible unit as the sum of—

(A) The unit's unrounded default allocation as determined in the previous round of the calculation procedure; plus

(B) The product of the additional pool of allowances determined under paragraph (b)(8)(i) of this section multiplied by a fraction whose numerator is the unit's average heat input amount determined under paragraph (b)(3)(ii) of this section and whose denominator is the sum determined under paragraph (b)(6)(i) of this section.

(9) The Administrator will round the default allocation for each eligible unit determined under paragraph (b)(6), (7), or (8) of this section to the nearest allowance and make any adjustments required under paragraph (b)(10) of this section.

(10) If the sum of the default allocations after rounding under paragraph (b)(9) of this section does not equal the total amount of allowances determined for the State and control period under paragraph (b)(1) of this

section, the Administrator will adjust the default allocations as follows: The Administrator will list the CSAPR NO$_X$ Ozone Season Group 3 units in descending order based on such units' allocation amounts under paragraph (b)(9) of this section and, in cases of equal allocation amounts, in alphabetical order of the relevant sources' names and numerical order of the relevant units' identification numbers, and will adjust each unit's allocation amount upward or downward by one CSAPR NO$_X$ Ozone Season Group 3 allowance (but not below zero) in the order in which the units are listed, and will repeat this adjustment process as necessary, until the total of the adjusted default allocations equals the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section.

(11)(i) By March 1, 2025 and March 1 of each year thereafter, the Administrator will calculate the default allocation of CSAPR NO$_X$ Ozone Season Group 3 allowances to each CSAPR NO$_X$ Ozone Season Group 3 unit in a State and Indian country within the borders of the State, in accordance with paragraphs (b)(1) through (10) of this section and §§ 97.1006(b)(2) and 97.1030 through 97.1035, for the control period in the year after the year of the applicable calculation deadline under this paragraph (b)(11)(i) and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (b)(11)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice. Objections shall be submitted by the deadline specified in such notice and shall be limited to addressing whether the calculations (including the identification of the CSAPR NO$_X$ Ozone Season Group 3 units) are in accordance with the provisions referenced in paragraph (b)(11)(i) of this section.

(iii) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(11)(i) of this section. By May 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(11)(i) of this section, the Administrator will promulgate a notice of data availability of the results of the calculations incorporating any adjustments that the Administrator determines to be necessary and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(11)(ii) of this section.

(c) *Incorrect allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances to existing units.* (1) For each control period in 2021 and thereafter, if the Administrator determines that CSAPR NO$_X$ Ozone Season Group 3 allowances were allocated for the control period to a recipient covered by the provisions of paragraph (c)(1)(i), (ii), or (iii) of this section, then the Administrator will notify the designated representative of the recipient and will act in accordance with the procedures set forth in paragraphs (c)(2) through (5) of this section:

(i) The recipient is not actually a CSAPR NO$_X$ Ozone Season Group 3 unit under § 97.1004 as of the first day of the control period and is allocated CSAPR NO$_X$ Ozone Season Group 3 allowances for such control period under paragraph (a)(1) or (2) of this section;

(ii) The recipient is not actually a CSAPR NO$_X$ Ozone Season Group 3 unit under § 97.1004 as of the first day of the control period and is allocated CSAPR NO$_X$ Ozone Season Group 3 allowances for such control period under a provision of a SIP revision approved under § 52.38(b)(10), (11), or (12) of this chapter that the SIP revision provides should be allocated only to recipients that are CSAPR NO$_X$ Ozone Season Group 3 units as of the first day of such control period; or

(iii) The recipient is not located as of the first day of the control period in the State (and Indian country within the borders of the State) from whose NO$_X$ Ozone Season Group 3 trading budget CSAPR NO$_X$ Ozone Season Group 3 allowances were allocated to the recipient for such control period under paragraph (a)(1) or (2) of this section or under a provision of a SIP revision approved under § 52.38(b)(10), (11), or (12) of this chapter.

\*        \*        \*        \*        \*

(5) With regard to any CSAPR NO$_X$ Ozone Season Group 3 allowances that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section:

(i) If the non-recordation decision under paragraph (c)(2) of this section or the deduction under paragraph (c)(3) of this section occurs on or before May 1, 2024, the Administrator will transfer the CSAPR NO$_X$ Ozone Season Group 3 allowances to the new unit set-aside for 2021, 2022, or 2023 for the State from whose NO$_X$ Ozone Season Group 3 trading budget the CSAPR NO$_X$ Ozone Season Group 3 allowances were allocated.

(ii) If the non-recordation decision under paragraph (c)(2) of this section or

the deduction under paragraph (c)(3) of this section occurs after May 1, 2024, and on or before May 1 of the year following the year of the control period for which the CSAPR $NO_X$ Ozone Season Group 3 allowances were allocated, the Administrator will transfer the CSAPR $NO_X$ Ozone Season Group 3 allowances to the new unit set-aside for such control period for the State from whose $NO_X$ Ozone Season Group 3 trading budget the CSAPR $NO_X$ Ozone Season Group 3 allowances were allocated.

(iii) If the non-recordation decision under paragraph (c)(2) of this section or the deduction under paragraph (c)(3) of this section occurs after May 1, 2024, and after May 1 of the year following the year of the control period for which the CSAPR $NO_X$ Ozone Season Group 3 allowances were allocated, the Administrator will transfer the CSAPR $NO_X$ Ozone Season Group 3 allowances to a surrender account.

■ 66. Amend § 97.1012 by:
■ a. Revising paragraphs (a) introductory text and (a)(1)(i) and (ii);
■ b. Removing paragraphs (a)(1)(iii) and (iv);
■ c. Revising paragraphs (a)(2) and (a)(3)(i);
■ d. In paragraph (a)(3)(ii), adding "and" after the semicolon;
■ e. Revising paragraph (a)(3)(iii);
■ f. Removing paragraph (a)(3)(iv);
■ g. Revising paragraph (a)(4)(i);
■ h. Redesignating paragraph (a)(4)(ii) as paragraph (a)(4)(iii) and adding a new paragraph (a)(4)(ii);
■ i. Revising paragraphs (a)(5) and (10);
■ j. In paragraph (a)(11), removing "§ 97.1011(b)(1)(i), (ii), and (v), of" and adding in its place "paragraph (a)(13) of this section, of";
■ k. Adding paragraph (a)(13);
■ l. Revising paragraphs (b) introductory text and (b)(1) and (2);
■ m. In paragraph (b)(5), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority";
■ n. Revising paragraph (b)(10);
■ o. In paragraph (b)(11), removing "§ 97.1011(b)(2)(i), (ii), and (v), of" and adding in its place "paragraph (b)(13) of this section, of"; and
■ p. Adding paragraphs (b)(13) and (c).
The revisions and additions read as follows:

### § 97.1012   CSAPR $NO_X$ Ozone Season Group 3 allowance allocations to new units.

(a) *Allocations from new unit set-asides.* For each control period in 2021 and thereafter for a State listed in § 52.38(b)(2)(iii)(A) of this chapter, or

2023 and thereafter for a State listed in § 52.38(b)(2)(iii)(B) or (C) of this chapter, and for the CSAPR $NO_X$ Ozone Season Group 3 units in each State and areas of Indian country within the borders of the State (except, for the control periods in 2021 and 2022, areas of Indian country within the borders of the State not subject to the State's SIP authority), the Administrator will allocate CSAPR $NO_X$ Ozone Season Group 3 allowances to the CSAPR $NO_X$ Ozone Season Group 3 units as follows:

(1) * * *

(i) CSAPR $NO_X$ Ozone Season Group 3 units that are not allocated an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances for such control period in the applicable notice of data availability referenced in § 97.1011(a)(1) or (2) and that have deadlines for certification of monitoring systems under § 97.1030(b) not later than September 30 of the year of the control period; or

(ii) CSAPR $NO_X$ Ozone Season Group 3 units whose allocation of an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances for such control period in the applicable notice of data availability referenced in § 97.1011(a)(1) or (2) is covered by § 97.1011(c)(2) or (3).

(2) The Administrator will establish a separate new unit set-aside for the State for each such control period. Each such new unit set-aside will be allocated CSAPR $NO_X$ Ozone Season Group 3 allowances in an amount equal to the applicable amount of tons of $NO_X$ emissions as set forth in § 97.1010(c) and will be allocated additional CSAPR $NO_X$ Ozone Season Group 3 allowances (if any) in accordance with § 97.1011(c)(5) and paragraphs (b)(10) and (c)(5) of this section.

(3) * * *

(i) The control period in 2021, for a State listed in § 52.38(b)(2)(iii)(A) of this chapter, or the control period in 2023, for a State listed in § 52.38(b)(2)(iii)(B) or (C) of this chapter;

* * *

(iii) For a unit described in paragraph (a)(1)(ii) of this section, the first control period in which the CSAPR $NO_X$ Ozone Season Group 3 unit operates in the State and Indian country within the borders of the State (except, for the control periods in 2021 and 2022, areas of Indian country within the borders of the State not subject to the State's SIP authority) after operating in another jurisdiction and for which the unit is not already allocated one or more CSAPR $NO_X$ Ozone Season Group 3 allowances.

(4)(i) The allocation to each CSAPR $NO_X$ Ozone Season Group 3 unit described in paragraphs (a)(1)(i) through

(iii) of this section and for each control period described in paragraph (a)(3) of this section will be an amount equal to the unit's total tons of $NO_X$ emissions during the control period or, if less, any applicable amount calculated under paragraph (a)(4)(ii) of this section.

(ii)(A) The allocation under paragraph (a)(4)(i) of this section to a unit described in paragraph (a)(4)(ii)(B) or (C) of this section may not exceed a maximum controlled baseline calculated as the product (converted to tons at a conversion factor of 2,000 lb/ ton and rounded to the nearest ton) of the unit's total heat input during the control period in mmBtu multiplied by a $NO_X$ emissions rate of 0.08 lb/mmBtu.

(B) For a control period in 2024 through 2026, a maximum controlled baseline under paragraph (a)(4)(ii)(A) of this section shall apply to any unit combusting any coal or solid coal-derived fuel during the control period, serving a generator with nameplate capacity of 100 MW or more, and equipped with selective catalytic reduction controls on or before September 30 of the preceding control period, except a circulating fluidized bed boiler.

(C) For a control period in 2027 and thereafter, a maximum controlled baseline under paragraph (a)(4)(ii)(A) of this section shall apply to any unit combusting any coal or solid coal-derived fuel during the control period and serving a generator with nameplate capacity of 100 MW or more, except a circulating fluidized bed boiler.

* * *

(5) The Administrator will calculate the sum of the allocation amounts of CSAPR $NO_X$ Ozone Season Group 3 allowances determined for all such CSAPR $NO_X$ Ozone Season Group 3 units under paragraph (a)(4)(i) of this section in the State and Indian country within the borders of the State (except, for the control periods in 2021 and 2022, areas of Indian country within the borders of the State not subject to the State's SIP authority) for such control period.

* * *

(10)(i) For a control period in 2021 or 2022, if, after completion of the procedures under paragraphs (a)(2) through (7) and (12) of this section for a control period, any unallocated CSAPR $NO_X$ Ozone Season Group 3 allowances remain in the new unit set-aside for the State for such control period, the Administrator will allocate to each CSAPR $NO_X$ Ozone Season Group 3 unit that is in the State and areas of Indian country within the borders of the State subject to the State's

SIP authority and is allocated an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in the applicable notice of data availability referenced in § 97.1011(a)(1) an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances equal to the following: The total amount of such remaining unallocated CSAPR NO$_X$ Ozone Season Group 3 allowances in such new unit set-aside, multiplied by the unit's allocation under § 97.1011(a)(1) for such control period, divided by the remainder of the amount of tons in the applicable State NO$_X$ Ozone Season Group 3 trading budget minus the sum of the amounts of tons in such new unit set-aside and the Indian country new unit set-aside for the State for such control period, and rounded to the nearest allowance.

(ii) For a control period in 2023 or thereafter, if, after completion of the procedures under paragraphs (a)(2) through (7) and (12) of this section for a control period, any unallocated CSAPR NO$_X$ Ozone Season Group 3 allowances remain in the new unit set-aside for the State for such control period, the Administrator will allocate to each CSAPR NO$_X$ Ozone Season Group 3 unit that is in the State and Indian country within the borders of the State and is allocated an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period by the Administrator in the applicable notice of data availability referenced in § 97.1011(a)(1) or (2), or under a provision of a SIP revision approved under § 52.38(b)(10), (11), or (12) of this chapter, an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances equal to the following: The total amount of such remaining unallocated CSAPR NO$_X$ Ozone Season Group 3 allowances in such new unit set-aside, multiplied by the unit's allocation under § 97.1011(a)(1) or (2) or a provision of a SIP revision approved under § 52.38(b)(10), (11), or (12) of this chapter for such control period, divided by the remainder of the amount of tons in the applicable State NO$_X$ Ozone Season Group 3 trading budget minus the amount of tons in such new unit set-aside for the State for such control period, and rounded to the nearest allowance.

\*    \*    \*    \*    \*

(13)(i) By March 1, 2022, and March 1 of each year thereafter, the Administrator will calculate the CSAPR NO$_X$ Ozone Season Group 3 allowance allocation to each CSAPR NO$_X$ Ozone Season Group 3 unit in a State and Indian country within the borders of the State (except, for the control periods in 2021 and 2022, areas of Indian country within the State not subject to the State's SIP authority), in accordance with paragraphs (a)(2) through (7), (10), and (12) of this section and §§ 97.1006(b)(2) and 97.1030 through 97.1035, for the control period in the year before the year of the applicable calculation deadline under this paragraph (a)(13)(i) and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (a)(13)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice. Objections shall be submitted by the deadline specified in such notice and shall be limited to addressing whether the calculations (including the identification of the CSAPR NO$_X$ Ozone Season Group 3 units) are in accordance with the provisions referenced in paragraph (a)(13)(i) of this section.

(iii) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (a)(13)(i) of this section. By May 1 immediately after the promulgation of each notice of data availability required in paragraph (a)(13)(i) of this section, the Administrator will promulgate a notice of data availability of the results of the calculations incorporating any adjustments that the Administrator determines to be necessary and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (a)(13)(ii) of this section.

(b) *Allocations from Indian country new unit set-asides.* For the control periods in 2021 and 2022, for a State listed in § 52.38(b)(2)(iii)(A) of this chapter, and for the CSAPR NO$_X$ Ozone Season Group 3 units in areas of Indian country within the borders of each such State not subject to the State's SIP authority, the Administrator will allocate CSAPR NO$_X$ Ozone Season Group 3 allowances to the CSAPR NO$_X$ Ozone Season Group 3 units as follows:

(1) The CSAPR NO$_X$ Ozone Season Group 3 allowances will be allocated to CSAPR NO$_X$ Ozone Season Group 3 units that are not allocated an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for such control period in the applicable notice of data availability referenced in § 97.1011(a)(1) and that have deadlines for certification of monitoring systems under § 97.1030(b) not later than September 30 of the year of the control period, except as provided in paragraph (b)(10) of this section.

(2) The Administrator will establish a separate Indian country new unit set-aside for the State for each such control period. Each such Indian country new unit set-aside will be allocated CSAPR NO$_X$ Ozone Season Group 3 allowances in an amount equal to the applicable amount of tons of NO$_X$ emissions as set forth in § 97.1010(d) and will be allocated additional CSAPR NO$_X$ Ozone Season Group 3 allowances (if any) in accordance with paragraph (c)(5) of this section.

\*    \*    \*    \*    \*

(10) If, after completion of the procedures under paragraphs (b)(2) through (7) and (12) of this section for a control period, any unallocated CSAPR NO$_X$ Ozone Season Group 3 allowances remain in the Indian country new unit set-aside for the State for such control period, the Administrator will transfer such unallocated CSAPR NO$_X$ Ozone Season Group 3 allowances to the new unit set-aside for the State for such control period.

\*    \*    \*    \*    \*

(13)(i) By March 1, 2022, and March 1, 2023, the Administrator will calculate the CSAPR NO$_X$ Ozone Season Group 3 allowance allocation to each CSAPR NO$_X$ Ozone Season Group 3 unit in areas of Indian country within the borders of a State not subject to the State's SIP authority, in accordance with paragraphs (b)(2) through (7), (10), and (12) of this section and §§ 97.1006(b)(2) and 97.1030 through 97.1035, for the control period in the year before the year of the applicable calculation deadline under this paragraph (b)(13)(i) and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (b)(13)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice. Objections shall be submitted by the deadline specified in such notice and shall be limited to addressing whether the calculations (including the identification of the CSAPR NO$_X$ Ozone Season Group 3 units) are in accordance with the provisions referenced in paragraph (b)(13)(i) of this section.

(iii) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(13)(i) of this section. By May 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(13)(i) of this section, the Administrator will promulgate a notice of data availability of the results of the calculations incorporating any adjustments that the Administrator

determines to be necessary and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(13)(ii) of this section.

(c) *Incorrect allocations of CSAPR NOₓ Ozone Season Group 3 allowances to new units.* (1) For each control period in 2021 and thereafter, if the Administrator determines that CSAPR NOₓ Ozone Season Group 3 allowances were allocated for the control period under paragraphs (a)(2) through (7) and (12) of this section or paragraphs (b)(2) through (7) and (12) of this section to a recipient that is not actually a CSAPR NOₓ Ozone Season Group 3 unit under § 97.1004 as of the first day of such control period, then the Administrator will notify the designated representative of the recipient and will act in accordance with the procedures set forth in paragraphs (c)(2) through (5) of this section.

(2) Except as provided in paragraph (c)(3) or (4) of this section, the Administrator will not record such CSAPR NOₓ Ozone Season Group 3 allowances under § 97.1021.

(3) If the Administrator already recorded such CSAPR NOₓ Ozone Season Group 3 allowances under § 97.1021 and if the Administrator makes the determination under paragraph (c)(1) of this section before making deductions for the source that includes such recipient under § 97.1024(b) for such control period, then the Administrator will deduct from the account in which such CSAPR NOₓ Ozone Season Group 3 allowances were recorded an amount of CSAPR NOₓ Ozone Season Group 3 allowances allocated for the same or a prior control period equal to the amount of such already recorded CSAPR NOₓ Ozone Season Group 3 allowances. The authorized account representative shall ensure that there are sufficient CSAPR NOₓ Ozone Season Group 3 allowances in such account for completion of the deduction.

(4) If the Administrator already recorded such CSAPR NOₓ Ozone Season Group 3 allowances under § 97.1021 and if the Administrator makes the determination under paragraph (c)(1) of this section after making deductions for the source that includes such recipient under § 97.1024(b) for such control period, then the Administrator will not make any deduction to take account of such already recorded CSAPR NOₓ Ozone Season Group 3 allowances.

(5) With regard to any CSAPR NOₓ Ozone Season Group 3 allowances that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section:

(i) If the non-recordation decision under paragraph (c)(2) of this section or the deduction under paragraph (c)(3) of this section occurs on or before May 1, 2023, the Administrator will transfer the CSAPR NOₓ Ozone Season Group 3 allowances to the new unit set-aside, in the case of allowances allocated under paragraph (a) of this section, or the Indian country new unit set-aside, in the case of allowances allocated under paragraph (b) of this section, for the control period in 2021 or 2022 for the State from whose NOₓ Ozone Season Group 3 trading budget the CSAPR NOₓ Ozone Season Group 3 allowances were allocated.

(ii) If the non-recordation decision under paragraph (c)(2) of this section or the deduction under paragraph (c)(3) of this section occurs after May 1, 2023, and on or before May 1, 2024, the Administrator will transfer the CSAPR NOₓ Ozone Season Group 3 allowances to the new unit set-aside for the control period in 2023 for the State from whose NOₓ Ozone Season Group 3 trading budget the CSAPR NOₓ Ozone Season Group 3 allowances were allocated.

(iii) If the non-recordation decision under paragraph (c)(2) of this section or the deduction under paragraph (c)(3) of this section occurs after May 1, 2024, the Administrator will transfer the CSAPR NOₓ Ozone Season Group 3 allowances to a surrender account.

■ 67. Amend § 97.1021 by:
■ a. In paragraph (a), removing "§ 97.1011(a)" and adding in its place "§ 97.1011(a)(1)";
■ b. Revising paragraph (b);
■ c. Removing and reserving paragraph (c);
■ d. Adding paragraphs (d) and (e);
■ e. In paragraph (f), removing "§ 97.1011(a), or" and adding in its place "§ 97.1011(a)(1), or";
■ f. Redesignating paragraphs (g) and (h) as paragraphs (i) and (j), respectively, and adding new paragraphs (g) and (h);
■ g. Revising newly redesignated paragraph (i);
■ h. In newly redesignated paragraph (j), removing "and May 1 of each year thereafter, the" and adding in its place ", and May 1, 2023, the"; and
■ i. In paragraph (m), adding "or (e)" after "§ 97.811(d)" each time it appears.

The revisions and addition read as follows:

**§ 97.1021   Recordation of CSAPR NOₓ Ozone Season Group 3 allowance allocations and auction results.**

\*    \*    \*    \*    \*

(b) By July 29, 2021, the Administrator will record in each CSAPR NOₓ Ozone Season Group 3 source's compliance account the CSAPR NOₓ Ozone Season Group 3 allowances allocated to the CSAPR NOₓ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2022.

\*    \*    \*    \*    \*

(d) By September 5, 2023, the Administrator will record in each CSAPR NOₓ Ozone Season Group 3 source's compliance account the CSAPR NOₓ Ozone Season Group 3 allowances allocated to the CSAPR NOₓ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2023.

(e) By September 5, 2023, the Administrator will record in each CSAPR NOₓ Ozone Season Group 3 source's compliance account the CSAPR NOₓ Ozone Season Group 3 allowances allocated to the CSAPR NOₓ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2024, unless the State in which the source is located notifies the Administrator in writing by August 4, 2023, of the State's intent to submit to the Administrator a complete SIP revision by September 1, 2023, meeting the requirements of § 52.38(b)(10)(i) through (iv) of this chapter.

(1) If, by September 1, 2023, the State does not submit to the Administrator such complete SIP revision, the Administrator will record by September 15, 2023, in each CSAPR NOₓ Ozone Season Group 3 source's compliance account the CSAPR NOₓ Ozone Season Group 3 allowances allocated to the CSAPR NOₓ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2024.

(2) If the State submits to the Administrator by September 1, 2023, and the Administrator approves by March 1, 2024, such complete SIP revision, the Administrator will record by March 1, 2024, in each CSAPR NOₓ Ozone Season Group 3 source's compliance account the CSAPR NOₓ Ozone Season Group 3 allowances allocated to the CSAPR NOₓ Ozone Season Group 3 units at the source as provided in such approved, complete SIP revision for the control period in 2024.

(3) If the State submits to the Administrator by September 1, 2023, and the Administrator does not approve by March 1, 2024, such complete SIP revision, the Administrator will record by March 1, 2024, in each CSAPR NOₓ Ozone Season Group 3 source's compliance account the CSAPR NOₓ Ozone Season Group 3 allowances

allocated to the CSAPR $NO_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2024.

\* \* \* \* \*

(g) By September 5, 2023, the Administrator will record in each CSAPR $NO_X$ Ozone Season Group 3 source's compliance account the CSAPR $NO_X$ Ozone Season Group 3 allowances allocated to the CSAPR $NO_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(2) for the control periods in 2023 and 2024.

(h) By July 1, 2024, and July 1 of each year thereafter, the Administrator will record in each CSAPR $NO_X$ Ozone Season Group 3 source's compliance account the CSAPR $NO_X$ Ozone Season Group 3 allowances allocated to the CSAPR $NO_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(2) for the control period in the year after the year of the applicable recordation deadline under this paragraph (h).

(i) By May 1, 2022, and May 1 of each year thereafter, the Administrator will record in each CSAPR $NO_X$ Ozone Season Group 3 source's compliance account the CSAPR $NO_X$ Ozone Season Group 3 allowances allocated to the CSAPR $NO_X$ Ozone Season Group 3 units at the source in accordance with § 97.1012(a) for the control period in the year before the year of the applicable recordation deadline under this paragraph (i).

\* \* \* \* \*

■ 68. Amend § 97.1024 by:
■ a. Revising the section heading;
■ b. In paragraphs (a) introductory text and (b) introductory text, adding ''primary'' before ''emissions limitation'';
■ c. Revising paragraph (b)(1);
■ d. Adding paragraph (b)(3); and
■ e. In paragraph (c)(2)(ii), adding ''or (e)'' after ''§ 97.826(d)''.

The revisions and addition read as follows:

**§ 97.1024   Compliance with CSAPR $NO_X$ Ozone Season Group 3 primary emissions limitation; backstop daily $NO_X$ emissions rate.**

\* \* \* \* \*

(b) \* \* \*

(1) Until the amount of CSAPR $NO_X$ Ozone Season Group 3 allowances deducted equals the sum of:

(i) The number of tons of total $NO_X$ emissions from all CSAPR $NO_X$ Ozone Season Group 3 units at the source for such control period; plus

(ii) Two times the excess, if any, over 50 tons of the sum (converted to tons at a conversion factor of 2,000 lb/ton and rounded to the nearest ton), for all

calendar days in the control period and all CSAPR $NO_X$ Ozone Season Group 3 units at the source to which the backstop daily $NO_X$ emissions rate applies for the control period under paragraph (b)(3) of this section, of any amount by which a unit's $NO_X$ emissions for a given calendar day in pounds exceed the product in pounds of the unit's total heat input in mmBtu for that calendar day multiplied by 0.14 lb/ mmBtu; or

(3) The backstop daily $NO_X$ emissions rate of 0.14 lb/mmBtu applies as follows:

(i) For each control period in 2024 through 2029, the backstop daily $NO_X$ emissions rate shall apply to each CSAPR $NO_X$ Ozone Season Group 3 unit combusting any coal or solid coal-derived fuel during the control period, serving a generator with nameplate capacity of 100 MW or more, and equipped with selective catalytic reduction controls on or before September 30 of the preceding control period, except a circulating fluidized bed boiler.

(ii) For each control in 2030 and thereafter, the backstop daily $NO_X$ emissions rate shall apply to each CSAPR $NO_X$ Ozone Season Group 3 unit combusting any coal or solid coal-derived fuel during the control period and serving a generator with nameplate capacity of 100 MW or more, except a circulating fluidized bed boiler.

\* \* \* \* \*

■ 69. Amend § 97.1025 by:
■ a. Revising the section heading;
■ b. In paragraphs (a) introductory text, (a)(2), (b)(1)(i), (b)(1)(ii)(A) and (B), (b)(3), (b)(4)(i), (b)(5), (b)(6)(i), (b)(6)(iii) introductory text, and (b)(6)(iii)(A) and (B), removing ''base CSAPR'' and adding in its place ''CSAPR'' each time it appears; and
■ c. Adding paragraph (c).

The revision and addition read as follows:

**§ 97.1025   Compliance with CSAPR $NO_X$ Ozone Season Group 3 assurance provisions; CSAPR $NO_X$ Ozone Season Group 3 secondary emissions limitation.**

\* \* \* \* \*

(c) *CSAPR $NO_X$ Ozone Season Group 3 secondary emissions limitation.* (1) The owner or operator of a CSAPR $NO_X$ Ozone Season Group 3 unit equipped with selective catalytic reduction controls or selective non-catalytic reduction controls shall not discharge, or allow to be discharged, emissions of $NO_X$ to the atmosphere during a control period in excess of the tonnage amount calculated in accordance with paragraph (c)(2) of this section, provided that the

emissions limitation established under this paragraph (c)(1) shall apply to a unit for a control period only if:

(i) The unit is included for the control period in a group of CSAPR $NO_X$ Ozone Season Group 3 units at CSAPR $NO_X$ Ozone Season Group 3 sources in a State (and Indian country within the borders of such State) having a common designated representative and the owners and operators of such units and sources are subject to a requirement for such control period to hold one or more CSAPR $NO_X$ Ozone Season Group 3 allowances under § 97.1006(c)(2)(i) and paragraph (b) of this section with respect to such group; and

(ii) The unit was required to report $NO_X$ emissions and heat input data for all or portions of at least 367 operating hours during the control period and all or portions of at least 367 operating hours during at least one historical control period under the CSAPR $NO_X$ Ozone Season Group 1 Trading Program, CSAPR $NO_X$ Ozone Season Group 2 Trading Program, or CSAPR $NO_X$ Ozone Season Group 3 Trading Program.

(2) The amount of the emissions limitation applicable to a CSAPR $NO_X$ Ozone Season Group 3 unit for a control period under paragraph (c)(1) of this section, in tons of $NO_X$, shall be calculated as the sum of 50 plus the product (converted to tons at a conversion factor of 2,000 lb/ton and rounded to the nearest ton) of multiplying—

(i) The total heat input in mmBtu reported for the unit for the control period in accordance with §§ 97.1030 through 97.1035; and

(ii) A $NO_X$ emission rate of 0.10 lb/ mmBtu or, if higher, the product of 1.25 times the lowest seasonal average $NO_X$ emission rate in lb/mmBtu achieved by the unit in any historical control period for which the unit was required to report $NO_X$ emissions and heat input data for all or portions of at least 367 operating hours under the CSAPR $NO_X$ Ozone Season Group 1 Trading Program, CSAPR $NO_X$ Ozone Season Group 2 Trading Program, or CSAPR $NO_X$ Ozone Season Group 3 Trading Program, where the unit's seasonal average $NO_X$ emission rate for each such historical control period shall be calculated from such reported data as the quotient (converted to lb/mmBtu at a conversion factor of 2,000 lb/ton, and rounded to the nearest 0.0001 lb/ mmBtu) of the unit's total $NO_X$ emissions in tons for the historical control period divided by the unit's total heat input in mmBtu for the historical control period.

■ 70. Amend § 97.1026 by:

■ a. Revising the section heading and paragraph (b);

■ b. In paragraph (c):

■ i. Removing "set forth in" and adding in its place "established under"; and

■ ii. Removing "State (or Indian" and adding in its place "State (and Indian"; and

■ c. Adding paragraph (d).

The revision and addition read as follows:

### § 97.1026  Banking; bank recalibration.

\*    \*    \*    \*    \*

(b) Any CSAPR $NO_X$ Ozone Season Group 3 allowance that is held in a compliance account or a general account will remain in such account unless and until the CSAPR $NO_X$ Ozone Season Group 3 allowance is deducted or transferred under § 97.1011(c), § 97.1012(c), § 97.1023, § 97.1024, § 97.1025, § 97.1027, or § 97.1028 or paragraph (c) or (d) of this section.

\*    \*    \*    \*    \*

(d) Before the allowance transfer deadline for each control period in 2024 and thereafter, the Administrator will deduct amounts of CSAPR $NO_X$ Ozone Season Group 3 allowances issued for the control periods in previous years exceeding the CSAPR $NO_X$ Ozone Season Group 3 allowance bank ceiling target for the control period in accordance with paragraphs (d)(1) through (4) of this section.

(1) As soon as practicable on or after August 1, 2024, and August 1 of each year thereafter, the Administrator will temporarily suspend acceptance of CSAPR $NO_X$ Ozone Season Group 3 allowance transfers submitted under § 97.1022 and, before resuming acceptance of such transfers, will take the actions in paragraphs (d)(2) through (4) of this section.

(2) The Administrator will determine each of the following values:

(i) The total amount of CSAPR $NO_X$ Ozone Season Group 3 allowances issued for control periods in years before the year of the deadline under paragraph (d)(1) of this section and held in all compliance and general accounts.

(ii) The CSAPR $NO_X$ Ozone Season Group 3 allowance bank ceiling target for the control period in the year of the deadline under paragraph (d)(1) of this section, calculated as the product, rounded to the nearest allowance, of the sum for all States listed in § 52.38(b)(2)(iii) of this chapter of the State $NO_X$ Ozone Season Group 3 trading budgets under § 97.1010(a) for such States for such control period multiplied by—

(A) 0.210, for a control period in 2024 through 2029; or

(B) 0.105, for a control period in 2030 and thereafter.

(3) If the total amount of CSAPR $NO_X$ Ozone Season Group 3 allowances determined under paragraph (d)(2)(i) of this section exceeds the CSAPR $NO_X$ Ozone Season Group 3 allowance bank ceiling target determined under paragraph (d)(2)(ii) of this section, then for each compliance account or general account holding CSAPR $NO_X$ Ozone Season Group 3 allowances issued for control periods in years before the year of the deadline under paragraph (d)(1) of this section, the Administrator will:

(i) Determine the total amount of CSAPR $NO_X$ Ozone Season Group 3 allowances issued for control periods in years before the year of the deadline under paragraph (d)(1) of this section and held in the account.

(ii) Determine the account's share of the CSAPR $NO_X$ Ozone Season Group 3 allowance bank ceiling target for the control period, calculated as the product, rounded up to the nearest allowance, of the CSAPR $NO_X$ Ozone Season Group 3 allowance bank ceiling target determined under paragraph (d)(2)(ii) of this section multiplied by a fraction whose numerator is the total amount of CSAPR $NO_X$ Ozone Season Group 3 allowances held in the account determined under paragraph (d)(3)(i) of this section and whose denominator is the total amount of CSAPR $NO_X$ Ozone Season Group 3 allowances held in all compliance and general accounts determined under paragraph (d)(2)(i) of this section.

(iii) Deduct an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances issued for control periods in years before the year of the deadline under paragraph (d)(1) of this section equal to any positive remainder of the total amount of CSAPR $NO_X$ Ozone Season Group 3 allowances held in the account determined under paragraph (d)(3)(i) of this section minus the account's share of the CSAPR $NO_X$ Ozone Season Group 3 allowance bank ceiling target for the control period determined under paragraph (d)(3)(ii) of this section. The allowances will be deducted on a first-in, first-out basis in the order set forth in § 97.1024(c)(2)(i) and (ii).

(iv) Record the deductions under paragraph (d)(3)(iii) of this section in the account.

(4)(i) In computing any amounts of CSAPR $NO_X$ Ozone Season Group 3 allowances to be deducted from general accounts under paragraph (d)(3) of this section, the Administrator may group multiple general accounts whose ownership interests are held by the same or related persons or entities and treat the group of accounts as a single account for purposes of such computation.

(ii) Following a computation for a group of general accounts in accordance with paragraph (d)(4)(i) of this section, the Administrator will deduct from and record in each individual account in such group a proportional share of the quantity of CSAPR $NO_X$ Ozone Season Group 3 allowances computed for such group, basing such shares on the respective quantities of CSAPR $NO_X$ Ozone Season Group 3 allowances determined for such individual accounts under paragraph (d)(3)(i) of this section.

(iii) In determining the proportional shares under paragraph (d)(4)(ii) of this section, the Administrator may employ any reasonable adjustment methodology to truncate or round each such share up or down to a whole number and to cause the total of such whole numbers to equal the amount of CSAPR $NO_X$ Ozone Season Group 3 allowances computed for such group of accounts in accordance with paragraph (d)(4)(i) of this section, even where such adjustments cause the numbers of CSAPR $NO_X$ Ozone Season Group 3 allowances remaining in some individual accounts following the deductions to equal zero.

■ 71. Amend § 97.1030 by:

■ a. Revising paragraph (b)(1); and

■ b. In paragraph (b)(3), removing "(b)(2)" and adding in its place "(b)(1) or (2)" each time it appears.

The revision reads as follows:

### § 97.1030  General monitoring, recordkeeping, and reporting requirements.

\*    \*    \*    \*    \*

(b) \*  \*  \*

(1)(i) May 1, 2021, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(A) of this chapter;

(ii) May 1, 2023, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(B) of this chapter;

(iii) August 4, 2023, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(C) of this chapter, where the unit is required to report $NO_X$ mass emissions data or $NO_X$ emissions rate data according to 40 CFR part 75 to address other regulatory requirements; or

(iv) January 31, 2024, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(C) of this chapter, where the unit is not required to report $NO_X$ mass emissions data or $NO_X$ emissions rate data according to 40 CFR

part 75 to address other regulatory requirements.

\* \* \* \* \*

■ 72. Amend § 97.1034 by:
■ a. Revising paragraph (d)(2)(i); and
■ b. In paragraph (d)(4), removing "or CSAPR SO₂ Group 1 Trading Program, quarterly" and adding in its place "CSAPR SO₂ Group 1 Trading Program, or CSAPR SO₂ Group 2 Trading Program, quarterly".

The revision reads as follows:

**§ 97.1034    Recordkeeping and reporting.**

(d) \* \* \*
(2) \* \* \*
(i)(A) The calendar quarter covering May 1, 2021, through June 30, 2021, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(A) of this chapter;

(B) The calendar quarter covering May 1, 2023, through June 30, 2023, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(B) of this chapter; or

(C) The calendar quarter covering August 4, 2023, through June 30, 2023, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(C) of this chapter;

\* \* \* \* \*

[FR Doc. 2023–05744 Filed 6–2–23; 8:45 am]

**BILLING CODE 6560–50–P**

## TECHNICAL MEMORANDUM

TO:           Docket for Rulemaking, "Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards" (EPA-HQ-OAR-2021-0668)

DATE:        February 28, 2022

SUBJECT:   Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026

***Note: EPA originally posted this document on March 11, 2022. This document, posted on March 29, 2022, corrects inadvertent errors referencing a filename on page 9 and in Table 5 on page 16.***

## I. Introduction

The EPA developed an analytical framework to facilitate decisions about industries, emissions unit types, and cost thresholds for including emissions units in the non-electric generating unit "sector" (non-EGUs) in a federal implementation plan (FIP) proposal for the 2015 ozone national ambient air quality standards (NAAQS) transport obligations. Using this analytical framework, we prepared a screening assessment for the year 2026.

This memorandum presents the analytical framework and summarizes the screening assessment the EPA prepared to identify industries and emissions unit types to include in proposed rules to obtain NOx emissions reductions from non-EGUs. Sections VII.A.2. and VII.C. of the proposal preamble include discussions of the non-EGU NOx emissions limits, compliance timing, and other related-rule requirements for the industries and emissions unit types identified through the screening assessment.

The remainder of this memorandum includes the following sections:

    II.     Background on Analytical Framework
    III.    The Analytical Framework
         o   Step 1 -- Identifying Potentially Impactful Industries in 2023
         o   Step 2a -- Identifying a Cost Threshold to Evaluate Emissions Reductions in Potentially Impactful Industries for 2023
         o   Step 2b -- Assessing Non-EGU Emission Reduction Potential and Estimated Air Quality Impacts in Potentially Impactful Industries in 2023
         o   Step 2c – Refining Tier 2 by Identifying Potentially Impactful Boilers in 2023
    IV.    Modifying the Analytical Framework for the Screening Assessment for 2026
    V.     Screening Assessment Results for 2026 -- Estimated Total Emissions Reductions, Air Quality Improvements, and Annual Total Costs for Emissions Units in Tier 1 Industries and Impactful Boilers in Tier 2 Industries
    VI.    Request for Comment and Additional Information

## II. Background on Analytical Framework

The number of different industries and emissions unit categories and types, as well as the total number of emissions units that comprise the non-EGU "sector"[1] makes it challenging to define a single method to identify impactful emissions reductions. We incorporated air quality information as a first step in the analytical framework to help determine potentially impactful industries to focus on for further assessing emission reduction potential, air quality improvements, and costs. Given the lengthy decision-making and analysis schedules for the FIP

---

[1] The non-EGU "sector" includes non-electric generating emissions units in various manufacturing industries and does not include municipal waste combustors (MWC), cogeneration units, or <25 MW EGUs. For a discussion of MWCs, cogeneration units, and EGUs <25 MW, see Section VI.B.3. of the proposed rule preamble.

1

proposal, we developed the analytical framework using inputs from the air quality modeling for the Revised CSAPR Update (RCU) for 2023[2], as well as the projected 2023 annual emissions inventory from the 2016v2 emissions platform that was used for the air quality modeling for the proposed rule.

Using the RCU modeling for 2023, we identified upwind states linked to downwind nonattainment or maintenance receptors using the 1% of the NAAQS threshold criterion, which is 0.7 ppb (1% of a 70 ppb NAAQS). In 2023 there were 27 linked states for the 2015 NAAQS: AL, AR, CA, DE, IA, IL, IN, KY, LA, MD, MI, MN, MO, MS, NJ, NY, NV, OH, OK, PA, TN, TX, UT, VA, WI, WV, and WY.

To analyze non-EGU emissions units, we aggregated the underlying projected 2023 emissions inventory data into industries defined by 4-digit NAICS.[3] Then for the linked states, we followed the 2-step process below:

1. **Step 1** -- We identified industries whose potentially controllable emissions are estimated, by applying the analytical framework, to have the greatest ppb impact on downwind air quality, [4] and
2. **Step 2** – We determined which of the most impactful industries and emissions units had the most emissions reductions that would make meaningful air quality improvements at the downwind receptors at a marginal cost threshold we determined using underlying control device efficiency and cost information.

Additional details on these steps are presented in the Section III below.

Finally, the EPA concluded, based on the most recent information available from the CSAPR Update Non-EGU TSD,[5] that controls on all of the non-EGU emissions units cannot be installed by the 2023 ozone season.[6] As such, we modified the analytical framework slightly and applied it for a screening assessment estimating potential emissions reductions, air quality improvements, and costs for the year 2026.

### III. The Analytical Framework

### Step 1 - Identifying Potentially Impactful Industries in 2023

The analytical framework starts with identifying industries whose potentially controllable emissions may contribute to downwind receptors. To identify industries that have large, meaningful air quality impacts from potentially controllable emissions, we estimated air quality contribution by 4-digit NAICS-based industry for 2023. To estimate the contributions by 4-digit NAICS at each downwind receptor, we used the 2023 state-receptor specific RCU ppb/ton values and the RCU calibration factors used in the air quality assessment tool (AQAT) for control analyses in 2023.[7]

---

[2] We used the RCU air quality modeling for this screening assessment because the air quality modeling for the proposed rule was not completed in time to support this assessment.

[3] North American Industry Classification System (https://www.census.gov/naics/).

[4] To identify industries, we reviewed emissions units with >= 100tpy emissions units in the 2023 inventory in those industries in the upwind states.

[5] Final Technical Support Document (TSD) for the Final Cross-State Air Pollution Rule for the 2008 Ozone NAAQS, Assessment of Non-EGU $NO_X$ Emissions Controls, Cost of Controls, and Time for Compliance Final TSD ("CSAPR Update Non-EGU TSD"), August 2016, available at *https://www.epa.gov/csapr/assessment-non-egu-$NO_X$-emission-controls-cost-controls-and-time-compliance-final-tsd*.

[6] Note that information on control installation timing as detailed in the 2016 CSAPR Update Non-EGU TSD is not complete or sufficient to serve as a foundation for timing estimates for this proposed FIP.

[7] The calibration factors are receptor-specific factors. For the RCU, the calibration factors were generated using 2016 base case and 2023 base case air quality model runs. These receptor-level ppb/ton factors are discussed in the Ozone Transport

2

**267a**

We focused on assessing emissions units that emit >100 tpy of NOx.[8] By limiting the focus to potentially controllable emissions, well-controlled sources that still emit > 100 tpy are excluded from consideration. Instead, the focus is on uncontrolled sources or sources that could be better controlled at a reasonable cost. As a result, reductions from any industry identified by this process are more likely to be achievable and to lead to air quality improvements.

Based on the industry contribution data, we prepared a summary of the estimated total, maximum, and average contributions from each industry and the number of receptors with contributions >= 0.01 ppb from each industry. We evaluated this information to identify breakpoints in the data, as described in detail in Appendix A. These breakpoints were then used to identify the most impactful industries to focus on for the next steps in the analysis.[9]

A review of the contribution data indicated that we should focus the assessment of NOx reduction potential and cost primarily on four industries. These industries each (1) have a maximum contribution to any one receptor of >0.10 ppb and (2) contribute >= 0.01 ppb to at least 10 receptors. We refer to these four industries identified below as comprising **"Tier 1"**.

- Pipeline Transportation of Natural Gas
- Cement and Concrete Product Manufacturing
- Iron and Steel Mills and Ferroalloy Manufacturing
- Glass and Glass Product Manufacturing

In addition, the contribution data suggests that we should include five additional industries as a second tier in the assessment. These industries each either have (1) a maximum contribution to any one receptor >=0.10 ppb but contribute >=0.01 ppb to fewer than 10 receptors, or (2) a maximum contribution <0.10 ppb but contribute >=0.01 ppb to at least 10 receptors. We refer to these five industries identified below as comprising **"Tier 2"**.

- Basic Chemical Manufacturing
- Petroleum and Coal Products Manufacturing
- Metal Ore Mining
- Lime and Gypsum Product Manufacturing
- Pulp, Paper, and Paperboard Mills

---

Policy Analysis Final Rule TSD found here: https://www.epa.gov/sites/default/files/2021-03/documents/ozone_transport_policy_analysis_final_rule_tsd_0.pdf.

[8] In the non-EGU emission reduction assessment prepared for the Revised Cross State Air Pollution Rule Update (https://www.regulations.gov/document/EPA-HQ-OAR-2020-0272-0014), we reviewed emissions units with >150 tpy of NOx emissions. In this screening assessment, we broadened the scope to include emissions units with >=100 tpy of NOx emissions. We believe that emissions units that are smaller may already be controlled and reductions from these smaller units are likely to be more costly.

[9] The air quality contribution data and the R code that processed these data are available upon request.

3

**268a**

**Step 2a - Identifying a Cost Threshold to Evaluate Emissions Reductions in Potentially Impactful Industries for 2023**

To identify an annual cost threshold for evaluating potential emissions reductions in the Tier 1 and Tier 2 industries, the EPA used the Control Strategy Tool (CoST)[10], the Control Measures Database (CMDB)[11], and the projected 2023 emissions inventory to prepare a listing of potential control measures, and costs, applied to non-EGU emissions units in the projected 2023 emissions inventory. Using this data, we plotted curves for Tier 1 industries, Tier 2 industries, Tier 1 and 2 industries, and all industries at $500 per ton increments. Figure 1 indicates there is a "knee in the curve" at approximately $7,500 per ton.[12] We used this marginal cost threshold to further assess estimated emissions reductions, air quality improvements, and costs from the potentially impactful industries. Note that controls and related emissions reductions are available at several estimated cost levels up to the $7,500 per ton threshold. The costs do not include monitoring, recordkeeping, reporting, or testing costs.

**Figure 1. Ozone Season NOx Reductions and Costs per Ton (CPT) for Tier 1, Tier 2 Industries, and Other Industries**



---

[10] Further information on CoST can be found at the following link: https://www.epa.gov/economic-and-cost-analysis-air-pollution-regulations/cost-analysis-modelstools-air-pollution.

[11] The CMDB is available at the following link: https://www.epa.gov/economic-and-cost-analysis-air-pollution-regulations/cost-analysis-modelstools-air-pollution.

[12] The CoST run results, the CMDB, and the R code that generated the curves are available upon request.

4

**Step 2b - Assessing Non-EGU Emission Reduction Potential and Estimated Air Quality Impacts in Potentially Impactful Industries in 2023**

Next, using the marginal cost threshold of $7,500 per ton, to estimate emissions reductions and costs the EPA processed the CoST run using the maximum emission reduction algorithm[13,14] with known controls.[15] We identified controls for non-EGU emissions units in the Tier 1 and Tier 2 industries that cost up to $7,500 per ton. Note that $7,500 per ton represents a marginal cost, and controls and related emissions reductions are available at several estimated costs up to the $7,500 per ton threshold. The costs do not include monitoring, recordkeeping, reporting, or testing costs.

We then calculated air quality impacts associated with the estimated reductions for the 27 linked states in 2023 following the steps below.

1. We binned the estimated reductions by 4-digit NAICS code into the Tier 1 and Tier 2 industries.
2. We used the 2023 state-receptor specific RCU ppb/ton values and the RCU calibration factors used in the AQAT for control analyses in 2023. We multiplied the estimated non-EGU reductions by the ppb/ton values and by the receptor-specific calibration factor to estimate the ppb impacts from these emissions reductions.[16]

*Note that we did not include the impact of reductions in the "home state" even if the "home state" was linked to receptor(s) in another state. That is, we only looked at the impact of NOx emissions reductions from upwind states. Furthermore, for each receptor we included impacts from states that are upwind to any receptor, not just those states that are upwind to that particular receptor.*

**Step 2c – Refining Tier 2 by Identifying Potentially Impactful Boilers in 2023**

In 2023 because boilers represent the majority emissions unit in the Tier 2 industries for which there were controls that cost up to $7,500 per ton (see Table 1 below), we targeted emissions reductions and air quality improvements in Tier 2 industries by identifying potentially impactful industrial, commercial, and institutional (ICI) boilers.

---

[13] The maximum emission reduction algorithm assigns to each source the single measure (if a measure is available for the source) that provides the maximum reduction to the target pollutant. For more information, see the CoST User's Guide available at the following link: https://www.cmascenter.org/cost/documentation/3.7/CoST%20User's%20Guide/.

[14] The maximum emission reduction CoST run results and CMDB are available upon request.

[15] *Known controls* are well-demonstrated control devices and methods that are currently used in practice in many industries. *Known controls* do not include cutting edge or emerging pollution control technologies.

[16] The 2023 state-receptor specific RCU ppb/ton values, the RCU calibration factors used in AQAT for control analyses in 2023, the R code that processed the CoST run results using the maximum emission reduction algorithm, and the summaries of the air quality improvements are available upon request.

5

**Table 1. Number of Emissions Unit Types in Tier 2 Industries**

| Tier 2 Industries | Number of Emissions Units by Type | | |
|---|---|---|---|
| | Boiler | Internal Combustion Engine | Industrial Processes |
| Metal Ore Mining | -- | 1 | 15 |
| Pulp, Paper, and Paperboard Mills | 49 | 1 | -- |
| Petroleum and Coal Products Manufacturing | 37 | 4 | 48 |
| Basic Chemical Manufacturing | 46 | 8 | 13 |
| Lime and Gypsum Product Manufacturing | -- | -- | 1 |
| **Totals** | **132** | **14** | **77** |

To identify potentially impactful boilers, using the projected 2023 emissions inventory in the linked upwind states we identified a universe of boilers with >100 tpy NOx emissions that had <u>any</u> contributions at downwind receptors.[17,18] We refined the universe of boilers to a subset of impactful boilers by sequentially applying the three criteria below to each boiler. This approach is similar to the overall analytical framework and was tailored for application to individual boilers.[19,20]

- <u>Criterion 1</u> -- Estimated maximum air quality contribution at an individual receptor of >=0.0025 ppb *or* estimated total contribution across downwind receptors of >=0.01 ppb*.*
- <u>Criterion 2</u> -- Controls that cost up to $7,500 per ton.
- <u>Criterion 3</u> -- Estimated maximum air quality improvement at an individual receptor of >=0.001 ppb.

**IV. Modifying the Analytical Framework for the Screening Assessment for 2026**

EPA concluded, based on the most recent information available from the CSAPR Update Non-EGU TSD, that controls on all of the non-EGU emissions units cannot be installed by the 2023 ozone season. As such, we prepared a screening assessment for the year 2026 by generally applying the analytical framework detailed above. Specifically, we

- Retained the impactful industries identified in Tier 1 and Tier 2, the $7,500 cost per ton threshold, and the methodology for identifying impactful boilers,
- Modified the framework to address challenges associated with using the projected 2023 emissions inventory by using the 2019 emissions inventory, and
- Updated the air quality modeling data by using data for 2026.

Using the projected 2023 emissions inventory introduced challenges associated with the application of new source performance standards (NSPS).[21] Some of the projected emissions inventory records reflected percent

---

[17] We used the 2023fj non-EGU point source inventory files from the 2016v2 emissions platform.

[18] MD, MO, NV, and WY did not have boilers with >100 tpy NOx emissions.

[19] For the impactful boiler assessment, the estimated air quality contributions and improvements were not based on modeling of individual emissions units or emissions source sectors. The air quality estimates were derived by using the 2023 state/receptor specific RCU ppb/ton values and the RCU calibration factors used in AQAT. The results are intended to provide a general indication of the relative impact across sources.

[20] For the impactful boiler assessment, the 2023 state-receptor specific RCU ppb/ton values, the RCU calibration factors used in the AQAT for ozone for control analyses in 2023, and the R code that processed the CoST run results are available upon request.

[21] Using the projected inventory also introduced challenges associated with the growth of emissions at sources over time. EPA determined that the 2019 inventory was appropriate because it provided a more accurate prediction of potential near-

6

**271a**

reductions associated with the application of current NSPS (e.g., Reciprocating Internal Combustion Engine, Natural Gas Turbines, Process Heaters NSPS). Applying NSPSs during the emissions projections process includes estimating the number of modifications/replacements that would trigger NSPS requirements. None of the existing sources, as they currently exist, would install a control because of a NSPS. But some of those sources might modify and become subject to the NSPS. Because we do not know which sources might become subject to an NSPS by modifying, across-the-board percent reductions from unknown control measures are applied to all of the sources.[22] As a result, CoST replaced some of the unknown control measures with a control measure that it concluded was more efficient. However, we do not know if a control would be applied to a particular source in response to the NSPS rules and if so, what that control would be. Therefore, we do not know if CoST is correctly replacing those unknown control measures. To address this challenge, we used a current, not projected, emissions inventory along with the latest air quality modeling information for 2026. Specifically, we used the 2019 inventory for information on emissions, emissions units, and estimated emissions reductions in concert with the emissions sector-specific (non-EGU-specific) ppb/ton factors for 2026 and 2026 AQAT calibration factors to estimate the impacts on future air quality from reductions at emissions units as those units currently exist.[23]

**V. Screening Assessment Results for 2026 -- Estimated Total Emissions Reductions, Air Quality Improvements, and Annual Total Costs for Emissions Units in Tier 1 Industries and Impactful Boilers in Tier 2 Industries**

This screening assessment is not intended to be, nor take the place of, a unit-specific detailed engineering analysis that fully evaluates the feasibility of retrofits for the emissions units, potential controls, and related costs. We used CoST to identify emissions units, emissions reductions, and costs to include in a proposed FIP; however, CoST was designed to be used for illustrative control strategy analyses (e.g., NAAQS regulatory impact analyses) and not for unit-specific, detailed engineering analyses. The estimates from CoST identify proxies for (1) non-EGU emissions units that have emission reduction potential, (2) potential controls for and emissions reductions from these emissions units, and (3) control costs from the potential controls on these emissions units.

See Sections VII.A.2. and VII.C. of the proposal preamble for discussions of the NOx emissions limits, compliance timing, and other related rule requirements for the industries and emissions unit types identified through this screening assessment.

To prepare the screening assessment for 2026, we applied the analytical framework detailed in the sections above with the modifications discussed in the previous section. The assessment includes emissions units from the Tier 1 industries and impactful boilers from the Tier 2 industries. Using the latest air quality modeling for 2026, we identified upwind states linked to downwind nonattainment or maintenance receptors using the 1% of the NAAQS threshold criterion, or 0.7 ppb. In 2026 there are 23 linked states for the 2015 NAAQS: AR, CA, IL, IN, KY, LA, MD, MI, MN, MO, MS, NJ, NY, NV, OH, OK, PA, TX, UT, VA, WI, WV, and WY.
We re-ran CoST with known controls, the CMDB, and the 2019 emissions inventory. We specified CoST to allow replacing an existing control if a replacement control is estimated to be >10 percent more effective than the

---

term emissions reductions. For additional discussion of the 2019 inventory, please see the *2019 National Emissions Inventory Technical Support Document: Point Data Category* available in the docket. In switching to the 2019 inventory, however, we did not account for any growth or decrease in emissions that might occur at individual units. Because the controls applied by CoST have efficiencies, or percent reductions, this means we could be over- or under-estimating the emission reductions and their ppb impacts.

[22] For additional information on the 2016v2 inventory and the projected 2023 emissions inventory, please see the September 2021 *Technical Support Document Preparation of Emissions Inventories for 2016v2 North American Emissions Modeling Platform* in the docket or available at the following link: https://www.epa.gov/system/files/documents/2021-09/2016v2_emismod_tsd_september2021.pdf.

[23] For this proposed FIP, the EPA used the ozone AQAT, which is described in detail in *Ozone Policy Analysis Proposed Rule TSD* in the docket. The receptor-state specific calibration factors for 2026 were derived using the following air quality modeling runs: 2026 base case and 2026 control case with 30 percent across-the-board NOx emissions cuts.

7

existing control. We did not replace an existing control if the 2019 emissions inventory indicated the presence of that control, even if the CMDB reflects a greater control efficiency for that control. Also, we removed six facilities from consideration because they are subject to an existing consent decree, are shut down, or will shut down by 2026. See Appendix B for a summary of the facilities removed.

For the emissions units in the Tier 1 industries and the impactful boilers in the Tier 2 industries, the estimated emissions reductions, air quality improvements, and costs are summarized below and in Tables 2 through 5 that follow. The cost estimates do not include monitoring, recordkeeping, reporting, or testing costs.[24] As shown in Table 2, the total estimated ozone season emissions reductions are 47,186 tons, the estimated total ppb improvement across all downwind receptors is 5.16 ppb, and the estimated total cost is $410.8 million annually. The estimated ozone season reductions, total ppb improvements, and total cost are representative of single year impacts and not cumulative impacts.

Table 3 presents estimated ppb improvements at receptors grouped by region. For the coastal Connecticut/New York City nonattainment area receptors, total ppb improvements from Tier 1 and Tier 2 range from 0.247 to 0.356 ppb; for the receptors near Chicago, total ppb improvements range from 0.261 to 0.375 ppb; for the receptors along the western shoreline of Lake Michigan in Wisconsin, total ppb improvements range from 0.360 to 0.443 ppb; for the Houston receptors, total ppb improvements range from 0.284 to 0.472 ppb; and for the western receptors, ppb improvements range from <0.001 to 0.056 ppb. There are far fewer emissions reductions from western states because there are far fewer states and impacted emissions units in the west, and the resulting air quality improvements are noticeably lower.

For Tier 1 industries and the impactful boilers in the Tier 2 industries, Table 4 provides by state and by industry estimated emissions reductions and costs; Table 4a provides by state, estimated emissions reductions and costs. New Jersey and Nevada are not included in these tables because they did not have any estimated non-EGU reductions from the Tier 1 industries and boilers in Tier 2 industries that cost up to $7,500 per ton. In addition, Figure 2 shows the geographical distribution of ozone season reductions.

Table 5 provides by industry and east/west, the number and type of emissions units, total estimated emissions reductions, total ppb improvements, and costs. There are 489 emissions units contributing to the total estimated reductions of 47,186 ozone season tons and total estimated ppb improvements of 5.16 ppb.[25]

Table 6 includes by industry, the emissions source group, control technology, number of emissions units, ozone season emissions reductions, and annual total cost for the emissions units in the screening assessment. Lastly, Tables 7, 8, and 9 provide summaries of estimated ozone season emissions reductions, annual total cost, and average cost per ton by the control technologies CoST applied (i) across all non-EGU emissions units, (ii) across non-EGU emissions units grouped by the Tier 1 industries and impactful boilers in Tier 2 industries, (iii) across non-EGU emissions units grouped by the seven individual Tier 1 and 2 industries.

---

[24] EPA submitted an information collection request (ICR) to OMB associated with the proposed monitoring, calibrating, recordkeeping, reporting and testing activities required for non-EGU emissions units -- *ICR for the Proposed Rule, Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Primary Ozone National Ambient Air Quality Standard: Transport Obligations for non-Electric Generating Units*, EPA ICR No. 2705.01. The ICR is summarized in Section XI.B.2 of the proposed rule preamble. The ICR includes estimated monitoring, recordkeeping, reporting, and testing costs of approximately $11.45 million per year for the first three years. These costs are not reflected in the cost estimates presented in Tables 2 through 9.

[25] While the number of units listed in Table 5 sums to 491, the emissions inventory records for two of the units in Tier 1 industries include SCCs for both boilers and industrial processes. As a result, those units appear twice in the counts.

8

For the Excel workbooks with Tables 2 through 9, see *Transport Proposal – NonEGU Results – 03-16-2022.xlsx* and *Non-EGU Analysis Controls – 11-15-2021.xlsx* in the docket.[26]

---

[26] The R code that processed the CoST run results, the sector-specific (non-EGU-specific) ppb/ton values, and the 2026 AQAT calibration factors used to prepare these tables are available upon request.

9

*All costs are in 2016$ and do not include monitoring, recordkeeping, reporting, or testing costs.*

**Table 2. Estimated Emissions Reductions (ozone season tons), Maximum PPB Improvements, and Costs**

| Option | Ozone Season Emissions Reductions (East/West) | Total PPB Improvement Across All Downwind Receptors | Max PPB Improvement Across All Downwind Receptors | Annual Total Cost (million $) (Avg Annual Cost per Ton) | Industries (# of emissions units > 100 tpy in identified industries) |
|---|---|---|---|---|---|
| Tier 1 Industries with Known Controls that Cost up to $7,500/ton | 41,153 (37,972/3,181) | 4.352 | 0.392 | $356.6 ($3,610) | Cement and Concrete Product Manufacturing (47), Glass and Glass Product Manufacturing (44), Iron and Steel Mills and Ferroalloy Manufacturing (39), Pipeline Transportation of Natural Gas (307) |
| Tier 2 Industry Boilers with Known Controls that Cost up to $7,500/ton | 6,033 (5,965/68) | 0.809 | 0.169 | $54.2 ($3,744) | Basic Chemical Manufacturing (17), Petroleum and Coal Products Manufacturing (10), Pulp, Paper, and Paperboard Mills (25) |

*The estimated ozone season reductions, total ppb improvements, and total cost are representative of single year impacts and not cumulative impacts.*

10

**275a**

**Table 3. Estimated PPB Improvements at Receptors Grouped by Region\***

| Receptor ID | State | Receptor Name | Average/Max PPB Improvement Needed to Attain | Home State PPB Contribution | Tier 1 | Tier 2 | Total |
|---|---|---|---|---|---|---|---|
| 90010017 | CT | Greenwich | 0.6/1.3 | 9.3 | 0.231 | 0.016 | 0.247 |
| 90013007 | CT | Stratford | 1.9/2.8 | 4.1 | 0.332 | 0.024 | 0.356 |
| 90019003 | CT | Westport | 3.7/3.9 | 2.9 | 0.314 | 0.022 | 0.336 |
| 90099002 | CT | Madison | -/1.5 | 3.9 | 0.323 | 0.023 | 0.346 |
| 170310001 | IL | Chicago/Alsip | -/1.6 | 19.4 | 0.196 | 0.065 | 0.261 |
| 170310032 | IL | Chicago/South | -/0.8 | 16.6 | 0.299 | 0.076 | 0.375 |
| 170310076 | IL | Chicago/ComEd | -/0.4 | 18.7 | 0.229 | 0.060 | 0.289 |
| 170314201 | IL | Chicago/Northbrook | -/1.5 | 21.4 | 0.262 | 0.069 | 0.332 |
| 170317002 | IL | Chicago/Evanston | -/1.1 | 18.9 | 0.307 | 0.049 | 0.356 |
| 550590019 | WI | Kenosha/Water Tower | 0.8/1.7 | 5.8 | 0.325 | 0.035 | 0.360 |
| 550590025 | WI | Kenosha/Chiwaukee | -/0.2 | 2.6 | 0.392 | 0.051 | 0.443 |
| 551010020 | WI | Racine/Racine | -/1.2 | 10.8 | 0.353 | 0.044 | 0.397 |
| 480391004 | TX | Houston/Brazoria | -/0.3 | 29.3 | 0.302 | 0.169 | 0.472 |
| 482010024 | TX | Houston/Aldine | 3.3/4.8 | 29.7 | 0.186 | 0.098 | 0.284 |
| 40278011 | AZ | Yuma | -/0.9 | 2.8 | 0.027 | 0.001 | 0.028 |
| 60070007 | CA | Butte | -/-0.8 | 23.5 | 0.000 | 0.000 | 0.000 |
| 60170010 | CA | El Dorado #1 | 4.1/6.5 | 26.7 | 0.000 | 0.000 | 0.000 |
| 60170020 | CA | El Dorado #2 | 2.3/4.1 | 28.7 | 0.000 | 0.000 | 0.000 |
| 60190007 | CA | Fresno #1 | 8.6/10.4 | 29.1 | 0.001 | 0.000 | 0.001 |
| 60190011 | CA | Fresno #2 | 11/11.9 | 31.1 | 0.002 | 0.000 | 0.002 |
| 60195001 | CA | Fresno #3 | 11.8/14.5 | 30.2 | 0.002 | 0.000 | 0.002 |
| 60570005 | CA | Nevada | 6.3/9.6 | 25.4 | 0.000 | 0.000 | 0.000 |
| 60610003 | CA | Placer #1 | 5/7.7 | 29.8 | 0.000 | 0.000 | 0.000 |
| 60610004 | CA | Placer #2 | 0/5.1 | 24 | 0.000 | 0.000 | 0.000 |
| 60670012 | CA | Sacramento | 2.7/3.4 | 30.8 | 0.000 | 0.000 | 0.000 |
| 60990005 | CA | Stanislaus | 3.8/4.7 | 29.2 | 0.001 | 0.000 | 0.001 |
| 80350004 | CO | Denver/Chatfield | -/0.2 | 15.6 | 0.055 | 0.001 | 0.056 |
| 80590006 | CO | Rocky Flats | 0.8/1.4 | 17.3 | 0.042 | 0.000 | 0.042 |
| 80590011 | CO | Denver/NREL | 1.7/2.4 | 17.6 | 0.044 | 0.001 | 0.044 |
| 490110004 | UT | SLC/Bountiful | 0.8/3 | 8 | 0.037 | 0.002 | 0.038 |
| 490353006 | UT | SLC/Hawthorne | 1.6/3.2 | 8.3 | 0.036 | 0.002 | 0.038 |
| 490353013 | UT | SLC/Herriman | 2.6/3.1 | 8.9 | 0.018 | 0.001 | 0.019 |
| 490570002 | UT | SLC/Ogden | -/0.8 | 6.1 | 0.034 | 0.001 | 0.035 |

*\*Home state emission reductions are not assumed in this analysis.*

**Table 4. For Tier 1 Industries and Impactful Boilers in Tier 2 Industries, By State And By Industry, Estimated Emissions Reductions (ozone season tons\*) and Costs**

| State | Industry | Tier 1 | | Tier 2 | |
|---|---|---|---|---|---|
| | | Ozone Season Emissions Reductions | Annual Total Cost (million $) (Avg Annual Cost per Ton) | Ozone Season Emissions Reductions | Annual Total Cost (million $) (Avg Annual Cost per Ton) |
| AR | Basic Chemical Manufacturing | - | - | 87 | $1.1 ($5,113) |
| AR | Glass and Glass Product Manufacturing | 47 | $0.2 ($2,046) | - | - |
| AR | Iron and Steel Mills and Ferroalloy Manufacturing | 6 | $0.0 ($631) | - | - |
| AR | Pipeline Transportation of Natural Gas | 868 | $10.1 ($4,852) | - | - |
| AR | Pulp, Paper, and Paperboard Mills | - | - | 646 | $6.1 ($3,967) |
| CA | Cement and Concrete Product Manufacturing | 1,162 | $3.6 ($1,279) | - | - |
| CA | Glass and Glass Product Manufacturing | 299 | $0.9 ($1,293) | - | - |
| CA | Petroleum and Coal Products Manufacturing | - | - | 68 | $0.4 ($2,349) |
| CA | Pipeline Transportation of Natural Gas | 137 | $1.5 ($4,718) | - | - |
| IL | Cement and Concrete Product Manufacturing | 234 | $0.7 ($1,279) | - | - |
| IL | Glass and Glass Product Manufacturing | 901 | $2.6 ($1,180) | - | - |
| IL | Pipeline Transportation of Natural Gas | 1,316 | $13.7 ($4,348) | - | - |
| IN | Cement and Concrete Product Manufacturing | 468 | $1.4 ($1,279) | - | - |
| IN | Glass and Glass Product Manufacturing | 338 | $1.7 ($2,046) | - | - |
| IN | Iron and Steel Mills and Ferroalloy Manufacturing | 1,829 | $16.0 ($3,653) | - | - |
| IN | Petroleum and Coal Products Manufacturing | - | - | 388 | $2.8 ($2,989) |
| IN | Pipeline Transportation of Natural Gas | 152 | $2.0 ($5,457) | - | - |
| KY | Pipeline Transportation of Natural Gas | 2,291 | $28.7 ($5,213) | - | - |
| LA | Basic Chemical Manufacturing | - | - | 1,611 | $15.2 ($3,939) |
| LA | Glass and Glass Product Manufacturing | 206 | $1.9 ($3,770) | - | - |
| LA | Petroleum and Coal Products Manufacturing | - | - | 477 | $4.0 ($3,498) |
| LA | Pipeline Transportation of Natural Gas | 3,915 | $44.3 ($4,720) | - | - |
| LA | Pulp, Paper, and Paperboard Mills | - | - | 561 | $5.2 ($3,830) |
| MD | Pipeline Transportation of Natural Gas | 45 | $0.3 ($3,042) | - | - |
| MI | Cement and Concrete Product Manufacturing | 371 | $1.1 ($1,279) | - | - |
| MI | Glass and Glass Product Manufacturing | 50 | $0.3 ($2,661) | - | - |
| MI | Iron and Steel Mills and Ferroalloy Manufacturing | 38 | $0.4 ($4,194) | - | - |
| MI | Pipeline Transportation of Natural Gas | 2,272 | $25.9 ($4,747) | - | - |
| MN | Glass and Glass Product Manufacturing | 115 | $0.6 ($2,288) | - | - |
| MN | Pipeline Transportation of Natural Gas | 558 | $7.3 ($5,452) | - | - |
| MO | Cement and Concrete Product Manufacturing | 1,296 | $4.0 ($1,279) | - | - |
| MO | Glass and Glass Product Manufacturing | 227 | $1.1 ($1,992) | - | - |
| MO | Pipeline Transportation of Natural Gas | 1,581 | $20.2 ($5,338) | - | - |
| MS | Pipeline Transportation of Natural Gas | 1,577 | $19.0 ($5,009) | - | - |
| MS | Pulp, Paper, and Paperboard Mills | - | - | 184 | $1.4 ($3,243) |
| NY | Cement and Concrete Product Manufacturing | 142 | $0.4 ($1,279) | - | - |
| NY | Glass and Glass Product Manufacturing | 141 | $0.5 ($1,572) | - | - |
| NY | Pipeline Transportation of Natural Gas | 106 | $1.2 ($4,697) | - | - |
| NY | Pulp, Paper, and Paperboard Mills | - | - | 111 | $1.2 ($4,486) |

12

**277a**

| | | | | |
|---|---|---|---|---|
| OH | Cement and Concrete Product Manufacturing | 116 | $0.4 ($1,279) | - | - |
| OH | Glass and Glass Product Manufacturing | 451 | $2.2 ($1,998) | - | - |
| OH | Iron and Steel Mills and Ferroalloy Manufacturing | 847 | $7.6 ($3,763) | - | - |
| OH | Pipeline Transportation of Natural Gas | 1,198 | $14.6 ($5,062) | - | - |
| OH | Pulp, Paper, and Paperboard Mills | - | - | 179 | $2.3 ($5,303) |
| OK | Cement and Concrete Product Manufacturing | 586 | $1.8 ($1,279) | - | - |
| OK | Glass and Glass Product Manufacturing | 190 | $1.2 ($2,550) | - | - |
| OK | Pipeline Transportation of Natural Gas | 2,799 | $34.1 ($5,083) | - | - |
| PA | Cement and Concrete Product Manufacturing | 888 | $2.8 ($1,336) | - | - |
| PA | Glass and Glass Product Manufacturing | 1,379 | $3.8 ($1,133) | - | - |
| PA | Iron and Steel Mills and Ferroalloy Manufacturing | 438 | $6.1 ($5,823) | - | - |
| PA | Petroleum and Coal Products Manufacturing | - | - | 98 | $0.6 ($2,349) |
| PA | Pipeline Transportation of Natural Gas | 427 | $4.1 ($3,994) | - | - |
| PA | Pulp, Paper, and Paperboard Mills | - | - | 54 | $0.9 ($7,019) |
| TX | Cement and Concrete Product Manufacturing | 1,234 | $7.8 ($2,624) | - | - |
| TX | Glass and Glass Product Manufacturing | 1,470 | $3.9 ($1,109) | - | - |
| TX | Pipeline Transportation of Natural Gas | 1,736 | $20.7 ($4,966) | - | - |
| UT | Cement and Concrete Product Manufacturing | 520 | $1.6 ($1,279) | - | - |
| UT | Pipeline Transportation of Natural Gas | 237 | $2.7 ($4,718) | - | - |
| VA | Cement and Concrete Product Manufacturing | 398 | $1.2 ($1,279) | - | - |
| VA | Glass and Glass Product Manufacturing | 174 | $0.9 ($2,154) | - | - |
| VA | Iron and Steel Mills and Ferroalloy Manufacturing | 92 | $1.0 ($4,357) | - | - |
| VA | Pipeline Transportation of Natural Gas | 801 | $10.5 ($5,457) | - | - |
| VA | Pulp, Paper, and Paperboard Mills | - | - | 98 | $1.4 ($5,903) |
| WI | Glass and Glass Product Manufacturing | 677 | $2.5 ($1,517) | - | - |
| WI | Pulp, Paper, and Paperboard Mills | - | - | 1,472 | $11.7 ($3,307) |
| WV | Cement and Concrete Product Manufacturing | 230 | $0.7 ($1,279) | - | - |
| WV | Pipeline Transportation of Natural Gas | 751 | $6.5 ($3,612) | - | - |
| WY | Cement and Concrete Product Manufacturing | 446 | $1.4 ($1,279) | - | - |
| WY | Pipeline Transportation of Natural Gas | 380 | $4.9 ($5,349) | - | - |
| | **Grand Total** | **41,153** | **$356.6 ($3,610)** | **6,033** | **$54.2 ($3,744)** |

*Ozone season tons are calculated as tpy from the NEI multiplied by 5/12.
*Note that New Jersey and Nevada did not have any estimated non-EGU reductions that cost up to $7,500 per ton from the Tier 1 industries and boilers in Tier 2 industries.*

**Table 4a. For Tier 1 Industries and Impactful Boilers in Tier 2 Industries, By State, Estimated Emissions Reductions (ozone season tons) and Costs**

| State | Tier 1 | | Tier 2 | |
|---|---|---|---|---|
| | Ozone Season Emissions Reductions | Annual Total Cost (million $) (Avg Annual Cost per Ton) | Ozone Season Emissions Reductions | Annual Total Cost (million $) (Avg Annual Cost per Ton) |
| AR | 922 | $10.4 ($4,679) | 732 | $7.2 ($4,102) |
| CA | 1,598 | $6.0 ($1,576) | 68 | $0.4 ($2,349) |
| IL | 2,452 | $17.0 ($2,890) | - | - |
| IN | 2,787 | $21.1 ($3,157) | 388 | $2.8 ($2,989) |
| KY | 2,291 | $28.7 ($5,213) | - | - |
| LA | 4,121 | $46.2 ($4,673) | 2,649 | $24.4 ($3,837) |
| MD | 45 | $0.3 ($3,042) | - | - |
| MI | 2,731 | $27.7 ($4,230) | - | - |
| MN | 673 | $7.9 ($4,910) | - | - |
| MO | 3,103 | $25.3 ($3,399) | - | - |
| MS | 1,577 | $19.0 ($5,009) | 184 | $1.4 ($3,243) |
| NY | 389 | $2.2 ($2,316) | 111 | $1.2 ($4,486) |
| OH | 2,611 | $24.7 ($3,944) | 179 | $2.3 ($5,303) |
| OK | 3,575 | $37.1 ($4,325) | - | - |
| PA | 3,132 | $16.8 ($2,237) | 152 | $1.5 ($4,013) |
| TX | 4,440 | $32.4 ($3,038) | - | - |
| UT | 757 | $4.3 ($2,356) | - | - |
| VA | 1,465 | $13.6 ($3,861) | 98 | $1.4 ($5,903) |
| WI | 677 | $2.5 ($1,517) | 1,472 | $11.7 ($3,307) |
| WV | 982 | $7.2 ($3,065) | - | - |
| WY | 826 | $6.2 ($3,152) | - | - |

14

**279a**

**Figure 2. Geographical Distribution of Ozone Season NOx Reductions and Summary of Reductions by Industry and by State**

### Non-EGU Ozone Season NOx Reductions



| State | Cement and Concrete Product Manufacturing | Glass and Glass Product Manufacturing | Iron and Steel Mills and Ferroalloy Manufacturing | Pipeline Transportation of Natural Gas | High Emitting Equipment from Tier 2 industries | Total |
|---|---|---|---|---|---|---|
| LA | 0 | 206 | 0 | 3,915 | 2,649 | 6,769 |
| TX | 1,234 | 1,470 | 0 | 1,736 | 0 | 4,440 |
| OK | 586 | 190 | 0 | 2,799 | 0 | 3,575 |
| PA | 888 | 1,379 | 438 | 427 | 152 | 3,284 |
| IN | 468 | 338 | 1,829 | 152 | 388 | 3,175 |
| MO | 1,296 | 227 | 0 | 1,581 | 0 | 3,103 |
| OH | 116 | 451 | 847 | 1,198 | 179 | 2,790 |
| MI | 371 | 50 | 38 | 2,272 | 0 | 2,731 |
| IL | 234 | 901 | 0 | 1,316 | 0 | 2,452 |
| KY | 0 | 0 | 0 | 2,291 | 0 | 2,291 |
| WI | 0 | 677 | 0 | 0 | 1,472 | 2,150 |
| MS | 0 | 0 | 0 | 1,577 | 184 | 1,761 |
| CA | 1,162 | 299 | 0 | 137 | 68 | 1,666 |
| AR | 0 | 47 | 6 | 868 | 732 | 1,654 |
| VA | 398 | 174 | 92 | 801 | 98 | 1,563 |
| WV | 230 | 0 | 0 | 751 | 0 | 982 |
| WY | 446 | 0 | 0 | 380 | 0 | 826 |
| UT | 520 | 0 | 0 | 237 | 0 | 757 |
| MN | 0 | 115 | 0 | 558 | 0 | 673 |
| NY | 142 | 141 | 0 | 106 | 111 | 500 |
| MD | 0 | 0 | 0 | 45 | 0 | 45 |

● Cement and Concrete Product Manufacturing
● Glass and Glass Product Manufacturing
● Iron and Steel Mills and Ferroalloy Manufacturing
● Pipeline Transportation of Natural Gas
● High Emitting Equipment from Tier 2 industries

○ >1000 tons
○ 500-1000 tons
○ 100-500 tons
○ Under 100 tons

15

**280a**

**Table 5. By Industry, Number and Type of Emissions Units, Total Estimated Emissions Reductions (ozone season tons), Total PPB Improvements, and Costs**

| Industry | Region | Number of Units by Type | | | Ozone Season Emissions Reductions (tons) by Type of Unit | | | Total PPB Improvement Across Downwind Receptors (Max Improvement At Receptor) | | Annual Total Cost (million $) (Avg Annual Cost per Ton) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Boilers | Internal Combustion Engines | Industrial Processes | Boilers | Internal Combustion Engines | Industrial Processes | East | West | |
| Glass and Glass Product Manufacturing | East | - | - | 41 | - | - | 6,367 | 0.6962 (0.0865) | 0.0015 (0.0004) | $23.2 ($1,520) |
| | West | - | - | 3 | - | - | 299 | 0.0009 (0.0001) | 0.0332 (0.0066) | $0.9 ($1,293) |
| Cement and Concrete Product Manufacturing | East | 1 | - | 39 | 16 | - | 5,948 | 0.6382 (0.0707) | 0.0018 (0.0006) | $22.4 ($1,566) |
| | West | - | - | 8 | - | - | 2,128 | 0.0151 (0.0019) | 0.1996 (0.0332) | $6.5 ($1,279) |
| Iron and Steel Mills and Ferroalloy Manufacturing | East | 25 | - | 15 | 2,044 | - | 1,207 | 1.1556 (0.1750) | 0.0000 (0.0000) | $31.2 ($3,995) |
| Pipeline Transportation of Natural Gas | East | - | 296 | - | - | 22,390 | - | 1.5373 (0.2815) | 0.0057 (0.0020) | $263.2 ($4,898) |
| | West | - | 11 | - | - | 754 | - | 0.0086 (0.0010) | 0.0586 (0.0170) | $9.1 ($5,037) |
| Basic Chemical Manufacturing | East | 17 | - | - | 1,698 | - | - | 0.1655 (0.0107) | 0.0002 (0.0000) | $16.3 ($3,999) |
| Petroleum and Coal Products Manufacturing | East | 9 | - | - | 962 | - | - | 0.2677 (0.0258) | 0.0000 (0.0000) | $7.3 ($3,176) |
| | West | 1 | - | - | 68 | - | - | 0.0002 (0.0000) | 0.0075 (0.0015) | $0.4 ($2,349) |
| Pulp, Paper, and Paperboard Mills | East | 25 | - | - | 3,305 | - | - | 0.3678 (0.0117) | 0.0002 (0.0000) | $30.2 ($3,807) |
| | | | | | | | | | | |
| *Blue highlights reflect western states information.* | | | | | | | | | | |
| *Orange highlights reflect Tier 2 industries with impactful boilers.* | | | | | | | | | | |

16

**Table 6. By Industry, Emissions Source Group, Control Technology, Number of Units, Estimated Emissions Reductions (ozone season tons), and Annual Total Cost**

| Industry | Emissions Source Group | Control Technology | Number of Units | Ozone Season Emissions Reductions | Annual Total Cost (million $) |
|---|---|---|---|---|---|
| Cement and Concrete Product Manufacturing | Boilers - < 10 Million BTU/hr; Industrial Processes - Kiln | Ultra Low NOx Burner; Selective Non-Catalytic Reduction | 1 | 117 | $0.5 |
| | Industrial Processes - Kiln | Selective Non-Catalytic Reduction | 24 | 3,123 | $9.7 |
| | Industrial Processes - Preheater Kiln | Selective Non-Catalytic Reduction | 3 | 342 | $1.2 |
| | Industrial Processes - Preheater/Precalciner Kiln | Selective Non-Catalytic Reduction | 19 | 4,510 | $17.5 |
| Glass and Glass Product Manufacturing | Industrial Processes - Container Glass: Melting Furnace | Selective Catalytic Reduction | 27 | 1,676 | $8.7 |
| | Industrial Processes - Flat Glass: Melting Furnace | Selective Catalytic Reduction | 13 | 4,674 | $12.7 |
| | Industrial Processes - Furnace: General | Oxygen Enriched Air Staging | 1 | 52 | $0.1 |
| | Industrial Processes - Pressed and Blown Glass: Melting Furnace | Selective Catalytic Reduction | 3 | 264 | $2.7 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Boilers - > 100 Million BTU/hr | Ultra Low NOx Burner and Selective Catalytic Reduction | 3 | 383 | $4.2 |
| | Boilers - > 100 Million BTU/hr | Ultra Low NOx Burner | 6 | 282 | $2.2 |
| | Boilers - > 100 Million BTU/hr | Selective Catalytic Reduction | 2 | 106 | $1.2 |
| | Boilers - > 100 Million BTU/hr; Boilers - Blast Furnace Gas | Ultra Low NOx Burner | 1 | 166 | $1.0 |
| | Boilers - > 100 Million BTU/hr; Boilers - Coke Oven Gas | Ultra Low NOx Burner | 6 | 360 | $2.9 |
| | Boilers - > 100 Million BTU/hr; Boilers - Coke Oven Gas | Selective Catalytic Reduction; Ultra Low NOx Burner and Selective Catalytic Reduction | 1 | 114 | $1.7 |
| | Boilers - Blast Furnace Gas | Ultra Low NOx Burner | 1 | 65 | $0.4 |
| | Boilers - Blast Furnace Gas; Industrial Processes - Sintering: Windbox; Industrial Processes - Blast Furnace: Casting/Tapping: Local Evacuation; Industrial Processes - Process Gas: Process Heaters | Ultra Low NOx Burner; Selective Catalytic Reduction; Low NOx Burner and Flue Gas Recirculation | 1 | 440 | $4.4 |
| | Boilers - Coke Oven Gas | Ultra Low NOx Burner and Selective Catalytic Reduction | 3 | 394 | $3.7 |
| | Boilers - Coke Oven Gas; Boilers - > 100 Million BTU/hr | Ultra Low NOx Burner; Ultra Low NOx Burner and Selective Catalytic Reduction | 1 | 116 | $1.6 |
| | Industrial Processes - Basic Oxygen Furnace (BOF): Open Hood Stack | Selective Catalytic Reduction | 2 | 185 | $1.9 |
| | Industrial Processes - Basic Oxygen Furnace (BOF): Open Hood Stack; Industrial Processes - General | Selective Catalytic Reduction; Low NOx Burner | 1 | 172 | $1.7 |
| | Industrial Processes - Basic Oxygen Furnace (BOF): Top Blown Furnace: Primary | Selective Catalytic Reduction | 1 | 50 | $0.5 |
| | Industrial Processes - Blast Furnace: Casting/Tapping: Local Evacuation | Selective Catalytic Reduction | 1 | 38 | $0.4 |
| | Industrial Processes - General | Low NOx Burner | 5 | 191 | $1.7 |
| | Industrial Processes - General; Industrial Processes - Coke Oven or Blast Furnace | Low NOx Burner; Low NOx Burner and Flue Gas Recirculation | 1 | 84 | $1.0 |
| | Industrial Processes - Other Not Classified | Low NOx Burner and Flue Gas Recirculation | 2 | 43 | $0.1 |
| | Industrial Processes - Sintering: Windbox | Selective Catalytic Reduction | 1 | 60 | $0.6 |
| Pipeline Transportation of Natural Gas | Internal Combustion Engines - 2-cycle Clean Burn | Layered Combustion | 1 | 60 | $0.8 |
| | Internal Combustion Engines - 2-cycle Lean Burn | Layered Combustion | 136 | 12,645 | $165.6 |
| | Internal Combustion Engines - 4-cycle Lean Burn | Selective Catalytic Reduction | 41 | 2,656 | $21.6 |
| | Internal Combustion Engines - 4-cycle Rich Burn | Non-Selective Catalytic Reduction | 2 | 147 | $0.2 |
| | Internal Combustion Engines - Reciprocating | Non-Selective Catalytic Reduction or Layered Combustion | 94 | 6,329 | $72.0 |
| | Internal Combustion Engines - Reciprocating | Adjust Air to Fuel Ratio and Ignition Retard | 12 | 193 | $1.1 |
| | Internal Combustion Engines - Reciprocating | Non-Selective Catalytic Reduction or Layered Combustion; Adjust Air to Fuel Ratio and Ignition Retard | 1 | 49 | $0.4 |
| | Internal Combustion Engines - Turbine | Selective Catalytic Reduction and Steam Injection | 17 | 929 | $8.4 |
| | Internal Combustion Engines - Turbine | SCR + DLN Combustion | 3 | 136 | $2.1 |

17

282a

| | | | | | |
|---|---|---|---|---|---|
| Basic Chemical Manufacturing | Boilers - > 100 Million BTU/hr | Ultra Low NOx Burner and Selective Catalytic Reduction | 6 | 786 | $7.5 |
| | Boilers - > 100 Million BTU/hr | Selective Catalytic Reduction | 2 | 104 | $1.5 |
| | Boilers - 10-100 Million BTU/hr | Ultra Low NOx Burner and Selective Catalytic Reduction | 1 | 133 | $1.0 |
| | Boilers - 10-100 Million BTU/hr | Selective Catalytic Reduction | 1 | 43 | $0.1 |
| | Boilers - Cogeneration | Selective Catalytic Reduction | 1 | 68 | $0.9 |
| | Boilers - Distillate Oil - Grades 1 and 2: Boiler | Selective Catalytic Reduction | 1 | 47 | $0.6 |
| | Boilers - Petroleum Refinery Gas | Ultra Low NOx Burner and Selective Catalytic Reduction | 2 | 293 | $2.8 |
| | Boilers - Petroleum Refinery Gas | Ultra Low NOx Burner | 2 | 138 | $0.8 |
| | Boilers - Subbituminous Coal: Traveling Grate (Overfeed) Stoker | Selective Catalytic Reduction | 1 | 87 | $1.1 |
| Petroleum and Coal Products Manufacturing | Boilers - > 100 Million BTU/hr | Ultra Low NOx Burner | 1 | 41 | $0.2 |
| | Boilers - > 100 Million BTU/hr; Boilers - Blast Furnace Gas | Ultra Low NOx Burner | 1 | 38 | $0.4 |
| | Boilers - Boiler, >= 100 Million BTU/hr | Natural Gas Reburn | 1 | 284 | $1.8 |
| | Boilers - Coke Oven Gas | Ultra Low NOx Burner | 1 | 98 | $0.6 |
| | Boilers - Petroleum Refinery Gas | Ultra Low NOx Burner and Selective Catalytic Reduction | 3 | 433 | $3.8 |
| | Boilers - Petroleum Refinery Gas | Ultra Low NOx Burner | 3 | 137 | $0.9 |
| Pulp, Paper, and Paperboard Mills | Boilers - > 100 Million BTU/hr | Ultra Low NOx Burner and Selective Catalytic Reduction | 5 | 618 | $6.8 |
| | Boilers - > 100 Million BTU/hr | Ultra Low NOx Burner | 3 | 151 | $1.0 |
| | Boilers - > 100 Million BTU/hr | Selective Catalytic Reduction | 1 | 68 | $1.2 |
| | Boilers - 10-100 Million BTU/hr | Ultra Low NOx Burner | 2 | 106 | $0.5 |
| | Boilers - Bituminous Coal: Cyclone Furnace | Selective Catalytic Reduction | 2 | 662 | $3.4 |
| | Boilers - Bituminous Coal: Pulverized Coal: Dry Bottom | Ultra Low NOx Burner and Selective Catalytic Reduction | 1 | 111 | $1.1 |
| | Boilers - Bituminous Coal: Pulverized Coal: Dry Bottom; Boilers - > 100 Million BTU/hr | Low NOx Burner; Selective Catalytic Reduction | 1 | 98 | $1.4 |
| | Boilers - Bituminous Coal: Spreader Stoker | Selective Catalytic Reduction | 3 | 251 | $3.2 |
| | Boilers - Cogeneration | Ultra Low NOx Burner and Selective Catalytic Reduction | 2 | 338 | $2.9 |
| | Boilers - Fluid Catalytic Cracking Unit with CO Boiler: Natural Gas | Ultra Low NOx Burner and Selective Catalytic Reduction | 2 | 289 | $2.7 |
| | Boilers - Subbituminous Coal: Boiler, Spreader Stoker | Selective Catalytic Reduction | 2 | 348 | $3.7 |
| | Boilers - Subbituminous Coal: Spreader Stoker | Selective Catalytic Reduction | 1 | 266 | $2.3 |

**283a**

**Table 7. Estimated Emissions Reductions (ozone season tons), Annual Total Cost, and Average Cost per Ton by Control Technology Across All Non-EGU Emissions Units**

| Control Technology | OS NOx Reductions | Annual Total Cost | Average Cost per Ton |
|---|---|---|---|
| Adjust Air to Fuel Ratio and Ignition Retard | 212 | $1,216,435 | $2,393 |
| Layered Combustion | 12,706 | $166,398,282 | $5,457 |
| Low NOx Burner | 231 | $2,092,579 | $3,773 |
| Low NOx Burner and Flue Gas Recirculation | 200 | $2,054,876 | $4,288 |
| Natural Gas Reburn | 284 | $1,843,948 | $2,703 |
| Non-Selective Catalytic Reduction | 147 | $205,808 | $585 |
| Non-Selective Catalytic Reduction or Layered Combustion | 6,359 | $72,383,222 | $4,743 |
| Oxygen Enriched Air Staging | 52 | $95,641 | $764 |
| SCR + DLN Combustion | 136 | $2,060,943 | $6,301 |
| Selective Catalytic Reduction | 12,239 | $74,692,132 | $2,543 |
| Selective Catalytic Reduction and Steam Injection | 929 | $8,439,921 | $3,787 |
| Selective Non-Catalytic Reduction | 8,076 | $28,782,335 | $1,485 |
| Ultra Low NOx Burner | 1,670 | $11,584,405 | $2,890 |
| Ultra Low NOx Burner and Selective Catalytic Reduction | 3,946 | $38,959,490 | $4,114 |

**Table 8. Estimated Emissions Reductions (ozone season tons), Annual Total Cost, and Average Cost per Ton by Control Technology Across Non-EGU Emissions Units Grouped by the Tier 1 Industries and Impactful Boilers in Tier 2 Industries**

| Tier | Control Technology | OS NOx Reductions | Annual Total Cost | Average Cost per Ton |
|---|---|---|---|---|
| Tier 1 | Adjust Air to Fuel Ratio and Ignition Retard | 212 | $1,216,435 | $2,393 |
| Tier 1 | Layered Combustion | 12,706 | $166,398,282 | $5,457 |
| Tier 1 | Low NOx Burner | 211 | $1,852,495 | $3,656 |
| Tier 1 | Low NOx Burner and Flue Gas Recirculation | 200 | $2,054,876 | $4,288 |
| Tier 1 | Non-Selective Catalytic Reduction | 147 | $205,808 | $585 |
| Tier 1 | Non-Selective Catalytic Reduction or Layered Combustion | 6,359 | $72,383,222 | $4,743 |
| Tier 1 | Oxygen Enriched Air Staging | 52 | $95,641 | $764 |
| Tier 1 | SCR + DLN Combustion | 136 | $2,060,943 | $6,301 |
| Tier 1 | Selective Catalytic Reduction | 10,219 | $55,575,188 | $2,266 |
| Tier 1 | Selective Catalytic Reduction and Steam Injection | 929 | $8,439,921 | $3,787 |
| Tier 1 | Selective Non-Catalytic Reduction | 8,076 | $28,782,335 | $1,485 |
| Tier 1 | Ultra Low NOx Burner | 962 | $7,172,778 | $3,107 |
| Tier 1 | Ultra Low NOx Burner and Selective Catalytic Reduction | 946 | $10,362,549 | $4,567 |
| Tier 2 | Low NOx Burner | 20 | $240,084 | $5,022 |
| Tier 2 | Natural Gas Reburn | 284 | $1,843,948 | $2,703 |
| Tier 2 | Selective Catalytic Reduction | 2,020 | $19,116,944 | $3,942 |
| Tier 2 | Ultra Low NOx Burner | 708 | $4,411,626 | $2,594 |
| Tier 2 | Ultra Low NOx Burner and Selective Catalytic Reduction | 3,000 | $28,596,941 | $3,972 |

**Table 9. Estimated Emissions Reductions (ozone season tons), Annual Total Cost, and Average Cost per Ton by Control Technology Across Non-EGU Emissions Units Grouped by the Seven Individual Tier 1 and Tier 2 Industries**

| Industry | Control Technology | OS NOx Reductions | Annual Total Cost | Average Cost per Ton |
|---|---|---|---|---|
| Cement and Concrete Product Manufacturing | Selective Non-Catalytic Reduction | 8,076 | $28,782,335 | $1,485 |
| Cement and Concrete Product Manufacturing | Ultra Low NOx Burner | 16 | $169,531 | $4,410 |
| Glass and Glass Product Manufacturing | Oxygen Enriched Air Staging | 52 | $95,641 | $764 |
| Glass and Glass Product Manufacturing | Selective Catalytic Reduction | 6,615 | $24,062,362 | $1,516 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Low NOx Burner | 211 | $1,852,495 | $3,656 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Low NOx Burner and Flue Gas Recirculation | 200 | $2,054,876 | $4,288 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Selective Catalytic Reduction | 948 | $9,886,092 | $4,345 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Ultra Low NOx Burner | 946 | $7,003,247 | $3,085 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Ultra Low NOx Burner and Selective Catalytic Reduction | 946 | $10,362,549 | $4,567 |
| Pipeline Transportation of Natural Gas | Adjust Air to Fuel Ratio and Ignition Retard | 212 | $1,216,435 | $2,393 |
| Pipeline Transportation of Natural Gas | Layered Combustion | 12,706 | $166,398,282 | $5,457 |
| Pipeline Transportation of Natural Gas | Non-Selective Catalytic Reduction | 147 | $205,808 | $585 |
| Pipeline Transportation of Natural Gas | Non-Selective Catalytic Reduction or Layered Combustion | 6,359 | $72,383,222 | $4,743 |
| Pipeline Transportation of Natural Gas | SCR + DLN Combustion | 136 | $2,060,943 | $6,301 |
| Pipeline Transportation of Natural Gas | Selective Catalytic Reduction | 2,656 | $21,626,734 | $3,393 |
| Pipeline Transportation of Natural Gas | Selective Catalytic Reduction and Steam Injection | 929 | $8,439,921 | $3,787 |
| Basic Chemical Manufacturing | Selective Catalytic Reduction | 348 | $4,198,768 | $5,027 |
| Basic Chemical Manufacturing | Ultra Low NOx Burner | 138 | $769,564 | $2,317 |
| Basic Chemical Manufacturing | Ultra Low NOx Burner and Selective Catalytic Reduction | 1,211 | $11,326,715 | $3,896 |
| Petroleum and Coal Products Manufacturing | Natural Gas Reburn | 284 | $1,843,948 | $2,703 |
| Petroleum and Coal Products Manufacturing | Ultra Low NOx Burner | 313 | $2,110,773 | $2,808 |
| Petroleum and Coal Products Manufacturing | Ultra Low NOx Burner and Selective Catalytic Reduction | 433 | $3,762,867 | $3,624 |
| Pulp, Paper, and Paperboard Mills | Low NOx Burner | 20 | $240,084 | $5,022 |
| Pulp, Paper, and Paperboard Mills | Selective Catalytic Reduction | 1,672 | $14,918,176 | $3,717 |
| Pulp, Paper, and Paperboard Mills | Ultra Low NOx Burner | 257 | $1,531,289 | $2,484 |
| Pulp, Paper, and Paperboard Mills | Ultra Low NOx Burner and Selective Catalytic Reduction | 1,356 | $13,507,360 | $4,151 |

**VI.**     **Request for Comment and Additional Information**

In this screening assessment the EPA used CoST, the CMDB, and the 2019 emissions inventory to assess emission reduction potential from non-EGU emissions units in several industries. We identified emissions units that were uncontrolled or that could be better controlled and then applied control technologies to estimate emissions reductions and costs. As noted above, the cost estimates do not include monitoring, recordkeeping, reporting, or testing costs.

As discussed in Section VI.D.2.a of the proposal preamble, the EPA requests comment on the capital and annual costs of several potential control technologies, and in particular whether ultra-low $NO_X$ burners or low $NO_X$ burners are generally considered part of the process or add-on controls for ICI boilers (and how process changes or retrofits to accommodate controls would affect the cost estimates); the effectiveness of low emissions combustion in controlling $NO_X$ from reciprocating IC engines, compared to other potential $NO_X$ controls for these engines; and whether controls on ICI boilers and reciprocating IC engines are likely to be run all year or only during the ozone season.

The EPA also requests comment on the time needed to install the various control technologies across all of the emissions units in the Tier 1 and Tier 2 industries. In particular, the EPA solicits comment on the time needed to obtain permits, the availability of vendors and materials, and the earliest possible installation times for SCR on glass furnaces; SNCR on cement kilns; ultra-low $NO_X$ burners, low $NO_X$ burners, and SCR on ICI boilers (coal-fired, gas-fired, or oil-fired); low $NO_X$ burners on large non-EGU ICI boilers; and low emissions combustion, layered emissions combustion, NSCR, and SCR on reciprocating rich-burn or lean-burn IC engines.

Finally, with respect to emissions monitoring requirements, the EPA requests comment on the costs of installing and operating CEMS at non-EGU sources without $NO_X$ emissions monitors; the time needed to program and install CEMS at non-EGU sources; whether monitoring techniques other than CEMS, such as predictive emissions monitoring systems (PEMS), may be sufficient for certain non-EGU facilities, and the types of non-EGU facilities for which such PEMS may be sufficient; and the costs of installing and operating monitoring techniques other than CEMS.

## APPENDIX A – Analysis of Industry Contribution Data

This appendix describes the analyses performed to help focus the non-EGU analytical framework and resulting screening assessment on the most impactful industries.

To inform this analysis, first using the procedure described in Section III, Step 1 above, we estimated contributions from each of 41 industries to each nonattainment and maintenance receptor in 2023 and used these data to calculate the 5 metrics identified in Table A-1.[27,28] A summary of the data for each metric for each industry is provided in Table A-3. These metrics were selected to provide air quality information to inform an evaluation of the magnitude and geographic scope of contributions from individual industries. Metrics 1, 2, and 3 provide information on the magnitude of the contribution. Metric 4 provides information on the geographic scope of the downwind impact, whereas Metric 5 provides information on the geographic scope of upwind state contributions. Of the three air quality metrics we chose to analyze the data for Metric 2, the maximum contribution to any downwind receptor, because this metric aligns with the air quality metric used in Step 2 of the four-step interstate transport framework to identify linked upwind states for further review in Step 3 of the interstate transport framework. To examine the geographic breadth of the industry contributions we chose Metric 4 because that metric provides information on the extent of impacts on downwind air quality problems.

**Table A-1. Contribution Metrics for Non-EGU Assessment**

| 1 | Total contribution to all downwind receptors |
|---|---|
| 2 | Maximum contribution to any downwind receptor |
| 3 | Average contribution across all receptors |
| 4 | Number of receptors with contributions >= 0.01 ppb |
| 5 | Number of linked upwind states with highest industry contribution >= 0.01 ppb |

Next, we evaluated the maximum downwind contributions to identify the most impactful industries for further analysis. This approach included a semi-quantitative examination of rank-ordered maximum contributions to identify breakpoints in the data that might serve as an initial screen to eliminate non-impactful industries from further analysis of the contribution data. The distribution of maximum contributions provided in Table A-3 indicate that there is a large range in the values across the 41 industries. Specifically, 5 industries individually contribute more than 0.10 ppb, 3 industries contribute between 0.05 ppb and 0.10 ppb, 11 industries contribute between 0.01 and 0.05 ppb, 8 industries contribution between 0.005 and 0.01 ppb, and 14 industries contribute less than 0.005 ppb.

The rank-ordered maximum downwind contributions from individual industries are shown in Figure A-1. In this figure each point represents the maximum contribution to a downwind receptor from a particular industry. Note that the values for the highest contributing industries are not show in the figure in order to provide greater resolution of the shape of the distribution at the lower end of the values. The declining curve in Figure A-1 exhibits a shape similar to a harmonic distribution. Initially, there is a fairly steep drop in contributions with a breakpoint between roughly 0.04 and 0.06 ppb followed by a steady decline to 0.01 ppb. Beyond 0.01 ppb the shape of the distribution is much flatter. The data suggest that perhaps 0.05 ppb or 0.01 ppb could serve as breakpoints in the data. Based on the distribution

---

[27] Receptors in California were not considered in evaluating the impacts of non-EGU sources because EPA's contributions from upwind states to these receptors at Step 2 of the four-step interstate transport framework finds that these monitoring sites are overwhelmingly impacted by in-state emissions to a degree not comparable with any other identified nonattainment or maintenance-only receptors in the country. In this regard, EPA is proposing a determination that California receptors are not sufficiently impacted by interstate transport of ozone to warrant proceeding with a Step 3 evaluation of emissions reduction opportunities.
[28] The methods for identifying receptors are described in the Air Quality Modeling TSD for this proposed rule.

of the data we determined that 0.01 ppb provides a meaningful conservative breakpoint for screening out non-impactful industries from the non-EGU contribution analysis. The specific industries with a maximum downwind contribution >= 0.01 ppb are identified in Table A-2.



Figure A-1. Rank-ordered maximum downwind contributions from individual industries

We then examined the data for Metrics 2 and 4 for each industry that has a maximum contribution >= 0.01 ppb. The data for Metric 4, as shown in Figure A-2, suggests that there as a breakpoint between those industries that contribute to 10 or more receptors versus those industries that contribute to fewer than 10 receptors. Table A-2 provides the data for Metrics 2 and 4, ranked by the magnitude of Metric 4. The data show that 8 industries contribute >= 0.01 ppb to more than 10 receptors. Of these 8 industries, 5 have a maximum contributions of > 0.10 ppb to one of these receptors. In addition, one industry, Basic Chemical Manufacturing, contributes to only 9 receptors, but the maximum contribution to one of these receptors is >0.10 ppb. Using this information, we grouped the 9 industries into one of 2 tiers based on considering both the magnitude of the contribution and the downwind extent of affected receptors. Tier 1 includes the 4 industries that each have (1) a maximum contribution to any one receptor of >0.10 ppb and (2) a contribution >= 0.01 ppb to at least 10 receptors. Tier 2 includes the 5 industries that each have (1) a maximum contribution to any one receptor >=0.10 ppb but contribute >=0.01 ppb to fewer than 10 receptors, or (2) a maximum contribution <0.10 ppb but contribute >=0.01 ppb to at least 10 receptors.



Figure A-2.  Number of downwind receptors with contributions >= 0.10 ppb for each industry with a maximum downwind contribution >= 0.01 ppb

Table A-2. Maximum downwind contribution and number of receptors with contributions >= 0.01 ppb

| Industry | Max Downwind Contribution | # Receptors with Contributions >= 0.01 ppb |
|---|---|---|
| Cement and Concrete Products | **0.231** | **19** |
| Metal Ore Mining | 0.079 | **15** |
| Lime and Gypsum Products | 0.066 | **13** |
| Pipeline Transportation of Natural Gas | **0.287** | **12** |
| Petroleum and Coal Products | 0.098 | **12** |
| Iron and Steel Mills and Ferroalloy | **0.129** | **11** |
| Glass and Glass Products | **0.105** | **11** |
| Pulp, Paper, and Paperboard Mills | 0.043 | **11** |
| Basic Chemical | **0.123** | 9 |
| Oil and Gas Extraction | 0.035 | 9 |
| Resin, Synthetic Rubber, and Fibers and Filaments | 0.027 | 7 |
| Nonmetallic Mineral Mining and Quarrying | 0.035 | 4 |
| Clay Product and Refractory | 0.024 | 4 |
| Water, Sewage and Other Systems | 0.016 | 4 |
| Pesticide, Fertilizer, and Other Ag | 0.044 | 3 |
| Other Chemical Products | 0.024 | 3 |
| Chemical and Allied Products | 0.019 | 2 |
| Natural Gas Distribution | 0.016 | 1 |
| Pharmaceutical and Medicine | 0.011 | 1 |

24

**289a**

**Table A-3. Estimated Total, Maximum, and Average Contributions from Each Industry, and Number of Receptors with Contributions >= 0.01 ppb for 2023**

| Industry | # Facilities with Units > 100tpy | # Units > 100 tpy | Ozone Season Emissions | Total Contribution | Max Contribution | Average Contribution | # Receptors with Contributions >= 0.01 ppb | # States with Highest Contribution >= 0.01 ppb |
|---|---|---|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 144 | 399 | 34,343 | 1.679 | 0.287 | 0.084 | 12 | 12 |
| Cement and Concrete Product Manufacturing | 61 | 84 | 36,244 | 1.871 | 0.231 | 0.094 | 19 | 13 |
| Iron and Steel Mills and Ferroalloy Manufacturing | 14 | 43 | 4,622 | 0.577 | 0.129 | 0.029 | 11 | 1 |
| Basic Chemical Manufacturing | 38 | 78 | 9,612 | 0.293 | 0.123 | 0.015 | 9 | 2 |
| Glass and Glass Product Manufacturing | 38 | 53 | 12,059 | 0.695 | 0.105 | 0.035 | 11 | 7 |
| Petroleum and Coal Products Manufacturing | 47 | 94 | 8,163 | 0.733 | 0.098 | 0.037 | 12 | 6 |
| Metal Ore Mining | 9 | 21 | 17,778 | 0.687 | 0.079 | 0.034 | 15 | 3 |
| Lime and Gypsum Product Manufacturing | 31 | 60 | 8,856 | 0.531 | 0.066 | 0.027 | 13 | 3 |
| Pesticide, Fertilizer, and Other Agricultural Chemical Manufacturing | 16 | 27 | 3,680 | 0.162 | 0.044 | 0.008 | 3 | 1 |
| Pulp, Paper, and Paperboard Mills | 46 | 73 | 6,773 | 0.306 | 0.043 | 0.015 | 11 | 3 |
| Oil and Gas Extraction | 59 | 139 | 9,150 | 0.207 | 0.035 | 0.010 | 9 | 2 |
| Nonmetallic Mineral Mining and Quarrying | 8 | 18 | 3,808 | 0.167 | 0.035 | 0.008 | 4 | 1 |
| Resin, Synthetic Rubber, and Artificial and Synthetic Fibers and Filaments Manufacturing | 10 | 16 | 1,779 | 0.152 | 0.027 | 0.008 | 7 | 2 |
| Other Chemical Product and Preparation Manufacturing | 7 | 8 | 683 | 0.074 | 0.024 | 0.004 | 3 | 1 |
| Clay Product and Refractory Manufacturing | 1 | 2 | 1,098 | 0.088 | 0.024 | 0.004 | 4 | 1 |
| Chemical and Allied Products Merchant Wholesalers | 1 | 4 | 573 | 0.032 | 0.019 | 0.002 | 2 | 1 |
| Natural Gas Distribution | 6 | 17 | 1,027 | 0.058 | 0.016 | 0.003 | 1 | 1 |
| Water, Sewage and Other Systems | 6 | 6 | 375 | 0.069 | 0.016 | 0.003 | 4 | 1 |
| Pharmaceutical and Medicine Manufacturing | 2 | 2 | 300 | 0.057 | 0.011 | 0.003 | 1 | 1 |
| Grain and Oilseed Milling | 4 | 4 | 376 | 0.042 | 0.009 | 0.002 | 0 | 0 |
| Lessors of Real Estate | 2 | 2 | 138 | 0.037 | 0.009 | 0.002 | 0 | 0 |
| Nonferrous Metal (except Aluminum) Production and Processing | 1 | 4 | 408 | 0.025 | 0.008 | 0.001 | 0 | 0 |
| Sugar and Confectionery Product Manufacturing | 5 | 10 | 1,068 | 0.043 | 0.008 | 0.002 | 0 | 0 |
| Electric Power Generation, Transmission and Distribution | 4 | 4 | 296 | 0.039 | 0.006 | 0.002 | 0 | 0 |
| Engine, Turbine, and Power Transmission Equipment Manufacturing | 2 | 2 | 112 | 0.020 | 0.005 | 0.001 | 0 | 0 |
| Agriculture, Construction, and Mining Machinery Manufacturing | 1 | 1 | 73 | 0.012 | 0.005 | 0.001 | 0 | 0 |
| Colleges, Universities, and Professional Schools | 4 | 4 | 263 | 0.030 | 0.005 | 0.002 | 0 | 0 |
| Coal Mining | 5 | 5 | 283 | 0.015 | 0.004 | 0.001 | 0 | 0 |
| Plastics Product Manufacturing | 2 | 2 | 126 | 0.012 | 0.004 | 0.001 | 0 | 0 |
| Architectural, Engineering, and Related Services | 2 | 2 | 117 | 0.013 | 0.003 | 0.001 | 0 | 0 |
| Motor Vehicle Parts Manufacturing | 1 | 1 | 62 | 0.011 | 0.003 | 0.001 | 0 | 0 |
| Advertising, Public Relations, and Related Services | 1 | 1 | 51 | 0.009 | | | | |
| Waste Treatment and Disposal | 5 | 5 | 376 | 0.010 | | | | |
| National Security and International Affairs | 1 | 1 | 42 | 0.002 | | | | |
| Support Activities for Mining | 1 | 1 | 56 | 0.003 | | | | |
| Beverage Manufacturing | 1 | 1 | 45 | 0.002 | | | | |
| Veneer, Plywood, and Engineered Wood Product Manufacturing | 1 | 1 | 9 | 0.001 | | | | |
| Scientific Research and Development Services | 1 | 1 | 78 | 0.001 | | | | |
| Alumina and Aluminum Production and Processing | 1 | 1 | 13 | 0.000 | | | | |
| Other Food Manufacturing | 1 | 1 | 45 | 0.000 | | | | |
| Office Administrative Services | 1 | 1 | 5 | 0.000 | | | | |
| **Total** | 591 | 1,199 | 164,962 | 8.77 | | | | |
| **Tier 1 Industries** | 257 | 579 | 87,267 | 4.82 | | | | |
| **Tier 2 Industries** | 171 | 326 | 51,182 | 2.55 | | | | |
| **Tier 1 Industries (% of Total)** | 43% | 48% | 53% | 55% | | | | |
| **Tier 2 Industries (% of Total)** | 29% | 27% | 31% | 29% | | | | |

**Legend**

| Break Points | Maximum Contribution | # Receptors with Contributions >=0.01 ppb | Total Contribution | # States with Highest Contribution >= 0.01 |
|---|---|---|---|---|
| | 0.01 to 0.04 | 1 to 9 | 0.1 to 0.4 | > 1 to 9 |
| | >= 0.05 | >= 10 | >= 0.5 | >= 10 |

**1st Tier of Industries for Further Analysis Based on AQ Contributions**
These industries (1) have a maximum contribution to any one receptor of >0.10 ppb AND (2) contribute >= 0.01 ppb to at least 10 receptors.

**2nd Tier of Industries for Further Analysis Based on AQ Contributions**
These industries either have:
(1) a maximum contribution to any one receptor >0.10 ppb but contribute >=0.01 ppb to fewer than 10 receptors, or
(2) a maximum contribution <0.10 ppb but contribute >=0.01 ppb to at least 10 receptors

**290a**

# APPENDIX B – SUMMARY OF FACILITIES REMOVED in the SCREENING ASSESSMENT for 2026

| REGION_CD | FACILITY_ID | Reason for Removal | state | county | site_name | naics_code | naics_description | city |
|---|---|---|---|---|---|---|---|---|
| 24001 | 7763811 | Closure | MD | Allegany | Luke Paper Company | 322121 | Paper (except Newsprint) Mills | Luke |
| 06029 | 4789011 | Subject to Consent Decree | CA | Kern | LEHIGH SOUTHWEST CEMENT CO. | 327310 | Cement Manufacturing | MONOLITH |
| 06029 | 4789311 | Subject to Consent Decree | CA | Kern | CALIFORNIA PORTLAND CEMENT CO. | 327310 | Cement Manufacturing | MOJAVE |
| 06071 | 4841311 | Subject to Consent Decree | CA | San Bernardino | CEMEX - BLACK MOUNTAIN QUARRY PLANT | 327310 | Cement Manufacturing | APPLE VALLEY |
| 18093 | 8225311 | Units to be replaced by new kiln by 2023 | IN | Lawrence | LEHIGH CEMENT COMPANY LLC | 32731 | Cement Manufacturing | Mitchell |
| 26007 | 8127411 | Subject to Consent Decree | MI | Alpena | Holcim (US) Inc. DBA Lafarge Alpena Plant | 327310 | Cement Manufacturing | ALPENA |

26

**20036**          **Federal Register** / Vol. 87, No. 66 / Wednesday, April 6, 2022 / Proposed Rules

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 52, 75, 78 and 97**

**[EPA–HQ–OAR–2021–0668; FRL 8670–01–OAR]**

**RIN 2060–AV51**

## Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** This action proposes Federal Implementation Plan (FIP) requirements to address twenty-six states' obligations to eliminate significant contribution to nonattainment, or interference with maintenance, of the 2015 ozone National Ambient Air Quality Standard (NAAQS) in other states. The U.S. Environmental Protection Agency (EPA) is proposing this action under the "good neighbor" or "interstate transport" provision of the Clean Air Act (CAA or Act). The Agency proposes establishing nitrogen oxides emissions budgets requiring fossil fuel-fired power plants in 25 states to participate in an allowance-based ozone season trading program beginning in 2023. The Agency is also proposing to establish nitrogen oxides emissions limitations applicable to certain other industrial stationary sources in 23 states with an earliest possible compliance date of 2026. These industrial source types are: Reciprocating internal combustion engines in Pipeline Transportation of Natural Gas; kilns in Cement and Cement Product Manufacturing; boilers and furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; furnaces in Glass and Glass Product Manufacturing; and high-emitting equipment and large boilers in Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills.

**DATES:** Comments must be received on or before June 6, 2022.

*Public Hearing:* The EPA will hold a virtual public hearing on April 21, 2022. Please refer to the **SUPPLEMENTARY INFORMATION** section for additional information on the public hearing.

*Information Collection Request (ICR):* Under the Paperwork Reduction Act (PRA), comments on the information collection provisions are best assured of consideration if the Office of Management and Budget (OMB) receives a copy of your comments on or before May 6, 2022.

**ADDRESSES:** You may send comments, identified by Docket ID No. EPA–HQ–OAR–2021–0668; via the Federal eRulemaking Portal: *https://www.regulations.gov/* (our preferred method). Follow the online instructions for submitting comments.

*Instructions:* All submissions received must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/*, including any personal information provided. For detailed instructions on sending comments and additional information on the rulemaking process, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document. Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are open to the public by appointment only to reduce the risk of transmitting COVID–19. Our Docket Center staff also continues to provide remote customer service via email, phone, and webform. Hand deliveries and couriers may be received by scheduled appointment only. For further information on EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

The virtual public hearing will be held on April 21, 2022. The virtual public hearing will convene at 10 a.m. Eastern Time (ET) and will conclude at 7 p.m. ET. The EPA may close a session 15 minutes after the last pre-registered speaker has testified if there are no additional speakers. For information or questions about the public hearing, please contact Ms. Holly DeJong at *Dejong.holly@epa.gov.* The EPA will announce further details at *https://www.epa.gov/csapr/csapr-2015-ozone-naaqs.* Refer to the **SUPPLEMENTARY INFORMATION** section for additional information.

**FOR FURTHER INFORMATION CONTACT:** Ms. Elizabeth Selbst, Air Quality Policy Division, Office of Air Quality Planning and Standards (C539–01), Environmental Protection Agency, 109 TW Alexander Drive, Research Triangle Park, NC 27711; telephone number: (919)-541–3918; email address: *Selbst.elizabeth@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## Preamble Glossary of Terms and Abbreviations

The following are abbreviations of terms used in the preamble.

2016v1   2016 Version 1 Emissions Modeling Platform
2016v2   2016 Version 2 Emissions Modeling Platform
4-Step Framework   4-Step Interstate Transport Framework
ACS   American Community Survey
AEO   Annual Energy Outlook
AQAT   Air Quality Assessment Tool
AQMTSD   Air Quality Modeling Technical Support Document
BACT   Best Available Control Technology
BPT   Benefit Per Ton
CAA or Act   Clean Air Act
CAIR   Clean Air Interstate Rule
CBI   Confidential Business Information
CCR   Coal Combustion Residual
CDC   Centers for Disease Control and Prevention
CEMS   Continuous Emissions Monitoring Systems
CES   Clean Energy Standards
CHP   Combined Heat and Power
CMDB   Control Measures Database
CMV   Commercial Marine Vehicle
CoST   Control Strategy Tool
CPT   Cost Per Ton
CSAPR   Cross-State Air Pollution Rule
EGU   Electric Generating Unit
EIA   U.S. Energy Information Agency
EISA   Energy Independence and Security Act
ELG   Effluent Limitation Guidelines
E.O.   Executive Order
EPA or the Agency   United States Environmental Protection Agency
FFS   Finding of Failure To Submit
FIP   Federal Implementation Plan
GIS   Geographic Information System
HDGHG   Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles
HEDD   High Electricity Demand Days
ICI   Industrial, Commercial, and Institutional
I/M   Inspection and Maintenance
IPM   Integrated Planning Model
LNB   Low-$NO_X$ Burners
MJO   Multi-Jurisdictional Organization
MOVES   Motor Vehicle Emission Simulator
MSAT2   Mobile Source Air Toxics Rule
MWC   Municipal Waste Combustor
NAAQS   National Ambient Air Quality Standards
NAICS   North American Industry Classification System
NEEDS   National Electric Energy Data System
NEI   National Emissions Inventory
NESHAP   National Emissions Standards for Hazardous Air Pollutants
No SISNOSE   No Significant Economic Impact on a Substantial Number of Small Entities
Non-EGU   Non-Electric Generating Unit
$NO_X$   Nitrogen Oxides
NSPS   New Source Performance Standard
NREL   National Renewable Energy Lab
NTTAA   National Technology Transfer and Advancement Act
OFA   Over-Fire Air
OMB   United States Office of Management and Budget
OSAT/APCA   Ozone Source Apportionment Technology/Anthropogenic Precursor Culpability Analysis
OTC   Ozone Transport Commission
OTR   Ozone Transport Region
OTSA   Oklahoma Tribal Statistical Area
PEMS   Predictive Emissions Monitoring Systems

PM₂.₅   Fine Particulate Matter
ppb   parts per billion
ppm   parts per million
ppmvd   parts per million by volume, dry
PRA   Paperwork Reduction Act
RACT   Reasonably Available Control Technology
RFA   Regulatory Flexibility Act
RICE   Reciprocating Internal Combustion Engines
ROP   Rate of Progress
RPS   Renewable Portfolio Standards
RRF   Relative Response Factor
SAFE   Safer Affordable Fuel-Efficient Vehicles Rule
SAFETEA   Safe, Accountable, Flexible, Efficient, Transportation Equity Act
SCR   Selective Catalytic Reduction
SIP   State Implementation Plan
SMOKE   Sparse Matrix Operator Kernel Emissions
SNCR   Selective Non-Catalytic Reduction
SO₂   Sulfur Dioxide
tpd   ton per day
TSD   Technical Support Document
UMRA   Unfunded Mandates Reform Act
VMT   Vehicle Miles Traveled
VOCs   Volatile Organic Compounds
WRAP   Western Regional Air Partnership
WRF   Weather Research and Forecasting

## Table of Contents

I. Executive Summary
A. Purpose of Regulatory Action
1. Emissions Limitations for EGUs Established by the Proposed Rule
2. Emissions Limitations for Non-EGU Stationary Point Sources Established by the Proposed Rule
3. Proposed Error Correction for Previously Approved 2015 Ozone Transport SIP
4. Request for Comment on All Aspects of the Proposal
B. Summary of the Major Provisions of the Regulatory Action
C. Benefits and Costs
II. Public Participation
A. Written Comments
B. Submitting Confidential Business Information
C. Participation in Virtual Public Hearing
III. General Information
A. Does this action apply to me?
B. What action is the Agency taking?
C. What is the Agency's legal authority for taking this action?
1. Statutory Authority
D. What actions has EPA previously issued to address regional ozone transport?
IV. Air Quality Issues Addressed and Overall Approach for the Proposed Rule
A. The Interstate Ozone Transport Air Quality Challenge
1. Nature of Ozone and the Ozone NAAQS
2. Ozone Transport
3. Health and Environmental Effects
B. Proposed Rule Approach
1. The 4-Step Interstate Transport Framework
a. Step 1 Approach
b. Step 2 Approach
c. Step 3 Approach
d. Step 4 Approach
2. FIP Authority for Each State Covered by the Proposed Rule
C. Other CAA Authorities for This Action

1. Correction of EPA's Determination Regarding Delaware's SIP Submission and Its Impact on EPA's FIP Authority for Delaware
2. Application of Rule in Indian Country and Necessary or Appropriate Finding
a. Indian Country Subject to State Implementation Planning Authority
V. Analyzing Downwind Air Quality Problems and Contributions From Upwind States
A. Selection of Analytic Years for Evaluating Ozone Transport Contributions to Downwind Air Quality Problems
B. Overview of Air Quality Modeling Platform
C. Emissions Inventories
1. Foundation Emissions Inventory Data Sets
2. Development of Emissions Inventories for EGUs
3. Development of Emissions Inventories for Non-EGU Point Sources
4. Development of Emissions Inventories for Onroad Mobile Sources
5. Development of Emissions Inventories for Commercial Marine Vessels
6. Development of Emissions Inventories for Other Nonroad Mobile Sources
7. Development of Emissions Inventories for Nonpoint Sources
D. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors
E. Pollutant Transport From Upwind States
1. Air Quality Modeling To Quantify Upwind State Contributions
2. Application of Contribution Screening Threshold
a. States That Contribute at or Above the Screening Threshold
F. Treatment of Certain Receptors in California and Implications for Oregon's Good Neighbor Obligations for 2015 Ozone NAAQS
VI. Quantifying Upwind-State NOₓ Emissions Reduction Potential To Reduce Interstate Ozone Transport for the 2015 Ozone NAAQS
A. The Multi-Factor Test for Determining Significant Contribution
B. Identifying Control Stringency Levels
1. EGU NOₓ Mitigation Strategies
a. Optimizing Existing SCRs
b. Installing State-of-the-Art NOₓ Combustion Controls
c. Optimizing Already Operating SNCRs or Turning on Idled Existing SNCRs
d. Installing New SNCRs
e. Installing New SCRs
f. Generation Shifting
2. Non-EGU NOₓ Mitigation Strategies
a. Determining Non-EGU NOₓ Reduction Potential
3. Other Stationary Sources NOₓ Mitigation Strategies
a. Units Less Than or Equal to 25 MW
b. Municipal Solid Waste Units
c. Cogeneration Units
4. Mobile Source NOₓ Mitigation Strategies
C. Control Stringencies Represented by Cost Threshold ($ per Ton) and Corresponding Emissions Reductions
1. EGU Emissions Reduction Potential by Cost Threshold

2. Non-EGU Emissions Reduction Potential—Cost Threshold Up to $7,500/Ton
D. Assessing Cost, EGU and Non-EGU NOₓ Reductions, and Air Quality
1. EGU Assessment
2. Non-EGU Assessment
3. Request for Comment on Non-EGU Control Strategies and Measures
4. Combined EGU and Non-EGU Assessment
5. Over-Control Analysis
VII. Implementation of Emissions Reductions
A. NOₓ Reduction Implementation Schedule
1. 2023–2025: EGU NOₓ Reductions Beginning in 2023
2. 2026 and Later Years: EGU and Non-EGU EGU NOₓ Reductions Beginning in 2026
a. EGU Schedule for 2026 and Later Years
b. Non-EGU Schedule for 2026 and Later Years
B. Regulatory Requirements for EGUs
1. Trading Program Background and Overview of Proposed Revisions
a. Current CSAPR Trading Program Design Elements and Identified Concerns
b. Enhancements To Maintain Selected Control Stringency Over Time
i. Revised Emissions Budget-Setting Process
ii. Allowance Bank Recalibration
c. Enhancements To Improve Emissions Performance at Individual Units
i. Unit-Specific Backstop Daily Emissions Rates
ii. Unit-Specific Emissions Limitations Contingent on Assurance Level Exceedances
2. Expansion of Geographic Scope
3. Applicability and Tentative Identification of Newly Affected Units
4. New and Revised State Emissions Budgets
a. Methodology for Determining Preset State Emissions Budgets for the 2023 and 2024 Control Periods
b. Methodology for Determining Dynamic State Emissions Budgets for Control Periods in 2025 and Beyond
c. Proposed and Illustrative State Emissions Budgets
5. Variability Limits and Assurance Levels
6. Annual Recalibration of Allowance Bank
7. Unit-Specific Backstop Daily Emissions Rates
8. Unit-Specific Emissions Limitations Contingent on Assurance Level Exceedances
9. Unit-Level Allowance Allocation and Recordation Procedures
a. Set-Asides of Portions of State Emissions Budgets for New Units
b. Allocations to Existing Units, Including Units That Cease Operation
c. Allocations From Portions of State Emissions Budgets Set Aside for New Units
d. Incorrectly Allocated Allowances
10. Other Trading Program Provisions
a. Designated Representative Requirements
b. Monitoring and Reporting Requirements
11. Transitional Provisions
a. Prorating Emissions Budgets, Assurance Levels, and Unit-Level Allowance

Allocations in the Event of an Effective Date After May 1, 2023

b. Creation of Additional Group 3 Allowance Bank for 2023 Control Period

c. Recall of Group 2 Allowances for Control Periods After 2022

12. Conforming Revisions to Other Regulations

C. Regulatory Requirements for Non-EGUs

1. Pipeline Transportation of Natural Gas

2. Cement and Concrete Product Manufacturing

3. Iron and Steel Mills and Ferroalloy Manufacturing

4. Glass and Glass Product Manufacturing

5. Boilers From Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills

a. Coal-Fired Industrial Boilers

b. Oil-Fired Industrial Boilers

c. Gas-Fired Industrial Boilers

D. Submitting a SIP

1. SIP Option To Modify Allocations for 2024 Under EGU Trading Program

2. SIP Option To Modify Allocations for 2025 and Beyond Under EGU Trading Program

3. SIP Option To Replace the Federal EGU Trading Program With an Integrated State EGU Trading Program

4. SIP Revisions That Do Not Use the New Trading Program

5. SIP Revision Requirements for Non-EGU Emissions Limits

E. Title V Permitting

F. Relationship to Other Emissions Trading and Ozone Transport Programs

1. NO$_X$ SIP Call

2. Acid Rain Program

3. Other Current Emissions Trading Programs

VIII. Environmental Justice Considerations, Implications, and Stakeholder Outreach

A. Introduction

B. Analytical Considerations

C. Outreach and Engagement

IX. Costs, Benefits, and Other Impacts of the Proposed Rule

X. Summary of Proposed Changes to the Regulatory Text for the Federal Implementation Plans and Trading Programs for EGUs

A. Amendments to FIP Provisions in 40 CFR Part 52

B. Amendments to Group 3 Trading Program and Related Regulations

C. Transitional Provisions

D. Clarifications and Conforming Revisions

XI. Statutory and Executive Order Reviews

A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

B. Paperwork Reduction Act (PRA)

C. Regulatory Flexibility Act (RFA)

D. Unfunded Mandates Reform Act (UMRA)

E. Executive Order 13132: Federalism

F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use

I. National Technology Transfer and Advancement Act (NTTAA)

J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

K. Determinations Under CAA Section 307(b)(1) and (d)

# I. Executive Summary

This proposed rule would resolve the interstate transport obligations of 26 states under CAA section 110(a)(2)(D)(i)(I), referred to as the "good neighbor provision" or the "interstate transport provision" of the Act, for the 2015 ozone NAAQS. On October 1, 2015, the EPA revised the primary and secondary 8-hour standards for ozone to 70 parts per billion (ppb).[1] States were required to provide ozone infrastructure State Implementation Plan (SIP) submissions to fulfill interstate transport obligations for the 2015 ozone NAAQS by October 1, 2018.

The EPA proposes to make a finding that interstate transport of ozone precursor emissions from 26 upwind states (Alabama, Arkansas, California, Delaware, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming) is significantly contributing to downwind nonattainment or interfering with maintenance of the 2015 ozone NAAQS in other states, based on projected nitrogen oxides (NO$_X$) emissions in the 2023 ozone season. The EPA is proposing to issue FIP requirements to eliminate interstate transport of ozone precursors from these 26 states that significantly contributes to nonattainment or interferes with maintenance of the NAAQS in other states.

The EPA is proposing FIPs for 23 states for which the Agency has not approved an ozone transport SIP that was submitted for the 2015 ozone NAAQS: Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Tennessee, Texas, Utah, West Virginia, Wisconsin, and Wyoming. In this proposed rule, the EPA is proposing to issue FIPs for two states—Pennsylvania and Virginia—for which the EPA issued a Finding of Failure to Submit for 2015 ozone transport SIPs with an effective date of January 6, 2020. Under CAA

section 301(d)(4), the EPA proposes to extend FIP requirements to apply in Indian country located within the upwind geography of the proposed rule, including Indian reservation lands and other areas of Indian country over which the EPA or a tribe has demonstrated that a tribe has jurisdiction.[2] The EPA is also proposing a FIP for Delaware and an error correction for the Agency's May 1, 2020, approval at 85 FR 25307 of the interstate transport elements for Delaware's October 11, 2018, and December 26, 2019, ozone infrastructure SIP submissions.

In this proposed rule, the EPA proposes to establish new ozone season NO$_X$ emissions budgets beginning in 2023 for Electric Generating Unit (EGU) sources. The EPA is also proposing to establish emissions limitations beginning in 2026 for certain other industrial stationary sources (referred to generally as "non-Electric Generating Units" (non-EGUs). Taken together, these strategies will fully eliminate the covered states' significant contribution to downwind ozone air quality problems in other states.

The EPA proposes to implement the necessary emissions reductions as follows. The proposed FIP requirements establish ozone season NO$_X$ emissions budgets for EGUs in 25 states (Alabama, Arkansas, Delaware, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming) and require EGUs in these states to participate in a revised version of the Cross-State Air Pollution Rule (CSAPR) NO$_X$ Ozone Season Group 3 Trading Program that was previously established in the Revised CSAPR Update.[3] The EPA proposes to amend existing FIPs for 12 states currently participating in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program (Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia) to replace their existing emissions budgets established in the Revised CSAPR Update (with respect to the 2008 ozone NAAQS) with new

---

[1] See 80 FR 65291 (October 26, 2015).

[2] In general, specific tribal names or reservations are not identified separately in this proposal except as needed. See Section IV.C.2 of this notice for further discussion.

[3] As explained in Section VI.C.1 of this notice, EPA proposes finding that EGU sources within the State of California are sufficiently controlled such that no further emissions reductions are needed from them to eliminate significant contribution to downwind states.

emissions budgets. For eight states currently covered by the CSAPR $NO_X$ Ozone Season Group 2 Trading Program under SIPs or FIPs, the EPA is proposing to issue new FIPs for two states (Alabama and Missouri) and amend existing FIPs for six states (Arkansas, Mississippi, Oklahoma, Tennessee, Texas, and Wisconsin) to transition EGU sources in these states from the Group 2 program to the revised Group 3 trading program, beginning with the 2023 ozone season. EPA proposes to issue new FIPs for five states not currently covered by any CSAPR $NO_X$ ozone season trading program: Delaware, Minnesota, Nevada, Utah, and Wyoming.

Under this proposed rulemaking, emissions reductions in the selected control stringency would be achieved as soon as they are available, some of which are scheduled to occur by the 2023 ozone season and prior to the August 3, 2024, attainment date for areas classified as Moderate nonattainment for the 2015 ozone NAAQS, and the rest of which occur as soon as possible thereafter through the 2026 ozone season, prior to the August 3, 2027, attainment date for areas classified as Serious nonattainment for the 2015 ozone NAAQS. As discussed in Section VII.A.2 of this notice, the EPA proposes to find that the 2026 ozone season is as expeditious as practicable to implement substantial emissions reductions from potential new post-combustion control installations at EGUs as well as from installation of new pollution controls at non-EGUs.

These EGU emissions reductions are scheduled to begin in the 2026 ozone season based on the feasibility of control installation for EGUs in 22 states that remain linked to downwind nonattainment and maintenance receptors in that year. These 22 states are: Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming. The additional emissions reductions required for these states are based primarily on the potential retrofit of additional post-combustion controls for $NO_X$ on most coal steam EGUs and a portion of oil/gas steam EGUs that are currently lacking such controls.

In this proposed rule, the EPA introduces additional features to the allowance-based trading program approach for EGUs, including dynamic adjustments of the emissions budgets over time and backstop daily emissions rate limits for most coal-fired units, that will help maintain control stringency over time and improve emissions performance at individual units, providing further assurance that existing pollution controls will be operated during the ozone season and that the emission reductions necessary to meet good neighbor requirements will be achieved.

The EPA proposes to find that $NO_X$ emissions from non-EGU sources are significantly contributing to nonattainment or interfering with maintenance of the 2015 ozone NAAQS and that cost-effective controls for $NO_X$ emissions reductions are available in certain industrial source categories that would result in meaningful air quality improvements in downwind receptors. The EPA proposes to require emissions limitations beginning in 2026 for non-EGUs located within 23 states: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming. The proposed rule establishes $NO_X$ emissions limitations during the ozone season for the following unit types for sources in non-EGU industries: Reciprocating internal combustion in Pipeline Transportation of Natural Gas sources; kilns in Cement and Cement Product Manufacturing sources; boilers and furnaces in Iron and Steel Mills and Ferroalloy Manufacturing sources; furnaces in Glass and Glass Product Manufacturing sources; and high-emitting equipment and large boilers in Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills.

*A. Purpose of the Regulatory Action*

The purpose of this rulemaking is to protect public health and the environment by reducing interstate transport of certain air pollutants that significantly contribute to nonattainment, or interfere with maintenance, of the 2015 ozone NAAQS in other states. Ground-level ozone has detrimental effects on human health as well as vegetation and ecosystems. Acute and chronic exposure to ozone in humans is associated with premature mortality and a number of morbidity effects, such as asthma exacerbation. Ozone exposure can also negatively impact ecosystems by limiting tree growth, causing foliar injury, and changing ecosystem community composition. Section IV of this proposed rule provides additional evidence of the harmful effects of ozone exposure on human health and the environment. Studies have established that ozone air pollution can be transported over hundreds of miles, with elevated ground-level ozone concentrations occurring in rural and metropolitan areas.[4][5] Assessments of ozone control approaches have concluded that control strategies targeting reduction of $NO_X$ emissions are an effective method to reduce regional-scale ozone transport.[6]

CAA section 110(a)(2)(D)(i)(I) requires states to prohibit emissions that will contribute significantly to nonattainment or interfere with maintenance in any other state with respect to any primary or secondary NAAQS.[7] States fulfill their primary responsibility to address interstate transport emissions under the good neighbor provision by submitting SIPs containing enforceable emission limitations and other control measures, means, or techniques required to address the interstate transport provision. Within 3 years of the EPA promulgating a new or revised NAAQS, states are required to provide infrastructure SIP submittals, including good neighbor SIPs. *See* CAA section 110(a)(1) and (2). When states do not submit approvable interstate transport SIPs or fail to submit interstate transport SIPs by the statutory deadline, the CAA requires the EPA to issue FIPs to ensure that states eliminate their significant contribution to downwind air quality problems under the good neighbor provision. *See generally* CAA section 110(k) and 110(c). As such, in this proposed rule, the EPA is proposing requirements to fully address good neighbor obligations for these states for the 2015 ozone NAAQS under its authority to promulgate FIPs under CAA section 110(c).

It is appropriate to issue this proposal at this time for at least three reasons. First, this proposal will ensure that necessary emissions reductions to eliminate significant contribution are achieved as expeditiously as practicable. The EPA's anticipated timing will provide for all possible emissions reductions to go into effect

---

[4] Bergin, M.S. et al. (2007) Regional air quality: Local and interstate impacts of $NO_X$ and $SO_2$ emissions on ozone and fine particulate matter in the eastern United States. Environmental Sci & Tech. 41: 4677–4689.

[5] Liao, K. et al. (2013) Impacts of interstate transport of pollutants on high ozone events over the Mid-Atlantic United States. Atmospheric Environment 84, 100–112.

[6] *See* 82 FR 51238, 51248 (November 3, 2017) [citing 76 FR 48208, 48222 (August 8, 2011)] and 63 FR 57381 (October 27, 1998).

[7] 42 U.S.C. 7410(a)(2)(D)(i)(I).

beginning in the 2023 ozone season, which is aligned with the next upcoming attainment date of August 3, 2024, for areas classified as Moderate nonattainment under the 2015 ozone standard. Additional emissions reductions that the EPA finds not possible to implement by that attainment date are proposed to take effect as expeditiously as practicable, with the full suite of emissions reductions taking effect by the 2026 ozone season, which is aligned with the August 3, 2027, attainment date for areas classified as Serious nonattainment under the 2015 ozone NAAQS. As explained in sections V.A, VI, and VII.A of this proposed rule, these proposed timeframes for eliminating significant contribution are consistent with the provisions of title I of the CAA. Second, this proposal will provide states with as much information as the EPA can supply at this time to support their ability to submit SIP revisions to achieve the emissions reductions the EPA believes necessary to eliminate significant contribution. Third, for all of the states included in this proposed rule, the EPA's modeling and analysis indicate that additional emissions reductions beyond those which are provided in any state's 2015 ozone transport SIP are necessary to eliminate significant contribution.

The EPA anticipates that the states covered in this proposed FIP rulemaking may not have adequate provisions in their SIPs to address their interstate transport obligations for the 2015 ozone NAAQS. As discussed in Section IV.B.2 of this proposed rule, the EPA has, for certain states, made findings that the state failed to submit a complete good neighbor SIP revision for the 2015 ozone NAAQS. For certain other states, the EPA has proposed, but has not finalized, actions disapproving good neighbor SIP revisions. And for other states, the EPA has not yet proposed action on these good neighbor SIP submittals, but these submittals are currently under review, and EPA intends to act on these submittals in the coming months. The EPA will not finalize this proposed FIP action for any state for which it has not taken final action either disapproving that state's good neighbor SIP submittal or finding that the state failed to submit a complete SIP.

The EPA conducted air quality modeling for future analytic years to identify (1) the downwind areas that are expected to have trouble attaining or maintaining the 2015 ozone NAAQS in the future and (2) the contribution of ozone transport from upwind states to the downwind air quality problems.

Section V of this proposed rule provides a full description of the results of EPA's air quality modeling and relevant analyses for the proposed rulemaking. Based on EPA's air quality analysis, a total of 27 upwind states are linked above the 1 percent of the NAAQS threshold to downwind air quality problems in other states. The EPA had previously approved 2015 ozone transport SIPs submitted by two of these states—Oregon and Delaware—and proposes in this proposed rule to issue an error correction for its prior approval of Delaware's 2015 ozone transport SIP (*see* Section IV.C.1 of this notice for additional information on the proposed error correction). The EPA is not proposing any change to its prior approval of Oregon's 2015 ozone transport SIP, a determination which is further described in Section V.F of this proposed rule.

In this proposed rule, the EPA is proposing to issue FIP requirements for 26 states, which include emissions reductions for EGU sources within the borders of 25 states (described in Section VII.B of this proposed rule) and include emissions reductions for non-EGU sources within the borders of 23 states (described in Section VII.C in this proposed rule). Based on EPA's assessment of remaining air quality issues and additional emissions control strategies, the EPA further proposes to find that the EGU and non-EGU $NO_X$ emissions reductions required in the proposed rule would fully eliminate these states' significant contributions to downwind air quality problems for the 2015 ozone NAAQS. By eliminating significant contribution from these upwind states, this rule, if finalized as proposed, will make substantial and meaningful improvements in air quality by reducing ozone levels at the identified downwind receptors as well as many other areas of the country.

1. Emissions Limitations for EGUs Established by the Proposed Rule

In this proposed rule, the EPA proposes to issue FIP requirements that include new $NO_X$ ozone season emissions budgets for EGU sources within the borders of the 25 states listed in Table I.A–1, with implementation of these emissions budgets beginning in the 2023 ozone season. The EPA proposes to find that these emissions reductions are necessary to address upwind states' interstate transport obligations for the 2015 ozone NAAQS.

TABLE I.A–1—PROPOSED LIST OF 25 COVERED STATES FOR EGU EMISSIONS REDUCTIONS FOR THE 2015 8-HOUR OZONE NAAQS

| State |
| --- |
| Alabama |
| Arkansas |
| Delaware |
| Illinois |
| Indiana |
| Kentucky |
| Louisiana |
| Maryland |
| Michigan |
| Minnesota |
| Mississippi |
| Missouri |
| Nevada |
| New Jersey |
| New York |
| Ohio |
| Oklahoma |
| Pennsylvania |
| Tennessee |
| Texas |
| Utah |
| Virginia |
| West Virginia |
| Wisconsin |
| Wyoming |

The EPA proposes to expand the CSAPR $NO_X$ Ozone Season Group 3 Trading Program beginning in the 2023 ozone season. Specifically, the FIPs would require power plants within the borders of the 25 states listed in Table I.A–1 to participate in a revised version of the CSAPR $NO_X$ Ozone Season Group 3 Trading Program created by the Revised CSAPR Update. Affected EGUs within the borders of twelve states currently participating in the Group 3 Trading Program under FIPs or SIPs would remain in the program, with revised provisions beginning in the 2023 ozone season, under this proposed rule: Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia. The FIPs would also require affected EGUs within the borders of eight states currently covered by the CSAPR $NO_X$ Ozone Season Group 2 Trading Program (the "Group 2 trading program") under existing FIPs or existing SIPs to transition from the Group 2 program to the revised Group 3 trading program beginning with the 2023 control period: (Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Tennessee, Texas, and Wisconsin).[8] Finally, the EPA is

---

[8] Six of these eight states (Arkansas, Mississippi, Oklahoma, Tennessee, Texas, and Wisconsin) currently participate in the federal Group 2 trading program pursuant to the FIPs finalized in the CSAPR Update, so the FIPs proposed in this rulemaking would amend the existing FIPs for these

proposing to issue new FIPs for EGUs within the borders of five states not currently covered by any CSAPR trading program for seasonal $NO_X$ emissions: Delaware, Minnesota, Nevada, Utah, and Wyoming. If the proposed FIP is finalized, sources in these states would enter the Group 3 trading program in the 2023 control period following the effective date of the final rule.[9] In all cases, if the state submits and the EPA approves a SIP revision that would fully achieve the emissions reductions needed to meet the state's good neighbor obligations with respect to the 2015 ozone NAAQS before a final rule is promulgated in this rulemaking, the proposed FIP requirements summarized above would not be finalized. Refer to Section VII.B of this proposed rule for details on EGU regulatory requirements.

2. Emissions Limitations for Non-EGU Stationary Point Sources Established by the Proposed Rule

In this proposed rule, the EPA proposes to issue FIP requirements that include new $NO_X$ emissions limitations for non-Electric Generating Unit (non-EGU) sources in 23 states, with earliest possible compliance dates for these emissions limitations beginning in 2026. The EPA proposes to require emissions reductions from non-EGU sources to address interstate transport obligations for the 2015 ozone NAAQS for the 23 states listed in Table I.A–2.

TABLE I.A–2—PROPOSED LIST OF 23 COVERED STATES FOR NON-EGU EMISSIONS REDUCTIONS FOR THE 2015 8-HOUR OZONE NAAQS

| State |
| --- |
| Arkansas |
| California |
| Illinois |
| Indiana |
| Kentucky |
| Louisiana |
| Maryland |
| Michigan |
| Minnesota |
| Mississippi |
| Missouri |
| Nevada |
| New Jersey |
| New York |

TABLE I.A–2—PROPOSED LIST OF 23 COVERED STATES FOR NON-EGU EMISSIONS REDUCTIONS FOR THE 2015 8-HOUR OZONE NAAQS—Continued

| State |
| --- |
| Ohio |
| Oklahoma |
| Pennsylvania |
| Texas |
| Utah |
| Virginia |
| West Virginia |
| Wisconsin |
| Wyoming |

The EPA is proposing to require emissions limitations for the following unit types in non-EGU industries: Reciprocating internal combustion engines in Pipeline Transportation of Natural Gas sources; kilns in Cement and Cement Product Manufacturing sources; boilers and furnaces in Iron and Steel Mills and Ferroalloy Manufacturing sources; furnaces in Glass and Glass Product Manufacturing sources; and high-emitting equipment and large boilers in Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills. Refer to Table III.A–1 for a list of North American Industry Classification System (NAICS) codes for each entity included for regulation under this proposed rule.

3. Proposed Error Correction for Previously Approved 2015 Ozone Transport SIP

The EPA proposes to make an error correction under CAA section 110(k)(6) of its May 1, 2020, approval at 85 FR 25307 of the interstate transport elements for Delaware's October 11, 2018, and December 26, 2019, ozone infrastructure SIP submissions as satisfying the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. The EPA proposes to determine that the basis for the prior SIP approval is invalidated by the Agency's more recent technical evaluation of air quality modeling performed in support of the proposed rule,[10] and that Delaware has unresolved interstate transport obligations for the 2015 ozone NAAQS. In this proposed rule, the EPA is also exercising its authority to propose to issue a FIP for Delaware in light of these unresolved interstate transport obligations.

4. Request for Comment on All Aspects of the Proposal

Throughout this proposed rule, unless noted otherwise, the EPA is requesting comments on all aspects of the proposal to enable the Agency to develop a final rule that, consistent with our responsibilities under section 110 of the CAA, eliminates air pollution that significantly contributes to nonattainment or interference with maintenance of the 2015 ozone NAAQS. This proposed rule adheres closely to the legal and analytical framework that the EPA has applied in the past in implementing the good neighbor provision of the CAA, as well as the ample case law reviewing that framework. At the same time, in this proposal, the EPA is applying lessons learned from the performance of regulatory programs established by previous ozone transport rulemakings, as well as updating the Agency's application of the 4-step interstate transport framework with recent information on the nature of ozone transport and emissions reductions opportunities in order to eliminate significant contribution for the more stringent 2015 ozone NAAQS under the good neighbor provision. The EPA invites comments and information to support its efforts to improve the regulation of interstate ozone transport under the good neighbor provision and to fulfill our mission to protect human health and the environment. The EPA will carefully consider information provided in response to this request and will respond to comments submitted through the regulatory docket in the final rule.

B. Summary of the Major Provisions of the Regulatory Action

The EPA is applying the 4-step interstate transport framework developed in CSAPR, the CSAPR Update, the Revised CSAPR Update, and other previous ozone transport rules to propose to further limit $NO_X$ emissions from EGU sources within the borders of 25 states during the ozone season (May 1 through September 30) and to limit ozone season $NO_X$ emissions from non-EGU sources in 23 states to reduce interstate ozone transport under the authority provided in CAA section 110(a)(2)(D)(i)(I). The 4-step interstate transport framework provides a stepwise method for the EPA to propose rule provisions that are required to address the requirements of the good neighbor provision for the 2015 ozone NAAQS: (1) Identifying downwind receptors that are expected to have problems attaining or

---

states. The other two states (Alabama and Missouri) have already replaced the FIPs finalized in the CSAPR Update with approved SIP revisions that require their EGUs to participate in state Group 2 trading programs integrated with the federal Group 2 trading program, so the FIPs proposed in this action would constitute new FIPs for these states, and the EPA would cease implementation of the state Group 2 trading programs included in the two states' SIPs.

[9] Two states, Kansas and Iowa, will remain in the Group 2 Trading Program.

[10] See the Air Quality Modeling Technical Support Document (AQM TSD) in the docket for this proposed rule.

maintaining the NAAQS; (2) determining which upwind states contribute to these identified problems in amounts sufficient to "link" them to the downwind air quality problems (*i.e.,* in this proposed rule, a contribution threshold of 1 percent of the NAAQS); (3) for states linked to downwind air quality problems, identifying upwind emissions that significantly contribute to downwind nonattainment or interfere with downwind maintenance of the NAAQS; and (4) for states that are found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in downwind areas, implementing the necessary emissions reductions through enforceable measures. In this proposed rule, the EPA applies the 4-step framework to evaluate upwind states' obligations to reduce interstate transport of ozone precursor emissions for the 2015 ozone NAAQS. The remainder of this section provides a general overview of the EPA's application of the 4-step framework as it applies to major provisions of the proposed rule; additional details regarding EPA's proposed rule approach are found in Section IV of this proposed rule.

In order to apply the first step of the 4-step framework to the 2015 ozone NAAQS, the EPA performed air quality modeling to project ozone concentrations at air quality monitoring sites in 2023, 2026, and 2032.[11] The EPA evaluated projected ozone concentrations for the 2023 analytic year at individual monitoring sites and considered current ozone monitoring data at these sites to identify receptors that are anticipated to have problems attaining or maintaining the 2015 ozone NAAQS. This analysis was then repeated using projected ozone concentrations for 2026 and 2032.

To apply the second step of the framework, the EPA used air quality modeling to quantify the contributions from upwind states to ozone concentrations in 2023 and 2026 at downwind receptors.[12] Once quantified, EPA then evaluated these contributions relative to a screening threshold of 1 percent of the NAAQS (*i.e.,* 0.70 ppb).[13]

States with contributions that equaled or exceeded 1 percent of the NAAQS were identified as warranting further analysis at Step 3 of the four-step framework to determine if the upwind state significantly contributes to nonattainment or interference with maintenance in a downwind state. States with contributions below 1 percent of the NAAQS were considered not to significantly contribute to nonattainment or interfere with maintenance of the NAAQS in downwind states. Based on EPA's most recent air quality modeling and contribution analysis using 2023 as the analytic year, the EPA proposes to find that the following 27 states have contributions that equal or exceed 1 percent of the 2015 ozone NAAQS, and, thereby, warrant further analysis of significant contribution to nonattainment or interference with maintenance of the NAAQS: Alabama, Arkansas, California, Delaware, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming. Further evaluation of the locations in California to which Oregon was linked at Step 2 leads the EPA to conclude downwind areas represented by these monitoring sites should not be considered interstate ozone transport receptors. Therefore, the EPA is not proposing any further emissions reductions from the state of Oregon because there is no significant contribution required to be eliminated under the interstate transport provision, as described in Section V.F of this proposed rule.

Based on the air quality analysis presented in Section V of this proposed rule, the EPA proposes to find that in the absence of additional emissions reductions in those states the majority of the states that the EPA is proposing to participate in the Ozone Season Group 3 Trading Program will continue to contribute above the 1 percent of the NAAQS threshold to at least one receptor whose nonattainment and maintenance concerns persist through the 2026 ozone season, with the exception of Alabama, Delaware, and Tennessee. As a result, EPA's evaluation of emissions reduction potential at Step 3 for Alabama, Delaware, and Tennessee is limited to emission reductions achievable by the 2023 ozone season. For each of these three states, EPA's analysis does not consider, nor does the EPA propose to require, emissions reductions at either EGUs or non-EGUs

that cannot be implemented until the 2026 ozone season.

At the third step of the 4-step framework, EPA applied a multi-factor test that incorporates cost, availability of emissions reductions, and air quality impacts at the downwind receptors to determine the amount of ozone precursor emissions from the linked upwind states that "significantly" contribute to downwind nonattainment or maintenance receptors. In this proposed rule, the EPA proposes to apply the multifactor test described in Section VI.A of this proposed rule to both EGU and non-EGU sources. The EPA assessed the potential emissions reductions in 2023 and 2026, as well as in intervening and later years to determine the emissions reductions required to eliminate significant contribution in any future year where downwind areas are projected to have potential problems attaining or maintaining the 2015 ozone NAAQS.

For EGU sources, the EPA evaluated the following set of widely-available $NO_X$ emissions control technologies: (1) Fully operating existing selective catalytic reduction (SCR) controls, including both optimizing $NO_X$ removal by existing operational SCRs and turning on and optimizing existing idled SCRs; (2) installing state-of-the-art $NO_X$ combustion controls; (3) fully operating existing selective non-catalytic reduction (SNCR) controls, including both optimizing $NO_X$ removal by existing operational SNCRs and turning on and optimizing existing idled SNCRs; (4) installing new SNCRs; (5) installing new SCRs; and (6) generation shifting. For the reasons explained in Section VI of this proposed rule and supported by the EGU $NO_X$ Mitigation Strategies Proposed Rule Technical Support Document (TSD) included in the docket for this proposed rule, the EPA determined that for the regional, multi-state scale of this rulemaking, only fully operating and optimizing existing SCRs and existing SNCRs (EGU $NO_X$ emissions controls options 1 and 3 in the list earlier) are possible for the 2023 ozone season. The EPA determined that state-of-the-art $NO_X$ combustion controls at EGUs (emissions control option 2 in the list above) are available by the beginning of the 2024 ozone season. Based on EPA's assessment of the earliest possible timeframe for installation of new SNCR and SCRs (EGU emissions controls options 4 and 5 in the list), the EPA proposes to require emissions reductions commensurate with these controls by the beginning of the 2026 ozone season. *See* Section VI.B.1 of this proposed rule for a full description of

---

[11] These 3 analytic years are the last full ozone seasons before, and thus align with, upcoming attainment dates for the 2015 ozone NAAQS: August 3, 2024, for areas classified as Moderate nonattainment, August 3, 2027, for areas classified as Serious nonattainment, and August 3, 2033, for areas classified as Severe. *See* 83 FR 25776.

[12] The EPA did not perform contribution modeling for 2032 since contribution data for this year were not needed to identify upwind states to be analyzed in Step 3.

[13] *See* Section V of this proposed rule for explanation of EPA's use of the 1 percent of the NAAQS threshold in the Step 2 analysis.

EPA's analysis of $NO_X$ emissions mitigation strategies for EGU sources.

The EPA proposes control stringency levels that maximize incremental $NO_X$ emissions reduction potential from EGUs and corresponding downwind ozone air quality improvements to the extent feasible in each year analyzed. The EPA believes that the required controls provide cost-effective reductions of $NO_X$ emissions that will provide substantial improvements in downwind ozone air quality to address interstate transport obligations for the 2015 ozone NAAQS in a timely manner. These controls represent greater stringency in upwind EGU controls than in EPA's most recent ozone transport rulemakings, such as the CSAPR Update and the Revised CSAPR Update. However, programs to address interstate ozone transport based on the retrofit of post-combustion controls are by no means unprecedented. In prior ozone transport rulemakings such as the $NO_X$ SIP Call and the Clean Air Interstate Rule (CAIR), the EPA established EGU budgets premised on the widespread availability of retrofitting EGUs with post-combustion emissions controls such as SCR.[14] While these programs successfully drove many EGUs to retrofit post-combustion controls, other EGUs throughout the present geography of linked upwind states continue to operate without such controls and continue to emit at relatively high rates more than 20 years after similar units reduced these emissions under prior interstate ozone transport rulemakings.

Furthermore, the CSAPR Update provided only a partial remedy for eliminating significant contribution for the 2008 ozone NAAQS, as needed to obtain available reductions by the 2017 ozone season. In that rule, the EPA made no determination regarding the appropriateness of more stringent EGU $NO_X$ controls that would be required for a *full* remedy for interstate transport for the 2008 ozone NAAQS. Following the remand of the CSAPR Update in *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019) (*Wisconsin*), the EPA again declined to require the retrofit of new post-combustion controls on EGUs in the Revised CSAPR Update, but that determination was based on a specific timing consideration: Downwind air quality problems under the 2008 ozone NAAQS were projected to resolve before post-combustion control retrofits could be accomplished on a fleetwide,

regional scale. *See* 86 FR 23054, 23110 (April 30, 2021).

In this proposed rulemaking, the EPA is addressing good neighbor obligations for the more stringent 2015 ozone NAAQS, and the Agency observes ongoing and persistent contribution from upwind states to ozone nonattainment and maintenance receptors in other states under that NAAQS. As further discussed in Section VI of this proposed rule, the nature of this contribution warrants a greater degree of control stringency than the EPA determined to be necessary to eliminate significant contribution of ozone transport in prior CSAPR rulemakings. The EPA is therefore returning to EGU $NO_X$ control strategies commensurate with those determined to be necessary in the $NO_X$ SIP Call and CAIR.

Based on the Step 3 analysis described in Section VI of this proposed rule, the EPA is proposing that emissions reductions commensurate with the full operation of all existing post-combustion controls (both SCRs and SNCRs) and state-of-the-art combustion control upgrades constitute the Agency's selected control stringency for EGUs within the borders of 25 states linked to downwind nonattainment or maintenance in 2023 (Alabama, Arkansas, Delaware, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming). For 22 of those states that are also linked in 2026 (Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming), the EPA is determining that the selected EGU control stringency also includes emissions reductions commensurate with the retrofit of SCR at coal steam units of 100 MW or greater capacity (excepting circulating fluidized bed units (CFB)), new SNCR on coal steam units of less than 100 MW capacity and CFBs, and SCR on oil/gas steam units greater than 100 MW that have historically emitted at least 150 tons of $NO_X$ per ozone season.

To identify appropriate control strategies for non-EGU sources to achieve $NO_X$ emissions reductions that would result in meaningful air quality improvements in downwind areas, the EPA developed an analytical framework

to evaluate the air quality impacts of potential emissions reductions from non-EGU sources located in the linked upwind states. The EPA incorporated air quality modeling information, annual emissions, and information about potential controls to determine which industries, if subject to further control requirements, would have the greatest impact in providing air quality improvements at the downwind receptors. This evaluation was subject to a marginal cost threshold of up to $7,500 per ton, which the EPA determined based on information available to the Agency about existing control device efficiency and cost information. Additional information on the analytical framework is described in Section VI.B.2 of this proposed rule and is presented in the memorandum titled *Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026* ("Non-EGU Screening Assessment memorandum"), which is available in the docket for this proposed rulemaking. Based on the results of this assessment, the EPA identified emissions unit types in seven industries (identified in Section I.A.2 of this proposed rule) that provide opportunities for $NO_X$ emissions reductions that result in meaningful impacts on air quality at the downwind receptors.

The EPA performed air quality analysis using the Ozone Air Quality Assessment Tool (AQAT) to determine whether the proposed emissions reductions for both EGUs and non-EGUs potentially create an "over-control" scenario whereby (1) the expected ozone improvements would be greater than necessary to resolve the downwind ozone pollution problem (*i.e.,* beyond what is necessary to resolve all nonattainment and maintenance problems to which an upwind state is linked) or (2) the expected ozone improvements would reduce the upwind state's ozone contributions below the screening threshold (*i.e.,* 1 percent of the NAAQS or 0.70 ppb). The EPA's over-control analysis, discussed in Section VI.D.4 of this proposed rule, shows that the proposed control stringencies for EGU and non-EGU sources do not over-control upwind states' emissions either with respect to the downwind air quality problems to which they are linked or with respect to the 1 percent of the NAAQS contribution threshold, such that over-control would trigger re-evaluation at Step 3 for any linked upwind state.

[14] *See, e.g.,* 70 FR 25162, 25205–06 (May 12, 2005).

Based on the multi-factor test applied to both EGU and non-EGU sources and our subsequent assessment of over-control, the EPA finds that the selected EGU and non-EGU control stringencies constitute the elimination of significant contribution and interference with maintenance, without over-controlling emissions, from the 26 upwind states subject to EGU and non-EGU emissions reductions requirements under the proposed rule. In order to eliminate significant contribution and interference with maintenance through the fourth step of the 4-step framework, as described in Section VII of this proposed rule, the EPA is establishing emissions budgets for EGUs within the borders of 25 states that reflect the remaining allowable emissions after the emissions reductions associated with the selected control stringency have been achieved. For the same reason, the EPA is establishing non-EGU emissions limits in 23 states that result in the elimination of significant contribution from non-EGU sources in these states. For additional details about the test and the over-control analysis, *see* the document titled, "Ozone Transport Policy Analysis Proposed Rule TSD" included in the docket for this rulemaking.

In this fourth step of the 4-step framework, the EPA proposes to include enforceable measures in the promulgated FIPs to achieve the required emissions reductions in each of the 26 states. Specifically, the FIPs would require covered power plants within the borders of the 25 states listed in Table I.A–1 to participate in the CSAPR $NO_X$ Ozone Season Group 3 Trading Program created by the Revised CSAPR Update. Affected EGUs within the borders of twelve states currently participating in the Group 3 Trading Program would remain in the program, with revised provisions beginning in the 2023 ozone season, under this proposed rule: Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia. Affected EGUs within the borders of eight states currently covered by the CSAPR $NO_X$ Ozone Season Group 2 Trading Program (the "Group 2 trading program")—Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Tennessee, Texas, and Wisconsin—would transition from the Group 2 program to the revised Group 3 trading program beginning with the 2023 control period,[15] and affected EGUs within the borders of five states not currently covered by any CSAPR

trading program for seasonal $NO_X$ emissions—Delaware, Minnesota, Nevada, Utah, and Wyoming—would enter the Group 3 trading program in the 2023 control period following the effective date of the final rule. In addition, the EPA proposes to revise other aspects of the Group 3 trading program to help maintain control stringency over time and improve emissions performance at individual units, offering a necessary measure of assurance that existing pollution controls will be operated during the ozone season, as described in Section VII of this proposed rule. This proposal does not revise the budget stringency and geography of the existing CSAPR $NO_X$ Ozone Season Group 1 trading program. Aside from the eight states moving from the Group 2 trading program to the Group 3 trading program under the proposed rule, this proposal otherwise leaves unchanged the budget stringency of the existing CSAPR $NO_X$ Ozone Season Group 2 trading program.

The EPA is proposing preset ozone season $NO_X$ emissions budgets for the 2023 and 2024 ozone seasons, as explained in Section VII.B of this proposed rule and as shown in Table I.B–1.

TABLE I.B–1—PROPOSED AND ILLUSTRATIVE CSAPR $NO_X$ OZONE SEASON GROUP 3 STATE EMISSIONS BUDGETS FOR 2023 THROUGH 2026 CONTROL PERIODS *

| State | Proposed emissions budgets for 2023 control period (tons) | Proposed emissions budgets for 2024 control period (tons) | Illustrative emissions budgets for 2025 control period (tons) | Illustrative emissions budgets for 2026 control period (tons) |
|---|---|---|---|---|
| Alabama | 6,364 | 6,306 | 6,306 | 6,306 |
| Arkansas | 8,889 | 8,889 | 8,889 | 3,923 |
| Delaware | 384 | 434 | 434 | 434 |
| Illinois | 7,364 | 7,463 | 7,463 | 6,115 |
| Indiana | 11,151 | 9,391 | 8,714 | 7,791 |
| Kentucky | 11,640 | 11,640 | 11,134 | 7,573 |
| Louisiana | 9,312 | 9,312 | 9,179 | 3,752 |
| Maryland | 1,187 | 1,187 | 1,187 | 1,189 |
| Michigan | 10,718 | 10,718 | 10,759 | 6,114 |
| Minnesota | 3,921 | 3,921 | 3,910 | 2,536 |
| Mississippi | 5,024 | 4,400 | 4,400 | 1,914 |
| Missouri | 11,857 | 11,857 | 10,456 | 7,246 |
| Nevada | 2,280 | 2,372 | 2,372 | 1,211 |
| New Jersey | 799 | 799 | 799 | 799 |
| New York | 3,763 | 3,763 | 3,763 | 3,238 |
| Ohio | 8,369 | 8,369 | 8,369 | 8,586 |
| Oklahoma | 10,265 | 9,573 | 9,393 | 4,275 |
| Pennsylvania | 8,855 | 8,855 | 8,855 | 6,819 |
| Tennessee | 4,234 | 4,234 | 4,008 | 4,008 |
| Texas | 38,284 | 38,284 | 36,619 | 21,946 |
| Utah | 14,981 | 15,146 | 15,146 | 2,620 |
| Virginia | 3,090 | 2,814 | 2,948 | 2,567 |
| West Virginia | 12,478 | 12,478 | 12,478 | 10,597 |
| Wisconsin | 5,963 | 5,057 | 4,198 | 3,473 |

[15] The EPA would deem participation in the Group 3 trading program by the EGUs in these eight states as also addressing the respective states' good neighbor obligations with respect to the 2008 ozone NAAQS (for all eight states), the 1997 ozone NAAQS (for all the states except Texas), and the 1979 ozone NAAQS (for Alabama, Missouri, and Tennessee) to the same extent that those obligations are currently being addressed by participation of the states' EGUs in the Group 2 trading program.

TABLE I.B–1—PROPOSED AND ILLUSTRATIVE CSAPR NO$_X$ OZONE SEASON GROUP 3 STATE EMISSIONS BUDGETS FOR 2023 THROUGH 2026 CONTROL PERIODS *—Continued

| State | Proposed emissions budgets for 2023 control period (tons) | Proposed emissions budgets for 2024 control period (tons) | Illustrative emissions budgets for 2025 control period (tons) | Illustrative emissions budgets for 2026 control period (tons) |
|---|---|---|---|---|
| Wyoming | 9,125 | 8,573 | 8,573 | 4,490 |

*Further information on the state-level emissions budget calculations pertaining to Table I.B–1 is provided in Section VII.B.4 of this proposed rule as well as the Ozone Transport Policy Analysis Proposed Rule TSD. Further information on the proposed approach for allocating a portion of Utah's emissions budget for each control period to the existing EGU in the Uintah and Ouray Reservation within Utah's borders is provided in Section VII.B.9 of this proposed rule.

Beyond preset emissions budgets for the 2023 and 2024 control periods, the EPA also proposes to extend the Group 3 trading program budget-setting methodology used in the Revised CSAPR Update so as to routinely set emissions budgets for each future control period (beginning in 2025) in the year before that control period, with each emissions budget reflecting the latest available information on the composition and utilization of the EGU fleet at the time that emissions budget is determined (*see* Table VII.B.4.c–2 for illustrative examples of dynamic budget calculations that the EPA will publish in advance of each ozone season, effective for the 2025 control period and beyond). The stringency of the dynamic emissions budgets would simply reflect the stringency of the emissions control strategies selected in the rulemaking more consistently over time and ensure that the annual updates would eliminate emissions determined to be unlawful under the good neighbor provision. *See* Section VII.B of this proposed rule for additional discussion of EPA's proposed method for adjusting emissions budgets to ensure elimination of significant contribution from EGU sources in the linked upwind states.

As an enhancement to the structure of the trading program as originally promulgated in the Revised CSAPR Update, the EPA is also proposing to establish backstop daily emissions rates for coal steam units greater than or equal to 100 MW in covered states. Units emitting in excess of these daily rates would be subject to increased allowance surrender requirements under the trading program. The backstop daily emissions rates would work in tandem with the ozone season emissions budgets to offer downwind stakeholders a necessary measure of assurance that they will be protected on a daily basis during the ozone season by continuous operation of installed pollution controls. The EPA's experience with the CSAPR trading programs has revealed instances where EGUs have reduced their SCRs' performance on a given day, or across the entire ozone seasons in some cases, including high ozone days.[16] In addition to maintaining a mass-based seasonal requirement, the EPA proposes to require controls while maintaining as much compliance flexibility as possible through a unit-level emission rate designed to ensure that controls operate continuously and that required reductions occur on the highest ozone days. These trading program improvements would also promote consistent emissions control performance across the power sector, which protects communities living in downwind ozone nonattainment areas from exceedances of the NAAQS that might otherwise occur.

The EPA proposes to include enforceable emissions standards that

[16] *See* 86 FR 23090. The EPA highlighted the Miami Fort Unit 7 (possessing a SCR) more than tripled its ozone-season NO$_X$ emission rate between 2017 and 2019.

will apply during the ozone season (annually from May to September) for seven non-EGU industries in the promulgated FIPs to achieve the required emissions reductions in 23 states with remaining interstate transport obligations for the 2015 ozone NAAQS in 2026: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming. These requirements would apply to all existing emissions units and to any future emissions units constructed in the covered states after promulgation of the final rule. Thus, the emissions limits for non-EGU sources and associated compliance requirements would apply in all 23 states listed in this paragraph, even if certain of these states do not currently have existing emissions units within a particular industry.

Based on our evaluation of the time required to install controls at the types of non-EGU sources covered by this proposed rule, the EPA has identified the 2026 ozone season as the earliest compliance date possible for non-EGU emissions reductions. The EPA is therefore proposing to include non-EGU emissions reductions beginning in 2026. For sources located in the 23 states listed in the previous paragraph, The EPA proposes to require the emissions limits listed in Table I.B–2 for

reciprocating internal combustion engines in Pipeline Transportation of Natural Gas; the emissions limits listed in Table I.B–3 for kilns in Cement and Cement Product Manufacturing; the emissions limits listed in Table I.B–4 for boilers and furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; the emissions limits listed in Table I.B–5 for furnaces in Glass and Glass Product Manufacturing; and the emissions limits listed in Table I.B–6 for high-emitting equipment and large boilers in Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills.

TABLE I.B–2—SUMMARY OF PROPOSED NOₓ EMISSIONS LIMITS FOR PIPELINE TRANSPORTATION OF NATURAL GAS

| Engine type and fuel | Proposed NOₓ emissions limit |
|---|---|
| Natural Gas Fired Four Stroke Rich Burn. | 1.0 g/hp-hr. |
| Natural Gas Fired Four Stroke Lean Burn. | 1.5 g/hp-hr. |
| Natural Gas Fired Two Stroke Lean Burn. | 3.0 g/hp-hr. |

TABLE I.B–3—SUMMARY OF PROPOSED NOₓ EMISSIONS LIMITS FOR KILN TYPES IN CEMENT AND CONCRETE PRODUCT MANUFACTURING

| Kiln type | Proposed NOₓ emissions limit (lb/ton of clinker) |
|---|---|
| Long Wet | 4.0 |
| Long Dry | 3.0 |
| Preheater | 3.8 |
| Precalciner | 2.3 |
| Preheater/Precalciner | 2.8 |

The EPA is also proposing a source cap limit expressed in ton per day (tpd) of NOₓ for each individual cement plant according to the following equation.[17]

$$CAP\,2015\,Ozone\,Transport = \frac{(KW \times NW) + (KD \times ND)}{\left(2000\,\frac{pounds}{ton} \times 365\,\frac{days}{year}\right)}$$

Where:

CAP2015 Ozone Transport = total allowable NOₓ emissions from all cement kilns located at one cement plant, in tons per day, on a 30-operating day rolling average basis;

KD = 1.7 pounds NOₓ per ton of clinker for dry preheater-precalciner or precalciner kilns;

KW = 3.4 pounds NOₓ per ton of clinker for long wet kilns;

ND = the average annual production in tons of clinker plus one standard deviation for the three most recent calendar years from all dry preheater-precalciner or precalciner kilns located at one cement plant; and

NW = the average annual production in tons of clinker plus one standard deviation for the 3 most recent calendar years from all long wet kilns located at one cement plant.

An affected cement plant will need to comply with both the source cap limit and the specific NOₓ emissions limits assigned to its individual kiln type(s). Refer to Section VII.C.2 of this proposed rule for additional information concerning the application of the source cap limit to this industry source group.

TABLE I.B–4—SUMMARY OF PROPOSED NOₓ EMISSIONS LIMITS FOR IRON AND STEEL AND FERROALLOY EMISSIONS UNITS

| Emissions unit | Proposed NOₓ emissions standard or requirement (lbs/hour or lb/mmBtu) |
|---|---|
| Blast Furnace | 0.03 lb/mmBtu. |
| Basic Oxygen Furnace | 0.07 lb/ton. |
| Electric Arc Furnace | 0.15 lb/ton steel. |
| Ladle/tundish Preheaters | 0.06 lb/mmBtu. |
| Reheat furnace | 0.05 lb/mmBtu. |
| Annealing Furnace | 0.06 lb/mmBtu. |
| Vacuum Degasser | 0.03 lb/mmBtu. |
| Ladle Metallurgy Furnace | 0.1 lb/ton. |
| Taconite production kilns | Work practice standard to install low NOₓ technology/burners, test and set. |
| Coke ovens (charging and coking) | 0.6 lb/ton of coal charged. |
| Coke ovens (pushing) | 0.015 lb/ton of coal pushed. |
| Boilers—Coal | 0.20 lb/mmBtu. |
| Boilers—Residual oil | 0.20 lb/mmBtu. |
| Boilers—Distillate oil | 0.12 lb/mmBtu. |
| Boilers—Natural gas | 0.08 lb/mmBtu. |

---

[17] Based on source cap equation at 30 TAC § 117.3123(b); January 14, 2009 (74 FR 1927), Docket ID No. EPA–R06–OAR–2007–1147, also *see* https://wayback.archive-it.org/414/ 20210527223433/https://www.tceq.texas.gov/ assets/public/legal/rules/rules/pdflib/117e.pdf.

Federal Register / Vol. 87, No. 66 / Wednesday, April 6, 2022 / Proposed Rules **20047**

TABLE IV.B–5—SUMMARY OF PROPOSED NO$_X$ EMISSIONS LIMITS FOR FURNACE UNIT TYPES IN GLASS AND GLASS PRODUCT MANUFACTURING

| Furnace type | Proposed NO$_X$ emissions limit (lb/ton of glass produced) |
|---|---|
| Container Glass Manufacturing Furnace | 4.0 |
| Pressed/Blown Glass Manufacturing Furnace or Fiberglass Manufacturing Furnace | 4.0 |
| Flat Glass Manufacturing Furnace | 9.2 |

TABLE I.B–6—SUMMARY OF PROPOSED NO$_X$ EMISSIONS LIMITS FOR HIGH-EMITTING EQUIPMENT AND LARGE BOILERS IN BASIC CHEMICAL MANUFACTURING, PETROLEUM AND COAL PRODUCTS MANUFACTURING, AND PULP, PAPER, AND PAPERBOARD MILLS

| Unit type | Emissions limit (lbs NO$_X$/ mmBtu) |
|---|---|
| Coal | 0.20 |
| Residual oil | 0.20 |
| Distillate oil | 0.12 |
| Natural gas | 0.08 |

Refer to Section VII.C of this proposed rule for applicability criteria, compliance assurance requirements, and the EPA's rationale in proposing these emissions limits for each of the non-EGU industries covered by the proposed rule. In addition, the EPA requests comment on several topics regarding the implementation of emissions limits for non-EGU sources that are proposed in this rulemaking, including controls on emissions units and control installation timing. *See* Section VI.D.2.a of this proposed rule for a list of detailed questions on which the Agency is soliciting public comment.

The remainder of this preamble is organized as follows: Section III of this proposed rule outlines general applicability criteria for the proposed rule and describes the EPA's legal authority for this proposed rule, the relationship of the proposed rule to previous interstate ozone transport rulemakings, and the incremental costs and benefits of the proposed rule; Section IV of this proposed rule describes the human health and environmental challenges posed by interstate transport contributions to ozone air quality problems, as well as EPA's overall approach for addressing interstate transport for the 2015 ozone NAAQS in this proposed rule; Section V of this proposed rule describes the Agency's analyses of air quality data to inform this proposed rulemaking, including descriptions of the air quality modeling platform and emissions inventories used in the proposed rule, as well as EPA's methods for identifying downwind air quality problems and upwind states' ozone transport contributions to downwind states; Section VI of this proposed rule describes EPA's approach to quantifying upwind states' obligations in the form of EGU NO$_X$ control stringencies and non-EGU emissions limits; Section VII of this proposed rule describes key elements of the implementation schedule for EGU and non-EGU emissions reductions requirements, including details regarding the revised aspects of the CSAPR NO$_X$ Group 3 trading program and compliance deadlines, as well as regulatory requirements and compliance deadlines for non-EGU sources; Section VIII of this proposed rule discusses the environmental justice considerations of the proposed rule; Section IX of this proposed rule describes the expected costs, benefits, and other impacts of this proposed rule; Section X of this proposed rule provides a summary of proposed changes to the existing regulatory text; and Section XI of this proposed rule discusses the statutory and executive orders affecting this proposed rulemaking.

*C. Costs and Benefits*

A summary of the key results of the cost-benefit analysis that was prepared for this proposed rule is presented in Table I.C–1. Table I.C–1 presents estimates of the present values (PV) and equivalent annualized values (EAV), calculated using discount rates of 3 and 7 percent as directed by OMB's Circular A–4, of the health benefits, compliance costs, and net benefits of the proposed rule, in 2016 dollars, discounted to 2022. The estimated monetized net benefits are the estimated monetized benefits minus the estimated monetized costs of the proposed rule. These results present an incomplete overview of the effects of the proposal, because important categories of benefits—including benefits from reducing climate pollution, other types of air pollutants, and water pollution—were not monetized and are therefore not reflected in the cost-benefit tables. We anticipate that taking non-monetized effects into account would show the proposal to be more net beneficial than this table reflects.

TABLE I.C–1—ESTIMATED MONETIZED BENEFITS, COMPLIANCE COSTS, AND NET BENEFITS OF THE PROPOSED RULE, 2023 THROUGH 2042

[Millions 2016$, discounted to 2022] [a]

|  | 3% Discount rate | 7% Discount rate |
|---|---|---|
| Present Value: |  |  |
| Benefits [b] | 250,000 | 150,000 |
| Compliance Costs [c] | 22,000 | 14,000 |
| Net Benefits | 220,000 | 130,000 |
| Equivalent Annualized Value: |  |  |
| Benefits | 17,000 | 14,000 |
| Compliance Costs | 1,500 | 1,300 |

**303a**

Table I.C–1—Estimated Monetized Benefits, Compliance Costs, and Net Benefits of the Proposed Rule, 2023 through 2042—Continued

[Millions 2016$, discounted to 2022] [a]

|  | 3% Discount rate | 7% Discount rate |
|---|---|---|
| Net Benefits ............................................................ | 15,000 | 12,000 |

[a] Rows may not appear to add correctly due to rounding.

[b] The annualized present value of costs and benefits are calculated over a 20-year period from 2023 to 2042. Monetized benefits include those related to public health associated with reductions in $PM_{2.5}$ and ozone concentrations. The health benefits are associated with several point estimates and are presented at real discount rates of 3 and 7 percent. Several categories of benefits remain unmonetized and are thus not reflected in the table. Non-monetized benefits include important climate benefits from reductions in $CO_2$ emissions. The U.S. District Court for the Western District of Louisiana has issued an injunction concerning the monetization of the benefits of greenhouse gas emission reductions by EPA and other defendants. See *Louisiana* v. *Biden,* No. 21–cv–01074–JDC–KK (W.D. La. Feb. 11, 2022). Therefore, such values are not presented in the benefit-cost analysis of this proposal conducted pursuant to E.O. 12866. Please see Chapter 5, Section 5.2 of the RIA for more discussion. In addition, there are important unquantified water quality benefits and benefits associated with reductions in other air pollutants.

[c] The costs presented in this table are consistent with the costs presented in Chapter 4 of the RIA. To estimate these annualized costs, EPA uses a conventional and widely accepted approach that applies a capital recovery factor (CRF) multiplier to capital investments and adds that to the annual incremental operating expenses. Costs were calculated using a 3.76% real discount rate consistent with the rate used in IPM's objective function for cost-minimization.

As shown in Table I.C–1, the PV of the benefits, associated with reductions in $PM_{2.5}$ and ozone concentrations, of this proposed rule, discounted at a 3-percent discount rate, is estimated to be about $250,000 million, with an EAV of about $17,000 million. At a 7-percent discount rate, the PV of the benefits is estimated to be $150,000 million, with an EAV of about $14,000 million. The PV of the compliance costs, discounted at a 3-percent rate, is estimated to be about $22,000 million, with an EAV of about $1,500 million. At a 7-percent discount rate, the PV of the compliance costs is estimated to be about $14,000 million, with an EAV of about $1,300 million.

**II. Public Participation**

*A. Written Comments*

Submit your comments, identified by Docket ID No. EPA–HQ–OAR–2021–0668 at *https://www.regulations.gov* (our preferred method), or the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy,

information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/ commenting-epa-dockets.*

Due to public health concerns related to COVID–19, the EPA Docket Center and Reading Room are open to the public by appointment only. Our Docket Center staff also continues to provide remote customer service via email, phone, and webform. Hand deliveries or couriers will be received by scheduled appointment only. For further information and updates on EPA Docket Center services, please visit us online at *https://www.epa.gov/dockets.*

The EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and our Federal partners so that we can respond rapidly as conditions change regarding COVID–19.

*B. Submitting Confidential Business Information*

Do not submit information containing CBI to the EPA through *https:// www.regulations.gov.* Clearly mark the part or all of the information that you claim to be CBI. For CBI information on any digital storage media that you mail to the EPA, mark the outside of the digital storage media as CBI and then identify electronically within the digital storage media the specific information that is claimed as CBI. In addition to one complete version of the comments that includes information claimed as CBI, you must submit a copy of the comments that does not contain the information claimed as CBI directly to the public docket through the procedures outlined in *Instructions* earlier. If you submit any digital storage media that does not contain CBI, mark the outside of the digital storage media clearly that it does not contain CBI.

Information not marked as CBI will be included in the public docket and the EPA's electronic public docket without prior notice. Information marked as CBI will not be disclosed except in accordance with procedures set forth in 40 Code of Federal Regulations (CFR) part 2. Our preferred method to receive CBI is for it to be transmitted to electronically using email attachments, File Transfer Protocol (FTP), or other online file sharing services (*e.g.,* Dropbox, OneDrive, Google Drive). Electronic submissions must be transmitted directly to the OAQPS CBI Office using the email address, *oaqpscbi@epa.gov,* and should include clear CBI markings as described above. If assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please email *oaqpscbi@epa.gov* to request a file transfer link. If sending CBI information through the postal service, please send it to the following address: OAQPS Document Control Officer (C404–02), OAQPS, U.S. Environmental Protection Agency, Research Triangle Park, North Carolina 27711, Attention Docket ID No. EPA–HQ–OAR–2021–0668. The mailed CBI material should be double wrapped and clearly marked. Any CBI markings should not show through the outer envelope.

*C. Participation in Virtual Public Hearing*

Please note that because of current CDC recommendations, as well as state and local orders for social distancing to limit the spread of COVID–19, the EPA cannot hold in-person public meetings at this time.

The EPA will begin pre-registering speakers for the hearing no later than 1 business day after publication of this document in the **Federal Register**. To

register to speak at the virtual hearing, please use the online registration form available at *https://www.epa.gov/csapr/csapr-2015-ozone-naaqs.* The last day to pre-register to speak at the hearing will be April 21, 2022. The EPA will post a general agenda for the hearing that will list pre-registered speakers in approximate order at: *https://www.epa.gov/csapr/csapr-2015-ozone-naaqs.*

The virtual public hearing will be held on via teleconference on April 21, 2022. The virtual public hearing will convene at 10:00 a.m. Eastern Time (ET) and will conclude at 7:00 p.m. ET. The EPA may close a session 15 minutes after the last pre-registered speaker has testified if there are no additional speakers. For information or questions about the public hearing, please contact Ms. Holly DeJong at *Dejong.holly@epa.gov.* The EPA will announce further details at *https://www.epa.gov/csapr/csapr-2015-ozone-naaqs.*

The EPA will make every effort to follow the schedule as closely as possible on the day of the hearing; however, please plan for the hearings to run either ahead of schedule or behind schedule.

Each commenter will have 5 minutes to provide oral testimony. The EPA encourages commenters to provide the EPA with a copy of their oral testimony electronically (via email) by emailing it to *Dejong.holly@epa.gov.* The EPA also recommends submitting the text of your oral comments as written comments to the rulemaking docket.

The EPA may ask clarifying questions during the oral presentations, but will not respond to the presentations at that time. Written statements and supporting information submitted during the comment period will be considered with the same weight as oral comments and supporting information presented at the public hearing.

Please note that any updates made to any aspect of the hearing will be posted online at *https://www.epa.gov/csapr/csapr-2015-ozone-naaqs.* While the EPA expects the hearing to go forward as set forth above, please monitor our website or contact Ms. Holly DeJong at *Dejong.holly@epa.gov* to determine if there are any updates. The EPA does not intend to publish a document in the **Federal Register** announcing updates.

If you require the services of a translator or special accommodations such as audio description, please pre-register for the hearing and describe your needs by April 18, 2022. EPA may not be able to arrange accommodations without advanced notice.

## III. General Information

### A. Does this action apply to me?

This proposed rule affects EGU and non-EGU sources, and regulates the groups identified in Table III.A–1.

TABLE III.A–1—REGULATED GROUPS

| Industry group | NAICS |
|---|---|
| Fossil fuel-fired electric power generation | 221112 |
| Pipeline Transportation of Natural Gas | 4862 |
| Cement and Concrete Product Manufacturing | 3273 |
| Iron and Steel Mills and Ferroalloy Manufacturing | 3311 |
| Glass and Glass Product Manufacturing | 3272 |
| Basic Chemical Manufacturing | 3251 |
| Petroleum and Coal Products Manufacturing | 3241 |
| Pulp, Paper, and Paperboard Mills | 3221 |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be regulated by this proposed rule. This table lists the types of entities that the EPA is now aware could potentially be regulated by this proposed rule. Other types of entities not listed in the table could also be regulated. For example, the EPA is requesting comment in Section VI.B.3 of this proposed rule on potential control strategies for sources outside of the categories listed in the Table III.A.1, such as municipal waste combustors (MWCs). To determine whether your EGU entity is proposed to be regulated by this proposed rule, you should carefully examine the applicability criteria found in 40 CFR 97.1004, which the EPA is not proposing to alter in this proposed rule. If you have questions regarding the applicability of this proposed rule to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

### B. What action is the Agency taking?

The EPA evaluated whether interstate ozone transport emissions from upwind states are significantly contributing to nonattainment, or interfering with maintenance, of the 2015 ozone NAAQS in any downwind state using the same 4-step interstate transport framework that was developed in previous ozone transport rulemakings. The EPA is proposing to find that emissions reductions are required from EGU and non-EGU sources in a total of 26 upwind states to eliminate significant contribution to downwind air quality problems for the 2015 ozone standard under the interstate transport provision

of the CAA. The EPA will ensure that these $NO_X$ emissions reductions are achieved by issuing proposed FIP requirements for 26 states: Alabama, Arkansas, California, Delaware, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming.

The EPA is proposing to revise the existing CSAPR Group 3 Trading Program to include additional states beginning in the 2023 ozone season. EGUs in five states not currently covered by any CSAPR trading program for seasonal $NO_X$ emissions—Delaware, Minnesota, Nevada, Utah, and Wyoming—would be added to the CSAPR Group 3 Trading Program under this proposed rule. EGUs in twelve states currently participating in the Group 3 Trading Program would remain in the program under this proposed rule: Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia. EGUs in eight states (Alabama, Arkansas, Mississippi, Missouri, Tennessee, Texas, and Wisconsin) will transition from the CSAPR Group 2 Trading Program to the CSAPR Group 3 Trading Program under this proposed rule beginning in the 2023 ozone season. The EPA proposes to establish control stringency levels reflecting installation of state-of-the-art combustion controls on certain covered EGU sources in emissions budgets beginning in the 2024 ozone season. The EPA proposes to establish control stringency levels reflecting installation of new SCR or SNCR controls on certain covered EGU sources in emissions budgets beginning in the 2026 ozone season.

As a complement to the ozone season emissions budgets, the EPA is also proposing to establish backstop daily emissions rates of 0.14 lb/mmBtu for coal-fired steam units greater than or equal to 100 MW in covered states. The backstop emissions rates will first apply in 2024 for coal-fired steam sources with existing SCRs, and in 2027 for those currently without SCRs.

In this proposed rule, the EPA is proposing to require emissions limitations for non-EGU sources in 23 states: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, Wisconsin, and

Wyoming. In these states, EPA is proposing to require emissions limitations for the following unit types in non-EGU industries: Furnaces in Glass and Glass Product Manufacturing; boilers and furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; kilns in Cement and Cement Product Manufacturing; reciprocating internal combustion engines in Pipeline Transportation of Natural Gas; and high-emitting equipment and large boilers in Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mill. See Table III.A–1 for a list of NAICS codes for each entity included for regulation under this proposed rule.

The proposed rule would reduce the transport of ozone precursor emissions to downwind areas, which is protective of human health and the environment because acute and chronic exposure to ozone are both associated with negative health impacts. Ozone exposure is also associated with negative effects on ecosystems. Additional information on the human health and environmental benefits from the air quality issues addressed by this proposed rule are included in Section IV of this proposed rule.

*C. What is the Agency's legal authority for taking this action?*

1. Statutory Authority

The statutory authority for this proposed rule is provided by the CAA as amended (42 U.S.C. 7401 *et seq.*). Specifically, sections 110 and 301 of the CAA provide the primary statutory underpinnings for this proposed rule. The most relevant portions of CAA section 110 are subsections 110(a)(1), 110(a)(2) (including 110(a)(2)(D)(i)(I)), 110(c)(1), and 110(k)(6)).

CAA section 110(a)(1) provides that states must make SIP submissions "within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof)," and that these SIP submissions are to provide for the "implementation, maintenance, and enforcement" of such NAAQS.[18] The statute directly imposes on states the duty to make these SIP submissions, and the requirement to make the submissions is not conditioned upon the EPA taking any action other than promulgating a new or revised NAAQS.[19]

The EPA has historically referred to SIP submissions made for the purpose of satisfying the applicable requirements of CAA sections 110(a)(1) and 110(a)(2) as "infrastructure SIP" or "iSIP" submissions. CAA section 110(a)(1) addresses the timing and general requirements for iSIP submissions, and CAA section 110(a)(2) provides more details concerning the required content of these submissions.[20] It includes a list of specific elements that "[e]ach such plan" must address.[21]

CAA section 110(c)(1) requires the Administrator to promulgate a FIP at any time within two years after the Administrator: (1) Finds that a state has failed to make a required SIP submission; (2) finds a SIP submission to be incomplete pursuant to CAA section 110(k)(1)(C); or (3) disapproves a SIP submission. This obligation applies unless the state corrects the deficiency through a SIP revision that the Administrator approves before the FIP is promulgated.[22]

CAA section 110(a)(2)(D)(i)(I), also known as the "good neighbor" provision, provides the primary basis for this proposed rule.[23] It requires that each state SIP include provisions sufficient to "prohibit[ ], consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]." [24] The EPA often refers to the emissions reduction requirements under this provision as "good neighbor obligations" and submissions addressing these requirements as "good neighbor SIPs."

Once EPA promulgates a NAAQS, the EPA must designate areas as being in "attainment" or "nonattainment" of the NAAQS, or "unclassifiable." CAA section 107(d).[25] For ozone, nonattainment is further split into five classifications based on the severity of the violation—Marginal, Moderate, Serious, Severe, or Extreme. Higher classifications provide states with progressively more time to attain while

imposing progressively more stringent control requirements. *See* CAA sections 181, 182.[26] In general, states with nonattainment areas classified as Moderate or higher must submit plans to EPA to bring these areas into attainment according to the statutory schedule. CAA section 182.[27] If an area fails to attain the NAAQS by the attainment date associated with its classification, it is "bumped up" to the next classification. CAA section 181(b).[28]

Section 301(a)(1) of the CAA gives the Administrator the general authority to prescribe such regulations as are necessary to carry out functions under the Act.[29] Pursuant to this section, EPA has authority to clarify the applicability of CAA requirements and undertake other rulemaking action as necessary to implement CAA requirements. CAA section 301 affords the Agency any additional authority that may be needed in order to make certain other changes to its regulations under 40 CFR parts 52, 75, 78, and 97, in order to effectuate the purposes of the Act. Such changes are discussed in Section X of this proposed rule.

Section 110(k)(6) of the CAA gives the Administrator authority, without any further submission from a state, to revise certain prior actions, including actions to approve SIPs, upon determining that those actions were in error.[30] The EPA proposes to make an error correction under CAA section 110(k)(6) with respect to its prior approval of the 2015 ozone transport SIP submission from the State of Delaware. This is further discussed in Section IV.C.1 of the proposed rule.

Tribes are not required to submit state implementation plans. However, as explained in EPA's regulations outlining Tribal Clean Air Act authority, the EPA is authorized to promulgate FIPs for Indian country as necessary or appropriate to protect air quality if a tribe does not submit, and obtain EPA approval of, an implementation plan. *See* 40 CFR 49.11(a); *see also* CAA section 301(d)(4).[31] In this proposed rule, the EPA proposes an "appropriate or necessary" finding under CAA section 301(d) and proposes tribal FIP(s) as necessary to implement the relevant requirements. This is further discussed in Section IV.C.2 of the proposed rule.

---

[18] 42 U.S.C. 7410(a)(1).
[19] *See* EPA v. *EME Homer City Generation, L.P.,* 572 U.S. 489, 509–10 (2014).

[20] 42 U.S.C. 7410(a)(2).
[21] EPA's general approach to infrastructure SIP submissions is explained in greater detail in individual notices acting or proposing to act on state infrastructure SIP submissions and in guidance. *See, e.g.,* Memorandum from Stephen D. Page on Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2) (September 13, 2013).
[22] 42 U.S.C. 7410(c)(1).
[23] 42 U.S.C. 7410(a)(2)(D)(i)(I).
[24] *Id.*
[25] 42 U.S.C. 7407(d).

[26] 42 U.S.C. 7511, 7511a.
[27] 42 U.S.C. 7511a.
[28] 42 U.S.C. 7511(b).
[29] 42 U.S.C. 7601(a)(1).
[30] 42 U.S.C. 7410(k)(6).
[31] 42 U.S.C. 7601(d)(4).

*D. What actions has EPA previously issued to address regional ozone transport?*

The EPA has issued several major rules interpreting and clarifying the requirements of CAA section 110(a)(2)(D)(i)(I) with respect to the regional transport of ozone. These rules, and the associated court decisions addressing these rules, summarized here, provide important direction regarding the requirements of CAA section 110(a)(2)(D)(i)(I).

The "NO$_X$ SIP Call," promulgated in 1998, addressed the good neighbor provision for the 1979 1-hour ozone NAAQS.[32] The rule required 22 states and the District of Columbia to amend their SIPs to reduce NO$_X$ emissions that contribute to ozone nonattainment in downwind states. The EPA set ozone season NO$_X$ budgets for each state, and the states were given the option to participate in a regional allowance trading program, known as the NO$_X$ Budget Trading Program.[33] The D.C. Circuit largely upheld the NO$_X$ SIP Call in *Michigan* v. *EPA,* 213 F.3d 663 (D.C. Cir. 2000), *cert. denied,* 532 U.S. 904 (2001).

EPA's next rule addressing the good neighbor provision, the Clean Air Interstate Rule (CAIR), was promulgated in 2005 and addressed both the 1997 fine particulate matter (PM$_{2.5}$) NAAQS and 1997 ozone NAAQS.[34] CAIR required SIP revisions in 28 states and the District of Columbia to reduce emissions of sulfur dioxide (SO$_2$) or NO$_X$—important precursors of regionally transported PM$_{2.5}$ (SO$_2$ and annual NO$_X$) and ozone (summer-time NO$_X$). As in the NO$_X$ SIP Call, states were given the option to participate in regional trading programs to achieve the reductions. When the EPA promulgated the final CAIR in 2005, the EPA also issued findings that states nationwide had failed to submit SIPs to address the requirements of CAA section 110(a)(2)(D)(i) with respect to the 1997

PM$_{2.5}$ and 1997 ozone NAAQS.[35] On March 15, 2006, the EPA promulgated FIPs to implement the emissions reductions required by CAIR.[36] CAIR was remanded to EPA by the D.C. Circuit in *North Carolina* v. *EPA,* 531 F.3d 896 (D.C. Cir. 2008), *modified on reh'g,* 550 F.3d 1176. For more information on the legal issues underlying CAIR and the D.C. Circuit's holding in *North Carolina,* refer to the preamble of the CSAPR rule.[37]

In 2011, the EPA promulgated CSAPR to address the issues raised by the remand of CAIR. CSAPR addressed the two NAAQS at issue in CAIR and additionally addressed the good neighbor provision for the 2006 PM$_{2.5}$ NAAQS.[38] CSAPR required 28 states to reduce SO$_2$ emissions, annual NO$_X$ emissions, or ozone season NO$_X$ emissions that significantly contribute to other states' nonattainment or interfere with other states' abilities to maintain these air quality standards.[39] To align implementation with the applicable attainment deadlines, the EPA promulgated FIPs for each of the 28 states covered by CSAPR. The FIPs require EGUs in the covered states to participate in regional trading programs to achieve the necessary emissions reductions. Each state can submit a good neighbor SIP at any time that, if approved by EPA, would replace the CSAPR FIP for that state.

CSAPR was the subject of an adverse decision by the D.C. Circuit in August 2012.[40] However, this decision was reversed in April 2014 by the Supreme Court, which largely upheld the rule, including EPA's approach to addressing interstate transport in CSAPR. *EPA v. EME Homer City Generation, L.P.,* 572 U.S. 489 (2014) (*EME Homer City I*). The rule was remanded to the D.C. Circuit to consider claims not addressed by the Supreme Court. *Id.* In July 2015 the D.C. Circuit generally affirmed EPA's

interpretation of various statutory provisions and EPA's technical decisions. *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118 (2015) (*EME Homer City II*). However, the court remanded the rule without vacatur for reconsideration of EPA's emissions budgets for certain states, which the court found may have over-controlled those states' emissions with respect to the downwind air quality problems to which the states were linked. *Id.* at 129–30, 138. For more information on the legal issues associated with CSAPR and the Supreme Court's and D.C. Circuit's decisions in the *EME Homer City* litigation, refer to the preamble of the CSAPR Update.[41]

In 2016, the EPA promulgated the CSAPR Update to address interstate transport of ozone pollution with respect to the 2008 ozone NAAQS.[42] The final rule updated the CSAPR ozone season NO$_X$ emissions budgets for 22 states to achieve cost-effective and immediately feasible NO$_X$ emissions reductions from EGUs within those states.[43] The EPA aligned the analysis and implementation of the CSAPR Update with the 2017 ozone season in order to assist downwind states with timely attainment of the 2008 ozone NAAQS.[44] The CSAPR Update implemented the budgets through FIPs requiring sources to participate in a revised CSAPR NO$_X$ ozone season trading program beginning with the 2017 ozone season. As under CSAPR, each state could submit a good neighbor SIP at any time that, if approved by the EPA, would replace the CSAPR Update FIP for that state. The final CSAPR Update also addressed the remand by the D.C. Circuit of certain states' CSAPR phase 2 ozone season NO$_X$ emissions budgets in *EME Homer City II.*

In December 2018, the EPA promulgated the CSAPR "Close-Out," which determined that no further enforceable reductions in emissions of NO$_X$ were required with respect to the

---

[32] *Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone,* 63 FR 57356 (Oct. 27, 1998). As originally promulgated, the NO$_X$ SIP Call also addressed good neighbor obligations under the 1997 8-hour ozone NAAQS, but EPA subsequently stayed and later rescinded the rule's provisions with respect to that standard. *See* 84 FR 8422 (March 8, 2019).

[33] "Allowance Trading," sometimes referred to as "cap and trade," is an approach to reducing pollution that has been used successfully to protect human health and the environment. The design elements of EPA's most recent trading programs are discussed in Section VII.B.1.a of this proposed rule.

[34] *Rule To Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air Interstate Rule); Revisions to Acid Rain Program; Revisions to the* NO$_X$ *SIP Call,* 70 FR 25162 (May 12, 2005).

[35] 70 FR 21147 (April 25, 2005).

[36] 71 FR 25328 (April 28, 2006).

[37] *Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals,* 76 FR 48208, 48217 (August 8, 2011).

[38] 76 FR 48208.

[39] CSAPR was revised by several rulemakings after its initial promulgation in order to revise certain states' budgets and to promulgate FIPs for five additional states addressing the good neighbor obligation for the 1997 ozone NAAQS. *See* 76 FR 80760 (December 27, 2011); 77 FR 10324 (February 21, 2012); 77 FR 34830 (June 12, 2012).

[40] On August 21, 2012, the D.C. Circuit issued a decision in *EME Homer City Generation, L.P.* v. *EPA,* 696 F.3d 7 (D.C. Cir. 2012), vacating CSAPR. The EPA sought review with the D.C. Circuit *en banc* and the D.C. Circuit declined to consider EPA's appeal *en banc. EME Homer City Generation, L.P.* v. *EPA,* No. 11–1302 (D.C. Cir. January 24, 2013), ECF No. 1417012 (denying EPA's motion for rehearing en banc).

[41] *Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS,* 81 FR 74504, 74511 (October 26, 2016).

[42] 81 FR 74504.

[43] One state, Kansas, was made newly subject to ozone season NO$_X$ requirements by the CSAPR Update. All other CSAPR Update states were already subject to ozone season NO$_X$ requirements under CSAPR.

[44] 81 FR 74516. EPA's final 2008 Ozone NAAQS SIP Requirements Rule, 80 FR 12264, 12268 (March 6, 2015), revised the attainment deadline for ozone nonattainment areas designated as Moderate to July 20, 2018. *See* 40 CFR 51.1103. In order to demonstrate attainment by this deadline, states were required to rely on design values calculated using ozone season data from 2015 through 2017, since the July 20, 2018, deadline did not afford enough time for measured data of the full 2018 ozone season.

---

2008 ozone NAAQS for 20 of the 22 eastern states covered by the CSAPR Update, and reflected that determination in revisions to the existing state-specific sections of the CSAPR Update regulations for those states.[45]

The CSAPR Update and the CSAPR Close-Out were both subject to legal challenges in the D.C. Circuit. *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019) (*Wisconsin*); *New York* v. *EPA,* 781 Fed. App'x 4 (D.C. Cir. 2019) (*New York*). In September 2019, the D.C. Circuit upheld the CSAPR Update in virtually all respects but remanded the rule because it was partial in nature and did not fully eliminate upwind states' significant contribution to nonattainment or interference with maintenance of the 2008 ozone NAAQS by ''the relevant downwind attainment deadlines'' in the CAA. *Wisconsin,* 938 F.3d at 313–15. In October 2019, the D.C. Circuit vacated the CSAPR Close-Out on the same grounds that it remanded the CSAPR Update in *Wisconsin,* specifically that the Close-Out rule did not address good neighbor obligations by ''the next applicable attainment date'' of downwind states. *New York,* 781 Fed. App'x at 7.[46]

In response to the *Wisconsin* remand of the CSAPR Update and the *New York* vacatur of the CSAPR Close-Out, the EPA promulgated the Revised CSAPR Update on April 30, 2021.[47] The Revised CSAPR Update found that the CSAPR Update was a full remedy for nine of the covered states. For the 12 remaining states, the EPA found that their projected 2021 ozone season NOₓ emissions significantly contribute to downwind states' nonattainment or maintenance problems. The EPA issued new or amended FIPs for these 12 states and required implementation of revised emissions budgets for EGUs beginning with the 2021 ozone season. Based on EPA's assessment of remaining air quality issues and additional emissions control strategies for EGUs and emissions sources in other industry sectors (non-EGUs), the EPA determined that the $NO_X$ emissions reductions achieved by the Revised CSAPR Update fully eliminated these states' significant contributions to downwind air quality problems for the 2008 ozone NAAQS. As under the CSAPR and the CSAPR Update, each state can submit a good neighbor SIP at any time that, if approved by EPA, would replace the Revised CSAPR Update FIP for that state.[48]

## IV. Air Quality Issues Addressed and Overall Approach for the Proposed Rule

### A. The Interstate Ozone Transport Air Quality Challenge

#### 1. Nature of Ozone and the Ozone NAAQS

Ground-level ozone is not emitted directly into the air but is created by chemical reactions between $NO_X$ and volatile organic compounds (VOCs) in the presence of sunlight. Emissions from electric utilities and industrial facilities, motor vehicles, gasoline vapors, and chemical solvents are some of the major sources of $NO_X$ and VOCs.

Because ground-level ozone formation increases with temperature and sunlight, ozone levels are generally higher during the summer months. Increased temperature also increases emissions of volatile man-made and biogenic organics and can also indirectly increase $NO_X$ emissions (*e.g.,* increased electricity generation for air conditioning).

On October 1, 2015, the EPA strengthened the primary and secondary ozone standards to 70 ppb as an 8-hour level.[49] Specifically, the standards require that the 3-year average of the fourth highest 24-hour maximum 8-hour average ozone concentration may not exceed 70 ppb as a truncated value (*i.e.,* digits to right of decimal removed).[50] In general, areas that exceed the ozone standard are designated as nonattainment areas, pursuant to the designations process under CAA section 107, and are subject to heightened planning requirements depending on the degree of severity of their nonattainment classification, *see* CAA sections 181, 182.

In the process of setting the 2015 ozone NAAQS, the EPA noted that the conditions conducive to the formation of ozone (*i.e.,* seasonally-dependent factors such as ambient temperature, strength of solar insolation, and length of day) differ by location, and that the Agency believes it is important that ozone monitors operate during all periods when there is a reasonable possibility of ambient levels approaching the level of the NAAQS. At time, the EPA stated that ambient ozone concentrations in many areas could approach or exceed the level of the NAAQS, more frequently and during more months of the year compared with the historical ozone season monitoring lengths. Consequently, the EPA extended the ozone monitoring season for many locations. *See* 80 FR 65416 for more details.

Furthermore, the EPA stated that in addition to being affected by changing emissions, future ozone concentrations may also be affected by climate change. Modeling studies in the EPA's Interim Assessment (U.S. EPA, 2009a) that are cited in support of the 2009 Endangerment Finding under CAA section 202(a) (74 FR 66496, Dec. 15, 2009) as well as a recent assessment of potential climate change impacts (Fann et al., 2015) project that climate change may lead to future increases in summer ozone concentrations across the contiguous U.S.[51] (80 FR 65300). The increase in ozone results from changes in local weather conditions, including temperature and atmospheric circulation patterns, as well as changes in ozone precursor emissions that are influenced by meteorology (Nolte et al., 2018). While the projected impact may not be uniform, climate change has the potential to increase average summertime ozone relative to a future without climate change.[52][53][54] Climate

[45] *Determination Regarding Good Neighbor Obligations for the 2008 Ozone National Ambient Air Quality Standard,* 83 FR 65878, 65882 (Dec. 21, 2018). After promulgating the CSAPR Update and before promulgating the CSAPR Close-Out, the EPA approved a SIP from Kentucky resolving the Commonwealth's good neighbor obligations for the 2008 ozone NAAQS. 83 FR 33730 (July 17, 2018). In the Revised CSAPR Update, the EPA made an error correction under CAA section 110(k)(6) to convert this approval to a disapproval, because the Kentucky approval relied on the same analysis which the D.C. Circuit determined to be unlawful in the CSAPR Close-Out.

[46] Subsequently, the D.C. Circuit made clear in a decision reviewing EPA's denial of a petition under CAA section 126 that the holding in *Wisconsin* regarding alignment with downwind area's attainment schedules applies with equal force to the Marginal area attainment date established under CAA section 181(a). *See Maryland* v. *EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020).

[47] *Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS,* 86 FR 23054 (April 30, 2021).

[48] The Revised CSAPR Update is currently subject to a petition for judicial review pending in the D.C. Circuit Court of Appeals, *Midwest Ozone Group* v. *EPA,* No. 21–1146 (D.C. Cir. June 25, 2021).

[49] 80 FR 65291.

[50] 40 CFR part 50, Appendix P to part 50

[51] These modeling studies are based on coupled global climate and regional air quality models and are designed to assess the sensitivity of U.S. air quality to climate change. A wide range of future climate scenarios and future years have been modeled and there can be variations in the expected response in U.S. $O^3$ by scenario and across models and years, within the overall signal of higher summer $O^3$ concentrations in a warmer climate.

[52] Fann NL, Nolte CG, Sarofim MC, Martinich J, Nassikas NJ. Associations Between Simulated Future Changes in Climate, Air Quality, and Human Health. JAMA Netw Open. 2021;4(1):e2032064. doi: 10.1001/jamanetworkopen.2020.32064.

[53] Christopher G Nolte, Tanya L Spero, Jared H Bowden, Marcus C Sarofim, Jeremy Martinich, Megan S Mallard. Regional temperature-ozone relationships across the U.S. under multiple climate and emissions scenarios. J Air Waste Manag Assoc. 2021 Oct;71(10):1251–1264. doi: 10.1080/10962247.2021.1970048.

change has the potential to offset some of the improvements in ozone air quality, and therefore some of the improvements in public health, that are expected from reductions in emissions of ozone precursors (80 FR 65300).

2. Ozone Transport

Studies have established that ozone formation, atmospheric residence, and transport occur on a regional scale (*i.e.,* thousands of kilometers) over much of the U.S.[55] While substantial progress has been made in reducing ozone in many areas, the interstate transport of ozone precursor emissions remains an important contributor to peak ozone concentrations and high-ozone days during the summer ozone season.

The EPA has previously concluded in the NO$_X$ SIP Call, CAIR, CSAPR, the CSAPR Update, and the Revised CSAPR Update that a regional NO$_X$ control strategy would be effective in reducing regional-scale transport of ozone precursor emissions. NO$_X$ emissions can be transported downwind as NO$_X$ or as ozone after transformation in the atmosphere. In any given location, ozone pollution levels are impacted by a combination of background ozone concentration, local emissions, and emissions from upwind sources resulting from ozone transport. Downwind states' ability to meet health-based air quality standards such as the NAAQS is challenged by the transport of ozone pollution across state borders. For example, ozone assessments conducted for the October 2015 Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone continue to show the importance of NO$_X$ emissions for ozone transport. This analysis is included in the docket for this proposal.

Further, studies have found that EGU NO$_X$ emissions reductions can be effective in reducing individual 8-hour peak ozone concentrations and in reducing 8-hour peak ozone concentrations averaged across the ozone season. For example, a study that evaluates the effectiveness on ozone concentrations of EGU NO$_X$ reductions

achieved under the NO$_X$ Budget Trading Program (*i.e.,* the NO$_X$ SIP Call) shows that regulating NO$_X$ emissions in that program was highly effective in reducing ozone concentrations during the ozone season.[56]

Previous regional ozone transport efforts, including the NO$_X$ SIP Call, CAIR, CSAPR, the CSAPR Update, and the Revised CSAPR Update, required ozone season NO$_X$ reductions from EGU sources to address interstate transport of ozone. Together with NO$_X$, EPA has also identified VOCs as a precursor in forming ground-level ozone. Ozone formation chemistry can be "NO$_X$-limited," where ozone production is primarily determined by the amount of NO$_X$ emissions or "VOC-limited," where ozone production is primarily determined by the amount of VOC emissions.[57] The EPA and others have long regarded NO$_X$ to be the more significant ozone precursor in the context of interstate ozone transport.[58]

The EPA has determined that the regulation of VOCs as an ozone precursor is not necessary to eliminate significant contribution of ozone transport to downwind areas in this proposed rule. As described in Section VI.A of this proposed rule, the EPA examined the results of the contribution modeling performed for this rule to identify the portion of the ozone contribution attributable to anthropogenic NO$_X$ emissions versus VOC emissions from each linked upwind state to each downwind receptor. Our analysis of the ozone contribution from upwind states subject to regulation under this proposed rule demonstrates that the vast majority of the downwind air quality areas are NO$_X$-limited, rather than VOC-limited. Therefore, the proposed rule's strategy for reducing regional-scale transport of ozone targets NO$_X$ emissions from stationary sources to achieve the most effective reductions of ozone transport over the geography of the affected downwind areas.

Commenters on prior ozone transport rules have asserted that VOC emissions harm underserved and overburdened communities experiencing disproportionate environmental health burdens and facing other environmental injustices. The EPA acknowledges that VOCs can contain toxic chemicals that are detrimental to public health. The

EPA conducted a demographic analysis as part of the regulatory impact analysis for the 2015 revisions to the primary and secondary ozone NAAQS. This analysis, which is included in the docket for this proposed rulemaking, found greater representation of minority populations in areas with poor air quality relative to the revised ozone standard than in the U.S. as a whole. The EPA concluded that populations in these areas would be expected to benefit from implementation of future air pollution control actions from state and local air agencies in implementing the strengthened standard. This proposed rule is an example of air pollution control actions implemented by the federal government in support of the more stringent 2015 ozone NAAQS, and populations living in downwind ozone nonattainment areas are expected to benefit from improved air quality that will result from reducing ozone transport. Further discussion of the environmental justice impacts of this proposed rule is located in Section VIII of this proposed rule and in the accompanying regulatory impact analysis, titled "Regulatory Impact Analysis for the Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard'' [EPA–452/D–22–001], which is available in the docket for this rulemaking.

The Agency regulates exposure to toxic pollutant concentrations and ambient exposure to criteria pollutants other than ozone through other sections of the Act, such as the regulation of hazardous air pollutants under CAA section 112 or the process for revising and implementing the NAAQS under CAA sections 107–110. The purpose of the proposed rulemaking is to protect public health and the environment by eliminating significant contribution from 26 states to nonattainment or maintenance of the 2015 ozone NAAQS in order to meet the requirements of the CAA's interstate transport provision. In this proposed rule, the EPA continues to observe that requiring NO$_X$ emissions reductions from stationary sources is an effective strategy for reducing regional ozone transport in the U.S.

In Section VI of this proposed rule, EPA describes the multi-factor test that is used to determine NO$_X$ emissions reductions that are cost-effective and reduce interstate transport of ground-level ozone. Our analysis indicates that the EGU and non-EGU control requirements proposed in this rule will provide meaningful improvements in air quality at the downwind receptors. Based on the implementation schedule

[54] Nolte, C.G., P.D. Dolwick, N. Fann, L.W. Horowitz, V. Naik, R.W. Pinder, T.L. Spero, D.A. Winner, and L.H. Ziska, 2018: Air Quality. In Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 512–538. doi: 10.7930/NCA4.2018.CH13.

[55] Bergin, M.S. et al. (2007) Regional air quality: Local and interstate impacts of NO$_X$ and SO$_2$ emissions on ozone and fine particulate matter in the eastern United States. Environmental Sci & Tech. 41: 4677–4689.

[56] Butler, et al., "Response of Ozone and Nitrate to Stationary Source Reductions in the Eastern USA". *Atmospheric Environment*, 2011.

[57] "Ozone Air Pollution." *Introduction to Atmospheric Chemistry*, by DANIEL J. JACOB, Princeton University Press, PRINCETON, NEW JERSEY, 1999, pp. 231–244.

[58] 81 FR 74514.

established in Section VII.A of this proposed rule, the EPA proposes to determine that the regulatory requirements included in the proposed rule are as expeditious as practicable and are aligned with the attainment schedule of downwind areas.

3. Health and Environmental Effects

Exposure to ambient ozone causes a variety of negative effects on human health, vegetation, and ecosystems. In humans, acute and chronic exposure to ozone is associated with premature mortality and a number of morbidity effects, such as asthma exacerbation. In ecosystems, ozone exposure causes visible foliar injury, decreases plant growth, and affects ecosystem community composition. *See* EPA's October 2015 Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone [59] in the docket for this proposal for more information on the human health and ecosystem effects associated with ambient ozone exposure.

*B. Proposed Rule Approach*

1. The 4-Step Interstate Transport Framework

The EPA first developed a multi-step process to address the requirements of the good neighbor provision in the NO$_X$ SIP Call and CAIR. The Agency built upon this framework and further refined the methodology for addressing interstate transport obligations in subsequent rules such as CSAPR, the CSAPR Update, and the Revised CSAPR Update.[60] In CSAPR, the EPA first articulated a "4-step framework" within which to assess interstate transport obligations for ozone. In this proposed action to address interstate transport obligations for the 2015 ozone NAAQS, the EPA is again utilizing the 4-step interstate transport framework. These steps are: (1) Identifying downwind receptors that are expected to have problems attaining the NAAQS (nonattainment receptors) or maintaining the NAAQS (maintenance receptors); (2) determining which upwind states are "linked" to these identified downwind receptors based on a numerical contribution threshold; (3) for states linked to downwind air quality problems, identifying upwind emissions on a statewide basis that significantly contribute to downwind nonattainment or interfere with

downwind maintenance of the NAAQS, considering cost- and cost-quality-based factors; and (4) for upwind states that are found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in any downwind state, implementing the necessary emissions reductions through enforceable measures.

a. Step 1 Approach

The EPA proposes to continue to apply the method of the CSAPR Update and the Revised CSAPR Update for identifying nonattainment and maintenance receptors. In the Revised CSAPR Update, the EPA assessed downwind air quality problems using modeled future air quality concentrations for an analytic year aligned with the relevant attainment deadline for the NAAQS under consideration in that rulemaking.[61] Similarly, in CSAPR, downwind air quality problems were assessed using modeled future air quality concentrations for a year aligned with attainment deadlines for the NAAQS considered in that rulemaking. The base case scenario provides an assessment of future air quality conditions that generally accounts for enforceable "on-the-books" emissions reductions and provides the most up-to-date forecast of what future emissions would resemble, in the absence of the transport policy in the proposed rule under evaluation. Downwind air quality problems are identified as the locations of monitoring sites that are projected to be unable to attain the NAAQS ("nonattainment receptors") or as the locations of monitoring sites that are projected to be unable to maintain the NAAQS ("maintenance receptors"). In the CSAPR Update and the Revised CSAPR Update, unlike CSAPR,[62] the EPA also considered currently available monitored air quality data to further inform the identification of projected downwind air quality problems. These same considerations are included for this proposal. Further details regarding the application of Step 1 of the 4-step interstate transport framework in this

proposal are described in Section V.D of this proposed rule.

b. Step 2 Approach

The EPA proposes to apply the same approach for identifying which states are contributing to downwind nonattainment and maintenance receptors as it has applied in the three prior CSAPR rulemakings. CSAPR, the CSAPR Update, and the Revised CSAPR Update used a screening threshold of 1 percent of the NAAQS to identify upwind states that were "linked" to downwind air pollution problems. States with contributions greater than or equal to the threshold for at least one downwind nonattainment or maintenance receptor identified in Step 1 were identified as needing further evaluation of their good neighbor obligations to downwind states.[63] The EPA evaluated each state's contribution based on the average relative downwind impact calculated over multiple days.[64] States whose air quality impacts to all downwind receptors were below this threshold did not require further evaluation for actions to address transport. In other words, the EPA determined that these states did not contribute to downwind air quality problems and therefore had no emissions reduction obligations under the good neighbor provision. The EPA applies a contribution screening threshold because many downwind ozone nonattainment areas receive transport contributions from a number of upwind states. While the proportion of contribution from a single upwind state may be relatively small, the effect of collective contribution resulting from multiple upwind states may substantially contribute to nonattainment of or interference with maintenance of the NAAQS in downwind areas. The preambles to the

---

[59] Available at *https://www.epa.gov/sites/default/files/2016-02/documents/20151001ria.pdf*.

[60] *See* CSAPR, Final Rule, 76 FR 48208, 48248–48249 (August 8, 2011); CSAPR Update, Final Rule, 81 FR 74504, 74517–74521 (October 26, 2016).

[61] Specifically, the EPA analyzed 2021 to align with the attainment date for areas classified as Severe nonattainment for the 2008 ozone NAAQS, and because the last full ozone season before that date, in 2020, was already in the past.

[62] In CSAPR, the EPA did not use current monitored air quality conditions, because that data was influenced by the invalidated CAIR rule, which the EPA was replacing with CSAPR. *See* 81 FR 74506, 74531. As the EPA is not replacing an existing transport program in this proposed rule, the Agency proposes to once again consider current monitored data as part of the process for identifying projected receptors for this rulemaking.

[63] For ozone, the impacts include those from VOC and NO$_X$ from all sectors.

[64] The number of days used in calculating the average contribution metric has historically been determined in a manner that is generally consistent with EPA's recommendations for projecting future year ozone design values. Our ozone attainment demonstration modeling guidance at the time of CSAPR recommended using all model-predicted days above the NAAQS to calculate future year design values (*https://www3.epa.gov/ttn/scram/guidance/guide/final-03-pm-rh-guidance.pdf*). In 2014, the EPA issued draft revised guidance that changed the recommended number of days to the top-10 model predicted days (*https://www3.epa.gov/ttn/scram/guidance/guide/Draft-O3-PM-RH-Modeling_Guidance-2014.pdf*). For the CSAPR Update, the EPA transitioned to calculating design values based on this draft revised approach. The revised modeling guidance was finalized in 2019 and, in this regard, EPA is calculating both the ozone design values and the contributions based on a top-10 day approach (*https://www3.epa.gov/ttn/scram/guidance/guide/O3-PM-RH-Modeling_Guidance-2018.pdf*).

proposed and final CSAPR rules discuss the use of the 1 percent threshold for CSAPR. *See* 75 FR 45237 (August 2, 2010); 76 FR 48238 (August 8, 2011). The same metric is discussed in the CSAPR Update, *see* 81 FR 74538, and in the Revised CSAPR Update, *see* 86 FR 23054. In this proposed rule, the EPA updated the air quality modeling data used for determining contributions at Step 2 of the four-step interstate transport framework. The EPA otherwise continues to find that this threshold is appropriate to continue to apply for the 2015 ozone NAAQS. This proposal's application of the Step 2 approach is comprehensively described in Section V of this proposed rule.

c. Step 3 Approach

The EPA proposes to continue to apply the same approach as the prior three CSAPR rulemakings for evaluating "significant contribution" at Step 3.[65] For states that are linked in Step 3 to downwind air quality problems, CSAPR, the CSAPR Update, and the Revised CSAPR Update evaluated NO$_X$ reduction potential, cost, and downwind air quality improvements available at various mitigation technology breakpoints (represented by cost thresholds) in the multi-factor test. In CSAPR, the CSAPR Update, and the Revised CSAPR Update, the EPA selected the technology breakpoint (represented by a cost threshold) that, in general, maximized cost-effectiveness— *i.e.*, that achieved a reasonable balance of incremental NO$_X$ reduction potential and corresponding downwind ozone air quality improvements, relative to the other emissions budget levels evaluated. *See, e.g.*, 81 FR 74550. The EPA determined the level of emissions reductions associated with that level of control stringency to constitute significant contribution to nonattainment or interfere with maintenance of a NAAQS downwind. *See, e.g.*, 86 FR 23116. This approach

was upheld by the U.S. Supreme Court in *EPA* v. *EME Homer City*.[66]

The EPA proposes in this action to apply this approach to identify EGU and non-EGU NO$_X$ control stringencies necessary to address significant contribution for the 2015 ozone NAAQS. The EPA applies a multifactor assessment using cost-thresholds, total emissions reduction potential, and downwind air quality effects as key factors in determining a reasonable balance of NO$_X$ controls in light of the downwind air quality problems. EPA's evaluation of available NO$_X$ mitigation strategies for EGUs focuses on the same core set of measures as prior transport rules, and the EPA proposes a control stringency for EGUs from these measures that is commensurate with the nature of the ongoing ozone nonattainment and maintenance problems observed for the 2015 ozone NAAQS. Similarly, in this action, the EPA includes other industrial sources (non-EGUs) in its Step 3 analysis and proposes emissions limitations for certain non-EGU sources as needed to eliminate significant contribution and interference with maintenance. The available reductions and cost-levels for the non-EGU stringency is generally commensurate with the control strategy for EGUs.

In CSAPR, the CSAPR Update, and the Revised CSAPR Update, the EPA focused its Step 3 analysis on EGUs. In the Revised CSAPR Update, in response to the *Wisconsin* decision's finding that the EPA had not adequately evaluated potential non-EGU reductions, *see* 938 F.3d at 318, the EPA determined that the available NO$_X$ emissions reductions from non-EGU sources, for purposes of addressing good neighbor obligations for the 2008 ozone NAAQS, at a comparable cost threshold to the required EGU emissions reductions (for which EPA used an adjusted representative cost of $1,800 per ton), and based on the timing of when such measures could be implemented, did not provide a sufficiently meaningful and timely air quality improvement at the downwind receptors before those receptors were projected to resolve. *See* 86 FR 23110. On that basis, the EPA made a finding that emissions reductions from non-EGU sources were not required to eliminate significant contribution to downwind air quality problems under the interstate transport provision for the 2008 ozone NAAQS. In this proposal, EPA's "significant contribution" analysis at Step 3 of the 4-step framework includes a

comprehensive evaluation of major stationary source non-EGU industries in the linked upwind states. The EPA is proposing to find that emissions from certain non-EGU sources in the upwind states significantly contribute to downwind air quality problems for the 2015 ozone NAAQS, and that cost-effective emissions reductions from these sources are required to eliminate significant contribution under the interstate transport provision. Therefore, this proposed rule includes required emissions reductions from non-EGU sources in upwind states to fulfill interstate transport obligations for the 2015 ozone NAAQS. This analysis is described fully in Section VI of the proposed rule.

In this proposed rule, the EPA also continues to apply its approach for assessing and avoiding "over-control." In *EME Homer City,* the Supreme Court held that "EPA cannot require a State to reduce its output of pollution by more than is necessary to achieve attainment in every downwind State or at odds with the one-percent threshold the Agency has set." 572 U.S. at 521. The Court acknowledged that "instances of 'over-control' in particular downwind locations may be incidental to reductions necessary to ensure attainment elsewhere." *Id.* at 492.

"Because individual upwind States often 'contribute significantly' to nonattainment in multiple downwind locations, the emissions reductions required to bring one linked downwind State into attainment may well be large enough to push other linked downwind States over the attainment line. As the Good Neighbor Provision seeks attainment in *every* downwind State, however, exceeding attainment in one State cannot rank as 'over-control' unless unnecessary to achieving attainment in *any* downwind State. Only reductions unnecessary to downwind attainment *anywhere* fall outside the Agency's statutory authority."

*Id.* at 522 (footnotes excluded).

The Court further explained that "while EPA has a statutory duty to avoid over-control, the Agency also has a statutory obligation to avoid 'under-control,' *i.e.*, to maximize achievement of attainment downwind." *Id.* at 523. Therefore, in the CSAPR Update and Revised CSAPR Update, the EPA evaluated possible over-control by considering whether an upwind state is linked solely to downwind air quality problems that can be resolved at a lower cost threshold, or if upwind states would reduce their emissions at a lower cost threshold to the extent that they would no longer meet or exceed the 1 percent air quality contribution threshold. *See, e.g.*, 81 FR at 74551–52. *See also Wisconsin*, 938 F.3d at 325

---

[65] For simplicity, the EPA (and courts) at times will refer to the Step 3 analysis as determining "significant contribution"; however, EPA's approach at Step 3 also implements the "interference with maintenance" prong of the good neighbor provision, by also addressing emissions that impact the maintenance receptors identified at Step 1. *See* 86 FR 23074 ("In effect, EPA's determination of what level of upwind contribution constitutes 'interference' with a maintenance receptor is the same determination as what constitutes 'significant contribution' for a nonattainment receptor. Nonetheless, this continues to give independent effect to prong 2 because the EPA applies a broader definition for identifying maintenance receptors, which accounts for the possibility of problems maintaining the NAAQS under realistic potential future conditions.").

[66] *EPA* v. *EME Homer City Generation, L.P.*, 572 U.S. 489 (2014).

(over-control must be proven through a "'particularized, as-applied challenge'") (quoting *EME Homer City Generation,* 572 U.S. at 523–24). The EPA continues to apply this framework for assessing over-control in this proposed rule, and, as discussed in Section VI.D.4 of this proposed rule, does not find any over-control at the proposed stringency to be sufficiently certain to warrant a relaxation in requirements for the sources in any covered state.

This evaluation of cost, $NO_X$ reductions, and air quality improvements, including consideration of whether there is proven over-control, results in EPA's determination of the appropriate level of upwind control stringency that would result in elimination of emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in downwind areas.

d. Step 4 Approach

The EPA proposes an approach similar to its prior transport rulemakings to implement the necessary emissions reductions through permanent and enforceable measures. The EPA proposes to require EGU sources to participate in an emissions trading program and proposes additional enhancements to the trading regime to maintain the selected control stringency over time and improve emissions performance at individual units, offering a necessary measure of assurance that emissions controls will be operated throughout the ozone season. For non-EGUs, the EPA proposes permanent and enforceable emissions rate limits and work practice standards, and associated compliance requirements, on several types of $NO_X$-emitting combustion units across several industrial sectors. The measures for both EGUs and non-EGUs are proposed to be required throughout the May 1–September 30 ozone season annually. The EGU program will begin with the 2023 ozone season, and non-EGU implementation will begin with the 2026 ozone season. Refer to Section VII.A of this proposed rule for details on the implementation schedule.

Based on the EPA's experience in implementing prior transport rulemakings, the Agency is proposing several enhancements to its trading-program approach for implementing good neighbor requirements for EGUs. In CSAPR, the CSAPR Update, and the Revised CSAPR Update, the EPA established interstate trading programs for EGUs to implement the necessary emissions reductions. In each of these

rules, EGUs in each covered state are assigned an emissions budget for their collective emissions. Emissions allowances are allocated to units covered by the trading program, and the covered units then surrender allowances after the close of each control period, usually in an amount equal to their ozone season $NO_X$ emissions. While these programs have been effective in achieving overall reductions in emissions, experience has shown that these programs may not fully reflect in perpetuity the degree of emissions stringency determined necessary to eliminate significant contribution in Step 3 and may not adequately ensure the control of emissions throughout all days of the ozone season. At the same time, the EPA continues to find that an interstate-trading program approach delivers substantial benefits at Step 4 in terms of affording an appropriate degree of compliance flexibility, certainty in emissions outcomes, data and performance transparency, and cost-effective achievement of a high degree of aggregate emissions reductions. As such, EPA proposes to retain an interstate trading program approach while proposing several enhancements to that approach.

Thus, in this rulemaking, the EPA is proposing to include budget-setting procedures in the regulations that will allow state emissions budgets for control periods in 2025 and later years to reflect more current data on the composition and utilization of the EGU fleet (*e.g.,* the 2025 budgets would reflect 2023 data, the 2026 budgets would reflect 2024 data, etc.). These enhancements would enable the trading program to better maintain over time the selected control stringency that was determined to be necessary to address states' good neighbor obligations with respect to the 2015 ozone NAAQS. In prior programs, where state emissions budgets were static across years rather than calibrated to yearly fleet changes, the EPA has observed instances of units idling their emission controls in the latter years of the program.

In the trading programs established for ozone season $NO_X$ emissions under CSAPR, the CSAPR Update, and the Revised CSAPR Update, the EPA included assurance provisions to limit state emissions to levels below 121 percent of the state's budget by requiring additional allowance surrenders in the instance that emissions in the state exceed this level. This limit on the degree to which a state's emissions can exceed its budget is designed to allow for a certain level of year-to-year variability within power sector emissions to account for

fluctuations in demand and EGU operations and is responsive to previous court decisions (see discussion in Section VII.B.4 of this proposed rule). In this action, the EPA again proposes to retain the existing assurance provisions that limit state emissions to levels below 121 percent of the state's budget by requiring additional allowance surrenders in the instance that emissions in the state exceed this level for the 2023 and 2024 control periods. For control periods in 2025 and later years, the EPA is proposing to maintain the same general approach, but with adjustments that account for actual operational conditions in each control period to determine the specific levels above which additional allowance surrenders would be required. In addition, EPA is also proposing several additional enhancements to the EGU trading program in this action, including routine recalibrations of the total amount of banked allowances, unit-specific backstop daily emissions rates for certain units, and unit-specific secondary emissions limitations for units that contribute to exceedances of the assurance levels, to ensure EGU emissions control operation and associated air quality improvements. Implementation of the proposed EGU emissions reductions using a CSAPR $NO_X$ trading program is further described in Section VII.B of this proposed rule.

In this action, the EPA is also proposing to establish emissions limitations for the non-EGU industry sources listed in Table III.A–1. The EPA has the authority to require emissions limitations from stationary sources, as well as from other sources and emissions activities, under CAA section 110(a)(2)(D)(i)(I). The EPA proposes that requiring $NO_X$ emissions reductions through emissions rate limits from certain non-EGU industry sources that the EPA found at Step 3 to be relatively impactful [67] on downwind air quality is an effective strategy for reducing regional ozone transport. Therefore, the EPA proposes $NO_X$ emissions limitations and associated compliance requirements for non-EGU sources to ensure the elimination of significant contribution of ozone precursor emissions required under the interstate

[67] *Section III of the* Non-EGU Screening Assessment memorandum in the docket for this rulemaking describes EPA's approach to evaluating impacts on downwind air quality, considering estimated total, maximum, and average contributions from each industry and the total number of receptors with contributions from each industry.

Federal Register / Vol. 87, No. 66 / Wednesday, April 6, 2022 / Proposed Rules    **20057**

transport provision for the 2015 ozone NAAQS.

Finally, the EPA proposes that the control measures determined to be required for the identified EGU and non-EGU sources apply to both existing units and any new, modified, or reconstructed units meeting the applicability criteria established in this proposal. This is consistent with EPA's transport programs dating back to the $NO_X$ SIP Call and the $NO_X$ Budget Trading Program. In all CSAPR EGU trading programs, for instance, new EGUs are subject to the program, and the EPA established provisions for the allocation of allowances to such units through "new unit set asides." *See, e.g.,* 86 FR 23126. In the $NO_X$ SIP Call, the EPA required that states cover new and existing units in the relevant source sectors through an enforceable cap or other emissions limitation. *See* 40 CFR 51.121(f). EPA's approach of including new units in the $NO_X$ Budget Trading Program promulgated under EPA's CAA section 126 authority was upheld by the D.C. Circuit in *Appalachian Power* v. *EPA,* 249 F.3d 1032 (2001). The EPA explained in its action:

> Once EPA has determined that the emissions from the existing sources in an upwind State already make a significant contribution to one or more petitioning downwind States, any additional emissions from a new source in that upwind State would also constitute a portion of that significant contribution, unless the emissions from that new source are limited to the level of highly effective controls.

*Id.* at 1058 (quoting EPA 1999 RTC at 39). The court affirmed this approach: "Indeed, it would be irrational to enable the EPA to make findings that a group of sources in an upwind state contribute to downwind nonattainment, but then preclude the EPA from regulating new sources that contribute to that same pollution." *Id.* at 1057–58. The EPA proposes to adopt the same approach in this action, because this reasoning is equally applicable to addressing interstate transport obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.

### 2. FIP Authority for Each State Covered by the Proposed Rule

On October 1, 2015, the EPA promulgated a revision to the 2015 8-hour ozone NAAQS, lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm).[68] These revisions of the NAAQS,

in turn, established a 3-year deadline for states to provide SIP submissions addressing infrastructure requirements under CAA sections 110(a)(1) and 110(a)(2), including the good neighbor provision, by October 1, 2018. If the EPA makes a determination that a state failed to submit a SIP, or if EPA disapproves a SIP submission, then the EPA is obligated under CAA section 110(c) to promulgate a FIP for that state within 2 years. For a more detailed discussion of CAA section 110 authority and timelines, refer to Section III.C of this proposed rule.

The EPA is proposing this FIP action now to address twenty-six states' good neighbor obligations for the 2015 ozone NAAQS, but the EPA will not finalize this FIP action for any state unless and until it has issued a final finding of failure to submit or a final disapproval of that state's SIP submission. The EPA is not required to wait to propose a FIP until after the Agency proposes or finalizes a SIP disapproval or makes a finding of failure to submit.[69] CAA section 110(c) authorizes EPA to *promulgate* a FIP "at any time within 2 years" of a SIP disapproval or making a finding of failure to submit. Thus, the EPA may promulgate a FIP contemporaneously with or

immediately following predicate final action on a SIP (or finding no SIP was submitted). In order to accomplish this, the EPA must necessarily be able to propose a FIP prior to taking final action to disapprove a SIP or make a finding of failure to submit. The Supreme Court recognized this in *EME Homer City* in holding that the EPA is not obligated to first define a state's good neighbor obligations or give the state an additional opportunity to submit an approvable SIP before promulgating a FIP: "EPA is not obliged to wait two years or postpone its action even a single day: The Act empowers the Agency to promulgate a FIP 'at any time' within the two-year limit." [70] Furthermore, the D.C. Circuit in *Wisconsin* held that states and EPA are obligated to fully address good neighbor obligations for ozone "as expeditiously as practical" and in no event later than the next relevant downwind attainment dates found in CAA section 181(a).[71] In *Maryland* v. *EPA,* the D.C. Circuit made clear that *Wisconsin's* and *North Carolina's* holdings are fully applicable to the Marginal area attainment date for the 2015 ozone NAAQS,[72] which fell on August 3, 2021.[73] The *Wisconsin* court emphasized that EPA has the authority under CAA section 110 to structure and time its actions in a manner such that the Agency can ensure necessary reductions are achieved by the downwind attainment dates.[74]

On February 22, 2022, the EPA proposed to disapprove 19 good neighbor SIP submissions (Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Tennessee, Texas, West Virginia, Wisconsin).[75] The EPA is proposing to

---

[68] *National Ambient Air Quality Standards for Ozone,* Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also

described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[69] The EPA notes there are three consent decrees to resolve three deadline suits related to EPA's duty to act on good neighbor SIP submissions for the 2015 ozone NAAQS. In *New York et al.* v. *Regan, et al.* (No. 1:21–CV–00252, S.D.N.Y.), the EPA agreed to take final action on the 2015 ozone NAAQS good neighbor SIP submissions from Indiana, Kentucky, Michigan, Ohio, Texas, and West Virginia by April 30, 2022; however, if the EPA proposes to disapprove any SIP submissions and proposes a replacement FIP by February 28, 2022, then EPA's deadline to take final action on that SIP submission is extended to December 30, 2022. In *Downwinders at Risk et al.* v. *Regan* (No. 21–cv–03551, N.D. Cal.), the EPA agreed to take final action on the 2015 ozone NAAQS good neighbor SIP submissions from Alabama, Arkansas, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, New Jersey, New York, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Texas, West Virginia, and Wisconsin by April 30, 2022; however, if the EPA proposes to disapprove any of these SIP submissions and proposes a replacement FIP by February 28, 2022, then EPA's deadline to take final action on that SIP submission is December 30, 2022. In this CD, the EPA also agreed to take final action on Hawaii's SIP submission by April 30, 2022, and to take final action on the SIP submissions of Arizona, California, Montana, Nevada, and Wyoming by December 15, 2022. In *Our Children's Earth Foundation et al.* (No. 20–8232, S.D.N.Y.), the EPA agreed to take final action on the 2015 ozone NAAQS good neighbor SIP submission from New York by April 30, 2022; however, if the EPA proposes to disapprove New York's SIP submission and proposes a replacement FIP by February 28, 2022, then EPA's deadline to take final action on New York's SIP submission is extended to December 30, 2022.

[70] *See* EPA v. *EME Homer City Generation, L.P.,* 572 U.S. 489, 509 (2014) (citations omitted).

[71] *Wisconsin* v. *EPA,* 938 F.3d 303, 313–14 (D.C. Cir. 2019) (citing *North Carolina* v. *EPA,* 531 F.3d 896 (D.C. Cir. 2008).

[72] *Maryland* v. *EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020).

[73] *See* CAA section 181(a); 40 CFR 51.1303; *Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards,* 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[74] 938 F.3d at 318 ("When EPA determines a State's SIP is inadequate, EPA presumably must issue a FIP that will bring that State into compliance before upcoming attainment deadlines, even if the outer limit of the statutory timeframe gives EPA more time to formulate the FIP.") (citing *Sierra Club* v. *EPA,* 294 F.3d 155, 161 (D.C. Cir. 2002)).

[75] *See* 87 FR 9463 (March); 87 FR 9484 (New Jersey, New York); 87 FR 9498 (Kentucky); 87 FR 9516 (West Virginia); 87 FR 9533 (Missouri); 87 FR 9545 (Alabama, Mississippi, Tennessee); 87 FR 9798 (Arkansas, Louisiana, Oklahoma, Texas); 87 FR 9838 (Illinois, Indiana, Michigan, Minnesota,
Continued

promulgate 2015 ozone NAAQS good neighbor FIPs for these same states, as well as California, Nevada, and Wyoming, but will not finalize a FIP for any of these states unless and until the EPA formally finalizes disapprovals of their SIP submittals or, in the event that any of these states withdraw their good neighbor SIP submissions after this proposal, makes a finding of failure to submit.[76] *See* CAA section 110(c).

Additionally, the EPA has taken action that has triggered EPA's obligation under CAA section 110(c) to promulgate FIPs addressing the good neighbor provision for some other states. On December 5, 2019, the EPA published a rule finding that seven states (Maine, New Mexico, Pennsylvania, Rhode Island, South Dakota, Utah, and Virginia) failed to submit or otherwise make complete submissions that address the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.[77] This finding triggered a 2-year deadline for the EPA to issue FIPs to address the good neighbor provision for these states by January 6, 2022. As the EPA has subsequently received and taken final action to approve good neighbor SIPs from Maine, Rhode Island, and South Dakota,[78] the EPA currently has authority under the December 5, 2019, finding of failure to submit to issue FIPs for New Mexico, Pennsylvania, Utah, and Virginia. In this proposal, EPA is issuing proposed FIP requirements for Pennsylvania, Utah, and Virginia.[79]

## C. Other CAA Authorities for This Action

### 1. Correction of EPA's Determination Regarding Delaware's SIP Submission and Its Impact on EPA's FIP Authority for Delaware

In 2020, the EPA approved an infrastructure SIP submission from Delaware for the 2015 ozone NAAQS, which in part addressed the good neighbor provision at CAA section 110(a)(2)(D)(i)(I).[80] The EPA concluded that, based on the modeling results presented in a 2018 March memorandum and using a 2023 analytic year, Delaware's largest impact on any potential downwind nonattainment or maintenance receptor was less than 1 percent of the NAAQS.[81] As a result, the EPA found that Delaware would not significantly contribute to nonattainment or interfere with maintenance in any other state.[82] Therefore, the EPA approved the portion of Delaware's infrastructure SIP that addressed CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.

Subsequent to the release of the modeling data shared in the March 2018 memorandum and EPA's approval of Delaware's 2015 ozone NAAQS good neighbor SIP submission, the EPA performed updated modeling, as described in Section V of this proposal rule. The data from this updated air quality modeling now show that Delaware is projected to contribute more than 1 percent of the NAAQS to downwind receptors in Bristol, Pennsylvania, in the 2023 analytic year.[83] Therefore, in light of the modeling data, EPA is proposing to find that its approval of Delaware's 2015 ozone NAAQS infrastructure SIP submission, with regard only to the portion addressing the good neighbor provision at CAA section 110(a)(2)(D)(i)(I), was in error. Section 110(k)(6) of the CAA gives the Administrator authority, without any

further submission from a state, to revise certain prior actions, including actions to approve SIPs, upon determining that those actions were in error.[84] The modeling data demonstrate that EPA's prior conclusion that Delaware will not significantly contribute to nonattainment or interfere with maintenance in any other state in the 2023 analytic year was incorrect, which means that EPA's approval of Delaware's good neighbor SIP submission was in error.

Therefore, the EPA proposes to correct the error in Delaware's good neighbor SIP approval. This error correction under CAA section 110(k)(6) would revise the approval of the portion of Delaware's 2015 ozone NAAQS infrastructure SIP that addresses CAA section 110(a)(2)(D)(i)(I) to a disapproval and rescind any statements that the portion of Delaware's infrastructure SIP submission that addresses CAA section 110(a)(2)(D)(i)(I) satisfies the requirements of the good neighbor provision. The EPA is not proposing to correct the elements of Delaware's 2015 ozone NAAQS infrastructure SIP that do not address CAA section 110(a)(2)(D)(i)(I).

As discussed in greater detail in the sections that follow, the EPA is proposing to determine that there are additional emissions reductions that are required for Delaware to satisfy its good neighbor obligations for the 2015 ozone NAAQS. The analysis on which the EPA proposes this conclusion for Delaware is the same, regionally consistent analytical framework on which the Agency proposes FIP action for the other states included in this proposal. The Agency recognizes that it is possible, based on updated information for the final rule—as applied within a regionally consistent analytical framework—that Delaware (or other states for which the EPA proposes FIPs in this action) may be found to have no further interstate transport obligation for the 2015 ozone NAAQS. If such a circumstance were to occur, the EPA anticipates that it would not finalize this proposed error correction or may modify the error correction such that the approval of Delaware's portion of the SIP as it relates to its good neighbor obligations may be affirmed.

---

Ohio, Wisconsin). EPA has not yet proposed action on interstate transport SIPs submitted by California, Nevada, Utah, and Wyoming.

[76] See the document titled ''Status of CAA Section 110(a)(2)(D)(i)(I) SIP Submissions for the 2015 Ozone NAAQS for States Covered by the Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards,'' included in the docket for this rulemaking, for additional information on EPA's statutory authorities for this proposed rule.

[77] *Findings of Failure To Submit a Clean Air Act Section 110 State Implementation Plan for Interstate Transport for the 2015 Ozone National Ambient Air Quality Standards (NAAQS)*, 84 FR 66612 (December 5, 2019, effective January 6, 2020).

[78] *Air Plan Approval; Maine and New Hampshire; 2015 Ozone NAAQS Interstate Transport Requirements*, 86 FR 45870 (August 17, 2021); *Air Plan Approval; Rhode Island; 2015 Ozone NAAQS Interstate Transport Requirements*, 86 FR 70409 (December 10, 2021); *Promulgation of State Implementation Plan Revisions; Infrastructure Requirements for the 2015 Ozone National Ambient Air Quality Standards; South Dakota; Revisions to the Administrative Rules of South Dakota*, 85 FR 29882 (May 19, 2020).

[79] The EPA has not yet taken action on a subsequent good neighbor SIP submission from New Mexico or Utah; EPA is not including New Mexico in this proposed action.

[80] *Approval and Promulgation of Air Quality Implementation Plans; Delaware; Infrastructure Requirements for the 2015 Ozone Standard and Revisions to Modeling Requirements*, 85 FR 25307 (May 1, 2020).

[81] ''Technical Support Document for the Delaware State Implementation Plan for the Infrastructure Requirements for the 2015 Ozone Standard and Revisions to Modeling Requirements'' at 16, available in Docket No. EPA–R03–OAR–2019–0663.

[82] *Id.* at 17. Based on the 2023 modeling from the 2018 memorandum, Delaware was expected in 2023 to have a 0.40 ppb impact on a potential nonattainment receptor in Fairfield, Connecticut (Site ID 90019003) and a 0.38 ppb impact at a potential maintenance receptor in Queens, New York (Site ID 360810124).

[83] The contribution from Delaware in 2023 to the receptor in Bristol, Pennsylvania, is 1.36 ppb.

[84] *See, e.g.,* 86 FR 23054, 23068 (error correcting prior approval of Kentucky's transport SIP submission for the 2008 ozone NAAQS to a disapproval and simultaneously promulgating FIP on the basis of the *Wisconsin* and *New York* decisions remanding CSAPR Update and vacating CSAPR Close-Out and new information establishing Kentucky was linked to downwind receptors).

2. Application of Rule in Indian Country and Necessary or Appropriate Finding

The EPA proposes that this rule will be applicable in all areas of Indian country (as defined at 18 U.S.C. 1151) within the covered geography of the proposal, as defined below. Currently, certain areas of Indian country within the geography of the proposal are subject to state implementation planning authority. Other areas of Indian country within that geography would be subject to tribal planning authority, although none of the relevant tribes have as yet sought eligibility to administer a tribal plan to implement the good neighbor provision.[85] As described later, the EPA is proposing to include all areas of Indian country within the covered geography, notwithstanding whether those areas are currently subject to a state's implementation planning authority or the potential planning authority of a tribe.

With respect to areas of Indian country not currently subject to a state's implementation planning authority— *i.e.,* Indian reservation lands (with the partial exception of reservation lands located in the State of Oklahoma, as described further below) and other areas of Indian country over which the EPA or a tribe has demonstrated that a tribe has jurisdiction—the EPA here proposes a ''necessary or appropriate'' finding that direct federal implementation of the rule's requirements is warranted under CAA section 301(d)(4) and 40 CFR 49.11(a) (the areas of Indian country subject to this finding are referred to later as the 301(d) FIP areas). Indian Tribes may, but are not required to,

submit tribal plans to implement CAA requirements, including the good neighbor provision. Section 301(d) of the CAA and 40 CFR part 49 authorize the Administrator to treat an Indian Tribe in the same manner as a state (*i.e.,* TAS) for purposes of developing and implementing a tribal plan implementing good neighbor obligations. *See* 40 CFR 49.3; *see also* ''Indian Tribes: Air Quality Planning and Management,'' hereafter ''Tribal Authority Rule,'' (63 FR 7254, February 12, 1998). The EPA is authorized to directly implement the good neighbor provision in the 301(d) FIP areas when it finds, consistent with the authority of CAA section 301—which the EPA has exercised in 40 CFR 49.11—that it is necessary or appropriate to do so.[86]

The EPA proposes in this action to find that it is both necessary and appropriate to regulate all new and existing EGU and non-EGU sources meeting the applicability criteria set forth in this proposed rule in all of the 301(d) FIP areas that are located within the geographic scope of coverage of the rule. For purposes of this proposed finding, the geographic scope of coverage of the rule means the areas of the United States encompassed within the borders of the states EPA has determined to be linked at Steps 1 and 2 of the 4-step interstate transport framework.[87] For EGU applicability criteria, *see* Section VII.B of this proposed rule; for non-EGU applicability criteria, *see* Section VII.C of this proposed rule. To EPA's knowledge, only one existing EGU or non-EGU source is located within the 301(d) FIP areas: The Bonanza Power Plant, an EGU source, located on the Uintah and Ouray Reservation, geographically located within the borders of Utah.

This proposed finding is consistent with EPA's prior good neighbor rules. In prior rulemakings under the good neighbor provision, the EPA has

included all areas of Indian country within the geographic scope of those FIPs, such that any new or existing sources meeting the rules' applicability criteria would be subject to the rule irrespective of whether subject to state or tribal underlying CAA planning authority. In CSAPR, the CSAPR Update, and the Revised CSAPR Update, the scope of the emissions trading programs established for EGUs extended to cover all areas of Indian country located within the geographic boundaries of the covered states. In these rules, at the time of their promulgation, no existing units were located in the covered areas of Indian country; under the general applicability criteria of the trading programs, however, any new sources locating in such areas would become subject to the programs. Thus, EPA established a separate allowance allocation that would be available for any new units locating in any of the relevant areas of Indian country. *See, e.g.,* 76 FR at 48293 (describing the CSAPR methodology of allowance allocation under the ''Indian country new unit set-aside'' provisions); *see also id.* at 48217 (explaining EPA's source of authority for directly regulating in relevant areas of Indian country as necessary or appropriate). Further, in any action in which the EPA subsequently approved a state's SIP submittal to partially or wholly replace the provisions of a CSAPR FIP, EPA has clearly delineated that it will continue to administer the Indian country new unit set aside for sources in any areas of Indian country geographically located within a state's borders and not subject to that state's CAA planning authority, and the state may not exercise jurisdiction over any such sources. *See, e.g.,* 82 FR 46674, 46677 (October 6. 2017) (approving Alabama's SIP submission establishing a state CSAPR trading program for ozone season $NO_X$ but providing, ''The SIP is not approved to apply on any Indian reservation land or in any other area where EPA or an Indian tribe has demonstrated that a tribe has jurisdiction.'').

In this proposed rule, the EPA proposes to take an approach similar to the prior CSAPR rulemakings with respect to regulating sources in the 301(d) FIP areas.[88] The EPA believes this approach is necessary and appropriate for several reasons. First, the purpose of this rule is to address the

---

[85] We note that, consistent with EPA's prior good neighbor actions in California, the regulatory ozone monitor located on the Morongo Band of Mission Indians (''Morongo'') reservation is a projected downwind receptor in 2023. *See* monitoring site 060651016 in Table V.D–1. We also note that the Temecula, California regulatory ozone monitor is a projected downwind receptor in 2023 and in past regulatory actions has been deemed representative of air quality on the Pechanga Band of Luiseño Indians (''Pechanga'') reservation. *See, e.g., Approval of Tribal Implementation Plan and Designation of Air Quality Planning Area; Pechanga Band of Luiseño Mission Indians,* 80 FR 18120, at 18121–18123 (April 3, 2015); *see also* monitoring site 060650016 in Table V.D–1. The presence of receptors on, or representative of, the Morongo and Pechanga reservations does not trigger obligations for the Morongo and Pechanga Tribes. Nevertheless, these receptors are relevant to EPA's assessment of any linked upwind states' good neighbor obligations. *See, e.g., Approval and Promulgation of Air Quality State Implementation Plans; California; Interstate Transport Requirements for Ozone, Fine Particulate Matter, and Sulfur Dioxide,* 83 FR 65093 (December 19, 2018). Under 40 CFR 49.4(a), tribes are not subject to the specific plan submittal and implementation deadlines for NAAQS-related requirements, including deadlines for submittal of plans addressing transport impacts.

[86] *See Arizona Pub. Serv. Co.* v. *U.S. E.P.A.,* 562 F.3d 1116, 1125 (10th Cir. 2009) (stating that 40 CFR 49.11(a) ''provides the EPA discretion to determine what rulemaking is necessary or appropriate to protect air quality and requires the EPA to promulgate such rulemaking''); *Safe Air For Everyone* v. *U.S. Env't Prot. Agency,* No. 05–73383, 2006 WL 3697684, at *1 (9th Cir., Dec. 15, 2006) (''The statutes and regulations that enable EPA to regulate air quality on Indian reservations provide EPA with broad discretion in setting the content of such regulations.'').

[87] With respect to any non-EGU sources located in the 301(d) FIP areas, the geographic scope of coverage of this proposed rule does not include those states for which EPA proposes to find, based on air quality modeling, that no further linkage exists by the 2026 analytic year at Steps 1 and 2. The states no longer projected to be linked in 2026 are Alabama, Delaware, and Tennessee.

[88] *See* Section VII.B.9 of this action for a discussion of revisions that are proposed in this rulemaking regarding the point in the allowance allocation process at which the EPA would establish set-asides of allowances for units in Indian country not subject to a state's CAA implementation planning authority.

interstate transport of ozone on a national scale, and the technical record establishes that the nonattainment and maintenance receptors located throughout the country are impacted by sources of ozone pollution on a broad geographic scale. The upwind regions associated with each receptor typically span at least two, and often far more, states. Within the broad upwind region covered by this proposal, the EPA proposes to apply—consistent with the methodology of allocating upwind responsibility in prior transport rules going back to the NOₓ SIP Call—a uniform level of control stringency. (*See* Section VI of this proposed rule for a discussion of EPA's determination of control stringency for this proposal.) Within this approach, consistency in rule requirements across all jurisdictions is vital in ensuring the remedy for ozone transport is, in the words of the Supreme Court, "efficient and equitable," 572 U.S. 489, 519. In particular, as the Supreme Court found in *EME Homer City Generation,* allocating responsibility through uniform levels of control across the entire upwind geography is "equitable" because, by imposing uniform cost thresholds on regulated States, EPA's rule subjects to stricter regulation those States that have done relatively less in the past to control their pollution. Upwind States that have not yet implemented pollution controls of the same stringency as their neighbors will be stopped from free riding on their neighbors' efforts to reduce pollution. They will have to bring down their emissions by installing devices of the kind in which neighboring States have already invested. *Id.*

In the context of addressing regional-scale ozone transport in this proposal, a uniform level of stringency that extends to and includes the 301(d) FIP areas geographically located within the boundaries of the linked upwind states carries significant force. Failure to include all such areas within the scope of the rule creates a significant risk that these areas may be targeted for the siting of facilities emitting ozone-precursor pollutants, in order to avoid the regulatory costs that would be imposed under this proposed rule in the surrounding areas of state jurisdiction. Electricity generation or the production of other goods and commodities may become more cost-competitive at any EGUs or non-EGUs not subject to the rule but located in a geography where all surrounding facilities in the same industrial category are subject to the rule. For instance, the affected EGU source located on the Uintah and Ouray

Reservation of the Ute Tribe is in an area that is interconnected with the western electricity grid and is owned and operated by an entity that generates and provides electricity to customers in several states. It is both necessary and appropriate, in EPA's view, to avoid creating, via this proposed rule, a structure of incentives that may cause generation or production—and the associated NOₓ emissions—to shift into the 301(d) FIP areas to escape regulation needed to eliminate interstate transport under the good neighbor provision.

The EPA believes it is appropriate to propose direct federal implementation of the 301(d) FIP areas at this time rather than at a later date. Tribes have the opportunity to seek TAS and to undertake tribal implementation plans under the CAA. To date, the one tribe which could develop and seek approval of a tribal implementation plan to address good neighbor obligations with respect to an existing EGU in the 301(d) FIP areas for the 2015 ozone NAAQS (or for any other NAAQS), the Ute Indian Tribe of the Uintah and Ouray Reservation, has not expressed an intent to do so. Nor has the EPA heard such intentions from any other tribe, and it would not be reasonable to expect tribes to undertake that planning effort, particularly when no existing sources are currently located on their lands. Further, the EPA is mindful that under court precedent, the EPA and states generally bear an obligation to fully implement any required emissions reductions to eliminate significant contribution under the good neighbor provision as expeditiously as practicable and in alignment with downwind areas' attainment schedule under the Act. As discussed in Section VII.A of this proposed rule, the EPA anticipates implementing certain required emissions reductions by the 2023 ozone season, the last full ozone season before the 2024 Moderate area attainment date, and other key additional required emissions reductions by the 2026 ozone season, the last full ozone season before the 2027 Serious area attainment date. Absent this proposed federal implementation plan in the 301(d) FIP areas, NOₓ emissions from any existing or new EGU or non-EGU sources located in, or locating in, the 301(d) FIP areas within the covered geography of the rule would remain unregulated and could potentially increase. This would be inconsistent with EPA's overall goal of aligning good neighbor obligations with the downwind areas' attainment schedule and to achieve emissions

reductions as expeditiously as practicable.

Further, the EPA recognizes that Indian country, including the 301(d) FIP areas, is often home to communities with environmental justice concerns, and these communities may bear a disproportionate level of pollution burden as compared with other areas of the United States. EPA's draft Strategic Plan for Fiscal Year 2022–2026 [89] includes an objective to promote environmental justice at the Federal, Tribal, state, and local levels and states: "Integration of environmental justice principles into all EPA activities with Tribal governments and in Indian country is designed to be flexible enough to accommodate EPA's Tribal program activities and goals, while at the same time meeting the Agency's environmental justice goals." By including all areas of Indian country within the covered geography of the rule, the EPA is advancing environmental justice, lowering pollution burdens in such areas, and preventing the potential for "pollution havens" to form in such areas as a result of facilities seeking to locate there to avoid the requirements that would otherwise apply outside of such areas under this proposed rule.

Therefore, in order to ensure timely alignment of all needed emissions reductions with the larger timetable of this proposed rule, to ensure equitable distribution of the upwind pollution reduction obligation across all upwind jurisdictions, to avoid perverse economic incentives to locate sources of ozone-precursor pollution in the 301(d) FIP areas, and to deliver greater environmental justice to tribal communities in line with Executive Order 13985: Advancing Racial Equity and Support for Underserved Communities Through the Federal Government,[90] EPA proposes to find it both necessary and appropriate that all existing and new EGU and non-EGU sources that are located in the 301(d) FIP areas within the geographic boundaries of the covered states, and which would be subject to this rule if located within areas subject to state CAA planning authority, should be included in this rule. The EPA proposes this finding under section 301(d)(4) of the Act and 40 CFR 49.11. Further, in order to avoid "unreasonable delay" in

---

[89] *https://www.epa.gov/system/files/documents/ 2021-10/fy-2022-2026-epa-draft-strategic-plan.pdf*
[90] Executive Order 13985 (January 20, 2021): *https://www.whitehouse.gov/briefing-room/ presidential-actions/2021/01/20/executiveorder-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.*

promulgating this FIP, as required under section 49.11, the EPA believes it is appropriate to make this proposed finding now, in order to align emissions reduction obligations for any covered new or existing sources in the 301(d) FIP areas with the larger schedule of reductions under this proposed rule. Because all other covered EGU and non-EGU sources within the geography of this proposed rule would be subject to emissions reductions of uniform stringency beginning in the 2023 ozone season, and as necessary to fully and expeditiously address good neighbor obligations for the 2015 ozone NAAQS, there is little benefit to be had by not proposing to include the 301(d) FIP areas in this rule now and a potentially significant downside to not doing so.

The Agency recognizes that Tribal governments may still choose to seek TAS to develop a Tribal plan with respect to the obligations under this proposed rule, and this proposed determination does not preclude the tribes from taking such actions. The EPA will continue to consult with the government of the Ute Indian Tribe of the Uintah and Ouray Reservation, and any other tribe wishing to continue consultation, during the comment period for this proposal. The EPA invites comment on this proposed finding.

a. Indian Country Subject to State Implementation Planning Authority

Following the U.S. Supreme Court decision in *McGirt* v. *Oklahoma,* 140 S. Ct. 2452 (2020), the Governor of the State of Oklahoma requested approval under Section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005: A Legacy for Users, Public Law 109–59, 119 Stat. 1144, 1937 (August 10, 2005) ("SAFETEA"), to administer in certain areas of Indian country (as defined at 18 U.S.C. 1151) the State's environmental regulatory programs that were previously approved by the EPA for areas outside of Indian country. The State's request excluded certain areas of Indian country further described later. In addition, the State only sought approval to the extent that such approval is necessary for the State to administer a program in light of *Oklahoma Dept. of Environmental Quality* v. *EPA,* 740 F.3d 185 (D.C. Cir. 2014).[91]

On October 1, 2020, the EPA approved Oklahoma's SAFETEA request to administer all the State's EPA-approved environmental regulatory programs, including the Oklahoma SIP, in the requested areas of Indian country.[92] As requested by Oklahoma, the EPA's approval under SAFETEA does not include Indian country lands, including rights-of-way running through the same, that: (1) Qualify as Indian allotments, the Indian titles to which have not been extinguished, under 18 U.S.C. 1151(c); (2) are held in trust by the United States on behalf of an individual Indian or Tribe; or (3) are owned in fee by a Tribe, if the Tribe (a) acquired that fee title to such land, or an area that included such land, in accordance with a treaty with the United States to which such Tribe was a party, and (b) never allotted the land to a member or citizen of the Tribe (collectively "excluded Indian country lands").

EPA's approval under SAFETEA expressly provided that to the extent EPA's prior approvals of Oklahoma's environmental programs excluded Indian country, any such exclusions are superseded for the geographic areas of Indian country covered by EPA's approval of Oklahoma's SAFETEA request.[93] The approval also provided that future revisions or amendments to Oklahoma's approved environmental regulatory programs would extend to the covered areas of Indian country (without any further need for additional requests under SAFETEA).

In a **Federal Register** notice published on February 22, 2022 (87 FR 9798), the EPA proposed to disapprove the portion of an Oklahoma SIP submittal pertaining to the state's interstate transport obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Consistent with the D.C. Circuit's decision in *ODEQ* v. *EPA* and with EPA's October 1, 2020 SAFETEA approval, if this disapproval is finalized as proposed, EPA will have authority under CAA section 110(c) to promulgate a FIP as needed to address the

disapproved aspects of the State's good neighbor SIP submittal.[94] In accordance with the discussion above, EPA's FIP authority in this circumstance would extend to all Indian country in Oklahoma, other than the excluded Indian country lands, as described previously.[95] Because—per the State's request under SAFETEA—EPA's October 1, 2020 approval does not displace any SIP authority previously exercised by the State under the CAA as interpreted in *ODEQ* v. *EPA,* EPA's FIP authority under CAA section 110(c) would also apply to any Indian allotments or dependent Indian communities located outside of an Indian reservation over which there has been no demonstration of tribal authority. EPA's FIP authority under CAA section 110(c) would similarly apply to Indian allotments or dependent Indian communities located outside of an Indian reservation over which there has been no demonstration of tribal authority located in any other state within the geographic scope of this proposed rule.

In light of the relevant legal authorities discussed above regarding the scope of the State of Oklahoma's regulatory jurisdiction under the CAA, the EPA has FIP authority under CAA section 110(c) with respect to all Indian country in Oklahoma other than excluded Indian country lands. To the extent any change occurs in the scope of Oklahoma's SIP authority in Indian country before the finalization of this proposed rule, such a change may affect the ability of the Agency to exercise the FIP authority provided under section 110(c) of the Act.[96] In that eventuality,

---

[91] In *ODEQ* v. *EPA,* the D.C. Circuit held that under the CAA, a state has the authority to implement a SIP in non-reservation areas of Indian country in the state, where there has been no demonstration of tribal jurisdiction. Under the D.C. Circuit's decision, the CAA does not provide authority to states to implement SIPs in Indian

reservations. *ODEQ* did not, however, substantively address the separate authority in Indian country provided specifically to Oklahoma under SAFETEA. That separate authority was not invoked until the State submitted its request under SAFETEA, and was not approved until EPA's decision, described in this section, on October 1, 2020.

[92] Available in the docket for this rulemaking.

[93] EPA's prior approvals relating to Oklahoma's SIP frequently noted that the SIP was not approved to apply in areas of Indian country (consistent with the D.C. Circuit's decision in *ODEQ* v. *EPA*) located in the state. *See, e.g.,* 85 FR 20178, 20180 (April 10, 2020). Such prior expressed limitations are superseded by EPA's approval of Oklahoma's SAFETEA request.

[94] The antecedent fact that the state had the authority and jurisdiction to implement requirements under the good neighbor provision, in EPA's view, supplies the condition necessary for the Agency to exercise its FIP authority to the extent the EPA has disapproved the state's SIP submission with respect to those requirements. Under CAA section 110(c), the EPA "stands in the shoes of the defaulting state, and all of the rights and duties that would otherwise fall to the state accrue instead to the EPA." *Central Ariz. Water Conservation Dist.* v. *EPA,* 990 F.2d 1531, 1541 (9th Cir. 1993).

[95] With respect to those areas of Indian country constituting "excluded Indian country lands" in the State of Oklahoma, as defined above, the EPA proposes to apply the same necessary or appropriate finding as set forth above with respect to all other 301(d) FIP areas within the geographic scope of coverage of the rule.

[96] On December 22, 2021, the EPA proposed to withdraw and reconsider the October 1, 2020, SAFETEA approval. *See https://www.epa.gov/ok/ proposed-withdrawal-and-reconsideration-and-supporting-information.* The EPA is engaging in further consultation with tribal governments and expects to have discussions with the State of Oklahoma as part of this reconsideration. The EPA also notes that the October 1, 2020, approval is the
Continued

and to the extent any such areas would then fall more appropriately within the 301(d) FIP areas as described earlier in this section, EPA's proposed necessary or appropriate finding as set forth above with respect to all other 301(d) FIP areas within the geographic scope of coverage of the rule would then apply.

## V. Analyzing Downwind Air Quality Problems and Contributions From Upwind States

### A. Selection of Analytic Years for Evaluating Ozone Transport Contributions to Downwind Air Quality Problems

In this section, the EPA describes its process for selecting analytic years for air quality modeling and analyses performed to identify nonattainment and maintenance receptors and identify upwind state linkages. For this proposed rule, the EPA evaluated air quality to identify receptors at Step 1 for three analytic years: 2023, 2026, and 2032. The EPA evaluated interstate contributions to these receptors from individual upwind states at Step 2 for two of these analytic years: 2023 and 2026. In selecting these years, the EPA views 2023 and 2026, in particular, to constitute years by which key emissions reductions from EGUs and non-EGUS can be implemented "as expeditiously as practicable." (The EPA explains in detail in Section VII of this proposed rule its proposed determination that the necessary emissions reductions cannot be achieved any more quickly.) In addition, these years are the last full ozone seasons before the Moderate and Serious area attainment dates for the 2015 ozone NAAQS (ozone seasons run each year from May 1–September 30). In order to demonstrate attainment by these deadlines, downwind states would be required to rely on design values calculated using ozone design values from 2021 through 2023 and 2024 through 2026, respectively. By focusing its analysis, and, potentially, achieving emissions reductions by, the last full ozone seasons before the attainment dates (*i.e.*, in 2023 or 2026), this proposed rule, if finalized, can assist the downwind areas with demonstrating attainment or receiving extensions of attainment dates under CAA section 181(a)(5).

It would not make sense for the EPA to analyze any earlier year than 2023. EPA continues to interpret the good neighbor provision as forward-looking, based on Congress's use of the future-tense "will" in section 110(a)(2)(D)(i),

an interpretation upheld in *Wisconsin*, 938 F.3d at 322. It would be "anomalous," *id.*, for the EPA to impose good neighbor obligations in 2023 and future years based solely on finding that "significant contribution" had existed at some time in the past. *Id.*

Applying this framework in this proposal, the EPA recognizes that the 2021 Marginal area attainment date has already passed. Further, based on the timing of this proposal, it will not be possible to finalize this rulemaking before the 2022 ozone season has also passed. Thus, EPA has selected 2023 as the first appropriate future analytic year for this proposed rule because it reflects implementation of good neighbor obligations as expeditiously as practicable and coincides with the August 3, 2024, Moderate area attainment date established for the 2015 ozone NAAQS.

The EPA conducted additional analysis for the 2026 and 2032 analytic years in order to ensure a complete Step 3 analysis for future ozone transport contributions to downwind areas. These years also coincide with the last full ozone seasons before future attainment dates for the 2015 ozone NAAQS, and 2026 coincides with the ozone season by which key additional emissions reductions from EGUs and non-EGUs become available. Thus, the EPA analyzed additional years beyond 2023 to determine whether any additional emissions reductions that are impossible to obtain by the 2024 attainment date could still be necessary in order to fully address significant contribution, taking into account the 2027 Serious area attainment date and the 2033 Severe area attainment date for the 2015 ozone NAAQS. In all cases, the proposed implementation of necessary emissions reductions is as expeditiously as practicable, with all possible emissions reductions implemented by the next applicable attainment date.

The timing framework and selection of analytic years set forth above comports with the D.C. Circuit's direction in *Wisconsin* that implementing good neighbor obligations beyond the dates established for attainment may be justified on a proper showing of impossibility or necessity. *See* 938 F.3d at 320.

The remainder of this section includes information on (1) the air quality modeling platform used in support of the proposed rule with a focus on the base year and future year base case emissions inventories, (2) the method for projecting design values in 2023, 2026, and 2032, and (3) the approach for calculating ozone contributions from upwind states. The

Agency also provides the design values for nonattainment and maintenance receptors and the predicted interstate contributions that are at or above the 1 percent of the NAAQS screening threshold. The 2016 base period and 2023, 2026, and 2032 future design values and contributions for all ozone monitoring sites are provided in the docket for this proposed rule. The Air Quality Modeling Technical Support Document (AQM TSD) in the docket for this proposed rule contains more detailed information on the air quality modeling aspects of this rule.

### B. Overview of Air Quality Modeling Platform

The EPA used version 2 of the 2016-based modeling platform for the air quality modeling for this proposed rule. This modeling platform includes 2016 base year emissions from anthropogenic and natural sources and 2016 meteorology. The platform also includes anthropogenic emissions projections for 2023, 2026, and 2032. The emissions data contained in this platform represent an update to the 2016 version 1 inventories that were developed by the EPA, the Multi-Jurisdictional Organizations (MJOs), and state and local air agencies as part of the Emissions Inventory Collaborative Process.

The air quality modeling for this proposal was performed for a modeling region (*i.e.*, modeling domain) that covers the contiguous 48 states using a horizontal resolution of 12 x 12 km. The EPA used the CAMx version 7.10 for air quality modeling since this was the most recent version of CAMx available at the time the air quality modeling was performed.[97] Additional information on the 2016-based air quality modeling platform can be found in the AQM TSD.

### C. Emissions Inventories

The EPA developed emissions inventories for this proposal, including emissions estimates for EGUs, non-EGU point sources, stationary nonpoint sources, onroad mobile sources, nonroad mobile sources, other mobile sources, wildfires, prescribed fires, and biogenic emissions that are not the direct result of human activities. EPA's air quality modeling relies on this comprehensive set of emissions inventories because emissions from multiple source categories are needed to model ambient air quality and to facilitate comparison of model outputs with ambient measurements.

---

subject of a pending challenge in federal court. *Pawnee Nation of Oklahoma* v. *Regan*, No. 20–9635 (10th Cir.).

---

[97] Ramboll Environment and Health, January 2021, *http://www.camx.com.*

To prepare the emissions inventories for air quality modeling, the EPA processed the emissions inventories using the Sparse Matrix Operator Kernel Emissions (SMOKE) Modeling System version 4.8.1 to produce the gridded, hourly, speciated, model-ready emissions for input to the air quality model. Additional information on the development of the emissions inventories and on data sets used during the emissions modeling process are provided in the TSD titled, ''Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform,'' hereafter known as the ''Emissions Modeling TSD.'' This TSD is available in the docket for this rule.

1. Foundation Emissions Inventory Data Sets

The 2016v2 emissions platform is comprised of data from various sources including data developed using models, methods, and source datasets that became available in calendar years 2020 and 2021, in addition to data from the Inventory Collaborative 2016 version 1 (2016v1) Emissions Modeling Platform, released in October 2019. The 2016v1 platform was developed through a national collaborative effort between the EPA and state and local agencies along with MJOs and included emissions inventories for the years 2016, 2023, and 2028. For this proposed rule, emissions inventories were developed for the years 2016, 2023, 2026, and 2032 that represent changes in activity data and of predicted emissions reductions from on-the-books actions, planned emissions control installations, and promulgated federal measures that affect anthropogenic emissions.[98] The 2016 emissions inventories for the U.S. include data derived from the 2017 National Emissions Inventory (2017NEI) and some data derived from the 2014 National Emissions Inventory (NEI), version 2 (2014NEIv2). All of the inventory sectors were updated to better represent the year 2016 through the incorporation of 2016-specific state and local data along with nationally applied adjustment methods. The following sections provide an overview of the construct of the 2016v2 emissions and projections.

2. Development of Emissions Inventories for EGUs

Annual $NO_X$ and $SO_2$ emissions for EGUs in the 2016 base year inventory are based primarily on data from continuous emissions monitoring systems (CEMS) and other monitoring systems allowed for use by qualifying units under 40 CFR part 75, with other EGU pollutants estimated using emissions factors and annual heat input data reported to the EPA. For EGUs not reporting under part 75, the EPA used data submitted to the NEI and the 2016v1 platform by the states. Emissions data for EGUs that did not have data provided for the year 2016 were pulled forward from data submitted for the 2014 NEI. The Air Emissions Reporting Rule, (80 FR 8787; February 19, 2015), requires that Type A point sources large enough to meet or exceed specific thresholds for emissions be reported to the EPA every year, while the smaller Type B point sources must only be reported to EPA every 3 years.

The EPA projected future 2023, 2026, and 2032 baseline EGU emissions using the version 6—Summer 2021 Reference Case of the Integrated Planning Model (IPM). IPM developed by ICF Consulting, is a state-of-the-art, peer-reviewed, multi-regional, dynamic, deterministic linear programming model of the contiguous U.S. electric power sector. It provides forecasts of least cost capacity expansion, electricity dispatch, and emissions control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints. The EPA has used IPM for over two decades, including all prior implemented CSAPR rulemakings, to better understand power sector behavior under future business-as-usual conditions and to evaluate the economic and emissions impacts of prospective environmental policies. The model is designed to reflect electricity markets as accurately as possible. The EPA uses the best available information from utilities, industry experts, gas and coal market experts, financial institutions, and government statistics as the basis for the detailed power sector modeling in IPM. The model documentation provides additional information on the assumptions discussed here as well as all other model assumptions and inputs.[99]

The IPM version 6—Summer 2021 Reference Case incorporated recent updates through the Summer of 2021 to account for updated federal and state environmental regulations (including Renewable Portfolio Standards (RPS), Clean Energy Standards (CES) and other state mandates), fleet changes (committed EGU retirements and new builds), electricity demand, technology cost and performance assumptions from recent data (for renewables adopting from National Renewable Energy Lab (NREL's) Annual Technology Baseline 2020 and for fossil sources from U.S. Energy Information Agency's (EIA) Annual Energy Outlook (AEO) 2020. Natural gas and coal price projections reflect data developed in Fall 2020. The inventory of EGUs provided as an input to the model was the National Electric Energy Data System (NEEDS) Summer 2021 version and is available on EPA's website.[100] This version of NEEDS reflects announced retirements and under construction new builds known as of early summer 2021. This projected base case accounts for the effects of the finalized Mercury and Air Toxics Standards rule, CSAPR, the CSAPR Update, the Revised CSAPR Update, New Source Review settlements, the final Effluent Limitation Guidelines (ELG) Rule, the Coal Combustion Residual (CCR) Rule, and other on-the-books federal and state rules (including renewable energy tax credit extensions from the Consolidated Appropriations Act of 2021) through early 2021 impacting $SO_2$, $NO_X$, directly emitted particulate matter, $CO_2$, and power plant operations. It also includes final actions the EPA has taken to implement the Regional Haze Rule and BART requirements. IPM has projected output years for 2023 and 2025. IPM year 2025 outputs were adjusted for known retirements to be reflective of year 2026, and IPM year 2030 outputs were used for the year 2032 as is specified by the mapping of IPM output years to specific years.

Additional 2023 through 2026 EGU emissions baseline levels were developed through engineering analytics as an alternative approach that did not involve IPM. The EPA developed this inventory for use in Step 3 of this final rule, where it determines emissions reduction potential and corresponding state-level emissions budgets. IPM includes optimization and perfect foresight in solving for least cost dispatch. Given that this final rule will likely become effective immediately prior to the start of the 2023 ozone season, the EPA is adopting a similar approach to the CSAPR Update and the

---

[98] Biogenic emissions and emissions from wildfires and prescribed fires were held constant between 2016 and the future years because (1) these emissions are tied to the 2016 meteorological conditions and (2) the focus of this rule is on the contribution from anthropogenic emissions to projected ozone nonattainment and maintenance.

[99] Detailed information and documentation of EPA's Base Case, including all underlying assumptions, data sources, and architecture parameters can be found on EPA's website at: *https://www.epa.gov/airmarkets/epas-power-sector-modeling-platform-v6-using-ipm-summer-2021-reference-case.*

[100] *Available at https://www.epa.gov/airmarkets/national-electric-energy-data-system-needs-v6.*

Revised CSAPR Update where it relied on IPM in a relative way in Step 3 to avoid overstating optimization and dispatch decisions in state-emissions budget quantification that may not be possible in a short time frame. The EPA does this by using the difference in emissions rate observed between IPM runs with and without the cost threshold applied, rather than using absolute values. In both the CSAPR Update and in this rule at Step 3, EPA complemented that projected IPM EGU outlook with historical (*e.g.*, engineering analytics) perspective based on historical data that only factors in known changes to the fleet. This 2023 engineering analytics data set is described in more detail in the Ozone Transport Policy Analysis Proposed Rule TSD and corresponding Appendix A: State Emissions Budgets Calculations and Underlying Data. The Engineering Analysis used in Step 3 is also discussed further in Section VII.B of this proposed rule.

Both IPM and the Engineering Analytics tools are valuable for estimating future EGU emissions and examining the cone of uncertainty around any future sector-level inventory estimate. A key difference between the two tools is that IPM reflects both announced and projected changes in fleet operation, whereas the Engineering Analytics tool only reflects announced changes. By not including projected changes that are anticipated in response to market forces and fleet trends, the Engineering Analysis is deliberately conservative in its estimate of change in the power sector. Throughout all of the CSAPR rules to date, and prior interstate transport actions, the EPA has used IPM at Steps 1 and 2 as it is best suited for projecting emissions in an airshed, at projecting emissions for time horizons more than a few years out (for which changes would not yet be announced and thus projecting changes is critical), and for scenarios where the assumed change in emissions is not being codified into a state emissions reduction requirement. Using IPM at Steps 1 and 2 helps the EPA avoid overstating future year receptor values (Step 1) and future year linkages (Step 2) by reflecting reductions anticipated to occur within the airshed in the relevant timeframe.

Engineering analytics has a useful tool for Step 3 state-level emissions reduction estimates in CSAPR rulemaking, because at that step EPA is dealing with more geographic granularity (state-level as opposed to regional air shed), more near-term (as opposed to medium-term) assessments, and scenarios where reduction estimates are codified into regulatory

requirements. Using the Engineering Analytics tool at this step ensures that the EPA is not codifying into the base case, and consequently into state emissions budgets, changes in the power sector that are merely modeled to occur rather than announced by real-world actors.

Finally, both in the Revised CSAPR Update and in this rule, the EPA was able to use the Air Quality Assessment Tool to verify that regardless of which EGU inventory is used, the 2023 starting geography of the program is not impacted. In other words, regardless of whether a stakeholder takes a more comprehensive view of the EGU future (IPM) or a more conservative view of change in the EGU fleet (Engineering Analysis) the starting geography would be the same. This finding is consistent with the observation that EGUs are now less than 10% of the total ozone-season $NO_X$ inventory and the degree of near-term difference between the IPM and Engineering Analytic regional projections is relatively small on the regional level. While the EPA continues to believe that IPM is best suited for Step 1 and Step 2, and engineering analytics is best suited for Step 3 efforts in this rulemaking, the Agency is requesting comment on the EGU emissions inventory most reasonable for Step 1 and Step 2 in the analysis. The Ozone Transport Policy Analysis Proposed Rule TSD contains data on 2023 and 2026 AQ impacts of each dataset.

### 3. Development of Emissions Inventories for Non-EGU Point Sources

The updates to the non-EGU point source emissions include a few sources being moved to the EGU inventory and additional control efficiency information for the year 2016. In the 2016v2 platform, some non-EGU point source emissions were based on data submitted for 2016, others were projected from 2014 to 2016, and the emissions for any remaining small sources were kept at 2014 levels. Prior to air quality modeling, the emissions inventories were processed into a format that is appropriate for the air quality model to use. The future year non-EGU point inventories were grown from 2016 to the future years using factors based on the AEO 2021 except for limited cases where errors were identified with the AEO 2021 data in which case data from AEO 2020 were used. The future year inventories reflect emissions reductions due to national and local rules, control programs, plant closures, consent decrees, and settlements. Reductions from several Maximum Achievable Control Technology and

National Emissions Standards for Hazardous Air Pollutants (NESHAP) standards are included. Projection approaches for corn ethanol and biodiesel plants, refineries and upstream impacts represent requirements pursuant to the Energy Independence and Security Act of 2007 (EISA).

Aircraft emissions and ground support equipment at airports are represented as point sources and are based on adjustments to emissions in the January 2021 version of the 2017 NEI (see *https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-data* for data and a TSD). A notable update in the January 2021 version of the 2017 NEI as compared to the April 2020 version was a correction to some double counting of some airport emissions. This correction is incorporated into the inventories for this proposed rule. The EPA developed and applied factors to adjust the 2017 airport emissions to 2016, 2023, 2026, and 2032 based on activity growth projected by the Federal Aviation Administration 2019 Terminal Area Forecast [101] system, the latest available version at the time the factors were developed.

Emissions at rail yards were represented as point sources. The 2016 rail yard emissions are largely consistent with the 2017 NEI rail yard emissions. The 2016 and 2023 rail yard emissions were developed through the 2016v1 Inventory Collaborative process, with the 2026 emissions interpolated between the 2023 and 2028 emissions from 2016v1 rail yard emissions were interpolated from the 2016 and 2023 emissions. Class I rail yard emissions were projected based on the AEO freight rail energy use growth rate projections for 2016, 2023, and 2032 with the fleet mix assumed to be constant throughout the period.

Point source oil and gas emissions for 2016 were based on the 2016v1 point inventory except that an inventory generated by the Western Regional Air Partnership (WRAP) [102] was used for the states of Colorado, Montana, New Mexico, North Dakota, South Dakota, Utah, and Wyoming. The 2016 oil and gas inventories were first projected to 2019 values based on actual production data, and those 2019 emissions were projected to 2023, 2026, and 2032 using regional projection factors by product type based on AEO 2021 projections. $NO_X$ and VOC reductions that are co-

---

[101] *https://www.faa.gov/data_research/aviation/taf/.*
[102] *http://www.wrapair2.org/pdf/WRAP_OGWG_Report_Baseline_17Sep2019.pdf.*

benefits to the NESHAP and New Source Performance Standards (NSPS) for Stationary Reciprocating Internal Combustion Engines (RICE) are reflected for select source categories. In addition, Natural Gas Turbines and Process Heaters NSPS $NO_X$ controls and NSPS Oil and Gas VOC controls [103] are reflected for select source categories. The WRAP future year inventory was used in WRAP states in all future years.[104]

4. Development of Emissions Inventories for Onroad Mobile Sources

Onroad mobile sources include exhaust, evaporative, and brake and tire wear emissions from vehicles that drive on roads, parked vehicles, and vehicle refueling. Emissions from vehicles using regular gasoline, high ethanol gasoline, diesel fuel, and electric vehicles were represented, along with buses that used compressed natural gas. The EPA developed the onroad mobile source emissions for states other than California using EPA's Motor Vehicle Emissions Simulator (MOVES). MOVES3 was released in November 2020 and has been followed by some minor releases that improved the usage of the model but that do not have substantive impacts on the emissions estimates. For this proposal, MOVES3 was run using inputs provided by state and local agencies through the 2017 NEI where available, in combination with nationally available data sets to develop a complete inventory. Onroad emissions for 2016v2 were developed based on emissions factors output from MOVES3 run for the year 2016, coupled with activity data (*e.g.*, vehicle miles traveled and vehicle populations) representing the year 2016. The 2016 activity data were provided by some state and local agencies through the 2016v1 process, and the remaining activity data were derived from the 2017 NEI. The onroad emissions were computed within SMOKE by multiplying emissions factors developed using MOVES with the appropriate activity data. Onroad mobile source emissions for California were consistent with the emissions data provided by the state.

The future-year emissions estimates for onroad mobile sources represent all national control programs known at the time of modeling including rules newly added in MOVES3: The Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles (HDGHG)—Phase 2 [105] and the Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule.[106] Other finalized rules incorporated into the onroad mobile source emissions estimates include: Tier 3 Standards (March 2014), the Light-Duty Greenhouse Gas Rule (March 2013), Heavy (and Medium)-Duty Greenhouse Gas Rule (August 2011), the Renewable Fuel Standard (February 2010), the Light Duty Greenhouse Gas Rule (April 2010), the Corporate-Average Fuel Economy standards for 2008–2011 (April 2010), the 2007 Onroad Heavy-Duty Rule (February 2009), and the Final Mobile Source Air Toxics Rule (MSAT2) (February 2007). Estimates of the impacts of rules that were in effect in 2016 are included in the 2016 base year emissions at a level that corresponds to the extent to which each rule had penetrated into the fleet and fuel supply by the year 2016. Local control programs such as the California LEV III program for criteria pollutants are included in the onroad mobile source emissions.

The future year onroad emissions reflect projected changes to fuel properties and usage, along with the impact of the rules included in MOVES3 for each of the future years. MOVES was run for the years 2023, 2026, and 2032 to generate the emissions factors relevant to those years. Future year activity data for onroad mobile sources were provided by some state and local agencies, and otherwise were projected to 2023, 2026, and 2032 by first projecting the 2016 activity to year 2019 based on county level vehicle miles traveled (VMT) from the Federal Highway Administration, and then from 2019 to the future years using AEO 2021-based factors. The future year emissions were computed within SMOKE by multiplying the future year emissions factors developed using MOVES with the year-specific activity data.

5. Development of Emissions Inventories for Commercial Marine Vessels

The commercial marine vessel (CMV) emissions in the 2016 base case emissions inventory for this rule were based on those in the 2017 NEI. Factors were then applied to adjust the 2017 NEI emissions backward to represent emissions for the year 2016. The CMV emissions reflect emissions reductions associated with the Emissions Control Area proposal to the International Maritime Organization control strategy (EPA–420–F–10–041, August 2010); reductions of $NO_X$, VOC, and CO emissions for new C3 engines that went into effect in 2011; and fuel sulfur limits that went into effect prior to 2016. The cumulative impacts of these rules through 2023, 2026 and 2030 [107] were incorporated into the projected emissions for CMV sources. The CMV emissions were split into emissions inventories from the larger category 3 (C3) engines, and those from the smaller category 1 and 2 (C1C2) engines. CMV emissions in California are based on emissions provided by the state. The CMV emissions are consistent with the emissions for the 2016v1 platform updated CMV emissions released by February 2020 although they include future years of 2026 and 2030 instead of 2028.

6. Development of Emissions Inventories for Other Nonroad Mobile Sources

Nonroad mobile source emissions inventories (other than CMV, locomotive, and aircraft emissions) were developed from monthly, county, and process level emissions output from MOVES3. Types of nonroad equipment include recreational vehicles, pleasure craft, and construction, agricultural, mining, and lawn and garden equipment. State-submitted emissions data for nonroad sources were used for California.

The EPA also ran MOVES3 for 2023, 2026, and 2032 to prepare nonroad mobile emissions inventories for future years. The nonroad mobile emissions control programs include reductions to locomotives, diesel engines, and recreational marine engines, along with standards for fuel sulfur content and evaporative emissions. A comprehensive list of control programs included for mobile sources is available in the Emissions Modeling TSD.

---

[103] On November 15, 2021, the EPA published proposed revisions to standards of performance for new, reconstructed, and modified sources and proposed revisions to emissions guidelines for existing sources in the oil and natural gas sector at 86 FR 63110. Emissions reductions from proposed federal regulatory programs are not included in EPA's baseline analyses until they have been finalized.

[104] *http://www.wrapair2.org/pdf/WRAP_OGWG _2028_OTB_RevFinalReport_05March2020.pdf.*

[105] The effect of the HDGHG Phase 2 rule on criteria pollutants is estimated in Table 5–48 of the Regulatory Impact Analysis, available from *https:// nepis.epa.gov/Exe/ZyPDF.cgi/P100P7NS.PDF ?Dockey=P100P7NS.PDF.*

[106] Information on the SAFE vehicles rule is available from *https://www.epa.gov/regulations-emissions-vehicles-and-engines/safer-affordable-fuel-efficient-safe-vehicles-final-rule.* Preliminary analysis by the Office of Transportation and Air Quality of the impact of this rule on criteria pollutants show impacts of less than 1 percent for VOC and no impact for $NO_X$.

[107] CMV emissions were projected out to 2030 instead of 2032 because that was the last year of data available in a dataset used in the projections process. The year 2030 inventories were used in the 2032 emissions case.

Line haul locomotives are also considered a type of nonroad mobile source but the emissions inventories for locomotives were not developed using MOVES3. Year 2016 and 2023 locomotive emissions were developed through the 2016v1 process and the year 2016 emissions are mostly consistent with those in the 2017 NEI. The projected locomotive emissions for 2023, 2026, and 2030 [108] were developed by applying factors to the base year emissions using activity data based on AEO freight rail energy use growth rate projections along with emissions rates adjusted to account for recent historical trends.

7. Development of Emissions Inventories for Nonpoint Sources

Some emissions for stationary nonpoint sources in the 2016 base case emissions inventory come from the 2017 NEI adjusted to 2016 levels, while others are based on data from the 2014NEIv2 adjusted to reflect year 2016 more closely using factors based on changes to human population from 2014 to 2016. Stationary nonpoint sources include evaporative sources, consumer products, fuel combustion that is not captured by point sources, agricultural livestock, agricultural fertilizer, residential wood combustion, fugitive dust, and oil and gas sources. The emissions sources based on the 2017 NEI include agricultural livestock, fugitive dust, residential wood combustion, waste disposal (including composting), bulk gasoline terminals, and miscellaneous non-industrial sources such as cremation, hospitals, lamp breakage, and automotive repair shops. A new method for solvent VOC emissions was used.[109]

Where states provided the Inventory Collaborative information about projected control measures or changes in nonpoint source emissions for 2016v1 or 2016v2, those inputs were incorporated into the projected inventories for 2023, 2026, and 2032 to the extent possible. Where possible, projection factors based on the AEO were based on AEO 2021. Adjustments for state fuel sulfur content rules for fuel oil in the Northeast were included. Projected emissions for portable fuel containers reflect the impact of projection factors required by the final MSAT2 rule and the EISA, including updates to cellulosic ethanol plants, ethanol transport working losses, and ethanol distribution vapor losses.

For 2016, nonpoint oil and gas emissions inventories were developed based on a run of the 2017 NEI version of the EPA Oil and Gas Tool and data for year 2016 coupled with the WRAP inventory for production-related nonpoint oil and gas emissions in the states of Colorado, Montana, New Mexico, North Dakota, South Dakota, Utah, and Wyoming, and a California Air Resources Board-provided inventory was used for emissions in California. Nonpoint oil and gas emissions in other states and exploration-related emissions in the WRAP states were based on a run of the 2017 NEI version of the EPA Oil and Gas Tool with input data for the year 2016. The 2016 oil and gas inventories were first projected to 2019 values based on actual production data, and those 2019 emissions were projected to 2023, 2026, and 2032 using regional projection factors by product type based on AEO 2021 projections. $NO_X$ and VOC reductions that are co-benefits to the NESHAP and NSPS for RICE are reflected for select source categories. In addition, Natural Gas Turbines and Process Heaters NSPS $NO_X$ controls and NSPS Oil and Gas VOC controls are reflected for select source categories. The WRAP future year inventory was used in WRAP states in all future years.[110]

*D. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors*

In this section, the Agency describes the air quality modeling and analyses performed in Step 1 to identify locations where the Agency expects there to be nonattainment or maintenance receptors for the 2015 ozone NAAQS in the 2023, 2026, and 2032 analytic future years. Where EPA's analysis shows that an area or site does not fall under the definition of a nonattainment or maintenance receptor in 2023, that site is excluded from further analysis under EPA's good neighbor framework.

In this proposed rule, the EPA is applying the same approach used in the CSAPR Update and the Revised CSAPR Update to identify nonattainment and maintenance receptors for the 2008 ozone NAAQS. *See* 86 FR 23078–79.

EPA's approach gives independent effect to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina*.[111] Further, in its decision on the remand of the CSAPR from the Supreme Court in the *EME Homer City* case, the D.C. Circuit confirmed that EPA's approach to identifying maintenance receptors in the CSAPR comported with the court's prior instruction to give independent meaning to the "interfere with maintenance" prong in the good neighbor provision. *EME Homer City II*, 795 F.3d at 136.

In the CSAPR Update and the Revised CSAPR Update, the EPA identified nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the $NO_X$ SIP Call and CAIR, where the EPA defined nonattainment receptors as those areas that both currently monitor nonattainment and that the EPA projects will be in nonattainment in the future compliance year.[112]

The Agency explained in the $NO_X$ SIP Call and CAIR and then reaffirmed in the CSAPR Update that the EPA has the most confidence in our projections of nonattainment for those counties that also measure nonattainment for the most recent period of available ambient data. The EPA separately identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that accounts for historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future design value at each receptor based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, and air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the

---

[108] The farthest out year for which locomotive emissions were projected was 2030 and those were used in the 2032 case.

[109] *https://doi.org/10.5194/acp-21-5079-2021.*

[110] *http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf.*

[111] 531 F.3d at 910–911 (holding that the EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[112] *See* 63 FR 57375, 57377 (October 27, 1998); 70 FR 25241(January 14, 2005). *See also North Carolina,* 531 F.3d at 913–914 (affirming as reasonable EPA's approach to defining nonattainment in CAIR).

future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur.[113] The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Therefore, applying this methodology in this proposed rule, EPA assessed the magnitude of the maximum projected design values for 2023, 2026, and 2032 at each receptor in relation to the 2015 ozone NAAQS and, where such a value exceeds the NAAQS, the EPA determined that receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City II*.[114] That is, monitoring sites with a maximum design value that exceeds the NAAQS are projected to have maintenance problems in the future analytic years.[115]

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term "maintenance-only" to refer to receptors that are not also

nonattainment receptors. Consistent with the concepts for maintenance receptors, as described above, the EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as "maintenance only" receptors, even if they are currently measuring nonattainment based on the most recent official design values.

Consistent with EPA's modeling guidance, the 2016 base year and future year air quality modeling results were used in a relative sense to project design values for 2023, 2026, and 2032. That is, the ratios of future year model predictions to base year model predictions are used to adjust ambient ozone design values[116] up or down depending on the relative (percent) change in model predictions for each location. The modeling guidance recommends using measured ozone concentrations for the 5-year period centered on the base year as the air quality data starting point for future year projections. This average design value is used to dampen the effects of inter-annual variability in meteorology on ozone concentrations and to provide a reasonable projection of future air quality at the receptor under average conditions. In addition, the Agency calculated maximum design values from within the 5-year base period to represent conditions when meteorology is more favorable than average for ozone formation. Because the base year for the air quality modeling used in this proposed rule is 2016, measured data for 2014–2018 (*i.e.*, design values for 2016, 2017, and 2018) were used in order to project average and maximum design values in 2023, 2026, and 2032.

The ozone predictions from the 2016 and future year air quality model simulations were used to project 2016–2018 average and maximum ozone design values to 2023, 2026, and 2032 using an approach similar to the approach in EPA's guidance for attainment demonstration modeling. This guidance recommends using model predictions from the 3 x 3 array of grid cells[117] surrounding the location of the

monitoring site to calculate a Relative Response Factor (RRF) for that site.[118] The 2016–2018 base period average and maximum design values were multiplied by the RRF to project each of these design values to each of the three future years. In this manner, the projected design values are grounded in monitored data, and not the absolute model-predicted future year concentrations. Following the approach in the CSAPR Update and the Revised CSAPR Update, the EPA also projected future year design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. In this alternative approach, EPA eliminated from the RRF calculations the modeling data in those grid cells that are dominated by water (*i.e.*, more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (*i.e.*, if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation). The choice of more than 50 percent of the grid cell area as water as the criteria for identifying overwater grid cells is based on the treatment of land use in the Weather Research and Forecasting model (WRF).[119] Specifically, in the WRF meteorological model those grid cells that are greater than 50% overwater are treated as being 100 percent overwater. In such cases the meteorological conditions in the entire grid cell reflect the vertical mixing and winds over water, even if part of the grid cell also happens to be over land with land-based emissions, as can often be the case for coastal areas. Overlaying land-based emissions with overwater meteorology may be representative of conditions at coastal monitors during times of on-shore flow associated with synoptic conditions or sea-breeze or lake-breeze wind flows. But there may be other times, particularly with off-shore wind flow, when vertical mixing of land-based emissions may be too

---

[113] The EPA's air quality modeling guidance identifies the use of the highest of the relevant base period design values as a means to evaluate future year attainment under meteorological conditions that are especially conducive to ozone formation. *See* U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze, Research Triangle Park, NC.

[114] *See* 795 F.3d at 136.

[115] The EPA issued a memorandum in October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 8-hour ozone NAAQS concerning considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-step interstate transport framework. *See* Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, October 19, 2018 ("October 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.* The EPA does not propose to adopt the information or suggested analytical approaches in that memorandum in this proposed rule proposing FIPs. Potential alternative approaches would introduce unnecessary and substantial additional analytical burdens that could frustrate timely and efficient implementation of good neighbor obligations. In addition, the information supplied in that memorandum is now outdated due to several additional years of air quality monitoring data and updated modeling results. EPA's current approach to defining "maintenance" receptors has been upheld and continues to provide an appropriate approach to addressing the "interference with maintenance" prong of the Good Neighbor provision. *See EME Homer City*, 795 F.3d 118, 136–37; *Wisconsin*, 938 F.3d at 325–26.

[116] The ozone design value at a particular monitoring site is the 3-year average of the annual 4th highest daily maximum 8-hour ozone concentration at that site.

[117] As noted above, each model grid cell is 12 x 12 km.

[118] The relative response factor represents the change in ozone at a given site. In order to calculate the RRF, EPA's modeling guidance recommends selecting the 10 highest ozone days in an ozone season at a given monitor in the base year, noting which of the grid cells surrounding the monitor experienced the highest ozone concentrations in the base year, and averaging those ten highest concentrations. The model is then run using the projected year emissions, in this case 2023, with all other model variables held constant. Ozone concentrations from the same ten days, in the same grid cells, are then averaged. The fractional change between the base year (2016 model run) averaged ozone concentrations and the future year (*e.g.*, 2023 model run) averaged ozone concentrations represents the relative response factor.

[119] *https://www.mmm.ucar.edu/weather-research-and-forecasting-model.*

limited due to the presence of overwater meteorology. Thus, for our modeling EPA projected average and maximum design values at individual monitoring sites based on both the "3 x 3" approach as well as the alternative approach that eliminates overwater cells in the RRF calculation for near-coastal areas (*i.e.*, "no water" approach). The projected 2023, 2026, and 2032 design values using both the "3 x 3" and "no-water" approaches are provided in the docket for this proposed rule. For this proposed rule, the EPA is relying upon design values based on the "no water" approach for identifying nonattainment and maintenance receptors.[120]

Consistent with the truncation and rounding procedures for the 8-hour ozone NAAQS, the projected design values are truncated to integers in units of ppb.[121] Therefore, projected design values that are greater than or equal to 71 ppb are considered to be violating the 2015 ozone NAAQS. For those sites that are projected to be violating the

NAAQS based on the average design values in the future analytic years, the Agency examined the measured design values for 2020, which are the most recent official measured design values at the time of this proposal. As noted earlier, the Agency proposes to identify nonattainment receptors in this rulemaking as those sites that are violating the NAAQS based on current measured air quality and also have projected average design values of 71 ppb or greater. Maintenance-only receptors include both (1) those sites with projected average design values above the NAAQS that are currently measuring clean data and (2) those sites with projected average design values below the level of the NAAQS, but with projected maximum design values of 71 ppb or greater. In addition to the maintenance-only receptors, the 2021 ozone nonattainment receptors are also maintenance receptors because the maximum design values for each of these sites is always greater than or

equal to the average design value. The monitoring sites that the Agency projects to be nonattainment and maintenance receptors for the ozone NAAQS in the 2023 and 2026 base case are used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of ozone NAAQS as part of this proposal.

Table V.D–1 contains the 2016-centered[122] base period average and maximum 8-hour ozone design values, the 2023 base case average and maximum design values and the 2020 design values for the sites that are projected to be nonattainment receptors in 2023. Table V.D–2 contains this same information for monitoring sites that are projected to be maintenance-only receptors in 2023. The design values for all monitoring sites in the U.S. are provided in the docket for this rule. Additional details on the approach for projecting average and maximum design values are provided in the AQM TSD.

TABLE V.D–1—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2020 DESIGN VALUES (ppb) AT PROJECTED NONATTAINMENT RECEPTORS *

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2020 |
|---|---|---|---|---|---|---|---|
| 060170010 | CA | El Dorado | 85.3 | 88 | 76.3 | 78.7 | 84 |
| 060170020 | CA | El Dorado | 82.0 | 84 | 74.3 | 76.2 | 80 |
| 060190007 | CA | Fresno | 87.0 | 89 | 80.4 | 82.2 | 80 |
| 060190011 | CA | Fresno | 90.0 | 91 | 82.9 | 83.8 | 84 |
| 060190242 | CA | Fresno | 84.3 | 86 | 79.5 | 81.1 | 79 |
| 060194001 | CA | Fresno | 90.3 | 92 | 82.8 | 84.4 | 81 |
| 060195001 | CA | Fresno | 91.0 | 94 | 83.7 | 86.4 | 84 |
| 060250005 | CA | Imperial | 76.7 | 77 | 76.3 | 76.6 | 78 |
| 060251003 | CA | Imperial | 76.0 | 76 | 75.4 | 75.4 | 68 |
| 060290007 | CA | Kern | 87.7 | 89 | 82.8 | 84.0 | 93 |
| 060290008 | CA | Kern | 83.0 | 85 | 79.1 | 81.0 | 85 |
| 060290011 | CA | Kern | 83.3 | 85 | 78.8 | 80.4 | 86 |
| 060290014 | CA | Kern | 86.0 | 88 | 81.3 | 83.2 | 85 |
| 060290232 | CA | Kern | 79.3 | 82 | 74.9 | 77.5 | 83 |
| 060292012 | CA | Kern | 89.3 | 90 | 84.1 | 84.7 | 85 |
| 060295002 | CA | Kern | 87.3 | 89 | 82.4 | 84.0 | 89 |
| 060296001 | CA | Kern | 80.7 | 81 | 77.1 | 77.4 | 82 |
| 060311004 | CA | Kings | 83.3 | 84 | 76.9 | 77.6 | 80 |
| 060370002 | CA | Los Angeles | 94.3 | 99 | 88.0 | 92.4 | 97 |
| 060370016 | CA | Los Angeles | 100.0 | 103 | 93.4 | 96.2 | 107 |
| 060371201 | CA | Los Angeles | 88.3 | 91 | 82.7 | 85.3 | 92 |
| 060371602 | CA | Los Angeles | 75.7 | 76 | 73.6 | 73.9 | 78 |
| 060371701 | CA | Los Angeles | 92.0 | 95 | 85.6 | 88.4 | 88 |
| 060372005 | CA | Los Angeles | 84.7 | 86 | 80.7 | 81.9 | 93 |
| 060376012 | CA | Los Angeles | 98.0 | 100 | 91.6 | 93.4 | 101 |
| 060379033 | CA | Los Angeles | 87.3 | 89 | 80.7 | 82.2 | 80 |
| 060390004 | CA | Madera | 80.3 | 83 | 75.7 | 78.3 | 76 |
| 060392010 | CA | Madera | 82.7 | 84 | 77.0 | 78.2 | 78 |
| 060430003 | CA | Mariposa | 76.0 | 79 | 74.2 | 77.1 | 79 |
| 060470003 | CA | Merced | 80.7 | 82 | 74.7 | 75.9 | 76 |
| 060570005 | CA | Nevada | 86.3 | 90 | 78.1 | 81.5 | 82 |

[120] Using design values from the "3 x 3" approach, the maintenance-only receptor at site 170317002 in Cook County, IL would become a nonattainment receptor because the average design value with the "3 x 3" approach is 71.1 ppb versus 70.1 ppb with the "no water" approach. In addition, the monitor at site 170971007 in Lake County, IL which was not projected to be a receptor using the

"no water" approach would be a maintenance-only receptor with the "3 x 3" approach because the maximum design value with the "no water" approach was 69.9 ppb versus a maximum design value of 71.2 ppb with the "3 x 3" approach. However, including this Lake County, Illinois site as a receptor would not affect which states are covered by this proposed rule.

[121] 40 CFR part 50, Appendix P to Part 50— Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone.

[122] 2016-centered design values represent the average of the design values for 2016, 2017, and 2018. Similarly, the maximum 2016-centered design value is the highest measured design value from these three design value periods.

Table V.D–1—Average and Maximum 2016-Centered and 2023 Base Case 8-Hour Ozone Design Values and 2020 Design Values (ppb) at Projected Nonattainment Receptors *—Continued

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2020 |
|---|---|---|---|---|---|---|---|
| 060592022 ................. | CA | Orange .................... | 77.7 | 78 | 72.5 | 72.8 | 82 |
| 060595001 ................. | CA | Orange .................... | 75.3 | 76 | 72.3 | 73.0 | 77 |
| 060610003 ................. | CA | Placer ..................... | 85.0 | 88 | 77.1 | 79.8 | N/A |
| 060610004 ................. | CA | Placer ..................... | 79.3 | 85 | 71.9 | 77.0 | N/A |
| 060610006 ................. | CA | Placer ..................... | 80.0 | 81 | 72.8 | 73.7 | 72 |
| 060650008 ................. | CA | Riverside ................ | 76.5 | 79 | 71.0 | 73.3 | N/A |
| 060650012 ................. | CA | Riverside ................ | 95.3 | 98 | 85.9 | 88.3 | 99 |
| 060650016 ................. | CA | Riverside ................ | 79.0 | 80 | 72.0 | 72.9 | 78 |
| 060651016 ................. | CA | Riverside ................ | 99.7 | 101 | 89.8 | 90.9 | 99 |
| 060652002 ................. | CA | Riverside ................ | 82.7 | 85 | 76.4 | 78.5 | 84 |
| 060655001 ................. | CA | Riverside ................ | 88.7 | 91 | 80.5 | 82.6 | 88 |
| 060656001 ................. | CA | Riverside ................ | 92.3 | 93 | 83.5 | 84.1 | 94 |
| 060658001 ................. | CA | Riverside ................ | 96.7 | 98 | 89.5 | 90.7 | 96 |
| 060658005 ................. | CA | Riverside ................ | 95.0 | 98 | 87.9 | 90.7 | 98 |
| 060659001 ................. | CA | Riverside ................ | 88.7 | 91 | 80.8 | 82.9 | 87 |
| 060670002 ................. | CA | Sacramento ........... | 77.7 | 78 | 71.4 | 71.7 | 72 |
| 060670012 ................. | CA | Sacramento ........... | 82.3 | 83 | 74.8 | 75.4 | N/A |
| 060710001 ................. | CA | San Bernardino ..... | 79.0 | 80 | 74.5 | 75.4 | 81 |
| 060710005 ................. | CA | San Bernardino ..... | 110.3 | 112 | 100.3 | 101.8 | 109 |
| 060710012 ................. | CA | San Bernardino ..... | 95.0 | 98 | 87.3 | 90.1 | 90 |
| 060710306 ................. | CA | San Bernardino ..... | 84.0 | 86 | 76.8 | 78.6 | 83 |
| 060711004 ................. | CA | San Bernardino ..... | 105.7 | 109 | 97.2 | 100.2 | 106 |
| 060712002 ................. | CA | San Bernardino ..... | 97.7 | 99 | 90.1 | 91.3 | 102 |
| 060714001 ................. | CA | San Bernardino ..... | 90.3 | 91 | 82.6 | 83.3 | 87 |
| 060714003 ................. | CA | San Bernardino ..... | 104.0 | 107 | 95.2 | 98.0 | 114 |
| 060719002 ................. | CA | San Bernardino ..... | 87.3 | 89 | 80.1 | 81.6 | 86 |
| 060719004 ................. | CA | San Bernardino ..... | 108.7 | 111 | 99.5 | 101.6 | 110 |
| 060731006 ................. | CA | San Diego .............. | 83.0 | 84 | 76.9 | 77.9 | 79 |
| 060773005 ................. | CA | San Joaquin .......... | 77.3 | 79 | 71.3 | 72.8 | 70 |
| 060990005 ................. | CA | Stanislaus ............. | 81.0 | 82 | 75.4 | 76.3 | 79 |
| 060990006 ................. | CA | Stanislaus ............. | 83.7 | 84 | 77.5 | 77.8 | 80 |
| 061030004 ................. | CA | Tehama .................. | 79.7 | 81 | 72.3 | 73.4 | 74 |
| 061070006 ................. | CA | Tulare ..................... | 84.7 | 86 | 79.1 | 80.3 | 83 |
| 061070009 ................. | CA | Tulare ..................... | 89.0 | 89 | 82.6 | 82.6 | 88 |
| 061072002 ................. | CA | Tulare ..................... | 82.7 | 85 | 75.5 | 77.6 | 83 |
| 061072010 ................. | CA | Tulare ..................... | 84.0 | 86 | 77.0 | 78.8 | 80 |
| 061090005 ................. | CA | Tuolumne ............... | 80.7 | 83 | 75.6 | 77.8 | 77 |
| 080350004 ................. | CO | Douglas .................. | 77.3 | 78 | 71.7 | 72.3 | 81 |
| 080590006 ................. | CO | Jefferson ................ | 77.3 | 78 | 72.6 | 73.3 | 79 |
| 080590011 ................. | CO | Jefferson ................ | 79.3 | 80 | 73.8 | 74.4 | 80 |
| 080690011 ................. | CO | Larimer .................. | 75.7 | 77 | 71.3 | 72.6 | 75 |
| 090010017 ................. | CT | Fairfield .................. | 79.3 | 80 | 73.0 | 73.7 | 82 |
| 090013007 ................. | CT | Fairfield .................. | 82.0 | 83 | 74.2 | 75.1 | 80 |
| 090019003 ................. | CT | Fairfield .................. | 82.7 | 83 | 76.1 | 76.4 | 79 |
| 090099002 ................. | CT | New Haven ............. | 79.7 | 82 | 71.8 | 73.9 | 80 |
| 481671034 ................. | TX | Galveston .............. | 75.7 | 77 | 71.1 | 72.3 | 74 |
| 482010024 ................. | TX | Harris ..................... | 79.3 | 81 | 75.2 | 76.8 | 79 |
| 482010055 ................. | TX | Harris ..................... | 76.0 | 77 | 71.0 | 72.0 | 76 |
| 490110004 ................. | UT | Davis ...................... | 75.7 | 78 | 72.9 | 75.1 | 77 |
| 490353006 ................. | UT | Salt Lake ............... | 76.3 | 78 | 73.6 | 75.3 | 74 |
| 490353013 ................. | UT | Salt Lake ............... | 76.5 | 77 | 74.4 | 74.9 | 73 |
| 550590019 ................. | WI | Kenosha ................. | 78.0 | 79 | 72.8 | 73.7 | 74 |
| 551010020 ................. | WI | Racine .................... | 76.0 | 78 | 71.3 | 73.2 | 73 |
| 551170006 ................. | WI | Sheboygan ............. | 80.0 | 81 | 73.6 | 74.5 | 75 |

* "N/A" is used to denote that there is no valid 2020 design value.

Table V.D–2—Average and Maximum 2016-Centered and 2023 Base Case 8-Hour Ozone Design Values and 2020 Design Values (ppb) at Projected Maintenance-Only Receptors

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2020 |
|---|---|---|---|---|---|---|---|
| 040278011 ................. | AZ | Yuma ...................... | 72.3 | 74 | 70.5 | 72.2 | 68 |
| 060070007 ................. | CA | Butte ....................... | 76.7 | 79 | 68.9 | 71.0 | 73 |
| 060090001 ................. | CA | Calaveras ............... | 77.0 | 78 | 70.9 | 71.9 | 72 |
| 060371103 ................. | CA | Los Angeles ........... | 73.0 | 74 | 70.5 | 71.5 | 76 |
| 060430006 ................. | CA | Mariposa ................ | 75.0 | 76 | 70.1 | 71.0 | 79 |

**20070**        **Federal Register** / Vol. 87, No. 66 / Wednesday, April 6, 2022 / Proposed Rules

TABLE V.D–2—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2020 DESIGN VALUES (ppb) AT PROJECTED MAINTENANCE-ONLY RECEPTORS—Continued

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2020 |
|---|---|---|---|---|---|---|---|
| 060675003 .................. | CA | Sacramento ................ | 77.3 | 79 | 70.2 | 71.7 | 70 |
| 060711234 .................. | CA | San Bernardino ........... | 72.3 | 76 | 70.6 | 74.2 | 76 |
| 061112002 .................. | CA | Ventura ...................... | 77.3 | 78 | 70.9 | 71.6 | 77 |
| 170310001 .................. | IL | Cook .......................... | 73.0 | 77 | 69.6 | 73.4 | 75 |
| 170310032 .................. | IL | Cook .......................... | 72.3 | 75 | 69.8 | 72.4 | 74 |
| 170310076 .................. | IL | Cook .......................... | 72.0 | 75 | 69.3 | 72.1 | 69 |
| 170314201 .................. | IL | Cook .......................... | 73.3 | 77 | 69.9 | 73.4 | 77 |
| 170317002 .................. | IL | Cook .......................... | 74.0 | 77 | 70.1 | 73.0 | 75 |
| 320030075 .................. | NV | Clark .......................... | 75.0 | 76 | 70.0 | 71.0 | 74 |
| 350130021 .................. | NM | Dona Ana ................... | 72.7 | 74 | 70.9 | 72.2 | 78 |
| 350130022 .................. | NM | Dona Ana ................... | 71.3 | 74 | 69.5 | 72.1 | 74 |
| 420170012 .................. | PA | Bucks ......................... | 79.3 | 81 | 70.7 | 72.2 | 74 |
| 480391004 .................. | TX | Brazoria ..................... | 74.7 | 77 | 70.1 | 72.3 | 73 |
| 481210034 .................. | TX | Denton ....................... | 78.0 | 80 | 70.4 | 72.2 | 72 |
| 481410037 .................. | TX | El Paso ...................... | 71.3 | 73 | 69.6 | 71.3 | 76 |
| 482011034 .................. | TX | Harris ......................... | 73.7 | 75 | 70.3 | 71.6 | 73 |
| 482011035 .................. | TX | Harris ......................... | 71.3 | 75 | 68.0 | 71.6 | 70 |
| 490450004 .................. | UT | Tooele ........................ | 73.5 | 74 | 70.8 | 71.3 | 69 |
| 490570002 .................. | UT | Weber ........................ | 73.0 | 75 | 70.6 | 72.5 | N/A |
| 490571003 .................. | UT | Weber ........................ | 73.0 | 74 | 70.5 | 71.5 | 71 |
| 550590025 .................. | WI | Kenosha ..................... | 73.7 | 77 | 69.2 | 72.3 | 74 |

In total, in the 2023 base case there are a total of 111 receptors nationwide including 85 nonattainment receptors and 26 maintenance-only receptors.[123] Of the 85 nonattainment receptors in 2023, 75 remain nonattainment receptors while 8 are projected to become maintenance-only receptors and 2 are projected to be in attainment in 2026. Of the 26 maintenance-only receptors in 2023, 13 are projected to remain maintenance-only receptors and 13 are projected to be in attainment in 2026. The projected average and maximum design values in 2026 for all receptors are included in the AQM TSD.

---

[123] The EPA's modeling also projects that three monitoring sites in the Uintah Basin (*i.e.*, monitor 490472003 in Uintah County, Utah and monitors 490130002 and 490137011 in Duchesne County, Utah) will have average design values above the NAAQS in 2023. However, as described in the AQM TSD, the Uinta Basin nonattainment area was designated as nonattainment for the 2015 ozone NAAQS not because of an ongoing problem with summertime ozone (as is usually the case in other parts of the country), but instead because it violates the ozone NAAQS in winter. The main causes of the Uinta Basin's wintertime ozone are sources located at low elevations within the Basin, the Basin's unique topography, and the influence of the wintertime meteorological inversions that keep ozone and ozone precursors near the Basin floor and restrict air flow in the Basin. Because of the localized nature of the ozone problem at these sites the EPA has not identified these three monitors as receptors in Step 1 of this proposed rule.

### E. Pollutant Transport From Upwind States

#### 1. Air Quality Modeling To Quantify Upwind State Contributions

This section documents the procedures the EPA used to quantify the impact of emissions from specific upwind states on ozone design values in 2023 and 2026 for the identified downwind nonattainment and maintenance receptors. The EPA used CAMx photochemical source apportionment modeling to quantify the impact of emissions in specific upwind states on downwind nonattainment and maintenance receptors for 8-hour ozone. CAMx employs enhanced source apportionment techniques that track the formation and transport of ozone from specific emissions sources and calculates the contribution of sources and precursors to ozone for individual receptor locations. The benefit of the photochemical model source apportionment technique is that all modeled ozone at a given receptor location in the modeling domain is tracked back to specific sources of emissions and boundary conditions to fully characterize culpable sources.

The EPA performed nationwide, state-level ozone source apportionment modeling using the CAMx Ozone Source Apportionment Technology/Anthropogenic Precursor Culpability Analysis (OSAT/APCA) technique [124] to

---

[124] As part of this technique, ozone formed from reactions between biogenic VOC and NOx with

quantify the contribution of 2023 and 2026 base case NOx and VOC emissions from all sources in each state to the corresponding projected ozone design values in 2023 and 2026 at air quality monitoring sites. The CAMx OSAT/APCA model run was performed for the period May 1 through September 30 using the projected future base case emissions and 2016 meteorology for this time period. As described earlier, in the source apportionment modeling the Agency tracked (*i.e.*, tagged) the amount of ozone formed from anthropogenic emissions in each state individually as well as the contributions from other sources (*e.g.*, natural emissions).

In the state-by-state source apportionment model run, the EPA tracked the ozone formed from each of the following tags:

• States—anthropogenic NOx and VOC emissions from each state tracked individually (emissions from all anthropogenic sectors in a given state were combined);

• Biogenics—biogenic NOx and VOC emissions domain-wide (*i.e.*, not by state);

• Boundary Concentrations—concentrations transported into the air quality modeling domain;

• Tribes—the emissions from those tribal lands for which the Agency has point source inventory data in the 2016v1 emissions modeling platform (EPA did not model the contributions from individual tribes);

---

anthropogenic NOx and VOC are assigned to the anthropogenic emissions.

• Canada and Mexico—anthropogenic emissions from sources in the portions of Canada and Mexico included in the modeling domain (the EPA did not model the contributions from Canada and Mexico separately);

• Fires—combined emissions from wild and prescribed fires domain-wide (*i.e.,* not by state); and

• Offshore—combined emissions from offshore marine vessels and offshore drilling platforms.

The contribution modeling provided contributions to ozone from anthropogenic $NO_X$ and VOC emissions in each state, individually. The contributions to ozone from chemical reactions between biogenic $NO_X$ and VOC emissions were modeled and assigned to the ''biogenic'' category. The contributions from wildfire and prescribed fire $NO_X$ and VOC emissions were modeled and assigned to the ''fires'' category. That is, the contributions from the ''biogenic'' and ''fires'' categories are not assigned to individual states nor are they included in the state contributions.

For the Step 2 analysis, the EPA calculated a contribution metric that considers the average contribution on the 10 highest ozone concentration days (*i.e.,* top 10 days) in 2023. This average contribution metric is intended to provide a reasonable representation of the contribution from individual states to projected future year design values, based on modeled transport patterns and other meteorological conditions generally associated with modeled high ozone concentrations at the receptor. An average contribution metric constructed in this manner is beneficial since the magnitude of the contributions is directly related to the magnitude of the design value at each site.

The analytic steps for calculating the contribution metric for the 2023 analytic year are as follows:

(1) Calculate the 8-hour average contribution from each source tag to each monitoring site for the time period of the 8-hour daily maximum modeled concentrations in 2023;

(2) Average the contributions and average the concentrations for the top 10 modeled ozone concentration days in 2023;

(3) Divide the average contribution by the corresponding average concentration to obtain a Relative Contribution Factor (RCF) for each monitoring site;

(4) Multiply the 2023 average design values by the 2023 RCF at each site to produce the average contribution metric values in 2023.[125]

This same approach was applied to calculate contribution metric values at individual monitoring sites for 2026.[126]

The resulting contributions from each tag to each monitoring site in the U.S. for 2023 and 2026 can be found in the docket for this proposed rule. Additional details on the source apportionment modeling and the procedures for calculating contributions can be found in the AQM TSD.

The largest contribution from each state that is the subject of this rule to 8-hour ozone nonattainment and maintenance receptors in downwind states in 2023 and 2026 are provided in Table V.E.1–1 and Table V.E.1–2, respectively.

TABLE V.E.1–1—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023 (ppb)

| Upwind state | Largest contribution to downwind nonattainment receptors | Largest contribution to downwind maintenance-only receptors |
|---|---|---|
| Alabama | 0.88 | 0.71 |
| Arizona | 0.40 | 0.21 |
| Arkansas | 1.00 | 1.39 |
| California | 34.24 | 7.44 |
| Colorado | 0.07 | 0.20 |
| Connecticut | 0.01 | 0.21 |
| Delaware | 0.53 | 1.36 |
| District of Columbia | 0.04 | 0.07 |
| Florida | 0.16 | 0.15 |
| Georgia | 0.16 | 0.17 |
| Idaho | 0.55 | 0.57 |
| Illinois | 18.13 | 18.55 |
| Indiana | 6.60 | 7.10 |
| Iowa | 0.64 | 0.58 |
| Kansas | 0.42 | 0.59 |
| Kentucky | 0.83 | 0.88 |
| Louisiana | 5.39 | 7.03 |
| Maine | 0.01 | 0.01 |
| Maryland | 1.29 | 2.40 |
| Massachusetts | 0.30 | 0.30 |
| Michigan | 1.27 | 1.67 |
| Minnesota | 0.50 | 0.97 |
| Mississippi | 1.04 | 1.14 |
| Missouri | 1.08 | 1.66 |
| Montana | 0.08 | 0.11 |
| Nebraska | 0.26 | 0.36 |
| Nevada | 0.89 | 0.58 |
| New Hampshire | 0.10 | 0.06 |
| New Jersey | 8.85 | 5.79 |

[125] Note that a contribution metric value was not calculated for any receptor at which there were fewer than 5 days with model-predicted MDA8 ozone concentrations greater than or equal to 60 ppb in 2023. See the AQM TSD for information on those receptors that did not meet this criterion.

[126] In order to provide consistency in the contributions for 2023 and 2026, the contribution metric values for 2026 are based on the 2026 daily contributions for the same days that were used to calculate the contribution metric values for 2023.

TABLE V.E.1–1—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023 (ppb)—Continued

| Upwind state | Largest contribution to downwind nonattainment receptors | Largest contribution to downwind maintenance-only receptors |
|---|---|---|
| New Mexico | 0.30 | 0.13 |
| New York | 16.81 | 1.80 |
| North Carolina | 0.61 | 0.33 |
| North Dakota | 0.12 | 0.37 |
| Ohio | 1.94 | 1.88 |
| Oklahoma | 0.57 | 1.19 |
| Oregon | 1.10 | 1.31 |
| Pennsylvania | 6.90 | 0.51 |
| Rhode Island | 0.04 | 0.04 |
| South Carolina | 0.19 | 0.07 |
| South Dakota | 0.05 | 0.09 |
| Tennessee | 0.60 | 0.94 |
| Texas | 1.72 | 1.81 |
| Utah | 1.37 | 0.10 |
| Vermont | 0.02 | 0.02 |
| Virginia | 1.77 | 1.63 |
| Washington | 0.34 | 0.40 |
| West Virginia | 1.45 | 1.44 |
| Wisconsin | 0.19 | 2.61 |
| Wyoming | 0.81 | 0.19 |

TABLE V.E.1–2—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2026 (ppb)

| Upwind state | Largest contribution to downwind nonattainment receptors | Largest contribution to downwind maintenance-only receptors |
|---|---|---|
| Alabama | 0.17 | 0.48 |
| Arizona | 0.35 | 0.23 |
| Arkansas | 0.62 | 1.30 |
| California | 33.45 | 4.85 |
| Colorado | 0.05 | 0.08 |
| Connecticut | 0.01 | 0.01 |
| Delaware | 0.42 | 0.52 |
| District of Columbia | 0.03 | 0.04 |
| Florida | 0.10 | 0.09 |
| Georgia | 0.14 | 0.16 |
| Idaho | 0.48 | 0.48 |
| Illinois | 17.81 | 18.14 |
| Indiana | 6.43 | 6.99 |
| Iowa | 0.57 | 0.57 |
| Kansas | 0.40 | 0.57 |
| Kentucky | 0.80 | 0.80 |
| Louisiana | 4.25 | 6.97 |
| Maine | 0.01 | 0.01 |
| Maryland | 1.11 | 1.23 |
| Massachusetts | 0.29 | 0.14 |
| Michigan | 1.03 | 1.58 |
| Minnesota | 0.36 | 0.91 |
| Mississippi | 0.36 | 0.90 |
| Missouri | 0.98 | 1.53 |
| Montana | 0.07 | 0.08 |
| Nebraska | 0.11 | 0.23 |
| Nevada | 0.81 | 0.51 |
| New Hampshire | 0.09 | 0.02 |
| New Jersey | 8.54 | 5.47 |
| New Mexico | 0.29 | 0.23 |
| New York | 16.58 | 11.29 |
| North Carolina | 0.38 | 0.54 |
| North Dakota | 0.11 | 0.34 |
| Ohio | 1.78 | 1.83 |
| Oklahoma | 0.54 | 0.72 |

TABLE V.E.1–2—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2026 (ppb)—Continued

| Upwind state | Largest contribution to downwind nonattainment receptors | Largest contribution to downwind maintenance-only receptors |
|---|---|---|
| Oregon | 0.98 | 0.88 |
| Pennsylvania | 6.82 | 4.74 |
| Rhode Island | 0.04 | 0.01 |
| South Carolina | 0.15 | 0.17 |
| South Dakota | 0.03 | 0.06 |
| Tennessee | 0.25 | 0.34 |
| Texas | 1.61 | 1.70 |
| Utah | 0.95 | 1.18 |
| Vermont | 0.02 | 0.01 |
| Virginia | 1.14 | 1.68 |
| Washington | 0.31 | 0.28 |
| West Virginia | 1.23 | 1.35 |
| Wisconsin | 0.15 | 2.44 |
| Wyoming | 0.46 | 0.80 |

2. Application of Contribution Screening Threshold

The EPA evaluated the magnitude of the contributions from each upwind state to downwind nonattainment and maintenance receptors. In Step 2 of the interstate transport framework, the EPA uses an air quality screening threshold to identify upwind states that contribute to downwind ozone concentrations in amounts sufficient to "link" them to these to downwind nonattainment and maintenance receptors. The contributions from each state to each downwind nonattainment or maintenance receptor that were used for the Step 2 evaluation can be found in the AQM TSD.

The EPA proposes to apply an air quality screening threshold of 1 percent of the NAAQS, as it has used since the CSAPR rulemaking, including in the CSAPR Update, the Revised CSAPR Update, and numerous actions evaluating states' transport SIP submittals. EPA continues to observe that the majority of nonattainment and maintenance receptors identified at Step 1 are impacted collectively by contributions of ozone transport from numerous upwind states. Therefore, application of a uniform screening threshold allows EPA to identify upwind states that share a responsibility under the interstate transport provision to eliminate their significant contribution.

The EPA recognizes that in 2018 it issued a memorandum indicating the potential for states to use a higher threshold at Step 2 in the development of their good neighbor SIP submissions where it could be technically justified. The August 2018 memorandum stated

that "it may be reasonable and appropriate" for states to rely on an alternative 1 ppb threshold at Step 2.[127] (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) Here, the EPA proposes to fulfill its role under CAA section 110(c) in promulgating FIPs to directly implement good neighbor requirements, and in this role, the EPA notes that it is authorized to exercise discretion in making policy determinations such as the appropriateness of a particular contribution threshold that would otherwise have been exercised by states. Further, as the EPA has explained in several notices proposing transport SIP disapprovals, *see, e.g.,* 87 FR 9498 and 87 FR 9510 (Feb. 22, 2022), its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2, either in the context of SIPs or FIPs.

EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. In the context of a FIP proposal (as much as in the context of SIP actions), the Agency now believes using different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical

implementation concerns.[128] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of good neighbor obligations. From the perspective of ensuring effective regional implementation of good neighbor obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emissions controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

More importantly, in promulgating FIPs to address these obligations on a nationwide scale, national ozone transport policy is not well-served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memo that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this

---

[127] August 2018 memo at 4.

---

[128] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (*e.g.*, roughly 7 percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memo;[129] in EPA's updated modeling, the amount lost is roughly 5 percent). Considering the core statutory objective of ensuring elimination of *all* significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in moving to a 1 ppb threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS) is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport for the more stringent NAAQS. EPA made this point when it originally promulgated CSAPR to address the 1997 ozone NAAQS. The Agency continues to consider this an important consideration for the more stringent 2015 ozone NAAQS. *See* 76 FR 48237–38.

Lastly, the Agency does not find it to be a good use of limited resources to attempt to further justify the use of alternative thresholds for certain states at Step 2 for purposes of the 2015 ozone NAAQS. Therefore, while EPA articulated a potential basis for recognizing the usefulness of alternative Step 2 thresholds (particularly a 1 ppb threshold) in the August 2018 memorandum, EPA's experience and further evaluation since the issuance of that memo has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Depending on comment and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

In light of the considerations above, EPA proposes using a contribution threshold of 0.70 ppb as the

quantification of 1 percent of the 2015 ozone NAAQS for purposes of Step 2.

a. States That Contribute Below the Screening Threshold

Based on EPA's modeling, the contributions from each of the following states to nonattainment or maintenance-only receptors in the 2023 analytic year are below the 1% of the NAAQS threshold: Arizona, Colorado, Connecticut, the District of Columbia, Florida, Georgia, Idaho, Iowa, Kansas, Maine, Massachusetts, Montana, Nebraska, New Hampshire, New Mexico, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Vermont, and Washington. The EPA has already approved many of these states' SIP submittals or is in the process of taking action to approve them. Because the contributions from these states to projected downwind air quality problems are below the screening threshold in the current modeling, these states are not within the scope of this proposed rule. Additionally, the EPA has made proposed or final determinations that two states outside the modeling domain for the air quality modeling analyzed in this proposed rulemaking—Hawaii [130] and Alaska [131]—do not significantly contribute to nonattainment or interfere with maintenance of the NAAQS in any other state.

a. States That Contribute at or Above the Screening Threshold

Based on the maximum downwind contributions in Table V.E.1–1, the Step 2 analysis identifies that the following 22 states contribute at or above the 0.70 ppb threshold to downwind nonattainment receptors in 2023: Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oregon, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wyoming. Based on the maximum downwind contributions in Table V.E.1–1, the following 23 states contribute at or above the 0.70 ppb threshold to downwind maintenance-only receptors in 2023: Alabama, Arkansas, California, Delaware, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Oregon, Tennessee, Texas, Virginia, West

Virginia, and Wisconsin. The levels of contribution between each of these linked upwind states and downwind nonattainment receptors and maintenance-only receptors are provided in the AQM TSD.

Among the linked states are several western states—California, Nevada, Oregon, Utah, and Wyoming. While the EPA has not previously included action on linked western states in its prior CSAPR rulemakings, the EPA has consistently applied the 4-step framework in evaluating good neighbor obligations from these states. On a case-by-case basis, the EPA has found in some instances with respect to the 2008 ozone NAAQS that a unique consideration has warranted approval of a linked western state's good neighbor SIP submittal without concluding that additional emissions reductions are required at Step 3 of the framework.[132] The EPA has also explained in prior actions that its air quality modeling is reliable for assessing downwind air quality problems and ozone transport contributions from upwind states throughout the nationwide modeling domain.[133]

In EPA's current analysis, the EPA finds that for one linked state—Oregon—the same considerations that led it to approve another state's SIP submission, Arizona's, for the 2008 ozone NAAQS apply to Oregon's circumstances for the 2015 ozone NAAQS. As explained in the following section, the EPA therefore proposes to affirm its prior approval of Oregon's good neighbor SIP submission for the 2015 ozone NAAQS. For the remaining western states included in this proposed rule, EPA's modeling supports a conclusion that these states are linked above the contribution threshold to identified ozone transport receptors in other states, and therefore, consistent with the treatment of all other states within the modeling domain, the EPA proposes to proceed to evaluate these states for a determination of "significant contribution" at Step 3.

In conclusion, as described above, states with contributions that equal or exceed 1 percent of the NAAQS to either nonattainment or maintenance receptors are identified as "linked" at Step 2 of the good neighbor framework and warrant further analysis for significant contribution to nonattainment or interference with

---

[129] *See* August 2018 memo, at 4.

[130] The EPA proposed to approve Hawaii's 2015 ozone transport SIP on September 28, 2021. *See* 86 FR 53571.

[131] The EPA approved Alaska's 2015 ozone transport SIP on December 18, 2019. *See* 84 FR 69331.

[132] *See* interstate transport approval actions under the 2008 ozone NAAQS for Arizona, California, and Wyoming at 81 FR 36179 (June 6, 2016), 83 FR 65093 (December 19, 2018), and 84 FR 14270 (April 10, 2019), respectively.

[133] *See* 81 FR 71991 (October 19, 2016), 82 FR 9155 (February 3, 2017).

maintenance under Step 3. The EPA proposes that the following 27 States are linked at Step 2 in 2023: Alabama, Arkansas, California, Delaware, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming. In addition, the EPA proposes that the following 24 States are linked at Step 2 in 2026: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming. Three states, Alabama, Delaware, and Tennessee, that were linked in 2023 are not linked in 2026 because the receptor(s) to which each state was linked in 2023 are projected to attain by 2026.

*F. Treatment of Certain Receptors in California and Implications for Oregon's Good Neighbor Obligations for the 2015 Ozone NAAQS*

The EPA previously approved Oregon's September 25, 2018 transport SIP submittal for the 2015 ozone NAAQS on May 17, 2019 (84 FR 22376), because in an earlier round of modeling Oregon was not projected to contribute above 1 percent of the NAAQS to any downwind receptors. In EPA's updated modeling, Oregon is linked above the 1 percent of NAAQS threshold to several monitoring sites in California that would generally meet EPA's definition of nonattainment or maintenance "receptors" at Step 1.[134] However, EPA's analysis of the nature of the air quality problem at these monitoring sites leads EPA to propose a determination that these monitoring sites should not be treated as receptors for purposes of determining interstate transport obligations of upwind states under CAA section 110(a)(2)(D)(i)(I). EPA reaches this conclusion at Step 1 of its four-step framework.

The EPA previously made a similar assessment of the nature of certain other monitoring sites in California in approving Arizona's 2008 ozone NAAQS transport SIP submittal.[135] There, the EPA noted that a "factor

[. . .] relevant to determining the nature of a projected receptor's interstate transport problem is the magnitude of ozone attributable to transport from all upwind states collectively contributing to the air quality problem." [136] The EPA observed that only one upwind state (Arizona) was linked above 1 percent of the 2008 ozone NAAQS to the two relevant monitoring sites in California, and the cumulative ozone contribution from all upwind states to those sites was 2.5 percent and 4.4 percent of the total ozone, respectively. The EPA determined the size of these cumulative upwind contributions was "negligible, particularly when compared to the relatively large contributions from upwind states in the East or in certain other areas of the West." [137] In that action, the EPA concluded the two California sites to which Arizona was linked should not be treated as receptors for the purposes of determining Good Neighbor obligations for the 2008 ozone NAAQS.[138]

The EPA proposes to make a similar finding for the monitoring sites in California otherwise projected in its current modeling to be "receptors" for the 2015 ozone NAAQS and to which Oregon is linked. The highest percent of the total cumulative upwind ozone contribution to any of these sites is 2.8 percent.[139] This is lower than the largest transport contribution relative to total ozone at the California sites identified in EPA's approval of Arizona's 2008 ozone transport SIP (4.4 percent).[140] Further, as was the case for the sites in California analyzed in EPA's Arizona action, the identified sites in California each have only one upwind state contributing above 1 percent of the NAAQS to them (Oregon). These monitoring sites in California are overwhelmingly impacted by in-state emissions to a degree not comparable with any other identified nonattainment or maintenance-only receptors in the country.

The EPA proposes to find that these monitoring sites should not be considered receptors for the purpose of assessing 2015 ozone NAAQS interstate transport obligations. The EPA is not proposing a different contribution threshold at Step 2 for Western states or receptors, nor does the EPA reach its conclusion based on any evaluation at Step 3 of emissions reduction opportunities in Oregon.

As a consequence of this proposed finding, the EPA continues to find that ozone-precursor emissions from Oregon do not significantly contribute to nonattainment or interfere with maintenance of the NAAQS in any downwind state, because the total collective upwind state ozone contribution to the California monitoring sites is extremely low compared to the air quality problems typically addressed under the good neighbor provision. Therefore, the EPA is not proposing any change in this action to its prior approval of Oregon's SIP. The EPA is not proposing any new FIP requirements and is not proposing to require reductions from new or existing EGU or non-EGU sources in Oregon in this action. If, however, EPA were not to finalize this proposed approach, then EPA anticipates that it would apply the same control strategies in Oregon as applied in all other linked upwind states, as discussed in Sections VI and VII of this proposed rule. EPA requests public comment on its approach to characterizing the nature of the interstate transport problem at the California monitoring sites at issue and the consequent approach to assessing Oregon's good neighbor obligations.

**VI. Quantifying Upwind-State NO$_X$ Emissions Reduction Potential To Reduce Interstate Ozone Transport for the 2015 Ozone NAAQS**

*A. The Multi-Factor Test for Determining Significant Contribution*

This section describes EPA's methodology at Step 3 of the 4-step framework for identifying upwind emissions that constitute "significant" contribution for the states subject to this proposed rule and focuses on the 26 states with FIP requirements identified in the sections above. Following the existing framework as applied in all of the prior CSAPR rulemakings, EPA's assessment of linked upwind state emissions is based primarily on analysis of several alternative levels of NO$_X$ emissions control stringency applied uniformly across all of the linked states. The analysis includes assessment of non-EGU stationary sources in addition to EGU sources in the linked upwind states.

The EPA applies a multi-factor test—the same multi-factor test that was used in CSAPR, the CSAPR Update, and the Revised CSAPR Update [141]—to evaluate increasing levels of uniform NO$_X$ control stringency. The multi-factor test, which is central to EPA's Step 3

---

[134] Monitors are listed in the AQM TSD included in the docket for this rulemaking. While EPA is providing information about cumulative upwind contribution to the California monitors, the Agency does not consider these monitors as ozone transport receptors in this proposal.

[135] 81 FR 15200 (March 22, 2016) (proposal); 81 FR 31513 (May 19, 2016) (final rule).

[136] 81 FR at 15203.

[137] *Id.*

[138] *Id.*

[139] See Air Quality Modeling TSD in the docket for this action.

[140] 81 FR at 15203; 81 FR 31513.

[141] *See* CSAPR, Final Rule, 76 FR 48208 (August 8, 2011).

quantification of significant contribution, considers cost, available emissions reductions, downwind air quality impacts, and other factors to determine the appropriate level of uniform $NO_X$ control stringency that would eliminate significant contribution to downwind nonattainment or maintenance receptors. The selection of a uniform level of $NO_X$ emissions control stringency across all of the linked states, reflected as a representative cost per ton of emissions reduction (or a weighted average cost per ton in the case of EPA's non-EGU and EGU analysis for 2026 mitigation measures), also serves to apportion the reduction responsibility among collectively contributing upwind states. This approach to quantifying upwind state emission-reduction obligations using emission-cost was reviewed by the Supreme Court in *EME Homer City Generation,* which held that using such an approach to apportion emissions reduction responsibilities among upwind states that are collectively responsible for downwind air quality impacts "is an efficient and equitable solution to the allocation problem the Good Neighbor Provision requires the Agency to address." 572 U.S. at 519.

There are four stages in developing the multi-factor test: (1) Identify levels of uniform $NO_X$ control stringency; (2) evaluate potential $NO_X$ emissions reductions associated with each identified level of uniform control stringency; (3) assess air quality improvements at downwind receptors for each level of uniform control stringency; and (4) select a level of control stringency considering the identified cost, available $NO_X$ emissions reductions, and downwind air quality impacts, while also ensuring that emissions reductions do not unnecessarily over-control relative to the contribution threshold or downwind air quality.

As mentioned in Section IV.A.2 of this proposed rule, commenters on previous ozone transport rules have suggested that the EPA should regulate VOCs as an ozone precursor. For this proposed rule, the EPA examined the results of the contribution modeling performed for this rule to identify the portion of the ozone contribution attributable to anthropogenic $NO_X$ emissions versus VOC emissions from each linked upwind state to each downwind receptor. Of the total upwind-downwind linkages in 2023, the contributions from $NO_X$ emissions comprise 80 percent or more of the total anthropogenic contribution at the vast majority of linkages (136 out of 140 total). Across all receptors, the

contribution from $NO_X$ emissions ranges from 77 percent to 99 percent of the total anthropogenic contribution. This review of the portion of the ozone contribution attributable to anthropogenic $NO_X$ emissions versus VOC emissions from each linked upwind state leads the Agency to conclude that the vast majority of the downwind air quality areas addressed by the proposed rule under are primarily $NO_X$-limited, rather than VOC-limited. Therefore, the EPA is proposing to determine that the regulation of VOCs as an ozone precursor is not necessary to eliminate significant contribution of ozone transport to downwind areas in this proposed rule. The remainder of this section focuses on EPA's strategy for reducing regional-scale transport of ozone by targeting $NO_X$ emissions from stationary sources to achieve the most effective reductions of ozone transport over the geography of the affected downwind areas.

For both EGUs and non-EGUs, Section VI.B of this proposed rule describes the available $NO_X$ emissions controls that the EPA evaluated for this proposed rule and their representative cost levels (in 2016$). Section VI.C of this proposed rule discusses EPA's application of that information to assess emissions reduction potential of the identified control stringencies. Finally, Section VI.D of this proposed rule describes EPA's assessment of associated air quality impacts and EPA's subsequent identification of appropriate control stringencies considering the key relevant factors (cost, available emissions reductions, and downwind air quality impacts).

This multi-factor approach is consistent with EPA's approach in prior transport actions, such as CSAPR. In addition, as was evaluated in the CSAPR Update and Revised CSAPR Update, the EPA evaluated possible over-control by examining whether an upwind state is linked solely to downwind air quality problems that could have been resolved at a lesser threshold of control stringency and whether an upwind state could reduce its emissions below the 1 percent air quality contribution threshold at a lesser threshold of control stringency. This analysis is described in Section VI.D of this proposed rule.

Finally, while the EPA has evaluated potential emissions reductions from non-EGU sources in prior rules, this is the first action for which the EPA is proposing non-EGU emissions reductions within the context of its 4-step interstate transport framework. The EPA applies its multi-factor test to non-

EGUs and independently evaluates non-EGU industries in a consistent but parallel track to its Step 3 assessment for EGUs. This is consistent with the parallel assessment approach taken for EGUs and non-EGUs in the Revised CSAPR Update. Following the conclusions of the EGU and non-EGU multi-factor tests, the identified reductions for EGUs and non-EGUs are combined and collectively analyzed to assess their effects on downwind air quality and whether the rule achieves a full remedy to "significant contribution" while avoiding over-control.

In order to ensure that this rule implements a full remedy for the elimination of significant contribution from upwind states, the EPA has reviewed available information on all major industrial source sectors in the upwind states. This analysis leads the EPA to propose that both EGUs and certain large sources in several specific industrial categories should be evaluated for emissions control opportunities. As discussed in the sections that follow, the EPA proposes that for both EGUs and the selected non-EGU source categories, there are impactful emissions reduction opportunities available at reasonable cost-effectiveness thresholds. As in the Revised CSAPR Update, the EPA examines EGUs and non-EGUs in this section on consistent but distinct, parallel tracks due to differences stemming from the unique characteristics of the power sector compared to other industrial source categories. Since the $NO_X$ SIP Call, EGUs have consistently been regulated under ozone transport rules. These units operate in a coordinated manner across a highly interconnected electrical grid. Their configuration and emissions control strategies are relatively homogenous, and their emissions levels and emissions control opportunities are generally very well understood due to longstanding monitoring and data-reporting requirements. Non-EGU sources, by contrast, are relatively heterogeneous, even within a single industrial category, and have far greater variation in existing emissions control requirements, emissions levels, and technologies to reduce emissions. In general, despite these differences, the information available for this proposal indicates that both EGUs and certain non-EGU categories have available cost-effective $NO_X$ emissions reduction opportunities at relatively commensurate cost per ton levels, and these emissions reductions will make a meaningful improvement in air quality

**332a**

at the downwind receptors. Section VI.B.2 of this proposed rule describes EPA's process for selecting specific Tier I and Tier II non-EGU source categories included in this proposed rulemaking.

The EPA notes that its Step 3 analysis does not assess emissions reduction opportunities from mobile sources. The EPA continues to believe that title II of the CAA provides the primary authority and process for reducing ozone-precursor pollutants from mobile sources. EPA's federal mobile source programs have delivered and are projected to continue to deliver substantial nationwide reductions in both VOCs and $NO_X$ emissions; these reductions are factored into the Agency's assessment of air quality and contributions at Steps 1 and 2. Further, states are generally preempted from regulating new vehicles and engines with certain exceptions, and therefore a question exists regarding EPA's authority to address such emissions when regulating in place of the states under CAA section 110(c). *See generally* CAA sections 209, 177. *See also* 86 FR 23099. As noted earlier, the EPA accounted for mobile source emissions reductions resulting from other federally enforceable regulatory programs in the development of emissions inventories used to support analysis for this proposed rulemaking, and the EPA does not evaluate any mobile source control measures in its Step 3 evaluation in this proposal.[142] For further discussion of EPA's existing and ongoing mobile source measures, *see* Section VI.B.4 of this proposed rule.

*B. Identifying Control Stringency Levels*

1. EGU $NO_X$ Mitigation Strategies

In identifying levels of uniform control stringency for EGUs, the EPA assessed the same $NO_X$ emissions controls that the Agency analyzed in the CSAPR Update and the Revised CSAPR Update, all of which are considered to be widely available in this sector: (1) Fully operating existing SCR, including both optimizing $NO_X$ removal by existing operational SCRs and turning on and optimizing existing idled SCRs; (2) installing state-of-the-art $NO_X$

combustion controls; (3) fully operating existing SNCRs, including both optimizing $NO_X$ removal by existing operational SNCRs and turning on and optimizing existing idled SNCRs; (4) installing new SNCRs; (5) installing new SCRs; and (6) generation shifting (*i.e.,* emission reductions anticipated to occur from generation shifting from higher to lower emitting units at each of these stringency levels). For the reasons explained in the EGU $NO_X$ Mitigation Strategies Proposed Rule TSD included in the docket for this proposed rule, the EPA determined that for the regional, multi-state scale of this rulemaking, only EGU $NO_X$ emissions controls 1, 3, and 6 are possible for the 2023 ozone season (fully operating existing SCRs and SNCRs, and associated generation shifting). The EPA finds that it is not possible to install state-of-the-art $NO_X$ combustion controls by the 2023 ozone season on a regional scale for Group 3 states not covered under the Revised CSAPR Rule. The EPA also determined that state-of-the-art $NO_X$ combustion controls at EGUs are available by the beginning of the 2024 ozone season. All cost values discussed below for EGUs are in 2016 dollars.

a. Optimizing Existing SCRs

Optimizing (*i.e.,* turning on idled or improving operation of partially operating) existing SCRs can substantially reduce EGU $NO_X$ emissions quickly, using investments that have already been made in pollution control technologies. With the promulgation of the CSAPR Update and the Revised CSAPR Update, most operators in the covered states improved their SCR performance and have continued to maintain that level of improved operation. However, this optimized SCR performance was not universal and not always sustained. Between 2017 and 2020, as the CSAPR Update ozone-season $NO_X$ allowance price declined, $NO_X$ emissions rates at some SCR-controlled EGUs increased. For example, power sector data from 2019 revealed that, in some cases, operating units had SCR controls that had been idled or were operating partially, and therefore suggested that there remained emissions reduction potential through optimization.[143] The EPA determined that optimizing all of these remaining SCRs in the 12 linked states for the Revised CSAPR Update was a readily available approach for EGUs to reduce $NO_X$ emissions. This

emissions reduction measure is currently available at EGUs across the broader geography affected in this proposed rulemaking (including in states not previously affected by the Revised CSAPR Update). The EPA thus proposes that SCR optimization, of both idled and partially operating controls, is a viable mitigation strategy for the 2023 ozone season.

The EPA estimates a representative marginal cost of optimizing SCR controls to be approximately $1,600 per ton, consistent with its estimation in the Revised CSAPR Update for this technology. EPA's EGU $NO_X$ Mitigation Strategies Proposed Rule TSD for this rule describes a range of cost estimates for this technology noting that the costs are frequently lower than—and for the majority of EGUs, significantly lower than—this representative marginal cost. While the costs of optimizing existing, operational SCRs include only variable costs, the cost of optimizing SCR units that are currently idled considers both variable and fixed costs of returning the control into service. Variable and fixed costs include labor, maintenance and repair, parasitic load, and ammonia or urea for use as a $NO_X$ reduction reagent in SCR systems. Depending on a unit's control operating status, the representative cost at the 90th percentile unit (among the relevant fleet of coal units with SCR covered in this rulemaking) ranges between $900 and $1,700 per ton. The EPA performed an in-depth cost assessment for all coal-fired units with SCRs and found that for the subset of SCRs that are already partially operating, the cost of optimizing is often much lower than $1,600 per ton and is often under $900 per ton. The EPA anticipates the vast majority of realized cost for compliance with this strategy to be better reflected by the $900 per ton end of that range (reflecting the 90th percentile of EGUs optimizing SCRs that are already partially operating) because this circumstance is considerably more common than EGUs that have ceased operating their SCR. EPA's analysis of this emissions control is informed by the latest engineering modeling equations used in EPA's IPM platform. These cost and performance equations were recently updated in the summer of 2021. The description and development of the equations are documented in EGU $NO_X$ Mitigation Strategies Proposed Rule TSD and accompanying documents.[144] They are also

---

[142] The EPA recognizes that mechanisms exist under title I of the CAA that allow for the regulation of the use and operation of mobile sources to reduce ozone-precursor emissions. These include motor vehicle inspection and maintenance (I/M) programs, gasoline vapor recovery, clean-fuel vehicle programs, transportation control programs, and vehicle miles traveled programs. *See, e.g.,* CAA sections 182(b)(3), 182(b)(4), 182(c)(3), 182(c)(4), 182(c)(5), 182(d)(1), 182(e)(3), and 182(e)(4). The EPA views these programs as most effective and appropriate in the context of the planning requirements applicable to designated nonattainment areas.

[143] *See* "Ozone Season Data 2018 vs. 2019" and "Coal-fired Characteristics and Controls" at *https://www.epa.gov/airmarkets/power-plant-data-highlights#OzoneSeason.*

[144] The CSAPR Update estimated $1,400 per ton as a representative cost of turning on idled SCR controls. EPA used the same costing methodology
Continued

implemented in an interactive spreadsheet tool called the Retrofit Cost Analyzer and applied to all units in the fleet. These materials are available in the docket for this proposal.

The EPA is using the same methodology to identify SCR performance as it did in the Revised CSAPR Update. To estimate EGU $NO_X$ reduction potential from optimizing, the EPA considers the difference between the non-optimized $NO_X$ emissions rates and an achievable operating and optimized SCR $NO_X$ emissions rate. To determine this rate, EPA evaluated nationwide coal-fired EGU $NO_X$ ozone season emissions data from 2009 through 2019 and calculated an average $NO_X$ ozone season emissions rate across the fleet of coal-fired EGUs with SCR for each of these eleven years. The EPA found it prudent to not consider the lowest or second-lowest ozone season $NO_X$ emissions rates, which may reflect SCR systems that have all new components (e.g., new layers of catalyst). Data from these systems are potentially not representative of ongoing achievable $NO_X$ emissions rates considering broken-in components and routine maintenance schedules. To identify the potential reductions from SCR optimization in this proposed rule, the EPA followed the same methodology as the Revised CSAPR Update. Considering the emissions data over the full time period from 2009–2019 data results in a third-best rate of 0.079 pounds $NO_X$ per million British thermal units (lb/mmBtu).[145] Therefore, consistent with the Revised CSAPR Update, where EPA identified 0.08 lb/mmBtu as a reasonable level of performance for units with optimized SCR, the EPA proposes a rate of 0.08 lb/mmBtu as the optimized rate for this rule. The EPA notes that half of the SCR-controlled EGUs achieved a $NO_X$ emissions rate of 0.064 lb/mmBtu or less over their third-best entire ozone season. Moreover, for the SCR-controlled coal units that the EPA

identified as having a 2021 emissions rate greater than 0.08 lb/mmBtu, the EPA verified that in prior years, the majority (more than 90 percent) of these same units had demonstrated and achieved a $NO_X$ emissions rate of 0.08 lb/mmBtu or less on a seasonal or monthly basis. This further supports EPA's determination that 0.08 lb/mmBtu reflects a reasonable emissions rate for representing SCR optimization at coal steam units in identifying uniform control stringency. This emissions rate assumption of 0.08 lb/mmBtu reflects what those units would achieve on average when optimized, recognizing that individual units may achieve lower or higher rates based on unit-specific configuration and dispatch patterns. Units historically performing at, or better, than this rate of 0.08 lb/mmBtu are assumed to continue to operate at that prior performance level.

Given the magnitude and duration of the air quality problems addressed by this rulemaking, the EPA also applied the same methodology to identify a reasonable level of performance for optimizing existing SCRs at oil- and gas-fired steam units and simple cycle units (for which EPA determined that a 0.03 lb/mmBtu emissions rate reflected SCR optimization) as well as at combined-cycle units (for which the EPA determined that a 0.012 lb/mmBtu emissions rate reflected SCR optimization).

The EPA evaluated the feasibility of optimizing idled SCRs for the 2023 ozone season. Based on industry past practice, the EPA determined that idled controls can be restored to operation quickly (i.e., in less than 2 months). This timeframe is informed by many electric utilities' previous long-standing practice of utilizing SCRs to reduce EGU $NO_X$ emissions during the ozone season while putting the systems into protective lay-up during the non-ozone season months. For example, this was the long-standing practice of many EGUs that used SCR systems for compliance with the $NO_X$ Budget Trading Program. It was quite typical for SCRs to be turned off following the September 30 end of the ozone season control period. These controls would then be put into protective lay-up for several months of non-use before being returned to operation by May 1 of the following ozone season.[146] Therefore,

the EPA believes that optimization of existing SCRs is possible for the portion of the 2023 ozone season covered under this proposed rule.

The vast majority of SCR-controlled units (nationwide and in the 25 linked states for which EPA is issuing a FIP for EGUs) are already partially operating these controls during the ozone season based on reported 2021 emissions rates. Existing SCRs operating at partial capacity still provide functioning, maintained systems that may only require an increased chemical reagent feed rate (i.e., ammonia or urea) up to their design potential and catalyst maintenance for mitigating $NO_X$ emissions; such units may require increased frequency or quantity of deliveries, which can be accomplished within a few weeks. In many cases, EGUs with SCR have historically achieved more efficient $NO_X$ removal rates than their current performance and can therefore simply revert to earlier operation and maintenance plans that achieved demonstrably better SCR performance.

In the 12 states subject to this control stringency in the Revised CSAPR Update, the EPA observed significant immediate-term improvements in SCR performance in the first ozone season following finalization of that rule, as evidenced in particular by the sharp drop in emissions rate at Miami Fort unit 7 (see EGU $NO_X$ Mitigation Strategies Proposed Rule TSD). Such empirical data further illustrates the viability of this mitigation strategy for the 2023 control period in response to this rule.

b. Installing State-of-the-Art $NO_X$ Combustion Controls

The EPA estimates that the representative cost of installing state-of-the-art combustion controls is comparable to, if not notably less than, the estimated cost of optimizing existing SCR (represented by $1,600 per ton). State-of-the-art combustion controls such as low-$NO_X$ burners (LNB) and over-fire air (OFA) can be installed or updated quickly and can substantially reduce EGU $NO_X$ emissions. Nationwide, approximately 99 percent of coal-fired EGU capacity greater than 25 MW is equipped with some form of combustion control; however, the control configuration or corresponding emissions rates at a small portion of those units (including units in those states covered in this action) indicate they do not currently have state-of-the-

---

while updating for input cost increases (e.g., urea reagent) to arrive at $1,600 per ton in the final Revised CSAPR Update (while also updating from 2011 dollars to 2016 dollars).

[145] The EPA notes that updating the inventory of units to reflect recent retirements and most recent year data (e.g., 2009–2021) would provide a lower value of 0.071 lb/mmBtu. This value is lower than the 0.08 pounds per million British thermal units (lb/mmBtu) assessed in the Revised CSAPR Update as it reflects 2020 data and also excludes the SCR performance of since retired coal units with SCRs. However, 2020 was an outlier year (related to pandemic impacts on the electric grid). Additionally, a unit's retirement does not obviate the usefulness of its data for assessing technology performance. Consequently, EPA is proposing the same value of 0.08 lb/mmBtu identified at the time of the final Revised CSAPR Update Rule.

[146] In the 22-state CSAPR Update region, 2005 EGU $NO_X$ emissions data suggest that 125 EGUs operated SCR systems in the summer ozone season while idling these controls for the remaining 7 non-ozone season months of the year. Units with SCR were identified as those with 2005 ozone season average $NO_X$ rates that were less than 0.12 lbs/mmBtu and 2005 average non-ozone season $NO_X$

emissions rates that exceeded 0.12 lbs/mmBtu and where the average non-ozone season $NO_X$ rate was more than double the ozone season rate.

art combustion control technology. As described in the Revised CSAPR Update, the Agency updated its $NO_X$ emissions rates for upgrading existing combustion controls to state-of-the-art combustion control. The EPA is maintaining its determination that $NO_X$ emissions rates of 0.146 to 0.199 lbs/mmBtu can be achieved on average depending on the unit's boiler configuration,[147] and, once installed, reduce $NO_X$ emissions at all times of EGU operation.

These assumptions are consistent with the Revised CSAPR Update and they are further discussed in the EGU $NO_X$ Mitigation Strategies Proposed Rule TSD. In particular, the EPA proposes to apply the 0.199 lb/mmBtu emissions rate assumption for all unit types, consistent with its determination in the Revised CSAPR Update. The average emissions rate assumption derived from EPA's analysis would be 0.199 lb/mmBtu for combustion controls on dry bottom wall fired units and 0.146 lb/mmBtu for tangentially fired units. However, stakeholders have provided detailed analysis of how other unit considerations, such as coal rank, can result in large deviations from what has been historically demonstrated with this combustion control technology. Based on this and EPA's review of historical performance data for tangentially-fired units by coal rank with state-of-the-art combustion controls, the EPA determined in the final Revised CSAPR Update that it was appropriate to use the 0.199 lb/mmBtu rate for both tangentially and wall-fired units when estimating reduction potential for units with combustion control upgrade potential.

The EPA proposes to continue that approach in this action. Many of the likely impacted units burn bituminous coal, and the 0.146 lb/mmBtu nationwide average for tangentially-fired (inclusive of subbituminous units) appears to be below the demonstrated emissions rate of state-of-the-art combustion controls for bituminous coal units of this boiler type. Therefore, EPA's assumption of 0.199 lb/mmBtu for combustion controls is robust to current and future coal choice at a unit.

In promulgating CSAPR, the EPA examined the feasibility of installing combustion controls, and found that industry had demonstrated ability to install state-of-the-art LNB controls on a large unit (800 MW) in under six months when including the pre-installation phases (design, order

placement, fabrication, and delivery).[148] In prior rules, the EPA has documented its own assessment of combustion control timing installation as well as evaluated comments it received regarding installation of combustion controls from the Institute of Clean Air Companies.[149] Those comments provided information on the equipment and typical installation time frame for new combustion controls, accounting for all steps. Commenters noted that it generally takes between 6–8 months on a typical boiler—covering the time through bid evaluation through start-up of the technology. The deployment schedule is repeated here as:

- 4–8 weeks—bid evaluation and negotiation
- 4–6 weeks—engineering and completion of engineering drawings
- 2 weeks—drawing review and approval from user
- 10–12 weeks—fabrication of equipment and shipping to end user site
- 2–3 weeks—installation at end user site
- 1 week—commissioning and start-up of technology

Given the above timeframe of approximately 6 to 8 months to complete combustion control installation in the region, the EPA is proposing to determine that installation of state-of-the-art combustion controls is a readily available approach for EGUs to reduce $NO_X$ emissions by the start of the 2024 ozone season. More details on these analyses can be found in the EGU $NO_X$ Mitigation Strategies Proposed Rule TSD.

The cost of installing state-of-the-art combustion controls per ton of $NO_X$ reduced is dependent on the combustion control type and unit type. The EPA estimates the cost per ton of state-of-the-art combustion controls to be $400 per ton to $1,200 per ton of $NO_X$ removed using a representative capacity factor of 85 percent. This cost fits well within EPA's representative cost threshold observed for SCR optimization and combustion controls (of $1,600 per ton) which would accommodate combustion control upgrade even under scenarios where a lower capacity factor is assumed. *See* the EGU $NO_X$ Mitigation Strategies

Proposed Rule TSD for additional details.

### c. Optimizing Already Operating SNCRs or Turning on Idled Existing SNCRs

Optimizing already operating SNCRs or turning on idled existing SNCRs can also reduce EGU $NO_X$ emissions quickly, using investments in pollution control technologies that have already been made. Compared to no post-combustion controls on a unit, SNCRs can achieve a 25 percent reduction on average in EGU $NO_X$ emissions (with sufficient reagent). They are less capital intensive but less efficient at $NO_X$ removal than SCRs. These controls are in use to some degree across the U.S. power sector. In the 25 linked states identified in this proposed rule with identified EGU reductions in their proposed FIP, approximately 11 percent of coal-fired EGU capacity is equipped with SNCR.[150] Recent power sector data suggest that, in some cases, SNCR controls have been operating less in 2021 relative to performance in prior years.

The EPA determined that optimizing already operating SNCRs or turning on idled SNCRs is an available approach for EGUs to reduce $NO_X$ emissions, has similar implementation timing to restarting idled SCR controls (less than 2 months for a given unit), and therefore could be implemented in time for the 2023 ozone season. The EPA is proposing implementation of this emissions control technology beginning in the 2023 ozone season.

Using an updated data assessment using the Retrofit Cost Analyzer described in the EGU $NO_X$ Mitigation Strategies Proposed TSD, the EPA estimates a representative cost of optimizing SNCR ranging from approximately $1,800 per ton (for partially operating SNCRs) to $3,900 per ton (for idled SNCRs). For existing SNCRs that have been idled, unit operators may need to restart payment of some fixed and variable operating costs including labor, maintenance and repair, parasitic load, and ammonia or urea. The EPA determined that the majority of units with existing SNCR optimization potential were already partially operating their controls. Therefore, the EPA proposes a representative cost of $1,800 per ton for SNCR optimization as this value best reflects the circumstances of the majority of the affected EGUs with SNCR.

---

[147] Details of EPA's assessment of state-of-the-art $NO_X$ combustion controls are provided in the EGU $NO_X$ Mitigation Strategies Proposed Rule TSD.

[148] The EPA finds that, generally, the installation phase of state-of-the-art combustion control upgrades—on a single-unit basis—can be as little as 4 weeks to install with a scheduled outage (not including the pre-installation phases such as permitting, design, order, fabrication, and delivery) and as little as 6 months considering all implementation phases.

[149] EPA–HQ–OAR–2015–0500–0093.

[150] *https://www.epa.gov/airmarkets/national-electric-energy-data-system-needs-v6.*

## d. Installing New SNCRs

Like existing SNCRs, new SNCR retrofit is also available to power plants and can achieve a 25% NO$_X$ reduction on average. The EPA evaluated potential emissions reductions and associated costs from retrofitting EGUs with new SNCR post-combustion controls at steam units lacking such controls. New SNCR technology provides owners with a relatively less capital-intensive option for reducing NO$_X$ emissions compared to new SCR technology, albeit at the expense of higher operating costs on a per-ton basis and less total emissions reduction potential. SNCR is more widely observed on relatively smaller coal units given its low capital/variable cost ratio. The average capacity of a coal unit with SNCR is half the size of the average capacity of coal unit with SCR.[151] Given these observations, the EPA identifies this technology as an emissions reduction measure for coal units less than 100 MW lacking post-combustion NO$_X$ control technology. As described in the EGU NO$_X$ Mitigation Strategies Proposed Rule TSD, the EPA estimated that $6,700 per ton reflects a representative SNCR retrofit cost level for a majority of these units.

SNCR installations generally have shorter project installation timeframes relative to other post-combustion controls. The time for engineering review, contract award, fabrication, delivery, and hookup is as little as 16 months including pre-contract award steps for an individual power plant installing controls on more than one boiler. This timeframe would mean the control would be available for the start of the 2024 or 2025 ozone season (*i.e.,* calculating 16 months from when this proposal is finalized). However, SNCR retrofits have less pollution reduction potential than alternative post-combustion controls such as SCRs. The EPA is not identifying SNCR technology as a strategy for larger steam units due to this lower removal efficiency and the empirical evidence of existing sources preferring the more efficient SCRs. Even for those smaller units less than 100 MWs identified as potential candidates for this technology, the EPA does not want to preclude those units from pursuing more advanced pollution controls. Therefore, the EPA also considers the point in time when all types of post-combustion control installation could be achieved—*i.e.,* by the 2026 ozone season. SNCR installation share similar implementation steps with and also

need to account for the same regional factors as SCR installations.[152] Therefore, while the EPA is determining that at least 16 months would be needed to complete all necessary steps of SNCR development and installation at the EGUs not currently equipped with SNCRs in the 25 states linked to downwind receptors in this proposed rule, the EPA notes that the Agency evaluated SNCR as a post-combustion control technology collectively with SCR and estimated installation timing considerations of 36 months. EPA believes its proposed collective timing considerations for post-combustion control retrofit (SNCR and SCR) are practicable given that the preferable capital-intensive investment retrofit decision would be highly unit-specific and subject to a unit's compliance strategy choices with respect to multiple regulatory requirements.

Nonetheless, the EPA is requesting comment on whether post-combustion control timing assumptions (SCR and SNCR) should be decoupled, which would result in the EPA using the 16-month time frame specific to SNCR installation to estimate the first year in which these reductions are available. The EPA is only identifying this technology for units less than 100 MW (a size at which units rarely implement SCR retrofit technology). In effect, decoupling these timing assumptions would move the reductions associated with this control stringency from beginning in the 2026 ozone season to beginning in the 2024 or 2025 ozone season (depending on when this proposal is finalized). This would impact approximately 1,000 tons of identified reduction potential related to SNCR retrofit.

## e. Installing New SCRs

Selective Catalytic Reduction (SCR) controls already exist on approximately 60% of the coal fleet in the linked states that would be subject to a FIP in this proposed rulemaking. Nearly every pulverized coal unit larger than 100 MW built in the last 30 years has installed this control, which is generally required for Best Available Control Technology

(BACT) purposes. Other than circulating fluidized bed coal units which can achieve a comparably low emissions rate without this technology, the EPA identifies this emissions reduction measure for coal steam units greater than or equal to 100 MW. SCR is widely available for existing coal units of this size and can provide significant emissions reduction potential, with removal efficiencies of up to 90 percent. The EPA limited its consideration of SCR technology to steam units greater than or equal to 100 MW. The costs for retrofitting a plant smaller than 100 MW with SCR increase rapidly due to a lack of economy of scale.[153]

The amount of time needed to retrofit an EGU with new SCR extends beyond the 2023 ozone season. The EPA proposes that a strategy of retrofitting new SCR on a fleetwide, regional scale is available by, but no earlier than, the 2026 ozone season. Similar to the SNCR retrofits discussed above, the EPA evaluated potential emissions reductions and associated costs from this control technology, as well as the impacts and need for this emissions control strategy, at the earliest point in time when their installation could be achieved. In the past, the EPA has found the amount of time to retrofit a single EGU with new SCR, depending on the regulatory program under which such control may be required, may vary between approximately 2 and 4 years depending on site-specific engineering considerations and on the number of installations being considered. This includes steps for engineering review, construction permit, operating permit, and control technology installation (including fabrication, pre-hookup, control hookup, and testing). EPA's assessment of installation procedures suggests as little as 21 months may be needed for a single SCR at an individual plant and 36 months at a single plant with multiple boilers. EPA's assessment of units with SCR retrofit potential indicate the majority fall into this first classification, *i.e.,* a single SCR at a power plant. Given that some of the assumed SCR retrofit potential occurs at plants with multiple units identified with retrofit potential, and given the total volume of SCR retrofit capacity being implemented across the region, the EPA is proposing 36 months as an appropriate time frame to accommodate both instances as well as scheduling necessities attributable to the regional-scale nature of the program.

---

[151] *See* EGU NO$_X$ Mitigation Strategies Proposed Rule TSD for additional discussion.

[152] A month-by-month evaluation of SNCR installation is discussed in EPA's NO$_X$ Mitigation Strategies Proposed Rule TSD and in EPA's "Engineering and Economic Factors Affecting the Installation of Control Technologies for Multipollutant Strategies". The analysis in this exhibit estimates the installation period from contract award as within a 10–13-month timeframe. The exhibit also indicates a 16-month timeframe from start to finish, inclusive of pre-contract award steps of the engineering assessment of technologies and bid request development. The timeframe cited for installation of SNCR at an individual source in this action is consistent with this more complete timeframe estimated by the analysis in the exhibit.

[153] IPM Model-Updates to Cost and Performance for APC Technologies. SCR Cost Development Methodology for Coal-fired Boilers. February 2022.

Further, the EPA notes that it has previously determined in the context of ozone transport that regional scale implementation of SCRs at numerous EGUs is achievable in 36 months. *See* 63 FR 57356, 57447–50 (October. 27, 1998). The EPA has at times also found up to 39–48 months to be an appropriate installation timeframe for regionwide actions when the EPA is evaluating multiple installations at multiple locations.[154] However, as discussed in greater detail in Section VII.A in this proposed rule, the EPA now recognizes that the *Wisconsin* decision invalidated the standard under which the EPA had been evaluating appropriate compliance timeframes for purposes of assessing interstate transport under the good neighbor provision when the Agency had concluded a 39–48 month timeframe to install SCR was appropriate.

The Agency examined the cost for retrofitting a coal unit with new SCR technology, which typically attains controlled NO$_X$ rates of 0.05 lbs/mmBtu or less. These updates are further discussed in the EGU NO$_X$ Mitigation Strategies Proposed Rule TSD.[155] Based on the characteristics of coal units of 100 MW or greater capacity that do not have post-combustion NO$_X$ control technology, the EPA estimated a weighted-average representative SCR cost of $11,000 per ton.[156]

The 0.05 lb/mmBtu emission rate performance assumption for new SCR retrofits is supported by historical data and third party independent review by pollution control engineering and consulting firms. The EPA first examined unit-level emission rate data for coal-fired units that had a relatively recent SCR installation (within the last 10 years). These SCR retrofits reflect the most recent vintage of the pollution control technology applied to the power sector and are representative of new SCR retrofit capability. Although regulatory requirements or economic

incentives were not necessarily in place during this time period for these SCRs to operate at their full potential, the EPA found that half of these units had still demonstrated a seasonal emission rate of 0.05 lb/mmBtu or lower and 78 percent had demonstrated this rate on a monthly basis. The best performing 10 percent of these SCRs were demonstrating seasonal emission rates of 0.036 lb/mmBtu during this time.

While the EPA identified the 0.05 lb/mmBtu performance assumption consistent with historical data, these performance levels are also informed and consistent with the Agency's IPM modeling assumptions used for more than a decade. These modeling assumptions are based on input from leading engineering and pollution control consulting entities. Most recently, these data assumptions were affirmed and updated in the summer of 2021 and included in the docket for this rulemaking. The EPA relies on a global firm providing engineering, construction management, and consulting services for power and energy with expertise in grid modernization, renewable energy, energy storage, nuclear power, and fossil fuels. Their familiarity with state-of-the art pollution controls at power plants derives from experience providing comprehensive project services—from consulting, design, and implementation to construction management, commissioning, and operations/maintenance. This review and update supported the 0.05 lb/mmBtu performance assumption as a representative emission rate for new SCR across coal types.

The EPA performed an assessment for oil/gas steam units in which it evaluated the nationwide performance of those units with SCR technology. For these units, the EPA tabulated EGU NO$_X$ ozone season emissions data from 2009 through 2021 and calculated an average NO$_X$ ozone season emissions rate across the fleet of oil- and gas-fired EGUs with SCR for each of these years. The EPA identified the third lowest year which yielded an SCR performance rate of 0.03 lb/mmBtu as representative of performance for this retrofit technology applied to this type of EGU. Next, the EPA evaluated the emissions and operational characteristics for the existing oil/gas steam fleet lacking SCR technology. EPA's analysis indicated that the majority of reduction potential (approximately 76 percent) from these units occurred at units greater than or equal to 100 MW and that were emitting more than 150 tons per ozone season (*i.e.,* approximately 1 ton per day). Moreover, the cost of reductions for

units falling below these criteria increased significantly. Therefore, the EPA identified the portion of the oil/gas steam fleet meeting this criteria as representative of the SCR retrofit reduction potential.[157] For this segment of the oil/gas steam units lacking post-combustion NO$_X$ control technology, the EPA estimated a weighted-average representative SCR cost of $7,700 per ton.

#### f. Generation Shifting

Finally, EPA evaluates emissions reduction potential from generation shifting across the representative dollar per ton levels estimated for the emissions controls considered above. As the cost of emitting NO$_X$ increases, it becomes increasingly cost-effective for units with lower NO$_X$ rates to increase generation, while units with higher NO$_X$ rates reduce generation. Because the cost of generation is unit-specific, this generation shifting occurs incrementally on a continuum. Consequently, there is more generation shifting at higher cost NO$_X$-control levels.

It is reasonable for the EPA to quantify and include the emissions reduction potential from generation shifting at cost levels that are representative of the emissions control technologies evaluated in the multi-factor analysis, because all EGUs that would be regulated by this proposed rule participate in highly coordinated, interconnected systems where generation shifting will inevitably occur in response to pollution control requirements. If the EPA did not account for such emissions reduction potential in its analysis at Step 3, seeking emissions reductions from pollution control measures at higher-NO$_X$-emitting EGUs would still incentivize generation shifting toward lower-NO$_X$-emitting EGUs when sources comply under the remedy mechanism established in Step 4, and the corresponding reductions in emissions achieved through such generation shifting would potentially substitute for some of the emissions reductions intended through control operation and installation, potentially lessening the implementation of those mitigation strategies. Generation shifting treatment and results are discussed in greater detail in the EGU NO$_X$ Mitigation Strategies Proposed TSD and the Ozone Transport Policy Analysis Proposed Rule TSD.

---

[154] *See, e.g.,* CSAPR Close-Out, 83 FR 65878, 65895 (December 21, 2018). *See also* Final Report: Engineering and Economic Factors Affecting the Installation of Control Technologies for Multipollutant Strategies, EPA–600/R–02/073 (Oct. 2002), available at *https://nepis.epa.gov/Adobe/PDF/P1001G00.pdf.*

[155] As noted in that TSD, approximately half of the recent SCR retrofits (*i.e.,* installed in the last 10 years) have demonstrated an emission rate across the ozone season below 0.05 lb/mmBtu, even absent a requirement or strong incentive to operate at that level in many cases.

[156] This cost estimate is representative of coal units lacking any post-combustion control. A subset of units within the universe of coal sources with SCR retrofit potential, but that have an existing SNCR technology in place would have a weighted average cost that falls above this level, but still cost effective. See the EGU NO$_X$ Mitigation Strategies Proposed Rule TSD for more discussion.

[157] The EPA used a 3 year average of 2019–2021 reported ozone season emissions to derive a tons per ozone season value representative for each covered oil/gas steam unit.

The EPA notes that its treatment of generation shifting here is consistent with the prior CSAPR rulemakings and is grounded on the same statutory authority. *See, e.g.,* 76 FR 48208, 48280 (August 8, 2011). As the EPA explained in the CSAPR Update:[158]

The good neighbor provision requires state and federal plans implementing its requirements to "prohibit[ ] . . . *any source or other type of emissions activity within the State* from emitting any air pollutant in *amounts* which will" significantly contribute to nonattainment or interfere with maintenance of the NAAQS in any other state. CAA section 110(a)(2)(D)(i)(I) (emphasis added). . . . [T]he statute does not limit the EPA's authority under the good neighbor provision to basing regulation only to control strategies for individual sources. The statute authorizes the state or EPA in promulgating a plan to prohibit emissions from "any source or other type of emissions activity within the State" that contributes (as determined by EPA) to the interstate transport problem with respect to a particular NAAQS. This broad statutory language shows that Congress was directing the states and the EPA to address a wide range of entities and activities that may be responsible for downwind emissions. However, this provision is silent as to the type of emissions reduction measures that the states and the EPA may consider in establishing emissions reduction requirements, and it does not limit those measures to individual source controls. . . . The EPA reasonably interprets this provision to authorize consideration of a wide range of measures to reduce emissions from sources, which is consistent with the broad scope of this provision, as noted immediately above.

81 FR 74545.[159] The EPA continued to apply this same understanding in the Revised CSAPR Update. *See* 86 FR 23054, 23095–97 (April 30, 2021); *see also* 85 FR 68964, 68992–93 (October 30, 2020).

The EPA requests comment on the suite of mitigation technologies for EGUs described earlier and assessed in the determination of significant contribution. The EPA requests comment on the assumed performance or emissions rate of the technology, the representative cost, and the timing for installation.[160] Additionally, the EPA requests comment on whether other EGU ozone-season $NO_X$ Mitigation technologies should be required to eliminate significant contribution. For instance, the EGU $NO_X$ Mitigation Strategies Proposed Rule TSD discusses certain mitigation technologies that have been applied to "peaking" units (small, low capacity factor gas combustion turbines often only operating during periods of peak demand). To the extent that any of these sources meet the applicability requirements and are covered in the Group 3 trading program under this proposed rulemaking, they would have an incentive to reduce emissions consistent with the ozone season $NO_X$ allowance price. The EPA has not identified determinative evidence that there are additional meaningful, cost-effective upwind reductions from these emission controls that are not already being addressed by state rules. EPA's analysis discussed in the EGU $NO_X$ Mitigation Strategies Proposed Rule TSD highlights that there are 32 units emitting more than 10 tons per year on average for the 2019–2021 ozone seasons and lacking combustion controls or more advanced controls (totaling approximately 1,000 tons of ozone season $NO_X$ emissions in 2021). Some of the units in the limited inventory are subject to state requirements delivering additional reductions by 2023. Moreover, the EPA analysis suggested $25,000–$30,000 per ton estimates for dry low $NO_X$ burners or ultra-low $NO_X$ burners at these units, and over $100,000 per ton for SCR retrofit at some combustion turbines. Therefore, the EPA is not proposing any additional reductions from new controls for inclusion in its combustion control or retrofit technology breakpoints. Although the EPA is not proposing a mitigation technology for this type of unit, it requests comment on the potential emissions reductions and cost from such sources in covered states that do not currently have mitigation requirements for such sources.

### 2. Non-EGU $NO_X$ Mitigation Strategies

#### a. Determining Non-EGU $NO_X$ Reduction Potential

The number of different industries and emissions unit categories and types, as well as the total number of emissions units that comprise the universe of non-EGU sources, makes it challenging to define a single method to identify appropriate control technologies, measures, or strategies and resulting impactful emissions reductions. Because of these challenges, the EPA adopted a different approach for assessing non-EGU $NO_X$ emissions reduction potential than the approach for EGUs described in the preceding section. To assess emissions reduction potential from non-EGUs, the EPA first performed a screening assessment to identify those industries that could have the greatest air quality impact at downwind receptors. This was followed by an assessment estimating annual $NO_X$ emissions reduction potential at specific cost thresholds for each of the most impactful industries. Next, the EPA estimated the reductions in ozone concentrations resulting from the emissions reductions for each industry in each of the 27 linked upwind states. As described later, the results indicate that the most impactful industries fall into two tiers based on the estimated reductions in ozone concentrations associated with the $NO_X$ emissions reductions.

The Agency incorporated air quality information as a first step in an analytical framework to help determine potentially impactful industries to focus on for further assessing potential controls, emissions reduction potential, air quality improvements, and costs. The EPA developed the analytical framework using inputs from the air quality modeling for the Revised CSAPR Update for 2023,[161] as well as the projected 2023 annual emissions inventory from the 2016v2 emissions platform that was used for the air quality modeling for this proposed rule. Additional information on the analytical framework is presented in the Non-EGU Screening Assessment memorandum available in the docket.

Using the Revised CSAPR Update modeling for 2023, the EPA identified upwind states linked to downwind nonattainment or maintenance receptors using the 1 percent of the NAAQS threshold criterion, which is 0.7 ppb (1 percent of a 70 ppb NAAQS). In 2023 there were 27 linked states for the 2015 ozone NAAQS: Alabama, Arkansas, California, Delaware, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming.

---

[158] The EPA discussed its legal authority for and the technical viability of generation shifting as a method of emissions reduction under the good neighbor provision in the CSAPR Update. *See especially* 81 FR 74504, 74545–47; *see also* CSAPR Update Response to Comment Document at 546–550 (legal authority); *id.* 528–533 (technical feasibility). *See* Final Revised CSAPR Update, 86 FR 23096–97.

[159] The EPA also noted in the CSAPR Update, "Interpreting the Good Neighbor Provision to be sufficiently broad to authorize reliance on generation shifting is also consistent with the legislative history for the 1970 CAA Amendments. The Senate Report stated that to achieve the NAAQS, '[g]reater use of natural gas for electric power generation may be required,'" S. Rep. No. 91–1196 at 2." 81 FR 74545 n.141.

[160] The feasibility of the timetable for emissions reductions from both EGUs and non-EGUs is further addressed in Section VII.A of this proposed rule.

[161] The EPA used the Revised CSAPR Update air quality modeling for this screening assessment because the air quality modeling for this proposed rule was not completed in time to support the assessment.

To analyze non-EGU emissions units, the EPA aggregated the underlying projected 2023 emissions inventory data into industries defined by 4-digit NAICS. Then for linked states, the EPA followed the 2-step process below:

Step 1—The EPA identified industries whose potentially controllable emissions have the greatest ppb impact on downwind air quality, and

Step 2—The EPA determined which of the most impactful industries and emissions units had the most emissions reductions that would make meaningful air quality improvements at the downwind receptors at a marginal cost threshold the EPA determined using underlying control device efficiency and cost information.

To estimate the contributions by industry, defined by 4-digit NAICS, at each downwind receptor the EPA used the 2023 state-receptor specific Revised CSAPR Update ppb/ton values and the Revised CSAPR Update calibration factors used in the air quality assessment tool (AQAT) for control analyses in 2023.[162] The EPA focused on assessing emissions units that emit greater than 100 tons per year (tpy) of NOₓ.[163] By limiting the focus to potentially controllable emissions, well-controlled sources that still emit greater than 100 tpy are excluded. Instead, the focus is on uncontrolled sources or sources that could be better controlled at a reasonable cost. As a result, reductions from any industry identified by this process are more likely to be achievable and to lead to air quality improvements.

From this information, the EPA prepared a summary with the estimated total, maximum, and average contributions from each industry and the number of receptors with contributions greater than or equal to 0.01 ppb from each industry.[164] The

EPA used this information to identify breakpoints in the data to determine which industries to focus on for the next steps in its analysis, as described in the Non-EGU Screening Assessment memorandum.

A review of the maximum contribution data indicated that the EPA should focus the assessment of NOₓ reduction potential and cost primarily on four industries. These industries each (1) have a maximum contribution to any one receptor of greater than 0.10 ppb and (2) contribute greater than or equal to 0.01 ppb to at least 10 receptors. The four industries identified below comprise the "Tier 1" non-EGU industries.

- Pipeline Transportation of Natural Gas
- Cement and Concrete Product Manufacturing
- Iron and Steel Mills and Ferroalloy Manufacturing
- Glass and Glass Product Manufacturing

In addition to these industries, the maximum contribution data suggests including five additional industries as a second tier in the assessment. These industries each either have (1) a maximum contribution to any one receptor greater than or equal to 0.10 ppb but contribute greater than or equal to 0.01 ppb to fewer than 10 receptors, or (2) a maximum contribution less than 0.10 ppb but contribute greater than or equal to 0.01 ppb to at least 10 receptors. The five industries identified below comprise the "Tier 2" non-EGU industries.

- Basic Chemical Manufacturing
- Petroleum and Coal Products Manufacturing
- Metal Ore Mining
- Lime and Gypsum Product Manufacturing
- Pulp, Paper, and Paperboard Mills

For additional discussion of the contribution information, see Appendix A of the Non-EGU Screening Assessment memorandum included in the docket for this proposed rulemaking.

Next, to identify an annual cost threshold for evaluating potential emissions reductions in the Tier 1 and Tier 2 industries, the EPA used the Control Strategy Tool (CoST)[165] the

Control Measures Database (CMDB),[166] and the projected 2023 emissions inventory to prepare a listing of potential control measures, and costs, applied to non-EGU emissions units in the projected 2023 emissions inventory. Using these data, the EPA plotted curves for Tier 1 industries, Tier 2 industries, Tier 1 and 2 industries, and all industries at $500 per ton increments. Figure 1 on page 4 of the Non-EGU Screening Assessment memorandum, which is available in the docket for this proposed rulemaking, indicates there is a "knee in the curve" at approximately $7,500 per ton (all non-EGU cost estimates in the assessment and presented in the rest of this section are in 2016 dollars). The EPA used this marginal cost threshold to further assess potential control strategies, estimated emissions reductions, air quality improvements, and costs from the potentially impactful industries. Note that controls and related emissions reductions are available at several estimated cost levels up to the $7,500 per ton threshold. (These costs do not include monitoring, recordkeeping, reporting, or testing costs.)

Next, using the marginal cost threshold of $7,500 per ton, to estimate emissions reductions and costs the EPA processed the CoST run using the maximum emissions reduction algorithm,[167] with known controls.[168] The EPA identified controls for non-EGU emissions units in the Tier 1 and Tier 2 industries that cost up to $7,500 per ton. The EPA then calculated air quality impacts associated with the estimated reductions for the 27 linked states in 2023 using the following steps.

1. The EPA binned the estimated reductions by 4-digit NAICS code into the Tier 1 and Tier 2 industries.

2. The EPA used the 2023 state-receptor specific Revised CSAPR Update ppb/ton values and the Revised CSAPR Update calibration factors used in the AQAT for control analyses in 2023. The EPA multiplied the estimated

---

[162] The calibration factors are receptor-specific factors. For the Revised CSAPR Update, the calibration factors were generated using 2016 base case and 2023 base case air quality model runs. These receptor-level ppb/ton factors are discussed in the Ozone Transport Policy Analysis Final Rule TSD found here: *https://www.epa.gov/sites/default/files/2021-03/documents/ozone_transport_policy_analysis_final_rule_tsd_0.pdf*.

[163] In the non-EGU emissions reduction assessment prepared for the Revised Cross State Air Pollution Rule Update (*https://www.regulations.gov/document/EPA-HQ-OAR-2020-0272-0014*), The EPA reviewed emissions units with >150 tpy of NOₓ emissions. In this assessment, EPA broadened the scope to include emissions units with greater than or equal to 100 tpy of NOₓ emissions.

[164] The EPA chose to include in the Non-EGU NOₓ reduction potential analysis those industries that contribute at least 0.01 ppb to a downwind receptor in order to focus the analysis on the most impactful industries. The 0.01 criterion is based on an analysis of the distribution and relative

magnitude of contributions from 41 industries, as identified in the Non-EGU Screening Assessment memorandum. From these data the EPA determined that 0.01 ppb provides a meaningful conservative breakpoint for screening out non-impactful industries from the Non-EGU analysis in this proposed rule. Details on this analysis that provides the basis for using 0.01 ppb can be found in the Non-EGU Screening Assessment memorandum.

[165] Further information on CoST can be found at the following link: *https://www.epa.gov/economic-*

*and-cost-analysis-air-pollution-regulations/cost-analysis-modelstools-air-pollution*.

[166] The CMDB is available at the following link: *https://www.epa.gov/economic-and-cost-analysis-air-pollution-regulations/cost-analysis-modelstools-air-pollution*.

[167] The maximum emissions reduction algorithm assigns to each source the single measure (if a measure is available for the source) that provides the maximum reduction to the target pollutant. For more information, *see* the CoST User's Guide available at the following link: *https://www.cmascenter.org/cost/documentation/3.7/CoST%20User's%20Guide/*.

[168] Known controls are well-demonstrated control devices and methods that are currently used in practice in many industries. Known controls do not include cutting edge or emerging pollution control technologies.

non-EGU reductions by the ppb/ton values and by the receptor-specific calibration factor to estimate the ppb impacts from these emissions reductions.

Next, because boilers represent the majority emissions units in the Tier 2 industries for which there were controls that cost up to $7,500 per ton, the EPA further targeted emissions reductions and air quality improvements in Tier 2 industries by identifying potentially impactful industrial, commercial, and institutional (ICI) boilers. To identify potentially impactful boilers, using the projected 2023 emissions inventory in the linked upwind states, the EPA identified a universe of boilers with greater than 100 tpy $NO_X$ emissions that had contributions at downwind receptors.[169][170] The EPA refined the universe of boilers to a subset of impactful boilers by sequentially applying the three criteria below to each boiler. This approach is similar to the overall analytical framework and was tailored for application to individual boilers.[171]

• Criterion 1—Estimated maximum air quality contribution at an individual receptor of greater than or equal to 0.0025 ppb or estimated total contribution across downwind receptors of greater than or equal to 0.01 ppb.

• Criterion 2—Controls that cost up to $7,500 per ton.

• Criterion 3—Estimated maximum air quality improvement at an individual receptor of greater than or equal to 0.001 ppb.

Lastly, the EPA updated its analytical framework to the 2026 analytic year by which the EPA is proposing non-EGU controls be installed across the Tier 1 and Tier 2 industries and various emissions unit types. The EPA concluded, based on the most recent information available from the CSAPR Update Non-EGU TSD,[172] that controls

on all of the non-EGU emissions units cannot be installed by the 2023 ozone season. The EPA prepared the non-EGU screening assessment for the year 2026 by generally applying the analytical framework detailed above, with some modifications. The updated screening assessment results for 2026 are discussed in Section VI.C.2 [173] of this proposed rule. Specifically, the EPA

• Retained the impactful industries identified in Tier 1 and Tier 2, the $7,500 cost per ton threshold, and the methodology for identifying impactful boilers;

• Modified the framework to address challenges associated with using the projected 2023 emissions inventory by using the 2019 emissions inventory; [174] and

• Updated the air quality modeling data by using the most recent air quality modeling data for this proposal for the analytic year 2026.

### 3. Other Stationary Sources $NO_X$ Mitigation Strategies

As part of its analysis for this proposed rule, the EPA also reviewed whether $NO_X$ mitigation strategies for any other stationary sources may be appropriate. In this section, the EPA discusses three classes of units that have historically been excluded from our interstate air transport programs: (1) Units less than or equal to 25 MW, (2) solid waste incineration units, and (3) cogeneration units. EPA's initial assessment does not lead it to propose inclusion of the units less than or equal to 25 MW, but the EPA is requesting comment on any particular units within this category that may offer cost-effective reduction potential. The EPA is also taking comment on and considering whether to include emissions limitations for solid waste incineration units (many of which are less than 25 MW) in a final rule, as discussed later. For cogeneration units previously exempted from EGU emissions budgets established through ozone interstate transport rules, the EPA has not

identified a basis for inclusion in this proposal.

The EPA has not historically identified substantial emissions reduction or air quality gains from corresponding reductions from these segments of units and has therefore not considered inclusion of these segments of stationary sources in its federal programs for interstate transport.

However, given the need to implement a full remedy to address interstate transport, the more stringent 2015 ozone NAAQS of 70 ppb, and the extended period of time for which the EPA projects upwind contribution to persistent nonattainment and maintenance problems, the EPA is requesting comment on whether sources within these three segments—units serving a generator equal or smaller than 25 MW, cogeneration units, and solid waste incineration units—could merit inclusion within EPA's proposed $NO_X$ mitigation strategy in this rule. Specifically, the EPA requests comment on available $NO_X$ mitigation technologies, $NO_X$ emissions rate performance, total potentially available $NO_X$ reductions, installation timing, cost, air quality impacts, source-specific information, and any other information that could inform a control determination specific to these three types of units. The EPA provides an assessment of these three segments, their emissions control opportunities, and potential air quality benefits below. Additional considerations are further discussed in the EGU $NO_X$ Mitigation Strategies Proposed Rule TSD.

#### a. Units Less Than or Equal to 25 MW

The EPA has historically not included control requirements for emissions for units less than or equal to 25 MW for three primary reasons: Low potential reductions, relatively high cost per ton of reduction, and high monitoring and other compliance burdens. In the January 11, 1993, Acid Rain permitting rule, the EPA provided for a conditional exemption from the emissions reduction, emitting, and emissions monitoring requirements of the Acid Rain Program for new units having a nameplate capacity of 25 MW or less that burn fuels with a sulfur content no greater than 0.05% by weight, because of the *de minimis* nature of their potential $SO_2$, $CO_2$ and $NO_X$ emissions. *See* 63 FR 57484. The $NO_X$ SIP Call identified these as *Small Point Sources.* For the purposes of that rulemaking, the EPA considered electricity generating boilers and turbines serving a generator 25 MWe or less, to be small point sources. The EPA noted that the collective emissions from small sources

---

[169] The EPA used the 2023fj non-EGU point source inventory files from the 2016v2 emissions platform.

[170] Maryland, Missouri, Nevada, and Wyoming did not have boilers with >100 tpy $NO_X$ emissions.

[171] For the impactful boiler assessment, the estimated air quality contributions and improvements were not based on modeling of individual emissions units or emissions source sectors. The air quality estimates were derived by using the 2023 state/receptor specific Revised CSAPR Update ppb/ton values and the Revised CSAPR Update calibration factors used in AQAT. The results indicate a level of precision not supported by the underlying air quality modeling. The results were intended to provide an indication of the relative impact across sources.

[172] Final Technical Support Document (TSD) for the Final Cross-State Air Pollution Rule for the 2008 Ozone NAAQS, Assessment of Non-EGU $NO_X$ Emissions Controls, Cost of Controls, and Time for Compliance Final TSD ("CSAPR Update Non-EGU TSD"), August 2016, available at *https://*

*www.epa.gov/csapr/assessment-non-egu-$NO_X$-emission-controls-cost-controls-and-time-compliance-final-tsd.*

[173] The non-EGU screening assessment is not intended to be, nor take the place of, a unit-specific detailed engineering analysis that evaluates the feasibility of retrofits for the emissions units, potential controls, and related costs. For more detailed discussion of these issues, *see* Section VII.C of this proposed rule and the Non-EGU Sectors TSD included in the docket.

[174] The EPA determined that the 2019 inventory was appropriate because it provided a more accurate prediction of potential near-term emissions reductions. *See* the Non-EGU Screening Assessment memorandum, available in the docket, for a discussion of the challenges associated with using the projected 2023 emissions inventory.

were relatively small and the administrative burden to the states and regulated entities of controlling such sources was likely to be considerable. As a result, the rule did not assume reductions from those sources in state emissions budgets requirements (63 FR 57402). Similar size thresholds have been incorporated in subsequent transport programs such as CAIR and CSAPR. As these sources were not identified as having cost-effective reductions and so were not included in those programs, they were also exempted from certain reporting requirements and the data for these sources is, therefore, not of the same caliber as that of covered larger sources.

EPA's preliminary survey of current data, compared to this initial justification, does not appear to offer a compelling reason to depart from this past practice by requiring emission reductions from these small EGU sources as part of this rule. For instance, as explained in the EGU NO$_X$ Mitigation Strategies Proposed Rule TSD, EPA has evaluated the costs of SCR retrofits at small EGUs using its Retrofit Cost Analyzer and found that such controls become markedly less cost-effective at lower levels of generating capacity. This analysis concluded that, after controlling for all other unit characteristics, the dollar per ton cost for a SCR retrofit increases by about a factor of 2.5 when moving from a 500 MW to a 10 MW unit, and a factor of 8 when moving to a 1 MW unit.[175] Moreover, the EPA estimates that under 6% of nationwide EGU emissions come from units less than 25 MW and not covered by current applicability criteria due to this size exemption threshold. Therefore, the EPA is not proposing to require any emissions reductions from these units, but the EPA requests comment on whether there are any cost-effective reductions and corresponding air quality benefits to nonattainment or maintenance receptors from any units within this segment.

b. Municipal Solid Waste Units

The EPA seeks comment on whether NO$_X$ emissions reductions should be sought from municipal solid waste combustor units (MWCs) to address interstate ozone transport. As noted below, MWCs emit substantial amounts of NO$_X$, and some states have required emissions limits for these facilities that are more stringent than the federal requirements contained within EPA's

new source performance standard (NSPS) for this industry. These more stringent limits, if applied broadly to the 26 states included in this proposed FIP action, would create an additional means of reducing NO$_X$ emissions.

MWCs burn garbage and other non-hazardous solid material using a variety of combustion techniques. Section 2.1, Refuse Combustion, of the EPA emissions factor reference document AP–42[176] contains a description of the seven different combustion process technologies most commonly used in the industry. A copy of Section 2.1 of AP–42 is included within the Docket for this proposed rule. These seven combustion processes are as follows: Mass burn waterwall, mass burn rotary waterwall, mass burn refractory wall, refuse-derived fuel-fired, fluidized bed, modular starved air, and modular excess air. Section 2.1 of AP–42 contains detailed process descriptions of each of these MWC processes. During the combustion process, a number of pollutants are produced, including NO$_X$, which forms through oxidation of nitrogen in the waste and from fixation of nitrogen in the air used to burn the waste. NO$_X$ emissions from MWCs are typically released through tall stacks which enables the emissions to be transported long distances.

Most MWCs are cogeneration facilities that recover heat from the combustion process to power a turbine to produce electricity. According to a 2018 report from the Energy Recovery Council,[177] 72 of the 75 operating MWC facilities in the U.S. produce electricity from heat captured from the combustion process. The electrical output of MWCs is relatively small compared to the EGUs that will be regulated per the power requirements of Section VII.B of this proposal, with most MWCs having an electrical output capacity of less than 25 MW. The Non-EGU Sectors TSD located in the Docket identifies the electrical output capacity for MWC units that produce electricity as reflected in EPA's NEEDS database.

However, despite their relatively small electricity-generating potential, NO$_X$ emissions from MWCs located in the transport states identified in this proposal are substantial. According to the EPA's NEI database, MWCs emitted 19,222 tons of NO$_X$ in 2017 in the ten states included in this proposal that

contain them. Table 8 of the Non-EGU Sectors TSD provides a list of MWC facilities located within the states included in this proposal along with their NO$_X$ emissions as reported to the NEI.

The EPA has promulgated NO$_X$ emissions limits for large MWCs, defined as those that process 250 tons of municipal solid waste per day or more at 40 CFR part 60, subpart Cb and 40 CFR part 60, subpart Eb. Subpart Cb is applicable to MWCs that commenced construction on or before September 20, 1994, while Subpart Eb is applicable to MWCs that commenced construction, modification, or reconstruction after September 20, 1994. The NO$_X$ limits for subpart Cb are found within Tables 1 and 2 of 40 CFR 60.39b and range from 165 to 250 ppm depending on the combustor design type. The NO$_X$ limits for Subpart Eb are found at 40 CFR 60.52b(d) and are 180 ppm during a unit's first year of operation and drop to 150 ppm afterwards, applicable across all combustor types. These limits correspond to NO$_X$ emissions rates of 0.31 and 0.26 lbs/MMBtu, respectively.

Section 182(b)(2) and (f) of the CAA requires states with ozone nonattainment areas classified as Moderate or higher to adopt regulations with control requirements representing reasonably available control technology (RACT) for major sources of VOCs and NO$_X$. Sections 184(b)(1)(B) and 182(f) of the Act require RACT requirements be adopted in all areas included within the Ozone Transport Region (OTR). Due primarily to the NO$_X$ RACT requirement, many states within the Northeast located within the OTR have adopted NO$_X$ emissions limits for MWCs that are more stringent than what would otherwise be required by EPA's NSPS or the emissions guideline for these units. For example, the Montgomery County Resource Recovery Facility in Maryland is required to meet a NO$_X$ RACT limit of 140 ppm (at 7 percent oxygen) on a 24-hour block average. Additionally, MWC facilities located in Virginia operated by Covanta, Inc., are required to meet a NO$_X$ RACT limit of 110 ppm (at 7 percent oxygen) on a 24-hour basis, and a limit of 90 ppm (at 7 percent oxygen) on an annual average basis.[178] The 110 ppm limit equates to a limit of 0.19 lbs/MMBtu.

The Ozone Transport Commission (OTC) issued a report entitled "Municipal Waste Combustor Workgroup Report" in June of 2021. The

---

[175] Preliminary estimate based on representative coal units with starting NO$_X$ rate of 0.2 lb/mmBtu, 10,000 BTU/kwh, and assuming 80 percent reduction.

[176] "AP–42, Fifth Edition Compilation of Air Pollutant Emissions Factors, Volume 1: Stationary Point and Area Sources", available at: *https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-compilation-air-emissions-factors.*

[177] "2018 Directory of Waste to Energy Facilities"; Energy Recovery Council.

[178] The NO$_X$ permit limits for the Montgomery County facility and the Virginia facilities can be found within the OTC's Municipal Waste Combustor Workgroup Report included within the Docket for this proposed rule.

report is included within the docket for this proposal.[179] The report notes that MWCs are a significant source of NO$_X$ emissions in the OTR, releasing approximately 22,000 tons of NO$_X$ from facilities within 9 OTR states in 2018. The report summarizes the results of a literature review of state-of-the-art NO$_X$ controls that have been successfully installed and concludes that significant reductions could be achieved using several different technologies described in the report, primarily via combustion modifications made to MWC units already equipped with SNCR. The MWC workgroup evaluated the emissions reduction potential from two different control levels, one based on a NO$_X$ concentration in the effluent of 105 to 110 ppm, and another based on a limit of 130 ppm. The workgroup's findings were that a control level of 105 parts per million by volume, dry (ppmvd) on a 30-day average basis and a 110 ppmvd on a 24-hour averaging period would reduce NO$_X$ emissions from MWCs by approximately 7,300 tons annually, and that a limit of 130 ppmvd on a 30 day-average could achieve a 4,000 ton reduction. The report notes that 8 MWC units exist that are already subject to permit limits of 110 ppm, 7 in Virginia, and one in Florida. Studies evaluating MWCs similar in design to the large MWCs in the OTR found NO$_X$ reductions could be achieved at costs ranging from $2,900 to $6,600 per ton of NO$_X$ reduced. Based on the findings of this report, the Commissioners of the states within the OTR adopted a resolution to develop a recommendation for emissions reductions from MWCs during their June 15, 2021, annual public meeting.[180]

In light of the above, the EPA requests comment on whether NO$_X$ limits for MWCs located in the states covered by this proposed rule should be included in the final FIP. Specifically, if NO$_X$ controls are included in the final FIP, the EPA requests comment on the following issues:

• What NO$_X$ emissions limit and averaging time should MWCs be required to meet, and in particular should the EPA adopt emissions rates of 105 ppmvd on a 30-day averaging basis and 110 ppmvd on a 24-hour averaging basis?

• What types of NO$_X$ control technology could be used to reduce NO$_X$ emissions at MWCs, and in particular

should the EPA adopt the combustion control modifications made to units with previously installed SNCR identified by the MWC workgroup?

• Whether there is information that would call into question the OTC workgroup's estimated cost of controls for reducing NO$_X$ emissions from MWCs of $2,900 to $6,600 per ton, and, assuming that range is accurate, whether there is any justification for not requiring these controls in light of their relative cost-effectiveness and total level of reductions available, which compare favorably with the proposed EGU and non-EGU control strategies?

• If the final FIP includes emissions reduction requirements for MWCs, should any mechanism be available by which a particular MWC source could seek to establish that meeting the required emissions limits is not feasible?

• Is there any evidence that retrofit of MWC emissions controls would take longer to implement than the 2026 ozone season?

• Would it be appropriate to rely on existing testing, monitoring, recordkeeping, and reporting requirements for MWCs under the applicable NSPS or other requirements?

### c. Cogeneration Units

Consistent with prior transport rules, fossil fuel-fired boilers and combustion turbines that produce both electricity and useful thermal energy (generally referred to as "cogeneration units") and that meet the applicability criteria to be included in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program would be subject to the emissions reduction requirements established in this rulemaking for EGUs. However, those applicability criteria—which the EPA is not proposing to alter in this rulemaking (*see* Section VII.B.3 of this proposed rule)—exempt some cogeneration units from coverage as EGUs under the trading program. The EPA is proposing that fossil fuel-fired boilers and combustion turbines that produce both electricity and useful thermal energy and that do not meet the applicability criteria to be included in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program as EGUs would not be subject to any other emissions reduction requirements under this rulemaking.

Cogeneration systems can offer considerable environmental benefit as they often require less fuel to produce a given energy output. The average efficiency of fossil-fuel fired power plants in the United States is 33 percent. This means that two-thirds of the energy used to produce electricity at most power plants in the United States is

wasted in the form of heat discharged to the atmosphere. By recovering wasted heat, combined heat and power (CHP) systems at cogeneration units typically achieve total system efficiencies of 60 to 80% for producing electricity and useful thermal energy. Some systems achieve efficiencies approaching 90%. This increased efficiency allows the same level of energy use to be achieved with fewer criteria-pollutant and greenhouse gas emissions. Additionally, these systems increase the reliability of access to electrical power for the facilities they serve and reduce the need for electricity from regional power plants and their associated transmission and distribution networks.

According to information contained in the EPA's Combined Heat and Power Partnership's document "Catalog of CHP Technologies",[181] there are 4,226 CHP installations in the U.S. providing 83,317 MWe of electrical capacity. Over 99% of the installations are powered by 5 equipment types, those being reciprocating engines (52 percent), boilers/steam turbines (17 percent), gas turbines (16 percent), microturbines (8 percent), and fuel cells (4 percent). The majority of the electrical capacity is provided by gas turbine CHP systems (64 percent) and boiler/steam turbine CHP systems (32 percent). The various CHP technologies described above are available in a large range of sizes, from as small as 1 kilowatt reciprocating engine systems to as large as 300 megawatt gas turbine powered systems.

NO$_X$ emissions from fuel cell powered systems are negligible, and NO$_X$ emissions from rich-burn reciprocating engine, gas turbine, and microturbine systems are low, ranging from 0.013 to 0.05 lbs/mmBTU. NO$_X$ emissions from lean-burn reciprocating engine systems and gas-powered steam turbines systems range from 0.1 to 0.2 lbs/mmBTU. The highest NO$_X$ emitting CHP units are solid fuel-fired boiler/steam turbine systems which emit NO$_X$ at rates ranging from 0.2 to 1.2 lbs/mmBTU. A preliminary assessment from EPA's IPM Summer 2021 Reference Case model suggest that cogeneration units exempted from current EPA EGU transport programs due to such classification are projected to account for approximately 5% of nationwide summer NO$_X$ emissions in 2023.[182]

---

[179] This report is also available at *https://otcair.org/upload/Documents/Reports/20210624%20OTC%20SAS%20MWC%20report%20final.pdf*.

[180] *See* "Notice of Proposed rules Taken by Ozone Transport Commission At Annual Public Meeting, June 15, 2021" included in the Docket for this proposed rule.

[181] This document is available at: *https://www.epa.gov/sites/default/files/2015-07/documents/catalog_of_chp_technologies.pdf*.

[182] *https://www.epa.gov/airmarkets/results-using-epas-power-sector-modeling-platform-v6-summer-2021-reference-case*. The EPA notes that cogeneration units not exempted from EGU Air programs are included in the EPA assessment of

Under the proposed rule (consistent with prior CSAPR rulemakings), certain cogeneration units would be exempt from coverage under the CSAPR $NO_X$ Ozone Season Group 3 Trading Program as EGUs. Specifically, the trading program regulations include an exemption for a unit that qualifies as a cogeneration unit throughout the later of 2005 or the first 12 months during which the unit first produces electricity and continues to qualify through each calendar year ending after the later of 2005 or that 12-month period and that meets the limitation on electricity sales to the grid. In order to meet the trading program's definition of "cogeneration unit" under the regulations, a unit (*i.e.,* a fossil-fuel-fired boiler or combustion turbine) must be a topping-cycle or bottoming-cycle type that operates as part of a "cogeneration system." A cogeneration system is defined as an integrated group of equipment at a source (including a boiler, or combustion turbine, and a generator) designed to produce useful thermal energy for industrial, commercial, heating, or cooling purposes and electricity through the sequential use of energy. A topping-cycle unit is a unit where the sequential use of energy results in production of useful power first and then, through use of reject heat from such production, in production of useful thermal energy. A bottoming-cycle unit is a unit where the sequential use of energy results in production of useful thermal energy first, and then, through use of reject heat from such production, in production of useful power. In order to qualify as a cogeneration unit, a unit also must meet certain efficiency and operating standards in 2005 and each year thereafter. The electricity sales limitation under the exemption is applied in the same way whether a unit serves only one generator or serves more than one generator. In both cases, the total amount of electricity produced annually by a unit and sold to the grid cannot exceed the greater of one-third of the unit's potential electric output capacity or 219,000 MWh. This is consistent with the approach taken in the Acid Rain Program (40 CFR 72.7(b)(4)), where the cogeneration-unit exemption originated.

The EPA is requesting comment on the proposal to exempt cogeneration units meeting the above criteria from any emissions reduction requirements under this proposed rulemaking. The EPA also requests comment on the alternative of requiring fossil fuel-fired

boilers in the non-EGU industries identified earlier (Section VI.B.2.a of this proposed rule) that serve electricity generators and that qualify for an exemption from inclusion in the CSAPR $NO_X$ Ozone Season Group 3 Trading Program as EGUs to instead meet the same emissions standards, if any, that would apply under this proposed rulemaking to fossil fuel-fired boilers at facilities in the same non-EGU industries that do not serve electricity generators. These proposed emissions standards are set forth in Section VII.C.5 of this proposed rule. Cogeneration units at these facilities in the non-EGU industries identified in EPA's non-EGU screening assessment for this proposal (although potential emissions reductions from such cogeneration units were not specifically quantified in the assessment). Under this alternative approach, to the extent these industries have otherwise been determined in this proposal to significantly contribute to nonattainment or interfere with maintenance, the EPA would find that cogeneration units in these industries should not be excluded from EPA's overall $NO_X$ mitigation strategy.

### 4. Mobile Source $NO_X$ Mitigation Strategies

Under a variety of CAA programs, the EPA has established federal emissions and fuel quality standards that reduce emissions from cars, trucks, buses, nonroad engines and equipment, locomotives, marine vessels, and aircraft (*i.e.,* "mobile sources"). Because states are generally preempted from regulating new vehicles and engines with certain exceptions (*see generally* CAA sections 209, 177), mobile source emissions are primarily controlled through EPA's federal programs. The EPA has been regulating mobile source emissions since it was established as a federal agency in 1970, and all mobile source sectors are currently subject to $NO_X$ emissions standards. The EPA factors these standards and associated emissions reductions into its baseline air quality assessment in good neighbor rulemaking, including in this proposed rule. These data are factored into EPA's analysis at Steps 1 and 2 of the 4-step framework. As a result of this long history, $NO_X$ emissions from onroad and nonroad mobile sources have substantially decreased (73 percent and 57 percent since 2002, for onroad and nonroad, respectively)[183] and are predicted to continue to decrease into the future as newer vehicles and engines

that are subject to the most recent, stringent standards replace older vehicles and engines.[184]

For example, in 2014, the EPA promulgated new, more stringent emissions and fuel standards for light-duty passenger cars and trucks.[185] The fuel standards took effect in 2017, and the vehicle standards phase in between 2017 and 2025. Other EPA actions that are continuing to reduce $NO_X$ emissions include the Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements (66 FR 5002; January 18, 2001); the Clean Air Nonroad Diesel Rule (69 FR 38957; June 29, 2004); the Locomotive and Marine Rule (73 FR 25098; May 6, 2008); the Marine Spark-Ignition and Small Spark-Ignition Engine Rule (73 FR 59034; October 8, 2008); the New Marine Compression-Ignition Engines at or Above 30 Liters per Cylinder Rule (75 FR 22895; April 30, 2010); and the Aircraft and Aircraft Engine Emissions Standards (77 FR 36342; June 18, 2012).

The EPA is currently developing a new regulatory effort to reduce $NO_X$ and other pollution from heavy-duty trucks (known as the Cleaner Trucks Initiative), as described in the January 21, 2020, Advance Notice of Proposed Rulemaking (85 FR 3306). Heavy-duty vehicles are the largest contributor to mobile source emissions of $NO_X$ and will be one of the largest mobile source contributors to ozone in 2025.[186] Reducing heavy-duty vehicle emissions nationally would improve air quality where the trucks are operating as well as downwind. As required by CAA section 202(a)(3)(A) of the Act, the EPA will be proposing $NO_X$ emissions standards that "reflect the greatest degree of emissions reduction achievable through the application of technology which the Administrator determines will be available for the model year to which such standards apply, giving appropriate consideration to cost, energy, and safety factors associated with the application of such technology." Section 202(a)(3)(C) of the Act requires that standards apply for no less than 3 model years and apply no earlier than 4 years after promulgation.

The EPA's existing regulatory program for mobile sources will

---

EGU reduction potential in Section VI.B.1 of this proposed rule.

[183] US EPA. Our Nation's Air: Status and Trends Through 2019. *https://gispub.epa.gov/air/trendsreport/2020/#home.*

[184] National Emissions Inventory Collaborative (2019). 2016v1 Emissions Modeling Platform. Retrieved from *http://views.cira.colostate.edu/wiki/wiki/10202.*

[185] Control of Air Pollution from Motor Vehicles: Tier 3 Motor Vehicle Emissions and Fuel Standards, 79 FR 23414 (April 28, 2014).

[186] Zawacki et al., 2018. Mobile source contributions to ambient ozone and particulate matter in 2025. Atmospheric Environment. Vol 188, pg 129–141. Available online: *https://doi.org/10.1016/j.atmosenv.2018.04.057.*

**20088** **Federal Register** / Vol. 87, No. 66 / Wednesday, April 6, 2022 / Proposed Rules

continue to reduce $NO_X$ emissions into the future, and the EPA is currently taking active steps to ensure that these $NO_X$ reductions occur. The CAA prohibits tampering with emissions controls, as well as manufacturing, selling, and installing aftermarket devices intended to defeat those controls. The EPA currently has a National Compliance Initiative called ''Stopping Aftermarket Defeat Devices for Vehicles and Engines,'' which focuses on stopping the manufacture, sale, and installation of hardware and software specifically designed to defeat required emissions controls on onroad and nonroad vehicles and engines.

*C. Control Stringencies Represented by Cost Threshold ($ per Ton) and Corresponding Emissions Reductions*

1. EGU Emissions Reduction Potential by Cost Threshold

For EGUs, as discussed in Section VI.A of this proposed rule, the multi-

factor test considers increasing levels of uniform control stringency in combination with considering total $NO_X$ reduction potential and corresponding air quality improvements. The EPA evaluated EGU $NO_X$ emissions controls that are widely available (described previously in Section VI.B.1 of this proposed rule), that were assessed in previous rules to address ozone transport, and that have been incorporated into state planning requirements to address ozone nonattainment.

The EPA evaluated the EGU sources within the state of California and found there were no covered coal steam sources greater than 100 MW that would have emissions reduction potential according to EPA's assumed EGU SCR retrofit mitigation technologies.[187] The EGUs in the state are sufficiently well-controlled resulting in the lowest fossil-fuel emission rate and highest share of renewable generation among the 26

states examined at Step 3. EPA's Step 3 analysis, including analysis of the emissions reduction factors from EGU sources in the state, therefore resulted in no additional emission reductions required to eliminate significant contribution from any EGU sources in California.

The tables below summarize the emissions reduction potentials (in ozone season tons) from these emissions controls across the affected jurisdictions. Table VI.C.1–1 focuses on near-term emissions controls while Table VI.C.1–2 includes emissions controls with extended implementation timeframes.

TABLE VI.C.1–1—EGU OZONE-SEASON EMISSIONS AND REDUCTION POTENTIAL (tons)—2023

| State | Baseline 2023 OS $NO_X$ | Reduction potential (tons) for varying levels of technology inclusion | | | |
|---|---|---|---|---|---|
| | | SCR optimization | SCR optimization + combustion control upgrades * | SCR/SNCR optimization + combustion control upgrades | SCR/SNCR optimization + combustion control upgrades + generation shifting |
| Alabama | 6,648 | 32 | 156 | 156 | 387 |
| Arkansas | 8,955 | 28 | 28 | 28 | 66 |
| Delaware | 423 | 35 | 35 | 39 | 35 |
| Illinois | 7,662 | 70 | 70 | 247 | 120 |
| Indiana | 12,351 | 856 | 856 | 865 | 1,191 |
| Kentucky | 13,900 | 446 | 1,047 | 1,047 | 2,260 |
| Louisiana | 9,987 | 579 | 579 | 675 | 579 |
| Maryland | 1,208 | 0 | 0 | 8 | 13 |
| Michigan | 10,737 | 4 | 4 | 19 | 4 |
| Minnesota | 4,207 | 98 | 98 | 139 | 246 |
| Mississippi | 5,097 | 73 | 697 | 697 | 697 |
| Missouri | 20,094 | 7,345 | 7,345 | 7,569 | 8,013 |
| Nevada | 2,346 | 66 | 66 | 66 | 66 |
| New Jersey | 915 | 105 | 105 | 105 | 116 |
| New York | 3,927 | 64 | 64 | 64 | 164 |
| Ohio | 10,295 | 1,161 | 1,161 | 1,161 | 1,926 |
| Oklahoma | 10,463 | 199 | 890 | 890 | 890 |
| Pennsylvania | 12,242 | 2,878 | 2,878 | 2,978 | 3,287 |
| Tennessee | 4,319 | 110 | 110 | 110 | 85 |
| Texas | 40,860 | 921 | 921 | 1,154 | 2,344 |
| Utah | 15,500 | 7 | 7 | 7 | 519 |
| Virginia | 3,415 | 164 | 242 | 296 | 271 |
| West Virginia | 14,686 | 554 | 1,099 | 1,380 | 1,927 |
| Wisconsin | 5,933 | 7 | 7 | 26 | -50 |
| Wyoming | 10,191 | 82 | 677 | 690 | 1,648 |
| Total | 236,363 | 15,883 | 19,143 | 20,417 | 26,806 |

* The EPA shows reduction potential from state-of-the-art LNB upgrade as near-term reduction emissions controls, but explains in Section VI.B and VI.D of this proposed rule that this reduction potential would not be implemented until 2024 for states not included in the Revised CSAPR Update.

---

[187] The only coal-fired power plant in California is the 63 MW Argus Cogeneration facility in Trona, California.

**Federal Register** / Vol. 87, No. 66 / Wednesday, April 6, 2022 / Proposed Rules **20089**

TABLE VI.C.1–2—EGU OZONE-SEASON EMISSIONS AND REDUCTION POTENTIAL (tons)—2026

| State | Baseline 2026 OS NO$_X$ | Reduction potential (tons) for varying levels of technology inclusion | | | | |
|---|---|---|---|---|---|---|
| | | SCR optimization | SCR optimization + combustion control upgrades | SCR/SNCR optimization + combustion control upgrades | SCR/SNCR optimization + combustion control upgrades + SCR/SNCR retrofits | SCR/SNCR optimization + combustion control upgrades + SCR/SNCR retrofits + generation shifting |
| Alabama | 6,701 | 32 | 156 | 156 | 916 | 916 |
| Arkansas | 8,728 | 28 | 28 | 28 | 4,697 | 4,805 |
| Delaware | 473 | 35 | 35 | 39 | 39 | 39 |
| Illinois | 7,763 | 70 | 70 | 247 | 1,298 | 1,648 |
| Indiana | 9,737 | 720 | 720 | 729 | 1,740 | 1,946 |
| Kentucky | 13,211 | 446 | 885 | 885 | 5,450 | 5,638 |
| Louisiana | 9,854 | 579 | 579 | 675 | 6,102 | 6,102 |
| Maryland | 1,208 | 0 | 0 | 8 | 8 | 19 |
| Michigan | 9,129 | 4 | 4 | 19 | 2,959 | 3,015 |
| Minnesota | 4,197 | 98 | 98 | 139 | 1,613 | 1,661 |
| Mississippi | 5,077 | 73 | 697 | 697 | 3,164 | 3,163 |
| Missouri | 18,610 | 7,345 | 7,345 | 7,569 | 11,237 | 11,364 |
| Nevada | 2,438 | 66 | 66 | 66 | 1,227 | 1,227 |
| New Jersey | 915 | 105 | 105 | 105 | 105 | 116 |
| New York | 3,927 | 64 | 64 | 64 | 589 | 689 |
| Ohio | 10,295 | 1,161 | 1,161 | 1,161 | 1,354 | 1,709 |
| Oklahoma | 10,283 | 199 | 890 | 890 | 5,968 | 6,008 |
| Pennsylvania | 11,738 | 2,737 | 2,737 | 2,837 | 4,510 | 4,919 |
| Tennessee | 4,064 | 81 | 81 | 81 | 81 | 81 |
| Texas | 39,186 | 921 | 921 | 1,154 | 15,817 | 17,240 |
| Utah | 9,679 | 7 | 7 | 7 | 7,076 | 7,059 |
| Virginia | 3,243 | 164 | 242 | 263 | 646 | 676 |
| West Virginia | 14,686 | 554 | 1,099 | 1,380 | 3,660 | 4,089 |
| Wisconsin | 3,628 | 7 | 7 | 26 | 54 | 155 |
| Wyoming | 10,249 | 82 | 677 | 690 | 5,669 | 5,759 |
| Total | 219,017 | 15,577 | 18,675 | 19,917 | 85,978 | 90,041 |

2. Non-EGU Emissions Reduction Potential—Cost Threshold Up to $7,500/ton

The EPA used the updated non-EGU screening assessment for 2026 to estimate emissions reduction potential from the Tier 1 and Tier 2 industries and non-EGU emissions units. The EPA used CoST to identify emissions units, emissions reductions, and associated compliance costs to evaluate the effects of potential non-EGU emissions control measures and technologies. CoST is designed to be used for illustrative control strategy analyses (*e.g.*, NAAQS regulatory impact analyses) and not for unit-specific, detailed engineering analyses. These estimates from CoST identify proxies for (1) non-EGU emissions units that have emissions reduction potential, (2) potential controls for and emissions reductions from these emissions units, and (3) control costs from the potential controls on these emissions units. The cost

estimates do not include monitoring, recordkeeping, reporting, or testing costs.

To prepare the non-EGU screening assessment for 2026, the EPA applied the analytical framework detailed in Section VI.B.2 of this proposed rule. The assessment includes emissions units from the Tier 1 industries and impactful high-emitting boilers in Tier 2 Industries. Using the latest air quality modeling for 2026, the EPA identified upwind states linked to downwind nonattainment or maintenance receptors using the 1% of the NAAQS threshold criterion, or 0.7 ppb. In 2026 there are 23 linked states for the 2015 ozone NAAQS: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming.

The EPA re-ran CoST with known controls, the CMDB, and the 2019 emissions inventory.[188] The EPA specified CoST to allow replacing an existing control if a replacement control is estimated to be greater than 10% more effective than the existing control. The EPA did not replace an existing control if the 2019 emissions inventory indicated the presence of that control, even if CMDB reflects a greater control efficiency for that control. Also, the EPA removed six facilities from consideration because they are subject to an existing consent decree, are shut down, or will shut down by 2026. For additional detail on the six facilities removed, see Appendix B in the Non-EGU Screening Assessment memorandum. Table VI.C.2–1 summarizes the estimated reductions, total ppb improvements across all receptors, and annual total and average annual costs (in 2016 dollars) and Table VI.C.2–2 below summarizes the estimated reductions by state.

---

[188] The EPA determined that the 2019 inventory was appropriate because it provided a more accurate prediction of potential near-term non-EGU emissions reductions.

TABLE VI.C.2–1—ESTIMATED EMISSIONS REDUCTIONS (OZONE SEASON TONS), TOTAL PPB IMPROVEMENTS ACROSS ALL DOWNWIND RECEPTORS, AND COSTS

| Tier | Ozone season emissions reductions (East/West) | Total PPB improvement across all downwind receptors | Annual total cost (million 2016$) (average annual cost/ton) | Industries (# of emissions units >100 tpy in identified industries) |
|---|---|---|---|---|
| Tier 1 Industries with Known Controls that Cost up to $7,500/ton. | 41,153 (37,972/3,181) | 4.352 | $356.6 ($3,610) | Cement and Concrete Product Manufacturing (47) Glass and Glass Product Manufacturing (44) Iron and Steel Mills & Ferroalloy Manufacturing (39) Pipeline Transportation of Natural Gas (307). |
| Tier 2 Industry Boilers with Known Controls that Cost up to $7,500/ton. | 6,033 (5,965/68) | 0.809 | 54.2 (3,744) | Basic Chemical Manufacturing (17) Petroleum and Coal Products Manufacturing (10) Pulp Paper, and Paperboard Mills (25). |

TABLE VI.C.2–2—ESTIMATED EMISSIONS REDUCTIONS (OZONE SEASON TONS) BY UPWIND STATE * **

| State | 2019 OS NO$_X$ emissions | OS NO$_X$ reductions |
|---|---|---|
| AR | 8,265 | 1,654 |
| CA | 14,579 | 1,666 |
| IL | 16,870 | 2,452 |
| IN | 19,604 | 3,175 |
| KY | 11,934 | 2,291 |
| LA | 35,831 | 6,769 |
| MD | 2,365 | 45 |
| MI | 18,996 | 2,731 |
| MN | 17,591 | 673 |
| MO | 9,109 | 3,103 |
| MS | 12,284 | 1,761 |
| NJ | 2,025 | 0 |
| NV | 2,418 | 0 |
| NY | 6,003 | 500 |
| OH | 19,729 | 2,790 |
| OK | 22,146 | 3,575 |
| PA | 15,861 | 3,284 |
| TX | 47,135 | 4,440 |
| UT | 6,276 | 757 |
| VA | 7,041 | 1,563 |
| WI | 6,571 | 2,150 |
| WV | 9,825 | 982 |
| WY | 10,335 | 826 |
| Total | 322,793 | 47,187 |

* In the non-EGU screening assessment, EPA estimated emissions reduction potential from the non-EGU industries and emissions units. The estimated emissions reductions by state in the table above are from the non-EGU screening assessment; for additional results from the non-EGU screening assessment, including estimated reductions by state and by industry, please see the Non-EGU Screening Assessment memorandum available in the docket.

** In the assessment, EPA used CoST to identify emissions units, emissions reductions, and associated compliance costs to evaluate the effects of potential non-EGU emissions control measures and technologies. CoST is designed to be used for illustrative control strategy analyses (e.g., NAAQS regulatory impact analyses) and not for unit-specific, detailed engineering analyses. These estimates from CoST identify proxies for (1) non-EGU emissions units that have emissions reduction potential, (2) potential controls for and emissions reductions from these emissions units, and (3) control costs from the potential controls on these emissions units. The cost estimates do not include monitoring, recordkeeping, reporting, or testing costs.

In this section, EPA provides a summary of the control technologies applied and their average costs across all of the non-EGU emissions units included in the screening assessment. This summary reflects one approach to organizing this information, which the Agency finds reasonable based on the information available for this proposal. As discussed in Section VI.B.2 of this proposed rule, the number of different industries and emissions unit categories and types present a challenge to defining a single method to identify appropriate control technologies, measures or strategies, and related costs across non-EGU emissions units.

Because of the number of industries and emissions unit types, the available information does not easily allow grouping estimated emissions reductions by cost per ton threshold for a few control technologies, measures, or strategies. Nonetheless, Table VI.C.2–3 below provides a summary of estimated reductions and average cost per ton values by control technology across all non-EGU emissions units included in the non-EGU screening assessment. The summary reflects fourteen control technologies applied by CoST across all emissions units in the non-EGU screening assessment. The average cost per ton values range from $585 to

$6,300 per ton, all of which are below the marginal cost per ton threshold of $7,500 per ton. Note that the average cost per ton values are in 2016 dollars and reflect simple averages and not a percentile or other representative cost values from a distribution of cost estimates.

The Non-EGU Screening Assessment memorandum includes two other summaries of estimated reductions and average cost per ton values by technology across non-EGU emissions units. First, the memorandum includes a summary by control technology as applied across non-EGU emissions units grouped by the Tier 1 industries and

impactful boilers in Tier 2 industries, which given this further disaggregation reflects 18 control technologies across the tiers applied by CoST. Second, the memorandum includes a summary by control technology across non-EGU emissions units grouped by the seven individual Tier 1 and 2 industries, which given this disaggregation reflects 26 control technologies across the industries applied by CoST.

TABLE VI.C.2–3—ESTIMATED EMISSIONS REDUCTIONS (OZONE SEASON TONS), ANNUAL TOTAL COST, AND AVERAGE COST PER TON BY CONTROL TECHNOLOGY ACROSS ALL NON-EGU EMISSIONS UNITS

| Control technology | Ozone season emissions reductions | Average cost per ton |
|---|---|---|
| Adjust Air to Fuel Ratio and Ignition Retard | 212 | $2,393 |
| Layered Combustion | 12,706 | 5,457 |
| Low NOₓ Burner | 231 | 3,773 |
| Low NOₓ Burner and Flue Gas Recirculation | 200 | 4,288 |
| Natural Gas Reburn | 284 | 2,703 |
| Non-Selective Catalytic Reduction | 147 | 585 |
| Non-Selective Catalytic Reduction or Layered Combustion | 6,359 | 4,743 |
| Oxygen Enriched Air Staging | 52 | 764 |
| SCR + DLN Combustion | 136 | 6,301 |
| Selective Catalytic Reduction | 12,239 | 2,543 |
| Selective Catalytic Reduction and Steam Injection | 929 | 3,787 |
| Selective Non-Catalytic Reduction | 8,076 | 1,485 |
| Ultra-Low NOₓ Burner | 1,670 | 2,890 |
| Ultra-Low NOₓ Burner and Selective Catalytic Reduction | 3,946 | 4,114 |

Refer to the Non-EGU Screening Assessment memorandum for additional 2026 screening assessment results—including by industry and by state, estimated emissions reductions and costs, as well as by industry, emissions source groups, control technologies, number of emissions units, estimated ozone season reductions, and annual total cost.

*D. Assessing Cost, EGU and Non-EGU NOₓ Reductions, and Air Quality*

To determine the emissions that are significantly contributing to nonattainment or interfering with maintenance, the EPA applied the multi-factor test to EGUs and non-EGUs separately, considering for each the relationship of cost, available emissions reductions, and downwind air quality impacts. Specifically, for each sector, the EPA proposes a determination regarding the appropriate level of uniform NOₓ control stringency that would collectively eliminate significant contribution to downwind nonattainment and maintenance receptors. The EPA also evaluated whether the proposed rule resulted in possible over-control scenarios by evaluating if an upwind state is linked solely to downwind air quality problems that could have been resolved at a lower cost threshold, or if an upwind state could have reduced its emissions below the 1 percent air quality contribution threshold at a lower cost threshold.

1. EGU Assessment

For EGUs, the EPA examined the emissions reduction potential associated with each EGU emissions control technology (presented in Section VI.C.1 of this proposed rule) and its impact on the air quality at downwind receptors. Specifically, EPA identified and assessed the projected average air quality improvements relative to the base case and whether these improvements are sufficient to shift the status of receptors from projected nonattainment to maintenance or from maintenance to attainment. Combining these air quality factors, costs, and emissions reductions, the EPA identified a control stringency for EGUs that results in substantial air quality improvement from emissions controls that are available in the timeframe for which air quality problems at downwind receptors persist. For all affected jurisdictions, this control stringency reflects, at a minimum, the optimization of existing post-combustion controls and installation of state-of-the-art NOₓ combustion controls, which are widely available at a representative marginal cost of $1,800 per ton. EPA's evaluation also shows that the effective emissions rate performance across affected EGUs consistent with realization of these mitigation measures does not over-control upwind states' emissions relative to either the downwind air quality problems to which they are linked at Step 1 or the 1 percent contribution threshold that triggers further evaluation at Step 3 of the 4-step framework for the 2015 ozone NAAQS.

Similarly, the EPA also identified installation of new SCR post-combustion controls at coal steam sources greater than or equal to 100 MW and for a more limited portion of the oil/gas steam fleet that had higher levels of emissions as components of the required control stringency. These SCR retrofits are widely available by the 2026 ozone season at $11,000 and $7,700 per ton respectively. For all but 3 of the affected states (Alabama, Delaware, and Tennessee—which are no longer linked in 2026 at Steps 1 and 2 in EPA's base case air quality modeling), EPA's evaluation also shows that the effective emissions rate performance across EGUs consistent with realization of these mitigation measures does not over-control upwind states' emissions in 2026 relative to either the downwind air quality problems to which they are linked at Step 1 or the 1 percent contribution threshold that triggers further evaluation at Step 3 of the 4-step framework for the 2015 ozone NAAQS (*see* the Ozone Transport Policy Analysis Proposed Rule TSD for details).

To assess downwind air quality impacts for the nonattainment and maintenance receptors identified in Section V.D of this proposed rule, the EPA evaluated the air quality change at that receptor expected from the progressively more stringent upwind EGU control stringencies that were available for that time period in upwind states linked to that receptor. This assessment provides the downwind ozone improvements for consideration and provides air quality data that is

used to evaluate potential over-control situations.

To assess the air quality impacts of the various control stringencies at downwind receptors for the purposes of Step 3, the EPA evaluated changes resulting from the emissions reductions associated with the identified emissions controls in each of the upwind states, as well as assumed corresponding reductions of similar stringency in the downwind state containing the receptor to which they are linked. By applying these emissions reductions to the state containing the receptor, the EPA assumes that the downwind state will implement (if it has not already) an emissions control stringency for its sources that is comparable to the upwind control stringency identified here. Consequently, The EPA is accounting for the downwind state's share of a nonattainment or maintenance problem as a part of the over-control evaluation.[189]

For this assessment, the EPA used an ozone air quality assessment tool (ozone AQAT) to estimate downwind changes in ozone concentrations related to upwind changes in emissions levels. The EPA focused its assessment on the years 2023 and 2026 as they pertain to the last years for which ozone season emissions data can be used for purposes of determining attainment for the Moderate (2024) and Serious (2027) attainment dates. For each EGU emissions control technology, the EPA first evaluated the magnitude of the change in ozone concentrations at the nonattainment and maintenance receptors for each relevant year (i.e., 2023 and 2026). Next, the EPA evaluated whether the estimated change in concentration would resolve the receptor's nonattainment or maintenance concern by lowering the average or maximum design value, respectively, below 71 ppb. For a complete set of estimates, see the Ozone Transport Policy Analysis Proposed Rule TSD or the ozone AQAT excel file.

For 2023, the EPA evaluated potential air quality improvements at the downwind receptors outside of California associated with available EGU emissions control technologies in that timeframe. The EPA determined for the purposes of Step 3 that the average air quality improvement at the receptors relative to the engineering analytics base case was 0.11 ppb for emissions reductions commensurate with optimization of existing SCRs/SNCRs and combustion control upgrades. The EPA determined for the purposes of Step 3 that one receptor in Clark County, Nevada switches from maintenance to attainment with these mitigation strategies in place. Table VI.D.1–1 summarizes the results of EPA's Step 3 evaluation of air quality improvements at these receptors using AQAT.

For 2026, the EPA determined that the average air quality improvement at these receptors relative to the engineering analytics base case was 0.43 ppb for emissions reductions commensurate with optimization of existing SCRs/SNCRs, combustion control upgrades, and new post-combustion control (SCR and SNCR) retrofits at eligible units are assumed to be implemented. The EPA determined for the purposes of Step 3 that in 2026, all but one of the receptors are expected to remain nonattainment or maintenance across these control stringencies, with one receptor in Douglas County, Colorado switching from maintenance to attainment with these mitigation strategies in place.[190] Table VI.D.1–2 summarizes the results of EPA's Step 3 evaluation of air quality improvements at the receptors included in the AQAT analysis. For more information about how this assessment was performed and the results of the analysis for each receptor, refer to the Ozone Transport Policy Analysis Proposed Rule TSD and to the Ozone AQAT included in the docket for this rule.

TABLE VI.D.1–1—AIR QUALITY AT THE 29 RECEPTORS IN 2023 FROM EGU EMISSIONS CONTROL TECHNOLOGIES [a] [b]

| Monitor ID No. | State | County | Average DV (ppb) | | Max DV (ppb) | |
|---|---|---|---|---|---|---|
| | | | Baseline (engineering analysis) | SCR/SNCR optimization + LNB upgrade | Baseline (engineering analysis) | SCR/SNCR optimization + LNB upgrade |
| 040278011 | Arizona | Yuma | 70.53 | 70.53 | 72.25 | 72.24 |
| 080350004 | Colorado | Douglas | 72.35 | 72.28 | 72.96 | 72.89 |
| 080590006 | Colorado | Jefferson | 73.23 | 73.19 | 73.84 | 73.80 |
| 080590011 | Colorado | Jefferson | 74.41 | 74.38 | 75.13 | 75.09 |
| 090010017 | Connecticut | Fairfield | 73.11 | 73.14 | 73.82 | 73.85 |
| 090013007 | Connecticut | Fairfield | 74.45 | 74.44 | 75.37 | 75.36 |
| 090019003 | Connecticut | Fairfield | 76.30 | 76.29 | 76.51 | 76.50 |
| 090099002 | Connecticut | New Haven | 72.11 | 72.07 | 74.16 | 74.12 |
| 170310001 | Illinois | Cook | 70.02 | 70.02 | 73.90 | 73.89 |
| 170310032 | Illinois | Cook | 70.14 | 70.15 | 72.78 | 72.79 |
| 170310076 | Illinois | Cook | 69.64 | 69.65 | 72.49 | 72.49 |
| 170314201 | Illinois | Cook | 70.19 | 70.18 | 73.75 | 73.74 |
| 170317002 | Illinois | Cook | 70.42 | 70.33 | 73.37 | 73.29 |
| 320030075 | Nevada | Clark | 70.09 | 70.06 | 71.01 | 70.98 |
| 420170012 | Pennsylvania | Bucks | 71.09 | 71.03 | 72.63 | 72.57 |
| 480391004 | Texas | Brazoria | 71.71 | 71.29 | 73.89 | 73.45 |
| 481210034 | Texas | Denton | 71.20 | 71.03 | 73.06 | 72.89 |
| 482010024 | Texas | Harris | 76.92 | 76.55 | 78.48 | 78.10 |
| 482010055 | Texas | Harris | 72.50 | 72.14 | 73.54 | 73.17 |
| 482011034 | Texas | Harris | 72.07 | 71.67 | 73.32 | 72.91 |
| 482011035 | Texas | Harris | 69.69 | 69.31 | 73.32 | 72.92 |
| 490110004 | Utah | Davis | 73.65 | 73.59 | 75.91 | 75.85 |

[189] For EGUs, this analysis for the Connecticut receptors shows no EGU reduction potential from the emissions reduction measures identified given that state's already low-emitting fleet; however, EGU reductions were identified in Colorado and these reductions were included in the over-control analysis.

[190] As in prior rules, for the purpose of defining significant contribution at Step 3, the EPA evaluated air quality changes resulting from the application of the emissions reductions in only those states that are linked to each receptor as well as the state containing the receptor. By applying reductions to the state containing the receptor, the EPA ensures that it is accounting for the downwind state's fair share. This method holds each upwind state responsible for its fair share of the downwind problems to which it is linked. Reductions made by other states in order to address air quality problems at other receptors do not increase or decrease this share. The air quality impacts on design values that reflect the emissions reductions in all linked states and the health and climate benefits from this proposal are discussed in Section IX of this proposed rule.

TABLE VI.D.1–1—AIR QUALITY AT THE 29 RECEPTORS IN 2023 FROM EGU EMISSIONS CONTROL TECHNOLOGIES [a] [b]—Continued

| Monitor ID No. | State | County | Average DV (ppb) | | Max DV (ppb) | |
|---|---|---|---|---|---|---|
| | | | Baseline (engineering analysis) | SCR/SNCR optimization + LNB upgrade | Baseline (engineering analysis) | SCR/SNCR optimization + LNB upgrade |
| 490353006 .................. | Utah ...................... | Salt Lake ................... | 74.35 | 74.29 | 75.99 | 75.93 |
| 490353013 .................. | Utah ...................... | Salt Lake ................... | 75.27 | 75.21 | 75.78 | 75.72 |
| 490570002 .................. | Utah ...................... | Weber ..................... | 71.35 | 71.29 | 73.29 | 73.23 |
| 490571003 .................. | Utah ...................... | Weber ..................... | 71.24 | 71.19 | 72.16 | 72.11 |
| 550590019 .................. | Wisconsin ................ | Kenosha ................... | 73.17 | 73.07 | 74.09 | 73.99 |
| 550590025 .................. | Wisconsin ................ | Kenosha ................... | 69.62 | 69.46 | 72.69 | 72.52 |
| 551010020 .................. | Wisconsin ................ | Racine .................... | 71.70 | 71.61 | 73.64 | 73.55 |
| Average AQ Change Relative to Base (ppb) | | | | | | 0.11 |
| Total PPB Change Across All Receptors Relative to Base [c] | | | | | | 3.08 |

**Table Notes:**

[a] These results reflect the inclusion of all identified LNB upgrade potential. Some of which will be implemented in 2023 state emissions budgets, and some be implemented in 2024 state emissions budgets (for those states not included in the Revised CSAPR Update).

[b] The EPA notes that the design values reflected in tables VI.D.1–1 and 2 correspond to the engineering analysis EGU emissions inventory that was used in AQAT to determine state-level baseline emissions and reductions at Step 3. These tools are discussed in greater detail in the Ozone Transport Policy Analysis Proposed Rule TSD.

[c] The cumulative ppb change only shows the aggregate change across all problematic receptors (some of which are located within close proximity to one another) in this part of the Step 3 analysis. Section IX of this proposed rule provides a more complete picture of the air quality impacts of the proposed rule.

TABLE VI.D.1–2—AIR QUALITY AT RECEPTORS IN 2026 FROM EGU EMISSIONS CONTROL TECHNOLOGIES

| Monitor ID No. | State | County | Average DV (ppb) | | Max DV (ppb) | |
|---|---|---|---|---|---|---|
| | | | Baseline (engineering analysis) | SCR/SNCR optimization + LNB upgrade + SCR/SNCR retrofit | Baseline (engineering analysis) | SCR/SNCR optimization + LNB upgrade + SCR/SNCR retrofit |
| 40278011 .................. | Arizona .................. | Yuma ..................... | 70.11 | 70.09 | 71.81 | 71.79 |
| 80350004 .................. | Colorado ................. | Douglas ................... | 70.94 | 70.23 | 71.55 | 70.83 |
| 80590006 .................. | Colorado ................. | Jefferson .................. | 72.09 | 71.42 | 72.69 | 72.02 |
| 80590011 .................. | Colorado ................. | Jefferson .................. | 72.97 | 72.32 | 73.68 | 73.02 |
| 90010017 .................. | Connecticut .............. | Fairfield ................... | 71.60 | 71.52 | 72.30 | 72.22 |
| 90013007 .................. | Connecticut .............. | Fairfield ................... | 73.09 | 72.84 | 73.99 | 73.74 |
| 90019003 .................. | Connecticut .............. | Fairfield ................... | 74.83 | 74.63 | 75.03 | 74.83 |
| 90099002 .................. | Connecticut .............. | New Haven ................ | 70.77 | 70.51 | 72.78 | 72.51 |
| 170310001 ................. | Illinois ................... | Cook ...................... | 69.05 | 68.96 | 72.87 | 72.77 |
| 170310032 ................. | Illinois ................... | Cook ...................... | 69.37 | 69.32 | 71.98 | 71.93 |
| 170310076 ................. | Illinois ................... | Cook ...................... | 68.75 | 68.71 | 71.56 | 71.52 |
| 170314201 ................. | Illinois ................... | Cook ...................... | 69.10 | 69.02 | 72.61 | 72.53 |
| 170317002 ................. | Illinois ................... | Cook ...................... | 69.36 | 69.18 | 72.27 | 72.09 |
| 480391004 ................. | Texas .................... | Brazoria ................... | 70.93 | 69.35 | 73.09 | 71.46 |
| 482010024 ................. | Texas .................... | Harris ..................... | 76.28 | 74.77 | 77.82 | 76.28 |
| 490110004 ................. | Utah ..................... | Davis ..................... | 72.20 | 71.61 | 74.42 | 73.81 |
| 490353006 ................. | Utah ..................... | Salt Lake .................. | 73.00 | 72.40 | 74.61 | 74.00 |
| 490353013 ................. | Utah ..................... | Salt Lake .................. | 74.10 | 73.45 | 74.60 | 73.95 |
| 490570002 ................. | Utah ..................... | Weber .................... | 70.30 | 69.74 | 72.22 | 71.64 |
| 550590019 ................. | Wisconsin ................ | Kenosha ................... | 72.01 | 71.80 | 72.91 | 72.70 |
| 550590025 ................. | Wisconsin ................ | Kenosha ................... | 68.46 | 68.19 | 71.48 | 71.19 |
| 551010020 ................. | Wisconsin ................ | Racine .................... | 70.52 | 70.33 | 72.42 | 72.24 |
| Average AQ Change Relative to Base (ppb) | | | | | | 0.43 |
| Total PPB Change Across All Receptors Relative to Base (ppb) | | | | | | 9.42 |

Figures 1 and 2 to Section VI.D.1, included in Appendix G of the Ozone Transport Policy Analysis Proposed Rule TSD available in the docket for this rulemaking, illustrate the air quality improvement relative to the estimated representative cost associated with the previously identified emissions control technologies. The graphs show improving air quality at the downwind receptors as emissions reductions commensurate with the identified control technologies are assumed to be implemented. Figure 1 to Section VI.D.1 [191] reflects emissions reductions commensurate with optimization of existing SNCRs and SCRs. Figure 2 to Section VI.D.1 [192] reflects emissions reductions commensurate with installation of new post combustion controls (mainly SCRs) layered on top of the emissions reduction potential from the technologies represented in Figure 1 to Section VI.D.1.[193] The graphic, and underlying AQAT receptor-by-receptor analysis demonstrates that air quality continues to improve at downwind receptors as EPA examines increasingly stringent EGU NO$_X$ control

[191] Included in Appendix G of the Ozone Transport Policy Analysis Proposed Rule TSD, which is available in the docket for this rulemaking.

[192] Included in Appendix G of the Ozone Transport Policy Analysis Proposed Rule TSD, which is available in the docket for this rulemaking.

[193] Included in Appendix G of the Ozone Transport Policy Analysis Proposed Rule TSD, which is available in the docket for this rulemaking.

**20094**    **Federal Register** / Vol. 87, No. 66 / Wednesday, April 6, 2022 / Proposed Rules

technologies. While all major technology breakpoints identified in Sections VI.B and VI.C of this proposed rule show continued air quality improvements at problematic receptors and at cost and technology choice levels that are commensurate with mitigation strategies that are proven to be widely available and implemented, EPA's quantification and application of those breakpoints reflect certain exclusions to: (1) Preserve this consistency with widely observed mitigation measures in states, and (2) remove any retrofit assumptions at marginal units that would have much higher dollar per ton representative cost and little or no air quality benefit. For instance, the EPA does not define the SCR retrofit breakpoint ($11,000 per ton) to include retrofit application at steam units less than 100 MW or at oil/gas steam units emitting at less than 150 tons per ozone season. The emissions reductions from these potential categories of measures are small and do not constitute additional "breakpoints" in EPA's estimation. They would entail much higher dollar per ton costs, going beyond what is widely observed in the fleet. This careful calibration of technology breakpoints through exclusion of measures that are clearly not cost-effective in terms of air quality benefit allows for the identification of an EGU strategy that is an appropriate reflection of those readily available and widely implemented emissions reduction strategies that will have meaningful downwind air quality impact.

Moreover, these technologies (and representative cost) are demonstrated ozone pollution mitigation strategies that are widely practiced across the EGU fleet and are of comparable stringency to emissions reduction measures that many downwind states have already instituted. The coal SCR retrofit measures driving the majority of the emissions reductions in this action not only reflect industry best practice, but they also reflect prevailing practice among EGUs. More than 60% of the existing coal capacity already has this technology in place. For nearly 25 years, all new coal-fired EGUs that commenced construction have had SCR (or equivalent emissions rates). The 1997 proposed amendments to subpart Da revised the NOx standard based on the use of SCR. The NOx SIP Call (promulgated in 1998) established emissions reduction requirements premised on extensive SCR installation (142 units) and incentivized well over 40 GWs of SCR retrofit in the ensuing

years.[194] Similarly, the Clean Air Interstate Rule established emissions reductions requirements in 2006 that assumed another 58 units (15 GW) would be installed in the ensuing years among just 10 states, and an even greater volume of capacity chose SCR retrofit measures in the wake of finalizing that action.[195]

Basing emission reduction requirements for EGUs on SCR retrofits is also consistent with regulatory approaches adopted by states, which—particularly in downwind areas more impacted by ozone transport contribution from upwind state emissions—have already adopted SCR-based standards as part of stringent NOx control programs. Regulatory programs that impose stringent Reasonably Available Control Technology (RACT) requirements on all major power plants and Lowest Achievable Emission Rate (LAER) standards on all new major sources of NOx have resulted in remaining coal sources in states along the Northeast Corridor such as Connecticut, Delaware, New Jersey, New York, and Massachusetts all being retrofitted with SCR.[196] The Maryland Code of Regulations requires coal fired sources to operate existing SCR controls or install SCR controls by specified dates.[197] Programs like North Carolina's Clean Smokestacks Act and Colorado's Clean Air, Clean Jobs Act have also required or prompted SCR retrofits on units.[198] Unit-level Best Available Retrofit Technology (BART) requirements for the first Regional Haze planning period also determined SCR retrofits (and corresponding emissions rates) were cost-effective controls for a variety of sources in the U.S.[199]

As shown in Figure 1 to Section VI.D.1,[200] the majority of EGU emissions reduction potential and associated air quality improvements estimated for 2023 occurs from optimization of existing SCRs, with some additional reductions from installation of state-of-the-art combustion controls at the same representative cost threshold. At the slightly higher representative cost

threshold of $1,800 per ton, there is some additional air quality improvement from optimization of existing SNCRs. These measures taken together represent the control stringency at which near-term incremental EGU NOx reduction potential and corresponding downwind ozone air quality improvements are maximized. This evaluation shows that EGU NOx reductions for each of the near-term emissions control technologies are available at reasonable cost and that these reductions provide meaningful improvements in downwind ozone concentrations at the identified nonattainment and maintenance receptors. Figure 1 to Section VI.D.1 [201] highlights (1) the continuous connection between identified emission reduction potential and downwind air quality improvement across the range of near-term mitigation measures assessed, and (2) the cost-effective availability of these reductions and corresponding air quality improvements.

Additional considerations that are unique to EGUs provide additional support for EPA's proposal to include SCR and SNCR optimization as part of the identified near-term control stringency, including:

• These controls are already installed and available for operation on these units;

• they are on average already partially operating, but not necessarily optimized;

• the reductions are available in the near-term (during ozone seasons when the problematic receptors are projected to persist), including by the 2023 ozone season aligned with the Moderate area attainment date; and

• these sources are already covered under the existing CSAPR NOx Ozone Season Group 2 or Group 3 Trading Programs or the Acid Rain Program and thus have the monitoring, reporting, recordkeeping, and all other necessary elements of compliance with the trading program already in place.

The majority of emissions reduction potential and associated air quality improvements estimated for 2026 occur from retrofitting steam sources with post-combustion controls. At the representative cost threshold of $11,000 per ton, there are significant additional air quality improvements from emissions reductions commensurate with installation of new SCRs and SNCRs. These measures taken together with the near-term emissions reduction measures described

---

[194] 63 FR 57448.

[195] 71 FR 25345.

[196] EPA–HQ–OAR–2020–0272. Comment letter from Attorneys General of NY, NJ, CT, DE, MA.

[197] COMAR 26.11.38 (control of NOx Emissions from Coal-Fired Electric Generating Units).

[198] *https://www.epa.gov/system/files/documents/2021-09/table-3-30-state-power-sector-regulations-included-in-epa-platform-v6-summer-2021-refe.pdf.*

[199] *See* table 3–35 BART regulations in EPA IPM documentation available at *https://www.epa.gov/airmarkets/documentation-epas-power-sector-modeling-platform-v6-summer-2021-reference-case.*

[200] Included in Appendix G of the Ozone Transport Policy Analysis Proposed Rule TSD, which is available in the docket for this rulemaking.

[201] Included in Appendix G of the Ozone Transport Policy Analysis Proposed Rule TSD, which is available in the docket for this rulemaking.

previously represent the level of control stringency in 2026 at which incremental EGU $NO_X$ reduction potential and corresponding downwind ozone air quality improvements are maximized. This evaluation shows that EGU $NO_X$ reductions for each of the emissions control technologies are available at reasonable cost and that these reductions can provide improvements in downwind ozone concentrations at the identified nonattainment and maintenance receptors.

The EPA finds that the control stringency that reflects optimization of existing SCRs and SNCRs, installation of state-of-the-art combustion controls, and the retrofitting of new post combustion controls at the coal and oil/gas steam capacity described previously results in nearly 90,000 tons of $NO_X$ reduction (approximately 43 percent of the 2026 baseline level) for the 22 linked states in 2026 subject to a FIP for EGUs, which will deliver notable air quality improvements across all transport-impacted receptors and assist in fully resolving one downwind air quality problem for the 2015 ozone NAAQS. Figure 2 to Section VI.D.1 [202] demonstrates the continuous connection between identified emissions reduction potential and downwind air quality improvement across the range of mitigation measures assessed in 2026. At no point do the additional emission mitigation measures examined here fail to produce corresponding downwind air quality improvements.

The EPA is proposing that emissions reductions commensurate with the full operation of all existing post-combustion controls (both SCRs and SNCRs) and state-of-the-art combustion control upgrades constitute the Agency's selected control stringency for EGUs for those states linked to downwind nonattainment or maintenance in 2023. For those states also linked in 2026, the EPA is determining that the appropriate EGU control stringency also includes emissions reductions commensurate with the retrofit of SCR at coal steam units of 100 MW or greater capacity (excepting circulating fluidized bed units), new SNCR on coal steam units of less than 100 MW capacity and circulating fluidized bed units, and SCR on oil/gas steam units greater than 100 MW that have historically emitted at least 150 tons of $NO_X$ per ozone season.

As noted previously in Section VI.B of this proposed rule and in the EGU $NO_X$ Mitigation Strategies Proposed Rule

TSD, the EPA considered other methods of identifying mitigation measures (*e.g.*, SCRs on smaller units, combustion control upgrades on combustion turbines, SCRs on combustion turbines). The emission reductions from these potential categories of measures do not constitute additional "technology breakpoints" in EPA's estimation, but rather reflect a different tier of assessment where further mitigation measures are based on inclusion of smaller and/or different generator type of unit (rather than pollution control technology). Emissions reductions from these measures are relatively small and would entail much higher dollar per ton costs, going beyond what is widely observed in the fleet. Although these additional measures are not included in EPA's technology breakpoint analysis discussed above, the EPA did examine the cost, potential reductions, and air quality impact of these additional measures in a supplemental analysis to affirm that they do not merit inclusion in the proposed stringency for this action. Similar to prior rules, there is a notable "knee-in-the-curve" breakpoint if these additional measures are included in EPA's analysis. In other words, there are very little additional emissions reductions and air quality improvement at problematic receptors, and the cost associated with these measures increases substantially on a dollar per ton basis. The graphic below illustrates the significant loss in cost-effectiveness of reductions if these measures had been included in EPA's proposed stringency.[203]

This proposed determination regarding the appropriate level of control stringency for EGUs to eliminate significant contribution from upwind states finds that the amounts of $NO_X$ emissions reduction achieved through these strategies at EGUs are necessary and cost-justified under the Step 3 multifactor analysis for as long as the strategies remain available to the sources. In other words, the EPA finds

at Step 3 that so long as the identified $NO_X$ emissions reduction controls are available and can be implemented (such as optimization of SCRs), they must be implemented, even as total $NO_X$ emissions reductions on a mass basis decline. EPA's Step 3 finding is *not* limited to a determination of the mass-based reduction in emissions that the EPA determines is achievable for the covered EGU fleet under current operating conditions. Rather, the EPA finds at Step 3 that EGUs must continue to achieve $NO_X$ emissions performance in the ozone season commensurate with the level of emissions control stringency the EPA determines appropriate under the multifactor test as set forth in this section. The stringency of the emissions budgets would simply reflect the stringency of the emissions control strategies and would do so more consistently over time than EPA's previous approach of computing emissions budgets for all future control periods at the time of the rulemaking. This retention of a constant degree of stringency over time in emissions budgets under a flexible trading program would not constitute over-control any more than the permanent imposition of emissions rate standards on individual sources at the time of the rulemaking would constitute over-control.

EPA acknowledges that this is an adjustment in its historical approach to eliminating significant contribution, although it is consistent with the evolution of the Agency's thinking as set forth in the Revised CSAPR Update. In CSAPR and the CSAPR Update, EPA established static budgets at Step 4 based on the selected level of control stringency at Step 3. EPA's experience with this approach has been that while the initial mass-based budgets are achieved and compliance targets are even exceeded, this leads to a loss in efficacy of the program as the incentive to reduce emissions declines over time. Some sources emit at higher levels or relax their operation of $NO_X$ controls in response to the build-up of allowances available for compliance, even though EPA has concluded those controls are necessary to meet the statutory good neighbor requirements. This result is inconsistent with the statutory mandate to "prohibit" significant contribution and interference with maintenance of the NAAQS in other states, as evidenced most clearly in CAA section 126, which makes it unlawful for a source "to *operate* more than three months after [a finding that the source emits or would emit in violation of the good neighbor provision] has been made with respect

---

[202] Included in Appendix G of the Ozone Transport Policy Analysis Proposed Rule TSD, which is available in the docket for this rulemaking.

[203] This is not to discount the potential effectiveness of these or other $NO_X$ mitigation strategies outside the context of this rulemaking to address regional ozone transport on a nationwide basis. States and local jurisdictions may find such measures particularly impactful or necessary in the context of local attainment planning or other unique circumstances. Further, while the EPA proposes this rule as a complete remedy to the problem of interstate transport for the 2015 ozone NAAQS, the EPA has in the past recognized that circumstances may arise after the promulgation of remedies under CAA section 110(a)(2)(D)(i)(I) in which the exercise of further remedial authority against specific stationary sources or groups of sources under CAA section 126 may be warranted. *See* Response to Clean Air Act Section 126(b) Petition From Delaware and Maryland, 83 FR 50444, 50453–54 (Oct. 5, 2018).

to it.'' 42 U.S.C. 7426(c)(2) (emphasis added). Moreover, there is no policy justification at Step 3 for an upwind source to relax or cease operating its emissions controls simply because other sources of pollution have been reduced. In the Revised CSAPR Update, the EPA began to address this problem by establishing adjusted emissions budgets for each year from 2021 through 2025 based on information about the changing EGU fleet known at the time of promulgation of the rule. *See* 86 FR 23118. As discussed in Section VII.B of this proposed rule, the EPA is now implementing a more complete approach to eliminating significant contribution by imposing dynamic budget updates and banking restrictions to ensure that its selected control stringency at Step 3 continues to be implemented.

This approach at Step 4 is wholly consistent with EPA's findings at Step 3. This is best illustrated by comparing the trading program approach with the requirements the EPA could promulgate for EGUs based on an approach of assigning unit-specific emissions rate limitations. Under the latter approach, the EPA would assign an enforceable

emissions rate to each EGU, based on the operation of the selected $NO_X$ control strategy (*e.g.*, optimizing existing SCRs) that would apply in perpetuity. By continually adjusting budgets to ensure that emissions outcomes are achieved—and downwind air quality benefits are delivered—that are commensurate with the continuous operation of emissions controls at the selected control stringency at Step 3, the EPA is better aligning the implementation of the program at Step 4 with the level of emissions reductions from upwind sources that the EPA has determined is appropriate through the Step 3 multifactor analysis.[204] The EPA requests comment on its identified EGU control stringencies, including its consideration of the cost, air quality impacts, and timing of such mitigation strategies.

2. Non-EGU Assessment

The Agency prepared the non-EGU screening assessment for 2026 using the analytical framework detailed in Section VI.B.2 of this proposed rule. Using a $7,500/ton (in 2016 dollars) marginal cost threshold identified in the framework, the screening assessment used CoST with known controls, the

CMDB, and the 2019 emissions inventory and estimated emissions reductions from emissions units in the Tier 1 industries and impactful boilers in the Tier 2 industries.

Using 2026 as the potential earliest date by which controls on emissions units in the Tier 1 industries and impactful boilers in the Tier 2 industries could be installed, the EPA assessed whether these emissions reduction controls should be required at Step 3 under its multi-factor test.

The EPA determined that, for 2026, the average air quality improvement at receptors relative to the EGU case when SCR post-combustion controls were installed was 0.18 ppb when Tier 1 non-EGU controls were applied and an additional 0.04 ppb when Tier 2 non-EGU controls were applied, based on the Step 3 analysis. The EPA determined for the purposes of Step 3 that all but 3 receptors remain nonattainment or maintenance after the application of these controls, with two receptors (one in Brazoria County, Texas and one in Kenosha County, Wisconsin) switching from maintenance to attainment with these non-EGU controls in place.

TABLE VI.D.2–2—AIR QUALITY AT RECEPTORS IN 2026 FROM NON-EGU INDUSTRIES

| Monitor ID No. | State | County | Average DV (ppb) | | Max DV (ppb) | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Baseline (engineering analysis) | EGU SCR/SNCR optimization + LNB upgrade + SCR/SNCR retrofit + non-EGU Tier 1 + Tier 2 | Baseline (engineering analysis) | EGU SCR/SNCR optimization + LNB upgrade + SCR/SNCR retrofit + non-EGU Tier 1 + Tier 2 |
| 40278011 | Arizona | Yuma | 70.11 | 70.06 | 71.81 | 71.76 |
| 80350004 | Colorado | Douglas | 70.94 | 70.07 | 71.55 | 70.67 |
| 80590006 | Colorado | Jefferson | 72.09 | 71.26 | 72.69 | 71.86 |
| 80590011 | Colorado | Jefferson | 72.97 | 72.16 | 73.68 | 72.86 |
| 90010017 | Connecticut | Fairfield | 71.60 | 71.35 | 72.30 | 72.04 |
| 90013007 | Connecticut | Fairfield | 73.09 | 72.54 | 73.99 | 73.43 |
| 90019003 | Connecticut | Fairfield | 74.83 | 74.40 | 75.03 | 74.59 |
| 90099002 | Connecticut | New Haven | 70.77 | 70.22 | 72.78 | 72.21 |
| 170310001 | Illinois | Cook | 69.05 | 68.73 | 72.87 | 72.53 |
| 170310032 | Illinois | Cook | 69.37 | 69.20 | 71.98 | 71.80 |
| 170310076 | Illinois | Cook | 68.75 | 68.51 | 71.56 | 71.31 |
| 170314201 | Illinois | Cook | 69.10 | 68.83 | 72.61 | 72.32 |
| 170317002 | Illinois | Cook | 69.36 | 68.98 | 72.27 | 71.88 |
| 480391004 | Texas | Brazoria | 70.93 | 68.72 | 73.09 | 70.81 |
| 482010024 | Texas | Harris | 76.28 | 74.23 | 77.82 | 75.73 |
| 490110004 | Utah | Davis | 72.20 | 71.51 | 74.42 | 73.70 |
| 490353006 | Utah | Salt Lake | 73.00 | 72.30 | 74.61 | 73.90 |
| 490353013 | Utah | Salt Lake | 74.10 | 73.34 | 74.60 | 73.84 |
| 490570002 | Utah | Weber | 70.30 | 69.63 | 72.22 | 71.53 |
| 550590019 | Wisconsin | Kenosha | 72.01 | 71.57 | 72.91 | 72.47 |
| 550590025 | Wisconsin | Kenosha | 68.46 | 67.95 | 71.48 | 70.95 |
| 551010020 | Wisconsin | Racine | 70.52 | 70.12 | 72.42 | 72.02 |
| Average AQ Change Relative to Base (ppb) | | | | | | 0.64 |

[204] The EPA does not believe this adjustment in its Step 3 approach for EGUs, or its corresponding, improved approach to the trading program at Step 4—which, again, mimics the effect of permanent and enforceable unit-specific emissions limits—violates the prohibition on over-control. Our over-control analysis is set forth below in Section VI.D of this proposed rule, and the EPA proposes to find that there is no over-control at the proposed stringency (for both EGUs and non-EGUs) in any upwind state.

TABLE VI.D.2–2—AIR QUALITY AT RECEPTORS IN 2026 FROM NON-EGU INDUSTRIES—Continued

| Monitor ID No. | State | County | Average DV (ppb) | | Max DV (ppb) | |
|---|---|---|---|---|---|---|
| | | | Baseline (engineering analysis) | EGU SCR/SNCR optimization + LNB upgrade + SCR/SNCR retrofit + non-EGU Tier 1 + Tier 2 | Baseline (engineering analysis) | EGU SCR/SNCR optimization + LNB upgrade + SCR/SNCR retrofit + non-EGU Tier 1 + Tier 2 |
| Total PPB Change Across All Receptors Relative to Base (ppb) ................................................................... | | | | | | 14.13 |

For more information about how this assessment was performed and the results of the analysis for each receptor, refer to the Ozone Transport Policy Analysis Proposed Rule TSD and to the Ozone AQAT included in the docket for this rule.

a. Request for Comment on Non-EGU Control Strategies and Measures

In the non-EGU screening assessment, the EPA used CoST, the CMDB, and the 2019 emissions inventory to assess emissions reduction potential from non-EGU emissions units in several industries. The EPA identified emissions units that were uncontrolled or that could be better controlled and then applied control technologies to estimate emissions reductions and costs. As noted previously, the cost estimates do not include monitoring, recordkeeping, reporting, or testing costs. Based on the available information, the EPA is proposing to require implementation of the non-EGU emissions reductions at Step 3 by the beginning of the 2026 ozone season. The EPA discusses the basis for this proposed compliance schedule in Section VII.A.2 of this proposed rule.

The EPA requests comment on certain estimates and assumptions in this proposal that may affect EPA's evaluation of the capital and annual costs of several potential control technologies. In particular, the EPA requests comment on whether ultra-low

$NO_X$ burners or low $NO_X$ burners are generally considered part of the process or add-on controls for ICI boilers (and how process changes or retrofits to accommodate controls would affect the cost estimates). We request comment on our estimates regarding the effectiveness of low emissions combustion in controlling $NO_X$ from RICE compared to other potential $NO_X$ controls for these engines. We request comment on whether controls on ICI boilers and reciprocating IC engines are likely to be run all year (e.g., 8,760 hours/year) or only during the ozone season.

The EPA notes that the non-EGU $NO_X$ mitigation strategy in this proposed rule focuses on obtaining emissions reductions from non-EGU units that were quantitatively determined to have the most significant impacts on the downwind nonattainment and maintenance receptors. However, the EPA requests comment on the merits of requiring non-EGU sources within the linked upwind states to meet specified technology-based control standards, such as the RACT SIP requirements outlined in CFR part 51 for non-EGU sources located in OTR states.

3. Combined EGU and Non-EGU Assessment

The EPA used the Ozone AQAT to evaluate the combined impact of these selected stringency levels for both EGUs and non-EGUs on all receptors

remaining in the 2026 air quality modeling base case to inform the over-control analysis. EPA's evaluation demonstrated air quality improvement at the 22 remaining nonattainment or maintenance receptors outside of California (see Section V.D of this proposed rule for receptor details). The EPA estimated that the average air quality improvement at these receptors relative to the engineering analytics base case was 0.64 ppb for emissions reductions commensurate with optimization of existing SCRs/SNCRs, combustion control upgrades, application of new post-combustion control (SCR and SNCR) retrofits at eligible units, and all estimated emissions reductions from the Tier 1 industries and impactful boilers in the Tier 2 industries. Table VI.D.1–3 summarizes the results of EPA's Step 3 evaluation of air quality improvements at these receptors using AQAT. In summary, the collective application of these mitigation measures and emissions reductions continue to deliver downwind air quality improvements up until the most stringent thresholds identified. The health and climate benefits resulting from application of these measures (as described in the RIA) are estimated to exceed the costs, and the identified technologies reflect not only demonstrated best practices—but widely adopted best practices in the case of EGU retrofits.

TABLE VI.D.3–1—CHANGE IN AIR QUALITY REDUCTIONS AT RECEPTORS IN 2026 FROM PROPOSED EGU AND NON-EGU EMISSIONS REDUCTIONS [a] [b] [c]

| Tier/technology | Ozone season emissions reductions | Total PPB change across all downwind receptors [d] | Average PPB change across all downwind receptors |
|---|---|---|---|
| EGU (SCR/SNCR optimization + LNB upgrade) + Gen shifting ............................................ | 26,250 | 1.53 | 0.07 |
| EGU SCR/SNCR Retrofit + Gen shifting ..................................................................... | 63,883 | 7.89 | 0.36 |
| Non-EGU (Tier 1) ........................................................................................................ | 41,153 | 3.89 | 0.18 |
| Non-EGU (Tier 2) ........................................................................................................ | 6,033 | 0.82 | 0.04 |
| Total ...................................................................................................................... | ........................ | 14.13 | 0.64 |

**Table Notes:**

a As in prior rules, for the purpose of defining significant contribution at Step 3, the EPA evaluated air quality changes resulting from the application of the emissions reductions in only those states that are linked to each receptor as well as the state containing the receptor. By applying reductions to the state containing the receptor, the EPA ensures that it is accounting for the downwind state's fair share. In addition, this method holds each upwind state responsible for its fair share of the downwind problems to which it is linked. Reductions made by other states in order to address air quality problems at other receptors do not increase or decrease this share. The air quality impacts on design values that reflect the emissions reductions in all linked states and the health and climate benefits from this proposal are discussed in Section IX of this proposed rule.

b The EPA notes that the design values reflected in Tables VI.D.1–1 and 2 correspond to the engineering analysis EGU emissions inventory used in AQAT to determine state-level baseline emissions and reductions at Step 3. These tools are discussed in greater detail in the Ozone Transport Policy Analysis Proposed Rule TSD. Additionally, these emission reduction values vary slightly from the technology reduction estimates described in Section VI.C, as the values here reflect (1) the sum of the final identified stringency for each state (e.g., SCR retrofit potential is not assumed in Alabama, Delaware, and Tennessee), and (2) generation shifting reduction potential identified at each step.

c The total and average ppb results from non-EGUs emissions reductions shown here were generated using the Step 3 AQAT methodology consistent with that for EGUs (i.e., including reductions from the state containing the receptor and excluding states that are not explicitly linked to particular receptors). The values shown in Table VI.C.2–1 were prepared for the non-EGU screening assessment using a methodology where states within the program make emissions reductions for all receptors. States that contain receptors (i.e., Connecticut and Colorado) that are not linked to other receptors are not assumed to make reductions under that methodology.

d The cumulative ppb change only shows the aggregate change across all problematic receptors (some of which are located within close proximity to one another) in this part of the Step 3 analysis. Section IX of this proposed rule provides a more complete picture of the air quality impacts of the proposed rule.

4. Over-Control Analysis

The EPA applied its over-control test to this same set of aggregated EGU and non-EGU data described in the previous section. As part of the air quality analysis using the Ozone AQAT, the EPA evaluated potential over-control with respect to whether (1) the expected ozone improvements would be greater than necessary to resolve the downwind ozone pollution problem (i.e., beyond what is necessary to resolve all nonattainment and maintenance problems to which an upwind state is linked) or (2) the expected ozone improvements would reduce the upwind state's ozone contributions below the screening threshold (i.e., 1 percent of the 2015 ozone NAAQS).

In *EME Homer City,* the Supreme Court held that the EPA cannot "require[ ] an upwind State to reduce emissions by more than the amount necessary to achieve attainment in every downwind State to which it is linked." 572 U.S. at 521. On remand from the Supreme Court, the D.C. Circuit held that this means that the EPA might overstep its authority "when those downwind locations would achieve attainment even if less stringent emissions limits were imposed on the upwind States linked to those locations." *EME Homer City II,* 795 F.3d at 127. The D.C. Circuit qualified this statement by noting that this "does not mean that every such upwind state would then be entitled to less stringent emissions limits. Some of those upwind States may still be subject to the more stringent emissions limits so as not to cause other downwind locations to which those States are linked to fall into nonattainment." *Id.* at 14–15. As the Supreme Court explained, "while EPA has a statutory duty to avoid over-control, the Agency also has a statutory obligation to avoid 'under-control,' i.e., to maximize achievement of attainment downwind." 572 U.S. at 523. The Court noted that "a degree of imprecision is

inevitable in tackling the problem of interstate air pollution" and that incidental over-control may be unavoidable. *Id.* "Required to balance the possibilities of under-control and over-control, EPA must have leeway in fulfilling its statutory mandate." *Id.*[205]

Consistent with these instructions from the Supreme Court and the D.C. Circuit, using the Ozone AQAT, the EPA first evaluated whether reductions resulting from the selected control stringencies for EGUs in 2023 and 2026 combined with the emissions reductions selected for non-EGUs in 2026 can be anticipated to resolve any downwind nonattainment or maintenance problems (see the Ozone Policy Analysis Proposed Rule TSD for details on the construction and application of AQAT). The control stringency selected for 2023 (a representative cost threshold of $1,800 per ton for EGUs) includes emissions reductions commensurate with optimization of existing SCRs and SNCRs and installation of state-of-the-art combustion controls, which are estimated to change the status of one maintenance receptor, shifting the Clark County, Nevada monitor to attainment in 2023. However, no other nonattainment or maintenance problems would be resolved in 2023 with this level of stringency, and no state is linked solely to this receptor. Nor do any states' contribution levels drop below the 1% of NAAQS threshold. Thus, the EPA determined that none of the 26 linked states have all of their linkages resolved at the proposed EGU level of control stringency in 2023, and

hence, the EPA finds no over-control in the proposed level of stringency.

Based on the air quality baseline modeling for 2026, all receptors to which Alabama, Delaware, and Tennessee are linked in 2023 are projected to be in attainment in 2026. Therefore, no additional emissions reductions are proposed for EGUs or non-EGUs in those states beyond the 2023 level of stringency. For the remaining 23 states, the selected control stringency (at a representative cost per ton threshold of $11,000 for EGUs and a marginal cost threshold of $7,500 for non-EGUs) beginning in 2026 includes additional EGU controls and estimated non-EGU emissions reductions for Tier 1 and Tier 2 non-EGU industries. The EPA used the Ozone AQAT to evaluate the impact of this selected stringency level (as well as other potential stringency levels) on all receptors remaining in the 2026 air quality modeling base case. This assessment shows that the selected control stringency level and emissions reductions are estimated to change the status of three maintenance receptors to attainment in 2026—Douglas County, Colorado; Brazoria County, Texas; and Kenosha County, Wisconsin. Based on these data, EPA proposes that at least 20 of the 23 states continue to be linked to nonattainment or maintenance receptors after implementation of all identified Step 3 reductions, and hence, the EPA finds no over-control in its determination of that level of stringency for those 20 states.

For 2 of the 23 states, Arkansas and Mississippi, the last downwind receptor to which these two states are linked (i.e., Brazoria County, Texas) is estimated to achieve attainment and maintenance after full application of EGU reductions and Tier 1 non-EGU reductions. This suggests application of the estimated non-EGU emissions reductions from Tier 2 *may* constitute over-control for these states. However, this downwind

---

[205] Although the Court described over-control as going beyond what is needed to address "nonattainment" problems, the EPA interprets this holding as not impacting its approach to defining and addressing both nonattainment and maintenance receptors. In particular, the EPA continues to interpret the Good Neighbor provision as requiring it to give independent effect to the "interfere with maintenance" prong. *Accord Wisconsin,* 938 F.3d at 325–27.

receptor only resolves by a small margin after the application of all EGU and Tier 1 non-EGU emissions reductions. The EPA anticipates that updates to emissions inventories, emissions reduction potential from identified technologies, or the over-control test methodology resulting from comments or other updated information could possibly move this site back into nonattainment- or maintenance-receptor status when the EPA conducts an over-control analysis prior to finalizing this proposal.

For 1 of the 23 states, Wyoming, the EPA also notes a potential over-control finding under the methodological assumption where emissions reductions of commensurate stringency are assumed in the downwind state of Colorado (which is not subject to this proposal). As demonstrated in the Ozone Transport Policy Analysis Proposed Rule TSD, the last downwind receptor for Wyoming (*i.e.,* Douglas County, Colorado) is estimated to achieve attainment and maintenance after full application of EGU reductions. This suggests application of estimated non-EGU emissions reductions from Tier 1 and Tier 2 industries may constitute over-control for this state. However, when the assumption of commensurate downwind state reductions in Colorado is removed from the methodology, the downwind receptor to which Wyoming is linked does not resolve and there is no identified over-control estimated for Wyoming.[206]

Next, the EPA evaluated the potential for over-control with respect to the 1 percent of the NAAQS threshold applied in this proposed rulemaking at

Step 3 of the good neighbor framework, assessed for the selected control stringencies for each state for each period that downwind nonattainment and maintenance problems persist (*i.e.,* 2023 and 2026). Specifically, the EPA evaluated whether the selected control stringencies would reduce upwind emissions to a level where the contribution from any of the 26 linked states in 2023 or 23 linked states in 2026 would be below the 1 percent threshold. The EPA finds that for the mitigation measures assumed in 2023 and in 2026, all states that contributed greater than or equal to the 1 percent threshold in the base case continued to contribute greater than or equal to 1 percent of the NAAQS to at least one remaining downwind nonattainment or maintenance receptor for as long as that receptor remained in nonattainment or maintenance. In the case of Arkansas, Mississippi, and Wyoming, while their linkages resolved based on a change in receptor status at Step 1 (as discussed above), their contribution to the relevant monitoring sites remained above 1 percent of the NAAQS, and thus, the potential basis for an over-control finding with respect to these states is not based on their contribution dropping below 1 percent of the NAAQS at those sites. For more information about this assessment, refer to the Ozone Transport Policy Analysis Proposed Rule TSD and the Ozone AQAT.

Based on these results, under no scenario does EPA's AQAT analysis for this proposal indicate that including all identified EGU reductions would constitute over-control. Rather, if these results hold for a final rule, the potential over-control for Arkansas and Mississippi can be avoided by not requiring Tier 2 non-EGU reductions, and over-control for Wyoming can be avoided by not requiring any non-EGU reductions.

Nonetheless, while acknowledging these preliminary analytic results, the EPA is proposing that all of the selected EGU and non-EGU NOₓ reduction strategies selected in EPA's Step 3 analysis be applied to all linked states in 2026—including to Arkansas, Mississippi, and Wyoming—to eliminate significant contribution to nonattainment and interference with maintenance of the 2015 ozone NAAQS. The Supreme Court has directed the EPA to avoid both over-control and under-control in addressing good neighbor obligations. In addition, the D.C. Circuit has reinforced that over-control must be established based on particularized, record evidence on an as-applied basis. As noted previously,

even slight changes in analytics based on comments or new information between proposal and final could result in the Brazoria, Texas site remaining either a nonattainment or maintenance receptor. Further, with respect to Wyoming, its linkage only resolves based on an unenforceable assumption regarding a certain level of emissions reduction in Colorado. The proposed determination that the stringency of this proposal does not constitute over-control for any linked state is further reinforced by EPA's observation in Section IV.A.1 of this proposed rule regarding the nature of ozone, and in particular, that future ozone concentrations and the formation of ground level ozone, may be impacted by climate change in future years.

Under these circumstances, the EPA cannot conclude based on the current record that any aspect of its selected Step 3 level of control stringency constitutes unnecessary over-control for any of the 23 states found to be linked in 2026. The EPA requests comment on this proposed conclusion. The EPA requests comment on an alternative conclusion that, if this same analysis were to persist for a final rule, it must limit non-EGU reduction requirements for Arkansas and Mississippi to only the Tier 1 industries, and for Wyoming to limit the stringency of the rule to only the EGU reduction strategies.

## VII. Implementation of Emissions Reductions

### A. NOₓ Reduction Implementation Schedule

This proposal, if finalized, will ensure that emissions reductions necessary to eliminate significant contribution will be achieved as "as expeditiously as practicable" as required under CAA section 181(a). The EPA's anticipated timing will provide for all possible emissions reductions to go into effect beginning in the 2023 ozone season, which is aligned with the next upcoming attainment date of August 3, 2024, for areas classified as Moderate nonattainment under the 2015 ozone standard. Additional emissions reductions that the EPA finds not possible to implement by that attainment date are proposed to take effect as expeditiously as practicable, with the full suite of emissions reductions taking effect by the 2026 ozone season, which is aligned with the August 3, 2027, attainment date for areas classified as Serious nonattainment under the 2015 ozone NAAQS. This schedule of emissions reductions meets the requirement in the Good Neighbor Provision that it must be

---

[206] In this proposal, the EPA continues to assume, as it has in prior transport rules, that home-states (that are not otherwise linked) will make similar reductions as those assumed in this action for purposes of local attainment. While the EPA continues to view this to be an equitable means of assessing air quality improvement from good neighbor actions, because the downwind receptor state is assumed to do its "fair share," the EPA recognizes that recent case law has called the need for such an assumption into question, and thus using this assumption as a basis for finding over-control may be inappropriate. In *Maryland,* the EPA had argued that good neighbor obligations should not be required by the Marginal area attainment deadline in part because "marginal nonattainment areas often achieve the NAAQS without further downwind reductions, so it would be unreasonable to impose reductions on upwind sources based on the next marginal attainment deadline." 958 F.3d 1185, 1204. The D.C. Circuit rejected that argument, noting regulatory consequences for the downwind state for failure to attain even at the Marginal date, and, citing *Wisconsin,* the court held that upwind sources violate the good neighbor provision if they significantly contribute even at the Marginal area attainment date. *Id.* Thus, the EPA examines over-control in this proposal with and without the assumption of home-state emission reductions.

implemented "consistent with the provisions of [title I of the CAA.]" CAA section 110(a)(2)(D)(i). Finally, the timing of this proposed rulemaking is designed to achieve reductions as expeditiously as practicable while adhering to the procedural requirements of CAA section 110. The EPA proposes this rule to constitute a full remedy for interstate transport for the 2015 ozone NAAQS for the states covered by this proposal; the EPA does not anticipate further rulemaking to address good neighbor obligations will be required for these states with the finalization of this rule.

EPA's proposed determinations regarding the timing of this proposed rule are informed by and in compliance with several recent court decisions. The D.C. Circuit has reiterated several times since 2008 that, under the terms of the Good Neighbor Provision, upwind states must eliminate their significant contributions to downwind areas "consistent with the provisions of [title I of the Act]," including those provisions setting attainment deadlines for downwind areas.[207] In *North Carolina,* the D.C. Circuit found the 2015 compliance deadline that the EPA had established in CAIR unlawful in light of the downwind nonattainment areas' 2010 deadline for attaining the 1997 NAAQS for ozone and PM$_{2.5}$.[208] Similarly, in *Wisconsin,* the Court found the CSAPR Update unlawful to the extent it allowed upwind states to continue their significant contributions to downwind air quality problems beyond the downwind states' statutory deadlines for attaining the 2008 ozone NAAQS.[209] More recently, in *Maryland,* the Court found the EPA's selection of a 2023 analysis year in evaluating state petitions submitted under CAA section 126 unlawful in light of the downwind Marginal nonattainment areas' 2021 deadline for attaining the 2015 ozone NAAQS.[210] The Court noted in *Wisconsin* that the statutory command—that compliance with the Good Neighbor Provision must be achieved in a manner "consistent with" title I of the CAA—may be read to allow for some deviation from the mandate to eliminate

prohibited transport by downwind attainment deadlines, "under particular circumstances and upon a sufficient showing of necessity," but concluded that "[a]ny such deviation would need to be rooted in Title I's framework" and would need to "provide a sufficient level of protection to downwind States." [211]

## 1. 2023–2025: EGU NO$_X$ Reductions Beginning in 2023

The near-term EGU control stringencies and corresponding reductions in this proposed rulemaking cover the 2023, 2024, and 2025 ozone seasons. This is the period in which some reductions will be available, but the large portion of full remedy reductions—mainly those reductions that are driven by post combustion control installation—identified in Sections VI.B through VI.D of this proposed rule are not yet available. The EGU NO$_X$ mitigation strategies available during these initial 3 years are the optimization of existing post-combustion controls (SCRs and SNCRs) and combustion control upgrades. As described in Sections VI.B through VI.D of this proposed rule and in accompanying TSDs, these timing measures can be implemented in under two months in the case of existing control optimization and in 6 months in the case of combustion control upgrades.

As described in Section VI.B of this proposed rule and in the identified TSDs, these timing assumptions account for planning, procurement, and any physical or structural modification necessary. The EPA provides significant historical data, including the implementation of the most recent Revised CSAPR Update, as well as engineering studies and input factor analysis documenting the feasibility of these timing assumptions. However, these timing assumptions are representative of fleet averages, and the EPA has noted that some units will likely overperform their installation timing assumptions, while others may have unit configuration or operational considerations that result in their underperforming these timing assumptions. As in prior interstate transport rules, the EPA is implementing these EGU reductions through a trading program approach. The trading program's option to buy additional allowances provides flexibility in the program for outlier

sources that may need more time than what is representative of the fleet average to implement these mitigation strategies while providing an economic incentive to outperform rate and timing assumptions for those sources that can do so. In effect, this trading program implementation operationalizes the mitigation measures as state-wide assumptions for the EGU fleet rather than unit-specific assumptions.

However, starting in 2024, as described in Section VII.B.7 of this proposed rule, unit-specific daily emissions rate limits are applied to coal units with existing SCR at a level consistent with operating that control. The EPA believes that implementing these emissions reductions at the state level starting in 2023 (through state emissions budgets) while imposing the unit-specific emissions rate limits in 2024 achieves the necessary environmental performance as soon as possible while accommodating any heterogeneity in unit-level implementation schedules regarding daily operation of optimized SCRs.

Additionally, as in prior rules, the EPA assumes combustion control upgrade implementation may take up to 6 months. In the Revised CSAPR Update, covering 12 of the 25 states for which emissions reduction requirements for EGUs are established under this proposed action, the EPA finalized the rule in March of 2021 and thus did not require these combustion control-based emissions reductions in ozone-season state emissions budgets until 2022 (year two of that program).[212] The EPA is applying the same timing assumption regarding combustion control upgrades for this proposed rulemaking given the expected similar window between an anticipated final action date and the start of the year one ozone season. The EPA is not assuming the implementation of any additional combustion control upgrades in state emissions budgets until 2024. Therefore, those 13 states covered in this action for EGU emissions reductions that were not covered in the Revised CSAPR Rule have 2023 emissions budgets that only reflect optimization of existing controls. Any identified combustion control upgrade emissions reductions are reflected beginning in the 2024 ozone-season budgets for these states. For the 12 states covered under the Revised CSAPR Update, any identified emissions reduction potential from combustion control upgrade was included and reflected in those state budgets beginning in 2022 under the Revised CSAPR Update. Therefore, the

---

[207] *North Carolina* v. *EPA,* 531 F.3d 896 (D.C. Cir. 2008), *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019), and *Maryland* v. *EPA,* 958 F.3d 1185 (D.C. Cir. 2020).

[208] *North Carolina,* 531 F.3d at 911–913.

[209] *Wisconsin,* 938 F. 3d at 303, 3018–20.

[210] *Maryland,* 958 F.3d at 1203–1204. Similarly, in *New York* v. *EPA,* 964 F.3d 1214 (D.C. Cir. 2020), the Court found the EPA's selection of a 2023 analysis year in evaluating New York's section 126 petition unlawful in light of the New York Metropolitan Area's 2021 Serious area deadline for attaining the 2008 ozone NAAQS. 964 F.3d at 1226 (citing *Wisconsin* and *Maryland*).

[211] *Wisconsin,* 938 F. 3d at 320 (citing CAA section 181(a) (allowing one-year extension of attainment deadlines in particular circumstances) and *North Carolina,* 531 F.3d at 912).

[212] 86 FR 23093.

EPA is assuming that this combustion control upgrade potential is available, if not already realized, by the first year of this action (*i.e.*, 2023) in this proposed rule.

2. 2026 and Later Years: EGU and Non-EGU NO$_X$ Reductions Beginning in 2026

In accordance with the good neighbor provision and the downwind attainment schedule under CAA section 181 for the 2015 ozone NAAQS, the EPA is proposing to align its analysis and implementation of the emissions reductions addressing significant contribution from EGU and non-EGU sources that require relatively longer lead time at a sectoral scale with the 2026 ozone season, which is the last full ozone season preceding the August 3, 2027, Serious area attainment date for the 2015 ozone NAAQS.[213] The EPA proposes to find that this compliance deadline is the most expeditious date practicable and would achieve the required emissions reductions prior to the next applicable attainment date by which such reductions are, in fact, possible. The EPA proposes to find that it is not possible to require implementation of all necessary emissions controls across all of the affected EGU and non-EGU sources by the August 3, 2024, Moderate area attainment date.

Thus, the EPA is proposing to require compliance with the control requirements for all non-EGUs and the EGU reductions related to post-combustion control retrofit identified in this section no later than the 2026 ozone season (May through September). If finalized in early 2023, the final rule would provide more than three years for EGU and non-EGU sources to install whatever controls they deem suitable to comply with required emissions reductions by the 2026 ozone season. In addition, the publication of this proposal provides roughly an additional year of notice to these source owners and operators that they should begin engineering and financial planning now to be prepared to meet this implementation timetable.

The EPA views this timeframe for retrofitting post-combustion NO$_X$ emissions controls and other non-EGU controls to be presumptively reasonable

and achievable. A 3-year period for installation of post-combustion control technologies is consistent with the statutory timeframe for implementation of the controls required to address interstate pollution under section 110(a)(2)(D) and 126 of the Act, the statutory timeframes for implementation of RACT in ozone nonattainment areas classified as Moderate or above, and other statutory provisions that establish control requirements for existing stationary sources of pollution.

For example, section 126 of the CAA authorizes a downwind state or tribe to petition the EPA for a finding that emissions from "any major source or group of stationary sources" in an upwind state contribute significantly to nonattainment in, or interfere with maintenance by, the downwind state. If the EPA makes a finding that a major source or a group of stationary sources emits or would emit pollutants in violation of the relevant prohibition in CAA section 110(a)(2)(D), the source(s) must shut down within 3 months from the finding unless the EPA directly regulates the source(s) by establishing emissions limitations and a compliance schedule extending no later than three years from the date of the finding, to eliminate the prohibited interstate transport of pollutants as expeditiously as practicable.[214] Thus, in the provision that allows for direct federal regulation of sources violating the good neighbor provision, Congress established 3 years as the maximum amount of time available from a final action to when emissions reductions need to be achieved at the relevant source or group of sources.

Additionally, for ozone nonattainment areas classified as Moderate or higher, the CAA requires states to implement RACT requirements less than three years after the statutory deadline for submitting these measures to the EPA.[215] Specifically, for these areas, CAA sections 182(b)(2) and 182(f) require that states implement RACT for existing VOC and NO$_X$ sources as expeditiously as practicable but no later than May 31, 1995, approximately 30 months after the November 15, 1992, deadline for submitting RACT SIP revisions. For purposes of the 2015 ozone NAAQS, the EPA has interpreted these provisions to require

implementation of RACT SIP revisions as expeditiously as practicable but no later than January 1 of the fifth year after the effective date of designation, which is less than 3 years after the deadline for submitting RACT SIP revisions.[216] For areas initially designated nonattainment with a Moderate or higher classification effective August 3, 2018 (83 FR 25776), that implementation deadline falls on January 1, 2023, approximately 29 months after the August 3, 2020 submission deadline.[217] Moderate ozone nonattainment areas must also implement all reasonably available control measures (including RACT) needed for expeditious attainment within three years after the statutory deadline for states to submit these measures to the EPA as part of a Moderate area attainment demonstration.[218]

The EPA notes that the types and sizes of the EGU and non-EGU sources that the EPA proposes to include in this proposed rule, as well as the types of emissions control technologies on which the EPA proposes to base the

---

[213] For each nonattainment area classified under CAA section 181(a) for the 2015 ozone NAAQS, the attainment date is "as expeditiously as practicable" but not later than the date provided in table 1 to 40 CFR 51.1303(a). Thus, for areas initially designated nonattainment effective August 3, 2018 (83 FR 25776), the latest permissible attainment dates are: August 3, 2021 (for Marginal areas), August 3, 2024 (for Moderate areas), August 3, 2027 (for Serious areas), and August 3, 2033 (for Severe areas).

[214] CAA 110(a)(2)(D)(i) and 126(c).

[215] *See, e.g.*, 40 CFR 51.1112(a)(3) and 51.1312(a)(3)(i) (requiring implementation of RACT required pursuant to initial nonattainment area designations no later than January 1 of the fifth year after the effective date of designation, which is less than 3 years after the submission deadline under 40 CFR 51.1112(a)(2)) and 51.1312(a)(2)(i), respectively).

[216] 40 CFR 51.1312(a)(2)(i) (requiring submission of RACT SIP revisions no later than 24 months after the effective date of designation) and 51.1312(a)(3)(l) (requiring implementation of RACT SIP revisions as expeditiously as practicable, but no later than January 1 of the fifth year after the effective date of designation). For reclassified areas, states must implement RACT SIP revisions as expeditiously as practicable, but no later than the start of the attainment year ozone season associated with the area's new attainment deadline, or January 1 of the third year after the associated SIP revision submittal deadline, whichever is earlier; or the deadline established by the Administrator in the final action issuing the area reclassification. 40 CFR 51.1312(a)(3)(ii); *see also* 83 FR 62989, 63012–63014.

[217] 40 CFR 51.1312(a)(2)(i) (requiring submission of RACT SIP revisions no later than 24 months after the effective date of designation).

[218] *See, e.g.*, 40 CFR 51.1108(d) (requiring implementation of all control measures (including RACT) needed for expeditious attainment no later than the beginning of the attainment year ozone season, which, for a Moderate nonattainment area, occurs less than 3 years after the deadline for submission of reasonably available control measures under 40 CFR 51.1112(c) and 51.1108(a)) and 40 CFR 51.1308(d) (requiring implementation of all control measures (including RACT) needed for expeditious attainment no later than the beginning of the attainment year ozone season, which, for a Moderate nonattainment area, occurs less than three years after the deadline for submission of reasonably available control measures under 40 CFR 51.1112(c) and 51.1308(a)). Because the attainment demonstration for a Moderate nonattainment area (including RACT needed for expeditious attainment) is due three years after the effective date of the area's designation (40 CFR 51.1308(a) and 51.1312(c)), and all Moderate nonattainment areas must attain the NAAQS as expeditiously as practicable but no later than 6 years after the effective date of the area's designation (40 CFR 51.1303(a)), the beginning of the "attainment year ozone season" (as defined in 40 CFR 51.1300(g)) for such an area is less than three years after the due date for the attainment demonstration.

emissions limitations that would take effect for the 2026 ozone season, generally are intended to be consistent with the scope and stringency of RACT requirements for existing major sources of $NO_X$ in downwind Moderate nonattainment areas and some upwind areas, which many states have already implemented in their SIPs.[219] Thus, the timing Congress allotted for sources in downwind states to come into compliance with RACT requirements bears directly on the amount of time that should be allotted here and indicates, as does CAA section 126, that 3 years is an outer limit on the time that should be given sources to come into compliance.

Finally, with respect to emissions standards for hazardous air pollutants, section 112(i)(3) of the CAA requires the EPA to establish compliance dates for each category or subcategory of existing sources subject to an emissions standard that "provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard," with limited exceptions.[220] Here again, where Congress was concerned with addressing emissions of pollutants that impact public health, a 3-year time period was allotted as the time needed for existing sources to come into compliance.

All of these statutory timeframes for implementation of new control requirements on existing stationary sources indicate that Congress considered 3 years to be not only a sufficient amount of time but a maximum amount of time allowable for existing stationary sources to install pollution controls as necessary for expeditious attainment, to eliminate prohibited interstate transport of pollutants, and to protect public health.

Further, the EPA notes that, given the number of years that have passed since EPA's promulgation of the 2015 ozone NAAQS and related nonattainment area designations in 2018, and in light of the *Maryland* court's holding that good neighbor obligations for the 2015 ozone NAAQS should have been implemented

by the Marginal area attainment date in 2021,[221] many states are substantially delayed in implementing their good neighbor obligations for these NAAQS, and the sources proposed for $NO_X$ emissions control in this rule have continued to operate for several years without the controls necessary to eliminate their significant contribution to ongoing and persistent ozone nonattainment and maintenance problems in other states. Under these circumstances, we find it more than reasonable to require compliance with the control requirements for all non-EGUs and the EGU reductions related to post-combustion control retrofit identified in Section VI.B.1.b of this proposed rule by the beginning of the 2026 ozone season (i.e., by May 1, 2026). May 1, 2026, is more than 3 years after the date by which the EPA currently anticipates promulgating a final FIP for the covered states, more than three years after the January 1, 2023, deadline for implementation of section 182 RACT SIP provisions in areas classified as Moderate or higher, and almost 8 years after the October 1, 2018, deadline for submission of good neighbor SIPs that prohibit significant contribution to nonattainment or interference with maintenance in downwind states.[222]

As the D.C. Circuit noted in *Wisconsin*, the good neighbor provision requires upwind states to "eliminate their substantial contributions to downwind nonattainment in concert with the attainment deadlines" in the downwind states, even where those attainment deadlines occur before EPA's statutory deadline to promulgate a FIP.[223] Referencing the Supreme Court's description of the attainment deadlines as "the heart" of the CAA, the *Wisconsin* court noted that some deviation from the mandate to eliminate prohibited transport by downwind attainment deadlines may be allowed

only "under particular circumstances and upon a sufficient showing of necessity," e.g., when compliance with the statutory mandate amounts to an impossibility.[224]

For the reasons provided below in this section, the EPA is proposing to find that installation of certain EGU controls and all non-EGU controls is not possible by the Moderate area attainment date for the 2015 ozone NAAQS (i.e., August 3, 2024),[225] and that the 2026 ozone season, which corresponds to the August 3, 2027, Serious area attainment date for these NAAQS, is the earliest downwind attainment date by which the required emissions reductions from these strategies are possible.

a. EGU Schedule for 2026 and Later Years

As discussed in Sections VI.B through VI.D of this proposed rule, significant emissions reduction potential exists and is included in EPA's quantification of significant contribution based on the potential to install post-combustion controls (SCR and SNCRs) at EGUs. However, as discussed in detail in those sections, the assumption for installation of this technology on a region-wide scale is 36 months in this proposed rule. This amount of time allows for all necessary procurement, permitting, and installation milestones across multiple units in the covered region. Therefore, the EPA proposes to find that these emissions reductions are not available any earlier than the 2026 compliance period. For each year in 2026 and beyond, state emissions budgets include reductions commensurate with these post-combustion control technologies identified for covered units in Step 3. The EPA notes that similar compliance schedules and post-combustion control retrofit installations have been realized successfully in prior programs allowing similar timeframes. Subsequent to the $NO_X$ SIP Call and the parallel Finding of Significant Contribution and Rulemaking on Section 126 Petitions (which became effective December 28, 1998, and February 17, 2000, respectively[226]), nearly 19 GW of SCR

---

[219] See the Non-EGU Sectors TSD for a discussion of SIP-approved RACT rules in effect in downwind states.

[220] CAA section 112(i)(3)(B) generally authorizes the EPA to grant an extension of up to 1 additional year for an existing source to comply with emissions standards "if such additional period is necessary for the installation of controls," and sections 112(i)(4) through (8) provide for limited extensions granted by the President where certain conditions are met, for existing sources that have installed the best available control technology (BACT) or technology required to meet a lowest achievable emissions rate (LAER), and for new sources for which construction or reconstruction is commenced by certain dates.

[221] 958 F.3d at 1203–1204 (remanding the EPA denial of section 126 petition based on the EPA analysis of downwind air quality in 2023 rather than 2021, the year containing the Marginal area attainment date).

[222] CAA sections 110(a)(1) and 110(a)(2)(D)(i) (requiring states to submit, within 3 years after EPA's promulgation of a new or revised NAAQS, SIP provisions adequate to satisfy the Good Neighbor Provision). As the Supreme Court noted in *EME Homer City I*, "nothing in the statute places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations." 572 U.S. 489, 510.

[223] 938 F.3d at 317–318. For example, the court observed that the EPA may shorten the deadline for SIP submissions under CAA section 110(a)(1) and may issue FIPs soon thereafter under CAA section 110(c)(1), to align the upwind states' deadline for satisfying good neighbor obligations with the downwind states' deadline for attaining the NAAQS. *Id.* at 318.

[224] *Id.* at 316 and 319–320 (noting that any such deviation must be "rooted in Title I's framework" and "provide a sufficient level of protection to downwind States").

[225] Compliance by the August 3, 2021, Marginal area attainment date is also impossible as that date has passed.

[226] See 63 FR 57356 (October 27, 1998); 65 FR 2674 (January 18, 2000). The D.C. Circuit stayed the $NO_X$ SIP Call by an order issued May 25, 1999. After upholding the rule in most respects in *Michigan* v. *EPA*, 213 F.3d 663 (D.C. Cir. 2000), the court lifted the stay by an order issued June 22, 2000.

retrofit came online in 2002 and another 42 GW of SCR retrofit came online for steam boilers in 2003, illustrating that a considerable volume of SCR retrofit capacity is possible in a 36 month period.

However, the EPA is not proposing to apply daily emissions rates on coal-fired steam EGUs assumed to retrofit SCR until 2027 (as described in Section VII.B.1.c.i of this proposed rule). The EPA believes that implementing these emissions reductions at the state level starting in 2026 (through state emissions budgets) while imposing the unit-specific emissions rate limits in 2027 achieves the necessary environmental performance as soon as possible while accommodating any heterogeneity in unit-level implementation schedules regarding installation of new SCR.[227]

b. Non-EGU Schedule for 2026 and Later Years

For the suite of non-EGU controls on which the EPA has based its Step 3 findings as described in Section VI of this proposed rule, the EPA proposes to require that these controls be installed and operational by the 2026 ozone season and to find that any earlier date is not possible. The EPA previously examined the time necessary to install the controls identified for several non-EGU industries. Although the information on installation times for most NOₓ controls applied to glass and cement manufacturing was uncertain, the EPA identified minimum estimated installation times for a number of other non-EGU source categories that ranged from several weeks to slightly over a year. This included timeframes of 42–51 weeks for SCNR applied to dry cement manufacturing facilities and cement kilns/dryers burning bituminous coal, 28–58 weeks for SCR applied to boilers and process heaters, 28–58 weeks for SCR applied to iron and steel in-process combustion, and 6–8 months for low NOₓ burners and flue gas recirculation at iron and steel mills.[228] Taking into

account necessary scale-up of construction control installations at several emissions units, the time needed to have NOₓ monitoring installed and operating, and other necessary steps in the permitting and construction processes (e.g., review of vendor bids), the EPA estimates an additional period of 6 to 18 months may be necessary for existing non-EGU sources to install the necessary controls, depending on the number of control installations at a facility.[229]

Additionally, the EPA previously considered the installation timing needs for NOₓ controls (including SCR, SNCR, and combustion controls) at both EGU and non-EGU sources as part of the 1998 NOₓ SIP Call.[230] With respect to combustion controls (e.g., low-NOₓ burners, overfire air, etc.), the EPA found that sources should be able to complete control technology installations and obtain relevant permits in relatively short timeframes given considerable experience at that time among sources and permitting agencies with the implementation of such controls, the fact that combustion controls are constructed of commonly available materials (steel, piping, etc.) and do not require magnet during operation, and the then availability of many vendors of combustion control technology.[231]

With respect to post-combustion controls (primarily SCR and SNCR), the EPA considered three basic factors in assessing installation timing needs: (1) Availability of materials and labor, (2) the time needed to implement controls at plants with single or multiple retrofit requirements, and (3) the potential for interruptions in power supply resulting from outages needed to complete installations on EGUs.[232] Assuming adequate supplies of both off-the-shelf hardware (such as steel, piping, nozzles, pumps, and related equipment) and the catalyst used in the SCR process, as well as sufficient vendor capacity to supply retrofit SCR catalyst to sources, and taking into account the additional time needed for facility engineering review, developing control technology specifications, awarding a procurement contract, obtaining a construction permit, completing control technology

design, installation, and testing, and obtaining an operating permit, the EPA found that (a) about 21 months would be needed to implement an SCR retrofit on a single unit and (b) about 19 months would be needed to implement an SNCR retrofit on a single unit.[233] The EPA also examined several particularly complicated implementation efforts and found that 34 months would be needed for a plant to install a maximum of 6 SCRs while 24 months would be needed for a plant to install a maximum of 10 SNCRs.[234] Finally, the EPA found that the necessary controls could be installed on EGUs without any disruptions in the supply of electricity because connections between a NOₓ control system and a boiler can generally be completed in 5 weeks or less and thus could occur during the 5-week planned outage that each EGU typically has each year.[235]

Thus, for both EGUs and non-EGUs, EPA's technical analysis for the 1998 NOₓ SIP Call indicated that a 3-year period would be sufficient for installation of both combustion and post-combustion controls, from the planning and specification of controls to completion of control technology implementation.[236] EPA's evaluation of the timeframes for post-combustion controls was based on the Agency's projection that 639 retrofit installations at EGU sources and 235 retrofit installations at non-EGU industrial sources would be necessary for existing sources in the covered states to comply with the NOₓ SIP Call.[237] Although the scope of types of non-EGU sources covered by this proposed FIP is broader, and the estimated number of emissions units is greater (potentially including as many as 490 emissions units), than the scope and number of non-EGU sources evaluated in the 1998 NOₓ SIP Call, and although a later analysis of timeframes for installation of post-combustion controls at EGUs produced a more refined estimate for that sector only,[238] EPA's prior analyses nonetheless inform the evaluation in this proposal of the necessary implementation schedule for non-EGU sources given they generally address NOₓ control technologies similar to those that the EPA anticipates non-EGU sources may install to comply with the provisions of the proposed FIP

---

[227] However, as discussed in Section VII.B.1.c.i of this proposed rule, EPA's determinations in this regard are not based on a finding that the retrofit of post-combustion controls would not be feasible in the 2026 ozone season for all relevant units. The EPA finds that such retrofits are available and feasible on a fleetwide scale starting in the 2026 ozone season.

[228] Final Technical Support Document (TSD) for the Final Cross-State Air Pollution Rule for the 2008 Ozone NAAQS, Assessment of Non-EGU NOₓ Emissions Controls, Cost of Controls, and Time for Compliance Final TSD ("CSAPR Update Non-EGU TSD"), August 2016 (Table 3), available at *https://www.epa.gov/csapr/assessment-non-egu-NOₓ-emission-controls-cost-controls-and-time-compliance-final-tsd*. See also Institute of Clean Air Companies, SNCR Committee, "White Paper, Selective Non-Catalytic Reduction (SNCR) For

Controlling NOₓ Emissions," at 5 (noting that "SNCR retrofits typically do not require extended source shutdowns").

[229] 63 FR 57356, 57448 (October 27, 1998). EPA generally anticipates that any required permitting processes may run concurrent with other steps in the installation processes and thus may not significantly lengthen the total time needed for installation.

[230] Id. at 57447–57449.

[231] Id. at 57447, 57449.

[232] Id. at 57448.

[233] Id.

[234] Id.

[235] Id.

[236] Id. at 57449.

[237] Id. at 57448 (Table V–1 and Table V–2).

[238] See Final Report, "Engineering and Economic Factors Affecting the Installation of Control Technologies for Multipollutant Strategies," EPA–600/R–02/073 (October 2002).

(*e.g.*, SCR, SNCR, low-NO$_X$ burners and ultra-low NO$_X$ burners).

Additionally, as part of EPA's evaluation of installation timing needs in the proposed CAIR (69 FR 4566), the EPA projected that it would take on average 21 months to install an SCR on one EGU unit, 27 months to install a scrubber on one EGU unit, and 3 years to install seven SCRs at a single EGU.[239] The EPA also noted that some EGUs could install SCR controls in as short of a period as 13 months.[240] This information and EPA's general experience indicate that a two-year installation timeframe for a rule requiring installation of new control technologies across a variety of emissions sources in several industries on a regional basis is a relatively fast installation timeframe, but that a 3-year installation timeframe should be feasible for most if not all of the identified industries. A shorter installation timeframe of approximately one year would likely raise significant challenges for sources, suppliers, contractors, and other economic actors, potentially including customers relying on the products or services supplied by the regulated sources. Thus, if the EPA finalizes this proposed rule in 2023, implementation of the necessary emissions controls across all of the affected non-EGU sources by the August 3, 2024, Moderate area attainment date would not be possible.

For purposes of this proposed rule, the EPA estimates that the required controls for non-EGU source categories would take up to 3 years to install across the affected industries in the 23 states that remain linked in 2026. Therefore, based on the available information, the EPA proposes to require compliance with these non-EGU control requirements by the beginning of the 2026 ozone season.

The EPA requests comment on the time needed to install the various control technologies across all of the emissions units in the Tier 1 and Tier 2 industries. In particular, the EPA solicits comment on the time needed to obtain permits (including the potential applicability of NSR requirements), the availability of vendors and materials, design, construction, and the earliest possible installation times for SCR on glass furnaces; SNCR or SCR on cement

kilns; ultra-low NO$_X$ burners, low NO$_X$ burners, and SCR on ICI boilers (coal-fired, gas-fired, or oil-fired); low NO$_X$ burners on large non-EGU ICI boilers; and low emissions combustion, layered emissions combustion, NSCR, and SCR on reciprocating rich-burn or lean-burn IC engines.

With respect to emissions monitoring requirements, EPA requests comment on the costs of installing and operating CEMS at non-EGU sources without NO$_X$ emissions monitors; the time needed to program and install CEMS at non-EGU sources; whether monitoring techniques other than CEMS, such as predictive emissions monitoring systems (PEMS), may be sufficient for certain non-EGU facilities, and the types of non-EGU facilities for which such PEMS may be sufficient; and the costs of installing and operating monitoring techniques other than CEMS.

The EPA also requests comment on whether the FIP should provide a limited amount of time beyond the 2026 ozone season for individual non-EGU sources to meet the emissions limitations and associated compliance requirements, based on a facility-specific demonstration of necessity. As the D.C. Circuit stated in *Wisconsin,* the good neighbor provision may be read to allow for some deviation from the mandate to eliminate prohibited transport by downwind attainment deadlines, ''under particular circumstances and upon a sufficient showing of necessity,'' provided such deviation is ''rooted in Title I's framework [and] provide[s] a sufficient level of protection to downwind States.'' [241] Consistent with this directive, and recognizing that in general, the EPA aligns good neighbor obligations in the first instance with the last full ozone season before the downwind attainment date, the EPA requests comment on whether individual non-EGU sources should be allowed to request an extension of the May 1, 2026, compliance deadline by no more than 1 year (*i.e.,* to May 1, 2027) based on a sufficient showing of necessity. Any such comments should be supported by a detailed discussion of the facility-specific economic, technological, and other circumstances that may justify such an extension. The EPA notes that claims about infeasibility of controls are generally insufficient to justify an extension of time to comply, given the *Wisconsin* court's holding that the good neighbor provision requires

upwind states to eliminate their significant contribution in accordance with the downwind states' attainment deadlines, without regard to questions of feasibility.[242]

The EPA solicits comment on the specific criteria that the EPA should apply in evaluating requests for extension of the 2026 compliance deadline for non-EGU sources. Such criteria could include documentation of inability, despite best efforts, to procure necessary materials or equipment (*e.g.*, equipment manufacturers are not able to deliver equipment before a specific date) or hire labor as needed to install the emissions control technology by 2026; documentation of installation costs well in excess of the highest representative cost-per ton threshold identified for any source (including EGUs) discussed in Section VI of this proposed rule (*e.g.*, vendor estimate showing equipment cost); documentation of a source owner or operator's inability to secure necessary financing, due to circumstances beyond the owner/operator's control, in time to complete the installation of controls by 2026; or documentation of extreme financial or technological constraints that would require the subject non-EGU emissions unit or facility to significantly curtail its operations or shut down before it could comply with the requirements of this proposed rule by 2026. Finally, the EPA requests comment on the process through which the EPA should review and act on an extension request—*e.g.*, the appropriate deadline for submitting a request, and whether the EPA should provide an opportunity for public comment before granting or denying a request.

The EPA anticipates that the owner or operator of the facility would bear the burden of establishing the necessity of an extension of time to comply, based on particular circumstances described and sufficiently documented in the submitted request. Claims of generalized financial or economic hardship or any claim that controls are not necessary to eliminate significant contribution would

---

[239] 69 FR 4566, 4617 (January 30, 2004) (citing Final Report, ''Engineering and Economic Factors Affecting the Installation of Control Technologies for Multipollutant Strategies,'' EPA–600/R–02/073 (October 2002)).

[240] Final Report, ''Engineering and Economic Factors Affecting the Installation of Control Technologies for Multipollutant Strategies,'' EPA–600/R–02/073 (October 2002), at 21.

[241] *Wisconsin,* 938 F. 3d at 320 (citing CAA section 181(a) (allowing one-year extension of attainment deadlines in particular circumstances) and *North Carolina,* 531 F.3d at 912).

[242] *Wisconsin,* 938 F.3d at 313–314, 319 (''When an agency faces a statutory mandate, a decision to disregard it cannot be grounded in mere infeasibility''). We note also that in the CSAPR Close-Out Rule (83 FR 65878, December 21, 2018), the EPA required no further reductions from upwind states beyond those set forth in the prior CSAPR Update based, in part, on the Agency's conclusion that it was not feasible to implement cost-effective emissions controls before 2023, 2 years after the 2021 attainment deadline for the downwind serious areas. The D.C. Circuit vacated the Close-Out Rule for its reliance on the same interpretation of the Good Neighbor Provision that the court had rejected in *Wisconsin. New York* v. *EPA,* 781 F. App'x 4 (D.C. Cir. 2019) (unpublished opinion).

not suffice to justify an extension. If the EPA finalizes a provision allowing sources to request limited extensions of time to comply, the Agency would review each request on a case-by-case basis as necessary to ensure consistency with the provisions of title I of the CAA.

## B. Regulatory Requirements for EGUs

To implement the required emissions reductions from EGUs, the EPA proposes to revise the existing CSAPR $NO_X$ Ozone Season Group 3 Trading Program (the "Group 3 trading program") established in the Revised CSAPR Update both to expand the program's geographic scope and to enhance the program's ability to ensure favorable environmental outcomes.[243] The EPA proposes to use a trading program for EGUs because of the inherently greater flexibility that a trading program can provide relative to more prescriptive, "command-and-control" forms of regulation of sufficient stringency to achieve the necessary emissions reductions. In the electric power sector, EGUs' extensive interconnectedness and coordination create the ability to shift both electricity production and emissions among units, providing a closely related ability to achieve emissions reductions in part by shifting electricity production from higher-emitting units to lower-emitting or non-emitting units. The sector's unusual flexibility with respect to how emissions reductions can be achieved makes the flexibility of a trading program particularly useful as a means of lowering the overall costs of obtaining such reductions. In addition, it is essential for the electric power sector to retain short-term operational flexibility sufficient to allow electricity to be produced at all times in the quantities needed to meet demand simultaneously, and the flexibility of a trading program can be helpful in supporting this aspect of the industry as well. As discussed later, to provide improved environmental outcomes, in this rulemaking, the EPA is proposing certain enhancements to the current provisions of the Group 3 trading program addressing environmental performance that will necessarily reduce the flexibility of the individual units participating in the program to some extent. However, with the

proposed enhancements, the EPA believes the inherently greater flexibility of a trading program continues to favor the use of this form of regulation, relative to more prescriptive forms of regulation, as a vehicle for achieving the emissions reductions from the electric power sector found to be necessary in this rulemaking.

The Group 3 trading program currently applies to EGUs meeting the program's applicability criteria within the borders of twelve states: Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia. Affected EGUs in these twelve states would continue to participate in the Group 3 trading program as revised in this rulemaking, with some revised provisions taking effect in the 2023 control period and other revised provisions taking effect later as discussed elsewhere in this document. The EPA proposes to expand the Group 3 trading program's geographic scope to include all of the additional states for which EGU emissions reduction requirements are being established in this rulemaking. Affected EGUs within the borders of eight states currently covered by the CSAPR $NO_X$ Ozone Season Group 2 Trading Program (the "Group 2 trading program")—Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Tennessee, Texas, and Wisconsin— would transition from the Group 2 program to the revised Group 3 trading program at the beginning of the 2023 control period,[244] and affected EGUs within the borders of the five states not currently covered by any CSAPR trading program for seasonal $NO_X$ emissions— Delaware, Minnesota, Nevada, Utah, and Wyoming—would enter the Group 3 trading program in the 2023 control period following the effective date of a final rule in this rulemaking. As is the case for the states already in the Group 3 trading program, for each state added to the program, the set of affected EGUs would include new units as well as existing units and units located in Indian country within the state's borders as well as units not located in Indian country. Sections VII.B.2 and VII.B.3 of this proposed rule provide additional discussion of the proposed geographic expansion of the Group 3 trading program and the units in the expanded geography that would likely become subject to the program under

the program's existing applicability provisions.

In addition to expanding the Group 3 trading program's geographic scope, the EPA proposes to modify the program's regulations prospectively to include certain enhancements to improve environmental outcomes. Two of the proposed enhancements would adjust the overall quantities of allowances available for compliance in the trading program in each control period so as to maintain the rule's selected control stringency and related EGU effective emissions rate performance level as the EGU fleet evolves. First, instead of establishing emissions budgets for all future years under the program at the time of the rulemaking, which cannot reflect future changes in the EGU fleet unknown at the time of the rulemaking, the EPA proposes to revise the trading program regulations to include a dynamic budgeting procedure. This procedure would calculate emissions budgets for control periods in 2025 and later years based on more current information about the composition and utilization of the EGU fleet, specifically data available from the 2023 ozone season and following (e.g., for 2025, data from 2023; for 2026, data from 2024; etc.). (Associated revisions to the program's variability limits and unit-level allowance allocation procedures would coordinate these provisions with the revised budget-setting procedures.) Second, starting with the 2024 control period, the EPA proposes to annually recalibrate the quantity of accumulated banked allowances under the program to prevent the quantity of allowances carried over from each control period to the next from exceeding the target bank level, which would be revised to represent 10.5 percent of the sum of the state emissions budgets. Together, these enhancements would protect the intended stringency of the trading program against potential erosion caused by EGU fleet turnover and would better sustain over time the incentives created by the trading program to apply continuously the degree of emissions control the EPA determines is necessary to address states' good neighbor obligations.

Two further enhancements to the Group 3 trading program proposed in this rulemaking would establish provisions designed to promote more consistent emissions control by individual EGUs within the context of the trading program. First, starting with the 2024 control period for most coal-fired EGUs with existing SCR controls and the 2027 control period for most other coal-fired EGUs, a daily $NO_X$ emissions rate of 0.14 lb/mmBtu would

---

[243] If any of the states whose sources currently participate in the Group 3 trading program is determined in the final rule to not have additional emissions reduction requirements for EGUs, the EPA proposes in the alternative to establish a new trading program substantially similar to the revised Group 3 trading program described in this proposal that would cover units within the borders of all the states determined to have emissions reduction requirements for EGUs in the final rule.

[244] Affected EGUs in the two other states currently covered by the Group 2 trading program— Iowa and Kansas—would continue to participate in that program.

apply as a backstop to the more stringent seasonal emissions budgets. Each ton of emissions exceeding a unit's backstop daily emissions rate would incur a 3-for-1 allowance surrender ratio instead of the usual 1-for-1 allowance surrender ratio. Second, also starting with the 2024 control period, the trading program's existing assurance provisions, which require extra allowance surrenders from sources that are found responsible for contributing to an exceedance of the relevant state's "assurance level" (*i.e.*, currently 121 percent of the state's emissions budget), would be strengthened by the addition of another backstop requirement. Specifically, for any unit found responsible for contributing to an exceedance of the state's assurance level, the revised regulations would prohibit the unit's seasonal emissions from exceeding by more than 50 tons the emissions that would have resulted if the unit had achieved a seasonal average emissions rate equal to the higher of 0.10 lb/mmBtu or 125 percent of the unit's lowest previous seasonal average emissions rate under any CSAPR seasonal $NO_X$ trading program.[245]

These two enhancements are designed to ensure that all individual units with SCR controls have strong incentives to continuously operate and optimize their controls, and also to ensure that even units without SCR controls have strong incentives to optimize their emissions performance where a state's assurance level might otherwise be exceeded. These enhancements are generally designed to ensure consistency with EPA's determination regarding the emissions control stringency needed from EGUs to eliminate significant contribution under the Step 3 multifactor analysis as discussed in Section VI of this proposed rule. Further, these enhancements are designed to provide greater assurance that emissions controls will be operated on all days of the ozone season and therefore necessarily on the days that turn out to be most critical for downwind ozone levels. The EPA expects that promoting more consistently good emissions performance by individual EGUs will also help address disparate impacts of pollution on overburdened communities from individual units that might otherwise have chosen not to optimize their emissions performance.

### 1. Trading Program Background and Overview of Proposed Revisions

#### a. Current CSAPR Trading Program Design Elements and Identified Concerns

The use of allowance trading programs to achieve required emissions reductions from the electric power sector has a long history, rooted in the Clean Air Act Amendments of 1990. In Title IV of those amendments, Congress specified the design elements for a 48-state allowance trading program to reduce $SO_2$ emissions and the resulting acid precipitation. Building on the success of that first allowance trading program as a tool for addressing multi-state air pollution issues, since 1998 EPA has promulgated and implemented multiple allowance trading programs for $SO_2$ or $NO_X$ emissions to address the requirements of the CAA's good neighbor provision with respect to successively more stringent NAAQS for fine particulate matter and ozone. Most of these trading programs have applied either exclusively or primarily to EGUs.

The EPA currently administers six CSAPR trading programs for EGUs (promulgated in CSAPR, the CSAPR Update, and the Revised CSAPR Update) that differ in the pollutants, geographic regions, and time periods covered and in the levels of stringency, but that otherwise are nearly identical in their core design elements and their regulatory text.[246] The principal common design elements currently reflected in all of the programs are as follows:

- An "emissions budget" is established for each state for each control period, representing EPA's quantification of the emissions that would remain under certain projected conditions after elimination of the emissions prohibited by the good neighbor provision under those projected conditions. For each control period of program operation, a quantity of newly issued "allowances" equal to the amount of each state's emissions budget is allocated among the state's sources. (States have options to replace EPA's default allocations or to institute an auction process.) Total emissions in a given control period from all sources in the program are effectively capped at a level no higher than the total quantity

of allowances available for use in the control period, consisting of the sum of all states' emissions budgets for the control period plus any unused allowances carried over from previous control periods as "banked" allowances.

- "Assurance provisions" in each program establish an "assurance level" for each state for each control period, defined as the sum of the state's emissions budget plus a specified "variability limit." The purpose of the assurance provisions is to limit the total emissions from each state's sources in each control period to an amount close to the state's emissions budget for the control period, consistent with the good neighbor provision's mandate that required emissions reductions must be achieved within the state, while allowing some flexibility beyond the emissions budget to accommodate year-to-year operational variability. In the event a state's assurance level is exceeded, responsibility for the exceedance is apportioned among the state's sources through a procedure that accounts for the sources' shares of the state's total emissions for the control period as well as the sources' shares of the state's assurance level for the control period.

- At the program's compliance deadlines after each control period, sources are required to hold for surrender specified quantities of allowances. The minimum quantities of allowances that must be surrendered are based on the sources' reported emissions for the control period at a 1-for-1 ratio of allowances to tons of emissions (or 2-for-1 in instances of late compliance). In addition, two more allowances must be surrendered for each ton of emissions exceeding a state's assurance level for a control period, yielding an overall 3-for-1 surrender ratio for those emissions (or 4-for-1 in instances of late compliance). Failure to timely surrender all required allowances is potentially subject to penalties under the CAA's enforcement provisions.

- To continuously incentivize sources to reduce their emissions even when they already hold sufficient allowances to cover their expected emissions for a control period, and to promote compliance cost minimization, operational flexibility, and allowance market liquidity, the programs allow trading of allowances—both among sources in the program and with non-source entities—and also let allowances that are unused in one control period be carried over for use in future control periods as banked allowances. Although the programs do not directly limit either trading or banking of allowances, the 3-for-1 surrender ratio imposed by the

---

[245] The requirement would not apply for control periods during which the unit operated for less than 10 percent of the hours, and emissions rates achieved in such previous control periods would be excluded from the comparison.

[246] The six current CSAPR trading programs are the CSAPR $NO_X$ Annual Trading Program, CSAPR $NO_X$ Ozone Season Group 1 Trading Program, CSAPR $SO_2$ Group 1 Trading Program, CSAPR $SO_2$ Group 2 Trading Program, CSAPR $NO_X$ Ozone Season Group 2 Trading Program, and CSAPR $NO_X$ Ozone Season Group 3 Trading Program. The regulations for the six programs are set forth at subparts AAAAA, BBBBB, CCCCC, DDDDD, EEEEE, and GGGGG, respectively, of 40 CFR part 97.

assurance provisions on any emissions exceeding a state's assurance level disincentivizes sources from relying on either in-state banked allowances or net out-of-state purchased allowances to emit over the assurance level.

• Finally, other common design elements ensure program integrity, source accountability, and administrative transparency. Most notably, each unit must monitor and report emissions and operational data in accordance with the provisions of 40 CFR part 75; all allowance allocations or auction results, transfers, and deductions must be properly recorded in EPA's Allowance Management System; each source must have a designated representative who is authorized to represent all of the source's owners and operators and is responsible for certifying the accuracy of the source's reports to the EPA and overseeing the source's Allowance Management System account; and comprehensive data on emissions and allowances are made publicly available.

The EPA continues to believe that the current CSAPR trading program structure established by the common design elements described previously has important positive attributes, particularly with respect to the exceptional degree of compliance flexibility it can provide to a sector such as the electric power sector where such flexibility is especially useful and valuable. However, the EPA also shares some stakeholders' concerns about whether the current structure, without enhancements, is capable of adequately addressing states' good neighbor obligations with respect to the 2015 ozone NAAQS in light of the rapidly evolving EGU fleet and the stringency and short-term form of the standard. One set of concerns relates to the observed tendency under the current trading programs for the supply of allowances to grow over time while the demand for allowances falls, reducing allowance prices and eroding the consequent incentives for sources to effectively control their emissions. A second, overlapping set of concerns relates to the general absence of source- or unit-specific emissions reduction requirements, allowing some individual sources to idle existing emissions controls. Emissions from these individual sources can contribute to increased pollution concentrations downwind on the particular days that matter for downwind exceedances of the relevant air quality standard and also have the potential to cause disproportionate adverse impacts on downwind overburdened communities. The EPA has analyzed hourly emissions data reported in prior cap-and-trade programs and identified instances of sources that did not operate SCR controls for substantial portions of recent ozone seasons. In an effort to maintain as much compliance and operational flexibility as possible, ensure controls happen on critically important highest ozone days, guard against this behavior under a more stringent NAAQS, and provide relief to overburdened communities, the EPA would require control operation every day through a unit-level emission rate designed to ensure reductions occur on the highest ozone days in addition to maintaining a mass-based seasonal requirement. To meet the statutory requirement to eliminate significant contribution and interference with maintenance on the critically important days, this combination of requirements would require sources to plan to run controls all season, including the highest ozone days, while giving reasonable flexibility for occasional operational needs.

In this rulemaking, the EPA is proposing to revise the Group 3 trading program to include enhancements designed to address both sets of concerns described above.[247] The principles guiding the various proposed revisions and the relationships of the revisions to one another are discussed in Sections VII.B.1.b and VII.B.1.c of this proposed rule. The individual proposed revisions are discussed in more detail in Sections VII.B.4 through VII.B.9 of this proposed rule.

b. Enhancements To Maintain Selected Control Stringency Over Time

The first set of concerns noted about the current CSAPR trading program structure relates to the programs' ability to maintain the rule's selected control stringency and related EGU effective emissions rate performance level as the EGU fleet evolves over time. Under the structure of the current CSAPR trading programs, the effectiveness of the programs at maintaining the rule's selected control stringency depends entirely on how allowance prices over time compare to the costs of sources' various emissions reduction opportunities, which in turn depends on the relationship between the supply for allowances and the demand for allowances. In considering possible ways to address concerns about the ability to enhance the current trading program structure to better sustain incentives to control emissions over time, the EPA has focused on the trading program design elements that determine the supply of allowances, specifically the approach for setting state emissions budgets and the rules concerning the carryover of unused allowances for use in future control periods as banked allowances.

i. Revised Emissions Budget-Setting Process

In each of the previous rulemakings establishing CSAPR trading programs, the EPA has evaluated the emissions that could be eliminated through implementation of certain types of emissions control strategies available at various cost thresholds to achieve certain rates of emissions per unit of heat input (*i.e.*, the amount of fuel consumed) and the effects of the resulting emissions reductions on downwind air quality. After determining the emissions control strategies and associated emissions reductions that should be required under the good neighbor provision by considering these factors in a multifactor test, the EPA has then projected the amounts of emissions that would remain after the assumed implementation of the selected emissions control strategies at various points in the future and has established the projected remaining amounts of emissions as the state emissions budgets in trading programs.

Projecting the amounts of emissions remaining after implementation of selected emissions controls necessarily requires projections not only for sources' future emissions rates but also for other factors that influence total emissions, notably the composition of the future EGU fleet (*i.e.*, the capacity amounts of different types of sources with different emissions rates) and their future utilization levels (*i.e.*, their heat input). To the extent the projections made at the time of a rulemaking for these other factors prove inaccurate, over time the emissions budgets may not reflect the intended stringency of the emissions control strategies identified in the rulemaking as consistent with addressing states' good neighbor obligations. Further, projecting EGU fleet composition and utilization has become increasingly challenging in light of the rapid evolution of the electric power sector toward more efficient and cleaner sources of generation, driven by factors including lower prices for natural gas and wind and solar generation.

---

[247] With the exception of the proposed conforming revisions to allowance recordation schedules discussed in Section VII.B.12 of this proposed rule, the EPA is not proposing in this rulemaking to extend the enhancements proposed for the Group 3 trading program to the other CSAPR trading programs.

A consequence of using a trading program approach with preset emissions budgets that do not keep pace with the trends in EGU fleet composition and heat input is that the preset emissions budgets maintain the supply of allowances at levels that increasingly exceed the emissions that would occur even without implementation of the emissions control strategies used as the basis for determining the emissions budgets, causing decreases in allowance prices and hence the incentives to implement the control strategies. As an example, although the emissions budgets in the CSAPR Update established in 2016 reflected implementation of the emissions control strategy of operating and optimizing existing SCR controls, within 4 years the EPA found that EGU retirements and changes in utilization not anticipated in EPA's previous budget-setting computations had made it economically attractive for at least some sources to idle or reduce the effectiveness of their existing controls (relying on purchased allowances instead).[248] While the EPA has provided analysis indicating that, on average, sources operate their controls more effectively on high electric demand days, it has also identified cases where units fail to optimize their controls on these days. Downwind states have suggested this type of reduced pollution control performance has occurred on the day and preceding day of an ozone exceedance.[249][250] Such an outcome undermined the ongoing achievement of emissions rate performance consistent with the control strategies defined to eliminate significant contribution to nonattainment and interference with maintenance, including continuous operation and optimization of existing controls.

In the Revised CSAPR Update, the EPA took steps to better address the rapid evolution of the EGU fleet, specifically by setting updated emissions budgets for individual future years though 2024 that reflect future EGU fleet changes known with reasonable certainty at the time of the rulemaking. Some commenters requested that the EPA also update the year-by-year emissions budgets to reflect future fleet changes that might become known after the time of the rulemaking, but the EPA declined to do so, in part because no methodology for making future emissions budget adjustments in response to post-rulemaking data had been included in the proposal for the rulemaking.

Based on information available as of December 2021, it appears that the emissions budgets set for the first control period covered by the Revised CSAPR Update generally succeeded at creating incentives to operate emissions controls under the Group 3 trading program for the programs' first control period. However, the EPA recognizes that the lack of emissions budget adjustments after 2024 in conjunction with industry trends toward more efficient and cleaner resources would likely lead to a surplus of allowances after the adjustments end. In this rulemaking, besides setting new emissions budgets for the 2023 and 2024 control periods, the EPA also proposes to extend the Group 3 trading program budget-setting methodology used in the Revised CSAPR Update to routinely set emissions budgets for each future control period in the year before that control period, with each emissions budget reflecting the latest available information on the composition and utilization of the EGU fleet at the time that emissions budget is determined.

The current budget-setting methodology established in the Revised CSAPR Update and the proposed revisions are discussed in detail in Section VII.B.4 of this proposed rule and the Ozone Transport Policy Analysis Proposed Rule TSD. To summarize here, the Revised CSAPR Update's emissions budget-setting methodology includes three primary steps: (1) Establishment of a baseline inventory of EGUs adjusted for known retirements and new units, with heat input and emissions rate data for each EGU in the inventory based on recent historical data; (2) adjustment of the baseline data to reflect assumed emissions rate changes resulting from known new controls, known gas conversions, and implementation of the emissions control strategies used to determine states' good neighbor obligations; and (3) application of an increment or decrement to reflect the effect on emissions from projected generation shifting among the units in a state at the emissions reduction cost

associated with the selected emissions control strategies. In this rulemaking, the EPA proposes to modify this methodology in two ways. First, the baseline EGU inventory and heat input data, but not the emissions rate data, would be updated for each control period using the most recent available reported data. For example, in early 2024, using the final data reported for 2023, the EPA would update the baseline inventory and heat input data used to determine state emissions budgets for the 2025 control period. Second, the EPA would not apply an increment or decrement to any state emissions budget for projected generation shifting associated with implementation of the selected control strategies, because any such shifting should already be reflected in the heat input data used to update the baseline.[251]

The EPA believes that the proposed revisions to the emissions budget-setting process would substantially improve the ability of the emissions budgets to keep pace with changes in the composition and utilization of the EGU fleet. The revised methodology would account for the electric power sector's overall trends toward more efficient and cleaner resources, both of which tend to decrease total heat input at affected EGUs. The revised methodology would also account for other factors that could lead to increased heat input in some states, such as generation shifting from other states or increases in electricity demand caused by rising electrification. The updating procedure would be specified in the program regulations and the computations, which would be straightforward, could be performed in a spreadsheet to deliver reliable results. EPA would provide public notice of the preliminary calculations and the data used by March 1 of the year preceding the control period and would provide an opportunity for submission of any objections to the data and preliminary calculations before finalizing the budgets for each control period by May 1 of the year before the control period to which those budgets apply. Thus, for example, sources and other stakeholders will have certainty by May 1, 2024, of the emissions budgets that will be set for the 2025 control period that starts May 1, 2025.

---

[248] The price of allowances in CSAPR Update states started out at levels near $800 per ton in 2017 but declined to less than $100 per ton by 2019 and were less than $70 per ton in July 2020 (data from S&P Global Market Intelligence).

[249] 86 FR 23117.

[250] *See EPA–HQ–OAR–2020–0272–0094.* ". . . is demonstrated through examination of Maryland's ozone design value days for June 26th–28th, 2019. On those days, Maryland recorded 8-hour ozone levels of 75, 85 and 83 ppb at the Edgewood monitor. Maryland Department of the Environment evaluated the daily $NO_X$ emission rate for units in Pennsylvania that were found to influence the design values on the 3 exceedance days (and 1 day prior to the exceedance) against the past-best ozone season 30-day rolling average optimized $NO_X$ rate (which tends to be higher than the absolute lowest seasonal average rate)."

[251] Emission reductions derived from generation shifting will be captured in the dynamic budgets in all cases. For the pre-set budget years it is estimated and incorporated through an additional calculation step. For dynamic budget years, it is directly incorporated through the inclusion of updated heat input data reflecting observed, compliance period generation shifting.

It bears emphasis that the annually updated information would concern only the composition and utilization of the EGU fleet and not the emissions rate data also used in the emissions budget computations. The emissions budget computations for all years would reflect only the specific emissions control strategies used to determine states' good neighbor obligations as determined in this rulemaking, along with fixed historical emissions rates for units that are not assumed to implement additional control strategies, thereby ensuring that the annual updates would eliminate emissions as determined to be required under the good neighbor provision. The stringency of the emissions budgets would simply reflect the stringency of the emissions control strategies determined in the Step 3 multifactor analysis and would do so more consistently over time than EPA's previous approach of computing emissions budgets for all future control periods at the time of the rulemaking.

The proposed revisions to state emissions budgets and the budget-setting process are discussed further in Section VII.B.4 of this proposed rule. Proposed coordinated revisions to the determination of state-level variability limits and assurance levels and to unit-level allowance allocations are discussed in Sections VII.B.5 and VII.B.9 of this proposed rule, respectively.

ii. Allowance Bank Recalibration

Besides the levels of the emissions budgets, the second design element of the trading program structure that affects the supply of allowances in each control period, and that consequently also affects the ability of a trading program to maintain the rule's selected control stringency and related EGU effective emissions rate performance level as the EGU fleet evolves over time, is the set of rules concerning the carryover of unused allowances for use in future control periods as banked allowances. As noted previously, trading and banking of allowances in the CSAPR trading programs can serve a variety of purposes: Continuously incentivizing sources to reduce their emissions even when they already hold sufficient allowances to cover their expected emissions for a control period, facilitating compliance cost minimization, accommodating necessary operational flexibility, and promoting allowance market liquidity. All of these purposes are advanced by rules that allow sources to trade allowances freely (both with other sources and with non-source entities such as brokers). All of these purposes

are also advanced by rules that allow unused allowances to be carried over for possible use in future control periods, thereby preserving a value for the unused allowances. However, while the EPA considers it generally advantageous to place as few restrictions on the trading of allowances as possible,[252] unrestricted banking of allowances has a potentially significant disadvantage offsetting its advantages, namely that it allows what might otherwise be temporary surpluses of allowances in some individual control periods to accumulate into a long-term allowance surplus that reduces allowances prices and weakens the trading program's incentives to control emissions. With weakened incentives, some operators would be more likely to choose not to continuously operate and optimize their emissions controls, imperiling the ongoing achievement of emissions rate performance consistent with the control strategies defined as eliminating significant contribution to nonattainment and interference with maintenance.

As discussed in detail in Section VII.B.6 of this proposed rule, the EPA is proposing to revise the Group 3 trading program by adding provisions that would establish a routine recalibration process for banked allowances that would be carried out in August 2024 and each subsequent August, after the compliance deadline for the control period in the previous year. In each recalibration, the EPA would reset the total quantity of banked allowances for the Group 3 trading program ("Group 3 allowances") held in all Allowance Management System accounts to a target level of 10.5 percent of the sum of the state emissions budgets for the current control period. The procedure would entail identifying the ratio of the target

bank amount to the total quantity of banked allowances held in all accounts before the conversion and then, if the ratio is less than 1.0, multiplying the quantity of banked allowances held in each account by the ratio to identify the appropriate recalibrated amount for the account (rounded to the nearest allowance), and deducting any allowances in the account exceeding the recalibrated amount.

The EPA believes this revision to the Group 3 trading program's banking provisions would complement the proposed revisions to the budget-setting process by ensuring that the annual bank recalibration would prevent any surplus of allowances created in one control period from diminishing the intended stringency and resulting emissions reductions of the emissions budgets for subsequent control periods.[253]

The calibration procedure would not erase the value of unused allowances for the holder, because the larger the quantity of banked allowances that is held in a given account before each recalibration, the larger the quantity of banked allowances that would be left in the account after the recalibration for possible sale or use in meeting future compliance requirements. Because the banked allowances would always have value, the opportunity to bank allowances would continue to advance the purposes served by otherwise unrestricted banking as described above. Opportunities to bank unused allowances can serve all these same purposes whether a banked allowance is of partial value (if the bank needs recalibrating to its target level) or is of full value compared to a newly issued allowance for the next control period.

The proposal to routinely recalibrate the allowance bank is discussed further in Section VII.B.6 of this proposed rule.

d. Enhancements To Improve Emissions Performance at Individual Units

The second set of concerns about the structure of the current CSAPR trading programs relates to the general absence of source- or unit-specific emissions reduction requirements. Without such requirements, the programs affect individual sources' emissions

[252] The advantages of trading programs discussed earlier in this section—providing continuous emissions reduction incentives, facilitating compliance cost minimization, and supporting operational flexibility—depend on the existence of a marketplace for purchasing and selling allowances, and broader marketplaces generally provide greater market liquidity and therefore make trading programs better at providing these advantages. The EPA recognizes that unrestricted use of *net* purchased allowances—meaning quantities of purchased allowances that exceed the quantities of allowances sold—by a source or group of sources as an alternative to making emissions reductions can interfere with the achievement of the desired environmental outcome, and Section VII.B.1.c of this proposed rule discusses the enhancements to the Group 3 trading program that the EPA is proposing in this rulemaking to reduce reliance on net purchased allowances by incentivizing or requiring better environmental performance at individual EGUs. However, the concern arises from the *use of an excessive quantity* of net purchased allowances for a particular purpose, not from the existence of a *marketplace* where allowances may be freely bought and sold.

[253] The EPA recognizes there will be a data lag inherent in the future year emissions budgets, because the budgets would reflect fleet composition and utilization data reported for a previous control period. This means that the budgets for some individual control periods may fail to fully keep pace with the EGU fleet's trends toward more efficient and cleaner resources. Nonetheless, the new approach is a substantial improvement in environmental performance of the program compared to a more unlimited approach to allowance banking.

performance only to the extent that the incentives created by allowance prices are high enough relative to the costs of the sources' various emissions control opportunities. In circumstances where the incentives to control emissions are insufficient, some individual sources even idle existing emissions controls. Emissions from these individual sources can contribute to increased pollution concentrations downwind on the particular days that matter for downwind exceedances of the relevant air quality standard and also have the potential to cause disproportionate adverse impacts on downwind overburdened communities.

This EPA intends that the trading program enhancements described in Section VII.B.1.b of this proposed rule would improve the Group 3 trading program's ability to sustain emissions control incentives over time such that needed emissions performance would be achieved by all participating units without the need for additional requirements to be imposed at the level of individual units. However, because obtaining needed emissions performance at individual units is also important, the EPA proposes to supplement the previously discussed enhancements with two other new sets of provisions that would apply to certain individual units within the larger context of the Group 3 trading program. The allowance price would continue to be the most important driver of good environmental performance for most units, but the proposed unit-level requirements would be important supplemental drivers of performance and would offer additional assurance that significant contribution is eliminated on a daily basis during the ozone season by continuous operation of existing pollution controls.

i. Unit-Specific Backstop Daily Emissions Rates

The first of the proposed trading program enhancements intended to improve emissions performance at the level of individual units is the addition of backstop daily NOₓ emissions rate provisions that would apply to large coal-fired EGUs, defined for this purpose as units serving electricity generators with nameplate capacities equal to or greater than 100 MW and combusting any coal during the control period in question. Starting with the 2024 control period, a 3-for-1 allowance surrender ratio (instead of the usual 1-for-1 surrender ratio) would apply to emissions during the ozone season from any large coal-fired EGU with existing SCR controls exceeding a daily average NOₓ emissions rate of 0.14 lb/mmBtu.

The additional allowance surrender requirement would be integrated into the trading program as a new component in the calculation of each unit's primary emissions limitation, such that the additional allowances would have to be surrendered by the same compliance deadline of June 1 after each control period. The amount of additional allowances to be surrendered would be determined by computing, for each day of the control period, any excess of the unit's reported emissions (in pounds) over the emissions that would have resulted from combusting that day's actual heat input at an average daily emissions rate of 0.14 lb/ mmBtu, summing the daily amounts, converting from pounds to tons, and multiplying by two. Starting with the 2027 control period, the 3-for-1 surrender ratio would apply in the same way to all large coal-fired EGUs, consistent with EPA's proposed determinations, first, that a control stringency reflecting installation and operation of SCR controls on all large coal-fired EGUs is appropriate to address states' good neighbor obligations with respect to the 2015 ozone NAAQS, and second, that such controls could reasonably be installed by the 2026 control period.

In prior rules addressing interstate transport of air pollution, stakeholders have noted that while seasonal cap-and-trade programs are effective at lowering ozone and ozone-forming precursors across the ozone season, attainment of the standard is measured on key days and therefore it is necessary to ensure that the rule requires emissions reductions not just seasonally, but also on those key days.[254] They have noted that while the trading programs established under the NOₓ SIP Call, CAIR, and CSAPR have all been successful in ensuring seasonal reductions, states must remain below daily peak levels, not just seasonal levels, to reach attainment. These downwind stakeholder communities have suggested that operating pollution controls on the highest ozone days (and immediately preceding days) during the ozone season is of critical importance. The EPA has analyzed hourly emissions data reported in prior cap-and-trade programs and has identified instances of sources that did not operate SCR controls for substantial portions of recent ozone seasons. These instances are discussed below and in the EGU NOₓ Mitigation Strategies Proposed Rule TSD in the docket. While the EPA

has in prior ozone transport actions not found sufficient evidence of emissions control idling or non-operation to take the step of building in enhancements to the trading program to ensure unit-level control operation, our review of that information applied to this context suggests this problem could become more prevalent in future years relevant to this action. Rather than allow for the potential of continued deterioration in the environmental performance of our trading programs, the EPA finds the evidence of declining SCR performance in later years of trading programs sufficient to justify prophylactic measures in this proposal to ensure the emissions control strategy selected at Step 3 is indeed implemented at Step 4. Thus, particularly in the context of the more stringent 2015 ozone NAAQS combined with the full remedy nature of this action and the extended timeframe for which upwind contribution to downwind nonattainment is projected to persist, the EPA agrees with these stakeholders that the set of measures promulgated in this rulemaking to implement the control stringency levels found necessary to address states' good neighbor obligations should include measures designed to more effectively ensure that individual units operate their emission controls routinely throughout the ozone season, thereby also ensuring that the controls are planned to be in operation on the particular days that turn out to be most critical for ozone formation and for attainment of the NAAQS.[255] Routine operation of emissions controls will also provide relief to overburdened communities downwind of any units that might otherwise have chosen not to operate their controls. In the Ozone Transport TSD, the EPA conducted a screening analysis that found nearly all of the EGUs included in this analysis are located within a 24-hour transport distance of many areas with potential EJ concerns. The EPA is proposing to adopt backstop daily rate limits at the individual unit level for this purpose, implemented in the context of a trading program (i.e., through enhanced allowance surrender ratios), as an alternative to adopting enforceable rate limits.

The purpose of establishing a backstop daily NOₓ emissions rate and implementing it through additional

---

[254] EPA–HQ–OAR–2020–0272. Comment submitted by Ben Grumbles, Secretary, Maryland Department of the Environment (MDE).

[255] The CSAPR Update was a partial remedy and the Revised CSAPR Update addressed downwind nonattainment and maintenance issues that were projected to be resolved within a 4 year window. In contrast, this rule reflects a full remedy and is addressing downwind nonattainment and maintenance issues that are projected to persist for more than a decade.

allowance surrender requirements instead of as an enforceable rate limit is to incentivize improved emissions performance at the individual unit level while continuing to preserve, to the extent possible, the advantages that the flexibility of a trading program brings to the electric power sector. As discussed in Section VII.B.7 of this proposed rule, under existing trading programs without the enhancements proposed in this rulemaking, some individual coal-fired units with SCR controls have chosen to operate the controls at lower removal efficiencies in past ozone seasons or even to idle the controls for entire ozone seasons. In addition, some SCR-equipped units have chosen to routinely cycle their emissions controls off at lower load levels, such as while operating overnight, instead of operating the controls, upgrading the units to enable the controls to be operated under those conditions, or not operating the units under those conditions.

The EPA has identified sources of interstate ozone pollution such as the New Madrid and Conemaugh plants (in Missouri and Pennsylvania, respectively) whose SCR controls were not operating for substantial portions of recent ozone seasons. The data in Figures 1 and 2 to Section VII.B.1.c.i, included in Appendix G of the Ozone Transport Policy Analysis Proposed Rule TSD available in the docket for this rulemaking, demonstrate that these units have operated their SCRs better and more consistently during years with higher $NO_X$ allowance prices. Downwind stakeholders have noted that some of the higher emission rates (specifically in the case of Conemaugh Unit 2 in 2019) have occurred on the day of and the preceding day of an ozone exceedance in bordering states.[256]

The EPA believes that the design of the proposed daily emissions rate provisions would be effective in addressing these types of high-emitting behavior by significantly raising the cost of planned operator decisions that substantially compromise environmental performance. At the same time, the provision would not unduly penalize an occasional unplanned exceedance, because the amount of additional allowances that would have to be surrendered to address a single day's exceedance would be much smaller than the amount that would have to be surrendered to address planned poor performance sustained over longer time periods.[257]

The EPA proposes to apply the daily emissions rate provisions to large coal-fired EGUs, and not to other types of units, for reasons that are consistent with EPA's determinations regarding the appropriate control stringency for EGUs to address states' good neighbor obligations with respect to the 2015 ozone NAAQS. Installation and operation of SCR controls is well-established as best practice for control of $NO_X$ emissions from coal-fired EGUs, as evidenced by the fact that the technology is already installed on more than 60 percent of the sector's total coal-fired capacity. In the context of the need for states to address their good neighbor obligations with respect to the 2015 ozone NAAQS, the EPA is proposing to determine that a control stringency reflecting universal installation and operation of SCR technology at large coal-fired EGUs is appropriate, based on a multi-factor test that includes consideration of cost-effectiveness along with air quality factors. Finally, where SCR controls are installed, optimized operation of those controls is an extremely cost-effective method of achieving $NO_X$ emissions reductions. The EPA believes these considerations support establishment of the proposed daily emissions rate provisions on a universal basis for large coal-fired EGUs, with near-term application of the provisions for units that already have the controls installed and deferred application for other units, as discussed later.

With regard to gas-fired steam EGUs, SCR controls are nowhere near as prevalent, and while the EPA is proposing to include some SCR controls at gas-fired steam units in the selected control stringency, the EPA is not proposing to include universal SCR controls at gas-fired steam units. Because the EPA does not propose to determine that universal installation and operation of SCR controls at gas-fired steam EGUs is part of the selected control stringency, in order not to constrain the power sector's flexibility to choose which particular gas-fired steam EGUs are the preferred candidates for achieving the required emissions

reductions, the EPA is not proposing to apply the daily emissions rate provisions to large gas-fired steam EGUs. Focusing the backstop daily emissions rates on coal-fired units is also consistent with stakeholder input which has emphasized the need for short-term rate limits at coal units given their relatively higher emissions rates.

The EPA developed the proposed level of the daily average $NO_X$ emissions rate—0.14 lb/mmBtu—through analysis of historical data, as described in Section VII.B.7 of this proposed rule. A rate of 0.14 lb/mmBtu represents the daily average $NO_X$ emissions rate that has been demonstrated to be achievable on approximately 95 percent of days covering more than 99 percent of total ozone-season $NO_X$ emissions by coal-fired units with SCR controls that are achieving a seasonal $NO_X$ average emissions rate of 0.08 lb/mmBtu (or less), which is the seasonal $NO_X$ emissions rate that the EPA has determined is indicative of optimized SCR performance by units with existing SCR controls.

As noted previously, the daily average emissions rate provisions are proposed to apply beginning in the 2024 control period for large coal-fired units with installed SCR controls, one control period later than optimization of those controls would be reflected in the state emissions budgets under the proposal. Likewise, the daily average emissions rate provisions are proposed to apply beginning in the 2027 control period for other large coal-fired units, one control period later than emissions reductions consistent with the installation and operation of SCR controls for such units would be reflected in the state emissions budgets under the proposal. With respect to the units with existing SCR controls, not applying the daily average rate provisions until 2024 would serve two purposes. First, it would provide all the units with a preparatory interval to focus attention on improving not only the average performance of their SCR controls but also the day-to-day consistency of performance before they would be held to increased allowance-surrender consequences for exceeding the daily rate. Second, it would provide the subset of units that exhaust to common stacks with other units that currently lack SCR controls an opportunity to exercise the option to install and certify any additional monitoring systems needed to monitor the individual units' $NO_X$ emissions rates separately; otherwise, the daily emissions rate provisions would apply to the SCR-equipped units based on the combined

---

[256] EPA–HQ–OAR–2020–0272–0094.

[257] While the proposed design of the daily emissions rate provision would not deter another theoretical type of poor emissions control

behavior—*i.e.,* turning off emissions controls at times of peak electricity demand in order to sell the additional electricity that otherwise would have been used to run the control equipment—EPA's analysis of hourly emissions data does not show that this behavior is actually occurring. The data actually suggest the opposite—that emissions controls are generally operated better on peak demand days than on other days. *See* the Ozone Policy Analysis Proposed Rule TSD for additional details about the assessment of the tons and the Discussion of Short-term Emissions Limit document for an assessment of control operation on peak demand days.

NO$_X$ emissions rates measured in the common stacks.[258]

With respect to the units without existing SCR controls, not applying the daily average emissions rate provisions until 2027 would also serve two purposes. First, it would provide a window for plant personnel to gain experience operating any new SCR controls, and second, it would provide some timing flexibility for any individual unit operators who fail to complete SCR control installations before the start of the 2026 control period. With respect to both sets of units, the EPA believes that the lag in applicability of one control period is permissible because the emissions budget provisions are the principal provisions intended to drive the emissions reductions required under the proposal, while the daily average emissions rate provisions are included only to backstop those provisions.

The EPA believes that the proposed unit-specific daily emissions rate provisions would strengthen the incentives for individual coal-fired units with SCR controls to operate and optimize performance of the controls. Continuous operation and optimization of post-combustion controls at individual units would help address individual days that prove in real time to be most critical for downwind ozone levels. Better continuous emissions performance by individual units would also help address disparate impacts of pollution on overburdened communities downwind from the units.

The proposed unit-specific target daily emissions rates are discussed further in Section VII.B.7 of this proposed rule.

ii. Unit-Specific Emissions Limitations Contingent on Assurance Level Exceedances

The second of the proposed trading program enhancements intended to improve emissions performance at the level of individual units is the addition of unit-specific secondary emissions limitations. The secondary emissions limitations would be determined on a unit-specific basis according to each unit's individual performance but would apply to a given unit only under the circumstance where a state's assurance level for a control period has been exceeded, the unit is included in

---

[258] Based on the information reported by sources to the EPA in their monitoring plans under 40 CFR part 75, five plants subject to this proposal have SCR-equipped and non-SCR-equipped coal-fired EGUs that exhaust together to common stacks: The Clifty Creek plant in Indiana; the Cooper, Ghent, and Shawnee plants in Kentucky; and the Sammis plant in Ohio.

a group of units to which responsibility for the exceedance has been apportioned under the program's assurance provisions, and the unit operated during at least 10% of the hours in the control period. Where these conditions for application of a secondary emissions limitation to a given unit for a given control period are met, the unit's secondary emissions limitation would consist of a prohibition on NO$_X$ emissions during the control period that exceed by more than 50 tons the NO$_X$ emissions that would have resulted if the unit had achieved an average emissions rate for the control period equal to the higher of 0.10 lb/mmBtu or 125 percent of the unit's lowest average emissions rate for any previous control period under any CSAPR seasonal NO$_X$ trading program during which the unit operated for at least 10 percent of the hours.

The proposed secondary emissions limitation would be in addition to, not in lieu of, the primary emissions limitation applicable to each source, which would continue to take the form of a requirement to surrender a quantity of allowances based on the source's emissions, and also in addition to the existing assurance provisions, which similarly would continue to take the form of a requirement for the owners and operators of some sources to surrender additional allowances when a state's assurance level is exceeded. In contrast to these other requirements, the proposed unit-specific secondary emissions limitation would take the form of a prohibition on emissions over a specified level, such that any emissions by a unit exceeding its secondary emissions limitation would be subject to potential administrative or judicial action and subject to penalties and other forms of relief under the CAA's enforcement authorities. The reason for proposing this form of limitation is that experience under the existing CSAPR trading programs has shown that, in some circumstances, the existing assurance provisions have been insufficient to prevent exceedances of a state's assurance level for a control period even when the likelihood of an exceedance has been foreseeable and the exceedance could have been readily avoided if certain units had operated with emissions rates closer to the lower emissions rates achieved in past control periods. The assurance levels exist to ensure that emissions from each state that contribute significantly to nonattainment or interfere with maintenance of a NAAQS in another state are prohibited. *North Carolina* v. *EPA*, 531 F.3d 896, 906–908 (D.C. Cir.

2008). EPA's programs to eliminate significant contribution must therefore achieve this prohibition, and the new evidence of exceedances of the assurance provisions demonstrate that EPA's existing approach may not be sufficient to accomplish this statutory mandate.

The purpose of including assurance levels higher than the state emissions budgets in the CSAPR trading programs is to provide flexibility to accommodate operational variability attributable to factors that are largely outside of an individual owner's or operator's control, not to allow operators and operators to plan to emit at emissions rates that could be anticipated to cause a state's total emissions to exceed the state's emissions budget or assurance level. Conduct leading to a foreseeable, readily avoidable exceedance of a state's assurance level cannot be reconciled with the statutory mandate of the CAA's good neighbor provision that emissions "within the state" significantly contributing to nonattainment or interfering with maintenance of a NAAQS in another state must be prohibited. Because the current CSAPR regulations do not expressly prohibit such conduct and have proven insufficient to deter it in some circumstances, the EPA is proposing to correct the regulatory deficiency in the Group 3 trading program by adding secondary emissions limitations that cannot be complied with through the use of allowances.

The EPA notes that although the principal purpose of the proposed secondary emissions limitations is to strengthen the assurance provisions, which apply on a statewide, seasonal basis, the unit-specific structure of the new limitations would strengthen the incentives for individual units to maintain their emissions performance at levels consistent with their previously demonstrated capabilities. For units with existing post-combustion emissions controls, the new limitations would strengthen the incentives to operate and optimize the controls continuously, and for units without such existing controls, the new limitations would strengthen the incentives to minimize NO$_X$ emissions rates through other possible measures such as improved maintenance and optimization of combustion parameters. Continuous operation of post-combustion controls and greater attention to the combustion process at individual units can be expected to reduce some individual units' emissions rates throughout the ozone season, including on the days that turn out to be most critical for downwind ozone

levels. Better emissions performance on average across the ozone season by individual units would also help address disparate impacts of pollution on overburdened communities downwind from some such units.

The proposed unit-specific secondary emissions limitations are discussed further in Section VII.B.8 of this proposed rule.

2. Expansion of Geographic Scope

As part of the proposed approach for implementing the $NO_X$ emissions reductions from EGUs identified as necessary to address various states' obligations under the good neighbor provision with respect to the 2015 ozone NAAQS, the EPA is proposing to expand the existing geographic scope of the existing CSAPR $NO_X$ Ozone Season Group 3 Trading Program to encompass the additional states (and Indian country within the borders of such states) found to have such obligations with respect to EGUs. Specifically, the EPA is proposing to expand the Group 3 trading program to include the following states and Indian country within the borders of the states: Alabama, Arkansas, Delaware, Minnesota, Mississippi, Missouri, Nevada, Oklahoma, Tennessee, Texas, Utah, Wisconsin, and Wyoming. Any unit located in a newly added jurisdiction that meets the existing applicability criteria for the Group 3 trading program would become an affected unit under the program, as discussed in Section VII.B.3 of this proposed rule.

CSAPR, the CSAPR Update, and the Revised CSAPR Update also applied to sources in Indian country, although, when those rules were issued, no existing EGUs within the regions covered by the rules were located on lands that the EPA understood at the time to be Indian country.[259] In contrast, within the proposed geographic scope of this rulemaking, the EPA is aware of areas of Indian country within the borders of both Utah and Oklahoma with existing EGUs that would meet the program's applicability criteria. Issues related to state, tribal, and federal jurisdiction with respect to sources in Indian country in general and in these areas in particular are discussed in Section IV.C.2 of this proposed rule.

EPA's proposed approach for determining a portion of each state's budget for each control period that would be set aside for allocation to any units in areas of Indian country within the state not subject to the state's CAA implementation planning authority is discussed in Section VII.B.9 of this proposed rule.

Units in each state would join the Group 3 trading program on one of two possible dates during the program's 2023 control period (that is, the period from May 1, 2023, through September 30, 2023). The reason that two entry dates are possible is that, as discussed in Section VII.B.11 of this proposed rule, the effective date of a final rule in this rulemaking may fall after May 1, 2023. In the case of states (and Indian country within the states' borders) whose sources do not currently participate in the CSAPR $NO_X$ Ozone Season Group 2 trading program— Delaware, Minnesota, Nevada, Utah, and Wyoming—EPA proposes that the sources would begin participating in the Group 3 trading program on the later of May 1, 2023, or the final rule's effective date. However, in the case of the states (and Indian country within the states' borders) whose sources do currently participate in the Group 2 trading program—Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Tennessee, Texas, and Wisconsin—EPA proposes that the sources would begin participating in the Group 3 trading program on May 1, 2023, regardless of the final rule's effective date, subject to transitional provisions designed to ensure that the increased stringency of the Group 3 trading program as revised in this rulemaking would not substantially affect the sources' requirements prior to the rule's effective date. This approach provides a simpler transition for the sources currently covered by the Group 2 trading program than the alternative approach of being required to switch from the Group 2 trading program to the Group 3 trading program in the middle of a control period, and it is the same approach that was followed for sources that transitioned from the Group 2 trading program to the Group 3 trading program in 2021 under the Revised CSAPR Update. Section VII.B.11 of this proposed rule contains further discussion of the rationale for this approach and the specific proposed transitional provisions.

The EPA notes that under the proposed rule, the expanded Group 3 trading program would include not only the 22 states for which the EPA is proposing to determine that the required control stringency includes, among

other measures, installation of new post-combustion controls, but also the three states—Alabama, Delaware, and Tennessee—for which the EPA is proposing to determine that the required control stringency does not include such measures. In previous rulemakings, the EPA has chosen to combine states in a single multi-state trading program only where the selected control stringencies were comparable, in order to ensure that states did not effectively shift their emissions reduction requirements to other states with less stringent emissions reduction requirements by using net out-of-state purchased allowances. Although the assurance provisions in the CSAPR trading programs were designed to address the same general concern about excessive shifting of emissions reduction activities between states, EPA chose not to rely on the assurance provisions as sufficient to allow for interstate trading in situations where the states were assigned differing emissions control stringencies.

In this rulemaking, the EPA believes the previous concern about the possibility that certain states might not make the required emissions reductions is sufficiently addressed through the various proposed enhancements to the design of the trading program, even where states have been assigned differing emissions control stringencies. First, the existing assurance provisions would be substantially strengthened through the addition of the unit-specific secondary emissions limitations discussed in Sections VII.B.1.c.ii and VII.B.8 of this proposed rule. Second, by ensuring that individual units operate their emissions controls effectively, the unit-specific backstop daily emissions rate provisions discussed in Sections VII.B.1.c.i and VII.B.7 of this proposed rule would necessarily also ensure that required emissions reductions occur within the state. With these enhancements to the design of the trading program, the EPA does not believe it would be necessary for sources in Alabama, Delaware, and Tennessee to be excluded from the revised Group 3 trading program simply because their emissions budgets would reflect a different selected emissions control stringency than the other states in the program.

The EPA requests comment on the proposed expansion of the geographic scope of the Group 3 trading program to include the states and areas of Indian country identified above. The EPA also requests comment on the proposed timing under which the two sets of states and Indian country within the

---

[259] CSAPR and the CSAPR Update both applied to EGUs located in areas within Oklahoma's borders that are now understood to be Indian country, consistent with the U.S. Supreme Court's decision in *McGirt* v. *Oklahoma*, 140 S. Ct. 2452 (2020) (and subsequent case law), clarifying the extent of certain Indian country within Oklahoma's borders. However, those rules were issued before the *McGirt* decision. *See* Section IV.C.2.a.

respective states' borders would be added to the program.

3. Applicability and Tentative Identification of Newly Affected Units

The Group 3 trading program generally applies to any stationary, fossil-fuel-fired boiler or stationary, fossil fuel-fired combustion turbine located in a covered state (or Indian country within the borders of a covered state) and serving at any time on or after January 1, 2005, a generator with nameplate capacity exceeding 25 MW and producing electricity for sale, with exemptions for certain cogeneration units and certain solid waste incineration units. To qualify for an exemption as a cogeneration unit, an otherwise-affected unit generally (1) must be designed to produce electricity and useful thermal energy through the sequential use of energy, (2) must convert energy inputs to energy outputs with efficiency exceeding specified minimum levels, and (3) may not produce electricity for sale in amounts above specified thresholds. To qualify for an exemption as a solid waste incineration unit, an otherwise-affected unit generally (1) must meet the CAA section 129(g)(1) definition of a "solid waste incineration unit" and (2) may not consume fossil fuel in amounts above specified thresholds. The complete text of the Group 3 trading program's applicability provisions and the associated definitions can be found at 40 CFR 97.1004 and 97.1002, respectively.

The EPA is not proposing in this rulemaking to revise the existing applicability provisions for the Group 3 trading program. Thus, any unit that is located in a newly added state and that meets the existing applicability criteria for the Group 3 trading program would become an affected unit under the program. The fact that the applicability criteria for all of the CSAPR trading programs are identical therefore is sufficient to establish that any units that are currently required to participate in another CSAPR trading program in any of the proposed additional states where such other programs currently are in effect—Alabama, Arkansas, Minnesota, Mississippi, Missouri, Oklahoma, Tennessee, Texas, and Wisconsin (including Indian country within the borders of such states)—would also become subject to the Group 3 trading program.

In the proposed additional states where other CSAPR trading programs are not currently in effect—Delaware, Nevada, Utah, and Wyoming (including Indian country within the borders of such states)—units already subject to the Acid Rain Program generally would also meet the applicability criteria for the Group 3 trading program, especially if the units are not capable of producing both electricity and useful thermal energy. Based on a preliminary screening analysis of the units in these states that currently report emissions and operating data to the EPA under the Acid Rain Program and that do not report the capability to produce both electricity and useful thermal energy,

the Agency believes that all such units are likely to meet the applicability criteria for the Group 3 trading program.

Because the applicability criteria for the Acid Rain Program and the Group 3 trading program are not identical, it is possible that some units could meet the applicability criteria for one program but not the other. Using data reported to the U.S. Energy Information Administration, the EPA has identified 10 sources in Delaware, Nevada, Utah, and Wyoming (and Indian country within the borders of the states) with 27 units that appear to meet the general applicability criteria for the Group 3 trading program and that either (1) do not currently report $NO_X$ emissions and operating data to the EPA under the Acid Rain Program or (2) currently report $NO_X$ emissions and operating data to the EPA under the Acid Rain Program and also report the capability to produce both electricity and useful thermal energy. These units are listed in Table VII.B.3–1 of this proposed rule. For each of these units, the table shows the estimated historical heat input and emissions data that the EPA proposes to use for the unit when determining state emissions budgets if the unit is ultimately treated as subject to the Group 3 trading program.[260] The EPA currently lacks sufficient information to determine whether any of the units listed in the table meets all of the relevant criteria to qualify for an exemption from the Group 3 trading program as a cogeneration unit or a solid waste incineration unit.

TABLE VII.B.3–1—SELECTED EXISTING UNITS THAT COULD BE AFFECTED UNDER PROPOSAL

| State | Facility ID | Facility name | Unit ID | Unit type | Estimated ozone season heat input (mmBtu) | Estimated ozone season average $NO_X$ emissions rate (lb/mmBtu) | Notes |
|---|---|---|---|---|---|---|---|
| Delaware | 591 | Christiana | 11 | CT | 1,974 | 0.2594 | 1 |
| Delaware | 591 | Christiana | 14 | CT | 1,816 | 0.2027 | 1 |
| Delaware | 52193 | Delaware City Refinery | DCPP2 | Boiler | 872,824 | 0.0176 | 2 |
| Delaware | 52193 | Delaware City Refinery | DCPP3 | Boiler | 2,380,430 | 0.0169 | 2 |
| Delaware | 52193 | Delaware City Refinery | DCPP4 | Boiler | 1,374,817 | 0.0438 | 2, 3 |
| Delaware | 52193 | Delaware City Refinery | MECCU1 | CT | 1,679,396 | 0.0070 | 2 |
| Delaware | 52193 | Delaware City Refinery | MECCU2 | CT | 1,679,396 | 0.0062 | 2 |
| Delaware | 7153 | Hay Road | 1 | CT | 1,354,272 | 0.0685 | 1 |
| Delaware | 7153 | Hay Road | 2 | CT | 1,311,286 | 0.0663 | 1 |
| Nevada | 2322 | Clark | GT4 | CT | 190,985 | 0.0475 | .......... |
| Nevada | 2322 | Clark | GT5 | CT | 1,455,741 | 0.0191 | .......... |
| Nevada | 2322 | Clark | GT6 | CT | 1,455,741 | 0.0187 | .......... |
| Nevada | 2322 | Clark | GT7 | CT | 1,455,741 | 0.0178 | .......... |
| Nevada | 2322 | Clark | GT8 | CT | 1,455,741 | 0.0204 | .......... |
| Nevada | 54350 | Nev. Cogen. Assoc. 1—Garnet Val. | GTA | CT | 660,100 | 0.0377 | 2, 4 |

---

[260] As discussed in Section VII.B.10.b of this proposed rule, the EPA expects that any unit that becomes subject to the Group 3 trading program pursuant to a final rule in this rulemaking and that does not already report emissions data to the EPA in accordance with 40 CFR part 75 would not be required to report emissions data or be subject to allowance holding requirements under the Group 3 trading program until May 1, 2024, because of the minimum time interval allowed for installation and certification of the required monitoring systems. Such a unit would not be taken into account for purposes of determining state emissions budgets and unit-level allocations under the Group 3 trading program until the 2024 control period. As indicated in the notes to Table VII.B.3–1 of this proposed rule, six of the listed units have reported to the Energy Information Administration that they plan to retire in 2023.

TABLE VII.B.3–1—SELECTED EXISTING UNITS THAT COULD BE AFFECTED UNDER PROPOSAL—Continued

| State | Facility ID | Facility name | Unit ID | Unit type | Estimated ozone season heat input (mmBtu) | Estimated ozone season average NO$_X$ emissions rate (lb/mmBtu) | Notes |
|---|---|---|---|---|---|---|---|
| Nevada | 54350 | Nev. Cogen. Assoc. 1—Garnet Val. | GTB | CT | 660,100 | 0.0387 | 2, 4 |
| Nevada | 54350 | Nev. Cogen. Assoc. 1—Garnet Val. | GTC | CT | 660,100 | 0.0387 | 2, 4 |
| Nevada | 54349 | Nev. Cogen. Assoc. 2—Black Mtn. | GTA | CT | 749,778 | 0.0323 | 2, 4 |
| Nevada | 54349 | Nev. Cogen. Assoc. 2—Black Mtn. | GTB | CT | 749,778 | 0.0370 | 2, 4 |
| Nevada | 54349 | Nev. Cogen. Assoc. 2—Black Mtn. | GTC | CT | 749,778 | 0.0364 | 2, 4 |
| Nevada | 56405 | Nevada Solar One | HI | Boiler | 479,452 | 0.1667 | ......... |
| Nevada | 54271 | Saguaro | CTG1 | CT | 1,383,149 | 0.0314 | 2 |
| Nevada | 54271 | Saguaro | CTG2 | CT | 1,383,149 | 0.0301 | 2 |
| Utah | 50951 | Sunnyside | 1 | Boiler | 1,888,174 | 0.1715 | ......... |
| Wyoming | 56312 | Shute Creek | 021A | CT | 1,000,050 | 0.0081 | 2 |
| Wyoming | 56312 | Shute Creek | 021B | CT | 1,000,050 | 0.0093 | 2 |
| Wyoming | 56312 | Shute Creek | 021C | CT | 1,000,050 | 0.0084 | 2 |

**Table notes:**
[1] Unit already reports NO$_X$ emissions and heat input data to the EPA under 40 CFR part 75 to comply with SIP requirements.
[2] Unit reports capability of producing both electricity and useful thermal energy.
[3] Unit already reports NO$_X$ emissions and heat input data to EPA under 40 CFR part 75 for the Acid Rain Program.
[4] Unit has reported a planned retirement date of March 2023 to the Energy Information Administration.

The EPA requests comment on which existing units in Delaware, Nevada, Utah, and Wyoming and Indian country within the borders of such states would or would not meet the applicability criteria for the Group 3 trading program. In addition, with respect to each of the units listed in Table VII.B.3–1 of this proposed rule, the EPA requests comment, with supporting data, on whether the unit would or would not meet all relevant criteria set forth in 40 CFR 97.1004 and the associated definitions in 97.1002 to qualify for an exemption from the trading program as a cogeneration unit or a solid waste incineration unit (however, see Section VI.B.3 of this proposed rule). The EPA also requests comment, with supporting data, on whether the estimated historical heat input and emissions data identified for the units in Table VII.B.3–1 of this proposed rule are representative for the respective units.

4. New and Revised State Emissions Budgets

The EPA is quantifying budgets or budget formulas specific to each year to ensure that EGUs continue to be incentivized to implement the full extent of EPA's selected control stringency for future control periods. By doing so, the EPA is accounting for both scheduled and not-yet-scheduled fleet turnover in future years. For instance, if State X's budget was 5,000 tons in 2023 but there are 100 tons of emissions from a unit scheduled to retire at the end of that year and 50 tons expected from a new unit coming online by the

following year, then the state emissions budget for 2024 will reflect these scheduled changes by establishing a budget of 5,000 tons − 100 tons + 50 tons = 4,950 tons for the subsequent year.

In the Revised CSAPR Update, the EPA included announced fleet changes in state emissions budgets. Several commenters applauded the merit of this approach and the importance of establishing emissions budgets that were robust to an evolving fleet while noting that "fleet composition is changing constantly and can be exceedingly difficult to project" leading to overstated emissions budgets to the extent that future retirements were not announced at the time of rule promulgation. Commenters added that "to address this problem and prevent future unknown retirements from exacerbating this issue, the final rule should include a provision to make additional adjustments to the NO$_X$ budgets based on newly discovered fleet changes." [261] Commenters were suggesting a dynamic budget approach where the mitigation measures and control stringencies that constituted removal of significant contribution would be identified in a final rule, but the future year state budgets would be dynamic as the EPA applied those stringency assumptions to future year fleet composition data as it became available. While the stringency (reflected by assumed emissions rate for a mitigation technology), would be constant, the fleet composition

(reflected by unit heat input) is dynamic. Multiplying the assumed emissions rate for each unit by the heat input for each unit and summing the results to the state level would provide a given year's state emissions budget, and thus under this approach the state emissions budgets would be dynamic as well.

The EPA is proposing a dynamic budget approach in this rule, where emissions budgets starting in the 2025 control period and beyond will be determined through ministerial actions subsequent to this rule's promulgation and based upon the formula described in this rule. This rule will determine the mitigation strategies, respective emissions rates, and formulas and methodologies to be applied to future year data, with which the EPA will perform ministerial actions to calculate emissions budgets for control periods in 2025 and each year thereafter. (Such actions will be publicly announced through notices of data availability (NODAs), similar to how other periodic ministerial actions to implement the trading programs are currently handled. And as with such other actions, interested parties will have the opportunity to seek corrections or administrative adjudication under 40 CFR part 78 if they believe any data used in making these calculations, or the calculations themselves, are in error.) In this manner, the state emissions budgets ultimately implemented for each such future control period will be a product of the data and formula promulgated in this

---

[261] EPA–HQ–OAR–2020–0272–0094.

action applied to future year reported data that is closer to that future control period and therefore more representative of the fleet during that future control period. As such, the budgets will more accurately reflect power sector composition in that future year and will therefore better achieve the desired environmental outcome over time.

For instance, 2025 budgets will be identified by May 1, 2024, using the latest available reported operational data at that time (2023 heat input data and fleet inventory) along with the formulas and emissions rates quantified in this rule. Therefore, if a unit retires in early 2023 but had not announced its upcoming retirement at the time of rule finalization, the dynamic budget approach would ensure that the budgets for future control periods starting in 2025 would reflect the identified control stringency applied to a fleet that reflects

that retirement. If the EPA took an alternative approach of computing the 2025 budget with available data at the time final rule analysis was being conducted, this retirement would likely not be captured in the 2025 state emissions budget, which would lead to a budget that did not fully reflect the application of the identified control stringency. This approach has the advantage of mitigating uncertainty regarding future retirements, new builds, and existing fleet operational/ dispatch changes in response to EGU inventory changes.

The example below illustrates the effectiveness of the dynamic budget. In the preset budget approach for 2026, the 2026 heat input is estimated based on the latest available heat input data at the time of rule promulgation (e.g., 2021), which cannot reflect a subsequent fleet change in heat input values (column 2) due to an unanticipated retirement of

one of the state's coal-fired units in late 2023. However, the dynamic budget would use 2024 heat input values as opposed to the 2021 heat input values as the latest representative values to inform the 2026 state emissions budget. Therefore, the heat input values in column 2 under the dynamic scenario reflect the change in fleet composition, and when multiplied by the relevant identified control stringency (to be identified when this rule is finalized), the corresponding tonnage (15,000 tons) summed in column 4 constitutes a state budget that better reflects the identified control stringency applied to the fleet composition for that year as opposed to the 17,000 tons in summed in the first table. As illustrated in the example, the dynamic variable is the heat input variable which changes over time to reflect the most representative EGU fleet.

| | Preset Budget Appraoch (2026) | | | Dynamic Budget Approach (2026) | | |
|---|---|---|---|---|---|---|
| | Preset Heat Input (tBtu) | Preset Emissions Rate (lb/mmBtu) | Preset Tons (Heat input X Emissions Rate)/2000 | Updated Heat Input (tBtu) | Emissions Rate (lb/mmBtu) | Updated Tons (Heat Input X Emissions Rate)/2000 |
| Coal Units | 600 | 0.05 | 15,000 | 500 | 0.05 | 12,500 |
| Gas Units | 400 | 0.01 | 2,000 | 500 | 0.01 | 2,500 |
| **State Budget (tons)** | | | **17,000** | | | **15,000** |

The EPA requests comment on this dynamic budget approach, including the methodology, the start year, and the impacts.

With regard to the state emissions budgets for the 2023 and 2024 control periods promulgated in this rule, the EPA is using the best available data at the time of the proposed rule regarding retirements and new builds. The EPA relies on a compilation of data from DOE EIA Form 860 (where facilities report their future retirement plans) and information included in the Agency's NEEDS database. This information is considered to be highly reliable, real-world information that provides the EPA with high confidence that such retirements will in fact occur. EPA plans to update this data on retirements and new builds at final rule using the latest information available from these sources at that time as well as input provided by commenter.

EPA's emissions budget methodology and formula for establishing Group 3 budgets are described in detail in the Ozone Transport Policy Analysis

Proposed Rule TSD and summarized below.

a. Methodology for Determining Preset State Emissions Budgets for the 2023 and 2024 Control Periods

For determining state emissions budgets, the EPA generally uses historical ozone season data from the 2021 ozone season, the most recent data and therefore the most representative of near-term fleet conditions. This is similar to the approach taken in the CSAPR Update where the EPA began with 2015 data (the most recent year at the time). As in the CSAPR Update, the EPA combined historical data with IPM data to determine emissions budgets as follows:

(1) Determine a future year baseline—Start with the latest reported historical unit-level data (e.g., 2021), and adjust any unit data where a retirement, a new build, a coal-to-gas conversion, or a SCR retrofit is known to occur by the baseline year. This results in a future year (e.g., 2023) baseline for emissions budget purposes.

(2) Factor in additional emissions controls for the selected control stringency for the given state in the given year—For the unit-

level emissions control technologies identified in this control stringency, adjust the baseline unit-level emissions and emissions rates. For example, if an SCR-controlled coal unit had a baseline emissions rate greater than 0.08 lb/mmBtu, its emissions rate and corresponding emissions would be adjusted down to levels reflecting its operation at 0.08 lb/mmBtu.

(3) Incorporate generation shifting—Use IPM in a relative way to capture the reductions expected from generation shifting (constrained to within each state) at the representative dollar per ton level corresponding to the selected control stringency.

By using historical unit and state-level $NO_X$ emissions rates, heat input, and emissions data in the first stage of budget setting process outlined above, the EPA is grounding its budgets in the most recent representative historical operation for the covered units.[262] This dataset is a reasonable starting point for

---

[262] The EPA notes that historical state-level ozone season EGU $NO_X$ emissions rates are publicly available and quality assured data. They are monitored using CEMS or other methodologies allowed for use by qualifying units under 40 CFR part 75 and are reported to the EPA directly by power sector sources.

the budget-setting process as it reflects the latest data reported by affected facilities under 40 CFR part 75. The reporting requirements include quality control measures, verification measures, and instrumentation to best record and report the data. In addition, the designated representatives of EGU sources are required to attest to the accuracy and completeness of the data. The EPA adjusted the 2021 ozone-season data to reflect committed fleet changes under a baseline scenario (*i.e.,* announced and confirmed retirements, new builds, and retrofits that have already occurred). For example, if a unit emitted in 2021, but retired in 2022, its 2021 emissions would not be included in the 2023 baseline estimate. For units that had no known changes, the 2023 baseline emissions assumption was the actual reported data from 2021. The EPA also included known new units and scheduled retrofits in this manner. Using this method, the EPA arrived at a baseline emission, heat input, and emissions rate estimate for each unit for a future year (*e.g.,* 2023), and then was able to aggregate those unit-level estimates to state-level totals. These state-level totals constituted the state's baseline from an engineering analytics perspective. The ozone-season state-level emissions, heat input, and emissions rates for covered sources under a baseline scenario were determined for each future year examined that receives a preset budget under this proposed rule (2023 and 2024).

The EPA then examined how the baseline emissions and emissions rates would change under different control stringencies for EGUs. For instance, under the SCR optimization scenario, if a unit was not operating its SCR at 0.08 lb/mmBtu or lower in the baseline, the EPA lowered that unit's assumed emissions rate to 0.08 lb/mmBtu and calculated the impact on the unit's and state's emissions rate and emissions. Note that the heat input is held constant for the unit in the process, reflecting the same level of unit operation compared to historical 2021 data. An improved emissions rate is then applied to this heat input, reflecting control optimization. In this manner, the state-level baseline totals reflecting known changes were adjusted to reflect the additional application of the assumed control technology at a given control stringency.

Finally, the EPA used IPM to capture any generation shifting at a given control stringency necessary for the majority of the respective emissions control technology to operate. The EPA explains how it accounts for generation

shifting in more detail in Section VI.B of this proposed rule and in the Ozone Transport Policy Analysis Proposed Rule TSD. In this rule, as a proxy for the near-term reductions required in 2023 and 2024, the EPA has constrained generation shifting to occur only within-state. The EPA also estimates emissions reductions associated with generation shifting in 2025 and 2026 for purposes of the illustrative state budgets, but as explained below, the dynamic budget process to determine budgets for those years will incorporate emissions reductions attributable to generation shifting through the inclusion of newly reported unit-level data from the future compliance periods.

### b. Methodology for Determining Dynamic State Emissions Budgets for Control Periods in 2025 Onwards

The methodology for determining state emissions budgets for later control periods (2025 and beyond) is nearly identical to the process for quantifying preset budgets in 2023 and 2024 described earlier; it is just applied at a later date and applied to the most recent representative operational available at that time. The EPA will issue by ministerial action these dynamic budget quantifications approximately 1 year before the relevant control period. For instance, starting in early 2024, the EPA would take the most recent 2023 ozone season data, calculate 2025 state emissions budgets using the methodology below and update its unit-level and state-level state emissions budget files that will be released when this rule is finalized (and for which the EPA has included in this proposed rule current examples for public comment). By March 1 of 2024, and each year thereafter, the EPA would make publicly available (in manner similar to data and preliminary computations for allocations from new unit set-asides) the preliminary state emissions budgets and unit-level allocations for the subsequent control period (*e.g.,* 2025) and would provide stakeholders with a 30-day opportunity to submit any objections to the updated data and computations. By May 1 of 2024, and each year thereafter, the EPA would issue the final budgets and allowance allocations for the next control period (*e.g.,* 2025).

The differences to each of the formula steps to calculate dynamic budgets for control periods in 2025 and beyond, relative to the calculation of preset budgets for the 2023 and 2024 control periods, are described later:

(1) Determine a future year baseline—At this step, the EPA would start with the latest reported historical unit-level heat input data available at that time (*e.g.,* for 2025 state

emissions budgets, the EPA would use the newly available 2023 heat input data rather than 2021 heat input data). Doing so would capture the latest operational data reflecting new builds and retirements. This would yield a future year (*e.g.,* 2025) baseline for emissions budget purposes.

(2) Factor in additional emissions controls for the selected control stringency for the given state in the given year—For the unit-level emissions reduction measures identified in the selected control stringency, adjust the baseline unit-level emissions and emissions rates. This step would be nearly the same for control periods in 2025 and beyond as for the 2023 and 2024 control periods, the only difference being that as described in Section VI.D of this proposed rule, for each control period from 2026 onward, the unit-specific emissions rates assumed for all affected states except Alabama, Delaware, and Tennessee will reflect the selected control stringency that incorporates post-combustion control retrofit opportunities for the relevant units identified in the state emissions budgets and calculations appendix to the Ozone Transport Policy Analysis Proposed Rule TSD. These rates would be defined in this rule and would not change subsequently. They would be applied until 2026, based on the time necessary to install these mitigation technologies as discussed in Sections VI.B, VI.C, and VII.A of this proposed rule.

(3) Incorporate generation shifting—This step would be automatically captured in dynamic budget calculations as generation shifting in a compliance scenario would no longer have to be projected by IPM and incorporated into the state budgets through an additional calculation. Instead, it would be embodied in the newly reported heat input data described above and that is used to determine the dynamic budgets.

Additional details, corresponding data and formulas, and examples for the dynamic budget are described in the Ozone Transport Policy Analysis Proposed Rule TSD.

### c. Proposed and Illustrative State Emissions Budgets

For each covered state (and Indian country within the state's borders), preset budgets are established for the two individual control periods 2023 and 2024. For 2025 and beyond, the dynamic budget formula promulgated in this proposed rule would be applied to future year data to quantify state emissions budgets for those control periods. The proposed default procedures for allocating the allowances from each state budget among the units in each state (and Indian country within the state's borders) are described in Section VII.B.9 of this proposed rule. The amounts of the proposed state emissions budgets for the 2023 and 2024 control periods are shown in Table VII.B.4.c–1. Table VII.B.4.c–2 shows illustrative state emissions budgets for

the 2025 and 2026 control periods derived by applying the identified control stringency to the most recent historical data, but these budgets are only illustrative because, under the proposal, the implemented state emissions budgets for these years will be determined at a future date through application of the proposed budget-setting methodology to data that reflect the emissions control stringencies finalized in the rulemaking combined with the latest available data on the composition and utilization of the EGU fleet.

TABLE VII.B.4.c–1—PROPOSED CSAPR NO$_X$ OZONE SEASON GROUP 3 STATE EMISSIONS BUDGETS FOR THE 2023 AND 2024 CONTROL PERIODS [a] [b]

| State | Proposed emissions budgets for 2023 control period (tons) | Proposed emissions budgets for 2024 control period (tons) |
|---|---|---|
| Alabama | 6,364 | 6,306 |
| Arkansas | 8,889 | 8,889 |
| Delaware | 384 | 434 |
| Illinois | 7,364 | 7,463 |
| Indiana | 11,151 | 9,391 |
| Kentucky | 11,640 | 11,640 |
| Louisiana | 9,312 | 9,312 |
| Maryland | 1,187 | 1,187 |
| Michigan | 10,718 | 10,718 |
| Minnesota | 3,921 | 3,921 |
| Mississippi | 5,024 | 4,400 |
| Missouri | 11,857 | 11,857 |
| Nevada | 2,280 | 2,372 |
| New Jersey | 799 | 799 |
| New York | 3,763 | 3,763 |
| Ohio | 8,369 | 8,369 |
| Oklahoma | 10,265 | 9,573 |
| Pennsylvania | 8,855 | 8,855 |
| Tennessee | 4,234 | 4,234 |
| Texas | 38,284 | 38,284 |
| Utah | 14,981 | 15,146 |
| Virginia | 3,090 | 2,814 |
| West Virginia | 12,478 | 12,478 |
| Wisconsin | 5,963 | 5,057 |
| Wyoming | 9,125 | 8,573 |

**Table Notes:**

[a] The state emissions budget calculations pertaining to Tables VII.B.4.c–1 and VII.B.4.c–2 are described in greater detail in the Ozone Transport Policy Analysis Proposed Rule TSD. Budget calculations and underlying data are also available in Appendix A of that TSD.

[b] In the event a final rule in this rulemaking becomes effective after May 1, 2023, the emissions budgets and assurance levels for the 2023 control period would be adjusted under the rule's proposed transitional provisions to ensure that the increased stringency of the new budgets would apply only after the rule's effective date, even though the revised Group 3 trading program would be implemented for most sources as of the start of the 2023 ozone season on May 1, 2023. The 2023 budget amounts shown in Table VII.B.4.c–1 do not reflect these possible adjustments. The transitional provisions are discussed in Section VII.B.11 of this proposed rule.

TABLE VII.B.4.c–2—ILLUSTRATIVE CSAPR NO$_X$ OZONE SEASON GROUP 3 STATE EMISSIONS BUDGETS FOR THE 2025 AND 2026 CONTROL PERIODS

| State | Illustrative emissions budgets for 2025 control period (tons) | Illustrative emissions budgets for 2026 control period (tons) |
|---|---|---|
| Alabama | 6,306 | 6,306 |
| Arkansas | 8,889 | 3,923 |
| Delaware | 434 | 434 |
| Illinois | 7,463 | 6,115 |
| Indiana | 8,714 | 7,791 |
| Kentucky | 11,134 | 7,573 |
| Louisiana | 9,179 | 3,752 |
| Maryland | 1,187 | 1,189 |
| Michigan | 10,759 | 6,114 |
| Minnesota | 3,910 | 2,536 |
| Mississippi | 4,400 | 1,914 |
| Missouri | 10,456 | 7,246 |
| Nevada | 2,372 | 1,211 |
| New Jersey | 799 | 799 |
| New York | 3,763 | 3,238 |
| Ohio | 8,369 | 8,586 |
| Oklahoma | 9,393 | 4,275 |
| Pennsylvania | 8,855 | 6,819 |
| Tennessee | 4,008 | 4,008 |

TABLE VII.B.4.c–2—ILLUSTRATIVE CSAPR NO$_X$ OZONE SEASON GROUP 3 STATE EMISSIONS BUDGETS FOR THE 2025 AND 2026 CONTROL PERIODS—Continued

| State | Illustrative emissions budgets for 2025 control period (tons) | Illustrative emissions budgets for 2026 control period (tons) |
|---|---|---|
| Texas | 36,619 | 21,946 |
| Utah | 15,146 | 2,620 |
| Virginia | 2,948 | 2,567 |
| West Virginia | 12,478 | 10,597 |
| Wisconsin | 4,198 | 3,473 |
| Wyoming | 8,573 | 4,490 |

5. Variability Limits and Assurance Levels

Like each of the other CSAPR trading programs, the Group 3 trading program currently includes assurance provisions designed to limit the total emissions from the sources in each state (and Indian country within the state's borders) in each control period to an amount close to the state's emissions budget for the control period, consistent with the good neighbor provision's requirement that required emissions reductions must be achieved within the state, while allowing some flexibility beyond the emissions budget to accommodate year-to-year operational variability beyond sources' reasonable ability to control. For each state, the assurance provisions establish an assurance level for each control period, defined as the sum of the state's emissions budget for the control period plus a variability limit, which under the existing Group 3 trading program regulations is 21 percent of the relevant state emissions budget. The purpose of the variability limit is to account for year-to-year variability in EGU operations, which can occur for a variety of reasons including changes in weather patterns, changes in electricity demand, and disruptions in electricity supply from other units or from the transmission grid. Because of the need to account for such variability in operations of each state's EGUs, the fact that emissions from the state's EGUs may exceed the state's emissions budget for a given control period is not treated as inconsistent with satisfaction of the state's good neighbor obligations as long as the total emissions from the EGUs remain below the state's assurance level. Emissions from a state's EGUs above the state's emissions budget but below the state's assurance level are treated in the same manner as emissions below the state's emissions budget in that such emissions are subject to the same requirement to surrender allowances at a ratio of one allowance per ton of emissions. In contrast, emissions above the state's assurance level for a given control period are strongly discouraged as inconsistent with the state's good neighbor obligations and are subject to an overall 3-for-1 allowance surrender ratio. The establishment of assurance levels with associated extra allowance surrender requirements was intended to respond to the D.C. Circuit's holding in *North Carolina* requiring the EPA to ensure within the context of an interstate trading program that sources in each state are required to address their good neighbor obligations within the state and may not simply shift those obligations to other states by failing to reduce their own emissions and instead surrendering surplus allowances purchased from sources in other states.[263]

In this rulemaking, the EPA is not proposing to alter the basic structure of the Group 3 trading program's assurance provisions, which would continue to set an assurance level for each control period equal to the state's emissions budget for the control period plus a variability limit and would continue to apply a 3-for-1 surrender ratio to emissions exceeding the state's assurance level.[264] Each assurance level also would continue to apply to the collective emissions of all units within the state and Indian country within the state's borders.[265] For the 2023 and 2024 control periods, the EPA proposes to retain the Revised CSAPR Update's methodology for determining each state's variability limit as 21 percent of the state's emissions budget for the control period, except that because the EPA is proposing to revise the state emissions budgets for these control periods, the EPA proposes to determine the corresponding variability limits as 21 percent of the revised budgets. However, for control periods after 2024, the EPA is proposing a change to the methodology for determining the variability limits. Specifically, the EPA proposes to determine each state's variability limit for the control periods in 2025 or a later year so that, instead of always multiplying the state's emissions budget for the control period by a value of 21 percent, the percentage value used would be the higher of 21 percent or the percentage (if any) by which the total reported heat input of the state's affected EGUs in the control period exceeds the total reported heat input of the state's affected EGUs as reflected in the state's emissions budget for the control period. For example, if the total reported heat input of the state's covered sources for the 2025 control period was 90 percent or 110 percent of the total reported heat input of the state's covered sources for the 2023 control period (*i.e.,* the heat input the EPA would have used in computing the state's 2025 emissions budget), then the state's variability limit for the 2025 control period would be 21 percent of the state's emissions budget, while if the total reported heat input of the state's covered sources for the 2025 control period was 130 percent of the total reported heat input of the state's covered sources for the 2023 control period, then the state's variability limit for the 2025 control period would be 30 percent of the state's emissions budget. The EPA expects that the minimum 21 percent would apply in almost all instances, and that the alternative, higher percentage value would apply only in control periods where operational variability caused an extreme increase relative to the earlier year used in setting the state's emissions budget, which would be a situation

[263] 531 F.3d at 908.

[264] As discussed in Section VII.B.8 of this proposed rule, the EPA is also proposing to establish a new secondary emissions limitation for individual units that would apply in situations where an exceedance of the relevant state's assurance level has occurred.

[265] *See* 40 CFR 97.1002 (definitions of "common designated representative," "common designated representative's assurance level" and "common designated representative's share"), 97.1006(c)(2), and 97.1025.

meriting a temporarily higher variability limit and assurance level.

The purpose of the proposed revision to the variability limits is to better align the variability limits for successive control periods with the regularly updated heat input data that would be used in the proposed process for dynamically setting the state emissions budgets. Under EPA's proposed budget-setting process, each emissions budget would be computed using the latest available reported heat input, which for each budget set for a control period in 2025 or a later year would be the heat input for the control period two years before the control period whose budget is being determined (for example, the state emissions budgets for the 2025 control period would be computed in early 2024 using the reported heat input for the 2023 control period). The proposed revised variability limits would be well coordinated with the budgets established using this dynamic budgeting process, because the percentage change in the actual heat input for the control period relative to the earlier-year heat input used in computing the state's emissions budget would be an appropriate measure of the degree of operational variability actually experienced by the state's EGUs in the control period relative to the assumed operating conditions reflected in the state's budget. Setting a variability limit in this manner would be entirely consistent with the overall purpose of including variability limits in the assurance provisions.

The reason the EPA is proposing to use the higher of a fixed 21% or the percentage change in heat input computed as just described is that the EPA believes that, for operational planning purposes, it can be useful for sources to know in advance of the control period a minimum value for what the variability limit could turn out to be. Because a state's actual total heat input for a control period is not known until after the end of the control period, this proposed revision would have the consequence that the state's final variability limit and assurance level for the control period also would not be known until after the control period. However, because the proposed rule provides that the variability limit would always be at least 21 percent, the sources in a state would be able to rely for planning purposes on the knowledge that the assurance level would always be at least 121 percent of the state's emissions budget for the control period. Advance knowledge of the minimum possible amount of the assurance level can be useful to sources, because one way a source can be confident that it

will never incur the 3-for-1 allowance surrender ratio owed for emissions exceeding its state's assurance level is to plan its operations so as to never allow its own emissions to exceed its own share of the state's assurance level for the control period. Knowing that the variability limit would always be at least 21 percent would provide sources with values they could use for such planning purposes.

The EPA believes that 21 percent is a reasonable value to use as the fixed variability limit for the 2023 and 2024 control periods and as the minimum variability limit for the control periods in 2025 and later years. To determine appropriate variability limits for the trading programs established in CSAPR, the EPA analyzed historical state-level heat input variability over the period from 2000 through 2010 as a proxy for emissions variability, assuming constant emissions rates. *See* 76 FR 48265. Based on that analysis, the variability limits for ozone season $NO_X$ in both CSAPR and the CSAPR Update were set at 21 percent of each state's budget, and these variability limits for the $NO_X$ ozone season trading programs were then codified in 40 CFR 97.510 and 40 CFR 97.810, along with the respective state budgets. For the Revised CSAPR Update, the EPA performed an updated variability analysis for the twelve states being moved into the Group 3 trading program in that rulemaking, evaluating historical state-level heat input variability over the period from 2000 through 2019. The updated analysis again resulted in a variability estimate of 21 percent. The EPA also considered shorter time periods for the updated analysis and found that the resulting variability estimates were not especially sensitive to the particular time period analyzed.[266] A further updated analysis for this rulemaking again results in a variability estimate of 21 percent for most states, and although the historical analysis indicates higher percentages for the two states with the smallest total heat input figures in this analysis—Delaware and New Jersey—the EPA does not consider it appropriate to raise the variability limit percentage beyond 21 percent for all other states based on the analytic results for these states, where small absolute heat input figures

have resulted in larger variability percentages.[267] Based on the consistent conclusions of these multiple analyses, the EPA proposes to continue using 21 percent as the fixed variability limit percentage for the 2023 and 2024 control periods and as the minimum value in the revised approach for establishing variability limits for the control periods in 2025 and later years.

The EPA requests comment on the proposed rule to set variability limits for the 2023 and 2024 control periods as 21 percent of the respective revised state emissions budgets, consistent with the methodology used to determine the variability limits for these control periods set in the Revised CSAPR Update. In addition, the EPA requests comment on whether to set higher variability limits for Delaware and New Jersey for 2023 and 2024 based on the results of the most recent variability analysis. The EPA also requests comment on the proposed rule to establish a revised methodology for setting variability limits for all states for control periods in 2025 and later years, as discussed in this section.

6. Annual Recalibration of Allowance Bank

As discussed in Section VII.B.1.b of this proposed rule, in this rulemaking, the EPA is proposing two revisions to the Group 3 trading program designed to better maintain the control stringency selected in the final rule in this rulemaking. The first proposed revision, discussed Section VII.B.4 of this proposed rule, is to adopt a dynamic budget-setting methodology that would allow state emissions budgets in future years to reflect more accurate information about the composition and utilization of the EGU fleet. The second, complementary, proposed revision is to recalibrate the bank of unused allowances each control period in order to prevent allowance surpluses in individual control periods from accumulating and adversely impacting the ability of the trading program in future control periods to maintain the selected control stringency identified in the rulemaking as necessary to address states' good neighbor obligations with respect to the 2015 ozone NAAQS.

The EPA proposes to begin the bank recalibration process starting with the 2024 control period, after the compliance process for the 2023 control period for all current and newly added states in the Group 3 trading program

---

[266] For details on the original variability analysis for 26 states over the 2000–2010 period, including a description of the methodology, see the Power Sector Variability Final Rule TSD from the CSAPR (EPA–HQ–OAR–2009–0491–4454). For the updated variability analysis for twelve states for the 2000–2019 period, *see* the Excel file "Historical Variability in Heat Input 2000 to 2019.xls." Both documents are available in the docket for this proposal.

[267] *See* the Excel document, "OS Heat Input Variability 2000 to 2021.xls" for updated data, application of the CSAPR variability methodology, and results applied to heat input for 2000 through 2021 for all states and for the region collectively.

has been completed. The recalibration process for each control period would be carried out on or shortly after August 1 of that control period, two months after the compliance deadline for the previous control period, making the proposed date of the first recalibration August 1, 2024. The recalibrations could not take place significantly earlier than August 1 each year because compliance for the previous control period would not be completed until after June 1. However, because data on the amounts of allowances held are publicly available and the total quantity of allowances needed for compliance for the previous control period would be known shortly after the end of that control period, sources and other market participants would be able to ascertain with reasonable accuracy shortly after the end of each control period what degree of recalibration to expect for the next control period, even if the recalibration would not actually be carried out until the following August.

Before undertaking a recalibration process each control period, the EPA would first determine whether the total amount of all banked Group 3 allowances from previous control periods held in all facility accounts and general accounts in the Allowance Management System accounts exceeds the target bank amount. (For this purpose, no distinction would be made between banked Group 3 allowances issued from the state emissions budgets for previous control periods and banked Group 3 allowances issued through the conversion of previously banked Group 2 allowances.) If the total amount of banked Group 3 allowances does not exceed the target bank amount, the EPA would not carry out any recalibration for that control period. If the total amount of unused allowances does exceed the target bank amount, the EPA would determine for each account with holdings of banked Group 3 allowances the account-specific recalibrated amount of allowances, computed as the target bank amount multiplied by the account's total holdings of banked Group 3 allowances and divided by the total amount of banked Group 3 allowances in all accounts, rounded up to the nearest allowance. Finally, the EPA would deduct from each account any banked Group 3 allowances exceeding the account's recalibrated amount of banked allowances.

As the target bank amount used in the recalibration process for each control period, the EPA proposes to use an amount determined as 10.5 percent of the sum of the state emissions budgets for the control period, or half of the sum of the states' proposed minimum variability limits. The EPA has two reasons for proposing this amount. First, in the transition from CSAPR to the CSAPR Update, where the EPA set a target bank amount 1.5 times the sum of the variability limits, and in the transition from the CSAPR Update to the Revised CSAPR Update, where the EPA set a target bank amount of 1.0 times the sum of the variability limits, in each case the initial bank proved larger than necessary, as total emissions of all sources in the program were less than the budgets. Second, an analysis of year-to-year variability of heat input for the region covered by this proposed rule suggests that the regional heat input for an individual year can be expected to vary by up to 10.5 percent above or below the central trend with 95% confidence. This variability analysis is an application to the entire region of the variability analysis EPA has performed for individual states to establish the variability limit of 21 percent for the states in the trading program.[268] When the analysis is performed at the regional level, the data show less year-to-year variation than when the analysis is performed at the individual state level. Within the trading program structure, it is logical to use variability analyzed at the level of individual states to set the variability limits, which apply at the level of individual states, while using variability analyzed at the level of the overall region to set a target level for a bank, which will apply at the level of the overall program.

The annual bank recalibrations will help maintain the control stringency determined to be necessary to address states' good neighbor obligations for the 2015 ozone NAAQS. Moreover, the proposed recalibrations are less complex than alternative approaches would be. For example, the NO$_X$ Budget Trading Program established in the NO$_X$ SIP Call also contained provisions designed to prevent excessive accumulations of banked allowances on program stringency, but those provisions—under the name "progressive flow control"—introduced uncertainty as to whether banked allowances would be usable to offset one ton of emissions or less than one ton of emissions in the current control period. The EPA considers the recalibration mechanism proposed here

to be simpler with less associated uncertainty.

Finally, the EPA observes that the proposed recalibration mechanism is entirely consistent with the Agency's existing authority under 40 CFR 97.1006(c)(6) to "terminate or limit the use and duration" of any Group 3 allowance "to the extent the Administrator determines is necessary or appropriate to implement any provision of the Clean Air Act." The Administrator proposes to determine that the recalibrations are both necessary and appropriate to ensure that the control stringency selected in this rulemaking is maintained and states' good neighbor obligations with respect to the 2015 ozone NAAQS are addressed.

The EPA requests comment on the proposed bank recalibration provisions and the proposed use of a target bank amount computed as 10.5 percent times the sum of the state emissions budgets for each control period.

### 7. Unit-Specific Backstop Daily Emissions Rates

While the identified EGU emissions reductions in Section VI of this proposed rule are incentivized and secured primarily through the corresponding seasonal state emissions budgets (expressed as a seasonal tonnage limit for all covered EGUs within a state's borders) described earlier, the EPA is also incorporating backstop daily emissions rates of 0.14 lb/mmBtu for coal-fired steam units serving generators with nameplate capacity greater than or equal to 100 MW in covered states. The backstop emissions rates will first apply in 2024 for coal-fired steam units with existing SCR controls, and in 2027 for coal-fired steam units currently without SCR controls. For a unit that exceeds its applicable backstop daily emissions rate on any day, all emissions on that day exceeding the emissions that would have occurred at the backstop daily emissions rate will be subject to a 3-for-1 allowance surrender ratio instead of the normal 1-for-1 allowance surrender ratio. See Appendix A of the Ozone Transport Policy Proposed Rule TSD for a list of coal-fired steam units serving generators larger than or equal to 100 MW in covered states for which the identified backstop emissions rate would apply starting in either 2024 or 2027.

The EGU NO$_X$ Mitigation Strategies Proposed Rule TSD describes the methodology for deriving the 0.14 lb/mmBtu daily rate limit in more detail. The methodology is summarized as follows. First, consistent with

---

[268] See the Power Sector Variability Final Rule TSD from CSAPR, available at *https://www.epa.gov/csapr/power-sector-variability-final-rule-tsd for a description of the methodology.* Also see the Excel document "OS Heat Input—Variability 2000 to 2021.xls" for updated data, application of the CSAPR variability methodology, and results applied to heat input for 2000 through 2021 for all states and for the region collectively.

stakeholders' focus on providing daily assurance of control operation, EPA determined that daily (as opposed to hourly or monthly) was an appropriate time metric for backstop emissions rate limits instituted to ensure operation of controls on high ozone days. The EPA derived the 0.14 lb/mmBtu daily rate limit by determining the particular level of a daily rate that would be comparable in stringency to the 0.08 lb/mmBtu seasonal emissions rate that the Agency has identified as reflecting SCR optimization at existing units.[269] The EPA first conducted an empirical exercise using reported daily emissions rate data from existing, SCR-controlled coal units that were emitting at or below 0.08 lb/mmBtu on a seasonal average basis. Recognizing that this seasonal rate reflects the average across a unit's range of varying daily rates reflecting different operation conditions, including some occasions when the SCR control may not be operating or may not be fully optimized, the EPA identified the upper end of the daily emissions rate range for these units. When the EPA examined the daily emissions rate pattern for these units considered to be optimizing their SCRs on a seasonal basis, the EPA observed that over 95 percent of the time, their daily rates were below 0.14 lb/mmBtu. In addition, for these units, less than 1 percent of their seasonal emissions would exceed this daily rate limit.

The EPA conducted this analysis to be consistent with the methodology developed in the 2014 1-hr $SO_2$ attainment area guidance for identifying "comparably stringent" emissions rates over varying time-periods.[270] Appendix C of that guidance describes a series of steps that involve: (1) Compiling emissions data to reflect a distribution of emissions rates with various averaging times, (2) determining the 99th percentile of the average emissions values compiled in the previous step, and then (3) applying "adjustment factors" or ratios of the 99th percentile values to emissions rates to convert them (usually from a short-term rate to a longer-term rate). In this case, the EPA

applied the methodology in reverse to convert a longer-term limit (the seasonal rate of 0.08 lb/mmBtu which was assumed to be equal to a 30-day rate of 0.08 lb/mmBtu) to a comparably stringent short-term limit (a daily rate of 0.14 lb/mmBtu). The EPA requests comment on the proposed incorporation of a backstop daily emissions rate element into the Group 3 trading program and on the proposed methodology for determining the daily emissions rate of 0.14 lb/mmBtu.

In addition, the EPA requests comment on application of the backstop daily emissions rates in the event that an affected unit finds it more economic to retire shortly after the start of the 2027 ozone season in lieu of investing in new $NO_X$ post-combustion control technology. This proposed rule's state emissions budgets would require emissions reductions starting in 2026 commensurate with SCR retrofits at these units regardless of when these unit-level backstop rates are subsequently imposed. The EPA recognizes that such retrofits in practice may be less environmentally efficient compared to imminent retirement that would potentially yield lower cumulative emissions of $NO_X$ and multiple other pollutants over time. The EPA also recognizes that several coal-fired EGUs have been considering retirement by 2028 under compliance pathways available under Clean Water Act effluent guidelines [271] and the coal combustion residuals rule under the Resource Conservation and Recovery Act.[272] 2028 also represents the end of the second planning period under the Regional Haze program, and thus is a significant year in states' planning of strategies to make reasonable progress towards natural visibility at Class I areas.[273] To facilitate a potentially economic and environmentally superior unit-level compliance response across these programs that nonetheless maintains the $NO_X$ reductions required by the state budgets from 2026 forward in this proposed rule, the EPA is requesting comment on potentially deferring the application of the backstop daily rate for large coal EGUs that submit written attestation to the EPA that they make an enforceable commitment to retire by no later than the end of calendar year 2028. EPA anticipates that units failing to retire contrary to their attestation would become subject to the backstop emissions rate in the 2029 ozone season, and would likely be subject to other

appropriate enforcement proposed rule under the Clean Air Act or other relevant authorities.

**8. Unit-Specific Emissions Limitations Contingent on Assurance Level Exceedances**

As emphasized by the D.C. Circuit in its decision invalidating CAIR, under the CAA's good neighbor provision, emissions "within the State" that contribute significantly to nonattainment or interfere with maintenance of a NAAQS in another state must be prohibited. *North Carolina* v. *EPA,* 531 F.3d 896, 906–908 (D.C. Cir. 2008). The CAIR trading programs contained no provisions limiting the degree to which a state could rely on net purchased allowances as a substitute for making in-state emissions reductions, an omission which the court found was inconsistent with the requirements of the good neighbor provision. *Id.* In response to that holding, the EPA established the CSAPR trading programs' assurance provisions to ensure that, in the context of a flexible trading program, the emissions reductions required under the good neighbor provision in fact will take place within the state. The EPA believes the assurance provisions have generally been successful in achieving that objective, as evidenced by the fact that since the assurance provisions took effect in 2017, out of the nearly 300 instances where a given state's compliance with the assurance provisions of a given CSAPR trading program for a given control period has been assessed, a state's collective emissions have exceeded the applicable assurance level only four times.

Unfortunately, the EPA also recognizes that the assurance provisions' very good historical compliance record is not good enough. The four past exceedances all occurred under the Group 2 trading program: Sources in Mississippi collectively exceeded their applicable assurance levels in the 2019 and 2020 control periods, and sources in Missouri collectively exceeded their applicable assurance levels in the 2020 and 2021 control periods.[274] Both of the

---

[269] *See* page 24 of "Guidance for 1-hour $SO_2$ Nonattainment Area SIP Submission" at *https:// www.epa.gov/sites/default/files/2016-06/ documents/20140423guidance_nonattainment_ sip.pdf.* "A limit based on the 30-day average of emissions, for example, at a particular level is likely to be a less stringent limit than a 1-hour limit at the same level 1 since the control level needed to meet a 1-hour limit every hour is likely to be greater than the control level needed to achieve the same limit on a 30-day average basis."

[270] *See* Guidance for 1-Hour $SO_2$ Nonattainment Area SIP Submissions available at *https:// www.epa.gov/sites/default/files/2016-06/ documents/20140423guidance_nonattainment_ sip.pdf.*

[271] *See* 40 CFR 423.11(w).
[272] *See* 40 CFR 257.103(b).
[273] *See* 40 CFR 51.308(f).

[274] Information on the assurance level exceedances in the 2019 and 2020 control periods is available in the final notices concerning EPA's administration of the assurance provisions for those control periods. 85 FR 53364 (August 28, 2020); 86 FR 52674 (September 22, 2021). The EPA will publish an analogous final notice for the 2021 control period by October 1, 2022, and will also publish a preliminary notice by August 1, 2022. At this time, information on the relevant Missouri assurance level for the 2021 control period is available at 40 CFR 97.806(c)(2) and 97.810 and preliminary data on Missouri units' emissions of

exceedances by Missouri sources could easily have been avoided if the owner and operator of several SCR-equipped, coal-fired steam units had not chosen to idle the units' controls and rely instead on net out-of-state purchased allowances. The exceedances were large, and ample quantities of allowances to cover the resulting 3-for-1 allowance surrender requirements were purchased in advance, suggesting that the assurance level exceedances may have been anticipated as a possibility. In the case of the Mississippi exceedances, the exceedances were smaller, operational variability (manifesting as increased heat input) appears to have been a material contributing factor, and the EPA has not concluded that the owners and operators anticipated the exceedances. However, an additional contributing factor was the fact that several large, gas-fired steam units without SCR controls emitted NO$_X$ at average rates much higher than the average emissions rates the same units had achieved in previous control periods. In short, while the Missouri exceedances appear far more significant, EPA's analysis indicates that all four past exceedances could have been avoided if the units most responsible had achieved emissions rates more comparable to the same units' previous performance. In EPA's view, the operation of the Missouri units in particular—although not prohibited by the current regulatory requirements—cannot be reconciled with the statutory requirements of the good neighbor provision. The fact that such operation is not prohibited by the current regulations therefore indicates a deficiency in the current regulatory requirements.

To correct the deficiency in the regulatory requirements, the EPA proposes in this rulemaking to revise the Group 3 trading program regulations to establish an additional emissions limitation to more effectively deter avoidable assurance level exceedances. Because the pollutant involved is ozone season NO$_X$ and the particular sources for which deterrence is most needed are located in states that are proposed to transition soon from the Group 2 trading program to the Group 3 trading program, the EPA is proposing to promulgate the strengthening provisions as revisions to the Group 3 trading program regulations rather than the Group 2 trading program regulations.[275]

---

NO$_X$ during the 2021 ozone season are available at *ampd.epa.gov*.

[275] The EPA believes that the occurrence of avoidable assurance level exceedances under the

The two current emissions-related compliance requirements in the Group 3 trading program regulations are both structured in the form of requirements to hold allowances. The first requirement applies at the source level: Specifically, at the compliance deadline after each control period, the owners and operators of each source covered by the program must surrender a quantity of allowances that is determined based on the emissions from the units at the source during the control period. The second requirement applies at the designated representative level (which typically is the owner or operator level): If the state's sources collectively emit in excess of the state's assurance level, the owners and operators of each set of sources determined to have contributed to the exceedance must surrender an additional quantity of allowances. As long as a source's owners and operators comply with these two allowance surrender requirements (and meet certain other requirements not related to the amounts of the sources' emissions), they are in compliance with the program.

In light of the operation of the Missouri sources, the EPA is doubtful that strengthening the assurance provisions by increasing allowance surrender requirements at the unit, source, or designated representative level would create a sufficient deterrent. Accordingly, the EPA is proposing instead to add a new, unit-level emissions limitation structured as a prohibition to emit NO$_X$ in excess of a defined amount. A violation of the prohibition would not trigger additional allowance surrender requirements beyond the surrender requirements that would otherwise apply, but would trigger the possible application of the CAA's enforcement authorities. Because the purpose of the new unit-level emissions limitation would be to deter conduct causing exceedances of a state's assurance level, the EPA proposes to

---

Group 2 trading program, combined with the express statutory directive that good neighbor obligations must be addressed "within the state," and through "prohibition," would also provide a sufficient legal basis for the Agency to promulgate the same revisions to the assurance provisions for all the other CSAPR trading programs. The EPA is not proposing to do so at this time because the Agency has seen no reason to expect exceedances of the assurance levels under any of the other CSAPR trading programs by any of the states that will remain subject to the respective trading programs after this rulemaking, except possibly by Missouri under the CSAPR NO$_X$ Annual Trading Program. The EPA expects that reductions in Missouri's seasonal NO$_X$ emissions sufficient to comply with the proposed provisions of the revised Group 3 trading program, including the secondary emissions limitations, would also prevent exceedances of Missouri's currently applicable assurance level for annual NO$_X$ emissions.

condition applicability of the new limitation on (1) the occurrence of an exceedance of the state's assurance level for the control period, and (2) the apportionment of at least some of the responsibility for the assurance level exceedance to the set of units represented by the unit's designated representative. Apportionment of responsibility for the assurance level exceedance would be carried out according to the existing assurance provision procedures and would therefore depend on the designated representative's shares of both the state's total emissions for the control period and the state's assurance level for the control period. The new emissions limitation would be in addition to, not in lieu of, the other requirements of the Group 3 trading program. This point would be made explicit by relabeling the source-level allowance holding requirement, currently called the "emissions limitation," as the "primary emissions limitation" and labeling the new unit-level requirement as the "secondary emissions limitation." (The regulations label the designated representative-level requirement as "compliance with the . . . assurance provisions.")

The EPA proposes to define the unit-level secondary emissions limitation by formula to reflect the amount of additional NO$_X$ emissions caused by the unit's deviation from a benchmark seasonal average NO$_X$ emissions rate during the control period, where the benchmark seasonal average NO$_X$ emissions rate for the unit would be based on emissions rates the unit has achieved in the past plus a 25 percent margin. The EPA also proposes to use a floor for past performance of 0.08 lb/mmBtu (yielding 0.10 lb/mmBtu when the 25 percent margin is added), exclude control periods where the unit operated in less than 10 percent of the hours (in order to avoid data that might be unrepresentative), and screen out instances where the amount of additional emissions caused by the poor performance is less than 50 tons. Specifically:

• The EPA proposes to define a unit's secondary emissions limitation for a control period, in tons of NO$_X$, as the sum of 50 tons plus the product of (1) the unit's benchmark seasonal average emissions rate times (2) the unit's actual heat input for the control period, except that if the unit operated during less than 10 percent of the hours in the control period, no secondary emissions limitation would be defined for the unit for that control period.

• The EPA proposes to calculate the benchmark seasonal average NO$_X$

emissions rate for a unit for this purpose, in lb $NO_X$/mmBtu, as the higher of (1) 0.10 lb/mmBtu or (2) 125 percent of the unit's lowest seasonal average $NO_X$ emissions rate in a previous control period under the CSAPR $NO_X$ Ozone Season Group 1, Group 2, or Group 3 Trading Program, excluding any control periods where the unit operated for less than 10 percent of the hours in the ozone season.[276]

Table VII.B.8–1 shows the secondary emissions limitations that the proposed formula would have produced and which units would have exceeded those limitations if the limitations and formula had been in effect for the Group 2 trading program in 2019, 2020, and 2021 when assurance level exceedances occurred in Mississippi and Missouri. The EPA believes that in each case the formula functions in a reasonable manner, and the units identified as exceeding their respective secondary emissions limitations are sources for which an enforcement deterrent under CAA sections 113 and 304 would have been appropriate to compel better control of $NO_X$ emissions.

TABLE VII.B.8–1—ILLUSTRATIVE RESULTS OF APPLYING PROPOSED SECONDARY EMISSIONS LIMITATION IN PREVIOUS INSTANCES OF ASSURANCE LEVEL EXCEEDANCES

| Owner/operator | Unit | Benchmark $NO_X$ emissions rate (lb/mmBtu) | Actual $NO_X$ emissions rate (lb/mmBtu) | Secondary emissions limitation (tons) | Actual $NO_X$ emissions (tons) | Exceedance (tons) |
|---|---|---|---|---|---|---|
| *Mississippi—2019* | | | | | | |
| Miss. Power ............ | Watson 4 ...................... | 0.137 | 0.176 | 458 | 524 | 66 |
| Miss. Power ............ | Watson 5 ...................... | 0.215 | 0.349 | 1,247 | 1,943 | 696 |
| *Mississippi—2020* | | | | | | |
| Entergy Miss. .......... | Andrus 1 ...................... | 0.224 | 0.289 | 1,219 | 1,508 | 289 |
| Miss. Power ............ | Watson 5 ...................... | 0.215 | 0.286 | 1,086 | 1,381 | 295 |
| *Missouri—2020* | | | | | | |
| Assoc. Elec. Coop. | New Madrid 1 ................ | 0.135 | 0.670 | 961 | 4,524 | 3,563 |
| Assoc. Elec. Coop. | New Madrid 2 ................ | 0.131 | 0.497 | 866 | 3,108 | 2,242 |
| Assoc. Elec. Coop. | Thomas Hill 1 ............... | 0.123 | 0.526 | 374 | 1,384 | 1,010 |
| Assoc. Elec. Coop. | Thomas Hill 2 ............... | 0.122 | 0.537 | 548 | 2,187 | 1,639 |
| Assoc. Elec. Coop. | Thomas Hill 3 ............... | 0.104 | 0.195 | 780 | 1,374 | 594 |
| *Missouri—2021* | | | | | | |
| Assoc. Elec. Coop. | New Madrid 1 ................ | 0.135 | 0.652 | 353 | 1,466 | 1,113 |
| Assoc. Elec. Coop. | New Madrid 2 ................ | 0.131 | 0.611 | 1,054 | 4,700 | 3,646 |
| Assoc. Elec. Coop. | Thomas Hill 1 ............... | 0.123 | 0.146 | 421 | 440 | 19 |
| Assoc. Elec. Coop. | Thomas Hill 2 ............... | 0.122 | 0.400 | 600 | 1,801 | 1,201 |

For further illustrations of the application of the proposed formula and secondary emissions limitation to other units in the states proposed to be subject to the expanded Group 3 trading program in the control periods from 2016 through 2021, see the spreadsheet "Illustrative Calculations Using Proposed Secondary Emissions Limitation Formula", available in the docket. The EPA notes that, with the exception of the units listed in Table VII.B.8–1, no unit shown in the spreadsheet as having emissions exceeding the illustrative secondary emissions limitation calculated for the unit would have violated the proposed prohibition because no violation would occur in the absence of an exceedance of the assurance level and apportionment of responsibility for a share of the exceedance to the unit under the assurance provisions.

The EPA requests comment on the proposal to establish a secondary emissions limitation for the Group 3 trading program as described in this section. The EPA specifically requests comment on the proposed form of the secondary emissions limitation, the proposed formula for computing each unit's secondary emissions limitation, and the proposed values for the screening parameters used in the calculations.

9. Unit-Level Allowance Allocation and Recordation Procedures

In the Revised CSAPR Update, the EPA established default procedures for allocating CSAPR $NO_X$ Ozone Season Group 3 allowances ("Group 3 allowances") in amounts equal to each state emissions budget for each control period among the sources in the state for use in complying with the Group 3 trading program. The EPA also provided states with several options to submit SIP revisions which, if approved, would result in the replacement of EPA's allowance allocations with state-determined allowance allocations for the 2022 control period and beyond. The current regulations (i.e., before this proposed rule) provide that EPA's allocations and allocation procedures apply for the 2021 control period and, by default, for subsequent control periods unless and until a state provides state-determined allowance allocations under an approved SIP revision.

The current default allocation process for the Group 3 trading program established in the Revised CSAPR Update involves three main steps. First, a portion of each state emissions budget for each control period is reserved for potential allocation to units that are subject to allowance holding requirements and that would not otherwise receive allowance allocations in the overall allocation process. Under the current Group 3 trading programs, the reserved allowances are made available generally (but not exclusively[277]) to "new" units—which for purposes of the Revised CSAPR Update means units commencing commercial operation on or after January 1, 2019—through a "new unit set-aside" established for qualifying units in each state and, if areas of Indian country exist within the state's borders, a separate "Indian country new unit set-

---

[276] In proposing a formulation for a benchmark rate for the specific regulatory purpose of defining a secondary emissions limitation under the Group 3 trading program, the EPA is not expressing a view that the same formulation of a benchmark rate would be suitable for any other regulatory purpose.

[277] The units qualifying for allocations from a new unit set-aside may include not only units that have recently started operating but also units that previously received, but are no longer eligible to receive, allocations from the unreserved portion of the budget as "existing" units.

aside" for qualifying units in such Indian country. Second, in advance of each control period, the unreserved portion of the state budget is allocated among the state's eligible "existing" units—which for purposes of the Revised CSAPR Update generally means units that commenced commercial operation before January 1, 2019—and the allocations are recorded in the respective sources' compliance accounts. Finally, after the control period but before the compliance deadline by which sources must hold allowances to cover their emissions for the control period, allowances from the reserved portions of the budget are allocated to qualifying units, any remaining reserved allowances not allocated to qualifying units are allocated among the state's existing units, and the allocations are recorded in the respective sources' compliance accounts.

In this rulemaking, the EPA would retain the overall three-step allocation process summarized above but is proposing revisions to each step to better address units in Indian country and to better coordinate the unit-level allocation process with the proposed dynamic budget-setting process discussed in Section VII.B.4 of this proposed rule. Like the allocation process established in CSAPR, the CSAPR Update, and the Revised CSAPR Update, the revised process proposed in this rulemaking would be designed to provide default allowance allocations to all units that are subject to allowance holding requirements, including, for the first time under any CSAPR trading program, an existing EGU in Indian country not covered by a state's CAA implementation planning authority. The proposed revisions to the three steps are discussed in Sections VII.B.4.a, VII.B.4.b, and VII.B.4.c of this proposed rule, respectively.

Echoing the approach to unit-level allocations followed in CSAPR, the CSAPR Update, and the Revised CSAPR Update, in this rulemaking, EPA is again proposing to provide states with several options to submit SIP revisions which, if approved, would result in the replacement of EPA's default allocations with state-determined allocations for subsequent control periods. Specifically, the proposed regulations would provide that EPA's allocations and allocation procedures will apply for the 2023 control period and, by default, for subsequent control periods unless and until a state provides state-determined allocations under an approved SIP revision. The options to submit SIP revisions that would accomplish this purpose are discussed

in Section VII.D of this document. Similarly, for a covered area of Indian country not subject to a state's CAA implementation planning authority, a tribe could elect to work with the EPA under the Tribal Authority Rule to develop a full or partial tribal implementation plan under which the tribe would determine allowance allocations that would replace EPA's default allocations for subsequent control periods.

a. Set-Asides of Portions of State Emissions Budgets for New Units

As the first step in the default allocation process that the EPA has applied under CSAPR, the CSAPR Update, and the Revised CSAPR Update for any control period where a state does not employ an alternative allocation process pursuant to an approved SIP revision, EPA has reserved a portion of the state's emissions budget for potential allocation to units that are subject to allowance holding requirements and that would not otherwise receive allowance allocations in the overall allocation process. Consistent with the budget-setting approach in those rulemakings, where the state emissions budgets for all future control periods were determined in the initial rulemakings, the amounts of the reserved portions of the budgets were also determined in the initial rulemakings.[278]

The units for which portions of the budgets were reserved in set-asides have fallen into two main categories: First, units for which the data needed to determine allowance allocations does not exist at the time when the allocations for other units were being determined—*i.e.*, "new" units [279]—and second, units that would be left out if a state chooses to replace EPA's default allocations with state-determined allocations—*i.e.*, any units in Indian country not covered by a state's CAA implementation planning authority. Because there were no existing units in what the EPA understood to be Indian country for purposes of CSAPR, the CSAPR Update, and the Revised CSAPR Update, potential units in Indian country were considered to be a

subcategory of "new" units, and the two types of set-asides that have been created are "new unit set-asides" and "Indian country new unit set-asides." The principal difference between these two types of set-asides under the regulations for all of the CSAPR trading programs has been that a state can take over administration of the allowances allocated to a new unit set-aside from the EPA through an approved SIP revision but cannot take over administration of the allowances allocated to an Indian country new unit set-aside.

In this rulemaking, the EPA is proposing several revisions affecting the establishment of set-asides. The first proposed revision, which is largely unrelated to the other aspects of this rulemaking, would update the regulations for the Group 3 trading program [280] to reflect the D.C. Circuit's holding in *ODEQ* v. *EPA* that the relevant states have initial CAA implementation planning authority in non-reservation areas of Indian country until displaced by a demonstration of tribal jurisdiction over such an area.[281] Consistent with this holding, EPA is proposing to revise language in the Group 3 trading program regulations that, for purposes of allocating allowances from a given state's emissions budget, currently distinguishes between (1) the set of units within the state's borders that are not in Indian country and (2) the set of units within the state's borders that are in Indian country. As revised, the provisions would distinguish between (1) the set of units within the state's borders that are not in Indian country or are in areas of Indian country covered by the state's CAA implementation planning authority and (2) the set of units within the state's borders that are in areas of Indian country not covered by the state's CAA implementation planning authority. The revised language would more accurately distinguish which units are, or are not, covered by a state's CAA implementation planning authority, which is the underlying purpose for which the term "Indian country" is currently used in the allowance allocation provisions. The effect of the proposed revision would be that any

---

[278] Under the current regulations for each of the CSAPR trading programs, when a unit that has received allocations as an "existing" unit ceases operation, after a specified number of control periods the unit loses the allocations, which are then allocated to the state's new unit set-asides for subsequent control periods.

[279] A unit that has received allocations as an "existing" unit, then loses its allocations because of non-operation, and then later resumes operation is treated as a type of "new" unit for allocation purposes.

[280] As further discussed in Section VII.B.12 of this proposed rule, the EPA is also proposing to make this revision to the regulations for the other CSAPR trading programs in addition to the Group 3 trading program.

[281] For additional discussion of the *ODEQ* v. *EPA* decision and other issues related to the CAA implementation planning authority of states, tribes, and the EPA in various areas of Indian country, *see* Section IV.C.2 of this proposed rule.

units located in areas of "Indian country" as defined in 18 U.S.C. 1151 that are covered by a state's CAA implementation planning authority would be treated for allowance allocation purposes in the same manner as units in areas of the state that are not Indian country, consistent with the *ODEQ* holding.[282]

The remaining proposed revisions, which are interrelated, concern the types of set-asides that in the context of this proposal will best accomplish the goal of ensuring the availability of allocations to units that are subject to allowance holding requirements and that would not otherwise receive allowance allocations. One proposed revision to the types of set-asides addresses allocations to existing units in Indian country. The revised geographic scope of the Group 3 trading program under this proposal would for the first time include an existing EGU in Indian country not covered by a state's CAA implementation planning authority—the Bonanza coal-fired unit in the Uintah and Ouray Reservation within Utah's borders. In order to provide an option for Utah (or a similarly situated state in the future) to replace EPA's default allowance allocations to most existing units with state-determined allocations through a SIP revision while continuing to ensure the availability of a default allocation to the Bonanza unit (or similarly situated units in the future), the EPA would propose to revise the Group 3 trading program regulations to provide for "Indian country existing unit set-asides." Specifically, for each state and for each control period where the inventory of units used to compute the state's emissions budget includes one or more existing units[283] in an area of Indian country not covered by the state's CAA implementation planning authority, the EPA would reserve a portion of the state's emissions budget in an Indian country existing unit set-aside for the unit or units. The amount

of each Indian country existing unit set-aside would equal the sum of the default allocations that the units covered by the set-aside would receive if the allocations to all existing units within the state's borders were computed according to EPA's default allocation procedure (which is discussed in Section VII.B.9.b of this proposed rule). Immediately after determining the amount of a state's emissions budget for a control period (and after reserving a portion for potential allocation to new units, as discussed below), the EPA would first determine the default allocations for all existing units within the state's borders, then allocate the appropriate quantity of allowances to the Indian country existing unit set-aside, then allocate the allowances from the set-aside to the covered units in Indian country, and finally record the allocations in the sources' compliance accounts at the same time as the allocations to other sources not in Indian country. The existence of the Indian country existing unit set-aside thus would have no substantive effect unless and until the relevant state chose to replace EPA's default allowance allocations through a SIP revision, in which case the state would have the ability to establish state-determined allocations for the units subject to the state's CAA implementation planning authority while the EPA would continue to administer the Indian country existing unit set-aside for the units in Indian country not covered by the state's CAA implementation planning authority.[284] The EPA believes the proposal to establish Indian country existing unit set-asides would accomplish the objective of allowing states to control allowance allocations to units covered by their CAA implementation planning authority while providing equitable allocations to units in Indian country not covered by such authority.

The remaining revisions to the types of set-asides address the set-asides used to ensure availability of allowance allocations to *new* units in light of the division of the budget for *existing* units into a reserved portion for existing units in Indian country and an unreserved portion for other existing units. Under the current Group 3 trading program regulations, allowances for new units are provided from separate new unit set-

asides and Indian country new unit set-asides. The EPA proposes to combine these two types of set-asides starting with the 2023 control period by eliminating the Indian country new unit set-asides and expanding eligibility for allocations from the new unit set-asides to include units anywhere within the relevant states' borders. However, as with the Indian country new unit set-asides under the current regulations, the EPA would continue to administer the new unit set-asides in the event a state chose to replace EPA's default allocations to existing units with state-determined allocations, thereby ensuring the availability of allocations to any new units not covered by a state's CAA implementation planning authority.

The reason for the proposed revisions to the new unit set-asides and Indian country new unit set-asides is to avoid unnecessary and potentially inequitable changes to the degree to which individual existing units contribute to, or benefit from, the new unit set-asides. Under the current regulations, the allowances used to establish these set-asides are reserved from each state emissions budget before determination of the allocations from the unreserved portion of the budget to existing units, so that certain existing units—generally those receiving the largest allocations—contribute to creation of the set-asides through roughly proportional reductions in their allocations. Later, if any allowances in a set-aside are not allocated to qualifying new units, the remaining allowances are reallocated to the existing units in proportion to their initial allocations from the unreserved portion of the budget, so that certain existing units—again, generally those receiving the largest allocations—benefit from the reallocations in rough proportion to their previous contributions.[285] The EPA believes maintaining this symmetry, where the same existing units—whether in Indian country or not—both contribute to and potentially benefit from the set-asides, is a reasonable policy objective, and doing so requires that the EPA continue to administer the new unit set-asides in the event a state chooses to replace EPA's default allocations to existing units with state-determined allocations, because otherwise the EPA would be unable to ensure that the units in Indian country would receive an appropriate

---

[282] The EPA notes that the units that would be treated for allocation purposes in the same manner as units not in Indian country would include units in any areas of Indian country subject to a state's CAA implementation planning authority, whether those are non-reservation areas (consistent with those are non-reservation areas (consistent with *ODEQ*) or reservation areas (such as areas of Indian country within Oklahoma's borders covered by the EPA's October 1, 2020 approval of Oklahoma's request under SAFETEA, as discussed in Section IV.C.2 of this proposed rule).

[283] In coordination with the dynamic budgeting process discussed in Section VII.B.4 of this proposed rule, each unit included in the unit inventory used to determine a state's emissions budget for a given control period in 2025 or a later year would be considered an "existing" unit for that control period for purposes of the determination of unit-level allowance allocations. In other words, there would no longer be a single fixed date that would divide "existing" from "new" units.

[284] As noted in Section VII.D, of this proposed rule a tribe could elect to work with EPA under the Tribal Authority Rule to develop a full or partial tribal implementation plan under which the tribe would determine allowance allocations for units in the relevant area of Indian country that would replace EPA's default allocations for subsequent control periods.

[285] Allowances from an Indian country new unit set-aside that are not allocated to qualifying new units are first transferred to the state's new unit set-aside, and if the allowances are still not allocated to qualifying new units, the allowances are then reallocated to the state's existing units.

share of any reallocated allowances.[286] Since the principal difference between the new unit set-asides and the Indian country new unit set-asides under the current regulations is that the EPA continues to administer the Indian country new unit set-asides in the event a state chooses to replace EPA's default allocations with state-determined allocations, if under the revised regulations the EPA would need to continue to administer the new unit set-asides, then there would no longer be any reason to establish separate Indian country new unit set-asides.

With respect to the total amounts of allowances that would be set aside for potential allocation to new units from the emissions budgets for each state, for the control periods in 2023 and 2024 (but not for subsequent control periods,

as discussed below), EPA proposes to establish total set-aside amounts equal to the projected amounts of emissions from any planned units in the state for the control period, plus an additional 2% of the state emissions budget to address any unknown new units. For example, if planned units in a state are projected to emit 3% of the state's NOₓ ozone season emissions budget, then the new unit set-aside for the state would be set at 5 percent, which is the sum of the minimum 2% set-aside plus an additional 3 percent for planned units. This is the same approach previously used to establish the amounts of new unit set-asides in CSAPR, the CSAPR Update, and the Revised CSAPR Update for all the CSAPR trading programs. *See, e.g.,* 76 FR 48292 (August 8, 2011). As under the Revised CSAPR Update, EPA

proposes to make an exception for New York for the 2023 and 2024 control periods, establishing a total new unit set-aside amount for each control period of 5 percent of the state's emissions budget, with no additional consideration for planned units, because this approach is consistent with New York's preferences as reflected in an approved SIP addressing allowance allocations for the Group 2 trading program. Because the amounts of the state emissions budgets for the 2023 and 2024 control periods would be determined in the rulemaking, the amounts of the new unit set-asides for these control periods would also be determined in the rulemaking. The proposed amounts are shown in Tables VII.B.9.a-1 and VII.B.9.a-2 of this proposed rule.

TABLE VII.B.9.a–1—PROPOSED CSAPR NOₓ OZONE SEASON GROUP 3 NEW UNIT SET-ASIDE (NUSA) AMOUNTS FOR THE 2023 CONTROL PERIOD [a]

| State | Emissions budgets (tons) | New unit set-aside amount (percent) | New unit set-aside amount (tons) |
|---|---|---|---|
| Alabama | 6,364 | 3 | 191 |
| Arkansas | 8,889 | 2 | 178 |
| Delaware | 384 | 14 | 54 |
| Illinois | 7,364 | 5 | 368 |
| Indiana | 11,151 | 2 | 223 |
| Kentucky | 11,640 | 2 | 233 |
| Louisiana | 9,312 | 2 | 186 |
| Maryland | 1,187 | 2 | 24 |
| Michigan | 10,718 | 4 | 429 |
| Minnesota | 3,921 | 2 | 78 |
| Mississippi | 5,024 | 2 | 100 |
| Missouri | 11,857 | 2 | 237 |
| Nevada | 2,280 | 6 | 137 |
| New Jersey | 799 | 2 | 16 |
| New York | 3,763 | 5 | 188 |
| Ohio | 8,369 | 5 | 418 |
| Oklahoma | 10,265 | 2 | 205 |
| Pennsylvania | 8,855 | 3 | 266 |
| Tennessee | 4,234 | 2 | 85 |
| Texas | 38,284 | 2 | 766 |
| Utah | 14,981 | 3 | 449 |
| Virginia | 3,090 | 5 | 155 |
| West Virginia | 12,478 | 2 | 250 |
| Wisconsin | 5,963 | 2 | 119 |
| Wyoming | 9,125 | 3 | 274 |

Table Notes:

[a] In the event a final rule in this rulemaking becomes effective after May 1, 2023, the emissions budgets for the 2023 control period would be adjusted under the rule's proposed transitional provisions to ensure the new budgets would apply only after the rule's effective date, even though the revised Group 3 trading program would be implemented for most sources as of the start of the 2023 ozone season on May 1, 2023. The 2023 budget amounts shown in Table VII.B.9.a–1 do not reflect these possible adjustments. The transitional provisions are discussed in Section VII.B.11 of this proposed rule.

---

[286] If units in Indian country were unable to share in the benefits of reallocation of allowances from the new unit set-asides, it would be possible to achieve a different form of symmetry by simultaneously exempting the units in Indian country from the obligation to share in the contribution of allowances to the new unit set-asides. However, some stakeholders might view this alternative as potentially inequitable because existing units in Indian country would then make no contributions toward the new unit set-aside while other existing units would still be required to do so.

TABLE VII.B.9.a–2—PROPOSED CSAPR NOₓ OZONE SEASON GROUP 3 NEW UNIT SET-ASIDE (NUSA) AMOUNTS FOR THE 2024 CONTROL PERIOD

| State | Emissions budgets (tons) | New unit set-aside amount (percent) | New unit set-aside amount (tons) |
|---|---|---|---|
| Alabama | 6,306 | 3 | 189 |
| Arkansas | 8,889 | 2 | 178 |
| Delaware | 434 | 14 | 61 |
| Illinois | 7,463 | 5 | 373 |
| Indiana | 9,391 | 2 | 188 |
| Kentucky | 11,640 | 2 | 233 |
| Louisiana | 9,312 | 2 | 186 |
| Maryland | 1,187 | 2 | 24 |
| Michigan | 10,718 | 4 | 429 |
| Minnesota | 3,921 | 2 | 78 |
| Mississippi | 4,400 | 2 | 88 |
| Missouri | 11,857 | 2 | 237 |
| Nevada | 2,372 | 6 | 142 |
| New Jersey | 799 | 2 | 16 |
| New York | 3,763 | 5 | 188 |
| Ohio | 8,369 | 5 | 418 |
| Oklahoma | 9,573 | 2 | 191 |
| Pennsylvania | 8,855 | 3 | 266 |
| Tennessee | 4,234 | 2 | 85 |
| Texas | 38,284 | 2 | 766 |
| Utah | 15,146 | 3 | 454 |
| Virginia | 2,814 | 5 | 141 |
| West Virginia | 12,478 | 2 | 250 |
| Wisconsin | 5,057 | 2 | 101 |
| Wyoming | 8,573 | 3 | 257 |

For control periods in 2025 and later years, the EPA proposes to allocate a total of 2% of each state emissions budget to a new unit set-aside, with no additional amount for planned new units. The amounts of the set-asides for each state and control period would be computed when the emissions budgets for the control period are established, by May 1 of the year before the year of the control period. The procedure for determining the amounts of the set-asides based on the amounts of the state emissions budgets would be codified in the Group 3 trading program regulations and would reflect the same percentage of the emissions budget for all states.

The purpose of the proposed change to the procedure for establishing the amounts of the set-asides is to coordinate with the dynamic budget-setting process that would also become effective as of the 2025 control period. As discussed in Section VII.B.4 of this proposed rule, under the dynamic budget-setting process, each state's budget for each control period would be computed using fleet composition information and the total ozone season heat input reported by all affected units in the state for the latest control period before the budget-setting computations, which would be 2 years before the control period for which the budgets are being determined. (For example, 2025 emissions budgets would be based on

2023 fleet composition and heat input data.) Moreover, as discussed in Section VII.B.9.b of this proposed rule, all units whose heat input was used in the budget computations for a given control period would be eligible to receive allocations as "existing" units in that control period. Consequently, by the 2025 control period, all or almost all units that commence commercial operation before issuance of a final rule in this rulemaking would be considered "existing" units for purposes of budget-setting and allocations, and units commencing commercial operation after issuance of a final rule generally would be considered "existing" units for all but their first two full control periods of operation (and possibly a preceding partial control period). Given that new units would not be relying on the new unit set-asides as a permanent source of allowances, as is the case for "new" units under the other CSAPR trading programs, the EPA believes smaller set-asides would be sufficient.

The EPA requests comment on the proposals to establish Indian country existing unit set-asides, eliminate Indian country new unit set-asides, and expand eligibility for allocations from new unit set-asides to include units in Indian country for control periods in 2023 and later years. In the alternative, the EPA requests comment on establishing emissions budgets (and assurance levels

and new unit set-asides) for the Uintah and Ouray Reservation separate from the emissions budgets (and assurance levels, new unit set-asides, and Indian country new unit set-asides) established for the remaining lands within Utah's borders, and otherwise retaining the structure of prior CSAPR trading programs' approach to allocations to new units in Indian country (i.e., keeping the Indian country new unit set-asides, and not expanding eligibility for allocations from the new unit set-asides). The EPA also requests comment on the proposed new unit set-aside amounts for the 2023 and 2024 control periods, the proposed procedure for establishing the new unit set-aside amounts for the control periods in 2025 and later years, and the proposed procedure for establishing the Indian country existing unit set-aside amounts for the control periods in 2023 and later years.

b. Allocations to Existing Units, Including Units That Cease Operation

In conjunction with the new and revised state emissions budgets for the Group 3 trading program proposed in this rulemaking, the EPA is necessarily proposing new unit-level allocations of Group 3 allowances to existing units.[287]

---

[287] The proposed revisions to the procedures for computing unit-level allowance allocations in this rulemaking apply only to the Group 3 trading

The procedure that the EPA proposes to employ to compute the unit-level allocations is very similar but not identical to the procedure used to compute unit-level allocations for units subject to the Group 3 trading program in the Revised CSAPR Update. The steps of the proposed procedure for determining allocations from each state emissions budget for each control period, are described in detail in the Unit-Level Allowance Allocations Proposed Rule TSD. The steps are summarized later, with changes from the procedure followed in the Revised CSAPR Update noted.

In the first step, the EPA would identify the list of units eligible to receive allocations for the control period, which would be the same set of units whose heat input was used in computing the state's emissions budget for the control period (except any units that are included in the budgets as "new" units, which would receive allocations from the new unit set-asides instead). The unit inventories used to compute emissions budgets for the 2023 and 2024 control periods would be determined in the rulemaking in the same manner as in the Revised CSAPR Update. The unit inventories used to compute emissions budgets and unit-level allocations for control periods in 2025 and later years would be determined in the year before the control period in question based on the latest reported emissions and operational data, which is an extension of the methodology used in the Revised CSAPR Update to reflect more recent data (for example, the unit inventories used to compute 2025 budgets and allocations would reflect reported data for the 2023 control period). The procedures for updating the unit inventories for 2023 and 2024 and for 2025 and beyond are discussed in Section VII.B.4 of this proposed rule, and the criteria that the EPA has applied to determine whether a unit's scheduled retirement is sufficiently certain to serve as a basis for adjusting emissions budgets and unit-level allocations are discussed in Section VI.B and in the Ozone Transport Policy Analysis Proposed Rule TSD. With regard to the use of the inventories from the budget-setting procedure in setting unit-level allocations, in the Revised CSAPR Update, the inventories used to establish the budgets were generally also used to compute unit-level

allocations, except that units that commenced construction after January 1, 2019, were not treated as eligible to receive allocations as existing units and instead received allocations from the new unit set-asides. Under this rulemaking, any unit whose heat input is used to set a state's emissions budget for a given control period would also be eligible to receive allocations as an existing unit for that control period.

The EPA notes that this proposal to base the list of eligible units on the list of units that reported heat input in the control period 2 years earlier than the control period for which allocations are being determined would represent a revision to the current regulations concerning the treatment of allocations to retired units. Under the current regulations, units that cease operations for 2 consecutive control periods continue to receive allocations as existing units for 3 additional years (that is, a total of 5 years) before the allowances they would otherwise have received are reallocated to the new unit set-aside for the state. Under the proposal in this rulemaking, units that cease operation would receive allocations for only two full control periods of non-operation. While the EPA has in prior transport rulemakings noted a qualitative concern that ceasing allowance allocations prematurely could distort the economic incentives of EGUs to continue operating when retirement is more economical, the EPA believes current market conditions are such that a continuation of allowance allocations to retiring units likely has no more than a de minimis effect on the consideration of an EGU whether to retire or not.

In the second step of the procedure for determining allocations to existing units, the EPA would compile a database containing for each eligible unit the unit's historical heat input and total $NO_X$ emissions data for the five most recent ozone seasons. For each unit, the EPA would compute an average heat input value based on the three highest non-zero heat input values over the 5-year period, or as the average of all the non-zero values in the period if there are fewer than three non-zero values. For each unit, the EPA would also determine the maximum total $NO_X$ emissions value over the 5-year period. These procedures are nearly identical to the procedures used in the Revised CSAPR Update, with two exceptions. First, instead of using only the data available at the time of the rulemaking, for each control period the EPA would use data from the most recent five control periods for which data had been reported. (For example, for the 2025

control period, the EPA would use data for the 2019–2023 control periods.) Second, to simplify the data compilation process, the EPA would use only a five-year period for $NO_X$ mass emissions, in contrast to the 8-year period used in the Revised CSAPR Update for $NO_X$ mass emissions.

In the third step of the procedure for determining allocations to existing units in each state, the EPA would allocate the available allowances for that state among the state's eligible units in proportion to the share each unit's average heat input value represents of the total of the average heat input values for all the state's eligible units, but not more than the unit's maximum total $NO_X$ value. If the allocations to one or more units are curtailed because of the units' maximum total $NO_X$ values, the EPA would iterate the calculation procedure as needed to allocate the remaining allowances, excluding from each successive iteration any units whose allocations have already reached their maximum total $NO_X$ values. This calculation procedure is identical to the calculation procedure used in the Revised CSAPR Update (as well as the CSAPR Update and CSAPR).

The unit-level allocations for the 2023 and the 2024 control periods would be determined in the rulemaking based on the emissions budgets for those control periods also determined in the rulemaking and would be recorded 30 days after the effective date of the final rule (in order to provide time to execute the proposed recall of 2023 and 2024 Group 2 allowances, as discussed in Section VII.B.11.c of this proposed rule). This proposed recordation schedule represents a revision to the recordation schedule currently in the Group 3 trading program regulations which calls for allocations of 2023 and 2024 Group 3 allowances to existing units to be recorded on July 1, 2022. The EPA notes that for the three states with approved SIP revisions establishing their own methodologies for allocating Group 2 allowances—Alabama, Indiana, and New York—EPA proposes to follow those methodologies to the extent possible in developing the allocations of Group 3 allowances for the 2023 and 2024 control periods. For the amounts of the proposed allocations to existing units for the 2023 and 2024 control periods, see the "Unit-Level Allowance Allocations Proposed Rule TSD" in the docket.

The unit-level allocations for each control period in 2025 or a later year would be computed immediately following the determination of the emissions budgets for the control period. The EPA would perform the

program. In this rulemaking, the EPA is not proposing changes to or reopening the methodology for computing the amounts of allowances allocated to any unit under any other CSAPR trading program.

computations and issue a notice of data availability concerning the preliminary unit-level allocations for each control period by March 1 of the year before the control period. Objections to the data and preliminary computations could be submitted for 30 days, and the EPA would make any appropriate revisions and issue another notice of data availability by May 1 of the year before the control period. The EPA would then record the allocations by July 1 of the year before the control period. This proposed recordation schedule—which is necessitated by the fact that the amounts of the unit-level allocations to be recorded would not be known until the year before the control period, as just discussed—represents a revision to the recordation schedule currently in the Group 3 trading program regulations which calls for allocations of Group 3 allowances to existing units for control periods in 2025 and later years to be recorded on July 1 of the third year before the year of the control period. The EPA does not propose to follow any state-specific methodologies as part of the procedures for determining default unit-level allocations of Group 3 allowances for control periods in 2025 or later years, but any state wishing to use a procedure different than EPA's default allocations procedure could do so by obtaining approval of a SIP revision, as discussed in Section VII.D of this proposed rule.

In the case of any states making state-determined allocations under approved SIP revisions, the allocations would have to be submitted to EPA by June 1 of the year before the control period and the EPA would record the allocations by July 1 of the year before the control period. The proposed submission deadline would represent a revision of the current deadline of June 1 of the year 3 years before the control period, and the proposed recordation deadline would represent a revision of the current deadline of July 1 of the year 3 years before the control period. The purpose of revising the submission deadline is to provide each state for which the EPA has approved a SIP revision authorizing state-determined allowance allocations a period of time in which to apply the state's preferred allocation methodology to the state's trading budget for the appropriate control period. Because the state trading budgets under the Group 3 trading program as revised would not be known until May 1 of the year before each control period, states could not determine unit-level allocations of the budgets using their own methodologies significantly before June 1 of the year

before the control period. Submission by June 1 would allow the allowance allocations to the units in the state to be recorded by July 1 of the year before the control period, simultaneously with the recordation of allocations to units in states where the EPA determines the allocations.

As an exception to all of the recordation deadlines that would otherwise apply, the EPA proposes to not record any allocations of Group 3 allowances in a source's compliance account unless that source has complied with the requirements to surrender previously allocated 2023–2024 Group 2 allowances. The surrender requirements are necessary to maintain the previously established levels of stringency of the Group 2 trading program for the states and sources that remain subject to that program under this final rule. The EPA finds that it is reasonable to condition the recordation of Group 3 allowances on compliance with the surrender requirements because the condition will spur compliance and will not impose an inappropriate burden on sources. The EPA considers establishment of this condition, which will facilitate the continued functioning of the Group 2 trading program, to be an appropriate exercise of the Agency's authority under CAA section 301 (42 U.S.C. 7601) to prescribe such regulations as are necessary to carry out its functions under the Act.

The EPA requests comment on the proposed revisions to the procedures for allocating allowances to existing units under the Group 3 trading program, the deadlines for recording the allocations, and the deadlines for submission of state-determined allowance allocations to the EPA.

### c. Allocations From Portions of State Emissions Budgets Set Aside for New Units

As promulgated in the Revised CSAPR Update, the Group 3 trading program regulations provide for the EPA to allocate allowances from each new unit set-aside and Indian country new unit set-aside after the end of the control period at issue. The regulations call for the EPA to allocate allowances to any eligible "new" units in the state in proportion to their respective emissions during the control period, up to the amounts of those emissions if the relevant set-aside contains sufficient allowances, and not exceeding those emissions. An eligible new unit for purposes of allocations from a set-aside for a given control period is generally any unit in the relevant area that reported emissions subject to allowance surrender requirements during the

control period and that was not eligible to receive an allowance allocation as an "existing" unit for the control period. Any allowances remaining in an Indian country new unit set-aside after the allocations to new units are transferred to the new unit set-aside for the state for potential allocation to new units in non-Indian country areas of the state, and any allowances remaining in a new unit set-aside after the allocations to new units are reallocated to the existing units in the state in proportion to those units' previous allocations for the control period as existing units. The EPA issues a notice of data availability concerning the proposed allocations by March 1 following the control period, provides an opportunity for submission of objections, and issues a final notice of data availability and record the allocations by May 1 following the control period, one month before the June 1 compliance deadline.

In this rulemaking, as discussed in Section VII.B.9.a of this document, the EPA is proposing to eliminate Indian country new unit set-asides after the 2022 control period and to expand eligibility for allocations from each state's new unit set-aside for a control period in 2023 or a later year to include units in Indian country within the state's borders, regardless of whether the area of Indian country is covered by the state's CAA implementation planning authority. The reasons for these proposed revisions are discussed in Section VII.B.9.a of this proposed rule. The EPA is not proposing any substantive revisions to the current Group 3 trading program provisions governing the procedures for allocating allowances from a state's new unit set-aside for a control period to the eligible units within the state's borders.[288]

This EPA notes that the proposed revisions to other provisions of the Group 3 trading program regulations discussed elsewhere in this document will reduce the portions of the state emissions budgets that are allocated through the new unit set-asides. Specifically, because the new unit set-asides will no longer receive any additional allowances when units retire, for control periods in 2025 and later years the amounts of allowances in the new unit set-asides will always be 2 percent of the respective state emissions budgets for the respective control periods. This reduction in the size of the

---

[288] As discussed in Section X of this proposed rule, the EPA is proposing to relocate some of the regulatory provisions relating to administration of the new unit set-asides and is also proposing to remove certain provisions that would be made obsolete by proposed revisions to other provisions of the Group 3 trading program regulations.

new unit set-asides is appropriate given that the number of consecutive control periods for which any particular unit is likely to receive allocations from a state's new unit set-aside will be reduced to two or three before the unit becomes eligible to receive allocations from the unreserved portion of the state's emissions budget. This approach contrasts with the approach under the other CSAPR trading programs where a new unit never becomes eligible to receive allocations from the unreserved portion of the emissions budget and where the new unit set-aside therefore needs to grow to accommodate an ever-increasing share of the state's total emissions.

The EPA also notes that, as discussed in Sections VII.D.2 and VII.D.3 of this proposed rule, in the event that a state chooses to replace EPA's default allowance allocations under the Group 3 trading program with state-determined allocations through a SIP revision, the EPA will continue to administer the portion of each state emissions budget reserved in a new unit set-aside in order to ensure the availability of allowance allocations to new units in any areas of Indian country within the state not covered by the state's CAA implementation planning authority.

### d. Incorrectly Allocated Allowances

The Group 3 trading program regulations as promulgated in the Revised CSAPR Update include provisions addressing incorrectly allocated allowances. With regard to any allowances that were incorrectly allocated and are subsequently recovered, the current provisions generally call for the recovered allowances to be reallocated to other units in the relevant state (or Indian country within the borders of the state) through the process for allocating allowances from the new unit set-aside (or Indian country new unit set-aside) for the state. If the procedures for allocating allowances from the set-asides have already been carried out for the control period for which the recovered allowances were issued, the allowances would be allocated through the set-asides for subsequent control periods.

The EPA continues to view the current provisions for disposition of recovered allowances as reasonable in the case of any allowances that are recovered before the deadline for recording allocations of allowances from the new unit set-aside for the control period for which the recovered allowances were issued. However, in the case of any allowances that are recovered after that deadline, adding the recovered allowances to the new unit set-aside for a subsequent control period, as provided in the current regulations, would be inconsistent with the proposed trading program enhancements discussed elsewhere in this document, where the amounts of allowances provided in the state emissions budgets for each control period are designed to reflect the most current available information on fleet composition and utilization and where the quantities of banked allowances available for use in each control period are recalibrated for consistency with the state emissions budgets. The EPA therefore proposes that, starting with allowances allocated for the 2024 control period, any incorrectly allocated allowances that are recovered after the deadline for allocating allowances from the new unit set-aside for that control period (*i.e.,* May 1 of the year following the control period) would be transferred to a surrender account instead of being reallocated to other units in the state.

The EPA requests comment on the proposed revision to the provisions for disposition of incorrectly allocated allowances that are recovered after the deadline for allocating allowances from the new unit set-asides for the control periods for which the recovered allowances were issued.

### 10. Other Trading Program Provisions

This section discusses how certain existing provisions of the Group 3 trading program regulations would apply to sources that become subject to the program as a result of a final rule in this rulemaking as well as certain proposed changes to reporting requirements associated with the proposed backstop daily $NO_X$ emissions rates for coal-fired units.

### a. Designated Representative Requirements

As noted in Section VII.B.1.a of this document, a core design element of all the CSAPR trading programs is the requirement that each source must have a designated representative who is authorized to represent all of the source's owners and operators and is responsible for certifying the accuracy of the source's reports to the EPA and overseeing the source's Allowance Management System account. The necessary authorization of a designated representative is certified to the EPA in a certificate of representation. The EPA is not proposing any change to the Group 3 trading program's designated representative provisions in this rulemaking.

The existing designated representative provisions in the Group 3 trading program regulations already provide that EPA will interpret references to the Group 2 trading program in certain documents—including a certificate of representation as well as a notice of delegation to an agent or an application for a general account—as if the documents referenced the Group 3 trading program instead of the Group 2 trading program. For these reasons, sources that currently participate in the Group 2 trading program and that transition to the Group 3 trading program because of a final rule in this rulemaking will not need to submit any new forms as part of the transition, because previously submitted forms will be valid for purposes of the Group 3 trading program.

Designated representatives for sources that are newly affected under the Group 3 trading program and that are not currently affected under the Group 2 trading program would need to submit new or updated certificates of representation. If the source is also affected under other CSAPR trading programs or the Acid Rain Program, the source's designated representative for all of the programs must be the same individual. The EPA will not record any Group 3 allowances allocated to a source in the source's compliance account until the source has a properly authorized designated representative.

### b. Monitoring and Reporting Requirements

The Group 3 trading program requires monitoring and reporting of emissions and heat input data in accordance with the provisions of 40 CFR part 75. In this rulemaking, the EPA is not proposing any change to these provisions of the Group 3 trading program except with respect to the monitor certification deadline for certain units. The EPA is also not proposing any changes to the monitoring requirements in 40 CFR part 75 for units subject to such requirements. However, because of the proposed geographic expansion of the Group 3 trading program, certain units that were not previously subject to monitoring requirements under 40 CFR part 75 would become subject to such requirements. Also, the EPA is proposing certain additional recordkeeping and reporting requirements that could be met using some of the data that are already collected by the required monitoring systems.[289]

---

[289] The EPA is not proposing to amend the existing provisions of the Group 3 trading program regulations that govern whether units covered by the program must record and report required data on a year-round basis or may elect to record and
Continued

Under 40 CFR part 75, a unit has several options for monitoring and reporting, including the use of continuous emissions monitoring systems (CEMS), excepted monitoring methodologies for qualifying gas- or oil-fired units that rely in part on fuel-flow metering in combination with CEMS-based or testing-based $NO_X$ emissions rate data, low-mass emissions monitoring for certain non-coal-fired, low emitting units, and alternative monitoring systems approved by the Administrator through a petition process. In addition, sources can submit petitions to the Administrator for alternatives to individual monitoring, recordkeeping, and reporting requirements specified in 40 CFR part 75. Each CEMS must undergo rigorous initial certification testing and periodic quality assurance testing thereafter, including the use of relative accuracy test audits and 24-hour calibrations. In addition, when a monitoring system is not operating properly, standard substitute data procedures are applied to produce a conservative estimate of emissions for the period involved. Further, 40 CFR part 75 requires electronic submission of quarterly emissions reports to the Administrator, in a format prescribed by the Administrator. The reports would contain all of the data required concerning ozone season $NO_X$ emissions.

For units exhausting to common stacks, 40 CFR part 75 includes options that often allow monitoring to be conducted at the common stack on a combined basis for all the units as an alternative to installing separate monitoring systems for the individual units in the ductwork leading to the common stack. The units then keep records and report hourly and cumulative $NO_X$ mass emissions and in many cases heat input data on a combined basis for all units exhausting to the common stack. With respect to heat input data, but not $NO_X$ mass emissions data, most such units are also required to record and report hourly and cumulative data on an individual-unit basis, and where necessary they typically compute the necessary unit-level hourly heat input values by apportioning the combined hourly heat input values for the common stack in proportion to the individual units' recorded hourly output of electricity or steam. *See generally* 40 CFR 75.72.

In this rulemaking, the proposed provisions governing default unit-level allowance allocations, backstop daily $NO_X$ emissions rates for certain coal-fired units, and secondary emissions limitations for units contributing to assurance level exceedances would all require the use of unit-level reported data on $NO_X$ mass emissions (or unit-level $NO_X$ emissions rates computed in part based on unit-level reported data on $NO_X$ mass emissions). To facilitate the implementation of these proposed provisions, the EPA is proposing to require all units covered by the Group 3 trading program exhausting to common stacks to record and report unit-level hourly and cumulative $NO_X$ mass emissions data starting with the 2024 control period. To obtain the necessary unit-level hourly mass emissions values, the EPA proposes to allow the units to apportion hourly mass emissions values determined at the common stack in proportion to the individual units' recorded hourly heat input. The proposed apportionment procedure would be very similar to the apportionment procedure that most such units already apply to compute reported unit-level heat input data. Because the additional required data values would be obtained through apportionment, implementation of the proposed additional recordkeeping and reporting requirements would necessitate a one-time update to the units' data acquisition and handling systems but would not require any changes to the monitoring systems already needed to meet other requirements under 40 CFR part 75. In most cases, the EPA expects that the reported values computed through these apportionment procedures would reasonably approximate the values that could be obtained through installation and operation of separate monitoring systems for the individual units, because the units exhausting to the common stack would be expected to have similar $NO_X$ emissions rates. However, the EPA also recognizes that at some plants, unit-level values determined through apportionment based on electricity or steam output could overstate the reported $NO_X$ mass emissions for some units and correspondingly understate the reported $NO_X$ mass emissions for other units. While the EPA has not at this time identified any reason to expect such potential overstatement and understatement to cause the proposed

requirements in this rule to be less stringent overall, the Agency requests comment on whether units in particular situations should be required to obtain the necessary hourly mass emissions values through installation and operation of monitoring systems at the individual-unit level.[290]

In addition, to implement the proposed backstop daily $NO_X$ emissions rates during the ozone season for certain coal-fired units, the EPA is proposing to require additional recordkeeping and reporting requirements for these units. Specifically, starting in 2024 for coal-fired units with existing SCR controls serving generators larger than 100 MW, and starting in 2027 for other coal-fired units serving generators larger than 100 MW (except circulating fluidized bed units), the units would be required to record and report total daily $NO_X$ emissions and total daily heat input, daily average $NO_X$ emissions rate, and daily $NO_X$ emissions exceeding the applicable backstop daily $NO_X$ emissions rates. The units would also be required to record and report cumulative $NO_X$ emissions exceeding the backstop daily $NO_X$ emissions rates for the ozone season. These data would be used to determine the allowance surrender requirements related to the backstop daily $NO_X$ emissions rates. As with the additional recordkeeping and reporting requirements discussed above for units exhausting to common stacks, implementation of the additional recordkeeping and reporting requirements for coal-fired units would necessitate a one-time update to the units' data acquisition and handling systems but would not require any changes to the monitoring systems already needed to meet other requirements under 40 CFR part 75.

In states whose sources currently participate in the Group 3 trading program, as well as states whose sources participate in the Group 2 trading program and would transition to the

---

report required data on an ozone season-only basis. *See* 40 CFR 97.1034(d)(1); *see also* 40 CFR 75.74(a)–(b). Thus, for units that are required or elect to report other data on a year-round basis, the proposed additional recordkeeping and reporting requirements would also apply year-round, while for units that are allowed and elect to report other data on an ozone season-only basis, the proposed additional requirements would also apply for the ozone season only.

---

[290] For example, as noted in Section VII.B.7 of this proposed rule, there are currently five plants in the states covered by this proposal where SCR-equipped coal-fired units and non-SCR-equipped coal-fired units exhaust to common stacks. If the owners and operators of these plants choose to report apportioned $NO_X$ mass emissions data in preference to installing and operating separate monitoring systems, the likely effect would be to overstate reported $NO_X$ mass emissions for the SCR-equipped units and correspondingly understate reported $NO_X$ mass emissions for the non-SCR equipped units. This would make compliance with the proposed backstop daily $NO_X$ emissions rate more challenging for the SCR-equipped units. If the EPA does not require the owners and operators to install and operate separate monitoring systems for the individual units in a final rule in this rulemaking, the owners and operators would still have the option to do so if they believed it would be to their benefit.

Group 3 trading program under this proposal, units that are not subject to the proposed backstop daily NOₓ emissions rates would not need to make any changes to their current monitoring and reporting as a result of the transition. The sources in states currently in the Group 2 trading program would be required to begin monitoring and reporting of NOₓ emissions and operational data for purposes of the Group 3 trading program as of May 1, 2023, the start of the 2023 control period.

In states whose sources do not currently participate in the Group 2 trading program, any sources that currently report ozone season NOₓ mass emissions according to 40 CFR part 75 to comply with SIP requirements and that are not subject to the proposed backstop daily NOₓ emissions rates similarly would not need to make any changes to their current monitoring and reporting as a result of the transition. Other sources in these states that currently report SO₂ and NOₓ emissions data according to 40 CFR part 75 under other CSAPR trading programs or the Acid Rain Program would not need to certify new monitoring systems for purposes of the Group 3 trading program but would need to update their monitoring plans and possibly update the software in their data acquisition and handling systems to compute certain additional values from the measurements that are already being recorded. All the sources in these states that already have monitoring systems certified under 40 CFR part 75 would be required to begin monitoring and reporting of NOₓ emissions and operational data for purposes of the Group 3 trading program as of the later of May 1, 2023, or the effective date of the final rule.[291]

Finally, any sources that meet the applicability criteria of the Group 3 trading program and that do not

currently report NOₓ emissions data to the EPA under 40 CFR part 75 would need to certify new monitoring systems in accordance with part 75 before they would be required to monitor and report emissions for purposes of the Group 3 trading program. The units the EPA has been able to identify as potentially affected under this proposal that may need to certify new monitoring systems are listed in Table VII.B.3–1 (along with some other units that are potentially affected under this proposal and that already have certified monitoring systems). Because each of the listed units commenced commercial operation more than 180 days before the date when a final rule in this rulemaking would become effective, under the current Group 3 trading program regulations (*i.e.,* without the revisions proposed in this section), each unit's monitor certification deadline would generally be the effective date of the final rule. To ensure that the final rule does not impose monitor installation and certification requirements on these units before the effective date of the final rule, the EPA is proposing to revise the Group 3 trading program's monitor certification deadline provisions to establish a 180-day window for certification of the new monitoring systems after the effective date of a final rule in this rulemaking for units that do not already have monitoring systems certified under 40 CFR part 75, similar to the 180-day window already provided to units commencing commercial operation after (or less than 180 days before) the final rule's effective date. The 180th day for units in this situation would likely fall after the end of the 2023 ozone season, with the result that the certification deadline would be extended until May 1, 2024, the first day of the 2024 ozone season. Because the program's allowance holding requirements apply to a given unit only after that unit's monitor certification deadline, the units in this situation consequently would become subject to allowance holding requirements as of the 2024 ozone season rather than the 2023 ozone season.[292]

The EPA requests comment on the proposed revisions to the recordkeeping and reporting provisions in 40 CFR part 75 and the proposed establishment of a 180-day window for certification of new monitoring systems after the effective date of a final rule in this rulemaking for units that do not already have monitoring systems certified under 40 CFR part 75. As discussed above, with respect to units exhausting to common stacks, the EPA also requests comment on whether units in particular situations should be required to obtain hourly NOₓ mass emissions values through installation and operation of monitoring systems at the individual-unit level instead of being allowed to obtain values for individual units through apportionment of the combined values for the units exhausting to the common stack.

11. Transitional Provisions

This section discusses several provisions that the EPA proposes to implement in order to address the transition of sources into the Group 3 trading program as revised. The purposes of the proposed transitional provisions are generally the same as the purposes of the analogous transitional provisions promulgated in the Revised CSAPR Update: First, accounting for the possibility that the effective date of a final rule in this rulemaking will fall after the starting date of the first affected ozone season (which in this case is, May 1, 2023); second, establishing an appropriately-sized initial allowance bank through the conversion of previously banked allowances; and third, preserving the intended stringency of the Group 2 trading program for the sources that will continue to be subject to that program.[293] However, the sources that would be participants in the revised Group 3 trading program under this proposal are transitioning from several different starting points—with some sources already in the Group 3 trading

[291] For units that currently report under 40 CFR part 75 only for annual programs and that use the optional low mass emissions methodology in 40 CFR 75.19, an additional consideration could arise. Specifically, eligibility to use the low mass emissions methodology for reporting ozone season NOₓ mass emissions is restricted to units demonstrating that they have not exceeded or will not exceed a maximum of 50 tons of NOₓ per ozone season. In theory, some units that would be eligible to use the low mass emissions methodology for purposes of annual programs only might lose that eligibility because of the 50-ton ozone season cap (which does not apply to units reporting for annual programs only). Based on the emissions reports submitted for the 2018–2020 control periods under the Acid Rain Program and the CSAPR annual programs, none of the existing units that currently report under 40 CFR part 75 for annual programs only and that would be added to the Group 3 trading program under the proposal are presently in this theoretical situation.

[292] Table VII.B.3–1 of this proposed rule lists 22 existing units in Delaware, Nevada, Utah, and Wyoming that appear to meet the Group 3 trading program's general applicability criteria and that do not already report NOₓ emissions data to the EPA under 40 CFR part 75 pursuant to any other existing regulatory requirements. As noted in Section VII.B.3 of this proposed rule, six of the 22 listed units have reported that they may retire before the 2023 ozone season, and the possibility exists that up to nine of the remaining listed units could qualify for an exemption from the Group 3 trading program available to certain cogeneration units. EPA therefore projects that the revision to the

monitor certification deadline proposed in this section, and the related delay in allowance holding requirements from 2023 to 2024, could apply to between seven and 22 units, with the total estimated 2021 ozone season NOₓ emissions for all such units ranging between 250 and 450 tons. During the period before allowance holding requirements apply to the units—*i.e.,* the period from the effective date of a final rule in this rulemaking until the start of the 2024 control period—other requirements of the program would still apply, such as the requirement for submission of a certificate of representation by a designated representative and the requirements related to installation and certification of required monitoring systems.

[293] The EPA is not proposing to create a ''safety valve mechanism'' in this rulemaking analogous to the safety valve mechanism established under the Revised CSAPR Update.

program under its current regulations, some sources coming from the Group 2 trading program, and some sources not currently participating in any seasonal $NO_X$ trading program. EPA is therefore proposing transitional provisions that differ across the sets of potentially affected sources based on the sources' different starting points.

a. Prorating Emissions Budgets, Assurance Levels, and Unit-Level Allowance Allocations in the Event of an Effective Date After May 1, 2023

While it is EPA's intent for a final rule in this rulemaking to take effect before the start of the Group 3 trading program's 2023 control period on May 1, 2023, it is possible that the final rule's effective date will fall after that date. The EPA proposes to address this contingency by determining the amounts of emissions budgets and unit-level allowance allocations on a full-season basis in the rulemaking and by also including provisions in the revised regulations to prorate the full-season amounts as needed to ensure that no sources become subject to new or more stringent regulatory requirements before the final rule's effective date.[294] Variability limits and assurance levels for 2023 would be computed using the appropriately prorated emissions budgets amounts, and unit-level allocations would also be prorated.[295]

As discussed in Section VII.B.2 of this proposed rule, in the case of states (and Indian country within the states' borders) whose sources do not currently participate in either the Group 2 trading program or the Group 3 trading program—Delaware, Minnesota, Nevada, Utah, and Wyoming—the sources would begin participating in the Group 3 trading program on the later of May 1, 2023, or the final rule's effective date. For these states, in the rulemaking the EPA would compute the full-season emissions budgets that would apply for the entire 2023 control period if the final rule becomes effective no later than May 1, 2023, and is therefore in effect for the entire 153-day control period from May 1, 2023, through September 30, 2023. If the final rule becomes effective after May 1, 2023, the EPA would determine prorated emissions budgets by multiplying each

full-season emissions budget by the number of days from the rule's effective date through September 30, 2023, dividing by 153 days, and rounding to the nearest allowance. The prorated variability limits would be computed as 21 percent of the prorated emissions budgets, rounded to the nearest allowance, yielding prorated assurance levels that equal 121 percent of the prorated emissions budgets. To determine unit-level allocation amounts from the prorated emissions budgets, the EPA would determine full-season allocation amounts in the rulemaking and would determine preliminary prorated allocation amounts in the same manner as described for the emissions budgets previously. The preliminary prorated amounts of the largest unit-level allowance allocations for each state would then each be adjusted up or down by one allowance as needed to cause the sum of the final prorated unit-level allowance allocations for the state to equal the state's prorated emissions budget. All calculations required to determine the prorated emissions budgets and variability limits and the unit-level allocations for the 2023 control period would be carried out as soon as possible after the EPA learns the effective date of a final rule in this rulemaking (which is expected to be approximately 60 days after the date of the final rule's publication in the **Federal Register**). The unit-level allocations for both the 2023 and 2024 control periods would be recorded in facilities' compliance accounts approximately 30 days after the final rule's effective date, as discussed in Section VII.B.9.b of this proposed rule.

In the case of states (and Indian country within the states' borders) whose sources currently participate in the Group 3 trading program—Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia—the sources would continue to participate in the Group 3 trading program for the 2023 control period, subject to prorating procedures designed to ensure that the changes in 2023 emissions budgets and assurance levels would not substantively affect the sources' requirements prior to the rule's effective date. For these states, in the rulemaking the EPA would compute the full-season emissions budgets that would apply for the entire 2023 control period if the final rule becomes effective no later than May 1, 2023, but the EPA would not remove from the regulations the full-season emissions budgets for the 2023 control period that were established in the Revised CSAPR

Update rulemaking. Instead, the EPA would include both sets of emissions budgets and variability limits in the regulations, along with a provision indicating that the emissions budgets promulgated in the Revised CSAPR Update would apply on a prorated basis for the portion of the 2023 control period before the final rule's effective date and the emissions budgets established in this rulemaking would apply on a prorated basis for the portion of the 2023 control period on and after the final rule's effective date. Under this provision, the EPA would determine a blended emissions budget for each state for the 2023 control period, computed as the sum of the appropriately prorated amounts of the state's current and revised emissions budgets. (For example, if the final rule became effective on the eleventh day of the 153-day 2023 control period, the blended emissions budget would equal the sum of 10/153 times the current emissions budget plus 143/153 times the revised emissions budget, rounded to the nearest allowance.) Blended variability limits for the 2023 control period would be computed as 21% of the blended emissions budgets, yielding blended assurance levels equal to 121% of the blended emissions budgets. Unit-level allocations would be determined by applying the allocation procedure described in Section VII.B.9 of this proposed rule to the blended budgets. In the case of states (and Indian country within the states' borders) whose sources currently participate in the Group 2 trading program—Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Tennessee, Texas, and Wisconsin—the sources would begin to participate in the Group 3 trading program as of May 1, 2023, regardless of the final rule's effective date, as discussed in Section VII.B.2 of this proposed rule, subject to prorating procedures designed to ensure that the transition from the Group 2 trading program to the Group 3 trading program would not substantively affect the sources' requirements prior to the rule's effective date. The prorating procedures for these states would mirror the procedures for the states currently in the Group 3 trading program, except that because no emissions budgets currently appear in the Group 3 trading program regulations for the states that are currently covered by the Group 2 trading program, the EPA would add two sets of emissions budgets for these states to the Group 3 trading program regulations: First, the states' emissions budgets for the 2023 control period that currently appear in the Group 2 trading

---

[294] As discussed in Sections VII.B.7 and VII.B.8 of this proposed rule, the proposed revisions establishing unit-specific backstop daily emissions rates and, for units contributing to assurance level exceedances, secondary unit-specific emissions limitations, would not take effect until the 2024 control period or later.

[295] The EPA notes that transitional provisions similar to the prorating provisions proposed in this section were finalized and implemented under the Revised CSAPR Update.

program regulations, which would be included in the revised Group 3 trading program regulations to represent the states' emissions budgets for the portion of the 2023 control period before the final rule's effective date, and second, the emissions budgets for the 2023 control period established for the states in this rulemaking, which would be included in the revised Group 3 trading program regulations to represent the state's emissions budgets for the portion of the 2023 control period on and after the final rule's effective date. The procedures for determining blended emissions budgets, variability limits and assurance levels, and unit-level allowance allocations would be the same as for the states currently in the Group 3 trading program. Again, all calculations required to determine the prorated emissions budgets and variability limits and the unit-level allocations for the 2023 control period would be carried out as soon as possible after the EPA learns the effective date of a final rule in this rulemaking (which is expected to be approximately 60 days after the date of the final rule's publication in the **Federal Register**). The unit-level allocations for both the 2023 and 2024 control periods would be recorded in facilities' compliance accounts approximately 30 days after the final rule's effective date, as discussed in Section VII.B.9.b of this proposed rule.

The reason for proposing that sources currently in the Group 2 trading program would begin to participate in the Group 3 trading program on May 1, 2023 even if the final rule's effective date is after May 1, 2023, is that it would serve the public interest and greatly aid in administrative efficiency for most elements of the Group 3 trading program—specifically, all elements of the trading program other than the elements designed to establish more stringent emissions limitations for the sources coming from the Group 2 trading program—to apply to the sources starting on May 1, 2023. This would facilitate implementation of the Group 3 trading program in an orderly manner for the entire 2023 ozone season and reduce compliance burdens and potential confusion. Each of the CSAPR trading programs for ozone season $NO_X$ is designed to be implemented over an entire ozone season. Implementing the transition from the Group 2 trading program to the Group 3 trading program in a manner that required the covered sources to participate in the Group 2 trading program for part of the 2023 ozone season and the Group 3 trading program for the remainder of that ozone

season would be complex and burdensome for sources. Attempting to address the issue by splitting the Group 2 and Group 3 requirements for these sources into separate years is not a viable approach, because EPA has no legal basis for releasing the transitioning Group 2 sources from the emissions reduction requirements found to be necessary in the CSAPR Update for a portion of the 2023 ozone season, and EPA similarly has no legal basis for deferring implementation of the 2023 emissions reduction requirements found to be necessary under this rule for the transitioning Group 2 sources until 2024. Moreover, the requirements of the current Group 2 trading program and the revised Group 3 trading program for the 2023 control period are substantively identical as to almost all provisions, such that with respect to those provisions, a source will not need to alter its operations in any manner or face different compliance obligations as a consequence of a transition from the Group 2 trading program to the Group 3 trading program. Thus, the EPA believes that no substantive concerns regarding retroactivity arise from transitioning the sources currently in the Group 2 trading program to the Group 3 trading program starting on May 1, 2023, as long as those aspects of the revised Group 3 trading program for the 2023 control period that *do* meaningfully differ from the analogous aspects of the Group 2 trading program—that is, the relative stringencies of the two trading programs, as reflected in the emissions budgets and associated assurance levels—are applied only as of the effective date of the final rule.

In all respects other than prorating the emissions budgets, variability limits and assurance levels, and unit-level allowance allocations, with respect to the sources currently participating in the Group 2 trading program or the Group 3 trading program, the EPA proposes to implement the revised Group 3 trading program for the 2023 control period in a uniform manner for the entire control period. Thus, emissions would be monitored and reported for the entire 2023 ozone season (*i.e.,* May 1, 2023, through September 30, 2023), and as of the allowance transfer deadline for the 2023 control period (*i.e.,* June 1, 2024) each source would be required to hold in its compliance account vintage-year 2023 Group 3 allowances not less than the source's emissions of $NO_X$ during the entire 2023 ozone season. Any efforts undertaken by one of these sources to reduce its emissions during the portion

of the 2023 ozone season before the effective date of the rule would aid the source's compliance by reducing the amount of Group 3 allowances that the source would need to hold in its compliance account as of the allowance transfer deadline, increasing the range of options available to the source for meeting its compliance obligations under the revised Group 3 trading program. In the case of the sources that do not currently participate in the Group 2 trading program or the Group 3 trading program, the EPA similarly proposes to implement the revised Group 3 trading program for the 2023 control period in a uniform manner for the entire control period, except that the 2023 control period for these sources may be shorter than the normal 153-day length.

The EPA requests comment on this approach for implementing the Group 3 trading program in a manner that would apply the substantive increases in stringency of the emissions budgets and assurance levels established under the final rule on and after, but not before, the final rule's effective date.

b. Creation of Additional Group 3 Allowance Bank for 2023 Control Period

In the CSAPR Update, where the EPA established the Group 2 trading program and transitioned over 95% of the sources that had been participating in what is now the CSAPR $NO_X$ Ozone Season Group 1 Trading Program (the "Group 1 trading program") to the new program, the EPA determined that it was reasonable to establish an initial bank of allowances for the Group 2 trading program by converting almost all allowances banked under the Group 1 trading program at a conversion ratio determined by a formula. In the Revised CSAPR Update, where EPA established the Group 3 trading program and transitioned approximately 55% of the sources that had been participating in the Group 2 trading program to the new program, the EPA similarly determined that it was reasonable to establish an initial bank of allowances for the Group 3 trading program by converting allowances banked under the Group 2 trading program at a conversion ratio determined by a formula, using a conversion procedure that was modified to leave much of the Group 2 allowance bank available for use by the approximately 45% of sources then in the Group 2 trading program that would remain in that program. Any conversion of banked allowances from a previous trading program for use in a new trading program must ensure that implementation of the new trading program will result in $NO_X$ emissions

reductions sufficient to address significant contribution by all states that would be participating in the new trading program, while also providing industry certainty (and obtaining an environmental benefit) through continued recognition of the value of saving allowances through early reductions in emissions. EPA's approach to balancing these concerns in the CSAPR Update through the conversion of banked allowances from the Group 1 trading program to the Group 2 trading program was upheld in *Wisconsin* v. *EPA,* see 938 F.3d at 321.

In the current rulemaking, applying the same balancing principle as in the CSAPR Update and the Revised CSAPR Update, the EPA proposes to carry out a further conversion of allowances banked for control periods before 2023 under the Group 2 trading program into allowances usable in the Group 3 trading program in control periods in 2023 and later years. Because the EPA is proposing to transition over 90% of the remaining sources in the Group 2 trading program to the Group 3 trading program—much closer to the situation in the CSAPR Update than the situation in the Revised CSAPR Update—in this rulemaking EPA proposes to apply a conversion procedure similar to the procedure followed in the CSAPR Update. Under the proposed conversion procedure, in the final rule in this rulemaking the EPA would not set a predetermined conversion ratio but instead would set provisions defining the types of accounts whose holdings of Group 2 allowances would be converted to Group 3 allowances and establishing the target amount of new Group 3 allowances that would be created. The proposed conversion date would be August 1, 2023, which is 2 months after the compliance deadline for the 2022 control period under the Group 2 trading program and ten months before the compliance deadline for the 2023 control period under the Group 3 trading program. The actual conversion ratio would be determined as of the conversion date and would be the ratio of the total amount of Group 2 allowances held in the identified types of accounts prior to the conversion to the total amount of Group 3 allowances being created. Consistent with the approach taken in the CSAPR Update, the EPA proposes to define the types of accounts included in the conversion to include all accounts except the facility accounts of sources in states that would remain in the Group 2 trading program.[296] Thus, the accounts whose

holdings of Group 2 allowances would be converted to Group 3 allowances would include (1) the facility accounts of all sources in the states transitioning from the Group 2 trading program to the Group 3 trading program, (2) the facility accounts of all sources in the states already participating in the Group 3 trading program, (3) the facility accounts of all sources in any other states not covered by the Group 2 trading program that happen to hold Group 2 allowances as of the conversion date, and (4) all general accounts (that is, accounts that are not facility accounts, including other accounts controlled by source owners as well as accounts controlled by non-source entities such as allowance brokers). Creating the new Group 3 allowances through conversion of previously banked Group 2 allowances would also help preserve the stringency of the Group 2 trading program for the states that remain covered by that trading program at levels consistent with the stringency found to be appropriate to address those states' good neighbor obligations with respect to the 2008 ozone NAAQS in the CSAPR Update.

With respect to setting the target amount of Group 3 allowances that would be created in the conversion process, the EPA proposes to follow the same approach that was used in the Revised CSAPR Update for creation of the initial Group 3 allowance bank. Specifically, the target amount of Group 3 allowances to be created would be computed as the sum of the variability limits for the 2024 control period [297] established in the final rule for the states being transitioned to the Group 3 trading program from the Group 2 trading program, prorated to reflect the portion of the 2023 control period occurring on and after the effective date of the final rule. Based on the amounts of the proposed state emissions budgets and variability limits, the full-season target amount for the conversion would be 18,517 Group 3 allowances. The quantity of banked Group 2 allowances currently held in accounts other than the facility accounts of sources in Iowa and Kansas exceeding the quantity of allowances likely to be needed for 2021 compliance is approximately 110,000

allowances. If the quantities of banked Group 2 allowances did not change between now and the conversion date, and if there was no prorating adjustment, the conversion ratio would be approximately 5.9-to-1, meaning that one Group 3 allowance would be created for every 5.9 Group 2 allowances deducted in the conversion process.[298]

As noted in Section VII.B.11.a of this proposed rule, it is possible that the effective date of this rule will occur after the start of the 2023 ozone season, and provisions are being proposed to ensure that the increased stringency of this rule's state budgets and state assurance levels (*i.e.,* the sums of the budgets and variability limits) would take effect only after the rule's effective date. Consistent with these other procedures, the EPA is proposing to similarly prorate the bank target amount used in the conversion process. For example, if the effective date of the final rule is the eleventh day of the 153-day 2023 ozone season, the full-season initial bank target amount of 18,517 allowances would be prorated to an initial bank target amount of 17,307 allowances.[299] The EPA notes that prorating the bank amount in this manner would not reduce sources' compliance flexibility for the 2023 ozone season, because the amounts of Group 3 allowances that sources would receive for the portion of the 2023 ozone season before the rule's effective date would be based on the current trading program budgets for the 2023 control period before this rulemaking. The current trading program budgets exceed the sources' collective 2021 emissions by approximately 18,600 tons, indicating potentially surplus allowances roughly equal to the full-season bank conversion target amount of 18,517 allowances. Thus, although the prorating procedure would reduce the amount of Group 3 allowances that would be available to sources in the form of an initial bank, the reduction in the quantity of these allowances would be offset by the quantities of Group 3 allowances that would be allocated in excess of sources' recent historical emissions levels for the portion of the ozone season before the final rule's effective date.

As in the CSAPR Update and the Revised CSAPR Update, EPA's overall objective in establishing the target amount for the allowance conversion would be to achieve a total target amount for the bank at a level high enough to accommodate year-to-year

---

[296] If the proposed expansion of geographic scope for the Group 3 trading program is unchanged in the

final rule, the states whose sources would continue to participate in the Group 2 trading program would be Iowa and Kansas.

[297] Similar to the approach taken in the Revised CSAPR Update, because emissions reductions from some of the emissions controls that EPA has identified as appropriate to use in setting budgets are first reflected in the 2024 state budgets rather than the 2023 state budgets, the EPA is proposing to base the bank target amount on the sum of the states' 2024 variability limits rather than the 2023 variability limits.

[298] By comparison, the analogous conversion ratio under the Revised CSAPR Update was 8-to-1.

[299] $18,517 \times (153 - 10) \div 153 = 17,307.$

variability in operations and emissions, as reflected in states' variability limits, but not high enough to allow sources collectively to plan to emit in excess of the collective state budgets. EPA believes that a well-established trading program would be able to function with an allowance bank lower than the full amount of the covered states' variability limits, as discussed in section VII.B.6 with respect to the proposed bank recalibration process that would begin with the 2024 control period. However, EPA also believes there are several compelling reasons in this instance to use a bank target higher than the minimum practicable level.

First, making an allowance bank available for use in the 2023 control period that is somewhat higher than the minimum practicable level would help to address concerns that might otherwise arise regarding the transition to a new set of compliance requirements, for some sources, and the transition to compliance requirements based on revised emissions budgets different from the emissions budgets that the sources had reason to anticipate under previous rulemakings, for the remaining sources. Although the EPA is confident that the emissions budgets being proposed in this rulemaking for the 2023 control period are readily achievable, the EPA also believes that the existence of a somewhat larger allowance bank at this transition point will promote sources' confidence in their ability to meet their 2023 compliance obligations in general and in a liquid allowance market in particular. Second, because the large majority of the remaining Group 2 allowances that would be converted to Group 3 allowances in this rulemaking are held by the sources currently in the Group 2 trading program, while the large majority of the initial bank of Group 3 allowances previously created in the conversion under the Revised CSAPR Update are held by the sources already in the Group 3 trading program, basing the conversion in this rulemaking on a target bank amount set in the same manner as the target bank amount used in the Revised CSAPR Update is expected to result in a less concentrated distribution of holdings of banked Group 3 allowances following the conversion than would be the case if a more stringent target bank amount were used under this rulemaking than was used in the Revised CSAPR Update. A lower concentration of holdings of banked Group 3 allowances would generally be expected to help ensure allowance market liquidity. Third, EPA considers it equitable to treat the

sources in the states transitioning from the Group 2 trading program to the Group 3 trading program in this rulemaking roughly similarly to the sources in the states that transitioned between the same two trading programs in the Revised CSAPR Update with respect to the benefit they would receive under the Group 3 trading program for any efforts they may have made to make emissions reductions under the Group 2 trading program beyond the minimum efforts that were required to comply with the emissions budgets under that program. Finally, to the extent that the proposed conversion results in a larger bank of allowances remaining after the 2023 control period than is considered necessary to sustain a well-functioning trading program in subsequent control periods, the excess would be removed from the program in the proposed bank recalibration process that would be implemented starting with the 2024 control period and therefore would not weaken sources' incentives to control emissions on a permanent basis.

The EPA requests comment on the proposal to create additional banked Group 3 allowances through the conversion of Group 2 allowances banked for control periods before 2023.

c. Recall of Group 2 Allowances Allocated for Control Periods After 2022

To maintain the previously established levels of stringency of the Group 2 trading program for the states and sources that remain subject to that program under this proposed rule, the EPA proposes to recall CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in amount and usability to all vintage year 2023–2024 CSAPR NO$_X$ Ozone Season Group 2 allowances previously allocated to sources in Group 3 states and areas of Indian country and recorded in the sources' compliance accounts. The proposed recall provisions would apply to all sources in jurisdictions newly added to the Group 3 trading program in whose compliance accounts CSAPR NO$_X$ Ozone Season Group 2 allowances for a control period in 2023 or 2024 were recorded, including sources where some or all units have permanently retired or where the previously recorded 2023–2024 allowances have been transferred out of the compliance account. The proposed recall provisions provide a flexible compliance schedule intended to accommodate any sources that have already transferred the previously recorded 2023–2024 allowances out of their compliance accounts and allows Group 2 allowances of earlier vintages to be surrendered to achieve compliance. Like the similar recall

provisions finalized in the Revised CSAPR Update, the proposed recall provisions include specifications for how the recall provisions apply in instances where a source and its allowances have been transferred to different parties and for the procedures that the EPA will follow to implement the recall.

Under the Group 2 trading program regulations, each Group 2 allowance is a "limited authorization to emit one ton of NO$_X$ during the control period in one year," where the relevant limitations include the EPA Administrator's authority "to terminate or limit the use and duration of such authorization to the extent the Administrator determines is necessary or appropriate to implement any provision of the Clean Air Act." 40 CFR 97.806(c)(6)(ii). The Administrator proposes to determine that, in order to effectively implement the Group 2 trading program as a compliance mechanism through which states not subject to the Group 3 trading program may continue to meet their obligations under CAA section 110(a)(2)(D)(i)(I) with regard to the 2008 ozone NAAQS, it is necessary to limit the use of Group 2 allowances equivalent in quantity and usability to all Group 2 allowances previously allocated for the 2023–2024 control periods and recorded in the compliance accounts of sources in the newly added Group 3 jurisdictions. The Group 2 allowances that have already been allocated to sources in the newly added Group 3 states for the 2023–2024 control periods and recorded in the sources' compliance accounts represent the substantial majority of the total remaining quantity of Group 2 allowances that have been allocated and recorded for the 2023–2024 control periods and that were not already made subject to recall when other jurisdictions were transferred from the Group 2 trading program to the Group 3 trading program in the Revised CSAPR Update. Because allowances can be freely traded, if the use of the 2023–2024 Group 2 allowances previously recorded in newly added Group 3 sources' compliance accounts (or equivalent Group 2 allowances) were not limited, the effect would be the same as if the EPA had issued to sources in the states that will remain covered by the Group 2 trading program a quantity of allowances available for compliance under the 2023–2024 control periods many times the levels that the EPA determined to be appropriate emissions budgets for these states in the CSAPR Update. Through the use of banked allowances, the excess Group 2

allowances would affect compliance under the Group 2 trading program in control periods after 2024 as well. Continued implementation of the Group 2 trading program at levels of stringency consistent with the levels contemplated under the CSAPR Update therefore requires that the EPA limit the use of the excess allowances, as the EPA is proposing here.

In this rulemaking, the EPA proposes to implement limitations on the use of the excess 2023–2024 Group 2 allowances through requirements to surrender, for each 2023–2024 Group 2 allowance recorded in a newly added Group 3 source's compliance account, one Group 2 allowance of equivalent usability under the Group 2 trading program. The surrender requirements would apply to the owners and operators of the Group 3 sources in whose compliance account the excess 2023–2024 Group 2 allowances were initially recorded. In general, each source's current owners and operators would be required to comply with the surrender requirements for the source by ensuring that sufficient allowances to complete the deductions are available in the source's compliance account by one of two possible deadlines discussed below. However, an exception would be provided if a source's current owners and operators obtained ownership and operational control of the source in a transaction that did not include rights to direct the use and transfer of some or all of the 2023–2024 Group 2 allowances allocated and recorded (either before or after that transaction) in the source's compliance account. The proposed rule provides that in such a circumstance, with respect to the 2023–2024 Group 2 allowances for which rights were not included in the transaction, the surrender requirements would apply to the most recent former owners and operators of the source before any such transactions occurred. Because in this situation a source's former owners and operators might lack the ability to access the source's compliance account for purposes of complying with the surrender requirements, the former owners and operators would instead be allowed to meet the surrender requirements with Group 2 allowances held in a general account.[300]

To provide as much flexibility as possible consistent with the need to limit the use of the excess Group 2 allowances, for each 2023–2024 Group 2 allowance recorded in a Group 3

source's compliance account, the EPA proposes to accept the surrender of either the same specific 2023–2024 Group 2 allowance or any other Group 2 allowance with equivalent (or greater) usability under the Group 2 trading program. Thus, a surrender requirement with regard to a Group 2 allowance allocated for the 2023 control period could be met through the surrender of any Group 2 allowance allocated for the 2023 control period or the control period in any earlier year—in other words, any 2017–2023 Group 2 allowance.[301] Similarly, the surrender requirement with regard to a 2024 Group 2 allowance could be met through the surrender of any 2017–2024 Group 2 allowance.

Owners and operators subject to the surrender requirements could choose from two possible deadlines for meeting the requirements. The first deadline would be 15 days after the effective date of a final rule in this rulemaking.[302] As soon as practicable or after this date, the EPA would make a first attempt to complete the deductions of Group 2 allowances required for each Group 3 source from the source's compliance account. The EPA would deduct Group 2 allowances first to address any surrender requirements for the 2023 control period and then to address any surrender requirements for the 2024 control period. When deducting Group 2 allowances to address the surrender requirements for each control period, EPA would first deduct allowances allocated for that control period and then would deduct allowances allocated for each successively earlier control period. This order of deductions is intended to ensure that whatever Group 2 allowances are available in the account are applied to the surrender requirements in a manner that both maximizes the extent to which all of the source's surrender requirements would be met and also ensures that any Group 2 allowances left in the source's

compliance account after completion of all required deductions would be the earliest allocated, and therefore most useful, Group 2 allowances possible. Among the Group 2 allowances allocated for a given control period, The EPA would first deduct allowances that were initially recorded in that account, in the order of recordation, and would then deduct allowances that were transferred into that account after having been initially recorded in some other account, in the order of recordation.

Following the first attempt to deduct Group 2 allowances to address Group 3 sources' surrender requirements, the EPA would send a notification to the designated representative for each such source (as well as any alternate designated representative) indicating whether all required deductions were completed and, if not, the additional amounts of Group 2 allowances usable in the 2023 or 2024 control periods that must be held in the appropriate account by the second surrender deadline of September 15, 2023. Each notification would be sent to the email addresses most recently provided to the EPA for the recipients and would include information on how to contact the EPA with any questions. The EPA proposes that no allocations of Group 3 allowances would be recorded in a source's compliance account until all the source's surrender requirements with regard to 2023–2024 Group 2 allowances have been met. For this reason, the principal consequence to a source of failure to fully comply with the surrender requirements by 15 days after the effective date of a final rule would be that any Group 3 allowances allocated to the units at the source for the 2023 and 2024 control periods that would otherwise have been recorded in the source's compliance account by 30 days after the effective date of a final rule would not be recorded as of that recordation date.

If all surrender requirements of 2023–2024 Group 2 allowances for a source have not been met in EPA's first attempt, the EPA would make a second attempt to complete the required deductions from the source's compliance account (or from a specified general account, in the limited circumstance noted above) as soon as practicable on or after September 15, 2023. The order in which Group 2 allowances are deducted would be the same as described above for the first attempt.

If the second attempt to deduct Group 2 allowances to meet the surrender requirements through deductions from the source's compliance account (or

---

[300] The EPA is currently unaware of any source that would need to use this flexibility but has included the option in the proposal to address the theoretical possibility of such a situation.

[301] The first control period for the Group 2 trading program was in 2017.

[302] As discussed later in this section and in Section VII.B.9.b, the EPA is proposing to condition recordation of any allocations of Group 3 allowances in a source's compliance account on the source's prior compliance with the proposed recall requirements for Group 2 allowances. The purpose of providing a first deadline for the recall provisions 15 days after a final rule's effective would be to ensure that sources have an early opportunity to comply with the recall provisions in order to be eligible to have allocations of Group 3 allowances recorded in their accounts as proposed 30 days after the final rule's effective date. Because the vast majority of sources subject to the proposed recall provisions already hold sufficient Group 2 allowances to comply with the recall provisions, the EPA anticipates that the sources would easily be able to comply with the proposed first recall deadline.

from a specified general account) is unsuccessful for a given source, the EPA proposes that as soon as practicable on or after November 15, 2023, to the extent necessary to address the unsatisfied surrender requirements for the source, the EPA would deduct the 2023–2024 Group 2 allowances that were initially recorded in the source's compliance account from whatever accounts the allowances are held in as of the date of the deduction, except for any allowances where, as of April 1, 2022, no person with an ownership interest in the allowances was an owner or operator of the source, was a direct or indirect parent or subsidiary of an owner or operator of the source, or was directly or indirectly under common ownership with an owner or operator of the source.[303] Before making any deduction under this provision, the EPA would send a notification to the authorized account representative for the account in which the allowance is held and would provide an opportunity for submission of objections concerning the data upon which the EPA is relying. In EPA's view, this provision would not unduly interfere with the legitimate expectations of participants in the allowance markets because the provision would not be invoked in the case of any allowance that was transferred to an independent party in an arms-length transaction before EPA's intent to recall 2023–2024 Group 2 allowances became widely known. The provision would apply only to a Group 2 allowance that, as of April 1, 2022, was still controlled either by the owners and operators of the source in whose compliance account it was initially recorded or by an entity affiliated with such an owner or operator. The EPA believes that by April 1, 2022, all market participants will have had ample opportunity to become informed of the proposed rule provisions to recall 2023–2024 Group 2 allowances recorded in Group 3 sources' compliance accounts, particularly since the EPA implemented a closely analogous recall of Group 2 allowances in the Revised CSAPR Update.[304]

The EPA proposes that failure of a source's owners and operators to comply with the surrender requirements would be subject to possible enforcement as a violation of the CAA, with each allowance and each day of the control period constituting a separate violation.

To eliminate any possible uncertainty regarding the amounts of Group 2 allowances allocated for the 2023–2024 control periods (or earlier control periods) that the owners and operators of each Group 3 source would be required to surrender under the recall provisions, the EPA has prepared a list of the sources in the proposed additional Group 3 states and areas of Indian country in whose compliance accounts allocations of 2023–2024 Group 2 allowances were recorded, with the amounts of the allocations recorded in each such compliance account for the 2023 and 2024 control periods. An additional list shows, for each newly added Group 3 source, the specific Group 2 allowances (batched by serial number) allocated for each control period and recorded in the source's compliance account and indicates whether, as of December 31, 2021, that batch of allowances was held in the source's compliance account, in an account believed to be partially or fully controlled by a related party (*i.e.*, an owner or operator of the source or an affiliate of an owner or operator of the source), or in an account believed to be fully controlled by independent parties. The lists are in a spreadsheet titled, ''Recall of Additional CSAPR NO$_X$ Ozone Season Group 2 Allowances'', available in the docket for this proposed rule. After the first and second surrender deadlines, the EPA intends to update the lists to indicate for each Group 3 source whether the surrender requirements for the source under the recall provisions have been fully satisfied. The EPA would post the updated lists on a publicly accessible website to ensure that all market participants have the ability to determine which specific 2023–2024 Group 2 allowances initially recorded in any given Group 3 source's compliance account do or do not remain subject to potential deduction to address the source's surrender requirements under the recall provisions.

The EPA requests comment on the proposal to recall Group 2 allowances

equivalent in quantity and usability to the Group 2 allowances previously issued for the 2023 and 2024 control periods and recorded in the compliance accounts of sources in jurisdictions being newly added to the Group 3 trading program in this proposed rule.

### 12. Conforming Revisions to Other Regulations

As noted in Section VII.B.1.a of this proposed rule, in addition to the Group 3 trading program, EPA currently administers five other CSAPR trading programs, all of which have provisions that in most respects parallel the provisions of the Group 3 trading program.[305] The EPA also administers the Texas SO$_2$ Trading Program, whose provisions parallel the provisions of the CSAPR trading programs to a somewhat lesser extent.[306] In this rulemaking, in addition to the proposed revisions to the Group 3 trading program, the EPA is proposing a small number of conforming revisions to the other CSAPR trading programs and/or the Texas SO$_2$ Trading Program to maintain consistency across the regulations for the various trading programs to the extent possible.

The first set of proposed conforming revisions concerns the use of the term ''Indian country'' in the allowance allocation provisions of the regulations for all the CSAPR trading programs. As discussed in Section VII.B.9.a of this proposed rule, to reflect the D.C. Circuit's holding in *ODEQ* v. *EPA* that states have initial CAA implementation planning authority in non-reservation areas of Indian country until displaced by a demonstration of tribal jurisdiction over such an area, the EPA is proposing to revise the allowance allocation provisions in the Group 3 trading program regulations so that, instead of distinguishing between the sets of units within a given state's borders that either are not or are in Indian country, the revised regulations would distinguish between (1) the set of units within the state's borders that are not in Indian country or are in areas of Indian country covered by the state's CAA implementation planning authority and (2) the set of units within the state's borders that are in areas of Indian country not covered by the state's CAA implementation planning authority. For the same reasons stated in Section VII.B.9.a of this proposed rule for the

---

[303] The proposed provision under which the EPA would not deduct Group 2 allowances transferred to unrelated parties before April 1, 2022 from the transferees' accounts would not relieve the source to which the Group 2 allowances were originally allocated from the obligation to comply with the recall requirements. Specifically, the source would be required to comply with the recall requirements by obtaining and surrendering other Group 2 allowances.

[304] Even before publication of the proposed rule, the EPA posted information on its websites to notify market participants that a pending rulemaking could have consequences for the value and usability of Group 2 allowances. The posted locations

included the electronic portal that authorized account representatives use to enter allowance transfers for recordation by the EPA in the Allowance Management System. Additionally, the EPA emailed a notice identifying the possibility of such consequences to the representatives for all Allowance Management System accounts.

[305] The regulations for the Group 3 Trading Program are at 40 CFR 97, subpart GGGGG. The regulations for the other five CSAPR trading programs are at 40 CFR part 97, subparts AAAAA, BBBBB, CCCCC, DDDDD, and EEEEE.

[306] The regulations for the Texas SO$_2$ Trading Program are at 40 CFR part 97, subpart FFFFF.

establishing uniform emissions limits for categories of units rather than on a unit-by-unit basis, the EPA can also ensure that any new source of emissions constructed after this proposed rulemaking are also subject to the emissions limits identified later (*see* Section IV.B.1.d of this proposed rule).

The EPA recognizes that the numerous variables that contribute to differences in units' emissions rates may complicate development of limits for groups of units as large as those addressed in this proposed rule. For each emissions source category, the EPA considered the range of emissions limits that currently apply to these sources under other CAA programs, such as RACT, NSPS, NESHAP, and OTC model rules, to develop an emissions limit that should be achievable by all sources after installing the controls identified in the Step 3 analysis. For a detailed discussion of the technical bases for EPA's proposed requirements for non-EGU emissions units, see the Non-EGU Sectors TSD.

The EPA is proposing that the emissions limits and compliance requirements for non-EGUs will apply only during the ozone season (which runs annually from May–September). This is consistent with EPA's prior practice in federal actions to eliminate significant contribution of ozone in the 1998 $NO_X$ SIP Call, CAIR, CSAPR, CSAPR Update, and the Revised CSAPR Update. EPA is seeking comment on whether non-EGU sources would run controls that would be installed as a result of this proposed FIP year-round (*i.e.*, will some source categories run their controls year-round due to the nature of those controls?).

In addition, the EPA proposes to apply the FIP requirements to all existing emissions units and any future emissions units constructed after the promulgation of a final rule. Further, the non-EGU emissions limits and compliance requirements will apply in all 23 states (and, as discussed in Section IV.C.2 of this proposed rule, in areas of Indian country within the borders of those states), even if some of those states do not currently have emissions units in a particular source category. This approach will ensure that all new sources constructed in any of the 23 states will be subject to the same regulatory requirements as applied for the existing units under this proposed rule. This will also mitigate any potential incentive to move production from an existing non-EGU source in one linked state to a new non-EGU source of

the same type but lacking the relevant emissions control requirements in another linked state.

At this time, this EPA is not proposing to include non-EGUs in the trading program described in this proposed rule. If EPA were to include non-EGUs in the trading program, we would require monitoring and reporting of hourly mass emissions in accordance with 40 CFR part 75 as we have required for all trading programs. Monitoring and reporting under part 75 include CEMS (or an approved alternative method), rigorous initial certification testing, and periodic quality assurance testing thereafter, such as relative accuracy test audits and daily calibrations. This type of consistent and accurate measurement of emissions is necessary to ensure each allowance actually represents one ton of emissions and that one ton of reported emissions from one source would be equivalent to one ton of reported emissions from another source. *See* 75 FR 45325 (August 2, 2010). Moreover, these monitoring requirements generally would need to be in place for at least one full ozone season to establish baseline data before it would be appropriate to rely on a trading program as the mechanism to achieve the required emissions reductions. Therefore, at this time, the EPA believes that applying unit-level emissions limitations on non-EGU emissions units rather than constructing an emissions trading regime is more administratively feasible and more easily implementable at the source level, and it will effectively eliminate each state's significant contribution without the need for establishing a new emissions trading program.

The EPA is proposing to require electronic reporting for all seven non-EGU industries. Specifically, owners and operators of affected units must submit electronic copies of required performance test reports, performance evaluation reports, quarterly and semi-annual reports, and excess emissions reports through EPA's Central Data Exchange (CDX) using the Compliance and Emissions Data Reporting Interface (CEDRI). The EPA is proposing to require that performance test results collected using test methods that are supported by EPA's Electronic Reporting Tool (ERT) as listed on the ERT website[309] at the time of the test be submitted in the format generated through the use of the ERT or an electronic file consistent with the xml schema on the ERT website, and that other performance test results be

submitted in portable document format (PDF) using the attachment module of the ERT. Similarly, the EPA is proposing to require that performance evaluation results of CEMS measuring relative accuracy test audit (RATA) pollutants that are supported by the ERT at the time of the test be submitted in the format generated through the use of the ERT or an electronic file consistent with the xml schema on the ERT website, and that other performance evaluation results be submitted in PDF using the attachment module of the ERT. In addition, the EPA is proposing to require that quarterly and semi-annual reports and excess emissions reports be submitted in PDF uploaded in CEDRI.

The EPA is proposing to allow for an extension of time to file a report where an owner or operator demonstrates that it cannot meet the reporting deadline for reasons outside of its control. Specifically, the EPA has identified two broad circumstances under which the EPA may grant a request for an extension of time to file an electronic report. These circumstances are (1) outages of EPA's CDX or CEDRI which preclude an owner or operator from accessing the system and submitting required reports and (2) *force majeure* events, which are defined as events that will be or have been caused by circumstances beyond the control of the affected facility, its contractors, or any entity controlled by the affected facility that prevent an owner or operator from complying with the requirement to submit a report electronically. Examples of *force majeure* events are acts of nature, acts of war or terrorism, or equipment failure or safety hazards beyond the control of the facility. In both circumstances, the decision to grant an extension of time to report is within the discretion of the Administrator, and reporting should occur as soon as possible.

Electronic submittal of required reports will increase the usefulness of the data contained in those reports, is in keeping with current trends in data availability and transparency, will further assist in the protection of public health and the environment, will improve compliance by facilitating the ability of regulated facilities to demonstrate compliance with requirements and by facilitating the ability of the EPA to assess and determine compliance, and will ultimately reduce burden on regulated facilities and the EPA. Electronic reporting also eliminates paper-based, manual processes, thereby saving time and resources, simplifying data entry, eliminating redundancies, minimizing

---

netting analysis, the changes would trigger the applicability of NSR.

[309] *https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert.*

data reporting errors, and providing data quickly and accurately to the affected facilities, air agencies, EPA, and the public. Moreover, electronic reporting is consistent with EPA's plan [310] to implement Executive Order 13563 and is in keeping with EPA's agency-wide policy [311] developed in response to the White House's Digital Government Strategy.[312]

The EPA notes that no emissions standard or other requirement established for non-EGUs in these FIPs may be interpreted, construed, or applied to diminish or replace the requirements of any emissions limitation or other applicable requirement established by the Administrator pursuant to other CAA authority or a standard issued under State authority.

1. Pipeline Transportation of Natural Gas

Applicability

The EPA is proposing to establish regulatory requirements for the Pipeline Transportation of Natural Gas industry that apply to stationary, natural gas-fired, spark ignited reciprocating internal combustion engines ("stationary SI engines") within these facilities that have a maximum rated capacity of 1,000 horsepower (hp) or greater. Based on our review of the potential emissions from stationary SI engines, we find that use of a maximum rated capacity of 1,000 hp reasonably approximates the selection of 100 tpy used within the non-EGU screening assessment. Therefore, stationary SI engines subject to the proposed rule requirements of this section are those found within any of the 23 covered states with non-EGU emissions reduction obligations that are within the Pipeline Transportation of Natural Gas

industry and have a maximum rated capacity of 1,000 hp or greater.

Emissions Limitations and Rationale

In developing the emissions limits for the Pipeline Transportation of Natural Gas industry, EPA reviewed RACT $NO_X$ rules, air permits, and OTC model rules. While some permits and rules express engine emissions limits in parts per million by volume (ppmv), the majority of rules and source-specific requirements express the emissions limits in grams per horsepower per hour (g/hp-hr). The EPA has historically set emissions limits for these types of engines using g/hp-hr and finds that method appropriate for this proposed FIP as well.

Based on the available information for this industry, applicable State and local air agency rules, and active air permits issued to sources with similar engines, the EPA is proposing the following emissions limits for stationary SI engines in the covered states:

TABLE VII.C–1—SUMMARY OF PROPOSED $NO_X$ EMISSIONS LIMITS FOR PIPELINE TRANSPORTATION OF NATURAL GAS

| Engine type and fuel | Proposed $NO_X$ emissions limit | Additional information |
|---|---|---|
| Natural Gas Fired Four Stroke Rich Burn | 1.0 g/hp-hr | Limits reviewed ranged between 0.2 and 3.0 g/hp-hr. |
| Natural Gas Fired Four Stroke Lean Burn | 1.5 g/hp-hr | Limits reviewed ranged between 0.5 and 3.0 g/hp-hr. |
| Natural Gas Fired Two Stroke Lean Burn | 3.0 g/hp-hr | Limits reviewed ranged between 0.5 and 3.0 g/hp-hr. |

With regard to four stroke rich burn engines, the EPA is proposing an emissions limit of 1.0 g/hp-hr. This limit is designed to be achievable by installing Non-Selective Catalytic Reduction (NSCR) on existing four stroke rich burn engines, as identified in the non-EGU screening assessment. Sources are free to install another control technology besides NSCR as long as the unit is still able to meet the emissions limit. In particular for four stroke rich burn engines, NSCR can be an effective control technology due to the low oxygen percentage in the exhaust. Efficient operation of the catalyst in NSCR requires the engine exhaust gases contain no more than 0.5 percent oxygen, which makes rich burn engines uniquely suitable to NCSR. Given that NSCR can achieve $NO_X$ reductions of 90 to 99 percent, the EPA believes an emissions limit of 1.0 g/hp-

hr should be readily achievable by all four stroke rich burn engines subject to this proposed rulemaking. The EPA is taking comment on whether a lower emissions limit is more appropriate since even an assumed reduction of 95 percent would result in most engines being able to achieve an emissions rate of 0.5 g/hp-hr. However, at this time, the EPA does not have the information necessary to determine if a lower emissions limit is achievable for the four stroke rich burn engines subject to the proposed rulemaking, and therefore, the EPA is proposing an emissions limit of 1.0 g/hp-hr.

With regard to four stroke lean burn engines, the EPA is proposing an emissions limit of 1.5 g/hp-hr. This limit is designed to be achievable by installing SCR on existing four stroke lean burn engines. Sources are free to install another control technology with or without SCR as long as the unit is

still able to meet the emissions limit. For example, it might be more cost effective on an ongoing basis for some four stroke lean burn engines to install layered combustion controls alone or along with SCR to achieve the necessary emissions reductions. Information available to the EPA suggests that some four stroke lean burn engines can achieve 90% reductions from layered combustion controls alone, such as turbochargers and inter-cooling, pre-chamber ignition or high energy ignition, improved fuel injection control, air/fuel ratio control.[313] Independent of unit specific considerations, the EPA believes that four stroke lean burn engines subject to this proposed FIP can achieve an emissions limit of 1.5 g/hp-hr with the installation and operation of SCR or other control technologies at the marginal cost threshold of $7,500 per

[310] EPA's Final Plan for Periodic Retrospective Reviews, August 2011. Available at: *https://www.regulations.gov/document?D=EPA-HQ-OA-2011-0156-0154.*

[311] E-Reporting Policy Statement for EPA Regulations, September 2013. Available at: *https://www.epa.gov/sites/production/files/2016-03/documents/epa-ereporting-policy-statement-2013-09-30.pdf.*

[312] Digital Government: Building a 21st Century Platform to Better Serve the American People, May 2012. Available at: *https://obamawhitehouse.archives.gov/sites/default/files/omb/egov/digital-government/digital-government.html.* For more information on the benefits of electronic reporting, see the memorandum *Electronic Reporting Requirements for New Source Performance Standards (NSPS) and National Emission*

*Standards for Hazardous Air Pollutants (NESHAP) Rules,* referenced earlier in this section.

[313] Ozone Transport Commission, *Technical Information Oil and Gas Sector Significant Stationary Sources of $NO_X$ Emissions,* 35–39, October 17, 2012.

ton identified in the non-EGU screening assessment. While a lower emissions limit may be achievable with SCR for some four stroke lean burn engines, the achievability of those lower limits may depend on engine age and come with increased costs not accounted for in this proposed rule. The EPA is seeking comment on whether a lower and higher emissions limit is appropriate for these units.

For two stroke lean burn engines, the EPA is currently proposing an emissions limit of 3.0 g/hp-hr. This limit is designed to be achievable by retrofitting existing two stroke lean burn engines with layered combustion to achieve this emissions limit. Sources are free to install another control technology besides layered combustion as long as the unit is still able to meet the emissions limit. As identified in the non-EGU screening assessment, the EPA believes that layered combustion controls, such as improved airflow, improved fuel to air mixing, improved ignition, and modern engine electronic controls can be achieved on two stroke engines at the marginal cost threshold of $7,500 per ton. With these types of controls, the information currently available to the EPA indicates that the amount of achievable emissions reductions is unit specific and can range from a 60 to 90 percent reduction in $NO_X$ emissions. The EPA estimates that existing uncontrolled two stroke lean burn engines would need to reduce emissions by about 80 percent to comply with a 3.0 g/hp-hr emissions limit. While some RACT and model rules reviewed contained more stringent emissions limits for two stroke lean burn engines, the EPA does not have information adequate to conclude that the two stroke lean burn engines across all 23 states can meet a lower limit. Further, some information available supports a finding that an emissions limit below 3.0 g/hp-hr might not be achievable with layered combustion controls alone for some units, and those units would require additional controls beyond our cost threshold.[314] Therefore, the EPA is proposing an emissions limit of 3.0 g/bhp-hr for two stroke engines. The EPA is seeking comment on whether a lower emissions limit would be achievable with layered combustion alone for the sources covered by this FIP. Further, the EPA is seeking comment on whether additional control technology could be installed on these

sources at or below the marginal cost threshold to achieve a lower emissions rate.

Compliance Assurance Requirement

The EPA is proposing to require stationary SI engines subject to this proposed FIP to conduct semi-annual performance testing in accordance with 40 CFR 60.8 to ensure that the engine is meeting the $NO_X$ emissions limit. The EPA is proposing that affected engines then monitor and record hours of operation and fuel consumption to calculate ongoing compliance with the applicable emissions limit. In addition, the EPA is proposing that affected engines would use continuous parametric monitoring systems (CPMS) to ensure that the $NO_X$ emissions limit is being met at all times. For example, engines utilizing layered combustion controls would need to monitor and record temperature, air to fuel ratio, and other parameters as appropriate to ensure that combustion conditions are optimized to reduce $NO_X$ emissions and assure compliance with the emissions limit. For engines using SCR or NSCR, the EPA is proposing that source monitor and record parameters such as inlet temperature to the catalyst and pressure drop across the catalyst.

The EPA is seeking comment on whether it is feasible or appropriate to require affected engines to be equipped with continuous emissions monitoring systems (CEMS) to measure and monitor the $NO_X$ emissions instead of conducting performance tests on a semiannual basis.

2. Cement and Concrete Product Manufacturing

Applicability

The EPA is proposing to establish regulatory requirements for the Cement and Concrete Product Manufacturing source category that apply to emissions units (kilns) that directly emit or have the potential to emit 100 tpy or more of $NO_X$. Further, the EPA is proposing emissions limits based on type of unit to ensure that the necessary $NO_X$ emissions reductions occur. The EPA is seeking comment on whether it should set an applicability threshold based on a unit's design production capacity rather than an emissions threshold.

Emissions Limitations and Rationale

In developing the emissions limits for the Cement and Concrete Manufacturing

industry, the EPA reviewed RACT $NO_X$ rules, air permits, and consent decrees. These rules and source-specific requirements most commonly express the emissions limits for this industry in terms of mass of pollutant emitted (pounds) per kiln's clinker output (tons), *i.e.,* pounds of $NO_X$ emitted per ton of clinker produced. A regulated entity routinely monitors and keeps track of its clinker output as it pertains to a kiln design capacity and the plant's production. Therefore, the EPA believes that this form of $NO_X$ emissions limit is effective, practicable and convenient to record and report to an air agency.

In determining the averaging time for the limit, the EPA considered the NSPS for Portland Cement Plants at 40 CFR part 60, subpart F. Section 60.62(a)(3) of this subpart establishes a 30-operating day rolling average period for the $NO_X$ emitted per ton of clinker produced and further states that an operating day includes all valid data obtained in any daily 24-hour period during which the kiln operates and excludes any measurements made during the daily 24-hour period when the kiln was not operating. In addition, 40 CFR 60.44b(i) requires that compliance with the applicable $NO_X$ emissions limit be determined on a 30-day rolling average basis. The EPA is proposing to require a 30-operating day rolling average period as the averaging time frame for this particular industry. The proposed averaging timeframe is consistent with the longstanding national technology-based NSPS for this industry at 40 CFR part 60, subpart F. Furthermore, an air agency may choose to require an averaging period shorter than a 30-operating day rolling average in air permit(s) issued to these plants. The EPA finds that a 30-operating day rolling average period provides a reasonable balance between short term (hourly or daily) and long term (annual) averaging periods, while being flexible and responsive to fluctuations in operations and production.

Based on the available information for this industry, applicable State and local air agency rules, and active air permits or enforceable orders issued to affected cement plants, the EPA is proposing the following emissions limits for cement kilns:

---

[314] Ozone Transport Commission, *Technical Information Oil and Gas Sector Significant Stationary Sources of $NO_X$ Emissions* at 24–25.

Table VII.C–2—Summary of Proposed $NO_X$ Emissions Limits for Kiln Types in Cement and Concrete Product Manufacturing

| Kiln type | Proposed $NO_X$ emissions limit (lb/ton of clinker) | Additional information |
|---|---|---|
| Long Wet ....................... | 4.0 | Limits reviewed ranged between 3.88–5.2; one State rule allows as high as 6.0; with addition of a post combustion $NO_X$ control the upper range could be reduced significantly. |
| Long Dry ....................... | 3.0 | Limits reviewed showed 5.1; with addition of post combustion $NO_X$ control the limit could be reduced significantly; limit of 3.0 would achieve a 41% reduction in $NO_X$ emissions. |
| Preheater ..................... | 3.8 | Limits reviewed ranged between 1.5–3.44; limit of 3.8 is consistent with 30 TAC 117.3110(a)(3) and 35 IAC 217.224(a). |
| Precalciner .................. | 2.3 | Requires post combustion $NO_X$ control; consistent with permit A0017 for Lehigh Southwest Cement Company issued on May 5, 2020 by the Bay Area Air Quality Management District. |
| Preheater/Precalciner ..... | 2.8 | Limits reviewed ranged between 1.8–3.4; limit of 2.8 is consistent with 30 TAC 117.3110(a)(4); Mitsubishi Cement Corporation Lucerne Valley Federal Operating Permit 11800001 issued by the Mojave Desert Air Quality Management District (MDAQMD) June 18, 2020; MDAQMD Rule 1161 (C)(2); and Illinois 35 IAC 217.224(a). |

Although the EPA is proposing $NO_X$ emissions limits based on the specific kiln types listed in Table VII.C–2, to provide operational flexibility the EPA is also proposing a source cap limit expressed in tons per day (tpd) of $NO_X$ for each individual cement plant according to the following equation.

$$CAP\ 2015\ Ozone\ Transport = \frac{(KW\ x\ NW) + (KD\ x\ ND)}{\left(2000\ \frac{pounds}{ton}\ x\ 365\ \frac{days}{year}\right)}$$

Where:

CAP2015 Ozone Transport = total allowable $NO_X$ emissions from all cement kilns located at one cement plant, in tons per day, on a 30-operating day rolling average basis;

KD = 1.7 pounds $NO_X$ per ton of clinker for dry preheater-precalciner or precalciner kilns;

KW = 3.4 pounds $NO_X$ per ton of clinker for long wet kilns;

ND = the average annual production in tons of clinker plus one standard deviation for the three most recent calendar years from all dry preheater-precalciner or precalciner kilns located at one cement plant; and

NW = the average annual production in tons of clinker plus one standard deviation for the three most recent calendar years from all long wet kilns located at one cement plant.

An affected cement plant will need to comply with both the source cap limit and the specific $NO_X$ emissions limits assigned to its individual kiln type(s). The EPA notes that the above source cap would be calculated and assigned to operating kilns in a particular plant. That is, the total allowable $NO_X$ emissions in tpd from one plant cannot be traded with another plant, regardless of these plants' control of ownership or operator's status, or regardless of these plants' proximity to each other or their location.

The EPA is soliciting comment on whether it is feasible or appropriate to phase out and retire existing long wet kilns in the affected states and to replace them with more energy efficient and less emitting units like preheater/precalciner installations. The EPA is also requesting comment on the time needed to complete such a task. It has been shown that such kilns replacements (preheater/precalciner kilns), when equipped with post-combustion $NO_X$ control devices such as SNCR, are capable of meeting $NO_X$ emissions limit of 1.5 lb/ton of clinker on a 30-operating day basis. For this reason, the EPA proposes to find that conversion from long wet kilns to preheater/precalciner installations is generally feasible. Given that long wet kilns are less energy efficient and generally emit more $NO_X$ than other kiln types, conversion to preheater/precalciner installations would be the most effective method of $NO_X$ reduction (per ton of clinker produced).

Additionally, EPA is soliciting comments on whether it is feasible or appropriate to require sources with existing preheater/precalciner kilns in the affected states that currently utilize low $NO_X$ burners, combustion controls, staged combustion, or mid-kiln firing to add and operate a post combustion control device like SNCR or SCR to further improve their $NO_X$ removal efficiency and lower $NO_X$ emissions to 1.95 lb/ton of clinker or less. The EPA is also requesting comments on the time needed to complete such an addition.

We note that the EPA previously stated that it expects that the controls for cement kilns would take at least 2 years to install on a sector-wide basis across the 12-state region affected by the Revised CSAPR Update.[315]

Compliance Assurance Requirements

The EPA is proposing that performance tests be conducted on a semiannual basis. Such tests shall be conducted in conformance with the requirements of 40 CFR 60.8. Stack tests will need to conform with the Test Methods and Procedures in 40 CFR 60 appendix A, or other EPA-approved (federally enforceable) test methods and procedures.

The EPA is soliciting comments on whether it is feasible or appropriate to require affected units (kilns) to be equipped with CEMS to measure and monitor the $NO_X$ concentration (emissions level) instead of conducting performance tests on semiannual basis.

We are also soliciting comment on whether it is appropriate for the affected units (kilns) to use CPMS instead of CEMS to monitor the $NO_X$ concentration (emissions level). We note that CPMS, also called parametric monitoring, measures a parameter (or multiple parameters) as a key indicator of system performance. The parameter is generally an operational parameter of the process

---

[315] 85 FR 68999 (October 30, 2020).

or the air pollution control device (APCD) that is known to affect the emissions levels from the process or the control efficiency of the APCD. Examples of parametric monitoring include kiln feed rate, clinker production rate, fuel type, fuel flow rate, specific heat consumption, secondary air temperature, kiln feed-end temperature, preheater exhaust gas temperature, induced draught fan pressure drop, kiln feed-end percentage oxygen, percentage downcomer oxygen, primary air flow rate, ammonia feed rate and slippage.

### 3. Iron and Steel Mills and Ferroalloy Manufacturing

#### Applicability

The EPA is proposing to establish regulatory requirements for the Iron and Steel Mills and Ferroalloy Manufacturing source category that apply to emissions units that directly emit or have the potential to emit 100 tpy or more of $NO_X$ and to facilities containing two or more such units that collectively emit or have the potential to emit 100 tpy or more of $NO_X$. The EPA is setting emissions limits based on type of unit to ensure that the necessary emissions reductions occur across all units of the same type. The EPA is seeking comment on whether it should

set an applicability threshold based on a unit's production capacity rather than an emissions threshold.

#### Emissions Limitations and Rationale

In developing the emissions limits for the Iron and Steel and Ferroalloy Manufacturing industry, the EPA reviewed RACT $NO_X$ rules, NESHAP rules, air permits and related emissions tests, technical support documents, and consent decrees. These rules and source-specific requirements most commonly express the emissions limits for this industry in terms of mass of pollutant emitted (pounds) per operating hour (hours) (*i.e.,* pounds of $NO_X$ emitted per production hour), pounds per energy unit (*i.e.,* million British thermal unit (mmBtu)), or pounds of $NO_X$ per ton of steel produced. A regulated entity routinely monitors and keeps track of its production in terms of tons of steel produced per hour (heat rate) as it pertains to the facility's rate of iron and steel production. Depending on the type of unit and industry practice, the EPA is proposing rate-based emissions limits in the form of lb/mmBtu, production-based limits in the form of lb/ton, and work practice standards.

In determining the averaging times for the limits, EPA initially reviewed the NESHAP for Iron and Steel Foundries

codified at 40 CFR part 63 subpart EEEEE, the NESHAP for Integrated Iron and Steel manufacturing facilities codified at 40 CFR part 63 subpart FFFFF, the NESHAP for Ferroalloys Production: Ferromanganese and Silicomanganese codified at 40 CFR part 63 subpart XXX, and the NESHAP for Ferroalloys Production Facilities codified at 40 CFR part 63 subpart YYYYYY. EPA also reviewed various RACT $NO_X$ rules from states located within the OTR, several of which have chosen to implement OTC model rules and recommendations. Based on this information, the EPA is proposing to require a 30-operating day rolling average period as the averaging time frame for this particular industry. The EPA finds that a 30-operating day rolling average period provides a reasonable balance between short term (hourly or daily) and long term (annual) averaging periods, while being flexible and responsive to fluctuations in operations and production.

Based on the available information for this industry, applicable federal and state rules, and active air permits or enforceable orders issued to affected facilities in the iron and steel and ferroalloy manufacturing industry, the EPA proposes the following emissions limits:

TABLE VII.C–3—SUMMARY OF PROPOSED $NO_X$ EMISSIONS LIMITS FOR IRON AND STEEL AND FERROALLOY EMISSIONS UNITS

| Emissions unit | Proposed $NO_X$ emissions standard or requirement (lbs/hour or lb/mmBtu) | Additional information |
|---|---|---|
| Blast Furnace | 0.03 lb/mmBtu | OH $NO_X$ RACT rules limit $NO_X$ emissions from blast furnaces to 0.06 lb/mmBtu without requiring specific control technology. Control $NO_X$ at stoves (typically 3 or 4 per blast furnace), assuming 40–50% reduction) by burner replacement plus SCR. |
| Basic Oxygen Furnace | 0.07 lb/ton | Potential 25–50% reduction by SCR/SNCR from 0.14 lb/ton based on emissions testing. |
| Electric Arc Furnace | 0.15 lb/ton steel | Example permit limits at around 0.2 lb/ton. Assumes 25% reduction by SCR to achieve 0.15 lb/ton steel. |
| Ladle/tundish Preheaters | 0.06 lb/mmBtu | Nucor Kankakee BACT permit limit issued January 2021 is 0.1 lb/mmBtu, 2021. Assume 40% reduction by SCR. |
| Reheat furnace | 0.05 lb/mmBtu | Sterling Steel permit, issued 2019: Low-$NO_X$ natural gas fired burners designed to emit no more than 0.073 lb $NO_X$/mmBtu, Ohio RACT limit is 0.09 lb/mmBtu. Assume 40% reduction by SCR. |
| Annealing Furnace | 0.06 lb/mmBtu | Big River Steel (AR) 2018 limit and Benteler Steel (LA) 2019 limit (0.11 lb/mmBtu), 85 mmBtu/hr and 13 mmBtu/hr, respectively. Lowest was 0.0915 lb/mmBtu, Nucor AR. Assume 40% reduction by SCR. |
| Vacuum Degasser | 0.03 lb/mmBtu | 0.05 lb/mmBtu Nucor Darlington (SC) and Nucor Tuscaloosa (AL). Assume 40% reduction by SCR. |
| Ladle Metallurgy Furnace | 0.1 lb/ton | Assume 40% reduction by SCR. |
| Taconite Production Kilns | Work practice standard to install and operate low $NO_X$ burners. | Consistent with requirements in Minnesota Taconite FIP *See 81 FR 21671.* |
| Coke Ovens (charging) | 0.15 lb/ton of coal charged | Assume 50% reduction staged combustion and/or limited use SCR/SNCR during charging operations from AP–42 0.3 lb/ton emission factor. |
| Coke Ovens (pushing) | 0.015 lb/ton of coal pushed | SunCoke Middletown limit is 0.02 lb/ton of coal. Assume 25% reduction by SCR. |
| Boilers—Coal | 0.20 lb/mmBtu | See explanation in Section VII.C.5. |
| Boilers—Residual oil | 0.20 lb/mmBtu | See explanation in Section VII.C.5. |
| Boilers—Distillate oil | 0.12 lb/mmBtu | See explanation in Section VII.C.5. |

TABLE VII.C–3—SUMMARY OF PROPOSED NO$_X$ EMISSIONS LIMITS FOR IRON AND STEEL AND FERROALLOY EMISSIONS UNITS—Continued

| Emissions unit | Proposed NO$_X$ emissions standard or requirement (lbs/hour or lb/mmBtu) | Additional information |
| --- | --- | --- |
| Boilers—Natural gas ............... | 0.08 lb/mmBtu .......................... | See explanation in Section VII.C.5. |

Due to the many types of units within Iron and Steel Mills and Ferroalloy Manufacturing facilities that are not currently subject to NO$_X$ limitations of the stringency necessary to eliminate significant contribution, most of the emissions limits in this proposed rule are based on examples of permitted emissions and estimated reduction potential from the identified control technology. Based on the selection of SCR, SNCR, and burner replacement in the non-EGU screening assessment, the EPA assumed reductions of 20 to 50 percent from current permitted limits and emissions tests depending on the type of unit and controls being implemented.

In addition, for Taconite Production Kilns, the EPA does not currently have the data to determine appropriate emissions limits that these units could achieve by installing low NO$_X$ burners. Therefore, the EPA is proposing to require the installation of low NO$_X$ burners for Taconite Production Kilns and work practice standards for operating these control technologies to achieve emissions reductions. The EPA is also proposing to require these sources to perform performance tests and establish a unit-specific emissions limit at that time. These work practice standards are consistent with EPA's Taconite FIP for Minnesota. *See* 81 FR 21671 (April 12, 2016). Due to the ongoing nature of this FIP, the EPA is proposing to require installation of specific control technologies and a period of evaluation before setting a numerical emissions limit.

Compliance Assurance Requirements

The EPA is proposing to require each owner or operator of an affected facility that is subject to the NO$_X$ emissions limit for Iron and Steel Mills and Ferroalloy Manufacturing emissions units contained in this section to install, calibrate, maintain, and operate a CEMS for the measurement of NO$_X$ emissions discharged into the atmosphere from the affected facility. The EPA is proposing that each emissions unit will be required to conduct an initial performance test and to operate CEMS to assure compliance. In conducting the performance tests to demonstrate compliance, sources must use test

methods and procedures in 40 CFR 60 appendix A, Method 7E, or other EPA-approved (federally enforceable) test methods and procedures. The EPA is also soliciting comments on alternative monitoring systems or methods that are equivalent to CEMS to demonstrate compliance with the emissions limits.

4. Glass and Glass Product Manufacturing

Applicability

The EPA is proposing to establish regulatory requirements for the Glass and Glass Product Manufacturing source category that apply to emissions units that directly emit or have the potential to emit 100 tpy or more of NO$_X$. The EPA is setting emissions limits based on type of unit to ensure that the necessary emissions reductions occur. The EPA is seeking comment on whether it should set an applicability threshold based on a unit's production capacity rather than an emissions threshold.

Emissions Limitations and Rationale

In developing the emissions limits for the Glass and Glass Product Manufacturing industry, the EPA reviewed RACT NO$_X$ rules, air permits, Alternative Control Techniques (ACT), and consent decrees. These rules and source-specific requirements most commonly express the emissions limits for this industry in terms of mass of pollutant emitted (pounds) per weight of glass removed from the furnace (tons), *i.e.,* pounds of NO$_X$ emitted per ton of glass produced. A regulated entity routinely monitors and keeps track of its glass outputs as it pertains to a furnace's design capacity and the plant's production. Therefore, the EPA believes that this form of NO$_X$ emissions limit is effective, practicable, and convenient to record and report to an air agency.

In determining the averaging time for the limits, the EPA initially reviewed the NSPS for glass manufacturing plants codified at 40 CFR part 60 subpart CC. This NSPS applied to any glass melting furnace in an affected facility that commenced construction or modification after June 15, 1979, and produced more than 5 tons of glass per day. It was noted that the NSPS only provides standards for particulate matter and does not provide standards

or averaging times for NO$_X$. In order to determine the averaging time for the NO$_X$ emissions limits, the EPA reviewed various RACT NO$_X$ rules from states located within the OTR, several of which have chosen to implement OTC model rules and recommendations.

Most of the states within the OTR implement RACT regulations for the glass manufacturing industry that do not specify presumptive NO$_X$ limits.[316] With respect to those RACT rules in the OTR states that contain presumptive RACT NO$_X$ limits for glass manufacturing furnaces, EPA found variations in averaging times, ranging from a 30-day rolling average to a more stringent daily average.[317] The EPA also reviewed RACT NO$_X$ regulations for the glass manufacturing industry outside the OTR and observed that 30-day rolling averages and daily averages varied throughout the states.[318] The EPA is proposing to require owners or operators of glass manufacturing furnaces to comply with the applicable presumptive NO$_X$ emissions limits on a 30-day rolling average time frame. This averaging time frame is consistent with other statewide RACT NO$_X$ regulations for this particular industry. Furthermore, a state's air agency may choose to require an averaging period shorter than a 30-operating day rolling

[316] RACT NO$_X$ rules of the following OTR states CT, DC, DE, MD, ME, NH, NY, RI, VA, and VT do not provide presumptive NO$_X$ limits for glass manufacturing sources. These RACT regulations require owners or operators to submit RACT case-by-case analysis.

[317] Pennsylvania's presumptive RACT NO$_X$ emissions limits are based on 30-day rolling average. New Jersey's and Massachusetts' rules contain more stringent daily averages. Maryland's RACT rule, section 26.11.09.08.I, requires owner or operators to optimize combustion by performing daily oxygen tests and maintain excess oxygen at 4.5% or less. See *http://www.dsd.state.md.us/comar/comarhtml/26/26.11.09.08.htm.*

[318] For example, presumptive RACT NO$_X$ emissions limits in California are based on both 30-day rolling and daily averages (see *https://www.valleyair.org/rules/currntrules/R4354%20051911.pdf*). Wisconsin's NO$_X$ emissions limits are based on a 30-day rolling average (see *https://casetext.com/regulation/wisconsin-administrative-code/agency-department-of-natural-resources/environmental-protection-air-pollution-control/chapter-nr-428-control-of-nitrogen-compound-emissions/subchapter-iv-NO$_X$-reasonably-available-control-technology-requirements/section-nr-42822-emission-limitation-requirements*).

average in air permits or RACT regulations for these plants. The EPA finds that a 30-operating day rolling average period provides a reasonable balance between short term (hourly or daily) and long term (annual) averaging periods, while being flexible and responsive to fluctuations in operation and production.

Based on the available information for this industry, applicable state and local air agency rules, and active air permits or enforceable orders issued to affected glass manufacturing plants, EPA is proposing the following emissions limits for glass manufacturing furnaces:

TABLE VII.C–4—SUMMARY OF PROPOSED NO$_X$ EMISSIONS LIMITS FOR FURNACE UNIT TYPES IN GLASS AND GLASS PRODUCT MANUFACTURING

| Furnace type | Proposed NO$_X$ emissions limit (lb/ton of glass produced) | Additional information |
|---|---|---|
| Container Glass Manufacturing Furnace. | 4.0 | Limits reviewed ranged between 1–4; one state rule allowed as high as 5; with addition of post combustion NO$_X$ controls, the upper range could be reduced significantly; consistent with 25 Pennsylvania Code 129.304(a)(1) and New Jersey Administrative Code 7:27 Subchapter 19.1. |
| Pressed/Blown Glass Manufacturing Furnace or Fiberglass Manufacturing Furnace. | 4.0 | Limits reviewed ranged between 1.36–4; one state rule allowed as high as 7; with addition of post combustion control the limit could be reduced significantly; limit of 4.0 is consistent with RACT regulations for states located within OTR. |
| Flat Glass Manufacturing Furnace. | 9.2 | Limits reviewed ranged between 5–9.2; with the addition of post combustion controls the limit could be reduced significantly; consistent with San Joaquin Valley Air Pollution Control District Rule 4354 5.1.1 and New Jersey Administrative Code 7:27 Subchapter 19.1. |

The EPA is soliciting comment on whether it is feasible or appropriate to phase out and retire existing glass manufacturing furnaces in the affected states and replace them with more energy efficient and less emitting units like all-electric melter installations. The EPA is also requesting comment on the time needed to complete such a task. All-electric melters are glass melting furnaces in which all the heat required for melting is provided by electric current from electrodes submerged in the molten glass.[319] All-electric melter furnaces could provide an energy efficient and NO$_X$ emission-free alternative to current methods of melting and producing glass.

According to the EPA's "Alternative Control Techniques Document—NO$_X$ Emissions from Glass Manufacturing,"[320] glass manufacturing furnaces may utilize combustion modifications equivalent to low-NO$_X$ burners and oxy-firing. The EPA is soliciting comment on whether it is feasible or appropriate to require sources with existing glass manufacturing furnaces in affected states that currently utilize these combustion modifications to add and operate a post-combustion control device like SNCR and SCR to further improve their NO$_X$ removal efficiency. The EPA is also requesting comments on the time needed to install such controls.

Compliance Assurance Requirements

The EPA is proposing to require each owner or operator of an affected facility that is subject to the NO$_X$ emissions standards for glass manufacturing furnaces contained in this section to install, calibrate, maintain, and operate a CEMS for the measurement of NO$_X$ emissions discharged into the atmosphere from the affected facility. The EPA is also soliciting comments on alternative monitoring systems or methods that are equivalent to CEMS to demonstrate compliance with the emissions limits. In conducting the performance tests to demonstrate compliance, sources must use test methods and procedures in 40 CFR part 60 appendix A, method 7E, or other EPA-approved (federally enforceable) methods and procedures. Owners or operators must calculate and record the 30-operating day rolling emissions rate of NO$_X$ as the total of all hourly emissions data for a glass manufacturing furnace in the preceding 30 days, divided by the total tons of glass produced in that furnace during the same 30-operating day period. Owners or operators of glass manufacturing furnaces installed with continuous emissions monitoring may demonstrate compliance with the emissions limit as follows: (1) Determine the average pounds of NO$_X$ emitted per day, (2) determine the tons of glass removed per day during the same day, (3) divide the average pounds of NO$_X$ emitted per day by the tons of glass removed per day as determined in step (2), and (4) compare the quotient to the emissions limits prescribed in the Section VII of this proposed rule. If the pollutant mass emissions rate is in lb/hr, the following equation[321] shall be used to convert the emissions rate to lb pollutant/ton of glass pulled:

$$lb\ emitted\ /\ ton\ of\ glass\ pulled = \frac{\frac{lb}{hr}emitted}{Pull\ rate\ in\frac{tons}{hr}}$$

---

[319] See definitions in 40 CFR part 60 subpart CC.

[320] "Alternative Control Techniques Document—NO$_X$ Emissions from Glass Manufacturing," EPA–453/R–94–037, June 1994.

[321] This equation is provided in the San Joaquin Valley Unified Air Pollution Control District's Rule 4354, section 8.1.

5. Boilers From Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills

Applicability

The EPA is proposing to establish regulatory requirements for the Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills industries that apply to boilers within these facilities that have a design capacity of 100 mmBtu/hr or greater. These requirements are consistent with EPA's findings at Step 3 with respect to Tier 2 non-EGU industries. As noted here, we do not believe boilers meeting this size classification exist within the other Tier 2, or Tier 1 industries, but if they do, the EPA proposes that they would also be subject to the requirements of this part. Based on our review of the potential emissions from industrial boilers of various fuel types, we find that use of a boiler design capacity of 100 mmBtu/hr reasonably approximates the selection of 100 tpy used within the Non-EGU Screening Assessment memorandum. Therefore, boilers subject to the requirements of this section of the proposed rule are those found within any of the 23 covered states with non-EGU emissions reduction obligations that are within a Tier 1 or Tier 2 industry and have a design capacity of 100 mmBTU/hr or greater. The EPA is seeking comment on whether EPA should alternatively set an applicability threshold based on potential to emit.

Emissions Limitations and Rationale

This section of the proposed rule applies to certain boilers located at any facility identified as a Tier 2 industry within the non-EGU screening assessment. As described within the Non-EGU Screening Assessment memorandum, the EPA reviewed the projected 2026 emissions data to identify large boilers within the Tier 2 industries, defined as boilers projected to emit more than 100 tons per year in 2026. Boilers meeting this threshold were found in three of the five Tier 2 industries, as identified in Table VII.C.5–1.

TABLE VII.C.5–1—TIER 2 INDUSTRIES WITH LARGE BOILERS AND ASSOCIATED NAICS CODES

| Industry | NAICS code |
|---|---|
| Basic Chemical Manufacturing ......... | 3251xx |
| Petroleum and Coal Products Manufacturing ............................................ | 3241xx |
| Pulp, Paper, and Paperboard Mills .. | 3221xx |

The EPA did not find large boilers within the Lime and Gypsum Product Manufacturing (NAICS code 3274xx) or the Metal Ore Mining industries (NAICS code 2122xx). As such the EPA is not expressly proposing to include boilers in those industries. However, if as a result of receiving additional information during the comment period the EPA identifies large boilers within these two industries that meet the applicability criteria described below, those boilers could be subject to the requirements of the final rule.

As described within the Non-EGU Sectors TSD, the RACT rules we reviewed containing NO$_X$ limits for industrial boilers relied primarily on design capacity in mmBtu/hr as the metric for selecting design criteria. The EPA is proposing to use that same metric to establish control requirements for boilers with a design capacity of 100 mmBtu/hr or greater. As noted within the Non-EGU Sectors TSD, boilers rated at 100 mmBtu/hr or greater can emit large amounts of NO$_X$, particularly if they do not operate NO$_X$ control equipment.

The EPA reviewed NO$_X$ emissions limits for industrial boilers with design capacities of 100 mmBtu/hr or greater that have been adopted by states and incorporated into their SIPs. The Non-EGU Sectors TSD contains a detailed discussion of that evaluation. Based on our review, we propose to establish the following NO$_X$ emissions limits for coal, oil, and gas fired industrial boilers located at a Tier 2 industry:

TABLE VII.C.5–2—PROPOSED NO$_X$ EMISSIONS LIMITS FOR INDUSTRIAL BOILERS >100 MMBTU/HR

| Unit type | Emissions limit (lbs NO$_X$/mmBtu) | Additional information |
|---|---|---|
| Coal ................................. | 0.20 | Limits reviewed ranged from 0.08 to 1.0. Proposed limit will likely require a combination of combustion controls or post-combustion controls. |
| Residual oil .................... | 0.20 | Limits reviewed ranged from 0.15 to 0.50. Proposed limit will likely require combustion controls. |
| Distillate oil ................... | 0.12 | Limits reviewed ranged from 0.10 to 0.43. Proposed limit will likely require combustion controls. |
| Natural gas .................... | 0.08 | Limits reviewed ranged from 0.06 to 0.25. Proposed limit will likely require a combination of combustion controls or post-combustion controls. |

Additional information on the EPA's derivation of these proposed emissions rates for boilers is provided below and in the Non-EGU Sectors TSD.

The EPA notes that some coal, oil, and gas-fired industrial boilers may have already installed combustion or post-combustion control equipment, such as SCR or SNCR, sufficient to meet the emission limits established in this FIP. Some of the boilers covered by this FIP might have install controls to meet the emission limits contained within EPA's NSPS located at 40 CFR 60 Subpart Db, which requires that some fossil fuel-fired units that commenced construction, modification, or reconstruction after June 19, 1984, meet various NO$_X$ emission limits based on factors such as unit type or heat rate. Additionally, industrial boilers located in ozone nonattainment areas or within the ozone transport region may have installed controls to meet emission limits adopted by states to meet NO$_X$ RACT requirements.

a. Coal-Fired Industrial Boilers

Coal-fired industrial boilers subject to the proposed requirements of this section would have to meet a NO$_X$ emissions limit of 0.2 lbs/mmBtu on a 30-day rolling average basis.

Various forms of combustion and post-combustion NO$_X$ control technology exist that should enable most facilities to be retrofit with equipment that will enable them to meet these emissions limits. Additionally, as noted in the Non-EGU Sectors TSD, many states containing ozone nonattainment areas or located within the OTR have already adopted emissions limits similar to or more stringent than the limits the EPA proposes here. Furthermore, some coal-fired industrial boilers may have installed combustion or post-combustion control equipment to meet the emissions limits contained within EPA's NSPS located at 40 CFR part 60 subpart Db, which requires that coal-fired industrial boilers meet a NO$_X$ emissions limit of between 0.5 and 0.8

lbs/mmBtu depending on unit type.[322] Enhancements to or retrofit of additional $NO_X$ control technology should enable most sources to meet the proposed $NO_X$ limit.

There are two main types of $NO_X$ control technology that we believe can be retrofit to most existing industrial boilers, or incorporated into the design of new boilers, to meet our proposed emissions limits. These two control types are combustion controls and post-combustion controls, and in some instances both types are used together. As noted in the EPA's "Alternative Control Techniques Document—$NO_X$ Emissions from Industrial/Commercial/ Institutional (ICI) Boilers" (hereafter "ICI Boiler ACT"),[323] the type of $NO_X$ control available for use on a particular unit depends primarily on the type of boiler, fuel type, and fuel-firing configuration. For example, Table 2–3 of the ICI Boiler ACT indicates which types of combustion and post-combustion $NO_X$ controls are suitable to various types of coal-fired ICI boilers. We note that one type of combustion control, staged combustion air, and one type of post-combustion control, SNCR, are indicated as being compatible with all coal-fired unit types. Additional resources are available that document the availability of $NO_X$ control equipment for industrial boilers.[324]

b. Oil-Fired Industrial Boilers

Most oil-fired boilers are fueled by either residual (heavy) oil or distillate (light) oil. The proposed $NO_X$ emissions limit for residual oil-fired boilers subject to the requirements of this section is 0.2 lbs/mmBtu, and the proposed emissions limit for distillate oil-fired boilers is 0.12 lbs/mmBtu. The proposed averaging time for these emissions limits is a 30-day rolling average. As with coal-fired industrial boilers, a number of combustion and post-combustion $NO_X$ control technologies exist that should enable most facilities to meet these emissions limits, and the Non-EGU Sectors TSD identifies numerous states that have already adopted emissions limits similar to the limits EPA proposes here. Table 2–3 of

the ICI Boiler ACT indicates that two types of $NO_X$ combustion control, low-$NO_X$ burners and flue gas recirculation, are commonly found on oil-fueled industrial boilers, and that SNCR, a post-combustion control technology, is suitable to most oil-fueled industrial boilers other than those of the packaged firetube design. Some oil-fired industrial boilers may have already installed combustion or post-combustion control equipment to meet the emissions limits contained within EPA's NSPS at 40 CFR part 60 subpart Db, which requires that distillate oil-fired units meet a $NO_X$ emissions limit of between 0.1 to 0.2 lbs/mmBtu depending on heat release rate, and that residual oil-fired units meet a $NO_X$ emissions limit of between 0.3 to 0.4 lbs/mmBtu also depending on heat release rate.[325] The additional resources noted in the paragraph above discussing coal-fired industrial boilers also contain useful information regarding effective $NO_X$ control equipment for residual and distillate fueled industrial boilers.

c. Gas-Fired Industrial Boilers

The proposed $NO_X$ emissions limit for gas-fired boilers subject to the requirements of this section is 0.08 lbs/ mmBtu. The proposed averaging time for these emissions limits is a 30-day rolling average.

As with fossil-fuel-fired boilers, numerous combustion and post-combustion $NO_X$ control technologies exist that should enable most facilities to meet these emissions limits, and many states have already adopted emissions limits similar to the limits the EPA proposes here. Table 2–3 of the ICI Boiler ACT indicates the same control technologies that are suitable for application to oil-fired boilers are also likely to be effective at controlling $NO_X$ emissions from gas-fired industrial boilers. Some gas-fired industrial boilers may have already installed combustion or post-combustion control equipment to meet the emissions limits contained within EPA's NSPS at 40 CFR 60 Subpart Db, which requires that gas-fired units meet a $NO_X$ emissions limit of between 0.1 to 0.2 lbs/MMBtu depending on heat release rate. The additional resources noted in the discussion of coal-fired industrial boilers also contain useful information regarding effective $NO_X$ control equipment for gas-fired industrial boilers.

The EPA anticipates that the majority of boilers covered by this section of the FIP will combust one of the fuels for which we have proposed emissions

limits. However, we request comment on whether emissions limits for other types of fuels should be included in a final FIP, and if so, the types of fuels and the emissions limits that boilers powered by these fuels should be required to meet. Additionally, the EPA seeks comment on whether the EPA should establish less stringent emissions rates for boilers with low utilization rates, and if so, the appropriate emissions rate(s) and corresponding boiler utilization rate(s). The EPA also seeks comment on whether a different averaging time other than the 30-day averaging time proposed for boilers would be more appropriate and requests information supporting any suggested alternative.

Compliance Assurance Requirements

Given the similarities in the types of units covered, the EPA proposes that boilers subject to the requirements of this section demonstrate compliance in a manner similar to the emissions monitoring requirements found in section 60.45 of the NSPS for industrial, commercial, and institutional (ICI) boilers at 40 CFR part 60 subpart D. Those requirements include, among other provisions, the performance of an initial compliance test, installation of a CEMS unless the initial performance test indicates the unit's emissions rate is 70 percent or less of the required emissions rate, and an annual stack test for units not required to install a CEMS.

D. Submitting a SIP

A state may submit a SIP at any time to address CAA requirements that are covered by a FIP, and if the EPA approves the SIP it would replace the FIP, in whole or in part, as appropriate.[326] The EPA has established certain specialized provisions for replacing FIPs with SIPs within all the CSAPR trading programs, including the use of so-called "abbreviated SIPs" and "full SIPs," see 40 CFR 52.38(a)(4) and (5) and (b)(4), (5), (8), (9), (11), and (12); 40 CFR 52.39(e), (f), (h), and (i). For a state to remove all FIP provisions through an approved SIP revision, a state would need to address all of the required reductions addressed by the FIP for that state, i.e., reductions achieved through both EGU control and non-EGU control, as applicable to that state. Additionally, tribes in Indian country within the geographic scope of this proposed rule may elect to work with EPA under the Tribal Authority Rule to replace the FIP for areas of Indian country, in whole or in part, with a tribal implementation plan or

---

[322] 40 CFR 60.44b.

[323] "Alternative Control Techniques Document— $NO_X$ Emissions from Industrial/Commercial/ Institutional (ICI) Boilers," EPA–453/R–94–022, March 1994.

[324] For example, see "Applicability and Feasibility of $NO_X$, $SO_2$, and PM Emissions Control Technologies for Industrial, Commercial, and Institutional Boilers," Northeast States for Coordinated Air Use Management, November 2008 (revised January 2009) and "Nitrogen Oxides ($NO_x$), Why and How They Are Controlled," EPA, Clean Air Technical Center, 456/F–99–006R, November 1999.

[325] 40 CFR 60.44b.

[326] CAA sections 110(c)(1)(B), 110(k)(3).

reasonably severable portions of a tribal implementation plan.

Under the proposed new FIPs for the 25 states whose EGUs would be required to participate in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program with its proposed modifications, "abbreviated" and "full" SIP options continue to be available. An "abbreviated SIP" allows a state to submit a SIP revision that would establish state-determined allowance allocation provisions replacing the default FIP allocation provisions but leaves the remaining FIP provisions in place. A "full SIP" allows a state to adopt a trading program meeting certain requirements that would allow sources in the state to continue to use the EPA-administered trading program through an approved SIP revision, rather than a FIP. In addition, as under past CSAPR rulemakings, the EPA proposes to provide states with an opportunity to adopt state-determined allowance allocations for existing units for the second control period under this rule—in this case, the 2024 control period—through streamlined SIP revisions. *See* 76 FR 48326–48332 for additional discussion of full and abbreviated SIP options; *see also* 40 CFR 52.38(b).

1. SIP Option To Modify Allocations for 2024 Under EGU Trading Program

As with the start of past CSAPR rulemakings, the EPA proposes to allow a state to use a similar process to submit a SIP revision establishing allowance allocations for existing EGU units in the state for the second control period of the new requirements, *i.e.,* in 2024, to replace the EPA-determined default allocations. This proposed process would use updated deadlines, *i.e.,* a state must submit a letter to EPA within 60 days of publication of the final rule indicating its intent to submit a complete SIP revision by September 1, 2023. The SIP would provide in an EPA-prescribed format a list of existing units within the state and their allocations for the 2024 control period. If a state does not submit a letter of intent to submit a SIP revision, the EPA-determined default allocations will be recorded by 90 days of publication of the final rule. If a state submits a timely letter of intent but fails to submit a SIP revision, the EPA-determined default allocations will be recorded by September 15, 2023. If a state submits a timely letter of intent followed by a timely SIP revision that is approved, the approved SIP allocations will be recorded by March 1, 2024.

The EPA requests comment on the proposed option to modify allowance allocations under the Group 3 trading

program for EGUs for the 2024 control period through a SIP revision.

2. SIP Option To Modify Allocations for 2025 and Beyond Under EGU Trading Program

For the 2025 control period and later, the EPA proposes that states in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program can modify the EPA-determined default allocations with an approved SIP revision. For the 2025 control period and later, SIPs can be full or abbreviated SIPs. States will also have the option to expand applicability to include EGUs between 15 MWe and 25 MWe or, in the case of states subject to the NO$_X$ SIP Call, as discussed in Section VII.F.1 of this proposed rule, large non-EGU boilers and combustion turbines. Inclusion of the large non-EGUs would serve as a mechanism to address the state's outstanding regulatory obligations under the NO$_X$ SIP Call with respect to those sources, and the state would be allowed to allocate a defined quantity of additional Group 3 allowances because of the expanded set of sources. *See* above and 76 FR 48326–48332 for additional discussion of full and abbreviated SIP options; *see also* 40 CFR 52.38(b).

For states that want to modify the EPA-determined default allocations or expand applicability of the EGU trading program, the EPA proposes that a state could submit a SIP revision that makes changes only to one or both of those type of provisions while relying on the FIP for the remaining provisions of the EGU trading program. This abbreviated SIP option allows states to tailor the FIP to their individual choices while maintaining the FIP-based structure of the trading program. In order to ensure the availability of allowance allocations for units in any Indian country within a state not covered by the state's CAA implementation planning authority, if the state chose to replace EPA's default allocations with state-determined allocations, the EPA would continue to administer any portion of each state emissions budget reserved as a new unit set-aside or an Indian country existing unit set-aside.

The proposed SIP submittal deadline for this type of revision is December 1, 2023, if the state intends for the SIP revision to be effective beginning with the 2025 control period. For states that submit this type of SIP revision, the EPA proposes that the deadline to submit state-determined allocations beginning with the 2025 control period under an approved SIP would be June 1, 2024, and the deadline for the EPA to record those allocations would be July 1, 2024. Similarly, under the

proposed new deadlines a state could submit a SIP revision beginning with the 2026 control period and beyond by December 1, 2024, with state allocations for the 2026 control period due June 1, 2025, and the EPA recordation of the allocations by July 1, 2025.

The EPA requests comment on the proposed option to replace certain allowance allocation or applicability provisions under the Group 3 trading program for EGUs for control periods in 2025 and later years through a SIP revision.

3. SIP Option To Replace the Federal EGU Trading Program With an Integrated State EGU Trading Program

For the 2025 control period and later, the EPA proposes that states in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program can choose to replace the Federal EGU trading program with an integrated State EGU trading program through an approved SIP revision. Under this option, a state would submit a SIP revision that makes changes only to modify the EPA-determined default allocations or expand applicability of the EGU trading program and adopt identical provisions for the remaining portions of the EGU trading program. This SIP option allows states to replace these FIP provisions with state-based SIP provisions while continuing participation in the larger regional trading program. As with the abbreviated SIP option discussed above, in order to ensure the availability of allowance allocations for units in any Indian country within a state not covered by the state's CAA implementation planning authority, if the state chose to replace EPA's default allocations with state-determined allocations, EPA would continue to administer any portion of each state emissions budget reserved as a new unit set-aside or an Indian country existing unit set-aside.

Proposed deadlines for this type of SIP revision are the same as the deadlines for abbreviated SIP revisions. For the SIP-based program to start with the 2025 control period, the SIP deadline would be December 1, 2023, the deadline to submit state-determined allocations for the 2025 control period under an approved SIP would be June 1, 2024, and the deadline for the EPA to record those allocations would be July 1, 2024, and so on.

The EPA requests comment on the proposed option to replace the federal trading program for EGUs with an integrated state trading program for EGUs for control periods in 2025 and later years through a SIP revision.

## 4. SIP Revisions That Do Not Use the New Trading Program

States can submit SIP revisions to replace the FIP that achieve the necessary EGU emissions reductions but do not use the CSAPR NO_X Ozone Season Group 3 Trading Program. For a transport SIP revision that does not use the CSAPR NO_X Ozone Season Group 3 Trading Program, the EPA would evaluate the transport SIP based on the particular control strategies selected and whether the strategies as a whole provide adequate and enforceable provisions ensuring that the necessary emissions reductions (*i.e.*, reductions equal to or greater than what the Group 3 trading program will achieve) will be achieved. In order to address the applicable CAA requirements, the SIP revision should include the following general elements: (1) A comprehensive baseline 2023 statewide NO_X emissions inventory (which includes existing control requirements), which should be consistent with the 2023 emissions inventory that the EPA used to calculate the required state budget in this final proposed rule (unless the state can explain the discrepancy); (2) a list and description of control measures to satisfy the state emissions reduction obligation and a demonstration showing when each measure would be implemented to meet the 2023 and successive control periods; (3) fully-adopted state rules providing for such NO_X controls during the ozone season; (4) for EGUs greater than 25 MWe, monitoring and reporting under 40 CFR part 75, and for other units, monitoring and reporting procedures sufficient to demonstrate that sources are complying with the SIP (*see* 40 CFR part 51 subpart K ("source surveillance" requirements)); and (5) a projected inventory demonstrating that state measures along with federal measures will achieve the necessary emissions reductions in time to meet the 2023 and successive compliance deadlines (*e.g.*, enforceable reductions commensurate with installation of SCR on coal-fired EGUs by the 2026 ozone season). The SIPs must meet procedural requirements under the Act, such as the requirements for public hearing, be adopted by the appropriate state board or authority, and establish by a practically enforceable regulation or permit(s) a schedule and date for each affected source or source category to achieve compliance. Once the state has made a SIP submission, the EPA will evaluate the submission(s) for completeness before acting on the SIP. EPA's criteria for determining completeness of a SIP submission are codified at 40 CFR part 51 appendix V.

For further information on replacing a FIP with a SIP, *see* the discussion in the final CSAPR rulemaking (76 FR 48326).

## 5. SIP Revision Requirements for Non-EGU Emissions Limits

EPA's promulgation of a non-EGU transport FIP would in no way affect the ability of states to submit, for review and approval, a SIP that replaces the requirements of the FIP with state requirements. In order to replace the non-EGU portion of the FIP in a state, the state's SIP must provide adequate provisions to prohibit an equivalent or greater amount of NO_X emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. The non-EGU requirements of the FIP would remain in place in each covered state until a state's SIP has been approved by the EPA to replace the FIP.

After promulgation of the final FIP, the EPA anticipates that the most straightforward method for a state to submit a SIP revision to replace the non-EGU portion of the FIP for the state would be to provide a SIP that includes emissions limits at an equivalent or greater level of stringency than is specified for non-EGU sources meeting the applicability criteria and associated compliance assurance provisions for each of the unit types identified in Section VII.C of this proposed rule.

The EPA seeks comment on other potential methods by which states could develop a SIP to obtain emissions reductions from non-EGU sources that would replace the state's non-EGU portion of the FIP. The EPA recognizes that states may select emissions reductions strategies that differ from the emissions limitations included in the proposed non-EGU FIP. But the state must still demonstrate that the replacement SIP provides an equivalent or greater amount of emissions reductions as the proposed FIP. The EPA anticipates that such emissions reductions strategies would have to achieve reductions beyond those emissions reductions already projected to occur in EPA's emissions projections and air quality modeling conducted at Steps 1 and 2. Such reductions must also be achieved on the same timeframe as the reductions that would be required in a final FIP. A demonstration of equivalency using other control strategies is complicated by the fact that the proposed emissions limits for non-EGU sources are generally rate-based and expressed in a variety of forms; this will make comparative analysis to determine equivalency challenging.

In all cases, a SIP submitted by a state to replace the non-EGU FIPs would need to rely on permanent and practically enforceable controls measures that are included in the SIP and, once approved by the EPA, rendered federally enforceable. So-called "demonstration-only" or "non-regulatory" SIPs would be insufficient. Further, the EPA anticipates that states would bear the burden of establishing that the state's alternative approach achieves at least an equivalent level of emissions reduction as the FIP, and (unless merely adopting directly the control requirements of the FIP) the state would need to provide a Step 3 multifactor analysis that the state's SIP eliminates significant contribution.

## E. Title V Permitting

This proposed rule, like CSAPR, the CSAPR Update, and the Revised CSAPR Update does not establish any permitting requirements independent of those under Title V of the CAA and the regulations implementing Title V, 40 CFR parts 70 and 71.[327] All major stationary sources of air pollution and certain other sources are required to apply for title V operating permits that include emissions limitations and other conditions as necessary to ensure compliance with the applicable requirements of the CAA, including the requirements of the applicable SIP. CAA sections 502(a) and 504(a), 42 U.S.C. 7661a(a) and 7661c(a). The "applicable requirements" that must be addressed in title V permits are defined in the title V regulations (40 CFR 70.2 and 71.2 (definition of "applicable requirement")).

The EPA anticipates that, given the nature of the units subject to this proposed rule, most if not all of the sources at which the units are located are already subject to title V permitting requirements. For sources subject to title V, the interstate transport requirements for the 2015 ozone NAAQS that are applicable to them under the new or amended FIPs would be "applicable requirements" under title V and therefore must be addressed in the title V permits. For example, requirements concerning designated representatives, monitoring, reporting, and recordkeeping, the requirement to hold allowances covering emissions, the compliance assurance provisions, and liability are "applicable requirements" that must be addressed in the permits.

Title V of the CAA establishes the basic requirements for state title V

---

[327] Part 70 addresses requirements for state title V programs, and Part 71 governs the federal title V program.

permitting programs, including, among other things, provisions governing permit applications, permit content, and permit revisions that address applicable requirements under final FIPs in a manner that provides the flexibility necessary to implement market-based programs such as the trading programs established in CSAPR, the CSAPR Update, the Revised CSAPR Update and this proposed rule. 42 U.S.C. 7661a(b); 40 CFR 70.6(a)(8) & (10); 40 CFR 71.6(a)(8) & (10).

In CSAPR, the CSAPR Update and the Revised CSAPR Update, the EPA established standard requirements governing how sources covered by that rule would comply with title V and its regulations.[328] 40 CFR 97.506(d), 97.806(d) and 97.1006(d). For any new or existing sources subject to this proposed rule, identical title V compliance provisions would apply, just as they would have in the CSAPR $NO_X$ Ozone Season Group 3 Trading Program. For example, the title V regulations provide that a permit issued under title V must include "[a] provision stating that no permit revision shall be required under any approved . . . emissions trading and other similar programs or processes for changes that are provided for in the permit." 40 CFR 70.6(a)(8) and 71.6(a)(8). Consistent with these provisions in the title V regulations, in CSAPR, the CSAPR Update and the Revised CSAPR Update, the EPA included a provision stating that no permit revision is necessary for the allocation, holding, deduction, or transfer of allowances. 40 CFR 97.506(d)(1), 97.806(d)(1) and 97.1006(d)(1). This provision is also included in each title V permit for an affected source. This proposed rule maintains the approach taken under CSAPR, the CSAPR Update and the Revised CSAPR Update that allows allowances to be traded (or allocated, held, or deducted) without a revision to the title V permit of any of the sources involved.

Similarly, this proposed rule would also continue to support the means by which a source in the proposed trading program can use the title V minor modification procedure to change its

approach for monitoring and reporting emissions, in certain circumstances. Specifically, sources may use the minor modification procedure so long as the new monitoring and reporting approach is one of the prior-approved approaches under CSAPR, the CSAPR Update and the Revised CSAPR Update (i.e., approaches using a continuous emissions monitoring system under subparts B and H of part 75, an excepted monitoring system under appendices D and E to part 75, a low mass emissions excepted monitoring methodology under 40 CFR 75.19, or an alternative monitoring system under subpart E of part 75), and the permit already includes a description of the new monitoring and reporting approach to be used. See 40 CFR 97.506(d)(2), 97.806(d)(2) and 97.1006(d)(2); 40 CFR 70.7(e)(2)(i)(B) and 40 CFR 71.7(e)(1)(i)(B). As described in EPA's 2015 Title V Guidance, sources may comply with this requirement by including a table of all of the approved monitoring and reporting approaches under CSAPR, the CSAPR Update and the Revised CSAPR Update trading programs in which the source is required to participate, and the applicable requirements governing each of those approaches.[329] Inclusion of such a table in a source's title V permit therefore allows a covered unit that seeks to change or add to its chosen monitoring and recordkeeping approach to easily comply with the regulations governing the use of the title V minor modification procedure.

Under CSAPR, the CSAPR Update and the Revised CSAPR Update, in order to employ a monitoring or reporting approach different from the prior-approved approaches discussed previously, unit owners and operators must submit monitoring system certification applications to the EPA establishing the monitoring and reporting approach actually to be used by the unit, or, if the owners and operators choose to employ an alternative monitoring system, to submit petitions for that alternative to the EPA. These applications and petitions are subject to the EPA review and approval to ensure consistency in monitoring and reporting among all trading program participants. EPA's responses to any petitions for alternative monitoring systems or for alternatives to specific monitoring or reporting requirements are posted on EPA's website.[330] The

EPA maintains the same approach in this proposed rule.

Consistent with EPA's approach under CSAPR, the CSAPR Update and the Revised CSAPR Update, the applicable requirements resulting from the new and amended FIPs generally will have to be incorporated into affected sources' existing title V permits either pursuant to the provisions for reopening for cause (40 CFR 70.7(f) and 71.7(f)) or the standard permit renewal provisions (40 CFR 70.7(c) and 71.7(c)).[331] For sources newly subject to title V that are affected sources under the FIPs, the initial title V permit issued pursuant to 40 CFR 70.7(a) should address the final FIP requirements.

As was the case in the CSAPR, the CSAPR Update and the Revised CSAPR Update, the new and amended FIPs impose no independent permitting requirements and the title V permitting process will impose no additional burden on sources already required to be permitted under title V.

### F. Relationship to Other Emissions Trading and Ozone Transport Programs

#### 1. $NO_X$ SIP Call

States affected by both the $NO_X$ SIP Call for the 1979 ozone NAAQS and any final ozone season requirements established upon finalization of this proposed rule for the 2015 ozone NAAQS will be required to comply with the requirements of both rules. EPA is proposing to require $NO_X$ ozone season emissions reductions from EGUs larger than 25 MWe in many of the $NO_X$ SIP Call states, and at greater stringency than required by the $NO_X$ SIP Call, by requiring the EGUs to participate in the CSAPR $NO_X$ Ozone Season Group 3 Trading Program. Therefore, this proposed rule, if finalized, would satisfy the requirements of the $NO_X$ SIP Call for these large EGUs.

In the Revised CSAPR Update, the EPA finalized the option for any $NO_X$ SIP Call state that was also subject to the Revised CSAPR Update to voluntarily submit a SIP revision to expand the applicability of the Group 3 trading program to include all $NO_X$ Budget Trading Program units, which in addition to large EGUs also include large non-EGU boilers and combustion turbines with a maximum design heat input greater than 250 mmBtu/hr. As part of such a SIP revision, the state

---

[328] The EPA has also issued a guidance document and template that includes instructions for how to incorporate the applicable requirements into a source's Title V permit. See Memorandum dated May 13, 2015, from Anna Marie Wood, Director, Air Quality Policy Division, and Reid P. Harvey, Director, Clean Air Market Division, EPA, to Regional Air Division Directors, Subject: "Title V Permit Guidance and Template for the Cross-State Air Pollution Rule" ("2015 Title V Guidance"), available at https://www.epa.gov/sites/default/files/2016-10/documents/csapr_title_v_permit_guidance.pdf.

[329] Id.

[330] https://www.epa.gov/airmarkets/part-75-petition-responses.

[331] A permit is reopened for cause if any new applicable requirements (such as those under a FIP) become applicable to an affected source with a remaining permit term of 3 or more years. If the remaining permit term is less than 3 years, such new applicable requirements will be added to the permit during permit renewal. See 40 CFR 70.7(f)(1)(I) and 71.7(f)(1)(I).

would be allowed to issue additional emissions allowances capped at a level intended to preserve the stringency of the Group 3 trading program. In today's proposed rule, the EPA is not proposing any changes to this provision of the Group 3 trading program.[332]

## 2. Acid Rain Program

This proposed rule, if finalized, would not affect any Acid Rain Program requirements. Any Title IV sources that are subject to provisions of this proposed rule would still need to continue to comply with all Acid Rain provisions. Acid Rain Program $SO_2$ and $NO_X$ requirements are established independently in Title IV of the CAA and will continue to apply independently of this proposed rule's provisions. Acid Rain sources will still be required to comply with Title IV requirements, including the requirement to hold Title IV allowances to cover $SO_2$ emissions after the end of a compliance year.

## 3. Other Current Emissions Trading Programs

This proposed rule, if finalized, would not substantively affect any provisions of the CSAPR $NO_X$ Annual, CSAPR $SO_2$ Group 1, CSAPR $SO_2$ Group 2, CSAPR $NO_X$ Ozone Season Group 1, or CSAPR $NO_X$ Ozone Season Group 2 trading programs for sources that continue to participate in those programs except with regard to the schedule for EPA to record certain allowance allocations, as discussed in Section VII.B.12 of this proposed rule. In addition, certain revisions are proposed to the CSAPR $NO_X$ Ozone Season Group 2 Trading Program regulations to address the proposed transition of sources in eight states from that program to the CSAPR $NO_X$ Ozone Season Group 3 Trading Program, as discussed in Section VII.B.11 of this proposed rule. Sources that are subject to any of the CSAPR trading programs will still be required to comply with all requirements, including the requirement to hold allowances to cover emissions after the end of a control period.

---

[332] In the CSAPR Update, the EPA finalized an identical option allowing $NO_X$ SIP Call states to expand applicability of the Group 2 trading program to cover certain non-EGUs. If the geographic expansion of the Group 3 trading program proposed in this rulemaking is finalized as proposed, no $NO_X$ SIP Call states would continue to be covered by the Group 2 trading program. Because the provision allowing $NO_X$ SIP Call states to expand applicability of the Group 2 trading program to include such non-EGUs would therefore be obsolete, the EPA is proposing to remove the provision.

## VIII. Environmental Justice Analytical Considerations and Stakeholder Outreach and Engagement

Consistent with EPA's commitment to integrating environmental justice in the agency's actions, and following the directives set forth in multiple Executive Orders, the Agency has analyzed the impacts of this proposed rule on communities with environmental justice concerns and engaged with stakeholders representing these communities to seek input and feedback. Executive Order 12898 is discussed in Section XI.J of this proposed rule and analytical results are available in Chapter 7 of the RIA.

### A. Introduction

Executive Order 12898 directs EPA staff to identify the populations of concern who are most likely to experience unequal burdens from environmental harms; specifically, minority populations, low-income populations, and indigenous peoples.[333] Additionally, Executive Order 13985 is intended to advance racial equity and support underserved communities through federal government actions.[334] The EPA defines environmental justice as the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income, with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. EPA further defines the term fair treatment to mean that "no group of people should bear a disproportionate burden of environmental harms and risks, including those resulting from the negative environmental consequences of industrial, governmental, and commercial operations or programs and policies."[335] In recognizing that minority and low-income populations often bear an unequal burden of environmental harms and risks, EPA continues to consider ways of protecting them from adverse public health and environmental effects of air pollution.

### B. Analytical Considerations

EPA's environmental justice technical guidance[336] states that "[t]he analysis of potential EJ concerns for regulatory actions should address three questions:

1. Are there potential environmental justice concerns associated with environmental stressors affected by the

---

[333] 59 FR 7629, February 16, 1994.

[334] 86 FR 7009, January 20, 2021.

[335] *https://www.epa.gov/environmentaljustice.*

[336] U.S. Environmental Protection Agency (EPA), 2015. Guidance on Considering Environmental Justice During the Development of Regulatory Actions.

regulatory action for population groups of concern in the baseline?

2. Are there potential environmental justice concerns associated with environmental stressors affected by the regulatory action for population groups of concern for the regulatory option(s) under consideration?

3. For the regulatory option(s) under consideration, are potential environmental justice concerns created or mitigated compared to the baseline?''

To address these questions in EPA's first quantitative EJ analysis in the context of a transport rule, the EPA developed a unique analytical approach that considers the purpose and specifics of the proposed rulemaking, as well as the nature of known and potential exposures and impacts. However, due to data limitations, it is possible that our analysis failed to identify disparities that may exist, such as potential environmental justice characteristics (*e.g.,* unemployed), environmental impacts (*e.g.,* other ozone metrics), and more granular spatial resolutions (*e.g.,* neighborhood scale) that were not evaluated.

For the proposed rule, we employ two types of analytics to respond to the above three questions: Proximity analyses and exposure analyses. Both types of analyses can inform whether there are potential EJ concerns for population groups of concern in the baseline (question 1).[337] In contrast, only the exposure analyses, which are based on future air quality modeling, can inform whether there will be potential EJ concerns after implementation of the regulatory options under consideration (question 2) and whether potential EJ concerns will be created or mitigated compared to the baseline (question 3). While the exposure analysis can respond to all three questions, it should be noted that exposure is limited to a single ozone metric, the maximum daily 8-hour average, averaged across the April through September warm season (AS–MO3). This ozone metric likely smooths potential daily ozone gradients and is not directly relatable to the National Ambient Air Quality Standard (NAAQS). Additionally, the ozone exposure analytic results are provided in two formats: Aggregated and distributional. The aggregated results provide an overview of potential ozone exposure differences across populations at the national- and state-levels, while the distributional results show detailed

---

[337] The baseline for proximity analyses is current population information (*e.g.,* 2021), whereas the baseline for ozone exposure analyses are the future years in which the regulatory options will be implemented (*e.g.,* 2023 and 2026).

information about ozone concentrations experienced by everyone within each population.

In Chapter 7 of the RIA we utilize the two types of analytics to address the three EJ questions by quantitatively evaluating (1) the proximity of affected facilities to potentially disadvantaged populations (Section 7.3.1), (2) the potential for disproportionate total ozone concentrations in the baseline across different demographic groups (Sections 7.4.1.1 and 7.4.2.1), and (3) how regulatory alternatives differentially impact the ozone concentration changes experienced by different demographic populations (Sections 7.4.1.2 and 7.4.2.2). Each of these analyses depends on mutually exclusive assumptions, was performed to answer separate questions, and is associated with unique limitations and uncertainties.

Baseline demographic proximity analyses can be relevant for identifying populations that may be exposed to local pollutants, such as $NO_2$ emitted from affected sources in this proposed rule. However, such analyses are less useful here as they do not account for the potential impacts of this proposed rule on long-range ozone concentration changes. The baseline demographic proximity analysis presented in the RIA finds larger percentages of Hispanic individuals, Black individuals, people below the poverty level, people with less educational attainment, and people linguistically isolated living within 5 km and 10 km of an affected EGU, compared to national averages. It also finds larger percentages of people below the poverty level and with less educational attainment living within 5 km and 10 km of an affected non-EGU. Separately, the tribal proximity analysis finds multiple tribes and unique tribal lands located within 50 miles of an affected facility. These results do not in themselves demonstrate disproportionate impacts of affected facilities in the baseline but could suggest that emission reductions from this proposed rule may be responsive to potential local air quality concerns of nearby communities.

Whereas the proximity analyses are limited to evaluating local pollutants under baseline scenarios (question 1), the ozone exposure analyses can provide insight into all three EJ questions with regard to AS–MO3 concentrations. Even though both the proximity and ozone exposure analyses can improve understanding of baseline EJ concerns (question 1), the two should not be directly compared. This is because the demographic proximity analysis does not include air quality

information and is based on current, not future, population information.

Importantly, the baseline analysis of AS–MO3 ozone concentrations responds to question 1 from EPA's environmental justice technical guidance document more directly than the proximity analyses, as it evaluates a form of the environmental stressor targeted by the regulatory action. Baseline AS–MO3 analyses show that certain populations, such as American Indians, Hispanics, and Asians, may experience somewhat higher AS–MO3 concentrations compared to the national average. The less educated and children may also experience higher concentrations compared to the national average, but to a lesser extent. Conversely, Black populations may experience lower AS–MO3 concentrations than the national average. Therefore, also in response to question 1, there likely are potential environmental justice concerns associated with ozone exposures affected by the regulatory action for population groups of concern in the baseline. However, these baseline exposure results have not been fully explored and additional analyses are likely needed to understand potential implications.

The ozone exposure analysis evaluates the impacts of the proposed rule on future ozone concentrations after rule implementation. When comparing across the policy, more-, and less-stringent regulatory alternatives, AS–MO3 concentrations are reduced across all populations evaluated in both future years and across both EGUs and non-EGUs. In other words, we expect that populations experiencing disproportionate AS–MO3 exposures in the baseline will experience similar disproportionate AS–MO3 exposures under the proposed rulemaking, although to a lesser absolute extent as the action described in this proposed rule is expected to lower ozone in many areas, including residual ozone nonattainment areas, and thus alleviate some pre-existing health risks of ozone across all populations evaluated. Therefore, in response to question 2, we expect that there will be potential EJ concerns with regard to AS–MO3 concentrations after implementation of the regulatory options under consideration.

Question 3 asks whether potential EJ concerns will be created or mitigated as compared to the baseline. As the RIA estimates disproportionate AS–MO3 exposures in the baseline and similar reductions in all population evaluated, we do not predict that potential EJ concerns related to AS–MO3

concentrations will be created or mitigated as compared to the baseline (question 3).

The ozone exposure results should not be extrapolated to ozone metrics other than AS–MO3. Detailed environmental justice analytical results can be found in Chapter 7 of the RIA.

*C. Outreach and Engagement*

Prior to this proposed rule, EPA initiated a public outreach effort to gather input from stakeholder groups likely to be interested in this proposed rule. Specifically, the EPA hosted an environmental justice webinar on October 26, 2021, to share information about the proposed rule and solicit feedback about potential environmental justice considerations. The webinar was attended by over 180 individuals representing state governments, federally recognized tribes, environmental NGOs, higher education institutions, industry, and the EPA.[338] Participants were invited to comment during the webinar or provide written comments to a pre-regulatory docket. The webinar was recorded and distributed to attendees after the event. Some of the key issues raised by stakeholders during the webinar and in the pre-proposal comments are described below.

*Daily emissions rate limits.* Several commenters asserted that cap and trade programs with seasonal limits on overall $NO_X$ emissions do not prevent facilities from running their controls inefficiently on high ozone days. These commenters recommended that facilities linked to downwind ozone problems comply with daily rate limits to ensure that emissions reductions occur on days when ozone is highest. The commenters noted that daily limits could particularly benefit environmental justice communities located near facilities and would also benefit those located downwind.

*Regulation of other sources.* Several commenters asserted that the EPA should consider regulation of sources other than EGUs and sources of $NO_X$ in rulemakings pertaining to issues of ozone transport. For example, some commenters asserted that the EPA should regulate emissions from non-EGUs, mobile sources, and sources of VOCs.

*Environmental justice analysis and methodology in rulemakings.* Several commenters offered recommendations to improve environmental justice analysis and methodology in rulemakings that address air pollution.

---

[338] This does not constitute EPA's tribal consultation under E.O. 13175, which is described in Section XI.F of this proposed rule.

One commenter recommended that the EPA should broadly: (1) Identify communities of interest, based on the number of and proximity to polluting facilities; (2) integrate demographic factors to discern social, economic, and racial disparities in these areas; (3) consider the community's particular vulnerabilities and sensitivities to health harms and risks, and exposure to cumulative health harms and risks; and (4) reach out to the community members near such facilities themselves to gain tangible, lived experiences across their lifetimes. The commenter also suggested that the EPA should build off factors identified in existing environmental justice screening tools, including EPA EJSCREEN and California's CalEnviroScreen. One commenter noted that in developing environmental justice analyses, the EPA should consider and address the need for regulatory certainty, including the need for clear regulatory definitions of environmental justice areas and clear requirements for those areas.

*Environmental justice stakeholder outreach in rulemakings.* Some commenters asserted that the EPA could improve stakeholder outreach in the rulemaking process. For example, one commenter noted that during the development of a rule proposal, the EPA could more directly reach out to all potentially impacted environmental justice communities, be more prepared to answer questions about the rule proposal, and be more aware of holidays when establishing comment periods.

Additionally, some commenters touched on issues that are also relevant to other EPA policies and programs. For example, some commenters asserted that the EPA should base air pollutant transport policy more on monitored data rather than modeling data to promptly address air pollution in areas where current monitoring data indicates an exceedance of the NAAQS. Other commenters recommended that the EPA consider strengthening cost thresholds for Reasonably Available Control Technology (RACT), a program that is applicable to certain existing sources in non-attainment areas.

In addition to the engagement conducted prior to this proposed rule, EPA is providing the public, including those communities disproportionately impacted by the burdens of pollution, opportunities to engage in the EPA's public comment period for this proposed rule, including by hosting a public hearing. This public hearing will occur according to the schedule identified in the Public Participation section of this proposed rule.

## IX. Costs, Benefits, and Other Impacts of the Proposed Rule

In the Regulatory Impact Analysis for the proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards (RIA), EPA estimated the benefits, compliance costs, and emissions changes that may result from the proposed rule for the analysis period 2023 to 2042. The estimated benefits and compliance costs are presented in detail in the RIA accompanying this proposed rule. EPA notes that for EGUs the estimated benefits and compliance costs are directly associated with generation shifting to minimize costs; fully operating existing SCRs during ozone season; fully operating existing SNCRs during ozone season; installing state-of-the-art combustion controls; imposing backstop emission rate limits on certain units that lack SCR controls; and unit-level decisions to retrofit or retire. EPA also notes that for non-EGUs the estimated benefits and compliance costs are directly associated with installing controls to meet the $NO_X$ emissions limits presented in Section I.B above.

For EGUs, EPA analyzed this proposed rule's emission budgets using uniform control stringency represented by $1,800 per ton of $NO_X$ (2016$) in 2023 and $11,000 per ton of $NO_X$ (2016$) in 2026. EPA also analyzed a more and a less stringent alternative. The more and less stringent alternatives differ from the proposed rule in that they set different $NO_X$ ozone season emission budgets for the affected EGUs and different dates for compliance with backstop emission rate limits.

For non-EGUs, EPA analyzed this proposed rule using a marginal cost threshold of up to $7,500 per ton (2016$) for 2026 for the following emissions units and industries: Reciprocating internal combustion engines in Pipeline Transportation of Natural Gas; kilns in Cement and Cement Product Manufacturing; boilers and furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; furnaces in Glass and Glass Product Manufacturing; and high-emitting boilers in Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills. The less stringent alternative assumes there are emissions limits for all emission units from the proposal except for high-emitting boilers in Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills. The more stringent alternative assumes emissions limits for all emission units from the proposed rule and all boilers, not just high-emitting boilers, in Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills.

Table IX–1 provides the projected 2023 through 2027, 2030, 2035, and 2042 EGU emission reductions for the evaluated regulatory control alternatives. For additional information on emissions changes, *see* Table 4.6 and Table 4–7 in Chapter 4 of the RIA.

TABLE IX–1—EGU OZONE SEASON $NO_X$ EMISSIONS CHANGES AND ANNUAL EMISSIONS REDUCTIONS (TONS) FOR $NO_X$, $SO_2$, $PM_{2.5}$, AND $CO_2$ FOR THE REGULATORY CONTROL ALTERNATIVES FROM 2023–2042

| | Proposed rule | Less stringent alternative | More stringent alternative |
|---|---|---|---|
| *2023:* | | | |
| $NO_X$ (ozone season) | 6,000 | 6,000 | 7,000 |
| $NO_X$ (annual) | 10,000 | 10,000 | 10,000 |
| $SO_2$ (annual) * | | 1,000 | 2,000 |
| $CO_2$ (annual, thousand metric) | | | |
| $PM_{2.5}$ (annual) | | | |
| *2024:* | | | |
| $NO_X$ (ozone season) | 26,000 | 14,000 | 29,000 |
| $NO_X$ (annual) | 42,000 | 22,000 | 45,000 |
| $SO_2$ (annual) | 42,000 | 20,000 | 43,000 |
| $CO_2$ (annual, thousand metric) | 18,000 | 10,000 | 19,000 |
| $PM_{2.5}$ (annual) | 4,000 | 1,000 | 4,000 |
| *2025:* | | | |

TABLE IX–1—EGU OZONE SEASON NO$_X$ EMISSIONS CHANGES AND ANNUAL EMISSIONS REDUCTIONS (TONS) FOR NO$_X$, SO$_2$, PM$_{2.5}$, AND CO$_2$ FOR THE REGULATORY CONTROL ALTERNATIVES FROM 2023–2042—Continued

| | Proposed rule | Less stringent alternative | More stringent alternative |
|---|---|---|---|
| NO$_X$ (ozone season) | 46,000 | 22,000 | 51,000 |
| NO$_X$ (annual) | 73,000 | 33,000 | 80,000 |
| SO$_2$ (annual) | 83,000 | 39,000 | 84,000 |
| CO$_2$ (annual, thousand metric) | 37,000 | 19,000 | 38,000 |
| PM$_{2.5}$ (annual) | 9,000 | 2,000 | 9,000 |
| *2026:* | | | |
| NO$_X$ (ozone season) | 47,000 | 32,000 | 53,000 |
| NO$_X$ (annual) | 81,000 | 55,000 | 87,000 |
| SO$_2$ (annual) | 106,000 | 76,000 | 108,000 |
| CO$_2$ (annual, thousand metric) | 40,000 | 26,000 | 42,000 |
| PM$_{2.5}$ (annual) | 9,000 | 5,000 | 9,000 |
| *2027:* | | | |
| NO$_X$ (ozone season) | 49,000 | 42,000 | 54,000 |
| NO$_X$ (annual) | 88,000 | 76,000 | 95,000 |
| SO$_2$ (annual) | 129,000 | 113,000 | 131,000 |
| CO$_2$ (annual, thousand metric) | 43,000 | 34,000 | 46,000 |
| PM$_{2.5}$ (annual) | 10,000 | 7,000 | 10,000 |
| *2030:* | | | |
| NO$_X$ (ozone season) | 52,000 | 52,000 | 57,000 |
| NO$_X$ (annual) | 96,000 | 98,000 | 100,000 |
| SO$_2$ (annual) | 104,000 | 100,000 | 103,000 |
| CO$_2$ (annual, thousand metric) | 50,000 | 45,000 | 50,000 |
| PM$_{2.5}$ (annual) | 9,000 | 9,000 | 9,000 |
| *2035:* | | | |
| NO$_X$ (ozone season) | 49,000 | 50,000 | 52,000 |
| NO$_X$ (annual) | 90,000 | 93,000 | 93,000 |
| SO$_2$ (annual) | 96,000 | 93,000 | 98,000 |
| CO$_2$ (annual, thousand metric) | 38,000 | 36,000 | 38,000 |
| PM$_{2.5}$ (annual) | 11,000 | 12,000 | 10,000 |
| *2042:* | | | |
| NO$_X$ (ozone season) | 47,000 | 47,000 | 48,000 |
| NO$_X$ (annual) | 70,000 | 75,000 | 71,000 |
| SO$_2$ (annual) | 54,000 | 50,000 | 54,000 |
| CO$_2$ (annual, thousand metric) | 25,000 | 23,000 | 24,000 |
| PM$_{2.5}$ (annual) | 8,000 | 8,000 | 8,000 |

*SO$_2$ emissions reductions under the proposed rule are 350 tons and rounded to zero. SO$_2$ emissions reductions under the less stringent alternative are 507 tons and rounded to 1,000 tons. SO$_2$ emissions reductions are 1,699 tons under the more stringent alternative and rounded to 2,000 tons. Given the rounding, the difference between the reductions under the proposed rule and the less stringent alternative is approximately 160 tons.

Table IX–2 below provides a summary of the ozone season emissions for non-EGUs for the 23 states subject to the proposed non-EGU emissions limits starting in 2026, along with the estimated ozone season reductions for 2026 for the proposed rule and the less and more stringent alternatives. The analysis in the RIA assumes that the estimated reductions in 2026 will be the same in later years.

TABLE IX–2—OZONE SEASON (OS) NO$_X$ EMISSIONS AND EMISSIONS REDUCTIONS (TONS) FOR NON-EGUS FOR THE PROPOSED RULE AND THE LESS AND MORE STRINGENT ALTERNATIVES *

| State | 2019 OS NO$_X$ emissions [a] | Proposed rule—OS NO$_X$ reductions | Less stringent alternative—OS NO$_X$ reductions | More stringent alternative—OS NO$_X$ reductions |
|---|---|---|---|---|
| AR | 8,265 | 1,654 | 922 | 1,654 |
| CA | 14,579 | 1,666 | 1,598 | 1,777 |
| IL | 16,870 | 2,452 | 2,452 | 2,553 |
| IN | 19,604 | 3,175 | 2,787 | 3,175 |
| KY | 11,934 | 2,291 | 2,291 | 2,291 |
| LA | 35,831 | 6,769 | 4,121 | 6,955 |
| MD | 2,365 | 45 | 45 | 45 |
| MI | 18,996 | 2,731 | 2,731 | 3,093 |
| MN | 17,591 | 673 | 673 | 789 |
| MO | 9,109 | 3,103 | 3,103 | 3,103 |
| MS | 12,284 | 1,761 | 1,577 | 1,761 |
| NJ | 2,025 | 0 | 0 | 29 |
| NV | 2,418 | 0 | 0 | 0 |
| NY | 6,003 | 500 | 389 | 613 |
| OH | 19,729 | 2,790 | 2,611 | 2,814 |
| OK | 22,146 | 3,575 | 3,575 | 3,871 |

Federal Register / Vol. 87, No. 66 / Wednesday, April 6, 2022 / Proposed Rules **20157**

TABLE IX–2—OZONE SEASON (OS) $NO_X$ EMISSIONS AND EMISSIONS REDUCTIONS (TONS) FOR NON-EGUs FOR THE PROPOSED RULE AND THE LESS AND MORE STRINGENT ALTERNATIVES *—Continued

| State | 2019 OS $NO_X$ emissions [a] | Proposed rule—OS $NO_X$ reductions | Less stringent alternative—OS $NO_X$ reductions | More stringent alternative—OS $NO_X$ reductions |
|---|---|---|---|---|
| PA | 15,861 | 3,284 | 3,132 | 3,340 |
| TX | 47,135 | 4,440 | 4,440 | 6,596 |
| UT | 6,276 | 757 | 757 | 757 |
| VA | 7,041 | 1,563 | 1,465 | 1,660 |
| WI | 6,571 | 2,150 | 677 | 2,234 |
| WV | 9,825 | 982 | 982 | 982 |
| WY | 10,335 | 826 | 826 | 826 |
| Totals | 322,793 | 47,186 | 41,153 | 50,918 |

*In the non-EGU screening assessment for 2026, EPA estimated emissions reduction potential from the non-EGU industries and emissions units. In the screening assessment, EPA used CoST to identify emissions units, emissions reductions, and associated compliance costs to evaluate the effects of potential non-EGU emissions control measures and technologies. CoST is designed to be used for illustrative control strategy analyses (*e.g.*, NAAQS regulatory impact analyses) and not for unit-specific, detailed engineering analyses. The estimates from CoST identify proxies for (1) non-EGU emissions units that have emissions reduction potential, (2) potential controls for and emissions reductions from these emissions units, and (3) control costs from the potential controls on these emissions units. The control cost estimates do not include monitoring, recordkeeping, reporting, or testing costs. This screening assessment is not intended to be, nor take the place of, a unit-specific detailed engineering analysis that fully evaluates the feasibility of retrofits for the emissions units, potential controls, and related costs.

[a] EPA determined that the 2019 inventory was appropriate because it provided a more accurate prediction of potential near-term emissions reductions. The analysis in the RIA assumes that the 2019 ozone season emissions will be the same in 2026 and later years.

For EGUs, the EPA analyzed ozone season $NO_X$ emission reductions and the associated costs to the power sector using the Integrated Planning Model (IPM) and its underlying data and inputs. For non-EGUs, the EPA analyzed ozone season $NO_X$ emission reductions and the associated costs for 2026 in the Non-EGU Screening Assessment memorandum. Table IX–3 reflects the estimates of the changes in the cost of supplying electricity for the regulatory control alternatives for EGUs and estimates of complying with the emissions limits for non-EGUs. For EGUs, compliance costs in 2023. While seemingly counterintuitive, estimating negative compliance costs in a single year is possible given IPM's objective function is to minimize the discounted net present value (NPV) of a stream of annual total cost of generation over a multi-decadal time period. As such the model may undertake a compliance pathway that pushes higher costs later into the forecast period, since future costs are discounted more heavily than near term costs. This can result in a policy scenario showing single year costs that are lower than the Baseline, but over the entire forecast horizon, the policy scenario shows higher costs. For a detailed description of these cost trends, please see Chapter 4, Section 4.5.2 of the RIA. For a detailed description of the methods and results from Non-EGU Screening Assessment memorandum, see Chapter 4, Sections 4.4 and 4.5.2 of the RIA.

TABLE IX–3—TOTAL ESTIMATED COMPLIANCE COSTS (MILLION 2016$), 2023–2042

| | Proposed rule | Less-stringent alternative | More-stringent alternative |
|---|---|---|---|
| *2023:* | | | |
| EGUs | −209 | −173 | −178 |
| Non-EGUs | | | |
| Total | −209 | −173 | −178 |
| *2026:* | | | |
| EGUs | 707 | −406 | 1,180 |
| Non-EGUs | 411 | 357 | 445 |
| Total | 1,117 | −49 | 1,625 |
| *2027:* | | | |
| EGUs | 1,544 | 1,540 | 1,983 |
| Non-EGUs | 411 | 357 | 445 |
| Total | 1,955 | 1,896 | 2,428 |
| *2030:* | | | |
| EGUs | 1,235 | 1,200 | 1,740 |
| Non-EGUs | 411 | 357 | 445 |
| Total | 1,646 | 1,557 | 2,185 |
| *2035:* | | | |
| EGUs | 1,729 | 1,596 | 2,335 |
| Non-EGUs | 411 | 357 | 445 |
| Total | 2,139 | 1,953 | 2,780 |
| *2042:* | | | |
| EGUs | 910 | 1,757 | 1,001 |
| Non-EGUs | 411 | 357 | 445 |
| Total | 1,321 | 2,114 | 1,446 |

Tables IX–4 and IX–5 report the estimated economic value of avoided premature deaths and illness in each year relative to the baseline along with the 95% confidence interval. In each of these tables, for each discount rate and regulatory control alternative, multiple benefits estimates are presented reflecting alternative ozone and $PM_{2.5}$ mortality risk estimates. For additional information on these benefits, see Chapter 5 of the RIA.

TABLE IX–4—ESTIMATED DISCOUNTED ECONOMIC VALUE OF AVOIDED OZONE AND $PM_{2.5}$-ATTRIBUTABLE PREMATURE MORTALITY AND ILLNESS FOR THE PROPOSED POLICY SCENARIOS IN 2023

[95% Confidence interval; millions of 2016$][a b]

| Disc. rate | Pollutant | Proposal | More stringent alternative | Less stringent alternative |
|---|---|---|---|---|
| 3% | Ozone Benefits | $57 ($15 to $120)[c] and $460 ($51 to $1,200)[d]. | $65 ($17 to $140)[c] and $530 ($59 to $1,400)[d]. | $57 ($15 to $120)[c] and $460 ($51 to $1,200).[d] |
| | PM Benefit Per Ton (BPT)s. | $44 and $45 | $190 and $190 | $59 and $60. |
| | Ozone Benefits plus PM BPTs. | $100 ($59 to $160)[c] and $500 ($96 to $1,200)[d]. | $250 ($200 to $330)[c] and $720 ($250 to $1,600)[d]. | $120 ($74 to $180)[c] and $520 ($110 to $1,300).[d] |
| 7% | Ozone Benefits | $51 ($9.6 to 110)[c] and $410 ($42 to $1,100)[d]. | $58 ($11 to $130)[c] and $480 ($49 to $1,300)[d]. | $51 ($9.6 to $110)[c] and $410 ($42 to $1,100).[d] |
| | PM BPTs | $40 and $41 | $170 and $170 | $53 and $54. |
| | Ozone Benefits plus PM BPTs. | $90 ($49 to $150)[c] and $450 ($83 to $1,100)[d]. | $230 ($180 to $300)[c] and $650 ($220 to $1,400)[d]. | $100 ($63 to $170)[c] and $470 ($97 to $1,100).[d] |

[a] Values rounded to two significant figures. The two benefits estimates are separated by the word "and" to signify that they are two separate estimates. The estimates do not represent lower- and upper-bound estimates and should not be summed.
[b] We estimated ozone benefits for changes in $NO_X$ for the ozone season and changes in $PM_{2.5}$ and $PM_{2.5}$ precursors for EGUs in 2023. This table does not include benefits from reductions for non-EGUs because reductions from these sources are not expected prior to 2026 when the proposed standards would become effective.
[c] Using the pooled short-term ozone exposure mortality risk estimate.
[d] Using the long-term ozone exposure mortality risk estimate.

TABLE IX–5—ESTIMATED DISCOUNTED ECONOMIC VALUE OF AVOIDED OZONE AND $PM_{2.5}$-ATTRIBUTABLE PREMATURE MORTALITY AND ILLNESS FOR THE PROPOSED POLICY SCENARIO IN 2026

[95% Confidence interval; millions of 2016$][a b]

| Disc. rate | Pollutant | Proposal | More stringent alternative | Less stringent alternative |
|---|---|---|---|---|
| 3% | Ozone Benefits | $1,200 ($310 to $2,600)[c] and $10,000 ($1,100 to $26,000)[d]. | $1,300 (340 to $2,900)[c] and $11,000 ($1,200 to $29,000)[d]. | $830 ($210 to $1,800)[c] and $6,900 ($760 to $18,000).[d] |
| | PM BPTs | $8,100 and $8,300 | $7,800 and $7,900 | $3,400 and $3,500. |
| | Ozone Benefits plus PM BPTs. | $9,300 ($8,400 to $11,000)[c] and $18,000 ($9,400 to $35,000)[d]. | $9,100 ($8,100 to $11,000)[c] and $19,000 ($9,200 to $37,000)[d]. | $4,300 ($3,700 to $5,200)[c] and $10,000 ($4,300 to $22,000).[d] |
| 7% | Ozone Benefits | $1,100 ($200 to $2,400)[c] and $9,000 ($920 to $24,000)[d]. | $1,200 ($220 to $2,700)[c] and $10,000 ($1,000 to $26,000)[d]. | $740 ($140 to $1,700)[c] and $6,200 ($630 to $16,000).[d] |
| | PM BPTs | $7,300 and $7,400 | $7,000 and $7,100 | $3,100 and $3,200. |
| | Ozone Benefits plus PM BPTs. | $8,400 ($7,500 to $9,700)[c] and $16,000 ($8,300 to $31,000)[d]. | $8,200 ($7,200 to $9,700)[c] and $17,000 ($8,200 to $34,000)[d]. | $3,800 ($3,200 to $4,800)[c] and $9,300 ($3,800 to $19,000).[d] |

[a] Values rounded to two significant figures. The two benefits estimates are separated by the word "and" to signify that they are two separate estimates. The estimates do not represent lower- and upper-bound estimates and should not be summed.
[b] We estimated changes in $NO_X$ for the ozone season and changes in $PM_{2.5}$ and $PM_{2.5}$ precursors in 2026. This table represents changes in EGU and non-EGU ozone season and annual controls.
[c] Sum of ozone mortality estimated using the pooled short-term ozone exposure risk estimate and the Di et al. (2017) long-term $PM_{2.5}$ exposure mortality risk estimate.
[d] Sum of the Turner et al. (2016) long-term ozone exposure risk estimate and the Di et al. (2017) long-term $PM_{2.5}$ exposure mortality risk estimate.

In Tables IX–6, IX–7, and IX–8, EPA presents a summary of the monetized benefits, costs, and net benefits of the proposal and the more and less stringent alternatives for 2023, 2026, and 2030, respectively. The monetized benefits estimates do not include important climate benefits that were not monetized in the RIA. In addition, there are important water quality benefits and health benefits associated with reductions in concentrations of air pollutants other than $PM_{2.5}$ and ozone that are not quantified. We request comment on how to address the climate benefits and other categories of non-monetized benefits of the proposed rule. Discussion of the non-monetized health, climate, welfare, and water quality benefits is found in Chapter 5 of the RIA.

TABLE IX–6—MONETIZED BENEFITS, COSTS, AND NET BENEFITS OF THE PROPOSED AND LESS AND MORE STRINGENT ALTERNATIVES FOR 2023 FOR THE U.S.

[Millions of 2016$][a b]

| | Proposed rule | Less stringent alternative | More stringent alternative |
|---|---|---|---|
| Benefits[c] (3%) | $100 and $500 | $120 and $520 | $250 and $720. |
| Costs[d] | −$210 | −$170 | −$180. |
| Net Benefits | $310 and $710 | $290 and $690 | $430 and $900. |
| Benefits[c] (7%) | $90 and $450 | $100 and $470 | $230 and $650. |
| Costs[d] | −$210 | −$170 | −$180 |
| Net Benefits | $300 and $660 | $280 and $640 | $400 and $820. |

[a] We focus results to provide a snapshot of costs and benefits in 2023, using the best available information to approximate social costs and social benefits recognizing uncertainties and limitations in those estimates.
[b] Rows may not appear to add correctly due to rounding.

[c] Monetized benefits include those related to public health associated with reductions in $PM_{2.5}$ and ozone concentrations. The health benefits are associated with several point estimates and are presented at a real discount rate of 3 percent. Several categories of benefits remain unmonetized and are thus not reflected in the table. Non-monetized benefits include important climate benefits from reductions in $CO_2$ emissions. The U.S. District Court for the Western District of Louisiana has issued an injunction concerning the monetization of the benefits of greenhouse gas emission reductions by EPA and other defendants. *See Louisiana* v. *Biden,* No. 21–cv–01074–JDC–KK (W.D. La. Feb. 11, 2022). Therefore, such values are not presented in the benefit-cost analysis of this proposal conducted pursuant to E.O. 12866. Please see Chapter 5, Section 5.2 of the RIA for more discussion. In addition, there are important unquantified water quality benefits and benefits associated with reductions in other air pollutants.

[d] The costs presented in this table are 2023 annual estimates for each alternative analyzed. An NPV of costs was calculated using a 3.76% real discount rate consistent with the rate used in IPM's objective function for cost-minimization.

TABLE IX–7—MONETIZED BENEFITS, COSTS, AND NET BENEFITS OF THE PROPOSED AND LESS AND MORE STRINGENT ALTERNATIVES FOR 2026 FOR THE U.S.

[Millions of 2016$] [a b]

| | Proposed rule | Less stringent alternative | More stringent alternative |
|---|---|---|---|
| Benefits [c] (3%) | $9,300 and $18,000 | $4,300 and $10,000 | $9,100 and $19,000. |
| Costs [d] | $1,100 | −$49 | $1,600. |
| Net Benefits | $8,200 and $17,000 | $4,300 and $10,000 | $7,500 and $17,000. |
| Benefits [c] (7%) | $8,400 and $16,000 | $3,800 and $9,300 | $8,200 and $17,000. |
| Costs [d] | $1,100 | −$49 | $1,600 |
| Net Benefits | $7,300 and $15,000 | $9,300 and $3,900 | $6,600 and $15,000. |

[a] We focus results to provide a snapshot of costs and benefits in 2026, using the best available information to approximate social costs and social benefits recognizing uncertainties and limitations in those estimates.

[b] Rows may not appear to add correctly due to rounding.

[c] Monetized benefits include those related to public health associated with reductions in $PM_{2.5}$ and ozone concentrations. The health benefits are associated with several point estimates and are presented at a real discount rate of 3 percent. Several categories of benefits remain unmonetized and are thus not reflected in the table. Non-monetized benefits include important climate benefits from reductions in $CO_2$ emissions. The U.S. District Court for the Western District of Louisiana has issued an injunction concerning the monetization of the benefits of greenhouse gas emission reductions by EPA and other defendants. *See Louisiana* v. *Biden,* No. 21–cv–01074–JDC–KK (W.D. La. Feb. 11, 2022). Therefore, such values are not presented in the benefit-cost analysis of this proposal conducted pursuant to E.O. 12866. Please see Chapter 5, Section 5.2 of the RIA for more discussion. In addition, there are important unquantified water quality benefits and benefits associated with reductions in other air pollutants.

[d] The costs presented in this table are 2026 annual estimates for each alternative analyzed. An NPV of costs was calculated using a 3.76% real discount rate consistent with the rate used in IPM's objective function for cost-minimization.

TABLE IX–8—MONETIZED BENEFITS, COSTS, AND NET BENEFITS OF THE PROPOSED AND LESS AND MORE STRINGENT ALTERNATIVES FOR 2030 FOR THE U.S.

(Millions of 2016$) [a b]

| | Proposed rule | Less stringent alternative | More stringent alternative |
|---|---|---|---|
| Benefits [c] (3%) | $9,400 and $20,000 | $4,300 and $11,000 | $9,200 and $21,000. |
| Costs [d] | $1,600 | $1,600 | $2,200. |
| Net Benefits | $7,700 and $18,000 | $2,800 and $9,700 | $7,000 and $19,000. |
| Benefits [c] (7%) | $8,400 and $18,000 | $3,900 and $10,000 | $8,300 and $19,000. |
| Costs [d] | $1,600 | $1,600 | $2,200. |
| Net Benefits | $6,800 and $16,000 | $2,300 and $8,400 | $6,100 and $16,000. |

[a] We focus results to provide a snapshot of costs and benefits in 2030, using the best available information to approximate social costs and social benefits recognizing uncertainties and limitations in those estimates.

[b] Rows may not appear to add correctly due to rounding.

[c] Monetized benefits include those related to public health associated with reductions in $PM_{2.5}$ and ozone concentrations. The health benefits are associated with several point estimates and are presented at a real discount rate of 3 percent. Several categories of benefits remain unmonetized and are thus not reflected in the table. Non-monetized benefits include important climate benefits from reductions in $CO_2$ emissions. The U.S. District Court for the Western District of Louisiana has issued an injunction concerning the monetization of the benefits of greenhouse gas emission reductions by EPA and other defendants. *See Louisiana* v. *Biden,* No. 21–cv–01074–JDC–KK (W.D. La. Feb. 11, 2022). Therefore, such values are not presented in the benefit-cost analysis of this proposed rule conducted pursuant to E.O. 12866. Please see Chapter 5, Section 5.2 of the RIA for more discussion. In addition, there are important unquantified water quality benefits and benefits associated with reductions in other air pollutants.

[d] The costs presented in this table are 2030 annual estimates for each alternative analyzed. An NPV of costs was calculated using a 3.76% real discount rate consistent with the rate used in IPM's objective function for cost-minimization.

In addition, Table IX–9 presents estimates of the present value (PV) of the monetized benefits and costs and the equivalent annualized value (EAV), an estimate of the annualized value of the net benefits consistent with the present value, over the twenty-year period of 2023 to 2042. The estimates of the PV and EAV are calculated using discount rates of 3 and 7 percent as directed by OMB's Circular A–4 and are presented in 2016 dollars discounted to 2022.

TABLE IX–9—MONETIZED ESTIMATED BENEFITS, COMPLIANCE COSTS, AND NET BENEFITS OF THE PROPOSED RULE AND LESS AND MORE STRINGENT ALTERNATIVES, 2023 THROUGH 2042

(Millions 2016$, discounted to 2022) [a]

|  | 3 Percent discount rate | | 7 Percent discount rate | |
|---|---|---|---|---|
|  | PV | EAV | PV | EAV |
| **Benefits** | | | | |
| Proposed Rule | $250,000 | $17,000 | $150,000 | $14,000 |
| Less Stringent Alternative | 150,000 | 9,500 | 88,000 | 7,800 |
| More Stringent Alternative | 270,000 | 17,000 | 160,000 | 14,000 |
| **Compliance Costs** | | | | |
| Proposed Rule | 22,000 | 1,500 | 14,000 | 1,300 |
| Less Stringent Alternative | 20,000 | 1,300 | 12,000 | 1,100 |
| More Stringent Alternative | 28,000 | 1,900 | 18,000 | 1,700 |
| **Net Benefits** | | | | |
| Proposed Rule | 220,000 | 15,000 | 130,000 | 12,000 |
| Less Stringent Alternative | 120,000 | 8,100 | 70,000 | 6,600 |
| More Stringent Alternative | 230,000 | 15,000 | 130,000 | 12,000 |

[a] The U.S. District Court for the Western District of Louisiana has issued an injunction concerning the monetization of the benefits of greenhouse gas emission reductions by EPA and other defendants. See *Louisiana* v. *Biden,* No. 21–cv–01074–JDC–KK (W.D. La. Feb. 11, 2022). Therefore, such values are not presented in the benefit-cost analysis of this proposed rule conducted pursuant to E.O. 12866.

As shown in Table IX–9, the PV of the benefits of this proposed rule, discounted at a 3-percent discount rate, is estimated to be about $250,000 million, with an EAV of about $17,000 million. At a 7-percent discount rate, the PV of the benefits is estimated to be $150,000 million, with an EAV of about $14,000 million. The PV of the compliance costs, discounted at a 3-percent rate, is estimated to be about $22,000 million, with an EAV of about $1,500 million. At a 7-percent discount rate, the PV of the compliance costs is estimated to be about $14,000 million, with an EAV of about $1,300 million.

In addition to the analysis of costs and benefits, EPA also estimated the impacts on projected 2023 and 2026 ozone design values that are expected from the EGU and non-EGU control alternatives in this proposed rule. As described above, the alternative scenarios include the proposed rule along with scenarios that reflect less stringent and more stringent alternatives for EGUs and non-EGUs. The projected ozone design values and ozone impacts estimated in 2023 and 2026 for the proposed, less stringent, and more stringent alternatives are provided in Appendix 3B of the RIA. In summary, the differences in the amount of ozone reduction across the three alternatives at individual receptors in 2023 are consistent with the relative changes in $NO_X$ emissions in this year under the different scenarios. Overall, in 2023 the estimated ozone reductions from all three of the alternatives are projected to be less than 0.1 ppb at most receptors.

The exceptions are at certain receptors in Connecticut, Illinois, Texas, and Utah where impacts are between 0.1 and 0.2 ppb. In 2026, the largest impacts in the proposed rule are estimated at the two receptors in Texas (*i.e.,* Brazoria County and Harris County), where the average reduction is 1.3 ppb. Elsewhere in 2026, the average reductions for the proposed rule are on the order of 0.5 ppb at receptors in Connecticut, Illinois, and Wisconsin. The average reduction for the four receptors in Utah is approximately 0.3 ppb, while the average reduction at receptors in Colorado and California are approximately 0.2 ppb. Overall, the less stringent alternative provides approximately 0.1 to 0.3 ppb less ppb reduction (*i.e.,* 30 to 40 percent less reduction), on average, compared to the proposed rule at receptors in the East and in Colorado and Utah. The more stringent alternative does not appear to provide any notable additional ozone reductions compared to the proposed rule in all receptor areas, except at receptors in Connecticut and Texas where the average reduction increases by 0.1 ppb and 0.2 ppb with the more stringent alternative, respectively.

Examining the projected average and maximum design values in 2023 at individual receptors for the proposed, less stringent, and more stringent alternatives indicates that three of the receptors included in this impact analysis are projected to change attainment status in 2023 as a result of this proposed rule. Specifically, receptors in Clark County, Nevada,

Butte County, California, and Riverside County Californian (Monitor ID: 060650008) are projected to switch from maintenance-only in the 2023 baseline to attainment and the receptor in Harris County, Texas is projected to switch from nonattainment to maintenance-only under any of the alternatives in 2023. In 2026, six of the receptors in this analysis are projected to change attainment status as a result of the emissions reductions in this proposed rule. Specifically, Calaveras County, California, Brazoria County, Texas, and in Kenosha County, Wisconsin (Monitor ID: 550590025) are projected to switch from maintenance-only to attainment in 2026 and a receptor in Riverside County, California (Monitor ID: 060650016) is projected to switch from nonattainment to maintenance under any of the alternatives. The receptor in Douglas County, Colorado and one of the receptors in Cook County, Illinois (Monitor ID: 170310076) are projected to switch from maintenance-only to attainment under the proposed and more stringent alternatives, but these receptors are projected to remain as maintenance-only in the less stringent alternative. The projected design values and additional information on the ozone impact analysis can be found in Appendix 3B of the proposed rule RIA.

## X. Summary of Proposed Changes to the Regulatory Text for the Federal Implementation Plans and Trading Programs for EGUs

This section describes the proposed amendments to the regulatory text that

would implement the proposed findings and remedy discussed elsewhere in this proposed rule with respect to EGUs. The primary CFR amendments would be revisions to the FIP provisions addressing states' good neighbor obligations related to ozone in 40 CFR part 52 as well as the revisions to the regulations for the CSAPR $NO_X$ Ozone Season Group 3 Trading Program in 40 CFR part 97, subpart GGGGG. In conjunction with the amendments to the Group 3 trading program, the monitoring, recordkeeping, and reporting regulations in 40 CFR part 75 would be amended to reflect the addition of certain new reporting requirements associated with the amended trading program and the administrative appeal provisions in 40 CFR part 78 would be amended to identify certain additional types of appealable decisions of the EPA Administrator under the amended trading program. The proposed provisions to address the transition of the EGUs in certain states from the Group 2 trading program to the Group 3 trading program would be implemented in part through revisions to regulations noted above and in part through revisions to the regulations for the Group 2 trading program in 40 CFR part 97, subpart EEEEE.

In addition to these primary amendments, certain revisions are proposed to the regulations for the other CSAPR trading programs in 40 CFR part 97, subparts AAAAA through EEEEE, and the Texas $SO_2$ Trading Program in 40 CFR part 97, subpart FFFFF, for conformity with the proposed amended provisions of the Group 3 trading program, as discussed in Section VII.B.12 of this proposed rule. Documents have been included in the docket for this proposed rule showing all of the proposed revisions in redline-strikeout format.

*A. Amendments to FIP Provisions in 40 CFR Part 52*

The CSAPR, CSAPR Update, and Revised CSAPR Update FIP requirements related to ozone season $NO_X$ emissions are set forth in 40 CFR 52.38(b) as well as other sections of part 52 specific to each covered state. The existing text of § 52.38(b)(1) identifies the trading program regulations in 40 CFR part 97, subparts BBBBB, EEEEE, and GGGGG as constituting the relevant FIP provisions relating to seasonal $NO_X$ emissions and transported ozone pollution. Because the EPA is proposing in this rulemaking to establish new or amended FIP requirements not only for the types of EGUs covered by the trading programs but also for other types

of sources, a proposed amendment to § 52.38(b)(1) would clarify that the trading programs constitute the FIP provisions only for the sources meeting the applicability requirements of the trading programs. A parallel clarification would be added to §§ 52.38(a)(1) and 52.39(a) with respect to the CSAPR FIP requirements relating to annual $NO_X$ emissions, $SO_2$ emissions, and transported fine particulate pollution.

The states whose EGU sources are required to participate in the CSAPR $NO_X$ Ozone Season Group 1, Group 2, and Group 3 trading programs under the FIPs established in CSAPR, the CSAPR Update, and the Revised CSAPR Update, as well as the control periods for which those requirements apply, are identified in § 52.38(b)(2). Proposed amendments to this paragraph would expand the applicability of the Group 3 trading program to sources in the thirteen additional states that the EPA is proposing to add to the Group 3 trading program starting with the 2023 control period and would end the applicability of the Group 2 trading program (with the exception of certain provisions) for sources in eight of the thirteen states after the 2022 control period, as discussed in Section VII.B.2 of this proposed rule.[339] The current subparagraphs within § 52.38(b)(2) would also be renumbered to clarify the organization of the provisions and to facilitate cross-references from other regulatory provisions. Regarding the two states currently participating in the Group 2 trading program through approved SIP revisions that replaced the previous FIPs issued under the CSAPR Update (Alabama and Missouri), a provision indicating that EPA would no longer administer the state trading programs adopted under those SIP revisions after the 2022 control period would be added at § 52.38(b)(16)(ii)(B).

In the Revised CSAPR Update, the EPA established several options for states to revise their SIPs to modify or replace the FIPs applicable to their sources while continuing to use the Group 3 trading program as the mechanism for meeting the states' good neighbor obligations. Existing § 52.38(b)(10), (11), and (12) establish options to replace allowance allocations for the 2022 control period, to adopt an abbreviated SIP revision for control periods in 2023 or later years, and to adopt a full SIP revision for control periods in 2023 or later years,

respectively. As discussed in Section VII.D of this proposed rule, the EPA is proposing to retain these SIP revision options and to make them available for all states that would be covered by the Group 3 trading program after the proposed geographic expansion. The option under § 52.38(b)(10) to replace allowance allocations for a single control period would be amended to be available for the 2024 control period, with attendant revisions to the years and dates shown in § 52.38(b)(10) (multiple paragraphs) and (b)(17)(i) as well as the Group 3 trading program regulations, as discussed in Section X.B of this proposed rule. The options under § 52.38(b)(11) and (12) to adopt abbreviated or full SIP revisions would be amended to be available starting with the 2025 control period, with attendant revisions to § 52.38(b)(11)(iii), (b)(12)(iii), and (b)(17)(ii).[340]

The proposed changes with respect to set-asides, the treatment of units in Indian country, and recordation schedules discussed in Section VII.B.9 of this proposed rule, although implemented largely through proposed amendments to the Group 3 trading program regulations, would also be implemented in part through proposed amendments to § 52.38(b)(11) and (12). First, the text in § 52.38(b)(11)(iii)(A) and (b)(12)(iii)(A) identifying the portion of each state trading budget for which a state could establish state-determined allowance allocations would be revised to exclude any allowances in a new unit set-aside, Indian country new unit set-aside, or Indian country existing unit set-aside. Second, the text in § 52.38(b)(12)(vi) identifying provisions that states could not adopt into their SIPs (because the provisions concern regulation of sources in Indian country not subject to a state's CAA implementation planning authority) would be revised to include the provisions of the amended Group 3 trading program addressing allocation and recordation of allowances from all types of set-asides. Third, the text in § 52.38(b)(12)(vii) authorizing the EPA to modify the previous approval of a SIP revision with regard to the assurance provisions "if and when a covered unit is located in Indian country" would be revised to account for the fact that at least one covered unit would already be located in Indian country not subject to a state's jurisdiction if the geographic expansion proposed in this rulemaking

---

[339] Both the current text of § 52.38(b)(2) and the proposed amended text expressly encompass sources in Indian country within the respective states' borders.

[340] No state currently in the Group 3 trading program has submitted a SIP revision to make use of these options in control periods before the control periods in which the options could be used under the proposed amendments.

is finalized. Finally, the text in § 52.38(b)(11)(iii)(B) and (b)(12)(iii)(B) would be revised to amend the deadline for states to submit state-determined allowance allocations to the EPA from June 1 in the third year before the relevant control period to June 1 in the year before the relevant control period.

The proposed transitional provisions discussed in Section VII.B.11 of this proposed rule to convert certain 2017–2022 Group 2 allowances to Group 3 allowances and to recall certain 2023–2024 Group 2 allowances, although promulgated as amendments to the Group 2 trading program regulations, would necessarily be implemented after the end of the 2022 control period. Proposed amendments clarifying that these provisions continue to apply to the relevant sources and holders of allowances notwithstanding the transition of certain states out of the Group 2 trading program after the 2022 control period would be added at § 52.38(b)(14)(iii)(F) and (G). Cross-references clarifying that EPA's allocations of the converted Group 3 allowances would not be subject to modification through SIP revisions would also be added to the existing provisions at § 52.38(b)(11)(iii)(D) and (b)(12)(iii)(D).

The general FIP provisions applicable to all states covered by this proposed rule as set forth in § 52.38(b)(2) would be replicated in the state-specific subparts of 40 CFR part 52 for each of the thirteen states that the EPA is proposing to add to the Group 3 trading program.[341] In each such state-specific CFR subpart, provisions would be added indicating that sources in the state are required to participate in the CSAPR NOₓ Ozone Season Group 3 Trading Program with respect to emissions starting in 2023. Provisions would also be added repeating the substance of § 52.38(b)(13)(i), which generally provides that the Administrator's full and unconditional approval of a full SIP revision correcting the same SIP deficiency that is the basis for a FIP promulgated in this rulemaking would cause the FIP to no longer apply to sources subject to the state's CAA implementation planning authority, and § 52.38(b)(14)(ii), which generally provides the EPA with authority to complete recordation of EPA-determined allowance allocations for any control period for which EPA

has already started such recordation notwithstanding the approval of a state's SIP revision establishing state-determined allowance allocations.

For each of the eight states that the EPA is proposing to remove from the Group 2 trading program, the current provisions of the state-specific CFR subparts indicating that sources in the state are required to participate in that trading program would be revised to end that requirement with respect to emissions after 2022, and a further provision would be added repeating the substance of § 52.38(b)(14)(iii), which identifies certain provisions that continue to apply to sources and allowances notwithstanding discontinuation of a trading program with respect to a particular state.[342] In addition, for the six states that during their time in the Group 2 trading program have not exercised the option to adopt full SIP revisions to replace the FIPs issued under the CSAPR Update (all but Alabama and Missouri), obsolete provisions concerning the unexercised SIP revision option would be removed.

No amendments with respect to FIP requirements for EGUs would be made to the state-specific CFR subparts for the twelve states whose sources currently participate in the Group 3 trading program[343] except as needed to update cross-references or to implement the proposed changes related to the treatment of Indian country, as discussed in Section X.D of this proposed rule.

### B. Amendments to Group 3 Trading Program and Related Regulations

To implement the geographic expansion of the Group 3 trading program and the revised trading budgets that would be established under the new and amended FIPs proposed in this rulemaking, several sections of the Group 3 trading program regulations would be amended. Revisions identifying the applicable control periods, deadlines for certification of monitoring systems, and deadlines for commencement of quarterly reporting for sources not previously covered by the Group 3 trading program would be made at §§ 97.1006(c)(3)(i), 97.1030(b)(1), and 97.1034(d)(2)(i),

respectively. Revisions identifying the proposed new or revised budgets and new unit set-asides for the 2023 and 2024 control periods for all covered states would be made at § 97.1010(a)(1) and (b)(1), respectively.

Each of the proposed enhancements to the Group 3 trading program discussed in Section VII.B of this proposed rule would also be implemented primarily through revisions to the trading program regulations. The dynamic budget-setting process discussed in Section VII.B.4 of this proposed rule would be implemented at § 97.1010(a)(2) and (3), and the associated revised process for determining variability limits and assurance levels discussed in Section VII.B.5 of this proposed rule would be implemented at § 97.1010(e). The Group 3 allowance bank recalibration process discussed in Section VII.B.6 of this proposed rule would be implemented at § 97.1026(d). The backstop daily NOₓ emissions rate component of the primary emissions limitation discussed in Section VII.B.7 would be implemented at §§ 97.1006(c)(1)(i) and 97.1024(b)(1) and (3), accompanied by the addition of a definition of "backstop daily NOₓ emissions rate" and modification of the definition of "CSAPR NOₓ Ozone Season Group 3 allowance" in § 97.1002. The secondary emissions limitation for sources found responsible for exceedances of the assurance levels discussed in Section VII.B.8 of this proposed rule would be implemented at §§ 97.1006(c)(1)(iii) and (iv) and (c)(3)(ii) and 97.1025(c), accompanied by the addition of a definition of "CSAPR NOₓ Season Group 3 secondary emissions limitation" in § 97.1002.

The proposed changes relating to set-asides, the treatment of Indian country, unit-level allowance allocations, and recordation schedules discussed in Section VII.B.9 of this proposed rule would be implemented through revisions to multiple sections of §§ 97.1010, 97.1011, 97.1012, and 97.1021, as well as limited revisions to 97.1002 (definition of "allocate or allocation") and 97.1006(b)(2). In § 97.1010, paragraphs (b), (c), and (d) would address the amounts for each control period of the new unit set-asides, Indian country new unit set-asides, and Indian country existing unit set-asides, respectively. Paragraphs (c) and (d) would reflect the discontinuation of Indian country new unit set-asides after the 2022 control period and the establishment of Indian

---

[341] See proposed §§ 52.54(b) (Alabama), 52.184(a) (Arkansas), 52.440(d) (Delaware), 52.1240(d) (Minnesota), 52.1824(a) (Mississippi), 52.1326(b) (Missouri), 52.1492 (Nevada), 52.1930(a) (Oklahoma), 52.2240(e) (Tennessee), 52.2283(d) (Texas), 52.2356 (Utah), 52.2587(e) (Wisconsin), and 52.2638(a) (Wyoming).

[342] See proposed §§ 52.54(b) (Alabama), 52.184(a) (Arkansas), 52.1824(a) (Mississippi), 52.1326(b) (Missouri), 52.1930(a) (Oklahoma), 52.2240(e) (Tennessee), 52.2283(d) (Texas), and 52.2587(e) (Wisconsin).

[343] See proposed §§ 52.731(b) (Illinois), 52.789(b) (Indiana), 52.940(b) (Kentucky), 52.984(d) (Louisiana), 52.1186(e) (Maryland), 52.1584(e) (Michigan), 52.1684(b) (New Jersey), 52.1684(b) (New York), 52.1882(b) (Ohio), 52.2040(b) (Pennsylvania), 52.2440(b) (Virginia), and 52.2540(b) (West Virginia).

country existing unit set-asides starting with the 2023 control period.[344]

The proposed revisions to § 97.1011 would refocus the section exclusively on allocation to "existing" units from the portion of each state emissions budget not reserved in a new unit set-aside or Indian country new unit set-aside. In § 97.1011(a), the provision currently in § 97.1011(a)(1) requiring allocations to existing units to be made in the amounts provided in notices of data availability (NODAs) issued by the EPA would be split into two separate provisions, with paragraph (a)(1) applying to existing units in the state and areas of Indian country covered by the state's CAA implementation planning authority and paragraph (a)(2) applying to existing units in areas of Indian country not covered by the state's CAA implementation planning authority.[345] This split would facilitate the submission and approval of SIP revisions by states interested in submitting state-determined allowance allocations for the units over which they exercise CAA implementation authority, while leaving allocations to any units outside their authority to be addressed either by the EPA or by the relevant tribe under an approved tribal implementation plan. The proposed dynamic process for determining default allocations to existing units of allowances from state trading budgets starting with the 2025 control period would be set forth in revised § 97.1011(b), while the current provisions of § 97.1011(b), which concern timing and notice procedures for allocations to new units, would be relocated to § 97.1012. The provisions addressing incorrectly allocated allowances at § 97.1011(c) would be streamlined by relocating the portions applicable to new units to § 97.1012(c). In addition, as discussed in Section VII.B.9.d of this proposed rule, § 97.1011(c)(5) would be revised to provide that, starting with the 2024

control period, any incorrectly allocated allowances recovered after May 1 of the year following the control period would not be reallocated to other units in the state but instead would be transferred to a surrender account.

The proposed revisions to § 97.1012 would retain the section's current focus on allocations to "new" units, generally combining the current provisions at § 97.1012 with the current provisions at § 97.1011(b) and (c) that address new units. The text of multiple paragraphs in both § 97.1012(a) and (b) would be revised as needed to reflect the change in treatment of Indian country discussed in Section VII.B.9.a of this proposed rule, under which the new unit set-asides would be used to provide allowance allocations to new units both in non-Indian country and Indian country within the borders of the respective states for control periods starting in 2023.[346] The timing and notice provisions in proposed § 97.1012(a)(13) and (b)(13) are relocated from current § 97.1011(b)(1) and (2). The text of § 97.1012(c), addressing incorrect allocations to new units, is largely relocated from § 97.1011(c) (which addresses incorrect allocations to existing units) and reflects a parallel proposed revision addressing the disposition of recovered allowances, as discussed in Section VII.B.9.d of this proposed rule.

The proposed amendments to § 97.1021 would implement three distinct sets of changes discussed in Sections VII.B.9 and VII.D.1 of this proposed rule. First, revisions to § 97.1021(b) through (e) would replace the previous schedule for recording Group 3 allowances for the 2023 and 2024 control periods established in the Revised CSAPR Update with an updated recordation schedule tailored to the expected timing for issuance of a final rule in this rulemaking. The updated schedule would also reflect elimination of the unused former option for states to provide state-determined allowance allocations for the 2022 control period and the proposed establishment of a substantively equivalent new option for states to provide state-determined allowance allocations for the 2024 control period. Second, revisions to § 97.1021(f) would change the schedule for recording allocations to existing

units for future control periods from July 1 of the year three years before the control period to July 1 of the year before the control period. Finally, revisions to § 97.1021(g) through (j) would end recordation for Indian country new unit set-asides after allocations for the 2022 control period, begin recordation for Indian country existing unit set-asides starting with allocations for the 2023 control period, and modify the text to eliminate references to state-determined allocations of allowances from new unit set-asides.

Implementation of the proposed revisions to the Group 3 trading program would also be accomplished in part through amendments to regulations in other CFR parts. In 40 CFR part 75, which contains detailed monitoring, recordkeeping, and reporting requirements applicable to sources covered by the Group 3 trading program, the additional recordkeeping and reporting requirements discussed in Section VII.B.10.b of this proposed rule would be implemented through the addition of §§ 75.72(f) and 75.73(f)(1)(ix) and (x) and revisions to § 75.75, and the procedures for calculating daily total heat input and daily total $NO_X$ emissions and for apportioning $NO_X$ mass emissions monitored at a common stack among the individual units using the common stack would be added at sections 5.3.3, 8.4(c), and 8.5.3 of appendix F to part 75. In 40 CFR part 78, which contains the administrative appeal procedures applicable to decisions of the EPA Administrator under the Group 3 trading program, § 78.1(b)(19) would be amended to list additional decisions made as part of the trading program enhancements that would be appealable under those procedures.

*C. Transitional Provisions*

As discussed in Section VII.D.11 of this proposed rule, the EPA is proposing several transitional provisions for sources entering the Group 3 trading program. The provisions discussed in Section VII.D.11.a of this proposed rule, concerning the prorating of state emissions budgets, assurance levels, and unit-level allocations for the 2023 control period, would be implemented through the Group 3 trading program regulations. Specifically, the state emissions budgets for the 2023 control period would be prorated according to procedures set out at § 97.1010(a)(1)(ii). Variability limits for the 2023 control period, and the resulting assurance levels, would be computed under § 97.1010(e) from the prorated state emissions budgets. Unit-level

---

[344] The current § 97.1011(c), which addresses the relationships of set-asides and variability limits to state trading budgets, would be relocated to § 97.1011(f).

[345] An additional provision currently in § 97.1011(a)(1), which clarifies that an allocation or lack of allocation to a unit in a NODA does not constitute a determination by the EPA that the unit is or is not a CSAPR $NO_X$ Ozone Season Group 3 unit, would be relocated to § 97.1011(a)(3). The current § 97.1011(a)(2), which provides for certain existing units that cease operations to receive allocations for their first five control periods of non-operation and provides for the allowances for subsequent control periods to be allocated to the relevant state's new unit set-asides, is inconsistent with the proposed revisions to the set-asides and the default allowance allocation process, as discussed in Section VII.B.9 of this proposed rule, and would be removed as obsolete.

[346] Revisions are also proposed to the text of § 97.1012(a) and (b) for the control periods in 2021 and 2022 consistent with the proposed revisions to the parallel provisions in the regulations for the other CSAPR trading programs, generally calling for allocations to units in areas of Indian country subject to a state's CAA implementation planning authority to be made from the new unit set-asides instead of from the Indian country new unit set-asides.

allocations to existing units for the 2023 control period would be computed from the prorated state emissions budgets according to procedures substantively the same as the procedures codified in § 97.1011(b) for calculating default allocations to existing units for later control periods, as discussed in Section VII.B.9.b of this proposed rule, and would be announced in the notice of data availability issued under § 97.1011(a)(1) and (2) for the 2023 and 2024 control periods.

The remaining transitional provisions would be implemented through the Group 2 trading program regulations. The creation of an additional Group 3 allowance bank for the 2023 control period through the conversion of banked 2017–2022 Group 2 allowances as discussed in Section VII.B.11.b of this document would be implemented at § 97.826(e).[347] Related provisions addressing the use of Group 3 allowances to satisfy after-arising compliance obligations under the Group 2 trading program or the Group 1 trading program would be implemented at §§ 97.826(f)(2) and 97.526(e)(3), respectively, and related provisions addressing recordation of late-arising allocations of Group 1 allowances would be implemented at § 97.526(d)(2)(iii). The recall of Group 2 allowances previously issued for the 2023 and 2024 control periods as discussed in Section VII.B.11.c of this document would be implemented at § 97.811(e).

Decisions of the Administrator related to the allowance bank creation provisions and the allowance recall provisions would be identified as appealable decisions under 40 CFR part 78 through revisions to § 78.1(b)(17)(viii) and (ix).

*D. Clarifications and Conforming Revisions*

As discussed in Section VII.B.12 of this proposed rule, the EPA is proposing to make revisions to the provisions regarding allowance allocations for units in Indian country in all the CSAPR trading programs so that instead of distinguishing among units based on whether they are or are not located in Indian country, the revised provisions would distinguish among units based on whether they are or are not covered by a state's CAA implementation planning authority. The proposed revisions would be implemented in multiple paragraphs of §§ 97.411(b), 97.412, 97.511(b), 97.512, 97.611(b), 97.612, 97.711(b), 97.712, 97.811(b), and 97.812.

The associated revisions to states' options regarding SIP revisions to establish state-determined allowance allocations for units covered by their CAA implementation planning authority would be implemented in multiple paragraphs of §§ 52.38(a) and (b) and 52.39 as well as the state-specific subparts of 40 CFR part 52.

As also discussed in Section VII.B.12 of this proposed rule, the EPA is proposing to revise the recordation schedule for allowance allocations to existing units under all the CSAPR trading programs, as well as the Texas SO₂ Trading Program, so that starting with the 2025 control period the allocation deadline would generally be July 1 of the year before the control period instead of July 1 of the year 3 years before the control period. The revisions would be implemented at §§ 97.421(f)(2), 97.521(f)(2), 97.621(f)(2), 97.721(f)(2), 97.821(f), and 97.921(b)(2).

Certain other revisions to the regulatory text in the FIP and trading program regulations are proposed as non-substantive clarifications. First, in the Group 2 trading program regulations, the paragraphs in § 97.810 setting forth the amounts of state emissions budgets, new unit set-asides, Indian country new unit set-asides, and variability limits for states that the EPA is proposing to transition out of the Group 2 trading program would be modified to indicate that the amounts are applicable under that program only for control periods through 2022.

Second, as noted in Section VII.F.1 of this proposed rule, the existing option for states subject to the NOₓ SIP Call to expand applicability of the Group 2 trading program to include certain large non-EGU boilers and combustion turbines would become obsolete if this rule is finalized as proposed because no NOₓ SIP Call states would continue to be covered by the Group 2 trading program. The proposed elimination of the obsolete option would be implemented in part through revisions to § 52.38(b)(8) (multiple paragraphs), (b)(9) (multiple paragraphs), (b)(13)(ii), (b)(14)(i)(F), and (b)(16)(i)(B), and in part through revisions to the Group 2 trading program regulations at §§ 97.806(c)(2) and (3), 97.825, and 97.802 (removal of the definitions of "base CSAPR NOₓ Ozone Season Group 2 source" and "base CSAPR NOₓ Ozone Season Group 2 unit" and modification of the definitions of "assurance account", "common designated representative", common designated representative's assurance level", and "common designated representative's share").

Third, to clarify the regulatory text, the EPA is proposing to remove the language in the Group 3 trading program regulations finalized in the Revised CSAPR Update relating to the "supplemental allowances" issued for the 2021 control period in current §§ 97.1002 (definition of "common designated representative's assurance level"), 97.1006(c)(2)(iii), 97.1010(d), and 97.1011(a)(1). In place of the removed language, the EPA proposes to restate the amounts of the state emissions budgets for the 2021 control period in § 97.1010(a)(1)(i) so as to include the amounts of the supplemental allowances in the restated budget amounts. The revised language would be substantively equivalent to and simpler than the current language.

Fourth, in 40 CFR part 75, the EPA proposes to remove obsolete text in § 75.73(c) and (f) to clarify the context for other text that would be added to the section, as discussed in Section X.B.

Finally, the EPA proposes to update cross-references throughout 40 CFR parts 52 and 97 for consistency with the other amendments proposed in this rulemaking.

# XI. Statutory and Executive Orders Reviews

Additional information about these statutes and Executive Orders ("E.O.") can be found at *http://www2.epa.gov/laws-regulations/laws-and-executive-orders.*

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This proposed rule is an economically significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review. This proposed rule is in response to a court-ordered legal mandate and proposes to implement EGU and novel non-EGU NOₓ ozone season emissions reductions as part of the overall strategy for addressing interstate transport of ozone pollution for the 2015 ozone NAAQS. Any changes made in response to OMB recommendations have been documented in the docket. The EPA prepared an analysis of the potential costs and benefits associated with this proposed rule. This analysis, which is contained in the "Regulatory Impact Analysis for the Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard" [EPA–452/R–15–009], is available in the docket and is briefly summarized in Section IX of this proposed rule.

*B. Paperwork Reduction Act (PRA)*

1. Information Collection Request for Electric Generating Units

The information collection activities in this proposed rule have been submitted for approval to the Office of Management and Budget (OMB) under the PRA. The Information Collection Request (ICR) document that the EPA prepared has been assigned EPA ICR number 2709.01. EPA has placed a copy of the ICR in the docket for this rule, and it is briefly summarized here.

EPA is proposing an information collection request (ICR), related specifically to electric generating units (EGU), for the proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Primary Ozone National Ambient Air Quality Standard. The proposed rule would amend the Cross-State Air Pollution Rule (CSAPR) $NO_X$ Ozone Season Group 3 trading program addressing seasonal $NO_X$ emissions in various states. Under the proposed amendments, all EGU sources in the original twelve Group 3 states (Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia) would remain. Additionally, EGU sources in eight states (Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Tennessee, Texas, and Wisconsin) currently covered by the CSAPR $NO_X$ Ozone Season Group 2 Trading Program would transition from the Group 2 program to the revised Group 3 trading program beginning with the 2023 ozone season. Further, sources in five states not currently covered by any CSAPR $NO_X$ ozone season trading program would join the revised Group 3 trading program: Delaware, Minnesota, Nevada, Utah, and Wyoming. In total, EGU sources in 25 states would now be covered by the Group 3 program.

There is an existing ICR (OMB Control Number 2060–0667), that includes information collection requirements placed on EGU sources for the six Cross-State Air Pollution Rule (CSAPR) trading programs addressing sulfur dioxide ($SO_2$) emissions, annual nitrogen oxides ($NO_X$) emissions, or seasonal $NO_X$ emissions in various sets of states, and the Texas $SO_2$ trading program which is modeled after CSAPR. This ICR accounts for the additional respondent burden related to the amendments to the CSAPR $NO_X$ Ozone Group 3 trading program.

The principal information collection requirements under the CSAPR and Texas trading programs relate to the monitoring and reporting of emissions and associated data in accordance with 40 CFR part 75. Other information collection requirements under the programs concern the submittal of information necessary to allocate and transfer emission allowances and the submittal of certificates of representation and other typically one-time registration forms.

Affected sources under the CSAPR and Texas trading programs are generally stationary, fossil fuel-fired boilers and combustion turbines serving generators larger than 25 megawatts (MW) producing electricity for sale. Most of these affected sources are also subject to the Acid Rain Program (ARP). The information collection requirements under the CSAPR and Texas trading programs and the ARP substantially overlap and are fully integrated. The burden and costs of overlapping requirements are accounted for in the ARP ICR (OMB Control Number 2060–0258). Thus, this ICR accounts for information collection burden and costs under the CSAPR $NO_X$ Ozone Season Group 3 trading program that are incremental to the burden and costs already accounted for in both the ARP and CSAPR ICRs.

For most sources already reporting data under the CSAPR $NO_X$ Ozone Season Group 3 or CSAPR $NO_X$ Ozone Group 2 trading programs, there would be no incremental burden or cost, as reporting requirements will remain identical. Certain sources with a common stack configuration and/or those that are large, coal-fired EGUs, will be subject to additional emission reporting requirements under the proposed rule. These sources will need to make a one-time monitoring plan and Data Acquisition and Handling System (DAHS) update to meet the additional reporting requirements. Remaining for assessment of incremental cost and burden are only those sources in the five states not currently reporting data under a CSAPR $NO_X$ Ozone Season program. Sources in Minnesota are already reporting data for the CSAPR $NO_X$ Annual program with almost identical information collection requirements, requiring only a one-time monitoring plan and DAHS update. Most of the affected sources in Delaware, Nevada, Utah, and Wyoming are already reporting data as part of the Acid Rain Program, thus only requiring a monitoring plan and DAHS update as well. Four additional EGUs in Delaware already report data under SIP requirements adopted to meet the $NO_X$ SIP Call and would face identical information requirements under this proposed rule. For the units that already report to EPA under the Acid Rain Program or the $NO_X$ SIP Call, with the exception of any one-time costs to update monitoring plans and DAHS, all information collection costs and burden are already reflected in the previously approved ICRs for those other rules (OMB Control Nos. 2060–0258 and 2060–0445).

In total, there are an estimated 16 units in Delaware, Nevada, Utah, and Wyoming that do not already report data to EPA according to 40 CFR part 75 and that would need to implement one of the Part 75 monitoring methodologies including certification of monitoring systems or implementation of the low mass emissions methodology. These units would also require monitoring plan and DAHS updates. Of these sixteen units, two units would be expected to adopt low mass emissions (LME) as the monitoring method, thirteen would be expected to adopt Appendix D monitoring methods, and one would be expected to adopt CEMS monitoring methods.

*Respondents/affected entities:* Industry respondents are stationary, fossil fuel-fired boilers and combustion turbines serving electricity generators subject to the CSAPR and Texas trading programs, as well as non-source entities voluntarily participating in allowance trading activities. Potential state respondents are states that can elect to submit state-determined allowance allocations for sources located in their states.

*Respondent's obligation to respond:* Industry respondents: Voluntary and mandatory (Sections 110(a) and 301(a) of the Clean Air Act).

*Estimated number of respondents:* EPA estimates that there would be 188 industry respondents.

*Frequency of response:* On occasion, quarterly, and annually.

*Total estimated additional burden:* 1,834 hours (per year). Burden is defined at 5 CFR 1320.03(b).

*Total estimated additional cost:* $396,520 (per year); includes $210,571 annualized capital or operation & maintenance costs.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9.

Submit your comments on the Agency's need for this information, the accuracy of the provided burden estimates and any suggested methods for minimizing respondent burden to the EPA using the docket identified at the beginning of this rule. You may also send your ICR-related comments to

OMB's Office of Information and Regulatory Affairs via email to *OIRA_submission@omb.eop.gov,* Attention: Desk Officer for the EPA. Since OMB is required to make a decision concerning the ICR between 30 and 60 days after receipt, OMB must receive comments no later than May 6, 2022. The EPA will respond to any ICR-related comments in the final rule.

## 2. Information Collection Request for Non-Electric Generating Units

The information collection activities in this proposed rule have been submitted for approval to the Office of Management and Budget (OMB) under the PRA. The Information Collection Request (ICR) document that the EPA prepared has been assigned EPA ICR number 2705.01. The EPA has filed a copy of the non-EGU ICR in the docket for this rule, and it is briefly summarized here.

ICR No. 2705.01 is a new request and it addresses the burden associated with new regulatory requirements under the proposed rule. Owners and operators of certain non-Electric Generating Unit (non-EGU) industry stationary sources will potentially modify or install new emission controls and associated monitoring systems to meet the nitrogen oxides ($NO_X$) emission limits of this proposed rule. The burden in this ICR reflects the new monitoring, calibrating, recordkeeping, reporting and testing activities required by industry and the administrative review conducted by the states of the associated industry activities. This information is being collected to assure compliance with the proposed rule. In accordance with the Clean Air Act Amendments of 1990, any monitoring information to be submitted by sources is a matter of public record. Information received and identified by owners or operators as confidential business information (CBI) and approved as CBI by EPA, in accordance with Title 40, Chapter 1, Part 2, Subpart B, shall be maintained appropriately (see 40 CFR 2; 41 FR 36902, September 1, 1976; amended by 43 FR 39999, September 8, 1978; 43 FR 42251, September 28, 1978; 44 FR 17674, March 23, 1979).

*Respondents/affected entities:* The respondents/affected entities are the owners/operators of certain non-EGU industry sources in the following industry sectors: Furnaces in Glass and Glass Product Manufacturing; boilers and furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; kilns in Cement and Cement Product Manufacturing; reciprocating internal combustion engines in Pipeline Transportation of Natural Gas; and high-emitting equipment and large boilers in Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mill.

*Respondent's obligation to respond:* Voluntary and mandatory. (Sections 110(a) and 301(a) of the Clean Air Act). All data that is recorded or reported by respondents is required by the proposed rule, titled "Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Primary Ozone National Ambient Air Quality Standard: Transport Obligations for non-Electric Generating Units".

*Estimated number of respondents:* 489.

*Frequency of response:* The specific frequency for each information collection activity within the non-EGU ICR is shown at the end of the ICR document in the Tables 1–11. In general, the frequency varies across the monitoring, recordkeeping, and reporting activities. Some recordkeeping such as work plan preparation is a one-time activity whereas engine maintenance recordkeeping is conducted quarterly. Reporting frequency is on a quarterly and semi-annual basis.

*Total estimated burden:* 51,654 hours (per year). Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost:* $11,450,000 (average per year); includes $5,467,000 annualized capital or operation & maintenance costs.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9.

Submit your comments on the Agency's need for this information from the EGU ICR and non-EGU ICR, the accuracy of the provided burden estimates and any suggested methods for minimizing respondent burden to the EPA using the docket identified at the beginning of this rule. You may also send your ICR-related comments to OMB's Office of Information and Regulatory Affairs via email to *OIRA_submission@omb.eop.gov,* Attention: Desk Officer for the EPA. Since OMB is required to make a decision concerning the ICR between 30 and 60 days after receipt, OMB must receive comments no later than May 6, 2022. The EPA will respond to any ICR-related comments in the final rule.

## C. Regulatory Flexibility Act (RFA)

The EPA certifies that this proposed action will not have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (RFA). The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), as amended by the Small Business Regulatory Enforcement Fairness Act (Pub. L. 104–121), provides that whenever an agency is required to publish a general notice of proposed rulemaking, it must prepare and make available an initial regulatory flexibility analysis, unless it certifies that the proposed rule, if promulgated, will not have a significant economic impact on a substantial number of small entities (5 U.S.C. 605(b)). Small entities include small businesses, small organizations, and small governmental jurisdictions.

In 2026, EPA identified 34 small entities affected by the proposed rule, and of these 6 small entities may experience costs of greater than 1 percent of revenues. Of the 6 small entities projected to have costs greater than 1 percent of revenues, two of them operate in cost-of-service regions and would generally be able to pass any increased costs along to rate-payers. In EPA's modeling, most of the cost impacts for these small entities and their associated units are driven by lower electricity generation relative to the base case baseline. Specifically, four units reduce their generation by significant amounts, driving the bulk of the costs for all small entities. Finally, EPA's decision to exclude units smaller than 25 MW capacity from the proposed FIP, and exclusion of uncontrolled units smaller than 100 MW from backstop emission rate limits has already significantly reduced the burden on small entities by reducing the number of affected small entity-owned units. Further, in 2026 for non-EGUs, there are five small entities, and one small entity is estimated to have a cost-to-sales impact of 1.3 percent of their revenues.

The EPA has determined that an insignificant number of small entities potentially affected by the proposed rule will have compliance costs greater than 1 percent of annual revenues during the compliance period. EPA has concluded that there will be no significant economic impact on a substantial number of small entities (No SISNOSE) for this proposed rule overall. Details of this analysis are presented in Chapter 6 of the RIA, which is in the public docket.

## D. Unfunded Mandates Reform Act (UMRA)

This proposed action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and will not significantly or uniquely affect small governments. Note

that we expect the proposed rule to potentially have an impact on only one category of government-owned entities (municipality-owned entities). This analysis does not examine potential indirect economic impacts associated with the proposed rule, such as employment effects in industries providing fuel and pollution control equipment, or the potential effects of electricity price increases on government entities. For more information on the estimated impact on government entities, refer to the RIA, which is in the public docket.

*E. Executive Order 13132: Federalism*

This proposed action does not have federalism implications. If finalized, this proposed action will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This proposed action has tribal implications. However, it would neither impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law.

The EPA proposes to make a finding that interstate transport of ozone precursor emissions from 26 upwind states (Alabama, Arkansas, California, Delaware, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming) is significantly contributing to downwind nonattainment or interfering with maintenance of the 2015 ozone NAAQS in other states, based on projected nitrogen oxides ($NO_X$) emissions in the 2023 ozone season. EPA is proposing to issue FIP requirements to eliminate interstate transport of ozone precursors from these 26 states that significantly contributes to nonattainment or interferes with maintenance of the NAAQS in other states. Under CAA section 301(d)(4), EPA proposes to extend FIP requirements to apply in Indian country located within the upwind geography of the proposed rule, including Indian reservation lands and other areas of Indian country over which EPA or a tribe has demonstrated that a tribe has jurisdiction. EPA's proposed extension is described further above in Section IV.C.2., *Application of Rule in Indian Country and Necessary*

*or Appropriate Finding.* EPA proposes that all existing and new EGU and non-EGU sources that are located in the 301(d) FIP areas within the geographic boundaries of the covered states, and which would be subject to this rule if located within areas subject to state CAA planning authority, should be included in this rule. This proposed action has tribal implication because of the proposed extension of FIP requirements into Indian country and this proposed rule may have additional tribal implications if a new affected EGU or non-EGU is built in Indian country. To EPA's knowledge, only one existing EGU or non-EGU source is located within the 301(d) FIP areas: The Bonanza Power Plant, an EGU source, located on the Uintah and Ouray Reservation, geographically located within the borders of Utah. In general, tribes have a vested interest in how this proposed rule would affect air quality.

In the Revised CSAPR Update, EPA established default procedures for allocating CSAPR $NO_X$ Ozone Season Group 3 allowances ("Group 3 allowances") in amounts equal to each state emissions budget for each control period among the sources in the state for use in complying with the Group 3 trading program. Under the current Group 3 trading programs, reserved allowances are made available generally (but not exclusively [348]) to "new" units—which for purposes of the Revised CSAPR Update means units commencing commercial operation on or after January 1, 2019—through a "new unit set-aside" established for qualifying units in each state and, if areas of Indian country exist within the state's borders, a separate "Indian country new unit set-aside" for qualifying units in such Indian country. In this rulemaking, EPA is proposing revisions to each step of the three-step allocation process to better address units in Indian country and to better coordinate the unit-level allocation process with the proposed dynamic budget-setting process.

The EPA hosted an environmental justice webinar on October 26, 2021, that was attended by state regulatory authorities, environmental groups, federally recognized tribes, and small business stakeholders. The EPA will also continue to consult with the government of the Ute Indian Tribe of the Uintah and Ouray Reservation and plans to further consult with any other tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing this proposed regulation to solicit meaningful and timely input into its development. The EPA plans to issue

tribal consultation letters addressed to 574 tribes in February 2022 after the proposed rule is signed. The EPA will likely facilitate an additional tribal consultation through a webinar before finalizing this proposed rule.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive Order. This action is not subject to Executive Order 13045 because it implements a previously promulgated health-based federal standard. This action's health and risk assessments are contained in Chapter 5 of this RIA. The EPA believes that the ozone-related benefits, $PM_{2.5}$-related benefits, and $CO_2$-related benefits from this proposed rule will further improve children's health. Additionally, the ozone exposure analysis in Chapter 7 of the RIA suggests that nationally, children (ages 0–17) will experience at least as great a reduction in ozone exposures as adults (ages 18–64) in 2023 and 2026 under all regulatory alternatives of this proposed rulemaking.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use*

This action is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. EPA has prepared a Statement of Energy Effects for the proposed regulatory control alternative as follows. The Agency estimates a 1 percent change in retail electricity prices on average across the contiguous U.S. in 2025, a 7.8 percent reduction in coal-fired electricity generation, a 0.15 percent increase in natural gas-fired electricity generation, and a 3.8 percent increase in renewable electricity generation in 2025 as a result of this proposed rule. EPA projects that utility power sector delivered natural gas prices will change by less than 1 percent in 2025. Details of the estimated energy effects are presented in Chapter 4 of the RIA, which is in the public docket.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This proposed rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action does not have disproportionately high and adverse human health or environmental effects on minority populations, low-income populations and/or indigenous peoples, as specified in Executive Order 12898.[349] The documentation for this decision is contained in Section VIII. *Environmental Justice Analytical Considerations and Stakeholder Outreach and Engagement* of this Proposed rule and in Chapter 7, *Environmental Justice Impacts* of the RIA, which is in the public domain. The RIA was prepared under E.O. 12866 *Regulatory Planning and Review* for this proposed rule. While the ozone exposure assessment was subject to several limitations, also described in Chapter 7 of the RIA, overall, ozone concentrations under the proposal, more stringent, and less stringent alternatives are predicted to impact demographic groups very similarly in both future years and across both EGUs and non-EGUs.

Therefore, regarding ozone concentrations, EPA does not find evidence of meaningful environmental justice concerns associated with ozone concentrations after imposition of the proposed regulatory action or alternatives under consideration. We also do not find evidence that any potential environmental justice concerns related to ozone would be meaningfully exacerbated in the regulatory alternatives under consideration, compared to the baseline. Importantly, the action described in this proposed rule is expected to lower ozone in many areas, including residual ozone nonattainment areas, and thus mitigate some pre-existing health risks of ozone across all populations evaluated.

In addition, the EPA provided the public, including those communities disproportionately impacted by the burdens of pollution, opportunities for meaningful engagement with the EPA on this action. A summary of outreach activities conducted by the Agency and what was heard from communities is provided in section VIII of this proposed rule.

*K. Determinations Under CAA Section 307(b)(1) and (d)*

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that

petitions for review must be filed in the United States Court of Appeals for the District of Columbia Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final action taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to EPA complete discretion whether to invoke the exception in (ii).

This proposed action, if finalized, would be "nationally applicable" within the meaning of CAA section 307(b)(1). In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator proposes to exercise the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1).[350]

This proposed action, if finalized, will implement the good neighbor provision in 26 states, spanning 8 EPA regions and 10 federal judicial circuits. The proposed action applies a uniform, nationwide analytical method and interpretation of CAA section 110(a)(2)(D)(i)(I) across these states, and the proposed rule is based on a common core of legal, technical, and policy determinations (as explained in further detail in the following paragraph). For these reasons, this proposed action is nationally applicable.

Alternatively, for these same reasons, the Administrator is exercising the discretion afforded to him by the CAA and hereby finds that this proposed action is based on multiple determinations of nationwide scope or effect for purposes of CAA section 307(b)(1).[351] Specifically, the proposed rule is based on a common core of statutory and case law analysis, factual

findings, and policy determinations concerning the transport of ozone-precursor pollutants from the different states subject to it, as well as the impacts of those pollutants and the impacts of options to address those pollutants in yet other states. In this proposed action, EPA is applying its 4-step analytic framework to implement the good neighbor provision across these states, using a consistent set of policy and analytical determinations. The proposed determinations include a nationally consistent definition of receptors at Step 1 and findings identifying downwind nonattainment and maintenance receptors; the application of a nationally consistent contribution threshold at Step 2 to determine which states are linked to those receptors and should be further evaluated at Step 3; the use of a nationally consistent multi-factor test at Step 3 to determine which upwind-state contributions to nonattainment and maintenance receptors are "significant" and must be eliminated; and the proposed implementation at Step 4 of a nationally consistent set of emissions control strategies through emissions budgets and an integrated interstate emissions trading program for EGUs, a nationally consistent set of other compliance requirements for EGUs, and a nationally consistent set of enforceable emissions limits and associated compliance requirements for certain non-EGU sources in several industrial sectors across 23 states. Finally, the technical, scientific, and engineering information in support of these proposed determinations relies on a nationally consistent set of air quality modeling analyses and other nationally consistent analytical methods, as set forth elsewhere in this proposed rule and in the relevant supporting documents in the docket for this proposed rule.

Therefore, pursuant to CAA section 307(b), any petitions for review of this action, if and when it is finalized, must be filed in the D.C. Circuit within 60 days from the date such final action is published in the **Federal Register**.

This action is subject to the provisions of section 307(d). CAA section 307(d)(1)(B) provides that section 307(d) applies to, among other things, "the promulgation or revision of an implementation plan by the Administrator under [CAA section 110(c)]." 42 U.S.C. 7407(d)(1)(B). This action, among other things, proposes new federal implementation plans pursuant to the authority of section 110(c). To the extent any portion of this rulemaking, if finalized, is not expressly identified under section 307(d)(1)(B),

---

[349] 59 FR 7629, February 16, 1994.

[350] In proposing to invoke the exception by making and publishing a finding that this final action is based on a determination of nationwide scope or effect, the Administrator is taking into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

[351] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

**424a**

the Administrator determines that the provisions of section 307(d) apply to such final action. *See* CAA section 307(d)(1)(V) (the provisions of section 307(d) apply to "such other actions as the Administrator may determine").

## List of Subjects

### 40 CFR Part 52

Environmental protection, Administrative practice and procedure, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Ozone, Particulate matter, Sulfur dioxide.

### 40 CFR Part 75

Environmental protection, Administrative practice and procedure, Air pollution control, Continuous emission monitoring, Electric power plants, Incorporation by reference, Nitrogen oxides, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur dioxide.

### 40 CFR Part 78

Environmental protection, Administrative practice and procedure, Air pollution control, Electric power plants, Nitrogen oxides, Sulfur dioxide.

### 40 CFR Part 97

Environmental protection, Administrative practice and procedure, Air pollution control, Electric power plants, Nitrogen oxides, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur dioxide.

**Michael Regan,**

*Administrator.*

For the reasons stated in the preamble, parts 52, 75, 78, and 97 of title 40 of the Code of Federal Regulations are proposed to be amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart A—General Provisions

■ 2. Amend § 52.38 by:
■ a. In paragraph (a)(1), removing "(NO$_X$), except" and adding in its place "(NO$_X$) for sources meeting the applicability criteria set forth in that subpart, except";
■ b. In paragraph (a)(4) introductory text, removing "State's sources, and" and adding in its place "State, and";

■ c. In table 1 to paragraph (a)(4)(i)(B), revising the entry for "2025 and any year thereafter";
■ d. In paragraph (a)(5) introductory text, removing "State (but not sources in any Indian country within the borders of the State), regulations" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, regulations";
■ e. In table 2 to paragraph (a)(5)(i)(B), revising the entry for "2025 and any year thereafter";
■ f. In paragraph (a)(5)(iv), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority";
■ g. In paragraph (a)(5)(v), removing "Indian country within the borders of the State, the" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority, the";
■ h. Revising paragraphs (a)(6) and (a)(7)(ii);
■ i. In paragraph (a)(8)(iii), removing "State (but not sources in any Indian country within the borders of the State):" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority:";
■ j. In paragraph (b)(1), removing "year), except" and adding in its place "year) for sources meeting the applicability criteria set forth in those subparts, except";
■ k. Redesignating paragraphs (b)(2)(i) and (ii)as paragraphs (b)(2)(i)(A) and (B), respectively, redesignating paragraphs (b)(2)(iii) and (iv) as paragraphs (b)(2)(ii)(A) and (B), respectively, and redesignating paragraph (b)(2)(v) as paragraph (b)(2)(iii)(A);
■ l. In newly redesignated paragraph (b)(2)(ii)(A), removing "Alabama, Arkansas, Iowa, Kansas, Mississippi, Missouri, Oklahoma, Tennessee, Texas, and Wisconsin." and adding in its place "Iowa and Kansas.";
■ m. Adding paragraphs (b)(2)(ii)(C) and (b)(2)(iii)(B) and (C);
■ n. In paragraph (b)(3) introductory text, removing "or (ii)";
■ o. Revising paragraph (b)(4) introductory text;
■ p. In table 3 to paragraph (b)(4)(ii)(B), revising the entry for "2025 and any year thereafter";
■ q. Revising paragraph (b)(5) introductory text;
■ r. In table 4 to paragraph (b)(5)(ii)(B), revising the entry for "2025 and any year thereafter";
■ s. In paragraph (b)(5)(v), removing "Indian country within the borders of

the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority";
■ t. In paragraph (b)(5)(vi), removing "Indian country within the borders of the State, the" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority, the";
■ u. In paragraph (b)(7) introductory text, removing "(b)(2)(iii) or (iv)" and adding in its place "(b)(2)(ii)";
■ v. Revising paragraph (b)(8) introductory text;
■ w. In paragraph (b)(8)(i), adding "and" after the semicolon;
■ x. Removing and reserving paragraph (b)(8)(ii);
■ y. Revising paragraph (b)(8)(iii)(A);
■ z. In table 5 to paragraph (b)(8)(iii)(B), revising the entry for "2025 and any year thereafter";
■ aa. In paragraph (b)(8)(iv), removing "(b)(8)(i), (ii), or (iii)" and adding in its place "(b)(8)(i) or (iii)" each time it appears;
■ bb. Revising paragraph (b)(9) introductory text;
■ cc. Removing and reserving paragraph (b)(9)(ii);
■ dd. Revising paragraph (b)(9)(iii)(A);
■ ee. In table 6 to paragraph (b)(9)(iii)(B), revising the entry for "2025 and any year thereafter";
■ ff. In paragraph (b)(9)(vi), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority";
■ gg. Revising paragraph (b)(9)(vii);
■ hh. In paragraph (b)(9)(viii), removing "(b)(9)(i), (ii), or (iii)" and adding in its place "(b)(9)(i) or (iii)";
■ ii. Revising paragraphs (b)(10) introductory text, (b)(10)(i) and (ii), (b)(10)(v)(A) and (B), (b)(11) introductory text, (b)(11)(iii) introductory text, (b)(11)(iii)(A) introductory text, and (b)(11)(iii)(B);
■ jj. Removing and reserving paragraph (b)(11)(iii)(C);
■ kk. Revising paragraph (b)(11)(iii)(D);
■ ll. In paragraph (b)(11)(iv), removing "paragraphs (b)(11)(iii)(B) and (C)" and adding in its place "paragraph (b)(11)(iii)(B)";
■ mm. Revising paragraphs (b)(12) introductory text, (b)(12)(iii) introductory text, (b)(12)(iii)(A) introductory text, and (b)(12)(iii)(B);
■ nn. Removing and reserving paragraph (b)(12)(iii)(C);
■ oo. Revising paragraphs (b)(12)(iii)(D) and (b)(12)(vi) and (vii);
■ pp. In paragraph (b)(12)(viii), removing "paragraphs (b)(12)(iii)(B) and (C)" and adding in its place "paragraph (b)(12)(iii)(B)";

■ qq. Revising paragraphs (b)(13) introductory text and (b)(13)(i);
■ rr. In paragraph (b)(13)(ii), removing "(b)(9)(ii) or";
■ ss. In paragraph (b)(14)(i)(F), removing "§ 97.825(b)" and adding in its place "§§ 97.806(c)(2) and (3) and 97.825(b)";
■ tt. In paragraph (b)(14)(i)(G), removing "§ 97.826(e)" and adding in its place "§ 97.826(f)";
■ uu. Revising paragraphs (b)(14)(ii) and (b)(14)(iii) introductory text;
■ vv. In paragraph (b)(14)(iii)(D), removing "and" after the semicolon;
■ ww. In paragraph (b)(14)(iii)(E), removing "(b)(2)(iv) of this section)."

and adding in its place "(b)(2)(ii)(B) of this section);";
■ xx. Adding paragraphs (b)(14)(iii)(F) and (G);
■ yy. In paragraph (b)(15)(iii), removing "State (but not sources in any Indian country within the borders of the State):" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority:";
■ zz. In paragraph (b)(16)(i)(B), removing "§ 97.804(a) and (b) or";
■ aaa. Revising paragraph (b)(16)(i)(C);
■ bbb. Redesignating paragraph (b)(16)(ii) as paragraph (b)(16)(ii)(A), and in the newly redesignated

paragraph, removing "(b)(2)(iv)" and adding in its place "(b)(2)(ii)(B)";
■ ccc. Adding paragraph (b)(16)(ii)(B); and
■ ddd. Revising paragraphs (b)(17)(i) through (iii).

The revisions and additions read as follows:

### § 52.38    What are the requirements of the Federal Implementation Plans (FIPs) for the Cross-State Air Pollution Rule (CSAPR) relating to emissions of nitrogen oxides?

(a) * * *
(4) * * *
(i) * * *
(B) * * *

TABLE 1 TO PARAGRAPH (a)(4)(i)(B)

| Year of the control period for which CSAPR NO$_X$ annual allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the Administrator |
|---|---|
| *        *        *        *        *        *        * | |
| 2025 and any year thereafter ................................................. | June 1 of the year before the year of the control period. |

*        *        *        *        *
(5) * * *
(i) * * *

TABLE 2 TO PARAGRAPH (a)(5)(i)(B)

| Year of the control period for which CSAPR NO$_X$ annual allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the Administrator |
|---|---|
| *        *        *        *        *        *        * | |
| 2025 and any year thereafter ................................................. | June 1 of the year before the year of the control period. |

(B) * * *

*        *        *        *        *

(6) *Withdrawal of CSAPR FIP provisions relating to NO$_X$ annual emissions.* Except as provided in paragraph (a)(7) of this section, following promulgation of an approval by the Administrator of a State's SIP revision as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (a)(1), (a)(2)(i), and (a)(3) and (4) of this section for sources in the State and Indian country within the borders of the State, the provisions of paragraph (a)(2)(i) of this section will no longer apply to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, unless the Administrator's approval of the SIP revision is partial or conditional, and will continue to apply to sources in areas of Indian country within the borders of the State not subject to the State's SIP authority, provided that if the CSAPR Federal Implementation Plan was promulgated as a partial rather than full remedy for an obligation of the

State to address interstate air pollution, the SIP revision likewise will constitute a partial rather than full remedy for the State's obligation unless provided otherwise in the Administrator's approval of the SIP revision.

(7) * * *

(ii) Notwithstanding the provisions of paragraph (a)(6) of this section, if, at the time of any approval of a State's SIP revision under this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Annual allowances under subpart AAAAA of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of such subpart authorizing the Administrator to complete the allocation and recordation of such allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

*        *        *        *        *

(b) * * *

(2) * * *
(ii) * * *
(C) The provisions of subpart EEEEE of part 97 of this chapter apply to sources in each of the following States and Indian country located within the borders of such States with regard to emissions occurring in 2017 through 2022 only, except as provided in paragraph (b)(14)(iii) of this section: Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Tennessee, Texas, and Wisconsin.

(iii) * * *

(B) The provisions of subpart GGGGG of part 97 of this chapter apply to sources in each of the following States and Indian country located within the borders of such States with regard to emissions occurring in 2023 and each subsequent year: Alabama, Arkansas, Mississippi, Missouri, Oklahoma, Tennessee, Texas, and Wisconsin.

(C) The provisions of subpart GGGGG of part 97 of this chapter apply to sources in each of the following States and Indian country located within the borders of such States with regard to

**426a**

emissions occurring on and after [EFFECTIVE DATE OF FINAL RULE] and in each subsequent year: Delaware, Minnesota, Nevada, Utah, and Wyoming.

\*   \*   \*   \*   \*

(4) *Abbreviated SIP revisions replacing certain provisions of the federal CSAPR NO$_X$ Ozone Season Group 1 Trading Program.* A State listed in paragraph (b)(2)(i)(A) of this section may adopt and include in a SIP revision, and the Administrator will approve, regulations replacing specified provisions of subpart BBBBB of part 97 of this chapter for the State, and not substantively replacing any other provisions, as follows:

\*   \*   \*   \*   \*

(ii) \* \* \*
(B) \* \* \*

### Table 3 to Paragraph (b)(4)(ii)(B)

| Year of the control period for which CSAPR NO$_X$ ozone season Group 1 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the Administrator |
| --- | --- |
| \*   \*   \*   \*   \*   \*   \* | |
| 2025 and any year thereafter ................................................ | June 1 of the year before the year of the control period. |

\*   \*   \*   \*   \*

(5) *Full SIP revisions adopting State CSAPR NO$_X$ Ozone Season Group 1 Trading Programs.* A State listed in paragraph (b)(2)(i)(A) of this section may adopt and include in a SIP revision, and the Administrator will approve, as correcting the deficiency in the SIP that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (b)(1), (b)(2)(i), and (b)(3) and (4) of this section with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, regulations that are substantively identical to the provisions of the CSAPR NO$_X$ Ozone Season Group 1 Trading Program set forth in §§ 97.502 through 97.535 of this chapter, except that the SIP revision:

\*   \*   \*   \*   \*

(ii) \* \* \*
(B) \* \* \*

### Table 4 to Paragraph (b)(5)(ii)(B)

| Year of the control period for which CSAPR NO$_X$ ozone season Group 1 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the Administrator |
| --- | --- |
| \*   \*   \*   \*   \*   \*   \* | |
| 2025 and any year thereafter ................................................ | June 1 of the year before the year of the control period. |

\*   \*   \*   \*   \*

(8) *Abbreviated SIP revisions replacing certain provisions of the federal CSAPR NO$_X$ Ozone Season Group 2 Trading Program.* A State listed in paragraph (b)(2)(ii) of this section may adopt and include in a SIP revision, and the Administrator will approve, regulations replacing specified provisions of subpart EEEEE of part 97 of this chapter for the State, and not substantively replacing any other provisions, as follows:

\*   \*   \*   \*   \*

(iii) \* \* \*

(A) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of CSAPR NO$_X$ Ozone Season Group 2 allowances for any such control period not exceeding the amount, under §§ 97.810(a) and 97.821 of this chapter for the State and such control period, of the CSAPR NO$_X$ Ozone Season Group 2 trading budget minus the sum of the Indian country new unit set-aside and the amount of any CSAPR NO$_X$ Ozone Season Group 2 allowances already allocated and recorded by the Administrator;

(B) \* \* \*

### Table 5 to Paragraph (b)(8)(iii)(B)

| Year of the control period for which CSAPR NO$_X$ ozone season Group 2 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the Administrator |
| --- | --- |
| \*   \*   \*   \*   \*   \*   \* | |
| 2025 and any year thereafter ................................................ | June 1 of the year before the year of the control period. |

\*   \*   \*   \*   \*

(9) *Full SIP revisions adopting State CSAPR NO$_X$ Ozone Season Group 2 Trading Programs.* A State listed in paragraph (b)(2)(ii) of this section may adopt and include in a SIP revision, and the Administrator will approve, as correcting the deficiency in the SIP that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (b)(1), (b)(2)(ii), and (b)(7) and (8) of this section with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, regulations that are substantively identical to the provisions of the CSAPR NO$_X$ Ozone Season Group 2 Trading Program set forth in §§ 97.802 through 97.835 of this chapter, except that the SIP revision:

\*   \*   \*   \*   \*

(iii) \* \* \*

(A) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of CSAPR NO$_X$ Ozone Season Group 2 allowances for any such control period not exceeding the amount, under

§§ 97.810(a) and 97.821 of this chapter for the State and such control period, of the CSAPR NO$_X$ Ozone Season Group 2 trading budget minus the sum of the Indian country new unit set-aside and the amount of any CSAPR NO$_X$ Ozone Season Group 2 allowances already allocated and recorded by the Administrator;

(B) * * *

TABLE 6 TO PARAGRAPH (b)(9)(iii)(B)

| Year of the control period for which CSAPR NO$_X$ ozone season Group 2 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the Administrator |
|---|---|
| * * * * * * * | |
| 2025 and any year thereafter ................................................. | June 1 of the year before the year of the control period. |

* * * * *

(vii) Provided that, if and when any covered unit is located in areas of Indian country within the borders of the State not subject to the State's SIP authority, the Administrator may modify his or her approval of the SIP revision to exclude the provisions in §§ 97.802 (definitions of "common designated representative", "common designated representative's assurance level", and "common designated representative's share"), 97.806(c)(2), and 97.825 of this chapter and the portions of other provisions of subpart EEEEE of part 97 of this chapter referencing these sections and may modify any portion of the CSAPR Federal Implementation Plan that is not replaced by the SIP revision to include these provisions; and

* * * * *

(10) *State-determined allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for 2024.* A State listed in paragraph (b)(2)(iii) of this section may adopt and include in a SIP revision, and the Administrator will approve, as CSAPR NO$_X$ Ozone Season Group 3 allowance allocation provisions replacing the provisions in § 97.1011(a)(1) of this chapter with regard to the State and the control period in 2024, a list of CSAPR NO$_X$ Ozone Season Group 3 units and the amount of CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to each unit on such list, provided that the list of units and allocations meets the following requirements:

(i) All of the units on the list must be units that are in the State and areas of Indian country within the borders of the State subject to the State's SIP authority and that commenced commercial operation before January 1, 2021;

(ii) The total amount of CSAPR NO$_X$ Ozone Season Group 3 allowance allocations on the list must not exceed the amount, under § 97.1010 of this chapter for the State and the control period in 2024, of the CSAPR NO$_X$ Ozone Season Group 3 trading budget minus the sum of the new unit set-aside and Indian country existing unit set-aside;

* * * * *

(v) * * *

(A) By [EFFECTIVE DATE OF FINAL RULE], the State must notify the Administrator electronically in a format specified by the Administrator of the State's intent to submit to the Administrator a complete SIP revision meeting the requirements of paragraphs (b)(10)(i) through (iv) of this section by September 1, 2023; and

(B) The State must submit to the Administrator a complete SIP revision described in paragraph (b)(10)(v)(A) of this section by September 1, 2023.

(11) *Abbreviated SIP revisions replacing certain provisions of the federal CSAPR NO$_X$ Ozone Season Group 3 Trading Program.* A State listed in paragraph (b)(2)(iii) of this section may adopt and include in a SIP revision, and the Administrator will approve, regulations replacing specified provisions of subpart GGGGG of part 97 of this chapter for the State, and not substantively replacing any other provisions, as follows:

* * * * *

(iii) The State may adopt, as CSAPR NO$_X$ Ozone Season Group 3 allowance allocation or auction provisions replacing the provisions in § 97.1011(a)(1) of this chapter with regard to the State and the control period in 2025 or any subsequent year, any methodology under which the State or the permitting authority allocates or auctions CSAPR NO$_X$ Ozone Season Group 3 allowances and may adopt, in addition to the definitions in § 97.1002 of this chapter, one or more definitions that shall apply only to terms as used in the adopted CSAPR NO$_X$ Ozone Season Group 3 allowance allocation or auction provisions, if such methodology—

(A) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for any such control period not exceeding the amount, under §§ 97.1010 and 97.1021 of this chapter for the State and such control period, of the CSAPR NO$_X$ Ozone Season Group 3 trading budget minus the sum of the new unit set-aside, the Indian country existing unit set-aside, and the amount of any CSAPR NO$_X$ Ozone Season Group 3 allowances already allocated and recorded by the Administrator, plus, if the State adopts regulations expanding applicability to additional units pursuant to paragraph (b)(11)(ii) of this section, an additional amount of CSAPR NO$_X$ Ozone Season Group 3 allowances not exceeding the lesser of:

* * * * *

(B) Requires, to the extent the State adopts provisions for allocations or auctions of CSAPR NO$_X$ Ozone Season Group 3 allowances for any such control period to any CSAPR NO$_X$ Ozone Season Group 3 units covered by § 97.1011(a)(1) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions for such control period (except allocations or results of auctions to such units of CSAPR NO$_X$ Ozone Season Group 3 allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator by June 1 of the year before the year of such control period; and

* * * * *

(D) Does not provide for any change, after the submission deadlines in paragraph (b)(11)(iii)(B) of this section, in the allocations submitted to the Administrator by such deadlines and does not provide for any change in any allocation determined and recorded by the Administrator under subpart GGGGG of part 97 of this chapter or § 97.526(d) or § 97.826(d) or (e) of this chapter;

* * * * *

(12) *Full SIP revisions adopting State CSAPR NO$_X$ Ozone Season Group 3 Trading Programs.* A State listed in paragraph (b)(2)(iii) of this section may adopt and include in a SIP revision, and the Administrator will approve, as correcting the deficiency in the SIP that is the basis for the CSAPR Federal

Implementation Plan set forth in paragraphs (b)(1), (b)(2)(iii), and (b)(10) and (11) of this section with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, regulations that are substantively identical to the provisions of the CSAPR NO$_X$ Ozone Season Group 3 Trading Program set forth in §§ 97.1002 through 97.1035 of this chapter, except that the SIP revision:

\* \* \* \* \*

(iii) May adopt, as CSAPR NO$_X$ Ozone Season Group 3 allowance allocation provisions replacing the provisions in § 97.1011(a)(1) of this chapter with regard to the State and the control period in 2025 or any subsequent year, any methodology under which the State or the permitting authority allocates or auctions CSAPR NO$_X$ Ozone Season Group 3 allowances and that—

(A) Requires the State or the permitting authority to allocate and, if applicable, auction a total amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for any such control period not exceeding the amount, under §§ 97.1010 and 97.1021 of this chapter for the State and such control period, of the CSAPR NO$_X$ Ozone Season Group 3 trading budget minus the sum of the new unit set-aside, the Indian country existing unit set-aside, and the amount of any CSAPR NO$_X$ Ozone Season Group 3 allowances already allocated and recorded by the Administrator, plus, if the State adopts regulations expanding applicability to additional units pursuant to paragraph (b)(12)(ii) of this section, an additional amount of CSAPR NO$_X$ Ozone Season Group 3 allowances not exceeding the lesser of:

\* \* \* \* \*

(B) Requires, to the extent the State adopts provisions for allocations or auctions of CSAPR NO$_X$ Ozone Season Group 3 allowances for any such control period to any CSAPR NO$_X$ Ozone Season Group 3 units covered by § 97.1011(a)(1) of this chapter, that the State or the permitting authority submit such allocations or the results of such auctions for such control period (except allocations or results of auctions to such units of CSAPR NO$_X$ Ozone Season Group 3 allowances remaining in a set-aside after completion of the allocations or auctions for which the set-aside was created) to the Administrator by June 1 of the year before the year of such control period; and

\* \* \* \* \*

(D) Does not provide for any change, after the submission deadlines in paragraph (b)(12)(iii)(B) of this section, in the allocations submitted to the Administrator by such deadlines and not provide for any change in any allocation determined and recorded by the Administrator under subpart GGGGG of part 97 of this chapter or § 97.526(d) or § 97.826(d) or (e) of this chapter;

\* \* \* \* \*

(vi) Must not include any of the requirements imposed on any unit in areas of Indian country within the borders of the State not subject to the State's SIP authority in the provisions in §§ 97.1002 through 97.1035 of this chapter and must not include the provisions in §§ 97.1011(a)(2), 97.1012, and 97.1021(g) through (j) of this chapter, all of which provisions will continue to apply under the portion of the CSAPR Federal Implementation Plan that is not replaced by the SIP revision;

(vii) Provided that, if any covered unit is located in areas of Indian country within the borders of the State not subject to the State's SIP authority before the Administrator's approval of the SIP revision, the SIP revision must exclude the provisions in §§ 97.1002 (definitions of "base CSAPR NO$_X$ Ozone Season Group 3 source", "base CSAPR NO$_X$ Ozone Season Group 3 unit", "common designated representative", "common designated representative's assurance level", and "common designated representative's share"), 97.1006(c)(2), and 97.1025 of this chapter and the portions of other provisions of subpart GGGGG of part 97 of this chapter referencing these sections, and further provided that, if and when any covered unit is located in areas of Indian country within the borders of the State not subject to the State's SIP authority after the Administrator's approval of the SIP revision, the Administrator may modify his or her approval of the SIP revision to exclude these provisions and may modify any portion of the CSAPR Federal Implementation Plan that is not replaced by the SIP revision to include these provisions; and

(13) *Withdrawal of CSAPR FIP provisions relating to NO$_X$ ozone season emissions; satisfaction of NO$_X$ SIP Call requirements.* Following promulgation of an approval by the Administrator of a State's SIP revision as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (b)(1), (b)(2)(i), and (b)(3) and (4) of this section, paragraphs (b)(1), (b)(2)(ii), and (b)(7) and (8) of this section, or paragraphs (b)(1), (b)(2)(iii), and (b)(10) and (11) of this section for sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority—

(i) Except as provided in paragraph (b)(14) of this section, the provisions of paragraph (b)(2)(i), (ii), or (iii) of this section, as applicable, will no longer apply to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, unless the Administrator's approval of the SIP revision is partial or conditional, and will continue to apply to sources in areas of Indian country within the borders of the State not subject to the State's SIP authority, provided that if the CSAPR Federal Implementation Plan was promulgated as a partial rather than full remedy for an obligation of the State to address interstate air pollution, the SIP revision likewise will constitute a partial rather than full remedy for the State's obligation unless provided otherwise in the Administrator's approval of the SIP revision; and

\* \* \* \* \*

(14) \* \* \*

(ii) Notwithstanding the provisions of paragraph (b)(13)(i) of this section, if, at the time of any approval of a State's SIP revision under this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 1 allowances under subpart BBBBB of part 97 of this chapter, or allocations of CSAPR NO$_X$ Ozone Season Group 2 allowances under subpart EEEEE of part 97 of this chapter, or allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter, to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of such subpart authorizing the Administrator to complete the allocation and recordation of such allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(iii) Notwithstanding any discontinuation of the applicability of subpart BBBBB or EEEEE of part 97 of this chapter to the sources in a State and areas of Indian country within the borders of the State subject to the State's SIP authority with regard to emissions occurring in any control period pursuant to paragraph (b)(2)(i)(B), (b)(2)(ii)(B) or (C), or (b)(13)(i) of this section, the following provisions shall continue to apply with regard to all CSAPR NO$_X$ Ozone Season Group 1 allowances and CSAPR NO$_X$ Ozone Season Group 2 allowances at any time

**20174**      **Federal Register** / Vol. 87, No. 66 / Wednesday, April 6, 2022 / Proposed Rules

allocated for any control period to any source or other entity in the State and shall apply to all entities, wherever located, that at any time held or hold such allowances:

\*      \*      \*      \*      \*

(F) The provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances); and

(G) The provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods after 2022 and recorded in the compliance accounts of sources in States listed in paragraph (b)(2)(ii)(C) of this section).

\*      \*      \*      \*      \*

(16) \* \* \*
(i) \* \* \*
(C) For each of the following States, the Administrator has approved a SIP revision under paragraph (b)(9) of this section as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (b)(1), (b)(2)(ii), and (b)(7) and (8) of this section with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority: Alabama, Indiana, and Missouri.

(ii) \* \* \*
(B) Notwithstanding any provision of subpart EEEEE of part 97 of this chapter or any State's SIP, with regard to any State listed in paragraph (b)(2)(ii)(C) of this section and any control period that begins after December 31, 2022, the Administrator will not carry out any of the functions set forth for the Administrator in subpart EEEEE of part 97 of this chapter, except §§ 97.811(e) and 97.826(c) and (e) of this chapter, or in any emissions trading program provisions in a State's SIP approved under paragraph (b)(8) or (9) of this section.

(17) \* \* \*
(i) For each of the following States, the Administrator has approved a SIP

revision under paragraph (b)(10) of this section as replacing the CSAPR NO$_X$ Ozone Season Group 3 allowance allocation provisions in § 97.1011(a)(1) of this chapter with regard to the State and the control period in 2024: [none].

(ii) For each of the following States, the Administrator has approved a SIP revision under paragraph (b)(11) of this section as replacing the CSAPR NO$_X$ Ozone Season Group 3 applicability provisions in § 97.1004(a) and (b) or § 97.1004(a)(1) and (2) of this chapter or the CSAPR NO$_X$ Ozone Season Group 2 allowance allocation provisions in § 97.1011(a)(1) of this chapter with regard to the State and the control period in 2025 or any subsequent year: [none].

(iii) For each of the following States, the Administrator has approved a SIP revision under paragraph (b)(12) of this section as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (b)(1), (b)(2)(iii), and (b)(10) and (11) of this section with regard to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority: [none].

■ 3. Amend § 52.39 by:
■ a. In paragraph (a), removing "(SO$_2$), except" and adding in its place "(SO$_2$) for sources meeting the applicability criteria set forth in those subparts, except";
■ b. In paragraph (e) introductory text, removing "State's sources, and" and adding in its place "State, and";
■ c. In table 1 to paragraph (e)(1)(ii), revising the entry for "2025 and any year thereafter";
■ d. In paragraph (f) introductory text, removing "State (but not sources in any Indian country within the borders of the State), regulations" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, regulations";
■ e. In table 2 to paragraph (f)(1)(ii), revising the entry for "2025 and any year thereafter";
■ f. In paragraph (f)(4), removing "Indian country within the borders of the State" and adding in its place "areas

of Indian country within the borders of the State not subject to the State's SIP authority";
■ g. In paragraph (f)(5), removing "Indian country within the borders of the State, the" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority, the";
■ h. In paragraph (h) introductory text, removing "State's sources, and" and adding in its place "State, and";
■ i. In table 3 to paragraph (h)(1)(ii), revising the entry for "2025 and any thereafter";
■ j. In paragraph (i) introductory text, removing "State (but not sources in any Indian country within the borders of the State), regulations" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, regulations";
■ k. In table 4 to paragraph (i)(1)(ii), revising the entry for "2025 and any year thereafter";
■ l. In paragraph (i)(4), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority";
■ m. In paragraph (i)(5), removing "Indian country within the borders of the State, the" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority, the";
■ n. Revising paragraphs (j) and (k)(2); and
■ o. In paragraphs (l)(3) and (m)(3), removing "State (but not sources in any Indian country within the borders of the State):" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority:".

The revisions read as follows:

**§ 52.39  What are the requirements of the Federal Implementation Plans (FIPs) for the Cross-State Air Pollution Rule (CSAPR) relating to emissions of sulfur dioxide?**

\*      \*      \*      \*      \*

(e) \* \* \*
(1) \* \* \*
(ii) \* \* \*

TABLE 1 TO PARAGRAPH (e)(1)(ii)

| Year of the control period for which CSAPR SO$_2$ Group 1 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the Administrator |
|---|---|
| \*      \*      \*      \*      \*      \*      \* | |
| 2025 and any year thereafter ............................................................ | June 1 of the year before the year of the control period. |

\*   \*   \*   \*   \*
(f) \* \* \*
(i) \* \* \*

(ii) \* \* \*

### TABLE 2 TO PARAGRAPH (f)(1)(ii)

| Year of the control period for which CSAPR $SO_2$ Group 1 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the Administrator |
| --- | --- |
| 2025 and any year thereafter .................................................................. | June 1 of the year before the year of the control period. |

\*   \*   \*   \*   \*
(h) \* \* \*
(1) \* \* \*

(ii) \* \* \*

### TABLE 3 TO PARAGRAPH (h)(1)(ii)

| Year of the control period for which CSAPR $SO_2$ Group 2 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the Administrator |
| --- | --- |
| 2025 and any year thereafter .................................................................. | June 1 of the year before the year of the control period. |

\*   \*   \*   \*   \*
(i) \* \* \*
(1) \* \* \*

(ii) \* \* \*

### TABLE 4 TO PARAGRAPH (i)(1)(ii)

| Year of the control period for which CSAPR $SO_2$ Group 2 allowances are allocated or auctioned | Deadline for submission of allocations or auction results to the Administrator |
| --- | --- |
| 2025 and any year thereafter .................................................................. | June 1 of the year before the year of the control period. |

\*   \*   \*   \*   \*

(j) *Withdrawal of CSAPR FIP provisions relating to $SO_2$ emissions.* Except as provided in paragraph (k) of this section, following promulgation of an approval by the Administrator of a State's SIP revision as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan set forth in paragraphs (a), (b), (d), and (e) of this section or paragraphs (a), (c)(1), (g), and (h) of this section for sources in the State and Indian country within the borders of the State, the provisions of paragraph (b) or (c)(1) of this section, as applicable, will no longer apply to sources in the State and areas of Indian country within the borders of the State subject to the State's SIP authority, unless the Administrator's approval of the SIP revision is partial or conditional, and will continue to apply to sources in areas of Indian country within the borders of the State not subject to the State's SIP authority, provided that if the CSAPR Federal Implementation Plan was promulgated as a partial rather than full remedy for an obligation of the State to address interstate air pollution, the SIP revision likewise will constitute a partial rather than full remedy for the State's obligation unless provided otherwise in the Administrator's approval of the SIP revision.

(k) \* \* \*

(2) Notwithstanding the provisions of paragraph (j) of this section, if, at the time of any approval of a State's SIP revision under this section, the Administrator has already started recording any allocations of CSAPR $SO_2$ Group 1 allowances under subpart CCCCC of part 97 of this chapter, or allocations of CSAPR $SO_2$ Group 2 allowances under subpart DDDDD of part 97 of this chapter, to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of such subpart authorizing the Administrator to complete the allocation and recordation of such allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

\*   \*   \*   \*   \*

■ 4. Add §§ 52.40 through 52.45 to read as follows:

\*   \*   \*   \*   \*
Sec.
52.40  What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from sources not subject to the CSAPR ozone season trading program?
52.41  What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Pipeline Transportation of Natural Gas Industry?
52.42  What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Cement and Concrete Product Manufacturing Industry?
52.43  What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Iron and Steel Mills and Ferroalloy Manufacturing Industry?

52.44   What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Glass and Glass Product Manufacturing Industry?

52.45   What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills Industries?

\*      \*      \*      \*      \*

## §52.40   What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from sources not subject to the CSAPR ozone season trading program?

(a) $NO_X$ ozone season emissions. This section establishes Federal Implementation Plan requirements for new and existing units in the industries specified in paragraph (b) of this section to eliminate significant contribution to nonattainment, or interference with maintenance, of the 2015 8-hour ozone National Ambient Air Quality Standards in other states pursuant to 42 U.S.C. 7410(a)(2)(D)(i)(I).

(b) General requirements (1) The $NO_X$ emissions limitations and associated compliance requirements for the following listed source categories not subject to the CSAPR ozone season trading program constitute the Federal Implementation Plan provisions that relate to emissions of $NO_X$ during the ozone season (defined as May 1 through September 30 of a calendar year): §52.41 for engines in the Pipeline Transportation of Natural Gas Industry, §52.42 for kilns in the Cement and Concrete Product Manufacturing Industry, §52.43 for units in the Iron and Steel Mills and Ferroalloy Manufacturing Industry, §52.44 for units in the Glass and Glass Product Manufacturing Industry, §52.45 for boilers in Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills.

(2) The provisions of §§52.41 through 52.45 of this part apply to sources located in each of the following States, including Indian country located within the borders of such States, beginning in the 2026 ozone season and in each subsequent ozone season: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming.

(3) The owner or operator of an affected unit subject to the provisions of §§52.40 through 52.45 shall maintain files of all information (including all reports and notifications) required by these sections recorded in a form suitable and readily available for expeditious inspection and review. The files shall be retained for at least 5 years following the date of each occurrence, measurement, maintenance, corrective action, report, or record. At a minimum, the most recent 2 years of data shall be retained on site. The remaining 3 years of data may be retained off site. Such files may be maintained on microfilm, on a computer, on computer floppy disks, on magnetic tape disks, or on microfiche.

## §52.41   What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Pipeline Transportation of Natural Gas Industry?

(a) Definitions. All terms not defined herein shall have the meaning given them in the Act and in subpart A of part 60.

Affected unit means an engine meeting the applicability criteria of this section.

Four stroke means any type of engine which completes the power cycle in two crankshaft revolutions, with intake and compression strokes in the first revolution and power and exhaust strokes in the second revolution.

ISO conditions means 288 Kelvin (15 °C), 60 percent relative humidity and 101.3 kilopascals pressure.

Lean burn means any two-stroke or four-stroke spark ignited reciprocating internal combustion engine that does not meet the definition of a rich burn engine.

Nameplate rating means the manufacturer's design maximum capacity in horsepower (hp) at the installation site conditions. Starting from the completion of any physical change in the engine resulting in an increase in the maximum output (in hp) that the engine is capable of producing on a steady state basis and during continuous operation, such increased maximum output shall be as specified by the person conducting the physical change.

Natural gas means a fluid mixture of hydrocarbons (e.g., methane, ethane, or propane) or non-hydrocarbons, composed of at least 70 percent methane by volume or that has a gross calorific value between 35 and 41 megajoules (MJ) per dry standard cubic meter (950 and 1,100 Btu per dry standard cubic foot), that maintains a gaseous state under ISO conditions. Natural gas does not include the following gaseous fuels: Landfill gas, digester gas, refinery gas, sour gas, blast furnace gas, coal-derived gas, producer gas, coke oven gas, or any gaseous fuel produced in a process which might result in highly variable $CO_2$ content or heating value.

Natural gas-fired means that greater than or equal to 90% of the engine's heat input, excluding recirculated or recuperated exhaust heat, is derived from the combustion of natural gas.

Operator means any person who operates, controls, or supervises a natural gas-fired engine subject to this regulation and shall include, but not be limited to, any holding company, utility system, or plant manager of such natural gas-fired engine.

Owner means any holder of any portion of the legal or equitable title in a natural gas-fired engine subject to this regulation.

Pipeline transportation of natural gas means the movement of natural gas through an interconnected network of compressors and pipeline components, from field gathering networks near wellheads to end users, including:

(i) The compressor and pipeline network used for field gathering of natural gas from the wellheads for delivery to either processing facilities or connections to pipelines used for intrastate or interstate transportation of the natural gas; and

(ii) The compressor and pipeline network used to transport the natural gas from field gathering networks or processing facilities over a distance (intrastate or interstate) to and from storage facilities, to large natural gas end-users, and to distribution organizations that provide the natural gas to end-users.

Reciprocating internal combustion engine means a reciprocating engine in which power, produced by heat and/or pressure that is developed in the engine combustion chambers by the burning of a mixture of air and fuel, is subsequently converted to mechanical work.

Rich burn means any four-stroke spark ignited reciprocating internal combustion engine where the manufacturer's recommended operating air/fuel ratio divided by the stoichiometric air/fuel ratio at full load conditions is less than or equal to 1.1. Internal combustion engines originally manufactured as rich burn engines but modified with passive emission control technology for nitrogen oxides ($NO_X$) (such as pre-combustion chambers) will be considered lean burn engines. Existing internal combustion engines where there are no manufacturer's recommendations regarding air/fuel ratio will be considered rich burn engines if the excess oxygen content of

the exhaust at full load conditions is less than or equal to 2 percent.

*Spark ignition* means a reciprocating internal combustion engine utilizing a spark plug (or other sparking device) to ignite the air/fuel mixture and with operating characteristics significantly similar to the theoretical Otto combustion cycle.

*Stoichiometric* means the theoretical air-to-fuel ratio required for complete combustion.

*Two stroke* means a type of reciprocating internal combustion engine which completes the power cycle in a single crankshaft revolution by combining the intake and compression operations into one stroke (one-half revolution) and the power and exhaust operations into a second stroke. This system requires auxiliary exhaust scavenging of the combustion products and inherently runs lean (excess of air) of stoichiometry.

(b) *Applicability.* You are subject to the requirements under this section if you own or operate a new or existing natural gas-fired spark ignition engine with a nameplate rating of 1,000 hp or greater that is used for pipeline transportation of natural gas and is located within any of the States listed in § 52.40(a)(1)(ii), including Indian country located within the borders of any such State(s).

(c) *Emissions limitations.* Beginning with the 2026 ozone season and in each ozone season thereafter, the following emissions limitations must be met. Compliance with the numerical emissions limitations established in this section is based on the average of three 1-hour runs using the testing requirements and procedures in paragraph (d) of this section.

(1) If you own or operate a natural gas fired four stroke rich burn spark ignition engine with a nameplate rating of 1,000 hp or greater than you must meet a nitrogen oxides ($NO_X$) emissions limits of 1.0 grams per hp-hour (g/hp-hr).

(2) If you own or operate a natural gas fired four stroke lean burn spark ignition engine with a nameplate rating of 1,000 hp or greater than you must meet a $NO_X$ emissions limits of 1.5 g/hp-hr.

(3) If you own or operate a natural gas fired two stroke lean spark ignition engine with a nameplate rating of 1,000 hp or greater than you must meet a $NO_X$ emissions limits of 3.0 g/hp-hr.

(d) *Testing and monitoring requirements* (1) If you are an owner or operator of a natural gas fired spark ignition engine subject to a $NO_X$ emissions limit under paragraph (b) of this section, you must keep a maintenance plan and records of

conducted maintenance and must, to the extent practicable, maintain and operate the engine in a manner consistent with good air pollution control practice for minimizing emissions.

(2) Performance Testing Requirements:

(i) Engines that meet the certification requirements of § 60.4243(a) need not conduct any performance tests, consistent with the requirements of 40 CFR part 60, subpart JJJJ.

(ii) For non-certified engines, the following performance testing requirements apply:

(A) New engines must conduct an initial performance test within six months of engine startup and conduct subsequent performance testing every six months thereafter to demonstrate compliance.

(B) Existing engines must conduct an initial performance test within six months of becoming subject to an emissions limit under paragraph (b) of this section and conduct subsequent performance testing every six months thereafter to demonstrate compliance.

(iii) Performance tests must be conducted in accordance with the applicable reference test methods of 40 CFR part 60, appendix A, as of April 6, 2022 under 40 CFR 59.104(f), 60.8(b)(3), 61.13(h)(1)(ii), 63.7(e)(2)(ii), or 65.158(a)(2) and available at EPA's website (*https://www.epa.gov/emc/broadly-applicable-approved-alternative-test-methods*), or other methods and procedures approved by EPA through notice-and-comment rulemaking.

(3) If a selective catalytic reduction (SCR) or non-selective catalytic reduction (NSCR) control device is used to reduce emissions:

(i) Monitor the inlet temperature to the catalyst daily and conduct maintenance if the temperature is not within the observed inlet temperature range from the most recent performance test or the temperatures specified by the manufacturer if no performance test was required by this section.

(ii) Measure the pressure drop across the catalyst monthly and conduct maintenance if the pressure drop is greater than 2 inches outside the baseline value established after each semiannual portable analyzer monitoring.

(iii) Engines that are subject to catalyst temperatures and catalyst pressure drop monitoring requirements under 40 CFR part 63, subpart ZZZZ must satisfy the requirements of § 52.41(d)(3).

(4) If you are not using a SCR or NSCR control device to reduce emissions are required to install a continuous parameter monitoring system (CPMS). You must install, operate, and maintain each CPMS according to the requirements in paragraphs (d)(4)(i) through (vi) of this section.

(i) You must prepare a site-specific monitoring plan that addresses the monitoring system design, data collection, and quality assurance and quality control elements outlined in paragraphs (d)(4)(i)(A) through (E) of this section.

(A) The performance criteria and design specifications for the monitoring system equipment, including the sample interface, detector signal analyzer, and data acquisition and calculations.

(B) Sampling interface (*e.g.,* thermocouple) location such that the monitoring system will provide representative measurements.

(C) Equipment performance evaluations, system accuracy audits, or other audit procedures.

(D) Ongoing operation and maintenance procedures in accordance with the requirements of paragraph (d)(1) of this section.

(E) Ongoing recordkeeping and reporting procedures in accordance with the requirements of paragraphs (e) and (f) of this section.

(ii) Install, operate, and maintain each CPMS in continuous operation according to the procedures in your site-specific monitoring plan.

(iii) The CPMS must collect data at least once every 15 minutes.

(iv) For a CPMS for measuring temperature range, the temperature sensor must have a minimum tolerance of 2.8 degrees Celsius (5 degrees Fahrenheit) or 1 percent of the measurement range, whichever is larger.

(v) You must conduct the CPMS equipment performance evaluation, system accuracy audits, or other audit procedures specified in your site-specific monitoring plan at least annually.

(vi) You must conduct a performance evaluation of each CPMS in accordance with your site-specific monitoring plan.

(e) *Recordkeeping requirements* (1) You must keep records of:

(i) Performance tests conducted pursuant to § 52.41(d)(2), including the date, engine settings on the date of the test, and documentation of the methods and results of the testing.

(ii) Catalyst monitoring required by § 52.41(d)(3), if applicable, and any actions taken to address monitored values outside the temperature or pressure drop parameters, including the date and a description of actions taken.

(iii) Parameters monitored pursuant to your site-specific monitoring plan for your CPMS.

(iv) Hours of operation on a daily basis.

(v) Tuning, adjustments, or other combustion process adjustments and the date of the adjustment(s).

(2) Any records required to be maintained by this section that are submitted electronically via the EPA's Compliance and Emissions Data Reporting Interface (CEDRI) may be maintained in electronic format. This ability to maintain electronic copies does not affect the requirement for facilities to make records, data, and reports available upon request to the EPA as part of an on-site compliance evaluation.

(f) *Reporting requirements* (1) Within 60 days after the date of completing each performance test required by this section, you must submit the results of the performance test following the procedures specified in paragraphs (f)(1)(i) through (iii):

(i) *Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (https:// www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert) at the time of the test.* Submit the results of the performance test to the EPA via the CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section, which can be accessed through the EPA's Central Data Exchange (CDX) (*https://cdx.epa.gov/*). The data must be submitted in a file format generated using the EPA's ERT. Alternatively, you may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website.

(ii) *Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test.* The results of the performance test must be included as an attachment in the ERT or an alternate electronic file consistent with the XML schema listed on the EPA's ERT website. Submit the ERT generated package or alternative file to the EPA via CEDRI.

(iii) *Confidential business information (CBI). Do not use CEDRI to submit information you claim as CBI.* Anything submitted using CEDRI cannot later be claimed CBI. Although we do not expect persons to assert a claim of CBI, if you wish to assert a CBI claim for some of the information submitted under paragraphs (f)(1)(i) or (ii) of this section, you must submit a complete file, including information claimed to be

CBI, to the EPA. The file must be generated using the EPA's ERT or an alternate electronic file consistent with the XML schema listed on the EPA's ERT website. Submit the file on a compact disc, flash drive, or other commonly used electronic storage medium and clearly mark the medium as CBI. Mail the electronic medium to U.S. EPA/OAQPS/CORE CBI Office, MD C404–02, 4930 Old Page Rd., Durham, NC 27703. The same file with the CBI omitted must be submitted to the EPA via the EPA's CDX as described in paragraphs (f)(1)(i) and (ii). All CBI claims must be asserted at the time of submission. Furthermore, under CAA section 114(c), emissions data is not entitled to confidential treatment, and the EPA is required to make emissions data available to the public. Thus, emissions data will not be protected as CBI and will be made publicly available.

(2) If you are the owner or operator of an affected engine, you shall submit a semi-annual report, at least every six months, in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section. The report shall contain the following information:

(i) The name and address of the owner and operator;

(ii) The address of the subject engine;

(iii) Longitude and latitude coordinates of the subject engine;

(iv) Identification of the subject engine;

(v) Statement of compliance with the applicable emission limit under § 52.41(b);

(vi) Statement of compliance regarding the conduct of maintenance and operations in a manner consistent with good air pollution control practices for minimizing emissions;

(vii) The date and results of the performance test conducted pursuant to § 52.41(d);

(viii) If applicable, a statement documenting any change in the operating characteristics of the subject engine; and

(ix) A statement certifying that the information included in the semi-annual report is complete and accurate.

(3) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of EPA system outage for failure to timely comply with that reporting requirement. To assert a claim of EPA system outage, you must meet the requirements outlined in paragraphs (f)(3)(i) through (vii) of this section.

(i) You must have been or will be precluded from accessing CEDRI and submitting a required report within the

time prescribed due to an outage of either the EPA's CEDRI or CDX systems.

(ii) The outage must have occurred within the period of time beginning five business days prior to the date that the submission is due.

(iii) The outage may be planned or unplanned.

(iv) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(v) You must provide to the Administrator a written description identifying:

(A) The date(s) and time(s) when CDX or CEDRI was accessed and the system was unavailable;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to EPA system outage;

(C) A description of measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(vi) The decision to accept the claim of EPA system outage and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(vii) In any circumstance, the report must be submitted electronically as soon as possible after the outage is resolved.

(4) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of force majeure for failure to timely comply with that reporting requirement. To assert a claim of force majeure, you must meet the requirements outlined in paragraphs (f)(4)(i) through (v) of this section.

(i) You may submit a claim if a force majeure event is about to occur, occurs, or has occurred or there are lingering effects from such an event within the period of time beginning five business days prior to the date the submission is due. For the purposes of this section, a force majeure event is defined as an event that will be or has been caused by circumstances beyond the control of the affected facility, its contractors, or any entity controlled by the affected facility that prevents you from complying with the requirement to submit a report electronically within the time period prescribed. Examples of such events are acts of nature (*e.g.,* hurricanes, earthquakes, or floods), acts of war or terrorism, or equipment failure or safety hazard beyond the control of the

**434a**

affected facility (*e.g.*, large scale power outage).

(ii) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(iii) You must provide to the Administrator:

(A) A written description of the force majeure event;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to the force majeure event;

(C) A description of measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(iv) The decision to accept the claim of force majeure and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(v) In any circumstance, the reporting must occur as soon as possible after the force majeure event occurs.

### § 52.42 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Cement and Concrete Product Manufacturing Industry?

(a) *Definitions.* All terms not defined herein shall have the meaning given them in the Act and in subpart A of part 60.

*Affected unit* means a cement kiln meeting the applicability criteria of this section.

*Cement plant* means any facility manufacturing cement by either the wet or dry process.

*Clinker* means the product of a cement kiln from which finished cement is manufactured by milling and grinding.

*Cement kiln* means an installation, including any associated pre-heater or pre-calciner devices, that produces clinker by heating limestone and other materials to produce Portland cement.

*Operating day* means a 24-hour period beginning at 12:00 midnight during which the kiln produces clinker at any time.

*Rolling average* means the weighted average of all data, meeting QA/QC requirements or otherwise normalized, collected during the applicable averaging period. The period of a rolling average stipulates the frequency of data averaging and reporting. To demonstrate compliance with an operating parameter a 30-day rolling average period requires calculation of a new average value each operating day and shall include the average of all the hourly averages of the specific operating parameter. For demonstration of compliance with an emissions limit based on pollutant concentration, a 30-day rolling average is comprised of the average of all the hourly average concentrations over the previous 30 operating days. For demonstration of compliance with an emissions limit based on lbs-pollutant per production unit, the 30-day rolling

average is calculated by summing the hourly mass emissions over the previous 30 operating days, then dividing that sum by the total production during the same period.

(b) *Applicability.* You are subject to the requirements of this section if you own or operate a new or existing cement kiln that emits or has the potential to emit 100 tons per year or more of $NO_X$ and is located within any of the States listed in § 52.40(a)(1)(ii), including Indian Country located within the borders of any such State(s).

*(c) Emission limitations* (1) If you own or operate a cement kiln under paragraph (b) of this section you are subject to the $NO_X$ emissions limits in the following table and the $NO_X$ source cap limit under paragraph (c)(2) of this section, beginning with the 2026 ozone season and in each ozone season thereafter.

#### TABLE 1 TO PARAGRAPH (c)(1)

| Kiln type | Proposed $NO_X$ emissions limit (lb/ton of clinker) |
|---|---|
| Long Wet | 4.0 |
| Long Dry | 3.0 |
| Preheater | 3.8 |
| Precalciner | 2.3 |
| Preheater/Precalciner | 2.8 |

(2) The $NO_X$ source cap limit is calculated in accordance with the following equation:

$$CAP\,2015\,Ozone\,Transport = \frac{(KW\ x\ NW) + (KD\ x\ ND)}{\left(2000\,\frac{pounds}{ton}\ x\ 365\,\frac{days}{year}\right)}$$

Where:

CAP2015 Ozone Transport = total allowable $NO_X$ emissions from all cement kilns located at one cement plant, in tons per day, on a 30-operating day rolling average basis;

KD = 1.7 pounds $NO_X$ per ton of clinker for dry preheater-precalciner or precalciner kilns;

KW = 3.4 pounds $NO_X$ per ton of clinker for long wet kilns;

ND = the average annual production in tons of clinker plus one standard deviation for the three most recent calendar years from all dry preheater-precalciner or precalciner kilns located at one cement plant; and

NW = the average annual production in tons of clinker plus one standard deviation for the three most recent calendar years from all long wet kilns located at one cement plant.

(d)*Testing and monitoring requirements* (1) If you own or operate a cement manufacturing plant subject to the $NO_X$ emissions limits under paragraph (c) of this section you must conduct performance tests, on a semi-annual basis, in accordance with the applicable reference test methods of 40 CFR part 60, Appendix A, any alternative test method approved by EPA as of April 6, 2022 under 40 CFR

59.104(f), 60.8(b)(3), 61.13(h)(1)(ii), 63.7(e)(2)(ii), or 65.158(a)(2) and available at EPA's website (*https:// www.epa.gov/emc/broadly-applicable-approved-alternative-test-methods*), or other methods and procedures approved by EPA through notice-and-comment rulemaking. You must calculate and record the 30-operating day rolling emission rate of $NO_X$ as the total of all hourly emissions data for a cement kiln in the preceding 30 days, divided by the total tons of clinker produced in that kiln during the same 30-operating day period using Equation 6 of 40 CFR 60.64(c)(1), shown in this equation:

$$E_{30D} = k\left(\frac{\sum_{i=1}^{n} Ci\ Qi}{P}\right)$$

Where:

$E_{30D}$ = 30 kiln operating day average emission rate of $NO_X$, in lbs/ton of clinker.
Ci = Concentration of $NO_X$ for hour i, in ppm.
Qi = Volumetric flow rate of effluent gas for hour i, where Ci and Qi are on the same basis (either wet or dry), in scf/hr.
P = 30 days of clinker production during the same time period as the $NO_X$ emissions measured, in tons.
k = Conversion factor, $1.194 \times 10^{-7}$ for $NO_X$, in lb/scf/ppm.
n = Number of kiln operating hours over 30 kiln operating days.

*(e) Recordkeeping requirements* (1) If you own or operate a cement manufacturing plant subject to the $NO_X$ emissions limits under paragraph (c) of this section you must retain records of the calculations and measurements as required in paragraph (d) of this section for the 5-year period specified in 52.40(b)(3).

(2) Any records required to be maintained by this section that are submitted electronically via the EPA's CEDRI may be maintained in electronic format. This ability to maintain electronic copies does not affect the requirement for facilities to make records, data, and reports available upon request to the EPA as part of an on-site compliance evaluation.

*(f) Reporting requirements* (1) Within 60 days after the date of completing each performance test required by this section, you must submit the results of the performance test following the procedures specified in paragraphs (f)(1)(i) through (iii) of this section:

(i) *Data collected using test methods supported by the EPA's ERT as listed on the EPA's ERT website (https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert) at the time of the test.* Submit the results of the performance test to the EPA via the CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section, which can be accessed through the EPA's CDX (*https://cdx.epa.gov/*). The data must be submitted in a file format generated using the EPA's ERT. Alternatively, you may submit an electronic file consistent with the XML schema listed on the EPA's ERT website.

(ii) *Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test.* The results of the performance test must be included as an attachment in the ERT or an alternate electronic file consistent with the XML

schema listed on the EPA's ERT website. Submit the ERT generated package or alternative file to the EPA via CEDRI.

(iii) *CBI. Do not use CEDRI to submit information you claim as CBI.* Anything submitted using CEDRI cannot later be claimed CBI. Although we do not expect persons to assert a claim of CBI, if you wish to assert a CBI claim for some of the information submitted under paragraph (f)(1)(i) or (ii) of this section, you must submit a complete file, including information claimed to be CBI, to the EPA. The file must be generated using the EPA's ERT or an alternate electronic file consistent with the XML schema listed on the EPA's ERT website. Submit the file on a compact disc, flash drive, or other commonly used electronic storage medium and clearly mark the medium as CBI. Mail the electronic medium to U.S. EPA/OAQPS/CORE CBI Office, MD C404–02, 4930 Old Page Rd., Durham, NC 27703. The same file with the CBI omitted must be submitted to the EPA via the EPA's CDX as described in paragraphs (f)(1)(i) and (ii) of this section. All CBI claims must be asserted at the time of submission. Furthermore, under CAA section 114(c), emissions data is not entitled to confidential treatment, and the EPA is required to make emissions data available to the public. Thus, emissions data will not be protected as CBI and will be made publicly available.

(2) If you are the owner or operator of an affected cement kiln, you shall submit a semi-annual, at least every six months, report in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section.

(3) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of EPA system outage for failure to timely comply with that reporting requirement. To assert a claim of EPA system outage, you must meet the requirements outlined in paragraphs (f)(3)(i) through (vii) of this section.

(i) You must have been or will be precluded from accessing CEDRI and submitting a required report within the time prescribed due to an outage of either the EPA's CEDRI or CDX systems.

(ii) The outage must have occurred within the period of time beginning five business days prior to the date that the submission is due.

(iii) The outage may be planned or unplanned.

(iv) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(v) You must provide to the Administrator a written description identifying:

(A) The date(s) and time(s) when CDX or CEDRI was accessed and the system was unavailable;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to EPA system outage;

(C) A description of measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(vi) The decision to accept the claim of EPA system outage and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(vii) In any circumstance, the report must be submitted electronically as soon as possible after the outage is resolved.

(4) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of force majeure for failure to timely comply with that reporting requirement. To assert a claim of force majeure, you must meet the requirements outlined in paragraphs (f)(4)(i) through (v) of this section.

(i) You may submit a claim if a force majeure event is about to occur, occurs, or has occurred or there are lingering effects from such an event within the period of time beginning five business days prior to the date the submission is due. For the purposes of this section, a force majeure event is defined as an event that will be or has been caused by circumstances beyond the control of the affected facility, its contractors, or any entity controlled by the affected facility that prevents you from complying with the requirement to submit a report electronically within the time period prescribed. Examples of such events are acts of nature (*e.g.,* hurricanes, earthquakes, or floods), acts of war or terrorism, or equipment failure or safety hazard beyond the control of the affected facility (*e.g.,* large scale power outage).

(ii) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(iii) You must provide to the Administrator:

(A) A written description of the force majeure event;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to the force majeure event;

(C) A description of measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(iv) The decision to accept the claim of force majeure and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(v) In any circumstance, the reporting must occur as soon as possible after the force majeure event occurs.

### § 52.43 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Iron and Steel Mills and Ferroalloy Manufacturing Industry?

(a) *Definitions.* All terms not defined herein shall have the meaning given them in the Act and in subpart A of part 60.

*Affected unit* means any annealing furnace, basic oxygen process furnace, blast furnace, coke oven facility, electric arc furnace, ladle metallurgy furnace, ladle/tundish preheating system, reheat furnace, taconite production kiln, vacuum degasser, and industrial boiler meeting the applicability criteria of this section, and any such unit contained within a BOF Shop meeting the applicability criteria of this section.

*Annealing furnace* shall mean a furnace used to heat materials at very high temperatures to change their hardness and strength properties.

*Basic Oxygen Process Furnace (BOF)* shall mean a refractory-lined vessel in which high-purity oxygen is blown under pressure through a bath of molten iron, scrap metal, and fluxes to produce steel. This definition includes both top and bottom blown furnaces, but does not include argon oxygen decarburization furnaces.

*Blast furnace* means refractory-lined furnaces charged through its top with iron ore pellets (taconite), sinter, flux (limestone and dolomite), and coke in a reducing atmosphere to produce iron.

*BOF Shop* means the place where steel making operations occur, beginning with the transfer of molten iron (hot metal) from the torpedo car and ending just prior to casting the molten steel, including hot metal transfer, desulfurization, slag skimming, refining in a basic oxygen process furnace, and ladle metallurgy.

*BOF Baghouse System* means the control system for control of emissions from charging and tapping of the BOFs, including the capture hoods, ductwork and the BOF Baghouse.

*Coke* means carbon product that is formed by the thermal distillation of coal at high temperatures in the absence of air in coke oven batteries.

*Coke Ovens* means ovens producing coke for use in blast furnaces.

*Day* means a calendar day unless expressly stated to be a business day. In computing any period of time for recordkeeping and reporting purposes where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next business day.

*Electric Arc Furnace* means a furnace equipped with electrodes used to produce carbon steels and alloy steels primarily by recycling ferrous scrap.

*Exceedance* means a reading in excess of an applicable opacity or emissions limitation.

*Ladle Metallurgy Furnace* means a furnace used to refine molten steel into specialty grades while keeping the steel in the ladle.

*Ladle/Tundish Preheaters* means equipment used to preheat ladles or tundishes to minimize temperature drop prior to use in iron or molten steel refinement.

*Reheat Furnace* means a furnace used to heat steel product to temperatures at which it will be suitable for deformation and further processing.

*Steel Production Cycle* means the operations conducted within the basic oxygen process furnace shop that are required to produce each batch of steel, including scrap charging, preheating, hot metal charging, primary oxygen blowing, sampling, (vessel turndown and turnup), additional oxygen blowing, tapping, and deslagging. The steel production cycle begins when the scrap is charged to the furnace and ends three minutes after the slag is emptied from the vessel into the slag pot.

*Taconite production kiln* means a furnace designed to dry and indurate taconite concentrates to create taconite pellets.

*Vacuum degasser* means a unit operated within an iron and steel facility to expose molten steel at low pressure to remove certain gases during steel refinement.

(b) *Applicability* The requirements of this section apply to each new or existing emissions unit at an iron and steel mill or ferroalloy manufacturing facility that directly emits or has the potential to emit 100 tons per year or more of $NO_X$, and to each BOF Shop containing two or more such units that collectively emit or have the potential to emit 100 tons per year or more of $NO_X$, and that is located within any of the States listed in § 52.40(a)(1)(ii), including Indian country located within the borders of any such State(s).

(c) *Emissions Limitations and Requirements.* Beginning with the 2026 ozone season and in each ozone season thereafter, the emissions limitations in the following table must be met on a 3-hour rolling average.

TABLE 1 TO PARAGRAPH (c)

| Emission unit | $NO_X$ Emissions standard or control requirement |
| --- | --- |
| Blast Furnace | 0.03 lb/mmBtu. |
| Basic Oxygen Process Furnace | 0.07 lb/ton steel. |
| Electric Arc Furnace | 0.15 lb/ton steel. |
| Ladle/tundish Preheaters | 0.06 lb/mmBtu. |
| Reheat furnace | 0.05 lb/mmBtu. |
| Annealing Furnace | 0.06 lb/mmBtu. |
| Vacuum Degasser | 0.03 lb/mmBtu. |
| Ladle Metallurgy Furnace | 0.1 lb/ton steel. |
| Taconite Production Kilns | Install and operate low $NO_X$ burners as required by 2013 and 2016 Minnesota FIPs. 40 CFR § 52.1183. |
| Coke Ovens (charging) | 0.15 lb/ton of coal charged. |
| Coke Oven push cars and pushing-charging machines (pushing) | 0.015 lb/ton of coal pushed. |

TABLE 1 TO PARAGRAPH (c)—Continued

| Emission unit | NO$_X$ Emissions standard or control requirement |
|---|---|
| Boilers—Coal, blast furnace gas, and coke oven gas | 0.20 lb/mmBtu. |
| Boilers—Residual oil | 0.20 lb/mmBtu. |
| Boilers—Distillate oil | 0.12 lb/mmBtu. |
| Boilers—Natural gas | 0.08 lb/mmBtu. |

(d) *Compliance and Monitoring Requirements*—(1) *Compliance Requirements* (i) Each affected unit identified in Table 1 to paragraph (c) of this section must design, install, maintain, and continuously operate NO$_X$ control devices as necessary to achieve emissions limits set forth in Table 1 to paragraph (c) of this section in a manner consistent with good air pollution control practices as described in 40 CFR 63.6(e).

(A) If you are the owner or operator of an affected unit not identified in paragraph (d)(1)(i)(B) of this section, you must submit to EPA a work plan for each affected unit within 180 days of the effective date of this rule identifying how each affected unit will comply with the emissions limits set forth in Table 1 to paragraph (c) of this section. Each work plan must include identification of the control device selected and the phased construction timeframe by which you will design, install, and consistently operate the device.

(B) For each taconite production kiln affected by this rule, you must install, maintain, and continuously operate low-NO$_X$ burners to reduce existing average NO$_X$ emissions from the facility by 40% during all periods of kiln operation.

(*1*) If you have already installed low-NO$_X$ burners as required by the 2013 or 2016 Minnesota Regional Haze Federal Implementation Plans,[352] then you must submit a report to EPA within 180 days of the effective date of this rule demonstrating that the low-NO$_X$ burner is designed to achieve 40% reduction of kiln NO$_X$ emissions.

(*2*) If you have not yet installed low-NO$_X$ burners as required by the 2013 or 2016 Minnesota Regional Haze Federal Implementation Plans, then you must submit a work plan identifying the low-NO$_X$ burner selected and the phased construction timeframe by which you will design, install, and consistently operate the burner. Each work plan shall include performance test results obtained within five years of the effective date of this rule to be used as baseline emission testing data providing

[352] *https://archive.epa.gov/reg5oair/taconite/web/html/index.html.*

the basis for required emission reductions.

(2) *Monitoring Requirements* (i) For each unit identified in Table 1 to paragraph (c) of this section of this rule, you must install, operate, and maintain a NO$_X$ continuous emission monitoring system (CEMS) to monitor compliance with the emissions limits set forth in Table 1 to paragraph (c) of this section. Each CEMS shall be installed and operated in accordance with requirements set forth at 40 CFR part 60, appendix B.

(ii) You must conduct a performance evaluation of each CEMS according to the requirements in 40 CFR 63.8 and according to 40 CFR part 60, appendix B.

(iii) You must notify EPA in writing of your intention to conduct a performance test at least 60 calendar days before the performance test is initially scheduled to begin in accordance with 40 CFR 63.7 (b).

(iv) As specified in 40 CFR 63.8(c)(4)(ii), each CEMS must complete a minimum of one cycle of operation (sampling, analyzing, and data recording) for each successive 15-minute period. You must have at least two data points, each representing a different 15-minute period within the same hour, to have a valid hour of data.

(v) All CEMS data must be reduced as specified in 40 CFR 63.8(g)(2) and recorded as NO$_X$ in parts per million by volume, dry basis (ppmvd).

(vi) Proper maintenance. You must maintain the CEMS equipment at all times that the unit is operating, including but not limited to, maintaining necessary parts for routine repairs of the monitoring equipment.

(vii) You must conduct all monitoring in continuous operation at all times that the unit is operating, except for, as applicable, monitoring malfunctions, associated repairs, and required quality assurance or control activities (including, as applicable, calibration drift checks and required zero and high-level adjustments). Quality assurance or control activities must be performed according to procedure 1 of 40 CFR part 60, appendix F.

(viii) Data recorded during monitoring malfunctions, associated repairs, out-of-control periods, and required quality

assurance or control activities should not be used for purposes of calculating data averages. You must use all of the data collected from all other periods in assessing compliance. A monitoring malfunction is any sudden, infrequent, not reasonably preventable failure of the monitoring equipment to provide valid data. Monitoring failures that are caused in part by poor maintenance or careless operation are not malfunctions. Any period for which the monitoring system is out-of-control and data are not available for required calculations constitutes a deviation from the monitoring requirements.

(e) *Recordkeeping requirements* (1) You shall maintain records of the following information for each day the affected unit operates:

(i) Calendar date;

(ii) The average hourly NO$_X$ emission rates measured or predicted;

(iii) The 30-day average NO$_X$ emission rates calculated at the end of each affected unit operating day from the measured or predicted hourly NO$_X$ emission rates for the preceding 30 steam generating unit operating days;

(iv) Identification of the affected unit operating days when the calculated 30-day average NO$_X$ emission rates are in excess of the applicable NO$_X$ emission limit in Table 1 to paragraph (c) of this section with the reasons for such excess emissions as well as a description of corrective actions taken;

(v) Identification of the affected unit operating days for which pollutant data have not been obtained, including reasons for not obtaining sufficient data and a description of corrective actions taken;

(vi) Identification of the times when emission data have been excluded from the calculation of average emission rates and the reasons for excluding data;

(vii) Identification of the times when the pollutant concentration exceeded full span of the CEMS;

(viii) Description of any modifications to the CEMS that could affect the ability of the CEMS to comply with Performance Specification 2 or 3 in appendix B of 40 CFR part 60; and

(x) Results of daily CEMS drift tests and quarterly accuracy assessments as required under Procedure 1 of 40 CFR part 60, appendix F.

(2) Any records required to be maintained by this section that are submitted electronically via the EPA's CEDRI may be maintained in electronic format. This ability to maintain electronic copies does not affect the requirement for facilities to make records, data, and reports available upon request to the EPA as part of an on-site compliance evaluation.

(f) *Reporting requirements* (1) Within 180 days of the effective date of this rule, you shall submit a work plan in accordance with requirements set forth in paragraph (d)(1)(i)(A) of this section, including identification of the control device selected and the phased construction timeframe by which you will design, install, and consistently operate the device. For taconite kilns subject to paragraph (d)(1)(i)(B)(2) of this section each work plan shall include performance test results obtained within five years of the effective date of this rule to be used as baseline emission testing data providing the basis for required emission reductions.

(2) By no later than March 30, 2026, each owner/operator of an affected unit shall submit a final report certifying installation of each selected control device has completed. Each such report shall contain dates of final construction and relevant performance testing, where applicable, demonstrating compliance with limits set forth in Table 1 to paragraph (c) of this section.

(3) Within 60 days after the date of completing each performance test required by this section, you must submit the results of the performance test or performance evaluation of the CEMS following the procedures specified in paragraphs (c)(3)(i) through (iii) of this section:

(i) *Data collected using test methods supported by the EPA's ERT as listed on the EPA's ERT website (https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert) at the time of the test.* Submit the results of the performance test to the EPA via the CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section, which can be accessed through the EPA's CDX (*https://cdx.epa.gov/*). The data must be submitted in a file format generated using the EPA's ERT. Alternatively, you may submit an electronic file consistent with the XML schema listed on the EPA's ERT website.

(ii) *Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test.* The results of the performance test must be included as an attachment in the ERT or an alternate electronic file consistent with the XML schema listed on the EPA's ERT website. Submit the ERT generated package or alternative file to the EPA via CEDRI.

(iii) *CBI. Do not use CEDRI to submit information you claim as CBI.* Anything submitted using CEDRI cannot later be claimed CBI. Although we do not expect persons to assert a claim of CBI, if you wish to assert a CBI claim for some of the information submitted under paragraph (f)(1)(i) or (ii) of this section, you must submit a complete file, including information claimed to be CBI, to the EPA. The file must be generated using the EPA's ERT or an alternate electronic file consistent with the XML schema listed on the EPA's ERT website. Submit the file on a compact disc, flash drive, or other commonly used electronic storage medium and clearly mark the medium as CBI. Mail the electronic medium to U.S. EPA/OAQPS/CORE CBI Office, MD C404–02, 4930 Old Page Rd., Durham, NC 27703. The same file with the CBI omitted must be submitted to the EPA via the EPA's CDX as described in paragraphs (f)(1)(i) and (ii). All CBI claims must be asserted at the time of submission. Furthermore, under CAA section 114(c), emissions data is not entitled to confidential treatment, and the EPA is required to make emissions data available to the public. Thus, emissions data will not be protected as CBI and will be made publicly available.

(4) You are required to submit excess emission reports for any excess emissions that occurred during the reporting period. Excess emissions are defined as any calculated 30-day rolling average $NO_X$ emission rate, as determined under paragraph (c)(3)(iii) of this section, that exceeds the applicable emission limit in paragraph (c) of this section. Excess emission reports must be submitted in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section.

(5) If you own or operate an affected unit subject to the continuous monitoring requirements for $NO_X$ under paragraph (d) of this section, you shall submit reports containing the information recorded under paragraph (d) as described in paragraph (e)(6) of this section. Compliance reports for continuous monitoring must be submitted in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section.

(6) If you own or operate an affected unit, you must submit electronic quarterly reports no later than 30 days after the end of the calendar quarter. The reports shall be accompanied by a certification from the owner or operator indicating whether the affected unit was in compliance with the applicable emission limits and minimum data requirements of this section during the reporting period. These quarterly reports must be submitted in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section.

(7) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of EPA system outage for failure to timely comply with that reporting requirement. To assert a claim of EPA system outage, you must meet the requirements outlined in paragraphs (f)(7)(i) through (vii) of this section.

(i) You must have been or will be precluded from accessing CEDRI and submitting a required report within the time prescribed due to an outage of either the EPA's CEDRI or CDX systems.

(ii) The outage must have occurred within the period of time beginning five business days prior to the date that the submission is due.

(iii) The outage may be planned or unplanned.

(iv) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(v) You must provide to the Administrator a written description identifying:

(A) The date(s) and time(s) when CDX or CEDRI was accessed and the system was unavailable;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to EPA system outage;

(C) A description of measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(vi) The decision to accept the claim of EPA system outage and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(vii) In any circumstance, the report must be submitted electronically as soon as possible after the outage is resolved.

(8) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of force majeure for failure to timely comply with that

reporting requirement. To assert a claim of force majeure, you must meet the requirements outlined in paragraphs (f)(8)(i) through (v) of this section.

(i) You may submit a claim if a force majeure event is about to occur, occurs, or has occurred or there are lingering effects from such an event within the period of time beginning five business days prior to the date the submission is due. For the purposes of this section, a force majeure event is defined as an event that will be or has been caused by circumstances beyond the control of the affected facility, its contractors, or any entity controlled by the affected facility that prevents you from complying with the requirement to submit a report electronically within the time period prescribed. Examples of such events are acts of nature (*e.g.,* hurricanes, earthquakes, or floods), acts of war or terrorism, or equipment failure or safety hazard beyond the control of the affected facility (*e.g.,* large scale power outage).

(ii) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(iii) You must provide to the Administrator:

(A) A written description of the force majeure event;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to the force majeure event;

(C) A description of measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(iv) The decision to accept the claim of force majeure and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(v) In any circumstance, the reporting must occur as soon as possible after the force majeure event occurs.

**§ 52.44   What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Glass and Glass Product Manufacturing Industry?**

(a) *Definitions.* All terms not defined herein shall have the meaning given them in the Act and in subpart A of part 60.

*Affected units* means a glass manufacturing furnace meeting the applicability criteria of this section.

*All-electric melter* means a glass melting furnace in which all the heat required for melting is provided by electric current from electrodes submerged in the molten glass, although some fossil fuel may be charged to the furnace as raw material only.

*Borosilicate recipe* means glass product composition of the following approximate ranges of weight proportions: 60 to 80 percent silicon dioxide, 4 to 10 percent total $R_2O$ (*e.g.,* $Na_2O$ and $K_2O$), 5 to 35 percent boric oxides, and 0 to 13 percent other oxides.

*Container glass* means glass made of soda-lime recipe, clear or colored, which is pressed and/or blown into bottles, jars, ampoules, and other products listed in Standard Industrial Classification 3221 (SIC 3221).

*Experimental furnace* means a glass melting furnace with the sole purpose of operating to evaluate glass melting processes, technologies, or glass products. An experimental furnace does not produce glass that is sold (except for further research and development purposes) or that is used as a raw material for nonexperimental furnaces.

*Flat glass* means glass made of soda-lime recipe and produced into continuous flat sheets and other products listed in SIC 3211.

*Glass melting furnace* means a unit comprising a refractory vessel in which raw materials are charged, melted at high temperature, refined, and conditioned to produce molten glass. The unit includes foundations, superstructure and retaining walls, raw material charger systems, heat exchangers, melter cooling system, exhaust system, refractory brick work, fuel supply and electrical boosting equipment, integral control systems and instrumentation, and appendages for conditioning and distributing molten glass to forming apparatuses. The forming apparatuses, including the float bath used in flat glass manufacturing and flow channels in wool fiberglass and textile fiberglass manufacturing, are not considered part of the glass melting furnace.

*Glass produced* means the weight of the glass pulled from the glass melting furnace.

*Hand glass melting furnace* means a glass melting furnace where the molten glass is removed from the furnace by a glassworker using a blowpipe or a pontil.

*Lead recipe* means glass product composition of the following ranges of weight proportions: 50 to 60 percent silicon dioxide, 18 to 35 percent lead oxides, 5 to 20 percent total $R_2O$ (*e.g.,* $Na_2O$ and $K_2O$), 0 to 8 percent total $R_2O_3$ (*e.g.,* $Al_2O_3$), 0 to 15 percent total RO (*e.g.,* CaO, MgO), other than lead oxide, and 5 to 10 percent other oxides.

*Pressed and blown glass* means glass which is pressed, blown, or both, including textile fiberglass, noncontinuous flat glass, noncontainer glass, and other products listed in SIC 3229. It is separated into: Glass of borosilicate recipe, Glass of soda-lime and lead recipes, and Glass of opal, fluoride, and other recipes.

*Raw material* means minerals, such as silica sand, limestone, and dolomite; inorganic chemical compounds, such as soda ash (sodium carbonate), salt cake (sodium sulfate), and potash (potassium carbonate); metal oxides and other metal-based compounds, such as lead oxide, chromium oxide, and sodium antimonate; metal ores, such as chromite and pyrolusite; and other substances that are intentionally added to a glass manufacturing batch and melted in a glass melting furnace to produce glass. Metals that are naturally-occurring trace constituents or contaminants of other substances are not considered to be raw materials.

*Rebricking* means cold replacement of damaged or worn refractory parts of the glass melting furnace. Rebricking includes replacement of the refractories comprising the bottom, sidewalls, or roof of the melting vessel; replacement of refractory work in the heat exchanger; replacement of refractory portions of the glass conditioning and distribution system.

*Soda-lime recipe* means glass product composition of the following ranges of weight proportions: 60 to 75 percent silicon dioxide, 10 to 17 percent total $R_2O$ (*e.g.,* $Na_2O$ and $K_2O$), 8 to 20 percent total RO but not to include any PbO (*e.g.,* CaO, and MgO), 0 to 8 percent total $R_2O_3$ (*e.g.,* $Al_2O_3$), and 1 to 5 percent other oxides.

*Textile fiberglass* means fibrous glass in the form of continuous strands having uniform thickness.

*Wool fiberglass* means fibrous glass of random texture, including fiber glass insulation, and other products listed in SIC 3296.

(b) *Applicability* You are subject to the requirements under this section if you own or operate a new or existing glass manufacturing furnace that directly emits or has the potential to emit 100 tons per year or more of $NO_X$ and is located within any of the States listed in § 52.40(a)(1)(ii), including Indian country located within the borders of any such State(s).

(c) *Emissions limitations* If you own or operate an affected unit you are subject to the $NO_X$ emissions limits in the following table beginning with the 2026 ozone season and in each ozone season thereafter:

TABLE 1 TO PARAGRAPH (c)

| Furnace type | Proposed NO$_X$ emissions limit (lb/ton of glass produced) |
|---|---|
| Container Glass Manufacturing Furnace | 4.0 |
| Pressed/Blown Glass Manufacturing Furnace or Fiberglass Manufacturing Furnace | 4.0 |
| Flat Glass Manufacturing Furnace | 9.2 |

(d) *Testing and Monitoring Requirements* If you own or operate an affected unit you must conduct performance tests, on a semiannual basis, in accordance with the applicable reference test methods of 40 CFR part 60, Appendix A, any alternative test method approved by EPA as of April 6, 2022 under 40 CFR 59.104(f), 60.8(b)(3), 61.13(h)(1)(ii), 63.7(e)(2)(ii), or 65.158(a)(2) and available at EPA's website (*https://www.epa.gov/emc/broadly-applicable-approved-alternative-test-methods*), or other methods and procedures approved by EPA through notice-and-comment rulemaking. Direct measurement or material balance using good engineering practice shall be used to determine the amount of glass pulled during the performance test. The rate of glass produced is defined as the weight of glass pulled from the affected facility during the performance test divided by the number of hours taken to perform the performance test.

(1) Owners or operators of affected units must calculate and record the 30-operating day rolling emission rate of NO$_X$ as the total of all hourly emissions data for a glass manufacturing furnace in the preceding 30 days, divided by the total tons of glass produced in that furnace during the same 30-operating day period. If a continuous emission monitoring system has not been installed on the affected unit, the owner or operator shall conduct the following steps:

(A) *Step 1:* determine the average pounds of NO$_X$ emitted per hour by averaging three one-hour tests,

(B) *Step 2:* determine the average tons of glass removed per hour during the same time period as the three one-hour tests in step 1,

(C) *Step 3:* divide the average pounds of NO$_X$ emitted per hour determined in step 1 by the average tons of glass removed per hour determined in step 2,

(D) *Step 4:* compare the quotient to the emission limits specified at § 52.44(c)(1).

(2) If a continuous emission monitoring system has been installed on the affected unit, on a daily basis the owner or operator shall conduct the following steps:

(A) *Step 1:* determine the average pounds of NO$_X$ emitted per day,

(B) *Step 2:* determine the tons of glass removed per day,

(C) *Step 3:* divide the average pounds of NO$_X$ emitted per day determined in step (1) by the tons of glass removed per day determined in step (2). The quotient is pounds of NO$_X$ emitted per ton of glass removed; and

(D) *Step 4:* compare the quotient to the emission limit specified at § 52.44(c)(1).

(e) *Recordkeeping requirements* (1) If you own or operate an affected unit, you must retain records of the calculations and measurements as required in paragraph (e) of this section for 5-year period specified in 52.40(b)(3). You must record the results of each inspection and maintenance proposed rule in a logbook (written or electronic format). You shall keep the logbook onsite and make the logbook available to the permitting authority upon request, consistent with the requirements of 40 CFR part 63, subpart SSSSSS, § 63.11457(c).

(2) Any records required to be maintained by this section that are submitted electronically via the EPA's CEDRI may be maintained in electronic format. This ability to maintain electronic copies does not affect the requirement for facilities to make records, data, and reports available upon request to the EPA as part of an on-site compliance evaluation.

(f) *Reporting requirements* (1) Within 60 days after the date of completing each performance test required by this section, you must submit the results of the performance test following the procedures specified in paragraphs (e)(1)(i) through (iii) of this section.

(i) *Data collected using test methods supported by the EPA's ERT as listed on the EPA's ERT website (https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert) at the time of the test.* Submit the results of the performance test to the EPA via the CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section, which can be accessed through the EPA's CDX (*https://cdx.epa.gov/*). The data must be submitted in a file format generated using the EPA's ERT. Alternatively, you may submit an electronic file consistent with the XML schema listed on the EPA's ERT website.

(ii) *Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test.* The results of the performance test must be included as an attachment in the ERT or an alternate electronic file consistent with the XML schema listed on the EPA's ERT website. Submit the ERT generated package or alternative file to the EPA via CEDRI.

(iii) *CBI. Do not use CEDRI to submit information you claim as CBI.* Anything submitted using CEDRI cannot later be claimed as CBI. Although we do not expect persons to assert a claim of CBI, if you wish to assert a CBI claim for some of the information submitted under paragraph (f)(1)(i) or (ii) of this section, you must submit a complete file, including information claimed to be CBI, to the EPA. The file must be generated using the EPA's ERT or an alternate electronic file consistent with the XML schema listed on the EPA's ERT website. Submit the file on a compact disc, flash drive, or other commonly used electronic storage medium and clearly mark the medium as CBI. Mail the electronic medium to U.S. EPA/OAQPS/CORE CBI Office, MD C404–02, 4930 Old Page Rd., Durham, NC 27703. The same file with the CBI omitted must be submitted to the EPA via the EPA's CDX as described in paragraphs (f)(1)(i) and (ii). All CBI claims must be asserted at the time of submission. Furthermore, under CAA section 114(c), emissions data is not entitled to confidential treatment, and the EPA is required to make emissions data available to the public. Thus, emissions data will not be protected as CBI and will be made publicly available.

(2) If you own or operate an affected unit, you shall submit a semi-annual report, at least every six months, in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section.

(3) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of EPA system outage for failure to timely comply with that reporting requirement. To assert a claim of EPA system outage, you must meet the requirements outlined in paragraphs (f)(3)(i) through (vii) of this section.

(i) You must have been or will be precluded from accessing CEDRI and submitting a required report within the time prescribed due to an outage of either the EPA's CEDRI or CDX systems.

(ii) The outage must have occurred within the period of time beginning five business days prior to the date that the submission is due.

(iii) The outage may be planned or unplanned.

(iv) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(v) You must provide to the Administrator a written description identifying:

(A) The date(s) and time(s) when CDX or CEDRI was accessed and the system was unavailable;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to EPA system outage;

(C) A description of measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(vi) The decision to accept the claim of EPA system outage and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(vii) In any circumstance, the report must be submitted electronically as soon as possible after the outage is resolved.

(4) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of force majeure for failure to timely comply with that reporting requirement. To assert a claim of force majeure, you must meet the requirements outlined in paragraphs (f)(4)(i) through (v) of this section.

(i) You may submit a claim if a force majeure event is about to occur, occurs, or has occurred or there are lingering effects from such an event within the period of time beginning five business days prior to the date the submission is due. For the purposes of this section, a force majeure event is defined as an event that will be or has been caused by circumstances beyond the control of the affected facility, its contractors, or any entity controlled by the affected facility that prevents you from complying with the requirement to submit a report electronically within the time period prescribed. Examples of such events are acts of nature (*e.g.,* hurricanes, earthquakes, or floods), acts of war or terrorism, or equipment failure or safety hazard beyond the control of the affected facility (*e.g.,* large scale power outage).

(ii) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(iii) You must provide to the Administrator:

(A) A written description of the force majeure event;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to the force majeure event;

(C) A description of measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(iv) The decision to accept the claim of force majeure and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(v) In any circumstance, the reporting must occur as soon as possible after the force majeure event occurs.

### § 52.45 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills Industries?

(a) *Definitions.* All terms not defined herein shall have the meaning given them in the Act and in subpart A of 40 CFR part 60.

*Affected unit* means an industrial boiler meeting the applicability criteria of this section.

(b) *Applicability.* (1) The requirements of this section apply to each new or existing boiler with a design capacity of 100 mmBtu/hr or greater fueled by coal, residual oil, distillate oil, or natural gas, located at sources that are within the Basic Chemical Manufacturing industry (NAICS code 3251xx), the Petroleum and Coal Products Manufacturing industry (NAICS code 3241xx), and the Pulp, Paper, and Paperboard industry (NAICS code 3221xx), and which is located within any of the States listed in § 52.40(a)(1)(ii), including Indian country located within the borders of any such State(s).

(c) *Emission limitations.* Beginning with the 2026 ozone season and in each ozone season thereafter, the following emission limits apply, based on a 30-day averaging time:

(1) Coal-fired industrial boilers: 0.20 lbs $NO_X$/mmBtu;

(2) Residual oil-fired industrial boilers: 0.15 lbs $NO_X$/mmBtu;

(3) Distillate oil-fired industrial boilers: 0.12 lbs $NO_X$/mmBtu; and

(4) Natural gas-fired industrial boilers: 0.08 lbs $NO_X$/mmBtu.

(d) *Initial compliance testing.* (1) To determine compliance with the

emission limits for $NO_X$ identified in paragraph (c) of this section, you shall conduct an initial compliance test as described in 40 CFR § 60.8 using the continuous system for monitoring $NO_X$ specified by EPA Test Method 7E— Determination of Nitrogen Oxide Emissions from Stationary Sources (Instrumental Analyzer Procedure), as described at 40 CFR part 60, Appendix A–4. In lieu of the timing of the compliance test described in 40 CFR 60.8(a), the test shall be conducted within 90 days from the installation of the pollution control equipment used to comply with the $NO_X$ emission limits in paragraph (c) of this section.

(2) For the initial compliance test, $NO_X$ emissions from the affected unit shall be monitored for 30 successive operating days and the 30-day average emission rate will be used to determine compliance with the $NO_X$ emission limits in paragraph (c) of this section. The 30-day average emission rate is calculated as the average of all hourly emission data recorded by the monitoring system during the 30-day test period.

(e) *Monitoring requirements.* (1) The $NO_X$ emission limits in paragraph (c) of this section shall apply at all times.

(2) You shall install, calibrate, maintain, and operate a continuous emissions monitoring system (CEMS) for measuring $NO_X$ emissions and either oxygen ($O_2$) or carbon dioxide ($CO_2$), unless the Administrator has approved a request from the you to use an alternative monitoring technique under paragraph (e)(8) of this section. If you have previously installed a $NO_X$ emission rate CEMS to meet the requirements of 40 CFR part 75 and continue to meet the ongoing requirements of 40 CFR part 75, that CEMS may be used to meet the monitoring requirements of this section.

(3) The CEMS required under paragraph (e)(2) of this section shall be operated and data recorded during all periods of operation of the affected unit except for CEMS breakdowns and repairs. Data shall be recorded during calibration checks and zero and span adjustments.

(4) The 1-hour average $NO_X$ emission rates measured by the CEMS required by paragraph (e)(2) of this section shall be expressed in terms of lbs/mmBtu heat input and shall be used to calculate the average emission rates under 40 CFR 52.45(c).

(5) Following the date on which the initial compliance test is completed, you shall determine compliance with the applicable $NO_X$ emission limit in paragraph (c) of this section on a continuous basis using a 30-day rolling

average emission rate unless the affected unit monitors emissions by means of an alternative monitoring procedure approved pursuant to paragraph (e)(8) of this section. A new 30-day rolling average emission rate is calculated for each operating day as the average of all the hourly $NO_X$ emission data for the preceding 30 operating days.

(6) The procedures under 40 CFR 60.13 shall be followed for installation, evaluation, and operation of the continuous monitoring systems. Additionally, the span value for units combusting coal shall be 1,000 ppm $NO_X$, and for units combusting oil or gas the span value shall be 500 ppm $NO_X$. As an alternative to meeting the span value requirements stated above, you may elect to use the $NO_X$ span values determined according to section 2.1.2 in appendix A to 40 CFR part 75.

(7) When $NO_X$ emission data are not obtained because of CEMS breakdowns, repairs, calibration checks and zero and span adjustments, emission data will be obtained by using standby monitoring systems, Method 7 of 40 CFR part 60, Method 7A of 40 CFR part 60, or other approved reference methods to provide emission data for a minimum of 75 percent of the operating hours in each affected unit operating day, in at least 22 out of 30 successive operating days.

(8) Installation of a CEMS for $NO_X$ may be delayed until after the initial performance test has been conducted. If you demonstrate during the performance test that emissions of $NO_X$ are less than 70 percent of the applicable emission limit in paragraph (c) of this section, a CEMS for measuring $NO_X$ emissions is not required. If you demonstrate its boiler emits less than 70 percent of the applicable emission limit chooses to not install a CEMS, you must submit a written request to the Administrator that documents the results of the initial performance test and includes an alternative monitoring procedure that will be used to track compliance with the applicable $NO_X$ emission limit(s) in paragraph (c) of this section. The Administrator will consider the request and, following public notice and comment, may approve the alternative monitoring procedure with or without revision, or disapprove the request. Upon receipt of a disapproved request, you will have one year to install a CEMS in accordance with the provisions for CEMS described in paragraph (e) of this section.

(f) *Recordkeeping requirements* (1) You shall record and maintain records of the amounts of each fuel combusted during each calendar month.

(2) You shall maintain records of the following information for each day the affected unit operates:

(i) Calendar date;

(ii) The average hourly $NO_X$ emission rates (expressed as lbs $NO_2$/mmBtu heat input) measured or predicted;

(iii) The 30-day average $NO_X$ emission rates calculated at the end of each affected unit operating day from the measured or predicted hourly $NO_X$ emission rates for the preceding 30 steam generating unit operating days;

(iv) Identification of the affected unit operating days when the calculated 30-day average $NO_X$ emission rates are in excess of the applicable $NO_X$ emission limit in paragraph (c) of this section with the reasons for such excess emissions as well as a description of corrective actions taken;

(v) Identification of the affected unit operating days for which pollutant data have not been obtained, including reasons for not obtaining sufficient data and a description of corrective actions taken;

(vi) Identification of the times when emission data have been excluded from the calculation of average emission rates and the reasons for excluding data;

(vii) Identification of "F" factor used for calculations, method of determination, and type of fuel combusted;

(viii) Identification of the times when the pollutant concentration exceeded full span of the CEMS;

(ix) Description of any modifications to the CEMS that could affect the ability of the CEMS to comply with Performance Specification 2 or 3 in appendix B of 40 CFR part 60; and

(x) Results of daily CEMS drift tests and quarterly accuracy assessments as required under Procedure 1 of 40 CFR part 60, appendix F.

(3) Any records required to be maintained by this section that are submitted electronically via the EPA's CEDRI may be maintained in electronic format. This ability to maintain electronic copies does not affect the requirement for facilities to make records, data, and reports available upon request to the EPA as part of an on-site compliance evaluation.

(g) *Reporting requirements.* (1) Within 60 days after the date of completing each performance test required by this section, you must submit the results of the performance test or performance evaluation of the CEMS following the procedures specified in paragraphs (g)(i) through (iii) of this section:

(i) *Data collected using test methods supported by the EPA's ERT as listed on the EPA's ERT website (https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert) at the time of the test.* Submit the results of the performance test to the EPA via the CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section, which can be accessed through the EPA's CDX (*https://cdx.epa.gov/*). The data must be submitted in a file format generated using the EPA's ERT. Alternatively, you may submit an electronic file consistent with the XML schema listed on the EPA's ERT website.

(ii) *Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test.* The results of the performance test must be included as an attachment in the ERT or an alternate electronic file consistent with the XML schema listed on the EPA's ERT website. Submit the ERT generated package or alternative file to the EPA via CEDRI.

(iii) *CBI. Do not use CEDRI to submit information you claim as CBI.* Anything submitted using CEDRI cannot later be claimed CBI. Although we do not expect persons to assert a claim of CBI, if you wish to assert a CBI claim for some of the information submitted under paragraph (g)(1)(i) or (ii) of this section, you must submit a complete file, including information claimed to be CBI, to the EPA. The file must be generated using the EPA's ERT or an alternate electronic file consistent with the XML schema listed on the EPA's ERT website. Submit the file on a compact disc, flash drive, or other commonly used electronic storage medium and clearly mark the medium as CBI. Mail the electronic medium to U.S. EPA/OAQPS/CORE CBI Office, MD C404–02, 4930 Old Page Rd., Durham, NC 27703. The same file with the CBI omitted must be submitted to the EPA via the EPA's CDX as described in paragraphs (g)(1)(i) and (ii) of this section. All CBI claims must be asserted at the time of submission. Furthermore, under CAA section 114(c), emissions data is not entitled to confidential treatment, and the EPA is required to make emissions data available to the public. Thus, emissions data will not be protected as CBI and will be made publicly available.

(2) You are required to submit excess emission reports for any excess emissions that occurred during the reporting period. Excess emissions are defined as any calculated 30-day rolling average $NO_X$ emission rate, as determined under paragraph (g)(3)(iii) of this section, that exceeds the applicable emission limit in paragraph (c) of this section. Excess emission reports must be

submitted in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section.

(3) If you own or operate an affected unit subject to the continuous monitoring requirements for $NO_X$ under paragraph (e) of this section, you shall submit reports containing the information recorded under paragraph (e) of this section as described in paragraph (g)(2) of this section. Compliance reports for continuous monitoring must be submitted in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section.

(4) If you own or operate an affected unit, you must submit electronic quarterly reports no later than 30 days after the end of the calendar quarter. The reports shall be accompanied by a certification from the owner or operator indicating whether the affected unit was in compliance with the applicable emission limits and minimum data requirements of this section during the reporting period. These quarterly reports must be submitted in PDF format to the EPA via CEDRI or analogous electronic reporting approach provided by the EPA to report data required by this section.

(5) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of EPA system outage for failure to timely comply with that reporting requirement. To assert a claim of EPA system outage, you must meet the requirements outlined in paragraphs (g)(5)(i) through (vii) of this section.

(i) You must have been or will be precluded from accessing CEDRI and submitting a required report within the time prescribed due to an outage of either the EPA's CEDRI or CDX systems.

(ii) The outage must have occurred within the period of time beginning five business days prior to the date that the submission is due.

(iii) The outage may be planned or unplanned.

(iv) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(v) You must provide to the Administrator a written description identifying:

(A) The date(s) and time(s) when CDX or CEDRI was accessed and the system was unavailable;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to EPA system outage;

(C) A description of measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(vi) The decision to accept the claim of EPA system outage and allow an extension to the reporting deadline is solely within the discretion of the Administrator.

(vii) In any circumstance, the report must be submitted electronically as soon as possible after the outage is resolved.

(6) If you are required to electronically submit a report through CEDRI in the EPA's CDX, you may assert a claim of force majeure for failure to timely comply with that reporting requirement. To assert a claim of force majeure, you must meet the requirements outlined in paragraphs (g)(6)(i) through (v) of this section.

(i) You may submit a claim if a force majeure event is about to occur, occurs, or has occurred or there are lingering effects from such an event within the period of time beginning five business days prior to the date the submission is due. For the purposes of this section, a force majeure event is defined as an event that will be or has been caused by circumstances beyond the control of the affected facility, its contractors, or any entity controlled by the affected facility that prevents you from complying with the requirement to submit a report electronically within the time period prescribed. Examples of such events are acts of nature (*e.g.,* hurricanes, earthquakes, or floods), acts of war or terrorism, or equipment failure or safety hazard beyond the control of the affected facility (*e.g.,* large scale power outage).

(ii) You must submit notification to the Administrator in writing as soon as possible following the date you first knew, or through due diligence should have known, that the event may cause or has caused a delay in reporting.

(iii) You must provide to the Administrator:

(A) A written description of the force majeure event;

(B) A rationale for attributing the delay in reporting beyond the regulatory deadline to the force majeure event;

(C) A description of measures taken or to be taken to minimize the delay in reporting; and

(D) The date by which you propose to report, or if you have already met the reporting requirement at the time of the notification, the date you reported.

(iv) The decision to accept the claim of force majeure and allow an extension

to the reporting deadline is solely within the discretion of the Administrator.

(v) In any circumstance, the reporting must occur as soon as possible after the force majeure event occurs.

**Subpart B—Alabama**

■ 5. Amend § 52.54 by revising paragraphs (b)(2) and (3) and adding paragraphs (b)(4) and (5) to read as follows:

**§ 52.54   Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

\*      \*      \*      \*      \*

(b) \* \* \*

(2) The owner and operator of each source and each unit located in the State of Alabama and Indian country within the borders of the State and for which requirements are set forth under the CSAPR $NO_X$ Ozone Season Group 2 Trading Program in subpart EEEEE of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2017 through 2022. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Alabama's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(ii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Alabama's SIP.

(3) The owner and operator of each source and each unit located in the State of Alabama and Indian country within the borders of the State and for which requirements are set forth under the CSAPR $NO_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the

promulgation of an approval by the Administrator of a revision to Alabama's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Alabama's SIP.

(4) Notwithstanding the provisions of paragraphs (b)(2) and (3) of this section, if, at the time of the approval of Alabama's SIP revision described in paragraph (b)(2) or (3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 2 allowances or CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart EEEEE or GGGGG, respectively, of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of such subpart authorizing the Administrator to complete the allocation and recordation of such allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (b)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State and Indian country within the borders of the State for control periods after 2022) shall continue to apply.

## Subpart E—Arkansas

■ 6. Amend § 52.184 by:

■ a. Redesignating paragraphs (a) through (c) as paragraphs (a)(1) through (3);

■ b. In newly redesignated paragraph (a)(2), removing ''2017 and each subsequent year.'' and adding in its place ''2017 through 2022.'', and removing the second sentence;

■ c. Revising newly redesignated paragraph (a)(3); and

■ d. Adding paragraphs (a)(4) and (5) and (b).

The revision and additions read as follows:

### § 52.184 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a) * * *

(3) The owner and operator of each source and each unit located in the State of Arkansas and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Arkansas' State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii), except to the extent the Administrator's approval is partial or conditional.

(4) Notwithstanding the provisions of paragraph (a)(3) of this section, if, at the time of the approval of Arkansas' SIP revision described in paragraph (a)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (a)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State for control periods after 2022) shall continue to apply.

(b) The owner and operator of each source located in the State of Arkansas and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart F—California

■ 7. Add § 52.284 to read as follows:

### § 52.284 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

The owner and operator of each source located in the State of California and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart I—Delaware

■ 8. Amend § 52.440 by adding paragraph (d) to read as follows:

### § 52.440 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

* * * * *

(d)(1) The owner and operator of each source and each unit located in the State of Delaware and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Delaware's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii), except to the extent the Administrator's approval is partial or conditional.

(2) Notwithstanding the provisions of paragraph (d)(1) of this section, if, at the time of the approval of Delaware's SIP

revision described in paragraph (d)(1) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

## Subpart O—Illinois

■ 9. Amend § 52.731 by:
■ a. In paragraph (b)(3), removing ''(b)(2)(v), except'' and adding in its place ''(b)(2)(iii), except''; and
■ b. Adding paragraph (c).
The addition reads as follows:

### § 52.731  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(c) The owner and operator of each source located in the State of Illinois and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart P—Indiana

■ 10. Amend § 52.789 by:
■ a. In paragraph (b)(2), removing ''(b)(2)(iv), except'' and adding in its place ''(b)(2)(ii), except'';
■ b. In paragraph (b)(3), removing ''(b)(2)(v), except'' and adding in its place ''(b)(2)(iii), except''; and
■ c. Adding paragraph (c).
The addition reads as follows:

### § 52.789  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(c) The owner and operator of each source located in the State of Indiana and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart S—Kentucky

■ 11. Amend § 52.940 by:
■ a. In paragraph (b)(3), removing ''(b)(2)(v), except'' and adding in its place ''(b)(2)(iii), except''; and

■ b. Adding paragraph (c).
The addition reads as follows:

### § 52.940  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(c) The owner and operator of each source located in the State of Kentucky and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart T—Louisiana

■ 12. Amend § 52.984 by:
■ a. In paragraph (d)(3), revising the second and third sentences;
■ b. Revising paragraph (d)(4);
■ c. In paragraph (d)(5), adding ''and Indian country within the borders of the State'' after ''in the State''; and
■ d. Adding paragraph (e).
The revision and addition read as follows:

### § 52.984  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(d) \*    \*    \*

(3) \*    \*    \* The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Louisiana's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and(b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Louisiana's SIP.

(4) Notwithstanding the provisions of paragraph (d)(3) of this section, if, at the time of the approval of Louisiana's SIP revision described in paragraph (d)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within

the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

\*    \*    \*    \*    \*

(e) The owner and operator of each source located in the State of Louisiana and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart V—Maryland

■ 13. Amend § 52.1084 by:
■ a. In paragraph (b)(3), removing ''(b)(2)(v), except'' and adding in its place ''(b)(2)(iii), except''; and
■ b. Adding paragraph (c).
The addition reads as follows:

### § 52.1084  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(c) The owner and operator of each source located in the State of Maryland and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart X—Michigan

■ 14. Amend § 52.1186 by:
■ a. In paragraph (e)(3), revising the second and third sentences;
■ b. Revising paragraph (e)(4);
■ c. In paragraph (e)(5), adding ''and Indian country within the borders of the State'' after ''in the State''; and
■ d. Adding paragraph (f).
The revision and addition read as follows:

### § 52.1186  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(e) \*    \*    \*

(3) \*    \*    \* The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the

446a

Administrator of a revision to Michigan's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Michigan's SIP.

(4) Notwithstanding the provisions of paragraph (e)(3) of this section, if, at the time of the approval of Michigan's SIP revision described in paragraph (e)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

\*    \*    \*    \*    \*

(f) The owner and operator of each source located in the State of Michigan and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart Y—Minnesota

■ 15. Amend § 52.1240 by adding paragraphs (d) and (e) to read as follows:

### § 52.1240 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(d)(1) The owner and operator of each source and each unit located in the State of Minnesota and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to

comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Minnesota's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Minnesota's SIP.

(2) Notwithstanding the provisions of paragraph (d)(1) of this section, if, at the time of the approval of Minnesota's SIP revision described in paragraph (d)(1) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(e) The owner and operator of each source located in the State of Minnesota and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart Z—Mississippi

■ 16. Amend § 52.1284 by:
■ a. Redesignating paragraphs (a) through (c) as paragraphs (a)(1) through (3);
■ b. In newly redesignated paragraph (a)(2), removing ''2017 and each subsequent year.'' and adding in its place ''2017 through 2022.'', and removing the second and third sentences;
■ c. Revising newly redesignated paragraph (a)(3); and

■ d. Adding paragraphs (a)(4) and (5) and (b).

The revision and additions read as follows:

### § 52.1284 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a) \*    \*    \*

(3) The owner and operator of each source and each unit located in the State of Mississippi and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Mississippi's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Mississippi's SIP.

(4) Notwithstanding the provisions of paragraph (a)(3) of this section, if, at the time of the approval of Mississippi's SIP revision described in paragraph (a)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (a)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of

CSAPR NOₓ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NOₓ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NOₓ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NOₓ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State and Indian country within the borders of the State for control periods after 2022) shall continue to apply.

(b) The owner and operator of each source located in the State of Mississippi and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

**Subpart AA—Missouri**

■ 17. Amend § 52.1326 by revising paragraph (b)(2) and (3) and adding paragraphs (b)(4) and (5) and (c) to read as follows:

**§ 52.1326   Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

\*    \*    \*    \*    \*

(b) \* \* \*

(2) The owner and operator of each source and each unit located in the State of Missouri and for which requirements are set forth under the CSAPR NOₓ Ozone Season Group 2 Trading Program in subpart EEEEE of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2017 through 2022. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Missouri's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(ii), except to the extent the Administrator's approval is partial or conditional.

(3) The owner and operator of each source and each unit located in the State of Missouri and for which requirements are set forth under the CSAPR NOₓ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions

occurring in 2023 and each subsequent year. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Missouri's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii), except to the extent the Administrator's approval is partial or conditional.

(4) Notwithstanding the provisions of paragraphs (b)(2) and (3) of this section, if, at the time of the approval of Missouri's SIP revision described in paragraph (b)(2) or (3) of this section, the Administrator has already started recording any allocations of CSAPR NOₓ Ozone Season Group 2 allowances or CSAPR NOₓ Ozone Season Group 3 allowances under subpart EEEEE or GGGGG, respectively, of part 97 of this chapter to units in the State for a control period in any year, the provisions of such subpart authorizing the Administrator to complete the allocation and recordation of such allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (b)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NOₓ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NOₓ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NOₓ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NOₓ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State for control periods after 2022) shall continue to apply.

(c) The owner and operator of each source located in the State of Missouri and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

**Subpart DD—Nevada**

■ 18. Add § 52.1492 to read as follows:

**§ 52.1492   Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

(a)(1) The owner and operator of each source and each unit located in the State of Nevada and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NOₓ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Nevada's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval of a revision to Nevada's SIP.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Nevada's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of CSAPR NOₓ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NOₓ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b) The owner and operator of each source located in the State of Nevada and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart FF—New Jersey

■ 19. Amend § 52.1584 by:
■ a. In paragraph (e)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (f).
The addition reads as follows:

### § 52.1584  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(f) The owner and operator of each source located in the State of New Jersey and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart HH—New York

■ 20. Amend § 52.1684 by:
■ a. In paragraph (b)(3), revising the second and third sentences;
■ b. Revising paragraph (b)(4);
■ c. In paragraph (b)(5), adding "and Indian country within the borders of the State" after "in the State"; and
■ d. Adding paragraph (c).
The revision and addition read as follows:

### § 52.1684  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(b) \*    \*    \*
(3) \*    \*    \* The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to New York's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to New York's SIP.

(4) Notwithstanding the provisions of paragraph (b)(3) of this section, if, at the time of the approval of New York's SIP revision described in paragraph (b)(3) of this section, the Administrator has

already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

\*    \*    \*    \*    \*

(c) The owner and operator of each source located in the State of New York and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart KK—Ohio

■ 21. Amend § 52.1882 by:
■ a. In paragraph (b)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (c).
The addition reads as follows:

### § 52.1882  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(c) The owner and operator of each source located in the State of Ohio and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## Subpart LL—Oklahoma

■ 22. Amend § 52.1930 by:
■ a. Redesignating paragraphs (a) through (c) as paragraphs (a)(1) through (3);
■ b. In newly redesignated paragraph (a)(2), removing "2017 and each subsequent year." and adding in its place "2017 through 2022.", and removing the second and third sentences;
■ c. Revising newly redesignated paragraph (a)(3); and
■ c. Adding paragraphs (a)(4) and (5) and (b).
The revision and additions read as follows:

### § 52.1930  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a) \*    \*    \*
(3) The owner and operator of each source and each unit located in the State of Oklahoma and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Oklahoma's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Oklahoma's SIP.

(4) Notwithstanding the provisions of paragraph (a)(3) of this section, if, at the time of the approval of Oklahoma's SIP revision described in paragraph (a)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (a)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts

of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State and Indian country within the borders of the State for control periods after 2022) shall continue to apply.

(b) The owner and operator of each source located in the State of Oklahoma and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart NN—Pennsylvania

■ 23. Amend § 52.2040 by:
■ a. In paragraph (b)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (c).
The addition reads as follows:

### § 52.2040 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\* \* \* \* \*

(c) The owner and operator of each source located in the State of Pennsylvania and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart RR—Tennessee

■ 24. Amend § 52.2240 by:
■ a. In paragraph (e)(2), removing "2017 and each subsequent year." and adding in its place "2017 through 2022.", and removing the second sentence;
■ b. Revising paragraph (e)(3); and
■ c. Adding paragraphs (e)(4) and (5).
The revision and additions read as follows:

### § 52.2240 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\* \* \* \* \*

(e) \* \* \*

(3) The owner and operator of each source and each unit located in the State of Tennessee and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements will be eliminated by the promulgation of an approval by the Administrator of a revision to Tennessee's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii), except to the extent the Administrator's approval is partial or conditional.

(4) Notwithstanding the provisions of paragraph (e)(3) of this section, if, at the time of the approval of Tennessee's SIP revision described in paragraph (e)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (e)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State for control periods after 2022) shall continue to apply.

### Subpart SS—Texas

■ 25. Amend § 52.2283 by:
■ a. In paragraph (d)(2), removing "2017 and each subsequent year." and adding in its place "2017 through 2022.", and removing the second and third sentences;
■ b. Revising paragraph (d)(3); and
■ c. Adding paragraphs (d)(4) and (5) and (e).
The revision and additions read as follows:

### § 52.2283 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\* \* \* \* \*

(d) \* \* \*

(3) The owner and operator of each source and each unit located in the State of Texas and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Texas' State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Texas' SIP.

(4) Notwithstanding the provisions of paragraph (d)(3) of this section, if, at the time of the approval of Texas' SIP revision described in paragraph (d)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (d)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter

(concerning the conversion of amounts of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State and Indian country within the borders of the State for control periods after 2022) shall continue to apply.

(e) The owner and operator of each source located in the State of Texas and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart TT—Utah

■ 26. Add § 52.2356 to read as follows:

**§ 52.2356  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

(a)(1) The owner and operator of each source and each unit located in the State of Utah and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Utah's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Utah's SIP.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Utah's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b) The owner and operator of each source located in the State of Utah and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart VV—Virginia

■ 27. Amend § 52.2440 by:
■ a. In paragraph (b)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (c).
The addition reads as follows:

**§ 52.2440  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

\*    \*    \*    \*    \*

(c) The owner and operator of each source located in the State of Virginia and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart XX—West Virginia

■ 28. Amend § 52.2540 by:
■ a. In paragraph (b)(3), removing "(b)(2)(v), except" and adding in its place "(b)(2)(iii), except"; and
■ b. Adding paragraph (c).
The addition reads as follows:

**§ 52.2540  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

\*    \*    \*    \*    \*

(c) The owner and operator of each source located in the State of West Virginia and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart YY—Wisconsin

■ 29. Amend § 52.2587 by:
■ a. In paragraph (e)(2), removing "2017 and each subsequent year." and adding in its place "2017 through 2022.", and removing the second and third sentences;
■ b. Revising paragraph (e)(3); and
■ c. Adding paragraphs (e)(4) and (5) and (f).
The revision and additions read as follows:

**§ 52.2587  Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

\*    \*    \*    \*    \*

(e) \* \* \*
(3) The owner and operator of each source and each unit located in the State of Wisconsin and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Wisconsin's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Wisconsin's SIP.

(4) Notwithstanding the provisions of paragraph (e)(3) of this section, if, at the time of the approval of Wisconsin's SIP revision described in paragraph (e)(3) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart

GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NOₓ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (e)(2) of this section, after 2022 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR NO$_X$ Ozone Season Group 2 allowances between certain accounts under common control), the provisions of § 97.826(e) of this chapter (concerning the conversion of amounts of unused CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for control periods before 2023 to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances), and the provisions of § 97.811(e) of this chapter (concerning the recall of CSAPR NO$_X$ Ozone Season Group 2 allowances equivalent in quantity and usability to all such allowances allocated to units in the State and Indian country within the borders of the State for control periods after 2022) shall continue to apply.

(f) The owner and operator of each source located in the State of Wisconsin and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

### Subpart ZZ—Wyoming

■ 30. Add § 52.2638 to read as follows:

#### § 52.2638   Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a)(1) The owner and operator of each source and each unit located in the State of Wyoming and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2023 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Wyoming State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under

§ 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Wyoming's SIP.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Wyoming's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b) The owner and operator of each source located in the State of Wyoming and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, or § 52.45 must comply with such requirements with regard to emissions occurring in 2026 and each subsequent year.

## PART 75—CONTINUOUS EMISSION MONITORING

■ 31. The authority citation for part 75 is revised to read as follows:

**Authority:** 42 U.S.C. 7401–7671q and 7651k note.

■ 32. Amend § 75.72 by:
■ a. In paragraph (c)(3), removing "appendix B of this part." and adding in its place "appendix B to this part.";
■ b. In paragraph (e)(1)(ii), removing "heat input from" and adding in its place "heat input rate to";
■ c. In paragraph (e)(2), removing "appendix D of this part" and adding in its place "appendix D to this part"; and
■ d. Adding paragraph (f).

The addition reads as follows:

#### § 75.72   Determination of NO$_X$ mass emissions for common stack and multiple stack configurations.

\*      \*      \*      \*      \*

(f) *Procedures for apportioning hourly NO$_X$ mass emission rate to the unit*

*level.* If the owner or operator of a unit determining hourly NO$_X$ mass emission rate at a common stack under this section is subject to a State or federal NO$_X$ mass emissions reduction program under subpart GGGGG of part 97 of this chapter or under a state implementation plan approved pursuant to § 52.38(b)(12) of this chapter, then on and after January 1, 2024, the owner or operator shall apportion the hourly NO$_X$ mass emissions rate at the common stack to each unit using the common stack based on the ratio of the hourly heat input rate for each such unit to the total hourly heat input rate for all such units, in conjunction with the appropriate unit and stack operating times, according to the procedures in section 8.5.3 of appendix F to this part.

\*      \*      \*      \*      \*

■ 33. Amend § 75.73 by:
■ a. Revising paragraph (a)(3);
■ b. In paragraph (c)(1), removing "No$_X$ emissions" and adding in its place "NO$_X$ emissions";
■ c. Adding a paragraph heading to paragraph (c)(2);
■ d. Revising paragraphs (c)(3) and (f)(1) introductory text;
■ e. Removing and reserving paragraph (f)(1)(i)(B);
■ f. In paragraph (f)(1)(ii)(G), removing "appendix D;" and adding in its place "appendix D to this part;";
■ g. Adding paragraphs (f)(1)(ix) and (x);
■ h. Adding a paragraph heading to paragraph (f)(2); and
■ i. Revising paragraph (f)(4).

The revisions and addition reads as follows:

#### § 75.73   Recordkeeping and reporting.

\*      \*      \*      \*      \*

(a) \*  \*  \*

(3) For each hour when the unit is operating, NO$_X$ mass emission rate, calculated in accordance with section 8 of appendix F to this part.

\*      \*      \*      \*      \*

(c) \*  \*  \*

(2) *Monitoring plan updates.* \*  \*  \*

(3) *Contents of the monitoring plan.* Each monitoring plan shall contain the information in § 75.53(g)(1) in electronic format and the information in § 75.53(g)(2) in hardcopy format. In addition, to the extent applicable, each monitoring plan shall contain the information in § 75.53(h)(1)(i) and (h)(2)(i) in electronic format and the information in § 75.53(h)(1)(ii) and (h)(2)(ii) in hardcopy format. For units using the low mass emissions excepted methodology under § 75.19, the monitoring plan shall include the additional information in § 75.53(h)(4)(i) and (h)(4)(ii). The monitoring plan also

shall include a seasonal controls indicator and an ozone season fuel-switching flag.

(f) * * *

(1) *Electronic submission.* The designated representative for an affected unit shall electronically report the data and information in this paragraph (f)(1) and in paragraphs (f)(2) and (3) of this section to the Administrator quarterly, unless the unit has been placed in long-term cold storage (as defined in § 72.2 of this chapter). Each electronic report must be submitted to the Administrator within 30 days following the end of each calendar quarter. Each electronic report shall include the information provided in paragraphs (f)(1)(i) through (x) of this section and shall also include the date of report generation. A unit placed into long-term cold storage is exempted from submitting quarterly reports beginning with the calendar quarter following the quarter in which the unit is placed into long-term cold storage, provided that the owner or operator shall submit quarterly reports for the unit beginning with the data from the quarter in which the unit recommences operation (where the initial quarterly report contains hourly data beginning with the first hour of recommenced operation of the unit).

*    *    *    *    *

(ix) On and after on January 1, 2024, for a unit subject to subpart GGGGG of part 97 of this chapter or a state implementation plan approved under § 52.38(b)(12) of this chapter and determining $NO_X$ mass emission rate at a common stack, apportioned hourly $NO_X$ mass emission rate for the unit, lb/hr.

(x) On and after January 1, 2024, for a unit subject to a backstop daily $NO_X$ emission rate under subpart GGGGG of part 97 of this chapter or under a state implementation plan approved under § 52.38(b)(12) of this chapter:

(A) Daily $NO_X$ emissions (lbs) for each day of the reporting period;

(B) Daily heat input (mmBtu) for each day of the reporting period;

(C) Daily average $NO_X$ emission rate (lb/mmBtu, rounded to the nearest thousandth) for each day of the reporting period;

(D) Daily $NO_X$ emissions (lbs) exceeding the applicable backstop daily $NO_X$ emission rate for each day of the reporting period;

(E) Cumulative $NO_X$ emissions (tons, rounded to the nearest tenth) exceeding the applicable backstop daily $NO_X$ emission rate during the ozone season.

(2) *Verification of identification codes and formulas.* * * *

*    *    *    *    *

(4) *Electronic format, method of submission, and explanatory information.* The designated representative shall comply with all of the quarterly reporting requirements in § 75.64(d), (f), and (g).

■ 34. Revise § 75.75 to read as follows:

**§ 75.75   Additional ozone season calculation procedures.**

(a) The owner or operator of a unit that is required to calculate daily or ozone season heat input shall do so by summing the unit's hourly heat input determined according to the procedures in this part for all hours in which the unit operated during the day or ozone season.

(b) The owner or operator of a unit that is required to determine daily or ozone season $NO_X$ emission rate (in lbs/mmBtu) shall do so by dividing daily or ozone season $NO_X$ mass emissions (in lbs) determined in accordance with this subpart, by daily or ozone season heat input determined in accordance with paragraph (a) of this section.

■ 35. Amend appendix F to part 75 by:

■ a. Adding section 5.3.3;

■ b. In section 8.1.2, revising the introductory text preceding Equation F–25;

■ c. In section 8.4, revising the introductory text, paragraph (a) introductory text (preceding Equation F–27), and paragraph (b) introductory text (preceding Equation F–27a), and adding paragraph (c);

■ d. In section 8.5.2, removing "the hourly $NO_X$ mass emissions at each unit" and adding in its place "hourly $NO_X$ mass emissions at the common stack."; and

■ e. Adding section 8.5.3.

The additions and revisions read as follows

**Appendix F to Part 75—Conversion Procedures**

*    *    *    *    *

5.3.3   Calculate total daily heat input for a unit using a flow monitor and diluent monitor to calculate heat input, using the following equation:

$$HI_d = \sum_{h=1}^{24} HI_h t_h$$

(Eq. F-18c)

Where:

$HI_d$ = Total heat input for a unit for the day, mmBtu.

$HI_h$ = Heat input rate for the unit for hour "h" from Equation F–15, F–16, F–17, F–18, F–21a, or F–21b, mmBtu/hr.

$t_h$ = Unit operating time, fraction of the hour (0.00 to 1.00, in equal increments from one hundredth to one quarter of an hour, at the option of the owner or operator).

$h$ = Designation of a particular hour.

*    *    *    *    *

8.1.2   If $NO_X$ emission rate is measured at a common stack and heat input rate is measured at the unit level, calculate the hourly heat input rate at the common stack according to the following formula:

*    *    *    *    *

8.4   Use the following equations to calculate daily, quarterly, cumulative ozone season, and cumulative year-to-date $NO_X$ mass emissions:

(a) When hourly $NO_X$ mass emissions are reported in lb., use Eq. F–27 to calculate quarterly, cumulative ozone season, and cumulative year-to-date $NO_X$ mass emissions in tons. * * *

(b) When hourly $NO_X$ mass emission rate is reported in lb/hr, use Eq. F–27a to calculate quarterly, cumulative ozone season, and cumulative year-to-date $NO_X$ mass emissions in tons. * * *

(c) To calculate daily $NO_X$ mass emissions for a unit in pounds, use Eq. F–27b.

$$M_{(NOX)_d} = \sum_{h=1}^{24} E_{(NOX)_h}\, t_h$$

(Eq. F–27b)

Where:

$M_{(NOX)_d}$ = $NO_X$ mass emissions for a unit for the day, pounds.

$E_{(NOX)_h}$ = $NO_X$ mass emission rate for the unit for hour "h" from Equation F–24a, F–26a, F–26b, or F–28, lb/hr.

$t_h$ = Unit operating time, fraction of the hour (0.00 to 1.00, in equal increments from one hundredth to one quarter of an hour, at the option of the owner or operator).

$h$ = Designation of a particular hour.

\*      \*      \*      \*      \*

8.5.3  Where applicable, the owner or operator of a unit that determines hourly $NO_X$ mass emission rate at a common stack shall apportion hourly $NO_X$ mass emissions rate to the units using the common stack based on the hourly heat input rate, using Equation F–28:

$$E_{(NOX)_i} = E_{(NOX)_{CS}} \left(\frac{t_{CS}}{t_i}\right) \left[\frac{HI_i t_i}{\sum_{i=1}^{n} HI_i t_i}\right]$$

(Eq. F–28)

Where:

$E_{(NOX)_i}$ = Apportioned $NO_X$ mass emission rate for unit "i", lb/hr.

$E_{(NOX)_{CS}}$ = $NO_X$ mass emission rate at the common stack, lb/hr.

$HI_i$ = Heat input rate for unit "i", mmBtu/hr.

$t_i$ = Operating time for unit "i", fraction of the hour (0.00 to 1.00, in equal increments from one hundredth to one quarter of an hour, at the option of the owner or operator).

$t_{CS}$ = Common stack operating time, fraction of the hour (0.00 to 1.00, in equal increments from one hundredth to one quarter of an hour, at the option of the owner or operator).

$n$ = Number of units using the common stack.

$i$ = Designation of a particular unit.

## PART 78—APPEAL PROCEDURES

■ 36. The authority citation for part 78 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

■ 37. Amend § 78.1 by:
■ a. In paragraph (b)(17)(viii), adding "or (e)" after "§ 97.826(d)";
■ b. In paragraph (b)(17)(ix), adding "or (e)" after "§ 97.811(d)"; and
■ c. Revising paragraph (b)(19).
The revision reads as follows:

### § 78.1  Purpose and scope.

\*      \*      \*      \*      \*

(b) \* \* \*

(19) Under subpart GGGGG of part 97 of this chapter,

(i) The decision on the calculation of a state CSAPR $NO_X$ Ozone Season Group 3 trading budget under § 97.1010(a)(3) of this chapter.

(ii) The decision on the allocation of CSAPR $NO_X$ Ozone Season Group 3 allowances under § 97.1011 or § 97.1012 of this chapter.

(iii) The decision on the transfer of CSAPR $NO_X$ Ozone Season Group 3 allowances under § 97.1023 of this chapter.

(iv) The decision on the deduction of CSAPR $NO_X$ Ozone Season Group 3 allowances under § 97.1024, § 97.1025, or § 97.1026(d) of this chapter.

(v) The correction of an error in an Allowance Management System account under § 97.1027 of this chapter.

(vi) The adjustment of information in a submission and the decision on the deduction and transfer of CSAPR $NO_X$ Ozone Season Group 3 allowances based on the information as adjusted under § 97.1028 of this chapter.

(vii) The finalization of control period emissions data, including retroactive adjustment based on audit.

(viii) The approval or disapproval of a petition under § 97.1035 of this chapter.

\*      \*      \*      \*      \*

## PART 97—FEDERAL $NO_X$ BUDGET TRADING PROGRAM, CAIR $NO_X$ AND $SO_2$ TRADING PROGRAMS, CSAPR $NO_X$ AND $SO_2$ TRADING PROGRAMS, AND TEXAS $SO_2$ TRADING PROGRAM

■ 38. The authority citation for part 97 continues to read as follows:

**Authority:** 42 U.S.C. 7401, 7403, 7410, 7426, 7491, 7601, and 7651, *et seq.*

### Subpart AAAAA—CSAPR $NO_X$ Annual Trading Program

#### § 97.402  [Amended]

■ 39. Amend § 97.402 by:
■ a. In the definition of "CSAPR $NO_X$ Ozone Season Group 1 Trading Program", removing "(b)(2)(i) and (ii),

and" and adding in its place "(b)(2)(i), and";
■ b. In the definition of "CSAPR $NO_X$ Ozone Season Group 2 Trading Program", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and"; and
■ c. In the definition of "CSAPR $NO_X$ Ozone Season Group 3 Trading Program", removing "(b)(2)(v), and" and adding in its place "(b)(2)(iii), and";

#### § 97.411  [Amended]

■ 40. Amend § 97.411 by:
■ a. In paragraphs (b)(1)(i)(A) and (B), removing "State, in accordance" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, in accordance"; and
■ b. In paragraphs (b)(2)(i)(A) and (B), removing "Indian country within the borders of a State, in accordance" and adding in its place "areas of Indian country within the borders of a State not subject to the State's SIP authority, in accordance".

#### § 97.412  [Amended]

■ 41. Amend § 97.412 by:
■ a. In paragraph (a) introductory text, removing "State, the Administrator" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, the Administrator";
■ b. In paragraphs (a)(3)(iii) and (a)(5), adding "and areas of Indian country within the borders of the State subject to the State's SIP authority" after "in the State";
■ c. In paragraph (a)(10), removing "State, is allocated" and adding in its place "State and areas of Indian country

within the borders of the State subject to the State's SIP authority, is allocated'';

■ d. In paragraph (b) introductory text, removing "Indian country within the borders of each State, the Administrator" and adding in its place "areas of Indian country within the borders of each State not subject to the State's SIP authority, the Administrator"; and

■ e. In paragraph (b)(5), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority".

**§ 97.421    [Amended]**

■ 42. In § 97.421, amend paragraph (f)(2) by removing "2022" and adding in its place "2024", and removing "third" before "year after the year".

**§ 97.426    [Amended]**

■ 43. In § 97.426, amend paragraph (c) by removing "State (or Indian" and adding in its place "State (and Indian".

**Subpart BBBBB—CSAPR NO$_X$ Ozone Season Group 1 Trading Program**

**§ 97.502    [Amended]**

■ 44. Amend § 97.502 by:
■ a. In the definition of "CSAPR NO$_X$ Ozone Season Group 1 Trading Program", removing "(b)(2)(i) and (ii), and" and adding in its place "(b)(2)(i), and";
■ b. In the definition of "CSAPR NO$_X$ Ozone Season Group 2 Trading Program", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and";
■ c. In the definition of "CSAPR NO$_X$ Ozone Season Group 3 allowance", adding "or (e)" after "§ 97.826(d)", and adding "or less" after "one ton";
■ d. In the definition of "CSAPR NO$_X$ Ozone Season Group 3 Trading Program", removing "(b)(2)(v), and" and adding in its place "(b)(2)(iii), and"; and
■ e. In the definition of "State", removing "(b)(2)(i) and (ii), and" and adding in its place "(b)(2)(i), and".

**§ 97.511    [Amended]**

■ 45. Amend § 97.511 by:
■ a. In paragraphs (b)(1)(i)(A) and (B), removing "State, in accordance" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, in accordance"; and
■ b. In paragraphs (b)(2)(i)(A) and (B), removing "Indian country within the borders of a State, in accordance" and adding in its place "areas of Indian country within the borders of a State not

subject to the State's SIP authority, in accordance".

**§ 97.512    [Amended]**

■ 46. Amend § 97.512 by:
■ a. In paragraph (a) introductory text, removing "State, the Administrator" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, the Administrator";
■ b. In paragraphs (a)(3)(iii) and (a)(5), adding "and areas of Indian country within the borders of the State subject to the State's SIP authority" after "in the State";
■ c. In paragraph (a)(10), removing "State, is allocated" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, is allocated";
■ d. In paragraph (b) introductory text, removing "Indian country within the borders of each State, the Administrator" and adding in its place "areas of Indian country within the borders of each State not subject to the State's SIP authority, the Administrator"; and
■ e. In paragraph (b)(5), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority".

**§ 97.521    [Amended]**

■ 47. In § 97.521, amend paragraph (f)(2) by removing "2022" and adding in its place "2024", and removing "third" before "year after the year".
■ 48. Amend § 97.526 by:
■ a. In paragraph (c), removing "State (or Indian" and adding in its place "State (and Indian";
■ b. In paragraph (d)(1) introductory text, removing "§ 52.38(b)(2)(i) of this chapter (or" and adding in its place "§ 52.38(b)(2)(i)(A) of this chapter (and";
■ c. In paragraph (d)(1)(ii), removing "except a State listed in § 52.38(b)(2)(i)" and adding in its place "listed in § 52.38(b)(2)(ii)";
■ d. In paragraph (d)(1)(iv), removing "§ 52.38(b)(2)(iii) or (iv) of this chapter (or" and adding in its place "§ 52.38(b)(2)(ii) of this chapter (and";
■ e. Revising paragraph (d)(2)(i);
■ f. In paragraph (d)(2)(ii), removing "§ 52.38(b)(2)(v) of this chapter (or" and adding in its place "§ 52.38(b)(2)(iii)(A) of this chapter (and";
■ g. Adding paragraph (d)(2)(iii);
■ h. In paragraph (e)(1), removing "chapter (or Indian" and adding in its place "chapter (and Indian";
■ i. In paragraph (e)(2), removing "§ 52.38(b)(2)(iv) of this chapter (or"

and adding in its place "§ 52.38(b)(2)(iii)(A) of this chapter (and"; and
■ j. Adding paragraph (e)(3).
The revisions and additions read as follows:

**§ 97.526    Banking and conversion.**

\* \* \* \* \*

(d) \* \* \*
(2)(i) Except as provided in paragraphs (d)(2)(ii) and (iii) of this section, after the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section, upon any determination that would otherwise result in the initial recordation of a given number of CSAPR NO$_X$ Ozone Season Group 1 allowances in the compliance account for a source in a State listed in § 52.38(b)(2)(ii) of this chapter (and Indian country within the borders of such a State), the Administrator will not record such CSAPR NO$_X$ Ozone Season Group 1 allowances but instead will allocate and record in such account an amount of CSAPR NO$_X$ Ozone Season Group 2 allowances for the control period in 2017 computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Group 1 allowances divided by the conversion factor determined under paragraph (d)(1)(ii) of this section.

\* \* \* \* \*

(iii) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and § 97.826(e)(1), upon any determination that would otherwise result in the initial recordation of a given number of CSAPR NO$_X$ Ozone Season Group 1 allowances in the compliance account for a source in a State listed in § 52.38(b)(2)(iii)(B) of this chapter (and Indian country within the borders of such a State), the Administrator will not record such CSAPR NO$_X$ Ozone Season Group 1 allowances but instead will allocate and record in such account an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2023 computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Group 1 allowances divided by the conversion factor determined under paragraph (d)(1)(ii) of this section and further divided by the conversion factor determined under § 97.826(e)(1)(ii).

\* \* \* \* \*

(e) \* \* \*
(3) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and § 97.826(e)(1), the owner or operator of a CSAPR NO$_X$ Ozone Season Group 1

source in a State listed in § 52.38(b)(2)(iii)(B) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR NO$_X$ Ozone Season Group 1 allowances for the control period in 2015 or 2016 by holding instead, in a general account established for this sole purpose, an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2023 (or any later control period for which the allowance transfer deadline defined in § 97.1002 has passed) computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Group 1 allowances divided by the conversion factor determined under paragraph (d)(1)(ii) of this section and further divided by the conversion factor determined under § 97.826(e)(1)(ii).

## Subpart CCCCC—CSAPR SO$_2$ Group 1 Trading Program

**§ 97.602 [Amended]**

■ 49. Amend § 97.602 by:
■ a. In the definition of "CSAPR NO$_X$ Ozone Season Group 1 Trading Program", removing "(b)(2)(i) and (ii), and" and adding in its place "(b)(2)(i), and";
■ b. In the definition of "CSAPR NO$_X$ Ozone Season Group 2 Trading Program", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and";
■ c. In the definition of "CSAPR NO$_X$ Ozone Season Group 3 Trading Program", removing "(b)(2)(v), and" and adding in its place "(b)(2)(iii), and";

**§ 97.611 [Amended]**

■ 50. Amend § 97.611 by:
■ a. In paragraphs (b)(1)(i)(A) and (B), removing "State, in accordance" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, in accordance"; and
■ b. In paragraphs (b)(2)(i)(A) and (B), removing "Indian country within the borders of a State, in accordance" and adding in its place "areas of Indian country within the borders of a State not subject to the State's SIP authority, in accordance".

**§ 97.612 [Amended]**

■ 51. Amend § 97.612 by:
■ a. In paragraph (a) introductory text, removing "State, the Administrator" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, the Administrator";
■ b. In paragraphs (a)(3)(iii) and (a)(5), adding "and areas of Indian country

within the borders of the State subject to the State's SIP authority" after "in the State";
■ c. In paragraph (a)(10), removing "State, is allocated" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, is allocated";
■ d. In paragraph (b) introductory text, removing "Indian country within the borders of each State, the Administrator" and adding in its place "areas of Indian country within the borders of each State not subject to the State's SIP authority, the Administrator"; and
■ e. In paragraph (b)(5), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority".

**§ 97.621 [Amended]**

■ 52. In § 97.621, amend paragraph (f)(2) by removing "2022" and adding in its place "2024", and removing "third" before "year after the year".

**§ 97.626 [Amended]**

■ 53. In § 97.626, amend paragraph (c) by removing "State (or Indian" and adding in its place "State (and Indian".

## Subpart DDDDD—CSAPR SO$_2$ Group 2 Trading Program

■ 54. Amend § 97.702 by:
■ a. In the definition of "alternate designated representative", removing "or CSAPR NO$_X$ Ozone Season Group 2 Trading Program, then" and adding in its place "CSAPR NO$_X$ Ozone Season Group 2 Trading Program, or CSAPR NO$_X$ Ozone Season Group 3 Trading Program, then";
■ b. In the definition of "CSAPR NO$_X$ Ozone Season Group 1 Trading Program", removing "(b)(2)(i) and (ii), and" and adding in its place "(b)(2)(i), and";
■ c. In the definition of "CSAPR NO$_X$ Ozone Season Group 2 Trading Program", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and";
■ d. Adding in alphabetical order a definition for "CSAPR NO$_X$ Ozone Season Group 3 Trading Program"; and
■ e. In the definition of "designated representative", removing "or CSAPR NO$_X$ Ozone Season Group 2 Trading Program, then" and adding in its place "CSAPR NO$_X$ Ozone Season Group 2 Trading Program, or CSAPR NO$_X$ Ozone Season Group 3 Trading Program, then".

**§ 97.702   Definitions.**

\*    \*    \*    \*    \*

*CSAPR NO$_X$ Ozone Season Group 3 Trading Program* means a multi-state NO$_X$ air pollution control and emission reduction program established in accordance with subpart GGGGG of this part and § 52.38(b)(1), (b)(2)(iii), and (b)(10) through (14) and (17) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(b)(10) or (11) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(b)(12) of this chapter), as a means of mitigating interstate transport of ozone and NO$_X$.

\*    \*    \*    \*    \*

**§ 97.711 [Amended]**

■ 55. Amend § 97.711 by:
■ a. In paragraphs (b)(1)(i)(A) and (B), removing "State, in accordance" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, in accordance"; and
■ b. In paragraphs (b)(2)(i)(A) and (B), removing "Indian country within the borders of a State, in accordance" and adding in its place "areas of Indian country within the borders of a State not subject to the State's SIP authority, in accordance".

**§ 97.712 [Amended]**

■ 56. Amend § 97.712 by:
■ a. In paragraph (a) introductory text, removing "State, the Administrator" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, the Administrator";
■ b. In paragraphs (a)(3)(iii) and (a)(5), adding "and areas of Indian country within the borders of the State subject to the State's SIP authority" after "in the State";
■ c. In paragraph (a)(10), removing "State, is allocated" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, is allocated";
■ d. In paragraph (b) introductory text, removing "Indian country within the borders of each State, the Administrator" and adding in its place "areas of Indian country within the borders of each State not subject to the State's SIP authority, the Administrator"; and
■ e. In paragraph (b)(5), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority".

**§ 97.721   [Amended]**

■ 57. In § 97.721, amend paragraph (f)(2) by removing "2022" and adding in its place "2024", and removing "third" before "year after the year".

**§ 97.726   [Amended]**

■ 58. In § 97.726, amend paragraph (c) by removing "State (or Indian" and adding in its place "State (and Indian".

**§ 97.734   [Amended]**

■ 59. In § 97.734, amend paragraph (d)(3) by removing "or CSAPR NO_X Ozone Season Group 2 Trading Program, quarterly" and adding in its place "CSAPR NO_X Ozone Season Group 2 Trading Program, or CSAPR NO_X Ozone Season Group 3 Trading Program, quarterly".

**Subpart EEEEE—CSAPR NO_X Ozone Season Group 2 Trading Program**

■ 60. Amend § 97.802 by:
■ a. In the definition of "assurance account", removing "base CSAPR" and adding in its place "CSAPR";
■ b. Removing the definitions for "base CSAPR NO_X Ozone Season Group 2 source" and "base CSAPR NO_X Ozone Season Group 2 unit";
■ c. In the definition of "common designated representative", removing "base CSAPR" and adding in its place "CSAPR";
■ d. In the definition of "common designated representative's assurance level", revising paragraph (1);
■ e. In the definition of "common designated representative's share", removing "base CSAPR" and adding in its place "CSAPR" each time it appears;
■ f. In the definition of "CSAPR NO_X Ozone Season Group 2 Trading Program", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and";
■ g. In the definition of "CSAPR NO_X Ozone Season Group 3 allowance", adding "or (e)" after "§ 97.826(d)", and adding "or less" after "one ton";
■ h. In the definition of "CSAPR NO_X Ozone Season Group 3 Trading Program", removing "(b)(2)(v), and" and adding in its place "(b)(2)(iii), and"; and
■ i. In the definition of "State", removing "(b)(2)(iii) and (iv), and" and adding in its place "(b)(2)(ii), and".

The revision reads as follows:

**§ 97.802   Definitions.**

*  *  *  *  *

*Common designated representative's assurance level* *  *  *

(1) The amount (rounded to the nearest allowance) equal to the sum of the total amount of CSAPR NO_X Ozone Season Group 2 allowances allocated for such control period to the group of one

or more CSAPR NO_X Ozone Season Group 2 units in such State (and such Indian country) having the common designated representative for such control period and the total amount of CSAPR NO_X Ozone Season Group 2 allowances purchased by an owner or operator of such CSAPR NO_X Ozone Season Group 2 units in an auction for such control period and submitted by the State or the permitting authority to the Administrator for recordation in the compliance accounts for such CSAPR NO_X Ozone Season Group 2 units in accordance with the CSAPR NO_X Ozone Season Group 2 allowance auction provisions in a SIP revision approved by the Administrator under § 52.38(b)(8) or (9) of this chapter, multiplied by the sum of the State NO_X Ozone Season Group 2 trading budget under § 97.810(a) and the State's variability limit under § 97.810(b) for such control period, and divided by such State NO_X Ozone Season Group 2 trading budget;

*  *  *  *  *

**§ 97.806   [Amended]**

■ 61. In § 97.806, amend paragraphs (c)(2)(i) introductory text, (c)(2)(i)(B), (c)(2)(iii) and (iv), and (c)(3)(iii) by removing "base CSAPR" and adding in its place "CSAPR" each time it appears.

**§ 97.810   [Amended]**

■ 62. In § 97.810, amend paragraphs (a)(1)(i) through (iii), (a)(2)(i) and (ii), (a)(12)(i) through (iii), (a)(13)(i) and (ii), (a)(17)(i) through (iii), (a)(19)(i) and (ii), (a)(20)(i) through (iii), (a)(23)(i) through (iii), and (b)(1), (2), (12), (13), (17), (19), (20), and (23) by removing "and thereafter" and adding in its place "through 2022".

■ 63. Amend § 97.811 by:
■ a. In paragraphs (b)(1)(i)(A) and (B), removing "State, in accordance" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, in accordance";
■ b. In paragraphs (b)(2)(i)(A) and (B), removing "Indian country within the borders of a State, in accordance" and adding in its place "areas of Indian country within the borders of a State not subject to the State's SIP authority, in accordance";
■ c. In paragraph (d)(1), removing "§ 52.38(b)(2)(iv) of this chapter (or" and adding in its place "§ 52.38(b)(2)(ii)(B) of this chapter (and"; and
■ d. Adding paragraph (e).

The addition reads as follows:

**§ 97.811   Timing requirements for CSAPR NO_X Ozone Season Group 2 allowance allocations.**

*  *  *  *  *

(e) *Recall of CSAPR NO_X Ozone Season Group 2 allowances allocated for control periods after 2022.* (1) Notwithstanding any other provision of this subpart, part 52 of this chapter, or any SIP revision approved under § 52.38(b) of this chapter, the provisions of this paragraph and paragraphs (e)(2) through (7) of this section shall apply with regard to each CSAPR NO_X Ozone Season Group 2 allowance that was allocated for a control period after 2022 to any unit (including a permanently retired unit qualifying for an exemption under § 97.805) in a State listed in § 52.38(b)(2)(ii)(C) of this chapter (and Indian country within the borders of such a State) and that was initially recorded in the compliance account for the source that includes the unit, whether such CSAPR NO_X Ozone Season Group 2 allowance was allocated pursuant to this subpart or pursuant to a SIP revision approved under § 52.38(b) of this chapter and whether such CSAPR NO_X Ozone Season Group 2 allowance remains in such compliance account or has been transferred to another Allowance Management System account.

(2)(i) For each CSAPR NO_X Ozone Season Group 2 allowance described in paragraph (e)(1) of this section that was allocated for a given control period and initially recorded in a given source's compliance account, one CSAPR NO_X Ozone Season Group 2 allowance that was allocated for the same or an earlier control period and initially recorded in the same or any other Allowance Management System account must be surrendered in accordance with the procedures in paragraphs (e)(3) and (4) of this section.

(ii)(A) The surrender requirement under paragraph (e)(2)(i) of this section corresponding to each CSAPR NO_X Ozone Season Group 2 allowance described in paragraph (e)(1) of this section initially recorded in a given source's compliance account shall apply to such source's current owners and operators, except as provided in paragraph (e)(2)(ii)(B) of this section.

(B) If the owners and operators of a given source as of a given date assumed ownership and operational control of the source through a transaction that did not also provide rights to direct the use or transfer of a given CSAPR NO_X Ozone Season Group 2 allowance described in paragraph (e)(1) of this section with regard to such source (whether recordation of such CSAPR NO_X Ozone Season Group 2 allowance in the source's compliance account occurred before such transaction or was anticipated to occur after such transaction), then the surrender

requirement under paragraph (e)(2)(i) of this section corresponding to such CSAPR NO$_X$ Ozone Season Group 2 allowance shall apply to the most recent former owners and operators of the source before the occurrence of such a transaction.

(C) The Administrator will not adjudicate any private legal dispute among the owners and operators of a source or among the former owners and operators of a source, including any disputes relating to the requirements to surrender CSAPR NO$_X$ Ozone Season Group 2 allowances for the source under paragraph (e)(2)(i) of this section.

(3)(i) As soon as practicable on or after [EFFECTIVE DATE OF FINAL RULE], the Administrator will send a notification to the designated representative for each source described in paragraph (e)(1) of this section identifying the amounts of CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for each control period after 2022 and recorded in the source's compliance account and the corresponding surrender requirements for the source under paragraph (e)(2)(i) of this section.

(ii) As soon as practicable on or after [15 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], the Administrator will deduct from the compliance account for each source described in paragraph (e)(1) of this section CSAPR NO$_X$ Ozone Season Group 2 allowances eligible to satisfy the surrender requirements for the source under paragraph (e)(2)(i) of this section until all such surrender requirements for the source are satisfied or until no more CSAPR NO$_X$ Ozone Season Group 2 allowances eligible to satisfy such surrender requirements remain in the compliance account.

(iii) As soon as practicable after completion of the deductions under paragraph (e)(3)(ii) of this section, the Administrator will identify for each source described in paragraph (e)(1) of this section the amounts, if any, of CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for each control period after 2022 and recorded in the source's compliance account for which the corresponding surrender requirements under paragraph (e)(2)(i) of this section have not been satisfied and will send a notification concerning such identified amounts to the designated representative for the source.

(iv) With regard to each source for which unsatisfied surrender requirements under paragraph (e)(2)(i) of this section remain after the deductions under paragraph (e)(3)(ii) of this section:

(A) Except as provided in paragraph (e)(3)(iv)(B) of this section, not later

than September 15, 2023, the owners and operators of the source shall hold sufficient CSAPR NO$_X$ Ozone Season Group 2 allowances eligible to satisfy such unsatisfied surrender requirements under paragraph (e)(2)(i) of this section in the source's compliance account.

(B) With regard to any portion of such unsatisfied surrender requirements that apply to former owners and operators of the source pursuant to paragraph (e)(2)(ii)(B) of this section, not later than September 15, 2023, such former owners and operators shall hold sufficient CSAPR NO$_X$ Ozone Season Group 2 allowances eligible to satisfy such portion of the unsatisfied surrender requirements under paragraph (e)(2)(i) of this section either in the source's compliance account or in another Allowance Management System account identified to the Administrator on or before such date in a submission by the authorized account representative for such account.

(C) As soon as practicable on or after September 15, 2023, the Administrator will deduct from the Allowance Management System account identified in accordance with paragraph (e)(3)(iv)(A) or (B) of this section CSAPR NO$_X$ Ozone Season Group 2 allowances eligible to satisfy the surrender requirements for the source under paragraph (e)(2)(i) of this section until all such surrender requirements for the source are satisfied or until no more CSAPR NO$_X$ Ozone Season Group 2 allowances eligible to satisfy such surrender requirements remain in such account.

(v) When making deductions under paragraph (e)(3)(ii) or (iv) of this section to address the surrender requirements under paragraph (e)(2)(i) of this section for a given source:

(A) The Administrator will make deductions to address any surrender requirements with regard to first the 2023 control period and then the 2024 control period.

(B) When making deductions to address the surrender requirements with regard to a given control period, the Administrator will first deduct CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for such given control period and will then deduct CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for each successively earlier control period in sequence.

(C) When deducting CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for a given control period from a given Allowance Management System account, the Administrator will first deduct CSAPR NO$_X$ Ozone Season Group 2 allowances initially recorded in the account under § 97.821 (if the

account is a compliance account) in the order of recordation and will then deduct CSAPR NO$_X$ Ozone Season Group 2 allowances recorded in the account under § 97.526(d) or § 97.823 in the order of recordation.

(4)(i) To the extent the surrender requirements under paragraph (e)(2)(i) of this section corresponding to any CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for a control period after 2022 and initially recorded in a given source's compliance account have not been fully satisfied through the deductions under paragraph (e)(3) of this section, as soon as practicable on or after November 15, 2023, the Administrator will deduct such initially recorded CSAPR NO$_X$ Ozone Season Group 2 allowances from any Allowance Management System accounts in which such CSAPR NO$_X$ Ozone Season Group 2 allowances are held, making such deductions in any order determined by the Administrator, until all such surrender requirements for such source have been satisfied or until all such CSAPR NO$_X$ Ozone Season Group 2 allowances have been deducted, except as provided in paragraph (e)(4)(ii) of this section.

(ii) If no person with an ownership interest in a given CSAPR NO$_X$ Ozone Season Group 2 allowance as of April 30, 2022, was an owner or operator of the source in whose compliance account such CSAPR NO$_X$ Ozone Season Group 2 allowance was initially recorded, was a direct or indirect parent or subsidiary of an owner or operator of such source, or was directly or indirectly under common ownership with an owner or operator of such source, the Administrator will not deduct such CSAPR NO$_X$ Ozone Season Group 2 allowance under paragraph (e)(4)(i) of this section. For purposes of this paragraph, each owner or operator of a source shall be deemed to be a person with an ownership interest in any CSAPR NO$_X$ Ozone Season Group 2 allowance held in that source's compliance account. The limitation established by this paragraph on the deductibility of certain CSAPR NO$_X$ Ozone Season Group 2 allowances under paragraph (e)(4)(i) of this section shall not be construed as a waiver of the surrender requirements under paragraph (e)(2)(i) of this section corresponding to such CSAPR NO$_X$ Ozone Season Group 2 allowances.

(iii) Not less than 45 days before the planned date for any deductions under paragraph (e)(4)(i) of this section, the Administrator will send a notification to the authorized account representative for the Allowance Management System account from which such deductions

will be made identifying the CSAPR NO$_X$ Ozone Season Group 2 allowances to be deducted and the data upon which the Administrator has relied and specifying a process for submission of any objections to such data. Any objections must be submitted to the Administrator not later than 15 days before the planned date for such deductions as indicated in such notification.

(5) To the extent the surrender requirements under paragraph (e)(2)(i) of this section corresponding to any CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for a control period after 2022 and initially recorded in a given source's compliance account have not been fully satisfied through the deductions under paragraphs (e)(3) and (4) of this section:

(i) The persons identified in accordance with paragraph (e)(2)(ii) of this section with regard to such source and each such CSAPR NO$_X$ Ozone Season Group 2 allowance shall pay any fine, penalty, or assessment or comply with any other remedy imposed under the Clean Air Act; and

(ii) Each such CSAPR NO$_X$ Ozone Season Group 2 allowance, and each day in such control period, shall constitute a separate violation of this subpart and the Clean Air Act.

(6) The Administrator will record in the appropriate Allowance Management System accounts all deductions of CSAPR NO$_X$ Ozone Season Group 2 allowances under paragraphs (e)(3) and (4) of this section.

(7)(i) Each submission, objection, or other written communication from a designated representative, authorized account representative, or other person to the Administrator under paragraph (e)(2), (3), or (4) of this section shall be sent electronically to the email address *CSAPR@epa.gov*. Each such communication from a designated representative must contain the certification statement set forth in § 97.814(a), and each such communication from the authorized account representative for a general account must contain the certification statement set forth in § 97.820(c)(2)(ii).

(ii) Each notification from the Administrator to a designated representative or authorized account representative under paragraph (e)(3) or (4) of this section will be sent electronically to the email address most recently received by the Administrator for such representative. In any such notification, the Administrator may provide information by means of a reference to a publicly accessible website where the information is available.

§ 97.812    [Amended]

■ 64. Amend § 97.812 by:
■ a. In paragraph (a) introductory text, removing "State, the Administrator" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, the Administrator";
■ b. In paragraphs (a)(3)(iii) and (a)(5), adding "and areas of Indian country within the borders of the State subject to the State's SIP authority" after "in the State";
■ c. In paragraph (a)(10), removing "State, is allocated" and adding in its place "State and areas of Indian country within the borders of the State subject to the State's SIP authority, is allocated";
■ d. In paragraph (b) introductory text, removing "Indian country within the borders of each State, the Administrator" and adding in its place "areas of Indian country within the borders of each State not subject to the State's SIP authority, the Administrator"; and
■ e. In paragraph (b)(5), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority".

§ 97.821    [Amended]

■ 65. In § 97.821, amend paragraph (f) by removing "2022" and adding in its place "2024", and removing "third" before "year after the year".

§ 97.825    [Amended]

■ 66. In § 97.825, amend paragraphs (a) introductory text, (a)(2), (b)(1)(i), (b)(1)(ii)(A) and (B), (b)(3), (b)(4)(i), (b)(5), (b)(6)(i), (b)(6)(iii) introductory text, and (b)(6)(iii)(A) and (B) by removing "base CSAPR" and adding in its place "CSAPR" each time it appears.
■ 67. Amend § 97.826 by:
■ a. In paragraph (b), removing "(c) or (d)" and adding in its place "(c), (d), or (e)";
■ b. In paragraph (c), removing "State (or Indian" and adding in its place "State (and Indian";
■ c. In paragraphs (d)(1)(i)(A) and (B), removing "§ 52.38(b)(2)(iv)" and adding in its place "§ 52.38(b)(2)(iii)(B)";
■ d. Revising paragraph (d)(1)(i)(C);
■ e. In paragraph (d)(1)(ii) introductory text, removing "§ 52.38(b)(2)(v)" and adding in its place "§ 52.38(b)(2)(iii)";
■ f. Removing and reserving paragraph (d)(1)(iii);
■ g. Revising paragraph (d)(1)(iv) introductory text;
■ h. In paragraphs (d)(1)(iv)(A) and (B), removing "or (d)(1)(iii)(C)";
■ i. In paragraphs (d)(2)(i) and (d)(3), removing "§ 52.38(b)(2)(v) of this

chapter (or" and adding in its place "§ 52.38(b)(2)(iii) of this chapter (and";
■ j. Redesignating paragraph (e) as paragraph (f) and adding a new paragraph (e);
■ k. Revising newly redesignated paragraphs (f)(1) and (2); and
■ l. Adding paragraph (f)(3).
The revisions and additions read as follows:

§ 97.826    Banking and conversion.

*    *    *    *    *
(d) *    *    *
(1) *    *    *
(i) *    *    *
(C) The full-season CSAPR NO$_X$ Ozone Season Group 3 allowance bank target, computed as the sum for all States listed in § 52.38(b)(2)(iii)(A) of this chapter of the variability limits under § 97.1010(e) for such States for the control period in 2022.

*    *    *    *    *
(iv) For the compliance account of each source to which an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances greater than zero is allocated under paragraph (d)(1)(i)(C) of this section:

*    *    *    *    *
(e) Notwithstanding any other provision of this subpart, part 52 of this chapter, or any SIP revision approved under § 52.38(b)(8) or (9) of this chapter:

(1) By [45 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], the Administrator will temporarily suspend acceptance of CSAPR NO$_X$ Ozone Season Group 2 allowance transfers submitted under § 97.822 and, before resuming acceptance of such transfers, will take the following actions with regard to every general account and every compliance account except a compliance account for a CSAPR NO$_X$ Ozone Season Group 2 source in a State listed in § 52.38(b)(2)(ii)(A) of this chapter (and Indian country within the borders of such a State):

(i) The Administrator will deduct all CSAPR NO$_X$ Ozone Season Group 2 allowances allocated for the control periods in 2017 through 2022 from each such account.

(ii) The Administrator will determine a conversion factor equal to the greater of 1.0000 or the quotient, expressed to four decimal places, of the sum of all CSAPR NO$_X$ Ozone Season Group 2 allowances deducted from all such accounts under paragraph (e)(1)(i) of this section divided by the sum of the variability limits for the control period in 2024 under § 97.1010(e) for all States listed in § 52.38(b)(2)(iii)(B) of this chapter.

(iii) The Administrator will allocate and record in each such account an

amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2023 computed as the quotient, rounded up to the nearest allowance, of the number of CSAPR NO$_X$ Ozone Season Group 2 allowances deducted from such account under paragraph (e)(1)(i) of this section divided by the conversion factor determined under paragraph (e)(1)(ii) of this section, except as provided in paragraph (e)(1)(iv) or (v) of this section.

(iv) Where, pursuant to paragraph (e)(1)(i) of this section, the Administrator deducts CSAPR NO$_X$ Ozone Season Group 2 allowances from the compliance account for a source in a State not listed in § 52.38(b)(2)(iii) of this chapter (and Indian country within the borders of such a State), the Administrator will not record CSAPR NO$_X$ Ozone Season Group 3 allowances in that compliance account but instead will allocate and record the amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2023 computed for such source in accordance with paragraph (e)(1)(iii) of this section in a general account identified by the designated representative for such source, provided that if the designated representative fails to identify such a general account in a submission to the Administrator by [45 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], the Administrator may record such CSAPR NO$_X$ Ozone Season Group 3 allowances in a general account identified or established by the Administrator with the designated representative as the authorized account representative and with the owners and operators of such source (as indicated on the certificate of representation for the source) as the persons represented by the authorized account representative.

(v)(A) In computing any amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances to be allocated to and recorded in general accounts under paragraph (e)(1)(iii) of this section, the Administrator may group multiple general accounts whose ownership interests are held by the same or related persons or entities and treat the group of accounts as a single account for purposes of such computation.

(B) Following a computation for a group of general accounts in accordance with paragraph (e)(1)(v)(A) of this section, the Administrator will allocate to and record in each individual account in such group a proportional share of the quantity of CSAPR NO$_X$ Ozone Season Group 3 allowances computed for such group, basing such shares on the respective quantities of CSAPR NO$_X$ Ozone Season Group 2

allowances removed from such individual accounts under paragraph (e)(1)(i) of this section.

(C) In determining the proportional shares under paragraph (e)(1)(v)(B) of this section, the Administrator may employ any reasonable adjustment methodology to truncate or round each such share up or down to a whole number and to cause the total of such whole numbers to equal the amount of CSAPR NO$_X$ Ozone Season Group 3 allowances computed for such group of accounts in accordance with paragraph (e)(1)(v)(A) of this section, even where such adjustments cause the numbers of CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to some individual accounts to equal zero.

(2) After the Administrator has carried out the procedures set forth in paragraph (e)(1) of this section, upon any determination that would otherwise result in the initial recordation of a given number of CSAPR NO$_X$ Ozone Season Group 2 allowances in the compliance account for a source in a State listed in § 52.38(b)(2)(iii)(B) of this chapter (and Indian country within the borders of such a State), the Administrator will not record such CSAPR NO$_X$ Ozone Season Group 2 allowances but instead will allocate and record in such account an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2023 computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Group 2 allowances divided by the conversion factor determined under paragraph (e)(1)(ii) of this section.

(f) * * *

(1) Except as provided in paragraph (f)(3) of this section, after the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section, the owner or operator of a CSAPR NO$_X$ Ozone Season Group 2 source in a State listed in § 52.38(b)(2)(iii)(A) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR NO$_X$ Ozone Season Group 2 allowances for the control period in a year from 2017 through 2020 by holding instead, in a general account established for this sole purpose, an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2021 (or any later control period for which the allowance transfer deadline defined in § 97.1002 has passed) computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Group 2 allowances divided by the conversion factor

determined under paragraph (d)(1)(i)(D) of this section.

(2) Except as provided in paragraph (f)(3) of this section, after the Administrator has carried out the procedures set forth in paragraph (e)(1) of this section, the owner or operator of a CSAPR NO$_X$ Ozone Season Group 2 source in a State listed in § 52.38(b)(2)(iii)(B) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR NO$_X$ Ozone Season Group 2 allowances for the control period in a year from 2017 through 2022 by holding instead, in a general account established for this sole purpose, an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2023 (or any later control period for which the allowance transfer deadline defined in § 97.1002 has passed) computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Group 2 allowances divided by the conversion factor determined under paragraph (e)(1)(ii) of this section.

(3) CSAPR NO$_X$ Ozone Season Group 3 allowances may not be used to satisfy requirements to surrender CSAPR NO$_X$ Ozone Season Group 2 allowances under § 97.811(d) or (e).

## Subpart FFFFF—Texas SO$_2$ Trading Program

■ 68. Amend § 97.902 by:
■ a. In the definition of ''alternate designated representative'', removing ''Program or CSAPR NO$_X$ Ozone Season Group 2 Trading Program, then'' and adding in its place ''Program, CSAPR NO$_X$ Ozone Season Group 2 Trading Program, or CSAPR NO$_X$ Ozone Season Group 3 Trading Program, then'';
■ b. In the definition of ''CSAPR NO$_X$ Ozone Season Group 2 Trading Program'', removing ''(b)(2)(iii) and (iv), and'' and adding in its place ''(b)(2)(ii), and'';
■ c. Adding in alphabetical order a definition for ''CSAPR NO$_X$ Ozone Season Group 3 Trading Program''; and
■ d. In the definition of ''designated representative'', removing ''Program or CSAPR NO$_X$ Ozone Season Group 2 Trading Program, then'' and adding in its place ''Program, CSAPR NO$_X$ Ozone Season Group 2 Trading Program, or CSAPR NO$_X$ Ozone Season Group 3 Trading Program, then''.
The addition reads as follows:

### § 97.902  Definitions.

\* \* \* \* \*

*CSAPR NO$_X$ Ozone Season Group 3 Trading Program* means a multi-state

NO$_X$ air pollution control and emission reduction program established in accordance with subpart GGGGG of this part and § 52.38(b)(1), (b)(2)(iii), and (b)(10) through (14) and (17) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(b)(10) or (11) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(b)(12) of this chapter), as a means of mitigating interstate transport of ozone and NO$_X$.

\* \* \* \* \*

### § 97.921   [Amended]

■ 69. In § 97.921, amend paragraph (b)(2) by removing ''2022'' and adding in its place ''2024'', and removing ''third'' before ''year after the year''.

### § 97.934   [Amended]

■ 70. In § 97.934, amend paragraph (d)(3) by removing ''Program or CSAPR NO$_X$ Ozone Season Group 2 Trading Program, quarterly'' and adding in its place ''Program, CSAPR NO$_X$ Ozone Season Group 2 Trading Program, or CSAPR NO$_X$ Ozone Season Group 3 Trading Program, quarterly''.

### Subpart GGGGG—CSAPR NO$_X$ Ozone Season Group 3 Trading Program

■ 71. Amend § 97.1002 by:
■ a. Revising the definition of ''allocate or allocation'';
■ b. In the definition of ''allowance transfer deadline'', adding ''primary'' before ''emissions limitation'';
■ c. In the definition of ''alternate designated representative'', removing ''or CSAPR SO$_2$ Group 1 Trading Program, then'' and adding in its place ''CSAPR SO$_2$ Group 1 Trading Program, or CSAPR SO$_2$ Group 2 Trading Program, then'';
■ d. Adding in alphabetical order a definition for ''backstop daily NO$_X$ emissions rate'';
■ e. In the definition of ''common designated representative's assurance level'', in paragraph (1), removing ''§ 97.1010(b)'' and adding in its place ''§ 97.1010(e)'', and revising paragraph (2);
■ f. In the definition of ''compliance account'', adding ''primary'' before ''emissions limitation'';
■ g. Adding in alphabetical order a definition for ''CSAPR NO$_X$ Ozone Season Group 1 Trading Program'';
■ h. In the definition of ''CSAPR NO$_X$ Ozone Season Group 2 Trading Program'', removing ''(b)(2)(iii) and (iv), and'' and adding in its place ''(b)(2)(ii), and'';
■ i. In the definition of ''CSAPR NO$_X$ Ozone Season Group 3 allowance'',

adding ''or (e)'' after ''§ 97.826(d)'', and adding ''or less'' after ''one ton'';
■ j. In the definition of ''CSAPR NO$_X$ Ozone Season Group 3 allowance deduction or deduct CSAPR NO$_X$ Ozone Season Group 3 allowances'', adding ''primary'' before ''emissions limitation'';
■ k. In the definition of ''CSAPR NO$_X$ Ozone Season Group 3 emissions limitation'', adding ''primary'' before ''emissions limitation'';
■ l. Adding in alphabetical order a definition for ''CSAPR NO$_X$ Ozone Season Group 3 secondary emissions limitation'';
■ m. In the definition of ''CSAPR NO$_X$ Ozone Season Group 3 Trading Program'', removing ''(b)(2)(v), and'' and adding in its place ''(b)(2)(iii), and'';
■ n. Adding in alphabetical order a definition for ''CSAPR SO$_2$ Group 2 Trading Program'';
■ o. In the definition of ''designated representative'', removing ''or CSAPR SO$_2$ Group 1 Trading Program, then'' and adding in its place ''CSAPR SO$_2$ Group 1 Trading Program, or CSAPR SO$_2$ Group 2 Trading Program, then'';
■ p. In the definition of ''excess emissions'', adding ''primary'' before ''emissions limitation''; and
■ q. In the definition of ''State'', removing ''(b)(2)(v), and'' and adding in its place ''(b)(2)(iii), and''.

The revisions and additions read as follows:

### § 97.1002   Definitions.

\* \* \* \* \*

*Allocate* or *allocation* means, with regard to CSAPR NO$_X$ Ozone Season Group 3 allowances, the determination by the Administrator, State, or permitting authority, in accordance with this subpart, §§ 97.526(d) and 97.826(d) and (e), and any SIP revision submitted by the State and approved by the Administrator under § 52.38(b)(10), (11), or (12) of this chapter, of the amount of such CSAPR NO$_X$ Ozone Season Group 3 allowances to be initially credited, at no cost to the recipient, to:

(1) A CSAPR NO$_X$ Ozone Season Group 3 unit;

(2) A new unit set-aside;

(3) An Indian country new unit set-aside;

(4) An Indian country existing unit set-aside; or

(5) An entity not listed in paragraphs (1) through (4) of this definition;

(6) Provided that, if the Administrator, State, or permitting authority initially credits, to a CSAPR NO$_X$ Ozone Season Group 3 unit qualifying for an initial credit, a credit in the amount of zero CSAPR NO$_X$ Ozone Season Group 3 allowances, the

CSAPR NO$_X$ Ozone Season Group 3 unit will be treated as being allocated an amount (*i.e.*, zero) of CSAPR NO$_X$ Ozone Season Group 3 allowances.

\* \* \* \* \*

*Backstop daily NO$_X$ emissions rate* means an emissions rate limit used in the determination of the CSAPR NO$_X$ Ozone Season Group 3 primary emissions limitation for a CSAPR NO$_X$ Ozone Season Group 3 source in accordance with § 97.1024(b).

\* \* \* \* \*

*Common designated representative's assurance level* \* \* \*

(2) Provided that the allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for any control period taken into account for purposes of this definition shall exclude any CSAPR NO$_X$ Ozone Season Group 3 allowances allocated for such control period under § 97.526(d) or § 97.826(d) or (e).

\* \* \* \* \*

*CSAPR NO$_X$ Ozone Season Group 1 Trading Program* means a multi-state NO$_X$ air pollution control and emission reduction program established in accordance with subpart BBBBB of this part and § 52.38(b)(1), (b)(2)(i), and (b)(3) through (5) and (13) through (15) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.38(b)(3) or (4) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.38(b)(5) of this chapter), as a means of mitigating interstate transport of ozone and NO$_X$.

\* \* \* \* \*

*CSAPR NO$_X$ Ozone Season Group 3 secondary emissions limitation* means, for a CSAPR NO$_X$ Ozone Season Group 3 unit to which such a limitation applies under § 97.1025(c)(1) for a control period in a given year, the tonnage of NO$_X$ emissions calculated for the unit in accordance with § 97.1025(c)(2) for such control period.

\* \* \* \* \*

*CSAPR SO$_2$ Group 2 Trading Program* means a multi-state SO$_2$ air pollution control and emission reduction program established in accordance with subpart DDDDD of this part and § 52.39(a), (c), (g) through (k), and (m) of this chapter (including such a program that is revised in a SIP revision approved by the Administrator under § 52.39(g) or (h) of this chapter or that is established in a SIP revision approved by the Administrator under § 52.39(i) of this chapter), as a means of mitigating interstate transport of fine particulates and SO$_2$.

\* \* \* \* \*

■ 72. Amend § 97.1006 by:

■ a. Revising paragraph (b)(2), the paragraph (c)(1) heading, paragraph (c)(1)(i), and paragraph (c)(1)(ii) introductory text;

■ b. Adding paragraphs (c)(1)(iii) and (iv); and

■ c. Revising paragraphs (c)(2)(iii) and (c)(3).

The revisions and additions read as follows:

### § 97.1006  Standard requirements.

\* \* \* \* \*

(b) \* \* \*

(2) The emissions and heat input data determined in accordance with §§ 97.1030 through 97.1035 shall be used to calculate allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances under §§ 97.1011 and 97.1012 and to determine compliance with the CSAPR NO$_X$ Ozone Season Group 3 primary and secondary emissions limitations and assurance provisions under paragraph (c) of this section, provided that, for each monitoring location from which mass emissions are reported, the mass emissions amount used in calculating such allocations and determining such compliance shall be the mass emissions amount for the monitoring location determined in accordance with §§ 97.1030 through 97.1035 and rounded to the nearest ton, with any fraction of a ton less than 0.50 being deemed to be zero.

(c) \* \* \*

(1) *CSAPR NO$_X$ Ozone Season Group 3 primary and secondary emissions limitations*—(i) *Primary emissions limitation.* As of the allowance transfer deadline for a control period in a given year, the owners and operators of each CSAPR NO$_X$ Ozone Season Group 3 source and each CSAPR NO$_X$ Ozone Season Group 3 unit at the source shall hold, in the source's compliance account, CSAPR NO$_X$ Ozone Season Group 3 allowances available for deduction for such control period under § 97.1024(a) in an amount not less than the amount determined under § 97.1024(b), comprising the sum of:

(A) The tons of total NO$_X$ emissions for such control period from all CSAPR NO$_X$ Ozone Season Group 3 units at the source; plus

(B) Two times the sum, for all CSAPR NO$_X$ Ozone Season Group 3 units at the source and all days of the control period, of any NO$_X$ emissions from such a unit on any day of the control period exceeding the NO$_X$ emissions that would have occurred on that day if the unit had combusted the same daily heat input and emitted at any backstop daily NO$_X$ emissions rate applicable to the unit for that control period.

(ii) *Exceedances of primary emissions limitation.* If total NO$_X$ emissions during a control period in a given year from the CSAPR NO$_X$ Ozone Season Group 3 units at a CSAPR NO$_X$ Ozone Season Group 3 source are in excess of the CSAPR NO$_X$ Ozone Season Group 3 primary emissions limitation set forth in paragraph (c)(1)(i) of this section, then:

\* \* \* \* \*

(iii) *Secondary emissions limitation.* The owner or operator of a base CSAPR NO$_X$ Ozone Season Group 3 unit subject to an emissions limitation under § 97.1025(c)(1) shall not discharge, or allow to be discharged, emissions of NO$_X$ to the atmosphere during a control period in excess of the tonnage amount calculated in accordance with § 97.1025(c)(2).

(iv) *Exceedances of secondary emissions limitation.* If total NO$_X$ emissions during a control period in a given year from a base CSAPR NO$_X$ Ozone Season Group 3 unit are in excess of the amount of a CSAPR NO$_X$ Ozone Season Group 3 secondary emissions limitation applicable to the unit for the control period under paragraph (c)(1)(iii) of this section, then the owners and operators of the unit and the source at which the unit is located shall pay any fine, penalty, or assessment or comply with any other remedy imposed, for the same violations, under the Clean Air Act, and each ton of such excess emissions and each day of such control period shall constitute a separate violation of this subpart and the Clean Air Act.

(2) \* \* \*

(iii) Total NO$_X$ emissions from all base CSAPR NO$_X$ Ozone Season Group 3 units at base CSAPR NO$_X$ Ozone Season Group 3 sources in a State (and Indian country within the borders of such State) during a control period in a given year exceed the State assurance level if such total NO$_X$ emissions exceed the sum, for such control period, of the State NO$_X$ Ozone Season Group 3 trading budget under § 97.1010(a) and the State's variability limit under § 97.1010(e).

\* \* \* \* \*

(3) *Compliance periods.*(i) A CSAPR NO$_X$ Ozone Season Group 3 unit shall be subject to the requirements under paragraphs (c)(1)(i) and (ii) of this section, and a base CSAPR NO$_X$ Ozone Season Group 3 unit shall be subject to the requirements under paragraph (c)(2) of this section, for the control period starting on the later of the applicable date in paragraph (c)(3)(i)(A), (B), or (C) of this section or the deadline for meeting the unit's monitor certification requirements under § 97.1030(b) and for each control period thereafter:

(A) May 1, 2021, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(A) of this chapter;

(B) May 1, 2023, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(B) of this chapter; or

(C) [EFFECTIVE DATE OF FINAL RULE], for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(C) of this chapter.

(ii) A base CSAPR NO$_X$ Ozone Season Group 3 unit shall be subject to the requirements under paragraphs (c)(1)(iii) and (iv) of this section for the control period starting on the later of May 1, 2024 or the deadline for meeting the unit's monitor certification requirements under § 97.1030(b) and for each control period thereafter.

\* \* \* \* \*

■ 73. Revise § 97.1010 to read as follows:

### § 97.1010  State NO$_X$ Ozone Season Group 3 trading budgets, set-asides, and variability limits.

(a) *State NO$_X$ Ozone Season Group 3 trading budgets.* (1)(i) The State NO$_X$ Ozone Season Group 3 trading budgets for allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control periods in 2021, 2022, 2023, and 2024 are as indicated in Table 1 to this paragraph, subject to prorating for the control period in 2023 as provided in paragraph (a)(1)(ii) of this section:

TABLE 1 TO PARAGRAPH (a)(1)(i)—STATE NO$_X$ OZONE SEASON GROUP 3 TRADING BUDGETS BY CONTROL PERIOD

[Tons]

| State | 2021 | 2022 | Portion of 2023 control period before [EFFECTIVE DATE OF FINAL RULE], before prorating | Portion of 2023 control period on and after [EFFECTIVE DATE OF FINAL RULE], before prorating | 2024 |
|---|---|---|---|---|---|
| Alabama | | | 13,211 | 6,364 | 6,306 |
| Arkansas | | | 9,210 | 8,889 | 8,889 |
| Delaware | | | | 384 | 434 |
| Illinois | 11,223 | 9,102 | 8,179 | 7,364 | 7,463 |
| Indiana | 17,004 | 12,582 | 12,553 | 11,151 | 9,391 |
| Kentucky | 17,542 | 14,051 | 14,051 | 11,640 | 11,640 |
| Louisiana | 16,291 | 14,818 | 14,818 | 9,312 | 9,312 |
| Maryland | 2,397 | 1,266 | 1,266 | 1,187 | 1,187 |
| Michigan | 14,384 | 12,290 | 9,975 | 10,718 | 10,718 |
| Minnesota | | | | 3,921 | 3,921 |
| Mississippi | | | 6,315 | 5,024 | 4,400 |
| Missouri | | | 15,780 | 11,857 | 11,857 |
| Nevada | | | | 2,280 | 2,372 |
| New Jersey | 1,565 | 1,253 | 1,253 | 799 | 799 |
| New York | 4,079 | 3,416 | 3,421 | 3,763 | 3,763 |
| Ohio | 13,481 | 9,773 | 9,773 | 8,369 | 8,369 |
| Oklahoma | | | 11,641 | 10,265 | 9,573 |
| Pennsylvania | 12,071 | 8,373 | 8,373 | 8,855 | 8,855 |
| Tennessee | | | 7,736 | 4,234 | 4,234 |
| Texas | | | 52,301 | 38,284 | 38,284 |
| Utah | | | | 14,981 | 15,146 |
| Virginia | 6,331 | 3,897 | 3,980 | 3,090 | 2,814 |
| West Virginia | 15,062 | 12,884 | 12,884 | 12,478 | 12,478 |
| Wisconsin | | | 7,915 | 5,963 | 5,057 |
| Wyoming | | | | 9,125 | 8,573 |

(ii) For the control period in 2023, the State NO$_X$ Ozone Season Group 3 trading budget for each State shall be calculated as the sum of the following prorated amounts, rounded to the nearest allowance:

(A) The product of the non-prorated trading budget for the portion of the 2023 control period before [EFFECTIVE DATE OF FINAL RULE] shown for the State in Table 1 to paragraph (a)(1)(i) of this section (or zero if Table 1 shows no amount for such portion of the 2023 control period for the State) multiplied by a fraction whose numerator is the number of days from May 1, 2023 through the day before [EFFECTIVE DATE OF FINAL RULE], inclusive, and whose denominator is 153; and

(B) The product of the non-prorated trading budget for the portion of the 2023 control period on and after [EFFECTIVE DATE OF FINAL RULE] shown for the State in Table 1 to paragraph (a)(1)(i) of this section multiplied by a fraction whose numerator is the number of days from [EFFECTIVE DATE OF FINAL RULE] through September 30, 2023, inclusive, and whose denominator is 153.

(2) The State NO$_X$ Ozone Season Group 3 trading budget for each State and each control period in 2025 and thereafter shall be the amount provided for the State and control period in the applicable notice of data availability issued under paragraph (a)(3)(v)(C) of this section.

(3) The Administrator will calculate the State NO$_X$ Ozone Season Group 3 trading budget for each State and each control period in 2025 and thereafter in the year before the year of the control period as follows:

(i) The State's trading budget for the control period shall be calculated as the sum (converted to tons at a conversion factor of 2,000 lb/ton and rounded to the nearest ton), for all units identified for inclusion in the calculation under paragraph (a)(3)(ii) of this section, of the product for each such unit of the NO$_X$ emissions rate in lb/mmBtu identified for the unit under paragraph (a)(3)(iii) of this section multiplied by the heat input in mmBtu identified for the unit under paragraph (a)(3)(iv) of this section.

(ii) A unit in a State (and Indian country within the borders of the State) shall be included in the calculation of the State's trading budget for a control period if:

(A) The unit was included in the calculation of the State's trading budget for the immediately preceding control period; or

(B) The unit's deadline for certification of monitoring systems under § 97.1030(b) is on or before May 1 of the year two years before the year of the control period (*e.g.*, May 1, 2023 for calculation of the trading budget for the control period in 2025);

(C) Provided that a unit shall not be included in the calculation of a State's trading budget for a control period if, before completing such calculation, the Administrator determines that the unit is not actually a CSAPR NO$_X$ Ozone Season Group 3 unit.

(iii) For each unit included in the calculation of the State's trading budget for a control period, the NO$_X$ emissions rate in lb/mmBtu used in the calculation shall be identified as follows:

(A) For a unit listed in the table entitled "Dynamic Budget 2023 Template" and "Dynamic Budget 2026+ Template" posted at *www.regulations.gov* with docket identification number EPA–HQ–OAR–2021–0668–[XXXX], the NO$_X$ emissions rate used in the calculation for the control period shall be the NO$_X$ emissions rate shown for the unit and control period in the tables.

(B) For a unit not listed in the table referenced in paragraph (a)(3)(iii)(A) of this section, the $NO_X$ emissions rate used in the calculation for the control period shall be identified according to the type of unit and the type of fuel combusted by the unit during the control period beginning May 1 on or immediately after the unit's deadline for certification of monitoring systems under § 97.1030(b) as follows:

(1) 0.012 lb/mmBtu, for a combined cycle combustion turbine other than an integrated coal gasification combined cycle unit;

(2) 0.030 lb/mmBtu, for a simple cycle combustion turbine or a boiler combusting only fuel oil or gaseous fuel (other than coal-derived fuel) during such control period; or

(3) 0.050 lb/mmBtu, for a boiler combusting any amount of coal or coal-derived fuel during such control period or any other unit not covered by paragraph (a)(3)(iii)(B)(1) or (2) of this section.

(iv) For each unit included in the calculation of the State's trading budget for a control period, the heat input in mmBtu used in the calculation shall be identified as follows:

(A) Except as provided in paragraph (a)(3)(iv)(B) of this section, the heat input used in the calculation for the control period shall be the heat input reported for the unit for the control period in the year two years before the year of the control period (e.g., heat input reported for the control period in 2023 shall be used in calculating the trading budget for the control period in 2025).

(B) If no heat input data were reported for the unit for the control period in the year two years before the year of the control period and the heat input used for the unit in calculating the State's trading budget for the control period in 2024 was an estimate rather than the unit's actual reported heat input for the control period in 2021 or an earlier year, the same estimated heat input used in calculating the State's trading budget for the control period in 2024 shall be used in the calculations of the State's trading budgets for the control periods in 2025 and 2026.

(v)(A) By March 1, 2024 and March 1 of each year thereafter, the Administrator will calculate the State CSAPR $NO_X$ Ozone Season Group 3 trading budget for each State, in accordance with paragraph (a)(3)(i) through (iv) of this section and §§ 97.1006(b)(2) and 97.1030 through 97.1035, for the control period in the year after the year of the applicable calculation deadline under this paragraph and will promulgate a notice of data availability of the results of the calculations.

(B) For each notice of data availability required in paragraph (a)(3)(v)(A) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice. Objections shall be submitted by the deadline specified in such notice and shall be limited to addressing whether the calculations (including the identification of the units included in the calculations) are in accordance with the provisions referenced in paragraph (a)(3)(v)(A) of this section.

(C) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (a)(3)(v)(A) of this section. By May 1 immediately after the promulgation of each notice of data availability required in paragraph (a)(3)(v)(A) of this section, the Administrator will promulgate a notice of data availability of the results of the calculations incorporating any adjustments that the Administrator determines to be necessary and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (a)(3)(v)(B) of this section.

(b) *New unit set-asides.* (1) The States' new unit set-asides for allocations of CSAPR $NO_X$ Ozone Season Group 3 allowances for the control periods in 2021, 2022, 2023, and 2024 are as indicated in Table 2 to this paragraph:

TABLE 2 TO PARAGRAPH (b)(1)—NEW UNIT SET-ASIDES BY CONTROL PERIOD

[Tons]

| State | 2021 | 2022 | 2023 | 2024 |
|-------|-----:|-----:|-----:|-----:|
| Alabama | ............ | ............ | 191 | 189 |
| Arkansas | ............ | ............ | 178 | 178 |
| Delaware | ............ | ............ | 54 | 61 |
| Illinois | 265 | 265 | 368 | 373 |
| Indiana | 262 | 254 | 223 | 188 |
| Kentucky | 309 | 283 | 233 | 233 |
| Louisiana | 430 | 430 | 186 | 186 |
| Maryland | 135 | 115 | 24 | 24 |
| Michigan | 500 | 482 | 429 | 429 |
| Minnesota | ............ | ............ | 78 | 78 |
| Mississippi | ............ | ............ | 100 | 88 |
| Missouri | ............ | ............ | 237 | 237 |
| Nevada | ............ | ............ | 137 | 142 |
| New Jersey | 27 | 27 | 16 | 16 |
| New York | 168 | 168 | 188 | 188 |
| Ohio | 291 | 290 | 418 | 418 |
| Oklahoma | ............ | ............ | 205 | 191 |
| Pennsylvania | 335 | 339 | 266 | 266 |
| Tennessee | ............ | ............ | 85 | 85 |
| Texas | ............ | ............ | 766 | 766 |
| Utah | ............ | ............ | 449 | 454 |
| Virginia | 185 | 161 | 155 | 141 |
| West Virginia | 266 | 261 | 250 | 250 |
| Wisconsin | ............ | ............ | 119 | 101 |
| Wyoming | ............ | ............ | 274 | 257 |

(2) The new unit set-aside for allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for each State for each control period in 2025 and thereafter shall be calculated as the product (rounded to the nearest allowance) of the State NO$_X$ Ozone Season Group 3 trading budget determined for the State and control period under paragraph (a)(2) of this section multiplied by 0.02.

(c) *Indian country new unit set-asides for the control periods in 2021 and 2022.* The States' Indian country new unit set-asides for allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control periods in 2021 and 2022 are as indicated in Table 3 to this paragraph:

TABLE 3 TO PARAGRAPH (c)—INDIAN COUNTRY NEW UNIT SET-ASIDES BY CONTROL PERIOD

[Tons]

| State | 2021 | 2022 |
|---|---|---|
| Alabama | | |
| Arkansas | | |
| Delaware | | |
| Illinois | | |
| Indiana | | |
| Kentucky | | |
| Louisiana | 15 | 15 |
| Maryland | | |
| Michigan | 13 | 12 |
| Minnesota | | |
| Mississippi | | |
| Missouri | | |
| Nevada | | |
| New Jersey | | |
| New York | 3 | 3 |
| Ohio | | |
| Oklahoma | | |
| Pennsylvania | | |
| Tennessee | | |
| Texas | | |
| Utah | | |
| Virginia | | |
| West Virginia | | |
| Wisconsin | | |
| Wyoming | | |

(d) *Indian country existing unit set-asides for the control periods in 2023 and thereafter.* The Indian country existing unit set-aside for allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for each State for each control period in 2023 and thereafter shall be calculated as the sum of all allowance allocations to units in areas of Indian country within the borders of the State not subject to the State's SIP authority as provided in the applicable notice of data availability for the control period referenced in § 97.1011(a)(2).

(e) *Variability limits.* (1) The variability limit for the State NO$_X$ Ozone Season Group 3 trading budget for each State for each control period from 2021 through 2024 shall be calculated as the product (rounded to the nearest ton) of the State NO$_X$ Ozone Season Group 3 trading budget determined for the State and control period in accordance with paragraph (a)(1) of this section multiplied by 0.21.

(2) The variability limit for the State NO$_X$ Ozone Season Group 3 trading budget for each State for each control period in 2025 and thereafter shall be calculated as the product (rounded to the nearest ton) of the State NO$_X$ Ozone Season Group 3 trading budget determined for the State and control period in accordance with paragraph (a)(2) of this section multiplied by the greater of:

(i) 0.21; or

(ii) Any excess over 1.00 of the quotient (rounded to two decimal places) of the total heat input reported for the control period for all CSAPR NO$_X$ Ozone Season Group 3 units in the State and Indian country within the borders of the State divided by the total heat input used in the calculation of the State's trading budget for the control period under paragraph (a)(3) of this section.

(f) *Relationship of trading budgets, set-asides, and variability limits.* Each State NO$_X$ Ozone Season Group 3 trading budget in this section includes any tons in a new unit set-aside, Indian country new unit set-aside, or Indian country existing unit set-aside but does not include any tons in a variability limit.

■ 74. Amend § 97.1011 by revising the section heading and paragraphs (a), (b), and (c)(1) and (5) to read as follows:

**§ 97.1011   CSAPR NO$_X$ Ozone Season Group 3 allowance allocations to existing units.**

(a) *Allocations to existing units in general.* (1) For the control periods in 2021 and each year thereafter, CSAPR NO$_X$ Ozone Season Group 3 allowances will be allocated to units in each State and areas of Indian country within the borders of the State subject to the State's SIP authority as provided in notices of data availability issued by the Administrator. Starting with the control period in 2025, the notices of data availability will be the notices issued under paragraph (b)(10)(iii) of this section.

(2) For the control periods in 2023 and each year thereafter, CSAPR NO$_X$ Ozone Season Group 3 allowances will be allocated to units in areas of Indian country within the borders of each State not subject to the State's SIP authority as provided in notices of data availability issued by the Administrator. Starting with the control period in 2025, the notices of data availability will be the notices issued under paragraph (b)(10)(iii) of this section.

(3) Providing an allocation to a unit in a notice of data availability does not constitute a determination that the unit is a CSAPR NO$_X$ Ozone Season Group 3 unit, and not providing an allocation to a unit in such notice does not constitute a determination that the unit is not a CSAPR NO$_X$ Ozone Season Group 3 unit.

(b) *Calculation of default allocations to existing units for control periods in 2025 and thereafter.* For each control period in 2025 and thereafter, and for the CSAPR NO$_X$ Ozone Season Group 3 units in each State and areas of Indian country within the borders of the State, the Administrator will calculate default allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances to the CSAPR NO$_X$ Ozone Season Group 3 units as follows:

(1) For each State and control period, the total amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for which default allocations will be calculated will be the remainder of the State NO$_X$ Ozone Season Group 3 trading budget for the control period under § 97.1010(a)(2) minus the new unit set-aside for the control period under § 97.1010(b)(2).

(2) A default allocation of CSAPR NO$_X$ Ozone Season Group 3 allowances will be calculated for a CSAPR NO$_X$ Ozone Season Group 3 unit in the State and Indian country within the borders of the State for a control period if:

(i) The unit meets the conditions under § 97.1010(a)(3)(ii) to be included in the calculation of the State's trading budget for the control period; and

(ii) The unit reported heat input greater than zero for the control period in the year two years before the year of the control period.

(3) For each CSAPR NO$_X$ Ozone Season Group 3 unit for which a default allocation is being calculated for a control period, the Administrator will determine the following amounts for the five-year historical period ending with the year two years before the year of the control period for which default allocations are being calculated:

(i) The total heat input reported for the unit in accordance with part 75 of this chapter for the control period in each year of the five-year historical period;

(ii) The average of the three highest of the total heat input values determined for the unit under paragraph (b)(3)(i) of this section or, if fewer than three non-zero values were determined for the unit, the average of all such non-zero heat input values;

(iii) The total $NO_X$ emissions reported for the unit in accordance with part 75 of this chapter for the control period in each year of the five-year historical period; and

(iv) The maximum of the total $NO_X$ emissions values determined for the unit under paragraph (b)(3)(iii) of this section.

(4) The Administrator will calculate the initial unrounded default allocations for each CSAPR $NO_X$ Ozone Season Group 3 unit according to the procedure in paragraph (b)(5) of this section and will recalculate the unrounded default allocations according to the procedures in paragraph (b)(6) or (7) of this section, as applicable, iterating the recalculations as necessary until the total of the unrounded default allocations to all eligible units equals the amount of allowances determined for the State under paragraph (b)(1) of this section.

(5) The Administrator will calculate the initial unrounded default allocations to CSAPR $NO_X$ Ozone Season Group 3 units as follows:

(i) The Administrator will calculate the sum, for all units determined under paragraph (b)(2) of this section to be eligible to receive a default allocation, of the units' average heat input determined under paragraph (b)(3)(ii) of this section.

(ii) For each unit determined under paragraph (b)(2) of this section to be eligible to receive a default allocation, the Administrator will calculate the unit's unrounded default allocation as the lesser of:

(A) The product of the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section multiplied by a fraction whose numerator is the unit's average heat input determined under paragraph (b)(3)(ii) of this section and whose denominator is the sum determined under paragraph (b)(5)(i) of this section; and

(B) The unit's maximum total $NO_X$ emissions determined under paragraph (b)(3)(iv) of this section.

(iii) If the sum of the unrounded default allocations determined under paragraph (b)(5)(ii) of this section is less than the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section, the Administrator will follow the procedures in paragraph (b)(6) or (7) of this section, as applicable.

(iv) If the sum of the unrounded default allocations determined under paragraph (b)(5)(ii) of this section equals the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section, the Administrator will

determine the rounded default allocations according to the procedures in paragraphs (b)(8) and (9) of this section.

(6) If the unrounded default allocation determined in the previous round of the calculation procedure for at least one CSAPR $NO_X$ Ozone Season Group 3 unit is less than the unit's maximum total $NO_X$ emissions determined under paragraph (b)(3)(iv) of this section, the Administrator will recalculate the unrounded default allocations as follows:

(i) The Administrator will calculate the additional pool of allowances to be allocated as the remainder of the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section minus the sum of the unrounded default allocations from the previous round of the calculation procedure for all units determined under paragraph (b)(2) of this section to be eligible to receive a default allocation.

(ii) The Administrator will calculate the sum, for all units whose unrounded default allocations determined in the previous round of the calculation procedure were less than the respective units' maximum total $NO_X$ emissions determined under paragraph (b)(3)(iv) of this section, of the units' average heat input determined under paragraph (b)(3)(ii) of this section.

(iii) For each unit whose unrounded default allocation determined in the previous round of the calculation was less than the unit's maximum total $NO_X$ emissions determined under paragraph (b)(3)(iv) of this section, the Administrator will recalculate the unit's unrounded default allocation, before rounding, as the lesser of:

(A) The sum of the unit's unrounded default allocation determined in the previous round of the calculation procedure plus the product of the additional pool of allowances determined under paragraph (b)(6)(i) of this section multiplied by a fraction whose numerator is the unit's average heat input determined under paragraph (b)(3)(ii) of this section and whose denominator is the sum determined under paragraph (b)(6)(ii) of this section; and

(B) The unit's maximum total $NO_X$ emissions determined under paragraph (b)(3)(iv) of this section.

(iv) Except as provided in paragraph (b)(6)(iii) of this section, a unit's unrounded default allocation shall equal the amount determined in the previous round of the calculation procedure.

(v) If the sum of the unrounded default allocations determined under

paragraphs (b)(6)(iii) and (iv) of this section is less than the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section, the Administrator will iterate the procedures in paragraph (b)(6) of this section or follow the procedures in paragraph (b)(7) of this section, as applicable.

(vi) If the sum of the unrounded default allocations determined under paragraphs (b)(6)(iii) and (iv) of this section equals the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section, the Administrator will determine the rounded default allocations according to the procedures in paragraphs (b)(8) and (9) of this section.

(7) If the unrounded default allocation determined in the previous round of the calculation procedure for every CSAPR $NO_X$ Ozone Season Group 3 unit equals the unit's maximum total $NO_X$ emissions determined under paragraph (b)(3)(iv) of this section, the Administrator will recalculate the unrounded default allocations as follows:

(i) The Administrator will calculate the additional pool of allowances to be allocated as the remainder of the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section minus the sum of the unrounded default allocations from the previous round for all units determined under paragraph (b)(2) of this section to be eligible to receive a default allocation.

(ii) The Administrator will recalculate the unrounded default allocation for each eligible unit as the sum of:

(A) The unit's unrounded default allocation as determined in the previous round of the calculation procedure; plus

(B) The product of the additional pool of allowances determined under paragraph (b)(7)(i) of this section multiplied by a fraction whose numerator is the unit's average heat input determined under paragraph (b)(3)(ii) of this section and whose denominator is the sum determined under paragraph (b)(5)(i) of this section.

(8) The Administrator will round the default allocation for each eligible unit determined under paragraph (b)(5), (6), or (7) of this section to the nearest allowance and make any adjustments required under paragraph (b)(9) of this section.

(9) If the sum of the default allocations after rounding under paragraph (b)(8) of this section does not equal the total amount of allowances determined for the State and control period under paragraph (b)(1) of this

section, the Administrator will adjust the default allocations as follows. The Administrator will list the CSAPR NO$_X$ Ozone Season Group 3 units in descending order based on such units' allocation amounts under paragraph (b)(8) of this section and, in cases of equal allocation amounts, in alphabetical order of the relevant sources' names and numerical order of the relevant units' identification numbers, and will adjust each unit's allocation amount upward or downward by one CSAPR NO$_X$ Ozone Season Group 3 allowance (but not below zero) in the order in which the units are listed, and will repeat this adjustment process as necessary, until the total of the adjusted default allocations equals the total amount of allowances determined for the State and control period under paragraph (b)(1) of this section.

(10)(i) By March 1, 2024 and March 1 of each year thereafter, the Administrator will calculate the default allocation of CSAPR NO$_X$ Ozone Season Group 3 allowances to each CSAPR NO$_X$ Ozone Season Group 3 unit in a State and Indian country within the borders of the State, in accordance with paragraphs (b)(1) through (9) of this section and §§ 97.1006(b)(2) and 97.1030 through 97.1035, for the control period in the year after the year of the applicable calculation deadline under this paragraph and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (b)(10)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice. Objections shall be submitted by the deadline specified in such notice of data availability and shall be limited to addressing whether the calculations (including the identification of the CSAPR NO$_X$ Ozone Season Group 3 units) are in accordance with the provisions referenced in paragraph (b)(10)(i) of this section.

(iii) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(10)(i) of this section. By May 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(10)(i) of this section, the Administrator will promulgate a notice of data availability of the results of the calculations incorporating any adjustments that the Administrator determines to be necessary and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(10)(ii) of this section.

(c) *Incorrect allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances to existing units.* (1) For each control period in 2021 and thereafter, if the Administrator determines that CSAPR NO$_X$ Ozone Season Group 3 allowances were allocated for the control period to a recipient covered by the provisions of paragraph (c)(1)(i), (ii), or (iii) of this section, then the Administrator will notify the designated representative of the recipient and will act in accordance with the procedures set forth in paragraphs (c)(2) through (5) of this section:

(i) The recipient is not actually a CSAPR NO$_X$ Ozone Season Group 3 unit under § 97.1004 as of the first day of the control period and is allocated CSAPR NO$_X$ Ozone Season Group 3 allowances for such control period under paragraph (a)(1) or (2) of this section;

(ii) The recipient is not actually a CSAPR NO$_X$ Ozone Season Group 3 unit under § 97.1004 as of the first day of the control period and is allocated CSAPR NO$_X$ Ozone Season Group 3 allowances for such control period under a provision of a SIP revision approved under § 52.38(b)(10), (11), or (12) of this chapter that the SIP revision provides should be allocated only to recipients that are CSAPR NO$_X$ Ozone Season Group 3 units as of the first day of such control period; or

(iii) The recipient is not located as of the first day of the control period in the State (and Indian country within the borders of the State) from whose NO$_X$ Ozone Season Group 3 trading budget the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated under paragraph (a)(1) or (2) of this section, or under a provision of a SIP revision approved under § 52.38(b)(10), (11), or (12) of this chapter, were allocated for such control period.

\*        \*        \*        \*        \*

(5) With regard to any CSAPR NO$_X$ Ozone Season Group 3 allowances that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section:

(i) If the non-recordation decision under paragraph (c)(2) of this section or the deduction under paragraph (c)(3) of this section occurs on or before May 1, 2024, the Administrator will transfer the CSAPR NO$_X$ Ozone Season Group 3 allowances to the new unit set-aside for 2021, 2022, or 2023 for the State from whose NO$_X$ Ozone Season Group 3 trading budget the CSAPR NO$_X$ Ozone Season Group 3 allowances were allocated.

(ii) If the non-recordation decision under paragraph (c)(2) of this section or

the deduction under paragraph (c)(3) of this section occurs after May 1, 2024 and on or before May 1 of the year following the year of the control period for which the CSAPR NO$_X$ Ozone Season Group 3 allowances were allocated, the Administrator will transfer the CSAPR NO$_X$ Ozone Season Group 3 allowances to the new unit set-aside for such control period for the State from whose NO$_X$ Ozone Season Group 3 trading budget the CSAPR NO$_X$ Ozone Season Group 3 allowances were allocated.

(iii) If the non-recordation decision under paragraph (c)(2) of this section or the deduction under paragraph (c)(3) of this section occurs after May 1, 2024 and after May 1 of the year following the year of the control period for which the CSAPR NO$_X$ Ozone Season Group 3 allowances were allocated, the Administrator will transfer the CSAPR NO$_X$ Ozone Season Group 3 allowances to a surrender account.

■ 75. Amend § 97.1012 by:

■ a. Revising paragraphs (a) introductory text and (a)(1)(i) and (ii);

■ b. Removing paragraphs (a)(1)(iii) and (iv);

■ c. Revising paragraphs (a)(2) and (a)(3)(i);

■ d. In paragraph (a)(3)(ii), adding "and" after the semicolon;

■ e. Revising paragraph (a)(3)(iii);

■ f. Removing paragraph (a)(3)(iv);

■ g. Revising paragraphs (a)(5) and (10):

■ h. In paragraph (a)(11), removing "§ 97.1011(b)(1)(i), (ii), and (v), of" and adding in its place "paragraph (a)(13) of this section, of";

■ i. Adding paragraph (a)(13);

■ j. Revising paragraphs (b) introductory text and (b)(1) and (2);

■ k. In paragraph (b)(5), removing "Indian country within the borders of the State" and adding in its place "areas of Indian country within the borders of the State not subject to the State's SIP authority";

■ l. Revising paragraph (b)(10);

■ m. In paragraph (b)(11), removing "§ 97.1011(b)(2)(i), (ii), and (v), of" and adding in its place "paragraph (b)(13) of this section, of"; and

■ n. Adding paragraphs (b)(13) and (c).

The revisions and additions read as follows:

### § 97.1012  CSAPR NO$_X$ Ozone Season Group 3 allowance allocations to new units.

(a) *Allocations from new unit set-asides.* For each control period in 2021 and thereafter for a State listed in § 52.38(b)(2)(iii)(A) of this chapter, or 2023 and thereafter for a State listed in § 52.38(b)(2)(iii)(B) or (C) of this chapter, and for the CSAPR NO$_X$ Ozone Season Group 3 units in each State and areas of

Indian country within the borders of the State (except, for the control periods in 2021 and 2022, areas of Indian country within the borders of the State not subject to the State's SIP authority), the Administrator will allocate CSAPR $NO_X$ Ozone Season Group 3 allowances to the CSAPR $NO_X$ Ozone Season Group 3 units as follows:

(1) * * *

(i) CSAPR $NO_X$ Ozone Season Group 3 units that are not allocated an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances for such control period in the applicable notice of data availability referenced in § 97.1011(a)(1) or (2) and that have deadlines for certification of monitoring systems under § 97.1030(b) not later than September 30 of the year of the control period; or

(ii) CSAPR $NO_X$ Ozone Season Group 3 units whose allocation of an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances for such control period in the applicable notice of data availability referenced in § 97.1011(a)(1) or (2) is covered by § 97.1011(c)(2) or (3).

(2) The Administrator will establish a separate new unit set-aside for the State for each such control period. Each such new unit set-aside will be allocated CSAPR $NO_X$ Ozone Season Group 3 allowances in an amount equal to the applicable amount of tons of $NO_X$ emissions as set forth in § 97.1010(b) and will be allocated additional CSAPR $NO_X$ Ozone Season Group 3 allowances (if any) in accordance with § 97.1011(c)(5) and paragraphs (b)(10) and (c)(5) of this section.

(3) * * *

(i) The control period in 2021, for a State listed in § 52.38(b)(2)(iii)(A) of this chapter, or the control period in 2023, for a State listed in § 52.38(b)(2)(iii)(B) or (C) of this chapter;

* * * * *

(iii) For a unit described in paragraph (a)(1)(ii) of this section, the first control period in which the CSAPR $NO_X$ Ozone Season Group 3 unit operates in the State and Indian country within the borders of the State (except, for the control periods in 2021 and 2022, areas of Indian country within the borders of the State not subject to the State's SIP authority) after operating in another jurisdiction and for which the unit is not already allocated one or more CSAPR $NO_X$ Ozone Season Group 3 allowances.

* * * * *

(5) The Administrator will calculate the sum of the allocation amounts of CSAPR $NO_X$ Ozone Season Group 3 allowances determined for all such CSAPR $NO_X$ Ozone Season Group 3 units under paragraph (a)(4)(i) of this section in the State and Indian country within the borders of the State (except, for the control periods in 2021 and 2022, areas of Indian country within the borders of the State not subject to the State's SIP authority) for such control period.

* * * * *

(10)(i) For a control period in 2021 or 2022, if, after completion of the procedures under paragraphs (a)(2) through (7) and (12) of this section for a control period, any unallocated CSAPR $NO_X$ Ozone Season Group 3 allowances remain in the new unit set-aside for the State for such control period, the Administrator will allocate to each CSAPR $NO_X$ Ozone Season Group 3 unit that is in the State and areas of Indian country within the borders of the State subject to the State's SIP authority and is allocated an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances for the control period in the applicable notice of data availability referenced in § 97.1011(a)(1) an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances equal to the following: The total amount of such remaining unallocated CSAPR $NO_X$ Ozone Season Group 3 allowances in such new unit set-aside, multiplied by the unit's allocation under § 97.1011(a)(1) for such control period, divided by the remainder of the amount of tons in the applicable State $NO_X$ Ozone Season Group 3 trading budget minus the sum of the amounts of tons in such new unit set-aside and the Indian country new unit set-aside for the State for such control period, and rounded to the nearest allowance.

(ii) For a control period in 2023 or thereafter, if, after completion of the procedures under paragraphs (a)(2) through (7) and (12) of this section for a control period, any unallocated CSAPR $NO_X$ Ozone Season Group 3 allowances remain in the new unit set-aside for the State for such control period, the Administrator will allocate to each CSAPR $NO_X$ Ozone Season Group 3 unit that is in the State and Indian country within the borders of the State and is allocated an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances for the control period by the Administrator in the applicable notice of data availability referenced in § 97.1011(a)(1) or (2), or under a provision of a SIP revision approved under § 52.38(b)(10), (11), or (12) of this chapter, an amount of CSAPR $NO_X$ Ozone Season Group 3 allowances equal to the following: The total amount of such remaining unallocated CSAPR $NO_X$ Ozone Season Group 3 allowances in such new unit set-aside, multiplied by the unit's allocation under § 97.1011(a)(1) or (2) or a provision of a SIP revision approved under § 52.38(b)(10), (11), or (12) of this chapter for such control period, divided by the remainder of the amount of tons in the applicable State $NO_X$ Ozone Season Group 3 trading budget minus the amount of tons in such new unit set-aside for the State for such control period, and rounded to the nearest allowance.

* * * * *

(13)(i) By March 1, 2022 and March 1 of each year thereafter, the Administrator will calculate the CSAPR $NO_X$ Ozone Season Group 3 allowance allocation to each CSAPR $NO_X$ Ozone Season Group 3 unit in a State and Indian country within the borders of the State (except, for the control periods in 2021 and 2022, areas of Indian country within the State not subject to the State's SIP authority), in accordance with paragraphs (a)(2) through (7), (10), and (12) of this section and §§ 97.1006(b)(2) and 97.1030 through 97.1035, for the control period in the year before the year of the applicable calculation deadline under this paragraph and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (a)(13)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice. Objections shall be submitted by the deadline specified in such notice and shall be limited to addressing whether the calculations (including the identification of the CSAPR $NO_X$ Ozone Season Group 3 units) are in accordance with the provisions referenced in paragraph (a)(13)(i) of this section.

(iii) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (a)(13)(i) of this section. By May 1 immediately after the promulgation of each notice of data availability required in paragraph (a)(13)(i) of this section, the Administrator will promulgate a notice of data availability of the results of the calculations incorporating any adjustments that the Administrator determines to be necessary and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (a)(13)(ii) of this section.

(b) *Allocations from Indian country new unit set-asides.* For the control periods in 2021 and 2022, for a State listed in § 52.38(b)(2)(iii)(A) of this chapter, and for the CSAPR $NO_X$ Ozone

Season Group 3 units in areas of Indian country within the borders of each such State not subject to the State's SIP authority, the Administrator will allocate CSAPR NO$_X$ Ozone Season Group 3 allowances to the CSAPR NO$_X$ Ozone Season Group 3 units as follows:

(1) The CSAPR NO$_X$ Ozone Season Group 3 allowances will be allocated to CSAPR NO$_X$ Ozone Season Group 3 units that are not allocated an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for such control period in the applicable notice of data availability issued under § 97.1011(a)(1) and that have deadlines for certification of monitoring systems under § 97.1030(b) not later than September 30 of the year of the control period, except as provided in paragraph (b)(10) of this section.

(2) The Administrator will establish a separate Indian country new unit set-aside for the State for each such control period. Each such Indian country new unit set-aside will be allocated CSAPR NO$_X$ Ozone Season Group 3 allowances in an amount equal to the applicable amount of tons of NO$_X$ emissions as set forth in § 97.1010(c) and will be allocated additional CSAPR NO$_X$ Ozone Season Group 3 allowances (if any) in accordance with paragraph (c)(5) of this section.

\*      \*      \*      \*      \*

(10) If, after completion of the procedures under paragraphs (b)(2) through (7) and (12) of this section for a control period, any unallocated CSAPR NO$_X$ Ozone Season Group 3 allowances remain in the Indian country new unit set-aside for the State for such control period, the Administrator will transfer such unallocated CSAPR NO$_X$ Ozone Season Group 3 allowances to the new unit set-aside for the State for such control period.

\*      \*      \*      \*      \*

(13)(i) By March 1, 2022 and March 1, 2023, the Administrator will calculate the CSAPR NO$_X$ Ozone Season Group 3 allowance allocation to each CSAPR NO$_X$ Ozone Season Group 3 unit in areas of Indian country within the borders of a State not subject to the State's SIP authority, in accordance with paragraphs (b)(2) through (7), (10), and (12) of this section and §§ 97.1006(b)(2) and 97.1030 through 97.1035, for the control period in the year before the year of the applicable calculation deadline under this paragraph and will promulgate a notice of data availability of the results of the calculations.

(ii) For each notice of data availability required in paragraph (b)(13)(i) of this section, the Administrator will provide an opportunity for submission of objections to the calculations referenced in such notice. Objections shall be submitted by the deadline specified in such notice and shall be limited to addressing whether the calculations (including the identification of the CSAPR NO$_X$ Ozone Season Group 3 units) are in accordance with the provisions referenced in paragraph (b)(13)(i) of this section.

(iii) The Administrator will adjust the calculations to the extent necessary to ensure that they are in accordance with the provisions referenced in paragraph (b)(13)(i) of this section. By May 1 immediately after the promulgation of each notice of data availability required in paragraph (b)(13)(i) of this section, the Administrator will promulgate a notice of data availability of the results of the calculations incorporating any adjustments that the Administrator determines to be necessary and the reasons for accepting or rejecting any objections submitted in accordance with paragraph (b)(13)(ii) of this section.

(c) *Incorrect allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances to new units.* (1) For each control period in 2021 and thereafter, if the Administrator determines that CSAPR NO$_X$ Ozone Season Group 3 allowances were allocated for the control period under paragraphs (a)(2) through (7) and (12) of this section or paragraphs (b)(2) through (7) and (12) of this section to a recipient that is not actually a CSAPR NO$_X$ Ozone Season Group 3 unit under § 97.1004 as of the first day of such control period, then the Administrator will notify the designated representative of the recipient and will act in accordance with the procedures set forth in paragraphs (c)(2) through (5) of this section.

(2) Except as provided in paragraph (c)(3) or (4) of this section, the Administrator will not record such CSAPR NO$_X$ Ozone Season Group 3 allowances under § 97.1021.

(3) If the Administrator already recorded such CSAPR NO$_X$ Ozone Season Group 3 allowances under § 97.1021 and if the Administrator makes the determination under paragraph (c)(1) of this section before making deductions for the source that includes such recipient under § 97.1024(b) for such control period, then the Administrator will deduct from the account in which such CSAPR NO$_X$ Ozone Season Group 3 allowances were recorded an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances allocated for the same or a prior control period equal to the amount of such already recorded CSAPR NO$_X$ Ozone Season Group 3 allowances. The authorized account representative shall ensure that there are sufficient CSAPR NO$_X$ Ozone Season Group 3 allowances in such account for completion of the deduction.

(4) If the Administrator already recorded such CSAPR NO$_X$ Ozone Season Group 3 allowances under § 97.1021 and if the Administrator makes the determination under paragraph (c)(1) of this section after making deductions for the source that includes such recipient under § 97.1024(b) for such control period, then the Administrator will not make any deduction to take account of such already recorded CSAPR NO$_X$ Ozone Season Group 3 allowances.

(5) With regard to any CSAPR NO$_X$ Ozone Season Group 3 allowances that are not recorded, or that are deducted as an incorrect allocation, in accordance with paragraphs (c)(2) and (3) of this section:

(i) If the non-recordation decision under paragraph (c)(2) of this section or the deduction under paragraph (c)(3) of this section occurs on or before May 1, 2023, the Administrator will transfer the CSAPR NO$_X$ Ozone Season Group 3 allowances to the new unit set-aside, in the case of allowances allocated under paragraph (a) of this section, or the Indian country new unit set-aside, in the case of allowances allocated under paragraph (b) of this section, for the control period in 2021 or 2022 for the State from whose NO$_X$ Ozone Season Group 3 trading budget the CSAPR NO$_X$ Ozone Season Group 3 allowances were allocated.

(ii) If the non-recordation decision under paragraph (c)(2) of this section or the deduction under paragraph (c)(3) of this section occurs after May 1, 2023 and on or before May 1, 2024, the Administrator will transfer the CSAPR NO$_X$ Ozone Season Group 3 allowances to the new unit set-aside for the control period in 2023 for the State from whose NO$_X$ Ozone Season Group 3 trading budget the CSAPR NO$_X$ Ozone Season Group 3 allowances were allocated.

(iii) If the non-recordation decision under paragraph (c)(2) of this section or the deduction under paragraph (c)(3) of this section occurs after May 1, 2024, the Administrator will transfer the CSAPR NO$_X$ Ozone Season Group 3 allowances to a surrender account.

■ 76. Amend § 97.1021 by:

■ a. In paragraph (a), removing "§ 97.1011(a)" and adding in its place "§ 97.1011(a)(1)";

■ b. Revising paragraph (b);

■ c. Removing and reserving paragraph (c);

■ d. Revising paragraph (d);

■ e. Adding paragraph (e);

■ f. Revising paragraphs (f) and (g);

■ g. In paragraph (h), removing "May 1 of each year thereafter, the" and adding in its place "May 1, 2023, the";

■ h. Adding paragraphs (i) and (j); and

■ i. In paragraph (m), adding "or (e)" after "§ 97.811(d)" each time it appears.

The revisions and addition read as follows:

### § 97.1021  Recordation of CSAPR NO$_X$ Ozone Season Group 3 allowance allocations and auction results.

\*    \*    \*    \*    \*

(b) By July 29, 2021, the Administrator will record in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2022.

\*    \*    \*    \*    \*

(d) By [30 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], the Administrator will record in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2023.

(e) By [30 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], the Administrator will record in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2024, unless the State in which the source is located notifies the Administrator in writing by [EFFECTIVE DATE OF FINAL RULE] of the State's intent to submit to the Administrator a complete SIP revision by September 1, 2023 meeting the requirements of § 52.38(b)(10)(i) through (iv) of this chapter.

(1) If, by September 1, 2023 the State does not submit to the Administrator such complete SIP revision, the Administrator will record by September 15, 2023 in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2024.

(2) If the State submits to the Administrator by September 1, 2023 and the Administrator approves by March 1, 2024 such complete SIP revision, the Administrator will record by March 1, 2024 in each CSAPR NO$_X$ Ozone Season

Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source as provided in such approved, complete SIP revision for the control period in 2024.

(3) If the State submits to the Administrator by September 1, 2023 and the Administrator does not approve by March 1, 2024 such complete SIP revision, the Administrator will record by March 1, 2024 in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2024.

(f) By July 1, 2024 and July 1 of each year thereafter, the Administrator will record in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source, or in each appropriate Allowance Management System account the CSAPR NO$_X$ Ozone Season Group 3 allowances auctioned to CSAPR NO$_X$ Ozone Season Group 3 units, in accordance with § 97.1011(a)(1), or with a SIP revision approved under § 52.38(b)(11) or (12) of this chapter, for the control period in the year after the year of the applicable recordation deadline under this paragraph.

(g) By May 1, 2022 and May 1 of each year thereafter, the Administrator will record in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1012(a) for the control period in the year before the year of the applicable recordation deadline under this paragraph.

\*    \*    \*    \*    \*

(i) By [30 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], the Administrator will record in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(2) for the control periods in 2023 and 2024.

(j) By July 1, 2024 and July 1 of each year thereafter, the Administrator will record in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the

CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(2) for the control period in the year after the year of the applicable recordation deadline under this paragraph.

\*    \*    \*    \*    \*

■ 77. Amend § 97.1024 by:

■ a. Revising the section heading;

■ b. In paragraphs (a) introductory text and (b) introductory text, adding "primary" before "emissions limitation";

■ c. Revising paragraph (b)(1);

■ d. Adding paragraph (b)(3); and

■ e. In paragraph (c)(2)(ii), adding "or (e)" after "§ 97.826(d)".

The revisions and addition read as follows:

### § 97.1024  Compliance with CSAPR NO$_X$ Ozone Season Group 3 primary emissions limitation.

\*    \*    \*    \*    \*

(b) \* \* \*

(1) Until the amount of CSAPR NO$_X$ Ozone Season Group 3 allowances deducted equals the sum of:

(i) The number of tons of total NO$_X$ emissions from all CSAPR NO$_X$ Ozone Season Group 3 units at the source for such control period; plus

(ii) Two times the sum (converted to tons at a conversion factor of 2,000 lb/ton and rounded to the nearest ton), for all days in the control period and all CSAPR NO$_X$ Ozone Season Group 3 units at the source to which backstop daily NO$_X$ emissions rates apply for the control period under paragraph (b)(3) of this section, of any amount by which a unit's NO$_X$ emissions for a given day in pounds exceed the product in pounds of the unit's total heat input in mmBtu for that day multiplied by the applicable backstop daily NO$_X$ emissions rate in lb/mmBtu; or

\*    \*    \*    \*    \*

(3) The applicable backstop daily NO$_X$ emissions rates are as follows:

(i) For the control period in 2024 and each year thereafter, a backstop daily NO$_X$ emissions rate of 0.14 lb/mmBtu shall apply to each CSAPR NO$_X$ Ozone Season Group 3 unit combusting any coal during the control period, serving a generator with nameplate capacity of 100 MW or more, and equipped with selective catalytic reduction controls, except a circulating fluidized bed boiler.

(ii) For the control periods in 2027 and each year thereafter, a backstop daily NO$_X$ emissions rate of 0.14 lb/mmBtu shall apply to each CSAPR NO$_X$ Ozone Season Group 3 unit combusting any coal during the control period and serving a generator with nameplate

capacity of 100 MW or more, except a circulating fluidized bed boiler.

\* \* \* \* \*

■ 78. Amend § 97.1025 by revising the section heading and adding paragraph (c) to read as follows:

### § 97.1025 Compliance with CSAPR NOX Ozone Season Group 3 assurance provisions; CSAPR NOX Ozone Season Group 3 secondary emissions limitation.

\* \* \* \* \*

(c) *CSAPR NO$_X$ Ozone Season Group 3 secondary emissions limitation.* (1) The owner or operator of a base CSAPR NO$_X$ Ozone Season Group 3 unit shall not discharge, or allow to be discharged, emissions of NO$_X$ to the atmosphere during a control period in excess of the tonnage amount calculated in accordance with paragraph (c)(2) of this section, provided that the emissions limitation established under this paragraph shall apply to a unit for a control period only if:

(i) The unit is included for the control period in a group of base CSAPR NO$_X$ Ozone Season Group 3 units at base CSAPR NO$_X$ Ozone Season Group 3 sources in a State (and Indian country within the borders of such State) having a common designated representative and the owners and operators of such units and sources are subject to a requirement for such control period to hold one or more CSAPR NO$_X$ Ozone Season Group 3 allowances under § 97.1006(c)(2)(i) and paragraph (b) of this section with respect to such group; and

(ii) The unit was required to report NO$_X$ emissions and heat input data for all or portions of at least 367 operating hours during the control period and all or portions of at least 367 operating hours during at least one previous control period under the CSAPR NO$_X$ Ozone Season Group 1 Trading Program, CSAPR NO$_X$ Ozone Season Group 2 Trading Program, or CSAPR NO$_X$ Ozone Season Group 3 Trading Program.

(2) The amount of the emissions limitation applicable to a base CSAPR NO$_X$ Ozone Season Group 3 unit for a control period under paragraph (c)(1) of this section, in tons of NO$_X$, shall be calculated as the sum of 50 plus the product (converted to tons at a conversion factor of 2,000 lb/ton and rounded to the nearest ton) of multiplying—

(i) The total heat input in mmBtu reported for the unit for the control period in accordance with §§ 97.1030 through 97.1035; and

(ii) A NO$_X$ emission rate of 0.10 lb/mmBtu or, if higher, the product of 1.25 times the lowest seasonal average NO$_X$ emission rate in lb/mmBtu achieved by the unit in any previous control period for which the unit was required to report NO$_X$ emissions and heat input data for all or portions of at least 367 operating hours under the CSAPR NO$_X$ Ozone Season Group 1 Trading Program, CSAPR NO$_X$ Ozone Season Group 2 Trading Program, or CSAPR NO$_X$ Ozone Season Group 3 Trading Program, where the unit's seasonal average NO$_X$ emission rate for each such previous control period shall be calculated from such reported data as the quotient of the unit's total NO$_X$ emissions in tons for the control period divided by the unit's total heat input in mmBtu for the control period, multiplied by a conversion factor of 2,000 lb/ton, and rounded to the nearest 0.0001 lb/mmBtu.

■ 79. Amend § 97.1026 by:

■ a. Revising paragraph (b);

■ b. In paragraph (c), removing "State (or Indian" and adding in its place "State (and Indian"; and

■ c. Adding paragraph (d).

The revision and addition read as follows:

### § 97.1026   Banking.

\* \* \* \* \*

(b) Any CSAPR NO$_X$ Ozone Season Group 3 allowance that is held in a compliance account or a general account will remain in such account unless and until the CSAPR NO$_X$ Ozone Season Group 3 allowance is deducted or transferred under § 97.1011(c), § 97.1012(c), § 97.1023, § 97.1024, § 97.1025, § 97.1027, or § 97.1028 or paragraph (c) or (d) of this section.

\* \* \* \* \*

(d) Before the allowance transfer deadline for each control period in 2024 or a subsequent year, the Administrator will deduct amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances issued for the control periods in previous years exceeding the CSAPR NO$_X$ Ozone Season Group 3 allowance bank ceiling target for the control period in accordance with paragraphs (d)(1) through (4) of this section.

(1) As soon as practicable on or after August 1, 2024 and August 1 of each subsequent year, the Administrator will temporarily suspend acceptance of CSAPR NO$_X$ Ozone Season Group 3 allowance transfers submitted under § 97.1022 and, before resuming acceptance of such transfers, will take the actions in paragraphs (d)(2) through (4) of this section.

(2) The Administrator will determine each of the following values:

(i) The CSAPR NO$_X$ Ozone Season Group 3 allowance bank ceiling target for the control period in the year of the deadline under paragraph (d)(1) of this section, calculated as the product, rounded to the nearest allowance, of 0.105 times the sum for all States listed in § 52.38(b)(2)(iii) of this chapter of the State NO$_X$ Ozone Season Group 3 trading budgets under § 97.1010(a) for such States for such control period.

(ii) The total amount of CSAPR NO$_X$ Ozone Season Group 3 allowances issued for control periods in years before the year of the deadline under paragraph (d)(1) of this section and held in all compliance and general accounts.

(3) If the CSAPR NO$_X$ Ozone Season Group 3 allowance bank ceiling target determined under paragraph (d)(2)(i) of this section is less than the total amount of CSAPR NO$_X$ Ozone Season Group 3 allowances determined under paragraph (d)(2)(ii) of this section, then for each compliance account or general account holding CSAPR NO$_X$ Ozone Season Group 3 allowances issued for control periods in years before the year of the deadline under paragraph (d)(1) of this section, the Administrator will:

(i) Determine the total amount of CSAPR NO$_X$ Ozone Season Group 3 allowances issued for control periods in years before the year of the deadline under paragraph (d)(1) of this section and held in the account.

(ii) Determine the account's share of the CSAPR NO$_X$ Ozone Season Group 3 allowance bank ceiling target for the control period, calculated as the product, rounded up to the nearest allowance, of the CSAPR NO$_X$ Ozone Season Group 3 allowance bank ceiling target determined under paragraph (d)(2)(i) of this section multiplied by a fraction whose numerator is the total amount of CSAPR NO$_X$ Ozone Season Group 3 allowances held in the account determined under paragraph (d)(3)(i) of this section and whose denominator is the total amount of CSAPR NO$_X$ Ozone Season Group 3 allowances held in all compliance and general accounts determined under paragraph (d)(2)(ii) of this section.

(iii) Deduct an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances issued for control periods in years before the year of the deadline under paragraph (d)(1) of this section equal to any positive remainder of the total amount of CSAPR NO$_X$ Ozone Season Group 3 allowances held in the account determined under paragraph (d)(3)(i) of this section minus the account's share of the CSAPR NO$_X$ Ozone Season Group 3 allowance bank ceiling target for the control period determined under paragraph (d)(3)(ii) of this section. The allowances will be deducted on a first-in, first-out basis in the order set forth in § 97.1024(c)(2)(i) and (ii).

(iv) Record the deductions under paragraph (d)(3)(iii) of this section in the account.

(4)(i) In computing any amounts of CSAPR $NO_X$ Ozone Season Group 3 allowances to be deducted from general accounts under paragraph (d)(3) of this section, the Administrator may group multiple general accounts whose ownership interests are held by the same or related persons or entities and treat the group of accounts as a single account for purposes of such computation.

(ii) Following a computation for a group of general accounts in accordance with paragraph (d)(4)(i) of this section, the Administrator will deduct from and record in each individual account in such group a proportional share of the quantity of CSAPR $NO_X$ Ozone Season Group 3 allowances computed for such group, basing such shares on the respective quantities of CSAPR $NO_X$ Ozone Season Group 3 allowances determined for such individual accounts under paragraph (d)(3)(i) of this section.

(iii) In determining the proportional shares under paragraph (d)(4)(ii) of this section, the Administrator may employ any reasonable adjustment methodology to truncate or round each such share up or down to a whole number and to cause the total of such whole numbers to equal the amount of CSAPR $NO_X$ Ozone Season Group 3 allowances computed for such group of accounts in accordance with paragraph (d)(4)(i) of

this section, even where such adjustments cause the numbers of CSAPR $NO_X$ Ozone Season Group 3 allowances remaining in some individual accounts following the deductions to equal zero.

■ 80. Amend § 97.1030 by:
■ a. Revising paragraph (b)(1); and
■ b. In paragraph (b)(3), removing "(b)(2)" and adding in its place "(b)(1) or (2)".

The revision reads as follows:

**§ 97.1030  General monitoring, recordkeeping, and reporting requirements.**

*    *    *    *    *

(b) * * *

(1)(i) May 1, 2021, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(A) of this chapter;

(ii) May 1, 2023, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(B) of this chapter;

(iii) [EFFECTIVE DATE OF FINAL RULE], for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(C) of this chapter, where the unit is required to report $NO_X$ mass emissions data or $NO_X$ emissions rate data according to 40 CFR part 75 to address other regulatory requirements; or

(iv) [180 DAYS AFTER EFFECTIVE DATE OF FINAL RULE] for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(C) of this chapter, where the unit is not required to report

$NO_X$ mass emissions data or $NO_X$ emissions rate data according to 40 CFR part 75 to address other regulatory requirements.

*    *    *    *    *

■ 81. Amend § 97.1034 by:
■ a. Revising paragraph (d)(2)(i); and
■ b. In paragraph (d)(4), removing "or CSAPR $SO_2$ Group 1 Trading Program, quarterly" and adding in its place "CSAPR $SO_2$ Group 1 Trading Program, or CSAPR $SO_2$ Group 2 Trading Program, quarterly".

The revision reads as follows:

**§ 97.1034  Recordkeeping and reporting.**

*    *    *    *    *

(d) * * *

(2) * * *

(i)(A) The calendar quarter covering May 1, 2021 through June 30, 2021, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(A) of this chapter;

(B) The calendar quarter covering May 1, 2023 through June 30, 2023, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(B) of this chapter; or

(C) The calendar quarter covering [EFFECTIVE DATE OF FINAL RULE] through June 30, 2023, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(C) of this chapter;

*    *    *    *    *

[FR Doc. 2022–04551 Filed 3–30–22; 4:15 pm]
**BILLING CODE 6560–50–P**

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| 05 | OH | Fairfield | 8259811 | | 31313 0123000137 | | CRAWFORD COMPRESSOR STATION (0123000137) | 486210 |
| 05 | OH | Fairfield | 8259811 | | 31813 0123000137 | | CRAWFORD COMPRESSOR STATION (0123000137) | 486210 |
| 05 | OH | Fairfield | 8259811 | | 31913 0123000137 | | CRAWFORD COMPRESSOR STATION (0123000137) | 486210 |
| 05 | OH | Holmes | 8289411 | | 223813 0238000049 | Columbia Gas Transmission Corporation | HOLMES COMPRESSOR STATION (0238000049) | 486210 |
| 05 | OH | Holmes | 8289411 | | 224113 0238000049 | Columbia Gas Transmission Corporation | HOLMES COMPRESSOR STATION (0238000049) | 486210 |
| 05 | OH | Holmes | 8289411 | | 224213 0238000049 | Columbia Gas Transmission Corporation | HOLMES COMPRESSOR STATION (0238000049) | 486210 |
| 02 | NY | Columbia | 8525311 | | 236413 4102600037 | TENNESSEE GAS PIPELINE COMPANY | COMPRESSOR STATION 254 | 486210 |
| 06 | OK | Caddo | 8536611 | | 478413 493 | ENABLE OKLAHOMA INTRASTATE TRANSMISSION LLC | COGAR COMPRESSOR STATION | 486210 |
| 06 | OK | OKtuskee | 8519511 | | 519513 1613 | ENABLE OKLAHOMA INTRASTATE TRANSMISSION LLC | WELTY COMPRESSOR STATION | 486210 |
| 06 | OK | OKtuskee | 8519511 | | 519613 1613 | ENABLE OKLAHOMA INTRASTATE TRANSMISSION LLC | WELTY COMPRESSOR STATION | 486210 |
| 06 | OK | Carter | 8506111 | | 534713 1070 | NATURAL GAS PIPELINE CO OF AMERICA | STATION 801 | 486210 |
| 06 | OK | Carter | 8506111 | | 534813 1070 | NATURAL GAS PIPELINE CO OF AMERICA | STATION 801 | 486210 |
| 02 | NY | Erie | 8503511 | | 553613 9144000034 | TENNESSEE GAS PIPELINE COMPANY | TENNESSEE GAS PIPELINE CO COMPRESSOR STATION 229 | 486210 |
| 02 | NY | Erie | 8503411 | | 554113 9143800044 | NATIONAL FUEL GAS SUPPLY CORPORATION | CONCORD COMPRESSOR STATION | 48621 |
| 02 | NY | Steuben | 8437611 | | 582613 8468200006 | DOMINION TRANSMISSION INC | WOODHULL STATION | 48621 |
| 02 | NY | Schoharie | 8435311 | | 586513 4432400005 | TENNESSEE GAS PIPELINE COMPANY | COMPRESSOR STATION 249 | 48621 |
| 06 | OK | Logan | 8401711 | | 683713 1226 | ONEOK GAS STORAGE LLC | WEST EDMOND STATION | 486210 |
| 06 | OK | Logan | 8401711 | | 683813 1226 | ONEOK GAS STORAGE LLC | WEST EDMOND STATION | 486210 |
| 06 | OK | Logan | 8401711 | | 684113 1226 | ONEOK GAS STORAGE LLC | WEST EDMOND STATION | 486210 |
| 06 | OK | Logan | 8401711 | | 684213 1226 | ONEOK GAS STORAGE LLC | WEST EDMOND STATION | 486210 |
| 06 | OK | Pawnee | 8401611 | | 685613 852 | KPC PIPELINE LLC | PAWNEE STA | 486210 |
| 06 | OK | Kingfisher | 8464211 | | 1408313 1373 | PANHANDLE EASTERN PIPELINE CO | CASHION COMPRESSOR STATION | 486210 |
| 06 | OK | Kingfisher | 8464211 | | 1408413 1373 | PANHANDLE EASTERN PIPELINE CO | CASHION COMPRESSOR STATION | 486210 |
| 06 | OK | Kingfisher | 8464211 | | 1408513 1373 | PANHANDLE EASTERN PIPELINE CO | CASHION COMPRESSOR STATION | 486210 |
| 06 | OK | Kingfisher | 8464211 | | 1408613 1373 | PANHANDLE EASTERN PIPELINE CO | CASHION COMPRESSOR STATION | 486210 |
| 06 | OK | Beckham | 8449911 | | 1414413 1060 | NATURAL GAS PIPELINE CO OF AMERICA | COMPRESSOR STATION 184 | 486210 |
| 06 | OK | Beckham | 8449911 | | 1414513 1060 | NATURAL GAS PIPELINE CO OF AMERICA | COMPRESSOR STATION 184 | 486210 |
| 06 | TX | Pecos | 7926811 | | 2549113 3 | EL PASO NATURAL GAS COMPANY | PUXLEY COMPRESSOR STATION | 486210 |
| 02 | NY | Chautauqua | 7806411 | | 2857113 9064200016 | TENNESSEE GAS PIPELINE COMPANY | TENNESSEE GAS PIPELINE CO COMPRESSOR STATION 224 | 48621 |
| 06 | AR | Miller | 7737711 | | 2879013 0509100150 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#305 | 48621 |
| 06 | AR | Miller | 7737711 | | 2879113 0509100150 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#305 | 48621 |
| 06 | AR | Miller | 7737711 | | 2879213 0509100150 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#305 | 48621 |
| 06 | AR | Miller | 7737711 | | 2879313 0509100150 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#305 | 48621 |
| 06 | AR | Miller | 7737711 | | 2879413 0509100150 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#305 | 48621 |
| 06 | AR | Miller | 7737711 | | 2879513 0509100150 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#305 | 48621 |
| 06 | AR | Miller | 7737711 | | 2879713 0509100150 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#305 | 48621 |
| 06 | AR | Miller | 7737711 | | 2879813 0509100150 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#305 | 48621 |
| 02 | NY | Herkimer | 8035211 | | 3687513 6212600037 | DOMINION TRANSMISSION INC | DOMINION TRANSMISSION INC - UTICA STATION | 48621 |
| 02 | NY | Herkimer | 8035211 | | 3687713 6212600037 | DOMINION TRANSMISSION INC | DOMINION TRANSMISSION INC - UTICA STATION | 48621 |
| 05 | OH | Franklin | 8009911 | | 4038713 0125102034 | | Eastern Gas Transmission and Storage, Inc. (0125102034) | 486210 |
| 05 | OH | Franklin | 8009911 | | 4039313 0125102034 | | Eastern Gas Transmission and Storage, Inc. (0125102034) | 486210 |
| 05 | OH | Guernsey | 8008011 | | 406713 0630000001 | | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) | 486210 |
| 05 | OH | Guernsey | 8008011 | | 406713 0630000001 | | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) | 486210 |
| 05 | OH | Guernsey | 8008011 | | 406713 0630000001 | | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) | 486210 |
| 05 | OH | Guernsey | 8008011 | | 406613 0630000001 | | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) | 486210 |
| 05 | OH | Guernsey | 8008011 | | 406713 0630000001 | | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) | 486210 |
| 05 | OH | Guernsey | 8008011 | | 406803 0630000001 | | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) | 486210 |
| 05 | OH | Guernsey | 8008011 | | 406413 0630000001 | | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) | 486210 |
| 05 | OH | Guernsey | 8008011 | | 406213 0630000001 | | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) | 486210 |
| 05 | OH | Guernsey | 8008011 | | 406313 0630000001 | | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) | 486210 |
| 05 | OH | Guernsey | 8008011 | | 406413 0630000001 | | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) | 486210 |
| 05 | OH | Guernsey | 8008011 | | 406513 0630000001 | | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) | 486210 |
| 05 | OH | Guernsey | 8008011 | | 406613 0630000001 | | Kinder MorganTennessee Gas Pipeline Station 209 (0630000001) | 486210 |
| 05 | IN | Marion | 8238711 | | 4223113 00095 | No | PANHANDLE EASTERN PIPELINE COMPANY | 48621 |
| 05 | IL | Kendall | 8222211 | | 428913 093802AAF | | AMI Pipeline Co | 486210 |
| 05 | IL | Kendall | 8222211 | | 428913 093802AAF | | AMI Pipeline Co | 486210 |
| 05 | IL | Kendall | 8222211 | | 428913 093802AAF | | AMI Pipeline Co | 486210 |
| 05 | IN | Lawrence | 8089311 | | 4870713 00015 | No | Texas Gas Transmission, LLC - Leesville | 48621 |
| 05 | IN | Lagrange | 8088511 | | 4882313 00004 | No | ANR PIPELINE COMPANY  LAGRANGE COMPRES | 48621 |
| 05 | IN | Lagrange | 8088511 | | 4882413 00004 | No | ANR PIPELINE COMPANY  LAGRANGE COMPRES | 48621 |
| 06 | OK | Roger Mills | 8072311 | | 4927713 1611 | ENABLE GAS GATHERING LLC | TRM COMPRESSOR STATION | 486210 |
| 06 | OK | Woods | 8055011 | | 4998013 1372 | PANHANDLE EASTERN PIPELINE CO | ALVA N HOPETON COMPRESSOR STATION | 486210 |
| 06 | OK | Woods | 8055011 | | 4998113 1372 | PANHANDLE EASTERN PIPELINE CO | ALVA N HOPETON COMPRESSOR STATION | 486210 |
| 06 | OK | Woods | 8055011 | | 4998213 1372 | PANHANDLE EASTERN PIPELINE CO | ALVA N HOPETON COMPRESSOR STATION | 486210 |
| 06 | OK | Woods | 8055011 | | 4998313 1372 | PANHANDLE EASTERN PIPELINE CO | ALVA N HOPETON COMPRESSOR STATION | 486210 |
| 06 | OK | Woods | 8055011 | | 4999113 1372 | PANHANDLE EASTERN PIPELINE CO | ALVA N HOPETON COMPRESSOR STATION | 486210 |
| 06 | OK | Kay | 8007911 | | 5006713 1752 | SOUTHERN STAR CTL GAS PIPELINE INC | BLACKWELL COMPRESSOR STATION | 486210 |
| 06 | OK | Kay | 8007911 | | 5006813 1752 | SOUTHERN STAR CTL GAS PIPELINE INC | BLACKWELL COMPRESSOR STATION | 486210 |
| 06 | OK | Kay | 8007911 | | 5007013 1752 | SOUTHERN STAR CTL GAS PIPELINE INC | BLACKWELL COMPRESSOR STATION | 486210 |
| 06 | OK | Kay | 8007911 | | 5007113 1752 | SOUTHERN STAR CTL GAS PIPELINE INC | BLACKWELL COMPRESSOR STATION | 486210 |
| 06 | OK | Oklahoma | 8217311 | | 5295813 1763 | SOUTHERN STAR CTL GAS PIPELINE INC | EDMOND COMPRESSOR STATION | 486210 |
| 06 | OK | Oklahoma | 8217311 | | 5295913 1763 | SOUTHERN STAR CTL GAS PIPELINE INC | EDMOND COMPRESSOR STATION | 486210 |
| 06 | OK | Oklahoma | 8217311 | | 5296013 1763 | SOUTHERN STAR CTL GAS PIPELINE INC | EDMOND COMPRESSOR STATION | 486210 |
| 05 | IN | Shelby | 8201211 | | 5332213 00011 | No | ANR Pipeline Company Shelbyville Statio | 48621 |
| 05 | OH | Athens | 7984611 | | 5586013 0605000020 | | Kinder Morgan Tennessee Gas Pipeline Station 204 (0605000020) | 486210 |
| 05 | OH | Athens | 7984611 | | 5586213 0605000020 | | Kinder Morgan Tennessee Gas Pipeline Station 204 (0605000020) | 486210 |
| 05 | OH | Athens | 7984611 | | 5586413 0605000020 | | Kinder Morgan Tennessee Gas Pipeline Station 204 (0605000020) | 486210 |
| 05 | OH | Athens | 7984611 | | 5586513 0605000020 | | Kinder Morgan Tennessee Gas Pipeline Station 204 (0605000020) | 486210 |
| 05 | OH | Athens | 7984611 | | 5586613 0605000020 | | Kinder Morgan Tennessee Gas Pipeline Station 204 (0605000020) | 486210 |
| 05 | OH | Athens | 7984611 | | 5586713 0605000020 | | Kinder Morgan Tennessee Gas Pipeline Station 204 (0605000020) | 486210 |
| 05 | OH | Athens | 7984611 | | 5586813 0605000020 | | Kinder Morgan Tennessee Gas Pipeline Station 204 (0605000020) | 486210 |
| 05 | OH | Athens | 7984611 | | 5586913 0605000020 | | Kinder Morgan Tennessee Gas Pipeline Station 204 (0605000020) | 486210 |
| 05 | OH | Athens | 7984611 | | 5587013 0605000020 | | Kinder Morgan Tennessee Gas Pipeline Station 204 (0605000020) | 486210 |
| 05 | OH | Athens | 7984611 | | 5587113 0605000020 | | Kinder Morgan Tennessee Gas Pipeline Station 204 (0605000020) | 486210 |
| 05 | OH | Athens | 7984611 | | 5587213 0605000020 | | Kinder Morgan Tennessee Gas Pipeline Station 204 (0605000020) | 486210 |
| 05 | OH | Athens | 7984611 | | 5587413 0605000020 | | Kinder Morgan Tennessee Gas Pipeline Station 204 (0605000020) | 486210 |
| 06 | OK | Coal | 8147311 | | 5963713 1109 | ENABLE GAS TRANSMISSION LLC | CHILES DOME STATION | 486210 |
| 06 | OK | Cimarron | 8146911 | | 5967213 269 | COLORADO INTERSTATE GAS LLC | KEYES COMPRESSOR STATION | 486210 |
| 06 | OK | Cimarron | 8146911 | | 5967313 269 | COLORADO INTERSTATE GAS LLC | KEYES COMPRESSOR STATION | 486210 |
| 06 | OK | Cimarron | 8146911 | | 5967613 269 | COLORADO INTERSTATE GAS LLC | KEYES COMPRESSOR STATION | 486210 |
| 06 | OK | Cimarron | 8146911 | | 5967713 269 | COLORADO INTERSTATE GAS LLC | KEYES COMPRESSOR STATION | 486210 |
| 06 | OK | Latimer | 8132411 | | 5981413 1133 | ENABLE GAS TRANSMISSION LLC | CHANDLER STATION | 486210 |
| 06 | OK | Latimer | 8132411 | | 5981513 1133 | ENABLE GAS TRANSMISSION LLC | CHANDLER STATION | 486210 |
| 06 | OK | Latimer | 8132411 | | 5981713 1133 | ENABLE GAS TRANSMISSION LLC | CHANDLER STATION | 486210 |
| 05 | OH | Carroll | 8132011 | | 5989413 0210000046 | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| 05 | OH | Carroll | 8132011 | | 5990113 0210000046 | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| 05 | OH | Carroll | 8132011 | | 5990513 0210000046 | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| 05 | OH | Carroll | 8132011 | | 5990613 0210000046 | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| 06 | OK | Beaver | 8131911 | | 5991413 1173 | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 8131911 | | 5991513 1173 | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 8131911 | | 5991613 1173 | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 8131911 | | 5992913 1173 | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 8131911 | | 5993113 1173 | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 8131911 | | 5993713 1173 | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 8114411 | | 6061613 1055 | NATURAL GAS PIPELINE CO OF AMERICA | COMPRESSOR STATION 102 | 486210 |
| 06 | OK | Beaver | 8114411 | | 6062213 1055 | NATURAL GAS PIPELINE CO OF AMERICA | COMPRESSOR STATION 102 | 486210 |
| 06 | OK | Custer | 8114111 | | 6067813 1610 | ENABLE OKLAHOMA INTRASTATE TRANSMISSION LLC | THOMAS TIE STATION | 486210 |
| 06 | OK | Custer | 8114111 | | 6067913 1610 | ENABLE OKLAHOMA INTRASTATE TRANSMISSION LLC | THOMAS TIE STATION | 486210 |
| 06 | OK | Custer | 8114111 | | 6068013 1610 | ENABLE OKLAHOMA INTRASTATE TRANSMISSION LLC | THOMAS TIE STATION | 486210 |
| 06 | OK | Custer | 8064811 | | 6307813 1136 | ENABLE GAS TRANSMISSION LLC | CUSTER CMPSR STATION | 486210 |
| 05 | OH | Warren | 8063811 | | 6327113 1483060328 | | Texas Eastern Transmission - Lebanon (1483060328) | 486210 |
| 05 | OH | Warren | 8063811 | | 6327313 1483060328 | | Texas Eastern Transmission - Lebanon (1483060328) | 486210 |
| 05 | OH | Warren | 8063811 | | 6322413 1483060328 | | Texas Eastern Transmission - Lebanon (1483060328) | 486210 |
| 05 | OH | Warren | 8063811 | | 6322513 1483060328 | | Texas Eastern Transmission - Lebanon (1483060328) | 486210 |
| 05 | OH | Warren | 8063811 | | 6322613 1483060328 | | Texas Eastern Transmission - Lebanon (1483060328) | 486210 |
| 05 | OH | Warren | 8063811 | | 6327513 1483060328 | | Texas Eastern Transmission - Lebanon (1483060328) | 486210 |
| 05 | OH | Warren | 8063711 | | 6322813 1483000144 | | Eastern Gas Transmission and Storage - Lebanon Station (1483000144) | 486210 |
| 05 | OH | Warren | 8063711 | | 6322913 1483000144 | | Eastern Gas Transmission and Storage - Lebanon Station (1483000144) | 486210 |
| 05 | OH | Warren | 8063711 | | 6323013 1483000144 | | Eastern Gas Transmission and Storage - Lebanon Station (1483000144) | 486210 |
| 05 | OH | Warren | 8063711 | | 6323113 1483000144 | | Eastern Gas Transmission and Storage - Lebanon Station (1483000144) | 486210 |
| 05 | OH | Warren | 8063711 | | 6323313 1483000144 | | Eastern Gas Transmission and Storage - Lebanon Station (1483000144) | 486210 |
| 06 | OK | Grant | 8053011 | | 328913 1764 | SOUTHERN STAR CTL GAS PIPELINE INC | WEBB STATION | 486210 |
| 05 | OH | Richland | 8050211 | | 633163 0370000228 | | Weaver Compressor Station (0370000228) | 486210 |
| 05 | OH | Richland | 8050211 | | 633171 0370000228 | | Weaver Compressor Station (0370000228) | 486210 |
| 05 | OH | Richland | 8050211 | | 633191 0370000228 | | Weaver Compressor Station (0370000228) | 486210 |
| 05 | OH | Richland | 8050211 | | 633201 0370000228 | | Weaver Compressor Station (0370000228) | 486210 |
| 05 | OH | Richland | 8050111 | | 633253 0370000226 | | PAVONIA COMPRESSOR STATION (0370000226) | 486210 |
| 05 | OH | Richland | 8050111 | | 633253 0370000226 | | PAVONIA COMPRESSOR STATION (0370000226) | 486210 |
| 05 | OH | Richland | 8050111 | | 633263 0370000226 | | PAVONIA COMPRESSOR STATION (0370000226) | 486210 |
| 05 | OH | Richland | 8050111 | | 633713 0370000226 | | PAVONIA COMPRESSOR STATION (0370000226) | 486210 |
| 05 | OH | Richland | 8050011 | | 633283 0370000164 | | LUCAS COMPRESSOR STATION (0370000164) | 486210 |
| 05 | OH | Richland | 8050011 | | 633313 0370000164 | | LUCAS COMPRESSOR STATION (0370000164) | 486210 |
| 05 | OH | Richland | 8050011 | | 633343 0370000164 | | LUCAS COMPRESSOR STATION (0370000164) | 486210 |
| 05 | OH | Richland | 8050011 | | 633513 0370000164 | | LUCAS COMPRESSOR STATION (0370000164) | 486210 |
| 05 | OH | Richland | 8050011 | | 633613 0370000164 | | LUCAS COMPRESSOR STATION (0370000164) | 486210 |
| 06 | OK | Beaver | 7982911 | | 6442013 271 | COLORADO INTERSTATE GAS LLC | MOCANE COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 7982911 | | 6442613 271 | COLORADO INTERSTATE GAS LLC | MOCANE COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 7982911 | | 6442813 271 | COLORADO INTERSTATE GAS LLC | MOCANE COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 7982911 | | 6442913 271 | COLORADO INTERSTATE GAS LLC | MOCANE COMPRESSOR STATION | 486210 |

**473a**

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 2699 Pump Station Rd SE | Lancaster | 12.6 | E6BTU/HR | 31.57 |
| Pipeline Transportation of Natural Gas | 2699 Pump Station Rd SE | Lancaster | 33.6 | E6BTU/HR | 64.07 |
| Pipeline Transportation of Natural Gas | 2699 Pump Station Rd SE | Lancaster | 42 | E6BTU/HR | 60.75 |
| Pipeline Transportation of Natural Gas | 8462 State Rt. 179 | Washington Twp. | 12.6 | E6BTU/HR | 48.79 |
| Pipeline Transportation of Natural Gas | 8462 State Rt. 179 | Washington Twp. | 12.6 | E6BTU/HR | 48.63 |
| Pipeline Transportation of Natural Gas | 8462 State Rt. 179 | Washington Twp. | 12.6 | E6BTU/HR | 62.4 |
| Pipeline Transportation of Natural Gas | ST RTE 66 - E SIDE - S OF COUNTY LINE | RIDERS MILLS | 8400 | HP | 98.84795 |
| Pipeline Transportation of Natural Gas | 2 M N THEN 2 M W OF | COSAR | 1340 | HP | 0.02 |
| Pipeline Transportation of Natural Gas | 8 MILES N AND 1 MILE W OF | PADEN | 3300 | HP | 61.15 |
| Pipeline Transportation of Natural Gas | 8 MILES N AND 1 MILE W OF | PADEN | 3300 | HP | 103.44 |
| Pipeline Transportation of Natural Gas | 2 MI NW OF | RATLIFF CITY | 4600 | HP | 64.2116 |
| Pipeline Transportation of Natural Gas | 2 MI NW OF | RATLIFF CITY | 4600 | HP | 73.685 |
| Pipeline Transportation of Natural Gas | 7586 E EDEN RD | EDEN | | | 140.84245 |
| Pipeline Transportation of Natural Gas | 5510 GENESEE RD | SPRINGSVILLE | | | 22.488 |
| Pipeline Transportation of Natural Gas | 974 CO RTE 99 | WOODHULL | | | 227.5562 |
| Pipeline Transportation of Natural Gas | 2840 US RTE 20 | CARLISLE | 6820 | HP | 40.15115 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF ROCKWELL & SIMMONS | GUTHRIE | 1350 | HP | 36.945 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF ROCKWELL & SIMMONS | GUTHRIE | 1350 | HP | 37.744 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF ROCKWELL & SIMMONS | GUTHRIE | 1500 | HP | 47.66 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF ROCKWELL & SIMMONS | GUTHRIE | 1500 | HP | 48 |
| Pipeline Transportation of Natural Gas | 3.5 MI N 4 MI E OF SH18 US 64 | PAWNEE | 1480 | HP | 0.04 |
| Pipeline Transportation of Natural Gas | 5 MILES W OF | CASHION | 1800 | HP | 53.1 |
| Pipeline Transportation of Natural Gas | 5 MILES W OF | CASHION | 1800 | HP | 44.5 |
| Pipeline Transportation of Natural Gas | 5 MILES W OF | CASHION | 4500 | HP | 356 |
| Pipeline Transportation of Natural Gas | 5 MILES W OF | CASHION | 4500 | HP | 321 |
| Pipeline Transportation of Natural Gas | 0.3 MI S OF BK R & BK23 RD | SAYRE | 6350 | HP | 103.272 |
| Pipeline Transportation of Natural Gas | 0.3 MI S OF BK R & BK23 RD | SAYRE | 6350 | HP | 122.05 |
| Pipeline Transportation of Natural Gas | 18 M E ON IH10 11 M S ON FM2023 2 M E ON PLANT RD | FORT STOCKTON | 18.9 | E6BTU/HR | 11.931 |
| Pipeline Transportation of Natural Gas | 9766 RAVLIN HILL RD | CLYMER | | | 11.81768 |
| Pipeline Transportation of Natural Gas | 5121 JOEY LANE | TEXARKANA | 3080 | HP | 52.2261 |
| Pipeline Transportation of Natural Gas | 5121 JOEY LANE | TEXARKANA | 3080 | HP | 36.287 |
| Pipeline Transportation of Natural Gas | 5121 JOEY LANE | TEXARKANA | 3080 | HP | 44.1692 |
| Pipeline Transportation of Natural Gas | 5121 JOEY LANE | TEXARKANA | 3080 | HP | 34.2214 |
| Pipeline Transportation of Natural Gas | 5121 JOEY LANE | TEXARKANA | 3080 | HP | 48.506 |
| Pipeline Transportation of Natural Gas | 5121 JOEY LANE | TEXARKANA | 3080 | HP | 43.5115 |
| Pipeline Transportation of Natural Gas | 5121 JOEY LANE | TEXARKANA | 3080 | HP | 52.8928 |
| Pipeline Transportation of Natural Gas | 5121 JOEY LANE | TEXARKANA | 9060 | HP | 35.6809 |
| Pipeline Transportation of Natural Gas | HIGBY RD | FRANKFORT | | | 57.2402 |
| Pipeline Transportation of Natural Gas | HIGBY RD | FRANKFORT | | | 74.9476 |
| Pipeline Transportation of Natural Gas | 5509 Berger Road | Groveport | 4200 | HP | 41.84 |
| Pipeline Transportation of Natural Gas | 5509 Berger Road | Groveport | 4200 | HP | 28.43 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 102.7 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 95.38 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 131.1 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 121.4 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 114 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 57.06 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 136.9 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 113.7 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 129.7 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 31.75 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 35.91 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 93.75 |
| Pipeline Transportation of Natural Gas | 3428 Clay Pike Road | Cumberland | 0.1 | E6BTU/HR | 124.9 |
| Pipeline Transportation of Natural Gas | 9371 Zionsville Rd | Indianapolis | 0.1 | E6BTU/HR | 28.32737 |
| Pipeline Transportation of Natural Gas | 6650 Sandy Bluff Rd | Sandwich | 32.7 | E6BTU/HR | 64.70986 |
| Pipeline Transportation of Natural Gas | 6650 Sandy Bluff Rd | Sandwich | 10.2 | E6BTU/HR | 64.24215 |
| Pipeline Transportation of Natural Gas | 6650 Sandy Bluff Rd | Sandwich | 10.9 | E6BTU/HR | 30.0715 |
| Pipeline Transportation of Natural Gas | 857 ERIE CHURCH RD | Bedford | 0.1 | E6BTU/HR | 2.087038 |
| Pipeline Transportation of Natural Gas | 2255 W US Hwy 20 | Lagrange | 4750 | HP | 72.62298 |
| Pipeline Transportation of Natural Gas | 2255 W US Hwy 20 | Lagrange | 4750 | HP | 36.29176 |
| Pipeline Transportation of Natural Gas | 0.1 MI S OF N1940 & E0980 RD | CHEYENNE | 1220 | HP | 26.405 |
| Pipeline Transportation of Natural Gas | 6.5 MILES SW OF | ALVA | 5000 | HP | 297.63 |
| Pipeline Transportation of Natural Gas | 6.5 MILES SW OF | ALVA | 6000 | HP | 292 |
| Pipeline Transportation of Natural Gas | 6.5 MILES SW OF | ALVA | 4500 | HP | 101.6 |
| Pipeline Transportation of Natural Gas | 6.5 MILES SW OF | ALVA | 4500 | HP | 123.05 |
| Pipeline Transportation of Natural Gas | 6.5 MILES SW OF | ALVA | 4500 | HP | 143.38 |
| Pipeline Transportation of Natural Gas | 1600 N 13TH ST | BLACKWELL | 1800 | HP | 120.09 |
| Pipeline Transportation of Natural Gas | 1600 N 13TH ST | BLACKWELL | 2400 | HP | 220 |
| Pipeline Transportation of Natural Gas | 1600 N 13TH ST | BLACKWELL | 1800 | HP | 152.5 |
| Pipeline Transportation of Natural Gas | 1600 N 13TH ST | BLACKWELL | 2400 | HP | 234.87 |
| Pipeline Transportation of Natural Gas | 6724 N AIR DEPOT BLVD | EDMOND | 1350 | HP | 88.05 |
| Pipeline Transportation of Natural Gas | 6724 N AIR DEPOT BLVD | EDMOND | 1350 | HP | 97.27 |
| Pipeline Transportation of Natural Gas | 6724 N AIR DEPOT BLVD | EDMOND | 1350 | HP | 31.6 |
| Pipeline Transportation of Natural Gas | 5500 Smithland Rd | Shelbyville | 7830 | HP | 36.13645 |
| Pipeline Transportation of Natural Gas | 2335 US Route 50 West | Albany | 2000 | HP | 41.55 |
| Pipeline Transportation of Natural Gas | 2335 US Route 50 West | Albany | 2600 | HP | 63.45 |
| Pipeline Transportation of Natural Gas | 2335 US Route 50 West | Albany | 0.1 | E6BTU/HR | 72.44 |
| Pipeline Transportation of Natural Gas | 2335 US Route 50 West | Albany | 1320 | HP | 83.21 |
| Pipeline Transportation of Natural Gas | 2335 US Route 50 West | Albany | 2000 | HP | 65.36 |
| Pipeline Transportation of Natural Gas | 2335 US Route 50 West | Albany | 1320 | HP | 95.85 |
| Pipeline Transportation of Natural Gas | 2335 US Route 50 West | Albany | 1650 | HP | 76.1 |
| Pipeline Transportation of Natural Gas | 2335 US Route 50 West | Albany | 1320 | HP | 100.1 |
| Pipeline Transportation of Natural Gas | 2335 US Route 50 West | Albany | 1320 | HP | 101.8 |
| Pipeline Transportation of Natural Gas | 2335 US Route 50 West | Albany | 3400 | HP | 173.8 |
| Pipeline Transportation of Natural Gas | 2335 US Route 50 West | Albany | 3400 | HP | 117 |
| Pipeline Transportation of Natural Gas | 2335 US Route 50 West | Albany | 320 | HP | 103.3 |
| Pipeline Transportation of Natural Gas | 12 MILES N AND 2 MILES W OF | COALGATE | 2250 | HP | 22.75 |
| Pipeline Transportation of Natural Gas | 0.3 MI SE OF N0388/E0075 RDS | KEYES | 1200 | HP | 30.44 |
| Pipeline Transportation of Natural Gas | 0.3 MI SE OF N0388/E0075 RDS | KEYES | 1200 | HP | 44.178 |
| Pipeline Transportation of Natural Gas | 0.3 MI SE OF N0388/E0075 RDS | KEYES | 1200 | HP | 25.58 |
| Pipeline Transportation of Natural Gas | 0.3 MI SE OF N0388/E0075 RDS | KEYES | 1200 | HP | 80.72 |
| Pipeline Transportation of Natural Gas | 7 MI SW OF | WILBURTON | 8000 | HP | 148.46 |
| Pipeline Transportation of Natural Gas | 7 MI SW OF | WILBURTON | 4000 | HP | 75.24 |
| Pipeline Transportation of Natural Gas | 7 MI SW OF | WILBURTON | 8000 | HP | 591 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 0.1 | E6BTU/HR | 77.57 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 0.1 | E6BTU/HR | 116.3 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 0.1 | E6BTU/HR | 122.2 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 0.1 | E6BTU/HR | 129.1 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 2000 | HP | 119.29 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 8000 | HP | 394.526 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 2000 | HP | 103.161 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 6000 | HP | 511.088 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 2000 | HP | 127.152 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 6000 | HP | 308.878 |
| Pipeline Transportation of Natural Gas | 4 MILES S ON US83 3 MILES W | BALKO | 4000 | HP | 217.198 |
| Pipeline Transportation of Natural Gas | 4 MILES S ON US83 3 MILES W | BALKO | 6900 | HP | 48.139 |
| Pipeline Transportation of Natural Gas | 0.23 MI W OF N2360 & E 880 RD | THOMAS | 2000 | HP | 42.5 |
| Pipeline Transportation of Natural Gas | 0.23 MI W OF N2360 & E 880 RD | THOMAS | 1500 | HP | 26.42 |
| Pipeline Transportation of Natural Gas | 0.23 MI W OF N2360 & E 880 RD | THOMAS | 1500 | HP | 23.71 |
| Pipeline Transportation of Natural Gas | 7 MILES E OF BUTLER ON HWY 33 | ARAPAHO | 1100 | HP | 0.03 |
| Pipeline Transportation of Natural Gas | 1157 State Road 122 West | Lebanon | 16.8 | E6BTU/HR | 28.66 |
| Pipeline Transportation of Natural Gas | 1157 State Road 122 West | Lebanon | 13.5 | E6BTU/HR | 31.88 |
| Pipeline Transportation of Natural Gas | 1157 State Road 122 West | Lebanon | 13.5 | E6BTU/HR | 43.48 |
| Pipeline Transportation of Natural Gas | 1157 State Road 122 West | Lebanon | 13.5 | E6BTU/HR | 39.77 |
| Pipeline Transportation of Natural Gas | 1157 State Road 122 West | Lebanon | 16.8 | E6BTU/HR | 24.04 |
| Pipeline Transportation of Natural Gas | 1157 State Road 122 West | Lebanon | 13.5 | E6BTU/HR | 50.85 |
| Pipeline Transportation of Natural Gas | 1262 W State Rte 122 | Lebanon | 4200 | HP | 35.46 |
| Pipeline Transportation of Natural Gas | 1262 W State Rte 122 | Lebanon | 1550 | HP | 117.7 |
| Pipeline Transportation of Natural Gas | 1262 W State Rte 122 | Lebanon | 1550 | HP | 98.84 |
| Pipeline Transportation of Natural Gas | 1262 W State Rte 122 | Lebanon | 1550 | HP | 93.63 |
| Pipeline Transportation of Natural Gas | 1262 W State Rte 122 | Lebanon | 1550 | HP | 75.12 |
| Pipeline Transportation of Natural Gas | 3 MILES NE OFF HWY 11 OF | DEER CREEK | 2400 | HP | 82.5 |
| Pipeline Transportation of Natural Gas | 2873 Pleasant Valley Rd | Lucas | 22.6 | E6BTU/HR | 120.5 |
| Pipeline Transportation of Natural Gas | 2873 Pleasant Valley Rd | Lucas | 22.6 | E6BTU/HR | 96.08 |
| Pipeline Transportation of Natural Gas | 2873 Pleasant Valley Rd | Lucas | 12.6 | E6BTU/HR | 31.18 |
| Pipeline Transportation of Natural Gas | 2873 Pleasant Valley Rd | Lucas | 12.6 | E6BTU/HR | 80.11 |
| Pipeline Transportation of Natural Gas | 2385 Cotter Road | Mansfield | 16.8 | E6BTU/HR | 89.19 |
| Pipeline Transportation of Natural Gas | 2385 Cotter Road | Mansfield | 12.6 | E6BTU/HR | 81.35 |
| Pipeline Transportation of Natural Gas | 2385 Cotter Road | Mansfield | 12.6 | E6BTU/HR | 23.11 |
| Pipeline Transportation of Natural Gas | 2385 Cotter Road | Mansfield | 16.8 | E6BTU/HR | 112.9 |
| Pipeline Transportation of Natural Gas | 2385 Cotter Road | Mansfield | 16.8 | E6BTU/HR | 108.4 |
| Pipeline Transportation of Natural Gas | 4307 State Route 39 | Monroe Twp. | 12 | E6BTU/HR | 103.4 |
| Pipeline Transportation of Natural Gas | 4307 State Route 39 | Monroe Twp. | 12 | E6BTU/HR | 94.48 |
| Pipeline Transportation of Natural Gas | 4307 State Route 39 | Monroe Twp. | 28.5 | E6BTU/HR | 177.8 |
| Pipeline Transportation of Natural Gas | 4307 State Route 39 | Monroe Twp. | 28.5 | E6BTU/HR | 167.9 |
| Pipeline Transportation of Natural Gas | 4307 State Route 39 | Monroe Twp. | 12 | E6BTU/HR | 87.1 |
| Pipeline Transportation of Natural Gas | 8 MILES E ON HWY 64 OF | FORGAN | 1420 | HP | 131 |
| Pipeline Transportation of Natural Gas | 8 MILES E ON HWY 64 OF | FORGAN | 1420 | HP | 134.78 |
| Pipeline Transportation of Natural Gas | 8 MILES E ON HWY 64 OF | FORGAN | 1420 | HP | 129.44 |
| Pipeline Transportation of Natural Gas | 8 MILES E ON HWY 64 OF | FORGAN | 1420 | HP | 133 |

**474a**

| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | LEC (retrofit) | 87.45 | | | | |
| TON | | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | 85 | | 310 NSCR | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | | NSCR or Layered Combustion | Layered Combustion | 97 |
| TON | N/A | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | LEC | 87.45 | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | 80 | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | 17.5 | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | 17.5 | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | 17.5 | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | 17.5 | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | 65 | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |

**475a**

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| 05 | MI | Clare | 8246111 | 6498313 N5586 | No | | ANR Pipeline Company Lincoln Compressor Station | 486210 |
| 05 | MI | Clare | 8246111 | 6498613 N5586 | No | | ANR Pipeline Company Lincoln Compressor Station | 486210 |
| 05 | MI | Berrien | 8195311 | 6666213 N5575 | No | | ANR Pipeline Company - Bridgman Compressor Station | 486210 |
| 05 | MI | Berrien | 8195311 | 6666713 N5575 | No | | ANR Pipeline Company - Bridgman Compressor Station | 486210 |
| 05 | MI | Berrien | 8195311 | 6666813 N5575 | No | | ANR Pipeline Company - Bridgman Compressor Station | 486210 |
| 05 | MI | Berrien | 8195311 | 6666913 N5575 | No | | ANR Pipeline Company - Bridgman Compressor Station | 486210 |
| 05 | MI | Berrien | 8195311 | 6667113 N5575 | No | | ANR Pipeline Company - Bridgman Compressor Station | 486210 |
| 06 | OK | Washington | 8212311 | 6699513 1754 | SOUTHERN STAR CTL GAS PIPELINE INC | COTTON VALLEY STATION | 486210 |
| 05 | IN | Otsego | 8146511 | 6972313 B7219 | | ANR Pipeline Co. South Chester Compressor Station | 486210 |
| 05 | IN | Pike | 7250811 | 7443913 00004 | No | | Midwestern Gas Transmission Company Sta | 486621 |
| 05 | IN | Pike | 7250811 | 7444213 00004 | No | | Midwestern Gas Transmission Company Sta | 486621 |
| 05 | IN | Lake | 7248011 | 7461313 00069 | No | | ANR Pipeline Company St John Station | 486621 |
| 05 | IN | Lake | 7248011 | 7461913 00069 | No | | ANR Pipeline Company St John Station | 486621 |
| 02 | NY | Onondaga | 7436111 | 7946913 731340002Z | TENNESSEE GAS PIPELINE COMPANY | TENNESSEE GAS PIPELINE CO - COMP STA 241 | 486210 |
| 06 | OK | Coal | 7320111 | 8336613 1537 | ENABLE OKLAHOMA INTRASTATE TRANSMISSION LLC | ALLEN COMPRESSOR STATION | 486210 |
| 06 | OK | Coal | 7320111 | 8336813 1537 | ENABLE OKLAHOMA INTRASTATE TRANSMISSION LLC | ALLEN COMPRESSOR STATION | 486210 |
| 06 | OK | Texas | 7393711 | 10469613 1177 | WTG HUGOTON LP | TEXAS COUNTY 2 | 486210 |
| 04 | MS | Rankin | 7289311 | 1111071.3 2812100083 | A012162 | | SOUTHERN NATURAL GAS COMPANY LLC, RANKIN | 486621 |
| 04 | MS | Rankin | 7289311 | 1111101.3 2812100083 | A012162 | | SOUTHERN NATURAL GAS COMPANY LLC, RANKIN | 486621 |
| 04 | MS | Rankin | 7289311 | 1111151.3 2812100083 | A012162 | | SOUTHERN NATURAL GAS COMPANY LLC, RANKIN | 486621 |
| 07 | MO | Pettis | 6730011 | 1277171.3 0047 | | PANHANDLE EASTERN PIPE LINE CO HOUSTONIA | 486210 |
| 07 | MO | Pettis | 6730011 | 1277181.3 0047 | | PANHANDLE EASTERN PIPE LINE CO HOUSTONIA | 486210 |
| 07 | MO | Pettis | 6730011 | 1277191.3 0047 | | PANHANDLE EASTERN PIPE LINE CO HOUSTONIA | 486210 |
| 07 | MO | Pettis | 6730011 | 1277201.3 0047 | | PANHANDLE EASTERN PIPE LINE CO HOUSTONIA | 486210 |
| 07 | MO | Pettis | 6730011 | 1277211.3 0047 | | PANHANDLE EASTERN PIPE LINE CO HOUSTONIA | 486210 |
| 07 | MO | Pettis | 6730011 | 1277221.3 0047 | | PANHANDLE EASTERN PIPE LINE CO HOUSTONIA | 486210 |
| 07 | MO | Pettis | 6730011 | 1277231.3 0047 | | PANHANDLE EASTERN PIPE LINE CO HOUSTONIA | 486210 |
| 07 | MO | Pettis | 6730011 | 1277241.3 0047 | | PANHANDLE EASTERN PIPE LINE CO HOUSTONIA | 486210 |
| 07 | MO | Pettis | 6730011 | 1277301.3 0047 | | PANHANDLE EASTERN PIPE LINE CO HOUSTONIA | 486210 |
| 07 | MO | Pettis | 6730011 | 1277321.3 0047 | | PANHANDLE EASTERN PIPE LINE CO HOUSTONIA | 486210 |
| 07 | MO | Madison | 6699711 | 13180313 0018 | No | | ENABLE MISSISSIPPI RIVER TRANS, LLC TWELVE MILE COMPRESSOR STATION | 486210 |
| 07 | MO | Madison | 6699711 | 13180413 0018 | No | | ENABLE MISSISSIPPI RIVER TRANS, LLC TWELVE MILE COMPRESSOR STATION | 486210 |
| 07 | MO | Madison | 6699711 | 13180513 0018 | No | | ENABLE MISSISSIPPI RIVER TRANS, LLC TWELVE MILE COMPRESSOR STATION | 486210 |
| 07 | MO | Madison | 6699711 | 13180613 0018 | No | | ENABLE MISSISSIPPI RIVER TRANS, LLC TWELVE MILE COMPRESSOR STATION | 486210 |
| 07 | MO | Madison | 6699711 | 13180713 0018 | No | | ENABLE MISSISSIPPI RIVER TRANS, LLC TWELVE MILE COMPRESSOR STATION | 486210 |
| 07 | MO | Madison | 6699711 | 13181013 0018 | No | | ENABLE MISSISSIPPI RIVER TRANS, LLC TWELVE MILE COMPRESSOR STATION | 486210 |
| 04 | MS | Washtenaw | 6941411 | 14043613 N3920 | | Cenergy - Freedom Compressor Station | 486210 |
| 04 | MS | Calhoun | 7051611 | 14194813 2801300005 | A000699 | | COLUMBIA GULF TRANSMISSION, BANNER COMPR | 486210 |
| 04 | MS | Calhoun | 7051611 | 14195013 2801300005 | A000699 | | COLUMBIA GULF TRANSMISSION, BANNER COMPR | 486210 |
| 04 | MS | Calhoun | 7051611 | 14195113 2801300005 | A000699 | | COLUMBIA GULF TRANSMISSION, BANNER COMPR | 486210 |
| 04 | MS | Calhoun | 7051611 | 14195213 2801300005 | A000699 | | COLUMBIA GULF TRANSMISSION, BANNER COMPR | 486210 |
| 04 | MS | Jones | 7035911 | 14205913 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 486621 |
| 04 | MS | Jones | 7035911 | 14206013 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 486621 |
| 04 | MS | Jones | 7035911 | 14206513 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 486621 |
| 04 | MS | Jones | 7035911 | 14206513 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 486621 |
| 04 | MS | Jones | 7035911 | 14206613 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 486621 |
| 04 | MS | Jones | 7035911 | 14206913 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 486621 |
| 04 | MS | Jones | 7035911 | 14207013 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 486621 |
| 04 | MS | Jones | 7035911 | 14207113 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 486621 |
| 04 | MS | Jones | 7035911 | 14207213 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 486621 |
| 04 | MS | Jones | 7035911 | 14208113 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 486621 |
| 04 | MS | Jones | 7035911 | 14208313 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 486621 |
| 04 | MS | Jones | 7035911 | 14208413 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 486621 |
| 04 | MS | Jefferson | 7035611 | 14210713 2806300014 | A000618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 486621 |
| 04 | MS | Jefferson | 7035611 | 14210813 2806300014 | A000618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 486621 |
| 04 | MS | Jefferson | 7035611 | 14210913 2806300014 | A000618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 486621 |
| 04 | MS | Jefferson | 7035611 | 14211613 2806300014 | A000618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 486621 |
| 04 | MS | Jefferson | 7035611 | 14211713 2806300014 | A000618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 486621 |
| 04 | MS | Jefferson | 7035611 | 14211813 2806300014 | A000618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 486621 |
| 04 | MS | Jefferson | 7035611 | 14211913 2806300014 | A000618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 486621 |
| 04 | MS | Jefferson | 7035611 | 14212013 2806300014 | A000618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 486621 |
| 04 | MS | Jefferson | 7035611 | 14212113 2806300014 | A000618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 486621 |
| 04 | MS | Jefferson | 7035611 | 14212313 2806300014 | A000618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 486621 |
| 04 | MS | Jefferson | 7035611 | 14212413 2806300014 | A000618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 486621 |
| 04 | MS | Jefferson | 7035611 | 14212513 2806300014 | A000618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 486621 |
| 07 | MO | Boone | 7166411 | 14352413 0077 | No | | PANHANDLE EASTERN PIPELINE CENTRALIA COMPRESSOR STATION | 486210 |
| 07 | MO | Boone | 7166411 | 14352913 0077 | No | | PANHANDLE EASTERN PIPELINE CENTRALIA COMPRESSOR STATION | 486210 |
| 07 | MO | Boone | 7166411 | 14353113 0077 | No | | PANHANDLE EASTERN PIPELINE CENTRALIA COMPRESSOR STATION | 486210 |
| 07 | MO | Boone | 7166411 | 14353213 0077 | No | | PANHANDLE EASTERN PIPELINE CENTRALIA COMPRESSOR STATION | 486210 |
| 07 | MO | Bollinger | 7164311 | 14386213 0019 | | NATURAL GAS PIPELINE COMPANY STATION 309 | 486210 |
| 07 | MO | Bollinger | 7164311 | 14386313 0019 | | NATURAL GAS PIPELINE COMPANY STATION 309 | 486210 |
| 07 | MO | Bollinger | 7164311 | 14386713 0019 | | NATURAL GAS PIPELINE COMPANY STATION 309 | 486210 |
| 07 | MO | Bollinger | 7164311 | 14387213 0019 | | NATURAL GAS PIPELINE COMPANY STATION 309 | 486210 |
| 07 | MO | Bollinger | 7164311 | 14387313 0019 | | NATURAL GAS PIPELINE COMPANY STATION 309 | 486210 |
| 07 | MO | Bollinger | 7164311 | 14387413 0019 | | NATURAL GAS PIPELINE COMPANY STATION 309 | 486210 |
| 04 | MS | Winston | 7100711 | 14460413 2815900008 | A008007 | | SOUTHERN NATURAL GAS COMPANY LLC, LOUISV | 486621 |
| 04 | MS | Winston | 7100711 | 14461113 2815900008 | A008007 | | SOUTHERN NATURAL GAS COMPANY LLC, LOUISV | 486621 |
| 04 | MS | Winston | 7100711 | 14461213 2815900008 | A008007 | | SOUTHERN NATURAL GAS COMPANY LLC, LOUISV | 486621 |
| 04 | MS | Winston | 7100711 | 14461313 2815900008 | A008007 | | SOUTHERN NATURAL GAS COMPANY LLC, LOUISV | 486621 |
| 04 | MS | Winston | 7100711 | 14461413 2815900008 | A008007 | | SOUTHERN NATURAL GAS COMPANY LLC, LOUISV | 486621 |
| 04 | MS | Winston | 7100711 | 14461513 2815900008 | A008007 | | SOUTHERN NATURAL GAS COMPANY LLC, LOUISV | 486621 |
| 04 | MS | Perry | 6993911 | 14906813 2811100008 | A012462 | | FLORIDA GAS TRANSMISSION COMPANY, WIGGIN | 486621 |
| 04 | MS | Perry | 6993911 | 14906913 2811100008 | A012462 | | FLORIDA GAS TRANSMISSION COMPANY, WIGGIN | 486621 |
| 04 | MS | Perry | 6993911 | 14907013 2811100008 | A012462 | | FLORIDA GAS TRANSMISSION COMPANY, WIGGIN | 486621 |
| 04 | MS | Perry | 6993911 | 14907113 2811100008 | A012462 | | FLORIDA GAS TRANSMISSION COMPANY, WIGGIN | 486621 |
| 04 | MS | Perry | 6993911 | 14907513 2811100008 | A012462 | | FLORIDA GAS TRANSMISSION COMPANY, WIGGIN | 486621 |
| 04 | MS | Perry | 6993911 | 14907613 2811100008 | A012462 | | FLORIDA GAS TRANSMISSION COMPANY, WIGGIN | 486621 |
| 04 | MS | Perry | 6993911 | 14907713 2811100008 | A012462 | | FLORIDA GAS TRANSMISSION COMPANY, WIGGIN | 486621 |
| 04 | MS | Perry | 6993911 | 14907813 2811100008 | A012462 | | FLORIDA GAS TRANSMISSION COMPANY, WIGGIN | 486621 |
| 04 | MS | Monroe | 6942611 | 14926013 2809500039 | A005183 | | SOUTHERN NATURAL GAS COMPANY LLC, MULDON | 486621 |
| 04 | MS | Monroe | 6942611 | 14927113 2809500039 | A005183 | | SOUTHERN NATURAL GAS COMPANY LLC, MULDON | 486621 |
| 04 | MS | Monroe | 6942611 | 14928213 2809500039 | A005183 | | SOUTHERN NATURAL GAS COMPANY LLC, MULDON | 486621 |
| 05 | MI | Osceola | 6225611 | 15849113 B3721 | No | | ANR Pipeline - Reed City Compressor Station | 486210 |
| 04 | MS | Coahoma | 6320811 | 16386413 2802700008 | A001722 | | TEXAS GAS TRANSMISSION LLC, CLARKSDALE | 486621 |
| 04 | MS | Coahoma | 6320811 | 16386613 2802700008 | A001722 | | TEXAS GAS TRANSMISSION LLC, CLARKSDALE | 486621 |
| 04 | MS | Coahoma | 6320811 | 16387013 2802700008 | A001722 | | TEXAS GAS TRANSMISSION LLC, CLARKSDALE | 486621 |
| 04 | MS | Coahoma | 6320811 | 16387113 2802700008 | A001722 | | TEXAS GAS TRANSMISSION LLC, CLARKSDALE | 486621 |
| 04 | MS | Coahoma | 6320811 | 16387213 2802700008 | A001722 | | TEXAS GAS TRANSMISSION LLC, CLARKSDALE | 486621 |
| 04 | MS | Coahoma | 6320811 | 16387313 2802700008 | A001722 | | TEXAS GAS TRANSMISSION LLC, CLARKSDALE | 486621 |
| 05 | MI | Otsego | 6317011 | 16404813 B7390 | | ANR Pipeline - Central Charlton Compressor Station | 486210 |
| 04 | MS | Walthall | 6284611 | 16447813 2814700031 | A007097 | | GULF SOUTH PIPELINE COMPANY LLC, MCCOMB | 486621 |
| 04 | MS | Walthall | 6284611 | 16448213 2814700031 | A007097 | | GULF SOUTH PIPELINE COMPANY LLC, MCCOMB | 486621 |
| 04 | MS | Walthall | 6284611 | 16448413 2814700031 | A007097 | | GULF SOUTH PIPELINE COMPANY LLC, MCCOMB | 486621 |
| 04 | MS | Walthall | 6284611 | 16448513 2814700031 | A007097 | | GULF SOUTH PIPELINE COMPANY LLC, MCCOMB | 486621 |
| 04 | MS | Walthall | 6284611 | 16448613 2814700031 | A007097 | | GULF SOUTH PIPELINE COMPANY LLC, MCCOMB | 486621 |
| 04 | MS | Walthall | 6284611 | 16448713 2814700031 | A007097 | | GULF SOUTH PIPELINE COMPANY LLC, MCCOMB | 486621 |
| 03 | VA | Appomattox | 6217611 | 16508513 30863 | | Transco Station 170 | 486210 |
| 03 | VA | Appomattox | 6217611 | 16508613 30863 | | Transco Station 170 | 486210 |
| 03 | VA | Appomattox | 6217611 | 16508713 30863 | | Transco Station 170 | 486210 |
| 03 | VA | Appomattox | 6217611 | 16508813 30863 | | Transco Station 170 | 486210 |
| 03 | VA | Appomattox | 6217611 | 16508913 30863 | | Transco Station 170 | 486210 |
| 03 | VA | Appomattox | 6217611 | 16509013 30863 | | Transco Station 170 | 486210 |
| 03 | VA | Appomattox | 6217611 | 16509113 30863 | | Transco Station 170 | 486210 |
| 03 | VA | Appomattox | 6217611 | 16509213 30863 | | Transco Station 170 | 486210 |
| 03 | VA | Appomattox | 6217611 | 16509313 30863 | | Transco Station 170 | 486210 |
| 03 | VA | Appomattox | 6217611 | 16509413 30863 | | Transco Station 170 | 486210 |
| 06 | TX | Lamar | 6431111 | 16593413 15 | NATURAL GAS PIPELINE CO OF AMERICA LLC | COMPRESSOR STATION 802 | 486210 |
| 06 | TX | Lamar | 6431111 | 16593513 15 | NATURAL GAS PIPELINE CO OF AMERICA LLC | COMPRESSOR STATION 802 | 486210 |
| 06 | TX | Lamar | 6431111 | 16594613 15 | NATURAL GAS PIPELINE CO OF AMERICA LLC | COMPRESSOR STATION 802 | 486210 |
| 06 | TX | Yoakum | 6648711 | 17135313 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Yoakum | 6648711 | 17135813 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Yoakum | 6648711 | 17135913 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Yoakum | 6648711 | 17136013 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Yoakum | 6648711 | 17136113 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Yoakum | 6648711 | 17136213 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Yoakum | 6648711 | 17136413 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Yoakum | 6648711 | 17136513 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Yoakum | 6648711 | 17136713 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Yoakum | 6648711 | 17136913 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Yoakum | 6648711 | 17137013 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Yoakum | 6648711 | 17137113 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Yoakum | 6648711 | 17137213 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| 06 | TX | Hansford | 6534211 | 18506713 14 | ANR PIPELINE COMPANY | EG HILL COMPRESSOR | 486210 |
| 06 | TX | Hansford | 6534211 | 18506913 14 | ANR PIPELINE COMPANY | EG HILL COMPRESSOR | 486210 |
| 06 | TX | Hansford | 6534211 | 18507113 14 | ANR PIPELINE COMPANY | EG HILL COMPRESSOR | 486210 |
| 06 | TX | Hansford | 6534211 | 18507213 14 | ANR PIPELINE COMPANY | EG HILL COMPRESSOR | 486210 |
| 06 | TX | Hansford | 6534211 | 18507513 14 | ANR PIPELINE COMPANY | EG HILL COMPRESSOR | 486210 |
| 06 | TX | Hansford | 6534211 | 18507613 14 | ANR PIPELINE COMPANY | EG HILL COMPRESSOR | 486210 |
| 06 | TX | Hansford | 6534211 | 18508313 14 | ANR PIPELINE COMPANY | EG HILL COMPRESSOR | 486210 |

476a

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 3991 S. Hickory | LAKE GEORGE | 8000 | HP | 34.315 |
| Pipeline Transportation of Natural Gas | 3991 S. Hickory | LAKE GEORGE | 3200 | HP | 65.2 |
| Pipeline Transportation of Natural Gas | 3372 Browntown Rd | BRIDGMAN | 12000 | HP | 177.4 |
| Pipeline Transportation of Natural Gas | 3372 Browntown Rd | BRIDGMAN | 1550 | HP | 39.08 |
| Pipeline Transportation of Natural Gas | 3372 Browntown Rd | BRIDGMAN | 1550 | HP | 28.64 |
| Pipeline Transportation of Natural Gas | 3372 Browntown Rd | BRIDGMAN | 1550 | HP | 33.98 |
| Pipeline Transportation of Natural Gas | 3372 Browntown Rd | BRIDGMAN | 1550 | HP | 51.55 |
| Pipeline Transportation of Natural Gas | 3561 North 4000 Road | COPAN | 2000 | HP | 25.02 |
| Pipeline Transportation of Natural Gas | 6327 Old State Rd. | JOHANNESBURG | 3600 | HP | 28.555 |
| Pipeline Transportation of Natural Gas | 1275 N CR 550 E | Winslow | 2700 | HP | 26.5133 |
| Pipeline Transportation of Natural Gas | 1275 N CR 550 E | Winslow | 2700 | HP | 63.08065 |
| Pipeline Transportation of Natural Gas | 10313 White Oak Ave | Saint John | 12000 | HP | 26.5432 |
| Pipeline Transportation of Natural Gas | 10313 White Oak Ave | Saint John | 12000 | HP | 48.6252 |
| Pipeline Transportation of Natural Gas | 3447 SENTINEL HEIGHTS RD | LAFAYETTE | | | 23.76211 |
| Pipeline Transportation of Natural Gas | 0.15 MI W OF N3720/E1590 RDS | TUPELO | 2600 | HP | 60.86 |
| Pipeline Transportation of Natural Gas | 0.15 MI W OF N3720/E1590 RDS | TUPELO | 2600 | HP | 33.19 |
| Pipeline Transportation of Natural Gas | 12 MILES W AND 2 MILES N OF | GUYMON | 1100 | HP | 205.432 |
| Pipeline Transportation of Natural Gas | 191 ANDREW CHAPEL ROAD | BRANDON | | | 75.65 |
| Pipeline Transportation of Natural Gas | 191 ANDREW CHAPEL ROAD | BRANDON | | | 64 |
| Pipeline Transportation of Natural Gas | 191 ANDREW CHAPEL ROAD | BRANDON | | | 55.13 |
| Pipeline Transportation of Natural Gas | 16076 HIGHWAY T | LAMONTE | 1760 | HP | 117.2139 |
| Pipeline Transportation of Natural Gas | 16076 HIGHWAY T | LAMONTE | 5500 | HP | 105.3899 |
| Pipeline Transportation of Natural Gas | 16076 HIGHWAY T | LAMONTE | 10000 | HP | 848.5393 |
| Pipeline Transportation of Natural Gas | 16076 HIGHWAY T | LAMONTE | 3400 | HP | 269.412 |
| Pipeline Transportation of Natural Gas | 16076 HIGHWAY T | LAMONTE | 3400 | HP | 198.4135 |
| Pipeline Transportation of Natural Gas | 16076 HIGHWAY T | LAMONTE | 3400 | HP | 217.4731 |
| Pipeline Transportation of Natural Gas | 16076 HIGHWAY T | LAMONTE | 1600 | HP | 117.2456 |
| Pipeline Transportation of Natural Gas | 16076 HIGHWAY T | LAMONTE | 1600 | HP | 189.0905 |
| Pipeline Transportation of Natural Gas | 16076 HIGHWAY T | LAMONTE | 2000 | HP | 21.0849 |
| Pipeline Transportation of Natural Gas | 16076 HIGHWAY T | LAMONTE | 2000 | HP | 21.0809 |
| Pipeline Transportation of Natural Gas | 2331 MADISON 417 | FREDERICKTOWN | 11 | E6BTU/HR | 52.4844 |
| Pipeline Transportation of Natural Gas | 2331 MADISON 417 | FREDERICKTOWN | 11 | E6BTU/HR | 52.8286 |
| Pipeline Transportation of Natural Gas | 2331 MADISON 417 | FREDERICKTOWN | 11 | E6BTU/HR | 58.4642 |
| Pipeline Transportation of Natural Gas | 2331 MADISON 417 | FREDERICKTOWN | 11 | E6BTU/HR | 53.6244 |
| Pipeline Transportation of Natural Gas | 2331 MADISON 417 | FREDERICKTOWN | 11 | E6BTU/HR | 43.8589 |
| Pipeline Transportation of Natural Gas | 2331 MADISON 417 | FREDERICKTOWN | 11 | E6BTU/HR | 39.1185 |
| Pipeline Transportation of Natural Gas | 12201 PLEASANT LAKE RD | MANCHESTER | 0.01 | E6BTU/HR | 431.25 |
| Pipeline Transportation of Natural Gas | 82 COUNTY ROAD 233 | WATER VALLEY | 32.1 | E6BTU/HR | 29.65 |
| Pipeline Transportation of Natural Gas | 82 COUNTY ROAD 233 | WATER VALLEY | 20.9 | E6BTU/HR | 36.71 |
| Pipeline Transportation of Natural Gas | 82 COUNTY ROAD 233 | WATER VALLEY | 20.9 | E6BTU/HR | 44.6 |
| Pipeline Transportation of Natural Gas | 82 COUNTY ROAD 233 | WATER VALLEY | 20.9 | E6BTU/HR | 44.83 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 37.7 | E6BTU/HR | 75.11 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 19.3 | E6BTU/HR | 84.13 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 23.3 | E6BTU/HR | 37.91 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 23.3 | E6BTU/HR | 89.92 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 23.3 | E6BTU/HR | 123.57 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 18.8 | E6BTU/HR | 75.43 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 18.8 | E6BTU/HR | 137.36 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 19.3 | E6BTU/HR | 73.99 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 37.7 | E6BTU/HR | 47.61 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 18.8 | E6BTU/HR | 104.91 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 18.8 | E6BTU/HR | 123.52 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 18.8 | E6BTU/HR | 121.29 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 3400 | HP | 43.1 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 2050 | HP | 206.39 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 2050 | HP | 193.81 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 3400 | HP | 149.17 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 3400 | HP | 86.48 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 3400 | HP | 105.04 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 2050 | HP | 196.53 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 2050 | HP | 221.57 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 2050 | HP | 199.34 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 2050 | HP | 169 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 2050 | HP | 177.75 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 2050 | HP | 212.49 |
| Pipeline Transportation of Natural Gas | 16151 NORTH ROUTE Z | CENTRALIA | 23.5 | E6BTU/HR | 151.6687 |
| Pipeline Transportation of Natural Gas | 16151 NORTH ROUTE Z | CENTRALIA | 23.5 | E6BTU/HR | 169.2669 |
| Pipeline Transportation of Natural Gas | 16151 NORTH ROUTE Z | CENTRALIA | 27.6 | E6BTU/HR | 121.3841 |
| Pipeline Transportation of Natural Gas | 16151 NORTH ROUTE Z | CENTRALIA | 26 | E6BTU/HR | 31.3576 |
| Pipeline Transportation of Natural Gas | 8000 HIGHWAY 34 | MARBLE HILL | 26 | E6BTU/HR | 124.1986 |
| Pipeline Transportation of Natural Gas | 8000 HIGHWAY 34 | MARBLE HILL | 26 | E6BTU/HR | 99.8841 |
| Pipeline Transportation of Natural Gas | 8000 HIGHWAY 34 | MARBLE HILL | 26 | E6BTU/HR | 40.6193 |
| Pipeline Transportation of Natural Gas | 8000 HIGHWAY 34 | MARBLE HILL | 26 | E6BTU/HR | 123.1096 |
| Pipeline Transportation of Natural Gas | 8000 HIGHWAY 34 | MARBLE HILL | 26 | E6BTU/HR | 126.6515 |
| Pipeline Transportation of Natural Gas | 8000 HIGHWAY 34 | MARBLE HILL | 26 | E6BTU/HR | 119.0589 |
| Pipeline Transportation of Natural Gas | 8000 HIGHWAY 34 | MARBLE HILL | 26 | E6BTU/HR | 150.7116 |
| Pipeline Transportation of Natural Gas | 945 METTS STREET | LOUISVILLE | 11.8 | E6BTU/HR | 97.54 |
| Pipeline Transportation of Natural Gas | 945 METTS STREET | LOUISVILLE | 11.8 | E6BTU/HR | 84.47 |
| Pipeline Transportation of Natural Gas | 945 METTS STREET | LOUISVILLE | 11.8 | E6BTU/HR | 72.43 |
| Pipeline Transportation of Natural Gas | 945 METTS STREET | LOUISVILLE | 11.8 | E6BTU/HR | 66.75 |
| Pipeline Transportation of Natural Gas | 945 METTS STREET | LOUISVILLE | 11.8 | E6BTU/HR | 43.21 |
| Pipeline Transportation of Natural Gas | 945 METTS STREET | LOUISVILLE | 11.8 | E6BTU/HR | 21.31 |
| Pipeline Transportation of Natural Gas | 201 FLORIDA GAS ROAD | WIGGINS | 30.8 | E6BTU/HR | 64.14 |
| Pipeline Transportation of Natural Gas | 201 FLORIDA GAS ROAD | WIGGINS | 19 | E6BTU/HR | 35.73 |
| Pipeline Transportation of Natural Gas | 201 FLORIDA GAS ROAD | WIGGINS | 15.6 | E6BTU/HR | 159.26 |
| Pipeline Transportation of Natural Gas | 201 FLORIDA GAS ROAD | WIGGINS | 30.8 | E6BTU/HR | 63.93 |
| Pipeline Transportation of Natural Gas | 201 FLORIDA GAS ROAD | WIGGINS | 15.6 | E6BTU/HR | 165.71 |
| Pipeline Transportation of Natural Gas | 201 FLORIDA GAS ROAD | WIGGINS | 15.6 | E6BTU/HR | 166.82 |
| Pipeline Transportation of Natural Gas | 201 FLORIDA GAS ROAD | WIGGINS | 15.6 | E6BTU/HR | 188.11 |
| Pipeline Transportation of Natural Gas | 201 FLORIDA GAS ROAD | WIGGINS | 15.6 | E6BTU/HR | 195.37 |
| Pipeline Transportation of Natural Gas | 10156 OLD MAGNOLIA HIGHWAY | PRAIRIE | 7250 | HP | 154.04 |
| Pipeline Transportation of Natural Gas | 10156 OLD MAGNOLIA HIGHWAY | PRAIRIE | 7250 | HP | 132.21 |
| Pipeline Transportation of Natural Gas | 10156 OLD MAGNOLIA HIGHWAY | PRAIRIE | 7250 | HP | 146.21 |
| Pipeline Transportation of Natural Gas | 7677 230th Ave. | REED CITY | 8600 | HP | 111 |
| Pipeline Transportation of Natural Gas | 3305 US HIGHWAY 61 SOUTH | CLARKSDALE | 2000 | HP | 76.61 |
| Pipeline Transportation of Natural Gas | 3305 US HIGHWAY 61 SOUTH | CLARKSDALE | 2000 | HP | 54.72 |
| Pipeline Transportation of Natural Gas | 3305 US HIGHWAY 61 SOUTH | CLARKSDALE | 2000 | HP | 27.98 |
| Pipeline Transportation of Natural Gas | 3305 US HIGHWAY 61 SOUTH | CLARKSDALE | 2000 | HP | 53.06 |
| Pipeline Transportation of Natural Gas | 3305 US HIGHWAY 61 SOUTH | CLARKSDALE | 2000 | HP | 58.87 |
| Pipeline Transportation of Natural Gas | 3305 US HIGHWAY 61 SOUTH | CLARKSDALE | 2000 | HP | 28.97 |
| Pipeline Transportation of Natural Gas | 14490 Beckett Road | JOHANNESBURG | 0.01 | E6BTU/HR | 29.94 |
| Pipeline Transportation of Natural Gas | 37 ALEXANDER ROAD | JAYESS | 1500 | HP | 55.37 |
| Pipeline Transportation of Natural Gas | 37 ALEXANDER ROAD | JAYESS | 1500 | HP | 60.58 |
| Pipeline Transportation of Natural Gas | 37 ALEXANDER ROAD | JAYESS | 1600 | HP | 108.36 |
| Pipeline Transportation of Natural Gas | 37 ALEXANDER ROAD | JAYESS | 1600 | HP | 72.81 |
| Pipeline Transportation of Natural Gas | 37 ALEXANDER ROAD | JAYESS | 1600 | HP | 68.02 |
| Pipeline Transportation of Natural Gas | 37 ALEXANDER ROAD | JAYESS | 1600 | HP | 123.12 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 23 | E6BTU/HR | 46.4568 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 18 | E6BTU/HR | 23.77595 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 18 | E6BTU/HR | 31.0668 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 38 | E6BTU/HR | 58.21912 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 18 | E6BTU/HR | 29.47964 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 18 | E6BTU/HR | 29.57373 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 18 | E6BTU/HR | 27.58995 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 18 | E6BTU/HR | 22.35421 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 18.399996 | E6BTU/HR | 23.4627 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 24 | E6BTU/HR | 45.69195 |
| Pipeline Transportation of Natural Gas | 4 MI E/SE OF ROXTON; 1/2 MI W OF FM 1184 | ROXTON | 38 | E6BTU/HR | 56.8165 |
| Pipeline Transportation of Natural Gas | 4 MI E/SE OF ROXTON; 1/2 MI W OF FM 1184 | ROXTON | 38 | E6BTU/HR | 45.0146 |
| Pipeline Transportation of Natural Gas | 4 MI E/SE OF ROXTON; 1/2 MI W OF FM 1184 | ROXTON | 38 | E6BTU/HR | 44.4032 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 9.79 | E6BTU/HR | 81.032 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 13 | E6BTU/HR | 133.931 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 9.79 | E6BTU/HR | 120.787 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 9.79 | E6BTU/HR | 71.357 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 9.79 | E6BTU/HR | 80.821 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 9.79 | E6BTU/HR | 93.498 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 9.79 | E6BTU/HR | 91.501 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 9.79 | E6BTU/HR | 27.956 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 24.2 | E6BTU/HR | 50.559 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 9.79 | E6BTU/HR | 66.841 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 9.79 | E6BTU/HR | 60.743 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 9.79 | E6BTU/HR | 102.145 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS, 4 M E OF DENVER CITY | PLAINS | 9.79 | E6BTU/HR | 33.18 |
| Pipeline Transportation of Natural Gas | 20 M N OF TX 136 NEAR THE STATE BOUNDARY | GRUVER | 19 | E6BTU/HR | 503.6829 |
| Pipeline Transportation of Natural Gas | 20 M N OF TX 136 NEAR THE STATE BOUNDARY | GRUVER | 19 | E6BTU/HR | 198.0203 |
| Pipeline Transportation of Natural Gas | 20 M N OF TX 136 NEAR THE STATE BOUNDARY | GRUVER | 19 | E6BTU/HR | 62.6091 |
| Pipeline Transportation of Natural Gas | 20 M N OF TX 136 NEAR THE STATE BOUNDARY | GRUVER | 19 | E6BTU/HR | 83.9611 |
| Pipeline Transportation of Natural Gas | 20 M N OF TX 136 NEAR THE STATE BOUNDARY | GRUVER | 19 | E6BTU/HR | 70.9081 |
| Pipeline Transportation of Natural Gas | 20 M N OF TX 136 NEAR THE STATE BOUNDARY | GRUVER | 19 | E6BTU/HR | 68.6042 |
| Pipeline Transportation of Natural Gas | 20 M N OF TX 136 NEAR THE STATE BOUNDARY | GRUVER | 19 | E6BTU/HR | 40.7879 |
| Pipeline Transportation of Natural Gas | 20 M N OF TX 136 NEAR THE STATE BOUNDARY | GRUVER | 19 | E6BTU/HR | 91.8314 |

| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | LEC (retrofit) | 87.45 | NSCR or Layered Combustion | | |
| TON | | | 139 SCR | Selective Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |

**478a**

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| 06 | PA | Hansford | 6534211 | | 18510313 14 | ANR PIPELINE COMPANY | EG HILL COMPRESSOR | 486210 |
| 03 | PA | Clinton | 6601411 | | 19036913 420350011 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/LEIDY STA | 486210 |
| 03 | PA | Clinton | 6601411 | | 19037213 420350011 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/LEIDY STA | 486210 |
| 06 | TX | Victoria | 6496411 | | 19562013 17 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 9 VICTORIA | 486210 |
| 06 | TX | Victoria | 6496411 | | 19562113 17 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 9 VICTORIA | 486210 |
| 06 | TX | Victoria | 6496411 | | 19562213 17 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 9 VICTORIA | 486210 |
| 06 | TX | Victoria | 6496411 | | 19562313 17 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 9 VICTORIA | 486210 |
| 06 | TX | Victoria | 6496411 | | 19562413 17 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 9 VICTORIA | 486210 |
| 06 | TX | Victoria | 6496411 | | 19562513 17 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 9 VICTORIA | 486210 |
| 06 | TX | Victoria | 6496411 | | 19562713 17 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 9 VICTORIA | 486210 |
| 05 | TX | Jackson | 5653311 | | 19772313 11 | | EDNA COMPRESSOR STATION | 486210 |
| 05 | MI | Kalkaska | 5622111 | | 19994413 B7197 | No | ANR -- Rapid River Compressor Station | 486210 |
| 05 | MI | Kalkaska | 5622111 | | 19995213 B7197 | No | ANR -- Rapid River Compressor Station | 486210 |
| 05 | MI | Kalkaska | 5622011 | | 19995613 B7196 | No | ANR Storage Company - Excelsior Compressor Station | 486210 |
| 05 | MI | Kalkaska | 5622011 | | 19995613 B7196 | No | ANR Storage Company - Excelsior Compressor Station | 486210 |
| 05 | MI | Allegan | 5766211 | | 20397313 N5574 | No | ANR Pipeline Company - Hamilton Compressor Station | 486210 |
| 05 | MI | Allegan | 5766211 | | 20397413 N5574 | No | ANR Pipeline Company - Hamilton Compressor Station | 486210 |
| 05 | MI | Allegan | 5766211 | | 20397513 N5574 | No | ANR Pipeline Company - Hamilton Compressor Station | 486210 |
| 05 | MI | Allegan | 5766211 | | 20397613 N5574 | No | ANR Pipeline Company - Hamilton Compressor Station | 486210 |
| 06 | TX | Caldwell | 5631911 | | 21234013 5 | OASIS PIPELINE CO TEXAS LP | PRAIRIE LEA COMPRESSOR STATION | 486210 |
| 06 | TX | Caldwell | 5631911 | | 21234113 5 | OASIS PIPELINE CO TEXAS LP | PRAIRIE LEA COMPRESSOR STATION | 486210 |
| 06 | TX | Caldwell | 5631911 | | 21234613 5 | OASIS PIPELINE CO TEXAS LP | PRAIRIE LEA COMPRESSOR STATION | 486210 |
| 04 | KY | Hopkins | 5830611 | | 21385213 2110700134 | | ANR Pipeline Co (Madisonville Compressor Sta) | 486210 |
| 04 | KY | Hopkins | 5830611 | | 21385413 2110700134 | | ANR Pipeline Co (Madisonville Compressor Sta) | 486210 |
| 04 | KY | Hopkins | 5830611 | | 21385513 2110700134 | | ANR Pipeline Co (Madisonville Compressor Sta) | 486210 |
| 04 | KY | Hopkins | 5830611 | | 21385613 2110700134 | | ANR Pipeline Co (Madisonville Compressor Sta) | 486210 |
| 06 | TX | Pecos | 5781411 | | 21630513 7 | ETC FIELD SERVICES LLC | MITCHELL PLANT | 486210 |
| 06 | TX | Nueces | 5779811 | | 21679613 92 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 1 AGUA DULCE | 486210 |
| 06 | TX | Nueces | 5779811 | | 21679713 92 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 1 AGUA DULCE | 486210 |
| 06 | TX | Nueces | 5779811 | | 21680213 92 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 1 AGUA DULCE | 486210 |
| 06 | TX | Nueces | 5779811 | | 21680513 92 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 1 AGUA DULCE | 486210 |
| 06 | TX | Nueces | 5779811 | | 21680813 92 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 1 AGUA DULCE | 486210 |
| 06 | TX | Nueces | 5779811 | | 21681213 92 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 1 AGUA DULCE | 486210 |
| 06 | TX | Winkler | 5765511 | | 21710013 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| 06 | TX | Winkler | 5765511 | | 21710113 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| 06 | TX | Winkler | 5765511 | | 21710213 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| 06 | TX | Winkler | 5765511 | | 21710413 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| 06 | TX | Winkler | 5765511 | | 21710513 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| 06 | TX | Winkler | 5765511 | | 21710813 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| 06 | TX | Winkler | 5765511 | | 21710913 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| 06 | TX | Winkler | 5765511 | | 21711013 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| 06 | TX | Winkler | 5765511 | | 21711213 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| 06 | TX | Winkler | 5765511 | | 21711313 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| 06 | TX | Winkler | 5765511 | | 21711513 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| 06 | TX | Ochiltree | 5746811 | | 21808913 6 | DCP OPERATING COMPANY LP | SPEARMAN COMPRESSOR STATION | 486210 |
| 06 | TX | Ochiltree | 5746811 | | 21809113 6 | DCP OPERATING COMPANY LP | SPEARMAN COMPRESSOR STATION | 486210 |
| 06 | TX | Ochiltree | 5746811 | | 21809813 6 | DCP OPERATING COMPANY LP | SPEARMAN COMPRESSOR STATION | 486210 |
| 06 | TX | Ochiltree | 5746811 | | 21810013 6 | DCP OPERATING COMPANY LP | SPEARMAN COMPRESSOR STATION | 486210 |
| 06 | TX | Randall | 5745511 | | 21835913 11 | EL PASO NATURAL GAS COMPANY LLC | AMARILLO COMPRESSOR STATION | 486210 |
| 06 | TX | Potter | 5745511 | | 21836013 11 | EL PASO NATURAL GAS COMPANY LLC | AMARILLO COMPRESSOR STATION | 486210 |
| 06 | TX | Potter | 5678311 | | 22147113 52 | SCOUT ENERGY MANAGEMENT LLC | PFC 21 | 486210 |
| 06 | TX | Pecos | 5613411 | | 22158413 77 | ENTERPRISE PRODUCTS OPERATING LLC | WAHA COMPRESSOR STATION | 486210 |
| 05 | MI | Macomb | 5703511 | | 23059313 B8337 | No | ANR Pipeline Co.-Multonville Compressor Station | 486210 |
| 05 | MI | Livingston | 5888811 | | 23336613 N5572 | No | Howell Compressor Station | 486210 |
| 05 | MI | Livingston | 5888811 | | 23336713 N5572 | No | Howell Compressor Station | 486210 |
| 05 | MI | Livingston | 5888811 | | 23336813 N5572 | No | Howell Compressor Station | 486210 |
| 05 | MI | Livingston | 5888811 | | 23336913 N5572 | No | Howell Compressor Station | 486210 |
| 04 | KY | Lincoln | 6127911 | | 23416413 2113700008 | | Texas Eastern Transmission LP - Danville Compressor Station | 486210 |
| 04 | KY | Breckinridge | 5868411 | | 24267513 210700022 | No | Texas Gas Trans LLC | 486210 |
| 07 | MO | Nodaway | 5255011 | | 24939213 0024 | | ANR PIPELINE COMPANY - TRANSCANADA CORP MAITLAND COMPRESOR STATION | 486210 |
| 07 | MO | Nodaway | 5255011 | | 24939513 0024 | | ANR PIPELINE COMPANY - TRANSCANADA CORP MAITLAND COMPRESOR STATION | 486210 |
| 07 | MO | Nodaway | 5255011 | | 24939613 0024 | | ANR PIPELINE COMPANY - TRANSCANADA CORP MAITLAND COMPRESOR STATION | 486210 |
| 07 | MO | Nodaway | 5255011 | | 24940213 0024 | | ANR PIPELINE COMPANY - TRANSCANADA CORP MAITLAND COMPRESOR STATION | 486210 |
| 07 | MO | Nodaway | 5255011 | | 24940313 0024 | | ANR PIPELINE COMPANY - TRANSCANADA CORP MAITLAND COMPRESOR STATION | 486210 |
| 07 | MO | Nodaway | 5255011 | | 24940413 0024 | | ANR PIPELINE COMPANY - TRANSCANADA CORP MAITLAND COMPRESOR STATION | 486210 |
| 07 | MO | Nodaway | 5255011 | | 24940613 0024 | | ANR PIPELINE COMPANY - TRANSCANADA CORP MAITLAND COMPRESOR STATION | 486210 |
| 07 | MO | Newton | 5241311 | | 24954513 0049 | No | SAGINAW SOUTHERN STAR CENTRAL SAGINAW COMPRESSOR STATION | 486210 |
| 07 | MO | Newton | 5241311 | | 24954613 0049 | No | SAGINAW SOUTHERN STAR CENTRAL SAGINAW COMPRESSOR STATION | 486210 |
| 08 | TX | Wharton | 5172011 | | 25208713 17 | TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC | TRANSCO STATION 30 | 486210 |
| 08 | UT | Daggett | 5067111 | | 25967813 11532 | Questar Pipeline Company | Dominion Energy Questar Pipeline LLC: Kastler Manushack Compressor Station | 486210 |
| 08 | UT | Daggett | 5067111 | | 25967913 11532 | Questar Pipeline Company | Dominion Energy Questar Pipeline LLC: Kastler Manushack Compressor Station | 486210 |
| 08 | UT | Daggett | 5067111 | | 25968013 11532 | Questar Pipeline Company | Dominion Energy Questar Pipeline LLC: Kastler Manushack Compressor Station | 486210 |
| 08 | UT | Daggett | 5067111 | | 25968113 11532 | Questar Pipeline Company | Dominion Energy Questar Pipeline LLC: Kastler Manushack Compressor Station | 486210 |
| 08 | UT | Daggett | 5067111 | | 25968213 11532 | Questar Pipeline Company | Dominion Energy Questar Pipeline LLC: Kastler Manushack Compressor Station | 486210 |
| 04 | KY | Larue | 5502411 | | 26756313 2112300012 | | Louisville Gas & Electric | 486210 |
| 04 | KY | Larue | 5502411 | | 26756513 2112300012 | | Louisville Gas & Electric | 486210 |
| 05 | IL | Massac | 5535511 | | 26975113 127B55AAB | | Trunkline Gas Co | 486210 |
| 05 | IL | Massac | 5535511 | | 26975213 127B55AAB | | Trunkline Gas Co | 486210 |
| 05 | IL | Piatt | 5550111 | | 27147213 147802AAB | | Natural Gas Pipeline of America | 486210 |
| 05 | IL | Piatt | 5550111 | | 27147313 147802AAB | | Natural Gas Pipeline of America | 486210 |
| 05 | IL | Henry | 5529611 | | 27164413 073816AAA | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Henry | 5529311 | | 27164613 073816AAA | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Henry | 5529311 | | 27165613 073815AAC | | ANR Pipeline Co | 486210 |
| 05 | IL | Henry | 5529311 | | 27165713 073813AAC | | ANR Pipeline Co | 486210 |
| 05 | IL | Henry | 5529311 | | 27165813 073815AAC | | ANR Pipeline Co | 486210 |
| 05 | IL | Henry | 5529311 | | 27165913 073815AAC | | ANR Pipeline Co | 486210 |
| 05 | IL | Henry | 5529311 | | 27166113 073815AAC | | ANR Pipeline Co | 486210 |
| 05 | IL | Kankakee | 5428511 | | 27575313 091811AAB | No | Natural Gas Pipeline of America | 486210 |
| 05 | IL | Kankakee | 5428511 | | 27576113 091811AAB | No | Natural Gas Pipeline of America | 486210 |
| 03 | PA | Luzerne | 4743211 | | 27699713 420790058 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/BEAR CREEK STA 515 | 486210 |
| 03 | PA | Luzerne | 4743211 | | 27699913 420790058 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/BEAR CREEK STA 515 | 486210 |
| 03 | PA | Luzerne | 4743211 | | 27700013 420790058 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/BEAR CREEK STA 515 | 486210 |
| 03 | PA | Luzerne | 4743211 | | 27700113 420790058 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/BEAR CREEK STA 515 | 486210 |
| 03 | PA | Potter | 4720011 | | 27923013 420350004 | EASTERN GAS TRANS & STORAGE INC | EASTERN TRANS & STORAGE INC/ELLSBURG STA | 486210 |
| 03 | PA | Potter | 4720011 | | 27923413 420350004 | EASTERN GAS TRANS & STORAGE INC | EASTERN TRANS & STORAGE INC/ELLSBURG STA | 486210 |
| 03 | PA | Potter | 4719811 | | 27926313 421050002 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/GREENLICK STA | 486210 |
| 03 | PA | Potter | 4719811 | | 27926513 421050002 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/GREENLICK STA | 486210 |
| 03 | PA | Potter | 4719811 | | 27926613 421050002 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/GREENLICK STA | 486210 |
| 05 | IL | Sangamon | 4484711 | | 28065013 167801AAA | | Panhandle Eastern Pipe Line Co | 486210 |
| 05 | IN | Dearborn | 4748011 | | 28314013 00008 | No | Texas Gas Transmission LLC Dillsboro Co | 48621 |
| 05 | IN | Dearborn | 4748011 | | 28314113 00008 | No | Texas Gas Transmission LLC Dillsboro Co | 48621 |
| 05 | IN | Dearborn | 4748011 | | 28314213 00008 | No | Texas Gas Transmission LLC Dillsboro Co | 48621 |
| 05 | IN | Benton | 4728511 | | 28329113 00014 | No | Trunkline Gas Company LLC Ambia Compres | 48621 |
| 05 | IN | Benton | 4728511 | | 28329213 00014 | No | Trunkline Gas Company LLC Ambia Compres | 48621 |
| 05 | IN | Benton | 4728511 | | 28329313 00014 | No | Trunkline Gas Company LLC Ambia Compres | 48621 |
| 05 | IN | Benton | 4728511 | | 28329413 00014 | No | Trunkline Gas Company LLC Ambia Compres | 48621 |
| 05 | IN | Pike | 4672111 | | 28364413 00005 | No | Texas Gas Transmission, LLC | 48621 |
| 06 | TX | Sutton | 4914911 | | 29028413 7 | ENTERPRISE PRODUCTS OPERATING LLC | SONORA COMPRESSOR STATION | 486210 |
| 06 | TX | Sutton | 4914911 | | 29028513 7 | ENTERPRISE PRODUCTS OPERATING LLC | SONORA COMPRESSOR STATION | 486210 |
| 06 | TX | Sutton | 4914911 | | 29028713 7 | ENTERPRISE PRODUCTS OPERATING LLC | SONORA COMPRESSOR STATION | 486210 |
| 06 | TX | Bandera | 4898811 | | 29078713 2 | ENTERPRISE PRODUCTS OPERATING LLC | BANDERA COMPRESSOR STATION | 486210 |
| 06 | TX | Bandera | 4898811 | | 29078813 2 | ENTERPRISE PRODUCTS OPERATING LLC | BANDERA COMPRESSOR STATION | 486210 |
| 06 | TX | Bandera | 4898811 | | 29079013 2 | ENTERPRISE PRODUCTS OPERATING LLC | BANDERA COMPRESSOR STATION | 486210 |
| 06 | TX | Jasper | 4862311 | | 29540113 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| 06 | TX | Jasper | 4862311 | | 29540213 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| 06 | TX | Jasper | 4862311 | | 29540313 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| 06 | TX | Jasper | 4862311 | | 29540413 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| 06 | TX | Jasper | 4862311 | | 29540513 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| 06 | TX | Jasper | 4862311 | | 29540713 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| 06 | TX | Jasper | 4862311 | | 29540913 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| 06 | TX | Jasper | 4862311 | | 29541313 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| 06 | TX | Jasper | 4862311 | | 29541413 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| 06 | TX | Jasper | 4862311 | | 29541513 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| 06 | TX | Jasper | 4862311 | | 29541613 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| 06 | TX | Jasper | 4862311 | | 29542513 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| 06 | TX | Harrison | 4845511 | | 29666313 31 | NATURAL GAS PIPELINE CO OF AMERICA LLC | STATION 304 | 486210 |
| 06 | TX | Hemphill | 4981311 | | 29998513 22 | ONEOK WESTEX TRANSMISSION LP | BUFFALO WALLOW COMPRESOR FACILITY | 486210 |
| 06 | TX | Lamb | 4949511 | | 30119413 25 | EL PASO NATURAL GAS COMPANY LLC | DIMMITT COMPRESSOR | 486210 |
| 06 | TX | Lamb | 4949511 | | 30119513 25 | EL PASO NATURAL GAS COMPANY LLC | DIMMITT COMPRESSOR | 486210 |
| 06 | TX | Lamb | 4949511 | | 30119613 25 | EL PASO NATURAL GAS COMPANY LLC | DIMMITT COMPRESSOR | 486210 |
| 06 | TX | Lamb | 4949511 | | 30119713 25 | EL PASO NATURAL GAS COMPANY LLC | DIMMITT COMPRESSOR | 486210 |
| 05 | IN | Starke | 4911611 | | 30463713 00005 | No | TRUNKLINE GAS COMPANY NORTH JUDSON CO | 48621 |
| 05 | IN | Starke | 4911611 | | 30463813 00005 | No | TRUNKLINE GAS COMPANY NORTH JUDSON CO | 48621 |
| 05 | IN | Starke | 4911611 | | 30463913 00005 | No | TRUNKLINE GAS COMPANY NORTH JUDSON CO | 48621 |
| 05 | IN | Starke | 4911611 | | 30464313 00005 | No | TRUNKLINE GAS COMPANY NORTH JUDSON CO | 48621 |
| 05 | IL | McHenry | 4890911 | | 31547213 111816AAA | | ANR Pipeline Co | 486210 |
| 05 | IL | McHenry | 4890911 | | 31547613 111816AAA | | ANR Pipeline Co | 486210 |
| 05 | IN | Dubois | 4887211 | | 31557513 00031 | No | ANR PIPELINE CO CELESTINE COMPRESSOR ST | 48621 |
| 05 | IN | Dubois | 4887211 | | 31557613 00031 | No | ANR PIPELINE CO CELESTINE COMPRESSOR ST | 48621 |
| 05 | IN | Dubois | 4887211 | | 31557713 00031 | No | ANR PIPELINE CO CELESTINE COMPRESSOR ST | 48621 |

<center>**479a**</center>

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 20 M N OF TX 136 NEAR THE STATE BOUNDARY | GRUVER | 19 | E6BTU/HR | 141.6196 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 3400 | HP | 29.49 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 3400 | HP | 43.035 |
| Pipeline Transportation of Natural Gas | 1925 OLD BLOOMINGTON RD N | VICTORIA | 15.2 | E6BTU/HR | 65.514 |
| Pipeline Transportation of Natural Gas | 1925 OLD BLOOMINGTON RD N | VICTORIA | 15.2 | E6BTU/HR | 64.9974 |
| Pipeline Transportation of Natural Gas | 1925 OLD BLOOMINGTON RD N | VICTORIA | 15.2 | E6BTU/HR | 56.0915 |
| Pipeline Transportation of Natural Gas | 1925 OLD BLOOMINGTON RD N | VICTORIA | 15.2 | E6BTU/HR | 61.237 |
| Pipeline Transportation of Natural Gas | 1925 OLD BLOOMINGTON RD N | VICTORIA | 15.2 | E6BTU/HR | 54.7858 |
| Pipeline Transportation of Natural Gas | 1925 OLD BLOOMINGTON RD N | VICTORIA | 15.2 | E6BTU/HR | 56.5125 |
| Pipeline Transportation of Natural Gas | 1925 OLD BLOOMINGTON RD N | VICTORIA | 15.2 | E6BTU/HR | 35.6409 |
| Pipeline Transportation of Natural Gas | 4.3 M S OF EONA ON FM1822 | EONA | 11 | E6BTU/HR | 95.35 |
| Pipeline Transportation of Natural Gas | 2170  Rabourn Rd. NE | KALKASKA | 3750 | HP | 68.7 |
| Pipeline Transportation of Natural Gas | 2170  Rabourn Rd. NE | KALKASKA | 3750 | HP | 126.1 |
| Pipeline Transportation of Natural Gas | 4936  State Rd. NE | KALKASKA | 3750 | HP | 96.6 |
| Pipeline Transportation of Natural Gas | 4936  State Rd. NE | KALKASKA | 3750 | HP | 100.7 |
| Pipeline Transportation of Natural Gas | 4193  134th Ave | HAMILTON | 0.01 | E6BTU/HR | 23.55 |
| Pipeline Transportation of Natural Gas | 4193  134th Ave | HAMILTON | 0.01 | E6BTU/HR | 46.89 |
| Pipeline Transportation of Natural Gas | 4193  134th Ave | HAMILTON | 0.01 | E6BTU/HR | 45.18 |
| Pipeline Transportation of Natural Gas | 4193  134th Ave | HAMILTON | 0.01 | E6BTU/HR | 45.135 |
| Pipeline Transportation of Natural Gas | MILE TO C.R., LEFT ON C.R. 0.75 MI. TO STN. | PRAIRIE LEA | 41.6 | E6BTU/HR | 89.3057 |
| Pipeline Transportation of Natural Gas | MILE TO C.R., LEFT ON C.R. 0.75 MI. TO STN. | PRAIRIE LEA | 41.6 | E6BTU/HR | 174.5198 |
| Pipeline Transportation of Natural Gas | MILE TO C.R., LEFT ON C.R. 0.75 MI. TO STN. | PRAIRIE LEA | 41.6 | E6BTU/HR | 194.8726 |
| Pipeline Transportation of Natural Gas | 7500 Nebo Rd | Madisonville | 0.1 | E6BTU/HR | 197.9629 |
| Pipeline Transportation of Natural Gas | 7500 Nebo Rd | Madisonville | 0.1 | E6BTU/HR | 165.2401 |
| Pipeline Transportation of Natural Gas | 7500 Nebo Rd | Madisonville | 0.1 | E6BTU/HR | 172.9293 |
| Pipeline Transportation of Natural Gas | 7500 Nebo Rd | Madisonville | 0.1 | E6BTU/HR | 219.5694 |
| Pipeline Transportation of Natural Gas | 15 M S OF US 290 ON FM 2023 | FORT STOCKTON | 12.7 | E6BTU/HR | 0.138 |
| Pipeline Transportation of Natural Gas | 2960 CR 93 | AGUA DULCE | 14.8 | E6BTU/HR | 23.3575 |
| Pipeline Transportation of Natural Gas | 2960 CR 93 | AGUA DULCE | 14.8 | E6BTU/HR | 92.56 |
| Pipeline Transportation of Natural Gas | 2960 CR 93 | AGUA DULCE | 9.5 | E6BTU/HR | 51.004 |
| Pipeline Transportation of Natural Gas | 2960 CR 93 | AGUA DULCE | 14.8 | E6BTU/HR | 21.5812 |
| Pipeline Transportation of Natural Gas | 2960 CR 93 | AGUA DULCE | 10.2 | E6BTU/HR | 30.0407 |
| Pipeline Transportation of Natural Gas | 2960 CR 93 | AGUA DULCE | 9.5 | E6BTU/HR | 48.5973 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 10.5 | E6BTU/HR | 35.7005 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 10.5 | E6BTU/HR | 25.2761 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 10.5 | E6BTU/HR | 54.9231 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 10.5 | E6BTU/HR | 47.4036 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 10.5 | E6BTU/HR | 49.0408 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 10.5 | E6BTU/HR | 113.4994 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 15.1 | E6BTU/HR | 33.3286 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 10.5 | E6BTU/HR | 53.7343 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 10.5 | E6BTU/HR | 47.5473 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 10.5 | E6BTU/HR | 96.2242 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 10.5 | E6BTU/HR | 61.594 |
| Pipeline Transportation of Natural Gas | 8 M S OF SPEARMAN ON FM 760; THEN 7 M E ON FM 281 | SPEARMAN | 10.4 | E6BTU/HR | 45.7471 |
| Pipeline Transportation of Natural Gas | 8 M S OF SPEARMAN ON FM 760; THEN 7 M E ON FM 281 | SPEARMAN | 23.1 | E6BTU/HR | 149.2627 |
| Pipeline Transportation of Natural Gas | 8 M S OF SPEARMAN ON FM 760; THEN 7 M E ON FM 281 | SPEARMAN | 23.1 | E6BTU/HR | 287.3828 |
| Pipeline Transportation of Natural Gas | 8 M S OF SPEARMAN ON FM 760; THEN 7 M E ON FM 281 | SPEARMAN | 14 | E6BTU/HR | 57.5923 |
| Pipeline Transportation of Natural Gas | APPROX 4 M S OF BUSHLAND | AMARILLO | 18.6 | E6BTU/HR | 30.76 |
| Pipeline Transportation of Natural Gas | APPROX 4 M S OF BUSHLAND | AMARILLO | 18.6 | E6BTU/HR | 88.1791 |
| Pipeline Transportation of Natural Gas | 16 M S ON HWY 87 N | DUMAS | 8.7 | E6BTU/HR | 45.8002 |
| Pipeline Transportation of Natural Gas | 2 MI N ON HWY 1776; 0.8 MI W;  0.1 MI S | COYANOSA | 34 | E6BTU/HR | 2.3085 |
| Pipeline Transportation of Natural Gas | 36555  29 MILE RD. | MUTTONVILLE | 3200 | HP | 48.075 |
| Pipeline Transportation of Natural Gas | 3990  Crooked Lake  Rd | HOWELL | 1000 | HP | 215.05 |
| Pipeline Transportation of Natural Gas | 3990  Crooked Lake  Rd | HOWELL | 1000 | HP | 239.85 |
| Pipeline Transportation of Natural Gas | 3990  Crooked Lake  Rd | HOWELL | 1000 | HP | 127.85 |
| Pipeline Transportation of Natural Gas | 3990  Crooked Lake  Rd | HOWELL | 1000 | HP | 108.95 |
| Pipeline Transportation of Natural Gas | 1745 Airport Rd | Danville | 14.4 | E6BTU/HR | 84.1601391 |
| Pipeline Transportation of Natural Gas | 2332 US 60 W | Hardinsburg | 0.1 | E6BTU/HR | 53.96949 |
| Pipeline Transportation of Natural Gas | 33854 COUNTY ROAD TT | GRAHAM | 1400 | HP | 87.7735 |
| Pipeline Transportation of Natural Gas | 33854 COUNTY ROAD TT | GRAHAM | 1400 | HP | 101.513 |
| Pipeline Transportation of Natural Gas | 33854 COUNTY ROAD TT | GRAHAM | 2000 | HP | 189.4274 |
| Pipeline Transportation of Natural Gas | 33854 COUNTY ROAD TT | GRAHAM | 1400 | HP | 97.8375 |
| Pipeline Transportation of Natural Gas | 33854 COUNTY ROAD TT | GRAHAM | 1400 | HP | 102.1481 |
| Pipeline Transportation of Natural Gas | 33854 COUNTY ROAD TT | GRAHAM | 1400 | HP | 114.4917 |
| Pipeline Transportation of Natural Gas | 33854 COUNTY ROAD TT | GRAHAM | 1400 | HP | 128.3059 |
| Pipeline Transportation of Natural Gas | 6300 S RANGELINE | JOPLIN | 11 | E6BTU/HR | 88.1347 |
| Pipeline Transportation of Natural Gas | 6300 S RANGELINE | JOPLIN | 11 | E6BTU/HR | 57.6312 |
| Pipeline Transportation of Natural Gas | 2648 FM 2546 RD | EL CAMPO | 19.4 | E6BTU/HR | 34.8379 |
| Pipeline Transportation of Natural Gas | Section 16, T3N, R24E | Daggett County | 22.1 | E6BTU/HR | 141.3654 |
| Pipeline Transportation of Natural Gas | Section 16, T3N, R24E | Daggett County | 22.1 | E6BTU/HR | 180.6824 |
| Pipeline Transportation of Natural Gas | Section 16, T3N, R24E | Daggett County | 22.1 | E6BTU/HR | 135.6015 |
| Pipeline Transportation of Natural Gas | Section 16, T3N, R24E | Daggett County | 22.1 | E6BTU/HR | 35.73238 |
| Pipeline Transportation of Natural Gas | Section 16, T3N, R24E | Daggett County | 22.1 | E6BTU/HR | 135.0951 |
| Pipeline Transportation of Natural Gas | 650 LGE Rd | Magnolia | 10.4 | E6BTU/HR | 37.67313 |
| Pipeline Transportation of Natural Gas | 650 LGE Rd | Magnolia | 10.6 | E6BTU/HR | 32.29425 |
| Pipeline Transportation of Natural Gas | 2101 Portland Rd | Joppa | 24.3 | E6BTU/HR | 116.3498 |
| Pipeline Transportation of Natural Gas | 2101 Portland Rd | Joppa | 21.2 | E6BTU/HR | 48.19732 |
| Pipeline Transportation of Natural Gas | 2 miles W on US 36 | Hammond | 23.9 | E6BTU/HR | 95.04 |
| Pipeline Transportation of Natural Gas | 2 miles  W on US 36 | Hammond | 50.3 | E6BTU/HR | 119.7 |
| Pipeline Transportation of Natural Gas | 16048 Highway 82 | Geneseo | 50.7 | E6BTU/HR | 129.349 |
| Pipeline Transportation of Natural Gas | 16048 Highway 82 | Geneseo | 36.2 | E6BTU/HR | 112.2716 |
| Pipeline Transportation of Natural Gas | 296 N 600 Ave | New Windsor | 13 | E6BTU/HR | 48.03912 |
| Pipeline Transportation of Natural Gas | 296 N 600 Ave | New Windsor | 13 | E6BTU/HR | 47.3422 |
| Pipeline Transportation of Natural Gas | 296 N 600 Ave | New Windsor | 13 | E6BTU/HR | 46.66338 |
| Pipeline Transportation of Natural Gas | 296 N 600 Ave | New Windsor | 13 | E6BTU/HR | 60.27953 |
| Pipeline Transportation of Natural Gas | 296 N 600 Ave | New Windsor | 16 | E6BTU/HR | 74.49827 |
| Pipeline Transportation of Natural Gas | 5611 S 12000 West Rd | Herscher | 27.2 | E6BTU/HR | 101.5548 |
| Pipeline Transportation of Natural Gas | 5611 S 12000 West Rd | Herscher | 44.6 | E6BTU/HR | 73.61382 |
| Pipeline Transportation of Natural Gas | 182 BUCK BLVD HWY 115 | BEAR CREEK | | | 26.5408 |
| Pipeline Transportation of Natural Gas | 182 BUCK BLVD HWY 115 | BEAR CREEK | | | 28.2802 |
| Pipeline Transportation of Natural Gas | 182 BUCK BLVD HWY 115 | BEAR CREEK | | | 31.3898 |
| Pipeline Transportation of Natural Gas | 182 BUCK BLVD HWY 115 | BEAR CREEK | | | 26.4024 |
| Pipeline Transportation of Natural Gas | SR 0449 | GENESEE | 3400 | HP | 23.219 |
| Pipeline Transportation of Natural Gas | SR 0449 | GENESEE | 3400 | HP | 21.5481 |
| Pipeline Transportation of Natural Gas | SHEEPARD RD | STEWARDSON TWP | 0.01 | E6BTU/HR | 21.905 |
| Pipeline Transportation of Natural Gas | SHEEPARD RD | STEWARDSON TWP | 0.01 | E6BTU/HR | 31.223 |
| Pipeline Transportation of Natural Gas | SHEEPARD RD | STEWARDSON TWP | 0.01 | E6BTU/HR | 31.661 |
| Pipeline Transportation of Natural Gas | 11615 Old Route 66 | Glenarm | 31.7 | E6BTU/HR | 29.34027 |
| Pipeline Transportation of Natural Gas | 10622 Texas Gas Rd | Aurora | 0.1 | E6BTU/HR | 219.8293 |
| Pipeline Transportation of Natural Gas | 10622 Texas Gas Rd | Aurora | 0.1 | E6BTU/HR | 114.5589 |
| Pipeline Transportation of Natural Gas | 10622 Texas Gas Rd | Aurora | 0.1 | E6BTU/HR | 148.0714 |
| Pipeline Transportation of Natural Gas | 10483 W CR 600 S | Ambia | 0.1 | E6BTU/HR | 46.58 |
| Pipeline Transportation of Natural Gas | 10483 W CR 600 S | Ambia | 0.1 | E6BTU/HR | 64.48 |
| Pipeline Transportation of Natural Gas | 10483 W CR 600 S | Ambia | 0.1 | E6BTU/HR | 47.15 |
| Pipeline Transportation of Natural Gas | 10483 W CR 600 S | Ambia | 0.1 | E6BTU/HR | 70.99 |
| Pipeline Transportation of Natural Gas | 7935 W SR 56 | Hazleton | 0.1 | E6BTU/HR | 31.29623 |
| Pipeline Transportation of Natural Gas | 19 M S OF SONORA ON HWY 277 | SONORA | 30 | E6BTU/HR | 53.0696 |
| Pipeline Transportation of Natural Gas | 19 M S OF SONORA ON HWY 277 | SONORA | 30 | E6BTU/HR | 22.1121 |
| Pipeline Transportation of Natural Gas | 19 M S OF SONORA ON HWY 277 | SONORA | 30 | E6BTU/HR | 51.4748 |
| Pipeline Transportation of Natural Gas | 19 M S OF SONORA ON HWY 277 | SONORA | 30 | E6BTU/HR | 79.3536 |
| Pipeline Transportation of Natural Gas | 4.0 MI S OF BANDERA ON SH 16 | BANDERA | 30 | E6BTU/HR | 192.2291 |
| Pipeline Transportation of Natural Gas | 4.0 MI S OF BANDERA ON SH 16 | BANDERA | 30 | E6BTU/HR | 214.9589 |
| Pipeline Transportation of Natural Gas | 4.0 MI S OF BANDERA ON SH 16 | BANDERA | 30 | E6BTU/HR | 252.4726 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 14.8 | E6BTU/HR | 37.4055 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 14.8 | E6BTU/HR | 108.3725 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 14.8 | E6BTU/HR | 51.8154 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 14.8 | E6BTU/HR | 105.7196 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 14.8 | E6BTU/HR | 45.0137 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 14.8 | E6BTU/HR | 72.5691 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 14.8 | E6BTU/HR | 26.4794 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 10.5 | E6BTU/HR | 35.1227 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 10.5 | E6BTU/HR | 31.9915 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 10.5 | E6BTU/HR | 23.6019 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 10.5 | E6BTU/HR | 29.1544 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 14.8 | E6BTU/HR | 33.2035 |
| Pipeline Transportation of Natural Gas | 11 M S ON HWY 43 | MARSHALL | 28 | E6BTU/HR | 74.5495 |
| Pipeline Transportation of Natural Gas | 7 M E ON FM 277 FROM HWY 83 N OF BRISCOE | BRISCOE | 18.1 | E6BTU/HR | 0.0033 |
| Pipeline Transportation of Natural Gas | AT DIMMITT GO 16 M S ON TX 385 & 1 M W | DIMMITT | 9.44 | E6BTU/HR | 39.221 |
| Pipeline Transportation of Natural Gas | AT DIMMITT GO 16 M S ON TX 385 & 1 M W | DIMMITT | 9.44 | E6BTU/HR | 27.265 |
| Pipeline Transportation of Natural Gas | AT DIMMITT GO 16 M S ON TX 385 & 1 M W | DIMMITT | 10.1 | E6BTU/HR | 126.09 |
| Pipeline Transportation of Natural Gas | AT DIMMITT GO 16 M S ON TX 385 & 1 M W | DIMMITT | 10.1 | E6BTU/HR | 114.565 |
| Pipeline Transportation of Natural Gas | 6580 S CR 200 E | Knox | 0.1 | E6BTU/HR | 80.88 |
| Pipeline Transportation of Natural Gas | 6580 S CR 200 E | Knox | 0.1 | E6BTU/HR | 71.94 |
| Pipeline Transportation of Natural Gas | 6580 S CR 200 E | Knox | 0.1 | E6BTU/HR | 68.05 |
| Pipeline Transportation of Natural Gas | 6580 S CR 200 E | Knox | 0.1 | E6BTU/HR | 97.78 |
| Pipeline Transportation of Natural Gas | 15313 W South St | Woodstock | 4 | E6BTU/HR | 47.97552 |
| Pipeline Transportation of Natural Gas | 15313 W South St | Woodstock | 4 | E6BTU/HR | 32.84914 |
| Pipeline Transportation of Natural Gas | 146 S Celestine Rd | Celestine | 2160 | HP | 83.71639 |
| Pipeline Transportation of Natural Gas | 146 S Celestine Rd | Celestine | 10800 | HP | 79.47838 |
| Pipeline Transportation of Natural Gas | 146 S Celestine Rd | Celestine | 2160 | HP | 83.27339 |

| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | DCL 3-way catalyst with Air/fuel Ration | 90 | 310 NSCR | Non-Selective Catalytic Reduction or Layered Combustion | |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | Precombustion Chamber + LEC + Oxidat | 87.45 | NSCR or Layered Combustion | | |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | Fuel Injection | 90 | NSCR or Layered Combustion | | |
| TON | Fuel Injection | 90 | NSCR or Layered Combustion | | |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | LEC | 85 | NSCR or Layered Combustion | | |
| TON | NSCR | 90 | 310 NSCR | | |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| 05 | IN | Dubois | 4887211 | 31557813 00031 | No | | ANR PIPELINE CO CELESTINE COMPRESSOR ST | 48621 |
| 05 | MI | Clare | 4007011 | 32494713 N5S81 | No | | Great Lakes Gas - Farwell Compressor Station 12 | 486210 |
| 05 | MI | Clare | 4007011 | 32494813 N5S81 | No | | Great Lakes Gas - Farwell Compressor Station 12 | 486210 |
| 05 | MI | Clare | 4007011 | 32494913 N5S81 | No | | Great Lakes Gas - Farwell Compressor Station 12 | 486210 |
| 05 | MI | Clare | 4007011 | 32495013 N5S81 | No | | Great Lakes Gas - Farwell Compressor Station 12 | 486210 |
| 05 | MI | Clare | 4007011 | 32495113 N5S81 | No | | Great Lakes Gas - Farwell Compressor Station 12 | 486210 |
| 03 | VA | Pittsylvania | 4005411 | 32507513 30864 | Transco Gas Pipe Line Corp Station 165 | Transco Gas Pipe Line Corp Station 165 | 486210 |
| 03 | VA | Pittsylvania | 4005411 | 32507613 30864 | Transco Gas Pipe Line Corp Station 165 | Transco Gas Pipe Line Corp Station 165 | 486210 |
| 03 | VA | Pittsylvania | 4005411 | 32507713 30864 | Transco Gas Pipe Line Corp Station 165 | Transco Gas Pipe Line Corp Station 165 | 486210 |
| 03 | VA | Pittsylvania | 4005411 | 32507813 30864 | Transco Gas Pipe Line Corp Station 165 | Transco Gas Pipe Line Corp Station 165 | 486210 |
| 03 | VA | Pittsylvania | 4005411 | 32507913 30864 | Transco Gas Pipe Line Corp Station 165 | Transco Gas Pipe Line Corp Station 165 | 486210 |
| 03 | VA | Pittsylvania | 4005411 | 32508013 30864 | Transco Gas Pipe Line Corp Station 165 | Transco Gas Pipe Line Corp Station 165 | 486210 |
| 03 | VA | Pittsylvania | 4005411 | 32508113 30864 | Transco Gas Pipe Line Corp Station 165 | Transco Gas Pipe Line Corp Station 165 | 486210 |
| 03 | VA | Pittsylvania | 4005411 | 32508213 30864 | Transco Gas Pipe Line Corp Station 165 | Transco Gas Pipe Line Corp Station 165 | 486210 |
| 03 | VA | Pittsylvania | 4005411 | 32508313 30864 | Transco Gas Pipe Line Corp Station 165 | Transco Gas Pipe Line Corp Station 165 | 486210 |
| 03 | VA | Pittsylvania | 4005411 | 32508713 30864 | Transco Gas Pipe Line Corp Station 165 | Transco Gas Pipe Line Corp Station 165 | 486210 |
| 03 | VA | Dickenson | 4183911 | 32650913 11046 | East Tennessee Natural Gas Co - Station 3401 | East Tennessee Natural Gas Co-Station 3401- Nora | 486210 |
| 03 | VA | Dickenson | 4183911 | 32651013 11046 | East Tennessee Natural Gas Co-Station 3401- Nora | East Tennessee Natural Gas Co-Station 3401- Nora | 486210 |
| 06 | TX | Moore | 4179811 | 33907013 65 | PANHANDLE EASTERN PIPE LINE COMPANY LP | SUNRAY COMPRESSOR STATION | 486210 |
| 06 | TX | Moore | 4179811 | 33907513 65 | PANHANDLE EASTERN PIPE LINE COMPANY LP | SUNRAY COMPRESSOR STATION | 486210 |
| 06 | TX | Carson | 4160713 | 34014013 46 | SCOUT ENERGY MANAGEMENT LLC | LYNX MAIN & B | 486210 |
| 06 | OK | Grady | 3952011 | 34853613 1130 | ENABLE GAS TRANSMISSION LLC | AMBER JUNCTION COMPRESSOR STATION | 486210 |
| 06 | MI | Mecosta | 4190611 | 34936313 B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| 05 | MI | Mecosta | 4190611 | 34936413 B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| 06 | TX | Midland | 4017711 | 35409013 26 | ONEOK WESTEX TRANSMISSION LLC | DORA ROBERTS COMPRESSOR STATION | 486210 |
| 06 | TX | Moore | 4016311 | 35441513 27 | NORTHERN NATURAL GAS CO | SUNRAY PLANT | 486210 |
| 06 | TX | Moore | 4016311 | 35442413 27 | NORTHERN NATURAL GAS CO | SUNRAY PLANT | 486210 |
| 06 | TX | Moore | 4016311 | 35442613 27 | NORTHERN NATURAL GAS CO | SUNRAY PLANT | 486210 |
| 06 | TX | Moore | 4016311 | 35442913 27 | NORTHERN NATURAL GAS CO | SUNRAY PLANT | 486210 |
| 06 | TX | Midland | 4204311 | 35772113 7 | NORTHERN NATURAL GAS CO | SPRABERRY PLANT | 486210 |
| 06 | TX | Midland | 4204311 | 35772313 7 | NORTHERN NATURAL GAS CO | SPRABERRY PLANT | 486210 |
| 06 | TX | Midland | 4204311 | 35772413 7 | NORTHERN NATURAL GAS CO | SPRABERRY PLANT | 486210 |
| 06 | TX | Midland | 4204311 | 35772513 7 | NORTHERN NATURAL GAS CO | SPRABERRY PLANT | 486210 |
| 06 | TX | Midland | 4204311 | 35772613 7 | NORTHERN NATURAL GAS CO | SPRABERRY PLANT | 486210 |
| 06 | TX | Midland | 4204311 | 35773213 7 | NORTHERN NATURAL GAS CO | SPRABERRY PLANT | 486210 |
| 03 | PA | Armstrong | 3866311 | 37163413 420050014 | PEOPLES NATURAL GAS CO LLC | PEOPLES NATURAL GAS CO LLC/GIRTY STA | 486210 |
| 03 | PA | Lancaster | 3864011 | 37179413 42071007T | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS/MARIETTA | 486210 |
| 03 | PA | Lancaster | 3864011 | 37179613 42071007T | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS/MARIETTA | 486210 |
| 03 | PA | Lancaster | 3864011 | 37179713 42071007T | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS/MARIETTA | 486210 |
| 03 | PA | Lancaster | 3864011 | 37179813 42071007T | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS/MARIETTA | 486210 |
| 03 | PA | Lancaster | 3864011 | 37179913 42071007T | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS/MARIETTA | 486210 |
| 03 | PA | Tioga | 3878211 | 37460113 42117004B | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/TIOGA STA | 486210 |
| 03 | PA | Bedford | 3855611 | 37805913 420090009 | COLUMBIA GAS TRANS LLC | COLUMBIA GAS TRANS LLC/ARTEMAS COMP STA | 486210 |
| 03 | PA | Bedford | 3855611 | 37806513 420090009 | COLUMBIA GAS TRANS LLC | COLUMBIA GAS TRANS LLC/ARTEMAS COMP STA | 486210 |
| 03 | PA | Forest | 3768311 | 37872413 420530001 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC MARIENVILLE STA 307 | 486210 |
| 03 | PA | Forest | 3768311 | 37872613 420530001 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC MARIENVILLE STA 307 | 486210 |
| 03 | PA | Forest | 3768311 | 37872713 420530001 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC MARIENVILLE STA 307 | 486210 |
| 03 | PA | Forest | 3768311 | 37872813 420530001 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC MARIENVILLE STA 307 | 486210 |
| 03 | PA | Forest | 3768311 | 37872913 420530001 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC MARIENVILLE STA 307 | 486210 |
| 03 | PA | Forest | 3768311 | 37873113 420530001 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC MARIENVILLE STA 307 | 486210 |
| 03 | PA | Mercer | 3123311 | 38152113 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| 03 | PA | Mercer | 3123311 | 38152313 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| 03 | PA | Mercer | 3123311 | 38152413 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| 03 | PA | Mercer | 3123311 | 38152613 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| 03 | PA | Mercer | 3123311 | 38152813 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| 03 | PA | Mercer | 3123311 | 38152913 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| 03 | PA | Mercer | 3123311 | 38153013 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| 03 | PA | Mercer | 3123311 | 38153113 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| 03 | PA | Mercer | 3123311 | 38153213 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| 03 | PA | Mercer | 3123311 | 38153313 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| 03 | TX | Bailey | 2997711 | 38593213 10 | NATURAL GAS PIPELINE CO OF AMERICA LLC | BOOSTER STATION 158 | 486210 |
| 03 | PA | Westmoreland | 3190511 | 38711513 421290178 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/B TONKIN STA | 486210 |
| 03 | PA | Westmoreland | 3189311 | 38717713 421290062 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SOUTH OAKFORD STA | 486210 |
| 03 | PA | Westmoreland | 3189311 | 38717813 421290062 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SOUTH OAKFORD STA | 486210 |
| 09 | CA | San Bernardino | 2333611 | 39698613 3605.1839 | PACIFIC GAS & ELECTRIC COMPANY | PG&E - TOPOCK COMPRESSOR STATION | 486210 |
| 05 | IL | Douglas | 2600611 | 40756113 041804AAC | | Panhandle Eastern Pipe Line Co | 486210 |
| 05 | IL | Douglas | 2600611 | 40756213 041804AAC | | Panhandle Eastern Pipe Line Co | 486210 |
| 05 | IL | Douglas | 2600611 | 40756313 041804AAC | | Panhandle Eastern Pipe Line Co | 486210 |
| 05 | IL | Douglas | 2600611 | 40756413 041804AAC | | Panhandle Eastern Pipe Line Co | 486210 |
| 05 | IL | Douglas | 2600611 | 40756513 041804AAC | | Panhandle Eastern Pipe Line Co | 486210 |
| 05 | IL | Douglas | 2600611 | 40756813 041804AAC | | Panhandle Eastern Pipe Line Co | 486210 |
| 05 | IL | Fayette | 2670411 | 41044713 051808AAB | | Natural Gas Pipeline Co | 486210 |
| 05 | IL | Fayette | 2670411 | 41044913 051808AAB | | Natural Gas Pipeline Co | 486210 |
| 05 | IL | Fayette | 2670411 | 41045213 051808AAB | | Natural Gas Pipeline Co | 486210 |
| 05 | IL | Edgar | 2650911 | 41066813 045803AAA | | Midwestern Gas Transmission | 486210 |
| 05 | IL | Clinton | 1816411 | 41970013 027807AAC | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Clinton | 1816411 | 41970313 027807AAC | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Clinton | 1816411 | 41970413 027807AAC | | Natural Gas Pipeline Co of America | 486210 |
| 06 | OK | Roger Mills | 913811 | 46553213 3163 | ENABLE GAS GATHERING LLC | STRONG CITY COMPRESSOR STATION | 486210 |
| 06 | OK | Roger Mills | 913811 | 46553313 3163 | ENABLE GAS GATHERING LLC | STRONG CITY COMPRESSOR STATION | 486210 |
| 06 | AR | Hot Spring | 1136113 | 46779513 050S900039 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO. OF AMERICA-306 | 486210 |
| 06 | AR | Franklin | 1117711 | 46788313 050470068 | Black Hills Energy Arkansas, Inc. | Black Hills Energy ARKANSAS - WOOLSEY COMPRESSOR STATION | 48621 |
| 06 | AR | White | 1102611 | 46809313 051450104 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#307 | 48621 |
| 06 | AR | White | 1102611 | 46809513 051450104 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#307 | 48621 |
| 06 | AR | White | 1102611 | 46809413 051450104 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#307 | 48621 |
| 06 | AR | White | 1102611 | 46809613 051450104 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#307 | 48621 |
| 06 | AR | White | 1102611 | 46809513 051450104 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#307 | 48621 |
| 06 | AR | White | 1102611 | 46809713 051450104 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#307 | 48621 |
| 06 | AR | White | 1102611 | 46809813 051450104 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#307 | 48621 |
| 06 | AR | White | 1102611 | 46809913 051450104 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#307 | 48621 |
| 06 | AR | White | 1102611 | 46810013 051450104 | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO OF AMERICA-#307 | 48621 |
| 06 | AR | Jackson | 1101511 | 46832613 050670011 | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | TUCKERMAN COMPRESSOR STATION | 486210 |
| 06 | AR | White | 975311 | 47127013 051450123 | Enbridge | Texas Eastern Transmissions, LP (TETLP)-Bald Knob Compressor Station | 48621 |
| 06 | AR | Logan | 973211 | 47168513 050830088 | ENABLE GAS TRANSMISSION, LLC | DUNN COMPRESSOR STATION | 486210 |
| 06 | AR | Logan | 973211 | 47168613 050830088 | ENABLE GAS TRANSMISSION, LLC | DUNN COMPRESSOR STATION | 486210 |
| 06 | AR | Logan | 973211 | 47168713 050830088 | ENABLE GAS TRANSMISSION, LLC | DUNN COMPRESSOR STATION | 486210 |
| 06 | AR | Logan | 973211 | 47168813 050830088 | ENABLE GAS TRANSMISSION, LLC | DUNN COMPRESSOR STATION | 486210 |
| 06 | AR | Lonoke | 1075311 | 47595113 050E000093 | ENABLE GAS TRANSMISSION, LLC | CARLISLE COMPRESSOR STATION | 486210 |
| 09 | CA | Contra Costa | 241611 | 51024313 7130341 | PACIFIC GAS & ELECTRIC CO | PACIFIC GAS & ELECTRIC CO | 486210 |
| 06 | TX | Parker | 9310411 | 54814113 151 | | ALEDO JUNCTION COMPRESSOR STATION | 486210 |
| 05 | OH | Columbiana | 9293211 | 55659713 0215050202 | | BRINKER COMPRESSOR STATION (0215050202) | 48621 |
| 06 | TX | Gregg | 9125711 | 57490513 108 | MIDCOAST G & P EAST TEXAS LP | VOYAGEUR COMPRESSOR STATION | 486210 |
| 07 | MO | Scott | 7596311 | 59159913 0099 | | TEXAS EASTERN TRANSMISSION LP ORAN FACILITY | 486210 |
| 05 | IL | Clinton | 1816411 | 59354013 027807AAC | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Clinton | 1816411 | 59354113 027807AAC | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Clinton | 1816411 | 59354213 027807AAC | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Clinton | 1816411 | 59354313 027807AAC | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Clinton | 1816411 | 59354413 027807AAC | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Clinton | 1816411 | 59354513 027807AAC | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Fayette | 2670411 | 59575213 051808AAB | | Natural Gas Pipeline Co | 486210 |
| 05 | IL | Edgar | 2650911 | 59609503 045803AAA | | Midwestern Gas Transmission | 486210 |
| 05 | IL | Henry | 5529311 | 59716613 073851AAC | | ANR Pipeline Co | 486210 |
| 05 | IL | Henry | 5529311 | 59717413 073851AAA | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Henry | 5529311 | 59717513 073851AAA | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Kankakee | 5428511 | 59754013 091811AAB | No | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Kankakee | 5428511 | 59754113 091811AAB | No | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Kankakee | 5428511 | 59754213 091811AAB | No | | Natural Gas Pipeline Co of America | 486210 |
| 05 | IL | Kendall | 8222911 | 59760213 093802AAF | | ANR Pipeline Co | 486210 |
| 05 | IL | Sangamon | 4484711 | 59915413 167801AAA | | Panhandle Eastern Pipe Line Co | 486210 |
| 05 | IL | Sangamon | 4484711 | 59915713 167801AAA | | Panhandle Eastern Pipe Line Co | 486210 |
| 05 | IL | Massac | 5535511 | 60188713 127855AAB | | Trunkline Gas Co | 486210 |
| 05 | IL | Massac | 5535511 | 60188813 127855AAB | | Trunkline Gas Co | 486210 |
| 05 | IL | Massac | 5535511 | 60188913 127855AAB | | Trunkline Gas Co | 486210 |
| 05 | IL | Piatt | 5550111 | 60261113 147802AAB | | Natural Gas Pipeline of America | 486210 |
| 05 | IL | Piatt | 5550111 | 60261213 147802AAB | | Natural Gas Pipeline of America | 486210 |
| 05 | IL | Piatt | 5550111 | 60261313 147802AAB | | Natural Gas Pipeline of America | 486210 |
| 05 | IL | Piatt | 5550111 | 60261413 147802AAB | | Natural Gas Pipeline of America | 486210 |
| 05 | IL | Piatt | 5550111 | 60261513 147802AAB | | Natural Gas Pipeline of America | 486210 |
| 05 | IL | Piatt | 5550111 | 60261613 147802AAB | | Natural Gas Pipeline of America | 486210 |
| 05 | IL | Pike | 7807611 | 60269113 149820AAB | | Panhandle Eastern Pipe Line Co | 486210 |
| 05 | IL | Vermilion | 5401911 | 60337713 183814AAC | | Midwestern Gas Transmission | 486210 |
| 05 | IL | Vermilion | 5401911 | 60337813 183814AAC | | Midwestern Gas Transmission | 486210 |
| 05 | IL | Vermilion | 5401911 | 60337913 183814AAC | | Midwestern Gas Transmission | 486210 |
| 03 | PA | Jefferson | 3020911 | 67476813 420650011 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/BIG RUN COMP STA/JEFFERSON | 486210 |
| 05 | IN | Dubois | 4887211 | 68290313 00031 | No | | ANR PIPELINE CO CELESTINE COMPRESSOR ST | 48621 |
| 05 | IN | Dubois | 4887211 | 68290413 00031 | No | | ANR PIPELINE CO CELESTINE COMPRESSOR ST | 48621 |
| 05 | IN | Dubois | 4887211 | 68290513 00031 | No | | ANR PIPELINE CO CELESTINE COMPRESSOR ST | 48621 |
| 05 | IN | Dubois | 4887211 | 68290613 00031 | No | | ANR PIPELINE CO CELESTINE COMPRESSOR ST | 48621 |
| 06 | TX | Gregg | 9124211 | 70494013 54 | TEXAS EASTERN TRANSMISSION LP | LONGVIEW COMPRESSOR STATION | 486210 |
| 06 | TX | Jack | 9113411 | 71000713 34 | WORSHAM-STEED GAS STORAGE LLC | WORSHAM STEED GAS STORAGE | 486210 |
| 06 | TX | Wheeler | 4039311 | 71596113 6 | ONEOK WESTEX TRANSMISSION LLC | RED RIVER SC NO 1 WHEELER | 486210 |
| 03 | WV | Wyoming | 6214911 | 71684213 0019 | Eastern Gas Transmission and Storage, Inc. | EGTS - LOUP CREEK COMPRESSOR STATION | 48621 |

**482a**

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 146 S Celestine Rd | Celestine | 2160 | HP | 49.7928 |
| Pipeline Transportation of Natural Gas | 3400 HICKORY RD | LAKE GEORGE | 8000 | HP | 37.78 |
| Pipeline Transportation of Natural Gas | 3400 HICKORY RD | LAKE GEORGE | 3400 | HP | 122.1 |
| Pipeline Transportation of Natural Gas | 3400 HICKORY RD | LAKE GEORGE | 3400 | HP | 115.2 |
| Pipeline Transportation of Natural Gas | 3400 HICKORY RD | LAKE GEORGE | 0.01 | E6BTU/HR | 22.14 |
| Pipeline Transportation of Natural Gas | 3400 HICKORY RD | LAKE GEORGE | 3400 | HP | 123.35 |
| Pipeline Transportation of Natural Gas | 945 Transco Road | Chatham | 17.2000008 | E6BTU/HR | 238.2608 |
| Pipeline Transportation of Natural Gas | 945 Transco Road | Chatham | 17.2000008 | E6BTU/HR | 235.7966 |
| Pipeline Transportation of Natural Gas | 945 Transco Road | Chatham | 17.2000008 | E6BTU/HR | 159.7723 |
| Pipeline Transportation of Natural Gas | 945 Transco Road | Chatham | 17.2000008 | E6BTU/HR | 252.5683 |
| Pipeline Transportation of Natural Gas | 945 Transco Road | Chatham | 17.2000008 | E6BTU/HR | 258.5266 |
| Pipeline Transportation of Natural Gas | 945 Transco Road | Chatham | 17.2000008 | E6BTU/HR | 155.3219 |
| Pipeline Transportation of Natural Gas | 945 Transco Road | Chatham | 17.2000008 | E6BTU/HR | 245.8007 |
| Pipeline Transportation of Natural Gas | 945 Transco Road | Chatham | 17.2000008 | E6BTU/HR | 230.9784 |
| Pipeline Transportation of Natural Gas | 945 Transco Road | Chatham | 17.2000008 | E6BTU/HR | 204.4968 |
| Pipeline Transportation of Natural Gas | 2213 Smith Ridge Rd | McClure | 4650 | HP | 26.59 |
| Pipeline Transportation of Natural Gas | 2213 Smith Ridge Rd | McClure | 4650 | HP | 54.01 |
| Pipeline Transportation of Natural Gas | FROM SUNRAY, 3 M S ON FM 119, THEN 0.5 M W | SUNRAY | 8.25 | E6BTU/HR | 22.0992 |
| Pipeline Transportation of Natural Gas | FROM SUNRAY, 3 M S ON FM 119, THEN 0.5 M W | SUNRAY | 8.25 | E6BTU/HR | 58.7236 |
| Pipeline Transportation of Natural Gas | 11 M S OF BORGER ON W SIDE OF HWY 207 | BORGER | 2000 | HP | 22.5365 |
| Pipeline Transportation of Natural Gas | 3 MILES W OF | AMBER | 2750 | HP | 26.25 |
| Pipeline Transportation of Natural Gas | 11039  150th Ave. | BIG RAPIDS | 0.01 | E6BTU/HR | 165.2 |
| Pipeline Transportation of Natural Gas | 11039  150th Ave. | BIG RAPIDS | 0.01 | E6BTU/HR | 2145 |
| Pipeline Transportation of Natural Gas | FROM I 20 8 MI S ON 178B 5 MI W ON CR210W 1 MI  S ON PLANT RD | MIDLAND | 13.8 | E6BTU/HR | 25.7911 |
| Pipeline Transportation of Natural Gas | 3 M S OF SUNRAY ON FM 119 | SUNRAY | 15 | E6BTU/HR | 42.1615 |
| Pipeline Transportation of Natural Gas | 3 M S OF SUNRAY ON FM 119 | SUNRAY | 11.2 | E6BTU/HR | 117.9806 |
| Pipeline Transportation of Natural Gas | 3 M S OF SUNRAY ON FM 119 | SUNRAY | 15 | E6BTU/HR | 37.1261 |
| Pipeline Transportation of Natural Gas | 3 M S OF SUNRAY ON FM 119 | SUNRAY | 15 | E6BTU/HR | 46.1693 |
| Pipeline Transportation of Natural Gas | 5.1 M S ON FM 1379, 0.5 M E | MIDLAND | 10.1 | E6BTU/HR | 97.193 |
| Pipeline Transportation of Natural Gas | 5.1 M S ON FM 1379, 0.5 M E | MIDLAND | 9.41 | E6BTU/HR | 79.9088 |
| Pipeline Transportation of Natural Gas | 5.1 M S ON FM 1379, 0.5 M E | MIDLAND | 9.41 | E6BTU/HR | 65.3181 |
| Pipeline Transportation of Natural Gas | 5.1 M S ON FM 1379, 0.5 M E | MIDLAND | 9.41 | E6BTU/HR | 94.2953 |
| Pipeline Transportation of Natural Gas | 5.1 M S ON FM 1379, 0.5 M E | MIDLAND | 10.1 | E6BTU/HR | 104.2167 |
| Pipeline Transportation of Natural Gas | 5.1 M S ON FM 1379, 0.5 M E | MIDLAND | 9.41 | E6BTU/HR | 60.4553 |
| Pipeline Transportation of Natural Gas | SR 2027 MP40 | SHELOCTA | 0.01 | E6BTU/HR | 16.3298 |
| Pipeline Transportation of Natural Gas | ROUTE 441 | MARIETTA | 16.6 | E6BTU/HR | 21.2474 |
| Pipeline Transportation of Natural Gas | ROUTE 441 | MARIETTA | 16.6 | E6BTU/HR | 66.1286 |
| Pipeline Transportation of Natural Gas | ROUTE 441 | MARIETTA | 16.6 | E6BTU/HR | 36.2526 |
| Pipeline Transportation of Natural Gas | ROUTE 441 | MARIETTA | 16.6 | E6BTU/HR | 48.737 |
| Pipeline Transportation of Natural Gas | ROUTE 441 | MARIETTA | 16.6 | E6BTU/HR | 81.9045 |
| Pipeline Transportation of Natural Gas | ELK HORN RD | LAWRENCEVILLE | 0.01 | E6BTU/HR | 22.527 |
| Pipeline Transportation of Natural Gas | 210 HARRISBURG RD | ARTEMAS | 20.8 | E6BTU/HR | 25.48 |
| Pipeline Transportation of Natural Gas | 210 HARRISBURG RD | ARTEMAS | 20.8 | E6BTU/HR | 25.21 |
| Pipeline Transportation of Natural Gas | 44264 ROUTE 66 | MARIENVILLE | 4000 | HP | 56.0828 |
| Pipeline Transportation of Natural Gas | 44264 ROUTE 66 | MARIENVILLE | 3500 | HP | 245.3434 |
| Pipeline Transportation of Natural Gas | 44264 ROUTE 66 | MARIENVILLE | 2000 | HP | 25.6846 |
| Pipeline Transportation of Natural Gas | 44264 ROUTE 66 | MARIENVILLE | 2000 | HP | 25.8441 |
| Pipeline Transportation of Natural Gas | 44264 ROUTE 66 | MARIENVILLE | 2000 | HP | 22.03 |
| Pipeline Transportation of Natural Gas | 44264 ROUTE 66 | MARIENVILLE | 2000 | HP | 35.9843 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 1350 | HP | 26.1217 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 0.01 | E6BTU/HR | 23.3796 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 0.01 | E6BTU/HR | 24.8133 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 1350 | HP | 24.899 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 1100 | HP | 30.4611 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 1100 | HP | 26.3032 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 1100 | HP | 27.7346 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 1100 | HP | 27.2729 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 1100 | HP | 21.8531 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 1100 | HP | 31.9122 |
| Pipeline Transportation of Natural Gas | 2 M N & 6 M W OF MAPLE | MAPLE | 28 | E6BTU/HR | 37.948 |
| Pipeline Transportation of Natural Gas | 8385 HILLS CHURCH RD | MURRYSVILLE | 0.01 | E6BTU/HR | 22.861 |
| Pipeline Transportation of Natural Gas | ROUTE 22 | DELMONT | 0.01 | E6BTU/HR | 25.54 |
| Pipeline Transportation of Natural Gas | ROUTE 22 | DELMONT | 6350 | HP | 27.49 |
| Pipeline Transportation of Natural Gas | 5 MILES EAST OF NEEDLES ON I40 | NEEDLES | 0.1 | E6BTU/HR | 167.964227 |
| Pipeline Transportation of Natural Gas | 575 E Hwy US 36 | Tuscola | 22.9 | E6BTU/HR | 159.4496 |
| Pipeline Transportation of Natural Gas | 575 E Hwy US 36 | Tuscola | 22.9 | E6BTU/HR | 139.2335 |
| Pipeline Transportation of Natural Gas | 575 E Hwy US 36 | Tuscola | 17 | E6BTU/HR | 265.056 |
| Pipeline Transportation of Natural Gas | 575 E Hwy US 36 | Tuscola | 17 | E6BTU/HR | 286.176 |
| Pipeline Transportation of Natural Gas | 575 E Hwy US 36 | Tuscola | 17 | E6BTU/HR | 288.244 |
| Pipeline Transportation of Natural Gas | 575 E Hwy US 36 | Tuscola | 17 | E6BTU/HR | 135.5862 |
| Pipeline Transportation of Natural Gas | RR 2 Box 142b | St Elmo | 5.1 | E6BTU/HR | 74.48173 |
| Pipeline Transportation of Natural Gas | RR 2 Box 142b | St Elmo | 2.5 | E6BTU/HR | 37.55613 |
| Pipeline Transportation of Natural Gas | RR 2 Box 142b | St Elmo | 5.1 | E6BTU/HR | 88.54254 |
| Pipeline Transportation of Natural Gas | 2874 Midwestern Gas St | Paris | 15.7 | E6BTU/HR | 28.9979 |
| Pipeline Transportation of Natural Gas | 1/4 mile 5 of S 161 on Broadway | Centralia | 27.6 | E6BTU/HR | 110.768 |
| Pipeline Transportation of Natural Gas | 1/4 mile S of 3 161 on Broadway | Centralia | 27.6 | E6BTU/HR | 54.621 |
| Pipeline Transportation of Natural Gas | 1/4 mile S of 3 161 on Broadway | Centralia | 50.3 | E6BTU/HR | 82.74 |
| Pipeline Transportation of Natural Gas | 6 MILES N AND 1 MILE W OF | STRONG CITY | 1340 | HP | 37.475 |
| Pipeline Transportation of Natural Gas | 6 MILES N AND 1 MILE W OF | STRONG CITY | 1340 | HP | 31.369 |
| Pipeline Transportation of Natural Gas | ROUTE 2 BOX 762A RIDGE ROAD | MALVERN | 9060 | HP | 24.2693 |
| Pipeline Transportation of Natural Gas | 2002 CATABERRY RUN ROAD | OZARK | 2090 | HP | 18.404 |
| Pipeline Transportation of Natural Gas | 2227 HIGHWAY 267 SOUTH | SEARCY | 3080 | HP | 32.0187 |
| Pipeline Transportation of Natural Gas | 2227 HIGHWAY 267 SOUTH | SEARCY | 3080 | HP | 92.1518 |
| Pipeline Transportation of Natural Gas | 2227 HIGHWAY 267 SOUTH | SEARCY | 3080 | HP | 72.3165 |
| Pipeline Transportation of Natural Gas | 2227 HIGHWAY 267 SOUTH | SEARCY | 3080 | HP | 131.951 |
| Pipeline Transportation of Natural Gas | 2227 HIGHWAY 267 SOUTH | SEARCY | 3080 | HP | 128.901 |
| Pipeline Transportation of Natural Gas | 2227 HIGHWAY 267 SOUTH | SEARCY | 3080 | HP | 135.257 |
| Pipeline Transportation of Natural Gas | 2227 HIGHWAY 267 SOUTH | SEARCY | 3080 | HP | 126.707 |
| Pipeline Transportation of Natural Gas | 2227 HIGHWAY 267 SOUTH | SEARCY | 5000 | HP | 52.8295 |
| Pipeline Transportation of Natural Gas | 2227 HIGHWAY 267 SOUTH | SEARCY | 9060 | HP | 106.942 |
| Pipeline Transportation of Natural Gas | 210 JACKSON 62 | TUCKERMAN | 1100 | HP | 0.0152093 |
| Pipeline Transportation of Natural Gas | HIGHWAY 258 EAST | BALD KNOB | 3.22 | E6BTU/HR | 0.0868275 |
| Pipeline Transportation of Natural Gas | 7424 North State Highway 109N | Magazine | 1500 | HP | 148.892 |
| Pipeline Transportation of Natural Gas | 7424 North State Highway 109N | Magazine | 4000 | HP | 153.855 |
| Pipeline Transportation of Natural Gas | 7424 North State Highway 109N | Magazine | 4000 | HP | 434.372 |
| Pipeline Transportation of Natural Gas | 7424 North State Highway 109N | Magazine | 4000 | HP | 615.483 |
| Pipeline Transportation of Natural Gas | 2473 HILLMAN ROAD | CARLISLE | 1100 | HP | 24.5754 |
| Pipeline Transportation of Natural Gas | 4690 EVORA ROAD | CONCORD | 4000 | HP | 22.70393 |
| Pipeline Transportation of Natural Gas | BEAR CREEK RD | ALEDO | 1340 | HP | 3.6012 |
| Pipeline Transportation of Natural Gas | 5213 Leetonia Rd | Leetonia | 0.1 | E6BTU/HR | 27.66 |
| Pipeline Transportation of Natural Gas | 1.5 MI S ON INTX OF HWY 42 & HWY 80 ON HWY 41 L SIDE OFF RDWAY | LONGVIEW | 6 | E6BTU/HR | 0.2018 |
| Pipeline Transportation of Natural Gas | 7717 HWY 77 SOUTH | ORAN | 0.01 | E6BTU/HR | 42.8833 |
| Pipeline Transportation of Natural Gas | 1/4 mile 5 of S 161 on Broadway | Centralia | 50.3 | E6BTU/HR | 37.06605 |
| Pipeline Transportation of Natural Gas | 1/4 mile S of 3 161 on Broadway | Centralia | 27.6 | E6BTU/HR | 105.672 |
| Pipeline Transportation of Natural Gas | 1/4 mile S of 3 161 on Broadway | Centralia | 27.6 | E6BTU/HR | 98.532 |
| Pipeline Transportation of Natural Gas | 1/4 mile S of 3 161 on Broadway | Centralia | 27.6 | E6BTU/HR | 98.277 |
| Pipeline Transportation of Natural Gas | 1/4 mile S of 3 161 on Broadway | Centralia | 27.6 | E6BTU/HR | 88.689 |
| Pipeline Transportation of Natural Gas | 1/4 mile S of 3 161 on Broadway | Centralia | 27.6 | E6BTU/HR | 95.778 |
| Pipeline Transportation of Natural Gas | RR 2 Box 142b | St Elmo | 2.5 | E6BTU/HR | 38.60109 |
| Pipeline Transportation of Natural Gas | 2874 Midwestern Gas St | Paris | 15.7 | E6BTU/HR | 29.13277 |
| Pipeline Transportation of Natural Gas | 296 N 600 Ave | New Windsor | 13 | E6BTU/HR | 48.18888 |
| Pipeline Transportation of Natural Gas | 16048 Highway 82 | Geneseo | 36.2 | E6BTU/HR | 172.6156 |
| Pipeline Transportation of Natural Gas | 16048 Highway 82 | Geneseo | 36.2 | E6BTU/HR | 178.4912 |
| Pipeline Transportation of Natural Gas | 5611 S 12000 West Rd | Herscher | 27.2 | E6BTU/HR | 53.1054 |
| Pipeline Transportation of Natural Gas | 5611 S 12000 West Rd | Herscher | 27.2 | E6BTU/HR | 66.1346 |
| Pipeline Transportation of Natural Gas | 5611 S 12000 West Rd | Herscher | 27.2 | E6BTU/HR | 71.75923 |
| Pipeline Transportation of Natural Gas | 6650 Sandy Bluff Rd | Sandwich | 9.8 | E6BTU/HR | 49.35812 |
| Pipeline Transportation of Natural Gas | 11615 Old Route 66 | Glenarm | 29 | E6BTU/HR | 115.412 |
| Pipeline Transportation of Natural Gas | 11615 Old Route 66 | Glenarm | 29 | E6BTU/HR | 101.4473 |
| Pipeline Transportation of Natural Gas | 2101 Portland Rd | Joppa | 24.3 | E6BTU/HR | 197.6535 |
| Pipeline Transportation of Natural Gas | 2101 Portland Rd | Joppa | 21.2 | E6BTU/HR | 67.33408 |
| Pipeline Transportation of Natural Gas | 2101 Portland Rd | Joppa | 21.2 | E6BTU/HR | 50.15934 |
| Pipeline Transportation of Natural Gas | 2 miles W on US 36 | Hammond | 23.9 | E6BTU/HR | 149.58 |
| Pipeline Transportation of Natural Gas | 2 miles W on US 36 | Hammond | 23.9 | E6BTU/HR | 63 |
| Pipeline Transportation of Natural Gas | 2 miles W on US 36 | Hammond | 50.3 | E6BTU/HR | 140.91 |
| Pipeline Transportation of Natural Gas | 2 miles W on US 36 | Hammond | 23.9 | E6BTU/HR | 136.89 |
| Pipeline Transportation of Natural Gas | 2 miles W on US 36 | Hammond | 23.9 | E6BTU/HR | 121.32 |
| Pipeline Transportation of Natural Gas | 2 miles W on US 36 | Hammond | 23.9 | E6BTU/HR | 95.49 |
| Pipeline Transportation of Natural Gas | 4-1/2 Miles SE Atlas On Hwy 96 | Pleasant Hill | 20.7 | E6BTU/HR | 34.50096 |
| Pipeline Transportation of Natural Gas | 27385 N Rd 620 E | Potomac | 18.3 | E6BTU/HR | 47.75066 |
| Pipeline Transportation of Natural Gas | 27385 N Rd 620 E | Potomac | 18.3 | E6BTU/HR | 78.84954 |
| Pipeline Transportation of Natural Gas | 27385 N Rd 620 E | Potomac | 18.3 | E6BTU/HR | 90.45332 |
| Pipeline Transportation of Natural Gas | 1892 BOWSER RD | BIG RUN | 0.01 | E6BTU/HR | 5.39 |
| Pipeline Transportation of Natural Gas | 146 S Celestine Rd | Celestine | 2160 | HP | 88.55208 |
| Pipeline Transportation of Natural Gas | 146 S Celestine Rd | Celestine | 2160 | HP | 97.74775 |
| Pipeline Transportation of Natural Gas | 146 S Celestine Rd | Celestine | 2160 | HP | 93.13118 |
| Pipeline Transportation of Natural Gas | 146 S Celestine Rd | Celestine | 7830 | HP | 112.235 |
| Pipeline Transportation of Natural Gas | 3009 LILLY ST | LONGVIEW | 21.2 | E6BTU/HR | 0.623 |
| Pipeline Transportation of Natural Gas | HWY 281 3 M S OF  INTERX OF HWY | JACKSBORO | 32.1 | E6BTU/HR | 21.7464 |
| Pipeline Transportation of Natural Gas | FROM WHEELER APPROX 1.8 MI S ON HWY 83 1.7 MI E ON LEASE RD | WHEELER | 11.6 | E6BTU/HR | 1.5934 |
| Pipeline Transportation of Natural Gas | ROUTE 85 | KOPPERSTON | | | 2.2654 |

| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | Layered Combustion | Layered Combustion | 97 |
| TON | AFRC | 20 | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | AFRC | 20 | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | None | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | None | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | None | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | None | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | 90 | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | Precombustion Chamber + LEC + Oxidat | 87.45 | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | Precombustion Chamber + LEC + Oxidat | 87.45 | NSCR or Layered Combustion | | |
| TON | Fuel Injection | 90 | NSCR or Layered Combustion | | |
| TON | Fuel Injection | 90 | NSCR or Layered Combustion | | |
| TON | Fuel Injection | 90 | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | AFRC | 90 | 310 NSCR | | |
| TON | 2C | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |

**484a**

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| 03 | WV | Kanawha | 6885111 | 71699613 0048 | | Columbia Gas Transmission LLC | Columbia Gas - CLENDENIN 4C1200 | 486210 |
| 03 | WV | Kanawha | 6885411 | 71699213 0051 | | Eastern Gas Transmission and Storage, Inc. | EGTS - CORNWELL COMPRESSOR STATION | 48621 |
| 03 | WV | Kanawha | 6885811 | 71702513 0049 | | Columbia Gas Transmission LLC | Columbia Gas - COCO 4C1150 | 486210 |
| 03 | WV | Kanawha | 6885811 | 71703313 0101 | | Columbia Gas Transmission Corporation | Columbia Gas - HUNT 4C1160 | 486210 |
| 03 | WV | Jackson | 6883511 | 71716313 0003 | | Columbia Gas Transmission LLC | Columbia Gas - RIPLEY 4C4560 | 486210 |
| 03 | WV | Jackson | 6883511 | 71716413 0003 | | Columbia Gas Transmission LLC | Columbia Gas - RIPLEY 4C4560 | 486210 |
| 03 | WV | Wayne | 6341511 | 71743613 0014 | | Columbia Gas Transmission LLC | Columbia Gas - KENOVA 4C3350 | 486210 |
| 03 | WV | Wayne | 6341511 | 71743713 0014 | | Columbia Gas Transmission LLC | Columbia Gas - KENOVA 4C3350 | 486210 |
| 03 | WV | Wayne | 6341511 | 71743813 0014 | | Columbia Gas Transmission LLC | Columbia Gas - KENOVA 4C3350 | 486210 |
| 03 | WV | Wayne | 6341511 | 71743913 0014 | | Columbia Gas Transmission LLC | Columbia Gas - KENOVA 4C3350 | 486210 |
| 03 | WV | Wayne | 6341411 | 71749613 0013 | | Columbia Gas Transmission LLC | Columbia Gas - CEREDO 4C3360 | 486210 |
| 03 | WV | Wayne | 6341411 | 71749713 0013 | | Columbia Gas Transmission LLC | Columbia Gas - CEREDO 4C3360 | 486210 |
| 03 | WV | Wayne | 6341411 | 71749913 0013 | | Columbia Gas Transmission LLC | Columbia Gas - CEREDO 4C3360 | 486210 |
| 03 | WV | Wayne | 6341411 | 71750013 0013 | | Columbia Gas Transmission LLC | Columbia Gas - CEREDO 4C3360 | 486210 |
| 03 | WV | Wayne | 6341411 | 71750113 0013 | | Columbia Gas Transmission LLC | Columbia Gas - CEREDO 4C3360 | 486210 |
| 03 | WV | Wayne | 6341411 | 71750213 0013 | | Columbia Gas Transmission LLC | Columbia Gas - CEREDO 4C3360 | 486210 |
| 03 | WV | Marshall | 6760611 | 71760613 0100 | | Columbia Gas Transmission LLC | Columbia Gas - ADALINE 7C6600 | 486210 |
| 03 | WV | Marshall | 6760611 | 71760713 0100 | | Columbia Gas Transmission LLC | Columbia Gas - ADALINE 7C6600 | 486210 |
| 03 | WV | Calhoun | 6255811 | 71787013 0001 | | Eastern Gas Transmission and Storage, Inc. | EGTS - YELLOW CREEK CS | 48621 |
| 03 | WV | Calhoun | 6255811 | 71787113 0001 | | Eastern Gas Transmission and Storage, Inc. | EGTS - YELLOW CREEK CS | 48621 |
| 03 | WV | Calhoun | 6255811 | 71787213 0001 | | Eastern Gas Transmission and Storage, Inc. | EGTS - YELLOW CREEK CS | 48621 |
| 03 | WV | Randolph | 6790511 | 71900813 0017 | | Columbia Gas Transmission LLC | Columbia Gas - GLADY 6C4350 | 486210 |
| 03 | WV | Randolph | 6790511 | 71900913 0017 | | Columbia Gas Transmission LLC | Columbia Gas - GLADY 6C4350 | 486210 |
| 03 | WV | Randolph | 6790511 | 71901013 0017 | | Columbia Gas Transmission LLC | Columbia Gas - GLADY 6C4350 | 486210 |
| 03 | WV | Harrison | 6271511 | 71904413 0013 | | Eastern Gas Transmission and Storage, Inc. | EGTS - SARDIS COMPRESSOR STATION | 48621 |
| 03 | WV | Harrison | 6272011 | 71914913 0100 | | Columbia Gas Transmission LLC | Columbia Gas - BRIDGEPORT COMPRESSOR STATION | 486210 |
| 03 | WV | Lewis | 6900611 | 71920513 0012 | | Eastern Gas Transmission and Storage, Inc. | EGTS - SWEENEY COMPRESSOR STATION | 48621 |
| 03 | WV | Lewis | 6900611 | 71920613 0012 | | Eastern Gas Transmission and Storage, Inc. | EGTS - SWEENEY COMPRESSOR STATION | 48621 |
| 03 | WV | Lewis | 6900611 | 71920713 0012 | | Eastern Gas Transmission and Storage, Inc. | EGTS - SWEENEY COMPRESSOR STATION | 48621 |
| 03 | WV | Lewis | 6900611 | 71920813 0012 | | Eastern Gas Transmission and Storage, Inc. | EGTS - SWEENEY COMPRESSOR STATION | 48621 |
| 03 | WV | Gilmer | 6256711 | 71921613 0001 | | Columbia Gas Transmission LLC | Columbia Gas - GLENVILLE 4C1170 | 486210 |
| 03 | WV | Gilmer | 6256711 | 71921713 0001 | | Columbia Gas Transmission LLC | Columbia Gas - GLENVILLE 4C1170 | 486210 |
| 03 | WV | Gilmer | 6256711 | 71921813 0001 | | Columbia Gas Transmission LLC | Columbia Gas - GLENVILLE 4C1170 | 486210 |
| 03 | WV | Gilmer | 6256711 | 71922013 0001 | | Columbia Gas Transmission LLC | Columbia Gas - GLENVILLE 4C1170 | 486210 |
| 03 | WV | Lewis | 6900711 | 71925813 0013 | | Eastern Gas Transmission and Storage, Inc. | EGTS - LIGHTBURN COMPRESSOR STATION | 48621 |
| 03 | WV | Lewis | 6900711 | 71925913 0013 | | Eastern Gas Transmission and Storage, Inc. | EGTS - LIGHTBURN COMPRESSOR STATION | 48621 |
| 03 | WV | Lewis | 6900711 | 71926013 0013 | | Eastern Gas Transmission and Storage, Inc. | EGTS - LIGHTBURN COMPRESSOR STATION | 48621 |
| 03 | WV | Lewis | 6900711 | 71926113 0013 | | Eastern Gas Transmission and Storage, Inc. | EGTS - LIGHTBURN COMPRESSOR STATION | 48621 |
| 03 | WV | Lewis | 6900711 | 71926313 0013 | | Eastern Gas Transmission and Storage, Inc. | EGTS - LIGHTBURN COMPRESSOR STATION | 48621 |
| 03 | WV | Lewis | 6900711 | 71926413 0013 | | Eastern Gas Transmission and Storage, Inc. | EGTS - LIGHTBURN COMPRESSOR STATION | 48621 |
| 03 | WV | Marion | 6900111 | 71930413 0052 | | Equitrans, L.P. | Equitrans, L.P. - CURTISVILLE COMPRESSOR STATION #50 | 4862 |
| 03 | WV | Lewis | 6900311 | 71933013 0009 | | Equitrans, L.P. | Equitrans, L.P. - COPLEY RUN CS 70 | 4862 |
| 03 | WV | Lewis | 6900311 | 71933313 0009 | | Equitrans, L.P. | Equitrans, L.P. - COPLEY RUN CS 70 | 4862 |
| 03 | WV | Doddridge | 6256011 | 71934713 0001 | | Equitrans, L.P. | Equitrans, L.P. - WEST UNION CS 53 | 4862 |
| 03 | WV | Preston | 6776911 | 71963613 0017 | | Columbia Gas Transmission LLC | Columbia Gas - TERRA ALTA 6C4360 | 486210 |
| 03 | WV | Preston | 6776911 | 71963713 0017 | | Columbia Gas Transmission LLC | Columbia Gas - TERRA ALTA 6C4360 | 486210 |
| 03 | WV | Preston | 6776911 | 71963813 0017 | | Columbia Gas Transmission LLC | Columbia Gas - TERRA ALTA 6C4360 | 486210 |
| 03 | WV | Preston | 6776911 | 71963913 0017 | | Columbia Gas Transmission LLC | Columbia Gas - TERRA ALTA 6C4360 | 486210 |
| 03 | WV | Preston | 6776911 | 71964013 0017 | | Columbia Gas Transmission LLC | Columbia Gas - TERRA ALTA 6C4360 | 486210 |
| 08 | UT | Washington | 6733711 | 72099113 12512 | | Kern River Gas Transmission Company | Kern River Gas Transmission Company- Veyo Compressor Station | 486210 |
| 04 | KY | Casey | 5201011 | 73034813 2104500021 | | | Columbia Gulf Trans Co | 486210 |
| 04 | KY | Greenup | 6096911 | 73218513 2108900033 | | | TN Gas Pipeline Co - Station 200 | 486210 |
| 04 | KY | Taylor | 5727111 | 73219113 2121700034 | | Na | TN Gas Pipeline Co - Station 871 | 486210 |
| 06 | TX | Muhlenberg | 5177011 | 73255913 2111700066 | | Na | Texas Gas Transmission Co - Midland III Transmission | 486210 |
| 04 | KY | Hopkins | 13426213 | 73256313 2110700154 | | | Texas Gas Transmission LLC - Hanson Compressor Station | 486210 |
| 04 | KY | Powell | 5787111 | 73302513 2119700006 | | | Columbia Gulf Transmission Sta | 486210 |
| 06 | OK | Beaver | 8131911 | 73458513 1173 | | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 8131911 | 73458913 1173 | | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 8131911 | 73459113 1173 | | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 8131911 | 73459213 1173 | | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 8131911 | 73459313 1173 | | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| 06 | OK | Beaver | 8131911 | 73459413 1173 | | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| 06 | CA | Santa Barbara | 13697211 | 78913113 4211251734 | | SOUTHERN CALIFORNIA GAS COMPANY | LA-GOLETA | 486210 |
| 06 | LA | Ouachita | 5734611 | 79788313 1945 | | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Company LLC - Tennessee Gas Pipeline - Station #47 | 486210 |
| 06 | LA | Ouachita | 5734611 | 79788413 1945 | | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Company LLC - Tennessee Gas Pipeline - Station #47 | 486210 |
| 06 | LA | Ouachita | 5734611 | 79788713 1945 | | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Company LLC - Tennessee Gas Pipeline - Station #47 | 486210 |
| 06 | LA | Ouachita | 5734611 | 79788813 1945 | | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Company LLC - Tennessee Gas Pipeline - Station #47 | 486210 |
| 06 | LA | Ouachita | 5734611 | 79788913 1945 | | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Company LLC - Tennessee Gas Pipeline - Station #47 | 486210 |
| 06 | LA | Ouachita | 5734611 | 79789013 1945 | | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Company LLC - Tennessee Gas Pipeline - Station #47 | 486210 |
| 06 | LA | Ouachita | 5734611 | 79789613 1945 | | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Company LLC - Tennessee Gas Pipeline - Station #47 | 486210 |
| 06 | LA | La Salle | 7432411 | 80001613 9210 | | ANR Pipeline Co | ANR Pipeline Co - Jena Compressor Station | 486210 |
| 06 | LA | Franklin | 5173511 | 80036813 626 | | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Co - Compressor Station 834 | 486210 |
| 06 | LA | Franklin | 5173511 | 80037013 626 | | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Co - Compressor Station 834 | 486210 |
| 06 | LA | Franklin | 5173511 | 80037113 626 | | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Co - Compressor Station 834 | 486210 |
| 06 | LA | Franklin | 5173511 | 80037613 626 | | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Co - Compressor Station 834 | 486210 |
| 06 | LA | St. Mary | 5290211 | 80052313 4198 | | Southern Natural Gas Company LLC | Southern Natural Gas Co - Shadyside Compressor Station | 486210 |
| 06 | LA | St. Mary | 5290211 | 80052513 4198 | | Southern Natural Gas Company LLC | Southern Natural Gas Co - Shadyside Compressor Station | 486210 |
| 06 | LA | St. Mary | 5290211 | 80052913 4198 | | Southern Natural Gas Company LLC | Southern Natural Gas Co - Shadyside Compressor Station | 486210 |
| 06 | LA | St. Mary | 5290211 | 80053013 4198 | | Southern Natural Gas Company LLC | Southern Natural Gas Co - Shadyside Compressor Station | 486210 |
| 06 | LA | Avoyelles | 5987211 | 80089413 31S38 | | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Markville Compressor Station | 486210 |
| 06 | LA | Avoyelles | 5987211 | 80089513 31S38 | | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Markville Compressor Station | 486210 |
| 06 | LA | Avoyelles | 5987211 | 80090213 31S38 | | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Markville Compressor Station | 486210 |
| 06 | LA | Avoyelles | 5987211 | 80090513 31S38 | | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Markville Compressor Station | 486210 |
| 06 | LA | Caldwell | 6426511 | 80096113 7883 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Columbia Compressor Station | 486210 |
| 06 | LA | Caldwell | 6426511 | 80096313 7883 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Columbia Compressor Station | 486210 |
| 06 | LA | Caldwell | 6426511 | 80096413 7883 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Columbia Compressor Station | 486210 |
| 06 | LA | Caldwell | 6426511 | 80096513 7883 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Columbia Compressor Station | 486210 |
| 06 | LA | Caldwell | 6426511 | 80096613 7883 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Columbia Compressor Station | 486210 |
| 06 | LA | Caldwell | 6426511 | 80096813 7883 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Columbia Compressor Station | 486210 |
| 06 | LA | Beauregard | 5998711 | 80248413 13028 | | Trunkline Gas Co LLC | Trunkline Gas Co LLC - Longville Compressor Station #48 | 486210 |
| 06 | LA | Beauregard | 5998711 | 80248513 13028 | | Trunkline Gas Co LLC | Trunkline Gas Co LLC - Longville Compressor Station #48 | 486210 |
| 06 | LA | Beauregard | 5998711 | 80248713 13028 | | Trunkline Gas Co LLC | Trunkline Gas Co LLC - Longville Compressor Station #48 | 486210 |
| 06 | LA | Beauregard | 5998711 | 80249013 13028 | | Trunkline Gas Co LLC | Trunkline Gas Co LLC - Longville Compressor Station #48 | 486210 |
| 06 | LA | Beauregard | 5998711 | 80249213 13028 | | Trunkline Gas Co LLC | Trunkline Gas Co LLC - Longville Compressor Station #48 | 486210 |
| 06 | LA | Beauregard | 5998711 | 80249313 13028 | | Trunkline Gas Co LLC | Trunkline Gas Co LLC - Longville Compressor Station #48 | 486210 |
| 06 | LA | Beauregard | 5998711 | 80249713 13028 | | Trunkline Gas Co LLC | Trunkline Gas Co LLC - Longville Compressor Station #48 | 486210 |
| 06 | LA | Terrebonne | 5192411 | 80249913 17725 | | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Company LLC - Compressor Station 62 | 486210 |
| 06 | LA | Terrebonne | 5192411 | 80250713 17725 | | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Company LLC - Compressor Station 62 | 486210 |
| 06 | LA | West Carroll | 5208511 | 80492913 9512 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Epps Compressor Station | 486210 |
| 06 | LA | West Carroll | 5208511 | 80493613 9512 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Epps Compressor Station | 486210 |
| 06 | LA | Morehouse | 5543111 | 80556113 3247 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Bastrop Compressor Station | 486210 |
| 06 | LA | Morehouse | 5543111 | 80556413 3247 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Bastrop Compressor Station | 486210 |
| 06 | LA | Morehouse | 5543111 | 80556713 3247 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Bastrop Compressor Station | 486210 |
| 06 | LA | Bossier | 6115413 | 80580513 31656 | | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Koran Compressor Station | 486210 |
| 06 | LA | Bossier | 6115413 | 80586613 31656 | | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Koran Compressor Station | 486210 |
| 06 | LA | Bossier | 6115413 | 80586713 31656 | | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Koran Compressor Station | 486210 |
| 06 | LA | Acadia | 6082011 | 80587013 2839 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Rayne Compressor Station | 486210 |
| 06 | LA | Acadia | 6082011 | 80587313 2839 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Rayne Compressor Station | 486210 |
| 06 | LA | Acadia | 6082011 | 80587813 2839 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Rayne Compressor Station | 486210 |
| 06 | LA | Acadia | 6082011 | 80588313 2839 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Rayne Compressor Station | 486210 |
| 06 | LA | Acadia | 6082011 | 80588613 2839 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Rayne Compressor Station | 486210 |
| 06 | LA | Acadia | 6082011 | 80587213 2839 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Rayne Compressor Station | 486210 |
| 06 | LA | Acadia | 6082011 | 80588813 2839 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Rayne Compressor Station | 486210 |
| 06 | LA | Washington | 7204311 | 80700413 17216 | | Florida Gas Transmission Co LLC | Florida Gas Transmission Co LLC - Franklinton Compressor Station #9 | 486210 |
| 06 | LA | Washington | 7204311 | 80700713 17216 | | Florida Gas Transmission Co LLC | Florida Gas Transmission Co LLC - Franklinton Compressor Station #9 | 486210 |
| 06 | LA | Washington | 7204311 | 80701313 17216 | | Florida Gas Transmission Co LLC | Florida Gas Transmission Co LLC - Franklinton Compressor Station #9 | 486210 |
| 06 | LA | Vermilion | 5064331 | 80703213 43185 | | Sea Robin Pipeline Co | Sea Robin Pipeline Co LLC - Erath Compressor Station | 486210 |
| 06 | LA | Vermilion | 5064331 | 80703413 43185 | | Sea Robin Pipeline Co | Sea Robin Pipeline Co LLC - Erath Compressor Station | 486210 |
| 06 | LA | Richland | 5607611 | 80703813 32752 | | Enable Gas Transmission LLC | Enable Gas Transmission LLC - Delhi Compressor Station | 486210 |
| 06 | LA | Acadia | 6082411 | 80710313 8335 | | ANR Pipeline Co | ANR Pipeline Co - Eunice Compressor Station | 486210 |
| 06 | LA | Washington | 5356711 | 80730713 2555 | | Southern Natural Gas Company LLC | Southern Natural Gas Co - Franklinton Compressor Station | 486210 |
| 06 | LA | Washington | 5356711 | 80731313 2555 | | Southern Natural Gas Company LLC | Southern Natural Gas Co - Franklinton Compressor Station | 486210 |
| 06 | LA | Washington | 5356711 | 80731913 2555 | | Southern Natural Gas Company LLC | Southern Natural Gas Co - Franklinton Compressor Station | 486210 |
| 06 | LA | Richland | 5607711 | 80772013 2780 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Delhi Compressor Station | 486210 |
| 06 | LA | Richland | 5607711 | 80772213 2780 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Delhi Compressor Station | 486210 |
| 06 | LA | Richland | 5607711 | 80772513 2780 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Delhi Compressor Station | 486210 |
| 06 | LA | Richland | 5607711 | 80772713 2780 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Delhi Compressor Station | 486210 |
| 06 | LA | Richland | 5607711 | 80772913 2780 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Delhi Compressor Station | 486210 |
| 06 | LA | Richland | 5607711 | 80773013 2780 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Delhi Compressor Station | 486210 |
| 06 | LA | Richland | 5607711 | 80773113 2780 | | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Delhi Compressor Station | 486210 |
| 06 | LA | Claiborne | 7354311 | 80781013 4924 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Guthrie Station | 486210 |
| 06 | LA | Ouachita | 5734511 | 80792713 44723 | | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Guthrie Station | 486210 |
| 06 | LA | Evangeline | 5171311 | 80986913 2913 | | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Company LLC - Compressor Station 50 | 486210 |
| 06 | LA | Evangeline | 5173111 | 80987313 2913 | | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Company LLC - Compressor Station 50 | 486210 |
| 06 | LA | Jefferson Davis | 5283311 | 81058413 25002 | | Tennessee Gas Pipeline Co | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| 06 | LA | Jefferson Davis | 5283311 | 81058613 25002 | | Tennessee Gas Pipeline Co | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| 06 | LA | Jefferson Davis | 5283311 | 81058913 25002 | | Tennessee Gas Pipeline Co | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| 06 | LA | Jefferson Davis | 5283311 | 81059313 25002 | | Tennessee Gas Pipeline Co | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| 06 | LA | Jefferson Davis | 5283311 | 81060313 25002 | | Tennessee Gas Pipeline Co | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| 06 | LA | Jefferson Davis | 5283311 | 81060513 25002 | | Tennessee Gas Pipeline Co | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |

**485a**

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 120 WEST UNION RD | CLENDENIN | 4000 | HP | 1.939962 |
| Pipeline Transportation of Natural Gas | 200 RIVER HAVEN ROAD | CLENDENIN | | | 117.72 |
| Pipeline Transportation of Natural Gas | 7 COCO RD. | ELKVIEW | 4000 | HP | 88.7217 |
| Pipeline Transportation of Natural Gas | 105 PATTERSON DRIVE | ELKVIEW | 1100 | HP | 0 |
| Pipeline Transportation of Natural Gas | STATE ROUTE 21 | SANDYVILLE | 2250 | HP | 24.8703 |
| Pipeline Transportation of Natural Gas | STATE ROUTE 21 | SANDYVILLE | 2250 | HP | 22.72113 |
| Pipeline Transportation of Natural Gas | 2000 BIG SANDY RIVER RD | KENOVA | 2000 | HP | 162.4341 |
| Pipeline Transportation of Natural Gas | 2000 BIG SANDY RIVER RD | KENOVA | 2000 | HP | 33.57441 |
| Pipeline Transportation of Natural Gas | 2000 BIG SANDY RIVER RD | KENOVA | 2000 | HP | 54.23193 |
| Pipeline Transportation of Natural Gas | 2000 BIG SANDY RIVER RD | KENOVA | 2000 | HP | 113.5565 |
| Pipeline Transportation of Natural Gas | 1664 WALKER BRANCH RD. | HUNTINGTON | 2800 | HP | 202.8929 |
| Pipeline Transportation of Natural Gas | 1664 WALKER BRANCH RD. | HUNTINGTON | 2800 | HP | 204.9223 |
| Pipeline Transportation of Natural Gas | 1664 WALKER BRANCH RD. | HUNTINGTON | 2800 | HP | 95.20873 |
| Pipeline Transportation of Natural Gas | 1664 WALKER BRANCH RD. | HUNTINGTON | 2800 | HP | 110.1751 |
| Pipeline Transportation of Natural Gas | 1664 WALKER BRANCH RD. | HUNTINGTON | 2800 | HP | 41.7706 |
| Pipeline Transportation of Natural Gas | 1664 WALKER BRANCH RD. | HUNTINGTON | 2700 | HP | 58.28772 |
| Pipeline Transportation of Natural Gas | ROAD #5, CAMERON RIDGE RD, | CAMERON | 2000 | HP | 61.44635 |
| Pipeline Transportation of Natural Gas | ROAD #5, CAMERON RIDGE RD, | CAMERON | 2000 | HP | 50.15312 |
| Pipeline Transportation of Natural Gas | KLIPSTINE ROAD | BIG SPRINGS | | | 149.2258 |
| Pipeline Transportation of Natural Gas | KLIPSTINE ROAD | BIG SPRINGS | | | 97.1414 |
| Pipeline Transportation of Natural Gas | KLIPSTINE ROAD | BIG SPRINGS | | | 45.4325 |
| Pipeline Transportation of Natural Gas | ROUTE 1 | GLADY | 1320 | HP | 152.5936 |
| Pipeline Transportation of Natural Gas | ROUTE 1 | GLADY | 1320 | HP | 181.0403 |
| Pipeline Transportation of Natural Gas | ROUTE 1 | GLADY | 1320 | HP | 178.4885 |
| Pipeline Transportation of Natural Gas | ROUTE 4 BOX 260A | CLARKSBURG | | | 53.8017 |
| Pipeline Transportation of Natural Gas | ROUTE 2 BOX 145 | BRIDGEPORT | | | 62.9754 |
| Pipeline Transportation of Natural Gas | ROUTE 2, BOX 90 | CAMDEN | | | 65.0688 |
| Pipeline Transportation of Natural Gas | ROUTE 2, BOX 90 | CAMDEN | | | 72.5098 |
| Pipeline Transportation of Natural Gas | ROUTE 2, BOX 90 | CAMDEN | | | 64.7541 |
| Pipeline Transportation of Natural Gas | ROUTE 2, BOX 90 | CAMDEN | | | 102.728 |
| Pipeline Transportation of Natural Gas | HC 76, BOX 33B | GLENVILLE | 2000 | HP | 55.35212 |
| Pipeline Transportation of Natural Gas | HC 76, BOX 33B | GLENVILLE | 2000 | HP | 47.87394 |
| Pipeline Transportation of Natural Gas | HC 76, BOX 33B | GLENVILLE | 2000 | HP | 42.5676 |
| Pipeline Transportation of Natural Gas | HC 76, BOX 33B | GLENVILLE | 2000 | HP | 50.97387 |
| Pipeline Transportation of Natural Gas | ROUTE 2 | JANE LEW | | | 24.301 |
| Pipeline Transportation of Natural Gas | ROUTE 2 | JANE LEW | | | 31.34 |
| Pipeline Transportation of Natural Gas | ROUTE 2 | JANE LEW | | | 57.9831 |
| Pipeline Transportation of Natural Gas | ROUTE 2 | JANE LEW | | | 48.3716 |
| Pipeline Transportation of Natural Gas | ROUTE 2 | JANE LEW | | | 38.7932 |
| Pipeline Transportation of Natural Gas | ROUTE 2 | JANE LEW | | | 32.1205 |
| Pipeline Transportation of Natural Gas | 52 LILAC ROAD | SMITHFIELD | | | 41.5081 |
| Pipeline Transportation of Natural Gas | 544 COPLEY RUN ROAD | WESTON | | | 149.1219 |
| Pipeline Transportation of Natural Gas | 544 COPLEY RUN ROAD | WESTON | | | 87.70419 |
| Pipeline Transportation of Natural Gas | MIDDLEBOURNE STAR RTE, BOX 36 | WEST UNION | | | 25.49876 |
| Pipeline Transportation of Natural Gas | HC 82 BOX 10 | TERRA ALTA | 1100 | HP | 57.29894 |
| Pipeline Transportation of Natural Gas | HC 82 BOX 10 | TERRA ALTA | 1100 | HP | 54.6885 |
| Pipeline Transportation of Natural Gas | HC 82 BOX 10 | TERRA ALTA | 1100 | HP | 61.26564 |
| Pipeline Transportation of Natural Gas | HC 82 BOX 10 | TERRA ALTA | 1100 | HP | 61.34603 |
| Pipeline Transportation of Natural Gas | HC 82 BOX 10 | TERRA ALTA | 1100 | HP | 56.04557 |
| Pipeline Transportation of Natural Gas | Section 33&4, T39&40 S, R17W | Veyo | | 7.73 E6BTU/HR | 0.9934596 |
| Pipeline Transportation of Natural Gas | 170 Jackie Hollow Rd | Liberty  (Casey) | 2200 | HP | 653.31711 |
| Pipeline Transportation of Natural Gas | 14888 KY 7 | Greenup | 5500 | HP | 1554.469 |
| Pipeline Transportation of Natural Gas | 8690 New Columbia Rd | Campbellsville | | | 245.8336 |
| Pipeline Transportation of Natural Gas | 650 KY 175 S | Bremen | | | 0 |
| Pipeline Transportation of Natural Gas | 7095 Brown Rd | Madisonville | | | 1.64658 |
| Pipeline Transportation of Natural Gas | 3066 Morris Creek Rd | Stanton | 4400 | HP | 68.02486 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 2000 | HP | 93.463 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 1890 | HP | 113.419 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 1890 | HP | 155.722 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 1890 | HP | 123.017 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 1890 | HP | 49.37 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 1890 | HP | 24.4772 |
| Pipeline Transportation of Natural Gas | 1171 MORE RANCH ROAD | GOLETA | | | 0.6535135 |
| Pipeline Transportation of Natural Gas | 200 Worthey Rd | West Monroe | 1600 | HP | 38.08 |
| Pipeline Transportation of Natural Gas | 200 Worthey Rd | West Monroe | 1600 | HP | 88.34 |
| Pipeline Transportation of Natural Gas | 200 Worthey Rd | West Monroe | 1600 | HP | 117.44 |
| Pipeline Transportation of Natural Gas | 200 Worthey Rd | West Monroe | 1600 | HP | 88.83 |
| Pipeline Transportation of Natural Gas | 200 Worthey Rd | West Monroe | 1600 | HP | 93.57 |
| Pipeline Transportation of Natural Gas | 200 Worthey Rd | West Monroe | 1600 | HP | 70.7 |
| Pipeline Transportation of Natural Gas | 200 Worthey Rd | West Monroe | 1600 | HP | 67.37 |
| Pipeline Transportation of Natural Gas | 9992 Hwy 127 | Jena | 7830 | HP | 135.51 |
| Pipeline Transportation of Natural Gas | 552 Hwy 873 W | Extension | 1450 | HP | 22.26 |
| Pipeline Transportation of Natural Gas | 552 Hwy 873 W | Extension | 2050 | HP | 29.4 |
| Pipeline Transportation of Natural Gas | 552 Hwy 873 W | Extension | 1450 | HP | 22.28 |
| Pipeline Transportation of Natural Gas | 552 Hwy 873 W | Extension | 2050 | HP | 28.28 |
| Pipeline Transportation of Natural Gas | 293 Sonat Ln | Centerville | 1800 | HP | 158.7598 |
| Pipeline Transportation of Natural Gas | 293 Sonat Ln | Centerville | 1800 | HP | 79.3707 |
| Pipeline Transportation of Natural Gas | 293 Sonat Ln | Centerville | 1800 | HP | 55.9849 |
| Pipeline Transportation of Natural Gas | 293 Sonat Ln | Centerville | 1800 | HP | 52.2168 |
| Pipeline Transportation of Natural Gas | 195 United Gas Ln | Pineville | 3300 | HP | 139.055 |
| Pipeline Transportation of Natural Gas | 195 United Gas Ln | Pineville | 3300 | HP | 135.7306 |
| Pipeline Transportation of Natural Gas | 195 United Gas Ln | Pineville | 3300 | HP | 285.5291 |
| Pipeline Transportation of Natural Gas | 195 United Gas Ln | Pineville | 3300 | HP | 144.0989 |
| Pipeline Transportation of Natural Gas | 124 Texas Gas Rd | Columbia | 1500 | HP | 58.45739 |
| Pipeline Transportation of Natural Gas | 124 Texas Gas Rd | Columbia | 1500 | HP | 50.65253 |
| Pipeline Transportation of Natural Gas | 124 Texas Gas Rd | Columbia | 1500 | HP | 47.18638 |
| Pipeline Transportation of Natural Gas | 124 Texas Gas Rd | Columbia | 2000 | HP | 207.6801 |
| Pipeline Transportation of Natural Gas | 124 Texas Gas Rd | Columbia | 1500 | HP | 63.68198 |
| Pipeline Transportation of Natural Gas | 124 Texas Gas Rd | Columbia | 1500 | HP | 72.38239 |
| Pipeline Transportation of Natural Gas | 11383 Hwy 171 | Longville | 18.2 E6BTU/HR | | 82.98611 |
| Pipeline Transportation of Natural Gas | 11383 Hwy 171 | Longville | 18.9 E6BTU/HR | | 36.21429 |
| Pipeline Transportation of Natural Gas | 11383 Hwy 171 | Longville | 18.2 E6BTU/HR | | 32.34821 |
| Pipeline Transportation of Natural Gas | 11383 Hwy 171 | Longville | 18.9 E6BTU/HR | | 71.54167 |
| Pipeline Transportation of Natural Gas | 11383 Hwy 171 | Longville | 18.9 E6BTU/HR | | 57.77976 |
| Pipeline Transportation of Natural Gas | 11383 Hwy 171 | Longville | 18.9 E6BTU/HR | | 70.93254 |
| Pipeline Transportation of Natural Gas | 11383 Hwy 171 | Longville | 18.2 E6BTU/HR | | 120.1653 |
| Pipeline Transportation of Natural Gas | 4711 Bayou Black Dr | Gibson | 1440 | HP | 30.7 |
| Pipeline Transportation of Natural Gas | 4711 Bayou Black Dr | Gibson | 1440 | HP | 57.97 |
| Pipeline Transportation of Natural Gas | 745 Hwy 134 | Epps | 3000 | HP | 72.47 |
| Pipeline Transportation of Natural Gas | 745 Hwy 134 | Epps | 3000 | HP | 47.36 |
| Pipeline Transportation of Natural Gas | 7152 Pumping Station Rd | Bastrop | 1760 | HP | 60.54051 |
| Pipeline Transportation of Natural Gas | 7152 Pumping Station Rd | Bastrop | 1760 | HP | 60.92058 |
| Pipeline Transportation of Natural Gas | 7152 Pumping Station Rd | Bastrop | 1760 | HP | 54.95772 |
| Pipeline Transportation of Natural Gas | 4135 Camp Joy Rd | Haughton | 1000 | HP | 30.76812 |
| Pipeline Transportation of Natural Gas | 4135 Camp Joy Rd | Haughton | 1000 | HP | 59.83165 |
| Pipeline Transportation of Natural Gas | 4135 Camp Joy Rd | Haughton | 1000 | HP | 47.85354 |
| Pipeline Transportation of Natural Gas | 5799 Church Point Hwy | Rayne | 2050 | HP | 102.35 |
| Pipeline Transportation of Natural Gas | 5799 Church Point Hwy | Rayne | 2050 | HP | 79.16 |
| Pipeline Transportation of Natural Gas | 5799 Church Point Hwy | Rayne | 2050 | HP | 108.89 |
| Pipeline Transportation of Natural Gas | 5799 Church Point Hwy | Rayne | 2050 | HP | 95.4 |
| Pipeline Transportation of Natural Gas | 5799 Church Point Hwy | Rayne | 2050 | HP | 92.75 |
| Pipeline Transportation of Natural Gas | 5799 Church Point Hwy | Rayne | 2050 | HP | 67.93 |
| Pipeline Transportation of Natural Gas | 5799 Church Point Hwy | Rayne | 2050 | HP | 66.85 |
| Pipeline Transportation of Natural Gas | 18169 Lee Rd | Franklinton | 2700 | HP | 90.86 |
| Pipeline Transportation of Natural Gas | 18169 Lee Rd | Franklinton | 2700 | HP | 183.26 |
| Pipeline Transportation of Natural Gas | 18169 Lee Rd | Franklinton | 2700 | HP | 69.78 |
| Pipeline Transportation of Natural Gas | 15910 Hwy 331 | Erath | 97.5 E6BTU/HR | | 319.0256 |
| Pipeline Transportation of Natural Gas | 15910 Hwy 331 | Erath | 97.5 E6BTU/HR | | 633.8234 |
| Pipeline Transportation of Natural Gas | 2 Mi SE of | Holly Ridge | 3300 | HP | 51.36121 |
| Pipeline Transportation of Natural Gas | 4202 Fournerat Rd | Eunice | 12000 | HP | 642.55 |
| Pipeline Transportation of Natural Gas | 0.5 Mi SE of Hwys 25 & 10 jct near | Franklinton | 50 E6BTU/HR | | 27.5463 |
| Pipeline Transportation of Natural Gas | 0.5 Mi SE of Hwys 25 & 10 jct near | Franklinton | 16.2 E6BTU/HR | | 22.3161 |
| Pipeline Transportation of Natural Gas | 0.5 Mi SE of Hwys 25 & 10 jct near | Franklinton | 16.2 E6BTU/HR | | 22.7806 |
| Pipeline Transportation of Natural Gas | 7179 Hwy 17 | Delhi | 16.8 E6BTU/HR | | 50.38 |
| Pipeline Transportation of Natural Gas | 7179 Hwy 17 | Delhi | 16.8 E6BTU/HR | | 68.48 |
| Pipeline Transportation of Natural Gas | 7179 Hwy 17 | Delhi | 16.8 E6BTU/HR | | 66.92 |
| Pipeline Transportation of Natural Gas | 7179 Hwy 17 | Delhi | 16.8 E6BTU/HR | | 61.49 |
| Pipeline Transportation of Natural Gas | 7179 Hwy 17 | Delhi | 16.8 E6BTU/HR | | 51.94 |
| Pipeline Transportation of Natural Gas | 7179 Hwy 17 | Delhi | 16.8 E6BTU/HR | | 54.48 |
| Pipeline Transportation of Natural Gas | 7179 Hwy 17 | Delhi | 16.8 E6BTU/HR | | 51.85 |
| Pipeline Transportation of Natural Gas | 757 Sharon Rd | Dubach | 2650 | HP | 24.53496 |
| Pipeline Transportation of Natural Gas | 129 Texas Gas Rd | Sterlington | 1320 | HP | 2.541284 |
| Pipeline Transportation of Natural Gas | 2959 Veterans Memorial Hwy | Eunice | 2000 | HP | 64.42 |
| Pipeline Transportation of Natural Gas | 2959 Veterans Memorial Hwy | Eunice | 2000 | HP | 63.14 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 1450 | HP | 47.2896 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 5500 | HP | 297.1051 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 1550 | HP | 57.6511 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 1550 | HP | 47.8928 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 1550 | HP | 46.0054 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 1550 | HP | 52.2281 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 5500 | HP | 216.0606 |

| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|
| TON | | | | Selective Catalytic Reduction | 90 |
| TON | N/A | | 139 SCR | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | N/A | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | N/A | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | N/A | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | N/A | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | N/A | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | N/A | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | N/A | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | N/A | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | Oxidation Catalyst | | Layered Combustion | Layered Combustion | 97 |
| TON | Oxidation Catalyst | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | None | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | None | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | High Pressure Fuel Injection | 90 | 139 SCR | | |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | AFRC+HVFI | 90 | Layered Combustion | | |
| TON | AFRC+HVFI | 90 | Layered Combustion | | |
| TON | AFRC+HVFI | 90 | Layered Combustion | | |
| TON | AFRC+HVFI | 90 | Layered Combustion | | |
| TON | AFRC+HVFI | 90 | Layered Combustion | | |
| TON | AFRC+HVFI | 90 | Layered Combustion | | |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |

**487a**

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| 06 | LA | Jefferson Davis | 5283311 | 8106101 | 25002 | Tennessee Gas Pipeline Co | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| 06 | LA | Acadia | 7364911 | 8107473 | 3599 | Florida Gas Transmission Co LLC | Florida Gas Transmission Co C/S #7 | 486210 |
| 06 | LA | Acadia | 7364911 | 8107483 | 3599 | Florida Gas Transmission Co LLC | Florida Gas Transmission Co C/S #7 | 486210 |
| 06 | LA | Acadia | 7364911 | 8107503 | 3599 | Florida Gas Transmission Co LLC | Florida Gas Transmission Co C/S #7 | 486210 |
| 06 | LA | Acadia | 6082211 | 8124051 | 4205 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Eunice Compressor Station | 486210 |
| 06 | LA | Acadia | 6082211 | 8124071 | 4205 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Eunice Compressor Station | 486210 |
| 06 | LA | Acadia | 6082211 | 8124081 | 4205 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Eunice Compressor Station | 486210 |
| 06 | LA | Acadia | 6082211 | 8124091 | 4205 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Eunice Compressor Station | 486210 |
| 06 | LA | Acadia | 6082211 | 8124113 | 4205 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Eunice Compressor Station | 486210 |
| 06 | LA | St. Bernard | 5608211 | 8128513 | 17664 | Southern Natural Gas Co | Southern Natural Gas Co - Toca Compressor Station | 486210 |
| 06 | LA | St. Bernard | 5608211 | 8128611 | 17664 | Southern Natural Gas Co | Southern Natural Gas Co - Toca Compressor Station | 486210 |
| 06 | LA | Iberville | 5504711 | 8128913 | 4197 | Southern Natural Gas Company LLC | Southern Natural Gas Company LLC - White Castle Compressor Station | 486210 |
| 06 | LA | Iberville | 5504711 | 8128921 | 4197 | Southern Natural Gas Company LLC | Southern Natural Gas Company LLC - White Castle Compressor Station | 486210 |
| 06 | LA | Iberville | 5504711 | 8128931 | 4197 | Southern Natural Gas Company LLC | Southern Natural Gas Company LLC - White Castle Compressor Station | 486210 |
| 06 | LA | Natchitoches | 5543511 | 8137723 | 23088 | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Clarence Compressor Station | 486210 |
| 06 | LA | Natchitoches | 5543511 | 8137763 | 23088 | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Clarence Compressor Station | 486210 |
| 06 | LA | Natchitoches | 5543511 | 8137713 | 23088 | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Clarence Compressor Station | 486210 |
| 06 | LA | Lafayette | 6128811 | 8138563 | 17788 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Youngsville Compressor Station | 486210 |
| 06 | LA | Lafayette | 6128811 | 8138613 | 17788 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Youngsville Compressor Station | 486210 |
| 06 | LA | Lafayette | 6128811 | 8138643 | 17788 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Youngsville Compressor Station | 486210 |
| 06 | LA | Lafayette | 6128811 | 8138713 | 17788 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Youngsville Compressor Station | 486210 |
| 06 | LA | Rapides | 5740711 | 8138813 | 44779 | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Alexandria Compressor Station | 486210 |
| 06 | LA | Rapides | 5740711 | 8138863 | 44779 | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Alexandria Compressor Station | 486210 |
| 06 | LA | Rapides | 5740711 | 8138893 | 44779 | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Alexandria Compressor Station | 486210 |
| 06 | LA | Rapides | 5740711 | 8138903 | 44779 | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Alexandria Compressor Station | 486210 |
| 06 | LA | St. Landry | 5287611 | 8141613 | 3160 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Compressor Station #54 | 486210 |
| 06 | LA | St. Landry | 5287611 | 8141703 | 3160 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Compressor Station #54 | 486210 |
| 06 | LA | Beauregard | 5998611 | 8141891 3 | 7128 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 45 | 486210 |
| 06 | LA | Beauregard | 5998611 | 8141901 3 | 7128 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 45 | 486210 |
| 06 | LA | Beauregard | 5998611 | 8141913 | 7128 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 45 | 486210 |
| 06 | LA | Beauregard | 5998611 | 8141923 | 7128 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 45 | 486210 |
| 06 | LA | Beauregard | 5998611 | 8141953 | 7128 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 45 | 486210 |
| 06 | LA | Beauregard | 5998611 | 8142013 | 7128 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 45 | 486210 |
| 06 | LA | Beauregard | 5998611 | 8142013 | 7128 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 45 | 486210 |
| 06 | LA | Beauregard | 5998611 | 8142013 | 7128 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 45 | 486210 |
| 06 | LA | Ouachita | 5735011 | 8154123 | 44216 | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC - Perryville Compressor Station | 486210 |
| 06 | LA | Ouachita | 5735011 | 8154153 | 44216 | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC - Perryville Compressor Station | 486210 |
| 06 | LA | Ouachita | 5735011 | 8154203 | 44216 | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC - Perryville Compressor Station | 486210 |
| 06 | LA | Lincoln | 7234211 | 8156183 | 13145 | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC - Unionville Storage Compressor Statio | 486210 |
| 06 | LA | Lincoln | 7234211 | 8156293 | 13145 | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC - Unionville Storage Compressor Statio | 486210 |
| 06 | LA | Lincoln | 7234211 | 8156353 | 13145 | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC - Unionville Storage Compressor Statio | 486210 |
| 06 | LA | Richland | 5607811 | 8158691 3 | 3109 | ANR Pipeline Co | ANR Pipeline Co - Delhi Compressor Station | 486210 |
| 06 | LA | Richland | 5607811 | 8158713 3 | 3109 | ANR Pipeline Co | ANR Pipeline Co - Delhi Compressor Station | 486210 |
| 06 | LA | Richland | 5607811 | 8158751 3 | 3109 | ANR Pipeline Co | ANR Pipeline Co - Delhi Compressor Station | 486210 |
| 06 | LA | Richland | 5607811 | 8158771 3 | 3109 | ANR Pipeline Co | ANR Pipeline Co - Delhi Compressor Station | 486210 |
| 06 | LA | Richland | 5607811 | 8158013 | 3109 | ANR Pipeline Co | ANR Pipeline Co - Delhi Compressor Station | 486210 |
| 06 | LA | Rapides | 5740911 | 8159803 | 3120 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Pineville Compressor Station | 486210 |
| 06 | LA | Rapides | 5740911 | 8159823 | 3120 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Pineville Compressor Station | 486210 |
| 06 | LA | Rapides | 5740911 | 8159843 | 3120 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Pineville Compressor Station | 486210 |
| 06 | LA | Rapides | 5740911 | 8159873 | 3120 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Pineville Compressor Station | 486210 |
| 06 | LA | Rapides | 5740911 | 8159883 | 3120 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Pineville Compressor Station | 486210 |
| 06 | LA | Rapides | 5740911 | 8159903 | 3120 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Pineville Compressor Station | 486210 |
| 06 | LA | Bienville | 6000211 | 8205413 | 4042 | Kinder Morgan GP Inc | Southern Natural Gas Co - Bear Creek Storage Facility | 486210 |
| 06 | LA | Bienville | 6000211 | 8205473 | 4042 | Kinder Morgan GP Inc | Southern Natural Gas Co - Bear Creek Storage Facility | 486210 |
| 06 | LA | Bienville | 6000211 | 8205513 | 4042 | Kinder Morgan GP Inc | Southern Natural Gas Co - Bear Creek Storage Facility | 486210 |
| 06 | LA | Bienville | 6000211 | 8205523 | 4042 | Kinder Morgan GP Inc | Southern Natural Gas Co - Bear Creek Storage Facility | 486210 |
| 06 | LA | East Feliciana | 7228011 | 8208703 | 32061 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 60 | 486210 |
| 06 | LA | St. Mary | 5289911 | 8215213 | 1959 | ANR Pipeline Co | ANR Pipeline Co - Patterson Compressor Station | 486210 |
| 06 | LA | St. Mary | 5289911 | 8215233 | 1959 | ANR Pipeline Co | ANR Pipeline Co - Patterson Compressor Station | 486210 |
| 06 | LA | St. Mary | 5289911 | 8215273 | 1959 | ANR Pipeline Co | ANR Pipeline Co - Patterson Compressor Station | 486210 |
| 05 | MI | Wayne | 6442311 | 8268691 3 | N1099 | No | Consumers Energy - Northville Compressor Station | 486210 |
| 05 | MI | Allegan | 5766311 | 8269573 | N5792 | No | Consumers Energy - Overisel Compressor Station | 486210 |
| 05 | MI | Allegan | 5766311 | 8269881 3 | N5792 | No | Consumers Energy - Overisel Compressor Station | 486210 |
| 05 | MI | Clare | 4006811 | 8278421 3 | N2901 | No | Consumers Energy - Muskegon River Compressor Stat | 486210 |
| 05 | MI | Mecosta | 4190611 | 8282901 3 | B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| 05 | MI | Mecosta | 4190611 | 8282911 3 | B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| 05 | MI | Mecosta | 4190611 | 8282941 3 | B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| 05 | MI | Mecosta | 4190611 | 8282951 3 | B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| 05 | MI | Mecosta | 4190611 | 8282953 | B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| 05 | MI | Mecosta | 4190611 | 8282973 | B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| 04 | KY | Pike | 5659811 | 8320271 3 | 2195002S0 | | Columbia Gas Transmission Corp | 486210 |
| 04 | KY | Pike | 5659811 | 8320291 3 | 2195002S0 | | Columbia Gas Transmission Corp | 486210 |
| 04 | KY | Pike | 5659811 | 8320301 3 | 2195002S0 | | Columbia Gas Transmission Corp | 486210 |
| 04 | KY | Pike | 5659811 | 8320311 3 | 2195002S0 | | Columbia Gas Transmission Corp | 486210 |
| 05 | MI | Kalkaska | 5021311 | 8329913 | B7198 | | ANR Pipeline-Cold Spngs12 /Blue Lk/ Cold Spngs 1 | 486210 |
| 05 | MI | Kalkaska | 5021311 | 8333003 | B7198 | | ANR Pipeline-Cold Spngs12 /Blue Lk/ Cold Spngs 1 | 486210 |
| 05 | MI | Kalkaska | 5021311 | 8333013 | B7198 | | ANR Pipeline-Cold Spngs12 /Blue Lk/ Cold Spngs 1 | 486210 |
| 05 | MI | Kalkaska | 5021311 | 8330513 | B7198 | | ANR Pipeline-Cold Spngs12 /Blue Lk/ Cold Spngs 1 | 486210 |
| 05 | MI | Kalkaska | 5021311 | 8330613 | B7198 | | ANR Pipeline-Cold Spngs12 /Blue Lk/ Cold Spngs 1 | 486210 |
| 05 | MI | Kalkaska | 5021311 | 8330713 | B7198 | | ANR Pipeline-Cold Spngs12 /Blue Lk/ Cold Spngs 1 | 486210 |
| 03 | MD | Garrett | 6130911 | 8795413 | 023-0081 | Texas Eastern Transmission, LP | Texas Eastern Transmission | 486210 |
| 06 | LA | Caldwell | 6426511 | 8953113 | 7883 | | Texas Gas Transmission LLC - Columbia Compressor Station | 486210 |
| 06 | LA | Morehouse | 5543111 | 8956063 | 3247 | | Texas Gas Transmission LLC - Bastrop Compressor Station | 486210 |
| 06 | LA | Acadia | 6082411 | 8958373 | 8335 | | ANR Pipeline Co - Eunice Compressor Station | 486210 |
| 06 | TX | Lamar | 14751011 | 9030313 | 251 | | PARIS COMPRESSOR STATION | 486210 |
| 05 | OH | Muskingum | 15023313 | 9169123 | 0660002261 | | Rockies Express Pipeline LLC - Chandlersville CS (0660002261) | 486210 |
| 04 | KY | Hopkins | 5830611 | 9477133 | 2110700134 | | ANR Pipeline Co (Madisonville Compressor Sta) | 486210 |
| 04 | KY | Hopkins | 5830611 | 9477153 | 2110700134 | | ANR Pipeline Co (Madisonville Compressor Sta) | 486210 |
| 04 | KY | Greenup | 6096911 | 9477173 | 2108800033 | | TN Gas Pipeline LLC - Station 200 | 486210 |
| 04 | KY | Greenup | 6096911 | 9477193 | 2108800033 | | TN Gas Pipeline LLC - Station 200 | 486210 |
| 04 | KY | Powell | 5787411 | 9477223 | 2119700013 | No | TN Gas Pipeline Co LLC - Station 106 | 486210 |
| 04 | KY | Powell | 5787411 | 9477243 | 2119700013 | No | TN Gas Pipeline Co LLC - Station 106 | 486210 |
| 04 | KY | Powell | 5787411 | 9477253 | 2119700013 | No | TN Gas Pipeline Co LLC - Station 106 | 486210 |
| 04 | KY | Powell | 5787411 | 9477273 | 2119700013 | No | TN Gas Pipeline Co LLC - Station 106 | 486210 |
| 04 | KY | Powell | 5787411 | 9477283 | 2119700013 | No | TN Gas Pipeline Co LLC - Station 106 | 486210 |
| 04 | KY | Taylor | 5727011 | 9477313 | 2121700033 | No | TN Gas Pipeline Co LLC - Station 96 | 486210 |
| 04 | KY | Taylor | 5727011 | 9477323 | 2121700033 | No | TN Gas Pipeline Co LLC - Station 96 | 486210 |
| 04 | KY | Taylor | 5727011 | 9477343 | 2121700033 | No | TN Gas Pipeline Co LLC - Station 96 | 486210 |
| 04 | KY | Taylor | 5727011 | 9477393 | 2121700034 | No | TN Gas Pipeline Co LLC - Station 96 | 486210 |
| 04 | KY | Taylor | 5727111 | 9474113 | 2121700034 | No | TN Gas Pipeline Co LLC - Station 871 | 486210 |
| 04 | KY | Knott | 5351311 | 9477433 | 2111900030 | | Diversified Midstream LLC - Right Beaver Transmission Station | 486210 |
| 04 | KY | Webster | 6099111 | 9477693 | 2123300074 | | Texas Gas Transmission LLC - Slaughters Compressor | 486210 |
| 04 | KY | Webster | 6099111 | 9477703 | 2123300074 | No | Texas Gas Transmission LLC - Slaughters Compressor | 486210 |
| 04 | KY | Breckinridge | 5868411 | 9478053 | 2102700022 | No | Texas Gas Trans LLC | 486210 |
| 04 | KY | Breckinridge | 5868411 | 9478013 | 2102700022 | No | Texas Gas Trans LLC | 486210 |
| 04 | KY | Breckinridge | 5868411 | 9478063 | 2102700022 | No | Texas Gas Trans LLC | 486210 |
| 04 | KY | Breckinridge | 5868411 | 9478083 | 2102700022 | No | Texas Gas Trans LLC | 486210 |
| 04 | KY | Breckinridge | 5868411 | 9478093 | 2102700022 | No | Texas Gas Trans LLC | 486210 |
| 04 | KY | Breckinridge | 5868411 | 9478103 | 2102700022 | No | Texas Gas Trans LLC | 486210 |
| 03 | PA | Bedford | 15077911 | 9487313 | 420090005 | STECKMAN RIDGE LP | STECKMAN RIDGE LP/CLEARVILLE | 486210 |
| 04 | LA | Jackson | 15081511 | 9508913 | 166495 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Chatham Compressor Station | 486210 |
| 04 | LA | Jackson | 15081511 | 9508923 | 166495 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Chatham Compressor Station | 486210 |
| 04 | LA | Jackson | 15081511 | 9508953 | 166495 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Chatham Compressor Station | 486210 |
| 06 | LA | Marian | 5774811 | 9346813 | 2101100004 | No | Texas Eastern Transmission LP - Owingsville Transmission Station | 486210 |
| 04 | KY | Hart | 15519711 | 9738013 | 2109900123 | | Eco-Energy Stone Mountain LLP - Bills Branch Compressor Station | 486210 |
| 06 | OK | Coal | 15526011 | 9746063 | 6480 | MARKWEST PIONEER LLC | ARKOMA COMPRESSOR STATION | 486210 |
| 06 | OK | Coal | 15526211 | 9746321 | 6848 | ENABLE GAS GATHERING LLC | PARKER CAPER STA | 486210 |
| 06 | OK | Kiowa | 6730811 | 9841501 3 | 1056 | NATURAL GAS PIPELINE CO OF AMERICA | STATION 156 | 486210 |
| 06 | OK | Grady | 3952011 | 9841663 | 130 | ENABLE GAS TRANSMISSION LLC | AMBER JUNCTION COMPRESSOR STATION | 486210 |
| 04 | MS | Hinds | 15604911 | 9912491 3 | 2804900250 | A039671 | MIDCONTINENT EXPRESS PIPELINE LLC, MEP 4 | 486210 |
| 04 | MS | Hinds | 15604911 | 9912503 | 2804900250 | A039671 | MIDCONTINENT EXPRESS PIPELINE LLC, MEP 4 | 486210 |
| 06 | TX | Cass | 15624611 | 9917913 23 | | MIDCONTINENT EXPRESS PIPELINE LLC | ATLANTA COMPRESSOR STATION | 486210 |
| 06 | TX | Cass | 15624611 | 9917923 23 | | MIDCONTINENT EXPRESS PIPELINE LLC | ATLANTA COMPRESSOR STATION | 486210 |
| 06 | TX | Cass | 15624611 | 9917943 23 | | MIDCONTINENT EXPRESS PIPELINE LLC | ATLANTA COMPRESSOR STATION | 486210 |
| 05 | MI | Oakland | 15501911 | 9948183 | B7721 | | DTE Gas Company - Milford Compressor Station | 486210 |
| 06 | LA | Natchitoches | 15639611 | 9961413 | 169661 | Acadian Gas Pipeline System | Acadian Gas Pipeline System - Mansfield Compressor Station | 486210 |
| 06 | LA | Natchitoches | 15639611 | 9961433 | 169661 | Acadian Gas Pipeline System | Acadian Gas Pipeline System - Mansfield Compressor Station | 486210 |
| 06 | LA | Natchitoches | 15639611 | 9961493 | 169661 | Acadian Gas Pipeline System | Acadian Gas Pipeline System - Mansfield Compressor Station | 486210 |
| 06 | LA | Natchitoches | 15639611 | 9961483 | 169661 | Acadian Gas Pipeline System | Acadian Gas Pipeline System - Mansfield Compressor Station | 486210 |
| 06 | LA | Natchitoches | 15639611 | 9961453 | 169661 | Acadian Gas Pipeline System | Acadian Gas Pipeline System - Mansfield Compressor Station | 486210 |
| 06 | LA | Natchitoches | 15639611 | 9961513 | 169661 | Acadian Gas Pipeline System | Acadian Gas Pipeline System - Mansfield Compressor Station | 486210 |
| 06 | LA | Rapides | 15640611 | 9967441 3 | 169758 | Acadian Gas Pipeline System | Acadian Gas Pipeline System - Cheneyville Compressor Station | 486210 |
| 06 | LA | Rapides | 15640611 | 9967461 3 | 169758 | Acadian Gas Pipeline System | Acadian Gas Pipeline System - Cheneyville Compressor Station | 486210 |
| 06 | LA | Rapides | 15640611 | 9967473 | 169758 | Acadian Gas Pipeline System | Acadian Gas Pipeline System - Cheneyville Compressor Station | 486210 |
| 06 | LA | Jackson | 15081511 | 9973821 3 | 166495 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Chatham Compressor Station | 486210 |
| 06 | IN | Marion | 4667111 | 10083091 3 | 00287 | | Kinetrex Energy | 486210 |
| 06 | OK | Washita | 10680111 | 10390313 | 1548 | ENABLE GAS GATHERING LLC | BURNS FLAT COMPRESSOR STATION | 486210 |
| 06 | OK | Beckham | 16324711 | 10394163 90 | | MIDCOAST G AND P OKLAHOMA LP | MAYFIELD COMPRESSOR STATION | 486210 |
| 06 | OK | Caddo | 16325011 | 10394513 235 | | ENABLE GAS GATHERING LLC | ELM GROVE COMPRESSOR STATION | 486210 |

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 5500 | HP | 182.1846 |
| Pipeline Transportation of Natural Gas | 2747 Fourerat Rd | Eunice | 20.1 | E6BTU/HR | 267.3643 |
| Pipeline Transportation of Natural Gas | 2747 Fourerat Rd | Eunice | 20.1 | E6BTU/HR | 123.0147 |
| Pipeline Transportation of Natural Gas | 2747 Fourerat Rd | Eunice | 20.1 | E6BTU/HR | 257.858 |
| Pipeline Transportation of Natural Gas | 1661 Coulee Rd | Eunice | 1100 | HP | 209.9861 |
| Pipeline Transportation of Natural Gas | 1661 Coulee Rd | Eunice | 1100 | HP | 78.62247 |
| Pipeline Transportation of Natural Gas | 1661 Coulee Rd | Eunice | 1100 | HP | 113.1204 |
| Pipeline Transportation of Natural Gas | 1661 Coulee Rd | Eunice | 2250 | HP | 26.69931 |
| Pipeline Transportation of Natural Gas | 1661 Coulee Rd | Eunice | 1100 | HP | 146.4955 |
| Pipeline Transportation of Natural Gas | 2400 Bayou Rd | St. Bernard | 19.2 | E6BTU/HR | 82.8703 |
| Pipeline Transportation of Natural Gas | 2400 Bayou Rd | St. Bernard | 18.2 | E6BTU/HR | 83.1111 |
| Pipeline Transportation of Natural Gas | 33480 Hwy 405 | White Castle | 2000 | HP | 31.5392 |
| Pipeline Transportation of Natural Gas | 33480 Hwy 405 | White Castle | 2000 | HP | 33.3946 |
| Pipeline Transportation of Natural Gas | 33480 Hwy 405 | White Castle | 2700 | HP | 44.869 |
| Pipeline Transportation of Natural Gas | 2958 Mammy Trail | Goldonna | 4350 | HP | 47.44974 |
| Pipeline Transportation of Natural Gas | 2958 Mammy Trail | Goldonna | 4350 | HP | 63.82101 |
| Pipeline Transportation of Natural Gas | 2958 Mammy Trail | Goldonna | 4350 | HP | 66.1346 |
| Pipeline Transportation of Natural Gas | 4443 Verot School Rd | Youngsville | 2000 | HP | 22.47939 |
| Pipeline Transportation of Natural Gas | 4443 Verot School Rd | Youngsville | 2000 | HP | 233.223 |
| Pipeline Transportation of Natural Gas | 4443 Verot School Rd | Youngsville | 2000 | HP | 186.012 |
| Pipeline Transportation of Natural Gas | 4443 Verot School Rd | Youngsville | 1320 | HP | 64.11677 |
| Pipeline Transportation of Natural Gas | 7666 Hickory Grove Loop | Deville | 4400 | HP | 168.92 |
| Pipeline Transportation of Natural Gas | 7666 Hickory Grove Loop | Deville | 4400 | HP | 121.82 |
| Pipeline Transportation of Natural Gas | 7666 Hickory Grove Loop | Deville | 4400 | HP | 181.97 |
| Pipeline Transportation of Natural Gas | 7666 Hickory Grove Loop | Deville | 4400 | HP | 223.5 |
| Pipeline Transportation of Natural Gas | 1341 Plant Rd | Washington | 11000 | HP | 481.2316 |
| Pipeline Transportation of Natural Gas | 1341 Plant Rd | Washington | 11000 | HP | 467.1522 |
| Pipeline Transportation of Natural Gas | 17333 Hwy 171 | Ragley | 21 | E6BTU/HR | 59.92 |
| Pipeline Transportation of Natural Gas | 17333 Hwy 171 | Ragley | 21 | E6BTU/HR | 71.4 |
| Pipeline Transportation of Natural Gas | 17333 Hwy 171 | Ragley | 21 | E6BTU/HR | 87.43 |
| Pipeline Transportation of Natural Gas | 17333 Hwy 171 | Ragley | 19 | E6BTU/HR | 62.15 |
| Pipeline Transportation of Natural Gas | 17333 Hwy 171 | Ragley | 21 | E6BTU/HR | 57.72 |
| Pipeline Transportation of Natural Gas | 17333 Hwy 171 | Ragley | 21 | E6BTU/HR | 21.92 |
| Pipeline Transportation of Natural Gas | 17333 Hwy 171 | Ragley | 21 | E6BTU/HR | 45.06 |
| Pipeline Transportation of Natural Gas | 17333 Hwy 171 | Ragley | 21 | E6BTU/HR | 45.37 |
| Pipeline Transportation of Natural Gas | 2589 Hwy 554 | Bastrop | 2080 | HP | 106.6976 |
| Pipeline Transportation of Natural Gas | 2589 Hwy 554 | Bastrop | 2080 | HP | 107.7763 |
| Pipeline Transportation of Natural Gas | 2589 Hwy 554 | Bastrop | 2080 | HP | 53.45077 |
| Pipeline Transportation of Natural Gas | 452 Golf Course Rd | Dubach | 6500 | HP | 144.0303 |
| Pipeline Transportation of Natural Gas | 452 Golf Course Rd | Dubach | 6500 | HP | 95.31059 |
| Pipeline Transportation of Natural Gas | 452 Golf Course Rd | Dubach | 8000 | HP | 74.84914 |
| Pipeline Transportation of Natural Gas | 1894 Hwy 80 W | Delhi | 2000 | HP | 42.75 |
| Pipeline Transportation of Natural Gas | 1894 Hwy 80 W | Delhi | 2000 | HP | 29.32 |
| Pipeline Transportation of Natural Gas | 1894 Hwy 80 W | Delhi | 2000 | HP | 45.91 |
| Pipeline Transportation of Natural Gas | 1894 Hwy 80 W | Delhi | 2000 | HP | 46.76 |
| Pipeline Transportation of Natural Gas | 1894 Hwy 80 W | Delhi | 2000 | HP | 24.11 |
| Pipeline Transportation of Natural Gas | 1894 Hwy 80 W | Delhi | 2000 | HP | 33.93 |
| Pipeline Transportation of Natural Gas | 3983 Hwy 107 S | Pineville | 1580 | HP | 52.14274 |
| Pipeline Transportation of Natural Gas | 3983 Hwy 107 S | Pineville | 1580 | HP | 42.87239 |
| Pipeline Transportation of Natural Gas | 3983 Hwy 107 S | Pineville | 1580 | HP | 35.66885 |
| Pipeline Transportation of Natural Gas | 3983 Hwy 107 S | Pineville | 5040 | HP | 309.9245 |
| Pipeline Transportation of Natural Gas | 3983 Hwy 107 S | Pineville | 1580 | HP | 26.4433 |
| Pipeline Transportation of Natural Gas | 3983 Hwy 107 S | Pineville | 1580 | HP | 45.37211 |
| Pipeline Transportation of Natural Gas | 3983 Hwy 107 S | Pineville | 2100 | HP | 148.1106 |
| Pipeline Transportation of Natural Gas | 10275 Hwy 507 | Bienville | 67.5 | E6BTU/HR | 103.7265 |
| Pipeline Transportation of Natural Gas | 10275 Hwy 507 | Bienville | 67.5 | E6BTU/HR | 86.2222 |
| Pipeline Transportation of Natural Gas | 10275 Hwy 507 | Bienville | 67.5 | E6BTU/HR | 57.8559 |
| Pipeline Transportation of Natural Gas | 10275 Hwy 507 | Bienville | 67.5 | E6BTU/HR | 78.8843 |
| Pipeline Transportation of Natural Gas | Hwy 964 near | Jackson | 2500 | HP | 32.01 |
| Pipeline Transportation of Natural Gas | 3609 Hwy 90 W | Patterson | 7830 | HP | 173.94 |
| Pipeline Transportation of Natural Gas | 3609 Hwy 90 W | Patterson | 7830 | HP | 194.3 |
| Pipeline Transportation of Natural Gas | 3609 Hwy 90 W | Patterson | 7830 | HP | 230.21 |
| Pipeline Transportation of Natural Gas | 9440 NAPIER RD | NORTHVILLE | 0.01 | E6BTU/HR | 164.2 |
| Pipeline Transportation of Natural Gas | 4131 138th Ave. | HAMILTON | 0.01 | E6BTU/HR | 249.75 |
| Pipeline Transportation of Natural Gas | 4131 138th Ave. | HAMILTON | 0.01 | E6BTU/HR | 68.25 |
| Pipeline Transportation of Natural Gas | 8613 Pine Rd. | CHURCH BRIDGE | 0.01 | E6BTU/HR | 494.2 |
| Pipeline Transportation of Natural Gas | 11039 150th Ave. | BIG RAPIDS | 1000 | HP | 38.19 |
| Pipeline Transportation of Natural Gas | 11039 150th Ave. | BIG RAPIDS | 1000 | HP | 21.135 |
| Pipeline Transportation of Natural Gas | 11039 150th Ave. | BIG RAPIDS | 1320 | HP | 31.39 |
| Pipeline Transportation of Natural Gas | 11039 150th Ave. | BIG RAPIDS | 1320 | HP | 27.38 |
| Pipeline Transportation of Natural Gas | 11039 150th Ave. | BIG RAPIDS | 1320 | HP | 44.605 |
| Pipeline Transportation of Natural Gas | 11039 150th Ave. | BIG RAPIDS | 1320 | HP | 26.775 |
| Pipeline Transportation of Natural Gas | 6090 Hurricane Rd | Pikeville | | | 104.0734 |
| Pipeline Transportation of Natural Gas | 6090 Hurricane Rd | Pikeville | | | 86.49352 |
| Pipeline Transportation of Natural Gas | 6090 Hurricane Rd | Pikeville | | | 70.02181 |
| Pipeline Transportation of Natural Gas | 6090 Hurricane Rd | Pikeville | | | 33.39993 |
| Pipeline Transportation of Natural Gas | 10000 Pflum Rd. | MANCELONA | 6000 | HP | 28.78 |
| Pipeline Transportation of Natural Gas | 10000 Pflum Rd. | MANCELONA | 6000 | HP | 23.865 |
| Pipeline Transportation of Natural Gas | 10000 Pflum Rd. | MANCELONA | 6000 | HP | 57.85 |
| Pipeline Transportation of Natural Gas | 10000 Pflum Rd. | MANCELONA | 3750 | HP | 62.65 |
| Pipeline Transportation of Natural Gas | 10000 Pflum Rd. | MANCELONA | 3750 | HP | 105.3 |
| Pipeline Transportation of Natural Gas | 10000 Pflum Rd. | MANCELONA | 3750 | HP | 78.5 |
| Pipeline Transportation of Natural Gas | 196 Texas Eastern Dr | Accident | 5500 | HP | 31.06122 |
| Pipeline Transportation of Natural Gas | 124 Texas Gas Rd | Columbia | 1500 | HP | 59.15625 |
| Pipeline Transportation of Natural Gas | 7152 Pumping Station Rd | Bastrop | 1760 | HP | 59.3737 |
| Pipeline Transportation of Natural Gas | 4202 Fournerat Rd | Eunice | 625 | HP | 625.68 |
| Pipeline Transportation of Natural Gas | 5161 CR 24200 | PARIS | 21 | E6BTU/HR | 1.4241 |
| Pipeline Transportation of Natural Gas | 1420 Irish Ridge Rd. | Philo | | | 22.8 |
| Pipeline Transportation of Natural Gas | 7500 Nebo Rd | Madisonville | | | 184.65731 |
| Pipeline Transportation of Natural Gas | 7500 Nebo Rd | Madisonville | | | 28.0264985 |
| Pipeline Transportation of Natural Gas | 14888 KY 7 | Greenup | | | 157.2346 |
| Pipeline Transportation of Natural Gas | 14888 KY 7 | Greenup | | | 391.2023 |
| Pipeline Transportation of Natural Gas | 10205 Winchester Rd | Clay City | | | 25.54958 |
| Pipeline Transportation of Natural Gas | 10205 Winchester Rd | Clay City | | | 62.31344 |
| Pipeline Transportation of Natural Gas | 10205 Winchester Rd | Clay City | | | 33.2475 |
| Pipeline Transportation of Natural Gas | 10205 Winchester Rd | Clay City | | | 31.39024 |
| Pipeline Transportation of Natural Gas | 10205 Winchester Rd | Clay City | | | 178.3764 |
| Pipeline Transportation of Natural Gas | 1380 Hobson Rd | Campbellsville | | | 326.11724 |
| Pipeline Transportation of Natural Gas | 1380 Hobson Rd | Campbellsville | | | 450.3807 |
| Pipeline Transportation of Natural Gas | 1380 Hobson Rd | Campbellsville | | | 84.78855 |
| Pipeline Transportation of Natural Gas | 8690 New Columbia Rd | Campbellsville | | | 192.984 |
| Pipeline Transportation of Natural Gas | 8690 New Columbia Rd | Campbellsville | | | 401.4906 |
| Pipeline Transportation of Natural Gas | 2505 KY 7 S | Dema | | | 20.17877 |
| Pipeline Transportation of Natural Gas | 3562 KY 1405 | Slaughters | | | 32.27078 |
| Pipeline Transportation of Natural Gas | 3562 KY 1405 | Slaughters | | | 47.6018 |
| Pipeline Transportation of Natural Gas | 2332 US 60 W | Hardinsburg | | | 46.9624 |
| Pipeline Transportation of Natural Gas | 2332 US 60 W | Hardinsburg | | | 57.24941 |
| Pipeline Transportation of Natural Gas | 2332 US 60 W | Hardinsburg | | | 67.64946 |
| Pipeline Transportation of Natural Gas | 2332 US 60 W | Hardinsburg | | | 75.43802 |
| Pipeline Transportation of Natural Gas | 2332 US 60 W | Hardinsburg | | | 89.4522 |
| Pipeline Transportation of Natural Gas | 2332 US 60 W | Hardinsburg | | | 64.70376 |
| Pipeline Transportation of Natural Gas | 1809 ROCK HILL CHURCH RD | CLEARVILLE | | | 10.8669 |
| Pipeline Transportation of Natural Gas | off Hwy 146, 2.12 Mi NW of | Chatham | 54.3 | E6BTU/HR | 27.04 |
| Pipeline Transportation of Natural Gas | off Hwy 146, 2.12 Mi NW of | Chatham | 54.3 | E6BTU/HR | 26.76 |
| Pipeline Transportation of Natural Gas | off Hwy 146, 2.12 Mi NW of | Chatham | 54.3 | E6BTU/HR | 28.45 |
| Pipeline Transportation of Natural Gas | 216 Old Oakley Pebble Rd | Owingsville | | | 0 |
| Pipeline Transportation of Natural Gas | KY 2009 | Pathfork | 1340 | HP | 19.22342 |
| Pipeline Transportation of Natural Gas | 7 MILES NNW OF | COALGATE | 3550 | HP | 21.182 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF ILBERRY & N3880 RD | COALGATE | 1340 | HP | 22.265 |
| Pipeline Transportation of Natural Gas | 2 MILES SE OF | MOUNTAIN VIEW | 3550 | HP | 3.849 |
| Pipeline Transportation of Natural Gas | 3 MILES W OF | AMBER | 4740 | HP | 26.94 |
| Pipeline Transportation of Natural Gas | 4585 SMITH STATION ROAD | EDWARDS | 6140 | HP | 23 |
| Pipeline Transportation of Natural Gas | 4585 SMITH STATION ROAD | EDWARDS | 6140 | HP | 25.12 |
| Pipeline Transportation of Natural Gas | FROM LINDEN GO N ON HWY 59 EXIT R AT FM 2328 TURN L AT TX 43 END R AT HWY 4223 | LINDEN | 54.1 | E6BTU/HR | 26.9303 |
| Pipeline Transportation of Natural Gas | FROM LINDEN GO N ON HWY 59 EXIT R AT FM 2328 TURN L AT TX 43 END R AT HWY 4223 | LINDEN | 54.1 | E6BTU/HR | 21.6959 |
| Pipeline Transportation of Natural Gas | FROM LINDEN GO N ON HWY 59 EXIT R AT FM 2328 TURN L AT TX 43 END R AT HWY 4223 | LINDEN | 54.1 | E6BTU/HR | 24.5881 |
| Pipeline Transportation of Natural Gas | 3515  CHILDS LAKE RD. | MILFORD | 4000 | HP | 74.95 |
| Pipeline Transportation of Natural Gas | 2504 Hwy 174 | Pleasant Hill | 54.2 | E6BTU/HR | 27.1148 |
| Pipeline Transportation of Natural Gas | 2504 Hwy 174 | Pleasant Hill | 54.2 | E6BTU/HR | 21.5892 |
| Pipeline Transportation of Natural Gas | 2504 Hwy 174 | Pleasant Hill | 54.2 | E6BTU/HR | 34.2866 |
| Pipeline Transportation of Natural Gas | 2504 Hwy 174 | Pleasant Hill | 54.2 | E6BTU/HR | 26.6781 |
| Pipeline Transportation of Natural Gas | 2504 Hwy 174 | Pleasant Hill | 54.2 | E6BTU/HR | 24.6142 |
| Pipeline Transportation of Natural Gas | 2504 Hwy 174 | Pleasant Hill | 54.2 | E6BTU/HR | 27.5209 |
| Pipeline Transportation of Natural Gas | .8 Mi N of Bayou Rd & Jeff Horn Rd | Cheneyville | 54.2 | E6BTU/HR | 31.2526 |
| Pipeline Transportation of Natural Gas | .8 Mi N of Bayou Rd & Jeff Horn Rd | Cheneyville | 54.2 | E6BTU/HR | 33.499 |
| Pipeline Transportation of Natural Gas | .8 Mi N of Bayou Rd & Jeff Horn Rd | Cheneyville | 54.2 | E6BTU/HR | 33.1785 |
| Pipeline Transportation of Natural Gas | off Hwy 146, 2.12 Mi NW of | Chatham | 54.3 | E6BTU/HR | 30.56 |
| Pipeline Transportation of Natural Gas | 3565 Big Four Rd | Beech Grove | | | 8.0825 |
| Pipeline Transportation of Natural Gas | 0.4 Mi W OF N2150 & E1120 RD | BURNS FLAT | 1340 | HP | 24.57 |
| Pipeline Transportation of Natural Gas | 0.7 M NW OF N1710 & E1170 RD | SWEETWATER | 1340 | HP | 16.216 |
| Pipeline Transportation of Natural Gas | 0.7 M SE OF I 40 & N2560 RD | BRIDGEPORT | 1480 | HP | 23.389 |

| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | Lean Burn | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | Inherent LEC technology for NOX SIP Rul | 87.45 | | NSCR or Layered Combustion | | |
| TON | Inherent LEC technology for NOX SIP Rul | 87.45 | | NSCR or Layered Combustion | | |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | None | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | None | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | None | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 80 | 310 NSCR | | |

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| 06 | OK | Pittsburg | 16329811 | 103986513 483 | | ENABLE GAS GATHERING LLC | ASHLAND 1 STA | 486210 |
| 06 | OK | Pittsburg | 16329811 | 103986613 483 | | ENABLE GAS GATHERING LLC | ASHLAND 1 STA | 486210 |
| 06 | OK | Coal | 16396111 | 103987413 484 | | ENABLE GAS GATHERING LLC | ASHLAND 2 STA | 486210 |
| 06 | OK | Coal | 16396111 | 103987513 484 | | ENABLE GAS GATHERING LLC | ASHLAND 2 STA | 486210 |
| 06 | OK | Coal | 16396111 | 103987613 484 | | ENABLE GAS GATHERING LLC | ASHLAND 2 STA | 486210 |
| 06 | OK | Coal | 16396111 | 103987713 484 | | ENABLE GAS GATHERING LLC | ASHLAND 2 STA | 486210 |
| 06 | OK | Coal | 16396111 | 103987813 484 | | ENABLE GAS GATHERING LLC | ASHLAND 2 STA | 486210 |
| 06 | OK | Caddo | 16329911 | 103988813 489 | | ENABLE GAS GATHERING LLC | CANNEDY CREEK CMPSR STA | 486210 |
| 06 | OK | Grady | 16330211 | 103991013 498 | | ENABLE GAS GATHERING LLC | DUTTON COMPRESSOR STATION | 486210 |
| 06 | OK | Blaine | 16331011 | 103998413 519 | | ENABLE GAS GATHERING LLC | SOUTH OAKWOOD CMPSR STA | 486210 |
| 06 | OK | Blaine | 16331011 | 103998513 519 | | ENABLE GAS GATHERING LLC | SOUTH OAKWOOD CMPSR STA | 486210 |
| 06 | OK | Blaine | 16331011 | 103998913 519 | | ENABLE GAS GATHERING LLC | SOUTH OAKWOOD CMPSR STA | 486210 |
| 06 | OK | Pittsburg | 16338711 | 104081213 1131 | | ENABLE MIDSTREAM PARTNERS LP | CANADIAN STA | 486210 |
| 06 | OK | Creek | 16383111 | 104105013 1304 | | KEYSTONE GAS CORP | GG JONES BOOSTER | 486210 |
| 06 | OK | Washita | 16385815 | 104128813 1549 | | ENABLE GAS GATHERING LLC | BURNS FLAT SOUTH COMPRESSOR STATION | 486210 |
| 06 | OK | Grady | 16344911 | 104130213 1553 | | ENABLE GAS GATHERING LLC | CHEVRON KNOX CMPSR STA | 486210 |
| 06 | OK | Grady | 16344911 | 104130313 1553 | | ENABLE GAS GATHERING LLC | CHEVRON KNOX CMPSR STA | 486210 |
| 06 | OK | Grady | 16344911 | 104130613 1553 | | ENABLE GAS GATHERING LLC | CHEVRON KNOX CMPSR STA | 486210 |
| 06 | OK | Custer | 16345511 | 104136013 1583 | | ENABLE GAS GATHERING LLC | HAROLD COMPRESSOR STATION | 486210 |
| 06 | OK | Grady | 16345811 | 104137513 1592 | | ENABLE GAS GATHERING LLC | MINCO STA | 486210 |
| 06 | OK | Roger Mills | 16346211 | 104140313 1600 | | ENABLE GAS GATHERING LLC | RANKIN COMPRESSOR STATION | 486210 |
| 06 | OK | Caddo | 16346411 | 104143313 1614 | | ENABLE GAS GATHERING LLC | GRACEMONT WEST CADDO CMPSR STA | 486210 |
| 06 | OK | Pittsburg | 16349111 | 104168013 1939 | | XTO ENERGY INC | LIGON CMPSR STA | 486210 |
| 06 | OK | Hughes | 16400011 | 104177613 2183 | | ENABLE OKLAHOMA INTRASTATE TRANSMISSION LLC | STUART CMPSR STA | 486210 |
| 06 | OK | Hughes | 16400011 | 104177713 2183 | | ENABLE OKLAHOMA INTRASTATE TRANSMISSION LLC | STUART CMPSR STA | 486210 |
| 06 | OK | Stephens | 16351011 | 104186913 2298 | | ENABLE GAS GATHERING LLC | LAKE FUQUA STA | 486210 |
| 06 | OK | Custer | 16353811 | 104212913 3604 | | ENABLE GAS GATHERING LLC | WEATHERFORD CMPSR STA | 486210 |
| 06 | OK | Pittsburg | 16399311 | 104231413 4451 | | XTO ENERGY INC | STUART CMPSR STA | 486210 |
| 06 | OK | Custer | 16359111 | 104261613 5251 | | CONTINUUM MIDSTREAM LLC | FOSS COMPRESSOR STATION | 486210 |
| 06 | OK | Dewey | 16360211 | 104271613 5567 | | ENABLE GAS GATHERING LLC | VICI CMPSR STA | 486210 |
| 06 | OK | Okfuskee | 16363011 | 104303213 6035 | | ENERFIN RESOURCES I LP | SOUTH OKEMAH CMPSR STA | 486210 |
| 06 | OK | Coal | 16388311 | 104337413 6346 | | ENABLE GAS GATHERING LLC | ROCK CREEK CMPSR STA | 486210 |
| 06 | OK | Pittsburg | 16368211 | 104354813 6429 | | ENABLE GAS GATHERING LLC | ARMY CMPSR STA | 486210 |
| 06 | OK | Roger Mills | 16370111 | 104374413 6537 | | ENABLE GAS GATHERING LLC | HAMMON COMPRESSOR STATION | 486210 |
| 06 | OK | Roger Mills | 16370111 | 104374513 6537 | | ENABLE GAS GATHERING LLC | HAMMON COMPRESSOR STATION | 486210 |
| 06 | OK | Dewey | 16376211 | 104431913 7780 | | ENABLE GAS GATHERING LLC | ROUGH CREEK CMPSR STA | 486210 |
| 06 | OK | Dewey | 16376211 | 104432513 7780 | | ENABLE GAS GATHERING LLC | ROUGH CREEK CMPSR STA | 486210 |
| 06 | OK | Dewey | 8190611 | 105453213 513 | | ENABLE GAS GATHERING LLC | OAKWOOD CMPSR STA | 486210 |
| 06 | OK | Stephens | 9161611 | 105471813 1590 | | ENABLE GAS GATHERING LLC | WEST MARLOW CMPSR STA | 486210 |
| 06 | LA | Caddo | 16632611 | 106939513 151187 | | Gulf Crossing Pipeline Co LLC | Gulf Crossing Pipeline Co LLC - Mira Compressor Station | 486210 |
| 06 | LA | Union | 14665711 | 109687213 153989 | | Midcontinent Express Pipeline LLC | Midcontinent Express Pipeline LLC - Perryville Compressor Station | 486210 |
| 06 | LA | Union | 14665711 | 109687313 153989 | | Midcontinent Express Pipeline LLC | Midcontinent Express Pipeline LLC - Perryville Compressor Station | 486210 |
| 06 | LA | Union | 14665711 | 109687413 153989 | | Midcontinent Express Pipeline LLC | Midcontinent Express Pipeline LLC - Perryville Compressor Station | 486210 |
| 03 | WV | Barbour | 6328311 | 110314213 0100 | | Eastern Gas Transmission and Storage, Inc. | EGTS - PEPPER COMPRESSOR STATION | 48621 |
| 03 | WV | Wetzel | 6342511 | 110333813 0006 | | Eastern Gas Transmission and Storage, Inc. | EGTS - HASTINGS COMPRESSOR STATION | 48621 |
| 06 | OK | Ellis | 16992411 | 111961913 11443 | | ENABLE GAS GATHERING LLC | WOLF CREEK CMPSR STA | 486210 |
| 06 | OK | McIntosh | 16362511 | 112143113 5935 | | ENERFIN RESOURCES I LP | HANNA CMPSR STA | 486210 |
| 06 | OK | Custer | 17100411 | 113429713 1543 | | ENABLE GAS GATHERING LLC | BARNITZ CMPSR STA | 486210 |
| 06 | OK | Custer | 17100411 | 113429813 1543 | | ENABLE GAS GATHERING LLC | BARNITZ CMPSR STA | 486210 |
| 06 | OK | Caddo | 17101111 | 113436613 2914 | | ENABLE GAS GATHERING LLC | LIVINGSTON CMPSR STA | 486210 |
| 06 | OK | Latimer | 17102711 | 113452213 6800 | | SUPERIOR PIPELINE CO LLC | PANOLA SOUTH COMPRESSOR STATION | 486210 |
| 06 | OK | Grady | 17103511 | 113465413 8487 | | ENABLE GAS GATHERING LLC | TABLER COMPRESSOR STATION | 486210 |
| 06 | OK | Grady | 17103511 | 113465513 8487 | | ENABLE GAS GATHERING LLC | TABLER COMPRESSOR STATION | 486210 |
| 06 | OK | Alfalfa | 17104211 | 113476313 8691 | | ETC TEXAS PIPELINE LTD | JET COMPRESSOR STATION | 486210 |
| 04 | KY | Metcalfe | 17426111 | 121300513 2116900020 | | | Louisville Gas & Electric Center Storage | 486210 |
| 06 | LA | Vermilion | 8026111 | 122004113 19390 | | Sabine Pipe Line LLC | Sabine Pipe Line LLC - Henry Hub S Booster Station | 486210 |
| 06 | LA | Vermilion | 8026111 | 122004213 19390 | | Sabine Pipe Line LLC | Sabine Pipe Line LLC - Henry Hub S Booster Station | 486210 |
| 06 | LA | Vermilion | 8026111 | 122004313 19390 | | Sabine Pipe Line LLC | Sabine Pipe Line LLC - Henry Hub S Booster Station | 486210 |
| 06 | LA | Vermilion | 8026111 | 122004413 19390 | | Sabine Pipe Line LLC | Sabine Pipe Line LLC - Henry Hub S Booster Station | 486210 |
| 06 | LA | Vermilion | 8026111 | 122004513 19390 | | Sabine Pipe Line LLC | Sabine Pipe Line LLC - Henry Hub S Booster Station | 486210 |
| 05 | OH | Medina | 9256311 | 122827213 1652050071 | | | Medina Compressor Station (1652050071) | 486210 |
| 05 | IL | Kankakee | 17741911 | 123292813 091811AAH | | | Midwestern Gas Transmission Co | 486210 |
| 05 | OH | Washington | 9212711 | 125515513 0684020025 | | | Cobra Pipeline - Churchtown Compressor Station (0684020025) | 486210 |
| 06 | TX | Coke | 17910311 | 126686913 672 | | WTG JAMESON LP | WEST JAMESON TREATING FACILITY | 486210 |
| 03 | WV | Doddridge | 6256111 | 126977213 0003 | | Eastern Gas Transmission and Storage, Inc. | EGTS - L.L. TOMKIN COMPRESSOR STATION | 48621 |
| 06 | OK | Carroll | 17856511 | 127490213 021007002 | | | Rover Pipeline - Mainline CS1 (021007002) | 486210 |
| 05 | OH | Carroll | 17856511 | 127490313 021007002 | | | Rover Pipeline - Mainline CS1 (021007002) | 486210 |
| 05 | OH | Carroll | 17856511 | 127490413 021007002 | | | Rover Pipeline - Mainline CS1 (021007002) | 486210 |
| 05 | OH | Carroll | 17856511 | 127490513 021007002 | | | Rover Pipeline - Mainline CS1 (021007002) | 486210 |
| 06 | LA | Cameron | 6426711 | 127654013 7327 | | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 44 | 486210 |
| 06 | TX | Reeves | 4205711 | 127807613 2 | | ENTERPRISE PRODUCTS OPERATING LLC | WAHA BOOSTER STATION | 486210 |
| 06 | TX | Reagan | 17908911 | 127889013 40 | | TARGA MIDSTREAM SERVICES LLC | 2600 COMPRESSOR STATION | 486210 |
| 06 | OK | Grady | 18002511 | 128619613 14701 | | ENABLE GAS GATHERING LLC | L 12 BOOSTER STA | 486210 |
| 06 | OK | Grady | 18002511 | 128619713 14701 | | ENABLE GAS GATHERING LLC | L 12 BOOSTER STA | 486210 |
| 06 | OK | Washita | 18022911 | 128688313 16308 | | USA COMPRESSION PARTNERS LP | BONNY CMPSR STA | 486210 |
| 06 | OK | Kingfisher | 18007011 | 128691313 16339 | | KINGFISHER MIDSTREAM LLC | WAY 5 CMPSR STA 1 | 486210 |
| 06 | OK | Hughes | 16358711 | 128846813 5201 | | ENERFIN RESOURCES I LP | DUSTIN COMPRESSOR STATION | 486210 |
| 06 | OK | Blaine | 16376011 | 128891213 7754 | | ENABLE GAS GATHERING LLC | GREENFIELD CMPSR STA | 486210 |
| 06 | OK | Dewey | 17102911 | 128894313 8065 | | ENABLE GAS GATHERING LLC | ROBE CREEK CMPSR STA | 486210 |
| 06 | OK | Dewey | 16377611 | 128898013 8525 | | MARKWEST OKLAHOMA GAS CO LLC | MEYER COMPRESSOR STATION | 486210 |
| 03 | PA | Juniata | 18044811 | 129143713 420670701 | | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/PERULACK COMP STA | 486210 |
| 03 | PA | Armstrong | 3866211 | 129166713 420050013 | | PEOPLES NATURAL GAS CO LLC | PEOPLES NATURAL GAS CO LLC/VALLEY STA | 486210 |
| 03 | MD | Frederick | 17014311 | 129228413 021-0707 | | Dominion Transmission, Inc | Dominion Transmission, Inc | 486210 |
| 06 | LA | Riverside | 4939411 | 130941013 33651814317 | | SOCALGAS | SCG - BLYTHE | 486210 |
| 05 | WV | Marshall | 18812611 | 134128013 0216 | | Columbia Gas Transmission | Columbia Gas - Lone Oak | |
| 05 | OH | Wayne | 17856911 | 134944813 028503017 | | | Rover Pipeline - Mainline CS2 (028503017) | |
| 05 | OH | Wayne | 17856911 | 134944913 028503017 | | | Rover Pipeline - Mainline CS2 (028503017) | |
| 05 | OH | Wayne | 17856911 | 134945013 028503017 | | | Rover Pipeline - Mainline CS2 (028503017) | |
| 05 | OH | Crawford | 17857011 | 134948413 031700200S | | | Rover Pipeline - Mainline CS3 (031700200S) | |
| 05 | OH | Crawford | 17857011 | 134948513 031700200S | | | Rover Pipeline - Mainline CS3 (031700200S) | |
| 05 | OH | Crawford | 17857011 | 134948613 031700200S | | | Rover Pipeline - Mainline CS3 (031700200S) | |
| 06 | LA | Acadia | 18908611 | 135639413 19238D | | Kinder Morgan Louisiana Pipeline LLC | Kinder Morgan LA Pipeline LLC - Eunice Compressor Station No 760 | 486210 |
| 03 | WV | Jackson | 18938211 | 136114113 0062 | | Columbia Gas Transmission | Columbia Gas - Mount Olive | |
| 03 | WV | Calhoun | 18938311 | 136115413 0017 | | Columbia Gas Transmission | Columbia Gas - White Oak | |
| 03 | WV | Doddridge | 18938411 | 136116613 0162 | | Columbia Gas Transmission | Columbia Gas - Sherwood | |
| 06 | TX | Gregg | 9125911 | 136472513 105 | | MIDCOAST G & P EAST TEXAS LP | DANVILLE COMPRESSOR STAT | |
| 06 | TX | Gregg | 9125811 | 136472613 107 | | MIDCOAST G & P EAST TEXAS LP | WILLOW SPRINGS COMPRESSOR STATION | |
| 06 | LA | Plaquemines | 5837311 | 136870413 2448 | | Kinder Morgan GP Inc | Tennessee Gas Pipeline Company LLC - Compressor Station 527 | 486210 |
| AR | Randolph | | 212211 | 51038613 0512100076 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | BIGGERS COMPRESSOR STATION | 48621 |
| AR | Randolph | | 212211 | 51038713 0512100076 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | BIGGERS COMPRESSOR STATION | 48621 |
| AR | Randolph | | 212211 | 51038813 0512100076 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | BIGGERS COMPRESSOR STATION | 48621 |
| AR | Randolph | | 212211 | 51038913 0512100076 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | BIGGERS COMPRESSOR STATION | 48621 |
| AR | Randolph | | 212211 | 51038413 0512100076 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | BIGGERS COMPRESSOR STATION | 48621 |
| AR | Lincoln | | 237511 | 51050813 0507900041 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | GLENDALE COMPRESSOR STATION | 48621 |
| AR | Lincoln | | 237511 | 51050913 0507900041 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | GLENDALE COMPRESSOR STATION | 48621 |
| AR | Lincoln | | 237511 | 51051213 0507900041 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | GLENDALE COMPRESSOR STATION | 48621 |
| AR | Lincoln | | 237511 | 51051013 0507900041 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | GLENDALE COMPRESSOR STATION | 48621 |
| AR | Lincoln | | 237511 | 51051113 0507900041 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | GLENDALE COMPRESSOR STATION | 48621 |
| AR | Lincoln | | 237511 | 51051313 0507900041 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | GLENDALE COMPRESSOR STATION | 48621 |
| AR | White | | 975411 | 47125013 0514500127 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | WEST POINT COMPRESSOR STATION | 48621 |
| AR | White | | 975411 | 47125113 0514500127 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | WEST POINT COMPRESSOR STATION | 48621 |
| AR | White | | 975411 | 47125413 0514500127 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | WEST POINT COMPRESSOR STATION | 48621 |
| AR | White | | 975411 | 47125513 0514500127 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | WEST POINT COMPRESSOR STATION | 48621 |
| AR | White | | 975411 | 47125213 0514500127 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | WEST POINT COMPRESSOR STATION | 48621 |
| AR | White | | 975411 | 47125313 0514500127 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | WEST POINT COMPRESSOR STATION | 48621 |
| AR | Franklin | | 991911 | 47077413 0504700083 | | Black Bear Transmission, LLC | NOARK COMPRESSOR STATION | 48621 |
| AR | Franklin | | 991911 | 47077513 0504700083 | | Black Bear Transmission, LLC | NOARK COMPRESSOR STATION | 48621 |
| AR | Franklin | | 991911 | 47077613 0504700083 | | Black Bear Transmission, LLC | NOARK COMPRESSOR STATION | 48621 |
| AR | Franklin | | 991911 | 47077713 0504700083 | | Black Bear Transmission, LLC | NOARK COMPRESSOR STATION | 48621 |
| AR | Franklin | | 992211 | 47075413 0504700094 | | Black Hills Energy Arkansas, Inc. | Black Hills Energy ARKANSAS - SELLS COMPRESSOR STATION | 48621 |
| AR | Franklin | | 992211 | 47075813 0504700094 | | Black Hills Energy Arkansas, Inc. | Black Hills Energy ARKANSAS - SELLS COMPRESSOR STATION | 48621 |
| AR | Franklin | | 992211 | 47075713 0504700094 | | Black Hills Energy Arkansas, Inc. | Black Hills Energy ARKANSAS - SELLS COMPRESSOR STATION | 48621 |
| AR | Franklin | | 992211 | 47075613 0504700094 | | Black Hills Energy Arkansas, Inc. | Black Hills Energy ARKANSAS - SELLS COMPRESSOR STATION | 48621 |
| AR | Franklin | | 992211 | 47075513 0504700094 | | Black Hills Energy Arkansas, Inc. | Black Hills Energy ARKANSAS - SELLS COMPRESSOR STATION | 48621 |
| AR | Lonoke | | 1075311 | 47095313 0508500093 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | CARLISLE COMPRESSOR STATION | 48621 |
| AR | Lonoke | | 1075311 | 47095413 0508500093 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | CARLISLE COMPRESSOR STATION | 48621 |
| AR | Lonoke | | 1075311 | 47095513 0508500093 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | CARLISLE COMPRESSOR STATION | 48621 |
| AR | Lonoke | | 1075311 | 47095613 0508500093 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | CARLISLE COMPRESSOR STATION | 48621 |
| AR | Lonoke | | 1075311 | 47095713 0508500093 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | CARLISLE COMPRESSOR STATION | 48621 |
| AR | Lonoke | | 1075311 | 47095213 0508500093 | | ENABLE MISSISSIPPI RIVER TRANSMISSION, LLC | CARLISLE COMPRESSOR STATION | 48621 |
| AR | Franklin | | 1117811 | 46787513 0504700071 | | Black Hills Energy Arkansas, Inc. | Black Hills Energy ARKANSAS - DRAKE COMPRESSOR STATION | 48621 |
| AR | Franklin | | 1117811 | 63316713 0504700071 | | Black Hills Energy Arkansas, Inc. | Black Hills Energy ARKANSAS - DRAKE COMPRESSOR STATION | 48621 |
| AR | Franklin | | 1117811 | 46787413 0504700071 | | Black Hills Energy Arkansas, Inc. | Black Hills Energy ARKANSAS - DRAKE COMPRESSOR STATION | 48621 |
| AR | Franklin | | 1117811 | 46787113 0504700071 | | Black Hills Energy Arkansas, Inc. | Black Hills Energy ARKANSAS - DRAKE COMPRESSOR STATION | 48621 |
| AR | Nevada | | 1118111 | 46784313 0509900058 | | Enbridge | Texas Eastern Transmission LP (TETLP)-Hope Compressor Station | 48621 |
| AR | Nevada | | 1118111 | 46784413 0509900058 | | Enbridge | Texas Eastern Transmission LP (TETLP)-Hope Compressor Station | 48621 |
| AR | Nevada | | 1118111 | 46784513 0509900058 | | Enbridge | Texas Eastern Transmission LP (TETLP)-Hope Compressor Station | 48621 |
| AR | Nevada | | 1118111 | 46784613 0509900058 | | Enbridge | Texas Eastern Transmission LP (TETLP)-Hope Compressor Station | 48621 |
| AR | Nevada | | 1118111 | 46784013 0509900058 | | Enbridge | Texas Eastern Transmission LP (TETLP)-Hope Compressor Station | 48621 |
| AR | Nevada | | 1118111 | 46784113 0509900058 | | Enbridge | Texas Eastern Transmission LP (TETLP)-Hope Compressor Station | 48621 |
| AR | Nevada | | 1118111 | 46784213 0509900058 | | Enbridge | Texas Eastern Transmission LP (TETLP)-Hope Compressor Station | 48621 |

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 1 MILE E OF | ASHLAND | 1340 | HP | 25.237 |
| Pipeline Transportation of Natural Gas | 1 MILE E OF | ASHLAND | 1340 | HP | 25.713 |
| Pipeline Transportation of Natural Gas | 0.2 MI SE OF HWY31/E1570 RD | CAIRO | 1340 | HP | 25.075 |
| Pipeline Transportation of Natural Gas | 0.2 MI SE OF HWY31/E1570 RD | CAIRO | 1340 | HP | 24.469 |
| Pipeline Transportation of Natural Gas | 0.2 MI SE OF HWY31/E1570 RD | CAIRO | 1340 | HP | 25.355 |
| Pipeline Transportation of Natural Gas | 0.2 MI SE OF HWY31/E1570 RD | CAIRO | 1340 | HP | 25.695 |
| Pipeline Transportation of Natural Gas | 0.2 MI SE OF HWY31/E1570 RD | CAIRO | 1340 | HP | 25.663 |
| Pipeline Transportation of Natural Gas | 6 MI S | COSGAR | 1480 | HP | 23.659 |
| Pipeline Transportation of Natural Gas | 2 MI N AND 4 MI W | POCASSET | 1480 | HP | 23.868 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2490 & E0850 RD | WATONGA | 1230 | HP | 29.014 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2490 & E0850 RD | WATONGA | 1230 | HP | 29.208 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2490 & E0850 RD | WATONGA | 1480 | HP | 35.138 |
| Pipeline Transportation of Natural Gas | 7 MILES W AND 5 MILES N OF | MCALESTER | 1340 | HP | 25.8 |
| Pipeline Transportation of Natural Gas | 4 MI E HWY33/HWY16, THEN S | DRUMRIGHT | 1230 | HP | 12.6 |
| Pipeline Transportation of Natural Gas | 1 MILE SE OF | BURNS FLAT | 1150 | HP | 21.499 |
| Pipeline Transportation of Natural Gas | 0.6 MI NW OF N2960 & E1610 RD | COX CITY | 1340 | HP | 21.955 |
| Pipeline Transportation of Natural Gas | 0.6 MI NW OF N2960 & E1610 RD | COX CITY | 1340 | HP | 22.75 |
| Pipeline Transportation of Natural Gas | 0.6 MI NW OF N2960 & E1610 RD | COX CITY | 1340 | HP | 21.589 |
| Pipeline Transportation of Natural Gas | 0.3 MI S OF N2410/E1000 RDS | WEATHERFORD | 1340 | HP | 10.845 |
| Pipeline Transportation of Natural Gas | 6 MILES W OF | MINCO | 1100 | HP | 31.05 |
| Pipeline Transportation of Natural Gas | 2 MILES S 3 MILES W .75 MILE S | REYDON | 1340 | HP | 37.581 |
| Pipeline Transportation of Natural Gas | 1 MILE W AND 2 MILES S OF | GRACEMONT | 1220 | HP | 42.186 |
| Pipeline Transportation of Natural Gas | 2.5 MILES SE OF STUART | STUART | 1340 | HP | 17.305 |
| Pipeline Transportation of Natural Gas | 4 MI W OFF HWY 270 | STUART | 1660 | HP | 27.34 |
| Pipeline Transportation of Natural Gas | 4 MI W OFF HWY 270 | STUART | 1660 | HP | 22.77 |
| Pipeline Transportation of Natural Gas | 17 MILES NE OF | MARLOW | 1080 | HP | 25.747 |
| Pipeline Transportation of Natural Gas | 3 MILES E AND 2 MILES S OF | WEATHERFORD | 1340 | HP | 25.739 |
| Pipeline Transportation of Natural Gas | 1 MILE N OF HWY 270 W | ARPELAR | 1260 | HP | 11.76 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF N2120/E1040 RDS | FOSS | 1260 | HP | 24.166 |
| Pipeline Transportation of Natural Gas | AT N2160 & E0630 RD | VICI | 1660 | HP | 28.789 |
| Pipeline Transportation of Natural Gas | NE CNR HWY 27 AND E1120 RD | OKEMAH | 1340 | HP | 0.676 |
| Pipeline Transportation of Natural Gas | 5 MILES N AND 1 MILE E OF | CENTRAHOMA | 1480 | HP | 27.514 |
| Pipeline Transportation of Natural Gas | 3 MILES S AND 1.25 MILES E OF | ASHLAND | 1340 | HP | 21.374 |
| Pipeline Transportation of Natural Gas | 3 MILES S AND 5.75 MILES W OF | HAMMON | 1340 | HP | 25.553 |
| Pipeline Transportation of Natural Gas | 3 MILES S AND 5.75 MILES W OF | HAMMON | 1340 | HP | 25.22 |
| Pipeline Transportation of Natural Gas | 0.25 MI W OF N2390 & E0820 RD | FAY | 1340 | HP | 22.875 |
| Pipeline Transportation of Natural Gas | 0.25 MI W OF N2390 & E0820 RD | FAY | 1340 | HP | 24.22 |
| Pipeline Transportation of Natural Gas | 2/3 MI E OF N2440 & E0800 RD | OAKWOOD | 1230 | HP | 30.629 |
| Pipeline Transportation of Natural Gas | 0.6 MI E OF N2760/NABOR RD | MARLOW | 1340 | HP | 25.568 |
| Pipeline Transportation of Natural Gas | off Hwy 71, 2 MI NW of Mira LA, | Vivian | 1470 | HP | 0.06864 |
| Pipeline Transportation of Natural Gas | Mashaw Dr, W of Hwy 2 | Farmerville | 8180 | HP | 36.96 |
| Pipeline Transportation of Natural Gas | Mashaw Dr, W of Hwy 2 | Farmerville | 8180 | HP | 22.08 |
| Pipeline Transportation of Natural Gas | Mashaw Dr, W of Hwy 2 | Farmerville | 8180 | HP | 41.48 |
| Pipeline Transportation of Natural Gas | WV SECONDARY ROUTE # 7 | PEPPER | 1780 | HP | 0.095 |
| Pipeline Transportation of Natural Gas | ROUTE 20 | PINE GROVE | 3550 | HP | 1.5035 |
| Pipeline Transportation of Natural Gas | 0.4 MI NE OF E0490 RD/N1750 RD | SHATTUCK | 1380 | HP | 12.822 |
| Pipeline Transportation of Natural Gas | 1 MILE N AND 1 MILE E OF | HANNA | 1340 | HP | 14.467 |
| Pipeline Transportation of Natural Gas | 0.34 MI W OF N2120 & E0870 RD | BUTLER | 1340 | HP | 25.258 |
| Pipeline Transportation of Natural Gas | 0.34 MI W OF N2120 & E0870 RD | BUTLER | 1340 | HP | 25.302 |
| Pipeline Transportation of Natural Gas | 4 MI E ON HWY 19 | APACHE | 1080 | HP | 25.63 |
| Pipeline Transportation of Natural Gas | 1 MILE SE OF | PANOLA | 1340 | HP | 12.82 |
| Pipeline Transportation of Natural Gas | 0.55 N OF LUCILE & ELM RD | TABLER | 1340 | HP | 25.181 |
| Pipeline Transportation of Natural Gas | 0.55 N OF LUCILE & ELM RD | TABLER | 1340 | HP | 25.397 |
| Pipeline Transportation of Natural Gas | 1 MI E OF N2710/E0280 RDS | JET | 1380 | HP | 4.597 |
| Pipeline Transportation of Natural Gas | 2098 Atwell Rd | Hardyville | | | 1.677881 |
| Pipeline Transportation of Natural Gas | 5319 Aristide Rd | Erath | 2250 | HP | 134.71 |
| Pipeline Transportation of Natural Gas | 5319 Aristide Rd | Erath | 2250 | HP | 116.27 |
| Pipeline Transportation of Natural Gas | 5319 Aristide Rd | Erath | 2250 | HP | 58.2 |
| Pipeline Transportation of Natural Gas | 5319 Aristide Rd | Erath | 2250 | HP | 98.82 |
| Pipeline Transportation of Natural Gas | 5319 Aristide Rd | Erath | 2250 | HP | 89.47 |
| Pipeline Transportation of Natural Gas | 2834 Stiegler Road | Medina | | | 21.42 |
| Pipeline Transportation of Natural Gas | 3493 S 12000 W Rd | Henscher | 32.6 | E6BTU/HR | 8.143181 |
| Pipeline Transportation of Natural Gas | 1695 Lang Farm Road | Marietta | | | 26.1946 |
| Pipeline Transportation of Natural Gas | FROM ROBERT LEE TAKE TX-208 N FOR 17.6 MILES. TAKE SLIGHT LEFT ONTO RANCH RD 1672 FOR 0.8 MILES. TAK | SILVER | 0.01 | E6BTU/HR | 5.51 |
| Pipeline Transportation of Natural Gas | STAR ROUTE 18 - NORTH, BOX 11 | WEST UNION | 4.85 | E6BTU/HR | 0.0066 |
| Pipeline Transportation of Natural Gas | 0.7mi E of Cottage Rd SW on Azalea Rd SW | Sherrodsville | | | 32.03 |
| Pipeline Transportation of Natural Gas | 0.7mi E of Cottage Rd SW on Azalea Rd SW | Sherrodsville | | | 26.29 |
| Pipeline Transportation of Natural Gas | 0.7mi E of Cottage Rd SW on Azalea Rd SW | Sherrodsville | | | 32.76 |
| Pipeline Transportation of Natural Gas | 0.7mi E of Cottage Rd SW on Azalea Rd SW | Sherrodsville | | | 28.36 |
| Pipeline Transportation of Natural Gas | 5564 Gulf Beach Hwy (Old Hwy 82) | Johnsons Bayou | 1340 | HP | 0.295645 |
| Pipeline Transportation of Natural Gas | 3 MI NW OF COYANOS ON HWY 1450 | COYANOSA | 0.01 | E6BTU/HR | 2.0393 |
| Pipeline Transportation of Natural Gas | FROM CARSON CITY TAKE RANCH ROAD 33 SOUTH 21.0 MILES TURN LEFT ON FM 2600 STATION IS 9.0 MILES ON TH | BIG LAKE | 0.01 | E6BTU/HR | 21.613 |
| Pipeline Transportation of Natural Gas | 0.6MI N N2770/E1270 JN | POCASSET | 1340 | HP | 22.616 |
| Pipeline Transportation of Natural Gas | 0.6MI N N2770/E1270 JN | POCASSET | 1340 | HP | 22.755 |
| Pipeline Transportation of Natural Gas | 0.4 MI W OF E1120/N2070 RD | CANUTE | 12.2 | E6BTU/HR | 5.569 |
| Pipeline Transportation of Natural Gas | 0.4 MI W OF N2960/E0820 RDS | CASHION | 1380 | HP | 5.76 |
| Pipeline Transportation of Natural Gas | 5 MILES SW OF | DUSTIN | 1220 | HP | 7.65 |
| Pipeline Transportation of Natural Gas | N2540 & E0900 RD | GREENFIELD | 1340 | HP | 22.927 |
| Pipeline Transportation of Natural Gas | 0.45 MI W OF N2350/E0710 RD | SEILING | 1340 | HP | 25.217 |
| Pipeline Transportation of Natural Gas | 0.83 MI SE HWY 47/N2100 RD | LEEDEY | 1340 | HP | 21.264 |
| Pipeline Transportation of Natural Gas | 2980 PUMPING STATION RD | EAST WATERFORD | | | 0.4562 |
| Pipeline Transportation of Natural Gas | 1140 MARGRET RD | YATESBORO | | | 7.8516 |
| Pipeline Transportation of Natural Gas | 2870 Mill Summers Rd | Middletown | 740 | E6BTU/HR | 0.00762 |
| Pipeline Transportation of Natural Gas | 13100 WEST 18TH AVENUE | BLYTHE | | | 341.97932 |
| Pipeline Transportation of Natural Gas | Waynesburg Pike | Loon Oak | 1180 | BLRHP | 0.11 |
| Pipeline Transportation of Natural Gas | .5m N of W Lincoln Way on S Elyria Rd | Wooster | | | 31.73 |
| Pipeline Transportation of Natural Gas | .5m N of W Lincoln Way on S Elyria Rd | Wooster | | | 30.54 |
| Pipeline Transportation of Natural Gas | .5m N of W Lincoln Way on S Elyria Rd | Wooster | | | 30.56 |
| Pipeline Transportation of Natural Gas | 2903 Albaugh Rd | Chatfield Twp. | | | 26.89 |
| Pipeline Transportation of Natural Gas | 2903 Albaugh Rd | Chatfield Twp. | | | 31.42 |
| Pipeline Transportation of Natural Gas | 2903 Albaugh Rd | Chatfield Twp. | | | 30.99 |
| Pipeline Transportation of Natural Gas | 1949 Coulee Rd | Eunice | 1830 | HP | 0.0537 |
| Pipeline Transportation of Natural Gas | Charleston Road (Route 21) | Fairplain | 0.1278884 | | 0.1278884 |
| Pipeline Transportation of Natural Gas | Frederick Ridge Road | Brohard | 1180 | HP | 0.1502435 |
| Pipeline Transportation of Natural Gas | Route 18 | Sherwood | 1180 | HP | 0.1025844 |
| Pipeline Transportation of Natural Gas | 1000 W OF FM 2087 & 1 M SW OF INTX WITH IH 20 | KILGORE | | | 0.8979 |
| Pipeline Transportation of Natural Gas | 1/2 MI E ON FM 1844 FROM INTERX | KILGORE | | | 2.1787 |
| Pipeline Transportation of Natural Gas | 26166 Hwy 23 S | Port Sulphur | 19.1 | E6BTU/HR | 0.465 |
| Pipeline Transportation of Natural Gas | 278 GAS PLANT ROAD | BIGGERS | 1100 | HP | 0.0892929 |
| Pipeline Transportation of Natural Gas | 278 GAS PLANT ROAD | BIGGERS | 1000 | HP | 0.0746838 |
| Pipeline Transportation of Natural Gas | 278 GAS PLANT ROAD | BIGGERS | 1000 | HP | 0.0310378 |
| Pipeline Transportation of Natural Gas | 278 GAS PLANT ROAD | BIGGERS | 1000 | HP | 0.0654934 |
| Pipeline Transportation of Natural Gas | 278 GAS PLANT ROAD | BIGGERS | 1100 | HP | 0.0078066 |
| Pipeline Transportation of Natural Gas | 997 State Highway 54 West | STAR CITY | 1100 | HP | 0.306847 |
| Pipeline Transportation of Natural Gas | 997 State Highway 54 West | STAR CITY | 1100 | HP | 0.228908 |
| Pipeline Transportation of Natural Gas | 997 State Highway 54 West | STAR CITY | 1100 | HP | 0.0048936S |
| Pipeline Transportation of Natural Gas | 997 State Highway 54 West | STAR CITY | 1100 | HP | 0.00440055 |
| Pipeline Transportation of Natural Gas | 997 State Highway 54 West | STAR CITY | 1100 | HP | 0.0032208 |
| Pipeline Transportation of Natural Gas | 997 State Highway 54 West | STAR CITY | 1100 | HP | 0.00219945 |
| Pipeline Transportation of Natural Gas | 800 HIGHWAY 36 EAST | SEARCY | 1000 | HP | 10.3299 |
| Pipeline Transportation of Natural Gas | 800 HIGHWAY 36 EAST | SEARCY | 1000 | HP | 9.82612 |
| Pipeline Transportation of Natural Gas | 800 HIGHWAY 36 EAST | SEARCY | 1000 | HP | 8.27596 |
| Pipeline Transportation of Natural Gas | 800 HIGHWAY 36 EAST | SEARCY | 1000 | HP | 6.3875 |
| Pipeline Transportation of Natural Gas | 800 HIGHWAY 36 EAST | SEARCY | 1000 | HP | 5.80643 |
| Pipeline Transportation of Natural Gas | 800 HIGHWAY 36 EAST | SEARCY | 1000 | HP | 4.44111 |
| Pipeline Transportation of Natural Gas | FRANKLIN COUNTY ROAD 98 | Ozark | 1478 | HP | 0.042 |
| Pipeline Transportation of Natural Gas | FRANKLIN COUNTY ROAD 98 | Ozark | 1478 | HP | 0 |
| Pipeline Transportation of Natural Gas | FRANKLIN COUNTY ROAD 98 | Ozark | 1478 | HP | 0 |
| Pipeline Transportation of Natural Gas | FRANKLIN COUNTY ROAD 98 | Ozark | 1478 | HP | 0 |
| Pipeline Transportation of Natural Gas | 2339 Cataberry Run Road | OZARK | 1480 | HP | 2.273 |
| Pipeline Transportation of Natural Gas | 2339 Cataberry Run Road | OZARK | 1480 | HP | 0.885 |
| Pipeline Transportation of Natural Gas | 2339 Cataberry Run Road | OZARK | 1480 | HP | 0.833 |
| Pipeline Transportation of Natural Gas | 2339 Cataberry Run Road | OZARK | 1480 | HP | 0.682 |
| Pipeline Transportation of Natural Gas | 2339 Cataberry Run Road | OZARK | 1480 | HP | 0.398 |
| Pipeline Transportation of Natural Gas | 2473 HILLMAN ROAD | CARLISLE | 1000 | HP | 20.3793 |
| Pipeline Transportation of Natural Gas | 2473 HILLMAN ROAD | CARLISLE | 1000 | HP | 18.5822 |
| Pipeline Transportation of Natural Gas | 2473 HILLMAN ROAD | CARLISLE | 1100 | HP | 17.8765 |
| Pipeline Transportation of Natural Gas | 2473 HILLMAN ROAD | CARLISLE | 1000 | HP | 16.0444 |
| Pipeline Transportation of Natural Gas | 2473 HILLMAN ROAD | CARLISLE | 1100 | HP | 14.6632 |
| Pipeline Transportation of Natural Gas | 2473 HILLMAN ROAD | CARLISLE | 1100 | HP | 6.75748 |
| Pipeline Transportation of Natural Gas | 2473 HILLMAN ROAD | CARLISLE | 1100 | HP | 3.67347 |
| Pipeline Transportation of Natural Gas | 2204 WESTVIEW ROAD | OZARK | 1480 | HP | 3.109 |
| Pipeline Transportation of Natural Gas | 2204 WESTVIEW ROAD | OZARK | 1120 | HP | 2.489 |
| Pipeline Transportation of Natural Gas | 2204 WESTVIEW ROAD | OZARK | 1120 | HP | 2.342 |
| Pipeline Transportation of Natural Gas | 2204 WESTVIEW ROAD | OZARK | 1480 | HP | 1.828 |
| Pipeline Transportation of Natural Gas | 393 Nevada 112 Route 1 Box 134 | Emmet | 1000 | HP | 7.68 |
| Pipeline Transportation of Natural Gas | 393 Nevada 112 Route 1 Box 134 | Emmet | 1000 | HP | 7.18 |
| Pipeline Transportation of Natural Gas | 393 Nevada 112 Route 1 Box 134 | Emmet | 1000 | HP | 5.45 |
| Pipeline Transportation of Natural Gas | 393 Nevada 112 Route 1 Box 134 | Emmet | 1000 | HP | 2.27 |
| Pipeline Transportation of Natural Gas | 393 Nevada 112 Route 1 Box 134 | Emmet | 1100 | HP | 2.05 |
| Pipeline Transportation of Natural Gas | 393 Nevada 112 Route 1 Box 134 | Emmet | 1100 | HP | 0.57 |

| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | 80 | 310 NSCR | | |
| TON | | 80 | 310 NSCR | | |
| TON | | 85 | 310 NSCR | | |
| TON | | 85 | 310 NSCR | | |
| TON | | 85 | 310 NSCR | | |
| TON | | 90 | 310 NSCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | 90 | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | 90 | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | 80 | 310 NSCR | | |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | Catalytic Converter | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | Layered Combustion | Layered Combustion | 97 |
| TON | NSCR | 90 | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | 85 | 310 NSCR | | |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | Oxidation Catalyst | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | None | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | | | NSCR or Layered Combustion | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 |
| TON | AFRC | 20 | 310 NSCR | Non-Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | | | 139 SCR | Selective Catalytic Reduction | 90 |
| TON | 310 - Non-Selective Catalytic Reduction (NSCR) (OP - 2013) (NOX - 80%) | | | | |
| TON | 310 - Non-Selective Catalytic Reduction (NSCR) (OP - 2013) (NOX - 80%) | | | | |
| TON | 310 - Non-Selective Catalytic Reduction (NSCR) (OP - 2013) (NOX - 80%) | | | | |
| TON | 310 - Non-Selective Catalytic Reduction (NSCR) (OP - 2013) (NOX - 80%) | | | | |
| TON | 310 - Non-Selective Catalytic Reduction (NSCR) (OP - 2013) (NOX - 80%) | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |
| TON | | | | | |

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | AR | Nevada | 1118111 | 46784613 0509900058 | | Enbridge | Texas Eastern Transmission LP (TETLP)-Hope Compressor Station | 48621 |
| | AR | Nevada | 1118111 | 46784713 0509900058 | | Enbridge | Texas Eastern Transmission LP (TETLP)-Hope Compressor Station | 48621 |
| | AR | Hot Spring | 1118411 | 46778713 0509900039 | | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO. OF AMERICA-306 | 48621 |
| | AR | Hot Spring | 1118411 | 46779413 0509900039 | | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO. OF AMERICA-306 | 48621 |
| | AR | Hot Spring | 1118411 | 46779113 0509900039 | | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO. OF AMERICA-306 | 48621 |
| | AR | Hot Spring | 1118411 | 46779113 0509900039 | | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO. OF AMERICA-306 | 48621 |
| | AR | Hot Spring | 1118411 | 46778813 0509900039 | | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO. OF AMERICA-306 | 48621 |
| | AR | Hot Spring | 1118411 | 46778913 0509900039 | | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO. OF AMERICA-306 | 48621 |
| | AR | Hot Spring | 1118411 | 46779013 0509900039 | | NATURAL GAS PIPELINE CO OF AMERICA/JOHN PANNELL | NATURAL GAS PIPELINE CO. OF AMERICA-306 | 48621 |
| | AR | Hot Spring | 1118611 | 46777413 0505900081 | | ENABLE GAS TRANSMISSION COMPANY, LLC | MALVERN COMPRESSOR STATION | 48621 |
| | AR | Hot Spring | 1118611 | 46777213 0505900081 | | ENABLE GAS TRANSMISSION COMPANY, LLC | MALVERN COMPRESSOR STATION | 48621 |
| | AR | Hot Spring | 1118611 | 46777113 0505900081 | | ENABLE GAS TRANSMISSION COMPANY, LLC | MALVERN COMPRESSOR STATION | 48621 |
| | AR | Hot Spring | 1118611 | 46777313 0505900081 | | ENABLE GAS TRANSMISSION COMPANY, LLC | MALVERN COMPRESSOR STATION | 48621 |
| | AR | Miller | 7737711 | 2879613 0509100150 | | NATURAL GAS PIPELINE CO OF AMERICA-4935 | NATURAL GAS PIPELINE CO OF AMERICA-4935 | 48621 |
| | AR | White | 16157211 | 103378113 0514501084 | | Energy Transfer Company | FAYETTEVILLE EXPRESS PIPELINE-RCS | 48621 |
| | AR | White | 16157211 | 103378113 0514501084 | | Energy Transfer Company | FAYETTEVILLE EXPRESS PIPELINE-RCS | 48621 |
| | AR | White | 16157211 | 103377813 0514501084 | | Energy Transfer Company | FAYETTEVILLE EXPRESS PIPELINE-RCS | 48621 |
| | AR | White | 16157211 | 103378313 0514501084 | | Energy Transfer Company | FAYETTEVILLE EXPRESS PIPELINE-RCS | 48621 |
| | AR | White | 16157211 | 103377513 0514501084 | | Energy Transfer Company | FAYETTEVILLE EXPRESS PIPELINE-RCS | 48621 |
| | AR | White | 16157211 | 103377713 0514501084 | | Energy Transfer Company | FAYETTEVILLE EXPRESS PIPELINE-RCS | 48621 |
| | AR | White | 16157211 | 103378013 0514501084 | | Energy Transfer Company | FAYETTEVILLE EXPRESS PIPELINE-RCS | 48621 |
| | AR | White | 16157211 | 103377413 0514501084 | | Energy Transfer Company | FAYETTEVILLE EXPRESS PIPELINE-RCS | 48621 |
| | AR | White | 16157211 | 103378213 0514501084 | | Energy Transfer Company | FAYETTEVILLE EXPRESS PIPELINE-RCS | 48621 |
| | CA | Ventura | 1699311 | 45128013 56113461 | | SOUTHERN CALIF GAS COMPANY | SOUTHERN CALIF GAS COMPANY | 486210 |
| | CA | Ventura | 1699311 | 45128213 56113461 | | SOUTHERN CALIF GAS COMPANY | SOUTHERN CALIF GAS COMPANY | 486210 |
| | CA | Ventura | 1699311 | 45128313 56113461 | | SOUTHERN CALIF GAS COMPANY | SOUTHERN CALIF GAS COMPANY | 486210 |
| | CA | San Bernardino | 2334711 | 39688013 36051865 | | SOCALGAS | SCG - NEWBERRY SPRINGS | 486210 |
| | CA | San Bernardino | 2334711 | 39688113 36051865 | | SOCALGAS | SCG - NEWBERRY SPRINGS | 486210 |
| | CA | San Bernardino | 2334711 | 39688213 36051865 | | SOCALGAS | SCG - NEWBERRY SPRINGS | 486210 |
| | CA | San Bernardino | 2334711 | 39687113 36051865 | | SOCALGAS | SCG - NEWBERRY SPRINGS | 486210 |
| | CA | San Bernardino | 2334711 | 39687513 36051865 | | SOCALGAS | SCG - NEWBERRY SPRINGS | 486210 |
| | CA | San Bernardino | 2334711 | 39687613 36051865 | | SOCALGAS | SCG - NEWBERRY SPRINGS | 486210 |
| | CA | San Bernardino | 2335011 | 39680513 36051869 | | SOCALGAS | SCG - NO NEEDLES COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 2335011 | 85396313 36051869 | | SOCALGAS | SCG - NO NEEDLES COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 2335011 | 39680613 36051869 | | SOCALGAS | SCG - NO NEEDLES COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 32257013 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 32256413 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 32257413 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 32256513 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 32256413 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 32256313 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 32256713 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 32256813 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 32255713 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 32257313 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 32256913 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 32257213 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 91204413 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 91204313 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | San Bernardino | 4922411 | 91204513 36051853S | | PACIFIC GAS & ELECTRIC | PG&E - HINKLEY COMPRESSOR STATION | 486210 |
| | CA | Riverside | 4939411 | 130941313 330518143T | | SOCALGAS | SCG - BLYTHE | 486210 |
| | CA | Riverside | 4939411 | 130941113 330518143T | | SOCALGAS | SCG - BLYTHE | 486210 |
| | CA | Los Angeles | 5683511 | 2056843 19102680012B | | SO CAL GAS CO | SO CAL GAS CO | 486210 |
| | CA | Los Angeles | 5683511 | 20572913 19102680012B | | SO CAL GAS CO | SO CAL GAS CO | 486210 |
| | CA | Los Angeles | 5683511 | 2056773 19102680012B | | SO CAL GAS CO | SO CAL GAS CO | 486210 |
| | CA | Los Angeles | 5683511 | 20573613 19102680012B | | SO CAL GAS CO | SO CAL GAS CO | 486210 |
| | CA | Los Angeles | 5683511 | 2056761 19102680012B | | SO CAL GAS CO | SO CAL GAS CO | 486210 |
| | CA | Los Angeles | 5797311 | 21540913 19102659713 | | SOCAL GAS CO | SOCAL GAS CO | 486210 |
| | CA | Los Angeles | 5797311 | 21541113 19102659713 | | SOCAL GAS CO | SOCAL GAS CO | 486210 |
| | CA | Los Angeles | 5797311 | 21541313 19102659713 | | SOCAL GAS CO | SOCAL GAS CO | 486210 |
| | CA | Los Angeles | 5797311 | 21541013 19102659713 | | SOCAL GAS CO | SOCAL GAS CO | 486210 |
| | CA | Los Angeles | 5797311 | 21541053 19102659713 | | SOCAL GAS CO | SOCAL GAS CO | 486210 |
| | CA | San Joaquin | 10016111 | 57638213 391430423B | | LODI GAS STORAGE LLC | LODI GAS STORAGE LLC | 486210 |
| | CA | San Joaquin | 10016111 | 57638313 391430423B | | LODI GAS STORAGE LLC | LODI GAS STORAGE LLC | 486210 |
| | CA | San Joaquin | 10016111 | 57638413 391430423B | | LODI GAS STORAGE LLC | LODI GAS STORAGE LLC | 486210 |
| | CA | San Joaquin | 10016111 | 57638113 391430423B | | LODI GAS STORAGE LLC | LODI GAS STORAGE LLC | 486210 |
| | CA | San Joaquin | 10016111 | 57638713 391430423B | | LODI GAS STORAGE LLC | LODI GAS STORAGE LLC | 486210 |
| | IL | Douglas | 2600611 | 40757113 041804AAC | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | Douglas | 2600611 | 40757213 041804AAC | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | Douglas | 2600611 | 40756913 041804AAC | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | Douglas | 2600611 | 40756713 041804AAC | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | Douglas | 2600611 | 40756613 041804AAC | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | Fayette | 2670411 | 41064813 05180BAAB | | Natural Gas Pipeline Co | Natural Gas Pipeline Co | 486210 |
| | IL | Douglas | 2749511 | 41189713 041808AAF | | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Douglas | 2749511 | 41189613 041808AAF | | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Douglas | 2749511 | 5965103 041808AAF | | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Douglas | 2749511 | 5965121 041808AAF | | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Douglas | 2749511 | 5965112 041808AAF | | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Sangamon | 4484711 | 59915513 167801AAA | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | Sangamon | 4484711 | 28064813 167801AAA | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | Sangamon | 4484711 | 59915613 167801AAA | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | Sangamon | 4484711 | 28065213 167801AAA | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | White | 4659411 | 28176113 193807AAE | | Texas Eastern Transmission LP | Texas Eastern Transmission LP | 486210 |
| | IL | White | 4659411 | 60352213 193807AAE | | Texas Eastern Transmission LP | Texas Eastern Transmission LP | 486210 |
| | IL | White | 4659411 | 60352713 193807AAE | | Texas Eastern Transmission LP | Texas Eastern Transmission LP | 486210 |
| | IL | White | 4659411 | 60352313 193807AAE | | Texas Eastern Transmission LP | Texas Eastern Transmission LP | 486210 |
| | IL | White | 4659411 | 60352413 193807AAE | | Texas Eastern Transmission LP | Texas Eastern Transmission LP | 486210 |
| | IL | White | 4659411 | 60352513 193807AAE | | Texas Eastern Transmission LP | Texas Eastern Transmission LP | 486210 |
| | IL | McHenry | 4890911 | 31544813 111816AAA | | ANR Pipeline Co | ANR Pipeline Co | 486210 |
| | IL | McHenry | 4890911 | 31546913 111816AAA | | ANR Pipeline Co | ANR Pipeline Co | 486210 |
| | IL | Kankakee | 5428511 | 96506513 091811AAB | Na | Natural Gas Pipeline Co of America | Natural Gas Pipeline Co of America | 486210 |
| | IL | Kankakee | 5428511 | 59753913 091811AAB | Na | Natural Gas Pipeline Co of America | Natural Gas Pipeline Co of America | 486210 |
| | IL | Henry | 5529311 | 27165513 073815AAC | | ANR Pipeline Co | ANR Pipeline Co | 486210 |
| | IL | Henry | 5529311 | 27166013 073815AAC | | ANR Pipeline Co | ANR Pipeline Co | 486210 |
| | IL | Henry | 5529611 | 27164713 073816AAA | | Natural Gas Pipeline Co of America | Natural Gas Pipeline Co of America | 486210 |
| | IL | Henry | 5529611 | 59717313 073816AAA | | Natural Gas Pipeline Co of America | Natural Gas Pipeline Co of America | 486210 |
| | IL | Massac | 5555511 | 26975013 127855AAB | | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Piatt | 5550311 | 60261713 147802AAB | | Natural Gas Pipeline of America | Natural Gas Pipeline of America | 486210 |
| | IL | Wayne | 5574811 | 26940813 191803AAA | Na | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Wayne | 5574811 | 26940613 191803AAA | Na | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Wayne | 5574811 | 26940413 191803AAA | Na | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Wayne | 5574811 | 26940513 191803AAA | Na | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Wayne | 5574811 | 26940313 191803AAA | Na | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Wayne | 5574811 | 26940713 191803AAA | Na | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Wayne | 5574811 | 26940913 191803AAA | Na | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Wayne | 5574811 | 26940113 191803AAA | Na | Trunkline Gas Co | Trunkline Gas Co | 486210 |
| | IL | Pike | 7807611 | 2245613 149820AAB | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | Pike | 7807611 | 60268413 149820AAB | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | Pike | 7807611 | 2245513 149820AAB | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | Pike | 7807611 | 60268313 149820AAB | | Panhandle Eastern Pipe Line Co | Panhandle Eastern Pipe Line Co | 486210 |
| | IL | Kendall | 8222211 | 4289413 093802AAF | | ANR Pipeline Co | ANR Pipeline Co | 486210 |
| | IL | Will | 9678211 | 60389513 197800ABU | | Guardian Pipeline Co | Guardian Pipeline Co | 486210 |
| | IL | Will | 9678211 | 53463413 197800ABU | | Guardian Pipeline Co | Guardian Pipeline Co | 486210 |
| | IL | Will | 9678211 | 60389313 197800ABU | | Guardian Pipeline Co | Guardian Pipeline Co | 486210 |
| | IL | Will | 9678211 | 60389213 197800ABU | | Guardian Pipeline Co | Guardian Pipeline Co | 486210 |
| | IL | Will | 9678211 | 60389413 197800ABU | | Guardian Pipeline Co | Guardian Pipeline Co | 486210 |
| | IL | Christian | 10774011 | 91288413 021809AAB | | Blue Mound Compressor Station | Blue Mound Compressor Station | 486210 |
| | IL | Christian | 10774011 | 91288213 021809AAB | | Blue Mound Compressor Station | Blue Mound Compressor Station | 486210 |
| | IL | Christian | 10774011 | 91288113 021809AAB | | Blue Mound Compressor Station | Blue Mound Compressor Station | 486210 |
| | IL | Christian | 10774011 | 91288513 021809AAB | | Blue Mound Compressor Station | Blue Mound Compressor Station | 486210 |
| | IL | Christian | 10774011 | 91288913 021809AAB | | Blue Mound Compressor Station | Blue Mound Compressor Station | 486210 |
| | IL | Christian | 10774011 | 91288713 021809AAB | | Blue Mound Compressor Station | Blue Mound Compressor Station | 486210 |
| | IL | Madison | 10832711 | 60149513 119465AAE | | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC | 486210 |
| | IL | Madison | 10832711 | 60149413 119465AAE | | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC | 486210 |
| | IL | Madison | 10832711 | 60149613 119465AAE | | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC | 486210 |
| | IL | Madison | 10832711 | 60149313 119465AAE | | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC | 486210 |
| | IN | Allen | 4544011 | 28047813 00045 | Na | PANHANDLE EASTERN PIPE LINE CO EDGERT | PANHANDLE EASTERN PIPE LINE CO EDGERT | 48621 |
| | IN | Allen | 4544011 | 28047713 00045 | Na | PANHANDLE EASTERN PIPE LINE CO EDGERT | PANHANDLE EASTERN PIPE LINE CO EDGERT | 48621 |
| | IN | Allen | 4544011 | 28047413 00045 | Na | PANHANDLE EASTERN PIPE LINE CO EDGERT | PANHANDLE EASTERN PIPE LINE CO EDGERT | 48621 |
| | IN | Allen | 4544011 | 28047613 00045 | Na | PANHANDLE EASTERN PIPE LINE CO EDGERT | PANHANDLE EASTERN PIPE LINE CO EDGERT | 48621 |
| | IN | Allen | 4544011 | 28047513 00045 | Na | PANHANDLE EASTERN PIPE LINE CO EDGERT | PANHANDLE EASTERN PIPE LINE CO EDGERT | 48621 |
| | IN | Henry | 4664011 | 27970113 00019 | Na | ANR PIPELINE COMPANY SULPHUR SPRINGS | ANR PIPELINE COMPANY SULPHUR SPRINGS | 48621 |
| | IN | Henry | 4664011 | 27970413 00019 | Na | ANR PIPELINE COMPANY SULPHUR SPRINGS | ANR PIPELINE COMPANY SULPHUR SPRINGS | 48621 |
| | IN | Orange | 4670911 | 28368613 00010 | Na | TEXAS EASTERN TRANSMISSION LP | TEXAS EASTERN TRANSMISSION LP | 48621 |
| | IN | Orange | 4670911 | 28368813 00010 | Na | TEXAS EASTERN TRANSMISSION LP | TEXAS EASTERN TRANSMISSION LP | 48621 |
| | IN | Orange | 4670911 | 28368913 00010 | Na | TEXAS EASTERN TRANSMISSION LP | TEXAS EASTERN TRANSMISSION LP | 48621 |

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 393 Nevada 112 Route 1 Box 134 | Emmet | 1100 | HP | 0.15 |
| Pipeline Transportation of Natural Gas | 393 Nevada 112 Route 1 Box 134 | Emmet | 1100 | HP | 0 |
| Pipeline Transportation of Natural Gas | ROUTE 2 BOX 762A RIDGE ROAD | MALVERN | 3080 | HP | 10.8818 |
| Pipeline Transportation of Natural Gas | ROUTE 2 BOX 762A RIDGE ROAD | MALVERN | 3080 | HP | 9.99539 |
| Pipeline Transportation of Natural Gas | ROUTE 2 BOX 762A RIDGE ROAD | MALVERN | 3080 | HP | 9.36449 |
| Pipeline Transportation of Natural Gas | ROUTE 2 BOX 762A RIDGE ROAD | MALVERN | 3080 | HP | 8.23189 |
| Pipeline Transportation of Natural Gas | ROUTE 2 BOX 762A RIDGE ROAD | MALVERN | 3080 | HP | 8.12403 |
| Pipeline Transportation of Natural Gas | ROUTE 2 BOX 762A RIDGE ROAD | MALVERN | 3080 | HP | 6.28852 |
| Pipeline Transportation of Natural Gas | ROUTE 2 BOX 762A RIDGE ROAD | MALVERN | 3080 | HP | 2.10696 |
| Pipeline Transportation of Natural Gas | ROUTE 2 BOX 762A RIDGE ROAD | MALVERN | 3080 | HP | 0.97797 |
| Pipeline Transportation of Natural Gas | 5151 RIDGE ROAD | MALVERN | 2250 | HP | 5.83413 |
| Pipeline Transportation of Natural Gas | 5151 RIDGE ROAD | MALVERN | 2250 | HP | 5.00403 |
| Pipeline Transportation of Natural Gas | 5151 RIDGE ROAD | MALVERN | 8000 | HP | 4.53846 |
| Pipeline Transportation of Natural Gas | 5151 RIDGE ROAD | MALVERN | 2250 | HP | 2.30073 |
| Pipeline Transportation of Natural Gas | 5121 JOEY LANE | TEXARKANA | 3080 | HP | 14.0482 |
| Pipeline Transportation of Natural Gas | 310 Curtis Davis Road | Bald Knob | 8290 | HP | 12.06 |
| Pipeline Transportation of Natural Gas | 310 Curtis Davis Road | Bald Knob | 8290 | HP | 11.7581 |
| Pipeline Transportation of Natural Gas | 310 Curtis Davis Road | Bald Knob | 8290 | HP | 10.773 |
| Pipeline Transportation of Natural Gas | 310 Curtis Davis Road | Bald Knob | 4800 | HP | 7.93485 |
| Pipeline Transportation of Natural Gas | 310 Curtis Davis Road | Bald Knob | 4800 | HP | 6.5826 |
| Pipeline Transportation of Natural Gas | 310 Curtis Davis Road | Bald Knob | 8290 | HP | 4.07025 |
| Pipeline Transportation of Natural Gas | 310 Curtis Davis Road | Bald Knob | 8290 | HP | 0.850875 |
| Pipeline Transportation of Natural Gas | 310 Curtis Davis Road | Bald Knob | 8290 | HP | 0.58216 |
| Pipeline Transportation of Natural Gas | 310 Curtis Davis Road | Bald Knob | 4800 | HP | 0.4539 |
| Pipeline Transportation of Natural Gas | 310 Curtis Davis Road | Bald Knob | 8290 | HP | 0.2476 |
| Pipeline Transportation of Natural Gas | 1555 NORTH OLIVE STREET | VENTURA | 1100 | HP | 2.549052 |
| Pipeline Transportation of Natural Gas | 1555 NORTH OLIVE STREET | VENTURA | 1100 | HP | 2.329135 |
| Pipeline Transportation of Natural Gas | 1555 NORTH OLIVE STREET | VENTURA | 1100 | HP | 2.152535 |
| Pipeline Transportation of Natural Gas | 28901 FORT CADY ROAD | NEWBERRY SPRING | 2000 | BHP | 0.871884 |
| Pipeline Transportation of Natural Gas | 28901 FORT CADY ROAD | NEWBERRY SPRING | 2000 | BHP | 0.8158424 |
| Pipeline Transportation of Natural Gas | 28901 FORT CADY ROAD | NEWBERRY SPRING | 2000 | BHP | 0.631098 |
| Pipeline Transportation of Natural Gas | 28901 FORT CADY ROAD | NEWBERRY SPRING | 2000 | BHP | 0.410548 |
| Pipeline Transportation of Natural Gas | 28901 FORT CADY ROAD | NEWBERRY SPRING | 2000 | BHP | 0.302562 |
| Pipeline Transportation of Natural Gas | 28901 FORT CADY ROAD | NEWBERRY SPRING | 2000 | BHP | 0.13572 |
| Pipeline Transportation of Natural Gas | 4500 NEEDLES HWY (NORTH NEEDLES) | NEEDLES | 4000 | BHP | 10.43207 |
| Pipeline Transportation of Natural Gas | 4500 NEEDLES HWY (NORTH NEEDLES) | NEEDLES | 4000 | BHP | 5.952596 |
| Pipeline Transportation of Natural Gas | 4500 NEEDLES HWY (NORTH NEEDLES) | NEEDLES | 4000 | BHP | 4.443113 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 2500 | BHP | 18.61501 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 3500 | BHP | 14.91601 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 2500 | BHP | 13.23954 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 2500 | BHP | 13.08114 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 2500 | BHP | 8.071176 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 7250 | BHP | 4.512494 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 7250 | BHP | 3.795041 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 2500 | BHP | 3.758742 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 7250 | BHP | 2.679845 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 2500 | BHP | 2.607274 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 2500 | BHP | 2.603122 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 2500 | BHP | 1.59445 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 1083 | BHP | 0.2435438 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 1083 | BHP | 0.1487566 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 1083 | BHP | 0.1002464 |
| Pipeline Transportation of Natural Gas | 35863 FAIRVIEW ROAD | HINKLEY | 1083 | BHP | 0.07944536 |
| Pipeline Transportation of Natural Gas | 13100 WEST 14TH AVENUE | BLYTHE | 3785 | BHP | 9.672957 |
| Pipeline Transportation of Natural Gas | 13100 WEST 14TH AVENUE | BLYTHE | 1088 | BHP | 0.021565 |
| Pipeline Transportation of Natural Gas | 12801 TAMPA AVE | NORTHRIDGE | 2000 | HP | 1.27 |
| Pipeline Transportation of Natural Gas | 12801 TAMPA AVE | NORTHRIDGE | 2000 | HP | 1.04 |
| Pipeline Transportation of Natural Gas | 12801 TAMPA AVE | NORTHRIDGE | 2000 | HP | 0.98 |
| Pipeline Transportation of Natural Gas | 12801 TAMPA AVE | NORTHRIDGE | 2000 | HP | 0.85 |
| Pipeline Transportation of Natural Gas | 12801 TAMPA AVE | NORTHRIDGE | 2000 | HP | 0.47 |
| Pipeline Transportation of Natural Gas | 25205 W RYE CANYON RD | VALENCIA | 5500 | HP | 11.9 |
| Pipeline Transportation of Natural Gas | 25205 W RYE CANYON RD | VALENCIA | 5500 | HP | 10.3 |
| Pipeline Transportation of Natural Gas | 25205 W RYE CANYON RD | VALENCIA | 5500 | HP | 10.28 |
| Pipeline Transportation of Natural Gas | 25205 W RYE CANYON RD | VALENCIA | 5500 | HP | 9.07 |
| Pipeline Transportation of Natural Gas | 25205 W RYE CANYON RD | VALENCIA | 5500 | HP | 5.06 |
| Pipeline Transportation of Natural Gas | 23265 HIGHWAY 99 N W FRONTAGE | ACAMPO | 4440 | HP | 0.6506464 |
| Pipeline Transportation of Natural Gas | 23265 HIGHWAY 99 N W FRONTAGE | ACAMPO | 4440 | HP | 0.6181339 |
| Pipeline Transportation of Natural Gas | 23265 HIGHWAY 99 N W FRONTAGE | ACAMPO | 4440 | HP | 0.3523267 |
| Pipeline Transportation of Natural Gas | 23265 HIGHWAY 99 N W FRONTAGE | ACAMPO | 4440 | HP | 0.2731779 |
| Pipeline Transportation of Natural Gas | 23265 HIGHWAY 99 N W FRONTAGE | ACAMPO | 1510 | HP | 0.00797 |
| Pipeline Transportation of Natural Gas | 575 E Hwy US 36 | Tuscola | 3400 | HP | 12.24137 |
| Pipeline Transportation of Natural Gas | 575 E Hwy US 36 | Tuscola | 3400 | HP | 10.57112 |
| Pipeline Transportation of Natural Gas | 575 E Hwy US 36 | Tuscola | 3400 | HP | 6.4949 |
| Pipeline Transportation of Natural Gas | 575 E Hwy US 36 | Tuscola | 1600 | HP | 0 |
| Pipeline Transportation of Natural Gas | 575 E Hwy US 36 | Tuscola | 1600 | HP | 0 |
| Pipeline Transportation of Natural Gas | RR 2 Box 142b | St Elmo | 2587 | HP | 12.95435 |
| Pipeline Transportation of Natural Gas | 927 N CR 800 E | Tuscola | 2700 | HP | 0.07425 |
| Pipeline Transportation of Natural Gas | 927 N CR 800 E | Tuscola | 2000 | HP | 0.055 |
| Pipeline Transportation of Natural Gas | 927 N CR 800 E | Tuscola | 2000 | HP | 0.055 |
| Pipeline Transportation of Natural Gas | 927 N CR 800 E | Tuscola | 2000 | HP | 0.055 |
| Pipeline Transportation of Natural Gas | 927 N CR 800 E | Tuscola | 2000 | HP | 0.055 |
| Pipeline Transportation of Natural Gas | 11615 Old Route 66 | Glenarm | 4000 | HP | 18.21609 |
| Pipeline Transportation of Natural Gas | 11615 Old Route 66 | Glenarm | 2070 | HP | 11.60841 |
| Pipeline Transportation of Natural Gas | 11615 Old Route 66 | Glenarm | 2070 | HP | 9.652812 |
| Pipeline Transportation of Natural Gas | 11615 Old Route 66 | Glenarm | 4000 | HP | 8.524944 |
| Pipeline Transportation of Natural Gas | Hwy 1 And By-pass 45 | Norris City | 1000 | HP | 0.714285 |
| Pipeline Transportation of Natural Gas | Hwy 1 And By-pass 45 | Norris City | 1000 | HP | 0.714285 |
| Pipeline Transportation of Natural Gas | Hwy 1 And By-pass 45 | Norris City | 1000 | HP | 0.714285 |
| Pipeline Transportation of Natural Gas | Hwy 1 And By-pass 45 | Norris City | 1000 | HP | 0.714285 |
| Pipeline Transportation of Natural Gas | Hwy 1 And By-pass 45 | Norris City | 1000 | HP | 0.714285 |
| Pipeline Transportation of Natural Gas | Hwy 1 And By-pass 45 | Norris City | 1000 | HP | 0.714285 |
| Pipeline Transportation of Natural Gas | 15313 W South St | Woodstock | 1550 | HP | 12.9828 |
| Pipeline Transportation of Natural Gas | 15313 W South St | Woodstock | 1550 | HP | 10.00362 |
| Pipeline Transportation of Natural Gas | 5611 S 12000 West Rd | Herscher | 8180 | HP | 6.45632 |
| Pipeline Transportation of Natural Gas | 5611 S 12000 West Rd | Herscher | 2800 | HP | 0 |
| Pipeline Transportation of Natural Gas | 296 N 600 Ave | New Windsor | 2000 | HP | 17.98977 |
| Pipeline Transportation of Natural Gas | 296 N 600 Ave | New Windsor | 1400 | HP | 15.90966 |
| Pipeline Transportation of Natural Gas | 16048 Highway 82 | Geneseo | 4250 | HP | 20.27015 |
| Pipeline Transportation of Natural Gas | 16048 Highway 82 | Geneseo | 5000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 2101 Portland Rd | Joppa | 10000 | HP | 13.09 |
| Pipeline Transportation of Natural Gas | 2 miles W on US 36 | Hammond | 3130 | HP | 0 |
| Pipeline Transportation of Natural Gas | 1582 CR 775E | Johnsonville | 3000 | HP | 18.711 |
| Pipeline Transportation of Natural Gas | 1582 CR 775E | Johnsonville | 3000 | HP | 18.678 |
| Pipeline Transportation of Natural Gas | 1582 CR 775E | Johnsonville | 2667 | HP | 10.17924 |
| Pipeline Transportation of Natural Gas | 1582 CR 775E | Johnsonville | 2667 | HP | 9.03518 |
| Pipeline Transportation of Natural Gas | 1582 CR 775E | Johnsonville | 2667 | HP | 2.434805 |
| Pipeline Transportation of Natural Gas | 1582 CR 775E | Johnsonville | 3000 | HP | 0.858 |
| Pipeline Transportation of Natural Gas | 1582 CR 775E | Johnsonville | 10000 | HP | 0.22 |
| Pipeline Transportation of Natural Gas | 1582 CR 775E | Johnsonville | 3000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 4-1/2 Miles SE Atlas On Hwy 96 | Pleasant Hill | 2400 | HP | 18.82368 |
| Pipeline Transportation of Natural Gas | 4-1/2 Miles SE Atlas On Hwy 96 | Pleasant Hill | 3400 | HP | 11.77035 |
| Pipeline Transportation of Natural Gas | 4-1/2 Miles SE Atlas On Hwy 96 | Pleasant Hill | 3400 | HP | 10.1952 |
| Pipeline Transportation of Natural Gas | 4-1/2 Miles SE Atlas On Hwy 96 | Pleasant Hill | 3400 | HP | 10.0457 |
| Pipeline Transportation of Natural Gas | 6650 Sandy Bluff Rd | Sandwich | 12000 | HP | 6.24449 |
| Pipeline Transportation of Natural Gas | 23526 W Amoco Rd | Channahon | 4445 | HP | 14.05278 |
| Pipeline Transportation of Natural Gas | 23526 W Amoco Rd | Channahon | 4445 | HP | 11.77172 |
| Pipeline Transportation of Natural Gas | 23526 W Amoco Rd | Channahon | 4445 | HP | 10.58325 |
| Pipeline Transportation of Natural Gas | 23526 W Amoco Rd | Channahon | 4445 | HP | 9.703025 |
| Pipeline Transportation of Natural Gas | 23526 W Amoco Rd | Channahon | 4445 | HP | 6.71985 |
| Pipeline Transportation of Natural Gas | SE of N 1400 E Rd & E 2500 N Rd | Blue Mound | 8425 | HP | 8.9776 |
| Pipeline Transportation of Natural Gas | SE of N 1400 E Rd & E 2500 N Rd | Blue Mound | 8425 | HP | 7.9794 |
| Pipeline Transportation of Natural Gas | SE of N 1400 E Rd & E 2500 N Rd | Blue Mound | 6319 | HP | 6.7239 |
| Pipeline Transportation of Natural Gas | SE of N 1400 E Rd & E 2500 N Rd | Blue Mound | 8425 | HP | 6.1814 |
| Pipeline Transportation of Natural Gas | SE of N 1400 E Rd & E 2500 N Rd | Blue Mound | 6319 | HP | 3.5619 |
| Pipeline Transportation of Natural Gas | SE of N 1400 E Rd & E 2500 N Rd | Blue Mound | 1246 | HP | 0 |
| Pipeline Transportation of Natural Gas | 3200 Edwardsville Rd | Granite City | 1478 | HP | 0.18972 |
| Pipeline Transportation of Natural Gas | 3200 Edwardsville Rd | Granite City | 1478 | HP | 0.06509 |
| Pipeline Transportation of Natural Gas | 3200 Edwardsville Rd | Granite City | 1478 | HP | 0.05109 |
| Pipeline Transportation of Natural Gas | 3200 Edwardsville Rd | Granite City | 1478 | HP | 0.01536 |
| Pipeline Transportation of Natural Gas | 25419 Paulding Rd | Monroeville | 2000 | HP | 3.5492 |
| Pipeline Transportation of Natural Gas | 25419 Paulding Rd | Monroeville | 2000 | HP | 2.9937 |
| Pipeline Transportation of Natural Gas | 25419 Paulding Rd | Monroeville | 2000 | HP | 2.3283 |
| Pipeline Transportation of Natural Gas | 25419 Paulding Rd | Monroeville | 1600 | HP | 2.2937 |
| Pipeline Transportation of Natural Gas | 25419 Paulding Rd | Monroeville | 2000 | HP | 0.172 |
| Pipeline Transportation of Natural Gas | 25419 Paulding Rd | Monroeville | 2000 | HP | 0.1543 |
| Pipeline Transportation of Natural Gas | 6222 N CR 300 W | Sulphur Springs | 2850 | HP | 7.802065 |
| Pipeline Transportation of Natural Gas | 6222 N CR 300 W | Sulphur Springs | 2850 | HP | 7.764381 |
| Pipeline Transportation of Natural Gas | 11409 W SR 56 | French Lick | 1000 | HP | 10.68 |
| Pipeline Transportation of Natural Gas | 11409 W SR 56 | French Lick | 1000 | HP | 7.13 |
| Pipeline Transportation of Natural Gas | 11409 W SR 56 | French Lick | 1000 | HP | 4.41 |

**495a**

| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | 140 - Selective Non-catalytic Reduction (SNCR) (OP - 2020) (NOX - 85%) | | | | | |
| TON | 140 - Selective Non-catalytic Reduction (SNCR) (OP - 2020) (NOX - 85%) | | | | | |
| TON | 140 - Selective Non-catalytic Reduction (SNCR) (OP - 2020) (NOX - 85%) | | | | | |
| TON | 140 - Selective Non-catalytic Reduction (SNCR) (OP - 2020) (NOX - 85%) | | | | | |
| TON | 140 - Selective Non-catalytic Reduction (SNCR) (OP - 2020) (NOX - 85%) | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | 205 - Low NOx Burner (LNB) (OP - 2020) (NOX - 70%) | | | | | |
| TON | 205 - Low NOx Burner (LNB) (OP - 2020) (NOX - 70%) | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | 205 - Low NOx Burner (LNB) (OP - 2020) (NOX - 99%) | | | | | |
| TON | 205 - Low NOx Burner (LNB) (OP - 2020) (NOX - 99%) | | | | | |
| TON | 205 - Low NOx Burner (LNB) (OP - 2020) (NOX - 99%) | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | 203 - Catalytic Converter (OP - 2020) (NOX - 90%) | | | | | |
| TON | 203 - Catalytic Converter (OP - 2020) (NOX - 90%) | | | | | |
| TON | 203 - Catalytic Converter (OP - 2020) (NOX - 90%) | | | | | |
| TON | 203 - Catalytic Converter (OP - 2020) (NOX - 90%) | | | | | |
| TON | 203 - Catalytic Converter (OP - 2020) (NOX - 90%) | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | IN | Orange | 4670911 | 28369113 00010 | Na | | TEXAS EASTERN TRANSMISSION LP | 48621 |
| | IN | Orange | 4670911 | 28369213 00010 | Na | | TEXAS EASTERN TRANSMISSION LP | 48621 |
| | IN | Orange | 4670911 | 28369053 00010 | Na | | TEXAS EASTERN TRANSMISSION LP | 48621 |
| | IN | Orange | 4670911 | 28368713 00010 | Na | | TEXAS EASTERN TRANSMISSION LP | 48621 |
| | IN | Parke | 4671411 | 137363413 00008 | Na | | PANHANDLE EASTERN PIPE LINE COMPANY  M | 48621 |
| | IN | Parke | 4671411 | 137363313 00008 | Na | | PANHANDLE EASTERN PIPE LINE COMPANY  M | 48621 |
| | IN | Dearborn | 4748011 | 28314413 00008 | Na | | Texas Gas Transmission LLC Difisboro Co | 48621 |
| | IN | Dearborn | 4748011 | 28314313 00008 | Na | | Texas Gas Transmission LLC Difisboro Co | 48621 |
| | IN | Grant | 5389411 | 27584913 00040 | Na | | TEXAS EASTERN TRANSMISSION LP | 48621 |
| | IN | Grant | 5389411 | 27584813 00040 | Na | | TEXAS EASTERN TRANSMISSION LP | 48621 |
| | IN | Lake | 7248011 | 7461713 00069 | Na | | ANR Pipeline Company St John Station | 48621 |
| | IN | Lake | 7248011 | 7461413 00069 | Na | | ANR Pipeline Company St John Station | 48621 |
| | IN | Lake | 7248011 | 7461613 00069 | Na | | ANR Pipeline Company St John Station | 48621 |
| | IN | Lake | 7248011 | 91622113 00069 | Na | | ANR Pipeline Company St John Station | 48621 |
| | IN | Lake | 7248011 | 7462013 00069 | Na | | ANR Pipeline Company St John Station | 48621 |
| | IN | Pike | 7250811 | 7444013 00004 | Na | | Midwestern Gas Transmission Company Sta | 48621 |
| | IN | Jay | 7957111 | 68293113 00012 | Na | | ANR PIPELINE COMPANY  PORTLAND COMPRES | 48621 |
| | IN | Jay | 7957111 | 30088513 00012 | Na | | ANR PIPELINE COMPANY  PORTLAND COMPRES | 48621 |
| | IN | Jay | 7957111 | 30087113 00012 | Na | | ANR PIPELINE COMPANY  PORTLAND COMPRES | 48621 |
| | IN | Jay | 7957111 | 68293213 00012 | Na | | ANR PIPELINE COMPANY  PORTLAND COMPRES | 48621 |
| | IN | Jay | 7957111 | 68293313 00012 | Na | | ANR PIPELINE COMPANY  PORTLAND COMPRES | 48621 |
| | IN | Jay | 7957111 | 68293413 00012 | Na | | ANR PIPELINE COMPANY  PORTLAND COMPRES | 48621 |
| | IN | Jay | 7957111 | 68293513 00012 | Na | | ANR PIPELINE COMPANY  PORTLAND COMPRES | 48621 |
| | IN | Jay | 7957111 | 68293613 00012 | Na | | ANR PIPELINE COMPANY  PORTLAND COMPRES | 48621 |
| | IN | Jay | 7957111 | 68293713 00012 | Na | | ANR PIPELINE COMPANY  PORTLAND COMPRES | 48621 |
| | IN | Shelby | 8201211 | 5332613 00011 | Na | | ANR Pipeline Company Shelbyville Statio | 48621 |
| | IN | Shelby | 8201211 | 5332813 00011 | Na | | ANR Pipeline Company Shelbyville Statio | 48621 |
| | IN | Shelby | 8201211 | 5332313 00011 | Na | | ANR Pipeline Company Shelbyville Statio | 48621 |
| | IN | Shelby | 8201211 | 68269913 00011 | Na | | ANR Pipeline Company Shelbyville Statio | 48621 |
| | IN | Shelby | 8201211 | 5332113 00011 | Na | | ANR Pipeline Company Shelbyville Statio | 48621 |
| | IN | Shelby | 8201211 | 5332513 00011 | Na | | ANR Pipeline Company Shelbyville Statio | 48621 |
| | IN | Shelby | 8201211 | 5332713 00011 | Na | | ANR Pipeline Company Shelbyville Statio | 48621 |
| | IN | Marion | 8238711 | 4223213 00095 | Na | | PANHANDLE EASTERN PIPELINE COMPANY | 48621 |
| | IN | Marion | 8238711 | 4223413 00095 | Na | | PANHANDLE EASTERN PIPELINE COMPANY | 48621 |
| | IN | Marion | 8238711 | 4223313 00095 | Na | | PANHANDLE EASTERN PIPELINE COMPANY | 48621 |
| | IN | Marion | 8238711 | 91611713 00095 | Na | | PANHANDLE EASTERN PIPELINE COMPANY | 48621 |
| | IN | Marion | 8238711 | 4223813 00095 | Na | | PANHANDLE EASTERN PIPELINE COMPANY | 48621 |
| | IN | Marion | 8238711 | 4223613 00095 | Na | | PANHANDLE EASTERN PIPELINE COMPANY | 48621 |
| | IN | Marion | 8238711 | 4224113 00095 | Na | | PANHANDLE EASTERN PIPELINE COMPANY | 48621 |
| | KY | Boyd | 5075111 | 73353713 2101900106 | Na | | TN Gas Pipeline Co LLC - Station 114 | 486210 |
| | KY | Boyd | 5075111 | 94779113 2101900106 | Na | | TN Gas Pipeline Co LLC - Station 114 | 486210 |
| | KY | Boyd | 5075111 | 129607313 2101900106 | Na | | TN Gas Pipeline Co LLC - Station 114 | 486210 |
| | KY | Muhlenberg | 5177411 | 26148913 2117700073 | Na | | Texas Gas Transmission LLC - Midland II Compressor Station | 486210 |
| | KY | Muhlenberg | 5177411 | 94778513 2117700073 | Na | | Texas Gas Transmission LLC - Midland II Compressor Station | 486210 |
| | KY | Larue | 5502411 | 107139113 2112300012 | Na | | AGL Resources & Electric | 486210 |
| | KY | Taylor | 5727011 | 94773113 2121700033 | Na | | TN Gas Pipeline Co LLC - Station 96 | 486210 |
| | KY | Taylor | 5727011 | 94773213 2121700033 | Na | | TN Gas Pipeline Co LLC - Station 96 | 486210 |
| | KY | Taylor | 5727011 | 94773513 2121700033 | Na | | TN Gas Pipeline Co LLC - Station 96 | 486210 |
| | KY | Taylor | 5727011 | 94773313 2121700033 | Na | | TN Gas Pipeline Co LLC - Station 96 | 486210 |
| | KY | Taylor | 5787111 | 129579513 2119700006 | Na | | Columbia Gulf Transmission Sta | 486210 |
| | KY | Powell | 5787411 | 137255913 2119700013 | Na | | TN Gas Pipeline Co LLC - Station 106 | 486210 |
| | KY | Hopkins | 5830611 | 21385313 2110700134 | Na | | ANR Pipeline Co (Madisonville Compressor Sta) | 486210 |
| | KY | Hopkins | 5830611 | 94771413 2110700134 | Na | | ANR Pipeline Co (Madisonville Compressor Sta) | 486210 |
| | KY | Marshall | 5929211 | 94777313 2115700037 | Na | | Texas Gas Transmission LLC - Calvert City Compressor | 486210 |
| | KY | Marshall | 5929211 | 94777513 2115700037 | Na | | Texas Gas Transmission LLC - Calvert City Compressor | 486210 |
| | KY | Marshall | 5929211 | 94778013 2115700037 | Na | | Texas Gas Transmission LLC - Calvert City Compressor | 486210 |
| | KY | Marshall | 5929211 | 94777913 2115700037 | Na | | Texas Gas Transmission LLC - Calvert City Compressor | 486210 |
| | KY | Marshall | 5929211 | 94777413 2115700037 | Na | | Texas Gas Transmission LLC - Calvert City Compressor | 486210 |
| | KY | Meade | 5932411 | 83034613 2116300017 | Na | | Louisville Gas & Electric Co - Muldraugh Transmission Station | 486210 |
| | KY | Meade | 5932411 | 129702613 2116300017 | Na | | Louisville Gas & Electric Co - Muldraugh Transmission Station | 486210 |
| | KY | Meade | 5932411 | 83034913 2116300017 | Na | | Louisville Gas & Electric Co - Muldraugh Transmission Station | 486210 |
| | KY | Greenup | 6096911 | 129585213 2108900033 | Na | | TN Gas Pipeline Co LLC - Station 200 | 486210 |
| | KY | Webster | 6099111 | 94776813 2123300074 | Na | | Texas Gas Transmission LLC - Slaughters Compressor | 486210 |
| | KY | Webster | 6099111 | 94777113 2123300074 | Na | | Texas Gas Transmission LLC - Slaughters Compressor | 486210 |
| | KY | Webster | 6099111 | 94776613 2123300074 | Na | | Texas Gas Transmission LLC - Slaughters Compressor | 486210 |
| | KY | Webster | 6099111 | 94776513 2123300074 | Na | | Texas Gas Transmission LLC - Slaughters Compressor | 486210 |
| | KY | Webster | 6099111 | 94777213 2123300074 | Na | | Texas Gas Transmission LLC - Slaughters Compressor | 486210 |
| | KY | Webster | 6099111 | 94776413 2123300074 | Na | | Texas Gas Transmission LLC - Slaughters Compressor | 486210 |
| | KY | Webster | 6099111 | 94776113 2123300074 | Na | | Texas Gas Transmission LLC - Slaughters Compressor | 486210 |
| | KY | Lincoln | 6127911 | 23416713 2113700008 | Na | | Texas Eastern Transmission LP - Danville Compressor Station | 486210 |
| | KY | Lincoln | 6127911 | 94774713 2113700008 | Na | | Texas Eastern Transmission LP - Danville Compressor Station | 486210 |
| | KY | Lincoln | 6127911 | 137245713 2113700008 | Na | | Texas Eastern Transmission LP - Danville Compressor Station | 486210 |
| | LA | East Carroll | 5172811 | 94921113 625 | Tennessee Gas Pipeline Company LLC | | Tennessee Gas Pipeline Co - Compressor Station 838 | 486210 |
| | LA | East Carroll | 5172811 | 79785113 625 | Tennessee Gas Pipeline Company LLC | | Tennessee Gas Pipeline Co - Compressor Station 838 | 486210 |
| | LA | East Carroll | 5172811 | 79784513 625 | Tennessee Gas Pipeline Company LLC | | Tennessee Gas Pipeline Co - Compressor Station 838 | 486210 |
| | LA | Evangeline | 5173111 | 80987313 2913 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 50 | 486210 |
| | LA | Evangeline | 5173111 | 80987813 2913 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 50 | 486210 |
| | LA | Evangeline | 5173111 | 80986813 2913 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 50 | 486210 |
| | LA | Evangeline | 5173111 | 80987013 2913 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 50 | 486210 |
| | LA | Evangeline | 5173111 | 80988113 2913 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 50 | 486210 |
| | LA | Evangeline | 5173111 | 80987613 2913 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 50 | 486210 |
| | LA | Franklin | 5173511 | 80036913 626 | Tennessee Gas Pipeline Company LLC | | Tennessee Gas Pipeline Co - Compressor Station 834 | 486210 |
| | LA | Franklin | 5173511 | 80037813 626 | Tennessee Gas Pipeline Company LLC | | Tennessee Gas Pipeline Co - Compressor Station 834 | 486210 |
| | LA | Franklin | 5173511 | 80037213 626 | Tennessee Gas Pipeline Company LLC | | Tennessee Gas Pipeline Co - Compressor Station 834 | 486210 |
| | LA | Franklin | 5173511 | 109741413 626 | Tennessee Gas Pipeline Company LLC | | Tennessee Gas Pipeline Co - Compressor Station 834 | 486210 |
| | LA | Terrebonne | 5192411 | 80251313 17725 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Company LLC - Compressor Station 62 | 486210 |
| | LA | Terrebonne | 5192411 | 80251213 17725 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Company LLC - Compressor Station 62 | 486210 |
| | LA | Terrebonne | 5192411 | 80250513 17725 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Company LLC - Compressor Station 62 | 486210 |
| | LA | West Carroll | 5208511 | 80493713 9512 | Trunkline Gas Co LLC | | Trunkline Gas Co LLC - Epps Compressor Station | 486210 |
| | LA | West Carroll | 5208511 | 80493913 9512 | Trunkline Gas Co LLC | | Trunkline Gas Co LLC - Epps Compressor Station | 486210 |
| | LA | West Carroll | 5208511 | 80493213 9512 | Trunkline Gas Co LLC | | Trunkline Gas Co LLC - Epps Compressor Station | 486210 |
| | LA | West Carroll | 5208511 | 80494113 9512 | Trunkline Gas Co LLC | | Trunkline Gas Co LLC - Epps Compressor Station | 486210 |
| | LA | St. Helena | 5272511 | 80486613 71 | Gulf South Pipeline Company LLC | | Gulf South Pipeline Co LLC - Montpelier Compressor Station | 486210 |
| | LA | St. Helena | 5272511 | 80488213 71 | Gulf South Pipeline Company LLC | | Gulf South Pipeline Co LLC - Montpelier Compressor Station | 486210 |
| | LA | St. Helena | 5272511 | 80486713 71 | Gulf South Pipeline Company LLC | | Gulf South Pipeline Co LLC - Montpelier Compressor Station | 486210 |
| | LA | St. Helena | 5272511 | 80487113 71 | Gulf South Pipeline Company LLC | | Gulf South Pipeline Co LLC - Montpelier Compressor Station | 486210 |
| | LA | St. Helena | 5272511 | 80487913 71 | Gulf South Pipeline Company LLC | | Gulf South Pipeline Co LLC - Montpelier Compressor Station | 486210 |
| | LA | St. Helena | 5272511 | 80487013 71 | Gulf South Pipeline Company LLC | | Gulf South Pipeline Co LLC - Montpelier Compressor Station | 486210 |
| | LA | St. Helena | 5272611 | 80120613 2565 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC - Transco Station 65 | 486210 |
| | LA | St. Helena | 5272611 | 80119713 2565 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC - Transco Station 65 | 486210 |
| | LA | St. Helena | 5272611 | 80119613 2565 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC - Transco Station 65 | 486210 |
| | LA | St. Helena | 5272611 | 80120113 2565 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC - Transco Station 65 | 486210 |
| | LA | St. Helena | 5272611 | 80120513 2565 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC - Transco Station 65 | 486210 |
| | LA | St. Helena | 5272611 | 80120713 2565 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC - Transco Station 65 | 486210 |
| | LA | St. James | 5273011 | 80237713 7129 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Station 63 Natural Gas Compres | 486210 |
| | LA | St. James | 5273011 | 80237013 7129 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Station 63 Natural Gas Compres | 486210 |
| | LA | St. James | 5273011 | 80238113 7129 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Station 63 Natural Gas Compres | 486210 |
| | LA | St. James | 5273011 | 80237313 7129 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Station 63 Natural Gas Compres | 486210 |
| | LA | St. James | 5273011 | 80237613 7129 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Station 63 Natural Gas Compres | 486210 |
| | LA | St. James | 5273011 | 80237213 7129 | Transcontinental Gas Pipe Line Co LLC | | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Station 63 Natural Gas Compres | 486210 |
| | LA | Jefferson Davis | 5283311 | 31058913 25002 | Tennessee Gas Pipeline Co | | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| | LA | Jefferson Davis | 5283311 | 31059313 25002 | Tennessee Gas Pipeline Co | | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| | LA | Jefferson Davis | 5283311 | 31060713 25002 | Tennessee Gas Pipeline Co | | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| | LA | Jefferson Davis | 5283311 | 31060913 25002 | Tennessee Gas Pipeline Co | | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| | LA | Jefferson Davis | 5283311 | 136870513 25002 | Tennessee Gas Pipeline Co | | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| | LA | Jefferson Davis | 5283311 | 136870613 25002 | Tennessee Gas Pipeline Co | | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| | LA | Jefferson Davis | 5283311 | 31059213 25002 | Tennessee Gas Pipeline Co | | Tennessee Gas Pipeline Company LLC - Kinder Compressor Station 823 | 486210 |
| | LA | St. Landry | 5287511 | 81565313 264 | Texas Eastern Transmission LP (TETLP) | | Texas Eastern Transmission LP - Opelousas Compressor Station | 486210 |
| | LA | St. Landry | 5287511 | 81564213 264 | Texas Eastern Transmission LP (TETLP) | | Texas Eastern Transmission LP - Opelousas Compressor Station | 486210 |
| | LA | St. Landry | 5287511 | 81565413 264 | Texas Eastern Transmission LP (TETLP) | | Texas Eastern Transmission LP - Opelousas Compressor Station | 486210 |
| | LA | St. Landry | 5287511 | 81565013 264 | Texas Eastern Transmission LP (TETLP) | | Texas Eastern Transmission LP - Opelousas Compressor Station | 486210 |
| | LA | St. Landry | 5287511 | 81564413 264 | Texas Eastern Transmission LP (TETLP) | | Texas Eastern Transmission LP - Opelousas Compressor Station | 486210 |
| | LA | St. Landry | 5287511 | 81564113 264 | Texas Eastern Transmission LP (TETLP) | | Texas Eastern Transmission LP - Opelousas Compressor Station | 486210 |
| | LA | St. Landry | 5287511 | 81565313 264 | Texas Eastern Transmission LP (TETLP) | | Texas Eastern Transmission LP - Opelousas Compressor Station | 486210 |
| | LA | St. Landry | 5287511 | 81564813 264 | Texas Eastern Transmission LP (TETLP) | | Texas Eastern Transmission LP - Opelousas Compressor Station | 486210 |
| | LA | St. Mary | 5290211 | 80053113 4198 | Southern Natural Gas Co - Shadyside Compressor Station | | Southern Natural Gas Co - Shadyside Compressor Station | 486210 |
| | LA | Vermilion | 5355611 | 81351913 33270 | EnLink Midstream Operating LP | | AGL Resources - Jefferson Island Storage & Hub LLC | 486210 |
| | LA | Vermilion | 5355611 | 81352713 33270 | EnLink Midstream Operating LP | | AGL Resources - Jefferson Island Storage & Hub LLC | 486210 |
| | LA | Vermilion | 5355611 | 81351813 33270 | EnLink Midstream Operating LP | | AGL Resources - Jefferson Island Storage & Hub LLC | 486210 |
| | LA | Vermilion | 5355611 | 81351313 33270 | EnLink Midstream Operating LP | | AGL Resources - Jefferson Island Storage & Hub LLC | 486210 |
| | LA | Washington | 5504511 | 80730613 2555 | Southern Natural Gas Company LLC | | Southern Natural Gas Co - Franklinton Compressor Station | 486210 |
| | LA | Washington | 5504511 | 80731513 2555 | Southern Natural Gas Company LLC | | Southern Natural Gas Co - Franklinton Compressor Station | 486210 |
| | LA | Iberville | 5504711 | 81288813 4197 | Southern Natural Gas Company LLC | | Southern Natural Gas Company LLC - White Castle Compressor Station | 486210 |
| | LA | Iberville | 5504711 | 81288713 4197 | Southern Natural Gas Company LLC | | Southern Natural Gas Company LLC - White Castle Compressor Station | 486210 |
| | LA | Iberville | 5504711 | 81288113 4197 | Southern Natural Gas Company LLC | | Southern Natural Gas Company LLC - White Castle Compressor Station | 486210 |
| | LA | Iberville | 5504711 | 81288513 4197 | Southern Natural Gas Company LLC | | Southern Natural Gas Company LLC - White Castle Compressor Station | 486210 |
| | LA | Morehouse | 5543111 | 80559313 3247 | Texas Gas Transmission LLC | | Texas Gas Transmission LLC - Bastrop Compressor Station | 486210 |
| | LA | Morehouse | 5543111 | 80556613 3247 | Texas Gas Transmission LLC | | Texas Gas Transmission LLC - Bastrop Compressor Station | 486210 |
| | LA | Morehouse | 5543111 | 80556813 3247 | Texas Gas Transmission LLC | | Texas Gas Transmission LLC - Bastrop Compressor Station | 486210 |
| | LA | Morehouse | 5543111 | 80555413 3247 | Texas Gas Transmission LLC | | Texas Gas Transmission LLC - Bastrop Compressor Station | 486210 |

**497a**

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 11409 W SR 56 | French Lick | 1000 | HP | 3.98 |
| Pipeline Transportation of Natural Gas | 11409 W SR 56 | French Lick | 1000 | HP | 3.21 |
| Pipeline Transportation of Natural Gas | 11409 W SR 56 | French Lick | 1000 | HP | 1.15 |
| Pipeline Transportation of Natural Gas | 11409 W SR 56 | French Lick | 1000 | HP | 0.04 |
| Pipeline Transportation of Natural Gas | 2623 N CR 600 W | Montezuma | 4000 | HP | 1.36125 |
| Pipeline Transportation of Natural Gas | 2623 N CR 600 W | Montezuma | 3000 | HP | 0.33303 |
| Pipeline Transportation of Natural Gas | 10622 Texas Gas Rd | Aurora | 1320 | HP | 13.09643 |
| Pipeline Transportation of Natural Gas | 10622 Texas Gas Rd | Aurora | 1320 | HP | 8.15322b |
| Pipeline Transportation of Natural Gas | 5163 E CR 900 S | Jonesboro | 3400 | HP | 3.74 |
| Pipeline Transportation of Natural Gas | 5163 E CR 900 S | Jonesboro | 3400 | HP | 2.88 |
| Pipeline Transportation of Natural Gas | 10313 White Oak Ave | Saint John | 1550 | HP | 7.082 |
| Pipeline Transportation of Natural Gas | 10313 White Oak Ave | Saint John | 1550 | HP | 6.4333 |
| Pipeline Transportation of Natural Gas | 10313 White Oak Ave | Saint John | 1550 | HP | 1.4368 |
| Pipeline Transportation of Natural Gas | 10313 White Oak Ave | Saint John | 2000 | HP | 0.8221 |
| Pipeline Transportation of Natural Gas | 10313 White Oak Ave | Saint John | 1550 | HP | 0.7876 |
| Pipeline Transportation of Natural Gas | 1275 N CR 550 E | Winslow | 2700 | HP | 11.76035 |
| Pipeline Transportation of Natural Gas | 6059 W SR 26 | Portland | 2000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 6059 W SR 26 | Portland | 2000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 6059 W SR 26 | Portland | 2000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 6059 W SR 26 | Portland | 2000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 6059 W SR 26 | Portland | 2000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 6059 W SR 26 | Portland | 2000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 6059 W SR 26 | Portland | 6000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 6059 W SR 26 | Portland | 6000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 6059 W SR 26 | Portland | 11000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 5500 Smithland Rd | Shelbyville | 2000 | HP | 2.40511 |
| Pipeline Transportation of Natural Gas | 5500 Smithland Rd | Shelbyville | 2000 | HP | 1.75653 |
| Pipeline Transportation of Natural Gas | 5500 Smithland Rd | Shelbyville | 2160 | HP | 1.6732 |
| Pipeline Transportation of Natural Gas | 5500 Smithland Rd | Shelbyville | 2000 | HP | 0.73199 |
| Pipeline Transportation of Natural Gas | 5500 Smithland Rd | Shelbyville | 11000 | HP | 0.27288 |
| Pipeline Transportation of Natural Gas | 5500 Smithland Rd | Shelbyville | 2000 | HP | 0.09079 |
| Pipeline Transportation of Natural Gas | 5500 Smithland Rd | Shelbyville | 2000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 9371 Zionsville Rd | Indianapolis | 2000 | HP | 20.84242 |
| Pipeline Transportation of Natural Gas | 9371 Zionsville Rd | Indianapolis | 2700 | HP | 10.65212 |
| Pipeline Transportation of Natural Gas | 9371 Zionsville Rd | Indianapolis | 2000 | HP | 9.54584 |
| Pipeline Transportation of Natural Gas | 9371 Zionsville Rd | Indianapolis | 2700 | HP | 8.57151 |
| Pipeline Transportation of Natural Gas | 9371 Zionsville Rd | Indianapolis | 2700 | HP | 5.72646 |
| Pipeline Transportation of Natural Gas | 9371 Zionsville Rd | Indianapolis | 3400 | HP | 2.49953 |
| Pipeline Transportation of Natural Gas | 9371 Zionsville Rd | Indianapolis | 10000 | HP | 0.29295 |
| Pipeline Transportation of Natural Gas | 29450 Mayo Trl | Catlettsburg | 1350 | HP | 0.0872 |
| Pipeline Transportation of Natural Gas | 29450 Mayo Trl | Catlettsburg | 1350 | HP | 0.03465 |
| Pipeline Transportation of Natural Gas | 29450 Mayo Trl | Catlettsburg | 2175 | HP | 0 |
| Pipeline Transportation of Natural Gas | 6186 KY W | Bremen | 1400 | HP | 3.042968 |
| Pipeline Transportation of Natural Gas | 6186 KY W | Bremen | 1400 | HP | 1.622916 |
| Pipeline Transportation of Natural Gas | 650 LGE Rd | Magnolia | 3550 | HP | 0.2015081 |
| Pipeline Transportation of Natural Gas | 1380 Hobson Rd | Campbellsville | 1025 | HP | 0.18777 |
| Pipeline Transportation of Natural Gas | 1380 Hobson Rd | Campbellsville | 1100 | HP | 0 |
| Pipeline Transportation of Natural Gas | 1380 Hobson Rd | Campbellsville | 1100 | HP | 0 |
| Pipeline Transportation of Natural Gas | 1380 Hobson Rd | Campbellsville | 1350 | HP | 0 |
| Pipeline Transportation of Natural Gas | 3066 Morris Creek Rd | Stanton | 1175 | HP | 0.04271047 |
| Pipeline Transportation of Natural Gas | 10205 Winchester Rd | Clay City | 1462 | HP | 0.030762 |
| Pipeline Transportation of Natural Gas | 7500 Nebo Rd | Madisonville | 2700 | HP | 20.466955 |
| Pipeline Transportation of Natural Gas | 7500 Nebo Rd | Madisonville | 10833 | HP | 0 |
| Pipeline Transportation of Natural Gas | 93 Texas Gas Ln | Benton | 2000 | HP | 1.1095 |
| Pipeline Transportation of Natural Gas | 93 Texas Gas Ln | Benton | 2000 | HP | 0.7925 |
| Pipeline Transportation of Natural Gas | 93 Texas Gas Ln | Benton | 2000 | HP | 0.1585 |
| Pipeline Transportation of Natural Gas | 93 Texas Gas Ln | Benton | 1320 | HP | 0 |
| Pipeline Transportation of Natural Gas | 93 Texas Gas Ln | Benton | 1320 | HP | 0 |
| Pipeline Transportation of Natural Gas | US 31 W | Muldraugh | 1360 | HP | 10.4089728 |
| Pipeline Transportation of Natural Gas | US 31 W | Muldraugh | 1034 | HP | 0.0224943 |
| Pipeline Transportation of Natural Gas | US 31 W | Muldraugh | 1600 | HP | 0.0127995 |
| Pipeline Transportation of Natural Gas | 14888 KY 7 | Greenup | 1053 | HP | 0.0089595 |
| Pipeline Transportation of Natural Gas | 3562 KY 1405 | Slaughters | 3000 | BHP | 13.83034 |
| Pipeline Transportation of Natural Gas | 3562 KY 1405 | Slaughters | 2000 | BHP | 8.553458 |
| Pipeline Transportation of Natural Gas | 3562 KY 1405 | Slaughters | 2000 | BHP | 4.952002 |
| Pipeline Transportation of Natural Gas | 3562 KY 1405 | Slaughters | 2000 | BHP | 4.91849 |
| Pipeline Transportation of Natural Gas | 3562 KY 1405 | Slaughters | 1320 | BHP | 3.743884 |
| Pipeline Transportation of Natural Gas | 3562 KY 1405 | Slaughters | 2000 | BHP | 0.7878185 |
| Pipeline Transportation of Natural Gas | 3562 KY 1405 | Slaughters | 1320 | BHP | 0 |
| Pipeline Transportation of Natural Gas | 1745 Airport Rd | Danville | 2050 | HP | 4.5237817 |
| Pipeline Transportation of Natural Gas | 1745 Airport Rd | Danville | 1462 | HP | 0.1036405 |
| Pipeline Transportation of Natural Gas | 1745 Airport Rd | Danville | 1102 | HP | 0.02164355 |
| Pipeline Transportation of Natural Gas | 481 Bull Run Rd | Transylvania | 1085 | HP | 0.097 |
| Pipeline Transportation of Natural Gas | 481 Bull Run Rd | Transylvania | 1650 | HP | 0.08 |
| Pipeline Transportation of Natural Gas | 481 Bull Run Rd | Transylvania | 1650 | HP | 0.053 |
| Pipeline Transportation of Natural Gas | 2959 Veterans Memorial Hwy | Eunice | 2000 | HP | 7.27 |
| Pipeline Transportation of Natural Gas | 2959 Veterans Memorial Hwy | Eunice | 2000 | HP | 1.13 |
| Pipeline Transportation of Natural Gas | 2959 Veterans Memorial Hwy | Eunice | 2000 | HP | 0.9 |
| Pipeline Transportation of Natural Gas | 2959 Veterans Memorial Hwy | Eunice | 2000 | HP | 0.53 |
| Pipeline Transportation of Natural Gas | 2959 Veterans Memorial Hwy | Eunice | 1180 | HP | 0.12 |
| Pipeline Transportation of Natural Gas | 2959 Veterans Memorial Hwy | Eunice | 2000 | HP | 0.1 |
| Pipeline Transportation of Natural Gas | 552 Hwy 873 W | Extension | 1450 | HP | 18.07 |
| Pipeline Transportation of Natural Gas | 552 Hwy 873 W | Extension | 1450 | HP | 13.87 |
| Pipeline Transportation of Natural Gas | 552 Hwy 873 W | Extension | 1450 | HP | 11.4 |
| Pipeline Transportation of Natural Gas | 552 Hwy 873 W | Extension | 1080 | HP | 0.57 |
| Pipeline Transportation of Natural Gas | 4711 Bayou Black Dr | Gibson | 1440 | HP | 17.76 |
| Pipeline Transportation of Natural Gas | 4711 Bayou Black Dr | Gibson | 2500 | HP | 11.08 |
| Pipeline Transportation of Natural Gas | 4711 Bayou Black Dr | Gibson | 3000 | HP | 0.6 |
| Pipeline Transportation of Natural Gas | 745 Hwy 134 | Epps | 2000 | HP | 0.15 |
| Pipeline Transportation of Natural Gas | 745 Hwy 134 | Epps | 2000 | HP | 0.07 |
| Pipeline Transportation of Natural Gas | 745 Hwy 134 | Epps | 2000 | HP | 0.05 |
| Pipeline Transportation of Natural Gas | 745 Hwy 134 | Epps | 2000 | HP | 0.05 |
| Pipeline Transportation of Natural Gas | 477 Hwy 441 | Montpelier | 1500 | HP | 4.97421 |
| Pipeline Transportation of Natural Gas | 477 Hwy 441 | Montpelier | 1500 | HP | 4.50709 |
| Pipeline Transportation of Natural Gas | 477 Hwy 441 | Montpelier | 1600 | HP | 0.46577 |
| Pipeline Transportation of Natural Gas | 477 Hwy 441 | Montpelier | 1600 | HP | 0.07504 |
| Pipeline Transportation of Natural Gas | 477 Hwy 441 | Montpelier | 1600 | HP | 0.07277 |
| Pipeline Transportation of Natural Gas | 477 Hwy 441 | Montpelier | 1600 | HP | 0.03732 |
| Pipeline Transportation of Natural Gas | 29507 Hwy 43 | Greensburg | 4400 | HP | 2.561086 |
| Pipeline Transportation of Natural Gas | 29507 Hwy 43 | Greensburg | 4400 | HP | 0.876411 |
| Pipeline Transportation of Natural Gas | 29507 Hwy 43 | Greensburg | 4400 | HP | 0.788644 |
| Pipeline Transportation of Natural Gas | 29507 Hwy 43 | Greensburg | 4400 | HP | 0.744295 |
| Pipeline Transportation of Natural Gas | 29507 Hwy 43 | Greensburg | 4400 | HP | 0.298834 |
| Pipeline Transportation of Natural Gas | 29507 Hwy 43 | Greensburg | 4400 | HP | 0.185167 |
| Pipeline Transportation of Natural Gas | 8797 Helvetia St | Convent | 1320 | HP | 0.442679 |
| Pipeline Transportation of Natural Gas | 8797 Helvetia St | Convent | 1320 | HP | 0.383059 |
| Pipeline Transportation of Natural Gas | 8797 Helvetia St | Convent | 1320 | HP | 0.256366 |
| Pipeline Transportation of Natural Gas | 8797 Helvetia St | Convent | 2500 | HP | 0.18352 |
| Pipeline Transportation of Natural Gas | 8797 Helvetia St | Convent | 2750 | HP | 0.1326 |
| Pipeline Transportation of Natural Gas | 8797 Helvetia St | Convent | 3400 | HP | 0.03984 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 1450 | HP | 8.282 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 1450 | HP | 7.5045 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 1550 | HP | 6.4409 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 1450 | HP | 0.3614 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 1470 | HP | 0.3071 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 1470 | HP | 0.3 |
| Pipeline Transportation of Natural Gas | 15449 Parish Line Rd | Kinder | 2600 | HP | 0.0458 |
| Pipeline Transportation of Natural Gas | 586 Texas Eastern Rd | Opelousas | 2050 | HP | 3.82 |
| Pipeline Transportation of Natural Gas | 586 Texas Eastern Rd | Opelousas | 2050 | HP | 2.24 |
| Pipeline Transportation of Natural Gas | 586 Texas Eastern Rd | Opelousas | 2050 | HP | 1.93 |
| Pipeline Transportation of Natural Gas | 586 Texas Eastern Rd | Opelousas | 2050 | HP | 1.61 |
| Pipeline Transportation of Natural Gas | 586 Texas Eastern Rd | Opelousas | 2050 | HP | 0.98 |
| Pipeline Transportation of Natural Gas | 586 Texas Eastern Rd | Opelousas | 2050 | HP | 0.65 |
| Pipeline Transportation of Natural Gas | 586 Texas Eastern Rd | Opelousas | 2050 | HP | 0.64 |
| Pipeline Transportation of Natural Gas | 586 Texas Eastern Rd | Opelousas | 2050 | HP | 0.49 |
| Pipeline Transportation of Natural Gas | 586 Texas Eastern Rd | Opelousas | 2050 | HP | 0.07 |
| Pipeline Transportation of Natural Gas | 293 Sonat Ln | Centerville | 1800 | HP | 14.3256 |
| Pipeline Transportation of Natural Gas | 11408 Hwy 89 | Erath | 8180 | HP | 17.09 |
| Pipeline Transportation of Natural Gas | 11408 Hwy 89 | Erath | 3130 | HP | 10.51 |
| Pipeline Transportation of Natural Gas | 11408 Hwy 89 | Erath | 3130 | HP | 3.99 |
| Pipeline Transportation of Natural Gas | 11408 Hwy 89 | Erath | 3130 | HP | 2.31 |
| Pipeline Transportation of Natural Gas | 0.5 Mi SE of Hwys 25 & 10 jct near | Franklinton | 1350 | HP | 20.7115 |
| Pipeline Transportation of Natural Gas | 0.5 Mi SE of Hwys 25 & 10 jct near | Franklinton | 4445 | HP | 3.4064 |
| Pipeline Transportation of Natural Gas | 33480 Hwy 405 | White Castle | 1400 | HP | 19.0924 |
| Pipeline Transportation of Natural Gas | 33480 Hwy 405 | White Castle | 1700 | HP | 16.0148 |
| Pipeline Transportation of Natural Gas | 33480 Hwy 405 | White Castle | 1400 | HP | 12.2519 |
| Pipeline Transportation of Natural Gas | 33480 Hwy 405 | White Castle | 1400 | HP | 11.7964 |
| Pipeline Transportation of Natural Gas | 7152 Pumping Station Rd | Bastrop | 2700 | HP | 3.267654 |
| Pipeline Transportation of Natural Gas | 7152 Pumping Station Rd | Bastrop | 2700 | HP | 1.561713 |
| Pipeline Transportation of Natural Gas | 7152 Pumping Station Rd | Bastrop | 1760 | HP | 0.046407 |
| Pipeline Transportation of Natural Gas | 7152 Pumping Station Rd | Bastrop | 2700 | HP | 0.002983 |

**498a**



| Emissions UOM | Current Control (Description or ID) | Current Reduction Perc | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | LA | Richland | 5607611 | 80704113 | 32752 | Enable Gas Transmission LLC | Enable Gas Transmission LLC - Delhi Compressor Station | 486210 |
| | LA | Richland | 5607811 | 127610513 | 3109 | ANR Pipeline Co | ANR Pipeline Co - Delhi Compressor Station | 486210 |
| | LA | St. Bernard | 5608211 | 81286613 | 17664 | Southern Natural Gas Co | Southern Natural Gas Co - Toca Compressor Station | 486210 |
| | LA | St. Bernard | 5608211 | 81286313 | 17664 | Southern Natural Gas Co | Southern Natural Gas Co - Toca Compressor Station | 486210 |
| | LA | St. Bernard | 5608211 | 81285713 | 17664 | Southern Natural Gas Co | Southern Natural Gas Co - Toca Compressor Station | 486210 |
| | LA | St. Bernard | 5608211 | 81285913 | 17664 | Southern Natural Gas Co | Southern Natural Gas Co - Toca Compressor Station | 486210 |
| | LA | St. Bernard | 5608211 | 81286013 | 17664 | Southern Natural Gas Co | Southern Natural Gas Co - Toca Compressor Station | 486210 |
| | LA | Ouachita | 5734611 | 79789713 | 1945 | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Company LLC - Tennessee Gas Pipeline - Station #47 | 486210 |
| | LA | Ouachita | 5734611 | 79788013 | 1945 | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Company LLC - Tennessee Gas Pipeline - Station #47 | 486210 |
| | LA | Ouachita | 5735011 | 81541613 | 44216 | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC - Perryville Compressor Station | 486210 |
| | LA | Rapides | 5740711 | 126366613 | 44779 | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Alexandria Compressor Station | 486210 |
| | LA | Rapides | 5740911 | 81599213 | 3120 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Pineville Compressor Station | 486210 |
| | LA | Beauregard | 5998711 | 80248313 | 13028 | Trunkline Gas Co LLC | Trunkline Gas Co LLC - Longville Compressor Station #48 | 486210 |
| | LA | Beauregard | 5998711 | 80249613 | 13028 | Trunkline Gas Co LLC | Trunkline Gas Co LLC - Longville Compressor Station #48 | 486210 |
| | LA | Bienville | 6000111 | 82245613 | 31557 | Kinder Morgan Inc | Southern Natural Gas Co - Bienville Compressor Station | 486210 |
| | LA | Bienville | 6000111 | 82245313 | 31557 | Kinder Morgan Inc | Southern Natural Gas Co - Bienville Compressor Station | 486210 |
| | LA | Bienville | 6000111 | 82246013 | 31557 | Kinder Morgan Inc | Southern Natural Gas Co - Bienville Compressor Station | 486210 |
| | LA | Bienville | 6000111 | 82245513 | 31557 | Kinder Morgan Inc | Southern Natural Gas Co - Bienville Compressor Station | 486210 |
| | LA | Bienville | 6000411 | 80408213 | 23638 | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Hall Summit Compressor Station | 486210 |
| | LA | Bienville | 6000411 | 80408113 | 23638 | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Hall Summit Compressor Station | 486210 |
| | LA | Bienville | 6000411 | 80407713 | 23638 | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Hall Summit Compressor Station | 486210 |
| | LA | Bienville | 6000411 | 94942113 | 23638 | Gulf South Pipeline Company LLC | Gulf South Pipeline Co LLC - Hall Summit Compressor Station | 486210 |
| | LA | Acadia | 6082011 | 80587913 | 2839 | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Rayne Compressor Station | 486210 |
| | LA | Acadia | 6082011 | 80588413 | 2839 | Columbia Gulf Transmission Co | Columbia Gulf Transmission Co - Rayne Compressor Station | 486210 |
| | LA | Bossier | 6115511 | 80100713 | 13703 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Haughton Compressor Station | 486210 |
| | LA | Bossier | 6115511 | 80100713 | 13703 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Haughton Compressor Station | 486210 |
| | LA | Lafayette | 6128811 | 81386613 | 17788 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Youngsville Compressor Station | 486210 |
| | LA | Lafayette | 6128811 | 81386313 | 17788 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Youngsville Compressor Station | 486210 |
| | LA | Lafayette | 6128811 | 81387213 | 17788 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Youngsville Compressor Station | 486210 |
| | LA | Washington | 7204311 | 80701913 | 17216 | Florida Gas Transmission Co LLC | Florida Gas Transmission Co LLC - Franklinton Compressor Station #9 | 486210 |
| | LA | Washington | 7204311 | 80700313 | 17216 | Florida Gas Transmission Co LLC | Florida Gas Transmission Co LLC - Franklinton Compressor Station #9 | 486210 |
| | LA | Washington | 7204311 | 80699913 | 17216 | Florida Gas Transmission Co LLC | Florida Gas Transmission Co LLC - Franklinton Compressor Station #9 | 486210 |
| | LA | East Baton Rouge | 7227511 | 80256813 | 8007 | Florida Gas Transmission Co LLC | Florida Gas Transmission Co LLC - Zachary Compressor Stat #8 | 486210 |
| | LA | East Baton Rouge | 7227511 | 80256513 | 8007 | Florida Gas Transmission Co LLC | Florida Gas Transmission Co LLC - Zachary Compressor Stat #8 | 486210 |
| | LA | East Baton Rouge | 7227511 | 80256713 | 8007 | Florida Gas Transmission Co LLC | Florida Gas Transmission Co LLC - Zachary Compressor Stat #8 | 486210 |
| | LA | East Baton Rouge | 7227511 | 80255313 | 8007 | Florida Gas Transmission Co LLC | Florida Gas Transmission Co LLC - Zachary Compressor Stat #8 | 486210 |
| | LA | East Baton Rouge | 7227511 | 80255913 | 8007 | Florida Gas Transmission Co LLC | Florida Gas Transmission Co LLC - Zachary Compressor Stat #8 | 486210 |
| | LA | East Feliciana | 7228011 | 82085713 | 32061 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 60 | 486210 |
| | LA | East Feliciana | 7228011 | 82086113 | 32061 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 60 | 486210 |
| | LA | East Feliciana | 7228011 | 82086913 | 32061 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 60 | 486210 |
| | LA | East Feliciana | 7228011 | 82085013 | 32061 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 60 | 486210 |
| | LA | East Feliciana | 7228011 | 82086413 | 32061 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 60 | 486210 |
| | LA | East Feliciana | 7228011 | 82085313 | 32061 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 60 | 486210 |
| | LA | East Feliciana | 7228011 | 82086013 | 32061 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 60 | 486210 |
| | LA | East Feliciana | 7228011 | 82084813 | 32061 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 60 | 486210 |
| | LA | East Feliciana | 7228011 | 82086213 | 32061 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 60 | 486210 |
| | LA | East Feliciana | 7228011 | 82085513 | 32061 | Transcontinental Gas Pipe Line Co LLC | Transcontinental Gas Pipe Line Co LLC (TRANSCO) - Transco Compressor Station 60 | 486210 |
| | LA | Lincoln | 7234211 | 81562213 | 13145 | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC - Unionville Storage Compressor Statio | 486210 |
| | LA | Lincoln | 7234211 | 81563213 | 13145 | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC - Unionville Storage Compressor Statio | 486210 |
| | LA | Lincoln | 7234211 | 89645513 | 13145 | Enable Mississippi River Transmission LLC | Enable Mississippi River Transmission LLC - Unionville Storage Compressor Statio | 486210 |
| | LA | Claiborne | 7354311 | 80781613 | 4924 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Sharon Compressor Station | 486210 |
| | LA | Claiborne | 7354311 | 80781513 | 4924 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Sharon Compressor Station | 486210 |
| | LA | Claiborne | 7354311 | 80781413 | 4924 | Texas Gas Transmission LLC | Texas Gas Transmission LLC - Sharon Compressor Station | 486210 |
| | LA | Acadia | 7366711 | 81278313 | 24083 | Egan Hub Storage LLC | Egan Hub Storage LLC - Egan Gas Storage Facility | 486210 |
| | LA | Acadia | 7366711 | 81277513 | 24083 | Egan Hub Storage LLC | Egan Hub Storage LLC - Egan Gas Storage Facility | 486210 |
| | LA | Acadia | 7366711 | 81278813 | 24083 | Egan Hub Storage LLC | Egan Hub Storage LLC - Egan Gas Storage Facility | 486210 |
| | LA | Acadia | 7366711 | 81279513 | 24083 | Egan Hub Storage LLC | Egan Hub Storage LLC - Egan Gas Storage Facility | 486210 |
| | LA | Acadia | 7366711 | 81278213 | 24083 | Egan Hub Storage LLC | Egan Hub Storage LLC - Egan Gas Storage Facility | 486210 |
| | LA | Acadia | 7366711 | 81277413 | 24083 | Egan Hub Storage LLC | Egan Hub Storage LLC - Egan Gas Storage Facility | 486210 |
| | LA | Acadia | 7366711 | 81277413 | 24083 | Egan Hub Storage LLC | Egan Hub Storage LLC - Egan Gas Storage Facility | 486210 |
| | LA | Acadia | 7366711 | 81278713 | 24083 | Egan Hub Storage LLC | Egan Hub Storage LLC - Egan Gas Storage Facility | 486210 |
| | LA | Acadia | 7366711 | 81277313 | 24083 | Egan Hub Storage LLC | Egan Hub Storage LLC - Egan Gas Storage Facility | 486210 |
| | LA | Ascension | 7367111 | 111275813 | 11416 | Bridgeline Holdings LP | Bridgeline Holdings LP - Sorrento Underground Gas Storage Facility | 486210 |
| | LA | Ascension | 7367111 | 111275013 | 11416 | Bridgeline Holdings LP | Bridgeline Holdings LP - Sorrento Underground Gas Storage Facility | 486210 |
| | LA | Ascension | 7367111 | 111275913 | 11416 | Bridgeline Holdings LP | Bridgeline Holdings LP - Sorrento Underground Gas Storage Facility | 486210 |
| | LA | Ouachita | 7432711 | 80535813 | 8241 | Texas Eastern Transmission LP | Texas Eastern Transmission LP - West Monroe Compressor Station | 486210 |
| | LA | Ouachita | 7432711 | 80535413 | 8241 | Texas Eastern Transmission LP | Texas Eastern Transmission LP - West Monroe Compressor Station | 486210 |
| | LA | Ouachita | 7432711 | 80536213 | 8241 | Texas Eastern Transmission LP | Texas Eastern Transmission LP - West Monroe Compressor Station | 486210 |
| | LA | Natchitoches | 7447911 | 80044613 | 3144 | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Co LLC - Station 40 | 486210 |
| | LA | Natchitoches | 7447911 | 80045613 | 3144 | Tennessee Gas Pipeline Company LLC | Tennessee Gas Pipeline Co LLC - Station 40 | 486210 |
| | LA | Assumption | 8465511 | 122065113 | 27281 | Bridgeline Holdings LP | Bridgeline Holdings LP - Napoleonville Storage Facility | 486210 |
| | LA | Assumption | 8465511 | 122065313 | 27281 | Bridgeline Holdings LP | Bridgeline Holdings LP - Napoleonville Storage Facility | 486210 |
| | LA | Assumption | 8465511 | 122065313 | 27281 | Bridgeline Holdings LP | Bridgeline Holdings LP - Napoleonville Storage Facility | 486210 |
| | LA | Assumption | 8465511 | 122064713 | 27281 | Bridgeline Holdings LP | Bridgeline Holdings LP - Napoleonville Storage Facility | 486210 |
| | LA | Assumption | 8465511 | 122064713 | 27281 | Bridgeline Holdings LP | Bridgeline Holdings LP - Napoleonville Storage Facility | 486210 |
| | LA | Assumption | 9585611 | 80602013 | 98149 | Gulf South Pipeline Co LP | Gulf South Pipeline Co LP - Rodrigue Compressor Station | 486210 |
| | LA | Assumption | 9585611 | 80602813 | 98149 | Gulf South Pipeline Co LP | Gulf South Pipeline Co LP - Rodrigue Compressor Station | 486210 |
| | LA | St. Landry | 13609711 | 109562913 | 127089 | Port Barre Investments LLC | Bobcat Gas Storage Facility | 486210 |
| | LA | St. Landry | 13609711 | 109562613 | 127089 | Port Barre Investments LLC | Bobcat Gas Storage Facility | 486210 |
| | LA | St. Landry | 13609711 | 80516813 | 127089 | Port Barre Investments LLC | Bobcat Gas Storage Facility | 486210 |
| | LA | St. Landry | 13609711 | 109561513 | 127089 | Port Barre Investments LLC | Bobcat Gas Storage Facility | 486210 |
| | LA | St. Landry | 13609711 | 109563313 | 127089 | Port Barre Investments LLC | Bobcat Gas Storage Facility | 486210 |
| | LA | St. Landry | 13609711 | 89535813 | 127089 | Port Barre Investments LLC | Bobcat Gas Storage Facility | 486210 |
| | LA | St. Landry | 13609711 | 80516013 | 127089 | Port Barre Investments LLC | Bobcat Gas Storage Facility | 486210 |
| | LA | St. Landry | 13609711 | 109563013 | 127089 | Port Barre Investments LLC | Bobcat Gas Storage Facility | 486210 |
| | LA | St. Landry | 13609711 | 80516313 | 127089 | Port Barre Investments LLC | Bobcat Gas Storage Facility | 486210 |
| | LA | St. Landry | 13609711 | 89535313 | 127089 | Port Barre Investments LLC | Bobcat Gas Storage Facility | 486210 |
| | LA | St. Landry | 13609711 | 99682613 | 127089 | Port Barre Investments LLC | Bobcat Gas Storage Facility | 486210 |
| | LA | Evangeline | 13610811 | 81058113 | 123347 | Pine Prairie Energy Center LLC | Pine Prairie Energy Center LLC - Pine Prairie Energy Center | 486210 |
| | LA | Evangeline | 13610811 | 81058313 | 123347 | Pine Prairie Energy Center LLC | Pine Prairie Energy Center LLC - Pine Prairie Energy Center | 486210 |
| | LA | Evangeline | 13610811 | 81058013 | 123347 | Pine Prairie Energy Center LLC | Pine Prairie Energy Center LLC - Pine Prairie Energy Center | 486210 |
| | LA | Evangeline | 13610811 | 81058213 | 123347 | Pine Prairie Energy Center LLC | Pine Prairie Energy Center LLC - Pine Prairie Energy Center | 486210 |
| | LA | Evangeline | 13610811 | 95034113 | 123347 | Pine Prairie Energy Center LLC | Pine Prairie Energy Center LLC - Pine Prairie Energy Center | 486210 |
| | LA | Evangeline | 13610811 | 95034913 | 123347 | Pine Prairie Energy Center LLC | Pine Prairie Energy Center LLC - Pine Prairie Energy Center | 486210 |
| | LA | Union | 14665711 | 109686913 | 153989 | Midcontinent Express Pipeline LLC | Midcontinent Express Pipeline LLC - Perryville Compressor Station | 486210 |
| | LA | Union | 14665711 | 109686613 | 153989 | Midcontinent Express Pipeline LLC | Midcontinent Express Pipeline LLC - Perryville Compressor Station | 486210 |
| | LA | Jackson | 15081511 | 95088813 | 166495 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Chatham Compressor Station | 486210 |
| | LA | Jackson | 15081511 | 99738113 | 166495 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Chatham Compressor Station | 486210 |
| | LA | Jackson | 15081511 | 99738013 | 166495 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Chatham Compressor Station | 486210 |
| | LA | Jackson | 15081511 | 99737913 | 166495 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Chatham Compressor Station | 486210 |
| | LA | Rapides | 15640611 | 99674213 | 169758 | Acadian Gas Pipeline System | Acadian Gas Pipeline System - Cheneyville Compressor Station | 486210 |
| | LA | Red River | 15641111 | 99702413 | 166496 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Cannisnia Compressor Station | 486210 |
| | LA | Red River | 15641111 | 99702313 | 166496 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Cannisnia Compressor Station | 486210 |
| | LA | Red River | 15641111 | 99702613 | 166496 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Cannisnia Compressor Station | 486210 |
| | LA | Red River | 15641111 | 99702513 | 166496 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Cannisnia Compressor Station | 486210 |
| | LA | Red River | 15641111 | 99702113 | 166496 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Cannisnia Compressor Station | 486210 |
| | LA | Red River | 15641111 | 99702713 | 166496 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Cannisnia Compressor Station | 486210 |
| | LA | Bienville | 15642311 | 99648113 | 166494 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Bienville Compressor Station | 486210 |
| | LA | Bienville | 15642311 | 99649213 | 166494 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Bienville Compressor Station | 486210 |
| | LA | Bienville | 15642311 | 99649113 | 166494 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Bienville Compressor Station | 486210 |
| | LA | Bienville | 15642311 | 99648013 | 166494 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Bienville Compressor Station | 486210 |
| | LA | Bienville | 15642311 | 99648413 | 166494 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Bienville Compressor Station | 486210 |
| | LA | Bienville | 15642311 | 99647913 | 166494 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Bienville Compressor Station | 486210 |
| | LA | Bienville | 15642311 | 99648513 | 166494 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Bienville Compressor Station | 486210 |
| | LA | Bienville | 15642311 | 99648213 | 166494 | ETC Tiger Pipeline LLC | ETC Tiger Pipeline LLC - Bienville Compressor Station | 486210 |
| | LA | Calcasieu | 17969111 | 127574513 | 184545 | Cameron Interstate Pipeline LLC | Cameron Interstate Pipeline LLC - Holbrook Compressor Station | 486210 |
| | LA | Calcasieu | 17969111 | 127575113 | 184545 | Cameron Interstate Pipeline LLC | Cameron Interstate Pipeline LLC - Holbrook Compressor Station | 486210 |
| | LA | Calcasieu | 17969111 | 127575713 | 184545 | Cameron Interstate Pipeline LLC | Cameron Interstate Pipeline LLC - Holbrook Compressor Station | 486210 |
| | LA | Calcasieu | 17969111 | 127574313 | 184545 | Cameron Interstate Pipeline LLC | Cameron Interstate Pipeline LLC - Holbrook Compressor Station | 486210 |
| | LA | Calcasieu | 17969111 | 127574713 | 184545 | Cameron Interstate Pipeline LLC | Cameron Interstate Pipeline LLC - Holbrook Compressor Station | 486210 |
| | LA | Calcasieu | 17969111 | 127575013 | 184545 | Cameron Interstate Pipeline LLC | Cameron Interstate Pipeline LLC - Holbrook Compressor Station | 486210 |
| | MD | Calvert | 5169611 | 87923513 | 009-0021 | Dominion Energy Cove Point LNG, LP | Dominion Energy Cove Point LNG, LP | 486210 |
| | MD | Calvert | 5169611 | 87923613 | 009-0021 | Dominion Energy Cove Point LNG, LP | Dominion Energy Cove Point LNG, LP | 486210 |
| | MD | Calvert | 5169611 | 87923713 | 009-0021 | Dominion Energy Cove Point LNG, LP | Dominion Energy Cove Point LNG, LP | 486210 |
| | MD | Howard | 5997311 | 87954413 | 007-0223 | The Williams Companies Inc | Transcontinental Gas Pipeline | 486210 |
| | MD | Howard | 5997311 | 125594513 | 027-0223 | The Williams Companies Inc | Transcontinental Gas Pipeline | 486210 |
| | MD | Garrett | 6130911 | 87954213 | 023-0081 | Texas Eastern Transmission, LP | Texas Eastern Transmission | 486210 |
| | MI | Clare | 4006811 | 82784313 | N2901 | | Consumers Energy - Muskegon River Compressor Stat | 486210 |
| | MI | Mecosta | 4007011 | 110174913 | N5581 | Na | Great Lakes Gas - Farwell Compressor Station 12 | 486210 |
| | MI | Mecosta | 4190611 | 82829213 | B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| | MI | Mecosta | 4190611 | 82829313 | B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| | MI | Mecosta | 4190611 | 34937013 | B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| | MI | Mecosta | 4190611 | 82828913 | B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| | MI | Mecosta | 4190611 | 34938413 | B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| | MI | Mecosta | 4190611 | 135083213 | B7220 | | ANR Pipeline Co - Woolfolk Compressor Station | 486210 |
| | MI | Kalkaska | 5021311 | 83330413 | B7198 | | ANR Pipeline-Cold Sprng s12 /Blue Lk/ Cold Spngs 1 | 486210 |
| | MI | Kalkaska | 5021311 | 83330213 | B7198 | | ANR Pipeline-Cold Sprng s12 /Blue Lk/ Cold Spngs 1 | 486210 |
| | MI | Kalkaska | 5021311 | 83330313 | B7198 | | ANR Pipeline-Cold Sprng s12 /Blue Lk/ Cold Spngs 1 | 486210 |
| | MI | Montcalm | 5215411 | 25696913 | N5578 | | ANR Pipeline Co - Winfield Compressor Station | 486210 |
| | MI | Montcalm | 5215411 | 25696613 | N5578 | | ANR Pipeline Co - Winfield Compressor Station | 486210 |
| | MI | Montcalm | 5215411 | 25697213 | N5578 | | ANR Pipeline Co - Winfield Compressor Station | 486210 |

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 2 Mi SE of | Holly Ridge | 2200 | HP | 4.761574 |
| Pipeline Transportation of Natural Gas | 1894 Hwy 80 W | Delhi | 1170 | HP | 0.023805 |
| Pipeline Transportation of Natural Gas | 2400 Bayou Rd | St. Bernard | 2900 | HP | 3.6991 |
| Pipeline Transportation of Natural Gas | 2400 Bayou Rd | St. Bernard | 1100 | HP | 3.4766 |
| Pipeline Transportation of Natural Gas | 2400 Bayou Rd | St. Bernard | 1050 | HP | 1.8637 |
| Pipeline Transportation of Natural Gas | 2400 Bayou Rd | St. Bernard | 1100 | HP | 0.8203 |
| Pipeline Transportation of Natural Gas | 2400 Bayou Rd | St. Bernard | 2900 | HP | 0.8103 |
| Pipeline Transportation of Natural Gas | 200 Worthey Rd | West Monroe | 7700 | HP | 5.25 |
| Pipeline Transportation of Natural Gas | 200 Worthey Rd | West Monroe | 7700 | HP | 5 |
| Pipeline Transportation of Natural Gas | 2589 Hwy 554 | Bastrop | 1100 | HP | 20.14594 |
| Pipeline Transportation of Natural Gas | 7666 Hickory Grove Loop | Deville | 1180 | HP | 0.1347 |
| Pipeline Transportation of Natural Gas | 3983 Hwy 107 S | Pineville | 1580 | HP | 20.53519 |
| Pipeline Transportation of Natural Gas | 11383 Hwy 171 | Longville | 3000 | HP | 6.208333 |
| Pipeline Transportation of Natural Gas | 11383 Hwy 171 | Longville | 3400 | HP | 4.414903 |
| Pipeline Transportation of Natural Gas | 10275 Hwy 507 | Bienville | 1200 | HP | 16.9266 |
| Pipeline Transportation of Natural Gas | 10275 Hwy 507 | Bienville | 1200 | HP | 15.2639 |
| Pipeline Transportation of Natural Gas | 10275 Hwy 507 | Bienville | 1200 | HP | 13.8254 |
| Pipeline Transportation of Natural Gas | 10275 Hwy 507 | Bienville | 1200 | HP | 13.0623 |
| Pipeline Transportation of Natural Gas | 407 Hwy 371 | Ringgold | 2700 | HP | 15.15379 |
| Pipeline Transportation of Natural Gas | 407 Hwy 371 | Ringgold | 2700 | HP | 15.13333 |
| Pipeline Transportation of Natural Gas | 407 Hwy 371 | Ringgold | 2700 | HP | 8.768668 |
| Pipeline Transportation of Natural Gas | 407 Hwy 371 | Ringgold | 8180 | HP | 8.3314 |
| Pipeline Transportation of Natural Gas | 5799 Church Point Hwy | Rayne | 1780 | HP | 0.41051 |
| Pipeline Transportation of Natural Gas | 5799 Church Point Hwy | Rayne | 1780 | HP | 0.256535 |
| Pipeline Transportation of Natural Gas | 6172 Hwy 157 S | Haughton | 2350 | HP | 16.60403 |
| Pipeline Transportation of Natural Gas | 6172 Hwy 157 S | Haughton | 5000 | HP | 12.25257 |
| Pipeline Transportation of Natural Gas | 4443 Verot School Rd | Youngsville | 1320 | HP | 15.29346 |
| Pipeline Transportation of Natural Gas | 4443 Verot School Rd | Youngsville | 1320 | HP | 9.108755 |
| Pipeline Transportation of Natural Gas | 4443 Verot School Rd | Youngsville | 2000 | HP | 5.821918 |
| Pipeline Transportation of Natural Gas | 18169 Lee Rd | Franklinton | 6000 | HP | 14.4 |
| Pipeline Transportation of Natural Gas | 18169 Lee Rd | Franklinton | 2700 | HP | 5.23 |
| Pipeline Transportation of Natural Gas | 18169 Lee Rd | Franklinton | 2800 | HP | 4.98 |
| Pipeline Transportation of Natural Gas | 8406 Lower Zachary Rd | Zachary | 2000 | HP | 8.01 |
| Pipeline Transportation of Natural Gas | 8406 Lower Zachary Rd | Zachary | 2000 | HP | 7.85 |
| Pipeline Transportation of Natural Gas | 8406 Lower Zachary Rd | Zachary | 2700 | HP | 7.54 |
| Pipeline Transportation of Natural Gas | 8406 Lower Zachary Rd | Zachary | 6000 | HP | 3.68 |
| Pipeline Transportation of Natural Gas | 8406 Lower Zachary Rd | Zachary | 2000 | HP | 0.8 |
| Pipeline Transportation of Natural Gas | Hwy 964 near | Jackson | 3400 | HP | 16.5 |
| Pipeline Transportation of Natural Gas | Hwy 964 near | Jackson | 2500 | HP | 4.63 |
| Pipeline Transportation of Natural Gas | Hwy 964 near | Jackson | 2620 | HP | 4.02 |
| Pipeline Transportation of Natural Gas | Hwy 964 near | Jackson | 2500 | HP | 3.34 |
| Pipeline Transportation of Natural Gas | Hwy 964 near | Jackson | 2500 | HP | 2.97 |
| Pipeline Transportation of Natural Gas | Hwy 964 near | Jackson | 2500 | HP | 2.92 |
| Pipeline Transportation of Natural Gas | Hwy 964 near | Jackson | 2500 | HP | 1.82 |
| Pipeline Transportation of Natural Gas | Hwy 964 near | Jackson | 2500 | HP | 1.78 |
| Pipeline Transportation of Natural Gas | Hwy 964 near | Jackson | 2620 | HP | 0.71 |
| Pipeline Transportation of Natural Gas | 452 Golf Course Rd | Dubach | 1340 | HP | 1.81 |
| Pipeline Transportation of Natural Gas | 452 Golf Course Rd | Dubach | 2250 | HP | 1.18 |
| Pipeline Transportation of Natural Gas | 452 Golf Course Rd | Dubach | 1340 | HP | 0.14 |
| Pipeline Transportation of Natural Gas | 757 Sharon Rd | Dubach | 2530 | HP | 15.32617 |
| Pipeline Transportation of Natural Gas | 757 Sharon Rd | Dubach | 2530 | HP | 12.67964 |
| Pipeline Transportation of Natural Gas | 757 Sharon Rd | Dubach | 2530 | HP | 12.54754 |
| Pipeline Transportation of Natural Gas | 401 Ida Frage Rd | Evangeline | 13300 | HP | 8.73 |
| Pipeline Transportation of Natural Gas | 401 Ida Frage Rd | Evangeline | 4440 | HP | 7.34 |
| Pipeline Transportation of Natural Gas | 401 Ida Frage Rd | Evangeline | 4440 | HP | 5.45 |
| Pipeline Transportation of Natural Gas | 401 Ida Frage Rd | Evangeline | 4440 | HP | 5.26 |
| Pipeline Transportation of Natural Gas | 401 Ida Frage Rd | Evangeline | 4440 | HP | 3.94 |
| Pipeline Transportation of Natural Gas | 401 Ida Frage Rd | Evangeline | 3130 | HP | 3 |
| Pipeline Transportation of Natural Gas | 401 Ida Frage Rd | Evangeline | 4440 | HP | 2.7 |
| Pipeline Transportation of Natural Gas | 401 Ida Frage Rd | Evangeline | 13300 | HP | 2.56 |
| Pipeline Transportation of Natural Gas | 401 Ida Frage Rd | Evangeline | 3130 | HP | 1.29 |
| Pipeline Transportation of Natural Gas | 6576 Hwy 3140 | Sorrento | 2200 | HP | 9.78 |
| Pipeline Transportation of Natural Gas | 6576 Hwy 3140 | Sorrento | 2200 | HP | 7.53 |
| Pipeline Transportation of Natural Gas | 6576 Hwy 3140 | Sorrento | 2200 | HP | 6.46 |
| Pipeline Transportation of Natural Gas | 309 Worthy Rd | West Monroe | 2620 | HP | 11.9 |
| Pipeline Transportation of Natural Gas | 309 Worthy Rd | West Monroe | 2620 | HP | 8.48 |
| Pipeline Transportation of Natural Gas | 309 Worthy Rd | West Monroe | 2620 | HP | 1.84 |
| Pipeline Transportation of Natural Gas | 195 Hwy 504 | Natchitoches | 8000 | HP | 11.6094 |
| Pipeline Transportation of Natural Gas | 195 Hwy 504 | Natchitoches | 8000 | HP | 9.5466 |
| Pipeline Transportation of Natural Gas | 1282 Hwy 70 S | Belle Rose | 2650 | HP | 5 |
| Pipeline Transportation of Natural Gas | 1282 Hwy 70 S | Belle Rose | 2650 | HP | 5 |
| Pipeline Transportation of Natural Gas | 1282 Hwy 70 S | Belle Rose | 2650 | HP | 3.89 |
| Pipeline Transportation of Natural Gas | 1282 Hwy 70 S | Belle Rose | 2650 | HP | 3.89 |
| Pipeline Transportation of Natural Gas | 1282 Hwy 70 S | Belle Rose | 4450 | HP | 1.3 |
| Pipeline Transportation of Natural Gas | 6283 Hwy 996 | Belle Rose | 4740 | HP | 13.20073 |
| Pipeline Transportation of Natural Gas | 6283 Hwy 996 | Belle Rose | 4740 | HP | 12.17485 |
| Pipeline Transportation of Natural Gas | 19210 Hwy 190 | Port Barre | 4740 | HP | 6.72 |
| Pipeline Transportation of Natural Gas | 19210 Hwy 190 | Port Barre | 4740 | HP | 5.97 |
| Pipeline Transportation of Natural Gas | 19210 Hwy 190 | Port Barre | 4740 | HP | 4.95 |
| Pipeline Transportation of Natural Gas | 19210 Hwy 190 | Port Barre | 4740 | HP | 4.83 |
| Pipeline Transportation of Natural Gas | 19210 Hwy 190 | Port Barre | 4740 | HP | 4.75 |
| Pipeline Transportation of Natural Gas | 19210 Hwy 190 | Port Barre | 4740 | HP | 2.64 |
| Pipeline Transportation of Natural Gas | 19210 Hwy 190 | Port Barre | 4740 | HP | 2.53 |
| Pipeline Transportation of Natural Gas | 19210 Hwy 190 | Port Barre | 4740 | HP | 1.5 |
| Pipeline Transportation of Natural Gas | 19210 Hwy 190 | Port Barre | 4740 | HP | 1.39 |
| Pipeline Transportation of Natural Gas | 19210 Hwy 190 | Port Barre | 4740 | HP | 1.3 |
| Pipeline Transportation of Natural Gas | 19210 Hwy 190 | Port Barre | 1880 | HP | 0.01 |
| Pipeline Transportation of Natural Gas | 15 Mi N of Eunice & 1 Mi W of | Easton | 7720 | HP | 16.12465 |
| Pipeline Transportation of Natural Gas | 15 Mi N of Eunice & 1 Mi W of | Easton | 7720 | HP | 11.68431 |
| Pipeline Transportation of Natural Gas | 15 Mi N of Eunice & 1 Mi W of | Easton | 7720 | HP | 10.79232 |
| Pipeline Transportation of Natural Gas | 15 Mi N of Eunice & 1 Mi W of | Easton | 7720 | HP | 7.900735 |
| Pipeline Transportation of Natural Gas | 15 Mi N of Eunice & 1 Mi W of | Easton | 7800 | HP | 6.575523 |
| Pipeline Transportation of Natural Gas | 15 Mi N of Eunice & 1 Mi W of | Easton | 7800 | HP | 5.190358 |
| Pipeline Transportation of Natural Gas | Mashaw Dr, W of Hwy 2 | Farmerville | 8180 | HP | 18.23 |
| Pipeline Transportation of Natural Gas | Mashaw Dr, W of Hwy 2 | Farmerville | 1190 | HP | 0.26 |
| Pipeline Transportation of Natural Gas | off Hwy 146, 2.12 Mi NW of | Chatham | 4735 | HP | 9.72 |
| Pipeline Transportation of Natural Gas | off Hwy 146, 2.12 Mi NW of | Chatham | 4740 | HP | 5.88 |
| Pipeline Transportation of Natural Gas | off Hwy 146, 2.12 Mi NW of | Chatham | 4740 | HP | 4.81 |
| Pipeline Transportation of Natural Gas | off Hwy 146, 2.12 Mi NW of | Chatham | 1480 | HP | 0.06 |
| Pipeline Transportation of Natural Gas | .8 Mi N of Bayou Rd & Jeff Horn Rd | Cheneyville | 2889 | HP | 0.0827 |
| Pipeline Transportation of Natural Gas | PR 410, 4.57 Mi NW of | Williams | 1480 | HP | 0.041 |
| Pipeline Transportation of Natural Gas | PR 410, 4.57 Mi NW of | Williams | 8180 | HP | 0.035 |
| Pipeline Transportation of Natural Gas | PR 410, 4.57 Mi NW of | Williams | 4740 | HP | 0.019 |
| Pipeline Transportation of Natural Gas | PR 410, 4.57 Mi NW of | Williams | 8180 | HP | 0.016 |
| Pipeline Transportation of Natural Gas | PR 410, 4.57 Mi NW of | Williams | 8180 | HP | 0.012 |
| Pipeline Transportation of Natural Gas | PR 410, 4.57 Mi NW of | Williams | 4740 | HP | 0.012 |
| Pipeline Transportation of Natural Gas | off PR 496, 2.44 Mi NW of | Lucky | 8180 | HP | 12.301 |
| Pipeline Transportation of Natural Gas | off PR 496, 2.44 Mi NW of | Lucky | 8180 | HP | 11.588 |
| Pipeline Transportation of Natural Gas | off PR 496, 2.44 Mi NW of | Lucky | 8180 | HP | 11.583 |
| Pipeline Transportation of Natural Gas | off PR 496, 2.44 Mi NW of | Lucky | 8180 | HP | 8.09 |
| Pipeline Transportation of Natural Gas | off PR 496, 2.44 Mi NW of | Lucky | 8180 | HP | 7.894 |
| Pipeline Transportation of Natural Gas | off PR 496, 2.44 Mi NW of | Lucky | 4740 | HP | 4.21 |
| Pipeline Transportation of Natural Gas | off PR 496, 2.44 Mi NW of | Lucky | 4740 | HP | 2.435 |
| Pipeline Transportation of Natural Gas | off PR 496, 2.44 Mi NW of | Lucky | 1980 | HP | 0.234 |
| Pipeline Transportation of Natural Gas | 9.6 Mi NW of | Moss Bluff | 4500 | BHP | 2.6 |
| Pipeline Transportation of Natural Gas | 9.6 Mi NW of | Moss Bluff | 4500 | BHP | 2.59 |
| Pipeline Transportation of Natural Gas | 9.6 Mi NW of | Moss Bluff | 4500 | BHP | 2.38 |
| Pipeline Transportation of Natural Gas | 9.6 Mi NW of | Moss Bluff | 4500 | BHP | 2.25 |
| Pipeline Transportation of Natural Gas | 9.6 Mi NW of | Moss Bluff | 4500 | BHP | 2.08 |
| Pipeline Transportation of Natural Gas | 9.6 Mi NW of | Moss Bluff | 4500 | BHP | 2.08 |
| Pipeline Transportation of Natural Gas | 9.6 Mi NW of | Moss Bluff | 4500 | BHP | 2.07 |
| Pipeline Transportation of Natural Gas | 2100 Cove Point Road | Lusby | 1175 | HP | 0 |
| Pipeline Transportation of Natural Gas | 2100 Cove Point Road | Lusby | 1175 | HP | 0 |
| Pipeline Transportation of Natural Gas | 2100 Cove Point Road | Lusby | 1032 | HP | 0 |
| Pipeline Transportation of Natural Gas | 11910 Carroll Mill Rd | Ellicott City | 1480 | HP | 0.102 |
| Pipeline Transportation of Natural Gas | 11910 Carroll Mill Rd | Ellicott City | 1450 | BHP | 0.102 |
| Pipeline Transportation of Natural Gas | 196 Texas Eastern Dr | Accident | 5500 | HP | 15.36516 |
| Pipeline Transportation of Natural Gas | 8613  Pine Rd. | CHURCH BRIDGE | 3450 | HP | 0 |
| Pipeline Transportation of Natural Gas | 3400  HICKORY RD | LAKE GEORGE | 1053 | HP | 0.504 |
| Pipeline Transportation of Natural Gas | 11039  150th Ave. | BIG RAPIDS | 1000 | HP | 17.9 |
| Pipeline Transportation of Natural Gas | 11039  150th Ave. | BIG RAPIDS | 1000 | HP | 17.57 |
| Pipeline Transportation of Natural Gas | 11039  150th Ave. | BIG RAPIDS | 11000 | HP | 16.42 |
| Pipeline Transportation of Natural Gas | 11039  150th Ave. | BIG RAPIDS | 1000 | HP | 12.46 |
| Pipeline Transportation of Natural Gas | 11039  150th Ave. | BIG RAPIDS | 4000 | HP | 10.93 |
| Pipeline Transportation of Natural Gas | 11039  150th Ave. | BIG RAPIDS | 4000 | HP | 0.23705 |
| Pipeline Transportation of Natural Gas | 10000  Pfum Rd. | MANCELONA | 1120 | HP | 5.26 |
| Pipeline Transportation of Natural Gas | 10000  Pfum Rd. | MANCELONA | 3750 | HP | 5.085 |
| Pipeline Transportation of Natural Gas | 10000  Pfum Rd. | MANCELONA | 3750 | HP | 2.539 |
| Pipeline Transportation of Natural Gas | 21453  Tamarack Rd. | HOWARD CITY | 1500 | HP | 18.66 |
| Pipeline Transportation of Natural Gas | 21453  Tamarack Rd. | HOWARD CITY | 1500 | HP | 9.02 |
| Pipeline Transportation of Natural Gas | 21453  Tamarack Rd. | HOWARD CITY | 1500 | HP | 0 |

| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |

**502a**

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | MI | Kalkaska | 5636511 | 19992613 N3341 | Na | | DTE Gas Company - Kalkaska Compressor Station | 486210 |
| | MI | Kalkaska | 5636511 | 19992513 N3341 | | | DTE Gas Company - Kalkaska Compressor Station | 486210 |
| | MI | Kalkaska | 5636511 | 19992413 N3341 | Na | | DTE Gas Company - Kalkaska Compressor Station | 486210 |
| | MI | Macomb | 5703111 | 110173153 86636 | | | Consumers Energy - Ray Compressor Station | 486210 |
| | MI | Macomb | 5703111 | 112731513 86636 | | | Consumers Energy - Ray Compressor Station | 486210 |
| | MI | Macomb | 5703111 | 110172413 86636 | | | Consumers Energy - Ray Compressor Station | 486210 |
| | MI | Macomb | 5703111 | 23061313 86636 | | | Consumers Energy - Ray Compressor Station | 486210 |
| | MI | Macomb | 5703511 | 23059113 88337 | | | ANR Pipeline Co.-Muttonville Compressor Station | 486210 |
| | MI | Allegan | 5766211 | 20398513 N5574 | Na | | ANR Pipeline Company - Hamilton Compressor Station | 486210 |
| | MI | Allegan | 5766311 | 112748513 N5792 | Na | | Consumers Energy - Overisel Compressor Station | 486210 |
| | MI | Oakland | 6106911 | 99481513 87221 | Na | | DTE Gas Company - Milford Compressor Station | 486210 |
| | MI | Oakland | 6106911 | 99481713 87221 | | | DTE Gas Company - Milford Compressor Station | 486210 |
| | MI | Oakland | 6106911 | 99481613 87221 | Na | | DTE Gas Company - Milford Compressor Station | 486210 |
| | MI | Oakland | 6106911 | 135083613 87221 | | | DTE Gas Company - Milford Compressor Station | 486210 |
| | MI | Ogemaw | 6224411 | 82712113 N6764 | Na | | DCP West Branch Compressor Stn | 486210 |
| | MI | Ogemaw | 6224411 | 82711913 N6764 | | | DCP West Branch Compressor Stn | 486210 |
| | MI | Ogemaw | 6224411 | 82712013 N6764 | | | DCP West Branch Compressor Stn | 486210 |
| | MI | Ogemaw | 6224411 | 82711813 N6764 | Na | | DCP West Branch Compressor Stn | 486210 |
| | MI | Osceola | 6225611 | 15849513 B3721 | | | ANR Pipeline - Reed City Compressor Station | 486210 |
| | MI | Osceola | 6225611 | 15849313 B3721 | Na | | ANR Pipeline - Reed City Compressor Station | 486210 |
| | MI | Otsego | 6317011 | 16404713 B7390 | | | ANR Pipeline - Central Charlton Compressor Station | 486210 |
| | MI | Otsego | 6318211 | 82778313 N2940 | | | DCP Antrim Gas LLC | 486210 |
| | MI | Otsego | 6318211 | 82778113 N2940 | | | DCP Antrim Gas LLC | 486210 |
| | MI | Otsego | 6318211 | 82778413 N2940 | | | DCP Antrim Gas LLC | 486210 |
| | MI | Otsego | 6318211 | 82778213 N2940 | | | DCP Antrim Gas LLC | 486210 |
| | MI | St. Clair | 6343111 | 82765113 N5889 | | | SEMCO ENERGY Gas Company - Morton Wells Facility | 486210 |
| | MI | St. Clair | 6343111 | 112749053 N5989 | | | SEMCO ENERGY Gas Company - Morton Wells Facility | 486210 |
| | MI | St. Clair | 6343211 | 110164313 N6317 | Na | | SEMCO ENERGY Gas Company - Collin Field | 486210 |
| | MI | St. Clair | 6343211 | 110164213 N6317 | Na | | SEMCO ENERGY Gas Company - Collin Field | 486210 |
| | MI | St. Joseph | 6358811 | 107270513 N5573 | | | Consumers Energy - White Pigeon Compressor Station | 486210 |
| | MI | St. Joseph | 6358811 | 94624713 N5573 | | | Consumers Energy - White Pigeon Compressor Station | 486210 |
| | MI | Ingham | 6511011 | 17441913 N3022 | Na | | Eaton Rapids Gas Storage System | 486210 |
| | MI | Ingham | 6511011 | 17441213 N3022 | Na | | Eaton Rapids Gas Storage System | 486210 |
| | MI | Ingham | 6511011 | 17441513 N3022 | | | Eaton Rapids Gas Storage System | 486210 |
| | MI | Washtenaw | 6941411 | 125782713 N3920 | | | Consumers Energy - Freedom Compressor Station | 486210 |
| | MI | St. Clair | 7011411 | 127672413 86637 | | | Consumers Energy - St. Clair Compressor Station | 486210 |
| | MI | St. Clair | 7011411 | 127672113 86637 | | | Consumers Energy - St. Clair Compressor Station | 486210 |
| | MI | St. Clair | 7011411 | 82667513 86637 | | | Consumers Energy - St. Clair Compressor Station | 486210 |
| | MI | Otsego | 8146511 | 69725513 B7219 | | | ANR Pipeline Co. South Chester Compressor Station | 486210 |
| | MI | Berrien | 8195311 | 66666513 N5575 | Na | | ANR Pipeline Company - Bridgman Compressor Station | 486210 |
| | MI | Clare | 8246111 | 6498413 N5586 | Na | | ANR Pipeline Company Lincoln Compressor Station | 486210 |
| | MI | Washtenaw | 14740511 | 135102713 N7421 | | | DTE Gas Company - Willow Run Compressor Station | 486210 |
| | MI | Washtenaw | 14740511 | 135102513 N7421 | | | DTE Gas Company - Willow Run Compressor Station | 486210 |
| | MI | Washtenaw | 14740511 | 135102613 N7421 | | | DTE Gas Company - Willow Run Compressor Station | 486210 |
| | MI | Washtenaw | 14740511 | 90067713 N7421 | | | DTE Gas Company - Willow Run Compressor Station | 486210 |
| | MI | Washtenaw | 14740511 | 127687113 N7421 | | | DTE Gas Company - Willow Run Compressor Station | 486210 |
| | MO | Nodaway | 5255011 | 24939713 0024 | | | ANR PIPELINE COMPANY - TRANSCANADA CORP MAITLAND COMPRESSOR STATION | 486210 |
| | MO | Butler | 6321411 | 16017413 0042 | Na | | ENABLE MISSISSIPPI RIVER TRANS, LLC POPLAR BLUFF COMPRESSOR STATION | 486210 |
| | MO | Butler | 6321411 | 16017313 0042 | Na | | ENABLE MISSISSIPPI RIVER TRANS, LLC POPLAR BLUFF COMPRESSOR STATION | 486210 |
| | MO | Butler | 6321411 | 16017513 0042 | Na | | ENABLE MISSISSIPPI RIVER TRANS, LLC POPLAR BLUFF COMPRESSOR STATION | 486210 |
| | MO | Butler | 6321411 | 16017213 0042 | Na | | ENABLE MISSISSIPPI RIVER TRANS, LLC POPLAR BLUFF COMPRESSOR STATION | 486210 |
| | MO | Bollinger | 7164311 | 14386113 0019 | | | PANHANDLE EASTERN PIPE LINE CO HOUSTONIA | 486210 |
| | MO | Cass | 7358811 | 10996413 0048 | Na | | NATURAL GAS PIPELINE COMPANY STATION 309 | 486210 |
| | MO | Cass | 7358811 | 10996713 0048 | Na | | PECULIAR SOUTHERN STAR CENTRAL PECULIAR COMPRESSOR STATION | 486210 |
| | MO | Ste. Genevieve | 7391111 | 10923613 0024 | Na | | PECULIAR SOUTHERN STAR CENTRAL PECULIAR COMPRESSOR STATION | 486210 |
| | MO | Ste. Genevieve | 7391111 | 10923513 0024 | | | ENABLE MISSISSIPPI RIVER TRANS, LLC. STE. GENEVIEVE COMPRESSOR STATION | 486210 |
| | MS | Union | 6283711 | 16454113 2814500019 | A008213 | | TENNESSEE GAS PIPELINE COMPANY, NEW ALBA | 48621 |
| | MS | Union | 6283711 | 16454613 2814500019 | A008213 | | TENNESSEE GAS PIPELINE COMPANY, NEW ALBA | 48621 |
| | MS | Union | 6283711 | 16453713 2814500019 | A008213 | | TENNESSEE GAS PIPELINE COMPANY, NEW ALBA | 48621 |
| | MS | Union | 6283711 | 16454513 2814500019 | A008213 | | TENNESSEE GAS PIPELINE COMPANY, NEW ALBA | 48621 |
| | MS | Union | 6283711 | 16453913 2814500019 | A008213 | | TENNESSEE GAS PIPELINE COMPANY, NEW ALBA | 48621 |
| | MS | Union | 6283711 | 16454413 2814500019 | A008213 | | TENNESSEE GAS PIPELINE COMPANY, NEW ALBA | 48621 |
| | MS | Union | 6283711 | 16454813 2814500019 | A008213 | | TENNESSEE GAS PIPELINE COMPANY, NEW ALBA | 48621 |
| | MS | Union | 6283711 | 16454713 2814500019 | A008213 | | TENNESSEE GAS PIPELINE COMPANY, NEW ALBA | 48621 |
| | MS | Walthall | 6284611 | 16647613 2814700031 | A007097 | | GULF SOUTH PIPELINE COMPANY LLC, MCCOMB | 48621 |
| | MS | Alcorn | 6316811 | 16406113 2800300028 | A000276 | | COLUMBIA GULF TRANSMISSION, CORINTH COMP | 48621 |
| | MS | Alcorn | 6316811 | 16406313 2800300028 | A000276 | | COLUMBIA GULF TRANSMISSION, CORINTH COMP | 48621 |
| | MS | Alcorn | 6316811 | 16408213 2800300028 | A000276 | | COLUMBIA GULF TRANSMISSION, CORINTH COMP | 48621 |
| | MS | Alcorn | 6316811 | 16405413 2800300028 | A000276 | | COLUMBIA GULF TRANSMISSION, CORINTH COMP | 48621 |
| | MS | Coahoma | 6320811 | 16386513 2802700008 | A001272 | | TEXAS GAS TRANSMISSION LLC, CLARKSDALE | 48621 |
| | MS | Forrest | 6933511 | 14316813 2803500023 | A004957 | | TENNESSEE GAS PIPELINE COMPANY LLC, PURV | 48621 |
| | MS | Forrest | 6933511 | 14316713 2803500023 | A004957 | | TENNESSEE GAS PIPELINE COMPANY LLC, PURV | 48621 |
| | MS | Forrest | 6933511 | 14316213 2803500023 | A004957 | | TENNESSEE GAS PIPELINE COMPANY LLC, PURV | 48621 |
| | MS | Forrest | 6933511 | 14316513 2803500023 | A004957 | | TENNESSEE GAS PIPELINE COMPANY LLC, PURV | 48621 |
| | MS | Forrest | 6933511 | 14316313 2803500023 | A004957 | | TENNESSEE GAS PIPELINE COMPANY LLC, PURV | 48621 |
| | MS | Yazoo | 6949411 | 14722213 2816300046 | A005204 | | SOUTHERN NATURAL GAS COMPANY LLC, PICKEN | 48621 |
| | MS | Yazoo | 6949411 | 14721913 2816300046 | A005204 | | SOUTHERN NATURAL GAS COMPANY LLC, PICKEN | 48621 |
| | MS | Humphreys | 6967811 | 13982913 2805300003 | A002353 | | TENNESSEE GAS PIPELINE COMPANY LLC, ISOL | 48621 |
| | MS | Humphreys | 6967811 | 13984213 2805300003 | A002353 | | TENNESSEE GAS PIPELINE COMPANY LLC, ISOL | 48621 |
| | MS | Humphreys | 6967811 | 13983513 2805300003 | A002353 | | TENNESSEE GAS PIPELINE COMPANY LLC, ISOL | 48621 |
| | MS | Humphreys | 6967811 | 13984113 2805300003 | A002353 | | TENNESSEE GAS PIPELINE COMPANY LLC, ISOL | 48621 |
| | MS | Humphreys | 6967811 | 13983913 2805300003 | A002353 | | TENNESSEE GAS PIPELINE COMPANY LLC, ISOL | 48621 |
| | MS | Humphreys | 6967811 | 13983813 2805300003 | A002353 | | TENNESSEE GAS PIPELINE COMPANY LLC, ISOL | 48621 |
| | MS | Humphreys | 6967811 | 13984313 2805300003 | A002353 | | TENNESSEE GAS PIPELINE COMPANY LLC, ISOL | 48621 |
| | MS | Humphreys | 6967811 | 13984013 2805300003 | A002353 | | TENNESSEE GAS PIPELINE COMPANY LLC, ISOL | 48621 |
| | MS | Humphreys | 6967811 | 13983713 2805300003 | A002353 | | TENNESSEE GAS PIPELINE COMPANY LLC, ISOL | 48621 |
| | MS | Humphreys | 6967911 | 13982813 2805300020 | A002346 | | COLUMBIA GULF TRANSMISSION LLC, INVERNES | 48621 |
| | MS | Humphreys | 6967911 | 13982713 2805300020 | A002346 | | COLUMBIA GULF TRANSMISSION LLC, INVERNES | 48621 |
| | MS | Humphreys | 6967911 | 13981913 2805300020 | A002346 | | COLUMBIA GULF TRANSMISSION LLC, INVERNES | 48621 |
| | MS | Humphreys | 6967911 | 13982513 2805300020 | A002346 | | COLUMBIA GULF TRANSMISSION LLC, INVERNES | 48621 |
| | MS | Jefferson | 7035611 | 14212213 2806300014 | A006618 | | TEXAS EASTERN TRANSMISSION LP, UNION CHU | 48621 |
| | MS | Jones | 7035911 | 14206213 2806700010 | A005117 | | TRANSCONTINENTAL GAS PIPE LINE COMPANY L | 48621 |
| | MS | Attala | 7036411 | 14203513 2800700029 | A002073 | | TEXAS EASTERN TRANSMISSION CORPORATION, | 48621 |
| | MS | Attala | 7036411 | 14203113 2800700029 | A002073 | | TEXAS EASTERN TRANSMISSION CORPORATION, | 48621 |
| | MS | Attala | 7036411 | 14204613 2800700029 | A002073 | | TEXAS EASTERN TRANSMISSION CORPORATION, | 48621 |
| | MS | Attala | 7036411 | 14204913 2800700029 | A002073 | | TEXAS EASTERN TRANSMISSION CORPORATION, | 48621 |
| | MS | Attala | 7036411 | 14204213 2800700029 | A002073 | | TEXAS EASTERN TRANSMISSION CORPORATION, | 48621 |
| | MS | Attala | 7036411 | 14204813 2800700029 | A002073 | | TEXAS EASTERN TRANSMISSION CORPORATION, | 48621 |
| | MS | Attala | 7036411 | 14204513 2800700029 | A002073 | | TEXAS EASTERN TRANSMISSION CORPORATION, | 48621 |
| | MS | Attala | 7036411 | 14203413 2800700029 | A002073 | | TEXAS EASTERN TRANSMISSION CORPORATION, | 48621 |
| | MS | Attala | 7036411 | 14205113 2800700029 | A002073 | | TEXAS EASTERN TRANSMISSION CORPORATION, | 48621 |
| | MS | Attala | 7036411 | 14202913 2800700029 | A002073 | | TEXAS EASTERN TRANSMISSION CORPORATION, | 48621 |
| | MS | Attala | 7036411 | 14204413 2800700029 | A002073 | | TEXAS EASTERN TRANSMISSION CORPORATION, | 48621 |
| | MS | Attala | 7036411 | 14204713 2800700029 | A002073 | | TEXAS EASTERN TRANSMISSION CORPORATION, | 48621 |
| | MS | Bolivar | 7037511 | 14198013 2801100081 | A000645 | | TRUNKLINE GAS COMPANY, SHAW COMPRESSOR S | 48621 |
| | MS | Bolivar | 7037511 | 14198213 2801100081 | A000645 | | TRUNKLINE GAS COMPANY, SHAW COMPRESSOR S | 48621 |
| | MS | Bolivar | 7037511 | 14198313 2801100081 | A000645 | | TRUNKLINE GAS COMPANY, SHAW COMPRESSOR S | 48621 |
| | MS | Bolivar | 7037511 | 14197913 2801100081 | A000645 | | TRUNKLINE GAS COMPANY, SHAW COMPRESSOR S | 48621 |
| | MS | Bolivar | 7037511 | 14198413 2801100081 | A000645 | | TRUNKLINE GAS COMPANY, SHAW COMPRESSOR S | 48621 |
| | MS | Bolivar | 7037511 | 14198113 2801100081 | A000645 | | TRUNKLINE GAS COMPANY, SHAW COMPRESSOR S | 48621 |
| | MS | Calhoun | 7051611 | 14195313 2801300005 | A000699 | | COLUMBIA GULF TRANSMISSION, BANNER COMPR | 48621 |
| | MS | Calhoun | 7051611 | 14194913 2801300005 | A000699 | | COLUMBIA GULF TRANSMISSION, BANNER COMPR | 48621 |
| | MS | Calhoun | 7051611 | 14195413 2801300005 | A000699 | | COLUMBIA GULF TRANSMISSION, BANNER COMPR | 48621 |
| | MS | Washington | 7083711 | 14481113 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14481213 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14481613 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14482413 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14481813 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14482113 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14481713 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14482213 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14482513 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14484713 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14482313 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14484813 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14481513 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14484613 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 14481413 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Washington | 7083711 | 66600913 2815100037 | A002354 | | TENNESSEE GAS PIPELINE COMPANY LLC, GREE | 48621 |
| | MS | Winston | 7100711 | 14461713 2815900008 | A008007 | | SOUTHERN NATURAL GAS COMPANY LLC, LOUISV | 48621 |
| | MS | Winston | 7100711 | 14461413 2815900008 | A008007 | | SOUTHERN NATURAL GAS COMPANY LLC, LOUISV | 48621 |
| | MS | Winston | 7100711 | 14461313 2815900008 | A008007 | | SOUTHERN NATURAL GAS COMPANY LLC, LOUISV | 48621 |
| | MS | Winston | 7100711 | 14460313 2815900008 | A008007 | | SOUTHERN NATURAL GAS COMPANY LLC, LOUISV | 48621 |
| | MS | Sharkey | 7291111 | 11106513 2812700022 | A009474 | | SOUTHERN NATURAL GAS COMPANY LLC, ONWARD | 48621 |
| | MS | Sharkey | 7291111 | 11106113 2812700022 | A009474 | | SOUTHERN NATURAL GAS COMPANY LLC, ONWARD | 48621 |
| | MS | Simpson | 12585611 | 63802313 2812700071 | A035282 | | GULF SOUTH PIPELINE COMPANY LLC, HARRISV | 48621 |
| | MS | Simpson | 12585611 | 63802113 2812700071 | A035282 | | GULF SOUTH PIPELINE COMPANY LLC, HARRISV | 48621 |
| | MS | Simpson | 12585611 | 63802013 2812700071 | A035282 | | GULF SOUTH PIPELINE COMPANY LLC, HARRISV | 48621 |
| | MS | Simpson | 12585611 | 63802213 2812700071 | A035282 | | GULF SOUTH PIPELINE COMPANY LLC, HARRISV | 48621 |

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 1250 MichCon Lane | KALKASKA | 2700 | HP | 12.415 |
| Pipeline Transportation of Natural Gas | 1250 MichCon Lane | KALKASKA | 2700 | HP | 8.985 |
| Pipeline Transportation of Natural Gas | 1250 MichCon Lane | KALKASKA | 2700 | HP | 1.441 |
| Pipeline Transportation of Natural Gas | 69333 OMD RD. | ARMADA | 4735 | HP | 14.32 |
| Pipeline Transportation of Natural Gas | 69333 OMD RD. | ARMADA | 1085 | HP | 0.1552 |
| Pipeline Transportation of Natural Gas | 69333 OMD RD. | ARMADA | 1818 | HP | 0.035095 |
| Pipeline Transportation of Natural Gas | 69333 OMD RD. | ARMADA | 6000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 36555  29 MILE RD. | MUTTONVILLE | 3200 | HP | 0.886 |
| Pipeline Transportation of Natural Gas | 4193  134th Ave | HAMILTON | 1550 | HP | 19.34 |
| Pipeline Transportation of Natural Gas | 4131 138th Ave. | HAMILTON | 1462 | HP | 0.04643 |
| Pipeline Transportation of Natural Gas | 3515  CHILDS LAKE RD. | MILFORD | 4000 | HP | 13.255 |
| Pipeline Transportation of Natural Gas | 3515  CHILDS LAKE RD. | MILFORD | 4000 | HP | 4.0665 |
| Pipeline Transportation of Natural Gas | 3515  CHILDS LAKE RD. | MILFORD | 4000 | HP | 2.1285 |
| Pipeline Transportation of Natural Gas | 3515  CHILDS LAKE RD. | MILFORD | 1818 | HP | 0.01554 |
| Pipeline Transportation of Natural Gas | M-55 West of Simmons Rd | WEST BRANCH | 1305 | BHP | 0.987 |
| Pipeline Transportation of Natural Gas | M-55 West of Simmons Rd | WEST BRANCH | 1305 | BHP | 0.8065 |
| Pipeline Transportation of Natural Gas | M-55 West of Simmons Rd | WEST BRANCH | 1305 | BHP | 0.6845 |
| Pipeline Transportation of Natural Gas | M-55 West of Simmons Rd | WEST BRANCH | 1305 | BHP | 0.452 |
| Pipeline Transportation of Natural Gas | 7677  230th Ave. | REED CITY | 2000 | HP | 20.895 |
| Pipeline Transportation of Natural Gas | 7677  230th Ave. | REED CITY | 1000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 14490 Beckett Road | JOHANNESBURG | 4000 | HP | 7.005 |
| Pipeline Transportation of Natural Gas | 6250  OLD STATE RD | JOHANNESBURG | 1150 | HP | 0.891 |
| Pipeline Transportation of Natural Gas | 6250  OLD STATE RD | JOHANNESBURG | 1150 | HP | 0.5675 |
| Pipeline Transportation of Natural Gas | 6250  OLD STATE RD | JOHANNESBURG | 1150 | HP | 0.061 |
| Pipeline Transportation of Natural Gas | 6250  OLD STATE RD | JOHANNESBURG | 1150 | HP | 0 |
| Pipeline Transportation of Natural Gas | 1100 GRATIOT AVE | MARYSVILLE | 1340 | HP | 3.387 |
| Pipeline Transportation of Natural Gas | 1100 GRATIOT AVE | MARYSVILLE | 1380 | HP | 1.0065 |
| Pipeline Transportation of Natural Gas | ANGLING RD | STARRVILLE | 1000 | BHP | 0.6825 |
| Pipeline Transportation of Natural Gas | ANGLING RD | STARRVILLE | 1000 | BHP | 0.019975 |
| Pipeline Transportation of Natural Gas | 68536  A ROAD, ROUTE 1 | WHITE PIGEON | 4735 | HP | 10.475 |
| Pipeline Transportation of Natural Gas | 68536  A ROAD, ROUTE 1 | WHITE PIGEON | 1818 | HP | 0.02311 |
| Pipeline Transportation of Natural Gas | 3349 S Waverly Rd | EATON RAPIDS | 2650 | HP | 15.89 |
| Pipeline Transportation of Natural Gas | 3349 S Waverly Rd | EATON RAPIDS | 2650 | HP | 15.605 |
| Pipeline Transportation of Natural Gas | 3349 S Waverly Rd | EATON RAPIDS | 2650 | HP | 2.4245 |
| Pipeline Transportation of Natural Gas | 12201  PLEASANT LAKE RD | MANCHESTER | 1818 | HP | 5.585 |
| Pipeline Transportation of Natural Gas | 10021  MARINE CITY HWY. | IRA TWP | 4835 | HP | 12.14 |
| Pipeline Transportation of Natural Gas | 10021  MARINE CITY HWY. | IRA TWP | 2000 | HP | 0.02603 |
| Pipeline Transportation of Natural Gas | 10021  MARINE CITY HWY. | IRA TWP | 4000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 6327  Old State Rd. | JOHANNESBURG | 3600 | HP | 20.005 |
| Pipeline Transportation of Natural Gas | 3372  Browntown Rd | BRIDGMAN | 1550 | HP | 10.865 |
| Pipeline Transportation of Natural Gas | 3991  S. Hickory | LAKE GEORGE | 3200 | HP | 0.744 |
| Pipeline Transportation of Natural Gas | 3020 East Michigan Avenue | YPSILANTI | 5000 | HP | 0.848 |
| Pipeline Transportation of Natural Gas | 3020 East Michigan Avenue | YPSILANTI | 2500 | HP | 0.7265 |
| Pipeline Transportation of Natural Gas | 3020 East Michigan Avenue | YPSILANTI | 2500 | HP | 0.599 |
| Pipeline Transportation of Natural Gas | 3020 East Michigan Avenue | YPSILANTI | 4735 | HP | 0.46685 |
| Pipeline Transportation of Natural Gas | 3020 East Michigan Avenue | YPSILANTI | 1818 | HP | 0.03683 |
| Pipeline Transportation of Natural Gas | 33854 COUNTY ROAD TT | GRAHAM | 2700 | HP | 20.3856 |
| Pipeline Transportation of Natural Gas | 4011 TOWNSHIP LINE RD | POPLAR BLUFF | 1000 | HP | 9.2166 |
| Pipeline Transportation of Natural Gas | 4011 TOWNSHIP LINE RD | POPLAR BLUFF | 1000 | HP | 7.3898 |
| Pipeline Transportation of Natural Gas | 4011 TOWNSHIP LINE RD | POPLAR BLUFF | 1000 | HP | 5.0452 |
| Pipeline Transportation of Natural Gas | 4011 TOWNSHIP LINE RD | POPLAR BLUFF | 1000 | HP | 4.8979 |
| Pipeline Transportation of Natural Gas | 16076 HIGHWAY T | LAMONTE | 2000 | HP | 15.8054 |
| Pipeline Transportation of Natural Gas | 8000 HIGHWAY 34 | MARBLE HILL | 2800 | HP | 0.0126 |
| Pipeline Transportation of Natural Gas | 24304 SOUTH HARPER | PECULIAR | 2000 | HP | 2.4567 |
| Pipeline Transportation of Natural Gas | 24304 SOUTH HARPER | PECULIAR | 2000 | HP | 1.6588 |
| Pipeline Transportation of Natural Gas | 14718 HWY 61 NORTH | STE. GENEVIEVE | 1100 | HP | 2.9642 |
| Pipeline Transportation of Natural Gas | 14718 HWY 61 NORTH | STE. GENEVIEVE | 1100 | HP | 2.9642 |
| Pipeline Transportation of Natural Gas | 1362 COUNTY ROAD 81 | NEW ALBANY | 1450 | BHP | 3.1 |
| Pipeline Transportation of Natural Gas | 1362 COUNTY ROAD 81 | NEW ALBANY | 1450 | BHP | 1.87 |
| Pipeline Transportation of Natural Gas | 1362 COUNTY ROAD 81 | NEW ALBANY | 1450 | BHP | 1.51 |
| Pipeline Transportation of Natural Gas | 1362 COUNTY ROAD 81 | NEW ALBANY | 2050 | BHP | 1.41 |
| Pipeline Transportation of Natural Gas | 1362 COUNTY ROAD 81 | NEW ALBANY | 1650 | BHP | 1.35 |
| Pipeline Transportation of Natural Gas | 1362 COUNTY ROAD 81 | NEW ALBANY | 2050 | BHP | 0.72 |
| Pipeline Transportation of Natural Gas | 1362 COUNTY ROAD 81 | NEW ALBANY | 1450 | BHP | 0.48 |
| Pipeline Transportation of Natural Gas | 1362 COUNTY ROAD 81 | NEW ALBANY | 2050 | BHP | 0 |
| Pipeline Transportation of Natural Gas | 37 ALEXANDER ROAD | JAYESS | 1600 | HP | 0 |
| Pipeline Transportation of Natural Gas | 3659 COUNTY ROAD 100 | CORINTH | 4400 | BHP | 2.93 |
| Pipeline Transportation of Natural Gas | 3659 COUNTY ROAD 100 | CORINTH | 4400 | BHP | 0.13 |
| Pipeline Transportation of Natural Gas | 3659 COUNTY ROAD 100 | CORINTH | 4400 | BHP | 0.01 |
| Pipeline Transportation of Natural Gas | 3659 COUNTY ROAD 100 | CORINTH | 4400 | BHP | 0 |
| Pipeline Transportation of Natural Gas | 3305 US HIGHWAY 61 SOUTH | CLARKSDALE | 2000 | HP | 18.61 |
| Pipeline Transportation of Natural Gas | 560 PUMPING STATION ROAD | PURVIS | 3000 | HP | 0.58 |
| Pipeline Transportation of Natural Gas | 560 PUMPING STATION ROAD | PURVIS | 3000 | HP | 0.03 |
| Pipeline Transportation of Natural Gas | 560 PUMPING STATION ROAD | PURVIS | 3000 | HP | 0.02 |
| Pipeline Transportation of Natural Gas | 560 PUMPING STATION ROAD | PURVIS | 3000 | HP | 0.01 |
| Pipeline Transportation of Natural Gas | 560 PUMPING STATION ROAD | PURVIS | 5500 | HP | 0.01 |
| Pipeline Transportation of Natural Gas | 560 PUMPING STATION ROAD | PURVIS | 5500 | HP | 0.01 |
| Pipeline Transportation of Natural Gas | 340 GAS PLANT ROAD | PICKENS | 2600 | HP | 10.64 |
| Pipeline Transportation of Natural Gas | 340 GAS PLANT ROAD | PICKENS | 2600 | HP | 6.17 |
| Pipeline Transportation of Natural Gas | ROUTE 1 BOX 266, HWY 49 WEST | ISOLA | 1100 | HP | 1.88 |
| Pipeline Transportation of Natural Gas | ROUTE 1 BOX 266, HWY 49 WEST | ISOLA | 1100 | HP | 1.63 |
| Pipeline Transportation of Natural Gas | ROUTE 1 BOX 266, HWY 49 WEST | ISOLA | 2500 | HP | 1.58 |
| Pipeline Transportation of Natural Gas | ROUTE 1 BOX 266, HWY 49 WEST | ISOLA | 1100 | HP | 1.15 |
| Pipeline Transportation of Natural Gas | ROUTE 1 BOX 266, HWY 49 WEST | ISOLA | 1100 | HP | 1.08 |
| Pipeline Transportation of Natural Gas | ROUTE 1 BOX 266, HWY 49 WEST | ISOLA | 1100 | HP | 0.94 |
| Pipeline Transportation of Natural Gas | ROUTE 1 BOX 266, HWY 49 WEST | ISOLA | 2500 | HP | 0.84 |
| Pipeline Transportation of Natural Gas | ROUTE 1 BOX 266, HWY 49 WEST | ISOLA | 1080 | HP | 0.16 |
| Pipeline Transportation of Natural Gas | ROUTE 1 BOX 266, HWY 49 WEST | ISOLA | 1350 | HP | 0.04 |
| Pipeline Transportation of Natural Gas | ROUTE 1 BOX 266, HWY 49 WEST | ISOLA | 2500 | HP | 0 |
| Pipeline Transportation of Natural Gas | 4161 FOUR MILE ROAD | INVERNESS | 4800 | BHP | 0.12 |
| Pipeline Transportation of Natural Gas | 4161 FOUR MILE ROAD | INVERNESS | 4800 | BHP | 0.04 |
| Pipeline Transportation of Natural Gas | 4161 FOUR MILE ROAD | INVERNESS | 4800 | BHP | 0.02 |
| Pipeline Transportation of Natural Gas | 4161 FOUR MILE ROAD | INVERNESS | 4800 | BHP | 0 |
| Pipeline Transportation of Natural Gas | 2964 TEXAS EASTERN ROAD | UNION CHURCH | 2050 | HP | 15.22 |
| Pipeline Transportation of Natural Gas | 1666 BONNER ROAD | HEIDELBERG | 3400 | BHP | 15.27 |
| Pipeline Transportation of Natural Gas | 4396 HIGHWAY 741 | KOSCIUSKO | 2500 | HP | 3.13 |
| Pipeline Transportation of Natural Gas | 4396 HIGHWAY 741 | KOSCIUSKO | 2500 | HP | 2.37 |
| Pipeline Transportation of Natural Gas | 4396 HIGHWAY 741 | KOSCIUSKO | 2500 | HP | 1.54 |
| Pipeline Transportation of Natural Gas | 4396 HIGHWAY 741 | KOSCIUSKO | 2500 | HP | 0.8 |
| Pipeline Transportation of Natural Gas | 4396 HIGHWAY 741 | KOSCIUSKO | 2500 | HP | 0.75 |
| Pipeline Transportation of Natural Gas | 4396 HIGHWAY 741 | KOSCIUSKO | 2500 | HP | 0.66 |
| Pipeline Transportation of Natural Gas | 4396 HIGHWAY 741 | KOSCIUSKO | 2500 | HP | 0.43 |
| Pipeline Transportation of Natural Gas | 4396 HIGHWAY 741 | KOSCIUSKO | 2500 | HP | 0.34 |
| Pipeline Transportation of Natural Gas | 4396 HIGHWAY 741 | KOSCIUSKO | 2500 | HP | 0.24 |
| Pipeline Transportation of Natural Gas | 4396 HIGHWAY 741 | KOSCIUSKO | 2500 | HP | 0.13 |
| Pipeline Transportation of Natural Gas | 4396 HIGHWAY 741 | KOSCIUSKO | 2500 | HP | 0.02 |
| Pipeline Transportation of Natural Gas | 4396 HIGHWAY 741 | KOSCIUSKO | 2500 | HP | 0.02 |
| Pipeline Transportation of Natural Gas | 1069 SAND PIT ROAD | SHAW | 2670 | HP | 0.11 |
| Pipeline Transportation of Natural Gas | 1069 SAND PIT ROAD | SHAW | 2670 | HP | 0.11 |
| Pipeline Transportation of Natural Gas | 1069 SAND PIT ROAD | SHAW | 3000 | HP | 0.08 |
| Pipeline Transportation of Natural Gas | 1069 SAND PIT ROAD | SHAW | 2670 | HP | 0.01 |
| Pipeline Transportation of Natural Gas | 1069 SAND PIT ROAD | SHAW | 3000 | HP | 0.01 |
| Pipeline Transportation of Natural Gas | 1069 SAND PIT ROAD | SHAW | 3000 | HP | 0.01 |
| Pipeline Transportation of Natural Gas | 82 COUNTY ROAD 233 | WATER VALLEY | 2000 | HP | 18.7 |
| Pipeline Transportation of Natural Gas | 82 COUNTY ROAD 233 | WATER VALLEY | 2000 | HP | 12.53 |
| Pipeline Transportation of Natural Gas | 82 COUNTY ROAD 233 | WATER VALLEY | 2000 | HP | 8.45 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1700 | HP | 0.84 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1700 | HP | 0.84 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1700 | HP | 0.61 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1700 | HP | 0.29 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1700 | HP | 0.02 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1320 | HP | 0.01 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1320 | HP | 0.01 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1320 | HP | 0.01 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1700 | HP | 0 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1700 | HP | 0 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1700 | HP | 0 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1700 | HP | 0 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1320 | HP | 0 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1320 | HP | 0 |
| Pipeline Transportation of Natural Gas | 272 TENNESSEE GAS ROAD | GREENVILLE | 1080 | HP | 0 |
| Pipeline Transportation of Natural Gas | 945 METTS STREET | LOUISVILLE | 1000 | BHP | 9.13 |
| Pipeline Transportation of Natural Gas | 945 METTS STREET | LOUISVILLE | 1000 | BHP | 7.43 |
| Pipeline Transportation of Natural Gas | 945 METTS STREET | LOUISVILLE | 1000 | BHP | 7.29 |
| Pipeline Transportation of Natural Gas | 945 METTS STREET | LOUISVILLE | 1000 | BHP | 4.12 |
| Pipeline Transportation of Natural Gas | 6081 HIGHWAY 61 SOUTH | CARY | 2600 | HP | 7.87 |
| Pipeline Transportation of Natural Gas | 6081 HIGHWAY 61 SOUTH | CARY | 2600 | HP | 6.22 |
| Pipeline Transportation of Natural Gas | 444A TWIN LAKES RD & DAN KEYES | HARRISVILLE | 4740 | HP | 3.22 |
| Pipeline Transportation of Natural Gas | 444A TWIN LAKES RD & DAN KEYES | HARRISVILLE | 4740 | HP | 3.21 |
| Pipeline Transportation of Natural Gas | 444A TWIN LAKES RD & DAN KEYES | HARRISVILLE | 4740 | HP | 3.01 |
| Pipeline Transportation of Natural Gas | 444A TWIN LAKES RD & DAN KEYES | HARRISVILLE | 4740 | HP | 2.41 |

**504a**



| Emissions UOM | Current Control (Description or ID) | Current Reduction Perc | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | MS | Simpson | 12585611 | 63802413 2812700071 | A035282 | | GULF SOUTH PIPELINE COMPANY LLC, HARRISV | 48621 |
| | MS | Greene | 12587711 | 63808813 2804100013 | A017065 | | SG RESOURCES MISSISSIPPI LLC, SOUTHERN P | 48621 |
| | MS | Greene | 12587711 | 63808413 2804100013 | A017065 | | SG RESOURCES MISSISSIPPI LLC, SOUTHERN P | 48621 |
| | MS | Greene | 12587711 | 63808813 2804100013 | A017065 | | SG RESOURCES MISSISSIPPI LLC, SOUTHERN P | 48621 |
| | MS | Greene | 12587711 | 63808213 2804100013 | A017065 | | SG RESOURCES MISSISSIPPI LLC, SOUTHERN P | 48621 |
| | MS | Greene | 12587711 | 63808113 2804100013 | A017065 | | SG RESOURCES MISSISSIPPI LLC, SOUTHERN P | 48621 |
| | MS | Greene | 12587711 | 63808013 2804100013 | A017065 | | SG RESOURCES MISSISSIPPI LLC, SOUTHERN P | 48621 |
| | MS | Hinds | 15604911 | 99125113 2804900250 | A039671 | | MIDCONTINENT EXPRESS PIPELINE LLC, MEP 4 | 48621 |
| | MS | Hinds | 15604911 | 99124713 2804900250 | A039671 | | MIDCONTINENT EXPRESS PIPELINE LLC, MEP 4 | 48621 |
| | MS | Simpson | 15619811 | 99647213 2812700070 | A035025 | | MISSISSIPPI HUB LLC, NATURAL GAS TRANSM | 48621 |
| | MS | Simpson | 15619811 | 99640113 2812700070 | A035025 | | MISSISSIPPI HUB LLC, NATURAL GAS TRANSM | 48621 |
| | MS | Simpson | 15619811 | 99729313 2812700070 | A035025 | | MISSISSIPPI HUB LLC, NATURAL GAS TRANSM | 48621 |
| | MS | Simpson | 15619811 | 99640013 2812700070 | A035025 | | MISSISSIPPI HUB LLC, NATURAL GAS TRANSM | 48621 |
| | MS | Smith | 15619911 | 99499013 2812900085 | A036314 | | LEAF RIVER ENERGY CENTER LLC, LEAF RIVER | 48621 |
| | MS | Smith | 15619911 | 99498813 2812900085 | A036314 | | LEAF RIVER ENERGY CENTER LLC, LEAF RIVER | 48621 |
| | MS | Smith | 15619911 | 99498813 2812900085 | A036314 | | LEAF RIVER ENERGY CENTER LLC, LEAF RIVER | 48621 |
| | MS | Smith | 15619911 | 99499013 2812900085 | A036314 | | LEAF RIVER ENERGY CENTER LLC, LEAF RIVER | 48621 |
| | MS | Smith | 15619911 | 99499213 2812900085 | A036314 | | LEAF RIVER ENERGY CENTER LLC, LEAF RIVER | 48621 |
| | MS | Smith | 15619911 | 11854713 2812900085 | A036314 | | LEAF RIVER ENERGY CENTER LLC, LEAF RIVER | 48621 |
| | NJ | Somerset | 7481311 | 66242413 35742 | Na | | Transco Compressor Station 505 | 486210 |
| | NJ | Somerset | 7481311 | 66242213 35742 | Na | | Transco Compressor Station 505 | 486210 |
| | NJ | Bergen | 7525511 | 12017013 02626 | | | LNG PLANT STATION 240 | 486210 |
| | NJ | Bergen | 7525511 | 12016813 02626 | | | LNG PLANT STATION 240 | 486210 |
| | NJ | Union | 7548311 | 12707613 41722 | | | Linden Compressor Station | 486210 |
| | NJ | Union | 7548311 | 12708013 41722 | | | Linden Compressor Station | 486210 |
| | NJ | Union | 7548311 | 12707713 41722 | | | Linden Compressor Station | 486210 |
| | NJ | Union | 7548311 | 12707913 41722 | | | Linden Compressor Station | 486210 |
| | NJ | Hunterdon | 7604011 | 11864713 80337 | | | TEXAS EASTERN TRANSMISSION LP - LAMBERTVILLE | 486210 |
| | NJ | Hunterdon | 7604011 | 11864513 80337 | | | TEXAS EASTERN TRANSMISSION LP - LAMBERTVILLE | 486210 |
| | NY | Ontario | 7210411 | 7939913 8323400013 | TENNESSEE GAS PIPELINE COMPANY | | TGP COMPRESSOR STATION 237 | 48621 |
| | NY | Ontario | 7210411 | 7939713 8323400013 | TENNESSEE GAS PIPELINE COMPANY | | TGP COMPRESSOR STATION 237 | 48621 |
| | NY | Onondaga | 7436111 | 7947113 7313400022 | TENNESSEE GAS PIPELINE COMPANY | | TENNESSEE GAS PIPELINE CO - COMP STA 241 | 48621 |
| | NY | Onondaga | 7436111 | 64146813 7313400022 | TENNESSEE GAS PIPELINE COMPANY | | TENNESSEE GAS PIPELINE CO - COMP STA 241 | 48621 |
| | NY | Onondaga | 7436111 | 64146713 7313400022 | TENNESSEE GAS PIPELINE COMPANY | | TENNESSEE GAS PIPELINE CO - COMP STA 241 | 48621 |
| | NY | Herkimer | 8035411 | 64153413 6215600018 | TENNESSEE GAS PIPELINE COMPANY | | TGP COMPRESSOR STATION 245 | 48621 |
| | NY | Herkimer | 8035411 | 368691 6215600018 | TENNESSEE GAS PIPELINE COMPANY | | TGP COMPRESSOR STATION 245 | 48621 |
| | NY | Herkimer | 8035411 | 64153313 6215600018 | TENNESSEE GAS PIPELINE COMPANY | | TGP COMPRESSOR STATION 245 | 48621 |
| | NY | Allegany | 8377611 | 1493313 9026000009 | NATIONAL FUEL GAS SUPPLY CORPORATION | | INDEPENDENCE STATION | 48621 |
| | NY | Allegany | 8377611 | 9708203 9026000009 | NATIONAL FUEL GAS SUPPLY CORPORATION | | INDEPENDENCE STATION | 48621 |
| | NY | Allegany | 8377611 | 1493413 9026000009 | NATIONAL FUEL GAS SUPPLY CORPORATION | | INDEPENDENCE STATION | 48621 |
| | NY | Allegany | 8377611 | 1493713 9026000009 | NATIONAL FUEL GAS SUPPLY CORPORATION | | INDEPENDENCE STATION | 48621 |
| | NY | Schoharie | 8435311 | 586413 4432400005 | TENNESSEE GAS PIPELINE COMPANY | | COMPRESSOR STATION 249 | 48621 |
| | NY | Schoharie | 8435311 | 64147213 4432400005 | TENNESSEE GAS PIPELINE COMPANY | | COMPRESSOR STATION 249 | 48621 |
| | NY | Steuben | 8437611 | 582213 8468200006 | DOMINION TRANSMISSION INC | | WOODHULL STATION | 48621 |
| | NY | Steuben | 8437611 | 9708113 8468200006 | DOMINION TRANSMISSION INC | | WOODHULL STATION | 48621 |
| | NY | Erie | 8503411 | 118521613 9143800044 | NATIONAL FUEL GAS SUPPLY CORPORATION | | CONCORD COMPRESSOR STATION | 48621 |
| | OH | Defiance | 7938111 | 3087113 0320010169 | | | ANR Pipeline Company (0320010169) | 486210 |
| | OH | Defiance | 7938111 | 3086813 0320010169 | | | ANR Pipeline Company (0320010169) | 486210 |
| | OH | Defiance | 7938111 | 3087313 0320010169 | | | ANR Pipeline Company (0320010169) | 486210 |
| | OH | Franklin | 8009911 | 403913 0125102034 | | | Eastern Gas Transmission and Storage, Inc. (0125102034) | 486210 |
| | OH | Richland | 8050511 | 6332413 0370000226 | | | PAVONIA COMPRESSOR STATION (0370000226) | 486210 |
| | OH | Warren | 8063711 | 6323613 1483000144 | | | Eastern Gas Transmission and Storage - Lebanon Station (1483000144) | 486210 |
| | OH | Carroll | 8132011 | 599013 0210000046 | | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| | OH | Carroll | 8132011 | 599013 0210000046 | | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| | OH | Carroll | 8132011 | 598913 0210000046 | | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| | OH | Carroll | 8132011 | 598913 0210000046 | | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| | OH | Carroll | 8132011 | 598813 0210000046 | | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| | OH | Carroll | 8132011 | 598913 0210000046 | | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| | OH | Carroll | 8132011 | 598913 0210000046 | | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| | OH | Carroll | 8132011 | 598913 0210000046 | | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| | OH | Carroll | 8132011 | 599013 0210000046 | | | Tennessee Gas Pipeline - Station 214 (0210000046) | 486210 |
| | OH | Fairfield | 8259811 | 31513 0123000137 | | | CRAWFORD COMPRESSOR STATION (0123000137) | 486210 |
| | OH | Fairfield | 8259811 | 31613 0123000137 | | | CRAWFORD COMPRESSOR STATION (0123000137) | 486210 |
| | OH | Fairfield | 8259811 | 32213 0123000137 | | | CRAWFORD COMPRESSOR STATION (0123000137) | 486210 |
| | OH | Fairfield | 8259811 | 30613 0123000137 | | | CRAWFORD COMPRESSOR STATION (0123000137) | 486210 |
| | OH | Fairfield | 8259811 | 30813 0123000137 | | | CRAWFORD COMPRESSOR STATION (0123000137) | 486210 |
| | OH | Fairfield | 8259811 | 31413 0123000137 | | | CRAWFORD COMPRESSOR STATION (0123000137) | 486210 |
| | OH | Fairfield | 8259811 | 13641413 0123000137 | | | CRAWFORD COMPRESSOR STATION (0123000137) | 486210 |
| | OH | Fairfield | 8259811 | 31713 0123000137 | | | CRAWFORD COMPRESSOR STATION (0123000137) | 486210 |
| | OH | Holmes | 8289411 | 223913 0238000049 | | | HOLMES COMPRESSOR STATION (0238000049) | 486210 |
| | OH | Vinton | 9216711 | 12282613 0682000012 | COLUMBIA GAS TRANSMISSION CORP. | | Columbia Pipeline Group - McArthur Compressor Station (0682000012) | 486210 |
| | OH | Vinton | 9216711 | 13554013 0682000012 | COLUMBIA GAS TRANSMISSION CORP. | | Columbia Pipeline Group - McArthur Compressor Station (0682000012) | 486210 |
| | OH | Vinton | 9216711 | 13554013 0682000012 | COLUMBIA GAS TRANSMISSION CORP. | | Columbia Pipeline Group - McArthur Compressor Station (0682000012) | 486210 |
| | OH | Medina | 9256311 | 12282703 1652050071 | | | Medina Compressor Station (1652050071) | 486210 |
| | OH | Medina | 9256311 | 12282713 1652050071 | | | Medina Compressor Station (1652050071) | 486210 |
| | OH | Muskingum | 15023311 | 91691413 0660000261 | | | Rockies Express Pipeline LLC- Chandlersville CS (0660000261) | 486210 |
| | OH | Muskingum | 15023311 | 91691313 0660000261 | | | Rockies Express Pipeline LLC- Chandlersville CS (0660000261) | 486210 |
| | OH | Harrison | 16975011 | 11160513 0634005056 | | | Williams - Scio Compressor Station (0634005056) | 486210 |
| | OH | Harrison | 16975011 | 11160413 0634005056 | | | Williams - Scio Compressor Station (0634005056) | 486210 |
| | OH | Harrison | 16975011 | 11160613 0634005056 | | | Williams - Scio Compressor Station (0634005056) | 486210 |
| | OH | Harrison | 16975011 | 11160513 0634005056 | | | Williams - Scio Compressor Station (0634005056) | 486210 |
| | OH | Harrison | 16975011 | 11160413 0634005056 | | | Williams - Scio Compressor Station (0634005056) | 486210 |
| | OH | Harrison | 16975011 | 11160413 0634005056 | | | Williams - Scio Compressor Station (0634005056) | 486210 |
| | OH | Harrison | 16975011 | 11160813 0634005056 | | | Williams - Scio Compressor Station (0634005056) | 486210 |
| | OH | Harrison | 16975011 | 11160513 0634005056 | | | Williams - Scio Compressor Station (0634005056) | 486210 |
| | OH | Harrison | 16975011 | 11160613 0634005056 | | | Williams - Scio Compressor Station (0634005056) | 486210 |
| | OH | Harrison | 16975011 | 11160473 0634005056 | | | Williams - Scio Compressor Station (0634005056) | 486210 |
| | OH | Noble | 16975211 | 12263413 0661005020 | | | Rockies Express Pipeline - Seneca Compressor Station (0661005020) | 486210 |
| | OH | Noble | 16975211 | 12263213 0661005020 | | | Rockies Express Pipeline - Seneca Compressor Station (0661005020) | 486210 |
| | OH | Noble | 16975211 | 12263313 0661005020 | | | Rockies Express Pipeline - Seneca Compressor Station (0661005020) | 486210 |
| | OH | Noble | 16975211 | 11160713 0661005020 | | | Rockies Express Pipeline - Seneca Compressor Station (0661005020) | 486210 |
| | OH | Noble | 16975211 | 11160703 0661005020 | | | Rockies Express Pipeline - Seneca Compressor Station (0661005020) | 486210 |
| | OH | Belmont | 17703611 | 12262643 0607015007 | | | MarkWest Humphreys Compressor Station (0607015007) | 486210 |
| | OH | Belmont | 17703611 | 12262603 0607015007 | | | MarkWest Humphreys Compressor Station (0607015007) | 486210 |
| | OH | Belmont | 17703611 | 12262613 0607015007 | | | MarkWest Humphreys Compressor Station (0607015007) | 486210 |
| | OH | Belmont | 17703611 | 12262613 0607015007 | | | MarkWest Humphreys Compressor Station (0607015007) | 486210 |
| | OH | Belmont | 17703611 | 12262623 0607015007 | | | MarkWest Humphreys Compressor Station (0607015007) | 486210 |
| | OH | Belmont | 17703611 | 12262593 0607015007 | | | MarkWest Humphreys Compressor Station (0607015007) | 486210 |
| | OH | Carroll | 17856511 | 12749073 0210072002 | | | Rover Pipeline - Mainline CS1 (0210072002) | 486210 |
| | OH | Carroll | 17856511 | 12749063 0210072002 | | | Rover Pipeline - Mainline CS1 (0210072002) | 486210 |
| | OH | Wayne | 17856911 | 13494513 0285032017 | | | Rover Pipeline - Mainline CS2 (0285032017) | 486210 |
| | OH | Wayne | 17856911 | 13494513 0285032017 | | | Rover Pipeline - Mainline CS2 (0285032017) | 486210 |
| | OH | Wayne | 17856911 | 13494513 0285032017 | | | Rover Pipeline - Mainline CS2 (0285032017) | 486210 |
| | OH | Crawford | 17857011 | 13494813 0317002005 | | | Rover Pipeline - Mainline CS3 (0317002005) | 486210 |
| | OH | Crawford | 17857011 | 13494713 0317002005 | | | Rover Pipeline - Mainline CS3 (0317002005) | 486210 |
| | OH | Noble | 17857311 | 13495913 0661005054 | | | Energy Transfer- Rover Ppln - Seneca Compressor Station (0661005054) | 486210 |
| | OH | Noble | 17857311 | 13495943 0661005054 | | | Energy Transfer- Rover Ppln - Seneca Compressor Station (0661005054) | 486210 |
| | OH | Noble | 17857311 | 13495913 0661005054 | | | Energy Transfer- Rover Ppln - Seneca Compressor Station (0661005054) | 486210 |
| | OH | Noble | 17857311 | 13495913 0661005054 | | | Energy Transfer- Rover Ppln - Seneca Compressor Station (0661005054) | 486210 |
| | OH | Defiance | 17858611 | 13494913 0320012013 | | | Rover Pipeline - Defiance Compressor Station (0320012013) | 486210 |
| | OH | Defiance | 17858611 | 13494913 0320012013 | | | Rover Pipeline - Defiance Compressor Station (0320012013) | 486210 |
| | OH | Monroe | 17966511 | 12750913 0656025011 | | | MarkWest Lenw Compressor Station (0656025011) | 486210 |
| | OH | Monroe | 17966511 | 12750693 0656025011 | | | MarkWest Lenw Compressor Station (0656025011) | 486210 |
| | OH | Monroe | 17966511 | 12750703 0656025011 | | | MarkWest Lenw Compressor Station (0656025011) | 486210 |
| | OK | Roger Mills | 913811 | 46553413 3163 | ENABLE GAS GATHERING LLC | | STRONG CITY COMPRESSOR STATION | 486210 |
| | OK | Atoka | 959211 | 47176213 1069 | NATURAL GAS PIPELINE CO OF AMERICA | | STATION 812 | 486210 |
| | OK | Atoka | 959211 | 47176313 1069 | NATURAL GAS PIPELINE CO OF AMERICA | | STATION 812 | 486210 |
| | OK | Grant | 3951811 | 98436213 1762 | SOUTHERN STAR CTL GAS PIPELINE INC | | WAKITA STATION | 486210 |
| | OK | Grant | 3951811 | 34854313 1762 | SOUTHERN STAR CTL GAS PIPELINE INC | | WAKITA STATION | 486210 |
| | OK | Grady | 3952011 | 34853513 1130 | ENABLE GAS TRANSMISSION LLC | | AMBER JUNCTION COMPRESSOR STATION | 486210 |
| | OK | Grady | 3952011 | 34853413 1130 | ENABLE GAS TRANSMISSION LLC | | AMBER JUNCTION COMPRESSOR STATION | 486210 |
| | OK | Creek | 7320411 | 8333113 1218 | ONEOK GAS STORAGE LLC | | DEPEW STATION | 486210 |
| | OK | Creek | 7320411 | 8333913 1218 | ONEOK GAS STORAGE LLC | | DEPEW STATION | 486210 |
| | OK | Creek | 7320411 | 8334113 1218 | ONEOK GAS STORAGE LLC | | DEPEW STATION | 486210 |
| | OK | Creek | 7320411 | 8333713 1218 | ONEOK GAS STORAGE LLC | | DEPEW STATION | 486210 |
| | OK | Creek | 7320411 | 8333613 1218 | ONEOK GAS STORAGE LLC | | DEPEW STATION | 486210 |
| | OK | Creek | 7320411 | 11206613 1218 | ONEOK GAS STORAGE LLC | | DEPEW STATION | 486210 |
| | OK | Creek | 7320411 | 8332713 1218 | ONEOK GAS STORAGE LLC | | DEPEW STATION | 486210 |
| | OK | Creek | 7320411 | 8312813 1218 | ONEOK GAS STORAGE LLC | | DEPEW STATION | 486210 |
| | OK | Creek | 7320411 | 8333213 1218 | ONEOK GAS STORAGE LLC | | DEPEW STATION | 486210 |
| | OK | Creek | 7320411 | 8333413 1218 | ONEOK GAS STORAGE LLC | | DEPEW STATION | 486210 |
| | OK | Texas | 7393711 | 10469213 1177 | WTG HUGOTON LP | | TEXAS COUNTY 2 | 486210 |
| | OK | Woods | 8055011 | 4999213 1372 | PANHANDLE EASTERN PIPELINE CO | | ALVA N HOPETON COMPRESSOR STATION CO | 486210 |
| | OK | Woods | 8055011 | 4998413 1372 | PANHANDLE EASTERN PIPELINE CO | | ALVA N HOPETON COMPRESSOR STATION CO | 486210 |
| | OK | Grady | 8063111 | 6329413 1564 | ENABLE GAS GATHERING LLC | | COX CITY COMPRESSOR STATION | 486210 |
| | OK | Grady | 8063111 | 6329513 1564 | ENABLE GAS GATHERING LLC | | COX CITY COMPRESSOR STATION | 486210 |
| | OK | Grady | 8063111 | 6329313 1564 | ENABLE GAS GATHERING LLC | | COX CITY COMPRESSOR STATION | 486210 |
| | OK | Grady | 8063111 | 6329313 1564 | ENABLE GAS GATHERING LLC | | COX CITY COMPRESSOR STATION | 486210 |
| | OK | Roger Mills | 8072311 | 4922613 1611 | ENABLE GAS GATHERING LLC | | TRM COMPRESSOR STATION | 486210 |

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 444A TWIN LAKES RD & DAN KEYES | HARRISVILLE | 1200 | HP | 0.22 |
| Pipeline Transportation of Natural Gas | 2501 TUNG OIL ROAD | LEAKESVILLE | 7700 | HP | 5.61 |
| Pipeline Transportation of Natural Gas | 2501 TUNG OIL ROAD | LEAKESVILLE | 7700 | HP | 4.35 |
| Pipeline Transportation of Natural Gas | 2501 TUNG OIL ROAD | LEAKESVILLE | 7700 | HP | 3.86 |
| Pipeline Transportation of Natural Gas | 2501 TUNG OIL ROAD | LEAKESVILLE | 7700 | HP | 3.64 |
| Pipeline Transportation of Natural Gas | 2501 TUNG OIL ROAD | LEAKESVILLE | 7700 | HP | 3.36 |
| Pipeline Transportation of Natural Gas | 2501 TUNG OIL ROAD | LEAKESVILLE | 7700 | HP | 2.61 |
| Pipeline Transportation of Natural Gas | 4585 SMITH STATION ROAD | EDWARDS | 6140 | HP | 20.61 |
| Pipeline Transportation of Natural Gas | 4585 SMITH STATION ROAD | EDWARDS | 6140 | HP | 16.61 |
| Pipeline Transportation of Natural Gas | 222 SOUTH HIGHWAY 541 | MOUNT OLIVE | 4735 | BHP | 8.48 |
| Pipeline Transportation of Natural Gas | 222 SOUTH HIGHWAY 541 | MOUNT OLIVE | 4735 | BHP | 8.03 |
| Pipeline Transportation of Natural Gas | 222 SOUTH HIGHWAY 541 | MOUNT OLIVE | 4735 | BHP | 6.85 |
| Pipeline Transportation of Natural Gas | 222 SOUTH HIGHWAY 541 | MOUNT OLIVE | 4735 | BHP | 3.47 |
| Pipeline Transportation of Natural Gas | 855 SMITH COUNTY ROAD 5 | TAYLORSVILLE | 4740 | HP | 7.97 |
| Pipeline Transportation of Natural Gas | 855 SMITH COUNTY ROAD 5 | TAYLORSVILLE | 4740 | HP | 7.1 |
| Pipeline Transportation of Natural Gas | 855 SMITH COUNTY ROAD 5 | TAYLORSVILLE | 4740 | HP | 6.58 |
| Pipeline Transportation of Natural Gas | 855 SMITH COUNTY ROAD 5 | TAYLORSVILLE | 4740 | HP | 5.01 |
| Pipeline Transportation of Natural Gas | 855 SMITH COUNTY ROAD 5 | TAYLORSVILLE | 5000 | HP | 4.11 |
| Pipeline Transportation of Natural Gas | 855 SMITH COUNTY ROAD 5 | TAYLORSVILLE | 5000 | HP | 2.22 |
| Pipeline Transportation of Natural Gas | 855 SMITH COUNTY ROAD 5 | TAYLORSVILLE | 2330 | HP | 0.15 |
| Pipeline Transportation of Natural Gas | 623 CASE RD | NESHANIC STATION | 2050 | HP | 3.2443 |
| Pipeline Transportation of Natural Gas | 623 CASE RD | NESHANIC STATION | 1072 | HP | 0.1079 |
| Pipeline Transportation of Natural Gas | 718 PATERSON PLANK RD | CARLSTADT | 1500 | HP | 2.6524 |
| Pipeline Transportation of Natural Gas | 718 PATERSON PLANK RD | CARLSTADT | 1500 | HP | 1.3065 |
| Pipeline Transportation of Natural Gas | LOWR RD AND RANGE DR | LINDEN | 2153 | HP | 14.8954 |
| Pipeline Transportation of Natural Gas | LOWR RD AND RANGE DR | LINDEN | 2153 | HP | 10.8715 |
| Pipeline Transportation of Natural Gas | LOWR RD AND RANGE DR | LINDEN | 2153 | HP | 7.2221 |
| Pipeline Transportation of Natural Gas | LOWR RD AND RANGE DR | LINDEN | 1340 | HP | 0.0479 |
| Pipeline Transportation of Natural Gas | TEXAS EASTERN TRANSMISSION LP | LAMBERTVILLE | 2310 | BHP | 0.0585 |
| Pipeline Transportation of Natural Gas | TEXAS EASTERN TRANSMISSION LP | LAMBERTVILLE | 2310 | BHP | 0.0237 |
| Pipeline Transportation of Natural Gas | 2001 ARCHER RD | CLIFTON SPRINGS | 4000 | HP | 17.03781 |
| Pipeline Transportation of Natural Gas | 2001 ARCHER RD | CLIFTON SPRINGS | 2000 | HP | 0.927665 |
| Pipeline Transportation of Natural Gas | 3447 SENTINEL HEIGHTS RD | LAFAYETTE | 4500 | HP | 13.786665 |
| Pipeline Transportation of Natural Gas | 3447 SENTINEL HEIGHTS RD | LAFAYETTE | 3785 | HP | 5.253315 |
| Pipeline Transportation of Natural Gas | 3447 SENTINEL HEIGHTS RD | LAFAYETTE | 3785 | HP | 3.5236235 |
| Pipeline Transportation of Natural Gas | 457 BURROWS RD | WEST WINFIELD | 3785 | HP | 13.01436 |
| Pipeline Transportation of Natural Gas | 457 BURROWS RD | WEST WINFIELD | 2604 | BHP | 11.44752 |
| Pipeline Transportation of Natural Gas | 457 BURROWS RD | WEST WINFIELD | 1148 | BHP | 0.1785 |
| Pipeline Transportation of Natural Gas | CO RTE 22 BETW FULMER VALLEY RD & CO RTE 22A | ANDOVER | 1500 | HP | 6.405 |
| Pipeline Transportation of Natural Gas | CO RTE 22 BETW FULMER VALLEY RD & CO RTE 22A | ANDOVER | 1500 | HP | 6.3715 |
| Pipeline Transportation of Natural Gas | CO RTE 22 BETW FULMER VALLEY RD & CO RTE 22A | ANDOVER | 1000 | HP | 4.5225 |
| Pipeline Transportation of Natural Gas | CO RTE 22 BETW FULMER VALLEY RD & CO RTE 22A | ANDOVER | 1000 | HP | 2.403 |
| Pipeline Transportation of Natural Gas | 2840 US RTE 20 | CARLISLE | 4180 | HP | 20.17857 |
| Pipeline Transportation of Natural Gas | 2840 US RTE 20 | CARLISLE | 7570 | HP | 11.748175 |
| Pipeline Transportation of Natural Gas | 974 CO RTE 99 | WOODHULL | 1800 | HP | 17.409965 |
| Pipeline Transportation of Natural Gas | 974 CO RTE 99 | WOODHULL | 1000 | HP | 1.877467 |
| Pipeline Transportation of Natural Gas | 5510 GENESEE RD | SPRINGVILLE | 2250 | HP | 0 |
| Pipeline Transportation of Natural Gas | 6357 State Route 66 North | Defiance | 2000 | HP | 13.7 |
| Pipeline Transportation of Natural Gas | 6357 State Route 66 North | Defiance | 2000 | HP | 6.14 |
| Pipeline Transportation of Natural Gas | 6357 State Route 66 North | Defiance | 2000 | HP | 1.56 |
| Pipeline Transportation of Natural Gas | 5509 Bergor Road | Groveport | 3200 | HP | 20.04 |
| Pipeline Transportation of Natural Gas | 2385 Cotter Road | Mansfield | 1940 | HP | 14.08 |
| Pipeline Transportation of Natural Gas | 1262 W State Rte 122 | Lebanon | 4200 | HP | 13.6 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 1320 | HP | 8.303 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 1320 | HP | 3.562 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 1320 | HP | 3.355 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 1320 | HP | 3.215 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 1320 | HP | 2.866 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 1320 | HP | 1.972 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 1320 | HP | 1.739 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 1320 | HP | 1.643 |
| Pipeline Transportation of Natural Gas | 2029 Cobbler Road NE | Carrollton | 1320 | HP | 1.473 |
| Pipeline Transportation of Natural Gas | 2699 Pump Station Rd SE | Lancaster | 1650 | BHP | 20.43 |
| Pipeline Transportation of Natural Gas | 2699 Pump Station Rd SE | Lancaster | 1650 | BHP | 17.59 |
| Pipeline Transportation of Natural Gas | 2699 Pump Station Rd SE | Lancaster | 3080 | HP | 17.09 |
| Pipeline Transportation of Natural Gas | 2699 Pump Station Rd SE | Lancaster | 3080 | BHP | 14.65 |
| Pipeline Transportation of Natural Gas | 2699 Pump Station Rd SE | Lancaster | 3080 | BHP | 13.29 |
| Pipeline Transportation of Natural Gas | 2699 Pump Station Rd SE | Lancaster | 1650 | BHP | 5.96 |
| Pipeline Transportation of Natural Gas | 2699 Pump Station Rd SE | Lancaster | 1480 | BHP | 4.36 |
| Pipeline Transportation of Natural Gas | 2699 Pump Station Rd SE | Lancaster | 1650 | BHP | 4.25 |
| Pipeline Transportation of Natural Gas | 8462 State Rt. 179 | Washington Twp. | 1500 | HP | 8.58 |
| Pipeline Transportation of Natural Gas | 61318 Mt. Zion Rd. (Town Hwy 22A) | McArthur | 1100 | HP | 16.56 |
| Pipeline Transportation of Natural Gas | 61318 Mt. Zion Rd. (Town Hwy 22A) | McArthur | 1100 | HP | 14.71 |
| Pipeline Transportation of Natural Gas | 61318 Mt. Zion Rd. (Town Hwy 22A) | McArthur | 1100 | HP | 6.58 |
| Pipeline Transportation of Natural Gas | 2834 Stiegler Road | Medina | 1100 | HP | 20.43 |
| Pipeline Transportation of Natural Gas | 2834 Stiegler Road | Medina | 1100 | HP | 0.68 |
| Pipeline Transportation of Natural Gas | 1420 Irish Ridge Rd. | Philo | 6135 | HP | 0.1084 |
| Pipeline Transportation of Natural Gas | 1420 Irish Ridge Rd. | Philo | 6135 | HP | 0.0756 |
| Pipeline Transportation of Natural Gas | 37650 Bower Rd | Scio | 1780 | HP | 7.01 |
| Pipeline Transportation of Natural Gas | 37650 Bower Rd | Scio | 1780 | HP | 6.97 |
| Pipeline Transportation of Natural Gas | 37650 Bower Rd | Scio | 1780 | HP | 6.8 |
| Pipeline Transportation of Natural Gas | 37650 Bower Rd | Scio | 1780 | HP | 6.52 |
| Pipeline Transportation of Natural Gas | 37650 Bower Rd | Scio | 1780 | HP | 6.35 |
| Pipeline Transportation of Natural Gas | 37650 Bower Rd | Scio | 1780 | HP | 5.93 |
| Pipeline Transportation of Natural Gas | 37650 Bower Rd | Scio | 1780 | HP | 5.92 |
| Pipeline Transportation of Natural Gas | 37650 Bower Rd | Scio | 1780 | HP | 5.8 |
| Pipeline Transportation of Natural Gas | 37650 Bower Rd | Scio | 1780 | HP | 5.3 |
| Pipeline Transportation of Natural Gas | 37650 Bower Rd | Scio | 1780 | HP | 5.19 |
| Pipeline Transportation of Natural Gas | 57546 Seneca Lake Rd | Quaker City | 5000 | HP | 10.59 |
| Pipeline Transportation of Natural Gas | 57546 Seneca Lake Rd | Quaker City | 2250 | HP | 8.387 |
| Pipeline Transportation of Natural Gas | 57546 Seneca Lake Rd | Quaker City | 5000 | HP | 7.919 |
| Pipeline Transportation of Natural Gas | 57546 Seneca Lake Rd | Quaker City | 2250 | HP | 7.134 |
| Pipeline Transportation of Natural Gas | 57546 Seneca Lake Rd | Quaker City | 1480 | HP | 4.648 |
| Pipeline Transportation of Natural Gas | 34636 Johnson Ridge Rd | Barnesville | 3550 | HP | 10.94 |
| Pipeline Transportation of Natural Gas | 34636 Johnson Ridge Rd | Barnesville | 3550 | HP | 8.69 |
| Pipeline Transportation of Natural Gas | 34636 Johnson Ridge Rd | Barnesville | 3550 | HP | 7.118 |
| Pipeline Transportation of Natural Gas | 34636 Johnson Ridge Rd | Barnesville | 3550 | HP | 6.85 |
| Pipeline Transportation of Natural Gas | 34636 Johnson Ridge Rd | Barnesville | 3550 | HP | 6.447 |
| Pipeline Transportation of Natural Gas | 34636 Johnson Ridge Rd | Barnesville | 3550 | HP | 4.87 |
| Pipeline Transportation of Natural Gas | 0.7mi E of Cottage Rd SW on Azalea Rd SW | Sherrodsville | 4735 | HP | 16.62 |
| Pipeline Transportation of Natural Gas | 0.7mi E of Cottage Rd SW on Azalea Rd SW | Sherrodsville | 4735 | HP | 15.28 |
| Pipeline Transportation of Natural Gas | .5m N of W Lincoln Way on S Elyria Rd | Wooster | 4735 | HP | 16.51 |
| Pipeline Transportation of Natural Gas | .5m N of W Lincoln Way on S Elyria Rd | Wooster | 4735 | HP | 15.94 |
| Pipeline Transportation of Natural Gas | .5m N of W Lincoln Way on S Elyria Rd | Wooster | 4735 | HP | 15.78 |
| Pipeline Transportation of Natural Gas | 2903 Albaugh Rd | Chatfield Twp. | 4735 | HP | 12.07 |
| Pipeline Transportation of Natural Gas | 2903 Albaugh Rd | Chatfield Twp. | 4735 | HP | 10.66 |
| Pipeline Transportation of Natural Gas | 26310 Zep Road | Summerfield | 4735 | HP | 5.88 |
| Pipeline Transportation of Natural Gas | 26310 Zep Road | Summerfield | 4735 | HP | 5.75 |
| Pipeline Transportation of Natural Gas | 26310 Zep Road | Summerfield | 4735 | HP | 5.71 |
| Pipeline Transportation of Natural Gas | 26310 Zep Road | Summerfield | 4735 | HP | 4.95 |
| Pipeline Transportation of Natural Gas | 23831 Banner School Rd | Defiance | 8180 | HP | 16.82 |
| Pipeline Transportation of Natural Gas | 23831 Banner School Rd | Defiance | 8180 | HP | 14.31 |
| Pipeline Transportation of Natural Gas | 23831 Banner School Rd | Defiance | 4735 | HP | 2.34 |
| Pipeline Transportation of Natural Gas | corner of CR 31 and CR 1006 | Beallsville | 5000 | HP | 12.28 |
| Pipeline Transportation of Natural Gas | corner of CR 31 and CR 1006 | Beallsville | 5000 | HP | 10.99 |
| Pipeline Transportation of Natural Gas | corner of CR 31 and CR 1006 | Beallsville | 5000 | HP | 9.73 |
| Pipeline Transportation of Natural Gas | 6 MILES N AND 1 MILE W OF | STRONG CITY | 1340 | HP | 11.056 |
| Pipeline Transportation of Natural Gas | 9 MI N AND 7 MI E | STRINGTOWN | 1600 | HP | 0.32 |
| Pipeline Transportation of Natural Gas | 9 MI N AND 7 MI E | STRINGTOWN | 2400 | HP | 0.07 |
| Pipeline Transportation of Natural Gas | 1 MI S OF WAKITA ON 11A | WAKITA | 2000 | HP | 2.73 |
| Pipeline Transportation of Natural Gas | 1 MI S OF WAKITA ON 11A | WAKITA | 2000 | HP | 2.68 |
| Pipeline Transportation of Natural Gas | 3 MILES W OF | AMBER | 2750 | HP | 16.1 |
| Pipeline Transportation of Natural Gas | 3 MILES W OF | AMBER | 2750 | HP | 15.41 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF S465TH W&W291ST S | DEPEW | 1100 | HP | 15.899 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF S465TH W&W291ST S | DEPEW | 1100 | HP | 12.978 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF S465TH W&W291ST S | DEPEW | 1100 | HP | 12.364 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF S465TH W&W291ST S | DEPEW | 1100 | HP | 10.977 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF S465TH W&W291ST S | DEPEW | 1100 | HP | 4.735 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF S465TH W&W291ST S | DEPEW | 1830 | HP | 2.47 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF S465TH W&W291ST S | DEPEW | 1350 | HP | 1.678 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF S465TH W&W291ST S | DEPEW | 1350 | HP | 1.558 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF S465TH W&W291ST S | DEPEW | 1350 | HP | 1.548 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF S465TH W&W291ST S | DEPEW | 1350 | HP | 0.647 |
| Pipeline Transportation of Natural Gas | 12 MILES W AND 2 MILES N OF | GUYMON | 1650 | HP | 0.602 |
| Pipeline Transportation of Natural Gas | 6.5 MILES SW OF | ALVA | 2500 | HP | 8.85 |
| Pipeline Transportation of Natural Gas | 6.5 MILES SW OF | ALVA | 2500 | HP | 0.02 |
| Pipeline Transportation of Natural Gas | 2 MILES S OF | COX CITY | 1100 | HP | 19.844 |
| Pipeline Transportation of Natural Gas | 2 MILES S OF | COX CITY | 1100 | HP | 14.225 |
| Pipeline Transportation of Natural Gas | 2 MILES S OF | COX CITY | 1150 | HP | 14.127 |
| Pipeline Transportation of Natural Gas | 2 MILES S OF | COX CITY | 1230 | HP | 12.541 |
| Pipeline Transportation of Natural Gas | 0.1 MI S OF N1940 & E0980 RD | CHEYENNE | 1220 | HP | 12.77 |

| Emissions | UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|---|
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | 203 - Catalytic Converter (OP) (NOX - 92%) | | | | | |
| | TON | | | | | | |
| | TON | | 203 - Catalytic Converter (OP) (NOX - 92%) | | | | | |
| | TON | | 203 - Catalytic Converter (OP) (NOX - 92%) | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |

**508a**

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | OK | Caddo | 8115111 | 6053733 | 1571 | ENABLE GAS GATHERING LLC | EAKLY CMPSR STA | 486210 |
| | OK | Caddo | 8115111 | 6053813 | 1571 | ENABLE GAS GATHERING LLC | EAKLY CMPSR STA | 486210 |
| | OK | Beaver | 8131911 | 73459013 | 1173 | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| | OK | Beaver | 8131911 | 73459513 | 1173 | NORTHERN NATURAL GAS CO | BEAVER COMPRESSOR STATION | 486210 |
| | OK | Coal | 8147311 | 5963813 | 1109 | ENABLE GAS TRANSMISSION LLC | CHILES DOME STATION | 486210 |
| | OK | Coal | 8147311 | 5963913 | 1109 | ENABLE GAS TRANSMISSION LLC | CHILES DOME STATION | 486210 |
| | OK | Washington | 8212311 | 6699413 | 1754 | SOUTHERN STAR CTL GAS PIPELINE INC | COTTON VALLEY STATION | 486210 |
| | OK | Logan | 8401711 | 684313 | 1226 | ONEOK GAS STORAGE LLC | WEST EDMOND STATION | 486210 |
| | OK | Logan | 8401711 | 685513 | 1226 | ONEOK GAS STORAGE LLC | WEST EDMOND STATION | 486210 |
| | OK | Custer | 8448711 | 1418813 | 63 | ANR PIPELINE CO | CUSTER COMPRESSOR STATION | 486210 |
| | OK | Custer | 8448711 | 1418713 | 63 | ANR PIPELINE CO | CUSTER COMPRESSOR STATION | 486210 |
| | OK | Custer | 8448711 | 1418913 | 63 | ANR PIPELINE CO | CUSTER COMPRESSOR STATION | 486210 |
| | OK | Beckham | 8449911 | 73450313 | 1060 | NATURAL GAS PIPELINE CO OF AMERICA | COMPRESSOR STATION 184 | 486210 |
| | OK | Beckham | 8449911 | 1414313 | 1060 | NATURAL GAS PIPELINE CO OF AMERICA | COMPRESSOR STATION 184 | 486210 |
| | OK | Beckham | 8449911 | 73450213 | 1060 | NATURAL GAS PIPELINE CO OF AMERICA | COMPRESSOR STATION 184 | 486210 |
| | OK | Carter | 8506111 | 73451013 | 1070 | NATURAL GAS PIPELINE CO OF AMERICA | STATION 801 | 486210 |
| | OK | Carter | 8506111 | 73450913 | 1070 | NATURAL GAS PIPELINE CO OF AMERICA | STATION 801 | 486210 |
| | OK | Washita | 9244011 | 112124013 | 1928 | MIDCOAST G AND P OKLAHOMA LP | DILL CITY COMPRESSOR STATION | 486210 |
| | OK | Washita | 9244011 | 103901613 | 1928 | MIDCOAST G AND P OKLAHOMA LP | DILL CITY COMPRESSOR STATION | 486210 |
| | OK | Washita | 9244011 | 103901713 | 1928 | MIDCOAST G AND P OKLAHOMA LP | DILL CITY COMPRESSOR STATION | 486210 |
| | OK | Seminole | 9251311 | 57746813 | 479 | ENERFIN RESOURCES I LP | SEMINOLE COMPRESSOR STATION | 486210 |
| | OK | Seminole | 9251311 | 112101213 | 479 | ENERFIN RESOURCES I LP | SEMINOLE COMPRESSOR STATION | 486210 |
| | OK | Coal | 1341391 | 72240913 | 6232 | MARKWEST OKLAHOMA GAS CO LLC | SPRAGUE COMPRESSOR STATION | 486210 |
| | OK | Coal | 1341391 | 97019613 | 6232 | MARKWEST OKLAHOMA GAS CO LLC | SPRAGUE COMPRESSOR STATION | 486210 |
| | OK | Coal | 1341391 | 128859413 | 6232 | MARKWEST OKLAHOMA GAS CO LLC | SPRAGUE COMPRESSOR STATION | 486210 |
| | OK | Coal | 1341391 | 72239613 | 6232 | MARKWEST OKLAHOMA GAS CO LLC | SPRAGUE COMPRESSOR STATION | 486210 |
| | OK | Coal | 1341391 | 128859313 | 6232 | MARKWEST OKLAHOMA GAS CO LLC | SPRAGUE COMPRESSOR STATION | 486210 |
| | OK | Coal | 1341391 | 128859613 | 6232 | MARKWEST OKLAHOMA GAS CO LLC | SPRAGUE COMPRESSOR STATION | 486210 |
| | OK | Coal | 1341391 | 128859513 | 6232 | MARKWEST OKLAHOMA GAS CO LLC | SPRAGUE COMPRESSOR STATION | 486210 |
| | OK | Coal | 1341391 | 72239713 | 6232 | MARKWEST OKLAHOMA GAS CO LLC | SPRAGUE COMPRESSOR STATION | 486210 |
| | OK | Coal | 1341391 | 128859713 | 6232 | MARKWEST OKLAHOMA GAS CO LLC | SPRAGUE COMPRESSOR STATION | 486210 |
| | OK | Coal | 1341391 | 128859813 | 6232 | MARKWEST OKLAHOMA GAS CO LLC | SPRAGUE COMPRESSOR STATION | 486210 |
| | OK | Hughes | 1341401 | 72242913 | 6233 | MARKWEST OKLAHOMA GAS CO LLC | BREWER CMPSR STA | 486210 |
| | OK | Hughes | 1341401 | 72243013 | 6233 | MARKWEST OKLAHOMA GAS CO LLC | BREWER CMPSR STA | 486210 |
| | OK | Hughes | 1341401 | 72241513 | 6233 | MARKWEST OKLAHOMA GAS CO LLC | BREWER CMPSR STA | 486210 |
| | OK | Hughes | 1341401 | 72241413 | 6233 | MARKWEST OKLAHOMA GAS CO LLC | BREWER CMPSR STA | 486210 |
| | OK | Hughes | 1341411 | 72243613 | 6221 | MARKWEST OKLAHOMA GAS CO LLC | STUART NORTH COMPRESSOR STATION | 486210 |
| | OK | Hughes | 1341411 | 72243813 | 6221 | MARKWEST OKLAHOMA GAS CO LLC | STUART NORTH COMPRESSOR STATION | 486210 |
| | OK | Hughes | 1341411 | 112101613 | 6221 | MARKWEST OKLAHOMA GAS CO LLC | STUART NORTH COMPRESSOR STATION | 486210 |
| | OK | Hughes | 1341411 | 72244713 | 6221 | MARKWEST OKLAHOMA GAS CO LLC | STUART NORTH COMPRESSOR STATION | 486210 |
| | OK | Hughes | 1341411 | 112101413 | 6221 | MARKWEST OKLAHOMA GAS CO LLC | STUART NORTH COMPRESSOR STATION | 486210 |
| | OK | Hughes | 1341411 | 97019113 | 6221 | MARKWEST OKLAHOMA GAS CO LLC | STUART NORTH COMPRESSOR STATION | 486210 |
| | OK | Hughes | 1341411 | 72243913 | 6221 | MARKWEST OKLAHOMA GAS CO LLC | STUART NORTH COMPRESSOR STATION | 486210 |
| | OK | Hughes | 1341411 | 97019213 | 6221 | MARKWEST OKLAHOMA GAS CO LLC | STUART NORTH COMPRESSOR STATION | 486210 |
| | OK | Hughes | 1341411 | 72244613 | 6221 | MARKWEST OKLAHOMA GAS CO LLC | STUART NORTH COMPRESSOR STATION | 486210 |
| | OK | Hughes | 1341411 | 97019313 | 6221 | MARKWEST OKLAHOMA GAS CO LLC | STUART NORTH COMPRESSOR STATION | 486210 |
| | OK | Hughes | 1341411 | 112101313 | 6221 | MARKWEST OKLAHOMA GAS CO LLC | STUART NORTH COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549091 | 97020513 | 6235 | MARKWEST OKLAHOMA GAS CO LLC | NEWMAN COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549091 | 97020913 | 6235 | MARKWEST OKLAHOMA GAS CO LLC | NEWMAN COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549091 | 97020713 | 6235 | MARKWEST OKLAHOMA GAS CO LLC | NEWMAN COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549091 | 97021013 | 6235 | MARKWEST OKLAHOMA GAS CO LLC | NEWMAN COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549091 | 97021113 | 6235 | MARKWEST OKLAHOMA GAS CO LLC | NEWMAN COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549091 | 97020413 | 6235 | MARKWEST OKLAHOMA GAS CO LLC | NEWMAN COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549091 | 97021213 | 6235 | MARKWEST OKLAHOMA GAS CO LLC | NEWMAN COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549091 | 128859913 | 6235 | MARKWEST OKLAHOMA GAS CO LLC | NEWMAN COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549101 | 97021413 | 6237 | MARKWEST OKLAHOMA GAS CO LLC | VERNER COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549101 | 97021913 | 6237 | MARKWEST OKLAHOMA GAS CO LLC | VERNER COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549101 | 97022613 | 6237 | MARKWEST OKLAHOMA GAS CO LLC | VERNER COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549101 | 97022113 | 6237 | MARKWEST OKLAHOMA GAS CO LLC | VERNER COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549101 | 97022313 | 6237 | MARKWEST OKLAHOMA GAS CO LLC | VERNER COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549101 | 97021613 | 6237 | MARKWEST OKLAHOMA GAS CO LLC | VERNER COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549101 | 97022013 | 6237 | MARKWEST OKLAHOMA GAS CO LLC | VERNER COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549101 | 97021313 | 6237 | MARKWEST OKLAHOMA GAS CO LLC | VERNER COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549101 | 126968913 | 6237 | MARKWEST OKLAHOMA GAS CO LLC | VERNER COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549101 | 126968713 | 6237 | MARKWEST OKLAHOMA GAS CO LLC | VERNER COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549101 | 126968813 | 6237 | MARKWEST OKLAHOMA GAS CO LLC | VERNER COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549141 | 97030313 | 6366 | MARKWEST OKLAHOMA GAS CO LLC | SHERMAN ELLIS COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549141 | 97030413 | 6366 | MARKWEST OKLAHOMA GAS CO LLC | SHERMAN ELLIS COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1549141 | 97030213 | 6366 | MARKWEST OKLAHOMA GAS CO LLC | SHERMAN ELLIS COMPRESSOR STATION | 486210 |
| | OK | Coal | 1549161 | 97032513 | 6394 | MARKWEST OKLAHOMA GAS CO LLC | COFFEY CMPSR STA | 486210 |
| | OK | Coal | 1549161 | 97033313 | 6394 | MARKWEST OKLAHOMA GAS CO LLC | COFFEY CMPSR STA | 486210 |
| | OK | Coal | 1549161 | 97033413 | 6394 | MARKWEST OKLAHOMA GAS CO LLC | COFFEY CMPSR STA | 486210 |
| | OK | Coal | 1549161 | 97033213 | 6394 | MARKWEST OKLAHOMA GAS CO LLC | COFFEY CMPSR STA | 486210 |
| | OK | Coal | 1549181 | 97035013 | 6510 | MARKWEST OKLAHOMA GAS CO LLC | WOMACK COMPRESSOR STATION | 486210 |
| | OK | Coal | 1549181 | 97035713 | 6510 | MARKWEST OKLAHOMA GAS CO LLC | WOMACK COMPRESSOR STATION | 486210 |
| | OK | Coal | 1549181 | 97035313 | 6510 | MARKWEST OKLAHOMA GAS CO LLC | WOMACK COMPRESSOR STATION | 486210 |
| | OK | Coal | 1549181 | 97034713 | 6510 | MARKWEST OKLAHOMA GAS CO LLC | WOMACK COMPRESSOR STATION | 486210 |
| | OK | Coal | 1549181 | 97035613 | 6510 | MARKWEST OKLAHOMA GAS CO LLC | WOMACK COMPRESSOR STATION | 486210 |
| | OK | Coal | 1549181 | 126969913 | 6510 | MARKWEST OKLAHOMA GAS CO LLC | WOMACK COMPRESSOR STATION | 486210 |
| | OK | Coal | 1549181 | 97035213 | 6510 | MARKWEST OKLAHOMA GAS CO LLC | WOMACK COMPRESSOR STATION | 486210 |
| | OK | Coal | 1549181 | 126969813 | 6510 | MARKWEST OKLAHOMA GAS CO LLC | WOMACK COMPRESSOR STATION | 486210 |
| | OK | Coal | 1549181 | 97034813 | 6510 | MARKWEST OKLAHOMA GAS CO LLC | WOMACK COMPRESSOR STATION | 486210 |
| | OK | Coal | 1549181 | 128870513 | 6510 | MARKWEST OKLAHOMA GAS CO LLC | WOMACK COMPRESSOR STATION | 486210 |
| | OK | Coal | 1549181 | 128870413 | 6510 | MARKWEST OKLAHOMA GAS CO LLC | WOMACK COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1525311 | 128869113 | 6452 | MARKWEST OKLAHOMA GAS CO LLC | KERNS CANAAN POD 5 COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1525311 | 97459513 | 6452 | MARKWEST OKLAHOMA GAS CO LLC | KERNS CANAAN POD 5 COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1525511 | 97461913 | 6626 | MARKWEST OKLAHOMA GAS CO LLC | SCHWARZ COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1525511 | 97462013 | 6626 | MARKWEST OKLAHOMA GAS CO LLC | SCHWARZ COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1525511 | 97462113 | 6626 | MARKWEST OKLAHOMA GAS CO LLC | SCHWARZ COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 1525511 | 97462313 | 6626 | MARKWEST OKLAHOMA GAS CO LLC | SCHWARZ COMPRESSOR STATION | 486210 |
| | OK | Coal | 1526011 | 97460513 | 6480 | MARKWEST OKLAHOMA GAS CO LLC | ARKOMA COMPRESSOR STATION | 486210 |
| | OK | Coal | 1526011 | 97460313 | 6480 | MARKWEST OKLAHOMA GAS CO LLC | ARKOMA COMPRESSOR STATION | 486210 |
| | OK | Coal | 1526221 | 97463113 | 6848 | ENABLE GAS GATHERING LLC | PARKER CMPSR STA | 486210 |
| | OK | Coal | 1526221 | 97463313 | 6848 | ENABLE GAS GATHERING LLC | PARKER CMPSR STA | 486210 |
| | OK | Coal | 1526221 | 97463013 | 6848 | ENABLE GAS GATHERING LLC | PARKER CMPSR STA | 486210 |
| | OK | Beckham | 1632481 | 128904813 | 94 | MIDCOAST G AND P OKLAHOMA LP | MERRITT COMPRESSOR STATION | 486210 |
| | OK | Beckham | 1632481 | 103942713 | 94 | MIDCOAST G AND P OKLAHOMA LP | MERRITT COMPRESSOR STATION | 486210 |
| | OK | Beckham | 1632481 | 103942613 | 94 | MIDCOAST G AND P OKLAHOMA LP | MERRITT COMPRESSOR STATION | 486210 |
| | OK | Caddo | 1632501 | 103945213 | 235 | ELM GROVE COMPRESSOR STATION | ELM GROVE COMPRESSOR STATION | 486210 |
| | OK | Beaver | 1632571 | 103951313 | 268 | COLORADO INTERSTATE GAS LLC | BEAVER COUNTY COMPRESSOR STATION | 486210 |
| | OK | Beaver | 1632571 | 103951213 | 268 | COLORADO INTERSTATE GAS LLC | BEAVER COUNTY COMPRESSOR STATION | 486210 |
| | OK | Beaver | 1632571 | 103951113 | 268 | COLORADO INTERSTATE GAS LLC | BEAVER COUNTY COMPRESSOR STATION | 486210 |
| | OK | Grady | 1633021 | 103990913 | 498 | ENABLE GAS GATHERING LLC | DUTTON COMPRESSOR STATION | 486210 |
| | OK | Canadian | 1633031 | 103991713 | 503 | ENABLE GAS GATHERING LLC | GRANDVIEW COMPRESSOR STATION | 486210 |
| | OK | Canadian | 1633031 | 103991813 | 503 | ENABLE GAS GATHERING LLC | GRANDVIEW COMPRESSOR STATION | 486210 |
| | OK | Canadian | 1633031 | 128842713 | 503 | ENABLE GAS GATHERING LLC | GRANDVIEW COMPRESSOR STATION | 486210 |
| | OK | Canadian | 1633031 | 103991613 | 503 | ENABLE GAS GATHERING LLC | GRANDVIEW COMPRESSOR STATION | 486210 |
| | OK | Canadian | 1633031 | 103991513 | 503 | ENABLE GAS GATHERING LLC | GRANDVIEW COMPRESSOR STATION | 486210 |
| | OK | Blaine | 1633061 | 103990513 | 512 | ENABLE GAS GATHERING LLC | NORTH WATONGA COMPRESSOR STATION | 486210 |
| | OK | Blaine | 1633061 | 103994813 | 512 | ENABLE GAS GATHERING LLC | NORTH WATONGA COMPRESSOR STATION | 486210 |
| | OK | Blaine | 1633061 | 103994913 | 512 | ENABLE GAS GATHERING LLC | NORTH WATONGA COMPRESSOR STATION | 486210 |
| | OK | Caddo | 1633071 | 103995813 | 516 | ENABLE GAS GATHERING LLC | SICKLES CMPSR STA | 486210 |
| | OK | Caddo | 1633071 | 103995713 | 516 | ENABLE GAS GATHERING LLC | SICKLES CMPSR STA | 486210 |
| | OK | Canadian | 1633091 | 103997613 | 518 | ENABLE GAS GATHERING LLC | SIX MILE CREEK COMPRESSOR STATION | 486210 |
| | OK | Canadian | 1633091 | 103997713 | 518 | ENABLE GAS GATHERING LLC | SIX MILE CREEK COMPRESSOR STATION | 486210 |
| | OK | Canadian | 1633091 | 103997413 | 518 | ENABLE GAS GATHERING LLC | SIX MILE CREEK COMPRESSOR STATION | 486210 |
| | OK | Canadian | 1633091 | 103997513 | 518 | ENABLE GAS GATHERING LLC | SIX MILE CREEK COMPRESSOR STATION | 486210 |
| | OK | Roger Mills | 1634611 | 104127413 | 1545 | ENABLE GAS GATHERING LLC | BLACK KETTLE CMPSR STA | 486210 |
| | OK | Roger Mills | 1634611 | 104127313 | 1545 | ENABLE GAS GATHERING LLC | BLACK KETTLE CMPSR STA | 486210 |
| | OK | Grady | 1634561 | 112116913 | 1553 | ENABLE GAS GATHERING LLC | CHEVRON CMPSR STA | 486210 |
| | OK | Roger Mills | 1634541 | 104134313 | 1580 | ENABLE GAS GATHERING LLC | GRIMES CMPSR STA | 486210 |
| | OK | Roger Mills | 1634541 | 104134613 | 1580 | ENABLE GAS GATHERING LLC | GRIMES CMPSR STA | 486210 |
| | OK | Roger Mills | 1634541 | 104134413 | 1580 | ENABLE GAS GATHERING LLC | GRIMES CMPSR STA | 486210 |
| | OK | Roger Mills | 1634591 | 104138613 | 1595 | ENABLE GAS GATHERING LLC | MOOREWOOD CMPSR STA | 486210 |
| | OK | Roger Mills | 1634591 | 104138513 | 1595 | ENABLE GAS GATHERING LLC | MOOREWOOD CMPSR STA | 486210 |
| | OK | Washita | 1636281 | 104298113 | 5967 | MIDCOAST G AND P OKLAHOMA LP | SENTINEL COMPRESSOR STATION | 486210 |
| | OK | Washita | 1636281 | 104298013 | 5967 | MIDCOAST G AND P OKLAHOMA LP | SENTINEL COMPRESSOR STATION | 486210 |
| | OK | Washita | 1636281 | 104298213 | 5967 | MIDCOAST G AND P OKLAHOMA LP | SENTINEL COMPRESSOR STATION | 486210 |
| | OK | Washita | 1636411 | 112145413 | 6138 | MIDCOAST G AND P OKLAHOMA LP | SPRADLIN COMPRESSOR STATION | 486210 |
| | OK | Washita | 1636411 | 112145513 | 6138 | MIDCOAST G AND P OKLAHOMA LP | SPRADLIN COMPRESSOR STATION | 486210 |
| | OK | Roger Mills | 1636681 | 128863913 | 6371 | MARKWEST OKLAHOMA GAS CO LLC | JACKSON COMPRESSOR STATION | 486210 |
| | OK | Roger Mills | 1636681 | 104342013 | 6371 | MARKWEST OKLAHOMA GAS CO LLC | JACKSON COMPRESSOR STATION | 486210 |
| | OK | Roger Mills | 1636681 | 104341213 | 6371 | MARKWEST OKLAHOMA GAS CO LLC | JACKSON COMPRESSOR STATION | 486210 |
| | OK | Roger Mills | 1636681 | 128863813 | 6371 | MARKWEST OKLAHOMA GAS CO LLC | JACKSON COMPRESSOR STATION | 486210 |
| | OK | Roger Mills | 1636681 | 128864013 | 6371 | MARKWEST OKLAHOMA GAS CO LLC | JACKSON COMPRESSOR STATION | 486210 |
| | OK | Roger Mills | 1636681 | 128864113 | 6371 | MARKWEST OKLAHOMA GAS CO LLC | JACKSON COMPRESSOR STATION | 486210 |

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 0.5 MI NW OF N2500/E1170 RDS | EAKLY | 1340 | HP | 17.573 |
| Pipeline Transportation of Natural Gas | 0.5 MI NW OF N2500/E1170 RDS | EAKLY | 1340 | HP | 15.546 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 1890 | HP | 8.60736 |
| Pipeline Transportation of Natural Gas | 4 MILES E ON HWY 3 OF | ELMWOOD | 1820 | HP | 0.016 |
| Pipeline Transportation of Natural Gas | 12 MILES N AND 2 MILES W OF | COALGATE | 2250 | HP | 13.02 |
| Pipeline Transportation of Natural Gas | 12 MILES N AND 2 MILES W OF | COALGATE | 2250 | HP | 12.32 |
| Pipeline Transportation of Natural Gas | 3561 North 4000 Road | COPAN | 2000 | HP | 7.01 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF ROCKWELL & SIMMONS | GUTHRIE | 2600 | HP | 5.582 |
| Pipeline Transportation of Natural Gas | 0.4 MI N OF ROCKWELL & SIMMONS | GUTHRIE | 2600 | HP | 3.718 |
| Pipeline Transportation of Natural Gas | 0.1 MI W OF HWY 33 & N2230 RD | ARAPAHO | 2000 | HP | 1.188 |
| Pipeline Transportation of Natural Gas | 0.1 MI W OF HWY 33 & N2230 RD | ARAPAHO | 1100 | HP | 1.126 |
| Pipeline Transportation of Natural Gas | 0.1 MI W OF HWY 33 & N2230 RD | ARAPAHO | 2000 | HP | 0.492 |
| Pipeline Transportation of Natural Gas | 0.3 MI S OF BK R & BK23 RD | SAYRE | 4740 | HP | 8.2932 |
| Pipeline Transportation of Natural Gas | 0.3 MI S OF BK R & BK23 RD | SAYRE | 3000 | HP | 8.03601 |
| Pipeline Transportation of Natural Gas | 0.3 MI S OF BK R & BK23 RD | SAYRE | 3550 | HP | 7.97614 |
| Pipeline Transportation of Natural Gas | 2 MI NW OF | RATLIFF CITY | 3550 | HP | 11.7632 |
| Pipeline Transportation of Natural Gas | 2 MI NW OF | RATLIFF CITY | 2370 | HP | 7.7157 |
| Pipeline Transportation of Natural Gas | 0.2 MI SW OF N2090 / E1200 RD | DILL CITY | 1340 | HP | 15.208 |
| Pipeline Transportation of Natural Gas | 0.2 MI SW OF N2090 / E1200 RD | DILL CITY | 1340 | HP | 8.012 |
| Pipeline Transportation of Natural Gas | 0.2 MI SW OF N2090 / E1200 RD | DILL CITY | 1340 | HP | 5.186 |
| Pipeline Transportation of Natural Gas | 12625 N3566 RD | SEMINOLE | 1100 | HP | 4.564 |
| Pipeline Transportation of Natural Gas | 12625 N3566 RD | SEMINOLE | 1100 | HP | 2.25 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF N3840/E1628 RDS | COALGATE | 2370 | HP | 15.827 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF N3840/E1628 RDS | COALGATE | 2370 | HP | 15.727 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF N3840/E1628 RDS | COALGATE | 2370 | HP | 15.337 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF N3840/E1628 RDS | COALGATE | 1340 | HP | 15.169 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF N3840/E1628 RDS | COALGATE | 1340 | HP | 14.913 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF N3840/E1628 RDS | COALGATE | 1340 | HP | 13.298 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF N3840/E1628 RDS | COALGATE | 1340 | HP | 13.267 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF N3840/E1628 RDS | COALGATE | 1340 | HP | 12.427 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF N3840/E1628 RDS | COALGATE | 1340 | HP | 10.904 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF N3840/E1628 RDS | COALGATE | 1340 | HP | 6.7 |
| Pipeline Transportation of Natural Gas | 8 MILES SW OF | STUART | 2370 | HP | 15.602 |
| Pipeline Transportation of Natural Gas | 8 MILES SW OF | STUART | 2370 | HP | 14.212 |
| Pipeline Transportation of Natural Gas | 8 MILES SW OF | STUART | 1340 | HP | 12.986 |
| Pipeline Transportation of Natural Gas | 8 MILES SW OF | STUART | 1340 | HP | 11.256 |
| Pipeline Transportation of Natural Gas | 3 MILES NW OF HWY 270 | STUART | 1340 | HP | 19.091 |
| Pipeline Transportation of Natural Gas | 3 MILES NW OF HWY 270 | STUART | 1340 | HP | 18.93 |
| Pipeline Transportation of Natural Gas | 3 MILES NW OF HWY 270 | STUART | 1340 | HP | 18.848 |
| Pipeline Transportation of Natural Gas | 3 MILES NW OF HWY 270 | STUART | 1340 | HP | 18.702 |
| Pipeline Transportation of Natural Gas | 3 MILES NW OF HWY 270 | STUART | 1340 | HP | 17.703 |
| Pipeline Transportation of Natural Gas | 3 MILES NW OF HWY 270 | STUART | 1340 | HP | 17.488 |
| Pipeline Transportation of Natural Gas | 3 MILES NW OF HWY 270 | STUART | 1340 | HP | 17.447 |
| Pipeline Transportation of Natural Gas | 3 MILES NW OF HWY 270 | STUART | 1340 | HP | 17.366 |
| Pipeline Transportation of Natural Gas | 3 MILES NW OF HWY 270 | STUART | 1340 | HP | 16.915 |
| Pipeline Transportation of Natural Gas | 3 MILES NW OF HWY 270 | STUART | 1340 | HP | 15.479 |
| Pipeline Transportation of Natural Gas | 3 MILES NW OF HWY 270 | STUART | 1340 | HP | 15.469 |
| Pipeline Transportation of Natural Gas | 3 MILES NW OF HWY 270 | STUART | 1340 | HP | 15.115 |
| Pipeline Transportation of Natural Gas | 14 MILES WNW OF | MCALESTER | 1340 | HP | 19.046 |
| Pipeline Transportation of Natural Gas | 14 MILES WNW OF | MCALESTER | 1340 | HP | 18.285 |
| Pipeline Transportation of Natural Gas | 14 MILES WNW OF | MCALESTER | 1340 | HP | 17.974 |
| Pipeline Transportation of Natural Gas | 14 MILES WNW OF | MCALESTER | 1340 | HP | 17.954 |
| Pipeline Transportation of Natural Gas | 14 MILES WNW OF | MCALESTER | 1340 | HP | 16.319 |
| Pipeline Transportation of Natural Gas | 14 MILES WNW OF | MCALESTER | 1340 | HP | 15.89 |
| Pipeline Transportation of Natural Gas | 14 MILES WNW OF | MCALESTER | 1340 | HP | 15.114 |
| Pipeline Transportation of Natural Gas | 14 MILES WNW OF | MCALESTER | 1340 | HP | 6.137 |
| Pipeline Transportation of Natural Gas | 1.85 MI ESE OF HWY270 & HWY31A | HAYWOOD | 1340 | HP | 19.005 |
| Pipeline Transportation of Natural Gas | 1.85 MI ESE OF HWY270 & HWY31A | HAYWOOD | 1340 | HP | 18.662 |
| Pipeline Transportation of Natural Gas | 1.85 MI ESE OF HWY270 & HWY31A | HAYWOOD | 1340 | HP | 18.129 |
| Pipeline Transportation of Natural Gas | 1.85 MI ESE OF HWY270 & HWY31A | HAYWOOD | 1340 | HP | 17.677 |
| Pipeline Transportation of Natural Gas | 1.85 MI ESE OF HWY270 & HWY31A | HAYWOOD | 1340 | HP | 17.253 |
| Pipeline Transportation of Natural Gas | 1.85 MI ESE OF HWY270 & HWY31A | HAYWOOD | 1340 | HP | 16.897 |
| Pipeline Transportation of Natural Gas | 1.85 MI ESE OF HWY270 & HWY31A | HAYWOOD | 1340 | HP | 15.294 |
| Pipeline Transportation of Natural Gas | 1.85 MI ESE OF HWY270 & HWY31A | HAYWOOD | 1340 | HP | 15.284 |
| Pipeline Transportation of Natural Gas | 1.85 MI ESE OF HWY270 & HWY31A | HAYWOOD | 1340 | HP | 14.738 |
| Pipeline Transportation of Natural Gas | 1.85 MI ESE OF HWY270 & HWY31A | HAYWOOD | 1380 | HP | 8.811 |
| Pipeline Transportation of Natural Gas | 1.85 MI ESE OF HWY270 & HWY31A | HAYWOOD | 1340 | HP | 5.891 |
| Pipeline Transportation of Natural Gas | 1.85 MI ESE OF HWY270 & HWY31A | HAYWOOD | 1340 | HP | 5.196 |
| Pipeline Transportation of Natural Gas | 0.7 MI NW OF N3930 & E1470 RD | HAYWOOD | 2370 | HP | 12.822 |
| Pipeline Transportation of Natural Gas | 0.7 MI NW OF N3930 & E1470 RD | HAYWOOD | 2370 | HP | 10.275 |
| Pipeline Transportation of Natural Gas | 0.7 MI NW OF N3930 & E1470 RD | HAYWOOD | 2370 | HP | 8.695 |
| Pipeline Transportation of Natural Gas | 4 MILES NNW OF | CENTRAHOMA | 1340 | HP | 19.049 |
| Pipeline Transportation of Natural Gas | 4 MILES NNW OF | CENTRAHOMA | 1340 | HP | 17.987 |
| Pipeline Transportation of Natural Gas | 4 MILES NNW OF | CENTRAHOMA | 1340 | HP | 17.549 |
| Pipeline Transportation of Natural Gas | 4 MILES NNW OF | CENTRAHOMA | 1340 | HP | 15.102 |
| Pipeline Transportation of Natural Gas | 4 MILES NNW OF | CENTRAHOMA | 1340 | HP | 10.965 |
| Pipeline Transportation of Natural Gas | 0.15MI NW OF E1625/I8ERN RD | COALGATE | 1340 | HP | 19.189 |
| Pipeline Transportation of Natural Gas | 0.15MI NW OF E1625/I8ERN RD | COALGATE | 1340 | HP | 18.906 |
| Pipeline Transportation of Natural Gas | 0.15MI NW OF E1625/I8ERN RD | COALGATE | 1340 | HP | 18.873 |
| Pipeline Transportation of Natural Gas | 0.15MI NW OF E1625/I8ERN RD | COALGATE | 1340 | HP | 18.23 |
| Pipeline Transportation of Natural Gas | 0.15MI NW OF E1625/I8ERN RD | COALGATE | 1340 | HP | 17.647 |
| Pipeline Transportation of Natural Gas | 0.15MI NW OF E1625/I8ERN RD | COALGATE | 1340 | HP | 16.358 |
| Pipeline Transportation of Natural Gas | 0.15MI NW OF E1625/I8ERN RD | COALGATE | 2370 | HP | 15.647 |
| Pipeline Transportation of Natural Gas | 0.15MI NW OF E1625/I8ERN RD | COALGATE | 1340 | HP | 15.16 |
| Pipeline Transportation of Natural Gas | 0.15MI NW OF E1625/I8ERN RD | COALGATE | 1340 | HP | 9.61 |
| Pipeline Transportation of Natural Gas | 0.15MI NW OF E1625/I8ERN RD | COALGATE | 1780 | HP | 8.811 |
| Pipeline Transportation of Natural Gas | 0.15MI NW OF E1625/I8ERN RD | COALGATE | 1780 | HP | 8.505 |
| Pipeline Transportation of Natural Gas | 15 MILES NNW OF | MCALESTER | 1340 | HP | 2.637 |
| Pipeline Transportation of Natural Gas | 15 MILES NNW OF | MCALESTER | 1340 | HP | 1.343 |
| Pipeline Transportation of Natural Gas | 7 MILES N OF | MCALESTER | 1340 | HP | 17.965 |
| Pipeline Transportation of Natural Gas | 7 MILES N OF | MCALESTER | 1340 | HP | 15.387 |
| Pipeline Transportation of Natural Gas | 7 MILES N OF | MCALESTER | 1340 | HP | 11.574 |
| Pipeline Transportation of Natural Gas | 7 MILES N OF | MCALESTER | 1340 | HP | 0.937 |
| Pipeline Transportation of Natural Gas | 7 MILES NNW OF | COALGATE | 3550 | HP | 19.807 |
| Pipeline Transportation of Natural Gas | 7 MILES NNW OF | COALGATE | 3550 | HP | 16.506 |
| Pipeline Transportation of Natural Gas | 7 MILES NNW OF | COALGATE | 3550 | HP | 16.052 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF IL8ERRY & N3880 RD | COALGATE | 1340 | HP | 19.737 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF IL8ERRY & N3880 RD | COALGATE | 1340 | HP | 14.528 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF IL8ERRY & N3880 RD | COALGATE | 1340 | HP | 13.681 |
| Pipeline Transportation of Natural Gas | 0.2 MI E OF BK27 & BKL | ELK CITY | 1340 | HP | 17.294 |
| Pipeline Transportation of Natural Gas | 0.2 MI E OF BK27 & BKL | ELK CITY | 1340 | HP | 7.929 |
| Pipeline Transportation of Natural Gas | 0.2 MI E OF BK27 & BKL | ELK CITY | 1340 | HP | 7.85 |
| Pipeline Transportation of Natural Gas | 0.7 MI SE OF I-40 & N2560 RD | BRIDGEPORT | 1480 | HP | 4.901 |
| Pipeline Transportation of Natural Gas | 2.5 MI E OF TURPIN | TURPIN | 1100 | HP | 15.73 |
| Pipeline Transportation of Natural Gas | 2.5 MI E OF TURPIN | TURPIN | 1100 | HP | 15.27 |
| Pipeline Transportation of Natural Gas | 2.5 MI E OF TURPIN | TURPIN | 1100 | HP | 14.49 |
| Pipeline Transportation of Natural Gas | 2.5 MI E OF TURPIN | TURPIN | 1780 | HP | 5.23 |
| Pipeline Transportation of Natural Gas | 2 MI N AND 4 MI W | POCASSET | 1230 | HP | 4.696 |
| Pipeline Transportation of Natural Gas | 4 MILES E AND 4 MILES N OF | GEARY | 1480 | HP | 20.32 |
| Pipeline Transportation of Natural Gas | 4 MILES E AND 4 MILES N OF | GEARY | 1230 | HP | 20.039 |
| Pipeline Transportation of Natural Gas | 4 MILES E AND 4 MILES N OF | GEARY | 1380 | HP | 13.062 |
| Pipeline Transportation of Natural Gas | 4 MILES E AND 4 MILES N OF | GEARY | 1480 | HP | 11.686 |
| Pipeline Transportation of Natural Gas | 4 MILES E AND 4 MILES N OF | GEARY | 1480 | HP | 9.077 |
| Pipeline Transportation of Natural Gas | 5 MI E OF WATONGA | WATONGA | 1230 | HP | 8.192 |
| Pipeline Transportation of Natural Gas | 5 MI E OF WATONGA | WATONGA | 1230 | HP | 5.247 |
| Pipeline Transportation of Natural Gas | 5 MI E OF WATONGA | WATONGA | 1230 | HP | 4.332 |
| Pipeline Transportation of Natural Gas | 5 MI NE OF EAKLY | EAKLY | 1480 | HP | 17.807 |
| Pipeline Transportation of Natural Gas | 5 MI NE OF EAKLY | EAKLY | 1480 | HP | 11.026 |
| Pipeline Transportation of Natural Gas | 2 MILES SW OF | CALUMET | 1480 | HP | 16.999 |
| Pipeline Transportation of Natural Gas | 2 MILES SW OF | CALUMET | 1480 | HP | 15.037 |
| Pipeline Transportation of Natural Gas | 2 MILES SW OF | CALUMET | 1480 | HP | 11.349 |
| Pipeline Transportation of Natural Gas | 2 MILES SW OF | CALUMET | 1480 | HP | 6.464 |
| Pipeline Transportation of Natural Gas | 4 MI S OF HWY5 283 AND 33 | CHEYENNE | 1080 | HP | 1.818 |
| Pipeline Transportation of Natural Gas | 4 MI S OF HWY5 283 AND 33 | CHEYENNE | 1220 | HP | 0.43 |
| Pipeline Transportation of Natural Gas | 0.6 MI NW OF N2960 & E1610 RD | COX CITY | 1380 | HP | 10.884 |
| Pipeline Transportation of Natural Gas | 9 MI S 3 MI W OF HWY 283 | CHEYENNE | 1220 | HP | 20.869 |
| Pipeline Transportation of Natural Gas | 9 MI S 3 MI W OF HWY 283 | CHEYENNE | 1080 | HP | 0.366 |
| Pipeline Transportation of Natural Gas | 9 MI S 3 MI W OF HWY 283 | CHEYENNE | 1220 | HP | 0.067 |
| Pipeline Transportation of Natural Gas | 0.1 MI W OF N1980/E0850 RDS | HAMMON | 1660 | HP | 14.664 |
| Pipeline Transportation of Natural Gas | 0.1 MI W OF N1980/E0850 RDS | HAMMON | 1660 | HP | 6.565 |
| Pipeline Transportation of Natural Gas | 0.5 MI S OF N2090 & E1230 RD | SENTINEL | 1340 | HP | 14.402 |
| Pipeline Transportation of Natural Gas | 0.5 MI S OF N2090 & E1230 RD | SENTINEL | 1340 | HP | 14.067 |
| Pipeline Transportation of Natural Gas | 0.5 MI S OF N2090 & E1230 RD | SENTINEL | 1340 | HP | 12.33 |
| Pipeline Transportation of Natural Gas | JCT OF N2050/E1170 RDS | ELK CITY | 1340 | HP | 17.817 |
| Pipeline Transportation of Natural Gas | JCT OF N2050/E1170 RDS | ELK CITY | 1340 | HP | 7.084 |
| Pipeline Transportation of Natural Gas | 1 MI E OF RNCH2NKT 18 & F RD | SAYRE | 1340 | HP | 18.726 |
| Pipeline Transportation of Natural Gas | 1 MI E OF RNCH2NKT 18 & F RD | SAYRE | 1340 | HP | 5.448 |
| Pipeline Transportation of Natural Gas | 1 MI E OF RNCH2NKT 18 & F RD | SAYRE | 1340 | HP | 4.682 |
| Pipeline Transportation of Natural Gas | 1 MI E OF RNCH2NKT 18 & F RD | SAYRE | 1340 | HP | 3.447 |
| Pipeline Transportation of Natural Gas | 1 MI E OF RNCH2NKT 18 & F RD | SAYRE | 1380 | HP | 2.333 |
| Pipeline Transportation of Natural Gas | 1 MI E OF RNCH2NKT 18 & F RD | SAYRE | 1340 | HP | 1.164 |

| Emissions | UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|---|
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |



**511a**

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | OK | Roger Mills | 16366811 | 128864213 6371 | | MARKWEST OKLAHOMA GAS CO LLC | JACKSON COMPRESSOR STATION | 486210 |
| | OK | Grant | 16367511 | 128865813 6395 | | ETC TEXAS PIPELINE LTD | ESKIMO COMPRESSOR STATION | 486210 |
| | OK | Grant | 16367511 | 104348613 6395 | | ETC TEXAS PIPELINE LTD | ESKIMO COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 16368211 | 104354713 6429 | | ENABLE GAS GATHERING LLC | ARMY CMPSR STA | 486210 |
| | OK | Pittsburg | 16368211 | 104354913 6429 | | ENABLE GAS GATHERING LLC | ARMY CMPSR STA | 486210 |
| | OK | Pittsburg | 16368211 | 104354613 6429 | | ENABLE GAS GATHERING LLC | ARMY CMPSR STA | 486210 |
| | OK | Beckham | 16370711 | 104380313 6609 | | MIDCOAST G AND P OKLAHOMA LP | CEMETERY RD CMPSR STA | 486210 |
| | OK | Beckham | 16370711 | 104380213 6609 | | MIDCOAST G AND P OKLAHOMA LP | CEMETERY RD CMPSR STA | 486210 |
| | OK | Beckham | 16370711 | 112155913 6609 | | MIDCOAST G AND P OKLAHOMA LP | CEMETERY RD CMPSR STA | 486210 |
| | OK | Hughes | 16373111 | 104400313 7053 | | MARKWEST OKLAHOMA GAS CO LLC | DUNN COMPRESSOR STATION | 486210 |
| | OK | Hughes | 16373111 | 104400213 7053 | | MARKWEST OKLAHOMA GAS CO LLC | DUNN COMPRESSOR STATION | 486210 |
| | OK | Hughes | 16373111 | 104400513 7053 | | MARKWEST OKLAHOMA GAS CO LLC | DUNN COMPRESSOR STATION | 486210 |
| | OK | Hughes | 16373111 | 104400413 7053 | | MARKWEST OKLAHOMA GAS CO LLC | DUNN COMPRESSOR STATION | 486210 |
| | OK | Washita | 16373611 | 104404713 7140 | | ENABLE GAS GATHERING LLC | WASHITA RIVER CMPSR STA | 486210 |
| | OK | Washita | 16373611 | 104404613 7140 | | ENABLE GAS GATHERING LLC | WASHITA RIVER CMPSR STA | 486210 |
| | OK | Dewey | 16375611 | 104425713 7603 | | ENABLE GAS GATHERING LLC | TRAIL CREEK COMPRESSOR STATION | 486210 |
| | OK | Dewey | 16375611 | 128888713 7603 | | ENABLE GAS GATHERING LLC | TRAIL CREEK COMPRESSOR STATION | 486210 |
| | OK | Blaine | 16376011 | 128891013 7754 | | ENABLE GAS GATHERING LLC | GREENFIELD CMPSR STA | 486210 |
| | OK | Blaine | 16376011 | 112169413 7754 | | ENABLE GAS GATHERING LLC | GREENFIELD CMPSR STA | 486210 |
| | OK | Blaine | 16376011 | 112169713 7754 | | ENABLE GAS GATHERING LLC | GREENFIELD CMPSR STA | 486210 |
| | OK | Blaine | 16376011 | 112169513 7754 | | ENABLE GAS GATHERING LLC | GREENFIELD CMPSR STA | 486210 |
| | OK | Dewey | 16376211 | 104432013 7780 | | ENABLE GAS GATHERING LLC | ROUGH CREEK CMPSR STA | 486210 |
| | OK | Dewey | 16376211 | 104432113 7780 | | ENABLE GAS GATHERING LLC | ROUGH CREEK CMPSR STA | 486210 |
| | OK | Dewey | 16376411 | 104435313 7868 | | ENABLE GAS GATHERING LLC | FAY CMPSR STA | 486210 |
| | OK | Dewey | 16376411 | 104435213 7868 | | ENABLE GAS GATHERING LLC | FAY CMPSR STA | 486210 |
| | OK | Dewey | 16376411 | 104435413 7868 | | ENABLE GAS GATHERING LLC | FAY CMPSR STA | 486210 |
| | OK | Dewey | 16376411 | 104435513 7868 | | ENABLE GAS GATHERING LLC | FAY CMPSR STA | 486210 |
| | OK | Dewey | 16376411 | 104435113 7868 | | ENABLE GAS GATHERING LLC | FAY CMPSR STA | 486210 |
| | OK | Dewey | 16376411 | 104435013 7868 | | ENABLE GAS GATHERING LLC | FAY CMPSR STA | 486210 |
| | OK | Woods | 16376711 | 128894213 8027 | | ETC TEXAS PIPELINE LTD | LAKE CREEK COMPRESSOR STATION | 486210 |
| | OK | Woods | 16376711 | 128894113 8027 | | ETC TEXAS PIPELINE LTD | LAKE CREEK COMPRESSOR STATION | 486210 |
| | OK | Ellis | 16376911 | 112171613 8310 | | ENABLE GAS GATHERING LLC | BISHOP 1 COMPRESSOR STATION | 486210 |
| | OK | Ellis | 16376911 | 112171813 8310 | | ENABLE GAS GATHERING LLC | BISHOP 1 COMPRESSOR STATION | 486210 |
| | OK | Roger Mills | 16377511 | 112173313 8476 | | ENABLE GAS GATHERING LLC | DURHAM CMPSR STA | 486210 |
| | OK | Roger Mills | 16377511 | 112172513 8476 | | ENABLE GAS GATHERING LLC | DURHAM CMPSR STA | 486210 |
| | OK | Roger Mills | 16377511 | 112173113 8476 | | ENABLE GAS GATHERING LLC | DURHAM CMPSR STA | 486210 |
| | OK | Roger Mills | 16377511 | 112173413 8476 | | ENABLE GAS GATHERING LLC | DURHAM CMPSR STA | 486210 |
| | OK | Dewey | 16377611 | 128898113 8525 | | MARKWEST OKLAHOMA GAS CO LLC | MEYER COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 16380311 | 104409413 7225 | | MARKWEST OKLAHOMA GAS CO LLC | CALHOUN CMPSR STA | 486210 |
| | OK | Pittsburg | 16380311 | 112164313 7225 | | MARKWEST OKLAHOMA GAS CO LLC | CALHOUN CMPSR STA | 486210 |
| | OK | Grant | 16385411 | 104205013 3057 | | SALT PLAINS STORAGE LLC | SALT PLAINS STORAGE LLC | 486210 |
| | OK | Grant | 16385411 | 104205113 3057 | | SALT PLAINS STORAGE LLC | SALT PLAINS STORAGE LLC | 486210 |
| | OK | Grant | 16385411 | 104204913 3057 | | SALT PLAINS STORAGE LLC | SALT PLAINS STORAGE LLC | 486210 |
| | OK | Pittsburg | 16387411 | 104415613 7302 | | ENABLE GAS GATHERING LLC | POWELL CMPSR STA | 486210 |
| | OK | Pittsburg | 16387411 | 104415713 7302 | | ENABLE GAS GATHERING LLC | POWELL CMPSR STA | 486210 |
| | OK | Pittsburg | 16387411 | 104415513 7302 | | ENABLE GAS GATHERING LLC | POWELL CMPSR STA | 486210 |
| | OK | Pittsburg | 16387411 | 104415413 7302 | | ENABLE GAS GATHERING LLC | POWELL CMPSR STA | 486210 |
| | OK | Pittsburg | 16398511 | 104348113 6387 | | ENABLE GAS GATHERING LLC | KIOWA CMPSR STA | 486210 |
| | OK | Pittsburg | 16398511 | 104347813 6387 | | ENABLE GAS GATHERING LLC | KIOWA CMPSR STA | 486210 |
| | OK | Pittsburg | 16398511 | 104347913 6387 | | ENABLE GAS GATHERING LLC | KIOWA CMPSR STA | 486210 |
| | OK | Pittsburg | 16398511 | 104348013 6387 | | ENABLE GAS GATHERING LLC | KIOWA CMPSR STA | 486210 |
| | OK | Grady | 16992511 | 128561513 11848 | | ENABLE GAS GATHERING LLC | FRISCO COMPRESSOR STATION | 486210 |
| | OK | Grady | 16992511 | 128561413 11848 | | ENABLE GAS GATHERING LLC | FRISCO COMPRESSOR STATION | 486210 |
| | OK | Grady | 16992511 | 111965713 11848 | | ENABLE GAS GATHERING LLC | FRISCO COMPRESSOR STATION | 486210 |
| | OK | Grady | 16992511 | 111965613 11848 | | ENABLE GAS GATHERING LLC | FRISCO COMPRESSOR STATION | 486210 |
| | OK | Grady | 16992511 | 111965813 11848 | | ENABLE GAS GATHERING LLC | FRISCO COMPRESSOR STATION | 486210 |
| | OK | Grady | 16992511 | 128561313 11848 | | ENABLE GAS GATHERING LLC | FRISCO COMPRESSOR STATION | 486210 |
| | OK | Roger Mills | 16993511 | 111973813 12397 | | ENABLE GAS GATHERING LLC | PACK MULE CMPSR STA | 486210 |
| | OK | Roger Mills | 16993511 | 111974013 12397 | | ENABLE GAS GATHERING LLC | PACK MULE CMPSR STA | 486210 |
| | OK | Roger Mills | 16993511 | 111973913 12397 | | ENABLE GAS GATHERING LLC | PACK MULE CMPSR STA | 486210 |
| | OK | Grady | 16994411 | 111983513 12833 | | USA COMPRESSION PARTNERS LP | MORRIS COMPRESSOR STATION | 486210 |
| | OK | Grady | 16994411 | 111983413 12833 | | USA COMPRESSION PARTNERS LP | MORRIS COMPRESSOR STATION | 486210 |
| | OK | Grady | 16994411 | 111983613 12833 | | USA COMPRESSION PARTNERS LP | MORRIS COMPRESSOR STATION | 486210 |
| | OK | Grady | 16994411 | 111983313 12833 | | USA COMPRESSION PARTNERS LP | MORRIS COMPRESSOR STATION | 486210 |
| | OK | Grady | 16994411 | 111983713 12833 | | USA COMPRESSION PARTNERS LP | MORRIS COMPRESSOR STATION | 486210 |
| | OK | Grady | 16994411 | 111983813 12833 | | USA COMPRESSION PARTNERS LP | MORRIS COMPRESSOR STATION | 486210 |
| | OK | Grady | 16995011 | 128578413 13203 | | ENABLE GAS GATHERING LLC | BURTSCHI COMPRESSOR STATION | 486210 |
| | OK | Grady | 16995011 | 128578413 13203 | | ENABLE GAS GATHERING LLC | BURTSCHI COMPRESSOR STATION | 486210 |
| | OK | Roger Mills | 16995111 | 111989113 13204 | | ENABLE GAS GATHERING LLC | ANTELOPE CMPSR STA | 486210 |
| | OK | Roger Mills | 16995111 | 111989013 13204 | | ENABLE GAS GATHERING LLC | ANTELOPE CMPSR STA | 486210 |
| | OK | Roger Mills | 16995111 | 128578613 13204 | | ENABLE GAS GATHERING LLC | ANTELOPE CMPSR STA | 486210 |
| | OK | Roger Mills | 16995111 | 111989013 13204 | | ENABLE GAS GATHERING LLC | ANTELOPE CMPSR STA | 486210 |
| | OK | Garvin | 16995411 | 111993113 13306 | | USA COMPRESSION PARTNERS LP | PURDY COMPRESSOR STATION | 486210 |
| | OK | Garvin | 16995411 | 111993213 13306 | | USA COMPRESSION PARTNERS LP | PURDY COMPRESSOR STATION | 486210 |
| | OK | Garvin | 16995411 | 111993413 13306 | | USA COMPRESSION PARTNERS LP | PURDY COMPRESSOR STATION | 486210 |
| | OK | Garvin | 16995411 | 111993313 13306 | | USA COMPRESSION PARTNERS LP | PURDY COMPRESSOR STATION | 486210 |
| | OK | Garvin | 16995411 | 111993513 13306 | | USA COMPRESSION PARTNERS LP | PURDY COMPRESSOR STATION | 486210 |
| | OK | Stephens | 16996711 | 111996713 13332 | | USA COMPRESSION PARTNERS LP | LOCO COMPRESSOR STATION | 486210 |
| | OK | Stephens | 16996711 | 111996713 13332 | | USA COMPRESSION PARTNERS LP | LOCO COMPRESSOR STATION | 486210 |
| | OK | Grady | 16995811 | 111997513 13371 | | ENABLE GAS GATHERING LLC | NAPLES COMPRESSOR STATION | 486210 |
| | OK | Grady | 16995811 | 111997313 13371 | | ENABLE GAS GATHERING LLC | NAPLES COMPRESSOR STATION | 486210 |
| | OK | Grady | 16995811 | 111997413 13371 | | ENABLE GAS GATHERING LLC | NAPLES COMPRESSOR STATION | 486210 |
| | OK | Grady | 16995811 | 111997213 13371 | | ENABLE GAS GATHERING LLC | NAPLES COMPRESSOR STATION | 486210 |
| | OK | Grady | 16995811 | 111997613 13371 | | ENABLE GAS GATHERING LLC | NAPLES COMPRESSOR STATION | 486210 |
| | OK | Stephens | 17000111 | 111977313 12621 | | ENABLE GAS GATHERING LLC | BRAY COMPRESSOR STATION | 486210 |
| | OK | Stephens | 17000111 | 111977213 12621 | | ENABLE GAS GATHERING LLC | BRAY COMPRESSOR STATION | 486210 |
| | OK | Stephens | 17000111 | 111977113 12621 | | ENABLE GAS GATHERING LLC | BRAY COMPRESSOR STATION | 486210 |
| | OK | Stephens | 17000111 | 111977413 12621 | | ENABLE GAS GATHERING LLC | BRAY COMPRESSOR STATION | 486210 |
| | OK | Stephens | 17000111 | 111977513 12621 | | ENABLE GAS GATHERING LLC | BRAY COMPRESSOR STATION | 486210 |
| | OK | Stephens | 17000111 | 111977613 12621 | | ENABLE GAS GATHERING LLC | BRAY COMPRESSOR STATION | 486210 |
| | OK | Roger Mills | 17096311 | 113382013 10197 | | ENABLE GAS GATHERING LLC | ROLL CMPSR STA | 486210 |
| | OK | Roger Mills | 17096311 | 113381813 10197 | | ENABLE GAS GATHERING LLC | ROLL CMPSR STA | 486210 |
| | OK | Roger Mills | 17096311 | 113381913 10197 | | ENABLE GAS GATHERING LLC | ROLL CMPSR STA | 486210 |
| | OK | Dewey | 17102911 | 128894513 8065 | | ENABLE GAS GATHERING LLC | ROBE CREEK CMPSR STA | 486210 |
| | OK | Dewey | 17102911 | 113457913 8065 | | ENABLE GAS GATHERING LLC | ROBE CREEK CMPSR STA | 486210 |
| | OK | Dewey | 17102911 | 113458013 8065 | | ENABLE GAS GATHERING LLC | ROBE CREEK CMPSR STA | 486210 |
| | OK | Blaine | 17103011 | 113458913 8066 | | ENABLE GAS GATHERING LLC | EAGLE CITY CMPSR STA | 486210 |
| | OK | Blaine | 17103011 | 113459013 8066 | | ENABLE GAS GATHERING LLC | EAGLE CITY CMPSR STA | 486210 |
| | OK | Grady | 17103511 | 113466613 8487 | | ENABLE GAS GATHERING LLC | TABLER COMPRESSOR STATION | 486210 |
| | OK | Grady | 17103511 | 113464713 8487 | | ENABLE GAS GATHERING LLC | TABLER COMPRESSOR STATION | 486210 |
| | OK | Grady | 17103511 | 113466513 8487 | | ENABLE GAS GATHERING LLC | TABLER COMPRESSOR STATION | 486210 |
| | OK | Grady | 17103511 | 113466813 8487 | | ENABLE GAS GATHERING LLC | TABLER COMPRESSOR STATION | 486210 |
| | OK | Alfalfa | 17103811 | 128900413 8551 | | SEMGAS LP | LAMBERT CMPSR STA | 486210 |
| | OK | Alfalfa | 17103811 | 128900713 8551 | | SEMGAS LP | LAMBERT CMPSR STA | 486210 |
| | OK | Grady | 17105911 | 113500913 9538 | | ENABLE GAS GATHERING LLC | LINDSAY CMPSR STA | 486210 |
| | OK | Grady | 17105911 | 113500513 9538 | | ENABLE GAS GATHERING LLC | LINDSAY CMPSR STA | 486210 |
| | OK | Grady | 17105911 | 113500413 9538 | | ENABLE GAS GATHERING LLC | LINDSAY CMPSR STA | 486210 |
| | OK | Grady | 17105911 | 113500613 9538 | | ENABLE GAS GATHERING LLC | LINDSAY CMPSR STA | 486210 |
| | OK | Grady | 17105911 | 113500713 9538 | | ENABLE GAS GATHERING LLC | LINDSAY CMPSR STA | 486210 |
| | OK | Grady | 17105911 | 113500713 9538 | | ENABLE GAS GATHERING LLC | LINDSAY CMPSR STA | 486210 |
| | OK | Garvin | 17107211 | 113515113 9948 | | ENABLE GAS GATHERING LLC | FOSTER CMPSR STA | 486210 |
| | OK | Garvin | 17107211 | 113515113 9948 | | ENABLE GAS GATHERING LLC | FOSTER CMPSR STA | 486210 |
| | OK | Garvin | 17107211 | 113516113 9948 | | ENABLE GAS GATHERING LLC | FOSTER CMPSR STA | 486210 |
| | OK | Roger Mills | 17114811 | 113474913 8689 | | ENABLE GAS GATHERING LLC | CHEYENNE CMPSR STA | 486210 |
| | OK | Roger Mills | 17114811 | 113474813 8689 | | ENABLE GAS GATHERING LLC | CHEYENNE CMPSR STA | 486210 |
| | OK | Roger Mills | 17114811 | 113474713 8689 | | ENABLE GAS GATHERING LLC | CHEYENNE CMPSR STA | 486210 |
| | OK | Ellis | 17115011 | 113480913 8852 | | ENABLE GAS GATHERING LLC | BISHOP 2 COMPRESSOR STATION | 486210 |
| | OK | Ellis | 17115011 | 113481013 8852 | | ENABLE GAS GATHERING LLC | BISHOP 2 COMPRESSOR STATION | 486210 |
| | OK | Ellis | 17115011 | 113480813 8852 | | ENABLE GAS GATHERING LLC | BISHOP 2 COMPRESSOR STATION | 486210 |
| | OK | Ellis | 17115011 | 113481213 8852 | | ENABLE GAS GATHERING LLC | BISHOP 2 COMPRESSOR STATION | 486210 |
| | OK | Stephens | 17115911 | 113390413 10520 | | ENABLE GAS GATHERING LLC | DOYLE CMPSR STA | 486210 |
| | OK | Stephens | 17115911 | 113390513 10520 | | ENABLE GAS GATHERING LLC | DOYLE CMPSR STA | 486210 |
| | OK | Stephens | 17115911 | 113390813 10520 | | ENABLE GAS GATHERING LLC | DOYLE CMPSR STA | 486210 |
| | OK | Stephens | 17115911 | 113390913 10520 | | ENABLE GAS GATHERING LLC | DOYLE CMPSR STA | 486210 |
| | OK | Stephens | 17115911 | 113390713 10520 | | ENABLE GAS GATHERING LLC | DOYLE CMPSR STA | 486210 |
| | OK | Stephens | 17115911 | 113390613 10520 | | ENABLE GAS GATHERING LLC | DOYLE CMPSR STA | 486210 |
| | OK | Latimer | 17117511 | 113502213 9543 | | SUPERIOR PIPELINE CO LLC | PANOLA CENTRAL COMPRESSOR STATION | 486210 |
| | OK | Latimer | 17117511 | 113502313 9543 | | SUPERIOR PIPELINE CO LLC | PANOLA CENTRAL COMPRESSOR STATION | 486210 |
| | OK | Latimer | 17117511 | 113502213 9543 | | SUPERIOR PIPELINE CO LLC | PANOLA CENTRAL COMPRESSOR STATION | 486210 |
| | OK | Blaine | 17118011 | 128896313 8399 | | ENABLE GAS GATHERING LLC | MOON CMPSR STA | 486210 |
| | OK | Blaine | 17118011 | 128896213 8399 | | ENABLE GAS GATHERING LLC | MOON CMPSR STA | 486210 |
| | OK | Blaine | 17118011 | 128896413 8399 | | ENABLE GAS GATHERING LLC | MOON CMPSR STA | 486210 |
| | OK | Blaine | 17118011 | 113462413 8399 | | ENABLE GAS GATHERING LLC | MOON CMPSR STA | 486210 |
| | OK | Grady | 18000311 | 128593213 13790 | | ENABLE GAS GATHERING LLC | ALEX COMPRESSOR STATION | 486210 |
| | OK | Grady | 18000311 | 128593413 13790 | | ENABLE GAS GATHERING LLC | ALEX COMPRESSOR STATION | 486210 |
| | OK | Grady | 18000311 | 128594213 13790 | | ENABLE GAS GATHERING LLC | ALEX COMPRESSOR STATION | 486210 |
| | OK | Grady | 18000311 | 128594113 13790 | | ENABLE GAS GATHERING LLC | ALEX COMPRESSOR STATION | 486210 |
| | OK | Grady | 18000311 | 128593813 13790 | | ENABLE GAS GATHERING LLC | ALEX COMPRESSOR STATION | 486210 |
| | OK | Grady | 18000311 | 128593513 13790 | | ENABLE GAS GATHERING LLC | ALEX COMPRESSOR STATION | 486210 |

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 1 MI E OF RNCH2MKT 18 & F RD | SAYRE | 1340 | HP | 0.702 |
| Pipeline Transportation of Natural Gas | 4 MILES S AND 2 MILES W OF | NASH | 1340 | HP | 9.369 |
| Pipeline Transportation of Natural Gas | 4 MILES S AND 2 MILES W OF | NASH | 1340 | HP | 1.394 |
| Pipeline Transportation of Natural Gas | 3 MILES S AND 1.25 MILES E OF | ASHLAND | 1340 | HP | 18.021 |
| Pipeline Transportation of Natural Gas | 3 MILES S AND 1.25 MILES E OF | ASHLAND | 1340 | HP | 17.096 |
| Pipeline Transportation of Natural Gas | 3 MILES S AND 1.25 MILES E OF | ASHLAND | 1340 | HP | 15.631 |
| Pipeline Transportation of Natural Gas | 0.3 MI W OF E1140 & CEMETERY | SAYRE | 1340 | HP | 11.075 |
| Pipeline Transportation of Natural Gas | 0.3 MI W OF E1140 & CEMETERY | SAYRE | 1340 | HP | 10.11 |
| Pipeline Transportation of Natural Gas | 0.3 MI W OF E1140 & CEMETERY | SAYRE | 1340 | HP | 6.564 |
| Pipeline Transportation of Natural Gas | 5 MILES W OF | STUART | 1340 | HP | 16.397 |
| Pipeline Transportation of Natural Gas | 5 MILES W OF | STUART | 1340 | HP | 15.802 |
| Pipeline Transportation of Natural Gas | 5 MILES W OF | STUART | 1340 | HP | 14.794 |
| Pipeline Transportation of Natural Gas | 5 MILES W OF | STUART | 1340 | HP | 14.629 |
| Pipeline Transportation of Natural Gas | 5 MILES W OF | STUART | 1340 | HP | 14.483 |
| Pipeline Transportation of Natural Gas | 5 MILES NW OF | CORN | 1340 | HP | 14.193 |
| Pipeline Transportation of Natural Gas | 5 MILES NW OF | CORN | 1340 | HP | 9.523 |
| Pipeline Transportation of Natural Gas | 0.54 MI S OF N2400 & E0750 RD | OAKWOOD | 1340 | HP | 14.257 |
| Pipeline Transportation of Natural Gas | 0.54 MI S OF N2400 & E0750 RD | OAKWOOD | 1340 | HP | 1.619 |
| Pipeline Transportation of Natural Gas | N2540 & E0900 RD | GREENFIELD | 1380 | HP | 12.872 |
| Pipeline Transportation of Natural Gas | N2540 & E0900 RD | GREENFIELD | 1380 | HP | 12.708 |
| Pipeline Transportation of Natural Gas | N2540 & E0900 RD | GREENFIELD | 1380 | HP | 12.623 |
| Pipeline Transportation of Natural Gas | N2540 & E0900 RD | GREENFIELD | 1380 | HP | 12.609 |
| Pipeline Transportation of Natural Gas | 0.25 MI W OF N2390 & E0820 RD | FAY | 1340 | HP | 20.804 |
| Pipeline Transportation of Natural Gas | 0.25 MI W OF N2390 & E0820 RD | FAY | 1340 | HP | 20.173 |
| Pipeline Transportation of Natural Gas | 0.5 MI W OF N2410 /E0780 RD | OAKWOOD | 1380 | HP | 12.641 |
| Pipeline Transportation of Natural Gas | 0.5 MI W OF N2410 /E0780 RD | OAKWOOD | 1380 | HP | 11.47 |
| Pipeline Transportation of Natural Gas | 0.5 MI W OF N2410 /E0780 RD | OAKWOOD | 1380 | HP | 10.198 |
| Pipeline Transportation of Natural Gas | 0.5 MI W OF N2410 /E0780 RD | OAKWOOD | 1380 | HP | 7.375 |
| Pipeline Transportation of Natural Gas | 0.5 MI W OF N2410 /E0780 RD | OAKWOOD | 1380 | HP | 6.159 |
| Pipeline Transportation of Natural Gas | 0.5 MI W OF N2410 /E0780 RD | OAKWOOD | 1380 | HP | 6.066 |
| Pipeline Transportation of Natural Gas | 0.66 MI NE OF N2480 & E0250 RD | DACOMA | 1260 | HP | 1.766 |
| Pipeline Transportation of Natural Gas | 0.66 MI NE OF N2480 & E0250 RD | DACOMA | 1260 | HP | 0.521 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF N1770 & E0640 RD | ARNETT | 1340 | HP | 17.37 |
| Pipeline Transportation of Natural Gas | 0.2 MI S OF N1770 & E0640 RD | ARNETT | 1380 | HP | 0.864 |
| Pipeline Transportation of Natural Gas | 0.61 MI SE HWY 33/N1710 RD | DURHAM | 1380 | HP | 9.381 |
| Pipeline Transportation of Natural Gas | 0.61 MI SE HWY 33/N1710 RD | DURHAM | 1380 | HP | 8.117 |
| Pipeline Transportation of Natural Gas | 0.61 MI SE HWY 33/N1710 RD | DURHAM | 1380 | HP | 7.851 |
| Pipeline Transportation of Natural Gas | 0.61 MI SE HWY 33/N1710 RD | DURHAM | 1380 | HP | 7.362 |
| Pipeline Transportation of Natural Gas | 0.83 MI SE HWY 47/N2100 RD | LEEDY | 1340 | HP | 15.565 |
| Pipeline Transportation of Natural Gas | 2.2 MILES NW OF WARD SPRINGS | McALESTER | 1340 | HP | 19.322 |
| Pipeline Transportation of Natural Gas | 2.2 MILES NW OF WARD SPRINGS | McALESTER | 1340 | HP | 17.451 |
| Pipeline Transportation of Natural Gas | 0.41 MI E OF CNTRY780/DSAGE RD | MANCHESTER | 3340 | HP | 3.192 |
| Pipeline Transportation of Natural Gas | 0.41 MI E OF CNTRY780/DSAGE RD | MANCHESTER | 3340 | HP | 2.068 |
| Pipeline Transportation of Natural Gas | 0.41 MI E OF CNTRY780/DSAGE RD | MANCHESTER | 3340 | HP | 1.31 |
| Pipeline Transportation of Natural Gas | 1.25 MILES E AND 0.5 MILES S | ASHLAND | 1340 | HP | 20.813 |
| Pipeline Transportation of Natural Gas | 1.25 MILES E AND 0.5 MILES S | ASHLAND | 1340 | HP | 17.181 |
| Pipeline Transportation of Natural Gas | 1.25 MILES E AND 0.5 MILES S | ASHLAND | 1340 | HP | 16.952 |
| Pipeline Transportation of Natural Gas | 1.25 MILES E AND 0.5 MILES S | ASHLAND | 1340 | HP | 16.715 |
| Pipeline Transportation of Natural Gas | 2.5 MILES W AND 1 MILE S OF | KIOWA | 1340 | HP | 13.496 |
| Pipeline Transportation of Natural Gas | 2.5 MILES W AND 1 MILE S OF | KIOWA | 1340 | HP | 11.475 |
| Pipeline Transportation of Natural Gas | 2.5 MILES W AND 1 MILE S OF | KIOWA | 1340 | HP | 10.252 |
| Pipeline Transportation of Natural Gas | 2.5 MILES W AND 1 MILE S OF | KIOWA | 1340 | HP | 6.626 |
| Pipeline Transportation of Natural Gas | 0.6 MI E 4MI RD & N2850 RD | CHICKASHA | 1340 | HP | 10.292 |
| Pipeline Transportation of Natural Gas | 0.6 MI E 4MI RD & N2850 RD | CHICKASHA | 1340 | HP | 7.566 |
| Pipeline Transportation of Natural Gas | 0.6 MI E 4MI RD & N2850 RD | CHICKASHA | 1380 | HP | 5.957 |
| Pipeline Transportation of Natural Gas | 0.6 MI E 4MI RD & N2850 RD | CHICKASHA | 1380 | HP | 5 |
| Pipeline Transportation of Natural Gas | 0.6 MI E 4MI RD & N2850 RD | CHICKASHA | 1380 | HP | 4.857 |
| Pipeline Transportation of Natural Gas | 0.6 MI E 4MI RD & N2850 RD | CHICKASHA | 1380 | HP | 0.096 |
| Pipeline Transportation of Natural Gas | 0.5 MI S OF E0800 RD/ US283 | CRAWFORD | 1380 | HP | 7.277 |
| Pipeline Transportation of Natural Gas | 0.5 MI S OF E0800 RD/ US283 | CRAWFORD | 1380 | HP | 6.106 |
| Pipeline Transportation of Natural Gas | 0.5 MI S OF E0800 RD/ US283 | CRAWFORD | 1380 | HP | 5.58 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2950RD & E1520RD | BRADLEY | 1340 | HP | 19.965 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2950RD & E1520RD | BRADLEY | 1340 | HP | 14.656 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2950RD & E1520RD | BRADLEY | 1340 | HP | 14.175 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2950RD & E1520RD | BRADLEY | 1380 | HP | 6.039 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2950RD & E1520RD | BRADLEY | 1380 | HP | 5.914 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2950RD & E1520RD | BRADLEY | 1340 | HP | 5.545 |
| Pipeline Transportation of Natural Gas | 0.55 MI NE OF E1410 RD/WYATT RD | NORGE | 1380 | HP | 2.15 |
| Pipeline Transportation of Natural Gas | 0.55 MI NE OF E1410 RD/WYATT RD | NORGE | 1340 | HP | 1.837 |
| Pipeline Transportation of Natural Gas | 0.2 MI NW OF N1780 RD/E0770 RD | CRAWFORD | 1380 | HP | 12.265 |
| Pipeline Transportation of Natural Gas | 0.2 MI NW OF N1780 RD/E0770 RD | CRAWFORD | 1380 | HP | 12.159 |
| Pipeline Transportation of Natural Gas | 0.2 MI NW OF N1780 RD/E0770 RD | CRAWFORD | 1340 | HP | 8.363 |
| Pipeline Transportation of Natural Gas | 0.2 MI NW OF N1780 RD/E0770 RD | CRAWFORD | 1380 | HP | 5.864 |
| Pipeline Transportation of Natural Gas | 0.2 MI N OF N3010/E1600 RDS | PURDY | 1340 | HP | 20.708 |
| Pipeline Transportation of Natural Gas | 0.2 MI N OF N3010/E1600 RDS | PURDY | 1340 | HP | 18.402 |
| Pipeline Transportation of Natural Gas | 0.2 MI N OF N3010/E1600 RDS | PURDY | 1380 | HP | 7.128 |
| Pipeline Transportation of Natural Gas | 0.2 MI N OF N3010/E1600 RDS | PURDY | 1380 | HP | 6.919 |
| Pipeline Transportation of Natural Gas | 0.2 MI N OF N3010/E1600 RDS | PURDY | 1380 | HP | 6.2 |
| Pipeline Transportation of Natural Gas | 0.25 MI W OF E1850RD/N3040RD | LOCO | 1380 | HP | 6.853 |
| Pipeline Transportation of Natural Gas | 0.25 MI W OF E1850RD/N3040RD | LOCO | 1380 | HP | 6.605 |
| Pipeline Transportation of Natural Gas | 0.4 MI W OF HAWKINS RD/CS 2940 | ALEX | 1380 | HP | 13.009 |
| Pipeline Transportation of Natural Gas | 0.4 MI W OF HAWKINS RD/CS 2940 | ALEX | 1380 | HP | 12.983 |
| Pipeline Transportation of Natural Gas | 0.4 MI W OF HAWKINS RD/CS 2940 | ALEX | 1380 | HP | 12.764 |
| Pipeline Transportation of Natural Gas | 0.4 MI W OF HAWKINS RD/CS 2940 | ALEX | 1380 | HP | 12.533 |
| Pipeline Transportation of Natural Gas | 0.4 MI W OF HAWKINS RD/CS 2940 | ALEX | 1380 | HP | 12.232 |
| Pipeline Transportation of Natural Gas | 0.4 MI W OF HAWKINS RD/CS 2940 | ALEX | 1380 | HP | 12.139 |
| Pipeline Transportation of Natural Gas | 1.25 MI S OF CH29/N3010RD | BRAY | 1340 | HP | 14.942 |
| Pipeline Transportation of Natural Gas | 1.25 MI S OF CH29/N3010RD | BRAY | 1380 | HP | 8.78 |
| Pipeline Transportation of Natural Gas | 1.25 MI S OF CH29/N3010RD | BRAY | 1380 | HP | 8.087 |
| Pipeline Transportation of Natural Gas | 1.25 MI S OF CH29/N3010RD | BRAY | 1380 | HP | 6.868 |
| Pipeline Transportation of Natural Gas | 1.25 MI S OF CH29/N3010RD | BRAY | 1380 | HP | 6.867 |
| Pipeline Transportation of Natural Gas | 1.25 MI S OF CH29/N3010RD | BRAY | 1380 | HP | 6.827 |
| Pipeline Transportation of Natural Gas | SW OF HWY 33 & N1810 RD | CRAWFORD | 1380 | HP | 11.675 |
| Pipeline Transportation of Natural Gas | SW OF HWY 33 & N1810 RD | CRAWFORD | 1380 | HP | 3.181 |
| Pipeline Transportation of Natural Gas | SW OF HWY 33 & N1810 RD | CRAWFORD | 1380 | HP | 1.107 |
| Pipeline Transportation of Natural Gas | 0.45 MI W OF N2350/E0710 RD | SEILING | 1340 | HP | 17.695 |
| Pipeline Transportation of Natural Gas | 0.45 MI W OF N2350/E0710 RD | SEILING | 1380 | HP | 9.190 |
| Pipeline Transportation of Natural Gas | 0.45 MI W OF N2350/E0710 RD | SEILING | 1380 | HP | 8.505 |
| Pipeline Transportation of Natural Gas | 0.4 MI W OF HWY58 & E0760 RD | EAGLE CITY | 1380 | HP | 11.733 |
| Pipeline Transportation of Natural Gas | 0.4 MI W OF HWY58 & E0760 RD | EAGLE CITY | 1380 | HP | 11.535 |
| Pipeline Transportation of Natural Gas | 0.5 N OF LUCILE & ELM RD | TABLER | 1380 | HP | 9.178 |
| Pipeline Transportation of Natural Gas | 0.5 N OF LUCILE & ELM RD | TABLER | 1380 | HP | 9.136 |
| Pipeline Transportation of Natural Gas | 0.5 N OF LUCILE & ELM RD | TABLER | 1380 | HP | 9.076 |
| Pipeline Transportation of Natural Gas | 0.5 N OF LUCILE & ELM RD | TABLER | 1380 | HP | 9.069 |
| Pipeline Transportation of Natural Gas | 0.27 MI NNE N2510/E0230 RDS | DACOMA | 1340 | HP | 18.336 |
| Pipeline Transportation of Natural Gas | 0.27 MI NNE N2510/E0230 RDS | DACOMA | 1340 | HP | 5.196 |
| Pipeline Transportation of Natural Gas | 1.6 MI SSE OF N2980 & E1560 RD | RUSH SPRINGS | 1380 | HP | 13.193 |
| Pipeline Transportation of Natural Gas | 1.6 MI SSE OF N2980 & E1560 RD | RUSH SPRINGS | 1380 | HP | 12.648 |
| Pipeline Transportation of Natural Gas | 1.6 MI SSE OF N2980 & E1560 RD | RUSH SPRINGS | 1380 | HP | 11.749 |
| Pipeline Transportation of Natural Gas | 1.6 MI SSE OF N2980 & E1560 RD | RUSH SPRINGS | 1380 | HP | 10.995 |
| Pipeline Transportation of Natural Gas | 1.6 MI SSE OF N2980 & E1560 RD | RUSH SPRINGS | 1380 | HP | 10.38 |
| Pipeline Transportation of Natural Gas | 1.6 MI SSE OF N2980 & E1560 RD | RUSH SPRINGS | 1380 | HP | 9.909 |
| Pipeline Transportation of Natural Gas | 0.08 MI N OF N3060RD/ HW 76 | ELMORE CITY | 1340 | HP | 10.679 |
| Pipeline Transportation of Natural Gas | 0.08 MI N OF N3060RD/ HW 76 | ELMORE CITY | 1340 | HP | 10.594 |
| Pipeline Transportation of Natural Gas | 0.08 MI N OF N3060RD/ HW 76 | ELMORE CITY | 1380 | HP | 2.336 |
| Pipeline Transportation of Natural Gas | 1.6 MI W OF HWY47 & N3850 RD | CHEYENNE | 1380 | HP | 8.947 |
| Pipeline Transportation of Natural Gas | 1.6 MI W OF HWY47 & N3850 RD | CHEYENNE | 1380 | HP | 8.347 |
| Pipeline Transportation of Natural Gas | 1.6 MI W OF HWY47 & N3850 RD | CHEYENNE | 1380 | HP | 3.884 |
| Pipeline Transportation of Natural Gas | 0.29 W N1770/E0600 RDS | ARNETT | 1380 | HP | 10.221 |
| Pipeline Transportation of Natural Gas | 0.29 W N1770/E0600 RDS | ARNETT | 1380 | HP | 9.086 |
| Pipeline Transportation of Natural Gas | 0.29 W N1770/E0600 RDS | ARNETT | 1380 | HP | 9.065 |
| Pipeline Transportation of Natural Gas | 0.29 W N1770/E0600 RDS | ARNETT | 1380 | HP | 2.514 |
| Pipeline Transportation of Natural Gas | 0.5 MI N OF E1660 RD / N300 RD | VELMA | 1340 | HP | 19.911 |
| Pipeline Transportation of Natural Gas | 0.5 MI N OF E1660 RD / N300 RD | VELMA | 1340 | HP | 15.627 |
| Pipeline Transportation of Natural Gas | 0.5 MI N OF E1660 RD / N300 RD | VELMA | 1380 | HP | 8.105 |
| Pipeline Transportation of Natural Gas | 0.5 MI N OF E1660 RD / N300 RD | VELMA | 1380 | HP | 5.421 |
| Pipeline Transportation of Natural Gas | 0.5 MI N OF E1660 RD / N300 RD | VELMA | 1380 | HP | 4.105 |
| Pipeline Transportation of Natural Gas | 0.5 MI N OF E1660 RD / N300 RD | VELMA | 1380 | HP | 2.772 |
| Pipeline Transportation of Natural Gas | 0.86 MI N OF HWY270 &BETTAS RD | PANOLA | 1380 | HP | 6.62 |
| Pipeline Transportation of Natural Gas | 0.86 MI N OF HWY270 &BETTAS RD | PANOLA | 1380 | HP | 6.61 |
| Pipeline Transportation of Natural Gas | 0.86 MI N OF HWY270 &BETTAS RD | PANOLA | 1380 | HP | 6.32 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2530 & E0850 RD | WATONGA | 1380 | HP | 11.089 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2530 & E0850 RD | WATONGA | 1380 | HP | 9.923 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2530 & E0850 RD | WATONGA | 1380 | HP | 9.659 |
| Pipeline Transportation of Natural Gas | 0.25 MI E OF N2530 & E0850 RD | WATONGA | 1380 | HP | 8.403 |
| Pipeline Transportation of Natural Gas | 0.3 M W OF CEDAR HILL/E1450 RD | ALEX | 1380 | HP | 12.868 |
| Pipeline Transportation of Natural Gas | 0.3 M W OF CEDAR HILL/E1450 RD | ALEX | 1380 | HP | 12.839 |
| Pipeline Transportation of Natural Gas | 0.3 M W OF CEDAR HILL/E1450 RD | ALEX | 1380 | HP | 12.54 |
| Pipeline Transportation of Natural Gas | 0.3 M W OF CEDAR HILL/E1450 RD | ALEX | 1380 | HP | 12.492 |
| Pipeline Transportation of Natural Gas | 0.3 M W OF CEDAR HILL/E1450 RD | ALEX | 1380 | HP | 12.49 |
| Pipeline Transportation of Natural Gas | 0.3 M W OF CEDAR HILL/E1450 RD | ALEX | 1380 | HP | 12.212 |



| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | OK | Stephens | 18000611 | 128595713 13947 | | ENABLE GAS GATHERING LLC | VANARKEL CMPSR STA | 486210 |
| | OK | Stephens | 18000611 | 128596113 13947 | | ENABLE GAS GATHERING LLC | VANARKEL CMPSR STA | 486210 |
| | OK | Stephens | 18000611 | 128596013 13947 | | ENABLE GAS GATHERING LLC | VANARKEL CMPSR STA | 486210 |
| | OK | Stephens | 18000611 | 128595913 13947 | | ENABLE GAS GATHERING LLC | VANARKEL CMPSR STA | 486210 |
| | OK | Stephens | 18000611 | 128596313 13947 | | ENABLE GAS GATHERING LLC | VANARKEL CMPSR STA | 486210 |
| | OK | Stephens | 18000611 | 128596413 13947 | | ENABLE GAS GATHERING LLC | VANARKEL CMPSR STA | 486210 |
| | OK | Garvin | 18000711 | 128597313 14083 | | ENABLE GAS GATHERING LLC | MURRAY COMPRESSOR STATION | 486210 |
| | OK | Garvin | 18000711 | 128597213 14083 | | ENABLE GAS GATHERING LLC | MURRAY COMPRESSOR STATION | 486210 |
| | OK | Garvin | 18000711 | 128597413 14083 | | ENABLE GAS GATHERING LLC | MURRAY COMPRESSOR STATION | 486210 |
| | OK | Garvin | 18000711 | 128597513 14083 | | ENABLE GAS GATHERING LLC | MURRAY COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18000811 | 128599313 14112 | | ENABLE GAS GATHERING LLC | ROBBERSON CMPSR STA | 486210 |
| | OK | Stephens | 18000811 | 128599013 14112 | | ENABLE GAS GATHERING LLC | ROBBERSON CMPSR STA | 486210 |
| | OK | Stephens | 18000811 | 128599113 14112 | | ENABLE GAS GATHERING LLC | ROBBERSON CMPSR STA | 486210 |
| | OK | Stephens | 18000811 | 128598913 14112 | | ENABLE GAS GATHERING LLC | ROBBERSON CMPSR STA | 486210 |
| | OK | Stephens | 18000811 | 128598313 14112 | | ENABLE GAS GATHERING LLC | ROBBERSON CMPSR STA | 486210 |
| | OK | Roger Mills | 18001011 | 128600613 14279 | | ENABLE GAS GATHERING LLC | OASIS CMPSR STA | 486210 |
| | OK | Roger Mills | 18001011 | 128600713 14279 | | ENABLE GAS GATHERING LLC | OASIS CMPSR STA | 486210 |
| | OK | Carter | 18001911 | 128614113 14525 | | ENABLE GAS GATHERING LLC | OIL CITY CMPSR STA | 486210 |
| | OK | Carter | 18001911 | 128614613 14525 | | ENABLE GAS GATHERING LLC | OIL CITY CMPSR STA | 486210 |
| | OK | Carter | 18001911 | 128614213 14525 | | ENABLE GAS GATHERING LLC | OIL CITY CMPSR STA | 486210 |
| | OK | Carter | 18001911 | 128613813 14525 | | ENABLE GAS GATHERING LLC | OIL CITY CMPSR STA | 486210 |
| | OK | Grady | 18002511 | 128619413 14701 | | ENABLE GAS GATHERING LLC | L 12 BOOSTER STA | 486210 |
| | OK | Grady | 18002511 | 128620213 14701 | | ENABLE GAS GATHERING LLC | L 12 BOOSTER STA | 486210 |
| | OK | Blaine | 18003211 | 128632713 14940 | | ENABLE GAS GATHERING LLC | HYDRO COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18003211 | 128632113 14940 | | ENABLE GAS GATHERING LLC | HYDRO COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18003211 | 128632513 14940 | | ENABLE GAS GATHERING LLC | HYDRO COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18003211 | 128632013 14940 | | ENABLE GAS GATHERING LLC | HYDRO COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18003211 | 128631713 14940 | | ENABLE GAS GATHERING LLC | HYDRO COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18003211 | 128632413 14940 | | ENABLE GAS GATHERING LLC | HYDRO COMPRESSOR STATION | 486210 |
| | OK | Custer | 18003411 | 128635513 15015 | | ENABLE GAS GATHERING LLC | ONE HORSE COMPRESSOR STATION | 486210 |
| | OK | Custer | 18003411 | 128635613 15015 | | ENABLE GAS GATHERING LLC | ONE HORSE COMPRESSOR STATION | 486210 |
| | OK | Custer | 18003411 | 128635713 15015 | | ENABLE GAS GATHERING LLC | ONE HORSE COMPRESSOR STATION | 486210 |
| | OK | Custer | 18003411 | 128635213 15015 | | ENABLE GAS GATHERING LLC | ONE HORSE COMPRESSOR STATION | 486210 |
| | OK | Custer | 18003411 | 128635313 15015 | | ENABLE GAS GATHERING LLC | ONE HORSE COMPRESSOR STATION | 486210 |
| | OK | Custer | 18003411 | 128635313 15015 | | ENABLE GAS GATHERING LLC | ONE HORSE COMPRESSOR STATION | 486210 |
| | OK | Grady | 18004311 | 128653513 15658 | | USA COMPRESSION PARTNERS LP | PIONEER CMPSR STA | 486210 |
| | OK | Grady | 18004311 | 128653413 15658 | | USA COMPRESSION PARTNERS LP | PIONEER CMPSR STA | 486210 |
| | OK | Grady | 18004311 | 128653313 15658 | | USA COMPRESSION PARTNERS LP | PIONEER CMPSR STA | 486210 |
| | OK | Grady | 18004311 | 128653213 15658 | | USA COMPRESSION PARTNERS LP | PIONEER CMPSR STA | 486210 |
| | OK | Custer | 18004411 | 128659513 15676 | | ENABLE GAS GATHERING LLC | TERRIER COMPRESSOR STATION | 486210 |
| | OK | Custer | 18004411 | 128656013 15676 | | ENABLE GAS GATHERING LLC | TERRIER COMPRESSOR STATION | 486210 |
| | OK | Custer | 18004411 | 128656113 15676 | | ENABLE GAS GATHERING LLC | TERRIER COMPRESSOR STATION | 486210 |
| | OK | Custer | 18004411 | 128656213 15676 | | ENABLE GAS GATHERING LLC | TERRIER COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18004511 | 128657113 15679 | | ENABLE GAS GATHERING LLC | BOBCAT CMPSR STA | 486210 |
| | OK | Blaine | 18004511 | 128657413 15679 | | ENABLE GAS GATHERING LLC | BOBCAT CMPSR STA | 486210 |
| | OK | Blaine | 18004511 | 128656713 15679 | | ENABLE GAS GATHERING LLC | BOBCAT CMPSR STA | 486210 |
| | OK | Blaine | 18004511 | 128656813 15679 | | ENABLE GAS GATHERING LLC | BOBCAT CMPSR STA | 486210 |
| | OK | Blaine | 18004511 | 128657213 15679 | | ENABLE GAS GATHERING LLC | BOBCAT CMPSR STA | 486210 |
| | OK | Blaine | 18004511 | 128656913 15679 | | ENABLE GAS GATHERING LLC | BOBCAT CMPSR STA | 486210 |
| | OK | Grady | 18005711 | 128673513 15979 | | ENABLE GAS GATHERING LLC | HAYES COMPRESSOR STATION | 486210 |
| | OK | Grady | 18005711 | 128672813 15979 | | ENABLE GAS GATHERING LLC | HAYES COMPRESSOR STATION | 486210 |
| | OK | Grady | 18005711 | 128672513 15979 | | ENABLE GAS GATHERING LLC | HAYES COMPRESSOR STATION | 486210 |
| | OK | Grady | 18005711 | 128672113 15979 | | ENABLE GAS GATHERING LLC | HAYES COMPRESSOR STATION | 486210 |
| | OK | Grady | 18005711 | 128673713 15979 | | ENABLE GAS GATHERING LLC | HAYES COMPRESSOR STATION | 486210 |
| | OK | Grady | 18005711 | 128673113 15979 | | ENABLE GAS GATHERING LLC | HAYES COMPRESSOR STATION | 486210 |
| | OK | McClain | 18006211 | 128684313 16146 | | ENABLE GAS GATHERING LLC | DIBBLE COMPRESSOR STATION | 486210 |
| | OK | McClain | 18006211 | 128684913 16146 | | ENABLE GAS GATHERING LLC | DIBBLE COMPRESSOR STATION | 486210 |
| | OK | Kingfisher | 18007511 | 128695513 16504 | | MARKWEST OKLAHOMA GAS CO LLC | DOROTHY COMPRESSOR STATION | 486210 |
| | OK | Kingfisher | 18007511 | 128695413 16504 | | MARKWEST OKLAHOMA GAS CO LLC | DOROTHY COMPRESSOR STATION | 486210 |
| | OK | Kingfisher | 18007511 | 128695613 16504 | | MARKWEST OKLAHOMA GAS CO LLC | DOROTHY COMPRESSOR STATION | 486210 |
| | OK | Kingfisher | 18007511 | 128695313 16504 | | MARKWEST OKLAHOMA GAS CO LLC | DOROTHY COMPRESSOR STATION | 486210 |
| | OK | Kingfisher | 18007511 | 128696213 16504 | | MARKWEST OKLAHOMA GAS CO LLC | DOROTHY COMPRESSOR STATION | 486210 |
| | OK | Kingfisher | 18007511 | 128696113 16504 | | MARKWEST OKLAHOMA GAS CO LLC | DOROTHY COMPRESSOR STATION | 486210 |
| | OK | Kingfisher | 18007511 | 128696313 16504 | | MARKWEST OKLAHOMA GAS CO LLC | DOROTHY COMPRESSOR STATION | 486210 |
| | OK | Kingfisher | 18007511 | 128696513 16504 | | MARKWEST OKLAHOMA GAS CO LLC | DOROTHY COMPRESSOR STATION | 486210 |
| | OK | Kingfisher | 18007511 | 128696413 16504 | | MARKWEST OKLAHOMA GAS CO LLC | DOROTHY COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18008011 | 128703613 16667 | | ENABLE GAS GATHERING LLC | HAYSTACK COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18008011 | 128704213 16667 | | ENABLE GAS GATHERING LLC | HAYSTACK COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18008011 | 128703513 16667 | | ENABLE GAS GATHERING LLC | HAYSTACK COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18008011 | 128704113 16667 | | ENABLE GAS GATHERING LLC | HAYSTACK COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18008011 | 128704013 16667 | | ENABLE GAS GATHERING LLC | HAYSTACK COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18008611 | 128710313 16846 | | ENABLE GAS GATHERING LLC | HATCHETT COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18008611 | 128714013 16846 | | ENABLE GAS GATHERING LLC | HATCHETT COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18009411 | 128723513 17051 | | ENABLE GAS GATHERING LLC | UDORA COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18009411 | 128723413 17051 | | ENABLE GAS GATHERING LLC | UDORA COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18009411 | 128723313 17051 | | ENABLE GAS GATHERING LLC | UDORA COMPRESSOR STATION | 486210 |
| | OK | Custer | 18009911 | 128729213 17293 | | ENABLE GAS GATHERING LLC | SCHROCK COMPRESSOR STATION | 486210 |
| | OK | Custer | 18009911 | 128728913 17293 | | ENABLE GAS GATHERING LLC | SCHROCK COMPRESSOR STATION | 486210 |
| | OK | Custer | 18009911 | 128729113 17293 | | ENABLE GAS GATHERING LLC | SCHROCK COMPRESSOR STATION | 486210 |
| | OK | Custer | 18009911 | 128728713 17293 | | ENABLE GAS GATHERING LLC | SCHROCK COMPRESSOR STATION | 486210 |
| | OK | Custer | 18009911 | 128729013 17293 | | ENABLE GAS GATHERING LLC | SCHROCK COMPRESSOR STATION | 486210 |
| | OK | Custer | 18009911 | 128728513 17293 | | ENABLE GAS GATHERING LLC | SCHROCK COMPRESSOR STATION | 486210 |
| | OK | Dewey | 18014111 | 128797013 17756 | | ENABLE GAS GATHERING LLC | CYCLONE COMPRESSOR STATION | 486210 |
| | OK | Dewey | 18014111 | 128797713 17756 | | ENABLE GAS GATHERING LLC | CYCLONE COMPRESSOR STATION | 486210 |
| | OK | Dewey | 18014111 | 128797113 17756 | | ENABLE GAS GATHERING LLC | CYCLONE COMPRESSOR STATION | 486210 |
| | OK | Ellis | 18018711 | 128855513 5995 | | MARKWEST OKLAHOMA GAS CO LLC | ARNETT CMPSR STA | 486210 |
| | OK | Ellis | 18018711 | 128855413 5995 | | MARKWEST OKLAHOMA GAS CO LLC | ARNETT CMPSR STA | 486210 |
| | OK | Atoka | 18019511 | 128869613 6483 | | MARKWEST PIONEER LLC | MIDLINE COMPRESSOR STATION | 486210 |
| | OK | Atoka | 18019511 | 128869813 6483 | | MARKWEST PIONEER LLC | MIDLINE COMPRESSOR STATION | 486210 |
| | OK | Atoka | 18019511 | 128869513 6483 | | MARKWEST PIONEER LLC | MIDLINE COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18022411 | 128708413 16716 | | ENABLE GAS GATHERING LLC | AMERICAN HORSE COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18022411 | 128707613 16716 | | ENABLE GAS GATHERING LLC | AMERICAN HORSE COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18022411 | 128707713 16716 | | ENABLE GAS GATHERING LLC | AMERICAN HORSE COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18022511 | 128800013 17819 | | USA COMPRESSION PARTNERS LP | AMERICAN HORSE COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18022511 | 128800113 17819 | | USA COMPRESSION PARTNERS LP | AMERICAN HORSE COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18022511 | 128800213 17819 | | USA COMPRESSION PARTNERS LP | AMERICAN HORSE COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18022811 | 128585013 13496 | | ENABLE GAS GATHERING LLC | BLACK BEAR CMPSR STA | 486210 |
| | OK | Stephens | 18022811 | 128584313 13496 | | ENABLE GAS GATHERING LLC | BLACK BEAR CMPSR STA | 486210 |
| | OK | Stephens | 18022811 | 128584113 13496 | | ENABLE GAS GATHERING LLC | BLACK BEAR CMPSR STA | 486210 |
| | OK | Stephens | 18022811 | 128584713 13496 | | ENABLE GAS GATHERING LLC | BLACK BEAR CMPSR STA | 486210 |
| | OK | Stephens | 18022811 | 128584913 13496 | | ENABLE GAS GATHERING LLC | BLACK BEAR CMPSR STA | 486210 |
| | OK | Stephens | 18022811 | 128584213 13496 | | ENABLE GAS GATHERING LLC | BLACK BEAR CMPSR STA | 486210 |
| | OK | Pittsburg | 18023411 | 128910813 9734 | | SCISSORTAIL ENERGY LLC | CABLE COMPRESSOR STATION | 486210 |
| | OK | Pittsburg | 18023411 | 128909513 9734 | | SCISSORTAIL ENERGY LLC | CABLE COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18023711 | 128647713 15376 | | USA COMPRESSION PARTNERS LP | COTTONWOOD COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18023711 | 128647613 15376 | | USA COMPRESSION PARTNERS LP | COTTONWOOD COMPRESSOR STATION | 486210 |
| | OK | Hughes | 18024411 | 128705113 16683 | | MARKWEST OKLAHOMA GAS CO LLC | LAMAR COMPRESSOR STATION | 486210 |
| | OK | Hughes | 18024411 | 128705013 16683 | | MARKWEST OKLAHOMA GAS CO LLC | LAMAR COMPRESSOR STATION | 486210 |
| | OK | Hughes | 18024411 | 128704613 16683 | | MARKWEST OKLAHOMA GAS CO LLC | LAMAR COMPRESSOR STATION | 486210 |
| | OK | Hughes | 18024411 | 128705213 16683 | | MARKWEST OKLAHOMA GAS CO LLC | LAMAR COMPRESSOR STATION | 486210 |
| | OK | Hughes | 18024411 | 128704813 16683 | | MARKWEST OKLAHOMA GAS CO LLC | LAMAR COMPRESSOR STATION | 486210 |
| | OK | Hughes | 18024411 | 128704713 16683 | | MARKWEST OKLAHOMA GAS CO LLC | LAMAR COMPRESSOR STATION | 486210 |
| | OK | Hughes | 18024411 | 128705413 16683 | | MARKWEST OKLAHOMA GAS CO LLC | LAMAR COMPRESSOR STATION | 486210 |
| | OK | Hughes | 18024411 | 128705313 16683 | | MARKWEST OKLAHOMA GAS CO LLC | LAMAR COMPRESSOR STATION | 486210 |
| | OK | Hughes | 18024411 | 128705513 16683 | | MARKWEST OKLAHOMA GAS CO LLC | LAMAR COMPRESSOR STATION | 486210 |
| | OK | Hughes | 18024411 | 128704913 16683 | | MARKWEST OKLAHOMA GAS CO LLC | LAMAR COMPRESSOR STATION | 486210 |
| | OK | Garvin | 18024511 | 128583813 13415 | | ENABLE GAS GATHERING LLC | LANG COMPRESSOR STATION | 486210 |
| | OK | Garvin | 18024511 | 128582113 13415 | | ENABLE GAS GATHERING LLC | LANG COMPRESSOR STATION | 486210 |
| | OK | Garvin | 18024511 | 128581513 13415 | | ENABLE GAS GATHERING LLC | LANG COMPRESSOR STATION | 486210 |
| | OK | Garvin | 18024511 | 128581913 13415 | | ENABLE GAS GATHERING LLC | LANG COMPRESSOR STATION | 486210 |
| | OK | Garvin | 18024511 | 128581713 13415 | | ENABLE GAS GATHERING LLC | LANG COMPRESSOR STATION | 486210 |
| | OK | Dewey | 18024611 | 128679713 16089 | | ENABLE GAS GATHERING LLC | LENORA COMPRESSOR STATION | 486210 |
| | OK | Dewey | 18024611 | 128679613 16089 | | ENABLE GAS GATHERING LLC | LENORA COMPRESSOR STATION | 486210 |
| | OK | Dewey | 18024611 | 128680413 16089 | | ENABLE GAS GATHERING LLC | LENORA COMPRESSOR STATION | 486210 |
| | OK | Dewey | 18024611 | 128679813 16089 | | ENABLE GAS GATHERING LLC | LENORA COMPRESSOR STATION | 486210 |
| | OK | Dewey | 18024711 | 128775713 17358 | | USA COMPRESSION PARTNERS LP | LENORA COMPRESSOR STATION | 486210 |
| | OK | Dewey | 18024711 | 128775813 17358 | | USA COMPRESSION PARTNERS LP | LENORA COMPRESSOR STATION | 486210 |
| | OK | Blaine | 18024811 | 128716513 16887 | | USA COMPRESSION PARTNERS LP | MOON CMPSR STA | 486210 |
| | OK | Blaine | 18024811 | 128716613 16887 | | USA COMPRESSION PARTNERS LP | MOON CMPSR STA | 486210 |
| | OK | Woodward | 18024911 | 128720613 16995 | | USA COMPRESSION PARTNERS LP | MUTUAL CMPSR STA | 486210 |
| | OK | Woodward | 18024911 | 128720713 16995 | | USA COMPRESSION PARTNERS LP | MUTUAL CMPSR STA | 486210 |
| | OK | Woodward | 18024911 | 128720513 16995 | | USA COMPRESSION PARTNERS LP | MUTUAL CMPSR STA | 486210 |
| | OK | Woodward | 18025011 | 128683413 16108 | | ENABLE GAS GATHERING LLC | MUTUAL CMPSR STA | 486210 |
| | OK | Woodward | 18025011 | 128683113 16108 | | ENABLE GAS GATHERING LLC | MUTUAL CMPSR STA | 486210 |
| | OK | Stephens | 18025211 | 128636713 15086 | | USA COMPRESSION PARTNERS LP | POTEET COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18025211 | 128636613 15086 | | USA COMPRESSION PARTNERS LP | POTEET COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18025211 | 128636813 15086 | | USA COMPRESSION PARTNERS LP | POTEET COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18025211 | 128636913 15086 | | USA COMPRESSION PARTNERS LP | POTEET COMPRESSOR STATION | 486210 |

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 0.15 M NE OF BALL PARK/N3020RD | BRAY | 1380 HP | | 12.34 |
| Pipeline Transportation of Natural Gas | 0.15 M NE OF BALL PARK/N3020RD | BRAY | 1380 HP | | 11.298 |
| Pipeline Transportation of Natural Gas | 0.15 M NE OF BALL PARK/N3020RD | BRAY | 1380 HP | | 10.864 |
| Pipeline Transportation of Natural Gas | 0.15 M NE OF BALL PARK/N3020RD | BRAY | 1380 HP | | 6.021 |
| Pipeline Transportation of Natural Gas | 0.15 M NE OF BALL PARK/N3020RD | BRAY | 1380 HP | | 4.034 |
| Pipeline Transportation of Natural Gas | 0.15 M NE OF BALL PARK/N3020RD | BRAY | 1380 HP | | 3.721 |
| Pipeline Transportation of Natural Gas | 0.15 M NE OF E1590 RD/N3020RD | PURDY | 1380 HP | | 9.672 |
| Pipeline Transportation of Natural Gas | 0.15 M NE OF E1590 RD/N3020RD | PURDY | 1380 HP | | 9.472 |
| Pipeline Transportation of Natural Gas | 0.15 M NE OF E1590 RD/N3020RD | PURDY | 1380 HP | | 8.414 |
| Pipeline Transportation of Natural Gas | 0.15 M NE OF E1590 RD/N3020RD | PURDY | 1380 HP | | 5.409 |
| Pipeline Transportation of Natural Gas | 0.7 M SE OF OK-29/N3020 RD | BRAY | 1380 HP | | 13.091 |
| Pipeline Transportation of Natural Gas | 0.7 M SE OF OK-29/N3020 RD | BRAY | 1380 HP | | 10.393 |
| Pipeline Transportation of Natural Gas | 0.7 M SE OF OK-29/N3020 RD | BRAY | 1380 HP | | 10.002 |
| Pipeline Transportation of Natural Gas | 0.7 M SE OF OK-29/N3020 RD | BRAY | 1380 HP | | 9.623 |
| Pipeline Transportation of Natural Gas | 0.7 M SE OF OK-29/N3020 RD | BRAY | 1380 HP | | 7.822 |
| Pipeline Transportation of Natural Gas | 0.1 M W OF N1710/E0820 RDS | DURHAM | 1380 HP | | 8.707 |
| Pipeline Transportation of Natural Gas | 0.1 M W OF N1710/E0820 RDS | DURHAM | 1380 HP | | 4.416 |
| Pipeline Transportation of Natural Gas | 0.65 MI NE E1507/CK19 | HEALDTON | 1380 HP | | 11.226 |
| Pipeline Transportation of Natural Gas | 0.65 MI E1507/CK19 | HEALDTON | 1380 HP | | 10.568 |
| Pipeline Transportation of Natural Gas | 0.65 MI E1507/CK19 | HEALDTON | 1380 HP | | 10.082 |
| Pipeline Transportation of Natural Gas | 0.65 MI NE E1507/CK19 | HEALDTON | 1380 HP | | 6.619 |
| Pipeline Transportation of Natural Gas | 0.6MI N N2770/E1270 JN | POCASSET | 1340 HP | | 14.383 |
| Pipeline Transportation of Natural Gas | 0.6MI N N2770/E1270 JN | POCASSET | 1340 HP | | 11.175 |
| Pipeline Transportation of Natural Gas | 0.47 MI SE OF CR E0950/N2450 | HYDRO | 1380 HP | | 13.011 |
| Pipeline Transportation of Natural Gas | 0.47 MI SE OF CR E0950/N2450 | HYDRO | 1380 HP | | 12.921 |
| Pipeline Transportation of Natural Gas | 0.47 MI SE OF CR E0950/N2450 | HYDRO | 1380 HP | | 12.834 |
| Pipeline Transportation of Natural Gas | 0.47 MI SE OF CR E0950/N2450 | HYDRO | 1380 HP | | 12.671 |
| Pipeline Transportation of Natural Gas | 0.47 MI SE OF CR E0950/N2450 | HYDRO | 1380 HP | | 12.422 |
| Pipeline Transportation of Natural Gas | 0.47 MI SE OF CR E0950/N2450 | HYDRO | 1380 HP | | 12.067 |
| Pipeline Transportation of Natural Gas | 0.67 MI NE OF E0855RD/N2390RD | THOMAS | 1380 HP | | 13.269 |
| Pipeline Transportation of Natural Gas | 0.67 MI NE OF E0855RD/N2390RD | THOMAS | 1380 HP | | 13.141 |
| Pipeline Transportation of Natural Gas | 0.67 MI NE OF E0855RD/N2390RD | THOMAS | 1380 HP | | 13.114 |
| Pipeline Transportation of Natural Gas | 0.67 MI NE OF E0855RD/N2390RD | THOMAS | 1380 HP | | 13.094 |
| Pipeline Transportation of Natural Gas | 0.67 MI NE OF E0855RD/N2390RD | THOMAS | 1380 HP | | 13.038 |
| Pipeline Transportation of Natural Gas | 0.67 MI NE OF E0855RD/N2390RD | THOMAS | 1380 HP | | 13.026 |
| Pipeline Transportation of Natural Gas | 0.65 MI SW OF I44W/WYATT RD | CHICKASHA | 1500 HP | | 19.627 |
| Pipeline Transportation of Natural Gas | 0.65 MI SW OF I44W/WYATT RD | CHICKASHA | 1500 HP | | 14.839 |
| Pipeline Transportation of Natural Gas | 0.65 MI SW OF I44W/WYATT RD | CHICKASHA | 1500 HP | | 10.444 |
| Pipeline Transportation of Natural Gas | 0.65 MI SW OF I44W/WYATT RD | CHICKASHA | 1500 HP | | 8.066 |
| Pipeline Transportation of Natural Gas | 0.26 M W OF E0840/N2450 RD | THOMAS | 1380 HP | | 8.973 |
| Pipeline Transportation of Natural Gas | 0.26 M W OF E0840/N2450 RD | THOMAS | 1380 HP | | 7.756 |
| Pipeline Transportation of Natural Gas | 0.26 M W OF E0840/N2450 RD | THOMAS | 1380 HP | | 6.812 |
| Pipeline Transportation of Natural Gas | 0.26 M W OF E0840/N2450 RD | THOMAS | 1380 HP | | 6.575 |
| Pipeline Transportation of Natural Gas | 0.32 MI NW OF OK58/N2480 RD | HYDRO | 1380 HP | | 11.368 |
| Pipeline Transportation of Natural Gas | 0.32 MI NW OF OK58/N2480 RD | HYDRO | 1380 HP | | 11.31 |
| Pipeline Transportation of Natural Gas | 0.32 MI NW OF OK58/N2480 RD | HYDRO | 1380 HP | | 11.223 |
| Pipeline Transportation of Natural Gas | 0.32 MI NW OF OK58/N2480 RD | HYDRO | 1380 HP | | 9.189 |
| Pipeline Transportation of Natural Gas | 0.32 MI NW OF OK58/N2480 RD | HYDRO | 1380 HP | | 8.888 |
| Pipeline Transportation of Natural Gas | 0.32 MI NW OF OK58/N2480 RD | HYDRO | 1380 HP | | 8.643 |
| Pipeline Transportation of Natural Gas | 0.82 MI NW OF SH19/DELL ST JN | NINNEKAH | 1380 HP | | 12.761 |
| Pipeline Transportation of Natural Gas | 0.82 MI NW OF SH19/DELL ST JN | NINNEKAH | 1380 HP | | 11.352 |
| Pipeline Transportation of Natural Gas | 0.82 MI NW OF SH19/DELL ST JN | NINNEKAH | 1380 HP | | 10.695 |
| Pipeline Transportation of Natural Gas | 0.82 MI NW OF SH19/DELL ST JN | NINNEKAH | 1380 HP | | 10.195 |
| Pipeline Transportation of Natural Gas | 0.82 MI NW OF SH19/DELL ST JN | NINNEKAH | 1380 HP | | 5.396 |
| Pipeline Transportation of Natural Gas | 0.82 MI NW OF SH19/DELL ST JN | NINNEKAH | 1380 HP | | 0.211 |
| Pipeline Transportation of Natural Gas | 0.9 MI NW OF MERIDIAN/HAYHURST AVE | DIBBLE | 1380 HP | | 7.988 |
| Pipeline Transportation of Natural Gas | 0.9 MI NW OF MERIDIAN/HAYHURST AVE | DIBBLE | 1380 HP | | 6.628 |
| Pipeline Transportation of Natural Gas | 0.1 MI SW OF E0840/N2700 RDS | KINGFISHER | 1380 HP | | 5.979 |
| Pipeline Transportation of Natural Gas | 0.1 MI SW OF E0840/N2700 RDS | KINGFISHER | 1380 HP | | 5.614 |
| Pipeline Transportation of Natural Gas | 0.1 MI SW OF E0840/N2700 RDS | KINGFISHER | 1380 HP | | 5.175 |
| Pipeline Transportation of Natural Gas | 0.1 MI SW OF E0840/N2700 RDS | KINGFISHER | 1340 HP | | 3.716 |
| Pipeline Transportation of Natural Gas | 0.1 MI SW OF E0840/N2700 RDS | KINGFISHER | 1780 HP | | 3.374 |
| Pipeline Transportation of Natural Gas | 0.1 MI SW OF E0840/N2700 RDS | KINGFISHER | 1380 HP | | 3.153 |
| Pipeline Transportation of Natural Gas | 0.1 MI SW OF E0840/N2700 RDS | KINGFISHER | 1380 HP | | 3.025 |
| Pipeline Transportation of Natural Gas | 0.1 MI SW OF E0840/N2700 RDS | KINGFISHER | 1780 HP | | 0.775 |
| Pipeline Transportation of Natural Gas | 0.1 MI SW OF E0840/N2700 RDS | KINGFISHER | 1780 HP | | 0.769 |
| Pipeline Transportation of Natural Gas | 0.1 MI SW OF E0840/N2700 RDS | KINGFISHER | 1780 HP | | 0.164 |
| Pipeline Transportation of Natural Gas | 0.5 MI S OF E0830/N2620 RDS | WATONGA | 1380 HP | | 9.063 |
| Pipeline Transportation of Natural Gas | 0.5 MI S OF E0830/N2620 RDS | WATONGA | 1380 HP | | 9.052 |
| Pipeline Transportation of Natural Gas | 0.5 MI S OF E0830/N2620 RDS | WATONGA | 1380 HP | | 8.719 |
| Pipeline Transportation of Natural Gas | 0.5 MI S OF E0830/N2620 RDS | WATONGA | 1380 HP | | 8.71 |
| Pipeline Transportation of Natural Gas | 0.5 MI S OF E0830/N2620 RDS | WATONGA | 1380 HP | | 7.559 |
| Pipeline Transportation of Natural Gas | 0.5 MI S OF E0830/N2620 RDS | WATONGA | 1380 HP | | 7.337 |
| Pipeline Transportation of Natural Gas | 0.3 M W OF E0870/N2640 RDS | GREENFIELD | 1340 HP | | 1.507 |
| Pipeline Transportation of Natural Gas | 0.3 M W OF E0870/N2640 RDS | GREENFIELD | 1380 HP | | 0.674 |
| Pipeline Transportation of Natural Gas | 0.3 M N OF N2660 RD/OK3 | WATONGA | 1380 HP | | 0.502 |
| Pipeline Transportation of Natural Gas | 0.3 M N OF N2660 RD/OK3 | WATONGA | 1380 HP | | 0.475 |
| Pipeline Transportation of Natural Gas | 0.3 M N OF N2660 RD/OK3 | WATONGA | 1380 HP | | 0.469 |
| Pipeline Transportation of Natural Gas | 0.65 MI E OF E0900/N2410 RDS | THOMAS | 1340 HP | | 5.267 |
| Pipeline Transportation of Natural Gas | 0.65 MI E OF E0900/N2410 RDS | THOMAS | 1380 HP | | 3.313 |
| Pipeline Transportation of Natural Gas | 0.65 MI E OF E0900/N2410 RDS | THOMAS | 1380 HP | | 2.953 |
| Pipeline Transportation of Natural Gas | 0.65 MI E OF E0900/N2410 RDS | THOMAS | 1380 HP | | 2.902 |
| Pipeline Transportation of Natural Gas | 0.65 MI E OF E0900/N2410 RDS | THOMAS | 1380 HP | | 2.674 |
| Pipeline Transportation of Natural Gas | 0.65 MI E OF E0900/N2410 RDS | THOMAS | 1380 HP | | 2.134 |
| Pipeline Transportation of Natural Gas | 0.35 MI SE OF E0610/N2230 RDS | SEILING | 1380 HP | | 1.134 |
| Pipeline Transportation of Natural Gas | 0.35 MI SE OF E0610/N2230 RDS | SEILING | 1380 HP | | 1.087 |
| Pipeline Transportation of Natural Gas | 0.35 MI SE OF E0610/N2230 RDS | SEILING | 1380 HP | | 0.94 |
| Pipeline Transportation of Natural Gas | 12 MILES SE OF | ARNETT | 1340 HP | | 12.972 |
| Pipeline Transportation of Natural Gas | 12 MILES SE OF | ARNETT | 1340 HP | | 10.992 |
| Pipeline Transportation of Natural Gas | 1.5 MILES SW OF | TUSHKA | 1780 HP | | 2.619 |
| Pipeline Transportation of Natural Gas | 1.5 MILES SW OF | TUSHKA | 1780 HP | | 2.513 |
| Pipeline Transportation of Natural Gas | 1.5 MILES SW OF | TUSHKA | 1780 HP | | 2.434 |
| Pipeline Transportation of Natural Gas | 0.6 MI E OF N2500/E0910 RDS | GREENFIELD | 1380 HP | | 6.704 |
| Pipeline Transportation of Natural Gas | 0.6 MI E OF N2500/E0910 RDS | GREENFIELD | 1380 HP | | 6.114 |
| Pipeline Transportation of Natural Gas | 0.6 MI E OF N2500/E0910 RDS | GREENFIELD | 1340 HP | | 5.811 |
| Pipeline Transportation of Natural Gas | 0.5 MI E OF N2500/E0910 RDS | GREENFIELD | 1340 HP | | 9.753 |
| Pipeline Transportation of Natural Gas | 0.5 MI E OF N2500/E0910 RDS | GREENFIELD | 1380 HP | | 9.166 |
| Pipeline Transportation of Natural Gas | 0.5 MI E OF N2500/E0910 RDS | GREENFIELD | 1380 HP | | 3.07 |
| Pipeline Transportation of Natural Gas | 0.6 MI S OF CAMELBACK RD/N2960 | VELMA | 1380 HP | | 13.154 |
| Pipeline Transportation of Natural Gas | 0.6 MI S OF CAMELBACK RD/N2960 | VELMA | 1380 HP | | 12.881 |
| Pipeline Transportation of Natural Gas | 0.6 MI S OF CAMELBACK RD/N2960 | VELMA | 1380 HP | | 12.259 |
| Pipeline Transportation of Natural Gas | 0.6 MI S OF CAMELBACK RD/N2960 | VELMA | 1380 HP | | 12.258 |
| Pipeline Transportation of Natural Gas | 0.6 MI S OF CAMELBACK RD/N2960 | VELMA | 1380 HP | | 12.046 |
| Pipeline Transportation of Natural Gas | 0.6 MI S OF CAMELBACK RD/N2960 | VELMA | 1380 HP | | 11.2 |
| Pipeline Transportation of Natural Gas | 0.7 MI NE OF HWY31 & N4230 RD | BLOCKER | 1380 HP | | 11.088 |
| Pipeline Transportation of Natural Gas | 0.7 MI NE OF HWY31 & N4230 RD | BLOCKER | 1680 HP | | 10.122 |
| Pipeline Transportation of Natural Gas | 0.4 MI SW  CAMELBACK/CR N2990 | VELMA | 1380 HP | | 2.317 |
| Pipeline Transportation of Natural Gas | 0.4 MI SW  CAMELBACK/CR N2990 | VELMA | 1380 HP | | 1.451 |
| Pipeline Transportation of Natural Gas | 0.5 MI NW OF E1310/N3880 RDS | LAMAR | 1340 HP | | 7.487 |
| Pipeline Transportation of Natural Gas | 0.5 MI NW OF E1310/N3880 RDS | LAMAR | 1340 HP | | 7.422 |
| Pipeline Transportation of Natural Gas | 0.5 MI NW OF E1310/N3880 RDS | LAMAR | 1780 HP | | 6.731 |
| Pipeline Transportation of Natural Gas | 0.5 MI NW OF E1310/N3880 RDS | LAMAR | 1780 HP | | 5.791 |
| Pipeline Transportation of Natural Gas | 0.5 MI NW OF E1310/N3880 RDS | LAMAR | 1380 HP | | 4.71 |
| Pipeline Transportation of Natural Gas | 0.5 MI NW OF E1310/N3880 RDS | LAMAR | 1380 HP | | 4.344 |
| Pipeline Transportation of Natural Gas | 0.5 MI NW OF E1310/N3880 RDS | LAMAR | 1380 HP | | 3.59 |
| Pipeline Transportation of Natural Gas | 0.5 MI NW OF E1310/N3880 RDS | LAMAR | 1380 HP | | 3.506 |
| Pipeline Transportation of Natural Gas | 0.5 MI NW OF E1310/N3880 RDS | LAMAR | 1380 HP | | 3.464 |
| Pipeline Transportation of Natural Gas | 0.5 MI NW OF E1310/N3880 RDS | LAMAR | 1340 HP | | 2.203 |
| Pipeline Transportation of Natural Gas | 0.5 M N OF E1590 RD/N3010 RD | PURDY | 1380 HP | | 11.29 |
| Pipeline Transportation of Natural Gas | 0.5 M N OF E1590 RD/N3010 RD | PURDY | 1380 HP | | 10.742 |
| Pipeline Transportation of Natural Gas | 0.5 M N OF E1590 RD/N3010 RD | PURDY | 1380 HP | | 8.984 |
| Pipeline Transportation of Natural Gas | 0.5 M N OF E1590 RD/N3010 RD | PURDY | 1380 HP | | 8.003 |
| Pipeline Transportation of Natural Gas | 0.5 M N OF E1590 RD/N3010 RD | PURDY | 1380 HP | | 6.425 |
| Pipeline Transportation of Natural Gas | 0.51 MI E OF E0630/N2190 RD | SEILING | 1380 HP | | 9.164 |
| Pipeline Transportation of Natural Gas | 0.51 MI E OF E0630/N2190 RD | SEILING | 1380 HP | | 9.156 |
| Pipeline Transportation of Natural Gas | 0.51 MI E OF E0630/N2190 RD | SEILING | 1380 HP | | 9.045 |
| Pipeline Transportation of Natural Gas | 0.51 MI E OF E0630/N2190 RD | SEILING | 1380 HP | | 8.519 |
| Pipeline Transportation of Natural Gas | 0.5 MI E OF E0630/N2190 RDS | SEILING | 1340 HP | | 13.166 |
| Pipeline Transportation of Natural Gas | 0.5 MI E OF E0630/N2190 RDS | SEILING | 1340 HP | | 10.233 |
| Pipeline Transportation of Natural Gas | 0.2 MI E OF E0850/N2530 RDS | WATONGA | 1380 HP | | 7.39 |
| Pipeline Transportation of Natural Gas | 0.2 MI E OF E0850/N2530 RDS | WATONGA | 1380 HP | | 6.649 |
| Pipeline Transportation of Natural Gas | 0.6 MI E OF E0560/N2150 RDS | MUTUAL | 1380 HP | | 5.769 |
| Pipeline Transportation of Natural Gas | 0.6 MI E OF E0560/N2150 RDS | MUTUAL | 1380 HP | | 5.286 |
| Pipeline Transportation of Natural Gas | 0.6 MI E OF E0560/N2150 RDS | MUTUAL | 1380 HP | | 4.912 |
| Pipeline Transportation of Natural Gas | 0.6 MI E OF E0560/N2150 RDS | MUTUAL | 1340 HP | | 1.261 |
| Pipeline Transportation of Natural Gas | 0.6 MI E OF E0560/N2150 RDS | MUTUAL | 1340 HP | | 0.659 |
| Pipeline Transportation of Natural Gas | 0.93 MI NW OF CK29/N3000 RD JN | BRAY | 1340 HP | | 5.843 |
| Pipeline Transportation of Natural Gas | 0.93 MI NW OF CK29/N3000 RD JN | BRAY | 1380 HP | | 5.421 |
| Pipeline Transportation of Natural Gas | 0.93 MI NW OF CK29/N3000 RD JN | BRAY | 1380 HP | | 2.438 |
| Pipeline Transportation of Natural Gas | 0.93 MI NW OF CK29/N3000 RD JN | BRAY | 1380 HP | | 1.969 |
| Pipeline Transportation of Natural Gas | 0.93 MI NW OF CK29/N3000 RD JN | BRAY | 1380 HP | | 1.946 |

| Emissions | UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|---|
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |

**517a**

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | OK | Stephens | 18025211 | 128637013 | 15086 | USA COMPRESSION PARTNERS LP | POTEET COMPRESSOR STATION | 486210 |
| | OK | Dewey | 18025411 | 128679113 | 16088 | ENABLE GAS GATHERING LLC | SEILING CMPSR STA | 486210 |
| | OK | Dewey | 18025411 | 128679513 | 16088 | ENABLE GAS GATHERING LLC | SEILING CMPSR STA | 486210 |
| | OK | Dewey | 18025411 | 128679213 | 16088 | ENABLE GAS GATHERING LLC | SEILING CMPSR STA | 486210 |
| | OK | Dewey | 18025411 | 128679313 | 16088 | ENABLE GAS GATHERING LLC | SEILING CMPSR STA | 486210 |
| | OK | Dewey | 18025511 | 128819113 | 18439 | CDM RESOURCE MANAGEMENT LLC | SEILING COMPRESSOR STATION | 486210 |
| | OK | Dewey | 18025511 | 128819413 | 18439 | CDM RESOURCE MANAGEMENT LLC | SEILING COMPRESSOR STATION | 486210 |
| | OK | Custer | 18025611 | 128784213 | 17483 | USA COMPRESSION PARTNERS LP | TERRIER COMPRESSOR STATION | 486210 |
| | OK | Custer | 18025611 | 128784113 | 17483 | USA COMPRESSION PARTNERS LP | TERRIER COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18025711 | 128659813 | 15728 | USA COMPRESSION PARTNERS LP | TRI COUNTY COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18025711 | 128659913 | 15728 | USA COMPRESSION PARTNERS LP | TRI COUNTY COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18025711 | 128659613 | 15728 | USA COMPRESSION PARTNERS LP | TRI COUNTY COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18025711 | 128659513 | 15728 | USA COMPRESSION PARTNERS LP | TRI COUNTY COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18025711 | 128659713 | 15728 | USA COMPRESSION PARTNERS LP | TRI COUNTY COMPRESSOR STATION | 486210 |
| | OK | Stephens | 18025711 | 128659413 | 15728 | USA COMPRESSION PARTNERS LP | TRI COUNTY COMPRESSOR STATION | 486210 |
| | PA | Chester | 2980611 | 38527513 | 420290045 | COLUMBIA GAS TRANS LLC | COLUMBIA GAS TRANS LLC/EAGLE | 486210 |
| | PA | Chester | 2980611 | 38527613 | 420290045 | COLUMBIA GAS TRANS LLC | COLUMBIA GAS TRANS LLC/EAGLE | 486210 |
| | PA | Chester | 2980611 | 38527713 | 420290045 | COLUMBIA GAS TRANS LLC | COLUMBIA GAS TRANS LLC/EAGLE | 486210 |
| | PA | Chester | 2980611 | 38527813 | 420290045 | COLUMBIA GAS TRANS LLC | COLUMBIA GAS TRANS LLC/EAGLE | 486210 |
| | PA | Chester | 2980811 | 38525413 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38525213 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38525713 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38524513 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38525513 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38525613 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38525113 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38525313 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38524913 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38524713 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38524213 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38524613 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38524113 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2980811 | 38524313 | 420290047 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/FRAZER STA 200 | 486210 |
| | PA | Chester | 2981211 | 38547213 | 420290058 | EASTERN SHORE NATURAL GAS CO | EASTERN SHORE NATURAL GAS CO/DALEVILLE | 486210 |
| | PA | Chester | 2981211 | 38523513 | 420290058 | EASTERN SHORE NATURAL GAS CO | EASTERN SHORE NATURAL GAS CO/DALEVILLE | 486210 |
| | PA | Chester | 2981211 | 38524213 | 420290058 | EASTERN SHORE NATURAL GAS CO | EASTERN SHORE NATURAL GAS CO/DALEVILLE | 486210 |
| | PA | Chester | 2981211 | 11389413 | 420290058 | EASTERN SHORE NATURAL GAS CO | EASTERN SHORE NATURAL GAS CO/DALEVILLE | 486210 |
| | PA | Chester | 2981211 | 11389461 | 420290058 | EASTERN SHORE NATURAL GAS CO | EASTERN SHORE NATURAL GAS CO/DALEVILLE | 486210 |
| | PA | Chester | 2981211 | 13544713 | 420290058 | EASTERN SHORE NATURAL GAS CO | EASTERN SHORE NATURAL GAS CO/DALEVILLE | 486210 |
| | PA | Indiana | 3020211 | 38362813 | 420630093 | EQUITRANS LP | EQUITRANS LP/PENNVIEW | 486210 |
| | PA | Indiana | 3020211 | 38362913 | 420630093 | EQUITRANS LP | EQUITRANS LP/PENNVIEW | 486210 |
| | PA | Jefferson | 3021111 | 38359813 | 420650032 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE/PUNXSUTAWNEY/JEFFERSON | 486210 |
| | PA | Jefferson | 3021111 | 38359613 | 420650032 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE/PUNXSUTAWNEY/JEFFERSON | 486210 |
| | PA | Jefferson | 3021111 | 38359413 | 420650032 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE/PUNXSUTAWNEY/JEFFERSON | 486210 |
| | PA | Juniata | 3022011 | 38355413 | 420670003 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/PERULACK STA | 486210 |
| | PA | Juniata | 3022011 | 38355913 | 420670003 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/PERULACK STA | 486210 |
| | PA | Juniata | 3022011 | 38356213 | 420670003 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/PERULACK STA | 486210 |
| | PA | Mercer | 3123311 | 38153413 | 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| | PA | Mercer | 3123311 | 38152113 | 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| | PA | Mercer | 3123311 | 38151913 | 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| | PA | Mercer | 3123311 | 38151813 | 420850013 | KINDER MORGAN INC | TENNESSEE GAS PIPELINE CO LLC/MERCER STA 219 | 486210 |
| | PA | Westmoreland | 3189211 | 38718713 | 421290060 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/DELMONT COMP STA | 486210 |
| | PA | Westmoreland | 3189211 | 38718513 | 421290060 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/DELMONT COMP STA | 486210 |
| | PA | Westmoreland | 3189211 | 38718113 | 421290060 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/DELMONT COMP STA | 486210 |
| | PA | Westmoreland | 3189211 | 38718413 | 421290060 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/DELMONT COMP STA | 486210 |
| | PA | Westmoreland | 3189211 | 38718613 | 421290060 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/DELMONT COMP STA | 486210 |
| | PA | Westmoreland | 3189211 | 38719313 | 421290060 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/DELMONT COMP STA | 486210 |
| | PA | Westmoreland | 3189411 | 38716013 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38716513 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38717413 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38717013 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38716113 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38716413 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38716313 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38716213 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38716613 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38716713 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38716813 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38717513 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38717313 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | Westmoreland | 3189411 | 38715813 | 421290064 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/OAKFORD COMPRESSOR STA | 486210 |
| | PA | York | 3194611 | 38697713 | 421330053 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS PIPE LINE CO LLC/STA 195 | 486210 |
| | PA | York | 3194611 | 38697813 | 421330053 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS PIPE LINE CO LLC/STA 195 | 486210 |
| | PA | York | 3194611 | 38697513 | 421330053 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS PIPE LINE CO LLC/STA 195 | 486210 |
| | PA | Armstrong | 3731011 | 37878713 | 420050204 | PEOPLES NATURAL GAS CO | PEOPLES NATURAL GAS CO/SHOEMAKER STA | 486210 |
| | PA | Armstrong | 3731011 | 37878613 | 420050204 | PEOPLES NATURAL GAS CO | PEOPLES NATURAL GAS CO/SHOEMAKER STA | 486210 |
| | PA | Greene | 3747111 | 37859913 | 420590139 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/HOLBROOK STA | 486210 |
| | PA | Greene | 3747111 | 37860213 | 420590139 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/HOLBROOK STA | 486210 |
| | PA | Greene | 3747111 | 37859013 | 420590139 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/HOLBROOK STA | 486210 |
| | PA | Greene | 3747111 | 37859113 | 420590139 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/HOLBROOK STA | 486210 |
| | PA | Greene | 3747111 | 37860313 | 420590139 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/HOLBROOK STA | 486210 |
| | PA | Greene | 3747111 | 37858813 | 420590139 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/HOLBROOK STA | 486210 |
| | PA | Greene | 3747111 | 37858413 | 420590139 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/HOLBROOK STA | 486210 |
| | PA | Greene | 3747111 | 37858713 | 420590139 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/HOLBROOK STA | 486210 |
| | PA | Greene | 3747111 | 37859513 | 420590139 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/HOLBROOK STA | 486210 |
| | PA | Greene | 3747111 | 37859813 | 420590139 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/HOLBROOK STA | 486210 |
| | PA | Greene | 3747111 | 37859013 | 420590139 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS LP/HOLBROOK STA | 486210 |
| | PA | Fayette | 3767911 | 37873713 | 420510167 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANSMISSION & STORAGE INC/NORTH SUMMIT | 486210 |
| | PA | Fayette | 3767911 | 37873613 | 420510167 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANSMISSION & STORAGE INC/NORTH SUMMIT | 486210 |
| | PA | Beaver | 3854311 | 37811513 | 420070119 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANSMISSION & STORAGE INC/BEAVER | 486210 |
| | PA | Beaver | 3854311 | 37811513 | 420070119 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANSMISSION & STORAGE INC/BEAVER | 486210 |
| | PA | Beaver | 3854311 | 37811813 | 420070119 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANSMISSION & STORAGE INC/BEAVER | 486210 |
| | PA | Beaver | 3854311 | 37811713 | 420070119 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANSMISSION & STORAGE INC/BEAVER | 486210 |
| | PA | Lancaster | 3864011 | 37180013 | 420710077 | TEXAS EASTERN TRANS LP | TEXAS EASTERN TRANS/MARIETTA | 486210 |
| | PA | Armstrong | 3866411 | 37162513 | 420050015 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SOUTH BEND COMP STA | 486210 |
| | PA | Armstrong | 3866411 | 37162913 | 420050015 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SOUTH BEND COMP STA | 486210 |
| | PA | Armstrong | 3866411 | 37162413 | 420050015 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SOUTH BEND COMP STA | 486210 |
| | PA | Armstrong | 3866411 | 37163013 | 420050015 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SOUTH BEND COMP STA | 486210 |
| | PA | Armstrong | 3866411 | 37162313 | 420050015 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SOUTH BEND COMP STA | 486210 |
| | PA | Armstrong | 3866411 | 37162613 | 420050015 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SOUTH BEND COMP STA | 486210 |
| | PA | Tioga | 3878311 | 37460013 | 421170048 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/TIOGA STA | 486210 |
| | PA | Tioga | 3878311 | 67572613 | 421170050 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/BOOM STA | 486210 |
| | PA | Tioga | 3878311 | 37459613 | 421170050 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/BOOM STA | 486210 |
| | PA | Washington | 3895611 | 37441913 | 421250459 | EQUITRANS LP | EQUITRANS LP/HARTSON | 486210 |
| | PA | Washington | 3895611 | 37441613 | 421250459 | EQUITRANS LP | EQUITRANS LP/HARTSON | 486210 |
| | PA | Washington | 3895611 | 37442013 | 421250459 | EQUITRANS LP | EQUITRANS LP/HARTSON | 486210 |
| | PA | Tioga | 3897111 | 37439113 | 421170022 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SABINSVILLE STA | 486210 |
| | PA | Tioga | 3897111 | 37438313 | 421170022 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SABINSVILLE STA | 486210 |
| | PA | Tioga | 3897111 | 37438713 | 421170022 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SABINSVILLE STA | 486210 |
| | PA | Tioga | 3897111 | 37438513 | 421170022 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SABINSVILLE STA | 486210 |
| | PA | Tioga | 3897111 | 37438413 | 421170022 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SABINSVILLE STA | 486210 |
| | PA | Tioga | 3897111 | 37438813 | 421170022 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SABINSVILLE STA | 486210 |
| | PA | Tioga | 3897111 | 94836213 | 421170022 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/SABINSVILLE STA | 486210 |
| | PA | Potter | 4719811 | 27926413 | 421050002 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/GREENLICK STA | 486210 |
| | PA | Potter | 4719811 | 27924813 | 421050002 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/GREENLICK STA | 486210 |
| | PA | Potter | 4719911 | 27924713 | 421050003 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/HARRISON STA | 486210 |
| | PA | Potter | 4719911 | 27923713 | 421050003 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/HARRISON STA | 486210 |
| | PA | Potter | 4719911 | 27924513 | 421050003 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/HARRISON STA | 486210 |
| | PA | Potter | 4719911 | 27924213 | 421050003 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/HARRISON STA | 486210 |
| | PA | Potter | 4719911 | 27923813 | 421050003 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/HARRISON STA | 486210 |
| | PA | Potter | 4719911 | 27924613 | 421050003 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/HARRISON STA | 486210 |
| | PA | Potter | 4720011 | 27922613 | 421050004 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/ELLISBURG STA | 486210 |
| | PA | Potter | 4720011 | 27922713 | 421050004 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/ELLISBURG STA | 486210 |
| | PA | Potter | 4720011 | 27922313 | 421050004 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/ELLISBURG STA | 486210 |
| | PA | Potter | 4720011 | 27922413 | 421050004 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/ELLISBURG STA | 486210 |
| | PA | Potter | 4720011 | 27922213 | 421050004 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/ELLISBURG STA | 486210 |
| | PA | Potter | 4720111 | 27920513 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |
| | PA | Potter | 4720111 | 67562213 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |
| | PA | Potter | 4720111 | 67562113 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |
| | PA | Potter | 4720111 | 27920813 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |
| | PA | Potter | 4720111 | 11014813 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |
| | PA | Potter | 4720111 | 27921213 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |
| | PA | Potter | 4720111 | 27921513 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |
| | PA | Potter | 4720111 | 27920513 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |
| | PA | Potter | 4720111 | 27921613 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |
| | PA | Potter | 4720111 | 27921113 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |
| | PA | Potter | 4720111 | 27920913 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |

**518a**

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 0.93 MI NW OF CH29/N3000 RD IN | BRAY | 1380 | HP | 1.929 |
| Pipeline Transportation of Natural Gas | 0.2 MI E OF N2290/E0640 RD | SEILING | 1380 | HP | 11.43 |
| Pipeline Transportation of Natural Gas | 0.2 MI E OF N2290/E0640 RD | SEILING | 1380 | HP | 10.435 |
| Pipeline Transportation of Natural Gas | 0.2 MI E OF N2290/E0640 RD | SEILING | 1380 | HP | 8.08 |
| Pipeline Transportation of Natural Gas | 0.2 MI E OF N2290/E0640 RD | SEILING | 1380 | HP | 5.82 |
| Pipeline Transportation of Natural Gas | 0.3 MI E OF E0640/N2290 RDS | SEILING | 1380 | HP | 4.694 |
| Pipeline Transportation of Natural Gas | 0.3 MI E OF E0640/N2290 RDS | SEILING | 1380 | HP | 1.734 |
| Pipeline Transportation of Natural Gas | 0.26 MI W OF E0840/N0450 RDS | FAY | 1340 | HP | 10.013 |
| Pipeline Transportation of Natural Gas | 0.26 MI W OF E0840/N0450 RDS | FAY | 1340 | HP | 9.311 |
| Pipeline Transportation of Natural Gas | 0.29 MI SE OF N2990/E1610 RD | BRAY | 1380 | HP | 6.822 |
| Pipeline Transportation of Natural Gas | 0.29 MI SE OF N2990/E1610 RD | BRAY | 1380 | HP | 6.714 |
| Pipeline Transportation of Natural Gas | 0.29 MI SE OF N2990/E1610 RD | BRAY | 1380 | HP | 6.419 |
| Pipeline Transportation of Natural Gas | 0.29 MI SE OF N2990/E1610 RD | BRAY | 1380 | HP | 6.075 |
| Pipeline Transportation of Natural Gas | 0.29 MI SE OF N2990/E1610 RD | BRAY | 1340 | HP | 3.483 |
| Pipeline Transportation of Natural Gas | 0.29 MI SE OF N2990/E1610 RD | BRAY | 1340 | HP | 3.173 |
| Pipeline Transportation of Natural Gas | 310 FELLOWSHIP RD | CHESTER SPRINGS | 4000 | BHP | 14.6 |
| Pipeline Transportation of Natural Gas | 310 FELLOWSHIP RD | CHESTER SPRINGS | 1300 | BHP | 10.3 |
| Pipeline Transportation of Natural Gas | 310 FELLOWSHIP RD | CHESTER SPRINGS | 1300 | BHP | 7.31 |
| Pipeline Transportation of Natural Gas | 310 FELLOWSHIP RD | CHESTER SPRINGS | 1300 | BHP | 7.14 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 2100 | HP | 0.4963 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 2100 | HP | 0.3139 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 2100 | HP | 0.2256 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 1970 | HP | 0.1615 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 3400 | HP | 0.1539 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 2050 | HP | 0.1435 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 2050 | HP | 0.1389 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 2100 | HP | 0.1315 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 2050 | HP | 0.0919 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 2050 | HP | 0.0873 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 2050 | HP | 0.0747 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 3400 | HP | 0.0515 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 2050 | HP | 0.0503 |
| Pipeline Transportation of Natural Gas | 60 BACTON HILL RD | MALVERN | 5500 | HP | 0.0019 |
| Pipeline Transportation of Natural Gas | 604 STREET RD | COCHRANVILLE | 3750 | BHP | 2.12 |
| Pipeline Transportation of Natural Gas | 604 STREET RD | COCHRANVILLE | 1650 | HP | 1.757 |
| Pipeline Transportation of Natural Gas | 604 STREET RD | COCHRANVILLE | 1650 | HP | 1.415 |
| Pipeline Transportation of Natural Gas | 604 STREET RD | COCHRANVILLE | 1775 | BHP | 0.877 |
| Pipeline Transportation of Natural Gas | 604 STREET RD | COCHRANVILLE | 1775 | BHP | 0.843 |
| Pipeline Transportation of Natural Gas | 604 STREET RD | COCHRANVILLE | 1080 | HP | 0.0074 |
| Pipeline Transportation of Natural Gas | MUIR RD | NEW FLORENCE | 1470 | HP | 6.4015 |
| Pipeline Transportation of Natural Gas | MUIR RD | NEW FLORENCE | 1470 | HP | 2.0605 |
| Pipeline Transportation of Natural Gas | 88 LASKA RD | PUNXSUTAWNEY | 4735 | HP | 4.5421 |
| Pipeline Transportation of Natural Gas | 88 LASKA RD | PUNXSUTAWNEY | 4200 | HP | 4.2862 |
| Pipeline Transportation of Natural Gas | 88 LASKA RD | PUNXSUTAWNEY | 4200 | HP | 1.7759 |
| Pipeline Transportation of Natural Gas | 3318 PUMPING STATION RD | EAST WATERFORD | 1100 | HP | 6.36 |
| Pipeline Transportation of Natural Gas | 3318 PUMPING STATION RD | EAST WATERFORD | 1100 | HP | 4.5906 |
| Pipeline Transportation of Natural Gas | 3318 PUMPING STATION RD | EAST WATERFORD | 1100 | HP | 3.5623 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 1350 | HP | 19.8591 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 5500 | HP | 13.6721 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 1350 | HP | 8.7372 |
| Pipeline Transportation of Natural Gas | 1211 GREENVILLE MERCER RD | MERCER | 1350 | HP | 4.9766 |
| Pipeline Transportation of Natural Gas | 160 ADELE LN | GREENSBURG | 1100 | BHP | 0.0121 |
| Pipeline Transportation of Natural Gas | 160 ADELE LN | GREENSBURG | 1100 | BHP | 0.0107 |
| Pipeline Transportation of Natural Gas | 160 ADELE LN | GREENSBURG | 1100 | BHP | 0.0055 |
| Pipeline Transportation of Natural Gas | 160 ADELE LN | GREENSBURG | 1100 | BHP | 0.0051 |
| Pipeline Transportation of Natural Gas | 160 ADELE LN | GREENSBURG | 1100 | BHP | 0.0047 |
| Pipeline Transportation of Natural Gas | 160 ADELE LN | GREENSBURG | 1100 | BHP | 0.0005 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 2500 | BHP | 15.62 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 2500 | BHP | 13.21 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 2500 | BHP | 12.28 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 2500 | BHP | 11.4 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 2500 | BHP | 10.04 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 2500 | BHP | 9.37 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 2500 | BHP | 9.14 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 2500 | BHP | 7.62 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 2500 | BHP | 6.95 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 2500 | BHP | 6.57 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 2500 | BHP | 6.26 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 2500 | BHP | 4.21 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 1445 | BHP | 0.18 |
| Pipeline Transportation of Natural Gas | RTE 22 | DELMONT | 1445 | BHP | 0.12 |
| Pipeline Transportation of Natural Gas | 2204 BRYANSVILLE RD | DELTA | 4000 | HP | 0.3943 |
| Pipeline Transportation of Natural Gas | 2204 BRYANSVILLE RD | DELTA | 4000 | HP | 0.359 |
| Pipeline Transportation of Natural Gas | 335 LOGANSPORT RD | FORD CITY | 1072 | HP | 0.1905 |
| Pipeline Transportation of Natural Gas | 335 LOGANSPORT RD | FORD CITY | 1350 | HP | 15.6162 |
| Pipeline Transportation of Natural Gas | 335 LOGANSPORT RD | FORD CITY | 1350 | HP | 11.7017 |
| Pipeline Transportation of Natural Gas | 258 BRISTORIA RD | WIND RIDGE | 2000 | HP | 0.3012 |
| Pipeline Transportation of Natural Gas | 258 BRISTORIA RD | WIND RIDGE | 2000 | HP | 0.271 |
| Pipeline Transportation of Natural Gas | 258 BRISTORIA RD | WIND RIDGE | 1100 | HP | 0.2302 |
| Pipeline Transportation of Natural Gas | 258 BRISTORIA RD | WIND RIDGE | 1100 | HP | 0.1032 |
| Pipeline Transportation of Natural Gas | 258 BRISTORIA RD | WIND RIDGE | 1100 | HP | 0.0879 |
| Pipeline Transportation of Natural Gas | 258 BRISTORIA RD | WIND RIDGE | 2000 | HP | 0.0487 |
| Pipeline Transportation of Natural Gas | 258 BRISTORIA RD | WIND RIDGE | 2000 | BHP | 0.0426 |
| Pipeline Transportation of Natural Gas | 258 BRISTORIA RD | WIND RIDGE | 1350 | BHP | 0.0423 |
| Pipeline Transportation of Natural Gas | 258 BRISTORIA RD | WIND RIDGE | 1350 | HP | 0.0417 |
| Pipeline Transportation of Natural Gas | 258 BRISTORIA RD | WIND RIDGE | 1350 | HP | 0.0336 |
| Pipeline Transportation of Natural Gas | 258 BRISTORIA RD | WIND RIDGE | 1100 | HP | 0.0257 |
| Pipeline Transportation of Natural Gas | 258 BRISTORIA RD | WIND RIDGE | 1350 | HP | 0.0198 |
| Pipeline Transportation of Natural Gas | 252 JUMONVILLE RD | HOPWOOD | 3200 | HP | 9.907 |
| Pipeline Transportation of Natural Gas | 252 JUMONVILLE RD | HOPWOOD | 3200 | HP | 3.545 |
| Pipeline Transportation of Natural Gas | 398 THOMPSON RUN RD | BEAVER FALLS | 3200 | BHP | 0.0291 |
| Pipeline Transportation of Natural Gas | 398 THOMPSON RUN RD | BEAVER FALLS | 3200 | BHP | 0.0147 |
| Pipeline Transportation of Natural Gas | 398 THOMPSON RUN RD | BEAVER FALLS | 3200 | BHP | 0.0065 |
| Pipeline Transportation of Natural Gas | 398 THOMPSON RUN RD | BEAVER FALLS | 3200 | BHP | 0.0025 |
| Pipeline Transportation of Natural Gas | ROUTE 441 | MARIETTA | 1760 | HP | 16.0047 |
| Pipeline Transportation of Natural Gas | 104 CNG ST | SHELOCTA | 2000 | BHP | 2.9 |
| Pipeline Transportation of Natural Gas | 104 CNG ST | SHELOCTA | 2000 | BHP | 2.6 |
| Pipeline Transportation of Natural Gas | 104 CNG ST | SHELOCTA | 2000 | BHP | 1.08 |
| Pipeline Transportation of Natural Gas | 104 CNG ST | SHELOCTA | 2000 | BHP | 0.88 |
| Pipeline Transportation of Natural Gas | 104 CNG ST | SHELOCTA | 2000 | BHP | 0.69 |
| Pipeline Transportation of Natural Gas | 104 CNG ST | SHELOCTA | 2000 | BHP | 0.55 |
| Pipeline Transportation of Natural Gas | ELK HORN RD | LAWRENCEVILLE | 4200 | HP | 13.422 |
| Pipeline Transportation of Natural Gas | 86 PUMP STATION LN | LAWRENCEVILLE | 2000 | HP | 8.27 |
| Pipeline Transportation of Natural Gas | 86 PUMP STATION LN | LAWRENCEVILLE | 3200 | HP | 0.45 |
| Pipeline Transportation of Natural Gas | 4111 FINLEYVILLE ELRAMA RD | FINLEYVILLE | 1350 | HP | 6.0781 |
| Pipeline Transportation of Natural Gas | 4111 FINLEYVILLE ELRAMA RD | FINLEYVILLE | 1350 | HP | 5.831 |
| Pipeline Transportation of Natural Gas | 4111 FINLEYVILLE ELRAMA RD | FINLEYVILLE | 1350 | HP | 4.3306 |
| Pipeline Transportation of Natural Gas | SR 0349 | WESTFIELD | 2000 | HP | 10.47 |
| Pipeline Transportation of Natural Gas | SR 0349 | WESTFIELD | 1300 | HP | 6.96 |
| Pipeline Transportation of Natural Gas | SR 0349 | WESTFIELD | 1300 | HP | 4.55 |
| Pipeline Transportation of Natural Gas | SR 0349 | WESTFIELD | 1300 | HP | 4.38 |
| Pipeline Transportation of Natural Gas | SR 0349 | WESTFIELD | 1300 | HP | 3.89 |
| Pipeline Transportation of Natural Gas | SR 0349 | WESTFIELD | 1300 | HP | 3.62 |
| Pipeline Transportation of Natural Gas | SR 0349 | WESTFIELD | 2000 | HP | 2.82 |
| Pipeline Transportation of Natural Gas | SR 0349 | WESTFIELD | 2370 | HP | 2.04 |
| Pipeline Transportation of Natural Gas | SHEEPARD RD | STEWARDSON TWP | 3400 | HP | 10.032 |
| Pipeline Transportation of Natural Gas | SHEEPARD RD | STEWARDSON TWP | 1084 | HP | 0.332 |
| Pipeline Transportation of Natural Gas | LR 52004 | HARRISON VALLEY | 2000 | HP | 19.7 |
| Pipeline Transportation of Natural Gas | LR 52004 | HARRISON VALLEY | 2000 | HP | 18 |
| Pipeline Transportation of Natural Gas | LR 52004 | HARRISON VALLEY | 2000 | HP | 15.5 |
| Pipeline Transportation of Natural Gas | LR 52004 | HARRISON VALLEY | 2000 | HP | 10 |
| Pipeline Transportation of Natural Gas | LR 52004 | HARRISON VALLEY | 1100 | HP | 9.742 |
| Pipeline Transportation of Natural Gas | LR 52004 | HARRISON VALLEY | 2200 | HP | 0.1 |
| Pipeline Transportation of Natural Gas | SR 0449 | GENESEE | 3400 | HP | 19.4038 |
| Pipeline Transportation of Natural Gas | SR 0449 | GENESEE | 2000 | HP | 14.0345 |
| Pipeline Transportation of Natural Gas | SR 0449 | GENESEE | 2000 | HP | 11.7909 |
| Pipeline Transportation of Natural Gas | SR 0449 | GENESEE | 2000 | HP | 11.5131 |
| Pipeline Transportation of Natural Gas | SR 0449 | GENESEE | 1100 | HP | 4.8363 |
| Pipeline Transportation of Natural Gas | SR 0449 | GENESEE | 1100 | HP | 4.8334 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 2000 | HP | 5.82 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 3550 | HP | 4.33 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 2520 | HP | 4.25 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 1320 | HP | 2.44 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 1380 | HP | 1.05 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 1320 | HP | 0.45 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 1320 | HP | 0.32 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 1320 | HP | 0.29 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 1320 | HP | 0.2 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 1320 | HP | 0.18 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 1320 | HP | 0.17 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 1320 | HP | 0.13 |

**519a**



| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | PA | Potter | 4720111 | 27921413 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |
| | PA | Potter | 4720111 | 27920613 | 421050005 | TENNESSEE GAS PIPELINE CO LLC | TENNESSEE GAS PIPELINE CO/313 COUDERSPORT | 486210 |
| | PA | Potter | 4720211 | 27919713 | 421050006 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/WHARTON STATION 535 | 486210 |
| | PA | Potter | 4720211 | 27919813 | 421050006 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/WHARTON STATION 535 | 486210 |
| | PA | Potter | 4720211 | 27920313 | 421050006 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/WHARTON STATION 535 | 486210 |
| | PA | Potter | 4720211 | 27920413 | 421050006 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/WHARTON STATION 535 | 486210 |
| | PA | Potter | 4720211 | 27919213 | 421050006 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/WHARTON STATION 535 | 486210 |
| | PA | Potter | 4720711 | 27916313 | 421050027 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/STATE LINE STA | 486210 |
| | PA | Luzerne | 4743211 | 27700213 | 420790058 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/BEAR CREEK STA 515 | 486210 |
| | PA | Elk | 5308711 | 67458513 | 420470007 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/ARDELL COMP STA/ELK | 486210 |
| | PA | Elk | 5308711 | 67458413 | 420470007 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/ARDELL COMP STA/ELK | 486210 |
| | PA | Lycoming | 5450911 | 27550013 | 420810036 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/SALLADASBURG STATION 520 | 486210 |
| | PA | Lycoming | 5450911 | 27549513 | 420810036 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/SALLADASBURG STATION 520 | 486210 |
| | PA | Lycoming | 5450911 | 27549813 | 420810036 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/SALLADASBURG STATION 520 | 486210 |
| | PA | Lycoming | 5450911 | 27549612 | 420810036 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/SALLADASBURG STATION 520 | 486210 |
| | PA | Lycoming | 5450911 | 27549713 | 420810036 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/SALLADASBURG STATION 520 | 486210 |
| | PA | Lycoming | 5450911 | 13542813 | 420810036 | TRANSCONTINENTAL GAS PIPE LINE CO LLC | TRANSCONTINENTAL GAS/SALLADASBURG STATION 520 | 486210 |
| | PA | Clinton | 6601411 | 19038213 | 420350011 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/LEIDY STA | 486210 |
| | PA | Clinton | 6601411 | 19037713 | 420350011 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/LEIDY STA | 486210 |
| | PA | Clinton | 6601411 | 19038013 | 420350011 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/LEIDY STA | 486210 |
| | PA | Clinton | 6601411 | 19038813 | 420350011 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/LEIDY STA | 486210 |
| | PA | Clinton | 6601411 | 19038313 | 420350011 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/LEIDY STA | 486210 |
| | PA | Clinton | 6601411 | 19037913 | 420350011 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/LEIDY STA | 486210 |
| | PA | Clinton | 6601411 | 19037813 | 420350011 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/LEIDY STA | 486210 |
| | PA | Clinton | 6601411 | 19038113 | 420350011 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/LEIDY STA | 486210 |
| | PA | Clinton | 6601411 | 19037413 | 420350011 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/LEIDY STA | 486210 |
| | PA | Clinton | 6661711 | 17768713 | 420350010 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/FINNEFROCK STA | 486210 |
| | PA | Clinton | 6661711 | 17769113 | 420350010 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/FINNEFROCK STA | 486210 |
| | PA | Clinton | 6661711 | 17769413 | 420350010 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/FINNEFROCK STA | 486210 |
| | PA | Clinton | 6661711 | 17769913 | 420350010 | EASTERN GAS TRANS & STORAGE INC | EASTERN GAS TRANS & STORAGE INC/FINNEFROCK STA | 486210 |
| | PA | Westmoreland | 1687441 | 110144813 | 421290326 | PEOPLES GAS CO LLC | PEOPLES GAS CO LLC/RUBRIGHT COMP STA | 486210 |
| | PA | Westmoreland | 1687441 | 110144613 | 421290326 | PEOPLES GAS CO LLC | PEOPLES GAS CO LLC/RUBRIGHT COMP STA | 486210 |
| | PA | Elk | 1803681 | 129159913 | 420470060 | NATL FUEL GAS SUPPLY CORP | NATL FUEL GAS SUPPLY/BOWEN COMP STA | 486210 |
| | PA | Elk | 1803681 | 129160013 | 420470060 | NATL FUEL GAS SUPPLY CORP | NATL FUEL GAS SUPPLY/BOWEN COMP STA | 486210 |
| | PA | Elk | 1803681 | 129160113 | 420470060 | NATL FUEL GAS SUPPLY CORP | NATL FUEL GAS SUPPLY/BOWEN COMP STA | 486210 |
| | PA | Greene | 19003211 | 137531213 | 420590001 | EQUITRANS LP | EQUITRANS LP/REDHOOK COMPRESSOR STATION | 486210 |
| | PA | Greene | 19003211 | 137531013 | 420590001 | EQUITRANS LP | EQUITRANS LP/REDHOOK COMPRESSOR STATION | 486210 |
| | TX | Brazoria | 2860811 | 38270313 | 133 | KINDER MORGAN TEJAS PIPELINE LP | STRATTON RIDGE STORAGE FACILITY | 486210 |
| | TX | Brazoria | 2860811 | 38270413 | 133 | KINDER MORGAN TEJAS PIPELINE LP | STRATTON RIDGE STORAGE FACILITY | 486210 |
| | TX | Brazoria | 2860811 | 38270113 | 133 | KINDER MORGAN TEJAS PIPELINE LP | STRATTON RIDGE STORAGE FACILITY | 486210 |
| | TX | Brazoria | 3025711 | 38186313 | 97 | HOUSTON PIPELINE COMPANY LP | MANVEL COMPRESSOR STATION | 486210 |
| | TX | Brazoria | 3025711 | 38186213 | 97 | HOUSTON PIPELINE COMPANY LP | MANVEL COMPRESSOR STATION | 486210 |
| | TX | Freestone | 3052211 | 70380913 | 29 | LEGACY RESERVES OPERATING LP | DEW CENTRAL GATHERING FACILITY | 486210 |
| | TX | Freestone | 3052211 | 37994113 | 29 | LEGACY RESERVES OPERATING LP | DEW CENTRAL GATHERING FACILITY | 486210 |
| | TX | Freestone | 3052211 | 37994613 | 29 | LEGACY RESERVES OPERATING LP | DEW CENTRAL GATHERING FACILITY | 486210 |
| | TX | Freestone | 3052211 | 37994713 | 29 | LEGACY RESERVES OPERATING LP | DEW CENTRAL GATHERING FACILITY | 486210 |
| | TX | Freestone | 3052211 | 37993813 | 29 | LEGACY RESERVES OPERATING LP | DEW CENTRAL GATHERING FACILITY | 486210 |
| | TX | Freestone | 3052211 | 37994913 | 29 | LEGACY RESERVES OPERATING LP | DEW CENTRAL GATHERING FACILITY | 486210 |
| | TX | DeWitt | 3116011 | 38299513 | 8 | TEXAS EASTERN TRANSMISSION LP | THOMASTON COMPRESSOR STATION | 486210 |
| | TX | DeWitt | 3116011 | 38299813 | 8 | TEXAS EASTERN TRANSMISSION LP | THOMASTON COMPRESSOR STATION | 486210 |
| | TX | Duval | 3116511 | 122853913 | 11 | KINDER MORGAN TEXAS PIPELINE LLC | FREER COMPRESSOR STATION 551 | 486210 |
| | TX | Duval | 3116511 | 122853813 | 11 | KINDER MORGAN TEXAS PIPELINE LLC | FREER COMPRESSOR STATION 551 | 486210 |
| | TX | Duval | 3116511 | 122853713 | 11 | KINDER MORGAN TEXAS PIPELINE LLC | FREER COMPRESSOR STATION 551 | 486210 |
| | TX | Duval | 3116511 | 122854013 | 11 | KINDER MORGAN TEXAS PIPELINE LLC | FREER COMPRESSOR STATION 551 | 486210 |
| | TX | Eastland | 3116711 | 136656213 | 32 | ENTERPRISE PRODUCTS OPERATING LLC | CISCO COMPRESSOR STATION | 486210 |
| | TX | Eastland | 3116711 | 136655813 | 32 | ENTERPRISE PRODUCTS OPERATING LLC | CISCO COMPRESSOR STATION | 486210 |
| | TX | Eastland | 3116711 | 136656013 | 32 | ENTERPRISE PRODUCTS OPERATING LLC | CISCO COMPRESSOR STATION | 486210 |
| | TX | Eastland | 3116711 | 136655913 | 32 | ENTERPRISE PRODUCTS OPERATING LLC | CISCO COMPRESSOR STATION | 486210 |
| | TX | Eastland | 3116711 | 136656113 | 32 | ENTERPRISE PRODUCTS OPERATING LLC | CISCO COMPRESSOR STATION | 486210 |
| | TX | Hardin | 3687111 | 37375413 | 23 | TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC | STATION 40 | 486210 |
| | TX | Hardin | 3687111 | 37375713 | 23 | TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC | STATION 40 | 486210 |
| | TX | Hardin | 3687111 | 37375613 | 23 | TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC | STATION 40 | 486210 |
| | TX | Hardin | 3687111 | 37376413 | 23 | TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC | STATION 40 | 486210 |
| | TX | Anderson | 4015311 | 35447613 | 12 | ENERGY TRANSFER FUEL LP | BETHEL COMP STATION | 486210 |
| | TX | Anderson | 4015311 | 35447513 | 12 | ENERGY TRANSFER FUEL LP | BETHEL COMP STATION | 486210 |
| | TX | Anderson | 4015311 | 69859113 | 12 | ENERGY TRANSFER FUEL LP | BETHEL COMP STATION | 486210 |
| | TX | Anderson | 4015311 | 69859213 | 12 | ENERGY TRANSFER FUEL LP | BETHEL COMP STATION | 486210 |
| | TX | Anderson | 4015311 | 69859413 | 12 | ENERGY TRANSFER FUEL LP | BETHEL COMP STATION | 486210 |
| | TX | Anderson | 4015311 | 69859313 | 12 | ENERGY TRANSFER FUEL LP | BETHEL COMP STATION | 486210 |
| | TX | Moore | 4016311 | 35442313 | 27 | NORTHERN NATURAL GAS CO | SUNRAY PLANT | 486210 |
| | TX | Moore | 4016311 | 35442213 | 27 | NORTHERN NATURAL GAS CO | SUNRAY PLANT | 486210 |
| | TX | Moore | 4016311 | 35442513 | 27 | NORTHERN NATURAL GAS CO | SUNRAY PLANT | 486210 |
| | TX | Moore | 4016311 | 35441913 | 27 | NORTHERN NATURAL GAS CO | SUNRAY PLANT | 486210 |
| | TX | Hardin | 4020311 | 34370513 | 38 | ENTERPRISE PRODUCTS OPERATING LLC | SILSBEE COMPRESSOR STATION | 486210 |
| | TX | Hardin | 4020311 | 34369113 | 38 | ENTERPRISE PRODUCTS OPERATING LLC | SILSBEE COMPRESSOR STATION | 486210 |
| | TX | Gregg | 4021511 | 34349613 | 90 | GULF SOUTH PIPELINE COMPANY LLC | LONGVIEW #2 COMPRESSOR STATION | 486210 |
| | TX | Gregg | 4021511 | 34349713 | 90 | GULF SOUTH PIPELINE COMPANY LLC | LONGVIEW #2 COMPRESSOR STATION | 486210 |
| | TX | Gregg | 4021511 | 34349513 | 90 | GULF SOUTH PIPELINE COMPANY LLC | LONGVIEW #2 COMPRESSOR STATION | 486210 |
| | TX | Duval | 4144111 | 34087613 | 15 | ENTERPRISE PRODUCTS OPERATING LLC | HAGIST COMPRESSOR STATION | 486210 |
| | TX | Duval | 4144111 | 34087515 | 15 | ENTERPRISE PRODUCTS OPERATING LLC | HAGIST COMPRESSOR STATION | 486210 |
| | TX | Carson | 4160711 | 34013213 | 46 | SCOUT ENERGY MANAGEMENT LLC | LYNX MAIN B.3 | 486210 |
| | TX | Rusk | 4179011 | 33929013 | 35 | DCP OPERATING COMPANY LP | ALFORD B COMPRESSOR | 486210 |
| | TX | Rusk | 4179011 | 33928613 | 35 | DCP OPERATING COMPANY LP | ALFORD B COMPRESSOR | 486210 |
| | TX | Moore | 4179811 | 33907813 | 65 | PANHANDLE EASTERN PIPE LINE COMPANY LP | SUNRAY COMPRESSOR STATION | 486210 |
| | TX | Moore | 4179811 | 33907313 | 65 | PANHANDLE EASTERN PIPE LINE COMPANY LP | SUNRAY COMPRESSOR STATION | 486210 |
| | TX | Moore | 4179811 | 33906813 | 65 | PANHANDLE EASTERN PIPE LINE COMPANY LP | SUNRAY COMPRESSOR STATION | 486210 |
| | TX | Moore | 4179811 | 33906713 | 65 | PANHANDLE EASTERN PIPE LINE COMPANY LP | SUNRAY COMPRESSOR STATION | 486210 |
| | TX | Moore | 4179811 | 33907013 | 65 | PANHANDLE EASTERN PIPE LINE COMPANY LP | SUNRAY COMPRESSOR STATION | 486210 |
| | TX | Moore | 4179811 | 33907113 | 65 | PANHANDLE EASTERN PIPE LINE COMPANY LP | SUNRAY COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 70923513 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 70924213 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 70923413 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 70923913 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 70924313 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 70923813 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 70924013 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 70923613 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 106734313 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 90302713 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 123129713 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 70924113 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 29659413 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 29658713 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Harrison | 4846011 | 29659313 | 55 | ENABLE MIDSTREAM PARTNERS LP | STATELINE COMPRESSOR STATION | 486210 |
| | TX | Henderson | 4861911 | 29569213 | 10 | ATMOS ENERGY CORP | TRI CITIES STORAGE COMPRESSOR STATION | 486210 |
| | TX | Henderson | 4861911 | 92199913 | 10 | ATMOS ENERGY CORP | TRI CITIES STORAGE COMPRESSOR STATION | 486210 |
| | TX | Henderson | 4861911 | 92200013 | 10 | ATMOS ENERGY CORP | TRI CITIES STORAGE COMPRESSOR STATION | 486210 |
| | TX | Henderson | 4861911 | 70957513 | 10 | ATMOS ENERGY CORP | TRI CITIES STORAGE COMPRESSOR STATION | 486210 |
| | TX | Henderson | 4861911 | 70957413 | 10 | ATMOS ENERGY CORP | TRI CITIES STORAGE COMPRESSOR STATION | 486210 |
| | TX | Jasper | 4862331 | 29541013 | 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| | TX | Jasper | 4862331 | 29541113 | 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| | TX | Jasper | 4862331 | 29540813 | 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| | TX | Jasper | 4862331 | 29541213 | 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| | TX | Jasper | 4862331 | 29541513 | 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| | TX | Jasper | 4862331 | 29539913 | 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| | TX | Jasper | 4862331 | 29541713 | 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| | TX | Jasper | 4862331 | 29540613 | 22 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 32 | 486210 |
| | TX | Anderson | 4881211 | 29284713 | 34 | ATMOS ENERGY CORP | BETHEL STORAGE COMPRESSOR STATION | 486210 |
| | TX | Anderson | 4881211 | 29283013 | 34 | ATMOS ENERGY CORP | BETHEL STORAGE COMPRESSOR STATION | 486210 |
| | TX | Gaines | 4899911 | 29051213 | 48 | ONEOK TEXAS GAS STORAGE LLC | LOOP COMPLEX | 486210 |
| | TX | Gaines | 4899911 | 29050013 | 48 | ONEOK TEXAS GAS STORAGE LLC | LOOP COMPLEX | 486210 |
| | TX | Gaines | 4899911 | 29051013 | 48 | ONEOK TEXAS GAS STORAGE LLC | LOOP COMPLEX | 486210 |
| | TX | Gaines | 4899911 | 29050113 | 48 | ONEOK TEXAS GAS STORAGE LLC | LOOP COMPLEX | 486210 |
| | TX | Gaines | 4899911 | 29050213 | 48 | ONEOK TEXAS GAS STORAGE LLC | LOOP COMPLEX | 486210 |
| | TX | Gaines | 4899911 | 29050313 | 48 | ONEOK TEXAS GAS STORAGE LLC | LOOP COMPLEX | 486210 |
| | TX | Wharton | 5127011 | 25209113 | 17 | TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC | TRANSCO STATION 30 | 486210 |
| | TX | Wharton | 5127011 | 25208813 | 17 | TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC | TRANSCO STATION 30 | 486210 |
| | TX | Wharton | 5127011 | 25208913 | 17 | TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC | TRANSCO STATION 30 | 486210 |
| | TX | Wharton | 5127011 | 25209313 | 17 | TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC | TRANSCO STATION 30 | 486210 |
| | TX | Liberty | 5612811 | 22165713 | 43 | MOSS BLUFF HUB LLC | MOSS BLUFF STORAGE FACILITY | 486210 |
| | TX | Liberty | 5612811 | 22165513 | 43 | MOSS BLUFF HUB LLC | MOSS BLUFF STORAGE FACILITY | 486210 |
| | TX | Liberty | 5612811 | 22165413 | 43 | MOSS BLUFF HUB LLC | MOSS BLUFF STORAGE FACILITY | 486210 |
| | TX | Liberty | 5612811 | 22164413 | 43 | MOSS BLUFF HUB LLC | MOSS BLUFF STORAGE FACILITY | 486210 |
| | TX | Liberty | 5612811 | 22164813 | 43 | MOSS BLUFF HUB LLC | MOSS BLUFF STORAGE FACILITY | 486210 |
| | TX | Liberty | 5612811 | 22166313 | 43 | MOSS BLUFF HUB LLC | MOSS BLUFF STORAGE FACILITY | 486210 |
| | TX | Caldwell | 5633911 | 70057313 | 5 | OASIS PIPELINE CO TEXAS LP | PRAIRIE LEA COMPRESSOR STATION | 486210 |

**521a**

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 1320 | HP | 0.1 |
| Pipeline Transportation of Natural Gas | 197 TENNESSEE RD | COUDERSPORT | 3000 | HP | 0.02 |
| Pipeline Transportation of Natural Gas | 122 TROUT RUN RD | AUSTIN | 2500 | HP | 4.8334 |
| Pipeline Transportation of Natural Gas | 122 TROUT RUN RD | AUSTIN | 2000 | HP | 2.6196 |
| Pipeline Transportation of Natural Gas | 122 TROUT RUN RD | AUSTIN | 2000 | HP | 2.4304 |
| Pipeline Transportation of Natural Gas | 122 TROUT RUN RD | AUSTIN | 1000 | HP | 1.1348 |
| Pipeline Transportation of Natural Gas | 122 TROUT RUN RD | AUSTIN | 1000 | HP | 0.9426 |
| Pipeline Transportation of Natural Gas | STATE LINE COMP STA | GENESEE | 1100 | HP | 1.2 |
| Pipeline Transportation of Natural Gas | STATE LINE COMP STA | GENESEE | 1100 | HP | 0.33 |
| Pipeline Transportation of Natural Gas | 182 BUCK BLVD HWY 115 | BEAR CREEK | 3500 | HP | 7.9995 |
| Pipeline Transportation of Natural Gas | 389 CRISSMAN RD | WEEDVILLE | 1775 | HP | 3.0647 |
| Pipeline Transportation of Natural Gas | 389 CRISSMAN RD | WEEDVILLE | 1775 | HP | 2.7794 |
| Pipeline Transportation of Natural Gas | 2782 ROUTE 287 HWY | JERSEY SHORE | 2050 | HP | 2.1132 |
| Pipeline Transportation of Natural Gas | 2782 ROUTE 287 HWY | JERSEY SHORE | 2000 | BHP | 1.7583 |
| Pipeline Transportation of Natural Gas | 2782 ROUTE 287 HWY | JERSEY SHORE | 2050 | HP | 0.9806 |
| Pipeline Transportation of Natural Gas | 2782 ROUTE 287 HWY | JERSEY SHORE | 2000 | BHP | 0.3809 |
| Pipeline Transportation of Natural Gas | 2782 ROUTE 287 HWY | JERSEY SHORE | 2050 | HP | 0.2871 |
| Pipeline Transportation of Natural Gas | 2782 ROUTE 287 HWY | JERSEY SHORE | 1175 | BHP | 0.1763 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 2000 | HP | 20.95 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 2000 | HP | 20.28 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 2000 | HP | 18.08 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 1000 | HP | 15.73 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 2000 | HP | 14.26 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 2000 | HP | 13.5715 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 1000 | HP | 8.687 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 1000 | HP | 5.42 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 1000 | HP | 4.1707 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 2000 | HP | 3.08 |
| Pipeline Transportation of Natural Gas | 91 GAS PLANT LN | RENOVO | 2650 | HP | 0.04 |
| Pipeline Transportation of Natural Gas | FINNEFROCK TRACT | RENOVO | 6000 | HP | 8.3429 |
| Pipeline Transportation of Natural Gas | FINNEFROCK TRACT | RENOVO | 4000 | HP | 4.9922 |
| Pipeline Transportation of Natural Gas | FINNEFROCK TRACT | RENOVO | 4200 | HP | 3.3755 |
| Pipeline Transportation of Natural Gas | FINNEFROCK TRACT | RENOVO | 1100 | HP | 0.0324 |
| Pipeline Transportation of Natural Gas | 600-699 RUBRIGHT RD | APOLLO | 1340 | BHP | 3.9167 |
| Pipeline Transportation of Natural Gas | 600-699 RUBRIGHT RD | APOLLO | 1265 | BHP | 0.0697 |
| Pipeline Transportation of Natural Gas | 1498 HIGHLAND RD | KANE | 1490 | HP | 0.1323 |
| Pipeline Transportation of Natural Gas | 1498 HIGHLAND RD | KANE | 1750 | HP | 0.008 |
| Pipeline Transportation of Natural Gas | 1498 HIGHLAND RD | KANE | 1750 | HP | 0.0065 |
| Pipeline Transportation of Natural Gas | BRADEN RUN RD | WAYNESBURG | 5350 | BHP | 4.109 |
| Pipeline Transportation of Natural Gas | BRADEN RUN RD | WAYNESBURG | 5350 | BHP | 3.4851 |
| Pipeline Transportation of Natural Gas | 5 M S OF HWY 2004 ON HWY 523 | CLUTE | 2200 | HP | 0.2805 |
| Pipeline Transportation of Natural Gas | 5 M S OF HWY 2004 ON HWY 523 | CLUTE | 1100 | HP | 0.2206 |
| Pipeline Transportation of Natural Gas | 5 M S OF HWY 2004 ON HWY 523 | CLUTE | 1100 | HP | 0.1562 |
| Pipeline Transportation of Natural Gas | 9403 LIZZEL ROAD | MANVEL | 1100 | HP | 1.562 |
| Pipeline Transportation of Natural Gas | 9403 LIZZEL ROAD | MANVEL | 1100 | HP | 1.1047 |
| Pipeline Transportation of Natural Gas | 0.7 M S OF DEW, TX, ON HWY 75 | DONIE | 1340 | HP | 20.003 |
| Pipeline Transportation of Natural Gas | 0.7 M S OF DEW, TX, ON HWY 75 | DONIE | 1340 | HP | 9.429 |
| Pipeline Transportation of Natural Gas | 0.7 M S OF DEW, TX, ON HWY 75 | DONIE | 1340 | HP | 8.212 |
| Pipeline Transportation of Natural Gas | 0.7 M S OF DEW, TX, ON HWY 75 | DONIE | 1340 | HP | 8.067 |
| Pipeline Transportation of Natural Gas | 0.7 M S OF DEW, TX, ON HWY 75 | DONIE | 1340 | HP | 6.478 |
| Pipeline Transportation of Natural Gas | 0.7 M S OF DEW, TX, ON HWY 75 | DONIE | 1340 | HP | 3.75 |
| Pipeline Transportation of Natural Gas | HWY 87; 17 MI NW | VICTORIA | 1000 | HP | 8.8148 |
| Pipeline Transportation of Natural Gas | HWY 87; 17 MI NW | VICTORIA | 1000 | HP | 4.6181 |
| Pipeline Transportation of Natural Gas | 600 TRAVIS ST | FREER | 1480 | HP | 2.0964 |
| Pipeline Transportation of Natural Gas | 600 TRAVIS ST | FREER | 1480 | HP | 1.8465 |
| Pipeline Transportation of Natural Gas | 600 TRAVIS ST | FREER | 1480 | HP | 1.7169 |
| Pipeline Transportation of Natural Gas | 600 TRAVIS ST | FREER | 1480 | HP | 1.5003 |
| Pipeline Transportation of Natural Gas | 8 MI. S. OF CISCO ON S.H. 206 | CISCO | 4735 | HP | 17.7383 |
| Pipeline Transportation of Natural Gas | 8 MI. S. OF CISCO ON S.H. 206 | CISCO | 4735 | HP | 17.0728 |
| Pipeline Transportation of Natural Gas | 8 MI. S. OF CISCO ON S.H. 206 | CISCO | 3550 | HP | 10.0745 |
| Pipeline Transportation of Natural Gas | 8 MI. S. OF CISCO ON S.H. 206 | CISCO | 3550 | HP | 6.3417 |
| Pipeline Transportation of Natural Gas | 8 MI. S. OF CISCO ON S.H. 206 | CISCO | 2370 | HP | 5.1668 |
| Pipeline Transportation of Natural Gas | 8 MI W ON HWY 105 | SOUR LAKE | 2500 | HP | 3.6652 |
| Pipeline Transportation of Natural Gas | 8 MI W ON HWY 105 | SOUR LAKE | 2500 | HP | 3.3985 |
| Pipeline Transportation of Natural Gas | 8 MI W ON HWY 105 | SOUR LAKE | 2500 | HP | 1.97 |
| Pipeline Transportation of Natural Gas | 8 MI W ON HWY 105 | SOUR LAKE | 2500 | HP | 0.6163 |
| Pipeline Transportation of Natural Gas | 0.75 MILES S OF BETHEL & 1 MI W OF FM 2706 | CAYUGA | 2650 | HP | 4.2414 |
| Pipeline Transportation of Natural Gas | 0.75 MILES S OF BETHEL & 1 MI W OF FM 2706 | CAYUGA | 2650 | HP | 4.2119 |
| Pipeline Transportation of Natural Gas | 0.75 MILES S OF BETHEL & 1 MI W OF FM 2706 | CAYUGA | 4740 | HP | 3.8361 |
| Pipeline Transportation of Natural Gas | 0.75 MILES S OF BETHEL & 1 MI W OF FM 2706 | CAYUGA | 4740 | HP | 3.3146 |
| Pipeline Transportation of Natural Gas | 0.75 MILES S OF BETHEL & 1 MI W OF FM 2706 | CAYUGA | 4740 | HP | 3.0017 |
| Pipeline Transportation of Natural Gas | 0.75 MILES S OF BETHEL & 1 MI W OF FM 2706 | CAYUGA | 4740 | HP | 1.5157 |
| Pipeline Transportation of Natural Gas | 3 M S OF SUNRAY ON FM 119 | SUNRAY | 1500 | HP | 19.9888 |
| Pipeline Transportation of Natural Gas | 3 M S OF SUNRAY ON FM 119 | SUNRAY | 2650 | HP | 14.3235 |
| Pipeline Transportation of Natural Gas | 3 M S OF SUNRAY ON FM 119 | SUNRAY | 2650 | HP | 4.725 |
| Pipeline Transportation of Natural Gas | 3 M S OF SUNRAY ON FM 119 | SUNRAY | 1500 | HP | 0.0758 |
| Pipeline Transportation of Natural Gas | 6586 OLD SPURGER RD SILSBEE | SILSBEE | 1232 | HP | 6.7859 |
| Pipeline Transportation of Natural Gas | 6586 OLD SPURGER RD SILSBEE | SILSBEE | 1232 | HP | 3.6675 |
| Pipeline Transportation of Natural Gas | NW OF PITTMAN & LILLY STS | LAKEPORT | 1060 | HP | 4.9676 |
| Pipeline Transportation of Natural Gas | NW OF PITTMAN & LILLY STS | LAKEPORT | 1060 | HP | 3.3749 |
| Pipeline Transportation of Natural Gas | NW OF PITTMAN & LILLY STS | LAKEPORT | 1060 | HP | 2.6104 |
| Pipeline Transportation of Natural Gas | 1 MI N OF FM 2350 ON HWY 16 | FREER | 1000 | HP | 20.9278 |
| Pipeline Transportation of Natural Gas | 1 MI N OF FM 2350 ON HWY 16 | FREER | 1000 | HP | 17.9129 |
| Pipeline Transportation of Natural Gas | 11 M S OF BORGER ON W SIDE OF HWY 207 | BORGER | 2000 | HP | 19.279 |
| Pipeline Transportation of Natural Gas | ON OR NEAR CHARLIE HUNT ROAD | HENDERSON | 1100 | HP | 15.5713 |
| Pipeline Transportation of Natural Gas | ON OR NEAR CHARLIE HUNT ROAD | HENDERSON | 1100 | HP | 2.5415 |
| Pipeline Transportation of Natural Gas | FROM SUNRAY; 3 M S ON FM 119; THEN 0.5 M W | SUNRAY | 1100 | HP | 18.0274 |
| Pipeline Transportation of Natural Gas | FROM SUNRAY; 3 M S ON FM 119; THEN 0.5 M W | SUNRAY | 1100 | HP | 7.9004 |
| Pipeline Transportation of Natural Gas | FROM SUNRAY; 3 M S ON FM 119; THEN 0.5 M W | SUNRAY | 1100 | HP | 7.2919 |
| Pipeline Transportation of Natural Gas | FROM SUNRAY; 3 M S ON FM 119; THEN 0.5 M W | SUNRAY | 1100 | HP | 4.6973 |
| Pipeline Transportation of Natural Gas | FROM SUNRAY; 3 M S ON FM 119; THEN 0.5 M W | SUNRAY | 1100 | HP | 4.5047 |
| Pipeline Transportation of Natural Gas | FROM SUNRAY; 3 M S ON FM 119; THEN 0.5 M W | SUNRAY | 1100 | HP | 3.4382 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1340 | HP | 18.13 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1340 | HP | 17.34 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1340 | HP | 16.96 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1340 | HP | 16.61 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1340 | HP | 16.58 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1340 | HP | 16.3 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1340 | HP | 16.15 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1340 | HP | 15.9 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1340 | HP | 15.28 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1340 | HP | 14.1 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1340 | HP | 13.85 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1340 | HP | 12.83 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1215 | HP | 10.99 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1215 | HP | 9.95 |
| Pipeline Transportation of Natural Gas | S OF IH 20 & W OF FM 9 | WASKOM | 1215 | HP | 8.13 |
| Pipeline Transportation of Natural Gas | 8.25 M E OF TRINIDAD | MALAKOFF | 4445 | BHP | 4.5737 |
| Pipeline Transportation of Natural Gas | 8.25 M E OF TRINIDAD | MALAKOFF | 2370 | HP | 2.1406 |
| Pipeline Transportation of Natural Gas | 8.25 M E OF TRINIDAD | MALAKOFF | 2370 | HP | 1.7666 |
| Pipeline Transportation of Natural Gas | 8.25 M E OF TRINIDAD | MALAKOFF | 2370 | HP | 1.0682 |
| Pipeline Transportation of Natural Gas | 8.25 M E OF TRINIDAD | MALAKOFF | 2370 | HP | 0.9201 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 1100 | HP | 10.2559 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 1100 | HP | 10.0473 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 1100 | HP | 7.8433 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 1100 | HP | 6.3782 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 1850 | HP | 4.4722 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 1100 | HP | 3.7009 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 1100 | HP | 3.3018 |
| Pipeline Transportation of Natural Gas | NEAR SH 63 | JASPER | 1100 | HP | 3.2461 |
| Pipeline Transportation of Natural Gas | BETHEL; 1.8 MI S OF BETHEL ON FM 2706; 2.1 MI S OF HWY 287 | CAYUGA | 3300 | HP | 7.6298 |
| Pipeline Transportation of Natural Gas | BETHEL; 1.8 MI S OF BETHEL ON FM 2706; 2.1 MI S OF HWY 287 | CAYUGA | 3300 | HP | 5.2534 |
| Pipeline Transportation of Natural Gas | BETHEL; 1.8 MI S OF BETHEL ON FM 2706; 2.1 MI S OF HWY 287 | CAYUGA | 2650 | HP | 1.9904 |
| Pipeline Transportation of Natural Gas | 1 MIS ON FM 303; 2.5 M W ON CR | LOOP | 1478 | HP | 10.8752 |
| Pipeline Transportation of Natural Gas | 1 MIS ON FM 303; 2.5 M W ON CR | LOOP | 3250 | HP | 9.2644 |
| Pipeline Transportation of Natural Gas | 1 MIS ON FM 303; 2.5 M W ON CR | LOOP | 1478 | HP | 8.9061 |
| Pipeline Transportation of Natural Gas | 1 MIS ON FM 303; 2.5 M W ON CR | LOOP | 1478 | HP | 8.371 |
| Pipeline Transportation of Natural Gas | 1 MIS ON FM 303; 2.5 M W ON CR | LOOP | 1232 | HP | 5.3927 |
| Pipeline Transportation of Natural Gas | 1 MIS ON FM 303; 2.5 M W ON CR | LOOP | 1232 | HP | 4.1056 |
| Pipeline Transportation of Natural Gas | 1 MIS ON FM 303; 2.5 M W ON CR | LOOP | 1232 | HP | 2.1049 |
| Pipeline Transportation of Natural Gas | 2648 FM 2546 RD | EL CAMPO | 2500 | HP | 17.9521 |
| Pipeline Transportation of Natural Gas | 2648 FM 2546 RD | EL CAMPO | 2625 | HP | 7.2928 |
| Pipeline Transportation of Natural Gas | 2648 FM 2546 RD | EL CAMPO | 2500 | HP | 6.666 |
| Pipeline Transportation of Natural Gas | 2648 FM 2546 RD | EL CAMPO | 2500 | HP | 6.1918 |
| Pipeline Transportation of Natural Gas | 4 M N OF IH 10 ON FM HWY 563 | LIBERTY | 7605 | HP | 4.9733 |
| Pipeline Transportation of Natural Gas | 4 M N OF IH 10 ON FM HWY 563 | LIBERTY | 3335 | HP | 3.2268 |
| Pipeline Transportation of Natural Gas | 4 M N OF IH 10 ON FM HWY 563 | LIBERTY | 3335 | HP | 3.168 |
| Pipeline Transportation of Natural Gas | 4 M N OF IH 10 ON FM HWY 563 | LIBERTY | 2587 | HP | 1.395 |
| Pipeline Transportation of Natural Gas | 4 M N OF IH 10 ON FM HWY 563 | LIBERTY | 2587 | HP | 0.5568 |
| Pipeline Transportation of Natural Gas | 4 M N OF IH 10 ON FM HWY 563 | LIBERTY | 2587 | HP | 0.4273 |
| Pipeline Transportation of Natural Gas | MILE TO C.R., LEFT ON C.R. 0.75 M. TO STN. | PRAIRIE LEA | 4740 | HP | 2.8017 |

| Emissions | UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|---|
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |

**523a**

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | TX | Jefferson | 5650811 | 19894113 | 169 | DCP OPERATING COMPANY LP | SPINDLETOP STORAGE | 486210 |
| | TX | Jefferson | 5650811 | 19893413 | 169 | DCP OPERATING COMPANY LP | SPINDLETOP STORAGE | 486210 |
| | TX | Jefferson | 5650811 | 19893313 | 169 | DCP OPERATING COMPANY LP | SPINDLETOP STORAGE | 486210 |
| | TX | Jefferson | 5650811 | 19893013 | 169 | DCP OPERATING COMPANY LP | SPINDLETOP STORAGE | 486210 |
| | TX | Jefferson | 5650811 | 19894213 | 169 | DCP OPERATING COMPANY LP | SPINDLETOP STORAGE | 486210 |
| | TX | Jefferson | 5650811 | 19893513 | 169 | DCP OPERATING COMPANY LP | SPINDLETOP STORAGE | 486210 |
| | TX | Jefferson | 5650811 | 19892613 | 169 | DCP OPERATING COMPANY LP | SPINDLETOP STORAGE | 486210 |
| | TX | Jefferson | 5650811 | 19892513 | 169 | DCP OPERATING COMPANY LP | SPINDLETOP STORAGE | 486210 |
| | TX | Jackson | 5653311 | 19772613 | 11 | BOARDWALK TEXAS INTRASTATE LLC | EDNA COMPRESSOR STATION | 486210 |
| | TX | Pecos | 5677811 | 71498913 | 86 | ETC TEXAS PIPELINE LTD | GOMEZ COMPRESSOR STATION | 486210 |
| | TX | Pecos | 5677811 | 22154513 | 86 | ETC TEXAS PIPELINE LTD | GOMEZ COMPRESSOR STATION | 486210 |
| | TX | Pecos | 5677811 | 22154213 | 86 | ETC TEXAS PIPELINE LTD | GOMEZ COMPRESSOR STATION | 486210 |
| | TX | Pecos | 5677811 | 22154413 | 86 | ETC TEXAS PIPELINE LTD | GOMEZ COMPRESSOR STATION | 486210 |
| | TX | Pecos | 5677811 | 22154313 | 86 | ETC TEXAS PIPELINE LTD | GOMEZ COMPRESSOR STATION | 486210 |
| | TX | Potter | 5678311 | 22147413 | 52 | SCOUT ENERGY MANAGEMENT LLC | PPC 21 | 486210 |
| | TX | Potter | 5678311 | 22147013 | 52 | SCOUT ENERGY MANAGEMENT LLC | PPC 21 | 486210 |
| | TX | Potter | 5678311 | 22147513 | 52 | SCOUT ENERGY MANAGEMENT LLC | PPC 21 | 486210 |
| | TX | Potter | 5678311 | 22146713 | 52 | SCOUT ENERGY MANAGEMENT LLC | PPC 21 | 486210 |
| | TX | Waller | 5680911 | 99439513 | 34 | DCP OPERATING COMPANY LP | KATY COMPRESSOR STATION | 486210 |
| | TX | Waller | 5680911 | 134051913 | 34 | DCP OPERATING COMPANY LP | KATY COMPRESSOR STATION | 486210 |
| | TX | Waller | 5680911 | 105262613 | 34 | DCP OPERATING COMPANY LP | KATY COMPRESSOR STATION | 486210 |
| | TX | Polk | 5731711 | 21840413 | 12 | GULF SOUTH PIPELINE COMPANY LLC | GOODRICH COMPRESSOR STATION | 486210 |
| | TX | Polk | 5731711 | 21840513 | 12 | GULF SOUTH PIPELINE COMPANY LLC | GOODRICH COMPRESSOR STATION | 486210 |
| | TX | Polk | 5731711 | 21839813 | 12 | GULF SOUTH PIPELINE COMPANY LLC | GOODRICH COMPRESSOR STATION | 486210 |
| | TX | Polk | 5731711 | 21840213 | 12 | GULF SOUTH PIPELINE COMPANY LLC | GOODRICH COMPRESSOR STATION | 486210 |
| | TX | Polk | 5731711 | 21840313 | 12 | GULF SOUTH PIPELINE COMPANY LLC | GOODRICH COMPRESSOR STATION | 486210 |
| | TX | Polk | 5731711 | 21840613 | 12 | GULF SOUTH PIPELINE COMPANY LLC | GOODRICH COMPRESSOR STATION | 486210 |
| | TX | Upshur | 5746311 | 127731413 | 14 | SULPHUR RIVER GATHERING LLC | GILMER COMPRESSOR STATION | 486210 |
| | TX | Upshur | 5746311 | 127731613 | 14 | SULPHUR RIVER GATHERING LLC | GILMER COMPRESSOR STATION | 486210 |
| | TX | Wharton | 5748911 | 92268813 | 27 | ENTERPRISE PRODUCTS OPERATING LLC | WILSON STORAGE STATION | 486210 |
| | TX | Wharton | 5748911 | 92268913 | 27 | ENTERPRISE PRODUCTS OPERATING LLC | WILSON STORAGE STATION | 486210 |
| | TX | Wharton | 5748911 | 21772813 | 27 | ENTERPRISE PRODUCTS OPERATING LLC | WILSON STORAGE STATION | 486210 |
| | TX | Wharton | 5748911 | 21772613 | 27 | ENTERPRISE PRODUCTS OPERATING LLC | WILSON STORAGE STATION | 486210 |
| | TX | Wharton | 5748911 | 21772713 | 27 | ENTERPRISE PRODUCTS OPERATING LLC | WILSON STORAGE STATION | 486210 |
| | TX | Wharton | 5748911 | 21772913 | 27 | ENTERPRISE PRODUCTS OPERATING LLC | WILSON STORAGE STATION | 486210 |
| | TX | Wharton | 5748911 | 71579913 | 27 | ENTERPRISE PRODUCTS OPERATING LLC | WILSON STORAGE STATION | 486210 |
| | TX | Winkler | 5764311 | 21724413 | 20 | TRANSWESTERN PIPELINE COMPANY | WT 2 COMPRESSOR STATION | 486210 |
| | TX | Winkler | 5764311 | 21724613 | 20 | TRANSWESTERN PIPELINE COMPANY | WT 2 COMPRESSOR STATION | 486210 |
| | TX | Winkler | 5764311 | 21724513 | 20 | TRANSWESTERN PIPELINE COMPANY | WT 2 COMPRESSOR STATION | 486210 |
| | TX | Orange | 5764611 | 21722133 | | FLORIDA GAS TRANSMISSION CO LLC | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Orange | 5764611 | 21722213 | 33 | FLORIDA GAS TRANSMISSION CO LLC | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Orange | 5764611 | 21722013 | 33 | FLORIDA GAS TRANSMISSION CO LLC | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Winkler | 5765511 | 21710713 | 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| | TX | Winkler | 5765511 | 21711113 | 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| | TX | Winkler | 5765511 | 21711413 | 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| | TX | Winkler | 5765511 | 21712013 | 30 | EL PASO NATURAL GAS COMPANY LLC | KEYSTONE COMPRESSOR STATION | 486210 |
| | TX | Nueces | 5779811 | 21680313 | 92 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 1 AGUA DULCE | 486210 |
| | TX | Nueces | 5779811 | 21680613 | 92 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 1 AGUA DULCE | 486210 |
| | TX | Nueces | 5779811 | 21679813 | 92 | TENNESSEE GAS PIPELINE COMPANY LLC | COMPRESSOR STATION 1 AGUA DULCE | 486210 |
| | TX | Matagorda | 6386611 | 136640913 | 29 | TEXAS EASTERN TRANSMISSION LP | BLESSING COMPRESSOR STATION | 486210 |
| | TX | Matagorda | 6386611 | 136641013 | 29 | TEXAS EASTERN TRANSMISSION LP | BLESSING COMPRESSOR STATION | 486210 |
| | TX | Matagorda | 6386611 | 16290713 | 29 | TEXAS EASTERN TRANSMISSION LP | BLESSING COMPRESSOR STATION | 486210 |
| | TX | Matagorda | 6386611 | 16290613 | 29 | TEXAS EASTERN TRANSMISSION LP | BLESSING COMPRESSOR STATION | 486210 |
| | TX | Matagorda | 6386611 | 16290013 | 29 | TEXAS EASTERN TRANSMISSION LP | BLESSING COMPRESSOR STATION | 486210 |
| | TX | Matagorda | 6386611 | 16290413 | 29 | TEXAS EASTERN TRANSMISSION LP | BLESSING COMPRESSOR STATION | 486210 |
| | TX | Matagorda | 6386611 | 16290913 | 29 | TEXAS EASTERN TRANSMISSION LP | BLESSING COMPRESSOR STATION | 486210 |
| | TX | Matagorda | 6386611 | 16290513 | 29 | TEXAS EASTERN TRANSMISSION LP | BLESSING COMPRESSOR STATION | 486210 |
| | TX | Matagorda | 6431411 | 71281913 | 57 | KINDER MORGAN TEXAS PIPELINE LLC | STATION 581 | 486210 |
| | TX | Matagorda | 6431411 | 92193413 | 57 | KINDER MORGAN TEXAS PIPELINE LLC | STATION 581 | 486210 |
| | TX | Matagorda | 6431411 | 16586813 | 57 | KINDER MORGAN TEXAS PIPELINE LLC | STATION 581 | 486210 |
| | TX | Matagorda | 6431411 | 16586613 | 57 | KINDER MORGAN TEXAS PIPELINE LLC | STATION 581 | 486210 |
| | TX | Matagorda | 6431411 | 16586713 | 57 | KINDER MORGAN TEXAS PIPELINE LLC | STATION 581 | 486210 |
| | TX | Fort Bend | 6435611 | 16971613 | 85 | ENSTOR KATY STORAGE AND TRANSPORTATION LP | KATY HUB AND STORAGE | 486210 |
| | TX | Fort Bend | 6435611 | 16970813 | 85 | ENSTOR KATY STORAGE AND TRANSPORTATION LP | KATY HUB AND STORAGE | 486210 |
| | TX | Fort Bend | 6435611 | 16970313 | 85 | ENSTOR KATY STORAGE AND TRANSPORTATION LP | KATY HUB AND STORAGE | 486210 |
| | TX | Fort Bend | 6435611 | 16970013 | 85 | ENSTOR KATY STORAGE AND TRANSPORTATION LP | KATY HUB AND STORAGE | 486210 |
| | TX | Fort Bend | 6435611 | 16970213 | 85 | ENSTOR KATY STORAGE AND TRANSPORTATION LP | KATY HUB AND STORAGE | 486210 |
| | TX | Fort Bend | 6435611 | 16971213 | 85 | ENSTOR KATY STORAGE AND TRANSPORTATION LP | KATY HUB AND STORAGE | 486210 |
| | TX | Fort Bend | 6435611 | 16971113 | 85 | ENSTOR KATY STORAGE AND TRANSPORTATION LP | KATY HUB AND STORAGE | 486210 |
| | TX | Fort Bend | 6435611 | 16970413 | 85 | ENSTOR KATY STORAGE AND TRANSPORTATION LP | KATY HUB AND STORAGE | 486210 |
| | TX | Fort Bend | 6435611 | 16970613 | 85 | ENSTOR KATY STORAGE AND TRANSPORTATION LP | KATY HUB AND STORAGE | 486210 |
| | TX | Fort Bend | 6435611 | 16970913 | 85 | ENSTOR KATY STORAGE AND TRANSPORTATION LP | KATY HUB AND STORAGE | 486210 |
| | TX | Ellis | 6491711 | 70323813 | 56 | ATMOS ENERGY CORP | HOWARD COMPRESSOR STATION | 486210 |
| | TX | Ellis | 6491711 | 70323713 | 56 | ATMOS ENERGY CORP | HOWARD COMPRESSOR STATION | 486210 |
| | TX | Eastland | 6492011 | 17625113 | 9 | HILL-LAKE GAS STORAGE LLC | HILL LAKE COMPRESSOR STATION | 486210 |
| | TX | Eastland | 6492011 | 70289513 | 9 | HILL-LAKE GAS STORAGE LLC | HILL LAKE COMPRESSOR STATION | 486210 |
| | TX | Eastland | 6492011 | 70289813 | 9 | HILL-LAKE GAS STORAGE LLC | HILL LAKE COMPRESSOR STATION | 486210 |
| | TX | Eastland | 6492011 | 70289613 | 9 | HILL-LAKE GAS STORAGE LLC | HILL LAKE COMPRESSOR STATION | 486210 |
| | TX | Eastland | 6492011 | 70289713 | 9 | HILL-LAKE GAS STORAGE LLC | HILL LAKE COMPRESSOR STATION | 486210 |
| | TX | Shelby | 6496211 | 19577013 | 18 | TEXAS EASTERN TRANSMISSION LP | JOAQUIN COMPRESSOR STATION | 486210 |
| | TX | Shelby | 6496211 | 19577113 | 18 | TEXAS EASTERN TRANSMISSION LP | JOAQUIN COMPRESSOR STATION | 486210 |
| | TX | Shelby | 6496211 | 19577413 | 18 | TEXAS EASTERN TRANSMISSION LP | JOAQUIN COMPRESSOR STATION | 486210 |
| | TX | Shelby | 6496211 | 136537413 | 18 | TEXAS EASTERN TRANSMISSION LP | JOAQUIN COMPRESSOR STATION | 486210 |
| | TX | Shelby | 6496211 | 136537313 | 18 | TEXAS EASTERN TRANSMISSION LP | JOAQUIN COMPRESSOR STATION | 486210 |
| | TX | Orange | 6497511 | 19544513 | 56 | TEXAS EASTERN TRANSMISSION LP | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Orange | 6497511 | 19544413 | 56 | TEXAS EASTERN TRANSMISSION LP | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Orange | 6497511 | 19544813 | 56 | TEXAS EASTERN TRANSMISSION LP | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Orange | 6497511 | 19544913 | 56 | TEXAS EASTERN TRANSMISSION LP | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Orange | 6497511 | 19545313 | 56 | TEXAS EASTERN TRANSMISSION LP | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Orange | 6497511 | 19545213 | 56 | TEXAS EASTERN TRANSMISSION LP | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Orange | 6497511 | 19545113 | 56 | TEXAS EASTERN TRANSMISSION LP | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Orange | 6497511 | 19544713 | 56 | TEXAS EASTERN TRANSMISSION LP | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Orange | 6497511 | 19545413 | 56 | TEXAS EASTERN TRANSMISSION LP | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Hansford | 6534211 | 18510413 | 14 | ANR PIPELINE COMPANY | EG HILL COMPRESSOR | 486210 |
| | TX | Hansford | 6534211 | 70502513 | 14 | ANR PIPELINE COMPANY | EG HILL COMPRESSOR | 486210 |
| | TX | Clay | 6599011 | 70164613 | 8 | ATMOS ENERGY CORP | LA PAN STORAGE COMPRESSOR STATION | 486210 |
| | TX | Clay | 6599011 | 17322613 | 8 | ATMOS ENERGY CORP | LA PAN STORAGE COMPRESSOR STATION | 486210 |
| | TX | Clay | 6599011 | 135397913 | 8 | ATMOS ENERGY CORP | LA PAN STORAGE COMPRESSOR STATION | 486210 |
| | TX | Chambers | 6599911 | 17307813 | 24 | TEXAS EASTERN TRANSMISSION LP | MT BELVIEU COMPRESSOR STATION | 486210 |
| | TX | Chambers | 6599911 | 17307913 | 24 | TEXAS EASTERN TRANSMISSION LP | MT BELVIEU COMPRESSOR STATION | 486210 |
| | TX | Chambers | 6599911 | 17308213 | 24 | TEXAS EASTERN TRANSMISSION LP | MT BELVIEU COMPRESSOR STATION | 486210 |
| | TX | Chambers | 6599911 | 17308313 | 24 | TEXAS EASTERN TRANSMISSION LP | MT BELVIEU COMPRESSOR STATION | 486210 |
| | TX | Chambers | 6599911 | 17308113 | 24 | TEXAS EASTERN TRANSMISSION LP | MT BELVIEU COMPRESSOR STATION | 486210 |
| | TX | Yoakum | 6648711 | 17136213 | 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| | TX | Yoakum | 6648711 | 17136213 | 24 | EL PASO NATURAL GAS COMPANY LLC | PLAINS COMPRESSOR STATION | 486210 |
| | TX | Pecos | 7539811 | 71498413 | 80 | ONEOK WESTEX TRANSMISSION LLC | COYANOSA COMPRESSOR STATION | 486210 |
| | TX | Pecos | 7539811 | 12346913 | 80 | ONEOK WESTEX TRANSMISSION LLC | COYANOSA COMPRESSOR STATION | 486210 |
| | TX | Pecos | 7539811 | 71498313 | 80 | ONEOK WESTEX TRANSMISSION LLC | COYANOSA COMPRESSOR STATION | 486210 |
| | TX | Midland | 7924511 | 2563913 | 2 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | DRIVER GAS PLANT | 486210 |
| | TX | Midland | 7924511 | 2564013 | 2 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | DRIVER GAS PLANT | 486210 |
| | TX | Panola | 9110611 | 57564213 | 62 | MARKWEST ENERGY EAST TX GAS COMPANY LLC | BECKVILLE COMPRESSOR STATION | 486210 |
| | TX | Panola | 9110611 | 57564713 | 62 | MARKWEST ENERGY EAST TX GAS COMPANY LLC | BECKVILLE COMPRESSOR STATION | 486210 |
| | TX | Panola | 9110611 | 57564513 | 62 | MARKWEST ENERGY EAST TX GAS COMPANY LLC | BECKVILLE COMPRESSOR STATION | 486210 |
| | TX | Panola | 9110611 | 57564513 | 62 | MARKWEST ENERGY EAST TX GAS COMPANY LLC | BECKVILLE COMPRESSOR STATION | 486210 |
| | TX | Panola | 9110611 | 57564613 | 62 | MARKWEST ENERGY EAST TX GAS COMPANY LLC | BECKVILLE COMPRESSOR STATION | 486210 |
| | TX | Panola | 9110611 | 57564813 | 62 | MARKWEST ENERGY EAST TX GAS COMPANY LLC | BECKVILLE COMPRESSOR STATION | 486210 |
| | TX | Panola | 9110611 | 57564313 | 62 | MARKWEST ENERGY EAST TX GAS COMPANY LLC | BECKVILLE COMPRESSOR STATION | 486210 |
| | TX | Orange | 9113011 | 54892313 | 248 | ENERGY TRANSFER CO | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Orange | 9113011 | 71438313 | 248 | ENERGY TRANSFER CO | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Orange | 9113011 | 54892413 | 248 | ENERGY TRANSFER CO | VIDOR COMPRESSOR STATION | 486210 |
| | TX | Jack | 9113411 | 71000813 | 14 | WORSHAM-STEED GAS STORAGE LLC | WORSHAM-STEED GAS STORAGE | 486210 |
| | TX | Jack | 9113411 | 99309813 | 14 | WORSHAM-STEED GAS STORAGE LLC | WORSHAM-STEED GAS STORAGE | 486210 |
| | TX | Jack | 9113411 | 71001013 | 14 | WORSHAM-STEED GAS STORAGE LLC | WORSHAM-STEED GAS STORAGE | 486210 |
| | TX | Jack | 9113411 | 71001113 | 14 | WORSHAM-STEED GAS STORAGE LLC | WORSHAM-STEED GAS STORAGE | 486210 |
| | TX | Jack | 9113411 | 71001213 | 14 | WORSHAM-STEED GAS STORAGE LLC | WORSHAM-STEED GAS STORAGE | 486210 |
| | TX | Jack | 9113411 | 71000913 | 14 | WORSHAM-STEED GAS STORAGE LLC | WORSHAM-STEED GAS STORAGE | 486210 |
| | TX | Hemphill | 9119511 | 57533313 | 38 | MIDCOAST PIPELINES TEXAS GATHERING LP | HOBART CRYOGENIC (277) PLANT | 486210 |
| | TX | Hemphill | 9119511 | 57533813 | 38 | MIDCOAST PIPELINES TEXAS GATHERING LP | HOBART CRYOGENIC (277) PLANT | 486210 |
| | TX | Hemphill | 9119511 | 57533413 | 38 | MIDCOAST PIPELINES TEXAS GATHERING LP | HOBART CRYOGENIC (277) PLANT | 486210 |
| | TX | Hemphill | 9119511 | 57533513 | 38 | MIDCOAST PIPELINES TEXAS GATHERING LP | HOBART CRYOGENIC (277) PLANT | 486210 |
| | TX | Hemphill | 9119511 | 57533613 | 38 | MIDCOAST PIPELINES TEXAS GATHERING LP | HOBART CRYOGENIC (277) PLANT | 486210 |
| | TX | Grimes | 9123711 | 70498513 | 21 | ETC TEXAS PIPELINE LTD | GRIMES COUNTY COMPRESSOR STATION | 486210 |
| | TX | Grimes | 9123711 | 70498613 | 21 | ETC TEXAS PIPELINE LTD | GRIMES COUNTY COMPRESSOR STATION | 486210 |
| | TX | Grimes | 9123711 | 70498413 | 21 | ETC TEXAS PIPELINE LTD | GRIMES COUNTY COMPRESSOR STATION | 486210 |
| | TX | Grimes | 9123711 | 70498813 | 21 | ETC TEXAS PIPELINE LTD | GRIMES COUNTY COMPRESSOR STATION | 486210 |
| | TX | Grimes | 9123711 | 70498313 | 21 | ETC TEXAS PIPELINE LTD | GRIMES COUNTY COMPRESSOR STATION | 486210 |
| | TX | Limestone | 9136811 | 57538013 | 17 | CRESCENT PASS ENERGY LLC | ROTHERMEL COMPRESSOR | 486210 |
| | TX | Limestone | 9136811 | 57537913 | 17 | CRESCENT PASS ENERGY LLC | ROTHERMEL COMPRESSOR | 486210 |
| | TX | Limestone | 9136811 | 110003313 | 17 | CRESCENT PASS ENERGY LLC | ROTHERMEL COMPRESSOR | 486210 |

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 6006 HIGHLAND AVE EXTENDED | BEAUMONT | 2518 | HP | 8.0826 |
| Pipeline Transportation of Natural Gas | 6006 HIGHLAND AVE EXTENDED | BEAUMONT | 2518 | HP | 5.2894 |
| Pipeline Transportation of Natural Gas | 6006 HIGHLAND AVE EXTENDED | BEAUMONT | 2518 | HP | 5.2601 |
| Pipeline Transportation of Natural Gas | 6006 HIGHLAND AVE EXTENDED | BEAUMONT | 2518 | HP | 4.4749 |
| Pipeline Transportation of Natural Gas | 6006 HIGHLAND AVE EXTENDED | BEAUMONT | 2518 | HP | 4.0679 |
| Pipeline Transportation of Natural Gas | 6006 HIGHLAND AVE EXTENDED | BEAUMONT | 2518 | HP | 3.9099 |
| Pipeline Transportation of Natural Gas | 6006 HIGHLAND AVE EXTENDED | BEAUMONT | 3550 | HP | 3.5357 |
| Pipeline Transportation of Natural Gas | 6006 HIGHLAND AVE EXTENDED | BEAUMONT | 3550 | HP | 2.1281 |
| Pipeline Transportation of Natural Gas | 4.3 M S OF EDNA ON FM1822 | EDNA | 1500 | HP | 15.49 |
| Pipeline Transportation of Natural Gas | 6 M N ON SH 18 5.6 M W ON CNTY RD | FORT STOCKTON | 1340 | HP | 13.5682 |
| Pipeline Transportation of Natural Gas | 6 M N ON SH 18 5.6 M W ON CNTY RD | FORT STOCKTON | 1265 | HP | 8.2015 |
| Pipeline Transportation of Natural Gas | 6 M N ON SH 18 5.6 M W ON CNTY RD | FORT STOCKTON | 1108 | HP | 7.9653 |
| Pipeline Transportation of Natural Gas | 6 M N ON SH 18 5.6 M W ON CNTY RD | FORT STOCKTON | 1108 | HP | 7.4385 |
| Pipeline Transportation of Natural Gas | 6 M N ON SH 18 5.6 M W ON CNTY RD | FORT STOCKTON | 1108 | HP | 1.0302 |
| Pipeline Transportation of Natural Gas | 16 M S ON HWY 87 N | DUMAS | 1069 | HP | 10.02 |
| Pipeline Transportation of Natural Gas | 16 M S ON HWY 87 N | DUMAS | 1100 | HP | 1.4338 |
| Pipeline Transportation of Natural Gas | 16 M S ON HWY 87 N | DUMAS | 1100 | HP | 1.4074 |
| Pipeline Transportation of Natural Gas | 16 M S ON HWY 87 N | DUMAS | 1100 | HP | 1.2273 |
| Pipeline Transportation of Natural Gas | APPROX 4.9 E / NE OF BROOKSHIRE | KATY | 1480 | HP | 2.1859 |
| Pipeline Transportation of Natural Gas | APPROX 4.9 E / NE OF BROOKSHIRE | KATY | 1478 | HP | 0.6331 |
| Pipeline Transportation of Natural Gas | APPROX 4.9 E / NE OF BROOKSHIRE | KATY | 1480 | HP | 0.089 |
| Pipeline Transportation of Natural Gas | 228 E FM 1988 | GOODRICH | 1320 | HP | 8.7433 |
| Pipeline Transportation of Natural Gas | 228 E FM 1988 | GOODRICH | 1320 | HP | 6.9486 |
| Pipeline Transportation of Natural Gas | 228 E FM 1988 | GOODRICH | 1320 | HP | 6.6528 |
| Pipeline Transportation of Natural Gas | 228 E FM 1988 | GOODRICH | 1320 | HP | 5.9453 |
| Pipeline Transportation of Natural Gas | 228 E FM 1988 | GOODRICH | 1320 | HP | 2.6234 |
| Pipeline Transportation of Natural Gas | 228 E FM 1988 | GOODRICH | 1320 | HP | 2.4627 |
| Pipeline Transportation of Natural Gas | 8 M ESE OF PITTSBURG | GILMER | 1340 | HP | 9.0873 |
| Pipeline Transportation of Natural Gas | 8 M ESE OF PITTSBURG | GILMER | 1340 | HP | 8.7394 |
| Pipeline Transportation of Natural Gas | 2020 CR 103 | BOLING | 4740 | HP | 3.1553 |
| Pipeline Transportation of Natural Gas | 2020 CR 103 | BOLING | 4740 | HP | 2.3427 |
| Pipeline Transportation of Natural Gas | 2020 CR 103 | BOLING | 2000 | HP | 1.2068 |
| Pipeline Transportation of Natural Gas | 2020 CR 103 | BOLING | 2000 | HP | 1.1852 |
| Pipeline Transportation of Natural Gas | 2020 CR 103 | BOLING | 2000 | HP | 1.1537 |
| Pipeline Transportation of Natural Gas | 2020 CR 103 | BOLING | 2000 | HP | 0.5234 |
| Pipeline Transportation of Natural Gas | 2020 CR 103 | BOLING | 1000 | HP | 0.288 |
| Pipeline Transportation of Natural Gas | 15 MI W ON HWY 302; 3 MI N ON PRIVATE RD | KERMIT | 4000 | HP | 1.4863 |
| Pipeline Transportation of Natural Gas | 15 MI W ON HWY 302; 3 MI N ON PRIVATE RD | KERMIT | 4000 | HP | 0.0324 |
| Pipeline Transportation of Natural Gas | 15 MI W ON HWY 302; 3 MI N ON PRIVATE RD | KERMIT | 4000 | HP | 0.0169 |
| Pipeline Transportation of Natural Gas | FROM VIDOR TX, 1.3 M S ON HWY 105 | VIDOR | 2000 | HP | 1.5626 |
| Pipeline Transportation of Natural Gas | FROM VIDOR TX, 1.3 M S ON HWY 105 | VIDOR | 2000 | HP | 0.2125 |
| Pipeline Transportation of Natural Gas | FROM VIDOR TX, 1.3 M S ON HWY 105 | VIDOR | 2000 | HP | 0.0867 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 2017 | HP | 19.8759 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 1404 | HP | 18.8567 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 1404 | HP | 8.7824 |
| Pipeline Transportation of Natural Gas | 8 M N OF KERMIT ON HWY 18 | KERMIT | 2017 | HP | 8.5876 |
| Pipeline Transportation of Natural Gas | 2960 CR 93 | AGUA DULCE | 1000 | HP | 14.9834 |
| Pipeline Transportation of Natural Gas | 2960 CR 93 | AGUA DULCE | 1600 | HP | 7.8489 |
| Pipeline Transportation of Natural Gas | 2960 CR 93 | AGUA DULCE | 1850 | HP | 0.1678 |
| Pipeline Transportation of Natural Gas | RAILROAD AVE 4 M S OF BLESSING | BLESSING | 1468 | BHP | 0.0621 |
| Pipeline Transportation of Natural Gas | RAILROAD AVE 4 M S OF BLESSING | BLESSING | 1468 | BHP | 0.0621 |
| Pipeline Transportation of Natural Gas | RAILROAD AVE 4 M S OF BLESSING | BLESSING | 1100 | BHP | 0.05 |
| Pipeline Transportation of Natural Gas | RAILROAD AVE 4 M S OF BLESSING | BLESSING | 1100 | BHP | 0.046 |
| Pipeline Transportation of Natural Gas | RAILROAD AVE 4 M S OF BLESSING | BLESSING | 1100 | BHP | 0.0403 |
| Pipeline Transportation of Natural Gas | RAILROAD AVE 4 M S OF BLESSING | BLESSING | 1100 | BHP | 0.0353 |
| Pipeline Transportation of Natural Gas | RAILROAD AVE 4 M S OF BLESSING | BLESSING | 1100 | BHP | 0.022 |
| Pipeline Transportation of Natural Gas | RAILROAD AVE 4 M S OF BLESSING | BLESSING | 1100 | BHP | 0.0178 |
| Pipeline Transportation of Natural Gas | FM 1468; 3 M E OF HWY 71 | EDNA | 4735 | HP | 12.9051 |
| Pipeline Transportation of Natural Gas | FM 1468; 3 M E OF HWY 71 | EDNA | 6237 | HP | 12.2653 |
| Pipeline Transportation of Natural Gas | FM 1468; 3 M E OF HWY 71 | EDNA | 2650 | HP | 9.3477 |
| Pipeline Transportation of Natural Gas | FM 1468; 3 M E OF HWY 71 | EDNA | 2650 | HP | 4.7274 |
| Pipeline Transportation of Natural Gas | FM 1468; 3 M E OF HWY 71 | EDNA | 2650 | HP | 4.4626 |
| Pipeline Transportation of Natural Gas | 25959 WESTHEIMER PKWY | KATY | 4740 | HP | 16.136 |
| Pipeline Transportation of Natural Gas | 25959 WESTHEIMER PKWY | KATY | 1480 | HP | 2.7332 |
| Pipeline Transportation of Natural Gas | 25959 WESTHEIMER PKWY | KATY | 1480 | HP | 2.1879 |
| Pipeline Transportation of Natural Gas | 25959 WESTHEIMER PKWY | KATY | 1480 | HP | 1.5734 |
| Pipeline Transportation of Natural Gas | 25959 WESTHEIMER PKWY | KATY | 1480 | HP | 1.4603 |
| Pipeline Transportation of Natural Gas | 25959 WESTHEIMER PKWY | KATY | 1480 | HP | 0.9273 |
| Pipeline Transportation of Natural Gas | 25959 WESTHEIMER PKWY | KATY | 1480 | HP | 0.617 |
| Pipeline Transportation of Natural Gas | 25959 WESTHEIMER PKWY | KATY | 1480 | HP | 0.5356 |
| Pipeline Transportation of Natural Gas | 25959 WESTHEIMER PKWY | KATY | 1480 | HP | 0.3893 |
| Pipeline Transportation of Natural Gas | 25959 WESTHEIMER PKWY | KATY | 1220 | HP | 0.1617 |
| Pipeline Transportation of Natural Gas | 25959 WESTHEIMER PKWY | KATY | 1480 | HP | 0.1118 |
| Pipeline Transportation of Natural Gas | ON FM 984; APPROX 1.4 M S OF HOWARD | ENNIS | 3550 | HP | 0.6192 |
| Pipeline Transportation of Natural Gas | ON FM 984; APPROX 1.4 M S OF HOWARD | ENNIS | 3550 | HP | 0.37 |
| Pipeline Transportation of Natural Gas | 909 FM 1853 | CISCO | 4445 | HP | 7.7384 |
| Pipeline Transportation of Natural Gas | 909 FM 1853 | CISCO | 1775 | HP | 2.7269 |
| Pipeline Transportation of Natural Gas | 909 FM 1853 | CISCO | 1775 | HP | 2.7228 |
| Pipeline Transportation of Natural Gas | 909 FM 1853 | CISCO | 1775 | HP | 2.1257 |
| Pipeline Transportation of Natural Gas | 909 FM 1853 | CISCO | 1775 | HP | 1.3765 |
| Pipeline Transportation of Natural Gas | HWY 139 APPROX 4 MI SE OF JOAQUIN | JOAQUIN | 1100 | BHP | 0.1746 |
| Pipeline Transportation of Natural Gas | HWY 139 APPROX 4 MI SE OF JOAQUIN | JOAQUIN | 1100 | BHP | 0.1032 |
| Pipeline Transportation of Natural Gas | HWY 139 APPROX 4 MI SE OF JOAQUIN | JOAQUIN | 1100 | BHP | 0.0551 |
| Pipeline Transportation of Natural Gas | HWY 139 APPROX 4 MI SE OF JOAQUIN | JOAQUIN | 1100 | BHP | 0.0545 |
| Pipeline Transportation of Natural Gas | HWY 139 APPROX 4 MI SE OF JOAQUIN | JOAQUIN | 1114 | BHP | 0.0132 |
| Pipeline Transportation of Natural Gas | HWY 139 APPROX 4 MI SE OF JOAQUIN | JOAQUIN | 1114 | BHP | 0.0129 |
| Pipeline Transportation of Natural Gas | HWY 105 S ON MANSFIELD FERRY RD | VIDOR | 1100 | HP | 0.477 |
| Pipeline Transportation of Natural Gas | HWY 105 S ON MANSFIELD FERRY RD | VIDOR | 2000 | HP | 0.4486 |
| Pipeline Transportation of Natural Gas | HWY 105 S ON MANSFIELD FERRY RD | VIDOR | 1100 | HP | 0.4406 |
| Pipeline Transportation of Natural Gas | HWY 105 S ON MANSFIELD FERRY RD | VIDOR | 1000 | HP | 0.3899 |
| Pipeline Transportation of Natural Gas | HWY 105 S ON MANSFIELD FERRY RD | VIDOR | 1000 | HP | 0.3111 |
| Pipeline Transportation of Natural Gas | HWY 105 S ON MANSFIELD FERRY RD | VIDOR | 1000 | HP | 0.214 |
| Pipeline Transportation of Natural Gas | HWY 105 S ON MANSFIELD FERRY RD | VIDOR | 1000 | HP | 0.1751 |
| Pipeline Transportation of Natural Gas | HWY 105 S ON MANSFIELD FERRY RD | VIDOR | 2000 | HP | 0.1206 |
| Pipeline Transportation of Natural Gas | HWY 105 S ON MANSFIELD FERRY RD | VIDOR | 1000 | HP | 0.0814 |
| Pipeline Transportation of Natural Gas | 20 M N OF TX 136 NEAR THE STATE BOUNDARY | GRUVER | 2500 | HP | 2.623 |
| Pipeline Transportation of Natural Gas | 20 M N OF TX 136 NEAR THE STATE BOUNDARY | GRUVER | 1820 | HP | 0.1206 |
| Pipeline Transportation of Natural Gas | 6 M S ON SH 148 | HENRIETTA | 2200 | HP | 11.2236 |
| Pipeline Transportation of Natural Gas | 6 M S ON SH 148 | HENRIETTA | 3000 | HP | 7.9962 |
| Pipeline Transportation of Natural Gas | 6 M S ON SH 148 | HENRIETTA | 2675 | HP | 1.326 |
| Pipeline Transportation of Natural Gas | HWY 565; 7 M E OF BAYTOWN | BAYTOWN | 2050 | HP | 0.5663 |
| Pipeline Transportation of Natural Gas | HWY 565; 7 M E OF BAYTOWN | BAYTOWN | 2050 | HP | 0.4928 |
| Pipeline Transportation of Natural Gas | HWY 565; 7 M E OF BAYTOWN | BAYTOWN | 2050 | HP | 0.3709 |
| Pipeline Transportation of Natural Gas | HWY 565; 7 M E OF BAYTOWN | BAYTOWN | 2050 | HP | 0.1392 |
| Pipeline Transportation of Natural Gas | HWY 565; 7 M E OF BAYTOWN | BAYTOWN | 2050 | HP | 0.1391 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS; 4 M E OF DENVER CITY | PLAINS | 3500 | BHP | 20.704 |
| Pipeline Transportation of Natural Gas | 15 M SE OF PLAINS; 4 M E OF DENVER CITY | PLAINS | 1800 | BHP | 3.605 |
| Pipeline Transportation of Natural Gas | 2 MI NW OF COYANOSA | COYANOSA | 1480 | HP | 9.7036 |
| Pipeline Transportation of Natural Gas | 2 MI NW OF COYANOSA | COYANOSA | 1480 | HP | 5.0547 |
| Pipeline Transportation of Natural Gas | 2 MI NW OF COYANOSA | COYANOSA | 1480 | HP | 4.4478 |
| Pipeline Transportation of Natural Gas | 13 MI E SH 158; & 13 MI S FM 1379 | MIDLAND | 3550 | HP | 19.322 |
| Pipeline Transportation of Natural Gas | 13 MI E SH 158; & 13 MI S FM 1379 | MIDLAND | 3550 | HP | 8.765 |
| Pipeline Transportation of Natural Gas | 1.75 MI SE OF BECKVILLE OFF HWY 149 | BECKVILLE | 1340 | HP | 15.7687 |
| Pipeline Transportation of Natural Gas | 1.75 MI SE OF BECKVILLE OFF HWY 149 | BECKVILLE | 1340 | HP | 14.4522 |
| Pipeline Transportation of Natural Gas | 1.75 MI SE OF BECKVILLE OFF HWY 149 | BECKVILLE | 1340 | HP | 12.2321 |
| Pipeline Transportation of Natural Gas | 1.75 MI SE OF BECKVILLE OFF HWY 149 | BECKVILLE | 1340 | HP | 10.3185 |
| Pipeline Transportation of Natural Gas | 1.75 MI SE OF BECKVILLE OFF HWY 149 | BECKVILLE | 1340 | HP | 10.0921 |
| Pipeline Transportation of Natural Gas | 1.75 MI SE OF BECKVILLE OFF HWY 149 | BECKVILLE | 1340 | HP | 5.6118 |
| Pipeline Transportation of Natural Gas | 1.75 MI SE OF BECKVILLE OFF HWY 149 | BECKVILLE | 1340 | HP | 5.1135 |
| Pipeline Transportation of Natural Gas | 5 MI S OF VIDOR OFF CHURCH HOUSE RD | VIDOR | 1780 | HP | 5.1046 |
| Pipeline Transportation of Natural Gas | 5 MI S OF VIDOR OFF CHURCH HOUSE RD | VIDOR | 1650 | HP | 4.4391 |
| Pipeline Transportation of Natural Gas | 5 MI S OF VIDOR OFF CHURCH HOUSE RD | VIDOR | 1780 | HP | 3.9294 |
| Pipeline Transportation of Natural Gas | HWY 281 3 M S OF INTERX OF HWY | JACKSBORO | 4735 | HP | 18.8162 |
| Pipeline Transportation of Natural Gas | HWY 281 3 M S OF INTERX OF HWY | JACKSBORO | 4740 | HP | 14.7022 |
| Pipeline Transportation of Natural Gas | HWY 281 3 M S OF INTERX OF HWY | JACKSBORO | 1775 | HP | 7.4357 |
| Pipeline Transportation of Natural Gas | HWY 281 3 M S OF INTERX OF HWY | JACKSBORO | 1775 | HP | 7.3467 |
| Pipeline Transportation of Natural Gas | HWY 281 3 M S OF INTERX OF HWY | JACKSBORO | 1775 | HP | 6.5208 |
| Pipeline Transportation of Natural Gas | HWY 281 3 M S OF INTERX OF HWY | JACKSBORO | 1775 | HP | 5.9538 |
| Pipeline Transportation of Natural Gas | SOUTH OF CANADIAN AT INT OF US83 AND FM277, 3/4 MI E ON 277 | CANADIAN | 1340 | HP | 12.1177 |
| Pipeline Transportation of Natural Gas | SOUTH OF CANADIAN AT INT OF US83 AND FM277, 3/4 MI E ON 277 | CANADIAN | 1340 | HP | 10.128 |
| Pipeline Transportation of Natural Gas | SOUTH OF CANADIAN AT INT OF US83 AND FM277, 3/4 MI E ON 277 | CANADIAN | 1340 | HP | 9.9815 |
| Pipeline Transportation of Natural Gas | SOUTH OF CANADIAN AT INT OF US83 AND FM277, 3/4 MI E ON 277 | CANADIAN | 1340 | HP | 4.5301 |
| Pipeline Transportation of Natural Gas | SOUTH OF CANADIAN AT INT OF US83 AND FM277, 3/4 MI E ON 277 | CANADIAN | 1340 | HP | 3.9943 |
| Pipeline Transportation of Natural Gas | TAKE HWY 90 S FROM ROANS PRAIRIE, TURN RIGHT ON CR 280, GO WEST ON CR 280 TO CR 180, SITE ON LEFT | ROANS PRAIRIE | 3680 | BHP | 17.1238 |
| Pipeline Transportation of Natural Gas | TAKE HWY 90 S FROM ROANS PRAIRIE, TURN RIGHT ON CR 280, GO WEST ON CR 280 TO CR 180, SITE ON LEFT | ROANS PRAIRIE | 3680 | BHP | 16.5238 |
| Pipeline Transportation of Natural Gas | TAKE HWY 90 S FROM ROANS PRAIRIE, TURN RIGHT ON CR 280, GO WEST ON CR 280 TO CR 180, SITE ON LEFT | ROANS PRAIRIE | 3680 | BHP | 14.7834 |
| Pipeline Transportation of Natural Gas | TAKE HWY 90 S FROM ROANS PRAIRIE, TURN RIGHT ON CR 280, GO WEST ON CR 280 TO CR 180, SITE ON LEFT | ROANS PRAIRIE | 4740 | HP | 11.4637 |
| Pipeline Transportation of Natural Gas | TAKE HWY 90 S FROM ROANS PRAIRIE, TURN RIGHT ON CR 280, GO WEST ON CR 280 TO CR 180, SITE ON LEFT | ROANS PRAIRIE | 4740 | HP | 9.3627 |
| Pipeline Transportation of Natural Gas | ON HWY 937 SE OF GROESBECK | GROESBECK | 1340 | HP | 12.7387 |
| Pipeline Transportation of Natural Gas | ON HWY 937 SE OF GROESBECK | GROESBECK | 1340 | HP | 12.6993 |
| Pipeline Transportation of Natural Gas | ON HWY 937 SE OF GROESBECK | GROESBECK | 1340 | HP | 9.647 |



| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | TX | Limestone | 9136811 | 57538733 17 | | CRESCENT PASS ENERGY LLC | ROTHERMEL COMPRESSOR | 486210 |
| | TX | Limestone | 9136811 | 122918413 17 | | CRESCENT PASS ENERGY LLC | ROTHERMEL COMPRESSOR | 486210 |
| | TX | Limestone | 9136811 | 136530913 17 | | CRESCENT PASS ENERGY LLC | ROTHERMEL COMPRESSOR | 486210 |
| | TX | Johnson | 9147611 | 70735613 39 | | ENERGY TRANSFER FUEL LP | CLEBURNE COMPRESSOR STATION | 486210 |
| | TX | Johnson | 9147611 | 70735713 39 | | ENERGY TRANSFER FUEL LP | CLEBURNE COMPRESSOR STATION | 486210 |
| | TX | Johnson | 9147611 | 57541513 39 | | ENERGY TRANSFER FUEL LP | CLEBURNE COMPRESSOR STATION | 486210 |
| | TX | Johnson | 9147611 | 57541613 39 | | ENERGY TRANSFER FUEL LP | CLEBURNE COMPRESSOR STATION | 486210 |
| | TX | Johnson | 9147611 | 70735513 39 | | ENERGY TRANSFER FUEL LP | CLEBURNE COMPRESSOR STATION | 486210 |
| | TX | Johnson | 9147611 | 57541713 39 | | ENERGY TRANSFER FUEL LP | CLEBURNE COMPRESSOR STATION | 486210 |
| | TX | Johnson | 9147611 | 57541813 39 | | ENERGY TRANSFER FUEL LP | CLEBURNE COMPRESSOR STATION | 486210 |
| | TX | Panola | 1067791 | 58885213 64 | | GULF SOUTH PIPELINE COMPANY LLC | CARTHAGE COMPRESSOR STATION 2 | 486210 |
| | TX | Panola | 1067791 | 58885313 64 | | GULF SOUTH PIPELINE COMPANY LLC | CARTHAGE COMPRESSOR STATION 2 | 486210 |
| | TX | Panola | 1067791 | 58885113 64 | | GULF SOUTH PIPELINE COMPANY LLC | CARTHAGE COMPRESSOR STATION 2 | 486210 |
| | TX | Fannin | 1337971 | 70345113 5 | | ETC TEXAS PIPELINE LTD | BAILEY COMPRESSOR STATION | 486210 |
| | TX | Fannin | 1337971 | 70345213 5 | | ETC TEXAS PIPELINE LTD | BAILEY COMPRESSOR STATION | 486210 |
| | TX | Fannin | 1337971 | 70344813 5 | | ETC TEXAS PIPELINE LTD | BAILEY COMPRESSOR STATION | 486210 |
| | TX | Fannin | 1337971 | 70344913 5 | | ETC TEXAS PIPELINE LTD | BAILEY COMPRESSOR STATION | 486210 |
| | TX | Fannin | 1337971 | 70345013 5 | | ETC TEXAS PIPELINE LTD | BAILEY COMPRESSOR STATION | 486210 |
| | TX | Freestone | 1338021 | 70388213 637 | | ENERGY TRANSFER FUEL LP | REED COMPRESSOR STATION | 486210 |
| | TX | Freestone | 1338021 | 70387313 637 | | ENERGY TRANSFER FUEL LP | REED COMPRESSOR STATION | 486210 |
| | TX | Freestone | 1338021 | 70388113 637 | | ENERGY TRANSFER FUEL LP | REED COMPRESSOR STATION | 486210 |
| | TX | Freestone | 1338021 | 70387213 637 | | ENERGY TRANSFER FUEL LP | REED COMPRESSOR STATION | 486210 |
| | TX | Roberts | 1338561 | 123242513 9 | | ETC TEXAS PIPELINE LTD | RED DEER GAS PLANT | 486210 |
| | TX | Roberts | 1338561 | 71173313 9 | | ETC TEXAS PIPELINE LTD | RED DEER GAS PLANT | 486210 |
| | TX | Parker | 1339021 | 91479313 153 | | ENLINK TEXAS PROCESSING  LP | GOFORTH PROCESSING PLANT | 486210 |
| | TX | Parker | 1339021 | 91479213 153 | | ENLINK TEXAS PROCESSING  LP | GOFORTH PROCESSING PLANT | 486210 |
| | TX | Parker | 1339021 | 91479113 153 | | ENLINK TEXAS PROCESSING  LP | GOFORTH PROCESSING PLANT | 486210 |
| | TX | Parker | 1339081 | 71477513 161 | | ENERGY TRANSFER FUEL LP | SPRINGTOWN COMPRESSOR STATION | 486210 |
| | TX | Parker | 1339081 | 71477713 161 | | ENERGY TRANSFER FUEL LP | SPRINGTOWN COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 1339341 | 99445813 264 | | MARKWEST OKLAHOMA GAS COMPANY LLC | EAST BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 1339341 | 71594313 264 | | MARKWEST OKLAHOMA GAS COMPANY LLC | EAST BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 1339341 | 71593913 264 | | MARKWEST OKLAHOMA GAS COMPANY LLC | EAST BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 1339341 | 71594013 264 | | MARKWEST OKLAHOMA GAS COMPANY LLC | EAST BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 1339341 | 71594113 264 | | MARKWEST OKLAHOMA GAS COMPANY LLC | EAST BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 1339341 | 71594113 264 | | MARKWEST OKLAHOMA GAS COMPANY LLC | EAST BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 1339341 | 99445613 264 | | MARKWEST OKLAHOMA GAS COMPANY LLC | EAST BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 1339351 | 71595113 265 | | MARKWEST OKLAHOMA GAS COMPANY LLC | SOUTH BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 1339351 | 71594913 265 | | MARKWEST OKLAHOMA GAS COMPANY LLC | SOUTH BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 1339351 | 71595013 265 | | MARKWEST OKLAHOMA GAS COMPANY LLC | SOUTH BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 1339351 | 71594813 265 | | MARKWEST OKLAHOMA GAS COMPANY LLC | SOUTH BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 1339351 | 71595213 265 | | MARKWEST OKLAHOMA GAS COMPANY LLC | SOUTH BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Panola | 1340251 | 71456613 66 | | GULF SOUTH PIPELINE COMPANY LLC | CARTHAGE JUNCTION COMPRESSOR STATION | 486210 |
| | TX | Panola | 1340251 | 71456713 66 | | GULF SOUTH PIPELINE COMPANY LLC | CARTHAGE JUNCTION COMPRESSOR STATION | 486210 |
| | TX | Panola | 1340251 | 71457413 66 | | GULF SOUTH PIPELINE COMPANY LLC | CARTHAGE JUNCTION COMPRESSOR STATION | 486210 |
| | TX | Panola | 1340251 | 71456813 66 | | GULF SOUTH PIPELINE COMPANY LLC | CARTHAGE JUNCTION COMPRESSOR STATION | 486210 |
| | TX | Harrison | 1340411 | 70933813 99 | | MARKWEST ENERGY EAST TX GAS CO LLC | GAS BLOCKER COMPRESSOR STATION | 486210 |
| | TX | Harrison | 1340411 | 70933613 99 | | MARKWEST ENERGY EAST TX GAS CO LLC | GAS BLOCKER COMPRESSOR STATION | 486210 |
| | TX | Harrison | 1340411 | 70933713 99 | | MARKWEST ENERGY EAST TX GAS CO LLC | GAS BLOCKER COMPRESSOR STATION | 486210 |
| | TX | Harrison | 1340411 | 70933913 99 | | MARKWEST ENERGY EAST TX GAS CO LLC | GAS BLOCKER COMPRESSOR STATION | 486210 |
| | TX | Ellis | 13411711 | 70310513 1660 | | ENERGY TRANSFER FUEL LP | MAYPEARL COMPRESSOR STATION | 486210 |
| | TX | Ellis | 13411711 | 70310113 1660 | | ENERGY TRANSFER FUEL LP | MAYPEARL COMPRESSOR STATION | 486210 |
| | TX | Ellis | 13411711 | 70309913 1660 | | ENERGY TRANSFER FUEL LP | MAYPEARL COMPRESSOR STATION | 486210 |
| | TX | Ellis | 13411711 | 70310413 1660 | | ENERGY TRANSFER FUEL LP | MAYPEARL COMPRESSOR STATION | 486210 |
| | TX | Ellis | 13411711 | 70310613 1660 | | ENERGY TRANSFER FUEL LP | MAYPEARL COMPRESSOR STATION | 486210 |
| | TX | Ellis | 13411711 | 70310713 1660 | | ENERGY TRANSFER FUEL LP | MAYPEARL COMPRESSOR STATION | 486210 |
| | TX | Ellis | 13411711 | 109801213 1660 | | ENERGY TRANSFER FUEL LP | MAYPEARL COMPRESSOR STATION | 486210 |
| | TX | Ellis | 13411711 | 105176213 1660 | | ENERGY TRANSFER FUEL LP | MAYPEARL COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 14749311 | 90284913 269 | | MARKWEST OKLAHOMA GAS COMPANY LLC | NORTH BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 14749311 | 90284813 269 | | MARKWEST OKLAHOMA GAS COMPANY LLC | NORTH BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 14749311 | 90284513 269 | | MARKWEST OKLAHOMA GAS COMPANY LLC | NORTH BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 14749311 | 90284713 269 | | MARKWEST OKLAHOMA GAS COMPANY LLC | NORTH BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 14749311 | 90284613 269 | | MARKWEST OKLAHOMA GAS COMPANY LLC | NORTH BRITT RANCH COMPRESSOR STATION | 486210 |
| | TX | Lamar | 14749411 | 90286213 250 | | MIDCONTINENT EXPRESS PIPELINE LLC | LAMAR COMPRESSOR STATION | 486210 |
| | TX | Lamar | 14749411 | 90286013 250 | | MIDCONTINENT EXPRESS PIPELINE LLC | LAMAR COMPRESSOR STATION | 486210 |
| | TX | Lamar | 14749411 | 90286113 250 | | MIDCONTINENT EXPRESS PIPELINE LLC | LAMAR COMPRESSOR STATION | 486210 |
| | TX | Lamar | 14749411 | 90286313 250 | | MIDCONTINENT EXPRESS PIPELINE LLC | LAMAR COMPRESSOR STATION | 486210 |
| | TX | Lamar | 14749411 | 90287513 250 | | MIDCONTINENT EXPRESS PIPELINE LLC | LAMAR COMPRESSOR STATION | 486210 |
| | TX | Lamar | 14749411 | 90286413 250 | | MIDCONTINENT EXPRESS PIPELINE LLC | LAMAR COMPRESSOR STATION | 486210 |
| | TX | Lamar | 14749411 | 90287113 250 | | MIDCONTINENT EXPRESS PIPELINE LLC | LAMAR COMPRESSOR STATION | 486210 |
| | TX | Parker | 14749511 | 110011013 170 | | ENLINK NORTH TEXAS GATHERING LP | KEMP COMPRESSOR STATION | 486210 |
| | TX | Parker | 14749511 | 90287713 170 | | ENLINK NORTH TEXAS GATHERING LP | KEMP COMPRESSOR STATION | 486210 |
| | TX | Parker | 14749511 | 90287913 170 | | ENLINK NORTH TEXAS GATHERING LP | KEMP COMPRESSOR STATION | 486210 |
| | TX | Parker | 14749511 | 90287613 170 | | ENLINK NORTH TEXAS GATHERING LP | KEMP COMPRESSOR STATION | 486210 |
| | TX | Parker | 14749611 | 90290213 1704 | | ENLINK NORTH TEXAS GATHERING LP | WHITE SETTLEMENT COMPRESSOR STATION | 486210 |
| | TX | Parker | 14749611 | 90290313 1704 | | ENLINK NORTH TEXAS GATHERING LP | WHITE SETTLEMENT COMPRESSOR STATION | 486210 |
| | TX | Parker | 14749611 | 92238813 1704 | | ENLINK NORTH TEXAS GATHERING LP | WHITE SETTLEMENT COMPRESSOR STATION | 486210 |
| | TX | Parker | 14749611 | 122924113 1704 | | ENLINK NORTH TEXAS GATHERING LP | WHITE SETTLEMENT COMPRESSOR STATION | 486210 |
| | TX | Parker | 14749611 | 90290113 1704 | | ENLINK NORTH TEXAS GATHERING LP | WHITE SETTLEMENT COMPRESSOR STATION | 486210 |
| | TX | Parker | 14749611 | 90290013 1704 | | ENLINK NORTH TEXAS GATHERING LP | WHITE SETTLEMENT COMPRESSOR STATION | 486210 |
| | TX | Parker | 14749611 | 90289613 1704 | | ENLINK NORTH TEXAS GATHERING LP | WHITE SETTLEMENT COMPRESSOR STATION | 486210 |
| | TX | Matagorda | 14749811 | 90292413 75 | | TRES PALACIOS GAS STORAGE LLC | TRES PALACIOS GAS STORAGE FACILITY | 486210 |
| | TX | Matagorda | 14749811 | 90292513 75 | | TRES PALACIOS GAS STORAGE LLC | TRES PALACIOS GAS STORAGE FACILITY | 486210 |
| | TX | Matagorda | 14749811 | 90292313 75 | | TRES PALACIOS GAS STORAGE LLC | TRES PALACIOS GAS STORAGE FACILITY | 486210 |
| | TX | Matagorda | 14749811 | 90292213 75 | | TRES PALACIOS GAS STORAGE LLC | TRES PALACIOS GAS STORAGE FACILITY | 486210 |
| | TX | Johnson | 14749911 | 90296113 97 | | ENLINK NORTH TEXAS GATHERING LP | CROUCH COMPRESSOR STATION | 486210 |
| | TX | Johnson | 14749911 | 90296213 97 | | ENLINK NORTH TEXAS GATHERING LP | CROUCH COMPRESSOR STATION | 486210 |
| | TX | Grayson | 14750011 | 92112813 77 | | GULF SOUTH PIPELINE COMPANY LLC | SHERMAN COMPRESSOR STATION | 486210 |
| | TX | Grayson | 14750011 | 92112713 77 | | GULF SOUTH PIPELINE COMPANY LLC | SHERMAN COMPRESSOR STATION | 486210 |
| | TX | Rusk | 14997211 | 91490913 643 | | ENERGY TRANSFER FUEL LP | MCKNIGHT COMPRESSOR STATION | 486210 |
| | TX | Rusk | 14997211 | 91490713 643 | | ENERGY TRANSFER FUEL LP | MCKNIGHT COMPRESSOR STATION | 486210 |
| | TX | Rusk | 14997211 | 91491013 643 | | ENERGY TRANSFER FUEL LP | MCKNIGHT COMPRESSOR STATION | 486210 |
| | TX | Rusk | 14997211 | 91490813 643 | | ENERGY TRANSFER FUEL LP | MCKNIGHT COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 15047011 | 92271213 273 | | MARKWEST OKLAHOMA GAS COMPANY LLC | MARKWEST HUFF COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 15047011 | 92271613 273 | | MARKWEST OKLAHOMA GAS COMPANY LLC | MARKWEST HUFF COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 15047011 | 92271513 273 | | MARKWEST OKLAHOMA GAS COMPANY LLC | MARKWEST HUFF COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 15047011 | 92272713 273 | | MARKWEST OKLAHOMA GAS COMPANY LLC | MARKWEST HUFF COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 15047011 | 92270313 273 | | MARKWEST OKLAHOMA GAS COMPANY LLC | MARKWEST HUFF COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 15047011 | 92271013 273 | | MARKWEST OKLAHOMA GAS COMPANY LLC | MARKWEST HUFF COMPRESSOR STATION | 486210 |
| | TX | Cass | 15624611 | 99179313 23 | | MIDCONTINENT EXPRESS PIPELINE LLC | ATLANTA COMPRESSOR STATION | 486210 |
| | TX | Karnes | 15627811 | 106699313 169 | | ENTERPRISE PRODUCTS OPERATING LLC | AREA 71 CGP FACILITY | 486210 |
| | TX | Karnes | 15627811 | 112991913 169 | | ENTERPRISE PRODUCTS OPERATING LLC | AREA 71 CGP FACILITY | 486210 |
| | TX | Karnes | 15627811 | 122912313 169 | | ENTERPRISE PRODUCTS OPERATING LLC | AREA 71 CGP FACILITY | 486210 |
| | TX | Karnes | 15627811 | 112993813 169 | | ENTERPRISE PRODUCTS OPERATING LLC | AREA 71 CGP FACILITY | 486210 |
| | TX | Karnes | 15627811 | 106699713 169 | | ENTERPRISE PRODUCTS OPERATING LLC | AREA 71 CGP FACILITY | 486210 |
| | TX | Karnes | 15627811 | 106699413 169 | | ENTERPRISE PRODUCTS OPERATING LLC | AREA 71 CGP FACILITY | 486210 |
| | TX | Karnes | 15627811 | 106699613 169 | | ENTERPRISE PRODUCTS OPERATING LLC | AREA 71 CGP FACILITY | 486210 |
| | TX | Karnes | 15627811 | 99332213 169 | | ENTERPRISE PRODUCTS OPERATING LLC | AREA 71 CGP FACILITY | 486210 |
| | TX | Karnes | 15627811 | 99333113 169 | | ENTERPRISE PRODUCTS OPERATING LLC | AREA 71 CGP FACILITY | 486210 |
| | TX | Karnes | 15627811 | 112993713 169 | | ENTERPRISE PRODUCTS OPERATING LLC | AREA 71 CGP FACILITY | 486210 |
| | TX | Montague | 15629311 | 105248813 225 | | TARGA MIDSTREAM SERVICES LLC | NEW HARP COMPRESSOR STATION | 486210 |
| | TX | Montague | 15629311 | 105249113 225 | | TARGA MIDSTREAM SERVICES LLC | NEW HARP COMPRESSOR STATION | 486210 |
| | TX | Montague | 15629311 | 105248613 225 | | TARGA MIDSTREAM SERVICES LLC | NEW HARP COMPRESSOR STATION | 486210 |
| | TX | Montague | 15629311 | 105249013 225 | | TARGA MIDSTREAM SERVICES LLC | NEW HARP COMPRESSOR STATION | 486210 |
| | TX | Montague | 15629311 | 105248713 225 | | TARGA MIDSTREAM SERVICES LLC | NEW HARP COMPRESSOR STATION | 486210 |
| | TX | Montague | 15629311 | 105248913 225 | | TARGA MIDSTREAM SERVICES LLC | NEW HARP COMPRESSOR STATION | 486210 |
| | TX | Tarrant | 15630611 | 127782713 1732 | | ENLINK NORTH TEXAS GATHERING LP | BENBROOK COMPRESSOR STATION | 486210 |
| | TX | Tarrant | 15630611 | 99425613 1732 | | ENLINK NORTH TEXAS GATHERING LP | BENBROOK COMPRESSOR STATION | 486210 |
| | TX | Tarrant | 15630611 | 99426013 1732 | | ENLINK NORTH TEXAS GATHERING LP | BENBROOK COMPRESSOR STATION | 486210 |
| | TX | Tarrant | 15630611 | 99425913 1732 | | ENLINK NORTH TEXAS GATHERING LP | BENBROOK COMPRESSOR STATION | 486210 |
| | TX | Tarrant | 15630611 | 99425413 1732 | | ENLINK NORTH TEXAS GATHERING LP | BENBROOK COMPRESSOR STATION | 486210 |
| | TX | Tarrant | 15630611 | 99425713 1732 | | ENLINK NORTH TEXAS GATHERING LP | BENBROOK COMPRESSOR STATION | 486210 |
| | TX | Ward | 15631111 | 99440513 72 | | TARGA MIDSTREAM SERVICES LLC | PIONEER COMPRESSOR STATION | 486210 |
| | TX | Ward | 15631111 | 99440613 72 | | TARGA MIDSTREAM SERVICES LLC | PIONEER COMPRESSOR STATION | 486210 |
| | TX | Denton | 16623011 | 106640713 1737 | | ATMOS ENERGY CORPORATION | PONDER COMPRESSOR STATION | 486210 |
| | TX | Denton | 16623011 | 106649013 1737 | | ATMOS ENERGY CORPORATION | PONDER COMPRESSOR STATION | 486210 |
| | TX | Midland | 16625311 | 106743113 182 | | TARGA MIDSTREAM SERVICES LLC | RAILWAY RANCH COMPRESSOR STATION | 486210 |
| | TX | Midland | 16625311 | 109977913 182 | | TARGA MIDSTREAM SERVICES LLC | RAILWAY RANCH COMPRESSOR STATION | 486210 |
| | TX | Midland | 16625311 | 113052013 182 | | TARGA MIDSTREAM SERVICES LLC | RAILWAY RANCH COMPRESSOR STATION | 486210 |
| | TX | Shelby | 16628911 | 106803513 1678 | | MIDCOAST G & P EAST TEXAS LP | TENEHA STATION | 486210 |
| | TX | Shelby | 16628911 | 106803813 1678 | | MIDCOAST G & P EAST TEXAS LP | TENEHA STATION | 486210 |
| | TX | Shelby | 16628911 | 106803613 1678 | | MIDCOAST G & P EAST TEXAS LP | TENEHA STATION | 486210 |
| | TX | Shelby | 16628911 | 106803713 1678 | | MIDCOAST G & P EAST TEXAS LP | TENEHA STATION | 486210 |
| | TX | Wheeler | 16629311 | 106813013 280 | | MIDCOAST PIPELINES TEXAS GATHERING LP | TEXAS BLOND COMPRESSOR STATION | 486210 |
| | TX | Wheeler | 16629311 | 106813113 280 | | MIDCOAST PIPELINES TEXAS GATHERING LP | TEXAS BLOND COMPRESSOR STATION | 486210 |
| | TX | Crane | 16861611 | 109833113 49 | | TARGA MIDSTREAM SERVICES LLC | JLS COMPRESSOR STATION | 486210 |
| | TX | Crane | 16861611 | 113187713 49 | | TARGA MIDSTREAM SERVICES LLC | JLS COMPRESSOR STATION | 486210 |
| | TX | Crane | 16861611 | 109833013 49 | | TARGA MIDSTREAM SERVICES LLC | JLS COMPRESSOR STATION | 486210 |
| | TX | Crane | 16861611 | 109832913 49 | | TARGA MIDSTREAM SERVICES LLC | JLS COMPRESSOR STATION | 486210 |
| | TX | Reeves | 16868511 | 110018713 236 | | ETC TEXAS PIPELINE LTD | RED BLUFF GAS PROCESSING PLANT | 486210 |
| | TX | Reeves | 16868511 | 110018913 236 | | ETC TEXAS PIPELINE LTD | RED BLUFF GAS PROCESSING PLANT | 486210 |

**527a**

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | ON HWY 937 SE OF GROESBECK | GROESBECK | 1340 | HP | 8.7701 |
| Pipeline Transportation of Natural Gas | ON HWY 937 SE OF GROESBECK | GROESBECK | 1380 | HP | 5.8546 |
| Pipeline Transportation of Natural Gas | ON HWY 937 SE OF GROESBECK | GROESBECK | 1380 | HP | 1.0744 |
| Pipeline Transportation of Natural Gas | CLEBURNE COMPRESSOR STATION | CLEBURNE | 8180 | HP | 18.839 |
| Pipeline Transportation of Natural Gas | CLEBURNE COMPRESSOR STATION | CLEBURNE | 8180 | HP | 13.8687 |
| Pipeline Transportation of Natural Gas | CLEBURNE COMPRESSOR STATION | CLEBURNE | 1775 | HP | 5.6106 |
| Pipeline Transportation of Natural Gas | CLEBURNE COMPRESSOR STATION | CLEBURNE | 1775 | HP | 5.411 |
| Pipeline Transportation of Natural Gas | CLEBURNE COMPRESSOR STATION | CLEBURNE | 4740 | HP | 3.9602 |
| Pipeline Transportation of Natural Gas | CLEBURNE COMPRESSOR STATION | CLEBURNE | 1680 | HP | 0.377 |
| Pipeline Transportation of Natural Gas | CLEBURNE COMPRESSOR STATION | CLEBURNE | 1680 | HP | 0.1588 |
| Pipeline Transportation of Natural Gas | 606 S SHELBY ST | CARTHAGE | 1000 | HP | 0.2356 |
| Pipeline Transportation of Natural Gas | 606 S SHELBY ST | CARTHAGE | 1000 | HP | 0.0675 |
| Pipeline Transportation of Natural Gas | 606 S SHELBY ST | CARTHAGE | 1000 | HP | 0.058 |
| Pipeline Transportation of Natural Gas | FROM BAILEY; GO 2.5 N ON SR78; 0.5 MI E ON FM68; 0.5 MI N ON CR311S; SITE ON LEFT | BAILEY | 1350 | HP | 0.9128 |
| Pipeline Transportation of Natural Gas | FROM BAILEY; GO 2.5 N ON SR78; 0.5 MI E ON FM68; 0.5 MI N ON CR311S; SITE ON LEFT | BAILEY | 1350 | HP | 0.5722 |
| Pipeline Transportation of Natural Gas | FROM BAILEY; GO 2.5 N ON SR78; 0.5 MI E ON FM68; 0.5 MI N ON CR311S; SITE ON LEFT | BAILEY | 1350 | HP | 0.3538 |
| Pipeline Transportation of Natural Gas | FROM BAILEY; GO 2.5 N ON SR78; 0.5 MI E ON FM68; 0.5 MI N ON CR311S; SITE ON LEFT | BAILEY | 1350 | HP | 0.333 |
| Pipeline Transportation of Natural Gas | FROM BAILEY; GO 2.5 N ON SR78; 0.5 MI E ON FM68; 0.5 MI N ON CR311S; SITE ON LEFT | BAILEY | 1350 | HP | 0.1721 |
| Pipeline Transportation of Natural Gas | X I-45 & HWY 27, W ON HWY 27 1 1/4  MI TO CR1291, L 1.5 MI TO SITE | FAIRFIELD | 8180 | HP | 14.3121 |
| Pipeline Transportation of Natural Gas | X I-45 & HWY 27, W ON HWY 27 1 1/4  MI TO CR1291, L 1.5 MI TO SITE | FAIRFIELD | 4735 | HP | 5.8823 |
| Pipeline Transportation of Natural Gas | X I-45 & HWY 27, W ON HWY 27 1 1/4  MI TO CR1291, L 1.5 MI TO SITE | FAIRFIELD | 8180 | HP | 5.1819 |
| Pipeline Transportation of Natural Gas | X I-45 & HWY 27, W ON HWY 27 1 1/4  MI TO CR1291, L 1.5 MI TO SITE | FAIRFIELD | 4735 | HP | 3.3605 |
| Pipeline Transportation of Natural Gas | 6 MI NORTH OF | MIAMI | 1340 | HP | 4.5388 |
| Pipeline Transportation of Natural Gas | 6 MI NORTH OF | MIAMI | 1340 | HP | 4.4198 |
| Pipeline Transportation of Natural Gas | 1540J S HWY 377 | CRESSON | 1380 | HP | 5.7268 |
| Pipeline Transportation of Natural Gas | 1540J S HWY 377 | CRESSON | 1680 | HP | 2.8223 |
| Pipeline Transportation of Natural Gas | 1540J S HWY 377 | CRESSON | 1680 | HP | 2.5292 |
| Pipeline Transportation of Natural Gas | 2 MI N OF SPRINGTOWN | SPRINGTOWN | 1340 | HP | 0.316 |
| Pipeline Transportation of Natural Gas | 2 MI N OF SPRINGTOWN | SPRINGTOWN | 1340 | HP | 0.2178 |
| Pipeline Transportation of Natural Gas | 12.5 MILES NE OF WHEELER EAST OF RR 592 | WHEELER | 1340 | HP | 13.1582 |
| Pipeline Transportation of Natural Gas | 12.5 MILES NE OF WHEELER EAST OF RR 592 | WHEELER | 1340 | HP | 11.557 |
| Pipeline Transportation of Natural Gas | 12.5 MILES NE OF WHEELER EAST OF RR 592 | WHEELER | 1340 | HP | 11.2859 |
| Pipeline Transportation of Natural Gas | 12.5 MILES NE OF WHEELER EAST OF RR 592 | WHEELER | 1340 | HP | 11.0288 |
| Pipeline Transportation of Natural Gas | 12.5 MILES NE OF WHEELER EAST OF RR 592 | WHEELER | 1340 | HP | 10.54 |
| Pipeline Transportation of Natural Gas | 12.5 MILES NE OF WHEELER EAST OF RR 592 | WHEELER | 1340 | HP | 6.1042 |
| Pipeline Transportation of Natural Gas | 12.5 MILES NE OF WHEELER EAST OF RR 592 | WHEELER | 1340 | HP | 2.5994 |
| Pipeline Transportation of Natural Gas | 9 MI ON HWY 152 FROM WHEELER TO RR 592; 2 MI N ON RR592 TO BRITT RANCH ON RT | WHEELER | 1340 | HP | 12.5003 |
| Pipeline Transportation of Natural Gas | 9 MI ON HWY 152 FROM WHEELER TO RR 592; 2 MI N ON RR592 TO BRITT RANCH ON RT | WHEELER | 1340 | HP | 12.5003 |
| Pipeline Transportation of Natural Gas | 9 MI ON HWY 152 FROM WHEELER TO RR 592; 2 MI N ON RR592 TO BRITT RANCH ON RT | WHEELER | 1340 | HP | 9.6684 |
| Pipeline Transportation of Natural Gas | 9 MI ON HWY 152 FROM WHEELER TO RR 592; 2 MI N ON RR592 TO BRITT RANCH ON RT | WHEELER | 1340 | HP | 8.2088 |
| Pipeline Transportation of Natural Gas | 9 MI ON HWY 152 FROM WHEELER TO RR 592; 2 MI N ON RR592 TO BRITT RANCH ON RT | WHEELER | 1340 | HP | 7.9403 |
| Pipeline Transportation of Natural Gas | OFF HILLS LAKE RD EAST OF CARTHAGE | CARTHAGE | 2000 | HP | 11.4177 |
| Pipeline Transportation of Natural Gas | OFF HILLS LAKE RD EAST OF CARTHAGE | CARTHAGE | 2000 | HP | 10.5229 |
| Pipeline Transportation of Natural Gas | OFF HILLS LAKE RD EAST OF CARTHAGE | CARTHAGE | 2650 | HP | 0.0218 |
| Pipeline Transportation of Natural Gas | OFF HILLS LAKE RD EAST OF CARTHAGE | CARTHAGE | 2000 | HP | 0.0136 |
| Pipeline Transportation of Natural Gas | FROM DARCO PROCEED E ON TERRAPIN NECK RD FORM .75 MI TURN LEFT PROCEED TO SITE | DARCO | 1340 | HP | 16.005 |
| Pipeline Transportation of Natural Gas | FROM DARCO PROCEED E ON TERRAPIN NECK RD FORM .75 MI TURN LEFT PROCEED TO SITE | DARCO | 1340 | HP | 11.2541 |
| Pipeline Transportation of Natural Gas | FROM DARCO PROCEED E ON TERRAPIN NECK RD FORM .75 MI TURN LEFT PROCEED TO SITE | DARCO | 1340 | HP | 8.878 |
| Pipeline Transportation of Natural Gas | FROM DARCO PROCEED E ON TERRAPIN NECK RD FORM .75 MI TURN LEFT PROCEED TO SITE | DARCO | 1340 | HP | 5.8461 |
| Pipeline Transportation of Natural Gas | MAYPEARL | MAYPEARL | 4740 | HP | 2.3909 |
| Pipeline Transportation of Natural Gas | MAYPEARL | MAYPEARL | 1775 | HP | 1.0046 |
| Pipeline Transportation of Natural Gas | MAYPEARL | MAYPEARL | 1680 | HP | 0.5044 |
| Pipeline Transportation of Natural Gas | MAYPEARL | MAYPEARL | 4740 | HP | 0.4394 |
| Pipeline Transportation of Natural Gas | MAYPEARL | MAYPEARL | 4740 | HP | 0.1269 |
| Pipeline Transportation of Natural Gas | MAYPEARL | MAYPEARL | 4740 | HP | 0.0843 |
| Pipeline Transportation of Natural Gas | MAYPEARL | MAYPEARL | 4740 | HP | 0.0339 |
| Pipeline Transportation of Natural Gas | MAYPEARL | MAYPEARL | 4740 | HP | 0.0245 |
| Pipeline Transportation of Natural Gas | FROM WHEELER; E ON HWY 152; 9 MI TO RR592 ON LEFT; GO 7.25 MI N ON RR592; SITE IS E OF RR592 | WHEELER | 1340 | HP | 15.6916 |
| Pipeline Transportation of Natural Gas | FROM WHEELER; E ON HWY 152; 9 MI TO RR592 ON LEFT; GO 7.25 MI N ON RR592; SITE IS E OF RR592 | WHEELER | 1340 | HP | 11.6954 |
| Pipeline Transportation of Natural Gas | FROM WHEELER; E ON HWY 152; 9 MI TO RR592 ON LEFT; GO 7.25 MI N ON RR592; SITE IS E OF RR592 | WHEELER | 1340 | HP | 10.792 |
| Pipeline Transportation of Natural Gas | FROM WHEELER; E ON HWY 152; 9 MI TO RR592 ON LEFT; GO 7.25 MI N ON RR592; SITE IS E OF RR592 | WHEELER | 1340 | HP | 10.5834 |
| Pipeline Transportation of Natural Gas | FROM WHEELER; E ON HWY 152; 9 MI TO RR592 ON LEFT; GO 7.25 MI N ON RR592; SITE IS E OF RR592 | WHEELER | 1340 | HP | 6.6028 |
| Pipeline Transportation of Natural Gas | 10 MI S OF PARIS; N WHY 24; 1 MI S OF X FM1184 & BROADWAY | PARIS | 8180 | HP | 20.6813 |
| Pipeline Transportation of Natural Gas | 10 MI S OF PARIS; N WHY 24; 1 MI S OF X FM1184 & BROADWAY | PARIS | 8180 | HP | 20.2377 |
| Pipeline Transportation of Natural Gas | 10 MI S OF PARIS; N WHY 24; 1 MI S OF X FM1184 & BROADWAY | PARIS | 8180 | HP | 20.0519 |
| Pipeline Transportation of Natural Gas | 10 MI S OF PARIS; N WHY 24; 1 MI S OF X FM1184 & BROADWAY | PARIS | 8180 | HP | 17.834 |
| Pipeline Transportation of Natural Gas | 10 MI S OF PARIS; N WHY 24; 1 MI S OF X FM1184 & BROADWAY | PARIS | 6135 | HP | 17.7947 |
| Pipeline Transportation of Natural Gas | 10 MI S OF PARIS; N WHY 24; 1 MI S OF X FM1184 & BROADWAY | PARIS | 6135 | HP | 8.7797 |
| Pipeline Transportation of Natural Gas | 10 MI S OF PARIS; N WHY 24; 1 MI S OF X FM1184 & BROADWAY | PARIS | 1070 | HP | 0.0434 |
| Pipeline Transportation of Natural Gas | FROM HWY 180 & FM 730 INTERX; TAKE FM 730 6 M NE TO PEARSON RANCH RD; TURN RT; SITE ON RT | WEATHERFORD | 4740 | HP | 15.022 |
| Pipeline Transportation of Natural Gas | FROM HWY 180 & FM 730 INTERX; TAKE FM 730 6 M NE TO PEARSON RANCH RD; TURN RT; SITE ON RT | WEATHERFORD | 4735 | HP | 14.7734 |
| Pipeline Transportation of Natural Gas | FROM HWY 180 & FM 730 INTERX; TAKE FM 730 6 M NE TO PEARSON RANCH RD; TURN RT; SITE ON RT | WEATHERFORD | 4735 | HP | 11.926 |
| Pipeline Transportation of Natural Gas | FROM HWY 180 & FM 730 INTERX; TAKE FM 730 6 M NE TO PEARSON RANCH RD; TURN RT; SITE ON RT | WEATHERFORD | 1340 | HP | 2.7613 |
| Pipeline Transportation of Natural Gas | I20 W FROM FT WORTH FOR APPROX 5 MI; TAKE EXIT TO FM3325; TRAVEL N ON FM3325 FOR 2.5 MI; SITE IS 400 | WHITE SETTLEMEN | 2370 | HP | 8.7347 |
| Pipeline Transportation of Natural Gas | I20 W FROM FT WORTH FOR APPROX 5 MI; TAKE EXIT TO FM3325; TRAVEL N ON FM3325 FOR 2.5 MI; SITE IS 400 | WHITE SETTLEMEN | 2370 | HP | 7.5749 |
| Pipeline Transportation of Natural Gas | I20 W FROM FT WORTH FOR APPROX 5 MI; TAKE EXIT TO FM3325; TRAVEL N ON FM3325 FOR 2.5 MI; SITE IS 400 | WHITE SETTLEMEN | 1725 | HP | 5.9851 |
| Pipeline Transportation of Natural Gas | I20 W FROM FT WORTH FOR APPROX 5 MI; TAKE EXIT TO FM3325; TRAVEL N ON FM3325 FOR 2.5 MI; SITE IS 400 | WHITE SETTLEMEN | 1680 | HP | 4.4546 |
| Pipeline Transportation of Natural Gas | I20 W FROM FT WORTH FOR APPROX 5 MI; TAKE EXIT TO FM3325; TRAVEL N ON FM3325 FOR 2.5 MI; SITE IS 400 | WHITE SETTLEMEN | 1380 | HP | 4.063 |
| Pipeline Transportation of Natural Gas | I20 W FROM FT WORTH FOR APPROX 5 MI; TAKE EXIT TO FM3325; TRAVEL N ON FM3325 FOR 2.5 MI; SITE IS 400 | WHITE SETTLEMEN | 1380 | HP | 3.7356 |
| Pipeline Transportation of Natural Gas | I20 W FROM FT WORTH FOR APPROX 5 MI; TAKE EXIT TO FM3325; TRAVEL N ON FM3325 FOR 2.5 MI; SITE IS 400 | WHITE SETTLEMEN | 1680 | HP | 1.7072 |
| Pipeline Transportation of Natural Gas | 67 FM 1468; FROM US59 IN EL CAMPO; TAKE 71 S 15.44 MI TO FM1468; TURN E ON FM1468; GO 4.1 MI TO SITE | MARKHAM | 4750 | HP | 10.0646 |
| Pipeline Transportation of Natural Gas | 67 FM 1468; FROM US59 IN EL CAMPO; TAKE 71 S 15.44 MI TO FM1468; TURN E ON FM1468; GO 4.1 MI TO SITE | MARKHAM | 4750 | HP | 6.7579 |
| Pipeline Transportation of Natural Gas | 67 FM 1468; FROM US59 IN EL CAMPO; TAKE 71 S 15.44 MI TO FM1468; TURN E ON FM1468; GO 4.1 MI TO SITE | MARKHAM | 4750 | HP | 6.2928 |
| Pipeline Transportation of Natural Gas | 67 FM 1468; FROM US59 IN EL CAMPO; TAKE 71 S 15.44 MI TO FM1468; TURN E ON FM1468; GO 4.1 MI TO SITE | MARKHAM | 4750 | HP | 4.9898 |
| Pipeline Transportation of Natural Gas | 67 FM 1468; FROM US59 IN EL CAMPO; TAKE 71 S 15.44 MI TO FM1468; TURN E ON FM1468; GO 4.1 MI TO SITE | MARKHAM | 4750 | HP | 4.6605 |
| Pipeline Transportation of Natural Gas | IN GODLEY FROM HWY 171; TURN RT ONTO CR 917; TURN L ONTO CR 1008; TURN RT ONTO CR 913; TURN RT ON DA | GODLEY | 1380 | HP | 6.6002 |
| Pipeline Transportation of Natural Gas | IN GODLEY FROM HWY 171; TURN RT ONTO CR 917; TURN L ONTO CR 1008; TURN RT ONTO CR 913; TURN RT ON DA | GODLEY | 1380 | HP | 6.4829 |
| Pipeline Transportation of Natural Gas | 460 SEVEN HILLS RD | DENISON | 1173 | HP | 0.0847 |
| Pipeline Transportation of Natural Gas | 460 SEVEN HILLS RD | DENISON | 4740 | HP | 0.0094 |
| Pipeline Transportation of Natural Gas | FROM X SH79 & FM1798; GO S ON FM1798 3 MI TO SITE ON RT | HENDERSON | 4740 | HP | 0.0207 |
| Pipeline Transportation of Natural Gas | FROM X SH79 & FM1798; GO S ON FM1798 3 MI TO SITE ON RT | HENDERSON | 4740 | HP | 0.0145 |
| Pipeline Transportation of Natural Gas | FROM X SH79 & FM1798; GO S ON FM1798 3 MI TO SITE ON RT | HENDERSON | 4740 | HP | 0.0115 |
| Pipeline Transportation of Natural Gas | FROM X SH79 & FM1798; GO S ON FM1798 3 MI TO SITE ON RT | HENDERSON | 4740 | HP | 0.0036 |
| Pipeline Transportation of Natural Gas | HWY 152; GO 9 M TO RR 592; N ON RR 592 FOR 6 M TO SITE ON LEFT | WHEELER | 1340 | HP | 17.4244 |
| Pipeline Transportation of Natural Gas | HWY 152; GO 9 M TO RR 592; N ON RR 592 FOR 6 M TO SITE ON LEFT | WHEELER | 1340 | HP | 17.3541 |
| Pipeline Transportation of Natural Gas | HWY 152; GO 9 M TO RR 592; N ON RR 592 FOR 6 M TO SITE ON LEFT | WHEELER | 1340 | HP | 15.9257 |
| Pipeline Transportation of Natural Gas | HWY 152; GO 9 M TO RR 592; N ON RR 592 FOR 6 M TO SITE ON LEFT | WHEELER | 1340 | HP | 14.6617 |
| Pipeline Transportation of Natural Gas | HWY 152; GO 9 M TO RR 592; N ON RR 592 FOR 6 M TO SITE ON LEFT | WHEELER | 1340 | HP | 10.2522 |
| Pipeline Transportation of Natural Gas | HWY 152; GO 9 M TO RR 592; N ON RR 592 FOR 6 M TO SITE ON LEFT | WHEELER | 1340 | HP | 8.907 |
| Pipeline Transportation of Natural Gas | FROM LINDEN GO N ON HWY 59 EXT R AT FM 2328 TURN L AT TX 43 END R AT HWY 4223 | LINDEN | 8180 | HP | 14.2254 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF FM 792 & WOFFORD CROSSING RD N OF THE TOWN OF KENEDY TRAVEL APPROXIMATELY 3 | KENEDY | 1780 | HP | 3.16 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF FM 792 & WOFFORD CROSSING RD N OF THE TOWN OF KENEDY TRAVEL APPROXIMATELY 3 | KENEDY | 1780 | HP | 2.9504 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF FM 792 & WOFFORD CROSSING RD N OF THE TOWN OF KENEDY TRAVEL APPROXIMATELY 3 | KENEDY | 1775 | HP | 2.4401 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF FM 792 & WOFFORD CROSSING RD N OF THE TOWN OF KENEDY TRAVEL APPROXIMATELY 3 | KENEDY | 1780 | HP | 2.2673 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF FM 792 & WOFFORD CROSSING RD N OF THE TOWN OF KENEDY TRAVEL APPROXIMATELY 3 | KENEDY | 1780 | HP | 2.0192 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF FM 792 & WOFFORD CROSSING RD N OF THE TOWN OF KENEDY TRAVEL APPROXIMATELY 3 | KENEDY | 1780 | HP | 1.7287 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF FM 792 & WOFFORD CROSSING RD N OF THE TOWN OF KENEDY TRAVEL APPROXIMATELY 3 | KENEDY | 1380 | HP | 1.424 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF FM 792 & WOFFORD CROSSING RD N OF THE TOWN OF KENEDY TRAVEL APPROXIMATELY 3 | KENEDY | 1340 | HP | 1.0497 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF FM 792 & WOFFORD CROSSING RD N OF THE TOWN OF KENEDY TRAVEL APPROXIMATELY 3 | KENEDY | 1000 | HP | 0.735 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF FM 792 & WOFFORD CROSSING RD N OF THE TOWN OF KENEDY TRAVEL APPROXIMATELY 3 | KENEDY | 1780 | HP | 0.1596 |
| Pipeline Transportation of Natural Gas | 10 MI NE OF ALVORD TX ON FM 1655 | DECATUR | 1480 | HP | 5.401 |
| Pipeline Transportation of Natural Gas | 10 MI NE OF ALVORD TX ON FM 1655 | DECATUR | 2370 | HP | 4.756 |
| Pipeline Transportation of Natural Gas | 10 MI NE OF ALVORD TX ON FM 1655 | DECATUR | 1660 | HP | 4.177 |
| Pipeline Transportation of Natural Gas | 10 MI NE OF ALVORD TX ON FM 1655 | DECATUR | 1480 | HP | 3.052 |
| Pipeline Transportation of Natural Gas | 10 MI NE OF ALVORD TX ON FM 1655 | DECATUR | 1480 | HP | 2.568 |
| Pipeline Transportation of Natural Gas | 10 MI NE OF ALVORD TX ON FM 1655 | DECATUR | 1480 | HP | 2.364 |
| Pipeline Transportation of Natural Gas | FROM THE INTX OF CHAPIN SCHOOL RD AND US HWY 377 GO SW ON US HWY 377 APPROX 3.4 MI TO SITE ON THE RI | BENBROOK | 1380 | HP | 5.9795 |
| Pipeline Transportation of Natural Gas | FROM THE INTX OF CHAPIN SCHOOL RD AND US HWY 377 GO SW ON US HWY 377 APPROX 3.4 MI TO SITE ON THE RI | BENBROOK | 1680 | HP | 5.8774 |
| Pipeline Transportation of Natural Gas | FROM THE INTX OF CHAPIN SCHOOL RD AND US HWY 377 GO SW ON US HWY 377 APPROX 3.4 MI TO SITE ON THE RI | BENBROOK | 1680 | HP | 4.8719 |
| Pipeline Transportation of Natural Gas | FROM THE INTX OF CHAPIN SCHOOL RD AND US HWY 377 GO SW ON US HWY 377 APPROX 3.4 MI TO SITE ON THE RI | BENBROOK | 1680 | HP | 3.3285 |
| Pipeline Transportation of Natural Gas | FROM THE INTX OF CHAPIN SCHOOL RD AND US HWY 377 GO SW ON US HWY 377 APPROX 3.4 MI TO SITE ON THE RI | BENBROOK | 1680 | HP | 3.1267 |
| Pipeline Transportation of Natural Gas | FROM THE INTX OF CHAPIN SCHOOL RD AND US HWY 377 GO SW ON US HWY 377 APPROX 3.4 MI TO SITE ON THE RI | BENBROOK | 1380 | HP | 0.3108 |
| Pipeline Transportation of Natural Gas | 11.3 MI W OF PYOTE ON RR 2355 R 2.7 MI R 2.2 MI L 0.6 MI | PYOTE | 1230 | HP | 11.254 |
| Pipeline Transportation of Natural Gas | 11.3 MI W OF PYOTE ON RR 2355 R 2.7 MI R 2.2 MI L 0.6 MI | PYOTE | 1230 | HP | 8.766 |
| Pipeline Transportation of Natural Gas | FROM HWY 2449/HWY 156 INTERSECTION IN PONDER, TAKE HWY 156 3.5 SOUTH TO W. STRADER RD. TURN RIGHT AN | DENTON | 3550 | HP | 0.0334 |
| Pipeline Transportation of Natural Gas | FROM HWY 2449/HWY 156 INTERSECTION IN PONDER, TAKE HWY 156 3.5 SOUTH TO W. STRADER RD. TURN RIGHT AN | DENTON | 3550 | HP | 0.0055 |
| Pipeline Transportation of Natural Gas | TAKE US 385 S FROM US 80 FOR 6 MI TURN L ON FM 1787 AND GO 7 MI TO STATION | PLEASANT FARMS | 1340 | HP | 16.119 |
| Pipeline Transportation of Natural Gas | TAKE US 385 S FROM US 80 FOR 6 MI TURN L ON FM 1787 AND GO 7 MI TO STATION | PLEASANT FARMS | 1260 | HP | 13.084 |
| Pipeline Transportation of Natural Gas | TAKE US 385 S FROM US 80 FOR 6 MI TURN L ON FM 1787 AND GO 7 MI TO STATION | PLEASANT FARMS | 1260 | HP | 7.178 |
| Pipeline Transportation of Natural Gas | FROM THE INTX OF US 59 AND MAIN ST IN TENEHA TAKE MAIN ST N APPROX 0.15 MI TURN L ON COLLEGE ST AND | TENEHA | 1780 | HP | 4.1491 |
| Pipeline Transportation of Natural Gas | FROM THE INTX OF US 59 AND MAIN ST IN TENEHA TAKE MAIN ST N APPROX 0.15 MI TURN L ON COLLEGE ST AND | TENEHA | 1780 | HP | 3.9424 |
| Pipeline Transportation of Natural Gas | FROM THE INTX OF US 59 AND MAIN ST IN TENEHA TAKE MAIN ST N APPROX 0.15 MI TURN L ON COLLEGE ST AND | TENEHA | 2450 | HP | 3.285 |
| Pipeline Transportation of Natural Gas | FROM THE INTX OF US 59 AND MAIN ST IN TENEHA TAKE MAIN ST N APPROX 0.15 MI TURN L ON COLLEGE ST AND | TENEHA | 3550 | HP | 3.036 |
| Pipeline Transportation of Natural Gas | FROM THE INTX OF FM 1066 AND FM 592 SW OF THE TOWN OF ALLISON TRAVEL APPROX 1.1M S ON FM 592 TO WHE | ALLISON | 1680 | HP | 5.2279 |
| Pipeline Transportation of Natural Gas | FROM THE INTX OF FM 1066 AND FM 592 SW OF THE TOWN OF ALLISON TRAVEL APPROX 1.1M S ON FM 592 TO WHE | ALLISON | 1680 | HP | 4.7374 |
| Pipeline Transportation of Natural Gas | E OF THE INTERSECTION OF HWY 1233 & HWY 1053 ON HWY 1233 | CRANE | 1680 | HP | 13.363 |
| Pipeline Transportation of Natural Gas | E OF THE INTERSECTION OF HWY 1233 & HWY 1053 ON HWY 1233 | CRANE | 2370 | HP | 6.133 |
| Pipeline Transportation of Natural Gas | E OF THE INTERSECTION OF HWY 1233 & HWY 1053 ON HWY 1233 | CRANE | 1230 | HP | 0.179 |
| Pipeline Transportation of Natural Gas | E OF THE INTERSECTION OF HWY 1233 & HWY 1053 ON HWY 1233 | CRANE | 1670 | HP | 0.072 |
| Pipeline Transportation of Natural Gas | FROM INTX HWY 652 AND 285 IN ORLA GO W ON HWY 652 0.3 MI SW ON CR 437 1.1 MI S ON LEASE RD 0.8 TO SI | ORLA | 4740 | HP | 7.2764 |
| Pipeline Transportation of Natural Gas | FROM INTX HWY 652 AND 285 IN ORLA GO W ON HWY 652 0.3 MI SW ON CR 437 1.1 MI S ON LEASE RD 0.8 TO SI | ORLA | 4740 | HP | 3.8469 |



| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |

**529a**

| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | TX | Reeves | 16868511 | 110018813 | 236 | ETC TEXAS PIPELINE LTD | RED BLUFF GAS PROCESSING PLANT | 486210 |
| | TX | Wise | 16870211 | 110092813 | 783 | TARGA MIDSTREAM SERVICES LLC | COTTONWOOD COMPRESSOR STATION | 486210 |
| | TX | Wise | 16870211 | 110092913 | 783 | TARGA MIDSTREAM SERVICES LLC | COTTONWOOD COMPRESSOR STATION | 486210 |
| | TX | San Patricio | 17088611 | 136171113 | 238 | CHENIERE CORPUS CHRISTI PIPELINE LP | SINTON COMPRESSOR STATION | 486210 |
| | TX | San Patricio | 17088611 | 136616813 | 238 | CHENIERE CORPUS CHRISTI PIPELINE LP | SINTON COMPRESSOR STATION | 486210 |
| | TX | Webb | 17730911 | 123156113 | 688 | ETC TEXAS PIPELINE LTD | B1LTE CDP COMPRESSOR STATION | 486210 |
| | TX | Webb | 17730911 | 123156013 | 688 | ETC TEXAS PIPELINE LTD | B1LTE CDP COMPRESSOR STATION | 486210 |
| | TX | Webb | 17730911 | 123156413 | 688 | ETC TEXAS PIPELINE LTD | B1LTE CDP COMPRESSOR STATION | 486210 |
| | TX | Webb | 17730911 | 123156313 | 688 | ETC TEXAS PIPELINE LTD | B1LTE CDP COMPRESSOR STATION | 486210 |
| | TX | Webb | 17730911 | 123156213 | 688 | ETC TEXAS PIPELINE LTD | B1LTE CDP COMPRESSOR STATION | 486210 |
| | TX | Webb | 17731111 | 123159813 | 690 | ETC TEXAS PIPELINE LTD | G9LT CDP | 486210 |
| | TX | Webb | 17731111 | 123159713 | 690 | ETC TEXAS PIPELINE LTD | G9LT CDP | 486210 |
| | TX | Webb | 17731111 | 123159913 | 690 | ETC TEXAS PIPELINE LTD | G9LT CDP | 486210 |
| | TX | Webb | 17731111 | 123159613 | 690 | ETC TEXAS PIPELINE LTD | G9LT CDP | 486210 |
| | TX | Webb | 17740311 | 123162313 | 691 | ETC TEXAS PIPELINE LTD | G12LT CDP | 486210 |
| | TX | Webb | 17740311 | 123162713 | 691 | ETC TEXAS PIPELINE LTD | G12LT CDP | 486210 |
| | TX | Webb | 17740311 | 123162413 | 691 | ETC TEXAS PIPELINE LTD | G12LT CDP | 486210 |
| | TX | Webb | 17740311 | 123162613 | 691 | ETC TEXAS PIPELINE LTD | G12LT CDP | 486210 |
| | TX | Webb | 17740311 | 123162513 | 691 | ETC TEXAS PIPELINE LTD | G12LT CDP | 486210 |
| | TX | Midland | 17906811 | 126489513 | 184 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | PARKS COMPRESSOR STATION | 486210 |
| | TX | Midland | 17906811 | 126489213 | 184 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | PARKS COMPRESSOR STATION | 486210 |
| | TX | Midland | 17906811 | 126489113 | 184 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | PARKS COMPRESSOR STATION | 486210 |
| | TX | Midland | 17906811 | 126489313 | 184 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | PARKS COMPRESSOR STATION | 486210 |
| | TX | Midland | 17906811 | 126489413 | 184 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | PARKS COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17908911 | 127889213 | 40 | TARGA MIDSTREAM SERVICES LLC | 2600 COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17908911 | 127889113 | 40 | TARGA MIDSTREAM SERVICES LLC | 2600 COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17908911 | 127889413 | 40 | TARGA MIDSTREAM SERVICES LLC | 2600 COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17908911 | 127889013 | 40 | TARGA MIDSTREAM SERVICES LLC | 2600 COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17908911 | 135317313 | 40 | TARGA MIDSTREAM SERVICES LLC | 2600 COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17908911 | 135317413 | 40 | TARGA MIDSTREAM SERVICES LLC | 2600 COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17908911 | 127889313 | 40 | TARGA MIDSTREAM SERVICES LLC | 2600 COMPRESSOR STATION | 486210 |
| | TX | Loving | 17974411 | 127746213 | 15 | TARGA DELAWARE LLC | DK BOYD COMPRESSOR STATION | 486210 |
| | TX | Loving | 17974411 | 127746313 | 15 | TARGA DELAWARE LLC | DK BOYD COMPRESSOR STATION | 486210 |
| | TX | Loving | 17974411 | 127746113 | 15 | TARGA DELAWARE LLC | DK BOYD COMPRESSOR STATION | 486210 |
| | TX | Loving | 17974411 | 127746013 | 15 | TARGA DELAWARE LLC | DK BOYD COMPRESSOR STATION | 486210 |
| | TX | Loving | 17974411 | 127746413 | 15 | TARGA DELAWARE LLC | DK BOYD COMPRESSOR STATION | 486210 |
| | TX | Loving | 17974411 | 127746513 | 15 | TARGA DELAWARE LLC | DK BOYD COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17980211 | 127874813 | 37 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COX COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17980211 | 127875113 | 37 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COX COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17980211 | 127874713 | 37 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COX COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17980211 | 127875013 | 37 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COX COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17980211 | 127874913 | 37 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COX COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17980211 | 127874613 | 37 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COX COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17980211 | 127874313 | 37 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COX COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17980211 | 135309513 | 37 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COX COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17980211 | 127874413 | 37 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COX COMPRESSOR STATION | 486210 |
| | TX | Reagan | 17980211 | 127874513 | 37 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COX COMPRESSOR STATION | 486210 |
| | TX | Upton | 17982611 | 136724413 | 60 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | GIDDINGS COMPRESSOR STATION | 486210 |
| | TX | Upton | 17982611 | 127945013 | 60 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | GIDDINGS COMPRESSOR STATION | 486210 |
| | TX | Upton | 17982611 | 127945813 | 60 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | GIDDINGS COMPRESSOR STATION | 486210 |
| | TX | Upton | 17982611 | 127945413 | 60 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | GIDDINGS COMPRESSOR STATION | 486210 |
| | TX | Upton | 17982611 | 127946313 | 60 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | GIDDINGS COMPRESSOR STATION | 486210 |
| | TX | Upton | 17982611 | 127945213 | 60 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | GIDDINGS COMPRESSOR STATION | 486210 |
| | TX | Upton | 17982611 | 136724313 | 60 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | GIDDINGS COMPRESSOR STATION | 486210 |
| | TX | Upton | 17982611 | 127945713 | 60 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | GIDDINGS COMPRESSOR STATION | 486210 |
| | TX | Upton | 17982611 | 127946413 | 60 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | GIDDINGS COMPRESSOR STATION | 486210 |
| | TX | Upton | 17982611 | 127945613 | 60 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | GIDDINGS COMPRESSOR STATION | 486210 |
| | TX | Upton | 17982611 | 136724513 | 60 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | GIDDINGS COMPRESSOR STATION | 486210 |
| | TX | Upton | 17982611 | 136724113 | 60 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | GIDDINGS COMPRESSOR STATION | 486210 |
| | TX | Dimmit | 18890111 | 135225313 | 21 | MARKWEST ENERGY SOUTH TEXAS GAS COMPANY LLC | CMWW A COMPRESSOR STATION | 486210 |
| | TX | Dimmit | 18890111 | 135225513 | 21 | MARKWEST ENERGY SOUTH TEXAS GAS COMPANY LLC | CMWW A COMPRESSOR STATION | 486210 |
| | TX | Dimmit | 18890111 | 135225213 | 21 | MARKWEST ENERGY SOUTH TEXAS GAS COMPANY LLC | CMWW A COMPRESSOR STATION | 486210 |
| | TX | Dimmit | 18890111 | 135225013 | 21 | MARKWEST ENERGY SOUTH TEXAS GAS COMPANY LLC | CMWW A COMPRESSOR STATION | 486210 |
| | TX | Dimmit | 18890111 | 135225413 | 21 | MARKWEST ENERGY SOUTH TEXAS GAS COMPANY LLC | CMWW A COMPRESSOR STATION | 486210 |
| | TX | Dimmit | 18890111 | 135225613 | 21 | MARKWEST ENERGY SOUTH TEXAS GAS COMPANY LLC | CMWW A COMPRESSOR STATION | 486210 |
| | TX | Glasscock | 18966311 | 136495113 | 145 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COLE RANCH COMPRESSOR STATION | 486210 |
| | TX | Glasscock | 18966311 | 136495013 | 145 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COLE RANCH COMPRESSOR STATION | 486210 |
| | TX | Glasscock | 18966311 | 136495213 | 145 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COLE RANCH COMPRESSOR STATION | 486210 |
| | TX | Glasscock | 18966311 | 136494713 | 145 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COLE RANCH COMPRESSOR STATION | 486210 |
| | TX | Glasscock | 18966311 | 136494813 | 145 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COLE RANCH COMPRESSOR STATION | 486210 |
| | TX | Glasscock | 18966311 | 136495513 | 145 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COLE RANCH COMPRESSOR STATION | 486210 |
| | TX | Glasscock | 18966311 | 136495313 | 145 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COLE RANCH COMPRESSOR STATION | 486210 |
| | TX | Glasscock | 18966311 | 136494913 | 145 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COLE RANCH COMPRESSOR STATION | 486210 |
| | TX | Glasscock | 18966311 | 136494513 | 145 | TARGA PIPELINE MID-CONTINENT WESTTEX LLC | COLE RANCH COMPRESSOR STATION | 486210 |
| | TX | Upton | 18971311 | 136725213 | 61 | GULF COAST EXPRESS PIPELINE LLC | RANKIN COMPRESSOR STATION | 486210 |
| | TX | Upton | 18971311 | 136724913 | 61 | GULF COAST EXPRESS PIPELINE LLC | RANKIN COMPRESSOR STATION | 486210 |
| | TX | Upton | 18971311 | 136725113 | 61 | GULF COAST EXPRESS PIPELINE LLC | RANKIN COMPRESSOR STATION | 486210 |
| | TX | Upton | 18971311 | 136724813 | 61 | GULF COAST EXPRESS PIPELINE LLC | RANKIN COMPRESSOR STATION | 486210 |
| | TX | Upton | 18971311 | 136725013 | 61 | GULF COAST EXPRESS PIPELINE LLC | RANKIN COMPRESSOR STATION | 486210 |
| | UT | Daggett | 5067111 | 259677113 | 11532 | Questar Pipeline Company | Dominion Energy Questar Pipeline LLC: Kastler Manuchack Compressor Station | 486210 |
| | UT | San Juan | 6432511 | 165782113 | 10627 | Northwest Pipeline GP | Northwest Pipeline GP: Moab Compressor Station | 486210 |
| | UT | San Juan | 6432511 | 165781313 | 10627 | Northwest Pipeline GP | Northwest Pipeline GP: Moab Compressor Station | 486210 |
| | UT | San Juan | 6432511 | 165783313 | 10627 | Northwest Pipeline GP | Northwest Pipeline GP: Moab Compressor Station | 486210 |
| | UT | San Juan | 6432511 | 165781213 | 10627 | Northwest Pipeline GP | Northwest Pipeline GP: Moab Compressor Station | 486210 |
| | UT | Carbon | 12730411 | 72102313 | 12948 | EnerVest Operating LLC | Wapiti Operating LLC.: Dry Canyon Compressor Station | 486210 |
| | UT | Carbon | 12730411 | 72102413 | 12948 | EnerVest Operating LLC | Wapiti Operating LLC.: Dry Canyon Compressor Station | 486210 |
| | UT | Carbon | 12730411 | 72102013 | 12948 | EnerVest Operating LLC | Wapiti Operating LLC.: Dry Canyon Compressor Station | 486210 |
| | UT | Carbon | 12730411 | 72101913 | 12948 | EnerVest Operating LLC | Wapiti Operating LLC.: Dry Canyon Compressor Station | 486210 |
| | VA | Pittsylvania | 4005411 | 107722213 | 30864 | Transco Gas Pipe Line Corp Station 165 | Transco Gas Pipe Line Corp Station 165 | 486210 |
| | VA | Pittsylvania | 4005411 | 325085313 | 30864 | Transco Gas Pipe Line Corp Station 165 | Transco Gas Pipe Line Corp Station 165 | 486210 |
| | VA | Loudoun | 5023311 | 28709913 | 71978 | Dominion - Leesburg Compressor Station | Dominion - Leesburg Compressor Station | 486210 |
| | VA | Loudoun | 5023311 | 287101113 | 71978 | Dominion - Leesburg Compressor Station | Dominion - Leesburg Compressor Station | 486210 |
| | VA | Appomattox | 6217611 | 16509513 | 30863 | Transco Station 170 | Transco Station 170 | 486210 |
| | VA | Appomattox | 6217611 | 107704313 | 30863 | Transco Station 170 | Transco Station 170 | 486210 |
| | VA | Appomattox | 6217611 | 107704013 | 30863 | Transco Station 170 | Transco Station 170 | 486210 |
| | VA | Prince William | 6438011 | 16749613 | 71958 | Transcontinental Gas Pipeline-Station 185 | Transcontinental Gas Pipeline-Station 185 | 486210 |
| | VA | Prince William | 6438011 | 16748713 | 71958 | Transcontinental Gas Pipeline-Station 185 | Transcontinental Gas Pipeline-Station 185 | 486210 |
| | VA | Prince William | 6438011 | 16749513 | 71958 | Transcontinental Gas Pipeline-Station 185 | Transcontinental Gas Pipeline-Station 185 | 486210 |
| | VA | Prince William | 6438011 | 16749413 | 71958 | Transcontinental Gas Pipeline-Station 185 | Transcontinental Gas Pipeline-Station 185 | 486210 |
| | VA | Prince William | 6438011 | 16749313 | 71958 | Transcontinental Gas Pipeline-Station 185 | Transcontinental Gas Pipeline-Station 185 | 486210 |
| | VA | Prince William | 6438011 | 16749113 | 71958 | Transcontinental Gas Pipeline-Station 185 | Transcontinental Gas Pipeline-Station 185 | 486210 |
| | VA | Prince William | 6438011 | 16749013 | 71958 | Transcontinental Gas Pipeline-Station 185 | Transcontinental Gas Pipeline-Station 185 | 486210 |
| | VA | Prince William | 6438011 | 16748913 | 71958 | Transcontinental Gas Pipeline-Station 185 | Transcontinental Gas Pipeline-Station 185 | 486210 |
| | VA | Prince William | 6438011 | 16748813 | 71958 | Transcontinental Gas Pipeline-Station 185 | Transcontinental Gas Pipeline-Station 185 | 486210 |
| | VA | Prince William | 6438011 | 16750013 | 71958 | Transcontinental Gas Pipeline-Station 185 | Transcontinental Gas Pipeline-Station 185 | 486210 |
| | WV | Doddridge | 6256011 | 71934513 | 0001 | Equitrans, L.P. | Equitrans, L.P. - WEST UNION CS 53 | 486210 |
| | WV | Doddridge | 6256011 | 71934613 | 0001 | Equitrans, L.P. | Equitrans, L.P. - WEST UNION CS 53 | 4862 |
| | WV | Gilmer | 6256711 | 71921913 | 0001 | Columbia Gas Transmission LLC | Columbia Gas - GLENVILLE 4C1170 | 486210 |
| | WV | Gilmer | 6256711 | 110317013 | 0001 | Columbia Gas Transmission LLC | Columbia Gas - GLENVILLE 4C1170 | 486210 |
| | WV | Hardy | 6271011 | 103870413 | 0002 | Columbia Gas Transmission LLC | Columbia Gas - LOST RIVER CS 6C3290 | 486210 |
| | WV | Hardy | 6271011 | 71966113 | 0002 | Columbia Gas Transmission LLC | Columbia Gas - LOST RIVER CS 6C3290 | 486210 |
| | WV | Hardy | 6271011 | 71966013 | 0002 | Columbia Gas Transmission LLC | Columbia Gas - LOST RIVER CS 6C3290 | 486210 |
| | WV | Hardy | 6271011 | 71965913 | 0002 | Columbia Gas Transmission LLC | Columbia Gas - LOST RIVER CS 6C3290 | 486210 |
| | WV | Hardy | 6271011 | 71965813 | 0002 | Columbia Gas Transmission LLC | Columbia Gas - LOST RIVER CS 6C3290 | 486210 |
| | WV | Hardy | 6271011 | 103319313 | 0002 | Columbia Gas Transmission LLC | Columbia Gas - LOST RIVER CS 6C3290 | 486210 |
| | WV | Harrison | 6272011 | 71915013 | 0100 | Eastern Gas Transmission and Storage, Inc. | EGTS - BRIDGEPORT COMPRESSOR STATION | 486210 |
| | WV | Upshur | 6340611 | 71898413 | 0009 | Columbia Gas Transmission LLC | Columbia Gas - CLEVELAND 6C4330 | 486210 |
| | WV | Upshur | 6340611 | 71898513 | 0009 | Columbia Gas Transmission LLC | Columbia Gas - CLEVELAND 6C4330 | 486210 |
| | WV | Upshur | 6340611 | 71897513 | 0009 | Columbia Gas Transmission LLC | Columbia Gas - CLEVELAND 6C4330 | 486210 |
| | WV | Upshur | 6340611 | 71898313 | 0009 | Columbia Gas Transmission LLC | Columbia Gas - CLEVELAND 6C4330 | 486210 |
| | WV | Wayne | 6341411 | 71749813 | 0013 | Columbia Gas Transmission LLC | Columbia Gas - CEREDO 4C3360 | 486210 |
| | WV | Wayne | 6341411 | 134116413 | 0013 | Columbia Gas Transmission LLC | Columbia Gas - CEREDO 4C3360 | 486210 |
| | WV | Wayne | 6341511 | 71744213 | 0014 | Columbia Gas Transmission LLC | Columbia Gas - KENOVA 4C3350 | 486210 |
| | WV | Wayne | 6341511 | 71744313 | 0014 | Columbia Gas Transmission LLC | Columbia Gas - KENOVA 4C3350 | 486210 |
| | WV | Wayne | 6341511 | 71744413 | 0014 | Columbia Gas Transmission LLC | Columbia Gas - KENOVA 4C3350 | 486210 |
| | WV | Wayne | 6341511 | 71744113 | 0014 | Columbia Gas Transmission LLC | Columbia Gas - KENOVA 4C3350 | 486210 |
| | WV | Wayne | 6341511 | 71744013 | 0014 | Columbia Gas Transmission LLC | Columbia Gas - KENOVA 4C3350 | 486210 |
| | WV | Wetzel | 6342711 | 71931313 | 0010 | Columbia Gas Transmission LLC | Columbia Gas - SMITHFIELD 7C6620/30 | 486210 |
| | WV | Wetzel | 6342711 | 71931213 | 0010 | Columbia Gas Transmission LLC | Columbia Gas - SMITHFIELD 7C6620/30 | 486210 |
| | WV | Randolph | 6790711 | 71900513 | 0019 | Columbia Gas Transmission LLC | Columbia Gas - FILES CREEK 6C4340 | 486210 |
| | WV | Randolph | 6790711 | 71900313 | 0019 | Columbia Gas Transmission LLC | Columbia Gas - FILES CREEK 6C4340 | 486210 |
| | WV | Randolph | 6790711 | 71900213 | 0019 | Columbia Gas Transmission LLC | Columbia Gas - FILES CREEK 6C4340 | 486210 |
| | WV | Randolph | 6790711 | 71888913 | 0019 | Columbia Gas Transmission LLC | Columbia Gas - FILES CREEK 6C4340 | 486210 |
| | WV | Kanawha | 6885011 | 71724413 | 0047 | Columbia Gas Transmission LLC | Columbia Gas - LANHAM 4C4590 | 486210 |
| | WV | Kanawha | 6885011 | 71724813 | 0047 | Columbia Gas Transmission LLC | Columbia Gas - LANHAM 4C4590 | 486210 |
| | WV | Kanawha | 6885011 | 71725113 | 0047 | Columbia Gas Transmission LLC | Columbia Gas - LANHAM 4C4590 | 486210 |
| | WV | Kanawha | 6885011 | 71724713 | 0047 | Columbia Gas Transmission LLC | Columbia Gas - LANHAM 4C4590 | 486210 |
| | WV | Kanawha | 6885011 | 71724513 | 0047 | Columbia Gas Transmission LLC | Columbia Gas - LANHAM 4C4590 | 486210 |
| | WV | Kanawha | 6885011 | 71724613 | 0047 | Columbia Gas Transmission LLC | Columbia Gas - LANHAM 4C4590 | 486210 |
| | WV | Kanawha | 6885011 | 71725013 | 0047 | Columbia Gas Transmission LLC | Columbia Gas - LANHAM 4C4590 | 486210 |
| | WV | Kanawha | 6885211 | 71702413 | 0049 | Columbia Gas Transmission LLC | Columbia Gas - COCO 4C1150 | 486210 |
| | WV | Kanawha | 6885211 | 126985813 | 0049 | Columbia Gas Transmission LLC | Columbia Gas - COCO 4C1150 | 486210 |

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | FROM INTX HWY 652 AND 285 IN ORLA GO W ON HWY 652 0.3 MI SW ON CR 437 1.1 MI S ON LEASE RD 0.8 TO SI | ORLA | 4740 | HP | 3.8224 |
| Pipeline Transportation of Natural Gas | FROM SUNSET, GO S ON 101 THRU R ON CR1785; TURN RIGHT. | SUNSET | 1775 | HP | 6.026 |
| Pipeline Transportation of Natural Gas | FROM SUNSET, GO S ON 101 THRU R ON CR1785; TURN RIGHT. | SUNSET | 1775 | HP | 1.267 |
| Pipeline Transportation of Natural Gas | PROCEED N ON HIGHWAY 77 STARTING AT THE INTERSECTION OF HIGHWAY 188 AND HIGHWAY 77 IN SINTON FOR APP | SINTON | 1114 | HP | 0.0469 |
| Pipeline Transportation of Natural Gas | PROCEED N ON HIGHWAY 77 STARTING AT THE INTERSECTION OF HIGHWAY 188 AND HIGHWAY 77 IN SINTON FOR APP | SINTON | 1114 | HP | 0.0378 |
| Pipeline Transportation of Natural Gas | 23 MI SW OF CATARINA 20 MI W OF HWY 83 2 MI W OF RR 5218A BRISCOE RANCH RD 8 MI N OF INTX OF EAGLE P | CATARINA | 1340 | HP | 15.6541 |
| Pipeline Transportation of Natural Gas | 23 MI SW OF CATARINA 20 MI W OF HWY 83 2 MI W OF RR 5218A BRISCOE RANCH RD 8 MI N OF INTX OF EAGLE P | CATARINA | 1340 | HP | 15.5021 |
| Pipeline Transportation of Natural Gas | 23 MI SW OF CATARINA 20 MI W OF HWY 83 2 MI W OF RR 5218A BRISCOE RANCH RD 8 MI N OF INTX OF EAGLE P | CATARINA | 1775 | HP | 7.8603 |
| Pipeline Transportation of Natural Gas | 23 MI SW OF CATARINA 20 MI W OF HWY 83 2 MI W OF RR 5218A BRISCOE RANCH RD 8 MI N OF INTX OF EAGLE P | CATARINA | 1775 | HP | 6.6609 |
| Pipeline Transportation of Natural Gas | 23 MI SW OF CATARINA 20 MI W OF HWY 83 2 MI W OF RR 5218A BRISCOE RANCH RD 8 MI N OF INTX OF EAGLE P | CATARINA | 1775 | HP | 1.946 |
| Pipeline Transportation of Natural Gas | SOUTH OF CATARINA ON HWY 83, 16.2 MILES TO THE GALVAN RANCH MAIN ROAD. TURN RIGHT ON GALVAN RANCH MA | CATARINA | 1775 | HP | 6.6445 |
| Pipeline Transportation of Natural Gas | SOUTH OF CATARINA ON HWY 83, 16.2 MILES TO THE GALVAN RANCH MAIN ROAD. TURN RIGHT ON GALVAN RANCH MA | CATARINA | 2370 | HP | 6.2215 |
| Pipeline Transportation of Natural Gas | SOUTH OF CATARINA ON HWY 83, 16.2 MILES TO THE GALVAN RANCH MAIN ROAD. TURN RIGHT ON GALVAN RANCH MA | CATARINA | 2370 | HP | 4.179 |
| Pipeline Transportation of Natural Gas | SOUTH OF CATARINA ON HWY 83, 16.2 MILES TO THE GALVAN RANCH MAIN ROAD. TURN RIGHT ON GALVAN RANCH MA | CATARINA | 1775 | HP | 2.0554 |
| Pipeline Transportation of Natural Gas | SOUTH OF CATARINA ON HWY 83, 16.2 MILES TO THE GALVAN RANCH MAIN ROAD. TURN RIGHT ON GALVAN RANCH MA | CATARINA | 2370 | HP | 1.7938 |
| Pipeline Transportation of Natural Gas | GO SOUTH FROM CATARINA ON HWY 83, 16.2 MILES TO THE GALVAN RANCH MAIN ROAD. TURN LEFT ON GALVN RANC | CATARINA | 1775 | HP | 4.2565 |
| Pipeline Transportation of Natural Gas | GO SOUTH FROM CATARINA ON HWY 83, 16.2 MILES TO THE GALVAN RANCH MAIN ROAD. TURN LEFT ON GALVN RANC | CATARINA | 1775 | HP | 2.5985 |
| Pipeline Transportation of Natural Gas | GO SOUTH FROM CATARINA ON HWY 83, 16.2 MILES TO THE GALVAN RANCH MAIN ROAD. TURN LEFT ON GALVN RANC | CATARINA | 2370 | HP | 1.8385 |
| Pipeline Transportation of Natural Gas | GO SOUTH FROM CATARINA ON HWY 83, 16.2 MILES TO THE GALVAN RANCH MAIN ROAD. TURN LEFT ON GALVN RANC | CATARINA | 2370 | HP | 1.6774 |
| Pipeline Transportation of Natural Gas | GO SOUTH FROM CATARINA ON HWY 83, 16.2 MILES TO THE GALVAN RANCH MAIN ROAD. TURN LEFT ON GALVIN RANC | CATARINA | 2370 | HP | 0.858 |
| Pipeline Transportation of Natural Gas | 4005 W COUNTY ROAD 270 | MIDLAND | 1775 | HP | 11.68 |
| Pipeline Transportation of Natural Gas | 4005 W COUNTY ROAD 270 | MIDLAND | 1775 | HP | 10.73 |
| Pipeline Transportation of Natural Gas | 4005 W COUNTY ROAD 270 | MIDLAND | 1775 | HP | 6.408 |
| Pipeline Transportation of Natural Gas | 4005 W COUNTY ROAD 270 | MIDLAND | 1775 | HP | 4.768 |
| Pipeline Transportation of Natural Gas | 4005 W COUNTY ROAD 270 | MIDLAND | 1775 | HP | 4.242 |
| Pipeline Transportation of Natural Gas | FROM GARDEN CITY TAKE RANCH ROAD 33 SOUTH 21.0 MILES TURN LEFT ON FM 2600 STATION IS 9.0 MILES ON TH | BIG LAKE | 1340 | HP | 18.004 |
| Pipeline Transportation of Natural Gas | FROM GARDEN CITY TAKE RANCH ROAD 33 SOUTH 21.0 MILES TURN LEFT ON FM 2600 STATION IS 9.0 MILES ON TH | BIG LAKE | 1340 | HP | 10.969 |
| Pipeline Transportation of Natural Gas | FROM GARDEN CITY TAKE RANCH ROAD 33 SOUTH 21.0 MILES TURN LEFT ON FM 2600 STATION IS 9.0 MILES ON TH | BIG LAKE | 1340 | HP | 10.331 |
| Pipeline Transportation of Natural Gas | FROM GARDEN CITY TAKE RANCH ROAD 33 SOUTH 21.0 MILES TURN LEFT ON FM 2600 STATION IS 9.0 MILES ON TH | BIG LAKE | 1380 | HP | 8.136 |
| Pipeline Transportation of Natural Gas | FROM GARDEN CITY TAKE RANCH ROAD 33 SOUTH 21.0 MILES TURN LEFT ON FM 2600 STATION IS 9.0 MILES ON TH | BIG LAKE | 1380 | HP | 6.964 |
| Pipeline Transportation of Natural Gas | FROM GARDEN CITY TAKE RANCH ROAD 33 SOUTH 21.0 MILES TURN LEFT ON FM 2600 STATION IS 9.0 MILES ON TH | BIG LAKE | 1380 | HP | 6.059 |
| Pipeline Transportation of Natural Gas | FROM GARDEN CITY TAKE RANCH ROAD 33 SOUTH 21.0 MILES TURN LEFT ON FM 2600 STATION IS 9.0 MILES ON TH | BIG LAKE | 1380 | HP | 5.562 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF HWY 300 AND HWY 302 IN MENTONE, TX, GO EAST ON HWY 302 FOR 10 MILES. GO NOR | MENTONE | 1775 | HP | 7.169 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF HWY 300 AND HWY 302 IN MENTONE, TX, GO EAST ON HWY 302 FOR 10 MILES. GO NOR | MENTONE | 1775 | HP | 6.252 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF HWY 300 AND HWY 302 IN MENTONE, TX, GO EAST ON HWY 302 FOR 10 MILES. GO NOR | MENTONE | 1775 | HP | 5.706 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF HWY 300 AND HWY 302 IN MENTONE, TX, GO EAST ON HWY 302 FOR 10 MILES. GO NOR | MENTONE | 1775 | HP | 5.558 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF HWY 300 AND HWY 302 IN MENTONE, TX, GO EAST ON HWY 302 FOR 10 MILES. GO NOR | MENTONE | 1775 | HP | 5.419 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF HWY 300 AND HWY 302 IN MENTONE, TX, GO EAST ON HWY 302 FOR 10 MILES. GO NOR | MENTONE | 1775 | HP | 3.781 |
| Pipeline Transportation of Natural Gas | 532 ANGLE ROAD | BIG LAKE | 1775 | HP | 9.474 |
| Pipeline Transportation of Natural Gas | 532 ANGLE ROAD | BIG LAKE | 1775 | HP | 7.73 |
| Pipeline Transportation of Natural Gas | 532 ANGLE ROAD | BIG LAKE | 1775 | HP | 7.313 |
| Pipeline Transportation of Natural Gas | 532 ANGLE ROAD | BIG LAKE | 1775 | HP | 7.231 |
| Pipeline Transportation of Natural Gas | 532 ANGLE ROAD | BIG LAKE | 1775 | HP | 6.549 |
| Pipeline Transportation of Natural Gas | 532 ANGLE ROAD | BIG LAKE | 1775 | HP | 6.531 |
| Pipeline Transportation of Natural Gas | 532 ANGLE ROAD | BIG LAKE | 1775 | HP | 6.469 |
| Pipeline Transportation of Natural Gas | 532 ANGLE ROAD | BIG LAKE | 1775 | HP | 5.767 |
| Pipeline Transportation of Natural Gas | 532 ANGLE ROAD | BIG LAKE | 1775 | HP | 5.661 |
| Pipeline Transportation of Natural Gas | 532 ANGLE ROAD | BIG LAKE | 1775 | HP | 3.278 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF TX-349 & US-67 IN RANKIN TX GO N ON TX-349 FOR 18.9 MILES GO L ONTO LEASE R | RANKIN | 1685 | BHP | 8.577 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF TX-349 & US-67 IN RANKIN TX GO N ON TX-349 FOR 18.9 MILES GO L ONTO LEASE R | RANKIN | 1775 | HP | 7.628 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF TX-349 & US-67 IN RANKIN TX GO N ON TX-349 FOR 18.9 MILES GO L ONTO LEASE R | RANKIN | 1775 | HP | 7.586 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF TX-349 & US-67 IN RANKIN TX GO N ON TX-349 FOR 18.9 MILES GO L ONTO LEASE R | RANKIN | 1775 | HP | 7.497 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF TX-349 & US-67 IN RANKIN TX GO N ON TX-349 FOR 18.9 MILES GO L ONTO LEASE R | RANKIN | 1775 | HP | 6.355 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF TX-349 & US-67 IN RANKIN TX GO N ON TX-349 FOR 18.9 MILES GO L ONTO LEASE R | RANKIN | 1775 | HP | 6.343 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF TX-349 & US-67 IN RANKIN TX GO N ON TX-349 FOR 18.9 MILES GO L ONTO LEASE R | RANKIN | 1775 | HP | 6.321 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF TX-349 & US-67 IN RANKIN TX GO N ON TX-349 FOR 18.9 MILES GO L ONTO LEASE R | RANKIN | 1685 | BHP | 6.185 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF TX-349 & US-67 IN RANKIN TX GO N ON TX-349 FOR 18.9 MILES GO L ONTO LEASE R | RANKIN | 1775 | HP | 6.12 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF TX-349 & US-67 IN RANKIN TX GO N ON TX-349 FOR 18.9 MILES GO L ONTO LEASE R | RANKIN | 1775 | HP | 4.173 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF TX-349 & US-67 IN RANKIN TX GO N ON TX-349 FOR 18.9 MILES GO L ONTO LEASE R | RANKIN | 1685 | BHP | 2.348 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF TX-349 & US-67 IN RANKIN TX GO N ON TX-349 FOR 18.9 MILES GO L ONTO LEASE R | RANKIN | 1685 | BHP | 2.007 |
| Pipeline Transportation of Natural Gas | FRM INTX FM RD 190 & 6TH ST GO S ON FM RD 190 FOR 1.3 MI FOLLOWING IT AS IT TURNS TO RR 1916 GO L ON | ASHERTON | 1340 | HP | 18.2589 |
| Pipeline Transportation of Natural Gas | FRM INTX FM RD 190 & 6TH ST GO S ON FM RD 190 FOR 1.3 MI FOLLOWING IT AS IT TURNS TO RR 1916 GO L ON | ASHERTON | 1340 | HP | 16.0709 |
| Pipeline Transportation of Natural Gas | FRM INTX FM RD 190 & 6TH ST GO S ON FM RD 190 FOR 1.3 MI FOLLOWING IT AS IT TURNS TO RR 1916 GO L ON | ASHERTON | 1340 | HP | 14.8183 |
| Pipeline Transportation of Natural Gas | FRM INTX FM RD 190 & 6TH ST GO S ON FM RD 190 FOR 1.3 MI FOLLOWING IT AS IT TURNS TO RR 1916 GO L ON | ASHERTON | 1340 | HP | 13.503 |
| Pipeline Transportation of Natural Gas | FRM INTX FM RD 190 & 6TH ST GO S ON FM RD 190 FOR 1.3 MI FOLLOWING IT AS IT TURNS TO RR 1916 GO L ON | ASHERTON | 1340 | HP | 13.3381 |
| Pipeline Transportation of Natural Gas | FRM INTX FM RD 190 & 6TH ST GO S ON FM RD 190 FOR 1.3 MI FOLLOWING IT AS IT TURNS TO RR 1916 GO L ON | ASHERTON | 1340 | HP | 12.6371 |
| Pipeline Transportation of Natural Gas | 2604 COUNTY ROAD 150 | GARDEN CITY | 1775 | HP | 11.612 |
| Pipeline Transportation of Natural Gas | 2604 COUNTY ROAD 150 | GARDEN CITY | 1775 | HP | 11.362 |
| Pipeline Transportation of Natural Gas | 2604 COUNTY ROAD 150 | GARDEN CITY | 1775 | HP | 11.247 |
| Pipeline Transportation of Natural Gas | 2604 COUNTY ROAD 150 | GARDEN CITY | 1775 | HP | 11.235 |
| Pipeline Transportation of Natural Gas | 2604 COUNTY ROAD 150 | GARDEN CITY | 1775 | HP | 10.936 |
| Pipeline Transportation of Natural Gas | 2604 COUNTY ROAD 150 | GARDEN CITY | 1775 | HP | 10.32 |
| Pipeline Transportation of Natural Gas | 2604 COUNTY ROAD 150 | GARDEN CITY | 1775 | HP | 9.038 |
| Pipeline Transportation of Natural Gas | 2604 COUNTY ROAD 150 | GARDEN CITY | 1775 | HP | 8.685 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF MAIN ST AND US-67 N IN RANKIN, TX TRAVEL N ON US-67 N FOR 4.8 MI. TURN RIGH | RANKIN | 1680 | HP | 0.0471 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF MAIN ST AND US-67 N IN RANKIN, TX TRAVEL N ON US-67 N FOR 4.8 MI. TURN RIGH | RANKIN | 1680 | HP | 0.045 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF MAIN ST AND US-67 N IN RANKIN, TX TRAVEL N ON US-67 N FOR 4.8 MI. TURN RIGH | RANKIN | 1680 | HP | 0.0421 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF MAIN ST AND US-67 N IN RANKIN, TX TRAVEL N ON US-67 N FOR 4.8 MI. TURN RIGH | RANKIN | 1680 | HP | 0.0414 |
| Pipeline Transportation of Natural Gas | FROM THE INTERSECTION OF MAIN ST AND US-67 N IN RANKIN, TX TRAVEL N ON US-67 N FOR 4.8 MI. TURN RIGH | RANKIN | 1680 | HP | 0.0403 |
| Pipeline Transportation of Natural Gas | Section 16, T3N, R24E | Daggett County | 1680 | HP | 0.180285 |
| Pipeline Transportation of Natural Gas | 23 Miles south of Moab on Highway 191; 10 mi WNW of La Sal | La Sal | 2000 | HP | 18.96712 |
| Pipeline Transportation of Natural Gas | 23 Miles south of Moab on Highway 191; 10 mi WNW of La Sal | La Sal | 2000 | HP | 9.916838 |
| Pipeline Transportation of Natural Gas | 23 Miles south of Moab on Highway 191; 10 mi WNW of La Sal | La Sal | 2000 | HP | 2.845392 |
| Pipeline Transportation of Natural Gas | 23 Miles south of Moab on Highway 191; 10 mi WNW of La Sal | La Sal | 2000 | HP | 1.765436 |
| Pipeline Transportation of Natural Gas | SW/4 Sec 7, T12S,R16E | Carbon County | 1680 | HP | 2.56802 |
| Pipeline Transportation of Natural Gas | SW/4 Sec 7, T12S,R16E | Carbon County | 1680 | HP | 1.45468 |
| Pipeline Transportation of Natural Gas | SW/4 Sec 7, T12S,R16E | Carbon County | 1680 | HP | 0.68413 |
| Pipeline Transportation of Natural Gas | SW/4 Sec 7, T12S,R16E | Carbon County | 1680 | HP | 0.06632 |
| Pipeline Transportation of Natural Gas | 945 Transco Road | Chatham | 3550 | HP | 10.82805 |
| Pipeline Transportation of Natural Gas | 945 Transco Road | Chatham | 3400 | HP | 0.81978 |
| Pipeline Transportation of Natural Gas | 40620 Consolidated Ln | Leesburg | 3010 | HP | 9.735665 |
| Pipeline Transportation of Natural Gas | 40620 Consolidated Ln | Leesburg | 3010 | HP | 9.27733 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 2500 | HP | 4.74534 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 1060 | HP | 0.00024 |
| Pipeline Transportation of Natural Gas | 2444 Pumping Station Road | Appomattox | 1060 | HP | 0.000216 |
| Pipeline Transportation of Natural Gas | 10201 Balls Ford Rd | Manassas | 2000 | BHP | 11.44326 |
| Pipeline Transportation of Natural Gas | 10201 Balls Ford Rd | Manassas | 2000 | BHP | 8.09472 |
| Pipeline Transportation of Natural Gas | 10201 Balls Ford Rd | Manassas | 2000 | BHP | 3.44881 |
| Pipeline Transportation of Natural Gas | 10201 Balls Ford Rd | Manassas | 2000 | BHP | 2.43144 |
| Pipeline Transportation of Natural Gas | 10201 Balls Ford Rd | Manassas | 2000 | BHP | 1.798245 |
| Pipeline Transportation of Natural Gas | 10201 Balls Ford Rd | Manassas | 2000 | BHP | 1.669115 |
| Pipeline Transportation of Natural Gas | 10201 Balls Ford Rd | Manassas | 2000 | BHP | 0.79125 |
| Pipeline Transportation of Natural Gas | 10201 Balls Ford Rd | Manassas | 2000 | BHP | 0.73692 |
| Pipeline Transportation of Natural Gas | 10201 Balls Ford Rd | Manassas | 2000 | BHP | 0.612625 |
| Pipeline Transportation of Natural Gas | MIDDLEBOURNE STAR RTE, BOX 36 | WEST UNION | 1080 | HP | 0 |
| Pipeline Transportation of Natural Gas | MIDDLEBOURNE STAR RTE, BOX 36 | WEST UNION | 1080 | HP | 0 |
| Pipeline Transportation of Natural Gas | HC 76, BOX 33B | GLENVILLE | 2000 | HP | 2.50997 |
| Pipeline Transportation of Natural Gas | HC 76, BOX 33B | GLENVILLE | 1060 | HP | 0.01010258 |
| Pipeline Transportation of Natural Gas | ROUTE 20 P O BOX 70 | MATHIAS | 4740 | HP | 1.576339 |
| Pipeline Transportation of Natural Gas | ROUTE 20 P O BOX 70 | MATHIAS | 4640 | HP | 1.116066 |
| Pipeline Transportation of Natural Gas | ROUTE 20 P O BOX 70 | MATHIAS | 2700 | HP | 0.8284353 |
| Pipeline Transportation of Natural Gas | ROUTE 20 P O BOX 70 | MATHIAS | 2700 | HP | 0.581184 |
| Pipeline Transportation of Natural Gas | ROUTE 20 P O BOX 70 | MATHIAS | 2700 | HP | 0.3603807 |
| Pipeline Transportation of Natural Gas | ROUTE 20 P O BOX 70 | MATHIAS | 1060 | HP | 0.0289322 |
| Pipeline Transportation of Natural Gas | ROUTE 2 BOX 145 | BRIDGEPORT | 1100 | HP | 14.8491 |
| Pipeline Transportation of Natural Gas | HC 32 BOX 12 | KANAWHA HEAD | 2000 | HP | 0.08877011 |
| Pipeline Transportation of Natural Gas | HC 32 BOX 12 | KANAWHA HEAD | 2000 | HP | 0.08158112 |
| Pipeline Transportation of Natural Gas | HC 32 BOX 12 | KANAWHA HEAD | 2000 | HP | 0.0745338 |
| Pipeline Transportation of Natural Gas | HC 32 BOX 12 | KANAWHA HEAD | 2000 | HP | 0.0681873 |
| Pipeline Transportation of Natural Gas | 1664 WALKER BRANCH RD. | HUNTINGTON | 2800 | HP | 8.239389 |
| Pipeline Transportation of Natural Gas | 1664 WALKER BRANCH RD. | HUNTINGTON | 1180 | HP | 0.02797637 |
| Pipeline Transportation of Natural Gas | 2000 BIG SANDY RIVER RD | KENOVA | 1100 | HP | 7.600663 |
| Pipeline Transportation of Natural Gas | 2000 BIG SANDY RIVER RD | KENOVA | 1100 | HP | 1.465886 |
| Pipeline Transportation of Natural Gas | 2000 BIG SANDY RIVER RD | KENOVA | 1100 | HP | 0.4718145 |
| Pipeline Transportation of Natural Gas | 2000 BIG SANDY RIVER RD | KENOVA | 1100 | HP | 0.4427926 |
| Pipeline Transportation of Natural Gas | RT 20 | SMITHFIELD | 1500 | HP | 0 |
| Pipeline Transportation of Natural Gas | RT 20 | SMITHFIELD | 1500 | HP | 0 |
| Pipeline Transportation of Natural Gas | 3.5M SE FILES CREEK RD, ST RT | BEVERLY | 2000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 3.5M SE FILES CREEK RD, ST RT | BEVERLY | 2000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 3.5M SE FILES CREEK RD, ST RT | BEVERLY | 2000 | HP | 0 |
| Pipeline Transportation of Natural Gas | 3.5M SE FILES CREEK RD, ST RT | BEVERLY | 2000 | HP | 0 |
| Pipeline Transportation of Natural Gas | ROUTE 4, BOX 144-A | CHARLESTON | 1100 | HP | 5.134022 |
| Pipeline Transportation of Natural Gas | ROUTE 4, BOX 144-A | CHARLESTON | 1100 | HP | 2.419293 |
| Pipeline Transportation of Natural Gas | ROUTE 4, BOX 144-A | CHARLESTON | 1100 | HP | 1.683373 |
| Pipeline Transportation of Natural Gas | ROUTE 4, BOX 144-A | CHARLESTON | 2700 | HP | 1.027108 |
| Pipeline Transportation of Natural Gas | ROUTE 4, BOX 144-A | CHARLESTON | 1100 | HP | 1.01925 |
| Pipeline Transportation of Natural Gas | ROUTE 4, BOX 144-A | CHARLESTON | 1100 | HP | 0.9653227 |
| Pipeline Transportation of Natural Gas | ROUTE 4, BOX 144-A | CHARLESTON | 1100 | HP | 0.6400374 |
| Pipeline Transportation of Natural Gas | ROUTE 4, BOX 144-A | CHARLESTON | 2700 | HP | 0.3205525 |
| Pipeline Transportation of Natural Gas | 7 COCO RD. | ELKVIEW | 1100 | HP | 12.36574 |
| Pipeline Transportation of Natural Gas | 7 COCO RD. | ELKVIEW | 1180 | HP | 0.31 |

| Emissions UOM | Current Control (Description or ID) | Current Reduction Per | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | 140 - Selective Non-catalytic Reduction (SNCR) (OP) (NOX - 91%) | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | 65 - Catalytic Reduction (OP) (NOX - 92.8%) | | | | | |
| TON | 65 - Catalytic Reduction (OP) (NOX - 92.8%) | | | | | |
| TON | 65 - Catalytic Reduction (OP) (NOX - 92.8%) | | | | | |
| TON | 65 - Catalytic Reduction (OP) (NOX - 92.8%) | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |
| TON | | | | | | |



| EPA Region Code | State | County | EIS Facility ID | EIS Unit ID | Agency Facility ID | Company Name | Site Name | Primary NAICS Code |
|---|---|---|---|---|---|---|---|---|
| | WV | Kanawha | 6885411 | 71700513 | 0051 | Eastern Gas Transmission and Storage, Inc. | EGTS - CORNWELL COMPRESSOR STATION | 48621 |
| | WV | Kanawha | 6885411 | 71699313 | 0051 | Eastern Gas Transmission and Storage, Inc. | EGTS - CORNWELL COMPRESSOR STATION | 48621 |
| | WV | Kanawha | 6885411 | 71700413 | 0051 | Eastern Gas Transmission and Storage, Inc. | EGTS - CORNWELL COMPRESSOR STATION | 48621 |
| | WV | Kanawha | 6885411 | 71699913 | 0051 | Eastern Gas Transmission and Storage, Inc. | EGTS - CORNWELL COMPRESSOR STATION | 48621 |
| | WV | Kanawha | 6885411 | 71700213 | 0051 | Eastern Gas Transmission and Storage, Inc. | EGTS - CORNWELL COMPRESSOR STATION | 48621 |
| | WV | Kanawha | 6885411 | 71700113 | 0051 | Eastern Gas Transmission and Storage, Inc. | EGTS - CORNWELL COMPRESSOR STATION | 48621 |
| | WV | Kanawha | 6885411 | 71700313 | 0051 | Eastern Gas Transmission and Storage, Inc. | EGTS - CORNWELL COMPRESSOR STATION | 48621 |
| | WV | Kanawha | 6885411 | 71700313 | 0051 | Eastern Gas Transmission and Storage, Inc. | EGTS - CORNWELL COMPRESSOR STATION | 48621 |
| | WV | Kanawha | 6885411 | 71699813 | 0051 | Eastern Gas Transmission and Storage, Inc. | EGTS - CORNWELL COMPRESSOR STATION | 48621 |
| | WV | Lewis | 6900311 | 71933213 | 0009 | Equitrans, L.P. | Equitrans, L.P. - COPLEY RUN CS 70 | 48621 |
| | WV | Lewis | 6900311 | 71933113 | 0009 | Equitrans, L.P. | Equitrans, L.P. - COPLEY RUN CS 70 | 48621 |
| | WV | Lewis | 6900311 | 71933413 | 0009 | Equitrans, L.P. | Equitrans, L.P. - COPLEY RUN CS 70 | 48621 |
| | WV | Lewis | 6900711 | 71926213 | 0013 | Eastern Gas Transmission and Storage, Inc. | EGTS - LIGHTBURN COMPRESSOR STATION | 48621 |
| | WV | Lewis | 6900711 | 107800113 | 0013 | Eastern Gas Transmission and Storage, Inc. | EGTS - LIGHTBURN COMPRESSOR STATION | 48621 |
| | WV | Lewis | 6900711 | 107800013 | 0013 | Eastern Gas Transmission and Storage, Inc. | EGTS - LIGHTBURN COMPRESSOR STATION | 48621 |
| | WV | Lewis | 6900711 | 71926713 | 0013 | Eastern Gas Transmission and Storage, Inc. | EGTS - LIGHTBURN COMPRESSOR STATION | 48621 |
| | WV | Lincoln | 6900911 | 71738513 | 0002 | Columbia Gas Transmission LLC | Columbia Gas - HUBBALL 4C4510 | 486210 |
| | WV | Lincoln | 6900911 | 71738413 | 0002 | Columbia Gas Transmission LLC | Columbia Gas - HUBBALL 4C4510 | 486210 |
| | WV | Doddridge | 17928511 | 126978813 | 0027 | EQM Gathering Opco, LLC | Equitrans - SATURN COMPRESSOR STATION | 4862 |
| | WV | Doddridge | 17928511 | 126978713 | 0027 | EQM Gathering Opco, LLC | Equitrans - SATURN COMPRESSOR STATION | 4862 |
| | WV | Doddridge | 17928511 | 126979113 | 0027 | EQM Gathering Opco, LLC | Equitrans - SATURN COMPRESSOR STATION | 4862 |
| | WV | Doddridge | 17928511 | 126978313 | 0027 | EQM Gathering Opco, LLC | Equitrans - SATURN COMPRESSOR STATION | 4862 |
| | WV | Doddridge | 17928511 | 126979313 | 0027 | EQM Gathering Opco, LLC | Equitrans - SATURN COMPRESSOR STATION | 4862 |
| | WV | Doddridge | 17928511 | 134121013 | 0027 | EQM Gathering Opco, LLC | Equitrans - SATURN COMPRESSOR STATION | 4862 |
| | WV | Doddridge | 17928511 | 126978613 | 0027 | EQM Gathering Opco, LLC | Equitrans - SATURN COMPRESSOR STATION | 4862 |
| | WV | Doddridge | 17928511 | 126978213 | 0027 | EQM Gathering Opco, LLC | Equitrans - SATURN COMPRESSOR STATION | 4862 |

**533a**

| Primary NAICS Description | Address | City | Design Capacity | Design Capacity UOM | Total Emissions |
|---|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | 200 RIVER HAVEN ROAD | CLENDENIN | 1350 | HP | 20.74 |
| Pipeline Transportation of Natural Gas | 200 RIVER HAVEN ROAD | CLENDENIN | 2500 | HP | 12.66 |
| Pipeline Transportation of Natural Gas | 200 RIVER HAVEN ROAD | CLENDENIN | 1350 | HP | 8.98 |
| Pipeline Transportation of Natural Gas | 200 RIVER HAVEN ROAD | CLENDENIN | 1350 | HP | 7.73 |
| Pipeline Transportation of Natural Gas | 200 RIVER HAVEN ROAD | CLENDENIN | 1350 | HP | 7 |
| Pipeline Transportation of Natural Gas | 200 RIVER HAVEN ROAD | CLENDENIN | 1350 | HP | 5.68 |
| Pipeline Transportation of Natural Gas | 200 RIVER HAVEN ROAD | CLENDENIN | 1350 | HP | 5.48 |
| Pipeline Transportation of Natural Gas | 200 RIVER HAVEN ROAD | CLENDENIN | 1350 | HP | 4.86 |
| Pipeline Transportation of Natural Gas | 200 RIVER HAVEN ROAD | CLENDENIN | 1350 | HP | 0.01 |
| Pipeline Transportation of Natural Gas | 544 COPLEY RUN ROAD | WESTON | 1350 | HP | 18.6309 |
| Pipeline Transportation of Natural Gas | 544 COPLEY RUN ROAD | WESTON | 1350 | HP | 15.1889 |
| Pipeline Transportation of Natural Gas | 544 COPLEY RUN ROAD | WESTON | 1350 | HP | 5.9433 |
| Pipeline Transportation of Natural Gas | ROUTE 2 | JANE LEW | 4000 | HP | 17.5234 |
| Pipeline Transportation of Natural Gas | ROUTE 2 | JANE LEW | 3550 | HP | 1.4121 |
| Pipeline Transportation of Natural Gas | ROUTE 2 | JANE LEW | 3550 | HP | 1.0087 |
| Pipeline Transportation of Natural Gas | ROUTE 2 | JANE LEW | 1085 | HP | 0.1268 |
| Pipeline Transportation of Natural Gas | ROUTE 3 | BRANCHLAND | 1320 | HP | 11.53019 |
| Pipeline Transportation of Natural Gas | ROUTE 3 | BRANCHLAND | 1320 | HP | 10.64093 |
| Pipeline Transportation of Natural Gas | 3415 SAM CAVINS ROAD. | WEST UNION | 4740 | HP | 16.8483 |
| Pipeline Transportation of Natural Gas | 3415 SAM CAVINS ROAD. | WEST UNION | 4740 | HP | 13.6958 |
| Pipeline Transportation of Natural Gas | 3415 SAM CAVINS ROAD. | WEST UNION | 2370 | HP | 7.3595 |
| Pipeline Transportation of Natural Gas | 3415 SAM CAVINS ROAD. | WEST UNION | 2370 | HP | 6.7378 |
| Pipeline Transportation of Natural Gas | 3415 SAM CAVINS ROAD. | WEST UNION | 2370 | HP | 6.3443 |
| Pipeline Transportation of Natural Gas | 3415 SAM CAVINS ROAD. | WEST UNION | 2370 | HP | 5.2894 |
| Pipeline Transportation of Natural Gas | 3415 SAM CAVINS ROAD. | WEST UNION | 2370 | HP | 4.0016 |
| Pipeline Transportation of Natural Gas | 3415 SAM CAVINS ROAD. | WEST UNION | 2370 | HP | 2.9494 |

**534a**

| Emissions | UOM | Current Control (Description or ID) | Current Reduction Pen | Expected Controls to be I | Expected Controls to be Installed Description | controltechnology_recommended | controlefficiency_recommended |
|---|---|---|---|---|---|---|---|
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |
| | TON | | | | | | |

**535a**

**Technical Support Document (TSD)**
**for the Final Rule**
Docket ID No. EPA-HQ-OAR-2021-0668

# Final Non-EGU Sectors TSD

U.S. Environmental Protection Agency
Office of Air and Radiation
March 2023

***This revised document replaces the version posted to EPA's website the morning of March 15, 2023. Revisions in this TSD include a revised title, date and slight changes to references supporting emissions limits/requirements for the Cement and Concrete Product Manufacturing industry. These revisions do not change any requirements in the final rulemaking.***

# Table of Contents

**1 Introduction/Purpose** ................................................................... 3

**2 Pipeline Transportation of Natural Gas** ......................................... 4

**3 Cement and Concrete Product Manufacturing** ............................... 22

**4 Iron and Steel Mills and Ferroalloy Manufacturing+** ..................... 33

**5 Glass and Glass Product Manufacturing** ...................................... 41

**6 Boilers from Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills, Metal Ore Mining, and the Iron and Steel and Ferroalloys Manufacturing Industry** .............................................. 57

**7 Municipal Waste Combustors** ...................................................... 85

# 1 Introduction/Purpose

The purpose of this Technical Support Document (TSD) is to discuss the basis for the final emissions limits and monitoring, recordkeeping, and reporting requirements for the following emissions unit types in non-EGU industries: engines in the Pipeline Transportation of Natural Gas industry; kilns in the Cement and Cement Product Manufacturing industry; boilers and reheat furnaces in the Iron and Steel Mills and Ferroalloy Manufacturing industry; furnaces in the Glass and Glass Product Manufacturing industry; high-emitting equipment and large boilers in the Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, Metal Ore Mining, and Pulp, Paper, and Paperboard Mills industries, and incinerators in the Municipal Waste Combustor industry. This TSD provides additional information to supplement the discussion in the preamble to the final rule on the basis for EPA's final emissions limits for each non-EGU unit and industry. All non-EGU emission limits identified in the final rule are set at a level that can be met through the installation of the control strategies identified in the preamble and further discussed in this TSD.

# 2 Pipeline Transportation of Natural Gas

Based on available information in the National Emissions Inventory (NEI), EPA has determined that reciprocating engines are the largest collective sources of nitrogen oxides (NOx) emissions from the Natural Gas Transportation Industry in the states covered by this final FIP. As explained in the Non-EGU Screening Assessment memorandum, the largest potential NOₓ emission reductions are from natural gas-fired spark ignition engines. Based on the NEI data, EPA has not identified a potential for significant emission reductions from turbines and compression ignition engines in this industry in the states covered by the final FIP. The process descriptions, background on each engine type, and summaries of applicable "reasonably available control technology" (RACT) emission limits and permit conditions, as well as a discussion of available NOₓ controls, are summarized in an analysis developed by the Ozone Transport Commission entitled *Technical Information Oil and Gas Sector Significant Stationary Sources of NOₓ Emissions* (October 17, 2012) ("OTC Engine Study"). The three types of engines for which EPA is finalizing emission limits in this final FIP are: 1) two stroke lean burn spark ignition engines, which are covered on pages 17-28 of the OTC Engine Study; four stroke lean burn spark ignition engines, which are covered on pages 30-42 of the OTC Engine Study; and four stroke rich burn spark ignition engines, which are covered on pages 44-52 of the OTC Engine Study.

EPA is finalizing an applicability threshold for spark ignition engines of 1000 horsepower (hp) or more. Based on the Non-EGU Screening Assessment memorandum, engines with a potential to emit 100 tpy or greater had the most significant potential for NOₓ emissions reductions. EPA reviewed available information in the NEI and determined that many engines above 1000 hp reported emissions above 100 tpy, while engines smaller than 1000 hp generally reported emissions below 100 tpy.[1] Specifically, EPA only noted two engines below 1000 hp that emitted more than 100 tpy, while over 200 engines over 1000 hp emitted greater than 100 tpy. In addition to the NEI data, EPA observed that uncontrolled emissions from engines can be as high as 16.8 grams per horsepower per hour (g/hp-hr).[2] In addition, operating hours can be as high as 7000 hours in a given year.[3] With these assumptions, EPA could justify regulating engines around 800 hp or more. While the available data indicate that average operating hours are below 7000 hours per year,[4] in light of the potential variability in operating hours and the clear potential for these sources to emit in excess of 100 tons per year, EPA is

---

[1] *See* 2017 NEI Engines Emissions.xlsx, available in the docket for this rulemaking.
[2] *U.S. Environmental Protection Agency*, Stationary Reciprocating Internal Combustion Engines: Technical Support Document for NOx SIP Call (October 2003); *U.S. Environmental Protection Agency*, Assessment of Non-EGU NOx Emission Controls, Cost of Controls, and Time for Compliance Final TSD, 5-8 (August 2016); *Illinois Environmental Protection Agency*, Technical Support Document for Controlling Emissions from Stationary Reciprocating Internal Combustion Engines and Turbines, 41 (March 19, 2007).
[3] *Illinois Environmental Protection Agency*, Technical Support Document for Controlling Emissions from Stationary Reciprocating Internal Combustion Engines and Turbines, 41 (March 19, 2007).
[4] OTC Engine Study, 88 (October 17, 2012) (explaining that the average operating hours was around 35% or around 3066 hours a year); *Illinois Environmental Protection Agency*, Technical Support Document for Controlling Emissions from Stationary Reciprocating Internal Combustion Engines and Turbines, 41 (March 19, 2007) (assuming operating hours for engines at 7000 hours a year); *U.S. Environmental Protection Agency*, Assessment of Non-EGU NOx Emission Controls, Cost of Controls, and Time for Compliance Final TSD, 5-6 through 5-9 (August 2016) (assuming operating hours of 2000 hours a year).

finalizing an applicability threshold of 1000 hp that is appropriately tailored to the scope of the screening assessment and should capture the majority of potential emission reductions.

**Federal Rules Affecting Engines**

Natural gas-fired spark ignition engines are subject to the New Source Performance Standards (NSPS) for Stationary Spark Ignition Internal Combustion Engines (40 CFR part 60, subpart JJJJ) and National Emission Standards for Hazardous Air Pollutants (NESHAP) for Stationary Reciprocating Internal Combustion Engines (40 CFR part 63, subpart ZZZZ).

**Four Stroke Lean Burn Spark Ignition Engines**

For four stroke lean burn spark ignition engines, EPA is finalizing an emissions limit of 1.5 g/hp-hr. EPA believes that installation of a selective catalytic reduction (SCR) system or a combination of other control technologies should be available for these engines to meet this emission limit. As explained in the OTC Engine Study, most of the four stroke lean burn spark ignition engines should be able to achieve 60 to 90% emission reductions with the installation of layered combustion controls, such as the installation of turbochargers and inter-cooling, pre-chamber ignition or high energy ignition, improved fuel injection control, air/fuel ratio control, etc.[5] With reduction in this range, these engines should be able to achieve an emissions limit of 1.5 g/hp-hr or less. For some engines that can only achieve a 60% reduction from layered combustion controls, information suggests that those engines should be able to install SCR to lower emissions to 1.5 g/hp-hr.[6] Further information about control measures to reduce NOx emissions from four stroke lean burn engines is shown below in the table excerpted from EPA's Menu of Control Measures for NAAQS Implementation.[7]

Many states containing ozone nonattainment areas or located within the Ozone Transport Region (OTR) have already adopted emission limits similar to or even significantly more stringent than the final emissions limit of 1.5 g/hp-hr. While some states have required limits equivalent to or even lower than 0.5 g/hp-hr,[8] most states have adopted emission limits at or close to 1.5 g/hp-hr.[9] Additional examples of state RACT rules and permitted emission limits can be found in the "NOx Permit Limits and RACT Tool spreadsheet" available in the docket. Many of these example RACT rules contain emission limits based on engine manufacture dates and set higher emissions limits between 1.5 and 3.0 g/hp-hr for older engines.

In addition to RACT limits, some four stroke lean burn spark ignition engines may have installed equipment to meet the emission limits contained within EPA's NSPS located at 40 CFR 60, subpart JJJJ, which requires that these engines meet a NOx emissions limit of 1.0 g/hp-hr if manufactured on or after July 1, 2010 and a NOx emissions limit of 2.0 g/hp-hr if manufactured

---

[5] OTC Engine Study, 43.
[6] Id.
[7] EPA, Menu of Control Measures for NAAQS Implementation, available at https://www.epa.gov/air-quality-implementation-plans/menu-control-measures-naaqs-implementation (URL dated January 5, 2022).
[8] See, e.g., South Coast Air Quality Management District Rule 1110.2, establishing a NOx emissions limit of 36 ppmvd, which is equivalent to about 0.5 g/hp-hr.
[9] For example, see Colorado Air Quality Control Commission Regulation 7, Part E, Section I, Table 1 and Table 2 (establishing emissions limits at 0.7 to 2.0 g/hp-hr depending on engine construction dates).

on or after July 1, 2007 but before July 1, 2010.[10] Given that many of the newer engines subject to this FIP are already required to meet the more stringent NSPS limits of 1.0 to 2.0 g/hp-hr, EPA's final FIP is targeting an emission limit that older engines not subject to the NSPS could still meet.

Based on the example RACT rules, applicability of the NSPS to newer engines, and the feasibility of $NO_X$ reductions analyzed in the OTC Engine Study, EPA believes an emissions limit of 1.5 g/hp-hr is achievable by the vast majority of four stroke lean burn spark ignition engines and will achieve the necessary $NO_X$ reductions for engines that are not subject to equivalent RACT requirements or the NSPS at 40 CFR 60, subpart JJJJ.

**Four Stroke Rich Burn Spark Ignition Engines**

For four stroke rich burn spark ignition engines, EPA is finalizing an emissions limit of 1.0 g/hp-hr. EPA believes that installation of non-selective catalytic reduction (NSCR) or a combination of other control technologies should be available for these engines to meet this emission limit. As explained in the OTC Engine Study, most of the four stroke rich burn spark ignition engines should be able to achieve 90 to 99% emission reductions with the installation of NSCR.[11] A 90 to 99% emission reduction should result in an emissions level of 1.0 g/hp-hr or less. Further information about control measures to reduce NOx emissions from four stroke rich burn engines is shown below in the table excerpted from EPA's Menu of Control Measures for NAAQS Implementation.

Many states containing ozone nonattainment areas or located within the Ozone Transport Region (OTR) have already adopted emission limits similar to the final emissions limit of 1.0 g/hp-hr. While some states have required limits equivalent to or even lower than 0.2 g/hp-hr,[12] most states have adopted emission limits at or close to 1.0 g/hp-hr.[13] Additional examples of state RACT rules and permitted emission limits can be found in the "$NO_X$ Permit Limits and RACT Tool spreadsheet" available in the docket. Many of these example RACT rules contain emission limits based on engine manufacture dates and set higher emissions limits at or close to 1.0 g/hp-hr for older engines.

In addition to RACT limits, some four stroke rich burn spark ignition engines may have installed equipment to meet the emission limits contained within EPA's NSPS located at 40 CFR 60, subpart JJJJ, which requires that these engines meet a NOx emissions limit of 1.0 g/hp-hr if manufactured on or after July 1, 2010 and a NOx emissions limit of 2.0 g/hp-hr if manufactured on or after July 1, 2007 but before July 1, 2010. *See* 40 CFR part 60, subpart JJJJ, Table 1. Further, some of these same units will have already installed NSCR to comply with EPA's NESHAP for Stationary Reciprocating Internal Combustion Engines at 40 CFR Part 63 subpart ZZZZ. Even though the NESHAP at subpart ZZZZ does not regulate $NO_X$ emissions, the

---

[10] *See* 40 CFR part 60, Subpart JJJJ, Table 1.
[11] OTC Engine Study at 45-46.
[12] *See* Pennsylvania General Permit 5 for Natural Gas Production and Processing Facilities, establishing $NO_X$ emissions limits for four stroke rich burn engines as low as 0.2 g/hp-hr.
[13] For example, see Colorado Air Quality Control Commission Regulation 7, Part E, Section I, Table 1 and Table 2 (establishing emissions limits at 0.5 to 2.0 g/hp-hr depending on engine construction dates).

installation of NSCR on these units should already provide the co-benefit of reducing $NO_X$ emissions to the levels necessary to comply with the final FIP.

Based on the example RACT rules, applicability of the NSPS to newer engines, and the feasibility of $NO_X$ reductions analyzed in the OTC Engine Study, EPA believes an emissions limit of 1.0 g/hp-hr is achievable by the vast majority of four stroke lean burn spark ignition engines and will achieve the necessary reductions.

**Two Stroke Lean Burn Spark Ignition Engines**

For two stroke lean burn spark ignition engines, EPA is finalizing an emissions limit of 3.0 g/hp-hr. EPA believes that installation of layered combustion controls or a combination of other control technologies should be available for these engines to meet this emission limit. As explained in the OTC Engine Study, most of the two stroke lean burn spark ignition engines should be able to achieve 60 to 90% emission reductions with the installation of layered combustion controls, such as the installation of turbochargers and inter-cooling, pre-chamber ignition or high energy ignition, improved fuel injection control, and air/fuel ratio control. [14] Available information suggests that some engines that can only achieve a 60% reduction from layered combustion controls will only be able to meet an emission limit of 3.0 g/hp-hr or greater. While some of these engines could install SCR to achieve greater reductions, EPA does not have information indicating that manufacturers and models of two stroke learn burn spark ignition engines generally can install the necessary combination of layered combustion controls and SCR to achieve a more stringent limit. [15] Further information about control measures to reduce $NO_X$ emissions from four stroke lean burn engines is shown below in the table excerpted from EPA's Menu of Control Measures for NAAQS Implementation.

Many states containing ozone nonattainment areas or located within the OTR have already adopted emission limits similar to the final emissions limit of 3.0 g/hp-hr. While some states have adopted limits equivalent to or even lower than 0.5 g/hp-hr,[16] most states have adopted emission limits between 1.0 g/hp-hr and 3.0 g/hp-hr.[17] Additional examples of state RACT rules and permitted emission limits can be found in the "$NO_X$ Permit Limits and RACT Tool spreadsheet" available in the docket. Many of these example RACT rules contain emission limits based on engine manufacture dates and set higher emissions limits closer to 3.0 g/hp-hr for older engines.

In addition to RACT limits, some two stroke lean burn spark ignition engines may have installed equipment to comply with EPA's NSPS at 40 CFR part 60, subpart JJJJ, which requires that these engines meet a NOx emissions limit of 1.0 g/hp-hr if manufactured on or after July 1, 2010 and a NOx emissions limit of 2.0 g/hp-hr if manufactured on or after July 1, 2007 but before July 1, 2010. *See* 40 CFR part 60, subpart JJJJ, Table 1. Given that many of the newer

---

[14] OTC Engine Study at 45-46.
[15] OTC Engine Study at 45-46.
[16] See South Coast Air Quality Management District Rule 1110.2, establishing a $NO_X$ emissions limit of 36 ppmvd or about 0.5 g/hp-hr.
[17] For example, see Colorado Air Quality Control Commission Regulation 7, Part E, Section I, Table 1 and Table 2 (establishing emissions limits at 1.0 to 3.0 g/hp-hr depending on engine construction dates).

engines subject to this final FIP are already required to meet the more stringent NSPS limits of 1.0 to 2.0 g/hp-hr, EPA's final FIP is targeting an emission limit that older engines not subject to the NSPS could still meet.

Based on the example RACT rules, applicability of the NSPS to newer engines, and the feasibility of $NO_X$ reductions analyzed in the OTC Engine Study, EPA believes an emissions limit of 3.0 g/hp-hr is achievable by the vast majority of four stroke lean burn spark ignition engines and will achieve the necessary reductions for engines that are not subject to equivalent RACT requirements or the NSPS at 40 CFR part 60, subpart JJJJ.

**Additional Information on NOx Controls**

EPA's Menu of Control Measures (MCM) provides state, local and tribal air agencies with information on existing criteria pollutant emission reduction measures as well as relevant information concerning the efficiency and cost effectiveness of the measures.[18] State, local, and tribal agencies may use this information in developing emission reduction strategies, plans and programs to assure they attain and maintain the NAAQS. The information from the MCM can also be found in the Control Measures Database (CMDB), a major input to the Control Strategy Tool (CoST), which EPA used in the NOx control strategy analysis included in the Non-EGU Screening Assessment memorandum.[19] Information about control measures to reduce NOx emissions from stationary internal combustion engines in service of the pipeline transportation of natural gas is tabulated below.

---

[18] EPA, Menu of Control Measures for NAAQS Implementation, available at https://www.epa.gov/air-quality-implementation-plans/menu-control-measures-naaqs-implementation (URL dated January 5, 2022).
[19] EPA, Control Measures Database (CMDB) for Stationary Sources, available at https://www.epa.gov/system/files/other-files/2021-09/cmdb_2021-09-02_0.zip (URL dated January 13, 2023).

**Table 2.A: NO$_X$ Controls Available for Natural Gas Fired Spark Ignition Engines**

| Source Category | Emission Reduction Measure | Control Efficiency (%) | Description/Notes/Caveats | References |
|---|---|---|---|---|
| Lean Burn ICE - NG | Air to Fuel Ratio Controller | 20 | This control is the use of air/fuel ratio adjustment to reduce NOx emissions. This control applies to gasoline powered internal combustion engines with uncontrolled NOx emissions greater than 10 tons per year. | CARB 2001, EPA 2018, RTI 2014 |
| Internal Combustion Engines - Gas | Adjust Air to Fuel Ratio | 20 | This control is the use of air/fuel ratio adjustment to reduce NOx emissions. This control applies to natural gas-fired internal combustion engines with uncontrolled NOx emissions greater than 10 tons per year. Capital and annual cost information was obtained from model engine data in the Alternative Control Techniques (ACT) Document -- NOx Emissions from Stationary Reciprocating Internal Combustion Engines (EPA 1993c). | EPA 1993c, Pechan 1998a, Pechan 2006 |
| Internal Combustion Engines - Gas | Adjust Air to Fuel Ratio and Ignition Retard | 30 | This control is the use of air/fuel and ignition retard to reduce NOx emissions. This control applies to natural gas-fired internal combustion engines with uncontrolled NOx emissions greater than 10 tons per year. Capital and annual cost information was obtained from model engine data in the Alternative Control Techniques (ACT) Document -- NOx Emissions from Stationary Reciprocating Internal Combustion Engines (EPA 1993c). | EPA 1993c, Pechan 2006 |
| Internal Combustion Engines - Gas | Ignition Retard | 20 | This control is the use of ignition retard technologies to reduce NOx emissions. This applies to small (<4,000 HP) natural gas-fired IC engines with uncontrolled NOx emissions greater than 10 tons per year. Capital and annual cost information was obtained from model engine data in the Alternative Control Techniques (ACT) Document - NOx Emissions from Stationary Reciprocating Internal Combustion Engines (EPA 1993c). | EPA 1993c, Pechan 1998a |

| Source Category | Emission Reduction Measure | Control Efficiency (%) | Description/Notes/Caveats | References |
|---|---|---|---|---|
| Lean Burn ICE - NG | Layered Combustion | 97 | Layered combustion - for Large Bore, 2 stroke, Lean Burn, Slow Speed (High Pressure Fuel Injection achieves 90% reduction; Turbocharging achieves 75% reduction; Precombustion chambers achieves 90% reduction; Cylinder Head Modifications). All retrofit combustion- related controls may not be available for all manufacturers and models of 2-stroke lean burn engines. Actual NOx emission rates would be engine design specific. Efficiency achieved may range from 60 to 90%, depending on the make/model of engine (approximate range of NOx emissions of 3.0 to 0.5 g/bhp-hr). | OTC 2012, RTI 2014 |
| Lean Burn ICE - NG | Layered Combustion | 97 | Layered combustion - 2 stroke, Lean Burn, NG (Air Supply; Fuel Supply; Ignition; Electronic Controls; Engine Monitoring). Evaluation for 3 most representative made/models of 2 stroke LB compressor engines. All retrofit combustion-related controls may not be available for all manufacturers and models of 2-stroke lean burn engines. Actual NOx emission rates would be engine design specific. Efficiency achieved may range from 60 to 90%, depending on the make/model of engine (approximate range of NOx emissions of 3.0 to 0.5 g/bhp-hr). | OTC 2012, RTI 2014 |
| Lean Burn ICE - NG | Low Emission Combustion | 80 | Low Emission Combustion includes Precombustion chamber head and related equipment on a Lean Burn engine. | RTI 2014, SJVAPCD 2003, EPA 2018 |
| Industrial NG ICE, SCCs with technology not specified | Non-Selective Catalytic Reduction or Adjust Air Fuel Ratio and Ignition Retard | 39 | This control measure is for natural gas fired internal combustion engines where the firing technology is not specified as to Rich Burn or Lean Burn. Existing control measures are applied based on the estimated percentage of lean-burn engines (85%) and rich-burn engines (15%). Adjust Air to Fuel Ratio and Ignition Retard (NAFRIICGS) is used for lean-burn engines and NSCR (NNSCRINGI4) is used for rich-burn engines. | Pechan 2006, EPA 2007b, INGAA 2014, CSRA 2016 |

545a

| Source Category | Emission Reduction Measure | Control Efficiency (%) | Description/Notes/Caveats | References |
|---|---|---|---|---|
| Industrial NG ICE, 4cycle (rich) | Non-Selective Catalytic Reduction | 90 | NSCR is achieved by placing a catalyst in the exhaust stream of the engine. The exhaust passes over the catalyst, usually a noble metal (platinum, rhodium or palladium) which reduces the reactants to N2, CO2 and H20 (NJDEP 2003). Typical exhaust temperatures for effective removal of NOx are 800-1200 degrees Fahrenheit. An oxidation catalyst using additional air can be installed downstream of the NSCR catalyst for additional CO and VOC control. This includes 4-cycle naturally aspirated engines and some 4-cycle turbocharged engines. Engines operating with NSCR require air/fuel control to maintain high reduction effectiveness. | EPA 2007b, NJDEP 2003 |
| Industrial NG ICE, SCCs with technology not specified | Non-Selective Catalytic Reduction or Layered Combustion | 95.95 | This control measure is for natural gas fired internal combustion engines where the firing technology is not specified as to Rich Burn or Lean Burn. Existing control measures are applied based on the estimated percentage of lean-burn engines (85%) and rich-burn engines (15%). Layered combustion (NLCICE2SNG) is used for lean-burn engines and NSCR (NNSCRINGI4) is used for rich-burn engines. | EPA 2007b, OTC 2012, INGAA 2014, CSRA 2016 |
| Industrial NG ICE, SCCs with technology not specified | Non-Selective Catalytic Reduction or Low Emission Combustion | 87.45 | This control measure is for natural gas fired internal combustion engines where the firing technology is not specified as to Rich Burn or Lean Burn. Existing control measures are applied based on the estimated percentage of lean-burn engines (85%) and rich-burn engines (15%). Low emission combustion (NLECICEGAS) is used for lean-burn engines and NSCR (NNSCRINGI4) is used for rich-burn engines. | EPA 2007b, CARB 2001, INGAA 2014, CSRA 2016 |
| Lean Burn ICE - NG | Selective Catalytic Reduction | 90 | SCR can be used on Lean Burn, NG engines. Assumed SCR can meet NOx emissions of 0.89 g/bh-hr. This is a known technology, however there is indication that applicability is engine/unit specific. | OTC 2012, SJVAPCD 2003, CARB 2001, EPA 2018, RTI 2014 |

Reproduced from EPA, Menu of Control Measures for NAAQS Implementation, available at https://www.epa.gov/air-quality-implementation-plans/menu-control-measures-naaqs-implementation (URL dated January 13, 2023).

**Applicability Requirements**

EPA received comments requesting a clarification of the meaning of "pipeline transportation of natural gas." EPA is clarifying and narrowing the definition of "pipeline transportation of natural gas" to mean the transport or storage of natural gas prior to delivery to a local distribution company custody transfer station or to a final end-user (if there is no local distribution company custody transfer station). The revised definition of this term in § 52.41(a) is consistent with EPA's regulatory definition of "natural gas transmission and storage segment" in 40 CFR 60.5430(a) (Subpart OOOOa, Standards of Performance for Crude Oil and Natural Gas Facilities for Which Construction, Modification, or Reconstruction Commenced After September 18, 2015).

EPA is adding definitions of the terms "local distribution company" and "local distribution company custody transfer station" that are consistent with the definitions found in 40 CFR 98.400 (Subpart NN, Suppliers of Natural Gas and Natural Gas Liquids) and 40 CFR 60.5430(a) (Subpart OOOOa, Standards of Performance for Crude Oil and Natural Gas Facilities for Which Construction, Modification, or Reconstruction Commenced After September 18, 2015), respectively.

Commenters stated that emergency generators are currently exempt from requirements applicable to non-emergency RICE covered by both the relevant NSPS rule (Subpart JJJJ), as well as the relevant NESHAP rule (Subpart ZZZZ), and that although the NSPS and NESHAP standards EPA has adopted for emergency RICE do not limit the amount of time they may run for emergency purposes, EPA has recognized in the past that states may assume a maximum of 500 hours of operation to estimate the "potential to emit" in issuing air permits for emergency RICE. Following a review of comments, EPA is finalizing an exemption for emergency engines. "Emergency engine" is defined to mean any stationary reciprocating internal combustion engine that is operated to provide electrical power or mechanical work during an emergency situation. Examples include stationary RICE used to produce power for critical networks or equipment (including power supplied to portions of a facility) when electric power from the local utility (or the normal power source, if the facility runs on its own power production) is interrupted, or stationary RICE used to pump water in the case of fire or flood, etc. Under the provisions of this rule, facilities may operate their emergency stationary RICE for limited non-emergency purposes for a maximum of 100 hours per calendar year.

**Emission Limits and Compliance Requirements**

In setting the emission limits for the Pipeline Transportation of Natural Gas, EPA reviewed state and local air agency rules, RACT NOx rules, NSPS rules applicable to newer engines, active air permits issues to sources with similar engines and the feasibility of NOx reductions analyzed in the OTC Engine Study. While some permits and rules reviewed express engine emissions limits in parts per million by volume (ppmv), the majority of rules and source-specific requirements express the emissions limits in grams per horsepower per hour (g/hp-hr). Based on the available information for this industry, EPA is finalizing the following emissions limits expressed in terms of g/hp-hr for stationary SI engines in the covered states. Beginning in the 2026 ozone season and in each ozone season thereafter, the NOx emissions limits shown in

the following table apply, based on a 30-day rolling average emissions rate during the ozone season:

**Table 2.B: Final NOX Emissions Limits**

| Engine Type and Fuel | Final NO$_X$ Emissions Limit |
|---|---|
| Natural Gas Fired Four Stroke Rich Burn | 1.0 g/hp-hr |
| Natural Gas Fired Four Stroke Lean Burn | 1.5 g/hp-hr |
| Natural Gas Fired Two Stroke Lean Burn | 3.0 g/hp-hr |

Generally, the emission limits in Table 2.B can be met through installation and operation of the following controls: 1) NSCR on four stroke rich burn engines; 2) SCR on four stroke lean burn engines; and 3) layered combustion on two stroke lean burn engines.

In response to industry concern about the number of units captured by the proposed applicability criteria, EPA has made several changes to the applicability criteria as noted above in the *Applicability Requirements* subsection and to the emissions limits requirements in the final rule to focus the control requirements on impactful non-EGU units. Based upon EPA's 2019 NEI emissions inventory data, EPA estimates that a total of 3,005 stationary SI engines are subject to the final rule. EPA recognizes that many low-use engines are captured by the 1,000 hp design capacity applicability threshold.

Several commenters raised concerns about the proposed rule and asserted that compliance flexibility should be allowed where the installation of NOx controls is infeasible or cost-ineffective. Commenters recommended that EPA promulgate emissions averaging provisions as a remedy, as it promulgated in the 2004 NOX SIP Call Phase 2 rule, in which EPA evaluated and supported reliance on emissions averaging for RICE in the Pipeline Transportation of Natural Gas industry sector.

EPA reviewed past EPA guidance and rulemaking in which averaging plans were considered or recommended. In 1998, EPA issued the NOx SIP Call requiring certain states to reduce their NOx emissions as a means to reduce interstate ozone pollution. In 2002, EPA issued a memorandum providing guidance to the States that chose to adopt rules covering stationary RICE as part of their response to the 1998 NOx SIP Call.[20] This memo encouraged flexibility for RICE owners/operators in terms of their choices of control technology and the size of engines to be controlled, so long as each state's total budget was met. While EPA did not promulgate averaging provisions in the 2004 NOX SIP Call Phase 2 rule, we referred back to the 2002 Wegman memorandum and again noted that states that chose to regulate IC engines were encouraged to consider such flexibilities, so long as it could be demonstrated that the control measures in the SIP are collectively adequate to comply with the state's NO$_X$ budget. *See* 69 FR

---

[20] Memorandum: "State Implementation Plan (SIP) Call for Reducing Nitrogen Oxides (NOx) –Stationary Reciprocating Internal Combustion Engines", L. Wegman, US EPA OAQPS, August 22, 2002.

at 21621. The 2002 memorandum and the 2004 NOx SIP Call Phase 2 rule provide a backdrop for existing state rules allowing facility-wide averaging of NOx emissions.

EPA conducted research into several states' air quality rules containing emissions averaging plan provisions to review potential models using existing regulatory frameworks and methodologies. EPA considered relevant regulations in Colorado, Illinois, Michigan, New Jersey, New Mexico, Oklahoma, Pennsylvania, Tennessee, and Wisconsin.

The table below summarizes state provisions that allow for NOx emissions averaging. As indicated in the second column, nearly all of these provisions address emissions averaging across all RICE addressed by that State's regulations. The exception is for Texas, which allows for averaging required NOx reductions for grandfathered RICE in natural gas gathering and transmission. In the table, the "Facility Definition(s)" column summarizes key differences among the states in how a "facility" is represented in the averaging plan. Key differences in state rules include:

- Whether units allowed to be averaged are within a single facility or whether multiple facilities can be averaged (e.g., a "system-wide averaging plan");
- If multiple facilities can be addressed with a single plan:
  - Geographic limitations: for example, only units at facilities within the same ozone nonattainment area (NAA) can be included in the same plan
  - Control over operation of emissions units: most states require that all emission units be under common operational control;
- Emissions units for inclusion in a state plan: most state plans did not specify whether only affected (e.g., State RACT) units were to be included in the plan or if non-affected units could also be included. Ohio's approach provides for both affected and non-affected units to be included.
- Most states allow units to be excluded from the averaging plan, if they are otherwise compliant with the applicable defined RACT limit for that source.

The fifth column of Table 1 summarizes the specifications for NOx emissions averaging. This includes whether ozone season limitations are involved, or if annual limits are also required. For ozone season emissions, we also evaluated whether these are measured on a total seasonal basis (e.g. tons per ozone season) or on an average ozone season daily basis (e.g., on a rolling 30-day average).

The final column of the table shows exemptions for certain types of RICE. Note that these are exemptions from State NOx emissions rules, rather than exemptions from averaging plan programs.

**Table 2.C. Existing State Regulations Containing Facility Averaging Plan Provisions for RICE NOx Reductions**

| State | RICE Coverage; Citation[a] | Affected Natural Gas RICE Units | Facility Definition(s) | Form of NOx Cap | Unit Exemptions |
|---|---|---|---|---|---|
| IL | All; Ill. Admin. Code title 35, § 217.386-390 | • RICE =/>500 bhp | • Units at single "sources" (PTE>100 tpy NOx) or multiple "sources" under common control; Chicago area counties<br>• Specified RICE, mainly pipeline units statewide | • Ozone season tons<br>• Calendar year tons | • Emergency/Standby<br>• Research, landfill gas, agricultural purpose<br>• Nonstationary and <1,500 bhp |
| LA | All; Title 33, Chapter 22, § 2201 | • Baton Rouge NAA: Rich and lean burn =/>150 bhp<br>• NAA region of influence: lean burn =/>1500 bhp; rich burn =/>300 bhp | • Units at single facilities (PTE>25 tpy NOx) in the Baton Rouge NAA or (PTE>/= 50 tpy) in the NAA region of influence<br>• Units located in multiple NAA or region of influence under common control | • OSD daily; 30 day rolling average, or<br>• Ozone season lb/hr cap | • Emergency/Standby<br>• Research, landfill gas, agricultural purpose, performance/ verification testing<br>• Firefighting training<br>• Flood control<br>• Use for powering other engines |
| MI | All; R 36.1818 | • "Large NOx SIP Call Engines": >1 ton per average OSD in 1995 | • Units at single facilities or multiple facilities in the MI fine grid zone under common control | • </= total 2007 ozone season NOx | • None specified |
| NJ | All; N.J.A.C. 7:27-19 | • Rich or lean burn >500 bhp<br>• Lean burn >200 and <500 bhp | • No specifications provided for averaging units in separate facilities | • OSD daily actual < allowable<br>• Non-OSD monthly actual < allowable | • None specified |

| State | RICE Coverage; Citation[a] | Affected Natural Gas RICE Units | Facility Definition(s) | Form of NOx Cap | Unit Exemptions |
|---|---|---|---|---|---|
| NY | All; 6 NYCRR § 227-2.5 | • RICE >200 bhp inside severe ozone NAA <br> • RICE >400 bhp outside severe ozone NAA | • Referred to as a "system." Multiple emission sources at different facilities in the same ozone NAA can be included in the system averaging plan. <br> • Can include multiple owners/ operators | • Maintain "weighted average permissible emissions rate" from the plan. | • Emergency generators <br> • Research and development or quality assurance testing |
| OH | All; Ohio Admin. Code 3745-110-03(I) | • RICE >500 bhp | • No specification for operational control <br> • Affected and non-affected sources can be included | • Actual NOx tpy < allowable NOx tpy | • Engine testing operations <br> • Permitted units with permitted restrictions resulting in <25 tpy NOx <br> • Affected units with capacity factors of <10% annually during a 3-yr rolling average |
| OK | All; OAC Title 252, Chapter 100, Subchapter 11 | • All fuel burning equipment >50 MMBtu/hr | • Multiple facilities can be included which are on adjacent properties and affect the same airshed <br> • Multiple facilities must be under control of the same owner or operator | • Actual NOx emissions < allowable NOx, no averaging time specified | • None specified |
| PA | All; PA Title 25, § 129 | • RICE >500 bhp | • Multiple units at a facility can be included or units at multiple facilities for system-wide averaging <br> • Facilities within a system must be within the same NAA <br> • Facilities must be under control of the same owner or operator | • Actual NOx emissions </= allowable NOx, 30-day rolling average | • Units with PTE <1 tpy NOx |

| State | RICE Coverage; Citation[a] | Affected Natural Gas RICE Units | Facility Definition(s) | Form of NOx Cap | Unit Exemptions |
|---|---|---|---|---|---|
| | | | • Each unit must be subject to a NOx RACT emissions limit | | |
| TX | Natural gas gathering or transmission RICE; 30 TAC §116.779(b)(3) | • All grandfathered RICE | • Specific provisions provided for grandfathered RICE used in natural gas gathering and transmission; allows averaging of required NOx reduction across units (50% east TX region; 20% west TX region • Averaging of reductions across east and west TX regions; but reductions achieved in east region must =/> required reductions | • Actual NOx emissions < allowable NOx, no averaging time specified | • None specified |
| VA | All: 9VAC5, Chapter 40, §§ 7370 – 7540 | • RICE >/=450 bhp | • No specifications for averaging plans are present; but since RACT for RICE NOx limitations are not specified, a case-specific plan is required. Conceivably, that plan could include an averaging approach. | • Actual NOx emissions < allowable NOx, no averaging time specified | • Emergency generators |
| WI | All; Wis. Adm. Code Chapter NR 428, § 428.25 (1) | • RICE =/>1000 bhp | • Multiple units at one facility can be included as well as averaging across facilities • Multiple owners/operators can be included | • Actual ozone season NOx < Allowable ozone season NOx • Actual annual NOx < Allowable annual NOx | • Units used to restart electricity generating units; Fire emergency water pumps; research & development units; engine testing • Backup generators operating <500 hours/yr or <200 hours during the ozone season |

| State | RICE Coverage; Citation[a] | Affected Natural Gas RICE Units | Facility Definition(s) | Form of NOx Cap | Unit Exemptions |
|---|---|---|---|---|---|
| | | | | | • <10% annual capacity factor, 3-yr rolling basis or <20% for utility owned engines |

Abbreviations: bhp – brake horse-power; MMBtu/hr – million British thermal units per hour; MW – megawatt; NAA – nonattainment area; OSD – ozone season day; PTE – potential to emit; RICE – reciprocating internal combustion engine; tpy – tons per year

[a]Weblinks to state regulatory text:

IL: https://pcb.illinois.gov/documents/dsweb/Get/Document-11928/ (URL dated February 6, 2023).
LA: https://deq.louisiana.gov/assets/docs/Air/Enforcement/Title33.pdf (URL dated February 6, 2023).
MI: https://www.michigan.gov/-/media/Project/Websites/egle/Documents/Laws-Rules/AQD/apc-part8-2009-05-28-amended.pdf?rev=9194185cf0f7489e83c8c906be6bbea8 (URL dated February 6, 2023).
NJ: https://www.nj.gov/dep/aqm/currentrules/Sub19.pdf (URL dated February 6, 2023).
NY: https://www.dec.ny.gov/regs/2492.html (URL dated February 6, 2023).
OH: https://codes.ohio.gov/ohio-administrative-code/rule-3745-110-03 (URL dated February 6, 2023).
OK: https://www.deq.ok.gov/wp-content/uploads/deqmainresources/100.pdf (URL dated February 6, 2023).
PA: http://www.pacodeandbulletin.gov/Display/pacode?file=/secure/pacode/data/025/chapter129/s129.98.html&d=reduce (URL dated February 6, 2023).
TX: https://www.tceq.texas.gov/assets/public/legal/rules/rules/pdflib/116h.pdf (URL dated February 6, 2023).
VA: https://www.deq.virginia.gov/home/showpublisheddocument/4168/637461452622230000 (URL dated February 6, 2023).
WI: https://docs.legis.wisconsin.gov/code/admin_code/nr/400/428.pdf (URL dated February 6, 2023).

553a

EPA conducted an analysis to evaluate the anticipated effect of a facility-wide emissions averaging compliance alternative. To estimate the number of facilities that may take advantage of the Facility-Wide Averaging Plan provisions, and the number of affected units that would install controls under such an emissions averaging plan, EPA conducted an analysis on a subset of the estimated 3,005 stationary IC engines subject to the final rule. EPA evaluated the reported actual $NO_X$ emissions data in tpy from a subset of facilities in the covered states using 2019 NEI data for stationary IC engines with design capacities of 1,000 hp or greater. Using this subset of facilities, EPA then identified a number of facilities that have more than one affected engine, calculated each facility's emissions "cap" as the total $NO_X$ emissions (in tons per year (tpy)) allowed facility-wide based on the unit-specific $NO_X$ emissions limits applicable to all affected units at the facility, and identified a number of higher-emitting engines at each facility that were candidates for having controls installed. For engines that EPA identified were likely to install controls, EPA assumed that four stroke rich burn engines, four stroke lean burn engines, and two stroke lean burn engines could achieve a $NO_X$ emissions rate of 0.5 g/hp-hr with the installation of SCR based on data obtained from the Ozone Transport Commission report entitled *Technical Information Oil and Gas Sector Significant Stationary Sources of $NO_X$ Emissions* (October 17, 2012). For the remaining engines identified as uncontrolled, EPA assumed a $NO_X$ emissions rate of 16 g/hp-hr for all engine types. Thus, under the assumed averaging scenarios, engines with controls installed would achieve emissions levels below the emissions limits in the final rule and would offset the higher emissions from the remaining uncontrolled units. EPA then calculated the total facility-wide emissions (in tpy) under various assumed averaging scenarios and compared those totals to each facility's calculated emissions cap (in tpy) to estimate the number of affected units at each facility that would need to install controls to ensure that total facility-wide emissions remained below the emissions cap.

For each facility in the subset, the next step in the analysis was to determine the average of the actual 2019 NEI emissions (tpy) of only engines for which no controls had been applied in the previous cap compliance step. The average actual 2019 emissions (tpy) for facilities in this subset was found to be 21 tpy NOx emissions. The next step in the analysis was to apply the 21 tpy uncontrolled emissions (tpy) threshold to the entire estimated 3,005 stationary IC engines subject to the rule. The application of this threshold to the engines subject to the final rule determined the estimated number of affected engines that would be expected to have controls installed under a facility-wide emissions averaging plan scenario. Based on this analysis, EPA found that emissions averaging should allow most facilities to install controls on approximately one-third of the engines at their sites, on average, while complying with the applicable $NO_X$ emissions cap on a facility-wide basis.

Following a review of public comments and evaluating the results of the analysis conducted, EPA is finalizing a facility-level emissions averaging provision as an alternative means of compliance with the emissions limits established in § 52.41(c). The requirements that we are finalizing for engines in the Pipeline Transportation of Natural Gas industry include provisions allowing source owner/operators to request EPA approval of facility-wide emissions averaging plans, which will enable owners and operators of affected units to take costs, installation timing needs, and other considerations into account in deciding which affected engines to control. Facility-wide emissions averaging plans will allow facility owners and operators to determine how to best achieve the necessary emissions reductions by installing

controls on the affected engines with the greatest emissions reduction potential rather than on units with lower actual emissions where the installation of controls would be less cost effective.

An owner or operator of a facility containing more than one affected unit may elect to use an EPA-approved Facility-Wide Averaging Plan as an alternative means of compliance with the NO$_X$ emissions limits in § 52.41(c). An approved Facility-Wide Averaging Plan will allow the owner or operator of the facility to average emissions across all participating units and thus to select the most cost-effective means for installing the necessary controls (i.e., by installing controls on the subset of engines that provide the greatest emissions reduction potential at lowest costs and avoiding installation of controls on equipment that is infrequently operated or otherwise less cost-effective to control). So long as all of the emissions units covered by the Facility-Wide Averaging Plan collectively emit less than or equal to the total amount that would be emitted if each covered unit individually met the applicable NO$_X$ emissions limitations, the covered units will be in compliance with the final rule. Under this alternative compliance option, facilities have the flexibility to prioritize emissions reductions from larger, dirtier engines.

The owner or operator of such a facility that elects to use a facility-wide emissions averaging plan must submit a request to EPA that, among other things, specifies the affected units that will be covered by the plan, provides facility and unit-level identification information, identifies a facility-wide emissions "cap" (in tpd) that the facility must comply with on a 30-day rolling average basis, and provides the calculation methodology used to demonstrate compliance with the identified emissions cap. The final rule defines "cap" to mean "the total amount of NOx emissions, in tons per day on a 30-day rolling average basis, that is collectively allowed from all of the affected units covered by a Facility-Wide Averaging Plan and is calculated as the sum each affected unit's NOx emissions at the emissions limit applicable to such unit under paragraph (c) of this section, converted to tons per day in accordance with [section 52.41(d)(3)]." The calculation of a facility's emissions "cap" is based in part on each affected unit's average daily operating hours. EPA will approve a request for a Facility-Wide Averaging Plan if EPA determines that the facility-wide emissions total (in tpd), based on a 30-day rolling emissions average basis during the ozone season, is less than the emissions cap (in tpd) and the plan establishes satisfactory means for determining initial and continuous compliance, including appropriate testing, monitoring, recordkeeping requirements. In calculating the facility-wide emissions total during the ozone season, affected engines covered by the Facility-Wide Averaging Plan must be identified by each engine's nameplate capacity in horsepower, its actual operating hours during the ozone season, and its emissions rates in g/hp-hr from certified engine data or from the most recent performance test results for non-certified engines according to § 52.41(e). For affected engines that meet the certification requirements of § 60.4243(a), the facility-wide emissions calculations may be based on certified engine emissions standards data pursuant to § 60.4243(a), instead of performance tests. An affected unit listed in an EPA-approved Facility-Wide Averaging Plan cannot be withdrawn from such plan, and the terms of an approved Facility-Wide Averaging Plan may not be changed unless approved in writing by the Administrator.

**Performance Tests and Monitoring**

Affected units subject to this rule that operate NOx CEMS meeting specified requirements may use CEMS data to demonstrate compliance.

With respect to affected units that do not operate CEMS, EPA received comments concerning the proposed semi-annual NOx performance testing to demonstrate continual compliance. As commenters pointed out, the emissions limits in these final FIPs only apply during the ozone season and testing once per calendar year should be sufficient to confirm the accuracy of the parameters being monitored to demonstrate continuous compliance during the ozone season. The final rule contains provisions requiring owners and operators of affected units that do not operate CEMS to conduct annual $NO_X$ performance tests, to monitor and record hours of operation and fuel consumption, and to use continuous parametric monitoring systems to demonstrate ongoing compliance with the applicable $NO_X$ emissions limits. To avoid challenges in scheduling and availability of testing firms, the annual performance tests do not have to be conducted during the ozone season. Owners and operators of affected units must also reassess and adjust the site-specific operating parameters in accordance with the results of each performance test, and report and include ongoing site-specific operating parameter data in the annual reports to EPA and the semi-annual title V monitoring reports to the relevant air permitting authority.

# 3 Cement and Concrete Product Manufacturing

**Process Description**[21]

Cement kilns are used by the cement industry in the production of cement. Portland cement, used in almost all construction applications, is the industry's primary product. Essentially all of the NOx emissions associated with cement manufacturing are generated in the kilns because of high process temperatures.

Detailed information describing cement production can be found in Section 3 of the TSD to the proposal and is not repeated here.

**Federal Rules Affecting Cement Plants**

Cement plants are subject to the Portland Cement NESHAP (40 CFR part 63 subpart LLL) and NSPS (40 CFR part 60, subpart F). Cement kilns that burn hazardous waste are subject to the Hazardous Waste Combustor NESHAP (40 CFR part 63 subpart LLL). Cement kilns that burn non-hazardous solid wastes are subject to the Commercial and Industrial Solid Waste Incinerator Units (CISWI) rule (40 CFR part 60, subparts CCCC and DDDD).

The NSPS implementing Clean Air Act (CAA) section 111(b) for Portland Cement Plants was first promulgated at 40 CFR part 60, subpart F on December 23, 1971 (36 FR 24876). EPA conducted three additional reviews of these standards on June 14, 1974 (39 FR 20793), November 12, 1974 (39 FR 39874) and December 14, 1988 (53 FR 50354). NOx emissions were not regulated under part 60, subpart F at that time.

On June 16, 2008 (73 FR 34072), EPA proposed amendments to the NSPS for Portland Cement Plants. The proposed amendments included revisions to the emission limits for affected facilities which commence construction, modification, or reconstruction after June 16, 2008. Among other things, EPA proposed establishing a NOx emission limit for cement kilns at portland cement plants.[22]

On September 9, 2010 (75 FR 54970) EPA finalized the proposed amendments to the NSPS establishing a NOx emission limit, among other things, for portland cement plants that commence construction, modification, or reconstruction after June 16, 2008. This final rule became effective on November 8, 2010 and is codified at 40 CFR part 60 subpart F.

**NOx Controls**

The National Association of Clean Air Agencies (NACAA, formerly STAPPA/ALAPCO) has recommended requiring combustion controls and selective non-catalytic reduction (SNCR) to achieve NOx reductions of up to 70 percent on certain processes at

---

[21] See generally EPA, "AP-42 Compilation of Air Emissions Factors," Chapter 11, Mineral Products Industry, Section 11.6, Portland Cement Manufacturing, Final Section (January 1995).

[22] 73 FR 34072 (proposed NSPS for Portland Cement Plants), Docket IN No. EPA–HQ–OAR–2007–0877.

cement kilns.[23] SNCR is a post combustion control technology used to reduce NOx emissions without the presence of a catalyst. Reagent (Ammonia or Urea) is injected directly into flue gas and reacts with NOx resulting in Nitrogen ($N_2$) and water ($H_2O$).

SNCR avoids the problems related to catalyst fouling that occur during use of SCR technology but requires injection of the reagents in the kiln at a temperature between 1600 to 2000°F, which is much higher than the typical temperatures for SCR operation (550-800°F). At these temperatures urea decomposes to produce ammonia which is responsible for NOx reduction. Because of the temperature constraint, SNCR technology is only applicable to preheater and precalciner kilns.[24] Preheater and precalciner kilns require relatively simple SNCR installations. In preheater/precalciner kiln design, the SNCR injection ports can be installed in the combustion zone in the calciner, the oxidation zone of the upper air inlet before the deflection chamber, or in the area after the mixing chamber before the inlet to the bottom. SNCR has been installed and is currently operating on numerous kilns in Europe and the U.S.

SCR is a process that uses ammonia in the presence of a catalyst to selectively reduce NOx emissions from exhaust gases. This technology was at first widely used for NOx abatement in other industries, such as coal-fired power stations and waste incinerators. In SCR, anhydrous ammonia, usually diluted with air or steam, is injected through a grid system into hot flue gases which are then passed through a catalyst bed to carry out NOx reduction reactions. Ammonia is typically injected to produce a $NH_3$ to NOx molar ratio of 1.05-1.1:1 to achieve a NOx conversion of 80 to 90 percent with an ammonia "slip" of about 10 ppm of unreacted ammonia in the gases leaving the reactor. In the cement industry, basically two SCR systems are being considered: low dust exhaust gas and high dust exhaust gas treatment. Low dust exhaust gas systems require reheating of the exhaust gases after dedusting, resulting in additional cost. High dust systems are considered preferable for technical and economical reasons.[25] While SCR installations are not common at cement kilns in the U.S, EPA is aware of one SCR system that has been installed on a cement kiln in Joppa, Illinois.[26]

The European Union Commission charged with establishing the Best Available Techniques (BAT) to control NOx emissions from the production of cement outlines the following control techniques presented in Table 3.A below.

---

[23] STAPPA/ALAPCO, Controlling Nitrogen Oxides Under the Clean Air Act: A Menu of Options, 72-73 (July 1994).

[24] EPA, NOx Control Technologies for the Cement Industry: Final Report, 6 (September 2000).

[25] Official Journal of European Union Commission, Best Available Techniques (BAT) Conclusions Under Directive 2010/75/EU of the European Parliament and of the Council on Industrial Emissions for the Production of Cement, Lime and Magnesium Oxide, March 26, 2013, at 42.

[26] State of Illinois Clean Air Act Program Permit No. 95090119 (issued September 11, 2018, to Holcim US, Inc. - Joppa Plant, 2500 Portland Road, Grand Chain, IL 62941), Section 4.1 Cement Kilns and Clinker Coolers, Kiln #1. See also Lafarge, North America, Inc., Clean Air Act Settlement (overview of injunctive relief, available at https://www.epa.gov/enforcement/lafarge-north-america-inc-clean-air-act-settlement (URL dated October 12, 2021)).

**Table 3.A: European Union Commission NOX BAT Controls**

| Primary Techniques/Measures | Description |
|---|---|
| Flame Cooling | The addition of water to the fuel or directly to the flame by using different injection methods, such as injection of one fluid (liquid) or two fluids (liquid and compressed air or solids) or the use of liquid/solid wastes with a high water content reduces the temperature and increases the concentration of hydroxyl radicals. This can have a positive effect on NOx reduction in the burning zone. |
| Low NOx Burners | Designs of low NOx burners (indirect firing) vary in detail but essentially the fuel and air are injected into the kiln through concentric tubes. The primary air proportion is reduced to some 6 - 10% of that required for stoichiometric combustion (typically 10 - 15% in traditional burners). Axial air is injected at high momentum in the outer channel. The coal may be blown through the center pipe or the middle channel. A third channel is used for swirl air, its swirl being induced by vanes at, or behind, the outlet of the firing pipe. The net effect of this burner design is to produce very early ignition, especially of the volatile compounds in the fuel, in an oxygen-deficient atmosphere, and this will tend to reduce the formation of NOx. The application of low NOx burners is not always followed by a reduction of NOx emissions. The set-up of the burner has to be optimized. |
| Mid Kiln Firing | In long wet and long dry kilns, the creation of a reducing zone by firing lump fuel can reduce NOx emissions. As long kilns usually have no access to a temperature zone of about 900 -1000°C, mid-kiln firing systems can be installed in order to be able to use waste fuels that cannot pass the main burner (for example tires). The rate of the burning of fuels can be critical. If it is too slow, reducing conditions can occur in the burning zone, which may severely affect product quality. If it is too high, the kiln chain section can be overheated - resulting in the chains being burned out. A temperature range of less than 1100°C excludes the use of hazardous waste with a chlorine content of greater than 1%. |
| Addition of mineralizers to improve the burnability of the raw meal (mineralized clinker) | The addition of mineralizers, such as fluorine, to the raw material is a technique to adjust the clinker quality and allow the sintering zone temperature to be reduced. By reducing/lowering the burning temperature, NOx formation is also reduced. |
| Staged combustion (conventional or waste fuels), also in combination | Staged combustion is applied at cement kilns with an especially designed precalciner. The first combustion stage takes place in the rotary kiln under optimum conditions for the clinker burning process. The second combustion stage is a burner at the kiln inlet, which produces a reducing |

| Primary Techniques/Measures | Description |
|---|---|
| with a precalciner and the use of optimized fuel mix | atmosphere that decomposes a portion of the nitrogen oxides generated in the sintering zone. The high temperature in this zone is particularly favorable for the reaction which reconverts the NOx to elementary nitrogen. In the third combustion stage, the calcining fuel is fed into the calciner with an amount of tertiary air, producing a reducing atmosphere there, too. This system reduces the generation of NOx from the fuel, and also decreases the NOx coming out of the kiln. In the fourth and final combustion stage, the remaining tertiary air is fed into the system as 'top air' for residual combustion. |
| SNCR | Selective non-catalytic reduction (SNCR) involves injecting ammonia water (up to 25% $NH_3$), ammonia precursor compounds or urea solution into the combustion gas to reduce NO to $N_2$. The reaction has an optimum effect in a temperature window of about 830 - 1050°C, and sufficient retention time must be provided for the injected agents to react with NO. |
| SCR | SCR reduces NO and $NO_2$ to Nitrogen with the help of $NH_3$ and a catalyst at a temperature range of 300 - 400°C. This technique was initially started for NOx abatement in other industries (coal fired power stations, waste incinerators) and is now available in the cement manufacturing industry. |

Reproduced from Official Journal of European Union Commission, Best Available Techniques (BAT) Conclusions Under Directive 2010/75/EU of the European Parliament and of the Council on Industrial Emissions for the Production of Cement, Lime and Magnesium Oxide, March 26, 2013, Table 1.5.2.

EPA's Menu of Control Measures (MCM) provides state, local and tribal air agencies with information on existing criteria pollutant emission reduction measures as well as relevant information concerning the efficiency and cost effectiveness of the measures.[27] State, local, and tribal agencies may use this information in developing emission reduction strategies, plans and programs to assure they attain and maintain the NAAQS. The information from the MCM can also be found in the Control Measures Database (CMDB), a major input to the Control Strategy Tool (CoST), which EPA used in the NOx control strategy analysis included in the Non-EGU Screening Assessment memorandum.[28] Information about control measures to reduce NOx emissions from cement kiln operations is presented in Table 3.B below.

---

[27] EPA, Menu of Control Measures for NAAQS Implementation, available at https://www.epa.gov/air-quality-implementation-plans/menu-control-measures-naaqs-implementation (URL dated January 5, 2022).

[28] EPA, Control Measures Database (CMDB) for Stationary Sources, available at https://www.epa.gov/system/files/other-files/2021-09/cmdb_2021-09-02_0.zip (URL dated January 6, 2022).

**Table 3.B: List of NO$_X$ Controls Available for Cement Kilns**

| Source Category | Emission Reduction Measure | Control Efficiency (%) | Description/Notes/Caveats | References |
|---|---|---|---|---|
| Cement kilns | Biosolid Injection Technology | 23 | This control is the use of biosolid injection to reduce NOx emissions. This control applies to cement kilns. | EPA 2006b, EPA 2007c |
| Cement kilns | Changing feed composition | 25-40 | This control is changing the cement formulation by adding steel slag to lower the clinkering temperatures and suppress NOx. The patented feed modification technique known as the CemStar Process is a raw feed modification process that can reduce NOx emissions by about 30 percent and increase production by approximately 15 percent. It involves the addition of a small amount of steel slag to the raw kiln feed. Steel slag has a chemical composition similar to clinker and many of the chemical reactions required to convert steel slag to clinker take place in the steel furnace. By substituting steel slag for a portion of the raw materials, facilities can increase thermal efficiency and thereby reduce NOx emissions. This control is applicable to wet- and dry-process kilns, as well as those with preheaters or precalciners. | STAPPA/ALAPCO 2006 |
| Cement Kilns | Process Control Systems | <25 | This control is the modification of the cement production process to improve fuel efficiency, increase capacity and kiln operational stability. NOx reductions result from the increase in productivity and reduced energy use. One process control that specifically targets NOx emissions is continuous emissions monitoring systems (CEMS). CEMS allow operators to continuously monitor oxygen and carbon monoxide (CO) emissions in cement kiln exhaust gases. The levels of these gases indicate the amount of | STAPPA/ALAPCO 2006 |

USCA Case #23-1157    Document #2009932    Filed: 07/27/2023    Page 607 of 944

| Source Category | Emission Reduction Measure | Control Efficiency (%) | Description/Notes/Caveats | References |
|---|---|---|---|---|
| | | | excess air in the combustion zone. At a given excess air level, NOx emissions increase as the temperature increases. Knowing the excess air level allows operators to maintain a lower temperature and thereby minimize NOx creation. Studies indicate that reducing excess air by half can reduce NOx emissions by about 15 percent. This control is applicable to wet- and dry-process kilns, as well as those with preheaters or precalciners. | |
| Cement Manufacturing - Dry Process | Selective Non-Catalytic Reduction - Ammonia | 50 | This control is the reduction of NOx emission through ammonia based selective non-catalytic reduction add-on controls. SNCR controls are post-combustion control technologies based on the chemical reduction of nitrogen oxides (NOx) into molecular nitrogen ($N_2$) and water vapor ($H_2O$). This control applies to dry-process cement manufacturing operations with uncontrolled NOx emissions greater than 10 tons per year. | EPA 2006b, Pechan 2001, EPA 1998e, EPA 2002a, EPA 1994h |
| Cement Manufacturing - Dry Process | Selective Non-Catalytic Reduction – Urea | 50 | This control is the reduction of NOx emission through urea based selective non-catalytic reduction add-on controls. SNCR controls are post-combustion control technologies based on the chemical reduction of nitrogen oxides (NOx) into molecular nitrogen ($N_2$) and water vapor ($H_2O$). This control applies to dry-process cement manufacturing with uncontrolled NOx emissions greater than 10 tons per year. | EPA 2006b, EPA 1998e, EPA 2002a, EPA 1994h |
| Cement Manufacturing - Dry Process or Wet Process | Low NOx Burner | 25 | This control is the use of low NOx burner (LNB) technology to reduce NOx emissions. LNBs reduce the amount of NOx created from reaction between fuel nitrogen and oxygen by lowering the temperature of | EPA 2006b, EPA 1998e, EPA 2002a, EPA 1994h, EC/R 2000 |

| Source Category | Emission Reduction Measure | Control Efficiency (%) | Description/Notes/Caveats | References |
|---|---|---|---|---|
| | | | one combustion zone and reducing the amount of oxygen available in another. This control applies to dry-process or wet-process cement manufacturing operations with indirect-fired kilns with uncontrolled NOx emissions greater 10 tons per year. | |
| Cement Manufacturing - Dry Process or Wet Process | Mid-Kiln Firing | 30 | This control is the use of mid-kiln firing to reduce NOx emissions. Mid-kiln firing is the injection of solid fuel into the calcining zone of a long kiln. This allows for part of the fuel to be burned at a lower temperature, reducing NOx formation. This control applies to wet-process and dry-process cement manufacturing operations with uncontrolled NOx emissions greater than 10 tons per year. | EPA 2006b, EPA 1998e, EPA 2002a, EPA 1994h, EC/R 2000 |
| Cement Manufacturing - Wet Process | Selective Catalytic Reduction | 90 | This control is the selective catalytic reduction of NOx through add-on controls. SCR controls are post-combustion control technologies based on the chemical reduction of nitrogen oxides (NOx) into molecular nitrogen (N2) and water vapor (H2O). The SCR utilizes a catalyst to increase the NOx removal efficiency, which allows the process to occur at lower temperatures. This control applies to wet-process cement manufacturing with uncontrolled NOx emissions greater than 10 tons per year. | EPA 2007b |

Reproduced from EPA, Menu of Control Measures for NAAQS Implementation, available at https://www.epa.gov/air-quality-implementation-plans/menu-control-measures-naaqs-implementation (URL dated January 5, 2022).

**State RACT Rules**

EPA reviewed information provided in a SIP submission from the Texas Commission on Environmental Quality (TCEQ) concerning NOx control technologies that have been implemented at portland cement plants.[29]

- Texas, Ellis County -Three companies currently operate four kilns in Midlothian, Ellis County. Since 2015, no cement plant is using wet kilns.

- Ash Grove Cement Company (Ash Grove) operated three kilns in Ellis County. However, a 2013 consent decree with EPA required by September 10, 2014 shutdown of two kilns and reconstruction of kiln #3 with SNCR with an emission limit of 1.5 pounds of NOx per ton of clinker and a 12-month rolling tonnage limit for NOx of 975 tpy. The reconstructed kiln is a dry kiln with year-round SNCR operation and is subject to the 1.5 lb NOx/ton of clinker emission standards in the NSPS for Portland Cement Plants. EPA has delegated authority to enforce this NSPS to the TCEQ and the NSPS satisfies RACT for Ash Grove.[30]

- Holcim U.S., Inc. (formerly Holnam) currently has two dry preheater/precalciner (PH/PC) kilns equipped with SNCR. On January 14, 2009, EPA approved the current source cap of 5.3 tons per day (tpd) NOx for Holcim at 30 TAC §117.3123 as satisfying RACT for 1997 8-hours ozone NAAQS.[31]

- Texas Industries, Inc. (TXI) currently operates one dry (PH/PC) kiln #5. The permitted capacity of this kiln is 2,800,000 tons of clinker per year, and it has a permitted emissions factor of 1.95 lb NOx/ton of clinker. Based on these permit limits, this kiln is therefore limited to a maximum of 7.48 tpd NOx, compared to the current 30 TAC §117.3123 source cap of 7.9 tpd NOx. Kiln #5 typically operates well below the source cap, at an average emission factor below 1.5 lb NOx/ton of clinker. EPA approved this limit as RACT on February 22, 2019 (84 FR 5601). The current NOx Source Cap (tpd) for Ellis County cement plants is shown below.

**Table 3.D: NOX Source Cap for Ellis County Cement Plant**

| Cement Plant | NOx Cap - tpd |
|---|---|
| Ash Grove | 4.4 |
| Holcim | 5.3 |
| TXI | 7.9 |
| Total | 17.6 |

---

[29] See TCEQ, Appendix F, Reasonably Available Control Technology Analysis, Dallas-Fort Worth Serious Classification Attainment Demonstration SIP Revision, TCEQ Project Number 2019-078-SIP-NR, available at https://www.tceq.texas.gov/assets/public/implementation/air/sip/dfw/dfw_ad_sip_2019/DFWAD_19078SIP_Appendix_F_pro.pdf (URL dated October 12, 2021).

[30] Delegation Documents for State of Texas, see https://www.epa.gov/tx/region-6-delegation-documents-state-texas-0.

[31] January 14, 2009 (74 FR 1927).

**Emission Limits and Compliance Requirements in the Final Rule**

In setting the emission limits for long wet kilns, EPA considered a range of emission limits from 3.88 to 6.0 lb/ton of clinker produced. EPA reviewed a 2008 ozone NAAQS RACT standard of 3.88 limit. *See* 25 Pa. Code 129.97 (h)(1). EPA initially approved a NOx emissions limit of 4.0 lb/ton of clinker (Texas Administrative Code (TAC), title 30, chapter 117, section 117.265), under the 1-hour ozone NAAQS, for long wet kilns in Ellis County, Texas. *See* Table III, entry for long wet kiln in Ellis County, at (69 FR 15685, March 26, 2004). This limit was later reaffirmed by approving 30 TAC section 117.3110(a)(1)(B), . *See* 74 FR 1927 (January 14, 2009). Also, *see* Chapter V of the TSD for the 2009 approval rulemaking action made available in docket. It is evident and has been shown in practice that a NOx emissions limit of 4.0 using is achievable using a post combustion control device like SNCR. The final rule establishes an emissions limit of 4.0 lb/ton clinker for long wet kilns (as we had proposed).

For setting emission limits for long dry kilns, EPA reviewed the consent agreement and final order (CAFO) for Docket No. CAA-01-2013-0053 issued to Dragon Products Company, in Maine; LaFarge Building Materials – Ravena Cement Plant of New York [subject to NSPS, 40 CFR 60.62(a)]; Hercules Cement Company LP/Stockertown in Pennsylvania [subject to 25 Pa Code §129.97(h)(2), 2008 Ozone RACT]; and Holcim US, Inc – Joppa Plan in Illinois [subject to 35 IAC 217.224(a), 2008 Ozone RACT]. These plants are assigned NOx emissions limit of 2.33, 1.5, 3.44, and 5.1 lbs/ton of clinker, respectively, averaging an emissions limit of 3.1. EPA also reviewed a NOx emission limit of 5.1 lbs/ton of clinker (69 FR 15681; March 26, 2004). We also reviewed the EPA-approved Texas SIP limit at 30 TAC 117.3110(a)(2), which is 5.1 lbs/ton of clinker. We note that the  LaFarge cement plant in New York, is required to comply with a limit of 1.5 lbs/ton of clinker. For the Joppa Illinois plant, air permit 9509119 – at section 8.2 subpart H identifies a limit of 5.1 lbs/ton of clinker for kiln #2. Kiln #2 (J-47) is not equipped with post-combustion controls such as SNCR. Several data in our review showed 5.1 lbs/ton of clinker to be a typical limit when a source operates without SNCR. The ERG cement study comparing common post combustion NOx abatement technologies for NOx emissions control has shown that SNCR in practice is capable of achieving NOx reduction of 40-71 percent.[32] Taking the largest emission limit of 5.1 lbs/ton of clinker from the above list and applying a conservative (the lower end of the achieved NOx emissions reduction range) control efficiency of 41% reduction through use of SNCR as control device ((5.1-3.0)/(5.1) x 100 = 41) would result in an emission limit of 3.0 lb/ton. The final rule establishes an emissions limit of 3.0 lb/ton clinker for long dry kilns (as we had proposed).

For setting emission limits for pre-calciner kilns, EPA reviewed a 2008 ozone NAAQS RACT standard, Regulation 19, Rule 13, Section 301.1, Bay Area Air Quality Management District (BAAQMD). This rule establishes a limit of 2.3 lbs/ton of clinker. EPA reviewed BAAQMD Lehigh Southwest Cement Company air permit #A0017. Section III, Table II B - Abatement Devices of said permit sets forth a limit of 2.3 lbs/ton of clinker. EPA also reviewed a

---

[32] ERG, Inc, Final Report, July 14, 2006, (TCEQ Contract No.  582-04-65589 Work Order No.05-06), ASSESSMENT OF NOx EMISSIONS REDUCTION STRATEGIES FOR CEMENT KILNS - ELLIS COUNTY, Table 4-3.1, page 4-47. Also, see  https://www.tceq.texas.gov/airquality/stationary-rules/BSA_settle.html (URL dated February 28, 2023).

consent decree in civil action No. 09-cv-0019-MSK-MEH (D. Colo.) entered with Cemex Construction Materials South LLC – Lyons Cement Plant of Colorado. The CD requires a limit of 1.85 to 3.11 lbs/ton of clinker, with SNCR as the control device. *See also* Colorado Department of Public Health Operating Permit 95OPBO082. Based on the range of emissions limit identified in the agreement above, permit #A0017, and BAAQMD Rule 13, Section 301.1, the final rule establishes an emissions limit of 2.3 lb/ton clinker for pre-calciner kilns (as we had proposed).

For setting emission limits for preheaters, EPA based the emission limit of 3.8 lb/ton on EPA-approved Texas and Illinois standards. *See, e.g.*, Appendix F, Reasonably Available Control Technology Analysis, https://www.tceq.texas.gov/assets/public/implementation/air/sip/dfw/dfw_ad_sip_2019/DFWAD _19078SIP_Appendix_F_pro.pdf (URL dated October 12, 2021); Illinois 35 IAC 217.224(a). Also *see* Table III at (69 FR 15681, March 26, 2004). The final rule establishes an emissions limit of 3.8 lb/ton clinker for preheater kilns (as we had proposed).

For setting emission limits for preheater/precalciner kilns, EPA reviewed a 2008 ozone NAAQS RACT standard, Pennsylvania Rule 25 Pa Code §129.97(h)(3). This rule establishes a limit of 2.36 lbs/ton of clinker. EPA reviewed Illinois Rule 35 IAC 217.224(a). This rule establishes a limit of 2.8 lbs/ton of clinker. EPA also reviewed California Rule 1161(C)(2).This rule establishes a limit of 2.8 lbs/ton of clinker. See MDAQMD Federal Operating Permit  # 100005 permits for CEMEX Construction Materials Pacific - Victorville and Apple Valley, Permit Number: 11800001 MDAQMD Federal Operating Permit Mitsubishi Cement Corporation. EPA also reviewed January 14, 2009 (74 FR 1927), Docket ID No. EPA-R06-OAR-2007-1147; and January 14, 2009 (74 FR 1903), Docket ID No. EPA-R06-OAR-2007-0524 establishing a limit of 2.8 lbs/ton of clinker. Both dockets are available at www.regulations.gov. See also 30 TAC 117.3110(a)(4). Based on above information, the final rule establishes an emissions limit of 2.8 lb/ton clinker for preheater kilns (as we had proposed).

Generally, the emission limits in the final rule can be met through installation and operation of SNCR on all types of cement kilns covered by the final rule.

**Performance Tests and Monitoring**

In the final rule, EPA is requiring that performance tests be conducted on annual basis and in accordance with the applicable reference test methods in 40 CFR part 60, any alternative test method approved by EPA as of the effective date of the final rule, or other methods and procedures approved by EPA through notice-and-comment rulemaking.

EPA solicited comment on whether it was feasible or appropriate to require affected units (kilns) to be equipped with continuous emission monitoring systems (CEMS) to measure and monitor the NOx concentration (emissions level) instead of conducting performance tests on a semiannual basis (as we had proposed).

In response to comments received, EPA has established provisions in the final rule allowing affected units in this industry that operate NOx CEMS meeting specified requirements

to use CEMS data in lieu of performance tests and parametric monitoring to demonstrate compliance. For affected units that do not operate a NOx CEMS, the final rule requires owners and operators to conduct an initial performance test before the 2026 ozone season to establish appropriate ranges for operating parameters and to subsequently conduct annual $NO_X$ performance tests. The final rule also requires owners and operators to monitor and record kiln stack exhaust gas flow rate, hourly clinker production rate or kiln feed rate, and stack exhaust temperature during the initial performance test and subsequent annual performance tests, and to continuously monitor and record those parameters to demonstrate continuous compliance with the NOx emissions limits. To avoid challenges in scheduling and availability of testing firms, the annual performance tests do not have to be conducted during the ozone season.

Owners and operators of affected units must also reassess and adjust the site-specific operating parameters in accordance with the results of each performance test, and report and include ongoing site-specific operating parameter data in the annual reports to EPA and the semi-annual title V monitoring reports to the relevant air permitting authority.

# 4 Iron and Steel Mills and Ferroalloy Manufacturing+

**Background**

The steel and iron making processes are iterative processes during which iron is first produced and then further refined to steel. The most common furnace types used for iron and steel production are blast furnaces, basic oxygen process furnaces (BOF), electric arc furnaces (EAF), annealing furnaces, ladle metallurgy furnaces (LMF), and reheat furnaces.

NOx emissions from iron and steel production are most often thermal NOx from the combustion of fossil fuels and other raw materials in furnaces or ancillary processes. The mixture of air and fuel in the furnace react to form NOx. Fuel and prompt NOx are also generated through oxidation of nitrogen compounds within the fossil fuels and the oxidation of hydrogen cyanide (HCN), respectively.

Detailed information describing iron and steel production was included in the TSD supporting the proposal.[33] This information included details related to the iron making process, the steel production process, and the ferroalloy manufacturing process; federal and state regulations that apply to facilities with these processes; and available NOx control technologies. This can be found in Section 4 of the TSD to the proposal and is not repeated here.

**Emissions Limits and Compliance Requirements in the Final Rule**

*Summary of Proposed Requirements*

EPA proposed to establish emissions control requirements for the Iron and Steel Mills and Ferroalloy Manufacturing source category for emission units that directly emit or have the potential to emit 100 tpy or more of NOx and for facilities containing two or more such units that

---

[33] See Document ID Number EPA-HQ-OAR-2021-0668-0145.

# TECHNICAL MEMORANDUM

TO:        Docket for Rulemaking, "Federal Good Neighbor Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards" (EPA-HQ-OAR-2021-0668)

DATE:      March 15, 2023

SUBJECT:   Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Units, Emissions Reductions, and Costs

**\*\*\* This revised document replaces the version posted to EPA's website the morning of March 15, 2023. This corrected version is the final document in the rulemaking docket. \*\*\***

## I.    Background

For the February 28, 2022 *Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards* (proposed FIP), the EPA developed an analytical framework to facilitate decisions about industries and emissions unit types for including emissions units in the non-electric generating unit "sector" (non-EGUs) in a proposed FIP for the 2015 ozone national ambient air quality standards (NAAQS) transport obligations. A February 28, 2022 memorandum, titled *Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026* (Non-EGU Screening Assessment), documents the analytical framework that the EPA used to identify industries and emissions unit types included in the proposed FIP.[1]

To further evaluate the industries and emissions unit types identified and to establish the proposed emissions limits, the EPA reviewed Reasonably Available Control Technology (RACT) rules, New Source Performance Standards (NSPS) rules, National Emissions Standards for Hazardous Air Pollutants (NESHAP) rules, existing technical studies, rules in approved state implementation plan (SIP) submittals, consent decrees, and permit limits. That evaluation is detailed in the EPA's December 2021 technical support document for the proposed FIP entitled *Technical Support Document (TSD) for the Proposed Rule, Non-EGU Sectors TSD* (Non-EGU Sectors TSD).[2]

Finally, in the proposed FIP the EPA proposed to find, based on the most recent information available from the EPA's August 2016 *Final Technical Support Document (TSD) for the Final Cross-State Air Pollution Rule for the 2008 Ozone NAAQS, Assessment of Non-EGU NO$_X$ Emissions Controls, Cost of Controls, and Time for Compliance Final TSD* (CSAPR Update Non-EGU TSD),[3] that controls on all of the non-EGU emissions units could not be installed by the 2023 ozone season. The proposed FIP estimated controls could be installed on non-EGU emissions units by the 2026 ozone season. For this final rule, the EPA prepared a report entitled *NOx Emission Control Technology Installation Timing for Non-EGU Sources* (Non-EGU Control Installation Timing Report)[4] that includes estimates of the amount of time needed to install the control equipment identified in the

---

[1] The Non-EGU Screening Assessment is available in the docket here: https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0150.

[2] The Non-EGU Sectors TSD is available in the docket here: https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0145.

[3]  The CSAPR Update Non-EGU TSD is available here: https://www.epa.gov/csapr/assessment-non-egu-NO$_X$-emission-controls-cost-controls-and-time-compliance-final-tsd.

[4] The Non-EGU Control Installation Timing Report is available in the docket here: https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668.

EPA's final rule and associated *Technical Support Document (TSD) for the Final Rule, Non-EGU Sectors TSD* (Final Non-EGU Sectors TSD).[5] All stages of the process to install control equipment, including but not limited to time for contract award, permitting, construction, and actual installation, are included in the control equipment installation time estimate. In addition, we included information on materials and labor needed to complete installation, including equipment vendor capacity.

This memorandum summarizes the emissions unit types, applicability criteria, emissions limits, estimated list of emissions units captured by the applicability criteria, and estimated emissions reductions and costs for the year 2026 associated with the final *Federal Good Neighbor Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards*. The remainder of this memorandum includes the following sections:

    II.   Applicability Criteria for Non-EGU Emissions Units Subject to the Final Rule
    III.   Emissions Limits for the Final Rule
    IV.   Assumed Control Technologies that Meet the Emissions Limits in the Final Rule
    V.   Estimating Emissions Units, Emissions Reductions, and Costs

## II.    Applicability Criteria for Non-EGU Emissions Units Subject to the Final Rule

The EPA is finalizing rate-based limits and production-based limits to directly control emissions of nitrogen oxides ($NO_X$) from the types of non-EGU emissions units identified in the proposed FIP. In addition, in Section V.B.3.b of the preamble for the proposed FIP, the EPA included a discussion of the potential for $NO_X$ emissions reductions from municipal waste combustors (MWCs) and solicited comment on whether these units should be included in a final FIP to address the 2015 ozone NAAQS transport obligations. The EPA is including these units in the final rule. For all of the non-EGU emissions units, the EPA developed emissions control requirements using applicability criteria based on size and type of unit and, in some cases, emissions thresholds. Table 1 below (Table II.A-1 of the final rule preamble) lists the nine non-EGU industries covered by the rule, identified by North American Industry Classification System (NAICS) codes. Table 2 below summarizes the industries, emissions unit types, and applicability requirements.

**Table 1. Industries and NAICS Codes Covered by Rule**

| Industry | NAICS |
|---|---|
| Pipeline Transportation of Natural Gas | 4862 |
| Cement and Concrete Product Manufacturing | 3273 |
| Iron and Steel Mills and Ferroalloy Manufacturing | 3311 |
| Glass and Glass Product Manufacturing | 3272 |
| Metal Ore Mining[6] | 2122 |
| Basic Chemical Manufacturing | 3251 |
| Petroleum and Coal Products Manufacturing | 3241 |
| Pulp, Paper, and Paperboard Mills | 3221 |
| Solid Waste Combustors and Incinerators | 562213 |

---

[5] The Final Non-EGU Sectors TSD is available in the docket here: https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668.

[6] The analytical framework applied in the Non-EGU Screening Assessment did not identify any boilers in the Metal Ore Mining industry with > 100 tpy NOx emissions. As such, no boilers were reflected in the proxy results from the screening assessment for proposal. The proposed and final applicability criterion for boilers is not based on tpy and is based on design capacity $\geq$100 MMBtu/hour. Metal Ore Mining has a few boilers with a design capacity of $\geq$100 MMBtu/hour that could be subject to the final emissions limits. See Section II.A., Table II.A-1 of the final rule preamble.

2

**Table 2. Summary of Industries, Non-EGU Emissions Unit Types, and Applicability Requirements**

| Industry | Emissions Unit Type | Applicability Requirements |
|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engines | Nameplate rating of ≥1000 braking horsepower (bhp) |
| Cement and Concrete Product Manufacturing | Kilns | Directly emits or has the potential to emit 100 tpy or more of $NO_X$ |
| Iron and Steel Mills and Ferroalloy Manufacturing | Reheat Furnaces | Directly emits or has the potential to emit 100 tpy or more of $NO_X$ |
| Glass and Glass Product Manufacturing | Furnaces | Directly emits or has the potential to emit 100 tons per year (tpy) or more of $NO_X$ |
| Iron and Steel Mills and Ferroalloy Manufacturing Metal Ore Mining Basic Chemical Manufacturing Petroleum and Coal Products Manufacturing Pulp, Paper, and Paperboard Mills | Boilers | Design capacity of ≥100 mmBtu/hr |
| Solid Waste Combustors and Incinerators | Combustors or Incinerators | Design capacity ≥ 250 tons of waste/day |

Any emissions unit that meets the applicability criteria in the final rule (as summarized in Table 2) and is located at a facility within one of the industries listed in Table 1 in any of the 20 states with non-EGU emissions control obligations[7] is subject to the final emissions limits. A detailed discussion of the applicability criteria for non-EGU sources is provided in Section VI.C of the preamble to the final rule.

### III.     Emissions Limits for the Final Rule

Establishing emissions limits for emissions units based on size and type of unit and, in some cases, emissions thresholds, will achieve the necessary reductions commensurate with the EPA's analysis of non-EGU industries and emissions units at Step 3 of the interstate transport framework. Between the proposal and this final rule, the EPA made several adjustments to the proposed emissions limits for the emissions units in non-EGU industries.

- For Pipeline Transportation of Natural Gas, the EPA is finalizing the emissions limits as proposed; however, the EPA is adjusting the applicability criteria to exclude emergency engines. Additionally, the final rule allows source owners/operators to request EPA approval of facility-wide emissions averaging plans on a case-by-case basis, where specified criteria are met. An approved facility-wide averaging plan would allow the source to install controls on the engines with the largest potential for emissions reductions at cost-effective thresholds.
- For Cement and Concrete Product Manufacturing, in the final rule the EPA has removed the daily source cap limit, which could have resulted in an artificially restrictive $NO_X$ emissions limit for affected cement kilns due to lower operating periods resulting from to the COVID-19 pandemic.
- For Iron and Steel and Ferroalloy Manufacturing, the EPA is finalizing only a test-and-set requirement for reheat furnaces premised on the installation of low-$NO_X$ burners. Based on commenters' concerns regarding the proposed requirements for other unit types in this industry, the EPA is not finalizing the proposed emissions limits for other emissions units in this industry.
- For Glass and Glass Product Manufacturing, the EPA is finalizing alternative requirements that may apply during startup, shutdown, and idling conditions.
- For boilers in Iron and Steel and Ferroalloy Manufacturing, Metal Ore Mining, Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills,

---

[7] The EPA is requiring emissions reductions from non-EGU sources to address interstate transport obligations for the 2015 ozone NAAQS for the following 20 states: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia.

the EPA is finalizing a low-use exemption to eliminate the need to install controls on low-use boilers that would have resulted in relatively small reductions.

More details on the bases for these changes can be found in the Section VI.C of the preamble to the final rule and in the Final Non-EGU Sectors TSD. Table 3 summarizes the industries, emissions unit types, the form of the final emissions limits, and the final emissions limits.

**Table 3. Summary of Non-EGU Industries, Emissions Unit Types, Form of Final Emissions Limits, and Final Emissions Limits**

| Industry | Emissions Unit Type | Form of Final Emissions Limits | Final Emissions Limits |
|---|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engines | Grams per horsepower per hours (g/hp-hr) | Four Stroke Rich Burn: 1.0 g/hp-hr<br>Four Stroke Lean Burn: 1.5 g/hp-hr<br>Two Stroke Lean Burn: 3.0 g/hp-hr |
| Cement and Concrete Product Manufacturing | Kilns | Pounds per ton (lbs/ton) of clinker | Long Wet: 4.0 lb/ton<br>Long Dry: 3.0 lb/ton<br>Preheater: 3.8 lb/ton<br>Precalciner: 2.3 lb/ton<br>Preheater/Precalciner: 2.8 lb/ton |
| Iron and Steel Mills and Ferroalloy Manufacturing | Reheat Furnaces | lbs/mmBtu[a] | Test and set limit based on installation of Low-NOx Burners |
| Glass and Glass Product Manufacturing | Furnaces | lbs/ton glass produced | Container Glass Furnace: 4.0 lb/ton<br>Pressed/Blown Glass Furnace: 4.0 lb/ton<br>Fiberglass Furnace: 4.0 lb/ton<br>Flat Glass Furnace: 7 lb/ton |
| Iron and Steel Mills and Ferroalloy Manufacturing<br>Metal Ore Mining<br>Basic Chemical Manufacturing<br>Petroleum and Coal Products Manufacturing<br>Pulp, Paper, and Paperboard Mills | Boilers | lbs/mmBtu[a] | Coal: 0.20 lb/mmBtu<br>Residual Oil: 0.20 lb/mmBtu<br>Distillate Oil: 0.12 lb/mmBtu<br>Natural Gas: 0.08 lb/mmBtu |
| Solid Waste Combustors and Incinerators | Combustors or Incinerators | ppmvd on a 24-hour averaging period and ppmvd on a 30-day averaging period | 110 ppmvd on a 24-hour averaging period<br>105 ppmvd on a 30-day averaging period |

[a] Heat input limit.

## IV.    Assumed Control Technologies that Meet the Final Emissions Limits

Because the EPA does not have complete information on the operating characteristics of every emissions unit potentially captured by the applicability criteria (e.g., existing emissions limit), the EPA made assumptions for each industry and emissions unit type about the control technology needed to meet the final emissions limits. Table 4 summarizes the industries, emissions unit types, and assumed control technologies that the EPA anticipates will meet the final emissions limits. The estimated emissions reductions and costs presented in Section V below reflect these assumed control technologies. A more detailed discussion of the EPA's basis for concluding that these assumed control technologies would meet the final emission limits is included in Section VI.C of the preamble to the final rule and in the Final Non-EGU Sectors TSD, both located in the docket.

4

**572a**

**Table 4. Summary of Non-EGU Industries, Emissions Unit Types, Assumed Control Technologies that Meet Final Emissions Limits**

| Industry | Emissions Unit Type | Assumed Control Technologies that Meet Final Emissions Limits |
|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engines | Layered Combustion (2-cycle Lean Burn)[a] SCR (4-cycle Lean Burn) NSCR (4-cycle Rich Burn) |
| Cement and Concrete Product Manufacturing | Kilns | SNCR |
| Iron and Steel Mills and Ferroalloy Manufacturing | Reheat Furnaces | LNB |
| Glass and Glass Product Manufacturing | Furnaces | LNB |
| Iron and Steel Mills and Ferroalloy Manufacturing | Boilers | LNB + FGR (Natural Gas, No Coal or Oil) SCR (Any Coal, Any Oil) |
| Metal Ore Mining | | |
| Basic Chemical Manufacturing Petroleum and Coal Products Manufacturing | | |
| Pulp, Paper, and Paperboard Mills | | |
| Solid Waste Combustors and Incinerators | Combustors or Incinerators | ANSCR[b] LN[tm] and SNCR [b,c] |

[a] Several emissions units, or engines, in the 2019 inventory had Source Classification Codes (SCC) indicating that the units were reciprocating without specifying the type of engine. We assumed NSCR or layered combustion as the control for these emissions units.
[b] *Municipal Waste Combustor Workgroup Report*, prepared by the Ozone Transport Commission Stationary and Area Sources Committee, Revised April 2022.
[c] Covanta has developed a proprietary low NOx combustion system (LN[TM]) that involves staging of combustion air. The system is a trademarked system and Covanta has received a patent for the technology.

## V.    Estimating Emissions Units, Emissions Reductions, and Costs

With the exception of Solid Waste Combustors and Incinerators (also referred to as Municipal Waste Combustors or MWCs), for each industry and emissions unit type, using a 2019 inventory prepared from the emissions inventory system (EIS) the EPA first estimated a list of emissions units captured by the applicability criteria for the final rule.[8] For Solid Waste Combustors and Incinerators, the EPA estimated the list for MWCs using the 2019 inventory and the NEEDS-v6-summer-2021-reference-case workbook.[9] Appendix A introduces the inventory data used and the general steps taken to filter the inventory data to estimate an initial list of units. In addition, there is an Excel workbook with a worksheet containing information for each industry, as well as for reciprocating internal combustion engines, boilers, and MWCs available in the docket.[10] Using the 2019 inventory from the EIS, the EPA reviewed permits for the estimated emissions units in the Cement and Concrete Product Manufacturing, Glass and Glass Product Manufacturing, and Iron and Steel Mills and Ferroalloy Manufacturing industries. Because the number of estimated emissions units for reciprocating internal

---

[8] Using a projected emissions inventory for 2026 introduces challenges associated with the growth of emissions at sources over time. The EPA determined that the 2019 inventory was appropriate because it provided a more accurate prediction of potential near-term emissions reductions. For additional discussion of the 2019 inventory, please see the *2019 National Emissions Inventory Technical Support Document: Point Data Category* available in the docket. In using the 2019 inventory, however, we did not account for any growth or decrease in emissions that might occur at individual units.
[9] Available here: https://www.epa.gov/power-sector-modeling/national-electric-energy-data-system-needs-v6.
[10] The Excel workbook is titled *Non-EGU Facilities and Units_Final.xlsx* and is available in the docket here: https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668.

5

combustion engines and boilers was larger, the EPA reviewed a smaller set of permits for those units. For boilers, the EPA also reviewed the database used in the July 2022 revised Boiler MACT.

Each workbook includes a worksheet labeled *README* with the detailed steps taken to estimate the list of emissions units captured by the applicability criteria (these steps are included in Appendix A). In developing the list, we assumed that the information in the 2019 inventory was accurate unless we updated that information through the permit reviews, information found in a dataset from the July 2022 revised boiler MACT rule, or information from other existing emissions inventories. In addition, each workbook includes a worksheet labeled *Units Will Need Controls* that represents the initial list of emissions units the EPA estimates could need the assumed controls to meet the emissions limits in the final rule.

For the final rule, the EPA did not run the Control Strategy Tool (CoST) to estimate emissions reductions and costs, as we did for the proposed rule, and instead programmed the assessment using R.[11] Using with the list of emissions units estimated to be captured by the applicability criteria, the assumed control technologies identified in Table 4, and information on control efficiencies and default cost/ton values from the control measures database (CMDB)[12], the EPA then estimated emissions reductions and costs for the year 2026. We estimated emissions reductions using the actual emissions (not potential to emit) from the 2019 emissions inventory. It is not clear what the impact of using actual emissions is on the estimated emissions reductions. As an example, if these emissions units were not subject to the emissions limits in this rule and their actual emissions were lower than their potential to emit, they could have increased emissions in 2026 (compared to actual emissions in 2019), resulting in greater estimated emissions reductions.

There were a few cases where an emissions unit had an existing control indicated in the inventory, but we estimated that the existing control might not enable the unit to meet the emissions limit and additional emissions reductions could be needed for the unit to meet the applicable emissions limit. When running CoST, the EPA can specify that a replacement control be applied if it achieves a specified, additional percent emissions reduction. In this analysis, we assumed a replacement control would need to result in 11% more emissions reductions than the control currently on an emissions unit. Lastly, when incorporating additional information on existing controls from other existing emissions inventories or when assessing replacement controls, we identified existing controls on some emissions units. In some cases, after identifying an existing control on an emissions unit, the control we assumed was needed to meet the final emissions limit actually was not.[13]

Finally, in the assessment the EPA matched emissions units by Source Classification Code (SCC) from the inventory to the applicable control technologies in the CMDB.[14,15] We modified SCC codes as necessary to match control technologies to inventory records. For each emissions unit type and industry, the following summarizes the approach used and data modifications made to estimate emissions reductions and costs.

---

[11] R is a free software environment for statistical computing and graphics. Additional information is available here: https://www.r-project.org/.

[12] More information about the Control Strategy Tool (CoST) and the control measures database (CMDB) can be found at the following link: https://www.epa.gov/economic-and-cost-analysis-air-pollution-regulations/cost-analysis-modelstools-air-pollution.

[13] As a result, the number of emissions units in the *Units Will Need Controls* worksheet may be larger than the number of emissions units in the Excel results workbook titled *Non-EGU Results – 11-17-2022.xlsx* (available in the docket here: https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668).

[14] The control measures in the CMDB have applicable SCC codes associated with them, facilitating the matching of inventory SCCs to control measure SCCs.

[15] The 2019 emissions inventory data, the control measure and default cost/ton data in the CMDB used to prepare the emission reduction and cost estimates, and the R code that processed these data are available upon request.

- For reciprocating internal combustion engines in the Pipeline Transportation of Natural Gas industry – The EPA used the control efficiencies and default cost/ton values from the CMDB for the assumed control and calculated emissions reductions and costs reflecting information on existing controls gathered from the review of a smaller set of permits, where available. The default cost/ton values from the CMDB may result in lower cost/ton values than is likely for some lower emitting units. We made some modifications where the inventory record and the CMDB had incompatible SCC codes or the CMDB had a gap in SCC coverage. For the inventory records with SCC codes specified as *Reciprocating*, we applied *NSCR or Layered Combustion*. Also, for two records with SCCs 20100202 and 20300201, we expanded the *NSCR or Layered Combustion* control in the CMDB to cover these SCCs.

- For the kilns in Cement and Concrete Product Manufacturing – The EPA reviewed permits and public comments on the proposed FIP to identify existing control information, where available, and estimated reductions using this information. The EPA used the control efficiency and default cost/ton values from the CMDB for the assumed control.

- For the reheat furnaces in Iron and Steel and Ferroalloy Manufacturing – The EPA reviewed permits to identify existing control information, where available, and estimated reductions using this information. The EPA used the control efficiency and default cost/ton values from the CMDB for the assumed control. We made some modifications where the inventory record and the CMDB had incompatible SCC codes or the CMDB had a gap in SCC coverage. For inventory records, we replaced SCC codes for all reheat furnaces with 30390003. Lastly, for the LNB control, the CMDB currently has two low NOx burner controls and to be conservative we used the control with a lower control efficiency.

- For the furnaces in Glass and Glass Product Manufacturing – The EPA reviewed permits to identify existing control information, where available, and estimated reductions using this information. The EPA used the control efficiency and default cost/ton values from the CMDB for the assumed control. For one inventory record, we changed an SCC code (30501401) and applied the LNB control measure.

- For boilers in Iron and Steel Mills and Ferroalloy Manufacturing, Metal Ore Mining, Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills industries – The EPA used the control efficiencies and default cost/ton values from the CMDB for the assumed control and calculated emissions reductions and costs reflecting information on existing controls gathered from the review of a smaller set of permits or information found in a dataset from the July 2022 revised boiler MACT rule, where available. The default cost/ton values from the CMDB may result in lower cost/ton values than is likely for some lower emitting units. In addition, the default control efficiency in the CMDB for LNB for boilers is 50 percent and the default control efficiency for LNB+FGR is 61%. In assessing replacement controls, we assumed boilers that already have LNB will find another way to comply with the final emissions limits and not install FGR.

We made some modifications where the inventory record and the CMDB had incompatible SCC codes or the CMDB had a gap in SCC coverage. For several inventory records, we replaced SCC codes for *Electric Generation: Boilers* and *Commercial/Industrial: Boilers* with *Industrial: Boilers* SCC codes for the same fuel type to assign control technology consistently across the industries. In the process level emissions inventory file, emissions can sometimes be below the 25 tpy threshold for which a default cost/ton gets used for LNB+FGR. We used the default cost/ton for the LNB+FGR control measure for some processes below the 25 tpy threshold.

7

**575a**

- For combustors or incinerators in Solid Waste Combustors and Incinerators – The EPA estimated reductions by comparing current emissions limits to the final rule's emissions limits and multiplied the percent difference by a unit's actual emissions. We assumed ANSCR or low NOx technology ($LN^{TM}$) and SNCR would meet final rule emissions limits and used costs for those technologies from the *Municipal Waste Combustor Workgroup Report*, prepared by the Ozone Transport Commission Stationary and Area Sources Committee, Revised April 2022.[16] See Appendix B for a summary of information from the *Municipal Waste Combustor Workgroup Report* used to estimate costs for waste combustors or incinerators.

Table 5 summarizes the industries, emissions unit types, assumed control technologies, and number of control installations expected to meet the final rule emissions limits. Table 6 summarizes the industries, emissions unit types, assumed control technologies, and estimated average cost/ton values. Table 7 summarizes the industries, emissions unit types, assumed control technologies, estimated total annual costs, and estimated ozone season NOx emissions reductions in 2026. Table 8 summarizes the industries, emissions unit types, estimated total annual costs, and estimated annual and ozone season NOx emissions reductions in 2026.

The data used in this assessment is sufficient to inform the EPA's identification of which emissions from non-EGU industries and emissions units are "significant" under Step 3 of the 4-step interstate transport framework. Further, this assessment for the final rule reflects comments we received regarding the relationship between EPA's Step 3 and Step 4 analyses for non-EGU industries and emissions units at proposal. In this assessment the EPA has more directly incorporated into the analysis at Step 3 the emissions controls that we estimate would likely be installed at these emissions units. This allows the EPA to assess whether these controls could result in emissions reductions and air quality benefits at downwind receptors that are relatively cost-effective when compared with the control strategies for EGUs (see Section V.D.2 of the preamble for a more detailed discussion).

The estimates presented below using the 2019 inventory and information from the CMDB identify proxies for emissions units, as well as emissions reductions, and costs associated with the assumed control technologies that would meet the final emissions limits. Emissions units subject to the final rule emissions limits may be different than those estimated in this assessment; the estimated emissions reductions from and costs to meet the final rule emissions limits may be different than those estimated in this assessment. The costs do not include monitoring, recordkeeping, reporting, or testing costs. In the regulatory provisions that implement these emissions limits at Step 4, the EPA has incorporated mechanisms that are designed to accommodate unique circumstances on a unit-specific basis, such as allowing for an extension of time to install controls or developing an alternative emissions limit where it can be established to be necessary. See Section VI.C. of the preamble for further discussion.

---

[16] The *Municipal Waste Combustor Workgroup Report*, prepared by the Ozone Transport Commission Stationary and Area Sources Committee, Revised April 2022 is available here: https://otcair.org/upload/Documents/Reports/MWC%20Report_revised%2020220425.pdf.

**Table 5. Summary of Non-EGU Industries, Emissions Unit Types, Assumed Control Technologies that Meet Final Emissions Limits, Estimated Number of Control Installations**

| Industry/Industries | Emissions Unit Type | Assumed Control Technologies that Meet Final Emissions Limits | Estimated Number of Units Per Assumed Control |
|---|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engines | NSCR or Layered Combustion (Reciprocating) | 323 |
| | | Layered Combustion (2-cycle Lean Burn) | 394 |
| | | SCR (4-cycle Lean Burn) | 158 |
| | | NSCR (4-cycle Rich Burn) | 30 |
| Cement and Concrete Product Manufacturing | Kiln | SNCR | 16 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Reheat Furnaces | LNB | 19 |
| Glass and Glass Product Manufacturing | Furnaces | LNB | 61 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Boilers | LNB + FGR (Natural Gas, No Coal or Oil) | 151 |
| Metal Ore Mining | | SCR (Any Coal, Any Oil) | 15 |
| Basic Chemical Manufacturing Petroleum and Coal Products Manufacturing | | | |
| Pulp, Paper, and Paperboard Mills | | | |
| Solid Waste Combustors and Incinerators[a] | Combustors or Incinerators | ANSCR | 57 |
| | | LN™ and SNCR | 4 |
| | Total | | 1,228 |

[a] Twelve MWCs have existing controls, and we estimated these units will use more reagent in those controls to meet the final emissions limits.

9

**577a**

**Table 6. Summary of Non-EGU Industries, Emissions Unit Types, Assumed Control Technologies, Estimated Average Cost/Ton (2016$)**

| Industry/Industries | Emissions Unit Type | Assumed Control Technologies that Meet Final Emissions Limits | Average Cost/Ton Values (2016$) |
|---|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engine | NSCR or Layered Combustion, Layered Combustion, SCR, NSCR | 4,981 |
| Cement and Concrete Product Manufacturing | Kiln | SNCR | 1,632 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Reheat Furnaces | LNB | 3,656 |
| Glass and Glass Product Manufacturing | Furnaces | LNB | 939 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Boilers | SCR or LNB + FGR | 8,369 |
| Metal Ore Mining | | | 14,595 |
| Basic Chemical Manufacturing | | | 11,845 |
| Petroleum and Coal Products Manufacturing | | | 14,582 |
| Pulp, Paper, and Paperboard Mills | | | 14,134 |
| Solid Waste Combustors and Incinerators | Combustors or Incinerators | ANSCR or LN™ and SNCR[a] | 7,836 |
| | | Overall Average Cost/Ton | 5,339 |

**Table 7. Summary of Non-EGU Industries, Emissions Unit Types, Assumed Control Technologies, Estimated Total Annual Costs (2016$), Ozone Season NOx Emissions Reductions in 2026**

| Industry/Industries | Emissions Unit Type | Assumed Control Technologies that Meet Final Emissions Limits | Annual Costs (2016$) | Ozone Season Emissions Reductions |
|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engine | NSCR or Layered Combustion, Layered Combustion, SCR, NSCR | 385,463,197 | 32,247 |
| Cement and Concrete Product Manufacturing | Kiln | SNCR | 10,078,205 | 2,573 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Reheat Furnaces | LNB | 3,579,294 | 408 |
| Glass and Glass Product Manufacturing | Furnaces | LNB | 7,052,088 | 3,129 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Boilers | SCR, LNB + FGR | 8,838,171 | 440 |
| Metal Ore Mining | | | 621,496 | 18 |
| Basic Chemical Manufacturing | | | 49,697,848 | 1,748 |
| Petroleum and Coal Products Manufacturing | | | 5,128,439 | 147 |
| Pulp, Paper, and Paperboard Mills | | | 62,268,540 | 1,836 |
| Solid Waste Combustors and Incinerators | Combustors or Incinerators | ANSCR or LN™ and SNCR | 38,949,560 | 2,071 |
| | | Totals | 571,676,839 | 44,616 |

10

**578a**

**Table 8. Summary by Industries, Estimated Total Annual Costs (2016$), Annual and Ozone Season NOx Emissions Reductions in 2026**

| Industry/Industries | Emissions Unit Type | Annual Costs (2016$) | Annual Emissions Reductions | Ozone Season Emissions Reductions |
|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engine | 385,463,197 | 77,392 | 32,247 |
| Cement and Concrete Product Manufacturing | Kiln | 10,078,205 | 6,174 | 2,573 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Reheat Furnaces | 3,579,294 | 979 | 408 |
| Glass and Glass Product Manufacturing | Furnaces | 7,052,088 | 7,510 | 3,129 |
| Iron and Steel Mills and Ferroalloy Manufacturing | Boilers | 8,838,171 | 1,056 | 440 |
| Metal Ore Mining | | 621,496 | 43 | 18 |
| Basic Chemical Manufacturing | | 49,697,848 | 4,196 | 1,748 |
| Petroleum and Coal Products Manufacturing | | 5,128,439 | 352 | 147 |
| Pulp, Paper, and Paperboard Mills | | 62,268,540 | 4,406 | 1,836 |
| Solid Waste Combustors and Incinerators | Combustors or Incinerators | 38,949,560 | 4,971 | 2,071 |
| | Totals | 571,676,839 | 107,077 | 44,616 |

In addition, Table 9 summarizes annual cost, estimated annual and ozone season NOx emissions reductions in 2026, and average cost/ton by state and by industry, and Table 10 summarizes annual cost, estimated annual and ozone season NOx emissions reductions in 2026, and average cost/ton by state. Figure 1 shows the geographical distribution of estimated ozone season NOx reductions, along with the summary of reductions by state and by industry. Note that while Nevada is a linked state in 2026, we did not estimate that any emissions units would need to apply the assumed control technologies to meet the final emissions limits.

11

**579a**

**Table 9. By State And By Industry, Estimated Annual Cost (2016$), Estimated Annual and Ozone Season NOx Emissions Reductions in 2026, and Estimated Average Cost/Ton (2016$)**

| State | NAICS Description | Annual Cost (2016$) | Annual Reductions | OS Emissions Reductions | Average Cost/Ton (2016$) |
|---|---|---|---|---|---|
| AR | Basic Chemical Manufacturing | 1,632,223 | 208 | 87 | 7,851 |
| AR | Glass and Glass Product Manufacturing | 123,157 | 90 | 37 | 1,376 |
| AR | Iron and Steel Mills and Ferroalloy Manufacturing | 309,447 | 85 | 35 | 3,656 |
| AR | Pipeline Transportation of Natural Gas | 13,129,973 | 2,555 | 1,065 | 5,139 |
| AR | Pulp, Paper, and Paperboard Mills | 9,518,419 | 774 | 323 | 12,290 |
| CA | Cement and Concrete Product Manufacturing | 3,486,679 | 2,725 | 1,135 | 1,279 |
| CA | Glass and Glass Product Manufacturing | 296,407 | 383 | 160 | 774 |
| CA | Pipeline Transportation of Natural Gas | 2,414,437 | 512 | 213 | 4,718 |
| CA | Waste Treatment and Disposal | 2,271,068 | 221 | 92 | 10,271 |
| IL | Basic Chemical Manufacturing | 588,959 | 24 | 10 | 24,690 |
| IL | Glass and Glass Product Manufacturing | 551,552 | 712 | 297 | 775 |
| IL | Petroleum and Coal Products Manufacturing | 1,952,466 | 148 | 62 | 13,221 |
| IL | Pipeline Transportation of Natural Gas | 20,610,074 | 4,664 | 1,943 | 4,419 |
| IN | Cement and Concrete Product Manufacturing | 3,192,728 | 1,148 | 478 | 2,782 |
| IN | Glass and Glass Product Manufacturing | 727,048 | 528 | 220 | 1,376 |
| IN | Iron and Steel Mills and Ferroalloy Manufacturing | 3,579,696 | 697 | 291 | 5,133 |
| IN | Petroleum and Coal Products Manufacturing | 564,315 | 80 | 33 | 7,031 |
| IN | Pipeline Transportation of Natural Gas | 9,272,053 | 1,768 | 737 | 5,243 |
| IN | Waste Treatment and Disposal | 1,706,754 | 520 | 217 | 3,282 |
| KY | Glass and Glass Product Manufacturing | 130,692 | 52 | 22 | 2,493 |
| KY | Iron and Steel Mills and Ferroalloy Manufacturing | 111,147 | 30 | 13 | 3,656 |
| KY | Pipeline Transportation of Natural Gas | 32,782,561 | 6,297 | 2,624 | 5,206 |
| KY | Pulp, Paper, and Paperboard Mills | 394,020 | 16 | 7 | 24,690 |
| LA | Basic Chemical Manufacturing | 19,965,275 | 1,886 | 786 | 10,584 |
| LA | Glass and Glass Product Manufacturing | 614,449 | 276 | 115 | 2,229 |
| LA | Petroleum and Coal Products Manufacturing | 497,471 | 20 | 8 | 24,690 |
| LA | Pipeline Transportation of Natural Gas | 72,118,746 | 14,880 | 6,200 | 4,847 |
| LA | Pulp, Paper, and Paperboard Mills | 1,045,465 | 79 | 33 | 13,221 |
| MD | Pipeline Transportation of Natural Gas | 164,447 | 30 | 13 | 5,457 |

12

**580a**

| MD | Waste Treatment and Disposal | 2,069,959 | 347 | 145 | 5,965 |
|----|------------------------------|-----------|-----|-----|-------|
| MI | Basic Chemical Manufacturing | 649,287 | 26 | 11 | 24,690 |
| MI | Glass and Glass Product Manufacturing | 35,459 | 65 | 27 | 549 |
| MI | Metal Ore Mining | 621,496 | 43 | 18 | 14,595 |
| MI | Pipeline Transportation of Natural Gas | 31,429,866 | 6,329 | 2,637 | 4,966 |
| MI | Pulp, Paper, and Paperboard Mills | 5,896,625 | 559 | 233 | 10,551 |
| MI | Waste Treatment and Disposal | 1,137,836 | 142 | 59 | 8,002 |
| MO | Cement and Concrete Product Manufacturing | 759,911 | 273 | 114 | 2,782 |
| MO | Glass and Glass Product Manufacturing | 249,721 | 182 | 76 | 1,376 |
| MO | Pipeline Transportation of Natural Gas | 22,471,530 | 4,501 | 1,875 | 4,993 |
| MS | Pipeline Transportation of Natural Gas | 29,429,138 | 5,828 | 2,428 | 5,050 |
| MS | Pulp, Paper, and Paperboard Mills | 3,468,462 | 170 | 71 | 20,424 |
| NJ | Glass and Glass Product Manufacturing | 59,949 | 44 | 18 | 1,376 |
| NJ | Waste Treatment and Disposal | 6,776,981 | 538 | 224 | 12,596 |
| NY | Glass and Glass Product Manufacturing | 349,137 | 191 | 80 | 1,826 |
| NY | Iron and Steel Mills and Ferroalloy Manufacturing | 82,491 | 23 | 9 | 3,656 |
| NY | Pipeline Transportation of Natural Gas | 2,698,676 | 553 | 230 | 4,884 |
| NY | Pulp, Paper, and Paperboard Mills | 1,956,608 | 278 | 116 | 7,031 |
| NY | Waste Treatment and Disposal | 10,195,093 | 1,255 | 523 | 8,125 |
| OH | Basic Chemical Manufacturing | 1,820,887 | 88 | 37 | 20,635 |
| OH | Glass and Glass Product Manufacturing | 861,166 | 660 | 275 | 1,305 |
| OH | Iron and Steel Mills and Ferroalloy Manufacturing | 6,109,926 | 874 | 364 | 6,993 |
| OH | Petroleum and Coal Products Manufacturing | 195,795 | 8 | 3 | 24,690 |
| OH | Pipeline Transportation of Natural Gas | 27,466,909 | 5,386 | 2,244 | 5,100 |
| OH | Pulp, Paper, and Paperboard Mills | 6,568,693 | 436 | 182 | 15,049 |
| OK | Cement and Concrete Product Manufacturing | 891,978 | 663 | 276 | 1,346 |
| OK | Glass and Glass Product Manufacturing | 334,023 | 243 | 101 | 1,376 |
| OK | Pipeline Transportation of Natural Gas | 42,845,192 | 8,631 | 3,596 | 4,964 |
| OK | Pulp, Paper, and Paperboard Mills | 7,406,196 | 754 | 314 | 9,827 |
| OK | Waste Treatment and Disposal | 1,706,754 | 240 | 100 | 7,104 |
| PA | Cement and Concrete Product Manufacturing | 526,032 | 411 | 171 | 1,279 |
| PA | Glass and Glass Product Manufacturing | 1,268,316 | 1,899 | 791 | 668 |
| PA | Iron and Steel Mills and Ferroalloy Manufacturing | 1,607,318 | 239 | 99 | 6,735 |

13

**581a**

| | | | | | |
|---|---|---|---|---|---|
| PA | Pipeline Transportation of Natural Gas | 6,599,932 | 1,377 | 574 | 4,792 |
| PA | Pulp, Paper, and Paperboard Mills | 4,446,769 | 197 | 82 | 22,540 |
| PA | Waste Treatment and Disposal | 10,809,443 | 1,118 | 466 | 9,670 |
| TX | Basic Chemical Manufacturing | 20,677,319 | 1,549 | 645 | 13,353 |
| TX | Glass and Glass Product Manufacturing | 1,144,406 | 1,963 | 818 | 583 |
| TX | Petroleum and Coal Products Manufacturing | 1,918,392 | 96 | 40 | 20,047 |
| TX | Pipeline Transportation of Natural Gas | 38,681,714 | 7,611 | 3,171 | 5,082 |
| TX | Pulp, Paper, and Paperboard Mills | 1,010,352 | 41 | 17 | 24,690 |
| UT | Pipeline Transportation of Natural Gas | 2,848,769 | 604 | 252 | 4,717 |
| VA | Basic Chemical Manufacturing | 362,998 | 15 | 6 | 24,690 |
| VA | Cement and Concrete Product Manufacturing | 1,220,878 | 954 | 398 | 1,279 |
| VA | Glass and Glass Product Manufacturing | 306,606 | 223 | 93 | 1,376 |
| VA | Iron and Steel Mills and Ferroalloy Manufacturing | 617,441 | 88 | 37 | 7,031 |
| VA | Pipeline Transportation of Natural Gas | 12,732,010 | 2,326 | 969 | 5,473 |
| VA | Pulp, Paper, and Paperboard Mills | 20,150,279 | 1,084 | 452 | 18,583 |
| VA | Waste Treatment and Disposal | 2,275,672 | 589 | 246 | 3,862 |
| WV | Basic Chemical Manufacturing | 4,000,899 | 400 | 167 | 10,004 |
| WV | Pipeline Transportation of Natural Gas | 17,767,169 | 3,540 | 1,475 | 5,019 |
| WV | Pulp, Paper, and Paperboard Mills | 406,652 | 16 | 7 | 24,690 |
| | Totals | 571,676,839 | 107,077 | 44,616 | 5,339 |

**Table 10. By State, Annual Cost (2016$), Estimated Annual and Ozone Season NOx Emissions Reductions in 2026, and Estimated Average Cost/Ton (2016$)**

| State | Annual Cost (2016$) | Annual Reductions | OS Emissions Reductions | Average Cost/Ton (2016$) |
|-------|-----|-----|-----|-----|
| AR | 24,713,219 | 3,711 | 1,546 | 6,659 |
| CA | 8,468,591 | 3,841 | 1,600 | 2,205 |
| IL | 23,703,051 | 5,547 | 2,311 | 4,273 |
| IN | 19,042,595 | 4,742 | 1,976 | 4,015 |
| KY | 33,418,421 | 6,396 | 2,665 | 5,225 |
| LA | 94,241,407 | 17,141 | 7,142 | 5,498 |
| MD | 2,234,405 | 377 | 157 | 5,924 |
| MI | 39,770,569 | 7,164 | 2,985 | 5,552 |
| MO | 23,481,162 | 4,955 | 2,065 | 4,739 |
| MS | 32,897,600 | 5,998 | 2,499 | 5,485 |
| NJ | 6,836,929 | 582 | 242 | 11,755 |
| NY | 15,282,005 | 2,299 | 958 | 6,646 |
| OH | 43,023,376 | 7,452 | 3,105 | 5,773 |
| OK | 53,184,143 | 10,530 | 4,388 | 5,051 |
| PA | 25,257,811 | 5,241 | 2,184 | 4,819 |
| TX | 63,432,182 | 11,259 | 4,691 | 5,634 |
| UT | 2,848,769 | 604 | 252 | 4,717 |
| VA | 37,665,883 | 5,279 | 2,200 | 7,135 |
| WV | 22,174,720 | 3,956 | 1,649 | 5,605 |
| Total | 571,676,839 | 107,077 | 44,616 | 5,339 |

15

**583a**

**Figure 1. Geographical Distribution of Ozone Season NOx Reductions in 2026 and Summary of Estimated Reductions by Industry and by State**



| State | Cement and Concrete Product Manufacturing | Glass and Glass Product Manufacturing | Iron and Steel Mills and Ferroalloy Manufacturing | Pipeline Transportation of Natural Gas | Applicable Boilers from Affected Industries | Municipal Waste Combustors | Total |
|---|---|---|---|---|---|---|---|
| LA | 0 | 115 | 0 | 6,200 | 827 | 0 | 7,142 |
| TX | 0 | 818 | 0 | 3,171 | 702 | 0 | 4,691 |
| OK | 276 | 101 | 0 | 3,596 | 314 | 100 | 4,388 |
| OH | 0 | 275 | 114 | 2,244 | 472 | 0 | 3,105 |
| MI | 0 | 27 | 0 | 2,637 | 262 | 59 | 2,985 |
| KY | 0 | 22 | 13 | 2,624 | 7 | 0 | 2,665 |
| MS | 0 | 0 | 0 | 2,428 | 71 | 0 | 2,499 |
| IL | 0 | 297 | 0 | 1,943 | 71 | 0 | 2,311 |
| VA | 398 | 93 | 0 | 969 | 495 | 246 | 2,200 |
| PA | 171 | 791 | 9 | 574 | 173 | 466 | 2,184 |
| MO | 114 | 76 | 0 | 1,875 | 0 | 0 | 2,065 |
| IN | 478 | 220 | 228 | 737 | 96 | 217 | 1,976 |
| WV | 0 | 0 | 0 | 1,475 | 174 | 0 | 1,649 |
| CA | 1,135 | 160 | 0 | 213 | 0 | 92 | 1,600 |
| AR | 0 | 37 | 35 | 1,065 | 409 | 0 | 1,546 |
| NY | 0 | 80 | 9 | 230 | 116 | 523 | 958 |
| UT | 0 | 0 | 0 | 252 | 0 | 0 | 252 |
| NJ | 0 | 18 | 0 | 0 | 0 | 224 | 242 |
| MD | 0 | 0 | 0 | 13 | 0 | 145 | 157 |

Lastly, because the estimated number of emissions units for the reciprocating internal combustion engines and the boilers was large, the EPA reviewed a smaller set of permits to gather or confirm information on existing controls on engines and boilers.[17] To consider the potential impact this limited review could have on the estimated emissions reductions and costs for engines and boilers, the EPA prepared a sensitivity assessment. The sensitivity assessment included subsets of the engines and boilers for which the limited review was conducted because we determined these subsets of engines and boilers would need controls.[18] We estimated the emissions reductions and costs for these engines and boilers both without (i.e., based only on information in the emissions inventory) and with the supplemental information (i.e., based on information in the emissions inventory, supplemented with information from the limited permit review or found in a dataset from the July 2022 revised boiler MACT rule). We calculated the percent differences in the emissions reductions and costs between those two estimates.

For reciprocating internal combustion engines when comparing the estimates (i) the estimated emissions reductions (annual and ozone season) using the supplemental information were 12 percent lower, and (ii) the estimated annual costs using the supplemental information were 10 percent lower. For boilers, when comparing

---

[17] The limited permit review was completed for approximately 330 engines and 40 boilers.

[18] The subset of engines reviewed that were identified in the *Units Will Need Controls* worksheet were approximately 135 engines. The subset of boilers reviewed that were identified in the *Units Will Need Controls* worksheet were approximately 28 boilers.

16

the estimates (i) the estimated emissions reductions (annual and ozone season) using the supplemental information were 25 percent lower, and (ii) the estimated annual costs using the supplemental information were approximately 22 percent higher.

The reason the estimated costs are higher and reductions are lower for boilers is that we are accounting for the increment of emission reduction beyond any existing control identified in supplemental information that was not reflected in the emissions inventory. These additional tons are likely more expensive, so as a conservative estimate we calculated the cost of the control based on the total tons reduced by that control if the source was uncontrolled. However, so as to not overstate the potential emission reduction, we report only the incremental emission reduction.

**Appendix A – Using 2019 Inventory Data to Identify Emissions Units**

**Boilers** -- Steps taken to filter 2019 NEI data to estimate a list of boilers captured by the applicability criteria for the final rule.

1. Filter to 23 States
2. Remove any units that for any process associated with the unit lists an SCC Code that has SCC Level-4 equal to "< 10 Million BTU/hr", "10-100 Million BTU/hr", or "Boiler < 100 Million BTU, except tangential"
3. Limit boilers to units in the following NAICS:
   Tier 1 Industries
       3311 - Iron and Steel Mills and Ferroalloy Manufacturing
   Tier 2 Industries
       2122 - Metal Ore Mining
       3274 - Lime and Gypsum Product Manufacturing
       3221 - Pulp, Paper, and Paperboard Mills
       3241 - Petroleum and Coal Products Manufacturing
       3251 - Basic Chemical Manufacturing
4. Remove any processes that do not list Unit Type equal to "Boiler" or "Unclassified".
5. Remove any processes that do not have SCC Level-2 equal to "Commercial/Institutional: Boilers", "Electric Generation: Boilers", or "Industrial: Boilers"
6. Remove any processes that do not have SCC Level-3 equal to "Natural Gas", "Residual Oil", "Distillate Oil", or "Bituminous/Subbituminous Coal" and re-confirm that SCC Level-4 is not equal to "< 10 Million BTU/hr", "10-100 Million BTU/hr", or "Boiler < 100 Million BTU, except tangential"
7. Select units from the EIS unit-level file that have processes that were not filtered out during Step 1-6 (559 Units)
8. Remove any units with actual NOx emissions less than 7.5 tpy (380 units after removals)
9. Remove any units with Design Capacity UOM="E6BTU/HR" and Design Capacity<100, unless Design Capacity is default value of 0.1 or 0.01 (329 units after removals)
   Note: The default values may need to be expanded.
10. Remove any units where Facility Status="PS" or Unit Status="PS" (323 units after removals)
11. Added in 2 with Design Capacity default of 1 (325 units).
12. Removed recovery boilers/furnaces and process heaters by reviewing SCC codes or the Unit Level Description (Column AI).

**For other industries and reciprocating internal combustion engines**, -- Steps taken to filter 2019 NEI data to estimate units captured by the applicability criteria for the final rule.

1. Rely on NAICS Codes, SCC Codes, and Unit Types in NEI Data
2. Combine 2019 NEI data with other available data from comments, previous data collections, limited permit review to fill in missing design capacity where possible
3. Conduct permit reviews to fill in missing information to determine applicability (boiler and engine design capacity, MWC PTE and tons/day, and PTE for remaining industries)
4. Review available data and permits to determine controls currently installed on emissions units
5. Narrow the list of applicable units to only include those that will need to install controls (e.g., remove low utilization boilers)

18

**586a**

**Appendix B – *Municipal Waste Combustor Workgroup Report* -- Information Used to Estimate Costs for Waste Combustors or Incinerators**

1. Cost/ton values were taken from the *Municipal Waste Combustor Workgroup Report*, prepared by the Ozone Transport Commission Stationary and Area Sources Committee, Revised April 2022 (https://otcair.org/upload/Documents/Reports/MWC%20Report_revised%2020220425.pdf).

2. For units that need to install ASNCR or low NOx technology (LN™) and SNCR
   a. The annual cost of ASNCR -- the *Municipal Waste Combustor Workgroup Report* cited $1,812,930 total annual costs (operating and capital) to install ASNCR at an MWC with 3 incinerators. We divided the value by 3 to derive an estimated annual cost of $604,310 per incinerator to install ASNCR.
   b. The annual cost of Covanta's LN™ and SNCR -- the *Municipal Waste Combustor Workgroup Report* cited total annual costs (operating and capital) for 1 incinerator ranging from $297,679 to $580,181. Using this information, we conservatively assumed $580,181 for any incinerator type that Covanta has indicated can install LN™ and SNCR.

3. For units that already have ASNCR or LN™ and SNCR installed
   a. The annual costs for facilities that already have ASNCR installed -- The *Municipal Waste Combustor Workgroup Report* cited $995,000 for the annual operating costs of ASNCR at an MWC with 3 incinerators. Because these facilities already have ASNCR installed, we did not include the capital costs. We divided the value by 3, to derive an estimated annual operating cost of $331,667 per incinerator to operate ASNCR. We believe this estimate is conservative because these units are already operating the installed ASNCR at a lower reagent usage and paying a portion of the $331,667 annual operating costs.
   b. For annual cost for facilities that already have Covanta LN™ and SNCR installed -- The *Municipal Waste Combustor Workgroup Report* cited annual operating costs for 1 incinerator ranging from $181,146 to $401,243. Because these facilities already have LN™ and SNCR installed, we did not include the capital costs. Using this information, we conservatively assumed $401,243 for the additional operating costs. We believe this estimate is conservative because these units are already operating the installed LN™ and SNCR at a lower reagent usage and paying a portion of the $401,243 annual operating costs.

# Comments of the Interstate Natural Gas Association of America on the U.S. Environmental Protection Agency's Proposed Rule: "Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard"

## 87 Fed. Reg. 20,036 (April 6, 2022)
## Docket ID No. EPA–HQ–OAR–2021–0668



**Date: June 21, 2022**

**Table of Contents**

Executive Summary ............................................................................... i

I.   Introduction ................................................................................ 1

II.  EPA Has Vastly Underestimated the Number of Engines that Would Be Subject to its Proposed Rule, Resulting in Serious Ramifications for Industry and the Validity of the Proposal. ................................................................... 8

     A.   EPA's State-by-State Unit Counts Differ Significantly from Data Available to INGAA and its Members. ............................................ 10

     B.   EPA Has Miscounted Affected Units Because its Applicability Threshold Does Not Take Utilization into Account. ....................................... 11

     C.   Estimates of State-Level NOx Reductions Demonstrate the Proposed Rule Requires Revision. ................................................................. 14

     D.   NOx Emissions, Potential NOx Reductions, and Cost Implications for Affected Units in Pennsylvania and Louisiana. ................................. 18

III. Without Appropriate Revisions, the Proposed Rule Will Result in Unlawful Over-Control of the Pipeline Transportation of Natural Gas Sector ........................ 19

     A.   INGAA's Analysis Demonstrates the Proposed Rule Would Over-Control the Pipeline Transportation of Natural Gas Sector. ........................... 21

     B.   Additional Considerations Do Not Undercut the Conclusion that the Proposed Rule Would Result in Over-Control. ................................... 23

IV.  The Proposed Rule Should Be Revised to Provide Cost-Effective and Environmentally Sound Compliance Flexibility Consistent with Other EPA and State Regulatory Policies. ............................................................... 25

     A.   EPA Precedent Supports Use of Averaging ...................................... 26

     B.   Averaging Will Help to Address Otherwise Insurmountable Obstacles to Compliance with the Proposed Rule. ........................................... 32

V.   EPA Has Underestimated the Length of Time Necessary to Retrofit Existing Units. ........................................................................................ 33

VI.  EPA Has Not Adequately Evaluated Reliability Issues. ............................. 41

VII. EPA Has Inappropriately Identified SCR as the Preferred Technology for Four-Stroke Lean Burn Engines ................................................................. 43

VIII.   Assumed NOx Control Efficiencies Are Inaccurate and Not Consistent with Past EPA Decisions ......................................................................................... 44

IX.   EPA Properly Proposed Parameter Monitoring for Compliance Assurance for Natural Gas Transmission Reciprocating Engines. .......................................... 46

    A.   Parameter Monitoring for LEC-equipped Lean Burn Engines ........................... 47

    B.   Parameter Monitoring for Rich Burn Engines ...................................... 48

    C.   CEMS are Not Warranted for Natural Gas Transmission Reciprocating Engines ................................................................................................ 49

X.   EPA Has Proposed Unnecessary Assurance and Compliance Provisions. ...................... 52

    A.   The Proposed Rule Should Be Amended to Clearly Identify Accepted Methods for NOx Emission Tests. ...................................................... 52

    B.   The Proposed Performance Testing and Reporting Requirements Are Overly Burdensome ............................................................................ 53

XI.   Issues Related to States EPA Has Identified as Linked to Downwind Nonattainment or Interference with Maintenance for Emissions from Non-EGUs. ........ 54

XII.   The Proposed Rule Contains Regulatory Language that Should Be Modified. .............. 55

XIII.   Conclusion ......................................................................................... 57

**Executive Summary**

The Interstate Natural Gas Association of America ("INGAA"), a trade association that represents 26 members of the interstate natural gas pipeline industry, is pleased to submit comments on the United States Environmental Protection Agency's ("EPA" or the "Agency") proposed "Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard" ("Proposed Rule"). The Proposed Rule represents significant efforts on the part of the Agency to address interstate transport of nitrogen oxides ("NOx") and the "significant contribution" of upwind states to downwind nonattainment and maintenance issues. INGAA has substantial experience addressing these issues and a track record of working with EPA to develop feasible and environmentally meaningful rules to address air quality.

The Proposed Rule is based on underlying assumptions and takes approaches to regulation that INGAA believes EPA should reevaluate. Most significantly, the Proposed Rule reflects a considerable underestimation of the number of units serving the pipeline transportation of natural gas industry that would become subject to new proposed emission limits. INGAA's estimates of these units are nearly five times larger than EPA's assumptions. The emission reductions that would result such a miscalculation would overwhelm EPA's intent as expressed in the Proposed Rule. Those projections, however, are what EPA has determined are needed to address the "significant contribution," as defined by the Clean Air Act, of the pipeline transportation of natural gas industry to downwind air quality problems. For that reason, the Proposed Rule would result in over-control in violation of Supreme Court and D.C. Circuit precedent. EPA can address this over-control problem by withdrawing the Proposed Rule and issuing a new proposal that achieves the emission reductions EPA has concluded are appropriate.

i

**591a**

EPA could achieve that outcome, for instance, by reevaluating the horsepower threshold and potentially raising it to reflect the realities industry faces. INGAA looks forward to supporting EPA's efforts in this regard.

In addition, EPA should incorporate emissions averaging as a compliance flexibility. Averaging will help to ensure that states and sources achieve the overall environmental objectives of the Proposed Rule while offering a level of flexibility that will make compliance more efficient and effective overall. EPA itself, with INGAA's input, developed emissions averaging rules in previous rulemakings and has approved the use of NOx emissions averaging in state plans for the natural gas industry. Incorporating averaging here would help ensure the successful implementation of a new rule.

EPA should also better account for realities facing the industry with respect to the time needed to complete the retrofits this new regulatory initiative envisions. There are considerable constraints on expertise and materials that will be needed to complete the installation of controls to meet the Proposed Rule's emission limits. These constraints render the proposed 2026 compliance timeframe unworkable. INGAA requests that EPA consider a phased approach to compliance that can be tailored to ensure the most timely implementation possible.

For similar reasons, the Proposed Rule would have serious impacts on reliability. EPA has not assessed how the natural gas pipeline system will be impacted or offered any guidance on how the massive effort to retrofit affected units could be coordinated to avoid reliability impacts. EPA must address reliability to provide an adequate basis for a new rule.

The Proposed Rule also includes a number of technical assumptions and requirements related to achieving and assuring compliance with the emission limits it would impose. INGAA believes that a number of changes to these provisions is warranted, but also supports many of the

provisions EPA has developed. For instance, although INGAA does not disagree with the emission limits EPA has proposed for the Proposed Rule's affected units, INGAA does believe that four stroke lean burn engines are not likely to comply with the proposed emission limits through installation and operation of selective catalytic reduction controls and are instead much more likely to use low emission combustion technology. A new rule should address that and similar issues.

INGAA also supports EPA's proposal to rely on parameter monitoring for compliance assurance and not to require continuous emission monitoring systems. On the other hand, INGAA does not believe EPA's proposed requirements that sources conduct semi-annual performance tests and semi-annual reporting are necessary to ensure compliance with the Proposed Rule, and they may be practically impossible for certain units.

Finally, INGAA has identified apparent errors or areas for clarification in the Proposed Rule's regulatory language and suggests revisions in these comments. INGAA further notes that substantial changes or departure from the proposal, including the addition of new states or new sources to the rule's coverage, would require a new proposed action.

INGAA supports appropriate action to address upwind state contributions to downwind nonattainment and maintenance issues for the 2015 ozone NAAQS. The Proposed Rule, however, is unfortunately premised on significantly flawed information that will undoubtedly lead to ongoing legal disputes and implementation problems. For those reasons, the proposal should be withdrawn, and EPA should issue a new proposal that remedies over-control. INGAA offers its expertise to assist in those efforts and appreciates the opportunity to continue working with EPA.



**Comments of the Interstate Natural Gas Association of America on the
U.S. Environmental Protection Agency's Proposed Rule:**

**"Proposed Federal Implementation Plan Addressing Regional
Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard"**

87 Fed. Reg. 20,036 (April 6, 2022)

Docket ID No. EPA-HQ-OAR-2021-0668

June 21, 2022

## I.    Introduction

The Interstate Natural Gas Association of America ("INGAA"), a trade association that represents 26 members of the interstate natural gas pipeline industry, respectfully submits these comments in response to the United States Environmental Protection Agency's ("EPA" or the "Agency") proposed rule entitled "Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard" (hereinafter, "Proposed Rule"), which was published in the Federal Register on April 6, 2022.[1]

INGAA members own and operate a large percentage of the reciprocating internal combustion engines ("RICE" or "engines") used in the interstate transportation of pipeline natural gas.[2] INGAA member companies transport more than 95 percent of the nation's natural

---

[1] 87 Fed. Reg. 20,036 (Apr. 6, 2022).

[2] The Proposed Rule does not appear to limit its application to interstate transportation of natural gas. INGAA's representation of its members, however, only extends to interstate pipelines. Although many of the issues addressed

1

gas, through approximately 200,000 miles of interstate natural gas pipelines. In 46 of the 48 contiguous United States, INGAA member companies operate over 5,400 natural gas compressors at over 1,300 compressor stations and storage facilities along the pipelines to transport natural gas to local gas distribution companies, industrial manufacturers, gas marketers, and gas-fired electric generators. This includes over 3,500 stationary natural gas-fired reciprocating engines. Accordingly, this rulemaking is of tremendous importance to INGAA and its members.

EPA first established primary and secondary national ambient air quality standards ("NAAQS") to protect against the adverse effects of nitrogen oxides ("NOx") and ozone in 1971 and has revised the standards numerous times since then.[3] EPA completed the most recent review of the primary and secondary NOx standards in 2018 and 2012, respectively, where the Agency retained the pre-existing NAAQS. NOx emissions, as a precursor to the formation of ozone, are subject to significant regulation under EPA's ozone NAAQS program. EPA last revised the ozone standards in 2015, setting the primary and secondary ozone NAAQS at 70 parts per billion ("ppb") in the form of the annual fourth-highest daily maximum 8-hour average concentration, averaged over 3 years.[4]

In addition to addressing emissions from sources located within NOx and ozone nonattainment areas, EPA has a long-established approach to reducing NOx emissions from sources located in "upwind" states that "significantly contribute" to either nonattainment or interference with maintenance in "downwind" states. EPA's authority to address the interstate

---

in these comments may apply with equal force to intrastate pipelines and natural gas transportation, INGAA does not purport to speak for that segment of the industry.

[3] Primary standards are intended to protect the public health, and secondary standards are intended to protect the public welfare.

[4] 80 Fed. Reg. 65,292 (Oct. 26, 2015).

transport of NOx emissions is found in the good neighbor provision of the Clean Air Act ("CAA" or the "Act").[5] That provision requires each state to submit a State Implementation Plan ("SIP") that prohibits emissions that will significantly contribute to nonattainment of a NAAQS, or interfere with maintenance of a NAAQS, in a downwind state. If a state fails to submit a good neighbor SIP or if EPA disapproves such a SIP, the Agency may be authorized to promulgate a Federal Implementation Plan ("FIP") in its place. The current Proposed Rule is such a FIP.

INGAA and its members have a strong commitment to environmental stewardship and to reducing the interstate gas pipeline industry's NOx emissions. NOx emissions from the interstate natural gas pipeline industry are not only subject to the NAAQS, but to a host of other CAA-based programs. These include emission control technology requirements for new or modified major emitting facilities and compliance with new source performance standards ("NSPS") that require the "best system of emissions reduction."[6] Pursuant to these regulatory requirements and other voluntary measures, INGAA members have collectively achieved significant reductions in NOx emissions.

EPA's Proposed Rule attempts to address the exceedingly complex issue of interstate transport of NOx and its contribution to downwind nonattainment of the 2015 ozone NAAQS from electric generating units ("EGUs") alongside emissions from seven non-EGU industrial sectors. The EGU portion of the Proposed Rule would apply to 25 states, and the non-EGU portion of the Proposed Rule would apply in 23 states, covering a vast and diverse geographic area. The covered states for non-EGU sources are Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New

---

[5] CAA § 110(a)(2)(D)(i)(I).

[6] 40 C.F.R. § 52.21(k)(1); 42 U.S.C. §§ 165(a)(4), 169(3); 40 C.F.R. § 165(a)(1)(xiii).

3

Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming.[7] Of the seven non-EGU industries, the only sources directly owned or operated by INGAA's members are RICE in the pipeline transportation of natural gas.[8]

The Proposed Rule would establish NOx limits for stationary, natural gas-fired, spark ignited RICE ("stationary SI engines") within the natural gas pipeline transportation industry that have a maximum rated capacity of 1,000 horsepower ("hp") or greater.[9] The applicable limits would be:

| Engine Type and Fuel[10] | Proposed NOx Emission Limit | Additional Information |
|---|---|---|
| Natural Gas Fired Four Stroke Rich Burn ("4SRB") | 1.0 g/hp-hr | Limits reviewed ranged between 0.2 and 3.0 g/hp-hr |
| Natural Gas Four Stroke Lean Burn ("4SLB") | 1.5 g/hp-hr | Limits reviewed ranged between 0.5 and 3.0g/hp-hr |
| Natural Gas Fired Two Stroke Lean Burn ("2SLB") | 3.0 g/hp-hr | Limits reviewed ranged between 0.5 and 3.0 g/hp-hr |

These emission limits would begin to apply at the start of the 2026 ozone season. EPA states that it has selected these limits based on reviews of reasonably available control technology ("RACT") NOx rules, air permits, and model rules by the Ozone Transport Commission.[11]

EPA asserts that the limit for Natural Gas Fired 4SRB RICE is designed to be achievable through installation and operation of Non-Selective Catalytic Reduction ("NSCR") controls.[12] The limit for Natural Gas 4SLB RICE is designed to be achievable through installation and

---

[7] 87 Fed. Reg. at 20,039.

[8] The other non-EGU industries are: kilns in cement and cement product manufacturing; boilers and furnaces in iron and steel mills and ferroalloy manufacturing; furnaces in glass and glass product manufacturing; and high-emitting equipment and large boilers in basic chemical manufacturing, petroleum and coal products manufacturing, and pulp, paper, and paperboard mills. *Id*.

[9] *Id*. at 20,142.

[10] *Id*. at 20,142, Table VII.C–1.

[11] *Id*. at 20,142.

[12] *Id*.

4

operation of selective catalytic reduction ("SCR") technology.[13] For Natural Gas Fired 2SLB RICE, EPA states the limit is designed to be achievable with layered combustion controls.[14]

For all of the limits, the Proposed Rule says that the covered RICE can install different emission control technology than the technology selected by EPA so long as the source achieves the applicable emission rate.[15] The cost-effectiveness of each control option appears to have been evaluated against EPA's cost threshold of $7,500 per ton.[16]

The Proposed Rule also includes monitoring and reporting requirements to ensure that the limits are being met at all covered stationary SI engines. The Proposed Rule would require semi-annual performance testing in accordance with 40 C.F.R. § 60.8. RICE would monitor hours of operation and fuel consumption to calculate ongoing compliance.[17] EPA proposes to use a parameter-based monitoring approach, although it requests comment on alternative monitoring systems.[18] Finally, all covered industries would be required to submit electronic copies of performance test reports, performance evaluation reports, quarterly and semi-annual reports, and excess emissions reports through EPA's Central Data Exchange ("CDX") using the Compliance and Emissions Data Reporting Interface ("CEDRI").[19]

As demonstrated in these comments, many of EPA's assumptions for the pipeline transportation of natural gas industry are seriously flawed and will require substantial changes to the Proposed Rule. Of particular concern, the Proposed Rule reflects a significant

---

[13] *Id*.

[14] *Id*. at 20,143.

[15] *Id*. at 20,142.

[16] *Id*. at 20,142-43.

[17] *Id*. at 20,143.

[18] *Id*.

[19] *Id*.

underestimation of the number of affected units and the proposal's resulting emission reductions. That miscalculation leads to inaccurate cost assessments and would result in substantial over-control of the pipeline transportation of natural gas industry in violation of the law. Further, the Proposed Rule does not contain basic and well-demonstrated compliance flexibilities like emissions averaging, and it would impose a compliance deadline for the pipeline natural gas sector that would result in major disruptions to the supply of natural gas. These significant negative impacts on natural gas reliability would result in increased consumer costs of natural gas and could lead to unnecessary facility closures due to unlawful over-control and infeasible compliance deadlines. EPA should remedy these issues, consistent with the case law that allows EPA to tailor its actions to avoid imposing standards that regulated industry cannot possibly meet.[20] In addition to EPA's underestimation of impacted sources and issues that stem from that error, there are a number of technical issues raised by the Proposed Rule that the Agency can easily remedy, thereby avoiding unnecessary hardship for the industry while maintaining the environmental integrity of the proposed regulatory program. Some of these technical issues are raised in requests for comment by EPA, and others are already reflected in the preamble or the proposed regulatory text.

Although INGAA recognizes that EPA wishes to proceed with this rulemaking to timely address ozone nonattainment in downwind states by the relevant deadlines, INGAA respectfully suggests that EPA take the time needed to develop a well-supported final rule. In accordance with the CAA, a number of states submitted their SIPs before the October 1, 2018 deadline.[21] But EPA failed to take action on these SIPs within the timelines required of it—as evidenced by

---

[20] *Wisconsin v. EPA*, 938 F.3d 303, 367 (D.C. Cir. 2019).

[21] 87 Fed. Reg. at 20,058.

6

**599a**

the four deadline suits that were filed against the agency.[22] More than 12 months after its approval or disapproval was required, on February 22, 2022, EPA proposed to disapprove 19 good neighbor plan SIP submissions.[23] Under the consent decrees for three of these suits, EPA was required to take final action on SIP submissions by April 30, 2022 (or, if it proposed to disapprove any SIP submissions and proposed a replacement FIP by February 28, 2022, the deadline would be extended to December 30, 2022). For seven other states, on December 5, 2019, EPA published a rule finding these states failed to submit or otherwise make complete SIP submissions, thereby requiring the agency to promulgate a FIP no later than January 6, 2022, unless prior to that time, the state made a submission to meet the requirements of CAA section 110(a)(2)(D)(i)(I) and EPA fully approved such submission.[24] However, it wasn't until April 6, 2022, that EPA published the Proposed Rule.[25] Rushing to finalize the Proposed Rule to make up for previously missed deadlines should not be done at the expense of a reasoned and defensible rule. Pushing forward a rule simply to meet deadlines will have unintended consequences that will negatively impact regulated parties and improperly shift EPA's burden to industry. Additionally, rushing the Proposed Rule invites litigation alleging that EPA has acted arbitrarily and capriciously. These are all outcomes that can and should be avoided. While it may take longer to finalize a rule after carefully considering industry's comments, including those

---

[22] *See id*. at 20,057 n.69 (noting there are consent decrees related to three of these suits: *New York et al. v. Regan,* (No. 1:21–CV–00252, S.D.N.Y.), *Downwinders at Risk v. Regan*, (No. 21–cv–03551, N.D. Cal.); *Our Children's Earth Foundation v. EPA*, (No. 20–8232, S.D.N.Y.)). The fourth deadline suit was filed on March 8, 2022, to compel EPA to perform its non-discretionary duty to promulgate a good neighbor FIP for New Mexico: <u>Wildearth Guardians v. Regan</u>, (No. 22-cv-174, D.N.M.)

[23] *See id.* at 20,057 n.75.

[24] *See* 42 U.S.C. § 7410(c)(1)(A).

[25] 87 Fed. Reg. at 20,057-58.

7

**600a**

contained herein, any such delay is not unreasonable in light of the complexity of the Proposed Rule. EPA must take the time to do this correctly.

For all of these reasons, INGAA strongly advises that EPA address the concerns raised in these comments. INGAA requests that EPA withdraw the proposal and offer a new proposed rule that substantially revises its regulatory approach.

## II.    EPA Has Vastly Underestimated the Number of Engines that Would Be Subject to its Proposed Rule, Resulting in Serious Ramifications for Industry and the Validity of the Proposal.

In the preamble and supporting documentation, EPA estimates that there are 307 affected units in this sector.[26] Based on review of INGAA member information, it is apparent that EPA has significantly underestimated the impacts of the Proposed Rule for natural gas transmission and storage companies by miscounting the number of affected units. As these comments explain, EPA's Proposed Rule would in fact apply to nearly five times the number of units that EPA assumes, vastly increasing the costs and time for compliance with the Proposed Rule and requiring more than twice as many emission reductions than EPA believes are necessary. INGAA understands that these results were not EPA's intention and that EPA's interest is in appropriately controlling only the most significant sources of NOx emissions in the pipeline transportation of natural gas sector. We expect the Agency would agree that the Proposed Rule must be substantially revised to address the incorrect factual underpinnings of the

---

[26] *See, e.g.*, *id*. at 20,090.

proposal and to achieve the Agency's policy goals—including the overall amount of NOx emission reductions—that EPA has identified as appropriate for this rulemaking.

These comments will help EPA to address those issues. Based on information currently available to INGAA members,[27] an estimate of actual unit counts and resulting emissions reductions was prepared:

- 1,199 engines owned or operated by INGAA members in natural gas transmission and storage would require control. **This is four times the EPA estimate.**

- Approximately 181 additional engines owned or operated by INGAA members currently include emission controls but cannot meet the proposed NOx limits, thus requiring incremental control. **The collective total of 1,380 reciprocating engines owned or operated by INGAA members requiring NOx control is 4.5 times EPA's estimate.**

- Another 678 units owned or operated by INGAA members that meet the emission limits would incur incremental compliance costs to address Proposed Rule requirements for biannual emissions tests and continuous parameter monitoring. For controlled units, compliance is typically based on an annual emissions test, and parameter monitoring is not typically required.

- While EPA projects NOx reductions of 55,546 tons per year ("TPY") for all covered states combined, INGAA's estimate indicates **additional reductions** in most states and total reductions of **over 57,000 TPY more than EPA's estimate**. This is more than double (203.4%) the reductions EPA estimates.[28]

As shown below, significant disparities exist in all states where pipeline transportation RICE are common. These disparities are of such a nature and magnitude that they require serious

---

[27] Although the comment period has limited the amount of information that INGAA has been able to compile at this time, INGAA would be pleased to continue to work with EPA to further evaluate the number of affected units and to help the Agency develop rule provisions that better reflect the realities of the industry. While initial information has been gathered on affected unit counts and location, the comment schedule precluded the ability to conduct a detailed, state-by-state analysis of EPA's underestimation of NOx reductions and costs.

[28] INGAA members account for 79 percent of the RICE included in EPA's list of 307 units, and INGAA members comprise the vast majority of interstate natural gas transmission companies, but these estimates do not include pipeline companies that are not INGAA members. In addition, INGAA data estimates are from transmission and storage operations and do not include RICE in the gathering and boosting segment located between the gas production and gas processing segments. RICE in gathering and boosting would also be affected units based on the proposed definition of "pipeline transportation of natural gas" in section 52.41(a). Many additional units would be affected in that segment, and the total count of affected units may be more than double the values presented above for transmission and storage facilities operated by INGAA members.

9

**602a**

reconsideration of key aspects of the Proposed Rule and the proposed approach to regulating the natural gas pipeline transportation sector. EPA might, for instance, address some of these issues by revising the hp applicability threshold for affected units to more appropriately target sources with significant annual emissions. EPA might also further refine the definition of "affected unit." Because the issues identified in these comments are so central to EPA's proposed action, the Agency should also consider issuing a supplemental proposal for the natural gas pipeline transportation portion of the Proposed Rule. INGAA believes such an approach is warranted.

A.    EPA's State-by-State Unit Counts Differ Significantly from Data Available to INGAA and its Members.

INGAA compiled a state-by-state assessment of affected units for comparison to EPA estimates.[29] Table 1 provides a comparison of EPA unit counts for the pipeline transportation of natural gas sector to INGAA-compiled counts of affected RICE requiring control (i.e., currently uncontrolled), as well as units with NOx emission controls in place that would require additional control to meet the proposed NOx standard.[30]

**Table 1. State-level comparison of EPA count of affected pipeline transportation reciprocating engines to actual INGAA member count of units requiring NOx control or incremental control.**

|          | AR | IL | IN | KY | LA | MI | MN | MS | MO | NY | OH | OK | PA | TX | UT | VA | WV | WI | WY |
|----------|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| EPA      | 10 | 22 | 3  | 17 | 45 | 21 | 9  | 25 | 22 | 2  | 25 | 32 | 7  | 26 | 4  | 9  | 20 | 0  | 6  |
| INGAA[1] | 52 | 51 | 46 | 121| 191| 95 | 37 | 218| 32 | 12 | 79 | 38 | 1  | 70 | 10 | 25 | 87 | 11 | 23 |
| INGAA[2] | 0  | 11 | 0  | 0  | 13 | 0  | 0  | 7  | 0  | 17 | 19 | 1  | 57 | 45 | 0  | 0  | 0  | 0  | 3  |

[29] EPA data is available from docket document number EPA-HQ-OAR-2021-0668-0191, which includes a technical memorandum and an Excel file identifying affected non-EGU units. "Technical Memorandum Describing Relationship between Proposed Applicability Criteria for Non-EGU Emissions Units Subject to the Proposed Rule and EPA's *'Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026'*" (Mar. 30, 2022).

[30] Four of the 23 states with non-EGU controls are not shown in Table 1 (California, Maryland, Nevada, and New Jersey have no, or limited, units). EPA estimates one affected unit in California, and INGAA estimates four units, but all are controlled. In Maryland, EPA estimates one unit; INGAA data indicate no uncontrolled units and 14 units that would meet the proposed standard. EPA estimates no affected units in Nevada and New Jersey. INGAA data indicate there are a total of four controlled units in Nevada and New Jersey, and eight New Jersey units with emission controls in place that would require additional control to meet the proposed standard.

10

INGAA[1]: Count of reciprocating engines requiring NOx control.
INGAA[2]: Count of units with NOx control installed that do not meet the proposed limits and would require incremental control.

These data discrepancies demonstrate, even at this high level of detail, the serious nature of the flaws in the current basis of support for the Proposed Rule. When an agency relies on a fatally flawed factual record as the justification for a regulation, that regulation is inherently arbitrary and capricious.[31] This underscores the need for EPA to substantially revise, if not re-propose, the Proposed Rule.

**B.    EPA Has Miscounted Affected Units Because its Applicability Threshold Does Not Take Utilization into Account.**

EPA explains that a NOx emission rate of 100 TPY provided the screening basis for identifying affected units. For pipeline transportation RICE, EPA equates that emission rate with the 1,000 hp applicability threshold in the Proposed Rule. This assumption is incorrect, and it has distorted much of what flows from it in the Proposed Rule. In particular, this error would inadvertently pull far more sources into the scope of the program than EPA apparently intends, leading to serious compliance concerns, unnecessary emission reductions and unlawful over-control. This serious flaw is another reason for EPA to withdraw or substantially revise the Proposed Rule.

For EPA's assumption to be accurate, an uncontrolled unit would need to operate a significant portion of the year, but that is not consistent with interstate natural gas transmission operations. For example, depending on the uncontrolled NOx emission factor used (*e.g.*, EPA AP-42 factor versus EPA factor from NOx SIP Call Phase 2 rule), a 1,000 hp two-stroke lean

---

[31] *Almay, Inc. v. Califano*, 569 F.2d 674, 682 (D.C. Cir. 1977) (regulation was arbitrary and capricious because it relied heavily on discredited study); *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923,935 (5th Cir. 1998) ("A regulation cannot stand if it is based on a flawed, inaccurate, or misapplied study.").

11

**604a**

burn engine would need to operate 62 percent to 86 percent of the year to emit 100 TPY. Actual operations are often much less than 25 percent of the year for gas transmission RICE in this size range, and ozone season operation may be very low for pipelines serving markets with lower gas demand in the summer. Transmission compressor stations are designed to meet peak demand days and typically include significant over-capacity.[32] This results in average annual utilization on the order of 40–45 percent for most natural gas transmission pipelines, with some units within the system operating minimally—*e.g.*, only when needed during peak demand during cold winter weather events.

Utilization data is not readily available for all units, but there are data sources available that demonstrate utilization for natural gas transmission and storage operations. For example, compressor stations that report greenhouse gas ("GHG") emissions to EPA under Subpart W of the GHG Reporting Program ("GHGRP") report annual hours in operating mode, standby-pressurized mode, and shutdown depressurized mode for each unit at the affected facility. A white paper[33] from the Pipeline Research Council International ("PRCI") compiled Subpart W utilization data for hundreds of affected facilities over six years, and those results are presented in Figure 1. For completeness, turbine data is included as well as RICE data. The figure shows the percentage of units with utilization in ten different "bins," from zero to 100 percent utilization. The data show that about 2/3 of transmission RICE units operate less than 50 percent of the time, with nearly 25 percent operating less than 10 percent of the time. For RICE at

---

[32] It should be noted that sources within the industry cannot generally accept enforceable limitations on operations because FERC certificate requirements demand that these units are available to operate at capacities well-above typical operating conditions. These units nevertheless can effectively address emissions through the use of emissions averaging. *See* section IV for additional discussion.

[33] PRCI White Paper, "Use of Probabilistic Statistical Techniques for Estimating NOx Emissions from Infrequently Operated Emission Units," Catalogue No. PR-312-18208-E01 (Apr. 2020).

12

**605a**

storage facilities, over 80 percent of the units operate less than 50 percent of the time. The GHGRP reporting threshold captures larger facilities with higher utilization because emissions from combustion are the driver that results in a facility exceeding the 25,000 metric ton reporting threshold. Thus, these data from GHGRP affected facilities *over-estimate* utilization for the entire population of RICE at natural gas transmission and storage facilities that will be impacted by the Proposed Rule.

Another important characteristic to understand for natural gas transmission compressor stations is that the smaller affected units (*e.g.*, those between 1,000 hp and 2,000 hp) are also more likely to be units that operate less frequently and thus have lower annual and ozone season emissions. A RICE compressor station typically includes several units, and, when demand is low, many or all units will be idle. Facility-specific cases differ, but typically the RICE with *lowest* utilization are the *smaller* affected RICE at the facility.

**Figure 1.  Histogram of RICE and turbine utilization at natural gas transmission and storage facilities subject to the federal GHGRP reporting program.**



13

**606a**

Since a 1,000 hp RICE must operate approximately 65 percent of the time or more to emit 100 TPY, and actual operation is much lower for the vast majority of such units, this characteristic utilization profile is the reason that significantly more units are affected by the proposed 1,000 hp threshold than a more reasonable threshold that considers actual emissions and/or unit utilization.  If an hp threshold is used as a proxy to identify affected units, *i.e.*, those with 100 TPY or more of annual NOx emissions, utilization should be factored into that threshold.

In sum, more than five times[34] as many RICE units are affected than EPA estimated because characteristic natural gas transmission RICE utilization was not properly considered when defining the 1,000 hp threshold. This threshold therefore results in control of units EPA did not intend to regulate and emission reductions that are not needed to remedy significant contribution. EPA must, therefore, reevaluate the threshold and develop a proposal that better reflects the realities of the industry.

### C. Estimates of State-Level NOx Reductions Demonstrate the Proposed Rule Requires Revision.

The comments above demonstrate the significant under-estimation of affected gas transmission RICE counts for states with non-EGU emissions reduction requirements. Based on an understanding of affected units, (average uncontrolled (or "under-controlled") emissions, typical utilization, and average size (hp) by unit type), the potential NOx reductions can be estimated for every state and compared to EPA estimates. The assumptions for this analysis are shown in Table 2.

---

[34] As noted above, based on INGAA member data, nearly five times as many units require NOx control or incremental control than EPA estimated. INGAA members account for about 80 percent of EPA's 307 units and the vast majority of the other 20% are in interstate natural gas transmission service. Thus, for gas transmission alone, the total count is likely more than 5 times EPA's estimate. Gathering and boosting could add many hundreds to more than a thousand additional units, significantly inflating the affected unit count relative to EPA's estimate.

14

**607a**

**Table 2.  Assumptions by Engine Type for NOx Reduction Estimates by State**

| Engine Type | Uncontrolled NOx (g/bhp-hr) | % Reduction | "Under-Controlled" NOx (g/bhp-hr) | % Reduction | Avg HP | Utilization (%) |
|---|---|---|---|---|---|---|
| 2SLB | 16.8 | 82% | 5.0 | 50 | 2,500 | 35% |
| 4SLB | 12.0 | 90% | 4.0 | 65 | 2,700 | 25% |
| 4SRB | 11.0 | 94% | 2.0 | 50 | 1,400 | 35% |

These are relatively conservative assumptions. For example:

- The uncontrolled baseline for four-stroke engines may be higher.

- Assuming 82 percent control for 2SLB engines, which are the most prevalent units, while EPA typically assumes >95 percent control).

- Utilization may be higher than estimated.

- Average size (hp) of the units may be larger.[35]

A more detailed analysis with unit-specific data may result in larger NOx emission reductions for each state or at least some states. Based on INGAA member unit counts and these assumptions, the reductions by state are shown in Table 3. While EPA projects NOx reductions of 55,546 TPY for all covered states combined, INGAA's estimate indicates additional reductions in most states and total reductions of over 57,000 TPY more than EPA's estimate. This is more than double (203.4 percent) the reductions EPA estimates.[36]

---

[35] These factors also contribute to EPA-estimated emission reductions in some states exceeding estimates based on INGAA data, even though INGAA data show EPA under-counted units in those states (*see, e.g.*, Missouri and Oklahoma data in Table 3). For Oklahoma, EPA estimated reductions may be higher due to the average unit size (information is not complete, but Oklahoma units appear to be larger than the average from Table 2) and assumed control (82 percent assumed versus 97 percent assumption by EPA for 2SLBs). For Missouri, nearly all of the units appear to be 2SLB, so the assumed percent reduction differences (82 percent versus >95 percent in most cases) likely contributes to EPA estimating more reductions than a calculation based on the assumptions above. For the NOx SIP Call Phase 2 rule in 2004, natural gas transmission stakeholders, including INGAA, conducted very detailed analysis for all potentially affected units, which provided a clear understanding of the assumptions discussed above. That task would be a significant undertaking that cannot be completed within the comment period for the Proposed Rule. INGAA, however, offers its continuing assistance to help EPA better understand the inventory of equipment and associated emissions and reductions for this rulemaking.

[36] INGAA's estimate would be higher if a higher 4SLB engine baseline is assumed, higher control levels (*i.e.*, >95 percent control is commonly applied in EPA's estimate) are assumed, average size (hp) is larger than assumed, or if average utilization exceeds the assumed values shown in Table 2.

16

**609a**

**Table 3.  Estimated emission reductions by state based on INGAA member unit counts and average assumptions for unit size, NOx baseline, and reduction.**

| State | EPA Unit Count | INGAA Unit Count: Uncontrolled | INGAA Count: Existing Control Insufficient | EPA NOx Reductions (TPY) | INGAA NOx Reductions | NOx Difference (TPY) | NOx TPY Overage (%) |
|---|---|---|---|---|---|---|---|
| AR | 10 | 52 | 0 | 2,083 | 6,053 | 3,970 | 191% |
| CA | 1 | 0 | 0 | 328 | 0 | (328) | NA |
| IL | 22 | 51 | 11 | 3,158 | 5,559 | 2,401 | 76% |
| IN | 3 | 46 | 0 | 364 | 4,334 | 3,970 | 1092% |
| KY | 17 | 121 | 0 | 5,497 | 9,665 | 4,168 | 76% |
| LA | 45 | 191 | 13 | 9,395 | 11,485 | 2,090 | 22% |
| MD | 1 | 0 | 0 | 107 | 0 | (107) | NA |
| MI | 21 | 95 | 0 | 5,452 | 9,071 | 3,619 | 66% |
| MN | 9 | 37 | 0 | 1,340 | 4,077 | 2,737 | 204% |
| MS | 25 | 218 | 7 | 3,784 | 19,954 | 16,680 | 427% |
| MO | 22 | 32 | 0 | 3,793 | 3,004 | (789) | -21% |
| NV | 0 | 0 | 0 | 0 | 0 | 0 | NA |
| NJ | 0 | 0 | 8 | 0 | 136 | 136 | NA |
| NY | 2 | 12 | 17 | 254 | 1,385 | 1,131 | 444% |
| OH | 25 | 79 | 19 | 2,875 | 9,197 | 6,322 | 220% |
| OK | 32 | 38 | 1 | 6,717 | 3,828 | (2,889) | -43% |
| PA | 7 | 1 | 57 | 1,025 | 564 | (461) | -45% |
| TX | 26 | 70 | 45 | 4,167 | 8,105 | 3,938 | 95% |
| UT | 4 | 10 | 0 | 569 | 867 | 298 | 52% |
| VA | 9 | 25 | 0 | 1,922 | 2,864 | 942 | 49% |
| WV | 20 | 87 | 0 | 1,803 | 9,030 | 7,227 | 401% |
| WI | 0 | 11 | 0 | 0 | 1,142 | 1,142 | NA |
| WY | 6 | 23 | 3 | 912 | 2,646 | 1,734 | 190% |
| **Total** | 307 | 1,199 | 181 | 55,546 | 112,967 | 57,421 | 203% |

These estimates, which show more than double the emission reductions that EPA has proposed to determine would be a full remedy for any significant contribution to downwind nonattainment or maintenance issues for the pipeline transportation of natural gas sector, again

17

**610a**

make clear that the basis for the Proposed Rule is so flawed that EPA must withdraw or substantially revise the proposal.

> **D.    NOx Emissions, Potential NOx Reductions, and Cost Implications for Affected Units in Pennsylvania and Louisiana.**

As noted previously, the comment period did not provide adequate time to complete unit-level analysis of emissions implications for all states, but a detailed analysis was conducted for two states with differing historical requirements, Pennsylvania and Louisiana, to provide EPA with additional detail and to further demonstrate that the factual basis on which EPA has relied is too flawed to reasonably form the basis for a proposed rule. In Louisiana, many gas transmission units are uncontrolled or only marginally controlled. In contrast, a Pennsylvania NOx RACT rule has resulted in installation of NOx controls on the majority of units, with some units not meeting the Proposed Rule limits due to marginally higher emission standards in Pennsylvania or unit-level compliance via emissions averaging or alternative RACT.

For Louisiana units:

- EPA estimates that there are 45 affected units, but INGAA member data indicate there are 204 units that would require control, and most of the units are currently uncontrolled (191 of 204).

- However, many units exhibit very low utilization, so actual annual NOx emissions are well below 100 TPY. **Actual utilization for the 204 units was approximately 23%** of potential operations (*i.e.*, based on annual hp-hours). This is indicative of "actual emissions" less than 100 TPY for most units, as compared to the 1,000 hp applicability threshold that assumes utilization more than three times higher.

- EPA estimates **9,395 TPY** of NOx emission reductions from the 45 units with an uncontrolled baseline of 9,823 TPY, which is equivalent to 95.6 percent reduction on average.

- Based on INGAA member data and more realistic average reductions, NOx reductions are estimated at approximately **11,485, TPY**. If EPA's assumption is used (95.6 percent average reduction), NOx reductions are **14,105 TPY**.

18

**611a**

- Note that these reductions include nominal amounts for many units with very little operating time. **Over 77 percent of the units operated less than 40 percent of the time.**

• The estimated cost for retrofitting 192 uncontrolled units in Louisiana likely exceeds $400 million. The types and sizes of units in Louisiana are similar to the full fleet of gas transmission RICE affected, so extrapolating this to 1,199 uncontrolled units (*see* Table 3) indicates a total capital cost of $3 billion or more for RICE affected by the Proposed Rule operated by INGAA members.

For Pennsylvania units:

• EPA estimates seven affected units in Pennsylvania, achieving **1,025 TPY of NOx reductions** based on 95.4 percent average control.

• Pennsylvania units include emissions control, but INGAA member data indicate there are 57 units with emissions marginally above the proposed standards (*e.g.*, 2–5 g/bhp-hr) that would require additional capital expenditure to further reduce NOx to meet the proposed standards. One unit is uncontrolled but will likely be installing controls to meet an update to Pennsylvania's NOx RACT rule.

• **Actual utilization for the 58 units was approximately 34 percent** of potential operations on an annual hp-hour basis. Because the units include NOx control and utilization is relatively low, actual emissions are less than 100 TPY for all units but one.

• EPA estimates **1,025 TPY** of NOx emission reductions from the 7 units with an uncontrolled baseline of 1,077 TPY, which is equivalent to 95.4 percent reduction on average.

• Based on INGAA member data, NOx reductions are estimated at approximately **611 TPY** with an average emission reduction of about 47 percent.

- Note that these reductions include nominal amounts for units that already include emission controls. In addition, about 40 percent of the units operated less than 40 percent of the time.

III.    **Without Appropriate Revisions, the Proposed Rule Will Result in Unlawful Over-Control of the Pipeline Transportation of Natural Gas Sector.**

The U.S. Supreme Court has made clear that EPA has an obligation to avoid "over-control" of upwind sources when it chooses to regulate pursuant to the good neighbor provision of the CAA to address interstate transport and downwind nonattainment or interference with

19

**612a**

maintenance.[37] That means that upwind states cannot be required to reduce their emissions below their levels of significant contribution to downwind nonattainment. In other words, all of the work to achieve attainment with the NAAQS cannot be left to upwind states. Downwind states must do their part as well.

The Supreme Court's ruling in *EME Homer II* provided EPA with some leeway to address the over-control issue. It noted that while EPA has a statutory duty to avoid over-control, the Agency also has a statutory obligation to avoid "under-control," *i.e.,* to maximize achievement of attainment downwind. The Court explained that:

> a degree of imprecision is inevitable in tackling the problem of interstate air pollution. Slight changes in wind patterns or energy consumption, for example, may vary downwind air quality in ways EPA might not have anticipated. The Good Neighbor Provision requires EPA to seek downwind attainment of NAAQS notwithstanding the uncertainties. Hence, some amount of over-control, *i.e.,* emission budgets that turn out to be more demanding than necessary, would not be surprising. Required to balance the possibilities of under-control and over-control, EPA must have leeway in fulfilling its statutory mandate.[38]

This "leeway" the Supreme Court explained, might allow EPA to require emissions reductions in an upwind state that could result in over-control relative to a downwind receptor in one state so long as those upwind reductions were still necessary to eliminate significant contribution at another receptor in another state. This sort of incidental over-control, the Supreme Court held, might still be consistent with the CAA's good neighbor provision. What would clearly be impermissible, the Court held, is an interstate transport rule that "requires an upwind State to reduce emissions by more than the amount necessary to achieve attainment in *every* downwind State to which it is linked."[39] Between these two extremes identified by the

---

[37] *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 523 (2014) ("*EME Homer II*").

[38] *Id*.

[39] *Id*.

Supreme Court, the record that EPA develops to support an interstate transport rule must certainly provide a legitimate basis for concluding that the Agency has struck a reasonable balance between potential over- and under-control, and that EPA has rational reasons for concluding that its rule will not result in either unlawful outcome. The Proposed Rule here does not appropriately strike that balance for natural gas transportation pipelines.

### A.     INGAA's Analysis Demonstrates the Proposed Rule Would Over-Control the Pipeline Transportation of Natural Gas Sector.

As demonstrated in section II above, EPA's Proposed Rule would require significantly more emission reductions on a national and a state-by-state basis than the Agency has assumed. On a national basis, EPA has calculated that its Proposed Rule would result in 55,546 TPY of NOx reductions from the pipeline transportation of natural gas sector. INGAA's analysis shows that the Proposed Rule would result in NOx reductions of at least approximately 112,967 TPY. EPA's national NOx reduction estimate is, therefore, off by *at least* an approximate 57,421 TPY. If EPA believes, as it must, that national NOx emission reductions on the order of 55,546 TPY are necessary to address the significant contribution of the pipeline industry in the 23 states covered by the non-EGU provisions of the Proposed Rule, then surely a rule that would result in reductions more than twice that amount would result in over-control.

The state-by-state estimates provided above further confirm that the Proposed Rule would result in over-control with respect to the natural gas pipeline transportation industry. Of the 23 states included in the non-EGU program, four states (California, Maryland, Nevada, and New Jersey) have very limited data, or no units owned or operated by INGAA members. INGAA has therefore not further evaluated them. Of the remaining 19 states, INGAA's analysis shows that 16 would be subjected to NOx emission reductions that are higher—in many cases

21

**614a**

substantially higher—than EPA has estimated the Proposed Rule would require.[40] The overages range from 22 percent to 1,092 percent, with nine of the overages over 100 percent. This is not incidental over-control that results by virtue of an upwind state being linked to more than one downwind state. This over-control has resulted from EPA's pervasive misunderstanding of the fundamental attributes of the natural gas pipeline transportation sector.

The conclusion that the Proposed Rule would result in over-control is not simply based on the sizeable difference between EPA's estimated emission reductions and the emission reductions that INGAA projects based on its more complete and accurate data. The CAA requires EPA, when acting pursuant to the good neighbor provision, to clearly identify "significant contribution" in terms of overall emission reductions that sources and states must achieve.[41] EPA does this by applying a cost-effective control analysis to the sources it chooses to regulate.[42] That analysis for this Proposed Rule identified a level of significant contribution from the pipeline transportation of natural gas sector consistent with national emission reductions of 55,546 TPY and state-by-state emission reductions calculated by EPA as set forth in Table 3 above. Flaws in the record have caused EPA to inadvertently propose to pull in sources and require emission reductions far in excess of what the Agency believes amounts to significant contribution. That is over-control, and eliminating it by revising the Proposed Rule will help

---

[40] Three states—Missouri, Oklahoma, and Pennsylvania—are expected to achieve fewer emission reductions than EPA has projected. INGAA's analysis shows EPA has estimated reduction overages of 37, 29, and 45 percent, respectively. As explained above, this is almost certainly due to a combination of factors, including that the sources in these states are either controlled pursuant to RACT and differences in unit-type and size. *See* footnote 35 above.

[41] *North Carolina v. EPA*, 531 F.3d 896, 908 (D.C. Cir. 2008) ("It is unclear how EPA can assure that the trading programs it has designed … will achieve section 110(a)(2)(D)(i)(I)'s goals if we do not know what each upwind state's 'significant contribution' is to another state.").

[42] *See, e.g.*, 87 Fed. Reg. at 20,055.

EPA achieve the emission reductions that are warranted without undue hardship on industry and protracted legal battles over these issues.

**B.    Additional Considerations Do Not Undercut the Conclusion that the Proposed Rule Would Result in Over-Control.**

It is also important to emphasize that EPA's underestimation of affected units and emission reductions does not stem from a misunderstanding of the pipeline transportation of natural gas sector's overall NOx emissions. On the contrary, EPA's national emissions inventory for the source category is complete. As explained above, the primary reason that the Proposed Rule would control more sources and result in more reductions than EPA expected is the Agency's lack of information on unit utilization and the Proposed Rule's flawed applicability threshold. The Agency does know exactly how many NOx emissions are at issue and what emission reductions (approximately 55,546 TPY) may be needed to address significant contribution.

Additionally, the over-control analysis presented in the Proposed Rule does not adequately address the issue and cannot counter the conclusion that the pipeline transportation of natural gas sector would be over-controlled under the Proposed Rule. EPA's analysis looks only at the emission reductions it has assumed. Because the record for the pipeline transportation of natural gas sector is so flawed, it does not speak to the actual effects of the proposal in the real world.

It is also important to discuss the manner in which the courts have previously addressed over-control issues. In *EME Homer II*, the Supreme Court determined that potential over-control did not warrant invalidation of a good neighbor rule "on its face" and that instead it was appropriate to contest over-control of individual upwind states in "particularized, as-applied

23

**616a**

challenge[s]."[43] While that was the appropriate remedy for the rule in question in that earlier litigation, it is not the necessary or appropriate approach here. In particular, state-specific, as-applied challenges were needed during the previous round of transport rule litigation because the petitioners there argued only that EPA's methodology for devising state budgets, using uniform emission control costs to select reasonable controls and to model budgets that reflect the installation and operation of those controls, had the *potential* to result in over-control.[44] Here, EPA has identified tonnage reductions from the pipeline transportation of natural gas sector that it believes will address the industry's significant contribution to downwind nonattainment, but inadvertently proposed requirements that would impose vastly larger reduction requirements. There is not just potential for over-control, as there was under previous versions of CSAPR. Over-control is guaranteed. As such, state-by-state as applied challenges are not necessary to demonstrate over-control.[45]

Finally, EPA should consider that the controls to be installed to comply with the Proposed Rule would operate year-round, not just during the ozone season. Although the Proposed Rule is concerned with ozone season reductions and those are the reductions needed to address significant contribution, EPA should acknowledge that the rule will result in additional reductions, and the Agency could find some manner to credit the sector for those additional reductions.

Because EPA's Proposed Rule will result in unlawful over-control, INGAA requests that the Agency reevaluate the control requirements it has proposed. One approach that could address

---

[43] *EME Homer II*, 572 U.S. at 524.

[44] *EME Homer III*, 795 F.3d at 126.

[45] A particularized as-applied challenge is appropriate "for challengers who raise the possibility of overcontrol in only a few instances," where petitioners "speculate" that EPA's methodology could lead to over-control. *Wisconsin v. Env't Prot. Agency*, 938 F.3d 303, 325 (D.C. Cir. 2019).

the issue of over-control would be raising the hp threshold for the Proposed Rule's applicability. Taking this approach, EPA could more effectively target those uncontrolled sources that emit more than 100 TPY. Determining an appropriate threshold with precision could involve additional technical analysis, and INGAA would be happy to assist EPA in that effort. Whichever approach EPA ultimately chooses, INGAA encourages the Agency to work collaboratively with the industry to identify regulatory requirements that will achieve meaningful environmental benefits consistent with EPA's legal obligation to address significant contribution without improper over-control.

## IV.    The Proposed Rule Should Be Revised to Provide Cost-Effective and Environmentally Sound Compliance Flexibility Consistent with Other EPA and State Regulatory Policies.

Because eliminating the significant contributions of upwind state sources to downwind state nonattainment and interference with maintenance poses many challenges, EPA has consistently sought to provide sources as much flexibility as possible. For electric utilities, EPA has consistently acknowledged the need to provide flexibility through emission allowance trading programs to address interstate transport.[46] For the natural gas pipeline transportation sector, EPA has historically provided regulatory flexibility through emissions averaging.[47] EPA should take that approach here.

---

[46] EPA adopted a trading program approach in the 1998 NOx SIP Call, 2005 Clean Air Interstate Rule ("CAIR"), 2011 Cross-State Air Pollution Rule, 2016 CSAPR Update, the 2018 CSAPR Closeout, and it is the approach EPA has proposed for EGU provisions of the Proposed Rule.

[47] INGAA supports EPA's decision to separate the EGU and natural gas transportation programs. EPA identified reasons (lack of data, lack of CEMS) for not including the natural gas pipeline industry in the EGU trading program. INGAA agrees that incorporating the pipeline transportation of natural gas industry into the EGU program would be unnecessarily complicated. Nevertheless, INGAA believes other forms of flexibility are necessary and that they would enhance the environmental benefits of the program.

25

**618a**

A.    **EPA Precedent Supports Use of Averaging.**

If EPA moves forward with the Proposed Rule, INGAA recommends EPA adopt emissions averaging, as it did in the NOx SIP Call Phase 2 rule, which demonstrated real and lasting emission reductions in an efficient manner. Starting in 1998, EPA's NOx SIP Call rule included control requirements for large stationary internal combustion engines.[48] INGAA challenged aspects of the 1998 NOx SIP Call, and the D.C. Circuit remanded the 1998 NOx SIP Call to EPA with respect to INGAA's challenge.[49]

In response to the court's decision and in support of EPA's action on remand, INGAA engaged in extensive discussions with the Agency to help design the elements of a replacement rulemaking. That resulted in the development of the 2004 NOx SIP Call Phase 2 rule. There, EPA evaluated and came to support reliance on emissions averaging for RICE in the natural gas pipeline sector as a reasonable compliance flexibility mechanism. The Phase 2 rule, like the Proposed Rule, was developed to address the interstate transport of ozone and required 21 states and the District of Columbia to eliminate NOx emissions that contributed significantly to downwind nonattainment of the 1-hour ozone standard. As such, the emissions averaging provisions used to implement the Phase 2 NOx SIP Call rule are particularly relevant to implementation of the Proposed Rule.

EPA first addressed in detail the issue of emissions averaging for the purpose of addressing interstate transport in an August 22, 2002 guidance memorandum[50] that was intended to help states developing SIPs respond to NOx SIP Call. The memo says that "[w]here states

---

[48] 63 Fed. Reg. 57,356 (Oct. 27, 1998).

[49] *See Michigan v. EPA*, 213 F.3d 663, 693, 695 (D.C. Cir. 2000).

[50] Memorandum from Lydia N. Wegman, "State Implementation Plan (SIP) Call for Reducing Nitrogen Oxides (NOx) – Stationary Reciprocating Internal Combustion Engines" (Aug. 22, 2002) ("Wegman Memo").

26

**619a**

choose to regulate large IC engines, EPA encourages states to allow owners and operators of large IC engines the flexibility to achieve the NOx ton/season reductions" by using a variety of control technologies, noting that while control technologies are known to have "a specific average control effectiveness for an engine population, some individual engines that install the controls would be expected to be above and some below that average control level, simply because it is an average."[51] For that reason, EPA stated:

> During the SIP development process the States may establish a *NOx tons/season emissions decrease target for individual companies and then provide the companies with the opportunity to develop a plan that would achieve the needed emissions reductions*. The companies may select from a variety of control measures to apply at their various emission units in the State or portion of the State affected under the NOx SIP call. These control measures would be adopted as part of the SIP and must yield enforceable and demonstrable reductions equal to the NOx tons/season reductions required by the State. *What is important from EPA's perspective is that the State, through a SIP revision, demonstrate that all the control measures contained in the SIP are collectively adequate to provide for compliance with the State's NOx budget during the 2007 ozone season.*[52]

Accordingly, in one of EPA's earliest rulemakings to address interstate transport for the ozone NAAQS, the Agency embraced emissions averaging for RICE on an individual company basis. In its 2004 final rule for the Phase 2 NOx SIP Call, EPA adopted the position stated in the Wegman memo, using almost exactly the same language.[53] As described in the final Phase 2 rule, commenters on the proposal provided additional well-reasoned rationales for allowing RICE to use emissions averaging for purposes of meeting their interstate transport obligations. The commenters noted the following benefits of company-specific emissions averaging:

---

[51] *Id*. at 1.

[52] *Id*. at 2 (emphases added).

[53] 69 Fed. Reg. 21,604, 21,621 (Apr. 21, 2004).

- Engine owners and operators would accept enforceable and verifiable measures to control engines to meet assigned NOx SIP Call reductions.

- Based on the company compliance plans, States would be able to clearly demonstrate their compliance with Phase II of the NOx SIP Call.

- The EPA, States, and regulated companies would not have to work through the technical confusion of definitions of lean-burn and rich-burn engines and whether individual engines could in fact achieve certain control levels with a prescribed control technology.

- Compliance with NOx SIP Call requirements could be achieved with minimum impacts on cost, natural gas capacity, and operational reliability.[54]

In furtherance of these goals and to encourage states to adopt SIPs that incorporated emissions averaging for RICE, EPA developed a model rule that states could adopt as part of their SIPs. The model rule was focused on compliance with the rule's emission reduction requirements by 2007 and was based on a "Facility Seasonal NOx 2007 Tonnage Reduction," which EPA defined as "the total of the Engine Seasonal NOx 2007 Tonnage Reductions attributable to all of an owner/operator's Large NOx SIP Call Engines," *i.e.*, the engines subject to the rule's requirements.[55]

As suggested by the language included in the preamble to final Phase 2 rule, the model rule was based on a compliance plan approach. These compliance plans "must demonstrate enforceable emission reductions from one or more stationary internal combustion engines equal to or higher than the Facility Seasonal NOx 2007 Tonnage Reduction."[56] The plan "may cover some or all engines at an individual facility or at several facilities or at all facilities in a State that are in control of the same owner/operator."[57] Interestingly, the model rule allowed facility

---

[54] *Id.*

[55] Model Rule § 1(c).

[56] *Id.* § 3(a)(2).

[57] *Id.* § 3(a)(3).

28

**621a**

owners to get credit for emission reductions from engines subject to the rule and from other engines:

> The compliance plan may include credit for decreases in NOx emissions from Large NOx SIP Call Engines in the State due to NOx control equipment. Credit may also be included for decreases in NOx emissions from other engines in the State due to NOx control equipment not reflected in the 2007 Ozone Season Base NOx Emissions in the NOx SIP Call Engine Inventory.[58]

Finally, the compliance plan had to include "[a] numerical demonstration that the emission reductions obtained from all engines included under the plan will be equivalent to or greater than the owner/operator's Facility Seasonal NOx 2007 Tonnage Reduction, based on the difference between the Past NOx Emission Rate and the Projected NOx Emission Rate multiplied by the Projected Operating Hours for each Affected Engine."[59]

Since the emissions averaging approach adopted in the NOx SIP Call Phase 2 rule has been demonstrated to achieve real and lasting emission reductions in an efficient manner, state environmental regulatory bodies have adopted similar regulatory approaches. Texas, for instance, has allowed emissions averaging to demonstrate compliance with its emission reduction requirements for grandfathered RICE located in West and East Texas. Those rules generally require each affected engine in East Texas to achieve at least a 50 percent reduction of the hourly emissions rate of NOx and affected engines in West Texas to achieve up to a 20 percent reduction of the hourly emissions rate of NOx.[60] The rules further provide, however, that "the owner or operator of more than one grandfathered reciprocating internal combustion engine may average the reductions achieved among more than one reciprocating internal combustion engine

---

[58] *Id*. § 3(a)(5).

[59] *Id*. § 3(a)(6)(v).

[60] 30 TAC § 116.779 (b)(1), (2).

connected to or part of a gathering or transmission pipeline in order to demonstrate" the required reductions.[61] The Texas rules even allow averaging across engines located in both East and West Texas so long as the owner or operator demonstrates that "the sum of the reductions achieved from all of the engines located in the East Texas region as defined in §101.330 of this title will achieve the reductions" required of such units.[62]

Pennsylvania has also adopted emissions averaging provisions to address NOx and volatile organic compounds ("VOCs") for purposes of RACT, and EPA has approved those provisions.[63] The Pennsylvania rules provide source-specific RACT determinations or alternative NOx emissions limits for sources at 23 major NOx and VOC emitting facilities within the state to address the 1997 and 2008 8-hour ozone NAAQS. The alternative NOx emission limits include facility-wide or system-wide NOx emissions averaging plans. To assess the effectiveness of averaging, Pennsylvania conducted an evaluation of aggregate NOx emissions emitted by the sources included in the facility-wide or system-wide NOx emissions averaging plan. The state concluded, and EPA agreed, that those emission reductions under the averaging plans would be equivalent to emissions if the individual sources were operating in accordance with the applicable presumptive limit. Accordingly, EPA determined that the averaging plan was consistent with all applicable laws and regulations and approved the plan.

These states are not outliers. On the contrary, a range of geographically diverse states have adopted emissions averaging based on EPA's model rule for control of RICE NOx emissions. Illinois, for instance, allows owners and operators of affected RICE units to comply

---

[61] *Id*. § 116.779 (b)(3).

[62] *Id*.

[63] *See* 87 Fed. Reg. 3,929 (Jan. 26, 2022).

30

**623a**

with NOx emission limits through an emissions averaging plan.[64] The rule provides equations by which owners and operators must demonstrate that total mass of actual NOx emissions from the units listed in the emissions averaging plan are equal to or less than the total mass of allowable NOx emissions for those units for both the ozone season and calendar year.

New York has also adopted emissions averaging rules.[65] New York's rules require emissions averaging plans to employ a weighted average permissible emission rate and include provisions for adjusting the weighted average to address forced outages. The state's rules also prohibit averaging of emissions from sources within the severe ozone nonattainment area with those outside the severe ozone nonattainment area.

Ohio has adopted similar regulations authorizing owners and operators of affected RICE to comply with NOx emission standards through EPA-approved emissions averaging plans.[66] Ohio's rules require that emission reductions counted under such a plan be "real, quantifiable and enforceable and … in excess of any state or federal requirements."[67] The rules further provide that those emission reductions must be equal to or greater than the actual emission reductions that would be required under Ohio's rules if an emissions averaging program were not employed. Further, Ohio allows an owner or operator to take credit for emission reductions resulting from a unit shutdown only if the owner or operator can demonstrate that "the shutdown does not correspond to load-shifting or other activity which results in or could result in an

[64] Ill. Admin. Code tit. 35, § 217.390.

[65] 6 NYCRR 227-2.5(b).

[66] Ohio Admin. Code 3745-110-03(I).

[67] *Id.*

31

**624a**

equivalent or greater emission increase and that the reduction accounts for any increase in NOx emissions from other sources as a result of the shutdown."[68]

Finally, in addition to EPA's model rule, the Ozone Transport Commission ("OTC") has developed its own NOx RACT technical guidelines for RICE used in natural gas transmission.[69] The OTC guidelines provide emission rate limits that would apply to various types and sizes of RICE. They also include provisions that would authorize emissions averaging for multiple natural gas-fueled units that are under the control of a common owner or operator at a single facility to achieve the same level of NOx reductions that would be achieved if all of the units at the location met the applicable NOx emissions limitations of the guidelines.[70] As EPA has relied on OTC model rules to establish the emission rate limits proposed in this Proposed Rule, EPA should likewise adopt emission averaging as a compliance measure based on OTC approval of that approach.

### B. Averaging Will Help to Address Otherwise Insurmountable Obstacles to Compliance with the Proposed Rule.

EPA has proposed to require non-EGU sources to comply with the Proposed Rule's emission limits beginning in 2026. As explained in section V of these comments, INGAA does not believe EPA has established record support for the feasibility of a 2026 compliance deadline. Indeed, there is no realistic pathway to retrofitting every affected unit with the controls necessary to meet EPA's proposed emission limits. The compliance deadline is not, however, the only practical impediment to compliance for INGAA members. Units of certain vintages and units

---

[68] *Id*. at 3745-110-03(I)(1)(e).

[69] OTC, "OTC Regulatory and Technical Guideline for Control of Nitrogen Oxides (NOx) Emissions from Natural Gas Pipeline Compressor Fuel- Fired Prime Movers," (May 14, 2019), available at https://otcair.org/upload/Documents/Model%20Rules/OTC_RegAndTechGuideline_NGPipelineCompressorPrimeMovers_TechFeasibility_CostEffectivenessAnalysis_Final_05142019.pdf.

[70] *Id*. at 5.1.2.

from certain manufacturers will not be able to meet the emission rate limits EPA has proposed. Absent a system based on source-specific emission limits, emissions averaging is one of the only practical mechanisms for addressing these challenges. Even with emissions averaging, absent additional changes to the Proposed Rule, compliance challenges will remain. Nevertheless, what is clear is that compliance without averaging will be impossible.

As the D.C. Circuit has explained, "impossibility" is a key concept under the good neighbor provision of the CAA.[71] EPA is obligated to align its interstate transport emission reduction requirements with the next applicable NAAQS attainment date unless doing so is "impossible." Just as EPA is obligated to provide sources with adequate time to achieve the emission reductions necessary to address significant contribution, EPA must provide adequate regulatory tools and safety valves to ensure that affected sources can comply with the Agency's rules.

## V.  EPA Has Underestimated the Length of Time Necessary to Retrofit Existing Units.

As EPA has acknowledged in past rulemakings where it has considered addressing interstate transport of ozone by including emission reduction requirements for RICE in the natural gas pipeline industry, significant time and resources are needed for acquiring control technologies, hiring the labor required for retrofits, obtaining needed permits, and managing the timing for staggering retrofits.[72] The Proposed Rule includes a compliance timeframe that cannot be reconciled with EPA's past positions and that the industry cannot meet under current conditions. INGAA's comments advocate for a number of changes to the Proposed Rule, all of

---

[71] *Wisconsin*, 938 F.3d at 320; *New York v. EPA*, 781 Fed. App'x 4, 7 (D.C. Cir. 2019).

[72] *See, e.g.*, U.S. EPA Office of Air and Radiation, Technical Support Document for the Cross-State Air Pollution Rule for the 2008 Ozone NAAQS: Assessment of Non-EGU NOx Emission Controls, Cost of Controls, and Time for Compliance at 21; Docket ID No. EPA-HQ-OAR-2015-0500 (November 2015) (hereinafter "Non-EGU NOx Emission Controls TSD").

33

**626a**

which would help to improve the feasibility of NOx regulation for affected units. Those changes include:

- Revising the Proposed Rule to regulate a number of units that would achieve emission reductions consistent with the level of control needed to address the significant contribution of the industry to downwind nonattainment and maintenance issues

- Preventing unlawful over-control

- Allowing the use of emissions averaging as a compliance tool for affected units

- Responsibly addressing regulatory costs and reliability impacts

Even with these changes, compliance with a well-designed and reasonable rule to address interstate transport of NOx is almost certainly impossible for the interstate natural gas pipeline industry to achieve by 2026. This section of INGAA's comments explains why that is the case and the nature of the constraints that will limit the installation or modification of controls on RICE that would be affected by the Proposed Rule. As described below, for these reasons, INGAA suggests that EPA generally consider a phased approach to compliance with any NOx standards that it promulgates for the industry.

In a 2014 analysis[73] prepared for the INGAA Foundation, Inc. and submitted to EPA as part of rulemaking docket for its 2014 CSAPR "Close-out" rule,[74] Innovative Environmental Solutions, Inc. & Optimized Technical Solutions evaluated "the resources required of the operating companies, emission reduction suppliers, engineering service providers, and contractors to implement NOx control regulations for low speed reciprocating engines used in the interstate natural gas transportation industry" and concluded that "the projected time to

---

[73] Innovative Environmental Solutions, Inc. & Optimized Technical Solutions, "Availability and Limitations of NOx Emission Control Resources for Natural Gas-Fired Reciprocating Engine Prime Movers Used in the Interstate Natural Gas Transmission Industry," (July 2014) ("Control Availability Report").

[74] 83 Fed. Reg. 31,915 (July 10, 2018).

34

**627a**

implement retrofit NOx control (or replacement) is far in excess of typical regulatory schedules."[75] The report is extremely relevant to the current rulemaking. It evaluates the same emission control technologies, including Low Emission Combustion ("LEC"), nonselective catalytic reduction ("NSCR"), and selective catalytic reductions ("SCR") that continue to be the basis for the emission rates proposed by EPA to address interstate transport for the 2015 ozone NAAQS.[76] The report also contains a review of the various types and numbers of RICE inventoried at the time.[77] The report's evaluation of potential regulatory drivers includes a new regional rule to address interstate transport comparable to but more stringent than the 2004 Phase 2 NOx SIP Call, precisely what the Proposed Rule is, and it specifically considers potential impacts (including "a broad regional NOx control rule") of a 2015 ozone NAAQS set in a range from 60 to 70 parts per billion ("ppb"), accurately reflecting the current regulatory landscape.[78] It also evaluated available resources and the cost and schedule to install controls based on NOx endpoints of 3 g/bhp-hr or 1 g/hp-hr, consistent with the limits EPA has now proposed.[79]

After reviewing this fundamental information, the report provides an assessment of resource constraints associated with NOx control retrofits. In doing so, it provides relevant examples, such as the conversion of 200 natural gas transmission units to LEC starting in 1999 as part of the NOx SIP Call. The report finds "[f]rom interviews with the operators and the emission reduction equipment suppliers, the conversion process took six years in total to fully implement."[80] The report further concludes that, generally, "[b]ased on interviews with pipeline

---

[75] Control Availability Report at 1.

[76] *Id*. at 6-9.

[77] *Id*. at 10-18.

[78] *Id*. at 18-19.

[79] *Id*. at 21.

[80] *Id*. at 27.

operations and emission reduction equipment suppliers having experience with previous conversion projects, NOx control for each engine requires between 1 and 2 ½ years to complete (from inception to completion of commissioning)" with older engines and retrofits requiring more infrastructure modifications taking additional time.[81] Most importantly for purposes of a broadly applicable rule like the Proposed Rule, "[t]aking into account both the lead time and conversion time and based on currently available resources (i.e., trained personnel), the average number of units that can be modified to lean combustion on a sustained basis is *approximately 75 engines per year*."[82] The report's conclusion in this regard is based on what it calls current resource availability, but it acknowledges that "a dramatic increase in market demand would likely result in hiring and training of additional resources."[83] Nevertheless, "the special skills associated with this niche market would require time to build that resource."[84]

To retrofit RICE to meet a 3 g/hp-hr standard, the report estimates that "[b]ased on current technical resources, the projected time to implement retrofit NOx control (or replacement) is far in excess of typical regulatory schedules[, and] that it would take decades to address NOx controls for a large number of engines, even if the annual rate of retrofit conversions is doubled."[85] Retrofitting a smaller number of engines to achieve a 1g/hp-hr standard, the report concludes, would have a minimal impact on schedule, but would have "a significant cost impact, with engine-specific costs on average about 65% higher to achieve 1 g/hp-hr."[86]

---

[81] *Id*.

[82] *Id*. (emphasis in original).

[83] *Id*.

[84] *Id*.

[85] *Id*. at 29.

[86] *Id*.

36

**629a**

The market for expert services needed to conduct the retrofits that would be required by the Proposed Rule has not improved in any substantial way since the preparation of the Control Availability Report. EPA's own estimate that covered RICE can install controls by the 2026 ozone season is undermined by the Agency's substantial underestimation of affected units, as described in section II of these comments. For the existing equipment in natural gas transmission, there is a limit of qualified service providers that support control implementation. Factors to be considered include service provider and equipment availability (which is limited), access to multiple vendors that serve the supply chain, budget cycles and lead time for procuring equipment, consideration of control installation downtime requirements of about one month for each unit serviced, operating constraints that limit out-of-service equipment, and timing for permitting. Further, current supply chain issues affecting the economy as a whole will undoubtedly result in further delays in performing necessary retrofits.

In addition, there are permitting constraints that will significantly expand the timeframe for completing retrofits required by the Proposed Rule. Due to the workload of the permitting agencies, the permitting process typically takes six to fifteen months to complete. In some cases, the process can take longer depending on the complexity of the project. With a rule that envisions permitting requirements as broadly applicable as the Proposed Rule's, significant delays and resource constraints are likely to add additional delays to the process.

EPA's proposal also does not take into account that pipelines that choose to replace RICE units with new units must seek permitting approval from various federal agencies, including the Federal Energy Regulatory Commission ("FERC") should they either increase the hp of the unit or need to seek a new or temporary right-of-way for construction. A pipeline that wishes to increase its hp must seek a certificate of public convenience and necessity from FERC under

37

**630a**

section 7 of the Natural Gas Act. It must also obtain various environmental permits from permitting agencies, such as U.S. Army Corps of Engineers, EPA, and the Department of Interior's Fish and Wildlife Service, and submit for safety review by the Department of Transportation's Pipeline and Hazardous Materials Safety Administration. The FERC timeline for reviewing—assuming it must go through a National Environmental Policy Act review—will take at a minimum 1 ½ years. EPA's proposal is likely to prompt a sudden, substantial increase in the number of certificate or permit applications submitted to the government for review if owners and operators determine that retrofitting affected units will require the expansion of facility footprints or if other similar action will be necessary. This increase in turn could further lengthen the review period by straining the resources of federal agencies. The review period also could take longer if the compressor is sited in a densely populated area or there are protests associated with the project.

As one measure to address potential compliance deadline bottlenecks and other complications, EPA has asked for comment on a case-by-case extension process for non-EGU sources. The Agency has asked for specific criteria by which it should judge such requests and on the process for reviewing and acting on such requests. A flexible and timely approach for addressing case-by-case compliance deadline extensions is an important backstop measure that could be of significant use to industry and permitting authorities when circumstances demand it. To that end, INGAA supports adoption of a process substantially similar to the approach used to determine RACT for individual sources. EPA could implement such a process pursuant to its FIP, but also could make clear in its final rule that states could submit simple SIPs to take over this process from EPA.

38

**631a**

It is unclear from EPA's proposal whether the Agency envisions making these determinations itself or delegating these sorts of decisions to the states. INGAA generally supports allowing states to take over the process for making source-by-source determinations, given their experience and expertise in overseeing such determinations. EPA should make clear in any final rule that it encourages states to take such action. To assist states in taking control of these interstate transport provisions, EPA should clearly state the emission reduction targets that it believes are needed to address significant contribution. EPA should also make clear, consistent with governing case law, that states are free to determine the means used to achieve emission reductions and that states may choose alternative approaches to the emission limits EPA has proposed in its FIP.[87]

In addition, INGAA suggests that upon submittal of a complete application for a case-by-case deadline extension determination, the final rule provide for an automatic tolling of the relevant compliance date or dates that would be commensurate with the time taken by EPA (or other decisionmakers) to make a final determination regarding the extension. Such a provision would confer a necessary level of certainty for regulated sources to make effective use of any extension provision.

INGAA supports EPA adopting the most flexible process possible for making such requests, as cost, technical, or issues or other constraints could arise at any time leading up to the Proposed Rule's general compliance deadline. Accordingly, INGAA does not recommend that EPA establish a hard cutoff date for submittal of case-by-case extension requests. EPA should

---

[87] *Michigan v. EPA*, 213 F.3d 663, 686 (D.C. Cir. 2000), *cert. denied*, 121 S. Ct. 1225 (2001) (noting that in the NOx SIP Call "EPA calculated the budgets using highly cost-effective emission controls, [but] the agency allows the states to choose the control measures necessary to bring their emissions within the budget requirements").

judge any such request on the merits of the issues that have arisen, including whether the issues were brought to EPA's attention in a timely manner.

Even if EPA adopts a case-by-case extension provision, INGAA nevertheless believes, as stated above, that the interstate natural gas pipeline industry requires a more comprehensive and universally applicable phased compliance schedule for any rule that EPA is likely to develop. How long that phased compliance schedule will need to be will depend on the number of units that are ultimately subject to the rule and key features of the rule. INGAA is prepared to work with EPA to help design a compliance program that will be reasonable and successful. What is clear, however, is that the proposed compliance deadline in 2026 is not possible for the industry.[88]

As noted above, impossibility is a key legal standard that the courts have identified as controlling EPA's discretion to establish compliance deadlines under the good neighbor provision. Generally, EPA's interstate transport rules must include compliance deadlines for upwind states that will ensure implementation of upwind state obligations by the next applicable

---

[88] EPA suggests in the Proposed Rule that affected units have been given additional notice by virtue of the Proposed Rule's availability and that this additional time further supports the 2026 compliance deadline for non-EGUs that would be subject to the Proposed Rule. 87 Fed. Reg. at 20,101 ("the publication of this proposal provides roughly an additional year of notice to these source owners and operators that they should begin engineering and financial planning now to be prepared to meet this implementation timetable"). EPA should acknowledge that owners and operators of potentially affected units cannot realistically plan for compliance with provisions of a Proposed Rule that is likely to change as a result of the rulemaking process and that the proposal of a new regulation will not alter the market constraints, permitting bottlenecks, and similar issues that will all determine the timeframe in which compliance with a final rule will be possible. As a legal matter, moreover, the courts have recognized that regulated parties must have fair notice of what will actually be required of them and the time necessary to comply. A proposed rule does not provide adequate assurance of what will ultimately be required. *See, e.g., FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."); *id.* ("regulated parties should know what is required of them so they may act accordingly"); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012) ("It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance …."). Further, under the most generous interpretation, the publication of the Proposed Rule would provide affected units, with at most, four years and 25 days until the beginning of the ozone season in 2026. Even if this were a valid consideration, the additional time provided by virtue of publication of the Proposed Rule would not come close to addressing the constraints on compliance for the interstate natural gas pipeline industry, as these comments explain.

attainment deadline. That is the case unless it is impossible for sources to achieve those emission reductions in that timeframe. The schedule EPA has proposed for engines in the pipeline transportation of natural gas sector is impossible for the affected units to meet. As such, EPA has the authority and the obligation to establish alternative, workable compliance deadlines in the final rule.

## VI.    EPA Has Not Adequately Evaluated Reliability Issues.

Installation of controls and monitoring equipment will require taking affected units offline for extended periods of time. Installing controls to meet EPA's proposed schedule is certain to have serious reliability implications due to the Proposed Rule's impact on interstate natural gas pipeline companies that operate as an interconnected system. EPA has not assessed how the system will be impacted nor offered any guidance on how such a massive effort could be coordinated.

Each pipeline will need to take their affected units offline at the same time to meet EPA's compliance deadline because the time needed to complete the necessary retrofits would preclude an orderly, sequential approach. This will greatly reduce throughput throughout the nation, leading to reliability issues. This is the case because the U.S. natural gas pipeline system is a highly integrated network.[89] Thus, if throughput is reduced across the 23 states covered by the Proposed Rule, shippers in other states who depend on natural gas being transported first to those 23 states will be impacted.

For example, New England "has no indigenous fossil fuels and therefore, fuels must be delivered by pipeline, ship, truck, or barge from distant places."[90] "[A] failure at a single point

---

[89] EIA, *Natural Gas Explained*, available at  https://www.eia.gov/energyexplained/natural-gas/natural-gas-pipelines.php.

[90] ISO-NE, Natural Gas Infrastructure Constraints, available at https://tinyurl.com/2p9ewwjc.

on the pipeline system . . . in New England will likely create significant impacts."[91] The pipelines delivering natural gas into New England run through New York and New Jersey—two states covered by the EPA's proposal. The removal of RICE units in those states could reduce capacity delivered into New England and cause significant disruptions.

Because affected pipelines will not be able to coordinate repair schedules, large volumes of capacity are likely to be reduced at the same time period as a result of the Proposed Rule. These periods will likely extend over times of "peak" demand, either during winter or summer months when natural gas utilities and electric generators (who are pipeline shippers) need natural gas service to provide heat or air conditioning for their customers. During these periods, at a minimum, pipelines operate at full capacity and need all of their compressor units available to run. Removing multiple units from service during these high demand periods will inevitably lead to reliability issues. Even during non-peak periods, reducing pipeline capacity for long periods of time will reduce pipeline throughput, preventing shippers from transporting as much gas as their users require.

Neither the Proposed Rule nor any of the technical support documents currently in the docket provide any substantive analysis of reliability issues for the interstate natural gas pipeline industry. EPA cannot reasonably evaluate the appropriateness and feasibility of the Proposed Rule without assessing potential impacts on natural gas system reliability, supplies, and price. The Proposed Rule, accordingly, lacks a reasoned basis based on the current record. To address this shortcoming, EPA must evaluate reliability and tailor its rule to prevent serious and predictable reliability problems.

---

[91] *Id.*

### VII. EPA Has Inappropriately Identified SCR as the Preferred Technology for Four-Stroke Lean Burn Engines.

For 4SLB engines, the Proposed Rule identifies SCR[92] as the technology basis to achieve the proposed NOx limit, while acknowledging that "layered combustion controls" (*i.e.*, typically referred to as low emissions combustion or LEC technology) may apply. While SCR application is fairly common for larger combustion sources, such as electric utilities and large industrial boilers, SCR application to RICE in the gas transmission industry is very rare. In previous RICE rulemakings, such as the spark ignition engine NSPS[93] or the NOx SIP Call Phase 2 rule, EPA clearly identified LEC technology as the preferred approach for 4SLB engines, and that technological choice still applies. For example, the Technical Support Document[94] for the NOx SIP Call and the Response to Comments[95] for that rulemaking identify LEC as the control technology for both 4SLB and 2SLB. An EPA commissioned report[96] supporting the NOx SIP Call also identifies LEC as the preferred control technology for lean burn engines. The more recent Subpart JJJJ rulemaking also based NOx standards on LEC control.

LEC is the preferred technology for natural gas operators for many reasons, including environmental, reliability, and economic reasons. Once the retrofit installation is complete, LEC technology is inherent to engine operation and requires minimal additional attention to engine operating and maintenance procedures. SCR requires considerable attention to the reagent

---

[92] 87 Fed. Reg. at 20,142.

[93] 40 C.F.R. Part 60, Subpart JJJJ.

[94] "Stationary Reciprocating Internal Combustion Engines Technical Support Document for NOx SIP Call" (Oct. 2003).

[95] "Response to Comments Phase II NOx SIP Call Rulemaking" (Apr. 1, 2004).

[96] "NOx Emissions Control Costs for Stationary Reciprocating Internal Combustion Engines in the NOx SIP Call States," E.H. Pechan and Associates report for U.S. EPA Innovative Strategies and Economics Group (Aug. 2000) ("Pechan Report").

injection system and instrumentation that controls reagent feed rate. The pollution prevention provided by LEC (*i.e.*, emissions are not formed) is far preferable to post-combustion exhaust control, and the operational simplicity compared to SCR ensures engine availability. While the initial capital investment *may* be marginally higher for LEC retrofit technology, ongoing operating costs are significantly lower.

The environmental performance of LEC is also superior. Similar NOx levels can be achieved with LEC and SCR, and LEC technology performance is ensured because it is inherent to engine operation, while SCR requires proper control of ammonia injection and catalyst performance. In addition to low NOx levels, LEC can provide improved efficiency (*i.e.*, lower fuel use) and lower emissions of unburned hydrocarbons due to improved in-cylinder mixing prior to ignition of the air-fuel mixture. Thus, LEC can reduce GHG, VOC, and carbon monoxide ("CO") emissions relative to an uncontrolled lean burn engine. In addition, since a reagent or chemical addition to the process is not required, LEC eliminates the negative environmental impacts of SCR—*e.g.*, ammonia emissions ("ammonia slip" past the catalyst); impacts of ammonia production and frequent delivery to the site; catalyst production, cleaning and disposal; and operational inefficiencies caused by exhaust back pressure on the engines caused by the catalyst.

This "technology choice" does not impact the NOx emission standard proposed, but EPA should ensure that the record in the final rule clearly indicates LEC is the preferred control technology for 4SLB engines.

## VIII.    Assumed NOx Control Efficiencies Are Inaccurate and Not Consistent with Past EPA Decisions.

The natural gas transmission reciprocating engines affected by the Proposed Rule are similar in key respects to the units regulated in the NOx SIP Call Phase 2 rule. In that action,

EPA focused on the very largest units (*i.e.*, those with ozone season emissions above 1 ton per day, which is equivalent to 365 TPY). As discussed above, in this rulemaking, EPA initially identified units in the affected states with emissions above 100 TPY and then incorrectly equated that to a 1,000 hp uncontrolled engine. The gas transmission reciprocating engines affected by the Proposed Rule are, therefore, the same industrial class and type of equipment regulated by the NOx SIP Call Phase 2 rule, but with a much lower applicability threshold. Since the NOx SIP Call Phase 2 rulemaking, additional units have been controlled or otherwise reduced emissions due to state RACT rules or system upgrades (*e.g.*, hp replacement with a turbine), but the technical facts and science relevant for the NOx SIP Call Phase 2 rule still apply today.

In the previous rulemaking, EPA analysis led to conclusions regarding baseline uncontrolled emissions, applicable control technologies (*e.g.*, LEC for lean burn engines and NSCR for rich burn engines), and average reductions from control. For example, EPA determined that the majority of affected units were 2SLB engines, and an EPA report[97] concluded, on average, that baseline emissions were 16.8 g/bhp-hr and that LEC would achieve 82 percent average control with an endpoint just under 3 g/bhp-hr. The "layered combustion technology" referred to in the Proposed Rule preamble is a new EPA moniker for LEC control, and that technology is discussed in detail in the EPA report noted above. The technology basis and emission standard for 2SLB evaluated in the 2000 Pechan Report are consistent with the NOx standard for 2SLB units in the Proposed Rule as well as EPA's emission standard for reconstructed or modified units (*i.e.*, units requiring retrofit) in Subpart JJJJ.[98]

---

[97] *See* Pechan Report, *supra* footnote 95.

[98] 40 C.F.R. § 60.4233(f)(4).

However, the docket document summarizing EPA reduction estimates includes much higher control levels than those EPA previously determined to be realistic. For 2SLB units with LEC, EPA now typically applies 97 percent reduction. From the baseline in the previous EPA report, this equates to an emission rate of 0.5 g/bhp-hr. While this may be acceptable as the level achievable for a new lean burn engine, it is not an accurate representation of the average emission level achievable for existing units. Similarly, EPA estimates over 95 percent reduction for NSCR on rich burn engines, which equates to an endpoint less than 0.5 g/bhp-hr. EPA notes that it has reviewed results within this range for all engine types,[99] but this assertion does not adequately justify EPA's departure from the Agency's well-documented conclusions in the EPA NOx SIP Call Phase 2 rule docket.

As discussed in comments above regarding EPA's significant underestimate of unit counts and estimated reductions, INGAA welcomes additional analysis to better define the emissions budget and reductions contained in the Proposed Rule. Additional time would be needed for EPA to prepare and the public to assess such information, and INGAA offers its assistance in those efforts. In the absence of additional detailed analysis, however, EPA should re-evaluate the emissions control levels assigned to affected gas transmission RICE because EPA did not assign accurate emission control level to those units.

## IX. EPA Properly Proposed Parameter Monitoring for Compliance Assurance for Natural Gas Transmission Reciprocating Engines.

For LEC-equipped lean burn reciprocating engines, EPA proposes continuous parameter monitoring[100] systems ("CPMS") for compliance assurance. INGAA supports EPA's proposed monitoring approach for compliance assurance of natural gas transmission reciprocating engines.

---

[99] 87 Fed. Reg. at 20,142, Table VII.C–1.

[100] *Id*. at 20,177; 40 C.F.R. § 52.41(d)(4).

INGAA recommends minor changes to the requirements for catalyst equipped engines (*e.g.*, 4SRB engines using NSCR). Additional details regarding parameter monitoring follows. In addition, information is provided to support EPA's decision not to require continuous emissions monitoring systems ("CEMS") for gas transmission reciprocating engines.

### A.    Parameter Monitoring for LEC-equipped Lean Burn Engines

As discussed in section VII, LEC is the preferred NOx control for all lean burn engines. Once installed, LEC technology is inherent to engine operation and the combustion controls cannot be "turned off" or bypassed. Compliant emissions are ensured by proper operation of the combustion process, and basic operating parameters can be monitored to ensure combustion health. The Proposed Rule requires a site-specific monitoring plan for LEC engine CPMS. A brief overview of example parameters to monitor is discussed here based on permit conditions for LEC monitoring at existing major source facilities (*e.g.*, to address compliance with state RACT requirements).

The majority of affected transmission reciprocating engines are 2SLB units, and combustion-based emission controls will include adding additional air (to lower temperatures and decrease NOx), higher energy ignition to ensure the lean mixture is ignited, and/or higher-pressure fuel injection to improve the uniformity of the in-cylinder mixture and enhance combustion stability. Combustion performance is ensured by monitoring parameters that indicate operation within expected norms, including fuel use, air manifold pressure, and air manifold temperature. The parameters, measurement specifications, and accepted operating range would be provided in the monitoring plan, and similar plans will be utilized for all 2SLB engines in a company fleet.

47

**640a**

### B.    Parameter Monitoring for Rich Burn Engines

For 4SRB engine parameter monitoring, the Proposed Rule includes continuous monitoring of catalyst inlet temperature and monthly monitoring of catalysis pressure drop ("$\Delta P$"). Section 52.41(d)(3)(ii) of the Proposed Rule requires $\Delta P$ monitoring monthly, with maintenance required "if the pressure drop is greater than 2 inches outside the baseline value established after each semiannual portable analyzer monitoring." The criteria are similar to RICE national emission standards for hazardous air pollutants ("NESHAP") monitoring requirements for 4SRB engines with NSCR but fail to acknowledge an important operational constraint—$\Delta P$ can vary from month to month due to the operating load of the engine because exhaust flows change with load. Thus, rather than requiring the operator to compare the monthly reading to the "baseline value established after each semiannual portable analyzer monitoring," the operator should be allowed to compare the $\Delta P$ to the value measured during any previous emissions test conducted at a similar load and then assess whether action is warranted. The operator can maintain records to document any instance where monthly $\Delta P$ monitoring warrants review or follow-up, including documentation of maintenance or other action conducted when deemed necessary.

This issue is discussed and explained in detail in INGAA comments[101] on the 2002 RICE NESHAP proposal, including documentation of how $\Delta P$ can vary with operating load. The RICE NESHAP approach to conduct $\Delta P$ at "full load" and compare to the value from a "full load" performance test is not recommended, because that load may not be achievable month-to-month. In addition, the proposed requirement to compare with the most recent performance test is not desirable because the biannual test may not always be possible at full load. Thus, INGAA recommends that monthly $\Delta P$ monitoring assess the measured value relative to a change greater than 2 inches from a

---

[101] INGAA Comments on Proposed RICE NESHAP, Docket ID No. OAR-2002-0059 (Feb. 19, 2003).

previously measured value associated with a performance test at a similar load. The operator can maintain records of the measurement and review of actions taken whenever the value by more than 2 inches (of water column) from the value measured in a previous test at similar load, rather than the most recent performance test.

### C.   CEMS are Not Warranted for Natural Gas Transmission Reciprocating Engines.

EPA has considered CEMS for natural gas transmission compressor drivers in past rulemakings and consistently concluded that CEMS are not warranted due to costs and the availability of other established methods for compliance assurance. This technical basis still stands, and CEMS are not warranted.

EPA contemplated NOx CEMS during combustion turbine NSPS review in 2005. The preamble to proposed Subpart KKKK indicates that NOx CEMS were considered as a monitoring requirement for the proposal, but EPA concluded that CEMS costs are too high relative to a reliable alternative—annual stack testing and/or parameter monitoring. INGAA supports the EPA conclusion regarding the excessive costs of CEMS (without commensurate benefit), and also supports the conclusion that a periodic source test provides a reliable basis for demonstrating compliance with the NSPS standard. Parameter monitoring is provided as an alternative to testing in Subpart KKKK.

Analysis of CEMS costs is presented in a docket memorandum (Docket Document No. OAR-2004-0490-0115). The docket document and the preamble conclusions regarding CEMS are further supported by:

- CEMS cost analysis for other reciprocating engines rules that indicate costs similar to or higher than the cost projection for Subpart KKKK.

- Recent precedent from NSPS and maximum achievable control technology ("MACT") standards regarding monitoring requirements and the exclusion of CEM requirements.

49

**642a**

In addition to the cost analysis in the Subpart KKKK docket, other EPA rulemakings included the consideration of the costs of CO CEMS for MACT standards. Note that CO CEMS costs are comparable to NOx CEMS costs, with a NOx unit likely to be marginally more costly due to higher instrumentation and operating costs for a NOx analyzer. Examples of regulations that considered CEMS include the Turbine NESHAP, Engine Test Cell NESHAP, Reciprocating Internal Combustion Engine NESHAP, Petroleum Refinery NESHAP, Mineral Wool NESHAP, and Hospital/Medical/Infectious Waste Incinerator NESHAP. For these standards, analysis indicated CEMS costs similar to or higher than the estimate for Subpart KKKK. In each case, costs were considered excessive and CEMS were not required. These decisions are relevant because they provide an indication of consistency in EPA's justification of monitoring requirements and demonstrate the environmental burdens associated with the sources and regulations that did not require CEMS under Part 63. For example, the environmental implications of the Waste Incineration MACT invoke a higher level of concern and are associated with a higher probability of emissions performance variability than reciprocating engine NOx emissions.

In addition, the efficacy of reciprocating engine LEC supports an approach based on parameter monitoring and periodic testing. As opposed to add-on emission control technologies where performance can be dramatically affected by short term deviations in a key process parameter (*e.g.*, ammonia feed rate for SCR), LEC is a pollution prevention approach with the NOx control inherent to the design and operation of the engine. The control technology cannot be "turned on or off" by the operator and emissions performance is inherent to the operation and functionality of the unit. A periodic test provides assurance that minor changes or upward trending of NOx emissions that may occur over longer time periods due to equipment wear will

50

**643a**

be monitored and addressed. Because of the performance of LEC combustion technology and the viability of periodic source tests and parameter monitoring, implementation of CEMS cannot realize an incremental benefit in ensuring performance commensurate with the CEMS costs.

The proposed RICE NESHAP (Part 63, Subpart ZZZZ) considered CEMS for CO for lean-burn engines greater than 5,000 hp to demonstrate compliance with the CO percent reduction standards. For lean burn engines less than 5,000 hp, EPA proposed periodic stack testing and continuous monitoring of operating parameters. For that standard, EPA ultimately concluded that CEMS were not warranted and parameter monitoring and periodic tests assured compliance.

CO CEMS costs were included for both the RICE NESHAP and the Engine Test Cell NESHAP, with estimated costs slightly higher in the latter. Very little detail was provided to understand how the different costs were derived, but costs were likely based on the EPA CEMS Cost Model. For the Engine Test Cell NESHAP MACT, a docket memorandum (Item II-B-9 of Air Docket A-98-29) indicates that the costs were determined using EPA's CEMS Cost Model Version 3.0, updated in 1998. The projected costs (20 years ago) include an estimated initial cost of $232,400, with an estimated annual cost of $69,000.

EPA considered the cost differential between CEMS and approaches based on parameter monitoring with periodic tests in several NESHAPs—and selected parameter monitoring as a reasonable approach. Many examples are available where EPA concluded CEMS were not warranted and other compliance assurance measures were available (*i.e.*, parameter monitoring and/or testing). Other examples include the Petroleum Refineries NESHAP for catalytic cracking units, the Mineral Wool NESHAP, and the Hospital/Medical/Infectious Waste Incinerator NESHAP. EPA consistently concluded that parameter monitoring and/or periodic tests provided

51

**644a**

compliance assurance.

In addition, there is no evidence in the Proposed Rule docket to suggest that CEMS would provide any appreciable emissions control improvement as compared to parameter monitoring and periodic tests. Lacking any such evidence, it is clear that parameter monitoring and periodic tests provide compliance assurance, and CEMS are not warranted.

**X.    EPA Has Proposed Unnecessary Assurance and Compliance Provisions.**

    **A.    The Proposed Rule Should Be Amended to Clearly Identify Accepted Methods for NOx Emission Tests.**

The Proposed Rule would require biannual emissions tests for affected RICE, and section 52.41(d)(2)(iii) cites federal code for identifying applicable test methods. To avoid confusion and ensure appropriate methods are clearly allowed, INGAA recommends amending this section to add a direct citation of applicable NOx methods and approved alternatives for units subject to EPA's NSPS for spark-ignited RICE, 40 C.F.R., Part 60, Subpart JJJJ. For NOx measurement, this includes:

- Method 7E of 40 CFR part 60, appendix A-4

- ASTM Method D6522

- Method 320 of 40 CFR part 63, appendix A

- ASTM Method D6348

- ALT 138,[102] which allows the use of OTM-39[103] as an alternative to ASTM Method D6522

- CTM-022, CTM-030, CTM-034

---

[102] Letter from Steffan M. Johnson, Leader, EPA Measurement Technology Group to Wendy Coulson (Aug. 25, 2020), available at https://www.epa.gov/sites/default/files/2020-08/documents/prci_08_24_2020_signed.pdf.

[103] OTM-39 Method for Determination of Oxygen, Carbon Monoxide and Nitrogen Oxides from Stationary Sources using Portable Gas Analyzers Equipped with Electrochemical Sensors, available at https://www.epa.gov/sites/default/files/2020-08/documents/otm-39_performance_method_using_portable_gas_analyzers_08_24_2020.pdf.

Amending the Proposed Rule to include this list of accepted NOx test methods will improve clarity and ensure the federally approved list of RICE test methods can be used for periodic tests. The Proposed Rule should make clear, moreover, that owners and operators of affected units are free to choose from among these various options.

### B.   The Proposed Performance Testing and Reporting Requirements Are Overly Burdensome.

The Proposed Rule would require semi-annual performance testing for units that do not meet the certification requirements of section 60.4243(a). Proposed section 52.41(d)(2) would require new engines to conduct an initial performance test within six months of engine startup and subsequent tests every six months thereafter. Existing engines would be required to conduct an initial performance test within six months of becoming subject to an emission limit under the Proposed Rule and would have to conduct subsequent tests every six months thereafter. Similarly, the Proposed Rule would require semi-annual reporting of data generated by the required performance testing.

Because the Proposed Rule is intended to address emissions during the ozone season, which runs from May 1 to September 30 of each calendar year, a single performance test and report per year should be sufficient to demonstrate compliance. Limiting performance testing and reporting to an annual requirement would also provide significant cost savings.

This would be a practical measure for a number of reasons. For instance, a significant number of the units that would be subject to the Proposed Rule would also be regulated pursuant to the NSPS for stationary spark ignition internal combustion engines in 40 C.F.R. Part 60, Subpart JJJJ. Those tests are conducted on an annual basis, and EPA should not layer additional, contrary requirements on Subpart JJJJ sources through the Proposed Rule.

Further, for many units, semi-annual testing would be impractical. For example, semi-annual testing for compressors located at storage facilities that are used both for storage and transmission operations is unnecessary and infeasible. Those units, which would be covered by the Proposed Rule, are used to inject gas into storage fields when it is purchased in the summer and pumped into transmission pipelines based upon market demands in the fall and winter. During the summer, when gas is purchased and injected, compressor capacity can be controlled and maintained at 90 percent, as required for conducting a reliable emissions test. During fall and winter withdrawals, however, that capacity cannot be maintained, preventing a meaningful stack test. Accordingly, EPA should eliminate semi-annual testing.

The Proposed Rule would also rely exclusively on electronic submittal of performance testing. EPA should allow owners and operators alternative means of submitting required reports. The Agency should also allow submittal in hard copy form where that approach is required by the relevant state authority.

INGAA requests that EPA consider amending these proposed requirements.

## XI.    Issues Related to States EPA Has Identified as Linked to Downwind Nonattainment or Interference with Maintenance for Emissions from Non-EGUs.

If EPA were to pursue adding additional states to the non-EGU Good Neighbor Plan region, the Agency would be required to first propose such action and provide a sufficient record basis to support such action. The requirement that agencies provide notice and an opportunity for comment on a proposed rule is a basic hallmark of administrative law that is grounded in the constitutional right to due process. As long recognized by the courts, the purpose of adequate notice in the rulemaking process is to "provide an accurate picture of the reasoning that has led the agency to the proposed rule," and to allow interested parties to contest that rulemaking if they

see fit.[104] Any decision to expand the scope of the Proposed Rule to include additional states or sources is substantial enough to fundamentally alter the premises of the proposal and to require additional notice to adequately inform potentially interested parties.[105] Accordingly, INGAA requests that EPA ensure that any significant change in course from the terms of the Proposed Rule be noticed through a supplemental proposal.

## XII.    The Proposed Rule Contains Regulatory Language that Should Be Modified.

The regulatory language that EPA has published includes provisions that are ambiguous, contain clerical errors, or that otherwise should be clarified to avoid unnecessary confusion. This section of INGAA's comments identifies those provisions and suggests appropriate revisions for EPA's consideration.

The definition of "affected unit" should be amended to make clear that emergency engines are not included in the Proposed Rule's requirements. As a policy matter, the vast majority of emergency engines are not likely to have emissions in significant amounts due to their limited hours of operation, and are, therefore, regulated pursuant to other, more appropriate programs. Furthermore, due to the limited hours of operation, it is extremely unlikely that additional controls on emergency engines over the hp threshold are economically feasible, based on the marginal cost threshold of up to $7,500 per ton referenced in the Proposed Rule. Clarifying the definition of affected unit to address this issue would avoid unnecessary confusion on behalf of potentially affected owners and operators.

---

[104] *Connecticut Light & Power Co. v. Nuclear Regulatory Commissions*, 673 F.2d 525, 530 (D.C. Cir.), *cert. denied*, 459 U.S. 835 (1982).

[105] *See City of Waukesha v. EPA*, 320 F.3D 228, 245-47 (D.C. Cir. 2003) (explaining that final rule must be "logical outgrowth" of the agency's proposed rule).

55

**648a**

The applicability section of the Proposed Rule should be amended to address several issues. First, the provision states that the Proposed Rule's requirements apply to states "listed in § 52.40(a)(1)(ii), including Indian country located within the borders of any such State(s)."[106] The cross-reference should be to § 52.40(b)(2).

Second, similar to recent NSPS on pipeline transportation for compressor stations, *i.e.*, NSPS Subpart OOOOa, the applicability section of the Proposed Rule should be amended to include only those activities at an LNG facility that meet the intent of the included industrial source type "Reciprocating internal combustion engines in Pipeline Transportation of Natural Gas." Based on the definition in the Proposed Rule for "Pipeline transportation of natural gas," only the portion of an LNG facility directly related to the pipeline transportation of natural gas, *i.e.*, the "compressor station" of the LNG facility, would be subject to the Proposed Rule.

The provisions specified in proposed section 52.41(c)(1)-(3), specifying emission limits, should be revised as follows:

(1)    If you own or operate a natural gas fired four stroke rich burn spark ignition engine with a nameplate rating of 1,000 hp or greater ~~than~~ then you must meet a nitrogen oxides (NOx) emissions ~~limits~~ limit of 1.0 grams per hp-hour (g/hp-hr).

(2)    If you own or operate a natural gas fired four stroke lean burn spark ignition engine with a nameplate rating of 1,000 hp or greater ~~than~~ then you must meet a NOx emissions ~~limits~~ limit of 1.5 g/hphr.

(3)    If you own or operate a natural gas fired two stroke lean spark ignition engine with a nameplate rating of 1,000 hp or greater ~~than~~ then you must meet a NOx emissions ~~limits~~ limit of 3.0 g/hp-hr.[107]

---

[106] 87 Fed. Reg. at 20,177.

[107] *See id*.

In proposed section 52.41(d)(1), the cross-reference to paragraph (b) should be paragraph (c).[108]

In proposed section 52.41(d)(2)(B), the cross-reference to paragraph (b) should be paragraph (c).[109]

The requirement stated in proposed section 52.41(d)(4)—"(4) If you are not using a SCR or NSCR control device to reduce emissions are required to install a continuous parameter monitoring system (CPMS)"—is unclear and should be revised.[110]

## XIII.   Conclusion

INGAA and its members appreciate this opportunity to provide EPA with comments on its proposed Good Neighbor Plan for the 2015 Ozone NAAQS. As these comments demonstrate, the Proposed Rue's requirements for the pipeline transportation of natural gas sector are based on seriously flawed data and assumptions about the industry. The misinformation in the record has resulted in estimates of affected units and projections of emission reductions under the Proposed Rule that bear little resemblance to reality and, if implemented, would not appropriately address significant contribution to downwind nonattainment or maintenance issues. On the contrary, the Proposed Rule would lead to significant over-control and risk the reliability of the nation's natural gas supply, while imposing costs and other burdens that EPA has not considered. Accordingly, INGAA requests that EPA reevaluate it proposed requirements for the pipeline transportation of natural gas sector, and that the Agency engage with INGAA and its members to develop a rule that will lawfully and more effectively address emissions from natural gas

---

[108] *See id.*

[109] *See id.*

[110] *See id.*

pipeline facilities. INGAA further suggests that EPA consider withdrawing the Proposed Rule or

issuing a supplemental proposal to address the issues raised in these comments. INGAA looks

forward to providing the Agency with additional information and support.


Sincerely,

Scott Yager
Vice President, Environment
Interstate Natural Gas Association of America
25 Massachusetts Ave. NW, Suite 500N | Washington, DC | 20001
P: (202) 216-5900
syager@ingaa.org

**651a**



June 21, 2022

**Filed Via** https://www.regulations.gov and a-and-r-docket@epa.gov

Ms. Elizabeth Selbst
Air Quality Policy Division
Office of Air Quality Planning and Standards (C539-01)
U.S. Environmental Protection Agency
109 TW Alexander Drive
Research Triangle Park, NC 27711
(919) 541-3918
Selbst.elizabeth@epa.gov

Re:      **Docket ID No. EPA-HQ-OAR-2021-0668: Kinder Morgan, Inc.'s Comments on the United States Environmental Protection Agency's Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard**

Ladies and Gentlemen:

     Kinder Morgan, Inc. ("Kinder Morgan," the "Company," or "we"), on behalf of itself and its subsidiaries and affiliates, submits the following comments in response to the U.S. Environmental Protection Agency's ("EPA") proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard (the "Proposed Rule").[1]

     Kinder Morgan operates in 14 of the 23 states that would be impacted by the Proposed Rule. As a result, the Proposed Rule would directly and significantly impact the Company and could impact the end users that the Company serves. Kinder Morgan has a long-standing record of being a collaborative and cooperative stakeholder with EPA on implementation of regulations and initiatives related to the oil and natural gas sector, including with respect to the Greenhouse Gas Reporting Program ("GHGRP"), the Natural Gas STAR program, prior New Source Performance Standards ("NSPS") and National Emissions Standards for Hazardous Air Pollutants ("NESHAP"), as well as relevant state proposals (including but not limited to Colorado, New Mexico, and Illinois) addressing emissions limits for larger engines. With this experience in mind, Kinder Morgan requests that EPA carefully consider its comments provided here. In this comment

---

[1] See Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard, 87 Fed. Reg. 20,036–216 (Apr. 6, 2022).

letter, we address EPA's proposal to establish emissions limits for certain "non-Electric Generating Units" ("non-EGUs"), in particular, for those operating in the Pipeline Transportation of Natural Gas sector. Specifically, Kinder Morgan addresses EPA's proposed emissions limits for stationary, natural gas-fired, spark ignited reciprocating internal combustion engines ("RICE") with a maximum rated capacity of 1,000 horsepower ("hp") or greater (collectively, "Engines") (the "Engine Proposal").[2]

Several trade organizations have submitted extensive comments in response to the Proposed Rule. Kinder Morgan endorses the comments of the Interstate Natural Gas Association of America ("INGAA"), the Gas Processors Association ("GPA"), the Texas Pipeline Association ("TPA"), and the joint comments of the Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council, and Texas Oil & Gas Association ("Texas Transport Working Group").[3] The Texas Transport Working Group, in particular, presents persuasive technical analysis on modeling flaws that run through EPA's analysis in support of its Proposed Rule. Kinder Morgan also appreciates the opportunity to comment separately on certain elements of the Proposed Rule.

## I.        EXECUTIVE SUMMARY

EPA's Proposed Rule is extensive, with a variety of proposals that impact multiple industries. Kinder Morgan focuses its comments on the Engine Proposal where EPA is proposing to establish stringent emissions limits for certain large engines operated across 23 states within the Pipeline Transportation of Natural Gas industry (summarized in further detail in Section III.A, below). Kinder Morgan recognizes the importance of continued emissions reductions, and the Company supports reasonable regulation that considers both technical feasibility and cost-effectiveness. As one of the largest energy infrastructure companies in North America, Kinder Morgan provides a unique and important perspective on the technical and cost impacts of adopting stringent $NO_x$ emissions thresholds, especially in the transmission segment of the oil and gas industry. The Company has significant experience deploying various technologies to achieve cost-effective emissions reductions, and we have gained important knowledge regarding the limitations of certain technologies as applied to certain engines. The Company shares its experiences in this comment letter. While we submit these comments, supported by detailed technical and cost analyses, the Company requests that EPA engage in dialogue with Kinder Morgan and other stakeholders to work through the complexities of the Proposed Rule.

Kinder Morgan recognizes the importance of clean air and of the mandates of the Clean Air Act ("CAA"). Nevertheless, Kinder Morgan respectfully notes that EPA's Engine Proposal has many significant legal and factual shortcomings and EPA cannot move forward with the rule as proposed. The Engine Proposal is based on materially inaccurate data, resulting in erroneous

---

[2] See id. at 20,142–143.
[3] For the avoidance of doubt, Kinder Morgan's endorsement of the INGAA, GPA, TPA, and Texas Transport Working Group comments includes all content, attachments, exhibits, citations, and documents associated with such submissions.

2

and consequential conclusions that are inconsistent with both good policy and with the CAA's Good Neighbor Provision. It is unclear how EPA could make the necessary findings for a final rule given the inaccurate data it relies upon. Should EPA choose to move forward with a version of the Engine Proposal, the agency must develop the proposal based on updated and accurate data; republish a proposed rule and supporting technical papers, including with respect to target and anticipated emissions reductions; and provide a renewed opportunity for public comment on the draft rule. A failure to do so would be directly contrary to EPA's obligations to the public for rulemaking under both the CAA[4] and the Administrative Procedures Act.[5] Here, EPA has not provided the requisite data from which it proposes to base its regulation.

The Engine Proposal is inadequate and contrary to law for several important reasons.

1. EPA is relying on an inaccurate set of data in support of the Engine Proposal. In particular, according to EPA, only 77 of Kinder Morgan's Engines would be affected by the Engine Proposal. Further, this count of 77 includes 20 turbines, which are explicitly not subject to the Engine Proposal. Consequently, EPA's proposal assumes that only 57 of Kinder Morgan's Engines are subject to the Engine Proposal. In stark contrast to that number— and calling into significant doubt EPA's underlying data—Kinder Morgan's records show that approximately 950 of its Engines would be affected by the Engine Proposal. Therefore, EPA has underestimated the impacts to Kinder Morgan by more than a factor of 16. EPA has also underestimated the impacts to the sector more broadly, as summarized in more detail in the INGAA comments, which show that the Proposed Rule would require costly modifications to nearly *five* times more units than EPA had estimated.[6] Using such inaccurate and under-representative data provides an inadequate basis for reasoned decision making and results in over-control. In brief, the agency has materially underestimated the number of subject Engines, thereby underestimating the anticipated emissions by nearly half. A proposal of this nature that is built on inaccurate data is simply unreasonable; EPA must re-publish a new proposed draft rule based on an accurate factual basis before pursuing any version of the Engine Proposal.

2. EPA also underestimates concerns around the technical feasibility involved with the proposed emissions limits. Plainly stated, it is not technically feasible to achieve the proposed emissions limits in all cases. The technologies available are limited when applied to certain type of engines, and even after exhausting layered technologies, the emissions limits may not be achievable. Any final rule must account for this, and EPA's proposal fails to do so.

---

[4] See 42 U.S.C. § 7607(d)(3) (setting forth requirements under the CAA for rulemaking in this context, among others, including the requirement that EPA identify the factual data it relies on).

[5] See 5 U.S.C. § 706(2)(A) (requiring reasoned decision-making); Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (same).

[6] See INGAA comments, Section II and Table 2 showing INGAA's count of its members units needing controls is 1,199, along with another 180 units that include emissions controls but would need additional controls. By contrast, EPA has undercounted the number at 307.

3. Assuming a given technology (or technologies) is technically feasible, achieving the standard could nonetheless be cost-prohibitive. In fact, the cost to Kinder Morgan alone to implement the Engine Proposal would be approximately, and on average, **$4.3 million per Engine** without the reasonable modifications Kinder Morgan proposes. In fact, Kinder Morgan's costs alone exceed EPA's estimated cost of implementation *for the entire Pipeline Transportation of Natural Gas sector to implement the Engine Proposal.* Furthermore, based on site-specific studies of Engines operated by Kinder Morgan (discussed in further detail below), we are seeing the cost-per-ton of $NO_x$ reduced in excess of $500,000 in some circumstances, which far exceeds EPA's own proposed cost threshold of $7,500 per ton of $NO_x$ reduced. The costs are largely driven by the fact that control technologies are limited, and where they are feasible, it is no small task to address after-market retrofit technologies on these Engines. When considering that Kinder Morgan alone operates approximately 950 Engines that would be subject to the Engine Proposal— and the majority would require retrofitting to meet the proposal—it is clear that the actual costs of the Proposed Rule were not accurately accounted for and considered.

4. EPA has not fully contemplated other foundationally important considerations necessary to make a final rule successful. For example, EPA fails to consider that the proposed timeline for compliance is unreasonable, if not impossible. Based on its significant and real-world experience of deploying $NO_x$ emissions reduction technologies on large engines, Kinder Morgan can say with confidence that it would likely take at least **until 2045** to implement the Engine Proposal across all of its Engines that currently exceed the proposed emissions limits. In discussions with manufacturers—of which (to our knowledge) there are only two that can manage certain of the Company's (and others') units—Kinder Morgan's understanding is that manufacturers would only be able to address twenty to twenty-five of Kinder Morgan's units per year that exceed the proposed thresholds. This rate assumes that manufacturers expand their capacity to work on other companies' Engines as well. Simply put, the proposed 2026 compliance year is unrealistic.

5. EPA requests comment on whether $NO_x$ controls would be operated seasonally. Once $NO_x$ controls are installed for the ozone season, they cannot be uninstalled or simply turned off. Rather, they will become an integral part of each Engine and would be employed throughout the year and not on a seasonal basis. To the extent EPA's cost analyses reduced its cost assumptions based on seasonal use of $NO_x$ controls, such an approach is unrealistic and must be revised.

6. EPA has not proposed an exemption for Engines used only in emergencies, which is inconsistent with other relevant federal and state engine rules.

7. The Engine Proposal includes a semi-annual testing requirement that is onerous, unnecessary, and does not consider the need for the Pipeline Transportation sector of the Natural Gas Industry to keep natural gas flowing throughout the country for the benefit of

4

**655a**

the end users.  To ease these burdens, while still ensuring adequate performance testing frequency and monitoring, Kinder Morgan suggests an alternative approach whereby testing frequency depends in part on past testing performance of a particular Engine.

To address the deficiencies in the Engine Proposal, Kinder Morgan respectfully recommends that EPA re-publish a proposed rule—supported by updated and accurate data—that would serve as a model rule that individual states can adopt as a part of their SIPs in furtherance of EPA's goals.  To be clear, the model rule would only be a model, and states should still be afforded the flexibility to take another approach—so long as the resulting emissions reductions are sufficient.  EPA's model rule should include the following core elements (1) an emissions averaging program to allow averaging across an operator's[7] fleet of Engines to offer flexibility in implementation to address cost, technical, and other constraints; (2) a site-specific Reasonable Available Control Technology ("RACT") analysis to address those individual circumstances where achieving the emissions limits is not cost-effective; (3) an exemption for emergency Engines; and (4) refined performance testing requirements.  As Kinder Morgan explains in these comments, averaging allows regulated entities to leverage their operational expertise to achieve significant emissions reductions at the lowest cost and through the most technically feasible approach.  Installing additional controls for certain types of Engines could be prohibitively expensive, even with averaging.  To address this reality, the model rule must also include the option for owners and operators to show—on an Engine-by-Engine basis—that attaining the specific emissions limit would be economically infeasible.  Such an option for individualized determination of economic infeasibility is critically important to accommodate circumstances in which a particular Engine cannot meet the emissions standards of the Proposed Rule due to unit-and/or site-specific considerations, and this option would operate in addition to (and before) any emissions averaging.  If the Proposed Rule is not modified to provide a more flexible and cost-effective approach, the natural gas supply chain faces a threat of shortages and constrained deliveries, and an increase in the price of transportation in some circumstances that may ultimately flow through to consumers.

Kinder Morgan provides these comments in the interest of arriving at a reasonable and feasible solution in response to EPA's obligation to address ozone transport.  Kinder Morgan is proposing an alternative approach that would result in a feasible, cost-effective, and workable final rule.  Again, the Company invites engagement with EPA on these highly technical issues, and respectfully requests EPA re-publish a new *draft* rule adopting the Company's proposed alternative approach for the reasons discussed throughout these comments.

## II.    BACKGROUND: KINDER MORGAN, INC.

Kinder Morgan is one of the largest energy infrastructure companies in North America and, more specifically, one of the largest natural gas transporters and natural gas storage operators in North America.  Kinder Morgan has interests in approximately 70,000 miles of natural gas

---

[7] By "operator," Kinder Morgan means a parent company together with any of its subsidiaries.  Allowing averaging at the parent-company level increases flexibility, which in turn fosters cost-effective emissions solutions.

5

**656a**

pipelines and owns approximately 700 billion cubic feet of working capacity of underground natural gas storage. The Company operates within 44 states in the Lower 48, with natural gas operations in 38 states. In fact, Kinder Morgan's natural gas pipelines are connected to every important natural gas resource play in the Lower 48, including the Bakken, Eagle Ford, Marcellus, Permian, Utica, Uinta, Haynesville, Fayetteville, Barnett, Mississippi Lime, and Woodford, all of which will play a significant role in meeting the nation's long-term natural gas supply. Approximately 40% of the natural gas consumed in the United States is transported by Kinder Morgan's pipelines. Key Kinder Morgan natural gas pipeline assets include Natural Gas Pipeline Company of America (which serves the high-demand Chicago market); Tennessee Gas Pipeline (which serves New York City and Boston); Southern Natural Gas (which serves the southeastern United States); intrastate pipelines in Texas (Texas is the largest producer and consumer of natural gas in the United States); El Paso Natural Gas, Mojave Pipeline, and Ruby Pipeline (which serve Southwestern and California markets).

Prioritizing the protection of public health, safety, welfare, and the environment has always been a priority for Kinder Morgan and is consistent with the Company's Vision and Mission statements. In particular, Kinder Morgan has been a leader and cooperative ally in state-level rulemakings to develop technically feasible and cost-effective programs that develop reasonable $NO_x$ emissions limits for certain larger engines, while ensuring operations are not disrupted and operators are afforded the necessary flexibility to implement appropriate control technologies. For example, in Colorado, Kinder Morgan worked with the Colorado Air Pollution Control Division and other stakeholders during the 2019 rulemaking process on Colorado's unique "company-wide plan" approach to $NO_x$ emissions reductions for engines over 1,000 hp. In New Mexico, Kinder Morgan was the primary transmission operator that worked closely with the New Mexico Environment Department and other industry members in 2021. In that rulemaking, the Company produced significant information and data to help inform reasonable emissions thresholds together with the options for alternative compliance plans and alternative emission standards in instances where the thresholds may be technically infeasible or not cost-effective. As a result of the expanse of Kinder Morgan's operations and its active involvement in this area, Kinder Morgan is well-versed in the complexities and challenges of cost-effectively reducing emissions from Engines, which are integral pieces of equipment necessary to ensure natural gas is delivered efficiently and safely to customers, the city gates, and homes alike. Importantly, in response to the Colorado and New Mexico rulemakings, as well as similar rulemakings in Arizona and Pennsylvania, Kinder Morgan has implemented or is in the process of implementing modifications to Engines that will achieve over 7,000 tons per year ("tpy") in total $NO_x$ reductions.[8]

Further, to the Company's commitment to sustainable operations, Kinder Morgan is a founding member of ONE Future, a unique coalition made up of members across the natural gas industry focused on identifying policy and technical solutions that result in improvements in the

---

[8] With regard to Colorado, as of May 1, 2022, Kinder Morgan has achieved reductions of 564.2 tpy of $NO_x$, and once the plan is fully implemented, the Company's potential to emit will be reduced by 3,000 tpy of $NO_x$. Kinder Morgan is projected to achieve reductions of 935 tpy of $NO_x$ in Arizona, 2330 tpy of $NO_x$ in New Mexico, and 742 tpy of $NO_x$ in Pennsylvania.

management of emissions associated with the production, gathering, processing, transmission, and distribution of natural gas. Members of ONE Future are committed to continuously improving their emissions management to achieve voluntary reductions in emissions and to assure efficient increased use of natural gas. ONE Future's goal is to enhance the energy delivery efficiency of the natural gas supply chain by limiting energy waste and achieving a total methane emission rate of less than one percent of gross natural gas production, well below current estimates for fugitive emissions in the sector. The ONE Future coalition represents the entire natural gas value chain, with members from some of the largest natural gas production, gathering, processing, transmission, and distribution companies in the United States.

In connection with Kinder Morgan's membership in ONE Future, it joined EPA's Methane Challenge program in 2016. As part of this program, Kinder Morgan committed to achieving a methane emission intensity[9] target of 0.31% by 2025.[10] In 2020, Kinder Morgan achieved an emission intensity of 0.04%.[11] Surpassing the 0.31% intensity target by such a wide margin reflects the depth of the Company's commitment to reducing emissions from its operations. For the period 2018 to 2020, Kinder Morgan achieved voluntary reductions in carbon dioxide equivalent emissions of 6.7 million metric tons and voluntary reductions in methane emissions of 14.2 billion cubic feet, resulting in an estimated $46 million in natural gas saved.[12]

## III.    BACKGROUND: EPA'S PROPOSED ENGINE EMISSIONS STANDARDS

### A.    Summary of EPA's Proposed Emissions Standards for the Pipeline Transportation of Natural Gas Sector.

As part of the Proposed Rule, EPA is proposing to establish emissions limits for certain industrial stationary sources referred to as non-EGUs in 23 states. All subject Engines would have to meet the emission limits by 2026. Based on the results of its Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026 ("Non-EGU Screening Assessment Memorandum"), EPA identified emissions unit types in seven industries that it believes "provide opportunities for $NO_x$ emissions reductions that result in meaningful impacts on air quality at the downwind receptors."[13] Of relevance to Kinder Morgan is the Engine Proposal portion of the Proposed Rule, which would apply to the Pipeline Transportation of Natural Gas sector. As discussed below in Section IV, however, EPA has not provided a clear definition of that sector.

---

[9] In this context, "intensity" means emissions per volume of throughput, and it is expressed as a percentage.

[10] Kinder Morgan, Inc., *Environmental, Social, and Governance Report: A Sustainability Accounting Standards Board and Task Force on Climate-related Financial Disclosure Report* at pdf page 2 (2020), https://www.kindermorgan.com/getmedia/b87cb3e5-d8d5-4d42-8e27-dd66c895768d/2020-ESG-Report.pdf (Rev. Dec. 21, 2021).

[11] See id.

[12] See id. at 27 (calculation based on values given for 2018, 2019, and 2020).

[13] Proposed Rule at 20,043.

The Engine Proposal would apply emissions limits (expressed in grams per horsepower per hour ("g/hp-hr"))[14] to three broad categories of stationary, natural-gas fired, spark ignited engines in the Pipeline Transportation of Natural Gas[15] sector that have a maximum rated capacity of 1,000 horsepower or greater: (i) natural gas fired four stroke rich burn engines ("4SRB"); (ii) natural gas fired four stroke lean burn engines ("4SLB"); and (iii) natural gas fired two stroke lean burn engines ("2SLB").[16]  EPA stated that it reviewed RACT NO$_x$ rules, air permits, and Ozone Transport Commission ("OTC") model rules to develop the following emissions limits for these engines:[17]

| Engine Type (would apply to new and existing) | Proposed NO$_x$ emissions limit (grams per horsepower hour) |
| --- | --- |
| Nat Gas fired 4-stroke rich burn, ≥ 1000 HP | 1.0 g/hp-hr |
| Nat Gas fired 4-stroke lean burn, ≥ 1000 HP | 1.5 g/hp-hr |
| Nat Gas fired 2-stroke lean burn, ≥ 1000 HP | 3.0 g/hp-hr |

EPA states that these limits can be achieved on existing Engines using various retrofit technologies at the cost-per-ton threshold of less than $7,500 per ton of NO$_x$ reduced.  With regard to the 4SRB Engines, EPA states that its proposed limits are designed to be achievable for existing Engines by installing Non-Selective Catalytic Reduction ("NSCR").[18]  EPA's position is that the proposed limit for 4SLB Engines can be achieved for existing Engines by installing Selective Catalytic Reduction ("SCR")—though EPA notes that in some cases it may be more cost effective to install layered combustion controls along with SCR to achieve the necessary emissions reductions.[19]  Finally, with regard to 2SLB Engines, EPA states that the proposed limit is designed to be achievable for existing Engines by retrofitting them with layered combustion technologies.[20]  In all cases, however, EPA notes that sources are free to install another control technology as long as the unit is still able to meet the emissions limit.[21]

Though EPA proposes certain limits for each type of Engine, the agency is also soliciting comments as to whether lower or higher limits would be more appropriate.  Specifically, EPA requests comment on whether: (i) a lower emissions limit is more appropriate for 4SRB Engines;

---

[14] EPA has historically set emission limits for these types of engines using g/hp-hr.  Id. at 20,142.

[15] As defined in the Proposed Rule, "Pipeline transportation of natural gas" means "the movement of natural gas through an interconnected network of compressors and pipeline components, from field gathering networks near wellheads to end users, including: (i) The compressor and pipeline network used for field gathering of natural gas from the wellheads for delivery to either processing facilities or connections to pipelines used for intrastate or interstate transportation of the natural gas; and (ii) The compressor and pipeline network used to transport the natural gas from field gathering networks or processing facilities over a distance (intrastate or interstate) to and from storage facilities, to large natural gas end-users, and to distribution organizations that provide the natural gas to end-users."  Id. at 20,176.

[16] Id. at 20,142.

[17] Id.

[18] Id.

[19] Id.

[20] Id. at 20,143.

[21] Id. at 20,142–143.

(ii) whether lower or higher emissions limits are more appropriate for 4SLB Engines; (iii) whether a lower emissions limit would be achievable with layered combustion alone for 2SLB Engines; and (iv) whether additional control technology could be installed on 2SLB Engines at or below EPA's $7,500 cost-per-ton threshold to achieve a lower emissions rate.[22]  Kinder Morgan provides responses to each of these questions in Section V.A below.

In addition to requiring Engines to meet certain emissions limits, EPA proposes certain testing, monitoring, and recording requirements for these Engines.  Specifically, EPA proposes: (i) requiring semi-annual performance testing in accordance with 40 C.F.R. § 60.8 to ensure the engines are meeting their $NO_x$ emissions limits; (ii) that affected engines monitor and record hours of operation and fuel consumption to calculate ongoing compliance with the applicable emissions limit; and (iii) the use of continuous parametric monitoring systems ("CPMS") to ensure that the $NO_x$ emissions limit is being met at all times.[23]  With regard to monitoring, EPA seeks comment on whether it is feasible or appropriate to require affected engines to be equipped with continuous emissions monitoring systems ("CEMS") to measure and monitor the $NO_x$ emissions instead of conducting performance tests on a semiannual basis.[24]  We provide our response to this request in Section V.F below.

## IV.     EPA VASTLY UNDERESTIMATES THE NUMBER OF AFFECTED ENGINES, RESULTING IN AN UNDERESTIMATE OF EMISSIONS REDUCTIONS AND UNLAWFUL OVER-CONTROL.

By requiring all stationary, natural-gas fired, spark ignited engines in the Pipeline Transportation of Natural Gas sector that: (i) have a maximum rated capacity of 1,000 horsepower or greater; (ii) fall into one of the three covered categories[25]; and (iii) are located in one of the 23 states covered by the Proposed Rule, the impact to Kinder Morgan is significant.  EPA estimates Kinder Morgan operates a mere 77 Engines that would be subject to the Engine Proposal. Furthermore, EPA erroneously included 20 of the Company's *turbines* in the agency's count of affected Engines.  By definition, turbines are not subject to this Proposed Rule.  This means that EPA only really considered 57 of Kinder Morgan's Engines as a part of the Engine Proposal.  In support of these comments, Kinder Morgan has inventoried its engine fleet through extensive analyses and determined that approximately 950 of its Engines would be subject to the Proposed Rule, a value that is orders of magnitude larger than EPA's estimates.  **Figure 1** below is a graphic showing the geographic dispersion and number of Kinder Morgan Engines that would be subject to the Proposed Rule.  Of the 950 affected units, 153 are 4SRB, 309 are 4SLB, and 488 are 2SLB.[26]

---

[22] Id.
[23] Id. at 20,143.
[24] Id.
[25] I.e., (i) 4SRB engines; (ii) 4SLB engines; and (iii) 2SLB engines.
[26] For purposes of Kinder Morgan's analysis, this Engine count includes engines in the gathering and boosting, processing, and transmission segments of its business units.

**Figure 1: Affected Kinder Morgan Engines**



| | |
|---|---|
| AR | : 36 |
| IL | : 37 |
| KY | : 65 |
| LA | : 101 |
| MS | : 133 |
| MO | : 9 |
| NY | : 44 |
| OH | : 38 |
| OK | : 126 |
| PA | : 39 |
| TX | : 260 |
| UT | : 38 |
| WV | : 2 |
| WY | : 22 |

Total = 950

Comparing EPA's estimate of the number of affected units with Kinder Morgan's on-the-ground analysis shows that EPA's estimates were off by more than a factor of 16. We expect that EPA miscounted the number of affected Engines because it relied on a $NO_x$ emission rate of 100 tpy as a proxy for 1,000 hp Engines. This approach fails to consider utilization of 1,000 hp Engines and results in a drastic and consequential underestimation of subject Engines, not just for Kinder Morgan, but across industry. EPA's reliance on such erroneous data calls into question the validity of the Engine Proposal, as it is apparent that EPA has significantly underestimated the impacts of the Proposed Rule, thereby underestimating the expected emissions reductions.[27] The result is one of over-control. Moreover, by not considering—or even demonstrating an awareness of—the vast majority of Engines covered by the Proposed Rule, EPA has "failed to consider an important aspect of the [alleged] problem" and failed to "examine the relevant data."[28]

Not only does EPA fail to consider utilization rates of 1,000 hp Engines, but EPA's definition of the Pipeline Transportation of Natural Gas sector may sweep more broadly than it

---

[27] See Sierra Club v. EPA, 671 F.3d 955, 966–68 (9th Cir. 2012) (finding the EPA's action arbitrary and capricious for not utilizing a more recent model and explaining that "we should not silently rubber stamp agency action that is arbitrary and capricious in its reliance on old data without meaningful comment on the significance of more current compiled data"); Alamy, Inc. v. Califano, 569 F.2d 674, 682–83 (D.C. Cir. 1977) (concluding agency rule was arbitrary and capricious in part because "statistical integrity" of survey data was "seriously questioned"); New Orleans v. SEC, 969 F.2d 1163, 1167 (D.C. Cir. 1992) ("We have held that an agency's reliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology used to collect the data 'is arbitrary agency action, and the findings based on such a study are unsupported by substantial evidence.'" (quoting Home Health Care, Inc. v. Heckler, 727 F.2d 587, 592 (D.C. Cir. 1983))).

[28] State Farm Mut. Auto. Ins. Co., 463 U.S. at 43.

10

appears EPA intended.  As defined in the Proposed Rule, "Pipeline transportation of natural gas" means:

> [T]he movement of natural gas through an interconnected network of compressors and pipeline components, from field gathering networks near wellheads to end users, including: (i) The compressor and pipeline network used for field gathering of natural gas from the wellheads for delivery to either processing facilities or connections to pipelines used for intrastate or interstate transportation of the natural gas; and (ii) The compressor and pipeline network used to transport the natural gas from field gathering networks or processing facilities over a distance (intrastate or interstate) to and from storage facilities, to large natural gas end-users, and to distribution organizations that provide the natural gas to end-users.[29]

At base, this scope is unclear, which impacts everything that falls under the Proposed Rule. This definition could arguably include not just the transmission segment of the natural gas industry, but also the gathering and boosting and processing segments.  However, the Proposed Rule does not discuss gathering and boosting or processing activities.  In particular, EPA's Engine count does not appear to consider Engines in the gathering and boosting or processing segments, and the various technical support documents similarly fail to consider these other segments of the oil and gas industry.  If EPA seeks to regulate Engines in the gathering and boosting or processing segments, then it has fallen short of the CAA's requirement to provide key information and supporting rationale to the public.[30]  Before EPA can go forward with the Engine Proposal, it must more clearly define the scope of its proposal, and then update its actual Engine counts accordingly.

The U.S. Supreme Court has previously cautioned EPA to avoid "over-control," defined as "[t]he possibility that a State might be compelled to reduce emissions beyond the point at which every affected downwind State is in attainment."[31]  The Court recognized that upwind states could not be forced to reduce their emissions below their levels of significant contribution to downwind nonattainment.[32]  And before the D.C. Court of Appeals in the same case, then judge and (now Justice) Kavanaugh, would have gone even further to hold that the Good Neighbor Provision of the Clean Air Act *only* empowers EPA to promulgate federal implementation plans ("FIPs") after a state "fails to make a required submission" or EPA disapproves of its SIP.[33]

The Proposed Rule would result in significant over-control because, due to its reliance on inaccurate data, the number of units that would be subject to the Proposed Rule is orders of

---

[29] Proposed Rule at 20,176.
[30] See 42 U.S.C. § 7607(d)(3)(A).
[31] EPA v. EME Homer City Generation, L.P., 572 U.S. 489, 521 (2014) (citing EME Homer City Generation, L.P. v. EPA, 696 F.3d 7, 22 (D.C. Cir. 2012)).
[32] Id.
[33] EME Homer City Generation, L.P., 696 F.3d at 37 n.34.  Under that standard, the EPA would not be authorized to promulgate a FIP for Arizona, California, Montana, Nevada, and Wyoming, as those states timely submitted SIPs, and the EPA has not formally disapproved of those SIPs.  See Consent Decree, Downwinders at Risk v. Regan (No. 21–cv–03551, N.D. Cal.) (Jan. 12, 2022).

11

**662a**

magnitude larger than EPA's estimations. Specifically, EPA estimates that there are 307 total engines in the Pipeline Transportation of Natural Gas sector affected by the rule,[34] only 77 (and really only 57 of those listed by EPA) of which belong to Kinder Morgan. However, Kinder Morgan alone has up to 950 Engines that would be subject to the Proposed Rule. And it appears EPA did not count or consider Engines operating in the gathering and boosting or processing segments, further undermining EPA's analysis. Additionally, emission controls would necessarily operate year-round rather than only during the ozone season (as discussed in further detail in Section V.D, below), further compounding the degree of over-control. The Proposed Rule would therefore result in significantly more emissions reductions on a national and a state-by-state basis than EPA has assumed. While EPA is permitted some "leeway" to over-control in light of the risk of "under-control,"[35] the Supreme Court was unequivocal that there were definite limits on EPA's discretion: "If EPA requires an upwind State to reduce emissions by more than the amount necessary to achieve attainment in *every* downwind State to which it is linked, the EPA will have overstepped its authority."[36]

Here, though, EPA has not disclosed what emissions reductions it is aiming to achieve with the Proposed Rule, effectively precluding any sort of mathematical analysis of over-control, or an evaluation of reasonable alternatives that could achieve the same result more efficiently. EPA's failure to provide this data is arbitrary and capricious, and EPA cannot rely on other data at a later time to support an adopted rule.[37] Thus, it could very well be that the Proposed Rule would fall into the category of over-control that the Supreme Court explicitly found would "overstep" EPA's authority. Pointedly, EPA has not provided the data necessary to support its Proposed Rule. Likewise, EPA's failure to provide data on how it calculated downwind emissions or disclose its emission reduction targets prevents Kinder Morgan and other stakeholders from being able to propose a comparable and reasonable alternative set of emission thresholds that would not run afoul of the prohibition against over-control. Kinder Morgan further adopts and incorporates by reference comments submitted by INGAA that address "over-control." In particular, given the erroneous Engine count, INGAA explains that EPA's calculation of $NO_x$ emissions reductions from the Pipeline Transportation of Natural Gas sector is considerably lower than would occur if the Engine Proposal's emissions limits were incorporated into any final rule, by about double. This outcome results in emissions reductions far greater than EPA has proposed is required to eliminate significant contribution to downwind nonattainment or interference with maintenance.

The Texas Transport Working Groups' comments also explain that EPA has undercounted Engines that would be affected by the Proposed Rule and that therefore EPA did not fully account for $NO_x$ emissions reductions resulting from emissions controls on Engines. More broadly, the

---

[34] EPA, Non-EGU Screening Assessment Memorandum, Tables 5 and 6, Document ID: EPA-HQ-OAR-2021-0668-0150; see also EPA, *Transport Proposal – NonEGU Results – 03-16-2022*, Document ID: EPA-HQ-OAR-2021-0668-0150_attachment_2.xlsx, Tables 4 and 5.

[35] See EME Homer City Generation, L.P., 572 U.S. at 523.

[36] Id. at 521.

[37] See State Farm Mut. Auto. Ins. Co., 463 U.S. at 50 (review of agency action must be of the basis articulated by the agency itself (citing SEC v. Chenery Corp., 332 U.S. 194, 196–97 (1947))).

12

Texas Transport Working Group identified multiple flaws in EPA's photochemical modeling, which call into question the basis for the Proposed Rule. Kinder Morgan supports and incorporates by reference the Texas Transport Working Group's comments on these topics.

To remedy these foundational issues, EPA must re-publish a proposed rule that properly analyzes the effects on the Pipeline Transport of Natural Gas industry. Three foundational elements in that pursuit are to first *clearly define* the sector subject to the rule, understand *how many* Engines exist (and might fall under any proposed rule) across the sector, and develop *a target for emissions reductions*. Kinder Morgan is willing to work with EPA to achieve these initial objectives.

## V.    IN ANY SUBSEQUENTLY REVISED DRAFT RULE, IF PURSUED BY EPA, EPA'S APPROACH MUST BE REVISED TO ENSURE ANY FINAL RULE IMPOSES LEGALY DEFENSIBLE, TECNICALLY FEASIBLE, AND COST-EFFECTIVE RULES.

Notwithstanding the foundational legal issues that undermine the Engine Proposal, Kinder Morgan offers EPA additional, and more specific, feedback regarding the proposal in the hopes that this feedback will assist EPA with development of a revised proposal. In particular, the Engine Proposal (A) is not technically feasible in all circumstances; (B) is not cost-effective in all circumstances; (C) cannot be achieved on the proposed timetable; (D) does not understand that the required controls are permanent and cannot be installed for the ozone season only; (E) fails to exempt emergency engines; and (F) requires onerous and unreasonable performance testing. We address each of these in turn.

### A.    The Engine Proposal is Not Technically Feasible in All Instances.

Kinder Morgan has serious concerns with EPA's characterization of the ready application of each of the described control technologies and the feasibility of installing the proposed control technologies on all Engines. It will be technically impracticable to retrofit certain of the Company's existing Engines to achieve the one-size-fits-all emissions standards set forth in the Engine Proposal. While Kinder Morgan does not oppose emission thresholds for *new* Engines, the technical feasibility of installing controls on any single *existing* Engine varies and depends, in part, on site-specific and Engine-specific considerations such as space for the installation of the control, the availability of sufficient power, the emissions reductions required to meet the applicable standards, and the vintage, make, and model of a particular Engine.

In explaining why some options may be technically impracticable, Kinder Morgan provides background on the type of control options available for each Engine type (i.e., 4SRB, 4SLB, and 2SLB). This background demonstrates the technical complexity of the various types of control options contemplated by the Engine Proposal and the limitations of each. As discussed in this section, not all proposed technologies are available across all relevant units, due to Engine- and site-specific considerations. The Proposed Rule's one-size-fits all approach fails to reflect this important fact. Furthermore, and an issue not considered in EPA's analysis: the addition of these

technologies and layered controls will inevitably increase fuel consumption, which will, in many cases, result in increased greenhouse gas and carbon monoxide emissions.

### 4SRB Engines.

Kinder Morgan operates approximately 150 4SRB Engines that would be subject to the Engine Proposal. Regarding 4SRB Engines, EPA states that its proposed limits are designed to be achievable for existing Engines by installing NSCR.[38] Kinder Morgan offers that in addition to NSCR, layered combustion controls applicable to 4SRB Engines include turbocharging and air-fuel ratio controllers ("AFRC") may be available. NSCR is a post-combustion approach, whereas layered combustion addresses the combustion process itself. Layered combustion approaches seek to reduce the combustion temperature because much of the $NO_x$ created by RICE results from higher combustion temperatures within the cylinder.[39]

NSCR uses the residual hydrocarbons and carbon monoxide ("CO") in the engine exhaust as a reducing agent for $NO_x$. In NSCR systems, hydrocarbons and CO are oxidized by oxygen and $NO_x$. The excess hydrocarbons, CO, and $NO_x$ pass over a catalyst (usually a precious metal such as platinum, rhodium, or palladium) that oxidizes the excess hydrocarbons and CO to water and carbon dioxide, while reducing $NO_x$ to $N_2$. The NSCR technique is effectively limited to engines with normal exhaust oxygen levels of four percent or less. As you approach leaner operation for $NO_x$ reduction, the effectiveness of NSCR is reduced as exhaust temperatures decrease and exhaust oxygen levels increase. NSCR is generally only available for 4SRB naturally-aspirated engines and some 4SRB turbocharged engines. Engines operating with NSCR require tight air-fuel control to maintain high reduction effectiveness without high hydrocarbon emissions. Rich-burn engines have lower oxygen levels and higher temperatures in the engine exhaust, which allows for the use of NSCR.

AFRC systems can be used to adjust and optimize operating parameters on natural gas-fired engines, such as air manifold pressure and temperature and fuel delivery to the combustion chambers. Optimizing engine operation with an AFRC system raises the heat capacity of the combustion mixture, which results in lower combustion temperatures and lower $NO_x$ formation. The feasibility of this approach depends on engine make and model.

Similarly, Turbochargers (often in conjunction with intercooling) increase the air charge density and obtain leaner air-fuel ratios. These leaner air-fuel ratios raise the heat capacity of the mixture, which results in decreased peak combustion temperatures, in turn reducing $NO_x$ formation. Notably, all of Kinder Morgan's 4SRB Engines covered by the rule already have turbochargers, meaning that turbocharging is not an available control that can be added for *additional* emissions reductions.

---

[38] Proposed Rule at 20,142.

[39] Notably, lowering the combustion temperature to avoid $NO_x$ emissions also results in less complete combustion. Therefore, combustion control requires a tradeoff—lower temperatures reduce $NO_x$ production but increase carbon monoxide resulting from incomplete combustion.

Importantly, however, some of Kinder Morgan's 4SRB Engines cannot achieve EPA's proposed 1.0 g/hp-hr emissions rate limit even with *both* NSCR and layered combustion controls. This is primarily due to the vintage design of the individual cylinder geometry and the fact that most of these engines are not in production today, which limits availability of parts and retrofit technologies. The takeaway is that although EPA is correct that layered combustion and NSCR are available control technologies for 4SRB Engines, these approaches are not feasible in all circumstances given site- and Engine-specific considerations and would not be sufficient to reduce emissions to the required limit for some of Kinder Morgan's Engines.

Based on preliminary assessments, the Company anticipates that over 15 4SRB Engines would require application of NSCR to meet the proposed 1.0 g/hp-hr limit. Of that subset of 4SRB Engines, Kinder Morgan would also have to add layered technologies such as AFRC to at least three of these 4SRB Engines in order to meet the standard (if feasible) and will have no margin for error against the standard even after applying the required controls. Beyond those approximately 15 4SRB Engines, Kinder Morgan also operates an additional approximately 25 4SRB Engines that already have NSCR, but that would require the Company also add AFRC to meet the 1.0 g/hp-hr limit. The Company also operates approximately 10 4SRB Engines that have all available controls on them. The Company's only option is to attempt to tune those Engines to meet the standards, but at present, even with all available controls, nearly half of these 10 Engines exceed EPA's proposed emissions limits. The incremental margin for reduction will undoubtedly be considerably more difficult to achieve, and with much less certainty. These considerations do not account for costs-per-ton estimates, which we discuss below. Even where NSCR or layered combustion is feasible, it is cost-prohibitive in some cases.

**<u>4SLB Engines.</u>**

Kinder Morgan operates approximately 310 4SLB Engines that would be subject to the Engine Proposal. EPA suggests the proposed limit for 4SLB Engines can be achieved for existing Engines by installing SCR, or layered combustion controls along with SCR to achieve the proposed 1.5 g/hp-hr limit.[40] SCR is a post-combustion control system meaning that it is an "add-on" control system that is applied after combustion occurs. It removes $NO_x$ from the exhaust gas of an engine by causing a chemical reaction between $NO_x$, ammonia, and oxygen. The ammonia gas is added prior to the exhaust reaching the SCR catalyst, and the chemical reaction occurs as the exhaust passes through the catalyst chamber. The result is that $NO_x$ in the exhaust gas is transformed into nitrogen gas and water vapor, both of which are harmless.

SCR is frequently the only option for vintage engines because manufacturers have not developed (and likely will not develop) combustion technology to reduce $NO_x$ from them. In these situations, SCR is the only available technology to reduce even a small amount of emissions. That said, SCR is rarely applied—and Kinder Morgan has never retrofitted units with SCR in its natural gas system—which is an important fact given that the Company is one of the largest natural gas

---

[40] Proposed Rule at 20,142.

15

**666a**

infrastructure and transmission companies in the U.S. This is largely because SCR is an extremely expensive and complex control technology, as discussed in more detail below, that also requires continued performance monitoring and additional, ongoing operations and maintenance costs. Furthermore, for the SCR system to operate properly, the exhaust gas must be within a specific temperature range, and the ratio of ammonia to $NO_x$ must be accurately controlled. To achieve the best control over $NO_x$ output, certain combustion controls may be required. Unfortunately, however, not all engines are suitable for the addition of such controls. This ultimately means that for some engines, SCR simply is not a feasible control technology. Again, because it bears repeating, certain engine-specific and site-specific factors dictate whether SCR is a feasible control technology—it is not technically feasible in all circumstances.

For some engines (1990 and more recent), however, options in addition to SCR are available to reduce emissions to the proposed limit. These options include turbocharging, high pressure fuel injection, and pre-chamber ignition. Turbocharging was discussed above for 4SRB engines. However, high pressure fuel injection and pre-chamber ignition are not techniques employed for 4SRB engines, so Kinder Morgan addresses them here in discussing 4SLB engines. High-pressure fuel injection improves air-fuel mixture and reduces $NO_x$ formation by inducing turbulence. Pre-chamber ignition is used in extremely lean combustion conditions to increase combustion stability while nevertheless maintaining a lean (and lower temperature) combustion environment. A disadvantage of pre-chamber ignition technology is the creation of a high temperature zone within the pre-chamber, which leads to a localized spike in $NO_x$ formation. This can reduce the overall effectiveness of that control technology.

Generally, high pressure fuel injection and pre-chamber ignition would not be used in conjunction; rather, one or the other would be used. But, as the Proposed Rule appears to acknowledge, independent unit-specific considerations can affect whether these approaches are sufficient for achieving the proposed emissions limit.[41] As noted above, these approaches are generally only available for newer engines. Nevertheless, even for some newer engines, their designs may not allow for the addition of pre-chamber ignition or turbochargers because the engine may require such extensive modification that it would be more cost effective to replace the *entire* engine. An emissions threshold that amounts to replacement of an existing engine with a new engine is wholly inappropriate.

Based on preliminary assessments, the Company anticipates that approximately 10 4SLB Engines would require SCR to meet the proposed 1.5 g/hp-hr limit. All of these Engines are older Engines, which means SCR is the *only* available control option. Moreover, adding SCR systems to these Engines would require custom retrofit because these models are no longer in production, and options such as turbocharging, high pressure fuel injection, and pre-chamber ignition are not technically feasible. These considerations do not account for costs-per-ton estimates, which we

---

[41] See id. at 20,089 (discussing how CoST model does not consider unit-specific engineering analyses), at 20,142-043 (noting variations in effectiveness of controls depending on unit-specific factors).

discuss below. In these particular cases, application of SCR is economically infeasible on a cost-per-ton basis.

### 2SLB Engines.

Kinder Morgan operates nearly 500 2SLB Engines that would be subject to the Engine Proposal. Regarding 2SLB Engines, EPA states its proposed limit of 3.0 g/hp-hr is achievable for existing Engines by retrofitting them with layered combustion.[42] These layered combustion options are the same as those for 4SLB Engines discussed above, including turbocharging, high pressure fuel injection, and pre-chamber ignition. As with the discussion of these control technologies for 4SLB Engines offered above, Kinder Morgan emphasizes that such technologies are not universally feasible for all 2SLB Engines.

In addition, SCR is a potential available control technology for 2SLB engines. However, for 2SLB engines, the addition of SCR is even more complicated than for 4SLB engines, and again, it is rarely applied given the technical complexities compounded by the overreaching costs. First, the relationship between engine load and exhaust flow rate is more complex than for 4SLB engines, which makes it more difficult to control a proper ratio of $NO_x$ to ammonia in the SCR. Second, SCR systems create backpressure in the exhaust system, and 2SLB engines are more susceptible to adverse effects caused by backpressure. Increased backpressure on a 2SLB engine reduces engine airflow, which reduces the efficiency of exhaust gas purging and can result in increased $NO_x$ output, engine knock, increased CO output, increased fuel consumption, increased cooling load, and decreased engine maximum load. Third, the use of direct cylinder lubrication in 2SLB engines likely results in faster SCR catalyst degradation, although long-term issues like this have not been studied extensively for 2SLB engines. Despite these difficulties, there are instances where the engine-specific circumstances dictate that SCR is the only available option for a particular 2SLB engine to meet the Proposed Rule's specified maximum emissions rate limit.

Based on preliminary assessments, the Company anticipates that approximately 110 2SLB Engines would require SCR to meet the proposed 3.0 g/hp-hr limit. For some 50 of these approximately 110 2SLB Engines Kinder Morgan has already expended significant capital costs in applying turbocharging, high pressure fuel injection, or pre-chamber ignition work to reduce emissions as required by the relevant state. For these 50 Engines, Kinder Morgan would still be required to apply SCR to meet the proposed standards. These considerations do not account for costs-per-ton estimates, which we discuss below. Even where SCR or layered control is feasible, it is cost-prohibitive in many cases.

Turning back to all engine types, for all three classes of Engines, EPA notes that sources are free to install "another control technology" as long as the unit is still able to meet the emissions limit.[43] However, there are no other control technologies. EPA has identified them all: NSCR, SCR, and layered combustion. While the Company recognizes that technologies continue to

---

[42] Id. at 20,143.
[43] Id. at 20,142–143.

advance, it is highly unlikely that technologies in this arena will advance faster than EPA's expected timeline for compliance with the proposed emissions limits. It is inaccurate to suggest that other technologies exist and can be cost-effectively implemented in response to the Proposed Rule.

As noted above, EPA requests comment on: (i) whether a lower emissions limit is more appropriate for 4SRB Engines; (ii) whether lower or higher emissions limits are more appropriate for 4SLB Engines; (iii) whether a lower emissions limit would be achievable with layered combustion alone for 2SLB Engines; and (iv) whether additional control technology could be installed on such Engines at or below EPA's $7,500 cost-per-ton threshold to achieve a lower emissions rate. As explained, the limits as currently proposed are not technically feasible in all circumstances. Kinder Morgan respectfully submits that if current limits are not achievable in some circumstances, then lower limits are likewise impossible for 4SRB Engines, 4SLB Engines, and 2SLB Engines in even more circumstances. Nor can additional control technology be installed on 2SLB Engines at or below the $7,500 cost-per-ton threshold to achieve a lower emissions rate in all circumstances, as discussed in more detail below. The negative consequences of EPA's over-reaching and one-size-fits-all proposal are significant and underscore the need for a revised and alternative approach.

Accordingly, and as discussed in further detail in Section VI.B below, rather than adopting the rule as currently proposed—or revising it to include more stringent emissions limits—Kinder Morgan respectfully requests that EPA revise the Engine Proposal as a model rule that states can adopt in their individual state implementation plans ("SIPs"). The model rule must incorporate emissions averaging for Engines together with an option to demonstrate economic infeasibility on an Engine-by-Engine basis.

### B. The Engine Proposal is Not Cost-Effective In All Instances.

EPA suggests that the proposed emissions limits can be achieved on existing Engines, by 2026, using various retrofits at what it has determined to be a reasonable cost threshold of $7,500 per ton of $NO_x$ reduced. As evidenced by other state and federal rulemakings, $7,500 per ton is at the high-end of what has been determined as cost-effective in other NOx rulemakings.[44] Assuming

---

[44] For example, in the recent New Mexico (2019) regional haze planning process, the New Mexico Environment Department ("Department") determined that an appropriate cost-effectiveness threshold for requiring controls was $7,000 per ton of pollutant reduced, including $NO_x$. In the recent (2022) New Mexico ozone precursor rulemaking, the Department and New Mexico Environment Improvement Board determined $7,500 per ton of $NO_x$ reduced was a reasonable cost-effectiveness threshold. See Proposed § 20.2.50.113(B) New Mexico Code of Administrative Regulations (May 6, 2021), https://www.env.nm.gov/air-quality/wp-content/uploads/sites/2/2018/08/Proposed-Part-20.2.50-May-6-2021-Version.pdf. Colorado's Regulation No. 7, applicable to certain rich burn RICE (2009), established a cost-per-ton threshold for $NO_x$ reduced of $5,000 per ton, which amounts to $6,400 in today's dollars. See 5 CCR 1001-9:E.I.D.4.a.(ii) (inflation adjustment calculated using the Bureau of Labor Statistics' online calculator: https://www.bls.gov/data/inflation_calculator.htm). New York established a threshold of $3,000 per ton of NOx reduced in 1994, which equates to approximately $5,500 per ton reduced after adjusting for inflation. See New York State Department of Environmental Conservation, DAR-20: Economic and Technical Analysis for Reasonably Available Control Technology (RACT) Networks (Aug. 8, 2013), at 1,

18

for argument's sake that $7,500 per ton reduced may be a reasonable threshold, it should certainly be considered a "not to exceed" threshold. More fundamentally, it is simply not cost effective to reduce emissions to the rates set forth in the Engine Proposal for each and every one of Kinder Morgan's Engines. As a result, the Proposed Rule would impose severe costs on Kinder Morgan and the natural gas transport sector—risking natural gas supply chain disruptions—and should be reconsidered.

### 1. EPA's Cost Data is Outdated and EPA Does Not Appear to Account for Inflation.

EPA's Proposed Rule uses 2016 dollars to further assess potential $NO_x$ emissions control strategies, estimated emissions reductions, air quality improvements, and costs from the potentially impactful industries.[45] In doing so, EPA came up with a cost threshold of $7,500 per ton of $NO_x$ reduced and identified controls for non-EGU emissions units that cost up to this amount.[46] While EPA states that these dollars are discounted to 2022 and they are "estimates of the present values (PV) and equivalent annualized values (EAV), calculated using discount rates of 3 and 7 percent as directed by OMB's Circular A–4," it provides no other support for using cost data that is over six years old.[47] Even if one were to assume that EPA could justify that $7,500 per ton of $NO_x$ reduced is reasonable, EPA's use of 2016 dollars to evaluate the cost of technologies will not lead to an accurate analysis. A number of dramatic macroeconomic changes have occurred since 2016 that have led to rising supply times and service costs, including the COVID-19 pandemic, the war in Ukraine, and inflation. According to a May 11, 2022 release by the Bureau of Labor Statistics, inflation has risen 8.6% in just the last 12 months, with the energy index surging to 34.6% year over year (natural gas alone increased 30.2% in the same period).[48] This is the highest level of

---

https://www.dec.ny.gov/docs/air_pdf/dar20.pdf. In Pennsylvania's RACT III program, the agency established cost-effectiveness benchmarks for installing RACT-level controls at $3,750 per ton of $NO_x$ reduced and $7,500 per ton of VOC reduced. See Technical Support Document for Proposed Rulemaking (Additional RACT Requirements for Major Sources of NOx and VOCs for the 2015 Ozone NAAQS RACT III)), at 12, https://files.dep.state.pa.us/PublicParticipation/Public%20Participation%20Center/PubPartCenterPortalFiles/Environmental%20Quality%20Board/2021/May%2019/02_7-561_RACT%20III%20Major%20Source/04b_7-561_RACT%20III%20VOC_Proposed_TSD%20w%20APPENDICES.pdf.

[45] Id. at 20,083 ("[A]ll non-EGU cost estimates in the assessment and presented in the rest of this section are in 2016 dollars."); 20,089 ("Table VI.C.2–1 summarizes the estimated reductions, total ppb improvements across all receptors, and annual total and average annual costs (in 2016 dollars)"; 20,090 ("Note that the average cost per ton values are in 2016 dollars."); 20,096 ("Using a $7,500/ton (in 2016 dollars) marginal cost threshold"); 20,155 ("For non-EGUs, EPA analyzed this proposed rule using a marginal cost threshold of up to $7,500 per ton (2016$) for 2026").

[46] Proposed Rule at 20,083.

[47] Id. at 20,047 ("Table I.C–1 presents estimates of the present values (PV) and equivalent annualized values (EAV), calculated using discount rates of 3 and 7 percent as directed by OMB's Circular A–4, of the health benefits, compliance costs, and net benefits of the proposed rule, in 2016 dollars, discounted to 2022."); 20,048 ("The PV of the compliance costs, discounted at a 3-percent rate, is estimated to be about $22,000 million, with an EAV of about $1,500 million"); 20,159; ("2016 dollars discounted to 2022"); 20,160 ("Millions 2016$, discounted to 2022").

[48] Bureau of Labor Statistics, *Consumer prices up 8.6 percent over year ended May 2022* (June 14, 2022), https://www.bls.gov/opub/ted/2022/consumer-prices-up-8-6-percent-over-year-ended-may-2022.htm.

19

**670a**

inflation seen in more than 40 years.[49]  Not accounting for these and other matters in its calculations of the cost of control technologies further compounds the inaccuracy of EPA's cost data.  To properly evaluate a proposal with such far-reaching and costly consequences, EPA should use present dollars to evaluate the impact of its proposal.

> **2.      Kinder Morgan's Cost-Analysis Demonstrates that EPA's Rule is Not Cost-Effective in Many Circumstances.**

On top of—or perhaps because of—its use of outdated cost data, EPA's estimated compliance costs for Engines do not reflect reality for many of Kinder Morgan's Engines.  Even if applying one or more of the technologies described above is technically feasible, in many instances, it remains cost-prohibitive.  The Engine Proposal and supporting information do not accurately reflect this fact.  In fact, specific details regarding how EPA arrived at its cost-per-ton estimates are not available, or at least not clear.  It appears that EPA rolled up cost ranges for Engines, which means that the costs are averaged across units.  In turn, EPA's Engine Proposal fails to appropriately account for those Engines that will, in fact, exceed a cost-per-ton threshold of $7,500.  As outlined below, and when reviewed on a case-by-case basis, a considerable number of Engines will have much higher costs than EPA presumes.  In addition, because EPA underestimates the total number of Engines that would be subject to the Engine Proposal it has not fully considered the total capital costs required to implement its proposal, which are far from insignificant.

The economic reasonableness of installing controls on any individual engine will vary and depend on variety of factors, including that the demand for these various technologies will certainly increase market costs.  In short, there is significant heterogeneity across Kinder Morgan's approximately 950 Engines resulting from differences like site layout, vintage, and manufacturer.[50]  As a result of this variability, Kinder Morgan is unable to fully analyze the costs of the Proposed Rule.  However, Kinder Morgan believes that the cost-analysis examples and total cost estimates provided below are indicative of the burdens imposed by the Proposed Rule, and these examples demonstrate why EPA's Proposed Rule would not be cost-effective in many circumstances.  This concrete evidence provides strong support for EPA to develop a model rule for states to adopt to allow for emissions averaging and an Engine-by-Engine demonstration of economic infeasibility.  Such an approach is imperative to respond to the noteworthy technical and cost issues that would arise from adopting the Engine Proposal without revisions.

Before turning to the cost examples, Kinder Morgan provides background on the process it used to develop each case study.  In connection with similar rulemakings and regulatory

---

[49] NBC, *Inflation hits 40-year high of 8.5 percent because of war in Ukraine, rent hikes* (Apr. 12, 2022), https://www.nbcnews.com/business/consumer/inflation-march-2022-hits-record-high-data-stats-details-rcna23654.

[50] Notably, the Proposed Rule acknowledges such heterogeneity.  See Proposed Rule at 20,076 ("Non-EGU sources, by contrast, are relatively heterogeneous, even within a single industrial category, and have far greater variation in existing emissions control requirements, emissions levels, and technologies to reduce emissions.").  The Proposed Rule's approach for emissions reductions should reflect such heterogeneity rather than imposing a one-size-fits all emissions limit.

20

**671a**

compliance undertakings in other states, Kinder Morgan has conducted analyses and sought out vendor quotes to assess the potential impact of various $NO_x$ emissions standards and to deploy $NO_x$ emissions reduction projects. The process that Kinder Morgan undertook to produce the attached case study-analyses was extensive, involving several layers of review and close coordination with vendors. Below, we present a summary of these various analyses, which evidence that in many circumstances, it is not cost-effective to achieve the proposed thresholds.

Using these site-specific estimates, Kinder Morgan then developed a cost-per-ton estimate applying the methodologies outlined in EPA's Cost Control Manual. To develop a cost-per-ton estimate, one of the most important assumptions is how many hours of runtime a particular unit will experience going forward. This is because runtime is directly proportional to emissions, but investment in a control technology is largely a fixed, one-time cost. Kinder Morgan determined that using average runtime over the most recent five-year period is most reflective of past and future operations because year-specific events are smoothed out. EPA's cost analysis used the year 2019, and Kinder Morgan's five-year fleet average runtime is similar in value to its 2019 fleet average runtime, but dissolves any anomalies in the single year data set.

**Examples 1 & 2: SCR Added to 2SLB Worthington Engines.**

For the following two case-studies, SCR is the only compliance option for these units to lower the $NO_x$ emissions rate to the proposed 3 g/hp-hr limit. As noted above, Kinder Morgan has never retrofitted units with SCR in its natural gas system; these remain estimates only.

Example 1. Kinder Morgan evaluated the costs of adding SCR to a 2SLB Worthington Engine (in the Northeast). As demonstrated in the project cost estimate case study attached as Exhibit 1, the capital cost to install SCR is $5,635,359. The largest component of this cost ($2,083,100) is for the SCR primary construction contractor, and the second-largest component ($1,778,700) is for the SCR materials themselves. It is also important to note that this estimate is dated April 21, 2020. Given recent inflation and supply chain delays, the costs would be even higher, as demonstrated by a letter Kinder Morgan received from a vendor indicating that the vendor is seeing "**25% pricing increase** and 4-6 week longer manufacturing lead times" from the initial quote used in the case study.[51] Using EPA's cost calculation methodologies, Kinder Morgan estimates that the resulting cost-per-ton of $NO_x$ reduced by adding SCR at this engine would be $109,301, as reflected in Table 1. This cost-per-ton value dramatically exceeds the $7,500 level that EPA identified as reasonable.

Example 2. Similarly, Kinder Morgan evaluated the costs of adding SCR to a different type of 2SLB Worthington Engine, and Kinder Morgan's project cost estimate found a capital cost of $6,215,151 to install SCR.[52] Like the analysis for the unit in the Northeast, the largest component of this cost ($3,138,700) is for the SCR construction contractor (both the primary and

---

[51] See Exhibit 15 (letter from vendor indicating that cost has likely risen 25% from the original quote) (emphasis added).

[52] See Exhibit 2.

21

**672a**

secondary), and the second-largest component ($1,326,500) is for the SCR materials. This estimate is dated September 8, 2021, meaning that the inflationary environment has likely driven this cost up as well. Further, the resulting cost per ton of $NO_x$ reduced by adding SCR at this engine would be $19,158 per ton,[53] which is more than double the $7,500 value.

As the foregoing case studies demonstrate, requiring Kinder Morgan to incur these costs to comply with the proposed emissions rate limits for 2SLB Engines would be unreasonable and contrary to the policy fundamentals that EPA states in its proposal. As noted above, SCR is the only compliance option for these units, and in total, Kinder Morgan has approximately 120 2SLB Engines for which SCR is the only control option to lower the $NO_x$ emissions rate to the proposed 3 g/hp-hr limit. Kinder Morgan expects the case studies presented above would be generally representative of the costs for each SCR installation. Thus, using a relatively conservative $5 million per SCR installation and assuming that SCR is technically feasible on each unit, Kinder Morgan would need to spend $600 million on SCRs at all these types of units to comply with the proposed limit. However, using the cost for the unit from Example 2 as the per-engine cost would require approximately $750 million to make the necessary modifications to all 120 units.

### Examples 3 – 6: Engine Combustion Alterations on 2SLB Engines.

For the following four case-studies, engine modifications through layered control are the most effective options to achieve the proposed emissions rate of 3 g/hp-hr.

Example 3.  Kinder Morgan evaluated engine modifications (pre-combustion chambers, along with accompanying hardware) to Cooper GMVA-10 engines. Kinder Morgan's detailed cost estimate determined that the capital cost for the entire four-unit station would be $15,433,535, for a per-unit cost of $3,858,384.[54] Materials represented the largest cost ($2,734,275 per unit). The resulting cost per ton of $NO_x$ reduced per unit would be $8,589 per ton,[55] which is above the $7,500 level. Kinder Morgan has nearly 270 units for which this would be the indicative cost to perform such upgrades. The total cost on all such units would be approximately $1.04 *billion*.

Example 4.  For engine modifications (upgrading intercooler and adding pre-combustion chambers) on a Clark TLA-6 2SLB unit, Kinder Morgan determined the upgrade cost would be $5,903,899.[56] Kinder Morgan has over 90 units for which this would be the indicative capital cost to perform such upgrades. This would result in a cost of $5,948 per ton of $NO_x$ reduced.[57] The total cost on all such units would be approximately $530 million.

Example 5.  For a Cooper 16W330 unit, Kinder Morgan evaluated the costs of re-aeroing the turbocharger and pre-combustion chambers to this unit. These are the modifications necessary to reach the proposed 3 g/hp-hr limit. Kinder Morgan's analysis shows that the cost of these

---

[53] See Table 1.
[54] See Exhibit 3.
[55] See Table 1.
[56] See Exhibit 4.
[57] See Table 1.

22

**673a**

upgrades would be $5,942,809 per unit,[58] with a resulting cost of $67,672 per ton of $NO_x$ reduced,[59] far above the $7,500 threshold.  Kinder Morgan has several similar units.

Example 6.   For a Clark TCV-16 unit, Kinder Morgan evaluated the costs of pre-combustion controls, turbocharger work, along with an intercooler to reach the proposed emissions limit of 3 g/hp-hr.  The evaluation found a total capital cost of $6,839,263.[60]  Kinder Morgan has more than 20 units that are similar to this one.  A project like this one would have a $NO_x$ reduction cost of approximately $1,000 per ton.[61]

Together, the wide variance in cost-per-ton for each potential project counsels for a more flexible approach, like an averaging program and an option to assess economic infeasibility on an Engine-by-Engine basis (discussed in further detail below).

### Examples 7 – 11: 4SLB SCR and Engine Combustion Alteration.

Example 7.   Kinder Morgan evaluated the cost of adding an SCR system to one of its Cooper Type 26 Engines to meet the proposed 1.5 g/hp-hr limit for 4SLB Engines.  SCR is the only option for Engines of this type and vintage because vendors do not have combustion control packages available.  Kinder Morgan estimated that the capital cost to install the SCR system and make necessary upgrades to accommodate the SCR would be $6,320,443.[62]  The SCR addition project would have a cost of $9,630 per ton of $NO_x$ reduced, assuming that the units run 50% of the time annually, which is conservatively high for these particular units and skews the cost-per-ton value lower than anticipated.[63]  In total, Kinder Morgan has approximately 10 units for which similar costs would be expected.

Example 8.    Kinder Morgan evaluated the cost for one of its Ingersoll-Rand KVS-412 Engines to meet a 1.5 g/hp-hr limit.  For this level, high pressure fuel injection, turbo re-aeroing, and pre-combustion chambers were all required.  These technologies are the most cost-effective to install and operate.  The total capital cost of these upgrades was determined to be $6,434,942.[64]  Based on the level of emissions reductions achieved, the resulting cost per ton of $NO_x$ reduced would be $5,931.[65]  This estimate is indicative of costs for many of Kinder Morgan's Ingersoll-Rand and Cooper 4SLB units.  Kinder Morgan has approximately 25 similar units.

Example 9.   Kinder Morgan evaluated the cost of combustion controls for its Caterpillar 3516 4EK Engines to meet the proposed 1.5 g/hp-hr limit.  Caterpillar provides a low-emissions

---

[58] See Exhibit 5.
[59] See Table 1.
[60] See Exhibit 6.
[61] See Table 1.
[62] See Exhibit 7.
[63] See Table 1.
[64] See Exhibit 8.
[65] See Table 1.

toolkit for such units, and the toolkit could be installed for approximately $322,000.[66]  The associated cost per ton of $NO_x$ reduced for this kit would be $225,587.[67]  This extremely high value results in large part because the total emissions reductions at the unit would be modest.  Kinder Morgan has more than 15 units like this one.

Example 10.  Kinder Morgan also evaluated the cost of combustion controls for its Caterpillar 3516 WPW Engines that would meet the proposed 1.5 g/hp-hr limit.  Caterpillar also provides a low-emissions toolkit for such engines, and the toolkit could be installed for approximately $196,000 in parts and labor.[68]  The associated cost per ton of $NO_x$ reduced for this kit would be $2,152.[69]  Kinder Morgan has nearly 20 Caterpillar 3516 WPW Engines like these.  Again, the variety in cost-per-ton for each potential project counsels for a more flexible approach, like an averaging program.

Example 11.  It is important to note, however, that not all of Kinder Morgan's Caterpillar Engines are suitable for an upgrade kit.  Kinder Morgan owns three Caterpillar 3512 units, for which Caterpillar does not offer an upgrade kit.  To satisfy the proposed 1.5 g/hp-hr emissions limit, these engines would either need to install SCR or be replaced.  However, replacement of the engine at a cost of millions of dollars is cheaper than SCR for these engines.  SCR would also have higher operating costs than a replaced Caterpillar 3512.  The total replacement cost would be $648,890,[70] for a cost per ton of $NO_x$ reduced of $10,165.[71]  Kinder Morgan maintains that while EPA may, pursuant to the CAA, impose reasonable emissions limits, those limits cannot be so stringent that they require *replacement* of existing units.  This result would be contrary to the CAA and EPA's interpretations.[72]

### Examples 12 – 14: 4SRB Engines.

Example 12.  Kinder Morgan evaluated the costs for a 4SRB Ingersoll-Rand KVG-310 to meet the proposed 1 g/hp-hr limit.  The project would require NSCR, AFRC, and adding turbochargers to meet the proposed 1 g/hp-hr limit, resulting in a total project cost of $5,684,158.[73]  This estimate reflects the likely costs for all three of Kinder Morgan's 4SRB Ingersoll-Rand Engines. Based on the level of emissions reductions achieved, the resulting cost per ton of $NO_x$ reduced would be $684,169, which greatly exceeds the $7,500 level.[74]

---

[66] See Exhibit 9.
[67] See Table 1.
[68] See Exhibit 10.
[69] See Table 1.
[70] See Exhibit 11.
[71] See Table 1.
[72] See 42 U.S.C. § 7502(c)(1) (applying RACT requirement to *existing* sources); see also 40 C.F.R. § 51.100(o) (defining RACT to mean "devices, systems, process modifications, or other apparatus or techniques that are reasonably available [providing factors to consider]").
[73] See Exhibit 12.
[74] See Table 1.

24

**675a**

Example 13. For one 4SRB Waukesha 7042 Engine, Kinder Morgan estimated the cost to add an NSCR catalyst and an AFRC, both of which would be required to meet the proposed 1 g/hp-hr limit. The total estimated cost was $278,318 per unit.[75] In total, Kinder Morgan has approximately 25 Engines like this one, for which a similar cost would be expected. Based on the level of emissions reductions achieved, the resulting cost per ton of $NO_x$ reduced would be $1,466, below the $7,500 level.[76]

Example 14. For another 4SRB Waukesha 7042 Engine, Kinder Morgan also estimated the cost to add only an AFRC. The total estimated cost was $157,709 per unit.[77] In total, Kinder Morgan has approximately 15 Engines like this one, for which a similar cost would be expected. Based on the level of emissions reductions achieved, the resulting cost per ton of $NO_x$ reduced would be $11,043, which exceeds the $7,500 level.[78]

These capital costs and costs per ton of $NO_x$ reduced highlight the wide variance of control costs that occur, even within the same type of Engine (e.g., 4SRB Engines), as summarized in **Table 1**, below. The wide variance in costs supports Kinder Morgan's alternative proposal that does not use a one-size-fits-all approach, in contrast to the Engine Proposal.

---

[75] See Exhibit 13.
[76] See Table 1.
[77] See Exhibit 14.
[78] See Table 1.

**Table 1: Summary of Kinder Morgan's Cost-Effectiveness Analyses**

| Ex. # | Project | Engine Cycle | Control Technology | # of similar units | # of units that exceed $7,500/ton[79] | Estimated Capital Cost | Total Direct Annual Costs | Total Indirect Annual Costs | Total Annual Costs | Cost Effectiveness ($/Ton) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | SCR added to 2SLB Worthington | 2SLB | SCR | 95 | 95 | $5,635,359 | $83,532 | $621,367 | $704,899 | $109,301 |
| 2 | SCR added to different 2SLB Worthington | 2SLB | SCR | 27 | 27 | $6,215,151 | $234,392 | $684,436 | $918,828 | $19,158 |
| 3 | Combustion controls for GMVA-10 | 2SLB | Turbo, PCC, Intercooler | 189 | 142 | $3,858,384 | $48,027 | $428,070 | $476,097 | $8,589 |
| 4 | Combustion controls for Clark TLA-6 | 2SLB | Turbo, PCC, Intercooler | 96 | 84 | $5,903,899 | $58,401 | $651,065 | $709,466 | $5,948 |
| 5 | Combustion controls for Cooper 16W330 | 2SLB | Turbo, PCC, Intercooler | 6 | 5 | $5,942,809 | $57,273 | $654,811 | $712,084 | $67,672 |
| 6 | Combustion controls for Clark TCV-16 | 2SLB | Turbo, PCC, Intercooler | 21 | 6 | $6,839,263 | $63,465 | $752,327 | $815,792 | $1,000 |
| 7 | SCR added to Cooper Type 26 | 4SLB | SCR | 9 | 9 | $6,320,443 | $176,422 | $695,890 | $872,312 | $9,630 |
| 8 | Combustion controls for Ingersoll-Rand KVS-412 | 4SLB | High Pressure Fuel, Turbo, PCC, Intercooler | 26 | 18 | $6,434,942 | $60,711 | $708,345 | $769,056 | $5,931 |
| 9 | Combustion controls for Caterpillar 3516 4EK | 4SLB | Low emissions kit | 16 | 14 | $322,130 | $29,633 | $43,400 | $73,033 | $225,587 |
| 10 | Combustion controls for Caterpillar 3516 WPW | 4SLB | Low emissions kit | 19 | 15 | $196,158 | $29,436 | $29,697 | $59,133 | $2,152 |
| 11 | SCR for Caterpillar 3512 | 4SLB | Replacement | 3 | 3 | $648,890 | $33,084 | $78,945 | $112,028 | $10,165 |
| 12 | Combustion controls and NSCR for Ingersoll-Rand KVG-310 | 4SRB | NSCR Catalyst, AFR controls, Turbocharger | 3 | 3 | $5,684,158 | $55,970 | $626,676 | $682,645 | $684,169 |
| 13 | NSCR and AFRC for 4SRB Waukesha 7042 | 4SRB | NSCR Catalyst & AFR controls | 25 | 19 | $278,318 | $40,125 | $38,634 | $78,759 | $1,466 |
| 14 | AFRC for 4SRB Waukesha 7042 | 4SRB | AFR controls | 15 | 14 | $157,709 | $29,270 | $25,515 | $54,784 | $11,043 |

---

[79] Kinder Morgan reasonably applied a 5-year average for operating hours when developing its cost-effectiveness analysis, as described above.

**Estimates of Fleetwide Costs.**

From the detailed case studies developed above, Kinder Morgan then evaluated the likely total costs of complying with the Proposed Rule across its entire fleet of Engines. In part because EPA's Engine Proposal does not allow for an Engine-by-Engine showing of economic infeasibility or emissions averaging, total costs to Kinder Morgan to implement the rule as proposed, without the reasonable provisions discussed in these comments, would be on average, approximately ***$4.3 million per Engine***.

### C. The Timetable for Installation of Controls and Meeting the Proposed Emissions Thresholds is Unreasonable (if not Impossible).

Even assuming the Engine Proposal's limits are technically feasible and cost-effective—and we respectfully submit that they are not in many circumstances—other technical limitations expose the shortcomings in the Engine Proposal. The chief flaw is EPA's failure to consider the realities of its proposed timeline for implementing the emissions limits on Engines. EPA is proposing to require compliance with the control requirements for all non-EGUs across 23 states *no later than the 2026 ozone season* (May through September) meaning that the emission controls would need to be installed by April 30, 2026.[80] This is simply an unreasonable timeline. EPA states that if the Proposed Rule is finalized in early 2023, "the final rule would provide more than three years for . . . non-EGU sources to install whatever controls they deem suitable to comply with required emissions" and that "the publication of this proposal provides roughly an additional year of notice to these source owners and operators that they should begin engineering and financial planning now to be prepared to meet this implementation timetable."[81] EPA's assumptions are misplaced, and the agency must offer both a reasonable phased-in schedule, as well as an opportunity for an operator to request an extension of that phased-in schedule based on site-specific circumstances.

As a threshold matter, EPA cannot expect operators to begin the significant undertaking of retrofitting their engine fleets, which requires a considerable expenditure of resources and time, before the standards are set through publication of a final rule. Indeed, EPA itself acknowledges that the standards could change by soliciting comments on whether the emissions standards should go up or down.[82] Additionally, the Proposed Rule is one of the most highly contentious proposed rules that EPA has published in the recent past and significant comments are expected—as EPA has conceded by extending the comment deadline to June 21, 2022. These comments are likely to result in numerous changes to the Proposed Rule. Accordingly, EPA cannot reasonably expect operators to believe they have four years to make required changes. However, even if that were true, an additional year is still not enough time for operators to implement the changes as they currently stand in the Proposed Rule, as explained in further detail below.

---

[80] Proposed Rule at 20,101–102.
[81] Id. at 20,101.
[82] Id. at 20,142–043.

27

**678a**

EPA's position that companies can install controls by the 2026 ozone season is undermined by the Agency's substantial underestimation of affected units. As noted in Section IV above, EPA estimated that the Company has 77 Engines subject to the Engine Proposal—an estimate that includes 20 turbines not subject to the Engine Proposal. But in fact, the Company operates approximately 950 Engines. Moreover, EPA fails to consider the significant undertaking of modifying existing Engines, as well as the impact to the natural gas supply chain of taking Engines offline for a considerable amount of time to conduct necessary modifications.

First, modifying existing Engines is a significant, custom, costly, and time-intensive undertaking. This is especially relevant for Kinder Morgan because it has approximately 950 Engines that would be impacted by the Proposed Rule. It is important to put into context the size of these particular Engines. An Engine typically weighs at least 100,000 pounds, and can weigh as much as 365,000 pounds. Along with size, the Engines are highly complex and fully integrated machines. The combination of these two facts means that it is no small task to address after-market retrofit technologies on these Engines. In the case of an Engine located in an area with insufficient space to install controls, for example, the surrounding Engine site may need to be reconfigured to accommodate the control technology.

Furthermore, Kinder Morgan is aware of just two companies with the capability to design, manufacture, and install controls which would reduce $NO_x$ emissions on certain of its Engines. Catalyst suppliers are similarly limited. And given that the proposed technologies are after-market modifications, each system must be custom designed for the relevant Engine, and the manufacturer can only work on one system at a time. As a result of the Proposed Rule, these limited number of companies will be flooded with requests by Kinder Morgan alone, let alone the rest of industry. As an illustration of the impossibility of meeting EPA's 2026 deadline, one of the companies that Kinder Morgan identified as capable of installing controls on its units has indicated that it would only be able to modify 20 or 30 Engines a year, across all of industry. Given that Kinder Morgan alone has 950 Engines and that Kinder Morgan would not be the only company competing for contracts with those suppliers, it is difficult to overstate how unrealistic EPA's proposed timeline would be. And even if the timeline could be feasible, Kinder Morgan and similarly situated companies would have to bid against each other for contracts with vendors, which raises serious concerns about increased costs resulting from such an aggressive timeline.

Second, Kinder Morgan uses these Engines to meet its obligation to the FERC to ensure the safe and efficient movement of natural gas along FERC-certificated interstate transmission pipelines to local distribution companies for ultimate distribution to residential, commercial, and other industrial consumers. To continue these operations without interruption, Kinder Morgan must install the required controls on each Engine one-by-one. Meaning, the Company cannot shut down an entire station for the six or more month period that may be required to install the control technologies.

Another very important issue that EPA has failed to consider is that each and every Engine modification must be accompanied by a permit modification. And in nearly every state, that

28

679a

Engine cannot operate unless and until the permit modification is granted. In the Company's experience, it can take over a year for a state to process even the simplest permit modification. For context—and based on the Company's recent experience with permit modifications—while minor modifications can take as little as 90 days, permit modifications for major changes can take 24 months or more to process. Given the magnitude of changes that retrofitting these engines entails, it is reasonable to assume that the timelines applicable to modifications in response to the Proposed Rule will fall on the longer end, especially as state permitting agencies may be inundated with permit modification applications. Additionally, as explained immediately above, Kinder Morgan cannot shut down all of the Engines in a compressor station at once without jeopardizing the safe and reliable transport of natural gas; instead it must retrofit the Engines in a single facility one at a time. Thus, if a Kinder Morgan compressor station has three Engines subject to the Proposed Rule, it could take as long as six years to obtain the permit modifications alone. EPA fails to consider the demands on already resource-constrained state agencies, and the ultimate backlog, that would result from the proposed timeline. After giving this issue proper consideration, EPA should modify its approach to allow for greater compliance flexibility and a phased-in approach, as discussed below.

In recent rulemakings, several states have recognized what a massive undertaking it is to retrofit engine fleets with control technology, and those states have provided a much longer timetable for compliance considering *a much smaller overall count of affected engines*. For example, New Mexico has proposed a phased compliance schedule, which allows owners or operators to retrofit their natural gas-fired spark-ignition engines over a period of six years, and Colorado also provides a phased approach over a five-year period, again, as applied to a much smaller count of Engines.[83] In addition, both states offer a "company-wide plan" approach that affords the operator an opportunity to effectively average emissions reductions across its fleet in the most reasonable and cost-effective manner to achieve the same or similar overall reductions. In contrast, EPA proposes only three years for the Company to retrofit 950 engines. In other words, EPA expects Kinder Morgan to retrofit approximately 13 to 30 times the number of units as the Colorado and New Mexico rules in 1/2 the amount of time. This is simply not a reasonably expectation, and EPA must amend its approach to provide regulated entities ample time to make changes.

Indeed, EPA appears to recognize that retrofits could take longer, specifically requesting "comment on whether individual non-EGU sources should be allowed to request an extension of the May 1, 2026, compliance deadline by no more than one year (i.e., to May 1, 2027) based on a sufficient showing of necessity" and the specific criteria that the EPA should apply in evaluating requests for extension.[84] As EPA concedes in this solicitation, the D.C. Circuit stated in *Wisconsin v. EPA* that the Good Neighbor Provision may be read to allow for some deviation from the mandate to eliminate prohibited transport by downwind attainment deadlines, "'under particular

---

[83] Proposed § 20.2.50.113(B) New Mexico Code of Administrative Regulations (May 6, 2021), https://www.env.nm.gov/air-quality/wp-content/uploads/sites/2/2018/08/Proposed-Part-20.2.50-May-6-2021-Version.pdf; 5 Colo. Code Regs. § 1001-9:E.I.D.5.c.
[84] Proposed Rule at 20,104.

29

circumstances and upon a sufficient showing of necessity,' provided such deviation is 'rooted in Title I's framework [and] provide[s] a sufficient level of protection to downwind States.'"[85] Specifically, EPA notes that the criteria for an extension could include a number of matters—most of which Kinder Morgan submits it has already demonstrated by its comments herein:

> Such criteria could include **documentation of inability, despite best efforts, to procure necessary materials or equipment (e.g., equipment manufacturers are not able to deliver equipment before a specific date) or hire labor as needed to install the emissions control technology by 2026**; **documentation of installation costs well in excess of the highest representative cost-per ton threshold identified for any source (including EGUs) discussed in Section VI of this proposed rule (e.g., vendor estimate showing equipment cost)**; . . . or **documentation of extreme financial or technological constraints that would require the subject non-EGU emissions unit or facility to significantly curtail its operations or shut down before it could comply with the requirements of this proposed rule by 2026**.[86]

While Kinder Morgan supports a compliance deadline extension, the underlying rule affecting over 2,000 Engines[87] cannot be drafted such that every subject operator would be required to request an extension for each Engine. Rather, the rule must be drafted to reflect consideration of the technical, practical, and economic constraints on implementation at the outset, with a reasonable phase-in schedule. Such an approach is consistent with RACT, best available retrofit technology ("BART"), and the Prevention of Significant Deterioration ("PSD") program's best available control technology ("BACT") requirements.[88]

---

[85] Id. at 20,104 (quoting Wisconsin v. EPA, 938 F.3d 303, 320 (D.C. Cir. 2019).

[86] Id. (emphasis added).

[87] As noted in INGAA's comments, approximately 1,199 Engines would require control, an additional approximately 180 Engines (bringing the total to approximately 1,380) currently include emission controls but cannot meet the proposed limits and will therefore require incremental control, and another 678 Engines that meet the emission limits would incur incremental compliance costs to address Proposed Rule requirements for biannual emissions tests and continuous parameter monitoring (bringing the total to 2,058). INGAA Comments at Section II. Additionally, these estimates do not include pipeline companies that are not INGAA members. Id.

[88] 44 Fed. Reg. 53,761, 53,762 (Sept. 17, 1979) ("EPA has defined RACT as: The lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility."); 40 C.F.R. § 51.301 ("Best Available Retrofit Technology (BART) means an emission limitation based on the degree of reduction achievable through the application of the best system of continuous emission reduction for each pollutant which is emitted by an existing stationary facility. The emission limitation must be established, on a case-by-case basis, taking into consideration the technology available, the costs of compliance, the energy and nonair quality environmental impacts of compliance, any pollution control equipment in use or in existence at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology."); 42 U.S.C. § 7479(3) ("The term 'best available control technology' means an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, **taking into account energy, environmental, and economic impacts and other costs**, determines is achievable for such facility

30

**681a**

Finally, as discussed in further detail in Section V.B.2 above, retrofitting engines is extremely costly, and it is not reasonable to expect operators to absorb the costs of retrofitting their Engine fleets on EPA's proposed timetable, especially at a time of record inflation and soaring energy prices.

Kinder Morgan consulted with a manufacturer to determine how long it would take to retrofit the 950 Company Engines subject to the Proposed Rule that do not currently meet the emissions limits. Based on this information, and taking into account a reasonable schedule for taking units offline (to account for FERC and delivery obligations), and the timeline for required permit modifications, Kinder Morgan determined that even on a reasonably fast-paced schedule— and assuming no competition for manufacturers and no unexpected delays—it will take approximately 23 years to achieve full implementation of the Engine Proposal. The final projects would not be completed until **the year 2046**.

Kinder Morgan's ability to offer an alternative timeline (or, for that matter, alternative emissions limits or HP threshold) for the EPA's consideration is hampered, however, by EPA's decision not to identify an overall target of emission reductions. The scant data that EPA does provide, moreover, is unreliable considering EPA's failure to provide an accurate account of the number of Engines to which the Proposed Rule would apply. This, among other foundational reasons, is why Kinder Morgan proposes an alternate approach outlined in Section VI below, which would encourage states to adopt SIPs that incorporate emissions averaging for Engines and allow an Engine-by-Engine showing of economic infeasibility to ensure cost-effective application of the emissions standards.

**D.    Requiring Controls Only in the Ozone Season is Not Practical.**

EPA's Proposed Rule proposes $NO_x$ emissions limits "only during the ozone season" (May 1 – September 30).[89] EPA requests comments on "whether controls on . . . reciprocating IC engines are likely to be run all year (e.g., 8,760 hours/year) or only during the ozone season."[90] Requiring controls only in the ozone season does not comport with practical realities. As noted above, retrofitting existing engines with control technology is a significant, custom, costly, and time-intensive undertaking. It would not make economic sense, or further our collective goal of meaningfully reducing emissions, to only require the emissions limits during the ozone season. Installation of SCR-type controls, for example, may require accompanying modifications to the engines' combustion process for better system operations. It is therefore not a "bolt-on" technology that can be readily "idled" or temporarily removed out of the season in all

---

through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant." (emphasis added)); EPA, *Guidelines for Determining Best Available Control Technology (BACT)* 4 (Dec. 1978) (stating that the determination of the weight to assign to energy, environmental, and economic impacts is a state allows "some flexibility in emission control requirements depending on local energy, environmental, and economic conditions and local preferences").

[89] Proposed Rule at 20,104; see also id. at 20,045, 20,0056, 20,177.

[90] Id. at 20,097.

31

circumstances.  Kinder Morgan respectfully submits that given the magnitude of changes that have to be made to add control technologies, they will be run all year.

EPA defends the feasibility of the cost of the Proposed Rule in part on the assumption that EGU and non-EGU control technologies could be put into protective lay-up during non-ozone-season months.[91]  But, tellingly, this assumption is derived from apparent industry practice *exclusively* with EGUs:

> This timeframe is informed by many electric utilities' previous long-standing practice of utilizing SCRs to reduce EGU $NO_x$ emissions during the ozone season while putting the systems into protective lay-up during the non-ozone season months.  For example, this was the long-standing practice of many EGUs that used SCR systems for compliance with the NOx Budget Trading Program.  It was quite typical for SCRs to be turned off following the September 30 end of the ozone season control period.  These controls would then be put into protective lay-up for several months of non-use before being returned to operation by May 1 of the following ozone season.[92]

As a starting point, for the majority of Kinder Morgan's units, SCR is not the most cost-effective and technically feasible option.  So, the data point EPA summarizes above is simply not relevant to the majority of Kinder Morgan's operations.  Furthermore, it may be that the process for installing or uninstalling SCR technology on Kinder Morgan's units, which are non-EGU units, is not comparable to application of SCR for EGU control technologies.  Converting 2SLB Engines, for example, would require a 10 ft$^2$ catalyst, which in many cases is so large that it can only be installed or uninstalled by crane, and then fluids like ammonia and urea must be drained before adding them back in.  Those liquid compounds, in most cases, require safe handling and disposal in compliance with state and federal regulation to avoid harm to the environment.  It is not within the Company's practice or protocol to unnecessarily increase the frequency of handling of products and chemicals like ammonia.

The Engine Proposal's exclusive reliance on EGU control data to justify a rule that would apply to non-EGU sources—along with the fact that is does not specifically evaluate and consider the challenges inherent in retrofitting a non-EGU Engine with the appropriate control technology—is puzzling, and calls into question the agency's understanding of the operations and businesses the agency intends to regulate.  We would be happy to schedule a meeting with EPA to discuss the specific application of the control technologies to Kinder Morgan's units.

---

[91] Id. at 20,078.
[92] Id.

32

**683a**

**E.      Emergency Engines Must be Exempted.**

The Proposed Rule does not contain an exemption for emergency Engines even though this is a standard exemption that EPA recognizes in all other relevant federal regulations.[93]  Other states, including New Mexico and Colorado (and many other states), have also incorporated an exemption for emergency engines from their engine emission limits rules.[94]  As EPA and states recognize, emergency engines should continue to be exempted for two primary reasons.  First, their continued operation during emergencies is critical; second, precisely because they are operated only in emergencies, their emissions are minimal.

To the first, emergency engines serve a vital function in Kinder Morgan's—and other operators'—operations.  When operators lose commercial power at compressor stations unexpectedly, whether as a result of inclement weather or electric grid equipment failures, they use emergency engines to sustain the most essential system needs, such as providing power for control rooms, lights, and safety and security systems, until power is restored.  These systems are necessary to protect company personnel, the public, and the environment.

To the second, consistent with their limited uses, Kinder Morgan generally operates its emergency engines in only three scenarios: (i) to test the engine to ensure it is ready to operate in the event of an emergency and run periodically as necessary for maintenance; (ii) to complete an emission test; and (iii) during an emergency event.  Because Kinder Morgan's emergency engines are used infrequently, they are responsible for a very limited amount of emissions.  Accordingly, not exempting emergency engines would create an impediment—under threat of potential enforcement action for non-compliance—for operators to run their emergency Engines to properly respond to and redress emergency situations with minimal emission-reduction benefits.

For these reasons, any final rule, including a model rule, must exempt emergency Engines.

**F.      Performance Testing Every Six Months is Unreasonable.**

EPA has proposed that owners and operators of stationary spark ignition Engines conduct semi-annual performance testing in accordance with 40 CFR § 60.8 to ensure that such Engines are meeting the proposed $NO_x$ limits.  This requirement would be unduly onerous.  Indeed, performance testing on a single unit can cost upwards of $5,000 per test.[95]  Testing Kinder Morgan's approximately 950 units twice a year would therefore cost approximately $9.5 million

---

[93]  See 40 C.F.R. §§ 60.4219 (defining emergency stationary internal combustion engines); 60.4248 (same); 60.4205 (designating separate compliance criteria for emergency engines); 60.4243 (same); 63.6585 ("[E]mergency stationary RICE . . . are not subject to [the National Emission Standards for Hazardous Air Pollutants for Stationary Reciprocating Internal Combustion Engines].").

[94]  5 Colo. Code Regs. § 1001-9:E.I.C.3 ("The air pollution control technology requirements . . . do not apply to: . . . any emergency power generator . . . ."); Proposed § 20.2.50.113(B)(10) New Mexico Code of Administrative Regulations (May 6, 2021), https://www.env.nm.gov/air-quality/wp-content/uploads/sites/2/2018/08/Proposed-Part-20.2.50-May-6-2021-Version.pdf ("The owner or operator of an emergency use engine that is operated less than 100 hours per year is not subject to the emissions standards in this Part . . . .").

[95]  See Exhibit 16 (showing invoices for $6,825, $5,000, and $11,950 for emissions testing).

33

**684a**

annually,[96] with a portion of additional costs passed on to consumers in the form of higher energy prices, without a corresponding environmental benefit.

Even apart from the financial costs, testing is operationally demanding, but the Proposed Rule wholly neglects that fundamental reality. For example, per current EPA regulations, units need to be tested when the load is between 90–100% of the maximum load,[97] a state which may not occur naturally. If a unit is not at that load capacity, Kinder Morgan must take steps to artificially increase the load prior to conducting any testing—an intensive process in both labor and time. And artificially increasing the load of an engine from 60% to 90% is orders of magnitude more complex than artificially increasing the load of an engine from 85% to 90%. Flexibility in timing is therefore of paramount importance. Moreover, it is not as if Kinder Morgan can simply pick two days in the year to conduct testing on all its units at once. There is no scenario in which performance testing on hundreds of units could be conducted simultaneously. The Proposed Rule simply does not account for the fact that Kinder Morgan would need a minimum of 12 months to spread out a *single* round of performance testing on all 950 of its units. It would therefore be operationally and logistically infeasible to conduct performance testing on all the affected units within the six months allotted (five months to the extent the EPA would require one of the semi-annual tests to be conducted during the ozone season as appears to be the intent of the Proposed Rule), as would be required for semi-annual testing.

In the past, EPA *has* correctly taken note of these operational realities. Indeed, semi-annual testing is also anomalous compared to performance testing regulations on other emission sources, such as under NSPS and NESHAP, which generally require only testing every 8,760 hours of run time.[98] There is no reason to impose more frequent testing requirements than under NSPS and NESHAP.

To be clear, the existence of the above operational and financial costs does not mean that operators would be better off installing CEMS. To the contrary, the cost of installing such monitoring technology would be exorbitant, even outpacing the costs of retrofitting units. While Kinder Morgan has limited experience with CEMS, that experience is illustrative. Indeed, Kinder Morgan had to replace CEMS at a facility in 2020, incurring around $100,000 in costs just to change out the analyzers while leaving alone the hard lines. A brand new installation would

---

[96] 950 x 5,000 x 2 = 9,500,000.

[97] See, e.g., 40 C.F.R § 60.4244(a) ("Each performance test must be conducted within 10 percent of 100 percent peak (or the highest achievable) load and according to the requirements in § 60.8 and under the specific conditions that are specified by Table 2 to this subpart.").

[98] See 40 C.F.R. § 60.4243(a)(2)(iii) ("subsequent performance testing [on stationary spark ignition internal combustion engine greater than 500 HP] every 8,760 hours or 3 years, whichever comes first"); 40 C.F.R. § 60.4211(g)(3) ("subsequent performance testing [on stationary internal combustion engine greater than 500 HP] every 8,760 hours of engine operation or 3 years, which comes first"); 40 C.F.R. § 63.6615 and Table 3 to Subpart ZZZZ of Part 63 (listing subsequent performance test requirements as "every 8,760 hours or 3 years, whichever comes first" for both limited use and non-limited use existing non-emergency non-black start CI stationary RICE engines). While semi-annual testing is required for some stationary RICE engines, see 40 C.F.R. § 63.6615, the applicability of that rule is far more limited than the number of units which would be affected by this Proposed Rule. And, in any event, even that rule allowed operators to reduce the frequency of testing after two successful tests. Id.

34

require significant and additional resources to install electric equipment and tubing. The projected upfront installation costs are significant, and EPA should not impose any CEMS testing requirements as part of a final rule or model rule included therein.

In addition to the stand-alone costs of CEMS technology, owners and operators of facilities would also need to build shelters for the CEMS units in order to ensure a controlled environment to protect the analyzer from extreme ambient conditions such as heat, cold, dust, wind, earthquakes, and corrosive or explosive atmospheres. They would also need to build out a whole new IT framework. Nor are the costs limited to the upfront fixed costs of installing CEMS. Owners and operators would need to hire and train CEMS operators and technicians, adding ongoing labor costs and forcing Kinder Morgan to compete with other companies to attract the scarce labor force with the appropriate training to run CEMS at their facilities. This is in addition to around $15,000 in annual service costs, and $5,000 per year for cylinder rentals, all per unit.

      **1.**    **Alternative Proposal to the Semi-Annual Performance Testing Requirement.**

As an alternative to the EPA's proposal, Kinder Morgan suggests a testing requirement in line with the testing requirements on stationary combustion turbines. Per 40 C.F.R. § 60.4340(a), annual performance tests are required to demonstrate continuous compliance with regulations, and where a performance test is less than or equal to 75% of the $NO_x$ emission limit for the turbine, an operator of the turbine can reduce the frequency of subsequent performance tests to once every two years. If the results of a subsequent performance test exceed 75% of the $NO_x$ emission limit for the turbine, an operator must resume annual testing. EPA adopted this proposal in response to comments noting that the sophisticated controls on lean premix turbines will provide consistent $NO_x$ emission results,[99] just as controls anticipated to be installed at Kinder Morgan's units, combined with the quality of FERC-regulated gas in the transmission sector, ensures consistent $NO_x$ emission results.

Here too, Kinder Morgan proposes that EPA allow for annual testing on Engines, with an opportunity to reduce the frequency of testing to every two years if testing shows that $NO_x$ emissions are equal to 75% or less of permitted $NO_x$ emissions limits. Whatever testing frequency EPA chooses it should, at the very least, provide an opportunity to reduce the frequency of testing if testing shows that $NO_x$ emissions are equal to 75% or less of permitted $NO_x$ emission limits. If semi-annual testing is not selected, EPA could work with INGAA and other industry members to develop reasonable best management practices for Engine operation and maintenance.

EPA should also include an option for portable testing. Use of portable gas analyzers equipped with electrochemical sensors has already been approved as an alternative method for determination of Oxygen, Carbon Monoxide, and Nitrogen Oxides from stationary sources for use at (1) Industrial/Commercial/Institutional Steam Generating Units subject to 40 CFR Part 60,

---

[99] See Dkt. No. EPA-HQ-OAR-2004-0490-0322, *Response to Public Comments on Proposed Standards of Performance for Stationary Combustion Turbines*, 88 (July 6, 2006).

35

Subpart Db; (2) stationary spark ignition internal combustion engines subject to 40 CFR Part 60, Subpart JJJJ; and (3) RICE subject to 40 CFR Part 63, Subpart ZZZZ.  This method leverages the inherent linear performance of electrochemical cell-based technology to provide simplified procedures that lower costs.[100]  There is no reason not to allow Engine owners and operators flexibility to employ this proven cost-effective and reliable method of performance testing.

### G.    As Proposed, the Engine Proposal Will Significantly Disrupt the Distribution of Energy in the United States.

Given the scale of the undertaking to retrofit approximately 950 units in order to comply with the Proposed Rule before the May 2026 deadline, a large-scale reduction in output of natural gas is unavoidable.  The very few manufacturers capable of retrofitting units would be at capacity working on Kinder Morgan's Engines alone, let alone the thousands of additional units from other natural gas suppliers operating in the same regions.  The backlog will inevitably result in Engines remaining offline for extended periods of time and could potentially jeopardize the safe and reliable transmission of natural gas in the United States and/or could lead to higher costs for transporting gas, which costs are ultimately passed along from the transmission companies to customers, the local distribution companies, and large end users, to their customers: the consumers.  Under EPA's unreasonable 2026 timetable, Engines will have to be idled until the retrofitting is complete and millions of end-users of natural gas could face periodic outages along with higher energy bills.

Moreover, EPA should consider that these impacts are likely to harm already disadvantaged communities including low-income communities and communities of color.  Research has documented that households at or near the Federal Poverty Level are significantly more burdened by energy insecurity (and therefore impacted more by scarcity and higher prices) than other socioeconomic groups.[101]  Researchers have shown that poor communities face worse health outcomes and worse educational outcomes in part due to energy insecurity.[102]  A 2019 study found that low-income households in U.S. cities spend on average 10–20% of their income on energy bills.[103]  Previous research has also shown that subsidized housing recipients face an increased burden from outages because they are more likely to rent from private landlords who

---

[100] Portable Analyzer Test Method Update for Common Analyzers Phase 3 Report, Innovative Environmental Solutions, Inc., for the Pipeline Research Council International, Inc., Catalog PR-312-17204-R01 (Oct. 10, 2017), https://www.prci.org/Research/CompressorPumpStation/CPSProjects/CPS-11 6A/3241/136252/125634.aspx.

[101] Jessel et al. *Energy, poverty, and health in climate change: a comprehensive review of an emerging literature*.  Frontiers in Public Health, 357 (2019), Frontiers | Energy, Poverty, and Health in Climate Change: A Comprehensive Review of an Emerging Literature | Public Health (frontiersin.org).

[102] See generally id.

[103] Kontokosta et al. *Energy cost burdens for low-income and minority households: Evidence from energy benchmarking and audit data in five US cities*, Journal of the American Planning Association, 86(1), at 95 (2020).

neither weatherize nor optimize energy efficiency due to upfront costs.[104]  Likewise, communities of color are also disproportionately affected by energy insecurity.[105]

EPA's Proposed Rule therefore will exacerbate harm to disproportionately impacted communities by creating energy shortages and corresponding increases in energy prices that historically have not been equally distributed.

## VI.    ALTERNATE PROPOSAL: EPA'S APPROACH SHOULD MODEL PAST SUCCESSFUL PRACTICE TO INFORM ANY NEWLY PROPOSED RULE

In summary, and following successful precedent, EPA must establish emissions targets for each state, and should publish a model rule (with core elements described below) and allow states to exercise their discretion to implement the model rule or other cost-effective and technically feasible rules through SIP implementation.

### A.    Summary of 1998 NOₓ SIP Call and Subsequent Developments

In 1998, EPA issued the "NOₓ SIP Call,"[106] requiring 23 states (including the District of Columbia) to reduce their $NO_x$ emissions in an attempt to reduce interstate ozone pollution based on the Good Neighbor Provision.  Under the $NO_x$ SIP Call, EPA established emissions "budgets" for each state, designating the acceptable level of $NO_x$ emissions from that jurisdiction and a model cap and trade program that allowed sources to buy and sell emissions allowances.  Following litigation, the D.C. Circuit struck down portions of the $NO_x$ SIP Call, remanding back to the EPA for further rulemaking.[107]

Following consultation with stakeholders, EPA came back with the 2004 $NO_x$ SIP Call Phase 2 rule ("2004 $NO_x$ Rule").  The 2004 $NO_x$ Rule required 21 States and the District of Columbia again set $NO_x$ budgets for states to eliminate those amounts of $NO_x$ emissions that contribute significantly to downwind nonattainment of the 1-hour ozone standard.  The implementation of the 2004 $NO_x$ Rule, moreover, relied on emission averaging provisions:

> States may establish a $NO_x$ tons/season emissions decrease target for individual companies and then provide the companies with the opportunity to develop a plan that would achieve the needed emissions reductions.  The companies may select from a variety of control measures to apply at their various emission units in the State or portion of the State affected under the $NO_x$ SIP call. . . . What is important from EPA's perspective is that the State, through a SIP revision, demonstrate that

---

[104] Hernández & Bird, *Energy burden and the need for integrated low-income housing and energy policy*, Poverty Public Policy, 2(4), at 5-25 (2010).

[105] Jessel, supra note 101.

[106] Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone, 63 Fed. Reg. 57,356 (Oct. 27, 1998) [hereinafter "NOx SIP Call"].

[107] See Michigan v. EPA, 213 F.3d 663 (D.C. Cir. 2000).

all the control measures contained in the SIP are collectively adequate to provide for compliance with the State's $NO_x$ budget during the 2007 ozone season.[108]

EPA coupled this flexible averaging approach with the development of a model rule that states could adopt as part of their SIPs. The model rule gave companies credit towards their individualized compliance plan for decreases in $NO_x$ emissions from engines that were not even subject to the 2004 $NO_x$ Rule.[109] Amongst other advantages, the averaging approach relieved the EPA, state agencies, and regulated companies of the difficulty of agreeing on technical definitions for lean-burn and rich-burn engines, obviated the need to determine whether individual engines could in fact achieve certain control levels with a prescribed control technology, and allowed companies and states to achieve compliance with $NO_x$ SIP Call requirements with minimal deleterious impact on natural gas capacity and operational reliability.[110]

This 2004 $NO_x$ Rule emission averaging approach has led to significant emission reductions. Indeed, in light of EPA's successful implementation of the emissions averaging approach in the 2004 $NO_x$ Rule, individual states have recognized these advantages and incorporated averaging into their own rulemakings.[111] EPA should therefore follow the same approach here.

B.    <u>Although Each State Should Be Afforded Discretion to Develop an Effective SIP, as a Part of this Proposed Rule, EPA Should Develop a Model Rule To Encourage States to Adopt SIPs that Incorporate Emissions Averaging for RICE and an Engine-by-Engine Showing of Economic Infeasibility.</u>

1.    **EPA's Model Rule Should Adopt Emissions Averaging as it Did in the 2004 $NO_x$ Rule.**

Kinder Morgan recommends that EPA adopt the emissions averaging approach it incorporated in the 2004 $NO_x$ Rule and as proposed by INGAA in its comments on the Proposed Rule. As EPA recognized in promulgating the 2004 $NO_x$ Rule, averaging is a reasonable compliance flexibility mechanism that allows for the achievement of emissions limitations with reduced impacts on cost, natural gas capacity, and operational reliability.[112] Specifically, averaging provides enforceable and verifiable measures to control engines without operators having to work through the technical confusion of the definitions of lean- and rich-burn engines or determine whether individual engines can achieve certain emissions limitations with the

---

[108] Memorandum from Lydia N. Wegman, "State Implementation Plan (SIP) Call for Reducing Nitrogen Oxides (NOx) – Stationary Reciprocating Internal Combustion Engines" (Aug. 22, 2002) at 2, https://archive.epa.gov/ttn/ozone/web/pdf/ic_engine_guidance_memo_8_22_2002.pdf.

[109] EPA Model Rule § 3(a)(5).

[110] See 69 Fed. Reg. 21,604, 21,621 (Apr. 21, 2004) (discussing additional rationales for emissions averaging in comments on what became the 2004 NOx Rule).

[111] See, e.g., 25 Pa. Code § 129.98(a) ("[A] major NOx emitting facility . . . that cannot meet the applicable NOx RACT emission limitation may elect to meet the applicable NOx RACT emission limitation . . . by averaging NOx emissions on either a facility-wide or system-wide basis using a 30-day rolling average").

[112] See 69 Fed. Reg. 21,604, 21,621 (Apr. 21, 2004).

prescribed control technologies. Additionally, emission averaging will help address the problem presented by achieving compliance on engines that are technically impossible to retrofit, as discussed in detail above. Because an averaging approach allows more regulatory flexibility while still achieving significant emissions reductions, it is a sensible policy that should be incorporated into the model rule. Indeed, many states, including Illinois, New York, Ohio, Pennsylvania, New Mexico, Colorado, and Texas have already incorporated emissions averaging into their approaches to reducing $NO_x$ emissions. In short, EPA should follow its own past approach—as well as those taken in other states—to incorporate this reasonable and sound regulatory approach into any final rule adopted here.

Kinder Morgan further adopts and incorporates by reference comments submitted by INGAA that address emissions averaging at the company level.

### 2. EPA's Model Rule Must Expressly Incorporate a RACT Analysis on an Engine-by-Engine Basis to Determine the Cost-Effective Application of the Emissions Standards.

The model rule that Kinder Morgan proposes should include the option for owners and operators to show—on an Engine-by-Engine basis—that attaining the specific emissions rate limit would be economically infeasible. This option should be available before calculating the emissions reductions required under an averaging approach because it will ensure the model rule can be reasonably implemented by regulated companies. Installing additional controls for certain types of Engines could be prohibitively expensive, even with averaging. Therefore, the model rule must also incorporate a RACT analysis on an engine-by-engine basis to determine a cost-effective application of the emissions standards. Under this approach, an owner or operator could be relieved of the obligation to comply with the proposed emissions limitations applicable to a particular existing Engine, upon a showing (and determination by the state) that compliance would be technically impracticable or economically infeasible, similar to the requirements EPA has established for RACT. For example, under RACT:

> The determination of RACT and the corresponding emission rate, ensuring the proper application and operation of RACT, may vary from source to source due to source configuration, retrofit feasibility, operation procedures, raw materials, and other technical or economic characteristics of an individual source or group of sources.[113]

As discussed above in Section V.A, SCR is frequently the only control option for some engines to comply with the emissions-limit standards contemplated by the EPA. Yet, as Kinder Morgan also discussed above, Kinder Morgan's detailed cost case studies for the addition of various control technologies on some of its Engines range from \$157,709 to \$6,434,942. Converting these capital costs to costs per ton of emissions abatement demonstrates the economic unreasonableness of such controls. Whereas such retrofits would cost from \$1,000 to \$684,169

---

[113] EPA, *Guidance for Determining Acceptability of SIP Regulations in Non-attainment Areas* 2 (Dec. 9, 1976).

on a per-ton basis (assuming reasonable average run-time over a five-year period), the Proposed Rule identifies a cost reasonableness threshold of $7,500 per ton of emissions abated by non-EGUs. Although $7,500 per ton is higher than what other $NO_x$ rules have used as the cost-effective threshold, it could be an appropriate cost threshold for reasonableness if it is adequately substantiated in the rulemaking record. At minimum, $7,500 per ton reduced must be considered a "not to exceed" threshold, which would be consistent with other similar state-level rulemakings.[114] In turn, any model rule for states should be updated to contemplate that in some circumstances, engines will not be able to reduce emissions at this cost threshold. Therefore, an engine-by-engine approach is merited and would provide an additional cost backstop for the aggressive emissions reductions that the Proposed Rule aims to achieve.

Including such an option is especially important given the Proposed Rule's own acknowledgment that the cost effectiveness-analysis performed by EPA using CoST was "designed to be used for illustrative control strategy analyses . . . and **not for unit-specific, detailed engineering analyses**."[115] Thus, the Proposed Rule acknowledges that unit-specific, engineering analyses are likely to reveal different costs for control technologies employed on a particular unit. Moreover, the EPA's definition of RACT evaluates what a "a **particular** source is capable of meeting,"[116] and thereby contemplates a particularized (i.e., case-by-case) approach for determining the reasonableness of a control technology given the circumstances.

Kinder Morgan proposes that regulated entities be allowed to demonstrate—through a unit-specific, detailed engineering analysis like the one contemplated by the Proposed Rule and EPA's RACT definition—that the cost to achieve the emissions rate limits would require costs above the $7,500 threshold, and therefore not economically feasible. Kinder Morgan also proposes that the appropriate state regulator would review the engineering analysis to verify that conclusion. If the cost is verified to be above the $7,500 threshold, then the engine would be exempted from compliance, and its contribution to total emissions would be subtracted out from any total emissions reductions required under an emissions averaging approach a compliance option incorporating emissions averaging. States where Kinder Morgan has participated in rulemakings have adopted such an approach,[117] and it safeguards against unreasonably high, if not prohibitive, compliance costs.

---

[114] See supra note 44.

[115] Proposed Rule at 20,089 (emphasis added). See also id. at 20,090 ("The number of different industries and emissions unit categories and types present a challenge to defining a single method to identify appropriate control technologies, measures or strategies, and related costs across non-EGU emissions units.").

[116] 44 Fed. Reg. 53,761, 53,762 (Sept. 17, 1979) (emphasis added); see also Michigan v. EPA, 805 F.2d 176, 180 (6th Cir. 1986) ("Since 1976, the EPA has interpreted [RACT] to be 'the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility.'").

[117] For example, in New Mexico, the New Mexico Environmental Improvement Board ("EIB") has approved both an emissions averaging approach through an Alternative Compliance Plan and an Alternative Emissions Standard for individual units. The EIB is in the process of finalizing the rules and publishing them to the New Mexico Register.

40

## VII.    CONCLUSION

Kinder Morgan appreciates the opportunity to submit these comments.  As a fundamental concern and fatal flaw to its proposal, EPA is relying on an extraordinarily inaccurate set of data in support of the Engine Proposal, which undermines the entire proposal.  In fact, the agency has underestimated the number of subject Engines at such a significant magnitude that it has in turn dramatically underestimated the anticipated emissions by at least half.  Not only is reliance on this inaccurate data unlawful rulemaking, but the rule itself results in over-control of emissions, contrary to the CAA and court precedent.  EPA cannot proceed with this rulemaking and must re-publish a proposed draft rule with updated and accurate data and transparent analysis.

If EPA pursues a new draft proposed rule, with a renewed public comment period, Kinder Morgan respectfully requests the agency consider and address each of the following concerns raised:

- EPA overestimates the technical feasibility involved with the proposed emissions limits.  The technologies available are limited when applied to certain types of engines, and even after applying available control technologies, the emission limits may not be achievable.

- Even if the control technologies are technically feasible, achieving the standard could nonetheless be cost-prohibitive, and well in excess of EPA's cost threshold of $7,500 per ton of $NO_x$ reduced in many cases.

- The proposed timeline for compliance is unreasonable if not impossible.

- EPA does not appear to recognize that controls cannot be installed just for the ozone season, an assumption that further exacerbates concerns around over-control.

- Emergency engines must be exempted.

- The semi-annual testing requirements are onerous, unnecessary, and do not consider the operational realities faced by the Pipeline Transportation of Natural Gas industry.  A revised approach consistent with current regulatory programs is appropriate.

In support of these comments, Kinder Morgan conducted extensive analyses of its existing Engine data, relevant control technologies, and actual cost-estimates.  The results summarized herein indicate that a one-size-fits all emissions standards across 23 states is not the appropriate avenue for cost-effective emissions reductions to address potential ozone transport.  Instead, based on its data and Kinder Morgan's extensive experience in numerous states already implementing $NO_x$ emissions reduction programs for large engines, Kinder Morgan encourages EPA to adopt a model rule that incorporates emissions averaging for Engines on a state-by-state basis, as well as

41

**692a**

an Engine-by-Engine showing of economic infeasibility, among other considerations described above.  We recognize the complexities and challenges around the relevant data and analysis, and the Company welcomes further engagement with EPA on this matter.

Sincerely,

Michael Pitta
Vice President of EHS

(enclosures)


**EXHIBITS LIST**

Exhibit 1 – Example Cost of 2SLB SCR Addition
Exhibit 2 – Example Cost of 2SLB SCR Addition
Exhibit 3 – Example Cost of 2SLB Combustion Modifications
Exhibit 4 – Example Cost of 2SLB Combustion Modifications
Exhibit 5 – Example Cost of 2SLB Combustion Modifications
Exhibit 6 – Example Cost of 2SLB Combustion Modifications
Exhibit 7 – Example Cost of 4SLB SCR Addition
Exhibit 8 – Example Cost of 4SLB Combustion Modifications
Exhibit 9 – Example Cost of 4SLB Combustion Modifications
Exhibit 10 – Example Cost of 4SLB Combustion Modifications
Exhibit 11 – Example Cost of 4SLB Unit Replacement
Exhibit 12 – Example Cost of 4SRB NSCR and Combustion Modifications
Exhibit 13 – Example Cost of 4SRB NSCR and AFRC
Exhibit 14 – Example Cost of 4SRB AFRC
Exhibit 15 –Vendor Letter Regarding SCR Cost Increase
Exhibit 16 – Emissions Testing Invoices

2SLB SCR Installation
Kinder Morgan – Exhibit 1

# EXHIBIT 1



## KINDER MORGAN

| | | | |
|---|---|---|---|
| PROJECT NAME | | | |
| COMPANY NAME | | COMPANY NO. | |
| REQUESTED BY | | PREPARED BY | |
| ESTIMATE NO. | | ORIGINAL EST. DATE | 04/21/20 |
| REVISION NO. | BASE | CONSTRUCTION CONTINGENCY | 10% |
| REVISION DATE | | OVERHEAD | 13.56% |
| PROJECT MANAGER | | | |
| STATE | | TAX GROSS UP | 0.00% |
| COUNTY | | PROJECT TYPE | KM Funded for Economics (& MC) |
| | | IN-SERVICE | Oct-23 |
| | | ESTIMATE ACCURACY LEVEL | Class 3 |

**Emission Control System SCOPE:** SCR Emissions control system provided by ▮▮▮▮. This cost is a per unit cost

**New Aux SCOPE:** Install new AUX building and Air Compressor to be used for SCR Installation on all five units

**ASSET CAPABILITIES:** Vol @ ### psi                     Pressure

| Minimum | MMCFD | Minimum | psig |
|---|---|---|---|
| Maximum | MMCFD | MAOP | psig |
| | | Normal Operating | psig |
| | | Delivery Pressure | psig |

**Metrics:**
Dia (Inch) =
Length (Miles) =
Aggregate Base Lay (Per Ft) =
Total Cost (Per Ft) =
Contractor Cost (DIM) =
Directs + Contingency Cost (DIM) =

| ESTIMATE SUMMARY | Emission Control System | New Aux | | | TOTAL |
|---|---|---|---|---|---|
| MATERIAL (INCL SALES TAX) | $ 895,400 | $ 883,300 | | $ | 1,778,700 |
| COMPANY LABOR COST | $ 92,900 | $ 55,800 | | $ | 148,700 |
| PM, ENG, LAND, ENVIRO - EXPENSE | $ 10,800 | $ 5,400 | | $ | 16,200 |
| PRIMARY CONSTRUCTION CONTRACTOR | $ 967,000 | $ 1,116,100 | | $ | 2,083,100 |
| SECONDARY CONTRACTOR | $ 16,200 | $ - | | $ | 16,200 |
| PROFESSIONAL ENGINEERING | $ 265,500 | $ 180,700 | | $ | 446,200 |
| INSPECTION SERVICES | $ 169,100 | $ 91,300 | | $ | 260,400 |
| RADIOGRAPHY SERVICES | $ 3,800 | $ 1,900 | | $ | 5,700 |
| ENVIRONMENTAL CONTRACTOR | $ 54,100 | $ 27,000 | | $ | 81,100 |
| ELECTRICAL & INSTRUMENTATION | $ - | $ - | | $ | - |
| RIGHT OF WAY CONTRACTOR | $ - | $ - | | $ | - |
| SURVEY CONTRACTOR | $ 31,800 | $ 47,700 | | $ | 79,500 |
| OUTSIDE LEGAL SERVICES | $ 28,400 | $ 16,600 | | $ | 45,000 |
| ROW & DAMAGES | $ 12,500 | $ 5,000 | | $ | 17,500 |
| PERMIT FEES | $ - | $ - | | $ | - |
| GAS LOSS | $ 6,700 | $ - | | $ | 6,700 |
| **SUBTOTAL** | $ 2,554,200 | $ 2,430,800 | | $ | 4,985,000 |
| CONSTRUCTION CONTINGENCY | $ 255,420 | $ 243,080 | | $ | 498,500 |
| AFUDC | $ 78,464 | $ 73,396 | | $ | 151,859 |
| **SUBTOTAL** | $ 2,888,084 | $ 2,747,276 | | $ | 5,635,359 |
| CAPITALIZED OVERHEAD (BURDEN) | $ - | $ - | | $ | - |
| TAX GROSS-UP | $ - | $ - | | $ | - |
| ESCALATION | $ - | $ - | | $ | - |
| RISK INSURANCE | $ - | $ - | | $ | - |
| **ESTIMATED TOTAL COST** | **$ 2,888,084** | **$ 2,747,276** | | **$** | **5,635,359** |

Price/Ton:
(If Applicable) Escalated Price/Ton:

| | | | | |
|---|---|---|---|---|
| Contingency: | 10% | 10% | 10% | 10% |
| In-Service Date: | Oct-23 | Oct-23 | Oct-23 | Oct-23 |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions | |
|---|---|---|
| Yes | See Assumptions Tab | ** Estimate shelf life is 6 months from published date. |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | Project Manager | | |
| | | | Project Manager Director | | |
| | | | Project Controls | | |
| | | | Vice President | | |

| AUTHORITY LEVELS: | | Escalation Rates FV=PV(1+i)ⁿ | |
|---|---|---|---|
| < $25,000,000 PM, PM Director, Project Controls | | Material: | 0.0% |
| > $25,000,000 PM, PM Director, Project Controls, VP | | Other: | 0.0% |

**695a**

2SLB SCR Installation
Kinder Morgan – Exhibit 2

# EXHIBIT 2

2SLB SCR Installation | Summary



## KINDER MORGAN

| | | | | |
|---|---|---|---|---|
| PROJECT NAME | | | | |
| COMPANY NAME | | COMPANY NO. | | |
| REQUESTED BY | | PREPARED BY | | |
| ESTIMATE NO. | | ORIGINAL EST. DATE | 09/08/21 | |
| REVISION NO. | BASE | CONSTRUCTION CONTINGENCY | 10% | |
| REVISION DATE | | OVERHEAD | 13.17% | |
| PROJECT MANAGER | | | | |
| STATE | | TAX GROSS UP | 0.00% | |
| COUNTY | | PROJECT TYPE | KM Funded for Economics (& MC) | |
| | | IN-SERVICE | Oct-23 | |
| | | ESTIMATE ACCURACY LEVEL | Class 3 | |

**Emission Control System SCOPE:** SCR Emissions control system provided by ▇▇▇▇. This cost is a per unit cost. Cost developed per approved estimate CE2004034

**Aux Building SCOPE:** Install new AUX building and Air Compressor to be used for SCR Installation. Cost developed per approved estimate CE2004034

| ASSET CAPABILITIES: | Vol @ ### psi | | | Pressure |
|---|---|---|---|---|
| Minimum | MMCFD | | Minimum | psig |
| Maximum | MMCFD | | MAOP | psig |
| | | | Normal Operating | psig |
| **Metrics:** | Dia (Inch) = | | Delivery Pressure | psig |
| | Length (Miles) = | | | |
| | Aggregate Base Lay (Per Ft) = | | | |
| | Total Cost (Per Ft) = | | | |
| | Contractor Cost (DIM) = | | | |
| | Directs + Contingency Cost (DIM) = | | | |

### ESTIMATE SUMMARY

| | Emission Control System | Aux Building | TOTAL |
|---|---|---|---|
| MATERIAL (INCL SALES TAX) | $ 676,100 | $ 650,400 | $ 1,326,500 |
| COMPANY LABOR COST | $ 71,200 | $ 44,800 | $ 116,000 |
| PM, ENG, LAND, ENVIRO - EXPENSE | $ 3,000 | $ 2,800 | $ 5,800 |
| PRIMARY CONSTRUCTION CONTRACTOR | $ 1,187,800 | $ 678,900 | $ 1,866,700 |
| SECONDARY CONTRACTOR | $ 1,272,000 | $ - | $ 1,272,000 |
| PROFESSIONAL ENGINEERING | $ 198,700 | $ 183,800 | $ 382,500 |
| INSPECTION SERVICES | $ 265,300 | $ 68,000 | $ 333,300 |
| RADIOGRAPHY SERVICES | $ 3,700 | $ 2,800 | $ 6,500 |
| ENVIRONMENTAL CONTRACTOR | $ 33,700 | $ 20,200 | $ 53,900 |
| ELECTRICAL & INSTRUMENTATION | $ - | $ - | $ - |
| RIGHT OF WAY CONTRACTOR | $ - | $ 21,200 | $ 21,200 |
| SURVEY CONTRACTOR | $ 10,700 | $ 10,700 | $ 21,400 |
| OUTSIDE LEGAL SERVICES | $ - | $ - | $ - |
| ROW & DAMAGES | $ 15,000 | $ 15,000 | $ 30,000 |
| PERMIT FEES | $ - | $ - | $ - |
| GAS LOSS | $ 9,600 | $ - | $ 9,600 |
| **SUBTOTAL** | $ 3,746,800 | $ 1,698,600 | $ 5,445,400 |
| CONSTRUCTION CONTINGENCY | $ 374,680 | $ 169,860 | $ 544,540 |
| AFUDC | $ 98,547 | $ 126,664 | $ 225,211 |
| **SUBTOTAL** | $ 4,220,027 | $ 1,995,124 | $ 6,215,151 |
| CAPITALIZED OVERHEAD (BURDEN) | $ - | $ - | $ - |
| TAX GROSS-UP | $ - | $ - | $ - |
| ESCALATION | $ - | $ - | $ - |
| RISK INSURANCE | $ - | $ - | $ - |
| **ESTIMATED TOTAL COST** | $ 4,220,027 | $ 1,995,124 | $ 6,215,151 |

| | | | | |
|---|---|---|---|---|
| Price/Ton: | | | | |
| (If Applicable) Escalated Price/Ton: | | | | |
| Contingency: | 10% | 10% | 10% | 10% |
| In-Service Date: | Oct-23 | Oct-23 | Oct-23 | Oct-23 |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions | |
|---|---|---|
| Yes | See Assumptions Tab | ** Estimate shelf life is 6 months from published date. |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | Project Manager | | |
| | | | Project Manager Director | | |
| | | | Project Controls | | |
| | | | Vice President | | |

**AUTHORITY LEVELS:**
< $25,000,000  PM, PM Director, Project Controls
> $25,000,000  PM, PM Director, Project Controls, VP

| Escalation Rates FV=PV(1+i)$^n$ | |
|---|---|
| Material: | 0.0% |
| Other: | 0.0% |

2SLB Turbo & PCC Installation
Kinder Morgan – Exhibit 3

# EXHIBIT 3



## KINDER MORGAN

| | | | |
|---|---|---|---|
| PROJECT NAME | ▮ | | |
| COMPANY NAME | ▮ | COMPANY NO. | ▮ |
| REQUESTED BY | ▮ | PREPARED BY | ▮ |
| ESTIMATE NO. | ▮ | ORIGINAL EST. DATE | 08/02/21 |
| REVISION NO. | BASE | CONSTRUCTION CONTINGENCY | 10% |
| REVISION DATE | | OVERHEAD | 0.00% |
| PROJECT MANAGER | | | ▮ |
| STATE | ▮ | TAX GROSS UP | 0.00% |
| COUNTY | | PROJECT TYPE | Sustaining Capital |
| | | IN-SERVICE | May-24 |
| | | ESTIMATE ACCURACY LEVEL | Class 3 |

**RWIP SCOPE:** Install new combustion modification equipment (pre-combustion chambers), ancillary hardware, and automation on 4-Cooper GMVA10 compressor units at ▮

**CWIP SCOPE:** Isolate and tear down compressor driver and exhaust on 4-Cooper GMVA10 compressor units ▮ Prep for installation of new combustion modification equipment (pre-combustion chambers), ancillary hardware, and automation.

| ASSET CAPABILITIES: | Vol @  ### psi | | Pressure | |
|---|---|---|---|---|
| Minimum | MMCFD | Minimum | | psig |
| Maximum | MMCFD | MAOP | | psig |
| | | Normal Operating | | psig |
| | | Delivery Pressure | | psig |

| **Metrics:** | | |
|---|---|---|
| Dia (Inch) = | | |
| Length (Miles) = | | |
| Aggregate Base Lay (Per Ft) = | | |
| Total Cost (Per Ft) = | | |
| Contractor Cost (DIM) = | | |
| Directs + Contingency Cost (DIM) = | | |

| ESTIMATE SUMMARY | Tab 12 | Tab 13 | RWIP | CWIP | TOTAL |
|---|---|---|---|---|---|
| MATERIAL (INCL SALES TAX) | | | $    - | $  10,937,100 | $  10,937,100 |
| COMPANY LABOR COST | | | $    - | $  161,900 | $  161,900 |
| PM, ENG, LAND, ENVIRO - EXPENSE | | | $    - | $  23,100 | $  23,100 |
| PRIMARY CONSTRUCTION CONTRACTOR | | | $  120,000 | $  1,230,500 | $  1,350,500 |
| SECONDARY CONTRACTOR | | | $  10,000 | $  910,000 | $  920,000 |
| PROFESSIONAL ENGINEERING | | | $    - | $  58,500 | $  58,500 |
| INSPECTION SERVICES | | | $  9,000 | $  178,600 | $  187,600 |
| RADIOGRAPHY SERVICES | | | $    - | $  1,800 | $  1,800 |
| ENVIRONMENTAL CONTRACTOR | | | $    - | $  15,000 | $  15,000 |
| ELECTRICAL & INSTRUMENTATION | | | $    - | $    - | $    - |
| RIGHT OF WAY CONTRACTOR | | | $    - | $    - | $    - |
| SURVEY CONTRACTOR | | | $    - | $    - | $    - |
| OUTSIDE LEGAL SERVICES | | | $    - | $    - | $    - |
| ROW & DAMAGES | | | $    - | $    - | $    - |
| PERMIT FEES | | | $    - | $    - | $    - |
| GAS LOSS | | | $    - | $    - | $    - |
| **SUBTOTAL** | | | $  139,000 | $  13,516,500 | $  13,655,500 |
| CONSTRUCTION CONTINGENCY | | | $  13,900 | $  1,351,650 | $  1,365,550 |
| AFUDC | | | $    - | $  412,485 | $  412,485 |
| **SUBTOTAL** | | | $  152,900 | $  15,280,635 | $  15,433,535 |
| CAPITALIZED OVERHEAD (BURDEN) | | | $    - | $    - | $    - |
| TAX GROSS-UP | | | $    - | $    - | $    - |
| ESCALATION | | | $    - | $    - | $    - |
| RISK INSURANCE | | | $    - | $    - | $    - |
| **ESTIMATED TOTAL COST** | | | $  152,900 | $  15,280,635 | $  15,433,535 |
| Price/Ton: | | | | | |
| (If Applicable) Escalated Price/Ton: | | | | | |
| Contingency: | 10% | 10% | 10% | 10% | |
| In-Service Date: | May-24 | May-24 | May-24 | May-24 | |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions | |
|---|---|---|
| Yes | See Assumptions Tab | ** Estimate shelf life is 6 months from published date. |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | Project Manager | | |
| | | | Project Manager Director | | |
| | | | Project Controls | | |
| | | | Vice President | | |

| AUTHORITY LEVELS: | | Escalation Rates $FV=PV(1+i)^n$ | |
|---|---|---|---|
| < $25,000,000 PM, PM Director, Project Controls | | Material: | 0.0% |
| > $25,000,000 PM, PM Director, Project Controls, VP | | Other: | 0.0% |

**699a**

2SLB Turbo & PCC Installation
Kinder Morgan – Exhibit 4

# EXHIBIT 4

2SLB Turbo & PCC Installation  *Summary*

## KINDER MORGAN

| | | | |
|---|---|---|---|
| PROJECT NAME | ███ | | |
| COMPANY NAME | ███ | COMPANY NO. | ███ |
| REQUESTED BY | ███ | PREPARED BY | ███ |
| ESTIMATE NO. | CE2109038 | ORIGINAL EST. DATE | 11/02/21 |
| REVISION NO. | BASE | CONSTRUCTION CONTINGENCY | 10% |
| REVISION DATE | | OVERHEAD | 0.00% |
| PROJECT MANAGER | ███ | | |
| STATE | ███ | TAX GROSS UP | 0.00% |
| COUNTY | ███ | PROJECT TYPE | Sustaining Capital |
| | | IN-SERVICE | Nov-25 |
| | | ESTIMATE ACCURACY LEVEL | Class 3 |

**RWIP SCOPE:** Removal of existing equipment for retrofit

**CWIP SCOPE:** Retrofits to meet proposed standards for existing reciprocating unit ███ using combustion modifications (PCCs, turbochargers, control panel upgrade, etc., as needed) and oxidation catalyst. All ancillaries and infrastructure must be considered and modified as needed to support the engine modifications for ongoing compliant operation.

**ASSET CAPABILITIES:** Vol @ ### psi

| | | | Pressure |
|---|---|---|---|
| Minimum | MMCFD | Minimum | psig |
| Maximum | MMCFD | MAOP | psig |
| | | Normal Operating | psig |
| | | Delivery Pressure | psig |

**Metrics:**
- Dia (Inch) =
- Length (Miles) =
- Aggregate Base Lay (Per Ft) =
- Total Cost (Per Ft) =
- Contractor Cost (DIM) =
- Directs + Contingency Cost (DIM) =

| ESTIMATE SUMMARY | Tab 12 | Tab 13 | RWIP | CWIP | TOTAL |
|---|---|---|---|---|---|
| MATERIAL (INCL SALES TAX) | | | $      - | $  3,172,100 | $  3,172,100 |
| COMPANY LABOR COST | | | $      - | $    161,900 | $    161,900 |
| PM, ENG, LAND, ENVIRO - EXPENSE | | | $      - | $     23,100 | $     23,100 |
| PRIMARY CONSTRUCTION CONTRACTOR | | | $ 64,700 | $    680,300 | $    745,000 |
| SECONDARY CONTRACTOR | | | $ 10,800 | $    981,900 | $    992,700 |
| PROFESSIONAL ENGINEERING | | | $      - | $     50,500 | $     50,500 |
| INSPECTION SERVICES | | | $  4,800 | $     69,800 | $     74,600 |
| RADIOGRAPHY SERVICES | | | $      - | $      1,900 | $      1,900 |
| ENVIRONMENTAL CONTRACTOR | | | $      - | $     16,200 | $     16,200 |
| ELECTRICAL & INSTRUMENTATION | | | $      - | $         - | $         - |
| RIGHT OF WAY CONTRACTOR | | | $      - | $         - | $         - |
| SURVEY CONTRACTOR | | | $      - | $         - | $         - |
| OUTSIDE LEGAL SERVICES | | | $      - | $         - | $         - |
| ROW & DAMAGES | | | $      - | $         - | $         - |
| PERMIT FEES | | | $      - | $         - | $         - |
| GAS LOSS | | | $      - | $         - | $         - |
| **SUBTOTAL** | | | $ 80,300 | $  5,157,700 | $  5,238,000 |
| CONSTRUCTION CONTINGENCY | | | $  8,030 | $    511,300 | $    519,330 |
| AFUDC | | | $      - | $    146,569 | $    146,569 |
| **SUBTOTAL** | | | $ 88,330 | $  5,815,569 | $  5,903,899 |
| CAPITALIZED OVERHEAD (BURDEN) | | | $      - | $         - | $         - |
| TAX GROSS-UP | | | $      - | $         - | $         - |
| ESCALATION | | | $      - | $         - | $         - |
| RISK INSURANCE | | | $      - | $         - | $         - |
| **ESTIMATED TOTAL COST** | | | $ 88,330 | $  5,815,569 | $  5,903,899 |
| Price/Ton: | | | | | |
| (If Applicable) Escalated Price/Ton: | | | | | |
| Contingency: | 10% | 10% | 10% | 10% | |
| In-Service Date: | Nov-25 | Nov-25 | Nov-25 | Nov-25 | |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions | |
|---|---|---|
| Yes | See Assumptions Tab | ** Estimate shelf life is 6 months from published date. |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | Project Manager | ███ | |
| | | | Project Manager Director | | |
| | | | Project Controls | | |
| | | | Vice President | | |

**AUTHORITY LEVELS:**
| | |
|---|---|
| < $25,000,000  PM, PM Director, Project Controls | |
| > $25,000,000  PM, PM Director, Project Controls, VP | |

**Escalation Rates** $FV=PV(1+i)^n$
| Material: | 0.0% |
|---|---|
| Other: | 0.0% |

**701a**

2SLB Turbo & PCC Installation
Kinder Morgan – Exhibit 5

# EXHIBIT 5

## KINDER MORGAN

| | | | | |
|---|---|---|---|---|
| PROJECT NAME | ▮ | | | |
| COMPANY NAME | ▮ | COMPANY NO. | | ▮ |
| REQUESTED BY | ▮ | PREPARED BY | | ▮ |
| ESTIMATE NO. | | ORIGINAL EST. DATE | | 08/24/21 |
| REVISION NO. | BASE | CONSTRUCTION CONTINGENCY | | 10% |
| REVISION DATE | | OVERHEAD | | 13.26% |
| PROJECT MANAGER | ▮ | | | |
| STATE | ▮ | TAX GROSS UP | | 0.00% |
| COUNTY | | PROJECT TYPE | | KM Funded for Economics (& MC) |
| | | IN-SERVICE | | May-24 |
| | | ESTIMATE ACCURACY LEVEL | | Class 3 |

**RWIP SCOPE:** Removal of existing equipment to be replaced.

**CWIP SCOPE:** This unit is a 2SLB unit that needs to meet 3 g/hp-hr of NOx. To achieve this a the turbocharger will need to be re-aeroed and ePCC's added.

**ASSET CAPABILITIES:** Vol @ ### psi

| | | | | |
|---|---|---|---|---|
| | | | Pressure | |
| Minimum | MMCFD | Minimum | | psig |
| Maximum | MMCFD | MAOP | | psig |
| | | Normal Operating | | psig |
| | | Delivery Pressure | | psig |

**Metrics:**
Dia (Inch) =
Length (Miles) =
Aggregate Base Lay (Per Ft) =
Total Cost (Per Ft) =
Contractor Cost (DIM) =
Directs + Contingency Cost (DIM) =

### ESTIMATE SUMMARY

| | Tab 12 | Tab 13 | RWIP | CWIP | TOTAL |
|---|---|---|---|---|---|
| MATERIAL (INCL SALES TAX) | | $ - | $ - | $ 841,800 | $ 841,800 |
| COMPANY LABOR COST | | $ - | $ - | $ 55,800 | $ 55,800 |
| PM, ENG, LAND, ENVIRO - EXPENSE | | $ - | $ - | $ 3,200 | $ 3,200 |
| PRIMARY CONSTRUCTION CONTRACTOR | | | $ 162,400 | $ 682,700 | $ 845,100 |
| SECONDARY CONTRACTOR | | $ - | $ - | $ 3,139,300 | $ 3,139,300 |
| PROFESSIONAL ENGINEERING | | $ - | $ - | $ 157,000 | $ 157,000 |
| INSPECTION SERVICES | | | $ 29,600 | $ 221,900 | $ 251,500 |
| RADIOGRAPHY SERVICES | | $ - | $ - | $ 4,700 | $ 4,700 |
| ENVIRONMENTAL CONTRACTOR | | $ - | $ - | $ 21,700 | $ 21,700 |
| ELECTRICAL & INSTRUMENTATION | | $ - | $ - | $ - | $ - |
| RIGHT OF WAY CONTRACTOR | | $ - | $ - | $ - | $ - |
| SURVEY CONTRACTOR | | $ - | $ - | $ - | $ - |
| OUTSIDE LEGAL SERVICES | | $ - | $ - | $ - | $ - |
| ROW & DAMAGES | | $ - | $ - | $ 10,000 | $ 10,000 |
| PERMIT FEES | | $ - | $ - | $ - | $ - |
| GAS LOSS | | $ - | $ - | $ - | $ - |
| **SUBTOTAL** | | | $ 192,000 | $ 5,138,100 | $ 5,330,100 |
| CONSTRUCTION CONTINGENCY | | | $ 19,200 | $ 513,810 | $ 533,010 |
| AFUDC | | $ - | $ - | $ 79,699 | $ 79,699 |
| **SUBTOTAL** | | | $ 211,200 | $ 5,731,609 | $ 5,942,809 |
| CAPITALIZED OVERHEAD (BURDEN) | | $ - | $ - | $ - | $ - |
| TAX GROSS-UP | | $ - | $ - | $ - | $ - |
| ESCALATION | | $ - | $ - | $ - | $ - |
| RISK INSURANCE | | $ - | $ - | $ - | $ - |
| **ESTIMATED TOTAL COST** | | | $ 211,200 | $ 5,731,609 | $ 5,942,809 |

Price/Ton:
(If Applicable) Escalated Price/Ton:

| Contingency: | 10% | 10% | 10% | 10% |
|---|---|---|---|---|
| In-Service Date: | May-24 | May-24 | May-24 | May-24 |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions | |
|---|---|---|
| Yes | See Assumptions Tab | ** Estimate shelf life is 6 months from published date. |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | Project Manager | ▮ | |
| | | | Project Manager Director | | |
| | | | Project Controls | | |
| | | | Vice President | | |

| AUTHORITY LEVELS: | |
|---|---|
| < $25,000,000  PM, PM Director, Project Controls | |
| > $25,000,000  PM, PM Director, Project Controls, VP | |

| Escalation Rates FV=PV(1+i)ⁿ | |
|---|---|
| Material: | 0.0% |
| Other: | 0.0% |

**703a**

2SLB Turbo & PCC Installation
Kinder Morgan – Exhibit 6

# EXHIBIT 6

## KINDER MORGAN

| | | | | |
|---|---|---|---|---|
| PROJECT NAME | ███████ | | | |
| COMPANY NAME | ███████ | COMPANY NO. | | |
| REQUESTED BY | ████ | PREPARED BY | | |
| ESTIMATE NO. | | ORIGINAL EST. DATE | 06/04/22 | |
| REVISION NO. | BASE | CONSTRUCTION CONTINGENCY | 10% | |
| REVISION DATE | | OVERHEAD | 0.00% | |
| PROJECT MANAGER | | | | |
| STATE | ███ | TAX GROSS UP | 0.00% | |
| COUNTY | | PROJECT TYPE | Sustaining Capital | |
| | | IN-SERVICE | Nov-25 | |
| | | ESTIMATE ACCURACY LEVEL | Class 3 | |

**RWIP SCOPE:** Removal of existing equipment for retrofit

**CWIP SCOPE:** Retrofits to meet proposed standards for existing reciprocating unit ███ using combustion modifications (PCCs, turbochargers, control panel upgrade, etc., as needed) and oxidation catalyst. All ancillaries and infrastructure must be considered and modified as needed to support the engine modifications for ongoing compliant operation.

**ASSET CAPABILITIES:** Vol @ ### psi

| | | | | Pressure |
|---|---|---|---|---|
| Minimum | MMCFD | Minimum | | psig |
| Maximum | MMCFD | MAOP | | psig |
| | | Normal Operating | | psig |
| | | Delivery Pressure | | psig |

| Metrics: | Dia (Inch) = | |
|---|---|---|
| | Length (Miles) = | |
| Aggregate Base Lay (Per Ft) = | | |
| Total Cost (Per Ft) = | | |
| Contractor Cost (DIM) = | | |
| Directs + Contingency Cost (DIM) = | | |

### ESTIMATE SUMMARY

| | Tab 12 | Tab 13 | RWIP | CWIP | TOTAL |
|---|---|---|---|---|---|
| MATERIAL (INCL SALES TAX) | | | $        - | $   4,004,900 | $   4,004,900 |
| COMPANY LABOR COST | | | $        - | $      161,900 | $      161,900 |
| PM, ENG, LAND, ENVIRO - EXPENSE | | | $        - | $       23,100 | $       23,100 |
| PRIMARY CONSTRUCTION CONTRACTOR | | | $   64,200 | $      674,600 | $      738,800 |
| SECONDARY CONTRACTOR | | | $   10,700 | $      973,700 | $      984,400 |
| PROFESSIONAL ENGINEERING | | | $        - | $       50,100 | $       50,100 |
| INSPECTION SERVICES | | | $    4,800 | $       69,200 | $       74,000 |
| RADIOGRAPHY SERVICES | | | $        - | $        1,900 | $        1,900 |
| ENVIRONMENTAL CONTRACTOR | | | $        - | $       16,100 | $       16,100 |
| ELECTRICAL & INSTRUMENTATION | | | $        - | $        - | $        - |
| RIGHT OF WAY CONTRACTOR | | | $        - | $        - | $        - |
| SURVEY CONTRACTOR | | | $        - | $        - | $        - |
| OUTSIDE LEGAL SERVICES | | | $        - | $        - | $        - |
| ROW & DAMAGES | | | $        - | $        - | $        - |
| PERMIT FEES | | | $        - | $        - | $        - |
| GAS LOSS | | | $        - | $        - | $        - |
| **SUBTOTAL** | | | $   79,700 | $   5,975,500 | $   6,055,200 |
| CONSTRUCTION CONTINGENCY | | | $    7,970 | $      597,550 | $      605,520 |
| AFUDC | | | $        - | $      178,543 | $      178,543 |
| **SUBTOTAL** | | | $   87,670 | $   6,751,593 | $   6,839,263 |
| CAPITALIZED OVERHEAD (BURDEN) | | | $        - | $        - | $        - |
| TAX GROSS-UP | | | $        - | $        - | $        - |
| ESCALATION | | | $        - | $        - | $        - |
| RISK INSURANCE | | | $        - | $        - | $        - |
| **ESTIMATED TOTAL COST** | | | $   87,670 | $   6,751,593 | $   6,839,263 |
| Price/Ton: | | | | | |
| (If Applicable) Escalated Price/Ton: | | | | | |
| Contingency: | 10% | 10% | 10% | 10% | |
| In-Service Date: | Nov-25 | Nov-25 | Nov-25 | Nov-25 | |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions | |
|---|---|---|
| Yes | See Assumptions Tab | ** Estimate shelf life is 6 months from published date. |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | Project Manager | | |
| | | | Project Manager Director | | |
| | | | Project Controls | ████ | |
| | | | Vice President | | |

| AUTHORITY LEVELS: | | Escalation Rates FV=PV(1+i)$^n$ | |
|---|---|---|---|
| < $25,000,000 PM, PM Director, Project Controls | | Material: | 0.0% |
| > $25,000,000 PM, PM Director, Project Controls, VP | | Other: | 0.0% |

**705a**

4SLB SCR Installation
Kinder Morgan – Exhibit 7

# EXHIBIT 7

4SLB SCR Installation    Summary

## KINDER MORGAN

| | | | | |
|---|---|---|---|---|
| **PROJECT NAME** | ▮▮▮ | | | |
| **COMPANY NAME** | ▮▮▮ | **COMPANY NO.** | | ▮▮▮ |
| **REQUESTED BY** | ▮▮▮ | **PREPARED BY** | | ▮▮▮ |
| **ESTIMATE NO.** | | **ORIGINAL EST. DATE** | | 09/08/21 |
| **REVISION NO.** | BASE | **CONSTRUCTION CONTINGENCY** | | 10% |
| **REVISION DATE** | | **OVERHEAD** | | 13.10% |
| **PROJECT MANAGER** | ▮▮▮ | | | |
| **STATE** | | **TAX GROSS UP** | | 0.00% |
| **COUNTY** | | **PROJECT TYPE** | | KM Funded for Economics (& MC) |
| | | **IN-SERVICE** | | Oct-23 |
| | | **ESTIMATE ACCURACY LEVEL** | | Class 3 |

**Emission Control System SCOPE:** SCR Emissions control system provided by ▮▮▮ This cost is a per unit cost.

**Aux Building SCOPE:** Install new AUX building and Air Compressor to be used for SCR Installation.

**ASSET CAPABILITIES:** Vol @ ### psi

| | | | |
|---|---|---|---|
| Minimum | MMCFD | Minimum | psig |
| Maximum | MMCFD | MAOP | psig |
| | | Normal Operating | psig |
| | | Delivery Pressure | psig |

**Metrics:**
- Dia (Inch) =
- Length (Miles) =
- Aggregate Base Lay (Per Ft) =
- Total Cost (Per Ft) =
- Contractor Cost (DIM) =
- Directs + Contingency Cost (DIM) =

## ESTIMATE SUMMARY

| | | Emission Control System | Aux Building | TOTAL |
|---|---|---|---|---|
| MATERIAL (INCL SALES TAX) | | $ 687,900 | $ 661,800 | $ 1,349,700 |
| COMPANY LABOR COST | | $ 71,200 | $ 44,800 | $ 116,000 |
| PM, ENG, LAND, ENVIRO - EXPENSE | | $ 3,000 | $ 2,800 | $ 5,800 |
| PRIMARY CONSTRUCTION CONTRACTOR | | $ 1,208,600 | $ 690,800 | $ 1,899,400 |
| SECONDARY CONTRACTOR | | $ 1,294,300 | $ - | $ 1,294,300 |
| PROFESSIONAL ENGINEERING | | $ 202,200 | $ 187,000 | $ 389,200 |
| INSPECTION SERVICES | | $ 269,900 | $ 69,200 | $ 339,100 |
| RADIOGRAPHY SERVICES | | $ 3,800 | $ 2,800 | $ 6,600 |
| ENVIRONMENTAL CONTRACTOR | | $ 34,300 | $ 20,600 | $ 54,900 |
| ELECTRICAL & INSTRUMENTATION | | $ - | $ - | $ - |
| RIGHT OF WAY CONTRACTOR | | $ - | $ 21,600 | $ 21,600 |
| SURVEY CONTRACTOR | | $ 10,800 | $ 10,800 | $ 21,600 |
| OUTSIDE LEGAL SERVICES | | $ - | $ - | $ - |
| ROW & DAMAGES | | $ 15,000 | $ 15,000 | $ 30,000 |
| PERMIT FEES | | $ - | $ - | $ - |
| GAS LOSS | | $ 9,600 | $ - | $ 9,600 |
| **SUBTOTAL** | | **$ 3,810,600** | **$ 1,727,200** | **$ 5,537,800** |
| CONSTRUCTION CONTINGENCY | | $ 381,060 | $ 172,720 | $ 553,780 |
| AFUDC | | $ 100,167 | $ 128,696 | $ 228,863 |
| **SUBTOTAL** | | **$ 4,291,827** | **$ 2,028,616** | **$ 6,320,443** |
| CAPITALIZED OVERHEAD (BURDEN) | | $ - | $ - | $ - |
| TAX GROSS-UP | | $ - | $ - | $ - |
| ESCALATION | | $ - | $ - | $ - |
| RISK INSURANCE | | $ - | $ - | $ - |
| **ESTIMATED TOTAL COST** | | **$ 4,291,827** | **$ 2,028,616** | **$ 6,320,443** |
| Price/Ton: | | | | |
| (If Applicable) Escalated Price/Ton: | | | | |
| Contingency: | 10% | 10% | 10% | 10% |
| In-Service Date: | Oct-23 | Oct-23 | Oct-23 | Oct-23 |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions | |
|---|---|---|
| Yes | See Assumptions Tab | ** Estimate shelf life is 6 months from published date. |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | Project Manager | ▮▮▮ | |
| | | | Project Manager Director | | |
| | | | Project Controls | | |
| | | | Vice President | | |

**AUTHORITY LEVELS:**
< $25,000,000  PM, PM Director, Project Controls
> $25,000,000  PM, PM Director, Project Controls, VP

| **Escalation Rates** FV=PV(1+i)ⁿ | |
|---|---|
| Material: | 0.0% |
| Other: | 0.0% |

**Escalation Rates** $FV=PV(1+i)^n$



## 707a

4SLB HPF & PCC Installation
Kinder Morgan – Exhibit 8

# EXHIBIT 8

4SLB HPF & PCC Installation Summary

## KINDER MORGAN

| | |
|---|---|
| PROJECT NAME | ▉ |
| COMPANY NAME | ▉ |
| REQUESTED BY | ▉ |
| ESTIMATE NO. | |
| REVISION NO. | BASE |
| REVISION DATE | |
| PROJECT MANAGER | ▉ |
| STATE | |
| COUNTY | |

| | |
|---|---|
| COMPANY NO. | ▉ |
| PREPARED BY | ▉ |
| ORIGINAL EST. DATE | 08/24/21 |
| CONSTRUCTION CONTINGENCY | 10% |
| OVERHEAD | 12.97% |
| TAX GROSS UP | 0.00% |
| PROJECT TYPE | KM Funded for Economics (& MC) |
| IN-SERVICE | Oct-23 |
| ESTIMATE ACCURACY LEVEL | Class 3 |

**RWIP SCOPE:** Removal of existing equipment to be replaced.

**CWIP SCOPE:** This unit is a 4SLB Ingersoll-Rand KVS-412 unit that will need to meet 1.5 g/hp-hr Nox. To achieve this reduction high pressure fuel and ePCC's will need to be added plus the turbocharger re-aeroed.

**ASSET CAPABILITIES:** Vol @ ### psi
| | | | |
|---|---|---|---|
| Minimum | MMCFD | | Pressure |
| Maximum | MMCFD | Minimum | psig |
| | | MAOP | psig |
| | | Normal Operating | psig |
| | | Delivery Pressure | psig |

**Metrics:** Dia (Inch) =
Length (Miles) =
Aggregate Base Lay (Per Ft) =
Total Cost (Per Ft) =
Contractor Cost (DIM) =
Directs + Contingency Cost (DIM) =

## ESTIMATE SUMMARY

| | Tab 12 | Tab 13 | RWIP | CWIP | TOTAL |
|---|---|---|---|---|---|
| MATERIAL (INCL SALES TAX) | | | $ - | $ 1,288,300 | $ 1,288,300 |
| COMPANY LABOR COST | | | $ - | $ 55,800 | $ 55,800 |
| PM, ENG, LAND, ENVIRO - EXPENSE | | | $ - | $ 3,200 | $ 3,200 |
| PRIMARY CONSTRUCTION CONTRACTOR | | | $ 162,400 | $ 684,000 | $ 846,400 |
| SECONDARY CONTRACTOR | | | $ - | $ 3,085,100 | $ 3,085,100 |
| PROFESSIONAL ENGINEERING | | | $ - | $ 157,000 | $ 157,000 |
| INSPECTION SERVICES | | | $ 29,600 | $ 221,900 | $ 251,500 |
| RADIOGRAPHY SERVICES | | | $ - | $ 4,700 | $ 4,700 |
| ENVIRONMENTAL SERVICES | | | $ - | $ 21,700 | $ 21,700 |
| ELECTRICAL & INSTRUMENTATION | | | $ - | $ - | $ - |
| RIGHT OF WAY CONTRACTOR | | | $ - | $ - | $ - |
| SURVEY CONTRACTOR | | | $ - | $ - | $ - |
| OUTSIDE LEGAL SERVICES | | | $ - | $ - | $ - |
| ROW & DAMAGES | | | $ - | $ 10,000 | $ 10,000 |
| PERMIT FEES | | | $ - | $ - | $ - |
| GAS LOSS | | | $ - | $ - | $ - |
| **SUBTOTAL** | | | $ 192,000 | $ 5,531,700 | $ 5,723,700 |
| CONSTRUCTION CONTINGENCY | | | $ 19,200 | $ 553,170 | $ 572,370 |
| AFUDC | | | $ - | $ 138,872 | $ 138,872 |
| **SUBTOTAL** | | | $ 211,200 | $ 6,223,742 | $ 6,434,942 |
| CAPITALIZED OVERHEAD (BURDEN) | | | $ - | $ - | $ - |
| TAX GROSS-UP | | | $ - | $ - | $ - |
| ESCALATION | | | $ - | $ - | $ - |
| RISK INSURANCE | | | $ - | $ - | $ - |
| **ESTIMATED TOTAL COST** | | | $ 211,200 | $ 6,223,742 | $ 6,434,942 |

| | | | | | |
|---|---|---|---|---|---|
| Price/Ton: | | | | | |
| (If Applicable) Escalated Price/Ton: | | | | | |
| Contingency: | 10% | 10% | 10% | 10% | |
| In-Service Date: | Oct-23 | Oct-23 | Oct-23 | Oct-23 | |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions | |
|---|---|---|
| Yes | See Assumptions Tab | ** Estimate shelf life is 6 months from published date. |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | Project Manager | ▉ | |
| | | | Project Manager Director | ▉ | |
| | | | Project Controls | ▉ | |
| | | | Vice President | ▉ | |

**AUTHORITY LEVELS:**
< $25,000,000  PM, PM Director, Project Controls
> $25,000,000  PM, PM Director, Project Controls, VP

**Escalation Rates** FV=PV(1+i)ⁿ
| Material: | 0.0% |
|---|---|
| Other: | 0.0% |

4SLB Clean Burn Modification
Kinder Morgan – Exhibit 9

# EXHIBIT 9

Summary

4SLB Clean Burn Modification

## KINDER MORGAN - MIDSTREAM

| | | | | |
|---|---|---|---|---|
| **PROJECT NAME** | | | | |
| **COMPANY NAME** | ████████ | **COMPANY NO.** | ████ | |
| **REQUESTED BY** | | **PREPARED BY** | ████████ | |
| **ESTIMATE NO.** | 1.0 | **ORIGINAL EST. DATE** | 06/09/22 | |
| **REVISION NO.** | | **CONSTRUCTION CONTINGENCY** | 10.0% | |
| **REVISION DATE** | 06/09/22 | **OVERHEAD** | 16.0% | |
| **PROJ MANAGER** | ████████ | | | |
| | | **GROSS UP** | 9.0% | |

**SCOPE**

| | |
|---|---|
| **CAT Low emissions kit SCOPE:** | Installation cleanburn modifications to Caterpillar unit with serial number starting with 4EK, as well as miscellaneous ancillary equipment to allow unit to meet 1.5 g/hp-hr NOx limit required by the Good Neighbor Rule. |
| **Tab 2 SCOPE:** | |
| **Tab 3 SCOPE:** | |
| **Tab 4 SCOPE:** | |
| **Tab 5 SCOPE:** | |

**ASSET CAPABILITIES:**

## ESTIMATE SUMMARY

| | CAT Low emissions | Tab 2 | Tab 3 | Tab 4 | Tab 5 | TOTAL |
|---|---|---|---|---|---|---|
| PIPE | $ - | | | | | $ - |
| VALVES | $ - | | | | | $ - |
| FITTINGS | $ - | | | | | $ - |
| MEASUREMENT EQUIPMENT | $ - | | | | | $ - |
| EFM & SCADA | $ - | | | | | $ - |
| COMPRESSION EQUIPMENT | 241,516 | | | | | 241,516 |
| PROCESS / TREATING EQUIPMENT | $ - | | | | | $ - |
| PRESSURE VESSELS | $ - | | | | | $ - |
| DIRECT FIRED HEATERS | $ - | | | | | $ - |
| HEAT EXCHANGERS | $ - | | | | | $ - |
| TANKS | $ - | | | | | $ - |
| PUMPS | $ - | | | | | $ - |
| PLC HARDWARE / SOFTWARE | $ - | | | | | $ - |
| MISC MATERIALS & SUPPLIES | $ - | | | | | $ - |
| **TOTAL MATERIAL COST** | **$ 241,516** | | | | | **$ 241,516** |
| **TOTAL COMPANY COST** | **$ 11,760** | | | | | **$ 11,760** |
| PIPELINE CONSTRUCTION CONTRACTOR | $ - | | | | | $ - |
| FACILITY CONSTRUCTION CONTRACTOR | $ - | | | | | $ - |
| **TOTAL CONSTRUCTION COST** | **$ -** | | | | | **$ -** |
| PROFESSIONAL ENGINEERING | $ 10,000 | | | | | 10,000 |
| INSPECTION SERVICES | $ 11,916 | | | | | 11,916 |
| RADIOGRAPHY SERVICES | $ - | | | | | $ - |
| ENVIRONMENTAL CONTRACTOR | $ - | | | | | $ - |
| ELECTRICAL & INSTRUMENTATION | $ 16,323 | | | | | 16,323 |
| RIGHT OF WAY CONTRACTOR | $ - | | | | | $ - |
| SURVEY CONTRACTOR | $ - | | | | | $ - |
| OUTSIDE LEGAL SERVICES | $ - | | | | | $ - |
| **TOTAL OUTSIDE SERVICES** | **$ 38,239** | | | | | **$ 38,239** |
| ROW & DAMAGES | $ - | | | | | $ - |
| PERMITTING | $ - | | | | | $ - |
| GAS LOSS | $ - | | | | | $ - |
| **SUBTOTAL** | **$ 291,515** | | | | | **$ 291,515** |
| CONSTRUCTION CONTINGENCY | 29,152 | | | | | 29,152 |
| AFUDC | 1,463 | | | | | 1,463 |
| **SUBTOTAL** | **$ 322,130** | | | | | **$ 322,130** |
| CAPITALIZED OVERHEAD (BURDEN) | $ - | | | | | $ - |
| TAX GROSS UP | $ - | | | | | $ - |
| **GROSS ESTIMATED COST** | **$ 322,130** | | | | | **$ 322,130** |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions |
|---|---|
| Yes | See Scoping Tab |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | PM | ████ | 1/27/2021 |
| | | | Director | ████████ | |
| | | | VP | ████████ | |

**AUTHORITY LEVELS:**

| | |
|---|---|
| < $100,000 | PROJECT MANAGER |
| $100,000 to $5,000,000 | MANAGER |
| > $5,000,000 | DIRECTOR AND VP |

**711a**

4SLB Clean Burn Modification
Kinder Morgan – Exhibit 10

# EXHIBIT 10

Summary
4SLB Clean Burn Modification

## KINDER MORGAN - MIDSTREAM

| | | | | |
|---|---|---|---|---|
| PROJECT NAME | | | | |
| COMPANY NAME | | COMPANY NO. | | |
| REQUESTED BY | | PREPARED BY | | |
| ESTIMATE NO. | | ORIGINAL EST. DATE | 06/09/22 | |
| REVISION NO. | 1.0 | CONSTRUCTION CONTINGENCY | 10.0% | |
| REVISION DATE | 06/09/22 | OVERHEAD | 16.0% | |
| PROJ MANAGER | | | | |
| STATE | COUNTY | GROSS UP | 9.0% | |

**SCOPE**

| | |
|---|---|
| CAT Low emissions kit SCOPE: | Installation cleanburn modifications to Caterpillar unit, as well as miscellaneous ancillary equipment to allow unit to meet 1.5 g/hp-hr NOx limit required by the Good Neighbor Rule. |
| Tab 2 SCOPE: | |
| Tab 3 SCOPE: | |
| Tab 4 SCOPE: | |
| Tab 5 SCOPE: | |

**ASSET CAPABILITIES:**

## ESTIMATE SUMMARY

| | CAT Low emissions | Tab 2 | Tab 3 | Tab 4 | Tab 5 | TOTAL |
|---|---|---|---|---|---|---|
| PIPE | $ - | | | | | $ - |
| VALVES | $ - | | | | | $ - |
| FITTINGS | $ - | | | | | $ - |
| MEASUREMENT EQUIPMENT | $ - | | | | | $ - |
| EFM & SCADA | $ - | | | | | $ - |
| COMPRESSION EQUIPMENT | $ 127,516 | | | | | $ 127,516 |
| PROCESS / TREATING EQUIPMENT | $ - | | | | | $ - |
| PRESSURE VESSELS | $ - | | | | | $ - |
| DIRECT FIRED HEATERS | $ - | | | | | $ - |
| HEAT EXCHANGERS | $ - | | | | | $ - |
| TANKS | $ - | | | | | $ - |
| PUMPS | $ - | | | | | $ - |
| PLC HARDWARE / SOFTWARE | $ - | | | | | $ - |
| MISC MATERIALS & SUPPLIES | $ - | | | | | $ - |
| **TOTAL MATERIAL COST** | $ 127,516 | | | | | $ 127,516 |
| **TOTAL COMPANY COST** | $ 11,760 | | | | | $ 11,760 |
| PIPELINE CONSTRUCTION CONTRACTOR | $ - | | | | | $ - |
| FACILITY CONSTRUCTION CONTRACTOR | $ - | | | | | $ - |
| **TOTAL CONSTRUCTION COST** | $ - | | | | | $ - |
| PROFESSIONAL ENGINEERING | $ 10,000 | | | | | $ 10,000 |
| INSPECTION SERVICES | $ 11,916 | | | | | $ 11,916 |
| RADIOGRAPHY SERVICES | $ - | | | | | $ - |
| ENVIRONMENTAL CONTRACTOR | $ - | | | | | $ - |
| ELECTRICAL & INSTRUMENTATION | $ 16,323 | | | | | $ 16,323 |
| RIGHT OF WAY CONTRACTOR | $ - | | | | | $ - |
| SURVEY CONTRACTOR | $ - | | | | | $ - |
| OUTSIDE LEGAL SERVICES | $ - | | | | | $ - |
| **TOTAL OUTSIDE SERVICES** | $ 38,239 | | | | | $ 38,239 |
| ROW & DAMAGES | $ - | | | | | $ - |
| PERMITTING | $ - | | | | | $ - |
| GAS LOSS | $ - | | | | | $ - |
| **SUBTOTAL** | $ 177,515 | | | | | $ 177,515 |
| CONSTRUCTION CONTINGENCY | 17,752 | | | | | 17,752 |
| AFUDC | 891 | | | | | 891 |
| **SUBTOTAL** | $ 196,158 | | | | | $ 196,158 |
| CAPITALIZED OVERHEAD (BURDEN) | $ - | | | | | $ - |
| TAX GROSS UP | $ - | | | | | $ - |
| **GROSS ESTIMATED COST** | $ 196,158 | | | | | $ 196,158 |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions |
|---|---|
| Yes | See Scoping Tab |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | PM | | 1/27/2021 |
| | | | Director | | |
| | | | VP | | |

**AUTHORITY LEVELS:**

| | |
|---|---|
| < $100,000 | PROJECT MANAGER |
| $100,000 to $5,000,000 | MANAGER |
| > $5,000,000 | DIRECTOR AND VP |

4SLB Replacement
Kinder Morgan – Exhibit 11

# EXHIBIT 11

Summary

4SLB Replacement

## KINDER MORGAN - MIDSTREAM

| | | | | |
|---|---|---|---|---|
| **PROJECT NAME** | ▮▮▮▮ | | | |
| **COMPANY NAME** | ▮▮▮▮ | **COMPANY NO.** | ▮ | |
| **REQUESTED BY** | ▮▮▮▮ | **PREPARED BY** | ▮▮▮▮ | |
| **ESTIMATE NO.** | | **ORIGINAL EST. DATE** | 06/09/22 | |
| **REVISION NO.** | 1.0 | **CONSTRUCTION CONTINGENCY** | 10.0% | |
| **REVISION DATE** | 06/09/22 | **OVERHEAD** | 16.0% | |
| **PROJ MANAGER** | TBD | | | |
| **STATE** | ▮▮ COUNTY ▮▮ | **GROSS UP** | 9.0% | |

### SCOPE

| | |
|---|---|
| **CAT replacement SCOPE:** | The Caterpillar 3512 unit at this location does not have a low emissions upgrade available to allow it to meet the Good Neighbor rule limit of 1.5 g/hp-hr. This option is to replace the engine with a newer model 3512 that can achieve the lower emissions. |
| **Tab 2 SCOPE:** | |
| **Tab 3 SCOPE:** | |
| **Tab 4 SCOPE:** | |
| **Tab 5 SCOPE:** | |

### ASSET CAPABILITIES:

## ESTIMATE SUMMARY

| | CAT replacement | Tab 2 | Tab 3 | Tab 4 | Tab 5 | TOTAL |
|---|---|---|---|---|---|---|
| PIPE | $ - | | | | | $ - |
| VALVES | $ - | | | | | $ - |
| FITTINGS | $ - | | | | | $ - |
| MEASUREMENT EQUIPMENT | $ - | | | | | $ - |
| EFM & SCADA | $ - | | | | | $ - |
| COMPRESSION EQUIPMENT | $ 553,545 | | | | | $ 553,545 |
| PROCESS / TREATING EQUIPMENT | $ - | | | | | $ - |
| PRESSURE VESSELS | $ - | | | | | $ - |
| DIRECT FIRED HEATERS | $ - | | | | | $ - |
| HEAT EXCHANGERS | $ - | | | | | $ - |
| TANKS | $ - | | | | | $ - |
| PUMPS | $ - | | | | | $ - |
| PLC HARDWARE / SOFTWARE | $ - | | | | | $ - |
| MISC MATERIALS & SUPPLIES | $ - | | | | | $ - |
| **TOTAL MATERIAL COST** | **$ 553,545** | | | | | **$ 553,545** |
| **TOTAL COMPANY COST** | **$ 11,760** | | | | | **$ 11,760** |
| PIPELINE CONSTRUCTION CONTRACTOR | $ - | | | | | $ - |
| FACILITY CONSTRUCTION CONTRACTOR | $ - | | | | | $ - |
| **TOTAL CONSTRUCTION COST** | **$ -** | | | | | **$ -** |
| PROFESSIONAL ENGINEERING | $ 10,000 | | | | | $ 10,000 |
| INSPECTION SERVICES | $ 11,916 | | | | | $ 11,916 |
| RADIOGRAPHY SERVICES | $ - | | | | | $ - |
| ENVIRONMENTAL CONTRACTOR | $ - | | | | | $ - |
| ELECTRICAL & INSTRUMENTATION | $ - | | | | | $ - |
| RIGHT OF WAY CONTRACTOR | $ - | | | | | $ - |
| SURVEY CONTRACTOR | $ - | | | | | $ - |
| OUTSIDE LEGAL SERVICES | $ - | | | | | $ - |
| **TOTAL OUTSIDE SERVICES** | **$ 21,916** | | | | | **$ 21,916** |
| ROW & DAMAGES | $ - | | | | | $ - |
| PERMITTING | $ - | | | | | $ - |
| GAS LOSS | $ - | | | | | $ - |
| **SUBTOTAL** | **$ 587,221** | | | | | **$ 587,221** |
| CONSTRUCTION CONTINGENCY | $ 58,722 | | | | | $ 58,722 |
| AFUDC | $ 2,947 | | | | | $ 2,947 |
| **SUBTOTAL** | **$ 648,890** | | | | | **$ 648,890** |
| CAPITALIZED OVERHEAD (BURDEN) | $ - | | | | | $ - |
| TAX GROSS UP | $ - | | | | | $ - |
| **GROSS ESTIMATED COST** | **$ 648,890** | | | | | **$ 648,890** |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions | |
|---|---|---|
| Yes | See Scoping Tab | |

| Revision | Date | Notes | Approval | | Date |
|---|---|---|---|---|---|
| | | | PM | ▮▮▮ | 1/27/2021 |
| | | | Director | | |
| | | | VP | | |

### AUTHORITY LEVELS:

| | |
|---|---|
| < $100,000 | PROJECT MANAGER |
| $100,000 to $5,000,000 | MANAGER |
| > $5,000,000 | DIRECTOR AND VP |

**715a**

4SRB NSCR & AFRC
Kinder Morgan – Exhibit 12

# EXHIBIT 12



# KINDER MORGAN

| | | | | | |
|---|---|---|---|---|---|
| PROJECT NAME | ████████████ | | | | |
| COMPANY NAME | ████████████ | | COMPANY NO. | 5100 | |
| REQUESTED BY | ████████████ | | PREPARED BY | ████████████ | |
| ESTIMATE NO. | | | ORIGINAL EST. DATE | 08/24/21 | |
| REVISION NO. | BASE | | CONSTRUCTION CONTINGENCY | 10% | |
| REVISION DATE | | | OVERHEAD | 13.49% | |
| PROJECT MANAGER | | | ████████ | | |
| STATE | ████████████ | | TAX GROSS UP | 0.00% | |
| COUNTY | | | PROJECT TYPE | KM Funded for Economics (& MC) | |
| | | | IN-SERVICE | May-24 | |
| | | | ESTIMATE ACCURACY LEVEL | Class 3 | |

**RWIP SCOPE:** Removal of existing equipment to be replaced.

**CWIP SCOPE:** This unit is a 4SRB unit that needs to meet 1 g/hp-hr of NOx. To achieve this a NSCR catalyst will be installed alonf with AFR controls.  The unit will also be turbocharged.

**ASSET CAPABILITIES:** Vol @  ### psi                                         Pressure

| | | | |
|---|---|---|---|
| Minimum | MMCFD | Minimum | psig |
| Maximum | MMCFD | MAOP | psig |
| | | Normal Operating | psig |
| | | Delivery Pressure | psig |

**Metrics:**        Dia (Inch) =
Length (Miles) =
Aggregate Base Lay (Per Ft) =
Total Cost (Per Ft) =
Contractor Cost (DIM) =
Directs + Contingency Cost (DIM) =

## ESTIMATE SUMMARY

| | Tab 12 | Tab 13 | RWIP | CWIP | TOTAL |
|---|---|---|---|---|---|
| MATERIAL (INCL SALES TAX) | | | $ - | $ 841,800 | $ 841,800 |
| COMPANY LABOR COST | | | $ - | $ 55,800 | $ 55,800 |
| PM, ENG, LAND, ENVIRO - EXPENSE | | | $ - | $ 3,200 | $ 3,200 |
| PRIMARY CONSTRUCTION CONTRACTOR | | | $ 162,400 | $ 682,700 | $ 845,100 |
| SECONDARY CONTRACTOR | | | $ - | $ 2,868,600 | $ 2,868,600 |
| PROFESSIONAL ENGINEERING | | | $ - | $ 157,000 | $ 157,000 |
| INSPECTION SERVICES | | | $ 29,600 | $ 221,900 | $ 251,500 |
| RADIOGRAPHY SERVICES | | | $ - | $ 4,700 | $ 4,700 |
| ENVIRONMENTAL CONTRACTOR | | | $ - | $ 21,700 | $ 21,700 |
| ELECTRICAL & INSTRUMENTATION | | | $ - | $ - | $ - |
| RIGHT OF WAY CONTRACTOR | | | $ - | $ - | $ - |
| SURVEY CONTRACTOR | | | $ - | $ - | $ - |
| OUTSIDE LEGAL SERVICES | | | $ - | $ - | $ - |
| ROW & DAMAGES | | | $ - | $ 10,000 | $ 10,000 |
| PERMIT FEES | | | $ - | $ - | $ - |
| GAS LOSS | | | $ - | $ - | $ - |
| **SUBTOTAL** | | | $ 192,000 | $ 4,867,400 | $ 5,059,400 |
| CONSTRUCTION CONTINGENCY | | | $ 19,200 | $ 486,740 | $ 505,940 |
| AFUDC | | | $ - | $ 118,818 | $ 118,818 |
| **SUBTOTAL** | | | $ 211,200 | $ 5,472,958 | $ 5,684,158 |
| CAPITALIZED OVERHEAD (BURDEN) | | | $ - | $ - | $ - |
| TAX GROSS-UP | | | $ - | $ - | $ - |
| ESCALATION | | | $ - | $ - | $ - |
| RISK INSURANCE | | | $ - | $ - | $ - |
| **ESTIMATED TOTAL COST** | | | $ 211,200 | $ 5,472,958 | $ 5,684,158 |

Price/Ton:
(If Applicable) Escalated Price/Ton:

| Contingency: | 10% | 10% | 10% | 10% | |
| In-Service Date: | May-24 | May-24 | May-24 | May-24 | |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions | |
|---|---|---|
| Yes | See Assumptions Tab | ** Estimate shelf life is 6 months from published date. |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | Project Manager | ████████ | |
| | | | Project Manager Director | | |
| | | | Project Controls | | |
| | | | Vice President | | |

**AUTHORITY LEVELS:**

| | Escalation Rates $FV=PV(1+i)^n$ | |
|---|---|---|
| < $25,000,000 PM, PM Director, Project Controls | Material: | 0.0% |
| > $25,000,000 PM, PM Director, Project Controls, VP | Other: | 0.0% |

4SRB NSCR & AFRC
Kinder Morgan – Exhibit 13

# EXHIBIT 13

## KINDER MORGAN - MIDSTREAM

| | | | | |
|---|---|---|---|---|
| PROJECT NAME | | | | |
| COMPANY NAME | ███████████████ | | COMPANY NO. | ██████ |
| REQUESTED BY | | | PREPARED BY | |
| ESTIMATE NO. | | | ORIGINAL EST. DATE | 01/18/21 |
| REVISION NO. | 1.0 | | CONSTRUCTION CONTINGENCY | 10.0% |
| REVISION DATE | ███████████ | | OVERHEAD | 16.0% |
| PROJ MANAGER | TBD | | AFUDC | ████████ |
| STATE | | COUNTY | GROSS UP | 9.0% |

### SCOPE

| | |
|---|---|
| Wauk Cat-AFR SCOPE: | Installation of catalyst, housing, exhaust modifications, Air Fuel Ratio Controller and required instruments, as well as miscellaneous ancillary equipment. |
| Tab 2 SCOPE: | |
| Tab 3 SCOPE: | |
| Tab 4 SCOPE: | |
| Tab 5 SCOPE: | |

### ASSET CAPABILITIES:

## ESTIMATE SUMMARY

| | Wauk Cat-AFR | Tab 2 | Tab 3 | Tab 4 | Tab 5 | TOTAL |
|---|---|---|---|---|---|---|
| PIPE | $ - | | | | | $ - |
| VALVES | $ - | | | | | $ - |
| FITTINGS | $ - | | | | | $ - |
| MEASUREMENT EQUIPMENT | $ - | | | | | $ - |
| EFM & SCADA | $ - | | | | | $ - |
| COMPRESSION EQUIPMENT | $ 108,658 | | | | | $ 108,658 |
| PROCESS / TREATING EQUIPMENT | $ - | | | | | $ - |
| PRESSURE VESSELS | $ - | | | | | $ - |
| DIRECT FIRED HEATERS | $ - | | | | | $ - |
| HEAT EXCHANGERS | $ - | | | | | $ - |
| TANKS | $ - | | | | | $ - |
| PUMPS | $ - | | | | | $ - |
| PLC HARDWARE / SOFTWARE | $ - | | | | | $ - |
| MISC MATERIALS & SUPPLIES | $ - | | | | | $ - |
| **TOTAL MATERIAL COST** | **$ 108,658** | | | | | **$ 108,658** |
| **TOTAL COMPANY COST** | **$ 20,520** | | | | | **$ 20,520** |
| PIPELINE CONSTRUCTION CONTRACTOR | $ - | | | | | $ - |
| FACILITY CONSTRUCTION CONTRACTOR | $ 57,188 | | | | | $ 57,188 |
| **TOTAL CONSTRUCTION COST** | **$ 57,188** | | | | | **$ 57,188** |
| PROFESSIONAL ENGINEERING | $ 25,000 | | | | | $ 25,000 |
| INSPECTION SERVICES | $ 23,365 | | | | | $ 23,365 |
| RADIOGRAPHY SERVICES | $ - | | | | | $ - |
| ENVIRONMENTAL CONTRACTOR | $ - | | | | | $ - |
| ELECTRICAL & INSTRUMENTATION | $ 16,004 | | | | | $ 16,004 |
| RIGHT OF WAY CONTRACTOR | $ - | | | | | $ - |
| SURVEY CONTRACTOR | $ - | | | | | $ - |
| OUTSIDE LEGAL SERVICES | $ - | | | | | $ - |
| **TOTAL OUTSIDE SERVICES** | **$ 64,369** | | | | | **$ 64,369** |
| ROW & DAMAGES | $ - | | | | | $ - |
| PERMITTING | $ - | | | | | $ - |
| GAS LOSS | $ - | | | | | $ - |
| **SUBTOTAL** | **$ 250,735** | | | | | **$ 250,735** |
| CONSTRUCTION CONTINGENCY | 25,074 | | | | | 25,074 |
| AFUDC | $ 2,509 | | | | | $ 2,509 |
| **SUBTOTAL** | **$ 278,318** | | | | | **$ 278,318** |
| CAPITALIZED OVERHEAD (BURDEN) | $ - | | | | | $ - |
| TAX GROSS UP | $ - | | | | | $ - |
| **GROSS ESTIMATED COST** | **$ 278,318** | | | | | **$ 278,318** |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions |
|---|---|
| Yes | See Scoping Tab |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | PM | ████████ | 1/27/2021 |
| | | | Director | | |
| | | | VP | | |

### AUTHORITY LEVELS:

| |
|---|
| < $100,000 PROJECT MANAGER |
| $100,000 to $5,000,000 MANAGER |
| > $5,000,000 DIRECTOR AND VP |

4SRB AFRC
Kinder Morgan – Exhibit 14

# EXHIBIT 14

## KINDER MORGAN - MIDSTREAM

| | | | | |
|---|---|---|---|---|
| PROJECT NAME | | | | |
| COMPANY NAME | ███████████ | COMPANY NO. | ████ | |
| REQUESTED BY | | PREPARED BY | █████████ | |
| ESTIMATE NO. | | ORIGINAL EST. DATE | 01/18/21 | |
| REVISION NO. | 1.0 | CONSTRUCTION CONTINGENCY | 10.0% | |
| REVISION DATE | 01/27/21 | OVERHEAD | 16.0% | |
| PROJ MANAGER | TBD | AFUDC | ███████ | |
| STATE | ███████████ | GROSS UP | 9.0% | |

### SCOPE

| | |
|---|---|
| Wauk AFR SCOPE: | Installation of Air Fuel Ratio Controller and required instruments, as well as miscellaneous ancillary equipment. |
| Tab 2 SCOPE: | |
| Tab 3 SCOPE: | |
| Tab 4 SCOPE: | |
| Tab 5 SCOPE: | |

### ASSET CAPABILITIES:

## ESTIMATE SUMMARY

| | Wauk AFR | Tab 2 | Tab 3 | Tab 4 | Tab 5 | TOTAL |
|---|---|---|---|---|---|---|
| PIPE | $ - | | | | | $ - |
| VALVES | $ - | | | | | $ - |
| FITTINGS | $ - | | | | | $ - |
| MEASUREMENT EQUIPMENT | $ - | | | | | $ - |
| EFM & SCADA | $ - | | | | | $ - |
| COMPRESSION EQUIPMENT | $ 21,086 | | | | | $ 21,086 |
| PROCESS / TREATING EQUIPMENT | $ - | | | | | $ - |
| PRESSURE VESSELS | $ - | | | | | $ - |
| DIRECT FIRED HEATERS | $ - | | | | | $ - |
| HEAT EXCHANGERS | $ - | | | | | $ - |
| TANKS | $ - | | | | | $ - |
| PUMPS | $ - | | | | | $ - |
| PLC HARDWARE / SOFTWARE | $ - | | | | | $ - |
| MISC MATERIALS & SUPPLIES | $ - | | | | | $ - |
| TOTAL MATERIAL COST | $ 21,086 | | | | | $ 21,086 |
| TOTAL COMPANY COST | $ 11,760 | | | | | $ 11,760 |
| PIPELINE CONSTRUCTION CONTRACTOR | $ - | | | | | $ - |
| FACILITY CONSTRUCTION CONTRACTOR | $ 57,188 | | | | | $ 57,188 |
| TOTAL CONSTRUCTION COST | $ 57,188 | | | | | $ 57,188 |
| PROFESSIONAL ENGINEERING | $ 25,000 | | | | | $ 25,000 |
| INSPECTION SERVICES | $ 11,683 | | | | | $ 11,683 |
| RADIOGRAPHY SERVICES | $ - | | | | | $ - |
| ENVIRONMENTAL CONTRACTOR | $ - | | | | | $ - |
| ELECTRICAL & INSTRUMENTATION | $ 16,004 | | | | | $ 16,004 |
| RIGHT OF WAY CONTRACTOR | $ - | | | | | $ - |
| SURVEY CONTRACTOR | $ - | | | | | $ - |
| OUTSIDE LEGAL SERVICES | $ - | | | | | $ - |
| TOTAL OUTSIDE SERVICES | $ 52,687 | | | | | $ 52,687 |
| ROW & DAMAGES | $ - | | | | | $ - |
| PERMITTING | $ - | | | | | $ - |
| GAS LOSS | $ - | | | | | $ - |
| SUBTOTAL | $ 142,721 | | | | | $ 142,721 |
| CONSTRUCTION CONTINGENCY | $ 14,272 | | | | | $ 14,272 |
| AFUDC | $ 716 | | | | | $ 716 |
| SUBTOTAL | $ 157,709 | | | | | $ 157,709 |
| CAPITALIZED OVERHEAD (BURDEN) | $ - | | | | | $ - |
| TAX GROSS UP | $ - | | | | | $ - |
| GROSS ESTIMATED COST | $ 157,709 | | | | | $ 157,709 |

## ASSUMPTIONS

| Include (Yes/No) | Assumptions |
|---|---|
| Yes | See Scoping Tab |

| Revision | Date | Notes | Approval | Name | Date |
|---|---|---|---|---|---|
| | | | PM | | |
| | | | Director | ████ | ████ |
| | | | VP | | |

### AUTHORITY LEVELS:

| | |
|---|---|
| < $100,000 | PROJECT MANAGER |
| $100,000 to $5,000,000 | MANAGER |
| > $5,000,000 | DIRECTOR AND VP |

Vendor Letter RE Increased SCR Costs
Kinder Morgan – Exhibit 15

# EXHIBIT 15

Vendor Letter RE Increased SCR Costs



Date:      June 6, 2022

To:        ▉▉▉▉▉▉▉

Subject:   ▉▉▉▉▉▉ Kinder Morgan – ▉▉▉▉▉▉▉ SCR System Budgetary Proposal
           ▉▉▉▉▉▉ Kinder Morgan – ▉▉▉▉▉▉▉ SCR System Budgetary Proposal

▉▉▉▉▉,


▉▉▉▉▉ has been experiencing both pricing and lead time changes on all of our active projects as well as proposals issued.   To date, we are seeing a nominal 25% pricing increase and 4-6 week longer manufacturing lead times based on the subject projects noted above.  We anticipate that later this year or early next year that lead times and hopefully pricing will stabilize and possibly decrease.



Sincerely,



Page **1** of **1**


**723a**

Performance Testing Invoice
Kinder Morgan – Exhibit 16

# EXHIBIT 16

Performance Testing Invoice



Kinder Morgan Operating LP "D"
370 Van Gordon Street
Lakewood, CO  80228

March 13, 2021
Project No:
Invoice No:
Project Manager:

**Project**          ▮▮▮          Kinder Morgan - 2021 ▮▮▮

Email authorization by: ▮▮▮

▮▮ Compressor Station

TRC Environmental provided emission testing on a compressor engine at the Colorado Interstate Gas ▮▮ ▮▮▮. Three test runs were conducted on the unit to determine the emission rates of NOx, VOC and CO for the CDPHE Regulation No. 7 requests.  A formal report was created that documented the result of the testing and suitable for submittal to the state and federal agencies.

**Emission Testing of ▮▮ Compressor -$5,000**
**Invoice Total Amount  -  $5,000**

Email invoice to: ▮▮▮

**Professional Services through: March 5, 2021**
**Fee**

| | | | | |
|---|---|---|---|---|
| Total Fee | 5,000.00 | | | |
| Percent Complete | 100.00 | Total Earned | 5,000.00 | |
| | | Previous Fee Billing | 0.00 | |
| | | Current Fee Billing | 5,000.00 | |
| | | **Total Fee** | | **5,000.00** |
| | | **Total this Invoice** | | **$5,000.00** |

Performance Testing Invoice



Kinder Morgan Operating LP "D"
370 Van Gordon Street
Lakewood, CO  80228

March 13, 2021

Project No: ██████████

Invoice No: ████████

Project Manager: ██████████

**Project** ██████████    ████████████████

**Email authorization by** ████████████████

**Compressor Station** ███

TRC Environmental provided emission testing on two Waukesha compressor engines at the Kinder Morgan Texas Pipeline, LLC Compressor Station ████████████. Three test runs were conducted on the unit to determine the emission of NOx, VOC and CO over three test runs and to determine the compliance status with the federal and state limits.  A formal test report was created that documented the result of the testing and suitable for submittal to the federal and state agencies.

**Emission Testing of Compressor s- $11,950**

**Invoice Total:  $11,950**

**Email invoice to:** ████████████████████

**Professional Services through: March 5, 2021**
**Fee**

|  |  |  |  |  |
|---|---|---|---|---|
| Total Fee | 11,950.00 | | | |
| Percent Complete | 100.00 | Total Earned | 11,950.00 | |
| | | Previous Fee Billing | 0.00 | |
| | | Current Fee Billing | 11,950.00 | |
| | | **Total Fee** | | **11,950.00** |
| | | **Total this Invoice** | | **$11,950.00** |

Performance Testing Invoice



Kinder Morgan Operating LP "D"
370 Van Gordon Street
Lakewood, CO  80228

April 14, 2021
Project No:
Invoice No:
Project Manager:

Project

Email authorization by

**Client Name:**
**Location:**
**Testing Date:**

TRC Invoice Description:  TRC Environmental provided emission testing on a Waukesha compressor engine at the Kinder Morgan Tejas Pipeline, LLC ▮ Compressor Station near ▮ Three tests runs were conducted on the unit to determine the emission of NOx, VOC and CO over three test runs and to determine the compliance status with the federal and state limits.  A formal test report was created that documented the result of the testing and suitable for submittal to the federal and state agencies.

Email invoice to:

**Professional Services through: April 9, 2021**
**Fee**

| | | | | |
|---|---|---|---|---|
| Total Fee | 6,825.00 | | | |
| Percent Complete | 100.00 | Total Earned | 6,825.00 | |
| | | Previous Fee Billing | 0.00 | |
| | | Current Fee Billing | 6,825.00 | |
| | | **Total Fee** | | **6,825.00** |
| | | **Total this Invoice** | | **$6,825.00** |

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

June 21, 2022                          Submitted Electronically Via www.regulations.gov

U.S. Environmental Protection Agency
EPA Docket Center
Attn: EPA-HQ-OAR-2021-0668
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

**Re:     Docket ID No. EPA-HQ-OAR-2021-0668 – "Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard," 87 Fed. Reg. 20,036 (April 6, 2022)**

TC Energy respectfully submits these comments in response to the U.S. Environmental Protection Agency (EPA) proposed rule, "Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard,"87 Fed. Reg. 20036 (Apr. 6, 2022) (Proposed Rule). TC Energy operates over 300 reciprocating internal combustion engines (RICE), which the proposed rule would subject to unprecedented new emissions reductions requirements – requirements that would cost far more than EPA calculates, and achieve far fewer emissions reductions than EPA assumes. The Proposed Rule would significantly impact TC Energy operations in ways that EPA has not considered.

Through its pipeline subsidiaries, TC Energy operates 57,900 miles of natural gas pipelines and 653 billion cubic feet of storage capacity in North America, including numerous natural gas pipeline and storage assets. TC Energy transports approximately 25 percent of North America's natural gas to market and continues to build significant natural gas transportation infrastructure to connect new gas supplies to various consuming markets. TC Energy is proud of its history of working collaboratively with EPA to develop rational, cost-effective $NO_x$ emissions limits through the rulemaking process, including the $NO_x$ SIP Call Phase 2 rule.[1]

The current proposal represents a dramatic departure from this cooperative history. Without any communication with or input from the regulated Transmission and Storage (T&S) industry, EPA has proposed to require over 1400 RICE in the T&S sector to meet new emissions limits based on the installation of retrofit $NO_x$ control – all within a three-year period. This proposal is based on a number of unfounded assumptions, including:

- EPA assumes that only 300 units industry-wide would be required to install controls, when the actual figure is over 1,400 based on a review by the Interstate Natural Gas Association of America (INGAA). Indeed, TCE alone operates over 260 RICE that would be subject to the proposed rule.

---

[1] 69 FR 21604, "Interstate Ozone Transport: Response to Court Decisions on the NOX SIP Call, NOX SIP Call Technical Amendments, and Section 126 Rules; Final Rule," April 21, 2004.

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

- The costs to retrofit this many engines will be significantly higher than EPA assumes. TC Energy's internal study indicates that retrofitting over 260 units would cost up to $900,000,000.

- EPA's benefits analysis in the RIA assumes that regulated engines would reduce emissions by an average of 75 tons per year $NO_x$. Yet the 2017 NEI data in the spreadsheet EPA uploaded to the docket illustrates that only a quarter of regulated units even *emit* 75 tpy $NO_x$ – meaning that the overall emissions reductions the rule would achieve will be significantly lower than EPA assumes.

- EPA assumes that the T&S sector can retrofit all affected engines within three years. Information from past EPA rulemakings demonstrates that only about 75 engines a year can be retrofitted on a sustained basis, given resource constraints and the time involved in obtaining and installing the required equipment. Even this projection is likely optimistic given the recent supply chain disruptions that have resulted from the COVID-19 pandemic. EPA's three-year schedule would be infeasible even with only 300 affected units nationwide – much less the more than 1400 that actually exist.

- EPA has not considered the impact of the proposal on the T&S industry's ability to comply with its FERC obligations. Because natural gas is a critical resource, FERC requires interstate pipelines to be able to provide maximum capacity at all times. To meet the proposed rule's three-year deadline, however, T&S companies will have no choice but to take multiple units out of service at the same time, leaving pipelines across the nation without the backup capacity needed to meet FERC's requirements – particularly if an unforeseen malfunction takes one of the remaining engines out of service.

The consequences of the proposed rule will affect far more than the T&S sector. Citizens and businesses rely on companies like TC Energy to provide the natural gas they need to heat their homes, cook their food, and run their businesses. That is *why* FERC regulates capacity: to ensure that citizens are not left without heat in January, and to minimize their vulnerability to the price spikes that accompany severe shortages of natural gas. Put simply, the country cannot afford disruption on this scale – particularly at a time when energy prices are rising dramatically, and when energy security is more important than ever.

TC Energy very strongly recommends that EPA reconsider both the universe of engines that require controls and the timeframe in which those controls must be installed. We offer our assistance in helping EPA develop more feasible alternatives that protect both the public health and its energy supply.

Sincerely,

Matt Parks
GB3D093AC93E412...

Title: VP Technical Operational Svc USPL

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

**TC Energy Comments on the Proposed Rule,**
**"Federal Implementation Plan Addressing Regional Ozone Transport for the**
**2015 Ozone National Ambient Air Quality Standard,"**

**87 Fed. Reg. 20,036 (April 6, 2022)**

Submitted: June 21, 2022

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

TC Energy respectfully submits these comments in response to the Environmental Protection Agency's (EPA) proposed rule, "Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard," (Proposed Rule).

## DETAILED COMMENTS

### 1. EPA has significantly under-estimated the number of natural gas transmission and storage (T&S) reciprocating internal combustion units subject to the Proposed Rule, along with the cost of achieving the proposed emission reductions.

The Proposed Rule would require $NO_x$ reductions from RICE used for pipeline transportation of natural gas. In the preamble and supporting documentation, EPA estimates that there are 307 affected units in this sector.[2] This estimate significantly underestimates the number of affected units. TC Energy operates 360 RICE in sixteen affected states that exceed the 1,000 horsepower (hp) applicability threshold. Over 80% of these units are not currently equipped with $NO_x$ controls and so would require significant retrofits or replacement to achieve the proposed emission limits; another 10% include some level of $NO_x$ control but would require additional controls to meet the proposed emission limits. Excluding units currently being retired, TC Energy alone operates 263 units that would require retrofit NOx control – almost as many as EPA assumes exist across the entire T&S sector. In contrast, EPA's list of 307 units includes only 56 TC Energy units, two of which are turbines, which are not subject to the Proposed Rule.

The Interstate Natural Gas Association of America (INGAA)[3] has also conducted a review of affected units across all its members, which identified nearly 1,380 units that would require $NO_x$ controls – 350% higher than EPA's estimates.[4] This figure does not even include units owned by non-INGAA members or those in the natural gas gathering and boosting sector that fall within the applicability triggers in the proposed rule. **All told, EPA has undercounted the number of affected units in the T&S sector by almost a factor of five.** As discussed below, the significant underestimation of affected unit counts results in an equally significant underestimate of the costs of compliance, along with implications for the compliance schedule that could even impact the reliability of the natural gas transmission pipeline network.

For TC Energy, disparities in unit counts occur across our system and are not limited to a particular state or region. Further discussion follows in these comments, and TC Energy welcomes additional discussion with EPA to ensure a sound technical basis for the applicability threshold in § 52.41(b) and associated definitions in § 52.41(a).

The underestimation of unit counts is primarily due to EPA's failure to account for typical operational use (*i.e.*, "utilization") in T&S as compared to other sectors. For the Proposed Rule, EPA analysis identified non-EGU units with actual emissions above 100 tons per year (tpy), which EPA then equated to a 1,000 hp RICE. However, the vast majority of 1,000 hp RICE do *not* emit anywhere close to 100 tpy.

Interstate natural gas pipeline systems operate in a unique regulatory environment, because a pipeline may be constructed only if the Federal Energy Regulatory Commission (FERC) certifies that the pipeline is "necessary." As a result, pipeline compressor stations must, by law, be designed with enough

---

[2] *See, e.g.*, Regulatory Impact Analysis for Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard, EPA-452/D-22-001 (Feb. 2022) (RIA) at 4-45, Table 4-18.

[3] TC Energy is a member of INGAA.

[4] INGAA members represent approximately 80% of domestic interstate natural gas transmission pipeline miles.

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

compression to provide the full capacity identified in the FERC certificate on peak demand days (*i.e.*, the coldest, multi-day winter event for heating). The vast majority of operating days, however, do not even approach this level of demand, because natural gas demand fluctuates significantly over the course of the year due to variations in heating and cooling demands. As a result, while most compressor stations are constructed with multiple units to meet the highest-demand days, most units operate minimally over the course of the year. On average, system utilization in the United States is on the order of 40% for compressor stations and lower for underground storage facilities. A TC Energy analysis indicates even lower utilization across the TC Energy system, averaging less than 30% for the entire RICE fleet.

The data that EPA relies on – the 2017 NEI engine data posted in the Docket[5] – illustrates this disparity. When that spreadsheet is sorted by highest-to-lowest NOx emissions, lines 1-811 of the spreadsheet exceed 100 tpy.[6] On the other hand, when the spreadsheet is sorted by largest-to-smallest engine size, lines 1-3,986 involve engines over 1000 hp. In other words, while almost all of the 100-tpy units exceed 1,000 hp, only one in five of the 1,000-hp units exceeds 100 tpy. Indeed, line 788 on the largest-to-smallest-engine sort is a 4,000 hp unit.

EPA's significant undercounting of the number of units that will be regulated under the proposed rule skews its cost-benefit analysis by undercounting the costs and overcounting the benefits. First, the cost of retrofitting almost 1400 units is significantly higher than the costs of retrofitting the 307 that EPA assumed would be regulated. In addition, a 1,000 hp unit is on the smaller end of the size range for typical T&S compressor drivers, and these units often entail higher retrofit costs than larger units, because they typically require more significant upgrades such as installing turbochargers (which may not be required for larger RICE). TC Energy's own internal analysis has concluded that it could cost up to $900,000,000 to retrofit the over 260 units in its own system.

Second, the low emissions from the vast majority of the 1,000 hp units means that the proposed rule will not achieve the emissions reductions that EPA assumes. EPA's Regulatory Impact Analysis assumes that 296 engines in the Eastern region will achieve total NOx reductions of 22,390 tpy, for an average of 75 tpy per unit. RIA at 4-45. The NEI data that EPA relies on, however, demonstrates that only about 25% of units over 1,000 hp even *emit* as much as 75 tpy.[7] These smaller engines are more likely to be operated sporadically (*e.g.*, when incremental HP is dispatched to address higher pipeline demand) and typically operate less than 20% of the year, resulting in actual emissions that are significantly below the engines' design capacity.

EPA should further review the applicability trigger and cost-benefit analysis to ensure that it has (a) identified *all* units that will be regulated under the proposal, and (b) accurately accounted for the true costs of retrofitting those units and the actual emissions reductions that those retrofits can achieve. Unless and until EPA does so, it would be arbitrary and capricious to move forward with efforts to regulate those units.

---

[5] The data is presented in an Excel spreadsheet entitled EPA-HQ-OAR-2021-0668-0058_content.
[6] Note that many rows are hidden in this spreadsheet, presumably because they do not involve engines in the states involved in the current FIP proposal. Referring to "rows 1-788" does not mean that 788 engines exceeded 100 tpy; the numbers are used only to illustrate the disparity between 100 tpy sources and 1,000 hp engines.
[7] As noted above, when sorted by size, lines 1-3986 of the spreadsheet include engines of at least 1000 hp. When sorted by emissions, however, only lines 1-1034 include engines that emit at least 75 tons. The remaining 2,950 lines represent engines that are over 1000 hp that emit less than 75 tpy.

へ

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

2. **The Proposed Rule should be revised to add compliance flexibility for T&S units, including emissions averaging and case-by-case review.**

The Proposed Rule should be revised to add compliance flexibility, including emissions averaging similar to the model rule developed by EPA for the $NO_x$ SIP Call Phase 2 rule, and case-by-case review to accommodate scheduling, especially for retirement or replacement of affected RICE. Comment 1 discusses the significant under-estimation of the number of affected RICE, which are primarily lean burn engines. Comment 3 discusses the infeasibility of the proposed compliance schedule, which is exacerbated by a much larger affected T&S fleet than EPA estimates. These issues are obviously inter-related, and compliance flexibility discussed in this comment is a partial remedy. Ultimately, reconciliation of affected unit counts and a revised applicability threshold, compliance flexibility, and a multi-year compliance schedule are all needed to address significant issues with the Proposed Rule.

**TC Energy recommends that EPA revise the Proposed Rule to include proven compliance options adopted in response to the 2004 $NO_x$ SIP Call Phase 2 rule and in related state $NO_x$ RACT. This includes emissions averaging and case-by-case review**. The latter is especially important when considering the schedule for mitigation options that may include replacement or retirement of older, higher emitting RICE.

<u>Emissions Averaging</u>

**TC Energy recommends that EPA adopt emissions averaging**, as it did in the $NO_x$ SIP Call Phase 2 rule, as it has encouraged states to do, and as many states have successfully implemented. EPA, INGAA, and other stakeholders including TC Energy extensively discussed similar issues in response to the $NO_x$ SIP Call; those discussions resulted in the development of the 2004 $NO_x$ SIP Call Phase 2 rule, where EPA evaluated and supported reliance on emissions averaging for RICE in the natural gas pipeline sector. Indeed, EPA's guidelines to states on developing an appropriate SIP in response to the SIP Call advocated for providing companies the "flexibility" to use a number of control options, as long as the *collective* result achieved the required NOx reductions:

> During the SIP development process the States may establish a *NOx tons/season emissions decrease target for individual companies and then provide the companies with the opportunity to develop a plan that would achieve the needed emissions reductions*. The companies may select from a variety of control measures to apply at their various emission units in the State or portion of the State affected under the NOx SIP call. These control measures would be adopted as part of the SIP and must yield enforceable and demonstrable reductions equal to the NOx tons/season reductions required by the State. *What is important from EPA's perspective is that the State, through a SIP revision, demonstrate that all the control measures contained in the SIP are collectively adequate to provide for compliance with the State's NOx budget during the 2007 ozone season.* [8]

The 2004 Phase 2 NOx SIP Call adopted this approach, using almost exactly the same language.[9]

The 2004 rule also included a model rule that states could adopt as part of their SIPs. The model rule was built on the principle of emissions averaging, centering on a "Facility Seasonal NOx 2007 Tonnage

---

[8] Memorandum from Lydia N. Wegman, "State Implementation Plan (SIP) Call for Reducing Nitrogen Oxides (NOx) – Stationary Reciprocating Internal Combustion Engines" (Aug. 22, 2002) ("Wegman Memo") (emphases added).
[9] 69. Fed. Reg. 21,604, 21,621 (Apr. 21, 2004).

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

Reduction," which EPA defined as "the total of the Engine Seasonal NOx 2007 Tonnage Reductions attributable to all of an owner/operator's Large NOx SIP Call Engines," *i.e.*, the engines subject to the rule's requirements.[10]  Simply put, the model rule allowed each company to develop its own compliance plan – identifying which facilities and engines would be included in the plan, which engines would receive additional emissions control, and what types of controls to use – as long as the plan achieved overall emissions reductions "equal to or higher than the Facility Seasonal NOx 2007 Tonnage Reduction."[11]  Indeed, the model rule even allowed companies to obtain credit for emission reductions from engines not subject to the SIP Call:

> Credit may also be included for decreases in NOx emissions from other engines in the State due to NOx control equipment not reflected in the 2007 Ozone Season Base NOx Emissions in the NOx SIP Call Engine Inventory.[12]

As EPA had recommended, many states built their revised SIPs around the emissions averaging approach that EPA advocated for in the model rule.  Some of these states include:

*Pennsylvania* has adopted emission averaging provisions to address NOx and volatile organic compounds for purposes of RACT, and EPA has approved those provisions.[13]  Alternative NOx RACT emission limits include facility-wide or system-wide NOx emissions averaging plans. To assess the effectiveness of averaging, Pennsylvania conducted an evaluation of aggregate NOx emissions emitted by the sources included in the facility-wide or system-wide NOx emissions averaging plan. The state concluded, and EPA agreed, that those emission reductions under the averaging plans would be equivalent to emissions if the individual sources were operating in accordance with the applicable presumptive limit. Accordingly, EPA approved the approach, determining that the averaging plan was consistent with all applicable laws and regulations, and approved the plan.

*New York* has also adopted emission averaging rules.[14] New York's rules require emission averaging plans to employ a weighted average permissible emission rate and include provisions for adjusting the weighted average to address forced outages. The state's rules also prohibit averaging of emissions from sources within the severe ozone nonattainment area with those outside the severe ozone nonattainment area.

*Ohio* has adopted similar regulations authorizing owners and operators of affected RICE to comply with NOx emission standards through EPA-approved emission averaging plans.[15]  Ohio's rules require that emission reductions counted under such a plan be "real, quantifiable and enforceable and … in excess of any state or federal requirements." The rules further provide that those emission reductions must be equal to or greater than the actual emission reductions that would be required under Ohio's rules if an emission averaging program were not employed. Further, Ohio allows an owner or operator to take credit for emission reductions resulting from a unit shutdown only if the owner or operator can demonstrate that "the shutdown does not correspond to load-shifting or other activity which results in or could result in an

---

[10] Model Rule § 1(c).
[11] *Id*. § 3(a)(2).
[12] *Id*. § 3(a)(5).
[13] *See* 87 Fed. Reg. 3929 (Jan. 26, 2022).
[14] 6 NYCRR 227-2.5(b).
[15] Ohio Admin. Code 3745-110-03(I).

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

equivalent or greater emission increase and that the reduction accounts for any increase in NOx emissions from other sources as a result of the shutdown."[16]

*Texas* has allowed emission averaging to demonstrate compliance with its emission reduction requirements for existing RICE located in West and East Texas. Those rules generally require each affected engine in East Texas to achieve at least a 50% reduction of the hourly emissions rate of $NO_x$ and affected engines in West Texas to achieve up to a 20% reduction of the hourly emissions rate of $NO_x$.[17] The rules further provide, however, that "the owner or operator of more than one grandfathered reciprocating internal combustion engine may average the reductions achieved among more than one reciprocating internal combustion engine connected to or part of a gathering or transmission pipeline in order to demonstrate" the required reductions.[18] The Texas rules even allow averaging across engines located in both East and West Texas so long as the owner or operator demonstrates that "the sum of the reductions achieved from all of the engines located in the East Texas region as defined in §101.330 of this title will achieve the reductions" required of such units.[19]

*Illinois* allows owners and operators of affected RICE units to comply with $NO_x$ emission limits through an emissions averaging plan.[20] Illinois follows the EPA model rule, and the IL EPA rule provides equations by which owners and operators must demonstrate that total mass of actual NOx emissions from the units listed in the emissions averaging plan are equal to or less than the total mass of allowable NOx emissions for those units for both the ozone season and calendar year.

In addition to these and other states, the Ozone Transport Commission ("OTC") developed $NO_x$ RACT technical guidelines for RICE used in natural gas transmission[21] and included emissions averaging in those guidelines.  The OTC guidelines provide emission rate limits that would apply to various types and sizes of RICE. They also include provisions that would authorize emission averaging for multiple natural gas fueled units that are under the control of a common owner or operator at a single facility to achieve the same level of NOx reductions that would be achieved if all of the units at the location met the applicable NOx emissions limitations of the guidelines.[22]

**Clearly, emissions averaging, as developed and outlined by EPA in its 2002 Wegman memo and model rule, is a valuable tool for achieving cost-effective $NO_x$ reductions under region-wide programs.  The regulatory structure is already in place throughout the states affected by the Proposed Rule to expand that approach to address the additional units covered by the Proposed Rule.**

As discussed in Comment 3, the Proposed Rule would require non-EGU sources to comply beginning in 2026, but that deadline is not feasible to control all of the units subject to the Proposed Rule, and the challenge is exacerbated by EPA's significant under-estimation of affected units.  A final rule that integrates emissions averaging, in conjunction with a phased schedule discussed in Comment 3, can provide a pathway to efficiently achieving $NO_x$ reductions on a timely basis to meet regulatory objectives.

---

[16] *Id*. at 3745-110-03(I)(1)(e).
[17] 30 TAC § 116.779 (b)(1), (2).
[18] *Id*. § 116.779 (b)(3)
[19] *Id*.
[20] Ill. Admin. Code tit. 35, § 217.390.
[21] OTC Regulatory and Technical Guideline for Control of Nitrogen Oxides (NOx) Emissions from Natural Gas Pipeline Compressor Fuel- Fired Prime Movers (May 14, 20-19), available at Microsoft Word - OTC_RegAndTechGuideline_NGPipelineCompressorPrimeMovers_Final_05142019.docx (otcair.org).
[22] *Id*. at 5.1.2.

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

Case-by-case Review

To address potential compliance schedule complications, the Proposed Rule requests comment on a case-by-case extension process for non-EGU sources. EPA asks for specific criteria to judge such requests and the process for reviewing and acting on such requests. A flexible and timely approach for addressing case-by-case compliance deadline extensions is an important measure that could be of significant use to both affected operators and permitting authorities. TC Energy recommends a process similar to the approach used to determine "alternatives" for reasonably available control technology (RACT) for individual sources. EPA could implement such a process via the FIP, and could also clearly indicate in the final rule that states could submit simple SIPs (*e.g.*, revisions to an existing state $NO_x$ RACT rule) to assume control of this process.

As an example, with hundreds of affected units (see Comment 1), TC Energy will need to consider many factors in implementing its response. In addition to $NO_x$ retrofit for many RICE, decommissioning or replacement of some units will occur. Significant planning will be necessary to design and execute the plan, including addressing requisite permitting requirements through the Federal Energy Regulatory Commission (FERC), as discussed in Comment 3. Schedule allowances to accommodate decommissioning or replacement could be executed within a multi-year phased program (see Comment 3), but a case-by-case review process will be needed regardless of the phase in period to ensure that unavoidable permitting and scheduling complications can be addressed.

For this process, TC Energy recommends that once a complete application for a case-by-case determination is submitted, the relevant compliance date or dates are adjusted to account for the time taken by EPA (or state decisionmaker) to make a final determination regarding the extension. This is necessary to ensure stakeholders are not disadvantaged by a lengthy agency review process.

Even if case-by-case review is adopted, TC Energy strongly believes that T&S RICE require a more comprehensive and complete solution to address inter-related issues including the under-estimate of affected RICE units, and the need for a multi-year phased schedule to accommodate resource constraints and permitting timelines. As was done with the 2004 $NO_x$ SIP Call Phase 2 rule, TC Energy offers its assistance in helping EPA understand related technical issues when devising workable solutions in the final rule.

**3. The implementation schedule is infeasible and a phased schedule should be adopted for affected T&S units.**

In past rulemakings where EPA has considered addressing interstate transport of ozone by including emission reduction requirements for RICE in the natural gas pipeline industry, EPA has acknowledged that significant time and resources are needed for installing retrofit control technologies, obtaining needed permits, and managing the timing for staggering retrofits. EPA has also acknowledged that limitations in technical expertise and resources, *e.g.*, aftermarket service providers that address LEC retrofit $NO_x$ control, affect emissions control upgrade schedules.

The situation is more concerning now than during these past rulemakings, because COVID-19-related supply chain disruptions have significantly limited the availability of both necessary equipment and the qualified personnel necessary to design, transport, and install it. Retrofitting even 300 units, as EPA assumed, within the three-year timeframe provided would be extremely difficult; retrofitting the almost 1400 units that are actually regulated will be impossible for all intents and purposes.

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

The Proposed Rule, however, does not build on any of EPA's past experience. nor does it consider the significant new challenges posed by COVID-19.  Rather, the rule sets forth a fixed 2026 compliance deadline for all units.  This cannot reasonably be done.  TC Energy recommends a phased approach, and offers our assistance in working with EPA to resolve scheduling concerns and defining a successful approach for phasing in emission reductions from T&S RICE over several years.

The following discussion provides background on LEC retrofit resource constraints, related permitting constraints, and significant concerns about the implications of an aggressive compliance schedule on natural gas transmission system reliability.

Background on Resource Constraints and Schedule Implications

In previous rules where $NO_x$ control of existing RICE in T&S was considered, EPA has acknowledged significant time and resources are needed for completing retrofit emissions control.  The Proposed Rule compliance timeframe is not consistent with EPAs past decisions, and the market constraints that supported previous EPA decisions have not changed.  In fact, supply chain challenges that have arisen in conjunction with the pandemic have only added to the challenges.

A 2014 report prepared for the INGAA Foundation, Inc. and submitted to EPA as part of rulemaking docket for its 2014 CSAPR "Close-out" rule evaluated "the resources required of the operating companies, emission reduction suppliers, engineering service providers, and contractors to implement NOx control regulations for low speed reciprocating engines used in the interstate natural gas transportation industry" and concluded that "the projected time to implement retrofit NOx control (or replacement) is far in excess of typical regulatory schedules."  The report is extremely relevant to the current rulemaking and has been cited by EPA. The report evaluates the same emission control technologies considered in the Proposed Rule, including Low Emission Combustion (LEC) and nonselective catalytic reduction (NSCR).  The report also contains a review of the various types and numbers of RICE inventoried at the time, and is cited by EPA in the Technical Support Document[23] for a 2015 rulemaking.

The report's evaluation of potential regulatory drivers includes a new regional rule to address interstate transport comparable to but more stringent than the 2004 Phase 2 $NO_x$ SIP Call – precisely what the Proposed Rule is – and it specifically considers potential impacts (including "a broad regional NOx control rule") of a 2015 ozone NAAQS set in a range from 60 to 70 parts per billion ("ppb"), accurately reflecting the current regulatory landscape.  It also evaluated available resources and the cost and schedule to install controls based on $NO_x$ endpoints of 3 g/bhp-hr or 1 g/hp-hr, consistent with the limits EPA has now proposed.

After reviewing this fundamental information, the report provides an assessment of resource constraints associated with NOx control retrofits.  In doing so, it provides relevant examples, such as the conversion of over 200 natural gas transmission RICE to add LEC starting in 1999 as part of the $NO_x$ SIP Call (and related Phase 2 rule).  The report finds "[f]rom interviews with the operators and the emission reduction equipment suppliers, the conversion process took six years in total to fully implement."  The report further concludes that, generally, "[b]ased on interviews with pipeline operations and emission reduction

---

[23] Docket ID No. EPA-HQ-OAR-2015-0500, "Technical Support Document (TSD) for the Cross-State Air Pollution Rule for the 2008 Ozone NAAQS, Assessment of Non-EGU NOx Emission Controls, Cost of Controls, and Time for Compliance," November 2015.

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

equipment suppliers having experience with previous conversion projects, NOx control for each engine requires between 1 and 2 ½ years to complete (from inception to completion of commissioning)" with older engines and retrofits requiring more infrastructure modifications taking additional time.  Most importantly for purposes of a broadly applicable rule like the Proposed Rule, "[t]aking into account both the lead time and conversion time and based on currently available resources (i.e., trained personnel), *the average number of units that can be modified to lean combustion on a sustained basis is approximately 75 engines per year*."  (emphasis added).  The report's conclusion in this regard is based on what it calls current resource availability, but it acknowledges that "a dramatic increase in market demand would likely result in hiring and training of additional resources."  Nevertheless, "the special skills associated with this niche market would require time to build that resource."

To retrofit RICE to meet a 3 g/hp-hr standard, the report estimates that "[b]ased on current technical resources, the projected time to implement retrofit NOx control (or replacement) is far in excess of typical regulatory schedules[, and] that it would take decades to address NOx controls for a large number of engines, even if the annual rate of retrofit conversions is doubled."  Retrofitting a smaller number of engines to achieve a 1g/hp-hr standard, the report concludes, would have a minimal impact on schedule, but would have "a significant cost impact, with engine-specific costs on average about 65% higher to achieve 1 g/hp-hr."

The market for expert services needed to conduct the retrofits that would be required by the Proposed Rule has not improved since the preparation of the Control Availability Report.  EPA's own estimate that all regulated RICE can install controls by the 2026 ozone season is undermined by the EPA's substantial underestimation of affected units, as described in Comment 1.  For the existing equipment in natural gas transmission, there is a limit of qualified service providers that support control implementation.  Factors to be considered include service provider and equipment availability (which is limited), access to multiple vendors that serve the supply chain, budget cycles and lead time for procuring equipment, consideration of control installation downtime requirements of about one month for each unit serviced, operating constraints that limit out-of-service equipment, and timing for permitting.  Further, current supply chain issues affecting the economy as a whole will undoubtedly result in further delays in performing necessary retrofits.  Seasonal gas demand can also impact schedule, because operators are legally obligated by FERC to ensure capacity is available during higher-demand periods, which limits the ability to remove units from service to install retrofit controls.  As discussed below, the reliability of the domestic natural gas transmission network could be impacted if the compliance schedule forces too many units to be out of service at once, with greater risk of reliability impacts during higher demand periods.

EPA has acknowledged the relevance of this issue in past rulemakings.  Most recently, in conjunction with an assessment of non-EGU NOx control in the November 2015 TSD noted above, EPA notes the following regarding NOx emissions control for natural gas transmission RICE,

> "While some of the recommended control technologies may involve installation timelines that are relatively short on a per-engine basis, there is substantial uncertainty in large-scale installation over numerous sources. *References indicate that implementation of NOx controls of any type on a large number of RICE will require significant lead time to train and develop resources to implement emission reduction projects; market demand could significantly exceed the available resource base of skilled professionals. Additionally, in order not to disrupt pipeline capacity, engine outages must be staggered and scheduled during periods of low system demands for those engines involved in natural gas pipelines (as is the case with 3 of the 4 RICE source groups with significant cost-effective reductions).* In addition to this uncertainty, the above-discussed issues regarding monitoring and reporting of NOx mass on non-EGU sources that currently lack such monitoring equipment make

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

installation of controls by the 2017 timeframe established in this rule less likely and more uncertain for industrial sources such as RICE."  (emphasis added).

<u>Permitting Constraints</u>

Permitting constraints can significantly affect the timeframe needed for completing retrofits required by the Proposed Rule or otherwise mitigating emissions (*e.g.*, via decommissioning / replacement).  Due to workload at permitting agencies, the permitting process typically takes six months to fifteen months complete, and in some cases the process can take longer.  The Proposed Rule would affect hundreds of permitted T&S facilities across the affected states, and this is likely to cause additional challenges (and resulting delays) in at least some locations.

In addition, the Proposed Rule does not consider that interstate pipeline operators who choose to replace RICE with new units must seek permitting approval from various federal agencies, including FERC in many cases.  The FERC timeline for review will likely take a *minimum* of 1½ years.  Operators must also obtain various environmental permits from permitting agencies, as relevant, such as US Army Corps of Engineers, EPA, Department of Interior's Fish and Wildlife Service, and submit for PHMSA safety review.  In addition, the need to retrofit or replace almost 1400 units nationwide within the same three-year period will necessarily trigger a substantial increase in the number of certificate or permit applications submitted for review within a very short window of time, which will challenge agency resources at both the federal and state levels and further extend processing times.

<u>System Reliability</u>

Requiring such extensive changes to the natural gas transmission system within such a short timeframe will very likely lead to reliability issues across the system.  Installation of controls will require taking affected units offline for extended periods of time; the number of units affected means that these efforts will need to extend to multiple units within a facility and/or at nearby compressor stations on the same pipeline.  These system-wide unit outages, in turn, leave the pipeline vulnerable to unexpected engine malfunctions or sudden spikes in demand; without the additional capacity provided by the engines that have been taken out of service for retrofit/replacement, the pipeline may not be able to keep up with demand.  Each of these pipelines, in turn, operates as part of an interconnected system – and each of those other pipelines connecting to that system will be undergoing the same capacity constraints due to the need to retrofit their own engines.

The failure of the pipeline system to keep up with demand can have serious consequences for local businesses and residents who count on the natural gas the pipelines supply to heat their homes and run their businesses.  For example, New England "has no indigenous fossil fuels and therefore, fuels must be delivered by pipeline, ship, truck, or barge from distant places."  "[A] failure at a single point on the pipeline system . . . in New England will likely create significant impacts."[24]  The pipelines delivering natural gas into New England run through states such as New York, Pennsylvania, and Virginia – states covered by the Proposed Rule.  Contemporaneous retrofit that takes RICE offline in those states could reduce capacity delivered into the northeast and New England and cause significant disruptions.

Neither the Proposed Rule nor any of the technical support documents currently in the docket provide any substantive analysis of reliability issues for the interstate natural gas pipeline industry. EPA cannot reasonably evaluate the appropriateness and feasibility of the Proposed Rule without assessing potential

---

[24] ISO-NE, Natural Gas Infrastructure Constraints, available at https://tinyurl.com/2p9ewwjc.

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

impacts on natural gas system reliability, supplies, and price. The Proposed Rule, accordingly, lacks a reasoned basis based on the current record. To address this shortcoming, EPA must evaluate reliability and tailor its rule to prevent serious and predictable reliability problems.

**4. Compliance assurance monitoring should rely on parameter monitoring systems implemented through state permits. CEMS should not be required.**

The Proposed Rule requests comment on RICE continuous monitoring for compliance assurance. TC Energy recommends the following:

- Continuous parameter monitoring is appropriate for RICE;

- EPA should defer to state permitting processes for continuous parameter monitoring implementation.

- CEMS are not warranted.

Parameter Monitoring for Lean Burn RICE

Low emission combustion (LEC) is the preferred $NO_x$ control for all lean burn engines. Once installed, LEC technology is inherent to engine operation and the combustion controls cannot be "turned off" or bypassed. Compliant emissions are ensured by proper operation of the combustion process, and basic operating parameters can be monitored to ensure combustion health. The Proposed Rule requires a site-specific monitoring plan for LEC engine CPMS, and TC Energy recommends that EPA defer authority for review and implementation of LEC parameters monitoring to states. A brief overview of example parameters to monitor is discussed based on permit conditions for LEC monitoring at existing major source facilities (*e.g.*, to address compliance with state RACT requirements).

The majority of affected T&S RICE are two-stroke or four-stroke lean burn (2SLB or 4SLB) units, and combustion-based emission controls will include adding additional air (to lower temperatures and decrease $NO_x$), higher energy ignition to ensure the lean mixture is ignited, and/or higher pressure fuel injection to improve the uniformity of the in-cylinder mixture and enhance combustion stability. Combustion performance is ensured by monitoring parameters that indicate operation within expected norms, including fuel use, air manifold pressure and air manifold temperature. The parameters, measurement specifications, and accepted operating range would be provided in the monitoring plan, and similar plans will be utilized for all lean burn engines in a company fleet. In many cases, states have already integrated analogous parameter monitoring requirements into facility permits. EPA should defer lean burn engine parameter monitoring oversight to states.

Parameter Monitoring for Rich Burn Engines

For 4-stroke rich burn (4SRB) engine parameter monitoring, the Proposed Rule includes continuous monitoring of catalyst inlet temperature and monthly monitoring of catalysis pressure drop (ΔP). Section 52.41(d)(3)(ii) of the Proposed Rule requires ΔP monitoring monthly, with maintenance required "if the pressure drop is greater than 2 inches outside the baseline value established after each semiannual portable analyzer monitoring."

The criteria are similar to RICE NESHAP monitoring requirements for 4SRB engines with NSCR, but fail to acknowledge an important operational constraint: ΔP can vary from month to month due to the operating load of the engine because exhaust flowrate changes with load. Thus, rather than requiring the operator to "conduct maintenance" and to compare to a "baseline value established after each semiannual portable analyzer monitoring," the operator should assess the test conditions and compare the ΔP to a

**740a**

value obtained from any previous emissions test conducted at a similar load, and then assess whether action is warranted, rather than *requiring* "maintenance." The operator can maintain records to document any instance where monthly ΔP monitoring warrants additional review, follow-up, and/or maintenance.

Fluctuations in ΔP are discussed and explained in great detail in INGAA comments on the 2002 RICE NESHAP proposal, including documentation of how ΔP can vary with engine load. The RICE NESHAP approach to conduct ΔP at "full load" and compare to the value from a "full load" performance test is not recommended, because full load may not be achievable month-to-month. Similarly, comparing to the most recent performance test result may not be appropriate because that test may not be at a similar engine load. Thus, TC Energy recommends that monthly ΔP monitoring assess the measured value relative to the result from a previous performance test at a similar load. The operator can maintain records of the measurement, with review or actions taken (as needed) when the value varies by more than 2 inches (of water column) from the value measured in a previous test at similar load.

<u>CEMS are Not Warranted for Natural Gas Transmission Reciprocating Engines</u>

The Proposed Rule solicits comment on using CEMS for continuous compliance monitoring. EPA has considered CEMS for natural gas transmission compressor drivers (RICE and turbines) in past rulemakings, and consistently concluded that CEMS are not warranted due to costs and the availability of other established methods for compliance assurance. This basis still stands, and CEMS are not warranted.

EPA contemplated $NO_x$ CEMS during combustion turbine NSPS review in 2005. The preamble to proposed Subpart KKKK indicates that $NO_x$ CEMS were considered as a monitoring requirement, but EPA concluded that CEMS costs are too high relative to a reliable alternative : annual stack testing and/or parameter monitoring. INGAA supported the EPA conclusion regarding the excessive costs of CEMS (without commensurate benefit), and also supported the conclusion that a periodic source test provides a reliable basis for demonstrating compliance with the NSPS standard. In Subpart KKKK, parameter monitoring is provided *as an alternative* to testing. This rulemaking would include both parameter monitoring and periodic tests, thus providing an extra measure of assurance.

Analysis on CEMS costs is presented in a docket memorandum from the Subpart KKKK rule (Docket Document No. OAR-2004-0490-0115). Conclusions regarding CEMS are further supported by:

- CEMS cost analysis for other RICE rules that indicate costs similar to or higher than the cost projection for Subpart KKKK.
- Recent precedent from NSPS and NESHAP rulemakings regarding monitoring requirements and the exclusion of CEM requirements.

In addition to the cost analysis in the Subpart KKKK docket, other EPA rulemakings considered CEMS costs, including consideration of CO CEMS for NESHAPs. Note that CO CEMS costs are comparable to $NO_x$ CEMS costs, with $NO_x$ CEMS likely to be marginally more costly due to higher instrumentation and operating costs. Additional examples of regulations that considered and rejected CEMS include the Turbine NESHAP, Engine Test Cell NESHAP, Reciprocating Internal Combustion Engine NESHAP, Petroleum Refinery NESHAP, Mineral Wool NESHAP, and Hospital / Medical / Infectious Waste Incinerator NESHAP. For these standards, analysis indicated CEMS costs similar to or higher than the estimate for Subpart KKKK. In each case, costs were considered excessive and CEMS were not required.

These decisions are relevant because they provide an indication of consistency in EPA's justification of monitoring requirements, and also because of the environmental burdens associated with the sources and

**741a**

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

regulations that did not require CEMS under Part 63. For example, the environmental implications of the Waste Incineration MACT invoke a higher level of concern and are associated with a higher probability of emissions performance variability than $NO_x$ emissions from RICE, where periodic performance tests and parameter monitoring assure compliance.

In addition, the efficacy of reciprocating engine LEC supports an approach based on parameter monitoring and periodic testing. As opposed to add-on emission control technologies where performance can be dramatically affected by short term deviations in a key process parameter (e.g., ammonia feed rate for SCR), LEC is a pollution prevention approach, with the $NO_x$ control inherent to the design and operation of the engine. The control technology cannot be "turned on or off" by the operator, and emissions performance is inherent to the operation and functionality of the unit. Periodic tests provide additional assurance – *e.g.*, whether minor changes or upward trending of $NO_x$ emissions may occur over longer time periods due to equipment wear. Because of the performance of LEC combustion technology and the viability of periodic source tests and parameter monitoring, implementation of CEMS cannot realize an incremental benefit in ensuring performance commensurate with the CEMS costs.

For engines, the proposed RICE NESHAP (Part 63, Subpart ZZZZ) considered CEMS for carbon monoxide (CO) for lean-burn engines greater than 5,000 horsepower to demonstrate compliance with the CO percent reduction standards. For lean burn engines less than 5,000 horsepower, EPA proposed periodic stack testing and continuous monitoring of operating parameters. For that standard, EPA ultimately concluded that CEMS were not warranted for the larger units and parameter monitoring and periodic tests assured compliance.

EPA estimated CO CEMS costs for both the RICE NESHAP and the Engine Test Cell NESHAP, with estimated costs slightly higher in the latter. Very little detail was provided to understand how the different costs were derived, but costs were likely based on the EPA CEMS Cost Model. For the Engine Test Cell NESHAP, a docket memorandum (Item II-B-9 of Air Docket A-98-29) indicates that the costs were determined using EPA's CEMS Cost Model Version 3.0, updated in 1998. The projected costs (20 years ago) include a first cost of $232,400, with an estimated annual cost of $69,000. These annual costs exceed the annual operating costs of the emissions control technology (*i.e.*, CEMS costs are higher than LEC and NSCR annual operating costs).

EPA considered the cost differential between CEMS and approaches based on parameter monitoring with periodic tests in several NESHAPs – and selected parameter monitoring as the preferred approach. Many examples are available where EPA concluded CEMS were not warranted and other compliance assurance measures were available (*i.e.*, parameter monitoring and/or testing) – *e.g.*, the Petroleum Refineries NESHAP for catalytic cracking units (CCU), the Mineral Wool NESHAP, and the Hospital/Medical/Infectious Waste Incinerator (HWI) NESHAP. EPA consistently concluded that parameter monitoring and/or periodic tests provided compliance assurance.

In addition, there is no evidence in the Proposed Rule docket to suggest that CEMS would provide any appreciable emissions control improvement as compared to parameter monitoring and periodic tests. Lacking any such evidence, it is clear that parameter monitoring and periodic tests provide compliance assurance, and CEMS are not warranted for T&S RICE.

**5.  Annual reporting, consistent with current permits for existing Title V facilities, is adequate.**

DocuSign Envelope ID: B496C066-3871-47C1-B5F1-B4715F0A55C9

The Proposed Rule would require semi-annual performance testing for affected RICE, with semi-annual reporting of data generated by the required performance testing.  In contrast, federal and state air quality permits and related programs typically require annual reporting.  This additional layer of reporting would result in requirements for affected units that differ from other annual facility reporting requirements, adding unnecessary complexity.  Since the Proposed Rule is intended to address ozone season (*i.e.*, May through September) emission reduction, TC Energy recommends a single, annual tests rather than semi-annual testing and reporting.  If EPA retains the semi-annual testing requirement, annual reporting is still adequate for conforming sources.  If anomalous test results occur, EPA or the delegated authority could be informed of that situation through the test report submittal process.

EPA Administrator Michael S. Regan signed the following interim final rule on June 29, 2023, and EPA is submitting it for publication in the Federal Register (FR). While we have taken steps to ensure the accuracy of this Internet version of the rule, it is not the official version. Please refer to the official version in a forthcoming FR publication, which will appear on Regulations.gov (www.regulations.gov) in Docket No. EPA-HQ-OAR-2021-0668 and on the Government Publishing Office's govinfo website (www.govinfo.gov/app/collection/fr).

6560-50-P

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Parts 52 and 97

## [EPA-HQ-OAR-2021-0668; FRL-8670.2-03-OAR]

## Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial Stays of SIP Disapproval Action for Certain States

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The Environmental Protection Agency (EPA) is taking interim final action to stay, for emissions sources in Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas only, the effectiveness of the federal implementation plan (FIP) requirements established to address the obligations of these and other states to mitigate interstate air pollution with respect to the 2015 national ambient air quality standards (NAAQS) for ozone (the Good Neighbor Plan). The EPA is also revising certain other regulations to ensure that sources in these states will continue to be subject to previously established requirements to mitigate interstate air pollution with respect to other ozone NAAQS while the Good Neighbor Plan's requirements are stayed. These revisions will also ensure that the stay is limited to requirements for which the EPA does not currently have authority to implement a FIP pending judicial review. The stay and the associated revisions to other regulations are being issued in response to judicial orders that partially stay, pending judicial review, a separate, earlier EPA action which disapproved certain state implementation plan (SIP) revisions submitted by these and other states. Finally, for states for

**744a**

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

which the Good Neighbor Plan's requirements are not being stayed, the EPA is revising three near-term deadlines that are incorrect as published in the Good Neighbor Plan.

**DATES:** This interim final rule is effective on August 4, 2023. Comments on this rule must be received on or before **[INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.

**ADDRESSES:** You may send comments, identified by Docket ID No. EPA-HQ-OAR-2021-0668, by any of the following methods:

- Federal eRulemaking portal: *https://www.regulations.gov* (our preferred method). Follow the online instructions for submitting comments.

- Mail: U.S. Environmental Protection Agency, EPA Docket Center, Air and Radiation Docket, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.

- Hand delivery or courier: EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operations are 8:30 a.m. – 4:30 p.m., Monday – Friday (except federal holidays).

Comments received may be posted without change to *https://www.regulations.gov*, including any personal information provided. For detailed instructions on sending comments, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document.

**FOR FURTHER INFORMATION CONTACT:** David Lifland, Clean Air Markets Division, Office of Atmospheric Protection, Office of Air and Radiation, U.S. Environmental Protection Agency, Mail Code 6204A, 1200 Pennsylvania Avenue NW, Washington, DC 20460; telephone: 202-343-9151; email: *lifland.david@epa.gov*.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

## SUPPLEMENTARY INFORMATION:

### I. General

*A. Public Participation*

Submit your written comments, identified by Docket ID No. EPA-HQ-OAR-2021-0668, at *https://www.regulations.gov* (our preferred method), or by the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI), Proprietary Business Information (PBI), or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (i.e., on the web, cloud, or other file sharing system). Please visit *https://www.epa.gov/dockets/commenting-epa-dockets* for additional submission methods; the full EPA public comment policy; information about CBI, PBI, or multimedia submissions; and general guidance on making effective comments.

*B. Potentially Affected Entities*

This action revises on an interim basis the Good Neighbor Plan, which applies to electricity generating units (EGUs) and non-EGU industrial sources. This action also revises other allowance trading program regulations that apply to EGUs but not to non-EGU industrial sources. The affected emissions sources are generally in the following industry groups:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| Industry Group | North American Industry Classification System (NAICS) Code |
|---|---|
| Fossil Fuel Electric Power Generation | 221112 |
| Pipeline Transportation of Natural Gas | 4862 |
| Cement and Concrete Product Manufacturing | 3273 |
| Iron and Steel Mills and Ferroalloy Manufacturing | 3311 |
| Glass and Glass Product Manufacturing | 3272 |
| Basic Chemical Manufacturing | 3251 |
| Petroleum and Coal Products Manufacturing | 3241 |
| Pulp, Paper, and Paperboard Mills | 3221 |
| Metal Ore Mining | 2122 |
| Solid Waste Combustors and Incinerators | 562213 |

The Good Neighbor Plan applies to emissions sources in Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wisconsin. The portions of this action staying the Good Neighbor Plan's requirements and revising other allowance trading program regulations apply to sources in Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas. The portions of this action revising certain near-term deadlines under the Good Neighbor Plan apply to emissions sources in the other listed states, for which the Good Neighbor Plan's requirements are not being stayed.

The information provided in this section on potentially affected entities is not intended to be exhaustive. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

*C. Statutory Authority*

Statutory authority to issue the amendments finalized in this action is provided by the same Clean Air Act (CAA) provisions that provided authority to issue the regulations being amended: CAA section 110(a) and (c), 42 U.S.C. 7410(a) and (c) (SIP and FIP requirements, including requirements for mitigation of interstate air pollution), and CAA section 301, 42

Page 4 of 60

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

U.S.C. 7601 (general rulemaking authority). Statutory authority for the rulemaking procedures followed in this action is provided by Administrative Procedure Act (APA) section 553, 5 U.S.C. 553.

## II. Regulatory Revisions

*A. Response to Stay Orders*

1. Background and Summary

CAA section 110(a)(2)(D)(i)(I), also known as the "good neighbor" provision, requires each state's SIP to include provisions sufficient to "prohibit[ ], consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]." The EPA often refers to the emissions reduction requirements under this provision as "good neighbor obligations" and submissions addressing these requirements as "good neighbor SIPs."

CAA section 110(c)(1) requires the EPA Administrator to promulgate a FIP at any time within two years after the Administrator: (i) finds that a state has failed to make a required SIP submission; (ii) finds a SIP submission to be incomplete pursuant to CAA section 110(k)(1)(C); or (iii) disapproves a SIP submission. This obligation applies unless the state corrects the deficiency through a SIP revision that the Administrator approves before the FIP is promulgated.

On February 13, 2023, the EPA published a final action fully or partially disapproving good neighbor SIPs submitted by 21 states with respect to the 2015 ozone NAAQS (the SIP Disapproval action).[1] Consistent with the requirements of CAA section 110(c)(1), following the

---

[1] Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 FR 9336 (February 13, 2023).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

SIP Disapproval action, on March 15, 2023, the EPA Administrator signed a separate final action promulgating a FIP, which is referred to here as the "Good Neighbor Plan" or the "Rule."[2] The Good Neighbor Plan requires EGUs and non-EGU industrial sources in the 21 states whose good neighbor SIPs the EPA had disapproved in the SIP Disapproval action (as well as two other states for which the EPA had previously made findings of failure to submit good neighbor SIPs) to reduce their emissions of nitrogen oxides ($NO_X$) during the May-September "ozone season" to address the states' good neighbor obligations with respect to the 2015 ozone NAAQS.[3] The Good Neighbor Plan was published in the *Federal Register* on June 5, 2023, and its requirements will be phased in over several years starting on the Rule's August 4, 2023, effective date.

To implement the required emissions reductions from EGUs, the Good Neighbor Plan uses an emissions allowance trading program. The EPA has previously established three successive allowance trading programs for EGUs' seasonal $NO_X$ emissions to address states' good neighbor obligations with respect to the 1997 and 2008 ozone NAAQS – referred to here as the CSAPR $NO_X$ Ozone Season "Group 1," "Group 2," and "Group 3" trading programs – in the Cross-State Air Pollution Rule (CSAPR),[4] the CSAPR Update,[5] and the Revised CSAPR

---

[2] Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 FR 36654 (June 5, 2023).

[3] *See generally id*. The Good Neighbor Plan's requirements for EGUs apply in 22 of the 23 covered states, while the requirements for non-EGU industrial sources apply in 20 of the 23 covered states.

[4] Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 FR 48208 (August 8, 2011). CSAPR addressed states' good neighbor obligations with respect to the 1997 ozone NAAQS, as well as the 1997 and 2006 NAAQS for fine particulate matter.

[5] Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 FR 74504 (October 26, 2016). The CSAPR Update addressed states' good neighbor obligations with respect to the 2008 ozone NAAQS.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Update,[6] respectively. The Good Neighbor Plan does not establish a new emissions trading program, but instead modifies the Group 3 trading program initially established in the Revised CSAPR Update and expands the program to apply to EGUs in the additional states included in the Good Neighbor Plan.

In each of the successive rulemakings to address good neighbor obligations with respect to an ozone NAAQS, the EPA has coordinated compliance requirements by allowing the participation of a state's EGUs in the most recent seasonal $NO_X$ trading program to also satisfy any requirements to participate in a previous seasonal $NO_X$ trading program established to address the state's good neighbor obligations with respect to a less protective NAAQS.[7] Because of the EPA's coordination efforts, for 19 of the states covered by the Good Neighbor Plan as signed, including Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas, participation of the state's EGUs in the Group 3 trading program not only serves as the mechanism for partially addressing the states' good neighbor obligations with respect to the 2015 ozone NAAQS, but also serves as the mechanism for addressing the states' good neighbor obligations with respect to the 2008 ozone NAAQS.[8] For eight of the states, including Arkansas, Kentucky, Louisiana, Mississippi, and Missouri, participation of the states' EGUs in the Group 3 trading program serves as the mechanism for addressing the states' good neighbor obligations with respect to the 1997 ozone NAAQS as well.[9]

---

[6] Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021). The Revised CSAPR Update readdressed states' good neighbor obligations with respect to the 2008 ozone NAAQS in response to the remand of the CSAPR Update in *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019).
[7] *See, e.g.,* 81 FR 74509; 86 FR 23122.
[8] *See* 88 FR 36844.
[9] *See id.*

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Petitioners challenging the SIP Disapproval action have filed motions in several courts for partial stays of that action with respect to the SIPs submitted by particular states. Subsequent to the Good Neighbor Plan's signature date, courts have granted some of these motions. On May 1 and June 8, 2023, the U.S. Court of Appeals for the Fifth Circuit issued orders staying the SIP Disapproval action with respect to Louisiana, Mississippi, and Texas pending judicial review on the merits.[10] On May 25 and 26, 2023, the U.S. Court of Appeals for the Eighth Circuit issued orders staying the SIP Disapproval action with respect to Arkansas and Missouri pending judicial review on the merits.[11] On May 31, 2023, the U.S. Court of Appeals for the Sixth Circuit issued an order administratively staying the SIP Disapproval action with respect to Kentucky pending review of Kentucky's stay motion.[12]

The EPA's authority under CAA section 110(c)(1) to establish the Good Neighbor Plan's FIP requirements for the sources in a given state is triggered by either the EPA's disapproval of the state's good neighbor SIP with respect to the 2015 ozone NAAQS or the EPA's finding of the state's failure to submit such a SIP. Accordingly, as a result of the orders partially staying the SIP Disapproval action, the EPA must act to ensure that the Good Neighbor Plan's requirements that were issued to address good neighbor obligations with respect to the 2015 ozone NAAQS and that apply to either EGUs or non-EGU industrial sources in each of the states for which a stay order has been issued will not take effect while the stay of the SIP Disapproval action as to that state remains in place. To ensure full compliance with the stay orders, the EPA is also

---

[10] Order, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023); Order, *Texas v. EPA*, No. 23-60069 (5th Cir. June 8, 2023). The orders are available in the docket.
[11] Order, *Arkansas v. EPA*, No. 23-1320 (8th Cir. May 25, 2023); Order, *Missouri v. EPA*, No. 23-1719 (8th Cir. May 26, 2023); Order, *Union Electric Co. v. EPA*, No. 23-1751 (8th Cir. May 26, 2023). The orders are available in the docket.
[12] Order, *Kentucky v. EPA*, No. 23-3216 (6th Cir. May 31, 2023), available in the docket.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

staying these requirements for sources in Indian country located within the borders of a state covered by a stay order, including areas of Indian country not subject to the state's SIP authority.[13] However, as noted earlier in this section, the Group 3 trading program is also the mechanism to implement requirements previously established for EGUs in most of the covered states to address the states' good neighbor obligations with respect to the 2008 ozone NAAQS and, in some cases, the 1997 ozone NAAQS. The SIP Disapproval action was not a basis for the authority relied on by the EPA in the previous rulemakings to establish emissions reduction requirements with respect to the 2008 or 1997 ozone NAAQS, and the stay orders do not affect these pre-existing requirements. The EPA's authority for the rulemakings addressing the 2008 and 1997 ozone NAAQS remains in place. Implementing the stay orders therefore requires the EPA not only to stay the new requirements established for EGUs and non-EGU industrial sources in the Good Neighbor Plan to address their states' good neighbor obligations with respect to the 2015 ozone NAAQS, but also to preserve status quo requirements established in previous rulemakings to address their states' good neighbor obligations with respect to the 2008 and 1997 ozone NAAQS.

Thus, the EPA in this action is revising the Good Neighbor Plan FIP requirements and the regulations for the Group 2 trading program to require the EGUs in each state covered by a stay order for the SIP Disapproval action to participate in the Group 2 trading program instead of the

---

[13] For sources in areas of Indian country not subject to the SIP authority of the states within whose borders the areas of Indian country are located, the EPA issued the Good Neighbor Plan's requirements not under authority of CAA section 110(c)(1) but under authority of CAA section 301(d)(4). *See* 88 FR 36690–92. However, because the EPA exercised its authority under CAA section 301(d)(4) only with respect to areas of Indian country within the borders of states for which requirements were being issued under CAA section 110(c)(1), *id.* at 36692, these areas of Indian country are indirectly implicated by the orders partially staying the SIP Disapproval action for the respective states.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Group 3 trading program while the stay for that state remains in place. A small number of conforming revisions are also being made to the regulations for the Group 1 and Group 3 trading programs. Together, the revisions preserve the status quo by making the trading program requirements that will apply to the EGUs in each state for which the SIP Disapproval action has been stayed substantively identical to the trading program requirements that would have applied to the EGUs in that state if the state had not been covered by the Good Neighbor Plan. The revisions to the trading program regulations are summarized in the remainder of this section and are discussed in detail in section II.A.2 of this document.[14]

First, for EGUs in Arkansas, Mississippi, Missouri, and Texas, which before the Good Neighbor Plan were covered by the Group 2 trading program as promulgated in the CSAPR Update rather than the Group 3 trading program, the revisions in this action restore the state emissions budgets, unit-level allowance allocation provisions, and banked allowance holdings that would have been in effect for the EGUs in these states under the Group 2 trading program in the absence of the Good Neighbor Plan.

Second, for EGUs in Kentucky and Louisiana, which before the Good Neighbor Plan were already covered by the Group 3 trading program as promulgated in the Revised CSAPR Update, the revisions in this action modify the Group 2 and Group 3 trading program regulations so as to establish under the Group 2 trading program the state emissions budgets, unit-level allowance allocation provisions, and banked allowance holdings that would have been in effect for the EGUs in these states under the Group 3 trading program in the absence of the Good Neighbor Plan.

---

[14] The EPA has included documents in the docket that show all the regulatory revisions being adopted in this action in redline-strikeout format.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Finally, for EGUs in all states that will now be covered by the Group 2 trading program, the revisions in this action establish two non-interchangeable subtypes of Group 2 allowances: CSAPR NO$_X$ Ozone Season Original Group 2 allowances and CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances.[15] EGUs in Arkansas, Mississippi, Missouri, and Texas, which would have been covered by the Group 2 trading program in the absence of the Good Neighbor Plan, will use Original Group 2 allowances for compliance (as will EGUs in Iowa, Kansas, and Tennessee, which are not covered by the Good Neighbor Plan and remain in the Group 2 trading program). EGUs in Kentucky and Louisiana, which would have been covered by the Group 3 trading program in the absence of the Good Neighbor Plan, will use Expanded Group 2 allowances for compliance. The requirements to use different subtypes of Group 2 allowances will preserve the status quo distinction between these two sets of EGUs that already existed before the Good Neighbor Plan and that continues to exist with the stay of the Good Neighbor Plan as to these states, because the allowances that EGUs in Kentucky and Louisiana have used for compliance under the Group 3 trading program as promulgated in the Revised CSAPR Update are not interchangeable with the allowances that EGUs in the other states have used for compliance under the Group 2 trading program.

The amendments to the regulatory requirements for EGUs and non-EGU industrial sources that the EPA is finalizing in this action in response to the stay orders are being made on an interim basis and will remain in place while the judicial proceedings in which the stay orders were issued remain pending. After the courts have reached final determinations on the merits in

---

[15] The non-interchangeability will be automatically enforced through the use of different codes for the two subtypes of Group 2 allowances in the EPA's Allowance Management System, where all allowance allocations, transfers, and deductions under the Group 2 trading program are recorded.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

those proceedings, the EPA will take further action consistent with the final determinations. At the time of this rulemaking, the EPA cannot predict how the Agency's future action may affect the amendments being finalized in this action.

2. Specific Regulatory Revisions

The regulatory revisions to 40 CFR part 52 that are being adopted in this action to implement the orders staying the SIP Disapproval action for non-EGU industrial sources in Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas and Indian country within the borders of those states include the addition of text at § 52.40(c)(4) to stay the effectiveness of the Good Neighbor Plan's requirements for non-EGU industrial sources at §§ 52.41 through 52.46 and the remainder of § 52.40 for states covered by stay orders and the addition of parallel text in the state-specific subparts of part 52 for each of the states.[16]

The regulatory revisions to 40 CFR parts 52 and 97 that are being adopted in this action to implement the orders staying the SIP Disapproval action for EGUs in Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas and Indian country within the borders of those states while ensuring continued implementation of requirements established to address good neighbor obligations under rules promulgated before the Good Neighbor Plan include the following:

- The addition of text at § 52.38(b)(2)(iii)(D) to stay the effectiveness of the Good Neighbor Plan's requirements at § 52.38(b)(2)(iii)(A) and (B) for EGUs to participate in the enhanced Group 3 trading program for control periods after 2022 for states covered by stay orders, the addition of text at § 52.38(b)(2)(ii)(D) to require those EGUs to

---

[16] *See* §§ 52.184(b)(2) (Arkansas), 52.940(c)(2) (Kentucky), 52.984(e)(2) (Louisiana), 52.1284(b)(2) (Mississippi), 52.1326(c)(2) (Missouri), and 52.2283(e)(2) (Texas).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

participate in the Group 2 trading program while that stay remains in place, and the addition of parallel text in the state-specific subparts of part 52 for each of the states.[17]

- The revision of text at § 52.38(b)(16)(ii)(B) to provide for continued administration by the EPA after 2022, for states covered by stay orders, of state Group 2 trading programs integrated with the federal Group 2 trading program under approved SIP revisions.[18]

- The revision and addition of text at § 97.802 to define "Original" and "Expanded" subtypes of CSAPR $NO_X$ Ozone Season Group 2 allowances, with conforming revisions and additions at §§ 97.502, 97.1002, 97.811(d) and (e), 97.821(e), 97.526(d) and (e), 97.826(d) through (f), and 52.38(b)(14).

- The revision of text at §§ 97.806(c), 97.824(a) and (d), and 97.825(a) to provide for EGUs in states covered by stay orders and covered by the Group 3 trading program before 2023 to use Expanded Group 2 allowances for compliance and for EGUs in other states covered by the Group 2 trading program to use Original Group 2 allowances for compliance, with conforming revisions at § 52.38(b)(14).

- The revision of text at § 97.810(a) and (b) to provide EGUs in states covered by stay orders the same amounts for state emissions budgets, new unit set-asides, Indian country new unit set-asides, and variability limits that would have applied under the Group 2 trading program or the Group 3 trading program, as applicable for the state, in the absence of the Good Neighbor Plan.

---

[17] *See* §§ 52.184(a)(6) (Arkansas), 52.940(b)(6) (Kentucky), 52.984(d)(6) (Louisiana), 52.1284(a)(6) (Mississippi), 52.1326(b)(6) (Missouri), and 52.2283(d)(6) (Texas).

[18] This revision ensures that Missouri's good neighbor obligations with respect to the 2008 and 1997 NAAQS can continue to be met through the participation of the state's EGUs in the state Group 2 trading program adopted by the state and included in the SIP revision that was approved by the EPA at 84 FR 66316 (December 4, 2019).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

- The revision of text at § 97.811(a)(2) and § 97.821(e) to provide EGUs in states covered by stay orders the same unit-level allocation and recordation provisions that would have applied under the Group 2 trading program or the Group 3 trading program, as applicable for the state, in the absence of the Good Neighbor Plan.[19]

- The revision of text at §§ 97.830(b)(1) and 97.834(d)(2)(i) to provide EGUs in states that were covered by the Group 3 trading program before 2023 the same deadlines for commencement of monitoring and reporting activities that would have applied in the absence of the Good Neighbor Plan.

- The addition of text at § 97.1026(e) to provide for the conversion of banked 2021–2022 Group 3 allowances held by EGUs in states that that were covered by the Group 3 trading program before 2023 into Expanded Group 2 allowances, with conforming revisions at §§ 97.502, 97.802, 97.1002, 97.824(c), and 52.38(b)(14).

- The revision of text at §§ 97.811(e)(1) and 97.826(e)(1) to exclude EGUs in states covered by stay orders from the Good Neighbor Plan's provisions converting banked 2017–2022 Original Group 2 allowances into Group 3 allowances and recalling previously allocated 2023–2024 Original Group 2 allowances.

- The revision of text at §§ 97.816(c), 97.818(f), and 97.820(c)(1)(iv), (c)(2)(iv), and (c)(5)(vi) to include the transition of states from the Group 3 trading program to the

---

[19] For sources in states that were not covered by the Group 3 trading program before the Good Neighbor Plan, the applicable notice of data availability (NODA) referenced in revised § 97.811(a)(2)(i) as identifying the unit-level allocations of Original Group 2 allowances to existing units will be the NODA published at 81 FR 67190 (September 30, 2016) to implement the CSAPR Update. For sources in states that were covered by the Group 3 trading program before the Good Neighbor Plan, the applicable NODA referenced in revised § 97.811(a)(2)(ii) as identifying the unit-level allocations of Expanded Group 2 allowances to existing units will be the NODA published at 86 FR 26719 (May 17, 2021) to implement the Revised CSAPR Update.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Group 2 trading program in the provisions that allow the EPA to treat certain certifications, applications, and notices of delegation as valid despite the use of terminology intended for use under a different trading program.

- The revision of text at §§ 97.526(e) and 97.826(f) and the addition of text at § 97.1026(f) to include the transition of states from the Group 3 trading program to the Group 2 trading program in the provisions that specify when and how an EGU in a state that has moved between trading programs may use allowances from a later trading program to meet surrender requirements for past control periods under a previous trading program, with conforming revisions at § 52.38(b)(14).

- The revision of text at § 97.526(d)(2)(ii) and 97.826(d)(3) to include the conversion of Group 3 allowances to Expanded Group 2 allowances in the provisions that address future conversions of allowances that were allocated for past control periods under a given trading program to an EGU in a state no longer covered by that trading program, where the allowances would have been included in a previous conversion to a different type of allowances if the allocations had been recorded before the previous conversion took place.

*B. Deadline Corrections*

In addition to the regulatory revisions described in section II.A of this document that are being made on an interim basis in response to judicial stay orders, in this action the EPA is also permanently revising three near-term deadlines that are incorrect in the Good Neighbor Plan as published in the *Federal Register*. Unlike the revisions described in section II.A of this document, these revisions apply to emissions sources in the states whose coverage under the Good Neighbor Plan is not affected by a stay order.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

The first deadline correction concerns a quarterly reporting deadline applicable to EGUs in states that were already covered by the Group 2 trading program or the Group 3 trading program before the 2023 ozone season. As explained in the Good Neighbor Plan preamble, these EGUs will participate in the revised Group 3 trading program for the entire 2023 ozone season, subject to transitional provisions ensuring that the only substantive new regulatory requirements in 2023 – specifically, the emissions control stringencies reflected in the revised Group 3 trading program's state emissions budgets and assurance levels – will take effect only after the Rule's effective date.[20] The Group 3 trading program's deadline for EGUs to submit quarterly reports of emissions and operating data for the first two months of the May–September ozone season in 2023 would normally have been July 31, 2023 (the first business day at least 30 days after the end of the second calendar quarter), but the timing of publication in the *Federal Register* caused the Good Neighbor Plan's effective date to fall four days after this date, on August 4, 2023. Accordingly, the EPA is extending the deadline in 40 CFR 97.1034(d)(3) by which EGUs subject to the Group 3 trading program must submit quarterly reports for this calendar quarter to August 4, 2023.[21] Further, because the quarterly reports required under the Group 3 trading program are consolidated with the quarterly reports required under several other EPA programs, the EPA is also amending 40 CFR 97.1034(d)(4) to similarly extend these EGUs' reporting deadlines under the other programs.

---

[20] *See* 88 FR 36775–76; 88 FR 36811–13.

[21] All the EGUs that are required under the Good Neighbor Plan to submit quarterly reports for the second calendar quarter of 2023 already participate in either the Group 2 trading program or the Group 3 trading program and therefore have already installed and certified the necessary monitoring systems. The data elements of the quarterly reports that these EGUs are required to submit under the Group 3 trading program for their ozone season emissions in 2023 are identical to the data elements of the quarterly reports that the EGUs were required to submit under the Group 2 trading program or Group 3 trading program for their ozone season emissions in 2022 and previous years.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

The second deadline correction concerns a quarterly reporting deadline applicable to EGUs in states that were not already covered by the Group 2 trading program or the Group 3 trading program before the 2023 ozone season. EGUs in these states will begin to participate in the Group 3 trading program as of the Good Neighbor Plan's effective date, and the regulations as published in the Rule correctly provide that most of these EGUs will be subject to the program's monitoring and reporting requirements for emissions occurring on and after August 4, 2023.[22] However, a separate regulatory provision incorrectly identifies the ending date of the first calendar quarter for which these EGUs must submit quarterly reports under the Group 3 trading program as June 30, 2023. The EPA is amending 40 CFR 97.1034(d)(2)(i)(C) to indicate the correct quarterly ending date of September 30, 2023. The deadline for EGUs to submit quarterly reports for this calendar quarter will be October 30, 2023.

The third deadline correction concerns a deadline for submission of initial notifications applicable to furnaces in the Glass and Glass Product Manufacturing industry that are subject to requirements under the Good Neighbor Plan. Because of a typographical error in the document submitted for publication in the *Federal Register*, the Rule as published incorrectly specifies a submission deadline of June 23, 2023 (the first business day at least 18 days after the Rule's publication date). The EPA is amending 40 CFR 52.44(j)(2) to specify the intended submission

---

[22] *See* 40 CFR 97.1030(b)(1)(iii). Most EGUs covered under the Good Neighbor Plan that do not already participate in the Group 2 trading program or the Group 3 trading program are already subject to closely related monitoring and reporting requirements under other EPA programs and consequently have already installed and certified the monitoring systems necessary to monitor and report under the Group 3 trading program. For the small number of EGUs in these states that have not already been required to install and certify the necessary monitoring systems under another EPA program, the deadline to begin monitoring and reporting under the Group 3 trading program will be either January 31, 2024 (180 days after the Rule's effective date), for units that report on a year-round basis, or May 1, 2024, for units that report on an ozone season-only basis. *See* 40 CFR 97.1030(b)(1)(iv) and (b)(3).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

deadline of December 4, 2023 (the first business day at least *180* days after the Rule's publication date).

## III. Rulemaking Procedures and Findings of Good Cause

As noted in section I.C of this document, the EPA's authority for the rulemaking procedures followed in this action is provided by APA section 553.[23] In general, an agency issuing a rule under the procedures in APA section 553 must provide prior notice and an opportunity for public comment, but APA section 553(b)(B) includes an exemption from notice-and-comment requirements "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rule issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." This action is being issued as an interim final rule without prior notice or opportunity for public comment because the EPA finds that the APA "good cause" exemption from notice-and-comment requirements applies here.

The EPA finds good cause to forgo notice-and-comment procedures because such procedures are both impracticable and unnecessary for this action. First, following notice-and-comment procedures is impracticable for the portions of this action responding to the stay orders because such procedures would require more time than is available. The earliest stay order to which the EPA must respond in this action was issued on May 1, 2023, just over three months before the Good Neighbor Plan's upcoming effective date on August 4, 2023, which is the date

---

[23] Under CAA section 307(d)(1)(B), the EPA's revision of a FIP under CAA section 110(c) would normally be subject to the rulemaking procedural requirements of CAA section 307(d), including notice-and-comment procedures, but CAA section 307(d) does not apply "in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of [APA section 553(b)]." CAA section 307(d)(1).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

by which this action responding to the stay order must be effective. The most recent of the subsequent stay orders to which the EPA's action must also respond was issued less than two months before the Rule's upcoming effective date. The EPA does not consider even the maximum three-month period sufficient time in which to conduct a notice-and-comment rulemaking encompassing the time to, at a minimum, evaluate possible actions for responding to the stay orders, prepare and publish a proposal describing the action identified through that evaluation, wait for comments on the proposal, review the comments received, and prepare and publish a final rule and response to comments. It is not possible for all of these steps to be completed within a three-month period for this action.

Second, following notice-and-comment procedures is unnecessary for this action. With respect to the portions of this action that respond to the stay orders, the EPA has no discretion as to the regulatory revisions that stay the effectiveness of the Good Neighbor Plan's requirements for sources in the states covered by stay orders. While some superficial discretion exists concerning the specific design of the regulatory revisions that provide an alternate mechanism for EGUs in states covered by the stay orders to continue to address the states' good neighbor obligations with respect to the 2008 and 1997 NAAQS, no discretion exists as to the function of that design, which is to maintain the status quo by implementing requirements that are substantively identical to the pre-existing requirements that would have continued to apply in the absence of the Good Neighbor Plan. The EPA's design for the regulatory revisions in this action accomplishes this function. Taking comment on the portions of the action that respond to the stay orders so as to allow the public to advocate for not staying the Good Neighbor Plan's requirements, not adopting regulatory revisions needed to implement requirements that are substantively identical to the requirements that would have applied in the absence of the Good

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Neighbor Plan, or adopting superficially different regulatory revisions to accomplish the same function would serve no purpose and is therefore unnecessary.[24]

With respect to the portions of this action that correct deadlines, each of the deadlines that is incorrect as published in the Good Neighbor Plan precedes the Rule's actual effective date and therefore could not be implemented as published. In the cases of the two deadlines that were incorrect as published because of the timing of the Rule's publication, the amended deadlines of August 4, 2023, and September 30, 2023, are the earliest possible revised deadlines that are both feasible in light of the Good Neighbor Plan's actual effective date and also consistent with the normal timing and sequence of monitoring and reporting activities under the Group 3 trading program regulations. In the case of the deadline that was incorrect as published because of a typographical error, the amended deadline of December 4, 2023, is the same deadline that has already been published in parallel provisions of the Good Neighbor Plan's regulations for other non-EGU industrial sources.[25] Because both the need for the corrections and the specific corrections that should be made are clear, taking comment to allow the public to advocate for not correcting the deadlines or for making different corrections would serve no purpose and is therefore unnecessary.

The regulatory revisions made in this action will take effect on August 4, 2023, the effective date of the Good Neighbor Plan. In general, an agency issuing a rule under APA section 553 must provide for a period of at least 30 days between the rule's dates of publication and

---

[24] To illustrate, the EPA could in theory preserve the status quo for EGUs in Kentucky and Louisiana by promulgating an entire set of trading program regulations under 40 CFR part 97 replicating the entire set of Group 3 trading program regulations as promulgated in the Revised CSAPR Update without the subsequent revisions promulgated in the Good Neighbor Plan to address states' good neighbor obligations with respect to the 2015 ozone NAAQS. However, the outcome would be substantively identical to the approach the EPA is taking here.

[25] *See* 40 CFR 52.42(g)(2); 40 CFR 52.43(h)(2).

Page 20 of 60

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

effectiveness, but APA section 553(d) includes several exceptions. Under APA section 553(d)(1), an exception applies to a rule that "grants or recognizes an exemption or relieves a restriction." Because the portions of this action that stay the effectiveness of the Good Neighbor Plan's requirements for the sources in certain states grant an exemption (on an interim basis while the stay remains in place), the normal 30-day minimum period between this action's dates of publication and effectiveness is not required. The EPA is making these portions of the action effective as of the Good Neighbor Plan's effective date to comply with the stay orders.

Under APA section 553(d)(3), the normal 30-day minimum period between a rule's dates of publication and effectiveness does not apply "as otherwise provided by the agency for good cause found and published with the rule." With respect to the portions of this action that provide an alternate mechanism for EGUs in states covered by the stay orders to continue to address the states' good neighbor obligations under rules issued before the Good Neighbor Plan and the portions of this action that correct certain deadlines, the EPA finds good cause to make the regulatory revisions effective on August 4, 2023, the effective date of the Good Neighbor Plan, even though that date is less than 30 days after the publication date of this action, for the following reasons. First, the regulatory revisions that facilitate continued implementation of requirements addressing good neighbor obligations under previous rules benefit the public by avoiding the possibility that interruption of the requirements would cause air quality degradation. Second, both these regulatory revisions and the regulatory revisions that correct deadlines benefit the regulated community by clarifying the regulatory requirements that apply in light of the stay orders and the timing of publication of the Good Neighbor Plan. Finally, making the regulatory revisions effective less than 30 days after this action's publication date does not violate the purpose of the normal requirement for a 30-day minimum period, which is "to give affected

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

parties a reasonable time to adjust their behavior before the final rule takes effect."[26] The regulatory revisions in this action facilitating continued implementation of previously applicable requirements impose no requirements on any source that differ substantively from the requirements that would have applied to that source in the absence of the Good Neighbor Plan, and the deadline corrections in this action extend the deadlines in the Rule as published. Thus, no affected party needs time to adjust its behavior in preparation for these regulatory revisions.

**IV. Request for Comment**

As explained in section III of this document, the EPA finds good cause to take this interim final action without prior notice or opportunity for public comment. However, the EPA is providing an opportunity for comment on the content of the amendments. The EPA requests comment on this rule. The EPA is not reopening for comment any provisions of the Good Neighbor Plan, 40 CFR part 52, or 40 CFR part 97 other than the specific provisions that are expressly added or amended in this rule.

**V. Statutory and Executive Order Reviews**

Additional information about these statutes and Executive Orders can be found at www.epa.gov/laws-regulations/laws-and-executive-orders.

*A. Executive Order 12866: Regulatory Planning and Review, as amended by Executive Order 14094: Modernizing Regulatory Review*

This action is not a significant regulatory action as defined in Executive Order 12866, as amended by Executive Order 14094, and was therefore not subject to a requirement for Executive Order 12866 review.

---

[26] *Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*B. Paperwork Reduction Act (PRA)*

This action does not impose any new information collection burden under the Paperwork Reduction Act (PRA), 44 U.S.C. 3501 *et seq*. The Office of Management and Budget (OMB) has previously approved the information collection activities that will apply to the EGUs affected by this action and has assigned OMB control numbers 2060–0258 and 2060–0667. Additional information collection activities that will apply to EGUs and non-EGU industrial sources under the Good Neighbor Plan have been submitted to OMB for approval in conjunction with that rulemaking. This action makes no changes to the information collection activities under the previously approved information collection requests (ICRs) or the additional information collection activities for which approval has been requested in the Good Neighbor Plan's ICRs.

*C. Regulatory Flexibility Act (RFA)*

This action is not subject to the Regulatory Flexibility Act (RFA), 5.U.S.C. 601–612. The RFA applies only to rules subject to notice-and-comment rulemaking requirements under the Administrative Procedure Act (APA), 5 U.S.C. 553, or any other statute. This rule is not subject to notice-and-comment requirements because the Agency has invoked the APA "good cause" exemption under 5 U.S.C. 553(b).

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain any unfunded mandate as described in the Unfunded Mandates Reform Act (UMRA), 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action imposes no enforceable duty on any state, local, or tribal governments or the private sector. This action simply stays the effectiveness of certain regulatory requirements for certain sources on an interim basis in response to procedural court orders while ensuring that previously applicable regulatory requirements remain in effect.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination with Indian Tribal Governments*

This action does not have tribal implications as specified in Executive Order 13175. This action simply stays the effectiveness of certain regulatory requirements for certain sources on an interim basis in response to procedural court orders while ensuring that previously applicable regulatory requirements remain in effect. Thus, Executive Order 13175 does not apply to this action.

*G. Executive Order 13045: Protection of Children from Environmental Health Risks and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2-202 of the Executive Order. This action responds to court orders issued by the U.S. Courts of Appeals for the Fifth, Sixth, and Eighth Circuits and the EPA lacks discretion to deviate from those orders. The EPA's assessment of health and safety risks for the action establishing the requirements that are being stayed is discussed in Chapter 5 of the regulatory impact analysis for the Good Neighbor Plan.[27]

---

[27] *See* Regulatory Impact Analysis for the Final Federal Good Neighbor Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard (March 2023) at 197–257, available in the docket.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211 because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*

Executive Order 12898 (59 FR 7629, February 16, 1994) directs federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations (people of color and/or Indigenous peoples) and low-income populations.

This action responds to court orders issued by the U.S. Courts of Appeals for the Fifth, Sixth, and Eighth Circuits and the EPA lacks discretion to deviate from those orders. The EPA's assessment of environmental justice considerations for the action establishing the requirements that are being stayed is discussed in section VII of the Good Neighbor Plan preamble.[28]

*K. Congressional Review Act (CRA)*

This action is subject to the Congressional Review Act (CRA), 5 U.S.C. 801–808, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. The CRA allows the issuing agency to make a rule effective sooner than

---

[28] *See* 88 FR 36844–46.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

otherwise provided by the CRA if the agency makes a good cause finding that notice and comment rulemaking procedures are impracticable, unnecessary, or contrary to the public interest (5 U.S.C. 808(2)). The EPA has made a good cause finding for this rule as discussed in section III of this document, including the basis for that finding.

*L. Judicial Review*

CAA section 307(b)(1) governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit): (i) when the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion to decide whether to invoke the exception in (ii).[29]

This rulemaking is "nationally applicable" within the meaning of CAA section 307(b)(1). In this action, in response to court orders, the EPA is amending on an interim basis the Good Neighbor Plan,[30] which the EPA developed by applying a uniform legal interpretation and common, nationwide analytical methods to address the requirements of CAA section 110(a)(2)(D)(i)(I) concerning interstate transport of pollution (i.e., "good neighbor" requirements) for the 2015 ozone NAAQS. Based on that nationwide analysis, the Good

---

[29] *Sierra Club v. EPA*, 47 F.4th 738, 745 (D.C. Cir. 2022) ("EPA's decision whether to make and publish a finding of nationwide scope or effect is committed to the agency's discretion and thus is unreviewable"); *Texas v. EPA*, 983 F.3d 826, 834–35 (5th Cir. 2020).

[30] The Good Neighbor Plan is nationally applicable or based on a determination of nationwide scope or effect found and published by the EPA. *See* 88 FR 36859–60.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Neighbor Plan established FIP requirements for sources in 23 states located across eight EPA Regions and ten federal judicial circuits. Given that this action amends an action implementing the good neighbor requirements of CAA section 110(a)(2)(D)(i)(I) in a large number of states located across the country and given the interdependent nature of interstate pollution transport and the common core of knowledge and analysis involved in promulgating the FIP requirements, this is a "nationally applicable" action within the meaning of CAA section 307(b)(1).

   In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). In this action, in response to court orders, the EPA is amending on an interim basis the Good Neighbor Plan, an action in which the EPA interpreted and applied section 110(a)(2)(D)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental United States. Based on that nationwide analysis, the Good Neighbor Plan established FIP requirements for sources in 23 states located across eight EPA Regions and ten federal judicial circuits. This action adjusts temporarily the scope and operation of the Good Neighbor Plan for six states in response to court orders, and also implements necessary measures to ensure the status quo is maintained with respect to existing obligations under previously issued regulations (that were themselves nationally applicable or based on a determination of nationwide scope or effect found and

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

published by the EPA[31]). This action also adjusts certain deadlines for all states that remain covered by the Good Neighbor Plan.

The Administrator finds that, like the Good Neighbor Plan which it amends, this action is a matter on which national uniformity in judicial resolution of any petitions for review is desirable, to take advantage of the D.C. Circuit's administrative law expertise, and to facilitate the orderly development of the basic law under the Act. The Administrator also finds that consolidated review of this action in the D.C. Circuit will avoid piecemeal litigation in the regional circuits, further judicial economy, and eliminate the risk of inconsistent results for different states, and that a nationally consistent approach to the CAA's mandate concerning interstate transport of ozone pollution constitutes the best use of Agency resources.

For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is publishing that finding in the *Federal Register*. Under CAA section 307(b)(1), petitions for judicial review of this action must be filed in the D.C. Circuit by **[INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN FEDERAL REGISTER]**.

---

[31] *See* 86 FR 23163–64; 81 FR 74585–86.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**List of Subjects**

*40 CFR Part 52*

Environmental protection, Administrative practice and procedure, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Ozone, Particulate matter, Sulfur dioxide.

*40 CFR Part 97*

Environmental protection, Administrative practice and procedure, Air pollution control, Electric power plants, Nitrogen oxides, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur dioxide.


Michael S. Regan,
Administrator.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

For the reasons stated in the preamble, parts 52 and 97 of title 40 of the Code of Federal Regulations are amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart A—General Provisions

2. Amend § 52.38 by:

a. Adding paragraphs (b)(2)(ii)(D) and (b)(2)(iii)(D);

b. In paragraph (b)(11)(iii)(D), removing "and" after the semicolon;

c. In paragraph (b)(14)(i)(F), removing "and" after the semicolon;

d. Revising paragraph (b)(14)(i)(G);

e. Adding paragraph (b)(14)(i)(H);

f. Revising paragraphs (b)(14)(iii) introductory text and (b)(14)(iii)(B);

g. In paragraph (b)(14)(iii)(C), adding "Original" before "Group 2 allowances" each time it appears; and

h. In paragraph (b)(16)(ii)(B), adding "and not listed in paragraph (b)(2)(ii)(D)(*2*) of this section" before "and any control period".

The additions and revisions read as follows:

### § 52.38 What are the requirements of the Federal Implementation Plans (FIPs) for the Cross-State Air Pollution Rule (CSAPR) relating to emissions of nitrogen oxides?

\*   \*   \*   \*   \*

(b) \*   \*   \*

(2) \*   \*   \*

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(ii) *  *  *

(D) Notwithstanding any other provision of this part:

(*1*) While a stay under paragraph (b)(2)(iii)(D)(*1*) of this section is in effect for the sources in a State and Indian country located within the borders of such State with regard to emissions occurring in a control period in a given year—

(*i*) The provisions of subpart EEEEE of part 97 of this chapter (as modified in any approval of a SIP revision for such State by the Administrator under paragraph (b)(8) of this chapter) or the provisions of a SIP revision approved for such State by the Administrator under paragraph (b)(9) of this section, if any, shall apply to the sources in such State and areas of Indian country within the borders of such State subject to the State's SIP authority, and the provisions of subpart EEEEE of part 97 of this chapter shall apply to the sources in areas of Indian country within the borders of such State not subject to the State's SIP authority, with regard to emissions occurring in such control period; and

(*ii*) Such State shall be deemed to be listed in this paragraph (b)(2)(ii)(D)(*1*) for purposes of this part and part 97 of this chapter.

(*2*) While a stay under paragraph (b)(2)(iii)(D)(*2*) of this section is in effect for the sources in a State and Indian country located within the borders of such State with regard to emissions occurring in a control period in a given year—

(*i*) The provisions of subpart EEEEE of part 97 of this chapter (as modified in any approval of a SIP revision for such State by the Administrator under paragraph (b)(8) of this chapter) or the provisions of a SIP revision approved for such State by the Administrator under paragraph (b)(9) of this section, if any, shall apply to the sources in such State and areas of Indian country within the borders of such State subject to the State's SIP authority, and the provisions of subpart

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

EEEEE of part 97 of this chapter shall apply to the sources in areas of Indian country within the borders of such State not subject to the State's SIP authority, with regard to emissions occurring in such control period; and

(*ii*) Such State shall be deemed to be listed in this paragraph (b)(2)(ii)(D)(*2*) for purposes of this part and part 97 of this chapter.

(iii) * * *

(D) Notwithstanding any other provision of this part:

(*1*) The effectiveness of paragraph (b)(2)(iii)(A) of this section is stayed for sources in Kentucky and Louisiana and Indian country located within the borders of such States with regard to emissions occurring in 2023 and thereafter. While a stay under this paragraph (b)(2)(iii)(D)(*1*) is in effect for a State, such State shall be deemed not to be listed in paragraph (b)(2)(iii)(A) of this section for purposes of part 97 of this chapter for a control period after 2022.

(*2*) The effectiveness of paragraph (b)(2)(iii)(B) of this section is stayed for sources in Arkansas, Mississippi, Missouri, and Texas and Indian country located within the borders of such States with regard to emissions occurring in 2023 and thereafter. While a stay under this paragraph (b)(2)(iii)(D)(*2*) is in effect for a State, such State shall be deemed not to be listed in paragraph (b)(2)(iii)(B) of this section for purposes of part 97 of this chapter.

* * * * *

(14) * * *

(i) * * *

(G) The provisions in § 97.526(e) of this chapter or § 97.826(f) of this chapter (concerning the use of CSAPR NO$_X$ Ozone Season Original Group 2 allowances, CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances, or CSAPR NO$_X$ Ozone Season Group 3 allowances to

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

satisfy requirements to hold CSAPR NO$_X$ Ozone Season Group 1 allowances or the use of CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances or CSAPR NO$_X$ Ozone Season Group 3 allowances to satisfy requirements to hold CSAPR NO$_X$ Ozone Season Original Group 2 allowances); and

(H) The provisions in §§ 97.806(c), 97.824(a) and (d), and 97.825(a) of this chapter (concerning the situations for which compliance requirements are defined in terms of either CSAPR NO$_X$ Ozone Season Original Group 2 allowances or CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances).

\* \* \* \* \*

(iii) Notwithstanding any discontinuation pursuant to paragraph (b)(2)(i)(B), (b)(2)(ii)(B) or (C), (b)(2)(iii)(D)(*1*), or (b)(13)(i) of this section of the applicability of subpart BBBBB, EEEEE, or GGGGG of part 97 of this chapter to the sources in a State and areas of Indian country within the borders of the State subject to the State's SIP authority with regard to emissions occurring in any control period, the following provisions shall continue to apply with regard to all CSAPR NO$_X$ Ozone Season Group 1 allowances, CSAPR NO$_X$ Ozone Season Group 2 allowances, and CSAPR NO$_X$ Ozone Season Group 3 allowances at any time allocated for any control period to any source or other entity in the State and areas of Indian country within the borders of the State subject to the State's SIP authority and shall apply to all entities, wherever located, that at any time held or hold such allowances:

\* \* \* \* \*

(B) The provisions of §§ 97.526(d), 97.826(d) and (e), and 97.1026(e) of this chapter (concerning the conversion of unused CSAPR NO$_X$ Ozone Season Group 1 allowances allocated for specified control periods to different amounts of CSAPR NO$_X$ Ozone Season Original Group

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

2 allowances or CSAPR NO$_X$ Ozone Season Group 3 allowances, the conversion of unused CSAPR NO$_X$ Ozone Season Original Group 2 allowances allocated for specified control periods to different amounts of CSAPR NO$_X$ Ozone Season Group 3 allowances, and the conversion of unused CSAPR NO$_X$ Ozone Season Group 3 allowances allocated for specified control periods to CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances); and

\*    \*    \*    \*    \*

3. Amend § 52.40 by adding paragraph (c)(4) to read as follows:

**§ 52.40 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from sources not subject to the CSAPR ozone season trading program?**

\*    \*    \*    \*    \*

(c) \*  \*  \*

(4) Notwithstanding any other provision of this part, the effectiveness of paragraphs (a) and (b), (c)(1) through (3), and (d) through (g) of this section and §§ 52.41, 52.42, 52.43, 52.44, 52.45, and 52.46 is stayed for sources located in Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas, including Indian country located within the borders of such States.

\*    \*    \*    \*    \*

**§ 52.44 [Amended]**

4. Amend § 52.44(j)(2) by removing "June 23, 2023" and adding in its place "December 4, 2023".

**Subpart E—Arkansas**

5. Amend § 52.184 by:

a. Adding paragraph (a)(6); and

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

b. Redesignating paragraph (b) as paragraph (b)(1) and adding paragraph (b)(2).

The additions read as follows:

### § 52.184 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a) *  *  *

(6) Notwithstanding any other provision of this part, the effectiveness of paragraph (a)(3) of this section is stayed with regard to emissions occurring in 2023 and thereafter, provided that while such stay remains in effect, the provisions of paragraph (a)(2) of this section shall apply with regard to such emissions.

(b) *  *  *

(2) Notwithstanding any other provision of this part, the effectiveness of paragraph (b)(1) of this section is stayed.

### Subpart S—Kentucky

6. Amend § 52.940 by:

a. Adding paragraph (b)(6); and

b. Redesignating paragraph (c) as paragraph (c)(1) and adding paragraph (c)(2).

The additions read as follows:

### § 52.940 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*   *   *   *   *

(b) *  *  *

(6) Notwithstanding any other provision of this part, the effectiveness of paragraph (b)(3) of this section is stayed with regard to emissions occurring in 2023 and thereafter, provided that

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

while such stay remains in effect, the provisions of paragraph (b)(2) of this section shall apply with regard to such emissions.

(c) *  *  *

(2) Notwithstanding any other provision of this part, the effectiveness of paragraph (c)(1) of this section is stayed.

**Subpart T—Louisiana**

7. Amend § 52.984 by:

a. Adding paragraph (d)(6); and

b. Redesignating paragraph (e) as paragraph (e)(1) and adding paragraph (e)(2).

The additions read as follows:

**§ 52.984 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

*  *  *  *  *

(d) *  *  *

(6) Notwithstanding any other provision of this part, the effectiveness of paragraph (d)(3) of this section is stayed with regard to emissions occurring in 2023 and thereafter, provided that while such stay remains in effect, the provisions of paragraph (d)(2) of this section shall apply with regard to such emissions.

(e) *  *  *

(2) Notwithstanding any other provision of this part, the effectiveness of paragraph (e)(1) of this section is stayed.

**Subpart Z—Mississippi**

8. Amend § 52.1284 by:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

a. Adding paragraph (a)(6); and

b. Redesignating paragraph (b) as paragraph (b)(1) and adding paragraph (b)(2).

The additions read as follows:

### § 52.1284 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a) *  *  *

(6) Notwithstanding any other provision of this part, the effectiveness of paragraph (a)(3) of this section is stayed with regard to emissions occurring in 2023 and thereafter, provided that while such stay remains in effect, the provisions of paragraph (a)(2) of this section shall apply with regard to such emissions.

(b) *  *  *

(2) Notwithstanding any other provision of this part, the effectiveness of paragraph (b)(1) of this section is stayed.

### Subpart AA—Missouri

9. Amend § 52.1326 by:

a. Adding paragraph (b)(6); and

b. Redesignating paragraph (c) as paragraph (c)(1) and adding paragraph (c)(2).

The additions read as follows:

### § 52.1326 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*  *  *  *  *

(b) *  *  *

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(6) Notwithstanding any other provision of this part, the effectiveness of paragraph (b)(3) of this section is stayed with regard to emissions occurring in 2023 and thereafter, provided that while such stay remains in effect, the provisions of paragraph (b)(2) of this section shall apply with regard to such emissions.

(c) *   *   *

(2) Notwithstanding any other provision of this part, the effectiveness of paragraph (c)(1) of this section is stayed.

**Subpart SS—Texas**

10. Amend § 52.2283 by:

a. Adding paragraph (d)(6); and

b. Redesignating paragraph (e) as paragraph (e)(1) and adding paragraph (e)(2).

The additions read as follows:

**§ 52.2283 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

*   *   *   *   *

(d) *   *   *

(6) Notwithstanding any other provision of this part, the effectiveness of paragraph (d)(3) of this section is stayed with regard to emissions occurring in 2023 and thereafter, provided that while such stay remains in effect, the provisions of paragraph (d)(2) of this section shall apply with regard to such emissions.

(e) *   *   *

(2) Notwithstanding any other provision of this part, the effectiveness of paragraph (e)(1) of this section is stayed.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

## PART 97—FEDERAL NO$_X$ BUDGET TRADING PROGRAM, CAIR NO$_X$ AND SO$_2$ TRADING PROGRAMS, CSAPR NO$_X$ AND SO$_2$ TRADING PROGRAMS, AND TEXAS SO$_2$ TRADING PROGRAM

11. The authority citation for part 97 continues to read as follows:

**Authority:** 42 U.S.C. 7401, 7403, 7410, 7426, 7491, 7601, and 7651, *et seq.*

**Subpart BBBBB—CSAPR NO$_X$ Ozone Season Group 1 Trading Program**

12. Amend § 97.502 by:

a. Adding in alphabetical order a definition of "CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance";

b. Revising the definition of "CSAPR NO$_X$ Ozone Season Group 2 allowance"; and

c. Adding in alphabetical order a definition of "CSAPR NO$_X$ Ozone Season Original Group 2 allowance".

The revision and additions read as follows:

**§ 97.502 Definitions.**

\*    \*    \*    \*    \*

*CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance* means a CSAPR NO$_X$ Ozone Season Group 2 allowance allocated for a control period after 2022 under subpart EEEEE of this part, § 97.526(d), or § 97.1026(e) to a unit in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) or allocated or auctioned for a control period after 2022 in accordance with the provisions of a SIP revision approved for such a State by the Administrator under § 52.38(b)(7), (8), or (9) of this chapter.

\*    \*    \*    \*    \*

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*CSAPR NO$_X$ Ozone Season Group 2 allowance* means a limited authorization issued and allocated or auctioned by the Administrator under subpart EEEEE of this part, § 97.526(d), or § 97.1026(e), or by a State or permitting authority under a SIP revision approved by the Administrator under § 52.38(b)(7), (8), or (9) of this chapter, to emit one ton of NO$_X$ during a control period of the specified calendar year for which the authorization is allocated or auctioned or of any calendar year thereafter under the CSAPR NO$_X$ Ozone Season Group 2 Trading Program, where each CSAPR NO$_X$ Ozone Season Group 2 allowance is either a CSAPR NO$_X$ Ozone Season Original Group 2 allowance or a CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance.

\*    \*    \*    \*    \*

*CSAPR NO$_X$ Ozone Season Original Group 2 allowance* means a CSAPR NO$_X$ Ozone Season Group 2 allowance other than a CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance.

\*    \*    \*    \*    \*

13. Amend § 97.526 by:

a. In paragraphs (d)(1)(iii) and (iv) and (d)(2)(i), adding "Original" before "Group 2 allowances" each time it appears;

b. Redesignating paragraph (d)(2)(ii) as paragraph (d)(2)(ii)(A);

c. In newly redesignated paragraph (d)(2)(ii)(A), removing "After the Administrator" and adding in its place "Except as provided in paragraph (d)(2)(ii)(B) of this section, after the Administrator";

d. Adding paragraph (d)(2)(ii)(B);

e. Revising paragraph (e) introductory text;

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

f. In paragraph (e)(1), adding "Original" before "Group 2 allowances";

g. Redesignating paragraph (e)(2) as paragraph (e)(2)(i);

h. In newly redesignated paragraph (e)(2)(i), removing "After the Administrator" and adding in its place "Except as provided in paragraph (e)(2)(ii) of this section, after the Administrator"; and

i. Adding paragraph (e)(2)(ii).

The additions and revision read as follows:

## § 97.526 Banking and conversion.

\*    \*    \*    \*    \*

(d) \*  \*  \*

(2) \*  \*  \*

(ii) \*  \*  \*

(B) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and §§ 97.826(d)(1) and 97.1026(e), upon any determination that would otherwise result in the initial recordation of a given number of CSAPR $NO_X$ Ozone Season Group 1 allowances in the compliance account for a source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State), the Administrator will not record such CSAPR $NO_X$ Ozone Season Group 1 allowances but instead will allocate and record in such account an amount of CSAPR $NO_X$ Ozone Season Expanded Group 2 allowances for the control period in 2023 computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR $NO_X$ Ozone Season Group 1 allowances divided by the conversion factor determined under paragraph (d)(1)(ii) of this section and further divided by the conversion factor determined under § 97.826(d)(1)(i)(D).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*    *    *    *    *

(e) Notwithstanding any other provision of this subpart or any SIP revision approved under § 52.38(b)(4) or (5) of this chapter, CSAPR NO$_X$ Ozone Season Original Group 2 allowances, CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances, or CSAPR NO$_X$ Ozone Season Group 3 allowances may be used to satisfy requirements to hold CSAPR NO$_X$ Ozone Season Group 1 allowances under this subpart as follows, provided that nothing in this paragraph (e) alters the time as of which any such allowance holding requirement must be met or limits any consequence of a failure to timely meet any such allowance holding requirement:

*    *    *    *    *

(2) *    *    *

(ii) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and §§ 97.826(d)(1) and 97.1026(e), the owner or operator of a CSAPR NO$_X$ Ozone Season Group 1 source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR NO$_X$ Ozone Season Group 1 allowances for the control period in 2015 or 2016 by holding instead, in a general account established for this sole purpose, an amount of CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances for the control period in 2021 (or any later control period for which the allowance transfer deadline defined in § 97.802 has passed) computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Group 1 allowances divided by the conversion factor determined under paragraph (d)(1)(ii) of this section and further divided by the conversion factor determined under § 97.826(d)(1)(i)(D).

*    *    *    *    *

Page 42 of 60

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**Subpart EEEEE—CSAPR NO$_X$ Ozone Season Group 2 Trading Program**

14. Amend § 97.802 by:

a. In the definition of "Allocate or allocation", removing "§ 97.526(d), and" and adding in its place "§§ 97.526(d), 97.826(d), and 97.1026(e), and";

b. In the definition of "Common designated representative's assurance level", paragraph (2), removing "§ 97.526(d)" and adding in its place "§ 97.526(d), § 97.826(d), or § 97.1026(e)";

c. Adding in alphabetical order a definition of "CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance";

d. Revising the definition of "CSAPR NO$_X$ Ozone Season Group 2 allowance"; and

e. Adding in alphabetical order a definition of "CSAPR NO$_X$ Ozone Season Original Group 2 allowance".

The additions and revision read as follows:

**§ 97.802 Definitions.**

*    *    *    *    *

*CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance* means a CSAPR NO$_X$ Ozone Season Group 2 allowance allocated for a control period after 2022 under this subpart, § 97.526(d), or § 97.1026(e) to a unit in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) or allocated or auctioned for a control period after 2022 in accordance with the provisions of a SIP revision approved for such a State by the Administrator under § 52.38(b)(7), (8), or (9) of this chapter.

*    *    *    *    *

*CSAPR NO$_X$ Ozone Season Group 2 allowance* means a limited authorization issued and allocated or auctioned by the Administrator under this subpart, § 97.526(d), or § 97.1026(e), or

Page 43 of 60

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

by a State or permitting authority under a SIP revision approved by the Administrator under

§ 52.38(b)(7), (8), or (9) of this chapter, to emit one ton of $NO_X$ during a control period of the

specified calendar year for which the authorization is allocated or auctioned or of any calendar

year thereafter under the CSAPR $NO_X$ Ozone Season Group 2 Trading Program, where each

CSAPR $NO_X$ Ozone Season Group 2 allowance is either a CSAPR $NO_X$ Ozone Season Original

Group 2 allowance or a CSAPR $NO_X$ Ozone Season Expanded Group 2 allowance.

\*    \*    \*    \*    \*

*CSAPR NO$_X$ Ozone Season Original Group 2 allowance* means a CSAPR $NO_X$ Ozone

Season Group 2 allowance other than a CSAPR $NO_X$ Ozone Season Expanded Group 2

allowance.

\*    \*    \*    \*    \*

15. Amend § 97.806 by:

a. In paragraph (c)(1)(i), adding "for such source" after "available for deduction";

b. In paragraph (c)(2)(i) introductory text, adding "for such group" after "available for

deduction";

c. In paragraph (c)(4) heading, adding "and type" after "Vintage"; and

d. Adding paragraphs (c)(4)(iii) and (iv).

The additions read as follows:

**$ 97.806 Standard requirements.**

\*    \*    \*    \*    \*

(c) \*    \*    \*

(4) \*    \*    \*

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(iii) Except as provided in paragraph (c)(4)(iv) of this section, a CSAPR $NO_X$ Ozone Season Group 2 allowance held for compliance with the requirements under paragraphs (c)(1)(i), (c)(1)(ii)(A), and (c)(2)(i) through (iii) of this section must be a CSAPR $NO_X$ Ozone Season Original Group 2 allowance.

(iv) A CSAPR $NO_X$ Ozone Season Group 2 allowance held for compliance with the requirements under paragraphs (c)(1)(i), (c)(1)(ii)(A), and (c)(2)(i) through (iii) of this section for a source or group of sources in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (or Indian country within the borders of such a State) for a control period after 2022 must be a CSAPR $NO_X$ Ozone Season Expanded Group 2 allowance.

*    *    *    *    *

16. Amend § 97.810 by:

a. In paragraphs (a)(2)(i) and (ii), removing "through 2022" and adding in its place "and thereafter";

b. Adding paragraphs (a)(8)(iv) through (vi) and (a)(9)(iv) through (vi);

c. In paragraphs (a)(12)(i) through (iii), (a)(13)(i) and (ii), (a)(20)(i) through (iii), and (b)(2), removing "through 2022" and adding in its place "and thereafter";

d. Redesignating paragraph (b)(8) as paragraph (b)(8)(i) and adding paragraph (b)(8)(ii);

e. Redesignating paragraph (b)(9) as paragraph (b)(9)(i) and adding paragraph (b)(9)(ii); and

f. In paragraphs (b)(12), (b)(13), and (b)(20), removing "through 2022" and adding in its place "and thereafter".

The additions read as follows:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

## § 97.810 State NO$_X$ Ozone Season Group 2 trading budgets, new unit set-asides, Indian country new unit set-asides, and variability limits.

(a) *   *   *

(8) *   *   *

(iv) The NO$_X$ Ozone Season Group 2 trading budget for 2023 and thereafter is 14,051 tons.

(v) The new unit set-aside for 2023 and thereafter is 283 tons.

(vi) [Reserved]

(9) *   *   *

(iv) The NO$_X$ Ozone Season Group 2 trading budget for 2023 and thereafter is 14,818 tons.

(v) The new unit set-aside for 2023 and thereafter is 430 tons.

(vi) The Indian country new unit set-aside for 2023 and thereafter is 15 tons.

*   *   *   *   *

(b) *   *   *

(8) *   *   *

(ii) The variability limit for Kentucky for 2023 and thereafter is 2,951 tons.

(9) *   *   *

(ii) The variability limit for Louisiana for 2023 and thereafter is 3,112 tons.

*   *   *   *   *

17. Amend § 97.811 by:

a. Revising paragraph (a)(2);

b. In paragraphs (d)(1), (d)(2)(i), (d)(2)(ii)(A) through (C), (d)(3)(i) through (iii), (d)(3)(iv)(A) through (C), (d)(3)(v)(B) and (C), (d)(4)(i) through (iii), (d)(5) introductory text, (d)(5)(i) and (ii), and (d)(6), adding "Original" before "Group 2" each time it appears;

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

c. In paragraph (e)(1):

i. Adding "and not listed in § 52.38(b)(2)(ii)(D)(*2*) of this chapter" before "(and Indian country"; and

ii. Adding "Original" before "Group 2" each time it appears; and

d. In paragraphs (e)(2)(i), (e)(2)(ii)(A) through (C), (e)(3)(i) through (iii), (e)(3)(iv)(A) through (C), (e)(3)(v)(B) and (C), (e)(4)(i) through (iii), (e)(5) introductory text, (e)(5)(i) and (ii), and (e)(6), adding "Original" before "Group 2" each time it appears.

The revision reads as follows:

## § 97.811 Timing requirements for CSAPR NO$_X$ Ozone Season Group 2 allowance allocations.

(a) *   *   *

(2) Notwithstanding paragraph (a)(1) of this section:

(i) If a unit provided an allocation of CSAPR NO$_X$ Ozone Season Original Group 2 allowances in the applicable notice of data availability issued under paragraph (a)(1) of this section does not operate, starting after 2016, during the control period in two consecutive years, such unit will not be allocated the CSAPR NO$_X$ Ozone Season Original Group 2 allowances provided in such notice for the unit for the control periods in the fifth year after the first such year and in each year after that fifth year.

(ii) If a unit provided an allocation of CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances in the applicable notice of data availability issued under paragraph (a)(1) of this section does not operate, starting after 2020, during the control period in two consecutive years, such unit will not be allocated the CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances

Page 47 of 60

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

provided in such notice for the unit for the control periods in the fifth year after the first such year and in each year after that fifth year.

(iii) All CSAPR NO$_X$ Ozone Season Group 2 allowances that would otherwise have been allocated to a unit described in paragraph (a)(2)(i) or (ii) of this section will be allocated to the new unit set-aside for the State where such unit is located and for the respective years involved. If such unit resumes operation, the Administrator will allocate CSAPR NO$_X$ Ozone Season Group 2 allowances to the unit in accordance with paragraph (b) of this section.

*    *    *    *    *

18. Amend § 97.816 by revising paragraph (c) to read as follows:

**§ 97.816 Certificate of representation.**

*    *    *    *    *

(c) A certificate of representation under this section, § 97.516, or § 97.1016 that complies with the provisions of paragraph (a) of this section except that it contains the phrase "TR NO$_X$ Ozone Season" or the phrase "CSAPR NO$_X$ Ozone Season Group 3" in place of the phrase "CSAPR NO$_X$ Ozone Season Group 2" in the required certification statements will be considered a complete certificate of representation under this section, and the certification statements included in such certificate of representation will be interpreted for purposes of this subpart as if the phrase "CSAPR NO$_X$ Ozone Season Group 2" appeared in place of the phrase "TR NO$_X$ Ozone Season" or the phrase "CSAPR NO$_X$ Ozone Season Group 3".

19. Amend § 97.818 by redesignating paragraph (f) as paragraph (f)(1) and adding paragraph (f)(2) to read as follows:

**§ 97.818 Delegation by designated representative and alternate designated representative.**

*    *    *    *    *

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(f) * * *

(2) A notice of delegation submitted under paragraph (c) of this section or § 97.1018(c) that complies with the provisions of paragraph (c) of this section except that it contains the terms "40 CFR 97.1018(d)" and "40 CFR 97.1018" in place of the terms "40 CFR 97.818(d)" and "40 CFR 97.818", respectively, in the required certification statements will be considered a valid notice of delegation submitted under paragraph (c) of this section, and the certification statements included in such notice of delegation will be interpreted for purposes of this subpart as if the terms "40 CFR 97.818(d)" and "40 CFR 97.818" appeared in place of the terms "40 CFR 97.1018(d)" and "40 CFR 97.1018", respectively.

20. Amend § 97.820 by:

a. Revising paragraphs (c)(1)(iv) and (c)(2)(iv); and

b. Redesignating paragraph (c)(5)(vi) as paragraph (c)(5)(vi)(A) and adding paragraph (c)(5)(vi)(B).

The revisions and addition read as follows:

§ 97.820 Establishment of compliance accounts, assurance accounts, and general accounts.

* * * * *

(c) * * *

(1) * * *

(iv) An application for a general account under paragraph (c)(1) of this section, § 97.520(c)(1), or § 97.1020(c)(1) that complies with the provisions of paragraph (c)(1) of this section except that it contains the phrase "TR $NO_X$ Ozone Season" or the phrase "CSAPR $NO_X$ Ozone Season Group 3" in place of the phrase "CSAPR $NO_X$ Ozone Season Group 2" in the required certification statement will be considered a complete application for a general account

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

under paragraph (c)(1) of this section, and the certification statement included in such application for a general account will be interpreted for purposes of this subpart as if the phrase "CSAPR NO$_X$ Ozone Season Group 2" appeared in place of the phrase "TR NO$_X$ Ozone Season" or the phrase "CSAPR NO$_X$ Ozone Season Group 3".

(2) *  *  *

(iv) A certification statement submitted in accordance with paragraph (c)(2)(ii) of this section that contains the phrase "TR NO$_X$ Ozone Season" or the phrase "CSAPR NO$_X$ Ozone Season Group 3" will be interpreted for purposes of this subpart as if the phrase "CSAPR NO$_X$ Ozone Season Group 2" appeared in place of the phrase "TR NO$_X$ Ozone Season" or the phrase "CSAPR NO$_X$ Ozone Season Group 3".

*   *   *   *   *

(5) *  *  *

(vi) *  *  *

(B) A notice of delegation submitted under paragraph (c)(5)(iii) of this section or § 97.1020(c)(5)(iii) that complies with the provisions of paragraph (c)(5)(iii) of this section except that it contains the terms "40 CFR 97.1020(c)(5)(iv)" and "40 CFR 97.1020(c)(5)" in place of the terms "40 CFR 97.820(c)(5)(iv)" and "40 CFR 97.820(c)(5)", respectively, in the required certification statements will be considered a valid notice of delegation submitted under paragraph (c)(5)(iii) of this section, and the certification statements included in such notice of delegation will be interpreted for purposes of this subpart as if the terms "40 CFR 97.820(c)(5)(iv)" and "40 CFR 97.820(c)(5)" appeared in place of the terms "40 CFR 97.1020(c)(5)(iv)" and "40 CFR 97.1020(c)(5)", respectively.

*   *   *   *   *

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

21. Amend § 97.821 by:

a. Redesignating paragraph (e) as paragraph (e)(1);

b. In newly redesignated paragraph (e)(1), adding "Original" before "Group 2 allowances" each time it appears; and

c. Adding paragraph (e)(2).

The addition reads as follows:

**§ 97.821 Recordation of CSAPR NO$_X$ Ozone Season Group 2 allowance allocations and auction results.**

\*   \*   \*   \*   \*

(e) \*   \*   \*

(2) By September 5, 2023, the Administrator will record in each CSAPR NO$_X$ Ozone Season Group 2 source's compliance account the CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 2 units at the source in accordance with § 97.811(a) for the control periods in 2023 and 2024.

\*   \*   \*   \*   \*

22. Amend § 97.824 by:

a. In paragraph (a)(1), removing "and" after the semicolon;

b. Adding paragraphs (a)(3) and (4);

c. In paragraph (c)(2)(ii), removing "§ 97.526(d), in" and adding in its place "§ 97.526(d), § 97.826(d), or § 97.1026(e), in"; and

d. Revising paragraph (d).

The additions and revision read as follows:

Page 51 of 60

**794a**

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**§ 97.824 Compliance with CSAPR NO$_X$ Ozone Season Group 2 emissions limitation.**

(a) * * *

(3) Are CSAPR NO$_X$ Ozone Season Original Group 2 allowances, if the deductions are not for compliance with the CSAPR NO$_X$ Ozone Season Group 2 emissions limitation of a source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) for a control period after 2022; and

(4) Are CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances, if the deductions are for compliance with the CSAPR NO$_X$ Ozone Season Group 2 emissions limitation of a source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) for a control period after 2022.

*    *    *    *    *

(d) *Deductions for excess emissions.* After making the deductions for compliance under paragraph (b) of this section for a control period in a year in which the CSAPR NO$_X$ Ozone Season Group 2 source has excess emissions, the Administrator will deduct from the source's compliance account an amount of CSAPR NO$_X$ Ozone Season Group 2 allowances, allocated or auctioned for a control period in a prior year or the control period in the year of the excess emissions or in the immediately following year, equal to two times the number of tons of the source's excess emissions, provided that—

(1) The allowances deducted shall be CSAPR NO$_X$ Ozone Season Original Group 2 allowances, if the excess emissions are not from a source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) for a control period after 2022; and

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(2) The allowances deducted shall be CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances, if the excess emissions are from a source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) for a control period after 2022.

\*   \*   \*   \*   \*

23. Amend § 97.825 by:

a. In paragraph (a)(1), removing "and" after the semicolon; and

b. Adding paragraphs (a)(3) and (4).

The additions read as follows:

### § 97.825 Compliance with CSAPR NO$_X$ Ozone Season Group 2 assurance provisions.

(a) \*   \*   \*

(3) Are CSAPR NO$_X$ Ozone Season Original Group 2 allowances, if the deductions are not for compliance with the CSAPR NO$_X$ Ozone Season Group 2 assurance provisions by the owners and operators of a group of sources in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) for a control period after 2022; and

(4) Are CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances, if the deductions are for compliance with the CSAPR NO$_X$ Ozone Season Group 2 assurance provisions by the owners and operators of a group of sources in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) for a control period after 2022.

\*   \*   \*   \*   \*

24. Amend § 97.826 by:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

a. In paragraphs (d)(1)(i)(A) and (D), (d)(1)(ii)(A), (d)(1)(iii)(A), (d)(1)(iv)(A) and (B), and (d)(2)(ii), adding "Original" before "Group 2 allowances" each time it appears;

b. Redesignating paragraph (d)(3) as paragraph (d)(3)(i);

c. In newly redesignated paragraph (d)(3)(i):

i. Removing "After the Administrator" and adding in its place "Except as provided in paragraph (d)(3)(ii) of this section, after the Administrator"; and

ii. Adding "Original" before "Group 2 allowances" each time it appears;

d. Adding paragraph (d)(3)(ii);

e. In paragraph (e)(1) introductory text, adding "or (D)" before "of this chapter";

f. In paragraphs (e)(1)(i), (e)(1)(ii)(A), (e)(1)(iii) and (iv), (e)(1)(v)(B), and (e)(2), adding "Original" before "Group 2 allowances" each time it appears;

g. Revising paragraph (f) introductory text;

h. Redesignating paragraph (f)(1) as paragraph (f)(1)(i);

i. In newly redesignated paragraph (f)(1)(i):

i. Removing "After the Administrator" and adding in its place "Except as provided in paragraph (f)(1)(ii) of this section, after the Administrator"; and

ii. Adding "Original" before "Group 2 allowances" each time it appears;

j. Adding paragraph (f)(1)(ii); and

k. In paragraph (f)(2):

i. Adding "and not listed in § 52.38(b)(ii)(D)(*2*) of this chapter" before "(and Indian country"; and

ii. Adding "Original" before "Group 2 allowances" each time it appears.

The additions and revision read as follows:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**§ 97.826 Banking and conversion.**

*    *    *    *    *

(d) *   *   *

(3) *   *   *

(ii) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and § 97.1026(e), upon any determination that would otherwise result in the initial recordation of a given number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances in the compliance account for a source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State), the Administrator will not record such CSAPR NO$_X$ Ozone Season Original Group 2 allowances but instead will allocate and record in such account an amount of CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances for the control period in 2023 computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances divided by the conversion factor determined under paragraph (d)(1)(i)(D) of this section.

*    *    *    *    *

(f) Notwithstanding any other provision of this subpart or any SIP revision approved under § 52.38(b)(8) or (9) of this chapter, CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances or CSAPR NO$_X$ Ozone Season Group 3 allowances may be used to satisfy requirements to hold CSAPR NO$_X$ Ozone Season Original Group 2 allowances under this subpart as follows, provided that nothing in this paragraph (f) alters the time as of which any such allowance holding requirement must be met or limits any consequence of a failure to timely meet any such allowance holding requirement:

(1) *   *   *

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(ii) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and § 97.1026(e), the owner or operator of a CSAPR NO$_X$ Ozone Season Group 2 source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances for a control period in 2017 through 2020 by holding instead, in a general account established for this sole purpose, an amount of CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances for the control period in 2023 (or any later control period for which the allowance transfer deadline defined in § 97.802 has passed) computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances divided by the conversion factor determined under paragraph (d)(1)(i)(D) of this section.

\*   \*   \*   \*   \*

25. Amend § 97.830 by revising paragraph (b)(1) to read as follows:

**§ 97.830 General monitoring, recordkeeping, and reporting requirements.**

\*   \*   \*   \*   \*

(b) \*   \*   \*

(1)(i) May 1, 2017, for a unit other than a unit described in paragraph (b)(1)(ii) of this section;

(ii) May 1, 2023, for a unit that did not commence commercial operation at least 180 calendar days before September 30, 2020 and that is located in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State);

\*   \*   \*   \*   \*

26. Amend § 97.834 by revising paragraph (d)(2)(i) to read as follows:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

## § 97.834 Recordkeeping and reporting.

\*    \*    \*    \*    \*

(d) \*   \*   \*

(2) \*   \*   \*

(i)(A) The calendar quarter covering May 1, 2017 through June 30, 2017, for a unit other than a unit described in paragraph (d)(2)(i)(B) of this section;

(B) The calendar quarter covering May 1, 2023 through June 30, 2023, for a unit that did not commence commercial operation at least 180 calendar days before September 30, 2020 and that is located in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State);

\*    \*    \*    \*    \*

## Subpart GGGGG—CSAPR NO$_X$ Ozone Season Group 3 Trading Program

27. Amend § 97.1002 by:

a. Adding in alphabetical order a definition of "CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance";

b. Revising the definition of "CSAPR NO$_X$ Ozone Season Group 2 allowance"; and

c. Adding in alphabetical order a definition of "CSAPR NO$_X$ Ozone Season Original Group 2 allowance".

The additions and revision read as follows:

## § 97.1002 Definitions.

\*    \*    \*    \*    \*

*CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance* means a CSAPR NO$_X$ Ozone Season Group 2 allowance allocated for a control period after 2022 under subpart EEEEE of this

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

part, § 97.526(d), or § 97.1026(e) to a unit in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) or allocated or auctioned for a control period after 2022 in accordance with the provisions of a SIP revision approved for such a State by the Administrator under § 52.38(b)(7), (8), or (9) of this chapter.

\* \* \* \* \*

*CSAPR NO$_X$ Ozone Season Group 2 allowance* means a limited authorization issued and allocated or auctioned by the Administrator under subpart EEEEE of this part, § 97.526(d), or § 97.1026(e), or by a State or permitting authority under a SIP revision approved by the Administrator under § 52.38(b)(7), (8), or (9) of this chapter, to emit one ton of NO$_X$ during a control period of the specified calendar year for which the authorization is allocated or auctioned or of any calendar year thereafter under the CSAPR NO$_X$ Ozone Season Group 2 Trading Program, where each CSAPR NO$_X$ Ozone Season Group 2 allowance is either a CSAPR NO$_X$ Ozone Season Original Group 2 allowance or a CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance.

\* \* \* \* \*

*CSAPR NO$_X$ Ozone Season Original Group 2 allowance* means a CSAPR NO$_X$ Ozone Season Group 2 allowance other than a CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance.

\* \* \* \* \*

28. Amend § 97.1026 by:

a. Revising the section heading; and

b. Adding paragraphs (e) and (f).

The revision and additions read as follows:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**§ 97.1026 Banking and conversion; bank recalibration.**

\*    \*    \*    \*    \*

(e) Notwithstanding any other provision of this subpart, by September 18, 2023, the Administrator will temporarily suspend acceptance of CSAPR NO$_X$ Ozone Season Group 3 allowance transfers submitted under § 97.1022 and, before resuming acceptance of such transfers, will take the actions in paragraphs (e)(1) and (2) of this section with regard to every compliance account for a CSAPR NO$_X$ Ozone Season Group 3 source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State):

(1) The Administrator will deduct all CSAPR NO$_X$ Ozone Season Group 3 allowances allocated for the control periods in 2021 and 2022 from each such compliance account.

(2) For each CSAPR NO$_X$ Ozone Season Group 3 allowance deducted from a given source's compliance account under paragraph (e)(1) of this section, the Administrator will allocate to the source and record in the source's compliance account one CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance for the control period in 2023.

(f) Notwithstanding any other provision of this subpart, CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances may be used to satisfy requirements to hold CSAPR NO$_X$ Ozone Season Group 3 allowances under this subpart as follows, provided that nothing in this paragraph (f) alters the time as of which any such allowance holding requirement must be met or limits any consequence of a failure to timely meet any such allowance holding requirement:

(1) After the Administrator has carried out the procedures set forth in paragraph (e) of this section, the owner or operator of a CSAPR NO$_X$ Ozone Season Group 3 source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR NO$_X$ Ozone Season Group 3

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

allowances for the control period in 2021 or 2022 by holding instead, in a general account established for this sole purpose, an equal amount of CSAPR $NO_X$ Ozone Season Expanded Group 2 allowances for the control period in 2023 (or any later control period for which the allowance transfer deadline defined in § 97.802 has passed).

(2) [Reserved]

29. Amend § 97.1034 by:

a. In paragraph (d)(2)(i)(C), removing "June" and adding in its place "September";

b. In paragraph (d)(3), revising the first sentence; and

c. In paragraph (d)(4), adding a second sentence.

The revision and addition read as follows:

**§ 97.1034 Recordkeeping and reporting.**

\*    \*    \*    \*    \*

(d) \*    \*    \*

(3) The designated representative shall submit each quarterly report to the Administrator within 30 days after the end of the calendar quarter covered by the report, except that quarterly reports required for the calendar quarter covering May 1, 2023, through June 30, 2023, shall be submitted by August 4, 2023. \*    \*    \*

(4) \*    \*    \* Notwithstanding the provisions of §§ 75.64(a), 75.73(f)(1), 97.434(d)(2), 97.634(d)(2), and 97.734(d)(2), the deadline for the designated representative of such a unit to submit the quarterly reports required under such additional programs for the calendar quarter covering May 1, 2023, through June 30, 2023, shall be August 4, 2023.

\*    \*    \*    \*    \*

**IN THE UNITED STATES CIRCUIT COURT**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

INTERSTATE NATURAL GAS ASSOCIATION
OF AMERICA; AMERICAN PETROLEUM
INSTITUTE,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; MICHAEL S. REGAN,
Administrator, U.S. EPA

Respondents.

Case No. 23-1193

**DECLARATION OF SCOTT YAGER IN SUPPORT OF INTERSTATE NATURAL GAS**
**ASSOCIATION OF AMERICA'S MOTION FOR STAY**

I, **SCOTT YAGER**, declare that the following is true and correct:

1. I am over the age of twenty-one years old and have personal knowledge of the statements made herein.

2. I am the Vice President of Environment at the Interstate Natural Gas Association of America ("INGAA").

3. INGAA is a trade association that advocates for the regulatory and legislative positions of importance to the interstate natural gas pipeline industry in North America. Its 26 member companies operate almost 200,000 miles of interstate pipelines that transport natural gas from producers to consumers, providing critical energy needed to heat our homes, cook our food, fuel our factories, and generate electricity. Natural gas is a domestically produced, affordable, and foundational fuel source that the U.S. will rely on for decades to come, and pipelines are the safest, most reliable, and most affordable way to deliver natural gas to consumers.

1

**804a**

Approximately one-third of the energy consumed in the U.S. travels through natural gas infrastructure.

4. Protecting the environment is a top priority for INGAA members, and natural gas is the cleanest burning fossil fuel. As demand for energy increases, expanded use of natural gas reduces overall greenhouse gas emissions by offsetting the use of higher carbon-intensive fuels. According to the International Energy Agency, switching from coal to gas reduces emissions by 50% when producing electricity and by 33% when providing heat. INGAA members implement pipeline integrity and maintenance programs as well as emissions reduction programs to further improve the industry's climate footprint.

5. INGAA and its members have a strong interest in supporting the efficient, transparent, and predictable regulation of natural gas pipeline facilities and related equipment.

6. To operate their pipelines, INGAA member companies own and operate numerous units to compress natural gas, which enables transportation of natural gas from the production sites to end-users across the country. These units ("compressor units") include combustion turbines and reciprocating internal combustion engines, the latter of which ("pipeline engines") are regulated by the rulemaking being challenged, *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 36,654 (June 5, 2023) ("Final Rule").

7. I have worked at INGAA since 2022 and my responsibilities include advocating for federal environmental policies, laws, and regulations that support the development and operation of safe, reliable, and environmentally-sound interstate natural gas transportation and storage infrastructure. Part of this advocacy includes working with our member companies to analyze, understand, and file comments on the U.S. Environmental Protection Agency ("EPA")

2

**805a**

proposal that led to the Final Rule under review. *See Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, 87 Fed. Reg. 20,036 (April 6, 2022) ("Proposed Rule").

**INGAA Member Companies Own Or Operate Approximately Two-Thirds Of The Pipeline Engines Subject To The Final Rule, The Majority Of Which Will Require Controls**

8. The Final Rule becomes effective on August 4, 2023, and it requires pipeline engines with a maximum rated capacity of 1,000 horsepower or more within 20 states[1] to comply with certain emissions limits by May 2026. 88 Fed. Reg. at 36,654, 36,820. EPA estimates that 3,005 pipeline engines meet or exceed 1,000 horsepower capacity in the 20 states. *Id.* at 36,842. INGAA members own or operate approximately 1,900 of those engines.

9. At this time, we cannot ascertain the exact number of engines that will require the application of controls to meet the Final Rule's emissions limits because EPA created several exemptions and alternative compliance approaches, including some that require EPA approval, in its discretion. Specifically, EPA exempted emergency engines and certain engines subject to New Source Performance Standards (40 C.F.R. Part 60, Subpart JJJJ), provided for facility-wide averaging, and allowed pipeline operators to petition for an alternative emissions limit in cases of technical impossibility or extreme economic hardship. 40 C.F.R. §§ 52.40(e), 52.41(a)-(b), (d). It is unclear how EPA will apply these provisions or to what extent INGAA members will be able to take advantage of them. Based on our current best estimates, which attempt to account for the exemptions and alternative compliance approaches, INGAA members believe that approximately 1,220 pipeline engines will require controls to comply with the Final Rule.

---

[1] EPA is requiring emissions reductions from natural gas pipelines to address interstate transport obligations for the 2015 ozone NAAQS for the following 20 states: Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia.

3

Of these, 520 are located in states that do not have a judicial stay of the Final Rule or the EPA

SIP disapproval that preceded issuance of the Final Rule, and approximately 700 are located

in states with judicial stays.

**Absent A Stay, INGAA's Members Will Incur Hundreds Of Millions, If Not Billions, In Compliance Costs During The Next 12 To 18 Months**

10. INGAA estimates that its members will have to spend $2.4 to $6.1 billion to comply with the

Final Rule's emissions limits. Of that cost, INGAA estimates up to 35% of the total (or

approximately $840 million to $2.1 billion) would need to be spent in the next 12-18 months

while this case is being litigated in this Court to attempt to meet the Final Rule's compliance

deadline for all engines subject to the Rule. If units located in states with a judicial stay are

excluded from consideration, the cost of installing controls on the engines in states that remain

subject to the Final Rule still exceeds $1 billon, with up to $300 million or more of that total

likely to be expended in the next 12 to 18 months.

11. These compliance costs are so large because installing emissions controls onto pipeline engines

is an expensive process and the installations will be implemented across approximately 1,220

pipeline engines, a project the scale of which has never been attempted by the industry (or the

regulatory permitting agencies).

12. The actual costs could be higher than these estimates because the Final Rule forces the entire

industry to add controls to pipeline engines at once. When pipeline companies compete for

contractors and equipment, the increased demand drives up costs.

13. Based on service provider cost projections provided by its members for lean burn engines,

INGAA estimates that its members will spend approximately $2 to $5 million per engine to

install controls to comply with the Final Rule's emissions limits. In some cases, INGAA's

members also will need to make additional facility upgrades and do support work for the engine

4

**807a**

controls that will significantly increase the costs. For example, one INGAA member reported that it recently spent over $11 million to retrofit a single pipeline engine due to the additional facility upgrades and support work that was needed for that particular project.

14. The Final Rule requires these expensive controls even on certain pipeline engines that, more often than not, do not operate. During high demand periods, or when other compressor units are offline due to planned or unplanned maintenance, INGAA's members might run (or prepare to run) all of their pipeline engines to meet human needs so the lights stay on and houses stay warm or cool, depending on the season. During other periods, however, some pipeline engines affected by the Final Rule operate as backup units and are not needed to operate. These units have overall utilization rates lower than 50%, including many with lower than 20% annually.

15. INGAA's members cannot recover these costs from the government if the lawsuit prevails. Moreover, no statute or regulation allows pipelines to recover, in real-time, the significant costs of imposing these controls from their customers. An interstate gas pipeline cannot raise its transportation rates absent authorization from the Federal Energy Regulatory Commission ("FERC"), 15 U.S.C. § 717c(d). A rate increase may be sought for *future costs,* however, the process is lengthy and expensive, with no guaranteed result. Further, some INGAA members have negotiated "stay out" provisions with their customers as part of prior rate case settlements or provide service subject to negotiated rate agreements that preclude them from increasing their contractually-defined rate for the length of the agreement – sometimes over a decade. If the company incurs costs to comply with the Final Rule during the "stay out" or rate-capped period, it may not recover those costs. Even if the pipeline can request a rate increase and FERC approves the request, the new rate only applies prospectively.

16. The Final Rule's cost to INGAA members goes beyond dollars; by diverting substantial resources to compliance, the Final Rule eliminates the opportunity to pursue other projects that would benefit pipeline customers and the environment. These projects include modernizing and/or expanding facilities, improving operational efficiencies and reliability of the system, and funding research and pilot projects on initiatives to further reduce the industry's climate footprint and other environmental priorities. If the court does not stay the Final Rule and INGAA prevails on its challenge to the Final Rule, INGAA members will have wasted hundreds of millions of dollars on engine modifications that are unnecessary to meet customer demands and that do not enhance the economic value of the engines and, in some instances, impose controls on pipeline engines that run infrequently or rarely.

**INGAA Members Must Begin Work Now To Be Prepared To Comply With The Final Rule Due To The Long Lead Times Associated With Procuring The Necessary Government Approvals And Installing Emissions Controls**

17. As explained below and in more detail in INGAA's comments on the Proposed Rule and in the separate declarations of INGAA's members, pipeline engines are large, complex pieces of equipment. To add emissions controls, INGAA members must develop engineering plans and designs for each engine. They must procure parts and hire specialized contractors to install and test the equipment. They must obtain a new or modified state or federal air quality permit for each engine they modify. And in some instances, they may have to obtain a prevention of significant deterioration ("PSD") permit. Each step is time-consuming and expensive, and each step becomes more difficult as INGAA members compete for limited resources in an attempt to install controls on upwards of 1,220 pipeline engines within the grossly insufficient time to comply with the Final Rule.

18. The vast majority of pipeline engines regulated by the Final Rule are lean burn engines, with the vast majority of these two-stroke cycle lean burn engines and a smaller subset of 4-stroke

6

**809a**

cycle lean burn engines. EPA suggested that pipelines can use selective catalytic reduction ("SCR") to reduce NOx emissions on four-stroke lean burn engines, but INGAA members plan to use SCR rarely, if at all. As explained in INGAA's comments on the rule, SCR application is fairly common for larger combustion sources, such as electric utilities and large industrial boilers, but it is very rarely used in lean burn engines due to a variety of environmental, reliability, and economic reasons. Instead, INGAA members are planning to install "low emissions combustion" ("LEC") technology (also referred to as "layered combustion" by EPA) on lean burn engines to comply with the Final Rule. There are currently only two primary technology service providers that offer LEC controls for two-stroke lean burn engines, and the limited supply of both contractors and LEC technology will lead to increased costs and delays for INGAA members. Indeed, EPA has previously acknowledged market limitations for retrofitting pipeline engines, noting that "market demand could significantly exceed the available resource base of skilled professionals." *Technical Support Document (TSD) for the Cross-State Air Pollution Rule for the 2008 Ozone NAAQS, Assessment of Non-EGU NOx Emission Controls, Cost of Controls, and Time for Compliance* § 3.4, at 21 (Aug. 2016). This results in "substantial uncertainty" in timelines for retrofit control installation over numerous sources. *Id.* In recent years, the service provider constraints have not improved. And even if these constraints were to improve, they would have to do so in the next couple of months to enable INGAA's members to meet the Final Rule's timeline.

19. As detailed and submitted to the record with its comments, INGAA commissioned a study of upgrades to install LEC technology on existing lean burn engines in natural gas transportation, and the study demonstrates why EPA's timeline and cost estimates for retrofitting pipeline

7

**810a**

engines are unrealistic.[2] The study used retrofits in response to potential NOx regulations triggered by the 2015 ozone National Ambient Air Quality Standards ("NAAQS") and interviews with equipment operators and equipment suppliers that serve our industry to estimate the timeline and cost to retrofit controls on pipeline engines. The study indicated that, from inception to completion, retrofitting a single pipeline engine with controls would require between one and two-and-a-half years to complete. Although INGAA published the report in 2014, its conclusions remain valid and, if anything, may underestimate the time needed to retrofit a single pipeline engine. The number of primary service providers has not increased since 2014, and vendors have advised INGAA members that the rule has forced an unprecedented level of demand for installation of technology to control NOx emissions. INGAA member Kinder Morgan reports that one of its primary contractors said that over the last 25 years, it has modified approximately 400 total engines across the entire pipeline transportation industry. The Final Rule requires INGAA member companies to modify three times that number of engines in just three years—and that is not counting the engines of operators that are not INGAA members but also must be retrofitted during the same timeframe.

20. What is more, before INGAA members can commence physical work on the engines, they must apply for and receive a new or modified air permit from the appropriate federal, state, local, or tribal air permitting authority for nearly all engines that need additional emissions control technology. This requires a significant amount of resources, first to assemble the information and supporting documentation for the application and then to respond to questions and requests for additional information from the staff of the permitting authority. Based on its

---

[2] Innovative Environmental Solutions, Inc. & Optimized Technical Solutions, "Availability and Limitations of NOx Emission Control Resources for Natural Gas-Fired Reciprocating Engine Prime Movers Used in the Interstate Natural Gas Transmission Industry" (July 2014)

8

members' experience, including those described in the declarations submitted in support of INGAA's motion for a stay, INGAA estimates that such permitting and approval could take 90 days to two years for each facility that has pipeline engines, or longer if PSD permitting is required.

21. Even assuming the best-case scenario in which the permitting process goes smoothly and companies are able to retain contractors to install controls as quickly as possible, INGAA anticipates that a significant portion of pipeline engines that need controls under the Final Rule will not be able to comply by May 2026 due to current lack of sufficient parts and labor. EPA says that in "limited circumstances for individual facilities," operators may obtain "extensions of time to install required pollution controls and achieve the emissions rates established in this rule based on a showing of necessity." 88 Fed. Reg. at 36,749. But the "circumstances where an extension of time may be warranted for any specific facility are unknown" at this time. *Id.* Thus, to meet the deadline for as many engines as possible, and to establish a basis to apply for an extension from EPA for pipeline engines that cannot be controlled by May 2026, INGAA members must begin work immediately. In fact, they have already begun this work, and several companies have submitted declarations providing further detail on work they are doing to attempt to meet the compliance deadline.

## Compliance With The Final Rule Could Threaten The Reliability Of The Country's Natural Gas System, Compromising Basic Needs

22. INGAA members design interstate natural gas pipelines to meet peak firm transportation contractual demand with little or no excess capacity. The vast majority of INGAA members operate at full capacity during peak demand periods, typically in the winter and summer months when natural gas utilities and gas-fired electric generators require natural gas to provide heat or air conditioning to American homes. In order to meet the tight timeline imposed

9

**812a**

by the Final Rule, INGAA members will not be able to avoid installing retrofits during these peak periods, with adverse consequences for reliability.

23. The Final Rule will force INGAA members to take significant numbers of pipeline engines out of service for retrofit within the same, or affecting service to the same, geographic area. The temporary loss of multiple pipeline engines will increase the risk that our customers—local gas utilities, industrial and manufacturing companies, and gas-fired electric generators—will not be able to obtain the natural gas they need to operate.

24. INGAA members have limited ability to mitigate disruptions of service because Section 4(b) of the Natural Gas Act and the antitrust laws restrict companies' ability to coordinate their outage and maintenance schedules with other pipelines.

### Conclusion

25. For all of these reasons, absent a stay, INGAA's member companies will be forced to incur hundreds of millions, if not billions, of dollars in compliance costs that are unrecoverable from the government while this case is being litigated, and they will have to take significant numbers of pipeline engines out of service, threatening disruptions to the nation's natural gas supply.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC on this 27th day of July, 2023.

Scott Yager
Vice President, Environment
Interstate Natural Gas Association of America

10

**813a**

**IN THE UNITED STATES CIRCUIT COURT**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| AMERICAN PETROLEUM INSTITUTE AND INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA,<br><br>                Petitioners,<br><br>    v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN,<br><br>                Respondents. | Case No. 23-____ |

**DECLARATION OF ROBIN RORICK IN SUPPORT OF AMERICAN PETROLEUM INSTITUTE AND INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA's MOTION FOR STAY**

I, Robin Rorick, declare that the following is true and correct:

1. I am over the age of twenty-one years old and have personal knowledge of the statements made herein.

2. I am the vice president of Midstream Policy at the American Petroleum Institute ("API").

3. API is the primary national trade association for the oil and natural gas industry. API represents more than 600 member companies involved in all aspects of the oil and natural gas industry, including exploration and production as well as the development of alternative energy facilities. Those member companies conduct much of the production, refining, marketing, and transportation of petroleum and petroleum products in the United States.

4. To operate their pipelines to transport petroleum and petroleum products, API members, like Enbridge, Inc., Kinder Morgan, TC Energy, and Williams, own and operate numerous reciprocating internal combustion engines rated at 1,000 horsepower or more ("pipeline engines"). Such pipeline engines are directly regulated by the final rulemaking being

1

**814a**

challenged, Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 36654 (June 5, 2023) ("Final Rule").

5. Based on my career at API, I am familiar with our member companies' activities gathering, processing, storing and transporting oil and natural gas in the United States. My responsibilities include helping to advocate for federal policies, laws, and regulations that support the development and operation of safe and reliable interstate natural gas transportation and storage infrastructure. Part of these responsibilities included working with our member companies to analyze and understand the U.S. Environmental Protection Agency ("EPA") proposal that would lead to the Final Rule under review. API submitted comments on behalf of its members to the EPA regarding that proposed rule, Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard, 87 Fed. Reg. 20,036 (April 6, 2022) ("Proposed Rule").

6. The Final Rule will become effective on August 4, 2023, and it requires that pipeline engines with a maximum rated capacity of 1,000 horsepower or more within 20 states[1] comply with certain emission limits by the beginning of the 2026 ozone season in May 2026. 88 Fed. Reg. at 36654, 36820.

7. Although the Final Rule's compliance deadline is in May 2026, API member companies with engines covered by the Final Rule ("API Midstream members") must immediately begin work to comply with the Final Rule and I understand that several have already begun. Securing the necessary contractors, parts, and equipment necessary to retrofit members' engines will be a significant undertaking that only becomes more difficult as the industry competes for these

---

[1] Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia.

2

**815a**

limited resources while trying to retrofit those  pipeline engines in a relatively short span of time. Further, those companies must immediately begin coordinating pipeline engine outages for installation work and obtaining the necessary permits for each retrofit.

8.  Older engines may require more time due to the need for additional modifications or to replace them entirely, if necessary. Should a company need to replace a pipeline engine in order to meet the Final Rule's emission limits, that company will be required to seek permits or approvals from multiple regulatory agencies, including the Federal Energy Regulatory Commission ("FERC"), the Department of Transportation's Pipeline and Hazardous Materials Safety Administration, and the state air permitting authority. Other approvals from the U.S. Army Corps of Engineers or the Department of Interior may also be required on a site-specific basis. Due to the time required for each of these permits and approvals, API Midstream member companies must begin the process of replacing older engines immediately.

9.  Overall, it will be extremely costly to comply with the Final Rule's emission limitations. Of that, a significant portion will have to be front-loaded, as members will need to place orders for parts and equipment long before that equipment is ready to be installed.

10. Through coordination by FERC, API Midstream member companies operate their separate natural gas pipeline assets as a highly interconnected system. Much like a highway system, if one route is blocked, natural gas can be temporarily diverted through other pipelines to connect natural gas suppliers with end users in multiple markets. However, during the next 12 to 18 months, those API members will have to start taking their pipeline engines off-line to begin the retrofit work required under the Final Rule. This will significantly reduce overall throughput in the States where pipeline engines are subject to the Final Rule's emission limits.

3

**816a**

11. Because the Final Rule requires multiple companies to install controls on their pipeline engines at the same time, and there is no opportunity to phase in the required controls or coordinate repair schedules, the natural gas transportation system in the subject States will likely lose significant capacity as retrofit work begins during the next 12 to 18 months. This will include times of peak demand, typically in the winter and summer months when natural gas utilities and electric generators require natural gas the most in order to provide heat or air conditioning. During times of peak demand, they require all of their compressor units to run so that pipelines can operate at full capacity. However, in order to comply with the Final Rule, all pipeline companies will either have compressor units entirely out of service in order to retrofit pipeline engines, or will be operating at reduced capacity.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC on this [18] day of July, 2023.

_____

Robin Rorick

Vice President, Midstream

American Petroleum Institute

Washington, D.C.

4

**817a**

**IN THE UNITED STATES CIRCUIT COURT**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

INTERSTATE NATURAL GAS ASSOCIATION
OF AMERICA,

                    Petitioner,

        v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY AND MICHAEL S.
REGAN,

                    Respondents.

Case No. 23-_____

**DECLARATION OF KIMBERLY TARR IN SUPPORT OF INTERSTATE NATURAL**
**GAS ASSOCIATION OF AMERICA'S MOTION FOR STAY**

        I, KIMBERLY TARR, declare that the following is true and correct:

1. I am over the age of twenty-one years old and have personal knowledge of the statements
   made herein.

2. I am Vice President of Engineering & Construction at Boardwalk Pipelines, LP ("Boardwalk"),
   a member of the Interstate Natural Gas Association of America ("INGAA").

3. As the owner and operator of numerous reciprocating internal combustion engines used to
   support pipeline compressor and storage facilities rated at 1,000 horsepower or more ("pipeline
   engines"), Boardwalk is directly regulated by the Final Rule being challenged, Federal "Good
   Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg.
   36654 (June 5, 2023) ("Final Rule").

4. I have been employed as a Vice President at Boardwalk for 15 years. My responsibilities
   include engineering, construction, land, and environmental permitting and compliance. Part of
   these responsibilities include helping Boardwalk prepare to comply with the Final Rule. This
   declaration is based on my personal knowledge of facts and information related to Boardwalk's

1

**818a**

business and strategy for compliance with the Final Rule, as well as my discussions with the company's Environmental staff as well as its Technical Services engineering staff.

5.  The Final Rule will become effective on August 4, 2023, and it requires that pipeline engines with a maximum rated capacity of 1,000 horsepower or more within 20 states[1] comply with certain emission limitations by the beginning of the 2026 ozone season on May 1, 2026. 88 Fed. Reg. at 36654, 36820. Boardwalk has 102 regulated pipeline engines in States that are subject to the Final Rule.

6.  To comply with the Final Rule when the emission limitations take effect on May 1, 2026, Boardwalk must immediately begin its efforts to comply with the Final Rule and has already begun taking actions. It will take several years to install the pipeline engine emission controls required to comply with the Final Rule's emission limitations. Boardwalk estimates that, in the absence of a stay and under the assumption that the Final Rule will take effect on May 1, 2026, it would be required to spend over $100 million within the next 18 to 24 months on design, engineering, parts, construction and employee time in order to comply with the Final Rule.

**Boardwalk Operations**

7.  Boardwalk is a wholly-owned subsidiary of Loews, Inc. whose interstate natural gas subsidiary companies include Texas Gas Transmission, LLC; Gulf South Pipeline Company, LLC; and Boardwalk Storage Company, LLC.  Boardwalk primarily provides the transportation and storage of natural gas and liquids for our customers.  Boardwalk, through its subsidiaries, operates approximately 14,365 miles of pipeline and 14 underground storage caverns with an aggregate working gas capacity of approximately 205 billion cubic feet and a liquids capacity

---

[1] Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia.

of approximately 32 million barrels. Boardwalk's natural gas pipeline systems are located in Alabama, Arkansas, Florida, Illinois, Indiana, Kentucky, Louisiana, Mississippi, Ohio, Oklahoma, Tennessee, Texas and Pennsylvania and our liquids pipelines and storage facilities are located in Louisiana and Texas.

8. Boardwalk owns 102 reciprocating pipeline engines with a capacity of 1,000 horsepower or more in the States of Texas, Louisiana, Mississippi, Kentucky, and Indiana. Each of these pipeline engines is subject to the Final Rule.

**Boardwalk Would Be Required to Spend Millions of Dollars in Compliance Costs While the Court is Considering INGAA's Challenge**

9. It is my understanding that the Court may take 12 to 18 months before it will rule on INGAA's challenge to the Final Rule. Boardwalk cannot wait until the Court issues its decision to start working to comply with the Final Rule. While the April 30, 2026 deadline may seem far away, retrofitting emission controls involves a multi-step process that involves long lead times for identification and analysis of each engine to be controlled, then design/engineering/procurement of equipment must occur, and then contracting with specialized contractors to install and test equipment before it can be placed back into service. Boardwalk must begin the evaluations required to retrofit its pipeline engines now, and even then Boardwalk may not finish the necessary work before the compliance deadline.

10. Pipeline engines are large, complex pieces of equipment. Installing emission controls requires design and engineering specific to each engine. The design, engineering, and installation of new controls requires Boardwalk to retain specialized contractors, of which there are few with the necessary experience with pipeline engines. Boardwalk has already hired engineering design firms as well as specialized controls suppliers/installers to assist in preparation of the full scope and cost of the required work. Some of these specialized contractors have limited

3

**820a**

capacity and have indicated they are attempting to increase their staff and production capabilities in order to meet the demands required by the Final Rule. Upon completion of this initial work, Boardwalk will begin to procure the long lead materials and contract for the construction of the work, however, Boardwalk is concerned that material and contractor availability will be inadequate to complete the work by the compliance deadline.

11. The pipeline engines regulated by the Final Rule are vital to Boardwalk's operation of its interstate transmission pipelines, which deliver natural gas to residential, electric generation, commercial, and industrial users. While the Court is considering INGAA's challenge to the Final Rule, Boardwalk may have to begin taking certain of its engines off-line to start emission control installation. Modifications to install controls could take between one to three months per unit. This means that, over the next 12 to 18 months, Boardwalk may shut down numerous pipeline engines for several months at a time, even potentially during the peak summer and winter seasons, threatening the interruption of natural gas services. This threat is significant because every other company subject to the Final Rule will also be attempting to design, procure, and install controls on their pipeline compressor engines at the same time. With pipeline engines for multiple companies being off-line at the same time, the options for temporarily re-routing the flow of natural gas to end users could be severely limited and threaten the overall reliability of our nation's pipeline grid.

12. Significant system outages will be required to complete installation of controls to comply with the Final Rule. Boardwalk will schedule this installation work in a way that minimizes the impact of these outages on customers and on the reliability of the electric grid at large. This will require undertaking work in a manner that is less efficient, and therefore more costly and more time consuming. For example, if six engines at a compressor station require controls to

4

**821a**

comply with the Final Rule, all six engines cannot be shut down at the same time without risking significant disruption to service. Instead we may shut down one or two engines at a time, mobilize a contractor onto the site to install controls, demobilize the contractor to a nearby compressor station for similar work, and months later return to the original compressor station to install controls on remaining, additional engines. This process will be inefficient but necessary to protect our customers and reduce the impacts to service. We will also have to limit outages to avoid peak demand periods that occur during the coldest months of winter and the hottest months of summer. This additional constraint will further complicate scheduling of outages and reduce the speed at which we can complete work necessary to comply with the Final Rule.

13. Retrofitting pipeline engines involves significant capital costs. Based on Boardwalk's preliminary estimates, achieving compliance with the Final Rule is expected to cost approximately $2 million per engine for the necessary controls, depending on the engine type, its size, and the generation of any previously installed controls, not including ancillary work and other required station modifications. Boardwalk has initiated the work to quantify additional requirements as a precursor to design, procurement and construction activities that will occur in the next 18 to 24 months.

14. In addition to these capital costs, Boardwalk will also incur permitting costs because installation of engine controls needed to comply with the Final Rule will most likely require an accompanying air permit modification. In most cases Boardwalk will be required to obtain approval of the permit modification from state permitting authorities before construction can begin. To secure permit modifications, Boardwalk's staff would be required to spend a significant amount of time assembling the information and supporting documentation that may

5

**822a**

be needed to apply for the necessary permit modifications and to coordinate with state permitting authorities as they process those applications. Permit processing timelines differ from state to state, creating yet another layer of complexity in planning installation projects. Permit processing timelines are also affected by the type of permit modification required for a specific engine in a specific state.  For example, engine controls will lower emissions of nitrogen oxides, but are also likely to increase emissions of carbon monoxide and volatile organic compounds.  Depending on the type of permit modification triggered by these changes to an engine's emissions profile, the state permitting authority could authorize downgrading the air permit for the unit or require upgrading the permit, which could entail public notice and other requirements that further extend to the state's permit review timeline.  The need to obtain prior approval for installation and ancillary work will complicate Boardwalk's efforts to achieve compliance with the Final Rule by May 1, 2026.

15. Altogether, Boardwalk estimates that, in the absence of a stay and under the assumption that the Final Rule will become effective May 1, 2026, it would be required to spend in excess of $200 million to comply with the Final Rule, with at least $23 million in expenses currently allocated during the next 18 months.

16. Boardwalk is aware that the Final Rule includes a possible option for a facility-wide averaging plan. 88 Fed. Reg. at 36,820. However, the Final Rule only allows "any owner or operator of an affected unit to *propose* a Facility-Wide Averaging Plan that would, *if approved by EPA*, provide an alternative means for compliance with the emissions limits in this final rule." *Id.* (emphases added). At this time, there is no way to know whether EPA will actually approve a proposed facility-wide averaging plan or on what criteria it would approve or disapprove such a proposal. Without any assurance of EPA acting on or even approving a plan in a timely

6

**823a**

manner, Boardwalk must proceed to plan to design, engineer, and procure controls without such approval.

17. Without a stay, should the Court later invalidate the Final Rule, Boardwalk will have spent millions of dollars attempting to comply with the Final Rule's emission limitations. To the best of my knowledge, the pollution controls that will need to be installed to comply with the Final Rule are not required for compliance with any other federal or state regulation and there is no mechanism to recover the costs of these pollution controls from EPA or any other branch of the federal government.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Houston, Texas on this 19 day of July, 2023.

Kimberly Tarr

**IN THE UNITED STATES CIRCUIT COURT**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA and AMERICAN PETROLEUM INSTITUTE,<br><br>                  Petitioners,<br><br>   v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN,<br><br>                  Respondents. | Case No. 23-____ |

## DECLARATION OF ENBRIDGE IN SUPPORT OF INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA'S MOTION FOR STAY

I, Thomas V. Wooden Jr., declare that the following is true and correct:

1. I am over the age of twenty-one years old and have personal knowledge of the statements made herein.

2. I am Vice President (VP) of the Gas Transmission and Midstream Engineering & Asset Integrity Management for Spectra Energy Transmission Services, LLC, the general partner of Texas Eastern Transmission, LP, which are indirectly owned by Enbridge (U.S.) Inc. (hereinafter "Enbridge"), a member of the Interstate Natural Gas Association of America ("INGAA").

3. As the owner and operator of numerous reciprocating internal combustion engines used to support pipeline compressor and storage facilities rated at 1,000 horsepower or more ("pipeline engines"), Enbridge is directly regulated by the Final Rule being challenged, Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 36654 (June 5, 2023) ("Final Rule").

1

**825a**

4. I am the Vice President of Gas Transmission and Midstream Engineering and Asset Management for Enbridge. I am charged with overseeing engineering, technical support and asset optimization for Enbridge gas transmission pipelines in both the U.S. and Canada. I earned a Bachelor's degree in Petroleum Engineering from Marietta College in May 1984. In December 1991, I earned a Master's degree in Petroleum Engineering from the University of Houston. I have been employed with Enbridge and its predecessor corporations, Spectra Energy Corp, Duke Energy Corporation, PanEnergy Corp, Panhandle Eastern Corp, and Texas Eastern Corporation, since 1985. During that time, I have worked in various operations and leadership positions, including Vice President of US Field Operations, Vice President of Northeast Operations, General Manager of the East Division, Director of Technical Operations for the Central Region, and Vice President of Gas Transmission and Midstream Operations. Most recently I was appointed to Vice President of Gas Transmission and Midstream Engineering and Asset Management. I have been in my current position since April 1, 2019. Part of the responsibilities of my current job include helping Enbridge prepare to comply with the Final Rule. This declaration is based on my personal knowledge of facts and information related to Enbridge's business and strategy for compliance with the Final Rule, as well as my discussions with individuals in departments Environment, Engineering Reliability and Risk, Legal, Asset Management, Projects, Operations, Regulatory, Safety, Commercial Operations who are responsible for implementing the Final Rule.

5. The Final Rule will become effective on August 4, 2023, and it requires that pipeline engines with a maximum rated capacity of 1,000 horsepower or more within 20 states comply with certain emission limitations by the beginning of the 2026 ozone season in May 2026. 88 Fed.

2

**826a**

Reg. at 36654, 36820. Enbridge has 176 regulated pipeline engines in the States that EPA has made subject to the Final Rule.

6. To comply with the Final Rule when emission limitations take effect in May 2026, Enbridge has already initiated work necessary for compliance. It will take several years to install the necessary pipeline engine emission controls. Enbridge estimates $350 million will be spent within the next 12-18 months on design, engineering, parts, and employee time while the case is being litigated. If States where there is a judicial stay are excluded from consideration, the cost is $228 million.

**Enbridge Operations**

7. Enbridge's U.S. Transmission System is an interstate natural gas pipeline network consisting of just over 14,000 miles of pipe and 3.4 million horsepower of compression equipment. U.S. Transmission operates in 30 states and offshore from the southern tip of Texas, across to Florida, and up into New England and moves about 20% of all gas consumed in the U.S.

8. Enbridge owns 176 pipeline engines with a capacity of 1,000 horsepower or more in the States of Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Missouri, Mississippi, New Jersey, Ohio, Pennsylvania, Texas, and Virginia. Each of these pipeline engines is subject to the Final Rule. There are 124 engines in States where the State Implementation Plan (SIP) disapproval is stayed (Arkansas, Kentucky, Louisiana, Missouri, Mississippi, Texas) and 52 engines are in States that are not stayed.

**Enbridge Will Spend Millions of Dollars in Potentially Unnecessary Compliance Costs While the Court is Considering INGAA's Challenge**

9. It is my understanding that the Court may take 12 to 18 months before it will rule on INGAA's challenge to the Final Rule. Enbridge cannot wait until the Court issues its decision to begin working to comply with the Final Rule. Although the April 30, 2026 deadline may seem far

away, retrofitting emission controls involves a multi-step process that involves long lead times for analysis of engines to be controlled, design/engineering/procurement of equipment, and contracting with specialized contractors to install and test equipment. It is not feasible for Enbridge and the rest of our industry to all plan to install new controls on 3000 pipeline engines across multiple states by April 2026. Even if Enbridge begins retrofitting its pipeline engines now Enbridge is not likely to finish the necessary work before the compliance deadline. Enbridge is requesting this stay pending outcome of the litigation to avoid potentially unnecessary compliance costs while the court is considering INGAA's challenge.

10. Since pipeline engines are large, complex pieces of equipment, installing emission controls requires design and engineering specific to each type of engine. The design, engineering, and installation of new controls requires Enbridge to retain specialized contractors, of which there are few with the necessary expertise with pipeline engines. Because these specialized contractors have limited capacity and are already seeing increased demand due to the Final Rule, Enbridge has hired three design firms and initiated emission control work design and development, however, the available pool of system integrators and construction contractors is limited. Emission control installations have two aspects: on-engine work and off-engine work. System Integrators perform on-engine work and electrical/mechanical/construction contractors perform off-engine work. There are only two system integrators in North America (and the world) that provide and install these types of emission controls, Cooper Machinery Services (CMS) and Siemens-Enginuity. EPA's research indicates that there will be capacity to retrofit up to 150 units per year. When installing emission controls on pipeline engines, only 25%-30% of the work and costs are associated with on-engine work which is provided by the system integrators. The remaining 70%-75% of the work and costs involve off-engine

4

**828a**

infrastructure additions and auxiliary system upgrades required to support the on-engine emission controls. Enbridge, and each of the other pipeline companies all draw from the same pool of design firms, suppliers, and construction companies to perform this work. Representative documentation in support of these costs is attached as Exhibit A. Enbridge believes EPA's cost analysis is grossly understated by not considering the full scope of emission control installation, and further, EPA's own documentation and analysis shows the volume of affected units cannot be retrofitted by the compliance deadline.

11. The pipeline engines regulated by the Final Rule are vital to Enbridge's operation of its interstate transmission infrastructure, delivering natural gas for distribution to residential, commercial, and industrial users. While the Court is considering INGAA's challenge to the Final Rule, Enbridge will have to begin taking its engines off-line to start emission control installation. Emission control installation at a single station could take between 3 and 6 months per unit or 6 to 12 months per station depending on the number of units and how many units can be done at the same time. This means that, over the next 12 to 18 months, Enbridge must shut down pipeline engines for several months at a time, even during the peak summer and winter seasons which will limit natural gas services. Every other company subject to the Final Rule will also be executing design, procurement, and installation of emission controls on their pipeline engines at the same time increasing constraints on natural gas deliveries. With pipeline engines for multiple companies being off-line at the same time, the options for temporarily re-routing the flow of natural gas from customers to end users will be limited and a threat to industry-wide system reliability.

12. Outages for retrofit will cause capacity restrictions and have the potential to impact our firm (uninterruptable) services. These firm services are counted upon by a wide range of customers

to provide heat and power, including small municipalities, local distribution companies, electric generators, manufacturers and industrial end users and Liquefied Natural Gas (LNG) exporters. Natural gas is also a raw material in a number of manufacturing processes, in fertilizer, ammonia, and chemical manufacturing industries. Each one of these groups has their own constituents that depend upon a reliable supply of natural gas. Interruption in system-wide flows of natural gas has larger economic impacts including employment, reliability of the electric grid, and the cost of electricity.

13. Retrofitting pipeline engines involves significant capital costs. Based on Enbridge's most recent 2019 emission control installation, retrofitting a single pipeline engine with the emission controls required by the Final Rule will cost approximately $11.5 million. Costs could be higher given ongoing supply chain constraints. Enbridge estimates that it will spend approximately $350 million within the next 12-18 months on design, engineering, parts, and employee time in order to comply with the Final Rule's emission limitations by May 2026. Enbridge believes that EPA's cost estimates are grossly understated.

14. Enbridge will need to divert funds from other capital projects planned for the next 12-18 months and beyond to fund work necessary to comply with the Final Rule. Enbridge currently estimates the overall cost impact of the Final Rule to be approximately $1 billion. To absorb this level of capital cost, system modernization plans are also being deferred to accommodate the funds required by the Final Rule.

15. Pipeline engine modifications require an accompanying permit modification. In addition to the normal workload, Enbridge's staff will be required to spend a significant amount of time assembling the information and supporting documentation needed to apply for the necessary permit modifications and to coordinate with state permitting authorities as they process those

6

**830a**

applications. This typically includes conference calls with state permitting staff, responding to requests for additional information, and meetings with staff and contractors. The permitting required for this rule will be an additional draw on resources at Enbridge and the affected State Agencies when the entire industry is re-permitting facilities in the compliance timeframe.

16. Altogether, Enbridge estimates that, in the absence of a stay, it will spend approximately $350 million to comply with the Final Rule just during the next 12-18 months. Representative documentation in support of these costs is attached as Exhibit A.

17. Enbridge is aware that the Final Rule includes a possible option for a facility-wide averaging plan. 88 Fed. Reg. at 36,820. However, facility-wide averaging is not a viable option for Enbridge for the following reasons:

First, the Final Rule only allows "any owner or operator of an affected unit to *propose* a Facility-Wide Averaging Plan that would, *if approved by EPA*, provide an alternative means for compliance with the emissions limits in this Final Rule." At this time, there are no published criteria to help a company understand what EPA will consider 'adequate' nor is there a defined timeframe for EPA to act upon those proposals. Unless and until the company receives approval from EPA for averaging plan, a company must proceed with emission control work per the Final Rule.

Second, EPA believes that Facility-Wide Averaging will reduce the number of industry wide pipeline engines affected by the Final Rule from 3000 units to 900 units, but this option is not practicable for Enbridge for the following reasons:

- EPA's Prevention of Significant Deterioration (PSD) rules require a company to evaluate an entire site rather than individual units during permit modifications associated with this type of work. The controls necessary to comply with the averaging provision would

7

**831a**

increase emissions of other pollutants, thus requiring a full PSD analysis for each entire site. If a PSD permit is required, which seems likely, that process itself could take several years and would require the installation of additional controls.

- A company's certificate obligations under Federal Energy Regulatory Commission (FERC) rules require that the full capacity of a station be available to customers year-round. EPA added the facility-wide averaging provision after the comment period closed to reduce the number of affected units but failed to consider PSD and/or FERC certificate obligations that may continue to require emission controls on all 3000 units. Facility averaging will prevent the sites from operating at full capacity for 5 months out of the year unless emission controls are installed on all engines, which is precisely what the averaging program is designed to avoid.

18. Without a stay, should the Court later invalidate the Final Rule, Enbridge will have wasted millions of dollars working to comply with the Final Rule's emission limitations. To the best of my knowledge, the emission controls that will need to be installed to comply with the Final Rule are not required for compliance with any other federal or state regulation and there is no mechanism to recover the costs of these emission controls from EPA or any other branch of the federal government.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Houston, Texas on this 19 day of July, 2023.

_Thomas V. Wooden_

Thomas V. Wooden, Jr.

8

**832a**

Exhibit A

Final project costs for CB work at Perulack

9

**833a**

**Perulack 2019 (Leidy) Clean Burn Costs**

| | | | |
|---|---|---|---|
| Exported from EcoSys on 06/08/2023 12:25:57 | | | |

**GTM009 Project Cost Data**

| WBS ID | WBS Description | Major Task | Incurred Cost |
|---|---|---|---|
| CE.000147.006.02.01 | CON - Mobilization | Construction | 148,210 |
| CE.000147.006.02.02 | CON - Site Work | Construction | 111,179 |
| CE.000147.006.02.03 | CON - Foundations | Construction | 369,199 |
| CE.000147.006.02.04 | CON - Equipment & Structures | Construction | 501,796 |
| CE.000147.006.02.09 | CON - Fab & Install | Construction | 350,044 |
| CE.000147.006.02.10 | CON - Pressure Testing/ Start-Up | Construction | 38,466 |
| CE.000147.006.02.11 | CON - Electrical | Construction | 421,691 |
| CE.000147.006.02.12 | CON - Instrumentation | Construction | 178,925 |
| CE.000147.006.02.13 | CON - Paint/ Coating/ Insulation | Construction | 103,417 |
| CE.000147.006.02.14 | CON - General Expenditures | Construction | 289,856 |
| CE.000147.006.02.25 | CON - Performance/ Payment Bonds | Construction | 303 |
| CE.000147.006.02.26 | CON - Contractor Fee | Construction | 321,631 |
| CE.000147.006.02.29 | CON - Change Orders | Construction | 10,897 |
| CE.000147.006.02.31 | CON - EPC/EPCM Prime Contractor | Construction | 350,000 |
| CE.000147.006.03.01 | MAT - Prime Mover and Compr Sets | Procurement | 1,759,152 |
| CE.000147.006.03.02 | MAT - Air Compressors | Procurement | 358,010 |
| CE.000147.006.03.03 | MAT - Generators | Procurement | 0 |
| CE.000147.006.04.01 | MAT - Coolers | Procurement | 0 |
| CE.000147.006.04.02 | MAT - Heaters | Procurement | 21,872 |
| CE.000147.006.04.03 | MAT - Buildings | Procurement | 0 |
| CE.000147.006.04.04 | MAT - Tanks/Vesseles | Procurement | 46,538 |
| CE.000147.006.04.05 | MAT - Scrubbers/Filter Separatrs | Procurement | 95,275 |
| CE.000147.006.04.07 | MAT - Fabrications - General | Procurement | 112,646 |
| CE.000147.006.05.03 | MAT - Pipe - 14in. & Smaller | Procurement | 21,837 |
| CE.000147.006.06.03 | MAT - Valves - 14in. & Smaller | Procurement | 62,153 |
| CE.000147.006.07.01 | MAT - Materials - General | Procurement | 2,736 |
| CE.000147.006.07.02 | MAT - Fittings & Flanges | Procurement | 10,138 |
| CE.000147.006.07.04 | MAT - Freight & Handling | Procurement | 42,177 |
| CE.000147.006.08.01 | MAT - Power | Procurement | 83,599 |
| CE.000147.006.08.02 | MAT - Controls | Procurement | 94,975 |
| CE.000147.006.08.03 | MAT - Instrumentation | Procurement | 36,819 |
| CE.000147.006.08.04 | MAT - Meters | Procurement | 20,730 |
| CE.000147.006.09.02 | MAT - Transmission Departments | Procurement | 103,641 |
| CE.000147.006.10.01 | ENG - Design Svcs | Engineering | 1,049,156 |
| CE.000147.006.10.02 | ENG - Testing Svcs | Engineering | 0 |
| CE.000147.006.10.06 | ENG - Engineering Design Consult | Engineering | 171,283 |
| CE.000147.006.10.07 | ENG - Commissioning Svcs | Engineering | 318,325 |
| CE.000147.006.10.08 | ENG - Close Out & As-Builts | Engineering | 11,479 |
| CE.000147.006.10.09 | ENG - EPC/EPCM Design Svcs | Engineering | 75,814 |
| CE.000147.006.10.13 | ENG - EPC/EPCM Commissioning Svcs | Engineering | 167,854 |
| CE.000147.006.10.14 | ENG - EPC/EPCM Close Out & As-Builts | Engineering | 83,927 |

| CE.000147.006.11.02 | ROW - Acquisitions | Land / ROW | 7,267 |
|---|---|---|---|
| CE.000147.006.11.04 | ROW - Agents | Land / ROW | 13,948 |
| CE.000147.006.12.01 | ENV - Bio Field Surveys | Environment | 27,070 |
| CE.000147.006.12.02 | ENV - Cultural Resource Surveys | Environment | 0 |
| CE.000147.006.12.04 | ENV - Permit Application-Fed,State,Local | Environment | 9,243 |
| CE.000147.006.12.05 | ENV - Air Permitting | Environment | 63,693 |
| CE.000147.006.12.07 | ENV - Environmental Inspection | Environment | 0 |
| CE.000147.006.12.11 | ENV - Waste Sampling / Disposal | Environment | 236,436 |
| CE.000147.006.12.13 | ENV - Post Construct. Monitoring/Report. | Environment | 0 |
| CE.000147.006.13.01 | CSV - Core Staff Svcs | Construction | 321,575 |
| CE.000147.006.13.02 | CSV - Inspection Svcs | Construction | 363,799 |
| CE.000147.006.13.03 | CSV - Survey Svcs | Construction | 3,324 |
| CE.000147.006.13.04 | CSV - X-Ray / UT Svcs | Construction | 120,742 |
| CE.000147.006.13.05 | CSV - Consulting Svcs | Construction | 31,250 |
| CE.000147.006.13.07 | CSV - General Construction Expns | Construction | 26,886 |
| CE.000147.006.14.01 | ICS - Supply Chain Svcs | Management | 34,039 |
| CE.000147.006.14.02 | ICS - Transmission Svcs | Management | 65,238 |
| CE.000147.006.14.03 | ICS - PR Svcs | Management | 0 |
| CE.000147.006.14.04 | ICS - Legal Svcs | Management | 0 |
| CE.000147.006.14.05 | ICS - Quality & Expediting Svcs | Management | 11,983 |
| CE.000147.006.14.07 | ICS - GR Svcs | Management | 126,500 |
| CE.000147.006.15.05 | GEN - Insurance & Bonds | Management | 0 |
| CE.000147.006.15.06 | GEN - General Expenses | Management | 55,418 |
| CE.000147.006.16.01 | EMP - Engineering Labor & Expens | Management | 822,855 |
| CE.000147.006.16.02 | EMP -Transmission Labor & Expens | Management | 187,069 |
| CE.000147.006.16.04 | EMP - A&G CWIP | Management | 235,684 |
| CE.000147.006.17 | Contingency | Contingency | 0 |
| CE.000147.006.18 | Escalation | Escalation | 0 |
| CE.000147.006.20 | Salvage | Management | (2,038) |
| CE.000147.006.FIN.ALLOC | ALLOCATIONS | Management | 1,891 |
| CE.000147.006.Z.90.90.1 | AEDC | AFUDC | 482,038 |
| CE.000147.006.Z.90.90.2 | AIDC | AFUDC | 84,003 |
| CE.000147.028.16.01 | EMP - Engineering Labor & Expens | Management | 14,269 |
| CE.000147.028.16.06 | EMP - A&G RWIP | Management | 4,935 |
| CE.000147.028.22 | Retirement | Construction | 228,869 |
| | | | **11,523,739** |

**835a**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA; AMERICAN PETROLEUM INSTITUTE, | |
| Petitioner, | Case No. 23-1193 |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, U.S. EPA | |
| Respondents. | |

## DECLARATION OF KENNETH W. GRUBB
## IN SUPPORT OF THE INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA'S MOTION TO STAY THE FINAL RULE OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY PENDING REVIEW

I, Kenneth W. Grubb, declare the following is true and correct:

1.    I am Chief Operating Officer for the natural gas pipelines business unit at Kinder Morgan, Inc. (Kinder Morgan), one of the largest energy infrastructure companies in North America and one of the largest natural gas transporters and natural gas storage operators in North America. I have worked for Kinder Morgan for 33 years, with roles in Market Development, Project Management, Construction, System Design, and Operations.

2.    I have a Bachelor of Science degree in Electrical Engineering from Oklahoma State University. In my 33 years with Kinder Morgan, I have held various

1

engineering and leadership roles. For the last eleven years, I have held senior level leadership roles within the natural gas pipeline business unit's operations department. As Chief Operating Officer of natural gas pipelines, my primary responsibility is to ensure safe, reliable, compliant, and efficient operations of the natural gas pipeline network. Part of my responsibilities include helping Kinder Morgan with environmental regulatory compliance, including emissions regulations affecting Kinder Morgan's operations.

3.    I am over 21 years of age. This declaration is based on my personal knowledge and analysis conducted by Kinder Morgan personnel and me.

4.    I am providing this declaration in support of Kinder Morgan's motion to stay the U.S. Environmental Protection Agency's (EPA) Final Rule adopting a federal implementation plan (FIP) for the 2015 ozone National Ambient Air Quality Standards. 88 Fed. Reg. 36,654 (June 5, 2023) (Rule). EPA promulgated the Rule after it concluded that over twenty States had not satisfied the Clean Air Act's requirements, referred to as "Interstate Transport" or "Good Neighbor" requirements. For those states, the Rule imposes emissions limits on certain industrial sources, also referred to as non-electric generating unit (non-EGU) sources (i.e., non-power plant sources). Engines over 1,000 horsepower that are used for pipeline transportation of natural gas are included in the non-EGU source categories covered by the Rule (pipeline engines). The Rule would require compliance for

2

**837a**

pipeline engines beginning May 1, 2026, which is a mere 31 months from the effective date of the Rule. Kinder Morgan's goal in commenting on the proposed Rule and filing a motion for stay has never been to avoid regulation altogether; rather, Kinder Morgan merely holds a sensible expectation of reasonable regulation. Kinder Morgan remains committed to implementing a reasonable and cost-effective solution to reduce ozone-precursor emissions.

5.      As discussed in more detail below, the Rule, if not stayed by the Court, will cause immediate and irreparable harm to Kinder Morgan and the public. For Kinder Morgan, 591[1] pipeline engines are subject to the nitrogen oxides emissions thresholds in the Rule. Somewhere between 360 and 443 of those pipeline engines will require retrofit, depending on whether EPA determines, in its sole discretion, that any individual facility (and the associated pipeline engines) qualifies for facility-wide averaging, discussed in further detail herein.[2]

---

[1]      In its comment letter on the proposed rule, Kinder Morgan estimated that approximately 950 of its engines would be subject to the rule. Kinder Morgan estimates that 591 pipeline engines are subject to the Rule. The difference in the values is primarily due to EPA excluding the gathering and boosting segment of the oil and gas industry from the Rule, and the fact that EPA exempted emergency engines.

[2]      In addition to the discretionary nature of facility-wide averaging, EPA's methodology requires an evaluation of averaging of pipeline engine emissions data on a rolling basis, based on the prior two ozone seasons. This is problematic insofar as the run time of individual pipeline engines at a facility will vary from year-to-year. Thus, depending on the year a pipeline engine may require controls based on averaging, and then the next year, a different pipeline engine may require controls.

6.    The tremendous effort that would be required to retrofit this unprecedented number of existing engines on an incredibly tight timeline will inevitably cause significant service disruptions, including electrical power outages to consumers and industrial customers, home heating outages, and delays to industry supply chains, which pose significant harm to the public interest. The cost to comply with the Rule is **approximately \$1.8 to \$2.1 billion** for pipeline engines operated by Kinder Morgan (which are all either fully or partially owned by Kinder Morgan). Kinder Morgan is anticipating spending <u>\$80 million</u> over the course of the next 12 to 18 months, assuming that the FIP remains stayed in eight states as a result of pending litigation and/or EPA's Interim Final Rule.[3] If the stays of the FIP were lifted across those states, Kinder Morgan anticipates it would be required to incur an *additional* <u>\$190 million</u> in the next 12 to 18 months.[4] In the Interim Final Rule in

_____

Over the course of the next five to ten years, Kinder Morgan's analysis indicates that nearly every individual engine is likely to require controls, which makes the financial (or cost-effective) benefit of facility-wide averaging largely obsolete. To address this issue, Kinder Morgan considered facility-wide averaging assuming its pipeline engines will operate 24 hours a day, 7 days a week, 365 days a year. This approach is different than EPA's formula in the Rule, which states an operator should use the highest consecutive 30-day operating period during the ozone season from the past two years for each pipeline engine.

[3]    EPA, *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial Stays of SIP Disapproval Action for Certain States*, released July 6, 2023, unpublished, EPA-HQ-OAR-2021-0668; FRL-8670.2-03-OAR (Interim Final Rule).

[4]    This cost estimates the retrofits that Kinder Morgan expects available vendors can reasonably achieve in the next 12 to 18 months.

4

particular, EPA did not expressly stay the effective date of the Rule for pipeline engines. Kinder Morgan and other industry cannot rely on EPA's uncertain regulatory action.[5]

7.    Importantly, for nearly 75 percent of Kinder Morgan's engines (329 of 443) that will require retrofit, the cost-per-ton to install the required emissions control technologies will exceed $7,500, which is the cost-effectiveness threshold that EPA stated it used to initially select which emissions controls and thresholds to mandate in its Proposed FIP.[6] In some cases, Kinder Morgan's costs-per-ton are in excess of $100,000 for an individual pipeline engine, and Kinder Morgan estimates that more than 216 (of 443) pipeline engines would cost more than $20,000 per ton of nitrogen oxides emissions reduced.[7]

---

[5]    Interim Final Rule, at 12 ("At the time of this rulemaking, the EPA cannot predict how the Agency's future action may affect the amendments being finalized in this action.")

[6]    In arriving at estimated cost-per-ton thresholds, Kinder Morgan evaluated costs compared to a five-year average of the operating hours of the individual engine to balance out any potential high or low years. This is more conservative than EPA's approach which used "actual emissions from the 2019 emissions inventory." 88 Fed. Reg. at 36,733. Kinder Morgan notes, however, that the cost-per-ton analysis it conducted to arrive at the pipeline engine count in this Paragraph 7 does not include the "reservation charge credit" refunds that Kinder Morgan will be required to pay its customers for failure to provide contracted capacity. *See infra* ¶¶ 70−72.

[7]    In arriving at estimated cost-per-ton thresholds, Kinder Morgan evaluated costs compared to a five-year average of the operating hours of the individual engine to balance out any potential high or low years.

5

8.     EPA's facility-wide averaging concept will not reduce the installation costs to the EPA's stated cost-effectiveness threshold. Kinder Morgan's 443 pipeline engines are located across 63 facilities. Applying EPA's facility-wide averaging concept, and considering costs, Kinder Morgan could only apply facility-wide averaging at 29 facilities. Facility-wide averaging would only eliminate 83 engines from requiring retrofit, which is less than 20 percent of Kinder Morgan's engines that require control. Averaging also does not materially reduce costs because, in many cases, it would cost Kinder Morgan more to over-control several engines at a facility, rather than controlling each individual engine to the emissions threshold. Thus, on a per-pipeline engine basis, it will cost more to apply facility-wide averaging than it will to control each individual pipeline engine. Analysis indicates that facility-wide averaging offers no meaningful reductions in costs or the number of pipeline engines requiring retrofits to comply with the Rule. At any rate, costs committed to compliance cannot be recovered if this Court determines that the Rule is unlawful, as Kinder Morgan contends the Court should.

9.     Compounding these astronomical costs is the Rule's unreasonable timetable for compliance. EPA states that industry must start now to meet the compliance deadline: The Rule directs "source owners and operators that they should begin engineering and financial planning . . . to be prepared to meet this implementation timetable." 88 Fed. Reg. at 36,755. As outlined in this declaration,

6

**841a**

even if Kinder Morgan begins planning, design, and other pre-installation work immediately to attempt to meet EPA's emission limits by the compliance deadline of May 1, 2026, Kinder Morgan will not achieve compliance in less than three years.

10.    Considering its real-world experience and depending on whether and to what extent Kinder Morgan could meaningfully apply facility-wide averaging, Kinder Morgan's analysis suggests a realistic completion date of no earlier than March 2029 as the best-case scenario, and December 2030 as the more likely scenario. Both dates are well beyond May 1, 2026. As a result, the Rule would require over 50 percent of Kinder Morgan's pipeline engines be granted a timeline extension, and some retrofits could extend beyond the discretionary timeline extensions the EPA suggests it would *consider*.

11.    Regardless of the timetable, compliance will result in significant interruptions of service to the public. For example, one computer simulation modeling exercise shows that if Kinder Morgan sought to achieve full compliance on one pipeline segment by May 1, 2026, it would fail to fulfill hundreds of thousands of dekatherms/day of natural gas capacity, which equates to a failure to provide natural gas to millions of homes for heat and cooking, and hot water for bathing. These modeling exercises provide only one snapshot of a single Kinder Morgan pipeline segment. These service interruption impacts would be

7

compounding across Kinder Morgan pipelines, as well as the national natural gas pipeline transportation sector.

12.    The failure to provide continuous service will also cause Kinder Morgan to violate its obligations to the Federal Energy Regulatory Commission (FERC) under the Natural Gas Act. Breaks in continuous service require Kinder Morgan to refund charges to natural gas shippers, resulting in additional significant charges and costs that EPA did not consider, up to tens of millions of dollars *per individual pipeline segment*.  Indeed in the example discussed below, the charges were estimated at $120 million for only three segments.

13.    Thus, absent a stay, Kinder Morgan will be irreparably harmed.

**Kinder Morgan is an Indispensable Player in the Natural Gas Supply Chain.**

14.    The natural gas industry involves three basic sectors: production and processing; transmission and storage; and distribution to consumers. Once extracted from the ground, oil and natural gas are transported to processing plants and processed into pipeline-quality natural gas. From there, natural gas transmission pipelines (either intrastate or interstate) move the natural gas to large industrial and commercial customers (such as power companies) and local distribution companies. Local distribution companies then deliver gas to retail consumers like homes and businesses to use for heating, cooking, fueling hot water heaters and other necessities.

8

**843a**

15.    Natural gas transmission pipelines and storage are indispensable steps in the natural gas supply chain. These pipelines form a vast cross-country highway of sorts, connecting sources of natural gas to the ultimate consumers. Natural gas is used to generate electricity for residential, commercial, and industrial applications; to heat and cool our homes; to cook food for our families; to fuel hot water heaters for bathing and to serve other necessary functions that support a basic standard of living. Underground storage of natural gas is similarly critical to the supply chain. As the term implies, underground storage of natural gas involves storing natural gas in underground formations. Storage capacity ensures that sufficient natural gas is available regardless of seasonal ebbs and flows of natural gas production or consumption. It makes gas reliably available to consistently serve basic human needs every hour of every day of every year, including at peak times during the coldest winter nights (for heating) and the hottest summer days (for electric power generation for air conditioning). Figure 1, below, shows how natural gas transmission and storage play a critical role in the natural gas supply chain:

**Figure 1: The Natural Gas Supply Chain**



Source: Adapted from the American Gas Association and EPA Natural Gas STAR Program.

16.     Kinder Morgan has interests in approximately 62,000 miles of natural gas transmission pipelines and owns approximately 700 billion cubic feet of underground storage capacity for natural gas. Kinder Morgan operates within 44 states and has natural gas transmission facilities in 32 states. Kinder Morgan's natural gas transmission pipelines are connected to every important natural gas resource in the lower 48 states, including the Bakken, Eagle Ford, Marcellus, Permian, Utica, Uinta, Haynesville, Fayetteville, Barnett, Mississippi Lime, and Woodford. Kinder Morgan's transportation of natural gas plays a significant role in meeting both the nation's long-term natural gas supply needs as well as its emission-reduction goals, particularly supporting the electricity sector's transition away from coal-fired power plants.

10

**845a**

17.    Approximately 40 percent of the natural gas consumed in the United States is transported by pipelines owned or operated by Kinder Morgan companies. Key Kinder Morgan natural gas pipeline assets include Natural Gas Pipeline Company of America LLC (which serves the high-demand Chicago market); Tennessee Gas Pipeline (which serves the supply-restricted areas in the Northeast including New York City and Boston as well as the Gulf Coast); Southern Natural Gas (which serves the southeastern United States); intrastate pipelines in Texas (the largest producer and consumer of natural gas in the United States); and El Paso Natural Gas Pipeline and Mojave Pipeline (which serve the southwestern United States, including supply-restricted California markets).

18.    Natural gas-fired reciprocating internal combustion engines (i.e., pipeline engines) make it possible for companies like Kinder Morgan to serve these energy markets and provide natural gas for public use. These engines are used at compressor stations along Kinder Morgan's natural gas transmission pipelines to compress the natural gas that Kinder Morgan transports. Compressing the natural gas increases its pressure, enabling the gas to flow along the pipeline system. Compressor stations are typically spaced about 40 to 100 miles apart, depending on topography, pipeline routes, pipeline diameter, and other factors. Natural gas is re-compressed at each station to facilitate its movement to the next station, ultimately arriving at (1) the facilities of industrial consumers including power generation, (2)

11

846a

underground storage facilities for storage until demand increases (like during winter months), or (3) local distribution companies for distribution to residential, commercial, and other industrial consumers.

19.    Although pipeline engines are "engines," these are not the typical engines found in cars. Pipeline engines are very expensive and very large. They weigh at least 100,000 pounds (50 tons) and as much as 365,000 pounds (182.5 tons). To put that weight in perspective, an average pickup truck weighs approximately 5,000 pounds. This means a large pipeline engine weighs the same as approximately 73 pickup trucks. The price of a new pipeline engine typically ranges from about $300,000 (for engines with less than 1,000 horsepower—five times greater than the horsepower of a standard car) to as much as $7 million (for engines larger than 5,000 horsepower).

20.    Protecting public health, safety, welfare, and the environment has always been a priority for Kinder Morgan. Further, per the Company's commitment to sustainable operations, Kinder Morgan is a founding member of ONE Future, a unique coalition made up of members across the natural gas industry focused on identifying policy and technical solutions to improve the management of emissions associated with the production, gathering, processing, transmission, and distribution of natural gas. Members of ONE Future are committed to continuously improving their emissions management to achieve voluntary reductions in emissions and to

assure efficient increased use of natural gas. In connection with Kinder Morgan's membership in ONE Future, the Company joined EPA's Methane Challenge program in 2016. As part of this program, Kinder Morgan committed to achieving a methane emission intensity target of 0.31 percent by 2025. In 2022, Kinder Morgan achieved an emissions intensity of 0.03 percent. Surpassing the 0.31 percent intensity target by such a wide margin reflects Kinder Morgan's deep commitment to reducing emissions from its operations. From 2020 to 2022, Kinder Morgan also achieved voluntary reductions in carbon dioxide equivalent emissions of 10.3 million metric tons and voluntary reductions in methane emissions of 19.1 billion cubic feet, resulting in an estimated $104 million in natural gas saved.

**The Rule Applies to Many of Kinder Morgan's Engines.**

21.    For the first time, the Rule establishes nitrogen oxide emission limits for the natural gas industry's use of reciprocating internal combustion engines in pipeline transportation. The Rule imposes stringent regulations on engines of 1,000 horsepower and greater located in the States EPA says did not satisfy the Clean Air Act's requirements. In particular, under the Rule, "two stroke lean burn" engines must achieve an emissions rate limit of 3.0 grams per horsepower per hour (g/hp-hr), "four stroke lean burn" engines must achieve an emissions rate limit of 1.5 g/hp-hr, and "four stroke rich burn" engines must achieve an emissions rate limit of 1.0 g/hp-hr. By way of comparison and to provide context, in the Rule, EPA assumes

13

**848a**

the uncontrolled industry average emissions rate for a two stroke lean burn engine is 16 g/hp-hr, over five times higher than the emissions threshold required in the Rule. For additional context, the Rule is targeting ozone-precursor emissions to address the maintenance and attainment of the 2015 *Ozone* National Ambient Air Quality Standard. Specifically, this Rule targets nitrogen oxides, as an ozone-precursor. Importantly, nitrogen oxides are not greenhouse gas emissions, and therefore, a reduction in nitrogen oxides does not reduce local, regional, national or global greenhouse gas emissions.

22.    The stringent emissions limits in the Rule can be satisfied only by implementing controls on reciprocating internal combustion engines. "Controls" describe a range of aftermarket technological modifications to engines to limit their emissions. The technical and cost practicability of installing controls on any individual engine depends on site-specific considerations such as space for the installation of the control, the availability of sufficient power, the make, model and age of the engine, and, of course, the emissions reductions required to meet the Rule's requirements. Costs are largely driven by the fact that control technologies are limited, and where they are feasible, it is no small task to address aftermarket retrofit technologies on these engines.

23.    These strict new limits under the Rule apply to approximately 591 of Kinder Morgan's engines, which are located across 90 transmission compressor

stations. Of those 591 engines, nearly 75 percent (about 443 engines) operate above the emissions thresholds in the Rule.[8] Those 443 engines are located across 63 compressor stations. Many of these engines operate close to the emissions thresholds, but would require additional, incremental controls. Notably, 469 of Kinder Morgan's 591 pipeline engine are two stroke lean burn engines, which limits control technologies. Considering cost-effectiveness of the control technologies, Kinder Morgan could only apply facility-wide averaging at 29 of 63 compressor stations. This would exempt only 83 of 443 engines (less than 20 percent) from requiring controls under the Rule, leaving Kinder Morgan at least 360 engines to retrofit by May 1, 2026.

24.    Kinder Morgan offered extensive comments on EPA's proposed rule, including detailed exhibits. Kinder Morgan specifically raised concerns regarding EPA's underlying data (in particular with respect to pipeline engine count and estimated actual emissions), technical feasibility analyses, cost and cost-effectiveness calculations, and unreasonable timelines, among other concerns. Kinder Morgan also offered an alternate proposal for EPA and states to comply with the Clean Air Act, suggesting EPA promulgate a model rule (as it has done in the

---

[8]    While 591 of Kinder Morgan's engines are subject to the Rule (i.e., are larger than 1,000 horsepower), 128 of those engines currently operate below the emissions thresholds in the Rule. Kinder Morgan's efforts to install controls on these 128 engines across the Unites States has taken place over the course of multiple decades.

15

**850a**

past) that each state would adopt, which would both allow emissions averaging at company-wide level within a state, and strictly consider cost-effectiveness and technical feasibility thresholds. Kinder Morgan welcomed the opportunity to engage and dialogue with EPA to identify a reasoned solution. In the interim, Kinder Morgan respectfully requested EPA re-publish a revised proposal and incorporate Kinder Morgan's workable state-wide, company-wide averaging program, coupled with a cost-effectiveness threshold.

**The Rule Imposes Enormous Costs of Compliance on Kinder Morgan.**

25.    The installation of controls at all required engines would require an immense and unprecedented effort on behalf of Kinder Morgan and its contractors. Kinder Morgan has experience installing control equipment at its units, but not on the scale and magnitude as required by the Rule, and certainly not within the mandated timeline of less than three years. Kinder Morgan has already begun extensive planning to comply with the Rule, which requires Kinder Morgan to make immediate expenditures.

26.    Installing the necessary controls to achieve the Rule's required emissions limits will be astronomically expensive, even by EPA's own optimistic estimates. Even incorrectly assuming an average cost-per-ton of $4,981 for pipeline engines, EPA anticipates that operators will be required to spend approximately $425,000 per engine in the year 2026 on installing the required controls. 88 Fed.

**851a**

Reg. at 36,739. Using EPA's incorrect data, for Kinder Morgan's 443 engines alone, EPA's estimate amounts to Kinder Morgan spending more than $188 million. However, using actual and current cost data, Kinder Morgan will spend between **$1.8 and $2.1 billion to comply with the Rule**, which amounts to approximately **$4.74 million (no facility-wide averaging) to $5 million (facility-wide averaging) per pipeline engine**. Interestingly, the overall cost-per-engine would be higher if Kinder Morgan elects to apply facility-wide averaging. This is largely because it will cost Kinder Morgan more per pipeline engine to overcontrol an engine, as opposed to controlling all engines from the start. This result is contrary to EPA's suggestion that Kinder Morgan's costs will decrease dramatically by applying facility-wide averaging.

27.    EPA's cost estimates are wrong because EPA relies on extremely outdated cost data, which is far lower than actual costs Kinder Morgan experiences for available control technology. Even though EPA expressly recognized that the control technologies it selected will not be cost-effective considering the variation of costs associated with different types of technologies and as applied to different types and vintages of engines, the agency nonetheless proceeded with the identified control technologies and associated emissions reductions.

28.    Kinder Morgan has calculated that its costs would be between $1.8 billion and $2.1 billion to install required controls for all of its affected engines to

satisfy the applicable emissions rate limits under the Rule. In the next 12 to 18 months, Kinder Morgan will be required to spend nearly **$80 million** to attempt to comply with the Rule, or **$270 million** if the individual state stays (put in place by other Circuit Courts) are lifted, with no ability to recover the costs from the government. These costs will include but are not limited to the cost of contracting for labor, parts, engineering, planning, permitting, and other capital costs.

29.    Importantly, for 329 (of 443) engines, the costs to achieve the emissions threshold will exceed the $7,500 per ton cost-effectiveness threshold that EPA relied on in its Proposed FIP to determine reasonable control technologies for this segment of industry. Kinder Morgan offered extensive comments during the comment period, producing detailed and site-specific studies of pipeline engines operated by Kinder Morgan, analyzing and demonstrating that the cost-per-ton of nitrogen oxide reduced can be in excess of $600,000 in some circumstances. For this declaration, Kinder Morgan provides a couple of examples of the costs-per-ton estimates (evaluated as of 2022) required to control engines subject to the Rule in the following two paragraphs. Each of these examples were provided to EPA during the comment period.

30.    Kinder Morgan evaluated the costs of adding selective catalytic reduction to a type of two stroke lean burn engine built by Worthington. Kinder Morgan estimates capital costs of $6,215,151 to install a control technology referred

18

**853a**

to as selective catalytic reduction (SCR). The largest component of this cost ($3,138,700) is for the construction contractor (both the primary and secondary), and the second-largest component ($1,326,500) is for the control technology materials. This estimate is dated September 8, 2021, meaning that the inflationary and market (i.e., high-demand) environment has driven these costs up even higher. Further, the resulting cost-per-ton of nitrogen oxide reduced by adding SCR at this engine would be approximately $19,158 per ton, which is far higher than EPA's initial estimates of no more than $7,500 per ton.

31.    In its cost analyses, EPA assumed SCR is the preferred, or most used, technology. That is not the case for Kinder Morgan. SCR is an add-on control system that removes nitrogen oxides from a turbine's exhaust gas by causing a chemical reaction between nitrogen oxides and ammonia gas. The ammonia gas is added prior to the exhaust reaching the SCR catalyst, and the chemical reaction occurs as the exhaust passes through the catalyst chamber. The process requires a significant amount of ammonia in quantities that are regulated by the Occupational Safety and Health Standards, Process Safety Management regulations for hazardous chemicals. Further, even without these other environmental and regulatory challenges, SCR does not function unless the exhaust temperature is sufficiently high. Many of Kinder Morgan's two stroke lean burn engines do not operate at high enough

19

**854a**

temperatures to allow for effective control and therefore SCR is not a universally viable option.

32.    Kinder Morgan also evaluated the costs for a four stroke lean burn engine manufactured by Ingersoll-Rand (model: KVG-310) to meet the Rule's 1.0 g/hp-hr limit. The project would require non-selective catalytic reduction, air-fuel ration controllers, and adding turbochargers to meet the 1.0 g/hp-hr limit, resulting in a total project cost of $5,684,158. Based on the level of emissions reductions achieved, the resulting cost-per-ton of nitrogen oxide reduced would be $684,169, which greatly exceeds EPA's estimates. This estimate reflects the likely costs for all three of Kinder Morgan's four stroke lean burn Ingersoll-Rand Engines.

**Case-by-Case Emissions Exemptions and the Facility-Wide Emissions Averaging Concepts Do Not Meaningful Reduce the Enormous Costs of Compliance on Kinder Morgan.**

33.    Recognizing the cost challenges in the pipeline transportation sector, EPA purports to provide relief through two options: case-by-case exemptions and facility-wide averaging. Neither option provides the requisite relief. And, beyond the substance, when more engines will go through the exception process than the Rule itself, it proves how illogical the Rule is.

34.    The Rule includes a provision for case-by-case exemptions that would allow EPA to approve, at the agency's sole discretion, unit-specific emissions rates. This provision does not eliminate the enormous costs imposed on Kinder Morgan.

Kinder Morgan anticipates that it will need to submit case-by-case requests for at least 250 engines. EPA requires a showing of "extreme economic hardship" to approve a request for a unit-specific emission rate, a term that EPA has not defined (either in narrative or with a cost-per-ton value), and Kinder Morgan has no way to assess what the exemption means. EPA is also requiring all case-by-case requests be submitted to EPA no later than August 5, 2024 (one year after the effective date of the Rule). Each exemption request requires expansive technical, emissions profiling, and cost analysis that are no simple feat. Neither Kinder Morgan nor EPA have processed exemptions on this scale, and EPA has also not offered any anticipated timeline by which applications for individual unit-specific exemptions would be processed. Kinder Morgan cannot rely on a remote, and completely discretionary, chance of relief on only certain, individual engines. To attempt compliance with the Rule, Kinder Morgan must begin implementing engine controls on all of its pipeline engines now, at great expense.

35.    EPA also suggests that the Rule has built-in compliance flexibility to mitigate any costs concerns by way of the EPA's facility-wide averaging proposal. EPA's facility-wide averaging program would allow an operator to take a facility-wide emissions "cap," which would be equal to the total nitrogen oxide emissions allowed for that facility based on the pipeline engine-specific emissions thresholds. In other words, if the average emissions from all the subject pipeline engines at the

facility equal the average emissions thresholds for those pipeline engines under the Rule, then the facility (and all engines) are in compliance. In theory, this provision allows an operator to "over control" some engines to achieve lower emissions than those required by the Rule, and in exchange, other pipeline engines would not require any modification or control.

36.    As a threshold matter, the formula codified in the Rule has an error. If applied strictly as drafted, the equation gives an operator a cap it could most likely never exceed and it would most likely not be required to control any units on the site. The error is that the conversion factor from grams per day to tons per day is improperly applied. These values calculated as codified leaves both the facility-wide average cap and facility-wide average actual emissions in grams per day, not tons per day, with the facility wide average cap multiplied by an additional factor of 907,184.74. I expect this was not EPA's intent. This further undermines EPA's facility-wide averaging approach. For purposes of this declaration, however, Kinder Morgan applied the formula, correcting the equation error.

37.    If applied as corrected, facility-wide averaging would have an operator determine the highest consecutive 30-day operating period during the ozone season from the past two years for each engine. The operator would then calculate the average daily operating hours for each engine, and multiply those hours by the unit's design horsepower and the applicable rule limit (i.e., g/hp-hr). The operator would

22

**857a**

then convert to tons per day for each engine and sum the resultant values to get a facility-wide cap in tons per day of nitrogen oxides. Using facility-wide averaging, theoretically, the facility has the flexibility to apply controls on one or more engines at its facility to meet this facility-wide cap. As explained below, this concept does not work in practice.

38.    EPA extrapolated this theory to its data set of 3,005 pipeline engines subject to the Rule. By its calculation, EPA determined that averaging would only require controls on one-third of all engines in the transmission pipeline sector that are subject to the Rule. If accurate, this would mean that of the 3,005 engines subject to the rule, EPA believes only 905 would require controls. The problem is the very small, and unrepresentative data set EPA used to justify facility-averaging. Specifically, EPA relied on a sample set of ten facilities (a total of 43 pipeline engines) from a total of 713 facilities (and 3,005 pipeline engines). EPA's ten selected facilities average 8.3 engines per facility. As discussed below, that is not representative of the facilities subject to the Rule. Of the 43 engines that EPA deemed to be controlled in the facility-wide averaging plan, only 34 of these engines appear in EPA's 905-engine subset, while the rest of the 9 engines do not (and thus are assumed not subject to emissions thresholds under Rule). EPA also did not consider pipeline engines located at any facility in Louisiana, the state with the highest number of covered pipeline engines under the Rule. Further, the ten facilities

23

**858a**

that EPA evaluated are located in 6 states, which constitutes less than half of the 20 states subject to pipeline engines requirements under the Rule. This is a consequence of selecting sample facilities to use in the facility-wide averaging approach that are biased, non-representative, and represent only a very small sample of the engines in the 905-engine subset. The bottom line is that the sample set that EPA used to extrapolate in support of the entire Rule is not representative of the number of facilities at each compressor station, the technology types, engine design capacity, and annual nitrogen oxide emissions. Furthermore, EPA did not provide documentation on the process that EPA followed while selecting the ten sample facilities.

39.    Figure 2 below shows the distribution of the 905 engines across all 307 facilities subject to the Rule. This distribution reflects that 133 facilities (out of the 307 total facilities, or 43% of the facilities) have only one engine, approximately 58% of the 307 facilities have two or fewer engines, and approximately 90% of the 307 facilities have 6 or fewer engines. By comparison, EPA's ten sample facilities average 8.3 engines per facility, and none of them contain only one engine. This skews EPA's averaging results.

**Figure 2: The Distribution of Engines Across Facilities Subject to the Rule, Compared to EPA's Sample Set**



Sources: Non-EGU Facilities and Units.xlsx; Pipeline Natural Gas - Engine Analysis data

40.     Notably, two of Kinder Morgan's compressor stations were included in the very small sample set of the ten facilities EPA analyzed, and Kinder Morgan can show with precision how EPA's facility-wide averaging analysis does not work. These facilities are Tennessee Gas Pipeline Station 214 and Tennessee Gas Pipeline Station 209.

41.     At Tennessee Gas Pipeline Station 209 (a facility owned and operated by Kinder Morgan), EPA assumed that only 9 of 13 pipeline engines would require controls based on facility-wide averaging. Considering the averaging data only, and

disregarding costs, Kinder Morgan's actual emissions data demonstrates that Kinder Morgan would have to over-control 10 of the 13 pipeline engines to make the facility-wide averaging work. However, neither EPA's emissions averaging calculation (9 engines requiring control) nor Kinder Morgan's (10 engines requiring control) considers cost-effectiveness. Considering costs, it would be more cost-effective for Kinder Morgan to retrofit *all* 13 pipeline engines than it would be for Kinder Morgan to overcontrol 10 pipeline engines. Therefore, the Station 209 example does not support an overall two-thirds cost savings across Rule applicability using facility-wide averaging.

42.    Tennessee Gas Pipeline Station 214 (owned and operated by Kinder Morgan) has a similar result. This facility operates 13 pipeline engines. EPA applied facility-wide averaging and calculated that only 4 of the 13 engines would require controls. This is however, a faulty and non-representative sample. EPA fails to clarify that the remaining 9 engines that EPA says do not require controls are already controlled and operating below the emissions thresholds in the Rule. So realistically, facility-wide averaging at this facility just means every engine onsite requires controls.

43.    This type of discrepancy between EPA's assumptions and reality is rife across Kinder Morgan's fleet. Considering facility-wide averaging on a cost-effective basis, Kinder Morgan's analysis shows it could only apply facility-wide

averaging at 29 of 63 compressor stations, which would eliminate only 83 (of 443) engines from requiring retrofit under the Rule. This is only a 19 percent reduction in engines requiring controls, not the sweeping 67 percent that EPA suggests.

44.    Further compounding the issue, EPA's averaging analysis is based on a moving target. The averaging analysis must consider data on a 30-day rolling emissions average, based on the prior two ozone seasons. Each pipeline engine operates a different number of hours every year. Importantly, the number of hours a pipeline engine runs per year is primarily a function of customer demand for natural gas, which of course varies over time. Kinder Morgan's analysis indicates that because of the "rolling" data that informs averaging, over the course of the next five to ten years, nearly every individual engine is likely to require controls, which makes any financial benefits of facility-wide averaging obsolete.

**The Direct Costs Kinder Morgan Would be Required to Incur to Comply with the Rule Will Restrict Other Planned Business Opportunities.**

45.    Furthermore, the costs Kinder Morgan must divert to comply with the Rule will leave Kinder Morgan unable to pursue other planned business opportunities. Kinder Morgan's long range outlook plans include a variety of business opportunities, including those focused on efficient, greenhouse gas reducing projects. In the future, if Kinder Morgan is capital constrained as a result of the Rule, Kinder Morgan may be unable to pursue similar projects, for example, to build natural gas pipeline facilities to support the retirement of third-party coal-

27

**862a**

fired generating units for replacement with lower carbon power generation (i.e., natural gas). For instance, the energy market often releases requests for proposals for diversified, reliable, and low-cost energy. Kinder Morgan plays an important role in these environmentally responsible and reliable power projects because natural gas is needed to support innovative projects. The following are examples of new-energy projects that Kinder Morgan typically supports: the Kentucky Municipal Energy Agency[9] (soliciting innovative energy proposals, including for natural gas combustion turbines), the Electric Reliability Council of Texas (soliciting qualified loads and generators to make themselves available for deployment in an electric grid emergency),[10] Integrated Resource Plans from Dominion Energy South Carolina, Inc. (evaluating resource adequacy, reliability, and commodity pricing and

---

[9]    Kentucky Municipal Energy Agency, Request for Proposals, *available at* https://www.kymea.org/rfp/ (last visited July 13, 2023).

[10]    Electric Reliability Council of Texas, Inc., Emergency Response Service, *available at* https://www.ercot.com/services/programs/load/eils ("ERS decreases the likelihood of system-wide load shedding by paying qualified scheduling entities (QSE) to make arrangements with residential, commercial and industrial participants to either reduce consumption or increase generation across the grid when called upon by ERCOT. These participants are required to provide an agreed-upon amount of megawatts (MW) within ten to thirty minutes to help prevent or alleviate an actual or anticipated Energy Emergency Alert (EEA) event."); *see also* Electric Reliability Council of Texas, Inc., Emergency Response Service Request for Proposal (Jan. 31, 2023),                    *available                    at* https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.ercot. com%2Ffiles%2Fdocs%2F2023%2F01%2F31%2FRequest-for-Proposal-ERS-AprMay23.docx&wdOrigin=BROWSELINK.

28

**863a**

developing a strategic framework),[11] and Tennessee Valley Authority 2019 Integrated Resource Plan (evaluating resource adequacy and reliability as the TVA power system is required to be self-supporting and operated on a nonprofit basis, at lowest cost rates, as feasible).[12]

46.    The costs required for compliance with the Rule will also divert resources from Kinder Morgan's efforts to modernize facilities, ensure pipeline integrity above and beyond the regulatory requirements, and achieve voluntary additional emissions reductions (*see supra* ¶ 20). For example, in 2023, Kinder Morgan spent approximately $54 million in voluntary operations and maintenance practices and approximately $49 million in voluntary capital projects, both focused on pipeline integrity. Through these voluntary programs, for example, Kinder Morgan conducted additional inline inspections of pipelines beyond what was required by the Pipeline and Hazardous Materials Safety Administration, the

---

[11]    Dominion Energy South Carolina, Inc., 2023 Integrated Resource Plan *available at* https://www.dominionenergy.com/-/media/pdfs/global/company/desc-2023-integrated-resource-plan.pdf (Filed January 30, 2023) ("Although most of the resources added in all build plans are non-emitting resources, the modeling shows that natural gas generation is also needed to support reliability and supply low-cost energy.").

[12]    Tennessee Valley Authority, 2019 Integrated Resource Plan, Volume I – Final Resource Plan (2019), *available at* https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/default-document-library/site-content/environment/environmental-stewardship/irp/2019-documents/tva-2019-integrated-resource-plan-volume-i-final-resource-plan.pdf?sfvrsn=44251e0a_4 ("Gas, storage and demand response additions provide reliability and/or flexibility across all seasons").

purpose of which was to inspect for potential anomalies that require additional investigation and likely remediation to maintain safe operation of the pipelines. The costs of compliance with the Rule will curtail Kinder Morgan from engaging in similar projects planned in the next several years.

47.    Thus, absent a stay, Kinder Morgan will be required to expend resources, not recoverable from the government, at a level contrary to EPA's own cost-effectiveness thresholds and averaging evaluations.

### The Rule's Accelerated Timeline for Compliance Compounds the Costs to Kinder Morgan.

48.    The Rule's compliance deadline of May 1, 2026, to implement all the mandated controls is unreasonable and impossible. Kinder Morgan operates 443 engines that do not currently meet the emissions thresholds. Based on Kinder Morgan's significant real-world experience of deploying emissions reduction technologies on large engines, Kinder Morgan estimates that a realistic completion date is no earlier than March 2029, and December 2030 as the more likely scenario. Both dates are well beyond May 1, 2026. As a result, the Rule would require over 50 percent of Kinder Morgan's pipeline engines be granted a timeline extension, and some retrofits could extend even beyond the discretionary timeline extensions the EPA considered.

49.    Transmission pipeline engines are large, complex pieces of equipment, and retrofitting engines with emissions controls involves a multi-step process with

30

**865a**

long lead times to appropriately stagger control deployment in a manner that ensures continuity of service; engine-specific design, engineering, and procurement of equipment; and contracting with specialized contractors to install and test equipment given the complexity of reciprocating internal combustion engines.

50.    As noted above, nearly 80 percent of Kinder Morgan's pipeline engines are two stroke lean burn engines. There are only two vendors nationwide with the necessary equipment and experience in retrofitting Kinder Morgan's two stroke lean burn engines. These vendors have never processed the scale and magnitude of requests that the Rule forces. Indeed, one of Kinder Morgan's primary contractors has shared that over the last 25 years, it has modified approximately 400 total engines across all of the pipeline transportation industry. This rate of approximately 16 engines a year would not allow Kinder Morgan, let alone the entire pipeline transportation sector, to achieve compliance by May 1, 2026.

51.    Even the study EPA published in support of the proposed timetable identified lack of skilled labor as a concern. The report says the compliance timeline is possible because the skilled labor pool "should be present," or "has likely already grown." EPA Timing Report at 60. No further data was provided to demonstrate this is the case. Kinder Morgan and consumers of natural gas cannot rely on the unpredictable status of the manufacturer's timetable and unsupported prognoses on

31

**866a**

the skilled labor force, the latter of which realistically needs to be in place in the next few months in order to even attempt to comply with the Rule.

52.     In addition, Kinder Morgan faces other hurdles that impact its compliance timeline. Nearly all emissions control projects require permits or permit modifications from EPA or state agencies before an operator is allowed to start construction to physically modify an engine. EPA estimated permitting timeframes range from 6–12 months. In my experience at Kinder Morgan, while minor modifications for permits often take around 90 days, major permit modifications, or new permits, can take 24 months or more to process. These permit applications require significant time from both external consultants and Kinder Morgan staff to complete, often between 65 and 500 total hours to prepare an individual application. For example, as recently as 2021, Kinder Morgan submitted an application for a permit modification to a major source permit to the Louisiana Department of Environmental Quality. The application was of the type that would be required before Kinder Morgan could undertake pipeline engine modifications required by the Rule. That project required 200 hours of consultant and Kinder Morgan staff time to prepare the application and coordinate with the regulatory agency. From start to finish, inclusive of application preparation time, agency processing time, and public comment, permitting for this application took 14 months. This is just one of

32

many real-world examples of realistic permitting timelines caused by factors outside of Kinder Morgan's control, including understaffed state agencies.

53.     Nearly all of Kinder Morgan's facilities where the pipeline engines are located are major sources. This means that if there is any substantial incremental increase in any regulated pollutant, the entire facility (and not just an individual emissions source) will trigger Prevention of Significant Deterioration permitting, which is one of the most complex and lengthy permitting processes required by the Clean Air Act, well beyond even EPA's longer permitting timelines.

54.     Recognizing that its own compliance timeline is incredibly short, EPA attempts to take cover by claiming that publication of the proposed rule "provided roughly an additional year of notice" that operators should begin implementation. 88 Fed. Reg. at 36,755. It would have been entirely irresponsible for Kinder Morgan to expend capital and material costs on a draft proposed rule that is subject to change, and in particular, when the proposal is one of the most highly contested rules EPA has published in the recent past, as evidenced by the numerous pending challenges to the Rule.

### EPA's Discretionary and Limited Timeline Extensions Do Not Address Kinder Morgan's Concerns.

55.     The Rule's provision of compliance deadline extensions on a case-by-case basis does not lessen the concerns on feasibility to comply or costs to comply. As stated above, based on Kinder Morgan's experience, the Rule would require

Kinder Morgan to apply for a discretionary timeline extension for over 50 percent of the pipeline engines in its fleet, and some retrofits could extend even beyond the discretionary timeline extensions to be considered by EPA.

56.     Because the timeline extension is discretionary, Kinder Morgan cannot delay its preparations for compliance with the Rule based on an assumption that EPA will grant an exemption. This is particularly true where, in its June 2023 Interim Final Rule, EPA declined to expressly extend the May 1, 2026 deadline for pipeline engines pending judicial review of the Rule. This omission to extend the timeline speaks for itself. And because the Rule says that even to be considered for an exemption, Kinder Morgan must "take[] all steps possible to install controls for compliance with the applicable requirements," Kinder Morgan must take action now to install emissions controls during the time the appeal is pending in this case. 88 Fed. Reg. at 36,760. Further, whether Kinder Morgan will fail to provide continuous service to its customers (thus violating FERC's continuous service requirements) is not listed as a factor EPA will consider in its assessment of whether to grant an operator more time to achieve compliance.

57.     Finally, the extension process further restricts the compliance timeline because owner or operator must submit the request to EPA at least 180 days before the May 1, 2026 deadline. 88 Fed. Reg. at 36,760. The owner or operator remains subject to the May 1, 2026 until the compliance deadline is granted, which opens

34

**869a**

Kinder Morgan to fines should that extension not be granted in a timely manner. There is no certainty in this completely discretionary path, and Kinder Morgan cannot rely on it. As EPA states, "A denial will be effective on the date of denial." 88 Fed. Reg. at 36,760.

**EPA's Compliance Timetable Fails to Meaningfully Consider the Natural Gas Act's Underlying Purpose of Ensuring Continuity of Service.**

58.    Another critical component of the compliance timeline is ensuring continuity of service consistent with Kinder Morgan's obligation to comply with the Natural Gas Act as implemented by FERC. Protecting continuity of service is a paramount concern for FERC, and natural gas pipelines must remain operational at all times to meet their natural gas delivery obligations. The expedited timeline for the Rule's mandated controls will curtail Kinder Morgan's ability to meet its FERC obligations. It does not appear that EPA considered the central role that the pipeline transportation sector plays in providing natural gas to consumers and to the overall energy generation and electric grid reliability discussion.

59.    According to publicly available information, EPA documented only one meeting with FERC in January 2023, well into the rulemaking process. EPA-FERC Meeting on GNP" Presentation, Dkt. No. EPA-HQ-OAR-2021-0668-1175 (Jan. 9, 2023), https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-1175. It is unclear from the singular EPA memorandum memorializing the meeting whether, for example, EPA received feedback on the Rule as it relates to both the

35

**870a**

electric power industry or the natural gas pipeline transportation industry, both of which fall under FERC's primary jurisdiction. Overall, commenters, including Kinder Morgan, expressed concerns regarding system reliability. EPA did not meaningfully address these important concerns on the record, in particular with respect to pipeline engines.

60.    Because natural gas is a foundational building block in the American economy, natural gas pipeline service interruptions pose significant harms to the public interest. Service interruptions can lead to electric power outages, heating outages, and delays to industrial supply chains.

61.    Given the considerable number of engines that require controls (approximately 360 to 443), Kinder Morgan will not be able to fulfill its obligation of continuity of service in all cases. In particular, based on my knowledge and experience of the complexity of engine installations, I expect that Kinder Morgan will need to take pipeline engines out of service to complete retrofits, timeframes for which will depend on the complexity of the modification.

62.    Ordinarily, most maintenance is completed by the start of the winter season to prevent disruptions to heating season needs. That said, in the south, some maintenance is performed before the summer heat so as not to impact peak cooling season needs. Either way, it is a complex evaluation that is highly sensitive to peak demand on a particular pipeline segment. It is Kinder Morgan's practice that prior

36

**871a**

to the next maintenance season, all approved maintenance and project activities are reviewed and an initial outage schedule is developed. The schedule takes into consideration a variety of factors to minimize interruptions. As impacts are calculated using modeling, consolidation or separation of maintenance and project activities are recommended to minimize outage impacts and durations. These recommendations are reviewed by key stakeholders within Kinder Morgan. A final outage schedule is developed just prior to the start of maintenance, which is then further refined and updated throughout the maintenance season.

63.    To make clear the gravity of Kinder Morgan's concerns regarding system capacity, Kinder Morgan performed computer simulation modeling on two of its transmission pipelines to evaluate the pipeline system capacity impacts that will result during implementation of the Rule. In particular, Kinder Morgan modeled its Tennessee Gas Pipeline (TGP) and the Natural Gas Pipeline Company of America LLC (NGPL) pipelines. TGP is a bi-directional pipeline system that transports natural gas supplied from the Northeastern United States, to diverse end-use demand markets including New York City and Boston in the Northeast, the Louisiana and Texas Gulf Coast, and Mexico, and back. TGP offers more than 1.6 million compression horsepower, 11,760 miles of pipeline, and 75.5 billion cubic feet of working natural gas storage. NGPL is the largest transporter of natural gas into the high-demand Chicago-area market, as well as one of the largest interstate pipeline

37

**872a**

systems in the country. NGPL offers approximately 9,100 miles of pipeline, more than 1 million compression horsepower and 288 billion cubic feet of working natural gas storage. The pipeline system provides its customers access to all major natural gas supply basins.

64.    The model calculated the amount of gas that would not be delivered to Kinder Morgan's customers if Kinder Morgan took engines offline to retrofit or modify with the required control technologies. The amount of gas was calculated in dekatherms per day (Dth/d). For perspective when considering the results of the model, based on information available through the U.S. Energy Information Administration, during the winter months, approximately 1,000 Dth/d of natural gas serves approximately 3,000 homes per day,[13] and 1,000 Dth/d of natural gas in the summer serves approximately 3,600 homes per day.[14] These modeling scenarios were based on June 2023 delivery obligations, and the modeling did not account for any other maintenance or outages, which is expected to have a negative compounding effect on the calculated capacity impacts.

---

[13]    *EIA forecasts U.S. winter natural gas bills will be 30% higher than last winter*, U.S. ENERGY INFORMATION ADMINISTRATION (Oct. 25, 2021), https://www.eia.gov/todayinenergy/detail.php?id=50076#:~:text=For%20househol ds%20that%20use%20natural,demand)%20compared%20with%20last%20winter.

[14]    *EIA expects 2019 summer average residential electricity use to be lowest in five years*, U.S. ENERGY INFORMATION ADMINISTRATION (April 18, 2019), https://www.eia.gov/todayinenergy/detail.php?id=39132.

38

**873a**

65.     Kinder Morgan ran two general scenarios in the model. The first scenario analyzed system capacity impacts on the affected sections of the TGP and NGPL pipelines, assuming Kinder Morgan completed all engine modifications required across those pipeline systems by May 1, 2026.[15] The second scenario analyzed system capacity impacts on the TGP and NGPL pipelines, considering implementation of the engine retrofits in the amount Kinder Morgan reasonably believes it can accomplish by May 1, 2026. In this second scenario, to ensure compliance with the Rule, this second model run assumed that Kinder Morgan would shut-down any engines subject to the Rule as of May 1, 2026 that do not meet the nitrogen oxides emissions thresholds, because the sweeping exceptions to the Rule offer no regulatory certainty. For purposes of this Declaration, I provide a summary of three specific impacts to exemplify the types of capacity constraints that will be caused by the Rule, and which EPA failed to consider.

66.     The first example summarizes the capacity impacts from the first scenario—compliance by May 1, 2026—on a segment of NGPL that services the greater Chicago area. This area is a high-demand market, especially in the winter

---

[15]     Out of an abundance of clarity, Kinder Morgan cannot achieve compliance across its entire fleet by May 1, 2026 due to vendor availability, supply chain, permitting, and the significant number of engines subject to the Rule. This modeling exercise, however, exemplifies the critical component of harm to both the public and Kinder Morgan that EPA failed to consider by requiring a 31-month compliance timeline.

months, which makes this a particularly sensitive market. And, NGPL provides approximately 60 percent of the natural gas to the Chicago area market. The analysis, reflected in Figure 3, below, shows that in the winter heating season months of 2024 and 2025, NGPL would be unable to provide approximately 587,000 Dth/d of natural gas. This equates to an inability to provide the natural gas necessary to heat approximately 1,761,000 homes. This includes the compression located at storage fields on this line, which are required to meet daily peak demand on the coldest, and thus most critical, days in the winter. Implementing the Rule could result in a 20 percent overall deficit in meeting the Chicago market peak demand on winter days. Moreover, the reduction in storage capacity on this system will also substantially increase the cost of natural gas for consumers.

**Figure 3: NGPL Chicago Area Market Capacity Impacts (Scenario 1)**



67.    Kinder Morgan also evaluated a segment of the TGP under the first scenario—compliance by May 1, 2026. This segment of TGP services the Gulf Coast region (Alabama, Mississippi, and Louisiana). The analysis, reflected in Figure 4, below, shows a multitude of capacity impacts, peaking in the winter months of 2024 at a deficit of 277,000 Dth/d of natural gas (Station 555 to 534 impacts). Importantly, this portion of TGP currently serves six power plants. Those power plants generate enough electricity to serve millions of homes, commercial loads, and industrial operations, daily. Kinder Morgan's implementation of the unreasonable deadline in the Rule would impede Kinder Morgan's ability to serve those power plants, which

41

**876a**

in turn would impede the power plants' ability to provide electricity to millions of consumers. This is just one pipeline segment of the TGP system, and multiple other segments will be impacted.

**Figure 4: TGP Gulf Coast Region Capacity Impacts (Scenario 1)**



68.    The following analysis summarizes the capacity impacts modeled on the same TGP Gulf Coast region, assuming a schedule Kinder Morgan reasonably expects to retrofit pipeline engines by May 1, 2026. This model assumes Kinder Morgan shuts down non-compliant pipeline engines after May 1, 2026, as reliance

on any exceptions is not a reasonable regulatory approach. The model shows that there are significant service interruptions, in both winter and summer months. As indicated above, this portion of the TGP system primarily serves power plants, which would means there could be loss of service to consumers, including residential, commercial, and industrial.

**Figure 5: TGP Gulf Coast Region Capacity Impacts (Scenario 2)**



43

69.     By requiring every major transmission pipeline system in the United States to take pipeline engines offline at the same time, the options for temporarily re-routing flow of natural gas to the consumer will be limited. Bottom line, Kinder Morgan is greatly concerned about providing reliable service to the public.

### Kinder Morgan will Face Additional Financial Harm (Not Considered by EPA) For Failure to Provide Continuity of Service in Favor of Compliance with the Rule.

70.     Service interruptions also mean that Kinder Morgan will incur additional financial harm from being unable to meet its FERC obligations to customers—a harm that EPA did not consider, even in its Regulatory Impact Analysis. Natural gas shippers who contract for firm capacity on a FERC-regulated interstate transmission pipeline typically pay two charges to transport gas on a pipeline. The first charge, called a "reservation charge," is based on the amount of pipeline capacity reserved by the shipper. The second charge, called a "usage charge," is based on the actual amount of gas transported by the shipper. When transmission pipeline service is interrupted for any reason, FERC policy requires Kinder Morgan to provide its shippers with "reservation charge credits"—essentially a refund of the reservation charge the shipper paid to reserve pipeline capacity. FERC's policy to refund reservation charges is crafted to ensure that service provided is as reliable as possible to minimize the harm to the public and financial injury caused by service outages.

44

**879a**

71.    By way of example, consider Figure 4, described in Paragraph 67 above. In that example, if TGP failed to deliver the deficit capacity for pipeline segments 500 and 800 shown in Figure 4, over the course of seasons shown along the three highlighted portions of the pipeline system, TGP would have to refund reservation charge credits in the amount of approximately $120 million. This scenario offers just one of many examples of the financial impact Kinder Morgan could incur from failure to ensure continuity of service under the Natural Gas Act. Kinder Morgan will face this situation innumerable times through implementation of the Rule.

72.    EPA did not consider these financial impacts of the required refund of reservation charge credits in its cost analyses. Kinder Morgan's analysis shows that when distributing the $120 million reservation charge credits across the applicable pipeline engines, *each individual engine* will see an additional capital cost in the range of $750,000 to $5,400,000 million, which increases the final cost-per-ton for each pipeline engine by multiple thousands of dollars. This is consequential when the cost threshold is the critical "amount" required by the Clean Air Act.

73.    If Kinder Morgan is put in the untenable position of continuing to provide natural gas services to its customers and the public, but failing to meet the compliance obligations of the Rule, Kinder Morgan would be exposed to civil, and even potential criminal, liability by EPA. For a facility that fails to comply with the

45

**880a**

Rule, EPA can seek a permanent or temporary injunction on the source and/or fines up to $117,468 (adjusted for inflation) per day for each violation (per engine). In addition to the civil penalties, the Clean Air Act includes criminal penalties for knowingly violating a FIP.

### The Rule's Enormous Costs of Compliance are Not Recoverable From the Government.

74.    Given the magnitude of the changes necessary for Kinder Morgan's engine assets to comply with the Rule by the May 1, 2026 deadline, the size and complexity of these engines, and the long lead time for installations, Kinder Morgan will be forced to incur substantial costs during this Court's consideration of the Rule to ensure compliance if the Rule is ultimately upheld. Kinder Morgan simply cannot afford to wait for the resolution of legal challenges to the Rule, or wait for EPA to determine at a later date it is going to extend the May 1, 2026 deadline, before installing controls.

75.    The costs of compliance are not recoverable from EPA or any other branch of federal or state government. For FERC-regulated pipelines, which includes the majority of Kinder Morgan's pipelines subject to the Rule, there is no way to recover these costs through existing FERC-approved rates. There are only limited circumstances, and no guarantee, for recovery of *future* costs through FERC's ratemaking process. For non-FERC regulated pipelines, which includes

several of Kinder Morgan's pipelines subject to the Rule, there is no regulatory mechanism for Kinder Morgan to seek revisions to future rates.

76.    The financial impact of reservation charge credits as described above are also unrecoverable under FERC policy, further exacerbating the financial harm to Kinder Morgan to ensure compliance during the Court's consideration of the Rule.

77.    Nor would the costs be recoverable from Kinder Morgan's vendors. Kinder Morgan must pay significant non-refundable deposits even to secure a vendor's services, which Kinder Morgan must do 6 to 12 months before an engine is offline to ensure continuity of service. Vendors also require timely, and incremental payment as an emissions control project is in development and through to completion. For example, many vendors require 30 percent of a payment due upon acceptance of the purchase order, 20 percent due upon submittal of drawings for approval, 30 percent due upon material shipment, and 20 percent due upon final commissioning of the unit. Once spent, the costs are not recoverable.

78.    As a result, Kinder Morgan will not be able to prioritize the public interest by serving all of its customers. Kinder Morgan also will not recover any costs it incurs for compliance with the Rule, and will not be able to salvage the lost business opportunities resulting from the Rule's forced reallocation of funds. These harms are irreparable and thus preventable only by a stay of the Rule.

47

**882a**

79.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of July, 2023.

_____

Kenneth W. Grubb
Chief Operating Officer
Kinder Morgan, Inc.

**IN THE UNITED STATES CIRCUIT COURT
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA; AMERICAN PETROLEUM INSTITUTE, Petitioners, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, Administrator, U.S. EPA, <br><br> Respondents. | Case No. 23-1193 |

**DECLARATION OF DANIKA YEAGER IN SUPPORT OF INTERSTATE
NATURAL GAS ASSOCIATION OF AMERICA'S MOTION FOR STAY**

I, Danika Yeager, declare that the following is true and correct:

1. I am over the age of twenty-one years old and have personal knowledge of the statements made herein.

2. I am Senior Vice-President of Operations, Projects, Technical and Operational Services, U.S. Natural Gas Pipelines at TC Energy, which is a member of the Interstate Natural Gas Association of America ("INGAA").

3. As the owner and operator of numerous reciprocating internal combustion engines used to support pipeline compressor and storage facilities rated at 1,000 horsepower or more ("pipeline engines"), TC Energy is directly regulated by the Final Rule being challenged, Federal "Good Neighbor Plan" for the 2015 Ozone

1

National Ambient Air Quality Standards, 88 Fed. Reg. 36,654 (June 5, 2023) ("Final Rule").

4. I joined TC Energy in September 2022 after holding executive positions at multiple midstream operator companies, and I possess over 25 years of combined midstream experience spanning operations; health, safety and environment; regulatory compliance; and commercial roles.  I earned a Bachelor of Arts from Mary Washington College in Virginia, a Master of Science from the University of South Carolina, and a Master of Business Administration from Richmond College in London, England.  In my current role, I am responsible for the operation and maintenance of TC Energy's U.S. natural gas pipeline system, which includes 32,000 miles of primarily interstate natural gas transmission pipeline, as well as the design and construction of new facilities associated with those assets.

5. Part of my responsibilities include helping TC Energy prepare to comply with the Final Rule. This declaration is based on my personal knowledge of facts and information related to TC Energy's business and strategy for compliance with the Final Rule, as well as my discussions with direct reports and the company's environmental and engineering staff.

6. I am providing this declaration in support of INGAA's motion to stay the Final Rule. The Final Rule will become effective on August 4, 2023, and it requires

2

**885a**

that pipeline engines with a maximum rated capacity of 1,000 horsepower or more within 20 states[1] comply with certain emission limitations by the beginning of the 2026 ozone season on May 1, 2026, only 31 months from the effective date. 88 Fed. Reg. at 36,654, 36,820.

7. In recent months, numerous Circuit Courts have granted stays pending judicial review of EPA's decisions that disapprove certain Good Neighbor State Implementation Plans. These Good Neighbor "SIPs" provide a necessary predicate for the Final Rule. EPA has since promulgated an interim final rule preventing the federal plan from taking effect in some of the States where courts have stayed EPA's disapproval of the state plan: Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas. *See* Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial Stays of SIP disapproval Action for Certain States, https://rb.gy/z6wfb (prepublication interim final rule signed June 30, 2023). EPA has not yet responded to stays issued for several additional states.

8. As discussed in more detail below, the Final Rule, if not stayed by the Court, will cause immediate and irreparable harm to TC Energy and the public. TC Energy estimates that 303 of the engines it owns and operates are subject to the Final

---

[1] Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and West Virginia.

Rule—10% of all the pipeline engines that EPA estimated. 88 Fed. Reg. at 36,842. Of these 303 engines, 280 engines will likely require retrofitting with controls to comply with the Final Rule.[2]

9. Bringing all 280 units into compliance is expected to be an incredible effort that we anticipate will cost TC Energy **approximately $600 million, up to $75 million of which TC Energy must spend in the next 12 to 18 months**.[3] These estimates do not account for the supply chain challenges and market constraints for necessary expert services as a result of the tight compliance deadlines for retrofitting an exorbitant number of existing engines that will likely increase costs, disrupt service, and compound compliance risk due to resource availability.

10. Compounding these astronomical costs is the Final Rule's unreasonable timetable for compliance. EPA states that industry must start now to meet the compliance deadline: The Final Rule directs "source owners and operators that they should begin engineering and financial planning . . . to be prepared to meet this implementation timetable." 88 Fed. Reg. at 36,755. As outlined in this

---

[2] 82 of these are located in states where the rule will not immediately take effect due to judicial stays.

[3] In its comments on EPA's proposed rule, TC Energy stated that it operates 360 reciprocating internal combustion engines in sixteen affected states that exceed the proposed rule's applicability threshold. Of those, TC Energy estimated that 260 engines would require retrofitting at a cost of approximately $900 million. Since that time, TC Energy has revised its estimates based on changes in the Final Rule and further discussion with vendors.

4

declaration, although TC Energy has begun planning, design, and other pre-installation work to attempt to meet EPA's emission limits by the compliance deadline of May 1, 2026, TC Energy cannot realistically complete retrofitting all 280 engines in less than three years.

11. If not stayed by the Court, the Final Rule will also cause significant disruptions that pose significant harms to the public. Citizens and businesses rely on companies like TC Energy to provide the natural gas they need to heat their homes, cook their food, and run their businesses. That is why the Federal Energy Regulatory Commission ("FERC") regulates capacity: to ensure that citizens are not left without heat in January, for example, and to minimize their vulnerability to the price spikes that accompany severe shortages of natural gas. Put simply, the country cannot afford disruption on this scale—particularly at a time when energy prices are rising dramatically, and when energy security is more important than ever.

### TC Energy's Operations and Final Rule Applicability

12. Through its pipeline subsidiaries, TC Energy operates 57,900 miles of natural gas pipelines and 653 billion cubic feet of storage capacity in North America. TC Energy transports approximately 25% of North America's natural gas to market and continues to build significant natural gas transportation infrastructure to connect new gas supplies to various consuming markets. TC Energy has 303

5

**888a**

Final Rule-impacted reciprocating internal combustion engines ("RICE") in 14 of the 20 regulated states.

13. TC Energy owns 303 RICE with a capacity of 1,000 horsepower or more in the States of Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, Virginia, and West Virginia that are subject to the Final Rule. TC Energy estimate that 280 of its engines will require controls to be retrofitted to achieve compliance with the Final Rule.

14. Natural gas-fired RICE allows TC Energy to serve energy markets nationwide and provide natural gas for public use. These engines are used at compressor stations along TC Energy's natural gas transmission pipelines to compress the natural gas that it transports. Compressing the natural gas increases its pressure, enabling the gas to flow along the pipeline system.

**Costs of Compliance with Final Rule on TC Energy While the Court is Considering INGAA's Challenge**

15. Pipeline engines are large, complex pieces of equipment and retrofitting them involves significant capital costs. Based on our estimates, discussions with contractors, and/or contractor quotes, retrofitting a single pipeline engine with the emission controls required by the Final Rule will range between $585,000 and $6.8 million depending on the engine type, its size, and current configuration. In total, TC Energy has calculated that it will cost approximately $600 million to install controls at *all* of TC Energy's 280 regulated engines. However, as

6

discussed further below, the Final Rule's compliance deadline of May 1, 2026, to implement all the mandated controls is unreasonable and likely unachievable.

16. Because of this aggressive deadline, TC Energy has already begun planning, design and other pre-installation work for all of its affected engines. Retrofitting emission controls involves long lead times to accommodate a multi-step process that includes identifying and analyzing which engines require controls to comply; designing, engineering, and procuring equipment; identifying and selecting a specialized contractor to install and test the equipment; preparing and submitting applications to modify existing permits and obtaining final permits; and finally, installation and testing.

17. The necessary permit modifications will require TC Energy's staff to spend a significant amount of time assembling the information and supporting documentation needed to apply for the necessary permit modifications and to coordinate with state permitting authorities as they process those applications. This typically includes conference calls with state permitting staff, responding to requests for additional information, revisions to the permit application as requested by state reviewers, and meetings with internal staff and third-party consultants. EPA estimates that the necessary permit modifications will take 6 to 12 months, but in TC Energy's experience, the timeline to receive a new permit

7

or complete major modifications to an existing permit is approximately 24 months or more.

18. Another key part of this multi-step process involves designing and engineering emission controls specific to each engine make and model. This requires TC Energy to retain specialized OEM primary combustion control vendors, of which there are few with the necessary experience in designing and installing controls on reciprocating internal combustion pipeline engines. Because these specialized contractors have limited capacity and are already seeing significant increases in demand for their services due to the Final Rule, TC Energy does not expect to be able to complete all the necessary engine retrofits in less than three years.

19. While TC Energy is diligently working with two of these specialized contractors to develop work scopes and budgets for specific unit makes and models, these vendors have indicated that current production and support levels allow only for the completion of approximately 25 units per year from each vendor across the industry. Additional manpower, training, and parts manufacturing to provide the ability to support the industry is only in preliminary stages. Each project from development to commissioning is expected to take 1yr+ for completion. Assuming these vendors can provide staffing dedicated to TC Energy and that current parts production does not diminish, TC Energy anticipates that, at most, it may be able to retrofit no more than 50 engines by the end of 2025.

8

**891a**

20. Assuming it is realistically able to conduct as many as 25 retrofits per year, TC Energy expects it would spend up to $75 million in the next 12 to 18 months. TC Energy will likely prioritize completing retrofits of engines not located within a state subject to a judicial stay of its underlying "Good Neighbor SIP," but TC Energy's cost estimate necessarily includes costs related to planning, design, and other pre-installation work for all its pipeline engines requiring retrofits.

**Impacts on Reliability of Nation's Natural Gas System Due to Compliance with Final Rule**

21. Absent a stay pending judicial review, the Final Rule will have significant impacts on the reliability of the nation's natural gas system. The pipeline engines regulated by the Final Rule are vital to TC Energy's operation of its interstate transmission infrastructure, distributing natural gas to residential, commercial, and industrial users. Citizens and businesses rely on companies like TC Energy to provide the natural gas they need to heat their homes, cook their food, and run their businesses. Consequently, FERC requires interstate pipelines to be able to provide maximum capacity at all times to ensure that citizens are not left without heat in January, and to minimize their vulnerability to the price spikes that accompany severe shortages of natural gas.

22. While the Court is considering INGAA's challenge to the Final Rule, TC Energy will have to begin taking its engines off-line to start emission control installation without the backup capacity needed to meet FERC's requirements. Emission

control installation could take between 12 and 13 months per unit. This means that, over the next 12 to 18 months, TC Energy must shut down pipeline engines for several months at a time, even during the peak summer and winter seasons, threatening the interruption of natural gas services. This threat is significant because every other company subject to the Final Rule will also be attempting to design, procure, and install controls on their pipeline engines at the same time. With pipeline engines for multiple companies being off-line at the same time, the options for temporarily re-routing the flow of natural gas from customers to end users will likely be severely limited and threaten overall system reliability.

23.  Further, failure to meet fully its FERC obligations to its customers could entail significant financial harm to TC Energy, because FERC rules require TC Energy to provide its shippers with "reservation charge credits" to refund what the shipper paid to reserve pipeline capacity, with limited exceptions. EPA's Regulatory Impact Analysis did not consider this potential impact.

24. To ensure reliable transportation of natural gas, TC Energy has a General Plant Maintenance Capital program that is established and funded 24 months in advance of project execution. With the timing of the Final Rule, TC Energy's 2024 and 2025 capital programs have already been established. This means that beginning compliance with the Final Rule now will cause funds earmarked for critical capital maintenance projects to be diverted.

10

**893a**

### Alternative Compliance Pathways in the Final Rule Do Not Eliminate the Harm to TC Energy

25. The Final Rule includes two possible compliance alternatives: case-by-case emissions rates and facility-wide averaging plans. 88 Fed. Reg. at 36,818, 36,820. Neither fully resolves TC Energy's concerns. The first alternative is a case-by-case exemption that would allow EPA to approve, at the agency's sole discretion, unit-specific emissions rates. TC Energy has determined that it may be appropriate to apply for such unit-specific rates for only a few of its pipeline engines subject to the Final Rule. Thus, this provision does not eliminate the enormous costs imposed on TC Energy to attain compliance for the majority of its affected engines.

26. All case-by-case requests must be submitted to EPA no later than August 5, 2024. Each request requires expansive technical, emissions profiling, and cost analysis that would require extensive internal staff time and support by third-party consultants, and assembling such applications would reduce resources TC Energy has available to work toward compliance for other engines. In addition, EPA requires a showing of "extreme economic hardship" to approve a request for a unit-specific emission rate, a term that EPA has not defined (either in narrative or with a cost-per-ton value). Moreover, EPA has also not offered any anticipated timeline by which applications for individual unit-specific exemptions would be processed. Thus—to the extent TC Energy avails itself of

11

**894a**

this alternative compliance option for some of its pipeline engines—there is no guarantee of relief in a timely fashion even for those units.

27. Additionally, TC Energy has conducted a detailed review of the facility-wide averaging option in the Final Rule and determined that it cannot be used to reduce the number of units requiring control. The Final Rule only allows "any owner or operator of an affected unit to *propose* a Facility-Wide Averaging Plan that would, *if approved by EPA*, provide an alternative means for compliance with the emissions limits in this final rule." 88 Fed. Reg. at 36,820 (emphases added). Even assuming TC Energy submitted proposed plans to attempt to utilize the facility-wide averaging alternative, it is unclear what criteria EPA will use to evaluate any proposed plans and therefore no way to know whether EPA would actually approve any proposed plan. Without any reasonable benefit from the facility-wide averaging option or assurance of EPA acting on or even approving a plan in a timely manner, we must proceed to plan to design/engineer/procure controls accordingly.  Therefore, TC Energy will need to install emission controls on practically all its impacted pipeline engines to comply with the Final Rule.

### EPA's Discretionary and Limited Timeline Extensions Do Not Address TC Energy's Concerns

28. The Final Rule provides for case-by-case deadline extensions, but this does not lessen TC Energy's concerns about the feasibility of compliance by May 1, 2026, or that unless stayed by the Court, the Final Rule will require TC Energy to spend

12

**895a**

up to $75 million while INGAA's challenge to the rule is pending. As stated above, due to vendor constraints, TC Energy expects it will—at most—be able to bring no more than 50 engines into compliance by the end of 2025. That means TC Energy would need to apply for a discretionary timeline extension for approximately 230 other engines, and some retrofits could extend even beyond the discretionary timeline extensions to be considered by EPA.

29. Because the timeline extension is discretionary, TC Energy cannot delay its preparations for compliance with the Final Rule based on an assumption that EPA will grant an extension. And because the Final Rule says that even to be considered for an extension, TC Energy must "take[] all steps possible to install controls for compliance with the applicable requirements," TC Energy must take action now to install emissions controls during the time the appeal is pending in this case. 88 Fed. Reg. at 36,760.

30. Finally, the extension process further restricts the compliance timeline because owner or operator must submit the request to EPA at least 180 days before the May 1, 2026, deadline. 88 Fed. Reg. at 36,760. The owner or operator remains subject to the May 1, 2026, deadline until the compliance extension is granted. Even will all reasonable diligence, there is no guarantee that EPA would grant the requested extensions or do so in enough time for TC Energy to make other

13

**896a**

plans. As EPA states, "A denial will be effective on the date of denial." 88 Fed. Reg. at 36,760.

### The Final Rule's Enormous Costs of Compliance are Not Automatically Recoverable, or Not Recoverable at All

31. Without a stay, should the Court later invalidate the Final Rule, TC Energy will have wasted enormous resources attempting to comply with the Final Rule's emission limitations while also potentially disrupting natural gas service nationwide. To the best of my knowledge, the pollution controls that will need to be installed to comply with the Final Rule are not required for compliance with any other federal or state regulation and there is no mechanism to recover the costs of these pollution controls from EPA or any federal entity.

32. The costs of adding controls to comply with the Final Rule are not automatically recoverable from TC Energy's customers, which pay based on fixed rates approved by FERC. If FERC were to approve a change to a rate sometime in the future, which is a lengthy and resource-intensive process, that new rate is applied prospectively and not retroactively to the time-period when the costs were incurred.

33. TC Energy would also be unable to recover costs from its vendors. Assuming vendors can provide staffing for even a portion of the necessary retrofitting projects, TC Energy will be required to pay vendor deposits months in advance of undertaking each project to secure a vendor's services. TC Energy will also

14

**897a**

be required to make incremental payments to each vendor for the design and execution of each project.  Absent a stay, TC Energy must incur these costs to attempt compliance by the Rule's deadline and will not be able to recover these costs from its vendors.

34. If the Court holds the Final Rule unlawful, TC Energy's expenditures to comply with the Final Rule will have been wasted on engine modifications that are unnecessary to meet TC Energy's customer demands. And once implemented, emission controls do not enhance the economic value of engines.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Houston, Texas on this 27th day of July, 2023.

_____ , SVP USNG

Danika Yeager

15

**898a**