Nos. 23-1190, 23-1191, 23-1195, 23-1199

# In the United States Court of Appeals for the District of Columbia Circuit

AMERICAN FOREST & PAPER ASSOCIATION, AMERICA'S POWER, ASSOCIATED ELECTRIC COOPERATIVE, INC., DESERET POWER ELECTRIC COOPERATIVE, MIDWEST OZONE GROUP, NATIONAL MINING ASSOCIATION, THE NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION, OHIO VALLEY ELECTRIC CORPORATION, THE PORTLAND CEMENT ASSOCIATION, WABASH VALLEY POWER ALLIANCE,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

## PETITIONERS' JOINT OPPOSED MOTION TO STAY FINAL RULE

**Michael B. Schon**
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave NW
Washington, DC 20001
(512) 693-8350
mike@lkcfirm.com

**Aaron M. Flynn**
**Allison D. Wood**
**Makram B. Jaber**
MCGUIREWOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006

**Mithun Mansinghani**
LEHOTSKY KELLER COHN LLP
629 W. Main St.
Oklahoma City, OK 73102
(512) 693-8350
mithun@lkcfirm.com

*Counsel for Petitioners National Mining Association*

*Counsel for America's Power, Associated Electric Cooperative, Inc., Deseret Power Electric Cooperative, the National Rural Electric Cooperative Association, Ohio Valley Electric Corporation, the Portland Cement Association, Wabash Valley Power Alliance*


**David M. Flannery**
**Kathy G. Beckett**
**Keeleigh S. Utt**
STEPTOE & JOHNSON, PLLC
707 Virginia Street, East
Post Office Box 1588
Charleston, WV 25326
(304) 353-8000
Dave.Flannery@steptoe-johson.com
Kathy.beckett@steptoe-johnson.com

**Edward L. Kropp**
STEPTOE & JOHNSON PLLC
PO Box 36425
Indianapolis, Indiana 46236
317-946-9882
Skipp.kropp@steptoe-johnson.com

*Counsel for American Forest & Paper Association and Midwest Ozone Group*

ii

**CERTIFICATE AS TO PARTIES,**
**RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rules 18(a)(4), 27, and 28(a)(1)(A), Petitioners certify:

**A. Parties and Amici to these Cases (Nos. 23-1190, 23-1191, 23-1195, and 23-1199)**

　　i.　No. 23-1190, *Am. Forest & Paper Assoc. v. EPA*

　　　　<u>Petitioner</u>: American Forest & Paper Association.

　　　　<u>Respondents</u>: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

　　　　<u>Proposed Intervenors</u>: None at present.

　　　　<u>Proposed Amici</u>: None at present.

　　ii.　No. 23-1191, *Midwest Ozone Group v. EPA*

　　　　<u>Petitioner</u>: Midwest Ozone Group.

　　　　<u>Respondents</u>: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

　　　　<u>Proposed Intervenors</u>: None at present.

　　　　<u>Proposed Amici</u>: None at present.

　　iii.　No. 23-1195, *Associated Electric Cooperative, Inc. v. EPA*

　　　　<u>Petitioners</u>: Associated Electric Cooperative, Inc.; Deseret Generation & Transmission Co-Operative, d/b/a Deseret Power Electric Cooperative; Ohio Valley Electric Corporation; Wabash Valley Power Association, Inc., d/b/a Wabash Valley Power Alliance; America's

iii

Power; National Rural Electric Cooperative Association; Portland Cement Association.

<u>Respondents</u>: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

<u>Proposed Intervenors</u>: None at present.

<u>Proposed Amici</u>: None at present.

iv. No. 23-1199, *National Mining Association v. EPA*

<u>Petitioner</u>: National Mining Association.

<u>Respondents</u>: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

<u>Proposed Intervenors</u>: None at present.

<u>Proposed Amici</u>: None at present.

**B. Parties and Amici to Related Cases in this Circuit**

i. No. 23-1157, *Utah v. EPA*

<u>Petitioner</u>: The State of Utah, by and through its Governor, Spencer J. Cox, and its Attorney General, Sean D. Reyes.

<u>Respondents</u>: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

<u>Proposed Intervenors</u>: Air Alliance Houston; Appalachian Mountain Club; Center for Biological Diversity; Chesapeake Bay Foundation; Citizens for Pennsylvania's Future; Clean Air Council; Clean Wisconsin; Downwinders at Risk; Environmental Defense Fund; Louisiana Environmental Action Network; Sierra Club; Southern

iv

Utah Wilderness Alliance; Utah Physicians for a Healthy Environ-
ment; State of New York; State of Connecticut; State of Delaware;
State of Illinois; State of Maryland; State of New Jersey; State of Wis-
consin; Commonwealth of Massachusetts; Commonwealth of Penn-
sylvania; District of Columbia; City of New York; Harris County,
Texas.

Proposed Amici: None at present.

ii.   No. 23-1181, *Kinder Morgan v. EPA*

Petitioner: Kinder Morgan, Inc.

Respondents: The United States Environmental Protection Agency;
Michael S. Regan, EPA Administrator.

Proposed Intervenors: State of New York; State of Connecticut; State
of Delaware; State of Illinois; State of Maryland; State of New Jersey;
State of Wisconsin; Commonwealth of Massachusetts; Common-
wealth of Pennsylvania; District of Columbia; City of New York;
Harris County, Texas.

Proposed Amici: None at present.

iii.   No. 23-1183, *Ohio v. EPA*

Petitioners: State of Ohio; State of West Virginia; State of Indiana.

Respondents: The United States Environmental Protection Agency;
Michael S. Regan, EPA Administrator.

Proposed Intervenors: State of New York; State of Connecticut; State
of Delaware; State of Illinois; State of Maryland; State of New Jersey;

State of Wisconsin; Commonwealth of Massachusetts; Common-
wealth of Pennsylvania; District of Columbia; City of New York;
Harris County, Texas.

Proposed Amici: None at present.

iv.  No. 23-1193, *Interstate Natural Gas Association of America v. EPA*

Petitioners: Interstate Natural Gas Association of America; Ameri-
can Petroleum Institute.

Respondents: The United States Environmental Protection Agency;
Michael S. Regan, EPA Administrator. Proposed

Intervenors: None at present.

Proposed Amici: None at present.

## C. Ruling Under Review

Petitioners seek review of a final rule promulgated by the Environmental
Protection Agency titled Federal "Good Neighbor Plan" for the 2015 Ozone
National Ambient Air Quality Standards, and published in the Federal Reg-
ister at 88 Fed. Reg. 36,654 (June 5, 2023).

/s/ *Aaron M. Flynn*
**Aaron M. Flynn**

## CERTIFICATE OF COMPLIANCE
## WITH CIRCUIT RULES 18(A)(1) AND (A)(2)

The undersigned certifies that this motion for stay complies with Circuit Rule 18(a)(1). Petitioners have requested relief from EPA in a Request for Stay of the Federal ''Good Neighbor Plan'' for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 36,654 (June 5, 2023), submitted on July 17, 2023. EPA has not acted on that request. Therefore, Petitioners now seek a stay from this Court. In accordance with Circuit Rule 18(a)(2), undersigned counsel notified EPA's counsel by email on July 28, 2023, that Petitioners planned to file this motion for stay. Counsel for EPA has authorized us to represent that the United States opposes this motion and intends to file a response.

/s/ Aaron M. Flynn
**Aaron M. Flynn**

## RULE 26.1 DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioners submit the following statements:

### AMERICAN FOREST & PAPER ASSOCIATION

The American Forest & Paper Association ("AF&PA") is a continuing association of individuals operated for the purpose of promoting the general interests of its membership. The AF&PA represents nearly 87% of the pulp, paper, packaging, and tissue products industry which employes 925,000 skilled workers.  The AF&PA is a "trade association" for the purposes of Rule 26.1 and has no outstanding shares or debt securities in the hand of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in AF&PA.

### AMERICA'S POWER

America's Power is a nonprofit membership corporation organized under the laws of the District of Columbia and is recognized as a tax-exempt trade association by the Internal Revenue Service under Section 501(c)(6) of the Internal Revenue Code. America's Power is the only national trade association whose sole mission is to advocate at the federal and state levels on behalf of coal-fueled electricity, the coal fleet, and its supply chain. America's Power supports policies that promote the use of coal to assure a reliable, resilient, and affordable supply of electricity to meet our nation's demand for energy.

America's Power is a "trade association" within the meaning of Circuit Rule 26.1(b). It has no parent corporation, and no publicly held company owns a 10 percent or greater interest in America's Power.

### ASSOCIATED ELECTRIC COOPERATIVE, INC.

Associated Electric Cooperative, Inc. ("AECI") is a rural electric cooperative that provides wholesale power and high-voltage transmission to its six regional generation and transmission cooperative member-owners. In addition to providing power sales and transmission service to its member cooperatives, AECI also takes and provides transmission service through enabling transmission agreements with and makes off-system power sales to various counterparties in the United States. These six regional generation and transmission cooperatives, in turn, supply wholesale power to fifty-one distribution cooperatives in Missouri, three distribution cooperatives in southeast Iowa, and nine distribution cooperatives in northeast Oklahoma, serving more than 910,000 customers. AECI has no parent company and no publicly held company has a 10% or greater ownership interest in AECI.

### DESERET POWER ELECTRIC COOPERATIVE

Deseret Generation & Transmission Co-Operative d/b/a Deseret Power Electric Cooperative ("Deseret") certifies that it is a nonprofit, regional generation and transmission cooperative, owned by its five member systems, serving approximately 65,000 customers in Utah, Colorado, Wyoming, Nevada, and Arizona. Neither Deseret, nor its member cooperatives issue stock, and therefore no publicly-traded company owns 10% or more of their stock.

**MIDWEST OZONE GROUP**

The Midwest Ozone Group ("MOG") is a 'trade association,' within the meaning of Circuit Rule 26.1(b), as it is a continuing association of organizations and individual entities operated to promote the general interests of its membership on matters related to air emissions and air quality. MOG has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public, although specific individuals in the membership of MOG have done so. MOG has no outstanding shares or debt securities in the hands of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in MOG.

**NATIONAL MINING ASSOCIATION**

The National Mining Association ("NMA") is a nonprofit national trade association within the meaning of Circuit Rule 26.1 that represents the interest of the mining industry, including every major coal company operating in the United States. NMA has approximately 280 members, whose interests it represents before Congress, the administration, federal agencies, the courts, and the media. NMA is not a publicly held corporation and has no parent corporation. No publicly held company has 10% or greater ownership interest in NMA.

**NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION**

Pursuant Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the National Rural Electric Cooperative Association ("NRECA") states that it is the nonprofit national trade association for electric cooperatives. On

behalf of its members, NRECA participates in administrative and judicial proceedings involving or affecting its members' interests. NRECA has no parent company. No publicly held company has a ten percent (10%) or greater ownership interest in NRECA. NRECA is an incorporated entity.

### OHIO VALLEY ELECTRIC CORPORATION

The Ohio Valley Electric Corporation ("OVEC") is a corporation originally formed by a consortium of utility companies for purposes of constructing and operating electric generating units to serve the electric energy needs of uranium processing facilities owned by the United States Department of Energy. OVEC owns the Kyger Creek generating station in Ohio, and OVEC's wholly owned subsidiary Indiana-Kentucky Electric Corporation owns the Clifty Creek generating station in Indiana. OVEC has no parent company. American Electric Power Company, Inc., and Buckeye Power, Inc., each owns greater than 10 percent of the equity in OVEC.

### PORTLAND CEMENT ASSOCIATION

The Portland Cement Association ("PCA"), founded in 1916, is the premier policy, research, education, and market intelligence organization serving America's cement manufacturers. PCA represents a majority of U.S. cement production capacity. PCA promotes safety, sustainability, and innovation in all aspects of construction, fosters continuous improvement in cement manufacturing and distribution, and generally promotes economic growth and sound infrastructure investment. PCA states that it is a "trade association"

for purposes of Circuit Rule 26.1(b). PCA has no parent corporation, and no publicly held company owns a 10 percent or greater interest in PCA.

**WABASH VALLEY POWER ALLIANCE**

Wabash Valley Power Association, Inc. d/b/a Wabash Valley Power Alliance ("WVPA") certifies that it is a nonprofit, generation and transmission cooperative, owned by twenty-three member-owned rural cooperative systems, serving more than 330,000 homes, businesses, farms, and schools – impacting more than a million people – across 50 counties in Indiana, 30 counties in Illinois, and four counties in Missouri. Neither WVPA, nor its member cooperatives issue stock, and therefore no publicly-traded company owns 10% or more of their stock.

# TABLE OF CONTENTS

Table of Authorities ........................................................................... xiv

Glossary ............................................................................................ xvi

Introduction ........................................................................................1

Background ..........................................................................................2

    I.   Statutory Background ................................................................2

    II.  The Final Rule ...........................................................................3

    III. Procedural History ..................................................................4

Argument .............................................................................................5

    I.   Petitioners are likely to prevail..............................................6

        A.  The Final Rule is designed to result in unlawful over-
            control of electric generating units. ..................................6

        B.  EPA failed to evaluate questions that are fundamental
            to the viability of the Final Rule. ...................................10

        C.  The various stays of EPA's State Plan disapprovals
            eliminate the bases for the Final Rule...........................14

    II.  Petitioners will suffer irreparable harm absent a stay.......................18

    III. The balance of equities and the public interest favor a stay............20

Conclusion........................................................................................22

# TABLE OF AUTHORITIES

Page(s)

## Cases

*EPA v. EME Homer City Generation, L.P., 572 U.S. 489 (2014) ........ 1, 2, 3, 6, 7

In re NTE Connecticut, LLC, 26 F.4th 980 (D.C. Cir. 2022)................................19

Long Island Care at Home. Ltd. v. Coke, 551 U.S. 158 (2007)..............................15

Mexichem Specialty Resins, Inc. v. EPA, 787 F.3d 544 (D.C. Cir. 2015) ............18

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463
    U.S. 29, 43 (1983) ........................................................................ 12, 17

Nat'l Fuel Gas Supply Corp. v. FERC, 59 F.3d 1281 (D.C. Cir. 1995)...............18

North Carolina v. EPA, 531 F.3d 896 (D.C. Cir. 2008) ...................................9, 11

Sierra Club v. EPA, 884 F. 3d 1185 (D.C. Cir. 2018) ...........................................12

Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994)........................................18

Union Elec. Co. v. EPA, 427 U.S. 246 (1976) ....................................................3, 5

Wash. Metro. Area Transit Comm'n v. Holiday Tours, 559 F.2d 841 (D.C. Cir.
    1977) ...............................................................................................................6

Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs., 485 F.
    Supp. 3d 1 (D.D.C. 2020) ................................................................................18

## Statutes

42 U.S.C. § 7407(a)..................................................................................................2

---

* Authorities chiefly relied upon are marked with asterisks.

42 U.S.C. § 7410(a)(1) ...................................................................3

42 U.S.C. § 7410(a)(2)(D)(i)(I)........................................................ 1, 2, 3

42 U.S.C. § 7410(c)(1) ...................................................................3

42 U.S.C. §§ 7407(1), 7410(a)(1) ...................................................2

42 U.S.C. §§ 7408, 7409...............................................................2

## Regulations

80 Fed. Reg. 65,292 (October 26, 2015) ...................................................3

88 Fed. Reg. 9,336 (Feb. 13, 2023) ........................................................3

88 Fed. Reg. 36,654 (June 5, 2023) ........ vi, vii, 1, 7, 12, 13, 14, 15, 16, 17, 18, 21

88 Fed. Reg. 49,295 (July 31, 2023) ...……………………………………… 15

# Glossary

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| Final Rule | Federal ''Good Neighbor Plan'' for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 36,654 (Jun. 5, 2023) |
| NAAQS | National Ambient Air Quality Standards |
| ppb | Parts per billion |
| PCA Comments | Portland Cement Association Comments (June 21, 2022) |
| AF&PA Comments | American Forest & Paper Association Comments (June 21, 2022) |

Introduction

The Clean Air Act's Good Neighbor Provision requires States to ensure their emissions do not "contribute significantly" to other states' air quality issues. 42 U.S.C. § 7410(a)(2)(D)(i)(I). EPA may only issue federal Good Neighbor requirements when a state's implementation plan fails to meet the Clean Air Act's basic standards and EPA lawfully disapproves it. *Id.* § 7410(c)(1). The Final Rule here, 88 Fed. Reg. 36,654 (Jun. 5, 2023), is a grouping of Federal implementation plans addressing the 2015 ozone standards for 23 States whose plans EPA rejected. That Rule suffers from serious legal infirmities and cannot remain in effect while this litigation proceeds.

The Supreme Court has made clear EPA's Federal plans may only require emission reductions to the extent necessary to eliminate a State's "significant contribution"—EPA cannot "over-control" a state's emissions. *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 521 (2014) ("*EME Homer II*"). But over-control is precisely what EPA designed its Final Rule to do here. The Final Rule is also arbitrary and capricious because EPA relied on unsupported assumptions in crafting the Rule.

Further, twelve of EPA's State plan disapprovals have been challenged, and five Courts of Appeals have already stayed ten of EPA's disapprovals. While those stays are in effect, EPA's Federal plans for those ten States are inapplicable and unenforceable. Without those States, EPA's plan, which was predicated on emissions trading and reductions from 23 states, looks nothing like EPA's proposed or final rules.

1

Absent a stay, the plan will impose devastating, unrecoverable costs on sources throughout the country, force premature plant closure, and exacerbate electric reliability issues. In light of these extraordinary circumstances, this Court should stay EPA's Final Rule.

## BACKGROUND

### I. Statutory Background

The Clean Air Act's "core principle" is "cooperative federalism." *EME Homer II*, 572 U.S. at 511 n.14. EPA establishes National Ambient Air Quality Standards ("NAAQS") for certain pollutants, including ozone. 42 U.S.C. §§ 7408, 7409. Then each State assumes "primary responsibility for assuring air quality." 42 U.S.C. § 7407(a). Within three years, each State must propose a state implementation plan that "specif[ies] the manner in which [the NAAQS] will be achieved and maintained." 42 U.S.C. §§ 7407(1), 7410(a)(1).

These plans must satisfy several statutory requirements, including the Act's "Good Neighbor" provision. 42 U.S.C. § 7410(a)(2)(D)(i)(I). That provision delegates to each State the task of ensuring no "emissions activity within the State" will emit "in amounts which will … contribute significantly to nonattainment," or "interfere with maintenance," of the NAAQS by "any other State." *Id.*

Once a State develops and submits its plan, EPA "shall approve" the plan "if it meets all of the applicable requirements of" the Act. *Id.* § 7410(k)(3); *see also Union Elec. Co. v. EPA*, 427 U.S. 246, 257 (1976). Only if

2

EPA lawfully determines a State plan violates the statute may EPA promulgate a "Federal implementation plan" for that State. 42 U.S.C. § 7410(c)(1).

EPA's federal plan authority is limited to imposing emissions limitations necessary for Good Neighbor compliance. "EPA cannot require a State to reduce its output of pollution more than is necessary" to ensure the State will not "contribute significantly" to another State's "inability to attain or maintain the NAAQS. " *EME Homer II*, 572 U.S. at 521. If EPA does, it engages in unlawful "over-control." *Id.* at 521-22. "EPA has a statutory duty to avoid over-control." *Id.* at 523.

## II. The Final Rule

In 2015, EPA lowered the NAAQS for ozone from 75 parts per billion ("ppb") to 70 ppb. 80 Fed. Reg. 65,292, 65,293-94 (Oct. 26, 2015). This required States to develop implementation plans for the revised NAAQS, including plans addressing the Good Neighbor provision, within three years. 42 U.S.C. § 7410(a)(1). After States submitted their plans, EPA had a statutory duty to approve or disapprove them within eighteen months. *Id.* § 7410(k)(1)-(3). Instead, EPA delayed *years* before acting on many of these state plans.

When it finally did act, EPA disapproved *en masse* 21 State plans. 88 Fed. Reg. 9,336 (Feb. 13, 2023). EPA then quickly issued a Federal plan for these and two other States in the Final Rule challenged here.

The Final Rule creates a host of new regulatory programs for electric utilities and other industries. Electric generating units must submit to an allowance-based ozone season trading program beginning on August 4, 2023. *Id.*

at 36,657. That trading program starts by using "preset emissions budgets" for each state. *Id.* at 36,662. EPA claims the emissions reductions required by each statewide budget are in the amount necessary to eliminate that State's alleged significant contribution to any downwind State's inability to attain or maintain the NAAQS. *Id.* at 36,657 and 36,667. Nevertheless, EPA imposed additional "enhancements" to the budget system to require that "pollution controls will be operated" even if the States would satisfy their Good Neighbor obligations without such operation. *Id.* Reliability experts and grid operators have noted reliability troubles that the Final Rule will exacerbate. *See* PJM, Energy Transition in PJM (Feb. 24, 2023) at 7 *available at* bit.ly/3YirOCr (noting the combined result of the Final Rule and others has "the potential to result" in "significant generation retirements" in a condensed time); North American Electric Reliability Corporation, 2023 Summer Reliability Assessment Infographic (May 2023) (noting reliability concerns) *available at* bit.ly/3qa6Jh4.

For the first time in any Good Neighbor plan, EPA also has subjected non-power generating industries to stringent emission limitations. The Final Rule covers, among others, cement kilns and boilers in iron mills, steel mills, and pulp, paper, and paperboard mills. *Id.* at 36,658.

### III. Procedural History

EPA's disapprovals of State plans—the statutory prerequisite for issuing Federal plans—have been challenged in twelve States. Five separate Circuits have concluded EPA's actions were likely unlawful as to ten of the State

plans and have stayed EPA's disapprovals.[1] Stay motions are pending for the remaining two States.[2]

Meanwhile, the Final Rule has its own suite of challenges. Individual States and industries have challenged the Federal plan for those particular States and moved courts to stay its applicability to those States or industries.[3] Petitioners in this case have asked EPA for an administrative stay to the *entire* Final Rule. *See* Exhibit B. EPA has not acted on that request, so Petitioners now move for a stay pending resolution of this action.

### ARGUMENT

This Court considers four factors when deciding whether to stay a rule: (1) the likelihood the movant will prevail on the merits, (2) the prospect of irreparable injury to the movant in the absence of a stay, (3) the possibility of substantial harm to others if a stay is granted, and (4) the public interest.

---

[1] *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023) (Texas and Louisiana); *id.* (5th Cir. June 8, 2023) (Mississippi); *Arkansas v. EPA*, No. 23-1320 (8th Cir. May 25, 2023); *Missouri v. EPA*, No. 23-1719 (8th Cir. May 26, 2023); *Nevada Cement Company v. EPA*, No. 23-682 (9th Cir. July 3, 2023); *Allete, Inc. v. EPA*, No. 23-1776 (8th Cir. July 5, 2023) (Minnesota); *Kentucky v. EPA*, No. 23-3216 (6th Cir. July 25, 2023); *Oklahoma v. EPA*, No. 23-9514 (10th Cir. July 27, 2023); *Utah v. EPA*, No. 23-9509 (10th Cir. July 27, 2023).

[2] *Alabama v. EPA*, No. 23-11173 (11th Cir. June 13, 2023); *West Virginia v. EPA*, No. 23-1814 (4th Cir. July 18, 2023).

[3] *See, e.g.*, *Kinder Morgan v. EPA*, No. 23-1181 (D.C. Cir. July 27, 2023); *Ohio v. EPA*, No. 23-1183 (July 19, 2023) (stay motion for Ohio, Indiana, and West Virginia).

*Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 842-43 (D.C. Cir. 1977). These factors all weigh in favor of a stay of the Final Rule.

## I.   Petitioners are likely to prevail.

EPA built the Final Rule on requirements designed to over-control sources in upwind states, skirting D.C. Circuit and Supreme Court rulings prohibiting EPA from regulating in that manner. And now, EPA's plan has no valid legal predicate. EPA's State plan disapprovals have been stayed in ten of 23 states, with more stays potentially to come. The Final Rule, effective soon, is therefore not the rule EPA promulgated months ago. No prior Federal plan has changed to this degree after finalization. For these reasons, Petitioners are likely to succeed on the merits.

### A.   The Final Rule is designed to result in unlawful over-control of electric generating units.

EPA can only impose obligations "necessary" to ensure compliance with the Good Neighbor Provision. *EME Homer II*, 572 U.S. at 521. Therefore, EPA "cannot require a State to reduce its output of pollution by more than is necessary to achieve attainment in every downwind State" or by more than would be necessary for a particular state to eliminate all of its "significant[]" contributions to downwind sites. *Id.* Yet even after the Final Rule's emissions budgets purport to eliminate all significant contributions to downwind sites, it imposes additional "enhancements." That, by definition, is over-control.

EPA developed the Final Rule against the backdrop of previous Federal Good Neighbor plans, which set emissions budgets tailored to eliminate

significant contributions to downwind nonattainment. But in this Rule, EPA imposed "enhancements" never included in those prior plans. 88 Fed. Reg. at 36,765 (acknowledging enhancements "modifies" methodology used in prior Good Neighbor rules). EPA first determined what emissions reductions are necessary to ensure compliance with the Good Neighbor provision, as it had with prior rulemakings. 88 Fed. Reg. at 36,754 (projecting emissions budgets to be a "full remedy" by the conclusion of the 2026 ozone season). Then, *on top of that*, EPA imposed enhancements designed to ratchet emissions downward—regardless of whether further reductions from these actions were needed to eliminate significant contribution. *See* 88 Fed. Reg. at 36,764 (explaining "enhancements" are to "better sustain incentives to control emissions over time"); *see also id.* at 36,685.

Most significantly, the enhancements include what EPA calls "dynamic budgeting." Dynamic budgeting reduces the pool of emissions allowances allocated to a State when a power plant shuts down or limits operation. *Id.* at 36,663. Thus, if EPA determined that budgeting a State 2,000 tons of emissions is sufficient to eliminate its significant downwind contributions by 2026, and afterwards a plant in that State that emits 500 of those tons shuts down, dynamic budgeting would reduce the State's emissions budget after 2030[4] to 1,500 tons even though that is, by EPA's own calculations, more than

---

[4] In the Final Rule, EPA modified the proposed dynamic budgeting, purportedly to address reliability concerns, so that budgets would not grow smaller

necessary to eliminate significant contributions. The Rule's requirements, therefore, will continue tightening even after emissions from a State stopped significantly contributing and even after downwind areas have reached attainment. *See id*. at 36,687.

EPA has not shown dynamic budgeting is "necessary" to prevent significant contributions. *See id*. at 36,751 (declining to evaluate over-control after the dynamic budget tightening provisions take effect in 2030). Nor could it: (1) the 2026 budget of a State *already* reflects the reductions sufficient to prevent significant contributions to any another state, so reducing that budget in a later year necessarily results in over-control, and (2) plant closures or curtailments are likely to reduce, not enhance, the need to address cross-state pollution. So EPA's dynamic budgeting requirement is *designed* to result in over-control.

EPA will also "over-control" by "recalibrating" sources' "banked" allowances. Past Good Neighbor plans permitted sources to "carryover" unused allowances. *Id*. at 36,766. Accordingly, when a source reduces emissions below its allocated allowances, it may typically "bank" excess allowances for future use or trade. The Final Rule instead "recalibrates" those banked allowances by a set amount each year to require a preferred

———————————————

during the program's early years. 88 Fed. Reg. at 36,662. In 2030, however, budgets will begin to grow more stringent to reflect changes in the generation fleet. *Id*. at 36,732. The stringency of the budgets will have nothing to do with significant contribution.

"stringency," even if recalibration is unnecessary to reduce significant contribution. *Id.* at 36,663, 36,766.

This Court addressed a similar problem in *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008). There, EPA had designed Good Neighbor requirements not to eliminate significant contributions, but instead to preserve the viability of an entirely separate program (the Title IV Acid Rain Program). The Court rejected EPA's approach because the requirements had nothing to do with addressing significant contribution. *Id.* at 918. Here, EPA intends to purloin allowances even if unnecessary to address significant contribution. That approach suffers from the same flaw as that identified in *North Carolina*.

Finally, EPA imposed a new "backstop daily limit" on top of the allowance trading program, without regard to significant contribution. *Id*. at 36,664. Backstop limits require electric generating units that emit above certain levels to surrender extra allowances, even if they have reduced emissions or purchased allowances to meet their required reductions. *Id.* But EPA already set the allotted emissions allowances at the levels it says are necessary to prevent significant contribution. So each reduction from the "daily backstop limit" is by definition beyond what is necessary to eliminate significant contribution.

In short, by devising "enhancements" that necessarily and inexorably result in over-control, EPA exceeds its statutory authority.

9

B.  **EPA failed to evaluate questions that are fundamental to the viability of the Final Rule.**

EPA also acted arbitrarily and capriciously when imposing limits on categories of emissions sources, including electric generating units and the cement, steel, and paper industries.

### 1.  Electric Generating Units

The Final Rule's "enhancement" provisions lack reasoned bases. EPA asserts, for instance, the enhancements *might* reduce "peak ozone days," but EPA has not analyzed the issue or cited a shred of evidence in support. EPA simply assumed generating units fail to use their controls prior to peak concentrations, emissions of upwind generating units significantly contributed to those peaks, and the enhancements will address those problems, assuming they exist. *See id*. at 36,767-68. Likewise, EPA based its adoption of the backstop daily limits on "suggest[ions]" from downwind communities and speculation about future increases in peak ozone days. *Id*. at 36,767. Such pure speculation cannot provide a sufficient basis for imposing a burdensome new requirement.

EPA also failed to address risks to electric reliability and the viability of the allowance market after reducing allowances through "enhancement." EPA acknowledged a vibrant allowance market is crucial to maintaining electric reliability through "compliance flexibility." *See id*. at 36,766 n.295 (stating a liquid market is crucial to the rule), *id*. at 36,771 (responding to comments on reliability). But EPA wrongly assumed that because past

trading programs (with no enhancements) did not impact reliability, this new trading program *with* enhancements would not either. *Id.* EPA admits the Final Rule involves fundamental "adjustment[s]," *id*. at 36,688, and it was arbitrary and capricious to ignore the likelihood those changes will harm reliability.

### 2. Cement Kilns

EPA's analysis of the cement industry was likewise unsupported. In its proposed rule, EPA wrongly assumed cement plants in affected states did not have any existing controls. Based on this assumption, EPA concluded these kilns could achieve significant emission reductions at a price EPA deemed cost-effective by installing selective catalytic reduction or selective non-catalytic reduction controls. *See* Exhibit C, Portland Cement Association Comments at 9 (June 21, 2022) ("PCA Comments"). But three quarters of the 47 kilns EPA evaluated already had selective non-catalytic reduction controls, so EPA's cost-effectiveness analysis was incorrect: installing new controls would impose high costs, as EPA acknowledged, but the emissions reductions from those additional controls would be much smaller than assumed. *Id*.[5]

EPA then carried forward its false assumptions regarding controls when evaluating emissions from the industry. Because it falsely assumed cement

---

[5] EPA also failed to evaluate 16 additional kilns subject to the rule without any basis for doing so. PCA Comments at 10.

kilns are not currently controlling their emissions at all, EPA projected 2023 emissions to be 9% higher than 2016 baseline emissions, even as emissions continue to trend downwards. *Id*. at 9-10. EPA then relied on its incorrect projections to determine cement sources had a significant impact. 88 Fed. Reg. at 36,739 (showing projections of reductions with what EPA falsely assumed would be "additional" controls). If EPA had used correct data, it would have excluded the cement industry from the Plan using its own methodology. PCA Comments at 10.

Because EPA used fundamentally false assumptions rather than the available data to analyze cement kilns, the Final Rule is arbitrary and capricious. *See Sierra Club v. EPA*, 884 F. 3d 1185, 1198 (D.C. Cir. 2018) (an action is arbitrary and capricious when based on assumptions that run "counter to the only empirical evidence EPA ha[s] before it" (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*")).

### 3.   Steel Industry

The Final Rule requires steel industry reheat furnaces to install Low NOx Burners by 2024. 88 Fed Reg 36,879. EPA did not include this requirement in the proposed rule. The steel industry therefore had no opportunity to comment on the use of this technology, much less adequate time to accomplish required engineering, procurement, installation, and operation required by the Final Rule. In addition, the Final Rule arbitrarily offers no reasoned explanation for the imposition of monitoring requirements on certain steel

industry boilers. Balserak Decl. (Ex. D) ¶¶6-8. These unexpected and unjustified requirements are arbitrary and capricious.

### 4. Paper Industry

EPA's decision to include pulp and paper-industry fossil fuel-fired boilers in the Final Rule was arbitrary and capricious.

First, EPA arbitrarily determined paper industry controls would significantly reduce contributions to downwind states. EPA found the average reduction of all non-power sector sources was 0.19 ppb and declared that "significant." *Id.* at 36,748. But EPA's data show the maximum estimated improvement at any receptor from EPA's onerous controls on 25 pulp and paper boilers is only 0.0117 ppb. *See* Exhibit E, American Forest & Paper Association Comments, (June 21, 2022), Docket ID No. EPA-HQ-OAR-2021-0668-0516 ("AF&PA Comments"), p. 6; EPA's Non-EGU Screening Assessment Memo, Docket ID No. EPA-HQ-OAR-2021-0668-0150, Table 5, p. 16. This miniscule decrease cannot tangibly eliminate significant contribution by any upwind state to any downwind nonattainment area.

Second, EPA's baseless determination that selective catalytic reduction is an available and appropriate technology for existing paper mill boilers is arbitrary and capricious. *See* 88 Fed. Reg. at 36,738-41, 36,750. This technology has never been required for existing paper mill boilers in the U.S. because there are unknown engineering and operational challenges. Noe Decl. (Ex. F) ¶12. Further, EPA arbitrarily assumed 90% emissions reduction from technology that has never been applied to pulp and paper mill boilers.

13

AF&PA Comments at 28. EPA overstated the assumed emission reductions for this sector, and wrongly assumed its proposed controls would cost-effectively and significantly reduce cross-state emission contributions. *Id.*

Third, EPA's inclusion of certain paper boilers will impose significantly greater costs than the $7,500/ton threshold used to identify reasonable costs in the proposal. EPA erroneously estimated compliance costs would be $3,800 per ton for paper boilers. EPA's estimate was off by an order of magnitude; the actual cost is $37,900. Noe Decl.¶10. In the Final Rule, apparently realizing it made a calculation mistake, EPA set a cost-effectiveness threshold at $33,900/ton, a significant increase over the proposal. *Id.* Instead of removing industries that exceeded the proposal's cost threshold, EPA created a "technical impossibility" test that it did not propose. 88 Fed. Reg. at 36,748. This fundamentally and arbitrarily changed the standard for determining whether an industry should be included in the Final Rule—without providing notice, an opportunity for public comment, or fair notice of EPA policy. Noe Decl. ¶10. EPA's rule is therefore not a "logical outgrowth" of the proposal.  *Long Island Care at Home. Ltd. v. Coke*, 551 U.S. 158, 174 (2007).

### C. The various stays of EPA's State Plan disapprovals eliminate the bases for the Final Rule.

Five circuits have held EPA likely acted unlawfully when it disapproved State implementation plans to address Good Neighbor requirements and have stayed EPA's disapprovals. Accordingly, EPA's Final Rule is inapplicable in ten of the 23 states EPA sought to regulate: Arkansas, Kentucky,

Louisiana, Minnesota, Mississippi, Missouri, Nevada, Oklahoma, Texas, and Utah. *Supra* n.1. Two additional states have their own stay motions pending. *Supra* n.2. The stays have fundamentally altered the nature and scope of the multi-state plan EPA proposed, received comments on, and promulgated. The rule before this Court is unsupported by any analysis and must be stayed.[6]

Without this Court's action, the Final Rule will become effective on August 4, 2023, not with the 23-states on which EPA premised its Rule, but with just 13 states (or fewer, if additional stays are granted).

Removing ten states from the Final Rule is even more significant than it may first seem. Eighty-four percent of the power plant emission reductions (and their associated trading program allowances) and fifty-seven percent of the emission reductions from all other sources are now excluded from the Final Rule. *See* Exhibit G, *Good Neighbor Plan for 2015 Ozone NAAQS Maps for power plants and industrial plants*. In other words, in terms of overall effects, burden, and feasibility, the majority of the Final Rule has been altered.

Implementing the Final Rule under such circumstances would be arbitrary and capricious. The Final Rule analyzed and attempted to promulgate

---

[6] On June 29, 2023, EPA released a final interim rule reacting to the stays of the State Plan disapprovals. *See* 88 Fed. Reg. 49,295 (July 31, 2023). The Interim Rule now asserts that the Final Rule will not take effect in the States that obtained stays (as of June 29, 2023) of EPA's state plan disapprovals.

a trading program with 22 states in an emissions allowance market known as "Group 3." 88 Fed. Reg. at 36,657. Now, because of the court-ordered stays and a new Interim Rule purporting to honor them, the vast majority of that market has been fractured into separate market "Groups" with no ability to trade between Groups. *See* Exhibit H, Interim Rule at 11. This significantly limits the availability of allowances and makes it more difficult for electric generating units to comply with the Final Rule's requirements, *see* Farah Decl. (Ex. I) ¶¶11-13  *see also* Brown (Ex. J) ¶19; Alban (Ex. K) ¶¶23, 26; Talley (Ex. L) ¶¶12, 15; Rickerson (Ex. M) ¶¶14-15; Zahn (Ex. N) ¶7; Purvis (Ex. O) ¶¶47-49—all contrary to EPA's basis for the Final Rule.

EPA itself explained the marketplace it envisioned depended on breadth because "[b]roader marketplaces generally provide greater market liquidity and therefore make trading programs better at providing … advantages" such as "cost minimization" and "operational flexibility." 88 Fed. Reg. at 36,766, n.295. Indeed, EPA has recently stated venue for reviewing the Final Rule is appropriate in this Court precisely *because* "the Plan depends on the continuing operation of 'interdependent' interstate mechanisms, like the allowance trading program, that reach beyond state or regional borders." *Tulsa Cement et al. v. EPA*, EPA's Motion to Dismiss or Transfer Petitions for Improper Venue, No. 23-9551 (10th Cir. July 20, 2023). Now, because of the stays, Petitioners face an "interdependent interstate mechanism" that is fundamentally different from the one EPA evaluated and promulgated.

As just one example, the price of allowances is heavily dependent on the availability of those allowances. The number of allowances EPA presumed would be available when it analyzed the cost-effectiveness of the Final Rule is now substantially lower. *See* 88 Fed. Reg. at 36,775. And EPA justified the Final Rule based on its conclusion that "meaningful" air quality improvements would result from inclusion of 22 states, *see* 88 Fed. Reg. at 36,657—a conclusion that is no longer valid.

In short, EPA never analyzed the efficacy or cost-effectiveness of implementing only a portion of the program, as it now intends to do. For this new program, EPA has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

Relatedly, EPA never considered the likely scenario that a significant number of its State plan disapprovals would be stayed or vacated, rendering large portions of the Final Rule in-operable. Commenters alerted EPA to the unlawfulness of the state plan disapprovals (on which the Final Rule itself is predicated), 88 Fed. Reg. at 36,672, and courts across the country have agreed because those disapprovals were "likely" unlawful. *Supra* n.1. Those courts did not create new law, but instead declared what the law always was, including when EPA finalized its Rule. *See Nat'l Fuel Gas Supply Corp. v. FERC*, 59 F.3d 1281, 1289 (D.C. Cir. 1995). Despite all of the warnings and everything EPA knew before it published the Final Rule, EPA failed to consider this "likely" possibility. That was arbitrary and capricious.

## II. Petitioners will suffer irreparable harm absent a stay.

Petitioners will suffer irreparable harm if the Federal Plan is not stayed. "[F]inancial or economic" injuries are "irreparable where no 'adequate compensatory or other corrective relief will be available at a later date in the ordinary course of litigation.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (citation omitted). Economic injuries are irreparable in two situations. First, because sovereign immunity bars recovery of compliance costs, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part); *see also Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020) (same and collecting examples). Second, when unlawful agency action deprives companies of "very significant future revenues" which will be "permanently" lost, even if the action is ultimately overturned, the companies have shown irreparable harm. *In re NTE Connecticut, LLC*, 26 F.4th 980, 991 (D.C. Cir. 2022).

Petitioners face both kinds of irreparable harm. The Final Rule requires Petitioners' sources to reduce emissions drastically. To reach compliance in time, they will have to immediately begin the process of installing prohibitively expensive emissions controls, incurring "hundreds of millions of dollars in capital compliance and construction costs." Farah Decl. ¶12; *see also* Brown Decl. ¶36; Balserak Decl. ¶¶9-10; Maule Decl. (Ex. P) ¶6; Piotrowski Decl. (Ex. Q) ¶5; Toso Decl. (Ex. R) ¶34-36.

Sources that cannot feasibly install new emissions controls will be forced to buy emissions allowances from other parties, decrease their production, or cease operations altogether. Marshall Decl. (Ex. S) at pp.2-3 (explaining sources may need to "reduce generating hours to meet emission restrictions" if "sufficient allowances" are not available); Balserak Decl. ¶8 (explaining sources "will need to immediately make a decision … on whether to upgrade or retire" units); Alban Decl. ¶27 (Final Rule will "likely force many baseload generation assets to retire"); Brown Decl. ¶21 (explaining the Final Rule will require OVEC to either transition a unit to only seasonal production or consider retirement); Toso Decl. ¶37 (PCA member has identified a real possibility it may cease operations). And because there will be both fewer emissions allowances and higher demand as a result of 10 States being removed from EPA's intended Final Rule, utility sources will be forced to either purchase allowances at a significantly higher premium or curtail operations. Farah Decl. ¶11 (explaining a spike in demand for allowance prices in 2022 imposed an additional $50 million in operating costs for a single plant); Brown Decl. ¶20 ("OVEC can no longer rely on a viable allowance trading market … to meet future compliance obligations").

Even setting aside the costs of the emissions controls themselves, electric generating units and industrial facilities will incur significant additional costs related to "the process of initiating engineering, design, and procurement" of controls by 2026 that "would be unnecessary" if the Rule is held invalid. Balserak Decl. ¶7; *see also* Brown Decl. ¶32 (OVEC must begin the

"process immediately" and will "incur costs within the next six months");
Alban Decl. ¶24 (utilities have "very little time to develop power supply
plans and environmental compliance plans"); Purvis Decl. ¶32; Farah Decl.
¶15 ("Mon Power will need to take imminent action in order to comply");
Champion Decl. (Ex. T) ¶9 (Georgia Pacific will be required to "start con-
tracting immediately" to comply "with the tight timeframe"); Maule Decl.
¶7; Kotara Decl. (Ex. U) ¶5; Piotrowski Decl. ¶7; Toso Decl. ¶30.

The paper industry in particular will incur significant costs to design,
install, and operate new controls, some of which have never been applied in
that industry. Noe Decl. ¶12. The capital costs of these investments range
from $45 to $125 million and will impact the market competitiveness of af-
fected mills.  Champion Decl. ¶¶6-8; *see also* Kotara Decl. ¶4.

As noted above, some companies may cease operations at specific
sources altogether. For those sources that must reduce or cease their use of
coal to comply with the Final Rule, the Rule will also drastically harm the
coal mine operators that supply those sources with their fuel. Brock Decl.
(Ex. X) ¶¶15-17; Adams Decl. (Ex. Z), ¶¶10-13; Hamilton Decl. (Ex. V) ¶¶12-
14; Bridgeford Decl. (Ex. W) ¶¶11-14.

## III. The balance of equities and the public interest favor a stay.

The remaining factors also favor a stay. First, a stay will not harm any
other parties. EPA ignored its statutory deadline to disapprove the state
plans it now proposes to replace for years. It cannot now argue a brief stay
will cause sweeping public harms. *See Texas v. EPA*, No. 23-60069, Stay

Order, Slip Op. at 24 (5th Cir. May 1, 2023). Despite the Final Rule's immediate harms to Petitioners, it will not actually result in any significant emission reductions for years. *See* 88 Fed. Reg. at 36,768 (Table VI.B.4.c-1). Nor will a stay interfere with projected future declines in nationwide ozone levels due to existing, robust ozone controls and regulations already in place.

Second, the public interest strongly supports a stay. The significant compliance costs the Final Rule will inflict may be passed on to ratepayers, including some ratepayers who will not be able to bear additional energy costs. Brown Decl. ¶45; Alban Decl. ¶24; Purvis Decl. ¶¶24, 33, 58; Farah Decl. ¶14.

In addition, if regulated companies reduce operations or stop operating altogether, communities around the country will lose jobs and tax revenue. *E.g.*, Fuentes Decl. (Ex. Y) ¶¶5-7; Purvis Decl. ¶¶33, 35, 58; Farah Decl. ¶10; Brock Decl. ¶15. Because the Final Rule will require sources to reduce their reliance on the most reliable power—like coal-fired generation—it will increase grid instability and unreliability. Fuentes Decl. ¶¶5, 8; Alban Decl. ¶¶26, 28; Purvis Decl. ¶¶25, 33, 54; Brown Decl. ¶27. Finally, EPA's disapproval of State plans is being litigated in multiple circuits, and those courts have issued multiple stays. EPA's decision to forge ahead anyway threatens an impossible tangle of regulatory obligations on sources, especially since the Final Rule was designed to work with 23, not 13 (or fewer) states. A stay by this Court will allow orderly review of EPA's unlawful actions.

# Conclusion

For the foregoing reasons, Petitioners request that this Court stay EPA's Final Rule pending completion of judicial review with respect to all States subject to the rule.

Date: August 2, 2023                              Respectfully submitted,

                                                  /s/ Aaron M. Flynn

**Michael B. Schon**                             **Aaron M. Flynn**
Lehotsky Keller Cohn LLP                         **Allison D. Wood**
200 Massachusetts Ave NW                         **Makram B. Jaber**
Washington, DC 20001                             McGuireWoods LLP
(512) 693-8350                                   888 16th Street N.W., Suite 500
mike@lkcfirm.com                                 Black Lives Matter Plaza
                                                 Washington, DC 20006

**Mithun Mansinghani**
Lehotsky Keller Cohn LLP                         *Counsel for America's Power, Associ-*
629 W. Main St.                                  *ated Electric Cooperative, Inc., Deseret*
Oklahoma City, OK 73102                          *Power Electric Cooperative, the Na-*
(512) 693-8350                                   *tional Rural Electric Cooperative Asso-*
mithun@lkcfirm.com                               *ciation, Ohio Valley Electric Corpora-*
                                                 *tion, the Portland Cement Association,*
                                                 *Wabash Valley Power Alliance*
*Counsel for Petitioners National Min-*
*ing Association*

                                                 **David M. Flannery**
                                                 **Kathy G. Beckett**
                                                 **Keeleigh S. Utt**
                                                 Steptoe & Johnson, PLLC
                                                 707 Virginia Street, East
                                                 Post Office Box 1588
                                                 Charleston, WV 25326
                                                 (304) 353-8000

Dave.Flannery@steptoe-johson.com
Kathy.beckett@steptoe-johson.com

**Edward L. Kropp**
STEPTOE & JOHNSON PLLC
PO Box 36425
Indianapolis, Indiana 46236
317-946-9882
Skipp.kropp@steptoe-johnson.com

*Counsel for American Forest & Paper*
*Association and Midwest Ozone Group*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(5)–(7) and D.C. Circuit Rules 27(a)(2) and 32, I certify that: This motion complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because it contains 5,170 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f) and 27(a)(2)(B). This motion complies with the typeface and type style requirements of Fed. R. App. P. 27(d)(1)(E) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word version 16.61 Palatino Linotype 14-point font.

/s/ *Aaron M. Flynn*
**Aaron M. Flynn**

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August, 2023, I filed the foregoing response with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

*/s/ Aaron M. Flynn*
**Aaron M. Flynn**

# Exhibits

Exhibit A ..................................................................................... Final Rule

Exhibit B .......................................... Petitioners' Administrative Stay Request

Exhibit C ..................................................................... PCA Comments

Exhibit D ............................................................... Balserak Declaration

Exhibit E ................................................................... AF&PA Comments

Exhibit F ..................................................................... Noe Declaration

Exhibit G ............................................. Final Rule Emissions Reductions Maps

Exhibit H ........................................................................... Interim Rule

Exhibit I ..................................................................... Farah Declaration

Exhibit J ................................................................... Brown Declaration

Exhibit K .................................................................... Alban Declaration

Exhibit L .................................................................... Talley Declaration

Exhibit M ............................................................... Rickerson Declaration

Exhibit N .................................................................... Zahn Declaration

Exhibit O ................................................................... Purvis Declaration

Exhibit P .................................................................... Maule Declaration

Exhibit Q ............................................................... Piotrowski Declaration

Exhibit R ..................................................................... Toso Declaration

Exhibit S ................................................................. Marshall Declaration

Exhibit T ................................................................ Champion Declaration

Exhibit U ................................................................... Kotara Declaration

Exhibit V ................................................................. Hamilton Declaration

Exhibit W ........................................................................ Bridgeford Declaration

Exhibit X .................................................................................. Brock Declaration

Exhibit Y ............................................................................. Fuentes Declaration

Exhibit Z ................................................................................. Adams Declaration