No. 23-1202 consolidated with 23-1157

Iɴ Tʜᴇ

# United States Court of Appeals
# for the District of Columbia Circuit

ENBRIDGE (U.S.) INC.,

*Petitioner,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN,
Administrator, U.S. EPA,

*Respondents,*

On Petition for Review of the Final Rule of the
U.S. Environmental Protection Agency

## PETITIONER'S MOTION TO STAY THE FINAL RULE
## OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY
## PENDING REVIEW

Laura K. McAfee
BEVERIDGE & DIAMOND, PC
201 North Charles Street, Suite 2200
Baltimore, MD 21201
410-230-1300
lkmcafee@bdlaw.com

*Counsel for Enbridge (U.S.) Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Pursuant to D.C. Circuit Rule 28(a)(1), the petitioner Enbridge (U.S.) Inc. hereby certify as follows:**

### A.     Parties

#### 1.     The following are parties in this Court:

Petitioner is Enbridge (U.S.) Inc.

Respondents are the United States Environmental Protection Agency (EPA) and Michael S. Regan, in his official capacity as Administrator of EPA.

### B.     Rulings Under Review

Enbridge seeks review of EPA's final action promulgating a federal implementation plan (FIP) for 23 States to address the interstate transport requirements of 42 U.S.C. § 7410(a)(2)(D)(i)(I) for the 2015 8-hour ozone national ambient air quality standards.

EPA's final action is titled "*Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality*," and is published in the Federal Register at 88 Fed. Reg. 36,654 (June 5, 2023) (EPA Docket No. EPA-HQ-OAR-2021-0668).

### C.     Related Cases

There are nine related cases that involve substantially the same parties and present the same or similar issues pending before this Court:

- Interstate Natural Gas Association of America v. EPA, No.23-1193 ((D.C. Cir. July 26, 2023)

- *Ohio v. EPA*, No. 23-1183 (D.C. Cir. July 19, 2023)

- *Kinder Morgan, Inc. v. EPA*, No. 23-1181 (D.C. Cir. July 14, 2023)

- *Utah v. EPA*, No. 23-1157 (D.C. Cir. June 20, 2023)

The following petitions for review challenging the portions of the EPA's Final Rule imposing the federal implementation plan on other States are pending before other Circuit Courts:

- *Oklahoma et al. v. EPA*, No. 23-9561 (10th Cir. June 30, 2023)

- *PacifiCorp v. EPA*, No. 23-9557 (10th Cir. June 26, 2023)

- *Texas v. EPA*, No. 23-60300 (5th Cir. June 7, 2023)

- *Nevada Cement Co. LLC v. EPA*, No. 23-1098 (9th Cir. June 5, 2023)

- *Tulsa Cement LLC v. EPA*, No. 23-9551 (10th Cir. June 5, 2023) (and consolidated cases).

/s/ Laura K. McAfee
Laura K. McAfee

ii

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Petitioner

Enbridge (U.S.) Inc. ("Enbridge") makes the following disclosures:

Enbridge (U.S.) Inc. is a wholly-owned subsidiary of Enbridge Inc., a

diversified energy company headquartered in Calgary, Canada.  Enbridge (U.S.)

Inc.'s holdings include natural gas pipelines regulated by the Federal Energy

Regulatory Commission. Enbridge Inc. is a publicly traded company that trades on

the New York and Toronto stock exchanges. Enbridge, Inc. has no parent

companies and no publicly held company owns a 10 percent or greater interest in

Enbridge, Inc.


Respectfully submitted,

 /s/ Laura K. McAfee

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 18(A)(1) AND 18(A)(2)

The undersigned certifies that this Motion to Stay complies with Circuit Rule 18(a).

Enbridge did not request a stay from the EPA because doing so would have been futile. Fed. R. App. P. 18(2)(A); 18(2)(a)(i); Circuit Rule 18(A)(1). EPA has previously stated that it has no legal authority to stay the effectiveness of a rule once that rule has been adopted. *See* 87 Fed. Reg. 13183, 13184-85 (Mar. 9, 2022) (lifting stay of 40 C.F.R. Part 63, Subpart YYYY after finding EPA had no authority to issue stay in the first place).

In accordance with Circuit Rule 18(a)(2), Counsel for Enbridge notified Respondents by email on Wednesday, August 2, 2023, that it planned to file this motion to stay. The respondents stated that they oppose this motion and plan to file a response.

/s/ Laura K. McAfee
Laura K. McAfee

iv

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i
    A.    Parties ...........................................................................................i
        1.    The following are parties in this Court:......................i
    B.    Rulings Under Review ...............................................................i
    C.    Related Cases ...........................................................................i

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ..................................... iii

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 18(a)(1) AND 18(a)(2)...........................................................................................iv

TABLE OF CONTENTS....................................................................................v

TABLE OF AUTHORITIES ......................................................................... vii

GLOSSARY.....................................................................................................xi

LIST OF EXHIBITS ...................................................................................... xii

INTRODUCTION .............................................................................................1

STATEMENT OF THE CASE...........................................................................2

I.     Statutory and Regulatory Background ..................................................2
    A.    State and Federal Implementation Plans ..................................2
    B.    The Interstate Transport Provision...........................................4

II.    Procedural Background ..........................................................................5
    A.    EPA's Adoption of Air Quality Standards for Ozone.........................5
    B.    EPA's SIP Disapprovals and FIPs. ....................................................6

ARGUMENT ....................................................................................................9

I.     Enbridge Is Likely To Succeed On The Merits.....................................9
    A.    The Good Neighbor Rule Violates the "Major Questions" Doctrine. ...............................................................................10
    B.    EPA Failed to Identify the Emissions "Amount" from Non-EGU Sources that Contribute Significantly to Nonattainment. ...................................................................13
    C.    EPA's Rule Is Arbitrary and Capricious. ...........................................15
        1.    EPA failed to consider reliability concerns. .............................15
        2.    EPA's compliance timeline is unsupported by substantial evidence and unrealistic.......................................................17

II.    Enbridge Will Be Irreparably Harmed Absent a Stay. ................................. 19

III.    The Balance of Harms and Public Interest Weigh Heavily in Favor of a Stay. ............................................................................................... 21

CONCLUSION ............................................................................................ 23

CERTIFICATE OF COMPLIANCE ............................................................ 24

CERTIFICATE OF SERVICE .................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  141 S. Ct. 2485 (2021) ........................................................................... 21

*Dist. of Columbia v. USDA*,
  444 F. Supp. 3d 1 (D.D.C. 2020) ........................................................ 20

*EME Homer City Generation, L.P. v. EPA*,
  795 F.3d 118 (D.C. Cir. 2015) ............................................................. 5

*\*EPA v. EME Homer City Generation, L.P.*,
  572 U.S. 489 (2014) ........................................................ 2, 4, 5, 13, 14

*Gas & Water Div. v. Craft*,
  436 U.S. 1 (1978) ................................................................................. 20

*Maryland v. EPA*,
  958 F.3d 1185 (D.C. Cir. 2020) .......................................................... 14

*Mexichem Specialty Resins, Inc. v. EPA*,
  787 F.3d 544 (D.C. Cir. 2015) ............................................................ 20

*Michigan v. EPA*,
  213 F.3d 663 (D.C. Cir. 2000) ............................................................ 14

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................. 9

*North Carolina v. EPA*,
  531 F.3d 896 (D.C. Cir.) ..................................................................... 14

*Sierra Club de Puerto Rico v. EPA*,
  815 F.3d 22 (D.C. Cir. 2016) ............................................................... 3

*Sierra Club v. EPA*,
  863 F.3d 834 (D.C. Cir. 2017) ............................................................ 17

*Sierra Club v. Ga. Power Co.*,
  180 F.3d 1309 (11th Cir. 1999)........................................................... 22

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016).......................................................... 3, 22

*Authorities upon which we chiefly rely are marked with an asterisk.

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ............................................................... 20

*Train v. Nat. Res. Def. Council, Inc.*,
  421 U.S. 60 (1975) ................................................................... 3

*Wages & White Lion Invs. v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ......................................... 20, 21

*Washington v. Reno*,
  35 F.3d 1093 (6th Cir. 1994) ................................................ 21

*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................. 20

STATUTES:

Clean Air Act, § 110

  42 U.S.C. § 7410(a)(1) ....................................................... 3, 6

  42 U.S.C. § 7410(a)(2) .......................................................... 4

  42 U.S.C. § 7410(a)(2)(D)(i)(I) ........................................... i, 4

  42 U.S.C. § 7410(c)(1) .......................................................... 4

  42 U.S.C. § 7410(k) ............................................................... 3

  42 U.S.C. § 7410(k)(3) .......................................................... 3

  42 U.S.C. § 7410(k)(5) ................................................ 4, 6, 12

RULES:

Fed. R. Civ. P. 18 ...................................................................... iv

REGULATIONS:

*National Ambient Air Quality Standards for Ozone*,
  80 Fed. Reg. 65292 (Oct. 26, 2015) ...................................... 6

*Revised Cross-State Air Pollution Rule Update*,
  86 Fed. Reg. 23054 (Apr. 30, 2021) ...................................... 7

*Air Plan Disapproval; Maryland Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standard,*
  87 Fed. Reg. 9463 (Feb. 22, 2022) ....................................... 6

*Air Plan Disapproval; New York and New Jersey Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards,*
87 Fed. Reg. 9484 (Feb. 22, 2022) ...................................................... 6

*Air Plan Disapproval; Kentucky Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards,*
87 Fed. Reg. 9498 (Feb. 22, 2022) ...................................................... 6

*Air Plan Disapproval; West Virginia Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards,*
87 Fed. Reg. 9516 (Feb. 22, 2022) ...................................................... 6

Air Plan Disapproval; Missouri Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards,
87 Fed. Reg. 9533 (Feb. 22, 2022) ...................................................... 6

*Air Plan Disapproval; AL, MS, TN; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards,*
87 Fed. Reg. 9545 (Feb. 22, 2022) ...................................................... 6

*Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, Texas; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards,*
87 Fed. Reg. 9798 (Feb. 22, 2022) ...................................................... 6

*Air Plan Disapproval; Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards,*
87 Fed. Reg. 9838 (Feb. 22, 2022) ...................................................... 6

*Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard,*
87 Fed. Reg. 20036 (Apr. 6, 2022) ...................................................... 6

*Air Plan Disapproval; California; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards,*
87 Fed. Reg. 31443 (May 24, 2022) ...................................................... 6

*Air Plan Disapproval; Utah; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards,*
87 Fed. Reg. 31470 (May 24, 2022) ...................................................... 6

*Air Plan Disapproval; Nevada; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards,*
87 Fed. Reg. 31485 (May 24, 2022) ...................................................... 6

*Air Plan Disapproval; Wyoming; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards,*
87 Fed. Reg. 31495 (May 24, 2022) ................................................... 6

*Air Plan Disapproval; AL; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards,*
87 Fed. Reg. 64412 (Oct. 22, 2022) ................................................... 6

*Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*,
88 Fed. Reg. 9336 (Feb. 13, 2023) ................................................... 7

*Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality,"*
*and is published in the Federal*,
88 Fed. Reg. 36654 (June 5, 2023) ............. 1, 4, 5, 7, 8, 13, 14, 15, 16, 17, 18, 22

## GLOSSARY

| | |
|---|---|
| EGU | Electric Generating Unit |
| EPA | U.S. Environmental Protection Agency |
| FIP | Federal Implementation Plan |
| INGAA | Interstate Natural Gas Association of America |
| Proposed FIP | *Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, 87 Fed. Reg. 20036 (Apr. 6, 2022) |
| NAAQS | National Ambient Air Quality Standards |
| Rule | *Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality,* 88 Fed. Reg. 36654 (June 5, 2023) |
| SIP | State Implementation Plan |

## LIST OF EXHIBITS

| Number | Title |
|--------|-------|
| 1 | "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality," 88 Fed. Reg. 36654 (June 5, 2023) ("Rule") |
| 2 | "$NO_x$ Emissions Control Technology Installation Timing for Non-EGU Sources," Final Report, Prepared for Larry Sorrels, Office of Air Quality Planning and Standards, Submitted by SC&A, Inc., EPA-HQ-OAR-2021-0668-1077, available at https://www.epa.gov/system/files/documents/2023-03/NOx%20Control%20Installation%20Timing_FinalReport_GoodNeighborFinalRule.pdf, (March 14, 2023) ("EPA Timing Report"). |
| 3 | Declaration of Thomas V. Wooden Jr, Vice President ("VP") of the Gas Transmission and Midstream Engineering & Asset Integrity Management for Spectra Energy Transmission Services, LLC, the general partner of Texas Eastern Transmission, LP, which are indirectly owned by Enbridge (U.S.) Inc. |
| 4 | Interstate Natural Gas Association of America ("INGAA") Comments on the Proposed Rule, EPA-HQ-OAR-2021-0668-0501 (June 21, 2022). |
| 5 | Kinder Morgan Comments on the Proposed Rule, EPA-HQ-OAR-2021-0668-0350 (June 21, 2022) ("Kinder Morgan Comments"). |

## INTRODUCTION

Petitioner Enbridge (U.S.) Inc. ("Enbridge") moves to stay the portions of the United States Environmental Protection Agency's ("EPA's") final rule adopting a Federal Implementation Plan for the 2015 ozone National Ambient Air Quality Standards applicable to certain internal combustion engines in the Pipeline Transportation of Natural Gas sector, 88 Fed. Reg. 36654 (June 5, 2023) (the "Good Neighbor Rule" or the "Rule") [Ex. 1], pending this Court's review of that Rule. The Good Neighbor Rule does not comply with the Clean Air Act's interstate transport provision and is arbitrary and capricious. Without a stay, Enbridge will be irreparably harmed, and the reliability of natural gas service would be threatened, risking potentially significant public harm.

Enbridge is a major transporter of natural gas in North America, with over 14,000 miles of pipe and 3.4 million horsepower of compression equipment across 30 States. Enbridge operates 176 engines over 1,000 hp in thirteen States affected by the Rule.  Declaration of Thomas V. Wooden Jr. ("Wooden Declaration") (Ex. 3) ¶ 8.

The Good Neighbor Rule establishes stringent new nitrogen oxide emissions limits across 23 States that EPA claims are contributing to increased pollution levels in nearby States. 88 Fed. Reg. at 36656. Consistent with past rulemakings, the Rule requires operators of power plants within those States to implement

control technologies to reduce emissions. However, for the first time, the Rule also reaches many other types of operations, including pipeline engines, in 20 of these states. But while electric utilities may meet their obligations through a more cost-effective emissions trading program, Enbridge and other natural gas transmission companies must install complex and costly emission controls on hundreds of pipeline engines across the country – on an impossible three-year timetable.

Enbridge and others have petitioned this Court for review of the Good Neighbor Rule. Given the incredibly short timeframe provided for compliance, however, Enbridge cannot afford to delay its compliance efforts until the Court rules on its challenge. Enbridge therefore asks this Court to stay the Rule pending review to mitigate potential irreparable harm to both Enbridge and public health and safety.

## STATEMENT OF THE CASE

## I.    Statutory and Regulatory Background

### A.    State and Federal Implementation Plans

The Clean Air Act is a fundamentally federalist statute: it tasks EPA with establishing air quality standards ("National Ambient Air Quality Standards," or "NAAQS") for certain air pollutants;[1] and then tasks states with the "primary responsibility" for determining how to achieve those standards within the state's

---

[1] *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498 (2014) ("*Homer II*").

jurisdiction.[2]  In effect, EPA determines how "clean" the air must be, and then each state has the discretion to determine how to achieve that goal. As "long as the ultimate effect of a State's choice of emission limitations is compliance with the [NAAQS], the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation." *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975).

States implement these provisions by crafting "State Implementation Plans," often called "SIPs." A SIP is the collection of all state regulations designed to enable the state to attain and maintain compliance with the air quality standards. Within three years after EPA issues or revises a standard, each state must submit a new or revised SIP to EPA explaining how it will either maintain or achieve attainment with that standard. 42 U.S.C. § 7410(a)(1).

EPA reviews each SIP to determine whether it meets all Clean Air Act requirements.  42 U.S.C. § 7410(k).  This role is a "ministerial" one;[3] if a SIP meets the minimum requirements set forth in the Clean Air Act, EPA "*shall* approve*" it. 42 U.S.C. § 7410(k)(3) (emphasis added); *see Sierra Club de Puerto Rico v. EPA*, 815 F.3d 22, 24 (D.C. Cir. 2016).

---

[2] *Michigan v. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001); 42 U.S.C. § 7410(a)(1).
[3] *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) (quotation marks omitted).

If EPA disapproves a SIP, it must give the state an opportunity to modify the SIP to cure any deficiencies. *See* 42 U.S.C. § 7410(c)(1); (k)(5). If the SIP remains out of compliance, EPA has two years to promulgate a Federal Implementation Plan ("FIP") for that state. 42 U.S.C. § 7410(c)(1).

### B.    The Interstate Transport Provision

Each SIP must comply with the Clean Air Act's "good neighbor" provision, which requires "upwind States to reduce emissions to account for pollution exported beyond their borders." *Homer II*, 572 U.S. at 499; 42 U.S.C. § 7410(a)(2)(D). This means a SIP must "contain adequate provisions" to prohibit in-state emissions from "contribut[ing] significantly to nonattainment in, or interfer[ing] with maintenance by, any other State[.]" 42 U.S.C. § 7410(a)(2)(D)(i)(I). Where a SIP does not meet this requirement, EPA must identify the specific "amount" of emission reductions required to prevent such significant contribution. If EPA seeks to compel reductions beyond the appropriate "amount," it "will have overstepped its authority." *Homer II*, 572 U.S. at 521.

Because the Clean Air Act does not specify how EPA must determine the degree of emission reduction required, EPA has defined "amount" to mean the "amount of emissions that is in excess of the emissions control strategies that EPA has deemed cost-effective." 88 Fed. Reg. at 36676. To accomplish this, EPA

employs a "multifactor test that incorporates cost, availability of emissions reductions, and air quality impacts at the downwind receptors." *Id.* at 36660. As part of the analysis, EPA "calculate[s] how much pollution each upwind State could eliminate if all of its sources applied pollution control technologies available at particular cost thresholds." *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 126 (D.C. Cir. 2015) ("*Homer III*").

To do so, EPA estimates the cost-per-ton of available control technologies, repeating the analysis at different cost thresholds until it reaches the "point at which further emissions mitigation strategies become excessively costly on a per-ton basis while also delivering far fewer additional emissions reductions and air quality benefits" – referred to as the "cost-effectiveness threshold." 88 Fed. Reg. at 36683. Once EPA identifies the appropriate cost-effectiveness threshold, it models the emissions anticipated to be reduced through implementation of thee control technologies available at that threshold, which becomes the "amount" that must be reduced. Properly implemented, this approach has been upheld by the Supreme Court as "efficient and equitable." *See Homer II*, 572 U.S. at 519.

## II.    Procedural Background

### A.    EPA's Adoption of Air Quality Standards for Ozone

In October 2015, EPA revised the NAAQS for ozone downward from 75 parts per billion (ppb) to "a level within a range from 65 to 70 ppb." National

Ambient Air Quality Standard for Ozone, 80 Fed. Reg. 65292, 65301 (Oct. 26, 2015). That action triggered the obligation for each state to submit a revised SIP to EPA, including a demonstration of how it would satisfy the "good neighbor" provision of the Act. 42 U.S.C. § 7410(a)(1). All of the States in question submitted SIPs addressing this obligation.

### B.     EPA's SIP Disapprovals and FIPs.

Between February and October 2022, EPA proposed to disapprove 23 of these revised SIPs because the states allegedly failed to comply with their good neighbor obligations.[4] The proposed disapprovals triggered EPA's obligation to ask each State "to revise the plan as necessary to correct . . . inadequacies." 42 U.S.C. § 7410(k)(5).

EPA did not do so.  Instead, before EPA had even disapproved the SIPs – indeed, even before the comment deadline had expired on the *proposed* disapproval, EPA proposed a single FIP implementing the Good Neighbor provisions of the Clean Air Act across all 23 States. *Federal Implementation Plan*

---

[4] *See* 87 Fed. Reg. 9463 (Maryland); 87 Fed. Reg. 9484 (New Jersey, New York); 87 Fed. Reg. 9498 (Kentucky); 87 Fed. Reg. 9516 (West Virginia); 87 Fed. Reg. 9533 (Missouri); 87 Fed. Reg. 9545 (Alabama, Mississippi, Tennessee); 87 Fed. Reg. 9798 (Arkansas, Louisiana, Oklahoma, Texas); 87 Fed. Reg. 9838 (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin); 87 Fed. Reg. 64412 (Alabama)(Alabama withdrew its initial SIP and resubmitted a revised SIP that was also disapproved); 87 Fed. Reg. 31443 (California); 87 Fed. Reg. 31485 (Nevada); 87 Fed. Reg. 31470 (Utah); 87 Fed. Reg. 31495 (Wyoming).

*Addressing Regional Ozone Transport*, 87 Fed. Reg. 20036 (Apr. 6, 2022). In February 2023, the EPA finalized disapproval of the States' SIPs. *Air Plan Disapprovals*, 88 Fed. Reg. 9336 (Feb. 13, 2023). A few months later, it finalized the proposed Good Neighbor Rule, with an effective date of August 4, 2023. 88 Fed. Reg. at 36654.

The Rule represents a substantial and unwarranted expansion of the Agency's authority under the "good neighbor" provision.  Historically, EPA has regulated only electric utilities in a few States, only through an emissions trading program to ensure reductions are cost-effective.  In fact, as recently as 2021, EPA determined that emission reductions for non-electric generating units[5] "were not required to eliminate significant contribution to downwind air quality problems under the interstate transport provision." *See* 88 Fed. Reg. at 36678 (*citing* 86 Fed. Reg. at 23110).

Nevertheless, the Good Neighbor Rule proposed to regulate natural gas pipelines, cement manufacturing, iron and steel mills, ferroalloy manufacturing, glass manufacturing, chemical manufacturing, petroleum and coal products manufacturing, and pulp and paper mills – and to regulate each through stringent unit-specific emissions limits.  87 Fed. Reg. at 20041.  While the final Rule

---

[5] Electric generating units, or "EGUs," are emission sources in the power sector, typically power plants. "Non-EGUs" is the term EPA uses for all other industrial and commercial emissions sources.

decreased the scope of the new program to 20 States, it expanded the scope of covered operations to include metal ore mining.  88 Fed. Reg. at 36659.

The Good Neighbor Rule represents a major expansion of regulatory authority, based on incorrect and incomplete facts and analyses, which will cost literally billions of dollars just within the natural gas pipeline industry, and which requires compliance by an impossible deadline. Given the magnitude of these impacts, the Fifth, Sixth, and Eighth Circuit have stayed EPA's SIP denial in Louisiana, Mississippi, Texas, Arkansas, Missouri, and Kentucky pending judicial review on the merits.[6]

Because EPA may not proceed with a FIP until it has disapproved the SIP for that state, EPA has been forced to stay the Good Neighbor Rule in these six states.  *See Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards: Response to Judicial Stays of SIP Disapproval Action for Certain States*, EPA-HQ-OAR-2021-0668 (June 29, 2023), https://perma.cc/432F-CRFE.  While companies operating within these States are thus protected from the immediate impacts of the Rule, the same is not true for companies operating in the remaining States.  Given the extensive flaws within the Rule itself, and the harm to

---

[6] Order, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023); Order, *Texas v. EPA*, No. 23-60069 (5th Cir. June 8, 2023); Order, *Arkansas v. EPA*, No. 23-1320 (8th Cir. May 25, 2023); Order, *Missouri v. EPA*, No. 23-1719 (8th Cir. May 26, 2023); Order, *Union Electric Co. v. EPA*, No. 23-1751 (8th Cir. May 26, 2023); Order, *Kentucky v. EPA*, No. 23-3216 (6th Cir. May 31, 2023).

both Enbridge and the public, the Court should stay the Good Neighbor Rule

pending its decision on Enbridge's and others' petitions for review.

## ARGUMENT

Courts consider four factors when determining whether to grant a stay: (1)

the likelihood of success on the merits; (2) irreparable injury absent a stay; (3)

irreparable harm to other parties in the case; and (4) the public interest. Cir. R.

8(a)(1), 18(a)(1); *Nken v. Holder*, 556 U.S. 418, 434 (2009). This Court has

previously held that likelihood of success on the merits is the "key issue – often the

dispositive one –" when a party seeks preliminary relief. *Greater New Orleans

Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1083 (D.C. Cir. 2011). The third

and fourth factors merge when the government is the opposing party. *Nken*, 556

U.S at 434–35. Each factor here supports a stay of the Rule.

## I.     Enbridge Is Likely To Succeed On The Merits.

Enbridge is likely to succeed on the merits, because the Good Neighbor Rule

exceeds EPA's statutory authority in two key ways: first, it violates the "Major

Questions" Doctrine; and second, EPA failed to identify the emissions "amount"

from Non-EGU Sources that significantly contributes to nonattainment, thus

failing to comply with its own requirements.  The rule is also arbitrary and

capricious because EPA ignored or misconstrued significant evidence in the record

and failed to respond appropriately to commenters' concerns.  Indeed, three

Federal Circuits have already found that a stay pending review is justified.  *See supra.*

### A.     The Good Neighbor Rule Violates the "Major Questions" Doctrine.

Where an agency seeks to exert sweeping authority over a matter of "vast economic and political significance," the agency must identify "clear congressional authorization" for that claimed power.  *West Virginia v. EPA*, 142 S. Ct. 2587, 2616 (2022) (Gorsuch, concurring).

There can be no question that the Good Neighbor Rule is of "vast economic and political significance.  The Rule applies across almost half of the United States, to emissions sources in multiple major industries, and compliance costs will be unfathomable. Enbridge is only one of many companies affected by the Rule, and it anticipates spending up to $350 million in the next eighteen months alone. Wooden Declaration, ¶ 6.

The Good Neighbor Rule merits careful scrutiny, because "when an agency claims the power to regulate vast swaths of American life, it not only risks intruding on Congress's power, it also risks intruding on powers reserved to the States."  *West Virginia v. EPA,* 142 S. Ct. at 2621 (Gorsuch, concurring).  That is precisely what EPA has done here.

Congress granted EPA extensive authority to regulate pipeline compressor engines – and other types of operations – under two exclusively federal programs.

10

The New Source Performance Standards ("NSPS") program under Section 111 and the National Emissions Standards for Hazardous Air Pollutants ("NESHAPs") under Section 112 allow EPA to directly regulate many types of equipment, without any state input, and with only the degree of state participation that EPA decides to allow.  EPA already regulates the equipment covered by the Good Neighbor Rule under these provisions, and has for decades.  *See*, *e.g.*, 40 C.F.R. Part 60, Subparts IIII and JJJJ; *id.* Part 63, Subpart ZZZZ.

The emissions limits under these pre-existing programs are stringent.  *See* 42 U.S.C. §§ 7411(a)(1), (b)(1)(B) (standards based on "the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements); *id.* 42 U.S.C. § 7412(d)(2) (§ 7412(d)(2)(emissions limits based on the "maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable"))  Both programs also require EPA to periodically update the existing standards to reflect new technology and, in the case of Section 112, residual risk.  42 U.S.C. §§ 7411(b)(1)(B), 7412(d)(6), (f)(2)(A).

11

Yet EPA did not elect to regulate compressor engines and other non-EGU equipment under either of these provisions. *Instead, it chose to do so under the portion of the Clean Air Act where Congress directly reserved the primary implementation authority to the States.* And it did so over the express objections of those States – many of whom have already challenged the Rule, and the associated SIP disapprovals, in court.

Congress granted EPA extensive authority to directly regulate non-EGUs through Sections 111 and 112 of the Clean Air Act. There is no evidence that Congress intended to grant the Agency similarly broad authority under the Good Neighbor provisions of Section 110. To the contrary: Congress expressly granted primary authority to implement that provision to the States. Indeed, where EPA determines a SIP to be inadequate, it cannot simply disapprove that plan; it must first notify the State of the inadequacies and give the State up to 18 months to correct the inadequacies before it disapproves the plan. 42 U.S.C. § 7410(k)(5).

EPA failed to provide even this minimal degree of cooperation here. Instead, the Agency proposed to disapprove multiple SIPs – then proposed its own FIP only two months later, even before the comment period on the SIP disapprovals had closed. That FIP, in turn, was not specifically targeted to each state's particular facts and circumstances, but rather imposed blanket requirements on specific types of operations – regardless of the extent to which those operations

12

contributed to the downwind nonattainment concerns, or indeed even existed within a particular state.

Congress crafted Section 110 of the Clean Air Act to create a careful balance of state primacy and EPA oversight. EPA's Good Neighbor Rule runs roughshod over that balance. It is inconceivable that Congress intended to authorize such a sweeping assertion of federal power under Section 110, and so the Good Neighbor Rule violates the Major Questions doctrine.

### B.    EPA Failed to Identify the Emissions "Amount" from Non-EGU Sources that Contribute Significantly to Nonattainment.

The Good Neighbor provision authorizes EPA to require only cost-effective controls. *Homer II*, 572 U.S. at 521. In its Proposed FIP, EPA initially identified $7,500 per ton of nitrogen oxide as the cost-effectiveness threshold for non-EGU sources. 87 Fed. Reg. at 20083. After commenters identified critical flaws in EPA's analysis, however, EPA abandoned that threshold in the Rule, acknowledging that "the $7,500/ton threshold does not reflect the full range of cost-effectiveness values that are likely present across the many different types of non-EGU industries and emissions units assessed." 88 Fed. Reg. at 36740.

Despite having discarded any cost-effectiveness metric non-EGUs, EPA nevertheless categorically concluded that the emission control strategies it selected for non-EGUs were "cost-effective." *Id.* at 36661, 36741. Of course, simply stating that a rule is "cost-effective" does not make it so – particularly where, as

13

here, that assertion contradicts EPA's own findings and willfully ignores its own processes.

EPA claims that the Rule "continues to apply the same approach as the prior three [interstate transport] rulemakings" for evaluating "amounts" of "significant contribution," which are "represented by cost thresholds." *Id.* at 36678; *see Maryland v. EPA*, 958 F.3d 1185, 1192 (D.C. Cir. 2020).  This is quite simply not true. When EPA recognized its cost-effective analysis was incorrect, rather than revising its analysis, it deserted that value entirely. By failing to conduct a proper cost-effectiveness assessment, EPA has overstepped. *See id.* at 88 Fed. Reg. at 36676; *see also Homer II*, 572 U.S. at 521.

While this Court has generally granted EPA latitude in selecting a "cut-off point" for cost-effectiveness,[7] that does not mean EPA can simply forgo selecting a cost threshold altogether. *North Carolina v. EPA*, 531 F.3d 896, 918 (D.C. Cir.), *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008) (EPA has discretion in "draw[ing] the 'significant contribution' line based on cost" but cannot refuse to "draw the line at all.").

By failing to set a cost threshold in the Rule to determine the "amount" of emissions required to be eliminated, EPA removed any semblance of a limiting

---

[7] *See, e.g.*, *Michigan v. EPA*, 213 F.3d 663, 680 (D.C. Cir. 2000) ("*Michigan*")

principle guiding its regulation of non-EGUs, thus exceeding its statutory authority.

### C.     EPA's Rule Is Arbitrary and Capricious.

In addition to violating the Clean Air Act, the Rule should be stayed because Enbridge will likely succeed in a showing that the Rule is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law for several reasons. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating agencies must provide "a rational connection between the facts found and the choice made"); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 18 (D.C. Cir. 2012) ("agency action is arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem.")  Here, the Rule imposes a sweeping new program across thousands of sources nationwide.  Yet the very breadth of the Rule, and the speed with which EPA acted, means that the Agency did not take sufficient time to understand specific concerns that apply to individual industry operations.

### 1.     EPA failed to consider reliability concerns.

The pipeline industry in particular is regulated not just by EPA but by the Federal Energy Regulatory Commission ("FERC") as well.  As EPA acknowledges, FERC has "primary responsibility for ensuring reliability of the bulk electric system." 88 Fed. Reg. at 36679.

A significant aspect of FERC regulation is the obligation to meet all "firm" service commitments, at all times.  INGAA and other industry commenters identified significant factual errors in EPA's assessment of the Rule – errors that led EPA to ignore the many ways in which the Rule threatens the industry's ability to meet its obligations to FERC and its customers.  These include: (1) the Rule applies to more than three times the number of engines EPA originally anticipated[8]; (2) there are currently a limited number of vendors available to manufacture the required controls and install them[9]; and so (3) it will not be possible for the entire industry to retrofit so many engines within the three-year period allowed in the Rule without threatening the reliable supply of natural gas to provide heat in winter, cooling in summer, and key raw materials for various manufacturing operations.[10]

EPA ignored these concerns, stating merely that it would approve extensions on a case-by-case basis.  Yet even that option is not any kind of guarantee; the commitment is entirely within EPA's discretion, based on standards EPA has not

---

[8] EPA erroneously calculated only 905 engines (roughly a third) of the 3,005 engines subject to the Rule will require controls. 88 Fed. Reg. at 36824; EPA Timing Report [Ex. 2] at 30. However, due to the 1,000-horsepower threshold, the rule requires controls on engines that, more often than not, do not operate. INGAA Comments [Ex. 4] at 12.
[9] Kinder Morgan Comments [Ex. 5] at 28.
[10] *Id.*

identified.  And indeed, threats to the reliability of the natural gas pipeline system are not even identified as a basis for such an extension.

EPA therefore failed to consider an important aspect of the landscape by overlooking the service interruptions that will likely result from the Rule. *Sierra Club v. Jackson*, 833 F. Supp. 2d at 18  ("agency action is arbitrary and capricious if the agency. . . entirely failed to consider an important aspect of the problem"). It also failed to adequately respond to industry comments proposing a workable solution to this complex problem. *Sierra Club v. EPA*, 863 F.3d 834, 838 (D.C. Cir. 2017) ("[w]e have frequently held in various contexts that, in APA review, we will often find agency decisions arbitrary or capricious where the agency has failed to respond to major substantive comments.").

## 2.    EPA's compliance timeline is unsupported by substantial evidence and unrealistic.

The Rule requires compliance by May 1, 2026 – only 31 months from the effective date of the Rule.  EPA claims this is reasonable, because compliance could be achieved in 28 months "if there are no supply chain delays." 88 Fed. Reg. at 36759.  Yet *EPA's own assessment* estimates that "[t]he supply chain delay timeline is expected to range from 40 to 72 months." EPA Timing Report [Ex. 2] at ES-8. EPA's timeline is entirely unrealistic, even by its own estimation. *Small Ref. Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 552 (D.C. Cir. 1983)

17

(vacating EPA's Clean Air Act standard for "lack of record evidence that a market for lead credits will develop virtually overnight.").

Additionally, EPA vastly undercounted the number of engines that will need emissions controls under the Rule. Applying facility-wide averaging, EPA determined that, theoretically, of the 3,000 engines subject to the Rule roughly a third (900) will require controls. 88 Fed. Reg. at 36824. This analysis, however, is based on EPA's assessment of only ten facilities, and the record identifies no information suggesting EPA even attempted to determine whether these facilities were representative of the industry as a whole. In reality, many pipeline compressor stations have only a few engines, which provides little to no flexibility to install controls on EPA's timeline without affecting service to their customers. Absent any demonstration that EPA's ten facilities are representative of the industry as a whole, EPA's analysis is insufficient to support the Rule. *Schmid v. Frosch*, 680 F.2d 248, 252 n.4 (D.C. Cir. 1982) ("[s]mall samples tend to be less reliable than large samples because of instability and variability caused by unrepresentative samples, measurement error, random selection, and random shocks from unknown or unknowable factors.").

EPA also failed to consider that only two vendors nationwide have the necessary equipment and experience to retrofit most of the regulated engines. These contractors have never processed the scale and magnitude of requests that

18

the Rule forces. Kinder Morgan Comments [Ex. 5] at 28. EPA also apparently

dismisses its own estimation that permitting – required before a facility may even

*begin* on-site construction – is expected to range from "2 [to] 12 months." EPA

Timing Report [Ex. 2] at 24. With two vendors to service thousands of engines,

and months required before work can even begin, EPA's 31-month timeline is

unworkable.  *See* Wooden Declaration [Ex. 3] ¶¶10-12, 15.

EPA's 31-month compliance timeline is unsupported and contradicted by

evidence on the record. It is therefore arbitrary and capricious. *See Small Ref. Lead*

*Phase-Down Task Force v. EPA*, 705 F.2d at 544-45, 552.

## II.    Enbridge Will Be Irreparably Harmed Absent a Stay.

If the Rule is not stayed, Enbridge will be subjected to significant

nonrecoverable compliance costs and may well face additional consequences for

failing to provide continuous service pursuant to FERC's policies. Based on

Enbridge's most recent 2019 emission control installation, retrofitting a *single*

pipeline engine with the emission controls required by the Final Rule will cost

approximately $11.5 million.  Wooden Declaration [Ex. 3] ¶ 13. Enbridge

estimates that it will spend approximately $350 million within the next 12-18

months alone on design, engineering, parts, and employee time in an attempt to

comply with the Final Rule's emission limitations by May 2026. *Id*.

Financial injuries are "irreparable where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment).

Enbridge's compliance with the Rule may well result in significant interruptions of service to the public. These outages could cause irreparable harm to Enbridge's customers, who need reliable gas service to heat their homes in winter. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978) ("Utility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety.").

None of these harms are recoverable from EPA in litigation, because the Eleventh Amendment bars retrospective relief. *See Wages & White Lion Invs. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) ("[F]ederal agencies generally enjoy sovereign immunity for any monetary damages."); *Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020) (concluding "economic injury caused by federal agency action is unrecoverable because the APA's waiver of sovereign immunity

does not extend to damages claims"). Enbridge and its customers will have no recourse for their injuries if the Rule is not stayed.

### III. The Balance of Harms and Public Interest Weigh Heavily in Favor of a Stay.

The public interest lies "in having governmental agencies abide by the federal laws that govern their existence and operation." *Wages & White Lion Invs.*, 16 F.4th at 1143; *see also Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994). "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021). Here, given EPA's arbitrary and capricious actions, the public interest strongly supports a stay.

A stay is also warranted because EPA itself is the source of the constrained timeline. EPA delayed evaluating many of the SIPs in question here – in some cases, for literally years – and then rushed to propose a FIP before it had even finalized the disapproval of those SIPs.  As the Fifth Circuit observed, "EPA's multi-year delay in disapproving . . . SIPs undercuts any claim that time is of the essence when it comes to imposing the EPA's Final FIP." *Texas v. EPA*, 5th Cir. No. 23-60069, ECF 269-1 at 24 (May 1, 2023). Accordingly, EPA has no credible argument that it is irreparably harmed by a stay.

The recent decisions to stay the SIP disapprovals pending review further merits a nationwide stay.  The Rule was designed to collectively apportion

responsibility for downwind air quality violations among the upwind States based on a "uniform" obligation of emissions controls to all the States concerned — including the now-exempted ones. 88 Fed. Reg. at 36719, 36677. The required emissions reductions for each State are, in part, based on the "combined effect of the entire program across all linked upwind States." 88 Fed. Reg. at 36749.

Yet almost half (46%) of the anticipated emissions reductions from non-EGUs are attributable to States in which the Rule has been stayed.[11] EPA's initial emissions control strategy is thus no longer the "efficient and equitable solution" EPA claimed it to be, because it will longer be applied "on a uniform basis across all linked upwind States." 88 Fed. Reg. at 36741.  Put simply, a rule of this magnitude, which purports to regulate multiple significant industries across almost half of the United States, should be evaluated and implemented (or not) consistently across all affected states, not piecemeal across multiple Federal Circuits.

Finally, courts recognize the public's interest in electricity that is both affordable and reliable.  *Texas v. EPA*, 829 F.3d at 419; *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999). Natural gas is critical not just to the power industry, but also to a number of industrial, commercial, and residential

---

[11] *See* EPA, Good Neighbor Plan for 2015 Ozone NAAQS (last updated June 30, 2023), computed from data maps available here https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.

users. A stay will ensure that the public receives continued access to natural gas while significant deficiencies in the Rule are addressed.

## CONCLUSION

The Court should stay the portions of the Rule applicable to Pipeline Engines and postpone the effective date of the Rule pending conclusion of the review proceedings.

Respectfully submitted,          /s/ Laura K. McAfee
                                 Laura K. McAfee (D.C. Cir. Bar No. 62386)
                                 BEVERIDGE & DIAMOND, PC
                                 201 North Charles Street, Suite 2200
                                 Baltimore, MD 21201
                                 410-230-1300
                                 lkmcafee@bdlaw.com

                                 *Counsel for Enbridge (U.S.) Inc.*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains <u>5128</u> words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

<u>/s/ Laura K. McAfee</u>
Laura K. McAfee

24

## CERTIFICATE OF SERVICE

I certify that on August 4, 2023, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Laura K. McAfee
Laura K. McAfee