ORAL ARGUMENT NOT SCHEDULED

No. _____

# In the United States Court of Appeals
# For the District of Columbia Circuit

TRANSCANADA PIPELINE USA LTD.,
*Petitioner,*
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY AND
MICHAEL S. REGAN, ADMINISTRATOR, U.S. EPA,
*Respondents,*

On Petition for Review of a Final Rule by the U.S. Environmental Protection Agency

## MOTION FOR STAY

August 4, 2023

Brittany M. Pemberton
Jeffrey R. Holmstead
Bracewell LLP
2001 M Street N.W.
Suite 900
Washington, D.C. 20036
(202) 828-5800 (telephone)
(202) 857-4812 (facsimile)
Brittany.Pemberton@bracewell.com
Jeff.Holmstead@bracewell.com

*Counsel for Petitioner TransCanada PipeLine USA Ltd.*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 18(a)(4), 27 and 28(a)(1)(A), petitioner certifies:

**A.    Parties, Intervenors, and *Amici* to this Case (No. _____)**

**Petitioner(s):**

Petitioner: TransCanada PipeLine USA Ltd.

Respondents: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

Proposed Intervenors: None at present.

Proposed *Amici*: None at present.

**B.    Rulings Presented for Review**

Petitioner seeks review of a final rule promulgated by the Environmental Protection Agency titled *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, published in the Federal Register*, and published in the Federal Register at 88 Fed. Reg. 36,654 (June 5, 2023).

**C.    Parties, Intervenors, and *Amici* in Related Cases in this Circuit**

**1.    No. 23-1157, *Utah v. EPA***

Petitioners: The State of Utah, by and through its Governor, Spencer J. Cox, and its Attorney General, Sean D. Reyes.

Respondents: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

Proposed Intervenors: Air Alliance Houston; Appalachian Mountain Club; Center for Biological Diversity; Chesapeake Bay Foundation; Citizens for Pennsylvania's Future; Clean Air Council; Clean Wisconsin; Downwinders at Risk; Environmental Defense Fund; Louisiana Environmental Action Network; Sierra Club; Southern Utah Wilderness Alliance; Utah Physicians for a Healthy Environment; State of New York; State of Connecticut; State of Delaware; State of Illinois; State of Maryland; State of New Jersey; State of Wisconsin; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; District of Columbia; City of New York; Harris County, Texas.

Proposed *Amici*: None at present.

## 2. No. 23-1181, *Kinder Morgan v. EPA*

Petitioner: Kinder Morgan, Inc.

Respondents: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

Proposed Intervenors: State of New York; State of Connecticut; State of Delaware; State of Illinois; State of Maryland; State of New Jersey; State of Wisconsin; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; District of Columbia; City of New York; Harris County, Texas.

Proposed *Amici*: None at present.

**3. No. 23-1183, *Ohio v. EPA***

Petitioners: State of Ohio; State of West Virginia; State of Indiana.

Respondents: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

Proposed Intervenors: State of New York; State of Connecticut; State of Delaware; State of Illinois; State of Maryland; State of New Jersey; State of Wisconsin; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; District of Columbia; City of New York; Harris County, Texas.

Proposed *Amici*: None at present.

**4. No. 23-1190, *Am. Forest & Paper Assoc. v. EPA***

Petitioner: American Forest & Paper Association.

Respondents: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

Proposed Intervenors: None at present.

Proposed Amici: None at present.

**5. No. 23-1191, *Midwest Ozone Group v. EPA***

Petitioner: Midwest Ozone Group.

Respondents: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

Proposed Intervenors: None at present.

Proposed *Amici*: None at present.

## 6. No. 23-1193, *INGAA v. EPA*

Petitioners: Interstate Natural Gas Association of America; American Petroleum Institute.

Respondents: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

Proposed Intervenors: None at present.

Proposed *Amici*: None at present.

## 7. No. 23-1195, *AECI v. EPA*

Petitioners: America's Power; Associated Electric Cooperative, Inc.; Deseret Generation & Transmission Co-Operative d/b/a Deseret Power Electric Cooperative; National Rural Electric Cooperative Association; Ohio Valley Electric Corporation; the Portland Cement Association; Wabash Valley Power Association, Inc. d/b/a Wabash Valley Power Alliance.

Respondents: The United States Environmental Protection Agency; Michael S. Regan, EPA Administrator.

Proposed Intervenors: None at present.

Proposed *Amici*: None at present.

**8. No. 23-1199,** *National Mining Association v. EPA*

Petitioners: National Mining Association

Respondents: The United States Environmental Protection Agency; Michael

S. Regan, EPA Administrator.

Proposed Intervenors: None at present.

Proposed *Amici*: None at present.

Date: August 4, 2023                    Respectfully submitted,

                                        */s/ Brittany M. Pemberton*
                                        Brittany M. Pemberton

# CERTIFICATE OF COMPLIANCE WITH CIRCUIT
## RULES 18(A)(1) AND (A)(2)

The undersigned certifies that this motion for stay complies with Circuit Rule 18(a)(1). On July 28, 2023, Petitioner submitted to EPA a Request for Administrative Stay Pending Judicial Review of the Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, published in the Federal Register at 88 Fed. Reg. 36,654 (June 5, 2023). On August 3, 2023, EPA responded to acknowledge receipt of this request.

In accordance with Circuit Rule 18(a)(2), undersigned counsel notified EPA's counsel by voicemail and email on August 2, 2023, that Petitioner planned to file this motion for stay. EPA opposes this motion and plans to file a response.

*/s/ Brittany M. Pemberton*
Brittany M. Pemberton

# **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioner TransCanada PipeLine USA Ltd. hereby submits the following Disclosure Statement:

TransCanada PipeLine USA Ltd. is an energy infrastructure company that, through its subsidiaries, owns natural gas pipelines across North America within the Pipeline Transportation of Natural Gas Sector, which is an industry sector subject to the U.S. Environmental Protection Agency's final action under review.

TransCanada PipeLine USA Ltd. is an indirectly owned subsidiary of TC Energy Corporation. TC Energy Corporation is a federally registered Canadian corporation, with its headquarters in Calgary, Alberta. TC Energy Corporation is a publicly held corporation with no parent corporation. Capital Group and its subsidiaries hold a 10.98% ownership interest in TC Energy Corporation. Capital Group is a publicly-held company.

 Date: August 4, 2023               Respectfully submitted,

                                    */s/ Brittany M. Pemberton*
                                    Brittany M. Pemberton

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULES 18(A)(1) AND (A)(2)..................................................................................................vi

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.................................. vii

TABLE OF AUTHORITIES ..................................................................ix

GLOSSARY.......................................................................................... xii

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................2

    A.    The Clean Air Act's Good Neighbor Provision....................................2

    B.    The Final Good Neighbor Rule............................................................5

    C.    The Good Neighbor Rule's Pipeline Engine Regulations ....................7

STANDARD OF REVIEW ......................................................................7

ARGUMENT ..........................................................................................8

    A.    TC Energy Is Likely To Succeed On The Merits. .............................8

        1.    EPA's 1,000-horsepower applicability criterion is contrary to law, arbitrary and capricious. ..................................8

        2.    EPA established arbitrary emissions limitations that are not cost-effective and that violate the Clean Air Act. .............13

        3.    EPA failed to consider that potential reliability impacts are an important aspect of the problem....................................18

    B.    TC Energy Will Suffer Irreparable Harm Absent A Stay..................20

    C.    The Balance of the Harms and the Public Interest Favor A Stay .......22

CONCLUSION.....................................................................................23

CERTIFICATE OF COMPLIANCE....................................................24

CERTIFICATE OF SERVICE ...............................**Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*E.P.A. v. EME Homer City Generation, L.P.*,
  572 U.S. 489 (2014).................................................................3, 4, 11

*EME Homer City Generation, L.P. v. EPA*,
  795 F.3d 118 (D.C. Cir. 2015)..............................................5, 14, 16

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009).......................................................................17

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)...........................................................22

*Maryland v. EPA*,
  958 F.3d 1185 (D.C. Cir. 2020).......................................................9

*Michigan v. EPA*,
  576 U.S. 743 (2015).......................................................................16

*Michigan v. U.S. E.P.A.*,
  213 F.3d 663 (D.C. Cir. 2000)..................................................16, 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
  Auto. Ins. Co.*,
  463 U.S. 29 (1983)...........................................................11, 16, 18

*Nken v. Holder*,
  556 U.S. 418 (2009).....................................................................7, 8

*In re NTE Conn., LLC*,
  26 F.4th 980 (D.C. Cir. 2022)...............................................20, 22, 23

*R.J. Reynolds Tobacco Co. v. FDA*,
  823 F. Supp. 2d 36 (D.D.C. 2011), vacated on other grounds, 696
  F.3d 1205 (D.C. Cir. 2012).............................................................21

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ...........................................................21

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) (Scalia, J., concurring in part and in the
   judgment) ............................................................................................20

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River
   Power, Inc.*,
   805 F.2d 351 (10th Cir. 1986) ..........................................................23

**Statutes**

42 U.S.C. § 7408 ....................................................................................2

42 U.S.C. § 7409 ....................................................................................2

42 U.S.C. § 7410(a)(1) .......................................................................2, 3

42 U.S.C. § 7410(a)(2) ...........................................................................2

42 U.S.C. § 7410(a)(2)(C) ......................................................................3

42 U.S.C. § 7410(a)(2)(D)(i) ................................................................11

42 U.S.C. § 7410(a)(2)(D)(i)(I) ........................................................3, 13

42 U.S.C. § 7410(c)(1) ...........................................................................3

**Regulations**

40 C.F.R. § 52.40(e) ..............................................................................7

40 C.F.R. § 52.41 .............................................................................20, 23

40 C.F.R. § 52.41(b)(1) ..........................................................................7

40 C.F.R. § 52.41(c) ...............................................................................7

40 C.F.R. § 52.41(d) ...............................................................................7

40 C.F.R. § 52.41(d)(2) .........................................................................12

40 C.F.R. § 52.45(b)(1)-(2) ...................................................................12

70 Fed. Reg. 25,162 (May 12, 2005) ...................................................17

81 Fed. Reg. 74,504 (Oct. 26, 2016) ...................................................17

87 Fed. Reg 20,036 (Apr. 6, 2022) ...........................................................5, 6, 9, 14, 15

88 Fed. Reg. 36,654
(June 5, 2023)........................ 1, 3, 4, 5, 6, 9, 10, 11, 12, 14, 15, 17, 18, 19, 21, 22

88 Fed. Reg. 49,295 (July 31, 2023).........................................................................6

# GLOSSARY

| EPA | Environmental Protection Agency |
|-----|--------------------------------|
| NO$_X$ | Nitrogen oxides |
| EGU | Electric generating unit |
| Non-EGU | Non-electric generating unit |

# INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 18(a)(2), Petitioner TransCanada PipeLine USA Ltd. ("TC Energy")[1] seeks a stay pending judicial review of an Environmental Protection Agency ("EPA" or "Agency") rule "*Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards*," 88 Fed. Reg. 36,654 (June 5, 2023), as it applies to certain pipeline engines used to transport natural gas.

EPA's final rule subjects pipeline engines to stringent limitations on nitrogen-oxide ("$NO_X$") emissions under the "good neighbor" provision of the Clean Air Act. EPA argues these emissions "contribute significantly" to air-quality issues in downwind states but imposing these limits exceeds the Agency's authority and is arbitrary and capricious for several reasons.

First, EPA made the limits applicable to certain engines based on an arbitrary and over-inclusive horsepower rating, resulting in the regulation of sources that emit well below the threshold EPA used to screen for a significant contribution to downwind nonattainment. Second, although EPA defined the emissions that "contribute significantly" based on the level of emission controls that maximized

---

[1] TC Energy Corporation submitted comments to EPA on the rule on behalf of its indirectly owned subsidiary, TransCanada PipeLine USA Ltd., which is the parent entity for its US natural gas subsidiaries, so this motion refers to Petitioner throughout as "TC Energy."

cost-effectiveness, EPA arbitrarily and unlawfully finalized emissions limitations without regard to their cost-effectiveness. Finally, EPA failed to consider an important aspect of the problem: the emissions limitations pose a serious threat to the reliable delivery of natural gas in the United States.

Absent a stay, TC Energy will suffer irreparable harm. Given the rule's short compliance timeline, TC Energy is already working to comply with the rule. Without a stay, TC Energy must expend up to $75 million in the near term on engineering plans and designs to retrofit each engine; procurement of parts; and entering into contracts with specialized vendors to install and test the equipment. These costs cannot be recovered from the federal government. The public interest also weighs in favor of staying the rule's pipeline engine requirements, given EPA's clear violation of the law and the potential for natural gas service disruptions that could threaten reliability and cause significant public harm.

## BACKGROUND

### A.  The Clean Air Act's Good Neighbor Provision

Congress directed EPA to establish national ambient air quality standards for pollutants at levels that will protect public health. 42 U.S.C. §§7408, 7409. These standards are implemented through state plans that must be approved by EPA. *Id.* §7410(a)(1), (2). If EPA determines that a state has failed to submit an adequate plan, either in whole or in part, the Clean Air Act requires the Agency to impose a

federal plan on that state within two years of EPA's determination, "unless the State corrects the deficiency" before a federal plan is issued. 42 U.S.C. §7410(c)(1).

Each state plan must "provide[] for implementation, maintenance, and enforcement" of such the national standards within the state's borders. *Id.* §7410(a)(1), (a)(2)(C). Additionally, the Clean Air Act contains a "Good Neighbor Provision" that requires states to prohibit in-state sources "from emitting any air pollutant in amounts which will ... contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any" national standard. *Id.* §7410(a)(2)(D)(1)(I); *see also EME Homer City Generation, L.P.*, 572 U.S. 489, 499 (2014).

EPA implements the Good Neighbor Provision by first using modeling and air quality monitoring data to identify "receptors" in downwind states expected to have problems attaining or maintaining the national standards, and then quantifying the contributions from upwind states to those downwind receptors. *See* 88 Fed. Reg. at 36,659; *EME Homer*, 572 U.S. at 500. To determine which upwind emissions must be eliminated because they "contribute significantly" to downwind nonattainment, EPA considers the cost of reducing the emissions, the availability of emission reductions, and the impact it will have on downwind air quality. 88 Fed. Reg. at 36,660.

More precisely, EPA determines that an upwind state's emissions "contribute significantly" to downwind nonattainment "to the extent its exported pollution both (1) produced one percent or more of a [national standard] in at least one downwind State;" and "(2) could be eliminated most cost-effectively as determined by EPA." *EME Homer*, 572 U.S. at 502-03. When applied in earlier Good Neighbor Provision rules, this approach was upheld by the Supreme Court in *EME Homer*. *See* 88 Fed. Reg. at 36,668-69. The Court concluded that eliminating "amounts that can cost-effectively be reduced is an efficient and equitable solution to the allocation problem the Good Neighbor Provision requires the Agency to address." *EME Homer*, 572 U.S. at 519.

The *EME Homer* Court was clear that EPA's authority has its limits: EPA must identify the specific "amount" that "contribute[s] significantly to nonattainment" in downwind states. *Id.* at 521. EPA cannot "require a State to reduce its output of pollution by more than is necessary to achieve attainment in every downwind State or at odds with the one-percent threshold the Agency has set." *Id.*

In implementing the Good Neighbor Provision, EPA defines "amounts" that "contribute significantly" to mean the "amount of emissions that is in excess of the emissions control strategies that EPA has deemed cost-effective." 88 Fed. Reg. at 36,676; *see also EME Homer*, 572 U.S. at 518. This EPA determines by "calculat[ing] how much pollution each upwind State could eliminate if all of its

sources applied pollution control technologies available at particular cost thresholds." *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 126 (D.C. Cir. 2015).

EPA's cost thresholds are "expressed in terms of cost per ton of emissions reduced." *Id.* EPA analyzes the control technologies that could be implemented in upwind states until it reaches the "cost-effectiveness threshold," or the "point at which further emissions mitigation strategies become excessively costly on a per-ton basis while also delivering far fewer additional emissions reductions and air quality benefits." 88 Fed. Reg. at 36,683. When the costs associated with installing emissions controls exceed EPA's cost-effectiveness threshold, EPA admits "there are very little additional emissions reductions and air quality improvement at problematic receptors, and the cost associated with these measures increases substantially on a dollar per ton basis." 87 Fed. Reg. at 20,095.

## B. The Final Good Neighbor Rule

In 2015, EPA set a new, more stringent national standard for ozone. This triggered upwind states' obligation to revise their state plans to fulfill their obligations under the Good Neighbor Provision by October 2018. 88 Fed. Reg. at 36,656. EPA subsequently concluded that 23 upwind states significantly contributed to nonattainment in downwind states but had failed to adequately address their good-neighbor obligations. *Id.* Therefore, on June 5, 2023, EPA issued a federal plan to

restrict the interstate transport of $NO_X$—an ozone precursor—from sources in these states. *Id*. The rule finalized new emissions limitations on power plants (referred to as "Electric Generating Units" or "EGUs" in the rule) beginning in 2023. *Id*. at 36,657. EPA also required unprecedented $NO_X$ emissions limitations for certain other industrial sources (which EPA refers to as "non-EGUs"), including reciprocating internal combustion engines used in transporting natural gas via pipeline. These limitations begin in 2026. *Id*.[2]

In its proposed rule, EPA identified $7,500 per ton of $NO_X$ as the cost-effectiveness proxy for the "amounts" of emissions to be eliminated for non-EGU sources like pipeline engines. 87 Fed. Reg. at 20,083. But, in the final rule, EPA abandoned this cost threshold and did not replace it. 88 Fed. Reg. at 36,740. Instead, EPA found there was no cost-effectiveness threshold for the selected control strategies and emissions thresholds. *Id*. at 36,741. Although EPA noted that "a 'knee-in-the-curve'" would "materialize" "if EPA were to go beyond the selected control stringency through inclusion of additional … $NO_X$ mitigation technologies … that are … far more costly," EPA did not adopt another proxy for the statutorily-required "amounts" under the Clean Air Act. *Id*.

---

[2] EPA has clarified that the rule will not take effect in states where courts have stayed EPA's disapproval of an underlying state plan. 88 Fed. Reg. 49,295 (July 31, 2023); *Notice of Forthcoming EPA Action to Address Additional Stay Orders* (Aug. 3, 2023), https://rb.gy/2bbth.

## C.     The Good Neighbor Rule's Pipeline Engine Regulations

EPA's rule establishes emissions limitations for stationary, natural gas-fired spark ignition engines with a maximum "nameplate rating of 1,000 horsepower or greater" that are used in the states subject to the rule for pipeline transportation of natural gas. 40 C.F.R. §52.41(b)(1). The rule includes emissions standards for different engine types, expressed in grams of $NO_X$ per horsepower-hour. *Id.* §52.41(c).

As an alternative, operators may seek EPA's approval of a "facility-wide averaging plan." If approved by EPA, such a plan would permit the operator to average emissions across the engines in a "facility" provided that the "total emission reductions" for all the engines in the facility are "equivalent to or greater than those" that would be achieved if each engine complied." *Id.* §52.41(d). Operators may also petition EPA for "case-by-case" discretionary, higher emissions limit for an engine that cannot comply with the applicable limit "due to technical impossibility or extreme economic hardship." *Id.* §52.40(e).

## STANDARD OF REVIEW

Courts determine whether to grant a stay pending judicial review based on four familiar factors: (1) likelihood of success on the merits; (2) whether the movant will suffer irreparable harm absent a stay; (3) the balance of the equities; and (4) the public interest. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). The first two factors

are "the most critical," and the last two factors merge in cases where the government is the opposing party. *Id*. at 434-35.

**ARGUMENT**

**A.    TC Energy Is Likely To Succeed On The Merits.**

The rule's pipeline engine emission limitations exceed EPA's statutory authority and are arbitrary and capricious. EPA established an applicability criterion for pipeline engines so broad that it regulates numerous sources that do not "contribute significantly" to downwind nonattainment. And EPA unreasonably and unlawfully abandoned its established approach of mandating only the emission reductions that can be obtained at or below a cost-effectiveness threshold EPA identified in the proposed rule, resulting in emissions limits that apply regardless of cost.

**1.    EPA's 1,000-horsepower applicability criterion is contrary to law, arbitrary and capricious.**

EPA adopted an unlawfully over-broad applicability criterion that subjects pipeline engines that do not "contribute significantly" to downwind nonattainment to stringent emissions limitations.

To identify industries and sources to include in the rule, EPA conducted a screening analysis in which it "focused on assessing emission units that emit > 100 [tons per year] of $NO_X$." EPA, *Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for*

*2026* at 3 (Feb. 28, 2022). In doing so, EPA necessarily concluded that only sources emitting above its 100-tons-per-year threshold "contribute significantly" to downwind nonattainment. If that were not the case, EPA would have to regulate lower-emitting sources to comply with the Clean Air Act. *See Maryland v. EPA*, 958 F.3d 1185, 1204 (D.C. Cir. 2020) ("[U]pwind sources violate the Good Neighbor Provision if they will significantly contribute" to downwind nonattainment.).

EPA used emissions of 100 tons per year as the threshold criterion for regulating cement and concrete product manufacturing, iron and steel mills and ferroalloy manufacturing, and glass and glass product manufacturing. 88 Fed. Reg. at 36,825-29. Despite this focus on emissions levels, EPA defined pipeline engines subject to the rule as those with a *design capacity* of 1,000-horsepower or greater. 88 Fed. Reg. at 36,820. According to EPA, this horsepower criterion "reasonably approximates" EPA's 100 tons-per-year emissions threshold. *Id*. EPA was mistaken.

Based on that assumption, EPA predicted in its proposal that the rule would apply to 307 pipeline engines nationally, 87 Fed. Reg. at 20,090, "over 200" of which would "emit[] greater than 100 [tons per year]." EPA, *Technical Support Document (TSD) for the Final Rule: Final Non-EGU Sectors TSD* at 4 (Mar. 2023) ("Final Rule TSD"). TC Energy and other commenters explained that EPA's projections undercounted the number of affected pipeline engines by almost a factor of five.

TC Energy alone operates approximately 360 pipeline engines in affected states that exceed the 1,000-horsepower threshold. TC Energy Comments at 4.

In the final rule, EPA acknowledged that its 1,000-horsepower applicability criterion "captured more units than the EPA intended," 88 Fed. Reg. at 36,819. In fact, EPA now "estimates that 3,005 stationary engines will be subject to the rule." *Id*. at 36,824. However, EPA data establish that most of the pipeline engines now subject to the rule emit well below EPA's supposedly "reasonable approximation" for the 100 tons-per-year threshold because most of these units do not operate at full capacity. TC Energy Comments at 4-5. The nationwide emissions inventory upon which EPA relied shows just how inapt the 1,000-horsepower criterion is. While almost all the engines in the inventory emitting above the 100 tons-per-year threshold exceed EPA's 1,000-horsepower applicability criteria, *only one in five* of the nearly 4,000 engines with a design capacity of at least 1,000 horsepower exceeds the 100 tons-per-year threshold. TC Energy Comments at 5. EPA even ultimately concluded that about a mere 10% of the 3,005 engines subject to the rule emit above the 100-tons-per-year threshold. *See* EPA, *Non-EGU Facilities and Units.xlsx* (Mar. 2023) (listing about 260 engines above the 100-tons-per-year threshold).

Contrary to the record before it, EPA nonetheless finalized its proposal to regulate pipeline engines with a 1,000-horsepower or greater rating. This resulted in the regulation of numerous engines that do not "contribute significantly" to

downwind nonattainment, violating EPA's obligations under the Good Neighbor Provision because EPA may not require emissions reductions "at odds with the [significant-contribution] threshold the Agency has set." *EME Homer*, 572 U.S. at 521. And it is arbitrary for EPA to conclude that its 1,000-horsepower applicability criterion "reasonably approximates" the 100-tons-per-year threshold when there is no "rational connection to the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

EPA attempts to rationalize its decision by arguing that (1) sources with a design capacity of at least 1,000 horsepower "contribute significantly" to downwind nonattainment when considered "collectively," and (2) its overreach is justified because the numerous engines below the emissions threshold might increase their emissions in the future. 88 Fed. Reg. at 36,821. Both arguments are inconsistent with the Good Neighbor Provision, which applies only to sources that "*will* … contribute significantly," not those that *may* do so at some unknown, future time. *See* 42 U.S.C. §7410(a)(2)(D)(i) (emphasis added). Similarly, nothing in the statute authorizes EPA to sweep into the rule sources that do not "contribute significantly" on an individual basis by lumping them together. EPA asserts that it is "not possible to guarantee without an effective emissions control program that all such units could not increase emissions in the future," 88 Fed. Reg. at 36,821, but this is not so. The Agency could subject natural gas transmission pipeline operators to reporting and

then require compliance with emissions limits if any engines exceed the 100-tons-per-year threshold. *Cf.* 40 C.F.R. §52.45(b)(1)-(2) (doing just that for certain low-use boilers).

EPA's manifest failures are not saved by the facility-wide averaging program. Per EPA, this alternative "allow[s] facilities to prioritize emissions reductions from larger, higher-emitting units" rather than units under 100 tons per year, and that "averaging should allow most facilities to install controls on approximately one-third of the engines at their sites, on average." 88 Fed. Reg. at 36,821, 36,824. But, as this is based only a "subset of facilities," it is not at all clear that EPA's conclusion universally applies. Final Rule TSD at 19.

Nor is facility-wide averaging a viable option for the entire industry. Averaging is premised on a facility reducing emissions from some engines within a facility *beyond* the emissions limitations required by the rule to enable higher-emitting engines to operate without controls. However, because the "cap" under any such plan is calculated using the facility's $NO_X$ emissions from the highest consecutive 30-day period during the prior two ozone seasons, *see* 40 C.F.R. §52.41(d)(2), this cap—along with much-needed operational flexibility—will necessarily decrease over time as operators install controls on some units and as the running time of units without controls varies from season to season. *See* TC Energy Comments at 5 (noting that most compressor stations have multiple units to address

significant fluctuations in demand, but that most of these units operate minimally over the course of the year); Yeager Decl. ¶27.

Even if EPA's subset analysis were representative, hundreds of pipeline units that emit below the 100-tons-per year threshold will still require controls because two-thirds of the 905 units EPA projected will install controls emit less than 100 tons per year. *See* EPA, *Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units* at 9 tbl.5 (Mar. 15, 2023); EPA, *Non-EGU Facilities and Units.xlsx* (Mar. 2023). In any case, EPA cannot lawfully regulate these pipeline engines that fall below the 100-tons-per-year threshold, even if an averaging plan might mean controls could be avoided.

### 2. EPA established arbitrary emissions limitations that are not cost-effective and that violate the Clean Air Act.

By abandoning its own cost-effectiveness threshold and subjecting units to emissions limitations that are not cost-effective and failing to identify the "amounts" of pollution that "contribute significantly" to downwind nonattainment, EPA established emissions limitations that are arbitrary or otherwise unlawful.

The Good Neighbor Provision gives EPA the authority to regulate "any source or other type of emissions activity … emitting any air pollutant in amounts which will … contribute significantly to nonattainment." 42 U.S.C. §7410(a)(2)(D)(i)(I). Therefore, EPA must first identify the "amounts" that contribute significantly to nonattainment. EPA does this by "calculat[ing] how much pollution each upwind

State could eliminate if all of its sources applied pollution control technologies available at particular cost thresholds." *EME Homer*, 795 F.3d at 126. As it did in prior rules, EPA evaluated "$NO_X$ reduction potential, cost, and downwind air quality improvements available at various mitigation technology breakpoints (represented by cost thresholds)." 88 Fed. Reg. at 36,678. EPA then "selected the technology breakpoint—the cost threshold "that, in general, maximized cost-effectiveness." *Id.* This allowed EPA to "determine[] the level of emissions reductions associated with that level of control stringency to constitute significant contribution to nonattainment." *Id.*

For non-EGUs, EPA proposed a cost-effectiveness threshold of $7,500 per ton of emissions, finding that only emissions reduction controls below this marginal cost threshold were cost-effective. 87 Fed. Reg. at 20,083. EPA explained that $7,500 per ton represented the "'knee in the curve' breakpoint'" above which "there are very little additional emissions reductions and air quality improvement at problematic receptors, and the cost associated with these [emissions reduction] measures increases substantially on a dollar per ton basis." *Id.* at 20,095. EPA noted that "controls and related emissions reductions are available at several estimated cost levels *up to* the $7,500 per ton threshold," and where certain engines required "additional controls beyond [EPA's] cost threshold," the Agency did not propose lower emissions limits. *Id.* at 20,083, 20,143 (emphasis added). EPA only sought

comment on "whether additional control technology could be installed on these sources at or below the marginal cost threshold to achieve a lower emissions rate." *Id.* at 20,143.

Commenters explained that the rule requires controls even on engines that do not typically operate except during periods of peak demand, *see* INGAA Comments at 12, and that the emissions controls needed for compliance can cost several million dollars per unit. TC Energy Comments at 5; Kinder Morgan Comments at 21-23. As a result, commenters noted that the rule would require emissions reductions at marginal costs that vastly exceed EPA's $7,500 per ton cost threshold—by as much as hundreds of thousands of dollars per ton. Kinder Morgan Comments at 21-26.

EPA did not dispute this information. Instead, the Agency abandoned the $7,500 per ton cost-effectiveness threshold without adopting a new one. 88 Fed. Reg. at 36,740. EPA admitted that the threshold "does not reflect the full range of cost-effectiveness values that are likely present across" the various types of non-EGUs regulated by the rule but nonetheless concluded the "overall mix of emissions controls it identified at proposal" remained "appropriate." *Id*. at 36,740.

EPA's decision to disregard its previously established cost-effectiveness threshold and require emissions reduction measures that will greatly exceed the $7,500 per ton cost threshold was arbitrary and capricious. After defining the "significant contribution" in terms of whether cost-effective emissions reductions

are available and setting threshold for measuring cost-effectiveness, EPA cannot then disregard information showing that the rule will impose costs that far exceed the threshold. Doing so is textbook arbitrary and capricious decisionmaking. *See State Farm*, 463 U.S. at 43 (an agency "must examine the relevant data and articulate a satisfactory explanation for its action," including "a rational connection between the facts found and the choice made"); *see also Michigan v. EPA*, 576 U.S. 743, 752 (2015) (holding that EPA acted unreasonably when it deemed "billions of dollars in economic costs" irrelevant to its decision to regulate emissions).

Moreover, by abandoning the cost threshold, EPA violated the Clean Air Act by failing to identify the "amounts" of emissions contributing significantly to downwind nonattainment. As this Court has recognized, "EPA's task is to reduce upwind pollution, but only in 'amounts' that push a downwind State's pollution concentrations above the relevant NAAQS." *EME Homer*, 795 F.3d at 127 (citation omitted); *see also Michigan v. U.S. E.P.A.*, 213 F.3d 663, 684 (D.C. Cir. 2000) ("Interstate contributions cannot be assumed out of thin air."). EPA did so at the proposal stage, but after commenters objected to the cost threshold, EPA did not adopt a new cost-effectiveness threshold when it finalized the rule. As a result, the rule contains no determination of the "amounts" of emissions that contribute significantly to downwind nonattainment.

This also marked a departure from EPA's prior practice in at least three prior rules under the Good Neighbor Provision in which the Agency determined the "amounts" by setting a cost-effectiveness threshold. 88 Fed. Reg. at 36,678; *see also* 70 Fed. Reg. 25,162, 25,214 (May 12, 2005) ("EPA believes it is necessary to have … better control cost information for [non-EGUs] before assuming reductions from them."); 81 Fed. Reg. 74,504, 74,509 (Oct. 26, 2016) ("Our analysis shows that there is uncertainty regarding whether or not meaningful, cost-effective non-EGU emission reductions *are achievable …. Therefore, non-EGU reductions are not included in the final rule*.") (emphasis added). EPA cannot depart from its own precedent without "display[ing] awareness that it *is* changing position" and "must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Neither facility-wide averaging nor case-by-case emissions limits cure EPA's failure. Facility-wide averaging is unlikely to be a viable option for every *operator*. *See supra* at 12-13. Nor is it likely to help even every *facility*, particularly those where controls are needed on more than one-third of the engines or those that contain only one engine. For these engines, compliance costs are unlikely to change at all.

The potential for "case-by-case emissions limits" also does little to address costs. Where a unit cannot meet the applicable emissions limit due to technical impossibility or extreme economic hardship, the rule provides for EPA approval of

a case-by-case emissions limit. 88 Fed. Reg. at 36,818. Although TC Energy may attempt to apply for such limits for a few of its engines, Yeager Decl. ¶26, because the final rule establishes no cost-effectiveness threshold, there is no way to anticipate what level of costs EPA will deem high enough to cause "extreme economic hardship" warranting a case-by-case emissions limit. EPA's approval of a case-by-case emissions limit is completely discretionary and does not remedy the Agency's failure to adequately assess the costs and benefits of the rule. *See Michigan v. EPA*, 213 F.3d at 678-79 (holding that the benefits of a regulation should be "roughly commensurate with their costs").

### 3. EPA failed to consider that potential reliability impacts are an important aspect of the problem.

The rule requires pipelines to install emissions controls within 31 months of the rule's effective date. 88 Fed. Reg. at 36,756. In adopting such a short timeline for compliance, EPA failed to consider how its action will impact the transportation and storage sector's ability to deliver gas on a reliable basis. This was unquestionably "an important aspect of the problem," making EPA's action arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

Multiple commenters, including TC Energy, warned EPA that the extensive changes to the natural gas transmission system that would be needed in a very short time under the rule would threaten the ability of pipeline companies to ensure reliable natural gas service. TC Energy Comments at 12 ("Installation of controls

will require taking affected units offline for extended periods of time … without the additional capacity provided by the engines that have been taken out of service for retrofit/replacement, the pipeline may not be able to keep up with demand."); Kinder Morgan Comments at 36 ("Under EPA's unreasonable 2026 timetable, engines will have to be idled until the retrofitting is complete and millions of end-users of natural gas could face periodic outages along with higher energy bills.").

EPA failed to address these comments when finalizing the rule. It considered reliability concerns regarding EGUs and the electric grid, but not natural gas transmission. *See* 88 Fed. Reg. 36,774. In its Response to Comments, EPA claims it discussed this issue in a preamble section on the implementation of the $NO_X$ limitations, but there EPA only describes how the rule works in phases and whether the compliance timelines are feasible. *See* EPA, Response to Comments at 485, 626; *see also* 88 Fed. Reg. at 36,754-60. An EPA "Timing Report" mentions "the need to allow sufficient time for planning around taking compressors offline to avoid system reliability concerns," but does not explain why reliability will not be a problem. EPA, *NOx Emissions Control Technology Installation Timing for Non-EGU Sources* at 31 (Mar. 14, 2023). EPA suggests that pipeline operators should "coordinate outages" to avoid impacts on capacity, *id*. at ES-8, but that is not only impractical but also potentially anti-competitive.

## B. TC Energy Will Suffer Irreparable Harm Absent A Stay

A stay of the rule's pipeline engine requirements in 40 C.F.R. §52.41 is necessary to prevent irreparable harm to TC Energy. The costs for TC Energy to comply with the rule are estimated to be $600 million—up to $75 million of which TC Energy must spend to develop the engineering designs and procure the equipment and specialized vendors to retrofit their engines over the next 12 to 18 months. Yeager Decl. ¶9. These costs are irreparable because they cannot later be recovered from the government. *See In re NTE Conn., LLC*, 26 F.4th 980, 990-91 (D.C. Cir. 2022) ("[F]inancial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." (cleaned up)); Yeager Decl. ¶31. Indeed, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment).

TC Energy's compliance costs will vary for different engines, but the company estimates that it will generally have to spend $585,000-$6.8 million per engine to bring its 280 affected engines into compliance. Yeager Decl. ¶15. And, because retrofitting all the engines covered by the rule will take years to complete, TC Energy has already begun incurring these costs. Engineering plans and designs must be developed for each engine; parts must be procured; and specialized vendors

hired to install and test the equipment. *See* Yeager Decl. ¶¶16, 18. To secure vendors' services, TC Energy will need to make non-refundable deposits and incremental payments for the design and execution of each retrofitting project. Yeager Decl. ¶33. Additionally, TC Energy will also have to obtain new or modified state or federal permits. As this process can take as much as two years (or more), TC Energy must also begin this work in the near term. Yeager Decl. ¶17; *see also* 88 Fed. Reg. at 36,759.

If an operator has any hope of obtaining possible compliance deadline extensions, EPA requires the operator to make "good faith efforts to install the necessary controls" under the rule by May 1, 2026. 88 Fed. Reg. at 36,760. Consequently, TC Energy has no choice but to begin incurring compliance costs even though there is no mechanism for TC Energy to recover these costs from EPA or its vendors. Yeager Decl. ¶¶31, 33. And, any recovery from TC Energy's customers is uncertain at best. Yeager Decl. ¶32. Courts have recognized that the unrecoverable and "tremendous" costs of complying with EPA emissions standards constitute irreparable harm. *See, e.g., Texas v. EPA*, 829 F.3d 405, 433-34 (5th Cir. 2016); *R.J. Reynolds Tobacco Co. v. FDA*, 823 F. Supp. 2d 36, 49-50 (D.D.C. 2011), vacated on other grounds, 696 F.3d 1205 (D.C. Cir. 2012).

**C.     The Balance of the Harms and the Public Interest Favor A Stay**

Issuing a stay will not substantially injure EPA. If time really were of the essence, the EPA would not have taken nearly five years to disapprove the states' plans and impose a federal plan. Nor would it have deferred issuing federal plans as to several other states that may be significantly contributing to downwind nonattainment. *See, e.g.*, 88 Fed. Reg. at 36,659-60 (deferring action on a proposed federal plan for Oregon despite its impacts on California). The balance of the equities therefore favors TC Energy. *In re NTE Conn. LLC*, 26 F.4th at 991.

Staying the rule's pipeline engine requirements is in the public interest, given EPA's unlawful actions. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations," including the Administrative Procedure Act).

And a stay would prevent potential natural gas services disruptions that could cause significant public harm. Citizens and businesses rely on companies like TC Energy to provide the natural gas they need to heat their homes, cook their food, and run their businesses. Consequently, the Federal Energy Regulatory Commission requires interstate pipelines to be able to provide maximum capacity at all times to ensure that citizens have reliable and sufficient supplies of natural gas. Yeager Decl. ¶21. But to install the required controls within EPA's compliance timeline,

TC Energy and other companies will need to take multiple engines offline at once, threatening capacity restrictions that would impact overall system reliability. Yeager Decl. ¶22. The public has a strong interest in avoiding these sorts of harms. *See, e.g., In re NTE Conn., LLC*, 26 F.4th at 992 (public interest in "more efficient (i.e., less expensive) electricity"); *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 357 (10th Cir. 1986) (public interest in avoiding loss of power supply).

## CONCLUSION

For the foregoing reasons, the Court should stay the provisions of the rule applicable to pipeline engines, 40 C.F.R. §52.41.

Date: August 4, 2023

Respectfully submitted,

*/s/ Brittany M. Pemberton*
Brittany M. Pemberton
Jeffrey R. Holmstead
Bracewell LLP
2001 M Street N.W.
Suite 900
Washington, D.C. 20036
(202) 828-5800 (telephone)
(202) 857-4812 (facsimile)
Brittany.pemberton@bracewell.com
Jeff.holmstead@bracewell.com

**Counsel for Petitioner TransCanada PipeLine USA Ltd.**

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(5)–(7), and D.C. Circuit Rules 27(a)(2) and 21, I certify that:

This motion complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because it contains 5,198 words, exclusive of those parts exempted by Fed. R. App. P. 32(f) and 27(a)(2)(B), as counted by Microsoft Word 365.

This motion complies with the typeface and type style requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in a proportionately spaced typeface using Microsoft Word 365 Times New Roman 14-point font.

Date: August 4, 2023

*/s/ Brittany M. Pemberton*
Brittany M. Pemberton

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rules of Appellate Procedure 15(c) and 25, D.C. Circuit

Rules 15(a) and 25, I hereby certify that I have caused a true and correct copy of the

foregoing Motion for Stay to be served by United States mail, postage prepaid, this

4th day of August, 2023, upon each of the following:

Hon. Michael S. Regan,
Administrator
U.S. Environmental
Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

U.S. Environmental
Protection Agency
Correspondence Control Unit
Office of General Counsel (2310A)
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Hon. Merrick B. Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

Hon. Todd Kim
Assistant Attorney General
Environmental and Natural
Resources Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

Date: August 4, 2023

Respectfully submitted,

*/s/ Brittany M. Pemberton*
Brittany M. Pemberton