ORAL ARGUMENT NOT YET SCHEDULED

Case No. 23-1157
(and consolidated cases)

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

STATE OF UTAH, ET AL.,

Petitioners,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

Respondents.

_____

On Petitions for Review of Final Action
by the United States Environmental Protection Agency

_____

**RESPONDENT EPA'S OPPOSITION TO MOTIONS TO STAY FINAL RULE**

_____

<table>
<tr><td></td><td>TODD KIM<br>Assistant Attorney General<br>Environment & Natural Resources Division</td></tr>
<tr><td>Of Counsel:</td><td>CHLOE H. KOLMAN</td></tr>
<tr><td></td><td>ELISABETH H. CARTER</td></tr>
<tr><td>DANIEL SCHRAMM</td><td>ZOE PALENIK</td></tr>
<tr><td>HALI KERR</td><td>U.S. Department of Justice</td></tr>
<tr><td>JEANHEE HONG</td><td>Environmental Defense Section</td></tr>
<tr><td>Office of General Counsel</td><td>P.O. Box 7611</td></tr>
<tr><td>U.S. Environmental</td><td>Washington, D.C. 20044</td></tr>
<tr><td>    Protection Agency</td><td>(202) 514-9277</td></tr>
<tr><td>1200 Pennsylvania Ave., N.W.</td><td>chloe.kolman@usdoj.gov</td></tr>
<tr><td>Washington, D.C. 20460</td><td></td></tr>
<tr><td></td><td>August 18, 2023</td></tr>
</table>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................iv

GLOSSARY.........................................................................................v

INTRODUCTION ................................................................................1

BACKGROUND ..................................................................................3

I.      The Clean Air Act's Good Neighbor Provision ...............................3

II.     EPA Regulation of "Good Neighbor" Emissions............................4

III.    The 2023 Good Neighbor Plan ......................................................6

STANDARD OF REVIEW .................................................................12

ARGUMENT .....................................................................................13

I.      The Good Neighbor Plan was a reasonable exercise of EPA's statutory
        authority, so Petitioners are unlikely to succeed on the merits. ..................13

        A.      The Good Neighbor Plan is consistent with EPA's authority and past
                practice, and is not arbitrary or capricious. ........................................13

                1.      The Good Neighbor Plan comported with EPA's duty to issue a
                        federal implementation plan for any state without an adequate
                        state plan. ................................................................................14

                2.      The regulatory scope of the Rule is appropriate and does not
                        require more specific authorization from Congress.................17

                3.      The Good Neighbor Plan reasonably allocates responsibility
                        between states. ..........................................................................21

                4.      Judicial orders in other cases staying underlying EPA actions
                        pending judicial review have no bearing on the merits of this
                        case..........................................................................................23

        B.      The Rule's provisions governing power plant $NO_X$ emissions are
                reasonable and likely to be upheld. ......................................................25

1.    The "enhancements" made to EPA's traditional power plant emissions trading program are reasonable and consistent with the Act. ...................................................................26

2.    The trading program appropriately implements power plant reductions no matter the number of covered states. .................30

C.    EPA's decision to regulate certain non-EGU sources follows its framework and is supported by the record. ..........................................31

1.    EPA appropriately determined the amount of emissions reductions from covered non-EGU sources. ..............................32

2.    Petitioners incorrectly equate the screening assessment EPA applied with the amount of emissions reductions EPA ultimately determined necessary. ................................................33

3.    EPA adequately explained its decision to use 100 tons per year in its Screening Assessment. .....................................................36

D.    EPA's regulation of emissions from natural gas pipeline engines is rational and well-supported. ...................................................37

1.    EPA reasonably applied a 1,000-horsepower applicability criterion for pipeline engines. ...................................................38

2.    EPA set a reasonable compliance timeline that accounted for installation challenges. ............................................................43

E.    EPA's regulation of emissions from cement kilns is rational and well-supported. ........................................................................45

F.    EPA's regulation of emissions from the steel industry is rational and well-supported. ...................................................................46

G.    EPA's regulation of emissions from the paper industry is rational and well-supported. ...................................................................47

II.    Petitioners have failed to demonstrate irreparable harm ...............................49

A.     Power plant compliance is feasible given the emissions budget surpluses, low allowance costs, and lengthy timeline.........................49

B.     Industrial sources have no emissions reduction obligations until at least 2026. .................................................................................53

C.     State Petitioners face no irreparable harm. .........................................56

III.    The balance of equities and the public interest disfavor a stay. ....................58

CONCLUSION .........................................................................................63

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abbassi v. INS,*
   143 F.3d 513 (9th Cir. 1998) ................................................................50

*Commonwealth v. Biden,*
   57 F.4th 545 (6th Cir. 2023) ...............................................................62

*Cuomo v. NRC,*
   772 F.2d 972 (D.C. Cir. 1985)............................................................12

*EME Homer City Generation, L.P. v. EPA,*
   795 F.3d 118 (D.C. Cir. 2015)..................................................... 5, 29, 60

*EPA v. EME Homer City Generation, L.P.,*
   572 U.S. 489 (2014)................................................... 3, 4, 5, 6, 15, 21, 22, 29, 59

*Maryland v. EPA,*
   958 F.3d 1185 (D.C. Cir. 2020)..........................................................60

*Michigan v. EPA,*
   213 F.3d 663 (D.C. Cir. 2000)............................................. 5, 16, 17, 60

*Midwest Ozone Grp. v. EPA,*
   61 F.4th 187 (D.C. Cir. 2023)............................................................20

*New York v. EPA,*
   964 F.3d 1214 (D.C. Cir. 2020)................................................... 60, 61

*Nken v. Holder,*
   556 U.S. 418 (2009)........................................................ 12, 13, 50, 58

*North Carolina v. EPA,*
   531 F.3d 896 (D.C. Cir. 2008)...................................................... 5, 23

*North Carolina v. EPA,*
   550 F.3d 1176 (D.C. Cir. 2008)..........................................................59

*USPS v. Gregory,*
   534 U.S. 1 (2001)..............................................................................26

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) .................................................................. 19, 21

*Wis. Gas Co. v. FERC*,
  758 F.3d 669 (D.C. Cir. 1985) ...................................................... 49, 50

*Wisconsin v. EPA*,
  938 F.3d 303 (D.C. Cir. 2019) ................... 5, 14, 15, 18, 24, 25, 30, 34, 45, 60, 62

**Statutes**

42 U.S.C. §§ 7401-7515 ............................................................3

42 U.S.C. § 7407 .......................................................................3

42 U.S.C. § 7409(b)(1) ..............................................................3

42 U.S.C. § 7410(a)(1) ..............................................................3

42 U.S.C. § 7410(a)(2)(D)(i) ............................................ 18, 20, 22, 25

42 U.S.C. § 7410(a)(2)(D)(i)(I) .................................... v, 1, 4, 29

42 U.S.C. § 7410(a)(2)(F) .........................................................47

42 U.S.C. § 7410(c) ...................................................................4

42 U.S.C. § 7410(c)(1) .............................................. 6, 14, 15, 25, 56, 62

42 U.S.C. § 7410(k)(3) ..............................................................16

42 U.S.C. § 7410(k)(5) ..............................................................16

42 U.S.C. § 7411(d)(1) ..............................................................20

42 U.S.C. § 7412(a)(6) ..............................................................21

42 U.S.C. § 7412(b) ...................................................................21

42 U.S.C. § 7511a ......................................................................60

42 U.S.C. § 7511a(b) .................................................................20

42 U.S.C. § 7607(b)(1) ..............................................................24

42 U.S.C. § 7607(d)(7)(B) ............................................................ 23, 24, 26, 31, 45

**Rules**

D.C. Cir. R. 18(a)(1) ..................................................................... 13

Fed. R. App. P. 32(a)(5) ................................................................ 65

Fed. R. App. P. 32(a)(6) ................................................................ 65

**Regulations**

40 C.F.R. §§ 51.210-51.212 ........................................................... 47

40 C.F.R. § 52.40(e) ..................................................................... 42

40 C.F.R. § 52.41(d) ..................................................................... 42

**Other Authorities**

63 Fed. Reg. 57356 (Oct. 27, 1998) ................................................ 17

76 Fed. Reg. 48208 (Aug. 8, 2011) ................................................. 18

78 Fed. Reg. 41846 (July 12, 2013) ................................................ 23

81 Fed. Reg. 74504 (Oct. 26, 2016) ................................................ 18

86 Fed. Reg. 43956 (Aug. 11, 2021) ............................................... 23

87 Fed. Reg. 20036 (Apr. 6, 2022) ................................................. 47

88 Fed. Reg. 9336 (Feb. 13, 2022) ............................................... 6, 14

88 Fed. Reg. 36654 (June 5, 2023) ............ v, 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15,
........................................................ 16, 17, 18, 19, 20, 23, 24, 26, 27, 28, 29, 30,
........................................................ 31, 32, 33, 35, 36, 39, 40, 41, 42, 43, 44, 45,
........................................................ 46, 47, 49, 50, 51, 52, 53, 54, 56, 57, 60, 61

# GLOSSARY

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| "Good Neighbor Plan" or "Rule" | "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 36654 (June 5, 2023) |
| Good Neighbor Provision | 42 U.S.C. § 7410(a)(2)(D)(i)(I) |
| Non-EGU | Industrial source other than a power plant |
| $NO_X$ | Nitrogen oxides |
| RTC | Response to Comments |

**INTRODUCTION**

Petitioners challenge a rule promulgated by the U.S. Environmental Protection Agency ("EPA") under the Clean Air Act entitled, "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 36654 (June 5, 2023) (the "Good Neighbor Plan" or "Rule"). That Rule implements the Clean Air Act's Good Neighbor Provision, 42 U.S.C. § 7410(a)(2)(D)(i)(I), which ensures that sources in upwind states whose pollutant emissions are affecting air quality in downwind states do their fair share to reduce that pollution. In accordance with that Provision, the Rule establishes a coordinated, interstate emissions control program for large industrial polluters in 23 states, based on a methodology EPA has used for decades and that has been repeatedly upheld by this Court and the Supreme Court.

Six groups of petitioners, covering nine petitions consolidated in the above-captioned cases, now seek a stay of the Rule pending judicial review. ECF 2008555 (Ohio Mot.), 2009836 (Kinder Morgan Mot.), 2009932 (INGAA Mot.), 2010655 (AFPA Mot.), 2011121 (Enbridge Mot.), and 2011451 (TransCanada Mot.). Petitioners take a kitchen-sink approach in their stay motions, rehashing arguments and allegations of harm raised against previous Good Neighbor rules. But those contentions have consistently been rejected by this Court and the

1

Supreme Court and disproven by the consistent, successful implementation of these rules.

Petitioners do not demonstrate any likelihood of success on the merits:  The Rule appropriately executes EPA's duty under the Act to issue a federal implementation plan for those states whose own plans were inadequate.  It reasonably ensures that compliance flexibilities available to power plants do not undercut required pollution reductions.  And it appropriately regulates other industrial sources based on reasonable technical and policy determinations, supported by a detailed record.

Nor have Petitioners demonstrated that they will suffer irreparable harm absent a stay.  Power plant sources have more than adequate emission allowances available to cover any near-term obligations under the Rule.  Other regulated industrial sources do not need to reduce their emissions until 2026.  And state parties – who have no obligations under the Rule at all – have failed to allege any concrete harms to either their sovereignty or their electric grids.  Moreover, a stay would be fundamentally at odds with the public interest and with Congress's express directive that states be good neighbors.  A stay would delay efforts to control pollution that not only contributes to unhealthy air in downwind states, but also forces those downwind states to bear additional regulatory burdens under the

Act.  As they fail to establish any basis for the "extraordinary" remedy of a stay, Petitioners' motions should be denied.

## BACKGROUND

### I.    The Clean Air Act's Good Neighbor Provision

Under Title I of the Clean Air Act, 42 U.S.C. §§ 7401-7515, EPA sets National Ambient Air Quality Standards for certain harmful pollutants, like ozone, to establish permissible concentrations of those pollutants in the ambient air.  *Id.* §§ 7409(b)(1), 7407.  Subsequently, each state must prepare a state implementation plan for EPA's review, "which provides for implementation, maintenance, and enforcement" of the air quality standard within that state.  *Id.* § 7410(a)(1).

But sometimes a state's pollution problems are caused in part by emissions from an "upwind" state.  Ozone-causing pollution – like nitrogen oxides or "$NO_X$" – in particular is known to travel long distances across state boundaries, subjecting downwind communities to increased mortality, poor health, and environmental effects – while allowing upwind states to avoid the costs of that pollution.  88 Fed. Reg. at 36658; *see EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 496 (2014).

The Act's "Good Neighbor Provision" addresses this problem by requiring states to eliminate emissions transported beyond their borders that will "contribute significantly" to nonattainment or "interfere with maintenance" of an air quality

standard in "any other state."[1]  42 U.S.C. § 7410(a)(2)(D)(i)(I).  Where a state fails to meet these obligations, the Act directs EPA to promulgate a federal implementation plan addressing those requirements in the state's place.  *Id.* § 7410(c).

## II.     EPA Regulation of "Good Neighbor" Emissions

The issue of cross-state air pollution "poses a complex challenge for environmental regulators," *EME Homer*, 572 U.S. at 496, not least because downwind air quality problems often result from the collective contribution of multiple upwind areas, creating a "thorny causation problem" that complicates the equitable allocation of responsibility.  *See id*. at 514-20.

To meet this challenge, EPA has long applied a (judicially-approved) four-step framework to identify those states whose emissions are significantly contributing to air quality violations in downwind states.  First, EPA performs air quality modeling across the 48 contiguous states to identify downwind air quality monitors, known as "receptors," in areas expected to have problems attaining or maintaining the given ozone standard – here, the 2015 ozone standard.  88 Fed. Reg. at 36659.

---

[1] This opposition, like the Rule, uses "significant contribution" to encompass both the "contribute significantly" and "interfere with maintenance" prongs.  But EPA must analyze both types of upwind effects on downwind areas.

Second, EPA uses that air quality modeling to quantify contributions from upwind states to downwind receptors across the 48 contiguous states. *Id.* EPA determines which upwind states "contribute" more than one percent of the air quality standard to ambient concentrations of ozone in other states and are therefore "linked" for purposes of further analysis. *Id.*

Third, for those states linked to downwind air quality problems, EPA identifies upwind emissions that contribute "significantly" to those problems. To do so, EPA considers the cost-effectiveness of potential emissions controls, the total emissions reductions that may be achieved by requiring such controls (if applied on a uniform basis across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked. Emissions in excess of the uniform emissions control strategies found justified under this multifactor analysis are deemed "significant." *See id.* at 36659-60; *EME Homer*, 572 U.S. at 519-20.

Fourth, EPA prohibits these emissions through enforceable control measures. 88 Fed. Reg. at 36659-64. This framework has been the subject of both D.C. Circuit and Supreme Court review. *See, e.g.*, *EME Homer*, 572 U.S. at 500; *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019); *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118 (D.C. Cir. 2015) ("*EME Homer II*"); *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008); *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir.

5

2000).  These courts have affirmed that EPA's longstanding approach to contending with thousands of "overlapping and interwoven linkages between upwind and downwind States," *EME Homer*, 572 U.S. at 496-97, is "permissible, workable, and equitable," and entitled to deference, *id.* at 524.

## III.    The 2023 Good Neighbor Plan

EPA's revision of the applicable ozone standard in 2015 triggered states' obligations to submit plans addressing the Good Neighbor Provision for the new standard.  EPA reviewed those submissions, many of which proposed to take no action to assist downwind neighbors, and on February 13, 2023, disapproved 21 state plans for failing to satisfy the Good Neighbor Provision.  88 Fed. Reg. at 9336.  EPA was then required to promulgate a federal plan for those states (along with two other states that failed to submit plans, for a total of 23 states), 42 U.S.C. § 7410(c)(1), which it did in the final Good Neighbor Plan challenged here.  88 Fed. Reg. at 36654, 36656.  The Act obligated EPA to issue that plan as expeditiously as practicable, and no later than the next deadline for downwind compliance with the ozone standard – which, in this case, required implementing upwind reductions in 2023.  *Id.* at 36669 (collecting cases).

Applying the 4-step framework, EPA concluded that many states were contributing significantly to air pollution in other states.  *See EME Homer*, 572 U.S. at 519; 88 Fed. Reg. at 36659-65.  That analysis also indicated that many

6

power plants' $NO_X$ emissions could be better controlled – by 2023, through better operation of existing controls and, beginning in 2026, by installing control technologies already widely adopted across the industry. *Id.* at 36660-61. Extending its analysis to other industrial stationary sources (referred to as "non-electricity generating units" or "non-EGUs") in the covered states, EPA found similarly cost-effective and feasible emissions reductions available at high-emitting sources in nine other industries. *Id.* at 36661.

EPA then provided for the elimination of those "significantly contributing" emissions through a coordinated emissions reduction program covering all 23 states. For power plants, the necessary reductions are achieved through an interstate, market-based trading program that allows covered sources to buy and sell emissions allowances from sources in other states, and that integrates with existing Good Neighbor trading programs for previous ozone standards. *Id.* at 36654, 36904-18. For non-EGUs, the Plan likewise implements the necessary reductions through standardized requirements that apply uniformly to each covered type of emissions source. *Id.* at 36664-65. These requirements apply directly to emission sources in covered states and are implemented by EPA, rather than states. *Id.* at 36838-43, 36675.

EPA's application of the 4-step framework in the Good Neighbor Plan reflected the Agency's practice in past rules. But the implementation of this more

7

stringent ozone standard necessitated the development of additional features for both power plant and non-EGU sources building on EPA's experience with prior Good Neighbor rules:

*EPA's Screening Assessment for Regulating Non-Electricity Generating Units.* To ensure a full remedy to the interstate transport problem for the 2015 ozone standard, EPA reviewed non-EGU industries for potential emissions reductions. In order to determine the appropriate scope of non-EGU industries and emissions unit types to regulate in the Rule, EPA developed a "screening assessment" that identified the non-EGU industries with a potentially meaningful impact on the air quality of downwind receptors. *Id.* at 36732. The Screening Assessment evaluated approximately 40 industries, ultimately identifying nine for further analysis. EPA-HQ-OAR-2021-0668-0150, at 2-3 ("Screening Assessment").[2] To assess potentially controllable emissions, the Screening Assessment analyzed emissions units that had emitted over 100 tons per year of $NO_X$. *Id.* at 3. Then, EPA analyzed the potential air quality improvements that could be delivered to downwind areas applying various emissions-control strategies, to identify those units and control strategies that could potentially deliver beneficial emissions reductions. *Id*. at 3.

---

[2] Record documents are available at www.regulations.gov.

The Screening Assessment arrived at a marginal cost threshold of $7,500 per ton, *i.e.*, the point at which further emissions controls generally appeared to become less cost-effective. *Id.* at 4. However, as explained in the Rule, the Screening Assessment was used to screen, *not* to make a final determination of "significant contribution" for non-EGUs. EPA used it to identify proxy estimates for (1) non-EGUs units with the potential for impactful emissions reductions, (2) potential control technologies for non-EGU emissions units, and (3) potential control costs at those units. 88 Fed. Reg. at 36733. With this information, EPA created an *initial* list of non-EGU emissions units for potential coverage under the Rule. *See* EPA-HQ-OAR-2021-0668-0191 at 3-4.

"To further evaluate the impactful industries and emissions unit types and establish the proposed emissions limits," EPA proceeded to a more detailed review of emissions controls imposed in downwind states, federal emissions standards, technical literature, consent decrees, and permit limits for similar source types. 88 Fed. Reg at 36740. EPA then (1) adjusted the emissions units included and the emissions limits and applicability criteria, (2) updated its analysis of the costs and emissions reductions estimates from the non-EGU control strategies, and (3) included certain compliance flexibilities in the final Rule in response to technical comments. *See* EPA-HQ-OAR-2021-0668-1110 ("Non-EGU TSD"); EPA-HQ-OAR-2021-0668-0956 ("Applicability TSD"). In the final Rule, EPA found the

9

average cost-per-ton of implementing these control strategies across all covered non-EGU industries and emission unit types was $5,339 per ton, or roughly half the representative cost threshold EPA applied for power plants. 88 Fed. Reg. at 36746. EPA acknowledged that costs could be higher or lower depending on the industry, emissions unit, and facility; however, EPA showed that the high end of the range of costs for non-EGU emissions units was still comparable to the costs for power plants. *Id.* EPA found these control strategies would make a meaningful improvement in downwind air quality, delivering approximately one-third of the total air quality benefits of the Rule. *Id.* at 36748.

*Enhancements to the power plant trading program.* For power plants, the Good Neighbor Plan included a handful of important new enhancements to improve the operation of the allowance trading program used to implement power plants' emission reductions at Step 4 of EPA's framework. *See* 88 Fed. Reg. at 36764-70. EPA explained that each of these enhancements is necessary to ensure that emissions deemed "significant" at Step 3 are adequately prohibited across all covered states on a permanent basis at Step 4. *Id.* at 36657. Three of those are challenged by Petitioners here:

First, the Rule implements a dynamic emissions budget-setting procedure, beginning in the 2026 ozone season. *Id.* at 36765. In past Good Neighbor rules, preset emissions budgets had difficulty keeping pace with changes in power plant

10

fleet composition – leading to budgets that provided covered sources far more allowances than the power plant fleet needed to comply. *Id.* at 36764. This, in turn, allowed sources to increase emissions in later years, contravening EPA's Step 3 determinations. *Id.* Dynamic budgeting prevents the Rule from getting less stringent over time by tailoring emissions budgets in later years to the actual composition of the fleet (keying budgets to a state's "heat-input" data to capture changes in the fleet). *See id.* at 36777-79.

The Rule implements this new budgeting methodology gradually. Until 2026, states are governed solely by pre-set budgets in the Rule, consistent with previous rules. Starting in 2026, dynamic budgeting will be used only to *increase* the Rule's fixed state budgets where appropriate (with those budgets and underlying data published one year in advance for compliance planning purposes). *Id.* at 36778. Starting in 2030, budgets are set exclusively by dynamic budgeting, with budgets rising or falling based on actual fleet composition. *Id.* at 36779.

Second, the Rule provides for the annual recalibration of "banks" of unused emissions allowances. This change complements the dynamic budgeting by similarly ensuring that an excess of banked allowances does not remove the incentive for power plants to maintain the emissions-control performance found necessary at Step 3. *Id.* at 36788. That recalibration holds the total amount of banked allowances in a given year to no more than 21% above the trading

11

program's total budget (with that percentage decreasing to 10.5% in 2030).  *Id.* at 37688-89.

Third, beginning in the 2024 control period, the Rule sets unit-specific daily backstop $NO_X$ emissions rates for large coal-fired power plants, ensuring that those units achieve a level of emission reduction commensurate with EPA's Step 3 determinations, even while they participate in the trading program's flexibilities. *Id.* at 36767-68.  In practice, this backstop functions by requiring large emitters with catalytic controls to surrender extra allowances if they exceed a daily $NO_X$ emissions rate of 0.14 lb/mmBtu (while allowing a 50-ton buffer).  *Id.*; *see also id.* at 36792.  For units without catalytic controls, the backstop limit will apply in the second control period after catalytic controls are installed, but no later than 2030. *Id.* at 36767.  The backstop rate incentivizes large units to operate emissions controls on a routine basis, better ensuring that emissions controls will be operated on future high-ozone days and that reductions will come from all upwind states and benefit all downwind states covered by the Rule.  *Id.* at 36767-68.

## STANDARD OF REVIEW

"On a motion for stay, it is the movant's obligation to justify the court's exercise of such an extraordinary remedy."  *Cuomo v. NRC*, 772 F.2d 972, 978 (D.C. Cir. 1985).  A movant must demonstrate: (1) a likelihood of success on the merits; (2) irreparable injury if relief is withheld; (3) lack of harm to other parties

from a stay; and (4) that a stay would serve the public interest.  *Nken v. Holder*, 556 U.S. 418, 434 (2009); *see also* D.C. Cir. R. 18(a)(1).

## ARGUMENT

### I.    The Good Neighbor Plan was a reasonable exercise of EPA's statutory authority, so Petitioners are unlikely to succeed on the merits.

Petitioners contend that they are likely to succeed on the merits because EPA improperly executed its authority under the Good Neighbor Provision, and because the specific policies and methodologies applied to the regulation of power plant sources and to non-EGU sources were unreasonable.  These three sets of allegations are all meritless.[3]  The Rule built on EPA's well-established ozone transport framework that has been reviewed and upheld numerous times by this Court and the Supreme Court, and the adjustments EPA made to that framework were reasonable and guided by precedent.  As such, the motions for stay should be denied.

---

[3] These allegations are advanced by separate petitioners concerning severable parts of the Rule.  88 Fed. Reg. at 36693.  Were this Court to find any of these contentions justified, stay should be granted only as to the specific states or industries who have justified their request.

**A.    The Good Neighbor Plan is consistent with EPA's authority and past practice, and is not arbitrary or capricious.**

**1.    The Good Neighbor Plan comported with EPA's duty to issue a federal implementation plan for any state without an adequate state plan.**

The Good Neighbor Plan was issued consistent with EPA's duty under the Clean Air Act, which unequivocally states that EPA "*shall* promulgate a Federal implementation plan" whenever it "finds that a State has failed to make a required submission" or does not meet "minimum criteria" for that plan, or whenever it "disapproves a State implementation plan submission in whole or in part." 42 U.S.C. § 7410(c)(1) (emphasis added). And the Act specifies that EPA may do so "at any time within 2 years" of that finding or disapproval. *Id.* The statute's text thus disproves Petitioners' suggestion that the Good Neighbor Plan impermissibly intruded on state authority to design state implementation plans. Ohio Mot. 9-10; Enbridge Mot. 12. EPA disapproved these states' inadequate plans, 88 Fed. Reg. 9336 (Feb. 13, 2022), so it was obligated to issue a federal plan in their place.

Petitioners' collection of arguments to the contrary hold no water. First, Petitioners' claims that EPA has "seized" power from the states, Ohio Mot. 9-10, 12, are collateral attacks on EPA's underlying state plan disapproval actions and so are barred. This Court has already specifically rejected this line of attack in Good Neighbor litigation. *See Wisconsin*, 938 F.3d 303, 336 (D.C. Cir. 2019) (holding

arguments that "depend on the invalidity of the prior [state plan] disapprovals" are an "improper collateral attack" (cleaned up)).

Second, EPA lawfully promulgated the Good Neighbor Plan months after it disapproved these Petitioners' state plans. *See* Ohio Mot. 10, 12; Enbridge Mot. 12. As the Supreme Court held, EPA's authority to issue a federal implementation plan "*at any time* within 2 years" of its disapproval action, 42 U.S.C. § 7410(c)(1), means that "EPA is not obliged to wait two years [to promulgate a federal plan] or postpone its action even a single day." *EME Homer*, 572 U.S. at 509. This Court recently clarified in *Wisconsin* that EPA is not only empowered to act more quickly than the two-year timeframe, *it must do so* when necessary to ensure that upwind states' Good Neighbor emissions are eliminated by the next statutory deadline for compliance with the ozone air quality standards. 938 F.3d at 318. Here, ensuring emission reductions by the next attainment deadline required EPA to implement the Good Neighbor Plan starting in the 2023 ozone season. 88 Fed. Reg. at 36690, 36754.

Third, EPA's issuance of the Good Neighbor Plan did not impermissibly inhibit these three States' ability to amend their state plans. Ohio Mot. 11-12; Enbridge Mot. 12. As *EME Homer* held, EPA is not obligated to provide *any* gap between disapproval of a state plan and issuance of a federal plan, so there is no

mandatory period afforded states to revise their plans.[4]  But no state was

prevented, as a practical matter, from doing so.  EPA proposed to disapprove the

Ohio, Indiana, and West Virginia state plans and proposed its alternative federal

plan in early 2022.  *See* Ohio Mot. 5.  Petitioners thus had ample "warning" of

EPA's concerns with their submissions, *see id.* at 12, and ample opportunity before

the Good Neighbor Plan was finalized to submit a revised plan addressing those

concerns.  And they may submit one still.  *See* 88 Fed. Reg. at 36838-43.

Petitioners' premature speculation about how EPA might act on a future

submission does not establish any defect in *this* Rule.  *See* Ohio Mot. 11-12.

   Nor did *Michigan*, 213 F.3d at 663, impose any limits on EPA's authority

that could be relevant here.  *See* Ohio Mot. 9, 10-11.  That case concerned the

requirements EPA can set when calling for *state* plan revisions under Section

7410(k)(5), not limitations on EPA's authority in its own plans.  88 Fed. Reg. at

36675.  Even so, *Michigan* held that EPA could determine the level of significant

contribution of each state – and, thus, the emissions to be eliminated – so long as

the state could choose the particular control measures.  213 F.3d at 688.  The same

---

[4] Petitioners claim Section 7410(k)(5) obligated EPA to leave a period for
revisions.  Enbridge Mot. 12.  But disapprovals under (k)(3) do not automatically
trigger "SIP calls" for state plan revisions under (k)(5).  *See* 42 U.S.C. §
7410(k)(3), (5); Response to Comments, EPA-HQ-OAR-2021-0668-1127 at 12-15
("RTC").

would be true of any state plan revision submitted here.  *See* 88 Fed. Reg. at

36839.

### 2. The regulatory scope of the Rule is appropriate and does not require more specific authorization from Congress.

The scope of the Good Neighbor Plan – requiring $NO_X$ emission reductions

from power plants and other industrial sources in covered states – is consistent

with both the statute and applicable precedent.  EPA has regulated $NO_X$ from

power plants under the Good Neighbor Provision for several decades now, and this

Rule is similar in scope and effect to those earlier rulemakings.  88 Fed. Reg. at

36679; RTC at 37-39.  EPA has also previously regulated $NO_X$ from non-EGUs

under this Provision, *see* 88 Fed. Reg. at 36681, and has reasonably done so here.

The Rule is thus reasonable and a far cry from the "extraordinary cases" examined

under the major questions doctrine.

Petitioners nonetheless claim a stay is warranted because EPA unreasonably

reversed "its previous decision not to regulate non-EGU sources."  Ohio Mot. 15.

That argument is erroneous in several respects.  First, this is not the first time EPA

has regulated sources other than power plants under the Good Neighbor Provision.

*Contra* Ohio Mot. 15.  EPA's 1998 "$NO_X$ SIP Call" addressed emissions from

industrial sources including boilers, cement kilns, and stationary engines, 63 Fed.

Reg. 57356, 57365 (Oct. 27, 1998), and this Court upheld their inclusion.

*Michigan*, 213 F.3d at 690-93.

Second, consistent with the statute's text, EPA has never denied its authority to regulate non-EGU sources.  42 U.S.C. § 7410(a)(2)(D)(i) (covering "any source or other type of emissions activity"); 88 Fed. Reg. at 36680-81.  Nor has EPA ever decided it would permanently forgo regulation of non-EGUs – only declining to regulate in the past based on practical considerations like the quality of EPA's information about source emissions.  *See, e.g.*, 88 Fed. Reg. at 36681; 81 Fed. Reg. 74504, 74508, 74522 (Oct. 26, 2016) (excluding non-EGUs on the basis of timing and data uncertainty); 76 Fed. Reg. 48208, 48323 (Aug. 8, 2011) (excluding non-EGUs because of cost of reductions).  To the contrary, the Agency has made clear that regulation of these sources was possible, if not likely, in the future.  81 Fed. Reg. at 74522; 76 Fed. Reg. at 48247-48.  And in this Rule, EPA explained that the circumstances justifying exclusion of non-EGUs from past rules were no longer present.  88 Fed. Reg. at 36681-82; *see* RTC at 94.

Third, Petitioners' argument ignores this Court's opinion in *Wisconsin*, which rejected the premise that EPA could decline to regulate non-EGUs based on "scientific uncertainty" or "administrative infeasibility."  938 F.3d at 319.  EPA has faithfully executed this Court's command by fully addressing significant contribution, including from high-emitting non-EGUs, in the Good Neighbor Plan.

Neither EPA's decision to regulate non-EGUs, nor any other feature of the Rule, raises a "major question" as to the regulatory scope of the Rule.  Enbridge

18

Mot. 10-13; *see* Ohio Mot. 19.  To begin, Petitioners misstate the major questions

doctrine, which does not apply to *any* action with potentially "vast economic and

political significance," Enbridge Mot. 10, but only to those "extraordinary" cases

where both the action's significance and the "history and the breadth of the

authority … asserted" "provide a 'reason to hesitate before concluding that

Congress' meant to confer such authority" through ambiguous statutory language.

*West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022).  In the handful of cases where

the major questions doctrine has been applied, the agency was uniformly engaged

in "unprecedented" action claiming previously "unheralded" power that effected a

"fundamental revision of the statute" inconsistent with its traditional interpretation

or use.  142 S. Ct. at 2608, 2612.

 That is far from the case here.  The Good Neighbor Plan is the latest in a

long series of rules, dating back to the 1990s, addressing ozone-forming pollution

from industrial sources across a large group of states.  *See* RTC at 38-40.  Those

rules have previously regulated both power plant and non-EGU sources, 88 Fed.

Reg. at 36681, and they have done so under the same basic framework for defining

necessary emission reductions.  *Id.* at 36671.  Unsurprisingly, this long line of

rulemakings has yielded a long line of precedents – including in the Supreme Court

– concluding that EPA's general ozone transport framework reasonably effectuates

Congressional intent.  *Id.* at 36668-69.  The authority exercised in the Rule can

hardly be "unheralded" where courts have upheld it numerous times. *See Midwest Ozone Grp. v. EPA*, 61 F.4th 187, 189 n.1 (D.C. Cir. 2023).

In any case, the Rule does not have "vast economic and political significance." *Cf.* Enbridge Mot. 10; Ohio Mot. 19. As addressed further below, Petitioners exaggerate the costs and burdens of the Rule – the same allegations against EPA's ozone transport rules that have consistently been disproven in the real world. *See infra* Argument II. Nor is the Good Neighbor Plan out of step with EPA's previous Good Neighbor rules, which were of comparable (or greater) cost. *See* 88 Fed. Reg. at 36660; Ex. 1, Birnbaum Decl. ¶¶ 10, 63. Petitioners also cannot rely on the fact that the Rule "applies across almost half of the United States" or addresses "multiple major industries." Enbridge Mot. 10. All national rulemakings under the Clean Air Act do the former (or more) and compliance with the ozone standards plainly reaches the latter. *See, e.g.*, 42 U.S.C. § 7511a(b). Indeed, even review under a clear statement rule would be required to conclude that Congress directed the states, or EPA in their place, to regulate in this manner when it required the "prohibit[ion]" of emissions from "any source or other type of emissions activity" significantly contributing to downwind air quality problems. 42 U.S.C. § 7410(a)(2)(D)(i); Response to Comments at 38-40.

Petitioners err further in suggesting that Congress could not have intended EPA to regulate $NO_X$ from non-EGUs because of EPA's regulatory authorities

under Sections 7411 and 7412.  Enbridge Mot. 10-13 (referring to statutory

sections 111 and 112).  Section 7412 regulates "hazardous air pollutants," which

NO$_X$ is not.  42 U.S.C. § 7412(a)(6), (b).  Section 7411, meanwhile, explicitly

forbids EPA from regulating existing sources' emissions of any pollutant covered

by the Act's National Ambient Air Quality Standards program, which includes

ozone.  42 U.S.C. § 7411(d)(1) (regulating pollutants "for which air quality criteria

have not been issued … under section 7408(a)).  The Act limits EPA in these ways

precisely *because* regulation of ozone precursors from all sources – including non-

EGUs – is the province of the National Ambient Air Quality Standards program,

including the Good Neighbor Provision.  *See West Virginia*, 142 S. Ct. at 2601.

For all these reasons, Petitioners' attempt to invoke the major questions doctrine is

unavailing.

### 3.   The Good Neighbor Plan reasonably allocates responsibility among states.

Petitioners next attempt to convince this Court that they will prevail on their

challenges because the Good Neighbor Plan requires more substantial emission

reductions from some states than others.  Ohio Mot. 17-19.  But this argument is

unequivocally foreclosed by *EME Homer*.  Like previous rules, the Good Neighbor

Plan applies a uniform contribution threshold at Step 2 (capturing any state

contributing more than one percent of the ozone standard to any downwind

receptor) and a uniform significance determination at Step 3 (identifying emission

reductions to be eliminated based on nationwide assessments of available emission controls) to define each state's Good Neighbor obligation – i.e., the "amounts" by which the state "contribute[s] significantly to nonattainment in" or "interfere[s] with maintenance by" any other state.  42 U.S.C. § 7410(a)(2)(D)(i); *see supra* Background I.  As the Supreme Court explained, this approach ensures equity between states by holding all upwind states contributing to downwind air quality problems to a common level of emissions performance, with comparable sources accomplishing comparable levels of emissions control.  *EME Homer*, 572 U.S. at 519-20.  The Court acknowledged that in any given rule, this might require some states to reduce their emissions more than others, but only because "[u]pwind States that have not yet implemented pollution controls of the same stringency as their neighbors will be stopped from free riding on their neighbors' efforts to reduce pollution."  *Id.* at 519.

Petitioners nonetheless invoke the State of New York to illustrate their perceived inequities, but the comparison only proves that *EME Homer* is dispositive.  New York is precisely the sort of "State A" the Supreme Court envisioned there: a "more populous" state that "therefore generates a larger sum of pollution overall," but that has "expended considerable resources installing modern pollution-control devices on their plants" and so might equitably be assigned fewer reductions than states "continu[ing] to run old, dirty plants."  *EME Homer*, 572

U.S. at 520; *see, e.g.*, 86 Fed. Reg. 43956 (Aug. 11, 2021) & 78 Fed. Reg. 41846 (July 12, 2013) (approving stringent $NO_X$ control measures into New York state plan).  New York's smaller reduction obligation under the Good Neighbor Plan thus does not make the Rule arbitrary or capricious.[5]

Petitioners' jab that New York was allotted a higher budget in 2024 than its emissions in 2022 is a red herring.  *See* Ohio Mot. 18.  New York's 2024 budget reasonably reflects small projected increases in the amount units will run that year – consistent with EPA's budgeting methodology for all states.  88 Fed. Reg. at 36777.  But in any case, New York's 2024 budget is still a *fraction* of the 2024 emissions budgets afforded Ohio, Indiana, or West Virginia – 3,912 tons for New York, compared to Ohio's 7,929 tons, Indiana's 11,413 tons, and West Virginia's 11,958 tons.  *Id.* at 36906-07.  Petitioners' comparisons of 2029 budgets are no more successful: all three states' budgets will still be well above New York's budget in 2029.  *See* Ohio Mot. 19; 88 Fed. Reg. at 36907.

---

[5] Petitioners cite *North Carolina*, *see* Ohio Mot. 17, but that case concerned EPA's decision to consider fuel type, and not just emissions share, when allocating allowances between states, which is not the case here.  *See* 531 F.3d at 920-21. Moreover, this argument was not raised in comments so it is barred.  42 U.S.C. § 7607(d)(7)(B).

### 4. Judicial orders in other cases staying underlying EPA actions pending judicial review have no bearing on the merits of this case.

Lastly, Petitioners cannot claim that the Rule is unlawful because *subsequent* judicial orders in separate litigation over EPA's state plan disapproval rule have had the effect of staying the federal plan's application to certain states. First, those claims are barred. The Clean Air Act's judicial review provisions are unequivocal that "[o]nly an objection to a rule … which was raised with reasonable specificity during the period for public comment … may be raised during judicial review." 42 U.S.C. § 7607(d)(7)(B) (barring judicial review and providing that administrative reconsideration, if any, does not stay a rule's effectiveness). This Court "'strictly' enforce[s]" that bar. *Wisconsin*, 938 F.3d at 331-32.

Even if these arguments were not obviously barred, Petitioners' arguments are baseless. EPA did not "exempt" certain states from the Rule, Ohio Mot. 13; it complied with judicial orders, which can hardly be an error – let alone an error sufficient to invalidate this separate Rule. EPA was also clear that implementation of the Rule was severable by state and by industry. 88 Fed. Reg. at 36693. In any event, it is entirely speculative that those states will remain excluded from the Rule, not least because the stays were issued by courts that are not the proper venue for those challenges. *See* 42 U.S.C. § 7607(b)(1) (Clean Air Act venue

24

provision); *see, e.g.*, Resp. Br. 58-76, ECF 397, *Texas v. EPA*, No. 23-60069 (5th Cir. Aug. 15, 2023) (addressing venue).

The fact that the Rule may now do less to ameliorate downwind air quality problems than anticipated (though perhaps only until the stays dissolve) also does not establish that the Rule is flawed. *See* Ohio Mot. 13. EPA's statutory obligation under Section 7410(c)(1) to implement a federal plan for states whose state plan disapprovals remain in effect has not been extinguished – and would not be even if only a single state remained. Moreover, neither the Good Neighbor Provision nor this Good Neighbor Plan is premised on accomplishing some minimum total of emission reductions. The Good Neighbor Provision pointedly does *not* require upwind states to reduce emissions until the downwind states attain the ozone standard – in which case, the number of covered states would determine the burden carried by each. *See* 42 U.S.C. § 7410(a)(2)(D)(i). Instead, it requires each state to shoulder responsibility for its own significant contribution, up to the point at which that state's significant contribution is eliminated. This Court has been clear that each state must do so regardless of whether other contributors also bear responsibility, *see Wisconsin*, 938 F.3d at 324-35, so the overall scope of the Rule does not change any individual state's responsibility.

Equally illogical is Petitioners' claim that EPA "failed to consider an important aspect of the problem" when it did not presuppose that some states

subject to the Rule would see their underlying state plan disapprovals stayed.

AFPA Mot. 17.  Petitioners cannot avoid the bar in Section 7607(d)(7)(B) by

repackaging their claims as a failure of Agency foresight – especially where they

would require an agency to anticipate adverse judicial rulings at odds with the

"presumption of regularity" afforded agency actions.  *USPS. v. Gregory*, 534 U.S.

1, 10 (2001).  Petitioners' displeasure that they remain subject to the Rule simply

does not justify the Rule's stay.

> **B.**  **The Rule's provisions governing power plant NO$_X$ emissions are reasonable and likely to be upheld.**

> **1.**  **The enhancements made to EPA's traditional power plant emissions trading program are reasonable and consistent with the Act.**

In designing the Good Neighbor Plan, EPA relied on its longstanding

framework for determining power plant NO$_X$ reductions (at Step 3) and

implementing those reductions through a market-based, multi-state allowance

trading program (at Step 4).  But the Good Neighbor Plan includes new trading

program enhancements to address the fact that sources subject to previous Good

Neighbor rules have often failed over time to maintain the level of control

stringency EPA determined was necessary to eliminate their Good Neighbor

emissions.  88 Fed. Reg. at 36762-63.  This past loosening of the program's

stringency, documented in the record here, has resulted from the application of

static trading budgets to a dynamic industry, allowing for the accumulation of

excessive amounts of emissions allowances.  *See, e.g.*, *id.* at 36764, 36767-68, 36797-99.  That in turn has allowed sources to idle controls during the ozone season (even to the point of exceeding the program's failsafe emissions "assurance levels") despite EPA's determinations that those controls were necessary to eliminate significant contribution.  *Id.* at 36676, 36720-24, 36752-53.  While trading programs can help find the most efficient means of reducing upwind emissions, that flexibility should not be allowed to undermine the control stringency EPA determined to be necessary at Step 3.  *Id.* at 36790.

The enhancements added to this Rule – "dynamic budgeting" (after 2025) to ensure that the number of annual allowances provided matches the actual composition of the state's power plant sources; "bank recalibration" to ensure allowance banks do not lead to widespread idling of controls; and "daily backstop rates" to ensure a basic level of emission performance at large emitters, *see supra* Background III – all work to close specific, observed loopholes in prior rules. Together, they maintain the level of control stringency that defines the line between allowed emissions and emissions that "significantly contribute" to downwind pollution and so must be eliminated – not just in the Rule's early years, but in a way that is "durable."  *Id.* at 36657.

Petitioners' objections to these enhancements are unavailing.  First, the bases for these enhancements are not unreasonable, nor are the benefits unduly

27

speculative or untethered from the Good Neighbor Provision, AFPA Mot. 10.  As explained in the Rule, the enhancements are not intended to reap *additional* emission reductions beyond states' significant contribution (for which EPA's presentation of bases and benefits at Step 3 is well-established).  The enhancements rather ensure that the emission reductions required by the Rule's Step 3 determination of significant contribution are not nullified by changes in the power sector.  They also ensure greater consistency of reductions both geographically (through backstop rates and additional assurance level provisions), 88 Fed. Reg. at 36767-70, and temporally (through dynamic budgeting and bank recalibration), *id.* at 36764-67.  In doing so, the enhancements limit the likelihood that the Rule's benefits will be unevenly distributed among the downwind states whose air quality the Good Neighbor Provision protects, or that the Rule will allow sources to resume polluting over time.[6]  *See* 88 Fed. Reg. at 36662-64, 36684-88, 36751-54, 36764-70.

Second, the enhancements do not "overcontrol" upwind states.  As Petitioners recognize, AFPA Mot. 6, a state is overcontrolled only where the Rule compels emission reductions in excess of what is necessary to bring all of its linked downwind receptors into attainment or to bring its contribution at all of

---

[6] Nor do the enhancements "limit[] the States' implementation discretion."  Ohio Mot. 11.  States have no role in implementing the federal plan or the trading program.

those linked receptors below one percent of the ozone standard.  *EME Homer*, 572

U.S. at 521-22; 88 Fed. Reg. at 36748.  The Rule's overcontrol analysis found that

no state met these definitions under either the control obligations beginning in

2023, or the control obligations beginning in 2026.  88 Fed. Reg. at 36748-54.

Petitioners do not actually challenge that analysis.  Instead, they claim the trading

program enhancements will create overcontrol in future years by increasing the

stringency of states' budgets and limiting the allowance pool over time.  APFA

Mot. 6-9.  But this argument misses the point: the enhancements operate to

maintain, not increase, the level of control stringency EPA determined was

necessary to prohibit each "source … from emitting any air pollutant in amounts

which will … contribute significantly to nonattainment in, or interfere with

maintenance" in downwind areas.  *See* 42 U.S.C. § 7410(a)(2)(D)(i)(I); *see* 88 Fed.

Reg. at 36657, 36751-54.  In years after 2026, the enhancements will incentivize

sources to continue to achieve the *same* level of performance required of them in

2026.  That cannot reasonably constitute an unlawful burden.  *See* 88 Fed. Reg. at

36676 (explaining that Good Neighbor emissions are defined as those in excess of

control strategies found justified at Step 3), 36752 (discussing the need for controls

on future high-ozone days).

　　　　Regardless, this Court has already held that assertions of overcontrol cannot

be raised in the abstract but must be brought through a "particularized, as-applied

challenge." *EME Homer II*, 795 F.3d at 137; 88 Fed. Reg. at 36752.  Petitioners

cannot meet that standard "because they do no more than speculate that aspects of

'EPA's methodology *could* lead to over-control of upwind states.'" *Wisconsin*,

938 F.3d at 325 (emphasis in original).

Finally, Petitioners' suggestion that EPA failed to assess the effect of the

Rule's trading program enhancements on grid reliability is incorrect.  AFPA Mot.

10-11.  EPA conducted a detailed technical analysis and engaged in consultation

on reliability issues, *see* 88 Fed. Reg. at 36679, and found no evidence that the

trading program enhancements would affect reliability.  *See id.* at 36771-75;

Birnbaum Decl. ¶¶ 60-61, 83 (noting record support).  As Petitioners acknowledge,

AFPA Mot. 10-11, EPA's numerous past federal Good Neighbor rulemakings have

not posed reliability concerns – despite similar sky-is-falling claims from

challengers to those rules.  *See id.*; Birnbaum Decl. ¶¶ 10, 64.  They provide no

evidence their worry is any more justified this time.[7]

## 2. The trading program appropriately implements power plant reductions no matter the number of covered states.

Petitioners are also unlikely to succeed on their claim that the trading

program is no longer viable because judicial stays in the underlying state-plan

---

[7] Petitioners' only citations, AFPA Mot. 4, are inapposite: the PJM report predates the final Rule and the North American Electric Reliability Corporation report does not discuss the Good Neighbor Plan at all.  *See also* Birnbaum Decl. ¶¶ 37-42.

litigation have temporarily removed some participating states. As noted earlier, *supra* Argument I.A.4, the judicial stays in question arose after the Rule's promulgation, so this argument is barred by 42 U.S.C. § 7607(d)(7)(B).

In any case, the argument is wrong. The Rule was clear that any particular state's obligations under the Rule were severable from, and did not undermine the Rule's implementation in, other states.[8] 88 Fed. Reg. at 36693. Moreover, EPA's determinations - at Step 3 of the transport framework – concerning the amounts of emissions reductions required from covered sources (based on the installation of particular controls), 88 Fed. Reg. at 36741-45, did not depend on the use of an interstate trading program. Birnbaum Decl. ¶¶ 73-75. Those determinations remain reasonable and applicable, no matter the size (or nature) of the trading program ultimately used to implement them.

While it is true that trading programs smooth the cost-curve for complying sources, incentivizing sources with cheap reductions to overperform and generate credits that sources with expensive reductions can purchase, *see* 88 Fed. Reg. at 36754, Petitioners have not demonstrated that the Rule's trading program (which still covers 10 states) will no longer serve this purpose. In fact, recent data

---

[8] EPA's assertions regarding the D.C. Circuit's exclusive venue over this Rule are consistent. *See* AFPA Mot. 16. The trading program's interstate design necessitates a single ruling on the common rules and obligations governing participating states. But that does not dictate a minimum enrollment in the trading program. *See* Birnbaum Decl. ¶¶ 71-82.

disproves Petitioners' suggestion, AFPA Mot. 16-17, that the current scope of the

trading program will create compliance challenges; allowances are readily

available and likely to remain so.  *See infra* Argument II.A; Birnbaum Decl. ¶ 73,

82.[9]

### C. EPA's decision to regulate certain non-EGU sources follows its framework and is supported by the record.

The Good Neighbor Plan, like EPA's 1998 $NO_X$ SIP Call, found that

emissions from non-EGU industrial sources are contributing to downwind air

quality problems.  *See* 88 Fed. Reg. at 36681.  Following the same framework

upheld in the Supreme Court's decision in *EME Homer City*, EPA identified cost-

effective and meaningful emissions reductions available through the

implementation of uniform emissions control requirements – set on an industry-by-

industry basis – for nine non-EGU industries.  *Id.* at 36682-83.  The Rule also set

adequate lead-times and established compliance flexibilities to ensure those

reductions could be implemented cost-effectively.  EPA's regulation of non-EGU

industrial sources was thus reasonable, consistent with prior EPA actions and case

law, and supported by the record.

---

[9] Declarant Birnbaum completed her declaration before the stay of EPA's state plan disapproval as to Alabama on August 17, 2023.  However, the analysis remains illustrative, even with one fewer state.

1.   **EPA appropriately determined the amount of emissions reductions from covered non-EGU sources.**

In the Rule, EPA "developed an emissions control strategy that prohibits the 'amount' of pollution that significantly contributes to nonattainment and/or interferes with maintenance." 88 Fed. Reg. at 36675.  At Step 3 of the Rule, EPA reasonably identified the "amount" of pollution for elimination from non-EGUs (as it did for power plants) as the "amount of emissions that is in excess of the emissions control strategies the EPA has deemed cost-effective" for those emissions unit types EPA concluded had potential highly impactful emissions reductions opportunities.  *Id.* at 36676.

Contrary to Petitioners' arguments, EPA did not improperly fail to designate an amount of pollution to be reduced.  EPA selected reasonable control strategies, applied them uniformly across each impactful industry, and demonstrated that these costs on a per-ton basis align with the cost-threshold selected for power plants and with what downwind states require of these source types.  88 Fed. Reg. at 36740, 36746-47; RTC at 62-63.

2.   **Petitioners incorrectly equate the screening assessment EPA applied with the amount of emissions reductions EPA ultimately determined necessary.**

The task of evaluating non-EGU industries is complex compared to power plants due to the much greater diversity in industries and emissions unit types.  88 Fed. Reg. at 36683.  But this Court's precedent is clear: complexity is no excuse

33

for not analyzing emissions sources unless the uncertainty is so profound as to preclude reasoned judgment. *Wisconsin*, 938 F.3d at 318-19. Thus, EPA adopted a series of analyses to identify which non-EGU industries and emissions unit types should be evaluated under the Good Neighbor Provision for the 2015 ozone standard.

First, EPA developed a Screening Assessment to help it determine what non-EGU industries and emissions unit types have potential for meaningful emissions reductions and thus warranted further analysis. *See generally* Screening Assessment. The Screening Assessment evaluated approximately forty industries, ultimately identifying nine for further analysis. RTC at 97. Petitioners repeatedly, and incorrectly, confuse the limited purpose of analytical steps within the Screening Assessment with EPA's ultimate determinations of significant contribution. *See* RTC at 90-94.

The Screening Assessment identified emissions units that had emitted over 100 tons per year of $NO_X$. Screening Assessment at 3. EPA assessed potentially controllable emissions, excluding sources the data suggested were already well-controlled, since such sources are less likely to have cost-effective control opportunities.[10] *Id.*; RTC at 109. After using this data to identify the nine most

---

[10] Ohio Petitioners' assertion that EPA failed to explain the term "well-controlled" is incorrect. Ohio Mot. 15-16. To determine whether sources were "well-controlled," EPA compared "the degree of existing emissions control on sources"

34

impactful industries to focus on, EPA prepared a list of potential control measures and costs.  Screening Assessment at 4.  By plotting curves for ozone season $NO_X$ reduction potential against the anticipated cost per ton of reductions for the nine most impactful industries, EPA identified $7,500 per ton as the point at which further emissions controls generally appeared to become less cost-effective, which it used to further assess estimated emissions reductions and associated air quality improvements.  *Id.*

But EPA made clear that the Screening Assessment and the $7,500 value "were not directly used to establish applicability thresholds and emissions limits in the proposal or in the final rule," RTC at 91, and arguments that EPA "abandoned" a $7,500 per ton cost-effectiveness threshold as the proxy for the necessary amount of emissions reductions, Kinder Morgan Mot. 10-11, misrepresent EPA's process.  EPA applied the $7,500 per ton threshold to help it identify potentially impactful emissions control opportunities for further evaluation, not as the maximum cost any facility may need to expend or as a definition of the necessary amount of pollution reductions.  88 Fed. Reg. at 36740; RTC at 91-92.  Rather, EPA anchored its ultimate determinations of "significance" for non-EGUs to several factors, including its final cost-effectiveness determinations, comparison to power plants,

---

to "what additional emissions controls could be available to these sources," taking into account "data from the Control Strategy Tool (CoST), the Control Measures Database (CMDB), and the 2023 emissions inventory[.]"  RTC at 102.

comparison to prior rules, and requirements imposed by downwind states. *See, e.g.*, 88 Fed. Reg. at 36740.

Costs for particular non-EGU emissions unit types, even when higher than $7,500 per ton, remained commensurate with selected control stringency for power plants, where the representative cost was $11,000 per ton and the cost at the 90th percentile was $20,900 per ton. 88 Fed. Reg. at 36746; *see also* RTC at 406-08 (explaining difference between representative and outlier costs and contextualizing the role of cost-per-ton estimates at Step 3). Moreover, the emissions control requirements EPA finalized were generally commensurate with the costs of certain preexisting emissions controls in downwind states under "reasonably available control technology" requirements for $NO_X$. RTC at 62, 855. EPA also compared its analysis of non-EGUs in the Rule to non-EGU emissions analysis in the "Revised CSAPR Update" rule. RTC at 94. "The same factors and considerations that the EPA applied in concluding that non-EGU emissions controls were not necessary to eliminate significant contribution in the Revised CSAPR Update all tend to support the basis for the EPA's conclusion to require such controls to eliminate significant contribution in [the Rule]." *Id.*; *see also* 88 Fed. Reg. at 36746-47; Non-EGU TSD. Thus, EPA was clear that the $7,500 per ton threshold used in the Screening Assessment was not intended to define the amount of emissions to be eliminated, and its analysis of cost-effectiveness and other factors

produced an entirely reasonable and justified level of control stringency for non-EGUs at Step 3.  Petitioners' arguments to the contrary miss the point and create unnecessary confusion.

### 3.    EPA adequately explained its decision to use 100 tons per year in its Screening Assessment.

Similarly, EPA's use of a 100 ton-per-year threshold in its Screening Assessment was reasonable and adequately explained.  As with the $7,500-per-ton threshold, this was not used to definitively exclude units emitting less than 100 tons per year from regulation under the Rule.  RTC at 109; *contra* Ohio Mot. 15-16.  Instead, EPA used a threshold of 100 tons per year (of actual emissions) to help it identify industries and emission unit types more likely to have cost-effective emissions control opportunities, at which point EPA conducted further analysis on appropriate emissions controls.  *Id.*  Thus, any suggestion that EPA relied on a 100-tons-per-year threshold in the Screening Assessment to make definitive cutoffs as to which emissions units should be covered by the Rule is incorrect.  *See* Ohio Mot. 16-17.

EPA also adequately explained its use of a lower threshold than the 150-tons-per-year threshold it used in a non-EGU assessment for the 2008 ozone standard.  RTC at 109.  The 2015 ozone standard is a more protective air quality standard, so consideration of a wider universe of emissions units for potential control opportunities was justified.  *Id.*  Further, EPA noted that a unit emitting 100

37

tons per year roughly corresponds to the definition of "major source" used in the Clean Air Act.  *Id.*  While the Good Neighbor Provision does not limit EPA to considering major sources, this correspondence supported EPA's decision.

### D. EPA's regulation of emissions from natural gas pipeline engines is rational and well-supported.

EPA identified reciprocating internal combustion engines in the Pipeline Transportation of Natural Gas industry ("pipeline engines") as the non-EGU sector with the greatest potential for emissions reductions.  *See* Applicability TSD at 10.  EPA's analysis revealed the potential to eliminate approximately 32,247 tons of ozone-season $NO_X$ emissions from pipeline engines, at an average cost per ton of $4,981 – well within representative cost-per-ton values that EPA found justified for other sources (e.g., for power plants, $11,000 per ton).  *Id.*  EPA's decision to include pipeline engines in the Rule was reasonable and supported by the record.

#### 1. EPA reasonably applied a 1,000-horsepower applicability criterion for pipeline engines.

EPA established emissions limitations applicable to pipeline engines of 1,000 horsepower or greater.  EPA chose this threshold for several reasons.

First, EPA's decision to include pipeline engines based on horsepower (i.e., design capacity) rather than tons per year (actual historic emissions) was reasonable.  Because many pipeline engines are not regularly run at full capacity, a threshold based on historic emissions would leave many pipeline engines outside

the scope of the Rule.  But, as EPA recognized, if those units were exempted based on historically low actual emissions, source owners could avoid regulation under the Rule by shifting operation from their regulated units to non-regulated ones.  88 Fed. Reg. at 36746.  Moreover, if certain operators could avoid the Rule's control requirements on this basis, they could gain a competitive advantage against other facilities operating units with the same horsepower capacity but higher use in the past.  *Id.*  Using design capacity was also consistent with the applicability criteria in "reasonably available control technology" rules and other preexisting control requirements for engines with which the industry is familiar.  *Id.* at 36821.

Second, EPA's decision to set the threshold at 1,000-horsepower engines was reasonable.  Based on the Screening Assessment, EPA had determined that engines with the potential to emit 100 tons per year of $NO_X$ emissions had the most significant potential for reductions.  Non-EGU Sector TSD at 4.  With this information in hand, EPA reviewed the National Emissions Inventory and determined that many engines above 1,000 horsepower reported emissions above 100 tons per year, while engines smaller than 1,000 horsepower generally reported emissions below 100 tons per year.  *Id.*  EPA recognized that the 1,000-horsepower threshold would not capture an identical subset of pipeline generator engines to those that would be regulated under a 100 tons-per-year threshold, but it served as a reasonable proxy.  88 Fed. Reg. at 36821.

There was nothing improper in this decision: EPA was in no way tied to selecting a control threshold that only regulated units emitting more than 100 tons per year. Rather, as explained above, the 100 tons-per-year actual-emissions threshold was just one factor in the Screening Assessment. RTC at 123. Thus, the assertion that EPA had already determined that sources emitting less than 100 tons per year do not contribute significantly to nonattainment in downwind states is incorrect. INGAA Mot. 8.

Further, EPA reasonably determined that the 1,000-horsepower threshold resulted in cost-effective regulation. EPA recognized that the 1,000-horsepower threshold captures significantly more units than it estimated at proposal but concluded that no adjustment was warranted because the higher number of units still allowed for cost-effective emissions reductions. *Id.* In fact, when EPA re-ran its cost estimates for the pipeline engine industry using the updated number of units expected to be covered, it found a remarkable amount of emissions reductions available from pipeline engines – approximately 32,247 tons of ozone-season $NO_X$. Applicability TSD at 10. And the average cost per ton value for the industry was $4,981 per ton – well within the range of cost-effectiveness estimates for the Rule. RTC at 124; Applicability TSD Tables 5 & 6. Moreover, EPA applied this updated data to its overcontrol assessment and determined the Rule does not result in prohibited overcontrol. RTC at 124; 88 Fed. Reg. at 36749-50.

To the extent certain pipeline units covered by the Rule may have higher costs to install the necessary control technology, EPA accounted for this possibility by making several adjustments in the final Rule to increase compliance flexibility. Because pollution controls will be more cost-effective for some units than others, EPA heeded commenters' suggestion to include in the Rule an option to implement an averaging plan, rather than requiring each individual unit to meet specific emissions limits.  RTC at 652-55.  This allows facilities to prioritize the most cost-effective emissions reductions, mirroring a similar mechanism EPA had previously suggested for this sector under the $NO_X$ SIP call.  88 Fed. Reg. at 36823-24.

Using averaging plans, EPA determined that of the 3,005 pipeline engines subject to the Rule, only approximately 905 would have to install controls.  Non-EGU TSD at 19.  Petitioners suggest that EPA's averaging plan is insufficient because many facilities only have a single engine and thus cannot take advantage of averaging across multiple units.  INGAA Mot. 18-19.  However, EPA's record shows that 80% of compressor stations in the United States have more than one compressor unit.  EPA-HQ-OAR- 2021-0668-1077 at 8 ("Timing Report").  EPA estimated the 905-unit figure by analyzing a representative sample of facility types, with different numbers and types of engines.  This estimate was reasonable and supported EPA's determination to allow facility-wide averaging as an effective way to reduce costs.  Non-EGU TSD at 19.

41

Commenters proposed numerous different structures for the averaging plan, including fleet-wide, company-wide, and facility-wide. *Id.* Contrary to Petitioners' claims, Kinder Morgan Mot. 16, EPA acknowledged these comments, and, after reviewing many states' averaging programs, it determined that a facility-wide averaging plan would offer the appropriate level of compliance flexibility to avoid forcing installation of highly cost-ineffective controls. RTC at 652-55. This was sufficient to address comments.

The Rule does not require regulated entities to install controls regardless of cost. INGAA Mot. 15. First, EPA notes that no party disputes the control technologies available for pipeline engines: the technology and limits that EPA applied are based on extensive literature review and existing requirements, and they are generally achievable for these units. 88 Fed. Reg. at 36821-23; Non-EGU TSD at 5-11. Second, to the extent that certain outlier units might have higher emissions control costs than others, EPA accounted for these potentially higher costs by allowing sources to request case-by-case alternative emissions limits, in addition to the flexibility provided pipeline engines by the averaging plan. 40 C.F.R. 52.40(e) and 52.41(d); 88 Fed. Reg. at 36818. This accounts for potential unique circumstances where the emissions control requirements for a particular source are shown to be technically impossible or impossible without extreme economic hardship. 88 Fed. Reg. at 36818.

42

EPA provided an objective metric for consideration of requests for case-by-case limits, but it was not required to guarantee in advance that it would approve an operator's request. *Contra* INGAA Mot. 19. As EPA explained, its evaluation of applications for alternative limits based on extreme economic hardship would be tied to the cost-effectiveness analysis used at Step 3. 88 Fed. Reg. at 36819. EPA would compare the costs of compliance for the requesting source to the emissions reductions and costs identified in the Rule for other sources in the relevant industry, to determine whether the source's costs would exceed the high end of the range of estimated cost-per-ton figures for the relevant industry. *Id.* Contrary to Petitioners' claims, the public docket provides access to information about the emissions reductions and cost estimates that informed EPA's cost-effectiveness evaluation for pipeline engines. *See* EPA-HQ-OAR-2021-0668-0952 ("Non-EGU Unit Results - 1-23-2023.xlsx" in the Results\ directory). EPA's provision in the Rule for alternative limits in cases of extreme economic hardship, in addition to the facility-wide averaging plan, reasonably addressed commenters' concerns regarding outlier costs.

### 2. EPA set a reasonable compliance timeline that accounted for installation challenges.

The Rule does not require non-EGU sources to implement emissions reductions until the 2026 ozone season, giving those sources a minimum of three full years until compliance obligations begin. 88 Fed. Reg. at 36755-57. This

implementation schedule aligns with the downwind nonattainment schedule, as well as Congress's statutory mandates setting three years as the general timeframe to reduce pollution impacting public health, found throughout title I of the Act. *Id.* (citing provisions). The non-EGU compliance schedule EPA set in the Rule is reasonable, well-supported, and accounts for potential installation challenges.

EPA commissioned a report to provide a comprehensive and systematic review of the potential timing challenges associated with installing controls for non-EGU units covered by the Rule, including pipeline engines. *See generally* Timing Report. The Timing Report found that, while three years is generally sufficient time for installation of all control types on a single facility basis, supply-chain disruption or labor shortages could cause industry-wide installation to take up to 72 months. *Id.* at ES-2; 88 Fed. Reg. at 36759. This estimate is based on an upper-bound assumption relating to how many pipeline engines are old enough to require specialized labor for control technology installation, with actual timelines likely to be shorter. Timing Report at ES-2-3; *see also id.* at 41 (finding vendor supply for "compact [catalytic and non-catalytic controls] applied to [pipeline engines]" sufficient based on vendor interviews), 59-60 (analyzing labor and vendor capacity and timing needs for pipeline engines).

EPA accounted for these estimates in the Rule by providing a process for individual non-EGU sources to seek extensions of up to three years from 2026,

44

based on a case-by-case demonstration of necessity.  This specifically aligns with

the outer-bound 72-month installation time.  EPA also found supply-chain

disruptions were already clearing up and noted that the market would likely

respond to the increase in demand caused by the Rule.  88 Fed. Reg. at 36759-60;

*cf. Wisconsin*, 938 F.3d at 330 ("[A]ll those anecdotes [of elongated control

installation times] show is that installation can drag on when companies are

unconstrained by the ticking clock of the law.").

Finally, EPA adequately considered reliability concerns raised by

commenters in setting this timeline.  As discussed further below, *see infra*

Argument II.B, natural gas compressor stations are required to maintain sufficient

capacity to meet demand on peak demand days.  Accordingly, stations have

backup engines, and over 40% of stations operate at less than 80% capacity; one

pipeline operator suggested average capacity utilization in the United States was

40%.  Timing Report at ES-8, 8.  Given the available capacity, EPA determined

that individual unit outages to upgrade controls need not interrupt natural gas

supply and thus the Rule would not pose risks to natural gas reliability.[11]

---

[11] Kinder Morgan offers no explanation why coordinating with FERC to ensure gas supply is not disrupted would necessitate "anti-competitive" practices, nor was this issue raised in comments, so it is waived.  42 U.S.C. § 7607(d)(7)(B).

### E.    EPA's regulation of emissions from cement kilns is rational and well-supported.

EPA did not base its regulation of cement kilns on improper assumptions. AFPA Mot. 11-12.  EPA recognized that many non-EGUs, including cement kilns, already have controls installed or are achieving reductions at or below the limits it set.  88 Fed. Reg. at 36836.  The Rule is intended to bring all units within each industry in upwind states up to a certain level of performance.  *Id.*  If a cement kiln is already equipped with control technology that allows it to meet the applicable emissions limit, the Rule does not require greater emissions reductions than are already being achieved.  RTC at 117.  Thus, sources that already achieve the applicable level of performance will face minimal costs to comply with the Rule.

Further, EPA determined that cement kilns are an impactful industry to regulate in the Rule with large amounts of controllable $NO_X$ emissions.  RTC at 117.  EPA's Rule indicates roughly 2,573 tons of ozone-season $NO_X$ emissions reductions are available from cement kilns, at an average cost-effectiveness value of $1,632 per ton.  *Id.*  Based on this information, EPA reasonably determined that cement kilns should be included in the Rule.  *Id.* at 117-18.

### F.    EPA's regulation of emissions from the steel industry is rational and well-supported.

Petitioners claim that EPA did not propose emissions limits for steel industry reheat furnaces, and that industry thus lacked opportunity to comment on

those proposed limits.  AFPA Mot. 12-13.  That is incorrect.  *See* 87 Fed. Reg. 20036, 20145 & Table VII.C-3 (Apr. 6, 2022) (identifying proposed emissions limit of 0.05 lb/mmBtu for steel industry reheat furnaces).  Upon consideration of industry comments on the proposed limit, EPA recognized that a single limit would be inappropriate for these units, given the wide variability in performance of low $NO_X$ burners.  88 Fed. Reg. at 36818.  As a result, in response to industry comments, EPA finalized a "test-and-set" approach requiring installation of low $NO_X$ burners and then testing to determine an appropriate limit.  *Id.*  Further, the Rule provides ample time to comply with the requirements for steel industry reheat furnaces; it provides industry a full year to give EPA the work plan for setting applicable limits.  *Id.* at 36879.  And it was not arbitrary or capricious for EPA to impose monitoring requirements, which are mandatory under the CAA.  42 U.S.C. § 7410(a)(2)(F); 40 C.F.R. 51.210-51.212.

## G. EPA's regulation of emissions from the paper industry is rational and well-supported.

EPA's inclusion of boilers in several industries, including the paper industry, was reasonable.  EPA's Screening Assessment identified boilers as particularly high-emitting units found in several industries that EPA found have controllable emissions that would yield downwind benefits.  Screening Assessment at 5-6. EPA explained that industrial boilers were a reasonable class of emissions unit to target across industries and that it had done so previously in the $NO_X$ SIP Call.

47

RTC at 92, 97-98, 99-100, 107.  Boilers in the paper industry fell squarely within EPA's analysis: in the Rule, EPA found that paper-industry boilers will account for an approximately 1,836-ton reduction in $NO_X$ emissions, the highest level of emissions reductions from boilers in any non-EGU industry covered by the Rule. RTC at 121.  Petitioners' claims that paper-industry boilers should be excluded from the Rule are based on assertions that misunderstand the Screening Assessment and could not be verified in any case.  RTC at 119-21.  The record provides a rational basis for EPA's decision to include paper-industry boilers in the Rule.

Moreover, EPA set emissions limits that are feasible for paper-industry boilers.  In reaching this conclusion, EPA relied on technical studies identifying available control types and what they can achieve, and reviewed state laws setting boiler emissions limits at least as stringent as EPA's.  Non-EGU TSD at 61-62.

Industry Consortium Petitioners argue that EPA's inclusion of certain paper boilers was arbitrary and capricious because it will impose costs significantly higher than $7,500 per ton of reduction.  As already explained, this argument fundamentally misunderstands the role of the $7,500-per-ton threshold in EPA's Screening Assessment.  *See supra* Argument I.C.2; RTC at 113-15.  Regardless, EPA's final cost analysis for boilers was consistent with the rest of its Step 3 analysis.  EPA acknowledged that boilers as a group within the non-EGU control

program could face representative costs as high as around $14,500 per ton to meet the uniform emissions limit EPA found reasonable for industrial boilers. Applicability TSD at 10.  EPA explained that this was commensurate with the representative cost figure of $11,000 per ton that EPA found justified for power plants, because the high-end of the range of industrial boiler costs generally tracked with the high end of the range for power plants.  88 Fed. Reg. at 36746. EPA also explained that its determinations of "significance" at Step 3 reflected more than just cost-per-ton analysis but an evaluation of available emissions reductions, improvement in downwind air quality, and what downwind states were already requiring of their sources.  *Id.* at 36747; RTC at 62-63.  Finally, EPA accommodated comments concerning potential implementation challenges for boilers by exempting low-use boilers, exempting boilers burning less than 90% fossil-fuel, weighting emissions rates by fossil-fuel type, and allowing for case-by-case exemptions and alternative emissions limits.  88 Fed. Reg. at 36819, 36833-34.  In sum, EPA reasonably included boilers in the Rule and established feasible requirements for them.

## II.    Petitioners have failed to demonstrate irreparable harm.

Petitioners have failed to demonstrate they will suffer irreparable harm absent a stay of the Good Neighbor Plan.  To support a stay, the claimed injury "must be both certain and great; it must be actual and not theoretical."  *Wis. Gas*

*Co. v. FERC*, 758 F.3d 669, 674 (D.C. Cir. 1985).  Consideration of harm is

"critical" and "simply showing some 'possibility of irreparable injury,' fails to

satisfy [this] factor."  *Nken*, 556 U.S. at 434-35 (quoting *Abbassi v. INS*, 143 F.3d

513, 514 (9th Cir. 1998)).  Petitioners have not established irreparable harm.

### A.    Power plant compliance is feasible given the emissions budget surpluses, low allowance costs, and lengthy timeline.

As with prior Good Neighbor rules upheld by this Court and successfully

implemented without undue cost or strain on the electric power sector, power

plants will comply with the Good Neighbor Plan through a market-based interstate

trading program.  *See* Birnbaum Decl. ¶¶ 16, 24.  Though Petitioners argue that

participating power plants will be harmed by immediate compliance costs and high

allowance prices, AFPA Mot. 18-20, those arguments ignore real-world data

showing power plants are already on track to comply in 2023 with no further

emissions reductions and will go into the 2024 and 2025 ozone seasons with

budget surpluses.

For the 2023 through 2025 ozone seasons, the Rule imposes familiar control

strategies that are effectively no different than those included in EPA's two most

recent Good Neighbor rules in 2016 and 2021.  Birnbaum Decl. ¶ 29.  Under the

Good Neighbor Plan, the initial state budgets for 2023 through 2025 are based on

"the optimization of *existing* post-combustion controls … and combustion control

upgrades."  88 Fed. Reg. at 36754 (emphasis added).  Most state emissions budgets

50

decrease only slightly, or not at all, during the 2023-2025 period – and these changes often only reflect previously planned changes in the power fleet. *See id.* at 36662-63.

In fact, had the Good Neighbor Plan's trading program gone into effect in all 22 states, the collective available allowances for 2023 would have been at least *60,000* tons *higher* than emissions in 2022. Birnbaum Decl. ¶¶ 55, 56. Further, newly released emissions data indicate that in May and June of 2023, $NO_X$ emissions from the original 22 states covered by the Rule were 19% lower than in 2022 (and emissions-*rate* performance substantially improved in these states). *Id.* ¶¶ 58-59. Power plants should face no difficulty in complying with the 2023 emissions budgets.

Petitioners argue, however, that they will be harmed because power plants in some states are not currently participating in the trading program as the result of judicial stays, thus allegedly limiting the pool of allowances and causing prices to increase. AFPA Mot. 19. Contrary to these unsubstantiated concerns, allowance prices trended downward over 2023 and then plummeted when second quarter emissions data were released. Birnbaum Decl. ¶¶ 66-68. Petitioners cite a price-spike in 2022 as an example of potentially "significantly higher premiums" for power plants on the allowance market, AFPA Mot. 19, but allowance prices have since declined by about 90% from that peak. Birnbaum Decl. ¶ 68. These price

51

drops accord with allowance supply, which remains well above actual emissions. *Id.* ¶¶ 76-82 (showing an allowance surplus of more than 29,000 tons in a smaller trading program[12]).  As there is no evidence that the smaller trading region will increase allowance prices, especially considering the scale of surplus allowances available, Petitioners' claim that allowance prices will inevitably increase is pure speculation.  AFPA Mot. 19; Birnbaum Decl. ¶¶ 71-82.  Petitioners cannot demonstrate that complying with emissions budgets in the short-term will cause irreparable harm.

Turning to compliance in later years: more stringent state budgets associated with the installation of post-combustion controls do not phase in until the 2026 and 2027 ozone seasons.  These reductions are largely based on catalytic control technology, which is widely available and already employed by about 60% of the U.S. coal fleet.  88 Fed. Reg. at 36680.  Should power plants choose to comply with 2026 and 2027 ozone season emissions budgets by installing this technology (rather than through other compliance strategies, for which the program preserves substantial flexibility, *see* Birnbaum Decl. ¶ 85), these power plants should still not need to expend large capital improvement costs during the next 12 months. Birnbaum Decl. ¶¶ 49-52.  EPA estimated a 21-month timeline for a single

---

[12] These portions of Declarant Birnbaum's declaration address an 11-state trading program.  *See supra* n.9.  However, as an explanation for the prior steep decline in allowance pricing, the analysis in this paragraph remains applicable.

installation of catalytic controls (including pre-contract and engineering assessment steps) and provided the 36- to 48-month timeline in the Rule to accommodate fleetwide compliance.  *Id.* ¶ 49; EPA-HQ-OAR-2021-0668-1092 at 32.  Accordingly, though some power plants may begin pre-construction activities while this case is pending, many could likely defer large capital expenditures pending judicial review.  *See* Birnbaum Decl. ¶ 52.  Petitioners have thus failed to demonstrate that power plants will suffer irreparable harm from either the Rule's near- or long-term requirements.

### B.    Industrial sources have no emissions reduction obligations until at least 2026.

The Good Neighbor Plan does not require non-EGU industrial sources to meet emissions limits until May 1, 2026, at the earliest, giving these sources over three years after the Plan was finalized to prepare for compliance.  *See* 88 Fed. Reg. at 36755-60; Ex. 2, Mathias Decl. ¶ 9.  As explained below, EPA designed the Good Neighbor Plan to provide flexibility and time for non-EGUs to comply by this deadline, and those same considerations will insulate non-EGUs from any "great" injury in the coming months.

For all non-EGU sources, the Plan provides for compliance extensions of up to three additional years, as well as alternative emissions limits.  Mathias Decl. ¶¶ 16-24.  The Plan also provides other industry-specific flexibility, such as the use of facility-wide averaging to reduce the compliance burden for pipeline engines.  *Id.*

¶¶ 25-27.  Similar to the retrofit-timing estimates for power plants, EPA's control-installation timelines for non-EGUs provide ample time and flexibility for compliance.  88 Fed. Reg. at 36759.

This conclusion is supported by the study EPA commissioned of installation timelines for non-EGU industries.  *Id*. at 36758; *supra* Argument I.C.  That study estimated that installation of the necessary controls would take between 6 and 28 months for covered facilities.  Timing Report at ES-2-3; *see also id.* at 25 (estimated timelines by industry); 88 Fed. Reg. at 36759 (estimating "maximum estimated installation times ranging from 12-28 months without any supply chain delays").  While certain facilities may be impacted by supply chain delays, the study showed these disruptions are now easing.[13]  *See* Timing Report at 50-54; 88 Fed. Reg. at 36759-60.  In addition, EPA explained that the longer estimates in the Installation Timing Report may be overstated, as they relied on the assumptions that supply chain delays would continue unabated and that the market for skilled labor will remain limited despite increasing demand.  88 Fed. Reg. at 36759.

As with power plants, EPA acknowledges that certain non-EGUs could begin planning and other pre-compliance activities in the next year.  Still, given the

---

[13] The availability of compliance extensions of up to three years (six years total) adequately addresses a concern unique to pipeline engines regarding specialized labor for which the Timing Report, at 59-60, identified an "upper-bound" need of up to 72 months.

flexibilities of the Good Neighbor Plan, many non-EGUs will likely be able to avoid large capital expenditures in the coming months while still complying by May 1, 2026.  Accordingly, while non-EGU Petitioners allege various costs of compliance associated with the Good Neighbor Plan, *see, e.g.*, INGAA Mot. 21, they have not demonstrated the type of economic harm that would constitute "certain" and "great" irreparable injury while this case proceeds.[14]

Finally, Petitioner natural gas transporters (a subset of non-EGUs) argue they and the public will be harmed because the Good Neighbor Plan may cause service outages.  *See* Kinder Morgan Mot. 20; INGAA Mot. 21; Enbridge Mot. 20. But any outages or shortages are entirely speculative given that natural gas compressor stations in the U.S. maintain substantial reserve capacity: the record shows that 80% of compressor stations have more than one unit, about 25% of units operate at less than 40% capacity, and more than 40% of units operate at less than 80% capacity.  Timing Report at 8.  One pipeline operator indicated that average utilization in the U.S. *was about 40%.  Id.* (citing TC Energy's Comments).  This suggests that pipeline operators have sufficient capacity to

---

[14] Even taking Petitioners' compliance estimates at face value, they are a fraction of these Petitioners' 2022 annual operating revenues.  For example, Enbridge alleges it will spend about $350 million over the next 12-18 months, which amounts to only about 0.88% of its 2022 operating revenues of about $39.7 billion (converted from 53.309 billion Canadian Dollars).  *See* Enbridge Inc., Annual Report (Form 10-K) at 96 (Feb. 10, 2023), available at: https://perma.cc/8JNN-KGCL.  The result is comparable for other Petitioners.

manage unit outages for pollution-control upgrades.  Moreover, the Good

Neighbor Plan exempts emergency engines from emissions limits.  Mathias Decl. ¶

26.  Petitioners thus fail to allege more than the mere possibility of future injury.[15]

### C.    State Petitioners face no irreparable harm.

State Petitioners moving here allege three forms of injury: impediment to

state sovereignty, economic impacts, and compliance burdens.  Ohio Mot. 20-21.

These theories do not support State Petitioners' irreparable harm allegations.

First, the Good Neighbor Plan does not injure state sovereignty.  *See supra*

Argument I.A.  EPA directly implements federal plans without commandeering

states into taking on any responsibility.  *See* 88 Fed. Reg. at 36675.  Even if

Petitioners could allege harm (and EPA disputes that they can), such allegations

would only be appropriate in challenges to EPA's separate state plan disapproval

action because, once EPA has disapproved a state plan, it is *obligated* to issue a

federal plan.  42 U.S.C. § 7410(c)(1).  Indeed, under Petitioners' view, EPA could

never promulgate a federal plan without irreparably "injuring" the relevant state –

a result plainly at odds with the Act.

Second, State Petitioners assert that electricity grid destabilization will cause

"devastating economic impacts."  Ohio Mot. 20-21.  But State Petitioners provide

---

[15] Petitioners' reliance on FERC reservation charges as the basis for irreparable
harm, *see* Kinder Morgan Mot. 20, hinges on the questionable assumption that
shortages will occur, which Petitioners have not established.

no more than speculative allegations that some power plants *may* opt to retire at *some future point*. In fact, EPA addressed this concern in the Good Neighbor Plan at length and concluded that the Plan would not degrade electric-system reliability, in primary part because neither the power plant reductions EPA found feasible nor the trading program implementing them requires that any power plant retire. *See* 88 Fed. Reg. at 36770-75; Birnbaum Decl. ¶¶ 34, 39-43, 85. Moreover, a power plant operator could not choose to retire a unit without complying with retirement procedures established by the relevant Regional Transmission Organization or other authority charged with maintaining grid reliability. 88 Fed. Reg. at 36771.

State Petitioners then stack assumption upon assumption to argue that severe weather events will cause emergencies given a purportedly weakened electricity grid. Ohio Mot. 20-21. As an example, State Petitioners cite a 2022 incident in which PJM (a Regional Transmission Operator) notified the Department of Energy that upcoming cold weather might cause an electricity shortage, causing the Department to subsequently suspend pollutant emissions regulations and capacity limits. *Id.* at 20. But Petitioners do not allege that any electricity shortages occurred at that time in 2022, and Petitioners ignore that the trading program is already designed specifically to adapt to unforeseen changes in demand. *See* 88 Fed. Reg. at 36732, 36778.

Third, State Petitioners allege they will be harmed by compliance costs. Ohio Mot. 21. The Good Neighbor Plan imposes no requirements on the states themselves, only on the covered sources. State Petitioners offer broad allegations of costs to the states from processing permit modifications and from ensuring compliance (the latter of which is at states' discretion). *See id.* (citing, *e.g.*, Hodanbosi Decl. ¶ 24; Crowder Decl. ¶¶ 40-44). But executing traditional permitting functions within their regular duties does not, in itself, irreparably "injure" states. And despite Petitioners' allegations that processing permits is burdensome, *see* Crowder Decl. ¶ 42, EPA's record establishes that states generally have the capacity to manage any uptick in permit modifications. Timing Installation Report at 44-45. Finally, these allegations rely on speculative claims that resources will be diverted from other projects and that state permitting decisions may be subject to litigation. Crowder Decl. ¶¶ 42-43. These arguments fail to demonstrate that the Petitioner States themselves are subject to a "certain" and "great" harm absent a stay of the Good Neighbor Plan.

## III.    The balance of equities and the public interest disfavor a stay.

The Court must also consider "the harm to the opposing party and weigh[] the public interest." *Nken*, 556 U.S. at 435. Where, as here, the government is the opposing party, these two factors merge. *Id.* Petitioners' purported harms do not outweigh the immense public benefit of the Good Neighbor Plan, which will

reduce harmful ozone levels across the United States.  Birnbaum Decl. ¶¶ 10-13.

The balance of equities disfavors a stay.

To begin, a stay would allow upwind states to "reap[] the benefits of the

economic activity causing the pollution without bearing all the costs," *EME Homer

City*, 572 U.S. at 495, stopping the implementation of necessary emissions

reductions while downwind areas shoulder the burden – and the harms – of these

continued emissions.  Realizing the severity of cross-state air pollution, Congress

dictated that such emissions must be addressed.  It is in the public interest to follow

that dictate and allow the Good Neighbor Plan to continue to address the upwind

states' harmful emissions and their accompanying public health impacts.  *Cf. North

Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (remanding the Clean Air

Interstate Rule without vacatur to "temporarily preserve the environmental values"

of the Rule).

Contrary to Petitioners' arguments, a delay of the Good Neighbor Plan

would cause substantial harm.  *See* Enbridge Mot. 21; Ohio Mot. 21-22.  The

incentive to improve emissions performance in the short-term – which has already

borne fruit, *see* Birnbaum Decl. ¶¶ 58-59 – would be lost, *id.* ¶ 89.  And a stay

would likely delay the phase-in of more significant reductions for power plants and

non-EGUs slated to begin in 2026.  Stays of two prior Good Neighbor rulemakings

(the $NO_X$ SIP Call and CSAPR) led to implementation delays of up to three years,

even though the rules were later largely upheld.  *Id.* ¶ 16; *see Michigan*, 213 F.3d at 695 (upholding NO$_X$ SIP Call in most respects and remanding without vacatur except as to three states); *EME Homer II*, 795 F.3d at 132 (remanding CSAPR without vacatur).  A similar delay here could delay elimination of upwind states' significant contribution until at least 2029.  Birnbaum Decl. ¶ 16.

Downwind states would be seriously harmed by any such delay.  The Good Neighbor Plan addresses emissions in 23 states that are significantly contributing to 19 nonattainment areas throughout the country where roughly a quarter of the U.S. population lives.  Birnbaum Decl. ¶¶ 12, 90.  And its benefits extend to even more areas not formally identified as receptors.  *Id.* ¶ 96.   The harms associated with acute and chronic ozone exposure in humans include premature mortality and "morbidity effects, such as asthma exacerbation."  88 Fed. Reg. 36671. In addition to the ongoing public health danger these emissions represent, areas in violation of ozone standards can face increasingly stringent regulatory burdens mandated by the Clean Air Act, *see* 42 U.S.C. § 7511a, thus generating economic harm and potentially stalling economic development in downwind states as well.  Birnbaum Decl. ¶¶ 92-95.

This Court has repeatedly held that EPA *must* address upwind states' harmful emissions as expeditiously as practicable and no later than the next attainment date.  *Wisconsin*, 938 F.3d at 313-20; *Maryland v. EPA*, 958 F.3d 1185,

60

1204 (D.C. Cir. 2020); *New York v. EPA*, 964 F.3d 1214, 1226 (D.C. Cir. 2020).  A stay would unnecessarily delay these emissions reductions in contravention of the Act and this Court's precedent.

That some upwind states cannot currently participate in the Good Neighbor Plan does not diminish the benefit of emissions reductions from participating states.  Petitioner Enbridge suggests that because the Rule "collectively apportioned responsibility for downwind air quality violations," either all states must participate or none should.  Enbridge Mot. 21-22.  But that *ipse dixit* approach makes no sense.  The Good Neighbor Provision imposes responsibility on individual states and requires them to eliminate pollution that is impacting downwind air quality.  It would be illogical to deprive downwind states of emission reductions from some upwind states simply because other states' reductions are temporarily stayed by courts evaluating challenges to a different EPA action.  *See supra* Argument I.A.3.  Moreover, given the public health benefits at stake, EPA clarified that it considers the Rule severable along both industry and state lines.  88 Fed. Reg. at 36693.  It remains entirely feasible to implement the Rule as currently configured.  *See* Birnbaum Decl. ¶¶ 71-85; Mathias Decl. ¶¶ 9-28.  Thus, while the participation of some states is presently on hold, this does nothing to diminish the benefits available from the remaining states where the Rule can be implemented now.

61

Nor do Petitioners' claims that EPA is to blame for the "constrained timeline," *see, e.g.*, Enbridge Mot. 21; Kinder Morgan Mot. 21, invalidate the public's equities or justify further delay. Any prior delay (arising in part from litigation on the preceding Good Neighbor rule) has already been remediated through citizen-suit enforcement as the Act contemplates and should not be exacerbated. *See* RTC at 66-67. And Petitioners cannot claim the Rule's timing is inequitable when it was dictated by the Act. 42 U.S.C. § 7410(c)(1); *Wisconsin*, 938 F.3d at 318-19 (holding that the Act requires elimination of upwind emissions in time for the next downwind attainment deadlines).

Petitioners' remaining arguments recycle points from their merits and harm arguments and are unpersuasive for the reasons set forth in those sections. *See* AFPA Mot. 21 (citing industry shutdowns and grid reliability); Ohio Mot. 22 (citing grid reliability). While several Petitioners rely perfunctorily on the axiom that "public interest lies in a correct application of the law," Ohio Mot. 22 (quoting *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)), that argument negates the public-interest factor as a criterion of granting stay, independent of a petitioner's likelihood of success on the merits. In any case, the argument presupposes that the Rule is unlawful, which it is not. The balance of equities demonstrates that a stay is not warranted here.

## CONCLUSION

As shown above, Petitioners have not demonstrated that they are entitled to a stay pending judicial review of the Rule so the requests for a stay should be denied. In the event this Court finds any of Petitioners' contentions justified, however, the "extraordinary" remedy of a judicial stay should be granted only as to that portion of the Rule for which the stay factors have been met.


DATED: August 18, 2023                 Respectfully submitted,

                                       TODD KIM
                                       Assistant Attorney General
                                       Environment & Natural Resources Division

                                       /s/ Chloe H. Kolman
                                       CHLOE H. KOLMAN
                                       ELISABETH H. CARTER
                                       ZOE PALENIK
                                       United States Department of Justice
                                       Environment & Natural Resources Division
                                       Environmental Defense Section
                                       P.O. Box 7611
                                       Washington, D.C. 20044
                                       (202) 514-9277
                                       chloe.kolman@usdoj.gov

                                       *Counsel for Respondents*

OF COUNSEL:

DANIEL SCHRAMM
HALI KERR
JEANHEE HONG
Office of General Counsel

U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C.  20460

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Opposition complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that the foregoing complies with the type-volume limitation specified in this Court's August 10th Order, ECF 2011681, because it contains approximately 14,292 words, excluding exempted portions, according to the count of Microsoft Word.

/s/ *Chloe H. Kolman*
CHLOE H. KOLMAN

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Opposition have been served through the Court's CM/ECF system on all registered counsel this 18th day of August, 2023.

*/s/ Chloe H. Kolman*
CHLOE H. KOLMAN