<u>ORAL ARGUMENT NOT YET SCHEDULED</u>
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**No. 23-1157 (consolidated with Nos. 23-1181, 23-1183, 23-1190, 23-1191, 23-1193, 23-1195, 23-1199, 23-1200, 23-1201, 23-1202, 23-1203, 23-1205 23-1206, 23-1207, 23-1208, 23-1209, 23-1211, 23-1306, 23-1307, 23-1314 23-1315, 23-1316, 23-1317)**

**STATE OF UTAH,** *et al.***,**

**Petitioners,**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** *et al.***,**

**Respondents.**

**On Petitions for Judicial Review of Final Agency Action of the United States Environmental Protection Agency 88 Fed. Reg. 36,654 (June 5, 2023)**

**JOINT OPENING BRIEF OF INDUSTRY PETITIONERS**

Catherine E. Stetson
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600

Ana M. Gutiérrez
Michael D. Miller
Womble Bond Dickinson (US) LLP
1899 Wynkoop St.
Denver, CO 80202
Ana.Gutierrez@wbd-us.com

*Counsel for Kinder Morgan, Inc.*
*Additional Counsel Listed on Inside Front Cover and Following Pages*

Dated: April 1, 2024

Michael B. Schon
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. N.W.
Washington, DC 20001
(512) 693-8350

Mithun Mansinghani
LEHOTSKY KELLER COHN LLP
629 W. Main St.
Oklahoma City, OK 73102
(512) 693-8350

*Counsel for National Mining
Association*

Allison D. Wood
Makram B. Jaber
Aaron M. Flynn
MCGUIRE WOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006

*Counsel for Associated Electric
Cooperative, Inc., Deseret
Generation & Transmission Co-
Operative d/b/a Deseret Power
Electric Cooperative, Ohio Valley
Electric corporation, Wabash
Valley Power Association, Inc.
d/b/a Wabash Valley Power
Alliance, America's Power,
National Rural Electric*

Samuel B. Boxerman
Eric D. McArthur
Kathleen Mueller
Jeremy Rozansky
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005

*Counsel for Interstate Natural
Gas Association of America and
American Petroleum Institute*

David M. Flannery
Kathy G. Beckett
Keeleigh S. Huffman
STEPTOE & JOHNSON, PLLC
707 Virginia St. East
Post Office Box 1588
Charleston, WV 25326
(304) 353-8000

Edward L. Kropp
STEPTOE & JOHNSON, PLLC
Post Office Box 36425
Indianapolis, Indiana 46236
(317) 946-9882

*Counsel for Petitioners American Forest &
Paper Association, American Iron and
Steel Institute, and Midwest Ozone Group*

*Cooperative Association and
Portland Cement Association, and
Movants for Intervention Arizona
Public Service Company and Salt
River Project Agricultural
Improvement and Power District*

Aaron M. Streett
Matthew L. Kuryla
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855

*Counsel for Energy Transfer LP*

Brittany M. Pemberton
BRACEWELL LLP
2001 M Street N.W., Suite 900
Washington, D.C. 20036
(202) 828-1708

*Counsel for TransCanada PipeLine USA
Ltd.*

John D. Lazzaretti
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower
127 Public Square
Cleveland, OH 44114
(216) 479-8500

*Counsel for Petitioner United
States Steel Corporation*

Elliott Zenick
AMERICAN CHEMISTRY COUNCIL
700 2nd St. N.E.
Washington, DC 20002
(202) 249-6744

*Counsel for Petitioner
American Chemistry Council*

Kelly M. McQueen
THE MCQUEEN FIRM, PLLC
12 Woodsong Drive
Roland, AR 72135
(501) 580-3291

Michael E. Born (49961)
Cheri A. Budzynski (51761)
SHUMAKER, LOOP & KENDRICK, LLP
Huntington Center
41 South High Street, Suite 2400

*Counsel for Petitioner*
*Arkansas League of Good*
*Neighbors*

Elbert Lin
Kevin S. Elliker
David N. Goldman
HUNTON ANDREWS KURTH LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
(804) 788-8200

F. William Brownell
E. Carter Chandler Clements
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue
N.W.
Washington, DC 20037
(202) 955-1500

*Counsel for Petitioners*
*Union Electric Company, d/b/a*
*Ameren Missouri, and Arkansas*
*League of Good Neighbors*

Columbus, OH 43215
(614) 463-9441

*Counsel for Petitioners Buckeye Power,*
*Inc. and the Ohio Valley Electric*
*Corporation*

Mark W. DeLaquil
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue N.W.
Washington, D.C. 20036
(202) 861-1500

Martin T. Booher
Joshua T. Wilson
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114

*Counsel for Hybar LLC*

Richard S. Moskowitz
Tyler Kubik
AMERICAN FUEL &
PETROCHEMICAL
MANUFACTURERS
1800 M Street, NW
Suite 900 North
Washington, DC 20036
(202) 844-5474

*Counsel for Petitioner American
Fuel & Petrochemical
Manufacturers*

Laura K. McAfee
(D.C. Cir. Bar No. 62386)
BEVERIDGE & DIAMOND, PC
201 North Charles Street, Suite 2200
Baltimore, MD 21201

*Counsel for Enbridge (U.S.) Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), this Certificate is submitted on behalf of Industry Petitioners in these consolidated cases: American Chemistry Council; American Forest & Paper Association; American Fuel & Petrochemical Manufacturers; American Iron and Steel Institute; American Petroleum Institute; America's Power; Arkansas League of Good Neighbors; Associated Electric Cooperative Inc.; Buckeye Power, Inc.; Deseret Power Electric Cooperative; Enbridge (U.S.) Inc.; Energy Transfer LP; Hybar LLC; Interstate Natural Gas Association of America; Kinder Morgan, Inc.; Midwest Ozone Group; National Mining Association; National Rural Electric Cooperative Association; Ohio Valley Electric Corporation; Portland Cement Association; TransCanada PipeLine USA Ltd.; Union Electric Company, d/b/a Ameren Missouri; United States Steel Corporation; Wabash Valley Power Association Alliance, Inc., d/b/a Wabash Valley Power Alliance.

### A. Parties, Intervenors, and *Amici Curiae*.

Because these consolidated cases involve direct review of a final

i

agency action, the requirement to furnish a list of parties, intervenors, and *amici curiae* that appeared below is inapplicable.  These cases involve the following parties:

**Petitioners:**

Case No. 23-1157:  State of Utah

Case No. 23-1181:  Kinder Morgan, Inc.

Case No. 23-1183: State of Ohio
State of West Virginia
State of Indiana

Case No. 23-1190:  American Forest & Paper Association

Case No. 23-1191: Midwest Ozone Group

Case No. 23-1193: Interstate Natural Gas Association of America
American Petroleum Institute

Case No. 23-1195: Associated Electric Cooperative, Inc.
Deseret Generation & Transmission Co-Operative, d/b/a Deseret Power Electric Cooperative
Ohio Valley Electric Corporation
Wabash Valley Power Association, Inc., d/b/a Wabash Valley Power Alliance
America's Power
National Rural Electric Cooperative Association
Portland Cement Association

ii

Case No. 23-1199: National Mining Association

Case No. 23-1200: American Iron and Steel Institute

Case No. 23-1201: State of Wisconsin

Case No. 23-1202: Enbridge (U.S.) Inc.

Case No. 23-1203: American Chemistry Council
American Fuel & Petrochemical Manufacturers

Case No. 23-1205: TransCanada Pipeline USA Ltd.

Case No. 23-1206: Hybar LLC

Case No. 23-1207: United States Steel Corporation

Case No. 23-1208: Union Electric Company, d/b/a Ameren Missouri

Case No. 23-1209: State of Nevada

Case No. 23-1211: Arkansas League of Good Neighbors

Case No. 23-1306: Energy Transfer LP (venue transferred from Seventh Circuit)

Case No. 23-1307: Energy Transfer LP (venue transferred from Seventh Circuit)

Case No. 23-1314: Kentucky Energy and Environment Cabinet (venue transferred from Sixth Circuit)

iii

Case No. 23-1315: State of Kentucky (venue transferred from Sixth Circuit)

Case No. 23-1316: Energy Transfer LP (venue transferred from Sixth Circuit)

Case No. 23-1317: Buckeye Power, Inc.
Ohio Valley Electric Corporation (venue transferred from the Sixth Circuit).

**Respondents:**

Respondents are the United States Environmental Protection Agency (EPA) and Michael S. Regan, in his capacity as Administrator of EPA.

**Intervenors:**

Intervenors in support of Respondents in Case No. 23-1201 are Midwest Ozone Group, which moved to intervene in support of Respondent with respect to Wisconsin's Petition challenging the Rule as insufficiently stringent (*see* ECF No. 2017374 (Sept. 18, 2023)).

Intervenors in support of Respondents in all other cases are: (i) the City of New York, the District of Columbia, Harris County, Texas, and the States of Connecticut, Delaware, Illinois, Maryland, Massachusetts, New Jersey,

iv

New York, Wisconsin, and Pennsylvania (State Intervenor-Respondents); and (ii) Air Alliance Houston, Appalachian Mountain Club, Center for Biological Diversity, Chesapeake Bay Foundation, Citizen's for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Downwinders at Risk, Environmental Defense Fund, Louisiana Environmental Action Network, Sierra Club, Southern Utah Wilderness Alliance, and Utah Physicians for a Healthy Environment (Environmental-Group Intervenor-Respondents). State Intervenor-Respondents together filed a joint motion to intervene (ECF No. 2008842 (July 20, 2023)), as did Environmental-Group Intervenor Respondents (*see* ECF No. 2007135 (July 10, 2023)). These Intervenor-Respondents oppose all petitions except those "challenging the Rule[s] as insufficiently stringent" (ECF No. 2007135 at 1-2).

Sierra Club is an Intervenor in support of Petitioner Wisconsin, arguing that the Rule is insufficiently stringent (*see* ECF No. 2021227 (Oct. 11, 2023); ECF No. 2024447 (Oct. 30, 2023)), and is an Intervenor in support

v

of Respondent with respect to all other petitions (*see* ECF No. 2011681 (Aug. 10, 2023)).

City Utilities of Springfield is an Intervenor in support of Petitioners in all cases (*see* ECF No. 2021227 (Oct. 11, 2023)).

Arizona Public Service Company and Salt River Project Agricultural Improvement and Power District are Movant-Intervenors in support of Petitioners Associated Electric Cooperative, Inc., et al. in Case No. 23-1195 (*see* ECF No. 2045571 (Mar. 18, 2024)).

*Amici Curiae***:**

The Chamber of Commerce of the United States of America is an *amicus curiae* in support of Petitioners challenging the Rule as overly stringent (*i.e.,* all but Wisconsin). The Energy Infrastructure Council was an *amicus curiae* at the stay motion stage in support of Petitioners Interstate Natural Gas Association of America, American Petroleum Institute, Kinder Morgan, Inc., Enbridge (U.S.) Inc., and TransCanada Pipeline USA Ltd.

vi

### B. Ruling Under Review

These consolidated cases involve petitions to review EPA's final action entitled "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," published at 88 FR 36,654 (June 5, 2023) (Rule), JA___.

### C. Related Cases

These consolidated cases have not been before this Court. However, several of these cases were transferred from the Sixth and Seventh Circuits.[1] The Rule's application to individual states is also being challenged in several other circuits, and the state plan disapprovals forming the predicate for the Rule are also being challenged in circuit courts across the country, as set forth in the following paragraphs. Two related rules[2] that EPA promulgated

---

[1] *See* ECF No. 2025739 (Order consolidating Case Nos. 23-1306 and 23-1307 with Case No. 23-1157, *et al.*); ECF No. 2027164 (Order consolidating Case Nos. 23-1314, 23-1315, 23-1316, 23-1317 with Case No. 23-1157, *et al.*).

[2] *See* 88 FR 49,295, JA___ (July 31, 2023) (staying application of the Rule to six States, among other actions); 88 FR 67,102, JA___ (Sept. 29, 2023) (same—for six additional states).

staying the application of the Rule in certain states are also being challenged

in this Court and are currently held in abeyance.

1. Challenges to the Rule

Fifth Circuit: *Texas v. EPA*, Case No. 23-60300 (5th Cir. filed June 7,

2023) (consolidated cases, challenging Rule's applicability in Texas,

Mississippi, and Louisiana).

Eighth Circuit: *Arkansas v. EPA*, Case No. 23-2769 (8th Cir. Aug. 2,

2023) (challenging Rule's applicability in Arkansas); *Missouri v. EPA*, 23-2771

(8th Cir. Aug. 3, 2023) (challenging Rule's applicability in Missouri); *Energy

Transfer LP v. EPA*, No. 23-2773 (8th Cir. Aug. 3, 2023) (challenging Rule's

pipeline engine provisions in Arkansas); *Energy Transfer LP v. EPA*, No. 23-

2774 (8th Cir. Aug. 4, 2023) (challenging Rule's pipeline engine provisions in

Missouri); *Hybar LLC v. EPA*, No. 23-2782 (8th Cir. Aug. 4, 2023) (challenging

Rule's applicability in Arkansas); *Union Electric Co., d/b/a Ameren Missouri v.

EPA*, No. 23-2786 (8th Cir. Aug. 4, 2023) (challenging Rule's applicability in

Missouri); *ALLETE v. EPA*, No. 23-2789 (8th Cir. Aug. 4, 2023) (challenging Rule's applicability in Minnesota).

Ninth Circuit: *Nevada Cement Co. LLC v. EPA*, No. 23-1098 (9th Cir. June 5, 2023) (challenging Rule's applicability in Nevada).

Tenth Circuit: *Tulsa Cement LLC v. EPA*, No. 23-9551 (10th Cir. June 5, 2023) (challenging Rule's applicability in Oklahoma); *PacifiCorp v. EPA*, No. 23-9557 (10th Cir. June 26, 2023) (challenging Rule's applicability in Utah); *State of Oklahoma v. EPA*, No. 23-9561 (10th Cir. June 30, 2023) (challenging Rule's applicability in Oklahoma); *Energy Transfer LP v. EPA*, No. 23-9569 (10th Cir. July 27, 2023) (challenging Rule's pipeline engine provisions in Oklahoma).

Eleventh Circuit: *State of Alabama v. EPA*, No. 23-12528 (11th Cir. Aug. 4, 2023) (challenging Rule's applicability in Alabama); *Alabama Power Co. v. EPA*, No. 23-12531 (11th Cir. Aug. 4, 2023) (challenging Rule's applicability in Alabama).

2. Challenges to the underlying state plan disapprovals

Fourth Circuit: *West Virginia v. EPA*, No. 23-1418 (4th Cir. Apr. 14, 2023).

Fifth Circuit: *Texas v. EPA*, No. 23-60069 (5th Cir. Feb. 14, 2023).

Sixth Circuit: *Kentucky v. EPA*, No. 23-3216 (6th Cir. Mar. 13, 2023); *Ky. Energy & Env't Cabinet v. EPA*, No. 23-3225 (6th Cir. Mar. 17, 2023).

Eighth Circuit: *Arkansas v. EPA*, No. 23-1320 (8th Cir. Feb. 16, 2023); *Missouri v. EPA*, No. 23-1719 (8th Cir. Apr. 13, 2023); *Union Elec. Co., d/b/a Ameren Missouri v. EPA*, No. 23-1751 (8th Cir. Apr. 13, 2023); *Sw. Elec. Power Co. v. EPA*, No. 23-1765 (8th Cir. Apr. 14, 2023); *City Utils. of Springfield v. EPA*, No. 23-1774 (8th Cir. Apr. 14, 2023); *ALLETE, Inc. v. EPA*, No. 23-1776 (8th Cir. Apr. 14, 2023); *Hybar LLC v. EPA*, No. 23-1777 (8th Cir. Apr. 14, 2023); *Ark. League of Good Neighbors v. EPA*, No. 23-1778, (8th Cir. Apr. 14, 2023).

Ninth Circuit: *Nev. Cement Co. v. EPA*, No. 23-682 (9th Cir. Apr. 17, 2023).

x

<u>Tenth Circuit</u>: *Utah v. EPA*, No. 23-9509 (10th Cir. Feb. 13, 2023) (transferred to the D.C. Circuit as No. 24-1040); *Oklahoma v. EPA*, No. 23-9514 (10th Cir. Mar. 2, 2023) (transferred to the D.C. Circuit as No. 24-1043); *Okla. Gas & Elec. Co. v. EPA*, No. 23-9521 (10th Cir. Mar. 16, 2023) (transferred to the D.C. Circuit as No. 24-1044); *PacifiCorp v. EPA*, No. 23-9512 (10th Cir. Feb. 23, 2023) (transferred to the D.C. Circuit as No. 24-1041); *Utah Associated Mun. Power Sys. v. EPA*, No. 23-9520 (10th Cir. Mar. 15, 2023) (transferred to the D.C. Circuit as No. 24-1042); *Wyoming v. EPA*, No. 23-9529 (10th Cir. Apr. 5, 2023) (voluntarily dismissed Jan. 19, 2024); *PacifiCorp v. EPA*, No. 23-9531 (10th Cir. Apr. 6, 2023) (voluntarily dismissed Jan. 19, 2024); *Tulsa Cement LLC v. EPA*, No. 23-9533 (10th Cir. Apr. 13, 2023) (transferred to the D.C. Circuit as No. 24-1045); *Western Farmers Electric Coop. v. EPA*, No. 23-9534 (10th Cir. Apr. 14, 2023) (transferred to the D.C. Circuit as No. 24-1046); *Basin Elec. Power Co. v. EPA*, No. 23-9537 (10th Cir. Apr. 14, 2023) (voluntarily dismissed Jan. 19, 2024).

Eleventh Circuit: *Alabama v. EPA*, No. 23-11173 (11th Cir. Apr. 13, 2023); *Ala. Power Co. v. EPA*, No. 23-11196 (11th Cir. Apr. 14, 2023).

D.C. Circuit: *Utah v. EPA*, No. 23-1102 (D.C. Cir. Apr. 13, 2023) (protective petition); *Oklahoma v. EPA*, No. 23-1103 (D.C. Cir. Apr. 13, 2023) (protective petition), *Okl. Gas & Elec. Co. v. EPA*, No. 23-1105 (D.C. Cir. Apr. 14, 2023) (protective petition); *Tulsa Cement LLC v. EPA*, No. 23-1106 (D.C. Cir. Apr. 14, 2023) (protective petition); *W. Farmers Elec. Coop. v. EPA*, No. 23-1107 (D.C. Cir. Apr. 14, 2023) (protective petition); *PacifiCorp v. EPA*, No. 23-1112 (D.C. Cir. Apr. 14, 2023) (protective petition), *Nevada v. EPA*, No. 23-1113 (Apr. 14, 2023); *Nevada Cement Co. v. EPA*, No. 23-1115 (Apr. 14, 2023) (protective petition).

3.  Challenges to EPA's two Interim Final Rules

D.C. Circuit: *Nat'l Mining Ass'n v. EPA*, No. 23-1275 (consolidated with case Nos. 23-1276, 23-1277, 23-1278, 23-1279, 23-1321, 23-1323, 23-1324, 23-1325, 23-1326) (D.C. Cir. Sept. 29, 2023) (cases held in abeyance).

xii

Undersigned counsel are not aware of any other related cases currently pending in this Court or in any other court.

xiii

## RULE 26.1 DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Industry Petitioners make the following statements:

The **American Chemistry Counsel** (ACC) represents the leading chemical companies. ACC members apply chemistry science to make innovative products and services that make people's lives better, healthier and safer. ACC is committed to improved environmental, health and safety performance through Responsible Care®; common sense advocacy addressing major public policy issues; and health and environmental research and product testing. The chemistry business is a $768 billion enterprise and a key element of the nation's economy. It is the largest exporter in the nation, accounting for 14% percent of all U.S. goods exported. ACC states that it is a "trade association" for the purposes of Circuit Rule 26.1(b). ACC has no parent corporation, and no publicly held company has 10% or greater ownership in ACC.

The **American Forest & Paper Association** is a continuing association of individuals operated for the purpose of promoting the general interests of

xiv

its membership. American Forest & Paper Association represents nearly 87% of the pulp, paper, packaging, and tissue products industry. American Forest & Paper Association is a "trade association" for the purposes of Rule 26.1 and has no outstanding shares or debt securities in the hands of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in American Forest & Paper Association.

**American Fuel & Petrochemical Manufacturers** (AFPM) is a national trade association including most U.S. refiners and petrochemical manufacturers. AFPM has no parent companies, and no publicly held company has a 10% or greater ownership interest in AFPM. AFPM is a "trade association" within the meaning of Circuit Rule 26.1(b). AFPM is a continuing association operating for the purpose of promoting the general commercial, professional, legislative, or other interests of its membership.

**American Iron and Steel Institute** is an association whose members promote the general interests of its membership. American Iron and Steel Institute has no outstanding shares or debt securities in the hand of the

xv

public and has no parent company. No publicly held company has a 10% or greater ownership interest in the American Iron and Steel Institute.

**American Petroleum Institute** (API) is a national trade association that represents all segments of America's natural gas and oil industry. API has no parent corporation, and no publicly held corporation has a 10% or greater ownership in API.

**America's Power** is a nonprofit membership corporation organized under the laws of the District of Columbia and is recognized as a tax-exempt trade association by the Internal Revenue Service under Section 501(c)(6) of the Internal Revenue Code. America's Power is the only national trade association whose sole mission is to advocate at the federal and state levels on behalf of coal-fueled electricity, the coal fleet, and its supply chain. America's Power supports policies that promote the use of coal to assure a reliable, resilient, and affordable supply of electricity to meet our nation's demand for energy. America's Power is a "trade association" within the meaning of Circuit Rule 26.1(b). It has no parent corporation, and no publicly

xvi

held company owns a 10 percent or greater interest in America's Power.

**Arizona Public Service Company** is a wholly-owned subsidiary of its parent corporation, Pinnacle West Capital Corporation. No publicly held corporation other than Pinnacle West Capital Corporation owns 10% or more of Arizona Public Service Company's stock.

**Arkansas League of Good Neighbors** (ALGN) is a nonprofit association located in Arkansas and dedicated to advancing members' interests in environmental and energy legal matters. ALGN has no outstanding shares or debt securities in the hands of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in ALGN.

**Associated Electric Cooperative** (AECI) is a rural electric cooperative that provides wholesale power and high-voltage transmission to its six regional generation and transmission cooperative member-owners. In addition to providing power sales and transmission service to its member cooperatives, AECI also takes and provides transmission service through

xvii

enabling transmission agreements with and makes off-system power sales to various counterparties in the United States. These six regional generation and transmission cooperatives, in turn, supply wholesale power to thirty-nine distribution cooperatives in Missouri, three distribution cooperatives in southeast Iowa, and nine distribution cooperatives in northeast Oklahoma, serving more than 910,000 customers. AECI has no parent company and no publicly held company has a 10% or greater ownership interest in AECI.

**Buckeye Power, Inc.** is an Ohio nonprofit corporation operating on a cooperative basis, a so-called generation and transmission electric cooperative or G&T, that provides wholesale electric service to its twenty-five members constituting all of the electric distribution cooperatives engaged in the retail sale of electricity within the State of Ohio, twenty-four of which are also Ohio nonprofit corporations operating on a cooperative basis. Buckeye owns or controls the output of natural gas-fired and coal-fired power plants to supply the wholesale power requirements of its members. It is wholly owned by its twenty-five-member electric distribution

xviii

cooperatives, none of which are publicly traded. Buckeye Power, Inc. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock or other membership interests.

**Deseret Power Electric Cooperative** certifies that it is a nonprofit, regional generation and transmission cooperative, owned by its five member systems, serving approximately 65,000 customers in Utah, Colorado, Wyoming, Nevada, and Arizona. Neither Deseret, nor its member cooperatives issue stock, and therefore no publicly-traded company owns 10% or more of their stock.

**Enbridge (U.S.) Inc.** is a wholly-owned subsidiary of Enbridge Inc., a diversified energy company headquartered in Calgary, Canada. Enbridge (U.S.) Inc.'s holdings include natural gas pipelines regulated by the Federal Energy Regulatory Commission. Enbridge Inc. is a publicly traded company that trades on the New York and Toronto stock exchanges. Enbridge, Inc. has no parent companies and no publicly held company owns a 10% or greater interest in Enbridge, Inc.

xix

**Energy Transfer LP** is a publicly held corporation. Energy Transfer does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

**Hybar LLC** is a steel manufacturer currently constructing a scrap-steel to rebar steel facility in Arkansas. Hybar LLC is 100% owned by Hybar Intermediate Holdings LLC, which is 100% owned by Green & Clean Holdings LLC. No publicly held corporation owns 10% or more of the stock of Hybar LLC, Hybar Intermediate Holdings LLC, or Green & Clean Holdings LLC.

**Interstate Natural Gas Association of America** (INGAA) is a national trade association that represents interstate natural gas transmission pipeline companies. INGAA members own and operate the vast majority of the interstate natural gas transmission and storage segment in the U.S. and Canada. INGAA member companies transport more than 95 percent of the nation's natural gas through approximately 200,000 miles of interstate natural gas pipelines. In 46 of the 48 contiguous United States, INGAA

xx

member companies operate over 5,400 natural gas compressors at over 1,300 compressor stations and storage facilities along the pipelines to transport natural gas to local gas distribution companies, industrials, gas marketers, and gas-fired electric generators. The compressor units operated by INGAA members include reciprocating internal combustion engines (engines) that are regulated by EPA's Rule being challenged in this case. INGAA has no parent corporation, and no publicly held corporation has a 10% or greater ownership in INGAA.

**Kinder Morgan, Inc.** is a publicly held corporation. Kinder Morgan does not have a parent corporation, and no publicly held corporation holds 10% or more of Kinder Morgan's stock.

**Midwest Ozone Group** is a "trade association" within the meaning of Circuit Court Rule 26.1(b) whose members promote the general interests of their electric power and industrial sources. The Midwest Ozone Group has no outstanding shares or debt securities in the hand of the public and has no parent company.

xxi

The **National Mining Association** (NMA) is a nonprofit national trade association that represents the interest of the mining industry, including every major coal company operating in the United States. NMA has approximately 280 members, whose interests it represents before Congress, the administration, federal agencies, the courts, and the media. NMA is not a publicly held corporation and has no parent corporation. No publicly held company has 10% or greater ownership interest in NMA.

The **National Rural Electric Cooperative Association** (NRECA) is the nonprofit national trade association for electric cooperatives. On behalf of its members, NRECA participates in administrative and judicial proceedings involving or affecting its members' interests. NRECA has no parent company. No publicly held company has a ten percent (10%) or greater ownership interest in NRECA. NRECA is an incorporated entity.

**Ohio Valley Electric Corporation** (OVEC) is a corporation originally formed by a consortium of utility companies for purposes of constructing and operating electric generating units to serve the electric energy needs of

xxii

uranium processing facilities owned by the United States Department of Energy. OVEC owns the Kyger Creek generating station in Ohio, and OVEC's wholly owned subsidiary Indiana-Kentucky Electric Corporation owns the Clifty Creek generating station in Indiana. OVEC has no parent company. American Electric Power Company, Inc., and Buckeye Power, Inc., each owns greater than 10 percent of the equity in OVEC.

The **Portland Cement Association** (PCA) is the premier policy, research, education, and market intelligence organization serving America's cement manufacturers. PCA represents a majority of U.S. cement production capacity. PCA promotes safety, sustainability, and innovation in all aspects of construction, fosters continuous improvement in cement manufacturing and distribution, and generally promotes economic growth and sound infrastructure investment. PCA states that it is a "trade association" for purposes of Circuit Rule 26.1(b). PCA has no parent corporation, and no publicly held company owns a 10% or greater interest in PCA.

**Salt River Project Agricultural Improvement and Power District** is an Arizona agricultural improvement district established pursuant to Title 48, Chapter 17, of the Arizona Revised Statutes. It is a political subdivision of the State of Arizona.

**TransCanada PipeLine USA Ltd.** is an indirectly owned subsidiary of TC Energy Corporation. TC Energy Corporation is a federally registered Canadian corporation, with its headquarters in Calgary, Alberta. TC Energy Corporation is a publicly held corporation with no parent corporation. No entity or firm has an ownership interest in TC Energy Corporation of 10% or more.

**Union Electric Company**, d/b/a Ameren Missouri, a Missouri corporation, is a public utility that provides wholesale and retail electric service in central and eastern Missouri. Union Electric Company's parent company is Ameren Corporation, and the only subsidiary of Union Electric Company that is not wholly owned by the company is STARS Alliance, LLC, in which the company owns a 25% interest. The only publicly held company

xxiv

that has a 10% or greater ownership interest in Union Electric Company is Ameren Corporation.

**United States Steel Corporation** is a publicly held company. United States Steel Corporation has no parent company and no publicly held company has a 10% or greater ownership interest in it.

**Wabash Valley Power Association Alliance** d/b/a Wabash Valley Power Alliance (WVPA) certifies that it is a nonprofit, generation and transmission cooperative, owned by twenty-three member-owned rural cooperative systems, serving more than 330,000 homes, businesses, farms, and schools – impacting more than a million people – across 50 counties in Indiana, 30 counties in Illinois, and four counties in Missouri. Neither WVPA, nor its member cooperatives issue stock, and therefore no publicly-traded company owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES ..................................................................i

RULE 26.1 DISCLOSURE STATEMENTS ......................................xiv

TABLE OF AUTHORITIES................................................ xxx

GLOSSARY ............................................................... xxxvi

JURISDICTION.................................................................1

QUESTIONS PRESENTED ...................................................1

STATUTES AND REGULATIONS.........................................3

STATEMENT OF THE CASE ..............................................3

    I.    Statutory Background .................................................3

    II.   State Plan Disapprovals and the Federal Plan .............................6

    III.  The Rule As It Now Exists .............................................13

STANDARD OF REVIEW ..................................................15

SUMMARY OF ARGUMENT ..............................................15

STANDING.......................................................................20

ARGUMENT.....................................................................20

    I.    Incorporation By Reference ...........................................20

    II.   EPA Failed to Justify The Rule's Application to Fewer
than 23 States...................................................................21

    III.  Regardless of How Many States are Involved, the Rule
is Unlawful .....................................................................27

xxvii

A.    The EGU Budget Enhancements are Designed to Over-Control ........................................................................... 28

B.    EPA's Cost-Effectiveness Analyses Result in an Unlawful Rule .......................................................................... 35

    1.    EPA Unlawfully Requires Controls on Non-EGUs Regardless of Actual Costs ............................. 35

    2.    EPA Unlawfully Used Annual Cost-Effectiveness Calculations To Justify Ozone-Season Emissions Limits for Non-EGUs .................. 46

    3.    The Enhancements Undermine EPA's EGU Cost-Effectiveness Analysis ........................................ 49

C.    The Rule is Overinclusive for Certain Non-EGUs ............ 52

    1.    EPA's Applicability Criteria For Engines and Boilers Are Unlawful ........................................... 52

    2.    EPA Erroneously Subjected Steel and Paper to the Rule, Based on Incorrect Data ......................... 58

    3.    The Steel Requirements Violate the Statute and Are Arbitrary and Capricious ............................ 71

            i.    EPA's Work Plan Process for Steel Violates the Act .................................................. 71

            ii.    The Reheat Furnace Requirements Are Arbitrary and Capricious ................................. 75

D.    EPA Failed to Consider Important Reliability and Feasibility Concerns ................................................................ 77

E.    EPA Deprived Industry Petitioners of a Meaningful Comment Opportunity Multiple Times Over ............................................................. 90

xxviii

1.    EPA's Budget "Enhancements" Deny a Meaningful Comment Opportunity ........................91

2.    EPA's Steel Reheat Furnace and Boiler Requirements Are Procedurally Improper ..............91

IV.   The Court Should Defer Considering Hybar's Petition .............93

CONCLUSION .....................................................................................94

xxix

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Am. Fuel & Petrochem. Mfrs. v. EPA,*
  3 F.4th 373 (D.C. Cir. 2021)...........................................................................20

*Appalachian Power Co. v. EPA,*
  135 F.3d 791 (D.C. Cir. 1998)........................................................................59

*Appalachian Power Co. v. EPA,*
  249 F.3d 1032 (D.C. Cir. 2001)................................................. 46, 49

*Ass'n of Oil Pipelines v. FERC,*
  281 F.3d 239 (D.C. Cir. 2002)........................................................................43

*Balt. Gas. & Elec. Co. v. FERC,*
  954 F.3d 279 (D.C. Cir. 2020)................................................. 39, 55, 57

*Belmont Mun. Light Dep't v. FERC,*
  38 F.4th 173 (D.C. Cir. 2022) ........................................................................27

*Cement Kiln Recycling Coal. v. EPA,*
  255 F.3d 855 (D.C. Cir. 2001)........................................................................58

*Clean Wisconsin v. EPA,*
  964 F.3d 1145 (D.C. Cir. 2020)......................................................................24

*Copperweld Corp. v. Indep. Tube Corp.,*
  467 U.S. 752 (1984)........................................................................................81

*Dist. Hosp. Partner, LP v. Burwell,*
  786 F.3d 46 (D.C. Cir. 2015)................................................. 22, 59

*EPA v. EME Homer City Generation, L.P.,*
  572 U.S. 489 (2014).....................3, 4, 5, 8, 11, 17, 28, 30, 33, 36, 40, 41, 42, 55

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009)........................................................................................36

xxx

*Fertilizer Inst. v. EPA,*
   935 F.2d 1303 (D.C. Cir. 1991) ........................................................92

*Growth Energy v. EPA,*
   5 F.4th 1 (D.C. Cir. 2021) ...............................................................55

*Int'l Union, United Mine Workers v. Mine Safety & Health Admin.,*
   407 F.3d 1250 (D.C. Cir. 2005) ......................................................92

*Maryland v. EPA,*
   958 F.3d 1185 (D.C. Cir. 2020) ......................................................35

*Michigan v. EPA,*
   213 F.3d 663 (D.C. Cir. 2000) ................................................ 39, 45

*Michigan v. EPA,*
   268 F.3d 1075 (D.C. Cir. 2001) ......................................................74

*Michigan v. EPA,*
   576 U.S. 743 (2015) ................................................................ 25, 43

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ................................... 22, 52, 60, 70, 75, 77, 81, 89

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
   545 U.S. 967 (2005) .........................................................................46

*Nevada Cement Company v. EPA,*
   No. 23-682 (9th Cir. July 3, 2023) ..................................................14

*Oklahoma v. EPA,*
   No. 23-9514 (10th Cir. July 27, 2023) .............................................14

*Portland Cement Ass'n v. Ruckelshaus,*
   486 F.2d 375 (D.C. Cir. 1973) ................................................ 71, 75

*Prill v. NLRB,*
   755 F.2d 941 (D.C. Cir. 1985) ........................................................62

xxxi

*Sierra Club v. EPA,*
  292 F.3d 895 (D.C. Cir. 2002).........................................................20

*Small Ref. Lead Phase-Down Task Force v. EPA,*
  705 F.2d 508 (D.C. Cir. 1983)................................................. 76, 90

*TRAC v. FCC,*
  750 F.2d 70 (D.C. Cir. 1984).........................................................93

*U.S. Sugar Corp. v. EPA,*
  830 F.3d 579 (D.C. Cir. 2016)................................................. 43, 75

*Union Elec. Co.* v. *EPA,*
  427 U.S. 246 (1976)........................................................................4

*Utah v. EPA,*
  No. 23-9509 (10th Cir. July 27, 2023)..........................................14

*West Virginia v. EPA,*
  597 U.S.  697 (2022)......................................................................27

*West Virginia v. EPA,*
  90 F.4th 323 (4th Cir. 2024)..........................................................14

*White Stallion Energy Ctr. v. EPA,*
  748 F.3d 1222 (D.C. Cir. 2014).....................................................43

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n,*
  82 F. 4th 1273 (D.C. Cir. 2023) ....................................................90

*Wisconsin v. EPA,*
  938 F.3d 303 (D.C. Cir. 2019)................................................. 45, 61

*Worldcom, Inc. v. FCC,*
  238 F.3d 449 (D.C. Cir. 2001).......................................................55

## Statutes and Other Authorities:

42 U.S.C. § 7407............................................................................3

xxxii

42 U.S.C. § 7408 ..................................................................................3

42 U.S.C. § 7409 ..................................................................................3

42 U.S.C. § 7410 ..................................................................................3

42 U.S.C. § 7410(a)(1) ........................................................................6

42 U.S.C. § 7410(a)(2)(A) ..................................................................73

42 U.S.C. § 7410(a)(2)(D)(i) ........................................................ 32, 65

42 U.S.C. § 7410(a)(2)(D)(i)(I) .........................................................58

42 U.S.C. § 7410(c)(1) ........................................................................4

42 U.S.C. § 7410(c)(1) ........................................................................6

42 U.S.C. § 7413 ..................................................................................3

42 U.S.C. § 7413 (a)(1)(B) ..................................................................3

42 U.S.C. § 7426 ........................................................................... 3, 74

42 U.S.C. § 7601(d)(1)(A) ................................................................26

42 U.S.C. § 7607(d)(1)(B) ................................................................74

42 U.S.C. § 7607 ..................................................................................3

42 U.S.C. § 7607(b)(1) ........................................................................1

42 U.S.C. § 7607(d) ..........................................................................72

42 U.S.C. § 7607(d)(3) ................................................................ 71, 72

42 U.S.C. § 7607(d)(4) ................................................................ 72, 74

42 U.S.C. § 7607(d)(5) ......................................................................72

42 U.S.C. § 7607(d)(6) ......................................................................71

42 U.S.C. § 7607(d)(6)(C) ................................................................72

42 U.S.C. § 7607(d)(8) ........................................................................93

42 U.S.C. § 7607(d)(9) ........................................................................15

42 U.S.C. § 7607(h) ............................................................................72

40 C.F.R. § 52.40 ...................................................................................3

40 C.F.R. § 52.40(c)(1) ........................................................................46

40 C.F.R. § 52.40(d)(3) ........................................................................90

40 C.F.R. § 52.40(e)(2)(i)(B) ...............................................................44

40 C.F.R. § 52.43(d)(4)(ii) ...................................................................88

40 C.F.R. § 52.45(b)(1) ........................................................................57

40 C.F.R. § 52.45(b)(2) ........................................................................57

40 C.F.R. § 52.184 ...............................................................................94

40 C.F.R. § 52.1235(b)(1)(ii)(A)(1)-(7) ..............................................73

76 FR 48,208 ........................................................................................35

80 FR 65,292 ..........................................................................................6

81 FR 74,504 ........................................................................................39

86 FR 23,054 ........................................................................................40

87 FR 20,036 .......................................................................... 7, 36, 75, 92

87 FR 36,090 ........................................................................................53

87 FR 7,734 ..........................................................................................65

88 FR 9,336 ........................................................................................6, 7

88 FR 36,470 ........................................................................................38

xxxiv

88 FR 36,654.........................................1, 7, 8, 9, 10, 11, 13, 16, 17, 18, 21, 23, 25,
26, 29, 30, 31, 32, 34, 35, 36, 39, 40, 41, 42, 43,
44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56,
57, 58, 59, 62, 63, 69, 70, 71, 72, 73, 74, 76, 77,
79, 81, 82, 84, 85, 86, 88, 89, 91, 92

88 FR 49,295........................................................................14

88 FR 49,305........................................................................26

88 FR 67,102........................................................................14

88 FR 67,108........................................................................26

89 FR 15,199.................................................................. 30, 31

xxxv

# GLOSSARY

| | |
|---|---|
| Act | Clean Air Act |
| EGUs | electric generating units |
| EPA | United States Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| JA | Joint Appendix |
| NAAQS | National Ambient Air Quality Standards |
| Non-EGUs | non-electric generating units |
| NOx | nitrogen oxides |
| ppb | parts per billion |

xxxvi

## JURISDICTION

These petitions challenge the "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," an EPA regulation (the Rule) under the Clean Air Act (the Act). 88 FR 36,654 (June 5, 2023), JA___. The petitions were timely filed under 42 U.S.C. § 7607(b)(1), under which this Court has jurisdiction.

## QUESTIONS PRESENTED

1.    Whether the Rule is unlawful because EPA justified it as an "integrated" 23-State Rule and neither assessed nor justified partial application of the Rule to fewer than 23 States, yet EPA's Rule now applies to just 11 States.

2.    Whether the Rule over-controls electric generating units (EGUs) by requiring emissions reductions below the levels of "significant contribution" that EPA itself defined.

3.    Whether the Rule is unlawful because EPA departed, without explanation, from its traditional "cost-effectiveness" analysis to determine other industrial sources' (non-EGUs') "amount" of "significant

1

contribution" and instead relied on an impermissible and unexplained "average cost" analysis; and because EPA estimated non-EGU costs-per-ton based on *annual* emissions rather than *actual* ozone-season emissions, as it calculated for EGUs.

4.    Whether the Rule is unlawful because EPA's EGU budget "enhancements" eliminate the trading flexibility EPA used to justify balancing out cost variations for EGUs.

5.    Whether the Rule unlawfully subjects certain non-EGUs to the Rule because EPA's capacity-based proxy for its 100 tons-per-year threshold is grossly inaccurate for engine and boiler non-EGU sources; and because EPA relied on error-ridden emissions data when determining which industries to include.

6.    Whether the Rule is unlawful because EPA ignored important feasibility and reliability concerns.

7.    Whether EPA deprived the public of an opportunity to comment because the Rule includes provisions that were not included in EPA's

2

original proposal (and are not logical outgrowths thereof), and because the

Rule includes as-at-yet undefined requirements (with no future notice-and-

and comment process).

8. Whether this Court should defer deciding Hybar's petition.

## STATUTES AND REGULATIONS

Applicable statutes, 42 U.S.C. §§ 7407 to 7410, 7413, 7426, 7607, and

regulations, 40 C.F.R. § 52.40 *et seq.*, appear in the Addendum.

## STATEMENT OF THE CASE

### I.    Statutory Background

The Act codifies "cooperative federalism." *EPA v. EME Homer City

Generation, L.P.*, 572 U.S. 489, 511 n.14 (2014). EPA establishes national

ambient air-quality standards (NAAQS) for certain pollutants, including

ozone. 42 U.S.C. §§ 7408, 7409. Within three years, each State then develops

an implementation plan that "specif[ies] the manner in which [the NAAQS]

will be achieved and maintained." *Id.* §§ 7407(a), 7410(a)(1). State plans must

satisfy several statutory requirements, including the "Transport" provision,

which requires plans to prohibit sources in the State from emitting air

3

pollutants "in amounts which will…contribute significantly to nonattainment" or "interfere with maintenance," of the NAAQS by "any other State." *Id.* § 7410(a)(2)(D)(i)(I).

EPA "shall approve" a State plan within 18 months "if it meets all of the applicable requirements." *Id.* § 7410(k)(3); *see also Union Elec. Co.* v. *EPA*, 427 U.S. 246, 257 (1976). Only if EPA lawfully determines a State plan violates the Act may EPA promulgate a "Federal implementation plan" for that State. 42 U.S.C. § 7410(c)(1). A federal plan cannot "over-control" the State by requiring it "to reduce its output of pollution more than is necessary" to ensure the State will not "contribute significantly" to another State's inability to attain or maintain the NAAQS. *EME Homer*, 572 U.S. at 521.

In earlier Transport rules, EPA conducted its "significant contribution" analysis by assessing both the cost of controls and their effect on downwind air quality. It used modeling to identify the "upwind" States that contribute more than *de minimis* amounts of ozone to "downwind"

4

States with difficulty attaining the NAAQS. *See id.* at 500. EPA then identified emissions controls it claimed would be "cost-effective," meaning controls that if applied by sources in every upwind State, produce a "combined effect…on air quality in downwind States." *Id.* at 501; 88 FR 36,683, JA___ (discussing the cost threshold, referred to as the "knee in the curve," where controls "become excessively costly on a per-ton basis" and fail to deliver meaningful "air quality benefits").

For EGUs, EPA used that "cost-effectiveness" methodology to create an annual emissions "budget" for each upwind state, representing "the quantity of pollution an upwind State would produce in a given year if its in-state sources implemented all pollution controls available at the chosen cost thresholds." *EME Homer*, 572 U.S. at 502. Finally, EPA allocated each upwind State's budget among in-state sources and created a "cap-and-trade" system, giving EGUs flexibility to meet their obligations by purchasing "allowances" from other EGU sources that are subject to the federal plan. *Id.* at 503 & n.10.

5

The Supreme Court upheld this cost-threshold approach to "significant contribution" in 2014. *Id.* at 524.

## II.    State Plan Disapprovals and the Federal Plan

In October 2015, EPA lowered the ozone NAAQS from 75 to 70 parts per billion (ppb), 80 FR 65,292, 65,293-94 (Oct. 26, 2015), requiring States to develop new plans by October 2018. 42 U.S.C. § 7410(a)(1). Although EPA had to approve or disapprove State plans by April 2020, *id.* § 7410(k)(1)-(3), it missed that deadline by years. Finally, in 2022, EPA proposed to disapprove 23 states' plans;[3] commenters warned EPA these proposed disapprovals were unlawful. *See, e.g.*, EPA, *2015 Ozone NAAQS Interstate Transport SIP Disapprovals – Response to Comment*, 12, 15, 29, 33, 57, 81, 189 (2023), https://t.ly/ikB1A.

Before EPA even made a final decision to disapprove State plans (and even before EPA *proposed* disapproving some State plans), EPA proposed a comprehensive *federal* plan to regulate sources across 23 States through a

---

[3] *See* 88 FR 9,336, 9,337 nn.5-6 (Feb. 13, 2023).

6

single multi-state program. 87 FR 20,036 (Apr. 6, 2022), JA___. Commenters again warned EPA that it lacked authority to issue a federal plan because the State plan disapprovals—the legal predicate for a federal plan—were unlawful. *See* Response to Comments 2-6, 9-11, 145-48, 152-55, JA___-___, ___-___, ___-___, ___-___.

Despite these warnings, EPA disapproved 21 State plans in February 2023. 88 FR 9,336. A mix of States and industry petitioners challenged 12 State plan disapprovals. By late May 2023, the Fifth, Sixth, and the Eighth Circuits had stayed the disapprovals for five States.[4]

EPA nonetheless published its 23-State federal plan on June 5, 2023, effective August 4, 2023. 88 FR 36,654, JA___. EPA justified the Rule based on the purported "meaningful" air-quality improvements that would result "collectively" from including all 23 States. *See id.* at 36,683, 37,648, JA___, ___.

---

[4] *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023) (Texas and Louisiana); *Arkansas v. EPA*, No. 23-1320 (8th Cir. May 25, 2023); *Missouri v. EPA*, No. 23-1719 (8th Cir. May 26, 2023); *Kentucky v. EPA*, No. 23-3216 (6th Cir. May 31, 2023) (administrative stay pending consideration of stay motion, ultimately granted July 2023, *see infra* n.5).

7

That total air quality improvement was an estimated average 0.66 ppb compared to a 70 ppb air-quality standard. *Id.* at 36,747, JA___.

In the Rule, EPA said it was adopting the same methodology the Supreme Court upheld in *EME Homer*. *See id.* at 36,741, JA___. But it departed from that methodology in numerous critical respects.

For EGUs, EPA used "preset emissions budgets" for each State. *Id.* at 36,662, JA___. EPA claims the emissions reductions required by each statewide budget is the amount necessary to eliminate that State's alleged significant contribution. *Id.* at 36,657, JA___. Based on these budgets, EPA then allocated emissions allowances to individual EGUs, allowing powerplants emitting below their allocation to sell or trade unused allowances to other EGUs. *Id.* at 36,801, JA___. *On top* of those budgets, EPA imposed "enhancements" that ratchet down the budgeted allowances for 2026 even further. *Id.* at 36,657, 36,667, JA___, ___. These enhancements include "Dynamic budgeting," "Bank recalibration," and "backstop daily emission rates," all of which reduce available, or usable, allowances for

8

EGUs. The intent, and result, of these "enhancements" is that "pollution controls will be operated"—*even if* a State no longer contributes significantly to downwind State nonattainment or maintenance challenges. *See id.* at 36,662, JA___.

Also, unlike prior Transport rules, the Rule for the first time covers other industrial sources (non-EGUs), including engines used for pipeline transportation of natural gas (Pipelines); cement kilns (Cement); reheat furnaces in iron and steel manufacturing; and boilers for iron and steel manufacturing (Steel), basic chemical manufacturing, petroleum and coal products manufacturing, and pulp, paper, and paperboard mills (Paper). *Id.* at 36,658, JA___. To determine which non-EGUs to regulate, EPA conducted a so-called "Screening Assessment" that purported to identify "potentially impactful industries and emissions unit types for further evaluation." *Id.* at 36,740, JA___. EPA focused on units that emit over 100 tons-per-year of NOx, and for which emissions reductions can be achieved at a cost of no more than

9

$7,500 per ton. Screening Assessment 3-4, JA___-___. But its Rule covers a number of sources that should have been screened out.

For Pipelines and Steel and Paper boilers, for instance, rather than identify sources emitting 100 or more tons-per-year of NOx, EPA applied "proxies" that it asserted "reasonably approximate[d]" the 100-ton-per-year threshold—even while recognizing those proxies were over-inclusive. 88 FR 36,821, JA___. The result: less than 10% of engines and 23% of boilers regulated under the Rule emit at or above EPA's Screening Assessment level of 100 tons-per-year of NOx. *See Non-EGU Facilities and Units.xslx*, JA___, [EPA-HQ-OAR-2021-0668-1174.](EPA-HQ-OAR-2021-0668-1174.)

Further, EPA also ignored comments from Paper showing only minimal impacts from its boilers. Response to Comments 118-20, JA___-___. For Steel, EPA failed to conduct its own modeling to demonstrate a need for emissions controls and ignored modeling demonstrating the contrary. *Id.* at 133, JA___. EPA also vastly overcounted emissions but failed to correct its assessment. *See* 88 FR 36,827, JA___.

10

EPA also changed, without explanation, its reliance on a "cost-effectiveness" analysis. In prior Transport rules, to determine the "amounts" of emissions that significantly contribute to downwind air-quality, EPA used a "cost threshold" called the "knee in the curve" to identify emissions controls that "achieved a reasonable balance of incremental NOx reduction potential and corresponding downwind air quality improvements." *Id.* at 36,678, JA___; *see EME Homer*, 572 U.S. at 501. At proposal, EPA set this threshold at $7,500/ton for non-EGUs, proposing a set of controls it thought were below that threshold. *Id.* But after commenters demonstrated the costs for many sources would significantly exceed $7,500/ton, EPA concluded that the $7,500/ton threshold did "not reflect the full range of cost-effectiveness values" for non-EGUs. 88 FR 36,740, JA___. EPA nevertheless adopted the same emissions controls identified at proposal, deviating drastically from the methodology it asserts it applied, rationalizing that the "average cost-per-ton" was tolerable. *Id.* at 36,746, JA___.

11

Further, the average cost-per-ton estimates that EPA found unrepresentative were based on annual emissions rather than emissions during the limited five months (May to September) the Rule regulates. *Applicability Criteria Summary* 11 tbl.8, JA___.

The Rule's compliance deadline for EGUs began in August 2023, with more stringent requirements based on installation of emissions controls beginning in May 2026, and with the limited potential for discretionary extensions "based on a case-by-case demonstration of necessity" totaling up to three additional years. *Id*. at 36,755, 36,758, JA___, ___. Although the compliance work has already begun, for non-EGUs, the deadline for the thousands of subject units is May 1, 2026, with discretionary, "case-by-case" emissions-limit exceptions and exemptions in "unique" and "limited" circumstances for "technical impossibility or extreme economic hardship." *Id.* at 36,819-90, JA___-___.

Finally, the Rule also includes a severability clause, though EPA did not initially propose one. EPA regards its uniform, 23-State Rule as a

12

"complete remedy…." *Id.* at 36,693, JA___. Nevertheless, EPA "believes that the remaining aspects…can and should continue to be implemented to the extent possible" if "a court find[s] any discrete aspect of this [Rule] to be invalid." *Id.* EPA "views" the Rule as severable along "state and/or tribal jurisdictional lines" and "as between the different industries and different types of emissions control requirements." *Id.* In reaching its severability belief, EPA performed no cost-effectiveness analyses, nor did EPA examine impacts on downwind air quality for a Rule regulating fewer than 23 States. *See id.*

### III.    The Rule As It Now Exists

EPA designed the Rule to "ensure[ ]…national consistency across all states." *Id.* at 36,673, JA___. Its stated purpose "is to address the interstate transport of ozone on a national scale." *Id.* at 36,691, JA___. As EPA has explained, its Rule is a "national-scale, multi-state" federal plan addressing "interstate transport of ozone-causing pollutants through a series of integrated multi-state emissions allowance trading programs for powerplants [and] uniform requirements for certain, high-emitting non-

13

powerplant industrial sources." Doc. 2018488, at 2-3, *Utah v. EPA*, No. 23-1157 (D.C. Cir. Sept. 22, 2023).

In the wake of the federal Rule, however, the wave of circuits staying State plan disapprovals continued. Seven federal circuits have now stayed 12 State plan disapprovals,[5] leading EPA to issue two interim final rules, acknowledging it cannot impose its Rule in those 12 States without additional process.[6]

The federal plan applicable to the remaining 11 States bears little resemblance to the "integrated" Rule EPA designed. Nearly 90% of

---

[5] *Texas v. EPA*, No. 23-60069 (5th Cir. June 8, 2023) (Mississippi); *Nevada Cement Company v. EPA*, No. 23-682 (9th Cir. July 3, 2023) (Nevada); *Allete, Inc. v. EPA*, No. 23-1776 (8th Cir. July 5, 2023) (Minnesota); *Kentucky v. EPA*, No. 23-3216 (6th Cir. July 25, 2023); *Oklahoma v. EPA*, No. 23-9514 (10th Cir. July 27, 2023); *Utah v. EPA*, No. 23-9509 (10th Cir. July 27, 2023); *Alabama v. EPA*, No. 23-11173 (11th Cir. Aug. 17, 2023); *West Virginia v. EPA*, 90 F.4th 323 (4th Cir. 2024) (administrative stay previously issued Aug. 2023).

[6] 88 FR 49,295, JA___ (July 31, 2023) (Arkansas, Kentucky, Louisiana, Mississippi, Missouri, Texas); 88 FR 67,102, JA___ (Sept. 29, 2023) (Alabama, Minnesota, Nevada, Oklahoma, Utah, West Virginia); *see also id.* at 67,103 ("EPA will take further action consistent" with final circuit court determinations on the state plan disapprovals).

14

powerplant emissions that EPA contemplated serving as both the basis for

its emissions limitations and for a robust allowance trading market have

been removed from the program. Similarly, 60% of the emissions reductions

from all other sources are now excluded from the Rule. *See* EPA, *Good*

*Neighbor    Plan    for    2015    Ozone    NAAQS    Maps*,

https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs

(reductions by State for EGUs and non-EGUs).

## STANDARD OF REVIEW

The Rule is subject to reversal if it is "arbitrary, capricious, an abuse of

discretion, or otherwise" unlawful or "in excess of statutory jurisdiction,

authority, or limitations." 42 U.S.C. § 7607(d)(9).

## SUMMARY OF ARGUMENT

1. EPA's Rule now applies to just 11 of the 23 States that EPA intended

to regulate. EPA had notice this would occur: Commenters explained that

EPA's proposed State plan disapprovals, the legal predicate for the Rule,

were unlawful. *See* Response to Comments 2-6, 9-11, 145-48, 152-55, JA___-

___, ___-___, ___-___, ___-___. Despite those warnings, EPA performed no

15

analysis to support a plan that applies to fewer than 23 States. Instead, it just inserted a conclusory severability statement in the Rule. 88 FR 36,693, JA___. Because EPA failed to undertake the analysis to justify the Rule with anything fewer than the 23 States EPA modeled, the Rule should be set aside.

2. Regardless of the number of States participating, the Rule violates the Act and is arbitrary and capricious in numerous respects.

*First*, the Rule imposes over-control; it requires more emissions reductions from EGUs than needed to eliminate each State's significant contribution to downwind air quality. EPA explained the reductions that would be achieved by the 2026 preset emissions budgets would deliver a "full remedy" to the downwind States. 88 FR 36,719, JA___. But EPA goes beyond this full remedy by imposing additional "enhancements" on EGUs that force even further emission cuts on top of the 2026 budgets. *Id.* at 36,657, JA___. "Dynamic budgeting" will reduce allowable emissions below levels of significant contribution. *Id.* "Bank recalibration" takes unused allowances out of the marketplace to force continuous operation of controls, making

16

budgets more stringent. *Id.* And "backstop daily emission rates" will require further emissions reductions with no regard for significant contribution. *Id.* All these "enhancements" constitute over-control.

*Second*, the Rule's cost analysis contains several significant legal and procedural errors. The Rule forces controls on non-EGUs under a new, flawed "*average* cost" analysis, requiring sources to install controls that cost vastly more than EPA's proposed $7,500/ton cost threshold, while failing to analyze the associated air quality benefits that result from these indisputably costly controls. 88 FR 36,739-40, JA___-___. That is not the "cost-effectiveness" analysis the Supreme Court endorsed in *EME Homer*, and it is not consistent with the Act. EPA's non-EGU cost assessment also identifies an *annual* cost-per-ton value even though the Rule only requires reductions during the five-month ozone season from May to September. *Applicability Criteria Summary* 11 tbl.8, JA___. By spreading the costs over a full year of emissions, EPA underestimated the per-ton costs of controls necessary to meet the Rule's ozone-season emissions limits.

17

EPA's cost-effectiveness analysis for EGUs is also flawed. EPA repeatedly made clear that it was relying on the flexibilities of the EGU trading program to smooth out cost variations across sources. *E.g.*, 88 FR 36,729, JA___. The "enhancements" to the EGU program, however, eliminate that flexibility—and EPA declined to analyze those effects in the Rule. This, too, renders EPA's cost assessment arbitrary and capricious.

*Third*, EPA unlawfully subjected certain non-EGUs to the Rule. In the Screening Assessment, EPA decided which sources to regulate and focused on units emitting over 100 tons-per-year of NOx. Screening Assessment 3-4, JA___-___. For some sources, however, EPA used size-proxies that it claimed "reasonably approximate[d]" 100 tons-per-year. 88 FR 36,820. EPA was wrong. Less than 10% of subject engines and 23% of subject boilers emit at or above 100 tons-per-year of NOx.

Analogous to over-control, EPA also subjected Paper and Steel units to the Rule despite acknowledging the data it used to include them was wrong, and despite record evidence that those industries were *not*

18

contributing significantly to downwind nonattainment or maintenance issues. Response to Comments 118-120, 333, JA ___-___, ___.

*Fourth*, EPA ignored crucial Pipeline and powerplant reliability issues that will impact the public, an issue heightened by impossible deadlines. Commenters demonstrated that retrofitting Pipelines, for instance, will necessitate taking numerous engines offline, disrupting natural gas markets and energy supply. INGAA Comment 42, JA___. Commenters and grid regulators also warned of the Rule's threat to electricity reliability, given the inflexibilities imposed by EGU budgets plus enhancements. *E.g.*, PJM Comment 1, JA___. But, confronted with information that its reliability conclusions were far too optimistic, EPA simply stood by its proposed compliance deadlines.

*Fifth*, EPA deprived the public of the opportunity to comment on its Rule in critical respects. EPA's budget "enhancements" for EGUs and "work plan" process for Steel are currently mere concepts—precisely how devastating those rule concepts will be for industry has been left to future

19

actions upon which EPA will not allow comment. Commenters were also deprived of the opportunity to comment on the applicability requirements for Steel boilers. The rulemaking process demands more of EPA.

For all of these reasons, the Rule should be vacated.

## STANDING

Petitioners include owners (and associations of owners) of sources that the Rule regulates. As directly regulated parties, Industry Petitioners suffer concrete, particularized injury-in-fact, remediable by a favorable ruling. *See Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (standing in such cases "is self-evident"); *accord Am. Fuel & Petrochem. Mfrs. v. EPA*, 3 F.4th 373, 379 (D.C. Cir. 2021) (when a petitioner is "directly regulated by the challenged rule," standing is "self-evident").

## ARGUMENT

### I.    Incorporation By Reference.

This brief incorporates by reference the briefs filed by the State Petitioners (other than Wisconsin). Circuit Handbook 38.

20

**II.    EPA Failed to Justify The Rule's Application to Fewer than 23 States.**

EPA modeled and justified the Rule based on the purported "meaningful" air-quality improvements that would result "collectively" from including all 23 States. *See* 88 FR 36,683, 37,648, JA___, ___. EPA claimed those collective reductions "across the hundreds of EGU and non-EGU industrial sources" would lead to "cumulative improvements in ozone levels at downwind receptors…[that] are both measurable and meaningful…" *Id.* at 36,741, JA___. Accordingly, EPA's analysis of "whether the rule achieves a full remedy to eliminate 'significant contribution' while avoiding over-control" of any State assumed "the identified reductions" from all 23 States in the Rule as "combined and collectively analyzed to assess their effects on downwind air quality." *Id.* at 36,719, JA___; *see id.* at 36,743, 36,747-48, JA___, ___-___ (listing "aggregate" and "collective" air-quality improvements).

Moreover, EPA's air-quality modeling assessed emissions reduction requirements for sources subject to the Rule in all 23 upwind States. *Air*

21

*Quality Technical Support Document* 27-28, JA___-___. EPA did not conduct

similar modeling to confirm whether any meaningful air-quality

improvement would result if the Rule applied to fewer than 23 States. EPA

would need to re-do its analysis to support a different Rule, and it is not

Industry Petitioners' obligation to guess at the results. *See Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Dist. Hosp.*

*Partner, LP v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) (court will not "uphold

agency action if it fails to consider 'significant and viable obvious

alternatives'").

Commenters criticized EPA's approach early in the process,

explaining it was "legally necessary and appropriate that EPA revise" its

proposed rule in light of the serious legal challenges to its State plan

disapprovals. Midwest Ozone Group Comment 10-13, JA__; Air

Stewardship Comment 14, JA___ (rejection of State plan disapprovals

"would require [EPA] to conduct a new assessment and modeling of

contribution"); Missouri Dept. Nat. Res. Comment 14, JA___; United States

22

Steel Corporation (USS) Comment 43, JA__; *supra* 15. Commenters' concerns were borne out before EPA even published the Rule in the Federal Register. By then, three courts had stayed the disapprovals in five States. *Supra* n.4.

EPA responded to commenters' concerns by adding a conclusory severability statement in the Rule: "[S]hould a court find any discrete aspect of this document to be invalid,…the remaining aspects of this rule can and should continue to be implemented to the extent possible." 88 FR 36,693, JA___. Further, "[s]hould any jurisdiction-specific aspect of the final rule be found invalid, the EPA views this rule as severable along those State and/or tribal jurisdictional lines, such that the rule can continue to be implemented as to any remaining jurisdictions." *Id.* Similarly, EPA considered the Rule severable "as between the different industries and different types of emissions control requirements." *Id.*

Seven federal circuits have now stayed EPA's State plan disapprovals in 12 States, removing nearly 90% of projected emissions reductions from EGUs and 75% of overall reductions. The question, then, is whether EPA has

23

adequately justified moving forward with the 11-State version of its "integrated" 23-State Rule. It has not.[7] EPA provided no explanation for its perfunctory conclusion that the Rule is "severable" along State lines, or along industry lines, or along any other lines. Just three business-days before this brief was due, EPA published a lengthy rationale for its partial denial of reconsideration petitions, illustrating the type of analysis EPA *did not* perform to support its conclusory severability view in the Rule. *See Basis for Reconsideration Petition Denial*, JA___ (Mar. 27, 2024), https://bit.ly/4aB7lh4. EPA's brand-new analysis is rife with "post hoc rationalizations" and is no basis for upholding EPA's view on severability here. *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1161 (D.C. Cir. 2020).

Even if EPA's *ipse dixit* were enough, implementing an 11-State version of the Rule is unreasonable. *First*, there is no record basis to conclude that

_____

[7] Four entities, including Hybar and U. S. Steel, petitioned EPA to reconsider the Rule given the State plan disapproval stays. Late last week, EPA partially denied the petitions on this issue (https://www.epa.gov/Cross-State-Air-Pollution/response-four-petitions-reconsideration). EPA has not acted on the remaining issues in those petitions.

24

the 11 states still in the Rule would "significant[ly] contribut[e]" to downwind nonattainment or maintenance. As EPA itself observed, "[n]ot every upwind state has the same mix of non-EGU industries and emissions unit types," 88 FR 36,683, JA___, meaning any cost-effectiveness analysis may, and likely would, reach a different result for just 11 States.

*Second,* EPA purports to examine "how many emissions reductions may be obtained, and how air-quality is ultimately impacted" in determining which emissions controls to require. *Id.* But where 75% of reductions are unavailable, and the Rule *even if fully implemented* would only have reduced ozone concentrations on average by 0.66 ppb, *id.* at 36,747, JA___, the Rule unreasonably imposes high costs for little apparent benefit, s*ee Michigan v. EPA*, 576 U.S. 743, 750-51 (2015) (EPA action unlawful where the agency failed to consider costs versus benefits).

*Third*, an 11-State rule decimates the trading program, undermining EGUs' ability to comply with the Rule. EPA analyzed a single trading program covering 22 States. 88 FR 36,657 & n.295, JA___. That unitary market

25

has now been fractured into pieces. *See* 88 FR 49,305, JA___; 88 FR 67,108. This limits allowance availability, which will increase allowance prices, making compliance even more difficult—all contrary to the findings upon which the Rule is based. *See, e.g.*, 88 FR 36,760, 36,771, 36,800, JA___, ___, ___ (discussing claimed benefits of trading program).

EPA's failure to engage in reasoned decision-making consistent with the Act's standards is illustrated by EPA's treatment of the Bonanza Power Plant, the only source located in Indian Country that the Rule regulates. The Act authorizes EPA to "to treat Indian tribes as States." 42 U.S.C. § 7601(d)(1)(A). EPA did not do that. Instead of assessing whether sources on Tribal lands contribute significantly to downwind air quality problems, EPA acted as if Bonanza were just another source within Utah. Commenters warned EPA its approach was unlawful, but EPA ploughed ahead. Deseret Power Comments 3-4, JA___-___. Just like its failure to analyze a program with fewer than 23 States, EPA's failure to appropriately examine the downwind impacts of sources on Tribal lands leaves the Rule without a

26

reasoned basis.

In sum, the Rule cannot "function sensibly without" all 23 States that were part of EPA's collective justification of downwind air-quality benefits. *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 188 (D.C. Cir. 2022). EPA did not analyze or attempt to justify the Rule on any other basis. Without that analysis, removing even one State renders the Rule unlawful.[8]

### III.   Regardless of How Many States are Involved, the Rule is Unlawful.

Setting aside the number of States or Tribal jurisdictions regulated by the Rule, the Rule is unlawful several times over. EPA actively over-controls EGUs by design, and, by failing to consider record evidence, it unlawfully subjects certain non-EGUs to the Rule. EPA justified the Rule on an impermissible average cost basis, departing from past practice without explanation and contrary to the Act. EPA failed to consider the dangerous

---

[8] EPA's approach also arguably raises major-question concerns; EPA set out to regulate major sectors of the national economy while subverting the Act's cooperative-federalism framework, making it both economically and politically significant. *See West Virginia v. EPA*, 597 U.S. 697 (2022).

27

natural gas Pipeline and powerplant (coal and natural gas-fired) reliability impacts faced by the public in the process of imposing impossible timelines. And EPA violated foundational notice-and-comment rulemaking principles. The Rule should be vacated.[9]

### A.    The EGU Budget Enhancements are Designed to Over-Control.

"EPA has a statutory duty to avoid over-control." *EME Homer,* 572 U.S. at 523. EPA may only prevent one State from "contribut[ing] significantly" to another's ozone attainment problems. *Id.* at 521-22. That is, EPA "cannot require a State to reduce its output of pollution by more than is necessary to achieve attainment in every downwind State" or by more than necessary for a particular State to eliminate its "significant[]" contributions to downwind sites. *Id.* The Rule purports to eliminate what EPA deems all significant

---

[9] EPA claims to be implementing the Transport Provision through the framework upheld by *EME Homer*. *See* 572 U.S. at 519-20. There, the Supreme Court approved EPA's interpretation under *Chevron* Step Two. *Id.* If the Supreme Court overturns *Chevron*, the Rule should be vacated so EPA can determine "significant contribution" consistent with the plain text or, alternatively, this Court should request further briefing on the issue.

28

contributions, and *also* imposes additional "enhancements" to further reduce emissions. That is over-control.

The 2026 emissions budgets achieve the reductions EPA deemed a "complete remedy" for upwind State contributions. 88 FR 36,754, JA___; *see id.* at 36,745 n.248, JA___. Starting in 2027, EPA imposes "enhancements" on top of the 2026 budgets that ratchet emissions downward—even when further reductions are not needed to eliminate significant contribution. *Id.* at 36,764, JA___.

EPA's first enhancement, "dynamic budgeting," reduces a State's budget when a powerplant shuts down or limits operation. *Id.* at 36,662-63, JA___-___. Starting in 2027, EPA uses preset budgets to implement these shifts, slashing the budgets based on anticipated reductions in future EGU operations. *Id.* After 2029, EPA compounds the problem, cutting future State budgets by additional amounts based on presently-unknown fleet changes. *Id.*

29

Thus, if EPA determined a State budget of 2,000 tons of emissions would eliminate its significant downwind contributions by 2026, and a powerplant that emits 500 of those tons later shuts down, dynamic budgeting would *reduce* the State's emissions budget to account for the shutdown—taking the overall budget below 2,000 tons. That necessarily over-controls emissions, because the 2026 budget purportedly eliminates significant contribution already. *See EME Homer*, 572 U.S. at 521-22.

EPA's second enhancement, "recalibration," requires EGUs to relinquish their unused allowances. 88 FR 36,663, 36,766, JA___, ___. EPA tacitly concedes this enhancement is designed to "continuously incentiviz[e] sources to reduce their emissions even when they already hold sufficient emissions allowances…." *Id.* at 36,766, JA___. But taking banked allowances away necessarily over-controls. EPA's first recalibration for the 2024 control period confirms this. *See* 89 FR 15,199 (Mar. 1, 2024). EPA will retire approximately 26,000 banked allowances out of a total 38,585 in the ten states that remain in the program, approximately two-thirds of all banked

30

allowances. *Id.* at 15,201. Sources must now compete for limited allowances to cover the three-for-one penalty, and, if EPA completes its latest proposed rulemaking, sources in five newly added states will have no banked allowances at all.[10] Every indicator says adequate allowances will not be available, forcing early retirements or installation of excessively costly controls. That is the point of recalibration. In this way, it is no different than a further reduction in each State's budget. For the same reasons, it also results in over-control.

EPA's third enhancement imposes "backstop daily emissions rates," which requires EGUs to either constantly meet emissions limits achievable with Selective Catalytic Reduction control technology or surrender allowances on a three-for-one basis. 88 FR 36,664, 36,767, JA___, ___. Again, State budgets and the trading program already provide a complete remedy. These backstops go beyond that, and therefore beyond the Act. Moreover,

_____

[10] In particular, Arizona Public Service Company and Salt River Project Agricultural Improvement and Power District own and operate sources within Arizona, which EPA has proposed to add to the Rule.

31

by functionally requiring Selective Catalytic Reduction on every facility, this enhancement arbitrarily eliminates the benefits of the trading program—ensuring both electric reliability and cost-effectiveness by allowing sources not able to efficiently install controls to purchase sufficient allowances—that were key to EPA's rationale for the Rule. *Id.* at 36,728-29, JA\_\_\_-\_\_\_.

EPA's stated purpose of the enhancements is to prevent individual sources from "idl[ing] controls." *Id.* at 36,720, JA\_\_\_. But the Transport Provision only addresses eliminating "amounts" of emissions *statewide* that "contribute significantly" to downwind issues. 42 U.S.C. § 7410(a)(2)(D)(i). Because the statewide "amounts" will be reduced below EPA's identified significant contribution level, the enhancements have nothing to do with preventing significant contribution. They impose control for the sake of control.

EPA also wrongly claims it "confirmed" the enhancements would not "over-control." EPA's over-control analysis stops at "the 2026 analytic" year, and EPA refused to engage in "further over-control analysis." 88 FR 36,751,

32

JA___. Meanwhile, the enhancements go into effect *after* 2026. EPA's "analysis," therefore, does not support its conclusion that its enhancements do not over-control because budgets nosedive after 2026. *Id.* at 36,907, JA___.[11] Rather, it implicitly confirms that the enhancements do over-control. EPA's decision to stop its over-control analysis at 2026 arbitrarily ignores this inevitability. This failure to address an important aspect of the problem is arbitrary and capricious.

EPA's own data prove the point. For example, EPA concedes the 2026 budget for Oklahoma brings Oklahoma's contribution below EPA's threshold for *de minimis* contribution *and*, at that point, the downwind states' ozone problems are "resolved." *Id.* at 36,750, JA___; *cf. EME Homer*, 572 U.S. at 521-22 (explaining the two disjunctive over-control possibilities). Each

---

[11] EPA has previously claimed these arguments must be addressed in "as-applied" challenges to the Rule's enhancements after 2026. But because the enhancements are facially designed to over-control, and EPA has entirely ignored this aspect of the problem, an as-applied challenge is not necessary. Moreover, if such challenges are brought after 2026, EPA will surely argue they are beyond the 60-day deadline for filing petitions for review.

33

enhancement will bring Oklahoma emissions even *lower*; the 2027 preset emissions budget alone is slashed by over 40% from 2026 levels, 88 FR 36,663, JA___. In other words, EPA's post-2026 budgets, enhancements and all, are designed to over-control *by a lot.* The same can be said of Alabama, Minnesota, and Wisconsin, where EPA did not impose the full suite of possible controls to avoid over-control, but will inevitably obtain the same over-controlling results by way of "enhancements" that further reduce allowances. *Id.* at 36,749, JA___. More broadly, EPA entirely ignored the over-control problem for *all* States because it failed to analyze over-control after 2026, and its enhancements will effectively alter State budgets in unpredictable ways.

The Rule's systematic, facial over-control exceeds EPA's statutory authority. EPA's decision to limit its over-control analysis to 2026 fails to consider an important aspect of the problem with the enhancements and violates EPA's statutory duty to avoid over-control.

34

B.    **EPA's Cost-Effectiveness Analyses Result in an Unlawful Rule.**

1.    **EPA Unlawfully Requires Controls on Non-EGUs Regardless of Actual Costs.**

In past Transport rulemakings, and purportedly in this one, EPA has defined the amount of emissions that "contribute significantly" under the Transport Provision by establishing a cost-effectiveness threshold for reductions, selecting a level where "further emissions mitigation strategies become excessively costly on a per-ton basis while also delivering far fewer additional emissions reductions and air quality benefits." 88 FR 36,683, JA___ (referred to as the "knee in the curve"). Emissions that can be abated at costs *up to* that threshold are considered significant contributions. *See, e.g.*, 76 FR 48,208, 48,248 (Aug. 8, 2011) ("defin[ing] each state's significant contribution…as the emission reductions available *at a particular cost threshold* in a specific upwind state" (emphasis added)); *Maryland v. EPA*, 958 F.3d 1185, 1192 (D.C. Cir. 2020) ("Emissions that can be reduced at or below the selected control level are considered 'significant' for purposes of Good

35

Neighbor compliance."). The Supreme Court affirmed this approach. *See EME Homer*, 572 U.S. at 519-20.

In the Rule, EPA claimed it applied the *EME Homer* framework. *E.g.*, 88 FR 36,678, JA___. It did not. Instead, EPA regulated non-EGUs *without regard* to the relationship between the cost of controlling a given source's emissions and the impact on downwind air-quality, arbitrarily and capriciously departing from past practice without explanation. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). And, regulating without the agency-defined "amounts" flouts EPA's obligations under the Act.

In the proposal, EPA applied the *EME Homer* framework, identifying a "marginal cost threshold of *up to* $7,500 per ton" for non-EGU controls. 87 FR 20,043, JA___ (emphasis added). But, as commenters showed, the controls EPA proposed mandating would often cost well more than $7,500/ton. Pipeline companies demonstrated, for example, that the Rule's emissions standards would impose exorbitant retrofit costs for over 100

36

affected engines, including $109,301/ton (95 engines), $225,587/ton (16 engines), and even $684,169/ton (3 engines). Kinder Morgan Comment 21-26, JA___-___. Similarly, Paper boilers will experience costs of $37,900/ton as contrasted against EPA's estimated $3,800/ton at proposal. American Forest & Paper Association (Paper Association) Comments 33, JA___. Steel will experience costs of approximately $20,873/ton for boilers and over $14,000/ton for reheat furnaces. USS Comment 100, JA___; *id.* Exhibit D at 20, 27, JA___, ___; *see also* USS Reconsideration Attachment A, ¶16, JA___ (reheat furnace costs up to $42,300/ton)). Additionally, units that operate fewer hours, burn alternative fuels, or are already well-controlled, inherently emit less NOx, making such units expensive to retrofit on a per-ton basis. *See, e.g.*, Kinder Morgan Comments 21, JA___; Paper Association Comments, 3-4, JA___-___; USS Comment 15, 95, 100, JA___, ___, ___ (blast furnace gas is already low-NOx fuel); *Applicability Criteria Summary* 7, JA___ (EPA assessment "may result in lower cost/ton values than is likely for some lower emitting units.").

37

EPA admits "costs to meet the final [R]ule emissions limits may also differ." 88 FR 36,470, JA___. It also acknowledged that $7,500/ton "does not reflect the full range of cost-effectiveness values that are likely present across the many different types of non-EGU industries and emissions units assessed." *Id.* at 36,746, JA___. EPA attempted to justify these variable costs by claiming that "overall" the "range of cost-effectiveness values for non-EGU industries and emissions units compares favorably with the values used to evaluate EGUs." *Id.* That explanation is arbitrary and capricious because EPA acknowledges the industries are different: EGUs are "relatively homogeneous," while non-EGU sources "are relatively heterogeneous, even within a single industrial category, and have far greater variation" in "emissions levels, and technologies to reduce emissions." *Id.* at 36,720, JA___. Consequently, the variability in costs-per-ton of emissions reductions for non-EGUs exceeds the variability and upper-end costs that EPA claims will be incurred by EGUs.

38

Further, EPA arbitrarily and capriciously lumped all non-EGUs together, even though EPA's own analysis shows that cost-effectiveness is dissimilar across industries. *See* Screening Assessment 4, fig.1, JA___. EPA *did* set an industry-specific cost-effectiveness threshold for one industry: EGUs. *See Balt. Gas. & Elec. Co. v. FERC*, 954 F.3d 279, 285 (D.C. Cir. 2020) (the "duty to explain inconsistent treatment is incumbent on the agency"). For the first time, EPA is regulating nine distinct non-EGU industries, which EPA concedes "is complex." 88 FR 36,683, JA___.[12] But just because the problem is complex does not mean EPA can forgo reasoned decision-making or exceed its statutory authority. "Interstate contributions cannot be assumed out of thin air." *Michigan v. EPA*, 213 F.3d 663, 684 (D.C. Cir. 2000).

---

[12] Historically, EPA declined to regulate non-EGUs under the Transport Provision because there was "greater uncertainty in the non-EGU emission inventory estimates than for EGUs." 81 FR 74,504, 74,521 (Oct. 26, 2016). Here, EPA changed course and now claims to have solved the riddle. To get there, however, EPA sidestepped its traditional modes of analysis, and did so without explanation.

39

In the face of variability and its erroneous cost data, EPA should have *re-evaluated* the "knee in the curve" for each non-EGU industry. 88 FR 36,683, JA___. Meaning, it should have incrementally evaluated costs in comparison to emissions benefits to identify the point on the curve, for *each* non-EGU, at which costs are unreasonable and reductions are no longer meaningful. *See, e.g.*, Screening Assessment 5, JA___; 86 FR 23,054, 23,110 (Apr. 30, 2021) (referring to "reductions…below" $2,000/ton threshold). Instead, EPA abandoned its court-approved cost-threshold methodology. By statute, significant contributions must be grounded in an "amount," which EPA itself has defined using a cost-effectiveness threshold. 88 FR 36,676, JA___ (citing the *EME Homer* framework). But here, EPA persisted in using data it determined did "not reflect" actual costs for many sources.

EPA tried to justify the Rule on the grounds that the "overall average" cost for *all* non-EGUs sources as a whole is "approximately $5,339/ton"— without considering whether that value represents *actual* costs, let alone excessive costs, for each of the varied sources and industries involved. *Id.* at

40

36,746, JA___.[13] Regardless of the "average," EPA is imposing costs above its $7,500/ton threshold, *and necessarily* above the arbitrary average value of $5,339/ton on many sources. EPA therefore violated the Act and departed, without explanation, from past practice by imposing emissions reduction requirements that apply to individual sources regardless of whether the controls are cost-effective for those sources—indeed, without any objective upper bound *at all* on the cost for a given source to comply.

EPA cannot justify this interpretation of the Act. *EME Homer* held that EPA reasonably interpreted the Act's phrase "significantly contributes" by requiring reductions of emissions that "can be eliminated *under* the cost threshold set by the Agency." 572 U.S. at 518 (emphasis added). The Court concluded this was "reasonable" because that approach offered "an efficient

---

[13] EPA even got the final "average cost" assessment, 88 FR 36,746, JA___, of non-EGU controls wrong. *See* Kinder Morgan Comment 21-26, JA___-___ (actual costs in excess of $600,000); Portland Cement Association Comments 24, JA___ (actual costs-per-ton far higher than EPA's average for cement); USS Comment Exhibit D at 20, 27, JA___, ___ (costs 2 to 4 times higher than EPA's average); Paper Association Comments 33, JA___ (actual costs 700% higher than EPA's average).

41

and equitable solution to the allocation problem." *Id.* at 519-20. Here, the Rule is neither equitable nor efficient, and therefore departs from past practice without explanation and is an unreasonable interpretation of the Transport Provision under *EME Homer*.

It is inequitable because the Rule imposes emissions limits on a variety of non-EGUs, regardless of cost, as discussed. The Rule is also inefficient, and therefore arbitrary, because the variability in costs for non-EGUs cannot be smoothed over by a trading program. For all past Transport rules, EPA utilized a trading program to allow regulated sources to achieve "required emissions reductions in a more flexible and cost-effective manner." 88 FR 36,800, JA___; *see also id.* at 36,729, JA___ ("[A] trading program, and its corresponding compliance flexibilities, make the use of a single representative cost all the more appropriate."). EPA did not propose a trading program for the disparate non-EGU industries, and it cannot, concluding it is infeasible. *See id.* at 36,817-18, JA___-___. Thus, each covered

42

source across non-EGU industries must comply with the applicable emissions limits regardless of how cost-effective it is to do so.

In sum, it is not "logical and rational," and is therefore "arbitrary and capricious," *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 647, 652 (D.C. Cir. 2016) (citation omitted), to define a source's significant contribution in terms of whether the source can make cost-effective emissions reductions, identify a threshold for assessing cost-effectiveness, and then act as if it were irrelevant whether the Rule will impose costs that vastly exceed that threshold. *See Michigan v. EPA*, 576 U.S. at 751-54 (cost is key consideration in regulating); *White Stallion Energy Ctr. v. EPA*, 748 F.3d 1222, 1261 (D.C. Cir. 2014) (Kavanaugh, J., dissenting) ("[C]onsideration of cost is commonly understood to be a central component of ordinary regulatory analysis, particularly in the context of…environmental regulation.").

The limited exception in the Rule for costs causing "extreme economic hardship," 88 FR 36,818, JA___, "cannot rescue [the Rule] from systemic errors," *Ass'n of Oil Pipelines v. FERC*, 281 F.3d 239, 244 (D.C. Cir. 2002). EPA

43

stressed this "case-by-case" exception is intended for "unique" and "limited" circumstances, 88 FR 36,818, JA___, for "individual facilities and emissions units," *id*. at 36,747 n.250, JA___, and only at its discretion, 40 C.F.R. § 52.40(e)(2)(i)(B). But *hundreds* of non-EGU units will require controls exceeding $7,500/ton. *See, e.g.*, Kinder Morgan Comment 26, JA___ (over half of its units exceeding $7,500/ton); USS Comment Exhibit D at 27, JA___; Paper Association Comments 8, 33, JA___, ___ (explaining no readily available control, including Selective Catalytic Reduction, and showing actual control costs of $38,900/ton). Moreover, to qualify for this "limited" exception, operators must demonstrate "extreme" hardship, which EPA describes as a showing that unit-specific costs would "significantly exceed the highest representative end of the range of estimated cost-per-ton figures identified for any source in the relevant industry." 88 FR 36,819, JA___. This produces absurd results. *See, e.g.*, Kinder Morgan Comment at 21-26 (costs exceeding $600,000/ton), JA___-___. EPA cannot save its unreasonable Rule with a discretionary and standardless exception that provides no assurance

44

that the Rule's "benefits [will] be 'at least roughly commensurate with its costs.'" *Wisconsin v. EPA*, 938 F.3d 303, 322 (D.C. Cir. 2019) (alteration omitted) (*quoting Michigan*, 213 F.3d. at 678-79).

EPA also purported to create a "facility-wide averaging" exception, only for Pipeline engines. *See* 88 FR 36,823-24, JA___-___. EPA said its analysis showed that "emissions averaging should allow most facilities to install controls on approximately one-third of the engines at their sites, on average." *Id.* at 26,824, JA___. But that analysis considered just 10 facilities and 83 engines—a fraction of the 713 facilities and 3,005 engines subject to the Rule. *Engines Analysis Data*, tab "Determine NOx Threshold", JA___, EPA-HQ-OAR-2021-0668-1050. And EPA did not confirm that the types, sizes, and runtimes of engines in the "subset" were representative of engines subject to the Rule. 88 FR 36,824, JA___. They are not. For example, the facilities EPA evaluated had 8.3 engines on average, while the average of all facilities in EPA's dataset is only *4.2* engines (3,005/713), and half the facilities have no more than 3 engines. *See Engines Analysis Data*. EPA's

45

analysis thus bears no "'rational relationship' to the real world." *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1053 (D.C. Cir. 2001). And EPA arbitrarily denied other industries the ability to even use facility-wide averaging. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Unexplained inconsistency is…a reason for holding [agency action] to be…arbitrary and capricious….").

> ### 2.   EPA Unlawfully Used Annual Cost-Effectiveness Calculations To Justify Ozone-Season Emissions Limits for Non-EGUs.

The haphazard nature of EPA's cost analyses continues. EPA's assessment of Non-EGU costs is also arbitrary due to its failure to properly account for emissions reductions *only* during the ozone season. EPA set NOx emissions limits for "non-EGU sources that will apply only during the ozone season, which runs annually from May to September." 88 FR 36,820, JA___; 40 C.F.R. § 52.40(c)(1). EPA found that these limits will eliminate upwind States' "significant contribution" to downwind States' nonattainment of the ozone standard because they will produce "impactful" emissions reductions "at reasonable cost-effectiveness thresholds." 88 FR 36,719, JA___.

46

EPA reported the "overall average" cost for all non-EGUs covered by the Rule is $5,339/ton of emissions reductions. 88 FR 36,746, JA___; *see also id.* at 36,739-40 & Tables.V.C.2-1, V.C.2-3, JA___-___. In addition to being infected by the deficiencies in EPA's cost analysis noted above, that figure reflects the average cost-per-ton of the *annual* emissions reductions EPA predicted the Rule would achieve in 2026, rather than the cost of reductions during ozone season.[14] Therefore, that figure "grossly underestimates the cost per ton of NOx emissions reductions" during ozone season. Mississippi Comment 26, JA___. EPA acted arbitrarily when it used *annual* cost-effectiveness calculations to justify *ozone-season* emissions limits.

Nor can EPA's use of annual cost-effectiveness data be justified as a proxy for the cost-effectiveness of ozone-season emissions reductions. The ratio between costs and ozone-season emissions varies across industries. Some sources' emissions controls can be turned off outside ozone season,

---

[14] EPA reported annual non-EGU costs of $571,676,839 and annual emissions reductions of 107,077 tons in 2026, which is $5,339 per ton. *Applicability Criteria Summary* 11 tbl.8, JA___.

47

while others are permanently integrated into the source. 88 FR 36,820, JA___.

In addition, the amount of NOx that individual sources emit varies throughout the year. For example, the use of engines that pressurize Pipelines varies with natural gas demand. TC Energy Comment 5, JA___; INGAA Comment 12, JA___. Thus, engines that transport less natural gas in the summer may have low emissions during ozone season, but higher emissions in the winter. INGAA Comment 12, JA___. Similarly, many of the "industrial, commercial and institutional boilers" covered by the Rule "are 'load following' boilers" whose use is "dictated by the thermal demands of end-use processes" that "are often weather dependent." Council of Industrial Boiler Owners Comment 7, JA___. The "practical effect" is that NOx emissions "var[y] throughout the year and the cost of reductions must be analyzed on that basis." *Id.* Yet EPA never even considered how this variability affected its cost per-ton calculations.

What is more, EPA did not accurately calculate the emissions reductions from non-EGU sources under the Rule. For EGUs, EPA used

48

actual emissions during the 2019 ozone season. 88 FR 36,737-39, JA___-___ (Tables V.C.1-1, V.C.1-2, V.C.2-2). But for non-EGUs, EPA used 2019 *annual* emissions and assumed ozone-season emissions are "5/12 of the annual emissions." *Id.* at 36,739, JA___ (Table.V.C.2-1), 36,848, JA___ (Table.VIII-2). EPA did not explain why it used a different methodology for non-EGUs. And because non-EGU emissions vary throughout the year, the assumption that ozone-season emissions are 5/12 of annual emissions lacks a "'rational relationship' to the real" world and cannot support the Rule. *Appalachian Power Co.*, 249 F.3d at 1053.

### 3.    The Enhancements Undermine EPA's EGU Cost-Effectiveness Analysis.

EPA asserted that its requirements for EGUs were cost-effective *because of* the "highly effective" emissions trading program it continued from past plans. *E.g.*, 88 FR 36,670, JA___. EPA's "enhancements" undermine this critical rationale for the Rule.

In response to comments that the selected control stringency was too expensive, non-representative of actual costs, and would not be cost-

49

effective for many powerplants, EPA explained that a uniform cost coupled with "the region and state reduction requirements through a mass-based trading program provides a means of alternative lower cost compliance for those sources particularly concerned about the higher retrofit cost at their unit." *Id*. at 36,730, JA___. EPA repeatedly asserted that the trading program would incentivize some sources to control more than is needed and then sell allowances to sources that could not install cost-effective controls. *Id*. at 36,727-28, JA___-___. And EPA emphatically stated that it is "not mandating that any EGU must install [Selective Catalytical Reduction] technology," due to the ability to trade allowances and thereby avoid exorbitant costs. *Id*. at 36,683-84, 36,686, JA___-___, ___.

All these statements are belied by EPA's enhancements. *See supra* 28-34. EPA provided zero analysis of what the costs or effectiveness of its "enhanced" requirements would be after 2026. *Id*. For example, EPA begins ratcheting down 2026 budgets in 2027, making fewer allowances available, and then further lowers budgets through "dynamic budgeting" starting in

50

2030. At the same time, any source that has not installed EPA's preferred control technology will have to hold and retire three times the number of allowances at a prohibitive cost. *See* 88 FR 36,680 n.91, JA___ (acknowledging "the imposition of the backstop emission rate in 2030…could lead to the owner of a given unit to decide that the unit's continued operation would be uneconomic without installation of [Selective Catalytic Reduction]"). In short, the enhancements functionally require installation and operation of controls by all units, regardless of cost, by making fewer and fewer allowances available for trading. All of this is exacerbated by the fact that EPA based its determination that the trading program would smooth costs on a 23-State trading program, which now only applies to 11.

EPA did not perform any analysis of the efficacy of the trading program after the enhancements take place, including as it relates to cost-effectiveness. The Agency's conclusion that the trading program would make up for the exorbitant costs and render EPA's assumed costs

51

representative are arbitrary and capricious because there is no rational support in the record after 2026. *State Farm*, 463 U.S. at 43.

### C. The Rule is Overinclusive for Certain Non-EGUs.

#### 1. EPA's Applicability Criteria For Engines and Boilers Are Unlawful.

In determining which sources to regulate, EPA "focused on assessing emission units that emit > 100 [tons-per-year] of NO$_X$." Screening Assessment 3, JA___. For certain Non-EGU sources—Cement, glass, and Steel reheat furnaces—EPA used the 100-tons-per-year threshold to include or exclude units. 88 FR 36,825-29, JA___-___. For engines and boilers, by contrast, EPA considered only a capacity proxy, rather than actual emissions when assessing the 100-tons-per-year threshold. Specifically, EPA regulated all pipeline engines with a design capacity of 1,000 horsepower or greater, and all boilers with a design capacity of 100 MMBtu/hr or greater, asserting that these criteria "reasonably approximate" the 100-tons-per-year threshold. *Id.* 36,820, 36,832, JA___, ___; *see also* 87 FR 20,142, 20,148, JA___, ___.

52

The flaws in EPA's proxy approach were apparent even at the proposal stage. For Pipelines, for example, EPA projected its horsepower proxy would sweep in only 307 engines nationwide. 87 FR 20,090, JA___. EPA believed most of those engines would exceed the 100-tons-per-year threshold: EPA estimated that "over 200 engines" out of 307 "emitted greater than 100 [tons-per-year]." *Final Non-EGU Sectors Technical Support Document* 4, JA___. Commenters, however, demonstrated that EPA had wildly underestimated the Rule's reach. INGAA Comment 8-9, JA___-___ (association members alone operate 1,380 regulated units); TC Energy Comment 4-5, JA___-___ (similar). Numerous commenters also raised concerns that EPA's boiler proxy was overinclusive, capturing units that never operate close to their design capacity or that burn low-NOx fuels. Response to Comments 133-35, 365-67, 790-99, JA___-___, ___-___, ___-___.

In the Rule, EPA acknowledged that its proxies "captured more units than the EPA intended," including "low-use units and some units with emissions of less than 100 [tons-per-year]." 88 FR 36,819, 36,821, JA___, ___.

That was an understatement. EPA now estimates less than 23% of the boilers with design capacity over 100 MMBtu/hr actually emit more than 100 tons-per-year of NOx. *See Non-EGU Facilities and Units.xlsx*, JA___, EPA-HQ-OAR-2021-0668-1174. For engines, EPA now projects that 3,005 units are subject to the Rule, 88 FR 36,824, JA___, even though fewer than 300 units will meet the 100-tons-per-year threshold, *see Non-EGU Facilities and Units.xlsx*, JA___, EPA-HQ-OAR-2021-0668-1174. EPA nonetheless persisted in regulating all engines at or above a 1,000-horsepower rating and boilers with a design capacity over 100 MMBtu/hr, refusing to adjust its applicability criteria to address the mismatch. 88 FR 36,819-21, JA___-___. This was unlawful on multiple levels.

*First*, EPA's applicability criteria result in regulating a significant number of units that, by EPA's own logic, do not "contribute significantly." At the outset, EPA used 100 tons-per-year to determine which sectors to regulate *at all*. *Id*. 36,732-33, JA___-___. But after using that threshold to screen out entire industries, EPA irrationally adopted a Rule that regulates

54

substantial numbers of engines that also emit below that threshold. EPA may not require emissions reductions "at odds with the [significant-contribution] threshold the Agency has set." *EME Homer*, 572 U.S. at 521. At a minimum, EPA failed to justify its disparate treatment of these units. *See Balt. Gas & Elec. Co.*, 954 F.3d at 285.

*Second*, EPA's finding that these proxies "reasonably approximate[]" the 100-tons-per-year threshold, 88 FR 36,820, JA___, is "contrary to the record evidence and thus arbitrary and capricious," *Growth Energy v. EPA*, 5 F.4th 1, 32 (D.C. Cir. 2021). According to EPA's own data, less than 10% of the engines and less than 23% of boilers subject to the Rule emit more than 100 tons-per-year. More than *half* of the engines emit *less than 10 tons-per-year*. *See Non-EGU Facilities and Units.xlsx*, JA___, EPA-HQ-OAR-2021-0668-1174. A "reasonable approximation" is one that fairly captures the target group. *Cf. Worldcom, Inc. v. FCC*, 238 F.3d 449, 459 (D.C. Cir. 2001). Instead,

EPA promulgated a grossly overinclusive rule that amounts to a tenfold expansion of its regulatory reach.[15]

*Third*, EPA's reasons for declining to adjust the applicability criterion are arbitrary and capricious. For Pipelines, EPA tried to justify its overreach by claiming that the hundreds of pipeline engines below the emissions threshold could one day exceed 100 tons-per-year and it is "not possible to guarantee without an effective emissions control program that all such units could not increase emissions in the future." 88 FR 36,821, JA___. But the statute applies only to sources that "*will*…contribute significantly," 42 U.S.C. § 7410(a)(2)(D)(i) (emphasis added), not that "could potentially" do so in the future. And it *is* possible to ensure units do not increase their emissions: EPA could impose a reporting obligation and require compliance with emissions

---

[15] Facility-wide averaging does not cure the problem. First, it is limited to engines at facilities that satisfy the averaging rule. Second, even with averaging, controls must be applied to hundreds of engines that emit *less than* 100 tons-per-year, regardless of cost. Of the 905 units that EPA projected will install controls, two-thirds of them emit less than 100 tons-per-year. *Applicability Criteria Summary* 9, JA___; *Non-EGU Facilities and Units.xlsx*, JA___, EPA-HQ-OAR-2021-0668-1174.

limits if the 100-tons-per-year threshold is exceeded. Indeed, EPA took precisely that approach in exempting certain low-use boilers from emissions limits. 40 C.F.R. § 52.45(b)(1)-(2); 88 FR 36,833, JA___. Here again, EPA failed to explain its "inconsistent treatment" of Pipelines. *Balt. Gas*, 954 F.3d at 285. For boilers, while EPA implemented a low-use and co-firing exception, EPA provided no basis for limiting the applicability of these exceptions, and the Rule remains significantly overinclusive.

EPA also tried to justify its decision on the ground that engines with a 1,000-horsepower rating "collectively" emit substantial amounts of $NO_X$. 88 FR 36,821, JA___. But the statute nowhere authorizes EPA to regulate individual sources that do not "contribute significantly" by lumping them together with other sources that do. Because EPA did just that, *see* Response to Comments 627, JA___ (recognizing that low-use engines' contribution "may be insignificant"), the Rule is unlawful and must be set aside.

## 2.    EPA Erroneously Subjected Steel and Paper to the Rule, Based on Incorrect Data.

EPA's Screening Assessment contained inaccurate data that vastly overestimated the emissions and emissions reduction potential of non-EGUs, highlighted in the context of Paper and Steel sources. While EPA recognized some errors (but did nothing about them), it totally ignored others. This was both arbitrary and capricious and exceeded EPA's statutory authority. *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 866 (D.C. Cir. 2001) (EPA must use "substantial evidence—not mere assertions"); 42 U.S.C. § 7410(a)(2)(D)(i)(I) (EPA may only regulate a "source" or "type of emissions activity" that contributes significantly to a downwind state).

***EPA Failed to Correct Acknowledged Errors in its Screening Assessment.*** The first step in EPA's Screening Assessment was to identify industries with the highest "potentially controllable emissions." Screening Assessment 2, JA___. Other industries were excluded because they did not "significantly contribute to nonattainment or interfere with maintenance in downwind states." 88 FR 36,682, JA___.

58

EPA's Assessment erroneously assumed Steel had thousands of tons of potential emissions from blast furnaces, electric arc furnaces, and other sources. Screening Assessment tbl.6, JA___. It also incorrectly assumed that Steel boilers with the same design capacity have the same emissions reduction potential. The Rule acknowledges that EPA lacked data to support many of the reductions assumed for Steel, and "co-fir[ing]" (burning fuels other than coal, oil and natural gas) or "limited-use" (operating far below their design capacity) boilers would not be able to achieve emissions reductions. 88 FR 36,827, 36,833, 36,760, JA___, ___, ___. EPA therefore removed these units from the Rule. *Id.* Remarkably, EPA failed to recognize that these units were still part of its Screening Assessment for whether to regulate Steel at all. This is a critical error.

EPA has a "duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a non-arbitrary, non-capricious rule." *Appalachian Power Co. v. EPA*, 135 F.3d 791, 818 (D.C. Cir. 1998) (internal quotations omitted). It "cannot ignore new and better data." *Dist.*

*Hosp. Partners, L.P.*, 786 F.3d 56. And it is arbitrary and capricious for EPA to offer an explanation that "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. When EPA realized that subject units did not have potential emissions reductions, it needed to not only remove them from regulation, but also remove them from its Screening Assessment analysis, and re-evaluate each industry on the basis of its actual emissions reduction potential.

*EPA Ignored Analysis Showing its Emission and Air-Quality Impacts Estimates Were Wrong.* EPA subjected both Paper and Steel to the Rule arbitrarily, contrary to record evidence, and in violation of the Act. Using correct data, neither should have been subject to the Rule.

For Paper, EPA's erroneous assumptions about the Paper sector resulted in faulty emissions reduction predictions. Paper Association Comments, 3-4, JA___-___. To illustrate, EPA included mills in Michigan and Virginia where EPA asserts the Paper boilers impact monitors along the Connecticut coast. Air Improvement Council Comments, App. A, JA___.

60

Yet, Paper used EPA's tools (the Air-Quality Analysis Tool) to model and found very limited impact—on the order of 0.01 ppb—on ozone concentrations when the standard is 70 ppb. *See id.* tbl.1, JA___. Paper shared this data with EPA. Paper also provided EPA corrections to the boiler inventory, utilizing EPA's own modeling tools to demonstrate that Paper boiler emissions impact only eight or nine ozone non-attainment areas. Paper Association Comments 6, JA___. Even so, Paper has never passed EPA's two-pronged criteria for inclusion. EPA did not factor in Paper's comments.

EPA similarly regulated Steel when it should have eliminated the industry based on available and relevant modeling. EPA ignored important data relevant to "maintenance" receptors after 2026, unlawfully including some States and their associated sources. EPA's rationale for cutting evidence off at 2026 is *Wisconsin v. EPA*'s statement that EPA should base upwind compliance on downwind nonattainment deadlines, paired with EPA's finding that the 2026 ozone season is the first season non-EGU limits

can feasibly go into effect. 87 FR 20,099-100, JA___-___; 88 FR 36657, JA___. But those statutory deadlines only apply to *nonattainment receptors*; EPA was therefore not required to set the same deadlines for upwind States like Arkansas linked only to maintenance receptors—which, by definition, are in attainment. Accordingly, it is arbitrary for EPA to refuse to consider factors beyond 2026. *Prill v. NLRB*, 755 F.2d 941, 942 (D.C. Cir. 1985) (where an agency erroneously assumed determination was mandated and outside agency's discretion, the determination "stands on a faulty legal premise and without adequate rationale.").

Arkansas offers a ready case study of EPA's arbitrarily and overreaching regulation. Arkansas allegedly contributes to Brazoria and Galveston Counties, but those receptors are predicted by EPA to be in maintenance before 2026, and achieve full attainment before 2032 (i.e., average ppb below 70 and max ppb below 71), even without application of the Rule to Non-EGUs. *See* EPA-HQ-OAR-2021-0668-0099 B-3, JA___; EPA-HQ-OAR-2021-0668-1157 14, 17, JA___, ___. This path to maintenance is also

62

highly conservative; three powerplants in Arkansas will close before 2030,[16] creating emissions reductions by 2028, USS Comment 64-65, JA___-___, dwarfing the 1,546 tons required from all non-EGUs in Arkansas. 88 FR 36,739 tbl.V.C.2-2, JA___. The arbitrariness of EPA's analysis is further evidenced by EPA's decision to defer applicability of "backstop daily emission rates" (*see supra* 31-32) until 2030, specifically to account for EGU closures in 2028, which contradicts the putative legal rationale above. *See* 88 FR 36,796, JA___.

EPA's own modeling found that Steel contributed to a nonattainment or maintenance receptor above EPA's own screening threshold (0.01 ppb) in only one state. Screening Assessment tbl.A-3, JA___. Yet, EPA nevertheless regulated Steel in all 23 States—a decision that is unlawful, arbitrary, and capricious. Take Arkansas, for example, which again highlights the

---

[16] Lake Catherine by 2027 (53,000 tons-per-year NOx permitted, 173 actual 2019 ozone season tons (2019ost)); White Bluff Powerplant by 2028 (53,000 tons-per-year NOx permitted, 2,908 actual 2019ost); and Independence Powerplant by 2030 (53,000 tons-per-year NOx permitted, 2,845 actual 2019ost). USS Comment 64-65, JA___-___.

63

erroneous over-inclusion of Steel units. For all 53,000+ square miles of Arkansas, EPA identified interference with maintenance at only two downwind receptors: Brazoria and Galveston (Texas). EPA-HQ-OAR-2021-0668-1157 14, 17, JA___, ___. But there is *no evidence* steelmakers in Arkansas (primarily located in far Northeast Arkansas, away from Texas) contribute significantly to these receptors. *See e.g.*, USS Comment 10-13, 54-66, JA___-___, ___-___. EPA performed no source-specific modeling to evaluate the impact (or lack thereof) of Arkansas steelmakers on any downwind receptors. Instead, EPA identified industries nationwide that contributed to greater than 0.1 ppb to at least one receptor, or greater than 0.01 ppb to at least ten receptors, then regulated all collective sources in each State, regardless of their impact on downwind receptors. Screening Assessment 2-3, 22-33, JA___-___, ___-___.

That error illustrates a more fundamental flaw in EPA's approach to non-EGUs: EPA used ambient impact criteria (i.e., the 0.10 and 0.01 ppb thresholds) to determine the non-EGU industries that have a meaningful

64

impact on downwind air-quality, but EPA based those determinations on industry-wide analyses instead of making State-by-State assessments. Consequently, any given industry is unlawfully regulated in *each* State because EPA has not demonstrated that emissions from that industry in a given State have an appreciable downwind impact. *See* 42 U.S.C. § 7410(a)(2)(d)(i) (significant contribution must be ascertained State-by-State).

For Hybar specifically, there is no link to the Brazoria or Galveston receptors. HYSPLIT modeling, the same system EPA uses for regional haze interstate transport issues, 87 FR 7,734 (Feb. 10, 2022), demonstrates that on the relevant days for ozone attainment status, the air parcels contributing to downwind ozone concentrations at those monitors did not pass through Northeast Arkansas. Thus, sources (like Hybar) in Northeast Arkansas do not significantly contribute to the Brazoria receptor. USS Comment 55, JA___; *id.* Exhibit A at 19-22, JA___-___.

65



Faced with this data, EPA provided a technical critique of HYSPLIT.

But all modeling is imperfect, and this HYSPLIT modeling beats what EPA

provided to show such a connection—nothing.

*EPA Failed to Correct Clear Errors in Its Baseline Inventory.*

Compounding the errors across both Paper and Steel, EPA relied on

incomplete, unverified, and uncertain data to arrive at the conclusion that

66

they should be regulated. Comments to EPA explained that (1) EPA assessed only annual emissions data, not ozone season values, *see supra* 46-49; (2) several units are not labeled correctly; (3) some units do not have a capacity associated with them; (4) emissions control information is incomplete; and (5) some States report allowable and not actual emissions. Paper Association Comments 3-4, JA___; USS Comments 24, 48, 92, 100, 103, JA___, ___, ___, ___, ___. The 2017 National Emissions Inventory (Inventory) is full of such errors and does not accurately reflect the emissions of boilers in regulated States. Paper Association Comments 1, JA___. Further, EPA did not consider that actual boiler usage is often less than design capacity, nor did EPA consider that some boilers burn low-NOx fuels, which weakens EPA's assumed correlation between design capacity and NOx emissions. *See* Response to Comments 133-35, 365-67, 790-99, JA___-___, ___-___, ___-___.

From a review of the Inventory, it is difficult to determine how many boilers are at a particular facility if a boiler fires multiple fuels and has one line per-fuel or if multiple boilers exhaust to one stack, and EPA did not

67

verify that the Inventory data were representative of the currently operating boiler types, sizes, controls, and emissions. Paper Association Comments 4, JA___. For example, EPA's Screening Assessment assigns boiler controls and NOx reductions to a facility that no longer operates (Appvion in Spring, PA). *Id.* The Inventory contains a number of discrepancies and in several cases overestimates the number of boilers at mills highlighted for EPA to consider yet did not. Even if the dataset were accurate, it does not include critical information, such as ozone season emissions, critical design or control features, or each boiler's actual lb/MMBtu NOx emission rate, so there is no way for EPA to accurately identify which boilers may not be able to comply with the proposed emissions limits.

Further, EPA baselessly assumed that Selective Catalytic Reduction was a proven and cost-effective control strategy for reducing NOx emissions from Paper boilers. It is not. Selective Catalytic Reduction has not been installed on existing Paper boilers in the U.S. given the significant operational and retrofit challenges. *id.* at 18-19, JA___-___ (citing exhaust

68

temperature limitations). Instead of removing paper from the Rule because it did not meet the screening for cost or technical feasibility, EPA offers a "technical impossibility" test that ignores the foundational truth that Paper factually should not be in the Rule. 88 FR 36,747-48, JA___-___. In addition, Selective Catalytic Reduction has disbenefits that EPA ignored, including higher energy to increase the exhaust gas temperature to operate the catalyst in Paper boiler application, resulting in greater greenhouse gas emissions. Paper Association Comments 3, JA___. Therefore, EPA's analysis is flawed relative to what can be achieved and underestimates the costs to the sector.

Steel and Paper were already among the lowest-emitting industries included in the Rule *before* EPA recognized it had significantly over-counted potentially controllable emissions. *See* Screening Assessment 25 tbl.A-3, JA___. Without analysis or citation EPA nonetheless asserted that record evidence does not change EPA's conclusions to include Paper and Steel. Response to Comments 128, JA___. This is arbitrary and capricious.

*    *    *

69

Had EPA removed Steel units that are excluded from the Rule, EPA would have been compelled to exclude Steel at the screening stage. Paper is no different. Had EPA corrected the baseline inventory by removing non-operational Paper boilers, the sector is only predicted to impact eight receptors (or 4 with an 11-State program). Similarly, had it considered the record before it, EPA would have been compelled to exclude Paper boilers.

EPA itself States the Screening Assessment "helped shape the proposal and [Rule]." 88 FR 36,661, JA___. Indeed, applying the Screening Assessment, EPA eliminated 32 industries from further consideration. Having done so, it cannot now ignore consequential errors in the Screening Assessment by claiming the entire process was immaterial. *State Farm*, 463 U.S. at 43 (EPA must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'").

70

3.    **The Steel Requirements Violate the Statute and Are Arbitrary and Capricious.**

i.    **EPA's Work Plan Process for Steel Violates the Act.**

EPA has acknowledged it lacked sufficient information to develop emission limits for reheat furnaces. 88 FR 36,818. This should have precluded their regulation. EPA cannot regulate without a record basis for doing so. 42 U.S.C. § 7607(d)(3),(6); *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 391-93 (D.C. Cir. 1973) ("It is not consonant with the purpose of a rulemaking proceeding to promulgate rules on the basis of inadequate data…."). Yet EPA arbitrarily proceeded anyway, promulgating a "work plan" process that requires sources to create post-promulgation data on which EPA will develop and impose unknown future emission limits without notice-and-comment rulemaking.

The Rule requires facilities to "install and operate" pollution control technology "designed to achieve at least a 40% reduction from baseline" emissions. 88 FR 36,879, JA___. It does not say what designs EPA will accept or even how future emissions limit will be set. Facilities must simply

71

"establish an emissions limit in the work plan that the affected unit must comply with." *Id.* This is not just arbitrary and capricious, it is beyond EPA's statutory authority.

*First*, EPA cannot base its Rule on information that is not in the record at the date of promulgation. 42 U.S.C. § 7607(d)(6)(C). The work plan process does just that.

*Second*, EPA must comply with § 7607(d) when imposing emission limits through a federal implementation plan. *Id.* § 7607(d)(1)(B). The work plan process violates several of its requirements. There is no publication of proposed or final emission limits in the Federal Register as required by § 7607(d)(3). The Administrator simply notifies facilities electronically whether their plan is approved. 88 FR 36,880, JA___. The comment period violates § 7607(d)(5) and (h), providing no initial comments and only 15 calendar days to respond to a disapproval. 88 FR 36,880, JA___. Finally, EPA will not create a regulatory docket, as required by § 7607(d)(4)-(6).

72

To be clear, the issue in not whether EPA can ever use a test-and-set approach. In its regional haze regulations, for example, EPA adopted a test-and-set approach that promulgated: (1) an emission limit range supported by the record; (2) a precise procedure to establish final limits within that range, including the data and equations that would be used; and (3) a prohibition on enforcement until "EPA's confirmation or modification of the emission limit" in a final action published in the Federal Register. 40 C.F.R. § 52.1235(b)(1)(ii)(A)(1)-(7). There is nothing close to that process here.

EPA also cannot claim that its "design" goal of a 40% reduction allows it to later impose an emission limit ministerially or through informal adjudication. The design requirement is not an emissions limit. Emissions limitations can be set higher or lower. 88 FR 36,879, JA___. Indeed, this is the purpose of the work plan process. *Id.* at 36,828, JA___.

Promulgating the final emission limitations is also not a peripheral matter reasonably subject to informal adjudication. Emission limitations are at the heart of an implementation plan. *See* 42 U.S.C. § 7410(a)(2)(A) (first

73

implementation plan requirement is inclusion of "enforceable emission limitations"). Their violation risks significant penalties. *Id.* § 7413(a)(1)(B). And EPA is required to engage in rulemaking before it can impose them. *Id.* § 7607(d).

Equally problematic is the authority EPA has granted itself after finding a work plan deficient. Before an emission limit is even imposed, if the Administrator disapproves a work plan, or finds a work plan was not timely submitted or complete, "[e]ach day that the affected unit operates following such disapproval or failure to submit shall constitute a violation." 88 FR 36,880, JA___. Thus, EPA asserts authority to prohibit operation on 15 days' notice without a hearing. Even when a facility directly violates the Transport requirement, EPA does not have this authority. 42 U.S.C. § 7426 (requiring a hearing and at least three months before EPA can prohibit operation). EPA cannot grant itself more authority than Congress provided. *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001).

74

### ii. The Reheat Furnace Requirements Are Arbitrary and Capricious.

EPA must adequately explain its decision on the record, have adequate data on which to base its decision, and adequately explain departures from prior decisions and established policies. *State Farm*, 463 U.S. at 43; *Portland Cement*, 486 F.2d at 391-93; *U.S. Sugar*, 830 F.3d at 626. The Rule violates each of these principles for reheat furnaces.

*First*, the Rule imposes a 40% design requirement, purportedly based on installation of low-NOx burners that EPA asserts in the Proposed Rule achieves only a 20% reduction. *See* 87 FR 20,145, JA___(Table VII.C-3). EPA defends this discrepancy by stating, without citation, that "most units would be able to meet target reduction design specifications between 20 percent and 98 percent reduction efficiency, depending on the unit." Response to Comments 748, JA___. This vague reference is contrary to the record before it and insufficient to explain the basis for the Rule.

*Second*, the Rule departs from long-standing policy without explanation when it requires that physical or operational limitations on

75

potential-to-emit be achieved *as of* the Effective Date of the Rule (August 2023) to be relevant to determining applicability. 88 FR 36,879, JA___. Federally enforceable physical and operational limitations on potential-to-emit have long been recognized as relevant to applicability. *See, e.g.*, EPA, Options for Limiting the Potential-to-Emit, EC-6-1998-29 (Jan. 25, 1995). The Rule itself adopts this policy. 88 FR 36,869, JA___. But for reheat furnaces alone, the Rule inexplicably excludes consideration of potential-to-emit occurring after the Effective Date. This is arbitrary and capricious. *Small Ref. Lead Phase-Down Task Force v. EPA*, 705 F.2d 508, 551 (D.C. Cir. 1983) (arbitrary inclusion of a cut-off date provides an "independent reason for vacating" the requirement because "[a] rule without a stated reason is necessarily arbitrary and capricious").

*Third*, the Rule acknowledges that emissions control technologies designed for units that burn traditional fuels have difficultly operating on co-fired units effectively, or at all. 88 FR 36,833, JA___. For this reason, EPA concluded it lacked sufficient information to impose requirements on co-

76

fired boilers, and excluded them from regulation. *Id.* Yet while the record contains the same information for reheat furnaces, EPA completely failed to consider the feasibility of achieving emissions reductions at co-fired reheat furnaces. EPA's failure to consider this important aspect of problem, particularly when it found the same issue outcome determinative for other sources in the Rule, was arbitrary and capricious. *State Farm*, 463 U.S. at 43.

### D. EPA Failed to Consider Important Reliability and Feasibility Concerns.

EPA arbitrarily and capriciously failed to consider an important aspect of the problem: the reliability of the energy system and the feasibility of the impossible compliance timelines. Regulating Pipelines and the power sectors without such an analysis, in the face of extensive comments highlighting reliability concerns, is arbitrary and capricious. EPA likewise failed to consider the feasibility of its Rule deadlines for certain industrial sources. Compliance for Paper requires the untried and unknown implementation of Selective Catalytic Reduction technology, Paper Association Comments 35-36, JA___, while the compliance timeline for

77

Pipelines and Steel ignores consideration of the quantity of units, vendor capacity, and the time necessary to implement necessary process. Failure to properly address these issues renders the Rule unlawful.

   *Pipeline reliability.* EPA acknowledges that each engine that must be retrofit to comply with the Rule will have to be out of service for a substantial period of time. *See Control Technology Installation Timing for Non-EGUs* 22, 32 (Timing Report), JA___, ___ (acknowledging construction downtime of one month or between three and seven months, depending on the type of engine and control installed). But EPA did not account for the fact that with approximately three thousand regulated engines, Pipelines must take numerous engines offline simultaneously to even attempt to meet the 2026 deadline. Thus, even if the Pipeline deadline were achievable as a matter of vendor capacity, natural gas service to the public *would be* impacted. Because engines are necessary to move natural gas on a linear system, taking multiple engines offline will cause a "large-scale reduction in output of natural gas," Kinder Morgan Comment 29, 36-37, JA___, ___-___, and "prevent[] [natural

78

gas] shippers from transporting as much gas as their users require," INGAA Comment 42, JA___. There is no slack capacity during peak periods to compensate for those reductions. Further, if Pipelines are unable to install the required controls by May 2026, they face a dilemma: continue operating (violating emissions limits) or shutdown engines, halting transportation service to powerplants or city gates. Yet the sole report EPA commissioned to address the Pipelines' timelines does not address reliability and offers flawed assumptions and perfunctory and conditional conclusions. *See* Timing Report ES-8, JA___.

*First*, the Timing Report expressly disavowed *any* consideration of the Federal Energy Regulatory Commission's (FERC) role, stating that "we were not able to complete an evaluation" of FERC process impact on the timeline. *Id.* And, even though EPA admits FERC has "primary responsibility for ensuring reliability of the bulk electric system," the record contains no indication that EPA conferred with FERC on Pipeline reliability. 88 FR 36,774, JA___.

*Second*, while the Timing Report mentioned average compressor station capacity utilization and estimated installation timelines for engine emissions controls, Timing Report ES-8, 8, 22, 32, JA___, ___, ___, ___, EPA failed to "articulate a satisfactory explanation," *State Farm*, 463 U.S. at 43—or any explanation, in fact—for how these factors interact to assure *reliability*. Nor could it; *average* capacity utilization is irrelevant to evaluating the capacity needed to serve customers at *peak* demand periods that occur during summer and winter, when energy demands for heating and cooling are highest. INGAA Comment 42, JA___.

*Third*, EPA concludes that "the ability to coordinate outages…*may* not" cause "much if any delay." Timing Report ES-8, JA___ (emphasis added). That is wrong. Pipeline engines are intentionally located to provide pressure for a single pipeline. If one engine is taken offline, an engine from a different pipeline cannot serve as a substitute. Each Pipeline operator can also have unique delivery points, so a customer served by one Pipeline may not be able to obtain natural gas from another to make up for lost deliveries. Even

80

where there are multiple Pipelines, agreements to "coordinate" outages among competing Pipelines raise obvious antitrust concerns. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (market allocation agreements per se illegal); INGAA Comment 42 (Pipelines cannot coordinate repairs), JA___.

Because the Timing Report represents EPA's only (non)analysis of Pipeline reliability, EPA plainly "failed to consider [this] important aspect of the problem." *State Farm*, 463 U.S. at 43. To the extent the Timing Report is a presumed reliability analysis, the analysis is arbitrary and capricious.

*Reliability for EGUs.* The Rule's potential to impair electric reliability, impacting coal and natural gas-fired powerplants, was obvious from the start. Numerous commenters, including grid operators and reliability experts, alerted EPA to the threat that would come from disorderly retirement of indispensable baseload generation. *E.g.,* 88 FR 36,770, JA___. Commenters further pointed out that there are well-established tools that can assess the impact of changes on grid reliability and that EPA should

81

consult with other expert agencies. *Id.* at 36,774, JA___. EPA responded by eschewing analysis, data, and consultation with experts in favor of guesswork.

Without analysis, EPA asserted that the Plan would not harm reliability because emissions trading would create flexibility for sources that face unjustifiable costs and because sources must inform grid operators before they can shutdown. *Id.* As discussed above, EPA has hamstrung the flexibility of its trading program through its enhancements. *Supra* 28-34. Even if allowances are available—every indication is they will not be—the enhancements will require EGUs to install controls or shutdown. Those powerplant closures will necessarily impact reliability.

Despite its lack of analysis, EPA conceded there are tools available to assess reliability. *Id.* at 36,774, JA___. It just believes that reliability is someone else's problem: "EPA notes that other entities responsible for maintaining reliability and managing entry and exit of resources…already routinely assess resource adequacy and reliability." *Id.* Those same entities

82

warned EPA that the Rule, which they cannot change, will threaten reliability. PJM Interconnection, one of the nation's grid operators, submitted comments telling EPA that its Rule, alongside the Agency's other Clean Air Act rulemakings, has "the potential to trigger material impacts to the reliability of the bulk electric system." PJM Comment 1, JA___. It also provided EPA with PJM and North American Electric Reliability Corporation studies demonstrating the real risks of the Rule to reliability. *Id*. at 12 nn.12-13, JA___. EPA nevertheless declined to assess the impacts of its Rule, either in isolation or in conjunction with concurrent powerplant rules.

The Midcontinent Independent System Operator provided similar warnings, explaining that the Rule's compliance deadlines and control requirements leave the region in "near-emergency or emergency conditions." Midcontinent Indep. System Operator Comment 5, JA___. Those comments further informed EPA that its proposal would increase "the number of hours of energy inadequacy [by] between 16 times and 80 times the base case." *Id*. at 7, JA___. Further, grid operators told EPA its

83

enhancements—particularly dynamic budgeting—were to blame. *See id*. at

7-8, JA___-___; PJM Comment 21-22, JA___-___. EPA arbitrarily sidestepped

these concerns. And, in anticipation of implementation, both grid operators

have issued updated reports confirming that the Rule still threatens

reliability. Energy Transition in PJM 7, https://bit.ly/3xoWh8q; Midcontinent

Independent System Operator's Response to the Reliability Imperative 7,

https://bit.ly/3TXipjd.

Finally, EPA does not explain how a requirement that sources inform

grid operators of pending shutdowns will address the danger the Rule poses

to reliability. 88 FR 36,771. Those entities cannot give sources permission to

violate EPA's requirements, and they told EPA as much. *See* PJM Comment

4, JA___ ("Regardless of whether deactivating the generating unit would

adversely affect the reliability of the transmission system, the generator may

deactivate its generating unit, subject to the [PJM] notice requirements.").

By failing to adequately address electric-sector reliability, EPA has

ignored a major aspect of the problem.

*Compliance timelines are unreasonable for Pipelines, Paper, and Steel.*

EPA similarly failed to consider important factors in adopting compliance timelines for Pipelines, Paper, and Steel. Where EPA was the source of the multi-year delay in disapproving State plans, it is even more unreasonable for EPA to force impossible compliance deadlines on industry. *Texas v. EPA*, 5th Cir. No. 23-60069, ECF 269-1 at 24 (May 1, 2023) ("EPA's multi-year delay in disapproving…[State plans] undercuts any claim that time is of the essence when it comes to imposing the EPA's Final FIP.").

Starting with Pipelines, the Rule applies to over three thousand engines, 88 FR 36,824, JA___, and the limited vendor capacity for certain control technologies makes it impossible to install the necessary controls within the Rule's deadline. *See* Timing Report 60-61, JA___-___ (noting vendor limitations); Kinder Morgan Comment 28, JA___ (same). EPA's analysis of this issue arbitrarily and capriciously relied on demonstrably faulty assumptions.

85

EPA's Timing Report concludes that *72 months* may be required to retrofit engines due to limited manufacturers and supply chain delay. Timing Report ES-8, 68, JA\_\_\_, \_\_\_; *see also id.* ES-9, JA\_\_\_ (potential that May 2026 compliance date not achievable). That's more than *three years longer* than the Rule's May 2026 compliance date allows. Based on EPA's own math, over half of all engines would not meet the Rule's deadline. *Id.* at 68, JA\_\_\_; 88 FR 36,760, JA\_\_\_.

And while the Timing Report frames six years as an "upper bound," Timing Report 68, JA\_\_\_, it is nowhere close. The Timing Report arrived at its 72-month figure by dividing the total number of engines EPA assessed could require retrofits (905) by an estimated rate of retrofits per year (150). *Id.*, JA\_\_\_. But neither number is supported. The Timing Report's assumption that only 905 engines would require controls apparently stems from EPA's faulty conclusion that facility-wide emissions averaging requires controls on only one-third of covered engines. *Id.* ES-8, 30, JA\_\_\_, \_\_\_. However, as explained, *supra* 45-46, EPA's estimate is fatally flawed.

86

Regarding the claimed 150 engines-per-year, Pipeline operators explained that because only two vendors can perform retrofits on certain types of engines, a maximum of only about 75 engines could be retrofitted annually. INGAA Comment 36, JA___; TC Energy Comment 11, JA___. The Timing Report acknowledged that "specialized labor" needed for engine retrofits was "found to be in limited supply" as of 2022. Timing Report ES-3, JA___. Despite the "limited supply," it nevertheless *doubled* industry's estimate, based on the unsubstantiated speculation "that the size of the skilled labor pool has grown along with natural gas production and [engine]-use expansion[.]" *Id.* at 60, JA___. That was the height of arbitrary.

The three-year compliance timeframe for Paper is also irrational. Paper Association Comments, 34-37, JA___-___. The process of retrofitting a project is complex, involving design, engineering, permitting, procurement, and installation. Paper Association Comments, 35-36, JA___-___. If a fuel switch from coal to natural gas is the compliance option, project timelines could be even longer than four years because of equipment or infrastructure

87

changes. Paper Association Comments, 35-36, JA___-___. Major new source review permitting also can be triggered resulting in further delay. *Id.* Three years is not enough time to achieve compliance with the paper boiler requirements of the Rule, particularly in light of the fact the control technologies that are driven by this Rule have never been applied to this sector in this country. *See* Paper Association Comments 17-19, JA___-___.

For Steel, EPA failed to consider two important aspects of the problem. *First*, it failed to consider the Rule's own work plan process for reheat furnaces. The Timing Report assumes that implementation can begin in "Month 3" (November 2023). Timing Report 22, JA___. But the Rule requires facilities to first submit work plans to EPA that will undergo a minimum of two rounds of review (for completeness and adequacy). 88 FR 36,879, JA___. The work plans themselves are not due until August 2024, and the Rule gives EPA 60 days to complete each review. *Id.* Thus, even if EPA has no objection to a work plan—which would involve additional steps under 40 C.F.R. § 52.43(d)(4)(ii)—owners and operators will not be able to reasonably

88

commence implementation *until 2025*. Since EPA's own Timing Report estimates installation will take 9-15 months, the omission of an 18-month work plan process was a failure to consider an important aspect of the problem.

*Second*, comments raised concerns that supply chain restrictions would render EPA's implementation schedule for Steel infeasible. *See* USS Comment, Exhibit C 15-16 (JA___-___), Exhibit D 29-30 (JA___-___). Yet while EPA recognizes that the supply chain, including vendor and skilled labor constraints, can introduce significant delays, it failed to assess those impacts for Steel. Timing Report 41, 53-54, JA___, ___-___. Having recognized the importance of the issue, EPA's failure to consider its impact on Steel was arbitrary and capricious. *State Farm*, 463 U.S. at 43.

**Case-by-case extensions do not save the arbitrary and capricious compliance deadline**. Extensions will be required across the board—but EPA has stressed that it "anticipates that the majority of the industrial sources covered by this final [R]ule will not qualify." 88 FR 36,760, JA___. Even

89

taking at face value the Timing Report's 72-month underestimate for engines, as an example, extensions would be required for *over half* of Pipeline engines. The extension also requires operators take "*all steps possible* to install the controls necessary for compliance," 40 C.F.R. § 52.40(d)(3) (emphasis added); there is thus no accommodation for maintaining reliability. For Pipelines, Steel, and Paper, a limited extension cannot remedy fundamental errors in the Timing Report's analysis.

The Rule's flawed compliance deadline warrants vacatur. *See Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F. 4th 1273, 1292 (D.C. Cir. 2023) (vacating rule with flawed compliance deadline).

### E.    EPA Deprived Industry Petitioners of a Meaningful Comment Opportunity Multiple Times Over.

Proper notice-and-comment rulemaking is a foundational procedural requirement. *Small Ref.*, 705 F.2d at 547. Here, EPA took petitioners by surprise in the Rule, offering unforeseeable material and demonstrably new requirements that were not considered at proposal, depriving Industry Petitioners the opportunity to comment.

90

1.    **EPA's Budget "Enhancements" Deny a Meaningful Comment Opportunity.**

EPA does not know what its own State emissions budgets will be after 2026, how much compliance will cost, or whether the resulting emissions reductions will meaningfully improve air quality. Thus, States and sources will be subject to a budget number that they will have had no opportunity to comment on, violating the Act's procedural requirements.

EPA contends that ongoing, "dynamic" changes caused by enhancements need not be subject to future comment and review because they are simply "ministerial." 88 FR 36,686, 36,753 n.257, JA___, ___. But these changes fundamentally affect the regulated industry. EPA does not and cannot answer any of these elements past 2026. EPA has therefore deprived stakeholders a meaningful opportunity to comment.

2.    **EPA's Steel Reheat Furnace and Boiler Requirements Are Procedurally Improper.**

For Steel, the Rule had many surprises. In the Rule EPA introduced (for the first time) a highly questionable "work plan" process for reheat furnaces. *Id.*at 36,879, JA___; *supra* 71-74. EPA offered no notice of the work

91

plan process before Rule publication, and it is for all practical purposes a "brand new rule." *Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).

EPA proposed to regulate Steel boilers based on annual emissions or production. 87 FR 20,181, JA___. Without notice, EPA pivoted to "design capacity." 88 FR 36,884, JA___. This was a significant change since it captures more Steel units than proposed. *Id*. at 36,819, JA___. EPA never offered an opportunity for comment.

EPA added exemptions to attempt to address this newly-created problem. *Id.* But these too were improperly excluded from notice-and-comment rulemaking. *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991) (adding exemptions that "offer new and different criticisms" are not a logical outgrowth (citation omitted)).

Similarly, an Arkansas HYSPLIT analysis for Galveston was not included in public comments (unlike Brazoria, discussed *supra* 62-66) because EPA's modeling at the time of the proposed rule only linked

92

Arkansas to Brazoria, so petitioners had no opportunity to comment on the newly purported linkage of Arkansas to Galveston. A petition for reconsideration including such analysis, as well as updated HYSPLIT and CAMx modeling, was filed by Hybar LLC on August 4, 2023.

Had EPA provided Steel adequate notice, and an opportunity to comment, there is a "substantial likelihood that the rule would have been significantly changed." 42 U.S.C. § 7607(d)(8).

## IV.    The Court Should Defer Considering Hybar's Petition.[17]

The Act only permits EPA to promulgate a federal plan after EPA lawfully disapproves a state plan. *Id.* § 7410(c)(1)(B). In Arkansas, where Hybar is located, that legal predicate is absent due to the Eighth Circuit's stay. This Court cannot uphold the Rule with respect to Arkansas without intruding on the Eighth Circuit's jurisdiction, or at least without violating comity principles. *Cf. TRAC v. FCC*, 750 F.2d 70, 72 (D.C. Cir. 1984) ("[W]here a statute commits final agency action to review by the Court of Appeals, the

_____

[17] Argument asserted by Hybar only.

93

appellate court has exclusive jurisdiction to hear suits seeking relief that might affect its future statutory power of review."). Moreover, the Rule is stayed in Arkansas. 40 C.F.R. § 52.184. Accordingly, this Court should defer considering Hybar's petition at this time. If the Court decides Hybar's petition, it should rule in Hybar's favor.

## <u>CONCLUSION</u>

For these reasons, the Rule is unlawful as to each Industry Petitioner and all industries collectively. Industry Petitioners' petitions should be granted and the Rule vacated.

94

Dated:  April 1, 2024                    Respectfully submitted,

                                         /s/ Ana M. Gutiérrez

Catherine E. Stetson                     Ana M. Gutiérrez
Hogan Lovells US LLP                     Michael D. Miller
555 Thirteenth Street, NW                Womble Bond Dickinson (US) LLP
Washington, DC 20004                     1899 Wynkoop St.
(202) 637-5600                           Denver, CO 80202
Cate.Stetson@hoganlovells.com            Ana.Gutierrez@wbd-us.com

*Counsel for Kinder Morgan, Inc.*

Michael B. Schon                         Samuel B. Boxerman
LEHOTSKY KELLER COHN LLP                 Eric D. McArthur
200 Massachusetts Ave. N.W.              Kathleen Mueller
Washington, DC 20001                     Jeremy Rozansky
(512) 693-8350                           SIDLEY AUSTIN LLP
                                         1501 K Street N.W.
Mithun Mansinghani                       Washington, DC 20005
LEHOTSKY KELLER COHN LLP                 *Counsel for Interstate Natural*
629 W. Main St.                          *Gas Association of America and*
Oklahoma City, OK 73102                  *American Petroleum Institute*
(512) 693-8350
*Counsel for National Mining*
*Association*

Allison D. Wood
Makram B. Jaber
Aaron M. Flynn
MCGUIRE WOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
*Counsel for Associated Electric
Cooperative, Inc., Deseret
Generation & Transmission Co-
Operative d/b/a Deseret Power
Electric Cooperative, Ohio Valley
Electric corporation, Wabash
Valley Power Association, Inc.
d/b/a Wabash Valley Power
Alliance, America's Power,
National Rural Electric
Cooperative Association and
Movants for Intervention Arizona
Public Service Company and Salt
River Project Agricultural
Improvement and Power District*

David M. Flannery
Kathy G. Beckett
Keeleigh S. Huffman
STEPTOE & JOHNSON, PLLC
707 Virginia St. East
Post Office Box 1588
Charleston, WV 25326
(304) 353-8000

Edward L. Kropp
STEPTOE & JOHNSON, PLLC
Post Office Box 36425
Indianapolis, Indiana 46236
(317) 946-9882
*Counsel for Petitioners American Forest &
Paper Association, American Iron and Steel
Institute, and Midwest Ozone Group*

Aaron M. Streett
Matthew L. Kuryla
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855
*Counsel for Energy Transfer LP*

Brittany M. Pemberton
BRACEWELL LLP
2001 M Street N.W., Suite 900
Washington, D.C. 20036
(202) 828-1708
*Counsel for TransCanada PipeLine USA
Ltd.*

96

John D. Lazzaretti
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower
127 Public Square
Cleveland, OH 44114
(216) 479-8500
*Counsel for Petitioner United
States Steel Corporation*

Elliott Zenick
AMERICAN CHEMISTRY COUNCIL
700 2nd St. N.E.
Washington, DC 20002
(202) 249-6744
*Counsel for Petitioner
American Chemistry Council*

Kelly M. McQueen
THE MCQUEEN FIRM, PLLC
12 Woodsong Drive
Roland, AR 72135
(501) 580-3291
*Counsel for Petitioner
Arkansas League of Good
Neighbors*

Michael E. Born (49961)
Cheri A. Budzynski (51761)
SHUMAKER, LOOP & KENDRICK, LLP
Huntington Center
41 South High Street, Suite 2400
Columbus, OH 43215
(614) 463-9441
*Counsel for Petitioners Buckeye Power, Inc.
and the Ohio Valley Electric Corporation*

Elbert Lin
Kevin S. Elliker
David N. Goldman
HUNTON ANDREWS KURTH LLP
951 East Byrd Street, East
Tower
Richmond, VA 23219
(804) 788-8200

Mark W. DeLaquil
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue N.W.
Washington, D.C. 20036
(202) 861-1500

97

F. William Brownell
E. Carter Chandler Clements
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue
N.W.
Washington, DC 20037
(202) 955-1500
*Counsel for Petitioners*
*Union Electric Company, d/b/a*
*Ameren Missouri, and Arkansas*
*League of Good Neighbors*

Martin T. Booher
Joshua T. Wilson
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114
*Counsel for Hybar LLC*

Richard S. Moskowitz
Tyler Kubik
American Fuel &
Petrochemical Manufacturers
1800 M Street, NW
Suite 900 North
Washington, DC 20036
(202) 844-5474
*Counsel for Petitioner American*
*Fuel & Petrochemical*
*Manufacturers*

Laura K. McAfee
(D.C. Cir. Bar No. 62386)
BEVERIDGE & DIAMOND, PC
201 North Charles Street, Suite 2200
Baltimore, MD 21201

*Counsel for Enbridge (U.S.) Inc.*

98

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(f) and (g) and Circuit Rule 32(e)(1), I hereby certify that this brief contains 15,586 words, excluding exempted parts, according to the count of Microsoft Word 365. This brief does not exceed 15,600 words, consistent with the Court's Order of December 4th, 2023 (ECF No. 2029865). I further certify that the foregoing Joint Opening Brief of Industry Petitioners complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point proportionally spaced Palatino Linotype typeface.

/s/ Ana M. Gutiérrez
Ana M. Gutiérrez
Womble Bond Dickinson (US) LLP
1899 Wynkoop St.
Denver, CO 80202
Ana.Gutierrez@wbd-us.com

Dated: April 1, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of April 2024, the foregoing

Joint Opening Briefing of Industry Petitioners was served

electronically on all registered counsel through the Court's CM/ECF

system.

/s/ Ana M. Gutiérrez
Ana M. Gutiérrez
Womble Bond Dickinson (US) LLP
1899 Wynkoop St.
Denver, CO 80202
Ana.Gutierrez@wbd-us.com