**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| ASSOCIATED ELECTRIC COOPERATIVE, INC., et al., <br><br> *Petitioners*, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> *Respondents*. | Case No. 23-1195 <br> Consolidated with 23-1157 |

**REPLY IN SUPPORT OF MOTION FOR LEAVE TO INTERVENE
AS INTERVENOR-PETITIONERS**

Movant Intervenor-Petitioners Arizona Public Service Company and Salt River Project Agricultural Improvement and Power District (collectively, "Movants") respectfully submit this reply in support of their Motion for Leave to Intervene as Intervenor-Petitioners, ECF No. 2045571 ("Motion"), and in response to the two oppositions to the Motion filed by Respondent United States Environmental Protection Agency ("EPA") and by Environmental and Public Health Respondent-Intervenors, State and Local Government Respondent-Intervenors, and Petitioner-Intervenor Sierra Club (collectively, "Opposing Intervenors"). *See* ECF No. 2047268 ("EPA Opp."); ECF 2047350 ("Int. Opp.").

Notably, neither EPA nor the Opposing Intervenors identify in any way how they would be harmed by the granting of the Motion. On the other hand, Movants

have shown that they face a very real threat of losing any opportunity to assert their legal rights with regard to the Good Neighbor Plan[1]—the rule at issue in these consolidated cases—if they are not granted intervention. *See,* Motion 2, 6-7. This Court has been clear that "if there is *any* doubt about the ripeness of a claim, petitioners must bring their challenge in a timely fashion or risk being barred." *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 914 (D.C. Cir. 1985) (emphasis in original).

Yet, EPA and Opposing Intervenors say absolutely nothing about *Eagle-Picher* or its implications for Movants' ability to exercise their judicial review rights with regard to the Good Neighbor Plan. Rather than addressing the *Eagle-Picher* risk Movants face, EPA instead asserts that Movants will get "two bites at the apple" if they are permitted to intervene in this action. EPA Opp. 4. Movants seek only to ensure that they are not time barred from being able to bite the apple *at all. See* Motion 2, 6-7 & n.3.

Should this Court determine that Movants' judicial review rights for the Good Neighbor Plan are not yet ripe and that claims that Movants have regarding the Good Neighbor Plan are appropriately raised later if and when EPA finalizes its proposed rule to add Arizona to the Good Neighbor Plan, 89 Fed. Reg. 12,666 (Feb. 16, 2024) ("Supplemental Good Neighbor Proposal"), then Movants ask that

---

[1] 88 Fed. Reg. 36,654 (June 5, 2023) ("Good Neighbor Plan").

the Court make clear that Movants are not precluded from challenging any aspect of the Good Neighbor Plan at that later time. EPA cannot have it both ways: It cannot deny Movants the opportunity to challenge fundamental aspects of the Good Neighbor Plan in this litigation while simultaneously purporting to foreclose the right to challenge those same aspects in all future litigation. *See* 89 Fed. Reg. at 12,669 ("The EPA is not reopening any determinations made in the Federal Good Neighbor Plan as to the 23 states covered in that action. Nor is the EPA taking comment on any aspect of the Federal Good Neighbor Plan, except to the extent of its application to these five states."); *id.* at 12,676 ("EPA is not reopening the modeling in relation to any other State or regulatory action. Any comments received on the modeling that are not relevant to the evaluation of these states' interstate transport obligations will be treated as beyond the scope of this action."); *id.* at 12,680 ("The issue of the appropriate contribution threshold to apply was thoroughly addressed in … the Federal Good Neighbor Plan rulemakings, and the EPA responded to numerous comments on this topic. The EPA is not reopening this issue in this action.").

Movants wish only to assert their judicial review rights with regard to the Good Neighbor Plan—nothing more, nothing less—and will do so at whatever time this Court determines is appropriate.

EPA and Opposing Intervenors also assert that the Motion has come too late and should be rejected for that reason alone. EPA Opp. at 5-7; Int. Opp. at 2-3. Aware that this litigation was already underway, Movants sought to intervene once EPA took concrete action to regulate them under the Good Neighbor Plan and as soon as it became clear that they risked losing their right to judicial review if they did not so move. This Court should not foreclose Movants' right to judicial review because EPA chose a chaotic and piecemeal rollout for this rule.

Moreover, granting the Motion will help to ensure that all challenges to the Good Neighbor Plan are handled in an efficient and coordinated manner. The positions put forth by EPA and the Opposing Intervenors would either deny Movants their legal rights or would force the need for additional proceedings. Granting the Motion avoids both of these unreasonable results.

## I.  Movants Have Standing.

EPA argues that Movants lack standing to challenge the Good Neighbor Plan because Arizona is not yet subject to the rule. EPA Opp. 3. EPA expresses its concern that Movants will end up with "two bites at the apple" if they are allowed to intervene in these consolidated cases and then, presumably, also challenge the Supplemental Good Neighbor Proposal should it be finalized and add Arizona to the program. *See id*. at 4. Movants do not want anything other than what they are entitled to: their right to challenge the Good Neighbor Plan in its entirety.

As Movants explained, they are concerned that even if they timely file petitions for review of a final rule supplementing the Good Neighbor Plan by adding Arizona to its coverage, they will nevertheless be time-barred from raising their arguments against the Good Neighbor Plan itself. In other words, Movants wish to ensure that they are able to challenge the aspects of the Good Neighbor Plan that were made final by EPA on June 5, 2023, and that are under review in these consolidated cases.

As the Motion explained, this Court's decision in *Eagle-Picher* cautions in favor of the action Movants have taken here: moving to intervene if there is even a possibility as to the ripeness of Movants' claims. To do otherwise is to risk being time-barred. EPA and Opposing Intervenors ignore the *Eagle-Picher* issue, and tellingly, they do not assert that Movants *would* be able to challenge the Good Neighbor Plan later as part of any challenge to the Supplemental Good Neighbor Proposal if and when it is finalized.

Movants' concern that they will not be able to raise any issues related to the Good Neighbor Plan later are not unfounded. In the Supplemental Good Neighbor Proposal, EPA explicitly states that it is not "taking comment on any aspect of the Federal Good Neighbor Plan, except to the extent of its application to these five states." 89 Fed. Reg. at 12,669. Because EPA is taking the position that any comments on the Good Neighbor Plan itself may not be raised in the rulemaking

on the Supplemental Good Neighbor Proposal, it is not unreasonable for Movants
to be concerned that EPA will take the position in any future litigation on a final
Supplemental Good Neighbor rule that adds Arizona to the Good Neighbor Plan
that any challengers to such a rule may raise issues only regarding the application
of the Good Neighbor Plan to Arizona—and not to the Good Neighbor Plan itself.

As set forth in the Motion, Mot. 6-7, Movants satisfy the requirements for
standing,[2] and this Court should grant the Motion.

## II.    The Court Has Discretion to Allow Intervention After the 30-Day Period.

EPA and Opposing Intervenors argue that because the Motion is not timely,
that is the end of the matter. EPA Opp. 5; Int. Opp. 2. Movants filed the Motion,
however, once it became clear that EPA plans to add Arizona to the Good
Neighbor Plan. Movants filed within 30 days of the publication of Supplemental
Good Neighbor Proposal in the Federal Register. *See* Mot. 9 & n.4. Yet, EPA and
Opposing Intervenors expound several theories regarding earlier dates by which
they think Movants should have moved to intervene. None of these theories hold
water.

---

[2] EPA argues that Movants lack standing because they merely asserted a "belief"
that the Good Neighbor Plan is unlawful and that "a 'belief' is not an injury." EPA
Opp. 3. Movants' phrasing in the Motion, however, merely reflects the fact that
this Court has not yet ruled on the merits of the petitions for review.

First, EPA and Opposing Intervenors suggest that Movants should have entered these consolidated cases back when the Good Neighbor Plan was promulgated in June 2023 because EPA said in the preamble to the Good Neighbor Plan that it was evaluating whether Arizona sources contributed significantly to downwind air quality problems. EPA Opp. at 6-7; Int. Opp. at 2-3. EPA's exact statement in the preamble regarding Arizona said:

> EPA's updated analysis of 2023 suggests that the state[] of Arizona … *may* be significantly contributing to one or more nonattainment or maintenance receptors. The EPA is not making any final determinations with respect to th[is] state[] in this action but intends to address th[is] state[] … in a subsequent action or actions.

88 Fed. Reg. at 36,656 (emphasis added). This passing statement in the Good Neighbor Plan's preamble did not provide sufficient certainty to Movants that EPA was proposing to find that Arizona is significantly contributing to nonattainment. EPA simply said that the state *might* be significantly contributing and that EPA "intend[ed] to expeditiously review" the issue. *Id.* at 36,658. Moreover, *nothing* in EPA's statement above in the Good Neighbor Plan gave *any* notice that EPA intended to add Arizona to the Good Neighbor Plan if it later found the state to be significantly contributing. For all Movants knew, an entirely separate rule and program could have been issued for the states EPA was evaluating. Indeed, EPA explicitly stated that it was *not* making any final determination as to Arizona and would do so in some other action or actions. *Id.* at 36,656.

7

Next, EPA suggests that a timelier filing might have been made in January 2024, when EPA posted the pre-publication version of the Supplemental Good Neighbor Proposal on its website. EPA Opp. 6. But it is publication in the Federal Register—not the release on EPA's website of a pre-publication version of a proposed rule that EPA says "is not the official version" on every single page[3]— that is the triggering event for all filing deadlines under the Clean Air Act. *See* 42 U.S.C. § 7607(b)(1). In that regard, Movants simply followed established practice.

Finally, Opposing Intervenors argue that because an industry group of which they are members filed comments on the proposed Good Neighbor Plan that somehow this means they should have entered the case earlier. Int. Opp. 3 & n.2. But those comments addressed general matters affecting any utility that would be subject to the rule; they did not address any issues specific to Movants, nor did they address the inclusion of Arizona in the Good Neighbor Plan. *See generally* Comments of the Class of '85 Regulatory Response Group on the Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard (June 21, 2022)*,* EPA-HQ-OAR-2021-0668-0533. Representative participation in those comments, therefore, does

---

[3] The pre-publication version of the Supplemental Good Neighbor Proposal is attached hereto as Attachment A.

8

not support the conclusion that Movants should have filed a petition for review or moved to intervene at an earlier time.

As the Fifth Circuit has observed, the analysis of whether a motion to intervene is timely "is contextual; absolute measures of timeliness should be ignored. The requirement of timeliness is not a tool of retribution to punish the tardy would-be intervenor, but rather a guard against prejudicing the original parties by failure to apply sooner." *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (internal citation omitted). Here, EPA and Opposing Intervenors identify no harm or prejudice to their interests, and there will be none. As EPA concedes, EPA Opp. 9, Movants are prepared to participate in briefing with industry petitioners, causing no disruption to the briefing schedule.[4] Accordingly, the Court should find that "good cause" exists to "extend the time prescribed by" Rule 15(d) to file a motion to intervene. Fed. R. App. P. 26(b).

---

[4] EPA questions why Movants have sought to join the industry petitioners' brief rather than the brief of Intervenor-Petitioner City Utilities of Springfield. EPA Opp. 7-8 n.3. Because Movants are represented by counsel that also represents industry petitioners in these cases, Movants can participate seamlessly in coordination with industry petitioners and without causing any disruption to the case—which might not be the case if it joined with Intervenor-Petitioner City Utilities of Springfield.

### III.    Existing Parties Do Not Adequately Represent Movants' Interests in This Case.

EPA argues that Movants will be adequately represented by Petitioners in this case, stating that Movants have not identified any new issues that they plan to raise. EPA Opp. 8. The manner in which the Good Neighbor Plan will impact Arizona, including sources that Movants own and operate, is of singular importance to Movants, and this sets their interests apart from those of the other parties in these cases. Indeed, the opening brief of industry petitioners illustrates this. Movants participated in the opening brief as "Movants for Intervention" and coordinated with industry petitioners to describe the distinct impacts the Good Neighbor Plan will have if it is implemented in Arizona. Industry Pets. Op. Br. at 30-31 & n.10, ECF No. 2047829. No other party to the case can adequately represent Movants in making these arguments.

Further, Movants' willingness to coordinate with industry petitioners so as to avoid seeking additional words or an extension of time for briefing does not suggest existing parties already adequately represent their interests. *See* EPA Opp. 8. It means that Movants respect and will work within the parameters set by this Court for briefing, specifically the Court's admonition that "parties with common interests in consolidated or joint appeals must join in a single brief where feasible." Handbook of Practice and Internal Procedures, United States Court of Appeals for the District of Columbia Circuit at 38.

10

## CONCLUSION

In sum, Movants have significant protectible interests at stake in this litigation. Movants sought intervention in this Court as soon as it became clear that EPA intended to add Arizona to the Good Neighbor Plan. That moment did not arrive until EPA published the Supplemental Good Neighbor Proposal in the Federal Register on February 16, 2024. Accordingly, good cause exists for this Court to grant Movants intervention at this time.

Dated: April 4, 2024                    Respectfully submitted,

                                        /s/ *Allison D. Wood*
                                        Allison D. Wood
                                        Makram B. Jaber
                                        Aaron M. Flynn
                                        MCGUIRE WOODS LLP
                                        888 16th Street N.W., Suite 500
                                        Black Lives Matter Plaza
                                        Washington, DC 20006

                                        *Counsel for Movants Arizona Public Service*
                                        *Company and Salt River Project*
                                        *Agricultural Improvement and Power*
                                        *District*

11

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(f) and (g) of the Federal Rules of Appellate Procedure, I hereby certify that the foregoing motion complies with the type volume limitation of Fed. R. App. P. 27(d)(2)(C) because it contains 2,387 words, excluding exempted portions, according to the count of Microsoft Word.

I further certify that this motion complies with Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared in 14-point Times New Roman type.

Dated: April 4, 2024                    Respectfully submitted,

                                        /s/ *Allison D. Wood*
                                        Allison D. Wood

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of April 2024, I am causing the foregoing document to be electronically filed with the Clerk of the Court by using the Court's CM/ECF system. All registered counsel will be served by the Court's CM/ECF system.

/s/ *Allison D. Wood*
Allison D. Wood

# Attachment A

The EPA Administrator, Michael S. Regan, signed the following notice on 1/16/2024, and EPA is submitting it for publication in the Federal Register (FR). While we have taken steps to ensure the accuracy of this Internet version of the rule, it is not the official version of the rule for purposes of compliance. Please refer to the official version in a forthcoming FR publication, which will appear on the Government Printing Office's govinfo website (https://www.govinfo.gov/app/collection/fr) and on Regulations.gov (https://www.regulations.gov) in Docket No. EPA-HQ-OAR-2021-0663; EPA-HQ-OAR-2021-0668; EPA-HQ-OAR-2023-0402. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

6560-50-P

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Parts 52 and 97

## [EPA-HQ-OAR-2021-0663; EPA-HQ-OAR-2021-0668; EPA-HQ-OAR-2023-0402; FRL-11159-01-OAR]

## RIN 2060-AW09

## Supplemental Air Plan Actions: Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards and Supplemental Federal "Good Neighbor Plan" Requirements for the 2015 8-hour Ozone National Ambient Air Quality Standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule; supplemental proposed rule and withdrawal of proposed rules.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA) is proposing to partially disapprove and partially approve State Implementation Plan (SIP) submissions from Arizona, Iowa, Kansas, New Mexico, and Tennessee regarding interstate transport for the 2015 8-hour ozone national ambient air quality standards (NAAQS). This action also proposes a Federal Implementation Plan (FIP) for Arizona, Iowa, Kansas, New Mexico, and Tennessee to address these States' obligations to eliminate significant contribution to nonattainment, or interference with maintenance, of the 2015 ozone NAAQS in other states. The FIP would require fossil fuel-fired power plants in the five states to participate in an allowance-based ozone season nitrogen oxides emissions trading program beginning in 2025. The Agency is also proposing to establish nitrogen oxides emissions limitations applicable to certain other industrial stationary sources in Arizona with a compliance

year no earlier than 2027. Finally, this action also includes proposed technical corrections to the regulatory text previously promulgated to establish comparable FIP requirements for emissions sources in other states.

**DATES:** *Comments*: Comments must be received on or before **[INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.

*Public hearing:* The EPA will hold a virtual public hearing on **[INSERT DATE 15 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]**. Please refer to the **SUPPLEMENTARY INFORMATION** section for additional information on the public hearing.

*Information collection request*: Under the Paperwork Reduction Act (PRA), comments on the information collection provisions are best assured of consideration if the Office of Management and Budget (OMB) receives a copy of your comments on or before **[INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.

**ADDRESSES:** *Comments*. You may send comments, identified as Docket ID No. EPA-HQ-OAR-2023-0402, by any of the following methods: Federal eRulemaking Portal: *https://www.regulations.gov/*. Follow the online instructions for submitting comments. Include Docket ID No. EPA-HQ-OAR-2023-0402 in the subject line of the message.

*Instructions*: All submissions received must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov*, including any personal information provided. For detailed instructions on sending comments and additional information on the rulemaking process, *see* the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*Hearing*: The virtual hearing will be held at *https://www.epa.gov/csapr/csapr-2015-ozone-naaqs*. The public hearing will convene at 9:00 a.m. and end at 6:00 p.m. Eastern Time (ET) or 1 hour after the last registered speaker has spoken. The EPA will make every effort to accommodate all individuals interested in providing oral testimony. A lunch break is scheduled from 12:00 p.m. until 1:00 p.m. Refer to the **SUPPLEMENTARY INFORMATION** section for additional information.

**FOR FURTHER INFORMATION CONTACT:** Thomas Uher, Air Quality Policy Division, Office of Air Quality Planning and Standards (C539-04), Environmental Protection Agency, 109 TW Alexander Drive, Research Triangle Park, NC 27711; telephone number: (919) 541-5534; email address: *uher.thomas@epa.gov*.

**SUPPLEMENTARY INFORMATION:** *Public participation*: Submit your comments, identified by Docket ID No. EPA-HQ-OAR-2023-0402, at *https://www.regulations.gov* (our preferred method. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

There are three dockets supporting this action, EPA-HQ-OAR-2023-0402, EPA-HQ-OAR-2021-0663, and EPA-HQ-OAR-2021-0668. All comments regarding information in any of these dockets are to be made in Docket ID No. EPA-HQ-OAR-2023-0402.

The index to the docket for this action, Docket ID No. EPA-HQ-OAR-2023-0402, is available electronically at *https://www.regulations.gov*. While all documents in the docket are listed in the index, some information may not be publicly available due to docket file size restrictions or content (*e.g.*, CBI).

**Preamble Glossary of Terms and Abbreviations**

The following are abbreviations of terms used in the preamble.

| | |
|---|---|
| 2016v1 | 2016 Version 1 Emissions Modeling Platform |
| 2016v2 | 2016 Version 2 Emissions Modeling Platform |
| 2016v3 | 2016 Version 3 Emissions Modeling Platform |
| ARP | Acid Rain Program |
| ADEQ | Arizona Department of Environmental Quality |
| CAA or Act | Clean Air Act |
| CAIR | Clean Air Interstate Rule |
| CBI | Confidential Business Information |
| CFB | Circulating Fluidized Bed Units |
| CFR | Code of Federal Regulations |
| CSAPR | Cross-State Air Pollution Rule |
| DAHS | Data Acquisition and Handling System |
| EAV | Equivalent Annualized Values |

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| | |
|---|---|
| EGU | Electric Generating Unit |
| EHD | Environmental Health Department |
| EIA | Economic Impact Assessment |
| EPA or the Agency | United States Environmental Protection Agency |
| FIP | Federal Implementation Plan |
| g/hp-hr | Grams per horsepower per hour |
| Group 2 allowances | CSAPR $NO_X$ Ozone Season Group 2 allowances |
| Group 2 trading program | CSAPR $NO_X$ Ozone Season Group 2 Trading Program |
| Group 3 allowances | CSAPR $NO_X$ Ozone Season Group 3 allowances |
| Group 3 Trading Program | CSAPR $NO_X$ Ozone Season Group 3 Trading Program |
| ICR | Information Collection Request |
| IPM | Integrated Planning Model |
| LNB | Low-$NO_X$ Burners |
| MJO | Multi-Jurisdictional Organization |
| MOVES | Motor Vehicle Emission Simulator |
| MW | Megawatts |
| NAA | Nonattainment Area |
| NAAQS | National Ambient Air Quality Standards |
| NAICS | North American Industry Classification System |
| NMED | New Mexico Environment Department |
| Non-EGU | Non-Electric Generating Unit |
| NODA | Notice of Data Availability |

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| | |
|---|---|
| $NO_X$ | Nitrogen Oxides |
| NSCR | Non-Selective Catalytic Reduction |
| OMB | United States Office of Management and Budget |
| PBI | Proprietary Business Information |
| ppb | parts per billion |
| ppm | parts per million |
| ppmvd | parts per million by volume, dry |
| PRA | Paperwork Reduction Act |
| PV | Present Value |
| RFA | Regulatory Flexibility Act |
| RIA | Regulatory Impact Analysis |
| RICE | Reciprocating Internal Combustion Engines |
| $SC\text{-}CO_2$ | Social Cost of Carbon |
| SCR | Selective Catalytic Reduction |
| SIL | Significant Impact Level |
| SIP | State Implementation Plan |
| SNCR | Selective Non-Catalytic Reduction |
| $SO_2$ | Sulfur Dioxide |
| TAS | Treatment as State |
| TDEC | Tennessee Department of Environmental Control |
| TSD | Technical Support Document |
| tpy | tons per year |

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| UMRA | Unfunded Mandates Reform Act |
| Violating-Monitor Receptors | Violating-Monitor Maintenance-Only Receptors |
| VOCs | Volatile Organic Compounds |

**Table of Contents**

I. Executive Summary
    A. Purpose of the Regulatory Action
    B. Costs and Benefits
II. General Information
    A. Does this action apply to me?
    B. What action is the Agency taking?
    C. What is the Agency's authority for taking this action?
    D. Severability
    E. Public Participation
        1. Written Comments
        2. Participation in Virtual Public Hearing
III. Background
    A. Description of Statutory Background
    B. Description of the EPA's 4-Step Interstate Transport Regulatory Process
    C. The EPA's Ozone Transport Modeling
    D. The EPA's Approach to Evaluating Interstate Transport for the 2015 Ozone NAAQS
        1. Selection of Analytic Years
        2. Step 1 of the 4-Step Interstate Transport Framework
        3. Step 2 of the 4-Step Interstate Transport Framework
        4. Step 3 of the 4-Step Interstate Transport Framework
        5. Step 4 of the 4-Step Interstate Transport Framework
IV. SIP Submissions Addressing Interstate Transport of Air Pollution for the 2015 8-hour Ozone NAAQS
    A. SIP Summaries
        1. Arizona
        Prior Notices Related to Arizona's SIP Submission
        2. New Mexico
          a. Information Provided by New Mexico Regarding Step 1
          b. Information Provided by New Mexico Regarding Step 2
          c. New Mexico Letter
        3. Tennessee
        Prior Notices Related to Tennessee's SIP Submission
    B. EPA Evaluation
        1. Arizona
          a. Evaluation of Information Provided by Arizona Regarding Steps 1 and 2

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

      b. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Arizona
      c. Evaluation of Information Provided Regarding Step 3
      d. Conclusion
  2. New Mexico
      a. Evaluation of Information Provided by New Mexico Regarding Step 1
      b. Evaluation of Information Provided by New Mexico Regarding Step 2
      c. Results of the EPA's Step 1 and Step 2 Modeling and Findings for New Mexico
      d. Evaluation of Information Provided Regarding Step 3
      e. NMED's July 2023 Letter
      f. Conclusion
  3. Tennessee
      a. Evaluation of Information Provided by Tennessee Regarding Step 1
      b. Evaluation of Information Provided by Tennessee Regarding Step 2
      c. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Tennessee
      d. Evaluation of Information Provided for Tenessee Regarding Step 3
      e. Conclusion
  C. Proposed SIP Action
V. Other Clean Air Act Authorities for this Action
  A. Correction of the EPA's Determination Regarding SIP Submissions from Iowa and
     Kansas and its Impact on the EPA's FIP Authority for Iowa and Kansas
  B. Application of Rule in Indian Country and Necessary or Appropriate Finding
VI. Quantifying Upwind-State NO$_X$ Emissions Reduction Potential to Reduce Interstate Ozone
   Transport for the 2015 Ozone NAAQS
  A. Summary of Multi-Factor Test
  B. Summary of Control Stringency Levels
    1. EGUs
    2. Non-EGUs
  C. Control Stringencies Represented by Cost Threshold ($ per ton) and Corresponding
     Emissions Reductions
    1. EGUs
    2. Non-EGUs
  D. Assessing Cost, EGU and Non-EGU NO$_X$ Reductions, and Air Quality
    1. EGU and Non-EGU Cost and Emissions Reductions Assessment
    2. Step 3 Air Quality Assessment Methodology
    3. Results for Combined EGU and Non-EGU Air Quality Assessment
    4. Conclusions
VII. Regulatory Requirements and Implementation
  A. Regulatory Requirements for EGUs
    1. Applicability and Tentative Identification of Newly Affected Units
    2. Preset State Emissions Budgets
    3. Unit-Level Allowance Allocations
    4. Timing Adjustments for Certain Trading Program Provisions
    5. Creation of an Additional Group 3 Allowance Bank for the 2025 Control Period and

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Adjustment to Bank Recalibration for the 2025 Control Period

B. Regulatory Requirements for Non-EGUs

C. Submitting a SIP

    1. SIP Option to Modify Allocations for 2026 Under EGU Trading Program

    2. SIP Option to Modify Allocations for 2027 and Beyond Under EGU Trading Program

    3. SIP Option to Replace the Federal EGU Trading Program with an Integrated State EGU Trading Program

    4. SIP Revisions that Do Not Use the Trading Program

    5. SIP Revision Requirements for Non-EGU or Industrial Source Control Requirements

D. Title V Permitting

VIII. Environmental Justice Considerations, Implications and Outreach

A. Environmental Justice

    1. EGU Proximity Assessment

    2. Non-EGU Proximity Assessment

B. Outreach

IX. Costs, Benefits, and Other Impacts of the Proposed Rule

X. Summary of Proposed Changes to Existing Regulatory Text

A. Amendments to Apply the Federal Good Neighbor Plan's Requirements to EGUs in Additional States

B. Amendments to Apply the Federal Good Neighbor Plan's Requirements to Non-EGUs in Additional States

C. Technical Corrections and Clarifications to Previously Finalized Regulatory Text

XI. Statutory and Executive Order Reviews

A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review

B. Paperwork Reduction Act (PRA)

    1. Information Collection Request for Electric Generating Units

    2. Information Collection Request for Non-Electric Generating Units

C. Regulatory Flexibility Act (RFA)

D. Unfunded Mandates Reform Act (UMRA)

E. Executive Order 13132: Federalism

F. Executive Order 13175: Consultation and Coordination with Indian Tribal Governments

G. Executive Order 13045: Protection of Children from Environmental Health Risks and Safety Risks

H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use

I. National Technology Transfer and Advancement Act

J. Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing our Nation's Commitment to Environmental Justice for All

K. Determinations Under CAA Section 307(b)(1) and (d)

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

## I. Executive Summary

This proposed rule would resolve the interstate transport obligations of five states under CAA section 110(a)(2)(D)(i)(I), referred to as the "good neighbor provision" or the "interstate transport provision" of the Act, for the 2015 ozone NAAQS. On October 1, 2015, the EPA revised the primary and secondary 8-hour standards for ozone to 70 parts per billion (ppb).[1] States were required to provide ozone infrastructure SIP submissions to fulfill interstate transport obligations for the 2015 ozone NAAQS by October 1, 2018.

The EPA proposes to make a finding that interstate transport of ozone precursor emissions from five upwind states (Arizona, Iowa, Kansas, New Mexico, and Tennessee) is interfering with maintenance of the 2015 ozone NAAQS in other states. The EPA is withdrawing its previous proposed actions on SIP submissions from Arizona and Tennessee,[2] proposing to partially approve and partially disapprove good neighbor SIP submissions from Arizona, New Mexico, and Tennessee, and to error-correct its prior good neighbor SIP approval actions for Iowa and Kansas to partial disapprovals.[3] To fulfill the EPA's responsibility to ensure that states meet their interstate transport obligations as expeditiously as practicable to meet attainment deadlines for the 2015 ozone NAAQS, the EPA also proposes FIP requirements for these five states to prohibit the emissions that interfere with maintenance of the NAAQS in other states. For states covered in this action, the EPA proposes to define new ozone season nitrogen oxides ($NO_X$) emissions performance obligations for Electric Generating Unit (EGU) sources and to

---

[1] *See* 80 FR 65291 (October 26, 2015).

[2] *See* 87 FR 37776 (June 24, 2022). (The EPA's proposed approval of Arizona's SIP); and 87 FR 9545 (February 22, 2022) (The EPA's proposed disapproval of Tennessee's SIP).

[3] *See* 87 FR 22463 (April 15, 2022) (Iowa); and 87 FR 19390 (April 4, 2022) (Kansas).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

fulfill those obligations by implementing an allowance-based ozone season trading program beginning in 2025. The EPA is also proposing to establish emissions limitations beginning in 2027 for certain other industrial stationary sources (referred to generally as "non-Electric Generating Units" (non-EGUs) in Arizona. Taken together, these strategies will fully resolve the covered states' good neighbor obligations for the 2015 ozone NAAQS.

The EPA proposes to implement the necessary emissions reductions as follows. The proposed FIP requirements establish ozone season $NO_X$ emissions budgets for EGUs in Arizona, Iowa, Kansas, New Mexico, and Tennessee and require EGUs in these states to participate in the revised version of the Cross-State Air Pollution Rule (CSAPR) $NO_X$ Ozone Season Group 3 Trading Program established in the final Federal Good Neighbor Plan Rule.[4] For states currently covered by the CSAPR $NO_X$ Ozone Season Group 2 Trading Program (*i.e.*, Iowa, Kansas, Tennessee), the EPA proposes to amend existing FIPs to transition EGU sources in these states from the Group 2 trading program to the revised Group 3 trading program, beginning with the 2025 ozone season. The EPA proposes to issue new FIPs for Arizona and New Mexico, which are not currently covered by any CSAPR $NO_X$ ozone season trading program. Under CAA section 301(d)(4), the EPA also proposes to extend the FIP requirements to apply in Indian country located within the geographical boundaries of the states included in this proposal, including Indian reservation lands and other areas of Indian country over which the EPA or a tribe has demonstrated that a tribe has jurisdiction.

---

[4] Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 FR 36654 (June 5, 2023).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

The timeframes for implementation of these emissions-reduction strategies are, in the EPA's judgment, as expeditious as practicable and aligned to the extent possible with the attainment schedule for downwind areas in nonattainment of the 2015 ozone NAAQS. As discussed in section VI. of this document, the EPA proposes to find that the 2025 ozone season is as expeditious as practicable to implement emissions reductions associated with near-term emissions control strategies at EGUs, and the 2027 ozone season is as expeditious as practicable to implement emissions reductions associated with new post-combustion control installations at EGUs as well as from installation of new pollution controls at non-EGUs.

As identified in section VI. of this document, the EPA proposes to find that, because Iowa, Kansas, New Mexico, and Tennessee are not linked to receptors in the 2026 ozone season, the near-term EGU emissions-control strategy is sufficient to eliminate these states' interference with maintenance of the NAAQS in other states. Because Arizona remains linked to receptors through the 2026 ozone season, the EPA proposes to find that additional $NO_X$ emissions from EGUs and $NO_X$ emissions from non-EGU sources in Arizona are interfering with maintenance of the 2015 ozone NAAQS in other states and that additional cost-effective controls for $NO_X$ emissions reductions are available from EGUs and in certain industries that would result in meaningful air quality improvements at downwind receptors. Thus, in addition to more stringent EGU emissions budgets for Arizona beginning in 2027, the EPA proposes to require emissions limitations beginning in 2027 for non-EGUs located within Arizona. The Federal Good Neighbor Plan established $NO_X$ emissions limitations during the ozone season for the following unit types for sources in non-EGU industries: reciprocating internal combustion engines (RICE) in Pipeline Transportation of Natural Gas; kilns in Cement and Cement Product Manufacturing; boilers and

Page 12 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

reheat furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; furnaces in Glass and

Glass Product Manufacturing; boilers in Basic Chemical Manufacturing, Metal Ore Mining,

Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills and

combustors and incinerators in Solid Waste Combustors and Incinerators.[5]

*A. Purpose of the Regulatory Action*

In this supplemental notice of proposed rulemaking, the EPA is providing an opportunity

for public comment on its proposed conclusion that SIP submissions from Arizona, New

Mexico, and Tennessee do not contain the necessary provisions to prohibit emissions from

sources within their states from interfering with maintenance of the 2015 ozone NAAQS in

downwind areas. The EPA also proposes to find it necessary to issue an error correction under

the authority of CAA section 110(k)(6) of its previous approval actions for Kansas and Iowa and

proposes to partially disapprove these states' interstate transport submissions. In addition, the

EPA proposes to conclude that emissions from sources in Arizona, Iowa, Kansas, New Mexico,

and Tennessee interfere with maintenance of the 2015 ozone NAAQS in other states, and

therefore the EPA is proposing FIPs to address these states' transport obligations through

expanding the coverage of the Federal Good Neighbor Plan Rule[6] finalized on March 15, 2023.

The EPA is proposing to implement the ozone season $NO_X$ trading program requirements for

EGU sources in the Federal Good Neighbor Plan as the FIPs for Arizona, Iowa, Kansas, New

Mexico, and Tennessee and the emissions limits for non-EGU (industrial) sources in the Federal

---

[5] 88 FR 36654, at 36817.
[6] Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 FR 36654 (June 5, 2023).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Good Neighbor Plan as the FIP for Arizona. These control strategies, if finalized, will prohibit the emissions from these five states identified as interfering with maintenance of the 2015 ozone NAAQS in other states.

The EPA proposes to extend the coverage of the Federal Good Neighbor Plan to these five additional states based on the same data and analyses contained in that rule. In the Federal Good Neighbor Plan, the EPA identified and finalized FIPs for 23 states with emissions that significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states. The EPA used the same set of nationwide air quality modeling, air quality monitoring data, and technical analysis of emissions control opportunities in defining good neighbor obligations for all states covered in that action. Consistent with the application of the EPA's 4-step interstate transport framework, which has been used in prior good neighbor rules like the CSAPR and upheld by the federal courts, the EPA applied emissions control requirements on a uniform basis across those states based on that record.

The EPA maintains that it is reasonable, appropriate, and consistent with the EPA's prior decisions to extend the Federal Good Neighbor Plan's contribution analysis and emissions control requirements to include the five states covered in this action. The EPA has not identified any factors unique to these five states that would warrant applying a different approach. These five states were not addressed in the Federal Good Neighbor Plan because the EPA was not positioned to take final rulemaking action to disapprove SIPs, error correct prior approvals to disapprovals, or promulgate FIPs for these states at that time. To maintain consistency across all states such that the allocation of responsibility for eliminating states' significant contribution and interference with maintenance of the NAAQS in downwind states is done on an equitable basis,

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

the EPA proposes to apply to five additional states the nationwide findings and determinations contained in the Federal Good Neighbor Plan as to the original 23 states which will, if finalized, eliminate these additional states' significant contribution. Thus, in this action the EPA proposes to apply to these five states its air quality modeling and contribution information for the analytical years 2023 and 2026 at Steps 1 and 2, its analysis of emissions control opportunities for EGUs and non-EGUs and determinations of stringency, including overcontrol analysis, at Step 3, and its implementation programs at Step 4. The technical materials and record-based findings that underlie these determinations are all contained in the Federal Good Neighbor Plan record. The scope of this rulemaking is limited to the application of that record to these five additional states.

Thus, in this document, the EPA is taking comment only on (a) the EPA's proposed conclusions that SIP submissions from Arizona, New Mexico, and Tennessee do not contain the necessary provisions to prohibit emissions from sources within their respective states from interfering with maintenance of the 2015 ozone standard, (b) the EPA's proposed conclusion that the Agency must error correct its final rules approving SIPs from Iowa and Kansas to partial disapprovals, (c) the EPA's proposed conclusions that the five states identified above have emissions that interfere with maintenance of the 2015 ozone NAAQS in other states, and (d) the EPA's proposed decision to apply the Federal Good Neighbor Plan emissions-control programs as the FIP requirements to address these emissions in these five states.

Additionally, the EPA has updated its analysis of air quality improvements at Step 3 and demonstration that there is no overcontrol resulting from the inclusion of these five additional states in the Federal Good Neighbor Plan. The EPA proposes that the 2025 and 2027 ozone

Page 15 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

seasons represent appropriate compliance start-dates for these states, affording sufficient lead time for sources to plan for compliance from the standpoint of when this rulemaking will likely be finalized, which the EPA currently anticipates will be in the summer of 2024. These proposed findings are within the scope of this rulemaking and open for public comment.

The EPA is not reopening any determinations made in the Federal Good Neighbor Plan as to the 23 states covered in that action. Nor is the EPA taking comment on any aspect of the Federal Good Neighbor Plan, except to the extent of its application to these five states. In general, the record for the Federal Good Neighbor Plan Rule contains information at each step of the 4-step interstate transport framework that can be applied to these five states. Thus, the identification of receptors to which these five states are linked and the level of contribution from these states to those receptors is based on the same analytical findings using the air quality modeling and monitoring data contained in the Federal Good Neighbor Plan. In addition, the analysis underlying the EPA's determinations at Step 3 as to EGUs and non-EGUs and the appropriate degree of emissions-control stringency needed to eliminate significant contribution and interference with maintenance likewise was conducted on a region-wide basis, and in the EPA's view is reasonably applied to the emissions sources in these five states. The emissions-control requirements were established on a uniform basis for each particular industry covered in the Federal Good Neighbor Plan, and do not vary by State (except to the extent that states not linked in 2026 are not subject to the requirements that onset in 2026 and California's EGUs are not subject to the EGU trading program). Based on these findings, these programs should be extended to these five states. This is reasonable and indeed necessary to ensure consistency and equitable treatment across all states in addressing the nationwide problem of interstate ozone

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

pollution for the 2015 ozone NAAQS. *See EME Homer City v. EPA*, 472 U.S. 572, 519, 524

(2014). This is also consistent with the EPA's practice throughout the history of implementing

the good neighbor provision for other NAAQS. For instance, using the final analysis in the

original CSAPR rulemaking, the EPA soon after conducted rulemaking to include five additional

states in the CSAPR trading programs. *See* 76 FR 80760 (December 27, 2011). Thus, for the

same reasons, the EPA proposes to find it reasonable and appropriate to extend the uniform set

of findings and determinations made in the Federal Good Neighbor Plan to these five additional

states for the 2015 ozone NAAQS. The EPA is not aware of any information with respect to

these states that would justify a deviation from the same set of findings and requirements that

already have been made for the 23 states covered in the Federal Good Neighbor Plan with

respect to these same obligations.

Finally, this action also includes proposed technical corrections to the existing regulatory

text finalized in the Federal Good Neighbor Plan.

*B. Costs and Benefits*

Table I.B-1 summarizes the key results of the cost-benefit analysis that was prepared for

this proposed rule. Table I.B-1 presents estimates of the present values (PV) and equivalent

annualized values (EAV), calculated using discount rates of 3 and 7 percent as recommended by

the Office of Management and Budget's (OMB) Circular A-4, of the health and climate benefits,

compliance costs, and net benefits of the proposed rule, in 2016 dollars, discounted to 2023. The

estimated monetized net benefits are the estimated monetized benefits minus the estimated

monetized costs of the proposed rule. These results present an incomplete overview of the effects

of the rule because important categories of benefits were not monetized (e.g., ecosystem effects,

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

visibility impairment, and water quality improvements) and are therefore not reflected in the cost-benefit tables. The EPA anticipates that taking non-monetized effects into account would show the proposed rule to be more net beneficial than this table reflects.

**Table I.B-1: Estimated Monetized Health and Climate Benefits, Compliance Costs, and Net Benefits of the Proposed Rule, 2025 Through 2044 (Millions 2016$, Discounted to 2023)[a]**

|  |  | 3% Discount Rate | 7% Discount Rate |
|---|---|---|---|
| **Present Value** | Health Benefits[b] | $330 and $1,900 | $210 and $1,200 |
|  | Climate Benefits[c] | $9.3 | $9.3 |
|  | Compliance Costs[d] | $67 | $45 |
|  | **Net Benefits** | $270 and $1,800 | $180 and $1,100 |
| **Equivalent Annualized Value** | Health Benefits | $22 and $130 | $20 and $110 |
|  | Climate Benefits | $0.6 | $0.6 |
|  | Compliance Costs | $4.5 | $4.2 |
|  | **Net Benefits** | $18 and $120 | $17 and $110 |

[a] Rows may not appear to add correctly due to rounding. The EPA used 2016 dollars in both the proposal and final Revised CSAPR Update Regulatory Impact Analysis (RIA), as well as the proposal and final Federal Good Neighbor Plan RIA; to be consistent with those recent actions we continued to use 2016 dollars as the dollar year for presenting costs and benefits.

[b] The annualized present value of costs and benefits are calculated over a 20-year period from 2025 to 2044. Monetized benefits include those related to public health associated with reductions in ozone and $PM_{2.5}$ concentrations. The health benefits are associated with two alternative estimates of the number of premature deaths and are presented at real discount rates of 3 and 7 percent. Several categories of benefits remain unmonetized and are thus not reflected in the table.

[c] Climate benefits are calculated using four different estimates of the social cost of carbon (SC-$CO_2$) (model average at 2.5 percent, 3 percent, and 5 percent discount rates; 95th percentile at 3 percent discount rate). For presentational purposes in this table, the climate benefits associated with the average SC-$CO_2$ at a 3-percent discount rate are used in the columns displaying results of other costs and benefits that are discounted at either a 3-percent or 7-percent discount rate.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

<sup>d</sup> The costs presented in this table are consistent with the costs presented in section 3 of the *Economic Impact Assessment (EIA)*. To estimate these annualized costs for EGUs, the EPA uses a conventional and widely accepted approach that applies a capital recovery factor multiplier to capital investments and adds that to the annual incremental operating expenses. Costs were calculated using a 3.75 percent real discount rate consistent with the rate used in the Integrated Planning Model's (IPM) objective function for cost-minimization. For further information on the discount rate use, please *see* section 3 of the *EIA*.

As shown in Table I.B-1, the PV of the monetized health benefits, associated with reductions in ozone and PM$_{2.5}$ of this proposed rule, discounted at a 3-percent discount rate, is estimated to be about $330 and $1,900 million, with an EAV of about $22 and $130 million. At a 7-percent discount rate, the PV of the monetized health benefits is estimated to be $210 and $1,200 million, with an EAV of about $20 and $110 million. The PV of the monetized climate benefits, associated with reductions in greenhouse gas (GHG) emissions, of this proposed rule, discounted at a 3-percent discount rate, is estimated to be about $9.3 million, with an EAV of about $0.6 million. The PV of the monetized compliance costs, discounted at a 3-percent rate, is estimated to be about $67 million, with an EAV of about $4.5 million. At a 7-percent discount rate, the PV of the compliance costs is estimated to be about $45 million, with an EAV of about $4.2 million.

## II. General Information

*A. Does this action apply to me?*

This supplemental proposed rule affects EGU and non-EGU sources, and regulates the groups identified in Table II.A-1, along with their North American Industry Classification System (NAICS) code.

**Table II.A-1: Regulated Groups**

Page 19 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| Industry Group | NAICS |
|---|---|
| Fossil fuel-fired electric power generation | 221112 |
| Pipeline Transportation of Natural Gas | 4862 |
| Metal Ore Mining | 2122 |
| Cement and Concrete Product Manufacturing | 3273 |
| Iron and Steel Mills and Ferroalloy Manufacturing | 3311 |
| Glass and Glass Product Manufacturing | 3272 |
| Basic Chemical Manufacturing | 3251 |
| Petroleum and Coal Products Manufacturing | 3241 |
| Pulp, Paper, and Paperboard Mills | 3221 |
| Solid Waste Combustors and Incinerators | 562213 |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be regulated by this proposed rule. This table lists the types of entities that the EPA is now aware could potentially be regulated by this proposed rule. Other types of entities not listed in the table could also be regulated. To determine whether a particular entity is regulated by this proposed rule, you should carefully examine the applicability criteria found in 40 CFR 97.1004 (EGUs) or 40 CFR 52.40(c), 52.41(b), 52.42(b), 52.43(b), 52.44(b), 52.45(b), and 52.46(b) (non-EGUs). If you have questions regarding the applicability of this proposed rule to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

*B. What action is the Agency taking?*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

The EPA evaluated whether interstate ozone transport emissions from upwind states are significantly contributing to nonattainment, or interfering with maintenance, of the 2015 ozone NAAQS in any downwind State using the same 4-step interstate transport framework that was developed in previous ozone transport rulemakings. In its previous action, the Federal Good Neighbor Plan, the EPA found that sources in 23 states had obligations to eliminate their significant contribution to nonattainment and interference with maintenance in downwind areas.[7] In this proposed rule, the EPA is proposing to apply that same analysis to find that emissions reductions are required from EGU sources in the additional states of Arizona, Iowa, Kansas, New Mexico, and Tennessee and from non-EGU sources in Arizona. The EPA proposes to ensure that these $NO_X$ emissions reductions are achieved by issuing FIP requirements for these five states.

In this rule, the EPA is proposing to find that SIP submissions from Arizona, New Mexico, and Tennessee lack adequate provisions to ensure sources and other emissions activity in their states are not interfering with maintenance of the 2015 ozone NAAQS in other states. The EPA is also proposing to error correct its previous actions on SIP submissions from Iowa and Kansas to partial disapprovals for the same reason.[8]

In this same action, the EPA proposes FIP requirements for these five states. The EPA is proposing to incorporate Arizona, Iowa, Kansas, New Mexico, and Tennessee into the existing CSAPR $NO_X$ Ozone Season Group 3 Trading Program established in the Federal Good Neighbor Plan, beginning in the 2025 ozone season. EGUs in states not currently covered by any CSAPR

---

[7] 88 FR 36654 (June 5, 2023).
[8] 87 FR 22463 (April 15, 2022) (Iowa); 87 FR 19390 (April 4, 2022) (Kansas).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

trading program for seasonal $NO_X$ emissions – Arizona and New Mexico – will be added to the CSAPR $NO_X$ Ozone Season Group 3 Trading Program under this rule. EGUs in Iowa, Kansas, and Tennessee will transition from the CSAPR $NO_X$ Ozone Season Group 2 Trading Program to the CSAPR $NO_X$ Ozone Season Group 3 Trading Program. The EPA is establishing a control stringency level reflecting optimization of existing post-combustion controls and installation of state-of-the-art combustion controls on certain covered EGU sources in the emissions budgets beginning in the 2025 ozone season. In addition, for Arizona, the EPA is establishing a control stringency level reflecting installation of new Selective Catalytic Reduction (SCR) or Selective Non-Catalytic Reduction (SNCR) controls on certain covered EGU sources in its emissions budgets beginning with the 2027 ozone season.

Consistent with the emissions limitations established for non-EGU sources in the Federal Good Neighbor Plan, this supplemental action proposes to establish emissions limitations for new and existing non-EGU sources in Arizona beginning with the 2027 ozone season. The Federal Good Neighbor Plan established control requirements for the following unit types in non-EGU industries: RICE in Pipeline Transportation of Natural Gas; kilns in Cement and Cement Product Manufacturing; reheat furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; furnaces in Glass and Glass Product Manufacturing; boilers in Iron and Steel Mills and Ferroalloy Manufacturing, Metal Ore Mining, Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills; and combustors and incinerators in Solid Waste Combustors and Incinerators. *See* Table II.A-1 in this document for a list of NAICS codes for the relevant industries.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

In accordance with the requirements of the good neighbor provision, CAA section 110(a)(2)(D)(i)(I), this proposed rule reduces the transport of ozone and ozone precursors from emissions in upwind states to downwind areas to protect human health and the environment from negative health impacts associated with acute and chronic exposure to ozone. Ozone exposure is also associated with negative effects on ecosystems. Additional information on the air quality issues addressed by this proposed rule is included in section IX. of this document.

## C. What is the Agency's authority for taking this action?

The statutory authority for this proposed action is provided by the CAA as amended (42 U.S.C. 7401 *et seq*.). Specifically, sections 110 and 301 of the CAA provide the primary statutory underpinnings for this action. The most relevant portions of CAA section 110 are subsections 110(a)(1), 110(a)(2) (including 110(a)(2)(D)(i)(I)), 110(k)(2), 110(k)(3), 110(k)(6), and 110(c)(1).

CAA section 110(a)(1) provides that states must make SIP submissions "within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof)," and that these SIP submissions are to provide for the "implementation, maintenance, and enforcement" of such NAAQS.[9] The statute directly imposes on states the duty to make these SIP submissions, and the requirement to

---

[9] 42 U.S.C. 7410(a)(1).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

make the submissions is not conditioned upon the EPA taking any action other than promulgating a new or revised NAAQS.[10]

The EPA has historically referred to SIP submissions made for the purpose of satisfying the applicable requirements of CAA sections 110(a)(1) and 110(a)(2) as "infrastructure SIP" or "iSIP" submissions." CAA section 110(a)(1) addresses the timing and general requirements for iSIP submissions, and CAA section 110(a)(2) provides more details concerning the required content of these submissions.[11] It includes a list of specific elements that "[e]ach such plan" must address, including the requirements of the good neighbor provision.[12]

CAA section 110(c)(1) requires the Administrator to promulgate a FIP at any time within 2 years after the Administrator: (1) finds that a State has failed to make a required SIP submission; (2) finds a SIP submission to be incomplete pursuant to CAA section 110(k)(1)(C); or (3) disapproves a SIP submission. This obligation applies unless the State corrects the deficiency through a SIP revision that the Administrator approves before the FIP is promulgated.[13]

CAA section 110(a)(2)(D)(i)(I), also known as the "good neighbor" provision, provides the primary basis for this proposed action.[14] It requires that each State's SIP include provisions

---

[10] *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 509-10 (2014).
[11] 42 U.S.C. 7410(a)(2).
[12] The EPA's general approach to infrastructure SIP submissions is explained in greater detail in individual documents acting or proposing to act on State infrastructure SIP submissions and in guidance. *See, e.g.,* Memorandum from Stephen D. Page on Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2) (September 13, 2013).
[13] 42 U.S.C. 7410(c)(1).
[14] 42 U.S.C. 7410(a)(2)(D)(i)(I).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

sufficient to "prohibit[ ], consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]."[15] The EPA often refers to the emissions reduction requirements under this provision as "good neighbor obligations" and submissions addressing these requirements as "good neighbor SIPs."

Once the EPA promulgates a NAAQS, the EPA must designate areas as being in "attainment" or "nonattainment" of the NAAQS, or "unclassifiable." CAA section 107(d).[16] For ozone, nonattainment is further split into five classifications based on the severity of the violation—Marginal, Moderate, Serious, Severe, or Extreme. Higher classifications provide states with progressively more time to attain while imposing progressively more stringent control requirements. *See* CAA sections 181, 182.[17] In general, states with nonattainment areas classified as Moderate or higher must submit plans to the EPA to bring these areas into attainment according to the statutory schedule in CAA section 182.[18] If an area fails to attain the NAAQS by the attainment date associated with its classification, it is "bumped up" to the next classification, per the requirements in CAA section 181(b).[19]

Section 301(a)(1) of the CAA gives the Administrator the general authority to prescribe such regulations as are necessary to carry out functions under the Act.[20] Pursuant to this section,

---

[15] *Id.*
[16] 42 U.S.C. 7407(d).
[17] 42 U.S.C. 7511, 7511a.
[18] 42 U.S.C. 7511a.
[19] 42 U.S.C. 7511(b).
[20] 42 U.S.C. 7601(a)(1).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

the EPA has authority to clarify the applicability of CAA requirements and undertake other rulemaking action as necessary to implement CAA requirements. CAA section 301 affords the Agency any additional authority that may be needed to make certain other changes to its regulations under 40 CFR parts 52 and 97 to effectuate the purposes of the Act. Such changes are discussed in section X. of this document.

Section 110(k)(6) of the CAA gives the Administrator authority, without any further submission from a state, to revise certain prior actions, including actions to approve SIP submissions, upon determining that those actions were in error.[21] As discussed further in section V.A. of this document, the EPA proposes to make error corrections under CAA section 110(k)(6) with respect to its prior approvals of the 2015 ozone transport SIP submissions from the States of Iowa and Kansas.

Tribes are not required to submit State implementation plans. However, as explained in the EPA's regulations outlining Tribal CAA authority, the EPA is authorized to promulgate FIPs for Indian country as necessary or appropriate to protect air quality if a Tribe does not submit, and obtain the EPA's approval of, an implementation plan. *See* 40 CFR 49.11(a); *see also* CAA section 301(d)(4).[22] In this action, the EPA proposes an "appropriate or necessary" finding under CAA section 301(d) and proposes Tribal FIP(s) as necessary to implement the relevant requirements. This is further discussed in section V.B. of this document.

*D. Severability*

---

[21] 42 U.S.C. 7410(k)(6).
[22] 42 U.S.C. 7601(d)(4).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

The EPA regards this proposal as a complete remedy for the covered states, which will as expeditiously as practicable implement good neighbor obligations for the 2015 ozone NAAQS, consistent with the requirements of the Act. *See North Carolina v. EPA*, 531 F.3d 896, 911–12 (D.C. Cir. 2008); *Wisconsin v. EPA*, 938 F.3d 303, 313– 20 (D.C. Cir. 2019); *Maryland v. EPA*, 958 F.3d 1185, 1204 (D.C. Cir. 2020); *New York v. EPA*, 964 F.3d 1214, 1226 (D.C. Cir. 2020); *New York v. EPA*, 781 Fed. App'x 4, 7–8 (D.C. Cir. 2019) (all holding that the EPA must address good neighbor obligations as expeditiously as practicable and by no later than the next applicable attainment date). Yet the EPA proposes that should a court find any discrete aspect of this action, if finalized, to be invalid, the Agency believes that, like the Federal Good Neighbor Plan, the remaining aspects of this proposed rule can and should continue to be implemented to the extent possible, consistent with law. *See* 88 FR 36693. In particular, this proposal would disapprove SIP submissions and promulgate a FIP for each covered state (and, pursuant to CAA section 301(d), for each area of tribal jurisdiction within the geographic boundaries of those states). Should any jurisdiction-specific aspect of the rule, once finalized be found invalid, the EPA views this rule, if finalized as proposed, as severable along those state and/or tribal jurisdictional lines, such that the proposed rule could continue to be implemented as to any remaining jurisdictions. This action proposes discrete emissions control requirements for the power sector and for each of nine other industries. Should any industry-specific aspect of the proposed rule be found invalid once final, the EPA views this rule as proposed as severable as between the different industries and different types of emissions control requirements. This is not intended to be an exhaustive list of the ways in which the proposed rule may be severable. In the

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

event any part of the rule, if finalized, is found invalid, our intention is that the remaining portions should continue to be implemented consistent with any judicial ruling.[23]

The EPA's conclusion that this proposed rule, upon finalization, is severable also reflects the important public health and environmental benefits of this rulemaking in eliminating significant contribution and to ensure to the greatest extent possible the ability of both upwind states and downwind states and other relevant stakeholders to be able to rely on this rule at final in their planning. *Cf. Wisconsin*, 938 F.3d at 336–37 ("As a general rule, we do not vacate regulations when doing so would risk significant harm to the public health or the environment."); *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (noting the need to preserve public health benefits); *EME Homer City v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (noting the need to avoid disruption to emissions trading market that had developed).

*E. Public Participation*

1. Written Comments

Submit your comments, identified by Docket ID No. EPA-HQ-OAR-2023-0402, at *https://www.regulations.gov.* Once submitted, comments cannot be edited or removed from the

---

[23] In a declaration dated October 28, 2023, and filed with the U.S. Supreme Court in *State of Ohio et al. v. EPA*, No. 23A349, the Agency, through Joseph Goffman, the Principal Deputy Assistant Administrator performing delegated duties of Assistant Administrator for the Office of Air and Radiation, explained in greater detail why it makes sense as both a technical and legal matter that the Federal Good Neighbor Plan can continue to be implemented in each covered state despite preliminary stays of the Plan in other states. This same reasoning applies with full force with respect to the additional states that are proposed for inclusion in these programs in this action. The declaration is included in the docket for this action.

Page 28 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be CBI, Proprietary Business Information (PBI), or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.*, on the web, cloud, or other file sharing system). Please visit *https://www.epa.gov/dockets/commenting-epa-dockets* for additional submission methods; the full EPA public comment policy; information about CBI, PBI, or multimedia submissions; and general guidance on making effective comments.

2. Participation in Virtual Public Hearing

The EPA will begin pre-registering speakers for the hearing upon publication of this document in the *Federal Register.* To register to speak at the virtual hearing, please use the online registration form available at https://www.epa.gov/csapr/csapr-2015-ozone-naaqs or contact Ms. Pamela Long at (919) 541-0641 and/or *long.pam@epa.gov* to register to speak at the virtual hearing. The last day to pre-register to speak at the hearing will be 3 working days before the hearing. On **[insert last working day before the hearing]**, the EPA will post a general agenda for the hearing that will list pre-registered speakers in approximate order at: https://www.epa.gov/csapr/csapr-2015-ozone-naaqs.

The EPA will make every effort to follow the schedule as closely as possible on the day of the hearing; however, please plan for the hearings to run either ahead of schedule or behind schedule. Additionally, requests to speak will be taken the day of the hearing at the hearing

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

registration desk. The EPA will make every effort to accommodate all speakers who arrive and register, although preferences on speaking times may not be able to be fulfilled.

Each commenter will have 3 minutes to provide oral testimony. The EPA encourages commenters to provide the EPA with a copy of their oral testimony electronically by emailing it to Ms. Pamela Long. The EPA also recommends submitting the text of your oral comments as written comments to the rulemaking docket.

The EPA may ask clarifying questions during the oral presentations but will not respond to the presentations at that time. Written statements and supporting information submitted during the comment period will be considered with the same weight as oral comments and supporting information presented at the public hearing.

Please note that any updates made to any aspect of the hearing are posted online at *https://www.epa.gov/csapr/csapr-2015-ozone-naaqs*. While the EPA expects the hearing to go forward as set forth above, please monitor our website or contact Ms. Pamela Long at (919) 541-0641 and/or *long.pam@epa.gov* to determine if there are any updates. The EPA does not intend to publish a document in the *Federal Register* announcing updates.

The EPA will not provide audiovisual equipment for presentations unless the Agency receives special requests in advance. Commenters should notify Ms. Pamela Long when they pre-register to speak that they will need specific equipment. If you require the services of an interpreter or special accommodations such as audio description, please pre-register for the hearing with Ms. Pamela Long and describe your needs by **[INSERT DATE 1 WEEK BEFORE THE PUBLIC HEARING DATE]**. The EPA may not be able to arrange accommodations without advance notice.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

## III. Background

*A. Description of Statutory Background*

On October 1, 2015, the EPA promulgated a revision to the ozone NAAQS (2015 8-hour ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm) for the 8-hour standard.[24] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions meeting the applicable requirements of CAA section 110(a)(2).[25] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the "good neighbor" or "interstate transport" provision, which generally requires that SIPs contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to interstate transport of pollution. There are two so-called "prongs" within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the State from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another State (Prong 1) or interfere with maintenance of the NAAQS in another State (Prong 2). The EPA and states must give independent significance to Prong 1 and Prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[26]

---

[24] National Ambient Air Quality Standards for Ozone, Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in ppb. For example, 0.070 ppm is equivalent to 70 ppb.

[25] SIP submissions that are intended to meet the applicable requirements of CAA section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the applicable elements under CAA section 110(a)(2) are referred to as infrastructure requirements.

[26] *See North Carolina v. EPA*, 531 F.3d 896, 909-11 (D.C. Cir. 2008).

Page 31 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

On January 31, 2023, the EPA finalized disapproval of 19 SIP submissions and partially approved and partially disapproved two SIP submissions addressing the good neighbor provision for the 2015 ozone NAAQS. The EPA's evaluation for those actions applied uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations, *i.e.*, implementation of good neighbor requirements under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS for states across the country. To maintain consistency across all states in light of the final analytical conclusions reached in that action and the separate Federal Good Neighbor Plan, the EPA indicated it would take subsequent action on remaining SIP submissions addressing interstate transport obligations for the 2015 ozone NAAQS.[27] The EPA also indicated it would address previous final actions on SIP submissions for states where the EPA's final analysis suggested the State may be significantly contributing to nonattainment or interfering with maintenance. In the Federal Good Neighbor Plan, finalized on March 15, 2023, the EPA indicated it would address these and any outstanding FIP obligations in a future action for these states, which included the five states included here and Wyoming.[28] The EPA finalized its approval of the SIP submission from Wyoming on December 13, 2023.[29] This action proposes to address the five additional remaining SIP submissions and FIP obligations.

*B. Description of the EPA's 4-Step Interstate Transport Regulatory Process*

---

[27] 88 FR 36656.

[28] 88 FR 36654 at 36656.

[29] *See* Air Plan Approval; Wyoming; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 FR 54998 (August 14, 2023). The EPA signed the final approval on December 13, 2023. 88 FR 87720 (December 19, 2023).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

For decades, when evaluating SIPs and formulating FIPs, EPA has consistently utilized the 4-step interstate transport framework (or 4-step framework), which was developed to give meaning to the critical statutory terms in CAA section 110(a)(2)(D)(i)(I) and to provide a reasonable organization to the analysis of the complex air quality challenge of interstate ozone transport. The EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior NAAQS using the 4-step framework in several regulatory actions, including the CSAPR, which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[30] the CSAPR Update[31] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[32] For the 2015 ozone NAAQS, the EPA uses this framework in evaluating SIP submissions (while considering any alternative approaches states may propose) and applied this framework in the Federal Good Neighbor Plan.[33]

---

[30] *See* Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 FR 48208 (August 8, 2011).

[31] Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 FR 74504 (October 26, 2016).

[32] In 2019, the D.C. Circuit Court of Appeals remanded the CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *Wisconsin v. EPA*, 938 F.3d 303, 313 (D.C. Cir. 2019). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of the CSAPR Update in *Wisconsin* and the vacatur of a separate rule, the "CSAPR Close-Out," 83 FR 65878 (December 21, 2018), in *New York v. EPA*, 781 F. App'x. 4 (D.C. Cir. 2019).

[33] *See* 88 FR at 9338; 88 FR at 36671.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Shaped through the years by input from State air agencies[34] and other stakeholders on the

EPA's prior interstate transport rulemakings and SIP submission actions,[35] as well as a number

of court decisions, the EPA has developed and used the 4-step interstate transport framework to

evaluate State's obligations to eliminate interstate transport emissions under the interstate

transport provision for the ozone NAAQS: (1) identify monitoring sites that are projected to have

problems attaining and/or maintaining the NAAQS (*i.e.*, nonattainment and/or maintenance

receptors); (2) identify states that impact those air quality problems in other (*i.e.*, downwind)

states sufficiently such that the states are considered to "contribute" (*i.e.*, are considered

"linked") to those receptors and whose emissions therefore warrant further review and analysis;

(3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to

eliminate each linked upwind State's significant contribution to nonattainment or interference

with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent

and enforceable measures needed to achieve those emissions reductions. EPA does not require

states to use the 4-step framework in good neighbor SIP submissions, but it is a useful

organizational tool that has been upheld by the Supreme Court as "permissible, workable, and

equitable." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 524 (2014).

The general steps of this framework allow for some methodological variation, and this

can be seen in the evolution of the EPA's analytic process across its prior rulemakings. This also

means states have some flexibility in developing analytic methods within this framework (and

---

[34] *See* 63 FR 57356, 57361 (October 27, 1998).

[35] In addition to CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "$NO_X$ SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

Page 34 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

may also attempt to justify an alternative framework altogether). The four steps of the framework provide a reasonable organization to the analysis of the complex air quality challenge of interstate ozone transport. As discussed further throughout this document, the EPA has organized its evaluation of good neighbor obligations around this analytical framework (including the specific methodologies within each step as evolved over the course of the CSAPR rulemakings since 2011). Where states presented alternative approaches either to the EPA's methodological approaches within the framework, or organized their analysis in some manner that differed from it entirely, the EPA has evaluated those analyses on their merits to determine compliance with the good neighbor obligation or, in some cases, identified why even if those approaches were acceptable, the State still does not meet the good neighbor requirement and therefore does not have an approvable SIP submission as a whole.

*C. The EPA's Ozone Transport Modeling*

The EPA has performed nationwide air quality modeling to project ozone design values that are used in combination with measured data to identify nonattainment and maintenance receptors at Step 1. To quantify the contribution of emissions from individual upwind states on 2023 and 2026 ozone design values for the identified downwind nonattainment and maintenance receptors at Step 2, the EPA has performed nationwide, state-level ozone source apportionment modeling for 2023 and 2026. The source apportionment modeling provides contributions to ozone at receptors from precursor emissions of anthropogenic $NO_X$ and volatile organic compounds (VOCs) in individual upwind states. In this action, the EPA is proposing to apply the air quality modeling and contribution results that were derived using the 2016v3 modeling and monitoring data that informed the EPA's Step 1 and Step 2 determinations in the Federal Good

Page 35 of 289

Neighbor Plan—inclusive of the approach for identifying certain addition sites as violating-monitor maintenance-only receptors based on certified monitoring data and regulatory design values for 2021 and 2022. This section provides an overview of the modeling developments that resulted in those analytical conclusions, which are used here to make good neighbor determinations for these five additional states.

The EPA released several documents containing projected ozone design values, contributions, and information relevant to air agencies for evaluation of interstate transport with respect to the 2015 ozone NAAQS. First, on January 6, 2017, the EPA published a notice of data availability (NODA) in which the Agency requested comment on preliminary interstate ozone transport data including projected ozone design values and interstate contributions for 2023 using a 2011 base year platform.[36] In the NODA, the EPA used the year 2023 as the analytic year for this preliminary modeling because this year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 8-hour ozone NAAQS.[37] On October 27, 2017, the EPA released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and was intended to provide information to assist states' efforts to develop SIP submissions to address interstate transport obligations for the 2008 ozone NAAQS.[38]

---

[36] *See* Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS), 82 FR 1733 (January 6, 2017).
[37] 82 FR at 1735.
[38] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act section 110(a)(2)(D)(i)(I), October 27, 2017, available in docket ID No. EPA-HQ-OAR-2021-0663.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

On March 27, 2018, the EPA issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 ozone NAAQS at Step 1 of the 4-step interstate transport framework.[39] The March 2018 memorandum also included the then newly available contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 8-hour ozone NAAQS under Step 2 of the 4-step interstate transport framework.[40] The EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-step interstate transport framework.[41]

---

[39] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act section 110(a)(2)(D)(i)(I), March 27, 2018 ("March 2018 memorandum"), available in docket ID No. EPA-HQ-OAR-2021-0663.

[40] The March 2018 memorandum, however, provided, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking."

[41] *See* Analysis of Contribution Thresholds for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, August 31, 2018 ("August 2018 memorandum"), and Considerations for Identifying Maintenance Receptors for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, October 19, 2018, available in docket ID No. EPA-HQ-OAR-2021-0663.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Following the release of the modeling data shared in the March 2018 memorandum, the EPA performed updated modeling using a 2016 base year emissions modeling platform (*i.e.*, 2016 Version 1 Emissions Platform Modeling, or "2016v1"). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state collaborative project.[42] This collaborative project was a multi-year joint effort by the EPA, MJOs, and states to develop a new, more recent emissions platform for use by the EPA and states in regulatory modeling as an improvement over the dated 2011-based platform that the EPA had used to project ozone design values and contribution data provided in the 2017 and 2018 memoranda. The EPA used the 2016v1 emissions to project ozone design values and contributions for 2023. On October 30, 2020, in the Notice of Proposed Rulemaking for the Revised CSAPR Update, the EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[43] Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected design values and contributions from the 2016v1 platform were also useful for identifying downwind ozone problems and linkages with respect to the 2015 ozone NAAQS.[44]

Following the final Revised CSAPR Update, the EPA made further updates to the 2016-based emissions platform to include updated onroad mobile emissions from Version 3 of the

---

[42] The results of this modeling, as well as the underlying modeling files, are included in docket ID No. EPA-HQ-OAR-2021-0663. The 2016v1 emissions modeling technical support document is available in Docket ID No. EPA-HQ-OAR-2020-0272-0187. Both dockets are available at *https://www.regulations.gov*.

[43] *See* 85 FR 68964, 68981.

[44] *See* the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, included in the Headquarters docket ID No. EPA-HQ-OAR-2021-0663.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

EPA's Motor Vehicle Emission Simulator (MOVES) model (MOVES3)[45] and updated emissions projections for EGUs that reflected the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other inventory improvements. The EPA published these emissions inventories on its website in September of 2021 and invited initial feedback from states and other interested stakeholders.[46] The construct of the updated emissions platform, (*i.e.*, 2016 Version 2 Emissions Platform Modeling, or "2016v2"), is described in the "Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform," hereafter known as the 2016v2 Emissions Modeling TSD, and is included in Docket No. EPA-HQ-OAR-2021-0663. The EPA performed air quality modeling using the 2016v2 emissions to provide projections of ozone design values and contributions in 2023 and 2026 that reflect the effects on air quality of the 2016v2 emissions platform. The EPA

---

[45] Additional details and documentation related to the MOVES3 model can be found at *https://www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves*.
[46] *https://www.epa.gov/air-emissions-modeling/2016v2-platform.*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

used the results of the 2016v2 modeling to inform proposed and final actions on 2015 ozone NAAQS good neighbor obligations for Iowa and Kansas.[47]

The EPA also used the 2016v2 emissions inventories and modeling to support proposed actions for several states, including the EPA's previous proposals on Arizona and Tennesse, as well as the proposed Federal Good Neighbor Plan. In response to comments received for these rulemakings, the EPA updated the 2016v2 inventories and model design to construct another emissions platform (*i.e.*, 2016 Version 3 Emissions Platform Modeling, or "2016v3"), which was used to update the air quality modeling. The EPA used this updated modeling to inform a final rulemaking taking final action on 21 interstate transport SIP submissions for the 2015 ozone NAAQS and to inform the final Federal Good Neighbor Plan.[48,49] In its final actions on both SIP disapprovals, and the Federal Good Neighbor Plan, the EPA provided an explanation of the adjustments and other modifications made to construct the 2016v3 platform. Details on the 2016v3 air quality modeling and the methods for projecting design values and determining contributions in 2023 and 2026 based on this platform are described in the TSD titled "Air

---

[47] The EPA was obligated by consent-decree deadline to finalize its action for Iowa and Kansas by April 30, 2022, and was unable to consider or incorporate the later comments received on the 2016v2 modeling that were used to inform the 2016v3 modeling informing the final Disapproval action and final Federal Good Neighbor Plan in early 2023.

[48] "Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards," 88 FR 9336 (February 13, 2023), and "Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards," 88 FR 36654 (June 5, 2023).

[49] In the Federal Good Neighbor Plan, the EPA identified and finalized FIPs for 23 states. This included the 21 states included in the SIP Disapproval action, as well as Pennsylvania and Virginia. The EPA had an obligation to finalize a FIP for these two states (and Utah) following the EPA's finding of a failure to submit a SIP from these two states (84 FR 66612). The EPA has not since received SIP submissions from Pennsylvania or Virginia.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Quality Modeling Final Rule TSD – 2015 Ozone NAAQS Good Neighbor Plan," hereafter

known as the Final Good Neighbor Plan AQM TSD.[50] Additional details related to the 2016v3

emissions platform are located in the TSD titled "Preparation of Emissions Inventories for the

2016v3 North American Emissions Modeling Platform," hereafter known as the 2016v3

Emissions Modeling TSD, included in Docket ID No. EPA-HQ-OAR-2021-0668.[51]

      In this proposed action, the EPA primarily relies on modeling based on the 2016v3

emissions platform coupled with measured data in Steps 1 and 2 of the 4-step interstate transport

framework, which will generally be referenced within this action as the "2016v3 modeling" for

2023 and 2026. As discussed further in section III.D.2. of this document, the EPA is also

applying its findings regarding violating-monitor maintenance-only receptors in 2023 using

certified monitoring data and regulatory design values for 2021 and 2022. The EPA used the

2016v3 modeling to calculate contributions to these receptors. By again using this same set of

monitoring data and updated modeling results, the EPA is using the most current and technically

appropriate information for this proposed rulemaking and also ensuring that its regulatory

determinations for these remaining states are wholly consistent with the findings informing the

EPA's final determinations for all of the states included in the final Federal Good Neighbor Plan.

In this proposed action, the EPA is accepting public comment on the 2016v3 modeling and the

violating-monitor methodology, solely as they relate to Arizona, Iowa, Kansas, New Mexico,

and Tennessee interstate transport obligations for the 2015 ozone NAAQS. The EPA is not

---

[50] Air Quality Modeling Final Rule Technical Support Document – 2015 Ozone NAAQS Good
Neighbor Plan in Docket ID No. EPA-HQ-OAR-2021-0668.
[51] 2016v3 Emissions Modeling TSD in Docket ID No. EPA-HQ-OAR-2021-0668.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have
taken steps to ensure the accuracy of this version, but it is not the official version.

reopening the modeling in relation to any other State or regulatory action. Any comments received on the modeling that are not relevant to the evaluation of these states' interstate transport obligations will be treated as beyond the scope of this action.

States may have chosen to rely on the results of prior versions of EPA's modeling and/or alternative modeling performed by states or MJOs to evaluate downwind air quality problems and contributions as part of their SIP submissions. The EPA is not proposing to disapprove any State's submission in this action based on the State's choice of modeling, but, consistent with its disapproval action, based on the EPA's evaluation of the entire record, which aims to factually determine whether states are projected to significantly contribute to or interfere with maintenance in the 2023 analytical year. *See* 88 FR at 9343. In section IV.B. of this document, the EPA evaluates how Arizona, Iowa, Kansas, New Mexico, and Tennessee used air quality modeling information in their SIP submissions.

A summary of the methodology and results of the 2016v3 modeling for 2023 and 2026, along with the application of the EPA's Step 1 and Step 2 methodology for identifying receptors and upwind states that contribute to those receptors can be found in the Final Good Neighbor Plan AQM TSD. That document also contains explanations as to how current measured ozone levels based on data for 2021 and 2022 at other monitoring sites (*i.e.*, monitoring sites that are not projected to be receptors in 2023 based on air quality modeling) confirm the likely continuation of elevated ozone levels in 2023 at these locations. This analysis shows that each of the five states in this action are linked at or above (i.e., contributing equal to or more than) 1 percent of the NAAQS to one or more of these monitors. Kansas and Tennessee are linked only to violating-monitor receptors, and not to modeling-based receptors. In recognition that the EPA

Page 42 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

had not proposed these sites as receptors, linkages to such receptors were used only in a "confirmatory" way to inform the final Disapproval action and Good Neighbor Plan (*i.e.*, to reinforce linkage findings as to states that were otherwise linked to modeling-based receptors). In this proposed action, the EPA finds the existence of such linkages is sufficient to establish that a State contributes to such receptors and is thus an adequate basis on which to propose disapproval of the SIP submissions from Kansas and Tennessee.

*D. The EPA's Approach to Evaluating Interstate Transport for the 2015 Ozone NAAQS*

The EPA has applied a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submissions for the 2015 ozone NAAQS under CAA section 110(a)(2)(D)(i)(I) and proposes to continue to do so in this action. These policy judgments conform with relevant case law and past Agency practice as reflected in the CSAPR and related rulemakings. Employing a nationally consistent approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem characterized by the collective contribution from many upwind states to geographically dispersed monitors over distances of hundreds of miles. Effective policy solutions to the problem of interstate ozone transport going back to the $NO_X$ SIP Call have necessitated the application of a uniform framework of policy judgments to ensure an "efficient and equitable" approach. *See EME Homer City Generation, LP v. EPA*, 572 U.S. 489, 519 (2014).

In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular State's SIP submission. In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must have a well-documented technical basis that is consistent with CAA obligations and relevant case law. Where states submitted SIP submissions that rely on any such potential concepts as the EPA or others may have identified or suggested in the past, the EPA will evaluate whether the State adequately justified the technical and legal basis for doing so.

The EPA notes that certain potential concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute Agency guidance with respect to interstate transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development. However, the EPA made clear in both the March 2018 memorandum[52] and in Attachment A that the list of ideas was not endorsed by the Agency but rather "comments provided in various forums" on which the EPA sought "feedback from interested stakeholders."[53] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches."[54] Attachment A to the March 2018 memorandum, therefore, does not constitute Agency guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among

---

[52] March 2018 memorandum, Attachment A.
[53] *Id.* at A-1.
[54] *Id.*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

interested stakeholders. To the extent states sought to develop or rely on one or more of these ideas in support of their SIP submissions, the EPA will thoroughly review the technical and legal justifications for doing so.

The remainder of this section describes the EPA's analytic framework and interpretation of the critical terms of the good neighbor provision with respect to analytic year, definition of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy assessment.

1. Selection of Analytic Years

In this section, the EPA describes its process for selecting analytic years for air quality modeling and analyses performed to identify nonattainment and maintenance receptors and identify upwind State linkages. The EPA is retaining the 2023 and 2026 analytical years used to inform the obligations of the 23 states included in the Federal Good Neighbor Plan, to ensure consistency and equitable treatment of all states. In the Federal Good Neighbor Plan, the EPA evaluated air quality to identify receptors at Step 1 and evaluate interstate contributions at Step 2 for two analytic years: 2023 and 2026.[55] These years are the last full ozone seasons before the Moderate and Serious area attainment dates for the 2015 ozone NAAQS (ozone seasons for purposes of the Federal Good Neighbor Plan run each year from May 1 – September 30, *see* 40 CFR 52.38(b)(1) and 40 CFR 52.40(c)(1)). To demonstrate attainment by these deadlines, downwind states would be required to rely on design values calculated using ozone data from

---

[55] While the 2023 analytic year provides a sufficient basis to act on the SIP submissions in this action, consistent with the EPA's Disapproval action, *see* 88 FR 9340-41, the EPA uses the 2026 analytic year to ensure a complete Step 3 analysis in the context of developing the FIP, *see* 88 FR 36694.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

2021 through 2023 and 2024 through 2026, respectively. Areas that do not attain by the deadline may be "bumped up" to a higher nonattainment classification level per CAA sections 181 and 182, thereby incurring additional ongoing obligations. Thus, in the Federal Good Neighbor Plan, consistent with each of its prior good neighbor rulemakings, the EPA focused its analysis on the last full ozone seasons before the attainment dates (*i.e.*, 2023 and 2026).

The Agency recognizes that in applying its 2023 and 2026 analytics to inform this action, it may be perceived as acting inconsistently with a longstanding policy of always considering a future analytic year from the standpoint of the timing of its rulemaking action. However, the EPA determined that several important, overriding considerations warrant adopting this approach in this supplemental rulemaking. As explained in section I.A. of this document, it is imperative to maintain a consistent set of analytical and policy determinations across all states in the context of addressing the interstate ozone problem; the EPA is doing so by using a consistent set of data and analytical conclusions between the states included in this action and those for which the EPA has already rendered final determinations in the final SIP Disapproval action and the Federal Good Neighbor Plan. Were the EPA to conduct a new set of air quality analyses tied to years beyond 2023 or 2026, the EPA would separately evaluate these states using different data than that which informed and defined the obligations of all other states, solely as a result of the timing of the EPA's action on these states. Where the need for parity among states or other jurisdictions in like circumstances warrants it, courts have recognized that it may be appropriate for agencies like the EPA to rely on a unified dataset to ensure consistency in treatment. *See Bd. County Commissioners of Weld County v. EPA*, 72 F.4th 284, 290 (D.C. Cir. 2023) (upholding as reasonable the EPA's determination that "greater parity among counties and faster turnaround []

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

make the original data a better choice than partial updating"). The importance of use of a single, already-developed dataset focused on the years 2023 and 2026 to define good neighbor obligations for all states to ensure consistency among states and for "faster turnaround" to complete this supplemental rulemaking is, in the EPA's judgment, sufficiently compelling to justify this approach here.

The EPA's use of a common and unified dataset here is consistent with all of its past good neighbor rulemakings, including those in which the EPA conducted updated air quality analysis to address remaining good neighbor obligations. In both the CSAPR Update and the Revised CSAPR Update, the EPA took action to address good neighbor FIP actions that had been remanded to the EPA. In each case, the EPA addressed the remanded obligations for all of the covered states through analysis of a new analytic year. This ensured consistency among all of the states where there were good neighbor obligations that needed to be addressed. *See, e.g.,* 86 FR 23067-68 (discussing error correction for Kentucky "consistent with EPA's methodology to address the other 20 states" included in that action). Further, the EPA already had updated modeling at hand that could inform its new action. *See, e.g., id.* at 23074, 23079-80. Likewise, where all of a group of states' obligations were being addressed on remand from an action that had not been vacated (as was the case in both the CSAPR Update and the Revised CSAPR Update), it was important to reflect the emissions reductions and air quality improvements that were already being achieved from the non-vacated action in the baseline. *See, e.g., id.* at 23075. In this case, the EPA is not re-evaluating a group of states but addressing additional states in a manner that ensures consistent treatment with the first set of states. This circumstance is analogous to the supplemental rulemaking the EPA undertook soon following the original

Page 47 of 289

CSAPR rulemaking to add several states to those programs based on the same data and analysis that informed the CSAPR. *See* 76 FR 80760 (December 27, 2011). In the EPA's judgment, the relevant considerations therefore weigh in favor of using the currently available air quality data that has already been used to define other states' obligations.

In addition, like the CSAPR supplemental rulemaking, the timing of this action is the result of procedural happenstance, rather than a substantive difference in the circumstances of any of these five states. This timing was driven by the nature of the EPA's prior proposed or final actions, or lack of such actions, that had been taken at the time the EPA completed its final, updated air quality analysis informing its final determinations on other states' obligations in the Federal Good Neighbor Plan (explained further in section III.C. of this document). This final analysis of obligations based on 2023 and 2026 analytics necessitated the EPA's reevaluation of its proposals on Arizona and Tennessee's SIP submissions, as well as the EPA's past final actions on Iowa and Kansas' SIPs.[56] In these circumstances, given the potential change in the status of these states, the EPA also found it would be appropriate to provide an opportunity for public comment on the EPA's changed basis for action.

Further, shifting the analysis of good neighbor obligations forward to a new analytic year for these five states would not be relevant to a proper definition of these good neighbor obligations, and switching the analytic year(s) for just these five states could create an inequitable result both amongst other upwind states and between these five states and the downwind states to which they are linked. Creating a different set of data for a later year for

---

[56] The EPA has not taken any previous proposed or final action on New Mexico's SIP submission.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

these states, when the Federal Good Neighbor Plan has already defined requirements and is in effect for certain other states, would introduce an interdependency, or "who goes first," problem that the EPA's framework generally is designed to avoid. *See Ky. Energy & Env't Cabinet v. EPA*, No. 23-3605 (6th Cir. Nov. 9, 2023), Slip Op. at 8. The EPA is not reopening the determinations made for the 23 upwind states covered in the Federal Good Neighbor Plan, and 2023 and 2026 were appropriately selected as the analytical years to inform the EPA's evaluation of these states. *See* 88 FR at 36694-96. These years are associated with the statutory attainment schedule faced by the downwind states with designated nonattainment areas where the identified receptors are located. It is at the least reasonable, therefore, to align these five states' evaluation with the remainder of the states in the country, which will maintain parity among all jurisdictions, which is preferable to only "partially updating" the analysis in the case of a handful of states. *Weld County*, 72 F.4th at 290. This is a particularly important consideration in implementing the good neighbor provision for ozone. The EPA must ensure each state is held to the elimination of its own significant contribution. *See North Carolina v. EPA*, 531 F.3d 896, 920-21 (D.C. Cir. 2008). And interstate ozone pollution presents a "collective contribution" problem in which the EPA must allocate a fair share of responsibility among sources across multiple states. *See Maryland v. EPA*, 1185 F.3d at 120304 (D.C. Cir. 2020); *id.* at 1204 ("So long as upwind sources significantly contribute to [a state's] nonattainment at its 2021 [Marginal] attainment deadline, they violate the Good Neighbor Provision.").

    As the *Maryland* court recognized, the consequences on downwind nonattainment areas from failure to obtain relief from upwind significant contribution are not just continuing poor air quality, but also regulatory requirements that apply for years into the future, including "a

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

requirement to provide for annual emissions reductions in SIPs." *Id.* (citing CAA section 182(b)). The relief that can be afforded through addressing the upwind states' significant contribution, as proposed in this action, will therefore potentially lessen regulatory burdens on downwind states that Congress commanded they are not to bear alone. *See* 88 FR 36840 (discussing the history of downwind states' and the EPA's reliance on emissions reductions achieved through prior good neighbor rules in, for example, redesignation actions and maintenance plans); *cf. Maryland*, 958 F.3d at 1200 (a state that cannot obtain relief from an upwind state's significant contribution to a continuing nonattainment designation "is stuck in regulatory limbo"). Thus, using a common dataset makes good sense in this context; it is consistent with the requirements and the purpose of the good neighbor provision, and it ensures these obligations are implemented both expeditiously and in a consistent and equitable manner. *Weld County*, 72 F.4th at 290.[57]

The use of a common set of air quality data was upheld in *Weld County*. The court, however, went on to find that another portion of the EPA's action under review constituted impermissible retroactive rulemaking, because it "effectively backdated" a nonattainment designation, leaving a state that would have had a three-year period to reach attainment in the position of "missing a compliance deadline that passed before the underlying legal obligation

---

[57] While use of a common dataset makes sense for the reasons stated, the EPA notes that it is not aware of other data sets, including either monitoring data or modeling projections, that would suggest alternative regulatory conclusions from those proposed here. As evidenced by the most recent certified monitoring data and design values from 2021 and 2022 used in the violating-monitor receptor-identification methodology, relatively elevated ozone levels exceeding the NAAQS continue to be observed throughout much of the continental U.S., including in the designated nonattainment areas where many of the ozone-transport receptors identified in the Federal Good Neighbor Plan are located.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

was imposed." 72 F.4th at 293. This proposed action does not operate retroactively. The EPA's use of the 2023 analytic year does not in and of itself impose any obligations on any sources or states. Rather it provides a common dataset to assess whether any state is contributing to downwind problems attaining the NAAQS. The EPA proposes to set compliance obligations based on the amount of time needed for sources to come into compliance and does not propose to impose liability on such sources for not meeting the proposed obligations at some point in the past. *See* section VII.A.4. and B. of this document. Nor would the proposed rule apply retroactively to the five states with SIP submissions proposed to be disapproved. The EPA is not proposing to backdate the date of finalization of these proposed disapprovals to sometime in the past. Rather, if the proposed disapprovals are finalized, the only legal consequence—the establishment of a duty on the EPA to promulgate a FIP—would run from the date a final action is taken. Unlike the three-year "runway" allowed to reach attainment that the court found had been impermissibly denied to the state in *Weld County*, 72 F.4th at 293, the statute affords no such period following a SIP disapproval. CAA section 110(c)(1). The EPA need not wait a single day to promulgate a FIP upon issuing a disapproval of a SIP submission. *EME Homer City*, 489 U.S. at 509. Nor is the EPA obligated to give states a second chance to submit a SIP before issuing a FIP. *Id.* Nonetheless, the states covered in this supplemental proposed rulemaking have been on notice since the issuance of the 2016v3 modeling and violating-monitor methodology in connection with the SIP Disapproval and Federal Good Neighbor Plan actions in winter of 2023 that they may be subject to a good neighbor FIP due to identified linkages with downwind receptors. 88 FR 36656. None of these five states has moved since that time to submit a revised SIP submission to address the relevant requirements.

Page 51 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

For consistency, the Agency similarly conducted its overcontrol analysis for this action using the 2023 and 2026 data (*see* section VI.D. of this document). The EPA recognizes that it is appropriate to provide sufficient lead time to allow sources in these five states to comply with the proposed requirements. Based on the compliance-timing analysis conducted in the final Federal Good Neighbor Plan and applied here (as discussed in section VII. of this document), the dates proposed for the onset of these requirements for these five states fall after the 2023 and 2026 analytic years. This too is a matter of happenstance and does not justify a deviation from the definition of these states' good neighbor obligations. Similarly, assuming favorable outcomes in the ongoing litigation resulting in stays of the Federal Good Neighbor Plan for several states pending judicial review, the EPA anticipates adjusting the timing of compliance obligations if these states are eventually made subject to the Federal Good Neighbor Plan. These circumstances are analogous to an issue the EPA addressed in the final Federal Good Neighbor Plan regarding the ability of individual sources to apply for and obtain compliance extensions. The EPA explained that where sources obtained such extensions, the EPA did not intend to conduct further analysis of whether those reductions were still required based on updated air quality analysis. As the EPA explained, the Agency did not think individual sources should gain the benefit of delaying emissions reductions simply in the hopes that they could show those reductions would be overcontrol. This would introduce an inter-dependency into the analysis, whereas each source must be held to the elimination of its portion of significant contribution. Necessity, the EPA explained, may demand some additional amount of time for compliance, but equity demands that individual sources not gain an untoward advantage from delay and reliance on other sources' timelier compliance. *See* 88 FR at 36750 n.253. Thus, here, the EPA continues to conduct its

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

overcontrol analysis using the common datasets for 2023 and 2026, to ensure consistent and equitable determinations for what constitutes "significant contribution" even if the implementation of those emissions reductions may be delayed in certain states or for certain sources.

Thus, the EPA proposes to continue to use its 2023 and 2026 analytics, to ensure parity by holding all states to a consistent set of data in defining good neighbor obligations for the 2015 ozone NAAQS, to avoid improperly shifting the burden of emissions reductions to other upwind and downwind states, and to provide for an efficient and administratively workable resolution of these remaining obligations for five additional states.

2. Step 1 of the 4-Step Interstate Transport Framework

In Step 1, the EPA identifies monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. This approach reflects the EPA's interpretation of the terms "nonattainment" and "maintenance" as used in the good neighbor provision in the context of the ozone NAAQS. *See* 88 FR at 9341-42. Where the EPA's analysis shows that a site does not meet the definition of a nonattainment or maintenance receptor, the EPA excludes that site from further analysis under the EPA's 4-step interstate transport framework. At Step 2 of the 4-step interstate transport framework, the EPA considers those sites identified as a nonattainment or maintenance receptor in 2023 and identifies which upwind states contribute to those receptors above the contribution threshold.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

The EPA's approach to identifying ozone nonattainment and maintenance receptors in this action is the same as that used in the Federal Good Neighbor Plan.[58] This approach gives independent consideration to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina*.[59] To summarize this methodology:

The EPA identifies nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where the EPA defined nonattainment receptors as those monitoring sites that both measure nonattainment based on recent monitoring data (here, using certified 2021 data to be consistent with the analysis in the Good Neighbor Plan) and that the EPA modeling projected to be in nonattainment in the analytic year (*i.e.*, 2023).[60,61]

In addition, the EPA identified a receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in the CSAPR and

---

[58] *See* Air Quality Modeling Final Rule Technical Support Document – 2015 Ozone NAAQS Good Neighbor Plan in Docket ID No. EPA-HQ-OAR-2021-0668 for additional details on the EPA's evaluation nonattainment and maintenance receptor identification.

[59] *See North Carolina v. EPA*, 531 F.3d at 910-11 (holding that the EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[60] The 2021 design values were the most current official design values available for use in the 2016v3 modeling. The 2021 ozone design values, by monitoring site, can be found in the file "Final GNP O3 DVs Contributions", in Docket ID No. EPA-HQ-OAR-2021-0668.

[61] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR at 25241, 25249 (January 14, 2005); *see also North Carolina*, 531 F.3d at 913-14 (affirming as reasonable the EPA's approach to defining nonattainment in CAIR).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

upheld by the D.C. Circuit in *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 136
(D.C. Cir. 2015) (*EME Homer City II*).[62] Specifically, the EPA identified maintenance receptors
as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that
takes into account historical variability in air quality at that receptor. The variability in air quality
was determined by evaluating the "maximum" future design value at each receptor based on a
projection of the maximum measured design value over the relevant period. The EPA interprets
the projected maximum future design value to be a potential future air quality outcome consistent
with the meteorology that yielded maximum measured concentrations in the ambient data set
analyzed for that receptor (*i.e.*, ozone conducive meteorology). The EPA also recognizes that
previously experienced meteorological conditions (*e.g.*, dominant wind direction, temperatures,
and air mass patterns) promoting ozone formation that led to maximum concentrations in the
measured data may reoccur in the future. The maximum design value gives a reasonable
projection of future air quality at the receptor under a scenario in which such conditions do, in
fact, reoccur. The projected maximum design value is used to identify upwind emissions that,
under those circumstances, could interfere with the downwind area's ability to maintain the
NAAQS.

Nonattainment receptors are also, by definition, maintenance receptors, and so the EPA
often uses the term "maintenance-only" to refer to those receptors that are not nonattainment
receptors. Consistent with the concepts for maintenance receptors, as described earlier, the EPA
identifies "maintenance-only" receptors as those monitoring sites that have projected average

---

[62] *See* 76 FR 48208 (August 8, 2011). CSAPR Update and Revised CSAPR Update also used this
approach. *See* 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have
taken steps to ensure the accuracy of this version, but it is not the official version.

design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values.[63] In addition, those monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as "maintenance-only" receptors, even if they are currently measuring nonattainment based on the most recent official design values.

The Agency has looked closely at measured ozone levels at ambient monitoring sites in 2021 and 2022 for the purposes of informing the identification of potential additional receptors in 2023. As explained in more detail in the February 13, 2022, final action disapproving 19 states' good neighbor SIP submissions, and partially approving and partially disapproving 2 states' good neighbor SIP submissions ("Disapproval action"), *see* 88 FR at 9349-50, the EPA finds there is a basis to consider certain sites with elevated ozone levels that are not otherwise identified as receptors to be an additional type of maintenance-only receptor given the likelihood that ozone levels above the NAAQS could persist at those locations through at least 2023. These are referred to as violating-monitor maintenance-only receptors (violating-monitor receptors). In this action, the EPA proposes to use certified ambient monitoring data as an additional method to identify maintenance-only receptors. More specifically, violating-monitor receptors are monitoring sites with measured 2021 and 2022 design values and 2021 and 2022 4th high maximum daily average 8-hour ozone concentrations that exceed the NAAQS, despite having

---

[63] The Agency often uses the terms maintenance receptor and maintenance-only receptor interchangeably when discussing maintenance receptors that are not also nonattainment receptors.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

model-projected average and maximum design values for 2023 below the NAAQS.[64] The EPA finds these sites are at continuing risk of failing to maintain the 2015 ozone NAAQS, which justifies categorizing these sites as maintenance-only receptors. By applying the criteria that certified 2021 and 2022 design values and 2021 and 2022 4th high maximum daily average 8-hour ozone concentrations must all exceed the NAAQS the EPA gives due consideration to both measured air quality data and its modeling projections. This reasonably identifies monitoring sites as receptors in 2023 using this methodology. If sites do not meet these criteria, then the EPA could reasonably anticipate these sites to not have a problem maintaining the NAAQS in 2023 and should therefore not be considered receptors.[65]

The EPA is not reopening its Step 1 methodologies or determinations in this action as to the 23 states included in the Federal Good Neighbor Plan. The EPA proposes to apply this same methodology to Arizona, Iowa, Kansas, New Mexico, and Tennessee. Comments that are unrelated to or go beyond the application of these methodologies to these five states will be treated as beyond the scope of this action.

3. Step 2 of the 4-Step Interstate Transport Framework

---

[64] A design value is calculated using the annual fourth-highest maximum daily 8-hour ozone concentration averaged over 3 years.

[65] We also note that 2023 monitoring data is not yet certified, and further, because the Federal Good Neighbor Plan was in effect in several states during the 2023 ozone season (and sources may have otherwise voluntarily taken emissions-reduction measures consistent with the Federal Good Neighbor Plan either earlier than the effective date or in states where the Federal Good Neighbor Plan was stayed), the 2023 monitoring data is less reliable for use in establishing an air quality baseline, i.e., one in the absence of the Federal Good Neighbor Plan.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

In Step 2 the contribution of each upwind State to each receptor in the 2023 analytic year is quantified. This approach reflects how the Agency gives meaning to the term "contribute" in the good neighbor provision in relation to the "collective contribution" problem posed by interstate ozone pollution. *See* 88 FR at 9342. The contribution metric used in Step 2 is defined as the average impact from each State to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a State's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.*, 0.70 ppb for the 2015 ozone NAAQS), the upwind State is not "linked" to a downwind air quality problem, and the EPA, therefore, concludes that the State does not contribute significantly to nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a State's average contribution equals or exceeds the 1 percent threshold, the EPA further evaluates the State's emissions in Step 3, considering both air quality and cost as part of a multi-factor analysis, to determine what, if any, emissions might be deemed "significant" and, thus, must be eliminated pursuant to the requirements of CAA section 110(a)(2)(D)(i)(I).

In this proposed action, the EPA relies in the first instance on the 1 percent threshold for the purpose of evaluating a State's contribution to nonattainment or maintenance of the 2015 ozone NAAQS (*i.e.*, 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that the EPA applied in the Disapproval action and in the Federal Good Neighbor Plan. The EPA has acknowledged that states may have been able to justify use of a different threshold at Step 2. For reasons explained in section IV. of this document, no State included in this action successfully made this demonstration. In addition, the EPA explained in both the Disapproval action and in the Federal Good Neighbor Plan that the need for consistent treatment of all states

Page 58 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

counsels against recognizing alternative thresholds on a state-by-state basis. Based on its experience since the release of the August 2018 memorandum, the EPA has also determined, as explained in the Disapproval action and Federal Good Neighbor Plan, that it is not a good use of Agency resources nor is it wise policy for the EPA to attempt to justify the use of an alternative threshold on behalf of any State that failed to conduct an adequate analysis itself. Likewise, maintaining continuity across ozone NAAQS through consistent application of a 1 percent of NAAQS threshold at Step 2 is appropriate, so that, as the NAAQS is revised and made more protective, the contribution threshold is correspondingly adjusted as well. *See* 88 FR at 36712-17; 88 FR at 9371-75. *See also* 86 FR at 23085 (use of 1 percent threshold in the Revised CSAPR Update); 81 FR at 74518 (basis for use of 1 percent threshold for the 2008 ozone NAAQS in the CSAPR Update)*;* 76 FR at 48237-38 (original determination to use 1 percent threshold for the 1997 ozone NAAQS in CSAPR).

Therefore, application of a consistent contribution threshold is important to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next and helps ensure that good neighbor obligations align with the stringency of the NAAQS.

The issue of the appropriate contribution threshold to apply was thoroughly addressed in the Disapproval action and the Federal Good Neighbor Plan rulemakings, and the EPA responded to numerous comments on this topic. The EPA is not reopening this issue in this

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

action, except as to the question of whether there is any reason to regard the Step 2 contribution threshold differently for any of these five additional states. The Agency, however, sees no basis to do so.

4. Step 3 of the 4-Step Interstate Transport Framework

At Step 3 of the 4-step interstate transport framework, the EPA further evaluates a State's emissions, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I). This approach reflects the EPA's interpretation of the phrases "contribute significantly" or "interfere with maintenance" as used in the good neighbor provision in the context of the ozone NAAQS. *See* 88 FR at 9342-43.

Under the EPA's longstanding approach to eliminating significant contribution to nonattainment and interference with maintenance, at Step 3, a multi-factor assessment of potential emissions controls would be conducted for states linked at Step 1 and 2. The EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a State is linked; other factors may potentially be relevant if adequately supported.

The EPA has consistently applied this general approach to Step 3 when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal and regional ozone transport rulemakings, and this

Page 60 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City*, 572

U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3

analysis in precisely the manner the EPA has done in its prior regional transport rulemakings,

State implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must

prohibit "any source or other type of emissions activity within the State" from emitting air

pollutants which will contribute significantly to downwind air quality problems. Thus, states

must undertake an analysis similar to the EPA's analysis (or an alternative approach to defining

"significance" that comports with the statute's objectives) to determine whether and to what

degree emissions from a State should be "prohibited" to eliminate emissions that will "contribute

significantly to nonattainment in or interfere with maintenance of" the NAAQS in any other

state. *See* 88 FR at 9342-43, 9375-76.

      In general, where the EPA's or state-provided alternative air quality and contribution

modeling establishes that a State is linked at Steps 1 and 2, it will be insufficient at Step 3 for a

State merely to point to its existing rules requiring control measures as a basis for SIP

submission approval. In general, the emissions-reducing effects of all existing emissions control

requirements are already reflected in the future year projected air quality results of the modeling

for Steps 1 and 2.

      If the State is shown to still be linked to one or more downwind receptor(s) despite these

existing controls, but that State believes it has no outstanding good neighbor obligations, the

EPA expects the State to provide sufficient justification to support a conclusion that the State has

adequate provisions prohibiting "any source or other type of emissions activity within the State

from emitting any air pollutant in amounts which will" "contribute significantly to nonattainment

Page 61 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

in, or interfere with maintenance by," any other State with respect to the NAAQS. *See* CAA

section 110(a)(2)(D)(i)(I). While the EPA has not prescribed a particular method for this

assessment, the EPA expects states at a minimum to present a sufficient technical evaluation.

This would typically include information on emissions sources, applicable control technologies,

emissions reductions, costs, cost-effectiveness, and downwind air quality impacts of the

estimated reductions, before concluding that no additional emissions controls should be

required.[66]

      As explained in section III.A. in this document, the EPA and states must give

independent significance to Prong 1 (significant contribution to nonattainment) and Prong 2

(interference with maintenance) when evaluating downwind air quality problems under CAA

section 110(a)(2)(D)(i)(I).[67] The EPA gives effect to Prong 2 through identifying receptors that

may have trouble attaining the NAAQS under varying air quality and meteorological conditions.

*EME Homer City* upheld the EPA's approach to using cost to determine "amounts" with respect

to both Prong 1 and 2. *EPA v. EME Homer City Generation*, 572 U.S. at 518-520. The EPA's

use of the term "significant contribution" in its analysis at the third step of the 4-step interstate

transport framework is applied for both Prongs 1 and 2. This approach to giving effect to the

"interfere with maintenance" prong has been upheld twice by the D.C. Circuit. *See EME Homer*

---

[66] As examples of general approaches for how such an analysis could be conducted for their
sources, states could look to the CSAPR Update, 81 FR 74504, 74539-51; CSAPR, 76 FR
48208, 48246-63; CAIR, 70 FR 25162, 25195-229; or the NO$_X$ SIP Call, 63 FR 57356, 57399-
405. *See also* Revised CSAPR Update, 86 FR 23054, 23086-23116. Consistently across these
rulemakings, the EPA has developed emissions inventories, analyzed different levels of control
stringency at different cost thresholds, and assessed resulting downwind air quality
improvements.

[67] *See North Carolina v. EPA*, 531 F.3d 896, 909-11 (D.C. Cir. 2008).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have
taken steps to ensure the accuracy of this version, but it is not the official version.

*City*, 795 F.3d at 136; *Wisconsin*, 938 F.3d at 325-27. In effect, the EPA's determination of what level of upwind contribution constitutes "interference" with a maintenance receptor is the same determination as what constitutes "significant contribution" for a nonattainment receptor. Nonetheless, this continues to give independent effect to Prong 2 because the EPA applies a broader definition for identifying maintenance receptors, which accounts for the possibility of problems maintaining the NAAQS under realistic potential future conditions. While the EPA and others may occasionally use the language of "significance" as a shorthand for determinations at the third step under both Prongs 1 and 2, this does not detract from the fact that the EPA gives Prong 2 independent effect under the 4-step interstate transport framework. Alternative approaches to defining and prohibiting emissions that "interfere with maintenance" must be, like the EPA's approach, legally and technically justified and give effect to the language of the statute in a manner that ensures states' good neighbor obligations are defined in a consistent and equitable manner.

As explained in section IV.B. and V.A. of this document, no states whose SIP submissions the EPA is proposing to partially disapprove in this action conducted an adequate analysis at Step 3, following either the EPA's approach or an alternative approach. As explained in section I.A. of this document and further detailed in section VI. of this document, the EPA is proposing to apply the same Step 3 analysis and methodology completed in the Federal Good Neighbor Plan for 23 states to the additional states of Arizona, Iowa, Kansas, New Mexico, and

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Tennessee. The EPA's approach to Step 3 is explained in section III.B.1.c. of the Federal Good Neighbor Plan.[68]

5. Step 4 of the 4-Step Interstate Transport Framework

At Step 4, states (or the EPA) develop permanent and federally-enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS, as necessary to comply with the terms of the good neighbor provision requiring that SIPs (or FIPs) "contain adequate provisions prohibiting" such emissions. 88 FR at 9343. These control strategies must be included in the State's SIP so that they are made permanent and federally enforceable. *See* CAA section 110(a)(2)(D) ("Each such [SIP] shall . . . contain adequate provisions--prohibiting . . ."). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin v. EPA*, 786 F.3d 1169, 1175-76 (9th Cir. 2015) (holding that measures relied on by a State to meet CAA requirements must be included in the SIP submission).

As with the previous steps of the framework, as explained in section I.A. of this document and further detailed in section VII. of this document, in proposing FIPs for Arizona, Iowa, Kansas, New Mexico, and Tennessee, the EPA is proposing to implement necessary emissions reductions through the same set of permanent and enforceable measures promulgated for 23 other states in the Federal Good Neighbor Plan. The EPA's approach to Step 4 is explained in section III.B.1.d. of the Federal Good Neighbor Plan.[69]

---

[68] 88 FR 36654, at 36678.
[69] 88 FR 36654, at 36684.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**IV. SIP Submissions Addressing Interstate Transport of Air Pollution for the 2015 8-hour Ozone NAAQS**

*A. SIP Summaries*

1. Arizona

On September 24, 2018, the Arizona Department of Environmental Quality (ADEQ) submitted to the EPA the "Arizona State Implementation Plan Revision under Clean Air Act Sections 110(a)(1) and 110(a)(2) for the 2015 Ozone National Ambient Air Quality Standards" ("Arizona's 2018 SIP Submission"). Arizona's 2018 SIP Submission addresses the "infrastructure" requirements of CAA section 110(a)(2), including the good neighbor provisions under CAA section 110(a)(2)(D)(i)(I), for the 2015 ozone NAAQS.[70]

Arizona's 2018 SIP Submission describes the 4-step interstate transport framework established by the EPA to address the good neighbor provision.[71] Arizona references the results of the ozone modeling completed by the EPA using CAMx version 6.40 and 2011 base year, made available in the March 2018 memorandum, to identify downwind nonattainment and maintenance receptors that may be impacted by emissions from sources in the State at Steps 1 and 2 of the 4-step interstate transport framework. Arizona noted that the modeling results cited in the March 2018 memorandum demonstrate that Arizona is not shown to contribute greater than 1 percent of the NAAQS (*i.e.*, 0.70 ppb) to any of the modeled nonattainment or

---

[70] Letter dated September 24, 2018, from Timothy S. Franquist, Director, Air Quality Division, ADEQ, to Michael Stoker, Regional Administrator, EPA Region IX, Subject: "Submittal of the Arizona State Implementation Plan Revision under Clean Air Act sections 110(a)(1) and 110(a)(2) for the 2015 Ozone NAAQS."

[71] Arizona's 2018 SIP submission, 12.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

maintenance receptors in other states.[72] Despite asserting that "Arizona still maintains that the one percent threshold is poorly suited for determining contribution obligations in the Southwestern US," Arizona relies on the contribution threshold of 1 percent of the NAAQS at Step 2.[73] Based on the model results cited in Arizona's 2018 iSIP Submission, Arizona finds that it does not contribute significantly to nonattainment or maintenance receptors in other states and that it is not necessary to identify emissions reductions or adopt any permanent or enforceable controls under the interstate transport provision for the 2015 ozone NAAQS.[74] Arizona also asserts that the Arizona SIP contains adequate provisions to ensure that air emissions in Arizona will not significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other State in the future.[75]

Prior Notices Related to Arizona's SIP Submission

On June 24, 2022, the EPA proposed to approve Arizona's 2018 iSIP Submission as meeting the good neighbor provision for the 2015 ozone NAAQS.[76] Our proposed approval was based upon the conclusion that Arizona was not linked to any downwind nonattainment or maintenance receptors, which was supported by the 2016v2 modeling described in the notice of proposed rulemaking for the proposed approval.[77] In response to that proposed rulemaking, the EPA received one comment letter providing evidence to suggest that Arizona likely contributes significantly to interstate ozone pollution. The commenter alleged that the 2016v2 modeling

---

[72] *Id*. at 13.
[73] *Id*.
[74] *Id*.
[75] *Id*. at 14.
[76] 87 FR 37776 (June 24, 2022).
[77] 87 FR 37776, 37782.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

arbitrarily omits Arizona contributions to monitors in El Paso County, Texas, and Doña Ana

County, New Mexico, and that Arizona is likely to significantly contribute to ozone

concentrations at these receptors. The commenter also incorporated by reference comments that

the commenter submitted in response to the EPA's April 6, 2022, proposed FIP addressing

regional ozone transport for the 2015 ozone NAAQS, identifying additional alleged flaws and

omissions in the 2016v2 modeling.[78]

   As described in section III.B. of this document, the EPA constructed its 2016v3

emissions platform to update ozone transport modeling in response to these and similar

comments received on the 2016v2 modeling and to develop the 2016v3 air quality modeling.

The EPA also recognized that monitoring data for 2021 and 2022 supported recognizing

additional, violating-monitor receptors. The EPA used this updated air quality analysis to inform

its final Disapproval and Federal Good Neighbor Plan actions.[79,80] As described later in section

IV.B.1. of this document, the 2016v3 modeling and violating-monitor receptor methodology

identifies Arizona's maximum contribution to numerous downwind maintenance receptors to be

greater than 1 percent of the standard (*i.e.*, greater than 0.70 ppb). Because the latest available

modeling indicates that Arizona is linked to downwind maintenance receptors, the EPA is now

---

[78] 87 FR 20036 (April 6, 2022).

[79] "Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards," 88 FR 9336 (February 13, 2023), and "Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards," 88 FR 36654 (June 5, 2023).

[80] Details on the 2016v3 air quality modeling and the methods for projecting design values and determining contributions in 2023 and 2026 are described in the TSD titled "Air Quality Modeling Final Rule TSD – 2015 Ozone NAAQS Good Neighbor Plan," hereafter known as the Final Good Neighbor Plan AQM TSD.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

withdrawing its 2022 proposed approval of Arizona's 2018 SIP Submission with respect to CAA section 110(a)(2)(d)(i)(I).

2. New Mexico

The EPA made a finding in 2019 that New Mexico had failed to submit a complete good neighbor SIP submission. *See* 84 FR 66612 (December 4, 2019). This triggered the EPA's obligation to promulgate a FIP for New Mexico within 2 years. When the EPA failed to do so, multiple parties brought deadline-suit litigation against the Agency. This resulted in a consent decree deadline of June 1, 2024, to either promulgate a FIP for New Mexico or approve a SIP submission fully resolving New Mexico's good neighbor obligations. *WildEarth Guardians v. Regan*, No. 22-cv-00174-RB-GBW (D.N.M. Aug. 16, 2022); *Sierra Club v. Regan*, No. 3:22-cv-01992-JD (N.D. Cal. Jan. 24, 2023). By stipulation of the parties, that deadline has now been extended to August 30, 2024. The EPA's duty to promulgate a FIP for New Mexico can only be suspended by the approval of a SIP submission. As discussed in section IV.B. of this document, the EPA proposes to disapprove the SIP submission New Mexico subsequently submitted, described below. This disapproval, if finalized, would not alter or reset the EPA's pre-existing obligation to promulgate a FIP for New Mexico.

On July 27, 2021, the New Mexico Environment Department (NMED) submitted a SIP submission certifying that the State's SIP satisfies requirements of interstate transport of air pollution for the 2015 ozone NAAQS. On June 9, 2021, on behalf of the City of Albuquerque Environmental Health Department (EHD), the Cabinet Secretary of NMED submitted to the EPA a certification that Albuquerque-Bernalillo County, and New Mexico as a whole, "does not cause or contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in

Page 68 of 289

any other state."[81] NMED and EHD's submission contained what NMED characterized as a weight of evidence analysis of New Mexico's contribution to ozone transport receptors using the data provided in the EPA's modeling results included as an attachment to the March 2018 memorandum. New Mexico did not explicitly follow the 4-step interstate transport framework but did examine downwind air quality and New Mexico's contributions using the analytic year of 2023 to describe New Mexico's linkages to receptors. On July 5, 2023, NMED submitted a supplemental letter containing Exhibit A, for the EPA's consideration in the Agency's review of the NMED and EHD SIP submissions. The following sections describe NMED and EHD's submissions, including Exhibit A, and the information provided for each step in the process.

a. Information Provided by New Mexico Regarding Step 1

For Step 1 of the 4-step interstate transport framework, NMED and EHD SIP submissions relied on the EPA's interstate transport modeling results that are included as an attachment to the March 2018 memorandum.[82] These EPA modeling results, using a 2011 base year, provided: (1) projected average design value and maximum design value for 2023 for ozone monitors to identify nonattainment or maintenance receptors and (2) projected average contribution from State emissions to the projected ozone concentrations at each ozone monitor to identify upwind state-to-downwind receptor linkages.

b. Information Provided by New Mexico Regarding Step 2

NMED and EHD's submission presented New Mexico's projected 2023 ozone

---

[81] *See* EHD SIP submission, attachment B, page 3.
[82] As explained in section IV.A.2.c., NMED's Exhibit A acknowledged the EPA's 2016v3 modeling results and linkages.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

contributions to maintenance and nonattainment receptors using the projections from the EPA's March 2018 memorandum. The State agencies state that in past rulemakings, the EPA has relied upon the 1 percent of the 2015 ozone NAAQS standard (0.70 ppb) contribution threshold when evaluating if an upwind State has a "potentially significant contribution to nonattainment or interference with maintenance"[83] impacts air quality in a downwind state. New Mexico began their Step 2 analysis by using the EPA's 1 percent threshold to evaluate contribution and identified that the State contributes 1 percent or more of the NAAQS to one maintenance receptor: Weld County Tower, Colorado (Monitor ID: 081230009), and one nonattainment receptor, Rocky Flats-N, Colorado (Monitor ID: 080590006).[84, 85] Additionally, the EPA's March 2018 memorandum modeling indicated that upwind states contribute roughly 8 and 10 percent of the modeled 2023 design value at the Weld County receptor and the Rocky Flats-N receptor, respectively.

However, NMED and EHD argue that New Mexico does not contribute significantly to nonattainment or interfere with maintenance at the Weld County Tower and Rocky Flats-N receptors. NMED and EHD assert that a "weight of evidence" analysis is more appropriate than relying on a single, national standard for identifying linkages and determining whether contributions from an upwind State are significant. NMED and EHD believe that New Mexico should not be linked to Colorado receptors in the EPA's transport Step 2 analysis because the

---

[83] EHD's SIP submission Attachment B, page 7.
[84] *Id*. at Table 1, page 4.
[85] *Id*. at page 5.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

majority of the contribution to these receptors comes directly from Colorado. NMED and EHD attempt to justify this position by relying on a previous transport rulemaking that determined certain monitoring sites in California were not interstate transport receptors. Specifically, New Mexico references the approval of Arizona's 2008 ozone transport SIP submission, *see* 81 FR 31513. In that action, the EPA determined that Arizona did not significantly contribute to two California monitoring sites despite contributing more than 1 percent of the NAAQS, because the EPA found the total collective contribution from all upwind states was so low at these sites that they need not be considered transport receptors. New Mexico attempts to expand the application of the EPA's reasoning in the Arizona action, asserting it would also be appropriate not to link New Mexico, or the other linked upwind states, to the Colorado receptors at the 1 percent threshold.

NMED and EHD's submission also claims that the relative share of in-state versus out-of-state contribution in Colorado, topographical influences on the transport of ozone in Colorado, and other air quality information support its "weight-of-evidence" analysis. To identify the portion of ozone levels in Colorado coming from in-state emissions as opposed to upwind-state emissions, New Mexico relied on the EPA's 2018 memorandum modeling data. Based on this data, NMED and EHD determined in-state emissions outweighed the portion of emissions coming from upwind states collectively.

NMED and EHD considered the topological influences on ozone concentrations in the Denver area based on information prepared by Colorado to support the final 2015 ozone NAAQS

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

designation of the Denver area.[86] NMED and EHD assert in their submissions that the receptors in Colorado are predominantly impacted from local sources and thus the minimal contributions from upwind states do not warrant further controls in New Mexico. They contend that the topography of the Denver nonattainment area (NAA) disproportionally favors the formation of ozone due to local emissions. As support for their argument, NMED and EHD point to the EPA's TSD supporting the designation of the Denver NAA: "The three key circulation patterns (drainage flow, upslope flow, and mountain-plains solenoid circulation), in conjunction with the surface topography, in the [Denver] area serve to trap emissions and produce ozone in the basin formed by the surrounding higher elevation features. Further, these circulation patterns serve to recirculate prior day emissions into the Denver area population centers as the mountain-plains solenoid flow lifts the polluted atmosphere up the mountain slopes of the Rocky Mountains to the west in warm afternoons, and then returns the polluted air to the surface as the lofted air circulates back to the east and subsides overnight."[87] New Mexico presents this information to further support their claim that the Denver NAA is significantly more impacted by emissions from within Colorado than from interstate transport.

NMED and EHD's final weight of evidence factor consisted of an assessment of ozone air quality monitoring data and design values. Here, they identify downward trends in ozone precursor emissions ($NO_X$ and VOC) from 2005 to 2018. NMED and EHD cite New Mexico's current on-the-books rules as sufficient to resolve the State's transport responsibilities and as reason to believe downward trends in emissions and ozone concentrations at the receptors for

---

[86] *Id.* at page 17. *See also* 83 FR 25776 (June 4, 2018).
[87] *See https://www.epa.gov/sites/default/files/2018-05/documents/co_tsd_final_0.pdf.*

Page 72 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

which they contribute greater than 0.70 ppb (Rock Flats-N and Well County Tower monitors) will continue to decrease. NMED included data on an overall trend of slightly increasing VOC emissions and decreasing $NO_X$ emissions in New Mexico, Utah, Wyoming, California, and Texas from 2002 to 2014. New Mexico also provided data exhibiting a decrease of VOC and $NO_X$ emissions from Colorado during the same time period. New Mexico credited the downward emissions trends to permanent and enforceable control measures. New Mexico made an argument that overall decreasing ozone concentrations and emissions trends in the state, and other upwind states, correlate with reduced contributions to nonattainment and maintenance receptors outside of New Mexico. NMED and EHD concluded that decreasing ambient ozone concentrations in Colorado is indicative of New Mexico contributing less to ozone in downwind states as time goes on.

This concluded New Mexico's analysis in its original submission. New Mexico did not conduct an analysis of emissions-control opportunities within the State at Step 3. NMED and EHD concluded it would be unreasonable for New Mexico to take further actions to address its obligations under the good neighbor provisions for the ozone NAAQS. Thus, at Step 4, NMED and EHD determined that no additional permanent and enforceable measures were necessary to reduce the State's emissions.

c. New Mexico Letter

On July 5, 2023, NMED submitted for the EPA's consideration a letter with an attachment, Exhibit A. The letter indicates its submission is in response to the EPA's indication that it may disapprove New Mexico's SIP submission. To the EPA's awareness, this letter was not subject to public notice or rulemaking process at the State level and does not in itself purport

Page 73 of 289

to be a SIP submission or a revision to New Mexico's SIP. As such, the EPA takes the information in the letter under advisement but does not consider this letter to be a new SIP submission in its own right or part of the SIP submission dated July 27, 2021.

In its letter, NMED asserts the EPA should account for emissions reductions that have occurred since 2020 that could resolve the State's transport obligations. NMED identified emissions reductions from two current compliance orders that resulted in a reduction of 236 tons of annual $NO_X$ emissions. NMED entered into a settlement agreement with ETC Texas Pipeline Ltd (ETC) for its Jal #3 plant, compliance order No. AQB 20-63, which was lodged on August 25, 2021. The settlement agreement mandated that the facility remove its sulfur recovery unit, which resulted in an emissions reduction of 4.8 tons of $NO_X$ per year. Additionally, NMED entered into a consent decree with ETC for its Eunice Gas Plant, compliance order No. AQB 20-64, which was lodged on September 9, 2021. The consent decree required the shutdown of the Eunice plant, except for Amanda Booster Station, resulting in emissions decrease of 231.4 tons of $NO_X$ per year. Lastly, NMED references emissions reductions anticipated from the consent decree lodged with Matador Production Company, filed on March 27, 2023. NMED is anticipating emissions reductions of a total 77 tons of $NO_X$ over 3 years and to occur before 2030.

NMED argues that the emissions reductions resulting from these compliance orders are satisfactory to fulfil the emissions reductions that would occur under the Federal Good Neighbor Plan for the 2015 Ozone Standard. NMED states that based on the formula applied under the Federal Good Neighbor Plan, the EPA identified 30 tons of emissions reductions achievable in

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

2023 under the current formula for EGU emissions reductions.[88] NMED claims that the "EPA indicated that this 30 ton per year reduction would be all that is necessary to meet its good neighbor FIP requirements."[89] NMED argues that as the $NO_X$ emissions decreases outlined in the provided consent decrees are greater than the emissions reductions anticipated in the Federal Good Neighbor Plan, the State will have met its obligations for interstate transport.

3. Tennessee

On September 13, 2018, Tennessee submitted a SIP revision addressing the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone NAAQS.[90,91] The SIP submission provided Tennessee's analysis of its impact to downwind states and concluded that emissions from the State will not significantly contribute to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in other states. Tennessee's submission relied on the EPA's modeling results for 2023 using a 2011 base year, contained in the March 2018, memorandum, to identify downwind nonattainment and maintenance receptors that may be impacted by emissions from sources in the State at Steps 1 and 2 of the 4-step interstate transport framework.[92] The Tennessee Department of Environmental Control (TDEC) reviewed the EPA's

---

[88] *Ozone Transport Policy Analysis Final Rule Technical Support Document.* Table B-3. 2024 Ozone Season $NO_X$ Emissions for States at Different Uniform Control Scenarios.

[89] NMED's July 5, 2023, letter to the EPA, at 1.

[90] The September 13, 2019, SIP submission provided by TDEC was received by the EPA on September 17, 2018.

[91] On September 18, 2018, Tennessee submitted multiple SIP revisions under one cover letter. The EPA is only acting on Tennessee's 2015 ozone good neighbor interstate transport SIP requirements in this document.

[92] The EPA notes that Tennessee's SIP submission is not organized around the EPA's 4-step interstate transport framework for assessing good neighbor obligations, but the EPA summarizes the submission using that framework for clarity here.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

2023 modeling, concurred with the results, and determined that the EPA's future year projections were reasonable and account for source shutdowns, new controls, and fuel switches. TDEC summarized the State's upwind contribution to 26 nonattainment and maintenance receptors and noted that according to the modeling, Tennessee's largest impact on any potential downwind receptor in 2023 would be 0.31 ppb to a nonattainment receptor and 0.65 ppb to a maintenance receptor. Tennessee concluded that emissions from Tennessee do not contribute above 1 percent of the NAAQS or above 1 ppb at any receptors.

Tennessee's submission asserted that $NO_X$ emissions are considered the primary cause of formation of ozone in the southeast United States, and emphasized a significant reduction in $NO_X$ emissions reductions from coal-fired EGUs and other large $NO_X$ sources leading to improvements in air quality, including reductions attributable to previous transport rulemakings.[93] Additionally, TDEC identifies existing SIP-approved provisions, Federal regulations and programs, court settlements, and statewide source shutdowns that TDEC believes limit ozone precursor emissions in the State.[94]

Based on the information contained in Tennessee's transport SIP submission, TDEC concluded that Tennessee does not significantly contribute to nonattainment or interfere with

---

[93] The Tennessee SIP revision specifically cites the $NO_X$ Budget Trading Program, CAIR, and CSAPR. In addition, the Tennessee SIP revision discusses Tennessee rule 1200-03-27-.12 ($NO_X$ SIP Call requirements for Stationary Boilers and Combustion Turbines), which had not been approved into the SIP at the time of the September 13, 2018, submission. The EPA finalized approval of TAPR 1200-03-27-.12 into the Tennessee SIP on March 2, 2021. *See* 86 FR 12092.
[94] *See* page 9 through 12 of Tennessee's September 13, 2018, SIP submission for a list of SIP-approved State rules and Federal rules. This can be found in Docket No. EPA-R04-OAR-2021-0841.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

maintenance in another State of the 2015 8-hour ozone NAAQS, and that the SIP submission

provides for adequate measures to control ozone precursor emissions.

Prior Notices Related to Tennessee's SIP Submission

Previously, the EPA proposed approval of Tennessee's September 13, 2018, SIP

submission, based on the contribution modeling provided in the March 2018 memorandum. *See*

84 FR 71854 (December 30, 2019). When the EPA completed updated modeling of the 2023

analytic year in 2020 using a 2016-based emissions modeling platform (2016v1), however, it

became evident that Tennessee was projected to be linked to downwind nonattainment and

maintenance receptors.[95] As a result, the EPA did not act on Tennessee's SIP submission when it

published a supplemental proposal in 2021 to approve four other southeastern states' good

neighbor SIP submissions, using the updated 2023 modeling. *See* 86 FR 37942, 37943 (July 19,

2021).

The 2016v2 modeling comported with the 2016v1 modeling results for Tennessee, in

that it continued to show Tennessee was linked to at least one downwind -maintenance-only

receptor in 2023. Based on this information and the EPA's evaluation of the information and

arguments put forward by the State in its submission, the EPA withdrew its December 30, 2019,

proposed approval of Tennessee's September 13, 2018, interstate transport SIP submission, and

the EPA proposed disapproval of Tennessee's submission. *See* 87 FR 9545 (February 22, 2022).

---

[95] *See* "Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air
Pollution Rule Update", available in Docket ID No. EPA-HQ-OAR-2021-0663.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have
taken steps to ensure the accuracy of this version, but it is not the official version.

As described in section III.C. of this document, the EPA received numerous comments on the 2016v2 modeling used in its proposed ozone transport actions, including its proposed disapproval of Tennessee's submission. The EPA incorporated this feedback and made several updates to the 2016v2 inventories and model design to construct a 2016v3 emissions platform, which the EPA used to develop the 2016v3 air quality modeling. The EPA used the 2016v3 modeling to support the final action on 21 interstate transport SIP submissions for the 2015 ozone NAAQS.[96],[97] The Agency also found there were additional receptors that would struggle to attain or maintain the NAAQS in 2023, which it identified as violating-monitor receptors. The final air quality analysis modeling indicated that while Tennessee was no longer projected in the modeling to be linked to any nonattainment or maintenance receptors, the State was linked above 1 percent of the NAAQS to five violating-monitor receptors, all located in Texas. *See* 2016v3 AQM TSD, at C-5.

Although the EPA identified a linkage between emissions in Tennessee and violating-monitor receptors, in recognition that it had not included such receptors in its proposed action, the EPA did not take final action on Tennessee's transport SIP submission at that time. The EPA is now withdrawing its proposed disapproval of Tennessee's September 13, 2018, interstate transport SIP submission as published on February 22, 2022, at 87 FR 9545.

*B. EPA Evaluation*

---

[96] Disapproval Action, 88 FR 9336 (February 13, 2023), and Federal Good Neighbor Plan, 88 FR 36654 (June 5, 2023).

[97] Details on the 2016v3 air quality modeling and the methods for projecting design values and determining contributions in 2023 and 2026 are described in the TSD titled "Air Quality Modeling Final Rule TSD – 2015 Ozone NAAQS Good Neighbor Plan," hereafter known as the Final Good Neighbor Plan AQM TSD.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

The EPA is proposing to find that SIP submissions from Arizona, New Mexico, and Tennessee meet the states' obligations with respect to Prong 1, prohibiting emissions that contribute significantly to nonattainment of the 2015 8-hour ozone NAAQS, but do not meet obligations with respect to Prong 2, interference with maintenance of the 2015 8-hour ozone NAAQS in any other state. This proposal is based on the EPA's evaluation of each State's SIP submission, considered in light of the state-of-the-science 2016v3 modeling for 2023 and 2026, the certified ozone monitoring data and design values for 2021 and 2022, and corresponding contribution analysis. Therefore, the EPA is proposing to partially approve with respect to Prong 1 and partially disapprove with respect to Prong 2 the SIP submissions from Arizona, New Mexico, and Tennessee.

1. Arizona

a. Evaluation of Information Provided by Arizona Regarding Steps 1 and 2

In Arizona's 2018 SIP Submission, the State cites the EPA modeling released in the March 2018 memorandum to conclude that Arizona does not contribute significantly (*i.e.*, equal to or above the 0.70 ppb threshold) to any nonattainment or maintenance receptor in another state.[98] In this proposal, the EPA relies on the Agency's 2016v3 modeling, which uses a more recent base year and more up-to-date emissions inventories, compared to the modeling that was released in the March 2018 memo. The 2016v3 modeling along with the violating-monitor receptor methodology are used to identify downwind receptors, calculate upwind contributions, and determine "linkages" to downwind air quality problems in 2023 using the 0.70 ppb threshold

---

[98] Arizona's 2018 iSIP submission, 13-14.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(*i.e.*, 1 percent of the NAAQS). As shown in Tables IV.B-1-3, the updated EPA contribution modeling identifies Arizona's maximum contribution to a downwind nonattainment or maintenance receptor to be greater than 1 percent of the standard (*i.e.*, greater than 0.70 ppb). Because the entire technical basis for Arizona's determination with respect to CAA section 110(a)(2)(D)(i)(I) in its 2018 SIP Submission is that Arizona is not linked at Step 2, the EPA proposes to partially disapprove Arizona's SIP submission with respect to Prong 2, interference with maintenance, based on the EPA's finding that such a linkage does exist to maintenance-only receptors.

b. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Arizona

As described in section III.B. of this document, the EPA performed air quality modeling using the 2016v3 emissions platform to project design values and contributions for 2023 and 2026. These data were examined to determine if Arizona contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table IV.B-1, the data indicate that, in 2023, emissions from Arizona contribute greater than 1 percent of the 2015 ozone NAAQS to six maintenance-only receptors in Colorado, Nevada, New Mexico, and Texas.[99] Table IV.B.1-3 indicates that in 2023, emissions from Arizona contribute greater than 1 percent of the NAAQS to three violating-monitor maintenance-only receptors in Nevada and New Mexico. Furthermore, data for 2026 in Table IV.B.1-2 indicate that emissions from Arizona contribute greater than 1 percent of the 2015

---

[99] Final Good Neighbor Plan AQM TSD, Appendix C, available in Docket ID No EPA-HQ-OAR-2021-0668.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

ozone NAAQS to five maintenance-only receptors in Colorado and New Mexico.[100] In addition, Arizona's contribution exceeds 1 ppb at five receptors in 2023 and two receptors in 2026. Thus, whether Arizona could have sought to justify an alternative 1 ppb threshold is irrelevant to EPA's determination that Arizona is linked, as Arizona's contributions to receptors exceed even that higher alternative contribution threshold.

**Table IV.B.1-1: Arizona Linkage Results Based on the EPA Updated 2023 Modeling**

| Receptor ID | Location | Nonattainment /Maintenance | 2023 Average Design Value (ppb) | 2023 Maximum Design Value (ppb) | Arizona Contribution (ppb) |
|---|---|---|---|---|---|
| 80690011 | Larimer, Colorado | Maintenance-Only | 70.9 | 72.1 | 0.86 |
| 350130021 | Doña Ana, New Mexico | Maintenance-Only | 70.8 | 72.1 | 1.04 |
| 350130022 | Doña Ana, New Mexico | Maintenance-Only | 69.7 | 72.4 | 1.06 |
| 350151005 | Eddy, New Mexico | Maintenance-Only | 69.7 | 74.1 | 1.34 |
| 350250008 | Lea, New Mexico | Maintenance-Only | 69.8 | 72.2 | 1.66 |
| 481410037 | El Paso, Texas | Maintenance-Only | 69.8 | 71.4 | 1.69 |
| Source: Final Good Neighbor Plan AQM TSD | | | | | |

---

[100] *Id.*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**Table IV.B.1-2: Arizona Linkage Results Based on the EPA Updated 2026 Modeling**

| Receptor ID | Location | Nonattainment /Maintenance | 2026 Average Design Value (ppb) | 2026 Maximum Design Value (ppb) | Arizona Contribution (ppb) |
|---|---|---|---|---|---|
| 80690011 | Larimer, Colorado | Maintenance-Only | 70.0 | 71.2 | 0.71 |
| 350130021 | Doña Ana, New Mexico | Maintenance-Only | 69.9 | 71.2 | 0.82 |
| 350130022 | Doña Ana, New Mexico | Maintenance-Only | 69.0 | 71.6 | 0.82 |
| 350151005 | Eddy, New Mexico | Maintenance-Only | 69.1 | 73.4 | 1.06 |
| 350250008 | Lea, New Mexico | Maintenance-Only | 69.2 | 71.6 | 1.34 |
| Source: Final Good Neighbor Plan AQM TSD | | | | | |

**Table IV.B.1-3: Arizona 2023 Linkage Results Based on Violating-Monitor Maintenance-Only Receptors**

| Receptor ID | Location | 2021 Design Value (ppb) | 2022 Design Value (ppb) | 2021 4th High (ppb) | 2022 4th High (ppb) | Arizona Contribution (ppb) |
|---|---|---|---|---|---|---|
| 320030043 | Clark, Nevada | 73 | 75 | 74 | 74 | 0.77 |
| 350011012 | Bernalillo, New Mexico | 72 | 73 | 76 | 74 | 1.62 |
| 350130008 | Doña Ana, New Mexico | 76 | 71 | 79 | 78 | 1.13 |
| Source: Final Good Neighbor Plan AQM TSD | | | | | | |

Therefore, based on the EPA's evaluation of the information submitted by Arizona, and based on the EPA's most recent modeling results for 2023 and 2026 using the 2016v3 emissions platform, the EPA proposes to find that Arizona is not linked to any nonattainment receptor. However, the EPA finds that Arizona is linked at Steps 1 and 2 to at least one, and in fact

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

several, maintenance-only receptors, based on the available analytical information, which includes the modeling results from the 2016v3 platform and the violating-monitor receptor analysis.

c. Evaluation of Information Provided Regarding Step 3

To determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I), at Step 3 of the 4-step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations. The EPA recognizes that the modeling results released with the March 2018 memorandum indicated Arizona would not contribute at or above 1 percent of the NAAQS to any downwind receptor. Arizona's 2018 SIP Submission therefore concluded that it was not necessary to identify any emissions reductions or adopt any permanent and enforceable controls to meet the good neighbor provision for the 2015 ozone NAAQS.[101] Arizona's 2018 SIP Submission states that "Arizona believes that this SIP contains adequate provisions to ensure that air emissions in Arizona do not significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other State in the future."[102]

However, as discussed previously in this section, the EPA's more recent air quality analysis for 2023 and 2026 indicates that sources in Arizona are in fact contributing to downwind air quality problems at several maintenance-only receptors. Based on this record, the EPA finds the State's conclusion that its SIP contains adequate provisions prohibiting emissions

---

[101] Arizona's 2018 iSIP Submission, 13-14.
[102] Id at 14.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

interfering with maintenance of the 2015 ozone NAAQS in other states to lack justification, and the EPA proposes to partially disapprove the submission.

d. Conclusion

For the reasons described in this section, the EPA proposes to partially approve Arizona's SIP submission with respect to Prong 1 of CAA section 110(a)(2)(D)(i)(I) and to partially disapprove Arizona's SIP submission with respect to Prong 2 of CAA section 110(a)(2)(D)(i)(I).

2. New Mexico

a. Evaluation of Information Provided by New Mexico Regarding Step 1

As noted earlier, NMED and EHD first relied on the modeling information from the EPA's March 2018 memorandum which used a 2011 base period with 2011 meteorology to identify nonattainment and maintenance receptors and upwind-state contribution levels at those receptors. NMED and EHD acknowledged that this modeling showed a linkage to one nonattainment and one maintenance-only receptor in the Denver area at or above 0.70 ppb. Since the time of the State's submission, the EPA updated the modeling to a 2016 base period with 2016 meteorology and updated emissions data to produce new 2023 model projections and released this new modeling in 2022 (commonly referred to as 2016v2 modeling platform). As explained in section III.C. of this document, in response to comments, the EPA further refined its modeling in the 2016v3 modeling platform, issued in 2023.[103] Under both the EPA's 2011-based modeling included in the March 2018 memorandum that New Mexico relied upon in their SIP submission and the EPA's updated 2016v3 modeling, there are receptors identified, to which

_____

[103] Air Quality Modeling Final Rule Technical Support Document – 2015 Ozone NAAQS Good Neighbor Plan in Docket ID No. EPA-R08-OAR-2023-0375.

Page 84 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

New Mexico is linked above 1 percent of the NAAQS, as described in the next section.[104]

b. Evaluation of Information Provided by New Mexico Regarding Step 2

As in Step 1, NMED and EHD relied upon the modeling released in the EPA's March 2018 memo, and in its July 2023 letter, NMED relied on the EPA's 2016v3 modeling results to analyze projected contributions to downwind receptors. As explained in section IV.A.2. of this document, while NMED and EHD acknowledge the EPA's modeling results identifying a contribution greater than 0.70 ppb, the agencies do not find it appropriate to rely on a particular threshold (*i.e.*, 0.70 ppb) at Step 2 to determine whether a State is linked (or significantly contributing) to a downwind receptor in the West, but instead they rely on a weight of evidence approach. NMED and EHD point to the EPA's past approval of Arizona's 2008 ozone good neighbor SIP submission, in which the EPA approved Arizona's SIP based on an evaluation of receptors in California to support the use of a weight of evidence approach in evaluating interstate transport and claim that the EPA determined a weight of evidence approach to be an appropriate evaluation to apply in the West.[105]

Although NMED and EHD's approach to evaluating whether an upwind State is linked to a downwind receptor differs from the EPA's broadly applied 4-step interstate transport framework by relying instead on a "weight of evidence" approach, here, we evaluate that "weight of evidence" methodology NMED has chosen to apply. While the NMED and EHD submission does not claim to establish a linkage, and instead postulates that it is inappropriate to

---

[104] The 2011 modeling relied on by NMED and EHD in the SIP submission identified linkages to one nonattainment receptor, the Rocky Flats-N receptor, and the one maintenance receptor, the Weld County Tower receptor, in 2023. *See* NMED SIP Submission at 4.
[105] NMED SIP submission at 5.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

apply a uniform standard to determine whether a State's contributions should be further evaluated in Step 3, the submission does rely on a 1 percent threshold to identify which receptors to apply a weight of evidence analysis. Therefore, while the NMED and EHD submission seems to disagree in principle with the use of a single threshold at Step 2, they have effectively moved to apply the same threshold for the same purpose the EPA would do at Step 2 – rely on a 1 percent threshold to identify receptors to which a State is linked and therefore require further evaluation at Step 3 to determine whether any of the State's contributions, if any, are significant.

While the EPA does not disagree with the methodology NMED and EHD used in the submission to identify receptors where the State is linked, the EPA continues to find its 4-step interstate transport framework to be an appropriate and nationally consistent approach to evaluating interstate transport, including the application of a contribution threshold at Step 2 of the framework. As stated in the EPA's final SIP disapproval action, the EPA disagrees with the NMED and EHD submission that neither its nationwide photochemical grid modeling nor the 4-step interstate transport framework for ozone can generally be applied to states in the western region of the U.S., including contributions from sources in New Mexico, and has maintained that position consistently throughout numerous actions.[106]

The NMED and EHD submission cites the EPA's action on Arizona's 2008 ozone good neighbor SIP as evidence that the EPA relied on a weight of evidence approach when evaluating interstate transport in the West. In that action, the EPA considered the collective contribution from upwind states to monitoring sites in California as part of the basis for approval of the State's submission,

---

[106] For a discussion of this history, *see* for example 87 FR 31480-81 (proposed disapproval of Utah SIP submission) and 87 FR 31453-56 (proposed disapproval of California SIP submission).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

despite linkages over 1 percent from Arizona to a select few California monitoring sites. The EPA disagrees that New Mexico's contribution to Colorado is comparable to the situation addressed in the Arizona 2008 ozone good neighbor action. The facts that supported the EPA's conclusion on Arizona's 2008 ozone good neighbor SIP were unique; in the Disapproval action and Federal Good Neighbor Plan, the EPA has already explained that it rejects that a comparable consideration is relevant for receptors in Colorado, which the EPA has consistently found are impacted by the collective contribution of numerous upwind states at levels that well exceed the circumstances of the California sites. *See* 88 FR at 9378-79 (western State policy generally); *id.* at 9360 (rejecting similar arguments in disapproving SIP submission from Utah); *see also* Response To Comments Document, EPA-HQ-OAR-2021-0663, at 236-237. At times the EPA has found it appropriate to examine more closely discreet issues for some western states;[107] however, the EPA has consistently applied the 4-step interstate transport framework in western states, as it proposes to do in this action, and has previously identified ozone transport problems in the West, including in Colorado, that are similar to those in the east.[108]

New Mexico claims that the Weld County Tower and Rocky Flats-N receptors are impacted by the same magnitude of contributions from interstate transport as the California receptors were in the approval of the Arizona transport SIP submission. This, however, is not represented in the data presented in NMED and EHD's submittals. Total upwind contributions

---

[107] *See, e.g.,* 87 FR 61249, 61254-55 (October 11, 2022) (in approving Colorado's interstate transport SIP for the 2015 ozone NAAQS, analyzing unique issues associated with wintertime inversion conditions in certain western areas).

[108] *See, e.g.,* 87 FR 31443, 31453-57 (May 24, 2022); 83 FR 65093, 65094 (December 19, 2018); 82 FR 9155, 9157 (February 3, 2017); 82 FR 9142, 9149-50 (February 3, 2017); 81 FR 74504, 74523 (October 26, 2016); 81 FR 71991, 71993-95 (October 19, 2016).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

were 10 percent and 8 percent of the projected 2023 design values at the Rocky Flats-N and

Weld County Tower receptors, respectively, and five states were determined to be linked at or

above 1 percent of the NAAQS. The results show that the upwind contributions to Colorado are

significantly greater than the upwind contributions to the monitors evaluated in California when

taking action on Arizona's 2008 ozone NAAQS SIP submission, where the total contribution

from all upwind states was 2.5 percent and 4.4 percent of the total ozone concentration at the two

monitoring sites in California to which Arizona contributed greater than 1 percent.

The determination made to remove the identified California receptors from the Step 1

analysis, done in the context of the less protective 2008 ozone NAAQS, was a narrow

circumstance that does not apply in the vast majority of receptors outside of California. The data

presented by New Mexico suggests the circumstances that led the EPA to remove California

receptors from Step 1 do not apply to receptors in Colorado. In previous rulemakings, for

example, the EPA has, in fact, determined that receptors in Colorado are heavily impacted by

upwind-state contribution. *See, e.g.,* 82 FR 9155 (Feb. 3, 2017); 81 FR 71991 (October 19,

2016). The EPA affirms, contrary to NMED's assertion, that the Colorado receptors that NMED

analyzed are impacted by upwind State contributions.[109] In fact, nowhere outside California do

we project that there will be receptors having such a low total upwind contribution as is the case

for California.[110] Further, at the El Paso UTEP receptor (Monitor ID: 481410037) which, as

shown in Table IV.B.2-1, is the receptor to which emissions from sources in New Mexico are

---

[109] Air Quality Modeling Final Rule Technical Support Document – 2015 Ozone NAAQS Good Neighbor Plan in Docket ID No. EPA-HQ-OAR-2021-0668.

[110] *See* 88 FR at 36718 regarding contribution to certain monitoring sites in California and its relation to the EPA's approval of Arizona's 2008 ozone NAAQS transport SIP submittal.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

linked, there are 2 states linked above 1 percent of the standard and 6 percent of the ozone design values is due to the collective contribution from upwind states.

c. Results of EPA's Step 1 and Step 2 Modeling and Findings for New Mexico

As described in section I. of this document, the EPA has performed updated air quality modeling using the 2016v3 emissions platform to project design values and contributions for 2023. These data were examined to determine if the newer modeling also indicated that New Mexico contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in IV.B.2-1, the data[111] indicates that in 2023, emissions from New Mexico contribute greater than 1 percent of the standard to a maintenance-only receptor in El Paso, Texas.[112] New Mexico is not linked to any violating-monitor receptors in 2023. Based on the 2016v3 modeling, the average and maximum design values for the El Paso monitor in 2026 are below the level of the 2015 ozone NAAQS. In this regard, New Mexico is not projected to be linked to any receptors in 2026.

---

[111] Design values and contributions at individual monitoring sites nationwide are provide in the file:" 2016v3_Final FIP_DVs_state_contributions.xlsx" which is included in docket ID No. EPA-HQ-OAR-2021-0668.

[112] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in section I. of this document. That modeling showed that New Mexico had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR Update.xlsx" in docket ID No. EPA-HQ-OAR-2021-0663.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**Table IV.B.2-1: New Mexico Linkage Results Based on the EPA's Updated 2016v3 2023 Modeling**

| Receptor ID | Location | Nonattainment/ Maintenance | 2023 Average Design Value (ppb) | 2023 Maximum Design Value (ppb) | New Mexico Contribution (ppb) |
|---|---|---|---|---|---|
| 481410037 | El Paso, TX | Maintenance | 69.8 | 71.4 | 1.59 |

Therefore, based on the EPA's evaluation of the information submitted by NMED and EHD, and based on the EPA's most recent modeling results for 2023 and 2026 using the 2016v3 emissions platform, the EPA proposes to find that New Mexico is not linked to a nonattainment receptor. However, the EPA finds that New Mexico is linked at Steps 1 and 2 to a maintenance-only receptor in 2023. Therefore, the EPA will proceed to evaluate NMED and EHD's SIP submission at Step 3 of the 4-step interstate transport framework as it pertains to Prong 2, interference with maintenance of the 2015 ozone NAAQS.

d. Evaluation of Information Provided Regarding Step 3

To determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I), at Step 3 of the 4-step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations. NMED and EHD's initial SIP submission did not conduct an analysis of emissions control opportunities within the state, applying either the EPA's multifactor analysis at Step 3 or using any other framework of analysis. Instead, the submission presents a three-part "weight of evidence" analysis to determine no reductions are needed beyond existing emissions reductions efforts to satisfy the State's obligations with regards to the good neighbor provision.

Page 90 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

NMED's July 2023 letter uses mass-based emissions reductions identified on an ozone-season wide basis derived from the Step 3 (and Step 4 analysis for EGUs) completed by the EPA in the Federal Good Neighbor Plan to identify the magnitude of emissions that NMED assumes constitutes the identification of "significant contribution" that must be eliminated to address the State's good neighbor obligations. NMED's letter asserts that certain compliance orders entered in recent years would achieve an equivalent or greater amount of $NO_X$ emissions reduction (on a mass-basis) than the Federal Good Neighbor Plan is projected to require from EGUs in New Mexico.

In this section, we evaluate the State's weight of evidence analysis submitted in the SIP submission, and then in the following section (Section IV.B.2.e of this document) address the argument put forward by NMED in the July 2023 letter.

As summarized in section IV.A.2. of this document, NMED and EHD's weight of evidence consisted of three parts, 1) a comparison of in-state emissions contributions and out-of-state contributions to the receptors with linkages from New Mexico, 2) consideration of topography and airflow associated with local ozone formation in the Denver area, and 3) an evaluation of trends in emissions and ozone concentrations at receptors with linkages and western states.

Regarding the first weight of evidence comparing in-state and out of State emissions, the EPA disagrees that these factors are sufficient to establish that New Mexico's emissions do not significantly contribute to receptors in any other state. While NMED and EHD point to a relatively higher level of contributions from non-anthropogenic, local, or international contributions in the West as reason for evaluating interstate transport differently in the West, a

Page 91 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

State is not excused from eliminating its significant contribution due to contributions from these sources, where the data show that anthropogenic emissions from upwind states also contribute to identified receptors at levels that indicate an interstate contribution problem as well. As stated in section V.C.2. of the EPA's final SIP Disapproval action, a State is not excused from eliminating its significant contribution on the basis that international emissions also contribute some amount of pollution to the same receptors to which the State is linked. This same principle applies broadly to other arguments as to which emissions are the "cause" of the problem; the good neighbor provision established a contribution standard, not a "but-for" causation standard. *See Wisconsin,* 938 F.3d at 323-25. The EPA's position on this issue is established in the SIP Disapproval action. *See* 88 FR at 9378 (rejecting this argument as to international contribution); Disapproval action RTC at 455-58 (rejecting this argument as to in-state contribution); *id.* at 459-62 (rejecting this argument as to non-anthropogenic contribution). Nor did New Mexico offer a test or standard by which these considerations could be applied on a principled basis to establish when, if they were relevant considerations, they would justify a different approach for any particular state. New Mexico only argued that these considerations should excuse its own obligations.

The submission's second weight of evidence factor considers the Denver area's topography and air flow direction. The EPA has evaluated the information in the submission and proposes to determine that this evidence does not provide sufficient reason to support NMED and EHD submission's conclusion that the contributions from New Mexico to the receptors identified by the EPA's modeling is not significant. The NMED and EHD submission claims that the EPA had concluded that geographical features (mountains, etc.) in and around the Denver

Page 92 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

NAA "magnify and constrain the influence of local emissions on air quality" and ozone production by citing the EPA's description of the region in the EPA's designation of the Denver NAA for the 2015 ozone standard.

The EPA evaluated this argument thoroughly in the SIP Disapproval action. The EPA explained, despite the local geographical features in and around the Denver NAA substantial portion of the transport problem at these receptors, on the order of 6-10 percent (depending on individual receptor and modeling version used) is the result of transport from states outside of Colorado. The EPA evaluated the performance of its 2016v3 modeling in all areas of the country, including in Colorado and in the southwest (where New Mexico is linked to an El Paso receptor), and the Agency found the modeling performed within parameters and is reliable for use to inform determinations of contribution, even in areas of unique western topography. *See* RTC 171-184. These same findings hold true for New Mexico's linkage, whether assessed in relation to its contribution to Colorado receptors in the 2011-based modeling, or in the linkage to El Paso found in 2016v3 modeling.

The third weight of evidence provided in the SIP consists of monitoring data and emissions data to justify their conclusion that no additional emissions reductions would be necessary to satisfy New Mexico's ozone transport obligations.

The NMED and EHD submission points to a projected downward trend of ozone levels at monitors within the Colorado nonattainment area from 2008 to 2018, and VOC and $NO_X$ emissions reductions from 2002 to 2014 in states contributing above 1 percent of the NAAQS to the Weld County or Rocky Flats-N receptors. The submission did not quantify the total anticipated reductions in $NO_X$ and VOC emissions from New Mexico's existing regulatory

Page 93 of 289

requirements nor did it evaluate the impact of those reductions in downwind air quality at the Denver area receptors to which New Mexico was projected to be linked in the 2011-based modeling. In general, the air quality modeling that the EPA has conducted already accounts for "on-the-books" emissions control measures, including the expected reductions those measures achieve through 2023. The 2016v3 modeling, which contains updated emissions inventories for New Mexico and other states, established a continued linkage from New Mexico to at least one downwind receptor in 2023 at Steps 1 and 2, despite emissions control efforts in the State[113] Applying the submission's same logic in this weight of evidence to the linkage identified in the EPA's 2016v3 modeling, the El Paso County, Texas, receptor, the EPA identifies a similar flaw. Because a linkage continues to occur under projected baseline emissions levels, the next analytical step would be to conduct an analysis of emissions control opportunities in the State to determine what, if any, emissions may constitute "significant contribution" and therefore should be prohibited. The EPA explained in the SIP Disapproval action that an alternative approach of simply relying on emissions trends data, without including those claimed reductions as enforceable control measures within a SIP, is insufficient. 88 FR at 9354, 9356, 9378-79; Response To Comments at 329-33. Similarly, emissions trends do not themselves provide a

---

[113] As the EPA explained in the final SIP Disapproval action, the EPA views changes in linkages between 2011-based meteorology and 2016-based meteorology not as an indication of uncertainty in whether a State is linked at Step 2 but rather as confirmation that the State's emissions are substantial enough to generate linkages under alternative meteorological data sets. As such, the changes in linkage observed between the 2011-based and 2016v3 modeling for New Mexico does not alter the EPA's findings or justify a less rigorous analysis at Step 3 – just as the EPA found for many other states in connection with the Disapproval action. *See* 88 FR at 9367.
Page 94 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

principled basis for determining what "amount" of emissions constitutes "significant contribution." *See* 88 FR at 9375-76.

Based on this evaluation of the weight of evidence analysis provided in NMED and EHD's SIP submission, the EPA finds that the analysis is insufficient to support the conclusion that the State does not interfere with maintenance at receptors in other states. The EPA's updated air quality analysis indicates New Mexico is not linked to any nonattainment receptors but is linked to a maintenance-only receptor in El Paso, Texas. Thus, the EPA proposes partial disapproval of New Mexico's submission with respect to Prong 2.

e. NMED's July 2023 Letter

The EPA has considered the additional information New Mexico provided in its July 2023 letter. At the outset, we note that this letter did not undergo the requisite public rulemaking process at the State level, so the EPA does not consider it to be either a SIP submission itself or a supplement to New Mexico's existing submission. *See* CAA section 110(a)(1), (2) (requiring public notice and hearing requirements before SIP revisions may be submitted to EPA); *id* CAA section 110(i) (prohibiting modifications of SIP requirements except as conducted pursuant to mandated SIP revision procedures); *id.* CAA section 110(l) (mandating analysis of all SIP revisions to ensure such revisions do not interfere with any applicable requirements under the Act). *See also* 40 CFR part 51, subpart F (setting forth minimum procedural requirements for the preparation, adoption, and submittal of implementation plans, including requirements of public notice and hearing); *id.* Appendix V, section 2 (setting forth administrative completeness criteria for State plan submissions including evidence of compliance with procedural requirements). However, the letter was provided to the EPA prior to this proposed document and the EPA has

Page 95 of 289

had time to consider its contents; the EPA in its discretion will provide its views on the relevance of the information contained in the letter.

In the letter, NMED explains that it believes the emissions reductions required under certain compliance orders in New Mexico applicable to several identified facilities will achieve greater emissions reductions than what would be achieved for New Mexico's EGU sources if those sources were subject to the Federal Good Neighbor Plan. NMED asserts that the EPA identified in the Federal Good Neighbor Plan that the control requirements for EGUs would achieve roughly 30 tons of ozone season $NO_X$ emissions reductions on an annual basis through the strategies of SCR and SNCR optimization and upgrade of combustion control requirements at qualifying EGUs. In the letter, NMED identified 236 tons of already established annual NOx emissions reductions due to two compliance orders lodged in 2021 that it claims had not been reflected in the EPA's 2016v3 emissions platform, and an additional 77 tons of emissions reductions across 3 years from a consent decree with Matador Production Company.[114] According to NMED, because these reductions are greater than the reductions that would be achieved under the Federal Good Neighbor Plan, there is no need to issue a FIP for New Mexico, since these other measures have already eliminated a greater mass-based quantity of emissions than the EPA found needed to eliminate significant contribution.

The Agency acknowledges and applauds the efforts to enforce air pollution control requirements and the reductions in ozone-precursor emissions that are claimed to be achieved under these orders. However, the information in this letter does not lead the EPA to a different

---

[114] NMED's July 5, 2023 letter, at 1.

Page 96 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

conclusion with respect to the approvability of New Mexico's interstate transport SIP submission. In addition to the fact that the letter is not a formal SIP submission, the EPA does not believe the information contained in the letter (even if it were a SIP submission) is sufficient to allow the EPA to conclude that New Mexico would satisfy its obligations to eliminate significant contribution either at Step 2 or Step 3. The EPA welcomes the opportunity to further discuss with New Mexico the content of a future SIP revision that would satisfy these obligations.

Regarding the existence of a linkage at Step 2, although the letter asserts these reductions are additional to those reflected in the emissions inventories used in the 2016v3 modeling, this conclusion is not clearly supported. The emissions inventories used in the modeling reflected a specific methodology for calculating and projecting ozone-precursor emissions from the oil and gas sector in New Mexico and particularly in the Permian Basin. *See* Disapproval Action RTC at 117. The reductions that may be achieved at the particular facilities under compliance orders New Mexico cites do not necessarily establish that those emissions projections, including growth factors, used in the EPA's modeling for the oil and gas sector are unreliable. (In this regard, the EPA does not view the information in the letter as undercutting its determinations at Steps 1 and 2.)

Briefly, some additional concerns that the EPA has identified with the approach suggested in New Mexico's letter include: 1) all new NOx emissions reduction measures would

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

need to be adopted into the SIP;[115] 2) any assessment of emissions reductions would likely need to be in terms of the ozone season of May 1 through September 30 rather than annual reductions and would need to be established consistent with a relevant baseline date and compliance date;[116] and 3) the approach would need to account for the impact of not placing additional NOx limitations on EGU sources in determining the amount of NOx emissions that New Mexico's SIP needs to reduce.

The Agency recognizes that states may replace a FIP with a SIP and the emissions controls in that SIP may differ from those the EPA selected in its FIP. *See* section VI.C. of this document. However, the mere existence of the compliance orders identified by NMED does not substitute for a Step 3 analysis and is insufficient in itself to support a conclusion that New Mexico has resolved its good neighbor obligations for the 2015 ozone NAAQS. Though there is not a single, prescribed method for how a State may conduct a Step 3 analysis, the EPA has consistently applied Step 3 of the good neighbor framework for ozone through a far more comprehensive evaluation of potential additional control technologies or measures, on industry-wide bases, than what New Mexico provided in its submission. Identifying various emissions control measures at specific units that have been enacted at the State level, is not analytically sufficient. And as explained above, the EPA has identified several additional concerns. First, as a *replacement* for the emissions control strategy that the Federal Good Neighbor Plan would

---

[115] The EPA made this requirement clear in its SIP Disapproval action. *See* 88 FR at 9343, 9376. In its letter, NMED has not indicated its intent to incorporate these orders and the commensurate NOx emissions reductions into their SIP.

[116] As such, the information in NMED's letter is inadequate to establish that these orders achieve an equivalent amount of emissions reduction to eliminate significant contribution as the Federal Good Neighbor Plan would in New Mexico.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

implement at Step 4 in New Mexico, the letter is insufficient to demonstrate equivalence. Second, as noted above, these measures have not been included as a revision to New Mexico's SIP and submitted for EPA's approval.

f. Conclusion

The EPA is proposing to find that the portion of NMED's July 27, 2021 and EHD's June 9, 2021, SIP submission addressing Prong 2 of CAA section 110(a)(2)(D)(i)(I), interference with maintenance of the 2015 ozone NAAQS, does not meet the State's interstate transport obligations, because it fails to contain the necessary provisions to prohibit emissions that will interfere with maintenance of the 2015 ozone NAAQS in any other state. Additionally, the EPA proposes to partially approve these submissions with respect to Prong 1 of the good neighbor provision regarding "significant contribution to nonattainment." The EPA in its discretion has considered the information in NMED's July 2023 letter but for the reasons explained in section IV.B.2.d. of this document, finds this information would not alter its conclusions as to New Mexico.

3. Tennessee

a. Evaluation of Information Provided by Tennessee Regarding Step 1

At Step 1 of the 4-step interstate transport framework, Tennessee relied on the EPA's 2011-based modeling included in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. As described previously in section III.C. of this document, the EPA has updated this modeling (2016v3) using the most current and technically appropriate information and has used that information, along with its violating-monitor receptor identification methodology, to determine the final good neighbor obligations for 23 other states.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

To ensure parity among states, the EPA proposes to rely on this air quality analysis to identify

nonattainment and maintenance receptors in the 2023 analytic year.

b. Evaluation of Information Provided by Tennessee Regarding Step 2

At Step 2 of the 4-step interstate transport framework, Tennessee relied on the 2011-based

modeling released in the March 2018 memorandum to identify upwind State linkages to

nonattainment and maintenance receptors in 2023. As described in section III.C. of this document, the

EPA has updated its air quality analytics (2016v3 modeling coupled with monitoring data to inform

identification of violating-monitor receptors) to identify upwind State contributions to nonattainment

and maintenance receptors in 2023. In this proposal, to ensure parity among states, the EPA relies on

this set of analytics to identify upwind contributions ("linkages") to downwind air quality problems in

the 2023 analytic year using a threshold of 1 percent of the NAAQS. *See* section III.D.3. of this

document for explanation of the use of 1 percent of the NAAQS. This set of analytical data

establishes that Tennessee is linked to violating-monitor receptors in 2023 in Dallas County, TX. as

shown in Table IV.B.3-1, Tennessee's maximum contribution to a violating-monitor receptor is 0.86

ppb which is greater than 1 percent of the ozone standard (*i.e.*, 0.70 ppb). Therefore, Tennessee is

linked to a downwind air quality problem at Steps 1 and 2. Because the entire technical basis for

Tennessee's submission is that the State is not linked at Step 2, but the state-of-the-science analytics

used to address all other states' obligations establishes that this is not correct, the EPA proposes to

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

partially disapprove Tennessee's SIP submission based on the EPA's finding that Tennessee contributes above the threshold to at least one maintenance-only receptor in another state.[117]

The EPA's air quality analytics indicate that Tennessee is not linked to any model-projected nonattainment receptors above 1 percent of the NAAQS. As a result, no further evaluation of the State's emissions (*i.e.*, multifactor analysis, including air quality and cost considerations emissions analysis) are required with respect to Prong 1 of section 110(a)(2)(D)(i)(I) of the CAA. This comports with the State's conclusions with regards to Prong 1, and therefore, the EPA proposes to partially approve Tennessee's SIP submission regarding Prong 1 of the good neighbor provision regarding "significant contribution to nonattainment."[118]

Tennessee references a 1 ppb threshold in its submission, citing the EPA's Significant Impact Level (SIL) Guidance as justification for the use of a 1 ppb threshold. The EPA explained in the final SIP Disapproval action that the SIL Guidance cannot be relied upon to justify an alternative threshold at Step 2 of the interstate transport framework for ozone. *See* 88 FR at 9372. The Agency is adopting that same position in relation to Tennessee's attempted reliance.

c. Results of EPA's Step 1 and Step 2 Modeling and Findings for Tennessee

As described in section III.B. of this document, the EPA performed updated air quality modeling (2016v3) to project design values and contributions for 2023. These data were examined to determine if Tennessee contributes at or above the threshold of 1 percent of the

---

[117] To the extent the Tennessee submittal included information regarding emissions controls that could be interpreted as relevant to a Step 3 analysis, the EPA evaluates that information in Section IV.C.3.d of this document.

[118] Tennessee's largest impact on any modeled-projected downwind nonattainment and maintenance-only receptor are 0.60 ppb and 0.68 ppb, respectively. These values are less than 0.70 ppb (one percent of the 2015 ozone NAAQS).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

2015 8-hour ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance-only receptor. Based on the EPA's modeling results, Tennessee is not linked to a model-identified nonattainment or maintenance receptor in 2023 or 2026. However, as shown in Table IV.B.3-1, the data[119] indicates that in 2023, emissions from Tennessee contribute greater than 1 percent of the standard to five violating-monitor maintenance-only receptors in the Dallas-Fort Worth-Arlington, Texas Core Based Statistical Area. [120,121]

| Table IV.B.3-1: Tennessee Linkage Results Based on Violating-Monitor Maintenance-Only Receptors | | | | | | |
|---|---|---|---|---|---|---|
| Receptor ID | Location | 2021 Design Value (ppb) | 2022 Design Value (ppb) | 2021 4th High (ppb) | 2022 4th High (ppb) | Contribution (ppb) |
| 481130075 | Dallas County, TX | 71 | 71 | 73 | 72 | 0.86 |
| 481211032 | Denton County, TX | 76 | 77 | 85 | 77 | 0.77 |
| 484392003 | Tarrant County, TX | 72 | 72 | 74 | 72 | 0.74 |
| 480850005 | Collin County, TX | 75 | 74 | 81 | 73 | 0.74 |
| 484390075 | Tarrant County, TX | 75 | 76 | 76 | 77 | 0.70 |

[119] Final Good Neighbor Plan AQM TSD, Appendix C, available in Docket ID No EPA-HQ-OAR-2021-0668.

[120] The EPA developed the violating-monitor approach in response to comments on the 2016v2 modeling received on the proposed Disapproval action and FIP. In this regard, EPA did not identify violating-monitors in the contribution data associated with the 2016v1 and 2016v3 modeling.

[121] As noted in section III.D.2. of this document, a violating-monitor receptor is not projected to have a maximum projected design value of 71 ppb or greater in 2023 based on the EPA's 2016v3 modeling results. Therefore, the receptors identified in Table IV.B.3-1 have both average and maximum projected design values below 70 ppb.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Therefore, based on the EPA's evaluation of the information in Tennessee's SIP

submission considering the modeling results for 2023 and 2026 using the 2016v3 emissions

platform and monitoring data used to inform the identification of violating-monitor receptors, the

EPA proposes to find that Tennesse is not linked to a nonattainment receptor. However, the EPA

finds that Tennessee is linked at Steps 1 and 2 to at least one maintenance-only receptor in

another state.

d. Evaluation of Information Provided for Tennessee Regarding Step 3

To determine what, if any, emissions significantly contribute to nonattainment or

interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I),

at Step 3 of the 4-step interstate transport framework, a state's emissions are further evaluated, in

light of multiple factors, including air quality and cost considerations. Tennessee did not conduct

a Step 3 analysis in its SIP submission because at the time, the EPA's modeling indicated the

State was not linked above 1 percent of the NAAQS to a projected downwind nonattainment or

maintenance receptor. However, based on the EPA's updated air quality analytics, which the

EPA has used to make final determinations for all other states, the State is currently linked to at

least one downwind violating-monitor maintenance-only receptor. To ensure consistency and

equity across all states in addressing good neighbor obligations for the 2015 ozone NAAQS, the

EPA is evaluating the SIP submission in the context of this same set of air quality analytics.

Tennessee's SIP submission does not analyze total ozone precursors that continue to be emitted

from sources and other emissions activity within the State, evaluate the emissions reduction

potential of any additional controls using cost or other metrics, nor evaluate any resulting

downwind air quality improvements that could result from such controls. Instead, Tennessee's

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

submission includes a list of existing emissions control programs and measures in the State. However, the EPA's modeling already takes account of such measures. Despite these existing emissions controls, the State is linked above 1 percent of the NAAQS to at least one downwind violating-monitor maintenance-only receptor.

Based on this record, the EPA finds the State's conclusion that its SIP contains adequate provisions prohibiting emissions interfering with maintenance of the 2015 ozone NAAQS in other states to lack justification. Thus, the EPA proposes to partially disapprove Tennessee's SIP submission with respect to Prong 2 of CAA section 110(a)(2)(D)(i)(I), interference with maintenance of the 2015 ozone NAAQS.

e. Conclusion

The EPA proposes to partially disapprove the State's SIP submission with respect to Prong 2 regarding "interference with maintenance" of the good neighbor provision. Additionally, the EPA proposes to partially approve Tennessee's SIP submission with respect to Prong 1 of the good neighbor provision regarding "significant contribution to nonattainment."

*C. Proposed SIP Action*

The EPA is proposing to partially disapprove the portions of SIP submissions from Arizona, New Mexico, and Tennessee pertaining to interstate transport of air pollution that will interfere with maintenance of the 2015 8-hour ozone NAAQS in other states. Under CAA section 110(c)(1), disapproval would establish a 2-year deadline for the EPA to promulgate a FIP for Arizona, New Mexico, and Tennessee to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements pertaining to interference with maintenance of the 2015 8-hour ozone NAAQS in other states, which the EPA proposes to do in this action, unless the EPA

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

approves a SIP submission that meets these requirements. Disapproval of a good neighbor submission does not start a mandatory sanctions clock. Additionally, the EPA is proposing to partially approve the portions of SIP submissions from Arizona, New Mexico, and Tennessee pertaining to interstate transport of air pollution that will significantly contribute to nonattainment of the 2015 8-hour ozone NAAQS in other states.

As discussed in greater detail in sections VI. and VII. of this document, the EPA is proposing to determine based on application of the EPA's 4-step interstate transport framework, that there are emissions reductions that are required for Arizona, New Mexico, and Tennessee to satisfy their good neighbor obligations for the 2015 ozone NAAQS. The analysis on which the EPA proposes this conclusion for these three states is the same, nationally consistent analytical framework on which the Agency proposes FIP action for Kansas and Iowa in this proposed action (*see* section V.A. of this document), as well as for the 23 states included in its March 15, 2023, Federal Good Neighbor Plan.

**V. Other Clean Air Act Authorities for this Action**

*A. Correction of the EPA's Determination Regarding SIP Submissions from Iowa and Kansas and its Impact on the EPA's FIP Authority for Iowa and Kansas*

In 2022, the EPA approved infrastructure SIP submissions from Iowa and Kansas for the 2015 ozone NAAQS, which in part addressed the good neighbor provision at CAA section 110(a)(2)(D)(i)(I).[122] The EPA concluded that, based on the 2016v2 modeling, which was the latest modeling results available at the time the EPA took action, the largest impact on any

---

[122] 87 FR 22463 (April 15, 2022) (Iowa); 87 FR 19390 (April 4, 2022) (Kansas)

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

potential downwind nonattainment or maintenance receptor from each of these states was less than 1 percent of the NAAQS.[123] As a result, the EPA found that neither Iowa nor Kansas would significantly contribute to nonattainment or interfere with maintenance in any other state.[124] Therefore, the EPA approved the portion of each State's infrastructure SIP submission that addressed CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.

Subsequent to the release of the 2016v2-based modeling and EPA's approval of Iowa's and Kansas' 2015 ozone NAAQS good neighbor SIP submission, the EPA performed updated modeling in response to comments received on other good neighbor proposals in 2022, as described in section III.C. of this document. Additionally, as described in section III.D.2. of this document, the EPA updated its definition of a maintenance receptor in recognition of comments and other information highlighting measured ozone levels continuing to exceed the 2015 ozone NAAQS at many monitoring sites throughout the country. The approach adopted in the Federal Good Neighbor Plan now takes into greater consideration monitoring data to determine whether a violating monitoring site will struggle to maintain the NAAQS in the 2023 analytic year. The EPA used this new, unified set of air quality analytics to inform its determinations of the obligations of all other states. Iowa and Kansas have SIP approvals in place that are inconsistent

---

[123] *See* "Air Quality Modeling Technical Support Document 2015 Ozone NAAQS Transport SIP Proposed Actions", available in Docket ID No. EPA-HQ-OAR-2021-0663

[124] *Id*. at 17. Based on the 2023 modeling from the Proposed AQM TSD, Iowa was expected in 2023 to have a 0.64 ppb impact on a potential nonattainment receptor in Kenosha County, Wisconsin (Site ID 550590019) and a 0.58 ppb impact at a potential maintenance receptor in Cook County, Illinois (Site ID 170310032). Kansas was expected in 2023 to have a 0.49 ppb impact on a potential nonattainment receptor in Kenosha County, Wisconsin (Site ID 550590019) and a 0.060 ppb impact at a potential maintenance receptor in Cook County, Illinois (Site ID 170310001).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

with that common set of information used for other states, including those states that are linked to the same receptors to which Iowa and Kansas are now shown to be linked in 2023. As such, the approvals were in error under CAA section 110(k)(6).

Based on this updated air quality modeling and considering contributions to violating-monitor receptors, both Iowa and Kansas are now projected to contribute more than 1 percent of the NAAQS to downwind receptors. Specifically, as shown in Table V.A-1, Iowa is projected to contribute 0.90 ppb to a maintenance-only receptor in Cook County, Illinois (Site ID 170310001) and 0.70 ppb to a maintenance-only receptor in Kenosha, Wisconsin (Site ID 550590019) in the 2023 analytic year. As shown in Table V.A-2, Iowa is also linked to three violating-monitor receptors at locations in Illinois, Michigan, and Wisconsin, in the 2023 analytic year.

**Table V.A-1: Iowa Linkage Results Based on the EPA Updated 2023 Modeling**

| Receptor ID | Location | Nonattainment /Maintenance | 2023 Average Design Value (ppb) | 2023 Maximum Design Value (ppb) | Iowa Contribution (ppb) |
|---|---|---|---|---|---|
| 170310001 | Cook, Illinois | Maintenance-Only | 68.2 | 71.9 | 0.90 |
| 550590019 | Kenosha, Wisconsin | Maintenance-Only | 70.8 | 71.7 | 0.70 |
| Source: Final Good Neighbor Plan AQM TSD | | | | | |

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**Table V.A-2: Iowa 2023 Linkage Results Based on Violating-Monitor Maintenance-Only Receptors**

| Receptor ID | Location | 2021 Design Value (ppb) | 2022 Design Value (ppb) | 2021 4th High (ppb) | 2022 4th High (ppb) | Iowa Contribution (ppb) |
|---|---|---|---|---|---|---|
| 260050003 | Allegan, Michigan | 75 | 75 | 78 | 73 | 0.77 |
| 170310032 | Cook, Illinois | 75 | 75 | 77 | 72 | 1.62 |
| 550590025 | Kenosha, Wisconsin | 72 | 73 | 72 | 71 | 1.13 |
| Source: Final Good Neighbor Plan AQM TSD | | | | | | |

Table V.A-3 shows that Kansas is projected to contribute 0.82 ppb to the violating-monitor receptor in Allegan, MI (Site ID 260050003) in the 2023 analytic year.

**Table V.A-3: Kansas 2023 Linkage Results Based on Violating-Monitor Maintenance-Only Receptors**

| Receptor ID | Location | 2021 Design Value (ppb) | 2022 Design Value (ppb) | 2021 4th High (ppb) | 2022 4th High (ppb) | Kansas Contribution (ppb) |
|---|---|---|---|---|---|---|
| 260050003 | Allegan, Michigan | 75 | 75 | 78 | 73 | 0.82 |
| Source: Final Good Neighbor Plan AQM TSD | | | | | | |

Iowa and Kansas are not projected to be linked above 1 percent of the NAAQS to receptors in the 2026 analytic year. The reasons for the changes in linkages in the 2016v3 modeling for Iowa are driven by a combination of factors. The EPA explained in the Federal Good Neighbor Plan that the 2016v3 modeling contains several changes to improve its performance from the 2016v2 modeling, particularly in recognition of an apparent under-

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

prediction problem particularly in the Upper Midwest. 88 FR at 36697; *see also* 88 FR at 9344-45. The EPA made changes to better incorporate the effects of biogenic emissions sources, lightning, and international/boundary conditions on ozone levels, and observed an improvement from a 19 percent underprediction to a 6.9 percent under prediction in the Upper Midwest. *Id.* The EPA also updated its anthropogenic-source emissions inventory data for all states, including Iowa and Kansas. *Id.* At 36698. The change in linkages for Kansas is attributable to the development of the violating-monitor receptor methodology for identifying additional maintenance-only receptors, coupled with updated calculations of contribution levels derived from the updated 2016v3 modeling.

The same air quality monitoring data and modeling used to analyze the analytic years 2023 and 2026 has been used in taking final action to define the obligations of 23 states already covered in the Federal Good Neighbor Plan. As explained in section I.A. of this document, the Agency finds it both reasonable—and necessary to ensuring consistency and equity across all states—to use this same analytical information to address the obligations of all states. These data are state-of-the-science regarding air quality conditions and contribution levels in 2023 and 2026, reflecting improvements in the EPA's understanding from the 2016v2 modeling and incorporating the input of many outside parties through their public comments during the rulemaking process. Using these data, methodological choices, and analytical findings, the EPA has determined that Kansas and Iowa each contribute to at least one maintenance receptor greater than 1 percent of the 2015 ozone NAAQS. Therefore, the EPA is proposing to find that its approval of each State's 2015 ozone NAAQS infrastructure SIP submission, with regard only to

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

the portion addressing Prong 2 of the good neighbor provision at CAA section 110(a)(2)(D)(i)(I), was in error.

Section 110(k)(6) of the CAA gives the Administrator authority, without any further submission from a state, to revise certain prior actions, including actions to approve SIP submissions, upon determining that those actions were in error.[125] The EPA's state-of-the-science analysis used in the Federal Good Neighbor Plan demonstrates that the EPA's prior conclusions that Iowa and Kansas will not interfere with maintenance in any other State in the 2023 analytic year was incorrect, which means that the EPA's approvals of Iowa's and Kansas' good neighbor SIP submissions were in error.

The Agency's use of error-correction authority in this instance is well-rooted in the statute and case law and is consistent with the EPA's longstanding practice and policy of addressing states' good neighbor obligations using state-of-the-science air quality analysis in a consistent manner across all states.

Section 110(k)(6) of the CAA provides the EPA with the authority to make corrections to actions on CAA implementation plans that are subsequently found to be in error. *Ass'n of Irritated Residents v. EPA*, 790 F.3d 934, 948 (9th Cir. 2015) (110(k)(6) is a "broad provision" enacted to provide the EPA with an avenue to correct errors). The key provisions of CAA section 110(k)(6) are that the Administrator has the authority to "determine" that the approval or

---

[125] *See, e.g.,* 86 FR 23054, 23068 (error correcting prior approval of Kentucky's transport SIP submission for the 2008 ozone NAAQS to a disapproval and simultaneously promulgating FIP on the basis of the *Wisconsin* and *New York* decisions remanding CSAPR Update and vacating CSAPR Close-Out and new information establishing Kentucky was linked to downwind receptors).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

promulgation of a plan was "in error," and when the Administrator so determines, he may then revise the action "as appropriate," in the same manner as the prior action.[126] Moreover, CAA section 110(k)(6) "confers discretion on the EPA to decide if and when it will invoke the statute to revise a prior action." 790 F.3d at 948 (CAA section 110(k)(6) grants the "EPA the discretion to decide when to act pursuant to that provision"). While CAA section 110(k)(6) provides the EPA with the authority to correct its own "error," nowhere does this provision or any other provision in the CAA define what qualifies as "error." Thus, the EPA concludes that the term should be given its plain language, everyday meaning, which includes all unintentional, incorrect, or wrong actions or mistakes.[127] Under CAA section 110(k)(6), the EPA must make an error determination and provide "the basis thereof." There is no indication that this is a substantial burden for the Agency to meet. To the contrary, the requirement is met if the EPA clearly articulates the error and its basis. *Ass'n of Irritated Residents v. EPA*, 790 F.3d at 948; *see also* 85 FR 73636, 73638.

In this action, the EPA proposes to determine that it made an error in approving Kansas' and Iowa's good neighbor SIP submittals. The EPA based its prior approvals on the conclusion that these states would not contribute above 1 percent of the NAAQS to any receptors in 2023, using modeling information that has since been updated to incorporate public comment and better information, is no longer considered state-of-the-science, and produces a different result for these states, one which is inconsistent with the set of air quality analysis used to inform the EPA's evaluation of all other states. *See* 88 FR 9344-45, 9349-50 (explaining updates to improve

---

[126] *See* 85 FR 73636, 73637 (November 19, 2020).
[127] *See* 85 FR at 73637–38.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

model performance and account for recent monitored ozone levels in response to public comments). Had the EPA known of this information regarding the 2023 analytic year reflected in the 2016v3 modeling and the violating-monitor receptor identification methodology at the time it issued those approvals, it would not have approved Kansas or Iowa's submissions. Under the plain meaning of the word "error," those approvals were in error and are in need of correction.

Application of the final air quality analysis and contribution information from the Federal Good Neighbor Plan in this manner is consistent with longstanding EPA practice and policy under the good neighbor provision. The EPA explained in the Disapproval action its view that use of updated information to inform its action on the states included in the Disapproval action was not prejudicial, in part because, had the Agency approved any of those states based on modeling that had been superseded by more recent and reliable information, it would exercise error correction authority under CAA section 110(k)(6) as it had done in the past, to convert those approvals to disapprovals (as it is now doing here). *See* 88 FR at 9364. The EPA explained that this would be consistent with prior error-correction actions it has taken or proposed under the good neighbor provision. *See id.* (citing 86 FR 23056, 23067–68 (April 30, 2021) (error correcting Kentucky's approval to a disapproval and promulgating FIP addressing Kentucky's outstanding 2008 ozone NAAQS good neighbor obligations); 87 FR 20036, 20041 (April 6, 2022) (proposing error correction for Delaware's 2015 ozone NAAQS SIP approval to a disapproval based on updated air quality modeling)). Similarly, in the original CSAPR rulemaking, the EPA issued error corrections under CAA section 110(k)(6) authority for 22 states where the EPA had issued approvals of SIPs adopted under the Clean Air Interstate Rule (CAIR), following the D.C. Circuit's decision in *North Carolina* that CAIR's "emissions budgets

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

were insufficiently related to the statutory mandate" of the good neighbor provision. *See* 76 FR 48208, 48220-22 (Aug. 8, 2011). The D.C. Circuit upheld this exercise of error-correction authority in *EME Homer City*, 795 F.3d 118, 132-35 (D.C. Cir. 2015).

The 22 error corrections in the original CSAPR and for Kentucky in the Revised CSAPR Update were prompted by judicial decisions that invalidated the reasoning that the EPA had used to support the approvals. In those circumstances, a change in the law occurring subsequent to the time of the EPA's original action on the SIPs, and which the EPA could not have been aware of at the time that it took such action, justified the use of error-correction authority. Likewise, a change in the EPA's understanding of the relevant facts, even if that understanding could not have been known at the time of the EPA's original action, may equally justify the exercise of error-correction authority.[128] The EPA does not read the statute to only authorize the use of error correction authority under 110(k)(6) when a judicial decision or other change in legal view or interpretation has been brought to light. This would read into the statute a term that is not there, namely, that the EPA can only exercise CAA section 110(k)(6) authority when there is a "legal" error. As explained previously, the statute does not say this. It only uses the term "error"; that term is not defined, and its plain meaning encompasses errors of law or fact. In this case, while no intervening judicial decision or change in legal interpretation has prompted this proposed error correction, this is no way diminishes the appropriate exercise of CAA section 110(k)(6)

---

[128] The court in *EME Homer City* noted that its holding was limited to the circumstance where "a federal court says that EPA lacked statutory authority at the time to approve a SIP." 795 F.3d at 135 n.12. However, this statement was in relation to its holding that the EPA had properly invoked the good cause exception of the Administrative Procedure Act to issue those error corrections without public notice and comment. *See id.* The EPA does not read this statement as a limitation on the exercise of error-correction authority generally.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

error correction authority in this instance. The EPA approved Kansas's and Iowa's SIPs based on a mistaken belief that they would not contribute above the 1 percent threshold to receptors in 2023. The updated air quality and contribution analysis that the EPA used to render final determinations in the Disapproval action and Federal Good Neighbor Plan as to all other states' interstate transport obligations for the 2015 ozone NAAQS now indicates these findings were in error. To align the treatment of these states with all others, it is not only reasonable, but necessary for consistency and equity, to correct these approvals to disapprovals. To clarify, if Kansas and Iowa are not required to now meet their interstate transport obligations based on this new information, other upwind states as well as the downwind areas to which they are linked could bear a greater burden to reduce air pollution.

In making this proposed determination, the EPA observes that all other states whose good neighbor SIP submissions had previously been approved using older data are found in the 2023 and 2026 air quality analysis used in the Federal Good Neighbor Plan to continue not to contribute above 1 percent of the NAAQS at any receptors. Thus, there remains no need to revisit those approvals, because the updated air quality analysis does not indicate that they were in error. Similarly, where the EPA's final analysis in the Federal Good Neighbor Plan indicated that, contrary to prior expectations, a State is *not* linked above 1 percent of the NAAQS to any receptors, the EPA has taken action to approve that State's submission. This is the case for Wyoming. *See* 88 FR 54998 (Aug. 14, 2023). In no case has the EPA issued a final *disapproval* of a good neighbor SIP submittal for the 2015 ozone NAAQS, only to find that State *not* linked in the 2016v3 modeling or pursuant to its violating-monitor receptor identification methodology.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Had this circumstance arisen, consistent with the position adopted here, the EPA fully expects it would have acted under CAA section 110(k)(6) to correct such a disapproval to an approval.[129]

Finally, the EPA affirms in general that it does not view all modeling results as subject to obligatory (or even discretionary) revision under error-correction authority, simply because later information shows a modeling projection to deviate from subsequent modeling or real-world information. Agencies such as the EPA, regulating in a scientifically complex arena such as the CAA, must be able to make and rely on modeling projections, and this reliance is appropriate and lawful even if modeling projections later may be found to deviate from real-world information. *See EME Homer City*, 795 F.3d at 135 ("We will not invalidate EPA's predictions solely because there might be discrepancies between those predictions and the real world."); *see also Wisconsin*, 938 F.3d at 318 (holding that the EPA must implement the Act even in the face of uncertainty). However, the distinction here is in the fact that, following the approval of Kansas' and Iowa's SIPs, new modeling information (and other air quality analysis) was developed that informed, on a nationally consistent basis, the EPA's determinations regarding the good neighbor obligations of all other states. The EPA finds that in this circumstance, error correction under CAA section 110(k)(6) is warranted and appropriate.

In proposing these error corrections, the Agency has reviewed the original submittals from Iowa and Kansas. The Agency finds no information, analysis, or implementation of control measures in these submittals that could warrant approval on an alternative basis. The EPA finds

---

[129] For the same reasons, this is not a circumstance in which the error correction is based in any sense on a change in agency policy. The use of error correction authority in this case is in keeping with the EPA's previously stated policy and consistent with its practices in evaluating good neighbor obligations. *See* 88 FR 9364.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

that neither Kansas nor Iowa submitted an appropriate analysis of receptor specific information that could justify the application of a higher Step 2 screening threshold of 1 ppb. As explained in section III.D.3. of this document, the Agency has concluded that it will not conduct such an analysis for any states that failed to develop such an analysis themselves, and further, the Agency has explained through both its Disapproval action and Federal Good Neighbor Plan rulemakings that it would not be wise policy and would frustrate the goals of consistency and equity among states in addressing interstate ozone pollution, to attempt to recognize alternative contribution thresholds in various states. 88 FR at 9371-75. In addition, neither Kansas or Iowa submitted an analysis of emissions control strategies or alternative frameworks for analysis at Step 3 that could justify approval of their submissions on that basis. Further, neither State provided any enforceable emissions control measures in their submissions.

Therefore, the EPA proposes to correct its error in approving Iowa's and Kansas' good neighbor SIP submissions. This error correction under CAA section 110(k)(6) would revise the approval of the portion of Iowa's and Kansas' 2015 ozone NAAQS infrastructure SIP submission that addresses CAA section 110(a)(2)(D)(i)(I) to a partial disapproval as to Prong 2 and rescinds any statements that the portion of Iowa's and Kansas' infrastructure SIP submission that addresses CAA section 110(a)(2)(D)(i)(I), Prong 2, satisfies the requirements of the good neighbor provision. The EPA's approval of these SIP submissions as to Prong 1 of the good neighbor provision is not proposed to be changed. The EPA is not proposing to correct the elements of Iowa's and Kansas' 2015 ozone NAAQS infrastructure SIP submission that do not address CAA section 110(a)(2)(D)(i)(I).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

Under CAA section 110(c)(1), finalization of this partial disapproval would establish a 2-year deadline for the EPA to promulgate a FIP for Kansas and Iowa to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements pertaining to significant contribution to nonattainment and interference with maintenance of the 2015 8-hour ozone NAAQS in other states, which the EPA proposes to do in this action, unless the EPA approves a SIP submission that meets these requirements. Disapproval of a good neighbor submission does not start a mandatory sanctions clock.

As discussed in greater detail in sections VI. and VII. of this document, the EPA is proposing to determine based on application of the EPA's 4-step interstate transport framework, that there are emissions reductions that are required for Iowa and Kansas to satisfy their good neighbor obligations for the 2015 ozone NAAQS. The analysis on which the EPA proposes this conclusion for Iowa and Kansas is the same, nationally consistent analytical framework on which the Agency proposes FIP action for the other states in this proposed action, as well as for the 23 states included in its March 15, 2023, Federal Good Neighbor Plan.

*B. Application of Rule in Indian Country and Necessary or Appropriate Finding*

In the Federal Good Neighbor Plan, the EPA finalized its determination that the rule is applicable in all areas of Indian country (as defined at 18 U.S.C. 1151) within the covered 23-state geography of the final rule, as explained in section III.C.2. of that action.[130] Here in this action, the EPA proposes to apply this determination to all areas of Indian country within the covered geography of this proposed rule. Certain areas of Indian country within the geography of

---

[130] 88 FR at 36690-93.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

the rule are or may be subject to State implementation planning authority. For the other areas of Indian country within that geography, none of the relevant tribes has as yet sought eligibility to administer a Tribal plan to implement the good neighbor provision.[131] Consistent with its final determination in section III.C.2. of the Federal Good Neighbor Plan, the EPA is proposing to include all areas of Indian country within the covered geography of this rule, notwithstanding whether those areas are currently subject to a State's implementation planning authority.

With respect to areas of Indian country not currently subject to a State's implementation planning authority – *i.e.*, Indian reservation lands and other areas of Indian country over which the EPA or a tribe has demonstrated that a tribe has jurisdiction – the EPA here proposes a "necessary or appropriate" finding that direct Federal implementation of the rule's requirements is warranted under CAA section 301(d)(4) and 40 CFR 49.11(a) (the areas of Indian country subject to this finding are referred to later as the CAA section 301(d) FIP areas). Indian Tribes may, but are not required to, submit Tribal plans to implement CAA requirements, including the good neighbor provision. Section 301(d) of the CAA and 40 CFR part 49 authorize the Administrator to treat an Indian Tribe in the same manner as a State (*i.e.,* Treatment As State (TAS)) for purposes of developing and implementing a Tribal plan that addresses good neighbor obligations. *See* 40 CFR 49.3; *see also* "Indian Tribes: Air Quality Planning and Management," hereafter "Tribal Authority Rule" (63 FR 7254, February 12, 1998). The EPA is authorized to directly implement the good neighbor provision in the 301(d) FIP areas when it finds, consistent

---

[131] Under 40 CFR 49.4(a), tribes are not subject to the specific plan submittal and implementation deadlines for NAAQS-related requirements, including deadlines for submittal of plans addressing transport impacts.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

with the authority of CAA section 301—which the EPA has exercised in 40 CFR 49.11—that it is necessary or appropriate to do so.[132]

The EPA proposes in this action to find that it is both necessary and appropriate to regulate all new and existing EGU and non-EGU sources meeting the applicability criteria set forth in this proposed rule in the 301(d) FIP areas that are located within the geographic scope of coverage of the rule. For purposes of this proposed finding, the geographic scope of coverage of the rule means the areas of the United States encompassed within the borders of the states of Arizona, Iowa, Kansas, New Mexico, and Tennessee.[133] For EGU applicability criteria, *see* section VII.A. of this document; for non-EGU applicability criteria, *see* section VII.B. of this document. To the EPA's knowledge, there are two existing EGU sources located within the 301(d) FIP areas: the South Point Energy Center located on the Fort Mojave Reservation, and the Four Corners Power Plant on the Navajo Reservation. These EGU sources are geographically located within the borders of Arizona and New Mexico, respectively.[134]

This proposed finding is consistent with the EPA's prior good neighbor rules, including the Federal Good Neighbor Plan. In prior rulemakings under the good neighbor provision, the

---

[132] *See Arizona Pub. Serv. Co. v. U.S. E.P.A.*, 562 F.3d 1116, 1125 (10th Cir. 2009) (stating that 40 CFR 49.11(a) "provides the EPA discretion to determine what rulemaking is necessary or appropriate to protect air quality and requires the EPA to promulgate such rulemaking"); *Safe Air For Everyone v. U.S. Env't Prot. Agency*, No. 05-73383, 2006 WL 3697684, at *1 (9th Cir., Dec. 15, 2006) ("The statutes and regulations that enable EPA to regulate air quality on Indian reservations provide EPA with broad discretion in setting the content of such regulations.").

[133] With respect to any non-EGU sources located in the 301(d) FIP areas, the geographic scope of coverage of this proposed rule does not include those states for which the EPA proposes to find, based on air quality modeling, that no further linkage exists by the 2026 analytic year at Steps 1 and 2. The only State in this rule projected to be linked in 2026 is Arizona.

[134] The EPA is currently not aware of any existing non-EGU sources that are located within the 301(d) FIP areas within Arizona's borders that meet the non-EGU applicability criteria.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

EPA has included all areas of Indian country within the geographic scope of those FIPs, such that any new or existing sources meeting the rules' applicability criteria would be subject to the rule. In the CSAPR, the CSAPR Update, and the Revised CSAPR Update, the scope of the emissions trading programs established for EGUs extended to cover all areas of Indian country located within the geographic boundaries of the covered states. In these rules, at the time of their promulgation, no existing units were located in the covered areas of Indian country; under the general applicability criteria of the trading programs, however, any new sources located in such areas would become subject to the programs. Thus, the EPA established a separate allowance allocation that would be available for any new units locating in any of the relevant areas of Indian country. *See, e.g.,* 76 FR at 48293 (describing the CSAPR methodology of allowance allocation under the "Indian country new unit set-aside" provisions); *see also id.* at 48217 (explaining the EPA's source of authority for directly regulating in relevant areas of Indian country as necessary or appropriate). Further, in any action in which the EPA subsequently approved a State's SIP submission to partially or wholly replace the provisions of a CSAPR FIP, the EPA has clearly delineated that it will continue to administer the Indian country new unit set aside for sources in any areas of Indian country geographically located within a State's borders and not subject to that State's CAA planning authority, and the State may not exercise jurisdiction over any such sources. *See, e.g.,* 82 FR 46674, 46677 (October 6. 2017) (approving Alabama's SIP submission establishing a State CSAPR trading program for ozone season $NO_X$, but providing, "The SIP is not approved to apply on any Indian reservation land or in any other area where EPA or an Indian tribe has demonstrated that a tribe has jurisdiction.").

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

For this proposed rulemaking, the EPA proposes to take the same approach with respect to regulating sources in the 301(d) FIP areas as was finalized in the Federal Good Neighbor Plan. The EPA finds this approach is necessary and appropriate for several reasons. First, as an extension of the Federal Good Neighbor Plan, the purpose of this rule is to address the interstate transport of ozone on a national scale. Consistent with its findings regarding the broad upwind region covered by the Federal Good Neighbor Plan, the EPA proposes to extend into the geography of these five additional states a uniform level of emissions-control stringency. (*See* section VI. of this document for a discussion of the EPA's determination of control stringency for this proposal.) Within this approach, consistency in rule requirements across all jurisdictions is vital in ensuring the remedy for ozone transport is, in the words of the Supreme Court, "efficient and equitable," 572 U.S. 489, 519. In particular, as the Supreme Court found in *EME Homer City Generation*, allocating responsibility through uniform levels of control across the entire upwind geography is "equitable" because, by imposing uniform cost thresholds on regulated States, the EPA's rule subjects to stricter regulation those States that have done relatively less in the past to control their pollution. Upwind States that have not yet implemented pollution controls of the same stringency as their neighbors will be stopped from free riding on their neighbors' efforts to reduce pollution. They will have to bring down their emissions by installing devices of the kind in which neighboring States have already invested. *Id.*

In the context of addressing regional-scale ozone transport in this proposal, a uniform level of stringency that extends to and includes the 301(d) FIP areas geographically located within the boundaries of the linked upwind states carries significant force. Failure to include all such areas within the scope of the rule creates a significant risk that these areas may be targeted

Page 121 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

for the siting of facilities emitting ozone-precursor pollutants to avoid the regulatory costs that would be imposed under this proposed rule in the surrounding areas of State jurisdiction. Electricity generation or the production of other goods and commodities may become more cost-competitive at any EGUs or non-EGUs not subject to the rule but located in a geography where all surrounding facilities in the same industrial category are subject to the rule. For instance, the affected EGU sources located on the Fort Mojave Reservation of the Fort Mojave Indian Tribe and the Navajo Reservation of the Navajo Nation are both in areas covered by the interconnected western electricity grid. The EGU source on the Fort Mojave Reservation is owned by a large merchant power supplier and the EGU source on the Navajo Reservation is jointly owned by entities that supply electricity to customers in several states. It is both necessary and appropriate, in the EPA's view, to avoid creating, via this proposed rule, a structure of incentives that may cause generation or production – and the associated $NO_X$ emissions – to shift into the 301(d) FIP areas to escape regulation needed to eliminate interstate transport under the good neighbor provision.

The EPA finds it is appropriate to propose direct Federal implementation of the proposed rule's requirements in the 301(d) FIP areas at this time rather than at a later date. Tribes generally have the opportunity to seek TAS and to undertake Tribal implementation plans under the CAA. To date, no tribe relevant to an existing EGU in the 301(d) FIP areas for the 2015 ozone NAAQS (or for any other NAAQS) has expressed an intent to do so for purposes of regulating interstate transport of air pollution under CAA section 110(a)(2)(D). Nor has the EPA heard such intentions from any other tribe within the geography of this rule, and it would not be reasonable to expect tribes to undertake that planning effort, particularly when no existing

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

sources are currently located on their lands. Further, the EPA is mindful that under court precedent, the EPA and states generally bear an obligation to fully implement any required emissions reductions to eliminate significant contribution under the good neighbor provision as expeditiously as practicable and in alignment with downwind areas' attainment schedule under the Act. As discussed in section VII.A. of this document, the EPA anticipates implementing certain required emissions reductions by the 2025 ozone season, and, for Arizona, additional required emissions reductions by the 2027 ozone season. Absent this proposed Federal implementation plan in the 301(d) FIP areas, $NO_X$ emissions from any existing or new EGU or non-EGU sources located in, or locating in, the 301(d) FIP areas within the covered geography of the rule would remain unregulated and could potentially increase. This would be inconsistent with the EPA's overall goal of aligning good neighbor obligations with the downwind areas' attainment schedule and to achieve emissions reductions as expeditiously as practicable.

Further, the EPA recognizes that Indian country, including the 301(d) FIP areas, is often home to communities with environmental justice concerns, and these communities may bear a disproportionate level of pollution burden as compared with other areas of the United States. The EPA's draft Strategic Plan for Fiscal Year 2022-2026[135] includes an objective to promote environmental justice at the Federal, Tribal, state, and local levels and states: "Integration of environmental justice principles into all EPA activities with Tribal governments and in Indian country is designed to be flexible enough to accommodate EPA's Tribal program activities and goals, while at the same time meeting the Agency's environmental justice goals." By including

---

[135] *https://www.epa.gov/system/files/documents/2021-10/fy-2022-2026-epa-draft-strategic-plan.pdf.*

Page 123 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

all areas of Indian country within the covered geography of the rule, the EPA is advancing environmental justice, lowering pollution burdens in such areas, and preventing the potential for "pollution havens" to form in such areas as a result of facilities seeking to locate there to avoid the requirements that would otherwise apply outside of such areas under this proposed rule.

Therefore, to ensure timely alignment of all needed emissions reductions with the larger timetable of this proposed rule, to ensure equitable distribution of the upwind pollution reduction obligation across all upwind jurisdictions, to avoid perverse economic incentives to locate sources of ozone-precursor pollution in the 301(d) FIP areas, and to deliver greater environmental justice, including protection for Tribal communities in line with Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All,[136] the EPA proposes to find it both necessary and appropriate that all existing and new EGU and non-EGU sources that are located in the 301(d) FIP areas within the geographic boundaries of the covered states, and which would be subject to this rule if located within areas subject to State CAA planning authority, should be included in this rule. The EPA proposes this finding under section 301(d)(4) of the Act and 40 CFR 49.11. Further, to avoid "unreasonable delay" in promulgating this FIP, as required under § 49.11, the EPA concludes it is appropriate to make this proposed finding now, to align emissions reduction obligations for any covered new or existing sources in the section 301(d) FIP areas with the larger schedule of reductions under this proposed rule. Because all other covered EGU and non-EGU sources within the geography of this proposed rule

---

[136] Executive Order 14096 (April 21, 2023): *https://www.federalregister.gov/documents/2023/04/26/2023-08955/revitalizing-our-nations-commitment-to-environmental-justice-for-all*.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

would be subject to emissions reductions of uniform stringency beginning in the 2025 ozone season, and as necessary to fully and expeditiously address good neighbor obligations for the 2015 ozone NAAQS, there is little benefit to be had by not proposing to include the 301(d) FIP areas in this rule now and a potentially significant downside to not doing so.

The EPA will continue to consult with the governments of the Fort Mojave Indian Tribe of the Fort Mojave Reservation, the Navajo Nation of the Navajo Reservation, and any other tribe wishing to continue consultation, during the comment period for this proposal. The EPA invites comment on this proposed finding.

## VI. Quantifying Upwind-State NOx Emissions Reduction Potential to Reduce Interstate Ozone Transport for the 2015 Ozone NAAQS

### A. Summary of Multi-Factor Test

This section describes the EPA's methodology at Step 3 of the 4-step interstate transport framework for identifying upwind emissions that constitute "significant" contribution or interference with maintenance for the five states identified in the previous sections. The EPA proposes to apply the same analysis to these states that it applied for 23 states in the Federal Good Neighbor Plan.[137] To summarize this analysis: The EPA applies a multi-factor test at Step 3. The multi-factor test considers cost, available emissions reductions, downwind air quality impacts, and other factors (e.g., controls that have been widely adopted by like sources in other upwind states and/or in downwind areas with ozone attainment problems) to determine the appropriate level of control stringency that would eliminate significant contribution to downwind

---

[137] *See* 88 FR at 36718.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

nonattainment or maintenance receptors. The selection of a uniform level of NO$_X$ emissions control stringency across all of the linked states, reflected by representative cost per ton of emissions reduction figures for EGUs and the identified units in non-EGU industries, were principal findings from the final Federal Good Neighbor Plan. These findings serve to apportion the reduction responsibility among collectively contributing upwind states. The EPA proposes to apply these same findings to five additional states. As explained in section I.A. of this document, these states are being addressed in this separate rulemaking due to a happenstance resulting from rulemaking procedures and the timing of development of information that informed action on other states. As such, these states are not substantively situated differently in a meaningful or material way from any of the other states for which the EPA has already rendered a final determination of the appropriate level of emissions-control stringency to eliminate significant contribution for the 2015 ozone NAAQS. Had the EPA originally included these five states in its multifactor test considering emissions reduction potential across all linked states for this 2015 ozone NAAQS, the Agency would have made the same control stringency determination due to the comparable air quality circumstances and cost-effective emissions reduction opportunities across the linked upwind-state geography.

The EPA therefore proposes to extend these findings on a uniform basis to these five additional states. This approach to quantifying upwind State emission-reduction obligations using a uniform level of control stringency was reviewed by the Supreme Court in *EME Homer City Generation*, which held that using such an approach to apportion emissions reduction responsibilities among upwind states that are collectively responsible for downwind air quality

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

impacts "is an efficient and equitable solution to the allocation problem the good neighbor provision requires the Agency to address." 572 U.S. at 519.

In the final Federal Good Neighbor Plan, the EPA's analysis focused on $NO_X$ as the primary ozone-precursor pollutant of concern.[138] The EPA then conducted four analytical steps as part of the Step 3 multifactor test to arrive at an appropriate level of stringency that eliminated significant contribution and/or interference with maintenance. These were: (1) identify levels of uniform $NO_X$ control stringency; (2) evaluate potential $NO_X$ emissions reductions associated with each identified level of uniform control stringency; (3) assess air quality improvements at downwind receptors for each level of uniform control stringency; and (4) select a level of control stringency considering the identified cost, available $NO_X$ emissions reductions, and downwind air quality impacts, while also ensuring that emissions reductions do not unnecessarily over-control upwind-state emissions relative to the contribution threshold applied at Step 2 or the resolution of downwind receptors at Step 1. The remainder of this section summarizes the application of this analytical framework to the EGU and non-EGU sources in Arizona, Iowa, Kansas, New Mexico, and Tennessee.

---

[138] As described in the Federal Good Neighbor Plan (88 FR 36719) the EPA examined the results of the contribution modeling performed for that rule to identify the portion of the ozone contribution attributable to anthropogenic $NO_X$ emissions versus VOC emissions from each linked upwind State to each downwind receptor. From that analysis, the Agency concluded that the vast majority of the downwind air quality areas addressed by the Federal Good Neighbor Plan are primarily $NO_X$-limited, rather than VOC-limited. Therefore, the EPA found that regulation of $NO_X$ emissions was necessary while regulation of VOCs as an ozone precursor in upwind states was not necessary to eliminate significant contribution or interference with maintenance in downwind areas in that rule. Considering that many of the downwind locations are the same in this rulemaking, and that the EPA is relying on the same air quality modeling, the EPA affirms that the conclusions about regulation of $NO_X$ emissions relative to VOCs from the final Federal Good Neighbor Plan apply in this rulemaking.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

For both EGUs and non-EGUs, section VI.B. of this document describes the available $NO_X$ emissions controls that the EPA evaluated for this proposed rule and their representative cost levels (in 2016$). Section VI.C. of this document discusses the EPA's application of that information to assess emissions reduction potential of the identified control stringencies. Finally, section VI.D. of this document describes the EPA's assessment of associated air quality impacts and proposed determination of significant contribution. Section VI.D. of this document also describes the analysis the Agency conducted to evaluate if its selected control strategy would result in over-control for any upwind state, that is, whether an upwind State could have reduced its air quality contributions below the 1 percent of NAAQS air quality contribution threshold at a lower level of emissions-control stringency than identified in the GNP.

As in the Federal Good Neighbor Plan, the EPA applies its multi-factor test at Step 3 to EGUs and non-EGUs on consistent but parallel tracks. Following the conclusions of the EGU and non-EGU multi-factor tests, the identified reductions for EGUs and non-EGUs are combined and collectively analyzed to assess their effects on downwind air quality and whether the proposed rule achieves a full remedy to eliminate "significant contribution" while avoiding over-control.

As described in section III.D.4. of this document and described in this section, the EPA proposes that it is reasonable and equitable to apply the same nationally-determined level of uniform emissions-control stringency already determined in the final Federal Good Neighbor Plan for 23 states to these five additional states. The EPA is aware of no state-specific circumstances as to any of these five states that would warrant different treatment or analysis than has already been applied on a nationwide basis in the Federal Good Neighbor Plan.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*B. Summary of Control Stringency Levels*

1. EGUs

The Federal Good Neighbor Plan analyzed five $NO_X$ emissions control strategies at EGUs: (1) fully operating existing SCR, including both optimizing $NO_X$ removal by existing operational SCRs and turning on and optimizing existing idled SCRs; (2) installing state-of-the-art $NO_X$ combustion controls; (3) fully operating existing SNCRs, including both optimizing $NO_X$ removal by existing operational SNCRs and turning on and optimizing existing idled SNCRs; (4) installing new SNCRs; and (5) installing new SCRs.

In prior good neighbor rules, the EPA typically evaluated the potential for emissions reductions from generation shifting at the representative cost for each mitigation technology. This is because shifting generation to lower $NO_X$ emitting or zero-emitting EGUs may occur in response to economic factors. As the cost of emitting $NO_X$ increases, it becomes increasingly cost-effective for units with lower $NO_X$ rates to increase generation, while units with higher $NO_X$ rates reduce generation. Because the cost of generation is unit-specific, this generation shifting occurs incrementally on a continuum. However, for reasons described in the preamble for the Federal Good Neighbor Plan, the EPA determined that it was not appropriate to incorporate emissions reductions from generation shifting.[139] For the same reasons, the EPA does not quantify emissions reductions from generation shifting for the states covered by this proposal.

It is equitable and reasonable to continue to use the same cost, performance, and timelines for EGU $NO_X$ mitigation strategies that were determined for EGUs for the Federal

---

[139] 88 FR 36731.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Good Neighbor Plan[140] for the five additional states, as described in section III.D.4. of this document. The analysis of $NO_X$ emissions controls was completed recently and there have been no meaningful changes in the factors considered since that analysis was completed.[141] Table VI.B.1-1 summarizes the cost, performance, and availability dates based on the implementation timelines for the EGU $NO_X$ mitigation strategies.

Under the analysis in the Federal Good Neighbor Plan and supported by technical information provided in the EGU $NO_X$ Mitigation Strategies Final Rule TSD and its Addendum included in the docket for this rulemaking, the EPA finds that the timeframe for optimizing existing SCR and SNCR controls is about 2 months or less, and the timeframe for upgrading combustion controls is about 6 months. Additionally, for the same reasons described in the Federal Good Neighbor Plan, the EPA proposes that the first season for installing new SNCRs should be aligned with the first season of feasible installation for SCRs, *i.e.*, the 2027 ozone season.[142] Finally, for the same reasons that the EPA described in the Federal Good Neighbor Plan, the EPA proposes that SCR installation at EGUs can occur over a 36-48 month period, taking into account the fleetwide nature of the Federal Good Neighbor Plan (including this supplemental rulemaking to expand the Plan's coverage to five additional states, which considers emissions reductions commensurate with retrofitting SCR on only an additional seven units in Arizona).[143]

**Table VI.B.1-1: Summary of EGU $NO_X$ Mitigation Strategies, Representative Costs, Timelines, and Applicability**

---

[140] 88 FR 36720 - 36732
[141] *See* the EGU $NO_X$ Mitigation Strategies Final Rule TSD Addendum
[142] 88 FR 36726
[143] 88 FR 36727

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| Mitigation Strategy | Representative Cost (2016$) | Implementation Timeline | First Ozone Season Available for Supplemental States | Unit Applicability | NOx Emissions Rate (lb/MMBtu) |
|---|---|---|---|---|---|
| Fully Operating Existing SCR (optimizing operating and idled SCR) | $1,600 / ton | < 2 months | 2025 | Covered fossil-fired units with SCR | Coal steam: 0.08 O/G Steam: 0.03 Combustion Turbine: 0.03 Combined Cycle: 0.012 |
| Installing State-Of-The-Art Combustion Controls | $1,600 / ton | 6 to 8 months | 2025 | Covered coal steam units lacking state-of-the-art combustion controls | 0.199 |
| Fully Operating Existing SNCR (optimizing operating and idled SNCR) | $1,800/ton | < 2 months | 2025 | Covered fossil-fired units with SNCR | Up to a 25% reduction in emissions rate if SNCR idled. |
| Installing New SNCR | $6,700/ton | 16 months | 2027 | Covered CFB units of any size and other coal steam units under 100 MW lacking post-combustion NOx controls[144] | Up to a 50% reduction in emissions rate for CFB units; up to a 25% reduction in emissions rate for other units |
| Installing New SCR | $11,000/ton (coal steam) | 36 to 48 months | 2027 (with phase in over | Covered coal steam units (except CFB) | 0.05 for coal steam units; |

[144] No units in Arizona, the only State in this proposal linked in 2026, meet this criterion, but the mitigation strategy is included in the table for completeness.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| Mitigation Strategy | Representative Cost (2016$) | Implementation Timeline | First Ozone Season Available for Supplemental States | Unit Applicability | NOx Emissions Rate (lb/MMBtu) |
|---|---|---|---|---|---|
|  | $7,700 (O/G steam) |  | 2027 and 2028) | great than 100 MW;<br><br>O/G Steam units at least 100 MW and with at least 150 tons $NO_X$ emissions on average for the 2019 to 2021 ozone seasons | 0.03 for O/G steam units |

## 2. Non-EGUs

For the Federal Good Neighbor Plan, the EPA developed an analytical framework to facilitate decisions about which industries and emissions unit types in the non-electric generating unit "sector" may have a share of upwind states' significant contribution to nonattainment or interference with maintenance of the 2015 ozone NAAQS in other states. A February 28, 2022 memorandum documents the analytical framework that the EPA used to initially identify, through a regional-scale, multistate screening assessment (Screening Assessment), industries and emissions unit types for which there appeared to be cost-effective reductions having the greatest potential for air quality benefit in downwind states.[145] From this Screening Assessment, the EPA further developed its proposed set of emissions control strategies for non-EGUs that would fully

---

[145] The memorandum titled *Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026* is available in the docket here: *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0150*.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

eliminate significant contribution from the upwind states.[146] Following consideration of public comment, in the final Federal Good Neighbor Plan the EPA finalized emissions control requirements for certain non-EGU sources. The EPA prepared a memorandum summarizing the emissions unit types, applicability criteria, emissions limits, estimated number of emissions units captured by the applicability criteria, and estimated emissions reductions and costs.[147] The EPA updated its technical analysis of non-EGU industry sectors and responded to public comments.[148] The final Federal Good Neighbor Plan established a uniform set of emissions control requirements for non-EGU sources in nine industries for each of the 20 states for which the EPA found continuing contribution at or above 1 percent of the NAAQS through the 2026 ozone season. *See generally* 88 FR at 36817-38.

As with its EGU analysis at Step 3, the EPA finds that it is equitable and reasonable to extend these same findings for the relevant non-EGU sources in the State of Arizona, which is the only state covered in this action for which the EPA continues to find a continuing contribution at or above 1 percent of the NAAQS through the 2026 ozone season. Several points that the EPA observed in the Federal Good Neighbor Plan bear emphasis in explaining why it is reasonable for Arizona's sources to be subject to the same Step 3 analysis and non-EGU control

---

[146] *See* Non-EGU Sectors Technical Support Document for the Proposed Rule, *available at https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0145.*

[147] The memorandum titled *Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Reductions, and Costs* is available in the docket here: *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0956.*

[148] *See* Non-EGU Sectors Technical Support Document for the Final Rule, *available at https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-1110.*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

requirements as the other covered states. There is an equitable concern that supports an approach by which direct competitors within identified industries within the geography of linked upwind states are held to the same level of emissions performance, as this avoids the potential for emissions shifting or competitive disadvantages brought on by assigning transport obligations to individual sources that are not borne by their competitors in other linked upwind states. Thus, this has informed how the EPA has consistently approached assessing emissions control opportunities in prior ozone transport rulemakings, and in particular, the analysis of emissions control opportunities on an industry-wide basis. For example, in CSAPR, we focused on a single industry, the power sector (or EGUs), because we found that in general, across this industry, there were highly cost-effective emissions control opportunities compared to other industries (based on our assessment at that time). *See* 76 FR at 48249. Similarly, in the $NO_X$ SIP Call, we also focused on assessing emissions-control opportunities by industry (using NAICS-code industry classifications as we do in this action), while recognizing that boilers are a unit type that could have cost-effective emissions reductions across multiple industries (as we again recognize in this action). *See* 63 FR at 57399. The EPA explained in the $NO_X$ SIP Call that this approach "assure[d] equity among the various source categories and the industries they represent," *id.*

It was precisely this analytical framework that the Supreme Court upheld in *EME Homer City*, noting the "thorny causation problem" of interstate pollution transport, 572 U.S. at 514, the need to account for "the vagaries of the wind," *id.* at 497, and the complexity of allocating responsibility among potentially large groups of states who may each contribute to one another's air quality problems as well as to multiple other states in varying degrees, *id.* 514-16.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Applying these principles here, the EPA views it as reasonable to conclude that the Screening Assessment methodology continues to serve as a reasonable and reliable method for distinguishing potentially impactful industries from non-impactful industries in Arizona, just as in the other states for purposes of defining good neighbor obligations for the 2015 ozone NAAQS in the context of a FIP. The Screening Assessment identified nine out of approximately 40 industries for further evaluation. That these were found to be the nine potentially most impactful industries is not surprising, as each of these industries typically involve large-scale fossil-fuel combustion as part of their manufacturing or other processes, have historically had high $NO_X$ emissions as a result, and are projected to continue to have relatively high $NO_X$ emissions into the future. For existing as well as any new sources that come to be located in Arizona, it therefore makes sense to require these sources to meet the same emissions control requirements that the same types of sources are subject to in the covered states that have been found to have non-EGU emissions that significantly contribute to other states' problems attaining and maintaining the 2015 ozone NAAQS.

The EPA therefore proposes to apply the same Step 3 non-EGU analytical framework for Arizona as applied in the covered states whose sources are subject to these requirements. Table VI.B.2-1 summarizes the industries, emissions unit types, and applicability requirements, and Table VI.B.2-2 summarizes the industries, emissions unit types, form of proposed emissions limits, and proposed emissions limits.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

**Table VI.B.2-1: Summary of Industries, Non-EGU Emissions Unit Types, and Applicability Requirements**

| Industry | Emissions Unit Type | Applicability Requirements |
|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engines | Nameplate rating of ≥1000 braking horsepower (bhp) |
| Cement and Concrete Product Manufacturing | Kilns | Directly emits or has the potential to emit 100 tons per year (tpy) or more of $NO_X$ |
| Iron and Steel Mills and Ferroalloy Manufacturing | Reheat Furnaces | Directly emits or has the potential to emit 100 tpy or more of $NO_X$ |
| Glass and Glass Product Manufacturing | Furnaces | Directly emits or has the potential to emit 100 tpy or more of $NO_X$ |
| Iron and Steel Mills and Ferroalloy Manufacturing<br>Metal Ore Mining<br>Basic Chemical Manufacturing<br>Petroleum and Coal Products Manufacturing<br>Pulp, Paper, and Paperboard Mills | Boilers | Design capacity of ≥100 mmBtu/hr |
| Solid Waste Combustors and Incinerators | Combustors or Incinerators | Design capacity ≥ 250 tons of waste/day |

**Table VI.B.2-2: Summary of Non-EGU Industries, Emissions Unit Types, Form of Proposed Emissions Limits, and Proposed Emissions Limits**

| Industry | Emissions Unit Type | Form of Proposed Emissions Limits | Proposed Emissions Limits |
|---|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engines | Grams per horsepower per hours (g/hp-hr) | Four Stroke Rich Burn: 1.0 g/hp-hr<br>Four Stroke Lean Burn: 1.5 g/hp-hr |

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

| Industry | Emissions Unit Type | Form of Proposed Emissions Limits | Proposed Emissions Limits |
|---|---|---|---|
| | | | Two Stroke Lean Burn: 3.0 g/hp-hr |
| Cement and Concrete Product Manufacturing | Kilns | Pounds per ton (lbs/ton) of clinker | Long Wet: 4.0 lb/ton Long Dry: 3.0 lb/ton Preheater: 3.8 lb/ton Precalciner: 2.3 lb/ton Preheater/Precalciner: 2.8 lb/ton |
| Iron and Steel Mills and Ferroalloy Manufacturing | Reheat Furnaces | lbs/mmBtu[a] | Test and set limit based on installation of Low-NOx Burners |
| Glass and Glass Product Manufacturing | Furnaces | lbs/ton glass produced | Container Glass Furnace: 4.0 lb/ton Pressed/Blown Glass Furnace: 4.0 lb/ton Fiberglass Furnace: 4.0 lb/ton Flat Glass Furnace: 7 lb/ton |
| Iron and Steel Mills and Ferroalloy Manufacturing Metal Ore Mining Basic Chemical Manufacturing Petroleum and Coal Products Manufacturing Pulp, Paper, and Paperboard Mills | Boilers | lbs/mmBtu[a] | Coal: 0.20 lb/mmBtu Residual Oil: 0.20 lb/mmBtu Distillate Oil: 0.12 lb/mmBtu Natural Gas: 0.08 lb/mmBtu |
| Solid Waste Combustors and Incinerators | Combustors or Incinerators | ppmvd on a 24-hour averaging period and ppmvd on a 30-day averaging period | 110 ppmvd on a 24-hour averaging period 105 ppmvd on a 30-day averaging period |

[a] Heat input limit.

*C. Control Stringencies Represented by Cost Threshold ($ per ton) and Corresponding*

*Emissions Reductions*

Page 137 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

1. EGUs

For EGUs, as discussed in section VI.A. of this document, the multi-factor test considers increasing levels of uniform control stringency in combination with considering total $NO_X$ reduction potential and corresponding air quality improvements. The EPA evaluated EGU $NO_X$ emissions controls that are widely available (described previously in section VI.B.1. of this document), that were assessed in previous rules to address ozone transport, and that have been incorporated into State planning requirements to address ozone nonattainment.

This analysis generated a selected representative cost threshold of $11,000 per ton, associated with the retrofit of SCR on coal-fired EGUs currently lacking that technology. 88 FR at 36745. All cost values discussed in this section for EGUs are in 2016 dollars.[149]

The following tables summarize the emissions reduction potentials (in ozone season tons) from these emissions controls across the affected jurisdictions. Table VI.C.1-1 focuses on near-term emissions controls while Table VI.C.1-2 includes emissions controls with extended implementation timeframes.

**Table VI.C.1-1: EGU Ozone-season Emissions and Reduction Potential (tons)– Near Term\***

| State | Baseline 2025 OS $NO_X$ | Reduction potential (tons) for varying levels of technology inclusion | | |
|---|---|---|---|---|
| | | SCR Optimization | SCR Optimization + Combustion Control Upgrades | SCR/SNCR Optimization + Combustion Control Upgrades |

---

[149] The EPA used 2016 dollars in both the proposal and final Revised CSAPR Update RIA, as well as the proposal and final Federal Good Neighbor Plan RIA, to be consistent with those recent actions we continued to use 2016 dollars as the dollar year for presenting costs and benefits.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| Arizona | 8,479 | 84 | 153 | 284 |
| Iowa | 9,867 | 0 | 54 | 115 |
| Kansas | 5,510 | 747 | 747 | 747 |
| New Mexico | 2,241 | 31 | 31 | 31 |
| Tennessee | 4,064 | 81 | 81 | 81 |
| **Total** | 30,162 | 943 | 1,066 | 1,257 |

\* This analysis applies the same data sets, including relevant analytical year, as used in the Federal Good Neighbor Plan.

**Table VI.C.1-2: EGU Ozone-season Emissions and Reduction Potential (tons) – Extended Implementation**

| State | Baseline 2026 OS NOₓ | Reduction potential (tons) for varying levels of technology inclusion | | | |
|---|---|---|---|---|---|
| | | SCR Optimization | SCR Optimization + Combustion Control Upgrades | SCR/SNCR Optimization + Combustion Control Upgrades | SCR/SNCR Optimization + Combustion Control Upgrades + SCR/SNCR Retrofits |
| Arizona | 6,098 | 84 | 153 | 284 | 2,085 |
| Iowa | 9,773 | 0 | 0 | 60 | 5,747 |
| Kansas | 5,510 | 747 | 747 | 747 | 2,398 |
| New Mexico | 2,038 | 31 | 31 | 31 | 361 |
| Tennessee | 4,064 | 81 | 81 | 81 | 81 |
| **Total** | 27,484 | 943 | 1,012 | 1,203 | 10,672 |

\* This analysis applies the same data sets, including relevant analytical year, as used in the Federal Good Neighbor Plan.

2. Non-EGUs

As detailed in the memorandum titled, *Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

*Final Emissions Limits, and Estimated Emissions Units, Emissions Reductions, and Costs*[150] prepared for the Federal Good Neighbor Plan*, the EPA uses the 2019 emissions inventory, the list of emissions units estimated to be captured by the applicability criteria, the assumed control technologies that would meet the emissions limits, and information on control efficiencies and default cost/ton values from the control measures database[151] to estimate $NO_X$ emissions reductions and costs for this proposal. The estimates using the 2019 inventory and information from the control measures database identify proxies for emissions units, as well as emissions reductions, and costs associated with the assumed control technologies that would meet the emissions limits. Emissions units subject to the proposed rule emissions limits may differ from those estimated in this assessment, and the estimated emissions reductions from and costs to meet the proposed rule emissions limits may also differ from those estimated in this assessment. The costs do not include monitoring, recordkeeping, reporting, or testing costs. As with the analysis for non-EGUs described in section VI.B.2. of this document, this proposal simply applies the same analysis that was conducted for these industries in the Federal Good Neighbor Plan, considering data specific to the one State included in this action, Arizona, that is proposed to be subject to the Federal Good Neighbor Plan's non-EGU emissions control requirements.

Table VI.C.2-1 of this document summarizes the industries, estimated emissions unit types, and assumed control technologies that meet the proposed emissions limits. Table VI.C.2-2

---

[150] Available in the docket here: *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0956*.
[151] More information on the control measures database can be found here: *https://www.epa.gov/economic-and-cost-analysis-air-pollution-regulations/cost-analysis-modelstools-air-pollution*.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

of this document summarizes the industries, estimated emissions unit types, assumed control

technologies that meet the proposed emissions limits, and the estimated number of control

installations in Arizona. Table VI.C.2-3 summarizes the industries, estimated emissions unit

types, assumed control technologies that meet the proposed emissions limits, annual costs

(2016$), and ozone season emissions reductions. The average cost per ton is $5,457 and is

estimated using annual emissions. As the EPA discussed in the Federal Good Neighbor Plan, the

cost estimates for all non-EGU industries were generally commensurate with the representative

uniform cost threshold of $11,000 per ton selected for EGUs. *See* 88 FR at 36746-47.

**Table VI.C.2-1: Summary of Non-EGU Industries, Emissions Unit Types, Assumed
Control Technologies that Meet Proposed Emissions Limits**

| Industry | Emissions Unit Type | Assumed Control Technologies that Meet Proposed Emissions Limits |
|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engines | Layered Combustion (2-cycle Lean Burn)[a]<br>SCR (4-cycle Lean Burn)<br>NSCR (4-cycle Rich Burn) |
| Cement and Concrete Product Manufacturing | Kilns | SNCR |
| Iron and Steel Mills and Ferroalloy Manufacturing | Reheat Furnaces | LNB |
| Glass and Glass Product Manufacturing | Furnaces | LNB |
| Iron and Steel Mills and Ferroalloy Manufacturing | Boilers | LNB + FGR (Natural Gas, No Coal or Oil) |
| Metal Ore Mining | | SCR (Any Coal, Any Oil) |
| Basic Chemical Manufacturing | | |
| Petroleum and Coal Products Manufacturing | | |
| Pulp, Paper, and Paperboard Mills | | |
| Solid Waste Combustors and Incinerators | Combustors or Incinerators | ANSCR[b]<br>LN[tm] and SNCR [b,c] |

[a] Some emissions units, or engines, in the 2019 inventory had Source Classification Codes
indicating that the units were reciprocating without specifying the type of engine. The EPA

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have
taken steps to ensure the accuracy of this version, but it is not the official version.

assumed Non-Selective Catalytic Reduction (NSCR) or layered combustion as the control for these emissions units.

[b] *Municipal Waste Combustor Workgroup Report*, prepared by the Ozone Transport Commission Stationary and Area Sources Committee, Revised April 2022.

[c] Covanta has developed a proprietary low $NO_X$ combustion system ($LN^{TM}$) that involves staging of combustion air. The system is a trademarked system and Covanta has received a patent for the technology.

**Table VI.C.2-2: Summary of Non-EGU Industries, Emissions Unit Types, Assumed Control Technologies that Meet Proposed Emissions Limits, Estimated Number of Control Installations\***

| Industry/Industries | Emissions Unit Type | Assumed Control Technologies that Meet Proposed Emissions Limits | Estimated Number of Existing Units Per Assumed Control |
|---|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engines | NSCR or Layered Combustion (Reciprocating) | -- |
| | | Layered Combustion (2-cycle Lean Burn) | 6 |
| | | SCR (4-cycle Lean Burn) | -- |
| | | NSCR (4-cycle Rich Burn) | -- |

\* This table is limited to existing covered non-EGU unit types located in the State of Arizona. This does not reflect a final determination that identified units, or any unidentified units meet or do not meet the applicability criteria of the proposed rule.

**Table VI.C.2-3: Summary of Non-EGU Industries, Emissions Unit Types, Assumed Control Technologies, Estimated Total Annual Costs (2016\$), Ozone Season $NO_X$ Emissions Reductions in 2026\***

| Industry/Industries | Emissions Unit Type | Assumed Control Technologies that Meet Proposed Emissions Limits | Annual Costs (2016$) | Ozone Season Emissions Reductions |
|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engine | Layered Combustion (2-cycle Lean Burn) | 4,309,893 | 329 |

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

\* This table is limited to existing covered non-EGU unit types located in the State of Arizona. This does not reflect a final determination that identified units, or any unidentified units meet or do not meet the applicability criteria of the proposed rule.

*D. Assessing Cost, EGU and Non-EGU NO$_X$ Reductions, and Air Quality*

As described in section V.A. of the Federal Good Neighbor Plan preamble, to determine the emissions that are significantly contributing to nonattainment or interfering with maintenance, the EPA applied the multi-factor test to EGUs and non-EGUs on separate but parallel tracks, considering for each the relationship of cost, available emissions reductions, and downwind air quality impacts. Specifically, for each sector, the EPA finalized a determination regarding the fact that a uniform NO$_X$ control stringency was appropriate and identified an appropriate level of uniform NO$_X$ control stringency that would eliminate significant contribution from each upwind state. Based on the air quality results presented in section V.D. of the Federal Good Neighbor Plan preamble, the EPA found that the emissions control strategies that were identified and evaluated in sections V.B. and V.C. of the Federal Good Neighbor Plan preamble were cost-effective and delivered meaningful air quality benefits through projected reductions in ozone levels across the linked downwind nonattainment and maintenance receptors in the relevant analytic years 2023 and 2026. Further, the EPA found the emissions control strategies in upwind states that would deliver these benefits to be widely available and in use at many other similar EGU and non-EGU facilities throughout the country, particularly in those areas that have historically or now continue to struggle to attain and maintain the 2015 ozone NAAQS. As described in the Federal Good Neighbor Plan, for this regional pollutant (*i.e.*, ozone), for this NAAQS (*i.e.*, 2015 ozone), applying these emissions control strategies on a

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

uniform basis across all linked upwind states constituted an efficient and equitable solution to the problem of allocating upwind-state responsibility for the elimination of significant contribution. *See* 88 FR at 36741.

The EPA finds that this solution should appropriately be extended to apply to the five remaining states addressed in this rulemaking. This uniform regional approach applying the levels of stringency determined in the Federal Good Neighbor Plan is in keeping with the uniform stringency approach that the EPA has applied across linked upwind states in its ozone transport rulemakings beginning with the $NO_X$ SIP Call. The EPA finds that this approach continues to effectively address the "thorny" causation problem of interstate pollution transport for regional-scale pollutants like ozone that transport over large distances and are affected by the vagaries of meteorology. *EME Homer City*, 572 U.S. at 514-16. It requires the most impactful sources in each State that has been found to contribute to ozone problems in other states to come up to minimum standards of environmental performance based on demonstrated $NO_X$ pollution-control technology. *Id.* at 519. As described in section V. of the Federal Good Neighbor Plan, when the effects of these emissions reductions are assessed collectively across the hundreds of EGU and non-EGU industrial sources that are subject to that rule, the cumulative improvements in ozone levels at downwind receptors, while they may vary to some extent, are both measurable and meaningful and will assist downwind areas in attaining and maintaining the 2015 ozone NAAQS. In this rule, we find that in these five additional states, there are emissions reductions available at the costs and control levels identified in the Federal Good Neighbor Plan and that these emissions reductions will likewise play a part in the meaningful air quality improvements

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

that will assist downwind areas in attaining and maintaining the 2015 ozone NAAQS and ensure that linked upwind states are held to resolving their fair share of the problem.

As discussed in the following sub-sections, the EPA has evaluated the air quality effects of the different emissions control strategies identified. The receptors show measurable improvement in air quality at each incremental control stringency, up to and including the selected emissions control strategies for EGUs and non-EGUs. These analytic findings further confirm that the selected control stringency applied in the Federal Good Neighbor Plan for 23 states is also the appropriate control stringency to eliminate significant contribution for the 2015 ozone NAAQS for these additional five states. In this proposal, for the states specifically included, the EPA also evaluates whether the proposal results in over-control by evaluating if an upwind State is linked solely to downwind air quality problems that could have been resolved at a lower cost threshold, or if an upwind State could have reduced its emissions below the 1 percent of NAAQS air quality contribution threshold at a lower cost threshold than identified in the Federal Good Neighbor Plan. The Agency finds no overcontrol from this proposal.

1. EGU and Non-EGU Cost and Emissions Reductions Assessment

As described in section VI.A. of this document, in Step 3, the multifactor test considers cost and air quality factors. In addition, in this proposed action the EPA continues to apply its longstanding approach of considering uniform level of $NO_X$ control stringency as foundational to the identification of emissions that significantly contribute or interfere with maintenance of the ozone NAAQS, in light of the regional-scale, meteorological-variability, and long-range transport aspects of the ozone pollution problem. Thus, at a foundational level, the EPA views it as fundamentally equitable, efficient, and workable to extend the same emissions control

Page 145 of 289

strategies found necessary to eliminate significant contribution from 23 states already covered by the Federal Good Neighbor Plan to these five additional states. *See EME Homer*, 572 U.S. at 524.

As described in section VI.A. of this document, in addition to being cost-effective on a cost per ton basis, the EPA's determination at Step 3 for both EGUs and non-EGUs is also informed by the overall level of emissions reductions that will be achieved and the effect those reductions are projected to have on air quality at the downwind receptors. The EPA also explained in the Federal Good Neighbor Plan that, for EGUs, the EPA is also influenced by the fact that the emissions control strategies for EGUs are generally well-demonstrated to be achieved in practice at many existing units, as established through our review of the controls currently installed on the fleet of existing EGUs (*see* 88 FR at 36680). For non-EGUs, the EPA is also influenced by the fact that the emissions control strategies for non-EGUs are generally well demonstrated to be achieved in practice at many existing units, as established through our review of consent decrees, permits, Reasonably Available Control Technologies determinations, and other data sources (*see* 88 FR at 36661).

2. Step 3 Air Quality Assessment Methodology

As described in the Federal Good Neighbor Plan, to assess the air quality impacts of the various control stringencies at downwind receptors for the purposes of Step 3 in that rule, the EPA evaluated changes resulting from the emissions reductions associated with the identified emissions controls in each of the upwind states, as well as assumed corresponding reductions of similar stringency in the downwind State containing the receptor to which they are linked. By applying these emissions reductions to the State containing the receptor, the EPA assumed that

Page 146 of 289

the downwind State will implement (if it has not already) an emissions control stringency for its sources that is comparable to the upwind control stringency that was applied. Consequently, the EPA accounted for the downwind State's "fair share" of the responsibility for resolving a nonattainment or maintenance problem as a part of the over-control evaluation.[152] As a result, the EPA estimated the air quality design values (both average and maximum design values) under both the base and control scenarios and, also, evaluated the air quality contributions from each State to each downwind monitor relative to the Step 2 contribution threshold. In this supplemental rule, for the Step 3 and over-control evaluations, the EPA applied the same framework using the data and tools from the Federal Good Neighbor Plan (*see* the Good Neighbor Plan Ozone Transport Policy Analysis Final Rule TSD for details). As described in the next section, the EPA examined whether its findings in the Federal Good Neighbor Plan regarding stringency and overcontrol were robust to the updated geographic coverage inclusive of the states identified in this action.

As explained in section III.D.1. of this document, the EPA continues to use 2023 and 2026 as the analytical years to inform its evaluation of good neighbor obligations for these five additional states, since these years were selected and used in the Federal Good Neighbor Plan as aligned with the 2024 and 2027 attainment dates and to maintain consistency and ensure equity among all states. *See* 88 FR at 36749-50.

3. Results for Combined EGU and Non-EGU Air Quality Assessment

---

[152] For EGUs, the analysis for the Connecticut receptors in the Federal Good Neighbor Plan shows no EGU reduction potential in Connecticut from the emissions reduction measures identified given that State's already low-emitting fleet; however, EGU reductions were identified in Colorado and these reductions were included in the over-control analysis.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

For 2023, the EPA examined the air quality effects of the emissions reduction potential associated with each EGU emissions control technology (summarized in section VI.C. of this document) in the Federal Good Neighbor Plan to arrive at an appropriate level of stringency. The EPA uses the same framework for this supplemental action, and similarly determined that 1) there are available emissions reductions from these additional states in 2023, 2) they have a beneficial impact on downwind air quality at identified receptors, and 3) the updated geography, when incorporated into the multi-factor test, supports the same stringency or over control findings in this action as that of the Federal Good Neighbor Plan. The EPA confirmed that the emissions reductions from the five states, in isolation and in combination with those from the states in the Federal Good Neighbor Plan, reduced ozone levels at downwind receptors. For 2023, the resulting average and maximum design values, adjusted relative to the modeled design values can be found in the Ozone Transport Policy Analysis Supplemental Proposed Rule TSD. The EPA confirmed that these emissions reductions also do not result in the air quality contributions for any of the supplemental states dropping below the Step 2 air quality contribution threshold to all monitors to which the State is linked (*see* the Ozone Transport Policy Analysis Supplemental Proposed Rule TSD for details). While the average improvement in downwind air quality improvement for these five states is expectedly smaller than that for the 22-state region of the Federal Good Neighbor Plan's EGU control program, so too are the expected emissions reductions. Importantly, for individual State and receptor linkages, downwind air quality improvement was found (*see* the Ozone Transport Policy Analysis Supplemental Proposed Rule TSD). Moreover, health benefits associated with just minor improvements in ozone concentrations far exceed the cost of such mitigation measures.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Likewise, for 2026, the EPA examined the air quality effects of the emissions reduction potential associated with the EGU and non-EGU emissions control technologies (presented in sections IV.B. and VI.C. of this document). Arizona was the only State among the five states with more stringent measures applied in 2026 due to their continued expected linkage. The EPA confirmed that these emissions reductions, both individually and in combination with those from the states in the Federal Good Neighbor Plan, had impacts on the air quality at downwind receptors. For 2026, the resulting average and maximum design values, adjusted relative to the modeled design values, can be found in the Ozone Transport Policy Analysis Supplemental Proposed Rule TSD. The EPA confirmed that these emissions reductions also do not result in the air quality contributions from Arizona dropping below the Step 2 air quality contribution threshold for all of its remaining receptors (*see* the Ozone Transport Policy Analysis Supplement Proposal for details).[153]

4. Conclusions

Considering the cost and air quality factors described above, with respect to emissions reductions available in the near term, the EPA proposes that the 2023 control stringency for

---

[153] The EPA's comprehensive Step 3 analysis for the Federal Good Neighbor Plan specifically evaluated all states contributing above the threshold to each individual monitor. This included each of the five supplemental states (Arizona, Iowa, Kansas, New Mexico, and Tennessee) even though they were not regulated in that rulemaking. These states had their emissions adjusted when their air quality contributions were greater than or equal to 1 percent of the NAAQS for each individual downwind monitor in that action. Thus, they were already aligned with EPA's GNP Step 3 conclusion even prior to their re-examination in this action. While the results below highlight the collective impact of the updated geography, consistent with the final GNP Step 3 analysis, the segmental air quality benefits pertaining to the emissions reductions from these five states can be found in the Ozone Transport Policy Analysis Supplemental Proposed TSD and corresponding files.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

EGUs identified for 22 states in the Federal Good Neighbor Plan constitutes the emissions reductions that comprise each of these five states' interference with maintenance of the 2015 ozone NAAQS in other states. For all affected supplemental states, this control stringency reflects the optimization of existing post-combustion controls and installation of state-of-the-art $NO_X$ combustion controls, which are widely available at a representative cost of $1,800 per ton. The EPA's evaluation also shows that the effective emissions rate performance across affected EGUs consistent with realization of these mitigation measures has substantial air quality benefits and does not over-control upwind states' emissions relative to either the downwind air quality problems to which they are linked at Step 1 or the 1 percent contribution threshold at Step 2. This strategy will fully resolve obligations for the states of Iowa, Kansas, New Mexico, and Tennessee.

Similarly, in the case of extended implementation control measures, the EPA proposes that the 2026 control stringencies for EGUs and non-EGUs finalized in the Federal Good Neighbor Plan constitute the emissions reductions that comprise the full elimination of Arizona's interference with maintenance of the 2015 ozone NAAQS in other states. For Arizona, this control stringency reflects the installation of new SCR post-combustion controls at coal steam sources greater than or equal to 100 Megawatts (MW) and for a more limited portion of the oil/gas steam fleet that had higher levels of emissions. As described in the Federal Good Neighbor Plan, for EGUs, in addition to the optimization of existing post-combustion controls and installation of state-of-the-art $NO_X$ combustion controls these SCR retrofits are appropriate for Arizona's linkages which persist and interfere with downwind areas' ability to maintain the 2015 ozone NAAQS by the Serious nonattainment date (*i.e.*, through the 2026 ozone season) at

Page 150 of 289

$11,000 and $7,700 per ton respectively. This control stringency also includes the estimated emissions reductions from certain non-EGUs. These emissions reductions for non-EGU sources are estimated to cost an average of $5,457/ton, which is approximately half the representative uniform cost threshold of $11,000 per ton selected for EGUs.

 Furthermore, the EPA's evaluation shows that the effective emissions rate performance across EGUs and non-EGUs consistent with the full realization of these mitigation measures reduces ozone levels at the receptors to which Arizona is linked and does not over-control Arizona's emissions in 2026 relative to either the downwind air quality problems to which it is linked at Step 1 or the 1 percent contribution threshold at Step 2.

**VII. Regulatory Requirements and Implementation**

*A. Regulatory Requirements for EGUs*

To implement the required emissions reductions from EGUs in Arizona, Iowa, Kansas, New Mexico, and Tennessee, the EPA in this rulemaking is proposing to expand the geographic scope of the CSAPR NO$_X$ Ozone Season Group 3 Trading Program ("Group 3 trading program") to include sources in these five states. Refer to section VI.B.1. of the preamble of the Federal Good Neighbor Plan for a general discussion of the use of allowance trading programs to achieve required emissions reductions from the electric power sector and an overview of the Group 3 trading program's enhancements to maintain the selected control stringency over time and to improve emissions performance at individual units.

The EPA is not proposing to alter the Group 3 trading program design elements finalized in the Federal Good Neighbor Plan. The EPA is proposing to extend the program and its design elements to apply to sources in these five additional states. These design elements include the

Page 151 of 289

methodology for determining preset State emissions budgets for the 2023-2029 control periods, the methodology for determining dynamic State emissions budgets for control periods in 2026 and onwards, the annual recalibration of the Group 3 allowance bank, the unit-specific backstop daily emissions rate, the unit-specific emissions limitations contingent on assurance level exceedances, and monitoring and reporting requirements. The EPA provided opportunity for comment on these design elements in the public comment period following the proposal of the Federal Good Neighbor Plan. Following feedback from many commenters throughout the country, the EPA finalized the design elements with some modifications, and section VI.B. of the Federal Good Neighbor Plan preamble provides robust discussion of changes made in response to comments. The EPA additionally carefully evaluated and comprehensively responded to comments in the Response to Comment document included in the Federal Good Neighbor Plan docket. In general, the Agency considers any issues associated with the application of the Group 3 Trading Program in these five additional states to be within the scope of this action. The EPA does not propose changes in the basic design elements that were finalized in the Federal Good Neighbor Plan and is not aware of any circumstances that would justify an alternative approach in extending these provisions to these five additional states. Throughout the remainder of this section, where the EPA has identified particular issues that are clearly within the scope of this proposal, it has noted its invitation to comment.

For the reasons explained in section VI.B.1. of this document, the EPA proposes that only the EGU $NO_X$ strategies of fully operating existing SCRs and SNCRs, and upgrading to state-of-the-art combustion controls are possible for the 2025 ozone season. Based on an assumption that

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

this proposed action may be finalized sometime in the summer of 2024, the first ozone season in which these strategies can be implemented is the 2025 ozone season.

Regarding the strategy of retrofitting SCR controls, as the EPA described in the Federal Good Neighbor Plan, the EPA proposes that SCR installation at EGUs can occur over a 36-48 month period, taking into account the fleetwide nature of the Federal Good Neighbor Plan. However, the Agency also recognizes that individual SCR installations at EGUs are capable of being completed on shorter timeframes (as little as 21 months), and this proposed action only analyzes SCR-retrofit potential on EGUs for a single state, Arizona. Recognizing that this proposal may be finalized sometime in the summer of 2024, the EPA proposes that some amount of SCR-retrofit potential could be accomplished by the start of the 2027 ozone season, which would be just shy of a 3-year time period. The EPA also recognizes that the Serious area attainment date falls on August 3, 2027, and that good neighbor obligations should be addressed, if at all possible, no later than this date. Taking all of these considerations into account, the EPA proposes that SCR retrofits at EGUs in Arizona can be phased in over two ozone seasons, 2027 and 2028. This generally aligns with the 36-48 month estimate in the Federal Good Neighbor Plan.

Thus, the EPA is proposing that EGU sources located in Arizona, Iowa, Kansas, New Mexico, and Tennessee (and Indian country within the states' borders) will participate in the Group 3 trading program starting with the 2025 ozone season, which runs from May 1, 2025, to September 30, 2025, and continuing in each ozone season after 2025. Sources in Iowa, Kansas, and Tennessee (and Indian country within the states' borders), which currently participate in the CSAPR $NO_X$ Ozone Season Group 2 Trading Program ("Group 2 trading program"), would not

Page 153 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

be required to participate in the Group 2 trading program with respect to emissions occurring after 2024.[154] The EPA invites comment on its proposed compliance start dates for these five states.

The remainder of this section discusses the potentially affected units and the changes the EPA is proposing to synchronize the integration and participation of sources in these five states into the Group 3 trading program.

1. Applicability and Tentative Identification of Newly Affected Units

The Group 3 trading program applies to any stationary, fossil-fuel-fired boiler or stationary, fossil fuel-fired combustion turbine located in a covered State (or Indian country within the borders of a covered state) and serving at any time on or after January 1, 2005, a generator with nameplate capacity of more than 25 MW producing electricity for sale, with exemptions for certain cogeneration units and certain solid waste incineration units. The complete text of the Group 3 trading program's applicability provisions (including the exemptions) and the associated definitions can be found at 40 CFR 97.1004 and 40 CFR 97.1002, respectively.

The EPA is not proposing any changes to the Group 3 trading program's applicability provisions in this rulemaking. The applicability criteria for the Group 2 and Group 3 trading programs are identical, with the result that any units in Iowa, Kansas, and Tennessee (including

---

[154] The EPA would consider these EGUs' participation in the Group 3 trading program as satisfying their states' good neighbor obligations with respect to the 2008 ozone NAAQS (and for Tennessee, the 1979 and 1997 ozone NAAQS as well) to the same extent that the states' obligations are currently being met through the EGUs' participation in the Group 2 trading program.

Page 154 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

units in Indian country within the borders of such states) that are already subject to the Group 2 trading program would also become subject to the Group 3 trading program. Further, the EPA expects that any units in Arizona and New Mexico (including units in Indian country within the borders of such states) that are already subject to the Acid Rain Program under that program's applicability criteria (*see* 40 CFR 72.6), would also meet the applicability criteria for the Group 3 trading program.

Because the applicability criteria for the Acid Rain Program and the Group 3 trading program are not identical, some units that are not subject to the Acid Rain Program could meet the applicability criteria for the Group 3 trading program. Using data reported to the U.S. Energy Information Administration, the EPA has identified nine sources in Arizona and New Mexico with a total of 23 units that that do not currently report $NO_X$ emissions and operating data to the EPA under the Acid Rain Program but that appear to meet the applicability criteria for the Group 3 trading program. The units are listed in Table VII.A.1-1. For each of these units, the table shows the estimated historical heat input and emissions data that the EPA proposes to use for the unit when determining State emissions budgets if the unit is ultimately treated as subject to the Group 3 trading program.

**Table VII.A.1-1: Selected Potentially Affected Existing Units**

| State | Facility ID | Facility name | Unit ID | Unit type | Estimated ozone season heat input (mmBtu) | Estimated ozone season NOx emissions rate (lb/mmBtu) |
|-------|-------------|---------------|---------|-----------|-------------------------------------------|------------------------------------------------------|
| Arizona | 141 | Agua Fria | AF4 | CT | 15,443 | 0.346 |
| Arizona | 141 | Agua Fria | AF5 | CT | 13,659 | 0.345 |
| Arizona | 141 | Agua Fria | AF6 | CT | 13,659 | 0.375 |
| Arizona | 160 | Apache | GT3 | CT | 633,453 | 0.135 |
| Arizona | 147 | Kyrene | KY4 | CT | 2,317 | 0.106 |

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| Arizona | 147 | Kyrene | KY5 | CT | 5,326 | 0.499 |
| Arizona | 147 | Kyrene | KY6 | CT | 5,326 | 0.322 |
| Arizona | 116 | Ocotillo | GT1 | CT | 1,752,453 | 0.016 |
| Arizona | 116 | Ocotillo | GT2 | CT | 1,752,453 | 0.006 |
| Arizona | 118 | Saguaro | GT1 | CT | 284,976 | 0.161 |
| Arizona | 118 | Saguaro | GT2 | CT | 284,976 | 0.049 |
| Arizona | 8068 | Santan | ST1 | CC | 1,037,153 | 0.037 |
| Arizona | 8068 | Santan | ST2 | CC | 1,037,153 | 0.067 |
| Arizona | 8068 | Santan | ST3 | CC | 1,037,153 | 0.052 |
| Arizona | 8068 | Santan | ST4 | CC | 1,037,153 | 0.036 |
| Arizona | 117 | West Phoenix | 1B | CC | 1,064,206 | 0.446 |
| Arizona | 117 | West Phoenix | 2B | CC | 1,064,206 | 0.444 |
| Arizona | 117 | West Phoenix | 3B | CC | 1,064,206 | 0.053 |
| Arizona | 117 | West Phoenix | GT1 | CT | 12,125 | 0.165 |
| Arizona | 117 | West Phoenix | GT2 | CT | 12,125 | 0.806 |
| Arizona | 120 | Yucca | GT3 | CT | 587,371 | 0.140 |
| Arizona | 120 | Yucca | GT4 | CT | 587,371 | 0.018 |
| New Mexico | 2446 | Maddox | 2 | CT | 62,445 | 0.309 |

The EPA requests comment on which existing units in Arizona and New Mexico and Indian country within the borders of each State would or would not meet the applicability criteria for the Group 3 trading program. The EPA also requests comment, with supporting data, on whether the estimated historical heat input and emissions data identified for each unit in Table VII.A.1-1 are representative for the unit.

2. Preset State Emissions Budgets

The Group 3 trading program as revised in the Federal Good Neighbor Plan provides for both preset and dynamic State emissions budgets. Preset emissions budgets were determined in the rulemaking for all states for the control periods in the years through 2029, and dynamic

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

emissions budgets are computed according to procedures set forth in 40 CFR 97.1010(a) for each control period starting with the 2026 control period. In the control periods for the years from 2026 through 2029, the emissions budget for each State will be the higher of the preset emissions budget or the dynamic emissions budget computed for the State for that control period. The variability limit for each State for each control period is determined as a percentage of the State's emissions budget for the control period in accordance with 40 CFR 97.1010(e), and the State's assurance level for the control period is the sum of the emissions budget and the variability limit. This same system for determining State emissions budgets, variability limits, and assurance levels would also apply to the five states that would be added to the Group 3 trading program in this rulemaking.

In this proposal, the EPA is presenting the proposed preset State ozone season $NO_X$ emissions budgets for covered EGUs in Arizona, Iowa, Kansas, New Mexico, and Tennessee for the control periods in 2025 through 2029. For all five states, starting with the 2025 control period, the State emissions budgets would reflect emissions reductions achievable through optimization of installed controls and installation of new state-of-the-art combustion controls. In addition, for Arizona but not for the other four states, the emissions reductions achievable through the installation and operation of new SCR controls would be phased in starting with the preset and dynamic budgets for the 2027 control periods and would be fully reflected in the preset and dynamic budgets for 2028 and later control periods. As noted previously, the EPA is not proposing changes in the methodologies used to establish the preset or dynamic State emissions budgets, the variability limits, or the assurance levels. The EPA is not aware of any circumstances that would justify an alternative approach in extending these provisions to these

Page 157 of 289

five additional states. Rather, the EPA is requesting comment on the preset State ozone season

$NO_X$ emissions budgets calculated using these methodologies. The preset State emissions

budgets for control periods 2025-2029 are presented in Table VII.A.2-1.

**Table VII.A.2-1—Proposed Preset State Emissions Budgets, 2025-2029 (tons)**

|  | **2025** | **2026** | **2027** | **2028** | **2029** |
|---|---|---|---|---|---|
| Arizona | 8,195 | 5,814 | 4,913 | 3,949 | 3,949 |
| Iowa | 9,752 | 9,713 | 9,713 | 9,713 | 9,077 |
| Kansas | 4,763 | 4,763 | 4,763 | 4,763 | 4,763 |
| New Mexico | 2,211 | 2,008 | 2,008 | 2,008 | 2,008 |
| Tennessee | 3,983 | 3,983 | 2,666 | 2,130 | 1,198 |

3. Unit-Level Allowance Allocations

Under the Group 3 trading program, in advance of each control period, a portion of each

State's emissions budget for the control period is reserved as a set-aside for potential allocation

to new units and the unreserved portion of the budget is then allocated among the state's existing

units. If there are existing units in areas of Indian country within a State's borders not subject to

the State's SIP authority, allocations to those units are made through Indian country existing unit

set-asides.[155] After each control period, the new unit set-aside is allocated among any units

qualifying for allocations within the State's borders (including areas of Indian country) and any

remaining allowances are reallocated among the existing units. In almost all cases, the

allocations to set-asides, to existing units, and to new units are made according to procedures laid

---

[155] The EPA is aware of four existing EGUs in Indian country that would be covered under this rulemaking's proposed expansion of the Group 3 trading program: South Point Units A and B in the Fort Mojave Reservation within Arizona's borders, and Four Corners Units 4 and 5 in the Navajo Reservation within New Mexico's borders.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

out in the regulations at 40 CFR 97.1010 through 97.1012. The exception is that for control periods where the final State emissions budgets are established in the related rulemaking – *e.g.*, the 2025 control period – the set-asides and allocations to existing units are also established in the related rulemaking, using the same allocation procedure applicable to later control periods. This same system for allocating allowances from the Federal Good Neighbor Plan would also apply to the five states that would be added to the Group 3 trading program in this rulemaking.

Based on the same methodology used to determine the percentages of the budgets set aside for new units for other states in the Federal Good Neighbor Plan, the EPA is proposing that the percentages of the budgets set aside for new units for the five proposed additional states would be the default of 5 percent for each of the states for all control periods, except for Arizona for the control periods in 2025 and 2026, for which the percentage would be 11 percent. The EPA is also presenting the proposed unit-level allocations to existing units in the newly added states for the 2025 control period. The methodology and procedures used to determine new unit set-aside percentages and unit-level allocations are described in section VI.B.9. of the preamble to the Federal Good Neighbor Plan and in the "Addendum to the Allowance Allocation Under the Final Rule TSD for the Federal Good Neighbor Plan" TSD available in the docket for this action. The EPA's allocations and allocation procedures apply for the 2025 control period, and, by default, for subsequent control periods unless and until a State or tribe provides state- or tribe-determined allowance allocations under an approved SIP revision or Tribal implementation

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

plan.[156] The EPA is taking comment only on the data inputs (*e.g.*, corrections to the heat input value used for a particular unit) used in applying the allowance allocation methodology for existing units and on the resulting existing unit allocations proposed for the five proposed additional states. The EPA is not proposing changes in the methodologies used for allowance allocation and for establishing set-asides determined in the Federal Good Neighbor Plan. The EPA is not aware of any circumstances that would justify an alternative approach in extending these provisions to these five additional states.

4. Timing Adjustments for Certain Trading Program Provisions

In general, sources in the proposed additional states would face the same compliance requirements as sources in states already covered by the Group 3 trading program, but the EPA is proposing three exceptions. The first exception concerns the timing with which elements of the selected emissions control strategy are reflected in the State emissions budgets. As discussed in section VI. of this document, the EPA proposes to find that it is reasonable for the State emissions budgets to reflect emissions reductions achievable from new combustion controls starting in the 2025 control period and emissions reductions achievable from new SCR controls phased in over the 2027-2028 control periods. These proposed timing determinations, which are necessarily later than the corresponding timing determinations for sources in states already covered by the Group 3 trading program, would be reflected in the preset and dynamic State

---

[156] The options for states to submit SIP revisions that would replace the EPA's default allowance allocations are discussed in sections VII.C.1., VII.C.2., and VII.C.3. of this document. Similarly, for a covered area of Indian country not subject to a State's CAA implementation planning authority, a tribe could elect to work with the EPA under the Tribal Authority Rule to develop a full or partial Tribal implementation plan under which the tribe would determine allowance allocations that would replace the EPA's default allocations for subsequent control periods.

Page 160 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

emissions budgets for the proposed additional states, as discussed in section VII.A.2. of this document.

The second exception concerns the timing of the application of the backstop daily $NO_X$ emissions rate provisions. For units in the proposed additional states with existing SCR controls, the EPA proposes that these provisions would apply starting in the 2026 control period, which would be the units' second control period in the revised Group 3 trading program. For units in Arizona without existing SCR controls, the backstop rate provision would apply in the second control period in which such controls are operated, but not later than the 2030 control period. These proposed schedules would reflect the same principles used to determine the schedules for units with and without existing SCR controls in the states already in the program. The backstop rate provisions would not apply to units without existing SCR controls in Iowa, Kansas, New Mexico, or Tennessee (unless the units choose to install such controls, in which case the backstop rate provisions would apply starting in the second control period in which such controls are operated) because the emissions control stringency identified as appropriate for those states to address the states' good neighbor obligations does not include the installation of new SCR controls.[157]

The third exception concerns the timing of the application of the maximum controlled baseline provisions which potentially cap allowance allocations to individual units. For units in the proposed additional states with existing SCR controls, the EPA proposes that these

---

[157] As discussed in section X.C. of this document, the EPA is proposing to make technical corrections to the backstop rate provisions to ensure that the provisions would not inadvertently apply to units without existing SCR controls in any State for which the EPA's identified emissions control stringency does not include the installation of new SCR controls.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

provisions would apply starting in the 2025 control period, which would be the units' first full control period in the revised Group 3 trading program. For units in Arizona without existing SCR controls, the maximum controlled baseline provisions would apply starting with the 2028 control period, which would be the first year in which the Arizona State emissions budget would fully reflect the emissions reductions achievable through the installation of new SCR controls. Again, these proposed schedules would reflect the same principles used to determine the schedules for units with and without existing SCR controls in the states already in the program. The maximum controlled baseline provisions would not apply to units without existing SCR controls in Iowa, Kansas, New Mexico, or Tennessee (unless the units choose to install such controls) because the emissions control stringency identified for those states as necessary to address the states' good neighbor obligations does not include the installation of new SCR controls.[158]

The EPA requests comment on the proposed timing of the backstop daily $NO_X$ emissions rate provisions and the maximum controlled baseline provisions for sources in the proposed additional states.

5. Creation of an Additional Group 3 Allowance Bank for the 2025 Control Period and Adjustment to Bank Recalibration for the 2025 Control Period

In the Federal Good Neighbor Plan, the EPA created an initial bank of 2023 Group 3 allowances available to sources in states newly added to the Group 3 trading program by converting banked 2017-2022 Group 2 allowances. Similarly, in this rulemaking the EPA

---

[158] As discussed in section X.C. of this document, the EPA is proposing to make technical corrections to the maximum controlled baseline provisions to ensure that the provisions would not inadvertently apply to units without existing SCR controls in any State for which the EPA's identified emissions control stringency does not include the installation of new SCR controls.

Page 162 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

proposes to create an initial bank of 2025 Group 3 allowances available to sources in the proposed additional states by converting banked 2017-2024 Group 2 allowances. The target quantity of banked 2025 Group 3 allowances to be created would be 21 percent of the sum of the 2025 State emissions budgets of the newly added states. The allowances to be converted would be all 2017-2024 Group 2 allowances held in the facility accounts of sources in the newly added states as of the conversion date, which is proposed to be 45 days after the effective date of a final rule in this rulemaking. The conversion ratio would be the total quantity of 2017-2024 Group 2 allowances being converted divided by the target quantity of 2025 Group 3 allowances being created, but not less than 1.0.

The EPA's rationale for proposing to create an initial allowance bank available to the sources in newly added states is generally the same as the rationale for creating the similar bank under the Federal Good Neighbor Plan. The limited differences between the two bank creation processes are attributable to changes in circumstances and are fully consistent with that rationale. First, because the emissions reductions achievable through installation of combustion controls would be reflected in the budgets for the newly added States' first control period in the program, the allowance bank target would be based on the first year's budgets rather than the second year's budgets. Second, because the EPA expects that the effective date of a final rule will not fall partway through an ozone season, there is no need in this proposal to plan for prorating of the allowance bank target quantity. Finally, because the sources in the newly added states would represent a minority of the sources currently participating in the Group 2 trading program, this proposal would not convert Group 2 allowances held in general accounts. For further discussion

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

of the rationale for the proposed bank creation, *see* section VI.B.12.b. of the Federal Good Neighbor Plan preamble.

In addition to providing for the creation of an initial Group 3 allowance bank through the conversion of banked Group 2 allowances, the EPA is also proposing an adjustment to the Group 3 trading program's bank recalibration provisions for the 2025 control period to coordinate those provisions with the proposed addition of the five additional states. Specifically, the EPA is proposing to exclude the five newly added states' 2025 budgets when calculating the bank ceiling target used to determine whether any bank recalibration for the 2025 control period will occur. The reason for this proposed change is that because the initial bank creation process described in the preceding paragraphs of this section (section VII.A.5. of this document) would separately create a quantity of banked allowances for 2025 of up to 21 percent of the newly added states' emissions budgets, to ensure that the overall quantity of banked allowances available for use in the entire Group 3 trading program in the 2025 control period is no more than 21 percent of the emissions budgets of all states covered by the program in 2025, the bank ceiling target used in the bank recalibration process for other banked allowances carried over into the 2025 control period in the Group 3 trading program would need to be limited to 21 percent of the budgets for the states other than the newly added states. For 2026 and later control periods, the bank ceiling target will be calculated for all states in the Group 3 trading program using the State emissions budgets for all covered states.

The EPA requests comment on the proposed creation of an initial Group 3 allowance bank and the proposed adjustment to the Group 3 allowance bank recalibration for the 2025 control period.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*B. Regulatory Requirements for Non-EGUs*

As summarized in section II.B. of this document, the EPA finalized requirements for emissions unit types in the following nine non-EGU industries (industrial sources) in the Federal Good Neighbor Plan: RICE in Pipeline Transportation of Natural Gas; kilns in Cement and Cement Product Manufacturing; reheat furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; furnaces in Glass and Glass Product Manufacturing; boilers in Iron and Steel Mills and Ferroalloy Manufacturing, Metal Ore Mining, Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills; and combustors and incinerators in Solid Waste Combustors and Incinerators. The EPA determined these are the most impactful types of units in the relevant industries and that emissions reductions are achievable with the control technologies identified in sections VI.C.1. through VI.C.6. of the Federal Good Neighbor Plan and further discussed in the Final Non-EGU Sectors TSD. The rationale behind the applicability criteria, emissions limits, and additional regulatory requirements for each industry can also be found in sections VI.C.1. through VI.C.6. of the Federal Good Neighbor Plan. The emissions control requirements of the Federal Good Neighbor Plan for non-EGU sources apply only during the ozone season (May through September) each year.

In this document, the EPA proposes to extend these regulatory requirements to affected units within the State of Arizona under the same rationale provided in the Federal Good Neighbor Plan. These proposed FIP requirements for Arizona apply to both new and existing emissions units in the State. This approach will ensure that all new and existing emissions units in Arizona that meet the applicability criteria will be subject to the same good neighbor

Page 165 of 289

requirements that apply to new and existing units under the Federal Good Neighbor Plan for other covered states, in a manner that is wholly consistent with the determination of significant contribution and interference with maintenance at Step 3 (*see* section VI. of this document). Applying this same uniform set of control requirements will also avoid creating, inadvertently or intentionally, any incentives to shift production (and therefore emissions) from an existing non-EGU source to a new non-EGU source of the same type but lacking the relevant emissions control requirements either within a linked State or in another linked state, including the State of Arizona. The rationale behind the applicability criteria, emissions limits, and additional regulatory requirements for each industry can be found in the Federal Good Neighbor Plan.

The EPA does not propose to make any changes in the non-EGU requirements that were finalized in the Federal Good Neighbor Plan as applicable to this one additional state. (The EPA does propose to make certain corrections in the regulatory text as applicable in all states that are subject to the Federal Good Neighbor Plan's non-EGU provisions, as discussed in section X. of this document.) The EPA proposes to extend these requirements to cover one additional state, Arizona. The EPA is not aware of any circumstances that would justify an alternative approach in extending these provisions to Arizona, which were already finalized to apply in other covered states on a uniform basis. However, the public is invited to comment on the proposed application of these requirements in Arizona.

Similar to the EPA's adjustment in the compliance schedule for EGUs, the EPA proposes that compliance with non-EGU requirements in Arizona can be accomplished by the start of the 2027 ozone season. This is 1 year later than the onset of these compliance obligations for states that currently are subject to the Federal Good Neighbor Plan. This reflects findings in the Federal

Page 166 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Good Neighbor Plan that all non-EGU emissions control strategies can generally be implemented within a 3-year timeframe. Three years from when this proposal may be finalized in 2024 roughly correlates to the 2027 ozone season. Respecting the potential need for compliance extensions beyond this ozone season, this proposal likewise includes the availability of compliance extensions under 40 CFR 52.40(d) (as well as the availability of alternative emissions limits under 40 CFR 52.40(e)). The dates associated with filing applications under these provisions, as well as for making other filings and demonstrations in association with compliance with the non-EGU requirements, are proposed to be adjusted from the dates finalized in the Federal Good Neighbor Plan, and generally are proposed to align with the 2027 ozone season. (The Agency anticipates and acknowledges that the dates associated for compliance in the Federal Good Neighbor Plan for other states where that rule is currently stayed pending judicial review will likewise need to be reviewed and adjusted through rulemaking action.) The Agency invites comment on its proposal that compliance with emissions limits for covered non-EGU sources in Arizona will be required beginning on May 1, 2027.

*C. Submitting a SIP*

Under the Federal Good Neighbor Plan, a State may submit a SIP at any time to address CAA requirements that are covered by a FIP, and if the EPA approves the SIP submission it would replace the FIP, in whole or in part, as appropriate. As discussed in this section, states may opt for one of several alternatives that the EPA has provided to take over all or portions of the FIP. However, as discussed in greater detail further in this section of the document, the EPA also recognizes that states retain the discretion to develop SIPs to replace a FIP under approaches that differ from those the EPA finalizes.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

The EPA has established certain specialized provisions for replacing FIPs with SIPs within all the CSAPR trading programs, including the use of so-called "abbreviated SIPs" and "full SIPs," *see* 40 CFR 52.38(a)(4) and (5) and (b)(4), (5), (8), (9), (11), and (12); 40 CFR 52.39(e), (f), (h), and (i). For a State to remove all FIP provisions through an approved SIP revision, a State would need to address all required reductions addressed by the FIP for that state, *i.e.*, reductions achieved through both EGU control and non-EGU control, as applicable to that state. Additionally, tribes in Indian country within the geographic scope of this rule may elect to work with the EPA under the Tribal Authority Rule to replace the FIP for areas of Indian country, in whole or in part, with a Tribal implementation plan or reasonably severable portions of a Tribal implementation plan.

Consistent with the options provided to states included in the Federal Good Neighbor Plan, under the FIPs for the five states in this proposed rule whose EGUs are required to participate in the CSAPR $NO_X$ Ozone Season Group 3 Trading Program, the EPA proposes to offer "abbreviated" and "full" SIP submission options for states. An "abbreviated SIP" would allow a State to submit a SIP revision that establishes state-determined allowance allocation provisions replacing the default FIP allocation provisions but leaving the remaining FIP provisions in place. A "full SIP" would allow a State to adopt a trading program meeting certain requirements that allow sources in the State to continue to use the EPA-administered trading program through an approved SIP revision, rather than a FIP. In addition, as under the Federal Good Neighbor Plan and past CSAPR rulemakings, the EPA proposes that newly added states have the option to adopt state-determined allowance allocations for existing units for the second control period under this rule – in this case, the 2026 control period – through streamlined SIP

Page 168 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

revisions. *See* 76 FR 48326-48332 for additional discussion of full and abbreviated SIP options; *see also* 40 CFR 52.38(b).

1. SIP Option to Modify Allocations for 2026 Under EGU Trading Program

As with the start of past CSAPR rulemakings, the EPA proposes the option to allow a newly added State to use a similar process to submit a SIP revision establishing allowance allocations for existing EGU units in the State for the second control period of the new requirements, *i.e.*, in 2026, to replace the EPA-determined default allocations. A State would have to submit a letter to the EPA by 15 days after the effective date of a final rule in this rulemaking indicating its intent to submit a complete SIP revision by April 1, 2025. The SIP revision would provide, in an EPA-prescribed format, a list of existing units within the State and their allocations for the 2026 control period. If a State does not submit a letter of intent to submit a SIP revision, or if a State submits a timely letter of intent but fails to submit a SIP revision, the EPA-determined default allocations would be recorded by July 1, 2025. If a State submits a timely letter of intent followed by a timely SIP revision that is approved, the approved SIP revision allocations would be recorded by October 1, 2025.

2. SIP Option to Modify Allocations for 2027 and Beyond Under EGU Trading Program

For the 2027 control period and later, the EPA also proposes that newly added states in the CSAPR $NO_X$ Ozone Season Group 3 Trading Program could submit a SIP revision that makes changes only to the allowance allocation provisions while relying on the FIP for the

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

remaining provisions of the EGU trading program.[159] This abbreviated SIP option would allow states to tailor the FIP to their individual choices while maintaining the FIP-based structure of the trading program. To ensure the availability of allowance allocations for units in any Indian country within a State not covered by the State's CAA implementation planning authority, if the State chose to replace the EPA's default allocations with state-determined allocations, the EPA would continue to administer any portion of each State emissions budget reserved as a new unit set-aside or an Indian country existing unit set-aside.

The SIP submission deadline for this type of revision would be December 1, 2025, if the State intends for the SIP revision to be effective beginning with the 2027 control period. For states that submit this type of SIP revision, the deadline to submit state-determined allocations beginning with the 2027 control period under an approved SIP would be June 1, 2026, and the deadline for the EPA to record those allocations would be July 1, 2026. Similarly, a State could submit a SIP revision beginning with the 2028 control period and beyond by December 1, 2026, with State allocations for the 2028 control period due June 1, 2027, and the EPA's recordation of the allocations due by July 1, 2027.

3. SIP Option to Replace the Federal EGU Trading Program with an Integrated State EGU Trading Program

For the 2027 control period and later, the EPA proposes that newly added states in the CSAPR NO$_X$ Ozone Season Group 3 Trading Program could choose to replace the Federal EGU

---

[159] Under the Federal Good Neighbor Plan, states already covered by the Group 3 trading program already have this option, starting with the 2025 control period. *See* 40 CFR 52.38(b)(11).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

trading program with an integrated State EGU trading program through an approved SIP

revision.[160] Under this full SIP option, a State could submit a SIP revision that makes changes

only to modify the EPA-determined default allocations while adopting identical provisions for

the remaining portions of the EGU trading program. This SIP option would allow states to

replace these FIP provisions with state-based SIP provisions while continuing participation in the

larger regional trading program. As with the abbreviated SIP option discussed previously, to

ensure the availability of allowance allocations for units in any Indian country within a State not

covered by the State's CAA implementation planning authority, if the State chooses to replace

the EPA's default allocations with state-determined allocations, the EPA would continue to

administer any portion of each State emissions budget reserved as a new unit set-aside or an

Indian country existing unit set-aside.

Deadlines for this type of SIP revision would be the same as the deadlines for abbreviated

SIP revisions. For the SIP-based program to start with the 2027 control period, the SIP revision

deadline would be December 1, 2025, the deadline to submit state-determined allocations for the

2027 control period under an approved SIP would be June 1, 2026, and the deadline for the EPA

to record those allocations would be July 1, 2026, and so on.

4. SIP Revisions that Do Not Use the Trading Program

States can submit SIP revisions to replace the FIP that achieve the necessary EGU

emissions reductions but do not use the CSAPR $NO_X$ Ozone Season Group 3 Trading Program.

---

[160] Under the Federal Good Neighbor Plan, states already covered by the Group 3 trading program already have this option, starting with the 2025 control period. *See* 40 CFR 52.38(b)(12).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

For a transport SIP revision that does not use the CSAPR $NO_X$ Ozone Season Group 3 Trading Program, the EPA would evaluate the transport SIP revision based on the particular control strategies selected and whether the strategies as a whole provide adequate and enforceable provisions ensuring that the necessary emissions reductions (*i.e.*, reductions equal to or greater than what the Group 3 trading program will achieve) will be achieved. To address the applicable CAA requirements, the SIP revision should include the following general elements: (1) a comprehensive baseline 2023 statewide $NO_X$ emissions inventory (which includes existing control requirements), which should be consistent with the 2023 emissions inventory that the EPA used to calculate the required State budget in this final proposed rule (unless the State can explain the discrepancy); (2) a list and description of control measures to satisfy the State emissions reduction obligation and a demonstration showing when each measure would be implemented to meet the 2025 and successive compliance deadlines; (3) fully-adopted State rules providing for such $NO_X$ controls during the ozone season; (4) for EGUs larger than 25 MW, monitoring and reporting under 40 CFR part 75, and for other units, monitoring and reporting procedures sufficient to demonstrate that sources are complying with the SIP (*see* 40 CFR part 51, subpart K ("source surveillance" requirements)); and (5) a projected inventory demonstrating that State measures along with Federal measures will achieve the necessary emissions reductions in time to meet the 2025 and successive compliance deadlines (*e.g*., enforceable reductions commensurate with installation of SCR on coal-fired EGUs by the 2027 ozone season). The SIPs must meet procedural requirements under the Act, such as the requirements for public hearing, be adopted by the appropriate State board or authority, and establish by a practically enforceable regulation or permit(s) a schedule and date for each affected source or source category to achieve

Page 172 of 289

compliance. Once the State has made a SIP submission, the EPA will evaluate the submission(s) for completeness before acting on the SIP submission. EPA's criteria for determining completeness of a SIP submission are codified at 40 CFR part 51, appendix V.

For further background information on considerations for replacing a FIP with a SIP, *see* the discussion in the final CSAPR rulemaking (76 FR 48326).

5. SIP Revision Requirements for Non-EGU or Industrial Source Control Requirements

Just as with the EGU requirements discussed in section VII.C.1.-4. of this document, the EPA's finalization of this proposed interstate ozone transport FIP for Arizona would in no way affect the ability of the State to submit, for review and approval, a SIP that replaces the requirements of the FIP with State requirements. To replace the non-EGU portion of the FIP in a state, the State's SIP submission must provide adequate provisions to prohibit $NO_X$ emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. The State SIP submission must demonstrate that the emissions reductions required by the SIP would continue to ensure that significant contribution and interference with maintenance from that State has been eliminated through permanent and enforceable measures. The non-EGU requirements of the FIP would remain in place in each covered State until a State's SIP submission has been approved by the EPA to replace the FIP.

The most straightforward method for a State to submit a presumptively approvable SIP revision to replace the non-EGU portion of the FIPs for the State would be to provide a SIP revision that includes emissions limits at an equivalent or greater level of stringency than is specified for non-EGU sources meeting the applicability criteria and associated compliance assurance provisions for each of the unit types identified in section VI.C. of this document.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

However, states are also free to develop alternative approaches to eliminating significant contribution and interference with maintenance in other states, so long as they are shown to be equivalent to the Federal plan they replace. The Federal Good Neighbor Plan contains a more detailed discussion of factors and considerations associated with replacing a good neighbor FIP. *See* 88 FR at 36842-43.

*D. Title V Permitting*

As with the Federal Good Neighbor Plan, as well as other previous good neighbor rules, like the CSAPR, the CSAPR Update, and the Revised CSAPR Update, this proposed rule would not establish any permitting requirements independent of those under Title V of the CAA and the regulations implementing Title V, 40 CFR parts 70 and 71.[161] All major stationary sources of air pollution and certain other sources are required to apply for title V operating permits that include emissions limitations and other conditions as necessary to ensure compliance with the applicable requirements of the CAA, including the requirements of the applicable SIP. CAA sections 502(a) and 504(a), 42 U.S.C. 7661a(a) and 7661c(a). The "applicable requirements" that must be addressed in title V permits are defined in the title V regulations (40 CFR 70.2 and 71.2 (definition of "applicable requirement")).

The EPA anticipates that, given the nature of the units subject to this final rule, most if not all of the sources at which the units are located are already subject to title V permitting requirements and already possess a title V operating permit. For sources subject to title V, the interstate transport requirements for the 2015 ozone NAAQS that are applicable to them under

---

[161] Part 70 addresses requirements for State title V programs, and Part 71 governs the Federal title V program.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

the FIPs proposed in this action would be "applicable requirements" under title V and therefore must be addressed in the title V permits. For example, EGU requirements concerning designated representatives, monitoring, reporting, and recordkeeping, the requirement to hold allowances covering emissions, the compliance assurance provisions, and liability, and for non-EGUs, the emissions limits and compliance requirements are, to the extent relevant to each source, "applicable requirements" that must be addressed in the permits.

Consistent with EPA's approach under the Federal Good Neighbor Plan, the applicable requirements resulting from the FIPs generally would have to be incorporated into affected sources' existing title V permits either pursuant to the provisions for reopening for cause (40 CFR 70.7(f) and 71.7(f)), significant modifications (40 CFR 70.7(e)(4)) or the standard permit renewal provisions (40 CFR 70.7(c) and 71.7(c)).[162] For sources newly subject to title V that would be affected sources under the FIPs, the initial title V permit issued pursuant to 40 CFR 70.7(a) would address the final FIP requirements.

As was the case in the Federal Good Neighbor Plan, the new and amended FIPs would impose no independent permitting requirements and the title V permitting process would impose no additional burden on sources already required to be permitted under title V. More detailed title V permitting considerations for both EGUs and non-EGUs are provided in section VI.D. of the Federal Good Neighbor Plan.

---

[162] A permit is reopened for cause if any new applicable requirements (such as those under a FIP) become applicable to an affected source with a remaining permit term of 3 or more years. If the remaining permit term is less than 3 years, such new applicable requirements will be added to the permit during permit renewal. *See* 40 CFR 70.7(f)(1)(I) and 71.7(f)(1)(I).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**VIII. Environmental Justice Considerations, Implications and Outreach**

*A. Environmental Justice*

Demographic proximity analyses allow one to assess the potentially vulnerable populations residing nearby affected facilities as an indicator of exposure and the potential for adverse health impacts that may occur at a local scale due to economic activity at a given location including noise, odors, traffic, and emissions such as $NO_2$, covered under this EPA action and not modeled elsewhere in this *EIA*.

Although baseline proximity analyses are presented here for the supplemental rule, several important caveats should be noted. In most areas, emissions are not expected to increase from the rulemaking, so most communities nearby affected facilities should experience decreases in exposure from directly emitted pollutants. However, facilities may vary widely in terms of the impacts on populations they already pose to nearby populations. In addition, proximity to affected facilities does not capture variation in baseline exposure across communities, nor does it indicate that any exposures or impacts will occur and should not be interpreted as a direct measure of exposure or impact. These points limit the usefulness of proximity analyses when attempting to answer question from EPA's Environmental Justice Technical Guidance. Demographic proximity analyses were performed for two subsets of facilities affected by the supplemental rule:

- Electricity Generating Unit (EGU): Comparison of the percentage of various populations (race/ethnicity, age, education, poverty status, income, and linguistic isolation) living nearby covered EGU sources to average national levels.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

- Non-EGU (non-electric generating units, or other stationary emissions sources): Comparison of the percentage of various populations (race/ethnicity, age, education, poverty status, income, and linguistic isolation) living nearby covered non-EGU sources to average national levels.

1. EGU Proximity Assessment

The current analysis identified all census blocks with centroids within a 5 km, 10 km and 50 km radius of the latitude/longitude location of each facility, and then linked each block with census-based demographic data.[163] The total population within a specific radius around each facility is the sum of the population for every census block within that specified radius, based on each block's population provided by the decennial Census.[164] Statistics on race, ethnicity, age, education level, poverty status and linguistic isolation were obtained from the Census' 2015-2019 American Community Survey 5-year averages. These data are provided at the block group level. For the purposes of this analysis, the demographic characteristics of a given block group – that is, the percentage of people in different races/ethnicities, the percentage in different age groups (<18, 18-64, and >64), the percentage without a high school diploma, the percentage that are below the poverty level, and the percentage that are linguistically isolated – are presumed to also describe each census block located within that block group.

---

[163] Five km and 50 km radii are the default distances currently used for proximity analyses. The 5 km distance is the shortest distance that should be chosen to avoid excessive demographic uncertainty and provides information on near-field populations. The 50 km distance offers a sub-regional perspective. The 10 km distance was added to this analysis as few to no people were within 5 km of some affected facilities.

[164] The location of the Census block centroid is used to determine if the entire population of the Census block is assumed to be within the specified radius. It is unknown how sensitive these results may be to different methods of population estimation, such as aerial apportionment.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

In addition to facility-specific demographics, the demographic composition of the total population within the specified radius (*e.g*., 50 km) for all facilities as a whole was also computed (*e.g*., all EGUs or all non-EGU facilities). In calculating the total populations, to avoid double-counting, each census block population was only counted once. That is, if a census block was located within the selected radius (*i.e.*, 50 km) for multiple facilities, the population of that census block was only counted once in the total population. Finally, this analysis compares the demographics at each specified radius (*i.e.*, 5 km, 10 km, and 50 km) to the demographic composition of the nationwide population.

For this action, a demographic analysis was conducted for nine EGU facilities assumed to install additional controls at the 5 km, 10 km, and 50 km radius distances (Table VIII.A.1-1). Approximately 7 million people live within 50 km of these nine EGU facilities, representing roughly 2 percent of the 328 million total population of the U.S. Within 50km of EGU facilities, there is a higher Hispanic/Latino population than the national average (26 percent versus 19 percent) and a higher Native American population than the national average (1.9 percent versus 0.7 percent). Other demographics of the population within 50km of the EGU facilities are similar to the national averages. Approximately 166 thousand and 716 thousand people live within 5 km and 10 km of the EGU facilities, respectively. The demographic make-up of the population within 5 km and 10 km of EGU facilities are very similar. Within 5 km and 10 km of EGU facilities, there is a higher Hispanic/Latino population than the national average (60 percent within 5 km and 53 percent within 10 km versus 19 percent nationwide) and a higher Native American population than the national average (5.5 percent within 5 km and 3.5 percent within 10 km versus 0.7 percent nationwide). The populations within 5 km and 10 km of EGU facilities

Page 178 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

have a higher percentage of people under the age of 18 compared to the national average (29 percent within both 5km and 10km versus 23 percent nationwide). The percent of people living below the poverty level is higher than the national average (24 percent within 5 km and 23 percent within 10 km versus 13 percent nationwide). The percent of people over the age of 25 without a high school diploma is higher than the national average (18 percent within 5 km and 16 percent within 10 km versus 12 percent nationwide), and the percent of people living in linguistic isolation is higher than the national average (12 percent within 5 km and 10 percent within 10 km versus 5 percent nationwide).

**Table VIII.A.1-1: Population Demographics for the Nine EGU Facilities Assumed to Install Additional Controls due to the Supplemental Rule**

| Demographic Group | | Percent (%) of Population Within Each Distance Compared to the National Average[1] | | | |
|---|---|---|---|---|---|
| | | 5km | 10km | 50km | National Average |
| Race/ Ethnicity | White | 23 | 28 | 59 | 60 |
| | African American | 9 | 10 | 7 | 12 |
| | Native American | 5.5 | 3.5 | 1.9 | 0.7 |
| | Other and Multiracial | 3 | 5 | 6 | 8 |
| | Hispanic or Latino[2] | 60 | 53 | 26 | 19 |
| Age | 0-17 Years Old | 29 | 29 | 24 | 23 |
| | 18-64 Years Old | 61 | 62 | 61 | 62 |
| | >=65 Years Old | 9 | 9 | 15 | 16 |
| Income | People Living Below the Poverty Level | 24 | 23 | 14 | 13 |
| Education | >= 25 Years Old Without a High School Diploma | 18 | 16 | 8 | 12 |
| Language | People Living in Linguistic Isolation | 12 | 10 | 5 | 5 |
| Total Population | | 165,712 | 716,296 | 6,742,898 | 328,016,242 |

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

---

[a] Demographic percentage is based on the Census' 2015-2019 American Community Survey 5-year averages, at the block group level, and include the 50 states, District of Columbia, and Puerto Rico. Total population is based on block level data from the 2010 Decennial Census.
[b] To avoid double counting, the "Hispanic or Latino" category is treated as a distinct demographic category for these analyses. A person who identifies as Hispanic or Latino is counted as Hispanic/Latino for this analysis, regardless of what race this person may have also identified as in the Census.

2. Non-EGU Proximity Assessment

For this action, a demographic analysis was also conducted for two non-EGU facilities assumed to install additional controls at the 5 km, 10 km, and 50 km radius distances (TableVIII.A.2-1). Approximately 218 thousand people live within 50 km of these two non-EGU facilities, representing roughly 0.07 percent of the 328 million total population of the U.S. Within 50km of the two non-EGU facilities, there is a higher White population than the national average (72 percent versus 60 percent), and there is a higher Native American population than the national average (3.8 percent versus 0.7 percent). There is also a higher population over the age of 65 than the national average (24 percent versus 16 percent). Approximately 200 and 3,000 people live within 5 km and 10 km of the non-EGU facilities, respectively. The demographic make-up of the population within 5 km and 10 km of non-EGU facilities are similar. Within 5 km and 10 km of non-EGU facilities, there is a higher White population than the national average (87 percent within 5km and 88 percent within 10 km versus 60 percent nationwide) and there is a higher Native American population than the national average (2.2 percent within 5 km and 1.0 percent within 10 km versus 0.7 percent nationwide). Concerning the age distribution within 5 and 10km of the two non-EGU facilities, the percent of people aged 65 or older is higher than the national average (31 percent within 5 km and 36 percent within 10 km versus 16 percent nationwide). Additionally, the percent of people living below the poverty level within 5

Page 180 of 289

km and 10 km of the non-EGU facilities is higher than the national average (18 percent within 5

km and 17 percent within 10 km versus 13 percent nationwide).

**Table VIII.A.2-1: Population Demographics for the Two Non-EGU Facilities Assumed to Install Additional Controls due to the Supplemental Rule**

| Demographic Group | | Percent (%) of Population Within Each Distance Compared to the National Average[1] | | | |
|---|---|---|---|---|---|
| | | **5km** | **10km** | **50km** | **National Average** |
| Race/ Ethnicity | White | 87 | 88 | 72 | 60 |
| | African American | 0 | 0 | 1 | 12 |
| | Native American | 2.2 | 1.0 | 3.8 | 0.7 |
| | Other and Multiracial | 4 | 4 | 5 | 8 |
| | Hispanic or Latino[2] | 7 | 7 | 19 | 19 |
| Age | 0-17 Years Old | 5 | 6 | 17 | 23 |
| | 18-64 Years Old | 65 | 58 | 59 | 62 |
| | >=65 Years Old | 31 | 36 | 24 | 16 |
| Income | People Living Below the Poverty Level | 18 | 17 | 14 | 13 |
| Education | >= 25 Years Old Without a High School Diploma | 7 | 8 | 8 | 12 |
| Language | People Living in Linguistic Isolation | 0 | 0 | 2 | 5 |
| **Total Population** | | **204** | **3,193** | **218,256** | **328,016,242** |

[1] Demographic percentage is based on the Census' 2015-2019 American Community Survey 5-year averages, at the block group level, and include the 50 states, District of Columbia, and Puerto Rico. Total population is based on block level data from the 2010 Decennial Census.
[2] To avoid double counting, the "Hispanic or Latino" category is treated as a distinct demographic category for these analyses. A person who identifies as Hispanic or Latino is counted as Hispanic/Latino for this analysis, regardless of what race this person may have also identified as in the Census.


For additional information on the EGU or non-EGU proximity analyses, *see* section

VII.3. of the Federal Good Neighbor Plan as well as the memorandum *Analysis of Demographic*

*Factors For Populations Living Near EGU and Non-EGU Facilities*, in the rulemaking docket.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*B. Outreach*

Prior to this proposal and prior to proposal of the EPA's Federal Good Neighbor Plan, the EPA initiated a public outreach effort to gather input from stakeholder groups likely to be interested in this action. Specifically, the EPA hosted an environmental justice webinar on October 26, 2021, to share information about the Federal Good Neighbor Plan and solicit feedback about potential environmental justice considerations. The webinar was attended by over 180 individuals representing State governments, federally recognized tribes, environmental NGOs, higher education institutions, industry, and the EPA.[165] Participants were invited to comment during the webinar or provide written comments to a pre-regulatory docket. The webinar was recorded and distributed to attendees after the event. The key issues raised by interested parties is summarized in section VIII.C. of the EPA's proposed Good Neighbor Plan Rulemaking, and the EPA's response to these comments regarding environmental justice considerations are available in section 6 of the *Response To Comments* document for the Federal Good Neighbor Plan.[166,167]

**IX. Costs, Benefits, and Other Impacts of the Proposed Rule**

In the *EIA* for this action, the EPA estimated the health and climate benefits, compliance costs, and emissions changes that may result from the proposed rule for the analysis period 2025 to 2044. The estimated health and climate benefits and compliance costs are presented in detail

---

[165] This does not constitute the EPA's Tribal consultation under Executive Order 13175, which is described in section XI.F. of this document.
[166] 87 FR 20036 at 20153
[167] "Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards Response to Public Comments on Proposed Rule" at 837. Available in Docket ID No. EPA-HQ-OAR-2021-0668-1127

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

in the *EIA*. The EPA notes that for EGUs the estimated benefits and compliance costs are directly associated with fully operating existing SCRs during ozone season; fully operating existing SNCRs during ozone season; installing state-of-the-art combustion controls; imposing a backstop emissions rate on certain units that lack SCR controls; and installing SCR and SNCR post-combustion controls. The EPA also notes that for non-EGUs the estimated health benefits and compliance costs are directly associated with installing controls to meet the $NO_X$ emissions requirements presented in section I.B. of this document.

For EGUs, the EPA analyzed this action's emissions budgets using uniform control stringency represented by $1,800 per ton of $NO_X$ (2016$) in 2025 and $11,000 per ton of $NO_X$ (2016$) in 2027. For non-EGUs, the EPA developed an analytical framework to determine which industries and emissions unit types to include in a proposed Transport FIP for the 2015 ozone NAAQS transport obligations. A February 28, 2022, memorandum, titled "*Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026*," documents the analytical framework used to identify industries and emissions unit types included in the proposed FIP.

Table IX-1 provides the projected 2025 through 2030, 2035, 2040, and 2044 EGU $NO_X$ ozone season emissions reductions for the proposed rule. For additional information on emissions changes, *see* Table 3-7 and Table 3-8 in the *EIA*.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**Table IX-*1*: EGU Ozone Season NO$_X$ Emissions and Emissions Changes (tons) for the Baseline run and Proposed Rule from 2025–2044**

| Ozone Season NO$_X$ | | Total Emissions | | Change from Baseline run |
|---|---|---|---|---|
| (Tons) | | **Baseline** | **Proposal** | |
| 2025 | 5 States | 23,701 | 22,243 | -1,458 |
| | Other States | 234,186 | 234,186 | 0 |
| | Nationwide | 257,887 | 256,428 | -1,459 |
| 2026 | 5 States | 23,701 | 22,243 | -1,458 |
| | Other States | 234,186 | 234,186 | 0 |
| | Nationwide | 257,887 | 256,428 | -1,459 |
| 2027 | 5 States | 18,270 | 17,012 | -1,258 |
| | Other States | 189,571 | 189,583 | 12 |
| | Nationwide | 207,840 | 206,595 | -1,245 |
| 2028 | 5 States | 18,270 | 17,012 | -1,258 |
| | Other States | 189,571 | 189,583 | 12 |
| | Nationwide | 207,840 | 206,595 | -1,245 |
| 2029 | 5 States | 18,270 | 17,012 | -1,258 |
| | Other States | 189,571 | 189,583 | 12 |
| | Nationwide | 207,840 | 206,595 | -1,245 |
| 2030 | 5 States | 16,184 | 15,427 | -756 |
| | Other States | 150,909 | 150,910 | 0 |
| | Nationwide | 167,093 | 166,337 | -756 |
| 2035 | 5 States | 5,967 | 5,453 | -513 |
| | Other States | 94,061 | 94,053 | -8 |
| | Nationwide | 100,028 | 99,506 | -521 |
| 2040 | 5 States | 5,623 | 4,901 | -722 |
| | Other States | 77,971 | 78,010 | 39 |
| | Nationwide | 83,594 | 82,910 | -683 |
| 2044 | 5 States | 5,271 | 4,549 | -722 |
| | Other States | 71,506 | 71,506 | 0 |
| | Nationwide | 76,778 | 76,055 | -722 |

Note: The *5 States* include Arizona, Iowa, Kansas, New Mexico, and Tennessee. The *Other State*s include the remaining states not covered by the proposal in the contiguous United States. *Nationwide* is the total of the *5 States* and the *Other States*.

Table IX-2 provides a summary of the ozone season NO$_X$ emissions reductions and costs

for non-EGUs in Arizona starting in 2028. We estimated the emissions reductions and costs for

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

2026 and assume compliance by 2028. The analysis in the *EIA* assumes that the estimated

reductions in 2028 will be the same in later years.

**Table IX-2: Summary of Non-EGU Industries, Emissions Unit Types, Assumed Control Technologies, Estimated Total Annual Costs (2016$), Ozone Season NOX Emissions Reductions**

| Industry/Industries | Emissions Unit Type | Assumed Control Technologies that Meet Proposed Emissions Limits | Annual Costs (million 2016$) | Ozone Season Emissions Reductions (tons) |
|---|---|---|---|---|
| Pipeline Transportation of Natural Gas | Reciprocating Internal Combustion Engine | Layered Combustion (2-cycle Lean Burn) | 4.3 | 329 |

For EGUs, the EPA analyzed ozone season NO$_X$ emissions reductions and the associated

costs to the power sector using IPM and its underlying data and inputs. For non-EGUs, the EPA

prepared an assessment summarized in the memorandum titled *Non-EGU Applicability*

*Requirements and Estimated Emissions Reductions and Costs_ Proposed Supplemental*, and the

memorandum includes estimated emissions reductions for the proposed rule.

Table IX-3 reflects the estimates of emissions reductions and the changes in the cost of

supplying electricity for the proposed rule for EGUs and estimates of complying with the

emissions requirements for non-EGUs. The costs presented in Table IX-3 do not include

monitoring, recordkeeping, and reporting costs.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**Table IX-3: Total Annual Estimated NO$_X$ Emissions Reductions (ozone season, tons) and Compliance Costs (million 2016$), 2025-2044**

|  | EGUs | Non-EGUs | Total | EGUs | Non-EGUs | Total |
|---|---|---|---|---|---|---|
|  | Emissions Reductions (Ozone season, tons) | | | Compliance Costs (Million 2016$) | | |
| 2025 | 1,459 | - | 1,459 | $1.0 | - | $1.0 |
| 2026 | 1,459 | - | 1,459 | $1.0 | - | $1.0 |
| 2027 | 1,245 | - | 1,245 | $3.4 | - | $3.4 |
| 2028 | 1,245 | 329 | 1,574 | $3.4 | $4.3 | $7.7 |
| 2029 | 1,245 | 329 | 1,574 | $3.4 | $4.3 | $7.7 |
| 2030 | 756 | 329 | 1,085 | $0.7 | $4.3 | $5.0 |
| 2035 | 513 | 329 | 842 | $0.7 | $4.3 | $5.0 |
| 2040 | 683 | 329 | 1,012 | $0.3 | $4.3 | $4.6 |
| 2044 | 722 | 329 | 1,051 | $0.7 | $4.3 | $4.6 |

For this proposed supplemental rule, the EPA monetizes the health benefits of avoided ozone and PM$_{2.5}$-attributable premature deaths and illnesses by multiplying a benefit per ton coefficient by the expected State NO$_X$ ozone season and primary PM$_{2.5}$, NOx and SO$_2$ emissions reductions. The benefit per ton calculations for EGUs and non-EGUs have been combined in Table IX-4.

**Table IX-4: Estimated Monetized Health Benefits of Avoided Ozone and PM$_{2.5}$-Attributable Premature Mortality and Illness for the Proposed Rule Emissions Reductions (EGUs and Non-EGUs), 2025–2044: Monetized Benefits Quantified as Sum of Avoided Morbidity Health Effects and Avoided Long-term Ozone and PM2.5 Mortality (3 percent discount rate; million 2016$)[a,b]**

| Year | Ozone | PM$_{2.5}$ | Combined Total |
|---|---|---|---|
| 2025 | $16 and $110 | $32 and $69 | $48 and $180 |
| 2026 | $16 and $110 | $32 and $69 | $48 and $180 |
| 2027 | $14 and $96 | $4.7 and $9.9 | $19 and $110 |
| 2028 | $18 and $140 | $8.3 and $17 | $26 and $160 |
| 2029 | $18 and $140 | $8.3 and $17 | $26 and $160 |
| 2030 | $13 and $99 | $5.4 and $11 | $18 and $110 |
| 2031 | $13 and $99 | $5.4 and $11 | $18 and $110 |

Page 186 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| Year | Ozone | PM$_{2.5}$ | Combined Total |
|------|-------|-------|----------------|
| 2032 | $12 and $95 | $4.9 and $9.8 | $17 and $100 |
| 2033 | $12 and $95 | $4.9 and $9.8 | $17 and $100 |
| 2034 | $12 and $95 | $4.9 and $9.8 | $17 and $100 |
| 2035 | $12 and $95 | $4.9 and $9.8 | $17 and $100 |
| 2036 | $12 and $95 | $4.9 and $9.8 | $17 and $100 |
| 2037 | $12 and $95 | $4.9 and $9.8 | $17 and $100 |
| 2038 | $14 and $120 | $4.8 and $9.5 | $19 and $130 |
| 2039 | $14 and $120 | $4.8 and $9.5 | $19 and $130 |
| 2040 | $14 and $120 | $4.8 and $9.5 | $19 and $130 |
| 2041 | $14 and $120 | $4.8 and $9.5 | $19 and $130 |
| 2042 | $14 and $120 | $4.8 and $9.5 | $19 and $130 |
| 2043 | $15 and $130 | $6 and $12 | $21 and $140 |
| 2044 | $15 and $130 | $6 and $12 | $21 and $140 |

[a] Values rounded to two significant figures.
[b] The benefits are associated with two point estimates from two different epidemiologic studies. The lower estimates includes ozone mortality estimated using the pooled Katsouyanni et al. (2009), the Zanobetti and Schwartz (2008) short-term risk estimates, and the Wu et al. (2020) long-term PM$_{2.5}$ exposure mortality risk estimate. The higher estimates includes ozone mortality estimated using the Turner et al. (2016) long-term risk estimate and the Pope et al. (2019) long-term PM$_{2.5}$ exposure mortality risk estimate. Health benefits are discounted at a rate of 3 and 7 percent over the SAB-recommended 20-year segmented lag. Individual values in the table are not further discounted for purposes of estimating a present value.

Table IX-5 shows the estimated monetary value of the estimated changes in CO$_2$ emissions from EGUs expected to occur over 2025-2044 for this proposed rule. The EPA estimated the dollar value of the CO$_2$-related effects for each year between 2025 and 2044 by applying the SC-CO$_2$ estimates to the estimated changes in CO$_2$ emissions in the corresponding year.

**Table IX-5: Stream of Climate Benefits from EGU CO$_2$ Emissions Reductions, 2025 - 2044 (Millions of 2016$)**

| | Discount Rate and Statistic | | | |
|------|---------|---------|---------|------------------|
| Year | 5% Average | 3% Average | 2.5% Average | 3% 95th Percentile |
| 2025 | $0.6 | $2.1 | $3.0 | $6.2 |
| 2026 | $0.6 | $2.1 | $3.1 | $6.3 |

Page 187 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| Discount Rate and Statistic | | | |
|---|---|---|---|
| 2027 | $0.5 | $1.5 | $2.2 | $4.6 |
| 2028 | $0.5 | $1.5 | $2.3 | $4.7 |
| 2029 | $0.5 | $1.6 | $2.3 | $4.8 |
| 2030 | $0.5 | $1.7 | $2.5 | $5.2 |
| 2031 | $0.6 | $1.8 | $2.5 | $5.3 |
| 2032 | $0.0 | -$0.1 | -$0.2 | -$0.4 |
| 2033 | $0.0 | -$0.1 | -$0.2 | -$0.4 |
| 2034 | $0.0 | -$0.1 | -$0.2 | -$0.4 |
| 2035 | $0.0 | -$0.1 | -$0.2 | -$0.4 |
| 2036 | $0.0 | -$0.1 | -$0.2 | -$0.4 |
| 2037 | $0.0 | -$0.1 | -$0.2 | -$0.4 |
| 2038 | -$0.1 | -$0.3 | -$0.4 | -$0.8 |
| 2039 | -$0.1 | -$0.3 | -$0.4 | -$0.8 |
| 2040 | -$0.1 | -$0.3 | -$0.4 | -$0.8 |
| 2041 | -$0.1 | -$0.3 | -$0.4 | -$0.8 |
| 2042 | -$0.1 | -$0.3 | -$0.4 | -$0.8 |
| 2043 | $0.0 | $0.0 | $0.0 | $0.0 |
| 2044 | $0.0 | $0.0 | $0.0 | $0.0 |

Note: Individual values in the table are not further discounted for purposes of estimating a present value.

The EPA calculates the monetized net benefits of the proposed rule by subtracting the estimated monetized compliance costs from the estimated monetized health and climate benefits. The benefits include those to public health associated with reductions ozone and $PM_{2.5}$ concentrations, as well as those to climate associated with reductions in GHG emissions. The EPA presents estimates of the PV of the monetized benefits and costs over the 20-year period 2025 to 2044. To calculate the PV of the social net-benefits of the proposed rule, annual benefits and costs are discounted to 2023 at 3 percent and 7 discount rates as recommended by OMB's Circular A-4. The EPA also presents the EAV, which represents a flow of constant annual values

Page 188 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

that, had they occurred in each year from 2025 to 2044, would yield a sum equivalent to the PV. The EAV represents the value of a typical cost or benefit for each year of the analysis. Table IX-6 provides the comparison of benefits and costs in PV and EAV terms for the proposed rule. Estimates in the table are presented as rounded values. For the 20-year period of 2025 to 2044, the PV of the net benefits, in 2016$ and discounted to 2023, is $270 and $1,800 million when using a 3 percent discount rate and $180 and $1,100 million when using a 7 percent discount rate. The EAV is $18 and $120 million per year when using a 3 percent discount rate and $17 and $110 million when using a 7 percent discount rate.

**Table IX-6. Summary of Present Values and Equivalent Annualized Values for the 2025-2044 Timeframe for Estimated Monetized Compliance Costs, Benefits, and Net Benefits for the Proposed Rule (millions of 2016$, discounted to 2023)[a]**

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| | Health Benefits | | Climate Benefits | Cost[c] | | Net Benefits | |
|---|---|---|---|---|---|---|---|
| | 3% | 7% | 3% | 3% | 7% | 3% | 7% |
| 2025 | $45 and $170 | $38 and $140 | $1.9 | $1.0 | $0.9 | $46 and $170 | $39 and $140 |
| 2026 | $44 and $160 | $35 and $130 | $1.9 | $1.0 | $0.9 | $45 and $160 | $36 and $130 |
| 2027 | $17 and $94 | $12 and $72 | $1.4 | $3.0 | $2.6 | $15 and $92 | $11 and $71 |
| 2028 | $23 and $140 | $17 and $100 | $1.3 | $6.6 | $5.5 | $17 and $130 | $13 and $99 |
| 2029 | $22 and $130 | $16 and $97 | $1.3 | $6.4 | $5.1 | $17 and $130 | $12 and $93 |
| 2030 | $15 and $89 | $9.9 and $62 | $1.4 | $4.1 | $3.1 | $12 and $87 | $8.2 and $60 |
| 2031 | $15 and $87 | $9.3 and $58 | $1.4 | $3.9 | $2.9 | $12 and $84 | $7.7 and $56 |
| 2032 | $13 and $80 | $7.8 and $51 | -$0.1 | $3.8 | $2.7 | $9.0 and $76 | $5.0 and $48 |
| 2033 | $13 and $78 | $7.3 and $47 | -$0.1 | $3.7 | $2.5 | $8.8 and $74 | $4.7 and $45 |
| 2034 | $12 and $76 | $6.8 and $44 | -$0.1 | $3.6 | $2.4 | $8.5 and $72 | $4.4 and $42 |
| 2035 | $12 and $74 | $6.4 and $41 | -$0.1 | $3.5 | $2.2 | $8.2 and $70 | $4.1 and $39 |
| 2036 | $12 and $71 | $6.0 and $39 | -$0.1 | $3.4 | $2.1 | $8.0 and $68 | $3.8 and $36 |
| 2037 | $11 and $69 | $5.6 and $36 | -$0.1 | $3.3 | $1.9 | $7.8 and $66 | $3.6 and $34 |
| 2038 | $12 and $83 | $6.3 and $43 | -$0.2 | $2.9 | $1.7 | $9.0 and $80 | $4.4 and $41 |
| 2039 | $12 and $81 | $5.9 and $40 | -$0.2 | $2.8 | $1.5 | $8.7 and $78 | $4.1 and $38 |
| 2040 | $11 and $78 | $5.5 and $38 | -$0.2 | $2.8 | $1.4 | $8.4 and $75 | $3.9 and $36 |
| 2041 | $11 and $76 | $5.1 and $35 | -$0.2 | $2.7 | $1.4 | $8.2 and $73 | $3.6 and $34 |
| 2042 | $11 and $74 | $4.8 and $33 | -$0.2 | $2.6 | $1.3 | $8.0 and $71 | $3.4 and $31 |
| 2043 | $12 and $79 | $4.8 and $31 | $0.0 | $2.8 | $1.3 | $8.9 and $76 | $3.5 and $30 |
| 2044 | $11 and $76 | $4.4 and $29 | $0.0 | $2.7 | $1.2 | $8.6 and $74 | $3.2 and $28 |
| PV 2025-2044 | $330 and $1,900 | $210 and $1,200 | $9.3 | $67 | $45 | $270 and $1,800 | $180 and $1,100 |
| EAV 2025-2044 | $22 and $130 | $20 and $110 | $0.6 | $4.5 | $4.2 | $18 and $120 | $17 and $110 |

[a] Rows may not appear to add correctly due to rounding.

## X. Summary of Proposed Changes to Existing Regulatory Text

This section describes proposed amendments to the regulatory text in the Code of Federal Regulations (CFR) to apply the Federal Good Neighbor Plan's requirements to emissions sources in Arizona, Iowa, Kansas, New Mexico, and Tennessee. The proposed CFR amendments relating to EGUs and to non-EGUs are addressed in section X.A. and section X.B. of this document,

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

respectively. In section X.C. of this document, the EPA describes additional proposed CFR amendments that would make technical corrections or clarifications to the regulatory text as finalized in the Federal Good Neighbor Plan. The EPA has included documents showing the proposed amendments in redline-strikeout format in the docket for this proposed action.

*A. Amendments to Apply the Federal Good Neighbor Plan's Requirements to EGUs in Additional States*

The primary CFR amendments that would apply the Federal Good Neighbor Plans requirements to EGUs in Arizona, Iowa, Kansas, New Mexico, and Tennessee would be made in the FIP provisions addressing states' good neighbor obligations related to ozone in 40 CFR part 52 as well as in the regulations for the CSAPR $NO_X$ Ozone Season Group 3 Trading Program in 40 CFR part 97, subpart GGGGG. In addition, amendments to address the transition of the EGUs in Iowa, Kansas, and Tennessee from the Group 2 trading program to the Group 3 trading program would be made in the regulations for the Group 2 trading program in 40 CFR part 97, subpart EEEEE, and conforming revisions would be made in the regulations for the Group 1 trading program in 40 CFR part 97, subpart BBBBB.

The FIP provisions that identify the states whose EGU sources must participate in the CSAPR $NO_X$ Ozone Season Group 1, Group 2, and Group 3 trading programs with respect to specified control periods to address transported ozone pollution are set forth at § 52.38(b)(2). The proposed expansion of the applicability of the Group 3 trading program to sources in the five newly added states starting with the 2025 control period would be implemented at § 52.38(b)(2)(iii)(E). The proposed end to the applicability of the Group 2 trading program (with

Page 191 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

the exception of certain provisions) for sources in Iowa, Kansas, and Tennessee after the 2024 control period would be implemented at § 52.38(b)(2)(ii)(A).

In the Federal Good Neighbor Plan, the EPA retained several previously established options for states to revise their SIPs to modify or replace the FIPs applicable to their sources while continuing to use the Group 3 trading program as the mechanism for meeting the states' good neighbor obligations. Under this proposal, the provision at § 52.38(b)(10) establishing an option for a State to replace allowance allocations for a single control period would be amended to make the option available for the five newly added states for the 2026 control period,[168] with coordinated revisions to the Group 3 trading program regulations as discussed later in this section X.A. The provisions at § 52.38(b)(11) and (12) establishing options for a State to adopt an abbreviated or full SIP revision starting with the 2025 control period would remain available to states already covered by the Group 3 trading program and would be amended to make the options available to the newly added states starting with the 2027 control period.

The general FIP provisions applicable to all states covered by this rule as set forth in § 52.38(b)(2) would be replicated in the state-specific subparts of 40 CFR part 52 for each of the five states that the EPA is proposing to add to the Group 3 trading program.[169] In each such state-specific CFR subpart, provisions would be added indicating that sources in the State would be required to participate in the CSAPR NOₓ Ozone Season Group 3 Trading Program with respect to emissions starting in 2025. Provisions would also be added repeating the substance of

---

[168] The provision as it exists before the proposed amendments is obsolete because no State elected to use the provision to establish state-determined allocations for the 2024 control period.
[169] *See* proposed §§ 52.154(a) (Arizona), 52.840(b) (Iowa), 52.882(b) (Kansas), 52.1641 (New Mexico), and 52.2240(e) (Tennessee).

Page 192 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

§ 52.38(b)(13)(i), which provides that the Administrator's full and unconditional approval of a full SIP revision correcting the same SIP deficiency that is the basis for a FIP promulgated in this rulemaking would cause the FIP to no longer apply to sources subject to the State's CAA implementation planning authority, and § 52.38(b)(14)(ii), which provides the EPA with authority to complete recordation of EPA-determined allowance allocations for any control period for which the EPA has already started such recordation notwithstanding the approval of a State's SIP revision establishing state-determined allowance allocations.

For each of the three states that the EPA is proposing to remove from the Group 2 trading program, the provisions of the state-specific CFR subparts indicating that sources in the State are required to participate in that trading program would be revised to end that requirement with respect to emissions after 2024, and a further provision would be added repeating the substance of § 52.38(b)(14)(iii), which identifies certain provisions that continue to apply to sources and allowances notwithstanding discontinuation of a trading program with respect to a particular state. In addition, obsolete text concerning the unexercised option to adopt full SIP revisions to replace the FIPs issued under the CSAPR Update would be removed.

To implement the geographic expansion of the Group 3 trading program and the trading budgets proposed under the new and amended FIPs in this rulemaking, several sections of the Group 3 trading program regulations would be amended. Revisions identifying the applicable control periods, the starting years for certain allocation provisions, the deadlines for certification of monitoring systems, and the deadlines for commencement of quarterly reporting for sources in the newly added states would be made at §§ 97.1006(c)(3), 97.1012, 97.1030(b)(1), and 97.1034(d)(2)(i), respectively. Revisions identifying the new or revised budgets, new unit set-

Page 193 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

aside percentages, and variability limits under the Group 3 trading program for the control periods starting in 2025 for the newly added states would be made at § 97.1010, while revisions ending the corresponding provisions under the Group 2 trading program for control periods after 2024 would be made at § 97.810. Revisions to § 97.1021 would establish the schedule for recording unit-level allocations of allowances to sources in the newly added states for the 2025 and 2026 control periods, including the schedule that would apply with respect to allocations for the 2026 control period if a State exercises the proposed option to establish state-determined allocations for that control period.

The proposed creation of an additional Group 3 allowance bank for the 2025 control period through the conversion of banked 2017-2024 Group 2 allowances as discussed in section VII.A.5. of this document would be implemented at a new § 97.826(f)(1).[170] Related provisions addressing the use of Group 3 allowances to satisfy compliance obligations under the Group 1 trading program or the Group 2 trading program arising after the conversion would be implemented at new §§ 97.526(e)(4) and 97.826(g)(3), respectively. Related provisions addressing delayed recordation of allocations of Group 1 or Group 2 allowances after the conversion would be implemented at new §§ 97.97.526(d)(2)(iv) and 97.826(f)(2), respectively. A coordinating amendment that excludes the emissions budgets of the newly added states from the Group 3 allowance bank recalibration target for the 2025 control period would be implemented at § 97.1026(d)(2).

---

[170] The provision currently designated as § 97.826(f) would be redesignated as § 97.826(g).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Finally, the EPA proposes to make conforming revisions to cross-references necessitated by the other amendments already described at § 52.38(b)(14) and in several sections of the regulations for the Group 1, Group 2, and Group 3 trading programs.

*B. Amendments to Apply the Federal Good Neighbor Plan's Requirements to Non-EGUs in Additional States*

The CFR amendments that would apply the Federal Good Neighbor Plans requirements to non-EGUs in Arizona would be made in the FIP provisions for non-EGUs promulgated in the Federal Good Neighbor Plan in 40 CFR 52.40 through 52.46. A proposed amendment to § 52.40(c)(2) would extend applicability of the non-EGU requirements under all seven of these CFR sections to Arizona emissions sources starting with the 2027 control period. This provision would be substantively replicated in the state-specific subpart of 40 CFR part 52 for Arizona at proposed § 52.154(b).

In addition, each provision in §§ 52.40 through 52.46 that either repeats the general applicability deadline from § 52.40(c)(2) or that establishes a deadline for a specific requirement or option would be revised to clearly indicate the applicable deadline for sources in Arizona as well as the applicable deadline for sources in states already covered by the Federal Good Neighbor Plan's requirements. In most cases, the EPA is proposing to establish the deadlines for Arizona sources 1 year after the comparable deadlines for sources in the other states. However, in cases where the Federal Good Neighbor Plan established a deadline in terms of a certain interval after the Federal Good Neighbor Plan's effective date, the EPA is proposing to similarly establish a comparable deadline for Arizona sources in terms of the same interval after the effective date of a final rule in this rulemaking.

Page 195 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*C. Technical Corrections and Clarifications to Previously Finalized Regulatory Text*

In addition to the amendments described in sections X.A. and X.B. for this document to implement the proposed extension of the Federal Good Neighbor Plan's requirements to emissions sources in additional states, the EPA is also proposing to make various technical corrections and clarifications to the previously finalized regulatory text. Most of the revisions would replace incorrect cross-references, improve grammar and clarity, or fix typographical errors. These corrections are not individually described in this preamble but are shown in the documents included in the docket for this rulemaking, which show all proposed changes to the regulatory text in redline-strikeout format.

Beyond the corrections of cross-references and grammatical and typographical errors, the EPA proposes to make the following additional technical corrections to the regulatory text for EGUs:

• The backstop daily $NO_X$ emissions rate provisions at §§ 97.1006(c)(1)(i)(B) and 97.1024(b)(1)(ii) would be revised to clarify that the 50-ton threshold that must be crossed before cumulative exceedances of the backstop daily rate require surrender of extra allowances applies individually to each unit subject to the backstop rate provisions, as discussed in the Federal Good Neighbor Plan preamble at 88 FR 36791–93, and not to all the units at a source on a collective basis.

• The backstop daily $NO_X$ emissions rate provisions at § 97.1024(b)(3) would be revised to avoid inadvertently applying the backstop emissions rate provisions in control periods after 2029 to units without installed SCR controls in states where the Federal Good Neighbor

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Plan's identified emissions control stringency does not include the installation of new SCR controls.

• The "maximum controlled baseline" language in the allowance allocation provisions at §§ 97.1011(b)(4)(ii) and 97.1012(a)(4)(ii) would be revised to avoid inadvertently applying SCR-based assumptions in the calculations of allowance allocations to units without installed SCR controls in states where the Federal Good Neighbor Plan's identified emissions control stringency does not include the installation of new SCR controls.

• The secondary emissions limitation provisions at § 97.1025(c)(1) would be revised to clarify that the provisions do not apply before the 2024 control period, as stated in the Federal Good Neighbor Plan preamble at 88 FR 36798 and consistent with the provisions for the timing of compliance requirements at § 97.1006(c)(3)(ii).

• The provisions to create an initial allowance bank for states transitioning to the Group 3 trading program under the Federal Good Neighbor Plan at § 97.826(e)(1)(ii)(B) would be revised to clarify that the initial bank target used to determine the conversion factor is calculated as 21 percent of the sum of the 2024 trading budgets under § 97.1010(a)(1)(i) for the relevant states, not as the potentially different sum of the final 2024 variability limits under § 97.1010(e) for the relevant states, because the final 2024 variability limit values under § 97.1010(e) would not be known until after the deadline for carrying out the bank conversion procedure.

• The provision at § 52.38(b)(14)(iii)(A) that clarifies the continued applicability of the EPA's allowance housekeeping authority after the sources in a State no longer participate in a given trading program would be revised to include Group 3 allowances, in light of the interim

Page 197 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

transition of sources in several states out of the Group 3 trading program in response to judicial stay orders.

Beyond the corrections of cross-references and grammatical and typographical errors, the EPA proposes to make the following additional technical corrections to the regulatory text for non-EGUs:

• The definition of "ozone season" currently provided as part of the general requirements of the non-EGU regulations at § 52.40(c)(1) would be broken out as a freestanding definition and relocated to § 52.40(b). The revision would clarify the regulations.

• The recordkeeping provisions at §§ 52.41(f), 52.42(e), 52.43(f), 52.44(h)(1) through (3), 52.45(e)(1), and 52.46(f) would be revised by adding language to the introductory text stating that the recordkeeping requirements apply only with respect to operations during the ozone season (unless stated otherwise), consistent with the existing regulations in the general recordkeeping requirements at § 52.40(c)(3). The revisions would also add cross-references to the general recordkeeping requirements at § 52.40(c)(3) and (f), where additional details on recordkeeping requirements are provided. Relatedly, the recordkeeping provisions at § 52.45(e)(2) for low-use industrial boilers would be revised to correctly cross-reference § 52.40(f) (but not § 52.40(c)(3)) and to include language stating that the recordkeeping requirements of that provision apply with respect to operations throughout the calendar year, consistent with the qualification criteria for the low-use exemption. The revisions would clarify the regulations.

• Two types of corrections would be made to the reporting provisions at §§ 52.40(g), 52.41(g), 52.42(f), 52.43(g), 52.44(i), 52.45(f), and 52.46(g). First, a statement would be added

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

to § 52.40(g) clarifying that requirements to use the EPA's Compliance and Emissions Data Reporting Interface (CEDRI) or an analogous electronic submission system provided by the EPA apply with respect to not only annual reports but also excess emissions reports, consistent with similar statements already included in the industry-specific reporting provisions. Second, the industry-specific reporting provisions for excess emissions reports and annual reports would be revised to remove a statement that the reports are required to be submitted in pdf format, which is not correct in all situations, and to add a statement indicating that the appropriate submission instructions for reports submitted via CEDRI will be provided in CEDRI. In conjunction with the additional cross-reference corrections that the EPA is proposing to make in this rulemaking (as discussed at the beginning of this section X.C.), each of the industry-specific reporting provisions would include a correct cross-reference to the general reporting provisions § 52.40(g), where information on the report format requirements for various situations is set forth in greater detail. The revisions would clarify the regulations.

• Several provisions concerning non-report submissions – that is, optional or required submissions other than required excess emissions reports and annual reports – would be revised to indicate that sources must make the submissions to the EPA via CEDRI or an analogous electronic submission system provided by the EPA. First, provisions at §§ 52.40(e)(1), 52.41(b)(1)(ii), 52.43(d)(4)(iii)(B), and 52.45(d)(2)(vii) which do not currently reflect the EPA's intent for all submissions to be made electronically would be revised to require use of the appropriate standard electronic submission mechanisms. Second, a provision at § 52.43(d)(1) which currently identifies the standard electronic submission mechanisms for reports would be revised to identify the standard electronic submission mechanisms for non-report submissions.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Finally, the provision currently designated as § 52.45(d)(4)[171] which currently identifies only CEDRI would be revised to also include the standard reference to an analogous electronic submission system. The revisions would make these provisions consistent with the other provisions governing non-report submissions throughout the Federal Good Neighbor Plan's non-EGU regulations and would clarify the regulations. *See* §§ 52.40(d)(4), (d)(9)(ii), and (e)(7)(ii); 52.41(d); 52.42(g)(2); 52.43(d)(1), (g)(1), and (h)(2); and 52.44(d)(1), (e)(1), and (j)(2).

• In the regulations governing compliance extension requests at § 52.40(d), the regulations governing case-by-case emissions limit requests at § 52.40(e), and the regulations governing steel reheat furnace work plan submissions at § 52.43(d)(4), multiple revisions would be made to the provisions concerning notifications from the EPA to sources. First, each of the provisions specifically identifying CEDRI as a mechanism for electronic notifications from the EPA would be revised to instead provide for the EPA's notifications to be made more generally "in writing or via an electronic submission system provided by the EPA," because CEDRI is not currently capable of serving this purpose. Second, a provision at § 52.43(d)(4)(iii)(B) that does not currently identify any electronic notification mechanism would be revised to include the same general reference to "an electronic submission system provided by the EPA" as the other notification provisions. Third, current phrases in §§ 52.40(d)(8) and (e)(6) and 52.43(d)(4)(ii) calling for the notifications to be made publicly available would be removed as overly broad, because some of the notifications made under those paragraphs do not concern final Agency decisions but instead concern non-final expressions of intent which the Agency did not mean to

---

[171] The EPA is proposing to redesignate this provision as § 52.45(d)(3)(iv).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

include within the scope of the public availability requirements. Finally, the revisions would add a new sentence to § 52.43(d)(4)(ii) that requires the relevant final decisions under that paragraph to be made publicly available but does not require any non-final expressions of intent to be made publicly available. *See also* § 52.43(d)(4)(iv) (requiring other types of final decisions to be made publicly available). In the case of § 52.40(d)(8) and (e)(6), the removed phrases about public availability requirements would not be replaced because other related provisions already require the relevant final decisions under those paragraphs to be made publicly available. *See* § 52.40(d)(6) and (e)(4); *see also* § 52.40(d)(10) and (e)(8) (requiring other types of final decisions to be made publicly available). The revisions would clarify the regulations.

• The definition of "facility" in the regulations for natural gas pipeline engines at § 52.41(a) would be revised to refer to "the set of states" instead of "the 20 states" covered by the non-EGU regulations. The revision would clarify the regulations and maintain the intent of the current definition as finalized in the Federal Good Neighbor Plan, which was to ensure that any facility-wide averaging plans do not extend beyond the geographic area covered by the regulations. *See* 88 FR 36824.

• The provisions on testing and monitoring requirements for natural gas pipeline engines at § 52.43(e) would be revised to correctly indicate the terms of the partial exemption created for certain engines in the Federal Good Neighbor Plan. As discussed in the rulemaking record, the EPA determined that it is appropriate to exempt engines that operate primarily during peak hours outside the ozone season and that operate for 50 hours or less during the ozone season from most of the testing and monitoring requirements applicable to other engines, with the exception of the requirement for an initial performance test. *See* EPA-HQ-OAR-2021-0668-1127, Federal "Good

Page 201 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards: Response to Public Comments on Proposed Rule, at 657. As revised, the provision at § 52.43(e)(6) would correctly specify which testing and monitoring requirements are covered by the exemption and would state the correct ozone season operating hour ceiling of 50 hours. Also, the largely duplicative provision currently at § 52.43(e)(3)(iii) would be removed and the provision currently designated as § 52.43(e)(3)(iv) would be redesignated as § 52.43(e)(3)(iii). The revisions would bring the regulations into agreement with the EPA's intent as discussed in the rulemaking record and improve clarity.

• The definitions section of the regulations for cement kilns at § 52.42(a) would be revised by removing a definition of "cement plant" because the term is not used in the final regulations.

• The applicability provisions of the regulations covering steel reheat furnaces at § 52.43(b) would be revised to eliminate the possibility of an incorrect inference that a unit previously affected under the regulations might no longer be affected after installation of low-$NO_X$ burners. The EPA's intent for the regulations to remain in effect for a given affected unit after any installation of low-$NO_X$ burners is clear from the overall structure of the regulations, including the requirements for work plans to set emissions limits achieving a minimum 40 percent reduction from baseline emissions levels for affected units based on the installation of low-$NO_X$ burners or alternative low-$NO_X$ technologies and the requirements for testing, monitoring, recordkeeping, and reporting to ensure compliance with those limits following installation. *See* § 52.43(d) through (g). There is also no mention anywhere in the regulations or in the preamble of the Federal Good Neighbor Plan of any possibility that a unit's status could

Page 202 of 289

change from affected to non-affected following the installation of low-NO$_X$ burners. The revision would clarify the regulations.

- The initial notification provisions of the regulations covering steel reheat furnaces at § 52.43(h)(2) would be revised to add a phrase stating that the initial notification requirement does not apply to sources that already have low-NO$_X$ burners installed. The revision would clarify the regulations by making the description of affected units in this paragraph consistent with the applicability criteria set forth in § 52.43(b).

- The emissions limitations provisions for glass manufacturing furnaces at § 52.44(c) would be revised to clarify how and when the exemptions during startup, shutdown and idling apply. As currently written, the provision could be interpreted as allowing an all-or-none package of shutdown and idling exemptions for the 2026 ozone season, if the regulations' shutdown and idling requirements are all met, and a broader all-or-none package of startup, shutdown, and idling exemptions for subsequent ozone seasons, if the regulations' startup, shutdown, and idling requirements are all met. The revised language would clarify that the exemptions during startup, shutdown, and idling are each available independently of the other exemptions if the appropriate requirements are met, and that this is the case for all ozone seasons. The EPA's intent for the startup, shutdown, and idling exemptions to be independent of one another is evident from the Federal Good Neighbor Plan preamble. *See, e.g.,* 88 FR 36831 ("The emissions limits for glass melting furnaces in § 52.44(c) do not apply during periods of start-up, shutdown, *and/or* idling at affected units that comply instead with the alternative requirements for start-up, shutdown, *and/or* idling periods specified in § 52.44(d), (e), *and/or* (f), *respectively*." (emphasis added)). Moreover, the preamble contains no discussion indicating any

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

intent for the exemptions to apply differently in the 2026 ozone season than in subsequent ozone seasons. The revisions would clarify the regulations.

• In the recordkeeping provisions for glass manufacturing furnaces at § 52.44(h), a provision concerning operating parameters would be redesignated from § 52.44(h)(1)(vii)(D) to § 52.44(h)(1)(viii) to correctly indicate that the provision's application is not limited to situations where continuous emissions monitoring systems (CEMS) are being used, and the succeeding subparagraphs of § 52.44(h)(1) would be renumbered accordingly. The correction is needed because the affected units are required to use the operating parameters for monitoring purposes only when CEMS are not being used. *See* § 52.44(g)(2) and (3).

• The provisions of the industrial boiler testing and monitoring requirements at § 52.45(d)(2)(vii) concerning requests for alternative monitoring requirements would be revised to explicitly require that if such a request is approved, the facility must request that the relevant permitting Agency incorporate the approved monitoring procedure into the facility's title V permit. The revision would ensure consistency with other provisions of the non-EGU regulations that call for facility-specific requirements to be incorporated into the facility's title V permits. *See* §§ 52.40(d)(5) and (e)(3) and 52.45(d)(4).[172] The revision would also carry out the Agency's broader intent expressed in the Federal Good Neighbor Plan for facilities' applicable requirements to be incorporated into their title V permits. *See* 88 FR 36844.

• The provisions concerning the required annual reports for industrial boilers at § 52.45(f) would be revised to identify the required contents of the reports, which would be the

---

[172] The EPA is proposing to redesignate § 52.45(d)(4) as § 52.45(d)(3)(iv).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

records required under the applicable recordkeeping requirements in § 52.45(e), including records of CEMS data or operating parameters required under § 52.45(d). The required contents of the annual reports for industrial boilers would be fully consistent with the required contents of the annual reports for the other types of non-EGU sources covered by the Federal Good Neighbor Plan. *See* §§ 52.41(g)(3), 52.42(f)(3), 52.43(g)(4), 52.44(i)(3), and 52.46(g)(2). The revision would clarify the regulations by filling an obviously unintended gap, because the regulations currently set forth a requirement for submission of annual reports but lack any description of what the required reports should contain. In addition, because the required contents of the annual reports would include the CEMS-related data that are currently identified as the contents of a separate reporting requirement in § 52.45(f)(3), that separate reporting requirement would be eliminated as redundant, and the annual report provision would be redesignated as § 52.45(f)(3).

- The definitions section of the municipal waste combustor regulations at § 52.46(a) would be revised to include a definition of "municipal solid waste" matching the definition of the same term in the standards of performance for new large municipal waste combustors at 40 CFR 60.51b. The portions of the Federal Good Neighbor Plan preamble discussing the requirements for municipal waste combustors contain no discussion of any intention to introduce a definition of municipal solid waste for these regulations differing from the definition included in the EPA's other regulations for large municipal waste combustors. *See* 88 FR 36836-38. Addition of the definition would clarify the regulations. Also, definitions in § 52.46(a) for "mass burn refractory municipal waste combustor", "mass burn rotary waterwall municipal waste combustor", and

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

"mass burn waterwall municipal waste combustor" would be removed because the terms are not used in the final regulation.

• Several provisions of the regulations for municipal waste combustors at § 52.46 would be revised to better implement the EPA's intent concerning the treatment of emissions during periods of startup and shutdown. As indicated in the Final Good Neighbor Plan preamble at 88 FR 36837, the EPA intended to address startup and shutdown emissions following an approach previously adopted in the standards of performance for commercial and industrial solid waste incineration (CISWI) units at 40 CFR part 60, subparts CCCC and DDDD. Under this approach, a single set of emissions limits applies at all times and the calculations of average emissions rates used to determine compliance with the stated emissions limits use the data measured in all operating hours, including periods of startup and shutdown, but unlike the emissions data measured at other times, the emissions data measured during periods of startup and shutdown are not required to be corrected to 7 percent oxygen. *See, e.g.,* 40 CFR 60.2145(j)(2)(i) and (u)(1); 60.2165(n)(4) and (7); 60.2710(j)(2)(i) and (u)(1); and 60.2730(n)(4) and (7). To implement this intended approach in § 52.46, paragraphs (c) and (e)(2)(vi) would be revised to clarify that a single set of 24-hour block average emission limits and 30-day rolling average emissions limits applies at all times, subject to differences in oxygen correction requirements for emissions data measured in periods of startup and shutdown, while paragraphs (d) and (e)(3) would be revised to remove separate emissions limits and monitoring requirements applicable only to periods of startup and shutdown. The revised regulations would implement the EPA's expressed intent concerning the treatment of emissions during startup and shutdown more accurately than the existing regulations.

Page 206 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

• The provisions on testing and monitoring requirements for municipal waste combustors at § 52.46(e)(vi) would be revised to clarify that where a source selects carbon dioxide for use in diluent corrections, the procedures used to determine the relationship between oxygen and carbon dioxide levels would be the procedures set forth for the same purpose in the standards of performance for new large municipal waste combustors at 40 CFR 60.58b(b)(6). This revision would correct an unintended omission and is consistent with the EPA's similar incorporation of aspects of those standards of performance in other provisions of the testing and monitoring requirements for municipal waste combustors at § 52.46(e)(2)(ii) and (3)(i).

• The reporting provisions for municipal waste combustors at § 52.46(g) would be revised to add a provision for excess emissions reports parallel to the excess emissions report provisions for each of the other non-EGU source categories. The EPA expressly indicated the intent to require excess emissions reports from all non-EGU source categories, including municipal waste combustors, in the Federal Good Neighbor Plan preamble. *See* 88 FR 36820. The revision would correct an inadvertent omission and clarify the regulations.

## XI. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders*.

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review*

This action is a "significant regulatory action" as defined in Executive Order 12866, as amended by Executive Order 14094. Accordingly, EPA submitted this action to the Office of Management and Budget (OMB) for Executive Order 12866 review. Documentation of any

Page 207 of 289

changes made in response to the Executive Order 12866 review is available in the docket. The

EPA prepared an economic analysis of the potential impacts associated with this action. This

analysis, "Economic Impact Assessment for the Proposed Supplemental Federal "Good Neighbor

Plan" Requirements for the 2015 8-hour Ozone National Ambient Air Quality Standard" is

briefly summarized in section IX. of this document and is also available in the docket.

*B. Paperwork Reduction Act (PRA)*

1. Information Collection Request for Electric Generating Units

The information collection activities in this proposed rule have been submitted for

approval to the OMB under the PRA. The Information Collection Request (ICR) document that

the EPA prepared has been assigned EPA ICR number 2792.01. The EPA has placed a copy of

the ICR in the docket for this rule, and it is briefly summarized here.

The EPA is proposing an ICR, related specifically to EGUs, for this proposal. The

proposed rule would amend the CSAPR $NO_X$ Ozone Season Group 3 trading program addressing

seasonal $NO_X$ emissions in various states. Under the proposed amendments, all EGU sources

located in states covered by the Federal Good Neighbor Plan and unaffected by stay orders

would remain in the Group 3 trading program. Additionally, EGU sources in three states (Iowa,

Kansas, and Tennessee) currently covered by the CSAPR $NO_X$ Ozone Season Group 2 Trading

Program would transition from the Group 2 program to the revised Group 3 trading program

beginning with the 2025 ozone season. Further, sources in Arizona and New Mexico not

currently covered by any CSAPR $NO_X$ ozone season trading program would join the revised

Group 3 trading program. In total, EGU sources in 15 states would now be covered by the Group

3 program.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

There is an existing ICR (OMB Control Number 2060-0667), that includes information collection requirements placed on EGU sources for the six Cross-State Air Pollution Rule (CSAPR) trading programs addressing sulfur dioxide ($SO_2$) emissions, annual $NO_X$ emissions, or seasonal $NO_X$ emissions in various sets of states, and the Texas $SO_2$ trading program which is modeled after CSAPR. Additionally, the EPA submitted an EGU ICR under the Federal Good Neighbor Plan (OMB Control Number 2060-0745). The ICR in this proposal accounts for the additional respondent burden related to the addition sources in the five states to the CSAPR $NO_X$ Ozone Group 3 trading program.

The principal information collection requirements under the CSAPR and Texas trading programs relate to the monitoring and reporting of emissions and associated data in accordance with 40 CFR part 75. Other information collection requirements under the programs concern the submittal of information necessary to allocate and transfer emissions allowances and the submittal of certificates of representation and other typically one-time registration forms.

Affected sources under the CSAPR and Texas trading programs are generally stationary, fossil fuel-fired boilers and combustion turbines serving generators larger than 25 MW producing electricity for sale. Most of these affected sources are also subject to the Acid Rain Program (ARP). The information collection requirements under the CSAPR and Texas trading programs and the ARP substantially overlap and are fully integrated. The burden and costs of overlapping requirements are accounted for in the ARP ICR (OMB Control Number 2060-0258). Thus, this ICR accounts for information collection burden and costs under the CSAPR $NO_X$ Ozone Season Group 3 trading program that are incremental to the burden and costs already accounted for in both the ARP and CSAPR ICRs.

Page 209 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

For most sources already reporting data under the CSAPR NOx Ozone Season Group 3 or CSAPR NO$_X$ Ozone Group 2 trading programs, there would be no incremental burden or cost, as reporting requirements will remain identical. Certain sources with a common stack configuration and/or those that are large, coal-fired EGUs, will be subject to additional emissions reporting requirements under the proposed rule. These sources will need to make a one-time monitoring plan and Data Acquisition and Handling System (DAHS) update to meet the additional reporting requirements. There is some incremental cost and burden for those sources in the two states not currently reporting data under a CSAPR NO$_X$ Ozone Season program. Affected sources in Arizona and New Mexico that are already reporting data as part of the Acid Rain Program only require monitoring plan and DAHS updates. For the units that already report to EPA under the Acid Rain Program or the NO$_X$ SIP Call, with the exception of any one-time costs to update monitoring plans and DAHS, all information collection costs and burden are already reflected in the previously approved ICRs for those other rules (OMB Control Nos. 2060-0258 and 2060-0445).

In total, there are an estimated 23 units in Arizona and New Mexico that do not already report data to EPA according to 40 CFR part 75 and that would need to implement one of the Part 75 monitoring methodologies including certification of monitoring systems or implementation of the low mass emissions methodology. These units would also require monitoring plan and DAHS updates. Of these 23 units, nine units would be expected to adopt low mass emissions (LME) as the monitoring method and 14 would be expected to adopt NOx CEMS/Appendix D monitoring methods.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*Respondents/affected entities*: Industry respondents are stationary, fossil fuel-fired boilers and combustion turbines serving electricity generators subject to the CSAPR and Texas trading programs, as well as non-source entities voluntarily participating in allowance trading activities. Potential State respondents are states that can elect to submit state-determined allowance allocations for sources located in their states.

*Respondent's obligation to respond*: Industry respondents: voluntary and mandatory (sections 110(a) and 301(a) of the CAA).

*Estimated number of respondents*: EPA estimates that there would be 64 industry respondents.

*Frequency of response*: on occasion, quarterly, and annually.

*Total estimated additional burden*: 7,538 hours (per year). Burden is defined at 5 CFR 1320.03(b).

*Total estimated additional cost*: $1,243,126 (per year); includes $593,874 annualized capital or operation and maintenance costs.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9.

Submit your comments on the Agency's need for this information, the accuracy of the provided burden estimates and any suggested methods for minimizing respondent burden to the EPA using the docket identified at the beginning of this rule. You may also send your ICR-related comments to OMB's Office of Information and Regulatory Affairs via email to *OIRA_submission@omb.eop.gov*, Attention: Desk Officer for the EPA. Since OMB is required to make a decision concerning the ICR between 30 and 60 days after receipt, OMB must receive

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

comments no later than **[INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]**. The EPA will respond to any ICR-related comments in the final rule.

2. Information Collection Request for Non-Electric Generating Units

The information collection activities in this proposed rule are included within OMB ICR Number 2060-0744, ICR for the Final Rule, Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards: Transport Obligations for non-Electric Generating Units. The EPA submitted this ICR to OMB under the PRA during the development of the Federal Good Neighbor Plan. In this action, the EPA proposes to extend the non-EGU regulatory requirements to affected units within the State of Arizona under the same rationale provided in the Federal Good Neighbor Plan. Because the respondent pool in this action is not well-defined and because the number of affected non-EGU sources in Arizona estimated to install controls is fewer than ten, we are not proposing to develop a new ICR or revise the existing ICR at this time. We will, however, revise the ICR to include any covered non-EGU sources in Arizona when we renew the ICR. The EPA has filed a copy of the non-EGU ICR in the docket for this rule, and it is briefly summarized here.

ICR No. 2060-0744 is an existing ICR that addresses the burden associated with new regulatory requirements under the Federal Good Neighbor Plan. Owners and operators of certain non-EGU industry stationary sources will potentially modify or install new emissions controls and associated monitoring systems to meet the $NO_X$ emissions limits of this final rule. The burden in ICR 2060-0744 reflects the new monitoring, calibrating, recordkeeping, reporting and testing activities required of covered industrial sources, which we are collecting to ensure

Page 212 of 289

compliance with the Federal Good Neighbor Plan. In accordance with the CAA Amendments of 1990, any monitoring information to be submitted by sources is a matter of public record. Information received and identified by owners or operators as CBI and approved as CBI by the EPA, in accordance with Title 40, Chapter 1, part 2, subpart B, shall be maintained appropriately (*see* 40 CFR part 2; 41 FR 36902, September 1, 1976; amended by 43 FR 39999, September 8, 1978; 43 FR 42251, September 28, 1978; 44 FR 17674, March 23, 1979).

*Respondents/affected entities*: The respondents/affected entities are the owners/operators of certain non-EGU industry sources in the following industry sectors: furnaces in Glass and Glass Product Manufacturing; boilers and furnaces in Iron and Steel Mills and Ferroalloy Manufacturing; kilns in Cement and Cement Product Manufacturing; reciprocating internal combustion engines in Pipeline Transportation of Natural Gas; and boilers in Metal Ore Mining, Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, and Pulp, Paper, and Paperboard Mills; and combustors and incinerators in Solid Waste Combustors and Incinerators.

*Respondent's obligation to respond*: Voluntary and mandatory. (Sections 110(a) and 301(a) of the CAA). Data recorded or reported by respondents are required by the final Federal Good Neighbor Plan.

*Estimated number of respondents*: 3,328

*Frequency of response*: The specific frequency for each information collection activity within the non-EGU ICR is shown at the end of the ICR document in Tables 1 through 18. In general, the frequency varies across the monitoring, recordkeeping, and reporting activities. Some

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

recordkeeping such as work plan preparation is a one-time activity whereas pipeline engine

maintenance recordkeeping is conducted quarterly. Reporting frequency is on an annual basis.

*Total estimated burden*: 11,481 hours (per year). Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost*: $3,823,000 (average per year); includes $2,400,000 annualized capital or

operation and maintenance costs.


*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial

number of small entities under the RFA. The small entities subject to the requirements of this

action are small businesses, which includes EGUs and non-EGUs and are briefly described

below. In 2028, the EPA identified a total of four EGUs owned by small entities affected by the

proposed rule. Of these, no small entities are estimated to have costs greater than 1 percent of

revenues.

The Agency has determined that there is not a significant number of small entities

potentially affected by the proposed rule that will have compliance costs greater than 1 percent

of annual revenues during the compliance period. The EPA has concluded that there is not a

significant economic impact on a substantial number of small entities for this proposed rule

overall. Details of this analysis are presented in section 3 of the *EIA*, which is in the public

docket.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate of $100 million or more as described

in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments.

Page 214 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

This action imposes no enforceable duty on any State, local or Tribal government. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination with Indian Tribal Governments*

This action has Tribal implications. However, it will neither impose substantial direct compliance costs on federally recognized Tribal governments, nor preempt Tribal law.

The EPA is proposing a finding that interstate transport of ozone precursor emissions from five upwind states (Arizona, Iowa, Kansas, New Mexico, and Tennessee) is interfering with maintenance of the 2015 ozone NAAQS in other states. The EPA is proposing FIP requirements to eliminate interstate transport of ozone precursors from these five states. Under CAA section 301(d)(4), the EPA is proposing to extend FIP requirements to apply in Indian country located within the upwind geography of the final rule, including Indian reservation lands and other areas of Indian country over which the EPA or a tribe has demonstrated that a tribe has jurisdiction. The EPA's proposed determinations in this regard are described further in section V.B., *Application of Rule in Indian Country and Necessary or Appropriate Finding*. The EPA proposes that all covered existing and new EGU and non-EGU sources that are located in the "301(d) FIP" areas within the geographic boundaries of the covered states, and which would be subject to this rule if located within areas subject to State CAA planning authority, should be included in this rule. To the EPA's knowledge, two covered existing EGU or non-EGU sources are located

Page 215 of 289

within the 301(d) FIP areas: the South Point Energy Center located on the Fort Mojave Reservation, and the Four Corners Power Plant on the Navajo Reservation. These EGU sources are geographically located within the borders of Arizona and New Mexico, respectively. This action has Tribal implication because of the extension of FIP requirements into Indian country and because, in general, tribes have a vested interest in how this final rule would affect air quality.

The EPA consulted with Tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing the Federal Good Neighbor Plan to permit them to have meaningful and timely input into its development. The EPA hosted an environmental justice webinar on October 26, 2021, that was attended by State regulatory authorities, environmental groups, federally recognized tribes, and small business stakeholders. Summaries of prior consultations are included in the docket for the Federal Good Neighbor Plan (Docket ID No. EPA-HQ-OAR-2021-0668). The EPA will also continue to consult with the governments of the Fort Mojave Indian Tribe of the Fort Mojave Reservation, the Navajo Nation of the Navajo Reservation, and plans to further consult with any other Tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing this proposed regulation to solicit meaningful and timely input into its development. The EPA plans to issue Tribal consultation letters addressed to the appropriate tribes in [Month Year] after the proposed rule is signed. Consultation summaries will be included in the docket for this action and in a summary section in the preamble when this action is finalized.

*G. Executive Order 13045: Protection of Children from Environmental Health Risks and Safety Risks*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Executive Order 13045 directs Federal agencies to include an evaluation of the health and safety effects of the planned regulation on children in Federal health and safety standards and explain why the regulation is preferable to potentially effective and reasonably feasible alternatives. This action is not subject to Executive Order 13045 because it is not a significant regulatory action under section 3(f)(1) of Executive Order 12866, and because the EPA does not believe the environmental health risks or safety risks addressed by this action present a disproportionate risk to children. This action's health and risk assessments are contained in Chapters 3 and 4 of the *Economic Impact Assessment for the Proposed Supplemental Federal "Good Neighbor Plan" Requirements for the 2015 8-hour Ozone National Ambient Air Quality Standard.* The EPA determined that the ozone-related benefits, Fine Particulate Matter-related benefits, and $CO_2$-related benefits from this final rule will further improve children's health.

However, the EPA's Policy on Children's Health applies to this action. Information on how the Policy was applied is available in the *Economic Impact Assessment for the Proposed Supplemental Federal "Good Neighbor Plan" Requirements for the 2015 8-hour Ozone National Ambient Air Quality Standard.*

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use*

This action is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. The EPA has prepared a Statement of Energy Effects for the proposed regulatory control alternative as follows. The Agency estimates a 0 percent change in retail electricity prices on average across the contiguous U.S. in 2025 and a 0 percent change in retail electricity prices on average across the contiguous

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

U.S. in 2028 as a result of this proposed rule. Additional details of the estimated retail electricity price changes are presented in section 3 of the *EIA at proposal*, which is in the public docket.

*I. National Technology Transfer and Advancement Act*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing our Nation's Commitment to Environmental Justice for All*

The EPA believes that the human health and environmental conditions that exist prior to this action do not result in disproportionate and adverse effects on communities with environmental justice concerns. The documentation for this decision is contained in section VIII. *Environmental Justice Considerations, Implications, and Outreach* of this Preamble. Briefly, proximity demographic analyses found larger percentages of Hispanics, people below the poverty level, people with less educational attainment, and people linguistically isolated are living within 5 km and 10 km of an affected EGU, compared to national averages. It also finds larger percentages of Native Americans and people below the poverty level living within 5 km and 10 km of an affected non-EGU facility.

The EPA believes that this action is not likely to result in new disproportionate and adverse effects on communities with environmental justice concerns. Importantly, the action described in this rule is expected to lower ozone and PM2.5 in some areas, including in ozone nonattainment areas, and thus mitigate some pre-existing health risks across most populations and communities evaluated.

*K. Determinations Under CAA Section 307(b)(1) and (d)*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (1) when the Agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (2) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion to decide whether to invoke the exception in (2).[173]

The EPA anticipates that this proposed rulemaking, if finalized, would be "nationally applicable" within the meaning of CAA section 307(b)(1) because it would extend the applicability of the Federal Good Neighbor Plan promulgated on March 15, 2023 (88 FR 36654 (June 5, 2023)), which as promulgated would apply to 23 states across the nation, to five additional states located in four EPA regions and four Federal judicial circuits, in conjunction with partial disapproval of the SIP submissions from these five states. The final rule would directly implement the Federal Good Neighbor Plan in these five additional states based on application of the same, nationally consistent 4-step interstate transport framework for assessing good neighbor obligations for the 2015 ozone NAAQS that the EPA applied in the Federal Good Neighbor Plan promulgated on March 15, 2023, and in other nationally applicable rulemakings,

---

[173] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of Agency resources.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

such as CSAPR, the CSAPR Update, and the Revised CSAPR Update. The final rule would thus apply a uniform, nationwide analytical method and interpretation of CAA section 110(a)(2)(D)(i)(I) across the covered states, expanding the scope of the Federal Good Neighbor Plan to a total of up to 28 states across the nation. The final rule would also make technical corrections to the nationally applicable regulatory provisions promulgated in the Federal Good Neighbor Plan, *see* section X.C. of this document.

In the alternative, to the extent a court finds this action, if finalized, to be locally or regionally applicable, the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action is based on several determinations of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). This proposal, if finalized, would be based on several determinations of nationwide scope or effect, each of which has the purpose of ensuring consistency and equity across all states, including: (1) the determination that use of the same 2023 and 2026 analytical year air quality modeling and monitoring analytics (including the use of the violating-monitor receptor identification methodology) that were used to define all other states' good neighbor obligations for the 2015 ozone NAAQS is appropriate for purposes of defining the obligations of the five additional states in this action; (2) the determination that use of a 1 percent of NAAQS threshold is appropriate for all states at Step 2 and that neither reliance on the EPA's August 2018 1 ppb Memo standing alone nor reliance on EPA's guidance on "significant impact levels" (SIL) for the prevention of significant deterioration (PSD) permitting program provides adequate justification for an alternative threshold; (3) the determination that the same level of emissions control stringency to the same industry and source types at Step 3 as was determined for 23 other

Page 220 of 289

states in the Federal Good Neighbor Plan is appropriate to apply to these five additional states; and (4) the determination that the relevant sources in these five states should be subject to the same nationally uniform emissions control programs promulgated at Step 4 for 23 other states in the Federal Good Neighbor Plan.[174]

These determinations would provide important bases for the action, if finalized, are needed to ensure consistency and equity in the treatment of all states in addressing the multistate problem of interstate ozone pollution under the good neighbor provision for the 2015 ozone NAAQS, and are not related to the particularities of the emissions sources in any specific state. The Federal Good Neighbor Plan and related rulemakings such as this one are designed as a "collective approach" to effectively address the nationwide problem of interstate ozone transport in an equitable and consistent manner across all states. *See Kentucky Energy and Environment Cabinet v. EPA*, No. 23-3605 (6th Cir. Nov. 9, 2023), Order at 8. The determinations underlying this proposed action are therefore of nationwide scope and effect, among other reasons, because they ensure that the requirements of the Federal Good Neighbor Plan (until replaced by SIPs meeting the statutory requirements) will be implemented on a consistent basis across all "upwind" states, and will deliver the full amount of relief from upwind emissions that the EPA

---

[174] A finding of nationwide scope or effect is also appropriate for actions that cover states in multiple judicial circuits. In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95-294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402-03.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

has found downwind jurisdictions are due.[175] For these reasons, the Administrator intends, if this proposed action is finalized, to exercise the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on several determinations of nationwide scope or effect for purposes of CAA section 307(b)(1), including, but not limited to, those identified above.

This action is subject to the provisions of CAA section 307(d). CAA section 307(d)(1)(B) provides that section 307(d) applies to, among other things, "the promulgation or revision of an implementation plan by the Administrator under [CAA section 110(c)]." 42 U.S.C. 7407(d)(1)(B). This proposed action, among other things, proposes Federal implementation plans for five additional states to extend the coverage of the Federal Good Neighbor Plan promulgated at 88 FR 36654 (June 5, 2023). To the extent any portion of this action is not expressly identified under CAA section 307(d)(1)(B), the Administrator determines that the provisions of CAA section 307(d) apply to such action. *See* CAA section 307(d)(1)(V) (the provisions of section 307(d) apply to "such other actions as the Administrator may determine").

**List of Subjects**

*40 CFR Part 52*

Environmental protection, Administrative practice and procedure, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Ozone, Particulate matter, Sulfur dioxide.

---

[175] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95-294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402-03.

Page 222 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*40 CFR Part 97*

Environmental protection, Administrative practice and procedure, Air pollution control, Electric power plants, Nitrogen oxides, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur dioxide.

Michael Regan,
Administrator.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

For the reasons stated in the preamble, parts 52 and 97 of title 40 of the Code of Federal Regulations are proposed to be amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq*.

## Subpart A—General Provisions

2. Amend § 52.38 by:

a. In paragraphs (a)(4)(i)(C) and (a)(5)(i)(C), removing "following the control" and adding in its place "following the year of such control";

b. In paragraph (b)(2)(ii)(A), removing "2017 and each subsequent year" and adding in its place "2017 through 2024 only, except as provided in paragraph (b)(14)(iii) of this section";

c. Adding paragraph (b)(2)(iii)(E);

d. In paragraphs (b)(4)(ii)(C), (b)(5)(ii)(C), (b)(8)(iii)(C), and (b)(9)(iii)(C), removing "following the control" and adding in its place "following the year of such control";

e. Revising paragraph (b)(10) introductory text;

f. In paragraph (b)(10)(ii), removing "2024, of" and adding in its place "2026, of";

g. Revising paragraphs (b)(10)(v)(A) and (B);

h. In paragraph (b)(11)(iii) introductory text and paragraph (b)(12)(iii) introductory text, removing "2025 or" and adding in its place "2025 (or for a State listed in paragraph (b)(2)(iii)(E) of this section, 2027) or";

i. In paragraph (b)(14)(i)(G), removing "§ 97.826(f)" and adding in its place "§ 97.826(g)";

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

j. In paragraph (b)(14)(iii) introductory text, removing "paragraphs (b)(2)(i)(B), (b)(2)(ii)(B) or (C), (b)(2)(iii)(D)(*1*), or" and adding in its place "paragraph (b)(2) or";

k. Revising paragraph (b)(14)(iii)(A);

l. In paragraph (b)(14)(iii)(B), removing "97.826(d) and (e), and" and adding in its place "97.826(d) through (f), and"; and

m. In paragraph (b)(17)(i), removing "2024" and adding in its place "2026".

The addition and revisions read as follows:

**§ 52.38 What are the requirements of the Federal Implementation Plans (FIPs) for the Cross-State Air Pollution Rule (CSAPR) relating to emissions of nitrogen oxides?**

\* \* \* \* \*

(b) \* \* \*

(2) \* \* \*

(iii) \* \* \*

(E) The provisions of subpart GGGGG of part 97 of this chapter apply to sources in each of the following States and Indian country located within the borders of such States with regard to emissions occurring in 2025 and each subsequent year: Arizona, Iowa, Kansas, New Mexico, and Tennessee.

\* \* \* \* \*

(10) *State-determined allocations of CSAPR NO$_X$ Ozone Season Group 3 allowances for 2026*. A State listed in paragraph (b)(2)(iii)(E) of this section may adopt and include in a SIP revision, and the Administrator will approve, as CSAPR NO$_X$ Ozone Season Group 3 allowance allocation provisions replacing the provisions in § 97.1011(a)(1) of this chapter with regard to

Page 225 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

sources in the State and areas of Indian country within the borders of the State subject to the

State's SIP authority for the control period in 2026, a list of CSAPR NO$_X$ Ozone Season Group 3

units and the amount of CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to each unit

on such list, provided that the list of units and allocations meets the following requirements:

\*   \*   \*   \*   \*

(v) \*   \*   \*

(A) By **[15 DAYS AFTER EFFECTIVE DATE OF FINAL RULE]**, the State must notify

the Administrator electronically in a format specified by the Administrator of the State's intent to

submit to the Administrator a complete SIP revision meeting the requirements of paragraphs

(b)(10)(i) through (iv) of this section by April 1, 2025; and

(B) The State must submit to the Administrator a complete SIP revision described in

paragraph (b)(10)(v)(A) of this section by April 1, 2025.

\*   \*   \*   \*   \*

(14) \*   \*   \*

(iii) \*   \*   \*

(A) The provisions of §§ 97.526(c), 97.826(c), and 97.1026(c) of this chapter (concerning the

transfer of CSAPR NO$_X$ Ozone Season Group 1 allowances, CSAPR NO$_X$ Ozone Season Group

2 allowances, and CSAPR NO$_X$ Ozone Season Group 3 allowances between certain Allowance

Management System accounts under common control);

\*   \*   \*   \*   \*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

**§ 52.39 [Amended]**

3. Amend § 52.39 in paragraphs (e)(1)(iii), (f)(1)(iii), (h)(1)(iii), and (i)(1)(iii) by removing "following the control" and adding in its place "following the year of such control".

4. Amend § 52.40 by:

    a. In paragraph (a), removing "paragraph (b)" and adding in its place "paragraph (c)(1)";

    b. In paragraph (b):

    i. In the introductory text, removing the section symbol before "52.46";

    ii. Revising the definitions "Existing affected unit" and "New affected unit"; and

    iii. Adding the definition "Ozone season" in alphabetical order;

    c. In paragraph (c)(1), removing "(defined as May 1 through September 30 of a calendar year)";

    d. Redesignating paragraph (c)(2) as paragraph (c)(2)(i) and adding paragraph (c)(2)(ii);

    e. Revising paragraph (d)(1);

    f. In paragraph (d)(2), removing "May 1, 2029" and adding in its place "the start date of the fourth ozone season identified for the applicable State in § 52.40(c)(2)";

    g. Revising paragraphs (d)(3)(v) and (d)(4) through (8) and paragraph (d)(9) introductory text;

    h. In paragraph (d)(9)(ii), removing "the CEDRI or" and adding in its place "CEDRI or an";

    i. Revising paragraphs (d)(10) and (11) and (e)(1);

    j. In paragraph (e)(2)(i)(A)(*1*), removing "63.7(e)(2)(ii)(2), or" and adding in its place "63.7(e)(2)(ii), or";

    k. Revising paragraphs (e)(3) through (6) and paragraph (e)(7) introductory text;

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

l. In paragraph (e)(7)(ii), removing "the CEDRI or" and adding in its place "CEDRI or an";

m. Revising paragraph (e)(8);

n. In paragraph (g)(1)(i), removing "the CEDRI or" and adding in its place "CEDRI or an"; and

o. Revising paragraphs (g)(1)(iii)(D) and (g)(2).

The revisions and additions read as follows:

**§ 52.40 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from sources not subject to the CSAPR ozone season trading program?**

\*    \*    \*    \*    \*

(b) \*    \*    \*

*Existing affected unit* means any affected unit for which construction commenced before August 4, 2023, for a unit in a State listed in paragraph (c)(2)(i) of this section, or [EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in paragraph (c)(2)(ii) of this section.

*New affected unit* means any affected unit for which construction commenced on or after August 4, 2023, for a unit in a State listed in paragraph (c)(2)(i) of this section, or [EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in paragraph (c)(2)(ii) of this section.

\*    \*    \*    \*    \*

*Ozone season* means the period between May 1 and September 30, inclusive, for a given year.

\*    \*    \*    \*    \*

(c) \*    \*    \*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

(ii) The provisions of this section or § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 apply to affected units located in each of the following States, including Indian country located within the borders of such States, beginning in the 2027 ozone season and in each subsequent ozone season: Arizona.

*    *    *    *    *

(d) * * *

(1) The owner or operator of an existing affected unit under § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 that cannot comply with the applicable requirements in those sections by the start date of the first ozone season identified for the applicable State in paragraph (c)(2) of this section, due to circumstances entirely beyond the owner or operator's control, may request an initial compliance extension to a date certain no later than the start date of the second ozone season identified for the applicable State in paragraph (c)(2) of this section. The extension request must contain a demonstration of necessity consistent with the requirements of paragraph (d)(3) of this section.

*    *    *    *    *

(3) * * *

(v) Identify the owner or operator's proposed compliance date. A request for an initial compliance extension under paragraph (d)(1) of this section must specify a proposed compliance date no later than the start date of the second ozone season identified for the applicable State in paragraph (c)(2) of this section and state whether the owner or operator anticipates a need to request a second compliance extension. A request for a second compliance extension under paragraph (d)(2) of this section must specify a proposed compliance date no later than the start

Page 229 of 289

date of the fourth ozone season identified for the applicable State in paragraph (c)(2) of this section and identify additional actions taken by the owner or operator to ensure that the affected unit(s) will be in compliance with the applicable requirements in this section by that proposed compliance date;

*    *    *    *    *

(4) Each request for a compliance extension shall be submitted via the Compliance and Emissions Data Reporting Interface (CEDRI) or an analogous electronic submission system provided by the EPA no later than 180 days prior to the applicable compliance date. Until an extension has been granted by the Administrator under this section, the owner or operator of an affected unit shall comply with all applicable requirements of this section and shall remain subject to the compliance date under paragraph (c)(2) of this section or the initial extended compliance date under paragraph (d)(1) of this section, as applicable. A denial will be effective as of the date of denial.

(5) The owner or operator of an affected unit who has requested a compliance extension under paragraph (d)(1) or (2) of this section and is required to have a title V permit shall apply to have the relevant title V permit revised to incorporate the conditions of the extension of compliance. The conditions of a compliance extension granted under paragraph (d)(6) of this section will be incorporated into the affected unit's title V permit according to the provisions of an EPA-approved state operating permit program or the Federal title V regulations in 40 CFR part 71, whichever apply.

(6) Based on the information provided in any request made under paragraph (d)(1) or (2) of this section or other information, the Administrator may grant an extension of time to comply

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

with applicable requirements in § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 consistent with the provisions of paragraph (d)(1) or (2). The decision to grant an extension will be provided by notification in writing or via an electronic submission system provided by the EPA, will be made publicly available, and will identify each affected unit covered by the extension; specify the termination date of the extension; and specify any additional conditions that the Administrator deems necessary to ensure timely installation of the necessary controls (e.g., the date(s) by which on-site construction, installation of control equipment, and/or process changes will be initiated).

(7) The Administrator will provide notification in writing or via an electronic submission system provided by the EPA to the owner or operator of an affected unit who has requested a compliance extension under paragraph (d)(1) or (2) of this section whether the submitted request is complete, that is, whether the request contains sufficient information to make a determination, within 60 calendar days after receipt of the original request and within 60 calendar days after receipt of any supplementary information.

(8) The Administrator will provide notification in writing or via an electronic submission system provided by the EPA to the owner or operator of a decision to grant or intention to deny a request for a compliance extension within 60 calendar days after providing written notification pursuant to paragraph (d)(7) of this section that the submitted request is complete.

(9) Before denying any request for an extension of compliance, the Administrator will provide notification in writing or via an electronic submission system provided by the EPA to the owner or operator of the Administrator's intention to issue the denial, together with:

*    *    *    *    *

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(10) The Administrator's final decision to deny any request for an extension will be provided in writing or via an electronic submission system provided by the EPA, will be made publicly available, and will set forth the specific grounds on which the denial is based. The final decision will be made within 60 calendar days after presentation of additional information or argument (if the request is complete), or within 60 calendar days after the deadline for the submission of additional information or argument under paragraph (d)(9)(ii) of this section, if no such submission is made.

(11) The granting of an extension under this section shall not abrogate the Administrator's authority under section 114 of the Act.

(e) *   *   *

(1)  The owner or operator of an existing affected unit under § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 that cannot comply with the applicable requirements in those sections due to technical impossibility or extreme economic hardship may submit to the Administrator, by August 5, 2024, for a unit in a State listed in paragraph (c)(2)(i) of this section, or [ONE YEAR AFTER EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in paragraph (c)(2)(ii) of this section, a request for approval of a case-by-case emissions limit. The request must be submitted via CEDRI or an analogous electronic submission system provided by the EPA and shall contain information sufficient for the Administrator to confirm that the affected unit is unable to comply with the applicable emissions limit, due to technical impossibility or extreme economic hardship, and to establish an appropriate alternative case-by-case emissions limit for the affected unit. Until a case-by-case emissions limit has been approved by the Administrator under this section, the owner or operator shall remain subject to all

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

applicable requirements in § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46. A denial will be effective as of the date of denial.

*     *     *     *     *

(3) The owner or operator of an affected unit who has requested a case-by-case emissions limit under paragraph (e)(1) of this section and is required to have a title V permit shall apply to have the relevant title V permit revised to incorporate the case-by-case emissions limit. Any case-by-case emissions limit approved under paragraph (e)(4) of this section will be incorporated into the affected unit's title V permit according to the provisions of an EPA-approved state operating permit program or the Federal title V regulations in 40 CFR part 71, whichever apply.

(4) Based on the information provided in any request made under paragraph (e)(1) of this section or other information, the Administrator may approve a case-by-case emissions limit that will apply to an affected unit in lieu of the applicable emissions limit in § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46. The decision to approve a case-by-case emissions limit will be provided in writing or via an electronic submission system provided by the EPA, will be made publicly available, and will identify each affected unit covered by the case-by-case emissions limit.

(5) The Administrator will provide notification in writing or via an electronic submission system provided by the EPA to the owner or operator of an affected unit who has requested a case-by-case emissions limit under paragraph (e)(1) of this section whether the submitted request is complete, that is, whether the request contains sufficient information to make a determination, within 60 calendar days after receipt of the original request and within 60 calendar days after receipt of any supplementary information.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(6)  The Administrator will provide notification in writing or via an electronic submission system provided by the EPA to the owner or operator of a decision to approve or intention to deny the request for a case-by-case emissions limit within 60 calendar days after providing notification pursuant to paragraph (e)(5) of this section that the submitted request is complete.

(7) Before denying any request for a case-by-case emissions limit, the Administrator will provide notification in writing or via an electronic submission system provided by the EPA to the owner or operator of the Administrator's intention to issue the denial, together with:

\*    \*    \*    \*    \*

(8) The Administrator's final decision to deny any request for a case-by-case emissions limit will be provided by notification in writing or via an electronic submission system provided by the EPA, will be made publicly available, and will set forth the specific grounds on which the denial is based. The final decision will be made within 60 calendar days after presentation of additional information or argument (if the request is complete), or within 60 calendar days after the deadline for the submission of additional information or argument under paragraph (e)(7)(ii) of this section, if no such submission is made.

\*    \*    \*    \*    \*

(g) \*  \*  \*

(1) \*  \*  \*

(iii) \*  \*  \*

(D) The preferred method to receive CBI is for it to be transmitted electronically using email attachments, File Transfer Protocol, or other online file sharing services. Electronic submissions must be transmitted directly to the Office of Air Quality Planning and Standards (OAQPS) CBI

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

Office at the email address oaqpscbi@epa.gov, should include clear CBI markings as described in paragraph (g)(1)(iii)(C) of this section, and should be flagged to the attention of Lead of 2015 Ozone Transport FIP. If assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please email oaqpscbi@epa.gov to request a file transfer link.

\*   \*   \*   \*   \*

(2) Annual reports and excess emissions reports must be submitted via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46.

\*   \*   \*   \*   \*

5. Amend § 52.41 by:

a. In paragraph (a):

i. In the definition for "Cap", removing "sum each" and adding in its place "sum of each";

ii. In the definition for "Facility", removing "20 states identified in § 52.40(b)(2)" and adding in its place "set of states identified in § 52.40(c)"; and

iii. In the definition for "Rich burn", removing "affected unit where" and adding in its place "affected units where";

b. Revising paragraph (b)(1) introductory text, paragraph (b)(1)(ii), and paragraph (c) introductory text;

c. In paragraph (d) introductory text, removing "the CEDRI or" and adding in its place "CEDRI or an";

d. Redesignating the second paragraph (d)(1)(iv) as paragraph (d)(1)(v);

Page 235 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

e. In paragraph (d)(4), removing "an affected units" and adding in its place "an affected unit";

f. Removing paragraph (e)(3)(iii) and redesignating paragraph (e)(3)(iv) as paragraph (e)(3)(iii);

g. In paragraph (e)(5) introductory text, removing "owner of operator" and adding in its place "owner or operator";

h. Revising paragraph (e)(6) and paragraph (f) introductory text;

i. In paragraph (f)(1), removing "paragraph (e)(2)" and adding in its place "paragraph (e)(3)";

j. In paragraph (f)(2), removing "paragraph (e)(3)" and adding in its place "paragraph (e)(4)"; and

k. Revising paragraphs (g)(1) and (2), paragraph (g)(3) introductory text, and paragraph (g)(3)(i).

The revisions read as follows:

**§ 52.41 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Pipeline Transportation of Natural Gas Industry?**

\*    \*    \*    \*    \*

(b) \*  \*  \*

(1) For purposes of this section, the owner or operator of an emergency stationary RICE must operate the RICE according to the requirements in paragraphs (b)(1)(i) through (iii) of this section to be treated as an emergency stationary RICE. In order for a stationary RICE to be treated as an emergency RICE under this section, any operation other than emergency operation,

Page 236 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

maintenance and testing, and operation in non-emergency situations for up to 50 hours per year, as described in paragraphs (b)(1)(i) through (iii), is prohibited. If you do not operate the RICE according to the requirements in paragraphs (b)(1)(i) through (iii), the RICE will not be considered an emergency engine under this section and must meet all requirements for affected units in this section.

*    *    *    *    *

(ii) The owner or operator may operate an emergency stationary RICE for maintenance checks and readiness testing for a maximum of 100 hours per calendar year, provided that the tests are recommended by a Federal, state, or local government agency, the manufacturer, the vendor, or the insurance company associated with the engine. Any operation for non-emergency situations as allowed by paragraph (b)(1)(iii) of this section counts as part of the 100 hours per calendar year allowed by this paragraph (b)(1)(ii). The owner or operator may petition the Administrator for approval of additional hours to be used for maintenance checks and readiness testing, but a petition is not required if the owner or operator maintains records confirming that Federal, state, or local standards require maintenance and testing of emergency RICE beyond 100 hours per calendar year. Any petition must be submitted via CEDRI or an analogous electronic submission system provided by the EPA. Any approval of a petition for additional hours granted by the Administrator under 40 CFR part 63, subpart ZZZZ, shall constitute approval by the Administrator of the same petition under this paragraph (b)(1)(ii).

*    *    *    *    *

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(c) *Emissions limitations*. If you are the owner or operator of an affected unit, you must meet the following emissions limitations on a 30-day rolling average basis during each ozone season identified for the applicable State in § 52.40(c)(2):

\*    \*    \*    \*    \*

(e) \*  \*  \*

(6)  If you are the owner or operator of an affected unit that is only operated during peak periods outside of the ozone season and your hours of operation during the ozone season are 50 or less, you are not subject to the testing and monitoring requirements of paragraphs (e)(4) and (5) of this section as long as you record and report your hours of operation during the ozone season in accordance with paragraphs (f) and (g) of this section.

(f) *Recordkeeping requirements*. If you are the owner or operator of an affected unit, you shall maintain records of the following information for each day the affected unit operates during the ozone season consistent with the requirements of § 52.40(c)(3) and (f):

\*    \*    \*    \*    \*

(g) \*  \*  \*

(1) If you are the owner or operator of an affected unit, you must submit the results of the performance test or performance evaluation of the CEMS to the EPA within 60 days after completing each performance test required by this section. The results must be submitted following the procedures specified in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section.

(2) If you are the owner or operator of an affected unit, you are required to submit excess emissions reports to the EPA for any excess emissions that occurred during the reporting period.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

Excess emissions are defined as any calculated 30-day rolling average $NO_X$ emissions rate that exceeds the applicable emissions limit in paragraph (c) of this section. Excess emissions reports must be submitted following the procedures specified in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section. Submissions made via CEDRI must be made in accordance with the appropriate submission instructions provided in CEDRI.

(3) If you are the owner or operator of an affected unit, you must submit an annual report to the EPA by January 30th of each year. Annual reports must be submitted following the procedures in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section. Submissions made via CEDRI must be made in accordance with the appropriate submission instructions provided in CEDRI. The report shall contain the following information:

(i) The name and address of the owner or operator;

*    *    *    *    *

6. Amend § 52.42 by:

a. In paragraph (a), removing the definition "Cement plant";

b. Revising paragraph (b) and paragraph (c) introductory text;

c. In equation 1 to paragraph (d)(1):

i. In the definition for "P", removing "Time" and adding in its place "time"; and

ii. In the definition for "n", removing "n = Number" and adding in its place "N = Number";

d. In paragraph (d)(3) introductory text, removing "2026 ozone season" and adding in its place "start date of the first ozone season identified for the applicable State in § 52.40(c)(2)";

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

e. In paragraph (d)(3)(v), removing "paragraph (e)" and adding in its place "paragraph (f)"; and

f. Revising paragraph (e) introductory text, paragraphs (f)(1) through (3), and paragraph (g)(2) introductory text.

The revisions read as follows:

**§ 52.42 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Cement and Concrete Product Manufacturing Industry?**

\*    \*    \*    \*    \*

(b) *Applicability*. You are subject to the requirements of this section if you own or operate a new or existing cement kiln that is located within any of the States listed in § 52.40(c)(2), including Indian country located within the borders of any such State(s), and emits or has the potential to emit 100 tons per year or more of $NO_X$ on or after August 4, 2023, for a unit in a State listed in § 52.40(c)(2)(i), or [EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in § 52.40(c)(2)(ii). Any existing cement kiln with a potential to emit of 100 tons per year or more of $NO_X$ on the date specified for the unit in the preceding sentence will continue to be subject to the requirements of this section even if that unit later becomes subject to a physical or operational limitation that lowers its potential to emit below 100 tons per year of $NO_X$.

(c) *Emissions limitations*. If you are the owner or operator of an affected unit, you must meet the following emissions limitations on a 30-day rolling average basis during each ozone season identified for the applicable State in § 52.40(c)(2):

\*    \*    \*    \*    \*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(e) *Recordkeeping requirements*. If you are the owner or operator of an affected unit, you shall maintain records of the following information for each day the affected unit operates during the ozone season consistent with the requirements of § 52.40(c)(3) and (f):

\*    \*    \*    \*    \*

(f) \*   \*   \*

(1) If you are the owner or operator of an affected unit, you shall submit the results of the performance test or performance evaluation of the CEMS to the EPA within 60 days after the date of completing each performance test required by this section. The results must be submitted following the procedures specified in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section.

(2) If you are the owner or operator of an affected unit, you are required to submit excess emissions reports to the EPA for any excess emissions that occurred during the reporting period. Excess emissions are defined as any calculated 30-day rolling average $NO_X$ emissions rate that exceeds the applicable emissions limit established under paragraph (c) of this section. Excess emissions reports must be submitted following the procedures specified in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section. Submissions made via CEDRI must be made in accordance with the appropriate submission instructions provided in CEDRI.

(3) If you are the owner or operator of an affected unit, you shall submit an annual report to the EPA by January 30th of each year. Annual reports must be submitted following the procedures in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section. Submissions made via CEDRI must be made in

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

accordance with the appropriate submission instructions provided in CEDRI. The report shall include all records required by paragraph (e) of this section, including records of CEMS data or operating parameters required by paragraph (d) of this section to demonstrate continuous compliance with the applicable emissions limits under paragraph (c) of this section.

(g) * * *

(2) The owner or operator of an existing affected unit that emits or has a potential to emit 100 tons per year or more of $NO_X$ as of August 4, 2023, for a unit in a State listed in § 52.40(c)(2)(i), or [EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in § 52.40(c)(2)(ii), shall notify the Administrator that the unit is subject to this section. The notification shall be submitted in PDF format via CEDRI or an analogous electronic submission system provided by the EPA not later than December 4, 2023, for a unit in a State listed in § 52.40(c)(2)(i), or [120 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in § 52.40(c)(2)(ii). CEDRI can be accessed through the EPA's CDX (*https://cdx.epa.gov/*). The notification shall provide the following information:

* * * * *

7. Amend § 52.43 by:

a. Revising paragraphs (b) and (d)(1), paragraph (d)(4) introductory text, and paragraphs (d)(4)(i) and (ii);

b. In paragraph (d)(4)(iii) introductory text, removing "via the CEDRI or analogous" and adding in its place "in writing or via an";

c. In paragraph (d)(4)(iii)(B), removing "in writing, within" and adding in its place "via CEDRI or an analogous electronic submission system provided by the EPA, within";

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

d. Revising paragraph (d)(4)(iv);

e. In paragraph (d)(4)(v), removing "August 5, 2024, the" and adding in its place "the submission deadline specified for the unit in paragraph (d)(1) of this section, the";

f. In paragraph (e)(3) introductory text, removing "2026 ozone season" and adding in its place "start date of the first ozone season identified for the applicable State in § 52.40(c)(2)";

g. In paragraph (e)(3)(ii), removing "a site-specific indicator" and adding in its place "site-specific indicator ranges";

h. In paragraph (e)(3)(iv), removing "paragraph (f)" and adding in its place "paragraph (g)";

i. Revising paragraph (f) introductory text;

j. In paragraph (f)(8), removing "paragraph (d)" and adding in its place "paragraph (e)"; and

k. Revising paragraphs (g)(1) through (4) and paragraph (h)(2) introductory text.

The revisions read as follows:

**§ 52.43 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Iron and Steel Mills and Ferroalloy Manufacturing Industry?**

\*    \*    \*    \*    \*

(b) *Applicability*. The  requirements of this section apply to each new or existing reheat furnace at an iron and steel mill or ferroalloy manufacturing facility that is located within any of the States listed in § 52.40(c)(2), including Indian country located within the borders of any such State(s), does not have low-$NO_X$ burners installed, and directly emits or has the potential to emit 100 tons per year or more of $NO_X$ on or after August 4, 2023, for a unit in a State listed in § 52.40(c)(2)(i), or [EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in

Page 243 of 289

§ 52.40(c)(2)(ii). Any existing reheat furnace without low-NO$_X$ burners installed and with a potential to emit of 100 tons per year or more of NO$_X$ on the date specified for the unit in the preceding sentence will continue to be subject to the requirements of this section even if that unit later installs low-NO$_X$ burners or becomes subject to a physical or operational limitation that lowers its potential to emit below 100 tons per year of NO$_X$.

\*    \*    \*    \*    \*

(d) \*    \*    \*

(1) The owner or operator of each affected unit must submit a work plan for each affected unit by August 5, 2024, for a unit in a State listed in § 52.40(c)(2)(i), or [ONE YEAR AFTER EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in § 52.40(c)(2)(ii). The work plan must be submitted via CEDRI or an analogous electronic submission system provided by the EPA. Each work plan must include a description of the affected unit and rated production and energy capacities, identification of the low-NO$_X$ burner or alternative low NO$_X$ technology selected, and the phased construction timeframe by which you will design, install, and consistently operate the device. Each work plan shall also include, where applicable, performance test results obtained no more than five years before August 4, 2023, for a unit in a State listed in § 52.40(c)(2)(i), or [EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in § 52.40(c)(2)(ii), to be used as baseline emissions testing data providing the basis for required emissions reductions. If no such data exist, then the owner or operator must perform pre-installation testing as described in paragraph (e)(3) of this section.

\*    \*    \*    \*    \*

(4) The Administrator will act as follows with respect to each submitted work plan:

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(i) The Administrator will provide notification in writing or via an electronic submission system provided by the EPA to the owner or operator of an affected unit if the submitted work plan is complete, that is, whether the submission contains sufficient information to make a determination, within 60 calendar days after receipt of the original work plan and within 60 calendar days after receipt of any supplementary information.

(ii) The Administrator will provide notification in writing or via an electronic submission system provided by the EPA to the owner or operator of a decision to approve or intention to disapprove the work plan within 60 calendar days after providing written notification pursuant to paragraph (d)(4)(i) of this section that the submitted work plan is complete. Any decision to approve a work plan will be made publicly available.

*   *   *   *   *

(iv) The Administrator's final decision to disapprove a work plan will be provided in writing or via an electronic submission system provided by the EPA, will be made publicly available, and will set forth the specific grounds on which the disapproval is based. The final decision will be made within 60 calendar days after presentation of additional information or argument (if the submitted work plan is complete), or within 60 calendar days after the deadline for the submission of additional information or argument under paragraph (d)(4)(iii)(B) of this section, if no such submission is made.

*   *   *   *   *

(f) *Recordkeeping requirements*. If you are the owner or operator of an affected unit, you shall maintain records of the following information for each day the affected unit operates during the ozone season consistent with the requirements of § 52.40(c)(3) and (f):

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

\*   \*   \*   \*   \*

(g) \* \* \*

(1) If you are the owner or operator of an affected unit, you shall submit a final report via CEDRI or an analogous electronic submission system provided by the EPA, by no later than one month before the start date of the first ozone season identified for the applicable State in § 52.40(c)(2), certifying that installation of each selected control device has been completed. You shall include in the report the dates of final construction and relevant performance testing, where applicable, demonstrating compliance with the selected emission limits pursuant to paragraphs (c) and (d) of this section.

(2) If you are the owner or operator of an affected unit, you must submit the results of the performance test or performance evaluation of the CEMS to the EPA within 60 days after the date of completing each performance test required by this section. The results must be submitted following the procedures specified in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section.

(3) If you are the owner or operator of an affected unit, you are required to submit excess emissions reports to the EPA for any excess emissions that occurred during the reporting period. Excess emissions are defined as any calculated 30-day rolling average $NO_X$ emissions rate that exceeds the applicable emissions limit established under paragraphs (c) and (d) of this section. Excess emissions reports must be submitted following the procedures specified in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section. Submissions made via CEDRI must be made in accordance with the appropriate submission instructions provided in CEDRI.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(4) If you are the owner or operator of an affected unit, you shall submit an annual report to the EPA by January 30th of each year. Annual reports must be submitted following the procedures in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section. Submissions made via CEDRI must be made in accordance with the appropriate submission instructions provided in CEDRI. The report shall include all records required by paragraph (f) of this section, including records of CEMS data or operating parameters required by paragraph (e) of this section to demonstrate compliance with the applicable emissions limits established under paragraphs (c) and (d) of this section.

(h) *   *   *

(2) The owner or operator of an existing affected unit that does not have low-NO$_X$ burners installed and that emits or has a potential to emit 100 tons per year or more of NO$_X$ as of August 4, 2023, for a unit in a State listed in § 52.40(c)(2)(i), or [EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in § 52.40(c)(2)(ii), shall notify the Administrator that the unit is subject to this section. The notification shall be submitted in PDF format via CEDRI or an analogous electronic submission system provided by the EPA not later than December 4, 2023, for a unit in a State listed in § 52.40(c)(2)(i), or [120 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in § 52.40(c)(2)(ii). CEDRI can be accessed through the EPA's CDX (*https://cdx.epa.gov/*). The notification shall provide the following information:

*   *   *   *   *

8. Amend § 52.44 by:

a. In paragraph (a):

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

i. In the definition for "Affected units", removing "Affected units means" and adding "Affected unit means"; and

ii. Revising the definition "Wool fiberglass";

b. Revising paragraph (b) and paragraph (c) introductory text;

c. In paragraph (d)(1) introductory text and paragraph (e)(1) introductory text, removing "the CEDRI or" and adding in its place "CEDRI or an";

d. In paragraph (g)(3) introductory text, removing "2026 ozone season" and adding in its place "start date of the first ozone season identified for the applicable State in § 52.40(c)(2)";

e. In paragraph (g)(3)(ii), removing "a";

f. In paragraph (g)(3)(iv), removing "paragraph (h)" and adding in its place "paragraph (i)";

g. Revising paragraph (h)(1) introductory text;

h. Redesignating paragraphs (h)(1)(vii)(D), (h)(1)(viii), and (h)(1)(ix) as paragraphs (h)(1)(viii), (h)(1)(ix), and (h)(1)(x), respectively;

i. In paragraph (h)(2), adding a second sentence;

j. In paragraph (h)(3), adding a third sentence; and

k. Revising paragraphs (i)(1) through (3) and paragraph (j)(2) introductory text.

The revisions and additions read as follows:

**§ 52.44 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Glass and Glass Product Manufacturing Industry?**

(a) *  *  *

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*Wool fiberglass* means fibrous glass of random texture, including acoustical board and tile (mineral wool), fiberglass insulation, glass wool, insulation (rock wool, fiberglass, slag, and silica minerals), and mineral wool roofing mats.

(b) *Applicability*. You are subject to the requirements under this section if you own or operate a new or existing glass manufacturing furnace that is located within any of the States listed in § 52.40(c)(2), including Indian country located within the borders of any such State(s), and directly emits or has the potential to emit 100 tons per year or more of $NO_X$ on or after August 4, 2023, for a unit in a State listed in § 52.40(c)(2)(i), or [EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in § 52.40(c)(2)(ii). Any existing glass manufacturing furnace with a potential to emit of 100 tons per year or more of $NO_X$ on the date specified for the unit in the preceding sentence will continue to be subject to the requirements of this section even if that unit later becomes subject to a physical or operational limitation that lowers its potential to emit below 100 tons per year of $NO_X$.

(c) *Emissions limitations*. If you are the owner or operator of an affected unit, you must meet the emissions limitations in paragraphs (c)(1) and (2) of this section on a 30-day rolling average basis during each ozone season identified for the applicable State in § 52.40(c)(2), provided that such emissions limitations shall not apply to the unit during startup, shutdown, and/or idling in any ozone season for which the unit complies with the startup requirements in paragraph (d) of this section, the shutdown requirements in paragraph (e) of this section, and/or the idling requirements in paragraph (f) of this section, respectively.

\*    \*    \*    \*    \*

(h) \* \* \*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(1) If you are the owner or operator of an affected unit, you shall maintain records of the following information for each day the affected unit operates during the ozone season consistent with the requirements of § 52.40(c)(3) and (f):

*    *    *    *    *

(2) *   *   * The records shall be maintained consistent with the requirements of § 52.40(c)(3) and (f).

(3) *   *   * The records shall be maintained consistent with the requirements of § 52.40(c)(3) and (f).

(i) *   *   *

(1) If you are the owner or operator of an affected unit, you must submit the results of the performance test or performance evaluation of the CEMS to the EPA within 60 days after the date of completing each performance test required by this section. The results must be submitted following the procedures specified in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section.

(2) If you are the owner or operator of an affected unit, you are required to submit excess emissions reports to the EPA for any excess emissions that occurred during the reporting period. Excess emissions are defined as any calculated 30-day rolling average $NO_X$ emissions rate that exceeds the applicable emissions limit in paragraph (c) of this section. Excess emissions reports must be submitted following the procedures specified in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section. Submissions made via CEDRI must be made in accordance with the appropriate submission instructions provided in CEDRI.

Page 250 of 289

(3) If you own or operate an affected unit, you shall submit an annual report to the EPA by January 30th of each year. Annual reports must be submitted following the procedures in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section. Submissions made via CEDRI must be made in accordance with the appropriate submission instructions provided in CEDRI. The report shall include all records required by paragraph (h) of this section, including records of CEMS data or operating parameters required by paragraph (g) of this section to demonstrate continuous compliance with the applicable emissions limits under paragraph (c) of this section.

(j) *  *  *

(2) The owner or operator of an existing affected unit that emits or has a potential to emit 100 tons per year or more of $NO_X$ as of August 4, 2023, for a unit in a State listed in § 52.40(c)(2)(i), or [EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in § 52.40(c)(2)(ii), shall notify the Administrator that the unit is subject to this section. The notification shall be submitted in PDF format via CEDRI or an analogous electronic submission system provided by the EPA not later than December 4, 2023, for a unit in a State listed in § 52.40(c)(2)(i), or [120 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], for a unit in a State listed in § 52.40(c)(2)(ii). CEDRI can be accessed through the EPA's CDX (*https://cdx.epa.gov/*). The notification shall provide the following information:

*    *    *    *    *

9. Amend § 52.45 by:

a. Revising the section heading;

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

b. In paragraph (a), in the definition for "Maximum heat input capacity", removing the second "means" before "the ability";

c. Revising paragraph (b)(1);

d. In paragraph (b)(2) introductory text, removing "paragraph (f)(2)" and adding in its place "paragraphs (e)(2) and (f)(3)";

e. Revising paragraph (b)(2)(i) and paragraph (c) introductory text;

f. In paragraph (d)(1) introductory text, removing "May 1, 2026" and adding in its place "the start date of the first ozone season identified for the applicable State in § 52.40(c)(2)";

g. In paragraph (d)(1)(i), removing "emission rate" and adding in its place "emissions rate";

h. In paragraph (d)(2) introductory text, removing "mmBTU/hr" and adding in its place "mmBtu/hr";

i. Revising paragraph (d)(2)(iii);

j. In paragraph (d)(2)(v), removing "coal and span value" and adding in its place "coal and a span value";

k. Revising paragraph (d)(2)(vii) and paragraph (d)(3) introductory text;

l. In paragraph (d)(3)(ii), removing "affected units operates" and adding in its place "affected unit operates";

m. In paragraphs (d)(3)(iii)(A) and (B), removing "emission rates" and adding in its place "emissions rates";

n. Adding paragraph (d)(3)(iv);

o. Removing paragraph (d)(4);

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

p. Revising paragraph (e)(1) introductory text, paragraph (e)(2) introductory text, and paragraphs (e)(2)(v) and (f)(1) through (3); and

q. Removing paragraph (f)(4).

The revisions and addition read as follows:

**§ 52.45 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from the Basic Chemical Manufacturing, Petroleum and Coal Products Manufacturing, Pulp, Paper, and Paperboard Mills, Metal Ore Mining, and Iron and Steel Mills and Ferroalloy Manufacturing Industries?**

\*   \*   \*   \*   \*

(b) \*   \*   \*

(1) The requirements of this section apply to each new or existing boiler with a design capacity of 100 mmBtu/hr or greater that received 90% or more of its heat input from coal, residual oil, distillate oil, natural gas, or combinations of these fuels in the previous ozone season; is located at sources that are within the Basic Chemical Manufacturing industry, the Petroleum and Coal Products Manufacturing industry, the Pulp, Paper, and Paperboard Mills industry, the Metal Ore Mining industry, and the Iron and Steel Mills and Ferroalloy Manufacturing industry; and is located within any of the States listed in § 52.40(c)(2), including Indian country located within the borders of any such State(s). The requirements of this section do not apply to an emissions unit that meets the requirements for a low-use exemption as provided in paragraph (b)(2) of this section.

\*   \*   \*   \*   \*

(2) \*   \*   \*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(i) If you are the owner or operator of an affected unit that exceeds the 10% per year hour of operation over three years criterion or the 20% hours of operation per year criterion, you can no longer comply via the low-use exemption provisions and must meet the applicable emissions limits and other applicable provisions as soon as possible but not later than one year from the date eligibility as a low-use boiler was negated by exceedance of the low-use boiler criteria.

\*    \*    \*    \*    \*

(c) *Emissions limitations.* If you are the owner or operator of an affected unit, you must meet the following emissions limitations on a 30-day rolling average basis during each ozone season identified for the applicable State in § 52.40(c)(2):

\*    \*    \*    \*    \*

(d) \*  \*  \*

(2) \*  \*  \*

(iii) The 1-hour average $NO_X$ emissions rates measured by the CEMS shall be expressed in terms of lbs/mmBtu heat input and shall be used to calculate the average emissions rates under paragraph (c) of this section.

\*    \*    \*    \*    \*

(vii) You may delay installing a CEMS for $NO_X$ until after the initial performance test has been conducted. If you demonstrate during the performance test that emissions of $NO_X$ are less than 70 percent of the applicable emissions limit in paragraph (c) of this section, you are not required to install a CEMS for measuring $NO_X$. If you demonstrate your affected unit emits less than 70 percent of the applicable emissions limit and choose to not install a CEMS, you must submit a request via CEDRI or an analogous electronic submission system provided by the EPA

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

to the Administrator that documents the results of the initial performance test and includes an alternative monitoring procedure that will be used to track compliance with the applicable $NO_X$ emissions limit(s) in paragraph (c) of this section. The Administrator may consider the request and, following public notice and comment, may approve the alternative monitoring procedure with or without revision, or disapprove the request. If the Administrator approves the request for the alternative monitoring procedure, you must request that the relevant permitting agency incorporate the monitoring procedure into the facility's title V permit. Upon receipt of a disapproved request, you will have one year to install a CEMS.

(3) If you are the owner or operator of an affected unit with a heat input capacity less than 250 mmBtu/hr, you must monitor $NO_X$ emissions via the requirements of paragraph (d)(2) of this section or you must monitor $NO_X$ emissions by conducting an annual test in conjunction with the implementation of a monitoring plan meeting the following requirements:

\*    \*    \*    \*    \*

(iv) You shall submit the monitoring plan to the EPA via CEDRI or an analogous electronic submission system provided by the EPA, and request that the relevant permitting agency incorporate the monitoring plan into the facility's title V permit.

(e) \*   \*   \*

(1) If you are the owner or operator of an affected unit which is not a low-use boiler, you shall maintain records of the following information for each day the affected unit operates during the ozone season consistent with the requirements of § 52.40(c)(3) and (f):

\*    \*    \*    \*    \*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(2)  If you are the owner or operator of an affected unit complying as a low-use boiler, you must maintain the following records for each operating day of the calendar year consistent with the requirements of § 52.40(f):

\*    \*    \*    \*    \*

(v) The annual hours of operation for each of the prior 3 years, and the 3-year average hours of operation.

(f) \*   \*   \*

(1) If you are the owner or operator of an affected unit, you must submit the results of the performance test or performance evaluation of the CEMS to the EPA within 60 days after the date of completing each performance test required by this section. The results must be submitted following the procedures specified in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section.

(2) If you are the owner or operator of an affected unit, you are required to submit excess emissions reports to the EPA for any excess emissions that occurred during the reporting period. Excess emissions are defined as any calculated 30-day rolling average $NO_X$ emissions rate, as determined under paragraph (e)(1)(iii) of this section, that exceeds the applicable emissions limit in paragraph (c) of this section. Excess emissions reports must be submitted following the procedures specified in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section. Submissions made via CEDRI must be made in accordance with the appropriate submission instructions provided in CEDRI.

(3) If you are the owner or operator of an affected unit, you shall submit an annual report to the EPA by January 30th of each year. Annual reports must be submitted following the

Page 256 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

procedures in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section. Submissions made via CEDRI must be made in accordance with the appropriate submission instructions provided in CEDRI. The report shall include all records required by paragraph (e) of this section, including records of CEMS data or operating parameters required by paragraph (d) of this section to demonstrate continuous compliance with the applicable emissions limits under paragraph (c) of this section.

10. Amend § 52.46 by:

a. In paragraph (a):

i. Removing the definitions "mass burn refractory waste combustor", "mass burn rotary waterwall municipal waste combustor", and "mass burn waterwall municipal waste combustor";

ii. Adding the definition "Municipal solid waste or MSW" in alphabetical order; and

iii. In the definition for "Municipal waste combustor, MWC, or municipal waste combustor unit", paragraph (i), removing "Means any" and adding in its place "Any";

b. In paragraph (b), removing "and";

c. Revising paragraph (c) introductory text;

d. In paragraphs (c)(1) and (2), removing "at 7 percent oxygen";

e. Removing and reserving paragraph (d)(1);

f. Revising paragraph (d)(2);

g. In paragraph (d)(5), removing "owner and operator" and adding in its place "owner or operator";

h. In paragraph (e)(1) introductory text, removing "$NO_X$ are" and adding in its palace "$NO_X$ emissions are";

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

i. Revising paragraph (e)(1)(vi) introductory text and paragraphs (e)(1)(vi)(A), (e)(2)(vi)(B), and (e)(2)(vii);

j. In paragraph (e)(2)(viii), removing "paragraph (e)(2)(iv)" and adding in its place "paragraph (e)(2)(vi)";

k. Removing and reserving paragraph (e)(3);

l. Revising paragraph (f) introductory text and paragraph (f)(3);

m. In paragraph (f)(4), removing "occurrence that" and adding in its place "occurrence where";

n. Revising paragraphs (g)(1) and (2); and

o. Adding paragraph (g)(3).

The additions and revisions read as follows:

**§ 52.46 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from Municipal Waste Combustors?**

(a) *  *  *

*Municipal solid waste* or *MSW* means "municipal solid waste or municipal-type solid waste or MSW" as defined in 40 CFR 60.51b.

*  *  *  *  *

(c) *Emissions limitations*. If you are the owner or operator of an affected unit, you must meet the following emissions limitations at all times on a 24-hour block average basis and a 30-day rolling average basis during each ozone season identified for the applicable State in § 52.40(c)(2), using $NO_X$ measurements corrected to 7 percent oxygen except as otherwise provided in paragraph (e)(2)(vi)(B) of this section:

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

\*   \*   \*   \*   \*

(d) \*  \*  \*

(2) Duration of startup and shutdown periods is limited to 3 hours per occurrence.

\*   \*   \*   \*   \*

(e) \*  \*  \*

(1) \*  \*  \*

(vi) If you select carbon dioxide for use in diluent corrections, you shall follow the requirements of 40 CFR 60.58b(b)(6) to establish the relationship between oxygen and carbon dioxide levels:

(A) This relationship shall be established during the initial performance test and may be reestablished during performance compliance tests; and

\*   \*   \*   \*   \*

(2) \*  \*  \*

(vi) \*  \*  \*

(B) Each $NO_X$ 1-hour arithmetic average shall be corrected to 7 percent oxygen on an hourly basis using the 1-hour arithmetic average of the oxygen (or carbon dioxide) CEMS data, except that $NO_X$ data for an hour identified as falling within a period of startup or shutdown in accordance with paragraphs (d)(2) through (4) of this section can reflect $NO_X$ as measured at stack oxygen content without such correction.

(vii) The 1-hour arithmetic averages shall be expressed in parts per million by volume (dry basis) and shall be used to calculate the 24-hour daily arithmetic average concentrations. The 1-

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

hour arithmetic averages shall be calculated using the data points required under 40 CFR

60.13(e)(2).

\*    \*    \*    \*    \*

(f) *Recordkeeping requirements*. If you are the owner or operator of an affected unit, you

shall maintain records of the following information, as applicable, for each day the affected unit

operates during the ozone season consistent with the requirements of § 52.40(c)(3) and (f):

\*    \*    \*    \*    \*

(3) Identification of the calendar dates and times (hours) for which valid hourly $NO_X$

emissions data have not been obtained, including reasons for not obtaining the data and a

description of corrective actions taken.

\*    \*    \*    \*    \*

(g) \*  \*  \*

(1) If you are the owner or operator of an affected unit, you must submit the results of the

performance test or performance evaluation of the CEMS to the EPA within 60 days after the

date of completing each performance test required by this section. The results must be submitted

following the procedures specified in § 52.40(g) via CEDRI or an analogous electronic reporting

approach provided by the EPA to report data required by this section.

(2) If you are the owner or operator of an affected unit, you are required to submit excess

emissions reports to the EPA for any excess emissions that occurred during the reporting period.

Excess emissions are defined as any calculated 24-hour block average $NO_X$ emissions rate or

calculated 30-day rolling average $NO_X$ emissions rate, as determined under paragraph (e)(2) of

this section, that exceeds the respective emissions limit in paragraph (c) of this section. Excess

Page 260 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

emissions reports must be submitted following the procedures specified in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section. Submissions made via CEDRI must be made in accordance with the appropriate submission instructions provided in CEDRI.

(3) If you are the owner or operator of an affected unit, you shall submit an annual report to the EPA by January 30th of each year. Annual reports must be submitted following the procedures in § 52.40(g) via CEDRI or an analogous electronic reporting approach provided by the EPA to report data required by this section. Submissions made via CEDRI must be made in accordance with the appropriate submission instructions provided in CEDRI.  The report shall include all information required by paragraph (f) of this section, including records of CEMS data required by paragraph (e) of this section to demonstrate compliance with the applicable emissions limits under paragraph (c) of this section.

**Subpart D—Arizona**

11. Add § 52.154 to subpart D to read as follows:

**§ 52.154 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

(a)(1) The owner and operator of each source and each unit located in the State of Arizona and Indian country within the borders of the State and for which requirements are set forth under the CSAPR $NO_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2025 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Arizona's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii) for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Arizona's SIP.

(2) Notwithstanding the provisions of paragraph (a)(1) of this section, if, at the time of the approval of Arizona's SIP revision described in paragraph (a)(1) of this section, the Administrator has already started recording any allocations of CSAPR $NO_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR $NO_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(b) The owner and operator of each source located in the State of Arizona and Indian country within the borders of the State and for which requirements are set forth in § 52.40 and § 52.41, § 52.42, § 52.43, § 52.44, § 52.45, or § 52.46 must comply with such requirements with regard to emissions occurring in 2027 and each subsequent year.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**Subpart Q—Iowa**

12. Amend § 52.840 by:

a. In paragraph (b)(2):

i. Removing "2017 and each subsequent year." and adding in its place "2017 through 2024."; and

ii. Removing the second and third sentences;

b. Revising paragraph (b)(3); and

c. Adding paragraphs (b)(4) and (5).

The revision and additions read as follows:

**§ 52.840 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

\*    \*    \*    \*    \*

(b) \*  \*  \*

(3) The owner and operator of each source and each unit located in the State of Iowa and Indian country within the borders of the State and for which requirements are set forth under the CSAPR $NO_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2025 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Iowa's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii),

Page 263 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Iowa's SIP.

(4) Notwithstanding the provisions of paragraph (b)(3) of this section, if, at the time of the approval of Iowa's SIP revision described in paragraph (b)(3) of this section, the Administrator has already started recording any allocations of CSAPR $NO_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR $NO_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (b)(2) of this section, after 2024 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR $NO_X$ Ozone Season Group 2 allowances between certain accounts under common control) and the provisions of § 97.826(f) of this chapter (concerning the conversion of amounts of unused CSAPR $NO_X$ Ozone Season Group 2 allowances allocated for control periods before 2025 to different amounts of CSAPR $NO_X$ Ozone Season Group 3 allowances) shall continue to apply.

**Subpart R—Kansas**

13. Amend § 52.882 by:

a. In paragraph (b)(1):

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

i. Removing "2017 and each subsequent year." and adding in its place "2017 through 2024.";
and

ii. Removing the second and third sentences;

b. Revising paragraph (b)(2); and

c. Adding paragraphs (b)(3) and (4).

The revision and additions read as follows:

## § 52.882 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

\*    \*    \*    \*    \*

(b) \* \* \*

(2) The owner and operator of each source and each unit located in the State of Kansas and Indian country within the borders of the State and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2025 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to Kansas' State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii), except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to Kansas' SIP.

(3) Notwithstanding the provisions of paragraph (b)(2) of this section, if, at the time of the approval of Kansas' SIP revision described in paragraph (b)(2) of this section, the Administrator has already started recording any allocations of CSAPR $NO_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR $NO_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(4) Notwithstanding the provisions of paragraph (b)(1) of this section, after 2024 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR $NO_X$ Ozone Season Group 2 allowances between certain accounts under common control) and the provisions of § 97.826(f) of this chapter (concerning the conversion of amounts of unused CSAPR $NO_X$ Ozone Season Group 2 allowances allocated for control periods before 2025 to different amounts of CSAPR $NO_X$ Ozone Season Group 3 allowances) shall continue to apply.

**Subpart GG—New Mexico**

14. Add § 52.1641 to subpart GG to read as follows:

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

### § 52.1641 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a) The owner and operator of each source and each unit located in the State of New Mexico and Indian country within the borders of the State and for which requirements are set forth under the CSAPR $NO_X$ Ozone Season Group 3 Trading Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with regard to emissions occurring in 2025 and each subsequent year. The obligation to comply with such requirements with regard to sources and units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority will be eliminated by the promulgation of an approval by the Administrator of a revision to New Mexico's State Implementation Plan (SIP) as correcting the SIP's deficiency that is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii)  for those sources and units, except to the extent the Administrator's approval is partial or conditional. The obligation to comply with such requirements with regard to sources and units located in areas of Indian country within the borders of the State not subject to the State's SIP authority will not be eliminated by the promulgation of an approval by the Administrator of a revision to New Mexico SIP.

(b) Notwithstanding the provisions of paragraph (a) of this section, if, at the time of the approval of New Mexico's SIP revision described in paragraph (a) of this section, the Administrator has already started recording any allocations of CSAPR $NO_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State and areas of Indian country within the borders of the State subject to the State's SIP authority for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter

Page 267 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

authorizing the Administrator to complete the allocation and recordation of CSAPR NO$_X$ Ozone

Season Group 3 allowances to such units for each such control period shall continue to apply,

unless provided otherwise by such approval of the State's SIP revision.

**Subpart RR—Tennessee**

15. Amend § 52.2240 by:

a. In paragraph (e)(2):

i. Removing "2017 and each subsequent year." and adding in its place "2017 through 2024.";
and

ii. Removing the second sentence;

b. Revising paragraph (e)(3); and

c. Adding paragraphs (e)(4) and (5).

The revision and additions read as follows:

**§ 52.2240 Interstate pollutant transport provisions; What are the FIP requirements for**

**decreases in emissions of nitrogen oxides?**

\*    \*    \*    \*    \*

(e) \*   \*   \*

(3) The owner and operator of each source and each unit located in the State of Tennessee

and for which requirements are set forth under the CSAPR NO$_X$ Ozone Season Group 3 Trading

Program in subpart GGGGG of part 97 of this chapter must comply with such requirements with

regard to emissions occurring in 2025 and each subsequent year. The obligation to comply with

such requirements will be eliminated by the promulgation of an approval by the Administrator of

a revision to Tennessee's State Implementation Plan (SIP) as correcting the SIP's deficiency that

Page 268 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

is the basis for the CSAPR Federal Implementation Plan (FIP) under § 52.38(b)(1) and (b)(2)(iii), except to the extent the Administrator's approval is partial or conditional.

(4) Notwithstanding the provisions of paragraph (e)(3) of this section, if, at the time of the approval of Tennessee's SIP revision described in paragraph (e)(3) of this section, the Administrator has already started recording any allocations of CSAPR $NO_X$ Ozone Season Group 3 allowances under subpart GGGGG of part 97 of this chapter to units in the State for a control period in any year, the provisions of subpart GGGGG of part 97 of this chapter authorizing the Administrator to complete the allocation and recordation of CSAPR $NO_X$ Ozone Season Group 3 allowances to such units for each such control period shall continue to apply, unless provided otherwise by such approval of the State's SIP revision.

(5) Notwithstanding the provisions of paragraph (e)(2) of this section, after 2024 the provisions of § 97.826(c) of this chapter (concerning the transfer of CSAPR $NO_X$ Ozone Season Group 2 allowances between certain accounts under common control) and the provisions of § 97.826(f) of this chapter (concerning the conversion of amounts of unused CSAPR $NO_X$ Ozone Season Group 2 allowances allocated for control periods before 2025 to different amounts of CSAPR $NO_X$ Ozone Season Group 3 allowances) shall continue to apply.

## PART 97—FEDERAL $NO_X$ BUDGET TRADING PROGRAM, CAIR $NO_X$ AND $SO_2$ TRADING PROGRAMS, CSAPR $NO_X$ AND $SO_2$ TRADING PROGRAMS, AND TEXAS $SO_2$ TRADING PROGRAM

16. The authority citation for part 97 continues to read as follows:

**Authority:** 42 U.S.C. 7401, 7403, 7410, 7426, 7491, 7601, and 7651, *et seq*.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**Subpart BBBBB—CSAPR NO$_X$ Ozone Season Group 1 Trading Program**

**§ 97.502 [Amended]**

17. Amend § 97.502 in the definition for "CSAPR NO$_X$ Ozone Season Group 3 allowance" by removing "§ 97.826(d) or (e), or" and adding in its place "§ 97.826(d), (e), or (f), or".

18. Amend § 97.526 by adding paragraphs (d)(2)(iv) and (e)(4) to read as follows:

**§ 97.526 Banking and conversion.**

\*    \*    \*    \*    \*

(d) \*   \*   \*

(2) \*   \*   \*

(iv) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and § 97.826(f)(1), upon any determination that would otherwise result in the initial recordation of a given number of CSAPR NO$_X$ Ozone Season Group 1 allowances in the compliance account for a source in a State listed in § 52.38(b)(2)(iii)(E) of this chapter (and Indian country within the borders of such a State), the Administrator will not record such CSAPR NO$_X$ Ozone Season Group 1 allowances but instead will allocate and record in such account an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2023 computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Group 1 allowances divided by the conversion factor determined under paragraph (d)(1)(ii) of this section and further divided by the conversion factor determined under § 97.826(f)(1)(ii).

(e) \*   \*   \*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(4) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and § 97.826(f)(1), the owner or operator of a CSAPR NO$_X$ Ozone Season Group 1 source in a State listed in § 52.38(b)(2)(ii)(A) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR NO$_X$ Ozone Season Group 1 allowances for the control period in 2015 or 2016 by holding instead, in a general account established for this sole purpose, an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2025 (or any later control period for which the allowance transfer deadline defined in § 97.1002 has passed) computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Group 1 allowances divided by the conversion factor determined under paragraph (d)(1)(ii) of this section and further divided by the conversion factor determined under § 97.826(f)(1)(ii).

**Subpart EEEEE—CSAPR NO$_X$ Ozone Season Group 2 Trading Program**

**§ 97.802 [Amended]**

19. Amend § 97.802 by:

a. In the definition for "Allocate or allocation", removing "§§ 97.526(d), 97.826(d), and 97.1026(e), and" and adding in its place "§§ 97.526 and 97.1026, and";

b. In the definition for "Common designated representative's assurance level", paragraph (2), removing "§ 97.526(d), § 97.826(d), or § 97.1026(e)." and adding in its place "§ 97.526, § 97.826, or § 97.1026."; and

c. In the definition for "CSAPR NO$_X$ Ozone Season Group 3 allowance", removing "§ 97.826(d) or (e), or" and adding in its place "§ 97.826(d), (e), or (f), or".

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**§ 97.810 [Amended]**

20. Amend § 97.810 in paragraphs (a)(6)(i) through (iii), (a)(7)(i) through (iii), (a)(19)(i) and (ii), and (b)(6), (7), and (19) by removing "and thereafter" and adding in its place "through 2024".

**§ 97.811 [Amended]**

21. Amend § 97.811(d) heading by adding "Original" before "Group 2 allowances".

**§ 97.824 [Amended]**

22. Amend § 97.824(c)(2)(ii) by removing "§ 97.526(d), § 97.826(d), or § 97.1026(e), in" and adding in its place "§ 97.526, § 97.826, or § 97.1026, in".

23. Amend § 97.826 by:

a. Revising paragraph (e)(1)(ii)(B);

b. Redesignating paragraph (f) as paragraph (g) and adding a new paragraph (f);

c. In newly redesignated paragraph (g) introductory text, removing "this paragraph (f)" and adding in its place "this paragraph (g)";

d. In newly redesignated paragraph (g)(1)(i), removing "paragraph (f)(1)(ii)" and adding in its place "paragraph (g)(1)(ii)"; and

e. Adding paragraph (g)(3).

The revision and additions read as follows:

**§ 97.826 Banking and conversion.**

\*    \*    \*    \*    \*

(e) \*    \*    \*

(1) \*    \*    \*

(ii) \*    \*    \*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

(B) The product of the sum of the trading budgets for the control period in 2024 under § 97.1010(a)(1)(i) for all States listed in § 52.38(b)(2)(iii)(B) and (C) of this chapter multiplied by 0.21 and further multiplied by a fraction whose numerator is the number of days from August 4, 2023, through September 30, 2023, inclusive, and whose denominator is 153.

*   *   *   *   *

(f) Notwithstanding any other provision of this subpart, part 52 of this chapter, or any SIP revision approved under § 52.38(b)(8) or (9) of this chapter:

(1) As soon as practicable on or after [45 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], the Administrator will temporarily suspend acceptance of CSAPR NO$_X$ Ozone Season Group 2 allowance transfers submitted under § 97.822 and, before resuming acceptance of such transfers, will take the following actions with regard to every compliance account for a CSAPR NO$_X$ Ozone Season Group 2 source in a State listed in § 52.38(b)(2)(iii)(E) of this chapter (and Indian country within the borders of such a State):

(i) The Administrator will deduct all CSAPR NO$_X$ Ozone Season Original Group 2 allowances allocated for the control periods in 2017 through 2024 from each such account.

(ii) The Administrator will determine a conversion factor equal to the greater of 1.0000 or the quotient, expressed to four decimal places, of—

(A) The sum of all CSAPR NO$_X$ Ozone Season Original Group 2 allowances deducted from all such accounts under paragraph (e)(1)(i) of this section; divided by

(B) The product of the sum of the preset trading budgets for the control period in 2025 under § 97.1010(a)(2)(i) for all States listed in § 52.38(b)(2)(iii)(E) of this chapter multiplied by 0.21.

Page 273 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

(iii) The Administrator will allocate and record in each such account an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2025 computed as the quotient, rounded up to the nearest allowance, of the number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances deducted from such account under paragraph (f)(1)(i) of this section divided by the conversion factor determined under paragraph (f)(1)(ii) of this section.

(2) After the Administrator has carried out the procedures set forth in paragraph (f)(1) of this section, upon any determination that would otherwise result in the initial recordation of a given number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances in the compliance account for a source in a State listed in § 52.38(b)(2)(iii)(E) of this chapter (and Indian country within the borders of such a State), the Administrator will not record such CSAPR NO$_X$ Ozone Season Original Group 2 allowances but instead will allocate and record in such account an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances for the control period in 2025 computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances divided by the conversion factor determined under paragraph (f)(1)(ii) of this section.

(g) * * *

(3) After the Administrator has carried out the procedures set forth in paragraph (f)(1) of this section, the owner or operator of a CSAPR NO$_X$ Ozone Season Group 2 source in a State listed in § 52.38(b)(2)(ii)(A) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances for a control period in 2017 through 2024 by holding instead, in a general account established for this sole purpose, an amount of CSAPR NO$_X$ Ozone Season Group 3 allowances

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

for the control period in 2025 (or any later control period for which the allowance transfer

deadline defined in § 97.1002 has passed) computed as the quotient, rounded up to the nearest

allowance, of such given number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances

divided by the conversion factor determined under paragraph (f)(1)(ii) of this section.

**Subpart GGGGG—CSAPR NO$_X$ Ozone Season Group 3 Trading Program**

**§ 97.1002 [Amended]**

24. Amend § 97.1002 by:

a. In the definition for "Allocate or allocation", removing "§§ 97.526(d) and 97.826(d) and

(e), and" and adding in its place "§§ 97.526 and 97.826, and";

b.  In the definition for "Common designated representative's assurance level", paragraph

(2), removing "§ 97.526(d) or § 97.826(d) or (e)." and adding in its place "§ 97.526 or

§ 97.826."; and

c. In the definition for "CSAPR NO$_X$ Ozone Season Group 3 allowance", removing

"§ 97.826(d) or (e), or" and adding in its place "§ 97.826(d), (e), or (f), or".

25. Amend § 97.1006 by:

a. Revising paragraph (c)(1)(i)(B);

b. In paragraph (c)(3)(i) introductory text, removing "paragraph (c)(3)(i)(A), (B), or (C)" and

adding in its place "paragraphs (c)(3)(i)(A) through (D)";

c. In paragraph (c)(3)(i)(A), removing the semicolon and adding in its place a period.

d. In paragraph (c)(3)(i)(B), removing "; or" and adding in its place a period.

e. Adding paragraph (c)(3)(i)(D); and

f. Revising paragraph (c)(3)(ii).

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

The revisions and addition read as follows:

**§ 97.1006 Standard requirements.**

\*   \*   \*   \*   \*

(c) \*   \*   \*

(1) \*   \*   \*

(i) \*   \*   \*

(B) Two times the sum, for all CSAPR $NO_X$ Ozone Season Group 3 units at the source, of any excess over 50 tons of the sum for such a unit, for all calendar days of the control period, of any $NO_X$ emissions on any calendar day of the control period exceeding the $NO_X$ emissions that would have occurred on that calendar day if the unit had combusted the same daily heat input and emitted at any backstop daily $NO_X$ emissions rate applicable to the unit for that control period.

\*   \*   \*   \*   \*

(3) \*   \*   \*

(i) \*   \*   \*

(D) May 1, 2025, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(E) of this chapter.

(ii) A CSAPR $NO_X$ Ozone Season Group 3 unit shall be subject to the requirements under paragraphs (c)(1)(iii) and (iv) of this section for the control period starting on the later of May 1, 2024, or the deadline applicable to the unit under paragraph (c)(3)(i) of this section and for each control period thereafter.

\*   \*   \*   \*   \*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

26. Amend § 97.1010 by:

a. In table 1 to paragraph (a)(1)(i) and table 2 to paragraph (a)(2)(i), adding the entries "Arizona", "Iowa", "Kansas", "New Mexico", and "Tennessee" in alphabetical order;

b. Revising paragraphs (a)(4)(ii)(B)(*1*) and (a)(4)(iii)(A);

c. In paragraph (a)(4)(iii)(B), adding "applicable" before "document referenced";

d. Revising paragraphs (c)(2)(iii) and (iv); and

e. In table 6 to paragraph (e)(3)(i), adding the entries "Arizona", "Iowa", "Kansas", "New Mexico", and "Tennessee" in alphabetical order.

The additions and revisions read as follows:

**§ 97.1010 State NO$_X$ Ozone Season Group 3 trading budgets, set-asides, and variability limits.**

(a) *   *   *

(1) *   *   *

(i) *   *   *

**Table 1 to Paragraph (a)(1)(i)—State NO$_X$ Ozone Season Group 3 Trading Budgets by Control Period, 2021–2025 [Tons]**

| State | 2021 | 2022 | Portion of 2023 control period before August 4, 2023, before prorating | | | Portion of 2023 control period on and after August 4, 2023, before prorating | | | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | * | * | * | * | * | * | * | | |
| Arizona | | | | | | | | | | 8,195 |
| | | * | * | * | * | * | * | * | | |
| Iowa | | | | | | | | | | 9,752 |
| Kansas | | | | | | | | | | 4,763 |
| | | * | * | * | * | * | * | * | | |
| New Mexico | | | | | | | | | | 2,211 |
| | | * | * | * | * | * | * | * | | |
| Tennessee | | | | | | | | | | 3,983 |
| | | * | * | * | * | * | * | * | | |

Page 277 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

\*   \*   \*   \*   \*

(2) \* \* \*

(i) \* \* \*

**Table 2 to Paragraph (a)(2)(i)—Preset Trading Budgets by Control Period, 2026–2029**

**[Tons]**

| State | 2026 | | 2027 | | | 2028 | | 2029 |
|---|---|---|---|---|---|---|---|---|
| | \* | \* | \* | \* | \* | \* | \* | |
| Arizona | 5,814 | | 4,913 | | | 3,949 | | 3,949 |
| | \* | \* | \* | \* | \* | \* | \* | |
| Iowa | 9,713 | | 9,713 | | | 9,713 | | 9,077 |
| Kansas | 4,763 | | 4,763 | | | 4,763 | | 4,763 |
| | \* | \* | \* | \* | \* | \* | \* | |
| New Mexico | 2,008 | | 2,008 | | | 2,008 | | 2,008 |
| | \* | \* | \* | \* | \* | \* | \* | |
| Tennessee | 3,983 | | 2,666 | | | 2,130 | | 1,198 |
| | \* | \* | \* | \* | \* | \* | \* | |

\*   \*   \*   \*   \*

(4) \* \* \*

(ii) \* \* \*

(B) \* \* \*

(*1*) The sum for all units in the State meeting the criterion under paragraph (a)(4)(i)(A) of this section, without regard to whether such units also meet the criteria under paragraphs (a)(4)(i)(B) and (C) of this section, of the total heat input amounts reported in accordance with part 75 of this chapter for the historical control periods in the years two, three, and four years before the year of the control period for which the dynamic trading budget is being calculated, provided that for the historical control periods in 2022 and 2023, the total reported heat input amounts for Nevada and Utah as otherwise determined under this paragraph (a)(4)(ii)(B)(1) shall be increased by

Page 278 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

13,489,332 mmBtu for Nevada and by 1,888,174 mmBtu for Utah, and provided that for the

historical control periods in 2022, 2023, and 2024, the total reported heat input amounts for

Arizona and New Mexico as otherwise determined under this paragraph (a)(4)(ii)(B)(1) shall be

increased by 13,304,261 mmBtu for Arizona and by 62,445 mmBtu for New Mexico;

\*   \*   \*   \*   \*

(iii) \* \* \*

(A) For a unit listed in the document entitled "Unit-Specific Ozone Season $NO_X$ Emissions

Rates for Dynamic Budget Calculations" posted at *www.regulations.gov* in docket EPA–HQ–

OAR–2021–0668 (applicable to units located within the borders of States listed in

§ 52.38(b)(2)(iii)(A) through (C) of this chapter) or the document entitled "Unit-Specific Ozone

Season $NO_X$ Emissions Rates for Dynamic Budget Calculations for Five Additional States"

posted at *www.regulations.gov* in docket EPA–HQ–OAR–2023–0402 (applicable to units

located within the borders of States listed in § 52.38(b)(2)(iii)(E) of this chapter), the $NO_X$

emissions rate used in the calculation for the control period shall be the $NO_X$ emissions rate

shown for the unit and control period in the applicable document.

\*   \*   \*   \*   \*

(c) \* \* \*

(2) \* \* \*

(iii) 0.11, for Arizona for the control periods in 2025 and 2026; or

(iv) 0.05, for each State for each control period in 2023 and thereafter except as otherwise

specified in paragraphs (c)(2)(i) through (iii) of this section.

\*   \*   \*   \*   \*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

(e) *  *  *

(3) *  *  *

(i) *  *  *

**Table 6 to Paragraph (e)(3)(i)—State-Level Total Heat Input Used in Calculations of Preset Trading Budgets by Control Period, 2023–2029 [mmBtu]**

| State | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|-------|------|------|------|------|------|------|------|
|  |  | *  * | * | * | * | *  * | |
| Arizona |  |  | 279,048,607 | 266,122,691 | 266,122,691 | 263,590,069 | 263,590,069 |
|  |  | *  * | * | * | * | *  * | |
| Iowa |  |  | 142,934,126 | 142,934,126 | 142,934,126 | 142,934,126 | 141,310,860 |
| Kansas |  |  | 104,571,293 | 104,571,293 | 104,571,293 | 104,571,293 | 104,571,293 |
|  |  | *  * | * | * | * | *  * | |
| New Mexico |  |  | 82,092,237 | 79,168,874 | 79,168,874 | 79,168,874 | 79,168,874 |
|  |  | *  * | * | * | * | *  * | |
| Tennessee |  |  | 152,351,271 | 152,351,271 | 115,344,086 | 100,187,179 | 76,883,950 |
|  |  | *  * | * | * | * | *  * | |

*    *    *    *    *

27. Amend § 97.1011 by revising paragraphs (b)(4)(iii)(B) and (C) to read as follows:

**§ 97.1011 CSAPR NOₓ Ozone Season Group 3 allowance allocations to existing units.**

*    *    *    *    *

(b) *  *  *

(4) *  *  *

(iii) *  *  *

(B) For the control periods in 2026 and thereafter, a maximum controlled baseline under paragraph (b)(4)(iii)(A) of this section shall apply to any unit combusting any coal or solid coal-derived fuel during the historical control period for which the unit's heat input was most recently

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

reported, serving a generator with nameplate capacity of 100 MW or more, and equipped with selective catalytic reduction controls, except a circulating fluidized bed boiler.

(C) In addition to the units described in paragraph (b)(4)(iii)(B) of this section, for the following States and control periods, a maximum controlled baseline under paragraph (b)(4)(iii)(A) of this section shall apply to any other unit located within the borders of the State, combusting any coal or solid coal-derived fuel during the historical control period for which the unit's heat input was most recently reported, and serving a generator with nameplate capacity of 100 MW or more, except a circulating fluidized bed boiler:

(*1*) For a State listed in § 52.38(b)(2)(iii)(A) through (C) of this chapter except Alabama, Minnesota, or Wisconsin, the control periods in 2027 and thereafter.

(*2*) For State listed in § 52.38(b)(2)(iii)(E) of this chapter except Iowa, Kansas, New Mexico, or Tennessee, the control periods in 2028 and thereafter.

\*     \*     \*     \*     \*

28. Amend § 97.1012 by revising paragraph (a) introductory text and paragraphs (a)(3)(i) and (a)(4)(ii)(B) and (C) to read as follows:

### § 97.1012 CSAPR NO$_X$ Ozone Season Group 3 allowance allocations to new units.

(a) *Allocations from new unit set-asides*. For each control period in 2021 and thereafter and for the CSAPR NO$_X$ Ozone Season Group 3 units in each State and areas of Indian country within the borders of the State (except, for the control periods in 2021 and 2022, areas of Indian country within the borders of the State not subject to the State's SIP authority), the Administrator will allocate CSAPR NO$_X$ Ozone Season Group 3 allowances to the CSAPR NO$_X$ Ozone Season Group 3 units as follows:

Page 281 of 289

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

\*   \*   \*   \*   \*

(3) \*  \*  \*

(i) The first control period for which the State within whose borders the unit is located is listed in § 52.38(b)(2)(iii)(A), (B), (C), or (E) of this chapter;

\*   \*   \*   \*   \*

(4) \*  \*  \*

(ii) \*  \*  \*

(B) For the control periods in 2024 and thereafter, a maximum controlled baseline under paragraph (a)(4)(ii)(A) of this section shall apply to any unit combusting any coal or solid coal-derived fuel during the control period, serving a generator with nameplate capacity of 100 MW or more, and equipped with selective catalytic reduction controls on or before September 30 of the preceding control period, except a circulating fluidized bed boiler.

(C) In addition to the units described in paragraph (a)(4)(ii)(B) of this section, for the following States and control periods, a maximum controlled baseline under paragraph (a)(4)(ii)(A) of this section shall apply to any other unit located within the borders of the State, combusting any coal or solid coal-derived fuel during the control period, and serving a generator with nameplate capacity of 100 MW or more, except a circulating fluidized bed boiler:

(*1*) For a State listed in § 52.38(b)(2)(iii)(A) through (C) of this chapter except Alabama, Minnesota, or Wisconsin, the control periods in 2027 and thereafter.

(*2*) For a State listed in § 52.38(b)(2)(iii)(E) of this chapter except Iowa, Kansas, New Mexico, or Tennessee, the control periods in 2028 and thereafter.

\*   \*   \*   \*   \*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

29. Amend § 97.1021 by:

a. In paragraph (a), removing "period in 2021." and adding in its place "periods in 2021 and 2022.";

b. Revising paragraphs (b), (d), and (e);

c. In paragraph (f), removing "July 1, 2024" and adding in its place "July 1, 2026"; and

d. Revising paragraph (h).

The revisions read as follows:

**§ 97.1021 Recordation of CSAPR NO$_X$ Ozone Season Group 3 allowance allocations and auction results.**

\*     \*     \*     \*     \*

(b) By September 5, 2023, the Administrator will record in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control periods in 2023 and 2024.

\*     \*     \*     \*     \*

(d) By July 1, 2024, or, for sources located within a State listed in § 52.38(b)(2)(iii)(E) of this chapter, by [30 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], the Administrator will record in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2025.

(e) By July 1, 2025, the Administrator will record in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

the CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2026, unless the State in which the source is located is listed in § 52.38(b)(2)(iii)(E) of this chapter and notifies the Administrator in writing by [15 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], of the State's intent to submit to the Administrator a complete SIP revision by April 1, 2025, meeting the requirements of § 52.38(b)(10)(i) through (iv) of this chapter.

(1) If, by April 1, 2025, the State does not submit to the Administrator such complete SIP revision, the Administrator will record by July 1, 2025, in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2026.

(2) If the State submits to the Administrator by April 1, 2025, and the Administrator approves by October 1, 2025, such complete SIP revision, the Administrator will record by October 1, 2025, in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source as provided in such approved, complete SIP revision for the control period in 2026.

(3) If the State submits to the Administrator by April 1, 2025, and the Administrator does not approve by October 1, 2025, such complete SIP revision, the Administrator will record by October 1, 2025, in each CSAPR NO$_X$ Ozone Season Group 3 source's compliance account the CSAPR NO$_X$ Ozone Season Group 3 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(1) for the control period in 2026.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

\*   \*   \*   \*   \*

(h) By July 1, 2024, or, for sources located within a State listed in § 52.38(b)(2)(iii)(E) of this chapter, by [30 DAYS AFTER EFFECTIVE DATE OF FINAL RULE], and by July 1 of each year thereafter, the Administrator will record in each CSAPR $NO_X$ Ozone Season Group 3 source's compliance account the CSAPR $NO_X$ Ozone Season Group 3 allowances allocated to the CSAPR $NO_X$ Ozone Season Group 3 units at the source in accordance with § 97.1011(a)(2) for the control period in the year after the year of the applicable recordation deadline under this paragraph (h).

\*   \*   \*   \*   \*

30. Amend § 97.1024 by:

a. Revising paragraphs (b)(1)(ii) and (b)(3)(i) and (ii); and

b. In paragraph (c)(2)(ii), removing "§ 97.526(d) or § 97.826(d) or (e), in" and adding in its place "§ 97.526 or § 97.826, in".

The revisions read as follows:

**§ 97.1024 Compliance with CSAPR $NO_X$ Ozone Season Group 3 primary emissions limitation; backstop daily $NO_X$ emissions rate.**

\*   \*   \*   \*   \*

(b) \*   \*   \*

(1) \*   \*   \*

(ii) Two times the sum, for all CSAPR $NO_X$ Ozone Season Group 3 units at the source to which the backstop daily $NO_X$ emissions rate applies for the control period under paragraph (b)(3) of this section, of any excess over 50 tons for such a unit of the sum (converted to tons at a

Page 285 of 289

conversion factor of 2,000 lb/ton and rounded to the nearest ton), for all calendar days in the control period, of any amount by which the unit's $NO_X$ emissions for a given calendar day in pounds exceed the product in pounds of the unit's total heat input in mmBtu for that calendar day multiplied by 0.14 lb/mmBtu; or

\*    \*    \*    \*    \*

(3) \* \* \*

(i) For the following States and control periods, the backstop daily $NO_X$ emissions rate shall apply to any CSAPR $NO_X$ Ozone Season Group 3 unit located within the borders of the State, combusting any coal or solid coal-derived fuel during the control period, serving a generator with nameplate capacity of 100 MW or more, and equipped with selective catalytic reduction controls on or before September 30 of the preceding control period, except a circulating fluidized bed boiler:

(A) For a State listed in § 52.38(b)(2)(iii)(A) through (C) of this chapter, the control periods in 2024 and thereafter.

(B) For a State listed in § 52.38(b)(2)(iii)(E) of this chapter, the control periods in 2026 and thereafter.

(ii) In addition to the units described in paragraph (b)(3)(i) of this section, for each control period in 2030 and thereafter, the backstop daily $NO_X$ emissions rate shall apply to any other CSAPR $NO_X$ Ozone Season Group 3 unit located with the borders of a State except Alabama, Iowa, Kansas, Minnesota, New Mexico, Tennessee, or Wisconsin, combusting any coal or solid coal-derived fuel during the control period, and serving a generator with nameplate capacity of 100 MW or more, except a circulating fluidized bed boiler.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

\*   \*   \*   \*   \*

## § 97.1025 [Amended]

31. Amend § 97.1025(c)(1) introductory text by adding "in 2024 or thereafter" after "control period".

32. Amend § 97.1026 by:

a. Revising paragraph (d)(2)(ii) introductory text; and

b. Adding paragraph (d)(2)(iii).

The revision and addition read as follows:

## § 97.1026 Banking and conversion; bank recalibration.

\*   \*   \*   \*   \*

(d) \* \* \*

(2) \* \* \*

(ii) The CSAPR $NO_X$ Ozone Season Group 3 allowance bank ceiling target for the control period in the year of the deadline under paragraph (d)(1) of this section, calculated as the product, rounded to the nearest allowance, of the sum for all States identified for the control period in paragraph (d)(2)(iii) of this section of the State $NO_X$ Ozone Season Group 3 trading budgets under § 97.1010(a) for such States for such control period multiplied by—

\*   \*   \*   \*   \*

(iii) The States whose trading budgets will be included in the calculation of the CSAPR $NO_X$ Ozone Season Group 3 allowance bank ceiling target for each control period are as follows:

(A) For the control periods in 2024 and 2025, the States listed in § 52.38(b)(2)(iii)(A) through (C) of this chapter.

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(B) For the control periods in 2026 and thereafter, the States listed in § 52.38(b)(2)(iii)(A) through (C) and (E) of this chapter.

\*   \*   \*   \*   \*

33. Amend § 97.1030 by:

a. In paragraph (b)(1)(iii), removing "or" after the semicolon;

b. In paragraph (b)(1)(iv), removing the period and adding in its place "; or"; and

c. Adding paragraph (b)(1)(v).

The addition reads as follows:

**§ 97.1030 General monitoring, recordkeeping, and reporting requirements.**

\*   \*   \*   \*   \*

(b) \*   \*   \*

(1) \*   \*   \*

(v) May 1, 2025, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(E) of this chapter;

\*   \*   \*   \*   \*

34. Amend § 97.1034 by:

a. In paragraph (d)(2)(i)(B), removing "or" after the semicolon;

b. In paragraph (d)(2)(i)(C), adding "or" after the semicolon; and

c. Adding paragraph (d)(2)(i)(D).

The addition reads as follows:

**§ 97.1034 Recordkeeping and reporting.**

\*   \*   \*   \*   \*

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024.  We have taken steps to ensure the accuracy of this version, but it is not the official version.

(d) *   *   *

(2) *   *   *

(i) *   *   *

(D) The calendar quarter covering May 1, 2025, through June 30, 2025, for a unit in a State (and Indian country within the borders of such State) listed in § 52.38(b)(2)(iii)(E) of this chapter;

*   *   *   *   *

This document is a prepublication version, signed by EPA Administrator, Michael S. Regan on 1/16/2024. We have taken steps to ensure the accuracy of this version, but it is not the official version.