Nos. 23-1157, 23-1181, 23-1183, 23-1190, 23-1191, 23-1193, 23-1195, 23-1199, 23-1200, 23-1201, 23-1202, 23-1203, 23-1205, 23-1206, 23-1207, 23-1208, 12-1209, 23-1211

# In the United States Court of Appeals for the District of Columbia Circuit

STATE OF UTAH, *et al.*,
*Petitioners,*
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*RESPONDENTS.*

On Petitions for Review of Final Agency Action
of the United States Environmental Protection Agency
88 Fed. Reg. 36,654 (June 5, 2023)

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS**

ROBERT E. DUNN
  *COUNSEL OF RECORD*
EIMER STAHL LLP
1999 S. Bascom Ave., Suite 1025
Campbell, CA 95008
(408) 889-1690
rdunn@eimerstahl.com

ANDREW R. VARCOE
MARIA C. MONAGHAN
U.S. CHAMBER
LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce of the United States of America*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with D.C. Circuit Rule 28(a)(1), *amicus curiae* states as follows:

### I. Parties and *Amici Curiae*

All parties, intervenors, and *amici* appearing in this Court are listed in the Joint Opening Brief of Industry Petitioners ("Joint Op. Br. Indus. Pet."), filed by American Chemistry Council, et al. (No. 23-1157, Aug. 9, 2023), at pages i–vi:

Pursuant to Federal Rule of Appellate Procedure 26.1(a), *amicus curiae* the Chamber of Commerce of the United States of America ("the Chamber") states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

### II. Rulings Under Review

These consolidated cases involve petitions to review EPA's final action entitled "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," published at 88 FR 36,654

(June 5, 2023) ("Final Rule"). Reference to the rulings at issue appear in the Joint Opening Brief for Industry Petitioners at vii.

## III. Related Cases

A list of related cases is provided in the Joint Opening Brief for Industry Petitioners at pages vii–xii.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... V

GLOSSARY ........................................................................................ X

INTEREST OF *AMICUS CURIAE* ............................................................ 1

INTRODUCTION ................................................................................. 2

ARGUMENT ....................................................................................... 3

   I.  The Final Rule Will Provide Few Benefits ...................................... 5

  II. The Final Rule Will Impose Significant Costs on the Economy ..................................................................................... 7

      A. The Final Rule Will Increase Energy Costs and Cause Grid Instability, Harming Downstream Energy Consumers, Including Manufacturers. ...................................... 9

      B. The Final Rule's Restrictions on Non-EGUs Will Harm Businesses That Depend on the Vital Products Produced by the Regulated Industries ..................................... 14

CONCLUSION ................................................................................... 18

CERTIFICATE OF COMPLIANCE ......................................................... 20

CERTIFICATE OF SERVICE ................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Entergy Corp. v. Riverkeeper, Inc.*,
 556 U.S. 208 (2009) ..................................................................4

*EPA v. EME Homer City Generation, L.P.*,
 572 U.S. 489 (2014) ...............................................................3, 4

*Commonwealth of Kentucky v. EPA*,
 23-3216/23-3225, ECF No. 39-2 (6th Cir. July 25, 2023) ...............10

*Maryland v. EPA*,
 958 F.3d 1185 (D.C. Cir. 2020) .................................................3

*Michigan v. EPA*,
 576 U.S. 743 (2015) .............................................................4, 5

*North Carolina v. EPA*,
 531 F.3d 896 (D.C. Cir. 2008) ...................................................4

*Texas v. EPA*,
 No. 23-60069, 2023 WL 7204840 (5th Cir. May 1, 2023) ...............10

*White Stallion Energy Ctr., LLC v. EPA*,
 748 F.3d 1222 (D.C. Cir. 2014) .................................................4

**Statutes**

42 U.S.C. § 7410..........................................................................2

**Rules**

D.C. Circuit Rule 28 ......................................................................i

D.C. Circuit Rule 32(e)(1)............................................................20

Federal Rule of Appellate Procedure 27.........................................20

Federal Rule of Appellate Procedure 29.........................................20

v

Federal Rule of Appellate Procedure 32 ................................................. 20

## Regulations

*Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS*,
   81 Fed. Reg. 74,504 (Oct. 26, 2016) ..................................................... 14

*Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air
   Quality Standards*,
   88 Fed. Reg. 36,654 (Jun. 5, 2023) ............................................. passim

*Federal Implementation Plan Addressing Regional Ozone Transport for
the 2015 Ozone National Ambient Air Quality* Standard,
87 Fed. Reg. 20,036 (Apr. 6, 2022) ............................................................ 5

*Federal Implementation Plans: Interstate Transport of Fine Particulate
   Matter and Ozone and Correction of SIP Approvals*,
   76 Fed. Reg. 48,208 (Aug. 8, 2011) .......................................................... 3

## Other Authorities

*2023 Summer Reliability Assessment*,
   NERC (May 2023) ................................................................................ 10

*Air Quality – National Summary*,
   U.S. EPA (Nov. 1, 2023) ........................................................................ 6

Assim Hussain,
   *A day without power: Outage costs for businesses,*
   Bloom Energy (Oct. 8, 2019) ................................................................ 13

*Cement Industry Implications of the Cross-State Air Pollution Rule*,
   Portland Cement Association (March 2023) ................................. 15, 16

Craig McDonnell and Kevin Lee,
   Comments on Proposed Ozone Transport Rule, Minnesota Pollution
   Control Agency and Minnesota Department of Commerce (June 21,
   2022) ..................................................................................................... 10

Daria B. Diaz, et al.,
  Comments on Proposed Ozone Transport Rule, Louisiana Public
  Service Commission, at 18–19 (June 21, 2022) ................................... 12

Donnie Colston,
  Comments on Proposed Ozone Transport Rule, Unions for Jobs &
  Environmental Progress (June 8, 2022).............................................. 10

*EPA's "Good Neighbor" Plan Cuts Ozone Pollution –
  Overview Fact Sheet*, U.S. EPA (2023) .................................................. 2

Itzhak Ben-David, et al,
  *Exporting pollution: where do multinational firms emit CO$_2$?*,
  Economic Policy (July 2021) ................................................................ 14

J. Edward Cichanowicz, et al.,
  *Technical Comments on Electric Generating Unit Control Technology
  Options and Emission Allocations Proposed by the Environmental
  Protection Agency in Support of the Proposed 2015 Ozone NAAQS
  Transport Rule*, Midwest Ozone Group, et al. (June 17, 2022)............ 8

Jason E. Sloan,
  Comments on Proposed Ozone Transport Rule, American Iron and
  Steel Institute (March 28, 2023)................................................... 17, 18

Joseph W. Kane & Adie Tomer,
  *Shifting into an era of repair: US infrastructure spending trends*,
  Brookings (May 10, 2019) .................................................................... 14

Kendra A. Jones,
  Comments on Proposed Ozone Transport Rule, U.S. Steel Corporation
  (June 21, 2022) .................................................................................... 18

Kevin Dempsey,
  Comments on Proposed Ozone Transport Rule, American Iron and
  Steel Institute (June 21, 2022) ........................................................... 17

*Manufacturing Sector: Real Sectoral Output for All Workers*,
  Federal Reserve Bank of St. Louis (March 7, 2024)........................... 13

*National Air Quality: Status and Trends of Key Air Pollutants Report*, U.S. EPA (Mar. 18, 2024) ................................. 6

*Our Nation's Air Trends Through 2022*, U.S. EPA (last visited Apr. 8, 2024) ..................................................... 6

Petitioners' Motion for Stay, *Interstate Natural Gas Association of America v. U.S. EPA*, No. 23-1193 (D.C. Cir. July 27, 2023) ............. 11

*Progress Cleaning the Air and Improving People's Health*, U.S. EPA (May 1, 2023) ........................................................... 6

*Regulatory Impact Analysis for Final Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, U.S. EPA (Mar. 2023) ........................ 8

*Regulatory Impact Analysis for Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, U.S. EPA (Feb. 2022) ........................ 9

Sean O'Neill, Comments on Proposed Ozone Transport Rule, Portland Cement Association (June 21, 2022) .................................................... 16

Senseye Predictive Maintenance, *The True Cost of Downtime 2022*, Siemens (2023) ............................ 13

*Technical Support Document (TSD) for the Final Federal Good Neighbor Plan for the 2015 Ozone National Ambient Air Quality Standards,* U.S. EPA (Mar. 2023) ........................................................ 7

Ted J. Thomas, Comments on Proposed Ozone Transport Rule, Arkansas Public Service Commission (June 21, 2022)................................................... 12

The White House, *FACT SHEET: Biden-Harris Administration Announces Supply Chain Disruptions Task Force to Address Short-Term Supply Chain Discontinuities (*June 8, 2021*)* ............................................................ 15

The White House,
  *The Biden-Harris Plan to Revitalize American Manufacturing and
  Secure Critical Supply Chains in 2022* (Feb. 24, 2022)...................... 13

# GLOSSARY

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| Final Rule | Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 36,654 (Jun. 5, 2023) |
| FIP | Federal Implementation Plan |
| NAAQS | National Ambient Air Quality Standards |
| SIP | State Implementation Plan |

## INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America ("the Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber's members include a wide range of businesses that are subject to the EPA's *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 36,654 (June 5, 2023) ("the Final Rule"), as well as many other businesses that depend on reliable and affordable energy, and access to affordable concrete, steel, paper, and other commodities.

---

[1] The Chamber states that no counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION

The Final Rule is an unprecedented expansion of EPA authority under the Clean Air Act's Good Neighbor Provision, 42 U.S.C. § 7410(a)(2)(D). Not only does the Final Rule impose stringent requirements on the power sector, but the EPA has also purported to regulate other industrial sectors of the economy under that provision, including the cement, steel, pipeline, and paper industries. Through the Final Rule, EPA seeks to reduce emissions "as quickly as possible,"[2] notwithstanding the toll on the economy. The EPA's cost-benefit analysis was fundamentally flawed, and the EPA simply ignored the substantial evidence presented by commenters that the rule will contribute to instability in the electric grid, decrease the availability of reliable energy, harm America's supply chain, hinder major infrastructure projects, jeopardize national security, cause unemployment, and pressure manufacturers to move their operations overseas. EPA failed to show that any of these costs are outweighed by the Final Rule's supposed benefits. Ambient air quality has improved steadily for decades and will likely continue to improve regardless of the Final Rule. EPA has not justified the massive costs that the rule will likely impose on the American economy and on American workers.

---

[2] *EPA's "Good Neighbor" Plan Cuts Ozone Pollution – Overview Fact Sheet*, U.S. EPA (2023), https://tinyurl.com/2vbm367f.

# ARGUMENT

Although the Good Neighbor Provision does not expressly require EPA to engage in cost-benefit analysis, the agency has adopted a cost-benefit approach as part of its "significant contribution" analysis. *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 500 (2014). Specifically, the EPA has attempted to determine the point at which emissions controls "become excessively costly on a per-ton basis" and cease delivering meaningful "air quality benefits."  88 Fed. Reg. at 36,683; *see also Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals*, 76 Fed. Reg. 48,208, 48,248 (Aug. 8, 2011) (an upwind state's "significant contribution" to downwind states' non-attainment is "the emission reductions available at a particular cost threshold in [that] upwind state"). The Supreme Court has upheld this weighing of costs and benefits because it "makes good sense" for EPA to reduce emissions in upwind states in "amounts that can cost-effectively be reduced." *EME Homer City Generation*, 572 U.S. at 519. As the Court explained, applying a form of cost-benefit analysis "is an efficient and equitable solution to the allocation problem the Good Neighbor Provision requires the Agency to address." *Id.*; *see also Maryland v. EPA*, 958 F.3d 1185, 1192 (D.C. Cir. 2020) ("Emissions that can be reduced at or below the selected control

3

level are considered 'significant' for purposes of Good Neighbor compliance").

The Supreme Court has also held that the Good Neighbor Provision does not give EPA authority to require an upwind state to "reduce its output of pollution by more than is necessary" to achieve attainment in every downwind state. *EME Homer City Generation*, 572 U.S. at 521. EPA must therefore determine the amount of emissions that constitutes a "significant contribution" to another state's nonattainment or maintenance problem, "determine the quantitative level of emissions reductions required of upwind sources," and avoid imposing a rule that would reduce emissions by any more than that amount. *North Carolina v. EPA*, 531 F.3d 896, 903 (D.C. Cir. 2008). The statute's prohibition on "overcontrol" further confirms that the EPA must take costs into account—it cannot focus exclusively on purported benefits—when promulgating emissions regulations for upwind states.

Indeed, unless prohibited from considering costs, the EPA always has discretion to weigh costs and benefits when promulgating new rules or setting new technological standards. *See Michigan v. EPA*, 576 U.S. 743 (2015) (holding that EPA unreasonably deemed cost irrelevant when it decided to regulate power plants); *see also Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 220–22 (2009) (holding that EPA reasonably interpreted the phrase "best technology available" in Clean Water Act to authorize consideration of the technology's costs, and that the statute's silence "convey[ed] nothing more than a refusal to tie the agency's hands as to whether cost-benefit analysis should be used, and if so to what

4

degree"); *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1261 (D.C. Cir. 2014) (per curiam) (Kavanaugh, J., dissenting) ("[C]onsideration of cost is commonly understood to be a central component of ordinary regulatory analysis, particularly in the context of . . . environmental regulation."), *rev'd by Michigan v. EPA*, 576 U.S. 743 (2015).

Here, the EPA overestimated the benefits of its proposed rule and vastly underestimated the costs. That was arbitrary and capricious.

## I.    THE FINAL RULE WILL PROVIDE FEW BENEFITS

EPA described its objective for the rule as achievement of "meaningful" improvement in air quality. *Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, 87 Fed. Reg. 20,036, 20,040, 20,043, 20,053, 20,055, 20,076, 20,083, 20,094 (Apr. 6, 2022) (proposed rule). But the EPA defined those "meaningful" benefits as an average reduction of only 0.66 parts per billion (ppb) of ozone by 2026, even though the air quality standard is set at 70 ppb. EPA's own projections show that these nominal benefits will decline slightly over time based on the improving health status of the population.[3] Far from providing "meaningful" benefits, the Final Rule imposes massive costs in exchange for comparatively negligible benefits.

Over the past 50 years, national air quality has significantly

---

[3] *EPA's "Good Neighbor" Plan Cuts Ozone Pollution*, *supra* note 2, at 4.

improved as a result of reductions of emissions from stationary and mobile sources, and the United States now has some of the cleanest air of any industrialized nation: over the past two decades, the ambient levels of ozone and of NOx, a contributor to ozone, have been reduced dramatically, yielding some of the cleanest air in the world.[4] Since the enactment of the Clean Air Act of 1970, which established initial NAAQS for common "criteria" pollutants—PM, $SO_2$, NOx, VOCs, CO, and Pb—the combined emissions of these pollutants have dropped by 78%.[5]

This downward trajectory will likely continue without the Final Rule. Indeed, the number of unhealthy air days has steadily declined since 2000. EPA graphed the number of unhealthy air days in the 2023 Air Trends Report, which showed a 71% decrease among 35 major U.S. cities for ozone and $PM_{2.5}$ combined since 2000.[6] Over the same period, the national average concentration of ozone emissions decreased 17%, and $PM_{10}$ concentrations declined by approximately 34%.[7] Reductions have occurred in both urban and rural areas and even at monitoring sites near roads. More recently, despite the growth of GDP, the increase in fuel and energy consumption, and the steady rise in vehicle miles traveled, the concentration of the six common criteria pollutants decreased 7%

---

[4] *National Air Quality: Status and Trends of Key Air Pollutants Report*, U.S. EPA (Mar. 18, 2024), https://tinyurl.com/2fysw86d.

[5] *Progress Cleaning the Air and Improving People's Health*, U.S. EPA (May 1, 2023), https://tinyurl.com/y26ezeu4.

[6] *Our Nation's Air Trends Through 2022*, U.S. EPA, https://tinyurl.com/m66eyvp9 (last visited Apr. 8, 2024).

[7] *Id.*

6

while NOx emissions decreased 52% between 2010 and 2022.[8]

In addition, since 2008, EPA has assessed the impact of ozone on the most common tree species in the eastern United States. It found that for the period from 2000 to 2021, the relative biomass loss of these tree species from pollution decreased substantially.[9] Under the Final Rule, EPA claims that ozone concentrations are expected to decline faster than without the rule. But EPA does not have the tools to quantify the expected level of improvement,[10] and progress is likely to continue regardless of whether the Final Rule takes effect. The agency should not be allowed to impose excessive costs in pursuit of such nominal, and likely diminishing, benefits.

## II.  THE FINAL RULE WILL IMPOSE SIGNIFICANT COSTS ON THE ECONOMY

As Industry Petitioners have explained, the Final Rule is unlawful with regard to both Electric Generating Units ("EGUs") and non-EGUs—such as cement kilns, steel mills, pipeline engines, and paper mills—for a variety of reasons. Whatever EPA's response to the petitioners' specific arguments, the agency cannot deny that the Final Rule will impose significant costs on the regulated sectors of the economy. Indeed, EPA's own regulatory impact analysis estimates the cost of complying with the

---

[8] *Air Quality – National Summary*, U.S. EPA (Nov. 1, 2023), https://tinyurl.com/4mepn8zy.

[9] *Technical Support Document (TSD) for the Final Federal Good Neighbor Plan for the 2015 Ozone National Ambient Air Quality Standards,* U.S. EPA (Mar. 2023), at 93, https://tinyurl.com/2nz77844.

[10] *Id.*

7

rule to be $910 million *annually* from 2023 to 2042.[11] Yet even this sizeable estimate drastically understates the cost of compliance, because EPA relied on extremely outdated cost data.[12] The true cost to regulated industries will likely be multiples of this estimate.

Moreover, the costs imposed by the Final Rule will not be incurred only by the regulated entities. Instead, the costs imposed on EGUs and non-EGUs will cascade down to other sectors of the economy that depend on affordable and reliable energy, and which require access to affordable cement, steel, paper, chemicals, and other commodities. The downstream costs will be especially harmful to the manufacturing sector, which is already faced with robust competition from overseas. The sizeable costs imposed by the Final Rule will thus likely compel many American manufacturers to scale down or even shutter operations or invest abroad, where they can obtain energy and critical commodities at lower prices, while operating under less stringent environmental oversight. The Final Rule will also impede critical infrastructure projects—many of which originated with federal support under the Infrastructure Investment and Jobs Act, the CHIPS and Science Act, and the Inflation Reduction Act—

---

[11] *Regulatory Impact Analysis for Final Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, U.S. EPA (Mar. 2023), at 172–74, https://tinyurl.com/yckc8va8.

[12] *See* J. Edward Cichanowicz, et al., *Technical Comments on Electric Generating Unit Control Technology Options and Emission Allocations Proposed by the Environmental Protection Agency in Support of the Proposed 2015 Ozone NAAQS Transport Rule*, Midwest Ozone Group, et al. (June 17, 2022), at 3, https://tinyurl.com/54bxd26e.

due to the increased costs of cement, steel, and energy. EPA did not appropriately consider these significant downstream costs when adopting the Final Rule.

### A. The Final Rule Will Increase Energy Costs and Cause Grid Instability, Harming Downstream Energy Consumers, Including Manufacturers.

The EPA's use of "dynamic budgeting," preset budgets, anticipated budget cuts based on speculative future changes to the EGU fleet, and other "enhancements"—such as "recalibration"—resulted in a rule that significantly over-controls EGUs. *See* Joint Op. Br. Indus. Pet. at 28–34. The predictable result of this over-control will be the early retirement of EGUs that cannot affordably comply with the rule's overly stringent new emissions standards and its mandated installation of costly controls. Energy suppliers will thus be compelled to switch away from dispatchable sources of power to less reliable sources that can satisfy the EPA's stringent requirements. Indeed, even EPA's own analysis assumes the Final Rule would significantly reduce electric power generation capacity.[13]

Shuttering existing EGUs that provide stable sources of energy will increase grid instability and decrease reliability.[14] Regulated states and

---

[13] *Regulatory Impact Analysis for Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, U.S. EPA (Feb. 2022), at 4-38–4-39. EPA-HQ-OAR-2021-0668-0151, https://tinyurl.com/bd7pj6cr.

[14] *See* Petitioners' Joint Opposed Motion to Stay Final Rule, ECF No. 2010655, at Ex. K (Declaration of Thomas Alban, Vice President of Generation for Buckeye Power) ¶¶ 26, 28; *id.* at Ex. J. (Declaration of J.

organizations have warned that dozens of power plants will prematurely close in the next few years because they cannot afford to comply with the Final Rule.[15] For example, Minnesota estimates that a power plant scheduled to retire in 2030 faces compliance costs of $100 million under the rule.[16] Because those costs cannot be recovered in the next six years, the plant may be forced to prematurely shut down under the Final Rule. This anticipated shutdown threatens power outages and increased energy costs for the communities that rely on the power plant. Closing that plant and others like it would also result in several thousand job losses in the mining, electric generation, and transport sectors.[17]

Even EGUs that remain operational must upgrade their pollution control equipment and emissions reductions systems, 88 Fed. Reg. 36,654, which will significantly increase facility investment and operating costs. *See Texas v. EPA*, No. 23-60069, 2023 WL 7204840, at

---

Michael Brown, Environmental Safety and Health Director for the Ohio Valley Electric Corporation) ¶27; *id.* at Ex. O (Declaration of Jerry Purvis, Vice President of Environmental Affairs for East Kentucky Power Cooperative, Inc.) ¶33.

[15] Donnie Colston, Comments on Proposed Ozone Transport Rule, Unions for Jobs & Environmental Progress (June 8, 2022), https://tinyurl.com/5yetfrxr (focusing concerns on "dozens" of "units that will shut down because SCR retrofits are not economic due to site-specific engineering").

[16] Craig McDonnell and Kevin Lee, Comments on Proposed Ozone Transport Rule, Minnesota Pollution Control Agency and Minnesota Department of Commerce (June 21, 2022), https://tinyurl.com/2zp67xtr.

[17] *2023 Summer Reliability Assessment*, NERC (May 2023), at 6, https://tinyurl.com/33fw8ejv (forecasting that two-thirds of the U.S. would experience an elevated risk of power outages this summer); *see also* Colston, supra note 15, at 2.

*10 (5th Cir. May 1, 2023) (costs imposed by rule "include[] the costs of buying new equipment and retrofitting existing equipment; installing, operating, and maintaining that machinery; and purchasing allowances (at greater cost) on the emissions-trading market"); *Commonwealth of Kentucky, et al. v. EPA*, Nos. 23-3216/3225, ECF No. 39-2 at 8–9 (6th Cir. July 25, 2023) (petitioners are likely to establish "that Kentucky faces irreparable injury due to unrecoverable compliance costs, which it faces immediately").

The rule's provisions regulating natural-gas pipeline engines will create additional energy supply and reliability challenges. *See generally* Petitioners' Motion for Stay at 24–25, *Interstate Natural Gas Association of America v. U.S. EPA*, No. 23-1193 (D.C. Cir. July 27, 2023) (retrofitting shutdowns in the timeframe required by Final Rule "will cause capacity restrictions that could result in significant interruptions to the supply of natural gas to households and businesses"; modeling suggests "that a significant share of the public will suffer electric power outages, heating outages, delays to industrial supply chains, and increases in the price of electricity") (quoting industry declarations). Approximately one-third of the energy consumed in the United States travels through natural gas infrastructure. Retrofitting this infrastructure—and particularly the pipeline engines necessary to move gas through these facilities—by May 2026 "will inevitably cause significant service disruptions, including electrical power outages to consumers and industrial customers,[18] home

---

[18] Natural gas-fired EGUs provide approximately 40% of America's

heating outages, and delays to industry supply chains, which pose significant harm to the public interest."[19] And because these retrofits entail substantial costs, the price of natural gas, and thus electricity generated by EGUs using natural gas, will also increase.

By presenting states and energy providers with the Hobson's choice of either retiring EGUs or spending hundreds of millions of dollars on compliance, the Final Rule will contribute to energy instability and increased prices for consumers already struggling with high energy costs.[20] While higher utility bills harm all consumers, they disproportionately impact poorer residential customers, including those in rural low-income households, who rely on the very power sources the Final Rule threatens to shutter.[21]

Manufacturers, which depend on reliable and affordable energy to run large-scale operations, will also be especially hard hit by the increased energy prices and risk of electricity shortfalls precipitated by the Final Rule. After decades of offshoring, America's manufacturing

---

electricity.

[19] *Id.* at Addendum at 836a (Declaration of Kenneth W. Grubb, Chief Operating Officer for the natural gas pipelines business unit at Kinder Morgan, Inc.) ¶ 6.

[20] Ted J. Thomas, Comments on Proposed Ozone Transport Rule, Arkansas Public Service Commission (June 21, 2022), at 2 https://tinyurl.com/3jxhajus; *see also Kentucky*, Nos. 23-3216/3225, ECF No. 39-2 at 9 ("Petitioners provide evidence that Kentucky residents will face higher prices and that Kentucky's power grid faces destabilization.").

[21] Daria B. Diaz, et al., Comments on Proposed Ozone Transport Rule, Louisiana Public Service Commission, at 18–19 (June 21, 2022), https://tinyurl.com/mvr7hmtx.

base has begun to recover in recent years.[22] The Final Rule puts that progress in jeopardy because manufacturers cannot remain competitive in the face of intermittent blackouts and exorbitant energy costs. The manufacturing sector requires energy for a range of purposes, from super-heating materials to operating machinery. And the cost of a power outage can escalate into millions of dollars per hour of downtime.[23] One estimate suggests that Fortune 500 manufacturers already lose up to $1.5 trillion a year to production outages and other unplanned downtime.[24] Increased energy costs and diminished energy reliability would discourage manufacturers from investing in the United States, contrary to the Administration's goal of revitalizing American manufacturing.[25]

Confronted with increased energy costs and degraded grid reliability, many manufacturers will likely scale down or eliminate future domestic production, and some may be compelled to relocate existing operations overseas. Indeed, previous environmental regulations that were less burdensome than the Final Rule have caused manufacturers to

---

[22] *Manufacturing Sector: Real Sectoral Output for All Workers*, Federal Reserve Bank of St. Louis (March 7, 2024), https://tinyurl.com/4tjdy4ha.

[23] Assim Hussain, *A day without power: Outage costs for businesses,* Bloom Energy (Oct. 8, 2019), https://tinyurl.com/3kssxwm7.

[24] Senseye Predictive Maintenance, *The True Cost of Downtime 2022,* Siemens (2023), https://tinyurl.com/59fnu7u7 ("the cost of a lost hour now ranges from an average of $39,000 for  factories producing Fast Moving Consumer Goods, to more than $2 [million] an hour in Automotive").

[25] The White House, *The Biden-Harris Plan to Revitalize American Manufacturing and Secure Critical Supply Chains in 2022* (Feb. 24, 2022), https://tinyurl.com/pnayrjsx.

reconsider their investment in the United States and relocate to other countries.[26]

The EPA failed to appropriately consider the enormous costs of the Final Rule on the manufacturing sector.

### B. The Final Rule's Restrictions on Non-EGUs Will Harm Businesses That Depend on the Vital Products Produced by the Regulated Industries

The EPA has generally not applied the Good Neighbor Provision to the non-EGU categories regulated by the Final Rule because of the "greater uncertainty in the non-EGU emission inventory estimates than for EGUs." *Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS*, 81 Fed. Reg. 74,504, 74,521 (Oct. 26, 2016). But the Final Rule imposes severe restrictions on nine different non-EGU industries, including cement, steel, paper, and chemicals. 88 Fed. Reg. at 36,658. These restrictions will require exorbitantly expensive retrofits of existing infrastructure, leading to increased prices for these important commodities. *See* Joint Op. Br. Indus. Pet. at 36–38. These increased costs will impair our Nation's infrastructure, which sorely needs to be updated, repaired, and expanded.[27] This will undermine the

---

[26] Itzhak Ben-David, et al, *Exporting pollution: where do multinational firms emit $CO_2$?*, Economic Policy (July 2021).

[27] Joseph W. Kane & Adie Tomer, *Shifting into an era of repair: US infrastructure spending trends*, Brookings (May 10, 2019), https://tinyurl.com/yyxtaeu3.

Administration's goal to revitalize domestic supply-chains after the pandemic-related destabilization.[28]

For example, the Final Rule will increase the cost of cement by requiring cement kilns to undergo costly retrofits. Unlike power plants, which are allowed to trade emissions, the cement industry and other industrial sources cannot trade emissions allowances with other plants.[29] As the Portland Cement Association has pointed out, the Final Rule contains "multiple technical inadequacies and misunderstandings about the cement industry."[30] The total capital costs imposed by the Final Rule are remarkable, including roughly $334.8 million in initial costs and annual costs of $62.8 million to operate under the new emissions controls.[31] The costs imposed on this industry cannot possibly be justified by any supposed benefits, because the cement industry accounts for merely 0.9% of total NOx emissions in the 23 states subject to the Final Rule.[32]

Cement is the key ingredient in concrete—one of the most consumed materials on earth—which provides sustainable, durable, and resilient construction materials. Concrete is essential to improving our

---

[28] *See* The White House, *FACT SHEET: Biden-Harris Administration Announces Supply Chain Disruptions Task Force to Address Short-Term Supply Chain Discontinuities* (June 8, 2021), https://tinyurl.com/4bdubcza.

[29] *Cement Industry Implications of the Cross-State Air Pollution Rule*, Portland Cement Association (March 2023), https://tinyurl.com/533zjfpz.

[30] *Id.* at 1.

[31] *Id.* at 7.

[32] *Id.* at 2.

roads, bridges, buildings, water systems, and other infrastructure. The Final Rule's NOx emissions limits apply to kilns used in the production of clinker—a key intermediary material made in the production of cement—and would impact approximately 66% of the U.S. cement clinker production. Roughly a third of the U.S. cement industry by cement-component capacity would have been out of compliance under the Final Rule had its restrictions been in effect in 2021.[33] The burdensome emissions and technology control requirements necessary to bring these kilns into compliance may cause some kilns to shut down while substantially raising costs at those kilns that remain in operation. Constricting supply and raising cement prices would directly impact the viability of planned infrastructure projects and drive-up construction costs.[34] Indeed, domestic cement production *already* falls short of national demand. And with the increased demand for concrete spurred by the recently enacted legislation promoting infrastructure programs, the gap will only widen. The Final Rule will prevent the industry from returning to peak production levels, and thus will require the construction sector to import more cement from overseas, with all the harmful environmental consequences that entails.[35]

---

[33] *Id.*

[34] Sean O'Neill, Comments on Proposed Ozone Transport Rule, Portland Cement Association (June 21, 2022), https://tinyurl.com/2rdfankw.

[35] *Id.* EPA neglected to account for the "factors referencing burnability, clinker types, fuel types, and age of the kiln system that should be considered in an analysis of setting feasible NOx emissions limit with broader applicability." *Id.* at 19.

16

The Final Rule will also impose significant costs on the steel industry, which is likewise a critical part of the domestic supply chain. The new regulation requires steel reheat furnaces to install low NOx burners to achieve a 40% NOx reduction. 88 Fed Reg at 36,879. The preliminarily estimated capital costs will be at least $3 to 5 million dollars per reheat furnace.[36] The American steel industry faces strong international competition and rising inflation, making it vulnerable to even small operating-cost increases. The American Iron and Steel Institute has warned that the Final Rule will be catastrophic to steelmaking producers because there is no proven technology that can produce the intended results of reducing NOx emissions in the steel industry to EPA's proposed level.[37] Consequently, to comply with the Final Rule, many steel mills will likely have to forfeit potential capacity, which would create major disruptions in the American economy given steel's prodigious use in infrastructure—rebuilding Baltimore's Francis Scott Key Bridge, for example—construction, and manufacturing. Interruptions in U.S. steel supply would also harm national security, as steel is critical to the defense industry.

The steel industry in the United States employs approximately

---

[36] *See* Petitioners' Joint Opposed Motion to Stay Final Rule, ECF No. 2010655, at Ex. D (Declaration of Paul Balserak, Vice President for Environmental of the American Iron and Steel Institute) at 3.

[37] Kevin Dempsey, Comments on Proposed Ozone Transport Rule, American Iron and Steel Institute (June 21, 2022), at 1–2 https://tinyurl.com/mwr4bm6b.

136,000 people and indirectly supports nearly two million jobs.[38] The Final Rule is a direct threat to the workers employed in steel manufacturing.   The steel industry also contributes more than $520 billion to the economy when considering the direct, indirect, and related impacts.[39] Given the steel industry's critical role in national security and infrastructure projects, any steelmaking outage during the installation of control equipment to bring facilities into compliance would be massively disruptive to the economy. In addition to the loss of immediate production, an outage would likely force mills to reduce workforce, which would affect their capacity going forward. Such reductions often lead to additional costs, such as specialized training for new workers and wait times to ramp-up production when the mill re-recruits its workforce.[40]

The EPA failed to consider any of these costs—and many others— when implementing the Final Rule.

## CONCLUSION

For these reasons, the petitions for review should be granted.

Dated: April 8, 2024                    /s/ Robert E. Dunn

                                        ROBERT E. DUNN
                                            COUNSEL OF RECORD

---

[38] Jason E. Sloan, Comments on Proposed Ozone Transport Rule, American Iron and Steel Institute (March 28, 2023), at 2 https://tinyurl.com/43p7tzcd.

[39] *Id.*

[40] Kendra A. Jones, Comments on Proposed Ozone Transport Rule, U.S. Steel Corporation (June 21, 2022), at 52 https://tinyurl.com/mtajkdjd.

18

EIMER STAHL LLP
1999 S. Bascom Ave.
Suite 1025
Campbell, CA 95008
(408) 889-1690
rdunn@eimerstahl.com

Andrew R. Varcoe
Maria C. Monaghan
U.S. CHAMBER
LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce of the United States of America*

## CERTIFICATE OF COMPLIANCE

This brief contains 4,246 words excluding the parts of the brief that Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1) exempt. The brief thus complies with Federal Rules of Appellate Procedure 27(d)(2) and 29(a)(5).

The brief also complies with Federal Rule of Appellate Procedure 32(a)(5)'s typeface requirements and Federal Rule of Appellate Procedure 32(a)(6)'s type style requirements because the brief has been prepared in a proportionally spaced type-face using Microsoft Word in Century Schoolbook 14-point font.

Dated: April 8, 2024

                                        /s/ *Robert E. Dunn*
                                        Robert E. Dunn

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 8, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit via the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by that system.

/s/ *Robert E. Dunn*
Robert E. Dunn