**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 23-1157 (and consolidated cases)**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF UTAH, by and through its Governor, Spencer J. Cox, and its Attorney
General, Sean D. Reyes,

Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, ADMINISTRATOR,
U.S.E.P.A.,

Respondents;

CITY UTILITIES OF SPRINGFIELD, MISSOURI, et al.,
Intervenors.

On Petition for Review of Action of the Environmental Protection Agency, 88 Fed.
Reg. 36,654, pursuant to 42 U.S.C. § 7607(b)(1)

## BRIEF OF SENS. SHELLEY MOORE CAPITO AND ROGER F. WICKER, REP. CATHY McMORRIS RODGERS, AND 44 MEMBERS OF CONGRESS AS *AMICI CURIAE* SUPPORTING PETITIONERS

Lawson E. Fite
Conor L. Butkus
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: (503) 222-9981
Email: lfite@schwabe.com / cbutkus@schwabe.com
*Attorneys for Amici Curiae*

# Table of Contents

I.    INTRODUCTION AND INTEREST OF *AMICI* ........... 1

II.   SUMMARY OF ARGUMENT ...................................... 9

III.  ARGUMENT ................................................................ 11

      A.    EPA's Rule does not rest on express authority and runs counter to the CAA's cooperative federalism structure. ............................................................. 13

      B.    The Rule seeks to impose transformative economic and social impacts without express authority. ...... 16

      C.    The Rule's transformative effects were not examined during the rulemaking, demonstrating that the Rule's policy reach is broader than EPA admits. .................................................................. 21

IV.   CONCLUSION ............................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dominion Transmission, Inc. v. Summers*,
  723 F.3d 238 (D.C. Cir. 2013) ............................................ 11

*Env't Comm. of Fla. Elec. Power Coordinating
  Grp., Inc. v. E.P.A.*,
  94 F.4th 77 (D.C. Cir. 2024) ............................................... 12

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ............................................................ 12

*MCI Telecommc'n Corp. v. Am. Telephone &
  Telegraph Co.*,
  512 U.S. 218 (1994) ............................................................ 17

*Michigan v. E.P.A.*,
  268 F.3d 1075 (D.C. Cir. 2001) .............................. 14, 15, 16

*Rapanos v. United States*,
  547 U.S. 715 (2006) ............................................................ 16

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
  590 U.S. 604 (2020) ............................................................ 12

*U.S. Telecom Ass'n v. F.C.C.*,
  855 F.3d 381 (D.C. Cir. 2017) ........................................... 10

*Util. Air Regul. Grp. v. E.P.A.*,
  573 U.S. 302 (2014) ............................................................ 12

*West Virginia v. E.P.A.*,
  597 U.S. 697 (2022) .......................... 9, 10, 11, 15, 16, 17, 18

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ............................................................ 17

*Denotes authorities principally relied upon

## Statutes and Court Rules

42 U.S.C. § 7407(a) ............................................................ 14, 15

42 U.S.C. § 7410(a)(2)(D)(i)(I) ........................................ 13, 18

42 U.S.C. § 7410(c)(1) ....................................................... 13

42 U.S.C. § 7411(a)(1) ....................................................... 17

42 U.S.C. § 7411(d)(1) ..................................................... 17, 18

Fed. R. App. P. 29(a)(2) ...................................................... 1

## Other Authorities

Press Release, "Senators Capito and Barrasso:
  FERC Must Fix EPA's Proposed Clean Power
  Plan 2.0," Dec. 20, 2023 ................................................... 24

Letter from Sen. Shelley Moore Capito to EPA
  Administrator Michael S. Regan, Feb. 8, 2022 .................... 3

Letter from Sen. Shelley Moore Capito to EPA
  Administrator Michael S. Regan, June 21, 2022 ................. 3

Jean Chemnick & Mike Lee, "What EPA's new
  power plant plans mean for carbon," *E&E
  News*, Mar. 11, 2022.  ...................................................... 20

iii

*Clean Power Plan 2.0: EPA's Latest Attack on America's Electric Reliability,* Hearing Before the H. Subcomm. on Env't, Mf'g, & Critical Minerals of the H. Comm. on Energy & Commerce, 118th Cong. (June 6, 2023) ............................. 3

Envtl. Prot. Agcy., *Current FIPs around the Nation*, https://www.epa.gov/air-quality-implementation-plans/basic-information-about-air-quality-fips .................................................................... 14

Envtl. Prot. Agcy., *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 36,654 (June 5, 2023) ....................................................... 13, 14, 21, 22, 23

Envtl. Prot. Agcy., *Regulatory Impact Analysis for the Final Federal Good Neighbor Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, Mar. 13, 2023 ...................................................... 23

Fed. Energy Reg. Comm'n, Docket No. AD23-9-000, 2023 Reliability Technical Conference Transcript (Nov. 9, 2023) .................................................. 25

*Full Committee Hearing to Conduct Oversight of FERC*, Hearing Before the S. Comm. on Energy & Natural Res., 118th Cong. (May 4, 2023) ................................................................................ 23

*Good Neighbor Rule: Healthier Air for Downwind States,* Hearing Before the S. Comm. on Env't & Pub. Works, 118th Cong., (Mar. 29, 2023) ...................... 3

Letter from Rep. Cathy McMorris Rodgers, et al.,
   to EPA Administrator Michael S. Regan, Apr.
   19, 2023 ................................................................................... 3

Letter from Reps. Cathy McMorris Rogers, Jeff
   Duncan, and Bill Johnson to FERC, Nov. 7,
   2023 ............................................................................... 24, 25

N. Am. Elec. Reliability Corp., *2023 Long-Term
   Reliability Assessment* (Dec. 2023)........................ 21, 25, 26

Sean Reilly & Kevin Bogardus, "Inside EPA's
   climate strategy for power plants," *E&E News*
   (Oct. 14, 2022) ...................................................................... 2

## I.    **INTRODUCTION AND INTEREST OF *AMICI***

*Amici* are Members of Congress,[1] many of whom sit on committees with jurisdiction over the Clean Air Act ("CAA"), specifically the U.S. Senate Committee on Environment and Public Works and the U.S. House Committee on Energy and Commerce (the "Committees"). *Amici* have a strong interest in overseeing the statutory bounds of the authority delegated to the U.S. Environmental Protection Agency ("EPA" or "Agency") to implement the CAA, and upholding the authority of States they represent under the cooperative federalism framework within the CAA.

*Amici* support practical, balanced, and effective environmental policies that protect the environment while also ensuring that States retain their traditional and Constitutional authority to take the lead on achieving air quality standards within their boundaries. *Amici* strongly oppose any actions from EPA, such as its Good Neighbor Rule (the "Rule"), that seek to flip the cooperative federalism framework

---

[1] A disclosure statement is not required as this brief is submitted under the first sentence of Fed. R. App. P. 29(a)(2). In the interest of transparency, however, *amici* state that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person—other than the *amici curiae* or their counsel—contributed money that was intended to fund preparing or submitting the brief.

of the CAA on its head and infringe on States' authority to establish the means of achieving EPA's air quality standards. The Committees of jurisdiction in both Houses of Congress over the CAA have conducted robust oversight of the Rule, as well as other related EPA regulations that are part of the Biden Administration's so-called "Electric Generating Unit Strategy" or "Power Sector Strategy" (the "Strategy").

The earliest publicly available documentation of the Strategy's existence is a slide deck presented by EPA officials to senior White House staff in February 2021, eventually released in redacted form following a Freedom of Information Act request.[2] The slide deck outlined the Biden Administration's coordinated series of planned EPA regulations to be issued under the CAA, Clean Water Act, and Solid Waste Disposal Act. EPA rulemakings that constitute the Strategy include: the Rule; a successor regulation to the Clean Power Plan; revised particulate matter national ambient air quality standards; revised hazardous air pollutant standards; revised regulation of coal combustion residuals; and revised

---

[2] *See* Sean Reilly & Kevin Bogardus, "Inside EPA's climate strategy for power plants," *E&E News* (Oct. 14, 2022), https://www.eenews.net/articles/inside-epas-climate-strategy-for-power-plants (providing a copy of EPA February 4, 2021 slide deck titled "Power Sector Strategy: Climate, Public Health, Environmental Justice: The Building Blocks").

effluent limitations guidelines from water discharges.

Congressional oversight of the plan, which is designed to force the premature retirement of dispatchable fossil-fuel-fired power plants, began even before the slides were publicly available.[3] The Committees and Members of Congress have continued to investigate the Rule and related regulations under the Strategy over the last three years through hearings[4] and oversight letters.[5]

---

[3] *See, e.g.*, Letter from Sen. Shelley Moore Capito to EPA Administrator Michael S. Regan, Feb. 8, 2022, https://www.epw.senate.gov/public/index.cfm/press-releases-republican?ID=DF7EA9A3-B9C7-43C9-A692-4F59F05D44C1.

[4] *See, e.g.*, *Good Neighbor Rule: Healthier Air for Downwind States,* Hearing Before the S. Comm. on Envt. & Pub. Works*,* 118th Cong., at 8–13 (Mar. 29, 2023) (statement of Ranking Member Shelley Moore Capito regarding necessary oversight of the Rule), https://www.epw.senate.gov/public/_cache/files/3/0/ 3006203b-ecf3-4f14-bb79-87887d4ad396/687C63FAD4D1AAA8C9321D361D33E5ED.spw-03292023.pdf; *Clean Power Plan 2.0: EPA's Latest Attack on America's Electric Reliability,* Hearing Before the H. Subcomm. on Env't, Mf'g, & Critical Materials of the H. Comm. on Energy & Commerce, 118th Cong. (June 6, 2023) (statement of Subcommittee Chairman Bill Johnson), https://energycommerce.house.gov/events/environment-manufacturing-and-critical-materials-subcommittee-hearing-clean-power-plan-2-0-epa-s-latest-attack-on-america-s-electric-reliability.

[5] *See, e.g.*, Letter from Rep. Cathy McMorris Rodgers, *et al*., to EPA Administrator Michael S. Regan, Apr. 19, 2023, https://energycommerce.house.gov/posts/e-and-c-seeks-answer-about-the-grid-reliability-impacts-of-epa-s-burdensome-regulations; Letter from Sen. Shelley Moore Capito to EPA Administrator Michael S. Regan, June 21, 2022,

**Senate *amici***

*Shelley Moore Capito* is U.S. Senator for West Virginia and Ranking Member of the Senate Committee on Environment and Public Works ("EPW").

*Roger F. Wicker* is U.S. Senator for Mississippi and a member of the EPW Committee.

*John Barrasso, M.D.* is U.S. Senator for Wyoming.

*Marsha Blackburn* is U.S. Senator for Tennessee.

*John Boozman* is U.S. Senator for Arkansas and a member of the EPW Committee.

*Mike Braun* is U.S. Senator for Indiana.

*John Cornyn* is U.S. Senator for Texas.

*Ted Cruz* is U.S. Senator for Texas.

*Steve Daines* is U.S. Senator for Montana.

*Deb Fischer* is U.S. Senator for Nebraska.

*John Hoeven* is U.S. Senator for North Dakota.

*Ron Johnson* is U.S. Senator for Wisconsin.

---

https://www.epw.senate.gov/public/index.cfm/2023/3/ranking-member-capito-statement-on-epa-s-final-good-neighbor-plan-burdening-states-targeting-american-energy-infrastructure.

*Cynthia M. Lummis* is U.S. Senator for Wyoming and a member of the EPW Committee, where she is Ranking Member of the Subcommittee on Fisheries, Water, and Wildlife.

*Markwayne Mullin* is U.S. Senator for Oklahoma and a member of the EPW Committee, where he is Ranking Member of the Subcommittee on Chemical Safety, Waste Management, Environmental Justice, and Regulatory Oversight.

*Pete Ricketts* is U.S. Senator for Nebraska and a member of the EPW Committee, where he is Ranking Member of the Subcommittee on Clean Air, Climate and Nuclear Safety.

*James E. Risch* is U.S. Senator for Idaho.

*Dan Sullivan* is U.S. Senator for Alaska and a member of the EPW Committee.

*John Thune* is U.S. Senator for South Dakota.

**House *amici***

*Cathy McMorris Rodgers* is the U.S. Representative for Washington's Fifth District and Chair of the U.S. House Committee on Energy and Commerce ("E&C").

*Michael C. Burgess* is the U.S. Representative for Texas' Twenty-Sixth

District and a member of the E&C Committee.

*Robert E. Latta* is the U.S. Representative for Ohio's Fifth Congressional District and a member of the E&C Committee, where he is Chair of the Subcommittee on Communications and Technology.

*Brett Guthrie* is the U.S. Representative for Kentucky's Second District and a member of the E&C Committee, where he is Chair of the Subcommittee on Health.

*H. Morgan Griffith* is the U.S. Representative for Virginia's Ninth District and a member of the E&C Committee, where he is Chair of the Subcommittee on Oversight and Investigations.

*Gus M. Bilirakis* is the U.S. Representative for Florida's Twelfth District and a member of the E&C Committee, where he is Chair of the Subcommittee on Innovation, Data and Commerce.

*Larry Bucshon* is the U.S. Representative for Indiana's Eighth District and a member of the E&C Committee.

*Richard Hudson* is the U.S. Representative for North Carolina's Ninth District and a member of the E&C Committee.

*Tim Walberg* is the U.S. Representative for Michigan's Fifth District and a

member of the E&C Committee.

*Earl L. "Buddy" Carter* is the U.S. Representative for Georgia's First District and a member of the E&C Committee, where he is Chair of the Subcommittee on Environment, Manufacturing, and Critical Materials.

*Jeff Duncan* is the U.S. Representative for South Carolina's Third District and a member of the E&C Committee, where he is Chair of the Subcommittee on Energy, Climate, and Grid Security.

*Gary J. Palmer* is the U.S. Representative for Alabama's Sixth District and a member of the E&C Committee.

*Neal P. Dunn* is the U.S. Representative for Florida's Second District and a member of the E&C Committee.

*John R. Curtis* is the U.S. Representative for Utah's Third District and a member of the E&C Committee.

*Debbie Lesko* is the U.S. Representative for Arizona's Eighth District and a member of E&C Committee.

*Greg Pence* is the U.S. Representative for Indiana's Sixth District and a member of the E&C Committee.

*Dan Crenshaw* is the U.S. Representative for Texas' Second District and a

member of the E&C Committee.

*John Joyce* is the U.S. Representative for Pennsylvania's Thirteenth District and a member of the E&C Committee.

*Kelly Armstrong* is the U.S. Representative for North Dakota (At-Large) and a member of the E&C Committee.

*Randy K. Weber* is the U.S. Representative for Texas' Fourteenth District and a member of the E&C Committee.

*Rick W. Allen* is the U.S. Representative for Georgia's Twelfth District and a member of the E&C Committee.

*Troy Balderson* is the U.S. Representative for Ohio's Twelfth District and a member of the E&C Committee.

*Russ Fulcher* is the U.S. Representative for Idaho's First District and a member of the E&C Committee.

*August Pfluger* is the U.S. Representative for Texas' Eleventh District and a member of the E&C Committee.

*Diana Harshbarger* is the U.S. Representative for Tennessee's First District and a member of the E&C Committee.

*Mariannette Miller-Meeks* is the U.S. Representative for Iowa's First

District and a member of the E&C Committee.

*Kat Cammack* is the U.S. Representative for Florida's Third District and a member of the E&C Committee.

*Jay Obernolte* is the U.S. Representative for California's Twenty-Third District and a member of the E&C Committee.

*John James* is the U.S. Representative for Michigan's Tenth District and an incoming member of the E&C Committee.

## II.    <u>SUMMARY OF ARGUMENT</u>

These petitions for review address a historically novel assertion by EPA of alleged authority to conduct nationwide air regulation, a decision with highly economically and politically significant consequences. EPA's expansive assertion merits judicial skepticism. *See West Virginia v. E.P.A.*, 597 U.S. 697, 721 (2022).

The Rule deviates from the narrow authority granted by Congress in section 110 of the CAA, 42 U.S.C. § 7410, to establish federal air pollution control plans when States fail to do so. The Administration attempts to transform section 110 – which establishes a cooperative federal framework for attaining and maintaining national ambient air quality standards – into a nationwide energy and industrial policy hammer. The Clean Air Act does not turn EPA into a general policy making

body. Rather, as courts presume, "Congress intends to make major policy decisions itself." *West Virginia*, 597 U.S. at 723 (quoting *U.S. Telecom Ass'n v. F.C.C.*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)).

Acting well beyond its delegated powers under the CAA, EPA's Rule proposes to remake the energy sector in the affected states toward the Agency's preferred ends. The Rule is part of the broader joint EPA-White House Strategy, a strategy that oversteps the Agency's authority by concurrently developing regulations under three separate environmental statutes. It does so not to meet any of the statutes' individual ends but to transform the power sector. The group of regulations – including the Rule – are designed to hurriedly rid the U.S. power sector of fossil fuels by sharply increasing the operating costs for fossil fuel-fired power plant operators, forcing the plants' premature retirement.

EPA's overreach is consequential. At a time of great pressure on power generation and the electrical grid, the maintenance of dispatchable generation capacity is an important component of adequate and reliable electricity, which affects daily life in nearly every sector of the economy throughout the country. The rapid shuttering of power plants under EPA's plan could lead to blackouts and

energy shortages. The Rule also expands beyond power generation to other sectors, potentially inhibiting the natural gas supply network and other industrial activity.

Energy policy is a complex undertaking, which is why Congress has sparingly and specifically delegated policy authority to agencies and why the Supreme Court has guarded Congress' authority in *West Virginia* and other major question cases. This is the proper balance which respects the integrity of the separation of powers. It also leaves ample room for reasonable regulation within Congress's statutory commands. This Court should reject another attempt by EPA to circumvent Congress and grant the petitions for review.

## III.    <u>ARGUMENT</u>

To justify the Rule, EPA must point to "clear congressional authorization" for the expansive authority that the Agency claims. *See West Virginia*, 597 U.S. at 724 (quoting *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014)). Section 110 provides no such grant. To the contrary, EPA's process for promulgating the Rule covering 23 States implicates serious federalism concerns by usurping States' statutory role in emissions regulations under CAA section 110 and works at cross-purposes with the statutory structure on which the Agency purports to rely. This eviscerates the "cooperative federalism" that is the core principle of the Act. *See, e.g.*, *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 240 (D.C. Cir. 2013);

- 11 -

*Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v. E.P.A.*, 94 F.4th 77
(D.C. Cir. 2024).

Such a dramatic change to the balance of Federal-State power, again without
Congressional command, is not justifiable under the language of section 110,
which narrowly authorizes EPA to step in only when a state's pollution plan is
inadequate. *See* 42 U.S.C. § 7410; *U.S. Forest Serv. v. Cowpasture River Pres.
Ass'n*, 590 U.S. 604, 621–22 (2020) ("Our precedents require Congress to enact
exceedingly clear language if it wishes to significantly alter the balance between
federal and state power"). The court's invalidation of the Rule would be "nothing
more than an acknowledgment that the States retain substantial sovereign powers
under our constitutional scheme, powers with which Congress does not readily
interfere." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). It would also
acknowledge that a court will not *imply* such interference at the behest of an
agency.

As in previous cases, EPA urges the Court, without the needed clear
authorization, to adopt "an enormous and transformative expansion in EPA's
regulatory authority…." *Util. Air Regul. Grp.*, 573 U.S. at 324 (2014). The Rule
represents EPA's attempt to promulgate a rule with significant similarities to its

invalidated Clean Power Plan. Like the Clean Power Plan, the Rule imposes transformative, nationally applicable standards that will abruptly and chaotically force the decommissioning of many dispatchable power plants. Even beyond the reach of the Clean Power Plan, the Rule also applies standards to essential manufacturing and fuel sectors, critical to the Nation's economic independence and defense.

### A.    EPA's Rule does not rest on express authority and runs counter to the CAA's cooperative federalism structure.

The Agency attempts to justify the Rule through a tenuous interpretation of language in CAA sections 110(a)(2)(D)(i)(I) and 110(c)(1), to support its attempt to radically alter the power generation and manufacturing sectors.

Both provisions are relatively straightforward and neither expressly authorize EPA to promulgate nationwide plans. CAA section 110(a)(2)(D)(i)(I) requires each State to submit a State Implementation Plan ("SIP") that contains "adequate provisions" to satisfy EPA's emission standards. 42 U.S.C. § 7410(a)(2)(D)(i)(I). CAA section 110(c)(1) allows EPA to promulgate a Federal Implementation Plan ("FIP") if EPA determines a SIP does not comply with minimum criteria. *Id*. § 7410(c)(1). According to the EPA, the Agency properly promulgated the Rule to address deficient SIPs that were submitted to implement

EPA's 2015 ozone national ambient air quality standards. 88 Fed. Reg. 36,654, 36,656 (June 5, 2023).

However, CAA section 110 by its very title – "State implementation plans for national primary and secondary ambient air quality standards" – envisions that States will take the lead on achieving EPA's air quality standards. *See* 42 U.S.C. § 7410. While EPA consistently uses CAA section 110 to approve or reject SIPs, its implementation of a FIP with nationwide impacts is novel and extreme. Unlike other FIPs, which apply only to individual states or tribal jurisdictions, the Rule promulgates the first FIP with national coverage across 23 States.[6]

By ignoring the structure of CAA section 110 and issuing a nationwide FIP, EPA claims the authority to tip the Act's principles of cooperative federalism on its head. This Court should reject this approach. The CAA expressly recognizes that States are essential to achieving the air quality standards of the Act, stating "[e]ach State shall have the primary responsibility for assuring air quality" within its own boundaries. 42 U.S.C. § 7407(a). This Court recognizes that this provision creates a collaborative statutory scheme understood as cooperative federalism. *Michigan v.*

---

[6] *See, e.g.*, Envtl. Prot. Agcy., *Current FIPs around the Nation*, https://www.epa.gov/air-quality-implementation-plans/basic-information-about-air-quality-fips (last visited Mar. 19, 2024).

*E.P.A.*, 268 F.3d 1075, 1083 (D.C. Cir. 2001) (stating the CAA is "an experiment in cooperative federalism.") (internal quotation marks omitted). Inherent in this structure is a recognition that the Federal Government's overarching role is to set air quality standards, while the States implement those standards through development of plans and requirements. *Id.*

Federalism serves as a check on abuses of government power and applies both to Congress's attempts to intrude on State sovereignty and the Executive's efforts at the same. See *id*. at 458. Indeed, "a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id*.

The Supreme Court recognizes that federalism considerations often inform cases applying the major questions doctrine. *See West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring). As occurred here, intrusions into State sovereignty by Executive agency overreach can be as detrimental to our federalist system as would be an Act of Congress. "When an agency claims the power to regulate vast swaths of American life, it not only risks intruding on Congress's power, it also risks intruding on powers reserved to the States." *Id.* This is especially so when Congress explicitly invokes federalism principles in establishing a regulatory

- 15 -

scheme, as the CAA does by reserving regulatory power to States. Section 107
provides that "[e]ach State shall have the primary responsibility for assuring air
quality within the entire geographic area comprising such State…" 42 U.S.C.
§ 7407(a). Section 110, at issue here, is merely a component of that primary State
responsibility. *See Michigan,* 268 F.3d at 1083.

**B.    The Rule seeks to impose transformative economic and
social impacts without express authority.**

Having overreached in *West Virginia,* EPA has taken another run with the
Rule at imposing national energy policy without new, explicit congressional
authority. This is different from a traditional rulemaking where agencies can
receive deference due to their expertise or delegated authority. Instead, this is an
instance where the agency, rather than "refining its view of its authority … and
providing guidance meriting deference under our generous standards," has chosen
"to adhere to its essentially boundless view of the scope of its power." *See
Rapanos v. United States*, 547 U.S. 715, 758 (2006) (Roberts, C.J., concurring).
The major questions doctrine exists to keep agencies within their zones, and the
upshot of EPA's attempt here should be "another defeat for the agency." *Id.*

Here, EPA's Rule imposes impracticable requirements on a broad array of
sources and does so by disregarding the statutory scheme of the CAA. But to

promulgate a regulation that has extraordinarily widespread and significant impacts like the Rule, EPA must point to "something more than a merely plausible textual basis." *West Virginia*, 597 U.S. at 723. That means the statutory authorization must clearly allow the subject agency action. *Id*. EPA can point to no such congressional authorization for its Rule.

As *West Virginia* recognized, judicial caution is warranted where agencies rely on existing statutory authority to promulgate novel regulatory schemes with major impacts. *Id.* Under such circumstances, courts should closely examine whether Congress intended "to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *Id*. (quoting *MCI Telecommc'n Corp. v. Am. Telephone & Telegraph Co.*, 512 U.S. 218, 229 (1994)).

In *West Virginia*, EPA argued that CAA section 111(d) "empowers it to substantially restructure the American energy market," 597 U.S. at 724, but the Court found that section 111(d), an "'ancillary provision[]'" and a "gap filler," did not support the weight put on it by the agency. *Id.* (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). EPA argued that section 111(d)(1)'s authority to establish performance standards for existing sources of air pollution, 42 U.S.C. § 7411(d)(1), with performance standards defined to include making use

- 17 -

of the "best system of emission reduction," *id.* § 7411(a)(1), empowered the agency to dictate transitioning the national mix of energy generation from 38% coal to 27% coal by 2030. *West Virginia*, 597 U.S. at 720.

The Court disagreed. It noted EPA's action was not consistent with the traditional approach of "improving the performance of individual sources" but aimed to "improve the *overall power system* by lowering the carbon intensity of power generation." *Id.* at 727. And EPA proposed to do so "by forcing a shift throughout the power grid from one type of energy source to another." *Id.* at 727–28. It was not "plausible," the Court held, that "Congress gave EPA the authority to adopt on its own such a regulatory scheme in Section 111(d). A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation from that representative body." *Id.* at 735.

In *West Virginia*, the Court held that section 111(d) was too slender a reed to support the 2015 Clean Power Plan. Little is different now. EPA merely turned back one section in the statute book, to the "Good Neighbor Provision" of section 110, to make another attempt at restructuring the Nation's energy system. Section 110 requires that SIPs include "adequate provisions" to address pollution that will "contribute significantly to nonattainment" in neighboring States. 42 U.S.C.

- 18 -

§ 7410(a)(2)(D)(i)(I). For the first time, the EPA argues that CAA section 110 authorizes it to promulgate rules that impose emission reduction requirements that will radically transform energy production and regulate manufacturing. For that reason, EPA's action implicates the major questions doctrine and the Rule should be invalidated because there is no clear command from Congress authorizing EPA to act as it did here.

Though it goes to great effort to align the Rule with workaday rules previously upheld in court, EPA concedes the Rule has a number of "enhancements." EPA Opp'n to Appls. for Stay, U.S. Nos. 23A349, 23A350, 23A351, at 10 (Oct. 30, 2023). These include dynamic emissions budgets, which ratchet down in the event of plant retirement, *id.* at 10–11 (citing 88 Fed. Reg. at 36,764–779), "recalibration" (devaluation) of emissions allowances deemed surplus, *id.* at 11 (citing 88 Fed. Reg. at 36,788), and direct regulation of industries beyond the power sector. *Id. at* 11–14.

The Rule is an integral component of the larger Strategy that EPA designed to transform the U.S. power generation sector by abruptly increasing costs to operate fossil-fuel-fired power plants. EPA has provided little information to the public or Congress on its strategy, but in a March 2022 speech to the "CERAWeek

by S&P Global" conference, EPA Administrator Regan acknowledged the Strategy is intended to phase-out fossil fuel-fired power plants. He stated "If some of these facilities decide that it's not worth investing in [control technologies] and you get an expedited retirement, that's the best tool for reducing greenhouse gas emissions."[7]

Administrator Regan's comments about the Strategy make clear that each of the rules of the Strategy is intended to be transformative. To implement these rulemakings that constitute the Strategy and comply with the major questions doctrine, EPA must demonstrate that the statutory provisions on which it relied authorize the broad, transformative intent of its Rule, but it cannot.

Congress recognizes that EPA lacks authority to promulgate the Rule and has attempted to conduct oversight of the Rule and the Strategy, but EPA refuses to heed that oversight. Letters to Administrator Regan from both the House Committee on Energy and Commerce and the Senate Committee on Environment and Public Works requested information on the Strategy and specific rulemakings.[8] In those letters, Members of Congress have expressed concerns that the Strategy

---

[7] Jean Chemnick & Mike Lee, "What EPA's new power plant plans mean for carbon," *E&E News*, Mar. 11, 2022.

[8] *See supra* notes 3 and 5.

and its associated rulemakings were improperly broad and would have far reaching consequences for power generation and manufacturing. Despite these oversight efforts from the Senate and House Committees with jurisdiction over EPA, the agency's stance remains that it may use existing CAA statutory authority to promulgate this Rule and others that comprise the Strategy without direction from Congress.

Through its Rule, EPA is now attempting to impose requirements that are remarkably similar in scope to the Clean Power Plan invalidated by the Supreme Court. The Rule expands upon the scope of the Clean Power Plan by also requiring unprecedented emissions reductions on critical manufacturing and fuel distribution sources. *See* 88 Fed. Reg. 36,654. Never before has section 110 been used as a basis for a nationwide strategy that directly affects such sources. In addition, the Rule poses serious concerns for resource adequacy and reliability of our electric grid, much as the Clean Power Plan did.

**C.     The Rule's transformative effects were not examined during the rulemaking, demonstrating that the Rule's policy reach is broader than EPA admits.**

Experts have highlighted the Rule's potential broader impact on electricity generation, especially in combination with the other rules that comprise the

- 21 -

Strategy.[9] The Rule regulates not just power plants, but also natural gas supply

through its imposition of ozone restrictions on compressor engines. If natural gas

pipelines must reduce compressor engine usage even temporarily, the resulting

suspension of supply will impact power plant operations, not to mention users of

the fuel in the industrial, commercial, and residential sectors. Regulations that

could affect the availability of critical electricity and energy sources demand

careful analysis to avoid harm to the nation's economy and National security.

But instead of conducting a comprehensive analysis of the Rule's impact on

reliability and resource adequacy, EPA buried its head in the sand. While EPA

addressed concerns about reliability in the preamble to the Rule, it wrongly

concluded that its rule merely limits ozone emissions, stating "[t]his rule, like all

prior EPA ozone transport rulemakings, regulates only one aspect of the operation

of fossil-fuel fired [electric generating units], that is, the emissions of NOX

[nitrogen oxides] as an ozone-precursor pollutant during the ozone season." 88

Fed. Reg. at 36,679. EPA's position that merely regulating ozone will produce no

reliability impacts is patently false. Requiring emissions controls that create

---

[9] North American Electric Reliability Corporation, *2023 Long-Term Reliability Assessment* (Dec. 2023), https://www.nerc.com/pa/RAPA/ra/ Reliability%20Assessments%20DL/NERC_LTRA_2023.pdf.

disastrous economic conditions for fossil fuel-fired power plants, while technically regulating "only one aspect of the operation" of power plants, has much more far-reaching impacts on our electrical system. Separately in the EPA's own Regulatory Impact Analysis, the EPA acknowledges that the Rule by 2030 "is projected to result in an *additional* 14 [gigawatts] of coal retirements nationwide relative to the baseline."[10] This reflects that owners will retire assets rather than install controls. The Rule does not just affect one aspect of operation but will lead to a cease of operations altogether. This is by design.

Because of Administrator Regan's statement that the intent of the Strategy is to shut down fossil fuel-fired power plants, this Court might reasonably expect EPA to have conducted comprehensive reliability analyses in consultation with the Federal Energy Regulatory Commission ("FERC"), but it has not. EPA recognizes that the Rule will lead to abrupt closures of power plants but insists without any evidence that the process will be orderly and predictable. 88 Fed. Reg. at 36,771.

---

[10] Envtl. Prot. Agcy., *Regulatory Impact Analysis for the Final Federal Good Neighbor Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, Mar. 13, 2023, at 27, https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-1115.

Senior regulators have warned about the already precarious state of the grid.[11] What EPA fails to recognize is that as power plants close, replacement electricity generation must be constructed to address the gaps, leading to reduced reliability. Constructing new electric generation capacity will take decades, but EPA provides little runway for adapting to the Rule's new standards.

In response to a Congressional request, FERC examined the effects of EPA's proposed successor regulation to the Clean Power Plan as part of the Commission's 2023 Reliability Technical Conference.[12] In that November 2023 forum, stakeholders warned of the potential effects of the Clean Power Plan 2.0 on whether power plant units will continue to operate, and noted how when making

---

[11] *Full Committee Hearing to Conduct Oversight of FERC*, Hearing Before the S. Comm. on Energy & Natural Res., 118th Cong. (May 4, 2023) (testimony of Comm'r Mark Christie), https://www.energy.senate.gov/hearings/2023/5/full-committee-hearing-to-conduct-oversight-of-ferc ("The United States is heading for a reliability crisis. I do not use the term 'crisis' for melodrama, but because it is an accurate description of what we are facing...dispatchable resources are retiring far too quickly and in quantities that threaten our ability to keep the lights on.").

[12] Press Release, "Senators Capito and Barrasso: FERC Must Fix EPA's Proposed Clean Power Plan 2.0," Dec. 20, 2023, https://www.capito.senate.gov/news/press-releases/capito-barrasso-ferc-must-fix-epas-proposed-clean-power-plan-20; Letter from Reps. Cathy McMorris Rogers, Jeff Duncan, and Bill Johnson to FERC, Nov. 7, 2023, https://d1dth6e84htgma.cloudfront.net/11_07_23_Letter_to_Chairman_Phillips_and_Commissioners_4f500ff050.pdf.

- 24 -

decisions about whether to invest in units or shut down, operators are looking at the collection of EPA's rules, including the Good Neighbor Rule.[13] EPA's then-Principal Deputy Assistant Administrator for the Office of Air and Radiation, Joe Goffman, also spoke during the conference and acknowledged that EPA had not conducted a full assessment of the likelihood of units getting financing to comply with the Clean Power Plan 2.0,[14] let alone an assessment of the financial impacts of installing equipment to meet the Rule's ozone emission standards as well. In a subsequent panel, Anthony Campbell, President and CEO of East Kentucky Power Cooperative, stated the Rule, in combination with other rules comprising the Strategy, would be "disastrous for grid reliability."[15]

Consistent with the statements during November 2023 technical conference, the North American Electric Reliability Corporation ("NERC") issued a warning the following month that the Rule and the other rules in the Strategy could have transformative negative impacts on resource adequacy and reliability. In its 2023

---

[13] Fed. Energy Reg. Comm'n, Docket No. AD23-9-000, 2023 Reliability Technical Conference Transcript (Nov. 9, 2023), at 205–09, 271 (https://www.ferc.gov/media/transcript-docket-no-ad23-9-000).

[14] *Id*. at 186–87.

[15] *Id*. at 195.

Long-term Reliability Assessment, NERC specifically noted that "[e]nvironmental regulations and energy policies that are overly rigid and lack provisions for electric grid reliability have the potential to influence generators to seek deactivation despite a projected resource adequacy or operating reliability risk."[16] This potential for the Rule to force deactivation is expected based on EPA's stated goal of the Strategy. It is then no surprise that the Assessment cites to the very six rules that comprise the Strategy, including the Rule, as examples of regulations and policies that "potentially jeopardize[e] the orderly transition of the resource mix."[17]

The Rule lacks a thorough analysis of reliability and resource adequacy issues, despite attempts from stakeholders to raise alarms about the impacts of the Rule. Congress' attempts at oversight have been similarly rebuffed, and EPA remains unwilling to reexamine the Rule, even though it has the potential to dramatically alter the Nation's energy security. The major questions doctrine prohibits EPA from promulgating a rule with such nationwide impacts absent clear Congressional authorization. This Court should reject it.

---

[16] NARC *2023 Long-Term Reliability Assessment* at 9 ("Without provisions for electric grid reliability, new and proposed Environmental Protection Agency (EPA) rules could heighten the risk of thermal unit retirements before solutions to resource adequacy and system planning issues are in place.").

[17] *Id.* & n. 11.

- 26 -

IV.   **<u>CONCLUSION</u>**

The petitions for review should be granted, and the Rule vacated and

remanded to EPA.

Dated this 8th day of April, 2024.

SCHWABE, WILLIAMSON & WYATT, P.C.


By:  */s/ Lawson E. Fite*
　　　Lawson E. Fite
　　　Conor L. Butkus
　　　*Attorneys for Amici*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 29(a)(4) and 32(f) and (g), I hereby certify that the foregoing complies with the word limit of Fed. R. App. P. 29(a)(5) and Circuit Rule 32(e)(3) because it contains 4,610 words, excluding exempted portions, according to the count of Microsoft Word.

I further certify that the brief complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman font.

*/s/Lawson E. Fite*
LAWSON E. FITE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 8th day of April, 2024, I caused to be served the

foregoing *Amici Curiae* Brief on all counsel of record via the Court's CM/ECF system.


 s/*Lawson E. Fite*
LAWSON E. FITE

142411\284354\CWE\45417378.1

- 1 -