<u>**ORAL ARGUMENT NO YET SCHEDULED**</u>

**No. 23-1157 (and consolidated cases)**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

STATE OF UTAH, *et al.*,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
and MICHAEL S. REGAN, in his official capacity as Administrator, United States
Environmental Protection Agency,

*Respondents.*

On Petitions for Judicial Review of Final Agency Action of
the United States Environmental Protection Agency
88 Fed. Reg. 36,654 (June 5, 2023)

**INITIAL BRIEF OF INTERVENOR CITY
UTILITIES OF SPRINGFIELD, MISSOURI IN
SUPPORT OF CERTAIN PETITIONERS**

Thomas J. Grever
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Telephone: (816) 474-6550
tgrever@shb.com

*Attorney for City Utilities of
Springfield, Missouri*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Intervenor-Petitioner City Utilities of Springfield, Missouri ("City Utilities") hereby certifies as follows:

A.      City Utilities adopts the certificates as to parties in the Opening Brief Of Petitioners Utah, Ohio, Indiana, Kentucky, Nevada, West Virginia, And The Kentucky Energy And Environment Cabinet ("State Petitioners' Brief"), ECF No. 2047800, and Joint Opening Brief Of Industry Petitioners ("Industry Petitioners' Brief"), ECF No. 2047829, with the following clarification: City Utilities is intervening in support of State Petitioners and Industry Petitioners only. City Utilities is not intervening in support of Petitioner State of Wisconsin (Case No. 23-1201).

B.      References to the ruling at issue appear in the State Petitioners' Brief, ECF No. 2047800, and Industry Petitioners' Brief, ECF No. 2047829. City Utilities therefore adopts the certificate as to rulings and related cases in those briefs. City Utilities refers to the final rule being challenged in this case, "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 36654 (June 5, 2023), as the "Final FIP."

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, proposed intervenor City Utilities of Springfield, Missouri states that the City of Springfield, Missouri is a constitutional charter city and a municipal corporation that operates its gas, water, electric, transit and telecommunications systems through its administrative board, The Board of Public Utilities of Springfield, Missouri, which operates under the name "City Utilities of Springfield, Missouri" ("City Utilities"). *See* Articles I and XVI, Charter of the City of Springfield, Missouri, and Section 19, Article VI of the Constitution of Missouri.

City Utilities owns and operates multiple electric-generating units, including two coal-fired electric generating stations, which provide electricity for approximately 111,000 residential, commercial and industrial customers. The facilities owned and operated by City Utilities are subject to regulation under the Clean Air Act, including the regulations and final rule involved in this action.

No parent company or publicly-held company has a 10% or greater ownership interest in City Utilities.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES ................................................................ i

RULE 26.1 DISCLOSURE STATEMENT ................................. ii

TABLE OF CONTENTS ....................................................... iii

TABLE OF AUTHORITIES ................................................... v

GLOSSARY .................................................................... vii

JURISDICTIONAL STATEMENT ............................................ 1

STATEMENT OF ISSUES .................................................... 1

STATEMENT OF THE CASE ................................................. 2

STATUTES AND REGULATIONS .......................................... 3

SUMMARY OF ARGUMENT ................................................. 4

STANDING .................................................................... 6

STANDARD OF REVIEW ..................................................... 6

ARGUMENT .................................................................... 7

    I.    EPA'S ALLOWANCE BANKING "ENHANCEMENTS" ARE
        ARBITRARY,  CAPRICIOUS, AND
        UNLAWFUL ............................................................ 7

        A. Allowance Trading Systems Are Premised on Reliance Interests
           and Legitimate Expectations that Banked Allowances will Retain
           Value in the Future ........................................................ 7

        B. EPA's Final FIP Undermines the Premise of Allowance Banking
           and is Fundamentally Unreasonable
           and Unfair ................................................................ 11

        C. In Response to Clear Concerns Raised by Commenters, EPA has
           Not Adequately Justified
           its Policy Decisions ..................................................... 21

CONCLUSION ................................................................................ 25

CERTIFICATE OF COMPLIANCE ................................................. 26

CERTIFICATE OF SERVICE ........................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Motor Vehicle Mfrs. Ass'n. v. EPA*,
  768 F.2d 385 (D.C. Cir. 1985)..............................................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
  Co.*, 463 U.S. 29 (1983) ....................................................................10

*\*Wisconsin v. EPA*,
  938 F.3d 303 (D.C. Cir. 2019)....................................................7, 9, 14

*\*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)..........................................................................10

**Statutes and Regulations**

5 U.S.C. § 706(2) ....................................................................................7

42 U.S.C. § 7607(d)(9)............................................................................6

63 Fed. Reg. 57356 (Oct. 27, 1998) ........................................................2

70 Fed. Reg. 25162 (May 12, 2005) ........................................................2

76 Fed. Reg. 48208 (Aug. 8, 2011) .........................................................2

*81 Fed. Reg. 74504 (Oct. 26, 2016)
  ("2016 CSAPR Update")  ........................................ 2, 8, 9, 11, 12, 13, 18

*86 Fed. Reg. 23054 (April 30, 2021)
  ("2021 Revised CSAPR Update") .................................... 2, 3, 11, 12, 13, 14, 18

*88 Fed. Reg. 36654 (June 5, 2023)
  ("Final FIP")...................................i, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13,
  ................................................................ 14, 15, 16, 17, 18, 19, 20, 23, 24

88 Fed. Reg. 49295 (July 31, 2023)........................................................13

**Other Authorities**

American Public Power Association Comments, Docket ID No. EPA-
  HQ-OAR-2021-0668-0394 (June 22, 2021)................................9, 21

City Utilities Comments, Docket ID No. EPA-HQ-OAR-2021-0668-0521 (June 21, 2022) ...........................................................21

Evergy, Inc. Comments, Docket ID No. EPA-HQ-OAR-2021-0668-0302 (June 20, 2022) .........................................................22

EPA, *2022 Progress Report – Program Compliance and Market Activity*, Market Activity Data for CSAPR NOx Ozone Season Group 3 Trading Program, https://www.epa.gov/power-sector/progress-report-program-compliance-and-market-activity#market-activity (updated Sept. 18, 2023) ...........................................17

The National Rural Electric Cooperative Association Comments, Docket ID No. EPA-HQ-OAR-2021-0668-0409 (June 21, 2020) ...................................................................22

# <u>GLOSSARY</u>

| | |
|---|---|
| CAA | Clean Air Act |
| CAIR | Clean Air Interstate Rule |
| CSAPR | Cross-State Air Pollution Rule |
| EGU | Electric generating units |
| EPA | United States Environmental Protection Agency |
| FIP | Federal Implementation Plan |
| NAAQS | National Ambient Air Quality Standards |
| NOx | Nitrogen oxides |
| SIP | State Implementation Plan |
| SO$_2$ | Sulfur dioxide |

## JURISDICTIONAL STATEMENT

City Utilities adopts the Jurisdictional Statements in the State Petitioners' Brief, ECF No. 2047800, and Industry Petitioners' Brief, ECF No. 2047829.

## STATEMENT OF ISSUES

City Utilities adopts the Statement of Issues in the State Petitioners' Brief, ECF No. 2047800, and Industry Petitioners' Brief, ECF No. 2047829. City Utilities addresses the following, additional issue:

1. Whether EPA acted arbitrarily, capriciously, or otherwise unlawfully when it finalized "enhancements" to its established allowance trading system that radically depart from prior rulemakings addressing the same trading market, undermine participants' significant reliance interests on the "legitimate expectation" that banked allowances will continue to have value in the future, punish utilities that have invested at great cost to generate early emissions reductions consistent with goals of the Clean Air Act, and effectively shift the ozone interstate transport regulatory framework away from a market-based trading system to a top-down command-and-control regulatory regime.

## STATEMENT OF THE CASE

City Utilities adopts the procedural and factual background set forth in the Statement of the Case in the State Petitioners' Brief, ECF No. 2047800, and Industry Petitioners' Brief, ECF No. 2047829, and provides the following supplemental material.

EPA has promulgated a variety of predecessor rules establishing allowance trading markets to address interstate ozone transport, including: the 1998 NOx SIP Call (63 Fed. Reg. 57356 (Oct. 27, 1998)), the Clean Air Interstate Rule ("CAIR") (70 Fed. Reg. 25162 (May 12, 2005)), and the Cross-State Air Pollution Rule ("CSAPR") (76 Fed. Reg. 48208 (Aug. 8, 2011)). EPA developed the NOx trading program framework addressed in the Final FIP under the CSAPR rule and its associated updates, the Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS (the "2016 CSAPR Update"), 81 Fed. Reg. 74504 (Oct. 26, 2016), and the 2021 Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS (the "2021 Revised CSAPR Update"), 86 Fed. Reg. 23054 (April 30, 2021).

After the 2021 Revised CSAPR Update, regulated facilities in upwind states required to participate in the CSAPR NOx ozone season trading programs were assigned to participate in either the so-called "Group 2" trading program or the "Group 3" trading program. 2021 Revised CSAPR Update at 23055-56. The 2021 Revised CSAPR Update created the Group 3 trading program as a more restrictive

pool of statewide emission budgets and associated allowances set by EPA, and required 12 upwind states found to be contributing significantly to downwind non-attainment or maintenance issues for the 2008 Ozone NAAQS to move from Group 2 to Group 3.  *Id.* at 23059. Certain states (including Missouri, where City Utilities operates) that were already participating in the Group 2 trading program were allowed to remain in the Group 2 program, because they were found not to significantly contribute to downwind nonattainment or maintenance problems. *Id.* at 23057.

The Final FIP now requires seven states currently participating in the Group 2 trading program, including Missouri, to move to the Group 3 trading program based on EPA's findings with respect to the 2015 Ozone NAAQS. Final FIP at 36657. But, as addressed further below, the Final FIP significantly modifies aspects of its established NOx allowance trading program under CSAPR, to the detriment those EGUs who have previously obtained and banked Group 2 emission allowances through their own early adoption of post-combustion pollution control technology that over-controlled NOx emissions from their facilities.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are included in the briefs and addenda of State Petitioners, ECF No. 2047800, and Industry Petitioners, ECF No. 2047829.

## SUMMARY OF ARGUMENT

City Utilities adopts and supports the arguments made by State Petitioners and Industry Petitioners that the program "enhancements" introduced by EPA in the Final FIP constitute unlawful "over-control" in violation of the Clean Air Act. EPA's decision to finalize these "enhancements" is arbitrary and capricious for the additional reason that they constitute a significant departure from past ozone good neighbor rulemakings, which EPA has not adequately explained or justified, and undercut the most basic principles of an allowance trading market. The Court should therefore set aside the Final FIP.

In the Final FIP's revised allowance trading market, EPA has devised a system that immediately confiscates banked allowances and thereafter continually diminishes the value of remaining allowances that electric generating units ("EGUs") have diligently saved, or "banked," for future use. These banked allowances can be used by an individual unit to meet future compliance obligations or sold on the market to generate revenue for capital improvements or investments in pollution control systems. EGUs are typically able to bank allowances by running very efficiently and operating pollution control systems that significantly reduce emissions in a given year above and beyond what is required under the regulations. Now under EPA's current trading program redesign, these good actors will lose the benefit of their early investment in pollution control systems—at great

4

cost to operators and customers—that have generated significant NOx emissions reductions in recent years.

EPA's allowance trading system is premised on the ability of EGU participants to plan for current and future compliance in economically efficient ways. Allowing participants to make early investments in pollution control systems and generate surplus allowances for future use is a key to this program. This system depends on what EPA and this Court have called an EGU's "legitimate expectation" that banked allowances will retain value in the future.

EPA undercuts this "legitimate expectation" in the Final FIP by (i) immediately requiring EGUs transitioning to a new allowance trading group to surrender banked allowances at a significantly unfavorable rate (where the actual transition rate has not even been finalized in the rule) without affording additional flexibilities provided in previous rulemakings, and then (ii) annually recalibrating the total amount of banked allowances that can be maintained in the new ozone trading season, further diminishing the value of an EGU's allowance bank each year. These actions, taken together with EPA's other program "enhancements," effectively shift the ozone "good neighbor" program from one rooted in market-based credit trading to one based on command-and-control regulation and energy generation shifting. This goes beyond the scope and rationales EPA has used in recent ozone "good neighbor" rules to support similar allowance trading markets.

Ultimately, the program design in this Final FIP unfairly, and unjustifiably, punishes EGUs that have consistently acted in good faith to reduce NOx emissions and makes medium- to long-term compliance planning more uncertain and more costly.

## STANDING

City Utilities demonstrated its standing in the Motion to Intervene in Support of Petitioners, ECF No. 2015365. In the Motion, City Utilities showed that it has Article III standing to challenge EPA's Final FIP because it is a utility owner and operator of EGUs directly regulated by the Final FIP.

## STANDARD OF REVIEW

The Court may reverse the Final FIP if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," per 42 U.S.C. § 7607(d)(9)(A), (C).

When reviewing agency action under either Clean Air Act provision, this Court uses "essentially the same" standard of review as it does under the Administrative Procedure Act, 5 U.S.C. § 706(2). *Wisconsin v. EPA*, 938 F.3d 303, 312 (D.C. Cir. 2019) (quoting *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1064 (D.C. Cir. 1995)); *see also Motor Vehicle Mfrs. Ass'n. v. EPA*, 768 F.2d 385, 389 n. 6 (D.C. Cir. 1985).

## ARGUMENT

I.    **EPA'S ALLOWANCE BANKING "ENHANCEMENTS" ARE ARBITRARY, CAPRICIOUS AND UNLAWFUL.**

>    **A. Allowance Trading Systems Are Premised on Reliance Interests and Legitimate Expectations that Banked Allowances will Retain Value in the Future.**

EPA's management of allowance-based trading programs "to achieve required emissions reductions from the electric power sector has a long history, rooted in the Clean Air Act Amendments of 1990." Final FIP at 36762.[1] According to EPA, "trading and banking of allowances in the CSAPR trading programs can serve a variety of purposes: continuously incentivizing sources to reduce their emissions even when they already hold sufficient allowances to cover their expected emissions for a control period, facilitating compliance cost minimization, accommodating necessary operational flexibility, and promoting allowance market liquidity." Final FIP at 36766. The Final FIP, however, imposes additional requirements on the existing interstate transport NOx trading program that cuts against these stated purposes by undermining economic efficiency,

---

[1] For example, EPA has developed separate regulations and allowance market trading schemes to regulate sulfur dioxide ($SO_2$) and NOx as part of the Clean Air Act's Acid Rain Program, codified at 40 C.F.R. Parts 72 through 78. The Final FIP does not affect these requirements.

upending established financial expectations and reliance interests, and penalizing those who have made early investments to reduce ozone-causing emissions.

The ability to bank allowances for later use or sale is central to every EPA Clean Air Act trading program. As EPA described in its 2016 CSAPR Update rulemaking, "[b]anking of allowances for later use [] creates incentives to make early emission reductions, which often result in improved air quality earlier than otherwise required." 2016 CSAPR Update at 74561. Incentivizing allowance banking has generated "early reductions … in implementing other trading programs over the past 20 years, such as the Acid Rain Program and the NOx SIP Call." *Id.*

The key to incentivizing allowance banking, and "the associated environmental benefits, is *conditioned on the expectation that the resulting banked allowances will have some value in the future of that program*." 2016 CSAPR Update at 74561 (emphasis added). This Court, in assessing EPA's 2016 CSAPR Update and the Agency's handling of allowance banking in redesigning that program, recognized that an EGU's "legitimate 'expectation'" that previously banked allowances will continue to have value in the future is essential to

8

preserving such a trading program. *Wisconsin*, 938 F.3d at 321 (quoting 2016 CSAPR Update at 74561).[2]

EPA's redesign of the NOx trading program in the Final FIP fundamentally undercuts this "legitimate expectation," a significant reliance interest, which undermines the entire premise and design of a market-based allowance trading program. This constitutes a stark departure from previous interstate ozone transport rulemakings, like CSAPR for instance, where EPA was designing allowance markets and contending with similar considerations and concerns as in the Final FIP.

But an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action…." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In situations where an

---

[2] *See also* Comments on the Final FIP submitted by the American Public Power Association at 21 & n. 56, Docket ID No. EPA-HQ-OAR-2021-0668-0394 (June 22, 2021) (quoting Matthew Polesetsky, *Will a Market in Air Pollution Clean the Nation's Dirtiest Air?: A Study of the South Coast Air Quality Management District's Regional Clean Air Incentives Market*, 22 ECOLOGY L. Q. 359, 374-75 (1995) ("[P]ollution credit markets operate on the assumption that polluters will develop rational responses to the incentives that the market creates. Sources that find it extremely costly to reduce their emissions have an interest in negotiating with sources that can reduce emissions relatively inexpensively. This process of pollution credit transfer requires planning. Planning, in turn, requires the ability to predict the future with some degree of certainty. If market participants believe that regulators will whimsically change the rules of the market, firms lose the ability to plan for the future. In the worst case scenario, market participants may fear that regulators will confiscate the credits that the participants generate.").

agency makes a decision to change a prior policy, "[a]n agency may not … depart from a prior policy *sub silentio* or simply disregard rules that are still on the books … [a]nd of course the agency must show there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In the case of policy changes that "rest[] upon factual findings that contradict those which underlay its prior policy; or when its prior policy has *engendered serious reliance interests that must be taken into account*" it would be "arbitrary and capricious to ignore such matters." *Id.* (emphasis added) (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).

EPA's decisions and rationales for these allowance market and banking "enhancements" in the Final FIP are unreasonable, arbitrary, and capricious. They are also fundamentally punitive and unfair to EGUs that have long acted in good faith and have made significant investments in pollution control, reducing NOx emissions beyond what was required under law. EPA does not adequately address these concerns or provide good reasons for departing from past policy on crafting allowance trading markets, where participants have significant investments based on critical assumptions about the structure and rules of the market. The Court should not allow these changes that impose command-and-control elements, under the guise of "enhancements," onto an existing allowance trading system to stand.

**B. EPA's Final FIP Undermines the Premise of Allowance Banking and is Fundamentally Unreasonable and Unfair.**

The Final FIP is not the first time EPA has transitioned EGUs from one trading group to another. When EPA finalized the 2016 CSAPR Update, to address the good neighbor provision for the 2008 ozone NAAQS revision, the Agency created a new Group 2 trading program and transitioned nearly 95% of participants from the existing Group 1 system. Final FIP at 36813. In the 2021 Revised CSAPR Update, also addressing the 2008 ozone NAAQS good neighbor provision, EPA created a new Group 3 trading program and transitioned nearly 55% of participants over to Group 3 from Group 2. *Id.* In both rules, EPA developed a process for converting allowances banked by utilities in the prior group system into the new group according to conversion ratios. As described by EPA in the Final FIP, "[a]ny conversion of banked allowances from a previous trading program for use in a new trading program must ensure that implementation of the new trading program will result in $NO_X$ emissions reductions sufficient to address significant contribution by all states that would be participating in the new trading program, *while also providing industry certainty (and obtaining an environmental benefit) through continued recognition of the value of saving allowances through early reductions in emissions*." Final FIP at 36813 (emphasis added).

EPA claims it has designed in the Final FIP its process for transitioning EGUs from one trading group to another based on the same rationale used in the 2016 CSAPR Update and 2021 Revised CSAPR Update. However, the Agency acknowledges that the Final FIP goes further than any prior good neighbor rule to restrict, control, and ultimately limit allowance banking. *See* Final FIP at 36763 ("…the CSAPR programs do not limit trading of allowances, and prior to this [Final FIP] rule have not limited banking of allowances within a given trading program…"). But the Final FIP introduces two critical changes to the allowance banking system that are significant departures from past CSAPR rulemakings and fundamentally undermine the expectations and purposes of allowance trading markets.

*First*, EPA has refused to provide the flexibility it has offered in previous NOx trading programs that would alleviate the loss of banked credits through moving from one trading group (Group 2) to the more restrictive trading group (Group 3). EPA's Final FIP plan will restrict the amount of banked allowances EGUs transitioning from Group 2 to Group 3 may carry over by applying an unfavorable conversion ratio. *See* Final FIP at 36813-14.[3] EPA has proposed

---

[3] As made clear in the Industry Petitioners' Brief and State Petitioners' Brief, the exact timing and process for transiting units from existing Group 2 into Group 3 is presently uncertain given the administrative stay of the FIP in 12 states (including Missouri, where City Utilities operates). *See, e.g.,* "Federal 'Good Neighbor Plan'

similar transitional banked allowance conversion policies in previous ozone good

neighbor rules (*see, e.g.*, 2016 CSAPR Update at 74557-61 and the 2021 Revised

CSAPR Update at 23134-37); however, in this Final FIP, EPA has not yet finalized

the actual conversion ratio that will be applied. Final FIP at 36813 ("Under the

conversion procedure in this rule, the EPA has not set a predetermined conversion

ratio in the regulations (as was done in the Revised CSAPR Update) but instead

has established provisions identifying the target amount of new Group 3

allowances that will be created and defining the types of accounts whose holdings

of Group 2 allowances will be converted to Group 3 allowances (as was done in

the CSAPR Update)."

    EPA estimates the final conversation ratio could be close to 6.5-to-1,

meaning that one new Group 3 allowance will be created for every 6.5 Group 2

allowances banked under the previous trading program parameters. Final FIP at

36813. If this were the final conversation ratio it would be higher than the final

ratio used by EPA in the 2016 CSAPR Update (a ratio of close to 3.5-to-1, which

---

for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial
Stays of SIP Disapproval Action for Certain States," 88 Fed. Reg. 49295, 49297
(July 31, 2023) ("[T]he EPA in this action is revising the Good Neighbor Plan FIP
requirements and the regulations for the Group 2 trading program to require the
EGUs in each state covered by a stay order for the SIP Disapproval action to
participate in the Group 2 trading program instead of the Group 3 trading program
while the stay for that state remains in place.").

was ultimately upheld by this Court in the *Wisconsin* decision) and lower than the final ratio provided for in the 2021 Revised CSAPR Update (a ratio of 8-to-1). However, even though a 6.5-to-1 conversion ratio is close to the 8-to-1 ratio finalized in the Revised CSAPR Update Rule, EPA is taking away one of the additional opportunities for EGUs transitioning to the new trading group to convert additional banked allowances for future use, as provided in the Revised CSAPR Update Rue: an additional voluntary "safety valve" conversion opportunity. In providing this "safety valve" conversion opportunity in the 2021 Revised CSAPR Update, EPA explained that, "[a]ny 2017–2020 Group 2 allowances that have not already been exchanged for Group 3 allowances through the process of creating the initial bank may be used to obtain additional Group 3 allowances through the safety valve mechanism. The availability of the starting bank and any additional allowances converted using this 'safety valve' ensures that compliance with the rule is feasible and addresses any market liquidity concerns raised by commenters." 2021 Revised CSAPR Update at 23060.

Although commenters specifically requested that EPA provide a comparable "safety valve" conversion provision in the Final FIP, EPA declined because the Agency believed the additional flexibility would be "unnecessary." Final FIP at 36775. EPA indicated only that it may in the near future "propose and take comment on potential amendments to the Group 3 trading program that would add

14

an auction mechanism to the regulations for the purpose of further increasing

allowance market liquidity in conjunction with other appropriate changes to ensure

program stringency is maintained." Final FIP at n. 365. EPA did not provide

additional information about what these extra mechanisms or flexibilities could

be.[4]

*Second,* under the Final FIP the Agency will "annually recalibrate" (*i.e.*, take

away) banked allowances that can be carried forward into the following year's

ozone trading season. EPA explains that annual recalibration will involve resetting

the total quantity of allowances banked for Group 3 based on a pre-set target

percentage of the total state emission budgets for that control period. EPA will then

require EGUs to surrender any banked allowances that exceed this new

recalibrated allowance number. Final FIP at 36766 ("The recalibration procedure

---

[4] This potential of future review offers little solace to EGUs who stand to lose their investments in early over-control. EPA emphatically asserts that any subsequent rulemaking to provide additional allowance market liquidity or flexibility "would not reopen any determinations which the Agency has made at Steps 1, 2, or 3 of the interstate transport framework in this action. Nor would it reopen any aspects of implementation of the program.… In this respect, such a rulemaking would constitute a discretionary action that is not necessary to resolution of good neighbor obligations. Rather, these adjustments, if finalized, would reflect a shift from one acceptable form of implementation at Step 4 to a slightly modified but also acceptable form of implementation at Step 4, as related to EGUs. No legal or technical justification for this action as set forth in the record here depends on or would be undermined by the development of an alternative approach that includes an auction…". Final FIP at n. 307.

entails identifying the ratio of the target bank amount to the total quantity of banked allowances held in all accounts before the recalibration and then, if the ratio is less than 1.0, multiplying the quantity of banked allowances held in each account by the ratio to identify the appropriate recalibrated amount for the account (rounded to the nearest allowance), and deducting any allowances in the account exceeding the recalibrated amount."). From 2024-2029 EPA's target percentage will be 21% and for control periods starting in 2030 the target percentage will be 10.5%. *Id.* This means that under the Final FIP, for each compliance year after 2024 any allowances a utility has managed to bank from previous ozone seasons will be further devalued by EPA annually, based on new target number generated each year.

EPA explains its decision to implement annual allowance banking recalibration by stating, "while the EPA considers it generally advantageous to place as few restrictions on the trading of allowances as possible, unrestricted banking of allowances… allows what might otherwise be temporary surpluses of allowances in some individual control periods to accumulate into a long-term allowance surplus that reduces allowance prices and weakens the trading

16

program's incentives to control emissions." Final FIP at 36766.[5]

EPA also acknowledges that the annual banking recalibration process will necessarily diminish the value of previously-banked allowances, but the Agency attempts to justify the decision because it does not believe recalibration will *entirely* erase the value of banked allowances – "the larger the quantity of banked allowances that is held in a given account before each recalibration, the larger the quantity of banked allowances that will be left in the account after the recalibration for possible sale or use in meeting future compliance requirements. Because the banked allowances will always have value, the opportunity to bank allowances will continue to advance the purposes served by otherwise unrestricted banking as described previously. Opportunities to bank unused allowances can serve all these same purposes whether a banked allowance is of partial value (if the bank needs recalibrating to its target level) or is of full value compared to a newly issued allowance for the next control period." Final FIP at 36767.

---

[5] EPA overstates this concern. After EPA published a proposed version of the Final FIP in April 2022, the Group 3 NOx season allowance trading market saw weekly average allowance prices in August 2022 rising to over $47,000 per allowance. If anything, these market conditions are indicative of a relative scarcity of allowances, not a glut or surplus as EPA claims are a concern. *See*, *e.g.,* EPA, *2022 Progress Report – Program Compliance and Market Activity*, Market Activity Data for CSAPR NOx Ozone Season Group 3 Trading Program, https://www.epa.gov/power-sector/progress-report-program-compliance-and-market-activity#market-activity (updated Sept. 18, 2023) (last visited April 22, 2024).

Annual allowance banking recalibration and surrender effectively destabilizes a utility's planning, expectations and reliance on a strategy of controlling pollution in order to bank allowances for future use. EPA admits that limiting banking in this way goes beyond anything the Agency has previously done for other ozone NOx trading programs. *See* Final FIP at 36773 ("[I]ncluding an annual bank recalibration of any percentage is an enhancement in the trading program from prior trading programs under the good neighbor provision established in the CAIR, CSAPR, CSAPR Update, and Revised CSAPR Update rulemakings….") and Final FIP at n. 288 ("[A]llowance banking has not previously been limited under any of the CSAPR trading programs….").

The 2016 CSAPR Update, which provided a methodological basis for the Final FIP, and the 2021 Revised CSAPR Update both balanced similar concerns about inadvertently creating an abundance of banked allowances versus incentivizing EGUs to continue reducing emissions in order to meet state-level emissions assurance levels, *without* resorting to additional extreme restrictions on allowance banking like annual recalibration. *See* 2016 CSAPR Update at 74558 ("the EPA is finalizing a limit on the number of banked allowances carried over based on the need to assure that the CAA objective of the CSAPR Update is achieved. This approach transitions some allowances for compliance to further ensure feasibility of implementing the CSAPR Update rule."); *compare* Final FIP

18

at 36663 ("the carryover of unused allowances for use in future control periods as banked allowances affects the ability of a trading program to maintain the rule's selected control stringency and related EGU effective emissions rate performance level as the EGU fleet evolves over time. Unrestricted banking of allowances allows what might otherwise be temporary surpluses of allowances in some individual control periods to accumulate into a long-term allowance surplus that reduces allowance prices and weakens the trading program's incentives to control emissions. To prevent this outcome, the EPA is also revising the Group 3 trading program by adding provisions that establish a routine recalibration process for banked allowances…").

Taken together, EPA's allowance bank conversion ratio policy (specifically excluding compliance flexibilities like a "safety valve" transition) and the annual allowance bank recalibration process, in combination with EPA's other unjustified trading program enhancements like dynamic state emissions budgeting, unit-specific daily backstop emissions rates and 3-for-1 surrender penalties, and unit-specific emissions limitations that are contingent on assurance level exceedances (i.e., unit-specific "secondary emissions limitations"), have the overall effect of undercutting the "legitimate expectation" EGUs have in the future value of banked allowances, undermining the basic premises and expectations of an allowance banking and trading market, and penalizing good actors, such as City Utilities and

19

many other utilities, who invested early in those pollution control systems (at great cost) EPA now deems necessary to meet the current standards in order to generate future bankable allowances that help finance the early investments and limit cost increases to ratepayers.

This appears to be the Agency's intention. The Agency claims that the Final FIP's primary mechanism of reducing ozone emissions to meet the Clean Air Act's good neighbor provision is based on "a trading program for EGUs because of the inherently greater flexibility that a trading program can provide relative to more prescriptive, 'command-and-control' forms of regulation of sufficient stringency to achieve the necessary emissions reductions." Final FIP at 36760-61. Yet, the effect of the Agency's allowance trading and banking policies in this final rule is to essentially regulate all participating EGUs under a strict command-and-control regime.

### C. In Response to Clear Concerns Raised by Commenters, EPA has Not Adequately Justified its Policy Decisions.

EPA has not adequately explained or justified how its "enhancements" in the Final FIP preserve the integrity and expectations of EGUs participating in an allowance trading program; nor has the Agency justified policy decisions that *de facto* punish EGUs that have historically and consistently invested in and operated

20

pollution control systems to reduce emissions and generate bankable emissions allowances for future trading years.

City Utilities raised this complaint squarely in its comments on the proposed FIP: "…[t]he FIP, as proposed, penalizes publicly-owned utilities and communities that have invested in and operated state-of-the-art control equipment to meet [CAIR] and now [CSAPR]." City Utilities Comments at 1, Docket ID No. EPA-HQ-OAR-2021-0668-0521 (June 21, 2022); *see also id.* at 5 ("[p]rovisions in the proposed rule should not penalize affected units that banked past seasonal allowances for future years at the cost to their electric utility customers.").

Other commenters, and particularly other EGUs, raised these same issues with EPA during the comment period. *See, e.g.*, Comments of the American Public Power Association at 20, (arguing that the 5.9-to-1 Group 2 to Group 3 transition ratio estimated in the proposed FIP was "overly restrictive and has the effect of penalizing sources that met their CSAPR Group 2 emission budgets through emission reductions and built a bank of allowances through early emission-reduction action, which is the very compliance behavior EPA seeks to encourage in the Proposed Rule.") *see also id.* at 20-21 ("Banked allowances represent assets that EGU owners – in the case of public power, communities – have invested in over the past several years to allow for compliance flexibility when needed, and to offset costs as needed through the sale of allowances. Seizing these assets through

21

conversion is likely to discourage early emission reductions in the future and risks disruption of the environmental markets."); Comments of The National Rural Electric Cooperative Association at 68-69, Docket ID No. EPA-HQ-OAR-2021-0668-0409 (June 21, 2020) ("Past transport trading programs allowed banking as a benefit to encourage operators to explore means to reduce NOx further. EPA acknowledges this benefit in the Proposed FIP. In the Revised CSAPR Update Rule, EPA lauds the flexibility of a mass-based trading program. A key feature to maintaining flexibility is banking. Routine bank recalibration was not used in past ozone transport programs. Instead, EPA found other means of addressing bank stringency on a need-basis…) (emphasis in original); Comments of Evergy, Inc. at 2, Docket ID No. EPA-HQ-OAR-2021-0668-0302 (June 20, 2022) ("The proposed FIP unfairly penalizes 'good actors' and rewards 'bad actors'. Evergy is a notable example of a good actor that is being unfairly penalized for having operated state-of-the-art pollution control equipment on our electric generating units. … Even though Evergy has voluntarily operated these units well below the permitted NOx emission limitations, EPA is proposing to reduce Evergy's allowance allocations, claw back the allowance bank, and impose a new daily NOx emission limitation. Evergy chose to operate well below the permitted NOx emission limitations because it was the right thing to do. Evergy should not be adversely penalized for being a good steward of the environment.").

In response to these critiques of the proposed rule, EPA half-heartedly speculates, without adequate support, that, "[b]y creating a 'sell or lose' incentive for holders of surplus allowances, the recalibration process should increase allowance market liquidity. At the same time, by ensuring a banked allowance will always have some value for use in a future control period, the bank recalibration mechanism in this program will continue to incentivize early emissions reduction." Final FIP at 36791.

As to the argument that EPA's Final FIP effectively punishes good actors that have proactively, and historically, reduced emissions consistent with the fundamental objectives of the Clean Air Act, the Agency retorts: "[w]ith respect to some commenters' assertions that bank recalibration would over-control by 'writing off' emission reductions that may have gone beyond the reductions necessary to address the Good Neighbor provision or would make it more difficult to create surplus allowances in one control period to offset excess emissions in later control periods, *EPA notes that the NAAQS apply continuously, and the possibility that the sources in a state may have done more than the minimum necessary to meet the state's Good Neighbor obligations in one control period does not create a right for the state to do less than is necessary to meet the state's Good Neighbor obligations in subsequent control periods*." Final FIP at 36790 (emphasis added). In other words, "tough luck."

In the end, EPA has finalized a rule that maintains the bare scaffolding of a an allowance trading market developed in past rulemakings, but that undercuts at every level fundamental expectations and incentives for the participants in that market (particularly, as this Court has recognized, the "legitimate expectation" that banked allowances will continue to retain their value into the future). The Agency acknowledges that these new "enhancements" go far beyond anything it has implemented in earlier versions of the allowance trading program, even though the legal and policy goals of those previous markets are basically identical to the newly-revised program. EPA has not justified these Final FIP policy decisions and has not adequately explained its radical departure from similar programs it has designed, managed and imposed on EGUs in the recent past. This is categorically arbitrary and capricious administrative behavior.

## CONCLUSION

For all of these reasons, and of those set forth in the briefs of Industry

Petitioners and State Petitioners, the Court should set aside the Final FIP.

Respectfully submitted,

By: _  /s/ Thomas J. Grever_
Thomas J. Grever
SHOOK, HARDY & BACON L.L.P
2555 Grand Blvd.
Kansas City, MO 64108
Phone: (816) 474-6550
Email: tgrever@shb.com

*Attorney for City Utilities of*
*Springfield, Missouri*

April 22, 2024

25

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(f) and (g), I hereby certify that the foregoing complies with the Court's Orders of December 4, 2023 and January 4, 2024 because it contains 5388 words, excluding portions exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the typeface and type-style requirements of Fed. R. App. Proc. 32(a)(5), (6) because it has been prepared in 14-point Times New Roman font, using Microsoft Word.

Dated: April 22, 2024

*/s/ Thomas J. Grever*
Thomas J. Grever

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2024, I electronically filed the foregoing with the Clerk of Court through the Court's CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished through the CM/ECF system.

*/s/ Thomas J. Grever*
Thomas J. Grever