ORAL ARGUMENT NOT YET SCHEDULED

## 23-1157
(and consolidated cases)

# United States Court of Appeals
# for the District of Columbia Circuit

---

STATE OF UTAH, et al.,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*,

CITY UTILITIES OF SPRINGFIELD, MISSOURI,

*Intervenor for Petitioner*,

CITY OF NEW YORK, et al.,

*Intervenors for Respondent*.

---

On Petitions for Review of Final Action
by the United States Environmental Protection Agency

**PROOF BRIEF FOR INTERVENORS STATES OF NEW YORK,
CONNECTICUT, DELAWARE, ILLINOIS, MARYLAND,
MASSACHUSETTS, NEW JERSEY, PENNSYLVANIA,
AND WISCONSIN, AND THE DISTRICT OF COLUMBIA,
HARRIS COUNTY, TEXAS, AND THE CITY OF NEW YORK**

---

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
ELIZABETH A. BRODY
  *Assistant Solicitor General*
MORGAN A. COSTELLO
CLAIBORNE E. WALTHALL
  *Assistant Attorneys General*
  *Environmental Protection Bureau*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, New York 10005
(212) 416-6167

Dated: July 8, 2024

*(Additional counsel listed on signature pages.)*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici.

Except for the following, all parties, intervenors, and amici appearing in this Court are listed in Respondent EPA's Initial Brief (ECF 2060371):

Amici for Respondents: Benjamin F. Hobbs, Brendan Kirby, Kenneth J. Lutz, & Susan F. Tierney; the Institute for Policy Integrity at New York University School of Law; Paul Miller, Russell Dickerson, Arlene Fiore, and Tracey Holloway; the American Thoracic Society and the American Lung Association; and Robert Perciasepe.

## B.    Rulings Under Review.

As listed in Respondent EPA's Initial Brief, the agency action under review is a final rule entitled "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 36,654 (June 5, 2023) ("Rule").

On July 5, 2024, EPA moved to consolidate this action with two petitions seeking review of a final action, entitled "Partial Denial of

Petitions for Reconsideration: Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," 89 Fed. Reg. 23,526 (Apr. 4, 2024), which partially denied several requests to administratively reconsider the Rule ("Partial Denial of Reconsideration"). *See* Mot. to Consolidate Cases, for Expedited Consideration, and to Establish a Briefing Schedule (ECF 2063227). *See generally United States Steel Corp. v. EPA*, No. 24-1172 (D.C. Cir.); *Hybar, LLC v. EPA*, No. 24-1176 (D.C. Cir.). If the petitions for review of the Partial Denial of Reconsideration are consolidated, the Partial Denial of Reconsideration will also constitute a ruling under review for purposes of Circuit Rule 28(a)(1).

## C.    Related Cases.

Except for the following, references to all related cases appear in Respondent EPA's Initial Brief:

<u>Stay applications</u>: As the enclosed brief for State Respondents discusses in subsection E of the "Background" section (entitled "This Litigation"), beginning on October 13, 2023, several petitioners in this action applied to the U.S. Supreme Court for an emergency stay of the Rule. *See Ohio v. EPA*, No. 23A349 (U.S.); *Kinder Morgan, Inc. v. EPA*, No. 23A350 (U.S.); *American Forest & Paper Ass'n v. EPA*, No. 23A351

(U.S.); *United States Steel Corp. v. EPA*, No. 23A384 (U.S.). On June 27, 2024, the U.S. Supreme Court granted the stay. *Ohio v. EPA*, 603 U.S. ---, No. 23A349, 2024 WL 3187768, at *11 (U.S. June 27, 2024).

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

GLOSSARY .........................................................................................vii

PRELIMINARY STATEMENT................................................................ 1

ISSUES PRESENTED ........................................................................... 2

STATEMENT.......................................................................................... 3

    A.   Interstate Ozone Pollution ................................................. 3

    B.   The Good Neighbor Provision............................................. 5

    C.   Disapproval of State Plans ................................................. 7

    D.   The Good Neighbor Rule..................................................... 8

    E.   This Litigation.................................................................... 9

SUMMARY OF ARGUMENT ............................................................... 11

ARGUMENT ....................................................................................... 13

POINT I

    AS EPA REASONABLY EXPLAINED, THE RULE'S DESIGN DOES NOT
    DEPEND ON ITS APPLICATION TO TWENTY-THREE STATES...................... 13

    A.   EPA Selected Cost-Effective Technologies Based on a
        Multifactor Analysis That Is Not Tied to the Rule's
        Twenty-Three-State Coverage................................................. 14

    B.   Petitioners' Contrary Arguments Fail. ................................... 24

i

**Page**

POINT II

 Any Deficiency in EPA's Explanation Is Harmless Error..............26

POINT III

 The Rule Is Not Otherwise Arbitrary and Capricious................30

  A. The Trading-Program Enhancements Are Critical to Protecting Downwind States and Do Not Overcontrol Upwind Sources. ....................................................31

  B. The Rule's Requirements for Industrial Sources Are Feasible.................................................................36

CONCLUSION .........................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Board of Cnty. Comm'rs of Weld Cnty. v. EPA,*
    72 F.4th 284 (D.C. Cir. 2023) ............................................................ 14

*Chemical Mfrs. Ass'n v. EPA,*
    28 F.3d 1259 (D.C. Cir. 1994) ........................................................... 27

*Envirocare of Utah, Inc. v. NRC,*
    194 F.3d 72 (D.C. Cir. 1999) ............................................................. 29

*EPA v. EME Homer City Generation, L.P.,*
    572 U.S. 489 (2014) ........................................................................ 5-6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
    *Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................... 14

*National Mining Ass'n v. EPA,*
    59 F.3d 1351 (D.C. Cir. 1995) ........................................................... 27

*North Carolina v. EPA,*
    531 F.3d 896 (D.C. Cir. 2008) ....................................................... 5, 28

*Northeast Md. Waste Disposal Auth. v. EPA,*
    358 F.3d 936 (D.C. Cir. 2004) ...................................................... 27-28

*Ohio v. EPA,*
    603 U.S. ---, 2024 WL 3187768 (2024)... 10, 13-14, 20-21, 23, 25-26, 28-29

*Recreation Vehicle Indus. Ass'n v. EPA,*
    653 F.2d 562 (D.C. Cir. 1981) ........................................................... 30

*Wisconsin v. EPA,*
    938 F.3d 303 (D.C. Cir. 2019) ......................................................... 5-6

**Laws**                                                                              **Page(s)**

42 U.S.C.

  § 7410(a) ............................................................................. 6

  § 7410(c) .......................................................................... 6, 8

  § 7410(k) ............................................................................. 6

  § 7607(b) ............................................................................. 7

  § 7607(d) ........................................................................... 27

## Administrative Sources

*Federal*

80 Fed. Reg. 65,292 (Oct. 26, 2015) ......................................... 7

82 Fed. Reg. 1733 (Jan. 6, 2017) .............................................. 7

86 Fed. Reg. 23,054 (Apr. 30, 2021) ....................................... 26

87 Fed. Reg. 9838 (Feb. 22, 2022) ............................................ 7

88 Fed. Reg. 9336 (Feb. 13, 2023) ............................................ 7

88 Fed. Reg. 36,654 (June 5, 2023) ............... 3-4, 8-9, 15-17, 19-25, 32-38

88 Fed. Reg. 67,102 (Sept. 29, 2023) ......................................... 9

89 Fed. Reg. 12,666 (Feb. 16, 2024) ........................................ 21

*State*

Conn. Agencies Regs. § 22a-174-22e(d) .................................... 38

## Rulemaking Docket

Appendix A: Final Rule State Emissions Budget Calculations
   and Engineering Analytics (xlsx) (Mar. 2023),
   EPA-HQ-OAR-2021-0668-1080 ....................................... 25

Comment Letter from Att'ys Gen. (June 21, 2022),
   EPA-HQ-OAR-2021-0668-0007 .................................. 3, 31-33

**Rulemaking Docket**                                             **Page(s)**

EPA, *Air Quality Modeling Final Rule Technical Support Document 2015 Ozone NAAQS Good Neighbor Plan* (2023), EPA-HQ-OAR-2021-0663-0085 ............................................................ 4

EPA, Basis for Partially Denying Petitions for Reconsideration of the Good Neighbor Plan on Grounds Related to Judicial Stays (Mar. 2024), EPA-HQ-OAR-2021-0668-1255 ...................... 28-29

EPA, *CSAPR Allowance Prices Jan. 2017 to Feb. 2022* (Apr. 6, 2022), EPA-HQ-OAR-2021-0668-0146 ................................................. 32

EPA, *EGU NOX Mitigation Strategies Final Rule TSD* (Mar. 2023), EPA-HQ-OAR-2021-0668-1092 ..................................................... 16-18

EPA, *Final GNP O3 DVs_Contributions* (2023), EPA-HQ-OAR-2021-0668-1130 ............................................................ 5

EPA, *Final Non-EGU Sectors TSD* (Mar. 2023), EPA-HQ-OAR-2021-0668-1110 .............................................. 16, 36-38

EPA, *Interview Notes S Short TCEQ*, EPA-HQ-OAR-2021-0668-1077 ............................................................ 37

EPA, *NOx Emission Control Technology Installation Timing for Non-EGU Sources* (Mar. 14, 2023), EPA-HQ-OAR-2021-0668-1077 ............................................................ 37

EPA, *NOx Permits Limits and RACT Data* (Jan. 3, 2023), EPA-HQ-OAR-2021-0668-0926 ..................................................... 36-37

EPA, *Ozone Air Quality Assessment Tool (AQAT) Results*, EPA-HQ-OAR-2021-0668-1116 ............................................................ 20

EPA, *Ozone Transport Policy Analysis TSD* (Dec. 2023), EPA-HQ-OAR-2021-0668-1080 ................................................ 19-21, 23

EPA, *Response to Public Comments on Proposed Rule* (Mar. 2023), EPA-HQ-OAR-2021-0668-1127 ............................................................ 22

**Rulemaking Docket**                                                      **Page(s)**

EPA, *Retrofit Cost Tool Fleetwide Final GNP* (Mar. 2023),
    EPA-HQ-OAR-2021-0668-0998 ..................................................... 15, 17

**Miscellaneous Authorities**

Am. Lung Ass'n, *State of the Air 2024: Connecticut: Fairfield*
    (2024), https://www.lung.org/research/sota/city-rankings/
    states/connecticut/fairfield ..................................................... 4

Am. Lung Ass'n, *State of the Air 2024: Wisconsin: Racine*
    (2024), https://www.lung.org/research/sota/city-rankings
    /states/wisconsin/racine ..................................................... 4

EPA, *Cost Analysis Models / Tools for Air Pollution Regulations*
    (Mar. 26, 2024), https://www.epa.gov/economic-and-cost-
    analysis-air-pollution-regulations/cost-analysis-modelstools-
    air-pollution ..................................................... 17

S. Rep. No. 101-228 (1989) ..................................................... 3

*Stock Split,* Black's Law Dictionary (12th ed. 2024) .............................. 33

Tr. of Oral Argument, *Ohio v. EPA*, 603 U.S. --- (2024) (No. 23A349) ... 9-10

United States Steel Corp., *Annual Report (Form 10-K)* (Feb. 15,
    2013), https://www.sec.gov/Archives/edgar/data/1163302/
    000119312513061613/d448577d10k.htm........................................... 37

# GLOSSARY

| | |
|---|---|
| EPA | United States Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| FIP | federal implementation plan |
| Good Neighbor Rule or Rule | Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 36,654 (June 5, 2023) |
| NOx | nitrogen oxides |
| ppb | parts per billion |
| SCR | selective catalytic reduction |
| SIP | state implementation plan |
| SIP Disapproval Rule | Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9336 (Feb. 13, 2023) |
| SNCR | selective non-catalytic reduction |

## PRELIMINARY STATEMENT

Petitioners seek to invalidate a crucial EPA regulation that requires each State to do its fair share to control air pollution that is emitted in upwind States but travels into and harms downwind States ("Good Neighbor Rule" or "Rule"). The Court should reject petitioners' arguments and uphold the Rule.

Petitioners argue that EPA failed to adequately explain why the Rule's pollution-control measures would have remained the same if EPA had considered that the Rule might not apply to all twenty-three States it covers. Petitioners' argument rests on the incorrect premise that EPA selected the pollution-control measures based on a narrow, technical analysis tied solely to the twenty-three covered States.

As EPA explained, it selected the measures based on a comprehensive, multifactor analysis that surveyed technologies in use nationwide; calculated each technology's cost-effectiveness using nationwide data; and compared each technology's relative potential to improve air quality downwind. That comparison assumed that *all* upwind and downwind States involved in interstate pollution linkages that EPA had found using nationwide data would use the pollution-control measures,

and was thus not tied to the Rule's application to twenty-three States. Only at the conclusion of this multifactor process did EPA look at the technical assessment petitioners identify, to confirm that the measures were far below any point of diminishing air-quality benefits per dollar spent.

Moreover, any purported failure by EPA to explain why changes to this technical assessment would not affect the Rule's requirements is harmless error that cannot invalidate the Rule under the Clean Air Act. Finally, contrary to petitioners' contentions, the Rule reasonably closed loopholes in a preexisting emission-trading program for power plants and included pollution-control requirements for industrial sources.

## ISSUES PRESENTED

1. Whether EPA adequately explained why the number of States covered by the Rule did not drive the selection of pollution-control technologies.

2. Even if EPA's explanation was inadequate, whether that procedural error was harmless.

3. Whether the Rule rationally included trading-program enhancements for power plants and pollution-control measures for industrial sources.

## STATEMENT

### A. Interstate Ozone Pollution

Ozone pollution poses major health threats. 88 Fed. Reg. 36,654, 36,658 (June 5, 2023). Accordingly, EPA periodically sets air-quality standards that establish an ozone level that is safe to breathe, and which each State must achieve by statutory deadlines. *See* EPA Br. 4-6. State Respondents stringently regulate emissions of ozone-forming pollutants ("ozone precursors") from power plants, industrial facilities, and other sources in their jurisdictions.[1]

However, sources in upwind States emit ozone precursors that travel with the prevailing winds into downwind States, impairing air quality. *See* S. Rep. No. 101-228, at 264 (1989). To illustrate, upwind pollution is responsible for as much as 57 percent of the ozone in Fairfield

---

[1] Comment Letter from Att'ys Gen. ("Comment Letter") 8 (June 21, 2022). EPA docket numbers and internet URLs appear in the Table of Authorities.

County, Connecticut, and 52 percent of the ozone in three Wisconsin counties.[2] Downwind States cannot directly regulate such upwind pollution. *See* 88 Fed. Reg. at 36,658.

Sources in State Petitioners' jurisdictions send significant amounts of pollution into State Respondents' jurisdictions. For example, Fairfield County receives up to 2.05 parts per billion (ppb) of ozone pollution from Ohio sources alone.[3] Fairfield County, rated "F" for ozone pollution by the American Lung Association, is home to approximately 212,000 children and adults who suffer from diseases that make them vulnerable to ozone.[4] Racine County, Wisconsin, which also has an "F" ozone-pollution rating, receives up to 10.03 ppb of pollution from Indiana sources.[5] And both Ohio and West Virginia contribute at least 0.70 ppb of ozone—the threshold used to screen for contributions (EPA Br. 8)—to every ozone

---

[2] EPA, *Air Quality Modeling Final Rule Technical Support Document 2015 Ozone NAAQS Good Neighbor Plan* ("*AQMF*") app. C at C-2-3 (2023).

[3] *AQMF* app. C at C-2.

[4] *See* Am. Lung Ass'n, *State of the Air 2024: Connecticut: Fairfield* (2024).

[5] *AQMF* app. C at C-2; Am. Lung Ass'n, *State of the Air 2024: Wisconsin: Racine* (2024).

4

monitor across Delaware, Maryland, New Jersey, Pennsylvania, and the District of Columbia, with Ohio also contributing to every monitor across New York and Connecticut.[6]

## B.    The Good Neighbor Provision

Under the Clean Air Act, downwind States must meet the federal air-quality standards within their borders even if large amounts of pollution come from upwind States. *North Carolina v. EPA*, 531 F.3d 896, 910 (D.C. Cir. 2008) (per curiam). To do so, downwind States must offset upwind pollution by squeezing additional reductions from their own sources. *Wisconsin v. EPA*, 938 F.3d 303, 317 (D.C. Cir. 2019) (per curiam). But further tightening stringent regulations in downwind States is costlier and less effective than requiring upwind sources to reduce exported pollution. This is particularly true because many upwind sources eschew conventional, widely available pollution-control equipment that most downwind sources already use. *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 519-20 (2014).

---

[6] *See* EPA, *Final GNP O3 DVs_Contributions* (2023), tab: "2023gf Ozone Contributions".

5

Congress added the Good Neighbor Provision to the Act to address this inequity. *See id.* at 495; *Wisconsin*, 938 F.3d at 309. When EPA sets an air-quality standard, each State must submit a state implementation plan (SIP) with measures that will achieve the federal standard within that State. 42 U.S.C. § 7410(a)(1). The Good Neighbor Provision requires a SIP to prohibit emissions that "contribute significantly to nonattainment" or "interfere with maintenance" of the federal standard in any other State. *Id.* § 7410(a)(2)(D)(i)(I).

EPA may approve a SIP only "if it meets all of the applicable requirements of" the Act—including the Good Neighbor Provision. *Id.* § 7410(k)(3). If a SIP does not adequately prevent the export of pollution into other States, EPA must disapprove that SIP and, within two years of such disapproval, issue a replacement federal implementation plan (FIP). *Id.* § 7410(c)(1).

6

## C.    Disapproval of State Plans

In 2015, EPA strengthened the air-quality standard for ozone and set deadlines for States to achieve this more stringent standard. 80 Fed. Reg. 65,292 (Oct. 26, 2015). EPA's modeling projected that pollution from approximately two dozen upwind States would impair downwind States' ability to attain or maintain safe ozone levels. *See* 82 Fed. Reg. 1733, 1739-40 (Jan. 6, 2017).

But many upwind States, including State Petitioners, failed to propose any emissions reductions in their SIPs. Instead, they submitted SIPs that downplayed the severity of downwind ozone problems or their role in causing them. *See, e.g.*, 87 Fed. Reg. 9838, 9845-47, 9849-51 (Feb. 22, 2022). EPA disapproved these SIPs for failing to satisfy the Good Neighbor Provision. 88 Fed. Reg. 9336 (Feb. 13, 2023) ("SIP Disapproval Rule").

States and industry filed petitions in seven circuit courts challenging the SIP Disapproval Rule, though the Act requires that petitions for review of "nationally applicable" regulations be filed in the D.C. Circuit. *See* 42 U.S.C. § 7607(b)(1).

7

**D.    The Good Neighbor Rule**

The SIP Disapproval Rule triggered EPA's statutory duty to promulgate a FIP for each State that submitted an inadequate SIP. *See id.* § 7410(c)(1). In March 2023, EPA finalized the Good Neighbor Rule, which contains FIPs for these twenty-one States, plus two States that had not submitted SIPs. 88 Fed. Reg. at 36,656. The Rule applies a well-established four-step framework to quantify each upwind State's significant contribution of pollution, i.e., the difference between the amount of pollution that sources in that State would emit without additional pollution-control measures and the (lower) amount of pollution those sources would emit if they used certain widely available, cost-effective pollution-control measures. *See* EPA Br. 7-10.

To remedy these significant contributions of pollution, the Rule sets requirements for power plants and industrial sources. For power plants, the Rule continues an emissions-trading program that incentivizes implementation of controls at the earliest practicable opportunity. 88 Fed. Reg. at 36,658-59. The Rule also closes loopholes in that trading program that had allowed compliance flexibilities to undermine the statutory requirement to reduce emissions. *See id.* at 36,657. For industrial sources, the

8

Rule requires reducing ozone-precursor emissions to the level that would be achieved using widely available technologies. *Id.* at 36,661.

After the Rule was finalized, circuit courts hearing challenges to the SIP Disapproval Rule temporarily stayed EPA's disapproval of twelve States' SIPs pending merits review. These stays temporarily prevented the Good Neighbor Rule from being enforced in those twelve States. *See* 88 Fed. Reg. 67,102, 67,103 (Sept. 29, 2023).

### E.    This Litigation

Petitioners sought review of the Rule in this Court and sought a stay pending review. This Court denied the stay motions. Order (Sept. 25, 2023), Doc.#2018645; Order (Oct. 11, 2023), Doc.#2021268.

Some petitioners sought a stay from the Supreme Court. For the first time at oral argument on the stay applications, petitioners argued that EPA's selection of pollution-control technologies hinged on identifying a point of diminishing returns—i.e., a dollar value above which using costlier controls in the specific twenty-three States covered by the Rule would produce too few air-quality benefits. *See* Tr. of Oral Argument 4-6, 11-12, 32-33, *Ohio v. EPA*, 603 U.S. --- (2024) (No. 23A349). Petitioners argued that this point of diminishing returns *might* have been lower, and

EPA *might* have selected cheaper controls, if EPA had considered that the Rule *might* apply to fewer States. *See id.* at 4-6.

The Court issued a stay. The Court reasoned that EPA might have selected controls based on the point of diminishing returns (known as the "knee-in-the-curve") that petitioners had posited, *Ohio*, 2024 WL 3187768, at *7-8 & *10 n.14, and that EPA likely had not adequately explained why the selected controls would have remained the same with fewer covered States, *id.* at *8-9 & n.11.

Four justices dissented. *Ohio*, 2024 WL 3187768 *1 (Barrett, J., dissenting). The dissent explained that petitioners' argument about a "knee-in-the-curve" was absent from their briefs, *id.* at *21, and unlikely to succeed on the merits, *id.* at *16-18. The dissent reasoned that EPA had selected cost-effective pollution-controls based on nationwide information and used a point of diminishing returns purely to confirm its selection. *Id.* at *16-19. The dissent also would have ruled that any inadequate explanation of this issue was harmless error. *Id.* at *19-22.

## SUMMARY OF ARGUMENT

I. As EPA explained during the rulemaking, the Rule's design remains reasonable if the Rule is applied to fewer than twenty-three States. Contrary to petitioners' contentions, the record shows that the Rule's methodology for selecting cost-effective pollution-control technologies *does not* depend on identifying a dollar value above which the use of costlier controls in the twenty-three covered States would produce too few air-quality benefits. Instead, the multifactor methodology is driven by EPA's review of nationwide information about different technologies and a comparison of each technology's efficacy compared to other feasible and economical alternatives. That comparison is *not* based on the twenty-three States covered by the Rule, but on the wider set of all upwind and downwind States with ozone-pollution links to each other.

II. Even if EPA failed to adequately explain why the Rule's selection of pollution-control technologies would remain appropriate, such an error would be procedural and thus subject to the Clean Air Act's harmless-error rule. And the alleged error would be harmless because petitioners fail to show that the Rule would have been significantly different had EPA issued a more fulsome explanation. Indeed, in declining to

11

reconsider the Rule following judicial stays, EPA made clear that the Rule's selection of pollution controls would not have changed. While that reconsideration decision could not supply the explanation the Supreme Court thought might be missing at the stay stage, it properly establishes that the Rule would not have changed and that any lack of explanation was thus harmless.

III. Contrary to petitioners' arguments, the Rule's emissions-trading program for power plants and requirements for industrial sources are also reasonably supported by the record. EPA rationally decided to close loopholes in the emissions-trading program that upwind States had historically exploited, to the detriment of downwind States. And as downwind States' experience confirms, the Rule's requirements for industrial sources are feasible.

# ARGUMENT

## POINT I

### AS EPA REASONABLY EXPLAINED, THE RULE'S DESIGN DOES NOT DEPEND ON ITS APPLICATION TO TWENTY-THREE STATES

Petitioners err in arguing that the Rule was rendered arbitrary and capricious by temporary stays issued in separate litigations after the Rule's finalization, which enjoined EPA's disapproval of twelve States' SIPs and thus temporarily precluded the Rule's application in those twelve States. Petitioners argue that the Rule's twenty-three FIPs are "interdependent" such that EPA needed to explain *why* the Rule remains workable if applied to fewer than twenty-three States. *See* Pet'r-States Br. 27-33; Industry Br. 21-27.

As EPA explains (Br. 32-33), petitioners' failure-to-explain argument is barred because they did not raise it during public comment. *See Ohio*, 2024 WL 3187768, at *13-16 (Barrett, J., dissenting). In any event, petitioners are wrong. Although the Supreme Court concluded at the stay stage that petitioners were likely to succeed on this failure-to-explain theory, the Court was evaluating only the probability of success on the merits, and was doing so without the benefit of any briefs exploring petitioners' theory, *see id.* at *22 (Barrett, J., dissenting), the parties' full

13

analysis of the 265-page Rule and technical support documents, or an opinion by this Court on the merits of these complex and technical matters. Accordingly, the Court's mistaken understanding of the Rule's operation is not binding here. A comprehensive examination of the Rule and record now establishes that petitioners' theory is incorrect on multiple fronts and that EPA adequately explained why. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *cf. Board of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023) (regulation severable if remaining portion is functional).

## A. EPA Selected Cost-Effective Technologies Based on a Multifactor Analysis That Is Not Tied to the Rule's Twenty-Three-State Coverage.

Petitioners' failure-to-explain argument rests on a fundamental misconception about EPA's selection of pollution-control measures. EPA did not select pollution-control measures by identifying a dollar amount above which costlier controls would result in diminishing air-quality improvements, and then select controls below that amount. *Contra* Pet'r-States Br. 18; Industry Br. 35; *Ohio*, 2024 WL 3187768, at *17. Rather, EPA conducted a complex, multifactor analysis that included surveying

pollution-control measures already utilized nationwide; using nationwide data to calculate the cost-per-ton of pollution reduced by such measures; and comparing the relative air-quality benefits of each measure. *See* 88 Fed. Reg. at 36,719 (describing stages of multifactor analysis). Only after this multifactor process did EPA check where the selected controls might appear relative to a dollar point of providing little air-quality benefit at too high a cost. And EPA did so only to reinforce its conclusion that the cost-effective pollution-control measures it had selected were not remotely close to such a point. *See* 88 Fed. Reg. at 36,741 (knee-in-the-curve is "not on its own a justification," but rather "a useful indicator for informing potential stopping points" (quotation marks omitted)).

*First*, EPA conducted a nationwide, market-driven survey to identify technologies widely used (and thus already considered cost-effective) among sources in particular sectors. *E.g.*, 88 Fed. Reg. at 36,720, 36,733. For example, EPA's survey of power plants included plants in States not included in the Rule (e.g., Florida, Georgia, New Hampshire, South Carolina, and Washington).[7] Through such nationwide informa-

---

[7] *See* EPA, *Retrofit Cost Tool Fleetwide Final GNP*, tab: "SCR_horz"; col. C ("*Retrofit SCR horz*") (Mar. 2023).

tion, EPA identified various pollution-control measures already in-use or widely available fleetwide.[8] *See* 88 Fed. Reg. at 36,720 (describing measures). For instance, as EPA explained, "99 percent of units have some form of combustion controls, indicating the widespread cost-effectiveness of this control," 88 Fed. Reg. at 36,725. Likewise, for strategies involving use or installation of catalytic (SCR) and noncatalytic (SNCR) controls, EPA observed that "more than 60 percent of the sector's total coal-fired capacity" had already installed SCR, *id.* at 36,768; that both technologies were widely available, *id.* at 36,726-27; and that the power sector is very familiar with optimizing these controls.[9] *See id.* at 36,721 (vast majority of SCR-controlled units nationwide already partially operating SCR controls). Similarly, for industrial sources, EPA surveyed controls already widely used nationwide in the relevant sectors.[10] *See* 88 Fed. Reg. at 36,732-33.

---

[8] *See* EPA, *EGU NOX Mitigation Strategies Final Rule TSD* ("*EGU TSD*") 2-3 (Mar. 2023).

[9] *EGU TSD* 30.

[10] *See* EPA, *Final Non-EGU Sectors TSD* pp. 8, 26, 44, 60 (Mar. 2023) ("*Non-EGU TSD*") (EPA consulted preexisting databases of pollution-control measures used nationwide).

*Second*, EPA calculated a representative cost-per-ton of ozone-precursor emissions reduced that such widely available technologies achieve based on "the fleet on average"—i.e., nationwide. 88 Fed. Reg. at 36,730. For example, EPA estimated the costs of retrofitting large coal-steam power plants across the nation with catalytic controls, including in States not covered by the Rule.[11] Indeed, commenters urged EPA to calculate cost-per-ton figures using data from only the twenty-three States covered by the Rule. In response, EPA confirmed that calculations based on those twenty-three States would produce cost-per-ton figures that were the same or slightly lower than the initial, nationwide calculations.[12] Similarly, for industrial sources, EPA assessed the default costs associated with each control technology by consulting a database that helps estimate the costs of pollution-control measures across the entire country.[13] 88 Fed. Reg. at 36,661.

---

[11] *Retrofit SCR horz.*

[12] *EGU TSD* 49.

[13] *See* <u>*EPA, Cost Analysis Models/Tools for Air Pollution Regulations*</u> (Mar. 26, 2024).

The cost-per-ton figures alone shaped EPA's selection of the Rule's cost-effective technologies. For example, EPA concluded that installing catalytic controls at smaller power plants was too expensive on a cost-per-ton-reduced basis and did not include this measure in the Rule.[14] Likewise, EPA examined the cost-per-ton figure for requiring controls on power plants used only on high-electricity-demand days, and determined that this measure would be too expensive to include in the Rule.[15] Neither decision resulted from identifying a point of diminishing returns, much less a point based on twenty-three States. *Contra* Pet'r-States Br. 18, 31; Industry Br. 35.

*Third*, EPA compared the air-quality benefits of using each technology it had selected—an analysis petitioners rely on. Pet'r-States Br. 17-18; Industry Br. 25, 35. But here, EPA did not compare the cost-effectiveness of the technologies by identifying a cost-based point of diminishing returns. *Contra* Pet'r-States Br. 31. Instead, EPA ran simulations that modeled scenarios applying the technologies that EPA had identified

---

[14] *EGU TSD* 41.

[15] *Id.* 37-38.

18

for power plants and industrial sources.[16] The simulations projected how each scenario would affect air-quality improvement at every ozone receptor across the country (approximately 730 receptors). As progressively costlier technologies were modeled, EPA compared the results to calculate the fractional improvements in air quality at all receptors, with a focus on those that were projected to struggle with ozone.[17]

The purpose of this air-quality analysis was not to reveal the point of diminishing returns, but to ensure that improvements at problem receptors were measurable and meaningful, and showed incremental improvements under each technological scenario. *See* 88 Fed. Reg. at 36,741. After running all scenarios involving the pollution-control measures that EPA had already identified as widespread, feasible, and cost-effective, EPA concluded that each additional measure resulted in

---

[16] *See* EPA, *Ozone Transport Policy Analysis TSD* ("*OTPA*") 45 (Dec. 2023). For example, EPA ran a scenario in which power plants optimized their preexisting catalytic controls ($1,600 per ton) and a scenario in which, in addition, other plants optimized their preexisting non-catalytic controls ($1,800 per ton).

[17] *See OTPA* 59-60 (tables comparing improvements across cost-threshold scenarios).

substantial and continued air-quality improvement at problem receptors.[18] *Id.*

Contrary to petitioners' characterization, EPA did not limit this air-quality comparison to the twenty-three States in the Rule. *Contra* Pet'r-States Br. 16-18; *Ohio*, 2024 WL 3187768, at *18. Instead, each scenario included all 730 receptors in the forty-eight contiguous States and the District of Columbia.[19] Importantly, for each receptor, EPA assumed that every upwind State linked to that receptor and the downwind State containing that linked receptor (the "home" State) would use the Rule's pollution-control technologies—"*regardless of whether the state is included in the rule.*" *OTPA* 55 (emphasis added); *see id.* 46-47, 55-56. *See* 88 Fed. Reg. at 36,741-48 & n.238. There were thus twenty-eight States (not twenty-three) to which the Rule's pollution-control technologies were applied because EPA's nationwide air-quality modeling had identified twenty-eight total upwind and downwind States involved in linkages to

---

[18] *See OTPA* 56 ("Generally, as the emissions cost threshold stringency increased, the estimated average and maximum design values at each receptor decreased.").

[19] *OTPA* 55; *see, e.g.*, EPA, Ozone Air Quality Assessment Tool (AQAT) Results, tab: "2023_step3_newSCR_wIRA", cols. I-BE.

problem receptors. *See* 88 Fed. Reg. at 36,717 (linked), 36,749 (home States). The twenty-eight States are the twenty-three States covered by the Rule (four of which are also downwind "home" States), three additional upwind States linked to a receptor but not included in the Rule (Arizona, Iowa, New Mexico), and two downwind-only "home" States containing linked receptors (Connecticut and Colorado).[20] *See OTPA* 3 n.2, 46-47, 55-56. Indeed, EPA modeled an alternative air-quality comparison approach based on just the twenty-three States in the Rule but *rejected* this approach, *OTPA* 56—which further confirms that EPA was not "focused on" twenty-three States. *Contra Ohio*, 2024 WL 3187768, at *10 n.14.

EPA designed this analysis to align with the Good Neighbor Provision's statutory requirements. By applying the pollution-control technologies to all States *linked* to each other, EPA properly held "each upwind state responsible for its fair share of the downwind problems to

---

[20] EPA subsequently proposed FIPs for Arizona, Iowa, New Mexico, and two other States. 89 Fed. Reg. 12,666 (Feb. 16, 2024). EPA's statement that it evaluated "'the 23 upwind states that were linked' to the down-wind States" does not capture the full scope of EPA's analysis. *See Ohio*, 2024 WL 3187768, at *10 n.14 (quoting *OTPA* 3).

which it is linked," and ensured that "[r]eductions made by other states to address air quality problems at other receptors d[id] not increase or decrease this share." 88 Fed. Reg. at 36,742 n.238. For example, EPA explained that its scenario modeling included the "home" States of Connecticut and Colorado to "ensure[] that [EPA] is accounting for the downwind state's fair share" of emissions reductions. *Id.*; *see id.* at 36,748.

Moreover, each upwind State linked to a downwind receptor has a statutory obligation to prohibit its significant contributions of pollution—whether through an approved SIP, a FIP in this Rule, or a FIP in a different rule. *See id.* at 36,658. As EPA explained, upwind States may "implement a different mix of emissions controls than [EPA] has implemented through a FIP so long as the overall obligation is met."[21] EPA's methodology thus contemplated that the Rule's coverage might change because a covered State may exit the Rule by submitting an approvable SIP, *see* 88 Fed. Reg. at 36,839, or because EPA may issue new FIPs in response to new ozone standards, *see* EPA Br. 36. EPA's methodology ensured that such changes to the Rule's coverage would not alter the

---

[21] EPA, *Response to Public Comments on Proposed Rule* 14 n.2 (Mar. 2023).

statutory obligations of either the exiting State or the remaining States to eliminate their own significant contribution of pollution.[22]

*Fourth*, only after all the foregoing did EPA graphically plot the cost of its chosen measures against the pollution reduction that could be achieved to see if a clear inflection point materialized. But contrary to petitioners' argument, there is "no evidence" that this exercise "was anything but confirmatory." *See Ohio*, 2024 WL 3187768, at *12 (Barrett, J., dissenting). As EPA explained, this exercise *supported* or *cemented* the cost-effective pollution-control measures it had already identified. *See* 88 Fed. Reg. at 36,741. Indeed, for all the feasible, cost-effective technologies that EPA selected, there was "no clear 'knee-in-the-curve' evident." *Id.* And while EPA noted that a knee-in-the-curve did materialize if EPA plotted other "not widely available, uncertain or untested, and/or far

---

[22] Nor did EPA calibrate "changes in emissions and changes in ozone contributions" based on the number of covered States. *See Ohio*, 2024 WL 3187768, at *10 n.14 (quotation marks omitted). EPA created bespoke calibration factors that converted tons of ozone-precursor emissions reduced in one State into ppb of ozone reduced in another State in a more sophisticated manner than assuming a linear, one-for-one ratio. *See OTPA* 49-50.

more costly" technologies, *id.*, EPA had already eliminated those technologies from consideration for other reasons (see *supra* at 18).

## B. Petitioners' Contrary Arguments Fail.

Petitioners do not recreate any step of EPA's comprehensive analysis or demonstrate that the selection of pollution-control measures would change if the Rule applied to fewer than twenty-three States. Instead, petitioners point to a spreadsheet (Pet'r-States Br. 31-32) and purport to calculate that air-quality benefits in Ohio, Indiana, and West Virginia would plateau at the $1,600-per-ton threshold if only those States were analyzed.

As EPA explains (Br. 42-43), petitioners' calculations use the wrong spreadsheet columns, and using the correct columns yields meaningful air-quality benefits above the $1,600-per-ton threshold. Moreover, using petitioners' *incorrect* columns yields meaningful air-quality benefits. For example, the addition of combustion controls (the difference between

Columns M and N) eliminates an additional 485 tons of ozone precursors.[23]

Petitioners misplace their reliance (Pet'r-States Br. 18) on EPA's discussion of emission-budget calculations. Although EPA "considered data specific to the emissions producing facilities" in each covered State to create budgets, *Ohio*, 2024 WL 3187768, at *4 (quotation marks omitted), these budget calculations were done *after* the Rule's pollution controls had been selected based on nationwide data and thus did not drive the selection of controls. *See* 88 Fed. Reg. at 36,779-80. Indeed, the state-specific nature of each budget further underscores that the Rule's FIPs are *not* interdependent. Because each State's budget is based on the amounts of emissions reductions that the power plants in that State could achieve using the controls, applying the Rule to fewer States would not change any remaining State's budget.

Specific calculations aside, there is no basis for petitioners' speculation (Pet'r-States Br. 32; Industry Br. 25) that EPA would have

---

[23] Appendix A: Final Rule State Emissions Budget Calculations and Engineering Analytics (xlsx), tab: "State 2026" (Mar. 2023). Summing Column M for Indiana, Ohio, and West Virginia equals 29,070 tons of emissions, while summing Column N for those States equals 28,585 tons.

required pollution-control measures costing $1,600-per-ton or less if the Rule applied to fewer States. EPA's previous ozone rule in 2021, which addressed the prior, less stringent federal ozone standard, already required power plants to attain pollution reductions at the level achievable with measures costing $1,600-per-ton—specifically, turning on installed pollution controls. 86 Fed. Reg. 23,054, 23,087-88 (Apr. 30, 2021). These same measures could not plausibly satisfy petitioners' heightened good-neighbor obligations under the new, more stringent ozone standard.

## POINT II

### ANY DEFICIENCY IN EPA'S EXPLANATION IS HARMLESS ERROR

Even if EPA should have more fully explained why the Rule reasonably applies to fewer than twenty-three States, any such error is harmless and provides no basis for relief. Although the Supreme Court found that harmless error was not raised during stay application briefing, it has been raised here, and this Court thus has a duty to consider it. *See Ohio*, 2024 WL 3187768, at *11; *id.* at *19-21 (Barrett., J., dissenting).

26

The Clean Air Act precludes relief for procedural defects unless they are both arbitrary *and* "so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made." 42 U.S.C. § 7607(d)(8), (9)(D); *see National Mining Ass'n v. EPA*, 59 F.3d 1351, 1357-58 (D.C. Cir. 1995) (per curiam). This Court treats failure-to-explain defects as procedural defects. *See Northeast Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 948, 950 (D.C. Cir. 2004) (per curiam); *Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1262-63 (D.C. Cir. 1994).

Here, as explained, petitioners fail to demonstrate a substantial likelihood that EPA's selection of cost-effective pollution-control measures would have changed at all, let alone substantially in petitioners' favor, based on the Rule's applying to fewer than twenty-three States. And petitioners argue only that EPA insufficiently *explained* why its selection of pollution-control measures would not have changed if the Rule applied to fewer than twenty-three States. *E.g.*, Pet'r-States Br. 27-29. Thus, although EPA did provide a sufficient explanation, any failure to do so would be a harmless procedural error at most. *See* 42 U.S.C. § 7607(d)(8),

27

(9)(D); *Northeast Md. Waste Disposal Auth.*, 358 F.3d at 950; *North Carolina*, 531 F.3d at 925 (upholding prior good-neighbor regulation despite flawed approach to rounding because "no prejudice could be shown").

To the extent there is any doubt whether the Rule would have looked different, EPA has already confirmed that the selection of pollution-control measures would not have changed with fewer States. *See* EPA Br. 35-36. In responding to petitions for administrative reconsideration lodged after the Rule's finalization and the judicial stays, EPA explained that its methodology for selecting controls was not limited to the twenty-three States expected to be covered by the Rule.[24]

This Court may consider the Reconsideration Denial for harmless-error analysis. In a footnote, the Supreme Court observed that a merits panel could not consult the Denial for purposes of its arbitrary-and-capricious analysis because the Denial could not supply the missing explanation of the issue. *See Ohio*, 2024 WL 3187768, at *8 n.11. This

---

[24] *See* EPA, Basis for Partially Denying Petitions for Reconsideration of the Good Neighbor Plan on Grounds Related to Judicial Stays 14-19 (Mar. 2024) ("Reconsideration Denial").

observation did not address whether a merits panel could consult the Denial to evaluate harmless error, which is a materially different question. *See id.* at *10. The Court can consider the Denial for harmless-error analysis because, rather than supplying any missing explanation, the Denial establishes that the allegedly missing explanation in the original decision in fact made no difference to the outcome. *See* EPA Br. 34-36. Notably, the dissenters considered harmless error and found the Denial relevant. *Ohio*, 2024 WL 3187768, at *20 n.13 (Barrett, J., dissenting).

Moreover, although not required by EPA's methodology, the Denial graphed the point of diminishing returns for the eleven States then subject to the Rule (including Ohio and Indiana). That analysis confirmed that EPA's selection of pollution-control measures would not have changed because each measure that EPA selected for the Rule (costing up to $11,000-per-ton of ozone-precursors reduced) continued to appear well before the point of diminishing returns. Reconsideration Denial 19, 21. Affirmance based on harmless error is particularly appropriate here, where the agency would clearly reach the same conclusion on remand. *See Envirocare of Utah, Inc. v. NRC*, 194 F.3d 72, 79 (D.C. Cir. 1999)

29

(affirmance appropriate when no uncertainty as to outcome); *Recreation Vehicle Indus. Ass'n v. EPA*, 653 F.2d 562, 572-73 (D.C. Cir. 1981) (remand "would serve no useful purpose" where post-rulemaking proceedings cured deficiency).

## POINT III

### THE RULE IS NOT OTHERWISE ARBITRARY AND CAPRICIOUS

Petitioners' other arguments about specific features of the Rule (Pet'r-States Br. 47-50; Industry Br. 28-52) are meritless for the reasons explained by EPA and the Public Interest Respondents. State Respondents provide additional reasons why there is no merit to petitioners' arguments about the trading-program enhancements for power plants and the requirements for industrial sources.

30

A.    **The Trading-Program Enhancements Are Critical to Protecting Downwind States and Do Not Overcontrol Upwind Sources.**

Petitioners err in arguing (Pet'r-States Br. 47-50; Industry Br. 28-34) that EPA's enhancements to the preexisting emissions-trading program constitute unlawful "overcontrol." These arguments misrepresent the enhancements and ignore EPA's comprehensive justification for their inclusion.

The trading-program enhancements do not mandate additional emissions cuts beyond each power plant's significant contribution of pollution. *Contra* Pet'r-States Br. 48. Rather, as EPA explains (Br. 48), the enhancements are additional parameters for the trading program—itself a compliance flexibility—to protect against participating plants using a glut of emissions allowances or other loopholes to avoid actually reducing their significant contributions to downwind pollution. Indeed, downwind States have flagged these loopholes for years and asked EPA to address them.[25]

---

[25] *See* Comment Letter 21-22.

Contrary to petitioners' contentions (Pet'r-States Br. 50), the enhancements merely close the same loopholes that upwind sources exploited under prior trading programs. *See* 88 Fed. Reg. at 36,762-64. For example, under prior programs, power plants in upwind States turned off or throttled down their pollution-control equipment, leading to uncontrolled emissions.[26] *See id.* at 36,763, 36,687 (Ohio power plant failed to use existing equipment). Power plants made these choices because, as they banked allowances year after year—or as other plants that retired dumped their allowances into the marketplace—an increased supply of allowances drove market prices down to levels that made paying to pollute cheaper than operating controls.[27] *Id.* at 36,767. In this Rule, EPA rationally included two enhancements to decrease these deflationary pressures on allowance prices—specifically, proportionally reducing the number of allowances allowed to circulate in the

---

[26] *See* Comment Letter 23 (Missouri power plant failed to use existing equipment).

[27] Under the 2016 ozone rule, allowance prices decreased from $600 in January 2017, to less than $100 in 2019. *See* EPA, *CSAPR Allowance Prices Jan. 2017 to Feb. 2022* (Apr. 6, 2022).

32

marketplace ("allowance bank recalibration"),[28] and, beginning in 2030, recalculating each State's emissions budget annually ("dynamic budgeting"). *See* EPA Br. 48-50.

Separately, because prior ozone programs capped *seasonal* (but not daily) emissions, power plants could idle their pollution controls on specific days and make up the difference later in the season. But single-day idling produced plumes of emissions that contributed to dangerous high-ozone days in downwind States, which harm public health. *See* 88 Fed. Reg. at 36,764 & n.293, 36,767. These high-ozone days also undermine downwind States' ability to reach attainment because nonattainment is triggered by just four eight-hour spikes of ozone levels at or above 71.0 ppb, for three consecutive ozone seasons.[29] Thus, another trading-program enhancement (the "backstop daily emissions rate") reasonably disincentivizes power plants from idling controls by defining a daily emissions rate that a plant can easily meet by operating its existing

---

[28] Allowance bank recalibration operates like a reverse stock split, which proportionally reduces the number of outstanding shares to increase each share's price. *See Stock Split*, Black's Law Dictionary (12th ed. 2024).

[29] *See* Comment Letter 23.

controls, and requiring plants to surrender triple allowances for pollution emitted above that rate. 88 Fed. Reg. at 36,767-69.

For the reasons explained by EPA (Br. 52-60), petitioners err in arguing that these trading-program enhancements constitute "overcontrol." *See* Industry Br. 28-34; Pet'r-States Br. 47-50. Moreover, EPA's overcontrol analysis already accounted for the enhancements by conservatively assuming that all regulated power plants would install and operate the technologies on which the Rule is based, rather than rely on purchased allowances. *See* 88 Fed. Reg. at 36,748-51.

Petitioners also incorrectly argue (Industry Br. 30) that dynamic budgeting constitutes overcontrol because the preset budgets already reflect pollution reductions that will eliminate power plants' significant contributions. Dynamic budgeting can only increase States' emissions budgets, and thus make compliance easier, before 2030. 88 Fed. Reg. at 36,765. In any event, petitioners' argument misunderstands the concept of significant contribution, which is *not* equivalent to each State's emissions budget (i.e., authorized seasonal emissions). Instead, "significant contribution" is the quantum of emissions that each State's sources can reduce by applying cost-effective controls. See *supra* at 8.

Dynamic budgeting reasonably addresses the fact that significant contribution is not static, and instead changes year to year as that State's power plant fleet changes. Indeed, the preset emissions budgets already include known retirements.[30] 88 Fed. Reg. at 36,765. But real-world changes to significant contribution amounts can become misaligned with preset emission budgets because preset budgets reflect EPA's *best prediction* about future fleet changes in each State. EPA reasonably determined that predicting fleet composition after 2029 would be difficult. And EPA reasonably responded to that difficulty by providing that, beginning in 2030, EPA would ministerially calculate plants' significant contributions based on updated information about that State's fleet, one year in advance of each ozone season, and incorporate those calculations into dynamic budgets. 88 Fed. Reg. at 36,764-66.

---

[30] For example, Indiana's preset budget decreases from 7,908 tons in 2027 to 7,392 tons in 2029. 88 Fed. Reg. at 36663.

**B.    The Rule's Requirements for Industrial Sources Are Feasible.**

Industry Petitioners erroneously contend (Br. 78-79, 85-88) that the scope and timing of the Rule's requirements for industrial sources are infeasible. Downwind States' experience confirms the opposite, as exemplified below.

***Pipelines.*** EPA properly relied on evidence that downwind States had successfully controlled pipeline engine emissions at the levels set in the Rule.[31] EPA specifically referenced statewide retrofits in Pennsylvania and Colorado that have achieved the Rule's emissions limits. *See* 88 Fed. Reg. at 36,822-23. EPA also agreed with commenters that the District of Columbia requires pipeline engines to achieve emissions rates from 40 to 330 percent lower than the Rule's rates. *See id.* at 36,822. Petitioners erroneously contend (*see* Industry Br. 79) that EPA failed to consider whether necessary approvals from FERC would delay state permitting processes. EPA interviewed state regulators from four upwind States—including three States with the most covered

---

[31] *See Non-EGU TSD* p. 5-6; EPA, *NOx Permits Limits and RACT Data* (Jan. 3, 2023) ("*RACT Spreadsheet*"), tab: "Pipeline Transport – Rules only" (state regulations and emissions limits for pipelines).

pipeline engines (Louisiana, Oklahoma, and Texas)—who confirmed that FERC did not play a significant role in permitting or shutdowns of compressor stations for control retrofits.[32]

***Steel.*** EPA also correctly relied on permits and regulations from downwind and other States as evidence that steel mills can feasibly install the pollution-control equipment in the Rule.[33] *See* 88 Fed. Reg. at 36,828. Indeed, many of the same *companies* covered by the Rule have already installed the equipment at some of their steel mills, undercutting their argument that it would be exorbitantly costly to do so.[34]

***Paper.*** In setting emissions limits for fossil-fuel-fired boilers (the only part of the Rule that affects the paper industry), EPA considered downwind States' regulations establishing comparable or stricter emis-

---

[32] *See* EPA, *NOx Emission Control Technology Installation Timing for Non-EGU Sources* 42-46 (Mar. 14, 2023); *see, e.g.,* EPA, *Interview Notes S Short TCEQ* 3 (Texas regulator).

[33] *See Non-EGU TSD* pp. 62-65 (regulations and limits in Connecticut, Delaware, Massachusetts, New Jersey, and New York); *RACT Spreadsheet*, tabs: "Iron & Steel Mills & Ferroalloy," "Iron & Steel Furnace Limits," "R5 Iron & Steel Mills & Ferroa," and "Iron and Steel RACT Rules" (steel-mill-related permits and regulations).

[34] *E.g.*, United States Steel Corp., *Annual Report (Form 10-K)* 51 (Feb. 15, 2013) (low-NOx burners).

sions limitations for the same equipment.[35] *See* 88 Fed. Reg. at 36,834-35. And EPA explained that using boiler design capacity, i.e., the maximum amount of energy a boiler is designed to produce, was a reasonable way to set emissions limits, given that downwind States' regulations use design capacity rather than the tons of ozone precursors a boiler has historically emitted. *Id.* at 36,834.

---

[35] *See Non-EGU TSD* 62-65. *Compare, e.g.*, Conn. Agencies Regs. § 22a-174-22e(d)(3)(C), *with* 88 Fed. Reg. at 36,834.

## CONCLUSION

This Court should deny the petitions for review.

Dated:  New York, New York
        July 8, 2024

                                    Respectfully submitted,

                                    LETITIA JAMES
                                      *Attorney General of New York*
                                    BARBARA D. UNDERWOOD
                                      *Solicitor General*
MORGAN A. COSTELLO                  JUDITH N. VALE
CLAIBORNE E. WALTHALL                 *Deputy Solicitor General*
  *Assistant Attorneys General*
  *Environmental Protection Bureau*  */s/ Elizabeth A. Brody*[36]
                                    ELIZABETH A. BRODY
                                    *Assistant Solicitor General*

                                    Office of the Attorney General
                                    28 Liberty Street, 23rd Floor
                                    New York, NY 10005
                                    (212) 416-6167
                                    elizabeth.brody1@ag.ny.gov

*(Counsel listing continues on next page.)*

---

[36] Counsel for the State of New York certifies that the other parties listed in the signature blocks consent to this filing.

STATE OF CONNECTICUT

WILLIAM TONG
  *Attorney General*

*/s/ Jill Lacedonia*
JILL LACEDONIA
Assistant Attorney General

165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Jill.Lacedonia@ct.gov

STATE OF DELAWARE

KATHLEEN JENNINGS
  *Attorney General*

*/s/ Christian Douglas Wright*
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation

Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Christian.wright@delaware.gov

DISTRICT OF COLUMBIA

BRIAN L. SCHWALB
  *Attorney General*

*/s/ Caroline S. Van Zile*
CAROLINE S. VAN ZILE
Solicitor General

Office of the Attorney General
for the District of Columbia
400 6th Street N.W., Ste 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

STATE OF ILLINOIS

KWAME RAOUL
  *Attorney General*

*/s/Jason E. James*
JASON E. JAMES
Assistant Attorney General
MATTHEW DUNN
Chief, Environmental Enforce-
ment/Asbestos Litigation Division

Office of the Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(872) 276-3583
jason.james@ilag.gov

40

STATE OF MARYLAND

ANTHONY G. BROWN
  *Attorney General*

*/s/ Michael F. Strande*
MICHAEL F. STRANDE
Assistant Attorney General
STEVEN J. GOLDSTEIN
Special Assistant Attorney General

Office of the Attorney General
1800 Washington Blvd.
Baltimore, MD 21230
(410) 537-3421
Michael.strande@maryland.gov
sgoldstein@oag.state.md.us

STATE OF NEW JERSEY

MATTHEW J. PLATKIN
  *Attorney General*

*/s/ Nell Hryshko*
NELL HRYSHKO
Deputy Attorney General

Division of Law
25 Market St., P.O. Box 093
Trenton, NJ 08625
(609) 376-2735
nell.hryshko@law.njoag.gov

COMMONWEALTH OF
  MASSACHUSETTS

ANDREA JOY CAMPBELL
  *Attorney General*

*/s/ Jillian M. Riley*
JILLIAN M. RILEY
JOHN S. CRAIG
JULIA JONAS-DAY
Assistant Attorneys General

Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2424
jriley@mass.gov

COMMONWEALTH OF
  PENNSYLVANIA

MICHELLE A. HENRY
  *Attorney General*

*/s/ Ann R. Johnston*
ANN R. JOHNSTON
Assistant Chief Deputy
  Attorney General

Office of the Attorney General
Civil Environmental
  Enforcement Unit
Strawberry Square, 14th Floor
Harrisburg, PA 17120
(717) 497-3678
ajohnston@attorneygeneral.gov

STATE OF WISCONSIN

JOSHUA L. KAUL
  *Attorney General*

*/s/ Gabe Johnson-Karp*
GABE JOHNSON-KARP
Assistant Attorney General

Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53702-7857
(608) 267-8904
johnsonkarpg@doj.state.wi.us

HARRIS COUNTY, TEXAS

CHRISTIAN MENEFEE
  *Harris County Attorney*
JONATHAN FOMBONNE
  *First Assistant County Attorney*
TIFFANY BINGHAM
  *Managing Counsel*

*/s/ Sarah Jane Utley*
SARAH JANE UTLEY
Environmental Division Director

1019 Congress, 15th Floor
Houston, Texas 77002
(713) 274-5124
sarah.utley@harriscountytx.gov

CITY OF NEW YORK, NEW YORK

MURIEL GOODE-TRUFANT
  *Acting Corporation Counsel*

*/s/ Christopher Gene King*
CHRISTOPHER GENE KING
Senior Counsel,
Environmental Law Division

New York City Law Department
100 Church Street
New York, NY 10007
(212) 356-2074
cking@law.nyc.gov

42

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Oren L. Zeve, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,493 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7), corresponding local rules, and, in coordination with the Environmental Groups, this Court's Order (Dec. 4, 2023), Document #2029865.

  /s/ *Oren L. Zeve*

# CERTIFICATE OF SERVICE

I hereby certify that, on July 8, 2024, I electronically filed the foregoing Proof Brief using the Court's CM/ECF system and that, therefore, service was accomplished upon counsel of record by the Court's CM/ECF system.

Dated:  New York, NY
        July 8, 2024

*/s/ Elizabeth A. Brody*