ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1157 (and consolidated cases)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

State of Utah, et al.,
*Petitioners,*

v.

Environmental Protection Agency and Michael S. Regan, in his official capacity, as Administrator of the U.S. Environmental Protection Agency
*Respondents.*

On Petition for Review of Action by the U.S. Environmental Protection Agency

## REPLY BRIEF OF PETITIONERS THE STATES OF OHIO, INDIANA, KENTUCKY, NEVADA, UTAH, WEST VIRGINIA, AND THE KENTUCKY ENERGY AND ENVIRONMENT CABINET

SEAN D. REYES
Attorney General of Utah

STANFORD E. PURSER
Utah Solicitor General*
  *Counsel of Record
Office of the Attorney General
Utah State Capitol Complex
350 North State Street, Ste. 230
Salt Lake City, Utah 84114-2320
801-538-9600
spurser@agutah.gov

WILLIAM L. WEHRUM
Wehrum Environmental Law LLC
1629 K Street, NW, Suite 300
Washington, D.C. 20006
302-300-0388
William_Wehrum@comcast.net

DAVE YOST
Attorney General of Ohio

T. ELLIOT GAISER
Ohio Solicitor General
MATHURA J. SRIDHARAN*
  *Counsel of Record
ZACHERY P. KELLER
Deputy Solicitors General
GREGG BACHMANN
Section Counsel – Environmental
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
mathura.sridharan@ohioago.gov

*Counsel for Petitioner State of Ohio*

EMILY C. SCHILLING
Holland & Hart LLP
222 South Main St., Suite 2200
Salt Lake City, UT 84101
801-799-5753
ecschilling@hollandhart.com

KRISTINA R. VAN BOCKERN
AARON B. TUCKER
Holland & Hart LLP
555 Seventeenth St., Suite 3200
Denver, CO 80202
303-295-8107
trvanbockern@hollandhart.com
abtucker@hollandhart.com

*Counsel for Petitioner State of Utah*

*(Additional counsel listed after signature block)*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... ii

GLOSSARY ............................................................................................... v

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

ARGUMENT ............................................................................................. 2

   I.    EPA failed to address an important aspect of the problem:  whether the interdependent federal-implementation plan remains reasonable when some States drop out. ................................................................. 2

       A.    EPA cannot, after the fact, abandon the knee-in-the-curve approach it utilized to select a maximized cost-effective, emissions-control strategy applied uniformly across each source category.......... 2

       B.    The States' interdependency objection was raised with reasonable specificity in the comment period. ....................................................7

       C.    EPA's failure to consider an important aspect of the problem is not subject to harmless-error review. ......................................................10

       D.    Because the FIP is structurally flawed, it should be reversed............. 13

   II.    EPA's inclusion of Utah and Nevada was arbitrary and capricious.........14

       A.    EPA mischaracterizes decades of regulatory history treating Western States as analytically distinct and fails to justify its significant change in course..............................................................14

       B.    EPA fails to explain why a weight-of-evidence approach is not appropriate here...................................................................................19

   III.    EPA fails to justify its treatment of the Bonanza Power Plant.................21

   IV.    EPA's "enhancements" go too far. .....................................................23

CONCLUSION........................................................................................23

CERTIFICATE OF COMPLIANCE................................................................27

CERTIFICATE OF SERVICE........................................................................ 28

i

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Appalachian Power Co. v. EPA*,
    135 F.3d 791 (D.C. Cir. 1998) ........................................................ 8, 12

*Cboe Futures Exch., LLC v. SEC*,
    77 F.4th 971 (D.C. Cir. 2023) ............................................................ 13

*Chemical Mfrs. Ass'n v. EPA*,
    28 F.3d 1259 (D.C. Cir. 1994) ........................................................... 11

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n*,
    975 F.2d 871 (D.C. Cir. 1992) (*en banc*) ........................................... 12

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) .............................................................................. 14

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) .......................................................................... 15

*FCC v. Fox TV Stations, Inc.*,
    556 U.S. 502 (2009) .......................................................................... 15

*Husqvarna Ab v. EPA*,
    254 F.3d 195 (D.C. Cir. 2001) ........................................................... 12

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut.
    Automobile Ins. Co.*,
    463 U.S. 29 (1983) .............................................................................. 1

*Nat'l Coal. Against Misuse of Pesticides v. Thomas*,
    809 F.2d 875 (D.C. Cir. 1987) ........................................................... 21

*National Mining Ass'n v. EPA*,
    59 F.3d 13518 (D.C. Cir. 1995) ......................................................... 11

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008) ....................................................... 11, 12

\* Authorities chiefly relied upon are marked with an asterisk.

*Northeast Md. Waste Disposal Auth. v. EPA*,
    358 F.3d 936 (D.C. Cir. 2004)........................................................ 11

*\*Ohio v. EPA*,
    603 U.S. ___, 144 S. Ct. 2040 (2024).......................... 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 13

*Portland Cement Ass'n v. EPA*,
    665 F.3d 177 (D.C. Cir. 2011) ......................................................9

*Ramaprakash v. FAA*,
    346 F.3d 1121 (D.C. Cir. 2003) ................................................... 21

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)..................................................................... 13

*Small Refiner Lead Phase-Down Task Force v. U.S. Envt'l Protection Agency*,
    705 F.2d 506 (D.C. Cir. 1983) .................................................... 12

*United States v. Washington*,
    142 S. Ct. 1976 (2022)............................................................... 10

*West Virginia v. EPA*,
    362 F.3d 861 (D.C. Cir. 2008)..................................................... 12

**Statutes and Rules**

42 U.S.C. §7410.............................................................................. 15

42 U.S.C. §7601.............................................................................. 23

*42 U.S.C. §7607..................................................................5, 10, 11, 13

63 Fed. Reg. 7,254 (Feb. 12, 1998)................................................... 23

81 Fed. Reg. 15,200 (March 22, 2016)............................................... 21

81 Fed. Reg. 71,991 (Oct. 19, 2016) ................................................. 16

81 Fed. Reg. 92,755 (Dec. 20, 2016) ................................................ 17

\* Authorities chiefly relied upon are marked with an asterisk.

82 Fed. Reg. 9,155 (Feb. 3, 2017) ........................................................... 17

*88 Fed. Reg. 36,654 (June 5, 2023)...................................................... 3, 10, 22, 23

89 Fed. Reg. 23,526 (April 4, 2024) ........................................................5

* Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| CAA or the Act | Clean Air Act |
| APA | Administrative Procedure Act |
| EGU | Electric Generating Unit |
| EPA | U.S. Environmental Protection Agency |
| Final Rule | *Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality,* 88 Fed. Reg. 36,654 (June 5, 2023) |
| FIP | Federal Implementation Plan |
| Interstate Transport Provision | Section 110(a)(1) of the CAA; 42 U.S.C. §7410(a)(1) |
| NAAQS | National Ambient Air Quality Standards |
| NO$_x$ | Nitrogen Oxides |
| ppb | Parts Per Billion |
| SIP | State Implementation Plan |
| State Petitioners | Utah, Ohio, Indiana, West Virginia, Kentucky, Nevada, and Kentucky Energy and Environment Cabinet |
| VOCs | Volatile Organic Compounds |

## INTRODUCTION AND SUMMARY OF ARGUMENT

The FIP has been stayed by the Supreme Court because EPA, in promulgating it, "likely r[an] afoul" of the well-settled requirement that agencies consider "'important aspect[s] of the problem'" to avoid arbitrary and capricious action. *Ohio v. EPA,* 603 U.S. ___, 144 S. Ct. 2040, 2053 (2024) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). The problem? Because the plan "rested on an assumption that all 23 upwind States would adopt emissions-reduction tools up to a 'uniform' level of 'costs' to the point of diminishing returns," a method that injects interdependency among the input States, EPA should have considered "[w]hat happens—as in fact did happen—when many of the upwind States fall out of the planned FIP." *Id.* at 2053–54. EPA failed to answer that critical question. Now, the FIP must be reversed.

The High Court's "resolution … ultimately turn[ed] on the merits" given the significant harms and equities each side raised. *Id.* at 2053. And, in deciding who will *likely* prevail on the merits, the Court "received and reviewed over 400 pages of briefing and a voluminous record, held over an hour of oral argument on the applications, and engaged in months of post-argument deliberations." *Id.* at 2052.

Thus, this weighty merits issue, though viewed through a "stay" lens, was treated on par with other "cases [the Court] hear[s]" solely on the merits. *Id.*

EPA's contrary arguments to this structural problem and to the numerous other problems raised by the States—including its unjustified inclusion of the Western States Utah and Nevada in the FIP—are meritless. The States are thus "entitled" to reversal of the rule in full. *Id.* at 2054, 2055 n.11.

## ARGUMENT

## I. EPA failed to address an important aspect of the problem: whether the interdependent federal-implementation plan remains reasonable when some States drop out.

Commenters warned that the FIP would need to be reassessed when States eventually drop out of the plan. EPA took little heed of this concern. Now, the agency explains away its failure to consider this structural problem. Because these excuses are meritless, the FIP must be reversed.

### A. EPA cannot, after the fact, abandon the knee-in-the-curve approach it utilized to select a maximized cost-effective, emissions-control strategy applied uniformly across each source category.

EPA argues that the FIP does not depend on the mix of States for which it was developed. Its arguments do not pass muster.

EPA distances itself from the "knee-in-the-curve" methodology that it utilized to maximize cost-effective control stringencies applied uniformly to all 23

States.  To do that, recall that EPA examined emissions reductions achieved by applying incrementally costlier technologies to those States "up to … the point of diminishing returns"—a *quantifiable* approach.  *Ohio*, 144 S. Ct. at 2053.  Now, EPA claims to have selected control stringencies via a "holistic policy judgment"—a *qualitative* judgment call.  EPA Br.37.  This explanation fares poorly.  For one thing, EPA contradicts itself later—by explaining how, for industrial sources, it utilized the knee-in-the-curve method to assess where "further control stringenc[ies] became less cost-effective in terms of the amount of emissions reduction that could be achieved."  EPA Br.77.  At any rate, EPA's about-turn is startling given that the agency referenced the knee-in-the-curve approach *multiple times over* in the FIP.  *Compare* EPA Br.29–45 *with* 88 Fed. Reg. at 36,683, 36,741, 36,745 and *Ohio,* 144 S. Ct. at 2049–50.  And if not that approach, then what?  EPA offers little by way of answer, relying instead on its say-so.

EPA's waning interest in its own methodology is most apparent in how it treats the States' example, which illustrated how the "knee in the curve" could shift when the mix of States differs from the original 23.  *See* States Br.32.  First, however, a correction:  as EPA pointed out, the $1,600/ton strategy that the States reference is in column L (not column M as the States previously stated) and the $1,800/ton strategy is in column M (not column N as the States previously stated).  *Compare*

3

Ozone Transport Policy Analysis, Table C-1 at 45 (charting "Baseline + SCR optimize + SOA CC" at $1,600/ton and "Baseline + SCR/SNCR optimize" at $1,800/ton) *with* Appendix A, State 2026 tab columns L and M, row 1.

That mislabeling aside, EPA still misses the point. Recall that the knee-in-the-curve approach requires examining the marginal benefit of incrementally costlier strategies, "up to … the point of diminishing returns." *Ohio,* 144 S. Ct. at 2053. Apply that here. The emissions produced when operating technology costing $1,600/ton (column L) across Ohio, Indiana, and West Virginia is 28,868 tons (8,700+7,929+12,239). The emissions produced when operating technology costing $1,800/ton (column M) across the same States is 29,070 tons (8,698+7,929+12,443). The additional $200/ton thus provides *worse* returns; it produced no fewer emissions at all.

EPA refuses to engage with this method and instead misdirects by focusing on the absolutes. EPA compares the emissions reductions achieved at these lower-cost control strategies against the emissions reduction achieved by the much more expensive ($11,000/ton) chosen strategy. That comparison makes little sense for selecting points of diminishing returns, which, again, requires examining incrementally costlier strategies "up to" a "point of diminishing returns." *Ohio,* 144 S. Ct. at 2053.

4

In a last-ditch effort, EPA argues that even if it used the knee-in-the-curve approach, that "it would not reach a different result for just 11 States." EPA Br.40. (quotation marks omitted) (citing *Partial Denial of Pets. For Reconsideration*, 89 Fed. Reg. 23,526 (April 4, 2024)). The High Court squarely rejected that exact post-hoc rationalization explaining that "the Clean Air Act prevents [the Court] (and courts that may in the future assess the FIP's merits) from consulting explanations and information offered after the rule's promulgation." *Ohio*, 144 S. Ct. at 2055 n.11 (citing §§7607(d)(6)(C), 7607(d)(7)(A)). This Court, too, cannot consider this after-the-fact rationale.

EPA concedes that it "tall[ied]" emissions reductions, and resulting downwind air improvements, across the 23 upwind States only. EPA Br.38. But it explains that away by setting up and striking down a strawman—arguing that the tally does not matter because the control stringencies were not selected to achieve some minimum level of downwind air-quality improvement or emissions reduction. EPA Br.38, 40–41. But the States' arguments do not turn on any emissions-reductions or downwind-air-improvement targets. And EPA will not explain why it conducted that 23-state tally if the plan did not depend on the cumulative emissions-reduction for all 23 States, except to vaguely claim to have "confirm[ed]" that the control stringency it chose was appropriate. EPA Br.38. Without more, it is hard to

5

know what is more arbitrary:  applying an interdependent methodology without considering its ramifications or selecting a control stringency at random and trying, but failing, to justify it on the back end.

Intervenor States also argue that the FIP does not depend on the input States because EPA used nationwide data at one part of the process for selecting control stringencies.  Intervenor-States Br.12, 15–21.  This misunderstands EPA's analysis. Although EPA identified various emissions-reduction technologies and assigned an average cost—determined using nationwide estimates—for operating each at any source, *see* EGU NO$_X$ Mitigation Strategies Final Rule TSD, 49, the comparison *between* control technologies to select *the* maximized cost-effective technology, looks only at cumulative emissions reductions achieved by operating these controls in the 23 upwind States *alone*.  *See Ohio*, 144 S. Ct. at 2053–54, 2057 n.14.  That makes sense:  the emissions reduction achievable for a group of States depends on the "particular technologies and industries" in those States.  *Id.* at 2054 (quotation omitted).  A control measure that maximizes cost-effective improvements for one group—with their unique mix of industries and technologies—may not be the same for another.  *Id.*  Nor does it matter that EPA estimated air-quality improvement achievable with these technologies *everywhere*, not just in the 23 States.  The ultimate

6

goal is to assure that the maximized cost-effective technology, once selected, achieves meaningful air-quality improvement where it matters—downwind.

Last, EPA points to the severability provision claiming to have considered and rejected the interdependency problems. EPA Br.38. Beyond "highlight[ing] that EPA was aware of the [States'] concern," that provision does not "solve the agency's problem." *Ohio*, 144 S. Ct. at 2054. Indeed, nothing in the severability provision "addresses whether and how measures found to maximize cost effectiveness in achieving downwind ozone air-quality improvements" with 23 States "remain so" with "fewer States." *Id.* at 2055. The severability provision is, as the Supreme Court held, less a consideration of the States' objection as much as it is a "sidestep." *Id.*

## B. The States' interdependency objection was raised with reasonable specificity in the comment period.

EPA argues that the just-discussed concerns are procedurally barred for two reasons: (1) because no commenter "raised with reasonable specificity" the States' interdependency concerns during the comment period so EPA had no opportunity to answer them; and (2) because the States were obligated to raise concerns about after-arising events by petitioning for reconsideration. EPA Br.31–35 (quotation omitted). As the High Court already confirmed, neither meets the mark. *Ohio*, 140 S. Ct. at 2055–56.

7

Begin with the first objection. As the States pointed out and the High Court agreed, commenters alerted the agency of the "potential pitfall" in its grand plan to impose a single, interdependent FIP when there was more than a "speculative possibility" that the SIP disapprovals would be reversed. *Id.* at 2050, 2055–56. The specter of lesser participation, commenters continued, would have "consequences for the proposed FIP" such that EPA would have "to conduct a new assessment and modeling of contribution and subject those findings to public comment." *Id.* at 2050 (citing Comments of Air Stewardship Coalition 13–14 (June 21, 2022); Comments of Portland Cement Association 7 (June 21, 2022)); *see* States Br.14–15 (collecting comments). These comments pass the reasonable-specificity bar to put EPA on notice of this problem. Requiring any more, as EPA demands, would turn impermissibly "the Act's 'reasonable specificity' requirement" into a "'hair-splitting approach.'" *Ohio*, 140 S. Ct. at 2055 (quoting *Appalachian Power Co. v. EPA*, 135 F.3d 791, 817–18 (D.C. Cir. 1998) (per curiam)).

Proving this point, EPA's including the severability provision in the proposed rule speaks directly to the notice it had of the glaring interdependency problem. *Id.* at 2055–56; *above* at 7. Indeed, at the High Court, EPA "emphatically" asserted that the provision was included in the final rule "as a result of that [interdependency] consideration." *Id.* at 2055. All this shows that commenters raised the

8

interdependency problem, with the required specificity under the Act, to put EPA on notice of the States' objection.

Turn to the latter—that concerns stemming from *subsequent* judicial stays should have been raised first in a petition for reconsideration. That misunderstands the States' argument, which points out what EPA missed when it promulgated the FIP, not after. *See* States Br.29–33. Indeed, subsequent events only served as "powerful confirmation" of EPA's flawed decision-making, States Br.33, that triggered EPA's "obligation" to regulate with its eyes wide open to the effect of the SIP-disapproval stays. *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (*per curiam*). Because the problem was cemented at promulgation, commenters "could and did" raise the interdependency concerns during the comment period. *Ohio*, 144 S. Ct. at 2056; *above* at 8. The Act does not require the States "to raise (again) a concern EPA already had a chance to address" in the final rule when "EPA had the basis of the applicants' objection before it during the comment period." *Id.*

EPA next argues that it *did* the analysis, for the first time, for the current composition of States subject to the FIP, so the States' objection is now moot. EPA Br.35. Again, the High Court rejected that EPA's flawed decision-making can be cured through after-the-fact analysis and explanation. *Ohio*, 140 S. Ct. at 2055 n.11. Rather, this Court's review is restricted to the "existing record" when the agency

promulgated the FIP. *Id.* And, the High Court determined, on that record, the States are likely entitled to "reversal" of the Rule in full, *id.* (alteration accepted), not the agency's new explanations produced during litigation. Because the Court can still grant that eventual relief—reversal—the case is not moot. *See United States v. Washington*, 142 S. Ct. 1976, 1983 (2022). EPA thus cannot moot this controversy by providing after-the-fact reasoning for its prior decision-making.

### C. EPA's failure to consider an important aspect of the problem is not subject to harmless-error review.

Intervenor States next argue that, even if EPA failed to consider lesser participation in the FIP, that error should be subject to harmless-error review under 42 U.S.C. §7607(d)(8). Intervenor-States Br.26–28. Not so.

The FIP is undisputedly "final" agency "action" and not a "procedural determination." *See, e.g.*, 88 Fed. Reg. 36,654, 36,656, 36,673, 36,677, 36,859. As the High Court observed, the Act "treat[s] separately" such "challenges to agency 'actions'"—"authorizing courts to 'reverse any … *action*,' found to be 'arbitrary' or 'capricious'"—from challenges to procedural determinations subject to harmless-error review. *Ohio,* 140 S. Ct. at 2057 (emphasis added) (citing §7607(d)(9)(A)). So harmless-error review under §7607(d)(8) is inapplicable to this arbitrary-and-capricious challenge.

The cases on which Intervenor States rely are now inapposite because they fail to engage with this exact textual distinction recognized by the High Court. *See* Intervenor-States Br.27–28 (citing *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008), *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008); *National Mining Ass'n v. EPA*, 59 F.3d 1351, 1357–58 (D.C. Cir. 1995) (per curiam); *Northeast Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 948, 950 (D.C. Cir. 2004) (per curiam); *Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1262–63 (D.C. Cir. 1994). Take, for example, *Northeast Md. Waste Disposal*. There, the petitioners launched a §7607(d)(9) challenge, arguing that EPA acted arbitrarily and capriciously by failing to include a statutorily required rationale for the rule's basis, purpose, and legal interpretations and considerations. 358 F.3d at 941–42, 949–50. The Court sustained the error. *Id.* at 949. But, without explanation, the Court then applied §7607(d)(8)'s harmless-error standard to the §7607(d)(9) error—deeming the error nonprejudicial because the agency could go back and develop the missing rationale while the rule remained in place. *Id.* at 949–50. That analysis was wrong then and wrong now. At the time, this merging of §7607(d)(9) review with §7607(d)(8) review mishandled the text:  the statute treats as separate "arbitrary" and "capricious" challenges to agency "action[s]," §7607(d)(9), and challenges to "procedural determinations," §7607(d)(8). Now, after the Supreme Court's

recognition of this textual distinction, this Court's cases that incorrectly merge both provisions without conducting *any* textual analysis have lost any remaining persuasive force. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871, 876 (D.C. Cir. 1992) (*en banc*).

Intervenor States' reliance on *North Carolina*, 531 F.3d 896, is doubly inapposite. Although purporting to conclude that the rounding-convention error, had it been one, did not carry prejudice, the Court had no occasion to reach that conclusion because it already determined there was no error at all. *Id.* at 925. Any harmless-error review is thus dicta.

What is more, this Court generally does not apply harmless-error review to the kind of structural problem at issue here. Rather, this Court has applied that review to unimportant aspects of the problem such as inadvertent omissions to the administrative record, late-in-time publication of data and analysis, and non-substantive changes to required specifications from the proposed to the final rule. *See, e.g.*, *Husqvarna Ab v. EPA*, 254 F.3d 195, 203 (D.C. Cir. 2001); *West Virginia v. EPA*, 362 F.3d 861, 869 (D.C. Cir. 2008); *Small Refiner Lead Phase-Down Task Force v. U.S. Envt'l Protection Agency*, 705 F.2d 506, 541 (D.C. Cir. 1983); *Appalachian Power Co. v. EPA*, 135 F.3d 791, 802–04 (D.C. Cir. 1998). As these examples show,

§7607(d)(8)'s harmless-error review does not apply in challenges to a core assumption on which the agency action rests.

In contrast, the method by which EPA crafted statewide emissions budgets is such "an important aspect of the problem" that EPA cannot cure this structural failure through post-hoc explanation. *Ohio*, 144 S. Ct. at 2054, 2055 n.11 (quotation omitted). It is not, for example, as unserious as EPA's inadvertent omission to the certified record in this litigation that can be cured with a late-in-the-day supplementation. *See Notice of Filing Corrected Certified Index to the Administrative Record*, Doc.2056522 (May 28, 2024). If placed within the ambit of §7607(d)(8)'s harmless-error review, challenges like this one of fundamentally flawed decision-making would simply evade "arbitrary" and "capricious" review and reversal as required under the Act.

### D.    Because the FIP is structurally flawed, it should be reversed.

If the States prevail on the just-discussed argument, the Act "entitles" them to "revers[al]" and not an explanation. *Accord Ohio*, 144 S. Ct. 2054–55 & n.11 (citing §7607(d)(9)(A)). EPA's request to remand to the agency, without vacatur, for further explanation thus should be rejected. It is well-established that "*post hoc* litigation rationalization" cannot save a fundamentally defective rule. *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 979 (D.C. Cir. 2023) (quotation omitted); *SEC v.*

13

*Chenery Corp.*, 318 U.S. 80, 87–88 (1943); *accord Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23 (2020). Over a year into this complex litigation and after Supreme Court intervention, any new explanation provided by EPA will only be more such "post hoc litigation rationalization." Indeed, the High Court considered and rejected the one post-hoc explanation EPA crafted during this litigation. *Above* at 5. At this point, nothing short of going back to the drawing board will suffice.

If this Court reverses, it need not consider the States' remaining arguments. But the Court cannot remand without vacatur unless it reaches the remaining arguments set forth in this brief.

## II.    EPA's inclusion of Utah and Nevada was arbitrary and capricious.

### A.    EPA mischaracterizes decades of regulatory history treating Western States as analytically distinct and fails to justify its significant change in course.

EPA wants to rewrite history, *see* EPA Br.124, ignoring over twenty years of precedent recognizing that interstate transport issues in the West are "analytically distinct" from the East and therefore warrant different approaches, *see* States Br.37 (quotation omitted); *see id.* at 36–38. EPA abandoned this distinction and well-settled policy for Western States in the FIP—finding significant contribution and imposing emissions control requirements on Utah and Nevada based *solely* on the four-

14

step framework developed for Eastern States.  EPA's failure to justify, let alone acknowledge, its abrupt change of course epitomizes arbitrary and capricious decision-making.  *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 516 (2009).

EPA first attacks a strawman—claiming State Petitioners assert that "no western State should be subject to interstate transport obligations."  EPA Br.126.  That is not true.  No one disputes that "[a]ll States have a statutory obligation to address their significant contribution to downwind air quality problems, including States west of the Rocky Mountains," or that EPA has the statutory authority to impose a FIP on Western States in limited circumstances.  *See* EPA Br.123; 42 U.S.C. §7410(a)(2)(D)(i)(I).  Rather State Petitioners object to EPA's actions in *this* FIP because EPA arbitrarily applied the four-step framework to Western States— *wholly excluding* the weight-of-evidence approach historically applied to Western States—without justifying its changed approach.

The record shows EPA has always treated Western States differently—addressing them case-by-case and emphasizing the need to consider additional factors to account for the important distinctions in assessing interstate transport in the West.  States Br.35–38.  EPA points out its use of the four-step framework in prior SIP actions involving Western States and Utah, in particular.  EPA Br.127–28. But

EPA seeks to downplay two important differences. First, each time EPA has applied the four-step framework, the agency has also recognized the need to account for aspects of interstate transport unique to the West, necessitating modified or supplemental approaches to account for geography, weather, or the like. *See id.* at 125–26 (explaining such case-by-case approaches applied to Utah, Wyoming, and Colorado). Second, EPA seeks—for the very first time—to find significant contribution and impose emissions control requirements through a FIP based *solely* on application of the four-step framework. EPA omits these crucial details from its brief. *See* EPA Br.127–28.

For example, when EPA initially disapproved Utah's interstate transport SIP for the 2008 ozone NAAQS, it emphasized "that it is appropriate to analyze all information for western states and *make a conclusion based on a weight of the evidence.*" 81 Fed. Reg. 71,991, 71,994 (Oct. 19, 2016) (emphasis added). EPA rejected Utah's SIP not because Utah failed to apply the four-step framework, but because EPA concluded it could not perform a weight-of-evidence analysis where it "ha[d] not received any such evidence from [Utah] that is sufficient to alter [EPA's] determination that Utah interferes with maintenance at Denver area receptors." *Id.*

Similarly, when EPA later approved Utah's SIP as to prong one of the Interstate Transport Provision for 2008 ozone NAAQS, EPA emphasized that "[a]s to

16

western states, … there may be geographically specific factors to consider in evaluating interstate transport" and "[c]onsistent with our statements in the CSAPR Update, EPA intends to address western states, like Utah, on a case-by-case basis." 81 Fed. Reg. 92,755, 92,757 (Dec. 20, 2016) (Proposed Rule); 82 Fed. Reg. 9,155, 9,155 (Feb. 3, 2017) (Final Rule) (noting that "EPA's rationale for this proposed action were provided in the notice of proposed rulemaking, and will not be restated here").

And importantly, EPA in the same Utah SIP approval used Step 2 of the four-step framework to *eliminate* Utah from further analysis because "the State's low modeled level of contribution to any receptors identified in EPA's technical analysis supports Utah's conclusion that the State does not contribute significantly to nonattainment of the 2008 ozone NAAQS in any other state." *See* 81 Fed. Reg. at 92,757; *see also* 82 Fed. Reg. at 9,155 (EPA's final SIP approval explaining that "EPA's rationale for this … action [was] provided in the notice of proposed rulemaking, and will not be restated here"). Thus, Western specific factors did not need to be considered because, even under the four-step framework, Utah was found not to be significantly contributing. The same is not true when EPA seeks to use the four-step framework to justify a significant contribution finding for Utah or other Western States.

17

Finally, EPA claims it offered "good reasons" for including Western States in the FIP. But EPA's reasoning misses the mark. First, EPA cites to its passing remarks in its response to comments, EPA Br.131 (citing Response to Public Comments ("RTC") at 158), which say "that air quality conditions and contribution from upwind states" in the West "are sufficiently analogous to the regional ozone problem in the eastern U.S. that applying the same framework across all linked states is warranted." RTC at 158; *see also* Public-Interest Respondents Br.21. But EPA's conclusory remarks are not sufficient to explain why EPA no longer believes ozone transport in the East and West are "analytically distinct" or how they are "sufficiently analogous." Second, EPA simply falls back on its modeling linking Utah and Nevada to downwind states, which it claims "works 'equally as well in eastern and western regions,' and accounts for factors that Petitioners allege may impact western States to a greater degree." EPA Br.127 (citing Air Quality Modeling TSD, EPA-HQ-OAR-2021-0668-1157 at B-9). But EPA's conclusory assertions do not explain why the four-step framework alone—*without consideration* of unique or modified analytic approaches such as the weight-of-evidence approach—is appropriate to assess Western States despite EPA's longstanding contrary position. EPA's failure to address that important question renders EPA's approach here fatally arbitrary.

18

**B.    EPA fails to explain why a weight-of-evidence approach is not appropriate here.**

EPA admits it applied its weight-of-evidence approach to other Western States but fails to provide a coherent response for not applying it in the FIP.  EPA asserts that "the circumstances of the 2016 Arizona approval are absent here because Nevada and Utah are linked to receptors that suffer from 'collective contribution.'" EPA Br.129.  But EPA has never defined when a receptor would "suffer" from "collective contribution"—in other words, when do "collective contributions" of pollutants from numerous states to a certain receptor trigger FIP obligations for states with otherwise *de minimis* individual contributions?  Instead, EPA simply argues that with respect to Utah, "[w]hile these percentages may be less than at other receptors, they are not so low that EPA could dismiss all upwind state contribution as 'negligible.'" EPA Br.130.  EPA repeats the circular reasoning it made during the underlying rulemaking and fails to articulate a reasoned basis for applying the four-step framework instead of a weight-of-evidence approach.

EPA asserts that the upwind contributions at issue here (6-8% total upwind contributions to the Denver nonattainment area) are sufficiently different from the 2-4% upwind contribution in Arizona's SIP action that it is inappropriate to use the

weight-of-evidence approach here.[1] Setting aside the arbitrary nature of EPA's unexplained premise, this comparison is the wrong starting point. Consistent with EPA's own approach to the approval of Arizona's SIP, the appropriate points of comparison are "the relatively large contributions from upwind states in the East" where EPA "found the total upwind states' contribution to ozone concentration (from linked and unlinked states) based on modeling for 2017 ranges from 17% to 67% …, with between 4 and 12 states each contributing above 1% to the downwind air

---

[1] Public-Interest Respondents utilize a different metric (the total upwind contribution expressed as a percent of the total U.S. anthropogenic contribution at each monitoring site also stated as "Upwind % of Total Anthro" in the Air Quality Modeling TSD) to assert that upwind contributions are significant because "27% of the controllable ozone pollution at [the Douglas County Colorado] receptor is from upwind States." Public-Interest Respondents Br.21. This single cherrypicked piece of data fails to justify EPA's decision. First, EPA did not base its decision on this metric but instead relied upon the total upwind contribution expressed as a percent of total ozone (i.e., the 2023 average design value) (stated as "Upwind % of Avg DV" in the Air Quality Modeling TSD). For good reason, only looking at total U.S. anthropogenic or "controllable" contributions excludes important sources of emissions—such as biogenic, initial and boundary concentrations, Canada and Mexico, fires, offshore and lightning strikes—that disproportionately impact western states. Finally, Public-Interest Respondents fail to provide important context including that respective upwind contributions to total anthropogenic emission are significantly higher at eastern receptors (CT (89.7%-94.3%), WI (81.0%-87.0%), IL (40.4%-48.4%)). Air Quality Modeling TSD at Appendix D, at D-4.

20

quality problem." 81 Fed. Reg. 15,200, 15,203 (March 22, 2016); *see also* States Br.41–42.

Plainly, total upwind contributions of 6-8% are nowhere near the same magnitude as those in Eastern States. Contributions of 6-8% are much more like the 2-4% levels that justified application of the weight-of-evidence approach to Arizona. In the face of those facts, EPA had a duty to explain its decision to apply the four-factor framework rather than a weight-of-evidence approach. Its failure to explain renders its decision patently arbitrary and capricious. *Ramaprakash v. FAA*, 346 F.3d 1121, 1130 (D.C. Cir. 2003) (Roberts, J.).

## III.  EPA fails to justify its treatment of the Bonanza Power Plant.

After failing to respond to comments questioning its treatment of sources within Indian Country (i.e., the Bonanza Power Plant within the Uintah and Ouray Reservation in northeastern Utah) in the rulemaking record, EPA finally explains that it independently modeled emissions from Utah and tribal sources but asserts it had "no obligation" to respond to those comments because they were not "significant." EPA Br.135 (quotation omitted; emphasis deleted). But the newly announced rationale cannot cure EPA's failure to adequately explain itself on the record during the rulemaking. *See Nat'l Coal. Against Misuse of Pesticides v. Thomas*, 809 F.2d 875, 883–84 (D.C. Cir. 1987) (the court is "unable to accept [post hoc

rationalization] to buttress agency action" when "rationale is wholly inadequate" on the record).

In any event, EPA's analysis does not support regulating emissions from tribal lands. While State Petitioners and EPA both agree "that it would be inappropriate to combine 301(d) area [*i.e.*, tribal lands] and state emissions in making its significant contribution determinations," *see* EPA Br.136, EPA's basis for regulating emissions from tribal lands still relies exclusively on Utah's emission contribution. EPA's modeling shows that emissions contributions from tribal lands to downwind receptors in Colorado are well below EPA's applicable screening threshold of 0.7 ppb. Air Quality Modeling TSD Appendix C-3, C-5, C-7. For instance, tribal emissions contributions range from 0.13 ppb to 0.18 ppb for monitoring plus modeled receptors in Colorado in 2023. Air Quality Modeling TSD Appendix C-3. Thus, emissions from tribal lands alone do not satisfy EPA's own significant-contribution test. EPA nonetheless asserts "that it is both necessary and appropriate to regulate all new and existing EGU and industrial sources meeting the applicability criteria set forth in this rule in all of the 301(d) FIP areas that are located within the geographic scope of coverage of the rule." 88 Fed. Reg. at 36,691. The Final Rule also explains that "[f]or purposes of this finding, the geographic scope of coverage of the rule means the areas of the United States encompassed within the borders of the states EPA has

22

determined to be linked at Steps 1 and 2 of the 4-step interstate transport framework." *Id.*

But the Tribal Authority Rule requires EPA to treat tribal lands as sovereign—akin to States. 63 Fed. Reg. 7,254, 7,254, 7,260 (Feb. 12, 1998); *see also* 42 U.S.C. §7601(d) (CAA authorizes EPA "to treat Indian tribes as States" under the Act). For the "provisions of the CAA … designed to address cross-boundary air impacts," EPA determined that "the prohibitions and authority contained in section[] 110(a)(2)(D) … of the CAA appl[ies] to tribes in the same manner as states." 63 Fed. Reg. at 7,260. So EPA's decision to include tribal lands in the FIP is unfounded and inconsistent with the Tribal Authority Rule because there is no justification based on tribal-only emissions to conclude that emissions from tribal lands cause significant contribution.

## IV. EPA's "enhancements" go too far.

EPA's enhancements to the trading program go beyond the amount necessary to address each State's "significant contribution" to downwind States and therefore constitute impermissible "over control." State Petitioners incorporate by reference the arguments in Industry Petitioners' Reply Brief.

## CONCLUSION

The FIP should be reversed.

23

Dated: July 29, 2024.

Respectfully submitted,

SEAN D. REYES
Attorney General of Utah

*/s/ Stanford E. Purser*
STANFORD E. PURSER
Utah Solicitor General
  *\*Counsel of record*
Office of the Attorney General
Utah State Capitol Complex
350 North State Street Suite 230
Salt Lake City, UT 84114-2320
Phone:  801-538-9600
spurser@agutah.gov

WILLIAM L. WEHRUM
Wehrum Environmental Law LLC
1629 K Street, NW, Suite 300
Washington, D.C. 20006
Ph. 302-300-0388
William_Wehrum@comcast.net

EMILY C. SCHILLING
Holland & Hart LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Phone:  801-799-5753
Fax:  202-747-6574
ecschilling@hollandhart.com

DAVE YOST
Ohio Attorney General

*/s/ Mathura J. Sridharan*
T. ELLIOT GAISER
Ohio Solicitor General
MATHURA J. SRIDHARAN\*
  *\*Counsel of record*
ZACHERY P. KELLER
Deputy Solicitors General
GREGG BACHMANN
Section Counsel – Environmental
30 East Broad Street, 17th Floor
Phone:  6l4-466-8980
Fax:  614-466-5087
mathura.sridharan@ohioago.gov

*Counsel for the State of Ohio*

THEODORE E. ROKITA
Attorney General of Indiana

*/s/ James A. Barta*
JAMES A. BARTA
Indiana Solicitor General
Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204
Phone:  317-232-0709
James.Barta@atg.in.gov

*Counsel for State of Indiana*

KRISTINA R. VAN BOCKERN
AARON B. TUCKER
Holland & Hart LLP
555 Seventeenth Street
Suite 3200
Denver, CO 80202
Phone: 303-295-8107
Fax: 720-545-9952
trvanbockern@hollandhart.com
abtucker@hollandhart.com

*Counsel for State of Utah*

PATRICK MORRISEY
Attorney General of West Virginia

*/s/ Michael R. Williams*
MICHAEL WILLIAMS
West Virginia Solicitor General
Office of the West Virginia Attorney
General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Phone: 682-313-4550
Michael.R.Williams@wvago.gov

*Counsel for State of West Virginia*

AARON D. FORD
Attorney General of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN
Nevada Solicitor General
State of Nevada
Office of the Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Counsel for State of Nevada*

RUSSELL COLEMAN
Attorney General of Kentucky

*/s/ Matthew F. Kuhn*
MATTHEW F. KUHN
Kentucky Solicitor General
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: 502-696-5300
Matt.Kuhn@ky.gov

*Counsel for the Commonwealth of Kentucky*

25

*/s/ Jarrod L. Bentley*
JARROD L. BENTLEY
Staff Attorney III
Kentucky Energy and Environment
Cabinet
Office of Legal Services
300 Sower Boulevard, 3rd Floor
Frankfort, KY 40601
jarrod.bentley@ky.gov

*Counsel for Kentucky Energy and Environment Cabinet*

26

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed R. App. P. 32(f) and (g), I hereby certify that the foregoing complies with the Court's December 4, 2023 Order because it contains 5,107 words, excluding exempted portions, according to the count of Microsoft Word.

I further certify that the brief complies with Fed. R. App. P. 27(d)(1)(E), 32(a)(5) and (6) because it has been prepared in 14-point Equity Font.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN
*Counsel for State of Ohio*

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2024, I caused the foregoing to be electrically filed with the Clerk of the Court by using the Court's CM/ECF system. All registered counsel will be served by the Court's CM/ECF system.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN
*Counsel for State of Ohio*