<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**No. 23-1157 (consolidated with Nos. 23-1181, 23-1183, 23-1190, 23-1191, 23-1193, 23-1195, 23-1199, 23-1200, 23-1201, 23-1202, 23-1203, 23-1205 23-1206, 23-1207, 23-1208, 23-1209, 23-1211, 23-1306, 23-1307, 23-1314 23-1315, 23-1316, 23-1317)**

**STATE OF UTAH,** *et al.*,
**Petitioners,**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** *et al.*,
**Respondents.**

**On Petitions for Judicial Review of Final Agency Action of**
**the United States Environmental Protection Agency**
**88 Fed. Reg. 36,654 (June 5, 2023)**

**JOINT REPLY BRIEF OF INDUSTRY PETITIONERS**

Catherine E. Stetson
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600

Ana M. Gutiérrez
Michael D. Miller
Womble Bond Dickinson (US) LLP
1899 Wynkoop St.
Denver, CO 80202
Ana.Gutierrez@wbd-us.com

*Counsel for Kinder Morgan, Inc.*
*Additional Counsel Listed on Inside Front Cover and Following Pages*

Dated: July 29, 2024

Michael B. Schon
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. N.W.
Washington, DC 20001
(512) 693-8350

Mithun Mansinghani
LEHOTSKY KELLER COHN LLP
629 W. Main St.
Oklahoma City, OK 73102
(512) 693-8350

*Counsel for National Mining Association*

Allison D. Wood
Makram B. Jaber
Aaron M. Flynn
MCGUIRE WOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006

*Counsel for Associated Electric Cooperative, Inc., Deseret Generation & Transmission Co-Operative d/b/a Deseret Power Electric Cooperative, Ohio Valley Electric corporation, Wabash Valley Power Association, Inc. d/b/a Wabash Valley Power Alliance, America's Power, National Rural Electric*

Samuel B. Boxerman
Eric D. McArthur
Kathleen Mueller
Jeremy Rozansky
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005

*Counsel for Interstate Natural Gas Association of America and American Petroleum Institute*

David M. Flannery
Kathy G. Beckett
Keeleigh S. Huffman
STEPTOE & JOHNSON, PLLC
707 Virginia St. East
Post Office Box 1588
Charleston, WV 25326
(304) 353-8000

Edward L. Kropp
STEPTOE & JOHNSON, PLLC
Post Office Box 36425
Indianapolis, Indiana 46236
(317) 946-9882

*Counsel for Petitioners American Forest & Paper Association, American Iron and Steel Institute, and Midwest Ozone Group*

*Cooperative Association and*
*Portland Cement Association*

Aaron M. Streett
Matthew L. Kuryla
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855

*Counsel for Energy Transfer LP*

Brittany M. Pemberton
BRACEWELL LLP
2001 M Street N.W., Suite 900
Washington, D.C. 20036
(202) 828-1708

*Counsel for TransCanada PipeLine USA
Ltd.*

John D. Lazzaretti
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower
127 Public Square
Cleveland, OH 44114
(216) 479-8500

*Counsel for Petitioner United
States Steel Corporation*

Elliott Zenick
AMERICAN CHEMISTRY COUNCIL
700 2nd St. N.E.
Washington, DC 20002
(202) 249-6744

*Counsel for Petitioner
American Chemistry Council*

Kelly M. McQueen
THE MCQUEEN FIRM, PLLC
12 Woodsong Drive
Roland, AR 72135
(501) 580-3291

*Counsel for Petitioner
Arkansas League of Good
Neighbors*

Michael E. Born (49961)
Cheri A. Budzynski (51761)
SHUMAKER, LOOP & KENDRICK, LLP
Huntington Center
41 South High Street, Suite 2400
Columbus, OH 43215
(614) 463-9441

*Counsel for Petitioners Buckeye Power,*

*Inc. and the Ohio Valley Electric Corporation*

Elbert Lin
Kevin S. Elliker
David N. Goldman
HUNTON ANDREWS KURTH LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
(804) 788-8200

F. William Brownell
E. Carter Chandler Clements
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue
N.W.
Washington, DC 20037
(202) 955-1500

*Counsel for Petitioners
Union Electric Company, d/b/a
Ameren Missouri, and Arkansas
League of Good Neighbors*

Mark W. DeLaquil
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue N.W.
Washington, D.C. 20036
(202) 861-1500

Martin T. Booher
Joshua T. Wilson
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114

*Counsel for Hybar LLC*

Richard S. Moskowitz
Tyler Kubik
AMERICAN FUEL &
PETROCHEMICAL
MANUFACTURERS
1800 M Street, NW
Suite 900 North
Washington, DC 20036
(202) 844-5474

*Counsel for Petitioner American*
*Fuel & Petrochemical*
*Manufacturers*

Laura K. McAfee
(D.C. Cir. Bar No. 62386)
BEVERIDGE & DIAMOND, PC
201 North Charles Street, Suite 2200
Baltimore, MD 21201

*Counsel for Enbridge (U.S.) Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

GLOSSARY ............................................................................................. vi

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

ARGUMENT ...........................................................................................3

I.    Deference is Inappropriate .........................................................3

II.   Incorporation by Reference ........................................................4

III.  EPA Failed to Justify the Rule's Application to Fewer than 23 States .........................................................................................4

IV.   EPA Violated Its Statutory Duty to Avoid Over-Control of EGUs ...........................................................................................9

V.    EPA Has Not Demonstrated that the Rule is Cost-Effective With the EGU Enhancements ....................................................15

VI.   The Rule Unlawfully Regulates Non-EGUs .............................17

      A.    EPA Concedes it Regulated Non-EGUs Regardless of Cost .................................................................................17

      B.    EPA Unlawfully Used Annual Cost-Effectiveness Calculations to Justify Ozone-Season Emissions Limits for Non-EGUs ................................................................24

      C.    EPA's Applicability Criteria for Engines and Boilers Are Unlawful .................................................................26

      D.    Pipeline, Paper, And Steel Compliance Deadlines Are Unreasonable .................................................................29

      E.    EPA Fails to Justify Regulation of Steel and Paper ......32

i

F.    Additional Steel-Specific Determinations Are Unlawful ...........35

      1.    The Work Plan Process Violates the Act ...........................35

      2.    The Reheat Furnace Requirements Are Arbitrary and Capricious ........................................................................36

G.    Hybar's Standing ................................................................37

H.    Source-Level Contributions ..............................................38

I.    Consideration of Post-2026 Facts ...................................39

VII.    Reliability Remains a Public Safety Concern ..........................40

A.    EGU Reliability ................................................................40

B.    Natural Gas Service Reliability ......................................42

VIII.    Indian Country .........................................................................45

CONCLUSION AND REMEDY ........................................................46

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ALLTEL Corp. v. FCC,*
   838 F.2d 551 (D.C. Cir. 1988) .................................................................23

*Ass'n of Oil Pipe Lines v. FERC,*
   281 F.3d 239 (D.C. Cir. 2002) ................................................................23

*Chem. Mfrs. Ass'n v. EPA,*
   28 F.3d 1259 (D.C. Cir. 1994) ...........................................................8, 31

*Clean Air Council v. Pruitt,*
   862 F.3d 1 (D.C. Cir. 2017) ...................................................................46

*Eagle-Picher Indus., Inc. v. EPA,*
   759 F.2d 905 (D.C. Cir. 1985) ...............................................................30

*EME Homer City Generation, L.P. v. EPA,*
   795 F.3d 118 (D.C. Cir. 2015) ........................................................10, 14

*EPA v. EME Homer City Generation, L.P.,*
   572 U.S. 489 (2014) ................................... 1, 4, 9, 10, 11, 12, 17, 21, 22, 38

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) .......................................................................5, 30, 34

*Loper Bright Enters. v. Raimondo,*
   144 S.Ct. 2244 (2024) ........................................................................3, 22

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ................................................................................37

*Motor Vehicle Mfrs. Assn. of U.S., Inc. v.*
   *State Farm Mut. Automobile Ins. Co.,*
   463 U.S. 29 (1983) ...........................................5, 9, 33, 37, 38-39

iii

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ................................................................37

*NRDC v. EPA,*
    489 F.3d 1250 (D.C. Cir. 2007) ...............................................46

*NRDC v. Thomas,*
    805 F.2d 410 (D.C. Cir. 1986) .................................................19

*Ohio v. EPA,*
    144 S.Ct. 2040 (2024) ..................... 1, 4, 5, 6, 7, 8, 9, 11, 17, 21, 26, 29, 34, 46

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
    547 U.S. 47 (2006) .................................................................37

*SEC v. Chenery,*
    332 U.S. 194 (1947) ............................................................25, 31

*Sinclair Wyo. Ref. Co. LLC v. EPA,*
    101 F.4th 871 (D.C. Cir. 2024) ...............................................33

*Spiegla v. Hull,*
    481 F.3d 961 (7th Cir. 2007) .....................................................3

*United States v. Washington,*
    596 U.S. 832 (2022) ..................................................................7

*White Stallion Energy Ctr. v. EPA,*
    748 F.3d 1222 (D.C. Cir. 2014) ........................................ 19-20

**Statutes & Other Authorities:**

42 U.S.C. §7410(a)(2) ..............................................................35

42 U.S.C. §7410(a)(2)(D) ........................................................38

42 U.S.C. §7410(a)(2)(D)(i) .............................................8, 10, 27

42 U.S.C. §7410(a)(3)(C) ........................................................35

42 U.S.C. §7414 ...................................................................25

42 U.S.C. §7426(b) ................................................................27

42 U.S.C. §7602(y) ...............................................................35

42 U.S.C. §7607(d) ........................................................2, 4, 35

42 U.S.C. §7607(d)(3) ...........................................................15

42 U.S.C. §7607(d)(6)(C) .......................................................35

42 U.S.C. §7607(d)(7)(A) .........................................................8

42 U.S.C. §7607(d)(8) ..............................................................8

42 U.S.C. §7607(d)(9) .....................................................6, 15, 46

42 U.S.C. §7607(d)(9)(A) .......................................................7, 8

42 U.S.C. §7607(d)(9)(D) ..........................................................8

63 FR 57,356 (Oct. 27, 1998) .................................................21

76 FR 48,208 (Aug. 8, 2011) ..............................................16, 18

81 FR 74,504 (Oct. 16, 2016) .................................................34

87 FR 20,036 (Apr. 6, 2022) ...................................17, 18, 23, 28

88 FR 36,654 (June 5, 2023) ...... 6, 11, 12, 13, 15, 17, 18, 19, 20, 23, 26, 37, 40, 41

*The EPA Defies the Supreme Court*, WALL ST. J. (Aug. 17, 2023) ....................40

## GLOSSARY

| | |
|---|---|
| Act | Clean Air Act |
| EGUs | electric generating units |
| EPA | United States Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| JA | Joint Appendix |
| NAAQS | National Ambient Air Quality Standards |
| Non-EGUs | non-electric generating units |
| NOx | nitrogen oxides |
| ppb | parts per billion |
| TSD | Technical Support Document |

## INTRODUCTION AND SUMMARY OF ARGUMENT

As Industry Petitioners demonstrated—and the Supreme Court has since held—the Rule is arbitrary and capricious because EPA did not explain why the Rule's uniform regulation of NOx emissions in 23 States could still rationally be applied if "as in fact did happen," the Rule covers "only a fraction of the States and emissions EPA anticipated." *Ohio v. EPA*, 144 S.Ct. 2040, 2053-54 (2024). That error is prejudicial and is by itself reason to vacate the Rule. But that was not EPA's only error.

EPA also violated its "statutory duty to avoid over-control," *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 523 (2014), by imposing "enhancements" on the trading program for EGUs that will force substantial reductions in statewide emissions budgets without any analysis showing that these reductions will not result in over-control. These "enhancements" also constrain EGUs' ability to keep costs at the level EPA found to be cost-effective—another reality EPA failed to analyze.

Similarly, EPA flouts its obligation under the Act and regulates non-EGUs without regard to actual compliance costs. And EPA arbitrarily used

1

*annual* cost calculations to set non-EGU emissions limits that apply only during ozone season, May through September.

EPA also fundamentally erred in its regulation of individual non-EGU industries. For Pipelines and Boilers, it chose applicability criteria so overbroad that the vast majority of the regulated sources emit less than the 100 tons-per-year-threshold EPA set. EPA subjected Paper and Steel to the Rule based on flawed assumptions and bad data. EPA set limits for reheat furnaces without meeting the procedural requirements of 42 U.S.C. §7607(d). And it did not show the need to regulate the Arkansas steel industry or sources located on Tribal lands.

Finally, EPA set unreasonable compliance deadlines for Pipelines, Paper, and Steel. And it failed to do the analysis needed to ensure the Rule will not compromise the reliability of the electric grid and natural gas service.

These are serious errors that infect EPA's core methodology and reasoning, impacting entire industries and States. This Court should vacate the Rule.

## ARGUMENT

### I.    Deference is Inappropriate.

Under the weight of it all, EPA pleads for deference, asking this Court to rely on "its particular expertise." EPA Br. 2, 45 n.12. But "Congress expects courts to handle technical statutory questions." *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2267 (2024). While *EME Homer* remains binding, the Rule here deviates from the methodology upheld in *EME Homer* in multiple significant respects. As to those issues, post-*Loper Bright*, the Court "must exercise [its] independent judgment in deciding whether [EPA] acted within its statutory authority…." 144 S.Ct. at 2273. EPA did not. Nor are arguments under *Loper Bright* waived: they were not available until *Loper Bright*. *See Spiegla v. Hull*, 481 F.3d 961, 964 (7th Cir. 2007).

For EGUs, EPA deserves no deference on the legality of the "enhancements" or the question of over-control, which is a "statutory"

question. *EME Homer*, 572 U.S. at 523. For non-EGUs, this Court also must not defer to EPA's assertion that the agency may dispense with selecting a cost threshold to fulfill its statutory duty to define significant contribution, or circumvent statutory rulemaking requirements. *Id.* at 519; 42 U.S.C. §7607(d).

## II.    Incorporation by Reference.

This brief incorporates by reference the reply brief filed by State Petitioners (except Wisconsin).

## III.    EPA Failed to Justify the Rule's Application to Fewer than 23 States.

EPA failed to justify applying the Rule to only a subset of the original 23 states. Industry Br. 21-27; *Ohio*, 144 S.Ct. at 2053-57. That alone dooms the Rule. EPA insists that (1) facially, the Rule is not tied to the number of states and, besides, it included a severability clause; (2) Petitioners insufficiently raised these points in comments; and (3) EPA's reconsideration ruling moots Petitioners' claim. EPA Br. 29-45. Petitioners, and the Supreme Court, have explained why each of EPA's arguments is wrong. *Ohio*, 144 S.Ct. at 2053-57.

1.    EPA principally claims that its "effort to ensure the Rule can be applied to any covered source, rather than narrowly tied to a particular constellation of States, is plain on the face of the Rule." EPA Br. 37. The Supreme Court ruled otherwise: "Perhaps there is some explanation why the number and identity of participating States does not affect what measures maximize cost-effective downwind air-quality improvements. But if there is an explanation, it does not appear in the [Rule]." 144 S.Ct. at 2054.

EPA's omission is fatal because EPA neither provided "a satisfactory explanation for [the Rule]" nor considered this "important aspect of the problem…." *Id.* (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). As Petitioners highlighted, EPA did not analyze whether it would make sense to implement the Rule after losing 75% of its projected emissions reductions, where the Rule as originally intended would only have achieved an average 0.66 ppb ozone reduction—less than 1% of the NAAQS—which is not in itself "significant." Industry Br. 25; *Ohio*, 144

S.Ct. at 2057 n.14 (EPA's "findings regarding air quality improvement" downwind were a "central component" of its analysis. (citing 88 FR 36,654, 36,741 (June 5, 2023))).

Additionally, EPA's severability clause merely demonstrates an "awareness" of the problem; it is not "an explanation" of how the severability provision solved the problem. *Ohio*, 144 S.Ct. at 2054-55. Thus, EPA "did not address [Petitioners'] concern so much as sidestep it." *Id.* at 2055.

EPA did not explain how the Rule would "yield the same results and command the same emission-control measures if conducted for, say, just one State." *Id.*; *see also* Industry Br. 25. Accordingly, "'revers[al]' of the [Rule]'s mandates" is required. *Ohio*, 144 S.Ct. at 2054 (quoting 42 U.S.C. §7607(d)(9)).

**2.**    EPA contends Petitioners' concerns were not adequately raised in comments, requiring reconsideration. EPA Br. 31-36. Not so. Industry Br. 22-23. "Commenters alerted the agency that, should some States no longer participate in the plan, the agency would need to return to the drawing

6

board…to determine what emissions-control measures maximized cost effectiveness in securing downwind ozone air-quality improvements." *Ohio*, 144 S.C.t at 2055. Indeed, EPA's inclusion of a "severability" clause in the final Rule, *for the first time*, demonstrated that "the agency appreciated that concern." *Id.*

Petitioners were not required "to return to EPA to raise (again) a concern EPA already had a chance to address." *Id.* at 2056; *contra* EPA Br. 34.

**3.**    Finally, this issue is not moot because the Court could still grant Petitioners "effectual relief"—vacatur of the Rule. *See United States v. Washington*, 596 U.S. 832, 837 (2022). Indeed, as *Ohio* held, if Petitioners prevail on their arbitrary-and-capricious argument, "the [Act] entitles them to 'revers[al]' of th[e] [R]ule's mandates on them." 144 S.Ct. at 2055 n.11 (quoting 42 U.S.C. §7607(d)(9)(A)).

There is no merit to the contention, advanced only by Intervenor-States (at 26-30) and not by EPA, that the error can be dismissed as "harmless." First, the Act's harmless-error rule applies only where the agency action is

"without observance of procedure required by law," 42 U.S.C. §7607(d)(9)(D)—not where, as here, the action is "arbitrary [and] capricious" because EPA issued an unreasoned decision, *id.* §7607(d)(9)(A); *see Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1263 (D.C. Cir. 1994) ("adequacy of the EPA's rationale" is "substantive"). Second, even if harmless-error review applied, it would exclude *post-hoc* rationalization and would be confined to the administrative record for this Rule. *See Ohio*, 144 S.Ct. at 2055 n.11 (citing 42 U.S.C. §7607(d)(7)(A)). Third, EPA's error is prejudicial because it goes to a matter of "central relevance to the rule," 42 U.S.C. §7607(d)(8)—namely, how to determine what "amounts" of emissions, from which sources, "contribute significantly" to downwind nonattainment, *id.* §7410(a)(2)(D)(i); *see also Ohio*, 144 S.Ct. at 2057 & n.14 (noting EPA's statements demonstrating state-specific factors influence Rule outcome).

Further explanation is not the appropriate remedy for Petitioners' successful arbitrary-and-capricious challenge. The remedy for arbitrary-

and-capricious action under the Act is not remand without vacatur, but "revers[al]." *Ohio*, 144 S.Ct. at 2054; *see also infra* 46-47. EPA must start over.

## IV.    EPA Violated Its Statutory Duty to Avoid Over-Control of EGUs.

EPA does not deny it failed to evaluate whether its post-2026 requirements will result in over-control. EPA Br. 60; Industry Br. 32-33. Nor does it deny that its statewide emissions budgets change after 2026 with each passing year. EPA Br. 58; Industry Br. 29-32. These two realities demonstrate EPA violated its "statutory duty to avoid over-control," *EME Homer*, 572 U.S. at 523, and "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43.

EPA responds that it may ignore over-control after 2026 because its post-2026 requirements maintain the Rule's stringency for *individual sources*, so EPA need not evaluate whether overall *statewide* post-2026 requirements result in over-control. EPA Br. 56-60. That is wrong.

The over-control question at Step 2 of the Transport framework centers on projected statewide contributions, and whether EPA goes beyond eliminating "significant" contribution. "EPA cannot require *a State* to reduce

its output of pollution by more than is necessary to achieve attainment in every downwind *State*," "[n]or can EPA demand reductions that would drive an upwind *State's contribution* to every downwind *State* to which it is linked below one percent of the relevant NAAQS." *EME Homer*, 572 U.S. at 521-22 (emphases added). And when this Court applied that test, it did so *by State*. *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 128-30 (D.C. Cir. 2015).

Indeed, under 42 U.S.C. §7410(a)(2)(D)(i), each *State* must ensure the "amounts" of emissions from "any source or other type of emissions activity within the State" do not "contribute significantly to nonattainment" in "any other State." *See also EME Homer*, 795 F.3d at 125. So "[i]f EPA requires an upwind *State* to reduce emissions by more than the amount necessary to achieve attainment in every downwind State to which it is linked, the Agency will have overstepped…." *EME Homer*, 572 U.S. at 521 (emphasis added).

10

"[S]tate-level analyses" also "play a significant role" in EPA's four-step framework. *Ohio*, 144 S.Ct. at 2057. At Step 2, "[a] State" only "contributes" under the Good Neighbor Provision "if its share of downwind pollution…is at or above a 'contribution threshold' that screens out de minimis impacts" which EPA set at "one percent of the [NAAQS]." EPA Br. 8 (citing 88 FR 36,712-17). If "EPA demand[s] reductions that would drive *an upwind State's contribution*…below one percent," that "would be counter to…the Agency's interpretation of the Good Neighbor Provision." *EME Homer*, 572 U.S. at 521-22 (emphasis added). Indeed, elsewhere EPA rejects source-by-source analysis because Step 2 focuses on "each upwind State *as a whole*." EPA Br. 97-99.

To obfuscate the state-based nature of the overcontrol question, EPA focuses exclusively on the third step of its framework, EPA Br. 56-60, creating a "muddle" it otherwise criticizes, *id.* at 96. *The over-control problem here is not a third-step issue.* At Step 3, EPA claims to "ensure[] a 'fair share' of the regulatory burden is allocated among sources in covered States" by

calculating the statewide emissions level that would be achieved if controls on each source were implemented at a uniform cost-threshold, deeming State contributions above that level "significant." *Id.* at 9-10, 46-47. EPA argues the Rule's "enhancements" that force overall state emissions downward from 2026 levels do not risk post-2026 overcontrol because the selected cost-threshold "stringency" for emissions controls on individual sources at Step 3 does not change. *Id.* at 52, 56, 58-60.

But if maintaining consistent source-specific stringency means increasingly stringent statewide budgets that lead a State's total downwind contributions to either fall below EPA's 1% threshold at Step 2 or go beyond bringing downwind States into attainment, then EPA over-controls. *EME Homer*, 572 U.S. at 521-22.

When EPA conducted its over-control analysis for 2026, it evaluated potential over-control "for any given *state*," examining downwind changes "from the emissions reductions of the upwind *states*." 88 FR 36748-49 (emphasis added); Policy Analysis TSD 42-44, 63-64, 72-74, JA___-___, ___-

___, ___-___. Because each of EPA's post-2026 budget changes force a reduction of a State's total emissions beyond the State's 2026 budget, Industry Br. 29-32, EPA's failure to evaluate over-control after 2026 abdicates its statutory duty and is arbitrary and capricious.[1]

Consider Oklahoma. EPA concedes that if Oklahoma complies with its 2026 "budget," emitting 6,631 tons of NOx, it will no longer "contribute" (much less "contribute significantly") to any downwind nonattainment. Industry Br. 33-34; EPA Br. 56-57. But EPA's 2027 preset budget permits Oklahoma to emit only 3,917 tons of NOx, 88 FR 36,663, far exceeding its Transport obligations. This massive overreach cannot be overcome by EPA's dodge that marginal changes create potential uncertainties regarding the exact extent of over-control. EPA Br. 57. And that is *before* the other

---

[1] The challenged post-2026 budget "enhancements" include EPA's preset budgets starting in 2027 that are below the 2026 budgets, *see* 88 FR 36,663, and the less-predictable dynamic budgeting, bank recalibration, and daily backstop limits.

13

enhancements that further limit emissions. Oklahoma is not the sole example. Industry Br. 34.

As statewide emissions decrease due to source retirement, curtailment, or conversion, still-operating *sources* may depart from EPA's uniform controls without the *State* running afoul of the Transport Provision. EPA may not disregard over-control in such circumstances merely because "'imposing less stringent emission budgets' on those upwind States 'would be inequitable and contrary to the rationale underlying uniform cost thresholds.'" *EME Homer*, 795 F.3d at 131.

EPA's final redoubt is to claim over-control can only be challenged years later, in 2027 and beyond, through "particularized," "as-applied" challenges. EPA Br. 53, 60. But Petitioners put forward precisely the evidence EPA seeks with respect to several States. Industry Br. 33-34. And, EPA does not contest that it would argue post-2026 challenges are beyond the 60-day deadline for review. *See id.* at 33 n.11. EPA *only* contemplates disputes regarding the accuracy of its future "ministerial" calculations of allowance

14

budgets and will forbid notice-and-comment on any other matter. EPA Br. 73-74; 88 FR 36,753.[2] Finally, neither this Court nor the Supreme Court has foreclosed facial challenges when a Transport rule either systematically effectuates or fails to evaluate over-control. Indeed, the Supreme Court just stayed the *whole* Rule based on the same type of failure-to-evaluate a *facial* flaw.

## V.    EPA Has Not Demonstrated that the Rule is Cost-Effective With the EGU Enhancements.

The Rule's "enhancements" eviscerate EPA's reliance on the $11,000/ton cost threshold to find EGU controls cost-effective, and EPA wholly failed to analyze that reality. Industry Br. 49-52. EPA's primary response points to past Transport rules (which lack these enhancements) and statements about the ubiquity of controls and ease of compliance. EPA Br.

---

[2] EPA does not contest that it will not allow comment on whether those recalculated budgets will result in over-control. Industry Br. 91; EPA Br. 73-74. Foreclosing opportunity to comment violates the Act's procedural requirements, requiring reversal. 42 U.S.C. §7607(d)(3), (9).

60-66. Yet absent from the record are any findings about the cost-effectiveness of the enhancements.[3]

Past Transport rules touted the "flexibility" allowances and interstate trading provide, where sources with high cost-of-control could purchase allowances. 76 FR 48,208, 48,272 (Aug. 8, 2011). EPA concedes this Rule "dampen[s]" the trading program with "stronger" "incentive[s]…to directly reduce their emissions." EPA Br. 50, 63. EPA's delay of certain enhancements only delays admitted "uneconomical expenses." *Id.* at 63. EPA cannot reasonably reach the same prior cost-effectiveness conclusions—based on past trading flexibilities allowing sources to take advantage of *average* costs—without evaluating the compliance-cost impacts of the new enhancements.[4]

---

[3] EPA points to its Regulatory Impact Analysis, EPA Br. 64, which just demonstrates that it did *not* consider the impact of the enhancements as part of its cost-effectiveness analysis.

[4] EPA also points to the *current* market liquidity and price of allowances, EPA Br. 62, but that is outside the record and ignores that the enhancements kick-in *after* 2026.

## VI. The Rule Unlawfully Regulates Non-EGUs.

### A. EPA Concedes it Regulated Non-EGUs Regardless of Cost.

Under *EME Homer*, emissions "contribute significantly" *only if* they "can be eliminated under the cost threshold set by [EPA.]" 572 U.S. at 518.[5] EPA repeatedly declares that it followed *EME Homer* to regulate non-EGUs in the Rule. *See, e.g.*, EPA Br. 7, 9, 40, 75-76; 88 FR 36,719. It did not.

1. EPA contends it used the $7,500/ton threshold to identify "industries with the potential for cost-effective emissions reductions," but "never intended" to use the threshold to determine "what non-EGU emissions should be eliminated." EPA Br. 77. The language in the proposed rule, the Screening Assessment, and the rule upheld in *EME Homer* belie EPA's *post-hoc* recasting of the $7,500/ton threshold. *See* 87 FR 20,036, 20,083-84, 20,155 (Apr. 6, 2022) (repeatedly referring to control costs "*up to* $7,500

---

[5] *Ohio*'s dissent even affirms *EME Homer* is the applicable test here. *See* 144 S.Ct. at 2064 (Barrett, J., dissenting) ("EPA explains…[i]t must halt those emissions that can be eliminated at a cost 'under the cost threshold set by the Agency' for sources in that industry.").

per ton" (emphasis added)); 76 FR 48,259 (same for $2,300/ton); Screening

Assessment 5, JA___ (same for $7,500/ton).

That EPA viewed $7,500/ton as a limit on compliance costs is clear

from the proposal's discussion of Pipeline engines. The proposal said that

"engines subject to this proposed [rule] can achieve" the proposed emissions

limits with "control technologies at the marginal cost threshold of $7,500 per

ton," and EPA had not proposed stricter limits because that would require

"some units" to install "additional controls beyond [that] cost threshold." 87

FR 20,142-43. EPA then invited comment on "whether additional control

technology could be installed on these sources at or below the marginal cost

threshold to achieve a lower emissions rate." *Id.* at 20,143.

Commenters demonstrated that a lower emissions rate was not

achievable and that the proposed emissions limits would require installation

of controls at costs that vastly exceed $7,500/ton for many non-EGU sources,

such as $37,900/ton for Paper and $109,301/ton for many Pipeline engines.

Industry Br. 36-37. Yet EPA imposed the same emissions limits from

proposal that would require installation of specific control technologies regardless of the actual costs of controlling a given unit.

In its response, EPA claims that it did a "more detailed analysis in the…[R]ule," and claims that analysis "did not reveal any 'knee-in-the-curve' cost for non-EGUs up through the control strategies selected." EPA Br. 78 (citing 88 FR 36,741). In so doing, EPA is clear that it *never identified its new cost-effectiveness threshold for non-EGUs*. EPA also provided no information about this "more detailed analysis," and cited no record document explaining how it was performed or its results. There is thus no substantial evidence and no reasoned explanation to support EPA's conclusion to regulate non-EGUs. *See NRDC v. Thomas*, 805 F.2d 410, 431 n.34 (D.C. Cir. 1986) (Act's "arbitrary and capricious" test requires that there be "substantial evidence" supporting EPA's action).

Both contrary to statute and arbitrarily, EPA has therefore discarded the $7,500/ton threshold, and with it, the *EME Homer* framework. 88 FR 36,740; Industry Br. 36-37, 42; *see also White Stallion Energy Ctr. v. EPA*, 748

F.3d 1222, 1261-62 (D.C. Cir. 2014) (Kavanaugh, J., dissenting) (citing statements of Justices Kagan and Breyer on importance of considering cost).

2.     Far afield from *EME Homer*'s knee-in-the-curve test, EPA seeks refuge in its assessment of the *average* cost of $5,339/ton within and across nine dissimilar industries, calling those costs "reasonable" as compared to the $11,000/ton cost for EGUs. EPA Br. 76. First, "average" cost is not the *EME Homer* test. Second, if $7,500/ton was not the knee-in-the-curve, how is $5,339/ton even relevant? Perhaps most importantly, the "technology breakpoint (represented by a cost threshold)" of $11,000/ton that EPA found "maximized cost-effectiveness" for EGUs contained *no analysis* relevant to non-EGUs. 88 FR 36,678, 36,744. EPA does not (and cannot) explain why it is rational to generally compare the knee-in-the-curve threshold for *EGUs* to justify the emissions limits for non-EGUs.

3.     Further, EPA recognizes non-EGUs are a "varied universe." EPA Br. 75; *see also* 88 FR 36,720 ("Non-EGU sources" "are relatively heterogenous"). So, EPA should have done separate analyses to identify the

cost-effectiveness threshold (i.e., the knee-in-the-curve) for each "varied" (i.e., individual) industry. Industry Br. 39-40. In response, EPA argues that neither EPA's methodology nor the Act requires separate analyses for each non-EGU industry. EPA Br. 79. But that argument flies in the face of the "efficient and equitable" cost threshold approach in *EME Homer* that EPA said it applied. 572 U.S. at 519-20 (applying cost threshold analysis to a single industry). Indeed, even the *Ohio* dissent understood *EME Homer* required a cost threshold "for sources in that industry." 144 S.Ct. at 2064 (Barrett, J., dissenting).

EPA also clings to its past Transport rules to support the amalgamation of nine distinct industries. EPA Br. 79-80. But those past rulemakings applied *exclusively* to a single industry: EGUs. And the prior rule EPA relies on, *id.* at 78-79, merely set statewide budgets and permitted emissions allowance trading so no specific high-cost non-EGU unit was required to install controls. 63 FR 57,356, 57,405 (Oct. 27, 1998).

Consider the irrational practical outcome of EPA's new inter-industry averaging approach—even if we assumed that was the right test (and it is not). Assume one non-EGU industry had average costs of $100/ton and a separate industry had average costs of $30,000/ton. If both industries emit the same volumes, the average cost (i.e., supposed "cost-effectiveness") is $15,050/ton even though one industry will clearly spend double that value. When "significant contribution" is defined as amounts that "can cost-effectively be reduced," *EME Homer*, 572 U.S. at 519, it is irrational for EPA to blind itself to such cost-effectiveness information.[6]

**4.**    Similarly, EPA's reliance on an average cost across all regulated non-EGU industries is irrational because it elides significant differences in the cost-effectiveness for individual non-EGU sources. *See* Industry Br. 36-38. EPA dismisses each industry's assessment of its own costs as "anecdotal," EPA Br. 81, but that is a *post-hoc* rationalization not contained

_____

[6] EPA has not asked this Court to adopt a different interpretation of "significant contribution," and any new interpretation would not be entitled to deference. *See Loper Bright*, 144 S.Ct. at 2273.

in the Rule or EPA's Response to Comments. Further, each industry derived these costs from unit-by-unit analyses. *See* Industry Br. 36-37 (collecting industry comments). It is arbitrary and capricious to ignore detailed, real-world data in favor of "proxy estimates," "illustrative" data, and "simple averages." 88 FR 36,739-40; 87 FR 20,089.

**5.**    Finally, EPA says that it "built several forms of compliance flexibility into the Rule" that may help offset high costs for some individual sources. EPA Br. 80. But "[a] safety valve cannot rescue [an irrational rule] from systemic errors." *Ass'n of Oil Pipe Lines v. FERC*, 281 F.3d 239, 244 (D.C. Cir. 2002). Otherwise, "no rule, no matter how irrational, could be struck down, provided only that a waiver provision was attached." *ALLTEL Corp. v. FCC*, 838 F.2d 551, 561-62 (D.C. Cir. 1988). EPA cannot regulate thousands of sources that do not "contribute significantly" and then attempt to save its overinclusive rule with mechanisms that *might* allow some unknown number to avoid controls.

In the end, the Rule provides no assurance that many non-EGU sources will not have to install controls costing significantly more than $7,500/ton, or any other amount that could reasonably be deemed cost-effective. That is inconsistent with the Act, with EPA's own understanding of "significant contribution," and with principles of reasoned decisionmaking.

### B. EPA Unlawfully Used Annual Cost-Effectiveness Calculations to Justify Ozone-Season Emissions Limits for Non-EGUs.

EPA does not dispute that it used *annual* cost calculations for non-EGUs to set emissions limits that apply only during the five months of ozone season. Nor does EPA dispute that it assumed ozone-season emissions for all non-EGU sources were 5/12ths of annual emissions. Industry Br. 49.

EPA insists its use of annual emissions "ma[d]e no difference" because they are only used "in a representative and relative way." EPA Br. 83-84 (citation omitted). But annual emissions reflect ozone-season emissions *only if there is little-to-no seasonal variation*. Take two sources that each emit 120 tons-per-year of NOx. The first emits 10 tons of NOx each month, emitting

24

50 tons in ozone season. The second has larger emissions in the winter and emits just 25 tons in ozone season. The cost-per-ton of *annual* emissions reductions is the same for both sources, but the cost-per-ton of *ozone-season* emissions reductions is *twice as high* for the second source. Using annual data, EPA wrongly viewed both sources as having equally cost-effective emissions reductions in ozone season, skewing the Rule's entire non-EGU cost analysis.

EPA claims using annual data has no impact because there is no meaningful seasonal variation. *Id.* at 85. But demand for natural gas in many areas is highest outside of ozone-season, in the winter. *See* TC Energy Comment 4-5, JA___-___.

EPA now says it could use annual data because it lacked "better data sources." EPA Br. 85. That argument, made for the first time here, is a *post-hoc* rationalization barred by *SEC v. Chenery*, 332 U.S. 194, 196 (1947). EPA could have requested the necessary data from industry through formal information requests (under 42 U.S.C. §7414), or simply adjusted to account

for seasonal variability. Instead, EPA ignored this "important aspect of the problem." *Ohio*, 144 S.Ct. at 2053 (citation omitted).

### C.    EPA's Applicability Criteria for Engines and Boilers Are Unlawful.

EPA does not dispute Industry Petitioners' showing that less than 10% of Pipeline engines and 23% of boilers subject to the Rule emit 100 tons-per-year of NOx. Industry Br. 53-54. EPA nevertheless claims it "reasonably determined" that the Rule's design-capacity criteria "'reasonably approximates' the 100-tons-per-year threshold." EPA Br. 90 (quoting 88 FR 36,820). That argument has no basis in law or fact. An inaccurate proxy is not reasonable and cannot be used to justify rules with no "rational connection between the facts found and the choice made." *Ohio*, 144 S.Ct. at 2053 (citation omitted).

EPA argues that it may regulate sources based on their *potential* to emit, not their actual emissions. EPA Br. 86-89. But EPA's screening "analysis focused on actual emissions rather than 'potential to emit' emissions," Response to Comment ("RTC") 109, JA___, and the Transport

Provision addresses *actual* emissions, Industry Br. 56. The Act prohibits EPA from regulating sources based only on hypothetical emissions—absent any basis to conclude that, without controls, those sources "will…contribute significantly."

EPA also claims that if low-emitting units were exempted, Pipelines could avoid controls "by shifting operation from their regulated units to non-regulated ones." EPA Br. 89. But EPA has no response to Industry Petitioners' showing that EPA could prevent emissions-shifting through simple reporting requirements. Industry Br. 56-57.

Next, EPA claims that it can regulate lower-emitting units if they "collectively 'significantly contribute," even if individual units do not. EPA Br. 91 (citation omitted). But the Transport Provision does not speak of "groups" of sources. *Cf.* 42 U.S.C. §7426(b). It says "any source." *Id.* §7410(a)(2)(D)(i). Consistent with that language, EPA did not endeavor, in the Rule, to identify "groups" of low-emitting sources whose collective contributions may be significant. Rather, "EPA focused on assessing

27

emissions *units* that emit greater than 100 tons per year" because it thought they are the "most impactful" units with "the most emissions reductions that would make meaningful air quality improvements" at a reasonable cost. 87 FR 20,083 (emphasis added); *see also* Non-EGU Screening Assessment 3, JA___. That rationale does not apply to the more than 2,600 Pipeline engines and boilers that emit less than 100 tons-per-year. Non-EGU Facilities and Units_Final, JA___.

EPA says it determined that the inclusion of these low-emitting units "still allows for cost-effective emissions reductions." EPA Br. 91. In support, it cites an average cost derived from "illustrative" data, 87 FR 20,089, that is the *industry-wide average* for *all* the Pipeline engines. Non-EGU Memorandum 11 (Table 8), JA___. Yet EPA acknowledges that the "cost/ton values" are likely higher for "lower emitting units." *Id.* at 7, JA___. Given that EPA's proxy means that 90% of regulated Pipeline engines and 77% of boilers are "lower-emitting units," general references to industry averages cannot show it is cost-effective to control low-emitting units.

28

### D.    Pipeline, Paper, And Steel Compliance Deadlines Are Unreasonable.

Industry Petitioners demonstrated that EPA's study of non-EGU compliance timeframes relies on unsupported and erroneous assumptions. Industry Br. 85-90.

In response, EPA argues, without support, that its timelines are "generally sufficient" for Pipelines. EPA Br. 110. Simply saying something does not make it true. *See Ohio*, 144 S.Ct. at 2055 ("EPA's response did not address the applicants' concern so much as sidestep it.").

Moreover, the Rule does not require "general" compliance; it requires *all* Pipelines to comply. EPA has acknowledged some Pipeline engines need 72 months to comply—longer than the Rule allows under *any* circumstance. Timing Report ES-3, 68, JA___, ___. Even if this were, as EPA claims, an upper-bound estimate, EPA Br. 110-11, EPA's other estimates are 40 and 58 months—again, far longer than the Rule allows. Timing Report ES-3, 68, JA___, ___. And while EPA's brief generally references the purported "clearing up" of "supply-chain disruptions," EPA Br. 112, EPA already

leveraged that unsupported justification when it arbitrarily assumed vendor capacity would double. *See* Timing Report 47, 59-61, JA___, ___-___ (labor pool analyzed as component of supply chain). The potential for case-by-case extensions is no cure for a systemic error. Industry Br. 89-90; *supra* 23.

Furthermore, even these extended timeframes assume that facility-wide averaging will significantly reduce the number of engines requiring controls within this 35-month period. EPA Br. 110. Yet Petitioners demonstrated that averaging is materially less impactful at compressor stations with fewer engines—stations that represent a significantly larger portion of the industry than EPA acknowledged. Industry Br. 45-46.

Rather than provide "a full analytical defense," *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 921 (D.C. Cir. 1985), of the facility-averaging model, EPA instead attempts to transfer its burden to Petitioners, arguing that Petitioners have not specified precisely how many engines require controls, EPA Br. 80-81, 110. But that is *EPA*'s task, not *Petitioners*'. *Prometheus*, 592 U.S. at 423. Regardless, Petitioners' critique of the averaging model was

30

based on EPA's own existing data. *See* Industry Br. 45-46. The errors in EPA's many assumptions (which EPA's response brief does not rebut) result in an unreasoned and impossible compliance timeline for Pipelines.

Petitioners do not demand perfection, as EPA suggests. EPA Br. 80-81. Petitioners ask only that EPA not rely on a model "so oversimplified that the agency's conclusions from it are unreasonable." *Chem. Mfrs. Ass'n*, 28 F.3d at 1265 (citation omitted). That is especially true where EPA uses the model to support both the 35-month deadline for Pipelines *and* the purported costs of controls for Pipelines. EPA Br. 80-81, 110.

For Steel, the compliance timelines are similarly unsupported. EPA does not dispute that the Timing Report failed to consider the additional time required for the Steel work plan process. EPA claims facilities *could* still install controls by the 2026 ozone season. *Id.* at 113-14. This *post-hoc* rationalization is irrelevant. *Chenery*, 332 U.S. at 196. It is also inaccurate, failing to account for: (1) EPA asking for any supplemental information or revisions; (2) permitting; and (3) supply chain delays. Industry Br. 88-89.

31

EPA ignores the first two. Its only response on the third is that it did not find supply chain issues in the Timing Report, which failed to consider that work cannot begin until a work plan is finalized, so did not address the supply chain for Steel.

For Paper, EPA offers hollow (and discretionary) compliance extensions of an upper bound of 37 months (more than the approximate 35 months to comply). This highlights that additional emissions units (besides Pipelines) would be required to seek case-by-case, discretionary compliance extensions under the plain findings of the Timing Report. *See* Timing Report 65-66 tbl. 6-1, JA___-___.

All-in-all, EPA's evasive maneuvers confirm its failure to take responsibility for a Rule with unachievable compliance deadlines.

### E.     EPA Fails to Justify Regulation of Steel and Paper.

There is no "misunderstand[ing]" of the role of the Screening Assessment. EPA Br. 25. It is also not without "legal effect." Public Interest Br. 9. EPA acknowledges it "used the Screening Analysis to identify potential industries for inclusion" in the Rule. EPA Br. 79; *see also id.* at 16.

EPA used the Screening Assessment "to determine whether non-EGU industries had meaningful, cost-effective emissions reduction opportunities." *Id.* at 77. It did this not by looking at all industries with *any* emission reduction opportunities, but which industries had *enough* opportunities to justify further assessment. *See* Industry Br. 58.

EPA does not contest that it overcounted the opportunities for Steel. *Id.* at 78 (acknowledging "issues of infeasibility"); *id.* at 93 (EPA "pared back" because technologies "were not sufficiently established"). While EPA now says this does not mean the Screening Assessment was "flawed," *id.* at 94, this claim is so undeveloped it is waived, *Sinclair Wyo. Ref. Co. LLC v. EPA*, 101 F.4th 871, 888 (D.C. Cir. 2024). It is also wrong. EPA cannot "offer[] an explanation…that runs counter to the evidence." *State Farm*, 463 U.S. at 43. And EPA does just that when it finds most emission reduction opportunities were illusory, yet nonetheless relies on the Screening Assessment to justify regulating Steel.

33

Similarly, for Paper, EPA admits to "scientific uncertainty [and] imperfect information." EPA Br. 26. EPA should have excluded Paper as the assumed application of selective catalytic reduction technology is clearly unproven, creates unconsidered environmental harms, NOx emission reductions from Paper are insignificant relative to the Rule's goal, and Paper did not meet the significant contribution test. Paper Comments 4, JA___. EPA's dismissal of Paper's comments as unable to be replicated and unverifiable, EPA Br. 100, is inadequate under *Ohio*. 144 S.Ct. at 2054. EPA's only response: bad information "does not negate EPA's duty to act." EPA Br. 26. But in all past Transport Rules, when EPA lacked the necessary data, it reasonably elected *not* to regulate the relevant industry. *See, e.g.*, 81 FR 74,504, 74,542 (Oct. 16, 2016).

EPA's regulation of Steel and Paper was not "reasonable and reasonably explained." *Ohio*, 144 S.Ct. at 2053 (quoting *Prometheus*, 592 U.S. at 423).

F.      **Additional Steel-Specific Determinations Are Unlawful.**

1.      **The Work Plan Process Violates the Act.**

EPA concedes it will set emission limits for Steel reheat furnaces without meeting the "procedural requirements of 42 U.S.C. §7607(d)." EPA Br. 105. It does not matter that EPA is offering "an adjudicatory process" instead. *Id.* EPA is not authorized to do so. *See* 42 U.S.C. §7607(d)(6)(C) (Rule must be based on information in docket when promulgated.). And, §7602(y) does not say otherwise. EPA Br. 105. Pointedly, EPA does not address the procedures the Agency must follow to impose emissions requirements.

EPA's examples of "adjudicatory, application, and appeal procedures" it "routinely" promulgates are similarly irrelevant. *Id.* EPA cannot violate the Act simply because it does so "routinely." And, appeal procedures; recordkeeping, reporting, and monitoring requirements; and exemptions are not the same as emission limitations. *See* 42 U.S.C. §7410(a)(2) (plans must "include enforceable emission limitations" but can "provide for establishment" of monitoring and recordkeeping requirements); *id.* §7410(a)(3)(C) (allowing certain exemptions without "revis[ing] an

35

applicable implementation plan"). EPA's reference to regional haze regulations is similarly unavailing. Industry Br. 73.

### 2. The Reheat Furnace Requirements Are Arbitrary and Capricious.

EPA misstates Petitioners' argument. The issue is not what low-NOx burners "could" achieve. EPA Br. 107. It is the lack of record support for the target EPA imposed. Tacitly acknowledging that nothing in the final TSD supports EPA's decision, EPA cites only its *proposed* TSD. *Id.* And, for good reason, the final TSD dropped the previous reference to a "66%" "reduction" that EPA now calls "generally achieve[d]." *Id.*; Non-EGU TSD 38, JA___. The number comes from a 1994 estimation of a single reheat furnace, for which EPA had "no uncontrolled NOx emission data." EPA-HQ-OAR-2021-0668-0038, at 5-24, JA___. The same memo estimated a 27% reduction for another furnace. *Id.* Nowhere does it claim a 98% reduction. EPA Br. 107. And the only "permit data" EPA cites is a single permit that happened to be 20% below an Ohio standard. RTC 748, 754, JA___, ___. EPA offers no "rational

36

connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

Similarly, EPA acknowledges that a co-firing exemption is necessary for boilers because "biomass burning can cause controls not to operate." EPA Br. 82. This understates the record. This issue relates to *any* non-traditional fuel, not just biomass. 88 FR 36,833. Having recognized the technical infeasibility of operating emissions controls when co-firing for boilers, EPA could not then ignore that finding for reheat furnaces. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Unexplained inconsistency is…arbitrary and capricious….").

### G.    Hybar's Standing

EPA anticipates (EPA-HQ-OAR-2021-0668-1174, JA___) that the Rule applies to steel units in Northeastern Arkansas, making them the "object of the action." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). EPA does not contest other Arkansas petitioners' standing and their presence "is sufficient to satisfy" standing. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006). Thus, derivative standing applies to all arguments,

including the linkage of sources in Northeast Arkansas, except for Hybar's request that the Court defer consideration of its petition. That argument, however, does not advance an independent claim for judgment. Accordingly, derivative standing also supports the Court deciding that argument.

### H.    Source-Level Contributions

EPA admits it neither determined whether individual sources, nor the Arkansas steel industry, contribute to downwind nonattainment or maintenance receptors. EPA Br. 97-99. That admission disposes of the as-applied challenge regarding Arkansas steel. 42 U.S.C. §7410(a)(2)(D). EPA may not hide behind *EME Homer*, which upheld statewide budgets imposed by EPA while preserving as-applied challenges. 572 U.S. at 523-24. Because this Rule directly regulates non-EGUs, as-applied challenges from individual sources or industries are appropriate. United States Steel Corp. (USS) Comment 10-12, JA___-___.

EPA's other defenses, i.e., appealing to "competitors," EPA. Br. 98, "rel[y] on factors which Congress has not intended," *State Farm*, 463 U.S. at

38

43. These factors are irrelevant to whether a "source" or "emission activity" significantly contributes to maintenance or nonattainment.

Finally, EPA is wrong that HYSPLIT modeling shows a contribution to nonattainment from Northeast Arkansas. EPA Br. 99. This modeling—which EPA conducted for the Rule without accepting comments—uses an out-of-date dataset to locate back-trajectories that do not correspond to ozone nonattainment days EPA used to link Arkansas to downwind monitors. This modeling is irrelevant for determining whether Northeast Arkansas contributed to the specific ozone events that EPA used to justify the significance of Arkansas contributions. USS Comment 55 & Ex.A 19-22, JA___, ___-___.

## I.    Consideration of Post-2026 Facts

EPA has no defense to Petitioners' argument that it should have considered post-2026 events guaranteed to reduce emissions. Industry Br. 62-63 & n.16. Instead, EPA claims waiver. EPA Br. 95.  But that is wrong. *See* USS Comment 39-41, 64-66, JA___-___, ___-___. And EPA's suggestion, EPA Br. 95, that it was *compelled* to regulate by 2026 is both incorrect, USS

Comment 40, JA___, and belied by EPA's consideration of identical 2028

closures to set EGU industry deadlines. 88 FR 36,796-97.

## VII.    Reliability Remains a Public Safety Concern.

### A.    EGU Reliability.

EPA claims that Industry Petitioners' concerns over the Agency's

inadequate reliability assessment are of a piece with previously upheld

Transport rules. EPA Br. 73. This situation is entirely different: unlike any

time in the recent past, the power sector "is currently undergoing rapid

change." 88 FR 36,770. EPA is forcing that transition through a suite of major

new regulations of coal plants that commenters repeatedly urged EPA to

consider together. *See* Class of '85 Regulatory Response Group Comment 34,

JA___, National Mining Association Comment 13-16, JA___-___; *The EPA*

*Defies the Supreme Court*, WALL ST. J. (Aug. 17, 2023), https://bit.ly/4fagmB1.

Yet EPA's paltry attempt at analyzing reliability looked myopically at this

Rule in isolation. *See* Resource Adequacy TSD 1, JA___.

Further, unlike prior Transport rules, EPA's trading program is constrained by EPA's "enhancements," which significantly interfere with the flexibility critical to reliability. *Supra* 15-16; Industry Br. 28-34, 82.

EPA's primary response to reliability concerns continues to be trading and its flexibilities. *See* 88 FR 36,771. EPA points to its Resource Adequacy TSD, which summarizes EPA's modeling to assess the impact of its rule on future retirements. EPA Br. 71. The document explains, however, that "[s]ince the model must maintain adequate reserves in each region, projected retirements must be offset" with "excess reserves, incremental builds, and the ability to shift transmission flows between regions…." Resource Adequacy TSD 3, JA___. Thus, EPA's model, programmed to preserve reserve margins, shows a world where reliability could be addressed, but it fails to establish (or even evaluate) whether that is a likely or even plausible outcome. Given real-world constraints on permitting, surging demand, challenges to building new generation, and EPA's other,

41

unexamined rules, the record does not establish that grid reliability has been safeguarded.

### B.    Natural Gas Service Reliability.

EPA does not dispute that natural gas service reliability is important. EPA Br. 114-18. Yet EPA arbitrarily and capriciously failed to analyze whether the Rule would jeopardize reliable service. Industry Br. 77-81; American Exploration and Production Council Amicus (AEPC) Br. 7-14.

First, the Timing Report is facially not a reliability report, Industry Br. 79-81, EPA's *post-hoc* claims notwithstanding. For EGUs, EPA at least purported to prepare one. *See* Resource Adequacy TSD, JA___(EGUs); *but see supra* 40-42. But it did not even attempt that for Pipelines.

EPA now argues the approximate three-year compliance timeline (plus potential case-by-case, discretionary extensions) is sufficient to avoid overlapping outages because the Timing Report estimates that it takes one to seven months to install emissions controls on a single Pipeline engine. EPA Br. 115. This is a *post-hoc* rationalization not supported by the Timing Report, which does not analyze, much less determine, that controls could be

42

installed on all regulated engines within the Rule's compliance timeframe without compromising service during peak-demand periods. AEPC Br. 9-11. And, EPA's argument ignores that a Pipeline operator does not have free rein to decide when controls can be installed. Control installation is the *sixth* step in the engine control process, Timing Report 32, JA___; so, the installation period is limited by the need to complete other steps.[7]

EPA also claims that capacity utilization is "modest," which "supports EPA's position that the timeline will not cause service disruption." EPA Br. 116-17. That, too, is *post-hoc* rationalization. The Timing Report made no such conclusion about how compressor-station capacity impacts whether controls can be installed without compromising reliability. Timing Report 8, JA___. On the merits, the claim also fails. It is based on the erroneous assumption

---

[7] EPA's reliance on case-by-case extension requests, *see* EPA Br. 118, fares no better. The Timing Report concluded that more than half of all engines may be unable to meet the May 2026 deadline. *See* Industry Br. 86. And EPA did not analyze, much less conclude, that exemption requests could be timely processed to leave sufficient time for control installations without service disruption. *Id.* at 89-90.

that an average utilization rate of 40% means there is significant backup capacity at *all* compressor stations at *all* times. But average *annual* utilization rates say nothing about excess capacity during *peak periods*. Industry Br. 80.

Indeed, EPA has no response to Industry Petitioners' demonstration that there "is no slack capacity during peak periods." *Id.* at 79-80; *see also* AEPC Br. 10-12. The Timing Report neither addresses the issue of seasonal variability nor establishes that there is excess capacity during periods of peak demand. Absent excess capacity, Pipelines cannot take engines offline to install controls during peak-demand periods without compromising service. *Contra* EPA Br. 116-17.[8]

Nor does EPA contest that it failed to consult with FERC—the agency with primary jurisdiction over safe and reliable transportation of natural gas. EPA Br. 117.

---

[8] EPA suggests Petitioners constructed a "strawman" argument regarding "coordinat[ing] outages." *Id.* at 115. Not so. EPA's Timing Report expressly refers to "compressor stations in the U.S.," and in the same breath suggests Pipelines could "coordinate outages." Timing Report ES-8, JA___.

EPA attempts to backstop its failure to analyze the feasibility of installing controls on all Pipeline engines by 2026 through facility averaging and exempting emergency engines. *Id.* at 118. But the Timing Report already assumes those exemptions, and still fails to analyze, let alone show, that compliance deadlines can be met without compromising service to the public. Industry Br. 86; Timing Report ES-8, JA___. Public Interest Respondent-Intervenors argue that some engines may already meet the emissions limits. Public Interest Br. 15. But EPA did not rely on this rationale, and the cited document addresses *feasibility* of emissions limits, not the number of engines requiring controls. Proposed Non-EGU TSD 6, JA___.

Finally, it is telling that although the amici for EPA addressed many issues, none defended EPA's position on Pipeline reliability.

## VIII.  Indian Country

EPA incorrectly asserts that no party challenged its necessary and appropriate finding for sources in Indian Country. EPA Br. 134. Industry Petitioners explicitly argued that EPA's finding was inadequate for failing to assess Indian Country significant contribution, independent of a State.

45

Industry Br. 26-27. EPA itself states that it only regulated Indian Country whenever a source is located within the borders of a State EPA has otherwise linked to a downwind receptor. EPA Br. 133-34. This is not a valid necessary and appropriate finding. Industry Br. 26-27. EPA must treat the relevant Tribe, a separate sovereign, as if it were an independent State. Thus, EPA concedes it did not perform the significant contribution analysis required by the Act.

## CONCLUSION AND REMEDY

This Court should grant the petitions and vacate the Rule. The Act "entitle[s]" Petitioners to "reversal" if the Rule is arbitrary and capricious. *Ohio*, 144 S.Ct. at 2054 (quoting 42 U.S.C. §7607(d)(9)). Consistent with *Ohio*, this Court has vacated past EPA actions that it concluded were arbitrary and capricious, in excess of statutory authority, or otherwise unlawful. *See, e.g., Clean Air Council v. Pruitt*, 862 F.3d 1, 8 (D.C. Cir. 2017); *NRDC v. EPA*, 489 F.3d 1250, 1254, 1261-62 (D.C. Cir. 2007). And EPA has not argued for remand without vacatur, thus forfeiting the issue. Further, the errors here are serious, go to the core of EPA's methodology, and are unlikely to be remedied on

remand; vacating the Rule would cause no disruption because the Rule has been stayed pending the conclusion of this litigation. To the extent the Court considers remanding without vacatur despite the Supreme Court's holding in *Ohio* and EPA's forfeiture of the issue, Petitioners respectfully request the opportunity to submit supplemental briefing on the appropriate remedy.

Dated:  July 29, 2024                    Respectfully submitted,

                                         /s/ Ana Maria Gutiérrez

Catherine E. Stetson                     Ana M. Gutiérrez
Hogan Lovells US LLP                     Michael D. Miller
555 Thirteenth Street, NW                Womble Bond Dickinson (US) LLP
Washington, DC 20004                     1899 Wynkoop St.
(202) 637-5600                           Denver, CO 80202
Cate.Stetson@hoganlovells.com            Ana.Gutierrez@wbd-us.com

                    *Counsel for Kinder Morgan, Inc.*


/s/ Michael B. Schon                     /s/ Eric D. McArthur

Michael B. Schon                         Samuel B. Boxerman
LEHOTSKY KELLER COHN LLP                  Eric D. McArthur
200 Massachusetts Ave. N.W.              Kathleen Mueller
Washington, DC 20001                     Jeremy Rozansky
(512) 693-8350                           SIDLEY AUSTIN LLP
                                         1501 K Street N.W.
Mithun Mansinghani                       Washington, DC 20005
LEHOTSKY KELLER COHN LLP
629 W. Main St.
Oklahoma City, OK 73102                  *Counsel for Interstate Natural*
(512) 693-8350                           *Gas Association of America and*
                                         *American Petroleum Institute*

*Counsel for National Mining*
*Association*

/s/ Aaron M. Streett
Aaron M. Streett
Matthew L. Kuryla
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855

Counsel for Energy Transfer LP

/s/ Allison D. Wood
Allison D. Wood
Makram B. Jaber
Aaron M. Flynn
MCGUIRE WOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006

Counsel for Associated Electric
Cooperative, Inc., Deseret
Generation & Transmission Co-
Operative d/b/a Deseret Power
Electric Cooperative, Ohio Valley
Electric corporation, Wabash
Valley Power Association, Inc.
d/b/a Wabash Valley Power
Alliance, America's Power,
National Rural Electric
Cooperative Association and
Portland Cement Association

/s/ Brittany M. Pemberton
Brittany M. Pemberton
BRACEWELL LLP
2001 M Street N.W., Suite 900
Washington, D.C. 20036
(202) 828-1708

Counsel for TransCanada PipeLine USA
Ltd.

/s/ David M. Flannery
David M. Flannery
Kathy G. Beckett
Keeleigh S. Huffman
STEPTOE & JOHNSON, PLLC
707 Virginia St. East
Post Office Box 1588
Charleston, WV 25326
(304) 353-8000

Edward L. Kropp
STEPTOE & JOHNSON, PLLC
Post Office Box 36425
Indianapolis, Indiana 46236
(317) 946-9882

Counsel for Petitioners American Forest &
Paper Association, American Iron and Steel
Institute, and Midwest Ozone Group

/s/ Laura K. McAfee
Laura K. McAfee
(D.C. Cir. Bar No. 62386)
BEVERIDGE & DIAMOND, PC
201 North Charles Street, Suite 2200
Baltimore, MD 21201

*Counsel for Enbridge (U.S.) Inc.*

/s/ Elliot Zenick
Elliott Zenick
AMERICAN CHEMISTRY COUNCIL
700 2nd St. N.E.
Washington, DC 20002
(202) 249-6744

*Counsel for Petitioner*
*American Chemistry Council*

/s/ John D. Lazzaretti
John D. Lazzaretti
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower
127 Public Square
Cleveland, OH 44114
(216) 479-8500

*Counsel for Petitioner United*
*States Steel Corporation*

/s/ Michael E. Born
Michael E. Born (49961)
Cheri A. Budzynski (51761)
SHUMAKER, LOOP & KENDRICK, LLP
Huntington Center
41 South High Street, Suite 2400
Columbus, OH 43215
(614) 463-9441

*Counsel for Petitioners Buckeye Power, Inc.*
*and the Ohio Valley Electric Corporation*

/s/ Kelly M. McQueen
Kelly M. McQueen
THE MCQUEEN FIRM, PLLC
12 Woodsong Drive
Roland, AR 72135
(501) 580-3291

*Counsel for Petitioner*
*Arkansas League of Good*
*Neighbors*

/s/ Elbert Lin
Elbert Lin
Kevin S. Elliker
David N. Goldman
HUNTON ANDREWS KURTH LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
(804) 788-8200

F. William Brownell

E. Carter Chandler Clements
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue N.W.
Washington, DC 20037
(202) 955-1500

*Counsel for Petitioners*
*Union Electric Company, d/b/a Ameren*
*Missouri, and Arkansas League of Good*
*Neighbors*

/s/ Mark W. DeLaquil                    /s/ Richard S. Moskowitz

Mark W. DeLaquil                         Richard S. Moskowitz
BAKER & HOSTETLER LLP                    Tyler Kubik
Washington Square, Suite 1100            American Fuel & Petrochemical
1050 Connecticut Avenue N.W.             Manufacturers
Washington, D.C. 20036                   1800 M Street, NW
(202) 861-1500                           Suite 900 North
                                         Washington, DC 20036
Martin T. Booher                         (202) 844-5474
Joshua T. Wilson
BAKER & HOSTETLER LLP                    *Counsel for Petitioner American Fuel &*
2000 Key Tower                           *Petrochemical Manufacturers*
127 Public Square
Cleveland, Ohio 44114

*Counsel for Hybar LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(f) and (g) and Circuit Rule 32(e)(1), I hereby certify that this brief contains 7,798 words, excluding exempted parts, according to the count of Microsoft Word 365. This brief does not exceed 7,800 words, consistent with the Court's Order of December 4th, 2023 (ECF No. 2029865). I further certify that the foregoing Joint Reply Brief of Industry Petitioners complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point proportionally spaced Palatino Linotype typeface.

/s/ *Ana M. Gutiérrez*
Ana M. Gutiérrez
Womble Bond Dickinson (US) LLP
1899 Wynkoop St.
Denver, CO 80202
Ana.Gutierrez@wbd-us.com

Dated: July 29, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of July 2024, the foregoing Joint

Reply Brief of Industry Petitioners was served electronically on all

registered counsel through the Court's CM/ECF system.

*/s/ Ana M. Gutiérrez*
Ana M. Gutiérrez
Womble Bond Dickinson (US) LLP
1899 Wynkoop St.
Denver, CO 80202
Ana.Gutierrez@wbd-us.com
