**ORAL ARGUMENT NOT YET SCHEDULED**

No. 23-1201 (and consolidated cases)

————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF WISCONSIN,

     Petitioner,

  v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY and MICHAEL S. REGAN,
Administrator, United States
Environmental Protection Agency,

     Respondents.

ON PETITION FOR JUDICIAL REVIEW OF FINAL AGENCY
ACTION OF THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, 88 Fed. Reg. 36,654 (June 5, 2023)

**THE STATE OF WISCONSIN'S PROOF REPLY BRIEF**

JOSHUA L. KAUL
Attorney General of Wisconsin

GABE JOHNSON-KARP
Assistant Attorney General
State Bar #1084731

Attorneys for Petitioner

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904
(608) 294-2907 (Fax)
johnsonkarpg@doj.state.wi.us

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT.....................................6

ARGUMENT ............................................................................................8

I.    EPA's interpretation of the Good Neighbor provision as allowing the agency to ignore significant contributions to Wisconsin's nonattainment is unreasonable. ................................................................8

    A.    EPA does not contest that Wisconsin is not responsible for eliminating additional emissions, including those left uncontrolled under the Rule. ........................................................8

    B.    EPA's interpretation of "significant contribution" is factually unsupported and inconsistent with the text and precedent. ......................... 10

    C.    EPA does not dispute that particularized under-control challenges are available to ensure that all significant contributions are addressed, and precedent supports the approach. .......................................................... 17

    D.    EPA's reliance on impossibility is factually unsupported and inconsistent with its statutory obligation. ............................................ 19

II.    EPA acted arbitrarily and capriciously by refusing to meaningfully consider additional reductions, particularly from VOCs and mobile sources. .............................. 23

    A.    EPA failed to adequately explain why it was not requiring VOC reductions to address under-control of sources upwind of Wisconsin. ................. 24

    B.    EPA failed to adequately explain why it was not requiring mobile-source reductions to address identified under-control. ....................................... 27

CONCLUSION................................................................. 31

# TABLE OF AUTHORITIES

## Cases

*Alabama Power Co. v. Costle,*
  636 F.2d 323 (D.C. Cir. 1979) ....................................................... 19–22

*Am. Hosp. Ass'n v. Price,*
  867 F.3d 160 (D.C. Cir. 2017) ............................................................ 19

*Catawba County v. EPA*
  571 F.3d 20 (D.C. Cir. 2009) ....................................................... 14–15

*EPA v. EME Homer City Generation, L.P. (EME Homer II),*
  572 U.S. 489 (2014) ................................................................. 7, *passim*

*EME Homer City Generation, L.P. v. EPA (EME Homer III),*
  795 F.3d 118 (D.C. Cir. 2015) .................................................. 7, 17–18

*F.C.C. v. NextWave Pers. Commc'ns Inc.,*
  537 U.S. 293 (2003) .............................................................................. 28

*J.E.M. AG Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.,*
  534 U.S. 124 (2001) .............................................................................. 28

*Maryland v. EPA,*
  958 F.3d 1185 (D.C. Cir. 2020) .......................................................... 14

*Michigan v. EPA,*
  213 F.3d 663 (D.C. Cir. 2000) ............................................................ 14

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................................ 31

*Util. Air Regulatory Grp. v. EPA,*
  573 U.S. 302 (2014) .............................................................................. 16

*Wisconsin v. EPA,*
  938 F.3d 303 (D.C. Cir. 2019) ............................................... 13, *passim*

**Statutes**

42 U.S.C. § 7401(a)(2)(D)(i)(I) ....................................................... 6, 14–15

**Regulations**

Air Plan Disapproval; Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin; Air Plan Disapproval; Region 5 Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 FR 9838, 9839 (Feb. 22, 2022) ..................................... 28

Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 FR 36,654 (June 5, 2023) ............... 9, 12–13, 20, 21, 22, 27

**Other Authorities**

Air Quality Modeling Final Rule Technical Support Document, EPA-HQ-OAR-2021-0668-1157 ....................................................... 11, 13

Wis. DNR Comments on 2015 Ozone Transport FIP Document, EPA-HQ-OAR-2021-0668-0324 (June 2022) ........... 9, 11, 18–19, 23, 28

NOx Emission Control Technology Installation Timing for Non-EGU Sources Document, EPA-HQ-OAR-2021-0668-1077 (March 2023) ......................... 16, 20–21

Ozone Transport Policy Analysis Final Rule Technical Support Document, EPA-HQ-OAR-2021-0668-1080 (March 2023). ................... 8

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| **CAA** | Clean Air Act |
| **EGU** | electric generating unit |
| **EPA** | United States Environmental Protection Agency |
| **FIP** | federal implementation plan |
| **JA** | Joint Appendix |
| **NAAQS** | National Ambient Air Quality Standard |
| **NOx** | nitrogen oxide |
| **ppb** | parts per billion |
| **SIP** | state implementation plan |
| **VOC** | volatile organic compound |

## INTRODUCTION AND SUMMARY OF ARGUMENT

In its opening brief, Wisconsin explained that, notwithstanding the Good Neighbor Rule's air-quality benefits elsewhere, it unlawfully leaves significant upwind emissions unaddressed as to Wisconsin.

EPA's principal argument in response is that the agency exercises broad discretion under the Good Neighbor provision to "define significant contributions under each Good Neighbor rule," and that once the agency exercises that discretion, it is irrelevant whether unaddressed upwind pollutants continue to contribute significantly to downwind nonattainment, as has occurred and will continue to occur in Wisconsin. (EPA Br. 138 (quoting 42 U.S.C. § 7401(a)(2)(D)(i)(I).)

EPA overstates its discretion under the Good Neighbor provision, and thus misunderstands the nature of the under-control problem and the possible remedies. Wisconsin's position is not that EPA must address under-control of upwind emissions impacting Wisconsin through imposition of uniform emission controls, or that the agency lacks discretion, generally, to determine what amounts of pollution "contribute significantly to nonattainment" and to select the most cost-effective technologies to eliminate those amounts.

Rather, Wisconsin's position is that EPA's general discretion cannot be understood to allow the agency to rest on uniform emissions-control measures that leave substantial amounts of pollutants unaddressed. When the agency adopts uniform control strategies that allow upwind pollutants to continue to "contribute significantly to nonattainment" downwind, there must be some safety check to ensure that air quality and human health do not suffer in the name of uniformity. An as-applied challenge based on under-control is the mechanism available to check the agency's discretion. *Cf. EPA v. EME Homer City Generation, L.P. (EME Homer II)*, 572 U.S. 489, 523–24 (2014); *EME Homer City Generation, L.P. v. EPA (EME Homer III)*, 795 F.3d 118, 127–32 (D.C. Cir. 2015). And here, Wisconsin's situation amounts to unlawful under-control, requiring remand.

EPA also does not adequately explain the Rule's timing delays. EPA claims it did all it could to require timely reductions of pollution and that faster compliance was impossible. But the record does not support the agency's claimed impossibility—indeed, the independent compliance-timing report on which EPA relied suggests that nearly all sources could have complied in half the time allowed.

The agency also claims that it adequately discussed and rejected controls on VOCs and mobile sources, but the record again does not support that. Rather, given the uncontrolled emissions in those two categories and the existence of readily-implemented control programs, the agency unreasonably ignored possible reductions from those categories of emissions.

The Rule should be remanded to EPA to implement particularized remedies as to the remaining emissions from states upwind of Wisconsin.

## ARGUMENT

### I. EPA's interpretation of the Good Neighbor provision as allowing the agency to ignore significant contributions to Wisconsin's nonattainment is unreasonable.

#### A. EPA does not contest that Wisconsin is not responsible for eliminating additional emissions, including those left uncontrolled under the Rule.

Wisconsin's under-control argument is based on a fact that EPA does not appear to contest: that Wisconsin's in-state emissions-control programs are adequate to control in-state emissions, and that the state is required to implement only minimal reductions under the Rule for the benefit of downwind states, and even those obligations terminate by 2026. (*See* AR_1080:28, JA__); *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, 88 FR 36,654, 36,660

(June 5, 2023); (Wisconsin Opening Br. 10–11 & n.8.) Throughout its response, EPA does not challenge these premises and seems to acknowledge that Wisconsin's ozone-control measures are sufficient to satisfy the state's statutory obligations. (EPA Br. 136–59.)

The upshot is that EPA effectively concedes that the Rule creates a no-man's land—a category of significant amounts of emissions that are not addressed under the Rule yet are not *explicitly* Wisconsin's obligation to address. (*See* AR_0324:2–3, JA__–__ (noting EPA's finding that "Wisconsin is only responsible for 8–16% of the ozone measured at its nonattaining monitors, while other states contribute 42 to 48%").) But because Wisconsin must, in the end, achieve attainment, the state would be left to eliminate those excess emissions that continue to "contribute significantly to [Wisconsin's] nonattainment." 42 U.S.C. § 7410(a)(2)(D)(i)(I).

In light of EPA's acknowledgment that those excess emissions are not in fact Wisconsin's obligation to eliminate, its refusal to address them is unreasonable and unlawful.

**B.    EPA's interpretation of "significant contribution" is factually unsupported and inconsistent with the text and precedent.**

EPA's primary argument is that the Rule requires stationary sources to eliminate amounts of pollution that EPA determined "contribute significantly to nonattainment," § 7410(a)(2)(D)(i)(I), and that the agency "was not required to go further" than the amounts it determined appropriate to eliminate. (EPA Br. 136–42.) EPA thus claims that the amount of pollutants remaining unaddressed are, by dint of the agency's discretion, insignificant. EPA's argument is both factually and legally unsupported, and therefore unreasonable.

To illustrate, in its opening brief, Wisconsin explained that the Rule required only minimal reductions from upwind states, amounting to 0.18ppb, 0.10ppb, and 0.14ppb for the Sheboygan, Kenosha, and Racine monitors respectively, which left significant amounts of emissions unaddressed. (Wisconsin Opening Br. 29–30.) For example, at the

Sheboygan monitor the Rule, by its own calculations, leaves unaddressed 0.56 ppb.[1]

EPA argues that despite these deficiencies, the Rule will "substantially improve" Wisconsin's air quality. (EPA Br. 142.) But recent monitoring shows that is not the case. EPA's final 2023 design values, released in June 2024, show values of 77 ppb at the Kenosha monitor; 74 ppb at the Milwaukee (Racine) monitor; and 77 ppb at the Sheboygan monitor.[2] These design values are 4–6 ppb higher than EPA projected, consistent with one of the concerns Wisconsin noted at the comment stage. (*See* AR_1157:14–15, JA__–__ (Rule's projected design values for 2023); AR_0324:8, JA___.) This demonstrates that the under-control problem facing Wisconsin is even more significant than the Rule acknowledged.

---

[1] EPA notes that Wisconsin's opening brief included a calculation error. (EPA Br. 137 n.21.) EPA is correct: Wisconsin's table on page 29 of the opening brief should read 41% in column D and 0.74ppb in column F. This miscalculation was inadvertent, and the corrected calculation does not materially change the under-control analysis, which still shows that the Rule leaves a significant amount of upwind emissions unaddressed, as discussed in the text.

[2] *2023 Design Value Reports; Ozone Design Values, 2023 (xlsx)*; U.S. EPA, lines 12 (Kenosha), 31 (Milwaukee), and 47 (Sheboygan)), https://www.epa.gov/air-trends/air-quality-design-values#report (last visited July 29, 2024).

Nonetheless, EPA claims that Wisconsin "fault[s] EPA for failing to eliminate upwind contributions that EPA found were not significant." (EPA Br. 139.[3]) But if EPA found that the remaining, unaddressed emissions were insignificant, it didn't explain that finding—particularly as to Wisconsin's situation—and that's the problem. While the agency made findings to support the significant contributions that it *did* address with its chosen control measures, *see, e.g.*, 88 FR 36,745, those findings do not explain the allowance of substantial amounts of pollutants that will continue to flow from upwind states when the downwind state has neither the responsibility nor authority to address those remaining emissions.

---

[3] In its brief supporting the Rule, Midwest Ozone Group similarly mischaracterizes Wisconsin's arguments. The group portrays Wisconsin as questioning the existence of EPA's discretion to determine the point at which emission controls are most cost-effective, and claims that Wisconsin seeks to upend EPA's established four-step Good Neighbor analysis. (MOG Br. 4–6 (Dkt. 2063500).). That is not Wisconsin's argument.

Rather, as explained, Wisconsin does not question EPA's general discretion to determine amounts that "contribute significantly" and set corresponding uniform control strategies. (*See* Wisconsin Opening Br. 7–9, 12.) Wisconsin's argument is simply that that discretion is not boundless, and that EPA may not, under the aegis of discretion or uniformity, allow upwind states to continue sending pollutants downwind in amounts that continue to "contribute significantly to nonattainment." Midwest Ozone Group's arguments do nothing to authorize EPA's allowance of under-control here.

As two examples, Indiana and Illinois both contribute pollutants to Wisconsin areas in amounts that exceed Wisconsin's own contributions to those areas. Those two states alone contribute 22.8 ppb to Sheboygan's projected design value of 72.7 ppb. (*See* AR_1157:81–82, JA___–___.) Yet EPA claims that it has fulfilled its statutory obligation by requiring *all* states upwind of Wisconsin to eliminate emissions that will result in a reduction of 0.18 ppb at the Sheboygan monitor. (EPA Br. 137–41; *see also* 88 FR 36,743.) EPA offers no explanation why the remaining amounts are insignificant.

As support for its claimed discretion to ignore remaining upwind emissions, EPA cites decisions recognizing that the Good Neighbor provision vests the agency with general discretion to determine which emissions are "significant" and to select those emissions-control strategies that will provide "the biggest bang for [the] buck." *Wisconsin v. EPA*, 938 F.3d 303, 311 (D.C. Cir. 2019); (EPA Br. 137–41.) Wisconsin does not contest that general discretion, but no Court has ever approved the type of no-man's land of unaddressed pollutants that the Rule authorizes as to Wisconsin.

For example, this Court in *Wisconsin* did not bless the approach EPA takes here. (*Contra* EPA Br. 138–39.) To the contrary, the Court, addressing a separate problem of timing under the rule at issue there, strongly indicated disapproval for the type of under-control that EPA allows here, invalidating that rule because it ultimately "forc[ed] downwind areas to make greater reductions than the Good Neighbor Provision requires." *Wisconsin*, 938 F.3d at 314 (cleaned up).

Nor does *Michigan v. EPA*, 213 F.3d 663, 676 (D.C. Cir. 2000), support the Rule's result here. (*Contra* EPA Br. 139.) There, this Court held that EPA could consider costs when determining which amounts of pollution constituted "significant contributions" for purposes of setting the Rule's uniform emissions control levels. *See id.* at 675–76. But the Court said nothing about the situation Wisconsin faces here, where unaddressed contributions remain that are concededly not the downwind state's responsibility to eliminate.[4]

---

[4] EPA also cites *Maryland v. EPA* (*see* EPA Br. 139), but the quoted proposition was simply the court's citation to EPA's brief explaining the multifactor process for determining, generally, how best to achieve most-effective emissions reductions. *See* 958 F.3d 1185, 1192 (D.C. Cir. 2020).

EPA also cites *Catawba County v. EPA*, 571 F.3d 20, 39 (D.C. Cir. 2009), claiming that nothing in the statute "precludes EPA from determining that a[ ] county's addition of [pollutants] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence." (EPA Br. 138.) But the Court there was rejecting a challenger's proposal to narrowly construe EPA's authority to regulate emissions, not approving the type of no-man's-land approach EPA has taken here. *See Catawba County*, 571 F.3d at 39. More relevant here, the Court rejected the proffered interpretation of "significantly contribute" because it would have done "violence to section 107(d)'s very purpose." *Id.* Given that EPA's approach here would do similar violence to the Good Neighbor provision's equitable purpose, *Catawba* does not help EPA.

*EME Homer* also does not support EPA's approach. (*See* EPA Br. 138–39.) The Court recognized that the statute "requires EPA to seek downwind attainment of NAAQS notwithstanding [any] uncertainties," and that, given the discretion to "balance the possibilities of under-control and over-control, EPA must have leeway in fulfilling its statutory mandate"—i.e., to avoid under-control. *EME Homer II*, 572 U.S. at 523.

EPA's argument also largely ignores the timing element of its Good Neighbor obligations. (*See* EPA Br. 136–41.) The requirement to eliminate upwind pollution "consistent with the provisions of this subchapter," § 7410(a)(2)(D)(i), means that EPA and upwind states must eliminate those amounts necessary to allow downwind states to timely reach attainment. *See Wisconsin*, 938 F.3d at 316.

The Rule, however, was released over a year ago as of this writing, and will not take full effect for another two years.[5] By failing to require sufficient upwind reductions to allow Wisconsin to meet its attainment obligations, this Rule fails for the same reason this Court rejected the Update Rule in *Wisconsin*: because it "puts downwind States to the choice of flouting the attainment deadlines or making greater reductions than the Good Neighbor Provision requires. That choice is 'incompatible with the substance of Congress' regulatory scheme.'" *Id.* (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 322 (2014)).

---

[5] As noted elsewhere in the brief, EPA offers no persuasive argument why faster compliance was not required. In short, EPA adopted an extended rollout timeline that even its independent analyst's report did not believe necessary for the vast majority of sources. (*See* AR_1077:ES-1–ES-3, 65–66, JA___–___, __–__.) In the meantime, yet another attainment deadline will soon have passed: Wisconsin's moderate-area attainment date is August 3, 2024.

16

### C. EPA does not dispute that particularized under-control challenges are available to ensure that all significant contributions are addressed, and precedent supports the approach.

While EPA calls Wisconsin's under-control claim "amorphous," the agency appears to concede that such a claim is conceivably viable. (EPA Br. 140–42.) Precedent supports this.

The process the Supreme Court recognized for challenging instances of overcontrol is equally applicable to under-control like what Wisconsin is experiencing here. *See EME Homer II*, 572 U.S. at 521–24. The Court recognized the availability of "particularized, as-applied challenge[s]" to a transport rule, based on the rule's unlawful effect on individual states—notwithstanding that the challenged rule, as a whole, might otherwise be lawful. *See id.* at 523–24. The same rationale supports Wisconsin's challenge here.

This Court's treatment of those overcontrol claims on remand in *EME Homer III* further confirms how the process ought to be applied. *See* 795 F.3d at 127–32. Importantly, this Court recognized that the remedy for these types of particularized claims is not in tension with EPA's general authority to set uniform control standards, and that the as-applied remedy does not require the agency to tinker with those

uniform standards. *See id.* Rather, the Court recognized that when the Court in *EME Homer II* explicitly authorized as-applied challenges, it approved a remedial procedure that "will necessarily mean a lack of uniformity in certain circumstances." *Id.* at 131.

Despite apparently acknowledging the availability of particularized relief, EPA faults Wisconsin for not pointing to "any technology EPA neglected to consider at the sources covered by the Rule or any error in the way EPA weighed the technologies it did consider." (EPA Br. 141.) This argument is incorrect, both because it wrongly focuses on uniform control strategies rather than particularized remedies to resolve under-control, and because Wisconsin has long advocated for specific changes to how EPA applies its methodology to address this sort of under-control. (*See, e.g.*, AR_0324:1–8, JA__–__.) In previous comments and in briefing, Wisconsin highlighted two clear examples that could be considered to address under-control: controlling VOCs and mobile sources. (AR_0324:5–7, JA__–__; Wisconsin Opening Br. 41–55.)

As to specific technological remedies, that is not the states' task. Rather, just as when this Court invalidated the Transport Rule based on as-applied overcontrol, neither the affected states nor this Court were

required to determine how best to implement the necessary technological or logistical fix. *See EME Homer III*, 795 F.3d at 127–32. Rather, that task is for EPA to address in the first instance on remand. *See id.*; *see also Wisconsin*, 938 F.3d at 336–37.

### D. EPA's reliance on impossibility is factually unsupported and inconsistent with its statutory obligation.

In response to Wisconsin's argument that the Rule's emissions reductions were untimely under the statute, EPA argues that "[t]he Rule's reductions were implemented as fast as possible." (EPA Br. 143.) EPA fails to adequately explain why timely reductions are "impossible" across the board and does not even attempt to distinguish those components of the Rule that would be difficult to timely implement from those that would be truly impossible.

To support claimed "impossibility," an agency must show good-faith efforts to meet its statutory obligations, must explain its capacity (or lack thereof) to fulfill its obligation, and must explain which components of the task are in fact impossible versus those that may be possible. *See Alabama Power Co. v. Costle*, 636 F.2d 323, 359–60 (D.C. Cir. 1979); *cf. Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 168 (D.C. Cir.

2017). That burden is "especially heavy" when, as here, an agency "seeks approval of a prospective exemption of certain categories from a statutory command based upon the agency's prediction of the difficulties of undertaking regulation." *Alabama Power Co.*, 636 F.2d at 359; *see also Wisconsin*, 938 F.3d at 319.

EPA seeks to support its three-year delay before requiring compliance (on top of eight years of delayed rulemaking (*see* Wisconsin Opening Br. 11, 33–34)) as grounded in concerns that *some sources* would not be able to comply with tight deadlines "due to simultaneous demand for labor and components and other factors." (*See* EPA Br. 145–46; *see also* 88 FR 36,755–57.) Based on those concerns for some sources, EPA elected to grant its blanket, baseline extension to avoid having to process plant-by-plant requests for additional time. (*See* EPA Br. 146–48; 88 FR 36,756–57.) EPA's explanation does not meet the demanding standards to justify its failure to require timely compliance.

For one thing, the agency's conclusion that timely compliance would have been "infeasible for nearly every regulated source" (EPA Br. 145–47) is not supported in the record. To the contrary, in the compliance-timing report on which EPA relies, the agency's independent

contractor estimated much shorter compliance timelines than what EPA ultimately adopted. (*See* AR_1077:ES-1–ES-3, 65–66, JA___–___, __–__ (Timing Report).) The report estimated that most categories of non-EGU sources, and the vast majority of individual sources, would be able to comply within 12 to 15 months. (*See id.*)

In fact, as EPA explains elsewhere in its brief, the bases for extended timelines—supply-chain disruptions, labor and resource shortages— "were already clearing up" by the time the Rule was finalized, and the agency believed "that the market would likely respond to the increase in demand caused by the Rule." (EPA Br. 112 (citing 88 FR at 36,759–60; Timing Report 48–54).)

EPA's concern about having to process too may extension requests (EPA Br. 147–48) also is insufficient to justify the delay. *See Alabama Power Co.*, 636 F.2d at 359. EPA might have made some effort to show that the number of requests would be unduly burdensome for the agency, but it did not do so, either in the Rule or in briefing. Even if it had, the Timing Report's conclusions would cut against any such claim. According to the report, only a small minority of non-EGU industrial sources would

have been unable to comply within that timeline, so the burden would appear to be minimal. (*See* AR_1077:65–66, JA___–__.)

EPA's suggestion that it would be too burdensome to process numerous extension requests also rings hollow in light of the Rule's explicit invitation for sources to seek *additional* extensions of the compliance deadlines beyond 2026. (*See* EPA Br. 148; *see also* 88 FR 36,755 n.266 (stating that sources seeking additional time after 2026 would require a "showing by the source that it would be 'impossible' for it to meet the compliance deadline").) In any event, these types of administrative burdens are just the sort of "difficulty or inconvenience" that this Court previously warned are insufficient to justify EPA's noncompliance with its statutory obligations under the Good Neighbor provision. *Wisconsin*, 938 F.3d at 319.

Whatever uncertainty EPA might have had about sources' ability to promptly implement emissions-control measures, the more reasonable approach under the Good Neighbor provision's timing requirements, *see* § 7410(a)(2)(D)(i), would have been to require implementation as soon as reasonably supportable (e.g., the 12–15 months stated in the Timing Report) and then let noncompliant sources try to support *their*

case-specific inability to comply. *Cf. Alabama Power Co.*, 636 F.2d at 359–60. Instead, EPA's lengthy compliance timeline gives upwind sources no incentive to fulfill their obligations until years after another attainment deadline has passed. (AR_0324:7–8, JA__–__ (discussing Wisconsin's imminent bump-up to serious nonattainment in August 2024).)

## II.  EPA acted arbitrarily and capriciously by refusing to meaningfully consider additional reductions, particularly from VOCs and mobile sources.

Given the Rule's under-control of sources upwind of Wisconsin, EPA might have taken any one of numerous approaches to correct those instances of under-control. In its comments, Wisconsin emphasized two: controlling VOCs and regulating mobile-source emissions. (AR_0324:1–8, JA___–___.) EPA's refusal to meaningfully consider and explain these alternatives to under-control renders the Rule arbitrary and capricious.

To be clear: Wisconsin is not arguing that EPA *had to* implement controls of VOCs or mobile sources. Rather, the state is saying only that, in the face of demonstrated under-control as to sources upwind of Wisconsin, the agency acted arbitrarily and capriciously in not

explaining why it would not require additional reductions from those (or any other) categories to eliminate the remaining emissions that continue to contribute significantly to Wisconsin's nonattainment.

### A. EPA failed to adequately explain why it was not requiring VOC reductions to address under-control of sources upwind of Wisconsin.

EPA first argues that the agency reasonably concluded that regulating VOCs "was unnecessary." (EPA Br. 149–54.) None of the agency's explanations for refusing to control VOCs is persuasive in light of ongoing under-control.

EPA first suggests that it has always been done this way, stating that "[a]s in prior Good Neighbor rules, the Rule targets cost-effective emissions reductions from large, stationary sources that emit NOx." (EPA Br. 149.) EPA's past practice in Good Neighbor rules is hardly supportive of the agency's inadequate approach here. Most recently, this Court in *Wisconsin* rejected EPA's business-as-usual approach when the agency sought to justify its refusal to consider emissions reductions from non-EGUs. *See Wisconsin*, 938 F.3d at 318–20 (rejecting EPA's assertion of impossibility for regulating non-EGU sources based on "uncertainty" of potential reductions from regulating those sources). Just as it was

24

unreasonable to refuse considering reductions from an entire category of sources there, so too is it unreasonable here, where the agency refuses to require reductions of a category of emissions responsible for up to 15% of ozone at Wisconsin monitors. (*See* EPA Br. 152 (discussing "Contributions from NOx Spreadsheet").

EPA next tries to shift all obligation to control VOCs to states experiencing nonattainment, stating that "once areas are classified as Moderate nonattainment, *they must* address VOCs along with NOx," and "at any point States may pursue local attainment strategies and choose to incorporate VOC controls." (EPA Br. 153 (emphasis added).) But this is precisely the problem: the VOC-emitting states upwind of Wisconsin have failed to adequately take those steps. Without federally mandated requirements, Wisconsin has no recourse while significant contributions from upwind remain unaddressed.

EPA also seems to argue that VOCs are a local problem, not suited to the same types of regional control strategies as are regularly used for NOx. (*See* EPA Br. 149–51.) But the agency offers nothing to suggest that "local" controls on VOCs in upwind states would not be effective to remedy downwind exceedances of the NAAQS. The reports EPA cites do

25

not support such a proposition, and, as EPA notes, there are some areas—such as the Chicago metropolitan area, directly upwind of Wisconsin—that will benefit from VOC reductions. (EPA Br. 153.) EPA further acknowledges that "local VOC emissions reductions could be part of an overall ozone-reduction strategy." (EPA Br. 153.)[6] Given the recognized, significant contributions from VOCs, and that Wisconsin monitors continue to suffer under-control, EPA's suggestion that local areas within Wisconsin pick up the slack is entirely inconsistent with the purpose of the Good Neighbor provision.

Moreover, the existence of localized programs requiring VOC-control measures further undercuts EPA's failure to explain why it has not required VOC reductions to avoid under-control. (*See* EPA Br. 153.) The existing regulatory infrastructure for VOC controls should make those emissions an easy target when addressing particularized instances of under-control in the Good Neighbor context.

---

[6]    Amici Air Quality Scientists confirm that while regional control strategies *may* be less effective to control VOCs, such controls "can be effective in localized applications, such as urban cores." (Dkt. 2061521:15.)

### B.   EPA failed to adequately explain why it was not requiring mobile-source reductions to address identified under-control.

As a category, mobile sources comprise roughly 40% of all ozone-forming pollutants in the United States. (AR_0324:6, JA__.) By refusing to meaningfully consider reductions from mobile sources, EPA acted arbitrarily and capriciously in allowing this entire category of pollutants to remain unaddressed while Wisconsin suffers the impacts of under-control upwind.[7]

The core of EPA's argument is that various other programs already address mobile-source emissions, so regulating them under the Good Neighbor provision would be "duplicat[ive]." (EPA Br. 154, 157.) But the

---

[7] In its brief, EPA acknowledges that "mobile sources are covered by the Good Neighbor provision." (EPA Br. 155.) This stands in stark contrast with the agency's comments in the Rule, which suggested that the agency believed it was somehow preempted from regulating mobile-source emissions under the provision. *See, e.g.*, 88 FR 36,737. Now, EPA suggests that this Court "need not reach" the question of whether the agency is preempted from requiring emission controls on mobile sources if necessary to comply with the Good Neighbor provision. (EPA Br. 157.)

But because the statute is so clear regarding EPA's obligation to find sufficient reductions to eliminate all amounts that contribute significantly to downwind nonattainment (*see* Wisconsin Opening Br. 49–55), this Court should address EPA's obligation regarding mobile-source emissions. That way, in future rules or when the agency corrects this Rule on remand, there will be no question about the authority to address mobile-source emissions where necessary to fulfill the statutory mandate.

same could be said about stationary sources, nearly all of which are also required to comply with various other emissions-control requirements. *See* 88 FR 36,755 (pointing to other programs regulating stationary sources).[8]

In any event, EPA's obligations under other programs controlling mobile-source emissions do not obviate the need to independently assess the agency's obligations under the Good Neighbor provision. "When two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 304 (2003) (quoting *J.E.M. AG Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.*, 534 U.S. 124, 143–144 (2001) (cleaned up)). And the fact that controls implemented under another program *might* result in emission reductions does not help EPA here, given that those other programs still have not

---

[8] EPA also expressed no such concerns over duplication when, in its disapproval of Wisconsin's transport SIP, it explicitly rejected Wisconsin's reliance on existing stationary source programs to satisfy GNP obligations, stating "In general, the listing of existing or on-the-way control measures . . . does not substitute for a complete Step 3 analysis under EPA's 4-step framework." *Air Plan Disapproval; Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin; Air Plan Disapproval; Region 5 Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 FR 9838, 9839 (Feb. 22, 2022).

resulted in sufficient emissions reductions to fulfill the separate Good Neighbor obligations. Indeed, as EPA acknowledges (EPA Br. 155–57), the air-quality benefits from those programs are years, if not decades, away, given that they set emission-standards for model-year vehicles that will be phasing in "between 2027 and *2045*." (EPA Br. 158.)

EPA also claims that, if this Court were to recognize the agency's obligation to regulate mobile sources under the Good Neighbor Provision, "there is no basis to assume that EPA could achieve reductions from mobile sources . . . any more quickly or more comprehensively" than under Title II. (EPA Br. 157.) This argument seems to assume that any emissions reductions the agency could require from mobile sources would have to be implemented exclusively through new-vehicle emissions standards. (*See* EPA Br. 157.) But the agency does not explain why that is so, and it stands in direct conflict with its recognition that it has authority "to regulate post-sale motor vehicles," among other mobile sources. (EPA Br. 157.) As EPA acknowledges, states already may (and do) implement state- or area-specific programs to control mobile-source emissions. (EPA Br. 159.) These programs are likewise available to EPA to address transported emissions from these sources.

Similarly, EPA claims that regulating mobile sources to fulfill Good Neighbor obligations is not "appropriate or practicable as a uniform control strategy in federal plans that apply to many upwind States." (EPA Br. 159.) As an initial matter, EPA provides no evidence to support this sweeping conclusion. Had EPA in the Rule properly included mobile source emissions at Step 3 of its analysis, it might have found appropriate uniform controls to be available.

Further, EPA again misunderstands the nature of Wisconsin's particularized under-control challenge. *See EME Homer II*, 572 U.S. at 524. Wisconsin is not suggesting that the agency must adopt uniform mobile-source strategies across all states subject to the Rule (although a proper analysis of mobile sources in the Rule might support that result). Wisconsin is simply asking that, where upwind states continue to contribute significantly to nonattainment after uniform controls are implemented, EPA require those upwind states to address those continued contributions. Implementation of mobile-source programs is one method EPA might have required. (*See* Wisconsin Opening Br. 53–55.)

By overlooking VOCs and mobile sources as possible categories of emissions to eliminate to address under-control, EPA failed to address an important aspect of the problem and the Rule is unlawful to that extent. *See Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## CONCLUSION

The Rule should be remanded to EPA without vacatur, with directions for the agency to promptly correct the deficiencies identified as to upwind states' significant contributions to Wisconsin's nonattainment.

Dated this 29th day of July 2024.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/Gabe Johnson-Karp
GABE JOHNSON-KARP
Assistant Attorney General
State Bar #1084731

Attorneys for Petitioner

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904
(608) 294-2907 (Fax)
johnsonkarpg@doj.state.wi.us

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 4,981 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1). The total number of words contained in this brief is fewer than 5,200 words, per this Court's Orders of December 4, 2023, and January 4, 2024.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using the 2013 version of Microsoft Word in 14-point Century Schoolbook font.

Dated this 29th day of July 2024.

s/Gabe Johnson-Karp
GABE JOHNSON-KARP
Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that on July 29, 2024, I electronically filed the foregoing *The State of Wisconsin's Proof Reply Brief* with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 29th day of July 2024.

s/Gabe Johnson-Karp
GABE JOHNSON-KARP
Assistant Attorney General