**ORAL ARGUMENT NOT YET SCHEDULED**

No. 23-1201 (and consolidated cases)
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

STATE OF WISCONSIN,

   Petitioner,

 v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY and MICHAEL S. REGAN,
Administrator, United States
Environmental Protection Agency,

   Respondents.

_____

ON PETITION FOR JUDICIAL REVIEW OF FINAL AGENCY
ACTION OF THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, 88 FED. REG. 36,654 (JUNE 5, 2023)

_____

**THE STATE OF WISCONSIN'S FINAL OPENING BRIEF**

_____

      JOSHUA L. KAUL
      Attorney General of Wisconsin

      GABE JOHNSON-KARP
      Assistant Attorney General
      State Bar #1084731

      Attorneys for Petitioner

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904
(608) 294-2907 (Fax)
johnsonkarpg@doj.state.wi.us

## CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Wisconsin states as follows:

### A.    Parties, Intervenors, and Amici Curiae

These cases involve the following parties:

**Petitioners:**

- No. 23-1157 (lead case): State of Utah

- No. 23-1181: Kinder Morgan, Inc.

- No. 23-1183: States of Ohio, Indiana, and West Virginia

- No. 23-1190: American Forest & Paper Association

- No. 23-1191: Midwest Ozone Group

- No. 23-1193: Interstate Natural Gas Association of America and American Petroleum Institute

- No. 23-1195: Associated Electric Cooperative, Inc., Ohio Valley Electric Corporation, America's Power, Deseret Generation & Transmission Co-Operative, National Rural Electric Cooperative Association, Portland Cement Association, and Wabash Valley Power Association, Inc.

- No. 23-1199: National Mining Association

- No. 23-1200: American Iron and Steel Institute

- No. 23-1201: State of Wisconsin

- No. 23-1202: Enbridge (U.S.) Inc.

- No. 23-1203: American Fuel & Petrochemical Manufacturers and American Chemistry Council

- No. 23-1205: TransCanada Pipeline USA Ltd.

- No. 23-1206: Hybar LLC

- No. 23-1207: United States Steel Corporation

- No. 23-1208: Union Electric Company

- No. 23-1209: State of Nevada

- No. 23-1211: Arkansas League of Good Neighbors

- No. 23-1306, 23-1307: Energy Transfer L.P.

- No. 23-1314: Commonwealth of Kentucky, Energy and Environment Cabinet

- No. 23-1315: Commonwealth of Kentucky

- No. 23-1316: Energy Transfer LP

- No. 23-1317: Buckeye Power, Inc., Ohio Valley Electric Corporation

**Respondents:**

Respondents are the United States Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency.

**Intervenors and *Amici Curiae*:**

Intervenors for the Petitioners:

- No. 23-1157: City Utilities of Springfield, Missouri

- No. 23-1201: Sierra Club

Intervenors for the Respondents:

- No 23-1157: City of New York; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; District of Columbia; Harris County, Texas; State of Connecticut; State of Delaware; State of Illinois; State of Maryland; State of New Jersey; State of New York; State of Wisconsin; Air Alliance Houston; Appalachian Mountain Club; Center for Biological Diversity; Chesapeake Bay Foundation; Citizens for Pennsylvania's Future; Clean Air Council; Clean Wisconsin; Downwinders at Risk; Environmental Defense Fund; Louisiana Environmental Action Network; Sierra Club;

Southern Utah Wilderness Alliance; Utah Physicians for a Healthy Environment

- No. 23-1201: Midwest Ozone Group

*Amici Curiae* for Petitioners:

- No. 23-1157: Chamber of Commerce of the United States of America, Energy Infrastructure Council

**B.    Rulings under review.**

Petitioners challenge a final action taken by the United States Environmental Protection Agency on June 5, 2023, published in the Federal Register at 88 FR 36,654 (June 5, 2023), and titled "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards."

**C.    Related cases.**

Additional cases pending in other U.S. Courts of Appeals challenging the same final action:

- State of Texas v. EPA, No. 23-60300 (5th Cir.) (and consolidated cases)

- State of Arkansas v. EPA, No. 23-2769 (8th Cir.)

- State of Missouri v. EPA, No. 23-2771 (8th Cir.)

- Energy Transfer LP v. EPA, No. 23-2773 (8th Cir.)

- Energy Transfer LP v. EPA, No. 23-2774 (8th Cir.)

- Hybar LLC v. EPA, No. 23-2782 (8th Cir.)

- Union Electric Co. v. EPA, No. 23-2786 (8th Cir.)

- ALLETE v. EPA, No. 23-2789 (8th Cir.)

- Nevada Cement Co. LLC v. EPA, No. 23-1098 (9th Cir.)

- Tulsa Cement LLC v. EPA, No. 23-9551 (10th Cir.)

- PacifiCorp v. EPA, No. 23-9557 (10th Cir.)

- State of Oklahoma v. EPA, No. 23-9561 (10th Cir.)

- Energy Transfer LP v. EPA, No. 23-9569 (10th Cir.)

- Alabama Power Co. v. EPA, No. 23-12531 (11th Cir.)

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ......................................................1

ISSUES PRESENTED ...........................................................................2

STATUTES AND REGULATIONS ......................................................4

STATEMENT OF THE CASE ..............................................................5

    I.    Factual and regulatory background. ............................................5

        A.    Ozone is harmful to human health and welfare.
             .................................................................................5

        B.    States must meet ambient air quality standards set by EPA. .............................................5

        C.    The Clean Air Act requires states, and ultimately EPA, to ensure that no state's emissions prevent any other state from attaining or maintaining a NAAQS. ....................7

        D.    Wisconsin's efforts to attain the 2015 ozone NAAQS have been hindered by emissions from upwind states. .........................................9

    II.    EPA proposed a transport rule to implement the Good Neighbor Provision for the 2015 NAAQS. ......................... 11

        A.    Wisconsin identified numerous deficiencies with the proposed transport rule. ...................... 13

        B.    EPA issued the final Rule, which purports to eliminate the significant contributions of upwind states to Wisconsin. .............................. 16

STANDARD OF REVIEW ............................................................... 17

SUMMARY OF ARGUMENT ......................................................... 17

STANDING ...................................................................................... 20

ARGUMENT ......................................................................... 21

I.  The Rule violates the Good Neighbor Provision by failing to timely eliminate upwind states' significant contributions of emissions to Wisconsin. ...................................... 21

   A.  The Good Neighbor Provision requires EPA to implement a full remedy for all "significant contributions" of pollutants in every downwind state covered by the Rule, and to do so by each downwind state's next applicable attainment deadline. ............................................................... 22

   B.  The Rule unlawfully fails to require timely elimination of significant contributions of emissions from states upwind of Wisconsin. ...................... 27

   C.  EPA's explanations do not justify the statutory violation. ............................................................. 31

   D.  EPA's explanations do not demonstrate impossibility. ...................................................... 38

   E.  EPA's proposed supplemental Good Neighbor Rule confirms that the current Rule under-controls for Wisconsin. ......................................... 41

II.  EPA acted arbitrarily and capriciously by ignoring evidence and refusing to incorporate additional emissions controls in the Rule, including by limiting VOCs or controlling mobile-source emissions. ............................ 42

   A.  EPA's refusal to control VOC emissions is contrary to the evidence before the agency. ...................... 43

   B.  EPA's refusal to control mobile-source emissions was arbitrary, capricious, and unlawful. ............................................................... 46

      1.  EPA unreasonably refused to require emission reductions from mobile sources. ...................................................................... 47

2.   EPA's rationales for refusing to consider
mobile-source        reductions        are
unpersuasive. ........................................... 49

CONCLUSION................................................................ 55

## TABLE OF AUTHORITIES[1]

**Cases**

*Am. Hosp. Ass'n v. Price*,
867 F.3d 160 (D.C. Cir. 2017) ....................................... 26, 38

*Am. Lung Ass'n v. EPA*,
985 F.3d 914 (D.C. Cir. 2021) ............................................ 46

*Am. Trucking Ass'ns, Inc. v. EPA*,
283 F.3d 355 (D.C. Cir. 2002) ............................................. 6

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................................... 51

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ........................................................... 21

*Clean Wisconsin v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020) ................................... 5, 10, 28

*Comm. for a Better Arvin v. EPA*,
786 F.3d 1169 (9th Cir. 2015) ........................................... 52

*Delaware Dep't of Nat. Res. & Env't Control v. EPA*,
895 F.3d 90 (D.C. Cir. 2018) ............................................... 7

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
438 U.S. 59 (1978) ............................................................. 20

---

[1] Authorities upon which we chiefly rely are marked with asterisks.

*Engine Mfrs. Ass'n v. EPA,*
  88 F.3d 1075 (D.C. Cir. 1996) ............................................................ 52

*\*EPA v. EME Homer City Generation, L.P.,*
  572 U.S. 489 (2014) ............................................................ 8, 23, 33, 38

*In re Volkswagen 'Clean Diesel' Mktg., Sales Pracs., & Prod. Liab. Litig.,
  et al. v. Volkswagen Grp. Of Am., Inc.,et al.,*
  959 F.3d 1201 (9th Cir. 2020) ........................................................ 52, 53

*Int'l Union, United Mine Workers v. Mine Safety & Health Admin.,*
  626 F.3d 84 (D.C. Cir. 2010) ............................................................... 42

*Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air
  Pollution Control Dist.,*
  644 F.3d 934 (9th Cir. 2011) ............................................................... 53

*Lujan v. Def's of Wildlife,*
  504 U.S. 555 (1992) ........................................................................... 20

*Maryland v. EPA,*
  958 F.3d 1185 (D.C. Cir. 2020) ................................................. 8, 26, 34

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ........................................................................... 20

*Midwest Ozone Grp. v. EPA,*
  61 F.4th 187 (D.C. Cir. 2023) .............................................................. 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................. 3, 42, 50

*\*North Carolina v. EPA,*
  531 F.3d 896 (D.C. Cir. 2008) ........................... 9, 21, 22, 23, 30, 32, 33

*S. Coast Air Quality Mgmt. Dist. v. EPA,*
  472 F.3d 882 (D.C. Cir. 2006) .............................................................. 5

*S. Coast Air Quality Mgmt. Dist. v. EPA,*
  882 F.3d 1138 (D.C. Cir. 2018) ............................................................ 7

*Sierra Club v. EPA,*
719 F.2d 436 (D.C. Cir. 1983) ....................................................... 27, 38

***State of Wisconsin v. EPA,***
938 F.3d 303
(D.C. Cir. 2019) ................. 6, 9, 12, 19, 23, 25, 26, 27, 28, 33, 35, 38, 40

*Train v. Nat. Res. Def. Council,*
421 U.S. 60 (1975) ............................................................................. 6

*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC,*
21 F.4th 1229 (10th Cir. 2021) ........................................................ 53

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001) ......................................................................... 32

**Statutes**

5 U.S.C. § 706(2)(A) ......................................................................... 17

5 U.S.C. § 706(2)(C) ......................................................................... 17

42 U.S.C. § 7407(d) ............................................................................ 6

42 U.S.C. § 7408(a)(1) ....................................................................... 5

42 U.S.C. § 7408(f) ........................................................................... 54

42 U.S.C. § 7409 ................................................................................ 6

42 U.S.C. § 7410(a)(1) ....................................................................... 7

42 U.S.C. § 7410(a)(2)(D) .................................................................. 2

*42 U.S.C. § 7410(a)(2)(D)(i) ............................ 8, 9, 35, 46, 47, 48, 50, 54

*42 U.S.C. § 7410(a)(2)(D)(i)(I) ..................................................... 2, 22

42 U.S.C. § 7502 .............................................................................. 54

42 U.S.C. § 7511(a) .......................................................................... 54

*42 U.S.C. § 7511(a)(1) ................................................ 6, 7, 28, 34, 53, 54

42 U.S.C. § 7511(b)(2)...................................................................17

42 U.S.C. § 7511(b)(2)(A)...............................................................7

42 U.S.C. § 7521(a)(1)....................................................................52

42 U.S.C. § 7521(a)(3)(B)(i) .........................................................47

42 U.S.C. § 7543(a) ..............................................................51, 52

42 U.S.C. § 7543(d)........................................................................53

42 U.S.C. § 7607(b) .........................................................................1

42 U.S.C. § 7607(b)(1)....................................................................17

42 U.S.C. § 7607(d)(1)(B)...............................................................17

42 U.S.C. § 7607(d)(9)(A)...............................................................17

42 U.S.C. § 7607(d)(9)(C)...............................................................17

**Regulations**

40 C.F.R. pt. 50 App U. ...............................................................30

National Ambient Air Quality Standards for Ozone,
 80 FR 65,292 (Oct. 26, 2015)....................................................9

Additional Air Quality Designations for the 2015 Ozone National
 Ambient Air Quality Standards,
 83 FR 25,776 (June 4, 2018) ....................................................10

Federal Implementation Plan Addressing Regional Ozone Transport for
 the 2015 Ozone National Ambient Air Quality Standard 87 FR 20,036
 (April 6, 2022).............................................................................11

Determinations of Attainment by the Attainment Date, Extensions of
 the Attainment Date, and Reclassification of Areas Classified as
 Marginal for the 2015 Ozone National Ambient Air Quality Standards
 87 FR 60,897 (Oct. 7, 2022)...........................................11, 34

Air Plan Approval; Wisconsin; Redesignation of the Wisconsin Portion of the Chicago-Naperville, Illinois-Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard, 87 FR 21,027 (April 11, 2022)........................................................................53

*Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards 88 FR 36,654 (June 5, 2023)...... 1, 8, 11, 12, 16, 27, 28, 29, 30, 31, 32, 33, 34, 35, 39, 40, 44, 45, 47, 48, 49, 50, 51, 54, 55

Supplemental Air Plan Actions: Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards and Supplemental Federal "Good Neighbor Plan" Requirements for the 2015 8-hour Ozone National Ambient Air Quality Stan, 89 FR 12,666 ........................................................................41

## Other Authorities

Air Quality Modeling Final Rule Technical Support Document, EPA-HQ-OAR-2021-0668-1157........................ 28, 30, 31, 33, 37, 41, 44

EPA Response to Comments, EPA-HQ-OAR-2021-0668-1127.......................................... 36, 44, 45, 46

Ozone Transport Policy Analysis Final Rule Technical Support Document, EPA-HQ-OAR-2021-0668-1080 (March 2023). ..... 11, 39, 42

Wis. DNR Comments on 2015 Ozone Transport FIP Document, EPA-HQ-OAR-2021-0668-0324 (June 2022)...........................................10, 13, 14, 15, 16, 36, 43, 46, 47

Wis. DNR Considerations for EPA's Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 National Ambient Air Quality Standard, EPA-HQ-OAR-2021-0668-0002 ......................15

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| **CAA** | Clean Air Act |
| **EGU** | electric generating unit |
| **EPA** | United States Environmental Protection Agency |
| **FIP** | federal implementation plan |
| **JA** | Joint Appendix |
| **NAAQS** | National Ambient Air Quality Standard |
| **NOx** | nitrogen oxide |
| **ppb** | parts per billion |
| **SIP** | state implementation plan |
| **VOC** | volatile organic compound |

# INTRODUCTION

The "Good Neighbor Provision" requires upwind states to control emissions within their borders so as not to force downwind states to do more than their fair share to control the nation's air pollution. When upwind states fail to implement sufficient measures to meet their statutory obligations, EPA must promulgate a rule that does so.

The rule EPA promulgated here fails to meet that obligation as to Wisconsin. That is, despite the Rule's efficacy elsewhere, it did not require sufficient reductions from states upwind of Wisconsin to meet the requirements of the Good Neighbor Provision. The Rule is therefore unlawful as to Wisconsin, and remand to EPA is required.

# JURISDICTIONAL STATEMENT

This case challenges EPA's final rule entitled "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards." 88 FR 36,654 (June 5, 2023) ("Rule"). Petitioner timely challenged the Rule within 60 days of publication. *See* No. 23-1201. This Court has jurisdiction under 42 U.S.C. § 7607(b).

## ISSUES PRESENTED

1. The Clean Air Act's "Good Neighbor Provision," 42 U.S.C. § 7410(a)(2)(D)(i)(I), requires states, and ultimately EPA, to "prohibit[ ], consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will…contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [national ambient air quality standard]." This means upwind states must control emissions from "any source" in the state as necessary to ensure the state does not "contribute significantly" to any downwind state's ability to attain the applicable air-pollution standards (here, ozone). Upwind states must eliminate those significant contributions by the same deadlines that downwind states must meet to satisfy their own air-quality obligations. Where an upwind state fails to enact a plan sufficient to control its emissions, EPA must promulgate a rule that does so, including requiring the upwind state to make necessary reductions in time to meet the corresponding downwind state's attainment deadlines.

Here, EPA correctly found that multiple states upwind of Wisconsin contribute significantly to some Wisconsin areas' nonattainment of the

ozone standards. But EPA's final Rule did not require those upwind states to eliminate all of their significant contributions to Wisconsin's nonattainment, nor to do so in time for Wisconsin to meet its impending attainment deadline of August 3, 2024.

Does the Rule's failure to require timely elimination of significant contributions of emissions to Wisconsin violate the Good Neighbor Provision?

2. Agency action is arbitrary and capricious if the agency "entirely fail[s] to consider an important aspect of the problem" or  "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

2.A. Wisconsin pointed out to EPA that multiple nonattainment areas, including in Wisconsin, would benefit from reductions to VOC emissions, not just NOx emissions as the proposed rule would have required. EPA, however, declined to include any controls on VOCs, finding that *most* areas across the country would realize sufficient benefits from reductions to NOx alone. Given the Rule's failure to require timely elimination of significant contributions of ozone by other means,

3

was EPA's refusal to implement VOC reductions arbitrary and capricious?

2.B. Wisconsin also urged EPA to control mobile-source emissions (e.g., automobiles, locomotives, marine vessels), which are the source of over 40% of ozone emissions transported into Wisconsin. Despite the Good Neighbor Provision's requirement that EPA control emissions from "any source," EPA declined to require emission reductions from mobile sources. Given the Rule's failure to require reductions from other sources sufficient to eliminate significant contributions to Wisconsin's nonattainment, was EPA's refusal to control mobile-source emissions arbitrary and capricious?

## STATUTES AND REGULATIONS

The principal statutes, 42 U.S.C. §§ 7410 and 7511, appear in the Addendum to this brief. This brief does not rely on any existing regulations.

## STATEMENT OF THE CASE

### I.    Factual and regulatory background.

#### A.    Ozone is harmful to human health and welfare.

Ozone is a natural and important component of the upper atmosphere; however, at ground level it becomes harmful to human health, potentially causing "lung dysfunction, coughing, wheezing, shortness of breath, nausea, respiratory infection, and in some cases, permanent scarring of the lung tissue." *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 887 (D.C. Cir. 2006). Ozone also has "a broad array of effects" on natural resources, and can have detrimental impacts on soil, water, and wildlife. *Id.* "Because ozone forms at ground level when 'precursor' emissions—nitrogen oxides (NOx) and volatile organic compounds (VOCs)—react with sunlight," effectively controlling ozone exposure for humans "largely depends on reducing emissions from ozone-precursor producers like power plants, motor vehicles, and combustion engines." *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1154 (D.C. Cir. 2020).

#### B.    States must meet ambient air quality standards set by EPA.

The Clean Air Act requires EPA to set and periodically update national ambient air quality standards (NAAQS) for certain pollutants

that endanger public health or welfare. 42 U.S.C. §§ 7408(a)(1), 7409. These standards must be established at a level that protects public health "with an adequate margin of safety." *Id.* § 7409. Once established, the standards "become the centerpiece of a complex statutory regime aimed at reducing the pollutant's atmospheric concentration." *Am. Trucking Ass'ns, Inc. v. EPA*, 283 F.3d 355, 358–59 (D.C. Cir. 2002).

After EPA establishes a NAAQS for a pollutant, like ozone, the agency designates areas as either "attainment" (i.e., where ambient air concentrations of ozone is less than the NAAQS), "nonattainment" (i.e., ozone concentration is greater than the NAAQS), or "unclassifiable." 42 U.S.C. § 7407(d). Nonattainment areas are then further classified based on the severity of their air quality problems: marginal, moderate, serious, severe, or extreme. *Id.* § 7511(a)(1).

These classifications determine the state's deadline to attain the NAAQS. The attainment deadlines—considered "the heart" of the CAA[2]—require states to reduce the targeted pollutant "as expeditiously as practicable but not later than" dates provided in statute, keyed to the

---

[2] *Train v. Nat. Res. Def. Council*, 421 U.S. 60, 66 (1975); *accord State of Wisconsin v. EPA*, 938 F.3d 303, 316 (D.C. Cir. 2019) (quoting *Train*).

6

date an area was designated nonattainment. 42 U.S.C. § 7511(a)(1). Areas exceeding the NAAQS by a greater margin are given more time to meet the standard. *Id.* If a state fails to meet an attainment deadline, the area is "bumped up" to the next highest classification, *see id.* § 7511(b)(2)(A), resulting in "additional regulatory responsibilities" for the state in which the nonattaining area is located, *Delaware Dep't of Nat. Res. & Env't Control v. EPA*, 895 F.3d 90, 94 (D.C. Cir. 2018).

After EPA establishes a NAAQS, states must develop implementation plans (SIPs) within three years to "provide[ ] for implementation, maintenance, and enforcement" of the NAAQS. 42 U.S.C. § 7410(a)(1). For nonattainment areas, a SIP must "show how the areas will achieve and maintain the relevant NAAQS." *S. Coast Air Quality Mgmt. Dist. v. EPA*, 882 F.3d 1138, 1143 (D.C. Cir. 2018).

### C. The Clean Air Act requires states, and ultimately EPA, to ensure that no state's emissions prevent any other state from attaining or maintaining a NAAQS.

Complicating state-level regulation is the reality that "[a]ir pollution is transient, heedless of state boundaries. Pollutants generated by upwind sources are often transported by air currents, sometimes over hundreds of miles, to downwind States." *EPA v. EME Homer City*

*Generation, L.P.*, 572 U.S. 489, 496 (2014) ("*EME Homer II*"). "Left unregulated," upwind states can interfere with downwind states' attainment of the NAAQS, with upwind states "reap[ing] the benefits of the economic activity causing the pollution" while shifting much of the cost to downwind states "by the steady stream of infiltrating pollution." *Id.* at 495–96.

Congress adopted the Good Neighbor Provision, 42 U.S.C. § 7410(a)(2)(D), to address this "potential inequity." *Maryland v. EPA*, 958 F.3d 1185, 1190 (D.C. Cir. 2020). It requires SIPs to include measures prohibiting "any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will…contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to [the NAAQS]." 42 U.S.C. § 7410(a)(2)(D)(i). If a state fails to include adequate regulatory measures to control in-state sources, EPA must issue a federal plan (FIP) to address the state's good-neighbor obligations. *See id.* § 7410(c)(1). In the past, EPA has issued multistate FIPs (transport rules) to implement the Good Neighbor Provision. *See* 88 FR at 36,668–36,669 (summarizing previous rules).

Whether set by a state or by EPA, emissions controls under the Good Neighbor Provision must be "consistent with" the other provisions of Title I of the CAA. 42 U.S.C. § 7410(a)(2)(D)(i). This means that "upwind States must eliminate their significant contributions" by the same deadlines by which downwind areas must attain the NAAQS. *Wisconsin v. EPA*, 938 F.3d 303, 313 (D.C. Cir. 2019). This Court has on multiple occasions invalidated previous rules under the Good Neighbor Provision to the extent they "fail[ed] to eliminate upwind States' significant contributions to downwind pollution by the statutory deadline for downwind States to meet the NAAQS for ozone." *Id.*; *North Carolina v. EPA*, 531 F.3d 896, 911–12 (D.C. Cir. 2008).

### D. Wisconsin's efforts to attain the 2015 ozone NAAQS have been hindered by emissions from upwind states.

In 2015, EPA promulgated an updated NAAQS for ozone of 70 ppb.[3] EPA subsequently promulgated area designations for the 2015 NAAQS, designating all or parts of six Wisconsin counties along the Lake

---

[3] *See* National Ambient Air Quality Standards for Ozone, 80 FR 65,292, 65,329 (Oct. 26, 2015).

Michigan shoreline as "marginal" nonattainment.[4] EPA set a date of August 3, 2021, for these areas to attain the NAAQS.

Wisconsin has historically struggled to attain ozone standards in its lakeshore areas, due largely to upwind emissions from the south and southeast, "compounded by the meteorological effects of Lake Michigan," (AR_0324:1, JA0307)[5]; *see also Clean Wisconsin*, 964 F.3d at 1170–74. EPA has acknowledged the impact of this phenomenon in Wisconsin.[6] This lack of control over ozone-causing emissions severely hinders Wisconsin's ability to demonstrate attainment.[7]

---

[4] In *Clean Wisconsin*, this Court held EPA's initial area designations for Wisconsin were unlawful. On remand, EPA reaffirmed or revised its designations for Wisconsin. *See* Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25,776, 25,845 (June 4, 2018).

[5] Citations to "AR_XXXX" refer to the final digits in the Document ID for each entry in the administrative record, as also reflected in EPA's index. (Dkt. 2008255.) For example, AR_0324 refers to EPA-HQ-OAR-2021-0668-0324, Comment submitted by Wisconsin Department of Natural Resources. (*See* Dkt. 2008255:27.) "JA" refers to the joint appendix.

[6] *See, e.g., Wisconsin; Milwaukee Area, Sheboygan County Area, Manitowoc County Area, Door County Area; Final Area Designations for the 2015 Ozone National Ambient Air Quality Standards TSD for Counties Remanded to EPA*, at 36–37, EPA, https://www.epa.gov/sites/default/files/2021-05/documents/wi_tsd_remand_final.pdf (last visited March 26, 2024).

[7] *See Letter from Gail Good to Debra Shore, EPA Region 5 Administrator, Dec. 30, 2022*, Wis. Dep't of Nat. Res., https://dnr.wisconsin.gov/sites/default/files/topic/AirQuality/AttainmentPlanLetter12302022.pdf (last visited March 26, 2024).

Thus, despite Wisconsin's successful efforts to reduce emissions of ozone-forming pollutants,[8] three Wisconsin areas did not attain the NAAQS by the August 2021 deadline.[9] These areas were reclassified to moderate nonattainment and given a new deadline to attain: August 3, 2024. *See* 87 FR 60,897.

## II.    EPA proposed a transport rule to implement the Good Neighbor Provision for the 2015 NAAQS.

In April 2022, nearly seven years after setting the operative NAAQS for ozone and four years after designating nonattainment areas, EPA issued a proposed rule that it described as "a full remedy" for good-neighbor requirements for the states covered by the rule, including Wisconsin. *See* 87 FR 20,036, 20,100 (April 6, 2022).

The rule followed the same four-step methodology EPA used in previous transport rules to assess and control upwind states' "significant

---

[8] Wisconsin implemented numerous programs controlling both stationary and mobile source emissions. *See* Letter from Gail Good to Debra Shore, *supra* n. 6, at 1. EPA acknowledges the effectiveness of Wisconsin's strong in-state emissions-control programs, with the final Rule requiring Wisconsin sources to implement only very modest short-term emissions reductions in 2023 and no reductions in 2026 and beyond. (*See* AR_1080:28, JA1037); 88 FR 36,660.

[9] These are the Milwaukee, Kenosha County, and Sheboygan County nonattainment areas.

contributions" to downwind nonattainment. *See, e.g.*, *Wisconsin*, 938 F.3d at 310–11.

At Step One, EPA identifies downwind areas projected to have trouble attaining or maintaining the NAAQS. *Id.* at 310. At Step Two, EPA determines which upwind states "contribute significantly" to the downwind sites identified under the first step. EPA sets the threshold for this significant contribution at 1%, so those upwind states that contribute at least 0.7 ppb to a downwind state are deemed "linked" to that downwind state for purposes of the remaining analysis. *Id.* at 310–11. At Step Three, EPA conducts a multifactor analysis to determine what, if any, emissions in states identified at Step Two significantly contribute to nonattainment (or interfere with maintenance of) the NAAQS in another state and, thus, must be eliminated. *Id.* at 311. Finally, at Step Four, after selecting an ideal control stringency, for each upwind state EPA establishes an emissions budget for electric generating units (EGUs) and sets emission limits for qualifying industrial sources. *Id.* at 311. EPA also establishes a trading program and other compliance flexibilities. *See* 88 FR 36,671–88.

### A.    Wisconsin identified numerous deficiencies with the proposed transport rule.

Wisconsin, through its Department of Natural Resources, submitted extensive comments identifying "several critical oversights" in the proposed rule. Collectively, those oversights "resulted in a rule that is significantly short of meeting CAA requirements." (AR_0324:1–2, JA0307–08.) Wisconsin's core objection was that, based on EPA's own modeling, other states contribute between 42% to 48% of ozone at Wisconsin's monitors, while the proposed rule would reduce ozone concentrations by "0.1 ppb…only a fraction of what is required" to address those upwind-state contributions.[10] (AR_0324:4–5, JA0310–11.)

In addition to this overarching shortcoming, Wisconsin pointed out three ways the proposal "fail[ed] to properly address the significant contributions of upwind states to Wisconsin." (AR_0324:3–7, JA0309–13.)

*VOCs.* Wisconsin took issue with the proposed rule's focus on reductions in NOx emissions to the exclusion of an entire category of ozone precursors, VOCs. (AR_0324:5–6, JA0311–12.) Wisconsin

---

[10] As discussed in more detail below, even the modest air quality improvements that EPA projected have not materialized.

explained that while most ozone-impacted areas would benefit from reductions in NOx alone, there is "compelling evidence" that some of Wisconsin's nonattainment areas "would improve with additional reductions of both NOx and VOCs," such that EPA should assess whether VOC reductions are necessary "to fully resolve upwind state contributions to Wisconsin's ozone levels." (AR_0324:5–6, JA0311–12.)

*Mobile sources*. Mobile sources include both on-road vehicles (e.g., cars and trucks) and non-road sources (e.g., locomotives and marine vessels). While recognizing that mobile sources are a major source of ozone-causing pollutants, the proposal did not consider reductions from mobile sources as part of the elimination of "significant contribution" to ozone nonattainment. (AR_0324:6–7, JA0312–13.) Recent modeling shows that "nearly 40% of all NOx emissions in the country are from mobile sources," and that "mobile sources contribute up to 32 ppb or 42% of ozone at Wisconsin's lakeshore nonattainment monitors"—nearly twice the combined impact of stationary and nonpoint source emissions. (AR_0324:6, JA0312.)

Yet the proposal did not require reductions from mobile sources. Instead, EPA referred to other, "existing and on-the-way" federal regulations the agency expects will "reduce emissions from that sector." (AR_0324:6, JA0312.) But even according to EPA, those other planned reductions "will not result in any measurable emissions reductions by attainment dates for the 2015 NAAQS" in Wisconsin. (AR_0324:6, JA0312.)

*Timeliness.* The proposal did not require timely reduction of upwind contributions to allow the state to meet the controlling attainment dates. (AR_0324:7, JA0313.) Wisconsin pointed out that if the state cannot meet the next attainment date—August 2024—its areas will be "bumped up" to serious nonattainment and will be subjected to the corresponding tightening of regulatory obligations. (AR_0324:7–8, JA0313–14). To avoid being penalized for not controlling what is recognized to be an upwind problem, Wisconsin urged EPA to ensure that the final rule "fully resolves *all* upwind state contributions by 2023." (AR_0324:8, JA0314.) Wisconsin also had previously urged EPA to issue a transport rule more promptly, by 2022, to account for the upcoming 2024 attainment date. (*See* AR_0002:1, JA0012.)

**B.    EPA issued the final Rule, which purports to eliminate the significant contributions of upwind states to Wisconsin.**

EPA issued the final Rule in June 2023.[11] By this time, the 2023 ozone season was already underway. The Rule declined to incorporate Wisconsin's requests for more significant reductions from upwind states.[12] The Rule does not require emissions reductions from the states upwind of Wisconsin in time for the state to attain the NAAQS in August 2024, nor does it impose any control measures for mobile sources or VOCs. *See* 88 FR 36,719, 36,737.

As Wisconsin warned, the Rule's failure to resolve the significant contributions of upwind states resulted in continued nonattainment. (AR_0324:1, JA 0307.) Current ozone data indicate Wisconsin's areas will not meet their revised August 2024 attainment date.[13] These areas face

---

[11] Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 FR 36,654 (June 5, 2023).

[12] In response to comments, EPA included in the final Rule a monitor in Sheboygan County, Wisconsin, that the state pointed out should have been included since multiple upwind states' emissions were "linked" to that monitor. (AR_0324:1–2, JA0307–08.) That correction, however, did not fix the more fundamental errors that Wisconsin raised in comments and presses here.

[13] *See Top Four 8-Hour Average Ozone Concentrations as of November 1, 2023*, Wis. Dep't of Nat. Res., https://widnr.widen.net/s/bx7s2cxttv/am_current ozonedvs_2021 (showing preliminary 2023 ozone data for Wisconsin) (last visited March 26, 2024).

an imminent bump up to serious nonattainment, which will impose additional regulatory requirements on the state. 42 U.S.C. § 7511(b)(2).

## STANDARD OF REVIEW

This Court reviews the Rule pursuant to 42 U.S.C. § 7607(b)(1), (d)(1)(B), applying "the same standard of review [as]… under the Administrative Procedure Act," *Midwest Ozone Grp. v. EPA*, 61 F.4th 187, 192 (D.C. Cir. 2023) (internal citation omitted). Under that standard, the Rule must be set aside if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A), (C); *accord* 5 U.S.C. § 706(2)(A), (C).

## SUMMARY OF ARGUMENT

The Rule unlawfully fails to require sufficient emission reductions from states upwind of Wisconsin to meet the Good Neighbor Provision's requirements. While the Rule requires some reductions from Wisconsin's upwind states, EPA's own projections show that the Rule does not require sufficient reductions in time for three Wisconsin areas to meet the state's impending August 2024 attainment deadline.

17

To illustrate, the Rule found that Wisconsin sources are responsible for 10% of the state's exceedance of the NAAQS, while linked upwind states are responsible for nearly 50%. For example, Indiana's sources contribute more to Wisconsin's nonattaining monitors than do all of Wisconsin's own sources.

Based on EPA's calculations of upwind states' contributions, those upwind states linked to Wisconsin would have to reduce their contribution to the Sheboygan County, Wisconsin, monitor by 0.86 ppb to eliminate their "significant contribution." But the Rule requires only a 0.18 ppb reduction from those states. So by its own calculations, the Rule does not require sufficient reductions to eliminate upwind states' significant contributions to Wisconsin's nonattaining and maintenance areas in 2023. This under-control of upwind-state emissions violates the statute, requiring remand.

EPA largely acknowledges that the Rule does not timely control all upwind emissions, but claims that effective reductions may have been more costly and difficult to obtain. This fails to carry the "heavy burden" that this Court has recognized the agency must meet to demonstrate "impossibility" as necessary to excuse a statutory violation.

That statutory violation is alone sufficient to support remand. But further confirmation of the Rule's deficiency comes from EPA's recent proposed supplemental rule, which requires additional reductions, including from one state contributing significantly to Wisconsin's nonattainment. The proposal confirms that, standing alone, the Rule under-controls sources upwind of Wisconsin.

Additionally, recent monitoring in Wisconsin demonstrates that the Rule's projections for Wisconsin's monitors were overly optimistic. Thus, in practice, the Rule is likely to be even more ineffective for Wisconsin than its own projections suggest.

The Rule also is arbitrary and capricious in two respects, either of which supports remand. In response to EPA's original proposed rule, Wisconsin pointed out that the proposal failed to require sufficient reductions upwind of Wisconsin and urged EPA to require additional reductions in other ways. One was to require reductions of emissions of VOCs, an ozone precursor that has been shown to affect ozone levels directly upwind of Wisconsin. The other was to control emissions from mobile sources, pointing out that over 40% of ozone transported into Wisconsin comes from those sources.

In the final Rule, EPA declined to require VOC reductions or reductions from mobile sources. Had the Rule required sufficient reductions in other ways, EPA's refusal to control VOCs or emissions from mobile sources likely would have been reasonable. But here, where the Rule's provisions failed to eliminate significant contributions to Wisconsin, EPA unreasonably ignored these other available reductions.

The Rule should be remanded to EPA so the agency may consider reductions to VOCs and from mobile sources, among all other possible reductions, as necessary to eliminate significant contributions to Wisconsin's nonattainment.

## STANDING

EPA's failure to adequately regulate "emissions presents a risk of harm to [a state] that is both 'actual' and imminent." *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007) (quoting *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560–561 (1992)). A state's challenge to such a rule affords "a 'substantial likelihood that the judicial relief requested' will prompt EPA to take steps to reduce that risk." *Id.* (quoting *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 79 (1978)).

Here, emissions of ozone precursors from upwind states directly impair Wisconsin's ability to attain the NAAQS and impose economic, environmental, public-health, and administrative harms on the state. (*See* Dkt. 2008842:80–81 (Declaration of Gail Good, Director of Air Management Program, Wisconsin Department of Natural Resources). The relief Wisconsin seeks—a rule requiring upwind states to eliminate emissions that significantly contribute to Wisconsin's nonattainment— would directly redress Wisconsin's injuries. *See North Carolina*, 531 F.3d at 914–15.

## ARGUMENT

## I.    The Rule violates the Good Neighbor Provision by failing to timely eliminate upwind states' significant contributions of emissions to Wisconsin.

When interpreting statutory provisions that "speak[ ] to the direct question at issue," courts "afford no deference to the agency's interpretation" and "'must give effect to the unambiguously expressed intent of Congress.'" *North Carolina*, 531 F.3d at 906 (quoting *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)).

The Good Neighbor Provision requires EPA to eliminate upwind states' significant contributions, and to do so by the next applicable

attainment date. EPA failed to give effect to that clear requirement for Wisconsin, and the Rule is invalid for that reason.

**A.   The Good Neighbor Provision requires EPA to implement a full remedy for all "significant contributions" of pollutants in every downwind state covered by the Rule, and to do so by each downwind state's next applicable attainment deadline.**

The statute requires states, or EPA, to promulgate an implementation plan "prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will…contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to [the NAAQS]." 42 U.S.C. § 7410(a)(2)(D)(i)(I). Four principles guide the analysis of the statute here.

First, the statute requires EPA to prohibit emissions from upwind states "consistent with" Title I of the CAA. 42 U.S.C. § 7410(a)(2)(D)(i). This phrase encompasses "the deadlines for states to attain particular NAAQS." *North Carolina*, 531 F.3d at 911–12. Because the Act requires a nonattaining state to "attain permissible levels of ozone 'as expeditiously as practicable,' but no later than the assigned date in the table the statute provides," any good-neighbor rule must require upwind

22

states to "eliminate their significant contribution" by the next applicable "attainment deadlines for downwind areas." *Id.* at 912 (quoting 42 U.S.C. § 7511).

This command leaves no room for flexibility: "The statute cannot reasonably be understood to enable upwind States to continue their significant contributions outside of the statutory timeframe by which downwind areas must achieve attainment." *Wisconsin*, 938 F.3d at 315–16. Not only is the text clear about the shared deadlines, but courts have consistently recognized those deadlines as "the heart" of the Act, and that allowing continued contributions beyond those dates would "subvert" the "central object" of the Act. *Id.* at 316.

For this reason, in both *North Carolina* and *Wisconsin* this Court invalidated rules that failed to "harmonize" upwind contributors' deadlines with the downwind states' next applicable attainment dates. *North Carolina*, 531 F.3d at 912; *see also Wisconsin*, 938 F.3d at 316.

Second, while the Clean Air Act does not allow EPA to "overcontrol" upwind states, it also commands EPA not to "under-control." *EME Homer II*, 572 U.S. at 522. Unlawful "over-control" would occur "[i]f EPA require[d] an upwind State to reduce emissions by more than the amount

necessary to achieve attainment in *every* downwind State to which it is linked," or if an upwind state were required to implement controls that would "drive [its] contribution to every downwind state to which it is linked below one percent of the relevant NAAQS." *Id.* at 521–22. At the same time, however, the statute imposes on EPA an "obligation to avoid 'under-control,' i.e., to maximize achievement of attainment downwind." *Id.* at 523.

To balance these competing demands, the Court has recognized that the statute's explicit command to "maximize achievement of attainment downwind" means that "EPA must have leeway in fulfilling its statutory mandate." *Id.* In other words, where the risks of overcontrol and under-control are in equipoise, or even close, EPA must err on the side of ensuring downwind attainment. *See id.*

As part of the process for reconciling these competing obligations, the Court has recognized the availability of as-applied challenges under the statute. *Id.* at 523–24. "If any upwind State concludes it has been forced to regulate emissions below the one-percent threshold or beyond the point necessary to bring all downwind States into attainment, that State may

bring a particularized, as-applied challenge to the Transport Rule, along with any other as-applied challenges it may have." *Id.*

Third, the fact that attainment deadlines may potentially be modified under other statutory provisions does not excuse EPA from requiring upwind states to eliminate their significant contributions by the established statutory deadlines. *See Wisconsin*, 938 F.3d at 317. In *Wisconsin*, EPA defended a good-neighbor rule in which upwind states were allowed to continue significant contributions beyond the downwind states' deadlines, on the theory that the downwind states' deadlines *could be* "subject to modification" pursuant to other statutory provisions. *Id.* This Court rejected EPA's rationale, holding that although the statutory deadlines were subject to modification, that possibility does not "render the deadlines discretionary or otherwise rob them of legal force." *Id.* The Court allowed that, if anything, in the event a downwind state's attainment deadline was actually modified, EPA could, "if justified" allow "a corresponding extension for an upwind State's good neighbor obligations." *Id.* But there was no indication that "any such modification" was appropriate in that case, and certainly not on the across-the-board scale applied in the rule. *Id.*

It also does not matter that the statute setting attainment dates lists multiple, sequential attainment dates based on the level of nonattainment (marginal, moderate, etc.). In *Maryland*, 958 F.3d at 1204, EPA sought to avoid the binding nature of the next applicable deadline for Delaware based on the possibility that Delaware's "marginal" area might fail to attain by the applicable deadline, in which case it would be "automatically bumped up to a moderate nonattainment status and then subjected to a [later] deadline." That possibility, the Court held, "does not make Delaware's obligation to attain the NAAQS by [the earlier date] any less binding." *Id.* This is confirmed by the fact that a bump-up "carries significant consequences" for the downwind state. *Id.*

Fourth, claims of "[s]cientific uncertainty" or administrative difficulty also do not excuse compliance with the statute's clear command. *Wisconsin,* 938 F.3d at 318–19. "An agency cannot 'shirk[ ] its duties by reason of mere difficulty or inconvenience.'" *Id.* at 319 (quoting *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 168 (D.C. Cir. 2017)). When faced with a statutory mandate, "a decision to disregard it cannot be grounded in mere infeasibility"; instead, the agency must "meet the 'heavy burden to

demonstrate the existence of an impossibility.'" *Id.* (quoting *Sierra Club v. EPA*, 719 F.2d 436, 462 (D.C. Cir. 1983).

### B. The Rule unlawfully fails to require timely elimination of significant contributions of emissions from states upwind of Wisconsin.

"The Clean Air Act requires upwind States to eliminate their significant contributions to downwind ozone nonattainment by prescribed deadlines." *Wisconsin*, 938 F.3d at 319. Because the Rule fails to require timely reductions as to Wisconsin, it is unlawful and must be remanded so EPA may rectify those errors.

The Rule identified three Wisconsin monitors—in Sheboygan, Racine, and Kenosha counties[14]—projected to be in nonattainment or maintenance in either 2023 or 2026, and for which upwind states must therefore eliminate their significant contributions. 88 FR 36,706, 36,747. Based on the Rule's own air quality projections and state contributions data, the Rule under-controls upwind state emissions to these monitors. These errors are evident on the face of the Rule and its supporting documents.

---

[14] Sheboygan and Kenosha counties contain multiple monitors. The monitors at issue here are the Kohler Andrae monitor ("Sheboygan") and Chiwaukee Prairie monitor ("Kenosha").

First, as to Sheboygan, the Rule projected the Sheboygan monitor to be in nonattainment in 2023, with a design value of 72.7 ppb.[15] 88 FR 36,706. Therefore, to attain the NAAQS by the next applicable deadline, which is August 2024, Sheboygan would need a further reduction of 1.8 ppb.[16] *See* 42 U.S.C. § 7511(a)(1).

The Rule also found that Wisconsin sources are responsible for 10% of that overage, while linked upwind states are responsible for 48%.[17,18] (AR_1157:91 (App'x_D:4), JA0862.)

For example, Indiana's sources contribute more to Wisconsin's nonattaining monitors than do all of Wisconsin's own sources. And Illinois's sources contribute almost double Wisconsin's sources' contributions (and for one monitor, triple). (*See* AR_1157:82–86 (App'x

---

[15] A monitor's "design value" reflects an average daily level of ozone at the monitor, calculated based on the highest eight hours of ozone measurements in each day over the course of three ozone seasons, expressed as parts-per-billion by volume. *See Clean Wisconsin*, 964 F.3d at 1154; *Wisconsin*, 938 F.3d at 310; 40 C.F.R. pt. 50 App. U.

[16] An area must achieve a design value below 71 ppb to attain.

[17] The balance comes from biogenic sources of ozone, lightning strikes, fires, and international sources. (AR_1157:91 (App'x_D:4), JA0862.)

[18] For 2023, the Rule found seven states "linked" to Wisconsin (i.e., contribute at least 0.7 ppb): Iowa, Illinois, Indiana, Michigan, Missouri, Ohio, and Texas. Despite modeling linking Iowa to one Wisconsin monitor for 2023, the Rule did not require any reductions from Iowa. EPA has since promulgated a supplemental rule to address this deficiency. *See infra*, § I.E.

For 2026, all but Iowa are projected to still be linked. (*See* AR_1157:98 (App'x_E:5), JA0869.)

28

C:2–7), JA0852–57.) Based on those upwind states' contributions, they collectively must reduce their contribution to the Sheboygan monitor by 0.86 ppb to eliminate their "significant contribution."

The Rule, however, required only a 0.18 ppb reduction from those states. 88 FR 36,743 (difference between baseline (72.64 ppb) and "SCR/SNCR optimization" (72.46 ppb)). Thus, by its own calculations, the Rule comes up well short of eliminating upwind states' significant contributions to Sheboygan in 2023, as illustrated in the following chart.

| | | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|---|
| Site ID | County | 2023 average design value | "Excess ozone" needed to attain | Wisconsin's contribution | Contribution of linked states | Wisconsin's share of excess | Linked states' share of excess | Reduction required by Rule |
| | | | *A-70.9* | | | *B * C* | *B * D* | |
| 551170006 | Sheboygan | 72.7 ppb | 1.8 ppb | 10% | 48% | 0.18 ppb | 0.86 ppb | 0.18 ppb |

This same pattern for 2023 plays out in Kenosha and Racine counties. Kenosha and Racine are "maintenance-only" receptors for 2023, meaning their "average" design values show attainment but their "maximum" design values still exceed the NAAQS. 88 FR 36,706 (Table IV.D-2; also providing explanation of maintenance-only methodology); *see also id.* at 36,703 (explaining methodology for calculating "projected maximum

future design values"). For purposes of coverage in the Rule, their status as "maintenance only" requires the same reductions to those monitors as for nonattaining monitors.[19] *North Carolina*, 531 F.3d at 908–11.

Applying the analysis above to these monitors reveals a similar deficiency to that seen for Sheboygan. The Rule's required emissions reductions from upwind states are insufficient to fully resolve either the 47% these states contribute to Kenosha or the 43% they contribute to Racine. At best, the Rule requires linked states to address only about half of their significant contributions (at Racine). The chart below illustrates these deficiencies.

| Site ID | County | 2023 maximum design value[20] | "Excess ozone" needed to maintain | Wisconsin's contribution[21] | Contribution of linked states[22] | Wisconsin's share of excess | Linked states' share of excess | Reduction required by Rule[23] |
|---|---|---|---|---|---|---|---|---|
| 550590019 | Kenosha | 71.7 ppb | 0.8 ppb | 8% | 47% | 0.06 ppb | 0.37 ppb | 0.10 ppb |
| 551010020 | Racine | 71.5 ppb | 0.6 ppb | 11% | 43% | 0.07 ppb | 0.26 ppb | 0.14 ppb |

---

[19] For this reason, this brief discusses them all in terms of nonattainment.

[20] 88 FR 36,706.

[21] (AR_1157:91 (App'x_D:4), JA0862.)

[22] (AR_1157:91 (App'x_D:4), JA0862.)

[23] 88 FR 36,743 (difference between baseline (72.64 ppb) and "SCR/SNCR optimization")

For 2026, EPA projects that Racine and Kenosha are no longer impacted by transport and for that reason, the Rule does not further analyze those monitors. However, the Rule predicts that Sheboygan will be "maintenance only" that year. As reflected in the following table, despite the additional emissions reductions the Rule requires in upwind states, even by 2026, the Rule still falls short of fully eliminating their significant contributions to Sheboygan.

| Site ID | County | 2026 max design value[24] | "Excess ozone" needed to maintain | Wisconsin's contribution[25] | Contribution of linked states[26] | Wisconsin's share of excess | Linked states' share of excess | Reduction required by Rule[27] |
|---|---|---|---|---|---|---|---|---|
| 551170006 | Sheboygan | 71.7 ppb | 0.8 ppb | 9% | 45% | 0.18 ppb | 0.31 ppb | 0.30 ppb |

## C.    EPA's explanations do not justify the statutory violation.

EPA seems to acknowledge that the Rule under-controls at least some upwind areas. *See* 88 FR 36,743–44. But none of the agency's rationales support its failure to require timely reductions for those states upwind of Wisconsin.

---

[24] 88 FR 36,706.
[25] (AR_1157:91 (App'x_D:4), JA0862.)
[26] (AR_1157:91 (App'x_D:4), JA0862.)
[27] (AR_1157:30–31, JA0802–03.)

For example, the Rule recognizes that, even under its own projections, some downwind receptors would not promptly attain through implementation of EPA's chosen control stringency measures. EPA justifies this on the ground that "all receptors show improvement in air quality even if their status does not change." 88 FR 36,741; *see also* 88 FR 36,661 (discussing EPA's finding of "meaningful improvement"). But "improvement" alone fails to fulfill the statutory mandate, and "[a]ll the policy reasons in the world cannot justify reading a substantive provision out of a statute." *North Carolina*, 531 F.3d at 910; *accord Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001).

EPA's under-control error is most evident in the Rule's explanation of its efforts to avoid *over-control*. In assessing whether the selected stringency levels would result in any upwind states being required to reduce their emissions too much, EPA explained that, for 2023 (the last full ozone season before the 2024 attainment date), the Rule's selected control stringency would leave all linked downwind receptors "unresolved." 88 FR 36,749. EPA touted this as proof that no upwind state could claim to be "overcontrolled." *Id.*

32

But as to Wisconsin, this is proof of the Rule's deficiency, not its success. In EPA's endeavor to ensure that no state is required to do too much, the agency has unlawfully allowed Wisconsin's (and other states') attainment dates to pass by "unresolved."[28] This is directly contrary to *North Carolina*, *Wisconsin*, and *EME Homer City*, all of which made clear that in balancing the risks of overcontrol and under-control, EPA's obligation is to "fulfill[ ] its statutory mandate" of fully controlling emissions by the downwind state's next attainment deadline. *EME Homer II*, 572 U.S. at 523; *see also Wisconsin*, 938 F.3d 303, 313–17; *North Carolina*, 531 F.3d at 911–12.

A central error in EPA's analysis is that it builds unlawful delay into the Rule's required reductions. EPA calls 2026 "the critical analytic year" because it is "the last full ozone season before the 2027 serious area attainment date and is the year by which significant contribution must be eliminated if at all possible." 88 FR 36,749.

---

[28] For example, emissions from Indiana and Illinois (both of which contribute significantly to Wisconsin's nonattaining monitors) also contribute significantly to monitors elsewhere, such as Connecticut. (*See* AR_1157:98 (App'x_E:5), JA0869); *see also* 88 FR 36,743.

As an initial matter, this glosses over the fact that EPA took eight years to promulgate this Rule, by which time the original attainment deadlines had passed. In this Rule, EPA's delay has already resulted in deadlines being missed, with multiple Wisconsin areas having been bumped up to a higher nonattainment classification.[29]

But even looking past EPA's delay in promulgating this Rule, its current focus on 2026 inexplicably ignores the intervening moderate area attainment date in August 2024. *See* 42 U.S.C. § 7511(a)(1). The Rule appears to give no recognition to this deadline, instead looking past 2026 before all of Wisconsin's monitors are projected to attain or maintain the NAAQS. *See* 88 FR 36,743. The Rule's treatment of these deadlines "cannot be reconciled with the Good Neighbor Provision." *Maryland*, 958 F.3d at 1204.

The Rule tries to justify this timing by reference to the statute's use of the future "will," arguing that "[i]t would be 'anomalous' for the EPA to impose good neighbor obligations in 2023 and future years based solely on finding that 'significant contribution' had existed at some time in the

---

[29] *See* 87 FR 60,897, 60,898 (reclassifying Sheboygan, Milwaukee, and Kenosha nonattainment areas from marginal to moderate on failure to attain by August 2021).

past." 88 FR 36,694 (quoting *Wisconsin*, 938 F.3d at 322). The statute does not support EPA's future-focused reading.

Rather, the statute most naturally and reasonably imposes a present requirement: prohibiting sources "*from emitting* any air pollutants in amounts *which will…contribute* significantly to nonattainment"—that is, to stop the emissions *before* they contribute significantly or, at worst, to stop existing emissions from continuing to do so. 42 U.S.C. § 7410(a)(2)(D)(i). Under EPA's reasoning, an upwind state must first be allowed to "contribute significantly"—apparently through a full cycle of attainment-date deadlines—before EPA could regulate it. *See* 88 FR 36,694. That reading is especially unreasonable in light of the obligation to eliminate significant contributions *before* downwind states' next attainment deadline.

While the identified problems are alone enough to support remanding the Rule to correct the Wisconsin-specific errors, subsequent monitoring is already showing that the Rule's modeling for Wisconsin was overly optimistic. Thus, the effect of the flawed Rule will be even more pronounced than is apparent on the face of the Rule.

As reflected in the table below, actual 2023 data indicate that the design values for all three Wisconsin monitors significantly exceed the Rule's projections.[30] This is precisely why Wisconsin urged EPA to include a mechanism in the Rule whereby EPA could adjust upwind states' required reductions upon a showing that the state continued to significantly contribute to downwind, nonattaining states. (*See* AR_0324:8, JA0314.)

| Monitor | EPA's modeled 2023 design value in Rule (ppb) | Actual 2023 design value (preliminary) (ppb)[31] | EPA's underprediction for 2023 (ppb) |
|---|---|---|---|
| Kenosha (Chiwaukee Prairie) | 70.8 | 77 | - 6.2 |
| Racine | 69.7 | 74 | - 4.3 |
| Sheboygan (Kohler Andrae) | 72.7 | 77 | - 4.3 |

---

[30] (*Compare* AR_1127:320, JA1461 (Rule's projected design values for Sheboygan)), *with Top Four 8-Hour Average Ozone Concentrations as of November 1, 2023*, Wis. Dep't of Nat. Res., https://widnr.widen.net/s/bx7s2cxttv /am_currentozonedvs_2021 (preliminary monitoring data for 2023, currently undergoing quality assurance) (last visited March 26, 2024).

[31] *See Top Four 8-Hour Average Ozone Concentrations as of November 1, 2023*, Wis. Dep't of Nat. Res., https://widnr.widen.net/s/bx7s2cxttv/am_current ozonedvs_2021 (last visited March 26, 2024).

Even before these recent results, EPA recognized the Rule's shortcomings for Wisconsin monitors. In its technical support document for the final air-quality modeling used for the final Rule (version 2016v3), EPA projected Sheboygan's average design value in 2026 as 70.8 ppb and its maximum design value as 71.7 ppb. (AR_1157:18, JA0789.) But EPA recognized that the model "under predicts peak MDA8 ozone concentration several of the days with the highest concentrations, *particularly at the Sheboygan receptor*." (AR_1157:65 (App'x B:9), JA0836.) MDA8 ozone concentration refers to actual, observed data. (*See* AR_1157:3, 58, JA0774, 0829.) In short, EPA acknowledged that when compared against actual, observed data, the modeling used for the Rule underpredicts ozone concentrations, especially at Sheboygan.

EPA does not even claim that its under-predictions for Sheboygan are somehow accounted for in the Rule. Instead, it claims that, in general, these modeling discrepancies are within the allegedly broad margin of error for such modeling efforts (*see* AR_1157:61 (Air Quality Modeling technical support document App'x B:5, JA0832), and that "model performance results demonstrate the scientific credibility of our 2016v3 modeling platform." (AR_1157:9, JA0780).

The model may be sufficiently accurate for most other sites, but on its face, the Rule fails to control significant contributions to three Wisconsin nonattaining monitors. The "credibility" of EPA's model is thus cold comfort to Wisconsin, whose nonattainment areas will continue to receive unlawful contributions from upwind sources.

"Required to balance" the competing possibilities of over- and under-control, EPA "has a statutory obligation to avoid 'under-control, i.e., to maximize achievement of attainment downwind." *EME Homer II*, 572 U.S. at 523. EPA's failure to do so as to Wisconsin's three nonattainment areas violates the Good Neighbor Provision.

### D.    EPA's explanations do not demonstrate impossibility.

EPA may not "shirk[ ] its duties by reason of mere difficulty or inconvenience." *Wisconsin*, 938 F.3d at 319 (quoting *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 168 (D.C. Cir. 2017). "When an agency faces a statutory mandate, a decision to disregard it cannot be grounded in mere infeasibility. Rather, the agency would need to meet the 'heavy burden to demonstrate the existence of an impossibility.'" *Id.* (quoting *Sierra Club*, 719 F.2d at 462). EPA has not carried its "heavy burden" to show that timely reductions upwind of Wisconsin were impossible.

For example, in response to comments from upwind states and sources about alleged compliance difficulties, EPA required only moderate reductions before 2026, and included in the Rule a process for individual sources "to seek limited compliance extensions" extending to 2029, "based on a case-by-case demonstration of necessity." 88 FR 36,755. EPA claims that a "three-year timeframe is not possible for all sources subject to this rule collectively to come into compliance," due to "the scope of this rule coupled with current information on the present economic capacity of sources, control-installation vendors, and associated markets for labor and material." 88 FR 36,757.

In short, because timely compliance by upwind states may be costly and may take greater effort to implement, EPA largely excuses them from having to try. (*See, e.g.*, AR_1080:27 (Ozone Transport Policy Analysis, explaining that because control at $11,000/ton "could not be widely accomplished until the 2026 ozone season," Rule allowed three years of control-stringency at $1,800/ton), JA1036.)

EPA's built-in delay and additional "case-by-case" extension process should have been the last resort rather than the baseline. That is, rather than EPA claiming impossibility in its own ability to regulate—based on

*some sources'* alleged inability to meet the deadlines—the agency should have demanded individual sources' "rigorous, source-specific demonstration of need for the additional time." 88 FR 36,755. By inverting that process, the Rule violates the statute, thereby forcing an imminent bump-up on Wisconsin and leaving Wisconsin sources to internalize all costs and regulatory burdens of the accompanying increased stringency.

The Rule also asserts that a three-year lag for certain sources is justifiable because it is "consistent with" other timelines under the Act—specifically, the time in which some stationary sources must eventually reduce emissions after being found to be a "major source." 88 FR 36,755. EPA does not explain why this timeline should apply in the context of required good-neighbor reductions. *See id.* More importantly, nothing in the statute itself supports such an extra, three-year allowance, and this Court's decision in *Wisconsin* directly refutes the suggestion. *See* 938 F.3d at 313–16.

40

### E.    EPA's proposed supplemental Good Neighbor Rule confirms that the current Rule under-controls for Wisconsin.

In January 2024, EPA released a proposed supplement to the Rule that adds emissions controls for Iowa, a state that EPA appropriately finds "contributes significantly" to Wisconsin. Supplemental Air Plan Actions: Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards and Supplemental Federal "Good Neighbor Plan" Requirements for the 2015 8-hour Ozone National Ambient Air Quality Standards, 89 FR 12,666; (*see also* AR_1157:98 (App'x_E:5), JA0869.) To resolve Iowa's significant contribution to Wisconsin, EPA proposes to require Iowa to make modest emissions reductions starting in 2025. 89 FR 12,707.

This proposal confirms Wisconsin's argument here: standing alone, the Rule under-controls sources upwind of Wisconsin. While the proposed update is a step in the right direction, the small, additional emissions reductions it imposes fail to reduce the impact of upwind state emissions

on Wisconsin's monitors and are projected to have no impact on Wisconsin's ozone levels.[32]

## II. EPA acted arbitrarily and capriciously by ignoring evidence and refusing to incorporate additional emissions controls in the Rule, including by limiting VOCs or controlling mobile-source emissions.

Agency action is arbitrary and capricious when it "entirely fail[s] to consider an important aspect of the problem" or where it "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency also must examine relevant data and adequately explain why it declined to take an alternative approach; "conclusory explanations…do not suffice," especially "where there is considerable evidence in conflict." *Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010).

Wisconsin raised multiple ways the final rule could adequately control emissions sources upwind of Wisconsin. These included implementing stricter reductions of VOCs (in addition to NOx) and requiring reductions

---

[32] (*Compare* AR_1080:67–68, JA1076–77) (Final Rule Ozone Transport Policy Analysis TSD), *with Ozone Transport Policy Analysis Proposed Supplemental Rule TSD*, at 54–55, EPA, https://www.epa.gov/system/files/documents/2024-01/ozone-transport-policy-analysis-proposed-supplemental-rule-tsd.pdf, (Sheboygan figures identical) (last visited March 26, 2024).

from mobile sources. (*See* AR_0324:1–8, JA0307–14.) EPA's refusal to take any of these measures is arbitrary and unlawful, particularly in light of the Rule's failure to require timely emissions reductions for sources upwind of Wisconsin.

## A.    EPA's refusal to control VOC emissions is contrary to the evidence before the agency.

In response to the proposed rule, Wisconsin urged EPA to consider requiring reductions of VOCs in addition to NOx emissions. Wisconsin explained that while NOx reductions may make up the bulk of efficient reductions, there is "compelling evidence" that some of Wisconsin's nonattainment areas are either "VOC-limited" (meaning VOC reductions are necessary to improve air quality) or are "transitional areas" (meaning ozone levels would improve with reductions of both NOx and VOCs). This is particularly true of the Chicago and Milwaukee areas, which research shows "to be more VOC sensitive" and would therefore "benefit from additional VOC reductions." (AR_0324:5–6, JA0311–12.)

Recognizing an area's status as VOC-limited is critical to effective ozone reduction because "[i]n a NOx-limited regime, ozone will decrease when NOx emissions are reduced"; however, in a "VOC-limited regime," focusing on NOx reductions "may not change" ozone levels, or worse,

"may actually increase" ozone when NOx emissions are reduced." (AR_1127:474, JA1484.) In other words, for areas of the country that are VOC-limited—like Wisconsin's lakeshore counties—this feature "dampens the responsiveness of ozone to NOx emissions controls." (AR_1127:474, JA1484.)

Multiple other commenters raised the same issue, explaining the need for the Rule to control VOCs, especially in VOC-limited areas like around Lake Michigan. (AR_1127:471–76, JA1481–86.) Commenters noted the Chicago area "is one of the few regions in the United States where ozone is still characterized by "VOC-limited chemistry." (AR_1127:474, JA1484.) The Chicago area is immediately south of Wisconsin, is a known contributor of ozone precursors to Wisconsin, and is part of the nonattainment area that includes the Kenosha monitor at issue here. (*See* AR_1157:82–86, 91, JA0852–56, 0862); 83 FR at 25,845.

EPA "disagree[d]" with the multiple commenters urging consideration of VOC reductions (AR_1127:476, JA1486), pointing to the fact that for nearly all of the upwind-downwind linkages covered by the rule, "contributions from NOx emissions comprise 80 percent or more of the total anthropogenic contributions." 88 FR 36,719. Because "the vast

44

majority of downwind air quality areas addressed by the final rule" would not benefit from upwind VOC reductions, EPA found that "regulation of VOCs…is not necessary to eliminate significant contribution" in the Rule. 88 FR 36,719.

EPA's refusal to regulate VOCs cannot be squared with the evidence before the agency, much less the Rule's failure to require greater reductions through other means. Had the Rule required sufficient reductions from EGUs and industrial sources to eliminate significant contributions to Wisconsin by the 2024 moderate attainment deadline, EPA's decision not to control VOCs likely could have survived. But here, EPA failed on both fronts.

EPA's explanation for refusing to control VOCs also is internally inconsistent. In its response to comments, after first flatly disagreeing that VOCs need to be considered at all, EPA then stated it "believes that local VOC emissions reductions combined with NOx reductions would reduce ozone concentrations in the central parts of urban areas that are VOC-limited," including "portions of the Chicago area," directly upwind of Wisconsin's violating monitors. (*See* AR_1127:476–77, JA1486–87.) EPA suggested that "states in the Chicago and New York City

nonattainment areas may want to consider both VOC and NOx emissions reductions as part of their local attainment planning." (AR_1127:479, JA1489.)

But the statute does not authorize EPA to foist this burden on states, and certainly not for those states suffering from excess upwind pollution. In urging EPA to control VOCs, Wisconsin "called the EPA's attention to an important aspect of the regulatory problem"; in response, "EPA looked away." *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 994 (D.C. Cir. 2021), *overruled on other grounds sub nom*. *W. Virginia v. EPA*, 597 U.S. 697 (2022). EPA's refusal to even consider, much less control, VOCs upwind of Wisconsin's violating monitors, was arbitrary and capricious.

## B.    EPA's refusal to control mobile-source emissions was arbitrary, capricious, and unlawful.

As another way to ensure sufficient reductions, Wisconsin urged EPA to control emissions from mobile sources. (*See* AR_0324:6–7, JA0312–13.) Despite the statutory command to control emissions from "any source or other type of emissions activity," 42 U.S.C. § 7410(a)(2)(D)(i), EPA refused to require reductions from mobile sources. EPA's refusal to control mobile sources ignores undisputed evidence, ignores statutory text, and lacks any persuasive reasoning.

46

### 1. EPA unreasonably refused to require emission reductions from mobile sources.

There is no dispute mobile sources comprise a significant share of the nation's emissions inventory. "[N]early 40% of all NOx emissions in the country are from mobile sources," with mobile sources contributing "up to 32 ppb or 42% of ozone at Wisconsin's lakeshore nonattainment monitors." (AR_0324:6, JA0312; *see also* 88 FR 36,736 (EPA "agree[ing]" that mobile sources "produce NOx emissions that contribute to ozone air quality problems across the U.S.").)

Nor can there be any real dispute that the Good Neighbor Provision covers mobile-source emissions. Mobile sources are within the broad universe of "any source" covered by the statute, 42 U.S.C. § 7410(a)(2)(D)(i), and EPA does not suggest otherwise.

Statutory context confirms the broad meaning of "any" in this context. When Congress means to limit a statutory provision's sweep to "stationary" or "mobile" sources, it says so. *See, e.g.*, 42 U.S.C. §§ 7521(a)(3)(B)(i) (governing "mobile source related pollutants"; (l) (standards for "mobile source-related air toxics"); 7503(a)(1)(B) (permit requirements for "major stationary sources"); 7424(a)(1) (requiring states to assess reliance on fossil fuels by "major fuel burning stationary

sources"). In the Good Neighbor Provision, Congress used no such limiting term and instead used the broadest possible modifier in "any." 42 U.S.C. § 7410(a)(2)(D)(i).

Alternatively, even assuming that "any source" could be read as somehow excluding "mobile sources," the statute's catchall provision— "any other type of emission activity"—contemplates no such limitation. The broad sweep of this phrase is confirmed by the statute's directive that emissions are to be controlled "consistent with the provisions of this subchapter." *Id*. Read together, these provisions mean that, whatever the source of pollutants, if their emission "contributes significantly" to downwind nonattainment, they must be "prohibit[ed]." *Id*.

EPA acknowledges that the statute includes no language limiting EPA's authority to stationary sources like the EGUs and industrial sources covered in the Rule. In response to comments objecting to the proposal to regulate some non-EGU sources, EPA relied directly on statutory text, which it highlighted "is not limited only to power plant emissions, nor is it limited only to 'major' sources or 'stationary' sources." 88 FR 36,680. The agency contrasted the varying uses of "source" elsewhere in the CAA with the statute's phrase "any source or other type

of emissions activity," noting that this contrast suggests the broadest possible scope of regulatory authority for the agency. 88 FR 36,681. Indeed, EPA went so far as to claim reserved authority to regulate *even more* source categories, such that its decision not to regulate certain sources or categories "does not reflect a determination that the EPA lacks legal authority to regulate such sources under different facts and circumstances." 88 FR 36,682.

EPA's explanation for regulating non-EGUs applies with equal force to mobile sources. The agency therefore unlawfully refused to control mobile-source emissions as necessary to eliminate significant contributions to Wisconsin.

### 2. EPA's rationales for refusing to consider mobile-source reductions are unpersuasive.

The agency offers two rationales for declining to require reductions from mobile sources. *See* 88 FR 36,736–37. Neither is persuasive.

First, EPA asserts that it regulates mobile sources primarily under different programs (namely, those under Title II of the CAA), and it "credits those on-the-books measures" within the four-step Good Neighbor framework by including emissions and "reductions from these sources in the emissions inventory for air quality modeling, which

49

informs Steps 1 and 2 of this analysis" (i.e., determining which areas are unable to attain the NAAQS and which upwind areas are contributing significantly to downwind nonattainment). 88 FR 36,736–37. According to EPA, the Rule "accurately represents emissions from mobile sources," which information is then "used to evaluate the contribution of states to ozone air quality problems in other states." 88 FR 36,737.

But "accurately represent[ing] emissions" is only half of EPA's task under the Good Neighbor Provision. After identifying mobile-source emissions as part of the inventory of regulable emissions, EPA offers no explanation why those same emissions are not a "source or other type of emissions activity" that must be eliminated under § 7410(a)(2)(D)(i). Without even attempting to explain that deficiency, EPA "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

EPA's second rationale for refusing to consider reductions from mobile sources is even more deeply flawed. EPA explains that "title II of the CAA provides the primary authority and process for reducing [mobile-source] emissions at the Federal level," and that "a question exists regarding the EPA's authority to address such emissions" when

50

the agency "regulat[es] in place of the states under CAA section 110(c)." 88 FR 36,737. EPA suggests that because the CAA generally prohibits states from establishing emission standards for new vehicles, *see* 42 U.S.C. § 7543(a), EPA is somehow prohibited from implementing any measures regulating motor-vehicle emissions when it issues a FIP to address cross-state air pollution. 88 FR 36,737.

This novel reverse-preemption theory has no basis in preemption doctrine. Preemption limits *states'* ability to regulate in areas where federal regulation entirely covers the field or where state regulation would conflict with the federal regulatory scheme. *See Arizona v. United States*, 567 U.S. 387, 401–07 (2012). EPA points to no authority for its novel proposition that federal regulation could be preempted under the type of statutory scheme created under the Good Neighbor Provision. The statute gives states the first opportunity to regulate downwind-bound emissions, but if state regulation is insufficient, the statute *requires* federal regulation. Neither principles of preemption nor common sense support the notion that federal regulators are prohibited from exercising the full scope of regulatory authority in this situation.

The statute on which EPA relies also defeats EPA's argument. *See* 42 U.S.C. § 7543(a) (CAA § 209). For one, the statute applies to states, not EPA. *See id.* Additionally, the statute only restricts states' ability to adopt or enforce standards "relating to the control of emissions from *new motor vehicles*," or to impose emission-limiting conditions on "the initial retail sale," titling, or registration of those new motor vehicles. *See id.* § 7543(a). Thus, by its terms, the statute imposes no limitation at all on EPA's regulatory authority over mobile sources.

Separate statutes confirm EPA's authority over mobile-source emissions. "Under Title II…the federal government has authority to establish 'standards applicable to the emission of any air pollutant from…new motor vehicles,'" including "the authority to set emission limits for air pollutants." *In re Volkswagen 'Clean Diesel' Mktg., Sales Pracs., & Prod. Liab. Litig., et al. v. Volkswagen Grp. Of Am., Inc., et al.*, 959 F.3d 1201, 1215 (9th Cir. 2020) (quoting 42 U.S.C. § 7521(a)(1)); *see also Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996) ("[R]egulation of motor vehicle emissions had been a principally federal project."); *accord Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1175 (9th Cir. 2015) (recognizing "the CAA makes 'the regulation of mobile

source emissions…a federal responsibility'" (quoting *Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 938 (9th Cir. 2011)). Thus, even if states couldn't control mobile-source emissions as part of their good-neighbor obligations, related statutes confirm that EPA still can.

Further undercutting EPA's novel preemption theory is that another provision of the statute explicitly preserves even the states' authority to regulate motor vehicle emissions post-sale: "Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." 42 U.S.C. § 7543(d). The statute thus "preserves state and local governments' authority over *post-sale* motor vehicles." *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1237 (10th Cir. 2021) (quoting *In re Volkswagen,* 959 F.3d at 1216. Indeed, in some circumstances states are "required to include regulations on post-sale motor vehicles, such as by providing for an emission-control inspection and maintenance program in certain ozone nonattainment areas." *Id.* at 1237; *see also* 42 U.S.C. § 7511(a). And according to EPA, there are multiple measures states may

take "to reduce emissions from mobile sources," including, for example, "transportation control measures" under 42 U.S.C. § 7408(f)). 88 FR 36,737 n.231.[33]

Thus, even accepting EPA's premise that when promulgating a FIP it exercises the same authority as does a state promulgating a SIP, *see* 88 FR 36,737, the agency nonetheless has the authority and obligation to regulate mobile-source emissions. States must regulate mobile-source emissions when necessary to address their own nonattainment, *see* §§ 7502, 7511(a), and must control their downwind-bound emissions "consistent with" related attainment obligations, § 7510(a)(2)(D)(i). The same is true of EPA when it promulgates a FIP.

Finally, and perhaps most tellingly, elsewhere in the Rule, EPA embraces the authority it attempts to disclaim over mobile-source emissions. In response to comments that EPA does not have authority to implement certain "emissions control requirements or other emissions control measures, means, or techniques," the agency disagreed, pointing to what it described as "broad authority to cure a defective SIP," and

---

[33] Wisconsin has implemented multiple such measures to control emissions within the state. *See, e.g.*, Air Plan Approval; Wisconsin; Redesignation of the Wisconsin Portion of the Chicago-Naperville, Illinois-Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard, 87 FR 21,027 (April 11, 2022).

explaining it "exercise[s] its own, independent regulatory authority in implementing a FIP in accordance with the CAA." 88 FR 36,675. EPA was correct there, but that same rationale defeats the agency's theory about its supposedly limited authority to regulate mobile-source emissions for this purpose. *See* 88 FR 36,736–37.

Like its failure to consider VOCs, EPA's treatment of mobile sources might have been reasonable had the Rule's other efforts fulfilled its statutory obligations—in particular, if EGU and industrial-source reductions in fact provided a full, *timely* remedy for all downwind states. But they don't, at least not for Wisconsin. Indeed, EPA does not even claim it excluded mobile sources from the Rule for that reason, instead, announcing the statute is not really about mobile sources. That atextual conclusion is unreasonable and cannot justify EPA's refusal to fulfill its statutory mandate.

## CONCLUSION

The Rule should be remanded without vacatur so EPA may correct the identified deficiencies as to states upwind of Wisconsin.

Dated this 22nd day of August 2024.

                        Respectfully submitted,

                        JOSHUA L. KAUL
                        Attorney General of Wisconsin

                        Electronically signed by:

                        s/ Gabe Johnson-Karp
                        GABE JOHNSON-KARP
                        Assistant Attorney General
                        State Bar #1084731

                        Attorneys for Petitioner

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904
(608) 294-2907 (Fax)
johnsonkarpg@doj.state.wi.us

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 10,340 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1). The total number of words contained in this brief is fewer than 10,340 words, per this Court's Orders of December 4, 2023, and January 4, 2024.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using the 2013 version of Microsoft Word in 14-point Century Schoolbook font.

Dated this 22nd day of August 2024.

s/ Gabe Johnson-Karp
GABE JOHNSON-KARP
Assistant Attorney General


## CERTIFICATE OF SERVICE

I certify that on August 22, 2024, I electronically filed the foregoing *The State of Wisconsin's Final Opening Brief* with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 22nd day of August 2024.

s/ Gabe Johnson-Karp
GABE JOHNSON-KARP
Assistant Attorney General

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

42 U.S.C. § 7410 .......................................................................ADD1–ADD9

42 U.S.C. § 7511 ....................................................................ADD10–ADD12



amended Pub. L. 95–95, title I, § 106, Aug. 7, 1977, 91 Stat. 691.)

### CODIFICATION

Section was formerly classified to section 1857c–4 of this title.

### PRIOR PROVISIONS

A prior section 109 of act July 14, 1955, was renumbered section 116 by Pub. L. 91–604 and is classified to section 7416 of this title.

### AMENDMENTS

1977—Subsec. (c). Pub. L. 95–95, § 106(b), added subsec. (c).

Subsec. (d). Pub. L. 95–95, § 106(a), added subsec. (d).

### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

### ROLE OF SECONDARY STANDARDS

Pub. L. 101–549, title VIII, § 817, Nov. 15, 1990, 104 Stat. 2697, provided that:

"(a) REPORT.—The Administrator shall request the National Academy of Sciences to prepare a report to the Congress on the role of national secondary ambient air quality standards in protecting welfare and the environment. The report shall:

"(1) include information on the effects on welfare and the environment which are caused by ambient concentrations of pollutants listed pursuant to section 108 [42 U.S.C. 7408] and other pollutants which may be listed;

"(2) estimate welfare and environmental costs incurred as a result of such effects;

"(3) examine the role of secondary standards and the State implementation planning process in preventing such effects;

"(4) determine ambient concentrations of each such pollutant which would be adequate to protect welfare and the environment from such effects;

"(5) estimate the costs and other impacts of meeting secondary standards; and

"(6) consider other means consistent with the goals and objectives of the Clean Air Act [42 U.S.C. 7401 et seq.] which may be more effective than secondary standards in preventing or mitigating such effects.

"(b) SUBMISSION TO CONGRESS; COMMENTS; AUTHORIZATION.—(1) The report shall be transmitted to the Congress not later than 3 years after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990].

"(2) At least 90 days before issuing a report the Administrator shall provide an opportunity for public comment on the proposed report. The Administrator shall include in the final report a summary of the comments received on the proposed report.

"(3) There are authorized to be appropriated such sums as are necessary to carry out this section."

## § 7410. State implementation plans for national primary and secondary ambient air quality standards

### (a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems

(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall—

(A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

(B) provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—

(i) monitor, compile, and analyze data on ambient air quality, and

(ii) upon request, make such data available to the Administrator;

(C) include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as nec-

essary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D of this subchapter;

(D) contain adequate provisions—

(i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—

(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

(II) interfere with measures required to be included in the applicable implementation plan for any other State under part C of this subchapter to prevent significant deterioration of air quality or to protect visibility,

(ii) insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

(E) provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

(F) require, as may be prescribed by the Administrator—

(i) the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

(ii) periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

(iii) correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

(G) provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

(H) provide for revision of such plan—

(i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

(ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

(I) in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D of this subchapter (relating to nonattainment areas);

(J) meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C of this subchapter (relating to prevention of significant deterioration of air quality and visibility protection);

(K) provide for—

(i) the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

(ii) the submission, upon request, of data related to such air quality modeling to the Administrator;

(L) require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover—

(i) the reasonable costs of reviewing and acting upon any application for such a permit, and

(ii) if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V of this chapter; and

(M) provide for consultation and participation by local political subdivisions affected by the plan.

(3)(A) Repealed. Pub. L. 101–549, title I, § 101(d)(1), Nov. 15, 1990, 104 Stat. 2409.

(B) As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after pub-

lic notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

(C) Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c) of this section, shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d)[1] of this title, suspensions under subsection (f) or (g) of this section (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e)[1] of this title (relating to iron-and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

(4) Repealed. Pub. L. 101–549, title I, §101(d)(2), Nov. 15, 1990, 104 Stat. 2409.

(5)(A)(i) Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

(ii) Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

(iii) Any State may revise an applicable implementation plan adopted under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

(B) The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) of this section respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

(C) For purposes of this paragraph, the term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii) of this section), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not

be deemed indirect sources for the purpose of this paragraph.

(D) For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations—

(i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

(ii) preventing maintenance of any such standard after such date.

(E) For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

(6) No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d)[1] of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

(1) The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator—

(A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A) of this section, or

(B) disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

(2)(A) Repealed. Pub. L. 101–549, title I, §101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409.

(B) No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Administrator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator

from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

(C) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409.

(D) For purposes of this paragraph—

(i) The term "parking surcharge regulation" means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

(ii) The term "management of parking supply" shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

(iii) The term "preferential bus/carpool lane" shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

(E) No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

(3) Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409.

(5)(A) Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

(B) In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

(i) establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

(ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

(C) Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D of this subchapter.

**(d), (e) Repealed. Pub. L. 101–549, title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409**

**(f) National or regional energy emergencies; determination by President**

(1) Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that—

(A) a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

(B) other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

(2) A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that—

(A) there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

(B) such unemployment or loss can be totally or partially alleviated by such emergency suspension.

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

(3) A temporary emergency suspension issued by a Governor under this subsection shall re-

main in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

(4) This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

(5) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10 [2] of this title, as in effect before August 7, 1977, or section 7413(d) [2] of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

(g) **Governor's authority to issue temporary emergency suspensions**

(1) In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines—

(A) meets the requirements of this section, and

(B) is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

(2) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of this subsection.

(3) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10 [2] of this title as in effect before August 7, 1977, or under section 7413(d) [2] of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

---

[2] See References in Text note below.

(h) **Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

(1) Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

(2) The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

(i) **Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) of this section (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d) [2] of this title (relating to compliance orders), a plan promulgation under subsection (c) of this section, or a plan revision under subsection (a)(3) of this section; no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

(j) **Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

(k) **Environmental Protection Agency action on plan submissions**

(1) Completeness of plan submissions

(A) Completeness criteria

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

(B) Completeness finding

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall deter-

mine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

**(C) Effect of finding of incompleteness**

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

**(2) Deadline for action**

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

**(3) Full and partial approval and disapproval**

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

**(4) Conditional approval**

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

**(5) Calls for plan revisions**

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequa-

cies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D of this subchapter, unless such date has elapsed).

**(6) Corrections**

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

**(l) Plan revisions**

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

**(m) Sanctions**

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

**(n) Savings clauses**

**(1) Existing plan provisions**

Any provision of any applicable implementation plan that was approved or promulgated by

ADD6

the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

**(2) Attainment dates**

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State—

(A) in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

(B) in response to a finding of substantial inadequacy under subsection (a)(2) of this section (as in effect immediately before November 15, 1990),

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

**(3) Retention of construction moratorium in certain areas**

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) of this section (as in effect immediately before November 15, 1990) applied by virtue of a finding of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D of this subchapter (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(o) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development [3] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

(July 14, 1955, ch. 360, title I, § 110, as added Pub. L. 91–604, § 4(a), Dec. 31, 1970, 84 Stat. 1680; amended Pub. L. 93–319, § 4, June 22, 1974, 88 Stat. 256; Pub. L. 95–95, title I, §§ 107, 108, Aug. 7, 1977, 91 Stat. 691, 693; Pub. L. 95–190, § 14(a)(1)–(6), Nov. 16, 1977, 91 Stat. 1399; Pub. L. 97–23, § 3, July 17, 1981, 95 Stat. 142; Pub. L. 101–549, title I, §§ 101(b)–(d), 102(h), 107(c), 108(d), title IV, § 412, Nov. 15, 1990, 104 Stat. 2404–2408, 2422, 2464, 2466, 2634.)

REFERENCES IN TEXT

The Energy Supply and Environmental Coordination Act of 1974, referred to in subsec. (a)(3)(B), is Pub. L. 93–319, June 22, 1974, 88 Stat. 246, as amended, which is classified principally to chapter 16C (§ 791 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 791 of Title 15 and Tables.

Section 7413 of this title, referred to in subsecs. (a)(3)(C), (6), (f)(5), (g)(3), and (i), was amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsecs. (d) and (e) of section 7413 no longer relates to final compliance orders and steel industry compliance extension, respectively.

Section 1857c–10 of this title, as in effect before August 7, 1977, referred to in subsecs. (f)(5) and (g)(3), was in the original "section 119, as in effect before the date of the enactment of this paragraph", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, § 3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of subsec. (f)(5) and (g)(3) of this section by Pub. L. 95–95, § 107, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to section 7413(d)(5) of this title. Section 7413 of this title was subsequently amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, see note above. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

CODIFICATION

Section was formerly classified to section 1857c–5 of this title.

PRIOR PROVISIONS

A prior section 110 of act July 14, 1955, was renumbered section 117 by Pub. L. 91–604 and is classified to section 7417 of this title.

AMENDMENTS

1990—Subsec. (a)(1). Pub. L. 101–549, § 101(d)(8), substituted "3 years (or such shorter period as the Administrator may prescribe)" for "nine months" in two places.

---

[3] So in original. Probably should be followed by a comma.

Subsec. (a)(2). Pub. L. 101–549, §101(b), amended par. (2) generally, substituting present provisions for provisions setting the time within which the Administrator was to approve or disapprove a plan or portion thereof and listing the conditions under which the plan or portion thereof was to be approved after reasonable notice and hearing.

Subsec. (a)(3)(A). Pub. L. 101–549, §101(d)(1), struck out subpar. (A) which directed Administrator to approve any revision of an implementation plan if it met certain requirements and had been adopted by the State after reasonable notice and public hearings.

Subsec. (a)(3)(D). Pub. L. 101–549, §101(d)(1), struck out subpar. (D) which directed that certain implementation plans be revised to include comprehensive measures and requirements.

Subsec. (a)(4). Pub. L. 101–549, §101(d)(2), struck out par. (4) which set forth requirements for review procedure.

Subsec. (c)(1). Pub. L. 101–549, §102(h), amended par. (1) generally, substituting present provisions for provisions relating to preparation and publication of regulations setting forth an implementation plan, after opportunity for a hearing, upon failure of a State to make required submission or revision.

Subsec. (c)(2)(A). Pub. L. 101–549, §101(d)(3)(A), struck out subpar. (A) which required a study and report on necessity of parking surcharge, management of parking supply, and preferential bus/carpool lane regulations to achieve and maintain national primary ambient air quality standards.

Subsec. (c)(2)(C). Pub. L. 101–549, §101(d)(3)(B), struck out subpar. (C) which authorized suspension of certain regulations and requirements relating to management of parking supply.

Subsec. (c)(4). Pub. L. 101–549, §101(d)(3)(C), struck out par. (4) which permitted Governors to temporarily suspend measures in implementation plans relating to retrofits, gas rationing, and reduction of on-street parking.

Subsec. (c)(5)(B). Pub. L. 101–549, §101(d)(3)(D), struck out "(including the written evidence required by part D)," after "include comprehensive measures".

Subsec. (d). Pub. L. 101–549, §101(d)(4), struck out subsec. (d) which defined an applicable implementation plan for purposes of this chapter.

Subsec. (e). Pub. L. 101–549, §101(d)(5), struck out subsec. (e) which permitted an extension of time for attainment of a national primary ambient air quality standard.

Subsec. (f)(1). Pub. L. 101–549, §412, inserted "or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets)" in subpar. (A) and in last sentence.

Subsec. (g)(1). Pub. L. 101–549, §101(d)(6), substituted "12 months of submission of the proposed plan revision" for "the required four month period" in closing provisions.

Subsec. (h)(1). Pub. L. 101–549, §101(d)(7), substituted "5 years after November 15, 1990, and every three years thereafter" for "one year after August 7, 1977, and annually thereafter" and struck out at end "Each such document shall be revised as frequently as practicable but not less often than annually."

Subsecs. (k) to (n). Pub. L. 101–549, §101(c), added subsecs. (k) to (n).

Subsec. (o). Pub. L. 101–549, §107(c), added subsec. (o).

Subsec. (p). Pub. L. 101–549, §108(d), added subsec. (p).

1981—Subsec. (a)(3)(C). Pub. L. 97–23 inserted reference to extensions of compliance in decrees entered under section 7413(e) of this title (relating to iron and steel-producing operations).

1977—Subsec. (a)(2)(A). Pub. L. 95–95, §108(a)(1), substituted "(A) except as may be provided in subparagraph (I)(I) in the case of a plan" for "(A)(I) in the case of a plan".

Subsec. (a)(2)(B). Pub. L. 95–95, §108(a)(2), substituted "transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D)" for "land use and transportation controls".

Subsec. (a)(2)(D). Pub. L. 95–95, §108(a)(3), substituted "it includes a program to provide for the enforcement of emission limitations and regulation of the modification, construction, and operation of any stationary source, including a permit program as required in parts C and D and a permit or equivalent program for any major emitting facility, within such region as necessary to assure (i) that national ambient air quality standards are achieved and maintained, and (ii) a procedure" for "it includes a procedure".

Subsec. (a)(2)(E). Pub. L. 95–95, §108(a)(4), substituted "it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement" for "it contains adequate provisions for intergovernmental cooperation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of each primary or secondary standard in any portion of such region outside of such State or in any other air quality control region".

Subsec. (a)(2)(F). Pub. L. 95–95, §108(a)(5), added cl. (vi).

Subsec. (a)(2)(H). Pub. L. 95–190, §14(a)(1), substituted "1977;" for "1977".

Pub. L. 95–95, §108(a)(6), inserted "except as provided in paragraph (3)(C)," after "or (ii)" and "or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977" after "to achieve the national ambient air quality primary or secondary standard which it implements".

Subsec. (a)(2)(I). Pub. L. 95–95, §108(b), added subpar. (I).

Subsec. (a)(2)(J). Pub. L. 95–190, §14(a)(2), substituted "; and" for ", and".

Pub. L. 95–95, §108(b), added subpar. (J).

Subsec. (a)(2)(K). Pub. L. 95–95, §108(b) added subpar. (K).

Subsec. (a)(3)(C). Pub. L. 95–95, §108(c), added subpar. (C).

Subsec. (a)(3)(D). Pub. L. 95–190, §14(a)(4), added subpar. (D).

Subsec. (a)(5). Pub. L. 95–95, §108(e), added par. (5).

Subsec. (a)(5)(D). Pub. L. 95–190, §14(a)(3), struck out "preconstruction or premodification" before "review".

Subsec. (a)(6). Pub. L. 95–95, §108(e), added par. (6).

Subsec. (c)(1). Pub. L. 95–95, §108(d)(1), (2), substituted "plan which meets the requirements of this section" for "plan for any national ambient air quality primary or secondary standard within the time prescribed" in subpar. (A) and, in provisions following subpar. (C), directed that any portion of a plan relating to any measure described in first sentence of 7421 of this title (relating to consultation) or the consultation process required under such section 7421 of this title not be required to be promulgated before the date eight months after such date required for submission.

Subsec. (c)(3) to (5). Pub. L. 95–95, §108(d)(3), added pars. (3) to (5).

Subsec. (d). Pub. L. 95–95, §108(f), substituted "and which implements the requirements of this section" for "and which implements a national primary or secondary ambient air quality standard in a State".

Subsec. (f). Pub. L. 95–95, §107(a), substituted provisions relating to the handling of national or regional energy emergencies for provisions relating to the postponement of compliance by stationary sources or classes of moving sources with any requirement of applicable implementation plans.

Subsec. (g). Pub. L. 95–95, §108(g), added subsec. (g) relating to publication of comprehensive document.

Pub. L. 95–95, § 107(b), added subsec. (g) relating to Governor's authority to issue temporary emergency suspensions.

Subsec. (h). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (g), added by Pub. L. 95–95, § 108(g), as (h). Former subsec. (h) redesignated (i).

Subsec. (i). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (h), added by Pub. L. 95–95, § 108(g), as (i). Former subsec. (i) redesignated (j) and amended.

Subsec. (j). Pub. L. 95–190 § 14(a)(5), (6), redesignated subsec. (i), added by Pub. L. 95–95, § 108(g), as (j) and in subsec. (j) as so redesignated, substituted "will enable such source" for "at such source will enable it".

1974—Subsec. (a)(3). Pub. L. 93–319, § 4(a), designated existing provisions as subpar. (A) and added subpar. (B).

Subsec. (c). Pub. L. 93–319, § 4(b), designated existing provisions as par. (1) and existing pars. (1), (2), and (3) as subpars. (A), (B), and (C), respectively, of such redesignated par. (1), and added par. (2).

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF IMPLEMENTATION PLANS APPROVED AND IN EFFECT PRIOR TO AUG. 7, 1977

Nothing in the Clean Air Act Amendments of 1977 [Pub. L. 95–95] to affect any requirement of an approved implementation plan under this section or any other provision in effect under this chapter before Aug. 7, 1977, until modified or rescinded in accordance with this chapter as amended by the Clean Air Act Amendments of 1977, see section 406(c) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

SAVINGS PROVISION

Section 16 of Pub. L. 91–604 provided that:

"(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act

[this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambient air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

"(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

"(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter]."

FEDERAL ENERGY ADMINISTRATOR

"Federal Energy Administrator", for purposes of this chapter, to mean Administrator of Federal Energy Administration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the term to mean any officer of the United States designated as such by the President until Federal Energy Administrator takes office and after Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

Federal Energy Administration terminated and functions vested by law in Administrator thereof transferred to Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

§ 7411. Standards of performance for new stationary sources

(a) Definitions

For purposes of this section:

(1) The term "standard of performance" means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

(2) The term "new stationary source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

(3) The term "stationary source" means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

(4) The term "modification" means any physical change in, or change in the method of



Agency's Control Techniques and Control Technology documents. Any such remediation program shall also identify those control measures implementation of which in Mexico would be expedited by the use of material and financial assistance of the United States.

"(c) ANNUAL REPORTS.—The Administrator shall, each year the program authorized in this section is in operation, report to Congress on the progress of the program in bringing nonattainment areas along the border of the United States into attainment with primary and secondary NAAQS. The report issued by the Administrator under this paragraph shall include recommendations on funding mechanisms to assist in implementation of monitoring and remediation efforts.

"(d) FUNDING AND PERSONNEL.—The Administrator may, where appropriate, make available, subject to the appropriations, such funds, personnel, and equipment as may be necessary to implement the provisions of this section. In those cases where direct financial assistance of the United States is provided to implement monitoring and remediation programs in Mexico, the Administrator shall develop grant agreements with appropriate representatives of Mexico to assure the accuracy and completeness of monitoring data and the performance of remediation measures which are financed by the United States. With respect to any control measures within Mexico funded by the United States, the Administrator shall, to the maximum extent practicable, utilize resources of Mexico where such utilization would reduce costs to the United States. Such funding agreements shall include authorization for the Administrator to—

"(1) review and agree to plans for monitoring and remediation;

"(2) inspect premises, equipment and records to insure compliance with the agreements established under and the purposes set forth in this section; and

"(3) where necessary, develop grant agreements with affected States to carry out the provisions of this section."

SUBPART 2—ADDITIONAL PROVISIONS FOR OZONE NONATTAINMENT AREAS

### § 7511. Classifications and attainment dates

#### (a) Classification and attainment dates for 1989 nonattainment areas

(1) Each area designated nonattainment for ozone pursuant to section 7407(d) of this title shall be classified at the time of such designation, under table 1, by operation of law, as a Marginal Area, a Moderate Area, a Serious Area, a Severe Area, or an Extreme Area based on the design value for the area. The design value shall be calculated according to the interpretation methodology issued by the Administrator most recently before November 15, 1990. For each area classified under this subsection, the primary standard attainment date for ozone shall be as expeditiously as practicable but not later than the date provided in table 1.

TABLE 1

| Area class | Design value* | Primary standard attainment date** |
|---|---|---|
| Marginal .. | 0.121 up to 0.138 ... | 3 years after November 15, 1990 |
| Moderate .. | 0.138 up to 0.160 ... | 6 years after November 15, 1990 |
| Serious ..... | 0.160 up to 0.180 ... | 9 years after November 15, 1990 |
| Severe ...... | 0.180 up to 0.280 ... | 15 years after November 15, 1990 |

TABLE 1—Continued

| Area class | Design value* | Primary standard attainment date** |
|---|---|---|
| Extreme ... | 0.280 and above ... | 20 years after November 15, 1990 |

*The design value is measured in parts per million (ppm).
**The primary standard attainment date is measured from November 15, 1990.

(2) Notwithstanding table 1, in the case of a severe area with a 1988 ozone design value between 0.190 and 0.280 ppm, the attainment date shall be 17 years (in lieu of 15 years) after November 15, 1990.

(3) At the time of publication of the notice under section 7407(d)(4) of this title (relating to area designations) for each ozone nonattainment area, the Administrator shall publish a notice announcing the classification of such ozone nonattainment area. The provisions of section 7502(a)(1)(B) of this title (relating to lack of notice and comment and judicial review) shall apply to such classification.

(4) If an area classified under paragraph (1) (Table 1) would have been classified in another category if the design value in the area were 5 percent greater or 5 percent less than the level on which such classification was based, the Administrator may, in the Administrator's discretion, within 90 days after the initial classification, by the procedure required under paragraph (3), adjust the classification to place the area in such other category. In making such adjustment, the Administrator may consider the number of exceedances of the national primary ambient air quality standard for ozone in the area, the level of pollution transport between the area and other affected areas, including both intrastate and interstate transport, and the mix of sources and air pollutants in the area.

(5) Upon application by any State, the Administrator may extend for 1 additional year (hereinafter referred to as the "Extension Year") the date specified in table 1 of paragraph (1) of this subsection if—

(A) the State has complied with all requirements and commitments pertaining to the area in the applicable implementation plan, and

(B) no more than 1 exceedance of the national ambient air quality standard level for ozone has occurred in the area in the year preceding the Extension Year.

No more than 2 one-year extensions may be issued under this paragraph for a single nonattainment area.

#### (b) New designations and reclassifications

#### (1) New designations to nonattainment

Any area that is designated attainment or unclassifiable for ozone under section 7407(d)(4) of this title, and that is subsequently redesignated to nonattainment for ozone under section 7407(d)(3) of this title, shall, at the time of the redesignation, be classified by operation of law in accordance with table 1 under subsection (a) of this section. Upon its classification, the area shall be subject to the same requirements under section 7410 of this

title, subpart 1 of this part, and this subpart that would have applied had the area been so classified at the time of the notice under subsection (a)(3) of this section, except that any absolute, fixed date applicable in connection with any such requirement is extended by operation of law by a period equal to the length of time between November 15, 1990, and the date the area is classified under this paragraph.

**(2) Reclassification upon failure to attain**

(A) Within 6 months following the applicable attainment date (including any extension thereof) for an ozone nonattainment area, the Administrator shall determine, based on the area's design value (as of the attainment date), whether the area attained the standard by that date. Except for any Severe or Extreme area, any area that the Administrator finds has not attained the standard by that date shall be reclassified by operation of law in accordance with table 1 of subsection (a) of this section to the higher of—

    (i) the next higher classification for the area, or

    (ii) the classification applicable to the area's design value as determined at the time of the notice required under subparagraph (B).

No area shall be reclassified as Extreme under clause (ii).

(B) The Administrator shall publish a notice in the Federal Register, no later than 6 months following the attainment date, identifying each area that the Administrator has determined under subparagraph (A) as having failed to attain and identifying the reclassification, if any, described under subparagraph (A).

**(3) Voluntary reclassification**

The Administrator shall grant the request of any State to reclassify a nonattainment area in that State in accordance with table 1 of subsection (a) of this section to a higher classification. The Administrator shall publish a notice in the Federal Register of any such request and of action by the Administrator granting the request.

**(4) Failure of Severe Areas to attain standard**

(A) If any Severe Area fails to achieve the national primary ambient air quality standard for ozone by the applicable attainment date (including any extension thereof), the fee provisions under section 7511d of this title shall apply within the area, the percent reduction requirements of section 7511a(c)(2)(B) and (C) of this title (relating to reasonable further progress demonstration and NOₓ control) shall continue to apply to the area, and the State shall demonstrate that such percent reduction has been achieved in each 3-year interval after such failure until the standard is attained. Any failure to make such a demonstration shall be subject to the sanctions provided under this part.

(B) In addition to the requirements of subparagraph (A), if the ozone design value for a Severe Area referred to in subparagraph (A) is above 0.140 ppm for the year of the applicable attainment date, or if the area has failed to achieve its most recent milestone under section 7511a(g) of this title, the new source review requirements applicable under this subpart in Extreme Areas shall apply in the area and the term¹ "major source" and "major stationary source" shall have the same meaning as in Extreme Areas.

(C) In addition to the requirements of subparagraph (A) for those areas referred to in subparagraph (A) and not covered by subparagraph (B), the provisions referred to in subparagraph (B) shall apply after 3 years from the applicable attainment date unless the area has attained the standard by the end of such 3-year period.

(D) If, after November 15, 1990, the Administrator modifies the method of determining compliance with the national primary ambient air quality standard, a design value or other indicator comparable to 0.140 in terms of its relationship to the standard shall be used in lieu of 0.140 for purposes of applying the provisions of subparagraphs (B) and (C).

**(c) References to terms**

(1) Any reference in this subpart to a "Marginal Area", a "Moderate Area", a "Serious Area", a "Severe Area", or an "Extreme Area" shall be considered a reference to a Marginal Area, a Moderate Area, a Serious Area, a Severe Area, or an Extreme Area as respectively classified under this section.

(2) Any reference in this subpart to "next higher classification" or comparable terms shall be considered a reference to the classification related to the next higher set of design values in table 1.

(July 14, 1955, ch. 360, title I, § 181, as added Pub. L. 101–549, title I, § 103, Nov. 15, 1990, 104 Stat. 2423.)

EXEMPTIONS FOR STRIPPER WELLS

Section 819 of Pub. L. 101–549 provided that: "Notwithstanding any other provision of law, the amendments to the Clean Air Act made by section 103 of the Clean Air Act Amendments of 1990 [enacting this section and sections 7511a to 7511f of this title] (relating to additional provisions for ozone nonattainment areas), by section 104 of such amendments [enacting sections 7512 and 7512a of this title] (relating to additional provisions for carbon monoxide nonattainment areas), by section 105 of such amendments [enacting sections 7513 to 7513b of this title and amending section 7476 of this title] (relating to additional provisions for PM–10 nonattainment areas), and by section 106 of such amendments [enacting sections 7514 and 7514a of this title] (relating to additional provisions for areas designated as nonattainment for sulfur oxides, nitrogen dioxide, and lead) shall not apply with respect to the production of and equipment and storage or processing of—

    "(1) oil from a stripper well property, within the meaning of the June 1979 energy regulations (within the meaning of section 4996(b)(7) of the Internal Revenue Code of 1986 [26 U.S.C. 4996(b)(7)], as in effect before the repeal of such section); and

    "(2) stripper well natural gas, as defined in section 108(b) of the Natural Gas Policy Act of 1978 [15 U.S.C. 3318(b)],[.]

except to the extent that provisions of such amendments cover areas designated as Serious pursuant to

---
¹So in original. Probably should be "terms".

part D of title I of the Clean Air Act [this part] and having a population of 350,000 or more, or areas designated as Severe or Extreme pursuant to such part D.''

## § 7511a. Plan submissions and requirements

### (a) Marginal Areas

Each State in which all or part of a Marginal Area is located shall, with respect to the Marginal Area (or portion thereof, to the extent specified in this subsection), submit to the Administrator the State implementation plan revisions (including the plan items) described under this subsection except to the extent the State has made such submissions as of November 15, 1990.

#### (1) Inventory

Within 2 years after November 15, 1990, the State shall submit a comprehensive, accurate, current inventory of actual emissions from all sources, as described in section 7502(c)(3) of this title, in accordance with guidance provided by the Administrator.

#### (2) Corrections to the State implementation plan

Within the periods prescribed in this paragraph, the State shall submit a revision to the State implementation plan that meets the following requirements—

##### (A) Reasonably available control technology corrections

For any Marginal Area (or, within the Administrator's discretion, portion thereof) the State shall submit, within 6 months of the date of classification under section 7511(a) of this title, a revision that includes such provisions to correct requirements in (or add requirements to) the plan concerning reasonably available control technology as were required under section 7502(b) of this title (as in effect immediately before November 15, 1990), as interpreted in guidance issued by the Administrator under section 7408 of this title before November 15, 1990.

##### (B) Savings clause for vehicle inspection and maintenance

(i) For any Marginal Area (or, within the Administrator's discretion, portion thereof), the plan for which already includes, or was required by section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) to have included, a specific schedule for implementation of a vehicle emission control inspection and maintenance program, the State shall submit, immediately after November 15, 1990, a revision that includes any provisions necessary to provide for a vehicle inspection and maintenance program of no less stringency than that of either the program defined in House Report Numbered 95–294, 95th Congress, 1st Session, 281–291 (1977) as interpreted in guidance of the Administrator issued pursuant to section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) or the program already included in the plan, whichever is more stringent.

(ii) Within 12 months after November 15, 1990, the Administrator shall review, revise, update, and republish in the Federal Register the guidance for the States for motor vehicle inspection and maintenance programs required by this chapter, taking into consideration the Administrator's investigations and audits of such program. The guidance shall, at a minimum, cover the frequency of inspections, the types of vehicles to be inspected (which shall include leased vehicles that are registered in the nonattainment area), vehicle maintenance by owners and operators, audits by the State, the test method and measures, including whether centralized or decentralized, inspection methods and procedures, quality of inspection, components covered, assurance that a vehicle subject to a recall notice from a manufacturer has complied with that notice, and effective implementation and enforcement, including ensuring that any retesting of a vehicle after a failure shall include proof of corrective action and providing for denial of vehicle registration in the case of tampering or misfueling. The guidance which shall be incorporated in the applicable State implementation plans by the States shall provide the States with continued reasonable flexibility to fashion effective, reasonable, and fair programs for the affected consumer. No later than 2 years after the Administrator promulgates regulations under section 7521(m)(3) of this title (relating to emission control diagnostics), the State shall submit a revision to such program to meet any requirements that the Administrator may prescribe under that section.

##### (C) Permit programs

Within 2 years after November 15, 1990, the State shall submit a revision that includes each of the following:

(i) Provisions to require permits, in accordance with sections 7502(c)(5) and 7503 of this title, for the construction and operation of each new or modified major stationary source (with respect to ozone) to be located in the area.

(ii) Provisions to correct requirements in (or add requirements to) the plan concerning permit programs as were required under section 7502(b)(6) of this title (as in effect immediately before November 15, 1990), as interpreted in regulations of the Administrator promulgated as of November 15, 1990.

#### (3) Periodic inventory

##### (A) General requirement

No later than the end of each 3-year period after submission of the inventory under paragraph (1) until the area is redesignated to attainment, the State shall submit a revised inventory meeting the requirements of subsection (a)(1) of this section.

##### (B) Emissions statements

(i) Within 2 years after November 15, 1990, the State shall submit a revision to the State implementation plan to require that the owner or operator of each stationary source of oxides of nitrogen or volatile or-