ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1157 (and consolidated cases)

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

State of Utah, by and through its Governor, Spencer J. Cox, and its Attorney General, Sean D. Reyes,
*Petitioner,*

v.

Environmental Protection Agency and Michael S. Regan, in his official capacity, as Administrator of the U.S. Environmental Protection Agency,
*Respondents.*

---

On Petition for Review of Action by the U.S. Environmental Protection Agency

---

## FINAL BRIEF OF PETITIONERS UTAH, OHIO, INDIANA, KENTUCKY, NEVADA, WEST VIRGINIA, AND THE KENTUCKY ENERGY AND ENVIRONMENT CABINET

---

SEAN D. REYES
Attorney General of Utah

STANFORD E. PURSER
Utah Solicitor General*
 *Counsel of Record*
Office of the Attorney General
Utah State Capitol Complex
350 North State Street, Ste. 230
Salt Lake City, Utah 84114-2320
801-538-9600
spurser@agutah.gov

WILLIAM L. WEHRUM
Wehrum Environmental Law LLC
1629 K Street, NW, Suite 300
Washington, D.C. 20006
302-300-0388
William_Wehrum@comcast.net

DAVE YOST
Attorney General of Ohio

T. ELLIOT GAISER
Ohio Solicitor General
MATHURA J. SRIDHARAN*
 *Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitors General
GREGG BACHMANN
Section Counsel – Environmental
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
mathura.sridharan@ohioago.gov

*Counsel for Petitioner State of Ohio*

EMILY C. SCHILLING
Holland & Hart LLP
222 South Main St., Suite 2200
Salt Lake City, UT 84101
801-799-5753
ecschilling@hollandhart.com

KRISTINA R. VAN BOCKERN
AARON B. TUCKER
Holland & Hart LLP
555 Seventeenth St., Suite 3200
Denver, CO 80202
303-295-8107
trvanbockern@hollandhart.com
abtucker@hollandhart.com

*Counsel for Petitioner State of Utah*

*(Additional counsel listed after signature block)*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioners, the Utah, Ohio, Indiana, West Virginia, Kentucky, Kentucky Energy and Environment Cabinet, and Nevada ("State Petitioners"), hereby certify as follows:

### (A) Parties and Amici

#### i.    Parties, Intervenors, and Amici who Appeared in the District Court

This case is a petition for review of final agency action, not an appeal from a district court's ruling.

#### ii.    Parties to this Case

<u>Petitioners</u>:

No. 23-1157: State of Utah

No. 23-1181: Kinder Morgan, Inc.

No. 23-1183: States of Ohio, West Virginia, and Indiana

No. 23-1190: American Forest & Paper Association

No. 23-1191: Midwest Ozone Group

No. 23-1193: Interstate Natural Gas Association of America and American Petroleum Institute

No. 23-1195: Associated Electric Cooperative, Inc., Deseret Generation & Transmission Co-Operative, d/b/a Deseret Power Electric Cooperative, Ohio

Valley Electric Corporation, Wabash Valley Power Association, Inc., d/b/a Wabash Valley Power Alliance, America's Power, National Rural Electric Cooperative Association, and Portland Cement Association

No. 23-1199: National Mining Association

No. 23-1200: American Iron and Steel Institute

No.23-1201: State of Wisconsin

No. 23-1202: Enbridge (U.S.) Inc.

No. 23-1203: American Chemistry Council and American Fuel & Petrochemical Manufacturers

No. 23-1205: TransCanada Pipeline USA Ltd.

No. 23-1206: Hybar LLC

No. 23-1207: United States Steel Corporation

No. 23-1208: Union Electric Company, d/b/a Ameren Missouri

No. 23-1209: State of Nevada

No. 23-1211: Arkansas League of Good Neighbors

No. 23-1306: Energy Transfer L.P.

No. 23-1307: Energy Transfer L.P.

No. 23-1314: Commonwealth of Kentucky, Energy and Environment Cabinet

No. 23-1315: Commonwealth of Kentucky

No. 23-1316: Energy Transfer LP

No. 23-1317: Buckeye Power, Inc. and Ohio Valley Electric Corporation

Respondents:

In all cases: the United States Environmental Protection Agency ("EPA") and Michael S. Regan, in his official capacity as Administrator of the EPA

Intervenors for Petitioners:

Nos. 23-1157, 23-1181, 23-1190, 23-1191, 23-1193, 23-1195, 23-1199, 23-1200, 23-1201, 23-1202, 23-1203, 23-1205, 23-1206, 23-1207, 23-1208, 23-1209, 23-1211: City Utilities of Springfield, Missouri

No. 23-1201: Sierra Club

Intervenors for Respondents:

Nos. 23-1157, 23-1181: States of New York, Connecticut, Delaware, Illinois, Maryland, New Jersey, and Wisconsin, the Commonwealths of Massachusetts and Pennsylvania, the District of Columbia, and Harris County, Texas

No. 23-1157: Air Alliance Houston, Appalachian Mountain Club, Center for Biological Diversity, Chesapeake Bay Foundation, Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Downwinders at Risk, Environmental Defense Fund, Louisiana Environmental Action Network, Sierra Club, Southern Utah Wilderness Alliance, and Utah Physicians for a Healthy Environment

No. 23-1201: Midwest Ozone Group

No. 23-1316: Appalachian Mountain Club, Ohio Environmental Council, and Sierra Club

### iii.    Amici in this Case

Amici Curiae for Petitioners:

Nos. 23-1157, 23-1181, 23-1183, 23-1190, 23-1191, 23-1193, 23-1195, 23-1199, 23-1200, 23-1201, 23-1202, 23-1203, 23-1205, 23-1206, 23-1207, 23-1208. 23-1209, 23-1211: Chamber of Commerce of the United States of America

Nos. 23-1157, 23-1181, 23-1183, 23-1202, 23-1205: Energy Infrastructure Council

No. 23-1306: Kinder Morgan, Inc.

No. 23-1306, 23-1307, 23-1316: TransCanada Pipeline USA Ltd.

### iv.    Circuit Rule 26.1 Disclosures

Not applicable because State Petitioners are state governments.

## (B) Rulings Under Review

State Petitioners seek review of EPA's final action promulgating a federal implementation plan ("FIP") for 23 states, including Utah, Ohio, Indiana, West Virginia, Kentucky, and Nevada, to address the interstate transport requirements of

42 U.S.C. §7410(a)(2)(D)(i)(I) for the 2015 8-hour ozone national ambient air quality standards.

EPA's final action is titled "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality," and is published in the Federal Register at 88 Fed. Reg. 36,654 (June 5, 2023) (EPA Docket No. EPA-HQ-OAR-2021-0668).

**(C) Related Cases**

### 1. Challenges to the FIP in other Circuits

Fifth Circuit:

*Texas v. EPA*, Case No. 23-60300 (5th Cir. June 7, 2023) (consolidated cases challenging FIP's applicability to Texas, Mississippi, and Louisiana).

Eighth Circuit:

*Arkansas v. EPA*, Case No. 23-2769 (8th Cir. Aug. 2, 2023) (challenging FIP's applicability to Arkansas); *Missouri v. EPA*, 23-2771 (8th Cir. Aug. 3, 2023) (challenging FIP's applicability to Missouri); *Energy Transfer LP v. EPA*, No. 23-2773 (8th Cir. Aug. 3, 2023) (challenging FIP's pipeline-engine provisions in Arkansas); *Energy Transfer LP v. EPA*, No. 23-2774 (8th Cir. Aug. 3, 2023) (challenging FIP's pipeline-engine provisions in Missouri); *Hybar LLC v. EPA*, No. 23-2782 (8th Cir. Aug. 4, 2023) (challenging FIP's applicability to Arkansas); *Union Electric Co., d/b/a Ameren Missouri v. EPA*, No. 23-2786 (8th

Cir. Aug. 4, 2023) (challenging FIP's applicability to Missouri); *ALLETE v. EPA*, No. 23-2789 (8th Cir. Aug. 4, 2023) (challenging FIP's applicability to Minnesota).

Ninth Circuit:

*Nevada Cement Co. LLC v. EPA*, No. 23-1098 (9th Cir. June 5, 2023) (challenging FIP's applicability to Nevada).

Tenth Circuit:

*Tulsa Cement LLC v. EPA*, No. 23-9551 (10th Cir. June 5, 2023) (challenging FIP's applicability to Oklahoma); *PacifiCorp v. EPA*, No. 23-9557 (10th Cir. June 26, 2023) (challenging FIP's applicability to Utah); *State of Oklahoma v. EPA*, No. 23-9561 (10th Cir. June 30, 2023) (challenging FIP's applicability to Oklahoma); *Energy Transfer LP v. EPA*, No. 23-9569 (10th Cir. July 27, 2023) (challenging FIP's pipeline-engine provisions in Oklahoma).

Eleventh Circuit:

*State of Alabama v. EPA*, No. 23-12528 (11th Cir. Aug. 4, 2023) (challenging FIP's applicability to Alabama); *Alabama Power Co. v. EPA*, No. 23-12531 (11th Cir. Aug. 4, 2023) (challenging FIP's applicability to Alabama).

**2.      Challenges to the Predicate SIP Disapprovals**

Fourth Circuit:

*West Virginia v. EPA*, No. 23-1418 (4th Cir. Apr. 14, 2023).

Fifth Circuit:

*Texas v. EPA*, No. 23-60069 (5th Cir. Feb. 14, 2023).

Sixth Circuit:

*Kentucky v. EPA*, No. 23-3216 (6th Cir. Mar. 13, 2023); *Ky. Energy & Env't Cabinet v. EPA*, No. 23-3225 (6th Cir. Mar. 17, 2023).

Eighth Circuit:

*Arkansas v. EPA*, No. 23-1320 (8th Cir. Feb. 16, 2023); *Missouri v. EPA*, No. 23-1719 (8th Cir. Apr. 13, 2023); *Union Elec. Co., d/b/a Ameren Missouri v. EPA*, No. 23-1751 (8th Cir. Apr. 13, 2023); *Sw. Elec. Power Co. v. EPA*, No. 23-1765 (8th Cir. Apr. 14, 2023); *City Utils. of Springfield v. EPA*, No. 23-1774 (8th Cir. Apr. 14, 2023); *ALLETE, Inc. v. EPA*, No. 23-1776 (8th Cir. Apr. 14, 2023); *Hybar LLC v. EPA*, No. 23-1777 (8th Cir. Apr. 14, 2023); *Ark. League of Good Neighbors v. EPA*, No. 23-1778, (8th Cir. Apr. 14, 2023).

Ninth Circuit:

*Nev. Cement Co. v. EPA*, No. 23-682 (9th Cir. Apr. 17, 2023).

Tenth Circuit:

*Utah v. EPA*, No. 23-9509 (10th Cir. Feb. 13, 2023) (transferred to D.C. Circuit as No. 24-1040); *Oklahoma v. EPA*, No. 23-9514 (10th Cir. Mar. 2,

2023) (transferred to D.C. Circuit as No. 24-1043); *Okla. Gas & Elec. Co. v. EPA*, No. 23-9521 (10th Cir. Mar. 16, 2023) (transferred to D.C. Circuit as No. 24-1044); *PacifiCorp v. EPA*, No. 23-9512 (10th Cir. Feb. 23, 2023) (transferred to D.C. Circuit as No. 24-1041); *Utah Associated Mun. Power Sys. v. EPA*, No. 23-9520 (10th Cir. Mar. 15, 2023) (transferred to D.C. Circuit as No. 24-1042); *Wyoming v. EPA*, No. 23-9529 (10th Cir. Apr. 5, 2023) (voluntarily dismissed Jan. 19, 2024); *PacifiCorp v. EPA*, No. 23-9531 (10th Cir. Apr. 6, 2023) (voluntarily dismissed Jan. 19, 2024); *Tulsa Cement LLC v. EPA*, No. 23-9533 (10th Cir. Apr. 13, 2023) (transferred to D.C. Circuit as No. 24-1045); *Western Farmers Electric Coop. v. EPA*, No. 23-9534 (10th Cir. Apr. 14, 2023) (transferred to the D.C. Circuit as No. 24-1046); *Basin Elec. Power Co. v. EPA*, No. 23-9537 (10th Cir. Apr. 14, 2023) (voluntarily dismissed Jan. 19, 2024).

Eleventh Circuit:

*Alabama v. EPA*, No. 23-11173 (11th Cir. Apr. 13, 2023); *Ala. Power Co. v. EPA*, No. 23-11196 (11th Cir. Apr. 14, 2023).

D.C. Circuit:

*Utah v. EPA*, No. 23-1102 (D.C. Cir. Apr. 13, 2023) (protective petition); *Oklahoma v. EPA*, No. 23-1103 (D.C. Cir. Apr. 13, 2023) (protective petition),

*Okl. Gas & Elec. Co. v. EPA*, No. 23-1105 (D.C. Cir. Apr. 14, 2023) (protective petition); *Tulsa Cement LLC v. EPA*, No. 23-1106 (D.C. Cir. Apr. 14, 2023) (protective petition); *W. Farmers Elec. Coop. v. EPA*, No. 23-1107 (D.C. Cir. Apr. 14, 2023) (protective petition); *PacifiCorp v. EPA*, No. 23-1112 (D.C. Cir. Apr. 14, 2023) (protective petition), *Nevada v. EPA*, No. 23-1113 (Apr. 14, 2023); *Nevada Cement Co. v. EPA*, No. 23-1115 (Apr. 14, 2023) (protective petition).

### 3.    Challenges to two related rules, the Interim Final Rules, challenged in this Court and currently held in abeyance.[*]

D.C. Circuit:

*Nat'l Mining Ass'n v. EPA*, No. 23-1275 (consolidated with case Nos. 23-1276, 23-1277, 23-1278, 23-1279, 23-1321, 23-1323, 23-1324, 23-1325, 23-1326) (D.C. Cir. Sept. 29, 2023) (cases held in abeyance).

---

[*] *See* 88 Fed. Reg. 49,295 (July 31, 2023) (staying application of the FIP to six States, among other actions); 88 Fed. Reg. 67,102 (Sept. 29, 2023) (staying application of the FIP for six additional states, among other actions).

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES .................i

TABLE OF CONTENTS ........................................................................... x

TABLE OF AUTHORITIES ............................................................... xiii

GLOSSARY OF TERMS .................................................................. xviii

JURISDICTIONAL STATEMENT ........................................................ 1

PERTINENT STATUTE ........................................................................ 2

INTRODUCTION ................................................................................... 3

STATEMENT OF ISSUES .................................................................... 5

STATEMENT OF THE CASE ............................................................... 6

   I.     The Clean Air Act employs cooperative federalism to address air pollution. .......................................................................................... 6

   II.    Factual and Procedural History.................................................. 9

      A.    2015-ozone NAAQS and SIP submissions............................ 9

      B.    EPA disapproves the State Petitioners' SIPs..................... 11

      C.    EPA proposes a FIP. ....................................................... 12

      D.    The States and their industries challenge the SIP disapprovals before the FIP becomes final. ........................................... 13

      E.    The FIP takes a coordinated approach premised on the participation of all twenty-three States it set out to regulate.............. 16

      F.    The FIP is now a shell of EPA's original plan................... 20

   III.   Judicial review proceedings.................................................. 22

ARGUMENT SUMMARY................................................................. 22

STANDING ..................................................................................... 24

STANDARD OF REVIEW ............................................................. 26

ARGUMENT .................................................................................. 27

I.   EPA acted arbitrarily, capriciously, and exceeded its authority in imposing a twenty-three-state FIP without considering whether the interdependent plan remains reasonable when some States drop out. ....................................................................................... 27

   A.   An agency acts arbitrarily and capriciously when it fails to consider an important aspect of the problem and the regulatory environment it created. ...................................................... 27

   B.   EPA acted arbitrarily and capriciously in imposing an interdependent FIP without considering how litigation over predicate rulemaking would destabilize the FIP. ............... 29

II.  EPA's inclusion of Utah and Nevada in the FIP was arbitrary and capricious. .............................................................................. 35

   A.   EPA failed to explain its change in the treatment of interstate-transport obligations in the West. ...................................... 35

      1.   Assessing interstate-transport obligations in the West requires distinct analytical considerations. .................... 35

      2.   EPA failed to explain its abrupt change in course. ....... 38

   B.   EPA arbitrarily applied the four-step framework to assess significant contribution for Utah and Nevada but not other Western States. ................................................................. 39

      1.   EPA has developed and applied a separate analytical approach for interstate transport in the West. .............. 39

      2.   EPA arbitrarily applied the four-step framework to the exclusion of the weight-of-evidence approach. ............ 41

   C.   EPA unlawfully included emissions from Indian country in Utah's contribution analysis. ......................................... 44

III.    EPA's "enhancements" improperly require emission reductions beyond levels needed to address significant contribution. ......................47

CONCLUSION............................................................................................50

CERTIFICATE OF COMPLIANCE....................................................54

CERTIFICATE OF SERVICE...............................................................55

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alabama v. EPA*,
    No. 23-11173 (11th Cir.) ..................................................... 13

*Am. Lung Ass'n v. EPA*,
    985 F.3d 914 (D.C. Cir. 2021) ............................................ 26

*Am. Petrol. Inst. v. Costle*,
    609 F.2d 20 (D.C. Cir. 1979) ............................................. 30

*Arkansas v. EPA*,
    No. 23-1320 (8th Cir.) ..................................................... 13

*Bennett v. Spear*,
    520 U.S. 154 (1997) ....................................................... 31

*District of Columbia v. Train*,
    521 F.2d 971 (D.C. Cir. 1975) ........................................... 26

*\*EME Homer City Generation, L.P. v. EPA*,
    696 F.3d 7 (D.C. Cir. 2012) ............................................. 26

*Encino Motorcars, L.L.C. v. Navarro*,
    579 U.S. 211 (2016) ................................................... 38, 39

*Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v. Env't Prot. Agency*,
    94 F.4th 77 (D.C. Cir. 2024) ........................................... 6, 7

*\*EPA v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014) ....................................... 3, 6, 13, 34, 48, 49, 50

*FCC v. Fox TV Stations, Inc.*,
    556 U.S. 502 (2009) ................................................... 28, 38

*Grayscale Invs., L.L.C. v. SEC*,
    82 F.4th 1239 (D.C. Cir. 2023) ........................................... 42

*Kentucky v. EPA*,
    No. 23-3216 (6th Cir.) ..................................................... 13

*\* Authorities upon which we chiefly rely are marked with asterisks.*

*Kentucky v. EPA,*
  Nos. 23-3216/3225, 2023 U.S. App. LEXIS 18981 (6th Cir. July 25, 2023) ..... 20

*Koog v. United States,*
  79 F.3d 452 (5th Cir. 1996) ................................................................. 34

*Ky. Energy & Env't Cabinet v. EPA,*
  No. 23-3225 (6th Cir.) ....................................................................... 13

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .......................................................................... 24

*Michigan v. EPA,*
  213 F.3d 663 (D.C. Cir. 2000) ............................................................ 34

*Michigan v. EPA,*
  576 U.S. 743 (2015) ..................................................................... 27, 28

*Missouri v. EPA,*
  No. 23-1719 (8th Cir.) ....................................................................... 13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ........................................................................... 47

*Nevada Cement Co. LLC v. EPA,*
  No. 23-682 (9th Cir.) ......................................................................... 13

*North Carolina v. EPA,*
  531 F.3d 896 (D.C. Cir. 2008) ............................................................ 49

*Portland Cement Ass'n v. EPA,*
  665 F.3d 177 (D.C. Cir. 2011) ....................................................... 28, 29

*Taylor v. Buchanan,*
  4 F.4th 406 (6th Cir. 2021) ................................................................ 34

*Texas v. EPA,*
  No. 23-60069 (5th Cir.) ..................................................................... 13

*\*Texas v. EPA,*
  No. 23-60069, 2023 WL 7204840 (5th Cir. May 1, 2023) ................... 14, 16, 30

*Texas v. EPA,*
  829 F.3d 405 (5th Cir. 2016) ............................................................... 8

*\* Authorities upon which we chiefly rely are marked with asterisks.*

*Train v. Nat'l Res. Def. Council*,
  421 U.S. 60 (1975) ........................................................................ 7

*Union Elec. Co. v. EPA*,
  427 U.S. 246 (1976) ...................................................................... 7

*Utah v. EPA*,
  No. 23-9509 (10th Cir.) ................................................................ 13

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ..................................................................... 24

*West Virginia v. EPA*,
  No. 23-1418 (4th Cir.) .................................................................. 13

*Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*,
  841 F.3d 1141 (10th Cir. 2016) ..................................................... 28

## Statutes and Rules

5 U.S.C. §706 ..................................................................... 26, 27

40 C.F.R. §70.4 ......................................................................... 25

42 U.S.C. §7401 ..................................................................... 6, 26

42 U.S.C. §7407 ...................................................................... 7, 8

*42 U.S.C. §7410 .............................. 4, 7, 8, 9, 11, 12, 16, 22, 29, 34, 47

42 U.S.C. §7601 .......................................................................... 44

42 U.S.C. §7602 ........................................................................... 8

*42 U.S.C. §7607 .............................................. 1, 26, 27, 31

62 Fed. Reg. 60,318 (Nov. 7, 1997) ................................................ 36, 37

63 Fed. Reg. 7,254 (Feb. 12, 1998) ................................................ 44, 45

63 Fed. Reg. 57,356 (Oct. 27, 1998) .................................................. 36

70 Fed. Reg. 25,162 (May 12, 2005) ................................................... 37

75 Fed. Reg. 45,210 (Aug. 2, 2010) ................................................. 9, 37

76 Fed. Reg. 48,208 (Aug. 8, 2011) ................................................ 37, 43

80 Fed. Reg. 65,292 (Oct. 26, 2015) ................................................... 9

80 Fed. Reg. 75,706 (Dec. 3, 2015) ......................................... 9, 37, 39, 40

*\* Authorities upon which we chiefly rely are marked with asterisks.*

*81 Fed. Reg. 15,200 (Mar. 22, 2016) ................................................. 12, 15, 40, 42

81 Fed. Reg. 74,504 (Oct. 26, 2016) ..................................................... 9, 37, 38

83 Fed. Reg. 65,878 (Dec. 21, 2018) ......................................................... 38

86 Fed. Reg. 23,054 (Apr. 30, 2021) ......................................................... 38

87 Fed. Reg. 9,498 (Feb. 22, 2022) ........................................................... 11

87 Fed. Reg. 9,516 (Feb. 22, 2022) ........................................................... 11

87 Fed. Reg. 9,838 (Feb. 22, 2022) .................................................... 11, 12, 14

*87 Fed. Reg. 20,036 (Apr. 6, 2022) ................................. 12, 13, 20, 40, 41, 45, 46

87 Fed. Reg. 31,470 (May 24, 2022) ......................................................... 11

87 Fed. Reg. 31,485 (May 24, 2022) ......................................................... 11

88 Fed. Reg. 9,336 (Feb. 13, 2023) ........................................................... 13

*88 Fed. Reg. 36,654 (June 5, 2023) ...... 14, 16, 17, 18,  19, 20, 21, 24, 25, 30, 31, 32, 33, 38, 39, 41, 42, 43, 44, 46, 47, 48, 49, 50

88 Fed. Reg. 49,295 (July 31, 2023) .................................................... 21, 33

88 Fed. Reg. 67,102 (Sept. 29, 2023) .................................................. 21, 33

## Other

Berkshire Hathaway Energy Comments (June 21, 2022) ...................................... 36

Deseret Comments (June 23, 2022) ......................................................... 46

EPA, Good Neighbor Plan for 2015 Ozone NAAQS (last updated June 30, 2023) ..................................................................................... 1, 8, 21

EPA, Integrated Science Assessment for Ozone (Apr. 2020) ................................ 36

Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards (March 15, 2023) ........................................................... 15

Interstate Natural Gas Ass'n of Am. Comments (June 21, 2022) ................... 14, 15

Memorandum from Peter Tsirigotis (Aug. 31, 2018) ...................................... 10, 12

Memorandum from Peter Tsirigotis (Mar. 27, 2018) ...................................... 10, 40

North American Electric Reliability Corporation, 2023 Summer Reliability Assessment Infographic (May 2023) ................................................... 25

Order, *Nevada Cement Co. v. EPA*, No. 23–682 (9th Cir. July 3, 2023) ............... 21

*\* Authorities upon which we chiefly rely are marked with asterisks.*

Order, *Utah v. EPA*, No. 23-9509 (10th Cir. July 27, 2023)  ................................. 21

Order, *Arkansas v. EPA*, No. 23-1320 (8th Cir. May 25, 2023)  ...................... 15, 16

Order, *Kentucky v. EPA*, No. 23-3216 (6th Cir. May 31, 2023)  ...................... 15, 16

Order, *Missouri v. EPA*, No. 23-1719 (8th Cir. May 26, 2023)  ........................ 15, 16

Order, *Texas v. EPA*, No. 23-60069 (5th Cir. June 8, 2023)  ................................ 15

Order, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023)  ................................ 15

Order, *Union Elec. Co. v. EPA*, No. 23-1751 (8th Cir. May 26, 2023)  .................. 15

Order, *West Virginia v. EPA*, 90 F.4th 323 (4th Cir. 2024)  ................................ 21

Order, *Alabama v. EPA*, No. 23-11173 (11th Cir. Aug. 17, 2023)  ........................ 21

Ozone Transport Policy Analysis Final Rule TSD  ........................................ 17, 18

Resource Retirements, Replacements & Risk (Feb. 24, 2023)  ............................ 25

U.S. Steel Corp. Comments (June 21, 2022)  ...................................................... 15

Utah Dep't of Env't Quality Comments (June 21, 2022)  .................................... 36

*\* Authorities upon which we chiefly rely are marked with asterisks.*

## GLOSSARY OF TERMS

| | |
|---|---|
| CAA or the Act | Clean Air Act |
| APA | Administrative Procedure Act |
| EGU | Electric Generating Unit |
| EPA | U.S. Environmental Protection Agency |
| Final Rule | *Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality,* 88 Fed. Reg. 36,654 (June 5, 2023) |
| FIP | Federal Implementation Plan |
| Interstate Transport Provision | Section 110(a)(1) of the CAA; 42 U.S.C. §7410(a)(1) |
| NAAQS | National Ambient Air Quality Standards |
| $NO_x$ | Nitrogen Oxide |
| ppb | Parts Per Billion |
| SIP | State Implementation Plan |
| State Petitioners | Utah, Ohio, Indiana, West Virginia, Kentucky, Nevada, and Kentucky Energy and Environment Cabinet |
| VOCs | Volatile Organic Compounds |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over, and is a proper venue for, State Petitioners' Petitions for Review under 42 U.S.C. §7607(b)(1).

State Petitioners filed their petitions in the relevant time period—between June 20 and August 4, 2023—which is within 60 days of publication of the challenged action in the Federal Register. *See id.*

## PERTINENT STATUTE

Relevant statutory provisions are reproduced in the attached Addendum.

## INTRODUCTION

The Clean Air Act pictures a world where the States and the federal Environmental Protection Agency ("EPA") work together to ensure the nation's air quality. EPA views its role differently—leading it to take unreasoned and unlawful action.

This dispute is many years in the making. EPA's 2015 revisions to the national ambient air quality standard ("NAAQS" or "air-quality standards") for ozone triggered each State's obligation to develop revised State-implementation plans ("SIPs" or "state plans") to implement and enforce the new standard. These plans must address each State's obligation under the Act to prevent their emissions from contributing "significantly" to downwind States' air quality. EPA delayed review of the state plans for many *years*. It then suddenly rejected the plans of roughly half of the country's States.

Soon after, EPA revealed an ambitious federal-implementation plan ("FIP" or "federal plan"). The federal plan adopts a four-step analytical framework—developed in an earlier rulemaking, *see EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014)—that ties the regulation of emissions from twenty-three upwind States together. EPA premised the federal plan on the assumption that all twenty-three States would participate. The plan also newly regulates nine major industries

3

on an accelerated timeline.  And it imposes draconian emissions reductions on power plants in each State, risking plant shutdowns and grid instability.

The federal plan is a product of unreasoned decisionmaking.  EPA has authority to adopt a federal plan *only after* it properly disapproves of state plans.  *See* 42 U.S.C. §7410(c)(1).  During the rulemaking process, commentors previewed that decisions on litigation over the EPA's disapproval of state plans would disrupt the EPA's authority to impose an interdependent federal plan governing twenty-three States.  EPA nonetheless pushed forward.  In doing so, EPA never considered, much less explained, whether its interdependent, twenty-three-state federal plan's methodology is sound when applied to only a subset of the regulated States.

Worse still, EPA's federal plan has many problems unique to the Western States, which EPA attempts to regulate for the first time.  Indeed, EPA shifted course from its past treatment of Western States, without proper justification.  The federal plan even forces one State—Utah—to account for emissions from Indian country that are beyond the State's regulatory authority.

Unsurprisingly, given the above problems, the federal plan is already a failure.  A combination of litigation and interim rulemaking has already exempted a dozen of the initially regulated States from the plan.  This Court should reverse this unlawful

federal mandate that threatens the States and their industries and inverts the federal-state balance that Congress struck through the Clean Air Act.

## STATEMENT OF ISSUES

1. Whether EPA acted arbitrarily, capriciously, or otherwise unlawfully when it failed to consider an important aspect of the federal-implementation plan: whether the interdependent, twenty-three-state federal plan is sound when applied to only a subset of the regulated States.

2. Whether EPA acted arbitrarily, capriciously, or otherwise unlawfully when it applied its non-binding four-step framework for assessing significant contribution to Utah and Nevada, even though EPA (a) developed the framework to assess interstate transport specific to the East, (b) repeatedly concluded in prior rulemakings that the framework was not appropriate for assessing significant contribution in the West, (c) failed to justify adequately its new position that the framework should apply to Utah, Nevada, and other Western States, and (d) refused to apply an alternative "weight-of-evidence" approach for Utah and Nevada while allowing it for Arizona and Oregon.

3. Whether EPA acted arbitrarily, capriciously, or otherwise unlawfully by including emissions from Indian country in Utah's contribution analysis and allowance allocations.

5

4.  Whether EPA acted arbitrarily, capriciously, or otherwise unlawfully by adding "enhancements" to the allowance-trading program that impose deeper emissions-reduction requirements than needed to adequately address significant contribution to downwind air pollution.

## STATEMENT OF THE CASE

**I.    The Clean Air Act employs cooperative federalism to address air pollution.**

Air pollution "is transient, heedless of state boundaries." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 496 (2014).  Some pollutants never leave a State's borders.  Others travel into States located downwind.  *Id.*  Often, a single State's pollutants will travel to multiple downwind States.  *Id.*  And some States simultaneously receive and export pollution.  But "air pollution control" has traditionally been "the primary responsibility of States and local governments."  42 U.S.C. §7401.

In 1970, Congress passed the Clean Air Act to encourage cooperation among the States in managing air pollution.  *See* 42 U.S.C. §7401, *et seq*.  The Act "is an exercise in cooperative federalism."  *Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v. Env't Prot. Agency*, 94 F.4th 77, 93 (D.C. Cir. 2024).  Congress tasked EPA with identifying harmful pollutants and establishing national air-quality standards.  *Id.*  Once EPA sets a national air-quality standard for a particular

pollutant, it must identify specific locations where the concentration of a regulated pollutant exceeds, or is in "nonattainment" with, the level EPA set.  §7407(d).

But the States retain "the primary responsibility" to decide the "manner" in which they will implement emissions control programs to meet the standards.  42 U.S.C. §7407(a); *See Env't Comm.*, 94 F.4th at 93.  Each State must submit a SIP to EPA that sets emission limitations adequate to attain a NAAQS within three years.  *Env't Comm.*, 94 F.4th at 84.  "Each State" has "wide discretion in formulating its plan." *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976).  As "long as the ultimate effect of a State's choice of emission limitations is compliance with the [NAAQS], the State is at liberty to adopt whatever mix of emissions limitations" and other controls "it deems best suited to its particular situation." *Train v. Nat. Res. Def. Coun.*, 421 U.S. 60, 79 (1975).

SIPs must "comply with a number of the Clean Air Act's specific legal requirements." *Env't Comm.*, 94 F.4th at 85.  The Act's "interstate transport" provision requires States to account for pollution that travels beyond their borders.  42 U.S.C. §7410(a)(2)(D)(i).  Specifically, SIPs must include "adequate provisions" to mitigate in-state emissions that "contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any" NAAQS.  *Id.*

After a State submits its SIP, EPA takes a "ministerial" role in "reviewing" it. *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) (quotation omitted). If a SIP meets the Act's requirements, EPA "shall approve" it. §7410(k)(3). That means EPA cannot disapprove a SIP merely because it believes there is a better way to achieve the Act's requirements. *See id.* EPA must act on a proposed SIP within 18 months of the State's submission. §§7410(k)(1)(B), (k)(2). If, after review, EPA deems a SIP deficient, EPA is expected to work with the State to make the SIP compliant, for example, by providing an opportunity for "the State" to "correct[] the deficiency." §§7410(c)(1)(B), (k)(5).

Critical here, EPA can issue a FIP *only after* it "disapproves" a SIP for failing to meet the Act's requirements. §7410(c)(1). A FIP, like a SIP, must meet the Act's requirements, including the Act's interstate-transport requirement. *See* §§7410(c)(1), 7602(y). EPA has up to two years after disapproving a SIP to issue a FIP. §7410(c)(1)(B). And a State may submit a revised SIP any time before a FIP goes into effect. *See* §7410(c)(1). These features reflect the Act's foundational principle that the States retain the "primary responsibility for assuring air quality." §7407(a).

## II.    Factual and Procedural History

### A.    2015-ozone NAAQS and SIP submissions

In October 2015, EPA reduced the NAAQS for ozone from 75 to 70 parts per billion ("ppb").  80 Fed. Reg. 65,292, 65,301 (Oct. 26, 2015).  That change triggered the States' obligation to update their SIPs.  42 U.S.C. §7410(a)(1).

For States that contribute significantly to downwind air pollution, the revised SIPs needed to include provisions for how each State would satisfy the Act's "good neighbor" (or "interstate transport") provision.  §7410(a)(2)(D).  Notably, before the 2015 ozone-NAAQS revision, EPA had never found that emissions from Western States, including Utah and Nevada, contributed significantly to air-quality problems in downwind States.  EPA had consistently viewed ozone transport as a uniquely Eastern issue, 81 Fed. Reg. 74,504, 74,523 (Oct. 26, 2016), noting that "the transport issues in the Eastern United States are analytically distinct" from the West.  75 Fed. Reg. 45,210, 45,227 (Aug. 2, 2010).  Even after identifying "problem receptors in the West," EPA did not apply the four-step framework or extend a prior rule (Cross-State-Air-Pollution Rule) to Western States in 2015, noting that "[t]here may be additional criteria to evaluate regarding collective contribution of transported air pollution in the West."  80 Fed. Reg. 75,706, 75,709 (Dec. 3, 2015); *see also* 81 Fed. Reg. 74,504, 74,523.

After EPA finalized the 2015-ozone NAAQS, EPA initially worked cooperatively with the States.  EPA issued guidance memoranda to "assist[] states in developing SIPs" for the new standards.  *See Memorandum from Peter Tsirigotis* at 3 (Mar. 27, 2018), https://perma.cc/Y8YF-CQMB ("March Memorandum"); *see also Memorandum from Peter Tsirigotis* (Aug. 31, 2018), https://perma.cc/G8EN-RN8Q ("August Memorandum").  Acknowledging that "its analytical approaches have varied over time," EPA emphasized that the States could use more than one framework to craft their good-neighbor provisions.  March Memorandum at 3; August Memorandum at 1.  EPA also acknowledged that its guidance does not impose "binding, enforceable requirements" and "state air agencies retain the discretion to develop" SIPs that "differ from this guidance."  August Memorandum at 1.  And EPA offered modeling parameters that the States could use in developing their plans alongside recommended screening thresholds for identifying "linkages" between upwind States and problem locations downwind.  *See* March Memorandum at Attachments B & C; August Memorandum at 4.  Many States—including the State Petitioners—worked cooperatively with EPA in formulating their SIPs.  *See* March Memorandum at 6; *see*, *e.g.*, Crowder Decl., JA2114 (¶¶14–15).

The State Petitioners submitted SIPs according to EPA's guidance:  Ohio in September 2018, 87 Fed. Reg. 9,838, 9,849 (Feb. 22, 2022); Nevada in October

10

2018, 87 Fed. Reg. 31,485 (May 24, 2022); Indiana in November of the same year, 87 Fed. Reg. 9,838, 9,845; Kentucky in January 2019, 87 Fed. Reg. 9,498, 9,503 (Feb. 22, 2022); West Virginia in February 2019, 87 Fed. Reg. 9,516, 9,522 (Feb. 22, 2022); and Utah in January 2020, 87 Fed. Reg. 31,470, 31,475 (May 24, 2022).

### B.    EPA disapproves the State Petitioners' SIPs.

EPA had eighteen months to review the SIP submissions.    42 U.S.C. §7410(k)(1)(B), (k)(2).  But the States' submissions sat with EPA for years.

Suddenly, on a single day, EPA proposed to disapprove *nineteen* SIPs, including those of Ohio, Indiana, Kentucky, and West Virginia.  87 Fed. Reg. at 9,838 (Ohio and Indiana); 87 Fed. Reg. at 9,516 (West Virginia); 87 Fed. Reg. 9,498 (Kentucky).  A few months later, EPA proposed to disapprove additional SIPs, including Utah's and Nevada's.  87 Fed. Reg. 31,470 (Utah); 87 Fed. Reg. 31,485 (Nevada).

EPA's proposed disapprovals had glaring flaws.  For example, EPA used air-quality modeling and data that were unavailable when the States made their submissions.  *See* 87 Fed. Reg. at 9,840–41.  And EPA faulted States for adopting a screening threshold (1 ppb), *id.* at 9,843, that the agency had previously stated would be "reasonable and appropriate," August Memorandum at 4.

For Utah and Nevada, EPA rejected their decision to use a weight-of-evidence approach that is more suitable for analyzing ozone-transport conditions in the West. Previously, however, EPA agreed that such an approach allowed for greater consideration of relevant local factors, including data related to unique Western conditions. *See* 81 Fed. Reg. 15,200, 15,203 (Mar. 22, 2016). Indeed, EPA used the same weight-of-evidence approach in approving Arizona's SIP addressing ozone-transport for the 2008-ozone NAAQS. *See id*.

### C.    EPA proposes a FIP.

At that point, EPA should have worked with the States to correct the perceived deficiencies in the SIPs. *See* 42 U.S.C. §7410(c)(1)(B). EPA had a different plan. Less than two months after proposing to disapprove nineteen States' SIPs—and before EPA had proposed to disapprove the Utah and Nevada SIPs—EPA unveiled a *federal*-implementation plan that would impose substitute obligations on States. 87 Fed. Reg. 20,036 (Apr. 6, 2022) ("Proposed FIP"), JA0115.

This FIP, EPA claimed, would "resolve" the interstate-transport obligations for twenty-three States whose plans EPA had just proposed, or would soon propose, to disapprove. The FIP proposed a coordinated solution—explained at length later in this brief—picking a single cost-effective strategy that would cover all twenty-

three upwind States. *Id*. Through this coordinated approach, EPA sought to apportion the responsibility of reducing emissions "collectively" among "contributing upwind states" in an "efficient and equitable" manner. *Id.* at 20,076, JA0155 (quoting *Homer*, 572 U.S. at 519).

> **D.    The States and their industries challenge the SIP disapprovals before the FIP becomes final.**

EPA's proposed SIP disapprovals drew strong objections. EPA pressed on, nonetheless. In February 2023, EPA finalized disapproval of SIPs—lumping together twenty-one separate disapprovals into the same Federal Register publication. 88 Fed. Reg. 9,336 (Feb. 13, 2023). In response, many States challenged EPA's flawed SIP disapprovals in courts. *See, e.g.*, *West Virginia v. EPA*, No. 23-1418 (4th Cir.); *Texas v. EPA*, No. 23-60069 (5th Cir.); *Kentucky v. EPA*, No. 23-3216 (6th Cir.); *Arkansas v. EPA*, No. 23-1320 (8th Cir.); *Missouri v. EPA*, No. 23-1719 (8th Cir.); *Ky. Energy & Env't Cabinet v. EPA*, No. 23-3225 (6th Cir.); *Nevada Cement Co. LLC v. EPA*, No. 23-682 (9th Cir.) (State of Nevada granted intervention); *Utah v. EPA*, No. 23-9509 (10th Cir.) (Utah and Oklahoma petitions transferred to D.C. Circuit); *Alabama v. EPA*, No. 23-11173 (11th Cir.). Other States—like Ohio and Indiana—chose not to pursue litigation, instead accepting that they would be regulated under a plan different from one they crafted, so long as it was lawful.

Litigation over the SIP disapprovals showcased the serious flaws with EPA's action. Challengers highlighted that EPA had "exceeded its authority" by using "non-statutory factors" during its evaluation and "invert[ed]" the Act by denying the States their "primary" role in regulating air pollution. *Texas v. EPA*, No. 23-60069, 2023 WL 7204840, *6–7 (5th Cir. May 1, 2023) (*per curiam*). And EPA unlawfully moved the "goalpost" by using modeling and data unavailable to the States when they made their submissions. *Id.* at *9. EPA's review also relied on "a material shift" from the guidance it had offered to the States about how to meet their requirements. *Id.* at *8; 87 Fed. Reg. at 9,840–41.

EPA had not published the FIP when the litigation over the SIP disapprovals commenced. During the FIP's public-comment period, commenters previewed the just-discussed legal problems with the SIP disapprovals. *See* 88 Fed. Reg. 36,654 (June 5, 2023) ("FIP"), at 36,672, JA1569; EPA, Response to Public Comments ("RTC"), JA1332–26, JA1329–31, JA1394–1404. Commenters further stressed that the legal problems with SIP disapprovals would lead to enforcement problems with the FIP. One commentor warned that the EPA's rushed approach was "at the expense of a reasoned and defensible rule." Interstate Natural Gas Ass'n of Am. Comments (June 21, 2022), JA2198. "Pushing forward" with the FIP, that commentor went on, "will have unintended consequences that will negatively

impact regulated parties" and will "invite[] litigation alleging that EPA has acted arbitrarily and capriciously." *Id.* Another commentor predicted that EPA's broad interpretation of its authority would lead to "legal challenges to any final rule in the same form as the Proposed Rule." U.S. Steel Corp. Comments (June 21, 2022), JA0619, JA0649–54. EPA's actions, that commenter explained, risked "stringing out any rulemaking in constant challenges" and "likely jettisoning the uniformity that EPA purports to seek." *Id.* at JA0620.

Notwithstanding these comments, EPA's Administrator signed the near-final FIP in March 2023. This prepublication notice cautioned that the announced version of the rule was not the "official version … for the purpose of compliance" and that the official FIP would be "forthcoming" in the Federal Register. *See* Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards at 1 (March 15, 2023), https://perma.cc/CDH8-TWUJ.

But even before EPA published the FIP, the commentors proved prescient: circuit courts of appeal began staying the SIP disapprovals starting in May. *See* Order, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023); Order, *Texas v. EPA*, No. 23-60069 (5th Cir. June 8, 2023); Order, *Arkansas v. EPA*, No. 23-1320 (8th Cir. May 25, 2023); Order, *Missouri v. EPA*, No. 23-1719 (8th Cir. May 26, 2023); Order, *Union Elec. Co. v. EPA*, No. 23-1751 (8th Cir. May 26, 2023); Order, *Kentucky v. EPA*,

No. 23-3216 (6th Cir. May 31, 2023) (administrative stay). The Fifth Circuit stayed the Texas and Louisiana SIP disapprovals finding that EPA likely behaved unlawfully when it disapproved them. *Texas*, 2023 WL 7204840, at *6–11. The Sixth and Eighth Circuits also stayed the SIP disapprovals of several states pending judicial review. *See* Order, *Kentucky*, No. 23-3216 (6th Cir. May 31, 2023); Order, *Arkansas*, No. 23-1320 (8th Cir. May 25, 2023); Order, *Missouri*, No. 23-1719 (8th Cir. May 26, 2023).

Because an operative SIP disapproval is the legal predicate for EPA's authority to impose a FIP, *see* §7410(c)(1), EPA lacked authority to impose a FIP on States whose SIP disapproval had been stayed. EPA nonetheless published the FIP in the Federal Register on June 5, 2023. FIP at 36,664, JA1561. Although judicial stays already precluded EPA from enforcing the FIP against many States, EPA maintained that the FIP would "resolve" the interstate-transport obligations for all of them. *Id.* at 36,656, JA1553.

### E.    The FIP takes a coordinated approach premised on the participation of all twenty-three States it set out to regulate.

The FIP purports to address emissions from twenty-three States. To quantify those States' interstate-transport obligations, EPA utilized a four-step framework. FIP at 36,659–60, JA1556–57; *id.* at 36,667, 36,671–73, 36,682, JA1564, JA1568–70, JA1579.

16

*Step one.* First, EPA tried to locate problematic areas. Specifically, EPA identified downwind locations, or "receptors," "that are expected to have problems attaining or maintaining the NAAQS." *Id.* at 36,659, JA1556.

*Step two.* Second, EPA sought to determine which upwind States contribute significant pollution to the problem locations. More technically, EPA "determine[d] which upwind states are 'linked' to these identified downwind receptors based on a numerical contribution threshold." *Id.* at 36,671, JA1568. For FIP purposes, EPA established a numerical contribution threshold of 0.7 ppb (1% of the NAAQS). *Id.* at 36,658, JA1555. States that contribute above that threshold to a delinquent receptor located in a downwind State's borders contribute to that State's ozone pollution. *Id.*

*Step three.* Next, and most important, the EPA determined *how much* emissions sources in each State identified at Step 2 must reduce. It did that by establishing acceptable statewide emissions levels, premised on the application of a *single* cost-effective strategy for each source category (i.e., power sources) for *all* of the upwind States, above which emissions contribute significantly to downwind pollution.

Selecting a single strategy relevant to all upwind States, itself, has multiple sub-steps. EPA first identified various technologies that reduce emissions. FIP at 36,678, JA1575; *id.* at 36,720–36,732, JA1617–29; *see*, *e.g.*, Ozone Transport Policy

17

Analysis Final Rule TSD ("OTPA") at JA1010, JA1054 (Table C-1), JA1014 (Table A-2). Then, EPA assigned a cost for implementing each identified technology (or mix of technologies). FIP at 36,678, 36,720–36,732, JA1575, JA1617–29; *see* OTPA at JA1010, JA1054 (Table C-1), JA1014 (Table A-2); EGU NOX Mitigation Strategies Final Rule TSD, JA1137. EPA next mapped the cost of implementing each mitigating technology against the emissions reductions achievable *across all regulated States* when that technology is applied. *See* OTPA at JA1023–36 & JA1105 (Appendix A) at State 2023–2029 (Rows 50–52; Columns K–P); *see* Technical Memo at JA0049. This can be visualized as a graph with the costs of technologies on one axis and the aggregate emissions produced on the other axis.

From there, for each source category, EPA selected *the* cost-effective strategy to govern the twenty-three upwind States. That is, EPA picked the point at which an additional dollar spent (on better technology) produces little additional benefits across the regulated States, that is, the "technology breakpoint" at which costlier mitigation has diminishing marginal returns. FIP at 36,678, JA1575. Locating this "knee in the curve" is critical to the FIP. *Id.* at 36,683, 36,741, 36,745, JA1580, JA1638, JA1642. And where EPA deviated from this inflection point—for example, upon a finding of technical infeasibility for a particular industry—it hewed to selecting a strategy that, in its view, best reflected this technology breakpoint. *See*,

*e.g.*, *id.* at 36,660, 36,733, 36,739–40, 36,746, 36,837, JA1557, JA1630, JA1636–37, JA1643, JA1734.

EPA then "uniform[ly]" applied "across the upwind sources" this "maximized cost-effective[]" emissions-control strategy to calculate statewide emissions budgets. FIP at 36,677–78, JA1574–75; *see id.* at 36,676, 36,688, JA1573, JA1585. To satisfy the State's interstate-transport obligations, sources must eliminate "emissions that are in excess" of the emissions levels achieved by applying the selected cost-effective control strategy "identified in Step 3." FIP at 36,753, JA1650. In EPA's view, holding similar sources across "linked upwind States" to a single cost-effective strategy, *id.* at 36,676, JA1573, is an "efficient and equitable … apportion[ment]" of "emissions reduction responsibilities among upwind states." *Id.* at 36,719, JA1616 (quotations omitted).

*Step four*. Finally, EPA laid out how regulated sources may achieve compliance. Power sources can, among other things, install the "cost-effective" technology or participate in an interstate allowance-trading program (first implemented for prior interstate-transport rulemakings). *Id.* at 36,654, 36,760–817, JA1551, JA1657–1714. But, EPA overhauled the pre-existing trading program in the FIP. It did so by imposing "enhancements" that progressively shrink the tradeable-

allowance bank by removing "surplus … allowances" that, in EPA's view, "diminish[] the intended stringency" of the program. *Id.* at 36,762–70, JA1659–67.

At bottom, the FIP dramatically expands EPA's authority. For the first time in decades, the FIP imposes specific interstate-transport obligations on several new industrial sources. FIP at 36,657–59, 36,654, 36,681, JA1554–1556, JA1578. Further, the FIP expands the geographic scope of the program to include, for the first time, Western States including Utah and Nevada. *See* Proposed FIP at 20,074, JA0513; FIP at 36,717, JA1614. Also "for the first time" the FIP requires a surrounding State, Utah, to account for emissions from "an existing EGU in Indian country not covered by [the] state's" regulatory authority. FIP at 36,802, JA1699.

The FIP includes a severability provision that was not included in the proposed rule. That provision states, without explanation, that the FIP is severable along state or other jurisdictional lines. FIP at 36,693, JA1590.

**F.    The FIP is now a shell of EPA's original plan.**

After finalizing the FIP, EPA continued to receive bad news in courts. To date, *every circuit* to have considered staying a SIP disapproval—seven in total—has granted a stay. The Sixth, Ninth, and Tenth Circuits joined the Fifth in concluding that the States had a strong case that EPA's SIP disapprovals were illegal. Order, *Kentucky v. EPA*, Nos. 23-3216/3225, 2023 U.S. App. LEXIS 18981 at *10–11 (6th

Cir. July 25, 2023); Order at 2, *Nevada Cement Co. v. EPA*, No. 23–682 (9th Cir. July 3, 2023); Order at 4, *Utah v. EPA*, No. 23-9509 (10th Cir. July 27, 2023).  The Fourth and Eleventh Circuits also stayed EPA's actions to allow for further judicial review. *See* Order, *West Virginia v. EPA*, 90 F.4th 323 (4th Cir. 2024); Order, *Alabama v. EPA*, No. 23-11173 (11th Cir. Aug. 17, 2023).  No circuit has yet decided the full merits of the SIP-disapproval cases.

Eventually, EPA acknowledged the effects of the above stays on the FIP.  In July and September, EPA issued interim final rules reacting to the judicial stays of the SIP disapprovals.  88 Fed. Reg. 49,295 (July 31, 2023), JA1816; 88 Fed. Reg. 67,102 (Sept. 29, 2023), JA1831.

As it now stands, the FIP—an "interdependent" plan designed for "23 upwind states," *see* FIP at 36,656, 36,860, JA1553, JA1757—applies only to 11.  That means, compared to the FIP's stated intent, it now regulates only 11% of the emissions from power sources and about 40% of the emissions from industrial sources.  *See* EPA, *Good Neighbor Plan for 2015 Ozone NAAQS* (last updated June 30, 2023)*, computed from data maps available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.  All in all, *over 75%* of the emissions that the FIP originally set out to control are presently exempt from the FIP.  *See id.*

## III.    Judicial review proceedings

State Petitioners, as well as other interested parties, sought judicial review of the FIP.  After a divided panel of this Court denied several petitioners' motions to stay the FIP pending judicial review, Ohio, Indiana, and West Virginia, along with private industry members, sought an emergency stay of the Final Rule at the Supreme Court.  The Court held oral argument on the consolidated stay applications on February 21, 2024.

## ARGUMENT SUMMARY

This Court should set aside EPA's unlawful action for four reasons.

**1.**  EPA acted arbitrarily, capriciously, and otherwise unlawfully because it failed to consider an important factor during its decisionmaking:  whether the FIP is sound when applied in its current form to only a subset of the States the FIP set out to regulate.  This consideration stems from two reasons:  (1) EPA's authority under the Clean Air Act to impose a FIP on a group of States hinges on prior predicate rulemaking, the SIP disapprovals, *see* 42 U.S.C. §7410(c), and (2) EPA chose an interdependent method that ties each State's emissions budget to the other States.  Commenters warned that many States would likely drop out of the FIP because of obvious flaws in the SIP disapprovals.  Litigation and judicial stays quickly confirmed as much.  Yet, EPA did not consider what effect the legal flaws in its SIP

22

disapprovals—the legal predicates for the FIP—would have on the almost-contemporaneously imposed FIP.  The EPA's failure to consider that important aspect of the problem renders the FIP arbitrary and capricious.

2.  EPA's inclusion of Utah and Nevada in the FIP is arbitrary and capricious. First, EPA failed to explain its change in the treatment of Western States when it analyzed significant contribution in the West using the four-step framework.  This is a stark change from EPA's prior position that the framework works only for Eastern States.  Second, even after EPA developed the "weight-of-evidence" approach for use on the Western States, it arbitrarily allowed that approach for Arizona and Oregon while rejecting it for Utah and Nevada.

3.  EPA violated the Clean Air Act by combining emissions from Indian country (the Uintah and Ouray Reservation) with emissions from sources in a surrounding State (Utah) in determining whether the combined emissions resulted in significant contribution.

4.  EPA's trading program "enhancements" constitute unlawful overcontrol. EPA confirmed that each State's emissions budget under the FIP is stringent enough to "fully eliminate" the regulated States' interstate-transport obligations.  Yet, EPA included "enhancements" on the trading program that take allowances out of the program to incentivize improved performance at individual sources.  EPA has no

authority to require additional emissions reductions when overall emissions budgets already satisfy States' interstate-transport obligations.

## STANDING

State Petitioners have standing to challenge the Final Rule. There is "little question that the rule … injure[s] the States because they" and sources within their borders are directly regulated under the FIP. *West Virginia v. EPA*, 597 U.S. 697, 719 (2022). The States are thus "the object[s] of" the regulation. *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 561–62 (1992)).

The FIP also injures the States economically. It requires States to issue or update permits for all covered sources (which now includes sources from nine new industries) within their borders. *See* FIP at 36,843–44, JA1740–41. The permitting process is resource intensive and lengthy. Issuing a single permit requires rounds of drafting, staff review, public notice, public meetings, and responses to public comments. Crowder Decl., JA2122–23 (¶¶41–43); Hodanbosi Decl., JA2094–95 (¶¶18–19). Because each permit is tailored uniquely to the needs of the regulated facility, the States' permitting authorities must conduct this resource-intensive process for each permit. And States must ensure that covered sources adequately monitor their emissions to assure compliance with the FIP. *See* FIP at 36,843,

JA1740; 40 C.F.R. §70.4; Hodanbosi Decl., JA2097 (¶24); *see Correspondence*, (Aug. 23, 2023), https://perma.cc/83CB-9BZW.

The FIP also threatens power and heating shortages. It regulates pipeline engines for the first time under an interstate-transport rule. Pipelines have warned that compliance with the FIP's compressed timeline will result in natural-gas shortages in metropolitan areas. Grubb Decl., JA2183–86 (¶¶66–67). And the FIP imposes draconian emissions reductions on power sources that may force them to prematurely shutter, compromising the reliability of the States' power supply. Experts have warned as much. *See* Hodanbosi Decl., JA2090–93 (¶¶7–15); Lane Decl., JA2128–37 (¶¶5–14, 17–19, 22); Farah Decl., JA2141–2143 (¶¶10–15); PJM Interconnection, Energy Transition in PJM: Resource Retirements, Replacements & Risk (Feb. 24, 2023), https://perma.cc/PQA7-9P6K; *see also* North American Electric Reliability Corporation, 2023 Summer Reliability Assessment Infographic (May 2023) at 6, https://perma.cc/A9G6-B398. At minimum, these measures will lead to higher retail electricity prices.

The FIP also injures the States' sovereign authority. By disapproving State Petitioners' SIPs and near-contemporaneously imposing a FIP, EPA effectively prevented the State Petitioners from formulating their own plans to regulate air quality within their borders. §7401(a)(3). By "commandeer[ing] the regulatory

powers of the states," EPA stripped them of their reserved, sovereign authority. *District of Columbia v. Train*, 521 F.2d 971, 992 (D.C. Cir. 1975), *vacated on other grounds*, *EPA v. Brown*, 431 U.S. 99 (1977).

State Petitioners thus have standing to challenge the FIP because they are harmed by the FIP, that harm is directly traceable to the FIP, and a favorable decision by this Court would redress that harm. Notably, because State Petitioners "seek the same relief on the same claim, only one needs to demonstrate standing." *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 988, *rev'd and remanded on other grounds*, *West Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022).

## STANDARD OF REVIEW

This Court must "reverse" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 42 U.S.C. §7607(d)(9), (A), (C). The standard of review "is the same" as that set by the Administrative Procedure Act, 5 U.S.C. §706(2)(A)–(B). *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 23 n.17 (D.C. Cir. 2012), *rev'd on other grounds*, 572 U.S. 489 (2014).

**ARGUMENT**

**I.    EPA acted arbitrarily, capriciously, and exceeded its authority in imposing a twenty-three-state FIP without considering whether the interdependent plan remains reasonable when some States drop out.**

Although commenters warned, and litigation reinforced, that EPA lacked authority to implement a twenty-three-state plan, EPA failed to consider whether the FIP's interdependent methodology remains sound when the FIP applies to only a subset of the regulated States. Its failure to consider this critical problem renders EPA's action arbitrary and capricious.

**A.    An agency acts arbitrarily and capriciously when it fails to consider an important aspect of the problem and the regulatory environment it created.**

The Clean Air Act, which mirrors the Administrative Procedure Act, requires federal courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. §7607(d); 5 U.S.C. §706(2)(A). This language directs "administrative agencies" to "engage in reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quotations omitted). Reasoned decisionmaking requires that "an agency's decreed result be within the scope of its lawful authority" *and* "the process by which it reaches that result must be logical and rational." *Id.* (quotations omitted). For its rule to be logical and rational, the agency must consider all "relevant factors" in coming to its

27

conclusion. *Id.* (quotations omitted). That requires an agency to be "aware[]" of the surrounding context in which the agency's rule operates and to "provide reasoned explanation for [the] action." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). When an agency "entirely fail[s] to consider an important aspect of the problem when deciding whether regulation is appropriate" the regulation must be set aside as unlawful. *Michigan*, 576 U.S. at 752 (alterations accepted, quotations omitted).

It follows from these principles that an agency has an "obligation to acknowledge and account for" the "regulatory posture the agency creates." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (*per curiam*); *accord Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, 841 F.3d 1141, 1150 (10th Cir. 2016). Said another way, an agency cannot ignore the effects—or likely effects—of "contemporaneous and closely related rulemaking," especially its own. *Portland Cement Ass'n*, 665 F.3d at 187. An agency must instead offer a "satisfactory explanation," which takes a "hard look" at any "salient problems" arising from the regulatory landscape. *Id.* (quotations omitted). True, an agency "must promulgate rules based on the information it currently possesses." *Id.* But that does not give an agency license to ignore "obvious" trends, *see Zen Magnets, LLC*, 841 F.3d at 1150, particularly when those trends stem from the agency's "own process," *see Portland*

*Cement Ass'n*, 665 F.3d at 187.  More simply, administrative law requires that "an agency's right hand take account of what its left hand is doing."  *Id.*

## B. EPA acted arbitrarily and capriciously in imposing an interdependent FIP without considering how litigation over predicate rulemaking would destabilize the FIP.

Applying the just-discussed principles, EPA had an obligation to consider "important aspects" of the problem the FIP purported to solve.  Whether the FIP would function correctly with lesser participation is one such "important aspect" for two reasons:  (1) the unique statutory posture that ties this rulemaking to prior predicate rulemaking and (2) the interdependent method EPA chose that connects each regulated State with the other.  Put together, EPA had to regulate with eyes wide open to the potential flaws in its SIP disapprovals.  Without valid disapprovals, the FIP's interdependent methodology, which only works for twenty-three States, is unsound.  At minimum, EPA had to address whether the FIP still works when States become exempt as their SIP disapprovals are paused.  EPA failed to do so.

Begin with this undisputed point:  EPA has authority to impose a FIP for twenty-three States *only* if it properly disapproved the SIPs of each of those States.  *See* 42 U.S.C. §7410(c)(1)(A).  When EPA imposes a FIP close in time (here, near-simultaneously) with the predicate SIP disapprovals, EPA has an obligation to consider its authority to impose a FIP in that context.

EPA's obligation to consider this prior predicate rulemaking was at its height here because of a high likelihood that the SIP disapprovals would not stick. The flaws with the SIP disapprovals were obvious. In disapproving the SIPs for twenty-one States, EPA used non-statutory factors, relied on data unavailable to the States, and contradicted its own earlier guidance. *See Texas*, 2023 WL 7204840, at *6–10. Commenters alerted EPA to these flaws and the effect they would have on the FIP's uniformity when the Agency was still finalizing the FIP. *Above* at 14–15.

Next, litigation over the SIP disapprovals brought the flaws raised in the comment period to the Courts. *Above* at 13. Then Courts began to weigh in; the Fifth Circuit granted a stay, and held the EPA's actions were likely unlawful, *before* EPA published the FIP in the Federal Register, and *during* the period when EPA had a continuing obligation to avoid arbitrary and capricious action. *Texas*, 2023 WL 7204840, at *6–10. Other circuits had also stayed EPA's actions by late spring, before the FIP was published. *Above* at 15–16. Thus, by the time the FIP was finalized through publication, there was a strong likelihood—if not a near certainty— that it would *not* go into effect for all "23 upwind states," as designed. FIP at 36,667, JA1564. True, this Court has held that a rule is "promulgated" when it is "signed and announced" to the public. *American Petroleum Institute v. Costle*, 609 F.2d 20, 24 (D.C. Cir. 1979). Even so, EPA has a *separate* statutory obligation to refrain from

arbitrary and capricious "action." §7607(d)(9). And agency "action" does not become final until "the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted).

All this was particularly problematic given the method EPA chose. Anticipating that its FIP would cover almost half the nation, EPA used a multi-state analysis to formulate an "efficient and equitable solution" that "apportion[s] emissions reduction responsibilities among upwind states that are collectively responsible for downwind air quality." FIP at 36,719, JA1616 (quotations omitted). Recall, also, that EPA selected a single cost-effective strategy—a point of diminishing marginal returns on emissions reductions—for twenty-three States. *Above* at 17–19. But EPA's calculation of the cost-effective strategy depends on the mix of States the agency is considering. Each State, after all, has its own unique blend of industries that use a unique mix of technologies. Thus, when the mix of States changes, the selected point of diminishing returns could also change. Reinforcing this point, at oral argument before the Supreme Court, EPA's counsel conceded that he was unable to confirm with certainty that the "cost/benefit analysis" would turn out the same with a different mix of States. Oral Arg. Tr. 52:07–52:59. Ultimately, EPA chose a method of calculating emissions budgets that is sensitive to the States that go into calculating it.

To illustrate, for power sources, a plan tailored to Ohio, Indiana, and West Virginia could apply a much cheaper technology breakpoint, at $1,600 cost-per-ton, rather than the $11,000 cost-per-ton selected for the twenty-three State group.  *See* OTPA at JA1105 (Appendix A) at State 2026 (Row 47; Columns K–P).  Take, for that year, emissions produced by optimizing selective-catalytic reductors and state-of-the-art combustion controls at $1,600 per ton for those three states (represented by summing Column M for those three States).  *Id.*  The next costlier strategy produces no additional emissions reductions (represented by summing Column N for three States).  *Id.*  In other words, the strategy that costs $1,600 per ton is a cost-effective point for power sources that EPA *could have* considered for that mix of States.  This example shows that what is cost-effective for twenty-three States may not be so for a different mix of States because of their unique mix of technologies.  *See* FIP at 36,676, 36,677, 36,688, JA1573, JA1574, JA1585.

Put together, EPA failed to consider an important factor during its decisionmaking:  what effect the legal flaws in its near-contemporaneous SIP disapprovals would have on the interdependent FIP's continued effectiveness.  EPA had an obligation to ask whether a FIP premised on the participation of all regulated States would remain an effective, "efficient[,] and equitable solution" when applied

to only a subset of the States that it set out to regulate—a scenario that was not only foreseeable but expected. *Id.* at 36,719, JA1616.

EPA's explanation revealed indifference to these considerations. Rather than address the mounting damage to its assumptions, EPA uncritically proceeded under the premise that the FIP would go into effect for all "23 upwind states." *Id.* At best, EPA added a barebones severability provision asserting, without analysis, that its plan would be severable. *Id.* at 36,693, JA1590. That broad brush dodges the key question of whether the FIP remains computationally sound and a fair and effective division of emission-reduction responsibilities if applied to a subset of States. This some-regulation-is-better-than-nothing approach falls short of the reasoned decisionmaking required of agencies. Had EPA stopped to consider lesser participation, it would have created a contingency for the most obviously interdependent program—the allowance trading program. But, consistent with its head-in-the-sand approach to this problem, EPA has scrambled to adjust the allowance-trading market with each interim final rule to reflect the current composition of States. 88 Fed. Reg. at 49,296–97, JA1817–18; 88 Fed. Reg. at 67,103–04, JA1832–33.

\*

33

The results serve as powerful confirmation of the problem.  The FIP is now a shell of its original self and falls far short of the emissions reductions that it set out to accomplish.  Currently, it regulates only about 11% of the emissions from electric-generating units it intended to regulate and about 40% of emissions from industrial sources it intended to regulate.  *See above* at 21.  More than 75% of the emissions that the FIP set out to control are now exempt from the FIP.  *See id.*  It is unlikely that EPA would have promulgated the FIP as it stands today.

Lastly, in addition to being arbitrary and capricious, EPA's action is unlawful in one other respect:  its near-contemporaneous imposition of a FIP alongside the SIP disapprovals left the States with no "real choice" but to accept the FIP or to prepare a materially identical SIP.  *Michigan v. EPA*, 213 F.3d 663, 687 (D.C. Cir. 2000).  Because the condensed timeline was designed to deprive the States of a chance to correct the purported deficiencies in the SIP as the Act contemplates, §§7410(c)(1)(B), (k)(5), EPA failed to engage in the cooperative federalism required by the Act.  *See Koog v. United States*, 79 F.3d 452, 462 (5th Cir. 1996).  To the extent *Homer* allows EPA to act on a timeline that prevents the States from participating in a cooperative revision process, that contradicts the statute.  *Contra Homer*, 572 U.S. at 507–10.  Because "only the Supreme Court can overrule its previous decisions,"

however, State Petitioners preserve this issue for appeal. *Taylor v. Buchanan*, 4 F.4th 406, 410 (6th Cir. 2021) (Thapar, J., concurring).

## II. EPA's inclusion of Utah and Nevada in the FIP was arbitrary and capricious.

EPA's inclusion of Utah and Nevada in the FIP was arbitrary and capricious for three reasons. *First*, EPA failed to explain adequately its decision to use its four-step framework for analyzing significant contributions in the West when that decision represents a clear departure from EPA's prior position that the framework does not apply to Western States. *Second*, EPA arbitrarily chose to apply an alternative weight-of-evidence approach for determining significant contributions for Arizona and Oregon while rejecting without adequate explanation the same approach for Utah and Nevada. *Third*, EPA unlawfully combined emissions from Indian country with those of Utah in determining that the combined emissions resulted in a significant contribution.

### A. EPA failed to explain its change in the treatment of interstate-transport obligations in the West.

#### 1. Assessing interstate-transport obligations in the West requires distinct analytical considerations.

EPA has long recognized that, with respect to ozone transport, the West is unique. EPA has thus excluded Western States from prior interstate-transport programs and applied a separate analytical approach to these States. For good

reason. Western States are generally geographically larger and more sparsely populated than Eastern States, resulting in smaller upwind contributions from Western States individually and collectively.

The West also faces unique regional conditions that complicate efforts to reduce ozone levels and accurately model pollution contributions. Those unique conditions include varied topography, higher altitude, elevated natural background ozone levels, deep stratospheric intrusions, increased instances of wildfire, significant biogenic contributions, and a greater influence of internationally transported pollutants. EPA, *Integrated Science Assessment for Ozone* (Apr. 2020), at JA0005, JA0008–9; Utah Dep't of Env't Quality Comments (June 21, 2022), at JA0404–07; Berkshire Hathaway Energy Comments (June 21, 2022), at JA0452–53. These factors are pronounced in Nevada and exacerbated in Utah and Colorado because of the Rocky Mountains.

EPA consistently recognized these fundamental differences over three decades of interstate-transport rulemakings.

From the very first interstate-transport rulemaking, EPA's initial rule applied exclusively to Eastern States. 63 Fed. Reg. 57,356 (Oct. 27, 1998). EPA was unconcerned with the West, making only passing references to Western States in its rulemaking. *See id.* at 57,372, 57,477, 57,486; 62 Fed. Reg. 60,318, 60,334–35, 60,375

(Nov. 7, 1997).  In the next rulemaking, EPA dismissed Western States with only cursory analysis.  *See* 70 Fed. Reg. 25,162, 25,169 (May 12, 2005).

When EPA finalized CSAPR in 2011, the agency "identified a 37-state region for the technical analysis, including all states east of the Rockies," but expressly excluded Western States because "the transport issues in the eastern United States are *analytically distinct*."  75 Fed. Reg. 45,210, 45,227 (Aug. 2, 2010) (emphasis added); *see also* 76 Fed. Reg. 48,208 (Aug. 8, 2011).

When EPA proposed the Cross-State-Air-Pollution-Rule Update for 2008-ozone NAAQS ("CSAPR Update") a few years later, it again limited the rulemaking's geographic scope to "states in the eastern U.S.," noting that "[t]hese rules did not address contributions in the 11 western contiguous United States."  80 Fed. Reg. 75,706, 75,715 (Dec. 3, 2015).  EPA explained that while modeling data "shows that there are problem receptors in the West[,]" "[t]here may be additional criteria to evaluate regarding collective contribution of transported air pollution in the West" beyond the 1% threshold.  *Id.*

In 2016, EPA finalized its decision declining to extend the CSAPR Update to Western States.  EPA noted that "for western states" it "believes that there may be geographically specific factors to consider in evaluating interstate ozone pollution transport."  81 Fed. Reg. 74,504, 74,523 (Oct. 26, 2016).  EPA stated that it would

begin working with the Western States case-by-case to assess whether emissions from their States significantly contributed to downwind air-quality concerns. 81 Fed. Reg. at 74,523. But, consistent with all prior rules, no Western States had emissions-control obligations under the CSAPR Update. *Id*.

Finally, neither 2018 nor 2021 rulemaking revisions expanded the geographic scope of the interstate-transport program to the West. *See* 83 Fed. Reg. 65,878 (Dec. 21, 2018); 86 Fed. Reg. 23,054 (Apr. 30, 2021).

## 2.    EPA failed to explain its abrupt change in course.

The FIP, for the first time, imposes interstate-transport obligations on Utah, Nevada, and other Western States. FIP at 36,775, JA1672. It does so using the four-step framework discussed at length above. *Above* at 16–20.

While "[a]gencies are free to change their existing policies," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," *Fox TV*, 556 U.S. at 516. More specifically, "the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC*, 579 U.S. at 221 (internal quotation marks omitted).

EPA failed to meet that burden in the FIP.  The FIP's preamble does not even acknowledge EPA's change in approach:  it noted only that the agency was extending the geographic scope of the FIP to Utah and Nevada.  FIP at 36,717, 36,775, JA1614, JA1672.  In response to comments, EPA later conceded that "geographically relevant factors … may warrant a different approach in the west," but incorrectly asserted that it has never articulated "what those factors might be or what different approaches might be warranted."  RTC, JA1406–07.  EPA doubled down on its erroneous assertion that it used the four-step framework all along in the West.  *See* FIP at 36,717, JA1614.  But EPA's claim contradicts its consistent past practice of declining to further analyze ozone transport in the West on grounds it is "analytically distinct."

EPA's failure to admit (or justify) its change in course renders the FIP arbitrary and capricious.  *See Encino Motorcars, LLC*, 579 U.S. at 222.

**B.  EPA arbitrarily applied the four-step framework to assess significant contribution for Utah and Nevada but not other Western States.**

**1.  EPA has developed and applied a separate analytical approach for interstate transport in the West.**

EPA's previous actions belie its assertion that it always applied the four-step framework to Western States.  When considering contributions in the West, EPA has developed and applied a "weight-of-evidence" approach, under which a wide

39

range of factors are considered beyond the four-step framework. *See* 80 Fed. Reg. at 75,715; 81 Fed. Reg. 15,200 (Mar. 22, 2016); Proposed FIP at 20,075, JA0154; March Memorandum, at 2, A-1.

In approving Arizona's SIP for the 2008-ozone NAAQS, EPA defined with specificity how a weight-of-evidence approach should be applied. *See* 81 Fed. Reg. at 15,203. When determining whether a Western State "should be considered to significantly contribute to nonattainment or interfere with maintenance of the NAAQS," EPA examines "several factors ... including the air quality and contribution modeling, receptor data, and the statewide measures reducing emissions." *Id*. As EPA noted, "no single piece of information is by itself dispositive of the issue for purposes of this analysis ... [i]nstead, EPA has considered the total weight of all the evidence taken together." *Id*.

One relevant factor was the "magnitude of ozone attributable to transport from all upwind states collectively contributing to the air quality problem." *Id*. EPA concluded that removing the receptors to which Arizona was linked was appropriate because "a 4.4% and 2.5% cumulative ozone contribution from all upwind states is negligible, particularly when compared to the relatively large contributions from upwind states in the East or in certain other areas of the West." *Id*.

In the East, EPA had "found the total upwind states' contribution to ozone concentration (from linked and unlinked states) based on modeling for 2017 ranges from 17% to 67% ..., with between 4 and 12 states each contributing above 1% to the downwind air quality problem." *Id*. EPA also concluded that "Arizona has demonstrated that both VOC and $NO_x$ emissions are going down and will continue to go down." *Id*.

EPA extended that approach in the proposed FIP. Using a weight-of-evidence analysis, EPA declined—when proposing the FIP—to propose interstate-transport obligations for Oregon despite that State being linked to California receptors above the 1% threshold. Proposed FIP at 20,074, JA0153. Oregon thus currently remains exempt from the FIP's obligations. FIP at 36,718, JA1615.

### 2. EPA arbitrarily applied the four-step framework to the exclusion of the weight-of-evidence approach.

Having developed and applied a weight-of-evidence approach to the West—including in the proposed FIP—EPA nevertheless applied the four-step framework in assessing Utah's and Nevada's impacts on downwind air quality in the FIP.

EPA failed to explain adequately this decision. Relatedly, EPA failed to explain adequately why it rejected an alternative weight-of-evidence approach for Utah and Nevada. The agency did not express any objective criteria for its approach. Nor did it reconcile its application of the alternative weight-of-evidence approach to

Arizona and Oregon.  *See* FIP at 36,717–18, JA1614–15.  In short, EPA arbitrarily applied two different approaches to Western States without adequate explanation.

EPA acknowledges that "in some instances … a unique consideration has warranted approval of a western state's good neighbor SIP submittal that might otherwise be found to contribute above 1 percent of the NAAQS."  88 Fed. Reg. at 36,717.  But EPA failed to assert any rational basis for rejecting that approach for Utah and Nevada.  EPA's rationale boils down, to the extent it exists, to a conclusory assertion that the 2.5%–4.4% collective upwind contribution in the Arizona SIP is "marginal" (thus justifying application of the weight-of-evidence approach) while the 6%–8% contribution in Utah's case is not (thus requiring application of the four-step framework).  FIP at 36,718, JA1615.

That is striking because the Eastern States' collective contributions typically range from 17% to 67%.  81 Fed. Reg. at 15,203.  Utah's collective contribution is barely more than that at issue in Arizona's SIP and two-to-eight times lower than typical contributions in the East.  Yet EPA inexplicably decided that Utah's situation looks more like the Eastern States' than Arizona's.  EPA's failure to "distinguish 'prior orders in similar cases ... fails to satisfy the APA's reasoned decisionmaking requirement.'"  *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (citation omitted).

42

That failure is particularly pronounced because the assumptions underpinning the second step in EPA's four-step framework—the 1% threshold for establishing linkages—do not exist in the West.  Citing to past rulemaking, EPA emphasized in the FIP that it "applies a relatively low contribution screening threshold because many downwind ozone nonattainment and maintenance receptors receive transport contributions from multiple upwind states."  FIP at 36,678, JA1575; *see also id.* at 36,712, JA1609.  But in past rulemaking, EPA developed the 1% percent threshold for establishing linkages "to account for the combined impact of relatively small contributions from many upwind states" in the East.  76 Fed. Reg. at 48,237.  But EPA's analysis presumes that the "'collective contribution' from upwind sources represents a large portion of … ozone at downwind locations and that the total amount of transport is composed of the individual contribution from numerous upwind states." *Id.*

Those assumptions do not hold in the West—where few upwind States contribute to nonattainment areas in the West and those upwind States have a combined contribution that is considerably lower than in the Eastern States.  For instance, only three States (including Utah) are linked to downwind receptors in Colorado with collective contributions from all upwind States ranging between 6%–8%.  *See* EPA, Air Quality Modeling Final Rule TSD, JA0850–64 (Appendices D and

E).  Similarly, only two States (including Nevada) are linked to downwind receptors in Utah with collective contributions from all upwind States ranging between 4%–5%. *Id*.  For that reason, the key underlying rationale for the 1% contribution threshold developed for Eastern States is not appropriate for assessing Utah's and Nevada's potential impacts on downwind States.

Simply put, EPA's claim that the four-step framework "ensures both national consistency across all states and consistency and continuity with our prior interstate transport actions for other NAAQS," FIP at 36,673, JA1570, cannot be squared with its prior treatment of Western States, its previous recognition of fundamental differences between interstate transport in the East and the West, and its key assumptions that support the four-step framework.

## C. EPA unlawfully included emissions from Indian country in Utah's contribution analysis.

The Clean Air Act authorizes EPA "to treat Indian tribes as States under this Act." §7601(d).  Under that authority, EPA promulgated the Tribal Authority Rule, 63 Fed. Reg. 7,254 (Feb. 12, 1998), concluding that the Act "constitutes a statutory grant of jurisdictional authority to tribes" such that "approved tribes [have] authority over all air resources within the exterior boundaries of a reservation." *Id*. at 7,260.  For the "provisions of the" Act "designed to address cross-boundary air impacts," EPA determined that "the prohibitions and authority contained in" the

44

interstate-transport provision of the Act "apply to tribes in the same manner as states." *Id.*

EPA also concluded that it has "broad authority to protect tribal air resources" and that it would "protect air quality throughout Indian country by directly implementing the Act's requirements in instances where tribes choose not to develop a program, fail to adopt an adequate program or fail to adequately implement an air program." *Id.* at 7,262 (cleaned up).

In other words, Tribes are treated as sovereigns under the Act, akin to States. Tribes may implement the Act's requirements where approved by EPA. EPA directly implements the Act's requirements when a Tribe does not have an approved program. States have no authority under the Act over Indian country and thus no responsibility for emissions from them.

Nonetheless, EPA proposed the FIP to "be applicable in all areas of Indian country … within the covered geography of the proposal." Proposed FIP at 20,059, JA0138. EPA explained that "the geographic scope of coverage of the rule means the areas of the United States encompassed within the borders of the States EPA has determined to be linked at Steps 1 and 2 of the 4-step interstate transport framework." *Id.* Thus, *all* emissions within a State—those from State lands and Tribal lands—were considered in assessing significant contribution in downwind

States.  *Id.*  EPA observed that "only one existing … source is located within the 301(d) FIP areas:  The Bonanza Power Plant, an EGU source, located on the Uintah and Ouray Reservation, geographically located within the borders of Utah."  *Id.*

Commenters asserted that it is unlawful for EPA to "summarily 'lump' Indian country sources as an appendage to state jurisdictional sources."    Deseret Comments (June 23, 2022), JA0448. This combining is "patently improper."  *Id.*  It is akin to "'annexing' a state or group of states into a different state's implementing plan, administration, and procedure."  *Id.*

EPA nevertheless combined State and Tribal emissions in assessing significant contribution.  *See, e.g.,* FIP at 36,690, JA1587.  The agency did not respond to comments arguing that combining State and Tribal emissions was unlawful.  So, EPA made two errors in addressing emissions from Indian country.

*First*, combining emissions from State and Indian country within the State in determining significant contribution violates the Act, because Tribes must be treated as States in implementing the interstate-transport provision.  Here, EPA combined emissions from Indian country (the Uintah and Ouray Reservation) with those of a surrounding State (Utah) in determining whether the combined emissions resulted in significant contribution.  Combining emissions from two sovereign entities is

46

unlawful, whether the two entities happen to be sovereign States or, in this case, a sovereign State and a sovereign Tribe.

*Second*, EPA's combining State and Tribal emissions in assessing significant contribution was arbitrary and capricious because EPA failed to address a key factor raised by commenters—whether EPA may implement such a combined analysis under the Act. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## III.    EPA's "enhancements" improperly require emission reductions beyond levels needed to address significant contribution.

EPA's authority to implement interstate-transport requirements is limited to regulating *only* the amount of emissions from one State that "contribute[s] significantly to nonattainment in, or interfere[s] with maintenance by, any other State." §7410(a)(2)(D)(i)(I). But the FIP went much further, resulting in unlawful overcontrol.

The FIP confirms that each State's emissions budget "will *fully eliminate* the amount of emissions that constitute the covered states' significant contribution to nonattainment *and* interference with maintenance in downwind states[.]" FIP at 36,657, JA1554 (emphases added). But EPA articulated a new policy of layering "enhancements" onto the allowance trading program, which effectively removes available allowances and restricts existing units' operational flexibility. That is

47

impermissible because EPA may not "require a State to reduce its output of pollution by more than is necessary to achieve attainment in every downwind State to which it is linked." *Homer*, 572 U.S. at 521.

A closer look at each enhancement highlights the impermissible overcontrol.

*Dynamic Budgeting & Allowance Recalibration.* Starting in 2026, EPA's dynamic-budgeting process will annually adjust the State emissions to account for a changing fleet. Although dynamic budgeting can only *increase* a State's budgets through 2029, starting in 2030, the process removes allocations for retiring EGUs and accounts for other changes in the composition of the EGU fleet. FIP at 36,662, JA1559. And the annual recalibration of banked allowances will constrain sources from carrying over allowances from one control (trading) period to the next. *Id.* at 36,766–67, JA1663–64. EPA reasoned that despite the overall emissions reductions associated with EGU retirements, those retirements will equate to a greater number of available allowances, thereby "eroding the consequent incentives for [other] sources to effectively control their emissions." *Id.* at 36,763, JA1660.

*Backstop Daily Emissions Rates & Secondary Emissions Limits.* The final enhancements would require certain coal-fired units to surrender three allowances for every ton of emissions that exceed a pre-set backstop daily emissions rate and impose a secondary emissions limitation for any unit found responsible for

contributing to an exceedance of the State's assurance level (currently 121% of the State's emissions budget). *Id.* at 36,769–70, JA1666–67. EPA stated these two enhancements are designed to "improve emissions performance at the level of individual units," even if an individual unit has purchased allowances to meet its required reductions. *Id.* at 36,767–68, JA1664–65.

These enhancements implement EPA's policy preferences in a manner that reduces available allowances in State budgets "by more than the amount necessary to achieve attainment in every downwind State to which it is linked." *Homer*, 572 U.S. at 521; *see also North Carolina v. EPA*, 531 F.3d 896, 917 (D.C. Cir. 2008). EPA's assertion that these enhancements are not overcontrol because they are intended to reflect "implementation program details" and not Step 3 "emissions control stringency determinations," FIP at 36,686, JA1583, defies logic. Trading program emissions budgets and available allowances are based on EPA's Step 3 determinations. EPA cannot hide behind "implementation program details" to accomplish more emissions reductions than needed to alleviate significant contribution. And although EPA purported to undertake an overcontrol analysis and concluded there was no overcontrol, that analysis was conducted through 2026 only, while enhancements such as dynamic budgeting only go into effect after 2026. *See* FIP at 36,907, JA1804.

49

EPA further asserted that previous trading programs are "effective in achieving overall reductions in emissions" but claimed that they "*may not* fully reflect in perpetuity" the necessary emissions stringency and "*may not* adequately ensure control of emissions throughout all days of the ozone season." *Id.* at 36,684, JA1581 (emphases added). But such hypothetical concerns do not provide a rational basis for imposing "enhancements" across the entire trading program. *Homer*, 572 U.S. at 523; FIP at 36,688, JA1585. Indeed, a "degree of imprecision is inevitable," due to unanticipated events such as "[s]light changes in wind patterns or energy consumption ... in ways EPA might not have anticipated." *Homer*, 572 U.S. at 523. Constraining allocations in all States below levels determined through EPA's significant-contribution analysis based on hypothetical concerns about under-control in a few States would swallow the prohibition against overcontrol. *See id.* at 522.[1]

## CONCLUSION

The Court should vacate the Final Rule.

---

[1] EPA also conceded that, except for three States, all other "linked states … are projected to continue to be linked to nonattainment or maintenance receptors after" implementing the FIP, FIP at 36,750, JA1647. But EPA imposed heavy compliance burdens on an accelerated timeline anyway without resolving the States' significant contributions to downwind air pollution. Because these "reductions" fail to achieve "downwind attainment *anywhere*," they constitute unlawful overcontrol. *Homer*, 572 U.S. at 522.

Dated: April 1, 2024.

SEAN D. REYES
Attorney General of Utah

*/s/ Stanford E. Purser*
STANFORD E. PURSER
Utah Solicitor General
Counsel of Record
Office of the Attorney General
Utah State Capitol Complex
350 North State Street Suite 230
Salt Lake City, UT 84114-2320
Phone: 801-538-9600
spurser@agutah.gov

WILLIAM L. WEHRUM
Wehrum Environmental Law LLC
1629 K Street, NW, Suite 300
Washington, D.C. 20006
Ph. 302-300-0388
William_Wehrum@comcast.net

EMILY C. SCHILLING
Holland & Hart LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Phone: 801-799-5753
Fax: 202-747-6574
ecschilling@hollandhart.com

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Mathura J. Sridharan*
T. ELLIOT GAISER
Ohio Solicitor General
MATHURA J. SRIDHARAN*
  *Counsel of record*
ZACHERY P. KELLER
Deputy Solicitors General
GREGG BACHMANN
Section Counsel – Environmental
30 East Broad Street, 17th Floor
Phone: 6l4-466-8980
Fax: 614-466-5087
mathura.sridharan@ohioago.gov

*Counsel for the State of Ohio*

THEODORE E. ROKITA
Attorney General of Indiana

*/s/ James A. Barta*
JAMES A. BARTA
Indiana Solicitor General
Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204
Phone: 317-232-0709
James.Barta@atg.in.gov

*Counsel for State of Indiana*

KRISTINA R. VAN BOCKERN
AARON B. TUCKER
Holland & Hart LLP
555 Seventeenth Street
Suite 3200
Denver, CO 80202
Phone: 303-295-8107
Fax: 720-545-9952
trvanbockern@hollandhart.com
abtucker@hollandhart.com

*Counsel for State of Utah*

PATRICK MORRISEY
Attorney General of West Virginia

*/s/ Michael R. Williams*
LINDSAY S. SEE
West Virginia Solicitor General
MICHAEL WILLIAMS
Principal Deputy Solicitor General
Office of the West Virginia Attorney
General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Phone: 682-313-4550
Michael.R.Williams@wvago.gov

*Counsel for State of West Virginia*

AARON D. FORD
Attorney General of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN
Nevada Solicitor General
State of Nevada
Office of the Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Counsel for State of Nevada*

RUSSELL COLEMAN
Attorney General of Kentucky

*/s/ Matthew F. Kuhn*
MATTHEW F. KUHN
Kentucky Solicitor General
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: 502-696-5300
Matt.Kuhn@ky.gov

*Counsel for the Commonwealth of Kentucky*

*/s/ Joseph A. Newberg, II*
JOSEPH A. NEWBERG, II
General Counsel
JARROD L. BENTLEY
Staff Attorney III
Kentucky Energy and Environment
Cabinet
Office of Legal Services
300 Sower Boulevard, 3rd Floor
Frankfort, KY 40601
joea.newberg@ky.gov
jarrod.bentley@ky.gov

*Counsel for Kentucky Energy and*
*Environment Cabinet*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed R. App. P. 32(f) and (g), I hereby certify that the foregoing complies with the Court's December 4, 2023 Order because it contains 10,351 words, excluding exempted portions, according to the count of Microsoft Word.

I further certify that the motion complies with Fed. R. App. P. 27(d)(1)(E), 32(a)(5) and (6) because it has been prepared in 14-point Equity Font.

/s/ *Mathura J. Sridharan*
MATHURA J. SRIDHARAN
*Counsel for State of Ohio*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2024, I caused the foregoing to be electrically filed with the Clerk of the Court by using the Court's CM/ECF system. All registered counsel will be served by the Court's CM/ECF system.

/s/ *Mathura J. Sridharan*
MATHURA J. SRIDHARAN
*Counsel for State of Ohio*

ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1157 (and consolidated cases)

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

State of Utah, by and through its Governor, Spencer J. Cox, and its Attorney General, Sean D. Reyes,
*Petitioner,*

v.

Environmental Protection Agency and Michael S. Regan, in his official capacity, as Administrator of the U.S. Environmental Protection Agency,
*Respondents.*

---

On Petition for Review of Action by the U.S. Environmental Protection Agency

---

## STATE PETITIONERS' ADDENDUM OF STATUTES

---

DAVE YOST
Attorney General of Ohio

T. ELLIOT GAISER
Ohio Solicitor General
MATHURA J. SRIDHARAN*
 *Counsel of Record
ZACHERY P. KELLER
Deputy Solicitors General
GREGG BACHMANN
Section Counsel – Environmental
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
mathura.sridharan@ohioago.gov

*Counsel for Petitioner State of Ohio*

*Additional counsel listed on signature pages of adjoining brief*

# TABLE OF CONTENTS

| Statutes | |
|---|---|
| **Title** | **Page** |
| 42 U.S.C. §7410 | Add.1 |
| 42 U.S.C. §7607 | Add.19 |

## PRIMARY STATUTES AND REGULATIONS

42 U.S.C. §7410, provides:

**(a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems**

**(1)** Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

**(2)** Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall—

**(A)** include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

**(B)** provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—

Add.1

**(i)** monitor, compile, and analyze data on ambient air quality, and

**(ii)** upon request, make such data available to the Administrator;

**(C)** include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D;

**(D)** contain adequate provisions—

**(i)** prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—

**(I)** contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

**(II)** interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility,

**(ii)** insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

**(E)** provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the

Add.2

requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

**(F)** require, as may be prescribed by the Administrator—

    **(i)** the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

    **(ii)** periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

    **(iii)** correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

**(G)** provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

**(H)** provide for revision of such plan—

    **(i)** from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

    **(ii)** except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

**(I)** in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D (relating to nonattainment areas);

Add.3

**(J)** meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C (relating to prevention of significant deterioration of air quality and visibility protection);

**(K)** provide for—

**(i)** the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

**(ii)** the submission, upon request, of data related to such air quality modeling to the Administrator;

**(L)** require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover—

**(i)** the reasonable costs of reviewing and acting upon any application for such a permit, and

**(ii)** if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V; and

**(M)** provide for consultation and participation by local political subdivisions affected by the plan.

**(3)**

**(A)** Repealed. Pub. L. 101–549, title I, § 101(d)(1), Nov. 15, 1990, 104 Stat. 2409.

**(B)** As soon as practicable, the Administrator shall, consistent with

Add.4

the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

**(C)** Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c), shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d) [1] of this title, suspensions under subsection (f) or (g) (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e) [1] of this title (relating to iron- and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

**(4)** Repealed. Pub. L. 101–549, title I, § 101(d)(2), Nov. 15, 1990, 104 Stat. 2409.

**(5)**

    **(A)**

        **(i)** Any State may include in a State implementation plan, but

Add.5

the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

**(ii)** Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

**(iii)** Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

**(B)** The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

**(C)** For purposes of this paragraph, the term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii)), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

**(D)** For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which

would cause or contribute to air pollution concentrations—

    **(i)** exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

    **(ii)** preventing maintenance of any such standard after such date.

**(E)** For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

**(6)** No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d) [1] of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

    **(1)** The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator—

    **(A)** finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A), or

**(B)** disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

**(2)**

**(A)** Repealed. Pub. L. 101–549, title I, § 101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409.

**(B)** No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Administrator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

**(C)** Repealed. Pub. L. 101–549, title I, § 101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409.

**(D)** For purposes of this paragraph—

**(i)** The term "parking surcharge regulation" means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

**(ii)** The term "management of parking supply" shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

**(iii)** The term "preferential bus/carpool lane" shall include any requirement for the setting aside of one or more lanes of a street

or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

**(E)** No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

**(3)** Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

**(4)** Repealed. Pub. L. 101–549, title I, § 101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409.

**(5)**

**(A)** Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

**(B)** In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

**(i)** establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is

Add.9

practicable; and

(ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

(C) Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D.

**(d), (e) Repealed. Pub. L. 101–549, title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409**

**(f) National or regional energy emergencies; determination by President**

(1) Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that—

(A) a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

(B) other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional

energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

**(2)** A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that—

**(A)** there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

**(B)** such unemployment or loss can be totally or partially alleviated by such emergency suspension.

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

**(3)** A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

**(4)** This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

**(5)** The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–

10 [1] of this title, as in effect before August 7, 1977, or section 7413(d) [1] of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

### (g) Governor's authority to issue temporary emergency suspensions

**(1)** In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines—

**(A)** meets the requirements of this section, and

**(B)** is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

**(2)** A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of this subsection.

**(3)** The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10 [1] of this title as in effect before August 7, 1977, or under section 7413(d) [1] of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

**(1)** Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

**(2)** The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

**(i) Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d) [1] of this title (relating to compliance orders), a plan promulgation under subsection (c), or a plan revision under subsection (a)(3); no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

**(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

**(k) Environmental Protection Agency action on plan submissions**

**(1) Completeness of plan submissions**

**(A) Completeness criteria**

Add.13

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

### (B) Completeness finding

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

### (C) Effect of finding of incompleteness

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

## (2) Deadline for action

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

## (3) Full and partial approval and disapproval

Add.14

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

**(4) Conditional approval**

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

**(5) Calls for plan revisions**

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D, unless such date has elapsed).

**(6) Corrections**

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

**(l) Plan revisions**

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

**(m) Sanctions**

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

**(n) Savings clauses**

**(1) Existing plan provisions**

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

**(2) Attainment dates**

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State—

**(A)** in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

**(B)** in response to a finding of substantial inadequacy under subsection (a)(2) (as in effect immediately before November 15, 1990),

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

**(3) Retention of construction moratorium in certain areas**

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) (as in effect immediately before November 15, 1990) applied by virtue of a finding of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part

Add.17

D (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(o) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development [2] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

Add.18

42 U.S.C. §7607, provides, in relevant part:

**(b) Judicial review**

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5) [1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be

Add.19

filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

...

**(d) Rulemaking**

**(9)** In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

**(D)** without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

Add.20