<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

No. 23-1157 (and consolidated cases)

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

STATE OF UTAH, *et al.*,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
and MICHAEL S. REGAN, in his official capacity as Administrator, United States Environmental Protection Agency,

*Respondents.*

On Petitions for Judicial Review of Final Agency Action of
the United States Environmental Protection Agency
88 Fed. Reg. 36,654 (June 5, 2023)

**FINAL REPLY BRIEF OF INTERVENOR CITY
UTILITIES OF SPRINGFIELD, MISSOURI IN
SUPPORT OF CERTAIN PETITIONERS**

Thomas J. Grever
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Telephone: (816) 474-6550
tgrever@shb.com

*Attorney for City Utilities of
Springfield, Missouri*

# TABLE OF CONTENTS

                                                                             Page

TABLE OF AUTHORITIES ................................................................................ii

GLOSSARY ........................................................................................................iii

INTRODUCTION AND SUMMARY OF ARGUMENT........................................ 1

ARGUMENT .......................................................................................................... 2

    I.     THE COURT SHOULD FULLY CONSIDER ALL ARGUMENTS RAISED IN CITY UTILITIES' OPENING BRIEF................................................................................................... 2

    II.    EPA'S ALLOWANCE BANKING "ENHANCEMENTS" ARE ARBITRARY, CAPRICIOUS, AND UNLAWFUL................................................................................ 6

         A. EPA Did Not Adequately Consider Industry's Significant Reliance Interests and Failed to Justify the Trading Program "Enhancements." ................................................................ 6

         B. Key Elements of the Trading Program "Enhancements" Remain Unknown. ................................................................... 10

CONCLUSION ................................................................................................... 12

CERTIFICATE OF COMPLIANCE ................................................................... 14

CERTIFICATE OF SERVICE ............................................................................ 14

i

## TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
   937 F.3d 559 (D.C. Cir. 2019) ............................................................... 3, 4, 5

*AMSC Subsidiary Corp. v. FCC*,
   216 F.3d 1154 (D.C. Cir. 2000) .................................................................... 5

*E. Ky. Power Coop., Inc. v. FERC*,
   489 F.3d 1299 (D.C. Cir. 2007) .................................................................... 5

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..................................................................................... 8

*Ohio v. EPA*,
   603 U.S. __, 144 S. Ct. 2040 (2024) .......................................................... 12

*Synovus Fin. Corp. v. Bd. of Governors of Fed. Res. Sys.*,
   952 F.2d 426 (D.C. Cir. 1991) ...................................................................... 5

*Wisconsin v. EPA*,
   938 F.3d 303 (D.C. Cir. 2019) ...................................................................... 6

**Regulations & Other Authorities**

*81 Fed. Reg. 74504 (Oct. 26, 2016)
   ("2016 CSAPR Update") ........................................................................... 6, 7

*86 Fed. Reg. 23054 (April 30, 2021)
   ("2021 Revised CSAPR Update") ............................................................... 11

*88 Fed. Reg. 36654 (June 5, 2023)
   ("Final FIP") ............................................... 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12

89 Fed. Reg. 29328 (Apr. 22, 2024) .................................................................. 11, 12

*D.C. Circuit Rule 28(d) ........................................................................................ 3

\* Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| 2016 CSAPR Update | "Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS," 81 Fed. Reg. 74504 (Oct. 26, 2016) |
| 2021 Revised CSAPR Update | "Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS," 86 Fed. Reg. 23054 (April 30, 2021) |
| CAA | Clean Air Act |
| CAIR | Clean Air Interstate Rule |
| CSAPR | Cross-State Air Pollution Rule |
| EGU | Electric generating units |
| EPA | United States Environmental Protection Agency |
| FIP | Federal Implementation Plan |
| Final FIP | "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 36654 (June 5, 2023) |
| NOx | Nitrogen oxides |

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The Environmental Protection Agency's ("EPA") redesign the Cross-State Air Pollution Rule ("CSAPR") NOx Ozone Season Group 3 Trading Program through so-called "enhancements" to the program was arbitrary, capricious, and unlawful. As State Petitioners and Industry Petitioners have shown, these "enhancements" constitute unlawful over-control, in violation of the Clean Air Act ("CAA").

But the Agency also failed to adequately justify the dramatic changes to the trading market program that fundamentally undermine the "legitimate expectation" electric generating unit ("EGU") industry participants, like City Utilities, have that banked allowances will retain their future value. Many of the program "enhancements" reflect a significant departure from past allowance-based trading markets EPA has designed and managed. And, key aspects of some of the trading program "enhancements"—like allowance conversion ratios, annual allowance recalibration values, and future state "dynamic" budgeting changes—were left unsettled in the Final FIP and are still not yet known. Finalizing a rule with so much uncertainty baked into the trading program undercuts the ability of industry participants to plan for near-term and future environmental compliance in economically sensible and efficient ways. When considered together, EPA's finalized "enhancements" transform the program from an allowance-based trading

1

market into a command-and-control regulatory regime that punishes good actors like City Utilities that prioritized early adoption of pollution control equipment and over-compliance, at great cost, in order to reduce emissions and bank allowances for the future.

**ARGUMENT**

**I.    THE COURT SHOULD FULLY CONSIDER ALL ARGUMENTS RAISED IN CITY UTILITIES' OPENING BRIEF**

EPA first argues that the Court should disregard City Utilities' Opening Brief because it "raises an entirely distinct challenge to the trading program enhancements." EPA Br. 66.[1] This is false. In its Opening Brief, City Utilities argues that EPA's allowance banking "enhancements" are arbitrary, capricious, and unlawful, consistent with Industry Petitioners (Industry Petitioner Opening Br. 16-17, 28-34, 49-52) and State Petitioners (State Petitioner Opening Br. 23-24, 47-50). As City Utilities summarized its argument in the Opening Brief, "[it] adopts and supports the arguments made by State Petitioners and Industry Petitioners that the program 'enhancements' introduced by EPA in the Final FIP constitute unlawful 'over-control' in violation of the Clean Air Act," but that the brief would

---

[1] It is unclear whether EPA's position is that only one of City Utilities' arguments—Section I.A. of the Opening Brief related to "reliance interests"—or all of City Utilities' arguments should be ignored. City Utilities assumes for the sake of a fulsome response that EPA intends the Court to disregard all arguments raised in the Opening Brief. For all of the reasons addressed in this Section, the Court should not disregard any of City Utilities' arguments.

2

show that "EPA's decision to finalize these 'enhancements' is arbitrary and capricious *for the additional reason* that they constitute a significant departure from past ozone good neighbor rulemakings, which EPA has not adequately explained or justified, and undercut the most basic principles of an allowance trading market." City Utilities Opening Br. 4 (emphasis added).

Per D.C. Circuit Rule 28(d)(2), and this Court's October 11, 2023 Order (ECF 2021227) granting City Utilities' motion to intervene and citing Circuit Rule 28(d), an intervenor's brief **must** focus exclusively on additional points and arguments not otherwise raised in the principal brief: "[t]he [intervenor's] brief *must avoid* repetition of facts or legal arguments made in the principal (appellant/petitioner or appellee/respondent) brief, and *focus on points not made or adequately elaborated upon in the principal brief*, although relevant to the issues before this court." (emphasis added). City Utilities' Opening Brief does just this— the arguments highlight additional reasons for why EPA's trading scheme "enhancements" are arbitrary, capricious, and unlawful not otherwise fully addressed by Industry Petitioners and State Petitioners.

EPA's cited case law for the proposition that intervenors "may only argue issues that have been raised by the principal parties" and that by failing to timely file its own petition for review an intervenor "forfeit[s] any guarantee to judicial review of its claim" is inapposite and distinguishable. EPA Br. 66 (citing *Am. Fuel*

3

*& Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 590 (D.C. Cir. 2019)). In *American Fuel & Petrochemical Manufacturers*, this Court declined to consider an "intervenor-only" argument alleging Regulatory Flexibility Act violations raised by the Small Retailers Coalition; however, in that case "the parties agree[d] that only the Coalition raises the [Regulatory Flexibility Act] argument." *Am. Fuel & Petrochemical Mfrs.*, 937 F.3d at 590. In other words, this Court determined that the intervenor raised a unique argument based on an alleged statutory violation not addressed or briefed by the principal petitioners. For this reason, the Court deemed it an "intervenor-only" argument it was not obliged to consider.

That is not the case here. Industry Petitioners and State Petitioners have both argued that EPA's program "enhancements" in the Final FIP are arbitrary, capricious, and unlawful under the CAA. *See, e.g.,* Industry Petitioners Opening Br. 16-17, 28-34, 49-52; State Petitioners Opening Br. 23-24, 47-50. City Utilities likewise argues that these "enhancements" are arbitrary, capricious, and unlawful and provides additional reasons to support this conclusion that were not fully briefed by Industry Petitioners or State Petitioners. These are not "intervenor-only" arguments that this Court can disregard.

Because City Utilities has not raised an "intervenor-only" argument, the Court does not need to determine whether this is an "extraordinary" case in which it should exercise its discretion to consider the arguments. EPA Br. 66-67 (citing

4

*Am. Fuel & Petrochemical Mfrs.*, 937 F.3d at 590, and *AMSC Subsidiary Corp. v. FCC*, 216 F.3d 1154, 1161-62 (D.C. Cir. 2000)). But even if the Court does find City Utilities' brief contains "intervenor-only" arguments, the Court would be well within its discretion to fully consider them. City Utilities' arguments about reliance interests in the usability of allowances, the stability of the allowance trading markets, and EPA's failure to justify its trading market "enhancements" in this Final FIP rulemaking go directly to the Agency's legal and regulatory authority to finalize the Good Neighbor Plan and they are highly relevant to all industry participants in EPA's Final FIP program. Therefore, City Utilities' arguments about why EPA's Final FIP was arbitrary, capricious, and unlawful constitute an "essential predicate" to the issue of EPA's authority and justifications for finalizing this rulemaking, *E. Ky. Power Coop., Inc. v. FERC*, 489 F.3d 1299, 1305 (D.C. Cir. 2007), and considering them would be entirely consistent with this Court's "traditionally flexible approach toward appellate procedure." *Synovus Fin. Corp. v. Bd. of Governors of Fed. Res. Sys.*, 952 F.2d 426, 433 (D.C. Cir. 1991).

## II. EPA'S ALLOWANCE BANKING "ENHANCEMENTS" ARE ARBITRARY, CAPRICIOUS AND UNLAWFUL.

### A. EPA Did Not Adequately Consider Industry's Significant Reliance Interests and Failed to Justify the Trading Program "Enhancements."

EPA has a long history of developing and supporting allowance-based trading programs across various CAA regulatory programs. *See, e.g.,* Final FIP at 36762, JA1659 (detailing past EPA trading programs under the CAA and identifying six active CSAPR trading programs constructed with nearly identical "core design elements"). The Agency itself has made clear it firmly believes such allowance-based trading and banking programs "can serve a variety of purposes: continuously incentivizing sources to reduce their emissions even when they already hold sufficient allowances to cover their expected emissions for a control period, facilitating compliance cost minimization, accommodating necessary operational flexibility, and promoting allowance market liquidity." Final FIP at 36766, JA1663; *see also* City Utilities Opening Br. 7. However, allowance-based trading programs, and the demonstrable environmental benefits they deliver, are "*conditioned on the expectation that the resulting banked allowances will have some value in the future of that program.*" City Utilities Opening Br. 8 (quoting 81 Fed. Reg. 74504, 74561 (Oct. 26, 2016) ("2016 CSAPR Update") (emphasis added)); *see also Wisconsin v. EPA*, 938 F.3d 303, 321 (D.C. Cir. 2019)

6

(recognizing that an EGU's "legitimate 'expectation'" that previously banked allowances will continue to have value in the future is essential to preserving such a trading program (quoting 2016 CSAPR Update at 74561)). Industry participants, like City Utilities, rely on the stability and predictable design of these trading programs in order to make forward-looking capital investments, deliver energy to customers efficiency and effectively, and achieve environmental compliance.

EPA's final design of the new CSAPR NO$_X$ Ozone Season Group 3 Trading Program in the Final FIP completely undermines the certainties and reliance interests in the program by finalizing "enhancements" that taken together, and by EPA's own admission, go far beyond anything the Agency has used in the past for similar trading programs that address similar regulatory concerns. *See, e.g.,* City Utilities Opening Br. 18 (quoting EPA's Final FIP at 36773, JA1670 ("[I]ncluding an annual bank recalibration of any percentage is an enhancement in the trading program from prior trading programs under the good neighbor provision established in the [Clean Air Interstate Rule ("CAIR")], CSAPR, [2016] CSAPR Update, and [2021] Revised CSAPR Update rulemakings….") and Final FIP at n. 288, JA1660 ("[A]llowance banking has not previously been limited under any of the CSAPR trading programs….")). In fact, all of EPA's "enhancements"—an initial allowance bank conversion ratio that has not yet been fixed, annual allowance bank recalibrations, "dynamic" state emissions budgeting, unit-specific

7

daily backstop rates and a 3-for-1 surrender penalty, and unit-specific "secondary emissions limitations"—together will essentially transform this program from a trading market into a top-down, command-and-control regulatory regime. City Utilities Opening Br. 5, 10. Agencies cannot abruptly break from prior policy, especially where there are significant reliance interest at stake, without serious attention, consideration, and justification for the changes because it would be "arbitrary and capricious to ignore such matters." City Utilities Opening Br. 9-10 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). But, this is precisely what EPA has done in the Final FIP—finalize, without adequate justification or attention, sweeping and transformative changes to the allowance-based trading market that undercut industry participant confidence and reliance on past program designs, and that particularly penalize those EGUs (like City Utilities) who adopted early emission controls at significant expense and in reliance on the trading program maintaining—not diminishing—the future value of allowances generated and sustained through pollution-reducing over-control.

　　EPA responds that "[t]he record includes extensive discussion" of these issues that justifies why EPA "determined that [the enhancements] best balanced the incentives provided by market-based trading with the need to ensure sustained, effective emission reductions to aid downwind areas." EPA Br. 67. But EPA does not, nor can they, show that the Agency fully considered the implications of

8

transforming the program from an allowance-based trading market into a virtual command-and-control program, especially for industry participants like City Utilities that have always and continue to rely on certainty and predictability in the allowance trading market. Nor does EPA adequately respond to City Utilities' arguments that these program "enhancements" effectively punish good actors like City Utilities that were early adopters of post-combustion pollution control technologies in order to over-control NOx emissions. *See, e.g.,* City Utilities Opening Br. 4-5, 7-8, n.4.

EPA misleadingly asserts that City Utilities "could have no reasonable expectation that its allowances from prior Good Neighbor rules would transfer untouched to the trading program for the new Rule." EPA Br. 68. EPA misstates City Utilities' position. City Utilities has not argued that its prior allowances must remain "untouched" or that EPA in the Final FIP was prohibited from transferring banked allowances in the transition from one trading program group to a new one; to the contrary, City Utilities acknowledged that EPA has developed new trading program groups in other recent rulemakings and that the Agency has had to grapple with setting allowance conversions in these actions. *See* City Utilities Opening Br. 11 ("The Final FIP is not the first time EPA has transitioned EGUs from one trading group to another … In both [recent CSAPR update rules], EPA developed a process for converting allowances banked by utilities in the prior group system into

9

the new group according to conversation ratios."). Rather, a critical deficiency in EPA's Final FIP is its significant departure from past allowance-based trading program revisions, without adequate justification, and in a way that undermines long-standing EGU reliance interests, by applying an as-yet unknown conversion ratio for allowances banked from earlier years, annually "recalibrating" the number of banked allowances that can be carried over each year, and then finalizing all of the other program "enhancements" that penalize industry participants and stifle the trading market generally. City Utilities Opening Br. 9-10, 12-16.

### B. Key Elements of the Trading Program "Enhancements" Remain Unknown.

EPA argues that industry participant reliance interests and certainty in the design and future operations of the trading program are not undermined by the Final FIP because bank conversion and annual recalibrations are done on a proportional basis and, generally, that "[a]llowances will have both monetary value and competitive value, and can be banked, sold, and used for compliance according to set, universal, and predictable rules." EPA Br. 69-70. But EPA fails to fully acknowledge that several critical components of the trading program "enhancements" are not completely fixed in the Final FIP, including the bank allowance conversion ratio, the exact annual recalibration amounts, or future "dynamic" state emissions budgeting, for example, and that this contributes to the

10

forward-looking uncertainty that electricity-generators like City Utilities face. City Utilities Opening Br. 12-15, 15-16, 19; *compare* 2021 Revised CSAPR Update Rule, 86 Fed. Reg. 23054, 23137 (April 30, 2021) (specifying the banked allowance conversion ratio in the rule "so that the value of the ratio… is knowable as of the date of this final rule.").

Instead, EPA tries to support its point that banking and allowance trading will continue in this program unimpeded and that market participants will have "a significant cushion of allowances" by citing to its April 2024 *Federal Register* publication titled "Information Regarding Allowances Used in Cross-State Pollution Rule (CSAPR) Trading Programs." EPA Br. 70 (citing 89 Fed. Reg. 29328 (Apr. 22, 2024)). This publication contains "an estimate of the data and calculations to be used in the allowance bank recalibration process for the 2024 control period under CSAPR NOx Ozone Season Group 3 Trading Program." 89 Fed. Reg. at 29328. EPA cites this data purportedly to demonstrate the certainty and clarity of EPA's trading program, but it shows the exact opposite. For one thing, the allowance bank data in this April publication only considers the 10 states where the Final FIP had not already been stayed by appellate courts and administratively stayed by EPA. *Id.* at 29329 ("For the 2024 control period, the allowance bank ceiling target is expected to be 12,605 tons, computed as 21% the sum of the 2024 state emission budgets *for the ten states currently covered by the*

11

*trading program.*" (emphasis added)); this does not include Missouri, where City Utilities operates. Furthermore, by EPA's own admission in the publication, "[a]s of the date of signature of this notice, applications for a stay of the Good Neighbor Plan are pending before the Supreme Court of the United States. If a stay order is issued and depending on its nature, it could affect EPA's ability to implement the regulatory provisions of the CSAPR NOx Ozone Season Group 3 Trading Program that are described in this notice." 89 Fed. Reg. at n.1. As EPA well knows, on June 27, the Supreme Court did issue a stay of the Final FIP in *Ohio v. EPA*, 603 U.S. __, 144 S. Ct. 2040 (2024). Therefore, EPA's already incomplete allowance bank recalibration estimates provided in this publication are moot and meaningless. Industry participants remain as uncertain today as when EPA finalized the FIP as to what the trading program and banking recalibration numbers will look like, and how severe the impact on market value of their banked allowances will be, in the near-term years in any new Group 3 trading program.

## CONCLUSION

For all of these reasons, and of those set forth in the briefs of Industry Petitioners and State Petitioners, the Court should set aside the Final FIP.

Respectfully submitted,

By:   */s/ Thomas J. Grever*
Thomas J. Grever
SHOOK, HARDY & BACON L.L.P
2555 Grand Blvd.
Kansas City, MO 64108
Phone: (816) 474-6550
Email: tgrever@shb.com

*Attorney for City Utilities of Springfield, Missouri*

August 22, 2024

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(f) and (g), I hereby certify that the foregoing complies with the Court's Orders of December 4, 2023 and January 4, 2024 because it contains 2,653 words, excluding portions exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the typeface and type-style requirements of Fed. R. App. Proc. 32(a)(5), (6) because it has been prepared in 14-point Times New Roman font, using Microsoft Word.

Dated: August 22, 2024

*/s/ Thomas J. Grever*
Thomas J. Grever

# CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2024, I electronically filed the foregoing with the Clerk of Court through the Court's CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished through the CM/ECF system.

*/s/ Thomas J. Grever*
Thomas J. Grever