**ORAL ARGUMENT NOT YET SCHEDULED**

No. 23-1157 (consolidated with Nos. 23-1181, 23-1183, 23-1190, 23-1191, 23-1193, 23-1195, 23-1199, 23-1200, 23-1201, 23-1202, 23-1203, 23-1205 23-1206, 23-1207, 23-1208, 23-1209, 23-1211, 23-1306, 23-1307, 23-1314 23-1315, 23-1316, 23-1317)

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

STATE OF UTAH, by and through its Governor, SPENCER J. COX,
and its Attorney General, SEAN D. REYES,

*Petitioner,*

*v.*

ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN,
Administrator, U.S. EPA,

*Respondents.*

---

On Petitions for Review of a Final Rule
of the U.S. Environmental Protection Agency

---

**BRIEF OF *AMICUS CURIAE* AMERICAN EXPLORATION AND PRODUCTION COUNCIL IN SUPPORT OF INDUSTRY PETITIONERS**

---

JAMES E. OLSON
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone: (832) 239-3866
Email: jolson@jonesday.com

CHARLOTTE H. TAYLOR
BRETT J. WIERENGA
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Telephone: (202) 879-3939
Email: ctaylor@jonesday.com
Email: bwierenga@jonesday.com

*Counsel for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Circuit Rule 28, counsel for the American Exploration and Production Council certifies as follows:

**A.      Parties**

All parties, intervenors, and *amici* appearing before the district court and in this court are listed in the Joint Opening Brief of Industry Petitioners with the exception of movant-*amicus* AXPC and potential other movant-*amici* in support of petitioners.

**B.      Rulings Under Review**

References to the rulings at issue appear in the Joint Opening Brief of Industry Petitioners.

**C.      Related Cases**

Related cases are listed in the Joint Opening Brief of Industry Petitioners.

August 22, 2024                                    Respectfully submitted,

                                            /s/ *Charlotte H. Taylor*
                                            CHARLOTTE H. TAYLOR
                                            JONES DAY
                                            51 Louisiana Ave. N.W.
                                            Washington, DC  20001
                                            Telephone:  (202) 879-3939
                                            Email:  ctaylor@jonesday.com

                                            *Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 29(b), Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the American Exploration and Production Council makes the following disclosures:

The American Exploration and Production Council is a District of Columbia nonprofit trade organization that represents the U.S. oil and gas industry before the national executive, legislative, and judicial branches of government.  It has no parent corporation, and no publicly held company owns ten percent or more of its stock.

/s/ *Charlotte H. Taylor*
CHARLOTTE H. TAYLOR

## RULE 29(d) CERTIFICATION

Pursuant to D.C. Cir. R. 29(d), *amicus* certifies that a separate brief is necessary because *amicus*, the American Exploration and Production Council, which represents producers of natural gas that ship gas on pipelines affected by the Good Neighbor Rule, has a unique perspective and expertise on issues raised in this appeal. It seeks to address only those issues for which that perspective and expertise are most relevant. *Amicus* believes that a separate brief is required to offer this unique perspective and expertise.

/s/ *Charlotte H. Taylor*
CHARLOTTE H. TAYLOR

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................1

INTRODUCTION ....................................................................................2

BACKGROUND ......................................................................................3

ARGUMENT ...........................................................................................7

I.     EPA's Failure to Consider the Impact of Its Compliance Timeline on the Reliability of Natural Gas Service was Arbitrary and Capricious. .........7

    A. EPA failed to provide an adequate response to significant comments. ..............................................................................7

    B. EPA failed to consider an important aspect of the Rule. .......................12

II.    Any Detrimental Impact to Pipeline Reliability Will Cause Serious Harm to Producers. ...................................................................14

CONCLUSION .....................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Petroleum Inst. v. EPA*,
  684 F.3d 1342 (D.C. Cir. 2012)............................................................12

*Bloomberg L.P. v. SEC*,
  45 F.4th 462 (D.C. Cir. 2022)...................................................7, 8, 12

*Carlson v. Postal Regul. Comm'n*,
  938 F.3d 337 (D.C. Cir. 2019).............................................................8

*Motor Vehicle Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983)...............................................................11, 12

*Physicians for Soc. Resp. v. Wheeler*,
  956 F.3d 634 (D.C. Cir. 2020).............................................................12

*United Distrib. Cos. v. FERC*,
  88 F.3d 1105 (D.C. Cir. 1996) (per curiam)........................................17

*Util. Solid Waste Activities Grp. v. EPA*,
  901 F.3d 414 (D.C. Cir. 2018) (per curiam)........................................12

STATUTES

15 U.S.C. § 717f.......................................................................15

42 U.S.C. § 7410 ......................................................................3

OTHER AUTHORITIES

*Antero Res. Corp. v. Columbia Gulf Transmission, LLC*,
  Dkt. No. RP24-408-000, Comments of SWN Energy Servs. Co.,
  LLC (Mar. 21, 2024)..........................................................17

Comments of Berkshire Hathaway Energy Co.
  (June 21, 2022)................................................................5

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Comments of Kinder Morgan, Inc. (June 21, 2022) ...................................4

Comments of TC Energy (June 21, 2022) ...................................5

Comments of the Interstate Natural Gas Association of America
(June 21, 2022) ...................................4

D.C. Cir. R. 32 ...................................20

EPA, *NOx Emission Control Technology Installation Timing for Non-
EGU Sources* (Mar. 14, 2023) ...................................6

*Equitrans*, *L.P.*,
Dkt. No. CP22-44-000, *Order Issuing Certificate*, 183 FERC
(June 15, 2023) ...................................16

Federal Energy and Regulatory Commission, *2023 State of the
Markets* (Mar. 21, 2024) ...................................14, 15

*Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient
Air Quality Standards*,
88 Fed. Reg. 36654 (June 5, 2023) .............. 2, 4, 6, 7, 8, 9, 11, 12, 13, 14, 17, 18

*Federal Implementation Plan Addressing Regional Ozone Transport
for the 2015 Ozone National Ambient Air Quality Standard*,
87 Fed. Reg. 20036 (Apr. 6, 2022) ...................................3, 5, 7, 8, 13

Fed. R. App. P. 29 ...................................1, 20

Fed. R. App. P. 32 ...................................20

Jorge Garduno & George King, *Managing Risk and Reducing
Damage from Well Shut-Ins*, J. of Petroleum Tech. (Apr. 29, 2020) ...............16

*Transcontinental Gas Pipe Line Company*,
*LLC*, Dkt. No. CP21-94-000, *Order Issuing Certificate and
Approving Abandonment*, 182 FERC (Jan. 11, 2023) ...................................16

# GLOSSARY

**AXPC:**    American Exploration and Production Council

**EGU:**    electric generating unit

**EPA:**    Environmental Protection Agency

**FERC:**    Federal Energy Regulatory Commission

**INGAA:**    Interstate Natural Gas Association of America

## INTEREST OF *AMICUS CURIAE*

The American Exploration and Production Council ("AXPC") is a national trade association representing 34 leading natural gas and oil exploration and production companies.  AXPC's mission is to constructively and thoughtfully work for sound energy, environmental, and related domestic public policies that encourage the responsible exploration, development and production of natural gas and oil to meet the needs of consumers and fuel the nation's economy.  AXPC's members depend on the consistent and reliable operation of natural-gas pipelines to deliver their production to market.[1]

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amicus curiae* states that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief.  No person other than *amicus curiae*, its members, or its counsel contributed money intended to fund the preparation or submission of this brief.

## INTRODUCTION

Natural-gas pipelines form a key portion of this country's energy infrastructure, ensuring the consistent availability of power to millions of businesses and citizens in all regions, even—indeed, especially—at times when hot or cold weather causes intense energy demand. In its rulemaking process, however, the Environmental Protection Agency failed to account for reliability concerns in this important sector. From start to finish, it underestimated and ignored the problems threatened by taking hundreds of pipeline compression engines offline for upgrades within the agency's unrealistic 3-year timeline. In its initial proposal, the agency estimated that approximately 300 engines would be affected and did not evaluate the impact on the affected pipeline systems. Commenters made clear that the true number was multiple times higher and pointed out that taking hundreds of engines offline within EPA's proposed 3-year timeline would undermine reliable natural gas service. In its final rule, EPA acknowledged that its rule applied to more than 3,000 engines and that more than 900 would likely need controls. Despite the admittedly greater scope of the rule, EPA ignored commenters' concerns about capacity and reliability during the compressed 3-year compliance timeline. This was arbitrary and capricious. EPA's flawed decisionmaking will have a severe impact on natural-gas producers such as AXPC's members, which depend entirely on the reliable operation of pipelines to move production continuously to market.

2

## BACKGROUND

**1.** In order to meet air quality standards established by EPA in 2015, EPA proposed a federal implementation plan under 42 U.S.C. § 7410(c), addressing the interstate transport of ozone across twenty-three States. *Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, 87 Fed. Reg. 20036 (Apr. 6, 2022) (the "Proposed Rule").[2] Among other measures, EPA proposed to establish regulatory requirements for nitrogen oxide emissions from pipeline engines with a capacity of at least 1,000 horsepower. *Id.* at 20142. To meet the standards, pipelines would have to retrofit their engines with various emission-control components and begin monitoring emissions. *Id.* EPA estimated that its proposal would affect 307 engines. *Id.* at 20090.

For all "non-EGU" sources, including pipeline engines, EPA proposed that controls be completed by May 2026, asserting that the timing was "presumptively reasonable and achievable." *Id.* at 20101. EPA also claimed that the deadline was necessary to make up for time lost in promulgating state and federal implementation plans to meet the 2015 standards. *Id.* at 20102. EPA did not indicate that it had any data or analysis showing that the timeline was reasonable or achievable in practice.

---

[2] Available at https://www.govinfo.gov/content/pkg/FR-2022-04-06/pdf/2022-04551.pdf

3

**2.** The Interstate Natural Gas Association of America (INGAA) and various pipeline companies filed comments on the proposal. Among other issues, the pipelines observed that EPA had severely underestimated the number of affected engines. INGAA counted 1,380 engines owned by its members that would need new or incremental emissions controls. INGAA Cmt. 8-9.[3] Kinder Morgan alone had 950 engines captured by the rule, with the majority requiring controls. Kinder Morgan Cmt. 4.[4]

The pipelines then pointed out that retrofitting 1,400 or more engines during the same three-year period—more than one engine per day—was not possible, given the limited supply of vendors and manufacturers able to perform the work and provide the custom parts needed. *E.g.* INGAA Cmt. 33-41 (discussing a technical report concluding that, given supplies of labor and components, only 75 engines per year can be retrofitted, not including potential permitting bottlenecks at FERC); Kinder Morgan Cmt. 28 (only two vendors currently have the capability to retrofit some classes of engine).

Furthermore, the pipelines pointed out that EPA had not analyzed what effect

---

[3] Comments of the Interstate Natural Gas Association of America (June 21, 2022), available at https://www.regulations.gov/comment/EPA-HQ-OAR-2021-0668-0501

[4] Comments of Kinder Morgan, Inc. (June 21, 2022), available at https://www.regulations.gov/comment/EPA-HQ-OAR-2021-0668-0350

4

the retrofitting of 1,400 engines in three years would have on the reliability of natural gas service, demand for which is highly seasonal. That timeline would necessitate taking multiple engines offline simultaneously, including during peak winter and summer seasons, resulting in potential reductions in service, especially if unscheduled engine outages occur at the same time. INGAA Cmt. 41-42 (simultaneous retrofits "will greatly reduce throughput throughout the nation," likely including during "peak" seasons when "pipelines operate at full capacity and need all of their compressor units available to run"); TC Energy Cmt. 2, 12-13 (simultaneous retrofits on the same pipeline mean that any "malfunction" while engines are offline would have "serious consequences" for consumers, but "[n]either the Proposed Rule nor any of the technical support documents currently in the docket provide any substantive analysis of reliability issues")[5]; Kinder Morgan Cmt. 36 (simultaneous retrofits could lead to "periodic outages"); Berkshire Hathaway Cmt. 51 (there is "no evidence in the Proposed Rule that EPA considered" the reliability impact when "hundreds of pipeline [engines] would need to come offline during a very short window of time").[6]

---

[5] Comments of TC Energy (June 21, 2022), available at https://www.regulations.gov/comment/EPA-HQ-OAR-2021-0668-0380

[6] Comments of Berkshire Hathaway Energy Company (June 21, 2022), available at https://www.regulations.gov/comment/EPA-HQ-OAR-2021-0668-0554

**3.**   After the notice-and-comment period, EPA promulgated a final rule, including regulations for pipeline engines. *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 36654 (June 5, 2023) (the "Rule").[7]   The Rule admitted that EPA's 1,000-horsepower threshold "captured more units than the EPA intended" but maintained the same threshold. *Id.* at 36819-20.

The Rule made two changes to the number of engines affected.   It exempted "emergency engines," which are "typically used only a few hours per year."  *Id.* at 36821.   And it provided that pipelines may request "facility-wide averaging," meaning that if a compression facility contains multiple engines, a pipeline may be able to install retrofits only on some subset of the facility's engines. *Id.* at 36823. All told, EPA estimated that, of the 3,005 engines ultimately captured by the Rule, 905 engines would need retrofits to comply.  *NOx Emission Control Technology Installation Timing for Non-EGU Sources* 30-31 (Mar. 14, 2023) ("Timing Report").[8]

EPA published a document responding to comments in connection with its

---

[7] Available at https://www.govinfo.gov/content/pkg/FR-2023-06-05/pdf/2023-05744.pdf

[8] Available at https://www.epa.gov/system/files/documents/2023-03/NOx%20Control%20Installation%20Timing_FinalReport_GoodNeighborFinalRule.pdf

Rule. *Response to Public Comments on Proposed Rule* (April 6, 2022).[9]  In the
document, EPA acknowledges the reliability concerns raised by the pipelines.  *Id.* at
625-26. And it points to the Timing Report for at least a "discussion" of system
reliability.  *Id.* at 626.  As explained below, however, that report does not discuss
reliability, much less engage in any substantive analysis of the impact of EPA's Rule
on gas transportation service.

## ARGUMENT

## I.    EPA's Failure to Consider the Impact of Its Compliance Timeline on the Reliability of Natural Gas Service Was Arbitrary and Capricious.

EPA promulgated its Rule without addressing commenters' point that
simultaneously retrofitting hundreds of pipeline engines would undermine the
pipeline system's reliability.  EPA's failure to consider that issue was arbitrary and
capricious.

### A.    EPA failed to provide an adequate response to significant comments.

**1.**  Under the APA, agency action is arbitrary and capricious when an agency
fails to "adequately explain its result and respond to relevant and significant public
comments."  *Bloomberg L.P. v. SEC*, 45 F.4th 462, 476 (D.C. Cir. 2022).  The
agency's response "must be sufficient to enable the courts to see what major issues

---

[9] Also available at https://www.epa.gov/system/files/documents/2023-03/Response%20To%20Comments%20Document%20Final%20Rule.pdf

of policy were ventilated and why the agency reacted to them as it did." *Id.* (cleaned up).   Significant comments can include "significant concerns about the costs associated with a proposed rule," *id.* at 477, or "relevant statutory objections and factors the [agency] was required to consider," *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 345 (D.C. Cir. 2019).

In *Delaware Department of Natural Resources & Environmental Control v. EPA*, for example, EPA acknowledged that it "heard" commenters' arguments regarding the "perverse effect" of certain programs on electric-grid reliability, but EPA "refused to engage" with the arguments and attempted to "pass[] the entire issue off onto" FERC, resulting in arbitrary and capricious action. 785 F.3d 1, 15–16 (D.C. Cir. 2015).   Likewise in *Appalachian Power Co. v. EPA*, EPA failed to respond to comments questioning its classification of "cogenerators" for purposes of emissions standards, leaving the court to "guess whether its decision was 'based on a consideration of the relevant factors.'" 249 F.3d 1032, 1063 (D.C. Cir. 2001) (per curiam) (citation omitted).

**2.**   Here, EPA's Rule is arbitrary and capricious because the agency again failed to engage with significant comments concerning the effect of its compliance timeline on the reliability of natural gas service.   As explained above, multiple commenters specifically highlighted that EPA was regulating pipeline engine emissions for the first time, mandating that pipelines take hundreds of engines

8

offline in a concentrated period of time, with no analysis of the effect on the pipelines' ability to provide reliable transportation during peak demand.

EPA admitted that the Rule captured many hundreds more engines than anticipated and specifically acknowledged comments on reliability, summarizing commenters' concerns that EPA's schedule "will result in serious reliability implications" and that "the EPA has not assessed (e.g., no technical support documents or substantive analysis)" the effects on reliability.  Response to Comments at 625.  EPA noted the concern that, given the brief compliance timeline, periods of lost capacity due to engine downtime "will likely extend over times of 'peak' demand" in winter and summer.  *Id.*  And EPA acknowledged calls to "tailor the rule to prevent serious and predictable reliability problems."  *Id.* at 626.  So far, so good.

But EPA never actually addressed the comments or considered the impact of the Rule on reliability.  EPA's sole response was to point to a specific section of the Timing Report:  "Section 4.3 of this study also discusses the EPA's consideration of system reliability for the pipeline transportation of natural gas due to control installation timing."  *Id.* at 626.  But Section 4.3 does no such thing.  That section of the report merely provides an estimate of the length of time required to install controls on a "single unit."  Timing Rept. 31-32.  Other portions of the Timing Report discuss the amount of time necessary to install controls on all affected

engines in light of constraints in the supply of parts and skilled labor. *E.g.*, *id.* at 59-61.   Nowhere, however, does the Timing Report purport to analyze whether retrofitting hundreds of engines can be done in three years without reducing pipeline capacity, or even in a way to mitigate any reduction to capacity or reliability, especially during periods of peak demand.  In short, EPA ignored the issue entirely.

**3.**  On appeal, in opposing requests for a stay, EPA attempted to backfill this hole, claiming that the Timing Report *does* discuss reliability.  EPA points not to Section 4.3 but to pages ES-8 and 8, where the report notes the "relatively modest" average capacity utilization of natural gas compression, and that FERC requires pipelines "to retain sufficient compression capacity to meet demand on peak demand days."  EPA Opp. to Mots. to Stay at 45, 55-56, No. 23-1157 (Aug. 18, 2023), Doc. 2013255.   EPA's attorneys argue that these capacity figures and FERC's requirement "suggest[] that pipeline operators have sufficient capacity to manage unit outages."  *Id.* at 55-56.

The problem with this theory is that the Timing Report itself never drew that conclusion.  The only statement the report *does* make is to suggest that low average utilization "may" mean that pipelines will have the ability to coordinate FERC review of pipeline upgrades, though with the disclaimer that "we were not able to complete an evaluation" of the issue.  Timing Rept. ES-8.  The report does not draw any conclusions from the average capacity utilization figures on page 8.  EPA cannot

10

in this litigation adopt a retroactive finding that it never made in promulgating its rule. "[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Motor Vehicle Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50 (1983). Nor can EPA hide behind FERC's requirement that pipelines maintain sufficient capacity to meet peak demand—that is precisely what the pipelines fear is not possible under EPA's timeline. *See Delaware Dep't of Nat. Res.*, 785 F.3d at 16 ("EPA" may not "excuse its inadequate responses by passing the entire issue off onto a different agency. Administrative law does not permit such a dodge.").

Nor could the Timing Report have adopted that position based on average capacity utilization figures. As the commenters explained to EPA, which EPA acknowledged, demand for natural gas transportation is highly seasonal, and surges in demand, especially during winter months when heating requirements are highest, can max out pipelines' capacity. Response to Comments 625 ("The commenter explains that during these peak periods, pipelines operate at full capacity and need all of their compressor units available to run."). Reliability is also location-specific. *See id.* at 626 (noting concern that new regulation would require taking offline "multiple units within a facility and/or at nearby compressor stations on the same pipeline"). In light of the cyclical nature of service demand and on-the-ground logistics of retrofitting engines on different pipelines, high-level statistics about

11

average utilization do not and could not support a finding that EPA's strict compliance timeline will not undermine pipeline reliability. The Timing Report did not make that determination, and EPA cannot do so for the first time in this appeal.

In sum, EPA's Rule is the result of arbitrary and capricious decisionmaking. EPA claimed to respond to comments pointing out that EPA had no idea whether its rule and compliance timeline would affect reliability, but it never actually responded. There is no way for courts or regulated parties "to see what major issues of policy were ventilated and why the agency reacted to them as it did." *Bloomberg L.P.*, 45 F.4th at 476-77 (cleaned up). This Court should vacate and remand.

## B.      EPA failed to consider an important aspect of the Rule.

Agency action is also arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem," unless "'the agency's path may reasonably be discerned.'" *State Farm*, 463 U.S. at 43 (citation omitted); *accord Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 430 (D.C. Cir. 2018) (per curiam) ("one of the hallmarks of arbitrary and capricious reasoning"). This principle does not bind the agency to take any particular position—only to engage with all of the important aspects of an issue, as part of a process of reasoned decisionmaking. *Compare Am. Petroleum Inst. v. EPA*, 684 F.3d 1342, 1350 (D.C. Cir. 2012) (upholding EPA action where EPA at least "acknowledge[d] the limitations inherent in its own study" on which it relied), *with Physicians for Soc.*

*Resp. v. Wheeler*, 956 F.3d 634, 647-48 (D.C. Cir. 2020) (reversing "intolerably mute" EPA decision that "fail[ed] to grapple with how EPA's policy affected its statutory scientific mandates").

Here, EPA promulgated regulations governing pipeline engines that require pipelines to take hundreds of engines offline in a relatively short period, but EPA failed entirely to consider whether pipelines could complete the retrofits without undermining pipeline service, especially during periods of peak demand. When EPA first published the Proposed Rule, the agency plainly had not considered the practical implications of its proposed compliance timeline. EPA did not even realize how many engines the regulations would sweep in, much less the effect of retrofits on natural gas service. After commenters pointed out the true scope and practical impact of the rule, EPA tripled its estimate of affected engines. Despite that dramatic expansion, and despite commenters' concerns, EPA remained mute on the Rule's effect on reliability, rendering its action arbitrary and capricious.

Nor can EPA now claim that pipeline reliability is not a "significant aspect" of regulating pipeline-engine emissions. EPA did not treat the issue that way below, instead acknowledging commenters' concerns and claiming (wrongly) that it did address those concerns in the Timing Report. Furthermore, EPA spent many pages addressing commenters' similar concerns about the effect of the Rule on the reliability of electric generation—there too, "the central reliability-related concern

13

was identified as one of timing." *See* Rule, 88 Fed. Reg. at 36772.  In response, EPA claimed to have "adopt[ed] several changes from the proposal to help address the reliability-related concerns." *Id.*  With regard to gas-service reliability, however, EPA did not analyze the impact on reliability, much less adopt changes in response to the concerns expressed in stakeholders' comments, resulting in arbitrary and capricious decisionmaking.

## II.    Any Detrimental Impact to Pipeline Reliability Will Cause Serious Harm to Producers.

EPA's casual approach to the reliability of the nation's gas pipelines risks inflicting serious harm on natural gas producers and others who depend on the pipeline's services.  Because of the physics and geography of natural gas production and consumption and the market forces of supply and demand, the consequences of curtailment of transportation service falls severely on gas producers, who count on long-term contracts with pipelines to guarantee reliable access to downstream markets.

As others have explained, many pipelines are already running at capacity during periods of peak demand and do not have the ability to take multiple units offline.  *See*, *e.g.*, INGAA Mot. for Stay at 25, 870a-879a, No. 23-1181 (July 7, 2023), Doc. 2009836.  That state of affairs is unsurprising.  Domestic production of natural gas is at an all-time high.  *See* Federal Energy and Regulatory Commission,

*2023 State of the Markets* at 24 (Mar. 21, 2024).[10]  This has allowed for replacement of coal-fired power plants, with natural gas now comprising 42% of electricity generation and coal declining nearly 20% in 2023 alone.  *Id.* at 5.  Consequently, that production is critical to the nation's "energy independence and security," a reinvigorated priority in the wake of the invasion of Ukraine.  *See* "Remarks by President Biden on Actions to Strengthen Energy Security and Lower Costs" (Oct. 19, 2022).[11]  The necessary result, however, is that the pipelines are operating at their maximum level to accommodate delivering record production to the market.

Furthermore, the tightly regulated system of permitting pipeline construction and upgrades *ensures* that the pipeline system remains at or near maximum capacity. The Natural Gas Act prohibits new pipeline construction unless FERC first issues a "certificate of public convenience and necessity."  15 U.S.C. § 717f(c)(1)(A).  FERC, in turn, tends to grant such certificates when a pipeline can show that it has already pre-sold the new capacity to a shipper via "precedent agreements" and when no existing shipper has offered to "turn back" their existing claim on pipeline capacity. *See*, *e.g.*, *Equitrans, L.P.*, Dkt. No. CP22-44-000, *Order Issuing Certificate*, 183

---

[10] Available at https://www.ferc.gov/news-events/news/presentation-report-2023-state-markets

[11] Available at https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/10/19/remarks-by-president-biden-on-actions-to-strengthen-energy-security-and-lower-costs/

FERC ¶ 61,200 (June 15, 2023) (precedent agreements for 94% of capacity and no turnback offers); *Transcontinental Gas Pipe Line Company, LLC*, Dkt. No. CP21-94-000, *Order Issuing Certificate and Approving Abandonment*, 182 FERC ¶ 61,006 (Jan. 11, 2023) (precedent agreement for 100% of capacity for 15-17 years and relatively small turnback offers).

Like other pipeline customers, natural gas producers depend on the effective and reliable functioning of the nation's pipelines. Producers pay pipelines "reservation charges" to reserve the use of a certain portion of a pipeline's capacity, and they depend on this access to capacity to undergird production plans and move gas to consumers. When capacity is curtailed, the economic consequences are severe.

Producers cannot simply turn production on and off at whim—reducing or stopping production is complex and can damage future production from a well. *See* Jorge Garduno & George King, *Managing Risk and Reducing Damage from Well Shut-Ins*, J. of Petroleum Tech. (Apr. 29, 2020).[12] Producers must therefore search for alternate routes to bring their production to customers, if such routes exist. But there may be few or no alternative routes—the difficulty of constructing new pipelines often leads to natural monopoly power in various geographic regions. *United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1122 (D.C. Cir. 1996) (per curiam)

---

[12] Available at https://jpt.spe.org/managing-risk-and-reducing-damage-well-shut-ins

("The enormous economies of scale involved in the construction of natural gas pipelines tend to make the transportation of gas a natural monopoly."). And even if there would be under typical circumstances, those routes could be suffering the same reduction in capacity due to simultaneous efforts to comply with EPA's rule.

Barring alternative routes, producers whose access to transportation is curtailed must sell their production in upstream markets—generally at much lower prices for a "distressed" sale—and then must work to secure alternative sources of supply for their downstream customers—this time at much higher prices due to the last-minute nature of the purchase—in order to fulfill their contracts. It may be that producers would be entitled to a refund of reservation charges under these circumstances, at the pipelines' expense. *See* INGAA Mot. for Stay 22, 243a. But the lost revenue from distressed upstream sales and outlays for distressed downstream purchases can far outstrip the reservation charges at stake.

For instance, in a recent dispute over the reliability of one pipeline's service, one shipper calculated that revenue losses from capacity cuts had cost the shipper more than twice as much in lost revenue as the shipper had received in reservation charge credits, amounting to millions of dollars. *Antero Res. Corp. v. Columbia Gulf Transmission, LLC*, Dkt. No. RP24-408-000, Comments of SWN Energy Servs. Co., LLC (Mar. 21, 2024). In another case, service was cut off during a period of peak summer demand due to a pressure imbalance at a delivery point, and the shipper—

17

which "was forced to dispose of its gas in other markets at lower prices"—lost more revenue during those weeks than it paid during the entire year in reservation charges, again amounting to millions of dollars.  Brief for *Amicus Curiae* TotalEnergies Gas & Power N.A. Inc. at 5, *Range Resources-Appalachia, LLC v. FERC*, No. 22-1151 (D.C. Cir. Jan. 5, 2023).

In sum, EPA's arbitrary and capricious disregard of the impact of its Rule on natural gas service will severely harm natural gas producers who depend on reliable transportation.  EPA never grappled with the reliability issues that will cause these harms and, more generally, threaten a stable natural-gas supply for businesses and consumers around the country.

## CONCLUSION

For the foregoing reasons, the Industry Petitioners' petition for review should be granted.

August 22, 2024                                    Respectfully submitted,


                                                   /s *Charlotte H. Taylor*

JAMES E. OLSON                                     CHARLOTTE H. TAYLOR
JONES DAY                                          BRETT J. WIERENGA
717 Texas, Suite 3300                              JONES DAY
Houston, Texas  77002                              51 Louisiana Ave. N.W.
Telephone: (832) 239-3866                          Washington, DC  20001
Email:jolson@jonesday.com                          Telephone:  (202) 879-3939
                                                   Email: ctaylor@jonesday.com
                                                   Email: bwierenga@jonesday.com

                                                   *Counsel for Amicus Curiae*


19

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains 3,826 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

August 22, 2024                                    /s/ *Charlotte H. Taylor*
                                                   CHARLOTTE H. TAYLOR

                                                   *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 22nd day of August, 2024, I electronically filed the original of the foregoing document with the clerk of this Court by using the CM/ECF system, which will serve the counsel for all parties at their designated electronic mail addresses.

August 22, 2024                                    /s/ *Charlotte H. Taylor*
                                                   CHARLOTTE H. TAYLOR

                                                   *Counsel for Amicus Curiae*