<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

No. 23-1157 and consolidated cases

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

STATE OF UTAH,
*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
and MICHAEL S. REGAN, ADMINISTRATOR, U.S. EPA,
*Respondents*.

---

**FINAL BRIEF OF PUBLIC INTEREST
RESPONDENT-INTERVENORS**

**Dated: August 22, 2024**

Megan M. Herzog
Sean H. Donahue
Donahue, Goldberg & Herzog
1008 Pennsylvania Avenue SE
Washington, DC 20003
(650) 353-8719
megan@donahuegoldberg.com
sean@donahuegoldberg.com

Vickie L. Patton
Noha Haggag
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
(202) 572-3286
vpatton@edf.org
nhaggag@edf.org

*Counsel for Environmental Defense
Fund*

Seth L. Johnson
Kathleen L. Riley
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 745-5227
sjohnson@earthjustice.org
kriley@earthjustice.org

*Counsel for Air Alliance Houston,
Appalachian Mountain Club, Center
for Biological Diversity, Chesapeake
Bay Foundation, Downwinders at Risk,
Louisiana Environmental Action
Network, Sierra Club, Southern Utah
Wilderness Alliance, and Utah
Physicians for a Healthy Environment*

Shaun A. Goho
Hayden Hashimoto
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 624-0234
sgoho@catf.us
hhashimoto@catf.us

*Counsel for Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, and the Ohio Environmental Council*

Zachary M. Fabish
Sierra Club
50 F Street NW, 8th Floor
Washington, DC 20001
(650) 388-8446
zachary.fabish@sierraclub.org

Joshua D. Smith
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5560
(415) 977-5704
joshua.smith@sierraclub.org

*Counsel for Sierra Club*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1)(A), Respondent-Intervenors Air Alliance Houston, Appalachian Mountain Club, Chesapeake Bay Foundation, Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Center for Biological Diversity, Downwinders at Risk, Environmental Defense Fund, Louisiana Environmental Action Network, the Ohio Environmental Council, Sierra Club, Southern Utah Wilderness Alliance, and Utah Physicians for a Healthy Environment submit this certificate as to parties, rulings, and related cases.

### I.     Parties

Petitioners: State of Wisconsin (No. 23-1201); State of Utah (lead case No. 23-1157); Kinder Morgan, Inc. (No. 23-1181); States of Ohio, Indiana, and West Virginia (No. 23-1183); American Forest & Paper Association (No. 23-1190); Midwest Ozone Group (No. 23-1191); Interstate Natural Gas Association of America and American Petroleum Institute (No. 23-1193); Associated Electric Cooperative Inc., Ohio Valley Electric Corporation, America's Power, Deseret Generation & Transmission Co-Operative, National Rural Electric Cooperative Association, Portland Cement Association, and Wabash Valley Power Association, Inc. (No. 23-1195); National Mining Association (No. 23-1199); American Iron and Steel Institute (No. 23-1200); Enbridge (U.S.) Inc. (23-1202); American Fuel & Petrochemical Manufacturers and American Chemistry Council (No. 23-1203);

TransCanada Pipeline USA Ltd. (No. 23-1205); Hybar LLC (No. 23-1206); United States Steel Corporation (No. 23-1207); Union Electric Company (No. 23-1208); State of Nevada (No. 23-1209); Arkansas League of Good Neighbors (No. 23-1211); Energy Transfer L.P. (Nos. 23-1306, -1307, -1316); Commonwealth of Kentucky Energy and Environment Cabinet (No. 23-1314); Commonwealth of Kentucky (No. 23-1315); Buckeye Power, Inc., Ohio Valley Electric Corporation (No. 23-1317).

Respondents: U.S. Environmental Protection Agency; Michael S. Regan, Administrator of the U.S. Environmental Protection Agency.

Intervenors for Petitioners: Sierra Club (as to No. 23-1201); City Utilities of Springfield, Missouri (as to lead case No. 23-1157).

Intervenors for Respondents: Midwest Ozone Group (as to No. 23-1201); Sierra Club, Chesapeake Bay Foundation; Environmental Defense Fund; Citizens for Pennsylvania's Future; Clean Air Council; Clean Wisconsin; Air Alliance Houston; Appalachian Mountain Club; Center for Biological Diversity; Downwinders at Risk; Louisiana Environmental Action Network; Southern Utah Wilderness Alliance; Utah Physicians for a Healthy Environment (all as to all cases except No. 23-1201); the Ohio Environmental Council (as to Nos. 23-1316, -1317); City of New York; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; District of Columbia; Harris County, Texas; State of Connecticut;

State of Delaware; State of Illinois; State of Maryland; State of New Jersey; State of New York; and State of Wisconsin (all as to all cases except No. 23-1201).

Amici Curiae in support of Petitioners: American Exploration and Production Council; The Chamber of Commerce of the United States of America; Sen. Shelley Moore Capito and Roger F. Wicker, Rep. Cathy McMorris Rodgers, and 44 Members of Congress (all as to lead case No. 23-1157).

Amici Curiae in support of Respondents: Benjamin F. Hobbs, Brendan Kirby, Kenneth J. Lutz, and Susan Tierney; Institute for Policy Integrity at New York University School of Law; American Thoracic Society and American Lung Association; Paul Miller, Russell Dickerson, Arlene Fiore, and Tracey Holloway; Robert Perciasepe.

## II.    Ruling Under Review

"Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," published in the Federal Register at 88 FR 36,654 (June 5, 2023) (EPA Docket No. EPA-HQ-OAR-2021-0668).

## III.    Related Cases

In the Fifth Circuit:

- 23-60300, *Texas et al. v. EPA*

In the Eighth Circuit:

- No. 23-2769, *Arkansas et al. v. EPA*
- No. 23-2771, *Missouri v. EPA*

- No. 23-2773, *Energy Transfer LP v. EPA*

- No. 23-2774, *Energy Transfer LP v. EPA*

- No. 23-2782, *Hybar LLC v. EPA*

- No. 23-2786, *Union Electric Company v. EPA*

- No. 23-2789, *Allete, Inc. v EPA*

<u>In the Ninth Circuit:</u>

- No. 23-1098, *Nevada Cement Co. LLC v. EPA*

<u>In the Tenth Circuit:</u>

- No. 23-9551, *Tulsa Cement v. EPA*

- No. 23-9557, *PacifiCorp et al. v. EPA*

- No. 23-9561, *Oklahoma v. EPA*

- No. 23-9569, *Energy Transfer LP v. EPA*

<u>In the Eleventh Circuit:</u>

- No. 23-12528, *Alabama et al. v. EPA*

Dated: August 22, 2024

*/s/ Seth L. Johnson*
Seth L. Johnson

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure and D.C. Circuit Rule 26.1, Movants Air Alliance Houston, Appalachian Mountain Club, Center for Biological Diversity, Chesapeake Bay Foundation, Citizens for Pennsylvania's Future, Clean Air Council, Clean Air Wisconsin, Downwinders at Risk, Environmental Defense Fund, Louisiana Environmental Action Network, the Ohio Environmental Council, Sierra Club, Southern Utah Wilderness Alliance, and Utah Physicians for a Healthy Environment state that they are non-profit environmental organizations without any parent corporation or stock.

Dated: August 22, 2024

*/s/ Seth L. Johnson*
Seth L. Johnson

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.....................................................................vii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ....................................ix

INTRODUCTION ..................................................................................1

STATEMENT OF THE CASE ...................................................................2

SUMMARY OF ARGUMENT....................................................................5

ARGUMENT ......................................................................................6

I.   EPA Properly Addressed Pollution from Non-EGUs.......................................6

    A.   EPA properly assessed the significance of non-EGU emissions.    7

        1.   EPA properly assessed the aggregate pollution from each State. .......7

        2.   EPA properly assessed significance in accordance with downwind attainment deadlines. ....................................................................10

    B.   EPA reasonably considered the costs of controlling non-EGU pollution……………………………………………………………11

        1.   EPA reasonably considered the average cost of controls for non-EGU industries.........................................................................................11

        2.   EPA reasonably considered annual costs. ........................................13

    C.   The Rule's pollution-reduction requirements for non-EGUs are reasonable…………………………………………………………..14

        1.   Compliance is feasible by the 2026 ozone season.............................14

        2.   The compliance timeline does not threaten gas reliability. ...............17

        3.   Using design capacity for engines and boilers is reasonable and well supported. ..................................................................................18

II.  EPA Properly Explained the Rule's Application to Nevada and Utah............19

    A.   As EPA explained, the application of the four-step framework to Nevada and Utah is consistent with past practice……………………………..20

    B.   EPA explained why its use of the four-step framework to determine Nevada's and Utah's obligations was reasonable, and State Petitioners' preferred approach would have been contrary to the Act…………….21

III. State and Industry Petitioners Are Not Entitled to the Relief They Seek........25

CONCLUSION ...................................................................................29

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ....................................................6, 26

*Appalachian Power Co. v. EPA*,
    249 F.3d 1032 (D.C. Cir. 2001) .............................................................8

*Bloomberg L.P. v. SEC*,
    45 F.4th 462 (D.C. Cir. 2022) ..............................................................26

*Cooper Indus. v. Aviall Servs.*,
    543 U.S. 157 (2004) ..............................................................................28

*EME Homer City Generation, L.P. v. EPA*,
    795 F.3d 118 (D.C. Cir. 2015) .............................................................14

*EPA v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014) ................................................................................8

*Loper Bright Enterprises v. Raimondo*,
    No. 22-451 (U.S. June 28, 2024) .........................................................12

*Maryland v. EPA*,
    958 F.3d 1185 (D.C. Cir. 2020) ...............................................9, 15, 19

*Michigan Gambling Opposition v. Kempthorne*,
    525 F.3d 23, (D.C. Cir. 2008) ..............................................................12

*Mississippi v. EPA*,
    744 F.3d 1334 (D.C. Cir. 2013) ..........................................................26

*Mo. River Energy Servs. v. FERC*,
    918 F.3d 954 (D.C. Cir. 2019) .............................................................24

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish*
    *Cnty., Wash.*, 554 U.S. 527 (2008)......................................................22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*
    *Co.*, 463 U.S. 29 (1983) .......................................................................15

*Nat'l Tel. Co-op. Ass'n v. FCC*,
    563 F.3d 536 (D.C. Cir. 2009) ............................................................12

*Ne. Md. Waste Disposal Auth. v. EPA*,
    358 F.3d 936 (D.C. Cir. 2004) ............................................................27

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008) ............................................................8

*North Carolina v. EPA*,
    550 F.3d 1176 (D.C. Cir. 2008),
    *modifying relief granted in* 531 F.3d 896 (D.C. Cir. 2008) ..............................26

*Ohio v. EPA*,
    No. 23A349 (U.S. June 27, 2024) ........................................................28

*Train v. Nat. Res. Def. Council, Inc.*,
    421 U.S. 60 (1975) ........................................................................10

*Wisconsin v. EPA*,
    938 F.3d 303 (D.C. Cir. 2019) ...................................2, 3, 7, 10, 15, 26, 27, 29

**Statutes**

42 U.S.C. § 7409(b)(1) ............................................................................10

42 U.S.C. § 7410(a)(2)(D) ........................................................................25

42 U.S.C. § 7410(a)(2)(D)(i)(I) ..................................................................2

42 U.S.C. § 7410(c)(1) ............................................................................2

42 U.S.C. § 7607(d)(9) ............................................................................29

**Code Of Federal Regulations**

40 C.F.R. § 52.40(e) ..............................................................................12

**Federal Register Notices**

75 FR 45210 (Aug. 2, 2010) ......................................................................11

80 FR 65292 (Oct. 26, 2015) ......................................................................3

81 FR 15200 (Mar. 22, 2016)..............................................................22, 23

81 FR 71991 (Oct. 19, 2016)...............................................................21, 24

81 FR 74504 (Oct. 26, 2016).............................................................3, 19, 20

87 FR 20036 (Apr. 6, 2022) ....................................................................4

88 FR 9336 (Feb. 13, 2023) ...................................................................24

88 FR 36654 (June 5, 2023) ...................................3, 4, 5, 6, 8, 11, 12, 13, 14, 15, 16
17, 18, 19, 20, 21, 23, 24

## **GLOSSARY OF ACRONYMS AND ABBREVIATIONS**

Pursuant to D.C. Circuit Rule 28(a)(3), the following is a glossary of uncommon acronyms and abbreviations used in this brief.

EGU ...................................................................................Electric Generating Unit

RIA ...............................................................................Regulatory Impact Analysis

RTC ......................................................................................Response to Comments

# INTRODUCTION

The Clean Air Act's Good Neighbor Provision requires upwind States to eliminate pollution that prevents downwind States from meeting or staying within the air quality standards that protect their residents. After EPA updated the air quality standards for ozone (smog), many upwind States failed to implement that requirement, foisting the costs of controlling that pollution onto downwind States. EPA thus stepped in as the Act required with a plan (the Good Neighbor Rule) for upwind States to meet their obligations under the Act. The Rule will save thousands of lives and prevent hundreds of thousands of asthma attacks and hospitalizations.

Various States and industry groups now seek to undo the Rule and trigger all the harms it would hold back. To do so, they raise a slew of arguments, nearly all of which merely flyspeck (and, often, misread) the record and EPA's explanation for the Rule. EPA has explained why this Court should reject those arguments. Here, Public Interest Respondent-Intervenors further explain why the challengers' arguments lack merit on three fronts: (1) the Rule's approach to non-power-plant heavy-industry sources (known as non-EGUs); (2) the Rule's inclusion of plans for Nevada and Utah to meet their obligations; and (3) the scope of the appropriate remedy (if any).

## STATEMENT OF THE CASE

Pollution from upwind States makes it harder for downwind States to meet health-protective air pollution standards, requires downwind States to bear more than their fair share of pollution control costs, and puts the health of people in downwind States at serious risk. Congress enacted the Good Neighbor Provision to prevent these harms. The provision requires each State to eliminate emissions of air pollutants "in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State" of air quality standards. 42 U.S.C. § 7410(a)(2)(D)(i)(I). If a State fails to do so, the provision requires EPA to step in and create a federal plan that will allow the State to meet its good neighbor obligations. *Id.* § 7410(c)(1).

In the decades since Congress enacted the Good Neighbor Provision, EPA has issued many rules that address how upwind States (or EPA, when it steps in) will meet their good neighbor obligations. EPA developed a four-step approach to set these obligations: (1) identify areas (receptors) at risk of not meeting an air quality standard; (2) identify upwind States that contribute pollution above 1% of the relevant standard at those receptors; (3) determine which of those States' contributions are significant or interfere with maintenance; and (4) impose control measures to reduce those contributions. *See Wisconsin v. EPA*, 938 F.3d 303, 310-11 (D.C. Cir. 2019). The agency has consistently used this general framework to

2

determine whether a State must reduce its pollution and by how much, regardless of where in the country a State is located.

EPA's previous good neighbor rules have sometimes not done enough to control upwind States' pollution. When implementing the 2008 ozone standard, for example, EPA adopted a "partial remedy." 81 FR 74504, 74504 (Oct. 26, 2016). It claimed that addressing pollution from non-EGUs would be difficult given the agency's limited time and resources, and so it put off doing so. *See Wisconsin*, 938 F.3d at 318. This Court found that approach inadequate because EPA "faces a statutory mandate" to fully implement the Good Neighbor Provision. *Id.* 319.

In the Rule at issue here, EPA had to step in after it found that several States failed to submit any plans for addressing the updated 2015 ozone standard, and others submitted plans that fell short of their good neighbor obligations with respect to this standard. 88 FR 36654, 36656 (June 5, 2023), JA1553. The updated 2015 standard reflects the latest scientific evidence about ozone's harmful effects. Ozone pollution reduces lung function and raises mortality rates, and children, those with asthma, and older adults are particularly vulnerable to the harms ozone pollution causes. 80 FR 65292, 65294 (Oct. 26, 2015).

Areas across the country are violating the 2015 ozone standard right now, due in large part to upwind States' emissions. *See* EPA-HQ-OAR-2021-0663-0083 304, JA0674 (upwind contributions account for "substantial fraction" of downwind

pollution); 88 FR 36714, JA1611. Over 139,000,000 people live in areas with unsafe ozone levels. *See* EPA, *Nonattainment and Maintenance Area Population Tool: 2015 Ozone*.[1] And in many of these unsafe areas, air quality improvements have stalled or reversed; recent EPA measurements in these areas show that pollution exceeds the ozone standard by ten percent or more. EPA-HQ-OAR-2021-0668-0758 29-47, JA0482-0500; *see also* 87 FR 20036, 20052 n.51 (Apr. 6, 2022), JA0131 (noting "higher summer [ozone] concentrations in a warmer climate").

This Rule reflects EPA's recognition that for downwind States to meet the stricter 2015 ozone standard, upwind States will need to implement more pollution control measures. 88 FR 36684, JA1581. In this Rule, EPA did the work needed to decide whether and how to control emissions from non-EGUs. *Id.* 36657, JA1554. And in some States where EPA had not required additional controls to satisfy the Good Neighbor Provision to meet the 2008 standard, EPA determined that these States—including California, Minnesota, Nevada, and Utah—need to impose controls to meet their obligations under the stricter 2015 standard. *Id.* 36657, 36717, JA1554, 1614.

EPA's Rule will improve air quality and protect public health. In 2026, when most of its emission reductions take effect, the Rule will annually prevent up

---

[1] https://epa.maps.arcgis.com/apps/MapSeries/index.html?appid=7935a00e2554440a8daf6cc035b9455e.

to 1,300 premature deaths nationwide, avoid thousands of hospital visits for asthma and other respiratory problems, help keep hundreds of thousands of children and adults from missing school and work, and more. EPA-HQ-OAR-2021-0668-1115 ("RIA") 215-16, JA1311-12. The monetized value of these and other health benefits of the Rule will be $13 *billion* annually, far exceeding the compliance costs of only $910 million. 88 FR 36852, JA1749.

## SUMMARY OF ARGUMENT

**I.**      In requiring several non-EGU industries to reduce their ozone-forming pollution, EPA faithfully implemented the Good Neighbor Provision. EPA properly assessed the significance of upwind pollution in the aggregate for each State, rather than separately for each individual industry or source, and properly assessed interference with downwind maintenance in line with the deadlines for downwind States to attain the standard. In allocating necessary pollution reductions, it was reasonable for EPA to consider the average cost of controls for each covered industry and to use annual cost figures. And EPA fully addressed industry concerns about the compliance timeline and alleged gas supply risks.

**II.**      EPA adequately explained how it determined Nevada's and Utah's good neighbor obligations in this Rule. As in prior actions, EPA made clear that the four-step framework it uses to set States' good neighbor obligations works across the country, including for western States like these. EPA explained that it

had never had a blanket "western States" policy, contrary to these States'

suggestion otherwise. EPA also explained why the facts that led it to a different

result in one case—in partially disapproving Arizona's plan for the 2008 ozone

standard—do not exist as to these two States. And in any event, the Good

Neighbor Provision does not even authorize State Petitioners' preferred approach.

**III.**     This Court should deny these Petitioners' requests to vacate the Rule.

The errors they allege—including their central claim—are mere failures to explain

and not the kind of serious errors that support vacatur under the familiar *Allied-*

*Signal* test. And as this Court has recognized when considering past good neighbor

rules, vacatur is inappropriate because it would visit serious, uncurable health harms

on residents of downwind States.

## ARGUMENT

## I.     EPA Properly Addressed Pollution from Non-EGUs.

Industry Petitioners raise a laundry list of claims against EPA's regulation of

non-EGUs, but do not—and cannot—dispute that EPA needed to address non-

EGU pollution in this Rule. Non-EGUs include some of the very largest polluters

like steel mills, cement kilns, and gas pipelines. 88 FR 36659, JA1556.

Collectively, non-EGUs emit a large share of total ozone-forming pollution, more

than the emissions from power plants. EPA-HQ-OAR-2021-0668-0004 7, tbl.1,

JA0021. In Texas, for example, non-EGUs are responsible for almost half the

6

emissions of the main ozone-forming pollutant (nitrogen oxides), while power plants emit only about one-eighth. *Id.* 9, fig.1, JA0023. On this record, it was not only reasonable for EPA to regulate non-EGUs but *necessary*. Indeed, this Court faulted EPA for not addressing these sources when implementing the Good Neighbor Provision for the less stringent 2008 ozone standard, *see Wisconsin*, 938 F.3d at 318.

Industry Petitioners do take issue with *how* the Rule addresses non-EGU pollution, but the record and this Court's precedents refute those arguments. Their scattershot claims generally relate to (1) whether pollution from particular non-EGU sources and industries is significant, (2) the cost of controlling that pollution, and (3) the three-year deadline for installing controls.

## A. EPA properly assessed the significance of non-EGU emissions.

### 1. EPA properly assessed the aggregate pollution from each State.

Industry Petitioners claim that various sources and industries should not be controlled because, in their view, they contribute only a little downwind pollution. *See* Br. 54-55 (boilers and pipeline engines), 60-66 (paper and steel industry sources). The pollution from these individual sources and industries considered separately, they argue, is not "significant." *Id.* EPA considered these claims and found several of them to be flawed on technical grounds, as explained below and by EPA. *Infra* 9-10; EPA Br. 99-100. More fundamentally, this argument fails

7

because the Good Neighbor Provision authorizes EPA to assess the magnitude of upwind contributions to downwind air quality problems "based on aggregate emissions from within each regulated state." *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1049 (D.C. Cir. 2001). That is because dangerous ozone levels result from "the collective emissions of many smaller contributors." 88 FR 36673, JA1570. Accordingly, "EPA need only have evidence that emissions 'within the State' contribute significantly to another state's nonattainment or interfere with its maintenance of [a standard]." *North Carolina v. EPA*, 531 F.3d 896, 923 (D.C. Cir. 2008) (quoting 42 U.S.C. § 7410(a)(2)(D)(i)(I)); *see also EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 519-20 (2014). That was EPA's approach here: It assessed contributions in the aggregate for each State and prioritized pollution reductions that could be achieved with cost-effective controls. 88 FR 36711-12, JA1608-09.

Industry Petitioners also argue (at 54-55) that EPA itself adopted a source-specific threshold for significant contribution that undermines the agency's case for assessing emissions at the state level, but they are wrong. The Non-EGU Screening Assessment they rely on reviewed data on sources with high historical emissions "to identify potentially impactful industries" for further evaluation. 88 FR 36740, JA1637. The assessment did *not* define a source-specific threshold for

significant contribution or interference with maintenance. *See id.*; EPA-HQ-OAR-2021-0668-0150 25, tbl.A-3, JA0056.

Relatedly, Industry Petitioners claim (at 59, 70) that after EPA concluded it was not cost-effective to require certain categories of sources to install controls, EPA had to go back and re-evaluate whether the entire industry those sources belong to contributed significantly. This argument again ignores that EPA used the Screening Assessment as a tool to identify industries with potentially controllable emissions, and EPA then determined significance based on aggregate statewide emissions. Because EPA had no obligation to—and did not—give legal effect to the pollution thresholds used for screening purposes, there was no reason to redo the screening. EPA-HQ-OAR-2021-0668-1127 ("RTC") 99, 128, JA1361, 1385. EPA's paragraph-long explanation of all this in the record refutes Petitioners' assertion (at 70) that EPA arbitrarily ignored this issue.

Finally, Industry Petitioners criticize (at 66-70) the data EPA used in its Screening Assessment, calling it "unverified" and pointing to alleged "discrepancies." But EPA's data and methodological choices were well-justified and at the heart of EPA's "technical expertise" and discretion. *Maryland v. EPA*, 958 F.3d 1185, 1196 (D.C. Cir. 2020). For example, Industry Petitioners claim that EPA did not address the paper industry's comments that certain sources had been closed or misidentified. Br. 61; RTC 119, JA1376. In reality, EPA carefully

considered those comments and found that some of the facilities the trade association claims have closed actually have active permits or recent renewal applications. RTC 119-120, JA1376-77. EPA determined there was no verifiable evidence for the trade association's claims. *Id.*

### 2. EPA properly assessed significance in accordance with downwind attainment deadlines.

Industry Petitioners also claim (at 61-62) that the steel industry should have been excluded from the Rule, notwithstanding that its pollution will interfere with downwind maintenance of the ozone standard through at least 2026, because the Act's deadlines supposedly apply only to pollution that contributes to nonattainment. This claim is both waived (EPA Br. 95) and foreclosed by the Act. This Court has repeatedly held that EPA must abate interstate ozone pollution "consistent with" downwind attainment deadlines. *E.g.*, *Wisconsin*, 938 F.3d at 313 (quoting 42 U.S.C. § 7410(a)(2)(D)). And there is no basis to exempt pollution that interferes with maintenance from that requirement. The Good Neighbor Provision requires EPA to prohibit *both* significant contributions to nonattainment and interference with maintenance consistently with "all provisions in Title I" of the Act. *North Carolina*, 531 F.3d at 910-12. That includes the "basic statutory mandate" that "[the ozone standard] be attained" by the applicable deadlines "and maintained thereafter." *Train v. Nat. Res. Def. Council*, 421 U.S. 60, 99 (1975); *see also* 42 U.S.C. § 7409(b)(1) (instructing EPA to set primary ambient air quality

10

standards "the attainment *and maintenance* of which . . . are requisite to protect the public health" (emphasis added)).

### B. EPA reasonably considered the costs of controlling non-EGU pollution.

Industry Petitioners complain about technical details of EPA's cost-consideration methodology, including EPA's decisions to consider the costs of pollution-control measures by industry category and on an annual basis. These arguments lack merit.

### 1. EPA reasonably considered the average cost of controls for non-EGU industries.

Industry Petitioners first assert (at 36) that EPA could not consider cost on an industry-average basis, theorizing that the Act and *EME Homer* require EPA to establish a cost threshold that no individual source may exceed. In fact, *EME Homer* held that the Act grants EPA discretion in how it allocates responsibility for controlling upwind emissions. 572 U.S. at 514-15 (holding EPA could do so "proportionally (10 ppb each), on a per capita basis, on the basis of cost of abatement, or by some other metric"), 518-20. Indeed, *EME Homer* actually upheld the approach Industry Petitioners say that the case bars. *EME Homer* approved EPA's decision to allocate necessary pollution reductions based on cost of abatement, *id.* 513-15, and the rule at issue there, like the one here, considered cost on an industry-wide, average basis. 75 FR 45210, 45231 (Aug. 2, 2010); EPA-

11

HQ-OAR-2021-0668-0956 8, 10, JA0902, 0904; *see* RTC 92, JA1354. Both here and in *EME Homer*, that approach enabled EPA to fashion an "efficient and equitable" remedy to the problem of interstate pollution. *See* 572 U.S. at 519.[2]

Despite *EME Homer*, Industry Petitioners claim EPA's approach is arbitrary based on their view that some individual pollution sources will face high costs. Br. 35-42, 68-69. But EPA considered industry claims of elevated costs and determined they were overstated or addressed by flexibilities EPA provided. *See* RTC 126, 135, 751-53, 795-800, JA1383, 1388, 1512-14, 1521-1526; 88 FR 36824, JA1721. EPA acknowledged some individual sources might have to spend more than the industry average, 88 FR 36746, JA1643, and created a process for any sources facing truly exorbitant costs to obtain a source-specific limit, 40 C.F.R. § 52.40(e). Because these policy judgments are "reasonable and reasonably explained," they should be upheld. *Nat'l Tel. Co-op. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009).

---

[2] Industry Petitioners' argument (at 28 n.9) that the Court should not follow these holdings of *EME Homer* is forfeited because it is confined to a footnote and not developed. *See Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, n.3, n.4 (D.C. Cir. 2008). It is also foreclosed by the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, No. 22-451, 34-35 (U.S. June 28, 2024) (reliance on *Chevron* is insufficient basis for overruling a statutory precedent).

## 2.  EPA reasonably considered annual costs.

Industry Petitioners' argument (at 46-47) that EPA erred by considering annual cost (as opposed to ozone-season cost) also misses the mark: considering annual figures was a reasonable way to conduct the relative cost comparison EPA uses to select control technologies. 88 FR 36733, JA1630. Petitioners argue that costs per ton may be higher when calculated for the ozone season alone, but that is true for all industries and thus, as EPA found, does not alter the relative assessment. EPA Br. 83-84. In fact, EPA has "used annual cost-per-ton figures throughout the history of transport rulemakings." RTC 409, JA1477; *see also* Revised CSAPR Update Non-EGU Analysis 2 (Sept. 1, 2020), EPA-HQ-OAR-2020-0272-0014 ("The cost per ton values are annual costs and the estimated reductions are annual emissions reductions."), JA0011.[3]

Industry Petitioners dispute (at 48) that annual cost per ton is an accurate proxy for ozone-season cost per ton, citing comments claiming that emissions from non-EGUs vary throughout the year. But those comments do not establish—or

---

[3] Contrary to Industry Petitioners' allegation (at 48-49) that EPA failed to explain why it used ozone-season figures for power plants and annual figures for non-EGUs, EPA explained it did so because it had ozone-season-specific data for the former but not the latter. EPA Br. 86. EPA also acted reasonably to ensure an apples-to-apples comparison between non-EGU costs and power-plant costs by multiplying non-EGU annual emissions by five-twelfths (corresponding to the five-month ozone season). *Id.*

even claim—that emissions variability during the year would alter the calculation of relative cost effectiveness. Thus, EPA reasonably concluded, "it is not clear how [the information] would change EPA's analysis, since the cost figures would still be used in a representative and relative way." RTC 409, JA1477. *See EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 135 (D.C. Cir. 2015) (upholding EPA's use of a model because small discrepancies "[did] not result in biases").

### C. The Rule's pollution-reduction requirements for non-EGUs are reasonable.

#### 1. Compliance is feasible by the 2026 ozone season.

Industry Petitioners' repeated allegations that EPA "failed to consider" compliance timeline feasibility (at 85-90) are wrong. EPA commissioned a detailed report on the timeframes needed to install controls ("Timing Report"),[4] and reasonably concluded that installation is feasible by 2026. As an extra precaution against unforeseen delays, EPA also created a process for individual sources to request an extension (of up to three years) if timely compliance is not possible due to "labor shortages, supply shortages, or other circumstances beyond the control of source owner/operators." 88 FR 36758, JA1655. As detailed below, EPA responded to all industry concerns about the compliance timeline, including the number of units at issue, potential supply chain and labor shortages, and potential

---

[4] EPA-HQ-OAR-2021-0668-1077, JA0681-771.

challenges in installing particular non-EGU controls. *Id.* 36758-60, JA1655-57; RTC §§ 4.2.2.7, 5.1.4, 10.9, JA1466-67, 1491-92, 1535-38.

In requiring most covered non-EGUs to install controls by the 2026 ozone season, EPA implemented *Wisconsin*'s directive to act "in concert with the attainment deadlines" in downwind States. 938 F.3d at 318. And in allowing only limited extensions beyond the 2026 ozone season, EPA complied with this Court's direction that EPA may deviate from the downwind attainment deadlines only upon a sufficient showing of impossibility. *Id.* 320.

Industry Petitioners' bare disagreements with EPA's analysis fall far short of demonstrating any "clear error of judgment" by the agency. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). For pipeline engines (at 85-87), for example, their argument rests on the faulty assumption that 3,000 engines must retrofit. As EPA explained, most engines do not need retrofits, either because they have already installed control technology or because they can utilize the Rule's flexible, facility-wide averaging provision to comply. *See* EPA-HQ-OAR-2021-0668-0145 6, JA0037; 88 FR 36824, JA1721. In fact, EPA determined that only about 900 engines need retrofits. Timing Report 30, JA0726. While Industry Petitioners disagree with EPA's determination (at 45-46), an agency's reasonable analysis of technical record data is entitled to deference given its expertise. *Maryland*, 958 F.3d at 1196.

Industry Petitioners speculate (at 87-88) about what "could" or "can" cause delays in paper industry installations, such as the need to obtain permits. Yet EPA's Timing Report (at 34, JA0730) "conservatively" estimated 6 to 12 months for permitting these sources, and that figure is likely an overestimate "since permitting analyses may generally proceed concurrent with other phases." The Timing Report estimates a total range, *including* permitting, of 14 to 25 months for boiler installation—which the Rule's multi-year compliance timeline amply accommodates. *Id.*; *see also* 88 FR 36759, JA1656 (discussing permitting); RTC 827, JA1530 (explaining why Title V permitting will not hold up projects).

In a similar vein, Industry Petitioners wrongly assert (at 88) that EPA's "work plan" requirement for steel reheat furnaces will cause installation delays. Contrary to Petitioners' claim (at 89), the work plan does not *extend* the installation timeline of 9 to 15 months estimated in the Timing Report (a figure Petitioners do not dispute). Instead, it dovetails with the early planning stages that are included in the Report's estimate. *See* Timing Report 22-23, JA0718-19 (considering "Analysis" as first step, including "conceptual studies/design" and "specifications").

Industry Petitioners also claim EPA failed to consider potential supply chain problems and labor shortages in the steel industry (at 89). Not so. EPA addressed these issues, including in response to U.S. Steel's comments. *See* RTC § 10.9 & A-

36 (listing commenters), JA1535-39. And in the final Rule, EPA explained that pandemic-related shortages have eased, but also provided the extension mechanism for individual sources facing "supply chain delays or other circumstances entirely beyond the owner or operator's control." 88 FR 36759-60, JA1656-57.

Finally, Industry Petitioners speculate (at 89) that extensions of the 2026 installation deadline "will be required across the board." That unfounded assertion is belied by the facts discussed above, showing that Petitioners' claims about the number of engines to be retrofit are inaccurate, and their concerns about delays from permitting and supply chain issues are overstated. Just as the 2026 deadline to reduce harmful emissions is reasonable and well supported by the record and the caselaw, the extension process is a reasonable safety valve for sources facing difficulties beyond their control.

### 2. The compliance timeline does not threaten gas reliability.

Industry Petitioners' claim (at 78-81) of gas supply risks rests on the same faulty assumptions as their objections to the Rule's compliance timeline. EPA reasonably disagreed with their estimate that 3,000 pipeline engines must retrofit, *supra* 15. Yet Industry Petitioners' attacks on EPA's findings that vendors have sufficient capacity and operators can coordinate outages to avoid disruption depend on that bare estimate. Br. 78. Industry Petitioners likewise assert that engines will be out of service during "peak demand periods" based on their assumption that

retrofits could take years. Br. 78, 80; EPA-HQ-OAR-2021-0668-0501 36, 41-42, JA0432-0434. But EPA reasonably concluded otherwise, conservatively estimating pipeline retrofit installation to require only 1-28 *weeks*, with most units needing only 1-4 weeks. *See* Timing Report 31-32, 65-66, JA0727-28, 0761-62. EPA's record amply supports the conclusion that pipeline operators have sufficient spare capacity to avoid disruptions to supply. *See* EPA Br. 116-17.

### 3. Using design capacity for engines and boilers is reasonable and well supported.

Contrary to Industry Petitioners' claims of arbitrariness (at 52-57, 67), EPA reasonably regulated pipeline engines with a design capacity of 1,000 horsepower or more and boilers with a design capacity of 100 mmBtu/hr or more. 88 FR 36819, 36833, JA1716, 1730. EPA did not determine, as Industry Petitioners incorrectly imply, that these design capacities perfectly approximate any particular emissions threshold.[5] Instead EPA reasonably concluded that (1) engines and boilers with those design capacities have the *potential* to emit over 100 tons and (2) it is appropriate to regulate based on design capacity to avoid incentivizing operators to "shift production" (and emissions) to unregulated units. *See* EPA-HQ-OAR-2021-0668-1110 4-5 (engines), 57-59 (boilers), JA1190-91, 1243-45; 88 FR

---

[5] Nor does the statute require that EPA's determination of significant contributions be made at the level of particular sources or industries. *Supra* I.A.1.

36746, JA1643.[6] These choices aligned with most federal and state regulations for engines and boilers, which have applicability thresholds based on design capacities, EPA Br. 88-89, and were well within EPA's technical expertise and discretion. *See Maryland*, 958 F.3d at 1196.

## II.    EPA Properly Explained the Rule's Application to Nevada and Utah.

State Petitioners argue (at 35) that EPA did not explain itself well enough when it applied the Good Neighbor Provision to Nevada and Utah's ozone emissions. They do not dispute that they needed to comply with the provision (rightly so, given that the provision refers to "[e]ach state," 42 U.S.C. § 7410(a)). Nor do they dispute that ozone pollution from western States is just as harmful as pollution from other parts of the country. *See, e.g.*, 81 FR 74537 (updating a prior good neighbor rule in 2016 and noting that EPA's "assessment shows that there are problem receptors in the West where western states contribute amounts greater than or equal to the screening threshold used to evaluate eastern states"). Instead, they make two largely overlapping arguments that boil down to a claim that EPA did not adequately explain why it used its usual four-step framework to establish the required emission controls in these States. Neither argument holds up.

---

[6] EPA also created an exemption for truly low-use boilers, 88 FR 36833, JA1730, and allowed facility-wide emissions averaging for pipeline engines, enabling "facilities to prioritize emissions reductions from larger, higher-emitting units." *Id.* 36821, JA1718.

**A.    As EPA explained, the application of the four-step framework to Nevada and Utah is consistent with past practice.**

EPA has consistently applied its four-step framework to all States, including western States like Nevada and Utah. As EPA explained when responding to comments on this Rule, it "applied the 4-step interstate transport framework across all states for purposes of the 2008 and 2015 ozone" standards. RTC 157, JA1406. Its use of the framework to set Nevada's and Utah's "good neighbor obligations in this action is consistent with those prior actions." *Id.*; *see also* 88 FR 36717, JA1614.

To claim that EPA's "consistent past practice" has been the opposite (at 39), State Petitioners wrongly describe EPA's prior actions *deferring* a decision on how to address certain States as *decisions* about how to address those States that EPA somehow departed from here. But as EPA explained, the ozone rules these Petitioners point to merely "deferred acting" on some States so that EPA could consider whether there might be "geographically relevant factors that may warrant a different approach in the west." RTC 157-58, JA1406-07. EPA emphasized that although it was deferring action on western States in that action, those "states are not relieved of their statutory obligation to address interstate transport" and that it would "fulfill its backstop role" and issue federal plans for those States "if and when that becomes necessary." 81 FR 74523. When EPA has actually acted—for example, by disapproving one of these States' plans—it has "consistently applied

20

the 4-step framework in evaluating [their] good neighbor obligations." 88 FR 36,717, JA1614; RTC 158, JA1407 (discussing EPA's final disapproval of Utah's plan for the 2008 ozone standard, 81 FR 71991 (Oct. 19, 2016)).

That is what happened here. EPA found "that air quality conditions and contribution from upwind states" like Nevada and Utah "are sufficiently analogous to the regional ozone problem in the eastern U.S." such that "applying the same framework across all linked states is warranted." RTC 158, JA1407. EPA thus did not "change . . . course," State Pets' Br. 39, and certainly did not do so without explanation, given that EPA addressed the arguments State Petitioners raise here. RTC 157 n.30, JA1406 (citing, among others, 87 FR 31443, 31453 (May 24, 2022) (rejecting California's argument that EPA's policy is to apply a different approach in western States)).

## B.    EPA explained why its use of the four-step framework to determine Nevada's and Utah's obligations was reasonable, and State Petitioners' preferred approach would have been contrary to the Act.

State Petitioners' second claim (at 39-41) is that EPA did not adequately explain why it previously used a "weight of evidence" approach but used the four-step framework in this Rule. In reality, EPA expressly explained how its approach here was consistent with its prior actions. What is more, the Good Neighbor Provision does not even authorize State Petitioners' preferred approach. For either

21

reason, this Court should reject the claim. *See Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527, 544 (2008).

State Petitioners' second claim rests (at 39) on an erroneous premise: that EPA applied a distinct "weight of the evidence" approach in western States. State Petitioners point (at 40) to EPA's partial approval of Arizona's plan for the 2008 ozone standard as evidence that EPA previously used a different standard. But there, EPA expressly "disagrees" with the claim that it applies a different approach to western States. 81 FR 15200, 15202 (Mar. 22, 2016). In partially approving Arizona's plan for the 2008 ozone standard, EPA modeled emissions (step 1) and asked whether the 1% threshold was met (step 2). It stated that a contribution "equal to or above 1% of the [ozone standard] could be considered significant where" upwind States' "collective contribution" is "a considerable portion of the downwind air quality problem regardless of where the receptor is geographically located." *Id.* EPA went on to conclude that as to the specific California receptors that Arizona contributed to, the collective upwind contribution was small, which led EPA to conclude that Arizona's emissions were not significant even though the 1% threshold was met. *See id.* 15203.

In this Rule, EPA explained that "[t]he rationale underpinning" its partial "approval of Arizona's 2008 ozone [standard] good neighbor [plan] submission is inapplicable." RTC 315, JA1456. EPA found that, as to the relevant downwind

receptors, the upwind States' (including Utah's[7]) collective contribution is considerable. For the receptor to which Utah contributes the most pollution—located in Douglas County, Colorado—8% of the total ozone pollution is attributable to upwind States—almost twice as large as the upwind contribution at issue in the Arizona approval. *See* 81 FR 15200; EPA-HQ-OAR-2021-0668-1157, App. D, JA0859-64. And 27% of the controllable ozone pollution at that receptor is from upwind States. RTC 315, JA1456.

State Petitioners also claim (at 41) that EPA treated Oregon differently than it treated Nevada and Utah, but EPA has not yet determined Oregon's good neighbor obligations. Instead, it deferred a decision "to give further thought to the appropriate treatment of both upwind states and downwind receptors in these circumstances." 88 FR 36718, JA1615. In short, EPA has not yet applied any approach to Oregon, so there is no final action for it to "reconcile" with this Rule. State Pets' Br. 41.

State Petitioners' cursory allegations (at 35-36, 40) about differences between western States and other States do not undercut EPA's rationale. By merely offering statements about generic differences and not developing an argument, they have forfeited any additional arguments against how EPA used the

---

[7] Nevada did not raise any specific arguments on this front before EPA.

four-step framework in this Rule. *See, e.g.*, *Mo. River Energy Servs. v. FERC*, 918 F.3d 954, 960 (D.C. Cir. 2019). Moreover, their statements do not undermine EPA's application of the four-step framework here. For example, EPA's emissions models take into account the very geographic features that State Petitioners gesture at (at 36). The modeling "considers multiple complex factors . . . such as terrain complexities, variability in emissions (e.g., wildfire emissions), meteorology, and topography." 88 FR 9336, 9379 (Feb. 13, 2023). EPA has consistently explained that its modeling—"the most up to date and scientifically robust" available, RTC 174, JA1414—is reliable when applied across the country. 88 FR 36717, JA1614; RTC 158, JA1407; 81 FR 71991, 71993 (the modeling is sufficient to assess and identify "downwind air quality problems and contributions from upwind States in both the eastern and the western U.S."); 88 FR 9379 (discussing adjustments to model, which "performs equally well in both the west and the east").

Despite State Petitioners' efforts to minimize them, Nevada's and Utah's contributions to downwind pollution are substantial. Nevada contributes between 1.1% and 1.6% of the ozone standard to receptors in Salt Lake, Davis, and Tooele counties in Utah; Utah contributes between 1.2% and 2.1% to Douglas, Jefferson, Larimer, and Arapahoe counties in Colorado (Denver and Fort Collins). EPA-HQ-OAR-2021-0668-1130, tab "2023gf Ozone Contributions," JA1540 (rounded to first decimal place). These areas suffer from some of the worst ozone pollution in

24

the country. Ozone levels in Colorado, including in Denver, are rising and exceed the 2015 standard. Fort Collins has consistently high ozone levels. EPA-HQ-OAR-2021-0668-0758 21-22, JA0474-75. And Salt Lake City is so far from attaining the 2015 ozone standard that it will remain in nonattainment after the Rule is fully implemented. EPA-HQ-OAR-2021-0668-1116, tab "23gf_days.2026gf_cntl," JA1313.

Finally, this Court should also reject State Petitioners' claim because the Good Neighbor Provision bars the approach that they wish EPA had adopted in this Rule. Under the provision's plain language, an upwind State's obligation to eliminate its significant contributions to downwind air quality problems does not depend on whether or how much *other* upwind States contribute. The provision instead defines the obligations of each State solely in terms of whether "emissions activity *within the State*" contributes significantly to nonattainment (or interferes with maintenance) downwind. 42 U.S.C. § 7410(a)(2)(D) (emphasis added). Thus EPA could not have excused Utah—or any other State—from the obligation to address its own contributions to downwind air quality problems based on claims that other States do not contribute enough pollution.

## III.    State and Industry Petitioners Are Not Entitled to the Relief They Seek.

Petitioners request vacatur, but this Court should deny that request. Even if this Court concludes that the Rule contains a non-harmless error, the relevant

standard governing whether vacatur is appropriate is not met here. *See Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (referring to "the seriousness of the [rule's] deficiencies" and "the disruptive consequences of an interim change"). This Court's consistent past practice when it has identified an error in a good neighbor rule has been to remand *without* vacatur. *See, e.g.*, *Wisconsin*, 938 F.3d at 336; *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008), *modifying relief granted in* 531 F.3d 896 (D.C. Cir. 2008). That would be the appropriate course here.

Here, none of the errors Petitioners allege are serious because, for all of them, there is "a serious possibility" that EPA can "cure" any error on remand and reach the same result as in the current Rule. *Allied-Signal*, 988 F.2d at 150-51. The vast majority of Petitioners' arguments are of the failure-to-explain variety, which is the archetypal "curable defect." *Mississippi v. EPA*, 744 F.3d 1334, 1362 (D.C. Cir. 2013); *accord Bloomberg L.P. v. SEC*, 45 F.4th 462, 477 (D.C. Cir. 2022) (more analysis of costs "can redress [agency's] failure of explanation"). For example, Petitioners' principal argument is that the number of States the Rule covers might vary over time, and EPA did not consider that possibility. But EPA has already illustrated in its response to petitions for reconsideration how readily it could cure this alleged error. After assessing that argument, EPA concluded that upwind States' obligations "are designed to be independent of the number of states

covered by the Plan and have not been affected by the judicial stays." EPA-HQ-OAR-2021-0668-1255 35, JA2023; *see Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 949-50 (D.C. Cir. 2004) (remanding without vacatur where separately published document "persuade[d]" Court that EPA "'may be able to explain'" decision).

And here, vacatur would have devastating, disruptive consequences. The Rule is integral to bringing communities where millions live into attainment with the health-protective 2015 ozone standard. *See Wisconsin*, 938 F.3d at 313, 315-18 (it would "subvert[]" the Act to allow upwind States' significant contribution to downwind nonattainment to persist beyond downwind attainment deadline). For example, less than 6% of the anthropogenic ozone pollution at a nonattainment monitor in Fairfield County, Connecticut, results from emissions in Connecticut, with pollution above the 1% threshold coming from Indiana, Kentucky, Maryland, Minnesota, New Jersey, New York, Ohio, Pennsylvania, Virginia, and West Virginia—all States the Rule covers. *See* EPA-HQ-OAR-2021-0668-1130, tab "2026gf Ozone Contributions," site ID "90019003," JA1540. Without the Rule, downwind States like Connecticut would find their efforts at planning for attainment severely disrupted. *See, e.g.*, *Wisconsin*, 938 F.3d at 336 (remanding without vacatur to avoid disruption to implementation mechanism); *see also id.* 316-17 (explaining that Congress did not intend to force downwind States to

choose between continuing in nonattainment or shouldering a disproportionate responsibility for reducing air pollution). The Rule's absence thus would mean more air pollution, for longer.

Failing to attain would mean a striking increase in deaths and other severe health harms. Fully implemented, the Rule will provide enormous environmental and public health benefits each year: up to 1,300 lives saved, thousands of hospital and emergency room visits avoided, hundreds of thousands of missed school days due to respiratory symptoms avoided, and over a million incidents of asthma symptoms and thousands of new asthma cases avoided. *See* RIA 215-16 tbl.5-3, JA1311-12.

Stray comments in the Supreme Court's stay opinion do not foreclose remand without vacatur. If they address remedy at all, statements suggesting that Petitioners are likely "entitled to 'revers[al]'" are ill-considered dicta, *Ohio v. EPA*, No. 23A349, 13 (U.S. June 27, 2024); *accord id.* 14-15 n.11. *See Cooper Indus. v. Aviall Servs.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). The parties to the applications for a stay pending judicial review did not brief in that Court the question of what the ultimate remedy might be—just the likelihood of success on the merits. Further, the dicta conflict with the Act's language, which actually

directs that the reviewing court "may" reverse arbitrary EPA action. 42 U.S.C.

§ 7607(d)(9).

This Court does not generally "vacate regulations when doing so would risk

significant harm to the public health or the environment." *Wisconsin*, 938 F.3d at

336. It should follow that sound practice here if it concludes that the Rule requires

further support.

## CONCLUSION

The petitions should be denied.

August 22, 2024                          Respectfully submitted,

*/s/ Megan M. Herzog*                    */s/ Seth L. Johnson*
Megan M. Herzog                          Seth L. Johnson
Sean H. Donahue                          Kathleen L. Riley
Donahue, Goldberg & Herzog               Earthjustice
1008 Pennsylvania Avenue SE              1001 G Street NW, Suite 1000
Washington, DC 20003                     Washington, DC 20001
(650) 353-8719                           (202) 797-5245
megan@donahuegoldberg.com                (202) 745-5227
sean@donahuegoldberg.com                 sjohnson@earthjustice.org
                                         kriley@earthjustice.org

Vickie L. Patton
Noha Haggag                              *Counsel for Air Alliance Houston,*
Environmental Defense Fund               *Appalachian Mountain Club, Center*
2060 Broadway, Suite 300                 *for Biological Diversity, Chesapeake*
Boulder, CO 80302                        *Bay Foundation, Downwinders at Risk,*
(202) 572-3286                           *Louisiana Environmental Action*
vpatton@edf.org                          *Network, Sierra Club, Southern Utah*
nhaggag@edf.org                          *Wilderness Alliance, and Utah*
                                         *Physicians for a Healthy Environment*

*Counsel for Environmental Defense*
*Fund*

*/s/ Shaun A. Goho*
Shaun A. Goho
Hayden Hashimoto
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 624-0234
sgoho@catf.us
hhashimoto@catf.us

*Counsel for Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, and the Ohio Environmental Council*

*/s/ Zachary M. Fabish*
Zachary M. Fabish
Sierra Club
50 F Street NW, 8th Floor
Washington, DC 20001
(650) 388-8446
zachary.fabish@sierraclub.org

Joshua D. Smith
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5560
(415) 977-5704
joshua.smith@sierraclub.org

*Counsel for Sierra Club*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), D.C. Circuit Rule 32(e)(2)(C), and the Court's December 4, 2023, Orders establishing the briefing format, counsel hereby certifies that the foregoing Final Brief of Public Interest Respondent-Intervenors contains 6,394 words, as counted by counsel's word processing system, and thus complies with the limit of 13,000 words shared between Public Interest Respondent-Intervenors and State Respondent-Intervenors. This document further complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure, 32(a)(5) and (a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 using size 14 Times New Roman font.

Dated: August 22, 2024

*/s/ Seth L. Johnson*
Seth L. Johnson