**ORAL ARGUMENT NOT YET SCHEDULED**
No. 23-1157 (and consolidated cases)

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

STATE OF UTAH, *et al.*,

*Petitioners*,

— v. —

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents.*

On Petitions for Review of Final Action by the United States
Environmental Protection Agency

**BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW
YORK UNIVERSITY SCHOOL OF LAW AS *AMICUS CURIAE* IN
SUPPORT OF RESPONDENTS**

Jason A. Schwartz
Andrew Stawasz
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3d Floor
New York, NY 10012
(212) 992-8932
jason.schwartz@nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

August 22, 2024

## CIRCUIT RULE 28(A)(1) STATEMENT

As required by Circuit Rule 28(a)(1), counsel for the Institute for Policy Integrity at New York University School of Law certify as follows:

(1)     All parties, amici, and intervenors appearing in this case are listed in Respondents' briefs.

(2)     References to the final agency action under review and related and consolidated cases appear in Respondents' briefs.

## RULE 26.1 DISCLOSURE STATEMENT

The Institute for Policy Integrity (Policy Integrity) is a nonpartisan, not-for-profit organization at New York University School of Law.* No publicly held entity owns an interest in Policy Integrity. Policy Integrity does not have any members who have issued shares or debt securities to the public.

---

* This brief does not purport to represent the views, if any, of New York University School of Law.

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 28(A)(1) STATEMENT .................................................... i

RULE 26.1 DISCLOSURE STATEMENT ................................................. ii

TABLE OF AUTHORITIES ................................................................ iv

GLOSSARY OF ACRONYMS & ABBREVIATIONS ............................. vi

INTEREST OF *AMICUS CURIAE* & AUTHORITY TO FILE ................ 1

SUMMARY OF ARGUMENT .................................................................. 3

ARGUMENT ........................................................................................... 4

     I.    The Good Neighbor Provision Is A Central Part Of Congress's Efforts To Correct The Externalities Associated With Interstate Air Pollution. ............................. 4

         A.    Upwind sources impose negative externalities on downwind industries by forcing them to take on an inefficiently large share of pollution abatement costs. ............................................................................... 5

         B.    Over multiple revisions, Congress designed the Good Neighbor Provision to efficiently allocate the costs of achieving air quality standards between upwind and downwind industries................................. 9

     II.    The Final Rule's Benefits More Than Justify Its Costs....... 13

CONCLUSION ....................................................................................... 19

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014) ....... 5, 12

*Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020) ................................. 5

*Sw. Elec. Power Co. v. EPA*, 920 F.3d 999 (5th Cir. 2019) .................... 14

## Statutes

42 U.S.C. §§ 7409–10........................................................................... 7

42 U.S.C. § 7401(a)(1)......................................................................... 4

42 U.S.C. § 7401(b)(1) ........................................................................ 4

42 U.S.C. § 7410(a)(2)(D) ................................................................... 3

Clean Air Act of 1963, Pub. L. No. 88-206, 77 Stat. 392, ...................... 10

Air Quality Act of 1967, Pub. L. No. 90-148, 81 Stat. 485 .................... 10

Clean Air Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676.........
.................................................................................................... 10, 11

Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 Stat. 685 ... 11

Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399
............................................................................................................ 12

## Legislative History

S. Rep. No. 91-1196 (1970) ................................................................. 10

H.R. Rep. No. 95-294 (1977)............................................................... 11

S. Rep. No. 101-228 (1989) ................................................................. 12

## Administrative and Executive Materials

EPA, *Fact Sheet: The Good Neighbor Plan and Reliable Electricity*
(2023) ................................................................................................ 17

EPA, Federal Good Neighbor Plan for the 2015 Ozone National Ambient
Air Quality Standards, 88 Fed. Reg. 36,654 (June 5, 2023) ................. 1

EPA, *Regulatory Impact Analysis for Proposed Federal Implementation Plan Addressing Regional Ozone Transport* (2022) (EPAHQ-OAR-2021-0668-0151) ...................................................... 16

EPA, *Regulatory Impact Analysis for the Final Federal Good Neighbor Plan* (2023) (EPA-HQ-OAR-2021-0668-1115) ................... 14, 15, 17, 18

EPA, *Resource Adequacy and Reliability Analysis: Final Rule TSD* (2023) (EPA-HQ-OAR-2021-0668-1256) .............................................. 17

EPA, Response to Comments on Proposed Rule 855 (2023) (EPA-HQ-OAR-2021-0668-1127)........................................................ 8, 13, 15, 16

## Other Authorities

Bruce M. Kramer, *Transboundary Air Pollution and the Clean Air Act*, 32 U. Kan. L. Rev. 181 (1983) ............................................ 10

Inst. for Pol'y Integrity, Brief as Amicus Curiae in Support of Petitioners, *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014)...... 1, 2

Inst. for Pol'y Integrity, Comments on Federal Implementation Plan Addressing Regional Ozone Transport (June 21, 2022) (EPA-HQ-OAR-2021-0668-0538) ...................................................... 1

Off. of Mgmt. & Budget, *Circular A-4: Regulatory Analysis* (2023) .. 6, 11

R.H. Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1 (1960) ........... 9

Richard L. Revesz & Jack Lienke, *Struggling for Air: Power Plants and the "War on Coal"* (2016).................................................... 1, 8

Richard L. Revesz, *Federalism and Environmental Regulation: A Public Choice Analysis*, 115 Harv. L. Rev. 555 (2001)...................................... 6

Richard L. Revesz, *Federalism and Interstate Environmental Externalities*, 144 U. Pa. L. Rev. 2341 (1996)............................. 5, 7, 8, 9

Richard L. Revesz, *Rehabilitating Interstate Competition: Rethinking the "Race-to-the-Bottom" Rationale for Federal Environmental Regulation*, 67 N.Y.U. L. Rev. 1210 (1992) ................................................ 6

## GLOSSARY OF ACRONYMS & ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| Chamber | Chamber of Commerce of the U.S.A. |
| EGUs | Electric Generating Units |
| EPA | Environmental Protection Agency |
| Good Neighbor Provision | 42 U.S.C. § 7410(a)(2)(D)(i) |
| RIA | Regulatory Impact Analysis for the Rule |
| RTC | Response to Comments |
| Rule | 88 Fed. Reg. 36,654 (June 5, 2023) |
| SIPs | State Implementation Plans |
| TWh | Trillion Kilowatt-hours |

## INTEREST OF *AMICUS CURIAE* & AUTHORITY TO FILE

The Institute for Policy Integrity at New York University School of Law (Policy Integrity) is a nonpartisan, not-for-profit think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in the fields of administrative law, economics, and public policy.[1]

Policy Integrity publishes scholarship on the role of federal regulation in correcting market failures, such as the federal role in addressing interstate air pollution. *E.g.*, Richard L. Revesz & Jack Lienke, *Struggling for Air: Power Plants and the "War on Coal"* (2016). Policy Integrity submitted public comments on the agency action under review here, 88 Fed. Reg. 36,654 (June 5, 2023) (the Rule). Pol'y Integrity, Comments on Federal Implementation Plan Addressing Regional Ozone Transport (June 21, 2022) (EPA-HQ-OAR-2021-0668-0538). And Policy Integrity filed an *amicus curiae* brief on interstate externalities when the Supreme Court upheld earlier regulation under 42 U.S.C. § 7410(a)(2)(D) (the Good Neighbor Provision) in 2014. Brief of Pol'y Integrity as Amicus

---

[1] Per Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief wholly or partly, and no person contributed money intended to fund its preparation or submission.

1

Curiae in Support of Petitioners, *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014).

Policy Integrity's expertise in environmental and administrative law, especially regarding economic analysis, provides a unique perspective on this case. Policy Integrity submits this *amicus curiae* brief to provide context on the economic motivations behind the Good Neighbor Provision's approach to cooperative federalism and to respond to economic arguments from Petitioners' *amicus curiae*.

No party objects to the filing of this brief, and several parties affirmatively consent. Because some parties have responded that they "take no position," Policy Integrity will separately file a motion for leave to participate. A single joint brief among possible *amicus curiae* for Respondents is not practicable in this case because not all potential *amicus curiae* are currently known, and moreover because of the numerous, complicated issues involved and Policy Integrity's distinct perspective on the market failures animating the Good Neighbor Provision, as informed by its academic scholarship.

## SUMMARY OF ARGUMENT

**I.** A central and original justification for the Clean Air Act was to more effectively address the serious and complex spillover effects that result from interstate air pollution. Congress refined its approach to this difficult problem through a series of revisions to the Clean Air Act over several decades, ultimately producing the current version of the Good Neighbor Provision. 42 U.S.C. § 7410(a)(2)(D).[2] Crucially, the Good Neighbor Provision defines the allocation of responsibility between states for implementing air quality standards: it aims to prevent sources in upwind states from inefficiently externalizing (i.e., pushing) the costs of controlling their pollution onto downwind states.

**II.** Contrary to arguments from the U.S. Chamber of Commerce (Chamber), the Rule's regulatory impact analysis further bolsters the Rule. The Environmental Protection Agency (EPA) estimated substantial health benefits that more than justify the Rule's costs, even with many key categories of benefits not monetized. EPA thoroughly considered the

---

[2] As explained below, Congress has revised the Good Neighbor Provision several times over the past few decades, including by renumbering and rewording it. This brief uses the phrase "Good Neighbor Provision" to refer to all versions of the statutory provision.

range of possible costs, including a study that concluded the Rule's effects on electricity reliability would be minimal and manageable.

For all these reasons, this Court should deny the petitions.

## ARGUMENT

### I.    The Good Neighbor Provision Is A Central Part Of Congress's Efforts To Correct The Externalities Associated With Interstate Air Pollution.

In their discussions of cooperative federalism, State Pet'rs Br. 6–8; Industry Pet'rs Br. 3, 27, Petitioners ignore that a central goal of the Clean Air Act is protecting not just the health and welfare of downwind states, but also the productive capacity of industry in downwind states. *See* 42 U.S.C. § 7401(b)(1) (declaring the goal to protect health, welfare, and productive capacity); 42 U.S.C. § 7401(a)(1) (highlighting the air pollution problems created when growing urban areas and their impacts "cross the boundary lines" between states).

Congress designed the Good Neighbor Provision to limit upwind industries from opportunistically externalizing across state lines the costs of controlling their pollution. As Respondents explain, without relief from the Good Neighbor Provision, downwind states incur greater regulatory burdens to address the pollution they receive from upwind

states. Resp'ts Br. 6 (citing *Maryland v. EPA*, 958 F.3d 1185, 1203–04 (D.C. Cir. 2020)).

### A.    Upwind sources impose negative externalities on downwind industries by forcing them to take on an inefficiently large share of pollution abatement costs.

The Supreme Court has recognized that the nature of interstate air pollution can pit states against each other in a competition to maximize their local economy at the expense of other states: "Left unregulated, the emitting or upwind State reaps the benefits of the economic activity causing the pollution without bearing all the costs." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014) (citing Richard L. Revesz, *Federalism and Interstate Environmental Externalities*, 144 U. Pa. L. Rev. 2341, 2343 (1996)). This interstate pollution harms downwind states' industries, which must reduce their emissions even more to compensate for the upwind states' pollution and still meet federal ambient air-quality standards. The plain language and legislative history of the Good Neighbor Provision confirm that Congress intended for upwind states to take substantial steps to protect downwind states from the harms these externalities cause—and, when upwind states fail

5

to adequately address their externalities on downwind populations and downwind industries, for EPA to act.

"Environmental problems are a classic case of externalities," as polluting activities impose uncompensated health and welfare costs on third parties. Off. of Mgmt. & Budget, *Circular A-4: Regulatory Analysis* 15 (2023). When those third parties cannot efficiently bargain with the polluters to mitigate those negative external costs, the resulting market failure justifies government regulation. *See id.* Given the potential for some states to externalize air pollution costs onto other states, state-level regulation may not sufficiently address air pollution. Indeed, "[t]he presence of interstate externalities is a powerful reason for intervention at the federal level." Richard L. Revesz, *Rehabilitating Interstate Competition: Rethinking the "Race-to-the-Bottom" Rationale for Federal Environmental Regulation*, 67 N.Y.U. L. Rev. 1210, 1222 (1992); *see also* Richard L. Revesz, *Federalism and Environmental Regulation: A Public Choice Analysis*, 115 Harv. L. Rev. 555, 557 n.3 (2001).

Here, the negative externalities of upwind air pollution include not just the health and welfare costs imposed on downwind populations, but also the disproportionate compliance costs imposed on downwind

6

industries. The Clean Air Act obligates every state to comply with standards specifying the maximum permissible concentrations of certain "criteria" pollutants, see 42 U.S.C. §§ 7409–10, a category that includes pollutants likely to cross borders and cause interstate harms. Upwind states' contributions to a downwind state's ambient concentrations do not relieve the downwind state of its obligation to comply with the federal ambient standards. Therefore, the externalities from upwind pollution often are not just health and welfare costs, since the downwind state is still charged with achieving the overall target level of health and welfare. Instead, the negative externalities often comprise the additional abatement costs that the downwind state's industries must incur to offset the upwind pollution. *See* Revesz, 144 U. Pa. L. Rev. at 2352. EPA recognized this "reality" in its response to public comments on the proposed federal implementation plan, explaining that "downwind states . . . have imposed much more costly emissions controls on their sources as measured in dollars per ton" as compared to the cost of current emission controls "for EGUs [electric generating units] and other

industries . . . in linked upwind states." EPA, Response to Comments on Proposed Rule 855 (2023) (EPA-HQ-OAR-2021-0668-1127) (RTC).[3]

Indeed, without the Good Neighbor Provision's corrective mechanism, the Clean Air Act's ambient air-quality standards inadvertently create additional incentives for upwind states to externalize pollution onto downwind states. Once an ambient air-quality standard is set, states naturally seek to minimize their own compliance costs. Often, redirecting emissions over their borders and into downwind states may be cheaper than reducing pollution. *See* Revesz & Lienke, *Struggling for Air*, *supra*, at 83–85. In the 1970s and 1980s, following the Clean Air Act's passage, upwind plants began installing taller emissions stacks, sending emissions into downwind states rather than curtailing the polluting activity: in 1970, only two stacks in the United States were higher than 500 feet; by 1985, more than 180 stacks were higher than 500 feet, and 23 surpassed 1000 feet. Revesz, 144 U. Pa. L. Rev. at 2352–53. Statutory provisions and EPA regulations have since addressed some, but not all, of the concerns associated with tall stacks. *Id.* at 2354.

---

[3] *Available at* https://www.epa.gov/system/files/documents/2023-03/Response%20To%20Comments%20Document%20Final%20Rule.pdf (https://perma.cc/G6MQ-2KU4).

Moreover, upwind states may be inclined to encourage their polluting sources to locate near their downwind borders to effectively export their uncontrolled pollution out of state. *Id.* at 2350–54.

Theoretically, states or private parties could address these externalities on their own, by negotiating with upwind states and offering payments to upwind industries in exchange for pollution abatement. *See* R.H. Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1, 15 (1960) (explaining that, absent transaction costs, parties would bargain to pay polluters in exchange for reducing pollution). History, however, strongly suggests that relying on private bargaining or even state-level negotiations is not a realistic way to tackle interstate air pollution. In fact, the failures of such approaches inspired the modern, stronger version of the Good Neighbor Provision, as explained next.

## B.     Over multiple revisions, Congress designed the Good Neighbor Provision to efficiently allocate the costs of achieving air quality standards between upwind and downwind industries.

After several revisions, today's version of the Good Neighbor Provision efficiently tackles interstate air pollution by reducing upwind states' incentives to let their sources externalize their pollution costs across state borders.

9

Initially, Congress attempted to address interstate air pollution largely by promoting bargaining among the states. To that end, Congress empowered the federal government to convene interstate conferences, Clean Air Act of 1963, Pub. L. No. 88-206, § 5(c), 77 Stat. 392, 396–97, and to set up interstate planning commissions, Air Quality Act of 1967, Pub. L. No. 90-148, § 106, 81 Stat. 485, 490. However, by 1970, no interstate planning commission had ever been empaneled, S. Rep. No. 91-1196, at 6 (1970), and only eight, largely ineffective conferences had ever been convened on interstate pollution, Bruce M. Kramer, *Transboundary Air Pollution and the Clean Air Act*, 32 U. Kan. L. Rev. 181, 189 (1983).

"Disappointed" with these results, S. Rep. No. 91-1196, at 6, in 1970 Congress abandoned its exclusive reliance on the conference procedure and imposed a more regulatory solution by moving interstate air pollution issues under the rubric of section 110's State Implementation Plans (SIPs). Specifically, this version of the Good Neighbor Provision required SIPs to provide for "intergovernmental cooperation," including measures to ensure upwind pollution would not "interfere with" downwind air quality standards. *See* Clean Air Amendments of 1970

10

§ 110(a)(2)(E), Pub. L. No. 91-604, 84 Stat. 1676, 1681. In short, the barriers to effective interstate negotiations were simply too intractable, and the market failures created by the interstate air pollution externalities required a more comprehensive federal response. *See* Off. of Mgmt. & Budget, *Circular A-4*, at 20 ("[P]roblems that spill across State lines . . . are probably best addressed by Federal regulation.").

Congress later deemed the 1970 version of the Good Neighbor Provision "inadequate," H.R. Rep. No. 95-294, at 330 (1977), but remained committed to designing a "better solution" to the "serious" problem of interstate air pollution, *id.* The 1977 Amendments began to establish the Clean Air Act's modern approach to interstate air pollution. Central to this structure was a stronger Good Neighbor Provision, which replaced the vague call for "intergovernmental cooperation" with a specific mandate for "adequate provisions . . . prohibiting any stationary source within the State from emitting any air pollutant in amounts which will . . . prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard." Clean Air Act Amendments of 1977 § 110(a)(2)(E), Pub. L. No. 95-95, 91 Stat. 685, 693; *see also id.*, 91 Stat. at 721–22, 724–25 (creating section 123

11

constraining tall stacks and section 126 allowing states to petition EPA to declare violations of the Good Neighbor Provision).

Ultimately, "the 1977 version of the Good Neighbor Provision [also] proved ineffective," inspiring Congress to push further still. *EME Homer City*, 572 U.S. at 499 (citing S. Rep. No. 101-228, at 21 (1989)). The final elements of the modern approach took shape in 1990, when Congress made two important changes to the Good Neighbor Provision. First, it expanded the scope from individual stationary sources to "any . . . emissions activity"; second, it changed the standard from "prevent attainment or maintenance" to "contribute significantly to nonattainment in, or interfere with maintenance by." Clean Air Act Amendments of 1990 § 110(a)(2)(D), Pub. L. No. 101-549, 104 Stat. 2399, 2404. These modifications gave EPA and the states authority to address cumulative emissions from multiple sources and activities, instead of just regulating individual stationary sources.

This progressively stronger approach to interstate pollution reflects congressional recognition of the substantial costs that upwind states impose on downwind states—not just to public health and welfare, but also to the productive capacity of downwind industry. Basic notions of

12

efficiency and fairness suggest that upwind sources should not be allowed to force downwind sources to incur excessive and disproportionate costs to meet air-quality standards when upwind sources could reduce their significant emissions much more economically. The Good Neighbor Provision is a cornerstone of the Clean Air Act's scheme to correct such misaligned economic incentives that drive interstate air pollution.

## II.   The Final Rule's Benefits More Than Justify Its Costs.

The Chamber, an *amicus curiae* for Petitioners, erroneously portrays the Rule as an exorbitant regulation that provides few benefits. But the Chamber's arguments invert reality: EPA's thorough regulatory analysis finds that the Rule's benefits greatly outweigh its costs—if anything, the Rule's benefits are likely even larger than EPA estimates.[4]

The Chamber dismisses the Rule's "meaningful" air quality improvements as "negligible" because they are "only 0.66 parts per billion (ppb) of ozone by 2026, even though the air quality standard is set at 70

---

[4] EPA conducted its regulatory impact analysis to comply with Executive Order 12,866, not to set or justify the Rule's requirements. *See* RTC at 67–68. As Respondents explain, EPA uses a distinct four-step methodology to implement the Good Neighbor Provision's statutory factors and determine the emissions-control levels that maximize cost-effectiveness without overcontrolling. Resp'ts Br. 8–9.

13

ppb." Chamber Br. 5. Yet even a seemingly "'very small portion' of a gargantuan source of . . . pollution" may "constitute[ ] a gargantuan source of . . . pollution on its own terms." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1032 (5th Cir. 2019). In fact, EPA estimates that the Rule will deliver substantial health benefits by reducing tens of thousands of tons of multiple pollutants per year, both from power plants, EPA, *Regulatory Impact Analysis for the Final Federal Good Neighbor Plan* 27–28 (2023) (EPA-HQ-OAR-2021-0668-1115) (RIA),[5] and from other industries, *id.* at 30. By 2026, the monetized health benefits from ozone reductions alone are estimated at up to $9.4 billion per year, *id.* at 34, plus up to an additional $4.4 billion in annual health benefits from particulate matter reductions, *id.*, and around $1 billion per year in climate benefits, *id.* at 37. Those values reflect a broad range of substantial health benefits, including hundreds of avoided premature deaths per year and hundreds of thousands of prevented school-day absences per year, *id.* at 215–17 (JA1311–12). By 2030, total monetized benefits grow to around $16

---

[5] *Available at* https://www.epa.gov/system/files/documents/2023-03/SAN%208670%20Federal%20Good%20Neighbor%20Plan%2020230315%20RIA_Final.pdf (https://perma.cc/ZV9X-ATWN).

billion. *Id.* at 38, 43 (JA1295) (showing total benefits at the 3% discount rate).

Importantly, many health benefits cannot be fully quantified or monetized. Key health benefits omitted from the above monetary benefit estimates include the effects of pollutants on outdoor worker productivity, yields of commercial crops and commercial fisheries, metabolic diseases, nervous system effects, and reproductive and development effects. RIA at 204–05, 236–38. Because such effects are not quantified or monetized, EPA's estimates—as large as they are—actually lowball the Rule's total benefits.

The Chamber also complains about the size of the compliance costs and contends that they outweigh the benefits. Chamber Br. 7–8. But the Rule's health benefits in fact dwarf the costs (even with EPA underestimating the benefits, as explained above). In 2026, for example, EPA estimates total compliance costs at $570 million per year, while estimated total benefits range from $4.3 billion to $15 billion that same year. RIA at 320. Even the ozone-specific health benefits by themselves ($1.1–$9.4 billion, *id.* at 34) easily justify the compliance costs. *See also* RTC at 871 (comparing ozone benefits to costs). And EPA explains that

the Rule's costs are "comparable to prior interstate transport rules" under the Good Neighbor Provision, which "have been successfully implemented . . . without deleterious effects on the operation or reliability of the electric power sector." *Id.* at 865 (also noting that the compliance costs for both EGUs and non-EGUs are based on the costs of "widely-available, proven . . . technologies that are already in place on many sources in these sectors throughout the country").

The Chamber next argues that the Rule will cause instability to the electric grid and energy infrastructure. Chamber Br. 9–11. To support this argument, the Chamber curiously cites the regulatory analysis for the *proposed* version of the Rule. *Id.* at 9 & n.13 ("EPA's own analysis assumes the Final Rule would significantly reduce electric power generation capacity.") (citing "Regulatory Impact Analysis for *Proposed* Federal Implementation Plan . . . (Feb. 2022) at 4-38–4-39) (emphasis added). In fact, even that initial analysis of the proposed rule show only minimal effects. EPA, *Regulatory Impact Analysis for Proposed Federal Implementation Plan Addressing Regional Ozone Transport* 4-38–4-39 (2022) (EPAHQ-OAR-2021-0668-0151)[6] (showing an *increase* in total

---

[6] *Available at* https://tinyurl.com/bd7pj6cr.

generation of 0.02% and a -1% decrease in total capacity by 2025 under the proposed rule). Moreover, after updates to both its regulatory content and estimation methodology, EPA's refined analysis of the final version of the Rule estimates a "0%" change in total U.S. electricity capacity occurring through the year 2030, RIA at 164 (JA1304) (showing gas and renewable capacity increasing to offset coal), as well as a "0%" change in total U.S. generation, *id.* at 161–62 (JA1301–02) (showing a decrease of about 1 trillion kilowatt-hours (TWh) out of 4,289 TWh, or only about 0.02% of total capacity). EPA completed an additional analysis to confirm that "implementation of this rule can be achieved without undermining resource adequacy or reliability." EPA, *Resource Adequacy and Reliability Analysis: Final Rule TSD* 1 (2023) (EPA-HQ-OAR-2021-0668-1256) (JA1543).[7] And throughout the Rule's development, "EPA actively engaged with key players in the electricity sector, including system operators, the Department of Energy (DOE), the Federal Energy Regulatory Commission (FERC), and other parties [who] are responsible for ensuring reliability." EPA, *Fact Sheet: The Good Neighbor Plan and*

---

[7] *Available at* https://www.epa.gov/system/files/documents/2023-03/Resource%20Adequacy%20and%20Reliability%20Analysis%20TSD.pdf (https://perma.cc/55DZ-ZLBR).

*Reliable Electricity* (2023).[8] In short, EPA thoroughly studied effects on energy infrastructure and found them to be minimal and manageable.

Finally, the Chamber asserts that EPA ignored the Rule's "downstream costs" to manufacturing. Chamber Br. 8. In fact, EPA estimates that the Rule will cause a "0%" change in average retail electricity prices for most regions of the country by 2025, RIA at 167 (JA1307), and an overall average change of just 1% by 2030, *id.* at 168 (JA1308). Nevertheless, EPA fully acknowledged that the Rule could have "indirect effects on a myriad of other markets." *Id.* at 176. By contrast, the Chamber's brief, while exaggerating the potential impacts to downstream sectors, fails to acknowledge the impacts to *downwind industry* of failing to control interstate air pollution. As explained above in Section I, EPA's actions under the Good Neighbor Provision are critical to prevent upwind industries from opportunistically externalizing across state lines the costs of controlling their pollution, at the expense of downwind industry's productive capacity. By overlooking these effects, it is the Chamber—not EPA—that has biased its assessment of the Rule.

---

[8]    *Available at* https://www.epa.gov/system/files/documents/2023-03/Reliability%20and%20the%20Good%20Neighbor%20Rule.pdf (https://perma.cc/W5SY-A38A).

## CONCLUSION

For the foregoing reasons, this Court should deny the petitions.

August 22, 2024                              Respectfully submitted,

*/s/ Jason A. Schwartz*
Jason A. Schwartz
Andrew Stawasz
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3d Floor
New York, NY 10012
(212) 992-8932
jason.schwartz@nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

19

## CERTIFICATE OF COMPLIANCE

This *amicus curiae* brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because this brief contains 3415 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by counsel's word processing system.

This *amicus curiae* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

DATED:    August 22, 2024                    Respectfully submitted,

*/s/ Jason A. Schwartz*
Jason A. Schwartz

*Counsel for Amicus Curiae*
*Institute for Policy Integrity*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of June 2024, a true and correct copy of the foregoing Final Brief of the Institute for Policy Integrity at New York University School of Law as Amicus Curiae in Respondents was filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit via the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

DATED:    August 22, 2024                Respectfully submitted,

                                         */s/ Jason A. Schwartz*
                                         Jason A. Schwartz

                                         *Counsel for Amicus Curiae*
                                         *Institute for Policy Integrity*